AUGUST DEKKER, et al.,

       *Plaintiffs*,

       v.

SIMONE MARSTILLER, et al.,

       *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 65, Plaintiffs hereby move for an order preliminarily enjoining the enforcement of Fla. Admin. Code R. 59G-1.050(7), Fla. Admin. Code.

1.    On August 21, 2022, Defendant Florida Agency for Healthcare Administration ("AHCA") adopted Fla. Admin. Code R. 59G-1.050(7) (the "Challenged Exclusion") prohibiting Medicaid coverage for medically necessary treatments for gender dysphoria. Defendants continue to cover those same services to treat other conditions.

2.    Plaintiffs are transgender Medicaid beneficiaries diagnosed with gender dysphoria who have received medically necessary treatment for their gender dysphoria diagnoses for years, which Medicaid has covered. Because of the

Challenged Exclusion, however, Medicaid coverage for this treatment is no longer available to them, resulting in the denial of access to necessary medical care, grave threats to their health and wellbeing, and other dire consequences.

3. Plaintiffs are likely to succeed on the merits. The Challenged Exclusion targets only transgender persons and violates the Equal Protection Clause (ECF 1, at 74-77) and Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116 (ECF 1, at 77-79), by discriminating against transgender Medicaid beneficiaries on the basis of sex, gender identity, nonconformity with sex stereotypes, and transgender status.[1]

4. Without the requested preliminary injunctive relief, Plaintiffs and other transgender Medicaid beneficiaries will be subjected to immediate and irreparable harms, including the further loss of access to medically necessary care.

5. Plaintiffs have already suffered and will continue to face irreparable harm, and have no adequate remedy at law.

6. The balance of equities and the public interest favor Plaintiffs because Plaintiffs' irreparable injuries far outweigh any burden on Defendants that might result from non-enforcement of the Challenged Exclusion during the pendency of this case. Governmental entities have no legitimate interest in enforcing unconstitutional policies.

---

[1] Although Plaintiffs' Complaint includes claims under the federal Medicaid Act, Plaintiffs do not seek preliminary injunctive relief under those claims.

7.     A preliminary injunction will maintain the status quo and preserve transgender beneficiaries' longstanding access to Medicaid coverage for the treatment of their gender dysphoria, including Plaintiffs, until a decision on the merits is rendered.

8.     Plaintiffs request that the Court waive the requirement of bond in Fed. R. Civ. P. 65(c). *See BellSouth Tellecomm., Inc. v. MCIMetro Access Transmission Srvcs., LLC,* 425 F.3d 964, 971 (11th Cir. 2005). Public interest litigation is a recognized exception to the bond requirement, especially where, as here, the bond would injure the civil and constitutional rights of Plaintiffs and the relief sought would not pose a hardship to Defendants. *See Univ. Books & Videos, Inc. v. Metro. Dade Cnty.*, 33 F.Supp.2d 1364, 1374 (S.D. Fla. 1999).

**WHEREFORE,** Plaintiffs respectfully request an order preliminarily enjoining Defendants from enforcing Fla. Admin. Code R. 59G-1.050(7).

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1(K), Plaintiffs respectfully request oral argument on this motion, estimating up to three hours for a non-evidentiary hearing.

<u>**MEMORANDUM OF LAW IN SUPPORT OF MOTION**</u>

## I.    INTRODUCTION

Defendants target transgender Medicaid beneficiaries, including Plaintiffs August Dekker, Brit Rothstein, Susan Doe,[2] and K.F., by excluding from Medicaid coverage the medically necessary treatments for their gender dysphoria. On August 21, 2022, after covering such care for years, Defendant the Florida Agency for Health Care Administration ("AHCA") adopted Fla. Admin. Code R. 59G-1.050(7) (the "Challenged Exclusion"), prohibiting Medicaid coverage of services necessary for the treatment of gender dysphoria. Defendants continue to cover the same services to treat other conditions.

Simply stated, the Challenged Exclusion targets only transgender persons and, accordingly, it violates the Fourteenth Amendment's Equal Protection Clause and Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116.

There is nothing experimental about the medical treatment (known as gender-affirming care) for gender dysphoria. To the contrary, gender-affirming care is supported by scientific evidence and recognized as safe, effective, and medically necessary.

Defendants' abrupt deviation from the status quo has caused and will continue

---

[2] By separate motion, Plaintiff Susan Doe, a minor, and her parents and next friends John Doe and Jane Doe, are requesting to proceed under pseudonyms.

to cause irreparable harm to Plaintiffs, who will no longer be able to access medically necessary care, endangering their health and wellbeing.

There is no rational basis, let alone the exceedingly persuasive justification or compelling interest, necessary for the implementation of the Challenged Exclusion. Plaintiffs seek to preserve the status quo wherein transgender Medicaid beneficiaries receive coverage for medically necessary treatments for their gender dysphoria, and respectfully request this Court grant Plaintiffs' Motion for a Preliminary Injunction.

## II.   STATEMENT OF FACTS

### A. The Medically Necessary Treatment of Gender Dysphoria

Gender identity is a person's internal sense of their sex. (*See* Decl. of J. Olson-Kennedy, M.D., M.S., ¶18 ("Olson-Kennedy"); Decl. of D. Karasic, M.D., ¶22 ("Karasic").) Gender identity is innate, immutable, has significant biological underpinnings, and it cannot be altered. (Olson-Kennedy, ¶¶18, 23, 25, 33; Karasic, ¶22.) Every person has a gender identity, and it does not always align with their sex assigned at birth. (Olson-Kennedy, ¶18; Karasic, ¶22.)

A person's sex assigned at birth is generally based on a visual assessment of external genitalia. (Olson-Kennedy, ¶21; Karasic, ¶21.) People who have a gender identity that aligns with their sex assigned at birth are cisgender, while people who have a gender identity that does not align with their sex assigned at birth are transgender. (Olson-Kennedy, ¶20; Decl. of L. Schechter, M.D. ¶21 ("Schechter").)

A transgender boy or man was assigned a female sex at birth but has a male gender identity. A transgender girl or woman was assigned a male sex at birth but has a female gender identity. The incongruence between a transgender person's gender identity and their sex assigned at birth can result in clinically significant distress, referred to as gender dysphoria. (Karasic, ¶23; Schechter, ¶22.)

Gender dysphoria is a serious medical condition, the diagnosis of which is codified in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, 5th Edition* ("DSM-5"). (Olson-Kennedy, ¶26; Karasic, ¶23; Schechter, ¶22.) It is also recognized as "gender incongruence" in the *International Classification of Diseases* (World Health Org., 11th rev.). (Olson-Kennedy, ¶27; Schechter, ¶22.)

Gender dysphoria, if left untreated, may result in debilitating anxiety, severe depression, self-harm, and even suicidality. (Olson-Kennedy, ¶96; Karasic, ¶25; Schechter, ¶22.) The longer a person goes without appropriate treatment for gender dysphoria, the greater the risk of severe harm to their health and wellbeing. (Olson-Kennedy, ¶113; Karasic, ¶89.)

Treatment for gender dysphoria is provided pursuant to well-established guidelines, developed through decades of research and clinical practice. (Olson-Kennedy, ¶¶29-30; Decl. of A. Antommaria, M.D., Ph.D. ¶40 ("Antommaria").) Like all medical care, treatment for gender dysphoria is individualized and based on

patient needs. (Olson-Kennedy, ¶38; Schechter, ¶73.) For more than four decades, medical organizations have studied and created evidence-based standards for the treatment of gender dysphoria. The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published guidelines for treating gender dysphoria.[3] (Olson-Kennedy, ¶¶29-30, 70; Schechter, ¶¶25-28; Karasic, ¶¶26-31, 36.) Major medical organizations have endorsed these guidelines. (Olson-Kennedy, ¶¶29, 112; Karasic, ¶¶31, 59, 86.)

Treatment seeks to eliminate the distress of gender dysphoria by aligning a patient's body and presentation with their gender identity. (Schechter, ¶26; Karasic, ¶¶33, 58.) Gender-affirming care may include counseling, hormone therapy, surgery, and other medically necessary treatments. (Olson-Kennedy, ¶38; Karasic, ¶¶26, 38-42; Schechter, ¶26.) The precise treatments are determined by the health care team in collaboration with the patient, and, if the patient is an adolescent, with the patient's parents or guardians. (Olson-Kennedy, ¶38.)

The guidelines differ depending on whether the patient is an adolescent who has started puberty or an adult. (Olson-Kennedy, ¶38.) Neither WPATH nor the

---

[3] Endocrine Society, *Endocrine Treatment of Gender Dysphoric/ Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline* (September 2017), *available at* https://www.endocrine.org/clinical-practice-guidelines/gender-dysphoria-gender-incongruence; World Prof'l Ass'n for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People (7th ver. 2012), https://www.wpath.org/publications/soc.

Endocrine Society recommend any medical, pharmaceutical, or surgical interventions before puberty. (*Id.*; Antommaria, ¶48.)

For adolescents with gender dysphoria who experience severe distress with the onset of puberty, puberty-delaying medication may be indicated. (Olson-Kennedy, ¶¶38-39; Karasic, ¶39.) Medical treatments for adolescents are provided in consultation with qualified mental health professionals. (Olson-Kennedy, ¶38; Karasic, ¶39.) Puberty-delaying medications pause endogenous puberty, limiting the influence of endogenous hormones on the body. (Olson-Kennedy, ¶40.) Such interventions afford the adolescent time to better understand their gender identity while delaying the development of secondary sex characteristics. (*Id.*)

Treatment with puberty-delaying medications is reversible, meaning that if an adolescent discontinues the treatment, puberty will resume. (*Id.*, ¶¶40-41, 102; Karasic, ¶39.) Treatment with puberty-delaying medication can drastically minimize gender dysphoria during adolescence and later in adulthood, and in some cases may eliminate the need for future surgery. (Olson-Kennedy, ¶40.)

For some adolescents with gender dysphoria, initiating puberty consistent with their gender identity through hormone therapy may be medically necessary. (Olson-Kennedy, ¶¶38, 43; Antommaria, ¶40; Karasic, ¶40.) For adults, hormone therapy may also be medically necessary. (Olson-Kennedy, ¶¶38, 43; Antommaria, ¶40; Karasic, ¶40.) Hormone therapy is provided only when medically indicated.

(Olson-Kennedy, ¶43; Karasic, ¶40.) As with all medical care, no treatment is provided without discussing the risks and benefits of the treatment and informed consent. (Olson-Kennedy, ¶43; Antommaria ¶¶46-48.)

Gender-affirming surgeries are means for transgender adult individuals to align their body with their gender identity. (Olson-Kennedy, ¶¶44-45; Karasic, ¶41; Schechter, ¶26.) Though not all transgender people require gender-affirming surgery, such care is necessary when medically indicated. (Schechter, ¶26.)

Every major medical association in the country agrees that gender-affirming care is safe, effective, and medically necessary treatment for gender dysphoria that improves the health and wellbeing of transgender people. (Olson-Kennedy, ¶112; Schechter, ¶28.) The consequences of untreated gender dysphoria are serious, including irreversible and harmful physical changes and irreparable mental harm, and can lead to higher levels of stigmatization, discrimination, and victimization. (Olson-Kennedy, ¶¶73, 96; Karasic, ¶58.)

### B. The Lead Up to the Challenged Exclusion

Florida participates in the federal Medicaid program. Defendant AHCA is the "single state agency" responsible for implementing the program. § 409.963, Fla. Stat. It oversees the promulgation of all Medicaid coverage policies, including the Challenged Exclusion. § 409.919, Fla. Stat.

On April 20, 2022, Florida's Department of Health ("FDOH"), issued a set

of guidelines titled "Treatment of Gender Dysphoria for Children and Adults" (hereinafter "FDOH Guidelines").[4] The FDOH Guidelines indicated that children should not be permitted to undergo a social transition, no one under 18 should be prescribed puberty-delaying medication or hormone therapy, and gender-affirming surgery should not be a treatment option for children or adolescents. The FDOH Guidelines directly contradicted guidance from the U.S. Department of Health and Human Services noting that access to "gender affirming care is crucial to overall health and well-being,"[5] as well as established experts in the treatment of gender dysphoria.

More than 300 Florida health care professionals who care for transgender youth published a letter denouncing the FDOH Guidelines for citing "a selective and non-representative sample of small studies and reviews, editorials, opinion pieces and commentary" which contradict existing guidelines for treating gender dysphoria.[6]

---

[4] *See* Fla. Dep't Health, *Treatment of Gender Dysphoria for Children and Adults* (April 20, 2022), Altman Ex. A.

Unless otherwise noted, all Exhibits cited herein are attached to the Declaration of Jennifer Altman filed concurrently.

[5] *See Gender-Affirming Care and Young People*, U.S. Dep't of Health & Human Servs. (March 2022), Altman Ex. B.

[6] Brittany S. Bruggeman, *We 300 Florida health care professionals say the state gets transgender guidance wrong*, TAMPA BAY TIMES (Apr. 27, 2022), Altman Ex. C, at 3.

Still, Secretary Marstiller requested that AHCA determine if the treatments addressed in the FDOH Guidelines "are consistent with generally accepted professional medical standards and not experimental or investigational."[7]

On June 2, 2022, Defendants published their report, "Florida Medicaid: Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria"[8] (hereinafter "GAPMS Memo"),[9] which was rife with errors and misrepresentations. The GAPMS Memo wrongly concluded that gender-affirming medical treatments "do not conform to [generally accepted professional medical standards] and are experimental and investigational."[10] The GAPMS Memo cited to, and relied upon, five non-peer-reviewed, unpublished "assessments" that Defendants commissioned solely to support their conclusion.

According to a report from a team of medical and legal experts, the GAPMS Memo was "so thoroughly flawed and biased that it deserves no scientific weight."[11]

_____

[7] Letter from Secretary Marstiller to Deputy Secretary Wallace (April 20, 2022), Altman Ex. D.

[8] The GAPMS process purports to be an independent determination based on "reliable scientific evidence published in peer-reviewed scientific literature generally recognized by the relevant medical community or practitioner specialty associations' recommendations." Fla. Admin. Code R. 59G-1.035.

[9] *See* Altman Ex. E.

[10] *See* Altman Ex. E, at 3.

[11] *A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria* (July 8, 2022), Altman Ex. F, at 2.

Some of those flaws are worth mentioning. *First*, the GAPMS Memo relies solely on unpublished papers that have not been peer-reviewed or scrutinized as is standard in the scientific community. *Second*, the GAPMS Memo does not identify these so-called "expert" authors' qualifications, the process through which they were selected, or why their outlier opinions are more credible than well-established guidelines and the opinions of major medical associations. *Third*, the GAPMS Memo relies on unscientific evidence, *e.g.*, blogs and articles. *Fourth*, no author of the "assessments" provided statements regarding their funding and conflicts of interest, violating a strong norm in scientific writing. *Fifth*, the GAPMS Memo ignored the standard of care for gender dysphoria supported by major professional medical associations and societies. And finally, each author of the commissioned "assessments" has been shown to have indicia of unreliability or bias:

- A Texas court barred Dr. Quentin Van Meter from providing expert testimony regarding medical treatment for gender dysphoria;[12]

- Dr. James Cantor's opinion regarding gender-affirming care was given little weight by a federal judge due to his lack of experience in this field;[13]

---

[12] *See* Stephen Caruso, *A Texas Judge Ruled That This Doctor Was Not an Expert*, Pennsylvania Capital-Star (Sept. 15, 2020) (reporting on the now-sealed case), Altman Ex. G.

[13] *Eknes-Tucker v. Marshall*, Case No. 2:22-CV-184, 2022 WL 1521889, at *5 (M.D. Ala. May 13, 2022).

- Dr. Romina Brignardello-Petersen conducts research for a group that opposes gender-affirming care, although she indicated in her assessment that she had no research interests in medical care for transgender youth;[14]

- A federal judge disqualified Dr. Patrick Lappert from testifying regarding aspects of gender-affirming care, citing the lack of scientific support for his opinions and "evidence that calls Dr. Lappert's bias and reliability into serious question."[15]

With the GAPMS Memo as foundation, on June 17, 2022, Defendants published a Notice of Proposed Rule seeking to amend Florida Administrative Code 59G-1.050 to prohibit Medicaid from covering "services for the treatment of gender dysphoria."[16] The Proposed Rule went beyond the FDOH Guidelines by seeking to prohibit Medicaid coverage for all transgender beneficiaries. AHCA accepted written comments from the public about the Proposed Rule, and on July 8, 2022, held a public hearing.

Thousands of written comments were submitted in opposition to the Proposed

---

[14] Alison Clayton et al., *The Signal and the Noise – Questioning the Benefits of Puberty Blockers for Youth with Gender Dysphoria – A Commentary on Rew et al. (2021), Child and Adolescent Mental Health* (Dec. 22, 2021), Altman Ex. H.

[15] *Kadel v. Folwell*, Case No. 1:19-CV-272, 2022 WL 3226731, *9 (M.D.N.C. Aug. 10, 2022).

[16] AHCA, Notice of Proposed Rule (June 17, 2022), Altman Ex. I.

Rule, including comments from the Endocrine Society,[17] the American Academy of Pediatrics,[18] and a team of legal and medical experts from various academic institutions.[19] Together, these comments made it clear that: (1) the Proposed Rule would cause unnecessary harm and suffering; (2) the GAPMS Memo was significantly flawed and contrary to established standards of care; and (3) the Proposed Rule was illegal.

Notwithstanding these comments, Defendants filed to adopt the Proposed Rule a mere three weeks after the close of the comment period. The final version was identical to the Proposed Rule, and went into effect on August 21, 2022.

The timing of the GAPMS Memo and adoption of the Challenged Exclusion underscores its biased nature, as it came amidst a wave of actions by Florida's government clawing back the rights of transgender persons. (*See* ECF 1, at 40-42.)

### C. The Challenged Exclusion

The Challenged Exclusion impermissibly targets solely those Florida Medicaid beneficiaries diagnosed with gender dysphoria, *i.e.*, those who are transgender, for unequal health care coverage. The Challenged Exclusion

---

[17] *Letter from the Endocrine Society to the AHCA* (July 8, 2022), Altman Ex. J.

[18] *Letter from the American Academy of Pediatrics et al. to AHCA Deputy Secretary Tom Wallace* (July 7, 2022), Altman Ex. K.

[19] *Letter from Anne L. Alstott et al. to AHCA Secretary Marstiller* (July 8, 2022), Altman Ex. L.

categorically excludes Medicaid coverage of treatment for gender dysphoria, specifically: (i) "puberty blockers;"[20] (ii) "hormones and hormone antagonists;" (iii) "sex reassignment surgeries;" and (iv) "[a]ny other procedures that alter primary or secondary sexual characteristics." Rule 59G-1.050(7), Fla. Admin. Code. The Challenged Exclusion provides that these services "do not meet the definition of medical necessity in accordance with Rule 59G-1.010, F.A.C." *Id.*

Defendants continue to cover these services when used to treat other medical conditions.

### D. Plaintiffs' Need for Medical Care

#### 1. <u>Plaintiff August Dekker</u>

Plaintiff August Dekker is a 28-year-old transgender man with rheumatoid arthritis who qualifies for Florida Medicaid coverage. (Decl. of A. Dekker, ¶¶3-5 ("Dekker").)

As early as age 5, August began experiencing symptoms of gender dysphoria, which continued into adulthood. (*Id.*, ¶8.) In 2017, August received a formal diagnosis of gender dysphoria. (*Id.*, ¶12.) August then began hormone therapy at the recommendation of his medical providers, which he continues to receive today. (*Id.*, ¶¶13, 15.) He received masculinizing chest surgery in April 2022. (*Id.*, ¶16.) All of August's gender-affirming care to date has been covered by Medicaid as

---

[20] We will refer to these medications as "puberty-delaying medication."

medically necessary. (*Id.*, ¶17.)

August continues to need hormone therapy to treat his gender dysphoria. (*Id.*, ¶26.)  The gender-affirming care August has received allows him to live without the symptoms of gender dysphoria in his day-to-day life.  (*Id.*, ¶¶18-19.)  Under the Challenged Exclusion, Medicaid will no longer cover this care, and because August cannot afford to pay out-of-pocket for it, he will lose access to hormone therapy, which will cause him to undergo physical changes that will cause him psychological distress and increase his risk of discrimination and violence.  (*Id.*, ¶¶23, 26-27.)

### 2. Plaintiff Brit Rothstein

Plaintiff Brit Rothstein is a 20-year-old transgender man attending college. Brit has been enrolled in Medicaid since he was a child.  (Decl. of B. Rothstein, ¶4 ("Rothstein").)  Brit has been aware of his gender identity since the third grade.  (*Id.* ¶¶7, 8.) Brit's gender dysphoria intensified over time, and he sought therapy for his dysphoria in seventh grade.  (*Id.* ¶9.)

At age 14 in July 2016, Brit received a formal diagnosis of gender dysphoria. (*Id.*, ¶11.)  At age 17, Brit began receiving medically necessary hormone therapy. (*Id.*, ¶12.)  And, in May 2022, after many years of debilitating dysphoria, a surgeon recommended that Brit undergo masculinizing chest surgery to align Brit's appearance with his gender identity.  (*Id.*, ¶¶15-17.)

Brit receives health insurance coverage through Medicaid, which has covered

all his gender-affirming care.  (*Id.*, ¶¶4, 12.)  Moreover, Brit has received Medicaid approval for his chest surgery, which is scheduled for December 2022.  (*Id.*, ¶¶17-18.)

Because of the Challenged Exclusion, Brit will not be able to have this medically-necessary procedure, despite Medicaid already approving it. (*Id.*, ¶17.) Now, Brit is without the ability to pay for his medications or his upcoming surgery. (*Id.*, ¶¶19-20.)  The Challenged Exclusion will cause Brit to continue to suffer intense gender dysphoria related to his chest, and subject him to increased risk of discrimination, harassment, and violence.  (*Id.*, ¶21.)

### 3.  <u>Plaintiff Susan Doe</u>

Plaintiff Susan Doe is 12-year-old transgender adolescent girl.  Jane and John Doe are Susan's parents. (Decl. of J. Doe ("Doe"), ¶¶2-3.) They adopted Susan out of medical foster care when she was two years old, which entitles her to Medicaid coverage until age 18.  (*Id.*, ¶9.)

Susan first realized she was a girl at age 3.  (*Id.*, ¶10.) The summer before starting second grade, Susan told her parents clearly: "I need to be a girl." (Id., ¶13.) Thereafter, her therapist diagnosed her with gender dysphoria.  (*Id.*, 13.)

In July 2020, after Susan began puberty, her endocrinologist prescribed her puberty-delaying medication (Lupron) as medically necessary treatment for her gender dysphoria.  (*Id.*, ¶19.)  Florida Medicaid covered this medication that

prevents Susan from developing secondary sex characteristics consistent with her sex-assigned birth. (*Id.*) Susan's endocrinologist expects that she will be ready to start cross-sex hormone therapy in a year or two. (*Id.*, ¶21.)

Susan is due to have her next Lupron injection on October 3, 2022. (*Id.*, ¶24.) Because of the Challenged Exclusion, Medicaid will no longer cover it; her parents will have no choice but to try to pay for the treatment out-of-pocket. Based on their research, the retail price for a single Lupron injection is roughly $11,000, a prohibitively high cost for a family of four living on a single income. (*Id.*, ¶29.)

Should Susan have to stop taking Lupron and go through endogenous puberty, she would be devastated. She has been living as a girl in every aspect of her life since 2017. (*Id.*, ¶26.) Without Lupron, Susan's mental health will suffer as endogenous puberty would be torture for her. (*Id.*) It will also be devastating for her parents to watch her suffer. (*Id.*)

### 4. **Plaintiff K.F.**

Plaintiff K.F. is a 12-year-old transgender boy who receives Medicaid coverage due to his family's income. (Decl. of J. Ladue, ¶8 ("Ladue").) From a very young age, K.F. knew that his sex assigned at birth did not match his gender identity. (*Id.*, ¶¶9-10.) When K.F. came out, his parents arranged for him to see mental health professionals and later pediatric endocrinologists. (*Id.*, ¶¶13, 16.)

In August 2020, before K.F.'s move to Florida, he received puberty-delaying medication, covered by Massachusetts' Medicaid program. (*Id.*, ¶6.) Upon moving to Florida, K.F. established care with Florida-based specialists, and he received his second puberty-delaying implant in April 2022, which Florida Medicaid covered. (*Id.*, ¶¶19-20.)

Presently, K.F.'s bloodwork demonstrates that K.F. may need to switch to a medication that is more effective at suppressing his puberty. (*Id.* ¶21.) The alternative medication would cost $3,000-3,600 every three months. (*Id.* ¶23.) Moreover, K.F.'s treating specialists have indicated that within the next year K.F. will need to begin hormone therapy. (*Id.* ¶24.) Whatever course K.F.'s treatment takes, his family will be unable to afford it because of the Challenged Exclusion. (*Id.* ¶30.)

Gender-affirming care created a "night and day" change in K.F. His persistent anxiety and issues functioning at school significantly improved, and he is now "thriving." (*Id.*, ¶25.) Without access to this care through Medicaid, K.F.'s mental health will suffer tremendously. (*Id.*, ¶28.)

## III.   ARGUMENT

The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits. *Powers v. Sec., Fla. Dep't of Corrections*, 691

Fed.App'x 581, 583 (11th Cir. 2017). To prevail, a plaintiff must demonstrate: (1) a substantial likelihood of success on the merits; (2) irreparable injury; (3) the harms will likely outweigh any harm that defendant will suffer as a result of an injunction; and (4) that preliminary relief will not disserve the public interest. *Scott v. Roberts*, 612 F.3d 1279, 1290 (11th Cir. 2010). "[A]ll of the well-pleaded allegations of [the] complaint and uncontroverted affidavits filed in support of the motion for a preliminary injunction are taken as true." *Elrod v. Burns*, 427 U.S. 347, 350 n.1 (1976).

## A. Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits of their claims that the Challenged Exclusion violates the Equal Protection Clause and Section 1557 of the Affordable Care Act.

### 1. Plaintiffs Are Likely to Succeed On the Merits of their Equal Protection Claim.

The Equal Protection Clause provides that no state may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Accordingly, Defendants Marstiller and AHCA must "treat all persons similarly situated alike or, conversely, [must] avoid all classifications that are 'arbitrary or irrational' and that reflect a 'bare desire to harm a politically unpopular group.'" *Glenn v. Brumby*, 663 F.3d 1312, 1315 (11th Cir. 2011) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446-47 (1985)).

Discrimination based on sex is subject to heightened scrutiny. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("*VMI*"); *Glenn*, 663 F.3d at 1319. And, both the Supreme Court and the Eleventh Circuit have made clear that discrimination because a person is transgender is discrimination based on sex. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1741 (2020); *Glenn*, 663 F.3d at 1317.

On its face, the Challenged Exclusion – which explicitly precludes Medicaid coverage for "services for the treatment of *gender* dysphoria," including "*[s]ex* reassignment surgeries" and any "procedures that alter primary or secondary *sexual* characteristics" – constitutes sex-based discrimination. Courts considering similar categorical coverage exclusions have held as much. *See Kadel*, 2022 WL 3226731, at *19; *Fain v. Crouch*, 2022 WL 3051015, at *8 (S.D.W. Va. Aug. 2, 2022); *Fletcher v. Alaska*, 443 F.Supp.3d 1024, 1027, 1030 (D. Alaska 2020); *Flack v. Wisconsin Dep't of Health Servs.*, 395 F.Supp.3d 1001, 1019-22 (W.D. Wis. 2019); *Boyden v. Conlin*, 341 F.Supp.3d 979, 1002-03 (W.D. Wis. 2018). *Cf. Brandt by & through Brandt v. Rutledge*, 2022 WL 3652745, at *2 (8th Cir. Aug. 25, 2022) (finding a state law banning gender-affirming care for minors discriminates on the basis of sex).

The Challenged Exclusion cannot withstand heightened scrutiny.

### i. Because the Challenged Exclusion Discriminates Based on Sex, Including Transgender Status, It Triggers Heightened Scrutiny.

"[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Bostock*, 140 S. Ct. at 1741. Taking adverse action against "a transgender person who was identified as a male at birth but who now identifies as a female," while not taking such action against "an otherwise identical [person] who was identified as female at birth," "intentionally penalizes" the transgender person. *Id*. at 1741-42; *see also Glenn*, 663 F.3d at 1317 (holding "discrimination against a transgender person because of her gender-nonconformity is sex discrimination, whether it's being described as being on the basis of sex or gender").

That is precisely what the Challenged Exclusion does. For example, "[a] minor born as a male may be prescribed testosterone … but a minor born as a female is not permitted to seek the same medical treatment." *Brandt*, 2022 WL 3652745, at *2; *see also Kadel*, 2022 WL 3226731, at *19 ("The Plan expressly limits members to coverage for treatments that align their physiology with their biological sex and prohibits coverage for treatments that 'change or modify' physiology to conflict with assigned sex."); *Fletcher*, 443 F.Supp.3d at 1030. In other words, "sex plays an unmistakable and impermissible role" in the Challenged Exclusion, which "intentionally penalizes a person … for traits or actions that it tolerates" in another

individual simply because of sex assigned at birth. *See Bostock*, 140 S. Ct. at 1741–42; *see also Boyden*, 341 F.Supp.3d at 995 (discrimination in coverage based on one's birth-assigned sex is a "straightforward" case of sex discrimination).

As *Boyden* explained, excluding coverage for gender-affirming care "entrenches" the sex-stereotyped "belief that transgender individuals must preserve the genitalia and other physical attributes of their [sex assigned at birth] sex over not just personal preference, but specific medical and psychological recommendations to the contrary." 341 F.Supp.3d at 997; *see also Flack*, 328 F.Supp.3d at 951. "This is textbook sex discrimination." *Kadel*, 2022 WL 3226731, at *19. And courts throughout the country have found similar discrimination against transgender people to be rooted in impermissible sex stereotyping. *See*, *e.g.*, *Kadel v. Folwell*, 446 F.Supp.3d 1, 14 (M.D.N.C. 2020) (exclusion "tethers Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject"); *Toomey v. Arizona*, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019).

Furthermore, discrimination "on the basis that an individual was going to, had, or was in the process of changing their sex … is still discrimination based on sex." *Flack.*, 328 F.Supp.3d at 949 (emphasis added). The same is true here because the Challenged Exclusion expressly prohibits coverage for "the treatment of *gender* dysphoria," including "[s]*ex reassignment* surgeries" and any "procedures that *alter* primary or secondary *sexual* characteristics[.]" Fla. Admin. Code R. 59G-1.050(7).

In addition to sex-based discrimination, discrimination based on transgender status is separately entitled to, at least, heightened scrutiny. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020), as amended (Aug. 28, 2020); *see also Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019). In identifying whether a classification is suspect or quasi-suspect, courts consider whether: (a) the class has historically been "subjected to discrimination," *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); (b) the class's defining characteristic "bears [any] relation to ability to perform or contribute to society," *City of Cleburne,* 473 U.S. at 440-41; (c) the class exhibits "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Gilliard*, 483 U.S. at 602; and (d) the class is "a minority or politically powerless." *Id*.

All indicia are present for transgender people. "[T]ransgender people as a class have historically been subject to discrimination or differentiation; … they have a defining characteristic that frequently bears no relation to an ability to perform or contribute to society; … as a class they exhibit immutable or distinguishing characteristics that define them as a discrete group; and … as a class, they are a minority with relatively little political power." *Evancho v. Pine-Richland Sch. Dist.*, 237 F.Supp.3d 267, 288 (W.D. Pa. 2017). Numerous courts have reached the same conclusion. *See, e.g.*, *Grimm*, 972 F.3d at 607; *Karnoski*, 926 F.3d at 1200; *Flack*, 328 F.Supp.3d at 951–53; *M.A.B. v. Bd. of Educ. of Talbot Cnty.*, 286 F.Supp.3d

704, 718–22 (D. Md. 2018); *Norsworthy v. Beard*, 87 F.Supp.3d, 1104, 1119 (N.D. Cal. 2015).

### ii. The Challenged Exclusion Cannot Survive Heightened Scrutiny.

Defendants' discriminatory rule targeting Plaintiffs and other transgender Medicaid beneficiaries demands meaningful review. Arguably, it is subject to the onerous strict scrutiny standard, wherein Defendants must show that the Challenged Exclusion is narrowly tailored to advance a compelling state interest. *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995). Even under the heightened scrutiny required for all sex-based classifications, Defendants carry the heavy burden of showing that the Challenged Exclusion is substantially related to an important government interest, and that they had an "exceedingly persuasive" justification for it. *Glenn*, 663 F.3d at 1321; *see also, e.g.*, *VMI*, 518 U.S. at 533. Under both standards, the "burden of justification is demanding and [] rests entirely on the State," and constitutionality is judged based on the "the actual state purposes, not rationalizations for actions in fact differently grounded." *VMI*, 518 U.S. at 533, 535-36.

Here, the Challenged Exclusion cannot meet either standard. To the extent that Defendants contend the Challenged Exclusion is justified because gender-affirming care is allegedly "experimental" and "investigational," that conclusion is contradicted by the evidence. (Antommaria, ¶52; Schechter, ¶¶48-50; Karasic,

¶¶67-72.) The Court cannot simply accept the assertions of the GAPMS memo that gender-affirming medical treatments are "experimental" and "investigational" [21] because "[t]he Court retains an independent constitutional duty to review factual findings where constitutional rights are at stake." *Gonzales* v. *Carhart*, 550 U.S. 124, 165 (2007).

AHCA cannot carry its burden to justify the Challenged Exclusion based on purported concerns about the quality of the evidence concerning treatment. AHCA's purported concern directly conflicts with the views of the mainstream medical community. (Antommaria, ¶¶22-24, 29, 52; Olson-Kennedy, ¶¶88, 112; Schechter, ¶74.) While the GAPMS Memo baldly asserts that this well-established treatment is "experimental,"[22] the medical and scientific landscape shows the opposite. Thus, AHCA cannot carry its burden to show a substantial relationship between the Challenged Exclusion and a purported interest in excluding coverage for experimental or investigational treatments.

The GAPMS Memo relies on a claimed absence of long-term longitudinal studies and randomized clinical trials assessing safety and efficacy of gender-affirming care.[23] These kinds of studies are not the only type of studies upon which

---

[21] Altman Ex. E, at 3.

[22] Altman Ex. E, at 3.

[23] Altman Ex. E, at 15.

the medical profession relies on to determine the safety and efficacy of treatments. (Antommaria, ¶¶29-44; Olson-Kennedy, ¶¶75-81.) In the context of pediatric medicine, the body of research is less likely to use randomized trials than is clinical research for adults, and, at times, it is unethical to conduct such randomized trials.[24] (Antommaria, ¶¶35-37; Olson-Kennedy, ¶¶73-74.) For similar reasons, researchers rarely use randomized clinical trials for surgical treatments. (Schechter, ¶55.) Thus, if AHCA were to exclude from Medicaid coverage all treatment unsupported by randomized clinical trials, it would have to exclude much of pediatric medicine and many surgical procedures.

If limiting Medicaid coverage to treatments supported by certain kinds of medical research, such as randomized clinical trials, somehow advanced a government interest in individual patients' well-being, then AHCA would have to require that standard to be met for all treatments, but it does not. *See Eisenstadt*, 405 U.S. at 452. AHCA cannot provide any rational explanation—much less an "exceedingly persuasive" one—to justify subjecting only gender-affirming care to this unique burden. *VMI*, 518 U.S. at 533.

---

[24] Requiring use of randomized trials to justify a medical intervention would be unethical because it would require doctors to disregard substantial evidence demonstrating the safety and efficacy of medical treatments and deny patients treatments that are known to provide relief for their medical conditions. Moreover, even if this demand were legitimate, an exclusion of coverage for treatment would prohibit any additional research, thereby undermining any purported desire for further study.

The only purportedly scientific or medical bases Defendants relied upon in promulgating the Challenged Exclusion were five non-peer reviewed, unpublished "assessments" that Defendants themselves commissioned to support their predetermined outcome. (*see* Section II.B, *supra*). The "assessments" authors have either been barred from testifying in court as to the treatment of gender dysphoria, have had their credibility called into "serious question" by a federal court, and otherwise lack any expertise in the treatment of gender dysphoria. (*see* Section II.B, *supra*). Defendants cannot establish any reputable scientific or medical support for the Challenged Exclusion, let alone an "exceedingly persuasive" justification, *VMI*, 518 U.S. at 531, or one "narrowly tailored to a compelling state interest." *Adarand*, 515 U.S. at 235.

The Challenged Exclusion cannot even withstand deferential "rational basis" review. Under rational basis, the classification must be rationally related to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440. States must "avoid all classifications that are arbitrary or irrational and those that reflect a bare … desire to harm a politically unpopular group." *Glenn*, 663 F.3d at 1315 (cleaned up). Here, Defendants have chosen to exclusively single out transgender Medicaid beneficiaries for exclusion of coverage. The Challenged Exclusion targets only transgender beneficiaries and their medical care alone for unequal treatment. *See Kadel*, 2022 WL 3226731, at *20 ("Discrimination against individuals suffering

from gender dysphoria is also discrimination based on sex and transgender status.");

*Toomey*, 2019 WL 7172144, at \*6 (noting exclusion "singles out transgender individuals for different treatment" because "transgender individuals are the only people who would ever seek gender reassignment surgery").[25]

Defendants' reliance on discredited, biased, and unreliable "experts" in promulgating the Challenged Exclusion demonstrates Defendants' true intent was to

---

[25] This is not a situation where Defendants are able to rely on *Geduldig v. Aiello*, 417 U.S. 484 (1974). *First*, the Challenged Exclusion explicitly classifies based on sex as it prohibits coverage for "services to treat *gender* dysphoria," ," including "*[s]ex* reassignment surgeries" and any "procedures that alter primary or secondary *sexual* characteristics." *See Fletcher*, 443 F.Supp.3d at 1027, 1030; *see also Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017). Every person to whom the Challenged Exclusion applies is therefore discriminated against because of sex. "[O]ne cannot explain gender dysphoria 'without referencing sex' or a synonym." *Kadel*, 2022 WL 3226731, at \*20. *Second*, *Geduldig* only held that an exclusion of pregnancy from a disability benefits program with no showing of "pretext" is not per se "discrimination against the members of one sex." 417 U.S. at 496 n.20. But "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). Here, the Exclusion was designed to categorically exclude gender-affirming care from coverage —care "which is only sought by transgender individuals." *Brandt v. Rutledge*, 2021 WL 3292057, at \*2 (E.D. Ark. Aug. 2, 2021). That is precisely what *Geduldig* and *Bray* prohibit: a pretextual classification designed to effectuate discrimination. *Third*, the centrality of gender transition to transgender identity distinguishes this case from *Geduldig*. Unlike the pregnancy exclusion in *Geduldig*, the Exclusion here is based on a characteristic that defines membership in the excluded group. Pregnancy is not the defining characteristic of a woman. Living in accord with one's gender identity rather than birth-assigned sex is the defining characteristic of a transgender person. *See, e.g.*, *Glenn*, 663 F.3d at 1316.

harm transgender people, not further any legitimate state interest. (Antommaria, ¶¶49-52.) As such, the Challenged Exclusion violates the Equal Protection Clause.

## 2. The Challenged Exclusion Violates the ACA's Section 1557.

Section 1557 of the Affordable Care Act provides that:

> [A]n individual shall not ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, ....

42 U.S.C. § 18116(a). An "important component of the ACA's effort to ensure the prompt and effective provision of health care to all individuals . . . is the statute's express anti-discrimination mandate" in Section 1557. *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1, 11 (D.D.C. 2020), *appeal dismissed*, No. 20-5331, 2021 WL 5537747 (D.C. Cir. Nov. 19, 2021). "To state a claim under this provision, a plaintiff is required to show that he or she (1) was a member of a protected class, (2) qualified for the benefit or program at issue, (3) suffered an adverse action, and (4) the adverse action gave rise to an inference of discrimination." *Griffin v. Gen. Elec. Co.*, 752 F. App'x 947, 949 (11th Cir. 2019).

Here, Section 1557 unquestionably applies to AHCA. Indeed, courts have routinely applied Section 1557 to state-administered Medicaid programs. *See, e.g.*, *Fain*, 2022 WL 3051015 at *8; *Flack*, 328 F.Supp.3d at 949; *Cruz v. Zucker*, 195 F.Supp.3d 554, 571 (S.D.N.Y. 2016).

Plaintiffs clearly satisfy the second and third elements of a Section 1557

claim. *See Griffin*, 752 Fed.App'x at 949. Each plaintiff is enrolled in Medicaid and received coverage for medically necessary gender-affirming services. Due to the Challenged Exclusion, however, Plaintiffs suffered an "adverse action."

As to the first element, Section 1557 incorporates Title IX to prohibit discrimination based on sex in healthcare. *See Kadel,* 2022 WL 3226731, at *29. And for the reasons explained above, *see* Section III.A.1, *supra*, Plaintiffs and other transgender Medicaid beneficiaries have been subjected to discrimination in the provision of health services based on sex. *See*, *e.g.*, *Fain*, 2022 WL 3051015, at *11.[26]

Finally, as to the fourth element, Defendants promulgated the Challenged Exclusion with discriminatory intent to achieve a discriminatory effect. The Challenged Exclusion bans coverage of medically necessary care for the treatment of gender dysphoria, which only transgender persons experience. (Olson-Kennedy, ¶24.) *See also Kadel*, 2022 WL 3226731, at *20. Defendants lack any legitimate justification for the Challenged Exclusion, which was premised solely on prejudice towards transgender persons.

The Challenged Exclusion therefore constitutes impermissible sex

---

[26] Courts often construe the anti-discrimination provisions in Title IX in the same manner as in Title VII. *See, e.g.*, *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1992). The Supreme Court discrimination has held that discrimination based on transgender status constitutes sex under Title VII. *Bostock*, 140 S. Ct. at 1743.

discrimination under Section 1557.

### B. The Challenged Exclusion Will Cause Immediate Irreparable Harm to Plaintiffs.

The denial of medically necessary care, including coverage thereof, constitutes irreparable harm for which there is no other adequate legal remedy. *See Brandt*, 2022 WL 3652745, at *4 (affirming conclusion that "Plaintiffs will suffer irreparable harm" by being "denied access to hormone treatment"); *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019); *Eknes-Tucker v. Marshall,* 2022 WL 1521889, at *12 (concluding "Plaintiffs will suffer irreparable harm absent injunctive relief" because "without transitioning medications, [] Plaintiffs will suffer severe medical harm, including anxiety, depression, eating disorders, substance abuse, self-harm, and suicidality"); *Flack*, 328 F.Supp.3d at 942-46 (finding likelihood of irreparable harm to transgender Medicaid beneficiaries denied coverage for gender dysphoria treatments); *Edmunds v. Levine*, 417 F.Supp.2d 1323, 1342 (S.D. Fla. 2006) ("The denial of medical benefits, and resultant loss of essential medical services, constitutes an irreparable harm to these individuals."); *Karnoski*, WL 6311305, at *9 ("[M]onetary damages proposed by Defendants will not … cure the medical harms caused by the denial of timely health care.").[27]

---

[27] *See also Mitson v. Coler*, 670 F.Supp. 1568, 1577 (S.D. Fla.1987); *Newton–Nations v. Rogers*, 316 F.Supp.2d 883, 888 (D. Ariz. 2004); *cf. Washington v.*

Without access to gender-affirming care, transgender Medicaid beneficiaries, like Plaintiffs, will suffer severe harms to their health and wellbeing, including anxiety, depression, and suicidality, on top of the aggravation of their gender dysphoria. (Olson-Kennedy, ¶113 ("The denial of gender-affirming care, on the other hand, is harmful to transgender people. It exacerbates their dysphoria and may cause anxiety, depression, and suicidality, among other harms."); Karasic, ¶58 ("The denial of medically indicated care to transgender people not only results in the prolonging of their gender dysphoria, but causes additional distress and poses other health risks, such as depression, posttraumatic stress disorder, and suicidality."); Schechter, ¶22.) Plaintiffs have noted their distress and fear over these certain consequences. (Dekker, ¶¶25-28; Rothstein, ¶¶15-16, 18-19, 21; Doe, ¶¶25-26; Ladue, ¶¶25, 28.)

In addition, without access to the medically necessary treatments for their gender dysphoria, transgender Medicaid beneficiaries will be forced to undergo physical changes that will cause them great distress and aggravate their gender dysphoria. (*E.g.*, Dekker, ¶26.) For some, like Plaintiffs Susan Doe and K.F., they will be forced to "undergo endogenous puberty—a process that cannot be reversed." *Brandt*, 2022 WL 3652745, at *4. (Doe, ¶¶25-26; Ladue, ¶28.)

---

*DeBeaugrine*, 658 F.Supp.2d 1332, 1339 (N.D. Fla. 2009) ("Withholding benefits essential to a disabled person's ability to remain in the community rather than in an institution rather obviously would constitute irreparable harm.").

The Challenged Exclusion also sends to transgender people a discriminatory message: That they are not worthy of protection and their health care needs may be disregarded. This governmental message on its own has and will continue to result in significant distress, hopelessness, anxiety, and stigma for transgender people like Plaintiffs. (*E.g.*, Dekker, ¶27; Rothstein, ¶22; Doe, ¶33; Ladue, ¶35.) Structural forms of stigma like the Challenged Exclusion harm the health of transgender people and are associated with minority stress. (Karasic, ¶58.)

The Challenged Exclusion imposes a combination of psychological and physical hardships. These hardships make it impossible for Plaintiffs to live and be accurately perceived, increasing the risk that Plaintiffs face discrimination, harassment, and violence. A preliminary injunction is the only way to prevent these irreparable harms from continuing.

### C. Injuries to Plaintiffs Sharply Outweigh Any Damage to the State.

When the state is a party, the "balance of harms" and "public interest" factors of the preliminary injunction test merge such that the harm caused to the state in the "balance of harms" prong is the same as the public interest. *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020); *Eknes-Tucker*, 2022 WL 1521889, at *13. However, "neither the government nor the public has any legitimate interest in enforcing an unconstitutional" policy. *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020); *see also Austin v. Univ. of Fla. Bd. of Trustees*, 2022 WL 195612,

at \*26 (N.D. Fla. Jan. 21, 2022) ("[T]he public and the State have no interest in enforcing a likely unconstitutional policy.").

As a threshold matter, the Challenged Exclusion violates the Equal Protection Clause. *See* Section III.A.1, *supra*. Issuing a preliminary injunction in this case will unquestionably serve the public interest by preserving Plaintiffs' constitutional rights.

By the same token, a preliminary injunction will enforce the Affordable Care Act's sex-discrimination prohibition. *See Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 955 (9th Cir. 2020) ("Section 1557 is an affirmative obligation not to discriminate in the provision of health care."). Defendants promulgated the Challenged Exclusion with the intent of discriminating against transgender beneficiaries, in clear violation of Section 1557. *See* Section III.A.2, *supra*. Such discrimination should not be enforceable while this case is pending.

In light of the harm caused to Plaintiffs, as well as the benefits to the public interest, the Court should grant the preliminary injunction. *See Eknes-Tucker*, 2022 WL 1521889, at \*13 (finding that the imminent threat of harm caused by restrictions on transgender care, including "severe physical and/or psychological harm," outweighs any harm the State will suffer from the injunction); *Flack*, 328 F.Supp.3d at 954-55 (finding that harm caused by the state Medicaid policy denying coverage for transgender surgeries is outweighed by any harm to the State).

### D. An Injunction Will Preserve the Status Quo.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "Preservation of the status quo enables the court to render a meaningful decision on the merits." *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983). Injunctions meant to prohibit enforcement of a new law or policy preserve the status quo. *See Hecox v. Little*, 479 F.Supp.3d 930, 972 (D. Id. 2020); *see also Austin*, 2022 WL 195612, at *26 ("Plaintiffs seek to restore the status quo that existed before Defendants implemented the subject policy. Thus, as the policy causes Plaintiffs irreparable injury, Plaintiffs move for a return to the last uncontested status quo between the parties.") (cleaned up).

For years before the Challenged Exclusion, the Florida Medicaid program covered transgender Medicaid beneficiaries' treatments for gender dysphoria. Plaintiff Susan Doe and K.F. have been receiving coverage for over two years. (Doe, ¶19; Ladue, ¶17.) Plaintiff Brit Rothstein has been receiving coverage for 3 years. (Rothstein, ¶12.) Finally, Plaintiff August Dekker has been receiving coverage for over four years. (Dekker, ¶13.) Only now have Defendants altered coverage for Plaintiffs and other transgender beneficiaries. The only parties altering the status quo are the Defendants. This Motion thus fulfills the purpose of all preliminary injunctions and preserves Plaintiffs' longstanding access to coverage until a decision

on the merits is rendered. *See Brandt v. Rutledge*, 4:21-cv-00450, Dkt. No. 59, at 68 (E.D. Ark. July 26, 2021) (emphasizing that the "status quo for a very long time has been that there's been no ban"), *subsequent written order affirmed by Brandt*, 2022 WL 3652745.

### E. Request for Relief from Requirement to Post Bond.

Plaintiffs request an exemption from the requirements of Fed. R. Civ. P. 65(c). "[T]he amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court…[and] the court may elect to require no security at all." *BellSouth Tellecomm., Inc. v. MCIMetro Access Transmission Srvcs., LLC,* 425 F.3d 964, 971 (11th Cir. 2005). Waiving the bond requirement is particularly appropriate in public interest litigation, where plaintiffs are primarily low-income and allege the infringement of a civil and constitutional rights. *See id*; *Washington v. DeBeaugrine*, 658 F. Supp. 2d 1332, 1339 (N.D. Fla. 2009). Courts that have ordered a preliminary injunction of a state Medicaid regulation have consistently ruled that the plaintiffs need not post a bond. *Flack*, 328 F.Supp.3d at 955; *cf. Eknes-Tucker*, 2022 WL 1521889, at *13.

## IV. CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court preliminarily enjoin the enforcement of the Challenged Exclusion.

Respectfully submitted this 12th day of September 2022.

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

By: */s/ Jennifer Altman*
**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**\*
**Gary J. Shaw**\*
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Joe Little**\*
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

By: */s/ Abigail Coursolle*
**Abigail Coursolle**\*
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**\*
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

By: */s/ Omar Gonzalez-Pagan*
**Omar Gonzalez-Pagan**\*
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**\*
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

By: */s/ Simone Chriss*
**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

By: */s/ Katy DeBriere*
**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

\* *Application for admission pro hac vice forthcoming.*

## CERTIFICATE OF WORD COUNT

According to Microsoft Word, the word-processing system used to prepare this Motion and Memorandum, there are 487 total words contained within the Motion, and there are 7,617 words contained within the Memorandum of Law.

*/s/ Jennifer Altman*
Jennifer Altman

## CERTIFICATE OF SATISFACTION OF
## ATTORNEY-CONFERENCE REQUIREMENT

Pursuant to Local Rule 7.1(B), counsel for the Plaintiffs conferred with counsel for the Defendants on September 7 and September 9, 2022. Counsel for Defendants indicated that Defendants oppose the relief sought.

## CERTIFICATE OF SERVICE

I hereby certify that, on September 12, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system. Counsel for Defendants had indicated that Defendants would accept service of this motion via email. I certify that I served by email the foregoing on the following non-CM/ECF participant:

Simone Marstiller, Secretary
Agency for Health Care Administration
c/o Andrew T. Sheeran
Deputy General Counsel
2727 Mahan Dr.
Tallahassee, FL 32308
(888) 419-3456
Andrew.Sheeran@ahca.myflorida.com

*/s/ Jennifer Altman*

Jennifer Altman