## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

|  |  |
|---|---|
| AUGUST DEKKER, et al., | |
| *Plaintiffs*, | |
| v. | No. 4:22-CV-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | |
| *Defendants*. | |

### DECLARATION OF JANE DOE

I, Jane Doe[1], hereby declare and state as follows:

1.      I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify completely to those facts if called to do so.

2.      I, along with my husband, John Doe, am next friend of my minor child, Susan Doe, who is a Plaintiff in this action.

3.      I am a Florida resident. I live in Brevard County with my husband John, our daughter Susan, who is 12 years old, and our son, who is 15 years old.

---

[1] Jane Doe, John Doe, and Susan Doe are pseudonyms. My daughter (who is a minor), husband, and I are proceeding under pseudonyms to protect our right to privacy and ourselves from discrimination, harassment, and violence, as well as retaliation for seeking to protect our rights.

4.      John works for the federal government. He has worked there for 19 years.

5.      I am a mother and homemaker. I do not work outside the home.

6.      John and I adopted Susan and her brother out of medical foster care in Florida. We adopted Susan when she was 2 years old.

7.      Susan is transgender.

8.      When we adopted Susan out of foster care, Susan had several medical issues. She was originally placed in regular foster care and was then moved into the medical foster care program after an incident where she stopped breathing as an infant. At the time she came into our care, she had severe acid reflux that was treated with antacids, acid blockers, and dietary changes. In addition, Susan was barely meeting developmental milestones. From the time she was two, she received weekly occupational therapy to support her development. She also received speech therapy for a period of time as a toddler, and later behavioral therapy.

9.      Because we adopted Susan out of foster care, Susan is eligible for Medicaid coverage until she turns 18. She has been eligible for and enrolled in the program since she entered Florida's foster care system as an infant. We have maintained Susan and her brother on Medicaid in order to ensure continuity of care with their existing providers and to ensure that their medical needs are met.

10.     Although Susan was assigned male at birth, she has known that she is a girl from a very young age. When she was 3 years old, she first told me that she was a girl. We monitored her developmental milestones and noted that she always preferred toys typically marketed towards girls. John and I discussed that when he presented Susan with toys marketed towards boys, Susan would refuse them, and she would show distress if not allowed to play with girl toys. Recognizing the strong distress Susan displayed when not allowed to play with girl toys and her strong interest in all things feminine, we researched how to best support our child and allowed her to explore her gender expression in deliberate and gradual steps. Susan had a large say with respect to how she presented herself. For example, she liked to wear ribbons in her hair and pink bracelets to school, even when she still wore typical boy clothes and had not yet grown out her hair. We kept princess dresses for her at home and she would often change into a dress as soon as she came home from school.

11.     When she was in first grade, Susan became extremely unhappy with her assigned gender. Before that time, she had mostly been a very happy-go-lucky child, but starting in first grade she began getting angry and frustrated easily, and then would become incredibly sad, often crying for 20 minutes or more. We consulted resources online and researched gender dysphoria in children, and as her

parents we had to acknowledge that the discrepancy between her sex assigned at birth and how she felt inside was causing her to suffer.

12. We looked for a therapist for Susan, but it was difficult to find someone in our area who had experience working with youth who felt the way our daughter did. Susan and I were able to go to one session with a therapist when she was 6, and the therapist talked with me about how best to support Susan. She told me to keep listening to Susan and to allow her to express herself, as we had been doing. She suggested buying clothes from the girls' department that were gender neutral so Susan could wear them to school without attracting attention about her gender presentation. She had her last short haircut when she was 6 years old, and when she saw how it looked, she started crying because she felt like the short haircut did not reflect her identity. After that, she started growing out her hair. I later found out that, around this same time, Susan had started to introduce herself to people with her chosen name, which has since become her legal name, and is more typically feminine.

13. During the summer of 2017, which was the summer before Susan started second grade, she told us emphatically "I need to be a girl and wear girl clothes to school." In order to ensure that we were properly supporting Susan, we began to see a therapist as a family. The therapist, Dr. Linda Ouellette, diagnosed Susan with gender dysphoria. Dr. Ouellette also made clear to us that Susan knows

exactly who she is and that any problems stemmed from when people question Susan's identity. Dr. Ouellette thus recommended we continue to support Susan in her social transition.

14.     Following the advice we had received from Dr. Ouellette, we followed Susan's lead and bought Susan more traditionally feminine clothes, including dresses and skirts to wear to school. We also worked with the principal and teachers at Susan's school to try to make sure that they used the appropriate name and pronouns for Susan. Dr. Ouellette shared with John and me, and we in turn shared with Susan's school, the latest research on helping children with gender dysphoria adjust well at school, in addition to in the home.

15.     After she was able to socially transition and live in accordance with her firmly asserted female gender identity, we observed Susan feeling a sense of joy. She was happy and comfortable in her own skin.

16.     Dr. Ouellette further recommended that Susan see a pediatric endocrinologist, who could monitor her hormone levels for the onset of puberty and assist with any future medical needs.

17.     We looked for someone close to us, but ultimately began working with Dr. Bethel Steindel-Spargo at Joe DiMaggio Children's Hospital in south Florida. Susan has been seeing Dr. Steindel-Spargo since 2019. We drive three hours there and three hours back for every appointment. Dr. Steindel-Spargo

closely monitored Susan's hormone levels to determine the onset of puberty. We had visits approximately every three months.

18.     We have been very deliberate in our approach to supporting Susan. Our goal has always been to support our daughter while following the advice and recommendations of medical and health professionals experienced in dealing with gender identity and gender dysphoria.

19.     In July 2020, after Susan began the onset of puberty, Dr. Steindel-Spargo started Susan on a puberty deferring medication called Lupron as medically necessary treatment for Susan's gender dysphoria. The medication, which Medicaid has been covering, prevents Susan from developing secondary sex characteristics consistent with male puberty. According to Dr. Steindel-Spargo, it is medically necessary for Susan to receive a Lupron injection every three months in order for her to live authentically in a manner consistent with her gender identity and to treat her gender dysphoria. By preventing the physical manifestations that accompany male puberty, Susan is also able to avoid negative social and emotional consequences associated with her being forced to develop the characteristics aligned with a gender with which she does not identify.

20.     When Susan learned that the puberty deferring medication was necessary to suppress male puberty, she was happy at the prospect. Though Susan is usually nervous about shots, after Dr. Steindel-Spargo explained that the shot

would help her in her transition process, Susan's hesitation was entirely overcome. There is nothing worse in Susan's mind then male puberty; she describes it as a "nightmare."

21.     Dr. Steindel-Spargo is currently monitoring Susan to determine when it would be medically appropriate for her to begin hormone therapy. Susan is very eager to go through female puberty. Notwithstanding Susan's eagerness to begin female puberty, we continue to follow the advice and direction of Susan's medical and mental health providers. At this point, Dr. Steindel-Spargo thinks that Susan could be ready to start hormone therapy in a year or two.

22.     In August 2021, Dr. Ouellette retired from her practice, and Susan went without mental health services for a period of time. In early November 2021, Susan began seeing Rebecca Thipsingh, who is a Licensed Clinical Social Worker. Like Dr. Ouellette, Ms. Thipsingh diagnosed Susan with gender dysphoria. Ms. Thipsingh has further supported Susan in managing the symptoms of her dysphoria.

23.     I understand that due to a new state regulation adopted by the Florida Agency for Health Care Administration ("AHCA"), beginning on August 21, 2022, Florida Medicaid will no longer provide coverage for medical treatments for gender dysphoria. Thus, we understand that Medicaid will no longer cover Lupron for Susan as treatment for her gender dysphoria. The regulation will also prohibit

Medicaid from covering hormone therapy as treatment for Susan's gender dysphoria when Susan is ready to begin the treatment, per the medical guidance of Dr. Steindel-Spargo.

24.     Susan is due to have her next Lupron injection on October 3, 2022. In light of the new regulation prohibiting Medicaid coverage for medical treatments for gender dysphoria, Medicaid will refuse to pay for the medically necessary Lupron injection when it is needed.

25.     I worry about the potential physical and mental health consequences of depriving Susan of the medically necessary treatment recommended by her doctors. Not providing such treatment is not an option for us. We believe providing Susan with the medical treatment for gender dysphoria that she requires is necessary to ensure her health and well-being.

26.     If Susan had to stop taking Lupron and go through male puberty as a result of the new regulation, she would be devastated. Susan has been living as a girl in every aspect of her life since 2017. Her legal name was changed to her affirmed name in 2018, and in 2020, her birth certificate was amended to reflect that she is female. If she were no longer able to access the medical care that she needs to align her body with her gender identity, her mental health would suffer tremendously. She wouldn't want to leave the house, and I fear that she might engage in self-harm or even contemplate suicide. Going through male puberty

would be torture for her. And it would be agony to watch her suffer needlessly when this could be easily eliminated with what I understand through first-hand experience to be an evidence-based medication that other children are commonly prescribed for the treatment of precocious puberty and that all the medical associations recommend for the treatment of gender dysphoria. Through my experience with my daughter's medical treatment and extensive conversations with her medical providers over the past five years, I understand that the treatment my daughter is receiving for her gender dysphoria is medically necessary, safe, and effective.

27. John and I have access to health care coverage as a result of his job.

28. While we can add Susan to our health plan, it is our understanding that we cannot do so until the open enrollment period near the end of the year, and her coverage would not start before January 1, 2023. Thus, given her need for her next Lupron shot in October 2022, this is not a feasible solution. What is more, as a child adopted out of foster care, Susan is entitled to have her medical needs covered by Medicaid, and we should not have to move Susan to John's employer-provided health plan.

29. With Medicaid no longer covering Susan's Lupron treatment, we will have no choice but to try to pay for her upcoming Lupron injection out of pocket. Based on my research, the retail price for a single Lupron shot is roughly $11,000

or more. We don't have sufficient resources to provide this care without sacrifice. We would have to put it on a credit card, and it would be a hardship for us.

30.     Even if we add Susan to John's employer-provided health plan, Susan's health care would be more expensive for us as a family. We would have a $300 annual deductible for Susan and higher cost-sharing for her gender-affirming care (including Lupron).

31.     Florida is our home. We are part of a community here. I worry not only about the multitude of harms caused to my own family through AHCA's new regulation, but also about the effect that the actions by AHCA and the current state government will have on other transgender people and their families. We know families that cannot afford to pay out of pocket, nor do they have any other options by which they could obtain health care coverage, if Medicaid stopped paying for their transgender child's medically necessary, physician recommended treatment.

32.     We have begun considering moving out of state if we need to in order to protect our daughter from state-sponsored discrimination because of who she is. We do not wish to move if it can be avoided, as, among other things, it could mean John having to switch jobs and separating Susan and our son from their long-term health care providers, friends, and family. That said, the health and wellbeing of our children are paramount to John and me.

33.	The state's decision to stop covering medically necessary gender-affirming medical care through Medicaid is tragic. It is also dehumanizing. We are concerned about the message the State of Florida is sending by excluding transgender people from Medicaid coverage to which they otherwise would be entitled simply because they are transgender.

34.	In addition, my husband and I keep in touch with other families in the LGBTQ+ affirming foster care community. Even before this rule, I have seen other families have trouble accessing services just because their kids are transgender. Now, I'm hearing about foster families giving up their placements because of the state's hostility toward LGBTQ+ people and concerns about being able to meet the health care needs of those children through Medicaid.

35.	The actions by AHCA and Florida's state government threaten the health and wellbeing of transgender Medicaid recipients, like my daughter Susan. We are challenging the new state regulation promulgated by AHCA to help not only Susan, but also the many other transgender Medicaid beneficiaries who will be harmed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9 day of September, 2022.

Respectfully Submitted,

*Jane Doe*

Jane Doe