IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

    *Plaintiffs*,

v.

SIMONE MARSTILLER, et al.,

    *Defendants*.

No.

## DECLARATION OF JADE LADUE

I, Jade Ladue, hereby declare and state as follows:

1. I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this Declaration and would testify completely to those facts if called to do so.

2. I, along with my husband, Joshua Ladue, am next friend of our minor child, K.F., who is a Plaintiff in this action.

3. I am a Florida resident. I live in Sarasota County with Joshua, our son K.F., who is 12 years old (almost 13), and our four other children who range in age from five to sixteen years old.

4. Joshua receives Social Security Disability Insurance because he is diagnosed with venous malformation, a type of vascular malformation that results from the veins in his leg having developed abnormally. Legally, Joshua is K.F.'s stepfather and has raised K.F. since he was three years old. K.F. considers and calls Joshua "dad."

5. I am employed as a patient coordinator at a dental office.

1

6. Our family moved to Florida from Massachusetts in August 2020.

7. Our son, K.F., is transgender.

8. Because of K.F.'s age and our family income, he is eligible for Medicaid and enrolled in Humana's Florida Medicaid managed care plan. He has been eligible for and enrolled in the program since we moved to Florida. Prior to our move, he was enrolled in Massachusetts' Medicaid program.

9. Although K.F. was assigned female at birth, he has known he was a boy from a very young age. When he was 7 years old, he came out to his grandparents during a camping trip, telling them that he has known since he was four years old that he is a boy and would one day be a father. In looking back on K.F.'s childhood, Joshua and I can both see that K.F. was showing us that he was a boy well before that conversation he had with his grandparents; he has always wanted to wear traditional boy clothes (no dresses or skirts), he insisted on his hair being kept short, and he loved to play shirtless with other boys in our neighborhood.

10. K.F. has never wavered about his gender identity. As his mother, it is clear to me that he has known his whole life what gender he is. Joshua and I marvel at K.F.'s self-confidence and self-assurance; he continues to develop as an intelligent, well-grounded, and mature young man. We are so proud of the person he is becoming.

11. After the camping trip, Joshua and I were a bit overwhelmed, like many parents upon first learning that their child is transgender. But we love our children for exactly who they are, so we adjusted quickly. We were fortunate to also have an extremely supportive extended family who have always been allies of the LGBTQ+ community.

12. As with all of our children before their pre-teen years, we established strict limitations on K.F.'s consumption of television, movies, videos, and video games. His internet

2

access was supervised by myself or my husband, and he had no access to social media until just two years ago, when he received his first cell phone. At the age of seven, when K.F. came out as transgender, he had never heard of the concept of gender dysphoria, or transgender people, beyond his own experience, which he described first to his grandparents, and then to us, as simply "being a boy."

13. After K.F. confided in us, I decided the next best step would be to locate a therapist who specializes in gender dysphoria. Within a week, K.F. had his first appointment with Eileen Casella Rider, a Licensed Mental Health Counselor. I remember being impressed by her thoroughness during that first appointment. We returned bi-weekly for appointments. After thorough evaluation, she was the first to diagnose K.F. with gender dysphoria. I really appreciated Eileen's knowledge and support; she made sure we understood K.F.'s diagnosis and walked us carefully through what we should expect as K.F. got older.

14. At Eileen's recommendation, I later joined the local PFLAG group, an organization which is dedicated to supporting, educating, and advocating for LGBTQ+ people and their families. I joined the group because it was important to me and my husband that we demonstrate to K.F. our commitment to supporting him.

15. K.F. was living in accordance with his male gender identity in every aspect of his life, and he wanted to be treated accordingly at school. Just before K.F. entered the second grade, Eileen helped facilitate a meeting between me and his school administrators, school nurse, and teachers to talk about K.F.'s gender identity and what actions the school should take to ensure he was fully affirmed and supported as a boy with his classmates in the school environment.

16. Our next step was to establish with a pediatric endocrinologist. I setup an appointment for K.F. to establish care with the Gender Multispecialty Service (GeMS) Program at

Boston Children's Hospital, the first pediatric and adolescent transgender health program in the United States. K.F. had his first appointment with the GeMS Program on September 13, 2015. That first appointment was incredibly thorough, lasting over two hours, and was overall a very happy occasion. It was clear K.F. would be receiving the best possible care and the team of providers confirmed everything that Eileen told us: that K.F. is a transgender boy and that his parents and extended family supporting him in his affirmation of his male gender identity was the best possible decision for his health and well-being. GeMS started him with pediatric nurse practitioner, Sarah Pilcher. Pilcher's role was to monitor K.F.'s hormone levels for the onset of puberty and assist with any future gender-affirming healthcare needs. We continued K.F.'s care with GeMS until we moved to Florida in August 2020.

17. Before we moved, in June 2020, Pilcher determined that based on the onset of K.F.'s puberty, it was medically necessary for K.F. to receive his first puberty delaying medication. At the recommendation of Pilcher, K.F. received the SUPPRELIN implant medication which would prevent the onset of secondary sex characteristics typical of girls and women. K.F. received the implant on August 8, 2020, and it was fully covered by Massachusetts' Medicaid program.

18. According to Pilcher and K.F.'s current medical providers, it is medically necessary for K.F. to receive SUPPRELIN so that K.F. can live authentically in a manner consistent with his gender identity and to treat his gender dysphoria. By preventing the physical manifestations that would accompany the puberty of his sex assigned at birth, K.F. is also able to avoid negative social and emotional consequences associated with his being forced to develop secondary sex characteristics that do not align with his male gender identity. As his parent, it is also important to me that K.F. be able to *choose* with whom to disclose this deeply personal, private information

4

about himself. Because of the puberty delaying medication, he has that option, and the inherent protection and privacy that it provides.

19. When we decided to move to Florida, I researched programs in the state that offered the same or similar level of care afforded by GeMS. Finding a program that offers high quality gender-affirming care *and* that accepts Medicaid can be challenging. Fortunately, through that research, I found the Emerge Gender & Sexuality Clinic for Children, Adolescents and Young Adults based at Johns Hopkins All Children's Hospital (Johns Hopkins Gender Clinic) located in St. Petersburg, Florida.

20. Once we moved, K.F. initiated care with Dr. Kevin Lewis, a doctoral-level pediatric nurse practitioner specializing in endocrinology at the Johns Hopkins Gender Clinic. On April 6, 2022, K.F. received his second SUPPRELIN implant which was fully covered by his Florida Medicaid plan, Humana.

21. K.F. typically visits the Johns Hopkins Gender Clinic every six months. Recently, however, K.F. has had more frequent visits because Dr. Lewis is monitoring whether K.F.'s second SUPPRELIN implant is adequately suppressing puberty. Unfortunately, Dr. Lewis has indicated that K.F.'s bloodwork is showing elevated estrogen and Luteinizing Hormone (LH) levels. Ultimately, K.F. may need a different type of puberty delaying medication to suppress puberty and successfully continue his medical transition. K.F. has another appointment scheduled at the end of October 2022 to check in with Dr. Lewis. Additionally, K.F. is in the coming months to recheck the implant's efficacy. If Dr. Lewis determines that the SUPPRELIN is not adequately suppressing puberty, then K.F. will likely need to switch to another puberty delaying medication that will need approximately every three months.

22. When having conversations with us and Dr. Lewis about suppressing puberty, K.F. is adamant that he does not want breasts and would eventually like to have facial hair and muscles. The idea of developing typically female secondary sex characteristics makes K.F. extremely anxious; he prays that his puberty delaying medication will be successful. Since K.F. came to understand and express the dysphoria he experienced resulting from his sex assigned at birth at an early age, we were able to get him the mental health and medical treatment that was necessary, and as a result K.F. is accepted by other people as male and very few people know he is transgender. Developing secondary sex characteristics typically associated with girls and women, instead of those aligned with his male gender identity, would be tremendously emotionally and physically painful for K.F.

23. In the event K.F.'s current implant is not effective, and because Florida Medicaid now excludes coverage of puberty delaying medication, we would have to pay out of pocket for the other puberty delaying shots. Those shots would cost $3000-$3600 per shot out of pocket. Our family has limited income, and we are very worried because we would not be able to afford these treatments without Medicaid coverage.

24. K.F.'s medical providers have also told us that likely within the next year, when K.F. is fourteen years old, that it will be medically indicated for him to begin cross-sex hormone therapy (testosterone) at a dose appropriate to his age and body composition. K.F. is very excited about starting testosterone therapy. K.F. usually hates receiving shots but he told me he would be happy to take a monthly shot if it meant that he would experience the male puberty that is aligned with his gender identity, such as his voice deepening and growing facial hair.

25. We are so grateful that K.F. was confident enough and felt safe to come out to us at such a young age. Identifying his gender dysphoria at a young age, combined with a loving and

supportive immediate and extended family means that we were able to ensure that K.F. received the health care appropriate for him as soon as possible. As a result, his gender dysphoria has been well managed. While K.F. has always dealt with some level of anxiety, before he came out to us as transgender, it was much worse. He experienced what I would describe as "night terrors" and had a persistent stomachache. We would get calls from his school that he was not doing well and was often in the nurse's office. We went to doctors to determine the source of his distress, but no one could identify what was causing the problem. After he had firmly established gender-affirming care with GeMS, he became a completely different child; it was like night and day. He had a smile on his face, a light in his eye, and even a glow about him. His performance and attendance in school improved, as did his peer relationships. Like any parent, Joshua and I were relieved to see our child happy and thriving.

26. K.F. has also begun the process of legal transition. He has legally changed his name and we are currently in the process of having his gender marker changed on his birth certificate and records with the Social Security Administration. His school has been great; they have ensured all records identify his new legal name and otherwise ensure he is treated the same as any other boy in the school.

27. I understand that due to a new state regulation adopted by the Florida Agency for Health Care Administration ("AHCA"), beginning on August 21, 2022, Florida Medicaid will no longer provide coverage for medical treatments for gender dysphoria. I understand this to mean that Medicaid will no longer cover puberty delaying medications for K.F. as treatment for his gender dysphoria. AHCA's regulation will also prohibit Medicaid from covering hormone therapy as a medically necessary treatment for K.F.'s gender dysphoria when K.F., pursuant to the medical expertise and recommendations of his physicians, is ready to begin that treatment.

28. I am incredibly worried about the potential physical and mental health consequences of depriving K.F. the medically necessary treatment recommended by his health care providers. K.F. has been living as a boy in every aspect of his life, medically, legally, and socially, since 2017. If he were no longer able to access the medication that aligns his body with his gender identity, his mental health would suffer tremendously; he would be devastated. He, and the whole family with him, would go down a dark and scary road fast. Most likely, he would not leave his bedroom and he would refuse to go to school. He would cut off his communications with his friends, teammates, and teachers. Given how much his gender-affirming care has improved his life and mental health, Joshua and I can only assume that reversing that course of treatment would result in the unthinkable happening.

29. Because of these concerns, K.F. going without treatment is simply not an option. We believe providing K.F. with the medical treatment for gender dysphoria that he requires is necessary to ensure his health and well-being. I do not believe that there is any way we could deprive K.F. of the necessary, medically recommended health care that he requires.

30. We are under 138% of the federal poverty limit; that is why our children, including K.F., qualify for Florida's Medicaid program. Whether it be paying for a different puberty delaying medication if K.F.'s provider determines the SUPPRELIN is not working or beginning K.F.'s course of hormone therapy in the next year, we simply do not have sufficient resources to provide K.F. the gender affirming care he requires. We could not pay out of pocket for the cost of K.F.'s care, even if we sacrificed everything.

31. Joshua receives his health insurance through Medicare. He cannot add K.F. to his health insurance. I have access to health care coverage for family members because of my job, but the cost of adding K.F. is unaffordable for our family.

8

32. Florida is our home. We are part of a community, comprised of family and friends that have been supportive and affirming of K.F. I worry not only about the multitude of harms caused to my own family through AHCA's new regulation, but also about the effect that the discriminatory actions by AHCA and the current state government will have on other transgender people and their families. We know families that cannot afford to pay out of pocket, nor do they have any other options by which they could obtain healthcare coverage, if their transgender child loses access to the medically necessary, physician recommended treatment.

33. Ultimately, if we need to protect our son's access to medication that is necessary for his health and well-being then we will move out of Florida. We do not wish to move if it can be avoided, as, among other things, it would mean I would have to find a new job, Joshua would have to establish his Social Security payment through a new field office, and our kids would be uprooted and forced to start at new schools and make new friends. We are Christian and just joined a church that we attend every Sunday. So far, we have felt very welcome and would be sad to break a tie with this faith community and the other communities and relationships we have established here in South Florida.

34. For K.F., this would be a particularly difficult and painful transition. K.F. is doing well academically, socially, and athletically. He is on the golf team at his school and he is looking forward to upcoming tryouts out for the baseball team in our town. It is awful to even think that K.F. would have to end this participation and leave his teammates because Florida refuses to provide him the medical treatment that he needs to live and thrive, medical treatment that is available to many other cisgender young people, simply because he is transgender.

35. The state's decision to stop covering medically necessary gender-affirming medical care through Medicaid is tragic. It is also dehumanizing. We are concerned about the

message the State of Florida is sending by excluding transgender people from Medicaid coverage to which they otherwise would be entitled simply because they are transgender.

36. The actions by AHCA and Florida's state government threaten the health and well-being of transgender Medicaid beneficiaries, like my son, K.F. K.F. did not choose this nor did anyone else for whom this treatment is medically necessary. It is who he is; it is who they are. Thus, we are challenging the new state regulation promulgated by AHCA to help not only K.F., but also the many other transgender Medicaid beneficiaries who will be harmed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of September 2022.

Respectfully Submitted,

*/s/ Jade Ladue*

Jade Ladue