D'Angelo, R., Syrulnik, E., Ayad, S., Marchiano, L., Kenny, D. T., & Clarke, P. (2021). One size does not fit all: In support of psychotherapy for gender dysphoria. *Archives of Sexual Behavior, 50,* 7–16.

Daniel, H., & Butkus, R. (2015a). Lesbian, gay, bisexual, and transgender health disparities: Executive summary of a policy position paper from the American College of Physicians. *Annals of Internal Medicine*, 163, 135–137.

Daniel, H., & Butkus, R. (2015b). Appendix: Lesbian, gay, bisexual, and transgender health disparities: A policy position paper from the American College of Physicians. *Annals of Internal Medicine*, 163(2), [unpaginated].

de Vries, A. L. C. & Cohen-Kettenis, P. T. (2012). Clinical management of gender dysphoria in children and adolescents: The Dutch Approach. *Journal of Homosexuality*, 59, 301–320.

de Vries, A. L. C., McGuire, J. K., Steensma, T. D., Wagenaar, E. C. F., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2014). Young adult psychological outcome after puberty suppression and gender reassignment. *Pediatrics*, 134, 1–9.

de Vries, A. L. C., Steensma, T. D., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *Journal of Sexual Medicine*, 8, 2276–2283.

de Vries, A. L., Doreleijers, T. A., Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Psychiatric comorbidity in gender dysphoric adolescents. *Journal of Child Psychology and Psychiatry*, 52, 1195–1202.

de Vries, A. L., Noens, I. L., Cohen-Kettenis, P. T., van Berckelaer- Onnes, I. A., & Doreleijers, T. A. (2010). Autism spectrum disorders in gender dysphoric children and adolescents. *Journal of Autism and Developmental Disorders*, 40, 930–936.

Delemarre-van de Waal, H. A., & Cohen- Kettenis, P. T. (2006). Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. *European Journal of Endocrinology*, 155 (suppl 1), S131–S137.

Dhejne, C., Van Vlerken, R., Geylens, G., & Arcelus, J. (2016). Mental health and gender dysphoria: A review of the literature. *International Review of Psychiatry*, 28, 44–57.

Dhejneberg, C., Öberg, K., Arver, S., & Landén, M. (2014). An analysis of all applications for sex reassignment surgery in Sweden, 1960–2010: Prevalence, incidence, and regrets. *Archives of Sexual Behavior*, 43, 1535–1545.

Donnelly, L. (2019, Dec. 12). Children's transgender clinic hit by 35 resignations in three years as psychologists warn of gender dysphoria 'over-diagnoses'. *The Telegraph*. Retrieved from https://www.telegraph.co.uk/news/2019/12/12/childrens-transgender-clinic-hit-35-resignations-three-years/?WT.mc_id=tmg_share_em

Drummond, K. D., Bradley, S. J., Peterson-Badali, M., & Zucker, K. J. (2008). A follow up study of girls with gender identity disorder. *Developmental Psychology*, 44, 34–

45.

Durwood, L., McLaughlin, K. A., & Olson, K. R. (2017). Mental health and self-worth in socially transitioned transgender youth. *Journal of the American Academy of Child & Adolescent Psychiatry*, 56, 116–123.

Finland Ministry of Social Affairs and Health, Council for Choices in Health Care. (2020, June 11). *Medical treatment methods for dysphoria associated with variations in gender identity in minors—Recommendation.* Retrieved from https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474

Finland Ministry of Social Affairs and Health, Council for Choices in Health Care. (2020, June 16). *Medical treatments for gender dysphoria that reduces functional capacity in transgender people—Recommendation.* Retrieved from https://palveluvalikoima.fi/documents/1237350/22895838/Summary+transgender.pdf/2cc3f053-2e34-39ce-4e21-becd685b3044/Summary+transgender.pdf?t=1592318543000

Freeman, A., Mergl, R., Kohls, E., Székely, A., Gusmao, R., Arensman, E., Koburger, N., Hegerl, U., & Rummel-Kluge, C. (2017). A cross-national study on gender differences in suicide intent. *BMC Psychiatry, 17,* 234.

Gould, M. S., & Lake, A. M. (2013, Feb. 6). II.4 *The contagion of suicidal behavior.* Forum on Global Violence Prevention, Board on Global Health; Institute of Medicine; National Research Council. Contagion of Violence: Workshop Summary. National Academies Press: Washington, DC. Retrieved from https://www.ncbi.nlm.nih.gov/books/NBK207262/

Green, R. (1987). *The "sissy boy syndrome" and the development of homosexuality.* New Haven, CT: Yale University Press.

Haas, A. P., Eliason, M., Mays, V. M., Mathy, R. M., Cochran, S. D., D'Augelli, A. R., Silverman, M. M., Fisher, P. W., Hughes, T., Rosario, M., Russell, S. T., Malley, E., Reed, J., Litts, D. A., Haller, E., Sell, R. L., Remafedi, G., Bradford, J., Beautrais, A. L., Brown, G. K., … Clayton, P. J. (2011). Suicide and suicide risk in lesbian, gay, bisexual, and transgender populations: Review and recommendations. *Journal of homosexuality, 58,* 10–51.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., Rosenthal, S. M., Safer, T. D., Tangpricha, V., & T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/ gender-incongruent persons: An Endocrine Society clinical practice guideline. *Journal of Clinical Endocrinology & Metabolism*, 102, 3869–3903.

Hepp, U., Kraemer, B., Schnyder, U., Miller, N., & Delsignore, A. (2005). Psychiatric comorbidity in gender identity disorder. *Journal of Psychosomatic Research, 58,* 259–261.

Hisle-Gorman, E., Schvey, N. A., Adirim, T. A., Rayne, A. K., Susi, A., Roberts, T. A., & Klein, D. A. (2021). Mental healthcare utilization of transgender youth before and after affirming treatment. *The Journal of Sexual Medicine, 18,* 1444–1454.

Holt, V., Skagerberg, E., & Dunsford, M. (2016). Young people with features of gender dysphoria: Demographics and associated difficulties. *Clinical Child Psychology and Psychiatry, 21*, 108–118.

Jacobs, L. A., Rachlin, K., Erickson-Schroth, L., & Janssen, A. (2014). Gender dysphoria and co-occurring autism spectrum disorders: Review, case examples, and treatment considerations. *LGBT Health, 1*, 277–282.

Janssen, A., Busa, S., Wernick, J. (2019). The complexities of treatment planning for transgender youth with co-occurring severe mental illness: A literature review and case study. *Archives of Sexual Behavior, 48*, 2003–2009.

Janssen, A., Huang, H., & Duncan, C. (2016). Gender variance among youth with autism spectrum disorders: A retrospective chart review. *Transgender Health, 1*, 63–68.

Kalin, N. H. (2020). Reassessing mental health treatment utilization reduction in transgender individuals after gender-affirming surgeries: A comment by the Editor on the process. *American Journal of Psychiatry, 177,* 765.

Kaltiala-Heino, R., Sumia, M., Työläjärvi, M., & Lindberg, N. (2015). Two years of gender identity service for minors: Overrepresentation of natal girls with severe problems in adolescent development. *Child and Adolescent Psychiatry and Mental Health, 9*, 9.

Kaltiala, R, Heino, E., Työläjärvi, & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry, 74*, 213–219.

Kaltiala, R., Heino, E., Työläjärvi, & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry, 74,* 213–219.

Klonsky, E. D., May, A. M., Saffer, B. Y. (2016). Suicide, suicide attempts, and suicidal ideation. *Annual Review of Clinical Psychology, 12,* 307–330.

Kuper, L. E., Stewart, S., Preston, S., Lau, M., & Lopez, X. (2020). Body dissatisfaction and mental health outcomes of youth on gender- affirming hormone therapy. *Pediatrics, 145*, e20193006.

Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a raid onset of gender dysphoria. *PLoS ONE, 13*(8), e0202330.

Marsh, S. (2020, Sept. 20). NHS to hold review into gender identity services for children and young people. *The Guardian.* Retrieved from https://www.theguardian.com/society/2020/sep/22/nhs-to-hold-review-into-gender-identity-services-for-children-and-young-people

Marshall, E., Claes, L. L., Bouman, W. P., Witcomb, G. L., & Arcelus, J. (2016). Non-suicidal self-injury and suicidality in trans people: A systematic review of the literature. *International Review of Psychiatry, 28,* 58–69.

May, T., Pang, K., & Williams, K. J. (2016). Gender variance in children and adolescents with autism spectrum disorder from the National Database for

Autism Research. *International Journal of Transgenderism, 18*, 7–15.

McCall, B. (2021, October 7). Psychiatrists shift stance on gender dysphoria, recommend therapy. *Medscape Psychiatry*. Retrieved from www.medscape.com/viewarticle/960390?src=soc_tw_share

McNeil, J., Ellis, S. J., & Eccles, F. J. R. (2017). Suicide in trans populations: A systematic review of prevalence and correlates. *Psychology of Sexual Orientation and Gender Diversity, 4*, 341–353.

Meyer, I. H. (2003). Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: Conceptual issues and research evidence. *Psychological Bulletin, 129*, 674–697.

Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant gender identity/ role in childhood: Longitudinal follow-up. *Journal of Pediatric Psychology, 4*, 29–41.

MSNBC. (2015, Jan. 5). *Trans youth and suicide: An epidemic*. Retrieved from https://www.msnbc.com/ronan-farrow/watch/trans-youth-and-suicide-an-epidemic-380294211712

Mustanski, B. S., Garofalo, R., & Emerson, E. M. (2010). Mental health disorders, psychological distress, and suicidality in a diverse sample of lesbian, gay, bisexual, and transgender youths. *American Journal of Public Health, 100*, 2426–2432.

Nainggolan, L. (2021, May 12). Hormonal Tx of youth with gender dysphoria stops in Sweden. Medscape Psychiatry. Retrieved from www.medscape.com/viewarticle/950964?src=soc_tw_share

National Health Service (NHS). (2020, Sept. 22). NHS announces independent review into gender identity services for children and young people. United Kingdom. Retrieved from https://www.england.nhs.uk/2020/09/nhs-announces-independent-review-into-gender-identity-services-for-children-and-young-people/

National Institute for Health and Care Excellence (NICE). (2020, Oct. 14). Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria. Retrieved from https://arms.nice.org.uk/resources/hub/1070905/attachment

Nock, M. K., Borges, G., Bromet, E. J., Alonso, J., Angermeyer, M., Beautrais, A....Williams, D. (2008). Cross-national prevalence and risk factors for suicidal ideation, plans and attempts. *British Journal of Psychiatry, 192,* 98–105.

Olson, K. R., Durwood, L., DeMeules, M., & McLaughlin, K. A. (2016). Mental health of transgender children who are supported in their identities. *Pediatrics, 137*, e20153223.

Orange, R. (2020, Feb 22). Teenage transgender row splits Sweden as dysphoria diagnoses soar by 1,500%: New health report and TV debates highlight backlash against gender reassignment. *The Guardian*. Retrieved from https://www.theguardian.com/society/2020/feb/22/ssweden-teenage-transgender-row-dysphoria-diagnoses-soar

Pediatric Endocrine Society & Endocrine Society. (2020, December 15). *Transgender health*. Retrieved from www.endocrine.org/advocacy/position-statements/transgender-health.

Pediatric Endocrine Society. (Online). About PES. Retrieved from https://pedsendo.org/about-pes/

Rae, J. R., Gülgoz, S., Durwood, L., DeMeules, M., Lowe, R., Lindquist, G., & Olson, K. R. (2019). Predicting early-childhood gender transitions. *Psychological Science, 30*, 669–681.

Rafferty, J., AAP Committee on psychosocial aspects of child and family health, AAP Committee on adolescence, AAP Section on lesbian, gay, bisexual, and transgender health and wellness. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics, 142*(4), e20182162

Rayner, G. (2018, Sept. 16). Minister orders inquiry into 4000 percent rise in children wanting to change sex. *The Telegraph*. Retrieved from https://www.telegraph.co.uk/politics/2018/09/16/minister-orders-inquiry-4000-per-cent-rise-children-wanting/

Reisner, S. L., Vetters, R., Leclerc, M., Zaslow, S., Wolfrum, S., Shumer, D., & Mimiaga, M. J. (2015). Mental health of transgender youth in care at an adolescent urban community health center: A matched retrospective cohort study. *Journal of Adolescent Health, 56(3)*, 274–279.

Reuter, T. R., Sharp, C., Kalpakci, A. H., Choi, H. J., & Temple, J. R. (2016). Sexual orientation and Borderline Personality Disorder features in a community sample of adolescents. *Journal of Personality Disorders, 30,* 694–707.

Rodriguez-Seijas, C., Morgan, T. A., & Zimmerman, M. (2021). A population-based examination of criterion-level disparities in the diagnosis of Borderline Personality Disorder among sexual minority adults. *Assessment, 28,* 1097–1109.

Safer, J. D., Tangpricha, V. (2019). In the clinic: Care of the transgender patient. *Annals of Internal Medicine, 171*(1), ITC1–ITC6.

Samaritans. (2020). *Media guidelines for reporting suicide*. Ewell, Surrey, UK. Retrieved from https://media.samaritans.org/documents/Media_Guidelines_FINAL_v2_TABa8C6.pdf

Schumm, W. R., & Crawford, D. W. (2020). Is research on transgender children what it seems? Comments on recent research on transgender children with high levels of parental support. *The Linacre Quarterly, 87,* 9–24.

Schumm, W. R., Crawford, D. W., Fawver, M. M., Gray, N. K., Niess, Z. M., & Wagner, A. D. (2019). Statistical errors in major journals: Two case studies used in a basic statistics class to assess understanding of applied statistics. *Psychology and Education—An Interdisciplinary Journal, 56,* 35–42.

Singh, D., Bradley, S. J., & Zucker, K. J. (2021). A follow-up study of boys with gender identity disorder. *Frontiers in Psychiatry*, 12, 632784.

Skagerberg, E., Parkinson, R., & Carmichael, P. (2013). Self-harming thoughts and behaviors in a group of children and adolescents with gender dysphoria. *International Journal of Transgenderism, 14*, 86–92.

Skelly, A. C., Dettori, J. R., & Brodt, E. D. (2012). Assessing bias: The importance of considering confounding. *Evidence-based Spine-Care Journal, 3,* 9–12.

Steensma, T. D., Cohen-Kettenis, P. T., & Zucker, K. J. (2018). Evidence for a change in the sex ratio of children referred for gender dysphoria: Data from the Center of Expertise on Gender Dysphoria in Amsterdam (1988–2016). *Journal of Sex & Marital Therapy, 44,* 713–715.

Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry, 52,* 582–590.

Strang, J. F., Kenworthy, L., Dominska, A., Sokoloff, J., Kenealy, L. E., Berl, M., … Wallace, G. L. (2014). Increased gender variance in autism spectrum disorders and attention deficit hyperactivity disorder. *Archives of Sexual Behavior, 43,* 1525–1533.

Strang, J. F., Meagher, H., Kenworthy, L., de Vries, A. L., Menvielle, E., Leibowitz, S., … Anthony, L. G. (2016). Initial clinical guidelines for co-occurring autism spectrum disorder and gender dysphoria or incongruence in adolescents. *Journal of Clinical Child and Adolescent Psychology, 47,* 105–115.

Swedish Agency for Health Technology Assessment and Assessment of Social Services (SBU). (2019, Sept. 6). Gender dysphoria in children and adolescents: An inventory of the literature. A systematic scoping review. Retrieved from https://www.sbu.se/en/publications/sbu-bereder/gender-dysphoria-in-children-and-adolescents-an-inventory-of-the-literature/

Swedish Agency of Health Technology Assessment and Assessment of Social Services. (2019). *Gender dysphoria in children and adolescents: An inventory of the literature.* Retrieved from: www.sbu.se/en/publications/sbu-bereder/gender-dysphoria-in-children-and-adolescents-an-inventory-of-the-literature/

Swedish National Board of Health and Welfare (NBHW). (2020, Feb. 22). Uppdaterade rekommendationer för hormonbehandling vid könsdysfori hos unga. [*Updated recommendations for hormone therapy for gender dysphoria in young people.*] Author: Socialstyrelsen. Retrieved from https://www.socialstyrelsen.se/om-socialstyrelsen/pressrum/press/uppdaterade-rekommendationer-for-hormonbehandling-vid-konsdysfori-hos-unga/

Tetelepta, B. (2021, Feb 27). More research is urgently needed into transgender care for young people: 'Where does the large flow of children come from?' [translated]. Algemeen Dagblad. Retrieved from www.ad.nl/nijmegen/dringend-meer-onderzoek-nodig-naar-transgenderzorg-aan-jongeren-waar-komt-de-grote-stroom-kinderen-vandaan~aec79d00/?referrer=https%3A%2F%2Ft.co%2F.

Thrower, E., Bretherton, I., Pang, K. C., Zajac, J. D., & Cheung, A. S. (2020). Prevalence of Autism Spectrum Disorder and Attention-Deficit Hyperactivity Disorder amongst individuals with Gender Dysphoria: A systematic review.

*Journal of Autism and Developmental Disorders*, 50, 695–706.

Turban, J. (2021, March 16). Trans girls belong on girls' sports teams. *Scientific American*. www.scientificamerican.com/article/trans-girls-belong-on-girls-sports-teams/

Turecki, G., & Brent, D. A. (2016). Suicide and suicidal behavior. *Lancet, 387,* 1227–1239.

United Kingdom National Health Service (NHS), National Institute for Health and Care Excellence, (2021, March 11). *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria.* Retrieved from www.evidence.nhs.uk/document?id=2334888&returnUrl=search%3ffrom%3d2020-01-01%26q%3dgender%2bdysphoria%26sp%3don%26to%3d2021-03-31

van der Miesen, A. I. R., Steensma, T. D., de Vries, A. L. C., Bos, H., Popma, A. (2020). Psychological functioning in transgender adolescence before and after gender-affirmative care compared with cisgender general population peers. *Journal of Adolescent Health, 66*, 699–704.

Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child & Adolescent Psychiatry, 47*, 1413–1423.

Wallien, M. S., Swaab, H., & Cohen-Kettenis, P. T. (2007). Psychiatric comorbidity among children with gender identity disorder. *Journal of the American Academy of Child and Adolescent Psychiatry, 46*, 1307–1314.

Warrier, V., Greenberg, D. M., Weir, E., Buckingham, C., Smith, P., Lai, M.-C., Allison, C., & Baron-Cohen, S. (2020). Elevated rates of autism, other neurodevelopmental and psychiatric diagnoses, and autistic traits in transgender and gender-diverse individuals. *Nature Communications, 11,* 3959.

Wiepjes, C. M., den Heijer, M., Bremmer, M. A., Nota, N. M., de Block, C. J. M., Coumou, B. J. G., & Steensma, T. D. (2020). Trends in suicide death risk in transgender people: Results from the Amsterdam Cohort of Gender Dysphoria study (1972–2017). *Acta Psychiatrica Scandinavica, 141,* 486–491.

Wiepjes, C. M., Nota, N. M., de Bok, C. J. M., Klaver, M., de Vries, A. L. C., Wensing-Kruger, S. A., de Jongh, R. T., Bouman, M-B., Steensma, T. D., Cohen-Kettenis, P., Gooren, L. J. G., Kreukels B. P. C., & den Heijer, M. (2018). The Amsterdam Cohort of Gender Dysphoria Study (1972–2015): Trends in prevalence, treatment, and regrets. *Journal of Sexual Medicine, 15,* 582–590.

World Health Organization (2022). *Age standardized suicide rates (per 100 000 population.* Retrieved from https://www.who.int/data/gho/data/themes/mental-health/suicide-rates

Wood, H., Sasaki, S., Bradley, S. J., Singh, D., Fantus, S., Own-Anderson, A., Di Giacomo, A., Bain, J., & Zucker, K. J. (2013). Patterns of referral to a gender identity service for children and adolescents (1976–2011): Age, sex ratio, and sexual orientation. *Journal of Sex & Marital Therapy, 39,* 1–6.

Zanarini, M. C., Magni, L. R., Temes, C. M., Hein, K. E., Aguirre, B. A., & Goodman, M. (2021). Sexual orientation and gender of intimate relationship partners among adolescents with BPD and psychiatrically healthy adolescents. *Journal of Personality Disorders, 35 (Suppl. B),* 1–7.

Zucker, K. J. (2019). Adolescents with gender dysphoria: Reflections on some contemporary clinical and research issues. *Archives of Sexual Behavior, 48,* 1983–1992.

Zucker, K. J., & Bradley, S. J. (1995). *Gender identity disorder and psychosexual problems in children and adolescents.* New York: Guilford Press.

Zucker, K. J., Bradley, S. J., Owen-Anderson, A., Kibblewhite, S. J., Wood, H., Singh, D., & Choi, K. (2012). Demographics, behavior problems, and psychosexual characteristics of adolescents with gender identity disorder or transvestic fetishism. *Journal of Sex & Marital Therapy, 38,* 151–189.

Zuger, B. (1984). Early effeminate behavior in boys: Outcome and significance for homosexuality. *Journal of Nervous and Mental Disease, 172,* 90–97.

APPENDICES

**Appendix 1**

The Outcomes Studies of Childhood-Onset Gender Dysphoria

**Appendix 2**

Peer-reviewed article:

Cantor, J. M. (2020). Transgender and gender diverse children and adolescents: Fact-checking of AAP policy. *Journal of Sex & Marital Therapy, 46,* 307–313. doi: 10.1080/0092623X.2019.1698481

## Prospective Outcomes Studies of Gender Dysphoric Children

| | | |
|---|---|---|
| 2/16<br>4/16<br>10/16 | gay<br>trans-/crossdress<br>straight/uncertain | Lebovitz, P. S. (1972). Feminine behavior in boys: Aspects of its outcome. *American Journal of Psychiatry, 128,* 1283–1289. |
| 2/16<br>2/16<br>12/16 | trans-<br>uncertain<br>gay | Zuger, B. (1978). Effeminate behavior present in boys from childhood: Ten additional years of follow-up. *Comprehensive Psychiatry, 19, 363–369.* |
| 0/9<br>9/9 | trans-<br>gay | Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant gender identity/role: Longitudinal follow-up. *Journal of Pediatric Psychology, 4,* 29–41. |
| 2/45<br>10/45<br>33/45 | trans-/crossdress<br>uncertain<br>gay | Zuger, B. (1984). Early effeminate behavior in boys: Outcome and significance for homosexuality. *Journal of Nervous and Mental Disease, 172,* 90–97. |
| 1/10<br>2/10<br>3/10<br>4/10 | trans-<br>gay<br>uncertain<br>straight | Davenport, C. W. (1986). A follow-up study of 10 feminine boys. *Archives of Sexual Behavior, 15,*511–517. |
| 1/44<br>43/44 | trans-<br>cis- | Green, R. (1987). *The "sissy boy syndrome" and the development of homosexuality.* New Haven, CT: Yale University Press. |
| 0/8<br>8/8 | trans-<br>cis- | Kosky, R. J. (1987). Gender-disordered children: Does inpatient treatment help? *Medical Journal of Australia, 146,* 565–569. |
| 21/54<br>33/54 | trans-<br>cis- | Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child and Adolescent Psychiatry, 47,* 1413–1423. |
| 3/25<br>6/25<br>16/25 | trans-<br>lesbian/bi-<br>straight | Drummond, K. D., Bradley, S. J., Badali-Peterson, M., & Zucker, K. J. (2008). A follow-up study of girls with gender identity disorder. *Developmental Psychology, 44,* 34–45. |
| 47/127<br>80/127 | trans-<br>cis- | Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry, 52,* 582–590. |
| 17/139<br>122/139 | trans-<br>cis- | Singh, D., Bradley, S. J., and Zucker, K. J. (2021) A follow-up study of boys with gender identity disorder. Frontiers in Psychiatry, 12, 632784. doi: 10.3389/fpsyt.2021.632784 |



**Journal of Sex & Marital Therapy**

ISSN: 0092-623X (Print) 1521-0715 (Online) Journal homepage: https://www.tandfonline.com/loi/usmt20

# Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy

James M. Cantor

**To cite this article:** James M. Cantor (2020) Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy, Journal of Sex & Marital Therapy, 46:4, 307-313, DOI: 10.1080/0092623X.2019.1698481

**To link to this article:** https://doi.org/10.1080/0092623X.2019.1698481

Published online: 14 Dec 2019.

Submit your article to this journal ☞

Article views: 2055

View related articles ☞

View Crossmark data ☞

Full Terms & Conditions of access and use can be found at
https://www.tandfonline.com/action/journalInformation?journalCode=usmt20

JOURNAL OF SEX & MARITAL THERAPY
2020, VOL. 46, NO. 4, 307–313
https://doi.org/10.1080/0092623X.2019.1698481





# Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy

James M. Cantor

Toronto Sexuality Centre, Toronto, Canada

**ABSTRACT**
The American Academy of Pediatrics (AAP) recently published a policy statement: *Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents*. Although almost all clinics and professional associations in the world use what's called the *watchful waiting* approach to helping gender diverse (GD) children, the AAP statement instead rejected that consensus, endorsing *gender affirmation* as the only acceptable approach. Remarkably, not only did the AAP statement fail to include any of the actual outcomes literature on such cases, but it also misrepresented the contents of its citations, which repeatedly said the very opposite of what AAP attributed to them.

The American Academy of Pediatrics (AAP) recently published a policy statement entitled, *Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents* (Rafferty, AAP Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness, 2018). These are children who manifest discontent with the sex they were born as and desire to live as the other sex (or as some alternative gender role). The policy was quite a remarkable document: Although almost all clinics and professional associations in the world use what's called the *watchful waiting* approach to helping transgender and gender diverse (GD) children, the AAP statement rejected that consensus, endorsing only *gender affirmation*. That is, where the consensus is to delay any transitions after the onset of puberty, AAP instead rejected waiting before transition. With AAP taking such a dramatic departure from other professional associations, I was immediately curious about what evidence led them to that conclusion. As I read the works on which they based their policy, however, I was pretty surprised—rather alarmed, actually: These documents simply did not say what AAP claimed they did. In fact, the references that AAP cited as the basis of their policy instead outright contradicted that policy, repeatedly endorsing *watchful waiting*.

The AAP statement was also remarkable in what it left out—namely, the actual outcomes research on GD children. In total, there have been 11 follow-up studies of GD children, of which AAP cited one (Wallien & Cohen-Kettenis, 2008), doing so without actually mentioning the outcome data it contained. The literature on outcomes was neither reviewed, summarized, nor subjected to meta-analysis to be considered in the aggregate—It was merely disappeared. (The list of all existing studies appears in the appendix.) As they make clear, *every* follow-up study of GD children, without exception, found the same thing: Over puberty, the majority of GD children cease to want to transition. AAP is, of course, free to establish whatever policy it likes on

---

CONTACT James Cantor ✉ jamescantorphd@gmail.com 🏢 Toronto Sexuality Centre, 2 Carlton Street, suite 1820, Toronto, Ontario M5B 1J3, Canada.
© 2019 Taylor & Francis Group, LLC

whatever basis it likes. But any assertion that their policy is based on evidence is demonstrably false, as detailed below.

AAP divided clinical approaches into three types—conversion therapy, watchful waiting, and gender affirmation. It rejected the first two and endorsed *gender affirmation* as the only acceptable alternative. Most readers will likely be familiar already with attempts to use conversion therapy to change sexual orientation. With regard to gender identity, AAP wrote:

> "[C]onversion" or "reparative" treatment models are used to prevent children and adolescents from identifying as transgender or to dissuade them from exhibiting gender-diverse expressions.… Reparative approaches have been proven to be not only unsuccessful[38] but also deleterious and are considered outside the mainstream of traditional medical practice.[29,39–42]

The citations were:

38. Haldeman DC. The practice and ethics of sexual orientation conversion therapy. *J Consult Clin Psychol.* 1994;62(2):221–227.

29. Adelson SL; American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Quality Issues (CQI). Practice parameter on gay, lesbian, or bisexual sexual orientation, gender nonconformity, and gender discordance in children and adolescents. *J Am Acad Child Adolesc Psychiatry.* 2012;51(9):957–974.

39. Byne W. Regulations restrict practice of conversion therapy. *LGBT Health.* 2016;3(2):97–99.

40. Cohen-Kettenis PT, Delemarrevan de Waal HA, Gooren LJ. The treatment of adolescent transsexuals: changing insights. *J Sex Med.* 2008;5(8):1892–1897.

41. Bryant K. Making gender identity disorder of childhood: historical lessons for contemporary debates. *Sex Res Soc Policy.* 2006;3(3):23–39.

42. World Professional Association for Transgender Health. *WPATH De-Psychopathologisation Statement.* Minneapolis, MN: World Professional Association for Transgender Health; 2010.

AAP's claims struck me as odd because *there are no studies of conversion therapy for gender identity.* Studies of conversion therapy have been limited to *sexual orientation,* and, moreover, to the sexual orientation *of adults,* not to gender identity and not of children in any case. The article AAP cited to support their claim (reference number 38) is indeed a classic and well-known review, but it is a review of sexual orientation research *only.* Neither gender identity, nor even children, received a single mention in it. Indeed, the narrower scope of that article should be clear to anyone reading even just its title: "The practice and ethics of *sexual orientation* conversion therapy" [italics added].

AAP continued, saying that conversion approaches for GD children have already been rejected by medical consensus, citing five sources. This claim struck me as just as odd, however—I recalled associations banning conversion therapy for sexual orientation, but not for gender identity, exactly because there is no evidence for generalizing from adult sexual orientation to childhood gender identity. So, I started checking AAP's citations for that, and these sources too pertained only to sexual orientation, not gender identity (specifics below). What AAP's sources *did* repeatedly emphasize was that:

A.  Sexual orientation of adults is unaffected by conversion therapy and any other [known] intervention;

B.  Gender dysphoria in childhood before puberty desists in the majority of cases, becoming (cis-gendered) homosexuality in adulthood, again regardless of any [known] intervention; and

C.  Gender dysphoria in childhood persisting after puberty tends to persist entirely.

That is, in the context of GD children, it simply makes no sense to refer to externally induced "conversion": The majority of children "convert" to cisgender or "desist" from transgender

JOURNAL OF SEX & MARITAL THERAPY  309

*regardless* of any attempt to change them. "Conversion" only makes sense with regard to adult sexual orientation because (unlike childhood gender identity), adult homosexuality never or nearly never spontaneously changes to heterosexuality. Although gender identity and sexual orientation may often be analogous and discussed together with regard to social or political values and to civil rights, they are nonetheless distinct—with distinct origins, needs, and responses to medical and mental health care choices. Although AAP emphasized to the reader that "gender identity is not synonymous with 'sexual orientation'" (Rafferty et al., 2018, p. 3), they went ahead to treat them as such nonetheless.

To return to checking AAP's fidelity to its sources: Reference 29 was a practice guideline from the Committee on Quality Issues of the American Academy of Child and Adolescent Psychiatry (AACAP). Despite AAP applying this source to *gender identity*, AACAP was quite unambiguous regarding their intent to speak to sexual orientation and *only* to sexual orientation: "Principle 6. Clinicians should be aware that there is no evidence that *sexual orientation* can be altered through therapy, and that attempts to do so may be harmful. There is no established evidence that change in a predominant, enduring *homosexual* pattern of development is possible. Although sexual fantasies can, to some degree, be suppressed or repressed by those who are ashamed of or in conflict about them, sexual desire is not a choice. However, behavior, social role, and—to a degree—identity and self-acceptance are. Although operant conditioning modifies sexual fetishes, it does not alter *homosexuality*. Psychiatric efforts to alter *sexual orientation* through 'reparative therapy' *in adults* have found little or no change in *sexual orientation*, while causing significant risk of harm to self-esteem" (AACAP, 2012, p. 967, italics added).

Whereas AAP cites AACAP to support gender affirmation as the only alternative for treating GD children, AACAP's actual view was decidedly neutral, noting the lack of evidence: "Given the lack of empirical evidence from randomized, controlled trials of the efficacy of treatment aimed at eliminating gender discordance, the potential risks of treatment, and longitudinal evidence that gender discordance persists in only a small minority of untreated cases arising in childhood, further research is needed on predictors of persistence and desistence of childhood gender discordance as well as the long-term risks and benefits of intervention before any treatment to eliminate gender discordance can be endorsed" (AACAP, 2012, p. 969). Moreover, whereas AAP rejected watchful waiting, what AACAP recommended was: "In general, it is desirable to help adolescents who may be experiencing gender distress and dysphoria to defer sex reassignment until adulthood" (AACAP, 2012, p. 969). So, not only did AAP attribute to AACAP something AACAP never said, but also AAP withheld from readers AACAP's actual view.

Next, in reference 39, Byne (2016) also addressed only sexual orientation, doing so very clearly: "Reparative therapy is a subset of conversion therapies based on the premise that *same-sex attraction* are reparations for childhood trauma. Thus, practitioners of reparative therapy believe that exploring, isolating, and repairing these childhood emotional wounds will often result in reducing *same-sex attractions*" (Byne, 2016, p. 97). Byne does not say this of gender identity, as the AAP statement misrepresents.

In AAP reference 40, Cohen-Kettenis et al. (2008) did finally pertain to gender identity; however, this article never mentions conversion therapy. (!) Rather, in this study, the authors presented that clinic's lowering of their minimum age for cross-sex hormone treatment from age 18 to 16, which they did on the basis of a series of studies showing the high rates of success with this age group. Although it did strike me as odd that AAP picked as support against conversion therapy an article that did not mention conversion therapy, I could imagine AAP cited the article as an example of what the "mainstream of traditional medical practice" consists of (the logic being that conversion therapy falls outside what an 'ideal' clinic like this one provides). However, what this clinic provides is the very *watchful waiting* approach that AAP rejected. The approach

espoused by Cohen-Kettenis (and the other clinics mentioned in the source—Gent, Boston, Oslo, and now formerly, Toronto) is to make puberty-halting interventions available at age 12 because: "[P]ubertal suppression may give adolescents, together with the attending health professional, more time to explore their gender identity, without the distress of the developing secondary sex characteristics. The precision of the diagnosis may thus be improved" (Cohen-Kettenis et al., 2008, p. 1894).

Reference 41 presented a very interesting history spanning the 1960s–1990s about how feminine boys and tomboyish girls came to be recognized as mostly pre-homosexual, and how that status came to be entered into the DSM at the same time as homosexuality was being *removed* from the DSM. Conversion therapy is never mentioned. Indeed, to the extent that Bryant mentions treatment at all, it is to say that treatment is entirely irrelevant to his analysis: "An important omission from the *DSM* is a discussion of the kinds of treatment that GIDC children should receive. (This omission is a general orientation of the DSM and not unique to GIDC)" (Bryant, 2006, p. 35). How this article supports AAP's claim is a mystery. Moreover, how AAP could cite a 2006 history discussing events of the 1990s and earlier to support a claim about the *current* consensus in this quickly evolving discussion remains all the more unfathomable.

Cited last in this section was a one-paragraph press release from the World Professional Association for Transgender Health. Written during the early stages of the American Psychiatric Association's (APA's) update of the DSM, the statement asserted simply that "The WPATH Board of Directors strongly urges the de-psychopathologisation of gender variance worldwide." Very reasonable debate can (and should) be had regarding whether gender dysphoria should be removed from the DSM as homosexuality was, and WPATH was well within its purview to assert that it should. Now that the DSM revision process is years completed however, history has seen that APA ultimately retained the diagnostic categories, rejecting WPATH's urging. This makes AAP's logic entirely backwards: That WPATH's request to depathologize gender dysphoria was *rejected* suggests that it is *WPATH's* view—and therefore the AAP policy—which fall "outside the mainstream of traditional medical practice." (!)

AAP based this entire line of reasoning on their belief that conversion therapy is being used "to prevent children and adolescents from identifying as transgender" (Rafferty et al., 2018, p. 4). That claim is left without citation or support. In contrast, what is said by AAP's sources is "delaying affirmation is *not* be construed as conversion therapy or an attempt to change gender identity" in the first place (Byne, 2016, p. 2). Nonetheless, AAP seems to be doing exactly that: simply relabeling any alternative approach as equivalent to conversion therapy.

Although AAP (and anyone else) may reject (what they label to be) conversion therapy purely on the basis of political or personal values, there is no evidence to back the AAP's stated claim about the existing science on gender identity at all, never mind gender identity of children.

AAP also dismissed the watchful waiting approach out of hand, not citing any evidence, but repeatedly calling it "outdated." The criticisms AAP provided, however, again defied the existing evidence, with even its own sources repeatedly calling watchful waiting the current standard. According to AAP:

> [G]ender affirmation is in contrast to the outdated approach in which a child's gender-diverse assertions are held as "possibly true" until an arbitrary age (often after pubertal onset) when they can be considered valid, an approach that authors of the literature have termed "watchful waiting." This outdated approach does not serve the child because critical support is withheld. Watchful waiting is based on binary notions of gender in which gender diversity and fluidity is pathologized; in watchful waiting, it is also assumed that notions of gender identity become fixed at a certain age. The approach is also influenced by a group of early studies with validity concerns, methodologic flaws, and limited follow-up on children who identified as TGD and, by adolescence, did not seek further treatment ("desisters").[45,47]

The citations from AAP's reference list are:



45. Ehrensaft D, Giammattei SV, Storck K, Tishelman AC, Keo-Meier C. Prepubertal social gender transitions: what we know; what we can learn—a view from a gender affirmative lens. *Int J Transgend.* 2018;19(2):251–268

47. Olson KR. Prepubescent transgender children: what we do and do not know. *J Am Acad Child Adolesc Psychiatry.* 2016;55(3):155–156.e3

I was surprised first by the AAP's claim that watchful waiting's delay to puberty was somehow "arbitrary." The literature, including AAP's sources, repeatedly indicated the pivotal importance of puberty, noting that outcomes strongly diverge at that point. According to AAP reference 29, in "*prepubertal* boys with gender discordance—including many without any mental health treatment—the cross gender wishes usually fade over time and do not persist into adulthood, with only 2.2% to 11.9% continuing to experience gender discordance" (Adelson & AACAP, 2012, p. 963, italics added), whereas "when gender variance with the desire to be the other sex is present *in adolescence,* this desire usually does persist through adulthood" (Adelson & AACAP, 2012, p. 964, italics added). Similarly, according to AAP reference 40, "Symptoms of GID *at prepubertal ages* decrease or even disappear in a considerable percentage of children (estimates range from 80–95%). Therefore, any intervention in childhood would seem premature and inappropriate. However, GID persisting *into early puberty* appears to be highly persistent" (Cohen-Kettenis et al., 2008, p. 1895, italics added). That follow-up studies of prepubertal transition differ from postpubertal transition is the very meaning of non-arbitrary. AAP gave readers exactly the reverse of what was contained in its own sources. If AAP were correct in saying that puberty is an arbitrarily selected age, then AAP will be able to offer another point to wait for with as much empirical backing as puberty has.

Next, it was not clear on what basis AAP could say that watchful waiting withholds support—AAP cited no support for its claim. The people in such programs often receive substantial support during this period. Also unclear on what basis AAP could already know exactly which treatments are "critical" and which are not—Answering that question is the very purpose of this entire endeavor. Indeed, the logic of AAP's claim appears entirely circular: It is only if one were already pre-convinced that gender affirmation is the only acceptable alternative that would make watchful waiting seem to withhold critical support—What it delays is gender affirmation, the method one has already decided to be critical.

Although AAP's next claim did not have a citation appearing at the end of its sentence, binary notions of gender were mentioned both in references 45 and 47. Specifically, both pointed out that existing outcome studies have been about people transitioning from one sex to the other, rather than from one sex to an in-between status or a combination of masculine/feminine features. Neither reference presented this as a reason to reject the results from the existing studies of complete transition however (which is how AAP cast it). Although it is indeed true that the outcome data have been about complete transition, some future study showing that partial transition shows a different outcome would not invalidate what is known about complete transition. Indeed, data showing that partial transition gives better outcomes than complete transition would, once again, support the watchful waiting approach which AAP rejected.

Next was a vague reference alleging concerns and criticisms about early studies. Had AAP indicated what those alleged concerns and flaws were (or which studies they were), then it would be possible to evaluate or address them. Nonetheless, the argument is a red herring: Because all of the later studies showed the same result as did the early studies, any such allegation is necessarily moot.

Reference 47 was a one-and-a-half page commentary in which the author off-handedly mentions criticisms criticisms previously made of three of the eleven outcome studies of GD children, but does not provide any analysis or discussion. The only specific claim was that studies (whether early or late) had limited follow-up periods—the logic being that had outcome researchers lengthened the follow-up period, then people who seemed to have desisted might have returned to the clinic as

cases of "persistence-after-interruption." Although one could debate the merits of that prediction, AAP instead simply withheld from the reader the result from the original researchers having tested that very prediction directly: Steensma and Cohen-Kettenis (2015) conducted another analysis of their cohort, by then ages 19–28 (mean age 25.9 years), and found that 3.3% (5 people of the sample of 150) later returned. That is, in long-term follow-up, the childhood sample showed 66.7% desistence instead of 70.0% desistance.

Reference 45 did not support the claim that watchful-waiting is "outdated" either. Indeed, that source said the very opposite, explicitly referring to watchful waiting as the *current* approach: "Put another way, if clinicians are straying from SOC 7 guidelines for social transitions, not abiding by the watchful waiting model *favored by the standards*, we will have adolescents who have been consistently living in their affirmed gender since age 3, 4, or 5" (Ehrensaft et al., 2018, p. 255). Moreover, Ehrensaft et al. said there are cases in which they too would still use watchful waiting: "When a child's gender identity is unclear, the watchful waiting approach can give the child and their family time to develop a clearer understanding and is not necessarily in contrast to the needs of the child" (p. 259). Ehrensaft et al. are indeed critical of the watchful waiting model (which they feel is applied too conservatively), but they do not come close to the position the AAP policy espouses. Where Ehrensaft summaries the potential benefits and potential risks both to transitioning and not transitioning, the AAP presents an ironically binary narrative.

In its policy statement, AAP told neither the truth nor the whole truth, committing sins both of commission and of omission, asserting claims easily falsified by anyone caring to do any fact-checking at all. AAP claimed, "This policy statement is focused specifically on children and youth that identify as TGD rather than the larger LGBTQ population"; however, much of that evidence was about sexual orientation, not gender identity. AAP claimed, "Current available research and expert opinion from clinical and research leaders … will serve as the basis for recommendations" (pp. 1–2); however, they provided recommendations entirely unsupported and even in direct opposition to that research and opinion.

AAP is advocating for something far in excess of mainstream practice and medical consensus. In the presence of compelling evidence, that is just what is called for. The problems with Rafferty, however, do not constitute merely a misquote, a misinterpretation of an ambiguous statement, or a missing reference or two. Rather, AAP's statement is a systematic exclusion and misrepresentation of entire literatures. Not only did AAP fail to provide compelling evidence, it failed to provide the evidence at all. Indeed, AAP's recommendations are *despite* the existing evidence.

## Disclosure statement

No potential conflict of interest was reported by the author.

## References

Rafferty, J., AAP Committee on Psychosocial Aspects of Child and Family Health, AAP Committee on Adolescence, AAP Section on Lesbian, Gay, Bisexual, and Transgender Health and Wellness. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics, 142*(4), e20182162 doi:10.1542/peds.2018-2162

Steensma, T. D., & Cohen-Kettenis, P. T. (2015). More than two developmental pathways in children with gender dysphoria? *Journal of the American Academy of Child and Adolescent Psychiatry, 52*, 147–148. doi:10.1016/j.jaac.2014.10.016

Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child and Adolescent Psychiatry, 47*, 1413–1423. doi:10.1097/CHI.0b013e31818956b9

JOURNAL OF SEX & MARITAL THERAPY  313

## Appendix

| Count | Group | Study |
|---|---|---|
| 2/16<br>4/16<br>10/16 | gay*<br>trans-/crossdress<br>straight*/uncertain | Lebovitz, P. S. (1972). Feminine behavior in boys: Aspects of its outcome. *American Journal of Psychiatry, 128,* 1283–1289. |
| 2/16<br>2/16<br>12/16 | trans-<br>uncertain<br>gay | Zuger, B. (1978). Effeminate behavior present in boys from childhood:<br>Ten additional years of follow-up. *Comprehensive Psychiatry, 19,* 363–369. |
| 0/9<br>9/9 | trans-<br>gay | Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant<br>gender identity/role: Longitudinal follow-up. *Journal of Pediatric Psychology, 4,* 29–41. |
| 2/45<br>10/45<br>33/45 | trans-/crossdress<br>uncertain<br>gay | Zuger, B. (1984). Early effeminate behavior in boys: Outcome and<br>significance for homosexuality. *Journal of Nervous and Mental Disease, 172,* 90–97. |
| 1/10<br>2/10<br>3/10<br>4/10 | trans-<br>gay<br>uncertain<br>straight | Davenport, C. W. (1986). A follow-up study of 10 feminine boys. *Archives of Sexual Behavior, 15,* 511–517. |
| 1/44<br>43/44 | trans-<br>cis- | Green, R. (1987). *The "sissy boy syndrome" and the development of homosexuality.* New Haven, CT: Yale University Press. |
| 0/8<br>8/8 | trans-<br>cis- | Kosky, R. J. (1987). Gender-disordered children: Does inpatient treatment help? *Medical Journal of Australia, 146,* 565–569. |
| 21/54<br>33/54 | trans-<br>cis- | Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child and Adolescent Psychiatry, 47,* 1413–1423. |
| 3/25<br>6/25<br>16/25 | trans-<br>lesbian/bi-<br>straight | Drummond, K. D., Bradley, S. J., Badali-Peterson, M., & Zucker, K. J. (2008). A follow-up study of girls with gender identity disorder. *Developmental Psychology, 44,* 34–45. |
| 17/139<br>122/139 | trans-<br>cis- | Singh, D. (2012). *A follow-up study of boys with gender identity disorder.* Unpublished doctoral dissertation, University of Toronto. |
| 47/127<br>80/127 | trans-<br>cis- | Steensma, T. D., McGuire, J. K., Kreukels, B. P. C., Beekman, A. J., & Cohen-Kettenis, P. T. (2013). Factors associated with desistence and persistence of childhood gender dysphoria: A quantitative follow-up study. *Journal of the American Academy of Child and Adolescent Psychiatry, 52,* 582–590. |

*For brevity, the list uses "gay" for "gay and cis-", "straight" for "straight and cis-", etc.

# Appendix Attachment

# 1e

# ATTACHMENT E

### Concerns about Affirmation of an Incongruent Gender in a Child or Adolescent

Quentin L. Van Meter, M.D.
May 17, 2022

**Qualifications**

I received my B.A. in Science at the College of William and Mary and my M.D. from the Medical College of Virginia, Virginia Commonwealth University. I am currently a pediatric endocrinologist in private practice in Atlanta, Georgia. I am the President of Van Meter Pediatric Endocrinology, P.C. I am on the clinical faculties of Emory University School of Medicine and Morehouse College of Medicine, in the role of adjunct Associate Professor of Pediatrics. I am board certified in Pediatrics and Pediatric Endocrinology. I have been licensed to practice medicine in Georgia since 1991. I have been previously licensed to practice medicine in California, Louisiana, and Maryland.

I did my Pediatric Endocrine fellowship at Johns Hopkins Hospital from 1978-1980. The faculty present at that time had carried on the tradition of excellence established by Lawson Wilkins, M.D. Because of the reputation of the endocrine program as a center for exceptional care for children with disorders of sexual differentiation, I had well-above average exposure to such patients. As a Pediatric Fellow, I was also exposed to adults with Gender Identity Disorder, then called Trans-Sexuality, and received training from John Money, Ph.D., in his Psycho-hormonal Division.  Over the past 44 years, I have closely followed the topic of incongruent gender in children adolescents and adults, but I am focusing in this document on working with children and adolescents. To get a more solid understanding of how male and female human beings develop in utero, it is important to start at the point when a sperm meets an egg.

**Differentiation in the Fetus**

From the moment of conception, a fetus is determined to be either a male (XY), female (XX), or in rare cases, to have a combination of sex-determining chromosomes, many of which are not compatible with life, and some of which are the cause of identifiable clinical syndromes. The presence of a Y chromosome in the developing fetus directs the developing gonadal tissue to develop as a testicle. The absence of a functional Y chromosome allows the gonadal tissue to develop as an ovary. Under the influence of the mother's placental hormones, the testicle will produce testosterone which directs the genital tissue to form a penis and a scrotum. Simultaneously, the testicle produces anti-Müllerian Hormone (AMH) which regresses development of the tissue that would otherwise develop into the uterus, fallopian tubes, and upper third of the vagina. This combination of actions in early fetal development is responsible for what we subsequently see on fetal sonograms, and what we observe at birth as male or female genitalia. It is only when the genital structures are ambiguous in appearance that sex determination is withheld until a thorough expert team evaluation has occurred.

For reasons most often occurring as random events, there are malfunctions of the normal differentiation. These aberrations of normal development are responsible for what we classify as Disorders of Sexual Differentiation (DSD), and they represent a very small fraction of the human population. The incidence of such circumstances occurs in 1:4500 to 1:5500 births.[1] Sex is binary, male or female, and is determined by chromosomal complement and corresponding reproductive role. The exceedingly rare DSDs are all medically identifiable deviations from this sexual binary norm. The 2006 consensus statement of the Intersex Society of North America and the 2015 revision of the Statement do not endorse DSD as a third sex.[2] DSD outcomes range from appearance of female external genitalia in an XY male (complete androgen insensitivity syndrome) to appearance of male external genitalia in an XX female (severe congenital adrenal hyperplasia).

As one would expect, there are variations of the degree of hormonally driven changes that create ambiguous genital development that prevent assigning of a specific classification as either male or female at birth. DSD patients are not "transgender"; they have an objective, physical, medically verifiable, physiologic condition. Transgender people generally do not have intersex conditions or any other verifiable physical anomaly. People who identify as "feeling like the opposite sex" or "somewhere in between" do not comprise a third sex. They remain biological men or biological women.

In some DSDs there exist more than one set of chromosomes. When there is a divergence of the appearance of the external genitalia from the chromosomally determined sex due to the presence of both an ovarian and testicular cell lines in a patient simultaneously, the patient is classified as having ovo-testicular DSD (formerly termed a true hermaphrodite). When there is a disruption in the development of genital structures but there is solely testicular tissue present in the chromosomal male or solely ovarian tissue in the chromosomal female, the term 46 XY DSD or 46 XX DSD is used instead respectively (formerly termed male pseudohermaphrodite or female pseudohermaphrodite).

The decision to assign a sex of rearing is complex and is specific to the diagnosis. Patients with complete androgen insensitivity (CAIS) are XY DSD but are never reared as a male. Because testosterone never influences development, they become happy, functional female adults with infertility. Females with severe congenital adrenal hyperplasia (CAH) are XX DSD but are not reared as males despite the male appearance of the genitalia at birth. Although these girls may show a tendency for male play behaviors as children, they generally assume a female sexual identity. Therapeutic interventions in the DSD individuals from infancy onward are aimed at what function can be expected from their disordered sexual anatomy in terms of function and fertility. Most often, the chromosomal sex aligns with the sex of rearing.

**Gender Identity**

"Gender" is a term that refers to the psychological and cultural characteristics associated with biological sex. It is a psychological concept and sociological term, not a biological one. The term gender possessed solely a linguistic meaning prior to the 1950s. This changed when sexologists of the 1950s and 1960s co-opted the term to conceptualize cross-dressing and transsexualism in their psychological practice. "Gender identity" is a term coined by my former endocrine faculty member John Money in the 1970s and has come to refer to an individual's mental and emotional sense of being male or female. The norm is for individuals to have a gender identity that aligns with one's biological sex.

Gender discordance (formerly Gender Identity Disorder) is used to describe a psychological condition in which a person experiences marked incongruence between his experienced gender and the gender associated with his biological sex. He will often express the belief that he is the opposite sex. Up until 2010, gender discordance occurred in 0.001% of biological females and in 0.0033% of biological males.[3] Exact numbers are hard to document since reporting is often anecdotal. Gender discordance is not considered a normal developmental variation.

"Gender Dysphoria" is a diagnostic term to describe the emotional distress caused by gender incongruity.[4] John Money played a prominent role in the early development of gender theory and transgenderism. He understood gender to be "the social performance indicative of an internal sexed identity."[5] He joined the Johns Hopkins faculty in 1951 specifically to have access to children diagnosed with DSD, hoping to prove his theory that gender was arbitrary and fluid. Money experimented with DSD infants by assigning them to the opposite biological sex through surgical revision, counseling, and hormonal manipulation during puberty. His mode of operation was to have a theory and then experiment with patients to see how his theory worked.

**Ethics in Clinical Research on Human Subjects**

It is important to discuss the need for ethics to play a role in the design of clinical studies involving human patients. To have a hypothesis, as did John Money, is not at issue. However, to clearly elucidate the potential for harm and balance that knowledge with the potential benefits is key and essential. After the travesties of open-ended experimentation in the Nazi concentration camps, international guidelines were established to protect human subjects from just such experimentation.[6] John Money ignored these guidelines as he assigned genders to infants and toddlers with ambiguous genitalia. There was no informed consent of the patients, who were infants and toddlers, and their parents were just told to follow the advice of Dr. Money and to trust that he had the correct information. There was no standardized protocol to follow, and no known outcome that could be guaranteed. This kind of endeavor did not anticipate or prevent adverse outcomes and was the antithesis of ethical science. Money never submitted his research proposals for review by an independent external review board. This left the patients unprotected and vulnerable to harm, and, indeed, in the case of the Reimer twins, to death due to drug addiction/overdose in one brother and to suicide in the other.[7]

Near the end of my fellowship training at Johns Hopkins, a male infant was sent to our clinic to assess the cause of his very small penis and testicles.  My attending physician and I laid out a diagnostic work-up based on the known science which would help us understand whether the problem was due to a pituitary deficiency or an inability of tissue response to hormones.  We purposely left John Money off the care "team," having some serious concerns about his tendency to dismiss science and to experiment.  We sent the family home with their son and were quite surprised when the mother returned six weeks later with a baby wearing a pink dress and an eyelet bonnet.  Without our knowledge, Dr. Money had intervened and told the family that our protocol was nonsense and the baby needed to be reared as female.  On physical exam, there was clear evidence that not only was the baby able to produce testosterone, but his penis responded well, as expected, to the hormone production by his own body.  The family was relieved but had not been spared suffering under the experimentation by Dr. Money.  They had suffered deeply when they divulged to their extended family that their baby boy was actually a baby girl, and then they suffered even more when they recanted and resumed calling him a boy.

Because of his experience with infants, Money initially garnered support from endocrine colleagues and surgical colleagues, and Johns Hopkins became a renowned center for care of patients with DSD in the 1970s, receiving referrals from around the world. Follow-up studies on these infants later showed, however, that altering their natal sexual identity via social intervention could lead to severe psychological harm. Clinical case reports of children with DSD have revealed that gender identity is indeed not immune to environmental input.[8]

Meanwhile, Money had expanded into the field of adult patients with persistent gender identity disorder. This very small group of patients chose voluntarily, as adults, to enter a very precise protocol which began with living socially as the opposite sex for a year, eventually receiving hormonal therapy to change their physical appearance to some extent. The final step was surgical revision of the body structures that would otherwise be at odds with their desired gender identity. This small group of patients was followed for a number of years past their final surgical procedures and required continuous counseling. These patients expressed some degree of subjective satisfaction but showed no objective improvement in overall wellbeing.[9] The legacy of John Money fell into disrepute and the transsexual treatment program at Johns Hopkin was closed in the 1980s based on the lack of evidence that this protocol produced an effective cure.

**Etiology of Gender Disorders**

Transgender affirming professionals claim transgender individuals have a "feminized brain" trapped in a male body at birth and vice versa based upon various brain studies. Diffusion-weighted MRI scans have demonstrated that the pubertal testosterone surge in boys increases white matter volume. A study by Rametti and colleagues found that the white matter microstructure of the brains of female-to-male (FtM) transsexual adults, who had not begun testosterone treatment, more closely resembled that of men than that of women.[10] Other

diffusion-weighted MRI studies have concluded that the white matter microstructure in both FtM and male-to-female (MtF) transsexuals falls halfway between that of genetic females and males.[11] These studies, however, are of limited clinical significance due to the small number of subjects and failure to account for neuroplasticity.

Neuroplasticity is the well-established phenomenon in which long-term behavior alters brain microstructure. For example, the MRI scans of experienced cab drivers in London are distinctly different from those of non-cab drivers, and the changes noted are dependent on the years of experience.[12] There is no evidence that people are born with brain microstructures that are forever unalterable, but there is significant evidence that experience changes brain microstructure.[13,14] Therefore, any transgender brain differences would more likely be the result of transgender behavior than its cause.

Furthermore, infants' brains are imprinted prenatally by their own endogenous sex hormones, which are secreted from their gonads beginning at approximately eight weeks' gestation.[15,16,17] There are no published studies documenting MRI-verified differences in the brains of gender-disordered children or adolescents. The DSD guidelines also specifically state that current MRI technology cannot be used to identify those patients who should be raised as males or raised as females.[18] Behavior geneticists have known for decades that while genes and hormones influence behavior, they do not hard-wire a person to think, feel, or behave in a particular way. The science of epigenetics has established that genes are not analogous to rigid "blueprints" for behavior. Rather, humans "develop traits through the dynamic process of gene-environment interaction. ... [genes alone] don't determine who we are." [19]

Regarding transgenderism, twin studies of adults prove definitively that prenatal genetic and hormone influence is minimal. The largest twin study of transgender adults found that only 20 percent of identical twins were both transgender-identified.[20] Since identical twins contain 100 percent of the same DNA from conception and develop in exactly the same prenatal environment exposed to the same prenatal hormones, if genes and/or prenatal hormones contributed to a significant degree to transgenderism, the concordance rates would be close to 100 percent. Instead, 80 percent of identical twin pairs were discordant. This difference would indicate that at least 80 percent of what contributes to transgenderism as an adult in one co-twin consists of one or more non-shared post-natal experiences including but not limited to non-shared family experiences. These findings also mean that persistent GD is due predominately to the impact of nonshared environmental influences. These studies provide compelling evidence that discordant gender is not hard-wired genetically.

**Gender Dysphoria vs. Gender Identity Disorder**

Up until the recent revision of the DSM-IV criteria, the American Psychological Association (APA) held that Gender Identity Disorder (GID) was the mental disorder described as a discordance between the natal sex and the gender identity of the patient. Dr. Kenneth Zucker, who is a highly respected clinician and researcher from Toronto, carried on evaluation and

treatment of GID patients for forty years. His works, widely published, found that the vast majority of boys and girls with GID identify with their biological sex by the time they emerge from puberty to adulthood, through either watchful waiting or family and individual counseling.[21] His results were mirrored in studies from Europe.[22,23]

When the DSM-V revision of the diagnosis of GID was proposed by the APA committee responsible for revision, Dr. Zucker strongly opposed the change to the term Gender Dysphoria, which purposefully removed gender discordance as a mental disorder apart from the presence of significant emotional distress. With this revision, Gender Dysphoria describes the mental anguish which is experienced by the gender discordant patient. The theory that societal rejection is the root cause of Gender Dysphoria was validly questioned by a study from Sweden which showed that the dysphoria was not eliminated by hormones and sex reassignment surgery even with widespread societal acceptance.[24]

**Treatment of Gender Dysphoria**

The treatment of children and adolescents with gender discordance and accompanying gender dysphoria should include an in-depth evaluation of the child and family dynamics. This evaluation provides a basis on which to proceed with psychologic therapy. The entire biologic and social family should be involved in psychological therapy designed to assist the patient, if at all possible, to align gender identity with natal sex. Psychological support by competent counselors with an intent of resolving the gender conflict should be provided as long as the patient continues to suffer emotionally. Given the high degree of eventual desistance of gender discordance/dysphoria by the end of puberty, it would be ethical and logical to counsel the patient and family to rear the child in conformity with natal sex.

There should be no interruption of natural puberty. Natural pubertal maturation in accordance with one's natal sex is not a disease. It is designed to carry malleable, immature children forward to be healthy adults capable of conceiving their own progeny by providing either a sperm or an egg. Puberty affects physical changes, some of them painful, unique to the natal sex to reflect the laws of nature. Interruption of puberty has been reserved for children who begin puberty at an age much younger than normal in an effort to preserve final height potential and avoid the social consequences of precocious maturation.[25]

There are a number of physical changes that are a consequence of normally timed puberty that could be classified as disadvantageous: changes in body proportions can alter success with dance and gymnastics; acne can be severe and disfiguring; a boy soprano can suddenly hardly carry a tune. It has not been the ethical standard of care to stop puberty so that these changes can be circumvented. Erikson described the stage of adolescence as "Identity versus Role Confusion" during which the teen works at developing a sense of self by testing roles then integrating them into a single identity.[26] This process is often unpleasant regardless of the presence or absence of gender identity conflicts. The major benefit of enduring puberty in a GD patient is that it provides a strong likelihood of alignment of his gender identity with his

natal sex. There is no doubt that these patients need compassionate care to get them through their innate pubertal changes.

The light at the end of the tunnel is the proven scientific evidence that 80%- 95% of pre-pubertal children with GD will come to identify with their biological sex by late adolescence. Some will require lifelong supportive counseling while others will not.[27] Intervention at a young age with gonadotropin releasing hormone analogs (often referred to as puberty blockers) to either stop puberty early on or prevent it from starting before it naturally occurs is suggested by guidelines developed by WPATH without scientific basis. These guidelines are essentially nothing more than an open-ended experiment in the manner of John Money. They represent the ideas of their authors with clear admission that there is no long-term evidence that harm will exceed benefits as these patients grow to old age.  There is evidence that bone mineral density is irreversibly decreased if puberty blockers are used during the years of adolescence.[28] To treat puberty as a pathologic state of health that should be avoided by using puberty blockers (GnRH analogs) is to interrupt a major necessary physiologic transformation at a critical age when such changes can effectively happen. We have definite evidence of the need for estrogen in females to store calcium in their skeleton in their teen years. That physiologic event can't be put off successfully to a later date. It is very difficult to imagine ethical controlled clinical trials that could elucidate the effects of delaying puberty until the age of consent.

The use of cross-sex hormones during this same time frame has no basis of safety and efficacy. The use of such treatment in adults raises scientifically valid concerns that were amply expressed in the 2009 Endocrine Society Guidelines on Transgender treatment. The next step in WPATH-recommended intervention is to use cross-sex hormone therapy during the time when the patient would naturally be experiencing endogenous pubertal changes. This too is not based on scientifically proven theories. The use of cross-sex hormones can cause permanent infertility.[29]

The final recommended step is so-called "sex reassignment surgery," which can include surgical removal of the breasts in natal females, or removal of the penis and scrotum in natal males. Each of these steps has adverse outcomes, some reversible and others not. Mastectomies leave scars, and there is great difficulty in creating a functional vaginal-like orifice, and certainly no success in creating an innervated erectile penis where none existed previously. Sex reassignment surgery is, by nature, permanent.

**Recurrent Themes that Are Repeatedly Published**

Puberty blockers are stated to be completely reversible in their effects on the adolescent who has entered puberty based on clinical studies in young children with precocious puberty who have been treated with these drugs. This is comparing apples to oranges. Precocious puberty, by definition, is defined as puberty which starts before the 8th birthday for a female child or the before the 9th birthday in a male child. The end of treatment is carefully timed so that resumption of puberty occurs at the average age for females (10.5 years) and males (11.5

years). This allows the necessary functions of puberty to prepare the body for reproduction and affects the bones, gonads, and brain, among other body systems. On the other hand, blocking puberty at the age of normal puberty prevents the needed accretion of calcium into the skeleton and prevents the maturation of the gonads. There is no long-term data that compares bone, gonad, and brain health in pubertal-aged patients who have had puberty interrupted and those who have not, as was noted as a concern in the Endocrine Society Guidelines. There are no such ongoing studies completed that guarantee the full reversibility of blocking puberty in this age group, but there is evidence that normal bone density can't be fully reestablished. Without any verifiable safety data, using the puberty blockers for interrupting normal puberty is not a sanctionable off-label use of these drugs and is therefore to be considered uncontrolled, non-consentable experimentation on children.

Advocates for the social, medical and surgical affirmation of gender incongruent children insist that they are only following established standards of care. There are no standards of care for transgender health. Standards of care established by broad consensus are reached by inclusion of the whole spectrum of opinions, clinical experience and published science in the formation thereof. The guidelines published by WPATH[30], the Endocrine Society,[29,31] the American Academy of Pediatrics[32], and the Pediatric Endocrine Society[33] are solely the opinions of like-minded practitioners who excluded any contrary opinion. The Endocrine Society Guidelines, as mentioned before, clearly stated that they are not to be considered standards of care. Before true consensus-driven standards of care are established for the treatment of transgender patients of all ages, following the current guidelines is risky experimentation in a manner reminiscent of John Money's tactics.

**What We Do Know and Do Not Know**

We do know that social affirmation of an incongruent gender tears the fabric of the patient's life into pieces- pitting family members against each other, ruining child friendships and it introduces the child to a fantasy world, much of it on the internet. Kenneth Zucker aptly documented the detrimental effects of such affirmation and the immense amount of work it takes to undo these effects when the child does come to realize they can't change their sex and wants to go back to identifying with their sex[34]. We do not know that social affirmation does anything other than push the child away from the proven, 80-90% effective, so-called watch-and wait treatment option. Embarrassingly unscientific short term convenience sample studies purport to show that all gender incongruent children who are socially affirmed have improved mental health and are therefore better off than those children who are not allowed to socially transition.[35]

We do know that blocking puberty during the age when puberty naturally happens lessens accretion of calcium into the skeleton and that this can't be regained by allowing puberty to resume or by using cross sex hormones. We do know that the ovary and testicle cease to mature with treatment. What we do not know is whether allowing puberty to resume will allow the ovary and testicle to fully mature and have full function in terms of fertility. We do

not know if brain development that is halted with puberty blockers can return to full . function once puberty is allowed to resume.

We do know that elevated levels of testosterone in females and of estrogen in males create significant medical morbidity. This knowledge comes from the evaluation and treatment of naturally occurring disease states in children and adults. Treatment of these conditions is aimed at returning hormone levels to normal, thereby avoiding cancers, heart disease, and stroke. We do not know that elevating testosterone in females and estrogen in males to levels ten-fold higher than these known disease states is safe, but common sense would say it can't possibly be safe.

**The Myth of Increased Suicide**

The affirmation advocates repeatedly refer to the established increased risk of suicide if any of the affirmation strategies are not followed to completion. They point to their own published studies touting dramatic improvement in mental health status of patients who are affirmed in all three ways, but they cite data from convenience sampling, which never should be sued to prove anything other than association, at best. Such studies can never prove causation. There are only two total population studies in the peer-reviewed medical literature.[24,36,37] They show that when every recorded case in the population of Sweden was analyzed, neither medical affirmation nor medical affirmation followed by surgical affirmation improved the mental health of the patients in the long run.

**What of the Nearly Logarithmic Increase in Incidence of Gender Incongruence?**

Data collection in this regard is subject to estimates based on surveys, which can easily alter the numbers upward or downward, depending on who designed the survey and to whom it was presented. Fear, self-loathing or suicide will necessarily lower the numbers of survey participants whose lives are made miserable by the choice to affirm an incongruent gender. Instant gratification, payback to strict parents, and current celebrity will draw survey participants to express euphoric satisfaction with their decision to affirm their incongruent gender, especially when the surveys are circulated by trans-activist organizations, such as the Trevor Project. What had been in 2010 a nearly invisible fraction of adults who admitted to living with an incongruent gender has exponentially increased in frequency to as many as one out of five students in a suburban Pittsburgh school district in 2021. After I completed my fellowship at Johns Hopkins in 1980, it was not until 1993 that a biologic male presented to my private practice office with a desire to be treated with estrogen to feminize his body so that he could appear to be a female and identify as such. There was nothing in published medical literature that I could find to guide my treatment options. I canvassed my broad contact pediatric endocrinology network across the United States, and nobody had heard of such a clinical case, and none had any suggestions about what I should do. In the ensuing 19 years, the number of transgender treatment centers have burgeoned from zero to several hundred between university-based centers and Planned parenthood. Minority stress theory is frequently used to cover this explosion in numbers, but that is utterly impossible. What does

explain this increase is online recruiting and grooming of vulnerable children and adolescents by a generously funded political movement aimed at dissolving the reality and birthright of biologic sex.  This will not end well.  By the time a plethora of legal action against those who promoted and engineered the social, medical, and surgical affirmation of incongruent gender knocks down this house of cards, millions of children and adolescents will have been medically, surgically, and mentally maimed as well sterilized.

_____

**Endnotes**

[1] Lee PA et al, Global Disorders of Sex Development Update since 2006: Perceptions, Approach and Care, 2016 Horm Res Paediatr.

[2] Lee PA et al, Consensus Statement on Management of Intersex Disorders, Pediatrics 2006; 118 e488-e500.

[3] Seaborg E, About Face, Endocrine News 2014 (May) 16-19.

[4] American Psychiatric Association. Diagnostic and Statistical Manual of Mental Disorders. 5th ed; 2013:451-459.

[5] Jeffreys, S. Gender Hurts: A feminist analysis of the politics of transgenderism. Routledge. 2014 (p. 27).

[6] Annas GJ and Grodin MA, Reflections on the 70th Anniversary of the Nuremberg Doctor's Trial, AM J Pub Health 2018;108:10-12

[7] https://www.baltimoresun.com/news/bs-xpm-2000-02-10-0002100278-story.html

[8] Whitehead, N. My Genes Made Me Do It. Chapter 5.

[9] Meyer J.K. and Reter D. Sex Reassignment Follow-up. Arch. Gen. Psychiatry 36:1010-1015, 1979.

[10] Rametti G, Carrillo B, Gomez-Gil E, et al. White matter microstructure in female to male transsexuals before cross-sex hormonal treatment. A diffusion tensor imaging study. J Psychiatr Res 2011; 45:199-204.

[11] Kranz GS, Hahn A, Kaufmann U, et al. White matter microstructure in transsexuals and controls.

[12] Maguire EA et al, Navigation-related structural change in the hippocampi of taxi drivers, PNAS 2000; 97:4398- 4403.

[13] Gu J, Kanai R. What contributes to individual differences in brain structure? Front Hum Neurosci 2014; 8:262.

[14] Sale A, Berardi N, Maffei L, Environment and Brain Plasticity: Towards an Endogenous Pharmacotherapy, Physiol Rev 2014; 94: 189 –234.

[15] Reyes FI, Winter JS, Faiman C. Studies on human sexual development fetal gonadal and adrenal sex steroids. J Clin Endocrinol Metab 1973; 37(1):74-78.

[16] Lombardo M. Fetal testosterone influences sexually dimorphic gray matter in the human brain. J Neurosci 2012; 32:674-680.

[17] Campano A. [ed]. Geneva Foundation for Medical Education and Research. Human Sexual Differentiation; 2016. Available at ww.gfmer.ch/Books/Reproductive_health/Human_sexual_differentiation.html. Accessed May 11, 2016.

[18] Lee PA et al, Consensus Statement on Management of Intersex Disorders, Pediatrics 2006; 118 e488-e500.

[19] Shenk, D. The Genius in All of Us: Why everything you've been told about genetics, talent, and IQ is wrong. (2010) New York, NY: Doubleday; p. 18.

[20] Diamond, M. "Transsexuality Among Twins: identity concordance, transition, rearing, and orientation." International Journal of Transgenderism, 14(1), 24-38.

[21] Zucker KJ, Gender Identity Disorder, in Rutter M, Taylor EA, editors. Child and Adolescent psychiatry, 4th ed, Malden Mass: Blackwell, 2006: 737-753.

[22] Wallien MS, Cohen-Kettenis PT. Psychosexual outcome of gender-dysphoric children. J AM Academy Child Adolescent Psychiatry 2008; 47:1413-1423.

[23] Schechner T. Gender Identity Disorder: A Literature Review from a Developmental Perspective. Isr J Psychiatry Related Sci 2010; 47:42-48.

[24] Dhejne C, et al. Long-term Follow-up of transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden PLoS One February 2011 Vol 6 Issue 2, e16885.

[25] Carel JC, Eugster EA, Rogol A, et al. Consensus statement on the use of gonadotropin-releasing hormone analogs in children. Pediatrics. 2009 Apr. 123(4):e752-62.

[26] Erikson EH (1993). Childhood and society. WW Norton & Company.

[27] Zucker KJ, Gender Identity Disorder, in Rutter M, Taylor EA, editors. Child and Adolescent psychiatry, 4th ed, Malden Mass: Blackwell, 2006: 737-753.

[28] J Clin Endo Metab 2008; 93:190-195.

[29] Hembree WC et al, Endocrine Treatment of Transsexual Persons: and Endocrine Society Clinical Practice Guideline, J Clin Endo Metab2009; 94:3132-3154.

[30] Coleman E, Bockting W, Botzer M et al, Standards of Care for the Health of Transsexual, Transgender, and Gender-Non-conforming People, version 7, International Journal of Transgenderism 2012;13(4): 165-232

[31] Wylie W et al, "Endocrine Treatment of Gender-dysphoric/Gender-incongruent Persons: An Endocrine Society Clinical Practice Guideline, JCEM 2017; 102:3869-3903

[32] Rafferty J, Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents, Pediatrics, 2018:142:e20182162

[33] Lopez X et al, Pediatric Endocrine Society Transgender Health Special Interest Group statement on gender-affirmative approach to care the Pediatric Endocrine Society, 2017 Curr Opin Pediatr;29:475-480.

[34] Zucker K. J. (2019), Debate: Different strokes for different folks. Child Adolesc Ment Health. doi:10.1111/camh.12330

[35] Olson KR et al, Mental Health of Transgender Children Who are Supported in Their Identities, Pediatrics 2016;137 e20153223

[36] Branstrom R Pachankis JE Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study, Am J Psychiatry 2020: 177:727-734

[37] Bränström R and Pachankis JE. Toward Rigorous Methodologies for Strengthening Causal Inference in the Association Between Gender-Affirming Care and Transgender Individuals' Mental Health: Response to Letters. American Journal of Psychiatry 2020 177:8, 769-772  doi: 10.1176/appi.ajp.2020.20050599.

# Appendix Attachment

# 1f

# ATTACHMENT F

# Florida Medicaid Project: Surgical Procedures and Gender Dysphoria

Patrick Lappert, M.D.

May 17, 2022

**Florida Medicaid Project: Surgical Procedures and Gender Dysphoria**

Patrick Lappert, M.D.

# Overview

The "Gender Affirmation" care model for children who suffer from gender identity issues is experimental in nature because it is based in low to very low-quality scientific evidence. There is no body of quality scientific evidence to support the hypothesis that gender dysphoria with its associated problems of self-harm and suicide, is improved long-term by gender affirmation surgical procedures.

The best evidence available today demonstrates that transgender is not a single condition that can be explained by any single factor. There are vast differences in age of presentation, predominant sex, persistence into adulthood, and resolution during adolescent development. Moreover, there are numerous and common co-morbid conditions such as autism-spectrum disorder, major anxiety disorders, and clinical depression that severely affect any sense of certainty about the true cause of the child's dysphoria, as well as their capacity to understand and give assent to irreversible medical and surgical procedures that lead to permanent sterility, sexual impotence, and a lifetime of medical problems associated with affirmation care.

The process of obtaining medical informed consent as part of gender affirming surgery is morally indefensible, and likely legally indefensible as well. Parents of suffering children are led by medical professionals to believe that there is only one valid option of care (affirmation medicine and surgery), utterly concealing the historic reality that greater than 92% of children desist in their cross-sex self-identification when treated using the "watchful waiting" therapeutic strategy. Parents are told that if they do not consent to affirmation care, there is a high likelihood that their child will die from suicide. This is not informed consent, but rather consent under duress.

Gender identity is being presented as a fixed and unchanging, biologically determined, personal characteristic. It is not. The medical literature has consistently shown over many years that the vast majority of children with cross-sex gender identity resolve the issue during adolescence and adopt a gender identity that is congruent with their biological sex.

Because surgeons who perform gender affirmation surgeries have no diagnostic test to predict who among the self-identified transgender minors would have persisted in their cross-sex self-identification into adulthood, and who among those children would have desisted, they have no way to know, in any particular case if the irreversible surgery is being performed on a person who would have continued to self-identify in the cross-sex persona into adulthood. Given the historically well-known desistance rate, it is possible that as many as 90% of children are undergoing surgery based upon an incorrect diagnosis.

"Gender Affirming" breast surgery for self-identifying transgender minors is not medically and ethically equivalent to similar procedures performed for objectively identifiable medical conditions. Transgender breast surgery is always cosmetic (aesthetic) in nature because the indication is a hoped-for improvement in the interior emotional life of the patient. Transgender surgery is not based in any medical diagnosis and does not seek to restore any form or function that may have been lost due to trauma, disease, or developmental accident. It begins with normal structures and changes their appearance in order to achieve a subjective improvement and is therefore cosmetic surgery.

Because gender affirming surgery is cosmetic (aesthetic) in nature, such surgeries must never be offered if they are known to predictably produce an irreversible loss of function. To knowingly sacrifice a human capacity (breast feeding, capacity for sexual intimacy, fertility) in the pursuit of a cosmetic result in a minor who is incapable of giving informed consent, is morally indefensible. The hoped-for subjective improvement that is sought in transgender surgery is a short-lived improvement and is only supported by low to very low-quality scientific evidence. Long term longitudinal cohort studies that are based in level III evidence show that affirmation surgical care is of no benefit in reducing self-harm including suicide.

## Problems with Informed Consent

The protection of children in situations requiring informed consent is a crucial problem that the state has a historic and abiding interest in. In the particular situation of self-identified transgender children, it becomes a most significant problem, given that they are being submitted for permanently life-altering interventions. In my opinion as a plastic and reconstructive surgeon, the life-altering nature of hormonal and surgical interventions needs to be addressed from the moment of the child's entry into the gender-transition system, given the fact that the overwhelming majority of children who first begin puberty blockade, go onto the physically altering and permanent changes produced by cross sex hormones, and many ultimately also pursue surgery, as is attested to by multiple papers, the content of which is examined below. Informed consent has several requirement that need to be met if such consent is to be deemed valid. These requirements include a thorough discussion of the details of the proposed procedure including risks, known complications, and some measure of the likelihood of a favorable outcome. The discussion must include alternative treatments, and their risks, known complications and their likelihood of a favorable outcome. In the case of the interventions associated with gender-transition medicine and surgery, the favorable outcomes should be evident over the lifetime of the patient, given that they are permanently sacrificing structures and capacities (breasts and breast-feeding, or genitals and fertility).

Because the commonly cited medical literature used in support of these surgeries is of low to very low quality, it must be recognized that such surgeries must be considered experimental in nature given the unknown long-term effects of treatment, and the vast uncertainty in the patient selection and diagnostic processes. Yet the experts who provide opinion in support of these surgeries speak with absolute certainty of their efficacy, and the absence of any alternative treatment. Considering these factors severally and together it becomes difficult to imagine a

more flawed consent process. It also becomes understandable how parents can be drawn into uninformed participation given the simultaneous presentation of dire consequences if gender dysphoria is left untreated, and the insistence that affirmation care including surgery is the only way to bring lasting happiness to the child.

## Chest Masculinization" in Natal Females is Not Ethically Equivalent to Mastectomies for Breast Cancer

When mastectomy is performed for the management of breast cancer, or to mitigate the proven risk of developing breast cancer in women, it is done on the basis of objective diagnoses either by pathological examination of biopsy tissue, or as in the case of prophylactic mastectomy, on the basis of genetic analysis that shows known markers of increased risk of developing breast cancer. These tests (microscopic examination of tissue specimens, detection of cell surface markers with proven association with malignancy, and genetic screening of at-risk patients) have known positive predictive value for the diagnosis of breast cancer, and these tests have known error rates that can be used when obtaining informed consent for mastectomy. The validity of these tests has been proven using scientific methodologies that produce high quality evidence in longitudinal population studies with control populations, and very long follow up. As the result, when a woman gives consent for mastectomy to control or prevent the potentially lethal disease, it is with a clear and proven evaluation of the risks and benefits that consent is obtained. Mastectomy is being performed based upon an objective diagnosis of a potentially lethal condition, and the surgical procedure has proven benefit in management of that condition.

In stark contrast, this is not the case when mastectomy is performed to "masculinize" the chest of girls and women who self-identify as transgender or who self-report symptoms of dysphoria. In the self-identified transgender adolescent, breasts are being removed on the basis of a diagnosis that is made by the patient since there are no tests with known error rates that can be used to predict who will benefit from this disfiguring and irreversible surgery. The claim is made that chest masculinization has proven benefit in reducing dysphoria and the associated risk of suicide. But published studies that make this claim of benefit offer evidence that is low to very low quality, typically small case collections with self-selection bias, very short follow up, and no case controls.

The best data presently available on the long-term effects of medical and surgical transitioning are long-term, longitudinal, population-based studies. For example, Dehjne, et al., examined the putative long-term benefit of full transitioning (including hormonal and surgical treatments) found in the Swedish medical database. (See Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden; Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. V. Johansson, Niklas Långström, Mikael Landén; PLOSOne February 22, 2011 https://doi.org/10.1371/journal.pone.0016885). That database includes all persons in the Swedish medical system, from pre-natal to death. It reports all episodes of care and all demographic information in a uniform vocabulary. Furthermore, Sweden has been on the forefront of "gender affirmation" long before the American medical

system seriously considered its claims. Because of the nature of Sweden's database, it is possible to study a cohort of patients that very closely matches the inquiry group with regards to age, sex, economic status, etc. It is possible to ask with great precision such questions as, "What is the likelihood that a fully transitioned transgender male will be hospitalized for psychiatric illness when compared to the age/sex matched control group?" Even more, one could urgently ask, "What is the relative risk of suicide in transgender persons, when compared to age/sex matched controls?"

Why are such longitudinal, population-based studies superior to the case-collection/case series methodology? Because confounding variables such as age, sex, and self-selection biases are removed. In the flawed case-collection methodology, the reported cases are typically only those who return for follow up. You have no way of knowing if the patient had a good outcome or didn't return for follow up because they were in a psychiatric hospital, were incarcerated, or committed suicide. In the Swedish longitudinal study, the suicide is in the same database, as are the other issues of hospitalization, incarceration, and addiction treatment, among other rates of comorbidity. Thus the longitudinal population study can give us what is called a "hazard ratio" for a particular study population (patients who have completed transgender transition in this case).

What this Swedish study shows us that the risk of completed suicide in all transgender persons is 19.1 times higher than in the control cohort. If you look only at patients who have transitioned — patients after "treatment" — from female to "male presentation," the risk of completed suicide is 40 times higher than in the general population. (Note: this finding is consistent with the historic Branstrom 10-year follow up study, which found no benefits to "transitioning treatments" but did note an increased risk of serious suicide attempts and anxiety disorders AFTER "treatment.") (Correction to Bränström and Pachankis, Am J Psychiatry 177:8, August 2020; see detailed citations in the "Notes" section of this report below).

Another cautionary note was added to the literature by the reputed Cochrane Review, a UK based international association of researchers who examine the quality of scientific evidence used in medical decision making. The Cochrane Review recently published findings concerning the medical evidence used to support the decision to give young women cross sex hormones as part of the transition process. The authors summarize the world literature review thus: "We found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition. This lack of studies shows a gap between current clinical practice and clinical research." (Does hormone therapy help transgender women undergoing gender reassignment to transition? See, Haupt C, Henke M, Kutschmar A, Hauser B, Baldinger S, Saenz SR, Schreiber G., Cochrane Review, 28 Nov 2020).

Similar issues of very poor, low quality scientific support for chest masculinization surgery can be seen in a recent article by Tolstrup et al. published in the journal Aesthetic Plastic Surgery (See Anders Tolstrup, Dennis Zetner, Jacob Rosenberg, Outcome Measures in Gender-Confirming Chest Surgery: A Systematic Scoping Review, Aesthetic Plast Surg 2020 Feb;44(1):219-228. doi: 10.1007/s00266-019-01523-1. Epub 2019 Oct 29). The article reports a

comprehensive review of the world literature concerning the efficacy of "gender confirming" chest surgery in transgender patients. The authors found 849 articles on the subject, published in peer reviewed medical journals. Of these 849 articles, only 47 could be included in the review. This means that only 5.5% of all the published, peer-reviewed transgender surgery articles demonstrated even rudimentary scientific rigor. Of those 47 articles, the authors report that only 29 of the articles addressed mental health outcomes (3.4% of all the articles). What is startling is that the mental health outcomes were judged only on the basis of uncorroborated, untested, and unassessed patient subjective reporting with descriptors that varied so widely from article to article that results could not even be compared. The authors summarize by saying, "Evaluation of outcomes in gender-confirming chest surgery showed large variations in reporting, and further streamlining of reporting is therefore required to be able to compare surgical outcomes between studies." None of these negligent articles even bothered to examine rates of psychiatric hospitalization, substance abuse, self-harm behaviors, and suicide. This tells us that the main reason for performing these surgeries (psychological distress and suicide risk) isn't even evaluated with regard to efficacy.

An example of an article with very low-quality data, reckless (now banned practices), and methodology, published in a "leading journal," and promoted as evidence for the efficacy of "chest masculinization" surgery makes this fact very clear. The lead author (Olson-Kennedy, a leading national advocate for the transgender treatment enterprise) is a board-certified pediatrician who leads the gender clinic for the Los Angeles Children's Hospital. The article appeared in 2018 (See J. Olson-Kennedy, J. Warus, MD1, et al., Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults; Comparisons of Nonsurgical and Postsurgical Cohorts., JAMA Pediatr. 2018;172(5):431-436. doi:10.1001/jamapediatrics. 2017.5440. In their summary of findings, the authors reported that "chest dysphoria" is common among "trans males" (natal females seeking to present as males) and claimed that dysphoria is "decreased by surgery." They claim that regret for surgery is "rare." The article reports breast removal surgery on at least one girl aged 13 years. (Note that this reckless, experimental practice has now apparently been abandoned as unethical/experimentation on children by England, Sweden, and Finland. The average age of patients in the study was 19. Children were entered into the study through recruitment from among patients visiting the clinic and by telephone over a six-month period. The authors found that, of the patients recruited from among visitors to the clinic (convenience sampling), there was an over-representation of non-operated patients, so the authors were forced to reach out to all the post-surgical patients by phone. Twenty-six percent of the clinic's post-surgical patients could not be reached for various reasons including no working phone, or failure to respond to multiple messages. The 26% drop-out rate is never even questioned by these authors. Were surgical patients lost to follow up because of dissatisfaction, psychiatric hospitalization, or suicide? This problem is called "self-selection bias," and it is evidence of careless study design. Of the remaining 74% of patients, only 72% completed the survey. This is a second example of self-selection bias. Why would some post-surgical patients who had been successfully contacted, not complete the survey? The authors — demonstrating multiple levels of confirmation bias — do not even ask such essential questions. (See detailed citations in the "Notes" section of this report below).

In the study, dysphoria was evaluated using what the author called "a novel measure," which amounted to a series of subjective questions about happiness that was in part designed by the adolescent test subjects themselves. Essentially, the methodology used an entirely unvalidated ("junk science") test instrument, with no known error rates and no proven predictive power. Furthermore, the post-surgical patients were administered the survey at widely varying time intervals post-surgery. The longest interval between surgery and the satisfaction survey was 5 years, but children less than a year post-surgery were included in this obviously flawed sample, and yet the authors claim evidence of "negligible regret." This is a remarkable, misleading, and deceptive claim given that long-term, longitudinal population studies show that there is a dramatic rise in post-surgical problems such as depression, hospitalization, substance abuse, and suicide beginning at around seven years post-surgery (Ibid). Surely the authors are familiar with the world literature on transgender outcomes?

Having deceptively or negligently promised in the introduction to their paper that "chest dysphoria" is reduced by surgery, at the conclusion the authors confessed to the fact that the study design and execution produced very low-quality data that is not useful for patient selection, or prediction of outcomes. They even confessed that the study does not address the efficacy of surgery in improving outcomes regarding the single most compelling reason for performing the operation: mitigation of depression and suicide. The authors write, "An additional limitation of the study was the small sample size. The nonsurgical cohort was a convenience sample, recruited from those with appointments during the data collection period. There could be unknown imbalances between the nonsurgical and postsurgical cohorts that could have confounded the study findings."

Finally, the authors did not even bother to validate their "Chest Dysphoria Scale." Such a "made-up" scale is unlikely to accurately represent distress or correlate with properly validated measures of quality of life, depression, anxiety, or functioning. Their own analysis at the conclusion or the paper directly contradicts the deceptive claim made in their introduction.

This is the kind of "junk science" that is used to support transgender medicine and surgery. The paper is only a few years old. It was written by board certified physicians who practice in one of the nation's largest pediatric gender clinics and was published in a peer-reviewed medical journal. It is essentially useless in making any clinical decisions regarding who should be offered surgery, what is the likelihood they will benefit from it, and what is the likelihood they will regret their decision. Most importantly, it does not even measure the effect of therapy on suicide risk. The very morbidity (the risk of suicide) that they claim is improved by surgery is not even measured in their low-quality study.

Because of the very low-quality scientific support for mastectomy in the management of gender dysphoria, valid consent would demand that these procedures be described as experimental, would need the approval of ethics panels to monitor human experimentation, and would require the use of valid controls found in long-term, longitudinal population-based study models. These are the kinds of patient protections now endorsed in England, Sweden and Finland but still

ignored in the US environment where proper scientific critiques of such studies can get faculty "cancelled."

Even though the transgender treatment industry has been performing these surgeries for over 50 years, gender treatment centers continue to publish the same low quality, methodologically defective studies based upon collected cases that are degraded in value by self-selection bias, confirmation bias, and short-term follow-up, while continuing to deceptively claim that such defective research provides a sufficient scientific basis for performing irreversible, disfiguring, and ultimately sterilizing hormonal treatments and surgeries on children.

## "Chest Masculinization" in Natal Females is Not Ethically Equivalent to Gynecomastectomy

Gynecomastectomy is the surgical treatment of gynecomastia, a fairly common condition in which males develop female-type breast gland tissue. Proponents of "masculinization" mastectomy in natal females erroneously equate the ethics of removing healthy breast tissue from gender dysphoric children with the removal of abnormal breast tissue in men (gynecomastia). In the case of gynecomastectomy in male patients, the operation is performed to remove the objectively diagnosed presence of female type glandular breast tissue present in a male patient. Physical examination demonstrates the presence of a dense retro-areolar mass which is tender and sometimes disfiguring. Pathological examination of the removed tissue will demonstrate the presence of female-type fibroglandular tissue in a male patient. This is an objectively abnormal condition. It should further be noted that the absence of such abnormal, female-type fibroglandular tissue in the submitted surgical specimen places the chest recontouring in the category of cosmetic surgery and is therefore not typically paid for by third-party payors.

A comprehensive literature review on the subject of gynecomastectomy and suicidal behavior conducted by Sollie in 2018 ( Management of gynecomastia—changes in psychological aspects after surgery—a systematic review: Gland Surg. 2018 Aug; 7(Suppl 1): S70– 76.doi: 10.21037/gs.2018.03.09) did not produce a single paper claiming improvement in suicide rate in patients who underwent this surgery. There were many reports concerning improvement in the pain that men with this objective condition suffer with. The remainder of the reported data was in the category of subjective "satisfaction survey". This tells us that the author did not distinguish between medically indicated and aesthetic surgeries. Nonetheless, no claim is made of decreased suicide rates in a suicidal population of male patients. This is because any male patient seeking removal of abnormal, female-type, breast tissue who reported suicidal ideation would be considered incompetent to give consent and would require a psychiatric evaluation and treatment to manage suicidal thinking before being considered for surgery. This kind of decision in favor of psychiatric support does not appear to be at work in the transgender affirmation world. There, and there alone, is suicidal thinking considered a qualification for a surgery.

# "Chest Masculinization" in Natal Females is Not Ethically Equivalent to Breast Reduction

It should be obvious that "Chest Masculinization" surgery in natal females is not ethically equivalent to breast reduction surgery in non-transgender females. In the case of breast reduction for females with excessively large breasts (macromastia, or gigantomastia), the operation is performed to relieve a debilitating orthopedic complaint of neck, back, and shoulder pain associated with the postural/mechanical effects of the weight of the breasts. These patients experience significant activity restriction and chronic pain that is not relieved by medical management or physical therapy. Furthermore, there is voluminous actuarial data, based upon many years of longitudinal population-based study by medical insurance agencies that is used to predict who will benefit from surgery, and who will not. These physical, objective tests, based upon the actual measurement of the breasts, and the patient's overall body habitus, have known error rates that can be used to predict the likelihood that a breast reduction will relieve the orthopedic complaints of neck, back, and shoulder pain. When the tissue specimens are submitted to pathology, they are weighed in order to ensure that enough tissue has been removed so that there will be a very high likelihood that the surgery will relieve the orthopedic condition of neck, back, and shoulder pain ( Accuracy of Predicted Resection Weights in Breast Reduction Surgery, Theodore A. Kung, MD, Raouf Ahmed, MBBS1 Christine O. Kang, MPH,1 Paul S. Cederna, MD, and Jeffrey H. Kozlow, MD; Plast Reconstr Surg Glob Open. 2018 Jun; 6(6): e1830.

Based upon that, adequate pre-operative consent can be obtained. The supporting data is based in very high-quality methodology. There is no quality research data, no pre-operative test or study, and no known error rates that can be used to predict the likelihood that any child suffering from gender dysphoria will benefit from the experimental procedures of mastectomy and chest "masculinization." As noted above, because of the very low quality data, transgender chest masculinization is at best experimental and at worst, should be viewed as a form of medical child abuse — it is important to note that Finland, Sweden, and the UK apparently now all agree with this analysis, as they have all retreated from such reckless surgical procedures for (See detailed citations in the "Notes" section of this report below).

It is crucial to remember that "chest masculinization-affirmation surgery" of healthy breast tissue results in a complete loss of function, that this loss is two-fold (breast feeding and erotic sensibility), and the cause of the loss is two-fold (gland removal and severing of the intercostal nerve). (See Breast Reduction with Use of the Free Nipple Graft Technique; Stephen R. Colen, MD; Aesthetic Surgery Journal, (Breast Reduction with Use of the Free Nipple Graft Technique; Stephen R. Colen, MD; Aesthetic Surgery Journal, Volume 21, Issue 3, May 2001, Pages 261–271, https://doi.org/10.1067/maj.2001.116439).

If a patient who undergoes "chest masculinization" should regret the surgery, they do have the option of breast reconstruction. However, all that will be produced is a counterfeit of a breast. The patient will have lost the function of breast feeding. Additionally, the most commonly performed "masculinization" surgery involves the removal of the nipples, and subsequent re-

attachment in the form of a nipple graft. Those nipples will have lost their native nerve connections that provoke erotic sensibility. All that can be hoped for is the eventual random ingrowth of local skin sensation, but there will never be erotic sensation because the particular branch of the fourth intercostal nerve which communicates with particular centers in the brain responsible for oxytocin release and erotic provocation will have been permanently severed. This means that breast function has been completely and irreversibly sacrificed for the sake of producing a cosmetic result (a masculine appearing chest). This is the exact opposite of the goals of any reconstructive surgery. It must therefore be understood that "chest masculinization" is a cosmetic procedure that has violated the most essential principle of cosmetic surgery: never sacrifice function for the sake of a cosmetic result.

## Erroneous use of the word "Reconstructive" to describe Gender Affirmation Surgeries

The transgender treatment enterprise uses the word "reconstructive" to characterize a group of surgical treatments that seek to alter the sexed appearance of the person. It is important to understand that these procedures, because of the indications for surgery, the motivations for surgery, and the outcomes of surgery, are not reconstructive, but are to be properly understood to be cosmetic in nature.

Reconstructive surgeries are procedures that seek to establish or restore structures and their functioning that have been lost due to trauma, disease, in-utero developmental abnormalities, or surgical treatment for disease. Such reconstructive surgeries must begin with the objective characterization of the defect, including abnormalities of form, and associated loss of function. This process of defining the defect begins with a thorough understanding of normal human form and function and seeks to select, develop, and execute procedures that will restore both. In some cases function may be emphasized more than form, as when the mangled hand of a man is reconstructed. In other cases, reconstruction of form is all that is possible because as yet there are no techniques to restore function. An example of this is seen in the reconstruction of a woman's breast following cancer care. All that can be offered is the appearance of a breast; she will never be able to feed an infant through the reconstructed part.

This is to be contrasted with cosmetic, or aesthetic surgery in which the appearance of a structure is modified in order to produce a subjective (aesthetic) result for the patient. No functional restoration is addressed because no functional or structural loss exists. The object of the surgery is aesthetic. There is no lost form or function that needs to be reconstructed. It is aesthetic surgery because the motivation is aesthetic (subjective feelings about appearance). Further evidence for this is the fact that nearly the entirety of the outcome studies cited in support of these surgeries use subjective questionnaires which the patient fills out. The questions used are typical of those used to evaluate any aesthetic surgery. They are called "satisfaction surveys". Such surveys are prone to suffer from self-selection bias, confirmation bias, and high drop-out rates.

One of the key problems that the transgender treatment enterprise faces on a daily basis is the issue of third-party payment for services. No health insurance provider, including federal and state agencies will pay for cosmetic surgery. For this reason, it is necessary, in order for the business model to succeed, that providers characterize their services as reconstructive. This is doubly difficult given the intense political pressure that has been exerted upon the medical community to "de-pathologize" the condition of transgender. This is seen in the abandoning of the diagnostic nomenclature of "body dysmorphic disorder", and "gender identity disorder" in favor of the more recent DSM manual using the term "gender dysphoria". This leads transgender treatment providers into the difficult situation of claiming that transgender is not a pathology, while at the same time insisting that the services are medically necessary and describing the procedures as reconstructive without characterizing any physical/ functional defect.

As we consider the specific "gender affirming" surgical procedures we will see that comparison to medically indicated surgeries on both men and women actually serves to reinforce the evidence that these surgeries are essentially and fundamentally cosmetic.

## Masculinizing and Feminizing Chest Surgeries are Not "Medically Necessary"

Supporters of "transitioning" treatments justify surgical treatment based upon "medical necessity." They claim that gender dysphoria can lead to debilitating anxiety and depression, as well as serious incidents of self-harm, including self-mutilation, suicide attempts, and suicide. Yet with only a single exception, in the studies they cite no measures are made of the effects of surgery on what is claimed to constitute the "medical necessity" for these procedures. In contrast, the Branstrom study[1] documented no reliable benefits for transgender surgery/hormonal treatments and no reduction in suicide and even an increase in serious suicide attempts requiring hospitalization in patients receiving surgery. These recent, long-term, published, peer reviewed, credible research findings are quite contrary to the claims of supporters of "transitioning treatments" — as are the National Science Reviews in this area from England-NICE, Sweden, and Finland. (See detailed citations in the Notes section in this declaration).

Scientific rigor would demand an examination of objective outcomes such as: rates of substance abuse, psychiatric hospitalization, self-harm, or suicide, and how they were changed by surgery. One paper does ask these crucial questions concerning efficacy is a very comprehensive, long term, longitudinal population cohort study which actually shows the opposite of what experts claim for these patient outcomes. When followed beyond eight years post operatively, this paper shows that patients receiving these treatments have the same alarmingly high rates of hospitalization, substance abuse, self-harm, and completed suicide as persons who have had no medical or surgical intervention.

---

[1]*Correction of a key study: No evidence of "gender-affirming" surgeries improving mental health.* Home. (2020, August 30). Retrieved May 17, 2022, from https://segm.org/ajp_correction_2020

In summary, on the issue of the efficacy of these surgeries, the scientific support is very weak, while the scientific evidence rejecting the hypothesis of efficacy is remarkably strong (See Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden; Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. V. Johansson, Niklas Långström, Mikael Landén; PLOS One February 22, 2011 https://doi.org/10.1371/journal.pone.0016885).

The surgical removal of the breasts, and the re-contouring of the chest through liposuction is a common procedure for women who seek to present as men. These operations are performed in both men and women, for a variety of reasons. They are generally very safe, and typically performed in the outpatient setting. It is important to understand that the only way of distinguishing cosmetic breast surgery from "medically necessary" surgery is based upon the diagnosis of underlying pathology. For example, breast reduction may be cosmetic, or it may be medically indicated. In both cases, the patient presents with a complaint that her breasts are too big. The distinction between cosmetic breast reduction and medically indicated breast reduction is based upon the presenting symptoms of orthopedic problems when working, such as chronic neck back and shoulder pain caused by the weight of the breasts. But even then, the weight of the removed tissue is factored into the objective verification that the surgery was "medically necessary." There is a vast body of medical and actuarial data that demonstrates the relationship between the weight of the breast tissue removed and the probability that back pain will be cured by performing a breast reduction.

The same issues are at stake in breast enhancement for men seeking to present as women. Cross-sex hormones will have caused varying degrees of gynecomastia (breast enlargement in men). Surgical enhancement procedures are exactly the same in both men and women.

Medically necessary surgery in women is based upon the diagnosis of an objective medical condition, such as Poland's syndrome (congenital absence of a breast), surgical absence of the breast following cancer care. In men, the objective diagnosis of gynecomastia might warrant surgery based upon medical necessity, but it would be the removal of tissue that has objective pathological features (breast gland proliferation in a man). A rare diagnosis of breast cancer in a man might warrant chest wall reconstruction after cancer care. On the other hand, cosmetic surgery of the breast is entirely about the subjective feelings of the patient, and that is all that we find in the case of the self-identified transgender patient.

In the case of transgender chest surgery, the diagnosis is based on the patient's subjective report of dysphoria, but the medical necessity is based on the expectation that surgery will relieve the patient of the risk of, among other things, major depression, self-harm behaviors, and suicide. None among the many papers typically cited by supporters of "transitioning treatments" address themselves to the question of medical necessity for either masculinizing surgery, or feminizing surgery. They only address technical issues, management of complications, and subjective outcomes that employ precisely the same language that is used to assess every

other cosmetic surgery of the breast. Such papers often begin with standard language about the suffering of self-identified transgender adolescents, and their risk of self-harm. They will claim that the reported surgeries somehow reduce the risk of suicide, or the frequency or severity of self-harm, but they never report actual results of improvement in the risk of suicide, or substance abuse, or cutting, or sexual risk taking. The claim of benefit is unsupported in the scientific literature.

In summary, the medical necessity of transgender chest surgery is not supported by scientific evidence and appears to be firmly in the category of cosmetic surgery. What is more, the surgeries when performed on natal females causes a life-long loss of function, placing those surgeries in the category of malpractice. No other cosmetic procedure is expected to produce major functional loss. Such a result would only be the result of a complication, or other surgical misadventure. To actually have a 100% certainty of loss when surgical consent is being obtained constitutes a complete neglect of one of the foundational principles in plastic surgery: Never sacrifice function for the sake of a cosmetic result.

## About the Author

Education and Training: I received my Bachelor of Arts in Biological Sciences at the University of California, Santa Barbara, 1979. There I was engaged in research in cell membrane physiology with Dr. Philip C. Laris, studying stoichiometry of the sodium: potassium ATPase pump. I received my M.D., Doctor of Medicine degree at the Uniformed Services University of the Health Sciences, 1983 at Bethesda, Md. I served my General Surgery Residency at the Naval Hospital Oakland/UC Davis East Bay Consortium, 1987-1991 and served as Chief Resident, Department of Surgery, Naval Hospital Oakland, 1990-1991. I also served a Plastic Surgery Residency at the University of Tennessee-Memphis, 1992-1994. My professional background, experience, and publications are described in more detail in my curriculum vitae, which is attached as Exhibit A to this declaration.

Board Certifications in Medicine: I have been Board Certified in Surgery (American Board of Surgery, 1992), in Plastic Surgery (American Board of Plastic Surgery, 1997; American Board of Plastic Surgery, 2008).

Medical Staff Appointments: I served as the Staff General Surgeon at the Naval Hospital Oakland, CA 1991-1992 and as Associate Professor of Surgery, UC Davis-East Bay, 1991-1992. I also served as a Plastic and Reconstructive Surgeon, Naval Medical Center, Portsmouth, Virginia, 1994-2002 and as Chairman, Department of Plastic and Reconstructive Surgery, Naval Hospital Portsmouth, Virginia, 1996-2002. I later served as Clinical Assistant Professor, Department of Surgery, Uniformed Services University of the Health Sciences, 1995-2002 and as Founding Director, Pediatric Cleft Palate and Craniofacial Deformities Clinic, Naval Hospital Portsmouth, Virginia, 1996-2002 also as the Founding Director, Wound Care Center, Naval Hospital Portsmouth, Virginia, 1995-2002. I have also served as a Staff Plastic Surgeon in Nebraska and Alabama.

U.S. Surgeon General Service: I served as a Specialty Leader, Plastic and Reconstructive Surgery, Office of the Surgeon General-USN, 1997-2002.

Faculty Appointments: I served as Teaching Faculty at Eastern Virginia Medical School, Division of Plastic Surgery, 1995-2002. I also served on the teaching faculty of the Via College of Osteopathic Medicine, 2017-2020.

Military Service: I served as an Aviation Officer Candidate, Naval Aviation Schools Command, NAS Pensacola, 1978 and was Commissioned an Ensign, MC, USNR 1979 and Commissioned as a Lieutenant, MC, USN 1983. I served as a Designated Naval Flight Surgeon, Naval Aerospace Medical Institute, 1985, and I was Assigned Marine Fighter/Attack Squadron-451, serving as Flight Surgeon, and serving as Radar Intercept Officer in the Marine F4S Phantom, accumulating 235 flight hours, and trained for qualification as an Air Combat Tactics Instructor. I was deployed to the Western Pacific as UDP forward deployed fighter squadron in Korea, Japan, and the Philippines. I served in the US Navy for 24 years, and I served in the USMC for 3 years. I retired with the rank of Captain, USN in 2002.

<u>Publications - Peer Reviewed Medical Journals</u>: Lappert PW. Peritoneal Fluid in Human Acute Pancreatitis. Surgery. 1987 Sep; 102(3):553-4; Toth B, Lappert P. Modified Skin Incisions for Mastectomy: The Need for Plastic Surgical Input in Preoperative Planning. J Plastic and Reconstructive Surgery. 1991; 87 (6): 1048-53; Lappert P. Patch Esophagoplasty. J Plastic and Reconstructive Surgery. 1993; 91 (5): 967-8; Smoot E C III, Bowen D G, Lappert P, Ruiz J A. Delayed development of an ectopic frontal sinus mucocele after pediatric cranial trauma. J Craniofacial Surg. 1995;6(4):327–331; Lappert PW. Scarless Fetal Skin Repair: "Unborn Patients" and "Fetal Material". J Plastic and Reconstructive Surgery. 1996 Nov; 98(6): 1125; Lappert PW, Lee JW. Treatment of an isolated outer table frontal sinus fracture using endoscopic reduction and fixation. Plastic and Reconstructive Surgery 1998; 102(5): 1642-5.

<u>Publications - Medical Textbooks</u>: Wound Management in the Military. Lappert PW, Weiss DD, Eriksson E. Plastic Surgery: Indications, Operations, and Outcomes, Vol. 1; 53-63. Mosby. St. Louis, MO 2000.

<u>Operations and Clinical Experience</u>: Consultations and Discussions: As a physician and surgeon, I have treated many thousands of patients in 7 states and 4 foreign nations. My practice has included Primary Care, Family Medicine, Aerospace Medicine, General Surgery, Reconstructive Surgery for combat injured, cancer reconstructive surgeries including extensive experience with microvascular surgery, Pediatric Congenital Deformity, and the care of chronic wounds. I have practiced in rural medicine, urban trauma centers, military field hospitals, university teaching hospitals, and as a solo private practitioner. In my private practice I have had occasion to treat many self-identified transgender patients for skin pathologies related to their use of high dose sex steroids, laser therapies for management of facial hair both in transitioners and detransitioners. I have performed breast reversal surgeries for detransitioning patients. My practice is rated as "LGBTQ friendly" on social media. I have consulted with families with children who are experiencing gender discordance. I have given many presentations to professional meetings of educators and counselors on the subject of transgender, and the present state of the science and treatment. I have discussed the scientific issues relevant to the case with many physicians and experts over a number of years and also discussed related issues with parents and others.

# Appendix Attachment

# 1g

# ATTACHMENT G

# Florida Medicaid Project: Treatment for Transgender Children

## Medical Experimentation without Informed Consent:

## An Ethicist's View of Transgender Treatment for Children

G. Kevin Donovan, MD, MA
5-12-2022

# Florida Medicaid Project: Treatment for Transgender Children

### Medical Experimentation without Informed Consent:
### An Ethicist's View of Transgender Treatment for Children

## I.  The Issue

Growing controversy attends the diagnosis and treatment of individuals identifying as transgender, particularly those who are still children or adolescents. As was recently pointed out, leading medical, mental health, and public health organizations support understanding gender-diverse youth and providing gender-affirming medical (hormonal) and other(surgical) care as the standard of care, including the American Academy of Pediatrics, American Psychological Association, Centers for Disease Control and Prevention, Society for Adolescent Health and Medicine, and the American Medical Association. Major nursing organizations—the American Nurses Association and the American Academy of Nursing— have made statements that young people's access to inclusive, safe, and competent health care is a human rights issue.  (Wolfe, I., & Goepferd, A. "Child Abuse in Texas." *The Hastings Center*. 14 Mar. 2022) However, this widespread support is not going unchallenged, even by those who have been providing medical interventions for these children and adolescents.

Recently, questions have arisen about the appropriateness of both the diagnosis, and the safety and efficacy of these interventions that have been strongly encouraged up until now. Currently, less than half of state Medicaid programs provide gender affirming care. (Mallory, C., & Tentindo, W. "Medicaid coverage of gender-affirming care." Williams Institute, UCLA School of Law. Oct 2019). The Florida Surgeon General has said that minors should not undergo gender transition procedures, puberty blockers and hormone treatments. "Florida Department of Health Releases Guidance on Treatment of Gender Dysphoria for Children and Adolescents." 20220420-Gender-Dysphoria-Press-Release | Florida Department of Health.) In Texas, the state attorney general issued a decision that gender-affirming medical treatments such as puberty-suppressing hormones fall under the definition of child abuse in Texas state law. In fact, 34 states have introduced legislation to limit hormonal and surgical interventions for such transgender patients. This aligns with similar reassessments and limitations in the United Kingdom, Sweden, Finland, and France. A new position statement from the Royal Australian and New Zealand College of Psychiatrists (RANZCP) stresses the importance of a mental health evaluation for people with gender dysphoria — in particular for children and adolescents — before any firm decisions are made on whether to prescribe hormonal treatments to transition or to perform surgeries, often referred to as "gender-affirming care." "There is a paucity of quality evidence on the outcomes of those presenting with gender dysphoria. In particular, there is a need for better evidence in relation to outcomes for children and young people," the guidance states.

Given the legitimate concerns about the diagnosis, treatment, and the paucity of supportive, scientific studies in regard to the interventions being offered to minors who identify as transgender, I will offer a view of these from the perspective of an ethicist and pediatrician. This will be done in the face of strong and sometimes heated opposition to any variance from the currently prevailing recommendations. Each category of currently recommended or potential treatments will be briefly considered within this framework. The evidence base for these will be reviewed, and an overall argument made that such interventions must be considered as medical experimentation, subject to the requirements of research in childhood with informed consent. Finally, I will conclude with an examination of the fundamental flaw of the transgender project in childhood, and how it is leading to inevitable and controversial challenges.

1

In order to do this, we must review the ethical requirements for medical research in childhood and the elements of **informed consent**. Because of numerous abuses in the past, a strong system of regulations and oversight has been developed for the protection of human subjects in the United States. This began with the Belmont Report: (https://www.hhs.gov/ohrp/regulations-and-policy/belmont-report/index.html) The report not only described the ethical principles listed below, but led to guidelines for research protections that are now codified in Federal regulations (Code of Federal Regulations, or 'CFR') and monitored by the U.S. Department of Health and Human Services (DHHS). These led to the establishment of IRBs (Institutional Review Boards) which are responsible for the protection of human subjects in federally funded research—IRBs are the Federally mandated committees that review research activities for the protection of human subjects. The Office for Human Research Protections (OHRP) provides leadership in the protection of the rights, welfare, and wellbeing of subjects involved in research conducted or supported by the DHHS. The OHRP helps ensure this by providing clarification and guidance, developing educational programs and materials, maintaining regulatory oversight, and providing advice on ethical and regulatory issues in biomedical and social-behavioral research. These measures have laid the ground rules for human research, in adults and children including the need for informed consent.

Although adults may be included in research, this should only be done with *fully informed consent*, and the requirements will differ for children and other vulnerable subjects. The bedrock of these protections lies in obtaining the informed consent from the participant. Informed consent to medical treatment and research involvement is fundamental to both ethics and law. The process requires that a *fully autonomous patient* have the ability to *understand relevant medical information* about the proposed interventions, including the *risks, benefits if any, and alternatives* (including doing nothing/non-participation). and consent *voluntarily* without *coercion*. This is rooted in respect for the **ethical principles** of **autonomy**, **beneficence**, and **justice**.

*Autonomy* is derived from respect for persons, which requires that we not only respect those who are fully autonomous but protect those individuals that are not fully autonomous. Vulnerable subjects such as children cannot legally or ethically participate in the consent process due to their age and maturity level. The rules for their involvement are set out by the Code of Federal Regulations (46 CFR 401-409). While consent cannot be given for another person, parents or guardians can give "permission" and children can give assent to the extent that they are able. The process of obtaining assent should be appropriate to the age, maturity, and psychological development of the child. The consent process must contain three ethically required components: *information*, *comprehension*, and *voluntariness*. Deficiencies in any of these categories would invalidate the process. The main contention here is that deficiencies in *all* these categories can be found in the current approach to minors who identify as transgender, and current attempts at treatment should not proceed as they are now practiced.

*Beneficence* is reflected in the complementary expressions of (1) do no harm and (2) maximize possible benefits and minimize possible harms. An assessment of risks and benefits will depend heavily on the delivery of accurate and complete information as described above. An assessment of risk will include both the probability and the severity of envisioned harms, both physical and psychological.

Finally, *justice* requires fairness in distribution of risks and benefits. It suggests that not only should like cases be treated alike, but different approaches are appropriate for different circumstances. This is highly relevant in the selection process for those being subjected to the various interventions while still minors.

2

Thus the process of informed consent must proceed with a correct diagnosis, the nature and purpose of recommended interventions, the known burdens and benefits of all options, including doing nothing or forgoing the intervention. While not able to do an exhaustive review of these elements as they apply to the main treatment approaches recommended for transgender minors, we can briefly examine each category to assess for obvious deficiencies. The issue of deficient information will be significant in each category, and questions of comprehension and voluntariness will be addressed at the end.

## II.   The Interventions

### Surgery

A variety of surgeries have been performed on transgender adults. These range from removal of both breasts (bilateral mastectomy) and associated chest reconstruction, nipple repositioning, dermal implant and tattooing, to gender surgery for trans men which includes construction of a penis (phalloplasty or metoidioplasty), construction of a scrotum (scrotoplasty) and testicular implants, or a penile implant. Removal of the womb (hysterectomy) and the ovaries and fallopian tubes (salpingo-oophorectomy) may also be considered. Surgery for trans women includes removal of the testes (orchidectomy), removal of the penis (penectomy), construction of a vagina (vaginoplasty), construction of a vulva (vulvoplasty), construction of a clitoris (clitoroplasty), as well as breast implants for trans women, facial feminisation surgery and hair transplants. Certainly there are multiple known risks to this long list of surgeries. These used to be described as "sex-change" operations; they are now termed "gender affirming surgeries." The semantic shift is important, as we will see.

Most, but not all, practitioners would delay undertaking these permanent alterations in minor children and adolescents. This may be as much for legal reasons as for medical considerations. However, the lack of sexual maturity in younger patients, especially if previously delayed by puberty blocking agents, makes the sparse tissue more difficult to work with and outcomes less favorable, with problems such as wound rupture more likely. These are not challenges that are routinely described to minors at the beginning of their treatment progression with puberty blocking agents or hormones. This deficit of information would be a major failing.

### Hormonal Treatment

Treatment with cross-sex hormones is a mainstay of gender affirming care. These result in the changes in body habitus, facies, voice tone, and hair development that transgender patients seek. They are described as "gender affirming", "life-saving" and "a human right" by their proponents. They have been prescribed by Planned Parenthood clinics and others after a first visit for gender dysphoria (https://www.plannedparenthood.org/planned-parenthood-greater-texas/patient-resources/transgender-healthcare). Surely no one would argue that such a precipitous practice has been accompanied by a full psychological evaluation, or disclosure of medical risks. Chief among these is the fact that the resulting bodily changes will not disappear, even if the initial desire for them changes. And this change is no unlikely development – upwards of 80% of minors who identify as transgender will reverse this identity by the time they reach their mid-20's if left untreated, and revert to their previous identification, albeit possibly with a same-sex attraction. It is more than simply changes in one's body that are at risk; sex hormones have an important and lasting effect on brain development and adolescent psychology. To not fully appreciate this fact, or to not have it delineated in the first place, is an egregious failure of informed consent.

3

## Puberty Blockers

Perhaps the greatest failure of informed consent, and non-disclosure of human experimentation outcomes, is found in the supposedly benign use of puberty blocking agents in minors. They are routinely and widely prescribed with the thought that this will "buy time" for those questioning their gender as minors. Children and their supportive parents are assured that they are a benign intervention whose effects are easily reversible, just in case the child decides not to transition. Some potential effect on the development of bone density may be mentioned. The extent of this danger is just now being appreciated, with severe and disabling osteoporosis described in at least one child in Sweden. This led to new guidelines for gender-affirming care issued in February by the National Board of Health and Welfare. It stated that, based on current knowledge: "the risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits, and that the treatments should be offered only in exceptional cases." However, the effect of puberty blocking agents (started in early adolescent development) on long-term sexual function seems to be largely unstudied. Current guidelines recommend starting puberty blockers at the earliest stage of sexual maturation in children (Tanner two). These will not only prevent the enlargement of penile tissue, it will desensitize the orgasmic potential for tissues later exposed to cross-sex hormones. Simply put, transgender adults treated in early adolescence with puberty blockers may never experience orgasm. When children with gender dysphoria are given these powerful hormones (around age 11) they are too young to appreciate the implications of what will happen.

It is not simply a matter of chronology. As children mature into adolescents and adults, their brains are also being formed and reformed under the influence of sex hormones. There is evidence for structural changes, and these are likely to be demonstrated in cognitive and behavioral changes. In fact, the development of the adolescent brain and the maturation of its rational and executive functions does not typically complete until one's early 20s. Although the deleterious effects on sexual development and function in adulthood from puberty blockers may be predicted, no one is entirely certain of the effects on other critical areas such as brain development and bone density. Carefully constructed and monitored studies have not been done. *Until they are, these off-label treatments with puberty blockers and cross sex hormones can only be considered experimental.* Experimental interventions should be done as carefully as any other research, and fully informed consent is the only ethical way to enter into such studies. Clearly, this is not the current practice.

## III.   The Fundamental Flaw

There appears to have been a headlong rush in the past decade towards the process of gender affirming care described above. After close scrutiny, it can only be seen as off label experimentation, despite the fact that informed consent practices do not conform to this reality. Given this, we must ask ourselves: how can experienced and ethical physicians so mislead others or be so misled themselves? In 2013, the American Psychiatric Association published their update of the Diagnostic and Statistical Manual of Mental Disorders, the DSM-5. In it the diagnosis of "gender identity disorder" was replaced with "gender dysphoria." This was done to "avoid stigma and ensure clinical care for individuals who see and feel themselves to be a different gender" other than the one to which they were born. The APA stated that "it is important to note the gender nonconformity is not in itself a mental disorder. The critical element of gender dysphoria is the presence of clinically significant distress associated with the condition." Dysphoria is a state of uneasiness, unhappiness, or dissatisfaction. With this change in terminology there was also a shift from seeking or correcting the underlying cause of the dysphoria, and a focus on transitioning to the preferred gender.

This revision has probably done more harm than good by accepting a self-diagnosis characterized by the belief that the patient (or their essence) is "trapped in the wrong body." This concept relies on the Cartesian duality, a body-self dichotomy. It reverts to the fallacious "ghost in the machine" concept. In reality, we cannot be trapped in the wrong body; we **are** our bodies, which are an integral and inseparable part of ourselves. To assert that there is a female self inside a male body (or the reverse), is to fail to achieve a full understanding that we are embodied persons, unified body and mind, if you will. A generation ago, sex and gender were taken to be synonyms for the same phenomena. Even now, a transgender female, no matter how much or how long of a hormonal therapeutic regimen they undergo, is still genetically male. Ignoring this fact has led to a contradiction, where sympathetic practitioners recommend "holistic care" while insisting on a fragmented concept of the self. This approach has been warmly embraced, even insisted upon, by many practitioners while viewed as nonsensical and even ludicrous by many laypersons.

Inevitably this has led to added difficulties. Even young patients are encouraged to begin puberty blockers and then hormones based on a self-diagnosis. Self-diagnosing psychiatric conditions is always fraught with the possibility of error. In this case, there can be no confirmatory lab tests, radiologic exams, or genetic findings. Moreover, the dysphoria can only be diagnosed and opened to treatment if it is causing significant trauma to the individual. The clinically significant distress manifests itself in underlying psychiatric diagnoses such as depression and suicidality. It is argued that embarking on affirmative treatment as early as possible is urgently needed to prevent further psychiatric complications, a contested assertion. Studies have shown that adult transgender persons continue to have evidence of depression and suicidality following treatment. The rate of suicide among post-operative transgender adults in a study from Sweden found an incidence 20 times greater than that of the general population. Such treatment may not be urgently needed to protect adolescents; it may not even be effective protection for their adult counterparts.

The claim of urgency coupled with an impulse toward nonjudgmental empathy for the disturbed patients has led to a frantic insistence on a single approach that may seem almost cult like in its insularity and opposition to outside challenges. Both parents (Trinko, K.(Nov. 19, 2018 "What It's Like to Lose Your Children to the 'Transgender Cult,' From a Mom Who Knows." *The Daily Signal*, 30 Oct. 2019) and teachers (Manning, M. for The Mail on Sunday. "Whistleblower Teacher Makes Shocking Claim That 'Most Are Autistic'." *Daily Mail Online*, Associated Newspapers, 19 Nov. 2018, https://www.dailymail.co.uk/news/article-6401593/Whistleblower-teacher-makes-shocking-claim-autistic.html.) report that their children or students are being wrongly encouraged at school to think of themselves as transgender. Sometimes this is the result of overenthusiastic acceptance or "love bombing". Sometimes it appears to influence the susceptible, as in autistic children. Sometimes transgender counseling is taking place even without the parents' knowledge, and this troubling approach has been supported in the literature with statements that adolescents should be legally empowered to obtain puberty-blocking without parental consent (Priest, M. Transgender Children and the Right to Transition: Medical Ethics When Parents Mean Well but Cause Harm. Am J Bioeth. 2019 Feb;19(2):45-59).

Inevitably, this has resulted in complications and conflicts. The media have been replete with reports of such things as contested accessibility of transgender females to such things as domestic abuse shelters, female prisons, and female sports competitions. Similar issues regarding bathroom accessibility in schools recently came to a boil in Virginia, when it came to light that a sexual assault by a self-described trans- female (with a penis) was repeated in another school after the perpetrator was transferred. (Poff, J. "Loudoun superintendent failed to inform state of school sexual assault." Washington Examiner, 4 May 2022.) These issues are far from any resolution by debate, discussion, or legislation. In fact, both sides of the debate have doubled down with insistence that the opposing viewpoint must not only be rejected but considered unethical and made illegal.

Some disturbing trends have developed resulting not only from this dichotomy of opinion about the proper treatment approach, but ultimately based in the acceptance of the mind-body dichotomy. There has been a change in the diagnosed population. As Abigail Schrier pointed out:

> For the nearly 100-year diagnostic history of gender dysphoria, it overwhelmingly afflicted boys and men, and it began in early childhood (ages two to four). According to the DSM-V, the latest edition of the historical rate of incidence was 0.01 percent of males (roughly one in 10,000).
>
> For decades, psychologists treated it with "watchful waiting" — that is, a method of psychotherapy that seeks to understand the source of a child's gender dysphoria, lessen its intensity, and ultimately help a child grow more comfortable in her own body. Now such an approach is disdained by the term "conversion therapy", and labelled as unethical, and even made illegal.

She continues:

> Since nearly seven in 10 children initially diagnosed with gender dysphoria eventually outgrew it, the conventional wisdom held that, with a little patience, most kids would come to accept their bodies. The underlying assumption was children didn't always know best. But in the last decade, watchful waiting has been supplanted by "affirmative care," which assumes children do know what's best. Affirmative care proponents urge doctors to corroborate their patients' belief that they are trapped in the wrong body. The family is pressured to help the child transition to a new gender identity — sometimes having been told by doctors or activists that, if they don't, their child may eventually commit suicide. From there, pressures build on parents to begin concrete medical steps to help children on their path to transitioning to the "right" body. That includes puberty blockers as a preliminary step. Typically, cross-sex hormones follow and then, if desired, gender surgery. (Shrier, A. "Top Trans Doctors Blow the Whistle on 'Sloppy' Care." Emmaus Road Ministries, 5 Oct. 2021)

These pressures apply not only to parents, but to the children themselves because of the strong emphasis on affirmative support for anyone declaring themselves transgender. As one mother described: "A lot of these kids have concurrent mental health issues, and they find a place to fit in because as soon as you say that you're trans, you get love-bombed," she reflects. "You get love-bombed online, you get love-bombed on at school … As soon as you say you're trans, you turn into a star. And kids are thirsty for that kind of affirmation." (Trinko, 2019)

Two phenomena may be associated with this. Strong affirmation for the diagnosis and hormonal treatment may be altering the natural course of the phenomenon in childhood. It may not only be easier to identify as transgender in today's environment; it may be more difficult to turn ones back on the diagnosis. This may help explain a recent report that found that an average of 5 years after their initial social transition, 7.3% of youth had retransitioned (changed gender identity) at least once. At the end of this period, most youth identified as binary transgender youth (94%), including 1.3% who retransitioned to another identity before returning to their binary transgender identity. 2.5% of youth identified as cisgender and 3.5% as nonbinary. Later cisgender identities were more common amongst youth whose initial social transition occurred before age 6 years; the retransition often occurred before age 10. Unlike previous studies of transgender youth, males were not predominant, but were outnumbered by 2 to 1. Moreover, this is a direct contradiction of previous data showing a high rate of reversion towards a sex/gender coherence in children as they mature. (Olson, Kristina R., Durwood, Lily, Horton, Rachel, Gallagher, Natalie M., & Devor, Aaron; Gender Identity 5 Years

After Social Transition. Pediatrics 2022; 10.1542/peds.2021-056082) We must ask if this represents a shift towards being trapped in a wrong diagnosis, rather than a child being trapped in a wrong body.

In fact, there has been another shift. Unlike in the past, we now see increased numbers of females identifying as transgender, and later in their adolescence. Sometimes this occurs in large cohorts within a single school or peer group, a phenomenon labelled "rapid onset gender dysphoria." Both these phenomena call into question the underlying cause for the concept of gender dysphoria. Rather than approaching it as an accurate self-diagnosis that must be affirmed and treated to change the outward sexual appearance, isn't there a better model? We may be making a fundamental mistake in approaching transgender phenomena, not as a disease or disorder, but at most a dysphoria that is a cause for affirmation. This contrasts with our approach to similar conditions claiming a mind- body divergence, such as anorexia nervosa or body integrity identity disorder. The former is familiar to most Americans. The latter is a rare mental disorder characterized by a desire to have a physical disability, claiming discomfort with being able-bodied and often resulting in a request for amputation of the body part that makes them uncomfortable. People with this condition may refer to themselves as "trans abled."

In all three of these conditions there is a claim for a mismatch between one's mental bodily image and physical body. All tend to find an onset in prepubescence and are frequently associated with other mental disturbances. "Affirmative care" is the only recommended standard for transgender patients. It is horribly disturbing to contemplate amputation of a healthy limb because of a mental disorder (although this has been done). No one would seriously consider surgery to limit caloric intake or weight gain for a patient with anorexia nervosa, in order to support and affirm her distorted body image. Nevertheless, sex change operations have been recast as "gender affirming surgeries", The change in language reflects the change in attitude that distorts the approach to treatment for a psychiatric, not medical/surgical, disorder.

Finally, what are we to make of this situation, as a medical profession, and as a society? This question cannot be answered until both the affected people and profession can overcome our collective hubris. It is not enough to admit we don't know all the answers. We must see that we are not yet certain of all the questions that must be answered. In such a situation, competing interests must not pretend to take the moral high ground when no one can be certain where it will be located. First and foremost, we must back off from our current approaches until questions can be answered with proper studies, done with sufficient patients, and sufficient controls, over a sufficient period of time. Any insistence on a single course of therapy without this information could prove to be the same type of morally unacceptable interventions that caused formal research protections to be created in the first place.

In the meantime, we must adopt a more respectful tone with those whom we disagree. As John Milton said, "Where there is much desire to learn, there of necessity will be much arguing, much writing, many opinions; for opinion in good men is but knowledge in the making." Most important of all, in order to protect the current and future well-being of these affected children, we must rely on the ancient principal of medical ethics "In the first place, do no harm." Until we can demonstrate the efficacy and safety of any proposed treatment or intervention, its usage must properly be considered a medical experimentation and require fully informed consent. Anything less is a betrayal of both our principles and our progeny.

---

*About the author: Dr. Donovan's observations flow from his professional experience. He has been a Board-certified pediatrician for over 40 years, as an academic physician who rose to Vice-chair of the Department of Pediatrics and ultimately interim Chair at the University of Oklahoma in Tulsa. His professional role and interests expanded in the 1990's after he took a sabbatical in medical ethics at*

*Georgetown University under the world-famous Dr. Edmund Pellegrino, a founding father of modern bioethics. He subsequently went on to earn a master's degree in Bioethics and founded the first bioethics center in his home university, where he was responsible for ethics training and education for students and physicians. He also served as clinical ethics consultant for three teaching hospitals. He was chair of the Section on Bioethics for the American Academy of Pediatrics (AAP) for three years and then their first liaison member of the AAP Committee on Bioethics. He has also served as the chair for a hospital Intuitional Review Board for 17 years. Finally, he was asked to become Director for the Center for Clinical Bioethics at Georgetown University School of Medicine, where he served from 2012-2020. His duties included teaching, consultation, publishing papers and speaking on bioethics extensively at the local, national, and international level on four continents. He has been interviewed and quoted on National Broadcasting Company (NBC), National Public Radio (NPR), Eternal Word Television Network (EWTN), and Al Jazeera, as well as the New York Times and the Washington Post, among others. He was awarded the Humanism in Medicine award from the Gold Foundation, which recognizes physicians to have successfully integrated humanism into the delivery of care to their patients and families. He has also offered formal testimony on bioethical issues before state legislatures and the U.S. Congress.*

App. 244

# Appendix Attachment

# 2

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

FIFTH EDITION

# DSM-5™

# American Psychiatric Association

*Officers 2012–2013*
PRESIDENT DILIP V. JESTE, M.D.
PRESIDENT-ELECT JEFFREY A. LIEBERMAN, M.D.
TREASURER DAVID FASSLER, M.D.
SECRETARY ROGER PEELE, M.D.

*Assembly*
SPEAKER R. SCOTT BENSON, M.D.
SPEAKER-ELECT MELINDA L. YOUNG, M.D.

*Board of Trustees*
JEFFREY AKAKA, M.D.
CAROL A. BERNSTEIN, M.D.
BRIAN CROWLEY, M.D.
ANITA S. EVERETT, M.D.
JEFFREY GELLER, M.D., M.P.H.
MARC DAVID GRAFF, M.D.
JAMES A. GREENE, M.D.
JUDITH F. KASHTAN, M.D.
MOLLY K. MCVOY, M.D.
JAMES E. NININGER, M.D.
JOHN M. OLDHAM, M.D.
ALAN F. SCHATZBERG, M.D.
ALIK S. WIDGE, M.D., PH.D.

ERIK R. VANDERLIP, M.D.,
MEMBER-IN-TRAINING TRUSTEE-ELECT

# DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

## FIFTH EDITION

# DSM-5™

New School Library





Washington, DC
London, England

Copyright © 2013 American Psychiatric Association

DSM and DSM-5 are trademarks of the American Psychiatric Association. Use of these terms is prohibited without permission of the American Psychiatric Association.

ALL RIGHTS RESERVED. Unless authorized in writing by the APA, no part of this book may be reproduced or used in a manner inconsistent with the APA's copyright. This prohibition applies to unauthorized uses or reproductions in any form, including electronic applications.

Correspondence regarding copyright permissions should be directed to DSM Permissions, American Psychiatric Publishing, 1000 Wilson Boulevard, Suite 1825, Arlington, VA 22209-3901.

Manufactured in the United States of America on acid-free paper.

ISBN 978-0-89042-554-1 (Hardcover)

ISBN 978-0-89042-555-8 (Paperback)

American Psychiatric Association
1000 Wilson Boulevard
Arlington, VA 22209-3901
www.psych.org

The correct citation for this book is American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. Arlington, VA, American Psychiatric Association, 2013.

**Library of Congress Cataloging-in-Publication Data**
Diagnostic and statistical manual of mental disorders : DSM-5. — 5th ed.
   p. ; cm.
DSM-5
DSM-V
Includes index.
ISBN 978-0-89042-554-1 (hardcover : alk. paper) — ISBN 978-0-89042-555-8 (pbk. : alk. paper)
I. American Psychiatric Association. II. American Psychiatric Association. DSM-5 Task Force.
III. Title: DSM-5. IV. Title: DSM-V.
[DNLM: 1. Diagnostic and statistical manual of mental disorders. 5th ed. 2. Mental Disorders—classification. 3. Mental Disorders—diagnosis. WM 15]
RC455.2.C4
616.89'075—dc23

2013011061

**British Library Cataloguing in Publication Data**
A CIP record is available from the British Library.

Text Design—Tammy J. Cordova

Manufacturing—Edwards Brothers Malloy

KC
455
.2
.C4
D5二
2013

# Gender Dysphoria

In this chapter, there is one overarching diagnosis of gender dysphoria, with separate developmentally appropriate criteria sets for children and for adolescents and adults. The area of sex and gender is highly controversial and has led to a proliferation of terms whose meanings vary over time and within and between disciplines. An additional source of confusion is that in English "sex" connotes both male/female and sexuality. This chapter employs constructs and terms as they are widely used by clinicians from various disciplines with specialization in this area. In this chapter, *sex* and *sexual* refer to the biological indicators of male and female (understood in the context of reproductive capacity), such as in sex chromosomes, gonads, sex hormones, and nonambiguous internal and external genitalia. Disorders of sex development denote conditions of inborn somatic deviations of the reproductive tract from the norm and/or discrepancies among the biological indicators of male and female. *Cross-sex* hormone treatment denotes the use of feminizing hormones in an individual assigned male at birth based on traditional biological indicators or the use of masculinizing hormones in an individual assigned female at birth.

The need to introduce the term *gender* arose with the realization that for individuals with conflicting or ambiguous biological indicators of sex (i.e., "intersex"), the lived role in society and/or the identification as male or female could not be uniformly associated with or predicted from the biological indicators and, later, that some individuals develop an identity as female or male at variance with their uniform set of classical biological indicators. Thus, *gender* is used to denote the public (and usually legally recognized) lived role as boy or girl, man or woman, but, in contrast to certain social constructionist theories, biological factors are seen as contributing, in interaction with social and psychological factors, to gender development. *Gender assignment* refers to the initial assignment as male or female. This occurs usually at birth and, thereby, yields the "natal gender." *Gender-atypical* refers to somatic features or behaviors that are not typical (in a statistical sense) of individuals with the same assigned gender in a given society and historical era; for behavior, *gender-nonconforming* is an alternative descriptive term. *Gender reassignment* denotes an official (and usually legal) change of gender. *Gender identity* is a category of social identity and refers to an individual's identification as male, female, or, occasionally, some category other than male or female. *Gender dysphoria* as a general descriptive term refers to an individual's affective/cognitive discontent with the assigned gender but is more specifically defined when used as a diagnostic category. *Transgender* refers to the broad spectrum of individuals who transiently or persistently identify with a gender different from their natal gender. *Transsexual* denotes an individual who seeks, or has undergone, a social transition from male to female or female to male, which in many, but not all, cases also involves a somatic transition by cross-sex hormone treatment and genital surgery (*sex reassignment surgery*).

*Gender dysphoria* refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender. Although not all individuals will experience distress as a result of such incongruence, many are distressed if the desired physical interventions by means of hormones and/or surgery are not available. The current term is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity per se.

451

# Gender Dysphoria

## Diagnostic Criteria

### Gender Dysphoria in Children                    302.6 (F64.2)

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least six of the following (one of which must be Criterion A1):

1. A strong desire to be of the other gender or an insistence that one is the other gender (or some alternative gender different from one's assigned gender).
2. In boys (assigned gender), a strong preference for cross-dressing or simulating female attire; or in girls (assigned gender), a strong preference for wearing only typical masculine clothing and a strong resistance to the wearing of typical feminine clothing.
3. A strong preference for cross-gender roles in make-believe play or fantasy play.
4. A strong preference for the toys, games, or activities stereotypically used or engaged in by the other gender.
5. A strong preference for playmates of the other gender.
6. In boys (assigned gender), a strong rejection of typically masculine toys, games, and activities and a strong avoidance of rough-and-tumble play; or in girls (assigned gender), a strong rejection of typically feminine toys, games, and activities.
7. A strong dislike of one's sexual anatomy.
8. A strong desire for the primary and/or secondary sex characteristics that match one's experienced gender.

B. The condition is associated with clinically significant distress or impairment in social, school, or other important areas of functioning.

*Specify* if:

> **With a disorder of sex development** (e.g., a congenital adrenogenital disorder such as 255.2 [E25.0] congenital adrenal hyperplasia or 259.50 [E34.50] androgen insensitivity syndrome).

> **Coding note:** Code the disorder of sex development as well as gender dysphoria.

### Gender Dysphoria in Adolescents and Adults      302.85 (F64.1)

A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
3. A strong desire for the primary and/or secondary sex characteristics of the other gender.
4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).
6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

*Specify* if:

**With a disorder of sex development** (e.g., a congenital adrenogenital disorder such as 255.2 [E25.0] congenital adrenal hyperplasia or 259.50 [E34.50] androgen insensitivity syndrome).

**Coding note:** Code the disorder of sex development as well as gender dysphoria.

*Specify* if:

**Posttransition:** The individual has transitioned to full-time living in the desired gender (with or without legalization of gender change) and has undergone (or is preparing to have) at least one cross-sex medical procedure or treatment regimen—namely, regular cross-sex hormone treatment or gender reassignment surgery confirming the desired gender (e.g., penectomy, vaginoplasty in a natal male; mastectomy or phalloplasty in a natal female).

## Specifiers

The posttransition specifier may be used in the context of continuing treatment procedures that serve to support the new gender assignment.

## Diagnostic Features

Individuals with gender dysphoria have a marked incongruence between the gender they have been assigned to (usually at birth, referred to as *natal gender*) and their experienced/expressed gender. This discrepancy is the core component of the diagnosis. There must also be evidence of distress about this incongruence. Experienced gender may include alternative gender identities beyond binary stereotypes. Consequently, the distress is not limited to a desire to simply be of the other gender, but may include a desire to be of an alternative gender, provided that it differs from the individual's assigned gender.

Gender dysphoria manifests itself differently in different age groups. Prepubertal natal girls with gender dysphoria may express the wish to be a boy, assert they are a boy, or assert they will grow up to be a man. They prefer boys' clothing and hairstyles, are often perceived by strangers as boys, and may ask to be called by a boy's name. Usually, they display intense negative reactions to parental attempts to have them wear dresses or other feminine attire. Some may refuse to attend school or social events where such clothes are required. These girls may demonstrate marked cross-gender identification in role-playing, dreams, and fantasies. Contact sports, rough-and-tumble play, traditional boyhood games, and boys as playmates are most often preferred. They show little interest in stereotypically feminine toys (e.g., dolls) or activities (e.g., feminine dress-up or role-play). Occasionally, they refuse to urinate in a sitting position. Some natal girls may express a desire to have a penis or claim to have a penis or that they will grow one when older. They may also state that they do not want to develop breasts or menstruate.

Prepubertal natal boys with gender dysphoria may express the wish to be a girl or assert they are a girl or that they will grow up to be a woman. They have a preference for dressing in girls' or women's clothes or may improvise clothing from available materials (e.g., using towels, aprons, and scarves for long hair or skirts). These children may role-play female figures (e.g., playing "mother") and often are intensely interested in female fantasy figures. Traditional feminine activities, stereotypical games, and pastimes (e.g., "playing house"; drawing feminine pictures; watching television or videos of favorite female characters) are most often preferred. Stereotypical female-type dolls (e.g., Barbie) are often favorite toys, and girls are their preferred playmates. They avoid rough-and-tumble play and competitive sports and have little interest in stereotypically masculine toys (e.g., cars, trucks). Some may pretend not to have a penis and insist on sitting to urinate. More

rarely, they may state that they find their penis or testes disgusting, that they wish them removed, or that they have, or wish to have, a vagina.

In young adolescents with gender dysphoria, clinical features may resemble those of children or adults with the condition, depending on developmental level. As secondary sex characteristics of young adolescents are not yet fully developed, these individuals may not state dislike of them, but they are concerned about imminent physical changes.

In adults with gender dysphoria, the discrepancy between experienced gender and physical sex characteristics is often, but not always, accompanied by a desire to be rid of primary and/or secondary sex characteristics and/or a strong desire to acquire some primary and/or secondary sex characteristics of the other gender. To varying degrees, adults with gender dysphoria may adopt the behavior, clothing, and mannerisms of the experienced gender. They feel uncomfortable being regarded by others, or functioning in society, as members of their assigned gender. Some adults may have a strong desire to be of a different gender and treated as such, and they may have an inner certainty to feel and respond as the experienced gender without seeking medical treatment to alter body characteristics. They may find other ways to resolve the incongruence between experienced/expressed and assigned gender by partially living in the desired role or by adopting a gender role neither conventionally male nor conventionally female.

## Associated Features Supporting Diagnosis

When visible signs of puberty develop, natal boys may shave their legs at the first signs of hair growth. They sometimes bind their genitals to make erections less visible. Girls may bind their breasts, walk with a stoop, or use loose sweaters to make breasts less visible. Increasingly, adolescents request, or may obtain without medical prescription and supervision, hormonal suppressors ("blockers") of gonadal steroids (e.g., gonadotropin-releasing hormone [GnRH] analog, spironolactone). Clinically referred adolescents often want hormone treatment and many also wish for gender reassignment surgery. Adolescents living in an accepting environment may openly express the desire to be and be treated as the experienced gender and dress partly or completely as the experienced gender, have a hairstyle typical of the experienced gender, preferentially seek friendships with peers of the other gender, and/or adopt a new first name consistent with the experienced gender. Older adolescents, when sexually active, usually do not show or allow partners to touch their sexual organs. For adults with an aversion toward their genitals, sexual activity is constrained by the preference that their genitals not be seen or touched by their partners. Some adults may seek hormone treatment (sometimes without medical prescription and supervision) and gender reassignment surgery. Others are satisfied with either hormone treatment or surgery alone.

Adolescents and adults with gender dysphoria before gender reassignment are at increased risk for suicidal ideation, suicide attempts, and suicides. After gender reassignment, adjustment may vary, and suicide risk may persist.

## Prevaience

For natal adult males, prevalence ranges from 0.005% to 0.014%, and for natal females, from 0.002% to 0.003%. Since not all adults seeking hormone treatment and surgical reassignment attend specialty clinics, these rates are likely modest underestimates. Sex differences in rate of referrals to specialty clinics vary by age group. In children, sex ratios of natal boys to girls range from 2:1 to 4.5:1. In adolescents, the sex ratio is close to parity; in adults, the sex ratio favors natal males, with ratios ranging from 1:1 to 6.1:1. In two countries, the sex ratio appears to favor natal females (Japan: 2.2:1; Poland: 3.4:1).

## Development and Course

Because expression of gender dysphoria varies with age, there are separate criteria sets for children versus adolescents and adults. Criteria for children are defined in a more con-

crete, behavioral manner than those for adolescents and adults. Many of the core criteria draw on well-documented behavioral gender differences between typically developing boys and girls. Young children are less likely than older children, adolescents, and adults to express extreme and persistent anatomic dysphoria. In adolescents and adults, incongruence between experienced gender and somatic sex is a central feature of the diagnosis. Factors related to distress and impairment also vary with age. A very young child may show signs of distress (e.g., intense crying) only when parents tell the child that he or she is "really" not a member of the other gender but only "desires" to be. Distress may not be manifest in social environments supportive of the child's desire to live in the role of the other gender and may emerge only if the desire is interfered with. In adolescents and adults, distress may manifest because of strong incongruence between experienced gender and somatic sex. Such distress may, however, be mitigated by supportive environments and knowledge that biomedical treatments exist to reduce incongruence. Impairment (e.g., school refusal, development of depression, anxiety, and substance abuse) may be a consequence of gender dysphoria.

**Gender dysphoria without a disorder of sex development.** For clinic-referred children, onset of cross-gender behaviors is usually between ages 2 and 4 years. This corresponds to the developmental time period in which most typically developing children begin expressing gendered behaviors and interests. For some preschool-age children, both pervasive cross-gender behaviors and the expressed desire to be the other gender may be present, or, more rarely, labeling oneself as a member of the other gender may occur. In some cases, the expressed desire to be the other gender appears later, usually at entry into elementary school. A small minority of children express discomfort with their sexual anatomy or will state the desire to have a sexual anatomy corresponding to the experienced gender ("anatomic dysphoria"). Expressions of anatomic dysphoria become more common as children with gender dysphoria approach and anticipate puberty.

Rates of persistence of gender dysphoria from childhood into adolescence or adulthood vary. In natal males, persistence has ranged from 2.2% to 30%. In natal females, persistence has ranged from 12% to 50%. Persistence of gender dysphoria is modestly correlated with dimensional measures of severity ascertained at the time of a childhood baseline assessment. In one sample of natal males, lower socioeconomic background was also modestly correlated with persistence. It is unclear if particular therapeutic approaches to gender dysphoria in children are related to rates of long-term persistence. Extant follow-up samples consisted of children receiving no formal therapeutic intervention or receiving therapeutic interventions of various types, ranging from active efforts to reduce gender dysphoria to a more neutral, "watchful waiting" approach. It is unclear if children "encouraged" or supported to live socially in the desired gender will show higher rates of persistence, since such children have not yet been followed longitudinally in a systematic manner. For both natal male and female children showing persistence, almost all are sexually attracted to individuals of their natal sex. For natal male children whose gender dysphoria does not persist, the majority are *androphilic* (sexually attracted to males) and often self-identify as gay or homosexual (ranging from 63% to 100%). In natal female children whose gender dysphoria does not persist, the percentage who are *gynephilic* (sexually attracted to females) and self-identify as lesbian is lower (ranging from 32% to 50%).

In both adolescent and adult natal males, there are two broad trajectories for development of gender dysphoria: early onset and late onset. *Early-onset gender dysphoria* starts in childhood and continues into adolescence and adulthood; or, there is an intermittent period in which the gender dysphoria desists and these individuals self-identify as gay or homosexual, followed by recurrence of gender dysphoria. *Late-onset gender dysphoria* occurs around puberty or much later in life. Some of these individuals report having had a desire to be of the other gender in childhood that was not expressed verbally to others. Others do not recall any signs of childhood gender dysphoria. For adolescent males with late-onset gender dysphoria, parents often report surprise because they did not see signs of gender

dysphoria during childhood. Expressions of anatomic dysphoria are more common and salient in adolescents and adults once secondary sex characteristics have developed.

Adolescent and adult natal males with early-onset gender dysphoria are almost always sexually attracted to men (androphilic). Adolescents and adults with late-onset gender dysphoria frequently engage in transvestic behavior with sexual excitement. The majority of these individuals are gynephilic or sexually attracted to other posttransition natal males with late-onset gender dysphoria. A substantial percentage of adult males with late-onset gender dysphoria cohabit with or are married to natal females. After gender transition, many self-identify as lesbian. Among adult natal males with gender dysphoria, the early-onset group seeks out clinical care for hormone treatment and reassignment surgery at an earlier age than does the late-onset group. The late-onset group may have more fluctuations in the degree of gender dysphoria and be more ambivalent about and less likely satisfied after gender reassignment surgery.

In both adolescent and adult natal females, the most common course is the early-onset form of gender dysphoria. The late-onset form is much less common in natal females compared with natal males. As in natal males with gender dysphoria, there may have been a period in which the gender dysphoria desisted and these individuals self-identified as lesbian; however, with recurrence of gender dysphoria, clinical consultation is sought, often with the desire for hormone treatment and reassignment surgery. Parents of natal adolescent females with the late-onset form also report surprise, as no signs of childhood gender dysphoria were evident. Expressions of anatomic dysphoria are much more common and salient in adolescents and adults than in children.

Adolescent and adult natal females with early-onset gender dysphoria are almost always gynephilic. Adolescents and adults with the late-onset form of gender dysphoria are usually androphilic and after gender transition self-identify as gay men. Natal females with the late-onset form do not have co-occurring transvestic behavior with sexual excitement.

**Gender dysphoria in association with a disorder of sex development.** Most individuals with a disorder of sex development who develop gender dysphoria have already come to medical attention at an early age. For many, starting at birth, issues of gender assignment were raised by physicians and parents. Moreover, as infertility is quite common for this group, physicians are more willing to perform cross-sex hormone treatments and genital surgery before adulthood.

Disorders of sex development in general are frequently associated with gender-atypical behavior starting in early childhood. However, in the majority of cases, this does not lead to gender dysphoria. As individuals with a disorder of sex development become aware of their medical history and condition, many experience uncertainty about their gender, as opposed to developing a firm conviction that they are another gender. However, most do not progress to gender transition. Gender dysphoria and gender transition may vary considerably as a function of a disorder of sex development, its severity, and assigned gender.

## Risk and Prognostic Factors

**Temperamental.** For individuals with gender dysphoria without a disorder of sex development, atypical gender behavior among individuals with early-onset gender dysphoria develops in early preschool age, and it is possible that a high degree of atypicality makes the development of gender dysphoria and its persistence into adolescence and adulthood more likely.

**Environmental.** Among individuals with gender dysphoria without a disorder of sex development, males with gender dysphoria (in both childhood and adolescence) more commonly have older brothers than do males without the condition. Additional predisposing

factors under consideration, especially in individuals with late-onset gender dysphoria (adolescence, adulthood), include habitual fetishistic transvestism developing into autogynephilia (i.e., sexual arousal associated with the thought or image of oneself as a woman) and other forms of more general social, psychological, or developmental problems.

**Genetic and physiological.**   For individuals with gender dysphoria without a disorder of sex development, some genetic contribution is suggested by evidence for (weak) familiality of transsexualism among nontwin siblings, increased concordance for transsexualism in monozygotic compared with dizygotic same-sex twins, and some degree of heritability of gender dysphoria. As to endocrine findings, no endogenous systemic abnormalities in sex-hormone levels have been found in 46,XY individuals, whereas there appear to be increased androgen levels (in the range found in hirsute women but far below normal male levels) in 46,XX individuals. Overall, current evidence is insufficient to label gender dysphoria without a disorder of sex development as a form of intersexuality limited to the central nervous system.

In gender dysphoria associated with a disorder of sex development, the likelihood of later gender dysphoria is increased if prenatal production and utilization (via receptor sensitivity) of androgens are grossly atypical relative to what is usually seen in individuals with the same assigned gender. Examples include 46,XY individuals with a history of normal male prenatal hormone milieu but inborn nonhormonal genital defects (as in cloacal bladder exstrophy or penile agenesis) and who have been assigned to the female gender. The likelihood of gender dysphoria is further enhanced by additional, prolonged, highly gender-atypical postnatal androgen exposure with somatic virilization as may occur in female-raised and noncastrated 46,XY individuals with 5-alpha reductase-2 deficiency or 17-beta-hydroxysteroid dehydrogenase-3 deficiency or in female-raised 46,XX individuals with classical congenital adrenal hyperplasia with prolonged periods of non-adherence to glucocorticoid replacement therapy. However, the prenatal androgen milieu is more closely related to gendered behavior than to gender identity. Many individuals with disorders of sex development and markedly gender-atypical behavior do not develop gender dysphoria. Thus, gender-atypical behavior by itself should not be interpreted as an indicator of current or future gender dysphoria. There appears to be a higher rate of gender dysphoria and patient-initiated gender change from assigned female to male than from assigned male to female in 46,XY individuals with a disorder of sex development.

## Culture-Related Diagnostic Issues

Individuals with gender dysphoria have been reported across many countries and cultures. The equivalent of gender dysphoria has also been reported in individuals living in cultures with institutionalized gender categories other than male or female. It is unclear whether with these individuals the diagnostic criteria for gender dysphoria would be met.

## Diagnostic Markers

Individuals with a somatic disorder of sex development show some correlation of final gender identity outcome with the degree of prenatal androgen production and utilization. However, the correlation is not robust enough for the biological factor, where ascertainable, to replace a detailed and comprehensive diagnostic interview evaluation for gender dysphoria.

## Functional Consequences of Gender Dysphoria

Preoccupation with cross-gender wishes may develop at all ages after the first 2–3 years of childhood and often interfere with daily activities. In older children, failure to develop age-typical same-sex peer relationships and skills may lead to isolation from peer groups and to distress. Some children may refuse to attend school because of teasing and harass-

ment or pressure to dress in attire associated with their assigned sex. Also in adolescents and adults, preoccupation with cross-gender wishes often interferes with daily activities. Relationship difficulties, including sexual relationship problems, are common, and functioning at school or at work may be impaired. Gender dysphoria, along with atypical gender expression, is associated with high levels of stigmatization, discrimination, and victimization, leading to negative self-concept, increased rates of mental disorder comorbidity, school dropout, and economic marginalization, including unemployment, with attendant social and mental health risks, especially in individuals from resource-poor family backgrounds. In addition, these individuals' access to health services and mental health services may be impeded by structural barriers, such as institutional discomfort or inexperience in working with this patient population.

## Differential Diagnosis

**Nonconformity to gender roles.**   Gender dysphoria should be distinguished from simple nonconformity to stereotypical gender role behavior by the strong desire to be of another gender than the assigned one and by the extent and pervasiveness of gender-variant activities and interests. The diagnosis is not meant to merely describe nonconformity to stereotypical gender role behavior (e.g., "tomboyism" in girls, "girly-boy" behavior in boys, occasional cross-dressing in adult men). Given the increased openness of atypical gender expressions by individuals across the entire range of the transgender spectrum, it is important that the clinical diagnosis be limited to those individuals whose distress and impairment meet the specified criteria.

**Transvestic disorder.**   Transvestic disorder occurs in heterosexual (or bisexual) adolescent and adult males (rarely in females) for whom cross-dressing behavior generates sexual excitement and causes distress and/or impairment without drawing their primary gender into question. It is occasionally accompanied by gender dysphoria. An individual with transvestic disorder who also has clinically significant gender dysphoria can be given both diagnoses. In many cases of late-onset gender dysphoria in gynephilic natal males, transvestic behavior with sexual excitement is a precursor.

**Body dysmorphic disorder.**   An individual with body dysmorphic disorder focuses on the alteration or removal of a specific body part because it is perceived as abnormally formed, not because it represents a repudiated assigned gender. When an individual's presentation meets criteria for both gender dysphoria and body dysmorphic disorder, both diagnoses can be given. Individuals wishing to have a healthy limb amputated (termed by some *body integrity identity disorder*) because it makes them feel more "complete" usually do not wish to change gender, but rather desire to live as an amputee or a disabled person.

**Schizophrenia and other psychotic disorders.**   In schizophrenia, there may rarely be delusions of belonging to some other gender. In the absence of psychotic symptoms, insistence by an individual with gender dysphoria that he or she is of some other gender is not considered a delusion. Schizophrenia (or other psychotic disorders) and gender dysphoria may co-occur.

**Other clinical presentations.**   Some individuals with an emasculinization desire who develop an alternative, nonmale/nonfemale gender identity do have a presentation that meets criteria for gender dysphoria. However, some males seek castration and/or penectomy for aesthetic reasons or to remove psychological effects of androgens without changing male identity; in these cases, the criteria for gender dysphoria are not met.

## Comorbidity

Clinically referred children with gender dysphoria show elevated levels of emotional and behavioral problems—most commonly, anxiety, disruptive and impulse-control, and de-

pressive disorders. In prepubertal children, increasing age is associated with having more behavioral or emotional problems; this is related to the increasing non-acceptance of gender-variant behavior by others. In older children, gender-variant behavior often leads to peer ostracism, which may lead to more behavioral problems. The prevalence of mental health problems differs among cultures; these differences may also be related to differences in attitudes toward gender variance in children. However, also in some non-Western cultures, anxiety has been found to be relatively common in individuals with gender dysphoria, even in cultures with accepting attitudes toward gender-variant behavior. Autism spectrum disorder is more prevalent in clinically referred children with gender dysphoria than in the general population. Clinically referred adolescents with gender dysphoria appear to have comorbid mental disorders, with anxiety and depressive disorders being the most common. As in children, autism spectrum disorder is more prevalent in clinically referred adolescents with gender dysphoria than in the general population. Clinically referred adults with gender dysphoria may have coexisting mental health problems, most commonly anxiety and depressive disorders.

# Other Specified Gender Dysphoria

## 302.6 (F64.8)

This category applies to presentations in which symptoms characteristic of gender dysphoria that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for gender dysphoria. The other specified gender dysphoria category is used in situations in which the clinician chooses to communicate the specific reason that the presentation does not meet the criteria for gender dysphoria. This is done by recording "other specified gender dysphoria" followed by the specific reason (e.g., "brief gender dysphoria").

An example of a presentation that can be specified using the "other specified" designation is the following:

**The current disturbance meets symptom criteria for gender dysphoria, but the duration is less than 6 months.**

# Unspecified Gender Dysphoria

## 302.6 (F64.9)

This category applies to presentations in which symptoms characteristic of gender dysphoria that cause clinically significant distress or impairment in social, occupational, or other important areas of functioning predominate but do not meet the full criteria for gender dysphoria. The unspecified gender dysphoria category is used in situations in which the clinician chooses *not* to specify the reason that the criteria are not met for gender dysphoria, and includes presentations in which there is insufficient information to make a more specific diagnosis.

# Appendix Attachment

# 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                             Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## DECLARATION OF MATTHEW BRACKETT

I, Matthew Brackett, hereby declare and state as follows:

1.     I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this declaration and would testify completely to those facts if called to do so.

2.     I am a program consultant for the Agency for Health Care Administration. While working for the agency, I prepared approximately ten reports supporting determinations of generally accepted professional medical standards.

3.     I was responsible for preparing the report, Florida Medicaid Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria ("the GAPMS Report"), which was published in June 2022.

4.     The GAPMS Report was created after "the Florida Department of Health released guidance on the treatment of gender dysphoria for children and adolescents."

1

GAPMS Report Att. A. Because the "Florida Medicaid program" did "not have a policy on whether to cover such treatments for Medicaid recipients diagnosed with gender dysphoria," *id.*, Secretary Marstiller requested the Division of Florida Medicaid to review "sex reassignment treatments" of gender dysphoria for a coverage determination under Rule 59G-1.035, Florida Administrative Code. Secretary Marstiller's request to the Division of Florida Medicaid is Attachment A to the GAPMS Report.

5.     "Sex reassignment treatments" refer to "medical services used to obtain primary and/or secondary physical sexual characteristics of a male or female." GAPMS Report at 2. The following sex reassignment treatments were discussed in the GAPMS Report: puberty blockers, cross-sex hormones, and sex reassignment surgery.

6.     As a condition for coverage, under Rule 59G-1.035, Florida Administrative Code, the treatments must be consistent with generally accepted professional medical standards and must not be experimental or investigational. That rule is Attachment B to the GAPMS Report. The Deputy Secretary for Medicaid makes the final determination as to whether treatments are consistent with generally accepted professional medical standards.

7.     The GAPMS Report included assessments from six subject-matter experts: Romina Brignardello-Petersen, Wojtek Wiercioch, James Cantor, Quentin Van Meter, Patrick Lappert, and G. Kevin Donovan. Those experts discussed the following subject matters concerning gender dysphoria: health care research, clinical psychology,

plastic surgery, pediatric endocrinology, and bioethics. Their reports are Attachments C through G to the GAPMS Report.

8.     Specifically, for health care research, Dr. Brignardello-Petersen and Dr. Wiercioch "performed a systematic review that graded a multitude of studies. They conclude[d] that evidence supporting sex reassignment treatments is low or very low quality." GAPMS Report at 2-3.

9.     For clinical psychology, Dr. Cantor "provided a review of literature on all aspects of the subject, covering therapies, lack of research on suicidality, practice guidelines, and Western European coverage requirements." *Id.* at 3.

10.     For plastic surgery, Dr. Lappert "provided an evaluation explaining how surgical interventions are cosmetic with little to no supporting evidence to improve mental health, particularly those altering the chest." *Id.*

11.     For pediatric endocrinology, Dr. Van Meter "explain[ed] how children and adolescent brains are in continuous phases of development and how puberty suppression and cross-sex hormones can potentially affect appropriate neural maturation." *Id.*

12.     And for bioethics, Dr. Donovan "provide[d] additional insight on the bioethics of administering these treatments, asserting that children and adolescents cannot provide truly informed consent." *Id.*

13.     The GAPMS Report concluded that "[a]vailable medical literature provides insufficient evidence that sex reassignment through medical intervention is

3

safe and effective treatment for gender dysphoria. Studies presenting the benefits to mental health, including those claiming that the services prevent suicide, are either low or very low quality and rely on unreliable methods such as surveys and retrospective analyses, both of which are cross-sectional and highly biased. Rather, the available evidence demonstrates that these treatments cause irreversible physical changes and side effects that can affect long-term health." *Id.* at 2.

14.     Specifically, for puberty blockers, "[e]vidence does not prove that puberty blockers are safe for treatment of gender dysphoria. Evidence that they improve mental health and reduce suicidality is low or very low quality." *Id.* at 38.

15.     For cross-sex hormones, "[e]vidence suggesting that cross-sex hormones provide benefits to mental health and prevents suicidality is low or very low quality. Rather, evidence shows that cross-sex hormones cause multiple irreversible physical consequences as well as infertility." *Id.*

16.     And for sex reassignment surgery, "[e]vidence of improvement in mental health and reduction in suicidality is low or very low quality. Sex reassignment surgery results in irreversible physical changes, including sterility." *Id.*

17.     The GAPMS Report also noted the emerging international consensus on treatments for gender dysphoria. Attachment D to the GAPMS Report provides more information on the consensus.

18.     In Sweden, for example, "the Swedish National Board of Health stated that 'the risks of hormonal interventions for gender dysphoric youth outweigh the

4

potential benefits.' With the exception of youths who exhibited 'classic' signs of gender identity issues, adolescents who present with the condition will receive behavioral health services and gender-exploratory therapy." *Id.* at 35.

19.     "In Finland, the Palveluvalikoima issued guidelines in 2020 stating that sex reassignment in minors 'is an experimental practice' and that 'no irreversible treatment should be initiated.' The guidelines further assert that youths diagnosed with gender dysphoria often have co-occurring psychiatric disorders that must be stabilized prior to prescribing any cross-sex hormones or undergoing sex reassignment surgery." *Id.*

20.     And in the United Kingdom, the government "is also reassessing the use of irreversible treatments for gender dysphoria due the long-term effects on mental and physical health. In 2022, an independent interim report commissioned by the U.K.'s National Health Service (NHS) indicates that additional research and systematic changes are necessary to ensure the safe treatment of gender dysphoric youths. These include reinforcing the diagnosis process to assess all areas of physical and behavioral health, additional training for pediatric endocrinologists, and informing parents about the uncertainties regarding puberty blockers. The interim report is serving as a benchmark until the research is completed for final guidelines." *Id.*

21.     As a result, the GAPMS Report did "not recommend sex reassignment treatment as a health service that is consistent with generally accepted professional medical standards. Available evidence indicates that the services are not proven safe or effective treatments for gender dysphoria." *Id.*

22.     On July 8, 2022, the agency held an in-person hearing to receive public comments on the proposed changes to Rule 59G-1.050, Florida Administrative Code. I served as a panelist during the hearing. Attendees included physicians, attorneys, individuals who had detransitioned, and other interested parties. A true and correct copy of the transcript of the hearing is attached to this declaration.

23.     Some attendees voiced opposition to the proposed rule change, but the overwhelming majority spoke in favor of the changes that will prohibit Medicaid coverage of puberty blockers, cross-sex hormones, and sex reassignment surgery when used to treat gender dysphoria.

24.     Several attendees' comments were notable. The first attendee who spoke was Chloe Cole, a 17-year-old detransitioner, and said:

> I was medically transitioned from ages 13 to 16.  My parents took me to a therapist to affirm my male identity. The therapist did not care about causality or encourage me to learn to be comfortable in my body because of—partially due to California's conversion therapy bans. He brushed off my parents' concerns about that because he had hormones, puberty blockers, and surgeries. My parents were given a suicide threat as a reason to move me forward in my transition. My endocrinologist, after two or three appointments, put me on puberty blockers and injectable testosterone. At age 15, I asked to remove my breasts. My therapist continued to affirm my transition. I went to a top surgery class that was filled with around 12 girls that thought they were men—I thought that they were men. Most were my age or younger. None of us were going to be men. We were just fleeing from the uncomfortable feeling of becoming women. I was unknowingly physically cutting off my true self from my body, irreversibly and painfully. Our transidentities were not questioned. I went through with the surgery. Despite having therapists and attending the top surgery class, I really didn't understand all of the ramifications of

6

any of the medical decisions I was making. I wasn't capable of understanding it, and it was downplayed consistently. My parents, on the other hand, were pressured to continue my so-called gender journey with the suicide threat. I have been forced to realize that I will never be able to breastfeed a child, despite my increasing desire to as I mature. I have blood clots in my urine. I am unable to fully empty my bladder.  I do not yet know if I am capable of carrying a child to full term. In fact, even the doctors who put me on puberty blockers and testosterone do not know. No child should have to experience what I have. My consent was not informed . . . .

Tr. 2:2 – 3:22.

25. Sophia Galvin, another detransitioner, also spoke and stated:

I began detransitioning at 17 and a half socially.  At 18 was when I began detrans—I mean transitioning medically. I had a history of mental illness. I had suicidal ideation and I would self-harm. And my wanting to transition was all in an effort to escape the fear of being a woman in this society and because of traumas that I had been through in my life. So I continued down the process, and then ended up removing my breasts at 19 years old because I was trapped, afraid to go back to my original ideo—to my original sex, and basically look crazy to the people around me. When I detransitioned—after I detransitioned, it was very difficult because I didn't have any support.  The doctor basically just told me to stop the hormones.  I didn't have any one to speak to about it, I didn't go to a mental health counselor, and I didn't prepare anything. I just really want to say that this is not good for children. I was harmed by this, and it should not be covered under Medicaid.

Id. at 4:2-25.

26. Katie Caterbury, a mother, spoke and stated:

At the age of 14, my once healthy and happy daughter was convinced by the Gay-Straight Alliance at school that she was my son.  At the age of 16, a physician injected her with testosterone without my consent and without my knowledge.  At the age of 17, Medicaid paid surgeons to perform a double mastectomy and a hysterectomy as an outpatient. At age 19,

7

Medicaid paid for her to undergo a phalloplasty. She had and still has private insurance that was bypassed. I fought against what happened to my daughter every step of the way, but to no avail. How can any rational adult, much less a physician, not know that it is impossible to change one's biological sex? Why are there doctors convincing trusting parents to affirm the lie that biological sex is changeable? They prescribe irreversible puberty-blocking drugs and powerful wrong-sex hormones and amputate healthy breasts and remove reproductive organs from children against the protests of their parents. . . . Why is this being funded with taxpayer dollars? This must be stopped. . . .

*Id.* at 5:3 – 6:18.

27.     The agency also received comments concerning the proposed rule change. Several stakeholder and advocacy groups, including the Endocrine Society, the American Academy of Pediatrics, and Yale University, raised concerns about the proposed rule change. The agency reviewed the comments and ultimately determined that the comments were not persuasive.

28.     It should also be noted that the agency offers coverage of services for gender dysphoria. Those services are community-based health services; psychiatric services; emergency services and inpatient services in hospital settings; and behavioral services provided in schools and by school districts. Documents evidencing these treatments are attached to this declaration.

8

"I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my current knowledge and belief." Executed this 3rd day of October 2022.

Respectfully submitted,

/s/ Matthew Brackett

_____

Matthew Brackett

1

2

3

4

5

6

7

8

9

10                          TAPED PROCEEDINGS
              IN RE:   PROPOSED RULE 59G-1.050
11                       HELD ON JULY 8, 2022

12

13

14

15

16

17                          Transcribed by:

18                        CLARA C. ROTRUCK

19                         Court Reporter

20

21

22

23

24

25

```
 1                    TAPED PROCEEDINGS
 2           MS. COLE:  My name is Chloe Cole, and I am a
 3      17-year-old detransitioner from the Central Valley
 4      of California.  I was medically transitioned from
 5      ages 13 to 16.  My parents took me to a therapist
 6      to affirm my male identity.  The therapist did not
 7      care about causality or encourage me to learn to be
 8      comfortable in my body because of -- partially due
 9      to California's conversion therapy bans.  He
10      brushed off my parents' concerns about that because
11      he had hormones, puberty blockers, and surgeries.
12      My parents were given a suicide threat as a reason
13      to move me forward in my transition.
14           My endocrinologist, after two or three
15      appointments, put me on puberty blockers and
16      injectable testosterone.  At age 15, I asked to
17      remove my breasts.
18           My therapist continued to affirm my
19      transition.  I went to a top surgery class that was
20      filled with around 12 girls that thought they were
21      men -- I thought that they were men.  Most were my
22      age or younger.  None of us were going to be men.
23      We were just fleeing from the uncomfortable feeling
24      of becoming women.
25           I was unknowingly physically cutting off my
```

1    true self from my body, irreversibly and painfully.

2    Our transidentities were not questioned.

3         I went through with the surgery.  Despite

4    having therapists and attending the top surgery

5    class, I really didn't understand all of the

6    ramifications of any of the medical decisions I was

7    making.  I wasn't capable of understanding it, and

8    it was downplayed consistently.

9         My parents, on the other hand, were pressured

10   to continue my so-called gender journey with the

11   suicide threat.

12        I have been forced to realize that I will

13   never be able to breastfeed a child, despite my

14   increasing desire to as I mature.  I have blood

15   clots in my urine.  I am unable to fully empty my

16   bladder.  I do not yet know if I am capable of

17   carrying a child to full term.  In fact, even the

18   doctors who put me on puberty blockers and

19   testosterone do not know.

20        No child should have to experience what I

21   have.  My consent was not informed and I was filled

22   by (inaudible).

23        A VOICE:  Thank you for your comment.

24        (Applause.)

25        A VOICE:  The next speaker will be Sophia

1    Galvin.

2        MS. GALVIN:  My name is Sophia Galvin.  I am a

3    detransitioner.  I began detransitioning at 17 and

4    a half socially.  At 18 was when I began

5    detrans- -- I mean transitioning medically.

6        I had a history of mental illness.  I had

7    suicidal ideation and I would self-harm.  And my

8    wanting to transition was all in an effort to

9    escape the fear of being a woman in this society

10   and because of traumas that I had been through in

11   my life.

12       So I continued down the process, and then I

13   ended up removing my breasts at 19 years old

14   because I was trapped, afraid to go back to my

15   original ideo- -- to my original sex, and basically

16   look crazy to the people around me.

17       When I detransitioned -- after I

18   detransitioned, it was very difficult because I

19   didn't have any support.  The doctor basically just

20   told me to stop the hormones.  I didn't have anyone

21   to speak to about it, I didn't go to a mental

22   health counselor, and I didn't prepare anything.  I

23   just really want to say that this is not good for

24   children.  I was harmed by this, and it should not

25   be covered under Medicaid.

FOR THE RECORD REPORTING, INC. 850.222.5491

1          A VOICE:  Thank you for your comments.

2          (Applause.)

3          A VOICE:  The next speaker is Katie Caterbury.

4          MS. CATERBURY:  At the age of 14, my once

5     healthy and happy daughter was convinced by the

6     Gay-Straight Alliance at school that she was my

7     son.  At the age of 16, a physician injected her

8     with testosterone without my consent and without my

9     knowledge.  At the age of 17, Medicaid paid

10    surgeons to perform a double mastectomy and a

11    hysterectomy as an outpatient.  At age 19, Medicaid

12    paid for her to undergo a phalloplasty.

13          She had and still has private insurance that

14    was bypassed.  I fought against what happened to my

15    daughter every step of the way, but to no avail.

16          How can any rational adult, much less a

17    physician, not know that it is impossible to change

18    one's biological sex?  Why are there doctors

19    convincing trusting parents to affirm the lie that

20    biological sex is changeable?  They prescribe

21    irreversible puberty-blocking drugs and powerful

22    wrong-sex hormones and amputate healthy breasts and

23    remove reproductive organs from children against

24    the protests of their parents.

25          Affirming the false notion to a child that it

FOR THE RECORD REPORTING, INC. 850.222.5491

App. 2735

1     is possible to change one's sex is child abuse.

2     Administering powerful hormones that cause

3     irreversible changes to their bodies and their

4     brains is child abuse.  Amputating the healthy body

5     parts of a child whose brain has not reached full

6     decision-making maturity is simply criminal.

7          Why are these doctors not criminally charged?

8     Why is this being funded with taxpayer dollars?

9     This must be stopped.

10         Three years ago, I traveled to Washington,

11    DC -- Washington, DC, to speak to federal

12    lawmakers.  I begged their staff to do something.

13    Democrats and Republicans, no one seemed to care.

14    But I will not give up trying until this medical

15    experiment on children is over.

16         To every single person fighting for the health

17    and lives of our children, I am profoundly

18    grateful.  Thank you.

19         (Applause.)

20         A VOICE:  Just so we get through all the

21    speakers, we'd ask that you hold your applause

22    until the end of the program.

23         Next speaker will be Jeanette Cooper.

24         MS. COOPER:  My name is Jeanette Cooper, and I

25    am here on behalf of Partners for Ethical Care, a

1    nonpartisan, nonprofit organization that has no

2    paid staff.

3         No therapy is better than bad therapy, and

4    children are suffering because parents cannot find

5    professionals to serve the psychological needs of

6    their families and children, and they are being met

7    with a medical treatment for a psychological

8    condition.  We need to make space in the public

9    sphere for ethical therapists by removing the

10   medical treatment option.

11        Nearly every therapist who publicly speaks is

12   a cheerleader for gender identity affirmation,

13   gluing that poisoned bandage on the skin of

14   children, causing permanent psychological and

15   physical harm by solidifying an idea that maybe you

16   were born in the wrong body.

17        We are here to state the obvious.  No child

18   can or ever will be born in the wrong body.

19   Everyone knows what a woman is, but some people are

20   afraid to say it.  We are not afraid.

21        Our organization was founded by a handful of

22   mothers who realized that no one was coming to

23   protect these children.  We could not wait any

24   longer for help to arrive.

25        Families are desperate to find actual support.

FOR THE RECORD REPORTING, INC. 850.222.5491

1   They do not want a poisoned bandage that

2   cosmetically covers a wound that grows deeper when

3   covered and left untreated.  Affirmation is a

4   poisoned bandage that does not help to heal, but

5   hides a deep need that will not be helped by

6   injections and surgeries.

7        The state has no business using taxpayer

8   funding to turn children into permanent medical

9   patients.  The state has no business assisting

10  doctors in selling disabilities to vulnerable,

11  suffering children by prescribing puberty blockers,

12  cross-sex hormones, and extreme cosmetic body

13  modification.  These so-called treatments are not

14  real health care.

15       The state should, however, fund legitimate and

16  proven care.  For many children, a transidentity is

17  a crutch.  It is a placeholder that stands in for

18  real suffering that hasn't been named.  If they can

19  find a pediatrician, family therapist, or other

20  professionals who will address their actual needs,

21  children discard their transidentity and move

22  forward with self-actualization, rather than

23  staying in a state of stunted psychological and

24  physical growth, surviving with superficial,

25  short-term validation like a street drug that needs

1    to be injected every day.  Our job is to protect

2    children, and we have to step in because the

3    medical field is failing these families.

4        Thank you for stepping in now before it costs

5    the State of Florida much more than dollars.  Thank

6    you for this proposed rule.  We support you.

7        (Applause.)

8        A VOICE:  Thank you for your comments.

9        Next speaker, Donna Lambart.

10       MS. LAMBART:  Hello.  My name is Donna

11   Lambart.  I am here on behalf of concerned parents

12   to speak in support of the rule to stop allowing

13   Medicaid to pay medical transition of children in

14   Florida.

15       Today I appeal to you on behalf of over 2,600

16   parents in our group.  As parents, we know our

17   kids.  As people, we know right from wrong.  But

18   the health care professionals are presenting many

19   of us with a false and painful choice:  Accept what

20   we know will permanently harm our children or lose

21   them to suicide.  These false ideas are being

22   stated in the presence of children.  This is not

23   only cruel, it's simply not true.  There is no data

24   to prove that medically transitioning minors

25   prevents suicide.

FOR THE RECORD REPORTING, INC. 850.222.5491

1        Society, the Internet, media, schools, and

2   government convince kids that their parents que- --

3   if their parents question -- if their parents

4   question their identity, it is because their

5   parents hate them.  Parents who are unwilling to

6   drop all rational thinking and surrender to the

7   affirmation-only model of care pay a social,

8   emotional, and custodial price no parent should

9   ever have to pay.

10       Parents lose their children every day to

11  people who help them transition, leading them down

12  a dangerous medical path that permanently --

13  permanently harming their healthy bodies with

14  off-label drugs and experimental surgeries.

15       I interact with parents on a -- every day

16  whose children are instantly derailed as a result

17  of adopting a transgender identity.  These children

18  become angry and hostile and resentful.  They begin

19  lashing out at anyone who will not agree with their

20  new-found identity.  Parents are left -- have been

21  forced to rely on each other to figure out how best

22  to navigate this destructive social phenomenon.

23       The current one-size-fits-all affirmation

24  model cuts parents out of the equation, charging

25  forward with a rigid, transition-only course of

1    action.

2         A VOICE:  Ma'am, excuse me, your time is up.

3    Could you please wrap it up?

4         MS. LAMBART:  Yes.

5         I would just like to say that on behalf of

6    thousands of loving parents, we ask Florida -- the

7    health -- to stand up for the protection of

8    children and teens who are under -- who are being

9    offered a magic fix.  Parents deserve support and

10   children deserve sound care.

11        Thank you for your support and your time.

12        (Applause.)

13        A VOICE:  Thank you for your comments.

14        The next speaker is Gerald Buston.

15        MR. BUSTON:  Ladies and gentlemen, I am here

16   as a Christian pastor.  71 years ago, I gave my

17   life to Jesus Christ and chose to live my life

18   according to the Word of God, the Bible.  The Bible

19   teaches that God makes people male and female, and

20   it says that repeatedly.  Jesus said that himself.

21   And for us to try to transition people away from

22   what God did should be -- well, it definitely is a

23   sin, but it should be a criminal abuse of children,

24   especially when they're not at the age where they

25   can properly process what they're doing to

1        themselves or allowing to be done to themselves.

2            I urge Medicaid don't support this.  I urge

3        the State of Florida to pass laws against it and

4        not allow our children to be abused the way they

5        are being abused by people that have one goal in

6        mind, and that is depopulating the world by cutting

7        back on the birth rate and by cutting back on the

8        population we have in our world right now.

9            So I support the bill that we do not pay for

10       this kind of stuff, and I would say let's go

11       further and pass laws against it and make that

12       extreme child abuse to do that to children that

13       don't have the right to know.

14           (Applause.)

15           A VOICE:  The next speaker is -- I believe

16       it's Brady or perhaps Brandy Andrews.

17           MS. ANDREWS:  Hey there, Brandy Andrews.  I'm

18       here to speak in support of banning Medicaid

19       funding for transgender surgeries and treatments.

20           Transgender surgeries, puberty blockers, and

21       cross-sex hormone treatments have been shown to be

22       extremely harmful, especially to minors, causing

23       sterility and irreversible physical and

24       psychological damage.

25           Physically healthy, gender-confused girls are

1    being given double mastectomies at 13 and

2    hysterectomies at 16, while males are referred for

3    surgical castration and penectomies at 16 and 17,

4    respectively.

5        How have we reached this point in life where

6    we're allowing this at such a young age, but yet

7    you have to be 16 to drive a car, 18 to buy a pack

8    of cigarettes, where we're allowing children to

9    change their genders before they've even reached

10   puberty or shortly after?

11       Pharmaceutical companies are unethically

12   enriching themselves off the destruction of

13   countless young lives that are being fed puberty

14   blockers, which these companies are advertising

15   children.  It's just straight-up child abuse, and

16   it's preying on our society's most vulnerable

17   youth.

18       Let kids be kids.  I am asking Medicaid to

19   stop funding experimental medical treatments on

20   minors.  Thank you.

21       (Applause.)

22       A VOICE:  If I could remind folks to please

23   state your name before you start your comments.

24       Next speaker is Sabrina Hartsfield.

25       MS. HARTSFIELD:  Good afternoon.  My name is

FOR THE RECORD REPORTING, INC. 850.222.5491

1    Sabrina Hartsfield, and I am speaking just from my

2    own opinions.  I am an alumni of Florida State

3    University and I am a born-again Christian.

4         Because of this conviction, I believe we as

5    human beings have an obligation to ensure poor and

6    marginalized people of all ages have adequate

7    medical care through the Medicaid program.

8         Without gender-affirming health care,

9    transgender and gender nonconforming individuals

10   will die.  According to every major legitimate

11   medical organization, gender affirming care is the

12   treatment for gender dysphoria.

13        I am here today to speak against Rule

14   59G-1.050, the Florida Medicaid trans and medical

15   care ban, from being put into place.

16        Gender-affirming care is medically necessary

17   and life-saving treatment that should be decided

18   between a patient, their caregivers, and a health

19   care professional, not big government.

20        Florida is about freedom from big government

21   overreach.  Medicaid should cover all

22   medically-necessary treatment, and under the right

23   to privacy found in Florida's constitution, this

24   is, again, a decision that should be hands -- in

25   the hands of the patient and their health care

FOR THE RECORD REPORTING, INC.  850.222.5491

1   providers.

2        This rule also violates the nondiscrimination

3   protections for people of all gender identities

4   found in the Affordable Care Act and the Medicaid

5   Act.

6        Transgender and gender nonconforming people

7   who have gender dysphoria are already at increased

8   risk for negative health outcomes, such as being

9   diagnosed with anxiety or depression, battling a

10  substance use disorder, and attempting suicide.

11  Denying medical care that has been determined to be

12  the best practice by every major medical

13  association from the American Psychological

14  Association to the American Medical Association to

15  the Endocrine Society will be life-threatening.

16  Denying transgender and gender nonconforming people

17  medical care can lead to depression, self-harming,

18  social rejection, and suicidal behavior.

19        If the trans medical care ban is enacted, it

20  will be putting the lives of over 9,000 transgender

21  Floridians in danger.

22        Please block proposed Rule 59G-1.050.

23        (Applause.)

24        A VOICE:  The next speaker is Simone Chris.

25        MS. CHRIS:  Good afternoon.  My name is Simone

FOR THE RECORD REPORTING, INC. 850.222.5491

1    Chris and I'm an attorney.  I'm the director of the

2    Transgender Rights Initiative Southern Legal

3    Council.  We are a statewide, not-for-profit,

4    public interest civil rights law firm that utilizes

5    federal impact litigation policy reform and

6    individual advocacy to ensure communities that we

7    serve have access to justice and freedom from

8    discrimination.

9        We vehemently oppose the proposed rule based

10   both on the science and evidence supporting the

11   medical necessity of treatment for gender dysphoria

12   and our own extensive experience working with

13   hundreds of transgender adults and minors and

14   witnessing the tremendous benefits that access to

15   such care provides.

16       In effect, the proposed rule creates a blanket

17   exclusion for coverage of medically-necessary

18   health care for one of the most vulnerable

19   populations in our state, eliminating the right of

20   all transgender Floridians with Medicaid to even

21   have their health care needs subjected to a

22   medical-necessity analysis.  The insidiousness of

23   this rule is exacerbated by the fact that it places

24   in its cross-hairs the individuals in our state who

25   are already disproportionately likely to experience

1    poverty, homelessness, unemployment, poor mental

2    and physical health outcomes, and to have the least

3    access to resources in health care as it is.

4        We urge AHCA to reject these proposed changes

5    to the rule excluding the coverage for all

6    medically-necessary gender-affirming care because

7    it directly contravenes the widely accepted,

8    authoritative standards of care and the consensus

9    of every major medical association in our country.

10   It will cause significant harm to the individuals

11   that we serve by depriving them of critical,

12   life-saving medical care.  It interferes with and

13   substitutes the state's judgment in place of the

14   doctor/patient relationship, the rights of the

15   individual, and the fundamental rights of a parent

16   to determine appropriate medical treatment for

17   their own child, and it is a shameful waste of

18   state resources.

19       Similar exclusions have been enjoined or

20   struck down by courts across the country as

21   inconsistent with the rights guarantee to Medicaid

22   recipients under the Medicaid Act, under the equal

23   protection clause of the 14th Amendment, the

24   Affordable Care Act.  And this litigation that the

25   state will certainly find itself embroiled in is

1    wasting valuable state resources that could be

2    better utilized enhancing the lives of Floridians

3    rather than attacking them.

4         Thank you.

5         (Applause.)

6         A VOICE:  Matthew Benson.

7         DR. BENSON:  My name is Matthew Benson.  I'm a

8    board-certified pediatrician and pediatric

9    endocrinologist in the state, and I agree with this

10   rule.  I think the data on which the gender

11   affirmative model is based is not scientific.

12        The National Board of Health and Welfare of

13   Sweden has recently enacted in that country pretty

14   significant restrictions.  And if we're going to do

15   this type of care, it needs to be under an

16   IRB-approved protocol and it needs to be based on

17   the best data.

18        I'm used to prescribing these medications in

19   the sense of puberty blockers.  And one of the

20   largest studies that came from Sweden was published

21   around 2016, and basically what they showed is that

22   in those individuals who are transgender and

23   receive these types of procedures, the rates of

24   overall mortality compared to the general

25   population was three times that of the general

FOR THE RECORD REPORTING, INC. 850.222.5491

1    population; completed suicide, 19 times that of the

2    general population; five times suicide attempts of

3    the general population.  Similarly, in Denmark, out

4    of a 20-year period, by the time a similar study

5    was done, 10 percent of the population had died.

6         We need better data.  We need long-term

7    perspective trials where we can look at adverse

8    effects.  We need much more robust data to justify

9    these kinds of very aggressive therapies.  And

10   we've already seen two individuals, Chloe and

11   Sophia, testify here today about how they were

12   harmed by these procedures.

13        Thank you for your time.

14        (Applause.)

15        A VOICE:  Next speaker, Karen Shoen.

16        MS. SHOEN:  My name is Karen Shoen.  I'm with

17   the Florida Citizens Alliance and I'm a former

18   teacher.

19        I would like to know why .03 percent of the

20   population is dictating to 99.97 percent of the

21   population to accept and pay for an elective

22   surgery.  Kids change their minds.  I can tell you

23   as a teacher, one day they want to be a fireman,

24   the next day they want to be an engineer, and then

25   they go into being something else.

1           The problem is we are not explaining the

2     wonders of what it is to be comfortable in your

3     body with both our parents and in our biology and

4     hygiene glasses.  So kids become fearful.  It's our

5     job to take that fear away as a teacher, not to

6     force them into something else.

7           The children may be afraid of maturing, they

8     may be afraid of a lot of things, but we're not

9     looking for the root cause, we are now suggesting

10    and implanting in their brains that they're not

11    comfortable in their body.

12          I'd like to leave you with this thought:  Can

13    I drive a car?  No, you're 13.  Can I have a drink?

14    No, you're 13.  Can I shoot a gun?  No, you're 13.

15    Can I change my gender?  Yes, you're in charge.

16    How is that possible?

17          (Applause.)

18          A VOICE:  Next speaker, Bill Snyder.

19          MR. SNYDER:  Thank you.  Bill Snyder.  I

20    (inaudible) Monticello.

21          I want to talk about a disease that has

22    infected society today called reality disease.

23    Charlie had reality disease.  He woke up one

24    morning and wouldn't get out of bed and go to work.

25    His wife said, "Charlie, you've got to get up,

1   you've got to go to work."  He said, "I can't, I'm

2   dead."  His wife said, "You're not dead, you're

3   talking to me.  I can see you breathing."  Charlie

4   says, "I can't get up and go to work, I'm dead."

5   The wife called in a psychologist.  Psychologist

6   gave Charlie a lengthy interview.  At the end of

7   the interview, the psychologist said, "Charlie,

8   come on, we're going to go downtown."  They went

9   downtown to the morgue.  The psychologist opened a

10  locker, (inaudible) out a cadaver on a tray, pulled

11  the sheet back over the feet of the cadaver, said,

12  "Charlie, dead people's hearts don't beat, they

13  don't have circulation, they do not bleed."  He

14  took the toe of the cadaver, stuck a pin in it.  No

15  blood came out.  The psychologist said, "See,

16  Charlie, dead people don't bleed.  Now, give me

17  your thumb."  Took Charlie's thumb, stuck a pin in

18  it, out came bright, red blood.  The psychologist

19  said, "See, Charlie, you're not dead.  That's

20  blood."  Charlie said, "What do you know?  Dead

21  people do bleed."

22      The further we live from reality, the further

23  we move from morality, the further we move from

24  virtue, the more secular we become.  The more

25  secular we become, the less freedom we have.

1      Please approve this proposed rule change.  Thank

2      you.

3              (Applause.)

4              A VOICE:  Next speaker, Ingrid Ford.

5              MS. FORD:  Yes.  Good afternoon.  I'm Ingrid

6      Ford.  Thank you for the opportunity.  I'm with

7      Christian Family Coalition.  I've been a college

8      counselor 15 years, and I'm here in support -- I'm

9      to speak in support of Rule 59G-1.050 to ban

10     Medicaid funding from transgender surgeries and

11     treatments.

12             This rule will protect Florida residents,

13     especially minors, from harmful transgender

14     surgeries, harmful blockers, and other unnatural

15     therapies being promoted by radical gender ideals

16     and with no basis in science.

17             This rule also will protect taxpayers from

18     being forced to subsidize these highly unethical

19     and dangerous procedures, which can cost upwards of

20     $300,000.

21             Thank you.

22             (Applause.)

23             A VOICE:  Next speaker, Richard Carlins.

24             MR. CARLINS:  Hello, my name is Richard

25     Carlins and I am in support of the rule and I'm

FOR THE RECORD REPORTING, INC. 850.222.5491

just going to speak from the heart a little bit.  I
feel like I'm walking in a house of mirrors or
something or it's just -- it's surreal, the world
that I live in today from the world that I grew up
in.

     I had a traditional family, a mother and
father.  We're saying the Pledge of Allegiance in
schools and having prayer in schools.  We were
founded upon Biblical principles.  Our constitution
goes hand in hand with that.  We're battling with
each other right now, you know, over things that
were clearly right and wrong before.

     Seriously, a kid has no idea.  They're being
indoctrinated.  They're being indoctrinated even
through commercials, Disney World, Coca-Cola
commercials, the restaurants they go to.  And then
when they want to be what it is that they were
pushed to be, we mutilate their bodies and it's
irreversible.  It's horrendous.  It's a horrendous
evil.

     And with that, I go.  I just can't believe
where we're at.  And we're -- God raises up nations
and he brings down nations, and we are in judgment
right now.  This is wrong, we need to be able to
admit that it is wrong and to help the children to

FOR THE RECORD REPORTING, INC. 850.222.5491

1   have wholesome lives that history prior to us --

2   this is just recent this -- what we're battling

3   with right now.  I'm just -- you know, not

4   well-studied or anything, but I think it's 1,500

5   years that we've been living in Judeo-Christian

6   principles, you know, and it's just recently that

7   we're throwing any mention of God, the Bible, under

8   the bus.  They're not allowed to hear it.  They're

9   not allowed to know it.  If you feel like you want

10  to have pleasure this way or that way, with this,

11  with that, you can and we're going to support it

12  and do whatever it is so that you can never change

13  your mind again and give you nothing wholesome to

14  hold onto.  That's all.

15       (Applause.)

16       A VOICE:  Amber Hand.  Amber Hand.

17       MS. HAND:  Hi, I'm Amber Hand and I am just

18  with the body of Christ.

19       So I come today because I represent -- well, I

20  come from a family, my mom was gay and my dad was

21  gay.  He struggled with his identity his whole

22  life, but he fought against it because he was a

23  Christian.  And I was taught by my dad I was a

24  little girl, and by mom, I was a little boy.  And

25  so I got real confused, you know what I mean, and

1    I'm 36 today and I just realized -- last year I was

2    thinking about getting a sex change still.  I've

3    always thought about it.  And when I was a kid, I

4    was like, "When I get boobs, I'm going to cut them

5    off with a butter knife," you know what I mean?

6         And when we're kids, we're so impressionable.

7    I remember my sister going and seeing my dad use

8    the bathroom, and she went to use the bathroom like

9    him, but he corrected her, you know, because we

10   have to teach these kids right from wrong.  And

11   it's wrong to take kids and teach them, "Hey, you

12   can make whatever decision you want and you don't

13   even know mentally what you're really going through

14   as a child."  We need to take Medicaid and treat

15   people for psychiatric problems and depression and

16   teach them like you can be a female, it's okay to

17   be a female today and say that you're a woman, you

18   know, like -- and I just realized now at 36 that I

19   want to have a baby, and if I had done that, I

20   would have never been able to have a child.

21        And I just have to say that the Bible says,

22   "Beloved, I wish above all things that thou mayest

23   prosper and be in health even as thy soul

24   prospers."  And when we struggle with identity, our

25   souls are in turmoil.  And if we just begin to

FOR THE RECORD REPORTING, INC. 850.222.5491

1    realize that we just need to teach these kids right

2    from wrong and that it's not okay to change your

3    identity when God made you a male or a female, and

4    when a little boy puts on a high heel because he

5    sees his mother wearing a high heel, it's just

6    play, like it's okay, but that's not what you wear,

7    and teach him what to wear.  We just don't

8    understand as kids what's going on until somebody

9    teaches us.  We have learned behavior.  We're

10   programming kids these days with everything --

11        A VOICE:  Time's up.  Please wrap it up.

12        MS. HAND:  -- (inaudible) around us to be

13   somebody we're not.  God bless.

14        (Applause.)

15        A VOICE:  Shauna Peace.

16        MS. PEACE:  Hi, my name is Shauna Peace, and I

17   am just am here to speak in support of Rule

18   59G-1.050 to ban Medicaid funding on transgender

19   surgery and treatment.

20        Children are being pressured and socialized at

21   a very young age to identify as transgender.  Much

22   of the pressure is coming from on-line social

23   networking sites that celebrate and encourage

24   transgenderism while denying normal heterosexual

25   behaviors.  It accounts for much of the metric rise

FOR THE RECORD REPORTING, INC. 850.222.5491

1   in the children's identifying as transgender in the

2   recent years.  It has doubled since 2017, according

3   to the news sensors for the Centers for Disease

4   Control and Prevention.

5         The most thorough followup of sex reassignment

6   people, which was conducted in Sweden, documented

7   that 10 to 15 years after surgical reassignment,

8   the suicide rate is twenty times to comparable

9   peers.  The alarmingly high suicide rate among

10  post-operative transgender demonstrates the deep

11  regret that may feel after irreversible mutilating

12  their bodies with these barbaric procedures.

13        I am here today because I have had children

14  that have battled with identity and sexual

15  identity, and that my stepson is now identified as

16  female.  He wanted to when he was younger in years,

17  to change, but now that he has gotten into his 20s,

18  he has now decided that he wants to have children,

19  and if you mutilate these children's bodies at an

20  early age, they don't understand that they will

21  never be able to procreate ever again.  Whether you

22  go female or male or male or female, neither sex

23  will be able to procreate ever again.  And I just

24  think it's mutilating and it's not right.

25        Thank you very much.

1       (Applause.)

2       A VOICE:  The next speaker, Leonard Lord.

3       MR. LORD:  My name is Leonard Lord.  I am much

4 in favor of the bill.

5       Even as a boy, I wasn't comfortable in my body

6 because I didn't know why I was here.  So when I

7 got the age to say, "I want to find out why I'm

8 here," I spent three days fasting, praying, seeking

9 God.  He brought me to his Word, and I found out

10 that the only way I got comfortable in my body was

11 to know what I was created for.

12       And so what I found, either we're playing

13 games, or if we really believe there's a God and

14 the Bible is true, we find out this whole problem

15 happens because we do not retain the knowledge of

16 God in our conscience and are given over onto our

17 own deception.

18       And now I hear all of the mental problems

19 we're having.  Well, it's real simple.  God's

20 spirit is the answer to what's missing in our

21 lives.  We're only complete in Jesus Christ.  And

22 the scripture says in Timothy 1:7, God has not

23 given us a spirit of fear, we ought to fear man or

24 woman, but he's given us power, love, and a sound

25 mind.  You take the Bible out of school, you take

FOR THE RECORD REPORTING, INC. 850.222.5491

1    God out of school, you take prayer out of school,

2    and what have you got?  You have no power, you have

3    no love, and you have no sound mind.

4         So I'm just saying let's go back to getting

5    mentally right is the only way I can at 75 is to

6    know God created me, his Word is true, live in

7    supernatural peace and joy and know where you'll

8    spend eternity and don't live confused.

9         A VOICE:  Thirty seconds.

10        MR. LORD:  The devil is the author of

11   confusion.  Get a pure heart and live in peace and

12   joy and enjoy things.  If you spend your life

13   trying to find out if you're a man or a woman,

14   you'll never know why you're here.

15        All I can say, God bless you, I'm in support

16   of the bill, and hopefully America will wake up and

17   be a shining city on a hill for all the nations one

18   more time.  Lord bless you.

19        (Applause.)

20        A VOICE:  Pam Olsen.  Pam Olsen.

21        A VOICE:  Dan or Pam?

22        A VOICE:  Pam.

23        MS. OLSEN:  It's me, Pam Olsen.

24        Thank you for this proposal.  I've read all

25   the pages.  It's excellent.  I am for stopping

FOR THE RECORD REPORTING, INC. 850.222.5491

1    Medicaid from paying for children and teenagers to

2    have sex changes.

3         I've talked to a lot of kids that are

4    confused, and they are confused.  That's what's

5    going on today.  There is so much onslaught against

6    these kids, and you've got kids saying, "I'm a boy,

7    I'm a girl; no, I'm a girl, I'm a boy."  You have

8    kids today saying, "I'm a furry animal."  Are we

9    going to start paying for them to have furry animal

10   body parts put into them?  I mean, where does this

11   stop?

12        And I am so thankful that this has been

13   proposed, that we will stop the madness in Florida

14   and we will not do this.  I hope that you guys do

15   approve this today because it matters for the sake

16   of the children.  You know, I've got 12 grandkids

17   and I'm going to fight tenaciously, not only for my

18   grandkids, but for their friends and for all the

19   children across our state, our nation.  We need to

20   say stop the nonsense and let's do what is right.

21   There are boys, there are girls, there are men,

22   there are women.

23        Thank you so much for approving this.  I

24   believe you will do that.  Thank you.

25        (Applause.)

FOR THE RECORD REPORTING, INC. 850.222.5491

1          A VOICE:   Jon Harris Maurer.

2          MR. MAURER:   Good afternoon.   My name is Jon

3     Harris Maurer and I'm the public policy director

4     for Equality Florida, the state's largest civil

5     rights organization based on securing full equality

6     for Florida's LGBTQ community.

7          The proposed change to Rule 59G-1.050 is

8     without sound scientific basis, it is without legal

9     basis, and it is clearly discriminatory.   The

10    agency should reject it.

11         The proposed rule is about politics, not

12    public health.   We urge you to listen to the

13    numerous medical professionals opposed to the rule.

14    Experts from the country's and the world's leading

15    health organizations disagree with the fundamental

16    premise of the proposed rule.   They endorse

17    gender-afforming [sic] care.   These organizations

18    represent millions of medical professionals, and

19    they recommend gender-affirming care.   We're

20    talking about the American Academy of Pediatrics

21    and its Florida chapter, the American Medical

22    Association, the American College of Obstetricians

23    and Gynecologists, the American College of

24    Physicians, the American Psychiatric Association,

25    the American Psychological Association, the

FOR THE RECORD REPORTING, INC. 850.222.5491

1    American Academy of Family Physicians, the American

2    Academy of Child and Adolescent Psychiatry, the

3    Endocrine Society, the Society for Adolescent

4    Health and Medicine, the Pediatric Endocrine

5    Society, the World Professional Health Association

6    for Transgender Health, and others; again,

7    representing millions of medical professionals.

8        Furthermore, AHCA lacks the specific delegated

9    rulemaking authority to adopt the proposed rule.

10   The statutes that AHCA names as its authority to

11   make this proposed rule --

12       A VOICE:  Thirty seconds.

13       MR. MAURER:  -- grant no authority for

14   (inaudible) patient of the individual role for

15   health care practitioners to make decisions with

16   their patients.

17       The rule is simply discriminatory, it

18   undeniably targets the transgender community.  You

19   may not understand what it's like to be

20   transgender --

21       A VOICE:  Fifteen seconds.

22       MR. MAURER:  -- or to be a parent of a

23   transgender kid just trying to find the best care

24   for your kid, but transgender Floridians are here

25   in this audience and they're telling you about how

FOR THE RECORD REPORTING, INC. 850.222.5491

1      harmful this rule would be to the more than 9,000

2      transgender Floridians on Medicaid.  We know these

3      therapies are safe because the agency is not

4      opposing them for all Floridians.

5           A VOICE:  Sir, please wrap it up.  Your time

6      is up.

7           MR. MAURER:  In conjunction with the state

8      willingly ignoring the body of scientific evidence

9      that supports gender-affirming care, there's no

10     question of the politically-calculated animus

11     behind this proposed rule.  Please reject the

12     proposed rule.

13          (Applause.)

14          A VOICE:  I appreciate your comments.  I would

15     just ask for decorum in the crowd.  We want to give

16     everybody equal opportunity to speak.

17          A VOICE:  Next speaker, Anthony Verdugo.

18          MR. VERDUGO:  Thank you.  Good afternoon.  I

19     want to start off by thanking all of you for being

20     here today and for your public service.

21          My name is Anthony Verdugo.  I am the founder

22     and executive director of the Christian Family

23     Coalition.  We are a leading human rights and

24     social justice advocacy organization of Florida,

25     and we're here to strongly support Rule 59G-1.050

FOR THE RECORD REPORTING, INC. 850.222.5491

1    to ban Medicaid funding for transgender surgeries

2    and treatment.

3         They call it gender-affirming care.  They

4    don't care and it's not affirming.  Let's get that

5    straight.  And we know that because of heroes who

6    are among us here today, folks like Chloe Cole and

7    Sophia Galvin.  They are heroes because they've had

8    the courage to come out and speak the truth in

9    love.

10        And everyone needs to be respected and treated

11   with dignity, but this is a war on children.  These

12   are crimes against humanity.  Groomers are using

13   their authority as adults to pressure children and

14   ruin their lives.

15        I'm going to share with you about a brand, the

16   No. 1 prescribed puberty blocker in America.  It's

17   called Lupron.  And they themselves list on their

18   package that "Emotional instability is a side

19   effect and warrants prescribers to monitor for

20   development or worsening of psychiatric symptoms

21   during treatment."

22        These so-called medical organizations which

23   were just listed --

24        A VOICE:  Thirty seconds.

25        MR. VERDUGO:  -- have been discredited.

FOR THE RECORD REPORTING, INC. 850.222.5491

1    World-renowned organizations such as the Royal

2    College of General Practitioners in the United

3    Kingdom, Australian College of Physicians, and the

4    American College of Pediatricians -- and I will end

5    with their quote -- say, "Americans are being led

6    astray by a medical establishment driven by a

7    dangerous ideology and economic opportunity, not

8    science and the Hippocratic oath."  The suppression

9    of normal puberty, the use of disease-causing

10   cross-sex hormones, and the surgical mutilation and

11   sterilization of children constitute atrocities to

12   be banned, not health care.  Let kids be kids.

13        Thank you.

14        (Applause.)

15        A VOICE:  Next speaker, Roberto Rodriguez.

16        MR. RODRIDGUEZ:  Thank you very much for this

17   opportunity.  I love America as a veteran,

18   ex-police officer, father, grandfather -- let me

19   see what else, you know, and a father of a veteran

20   who is serving in the Navy today as a pilot.  And

21   first of all, I wanted to thank you.  You guys made

22   me cry.  Why?  Because, you know, I have a

23   question.  Has -- you know, anybody can answer it.

24   Has a doctor ever been wrong?  You know, has a

25   parent ever been wrong?  Has teachers ever been

1    wrong?  Have scientists ever been wrong?  But,

2    then, why are we listening and waiting for

3    scientists and doctors to talk different to what we

4    have evidence here today?

5         We have the evidence right here today.  They

6    came walking in this place and we're being blind to

7    them, and I want to recognize you and I want you to

8    let you know that the true dream is interwoven in

9    every atom of your existence.  God will fulfill his

10   true dream to you, no matter what man try to do to

11   you.  You have a purpose, you have a reason, and

12   today proves it.

13        And I'm here to tell you that this rule, we

14   need to go ahead, I support it.  We need to stop

15   being ignorant to what faces us and listening to

16   people.

17        I am from the Centers of God and I have

18   multiple churches that will stand here today.  So

19   I'll tell you what, we're bigger than any

20   organization there is right now and represent that

21   we are for this rule.

22        God bless you and thank you.  We love you guys

23   for serving.  Thank you.

24        (Applause.)

25        A VOICE:  Next speaker, Michael Haller, M.D.

FOR THE RECORD REPORTING, INC. 850.222.5491

1      All right.  Michael Haller, M.D.

2          DR. HALLER:  Good afternoon, everyone.  My

3      name is Michael Haller and I am a graduate of the

4      University of Florida's College of Medicine,

5      pediatric residency, and the pediatric

6      endocrinology fellowship.  I hold a Master's in

7      clinical investigation and I am the professor and

8      chief of the Pediatric Endocrinology Division at

9      the University of Florida.  The views expressed

10     here are, however, my own.

11         I have trained thousands of medical providers,

12     participated in the development of national

13     guidelines, and have treated tens of thousands of

14     children, including many transgender youth.

15         I provide this background with full humility,

16     but also to establish myself as an actual expert,

17     both in the management of gender-diverse youth and

18     as one who can review and analyze relevant

19     literature.

20         The Gapums document and proposed rule change

21     seeking to remove Medicare -- medical -- Medicaid

22     coverage for gender dysphoria makes numerous false

23     claims, uses a biased review of the literature, and

24     relies on more so-called experts who actually lack

25     actual expertise in the care of children with

FOR THE RECORD REPORTING, INC. 850.222.5491

1    dysphoria.

2         While there are a number of flaws, the state's

3    plan following deserves specific commentary.

4         First, the state's primary assertion that

5    gender-affirming therapy has not demonstrated

6    efficacy and safety is patently false.  Nearly

7    every major medical organization that provides care

8    for children, as you heard previously, have

9    provided well-evidenced guidelines supporting

10   gender-affirming care as the standard of care.  The

11   assertion from the state, the data included in

12   those guidelines, are not as robust as the state

13   would like them to be --

14        A VOICE:  Thirty seconds.

15        DR. HALLER:  -- is at best a double standard,

16   and is at worst discriminary [sic] political fear.

17   The state is either unwilling or willfully chooses

18   to ignore the totality of evidence in support of

19   gender-affirming care, and the latter seems most

20   likely.

21        Second, the state's use of --

22        A VOICE:  Fifteen seconds.

23        DR. HALLER:  -- (inaudible) experts as

24   (inaudible) advisers seeking to discredit evidence

25   used (inaudible) of care is laughable.  Several of

FOR THE RECORD REPORTING, INC. 850.222.5491

1      the state's own experts have been legally

2      discredited from testifying as such in cases

3      regarding gender-affirming care, while others have

4      acknowledged publicly that they have never provided

5      gender-related care to children.

6           A VOICE:  Wrap it up.

7           DR. HALLER:  The proposal to limit

8      gender-affirming care to those dependent on

9      Medicaid is poorly conceived, is likely to cause

10     significant harm to Floridians dependent on

11     Medicaid, and should be rejected.  Thank you.

12          (Applause.)

13          A VOICE:  Next speaker, Robert Yules.

14          Jason, did you want to comment?

15          A VOICE:  I'm sorry, we have -- the panel has

16     one comment to that.  I'm going to refer this to

17     Dr. Van.

18          DR. V:  So just some insight into the support

19     of gender-affirming care by the large societies,

20     medical societies in the United States.  The

21     American Academy of Pediatrics has actually made a

22     statement against this -- this, and the Florida

23     chapter as well.

24          These are not standards of care.  Standards of

25     care by definition are an arduous process of

FOR THE RECORD REPORTING, INC. 850.222.5491

1      listening to all input from every side, every

2      aspect, of a medical condition, and these

3      individuals get together and they agree on

4      someplace in the middle that they can all live with

5      as a then standard of care.

6          These are merely guidelines.  The guidelines

7      from the Endocrine Society specifically state they

8      are not standards of care.  They're just

9      guidelines.  They are the opinions of the

10     individuals who wrote the guidelines.  The

11     Endocrine Society guidelines were written by nine

12     people in the first go-round and ten in the second

13     go-round, all of which were ideologues from the

14     World Professional Association of Transgender

15     health.

16         That group -- that interest group excluded

17     world renowned experts in the field and did not

18     listen to their input, didn't include their input

19     on purpose.  And so it's not surprising that you

20     come up with one view that does not really

21     represent any kind of standards of care.

22         So we have to stop using the term "standards

23     of care" when there are absolutely no standards of

24     care in this instance that have been addressed.

25         (Applause.)

FOR THE RECORD REPORTING, INC. 850.222.5491

1    A VOICE:  Mr. Yules.  Mr. Yules.

2    DR. HALLER:  I would also --

3    A VOICE:  Sir, you've spoken already.  If you

4  have further comments, please submit them in

5  writing.

6    A VOICE:  No, I'm sorry, Dr. Haller.  If you

7  have further comments, you can -- you can refer

8  them in writing.  You can refer them in writing,

9  Doctor.

10    A VOICE:  Robert Yules.

11    MR. YULES:  Yes, my name is Robert Yules.

12  It's an honor and privilege to be here.  I was born

13  and raised in St. Petersburg, Florida, and my, how

14  things have changed.  Forty-three years ago, my

15  senior high school class came here to view the

16  legislature, and the topic of the day was about

17  dog-catching rules in the state of Florida.  My,

18  how far we've come.

19    This was not even in the purview of anyone at

20  that time.  This was not in the purview of anyone

21  ten years ago.  This was not in the purview really

22  of anyone five years ago to bring it to the state

23  level, the city level, the classroom level, to be

24  driven by the teachers' unions with all of their

25  ideology, and really it begins and ends when man

1    proclaims himself as God.  The truth begins with me
2    and it ends with me.  And our country is in a lot
3    of trouble because people aren't willing to say
4    "No, that's not your truth."  There is a truth.
5    That might be your perspective of the truth, but
6    there is not your truth, your truth, your truth, my
7    truth, his truth.  It's not the way it works, and
8    we're going down -- just even philosophically and
9    morally, we're going down a very, very slippery
10   road when we start delving into these things.

11       It's interesting to me also how a child cannot
12   own this or own that or own this, and the thing
13   we've been told for the last ten years, "Well,
14   their brain's not fully developed until around 25."
15   Everybody says that, right?  Their brains aren't
16   developed until they're 25, and now our governor
17   caught such flack because he said don't teach
18   kindergarteners --

19       A VOICE:  Thirty seconds.

20       MR. YULES:  -- about transgendering, leave it
21   out till third grade.  I think they should leave it
22   out till 12th grade and let parents have those
23   conversations with people.  Put it back where
24   parents talk to their own kids, and let's -- let's
25   make school about science, technology,

FOR THE RECORD REPORTING, INC.  850.222.5491

1    engineering --

2         A VOICE:  Fifteen seconds.

3         MR. YULES:  -- and mathematics and get back

4    where we need to be.

5         Thank you so much for your time.  Thank you.

6         (Applause.)

7         A VOICE:  At this time, we would like to

8    remind everyone that they can submit comments in

9    writing to medicaidrulecomments@ahca.myflorida.com.

10   Information is provided on cards at the exit when

11   we are finished, as well as up on the screen.

12   We'll continue with the speakers.

13        A VOICE:  Flaugh.  Keith Flaugh.

14        MR. FLAUGH:  Good afternoon.  My name is Keith

15   Flaugh.  I am one of the founders of an

16   organization called Florida Citizens Alliance,

17   which is a not-for-profit organization of almost

18   200,000 parents and grandparents, and we focus on K

19   through 12 education.

20        We have recently completed a detailed study in

21   all 67 county school districts based on 58 novels

22   that we found throughout.  I've left a copy with

23   Cole.  I would encourage you to read it.

24        Twenty of those are LGBTQ and gender --

25   promoting gender dysphoria.  Some of these

FOR THE RECORD REPORTING, INC. 850.222.5491

1       materials are actually designed for pre-K.

2           Children in our public schools are being

3       purposefully confused, desensitized, and even

4       pressured into abnormal sexual behavior.  Gender

5       idealogues are coaching kids to be into this

6       dysphoria, and even telling them to threaten

7       suicide.

8           There is a considerable debate in the

9       psychiatric and medical circles about whether the

10      transgender condition is biological or

11      psychological.  In numerous public schools, staffs

12      and even teachers are aiding this dysphoria and

13      purposely hiding what they're doing from the

14      parents.  Further, taxpayers shouldn't have to pay

15      for this.

16          Florida Citizens Alliance strongly supports

17      the rule of 59G-1.050, especially to protect minors

18      from the harmful transgender surgeries, hormone

19      blockers, and other unnatural therapies.  Thank

20      you.

21          (Applause.)

22          A VOICE:  Robert Roper.

23          MR. ROPER:  Hi, my name is Robert Roper.  I'm

24      here to speak in support of the rule to ban

25      Medicaid funding for transgender surgeries and

1    treatments.  The most important aspect of this rule

2    is that it serves to protect the children of the

3    state of Florida.

4          Gender confusion is the only disorder that

5    comes with a false assertion that a child can

6    actually be born in the wrong body.  They are led

7    to believe that some day they'll actually become a

8    member of the opposite sex.  That's impossible.

9    Maybe that's why they call it "transgender."  You

10   never actually arrive at the desired outcome.

11         Gender confusion is the only disorder that the

12   body is mangled to conform to the thoughts of the

13   mind.

14         Gender confusion is the only disorder that the

15   child actually dictates his or her medical care to

16   medical and -- medical professionals and

17   counselors, instead of the other way around.

18         Gender confusion is the only disorder that the

19   parent can be completely excluded from determining

20   what is best for their own child.

21         Gender confusion is the only disorder that the

22   treatment takes the child down a dead-end road

23   literally.  What we are seeing in Florida and

24   across the nation is a social media-driven epidemic

25   manufactured by social media influencers making a

1   lot of money off the very vulnerable element of our

2   society -- that's our children.

3        While most counselors somehow have been

4   convinced that affirmation is the only way, even

5   the APA would be the first to affirm that a child

6   simply does not have the capacity to make these

7   kinds of long-range decisions.  In fact, you don't

8   need to be a doctor --

9        A VOICE:  Thirty seconds.

10       MR. ROPER:  -- of psychology to know this.

11  Ask any parent.  They will tell you that a child

12  wants what they want, and they want it now.

13       What some -- some will call on their faith,

14  some will call on a counselor, but all do so to be

15  delivered from the disorder, not to be sent deeper

16  into it.

17       A VOICE:  Fifteen seconds.

18       A VOICE:  You don't give drugs to a drug

19  addict, alcohol to an alcoholic, porn to someone

20  addicted to pornography.  This is not a form of

21  treatment.

22       In closing, transgender regret is among the

23  fastest-growing movements on social media today --

24       A VOICE:  (Inaudible).

25       MR. ROPER:  -- on Reddit this morning.  I

FOR THE RECORD REPORTING, INC. 850.222.5491

App. 3146

1    found a thread with 35,600 entries of people

2    regretting their transgenderism.  It increased to a

3    hundred more while I drove here today.

4         Watchful waiting from loving parents yields an

5    exponentially higher success rate of resolving

6    gender disorders than any prescription drugs or

7    surgery, 90 plus percent.  This rule will protect

8    Florida residents.

9         (Applause.)

10        A VOICE:  Carl Charles.

11        MR. CHARLES:  Good afternoon.  My name is Carl

12   Charles and I'm a senior attorney in the Atlanta,

13   Georgia, office of Lambda Legal, the nation's

14   oldest and largest legal organization fighting for

15   the rights of LGBT people and everyone living with

16   HIV.

17        We are here today to share that we strongly

18   oppose and are deeply disturbed by AHCA's notice of

19   proposed rule, which if approved will remove

20   coverage of medically-necessary care for

21   transgender youth and adults from the Florida

22   Medicaid program.  This essential and in some cases

23   life-saving care is clinically effective, evidence

24   based, and widely accepted and used by medical

25   professionals across the country to treat gender

1    dysphoria.

2         Unlawful exclusions of this kind cause

3    significant harm to a state's most vulnerable

4    residents.  Indeed, should this proposed rule be

5    adopted, it will cause serious, immediate, and

6    irreparable harm to transgender Medicaid

7    participants in Florida who already experience

8    well-documented and pervasive stigma,

9    discrimination in their day-to-day lives, including

10   significant challenges, if not all-out barriers to

11   accessing competent health care services.

12        We are especially concerned by the

13   administration's characterization of this care as

14   experimental and ineffective.  This is contrary to

15   all available medical evidence and relies on

16   misrepresentations of the findings of various

17   studies, as well as reports by so-called experts,

18   one of whom is on this panel, who have been

19   discredited and notably do not treat transgender

20   people --

21        A VOICE:  Thirty seconds.

22        MR. CHARLES:  -- in their medical practice.

23        Finally, I would like to note for the record

24   as to whether or not this was a negotiated

25   rulemaking process and who on the panel is a

1   transgender Medicaid recipient in Florida.  Okay,

2   there's no one.

3       Finally, singling out transgender Medicaid

4   participants for unequal treatment by denying them

5   coverage for services that non-trans Medicaid

6   participants access plainly violates the equal

7   protection clause of the U.S. Constitution and

8   federal law.

9       A VOICE:  Time.  Please wrap up your comment.

10      A VOICE:  Furthermore, Section 15-57 of the

11  Affordable Care Act prohibits discrimination on the

12  basis of sex by any health program or activity

13  receiving federal financial assistance.

14      Finally, shame on you all for proposing this

15  rule.

16      (Applause.)

17      A VOICE:  Jason, did you want to comment?

18      A VOICE:  Just quickly, I would like to refer

19  everyone to the Gapums report, in particular the

20  numerous appendices that we attached to that

21  report.  There have been references to the numerous

22  clinical organizations that have endorsed these

23  procedures, and in particular, I would refer you to

24  Dr. Canter's report, pages 27 through 28 -- I'm

25  sorry, pages 32 through 42, which go through each

1    one of those organizations.   Thank you.

2         A VOICE:   Speaker Ed Wilson.

3         MR. WILSON:   Ed Wilson.   I've traveled here

4    today to speak in support of Rule 59G-1.050 to ban

5    Medicare funding from being used for transgender

6    treatments and surgeries.

7         This rule will protect children who are not

8    mature enough to be comfortable in their own body

9    or to have sexual desires that they have not gone

10   through puberty yet from making mistakes that will

11   destroy their lives.

12        Children are being misguided into believing

13   that they're transgender.   Taxpayer money should

14   never be used to destroy innocent lives.

15        Transgender treatments and surgeries never

16   actually succeed in changing someone to the

17   opposite sex, but do cause permanent harm to the

18   people who undergo such treatments.

19        Health care professionals need to focus on

20   healing the mind of confused and/or abused people,

21   not mutilating their bodies.   As Anthony already

22   quoted, I'm going to skip part of the quote from

23   the American College of Pediatrics, but it ends

24   with, "The suppression of normal puberty, the use

25   of disease-causing cross-sex hormones, and the

FOR THE RECORD REPORTING, INC. 850.222.5491

1    surgical mutilation and sterilization of children

2    constitute atrocities to be banned, not health

3    care.

4        Please take their advice.  Ban these

5    atrocities --

6        A VOICE:  Thirty seconds.

7        MR. WILSON:  -- and keep Medicaid about health

8    care.  Thank you very much.

9        (Applause.)

10       A VOICE:  Speaker Suzanne Zimmerman.

11       MS. ZIMMERMAN:  I'm Suzanne Zimmerman, and I

12   am merely a mother, grandmother, great-grandmother,

13   aunt, great-aunt, and specifically great great-aunt

14   of a young child who is going through the throes of

15   gender dysphoria from the age -- a young age.  He

16   is now 8 years old, and I pray that our state

17   doesn't make it easy for her parents to be

18   dissuaded toward gender change.

19       I listened to the young people here who have

20   gone through this, and I think they speak volumes

21   more than any of the rest of us could say because

22   they've been through the difficulties and they've

23   learned through the difficulties.

24       And my bottom line is God doesn't make

25   mistakes.  We're all created equal and different,

FOR THE RECORD REPORTING, INC. 850.222.5491

1       each in His image, and there are many, many

2       different people in this world and we are to love

3       them all.  It's a commandment, it's God

4       commandment, and He loves us all.

5           I urge you to support this ban to make it easy

6       through Medicaid to have --

7           A VOICE:  Thirty seconds.

8           MS. ZIMMERMAN:  -- the surgery for children

9       who are children with very young brains.  Have a

10      heart and please pass this ban.  Thank you.

11          (Applause.)

12          A VOICE:  Judy Hollerza, H-o-l-l-e-r-z-a.

13          MS. HOLLERIN:  I'm Judy Hollerin, poor work --

14      poor penmanship apparently.

15          I support -- I support that we ban -- that we

16      ban this.  I -- every day, of course, we wake up

17      seeing new things that we can't believe are

18      happening to us today.  And I support everything

19      that's been said -- everything in support of that

20      has been said today.

21          The idea that Medicaid should be doing --

22      should be supporting this or paying for it --

23      again, this expansion of us paying for these kinds

24      of critical things without further thought.  My,

25      I -- I would like to look 20 years younger, but I

FOR THE RECORD REPORTING, INC. 850.222.5491

1    do not expect Medicaid to be paying for it.  Enough

2    said.

3        (Applause.)

4        A VOICE:  Next speaker, Ezra Stone.

5        MR. STONE:  Good afternoon.  My name is Ezra

6    Stone and I'm a licensed clinical social worker.

7        Social work is a profession with a long

8    history of valuing human dignity and autonomy, and

9    according to the values of my profession, I have an

10   ethical obligation to support my clients in

11   reaching their fullest potential, problem-solving

12   barriers to treatment with them, and collaborating

13   with other professionals.

14       Additionally, we have a professional

15   obligation to provide evidence-based treatment, and

16   there is significant research that medical

17   transition is safe, effective at relieving symptoms

18   of dysphoria, and improves mental health.

19       In my private therapy practice, my clients

20   express tremendous relief at being able to access

21   medical care, which decreases their anxiety and

22   depression and increases their feelings of safety,

23   comfort, and joy as their bodies and minds become

24   more congruent.  Understanding and being seen as

25   their true selves creates a sense of belonging,

1    which is a fundamental human need.

2         On the other hand, the current political

3    climate in the state is causing significant harm to

4    transgender, nonbinary questioning and gender

5    diverse Floridians.  My clients report increases in

6    anxiety with each proposed anti-LGBT measure the

7    state takes, fear violence in their daily lives,

8    and worry about their continued access to medical

9    care.

10        These observations from my clinical practice

11   support the research on the minority stress model,

12   which demonstrates that expecting experiences of

13   harm, marginalization, and rejection have a

14   negative impact on people's mental health and

15   overall well-being.

16        Passing this change to Medicaid --

17        A VOICE:  Thirty seconds.

18        MR. STONE:  -- will not only take away

19   medically-necessary care from several thousand of

20   the most vulnerable Floridians, but it will also

21   further create a climate of fear for LGBT people

22   and their health care providers across the state.

23        (Applause.)

24        A VOICE:  Jason.  Speaker Peggy Joseph.

25        MS. JOSEPH:  Hello.  I'm Peggy Joseph, and I

1    would just like to share some thoughts from an

2    author and doctor, Ryan T. Anderson, who wrote

3    about -- a book called, "When Harry Became Sally."

4         So in 2016, the Obama administration and the

5    Center for Medicare and Medicaid Services revisited

6    the question of whether sex reassignment surgery

7    would have to be covered by Medicare plans.  It

8    refused on the grounds that we lack evidence that

9    it benefits patients.  They stated, "Based on a

10   thorough review of the clinical evidence available,

11   there is not enough evidence to determine whether

12   gender reassignment surgery improves health

13   outcomes."

14        There were conflicting study results, and the

15   quality and strength of evidence were low.  Many

16   studies that reported positive outcomes were

17   exploratory-type studies with no confirming

18   follow-up.  The author says, "The lack -- the lost

19   of follow-up could be pointing to suicide."

20        The largest and most robust study, a study

21   from Sweden, found a 19 times greater likelihood of

22   death by suicide and a host of other poor outcomes.

23        To provide the best possible care serving the

24   patient's interest requires an understanding of

25   human --

FOR THE RECORD REPORTING, INC. 850.222.5491

1          A VOICE:  Thirty seconds.

2          MS. JOSEPH:  -- wholeness and well-being.  The

3     minimal standard of care should be with a standard

4     of normality.  Our brains and senses are designed

5     to bring us into contact with reality.  Thoughts

6     that distort --

7          A VOICE:  Fifteen seconds.

8          MS. JOSEPH:  -- (inaudible) are misguided and

9     cause harm.  Okay.

10         (Applause.)

11         A VOICE:  Next speaker, Jack Barton.

12         A VOICE:  Actually, I have one comment with

13    respect to that, so as a partial addendum to my

14    earlier answer focusing on some of the clinical

15    organizations in the United States, but I wanted to

16    also mention because it has come up a couple times

17    here, that the Gamus report on pages 35 and 36 also

18    talks about international consensus as also talked

19    about in Dr. James Canter's report on pages 42

20    through 45.  So I would encourage people to look at

21    that as well.

22         A VOICE:  Go ahead.

23         MR. BARTON:  My name is Jack Barton.  I'm here

24    with the Christian Family Coalition.  I'm an

25    Assembly of God pastor.  The 37 years I have

FOR THE RECORD REPORTING, INC. 850.222.5491

1    counseled, among them I've counseled lesbians,

2    gays, and bisexuals.  I believe in First

3    Corinthians 6:9, that people can escape from that

4    life.  Unfortunately for the transgender, they

5    suffer.  These young people have made that clear.

6         I believe that gender dysphoria should be

7    labeled as child abuse, it is not something that

8    should be happening to our children, and with the

9    doctors that will participate in this, it's not so

10   unlike the doctor who tears a child apart in

11   abortion and calls it health care.

12        These are the issues:  The puberty blockers,

13   the hormone manipulations, that's not science.  The

14   only name that was left out before was Anthony

15   Fauci.  I kept waiting to hear them to say that.

16        Every -- any procedure like this should be

17   labeled criminal.  You have a child that at that

18   age doesn't know if they like vanilla ice cream or

19   if they like chocolate ice cream, and yet they're

20   going to let them march in and either make that

21   decision to be led down that path.  Nearly

22   90 percent of those that escape from that life do

23   it by the time they reach the end of puberty

24   because they come back to their senses that they

25   were created male and female by God.

FOR THE RECORD REPORTING, INC. 850.222.5491

1          Suicide that we talk about so much comes when

2     a person has followed up on these things, has done

3     it, and now they are confused because they still

4     don't find the completion that they thought they

5     felt.

6          Among those that go through these processes,

7     many of it comes from child abuse that happened

8     when they were kids, some who have wanted to have

9     acceptance by others and were rejected.  One man,

10    his grandmother wanted a granddaughter.  She

11    dressed him like that, and so he adopted that life.

12         A VOICE:  Thirty seconds.

13         MR. BARTON:  I'll close with this.  There are

14    two genders, male and female.  Women bear children,

15    women breastfeed, women have menstrual cycles.  Men

16    do not.  I would not provide the anorexic with food

17    and I would not say give money to do something that

18    would harm a child.

19         A VOICE:  Fifteen seconds.

20         MR. BARTON:  It's a terrible thing to do and I

21    ask you to stand your ground.

22         (Applause.)

23         A VOICE:  Jose Martin.

24         MR. MARTIN:  Good afternoon.  Thank you for

25    letting me speak.  I'm also with the Christian

FOR THE RECORD REPORTING, INC. 850.222.5491

1    Coalition, and I'm here to speak in support of Rule

2    59G-1.050.  I am a father and a grandfather, and I

3    am here to stand against mutilation that we all are

4    asked to fund.  The people we are talking about

5    need counseling, not promotion to a destructive

6    choice.

7        I also want to remind that one day we will all

8    stand before a living God and give account for

9    where we stand on this and other issues.  And I

10   also want to thank you brave people, who I think

11   are more qualified than all the other experts that

12   came up, because you are living and you lived

13   through it and you know the results of that, and I

14   thank you.  Thank you very much.

15       (Applause.)

16       A VOICE:  Folks, we have a number of speakers

17   coming up from the same organization.  We just ask

18   that you be respectful of others' time.  We've got

19   a number of speakers to get through before 5:00

20   p.m., so if you could just be brief and support

21   comments of others, if possible.  Thank you.

22       Next speaker, Bob Johnson.

23       MR. JOHNSON:  Good afternoon, Bob Johnson.  I

24   am a retired and recovering attorney, but I am --

25   and I'll be very brief.

FOR THE RECORD REPORTING, INC. 850.222.5491

1    I say thank you to the Florida Division of

2    Medicaid for putting together this report.  I've

3    read the whole report.  It's not my area of

4    expertise, but I've had significant experience

5    working with the development of agency rules,

6    statements of need, and reasonableness as we call

7    them in the state that I come from, and I just want

8    to compliment the agency.  I've read through it.  I

9    think the case is compelling for the rule change.

10   I strongly support the rule change.

11       There is specifics in there again that's not

12   an area that I studied, but in reading the report

13   and looking how thorough that it was put together,

14   the case has been made for the need to adopt this

15   rule change, the case has been made for the

16   reasonableness of what you're proposing.  I just

17   found it compelling the fact that the FDA does not

18   approve any medication as clinically indicated for

19   gender dysphoria.  The fact that there's no

20   randomized, controlled trials for the use of these

21   puberty suppression, that's the gold standard, I

22   know, in medical studies, and there are no

23   randomized, controlled trials, and the fact that

24   there's no long-term data.  I just think there is

25   so much concrete, substantial evidence that totally

FOR THE RECORD REPORTING, INC. 850.222.5491

1    justifies it, and I would just echo many of the

2    others that have testified here today.  I urge you

3    to go forward, adopt these rules, changes --

4         A VOICE:  Thirty seconds.

5         MR. JOHNSON:  -- (inaudible) we need them, we

6    need them in the state of Florida.  Thank you.

7         (Applause.)

8         A VOICE:  Next speaker, Sandy Westad,

9    W-e-s-t-a-d, I believe.

10        MS. WESTAD:  My name is Sandy Westad and I'm

11   also here with CFC, Christian Family Coalition.

12        I -- I want to speak from the heart.  I'm a

13   mother, I'm a grandmother, I'm a sister, whatever,

14   and my heart is breaking for what these kids are

15   going through.  It just seems to me that if the

16   parents -- the parents need to stay in control.

17   They need to stay in the authority of their

18   children.  They need to be able to speak to their

19   kids about the sex and the transgender.

20        Kids play house.  They pretend.  You know,

21   they do things in a play world, but they don't want

22   to be or understand or even know what it is to

23   change from one sex to another.  They pretend.  I

24   remember my sons playing and pretending they were

25   girls and sometimes they would pretend they were

FOR THE RECORD REPORTING, INC. 850.222.5491

1  boys, but they were boys and they grew up to be

2  boys.  They didn't want to be girls.  They felt

3  that that was what they were supposed to be.  Jesus

4  made them boys, and they were going to stay boys.

5  But the thing is we -- we need to understand that

6  children cannot make those kinds of decisions.

7  They cannot --

8      A VOICE:  Thirty seconds.

9      A VOICE:  -- decide who they are.  The parents

10  need to be their guide, and the parents -- God gave

11  children parents for a reason.

12      So I just support this bill, this rule, and I

13  thank you so much for everyone that's here.

14      (Applause.)

15      A VOICE:  Gail Carlins.

16      MS. CARLINS:  Good afternoon.  I'm Gail

17  Carlins and I'm with CFC also.  And I am in favor,

18  I support this rule change here with not having the

19  funds -- the Medicaid funds go to supporting these.

20      My beliefs are based on the Bible, and the

21  Bible, I believe, is the only truth that there is.

22  And the Bible says, as was mentioned a couple

23  times, God created male and female.  If you want to

24  bring science into it, females have two X

25  chromosomes, males have an X and a Y chromosome.

FOR THE RECORD REPORTING, INC. 850.222.5491

1       It's an impossibility to change from one to the

2       other.  That cannot be done.  And so no matter what

3       kind of mutilation or anything is done to a person,

4       they can't change it.

5            So, again, I am in support of this bill and I

6       thank you for your time.

7            (Applause.)

8            A VOICE:  Dorothy Berring.

9            MS. BERRING:  Good afternoon.  My name is

10      Dorothy Berring, also with the Christian Family

11      Coalition.  I also live in The Villages, Florida.

12           First of all, I would like to thank our brave

13      governor once again for bringing this to the

14      forefront.  We are -- Florida definitely is going

15      to make change, and thank you to these brave people

16      and to Amber for not going along with what you were

17      trying to be brainwashed into believing.

18           Again, it's strange, you know, they're

19      definitely targeting our -- our youngest.  We can't

20      seem to find baby formula anywhere, but yet

21      Medicaid can fund this nonsense.

22           Again, this has to be left up to the parents.

23      Whatever you choose to practice in the privacy of

24      your own home is your business.  I'm not

25      discriminating against any genders or whatever.  I

FOR THE RECORD REPORTING, INC. 850.222.5491

```
 1        just -- it needs to be taken out of the schools,
 2        and this doctor that was from UF or USF or
 3        whatever, it's shameful, shameful what you are
 4        trying to teach our students, and that's why we are
 5        in this bloody mess right now.  Okay?  And this
 6        needs to be changed --
 7             A VOICE:  Thirty seconds.
 8             MS. BERRING:  -- and you all need to listen.
 9             And thank you, doctors, for being here and for
10        giving us this forum.  Thank you.
11             (Applause.)
12             A VOICE:  We would ask that the comments be
13        focused on the rule and be respectful of other
14        speakers, please.
15             Troy Peterson.
16             MR. PETERSON:  Good afternoon, Troy Peterson.
17        I come supporting Anthony and Christian Family
18        Coalition.  I'm also the President of Warriors of
19        Faith here in Florida.  We brought a few people
20        with us from the Tampa Bay area, and really we come
21        representing thousands that stand in agreement with
22        this rule.
23             And I want to thank you, doctors.  I read the
24        40-page report.  I'm not a doctor, I'm a pastor.
25        But when I saw the evidence, I could clearly see
```

1    that we need this rule.

2         In the book of Genesis, in the beginning God

3    created man in his own image, male and female, and

4    then he said, "Be fruitful and multiply the earth."

5    So that's why I'm here is because I'm opposed to

6    even that doctor back there.  And I appreciate you

7    said that because if I had any authority in the

8    medical field, I would have his license revoked.

9         The most thorough follow-up of sex reassigning

10   people, which was conducted in Sweden, documented

11   that 10 to 15 years --

12        A VOICE:  Thirty seconds.

13        MR. PETERSON:  -- of surgical reassessment,

14   that the suicide rate is 20 times that of the

15   comparable peers.

16        I also read in the medical evidence that

17   50 percent --

18        A VOICE:  Fifteen seconds.

19        MR. PETERSON:  -- of the gender

20   identity-confused children have thoughts of

21   suicide.

22        Thank you for your time.

23        (Applause.)

24        A VOICE:  Janet Rath.

25        MS. RATH:  Hi, my name is Janet Rath.  I'm a

1    mother, a grandmother, and a new great-grandmother.

2    And I think 50 years ago as parents, we were

3    smarter than what is going on today.  Parents are

4    left out of their children's lives.  Some of it is

5    the parents' fault, and some of it's the teachers'

6    faults.

7         I have a granddaughter that's a teacher who

8    has said that if she has a child that comes in and

9    identifies as a cat, she must have a litter box

10   there and a bowl of water.

11        We are as a country going absolutely insane,

12   absolutely insane.  We all bought into Dr. Fauci,

13   who was nothing but a money-grabbing liar -- pardon

14   my French -- and we have been hoodwinked ever

15   since.  We have got to stop this.

16        Chinese children in third grade are learning

17   advanced calculus.  Our third graders are learning

18   which bathroom to use.  I'm sorry, but I do not

19   want my great granddaughter growing up in this

20   world if this is what it's going to turn into.  We

21   have got to change, and we had best do it now.

22   Thank you.

23        (Applause.)

24        A VOICE:  Gerald Loomer, L-o-o-m-e-r, Gerald.

25        MR. LOOMER:  Good afternoon.  My name is

FOR THE RECORD REPORTING, INC. 850.222.5491

1    Gerald Loomer.  I drove three and a half hours from

2    Lady Lake, Florida, to be here because I want to

3    support Rule 59G-1.050.  Especially I want to

4    support the best governor in the United States, Ron

5    DeSantis who also supports this.

6         (Applause.)

7         MR. LOOMER:  But I'd like to share three quick

8    stories with you.  The first is the little girl who

9    saw her brothers go fishing with their dad, out in

10   the backyard playing catch with a football, says,

11   "You know, I'd like to spend more time with Dad.

12   If I were a boy, I could spend more time with Dad."

13        Or the boy who said, "You know, those girls,

14   they're in the kitchen cooking with Mom, they go

15   shopping with Mom, they're doing makeup with Mom.

16   I want to spend more time with Mom.  I think I

17   should be a girl, then I can spend more time with

18   Mom."  Well, those things passed.

19        Remember the child who said, "Can I drive the

20   car?"  "Of course not, you're 13 years old."

21   "Well, can I drink a beer?"  "Of course not, you're

22   13 years old."  "Can I smoke a cigarette?"

23        A VOICE:  Thirty seconds.

24        MR. LOOMER:  "Of course not, you're 13 years

25   old."  "Can I take hormones to block puberty?"

FOR THE RECORD REPORTING, INC. 850.222.5491

1      "No, you're 13 years old.  Of course, you can.  You

2      know what you want."  "Can I take cross-sex

3      hormones?"

4           A VOICE:  Fifteen seconds.

5           MR. LOOMER:  "You're 13 years old.  Of course,

6      you can.  You know what you want."  "Can I have

7      gender sterilizing surgery?"  "You're 13 years old.

8      Of course, you can, you know what you want."  "Can

9      I have body-mutilating surgery" --

10          A VOICE:  Time.  Please wrap up your comment.

11          MR. LOOMER:  -- "that's going to alter my

12     sex?"  "Of course, you can, you's are 13 years old,

13     you know what you want."

14          A VOICE:  Sir, your time is up.  Please wrap

15     it up.

16          MR. LOOMER:  How absurd is all of this?

17     Continue to keep this resolution.

18          Thank you.

19          (Applause.)

20          A VOICE:  Pastor Marta Marcano.

21          MS. MARCANO:  Good afternoon.  I'm Pastor

22     Marta Marcano from (inaudible) Jacksonville,

23     Florida.  I'm a director of Protect our Children

24     Project, Duval County chapter, and an organizer of

25     the Christian Family Coalition in Jacksonville too.

1          I'm here to let you know that I'm support of

2     the Rule 59G-1.050 to ban Medicaid funding for

3     transgenders, surgeries, (inaudible) blockers, and

4     other unnatural therapies.

5          Also, this rule protect taxpayers from being

6     forced to subsidize the (inaudible) is driving by

7     unethical pharmaceutical companies enriching

8     themselves with the puberty blockers.  That is an

9     atrocity of children abuse.

10         World-renowned Swedish psychiatric,

11    Dr. Christopher Gilbert, has said that pediatric

12    confusion is possibly one of the greater --

13         A VOICE:  Thirty seconds.

14         MS. MARCANO:  -- scandal in medical history

15    and call for an immediate moratorium.

16         As a pastor --

17         A VOICE:  Fifteen seconds.

18         MS. MARCANO:  -- I want to remind you that doc

19    do not been a stumbling block for the little one,

20    because Hebrews 10:31 said --

21         A VOICE:  Time.  Please complete your comment.

22         MS. MARCANO:  -- "It's a fearful thing to fall

23    into the hands of the living God."

24         Please protect our children.  Thank you very

25    much for this time.

1         (Applause.)

2         A VOICE:  Paul Arrans.

3         MR. ARRANS:  Good afternoon.  My name is Paul

4    Arrans.  I'm a physician.  In practice, I've had

5    transgender patients, and I have transgender

6    personal friends with whom I discuss their medical

7    care at length.

8         With profound respect for the young people who

9    testified earlier, I still oppose this amendment

10   (inaudible) the preponderance of medical science

11   and practice when we do irreparable harm to the

12   health and well-being of thousands of transgender

13   Floridians of all ages and their families.

14        The American Academy of Pediatrics and its

15   Florida chapter representing thousands of

16   board-certified pediatricians have directly

17   reviewed many controversial assertions in your

18   publication on gender dysphoria, and the Florida

19   Department of Health's statement responded.

20        Contrary to an earlier comment, the Endocrine

21   Society has stated, "Both medical intervention for

22   transgender youth and adults, including puberty

23   suppression, hormone therapy, and

24   medically-indicated surgery has been established as

25   the standard of care.  Federal and private

FOR THE RECORD REPORTING, INC. 850.222.5491

1    insurance should cover such interventions as

2    prescribed by a physician," end quote.

3        Gender dysphoria is very real.  You can learn

4    this for yourselves by meeting with transgender

5    people.  You will then realize that denial of

6    appropriate gender-affirming care at any age would

7    be inhumane and a violation of human rights.  These

8    medically-necessary treatments are the generally

9    accepted professional medical standards,

10   (inaudible) authoritative opposition to the

11   proposed rule.

12       A VOICE:  Thirty seconds.

13       MR. ARRANS:  (Inaudible) to just rush this

14   through, thereby putting the health and lives of

15   trans people in danger.

16       It feels like Medicaid is crossing into a

17   political lane by seeking to preempt

18   provider/patient/family decision-making here, and I

19   urge you to withdraw this proposal.

20       A VOICE:  Fifteen seconds.

21       MR. ARRANS:  This represents knowledge and

22   practice regarding gender-affirming care.  If you

23   are still determined to address this topic, at

24   least convene (inaudible) panels of experts,

25   including transgender community members, who inform

FOR THE RECORD REPORTING, INC. 850.222.5491

1    yourselves and the public about the overwhelming

2    evidence --

3          A VOICE:  Time.

4          MR. ARRANS -- against denying coverage for

5    gender-affirming care.

6          Thank you for the opportunity to testify.

7          (Applause.)

8          A VOICE:  Thank you for that comment.  I'm

9    going to refer for further comment to Dr. Van.

10   VANMOLE, VANMO, VENMO?

11         DR. V:  I would encourage everybody just to

12   read the Gaplins report, and particularly the

13   attachment to it.  A great deal of attention has

14   been put in there into evaluating the science.  And

15   some of the studies that have been brought up, both

16   pro and con, are involved -- they're specifically

17   the flaws that are in so many of these studies.

18   Specifically --

19         A VOICE:  Hold on.

20         A VOICE:  (Inaudible) while Dr. Vanmo speaks.

21         DR. V:  Yeah, and by the way, I like the idea

22   that everybody lets everybody speak.  So it kinds

23   of bothers me when I'm hearing speakers shout it

24   down because they're saying something you don't

25   like.  How we treat other people with whom we

1   disagree is a reflection of our own character, not

2   theirs.  So, please, let -- due decorum.

3       First of all, the Endocrine Society's 2017

4   guidelines are guidelines, just that.  And it

5   states specifically page 3895 that they do not

6   guarantee an outcome and they do not establish a

7   standard of care.  It's in black and white there.

8       I would refer you also, as is mentioned in the

9   Gaplins report, the histories in the United

10  Kingdom, Sweden, Finland, France, four nations that

11  were leading this from quite some time, they did

12  national-level reviews involving scientific

13  organizations, divisions of governments, medical

14  professionals.  And mind you, these are nations

15  that were leading it.  And after review, they all

16  came to the same conclusion, this should not be

17  going on in minors at all under 16, and only

18  between 16 and 18 under tightly-regulated studies,

19  the kind of which we really don't see happening.

20      And they also came to the conclusion that

21  strong psychological support is what's needed when

22  we talk about evaluating kids for this.  We have

23  four decades of literature showing the overwhelming

24  probability of mental health problems, adverse

25  childhood events, neuropsychological problems like

FOR THE RECORD REPORTING, INC. 850.222.5491

1    autism spectrum disorder, and other things that

2    need to be addressed.  And, in fact, also for these

3    nations, somebody strongly demonstrating

4    psychologic instability -- quite specifically, you

5    say you're suicidal -- blocks you from the

6    transition pathway.  They insist that those things

7    be taken care of first because transition simply

8    won't fix them.  The underlying problems of a

9    transgender youth become the underlying problems of

10    an adult who identifies as transgender.  That's

11    what is going on here.

12        So, again, I'd refer you to the report and

13    some of the other letter, complaints, that I've

14    seen come in in the past 24 hours from the AAP, as

15    well as from the Endocrine Society, what they're

16    complaining about is actually addressed here,

17    including some of the studies they bring up, and

18    there too, it's a very well-researched document.

19    The State of Florida put a lot of effort into this.

20        You're free to disagree, but please make sure

21    you've read it and understand it before you do.

22        A VOICE:  Just to be a little bit more

23    specific with respect to the report, I'd refer you

24    to Dr. Rigner (inaudible) Peterson's report, which

25    is Attachment C to the Gaplins report, and also a

FOR THE RECORD REPORTING, INC. 850.222.5491

1    doctor named Paul Hruz, H-r-u-z.  Title of his

2    publication is, "Deficiencies in Scientific

3    Evidence for Medical Management of Gender

4    Dysphoria."  He did not provide an expert report

5    for purposes of this report, but he is published in

6    medically reviewed literature, and I would

7    encourage you to read that as well.

8         Thank you.

9         (Applause.)

10        A VOICE:  January Littlejohn.

11        MS. LITTLEJOHN:  My name is January

12   Littlejohn.  I am a mother of three children and a

13   licensed mental health counselor.

14        In the spring of 2020, our 13-year-old

15   daughter told us that she was experiencing distress

16   over her sex and that she didn't feel like a girl.

17   She had expressed no previous signs of gender

18   confusion, and three of her friends at school had

19   recently started identifying as transgender.

20        As we tried to understand our own observations

21   and seek professional help, we discovered that her

22   middle school had socially transitioned her without

23   our knowledge or consent.  Her mental health

24   spiraled.  We worked with a psychologist to help

25   our daughter explore and resolve co-occurring

1    issues, including low self-esteem and anxiety.  We

2    also gave her more one-on-one time, in-person

3    activities away from trans influences, limited her

4    Internet use, and declined to affirm her

5    newly-chosen name and pronouns.  We set appropriate

6    boundaries and allowed her to choose her hair style

7    and clothing, but denied harmful requests such as

8    breast binders, puberty blockers, cross-sex

9    hormones, and surgeries.

10        It was clear from our conversations that our

11   daughter was uncomfortable with her developing body

12   and had an intense fear of being sexualized.  She

13   was filled with self-loathing and was in true

14   emotional pain, but had been led by peers and

15   influencers to believe that gender was the source

16   of her pain.

17        What she really needed was for us to help her

18   make sense of her confusion and remind her that

19   hormones and surgeries could never change her sex

20   or resolve her issues.

21        A VOICE:  Thirty seconds.

22        MS. LITTLEJOHN:  I shudder to think what could

23   have happened if we had affirmed her false identity

24   and consented to medical treatment as opposed to

25   what we did, which was to lovingly affirm her as

1    she is:  Beautifully unique and irreplaceable and

2    undeniably female.

3        A VOICE:  Fifteen seconds.

4        MS. LITTLEJOHN:  Our daughter has desisted and

5    is on a path to self-love, but, unfortunately,

6    gender-dysphoric children are being encouraged

7    through activism and peer pressure to disassociate

8    from their bodies and to believe their body parts

9    can be simply removed --

10        A VOICE:  Time.  Please finish your comment.

11        MS. LITTLEJOHN:  -- modified, or replaced.

12        The irreversible consequences of medically

13    transitioning, including loss of sexual and

14    reproductive function, cannot be fully understood

15    by children or teens who lack the necessary

16    maturity or experience.  These children need love

17    and therapy, not hormones or surgery.

18        Thank you.

19        (Applause.)

20        A VOICE:  Next up, Kendra Paris.

21        MS. PARIS:  Hi there, my name is Kendra Paris.

22    I still suffer from being an attorney.  I'm a

23    mental health attorney, and I wanted to follow up

24    on the comment about the lack of peer-reviewed

25    standards of care, because as an attorney, the lack

1    of peer-reviewed standards of care mean that a lot

2    of people who are harmed or experience bad outcomes

3    from these surgeries or other interventions have no

4    ability to sue, and I find that problematic as an

5    attorney.  They've had decades to create

6    peer-reviewed standards of care, and they have not.

7    And I suspect some people don't want those

8    standards of care because it would open them up to

9    lawsuits for bad outcomes, which is not happening

10   right now and it really frustrates me.

11       You all are so brave.  I'm so proud of you for

12   coming and telling your stories.

13       We just don't know, and I want to talk about a

14   particularized thing that we don't know yet.  When

15   you put a female on testosterone, within about five

16   years, she's going to have to have a hysterectomy,

17   though you passed most recent standards of care,

18   recommend hormone -- cross-sex hormone therapy for

19   females at 14.  So we're talking about a potential

20   hysterectomy before she turns 20.  We have known

21   for a very long time that hysterectomies correlated

22   with negative mental health outcomes and cognitive

23   decline.  And we know that the earlier a

24   hysterectomy is performed, the worse mental health

25   and cognitive decline is.  Essentially, the earlier

FOR THE RECORD REPORTING, INC. 850.222.5491

1   you do the hysterectomy, the earlier the onset of

2   dementia.

3        And so what I am very concerned about is in, I

4   don't know, 10, 20, 30 years, we're going to have

5   an absolute wave of young females, 40, 50 years

6   old, with early-onset cognitive decline --

7        A VOICE:  Thirty seconds.

8        MS. PARIS:  -- or dementia in our assisted

9   living facilities.

10       And in surveys and anecdotal experience is

11   starting to indicate that some individuals who are

12   trans and have dementia forget that they're trans.

13   In a state like Florida, we have substituted

14   judgment.

15       A VOICE:  Fifteen seconds.

16       MS. PARIS:  So if they don't have written

17   documentation allowing for their medical proxy to

18   allow for detransition, they might be cut off.  And

19   I really worry that we have not considered all of

20   the implications of this.

21       So I appreciate the rulemaking and I thank

22   you --

23       A VOICE:  Time.

24       MS. PARIS:  -- for your time.  Thank you.

25       (Applause.)

1          A VOICE:  Nathan (inaudible).

2          MR. BRUMER:  My name is Nathan Brumer.  I am

3     Florida's LGBTQ consumer advocate as appointed by

4     Commissioner of Agriculture Nikki Fried.  One of

5     FDACS' many critical roles here in the state

6     includes serving as Florida's consumer protection

7     agency.

8          On behalf of health care consumers, I provide

9     the following comments in opposition to the

10    proposed changes to Rule 59G-1.050:  As a state

11    agency, FDACS encourages all consumers to remain

12    aware, vigilant, and act when necessary, but to do

13    so, we know consumers must be provided with

14    accurate information, education, choice, safety,

15    representation, and redress.

16         Documented, well-researched standards of care

17    have been established, are based on a wide range of

18    evidence, and conclude gender-affirming medical

19    care is medically necessary and safe and effective.

20    In other words, gender-affirming care is the

21    standard of care, and the proposed rule as it

22    stands would deny health care consumers in the

23    state of Florida access to the standard of care.

24         State agencies must serve and advocate for all

25    Floridians.  We should not deny any Floridian the

FOR THE RECORD REPORTING, INC. 850.222.5491

1       ability to thrive.  We serve the public good and we

2       must defend the rights of every Floridian,

3       including transgender Floridians, and this includes

4       the right to nondiscriminatory health care

5       coverage.  We must work to increase access to

6       health care, not lessen it or remove it all

7       together.

8            A VOICE:  Thirty seconds.

9            MR. BRUMER:  On a personal note, Florida is my

10      home state.  I am one of thousands, tens of

11      thousands of transgender Floridians here in our

12      state who have had the privilege to have access to

13      gender-affirming health care --

14           A VOICE:  Fifteen seconds.

15           MR. BRUMER -- for decades who are happy and

16      successful and thriving.  I'm an attorney, I'm an

17      advocate, and I work for and very hard and I'm

18      proud to serve the State of Florida.  We are part

19      of the fabric of this nation --

20           A VOICE:  Time.  Please wrap up your comment.

21           MR. BRUMER -- and of this great state, and we

22      deserve the rights and benefits afforded to all.

23           (Applause.)

24           A VOICE:  Nathan Bremmer.

25           MR. NEWELL:  Hi, I'm Nathan Newell.  I think

1   we got the Nathans mixed up.  Here (inaudible) for

2   support.  Tell you a little bit, I have a son, I

3   have four children.  My son, 15, is -- doing

4   everything we can to keep him straight.  He doesn't

5   make good decisions.  One of the things lately, you

6   know those little things on the side of the road

7   that flashes and tells you your speed?  Well, we

8   had one of those near our house.  So he decides to

9   take his dirt bike in pitch black and with his

10  friends out there and go 80 miles per hour down the

11  road.  We know this because of the ring.  He was

12  bragging to his friends, so we watched the ring and

13  saw that.

14       Then a couple days ago, he was upset with us

15  and said he was leaving.  So we said, "Where are

16  you going to go, Hunter?"  He goes, "I'm going to

17  St. Teresa, I got friends down there."  "How are

18  you going to get there, Hunter?"  "I'm going to

19  ride my bike."  I said, "It's going to take you

20  forever," and he goes, "It's going to take me four

21  hours."

22       So, anyways, this 15-year-old, he's not making

23  good decisions.  And to sit here and to even think

24  that these kids can make a decision on what they

25  want that's going to be with them for the rest of

FOR THE RECORD REPORTING, INC.  850.222.5491

1    life is child abuse.  These doctors are despicable.

2    They need to have their license taken away.  They

3    are a disgrace to the human race.  It's just

4    despicable to think that these people are taking

5    care of us and taking care of our children, and I

6    appreciate what y'all are doing.

7         (Applause.)

8         A VOICE:  We'd ask that you please be

9    respectful to the other speakers.

10        A VOICE:  Thank you for your comments.  We

11   respect your comment, we respect everybody's

12   comments, including the doctors that you

13   referenced.

14        A VOICE:  Nathan Brumer.

15        Dotty McPherson.

16        MS. MCPHERSON:  Hi there, I'm Dotty McPherson.

17   I'm speaking as the District 2 representative for

18   the Florida Federation of Republican Women.

19        The age of majority is 18, but even at 18,

20   children don't have the maturity to handle certain

21   responsibilities given them, like driving, alcohol.

22   Even older adults don't.

23        Your agency's safety net programs include

24   programs for abused and neglected children, but not

25   gender decisions.  Please prevent funding the

FOR THE RECORD REPORTING, INC. 850.222.5491

1    destruction of children's genitalia and hormonal

2    balance.

3         Please consider unintended consequences of,

4    No. 1, is taxpayer money that will need to be used

5    for lawsuits by those whose lives are ruined from

6    surgeries that got -- that they got while they were

7    immature or too young to understand, also by

8    parents whose parental rights were denied to

9    protect their children's future.

10        I grew up in a low-income neighborhood on the

11   low-income side of town.  When I got to junior high

12   school, I saw how rich kids were, and a lot of them

13   were just real brainiacs, and I felt so inadequate.

14   I had a terrible inferiority complex, but I got

15   over it.  I graduated with honors from FSU.  I had

16   a good job and made a good life for myself and my

17   four children.  Life isn't fair.  We've got to stop

18   giving in to the poor, pitiful me syndrome.  People

19   need to get their brains right and --

20        A VOICE:  Thirty seconds.

21        MS. MCPHERSON:  -- get straight.  Government

22   has no business funding these things.  Our elected

23   governor has authority to make this rule, which

24   should be upheld.  Please support our governor's

25   rule.  Thank you.

FOR THE RECORD REPORTING, INC. 850.222.5491

1    (Applause.)

2    A VOICE:  I'm going to get this first name

3    wrong, but I think it's Marjorie Caulkins.

4    MS. CAULKINS:  Hello, my name is (inaudible)

5    Caulkins and I am from Milton, Florida, and I came

6    in support of the ban of Medicaid funding for

7    transgender surgeries and treatments.

8    I believe that Floridians do not need our

9    taxpayers' money to be spent in this funding of

10   surgeries that are both unnecessarily and

11   tremendously harmful.

12   As a mother of two, I believe there is a war

13   on our children and we need to stand on the right

14   side of this war and protect our children, support

15   our Governor DeSantis.  We are blessed with our

16   governor, and I think we should be on the right

17   side and support this rule and ban Medicaid funding

18   for transgender surgeries.

19   Thank you so much, and thank you for your

20   service.

21   (Applause.)

22   A VOICE:  James Caulkins.

23   MR. CAULKINS:  Hi.  I'm James Caulkins from

24   Milton, Florida, and I just want to say we really

25   need this rule passed to support Rule 59G-1.050 to

1    ban Medicaid funding for transgender surgery and

2    treatment.

3         We are in a battle in this country, and I'd

4    like to thank all the people who showed up today,

5    because your voice matters.  Our state -- the

6    people have spoken.  They elected the greatest

7    governor in the United States, Ron DeSantis.  They

8    put Republicans in office in this state to stand

9    for what's right, and this rule change is what's

10   right.

11        We don't need this stuff, this evil, this

12   Medicaid funding for transgender surgery.  We don't

13   need this in our state of Florida.  We need to lead

14   in Florida, we need to lead the other states in

15   Florida against this evil transgender surgeries.

16        So please pass this rule.  Thank you all so

17   much for your public service and God bless the

18   state of Florida.  Thank you.

19        (Applause.)

20        A VOICE:  Tuana Aman.

21        MS. AMAN:  Thank you for the opportunity for

22   us to be here.  I am in support of the ban to the

23   Medicaid funding for transgender surgeries and

24   treatments.  And let me say that years ago, I was

25   told that I needed to go on hormone therapy, and I

1   had one doctor tell me that it was the right thing

2   to do, but as I did more and more surg- -- more and

3   more study and research, I saw the risks involved

4   to hormonal therapy.  And when someone tries to

5   tell you there isn't any risk to these kinds of

6   procedures and these kinds of things that are

7   happening to young people, to young kids -- I mean,

8   I'm an adult who's fully developed, right, as a

9   human being now, right, and they say 25 generally,

10  look at these kids and their development, the

11  process.

12      And what I think is even more sad is that

13  they're born like the young girl with a certain

14  amount of eggs that will be released every month

15  from the time she starts puberty, and here we're

16  trying to prevent those natural things from

17  occurring and expect it not to have any problems.

18      I was watching Bill Mayer, which he's not a

19  favorite of conservatives, right?  And he came out

20  a couple of weeks ago and was slammed by the LGBT

21  community because he said, "Isn't it

22  interesting" -- and this is him, right -- "Isn't it

23  interesting that if you look at Los Angeles and New

24  York and Miami and all these different hubs, that's

25  where this transgender service -- these surgeries

FOR THE RECORD REPORTING, INC.  850.222.5491

1    are going on, the focus," and he got slammed.  They

2    said they wanted him off the air, and, I mean, he

3    had -- they had a campaign against him --

4        A VOICE:  Thirty seconds.

5        MS. AMAN:  -- because it was focused on the

6    fact that he was just saying, "Isn't there

7    something ironic about the fact that you look at

8    the rest of the country and these things aren't

9    going on, and then you look at these hubs where

10   social engineering is happening and where people

11   are being influenced that I" --

12       A VOICE:  Fifteen seconds.

13       MS. AMAN:  -- "can't go out into the media and

14   say anything against transgender, because what will

15   happen?  I will be criticized and condemned."  It

16   isn't fair.  I think it's right to be here and have

17   the opportunity to give our voices, but I believe

18   that the government should not be involved in

19   supporting any --

20       A VOICE:  Time.  Please wrap up your comment.

21       MS. AMAN:  -- kind of procedure for these

22   young kids.  Thank you.  Amen.

23       (Applause.)

24       A VOICE:  Jason, do you have a follow up?

25       A VOICE:  Just very quickly.  We appreciate

1      your comments, just like we appreciate the comments

2      of everyone in this room and all the people that

3      have made comments on-line and otherwise.

4          I just wanted to make sure -- clear, just so

5      we're crystal-clear about the purpose of this rule

6      is that we're not talking about a ban of treatment

7      for gender dysphoria.  We're talking about not

8      covering through reimbursement in the Florida

9      Medicaid program for the services that are

10     enumerated in the rule itself.

11         I also want to make clear that there are other

12     comprehensive coverage of services for gender

13     dysphoria currently in the Florida Medicaid

14     program, and I just want to read a couple of those:

15     "Community-based health services provided by an

16     array of provider types; psychiatric services

17     provided by a physician or other qualified health

18     care practitioner in office settings, clinics, and

19     hospitals; emergency services and inpatient

20     services in hospital settings; behavioral health

21     services provided in schools and by school

22     districts."

23         So I just wanted to make sure that everyone

24     was crystal-clear about the purpose of this rule.

25     I very much appreciate your comment and the

1    comments of everybody else.

2        A VOICE:  Thank you, everyone, for your

3    participation in this hearing.  We will accept

4    written material or comments until 5:00 p.m. on

5    Monday, July 11, 2022.  Comments may be submitted

6    by e-mail to

7    medicaidrulecomments@ahca.myflorida.com.

8        That being our time, this hearing is now

9    closed.  Thank you.

10       (Whereupon, the hearing was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2      STATE OF FLORIDA    )

3      COUNTY OF LEON      )

4            I hereby certify that the foregoing transcript

5      is of a tape-recording taken down by the undersigned,

6      and the contents thereof were reduced to typewriting

7      under my direction;

8            That the foregoing pages 02 through 91

9      represent a true, correct, and complete transcript of

10     the tape-recording;

11           And I further certify that I am not of kin or

12     counsel to the parties in the case; am not in the

13     regular employ of counsel for any of said parties; nor

14     am I in anywise interested in the result of said case.

15           Dated this 19th day of July, 2022.

16

17

18

19                    CLARA C. ROTRUCK

20                    Notary Public

21                    State of Florida at Large

22                    Commission Expires:

23                    November 13, 2022

24                    Commission NO.: GG 272880

25
```

FOR THE RECORD REPORTING, INC. 850.222.5491

## Medicaid Certified School Match Program Fee Schedule

## 2022

*Reimbursement amount is the Federal Share of these fees. However, reimbursement can also be based on the individual school district's cost and vary from school district to school district.

| Occupational Therapy Services | | | | |
|---|---|---|---|---|
| Code | Modifier | Description of Service | Maximum Fee | Maximum Allowable Units |
| 97165 | | Occupational Therapy Evaluation, Low Complexity | $51.05 | 1 per year |
| 97166 | | Occupational Therapy Evaluation, Moderate Complexity | $51.05 | 1 per year |
| 97167 | | Occupational Therapy Evaluation, High Complexity | $51.05 | 1 per year |
| 97530 | | Occupational Therapy Treatment Individual Session | $17.86 | 4 per day, 14 per week |
| 97530 | HM | Occupational Therapy Individual Session Provided by an Occupational Therapy Assistant | $14.30 | 4 per day, 14 per week |
| 97150 | GO | Occupational Therapy Group Session by an Occupational Therapist | $3.47 | 4 per day, per week |
| 97150 | UC | Occupational Therapy Group Session by an Occupational Therapy Assistant | $2.74 | 4 per day |
| 97542 | GO | Wheelchair Evaluation and Fitting by an Occupational Therapist | $51.05 | 1 per 5 years |
| 92597 | GO | AAC Initial Evaluation Provided by an Occupational Therapist | $102.63 | 1 per 5 years |
| 29799 | HA | Application of Casting or Strapping | $19.56 | 2 per day |

| Physical Therapy Services | | | | |
|---|---|---|---|---|
| Code | Modifier | Description of Service | Maximum Fee | Maximum Allowable Units |
| 97161 | | Physical Therapy Evaluation, Low Complexity | $51.05 | 1 per year |
| 97162 | | Physical Therapy Evaluation, Moderater Complexity | $51.05 | 1 per year |
| 97163 | | Physical Therapy Evaluation, High Complexity | $51.05 | 1 per year |
| 97110 | | Physical Therapy Treatment Individual Session | $17.86 | 4 per day, 14 per week |
| 97110 | HM | Physical Therapy Individual Session Provided by a Physical Therapy Assistant | $14.29 | 4 per day, 14 per week |
| 97150 | GP | Physical Therapy Group Session by a Physical Therapist | $3.47 | 4 per day |
| 97150 | HM | Physical Therapy Group Session by a Physical Therapist Assistant | $2.74 | 4 per day |
| 97542 | GP | Wheelchair Evaluation and Fitting by a Physical Therapist | $51.05 | 1 per 5 years |
| 92597 | GP | AAC Initial Evaluation Provided by a Physical Therapist | $102.63 | 1 per 5 years |
| 29799 | HA | Application of Casting or Strapping | $19.56 | 2 per day |

| Speech-Language Pathology Services | | | | |
|---|---|---|---|---|
| Code | Modifier | Description of Service | Maximum Fee | Maximum Allowable Units |
| 92521 | | Evaluation/ Re-evaluation of speech fluency (e.g., stuttering, cluttering) | $51.05 | 1 per 5 months |
| 92522 | | Evaluation/ Re-evaluation of speech sound production (e.g., articulation, phonological process, apraxia, dysarthria) | $51.05 | 1 per 5 months |

| 92523 | | Evaluation/ Re-evaluation of speech sound production (e.g., articulation, phonological process, apraxia, dysarthria); with evaluation of language comprehension and expression (e.g., receptive and expressive language) | $51.05 | 1 per 5 months |
|---|---|---|---|---|
| 92524 | | Evaluation/ Re-evaluation Behavioral and qualitative analysis of voice and resonance | $51.05 | 1 per 5 months |
| 92610 | | Evaluation/Re-Evaluation of oral and pharyngeal swallowing function | $48.94 | 1 per 5 months |
| 92507 | | Speech-Language Pathology Individual Session by a Speech-Language Pathologist | $17.86 | 4 per day, 14 per week |
| 92507 | HM | Speech-Language Pathology Individual Session Provided by a Speech Therapy Assistant | $14.30 | 4 per day, 14 per week |
| 92508 | | Speech-Language Pathology Group Session by a Speech-Language Pathologist | $3.47 | 4 per day 14 per week |
| 92508 | HM | Speech-Language Pathology Group Session by a Speech-Language Pathology Assistant | $3.74 | 4 per day, 14 per week |
| 92597 | | AAC Initial Evaluation Provided by a Speech-Language Pathologist | $102.63 | 1 per 5 years |
| 92597 | GN | AAC Re-Evaluation Provided by a Speech-Language Pathologist | $52.63 | 1 per 6 months |
| 92609 | | AAC Fitting, Adjustment, and Training Visit | $42.11 | 8 per year |

## TRANSPORTATION

Transportation fees vary for each school district. They are not included in this appendix, instead each district is notified of its fee.

| Behavioral Services | | | | | |
|---|---|---|---|---|---|
| Code | Modifier 1 | Modifer 2 | Description of services | Maximum Fee | Maximum Allowable Units |
| H0031 | AH | | Psychologist-Individual Service-Evaluation | $9.66 | 32 units per school district |

| | | | | | staff member, per day. |
|---|---|---|---|---|---|
| H0046 | AH | | Psychologist-Individual Service-All Else | $9.66 | 32 units per school district staff member, per day. |
| H0046 | AH | HQ | Psychologist-Group Service | $4.95 | 32 units per school district staff member, per day. |
| H0031 | SE | | Certified Behavior Analyst-Individual Service-Evaluation | $8.00 | 32 units per school district staff member, per day. |
| H2019 | HA | | Certified Behavior Analyst-Individual Service-All Else | $10.41 | 32 units per school district staff member, per day. |
| H2019 | HA | HQ | Certified Behavior Analyst-Group Service | $3.24 | 32 units per school district staff member, per day. |
| H0002 | HA | | Certified Behavior Analyst (Bachelor's Level) and Certified Assistant Behavior Analyst-Individual Service-Evaluation | $6.70 | 32 units per school district staff member, per day. |
| H2014 | HA | | Certified Behavior Analyst (Bachelor's Level) and Certified Assistant Behavior Analyst-Individual Service-All Else | $6.70 | 32 units per school district staff member, per day. |
| H2014 | HA | HQ | Certified Behavior Analyst (Bachelor's Level) and Certified Assistant Behavior Analyst-Group Service | $3.35 | 32 units per school district staff member, per day. |
| H0031 | HU | | Social Worker (Master's Level); Marriage and Family Therapist; Mental Health and Guidance Counselors Individual Service - Evaluation | $8.97 | 32 units per school district staff member, per day. |
| H0046 | SE | | Social Worker (Master's Level); | $8.97 | 32 units per school district |

| Code | Modifier | | Description of Service | Maximum Fee | Maximum Allowable Units |
|---|---|---|---|---|---|
| | | | Marriage and Family Therapist; Mental Health and Guidance Counselors-Individual Service-All Else | | staff member, per day. |
| H0046 | SE | HQ | Social Worker (Master's Level); Marriage and Family Therapist; Mental Health and Guidance Counselors-Group Service | $4.25 | 32 units per school district staff member, per day. |
| H0002 | HN | | Social Worker (Bachelor's Level)-Individual Service-Evaluation | $7.17 | 32 units per school district staff member, per day. |
| H0046 | HN | | Social Worker (Bachelor's Level)-Individual Service-All Else | $7.17 | 32 units per school district staff member, per day. |
| H0046 | HN | HQ | Social Worker (Bachelor's Level)-Group Service | $3.40 | 32 units per school district staff member, per day. |

| Nursing Services | | | | |
|---|---|---|---|---|
| Code | Modifier | Description of Service | Maximum Fee | Maximum Allowable Units |
| T1002 | | Nursing Service-Registered Nurse | $6.20 | 32 units per nurse or aide, per day |
| T1003 | | Nursing Service-Licensed Practical Nurse | $4.80 | 32 units per nurse or aide, per day |
| T1004 | | Nursing Service-School Health Aide | $3.80 | 32 units per nurse or aide, per day |
| T1002 | KO | Medication Administration-Registered Nurse | $2.07 | 32 units per nurse or aide, per day |
| T1003 | KO | Medication Administration-Licensed Practical Nurse | $1.06 | 32 units per nurse or aide, per day |
| T1004 | KO | Medication Administration-School Health Aide | $.80 | 32 units per nurse or aide, per day |

## Behavioral Health Overlay Services Fee Schedule
## 2022

| Description of Service | Procedure Code | Modifier | Maximum Fee | Reimbursement and Service Limitations |
|---|---|---|---|---|
| Behavioral health overlay services | H2020 | HA | $32.75 per day | Medicaid will not reimburse for behavioral health overlay services when a recipient is absent because he or she is in a Department of Juvenile Justice detention center placement.<br><br>Medicaid will not reimburse a provider for behavioral health overlay services if the provider has been paid for the provision of the same type of services by another purchasing entity. |

Florida Medicaid Community Behavior Health Fee Schedule
2022

| Description of Service | Procedure Code | Mod | Maximum Fee | Reimbursement and Service Limitations |
|---|---|---|---|---|
| *59G-4.028: Behavioral Health Assessment Services Coverage Policy* | | | | |
| Psychiatric evaluation by a physician | H2000 | HP | $210.00 per evaluation | Medicaid reimburses a maximum of two psychiatric evaluations per recipient, per state fiscal year. |
| Psychiatric evaluation by a non-physician | H2000 | HO | $150.00 per evaluation | Medicaid reimburses a maximum of two psychiatric evaluations per recipient, per state fiscal year. |
| Brief behavioral health status exam | H2010 | HO | $14.66 per quarter hour | There is a maximum daily limit of two quarter-hour units. Medicaid reimburses for brief behavioral health status examinations a maximum of 10 quarter-hour units annually (2.5 hours), per recipient, per state fiscal year. A brief behavioral assessment is not reimbursable on the same day that a psychiatric evaluation, bio-psychosocial assessment, or in-depth assessment has been completed by a qualified treating practitioner. |
| Psychiatric review of records | H2000 | | $26.00 per review | Medicaid reimburses a maximum of two psychiatric reviews of records, per recipient, per state fiscal year. This service may not be billed for review of lab work (see medication management). |
| In-depth assessment, new patient, mental health | H0031 | HO | $125.00 per assessment | Medicaid reimburses one in-depth assessment, per recipient, per state fiscal year. An in-depth assessment is not reimbursable on the same day for the same recipient as a biopsychosocial evaluation. A bio-psychosocial evaluation is not reimbursable for the same recipient after an in-depth assessment has been completed, unless there is a documented change in the recipient's status and additional information must be gathered to modify the recipient's treatment plan. |
| In-depth assessment, established patient, mental health | H0031 | TS | $100.00 per assessment | Medicaid reimburses one in-depth assessment, per recipient, per state fiscal year. An in-depth assessment is not reimbursable on the same day for the same recipient as a biopsychosocial evaluation. A bio-psychosocial evaluation is not reimbursable for the same recipient after an in-depth assessment has been completed, unless there is a documented change in the recipient's status and additional information must be gathered to modify the recipient's treatment plan. |
| In-depth assessment, new patient, substance abuse | H0001 | HO | $125.00 per assessment | Medicaid reimburses one in-depth assessment, per recipient, per state fiscal year. An in-depth assessment is not reimbursable on the same day for the same recipient as a biopsychosocial evaluation. A bio-psychosocial evaluation is not reimbursable for the same recipient after an in-depth assessment has been completed, unless there is a documented change in the recipient's status and additional information must be gathered to modify the recipient's treatment plan. |
| In-depth assessment, established patient, substance abuse | H0001 | TS | $100.00 per assessment | Medicaid reimburses one in-depth assessment, per recipient, per state fiscal year. An in-depth assessment is not reimbursable on the same day for the same recipient as a biopsychosocial evaluation. A bio-psychosocial evaluation is not reimbursable for the same recipient after an in-depth assessment has been completed, unless there is a documented change in the recipient's status and additional information must be gathered to modify the recipient's treatment plan. |

App. 366

Florida Medicaid Community Behavior Health Fee Schedule
2022

| Description of Service | Procedure Code | Mod | Maximum Fee | Reimbursement and Service Limitations |
|---|---|---|---|---|
| Bio-psychosocial Evaluation, mental health | H0031 | HN | $48.00 per assessment | Medicaid reimburses one biopsychosocial evaluation, per recipient, per state fiscal year. A bio-psychosocial evaluation is not reimbursable on the same day for the same recipient as an in-depth assessment. |
| Bio-psychosocial evaluation, substance abuse | H0001 | HN | $48.00 per assessment | Medicaid reimburses one biopsychosocial evaluation, per recipient, per state fiscal year. A bio-psychosocial evaluation is not reimbursable on the same day for the same recipient as an in-depth assessment. |
| Psychological testing | H2019 | | $15.00 per quarter hour | Medicaid reimburses a maximum of 40 quarter-hour units (10 hours) of psychological testing per state fiscal year. |
| Limited functional assessment,  mental health | H0031 | | $15.00 per assessment | Medicaid reimburses a maximum of three limited functional assessments, per recipient, per state fiscal year. |
| Limited functional assessment, substance abuse | H0001 | | $15.00 per assessment | Medicaid reimburses a maximum of three limited functional assessments, per recipient, per state fiscal year. |
| Treatment plan development, new and established patient, mental health | H0032 | | $97.00 per event | Medicaid reimburses for the development of one treatment plan per provider, per state fiscal year. Medicaid reimburses for a maximum total of two treatment plans per recipient per state fiscal year. The reimbursement date for treatment plan development is the day it is authorized by the treating practitioner. |
| Treatment plan development, new and established patient, substance abuse | T1007 | | $97.00 per event | Medicaid reimburses for the development of one treatment plan per provider, per state fiscal year. Medicaid reimburses for a maximum total of two treatment plans per recipient per state fiscal year. The reimbursement date for treatment plan development is the day it is authorized by the treating practitioner. |
| Treatment plan review, mental health | H0032 | TS | $48.50 per event | Medicaid reimburses a maximum of four treatment plan reviews, per recipient, per state fiscal year. The reimbursement date for a treatment plan review is the day it is authorized by the treating practitioner. |
| Treatment plan review, substance abuse | T1007 | TS | $48.50 per event | Medicaid reimburses a maximum of four treatment plan reviews, per recipient, per state fiscal year. The reimbursement date for a treatment plan review is the day it is authorized by the treating practitioner. |
| 59G-4.029: Behavioral Health Medication Management Services Coverage Policy | | | | |
| Medication management | T1015 | | $60.00 per event | Medicaid reimburses medication management as medically necessary. Medication management is not reimbursable on the same day, for the same recipient, as brief group medical therapy or brief individual medical psychotherapy. |
| Behavioral health medical screening, mental health | T1023 | HE | $43.62 per event | Medicaid reimburses two behavioral health medical screening services, per recipient, per state fiscal year. Behavioral health-related medical screening services are not reimbursable on the same day, for the same recipient, as behavioral health-related medical services: verbal interactions, medication management. |

App. 367

Florida Medicaid Community Behavior Health Fee Schedule
2022

| Description of Service | Procedure Code | Mod | Maximum Fee | Reimbursement and Service Limitations |
|---|---|---|---|---|
| Behavioral health medical screening, substance abuse | T1023 | HF | $43.62 per event | Medicaid reimburses two behavioral health medical screening services, per recipient, per state fiscal year. Behavioral health-related medical screening services are not reimbursable on the same day, for the same recipient, as behavioral health-related medical services: verbal interactions, medication management. |
| Behavioral health-related medical services: verbal interaction, mental health | H0046 | | $15.00 per event | Medicaid reimburses 52 behavioral health-related medical services: medical procedures, per recipient, per state fiscal year. Behavioral health-related medical services: verbal interactions are not reimbursable on the same day as behavioral health screening services. |
| Behavioral health-related medical services: verbal interaction, substance abuse | H0047 | | $15.00 per event | Medicaid reimburses 52 behavioral health-related medical services: medical procedures, per recipient, per state fiscal year. Behavioral health-related medical services: verbal interactions are not reimbursable on the same day as behavioral health screening services. |
| Behavioral health-related medical services: medical procedures, mental health | T1015 | HE | $10.00 per event | Medicaid reimburses 52 behavioral health-related medical services: medical procedures, per recipient, per state fiscal year. |
| Behavioral health-related medical services: medical procedures, substance abuse | T1015 | HF | $10.00 per event | Medicaid reimburses 52 behavioral health-related medical services: medical procedures, per recipient, per state fiscal year. |
| Behavioral health-related medical services: alcohol and other drug screening specimen | H0048 | | $10.00 per event | Medicaid reimburses 52 behavioral health – related medical services: alcohol and other drug screening specimen collections, per recipient, per state fiscal year. |
| Medication-assisted treatment services | H0020 | | $67.48 weekly rate | Medicaid reimburses medication assisted treatment services 52 times, per recipient, per state fiscal year. The service is billed one time per seven days. This service is not reimbursable using any other procedure code. |
| 59G-4.031: Behavioral Health Community Support Services Coverage Policy | | | | |
| Psychosocial rehabilitation services | H2017 | | $9.00 per quarter hour | Medicaid reimburses a maximum of 1,920 quarter-hour units (480 hours) of psychosocial rehabilitation services, per recipient, per state fiscal year. These units count against clubhouse service units. |
| Clubhouse services | H2030 | | $5.00 per quarter hour | Medicaid reimburses a maximum of 1920 quarter-hour units (480 hours) annually, per recipient, per state fiscal year. These units count against psychosocial rehabilitation units of service. |
| 59G-4.052: Behavioral Health Therapy Services | | | | |
| Brief individual medical psychotherapy, mental health | H2010 | HE | $15.00 per quarter hour | There is a maximum daily limit of two quarter-hour units. Medicaid reimburses a maximum of 16 quarter-hour units (4 hours) of brief individual medical psychotherapy, per recipient, per state fiscal year.* Brief individual medical psychotherapy is not reimbursable on the same day, for the same recipient, as brief group medical therapy or medication management. |

App. 368

Florida Medicaid Community Behavior Health Fee Schedule
2022

| Description of Service | Procedure Code | Mod | Maximum Fee | Reimbursement and Service Limitations |
|---|---|---|---|---|
| Brief individual medical psychotherapy, substance abuse | H2010 | HF | $15.00 per quarter hour | There is a maximum daily limit of two quarter-hour units. Medicaid reimburses a maximum of 16 quarter-hour units (4 hours) of brief individual medical psychotherapy, per recipient, per state fiscal year. Brief individual medical psychotherapy is not reimbursable on the same day, for the same recipient, as brief group medical therapy or medication management. |
| Brief group medical therapy | H2010 | HQ | $8.65 per quarter hour | There is a maximum daily limit of two quarter-hour units. Medicaid reimburses a maximum of 18 quarter-hour units (4.5 hours) of group medical therapy, per recipient, per state fiscal year. Brief group medical therapy is not reimbursable on the same day, for the same recipient as brief individual medical psychotherapy or behavioral health-related medical services: verbal interactions, medication management. |
| Individual and family therapy | H2019 | HR | $18.33 per quarter hour | Medicaid reimburses a maximum of 104 quarter-hour units (26 hours) of individual and family therapy services, per recipient, per state fiscal year. There is a maximum daily limit of four quarter-hour units (1 hour). |
| Group therapy | H2019 | HQ | $6.67 per quarter hour | Medicaid reimburses a maximum of 156 quarter-hour units (39 hours) of group therapy services, per recipient, per state fiscal year. |
| *59G-4.370: Behavioral Intervention Services Coverage Policy* | | | | |
| Therapeutic behavioral on-site services, therapy | H2019 | HO | $16.00 per quarter hour | Medicaid reimburses therapeutic behavioral on-site therapy services a maximum combined limit of a total of 36 15-minute units per month (9 hours) by a master's level or certified behavioral analyst. |
| Therapeutic behavioral on-site services, behavior management | H2019 | HN | $10.00 per quarter hour | Medicaid reimburses therapeutic behavioral on-site behavior management and therapeutic behavioral on-site therapy services for a maximum combined total of 36 15-minute units per month (9 hours) by a master's level practitioner, certified behavioral analyst, or certified associate behavioral analyst. |
| Therapeutic behavioral on-site services, therapeutic support | H2019 | HM | $4.00 per quarter hour | Medicaid reimburses therapeutic behavioral on-site therapeutic support services for a maximum of 128 quarter-hour units per month (32 hours), per recipient. |
| Behavioral health day services, mental health | H2012 | | $12.50 per hour | Medicaid reimburses a maximum of 190-hour units per recipient, per state fiscal year. Medicaid will not reimburse for behavioral health day services the same day as psychosocial rehabilitation services. |
| Behavioral health day services, substance abuse | H2012 | HF | $12.50 per hour | Medicaid reimburses a maximum of 190-hour units per recipient, per state fiscal year. Medicaid will not reimburse for behavioral health day services the same day as psychosocial rehabilitation services. |
| *59G-4.127: Florida Assertive Community Treatment (FACT) Services Coverage Policy* | | | | |
| Florida Assertive Community Treatment | H0040 | | $27.40 per day | Medicaid reimburses 1 unit per day for 365 or 366 days per state fiscal year per recipient. |

App. 369

# Appendix Attachment

# 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                               Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## DECLARATION OF JAMES M. CANTOR, PH.D

I, James M. Cantor, Ph.D., hereby declare and state as follows:

1.     I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this declaration and would testify completely to those facts if called to do so.

2.     I am a neuroscientist and sex researcher, with an internationally recognized record studying the development of human sexuality and atypical sexualities. I am the author of over 50 peer-reviewed articles in my field, spanning the development of sexual orientation, gender identity, hypersexuality, and atypical sexualities collectively referred to as *paraphilias*. I am the author of the past three editions of the gender identity and atypical sexualities chapter of the *Oxford Textbook of Psychopathology*. These works are now routinely cited in the field and are included in numerous other textbooks of sex research. These publications span the biological and non-biological development of human sexuality, the classification of sexual interest patterns, the assessment and treatment of atypical sexualities, and the application of statistics and research methodology in sex research.

3.     Over my academic career, my posts have included Senior Scientist and Psychologist at the Centre for Addiction and Mental Health (CAMH), Head of Research for CAMH's Sexual Behaviour Clinic, Associate Professor of Psychiatry on the University of Toronto Faculty of Medicine,

1

and Editor-in-Chief of the peer reviewed journal, *Sexual Abuse*. That journal is one of the top-impact, peer-reviewed journals in sexual behavior science and is the official journal of the Association for the Treatment of Sexual Abusers. In that appointment, I was charged to be the final arbiter for impartially deciding which contributions from other scientists in my field merited publication. I believe that appointment indicates not only my extensive experience evaluating scientific claims and methods, but also the faith put in me by the other scientists in my field. I have also served on the Editorial Boards of the *Journal of Sex Research*, the *Archives of Sexual Behavior*, and *Journal of Sexual Aggression*. I am currently the Director of the Toronto Sexuality Centre in Canada. Thus, although I cannot speak for other scientists, I regularly interact with and am routinely exposed to the views and opinions of most of the scientists active in our field today, within the United States and throughout the world.

4.      For my education and training, I received my Bachelor of Science degree from Rensselaer Polytechnic Institute, where I studied mathematics, physics, and computer science. I received my Master of Arts degree in psychology from Boston University, where I studied neuropsychology. I earned my Doctoral degree in psychology from McGill University, which included successfully defending my doctoral dissertation studying the effects of psychiatric medication and neurochemical changes on sexual behavior, and included a clinical internship assessing and treating people with a wide range of sexual and gender identity issues.

5.      I began providing clinical services to people with gender dysphoria in 1998. I trained under Dr. Ray Blanchard of CAMH and have participated in the assessment and treatment of over one hundred individuals at various stages of considering and enacting both transition and detransition, including its legal, social, and medical (both cross-hormonal and surgical) aspects. My clinical experience includes the assessment and treatment of several thousand individuals experiencing other atypical sexuality issues. I am regularly called upon to provide objective assessment of the science of

human sexuality by the courts (prosecution and defense), professional media, and mental health care providers.

      6.     I have been retained by the Defendants in the case to describe opinions regarding the science of gender dysphoria and transsexualism, as previously stated in a report that I prepared for the Florida Agency for Healthcare Administration. A copy of that report is attached and incorporated by reference as Exhibit "B." I also have been asked to respond to criticisms of my report made in declarations  If called to testify in this matter, I would testify truthfully based on my personal experience and knowledge.

      7.     I have testified in deposition or at trial in the following cases within the last four years:

| | | |
|---|---|---|
| 2022 | Roe v Utah High School Activities Assn. | Salt Lake County, UT |
| 2022 | Re Commitment of Baunee | Syracuse, NY |
| 2022 | PFLAG et al. v Abbott | Travis County, TX |
| 2022 | Doe v Texas | Travis County, TX |
| 2022 | A.M. v Indiana Public Schools | Southern District, IN |
| 2022 | Ricard v Kansas | Geery County, KS |
| 2022 | Eknes-Tucker v Alabama | Montgomery County, AL |
| 2022 | Hersom & Doe v WVa Health & Human Services | Southern District, WVa |
| 2022 | BPJ v West Virginia Board of Education | Southern District, WVa |
| 2021 | Cox v Indiana Child Services | Child Services, IN |
| 2021 | Cross et al. v Loudoun School Board | Loudoun, VA |
| 2021 | Josephson v University of Kentucky | Western District, KY |
| 2021 | Re Commitment of Michael Hughes (Frye Hearing) | Cook County, IL |
| 2019 | US v Peter Bright | Southern District, NY |
| 2019 | Spiegel-Savoie v Savoie-Sexten (Custody Hearing) | Boston, MA |
| 2019 | Re Commitment of Steven Casper (Frye Hearing) | Kendall County, IL |
| 2019 | Re Commitment of Inger (Frye Hearing) | Poughkeepsie, NY |

      8.     A list of my publications within the past 10 years is provided in my curriculum vitae.

      9.     I was compensated $400 per hour for preparing my initial report ("Exhibit "B"), totaling $9600. I am being compensated at an hourly rate of $400 per hour for my time preparing this declaration. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

App. 373

10.     My report summarized the scientific evidence which lead to these conclusions:

- The science shows more than one phenomenon can lead to gender dysphoria, distinguishable by their ages of onset. Each type shows distinct epidemiological and demographic patterns, unique psychological and behavioral profiles, and differing responses to treatment options.   Much misunderstanding follows from incorrectly extrapolating information about one type to another.

- The science shows neurological and prenatal components to sexual orientation, but not to gender dysphoria.  The terms *innate* and *immutable* pertain to sexual orientation, but not to gender dysphoria.

- For *prepubescent* children supported in their biological sex, there have been 11 cohort studies.  All 11 showed that feelings of gender dysphoria *desisted* by puberty for most, resolving as gay or lesbian and realizing they had misinterpreted their cross-sex interests.

- For *pubescent* minors undergoing medical transition (puberty blockers or cross-sex hormones) there have been 11 cohort studies. In four, mental health failed to improve or outright deteriorated. In seven, psychotherapy and medical interventions were provided together, and none found advantage to medical over non-medical intervention. Transition may be the best available option for some, but only a small proportion of the total.

- There has been a single cohort study of prepubescent children supported as their cross-sex identity: Feelings of gender dysphoria persisted past puberty for the majority of children, in contrast with studies of children supported in their biological sex.

- Internet surveys of youth show correlations between transition and mental health variables.  Tracking cases over time, cohort studies demonstrated, not that mental health improves with transition, but that minors with better mental health are those permitted to transition.

- U.S. medical organizations are increasingly out of line with international consensus. Although initially supportive of early transition, Sweden, Finland, France, U.K., and Australia have issued increasingly strong policies of psychotherapy as the first line treatment, including an outright ban on medical transition of minors in Sweden.

- Youth with gender dysphoria do not show extreme rates of suicide—Suicide remains exceptionally rare. In behavioral science, *suicide* is distinct from *suicidality* (ideation, gestures, and attempts). Suicide occurs primarily among biological males in middle age, uses highly lethal means, and involves an impulsive but sincere intent to die.  Suicidality occurs primarily among biological females in adolescence, uses less lethal means, and represents psychological distress, cries for help or attention, or manipulation with emotional blackmail. The evidence is not consistent with transphobia as a substantial cause, but is strongly consistent with other mental health issues being responsible for each of suicidality, generally unstable identity, and other issues.

- The first set of age requirements for transition proposed for minors was the Dutch Protocol.  Subsequent guidelines were released by the Endocrine Society and WPATH, lowering ages and repeatedly notes that medical judgement may overrule standards; however, neither document cites any research justifying the loosening of restrictions.

4

11.      Dr. Karasic asserted (without citing scientific support) that "being transgender is not a paraphilic disorder" (Karasic, footnote-2).  That assertion is not the whole truth: As detailed in my report, there is a substantial overlap gender identity and the paraphilias, with a well-documented paraphilia called autogynephilia motivating most cases of adult-onset gender dysphoria, but being unrelated to cases of childhood-onset gender dysphoria, which is instead primarily motivated by homosexuality.  It is exactly because I am a recognized expert with a history of published, peer-reviewed research in each sexual orientation, gender identity, and the paraphilias that I am uniquely qualified to discuss exactly this point, whereas neither Dr. Olson-Kennedy nor Dr. Karasic has or claims any expertise at all, whether scientific or clinical anecdote, in the paraphilias.

12.      Dr. Karasic asserts that "Dr. Cantor focuses on desistance rates of prepubertal children brought into clinics in Toronto and Amsterdam" (Karasic para 75).  Despite such language insinuating cherry-picking of evidence on my part, my report actually provides the comprehensive set of every such outcome study available.  Moreover, because every single study, without exception, came to the same conclusion, whether from Toronto, from Amsterdam, or from elsewhere, the entire point is moot.  The complete listing of all cohort studies of pre-pubescent children is reprinted as Table 1 at the end of the present report. Neither Drs. Karasic nor Olson-Kennedy cites any study to be missing.

13.      Dr. Karasic next faults cohort studies of pre-pubescent because they included a combination of children, some with and some with out formal diagnoses of gender dysphoria, and Dr Karasic offers in their place the results of the recent Olson et al. (2022) study.  In each of these claims, Dr. Karasic's report withholds key information that, when revealed, show the precisely opposite conclusions to Dr. Karasic's claims:  First, the evidence shows that having versus not having a formal diagnosis makes no difference in the outcomes of this population.  The cohort study following up the Canadian sample directly compared the children with and without a formal diagnosis:  Of the 88

children meeting criteria for a formal diagnosis, 13.6% were still gender dysphoric at follow-up, and of the 51 children who did not meet formal criteria, 9.8% were (Singh et al., 2021).

14.    Next, the Olson study that Dr. Karasic prefers engaged in exactly the same mixing of diagnostic status to which Karasic objected in the studies he wanted to reject.  As noted by Olson et al.: "This study did not assess whether participants met criteria for the DSM-5 diagnosis of Gender Dysphoria in Children. Many parents in this study did not believe that such diagnoses were either ethical or useful and some children did not experience the required distress criterion" (Olson et al., 2022, p. 2).  Dr. Karasic is attempting to have it both ways, criticizing or exempting research according to its convenience to his argument rather than providing any unbiased or even consistent accounting of the scientific evidence.

15.    Finally, despite Dr. Karasic suggesting that the high persistence rates (97.5%) reported by Olson et al. (2022) should entirely replace the low persistence rates of the 11 other studies, Dr. Karasic left out that Olson et al. (2022) differs from the other 11 studies in being the only one in which the children had already socially transitioned, whereas the other 11 came from clinics that did not permit transition.  That is, Olson et al. (2022) is much better explained as evidence that social transition causes a large increase in persistence rates.

16.    Dr. Karasic's language is similarly misleading in describing Olson et al. to be current while all other studies are outdated.  Karasic refers to Olson as "a more recent study, which is the only large American prospective study that has been published in the past 35 years" (Karasic para 75).  As Table 1 demonstrates, there has actually been a consistent flow of results, show the same result over and over, including as recently as 2021.  Dr. Karasic's emphasis the difference between American versus all international results, however inadvertently, supports the conclusion that differences reflect cultural and social issues rather than medical ones.

17.      Dr. Karasic claimed "longitudinal studies show that gender dysphoria in adolescence usually persists" (Karasic, para 76), citing DeVries et al. (2011).  That is, once again, not the whole truth: The de Vries study did not pertain to "gender dysphoria in adolescence," but rather to gender dysphoria *that began in early childhood and continued to persist* in adolescence.  Dr. Karasic's language, whether strategic or just carelessly vague, extrapolates without justification from a very small and specific population to the many times larger group of adolescent-onset cases, who differ on every objective variable available.

18.      Dr. Karasic's reminder that "no medical treatment, let alone irreversible medical and surgical interventions, is used prior to puberty" (para 76) again fails to provide the full evidence.  The evidence consistently suggests that each stage of transition makes taking the next step more likely.  Prepubescent children permitted to socially transition are more likely to go on to puberty blockers than are children who are not permitted to socially transition.  Pubescent age children who begin puberty blockers are more likely to go on to cross-sex hormones than those who do not begin puberty blockers.  Etc.  By ignoring the clear implications of this clear pattern, Dr. Karasic minimizes the caution required at each decision-making step, whereas a valid risk:benefit analysis must include such clearly foreseeable outcomes.

19.      It is not clear on what basis Dr. Karasic believes he contradicts me in his next two points (Karasic, para 75): Already emphasized in my report are that researchers have experimented with puberty blockers for childhood-onset gender dysphoria persisting into adolescence and that evidence regarding childhood-onset should not be generalized to adult-onset or adolescent-onset gender dysphoria.

20.      Regarding mental illness, Dr. Karasic cites the (now outdated) 2012 version of the WPATH Standards of Care to assert that "in most cases, having a history of mental illness should not

prevent people from receiving gender-affirming medical and surgical treatment" (para 77). The current (2022) version of the WPATH Standards of Care include[1]:

18.1- We recommend mental health professionals address mental health symptoms that interfere with a person's capacity to consent to gender-affirming treatment before gender-affirming treatment is initiated.

18.2- We recommend mental health professionals offer care and support to transgender and gender diverse people to address mental health symptoms that interfere with a person's capacity to participate in essential perioperative care before gender-affirmation surgery.

18.3- We recommend when significant mental health symptoms or substance abuse exists, mental health professionals assess the potential negative impact that mental health symptoms may have on outcomes based on the nature of the specific gender-affirming surgical procedure.

Dr. Karasic does not indicate what in my report is inconsistent with any of this. Dr. Karasic's assertion beg the question: The vague language of the WPATH standards allow care providers to draw at any arbitrary point any arbitrary line between (for example) what does or does not count as potential interference, with no objective basis and no accounting for consistency.

21.     Dr. Karasic contests my use of the phrase "affirmation on demand" because the (outdated) WPATH Standards of Care "requires a comprehensive mental health assessment" (Karasic, para 78). Dr. Karasic is in error to refer to anything in the WPATH documents as a requirement—the document itself is not binding, there does not exist any system for assessing adherence to it, WPATH has no professional disciplinary system for reported violations, and the contents of the WPATH SOC repeatedly explicate that health care providers may provide exceptions to guidelines due to "professional judgment." As already noted, the sketchy language of the WPATH and repeated indications that care providers may make exceptions without consequence allows any cursory assessment to be deemed "comprehensive" simply by declaring it to be so.

---

[1] Coleman et al., 2022, p. S171

22.     As already noted, my report summarized all 11 cohort studies of people with childhood onset gender dysphoria that persisted into adolescence.  Of these, Dr. Karasic mentions three.  In all three, Dr. Karasic's criticism is that they showed evidence of mental health improvement.  Thus, in all three, Dr. Karasic makes the same error: That some people in some studies showed some improvement is not the question.  The point is that these studies are unable to determine if the mental health improvements were caused by transition or by the mental health treatments that these people were also receiving at the same time.

23.     The only, even theoretically possible, exception was reported by Achille et al. (2020).  That was a small ($n = 50$) study that conducted very many analyses, using a very liberal statistical threshold, and finding overall that "Given our modest sample size, particularly when stratified by gender, most predictors did not reach statistical significance" (Achille et al., 2020, p. 3).  The single analysis that did meet the (liberal) threshold for statistical significance was in the male-to-female group on one of the several mental health measures.  In an analysis such as this, it is unclear whether a result is genuine or a statistical fluke, called a "False Positive."  That the other studies have failed to replicate the finding indicates it indeed represents a false positive, also called a "Type I Error."

24.     Dr. Olson-Kennedy claimed I "incorrectly allege that an increase in numbers of youth presenting for care related to GD provides support for the social contagion theory" (Olson-Kennedy, para 63).  My report, however, includes no such allegation: I never mention social contagion at all, and Dr. Olson-Kennedy provides no reference to where I allegedly did.

25.     My report does, however, include the following information from the peer-reviewed literature (Cantor, para 48)[2]:

---

[2] Footnote-58 of that document is the citation to Littman, 2018, and footnote-29 is the citation to Kaltiala-Heino, *et al.*, 2015; Littman, 2018; and Warrier, *et al.*, 2020.

> The majority of cases appear to occur within clusters of peers and in association with increased social media use[58] and especially among people with autism or other neurodevelopmental or mental health issues.[59]

These features—clustering and co-occurrence in people with social difficulties—are indeed consistent with the social contagion theory, but my report never attempts to make that argument. Moreover, although Olson-Kennedy tries to explain why the "increases in numbers" do not support social contagion theory, she offers no alternative explanation for the social group clustering or clinical history of social impediments.

26.    Dr. Olson-Kennedy next claimed (Olson-Kennedy, para 67):

> Dr. Cantor is wrong to assert that affirmation "increases the probability of unnecessary transition and unnecessary medical risks." (Cantor ¶ 21). There is no evidence to support the notion that affirmation of gender in pre-pubertal children, or at any age, leads to transition.

That evidence does indeed exist, and it is easily cited: As already indicated, there have been 11 follow-up studies of pre-pubertal children of clinics which did not permit social transition, and the feelings of gender dysphoria desisted 61–88% of cases (Table 1).  In direct contrast, Olson et al. (2022) published the follow-up data from children that *did* transition socially before puberty, finding that desistance occurred in only 6%. It is difficult to explain these results in any way other than as social transition greatly increasing the probability of the persistence of gender dysphoria in children.  Not only is the allegedly missing evidence easily cited, it was cited by Dr. Karasic (although he indicated a desistance rate of 2.5% instead of 6%).

27.    Dr. Olson-Kennedy's next claim regarding my report was (Olson-Kennedy para 92):

> The GAPMS Memo and Dr. Cantor criticize that the diagnosis of gender dysphoria is based, at least in part, on a patient's self-report. (GAPMS Memo at 19, 24, 28; Cantor ¶¶ 42, 49). This critique demonstrates a fundamental misunderstanding of how gender-affirming care is provided.

10

Any review of my report reveals it to say no such thing.  Paragraph 42 of my report instead states, very clearly, that the systematic and objective procedures used by the original research clinics have been replaced with non-systematic and subjective procedures[3]:

> 42.   The authors of the original Dutch studies were careful not to overstate the implications of their results, "We *cautiously* conclude that puberty suppression *may be* a valuable *element* in clinical management of adolescent gender dysphoria."[47] Nonetheless,  many other clinics and clinicians intrepidly proceeded on the basis of only the perceived positives, broadened the range of people beyond those represented in the research findings, and removed the protections applied in the procedures that led to those outcomes. Many clinics and individual clinicians have reduced the minimum age for transition to 10 instead of 12. While the Dutch Protocol involves interdisciplinary teams of clinicians, many clinics now rely on a single assessor, in some cases one without adequate professional training in childhood and adolescent mental health. Comprehensive, longitudinal assessments (*e.g.*, 1 to 2 *years*[48]) became approvals after one or two assessment sessions. Validated, objective measures of youths' psychological functioning were replaced with clinicians' subjective (and first) opinions, often reflecting only the clients' own self-report. Systematic recordings of outcomes, so as to allow for detection and correction of clinical deficiencies, were eliminated.

Dr. Olson-Kennedy's commentary regarding the inclusion of self-report evades the point: It is the self-report despite the availability of superior procedures and in addition to the simultaneous degradation of the multiple other safe-guards that demonstrates the loss of safety in the provision of health care with this issue.  Moreover, despite my listing very many problems in providing high quality care, Dr. Olson-Kennedy contests only this one aspect.

28.     Regarding my paragraph 49, I wrote[4]:

> It cannot be easily determined whether the self-reported gender dysphoria is a result of other underlying issues or if those mental health issues are the result of the stresses of being a sexual minority, as some writers are quick to assume.[60]

The only way in which Dr. Olson-Kennedy could find this objectionable would be if she believes it easy to distinguish exactly which of multiple stressors result in exactly which of multiple mental health symptoms.  There does not exist any published research leading to such a conclusion.

---

[3] Footnote-47 of that report is the citation to de Vries et al., 2011, at 2282; footnote-48 of that report is the citation to de Vries et al., 2011.
[4] Footnote-60 of that document is the citation to Boivin, *et al.,* 2020.

29.     Next, Dr. Olson-Kennedy writes, "The GAPMS Memo and Dr. Cantor allege that the provision of puberty delaying medications for the treatment of gender dysphoria are not effective. This is not true" (Olson-Kennedy, para 95).  Not only do I not make that claim, it is not scientifically possible to make such a claim.  It represents what in science is called "proving the null hypothesis." In the scientific method, we assume the null hypothesis and retain it until there is evidence requiring us to reject it, and future evidence remains eternally (even if only theoretically) possible.

30.     What my report does provide is: first, a depiction of the routine, scientific hierarchy of higher quality to lower quality research and, second, a comprehensive review providing all 11 cohort studies (the highest research quality level currently available in the peer reviewed literature).  Among those 11 studies, four found no mental health improvement, five provided psychotherapy at the same time as medicalize transition leaving unknown which resulted in mental health improvement, and two found no superiority of medical intervention over psychotherapy on mental health.

31.     Dr. Olson-Kennedy does not appear to contest of this.  Rather, her report simply reiterates the portions of the subset of studies suggesting improved mental health and fails to address the central issue—whether those mental health improvements (when detected at all) resulted from mental health treatment or from medicalized transition.

32.     Dr. Olson-Kennedy's report (para 110) is misleading in saying "Dr. Cantor describes several studies…" when I summarized the research literature: What I describe in my report is an exhaustive list including every single cohort study in the literature.  It is only with comprehensive evidence that one can avoid biased cherry-picking of the research.  Dr. Olson-Kennedy cites no example of any cohort (or higher quality) study that I missed.

33.     Dr. Olson-Kennedy objects to the highly plausible and parsimoniously superior idea that mental health treatment is what causes mental health improvement, but the basis of her objection is, however, entirely tangential:  I did not, and the studies I cited did not, suggest psychotherapy was

12

changing *gender identity,* as Dr. Olson-Kennedy mistakes.  Rather, and to repeat, I point out the obvious explanation that improvements in mental health resulted from mental health treatment.

34.     Dr. Olson-Kennedy also misrepresents the comments from Harry Benjamin's 1966 *The Transsexual Phenomenon.*  That text refers to adult, and only to adult, gender dysphoria.  Children are never mentioned.

35.     In summary, Drs. Karasic and Olson-Kennedy fail to provide any scientifically legitimate analysis of the type provided by experts in the development of human sexuality.  Their claims repeatedly extrapolate information from one population to others.  Their claims rely on subjective and anecdotal evidence, rejecting the objective evidence.  They fail to provide any consideration of alternative explanations to the objective evidence, actively avoiding superior and more parsimonious interpretations.  Their reports fail to provide any meaningfully full accounting of the science, instead citing and addressing only selective pieces, with language insinuating the presence of evidence that does not exist.

App. 383

# References

Achille, C., Taggart, T., Eaton, N. R., Osipoff, J., Tafuri, K., Lane, A., & Wilson, T. A. (2020). Longitudinal impact of gender-affirming endocrine intervention on the mental health and well-being of transgender youths: Preliminary results. *International Journal of Pediatric Endocrinology.* doi: 10.1186/s13633-020-00078-2

Benjamin, H. (1966). *The Transsexual Phenomenon.* New York, NY: The Julian Press.

Boivin, L., Notredame, C.-E., Jardri, R., & Medjkane, F. (2020). Supporting parents of transgender adolescents: Yes, but how? *Archives of Sexual Behavior, 49,* 81–83.

Coleman, E. et al. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International Journal of Transgender Health, 23,* S1–S258. doi: 10.1080/26895269.2022.2100644

de Vries, A. L. C., Steensma, T. D., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *Journal of Sexual Medicine, 8,* 2276–2283.

Kaltiala, R, Heino, E., Työläjärvi, & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry, 74,* 213–219.

Littman, L. (2018). Parent reports of adolescents and young adults perceived to show signs of a raid onset of gender dysphoria. *PLoS ONE, 13*(8), e0202330.

Olson, K. R., Durwood, L., Horton, R., Gallagher, N. M., & Devor, A. (2022). Gender identity 5 years after social transition. *Pediatrics, 150,* e2021056082. doi: 10.1542/peds.2021-056082

Warrier, V., Greenberg, D. M., Weir, E., Buckingham, C., Smith, P., Lai, M.-C., Allison, C., & Baron-Cohen, S. (2020). Elevated rates of autism, other neurodevelopmental and psychiatric diagnoses, and autistic traits in transgender and gender-diverse individuals. *Nature Communications, 11,* 3959.