IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

      Plaintiffs,

v.                           Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

      Defendants.

_____/

**DECLARATION OF PATRICK W. LAPPERT, MD**

      I, Patrick W. Lappert, MD., hereby declare and state as follows:

      1.     I am over the age of eighteen and submit this expert declaration based on my personal knowledge.

      2.     I have been retained by counsel for the defendants in the above captioned lawsuit to provide an expert opinion concerning the nature of gender surgery. That opinion will be based primarily in my own experience as a physician and surgeon. It will also be based in an evaluation of the scientific publications that Plaintiffs have provided to the court in support of their complaint. It will additionally include an examination the world literature on the subject, as well as an examination of the massive public controversies that have led to near complete reversal of public health policy in multiple European states who have turned away from the social, medical, and surgical transitioning of minors.

      3.     I am a retired plastic surgeon, as well as a retired senior medical officer in the United States Navy. I have been a physician for 40 years. I completed my undergraduate education at the University of California, Santa Barbara. While there I had significant experience in university level research having been invited to be an undergraduate research assistant, working in the laboratory of Dr. Philip C. Laris. It gave me experience in the evaluation of research publications. We were involved in the collaborative work of elucidating the electrodynamic and stoichiometric quantification of the sodium and potassium pump, located in every living cell. I completed my undergraduate degree in four years, and went directly to medical school.

App. 557

4.      I completed my preliminary medical training while on active duty in the US Navy. I attended the Uniformed Services University of the Health Sciences, F. Edward Hebert School of Medicine, graduating as Doctor of Medicine in 1983.

5.      I completed a surgical internship at the Oakland Naval Hospital, followed by Aerospace Medicine/ Flight Surgeon Training at the Naval Aerospace Medical Institute, Naval Air Station Pensacola.

6.      I then served for 2 1/2 years with a deploying, front-line Marine Corps fighter squadron, serving in the dual functions of medical department head, and squadron Radar Intercept Officer flying in the F-4 Phantom. I was deployed to Asia and the Western Pacific. I provided medical care to squadron personnel while deployed in Japan, Korea, and the Philippines.

7.      I completed my General Surgery residency at the Oakland Naval Hospital-University of California, Davis/ East Bay Consortium. Following residency, I was retained there as a staff surgeon, and was responsible for the training of surgical residents. I was awarded the inaugural "Resident's Choice" award given to the attending surgeon deemed most effective by the residents in training, and presented by Claude Organ, MD, past President, American College of Surgeons.

8.      I trained in Plastic and Reconstructive Surgery at the University of Tennessee, Memphis, graduating in 1994. During that training I traveled to Peru and provided craniofacial surgical care for indigent Peruvian children. This included the publication of a case report of surgical management of a very late post traumatic ectopic frontal sinus mucocele.

9.      I received Board Certification in General Surgery from the American Board of Surgery in 1992. I received Board Certification in Plastic and Reconstructive Surgery in 1997 from the American Board of Plastic Surgery. I re-certified in Plastic and Reconstructive Surgery in 2008.

10.     I served as a staff plastic surgeon at Naval Hospital Portsmouth, Virginia from 1994 to 2002. I became Department Chairman in 1998, and served in that office until my retirement. We had 5 staff plastic surgeons, and 10 Enlisted and civilian members. I established the Wound Care Center, providing specialized wound care services to a global catchment area. For example, our department was responsible for the limb and pelvic reconstruction of some of the sailors wounded when the USS Cole was attacked while at anchor at Aden in Yemen. I also established and chaired the

2

multi-disciplinary Cleft Palate, Craniofacial Board. We provided comprehensive services for congenital pediatric deformities to a global catchment area.

11.    Following selection to the rank of Captain, USN, I was selected to serve as Specialty Leader, Plastic and Reconstructive Surgery for the office of the Surgeon General, USN. In addition to being responsible for the selection and training of surgical residents, I was also responsible for Navy Medical Department policy concerning coverage for services, and medical evaluation and evacuation policy. I was responsible for the resolution of issues concerning what conditions constitute a requirement for immediate care in military hospitals, what may be purchased from civilian medical organizations and provided to eligible members on a delayed (elective) basis, and what is to be considered cosmetic surgery and therefore not an obligation of the government. I served in that position until my retirement. While serving as Department Chairman, I co-authored a textbook chapter on the management of combat injuries with the Chairman of Plastic Surgery at Harvard University, Dr. Eloff Ericksson. During that time I also published the first case report in the world literature detailing the use of endoscopic technique for reduction and plate fixation of a fronto-facial fracture.

12.    I retired from the Navy after 24 years of continuous active duty. I was invited to join a surgical group in Scottsbluff Nebraska, primarily to provide comprehensive reconstructive surgery for women suffering breast cancer. I also provided reconstructive services to a very large regional catchment served by the Level II trauma center at Regional West Medical Center (RWMC). I established and chaired the Cleft Palate/ Craniofacial multi-specialty clinic at RWMC. I also established comprehensive wound care services for the many rural community hospitals in the western prairie including Nebraska, Eastern Wyoming, southwest South Dakota and northeast Colorado.

13.    For reasons pertaining to the education of our six children, I moved my practice to Northern Alabama in 2005. I have been a solo practitioner here for the last 17 years. I was brought here by a local hospital that wanted to offer comprehensive breast reconstruction to women affected by breast cancer. I also started a comprehensive wound care center. I have also had a very active practice in aesthetic/ cosmetic surgery. I maintained my own surgical suite for in-office facial rejuvenation procedures as well as minimally invasive body contouring procedures. I was an early adopter of advanced techniques in autologous fat grafting for facial re- contouring as well as for the resolution of radiation burn wounds of the skin. I continued to serve in the training of medical students in my office practice.

3

14.     Although I maintain a practice in wound consultation, skin care, and laser services, I retired from my surgical practice in 2020, after having practiced as a plastic and reconstructive surgeon for 30 years. I was an Active Member in good standing of the American Society of Plastic Surgery for all but the last two years in practice. With only two years remaining in my practice, I elected to forgo a third certification by the American Board of Plastic Surgery. The certification was no longer necessary for maintaining my hospital credentials, and I saw it as an unjustifiable expense for a solo practitioner planning retirement.

15.     As can be gleaned from this summary, I have a meaningful breadth of experience, not only in the advanced surgical care of trauma, cancer, head/ neck disease, as well as cranial and facial birth defects. Many of those procedures require the use of the most advanced sensate, microvascular flaps, including composite and pre- fabricated flaps. These are all the same techniques employed by today's gender surgeons. As regards surgery of the breast, I co-authored a ground-breaking article regarding pre-operative plastic surgical planning in the care of women suffering from breast cancer. It is among the most frequently cited papers in the field of breast reconstruction.[1]

16.     Since 2014 I have made a concerted effort to examine the medical literature as it pertains to the care of self-identified transgender persons including children and adults. I have had an eight year long running discussion on these issues with Family Practitioners, Pediatricians, Pediatric and Adult Psychologists and Psychiatrists, Pediatric Endocrinologists, as well as PhDs who specialize in the evaluation of the validity of scientific publications. During that time I have made many public presentations to teachers, counselors, pastors, and administrators on the subject of transgender, and the medical-scientific evidence that informs that care.

17.     My curriculum vitae, which is attached as Exhibit "A", provides a list of my publications

18.     I prepared a report which is attached to the Florida Agency for Healthcare Administration's "Generally Accepted Professional Medical Standards Determination for the Treatment of Gender Dysphoria"   A copy of my report is attached and incorporated by reference as Exhibit "B" to this declaration.

---

[1] Toth, B.A. and Lappert, P. (1991) Modified Skin Incisions for Mastectomy: The Need for Plastic Surgical Input in Pre-Operative Planning. Plastic and Reconstructive Surgery, 87, 1048-1053. http://dx.doi.org/ 10.1097/00006534-199106000-00006

19.    I have offered testimony, both written and in person on this issue to state legislators, state health benefits management agencies, as well as to State Attorneys General.

20.    I have also had experience in making judgements concerning distinctions between reconstructive surgery and cosmetic surgery. I gained this experience while serving in senior leadership for a government medical care system in which I had no financial stake. I have no financial interests in the matter in question, and the professional opinion that I offer is not influenced by my sources of income nor by my position in any organization that financially benefits from medical services that are discussed in this opinion.

21.    For my services as an expert witness I am being compensated at an hourly rate of $400 for preparation of my written testimony as well for deposition and hearing. Additionally my travel expenses will be reimbursed. My compensation is not dependent upon the substance of my opinion nor upon the outcome of the litigation.

22.    If called to testify in this matter I will do so truthfully, and to the best of my ability.

23.    The Plaintiffs, supported by the opinions of Dr. Schechter, among others, are  making the claim that "gender affirmation care" including "gender affirming (or confirming) surgery" should be paid for by the State of Florida because such care has scientifically proven efficacy, and safety. Furthermore they claim that there is such an abundance of scientific support for these treatments that they must be understood to be the standard of care, and that there is no controversy in the matter. In support of this position they have provided in their declaration an abundance of citations from professional scientific publications that they expect will furnish the court with sufficient reliable evidence that Plaintiffs claims will be upheld. As shall be seen in this response, their claims are not supported in the science. This will be seen in the examination of those scientific documents which they have cited.

24.    In recent years professional medical societies have been making a concerted effort to strengthen the scientific basis upon which their particular specialties stand. This effort is commonly given the name "evidence based medicine". It is a systematic effort to categorize the quality of prognostic and therapeutic studies so that physicians reading these publications can distinguish what is vague and speculative from what is a matter of high likelihood, or grave certainty. Tools for making such

distinctions have been developed that categorize clinical or experimental findings on the basis of how that data was obtained, the reliability of the test instruments used, the variability of the results, the sample size, and the likelihood of bias among other factors. For the purposes of this response, I will use the tool developed by the American Society of Plastic Surgery.[2] For prognostic studies, the categorization of evidence is divided into Levels I- V, with Level I being the most rigorous and having the highest likelihood of scientific certainty, and Level V having the least rigor, and having very little certainty. Here are the definitions of those levels according to the American Society of Plastic Surgery:

Level I: High quality prospective cohorts study with adequate power or systematic review of these studies.

Level II: Lesser quality prospective cohort, retrospective cohort study, untreated controls from an RCT (randomized control study), or systematic review of these studies.

Level III: Case- control study or systematic review of these studies.

Level IV: Case series

Level V: Expert opinion; case report or clinical example; or evidence based on physiology, bench research or "first principles".

23.     For therapeutic studies, the ASPS categorization is similar, but with a few helpful distinctions:

| Leve | Type of evidence |
|------|------------------|
| 1A | Systematic review (with homogeneity) of RCTs |
| 1B | Individual RCT (with narrow confidence intervals) |
| 1C | All or none study |
| 2A | Systematic review (with homogeneity) of cohort studies |

---

[2] The Levels of Evidence and their role in Evidence-Based Medicine Patricia B. Burns, MPH,1 Rod J. Rohrich, MD,2 and Kevin C. Chung, MD, MS3 Plast Reconstr Surg. 2011 Jul; 128(1): 305–310. http://www.plasticsurgery.org/Medical_Professionals/Health_Policy_and_Advocacy/ Health_Policy_Resources/Evidence-based_GuidelinesPractice_Parameters/ Description_and_Development_of_Evidence-based_Practice_Guidelines/ ASPS_Evidence_Rating_Scales.html.

| 2B | Individual Cohort study (including low quality RCT, e.g. |
| 2C | "Outcomes" research; Ecological studies |
| 3A | Systematic review (with homogeneity) of case-control studies |
| 3B | Individual Case-control study |
| 4 | Case series (and poor quality cohort and case-control study |
| 5 | Expert opinion without explicit critical appraisal or based on physiology bench research or "first principles" |

24.     These distinctions are very important to physicians who seek to understand the weight of the evidence presented in support of a change in therapeutic care. Sometimes such scientific findings can be so compelling regarding an issue, that professional societies will publish clinical guidelines that strongly suggest conformity to a new treatment plan based in that evidence. Occasionally the evidence will be of such certainty, on a matter that is so grave, that professional societies and even public law will assert that there exists a standard of care based in this evidence that if ignored has a high probability of injury or harm to the patient. That is what is implied when the phrase "standard of care" is used.

25.     To that end, the ASPS document provides a grading system for Practice Recommendations that helps in the decision making. It is a synthesis of the breadth of scientific data that addresses the issue in question. In the case of Grade A ther is an accompanying "Strong recommendation", versus Grade D where the evidence is so lacking in empirical value that the proposed treatment can only be offered as an option if at all, depending upon the strength of existing or alternative treatments, and the particular issues of a particular patient.

26.     To summarize, it can be said that Level-V evidence is anecdotal, and in the world of surgery it is typified by the phrase "expert opinion". Such evidence is not to be dismissed since it is the known starting point for much meaningful research and discovery. A surgeon with great experience and unassailable credentials will observe something peculiar. He will form a hypothesis about its cause or treatment. Hopefully he will publish his single case report, and share his thoughts with the wider surgical community. Perhaps one of his residents will start a hunt for other cases. Perhaps

App. 563

surgeons who read his paper will report similar cases. Eventually it might lead the surgeon to apply his new principal to a series of cases. The series may already be there in his own case files. If he publishes his series of cases, that would constitute an improvement to Level-IV evidence. Even then, it would be considered "poor" evidence because it suffers from the fact that it is a small collection of cases, from a single surgeon, and perhaps no one has yet replicated his observations. Additionally it may suffer from "selection bias" (as when the patient decides if he will receive long term follow up), lack of proper controls (which help us to separate out what is the result of our treatment, and what is within the range of normal variation in the population), inadequate study duration (if you claim a long term improvement in survival, you have to follow the patients long-term).

27.    An example from the history of surgery will serve to illustrate how Level-IV and V evidence, when widely encouraged and applied through expert opinion, can result in grave missteps. For over 100 years, ulcer disease of the stomach was considered a surgical problem. This very debilitating disease did not appear to be manageable through medical means. Laboratory study of the stomach had already demonstrated that acid production in the stomach is regulated by particular nerves. That finding suggested that if those nerves are cut, acid production will decline, and the ulcer will heal. It was also determined that the surgery must include some form of "drainage procedure" because cutting the nerves would also impair the muscular contracture of the stomach. Through the course of the decades many of the greatest surgeons gave their names to the elegant techniques for selectively cutting the nerves, or draining the stomach in ways that hopefully would not result in a "gastric cripple" (an all too common outcome). Long hospitalizations, and many months spent accommodating to the reordering of their digestive tract was expected. There is a syndrome of bad effects from these surgeries that most people adapt to but some never do. Nonetheless, untreated peptic ulcer disease was often deadly, either from peritoneal sepsis, or bleeding to death. Because of the gravity of ulcer disease, it was ethically sound to risk "post gastrectomy syndrome" if it meant saving a life.[3] By the 1980s, level II and I studies had demonstrated that peptic ulcer disease is actually a bacterial infection that can be treated with antibiotics and an acid-reducing medication. This had been very seriously suspected for at least 30 years. However, poorly designed studies published by the greatest academic surgeons of the day had utterly suppressed the bacterial explanation in favor of the surgical solution. A very well reasoned 2014 paper by Seselja and Strasser[4] shows the heuristic pitfalls that can result in unintended harms to

[3] History and evolution of peptic ulcer surgery; John B.BlalockJr.MD1; The American Journal of Surgery Volume 141, Issue 3, March 1981, Pages 317-322

patients when surgical decision making is driven by expert opinions that aren't well supported by quality scientific evidence.

28.     Generations of surgeons will follow what is taught to them by the academic surgeons. These are esteemed mentors who are responsible for training the next generation of surgeons. That is how it has always been. However today, medical science has advanced in crucial ways through the application of the "science of science". We understand better now how to examine the evidence. We are less likely to make needless errors of judgment because we are better able to analyze the data particularly with regard to its reliability. This is indispensable when studying biological systems that, in every measurable trait, demonstrate great variability. It is particularly essential when examining and caring for the human person, because you have the added dimension of their subjective interior life.

29.     Dr. Schechter, by every measure known to me, is of very accomplishmed in the world of plastic surgery.  It is on that basis that we can expect that the published literature which he has offered in support of Plaintiff's assertions will be of the highest level available to him.  But the literature he offered does not bear out his conclusions

30.     In para. 21, Dr. Schechter defines the word "transgender" on the basis of a subjective conflict within the patient's internal sense of themselves. He affirms this interior subjective division on the basis of an idea that sex is somehow "assigned" at birth, rather than scientifically discovered through tissue sampling, in utero ultrasound, or simple inspection at birth. In 99.98% of cases, simple inspection correctly detects the sex of the subject. Furthermore, this test can be administered by untrained personnel. His use of the term "assigned" implies that there can be errors of "assignment". Such an assertion demands not only that we examine the result, but we must also look at the consistency of the data. We have seen previously that consistency of the data is one of the hallmarks of good evidence. Any test that can be correct 99.98% of the time regardless of who administers the test is perhaps unequaled in scientific medicine.

31.     Gender, on the other hand, as it relates to sex, is a very different matter. While there are some aspects of gender that are more fixedly related to the sex, there are large  areas of gender that are learned within the milieu of the local culture, and find their origins in family life. There is no objective, repeatable test, with known error rates that can be used to detect "gender". Gender, as the term is used in the world of medicine and surgery is not objectively measurable.  Such traits as hair length,

---

[4] Dunja Šešelja 1, Christian Straßer; Heuristic reevaluation of the bacterial hypothesis of peptic ulcer disease in the 1950s; Acta Biotheor 2014 Dec;62(4):429-54.

occupation, preference for violent sport, clothing selection, among others, may have vague gender associations, but are so variable from culture to culture as to be useless for our purposes. This is because "gender" is one of the many expressions of the interior life of the person. It is a mercurial thing because it is not entirely fixed to that part of the patient that is a reliable object for examination and treatment. That difficulty with diagnosis and prognosis is further complicated by the fact that variability in gender presentation doesn't just occur within any particular human grouping, it is also known to vary within the span of the life of a single patient.(Zucker)

33.     Beginning in 23, Dr. Schechter makes the claim that "hormone therapy and gender confirmation surgeries can help alleviate gender dysphoria" and that these treatments "have been shown to be an effective treatment for gender dysphoria". In para. 24 he further states that it is his professional opinion "supported by prevailing consensus of the medical community" that these treatments are medically necessary, and are "safe and effective treatments for gender dysphoria". We will examine the claims of efficacy, and safety by examining the papers offered in support of his claim. We will examine the world literature more broadly in order to examine Dr. Schechter's claim that there is a "prevailing consensus", which is a claim that suggests that there is no meaningful controversy surrounding the use of social, medical, and surgical gender affirmation, particularly with regard to the young.

34.     The first support that Dr. Schechter offers is the WPATH "Standards of Care". This document is the product of the World Professional Association of Transgender Health.  It has had 7 iterations, with the 8th version now pending publication. This document  has been, and continues to be produced through a process of consensus-seeking within working committees of experts. As we have seen in our discussion about the grading of scientific evidence, expert opinion is the most rudimentary level of evidence. It is the starting point of scientific investigation, not the end. As any medical subject is investigated over time, the expert opinion becomes better supported by well developed and monitored scientific processes. In short, expert consensus is only as valuable as the scientific evidence that can be reviewed and evaluated which supports the opinion. If the evidence hasn't progressed very far beyond the category of expert opinion, then we are speaking about evidence that is not sufficiently developed so as too drive either clinical decision making, nor fiduciary decision making when public or invested resources are involved.

35.     It will be recalled that the use of the words "standards of care" imply that a particular treatment or clinical principle, if not employed, would have an unacceptable probability of harm to the patient. The term "standard of care"  addresses issues of

duty, negligence, harm, and causation. It is a legal term that is applied when evaluating the malpractice of medicine. In its Introduction to the WPATH standards, the authors acknowledge that their document is meant to be a guideline only, and subject to individual and local adaptation, and that it is not binding in any way. On page 2 of v.7 in bold face it states "The Standards of Care are flexible clinical guidelines". This calls into question the motivation for the use of the phrase "standards of care" in all of its publications and statements.

36.     If the WPATH document is actually a collection of clinical guidelines, then we must examine how such guidelines are developed. In the International Journal of Quality in Healthcare (2016) Kredo et al.[5] (&) offer a helpful examination of that process. They point out that in the past they were just consensus statements offered by experts in the field. They were "'systematically developed statements to assist practitioner and patient decisions about appropriate health care for specific clinical circumstances." With the push toward evidence based medicine, it was realized that guidelines required more scientific rigor, so in 2011 the definition was changed to, "statements that include recommendations intended to optimize patient care that are informed by a systematic review of evidence and an assessment of the benefits and harms of alternative care options'". In order to have real value, clinical practice guidelines must therefore do two things: Use high quality scientific data to evaluate risks, and beneficial results while presenting alternative approaches for the practitioner and patient to consider.

37.     As Dr. Schechter has stated in his expert declaration, he is a co-author of the WPATH chapter on surgery in version 7, and is the co-lead author of the same chapter in version 8. It would be expected therefore that what Dr. Schechter has offered to the court is "high quality scientific data to evaluate risks, and results while presenting alternative approaches for the practitioner and patient to consider", since it is precisely that which is the question here.

38.     The first scientific publication he offers is one that is in support of hormonal treatment of transgender persons. It is a paper by Hembree et al.[6] which is itself a clinical practice guideline promulgated by the Endocrine Society (hereafter ES). This guideline was produced in order to update an earlier guideline from 2009. It was produced using GRADE consensus methodology, and is the product of 9 experts who

---

[5] Guide to clinical practice guidelines: the current state of play; Kredo et al. Int J Qual Health Care. 2016 Feb; 28(1): 122–128.Published online 2016 Jan 21. doi: 10.1093/ intqhc/mzv115

[6] Wylie C Hembree, et al. Endocrine Treatment of Gender-Dysphoric/Gender- Incongruent Persons: An Endocrine Society Clinical Practice Guideline, The Journal of Clinical Endocrinology & Metabolism, Volume 102, Issue 11, 1 November 2017, Pages 3869–3903, https://doi.org/10.1210/jc.2017-01658

App. 567

formed the committee. The GRADE methodology cautions its  users that
"inconsistency of result across multiple studies", "indirectness of evidence",
"imprecision in measurement", and "publication bias" are to be watched for in its
application; essentially that doctors must watch out for sloppy measurement, and bias in
the working group. The scientific evidence used to support the Endocrine Society's
special treatment guidelines for gender dysphoric/ gender incongruent persons
appears to be of low to very low quality, since the clinical recommendations were so
equivocal. It was published in 2017 and includes the statement:

**"guidelines cannot guarantee any specific outcome, nor do they establish a
standard of care": "The guidelines should not be considered inclusive of all
proper approaches or methods, or exclusive of others. The guidelines cannot
guarantee any specific outcome, nor do they establish a standard of care. The
guidelines are not intended to dictate the treatment of a particular patient." P.
3895.**

39.     As was discussed earlier, this language of uncertainty when included in a
clinical practice guideline is what we would expect with low quality evidence. This is
what the ASPS would call a Grade D result  that rests on level IV-V evidence, and is
therefore not useful in directing clinical decision making. This consensus process
described by Hembree et al. would likely appear very similar to the decision making that
drove peptic ulcer surgery in opposition to evidence that it is  a bacterial disease.
Academic physicians of the highest caliber were making recommendations to their
fellow practitioners, as they are now,  based upon anecdotal experience and low level
evidence.

40.     Just 2 years later, in 2019, the ES , along with an international panel of
endocrinology societies, concluded "**the only evidence-based indication for
testosterone therapy for women is for the treatment of HSDD** [Hypoactive sexual
desire disorder]," and that "There are **insufficient data to support the use of
testosterone for the treatment of any other symptom or clinical condition,** or for
disease prevention." Also, "The **safety of** long-term testosterone therapy has not been
established."[7] It is somewhat alarming to note that these findings are entirely consistent
with a consensus statement from  5 years earlier in 2014. In the span of just 5 years, the
Endocrine Society consensus has swung from "no other indication for androgen in
women" to something akin to, "it is crucial that androgens be given to women who are

---

[7] Endocrine Society Susan R Davis, et al, Global Consensus Position Statement on the Use of
Testosterone Therapy for Women, The Journal of Clinical Endocrinology & Metabolism, Volume 104,
Issue 10, October 2019, Pages 4660–4666, https://doi.org/10.1210/jc.2019-01603.

gender dysphoric", and then back to "no other indication for androgen". This kind of consensus oscillation is what you would expect when there is such scant scientific basis for the decision making.

41.     Dr. Schechter presented the ES guidelines as the "criteria for initiation of surgical treatment". Between para. 27 and 28 he claims that gender surgery is "often necessary and effective" citing the same ES document. He also correctly reports parallel, committee based consensus statements by the numerous academic societies, produced in the same way, and resting upon similar evidence as discussed above re: ES guidelines, and WPATH "standard of care".

42.     In para. 29 Dr. Schechter offers a listing of all of the surgeries that would be considered "generally accepted in the medical community". He does not explain how he measured the level of acceptance that transgender breast and genital surgery enjoys in the medical community. He further explains that all of the listed surgeries are "consistent with the standard of care". By the phrase "Standards of Care", he appears to refer to the WPATH document. The main salient chapter in that document was authored by Dr. Schechter, in his capacity as a leading academic expert in the field of transgender surgery. It is his own expert opinion that he cites as an authoritative guide in surgical decision making in matters relating to the care of transgender persons. Ipse dixit.

42.     In para. 30, while discussing surgeries for women who seek to present as men, he describes the removal of healthy breasts and the cosmetic masculinizing procedure as "reconstructive". This is somewhat problematic, particularly as regards the duties of third party payors, including the State of Florida Medicaid program, which includes the management of payment for services. The distinction between what is cosmetic (aesthetic) versus reconstructive is one of the key issues in the just management of payments by insurers, including the State of Florida. This distinction was a daily issue for me when I was in Navy Medical Department leadership. The distinction between cosmetic and reconstructive surgery rests upon objective, observable, repeatably measurable markers of conditions that diminish or impair human functioning. It is based in comprehensive objective knowledge of human structure and function and is in the service of human flourishing.

Reconstructive surgery is the restoration of form and function for a person who has suffered a loss through genetic or developmental in utero accident, trauma, infection, or surgery for infectious events or cancer. It begins with the most comprehensive knowledge available concerning the nature and function of the injured part, and seeks to optimize function as the primary goal, while seeking to restoring the

natural form. Both form and function are understood objectively, and both have subjective effects. Restoration of form and function in a combat injured leg has measurable effects on mobility, range of motion, strength, and capacity for work. Subjectively, the impact is profound as well, but it is not the central purpose of the operation.

In contrast, aesthetic surgery begins in the subjective life of the patient. The patient presents seeking an opinion concerning the aesthetics of a particular feature, such as the nose. They will express a dislike of the feature. Their hope is that by modifying its appearance, they will improve their interior subjective life. What the patient is seeking is a normal human objective: to improve the aesthetics of things, for ourselves and for the people around us. When the surgeon is planning and performing the operation on the nose, there is great objective precision, however all of it is placed in the service of the subjective life of the patient. It is of no use for the surgeon to impress himself with a technically perfect result if the patient loathes it. The surgeon additionally has the grave duty of managing the risk for the patient and weighing it against the potential benefit. The patient must not be submitted for a surgery which entails a significant risk of loss if the surgery is being performed only to achieve an aesthetic outcome. If there is a certainty of loss, then there is a certainty of error. To give a young woman a perfect nose, and in the process destroy her ability to breath through it would be a terrible error of surgical decision making. It is axiomatic in plastic surgery that we are to avoid a predictable sacrificing function in the pursuit of cosmetic improvement.

The procedure which Dr. Schechter labels "chest reconstruction surgery" in female to male presentation patients actually begins with the known expectation that the surgery will produce a degradation or loss of two essential human functions, namely: sexual arousal, and breast feeding. Both functions are permanently and irretrievably lost, and that loss is one of the expected results or the surgery. This step is then followed by the cosmetic shaping of the chest through the use of liposuctioning in an effort to further masculinize the appearance of the chest. This surgery is now being routinely performed on minor girls, and version 8 of the WPATH "standards of care", written by Dr. Schechter and presented here as authoritative, actually recommends mastectomy in girls as young as 15 years of age. This surgery does not involve the restoration of form and function, and is therefore not reconstructive. It is an operation that begins in the subjective life of the patient, and aims at a result that also resides entirely within the subjective life of the patient. It is thus by definition an aesthetic (cosmetic) surgery. Because it includes the 100% likelihood of a massive functional loss, it must be considered unsupportable as a matter of policy.

14

Similarly, genital surgery procedures listed in Dr. Schechter's declaration can not be considered reconstructive because they do not meet the definition of reconstructive surgery. They begin with an obsessive concern or anxiety in the subjective life of an otherwise normal, healthy person. They involve the planned destruction of an essential human function, and they are not restoring a form that is missing due to trauma, genetic accident, in utero event, or disease. The surgery seeks to create counterfeit structures that never could have existed in the patient, except as an artifact of surgery. I have done many reconstructive surgeries involving the entire genital area in patients with military injuries and infectious illnesses. If the injury is so devastating as to require a counterfeit structure, and that is all that can be offered, then there is no question as to how the surgeon must proceed.

In contrast, gender affirmation surgery only produces counterfeit structures that are created to serve the subjective life of the patient. Because these surgeries are cosmetic, and because they are 100% certain to produce grave functional losses, they must not be supported as a matter of public policy, and never be paid for by use of public funds.

43.     In para.31 Dr. Schechter discusses what he calls "medical necessity criteria for initiation of surgical treatment". His sole reference is the WPATH "standards of care" of which he is the principal author. It should be remembered that the WPATH standard of medical necessity is not supported in reliable scientific evidence, but only on rudimentary, low level data. His first criteria is that the patient must have "the capacity to make fully informed decisions and to consent for treatment". He adds that mental health concern must be "reasonably well controlled prior to surgery".

It is firmly established in high quality research that persons with gender dysphoria have a greater than 30% likelihood of being on the autism spectrum, and a nearly 40% probability of a diagnosis of depression or major anxiety disorder. The proponents of gender surgery will rightly point to the high probability of self-harming behavior, including suicide attempts and completed suicide among self-identified transgender persons.

In my experience as a surgeon, it is considered imprudent to obtain consent from patients suffering from psychological conditions that provoke the patient to acts of self-harm and/ or suicidal ideation. These psychological disturbances are known to impair the patient's capacity for understanding the information offered by the surgeon, interpreting that information, and reasoning from that information. If those capacities are

15

impaired by psychological disturbances sufficient to consider suicide, then meaningful consent must be questioned. Certainly in the case of conditions that constitute a threat to life and limb in a patient with decreased competence. consent may be obtained with the assistance of family, guardian, or in particularly urgent cases a group of professionals who agree on the grave necessity to proceed with surgery.

The difficulty here is that none of the surgeries on Dr. Schechter's list are emergency operations performed to save the life of the patient. They are all elective (scheduled when convenient and patient is deemed ready). Furthermore, an ever-growing percentage of patients submitted for gender surgeries are minors who by definition are not competent to consent. The claim is made that these surgeries are in fact "life saving". This is a claim that is not supported in high quality scientific evidence. In fact high quality evidence, which I will present below, shows that while self-harm and suicide rates are improved in the very short term for some sub-groupings of patients, in the long-term these problems remain if not worsen.

When Dr. Schechter speaks of the need to have these psychological disturbances "well- controlled" prior to surgery, he must certainly mean that self-harming or suicidal thoughts have been well controlled. If that is the case, then the chiefly claimed reason for the surgery has been successfully treated medically, and the patient would no longer require the surgery.

What is troubling is that the co-morbid conditions of autism spectrum disorder, clinical depression, and major anxiety disorder are never examined as the possible causes of the gender identity disturbance. These are conditions that, if treated, might improve if not resolve the gender problem. To the contrary, these serious problems are viewed as mere impediments to gender surgery that must be "reasonably well-controlled" so that surgery may proceed. This is consistent with the regnant WPATH model that there is a single explanation (disconnection between biological reality and subjective identity which has an as-yet undiscovered cause), and has only a single solution (social, medical, and surgical affirmation). Such a single cause/ single solution assumption would seem to be unlikely, given the massive range and the recent complete reversal in the demographics of transgenderism. What used to be a condition that was nearly exclusively found in little boys (and resolved nearly 90% of the time), is now predominantly a condition affecting young women, and at a rate that has risen between 4000 and 5000% in the course of the last decade.(Shreier et al.)

44.    In para.33 Dr. Schechter begins the evidentiary support for the assertion that "Gender Confirmation Surgeries are Medically Necessary". In para.34 he states that the "medical community generally considers those surgeries to be medically

necessary". He makes this assertion of broad acceptance in the medical community without evidence to support it. How was the data gathered and interpreted to support the assertion that the medical community broadly shares his opinion? I am not aware of any published study that has measured the acceptance of this therapeutic model among the members of the medical community.  The only evidence he has presented concerning the broader medical community is the collection of consensus statements, produced by the various specialty committees which was produced  using the faulty methodology described above, and supported with the lowest levels of evidence.

45.    In para.34 Dr. Schechter asserts that "gender confirming surgeries are not cosmetic because, when performed in accordance with the Standards of Care, they are clinically indicated to treat the underlying medical condition of gender dysphoria". He appears to be saying that medical necessity exists because he said so himself when he wrote the chapter for the Standards of Care. He is again standing upon his considerable expertise, but he hasn't up to this point supported the assertion with  scientific evidence. This is entirely analogous to the history of peptic ulcer surgery: driven by the highest level of academic expertise, but lacking rigorous scientific support.

46.    In para. 35 he continues his assertion that gender surgery is not cosmetic by making the claim that gender dysphoria is a medical diagnosis. This is an extremely problematic statement for him to make, given that the diagnosis comes to us from the Diagnostic and Statistical Manual of Mental Disorders (DSM) vol. 5 (2013). As Dr. Schechter described in his outline of the diagnostic and pre-operative selection for surgery, the patients are referred to him by a process that begins in psychology, continues with psycholgical support, and concludes with certification by psychological services that the patient is ready for surgical modification. At no point has he described any medical diagnostic process of history-taking, physical examination, laboratory evaluation, or radiographic examination that he has used to confirm a diagnosis which was produced and sustained by psychological services.  The indication for surgery begins in the subjective life of the patient. Surgery is offered to the patient with the assurance that it is likely to  improve the subjective life of the patient, and is therefore by definition cosmetic surgery.

47.    One of the essential mechanisms that third-party payors (including state Medicaid agencies) have for distinguishing reconstructive surgery from cosmetic surgery is found in the pathology department. Two operations may be outwardly identical even while one is reconstructive and the other cosmetic. An excellent example is the breast reduction surgery which I discussed in my previously submitted assessment. This surgery may be reconstructive when the size of the breast is being

sufficiently reduced in order to remedy a condition of orthopedic pain. These patients suffer from chronic neck, back, and shoulder pain caused by the orthopedic effects of their heavy breasts. The same, technically identical operation, might be done for purely cosmetic reasons. In the case of reconstruction, the patient has a condition that causes lost time from work, frequent covered visits to physical therapy, or to pain clinics, chiropractors and radiologists. There is abundant actuarial data, based upon the highest levels of scientific support, that a breast reduction of sufficient weight (based upon the anthropometric measurement of the patient) has a very high probability of resolving the chronic pain. High quality medical literature that addresses this issue, and its importance to insurance plans, is typically very precise in its data gathering and actuarial interpretation.[8] However, pain cannot really be measured. Pain is reported by the patient. Health insurance plans are able to distinguish cosmetic breast lift from reconstructive breast reduction based upon the reported weights of the breast tissue that is submitted to pathology. An objective, repeatable medical test, with known error rates is used to confirm the diagnosis, ensure correct care for the patient, and separate cosmetic surgery from reconstructive surgery in the interest of preserving medical resources and preventing fraud. No such process exists in the case of mastectomy for chest masculinization. There is no physical, biochemical, hormonal or tissue pathology, that can be demonstrated to localize the patient's condition in her healthy breasts. It is the young woman's subjective sense of revulsion when she looks at herself that has caused her to believe that mastectomy might make her feel better.

48.     Similarly, the pathology department helps us to make distinctions between reconstructive and cosmetic surgery in the case of gynecomastia, which is a condition that affects biological males, and results in the growth of female glandular breast tissue. Men who have enlargement of the soft tissue of the chest area may come to the surgeon seeking improvement in appearance. Most often this problem is caused by varying degrees of obesity, and in such cases surgical improvement would be rightly categorized as cosmetic. The patient is motivated by a dissatisfaction with his appearance, which he wishes to improve, so that he can feel better about his appearance. In contrast, the man with gynecomastia might present with a mass behind one nipple, that is tender, and disfiguring. Perhaps it interferes with his occupation because it is impinged upon by safety equipment that he has to wear in his occupation. In this case, the surgical removal of the mass (gynecomastectomy) would rightly be considered reconstructive because surgery is used to restore function and form in a person who has an objective finding (female glandular tissue in a male chest). As in the earlier case, insurance plans rely on the evaluation provided by the pathology

---

[8] Accuracy of Predicted Resection Weights in Breast Reduction Surgery: Kung, Theodore A. MD; Plastic and Reconstructive Surgery - Global Open: June 2018 - Volume 6 - Issue 6 - p e1830

department when surgical specimens are submitted. The lab, using proven, repeatable, accurate testing methodologies can report either the presence of nothing more than adult fat tissue, as would be expected in the case of the cosmetic chest re-contouring, or they would report the presence of "fibroglandular breast tissue", which would be the expected and necessary finding that would warrant payment for a reconstructive surgery that is a covered benefit in the insurance plan. Thus, the findings provided by the pathology department serve to confirm what expert opinion, supported by high quality evidence, diagnosed before the patient was brought to surgery. Such objective, measurable, repeatable findings from pathology help to advance the quality of care because outcomes of care can be evaluated in the long term, and the consistent language and data can be compared among multiple studies from multiple centers of care, thus increasing the reliability of expert opinion throughout the medical community.

In footnote #8 of Dr. Schechter's declaration he says that "Dr. Lappert incorrectly refers to breast growth in transgender women as "gynecomastia", and that "Gynecomastia refers to enlargement of the male breast, not to breast growth in transgender women" (biological males who present as women). From the standpoint of the validity of scientific-medical information, this is a very troubling statement for Dr. Schechter to make. He is essentially saying that the validity of objective, measurable, repeatable findings of the pathology department are completely negated by the subjective condition of the patient. The patient's subjective interior sense of themself cancels the objective validity of medical knowledge.

49.    In para. 38 Dr. Schechter begins the assertion that gender surgery "has been demonstrated to have other salutary effects, such as improving quality of life and reducing negative health outcomes". In support of this assertion he cites a 2019 publication by Miller et al. He summarizes the findings of the paper with a declaration of subjective satisfaction on the part of the patients (that 100% would do it again). Upon examination of Dr. Miller's paper we see that it is a report of a single surgeon retrospective review. It begins with a chart review of only 34 patients, only 12 of whom responded to the quality of life questionaire. This means 74% of the study patients dropped out (patient self-selection bias, with drop out rate greater than 20%). All of the data is based in subjective reporting by the patients, rather than objective findings (such as substance abuse rates, psychiatric hospitalization rates, suicide attempt etc.). Such reporting which is purely subjective (satisfaction survey, quality of life survey etc.) is characteristic of the cosmetic surgery literature, not the reconstructive surgery literature. He reports that "every patient surveyed at 1 year" reported that "their life had changed for the better". This statement is again reporting only subjective data, this time following a meaninglessly short follow-up of a very small group that has been biased by

19

self-selection. The overall study is little better from the standpoint of the duration of the study because the final follow-up was only 4 to 7 years. This paper presents level-IV and level-V (low to very low quality) evidence, and is therefore only useful in suggesting further research, particularly since it is authored and cited by subject matter experts. It is not useful for  clinical decision making. Neither can it be presented as evidence for anything more than a cautiously worded practice guideline (as in the ES guideline concerning the use of cross-sex hormones presented above), and certainly can never be used in support of a "standard of care". It is important that this was the first paper Dr. Schechter cited in support of efficacy, given the weakness of its content.

50.    In para. 40, Dr. Schechter continues his presentation of the scientific evidence that demonstrates the efficacy of gender surgery by citing a 2006 paper by Newfield et al. Dr. Schechter summarizes the paper's findings saying that mastectomy and chest masculinization in transgender biological females "increases self-esteem and improves body image" while providing the patient with "some security and safety for those who remove their shirts in public areas such as gyms or beaches". In reading the entirety of the paper I found that it did not demonstrate that at all. The passage Dr. Schechter quotes is a personal editorial opinion expressed by the authors in support of transgender surgery. It is found in the preamble to the paragraphs that describe their study of the self-identified, but never verified, post surgical patients.

This paper is a report of an anonymous survey. It claims to provide meaningful information about the effect of female to male transitioning medicine and surgery without even verifying that the subjects who responded to the survey have in fact undergone medical and surgical gender transition. Subjects were recruited **"via online promotion and printed materials, including flyers and postcards that were distributed to San Francisco Bay Area community centers, cafes, stores, and health clinics that serve the transgender community."** In terms of self-selection bias (patient determines who is followed by the study) it is hard to imagine a more problematic patient selection process. The researchers even admit that they were unable to determine how many surveys may have been submitted multiple times by the same study respondent. They write:  "Although this procedure *helped* (italics mine) prevent duplicate submissions by the same participant, we could not employ more sophisticated computerized systems due to administrative and financial constraints".

All of the demographic information contained in the study was self-reported but not verified, including age, sex, health status, history of hormonal therapy, and history of gender surgery. The study uses a quality of life survey with 36 questions in 8 areas of interest, producing only self-reported subjective information. Even the claim of simple

App. 576

benefit is poorly support, as is reflected in the conclusion to the paper. The authors write, **"The 376 US FTM transgender participants analyzed in this sample had diminished mental-health related QOL compared with the general US population, as measured by the SF36v2. These findings are consistent when compared against specific age and sex norms."** This statement demonstrates the lack of value in the study. The study participants demonstrated a quality of life that is statistically significantly lower than the age/ sex comparison cohort, and the authors can only speculate as to the cause. There is no way to tell if treatment helped, had no effect, or harmed the patients because there was no information available about the anonymous subjects. This is because the anonymous test subjects hadn't received pre-treatment evaluation using the same or comparable test instrument. This study, selected by Dr. Schechter to support the claim of efficacy is of the lowest evidentiary value, may be useful for suggesting future research, but is of no value in directing clinical decision making, or meaningful allocation of public resources in the service of health.

On the Safety of Transgender Surgery

51. A discussion of surgical safety must include anticipated losses which are either expected, or even remotely possible. In order to examine the comparable issues in transgender versus reconstructive surgery our effort is simplified by comparing identical operations.

On several occasions I have performed the reconstructive surgery called "Sensate radial- forearm microvascular free flap hypopharyngeal reconstruction". I operated in order to reconstruct the tongue and throat of patients who had suffered a grievous wound of the mouth and throat that resulted from removal of an aggressive cancer. The defects caused by that wounding needed to be replaced with thin, pliant, abrasion and lfluid resistant tissue. It needed to provide the patient with sensation in the reconstructed area so that they can feel the food and liquids in their mouth, and manipulate the food so as to swallow it. We selected an area of skin on the inside of the forearm that has regular and robust blood allow, is thin and durable, and has an easily dissected sensory nerve that can be attached to the nerves in the wound. The forearm flap satisfied all the requirements. An operation of this complexity, duration, and technical requirements has many issues, big and small, that can diminish or destroy the result.

That throat reconstruction operation is in almost every way identical to the second most commonly performed female to male (FtM) genital surgery, the "Sensate

radial forearm microvascular free flap phalloplasty", which I understand is performed by Dr. Schechter. In that operation, the identical flap is raised and transferred. It also must be resistant to abrasion, be water tight, pliant, sensate, and of correct volume. Through a process of incision, plication and suturing, a tubular phallus is constructed within which is a skin lined tube which will serve as the urethra. The suture closures in both flaps is where most things go wrong because the skin edges that define the suture line can lose sufficient  blood supply.  In the phalloplasty, when this happens, the patient suffers from delayed healing, urine leakage, varying degrees tissue death, and scarring. All of those problems can happen with either the throat flap, or the phallus flap. When the phallus flap fails, the patient suffers due to varying degrees of tissue loss, chronic urinary leakage, or urinary obstruction due to  scarring that can cause kidney injury if left un-treated. When the throat flap fails, bacteria laden saliva will leak into the neck where it can cause fulminant infections, or erode into a major artery and cause the patient to bleed to death in a matter of moments.  A singularly terrible event.

In the case of the throat operation, if the removal of the cancer had not been performed, there was a known and significant  probability that the cancer would have eroded into the tissues of the neck and caused a fulminant infection, or eroded into a large blood vessel, as described above.  In contrast,  if the phallus flap operation, had not been performed, the patient would have remained  fully functional in every human capacity, though suffering from an inner subjective disturbance called gender dysphoria, which has not yet been adequately addressed.

Both operations involve the use of a highly complex surgical techniques to remedy a wound. In the case of the cancer operation the wound was the result of a cancer that would have ended in a terrible death. In the case of the phallus operation the surgeon is creating multiple physical wounds (castration, loss of pelvic organs of reproduction, de-gloving injury of the forearm, skin graft donor site injury), with their associated risks of complications.  The surgery is performed in attempt to remedy a subjective, patient-reported sense of their identity.

Clearly the pre-operative condition of the cancer patient is far more grievous than the condition of the young person who is suffering from gender dysphoria. The cancer patient would likely be more than willing to endure significant loss, such as voice, or teeth, or the sense of smell. And yet, if I were discussing surgical risk pre-operatively with my patient who has the throat cancer, and told him that there was a certainty that in the course of the operation he would lose all of his reproductive organs, he would be justified in asking why he was being subjected to such an unsafe operation. The patient wouldn't be even slightly interested in any discussion of infection risk,  wound healing

App. 578

problems, or scarring. The question of safety addresses itself to the question of potential loss. Transgender surgery of the genital apparatus predictably causes grievous loss that dwarfs such complications as infection, local tissue loss, urinary leakage or scarring.

52.     Returning from safety to efficacy in para. 43, we have a reiteration of an expert, professional opinion, and referring to a "substantial body of peer reviewed research". This is the next issue we must address: the use of the phrase "peer reviewed". Peer review is the very important process by which highly educated and trained experts review scientific medical papers for publication. They are examined in order to ensure that the corpus of medical literature is protected from imprecise, substantively erroneous, or conceptually flawed publications. It is an essential part of the historic, magisterial process in medicine. In fact, it is so much a part of the life-long learning process of the doctor that any worthy training program will have a robust "journal club" in which doctors at every level of training take a turn at publicly "peer reviewing" an article and leading a lively discussion of its value. A good doctor is constantly peer reviewing. It is an essential element of good medical care.

Establishing that an article is peer-reviewed is a basic, and essential practice. You might read a medical paper with level-III evidence of high quality, or a paper that is level-V evidence of low or questionable quality, both of which undergo peer review, and are published. The level-III will likely drive decision making, and possibly a recommendation as high as "standard of care", while the poor-evidence paper drives research, or perhaps the consideration of an alternative approach, if that approach does not put the patient in any significant risk.

53.     In para. 44 he presents another peer reviewed article from 2013 by Weigert et al. which he summarizes. He asserts that the article demonstrates a statistically significant improvement in "psychosocial well-being" following cosmetic breast augmentation in biological males who are presenting as women. This paper is very simple to analyze and classify as not meaningful for informing clinical-therapeutic decision making. At the bottom of the published abstract, and on the front page of the full article is written, "Clinical question/level of evidence: Therapeutic, IV." As was discussed above, this paper is at the same low level, because it is a single-center sampling of a small cohort of patients, that relies on subjective, self-reporting through questionnaire, over a short study duration. Patient collection was made between 2008-2012. The paper was published   in 2013. If the peer review process followed the usual time-line, it is likely that there are a significant number of patients in the study who were followed for less than a year.  The authors, in the abstract only claim the pre-surgery, and the 4th month post-surgery as assured time points. This is remarkably short follow

up even for a cosmetic breast augmentation cohort. The article is perhaps useful in suggesting inquiry into why their cohort reported no improvement in physical well-being, given the known association between emotional health and physical health. There is nothing in the article that would rise even to the level of a guardedly worded clinical guideline suggestion.

54.     The next citation offered in support of gender surgery is another peer-reviewed study by Horbach et al. published in 2015. This is a review of transgender surgical literature published between 1995 and encompassing nearly 20 years. It yielded 26 papers that satisfied the search criteria, and includes 1,461 patients. As Dr. Schechter quoted, the paper claims that "transgender women (biological males presenting as women) who had vaginoplasty found that study participants' mean improvement in quality of life after surgery was 7.9 on a scale of one to ten". In the conclusion of the paper the authors write, ""Sexual function and patient satisfaction were overall acceptable, but many different outcome measures were used. QoL was only reported in one study. Comparison between techniques was difficult due to the lack of standardization."

Of the merely 26 studies out of a sampling that spanned 20 years, only one paper was found to have used a standardized metric, one that only measures subjective, patient reported information,  and the rest could not even be compared to each other. The authors write, **"The available literature is heterogeneous in patient groups, surgical procedure, outcome measurement tools, and follow-up. Standardized protocols and prospective study designs are mandatory for correct interpretation and comparability of data."**

56. This result is startlingly reminiscent of a paper published by Tolstrup et al. published in 2020. It is a comprehensive literature review on the subject of breast surgery in transgender patients, including both male to female, and female to male presentation. It is a scoping review that yielded 849 papers of which 47 papers met the inclusion criteria based upon title, abstract, and full text.  In the study results,the authors report that,
     **"The summary of outcome domains and classifications showed that there are large variations in outcome evaluation between studies. Although several studies reported on similar outcome categories, there was a high level of heterogeneity of domains and classifications of outcomes."** The authors then conclude by explaining that **"Evaluation of outcomes in gender-confirming chest**

App. 580

**surgery showed large variations in reporting, and further streamlining of reporting is therefore required to be able to compare surgical outcomes between studies."**

None of the articles examined rates of psychiatric hospitalization, substance abuse,

self-harm behaviors, or suicide. This tells us that the most compelling reason offered for performing these surgeries (psychological distress and suicide risk) isn't even evaluated with regard to efficacy in the world transgender surgery literature.

55.    Professionally speaking, these are very disappointing findings from comprehensive examination of the transgender surgery literature. To have a surgical sub-specialty working diligently, and guided by professionals at the highest levels of academic expertise, that has only produced case-series reports, retrospective case collections, and fruitless 20 year literature reviews, and still only have level-IV and V evidence to show for it is alarming. It shows that the sub-specialty has not developed uniform descriptive language, standardized  reporting nor test instruments that might raise the value of expert opinion to a level that could make reliable recommendations that might help in surgical decision making, rightly inform the consent process, or guide decision making by officials entrusted with the care of public and private medical resources. It would cause me to make a sober review of the medical and surgical principles that are guiding this work.

56.    The next article cited by Dr. Schechter is one  presented in support of masculinizing chest surgery in minors and young adults. This is the mastectomy and liposuctioning surgery discussed above. It is a 2017 paper, published in the peer reviewed journal JAMA Pediatrics. Dr. Schechter asserts that the paper demonstrates that "surgical intervention (mastectomy)positively affected both minors and adults". This paper is perhaps the most alarming of all the citations offered.

The principle author, Dr. Olson-Kennedy is also an academic expert in her capacity as Associate Professor of Clinical Pediatrics, Keck School of Medicine of USC, and Medical Director of The Center for Transyouth Health and Development in Los Angeles. She holds professional membership in The Society for Pediatric Research, the World Professional Association for Transgender Health(WPATH), and the Society for Adolescent Health and Medicine. If any expert would be in a position to offer high quality, evidence based publications, she would certainly be in contention.

In their summary of findings, the authors report that "chest dysphoria" is common

among "trans males" (natal females seeking to present as males), and that the dysphoria is decreased by surgery. They claim that regret for surgery is "rare". The article reports breast removal surgery on at least one girl aged 13 years. The average age was 19. Children were entered into the study through recruitment from among patients visiting the clinic, and by telephone over a six month period. The authors found that patients recruited from among visitors to the clinic (convenience sampling) yielded an abundance of non-operated patients, so they were forced to reach out to all the post surgical patients by phone. 26% of the clinic's post surgical patients could not be reached for various reasons including no working phone, or failure to respond to multiple messages. A 26% drop-out rate is never questioned by the authors. Were they lost to follow up because of dissatisfaction, psychiatric hospitalization, or suicide? This problem is called "self-selection bias", and is evidence of careless study design. Of the remaining 74% of patients, only 72% of them (only 53% of the study patients) completed the survey. This is a second example of self-selection bias. Why would some post surgical patients who had been successfully contacted, not complete the survey? The authors do not ask the question.

In the study, dysphoria was measured using "a novel measure" (an unproven test instrument) which was a series of subjective questions about happiness. Among the designers of this novel test instrument were some of the adolescent patients themselves. Their flawed methodology included the use of an entirely unvalidated test instrument, with no known error rates, or proven predictive power, **that was in part designed by the minors and young adults who were the subject of the study.**.

Furthermore, the post surgical patients were given the survey at varying time intervals post surgery. The longest interval between surgery and the satisfaction survey was 5 years, but children less than a year post surgery were included in their flawed sample, and yet the authors claim evidence of "negligible regret." This is a remarkable claim given that long term, longitudinal population studies show that there is a dramatic rise in post surgical problems such as depression, hospitalization, substance abuse, and suicide beginning at around year 7 post surgery(Dhejne). Surely Dr. Olson-Kennedy is familiar with the international literature on transgender outcomes?

Having promised in the introduction to her paper that "chest dysphoria" is reduced by surgery, at the conclusion they confess the fact that the study design and execution produced very low quality data that is not useful for patient selection, or prediction of outcomes. They even confess that the study does not address the efficacy of surgery in improving outcomes regarding the single most compelling reason for

26

performing the operation: mitigation of depression and suicide. The authors write: " **An additional limitation of the study was the small sample size. The nonsurgical cohort was a convenience sample, recruited from those with appointments during the data collection period. There could be unknown imbalances between the nonsurgical and postsurgical cohorts that could have confounded the study findings.**

**Finally, the Chest Dysphoria Scale is not yet validated, and may not represent distress or correlate with validated measures of quality of life, depression, anxiety, or functioning."**

This paper is a typical example of a publications which are used to support transgender medicine and surgery, written by board certified transgender expert physicians who practice in our nation's largest pediatric gender clinics, and was published in peer-reviewed medical journals. The article is essentially useless in making any clinical decisions regarding who should be offered surgery, what the likelihood is that they will benefit from it, or the likelihood that they will regret their decision. Most importantly, it can not even vaguely estimate if the risk of hospitalization, incarceration, or suicide will be reduced. For the same reason that the paper is not useful in clinical decision making, it is likewise not meaningful in decision- making for persons charged with the just management of public and private medical resources.

On the Experimental Nature of Transgender Surgery

57.    In para. 47 Dr. Schechter brings into question the assertion that transgender surgery is experimental in nature. He begins this response with the claim that referring to transgender surgery as experimental is "unsupported by the professional medical consensus and prevailing standards of care for treating gender dysphoria, and is inconsistent with mainstream medical standards." We previously discussed the lack of intrinsic validity of consensus methodology when evidence to support the consensus is weak. We discussed the evidentiary requirements for claiming a "standard of care"; that one must present evidence that is high (III or better) and consistent over multiple studies (with obvious exceptions when the consequences of error are minor). We also reviewed the historic meaninglessness of the phrase "mainstream medical standards" when trying to resolve the issue of the validity of novel research finding.

It is to be remembered that whenever there is a breakthrough in medical-scientific knowledge, it is characteristic that academic experts are proven to have been

in error. This is in the nature of the scientific method. As will be recalled from earlier discussion, the greatest names in academic surgery for 100 years wrote papers, published books, trained residents, wrote board questions, and examined candidates for board certification fully convinced that ulcer disease of the stomach is a surgical disease that demanded some of the most advanced operations known at the time. They considered it not only necessary, but in fact lifesaving beyond a shadow of doubt. These were great, and well-intentioned surgeons laboring under a poverty of information for 70 years, then laboring under an abundance of confidence that they could not possibly be wrong about their condemnation of the infection theory of ulcer disease. Eventually, high quality evidence proved them wrong, and now surgery for gastric ulcer disease is rarely seen. Through the whole history of ulcer surgery, the principle of acid reduction through nerve sectioning and drainage was "mainstream". This test of mainstream acceptance in the medical community, which Dr. Schechter offers,  is a test with no predictive value in making either clinical or medical executive decisions on the question of the validity of transgender surgery.

58.     One of the important usages of the term "experimental" in the world of medical care is in the domain of insurance services, both public and private. Leadership in  these agencies is charged with the responsibility of managing medical resources in a way that both preserves resources, while at the same time applying those resources to the patient as correctly as medical science and their own actuarial information will allow. Whenever a novel therapy is proposed for a given condition, insurance services will examine the medical and actuarial data to see if the proposed therapy is likely to yield a result that serves those two purposes (health of the patient, and financial soundness of the insurance process). Typically, in the early years of a new treatment there is resistance on the part of the payors because early on (as discussed in detail above) all that the proponents are able to present is low-level scientific papers that present anecdotal case collections without controls, or multiple studies that can not be compared due to methodological variation, or are methodologically questionable due to unvalidated test instruments. We surgeons are inclined to think uncharitable thoughts when reading letters from insurance plan managers. But history has shown, and the fact remains, that good surgery demands good evidence, particularly when permanent damage to the client is a possible result.

Nonetheless, if the reviewer see evidence that a new approach may be helpful, they prudently insist that therapies of known value be tried to their reasonable limit , and that they be found to fail in solving the patient's condition, before considering the new treatment.

28

This dynamic process between the patient, the physicians, and the insurance industry has many problems, but good, well validated scientific evidence is not one of those problems. In fact well validated science is typically the best remedy for those problems. Sometime the good science is from the doctors, and sometimes the good science comes from the actuaries. In both cases the patient benefits.

59.    From the perspective of the case in question, this sense of the term "experimental surgery" may be the most important. How did the  affirmation care scientific model and its associated social, medical and surgical treatments enter into the mainstream of the medical community. Did it follow this same process of gradual acceptance in both the medical and insurance communities through a process of steadily improving evidence levels? Was it used on a careful trial basis after having exhausted treatment by established methods? The answer is, "in a way, yes it did".

60.    The historically validated treatment  model for what is today called gender dysphoria is what is called "watchful waiting". On hearing the name one is tempted to think of this as a resignation to inaction. It is not. It is a psychotherapeutic process that is rooted first in an examination of the cognitive processes of the child, and seeing how the child has responded to the reality of their life. For this reason, in order to be effective, it must include family therapy. The goal is to keep the anxious and confused child in loving contact with reality, while seeking to understand and remedy the dynamic that is provoking the condition of distress. Occasionally, short courses of anxiety medications may be used to manage the intensity of obsessive thinking that has become centered on their physical appearance. It is essentially the same process used in helping persons who suffer other obsessive- compulsive issues, like eating disorders. Psychological research, having high level evidence, has shown that over the course of time  this approach results in over 80% resolution of the cross-sex self identification during adolescence, and nearly 92% by young adulthood.[9]

61.    This watchful-waiting approach is likely the reason why transgenderism used to be  a rare diagnosis. The vast majority of people with the condition resolved the issues,  and went on to live their lives without the need for life-long medications, without destructive surgeries, without the loss of their sexual faculties, and without the loss of fertility. What has happened, however, is that the dynamic between patient, physician,

[9] Zucker, K. J. (2018). The myth of persistence: response to "A critical commentary on follow-up studies and 'desistance' theories about transgender and gender nonconforming children" by Temple Newhook et al. International Journal of Transgenderism, 19(2), 231–245. Published online May 29, 2018. http://doi.org/10.1080/15532739.2018.1468293

App. 585

and insurance services has been severely disrupted. The science based medical and actuarial management of this  condition has been separated from the evidence, and now rests entirely on the opinions of academic experts who have managed to influence the decision makers in their favor. In large part, they have accomplished this by never speaking about watchful waiting except to dismiss it as folly. This process of silence and dismissal is exactly what ulcer surgeons did to the proponents of the scientifically correct infection model of ulcer disease.

62.     Sadly, silence and dismissal about watchful waiting is not the only reason for the 5,000% increase in the diagnosis of transgender over the past decade. Surgeons who were seeking to achieve the best results for their transgender patients came to realize that most of the difficulty with good cosmetic results was that young men seeking to present as women looked too masculine, and young women seeking to present as men looked to feminine.  If their masculine or feminine development had been arrested early, the surgeons theorized that they would achieve better results. It was reasonable, in light of their treatment model, to think that a better cosmetic result would mean a better resolution of the gender incongruence. Thus the idea was born that the earlier the child was transitioned, the better the cosmetic surgical result, and thus the better psychological result, which was the goal.

This theoretical improvement in outcomes for transgender persons through early transition was certainly an idea worth investigating. Because the lifelong effects of the approach might include some really bad outcomes for the children, and because the actual outcomes were unknown at the time, it would have been prudent, and scientifically consistent to categorize this from the above described insurance industry perspective, as  experimental. It would have required that the patients exhaust the fully established and proven treatment model of watchful waiting. If that treatment failed to resolve the issue, then on a trial basis, and supervised under very strenuous human experimentation oversight, the affirmation model could be tried.

In order for this highly supervised experimental approach to pass ethical standards in human experimentation there would have to have been a previously established diagnostic and patient selection process of very high specificity. If the proven and established method of watchful waiting is yielding 92% resolution, then what the ethically minded surgeon is really supposed to be doing is trying to find that 8% of children who would have failed watchful waiting, and select them out for surgery earlier in their life. Then studying the result on a very long-term and comprehensive basis, he would have been able to provide high-value evidence that his hypothesis about the

successful early management of transgenderism is a safe and valid option for his patient. This was not done. Instead, the routine social and medical transitioning of children began, which includes puberty blockade, and cross-sex hormones in children and youth.

Instead of seeking the historic, and small cohort of patients who would have carried the condition into adulthood  and treating them, physicians and surgeons are treating  all of those children now. Instead of seeking the scientific methodology with which to make a correct diagnosis so as to increase the likelihood that you are operating on the right person, the transgender treatment model is essentially turning all affected children  into "the right person". By the time the youth or young adult person arrives in the surgeon's office the process has been locked into place.

63.    It would seem that the best course of action for those who serve the insurance industry is to return  this process to the time tested dynamic model of patient, physician, and insurance plan discussed above.  Because the affirmation model rests upon such low quality evidence, it seems justifiable to suspend financial support until such time as testing and patient selection processes are improved to acceptable levels of reliability. Given the serious, life long consequences of mis-diagnosis, and the misapplication of surgery, levels of patient selection reliability would have to be quite high.

64.    There is the additional issue of liability for insurance providers, including the state. The massive surge of patient numbers over the past 10 years would predict that large numbers of patients are reaching the point where affirmation interventions will have been exhausted, and the numbers of treatment failures will start to rise dramatically. We are beginning to see this in the increasing numbers of "regretters" whose support groups and legal representatives are sounding the alarm. This may represent a serious liability to insurers in addition to the physicians and hospital systems that have taken such an active role in promoting this unproven treatment model.

65.    A review of the European literature on this topic forms the basis for this anticipation of liability and merits review here. As we have seen in this review of Dr. Schechter's expert declaration, the American literature used in support of the claim of benefit is of low reliability. We make this assertion based on the expectation the Dr. Schechter has provided the court with the best evidence available. One of the features of all those papers taken in aggregate is that they report studies of short duration. Follow up durations of less than 3 years are common. Some, as we have seen are as

short as 4 months. This fact helps us to understand why proponents of the affirmation model are enthusiastic. We see in the European literature that there is a trend line that looks favorable for up to 7 or 8 years, after which result decline precipitously.

66.     As described in my previous report, the Swedish medical establishment maintains an excellent and centralized data base of all episodes of care for beneficiaries. It uses uniform language, and captures treatment events at all levels, from school clinics, to psychiatric hospitals, to prison infirmaries, to public clinics. The database can be analyzed for such things as emergency room visits, drug addiction treatment, hospitalization for suicide, psychiatric admissions for self-harming event etc.

In 2011, Dhejne et al.,published a population based, longitudinal cohort study of the database that sought to examine the lifetime hazard ratio of such things as substance abuse, incarceration for violent behavior, psychiatric hospitalization, and completed suicide.[10] This is level-III evidence of high order given the methodology employed and  the proven reliability of the database. It examined persons who have fully completed transition and compared them to age and sex matched controls in the Swedish population. It did not use anonymous surveys, or other faulty convenience sampling. It found the post-transition patients by finding the associated  episodes of care, such as i hormone therapy prescriptions began, or admission for gender surgery occurred. The data set spans 30 years. What it shows is that fully transitioned subjects showed a relative risk of suicide roughly equal to the age/ sex matched controls, but the effect appears to last for just a few years. The trend line for death from any cause begins a sharp drop at approximately 10 years and continues to drop massively over the subsequent 15 years. When the researchers looked at the aggregate life-time relative risk of suicide, persons who fully transitioned were 19.1 times more likely to have killed themselves when compared to age and sex matched controls. If you only look at the subgroup of biological females who transitioned to male-presentation, the risk of  suicide is 40 times higher than the control group. Results such as these, because they are obtained using tested and reliable methodology, are able to help meaningfully in clinical and administrative decision making, and in several European countries it has.

67.     Over the past several years, the medical systems in Great Britain, Sweden, Finland, and France have stepped away from early medical and surgical

---

[10] Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in SwedenPLoS One. 2011; 6(2): e16885.
Published online 2011 Feb 22. doi: 10.1371/journal.pone.0016885

transitioning of the young. The Tavistock-Portman Institute in London, which was the sole provider of these services to children in Great Britain was closed recently following the public declaration by a review committee that the Institute was "unsafe for children".[11] Similarly, the Karolinska Institute in Stockholm reversed its policy by suspending the medical and surgical transitioning of the young in favor or psychological support and treatment.[12] Similar changes in treatment guidelines for self-identified transgender youth have been published in Finland.  Based upon these developments in Europe, it is very troubling to read assessments or declarations by leaders in the field of transgender surgery which assert that these treatments are mainstream and beyond controversy, or that they are part of a core curriculum of surgical training, or that an oral board examiner might fail a candidate surgeon if their answers reveal a reticence to join the mainstream that Dr. Schechter has described. The world literature demonstrates emphatically that early medical and surgical transitioning is in fact so controversial that medical leadership in multiple countries has put a stop to it.

68.     In summary, transgender surgery is based in a treatment model of affirmation that lacks scientific support based in quality evidence. The scientific support offered by the leaders in the field is entirely composed of small studies, single provider /single center studies that are lacking in control cohorts, and are often rendered uninterpretable due to haphazard case-collections such as the solicitation of study participants without methodology to confirm that the patient is a treatment subject.  All of the studies cited have short follow-up, and most studies suffer from massive self-selection bias and high drop-out rates. The studies often employ untested assessment methodologies, and all of the literature cited by experts report only subjective data, which is typical of papers that address outcomes in cosmetic surgery. Transgender surgery is, by definition, cosmetic surgery. The move towards surgery begins in the subjective life of the patient, is conducted with the aim of improving the subjective life of the patient, and outcomes are measured in subjective terms based in satisfaction surveys. Transgender surgery violates fundamental principle of cosmetic surgery, because it predictably destroys essential functions of the human person. It is not reconstructive surgery because the patient is physically healthy before the surgery, and has no definable deficit that can be objectively characterized to be the cause of the presenting complaint. There is no objective test to confirm the diagnosis of transgender, and no way to correctly select patients for surgery from among the young. The enterprise of gender affirmation medicine and surgery is based entirely in a consensus

[11] NHS to close Tavistock child gender identity clinic  https://www.bbc.com/news/uk-62335665

[12] rSweden's Karolinska Ends All Use of Puberty Blockers and Cross-Sex Hormones for Minors Outside of Clinical Studies  https://segm.org/Sweden_ends_use_of_Dutch_protocol

of expert opinion of low reliability because it is supported by unreliable scientific evidence.

69.    Based upon all of the above examined findings, it is my professional opinion that leaders in the medical community must stop the application of the affirmation care model to the young. The earlier model of watchful waiting, which gender affirmation unjustly replaced, must be restored as the tested and proven basis for care until such time as better, scientifically proven methods are found. Leaders in medical administration have a duty to the patients, and to their healthcare systems, to stop the financial support of this untested, demonstrably harmful treatment model, and to direct practitioners to the fullest use of the proven treatment model of watchful waiting. American physicians who care for persons who experience gender discordance likewise have a duty to follow evidence that has been offered by our European colleagues, and to  seriously consider the fact that long term evidence now shows that gender transitioning medicine and surgery do not reduce lifetime risk of self-harm. Physicians  must  instead seek more effective ways to treat this community of persons who are suffering greatly, and who deserve care based in the objective truths that are revealed by good science.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of October, 2022.

//s//Patrick W. Lappert, MD____
Patrick W. Lappert, MD

EXHIBIT "A"

## Curriculum Vitae-  Patrick W. Lappert, MD

**Education and Training :**

— Bachelor of Arts in Biological Sciences at the University of California, Santa Barbara, 1979.  Research in cell membrane physiology with Dr. Philip C. Laris, studying stoichiometry of the sodium: potassium ATPase pump.

— M.D., Doctor of Medicine degree at the Uniformed Services University of the Health Sciences, 1983 at Bethesda, Md.

— General Surgery Residency at the Naval Hospital Oakland/ UC Davis East Bay Consortium, 1987-1991

— Chief Resident, Department of Surgery, Naval Hospital Oakland, 1990-1991.

— Plastic Surgery Residency at the University of Tennessee- Memphis, 1992-1994.


**Board Certifications in Medicine :**

— Board Certified in Surgery —  American Board of Surgery, 1992-2002

— Board Certified in Plastic Surgery — American Board of Plastic Surgery, 1997-2018


**Medical Staff Appointments :**

— Staff General Surgeon at the Naval Hospital Oakland, CA 1991-1992

— Associate Professor of Surgery, UC Davis-East Bay, 1991-1992.

— Plastic and Reconstructive Surgeon, Naval Medical Center, Portsmouth, VA 1994-2002

— Chairman, Department of Plastic and Reconstructive Surgery, Naval Hospital Portsmouth, VA 1996-2002.

— Clinical Assistant Professor, Department of Surgery, Uniformed Services University of the Health Sciences, 1995-2002

— Founding Director, Pediatric Cleft Palate and Craniofacial Deformities Clinic, Naval Hospital Portsmouth, VA 1996-20002

— Founding Director, Wound Care Center, Naval Hospital Portsmouth, VA 1995-2002.

— Staff Plastic Surgeon in Nebraska, and Alabama.


**U.S.N. Surgeon General Service:**

— Specialty Leader, Plastic and Reconstructive Surgery, Office of the Surgeon General-USN, 1997-2002

**Faculty Appointments:**

— Teaching Faculty at Eastern Virginia Medical School, Division of Plastic Surgery, 1995-2002

**Military Service :**

— Aviation Officer Candidate, Naval Aviation Schools Command, NAS Pensacola, 1978

— Commissioned an Ensign, MC, USNR 1979 and Commissioned as a Lieutenant, MC, USN 1983 .

— Designated Naval Flight Surgeon, Naval Aerospace Medical Institute, 1985

— Flight Surgeon, Marine Fighter/ Attack Squadron-451

— Radar Intercept Officer in the Marine F-4S Phantom, accumulating 235 flight hours, and trained for qualification as an Air Combat Tactics Instructor.

— Deployed to the Western Pacific as UDP forward deployed fighter squadron in Korea, Japan, and the Philippines.

— Service in the US Navy for 24 years

— Service in the US Marine Corp. for 3 years.

— Retired with the rank of Captain, USN in 2002

**Military Awards:**

— Navy Commendation Medal - For service with Marine Fighter/Attack Squadron - 451

— Meritorious Unit Citation- 3rd award

— Humanitarian Service Medal - For service in the aftermath of the Loma Prieta earthquake.

**Publications** - **Peer Reviewed Medical Journals** :

— Lappert PW. Peritoneal Fluid in Human Acute Pancreatitis. Surgery. 1987 Sep;102(3):553-4

— Toth B, Lappert P. Modified Skin Incisions for Mastectomy: The Need for Plastic Surgical Input in Preoperative Planning. J Plastic and Reconstructive Surgery. 1991; 87: 1048-53

— Lappert P. Patch Esophagoplasty. J Plastic and Reconstructive Surgery. 1993; 91 (5): 967-8

— Smoot E C III, Bowen D G, Lappert P, Ruiz J A. Delayed development of an ectopic frontal sinus mucocele after pediatric cranial trauma. *J Craniofacial Surg.* 1995;6(4):327–331.

— Lappert PW. Scarless Fetal Skin Repair: "Unborn Patients" and "Fetal Material". J Plastic and Reconstructive Surgery. 1996 Nov;98(6):1125

— Lappert PW, Lee JW. Treatment of an isolated outer table frontal sinus fracture using endoscopic reduction and fixation. Plastic and Reconstructive Surgery 1998;102(5):1642-5.


**Publications - Medical Textbooks:**

— Wound Management in the Military. Lappert PW, Weiss DD, Eriksson E. Plastic Surgery: Indications, Operations, and Outcomes, Vol. 1; 53-63. Mosby. St. Louis, MO 2000

**Operations and Clinical Experience - Consultations and Discussions :** As a physician and surgeon, I have treated many thousands of patients in 7 states and 4 foreign nations. My practice has included Primary Care, Family Medicine, Aerospace Medicine, General Surgery, Reconstructive Surgery for combat injured, cancer reconstructive surgeries including extensive experience with microvascular surgery, Pediatric Congenital Deformity, and the care of chronic wounds. I have practiced in rural medicine, urban trauma centers, military field hospitals, university teaching hospitals, and as a solo private practitioner. In my private practice I have had occasion to treat many self-identified transgender patients for skin pathologies related to their use of high dose sex steroids, laser therapies for management of facial hair both in transitioners and detransitioners. I have performed breast reversal surgeries for detransitioning patients. My practice is rated as "LGBTQ friendly" on social media. I have consulted with families with children who are experiencing gender discordance. I have given many presentations to professional meetings of educators and counselors on the subject of transgender, and the present state of the science and treatment. I have discussed the scientific issues relevant to the case with many physicians and experts over a number of years and also discussed related issues with parents and others.

EXHIBIT "B"

# Florida Medicaid Project: Surgical Procedures and Gender Dysphoria

Patrick Lappert, M.D.

May 17, 2022

**Florida Medicaid Project: Surgical Procedures and Gender Dysphoria**

Patrick Lappert, M.D.

# Overview

The "Gender Affirmation" care model for children who suffer from gender identity issues is experimental in nature because it is based in low to very low-quality scientific evidence. There is no body of quality scientific evidence to support the hypothesis that gender dysphoria with its associated problems of self-harm and suicide, is improved long-term by gender affirmation surgical procedures.

The best evidence available today demonstrates that transgender is not a single condition that can be explained by any single factor. There are vast differences in age of presentation, predominant sex, persistence into adulthood, and resolution during adolescent development. Moreover, there are numerous and common co-morbid conditions such as autism-spectrum disorder, major anxiety disorders, and clinical depression that severely affect any sense of certainty about the true cause of the child's dysphoria, as well as their capacity to understand and give assent to irreversible medical and surgical procedures that lead to permanent sterility, sexual impotence, and a lifetime of medical problems associated with affirmation care.

The process of obtaining medical informed consent as part of gender affirming surgery is morally indefensible, and likely legally indefensible as well. Parents of suffering children are led by medical professionals to believe that there is only one valid option of care (affirmation medicine and surgery), utterly concealing the historic reality that greater than 92% of children desist in their cross-sex self-identification when treated using the "watchful waiting" therapeutic strategy. Parents are told that if they do not consent to affirmation care, there is a high likelihood that their child will die from suicide. This is not informed consent, but rather consent under duress.

Gender identity is being presented as a fixed and unchanging, biologically determined, personal characteristic. It is not. The medical literature has consistently shown over many years that the vast majority of children with cross-sex gender identity resolve the issue during adolescence and adopt a gender identity that is congruent with their biological sex.

Because surgeons who perform gender affirmation surgeries have no diagnostic test to predict who among the self-identified transgender minors would have persisted in their cross-sex self-identification into adulthood, and who among those children would have desisted, they have no way to know, in any particular case if the irreversible surgery is being performed on a person who would have continued to self-identify in the cross-sex persona into adulthood. Given the historically well-known desistance rate, it is possible that as many as 90% of children are undergoing surgery based upon an incorrect diagnosis.

"Gender Affirming" breast surgery for self-identifying transgender minors is not medically and ethically equivalent to similar procedures performed for objectively identifiable medical conditions. Transgender breast surgery is always cosmetic (aesthetic) in nature because the indication is a hoped-for improvement in the interior emotional life of the patient. Transgender surgery is not based in any medical diagnosis and does not seek to restore any form or function that may have been lost due to trauma, disease, or developmental accident. It begins with normal structures and changes their appearance in order to achieve a subjective improvement and is therefore cosmetic surgery.

Because gender affirming surgery is cosmetic (aesthetic) in nature, such surgeries must never be offered if they are known to predictably produce an irreversible loss of function. To knowingly sacrifice a human capacity (breast feeding, capacity for sexual intimacy, fertility) in the pursuit of a cosmetic result in a minor who is incapable of giving informed consent, is morally indefensible. The hoped-for subjective improvement that is sought in transgender surgery is a short-lived improvement and is only supported by low to very low-quality scientific evidence. Long term longitudinal cohort studies that are based in level III evidence show that affirmation surgical care is of no benefit in reducing self-harm including suicide.

## Problems with Informed Consent

The protection of children in situations requiring informed consent is a crucial problem that the state has a historic and abiding interest in. In the particular situation of self-identified transgender children, it becomes a most significant problem, given that they are being submitted for permanently life-altering interventions. In my opinion as a plastic and reconstructive surgeon, the life-altering nature of hormonal and surgical interventions needs to be addressed from the moment of the child's entry into the gender-transition system, given the fact that the overwhelming majority of children who first begin puberty blockade, go onto the physically altering and permanent changes produced by cross sex hormones, and many ultimately also pursue surgery, as is attested to by multiple papers, the content of which is examined below. Informed consent has several requirement that need to be met if such consent is to be deemed valid. These requirements include a thorough discussion of the details of the proposed procedure including risks, known complications, and some measure of the likelihood of a favorable outcome. The discussion must include alternative treatments, and their risks, known complications and their likelihood of a favorable outcome. In the case of the interventions associated with gender-transition medicine and surgery, the favorable outcomes should be evident over the lifetime of the patient, given that they are permanently sacrificing structures and capacities (breasts and breast-feeding, or genitals and fertility).

Because the commonly cited medical literature used in support of these surgeries is of low to very low quality, it must be recognized that such surgeries must be considered experimental in nature given the unknown long-term effects of treatment, and the vast uncertainty in the patient selection and diagnostic processes. Yet the experts who provide opinion in support of these surgeries speak with absolute certainty of their efficacy, and the absence of any alternative treatment. Considering these factors severally and together it becomes difficult to imagine a

more flawed consent process. It also becomes understandable how parents can be drawn into uninformed participation given the simultaneous presentation of dire consequences if gender dysphoria is left untreated, and the insistence that affirmation care including surgery is the only way to bring lasting happiness to the child.

## Chest Masculinization" in Natal Females is Not Ethically Equivalent to Mastectomies for Breast Cancer

When mastectomy is performed for the management of breast cancer, or to mitigate the proven risk of developing breast cancer in women, it is done on the basis of objective diagnoses either by pathological examination of biopsy tissue, or as in the case of prophylactic mastectomy, on the basis of genetic analysis that shows known markers of increased risk of developing breast cancer. These tests (microscopic examination of tissue specimens, detection of cell surface markers with proven association with malignancy, and genetic screening of at-risk patients) have known positive predictive value for the diagnosis of breast cancer, and these tests have known error rates that can be used when obtaining informed consent for mastectomy. The validity of these tests has been proven using scientific methodologies that produce high quality evidence in longitudinal population studies with control populations, and very long follow up. As the result, when a woman gives consent for mastectomy to control or prevent the potentially lethal disease, it is with a clear and proven evaluation of the risks and benefits that consent is obtained. Mastectomy is being performed based upon an objective diagnosis of a potentially lethal condition, and the surgical procedure has proven benefit in management of that condition.

In stark contrast, this is not the case when mastectomy is performed to "masculinize" the chest of girls and women who self-identify as transgender or who self-report symptoms of dysphoria. In the self-identified transgender adolescent, breasts are being removed on the basis of a diagnosis that is made by the patient since there are no tests with known error rates that can be used to predict who will benefit from this disfiguring and irreversible surgery. The claim is made that chest masculinization has proven benefit in reducing dysphoria and the associated risk of suicide. But published studies that make this claim of benefit offer evidence that is low to very low quality, typically small case collections with self-selection bias, very short follow up, and no case controls.

The best data presently available on the long-term effects of medical and surgical transitioning are long-term, longitudinal, population-based studies. For example, Dehjne, et al., examined the putative long-term benefit of full transitioning (including hormonal and surgical treatments) found in the Swedish medical database. (See Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden; Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. V. Johansson, Niklas Långström, Mikael Landén; PLOSOne February 22, 2011 https://doi.org/10.1371/journal.pone.0016885). That database includes all persons in the Swedish medical system, from pre-natal to death. It reports all episodes of care and all demographic information in a uniform vocabulary. Furthermore, Sweden has been on the forefront of "gender affirmation" long before the American medical

system seriously considered its claims. Because of the nature of Sweden's database, it is possible to study a cohort of patients that very closely matches the inquiry group with regards to age, sex, economic status, etc. It is possible to ask with great precision such questions as, "What is the likelihood that a fully transitioned transgender male will be hospitalized for psychiatric illness when compared to the age/sex matched control group?" Even more, one could urgently ask, "What is the relative risk of suicide in transgender persons, when compared to age/sex matched controls?"

Why are such longitudinal, population-based studies superior to the case-collection/case series methodology? Because confounding variables such as age, sex, and self-selection biases are removed. In the flawed case-collection methodology, the reported cases are typically only those who return for follow up. You have no way of knowing if the patient had a good outcome or didn't return for follow up because they were in a psychiatric hospital, were incarcerated, or committed suicide. In the Swedish longitudinal study, the suicide is in the same database, as are the other issues of hospitalization, incarceration, and addiction treatment, among other rates of comorbidity. Thus the longitudinal population study can give us what is called a "hazard ratio" for a particular study population (patients who have completed transgender transition in this case).

What this Swedish study shows us that the risk of completed suicide in all transgender persons is 19.1 times higher than in the control cohort. If you look only at patients who have transitioned — patients after "treatment" — from female to "male presentation," the risk of completed suicide is 40 times higher than in the general population. (Note: this finding is consistent with the historic Branstrom 10-year follow up study, which found no benefits to "transitioning treatments" but did note an increased risk of serious suicide attempts and anxiety disorders AFTER "treatment.") (Correction to Bränström and Pachankis, Am J Psychiatry 177:8, August 2020; see detailed citations in the "Notes" section of this report below).

Another cautionary note was added to the literature by the reputed Cochrane Review, a UK based international association of researchers who examine the quality of scientific evidence used in medical decision making. The Cochrane Review recently published findings concerning the medical evidence used to support the decision to give young women cross sex hormones as part of the transition process. The authors summarize the world literature review thus: "We found insufficient evidence to determine the efficacy or safety of hormonal treatment approaches for transgender women in transition. This lack of studies shows a gap between current clinical practice and clinical research." (Does hormone therapy help transgender women undergoing gender reassignment to transition? See, Haupt C, Henke M, Kutschmar A, Hauser B, Baldinger S, Saenz SR, Schreiber G., Cochrane Review, 28 Nov 2020).

Similar issues of very poor, low quality scientific support for chest masculinization surgery can be seen in a recent article by Tolstrup et al. published in the journal Aesthetic Plastic Surgery (See Anders Tolstrup, Dennis Zetner, Jacob Rosenberg, Outcome Measures in Gender-Confirming Chest Surgery: A Systematic Scoping Review, Aesthetic Plast Surg 2020 Feb;44(1):219-228. doi: 10.1007/s00266-019-01523-1. Epub 2019 Oct 29). The article reports a

comprehensive review of the world literature concerning the efficacy of "gender confirming" chest surgery in transgender patients. The authors found 849 articles on the subject, published in peer reviewed medical journals. Of these 849 articles, only 47 could be included in the review. This means that only 5.5% of all the published, peer-reviewed transgender surgery articles demonstrated even rudimentary scientific rigor. Of those 47 articles, the authors report that only 29 of the articles addressed mental health outcomes (3.4% of all the articles). What is startling is that the mental health outcomes were judged only on the basis of uncorroborated, untested, and unassessed patient subjective reporting with descriptors that varied so widely from article to article that results could not even be compared. The authors summarize by saying, "Evaluation of outcomes in gender-confirming chest surgery showed large variations in reporting, and further streamlining of reporting is therefore required to be able to compare surgical outcomes between studies." None of these negligent articles even bothered to examine rates of psychiatric hospitalization, substance abuse, self-harm behaviors, and suicide. This tells us that the main reason for performing these surgeries (psychological distress and suicide risk) isn't even evaluated with regard to efficacy.

An example of an article with very low-quality data, reckless (now banned practices), and methodology, published in a "leading journal," and promoted as evidence for the efficacy of "chest masculinization" surgery makes this fact very clear. The lead author (Olson-Kennedy, a leading national advocate for the transgender treatment enterprise) is a board-certified pediatrician who leads the gender clinic for the Los Angeles Children's Hospital. The article appeared in 2018 (See J. Olson-Kennedy, J. Warus, MD1, et al., Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults; Comparisons of Nonsurgical and Postsurgical Cohorts., JAMA Pediatr. 2018;172(5):431-436. doi:10.1001/jamapediatrics. 2017.5440. In their summary of findings, the authors reported that "chest dysphoria" is common among "trans males" (natal females seeking to present as males) and claimed that dysphoria is "decreased by surgery." They claim that regret for surgery is "rare." The article reports breast removal surgery on at least one girl aged 13 years. (Note that this reckless, experimental practice has now apparently been abandoned as unethical/experimentation on children by England, Sweden, and Finland. The average age of patients in the study was 19. Children were entered into the study through recruitment from among patients visiting the clinic and by telephone over a six-month period. The authors found that, of the patients recruited from among visitors to the clinic (convenience sampling), there was an over-representation of non-operated patients, so the authors were forced to reach out to all the post-surgical patients by phone. Twenty-six percent of the clinic's post-surgical patients could not be reached for various reasons including no working phone, or failure to respond to multiple messages. The 26% drop-out rate is never even questioned by these authors. Were surgical patients lost to follow up because of dissatisfaction, psychiatric hospitalization, or suicide? This problem is called "self-selection bias," and it is evidence of careless study design. Of the remaining 74% of patients, only 72% completed the survey. This is a second example of self-selection bias. Why would some post-surgical patients who had been successfully contacted, not complete the survey? The authors — demonstrating multiple levels of confirmation bias — do not even ask such essential questions. (See detailed citations in the "Notes" section of this report below).

In the study, dysphoria was evaluated using what the author called "a novel measure," which amounted to a series of subjective questions about happiness that was in part designed by the adolescent test subjects themselves. Essentially, the methodology used an entirely unvalidated ("junk science") test instrument, with no known error rates and no proven predictive power. Furthermore, the post-surgical patients were administered the survey at widely varying time intervals post-surgery. The longest interval between surgery and the satisfaction survey was 5 years, but children less than a year post-surgery were included in this obviously flawed sample, and yet the authors claim evidence of "negligible regret." This is a remarkable, misleading, and deceptive claim given that long-term, longitudinal population studies show that there is a dramatic rise in post-surgical problems such as depression, hospitalization, substance abuse, and suicide beginning at around seven years post-surgery (Ibid). Surely the authors are familiar with the world literature on transgender outcomes?

Having deceptively or negligently promised in the introduction to their paper that "chest dysphoria" is reduced by surgery, at the conclusion the authors confessed to the fact that the study design and execution produced very low-quality data that is not useful for patient selection, or prediction of outcomes. They even confessed that the study does not address the efficacy of surgery in improving outcomes regarding the single most compelling reason for performing the operation: mitigation of depression and suicide. The authors write, "An additional limitation of the study was the small sample size. The nonsurgical cohort was a convenience sample, recruited from those with appointments during the data collection period. There could be unknown imbalances between the nonsurgical and postsurgical cohorts that could have confounded the study findings."

Finally, the authors did not even bother to validate their "Chest Dysphoria Scale." Such a "made-up" scale is unlikely to accurately represent distress or correlate with properly validated measures of quality of life, depression, anxiety, or functioning. Their own analysis at the conclusion or the paper directly contradicts the deceptive claim made in their introduction.

This is the kind of "junk science" that is used to support transgender medicine and surgery. The paper is only a few years old. It was written by board certified physicians who practice in one of the nation's largest pediatric gender clinics and was published in a peer-reviewed medical journal. It is essentially useless in making any clinical decisions regarding who should be offered surgery, what is the likelihood they will benefit from it, and what is the likelihood they will regret their decision. Most importantly, it does not even measure the effect of therapy on suicide risk. The very morbidity (the risk of suicide) that they claim is improved by surgery is not even measured in their low-quality study.

Because of the very low-quality scientific support for mastectomy in the management of gender dysphoria, valid consent would demand that these procedures be described as experimental, would need the approval of ethics panels to monitor human experimentation, and would require the use of valid controls found in long-term, longitudinal population-based study models. These are the kinds of patient protections now endorsed in England, Sweden and Finland but still

ignored in the US environment where proper scientific critiques of such studies can get faculty "cancelled."

Even though the transgender treatment industry has been performing these surgeries for over 50 years, gender treatment centers continue to publish the same low quality, methodologically defective studies based upon collected cases that are degraded in value by self-selection bias, confirmation bias, and short-term follow-up, while continuing to deceptively claim that such defective research provides a sufficient scientific basis for performing irreversible, disfiguring, and ultimately sterilizing hormonal treatments and surgeries on children.

## "Chest Masculinization" in Natal Females is Not Ethically Equivalent to Gynecomastectomy

Gynecomastectomy is the surgical treatment of gynecomastia, a fairly common condition in which males develop female-type breast gland tissue. Proponents of "masculinization" mastectomy in natal females erroneously equate the ethics of removing healthy breast tissue from gender dysphoric children with the removal of abnormal breast tissue in men (gynecomastia). In the case of gynecomastectomy in male patients, the operation is performed to remove the objectively diagnosed presence of female type glandular breast tissue present in a male patient. Physical examination demonstrates the presence of a dense retro-areolar mass which is tender and sometimes disfiguring. Pathological examination of the removed tissue will demonstrate the presence of female-type fibroglandular tissue in a male patient. This is an objectively abnormal condition. It should further be noted that the absence of such abnormal, female-type fibroglandular tissue in the submitted surgical specimen places the chest recontouring in the category of cosmetic surgery and is therefore not typically paid for by third-party payors.

A comprehensive literature review on the subject of gynecomastectomy and suicidal behavior conducted by Sollie in 2018 ( Management of gynecomastia—changes in psychological aspects after surgery—a systematic review: Gland Surg. 2018 Aug; 7(Suppl 1): S70–76.doi: 10.21037/gs.2018.03.09) did not produce a single paper claiming improvement in suicide rate in patients who underwent this surgery. There were many reports concerning improvement in the pain that men with this objective condition suffer with. The remainder of the reported data was in the category of subjective "satisfaction survey". This tells us that the author did not distinguish between medically indicated and aesthetic surgeries. Nonetheless, no claim is made of decreased suicide rates in a suicidal population of male patients. This is because any male patient seeking removal of abnormal, female-type, breast tissue who reported suicidal ideation would be considered incompetent to give consent and would require a psychiatric evaluation and treatment to manage suicidal thinking before being considered for surgery. This kind of decision in favor of psychiatric support does not appear to be at work in the transgender affirmation world. There, and there alone, is suicidal thinking considered a qualification for a surgery.

# "Chest Masculinization" in Natal Females is Not Ethically Equivalent to Breast Reduction

It should be obvious that "Chest Masculinization" surgery in natal females is not ethically equivalent to breast reduction surgery in non-transgender females. In the case of breast reduction for females with excessively large breasts (macromastia, or gigantomastia), the operation is performed to relieve a debilitating orthopedic complaint of neck, back, and shoulder pain associated with the postural/mechanical effects of the weight of the breasts. These patients experience significant activity restriction and chronic pain that is not relieved by medical management or physical therapy. Furthermore, there is voluminous actuarial data, based upon many years of longitudinal population-based study by medical insurance agencies that is used to predict who will benefit from surgery, and who will not. These physical, objective tests, based upon the actual measurement of the breasts, and the patient's overall body habitus, have known error rates that can be used to predict the likelihood that a breast reduction will relieve the orthopedic complaints of neck, back, and shoulder pain. When the tissue specimens are submitted to pathology, they are weighed in order to ensure that enough tissue has been removed so that there will be a very high likelihood that the surgery will relieve the orthopedic condition of neck, back, and shoulder pain ( Accuracy of Predicted Resection Weights in Breast Reduction Surgery, Theodore A. Kung, MD, Raouf Ahmed, MBBS1 Christine O. Kang, MPH,1 Paul S. Cederna, MD, and Jeffrey H. Kozlow, MD; Plast Reconstr Surg Glob Open. 2018 Jun; 6(6): e1830.

Based upon that, adequate pre-operative consent can be obtained. The supporting data is based in very high-quality methodology. There is no quality research data, no pre-operative test or study, and no known error rates that can be used to predict the likelihood that any child suffering from gender dysphoria will benefit from the experimental procedures of mastectomy and chest "masculinization." As noted above, because of the very low quality data, transgender chest masculinization is at best experimental and at worst, should be viewed as a form of medical child abuse — it is important to note that Finland, Sweden, and the UK apparently now all agree with this analysis, as they have all retreated from such reckless surgical procedures for (See detailed citations in the "Notes" section of this report below).

It is crucial to remember that "chest masculinization-affirmation surgery" of healthy breast tissue results in a complete loss of function, that this loss is two-fold (breast feeding and erotic sensibility), and the cause of the loss is two-fold (gland removal and severing of the intercostal nerve). (See Breast Reduction with Use of the Free Nipple Graft Technique; Stephen R. Colen, MD; Aesthetic Surgery Journal, (Breast Reduction with Use of the Free Nipple Graft Technique; Stephen R. Colen, MD; Aesthetic Surgery Journal, Volume 21, Issue 3, May 2001, Pages 261–271, https://doi.org/10.1067/maj.2001.116439).

If a patient who undergoes "chest masculinization" should regret the surgery, they do have the option of breast reconstruction. However, all that will be produced is a counterfeit of a breast. The patient will have lost the function of breast feeding. Additionally, the most commonly performed "masculinization" surgery involves the removal of the nipples, and subsequent re-

attachment in the form of a nipple graft. Those nipples will have lost their native nerve connections that provoke erotic sensibility. All that can be hoped for is the eventual random ingrowth of local skin sensation, but there will never be erotic sensation because the particular branch of the fourth intercostal nerve which communicates with particular centers in the brain responsible for oxytocin release and erotic provocation will have been permanently severed. This means that breast function has been completely and irreversibly sacrificed for the sake of producing a cosmetic result (a masculine appearing chest). This is the exact opposite of the goals of any reconstructive surgery. It must therefore be understood that "chest masculinization" is a cosmetic procedure that has violated the most essential principle of cosmetic surgery: never sacrifice function for the sake of a cosmetic result.

## Erroneous use of the word "Reconstructive" to describe Gender Affirmation Surgeries

The transgender treatment enterprise uses the word "reconstructive" to characterize a group of surgical treatments that seek to alter the sexed appearance of the person. It is important to understand that these procedures, because of the indications for surgery, the motivations for surgery, and the outcomes of surgery, are not reconstructive, but are to be properly understood to be cosmetic in nature.

Reconstructive surgeries are procedures that seek to establish or restore structures and their functioning that have been lost due to trauma, disease, in-utero developmental abnormalities, or surgical treatment for disease. Such reconstructive surgeries must begin with the objective characterization of the defect, including abnormalities of form, and associated loss of function. This process of defining the defect begins with a thorough understanding of normal human form and function and seeks to select, develop, and execute procedures that will restore both. In some cases function may be emphasized more than form, as when the mangled hand of a man is reconstructed. In other cases, reconstruction of form is all that is possible because as yet there are no techniques to restore function. An example of this is seen in the reconstruction of a woman's breast following cancer care. All that can be offered is the appearance of a breast; she will never be able to feed an infant through the reconstructed part.

This is to be contrasted with cosmetic, or aesthetic surgery in which the appearance of a structure is modified in order to produce a subjective (aesthetic) result for the patient. No functional restoration is addressed because no functional or structural loss exists. The object of the surgery is aesthetic. There is no lost form or function that needs to be reconstructed. It is aesthetic surgery because the motivation is aesthetic (subjective feelings about appearance). Further evidence for this is the fact that nearly the entirety of the outcome studies cited in support of these surgeries use subjective questionnaires which the patient fills out. The questions used are typical of those used to evaluate any aesthetic surgery. They are called "satisfaction surveys". Such surveys are prone to suffer from self-selection bias, confirmation bias, and high drop-out rates.

One of the key problems that the transgender treatment enterprise faces on a daily basis is the issue of third-party payment for services. No health insurance provider, including federal and state agencies will pay for cosmetic surgery. For this reason, it is necessary, in order for the business model to succeed, that providers characterize their services as reconstructive. This is doubly difficult given the intense political pressure that has been exerted upon the medical community to "de-pathologize" the condition of transgender. This is seen in the abandoning of the diagnostic nomenclature of "body dysmorphic disorder", and "gender identity disorder" in favor of the more recent DSM manual using the term "gender dysphoria". This leads transgender treatment providers into the difficult situation of claiming that transgender is not a pathology, while at the same time insisting that the services are medically necessary and describing the procedures as reconstructive without characterizing any physical/ functional defect.

As we consider the specific "gender affirming" surgical procedures we will see that comparison to medically indicated surgeries on both men and women actually serves to reinforce the evidence that these surgeries are essentially and fundamentally cosmetic.

## Masculinizing and Feminizing Chest Surgeries are Not "Medically Necessary"

Supporters of "transitioning" treatments justify surgical treatment based upon "medical necessity." They claim that gender dysphoria can lead to debilitating anxiety and depression, as well as serious incidents of self-harm, including self-mutilation, suicide attempts, and suicide. Yet with only a single exception, in the studies they cite no measures are made of the effects of surgery on what is claimed to constitute the "medical necessity" for these procedures. In contrast, the Branstrom study[1] documented no reliable benefits for transgender surgery/hormonal treatments and no reduction in suicide and even an increase in serious suicide attempts requiring hospitalization in patients receiving surgery. These recent, long-term, published, peer reviewed, credible research findings are quite contrary to the claims of supporters of "transitioning treatments" — as are the National Science Reviews in this area from England-NICE, Sweden, and Finland. (See detailed citations in the Notes section in this declaration).

Scientific rigor would demand an examination of objective outcomes such as: rates of substance abuse, psychiatric hospitalization, self-harm, or suicide, and how they were changed by surgery. One paper does ask these crucial questions concerning efficacy is a very comprehensive, long term, longitudinal population cohort study which actually shows the opposite of what experts claim for these patient outcomes. When followed beyond eight years post operatively, this paper shows that patients receiving these treatments have the same alarmingly high rates of hospitalization, substance abuse, self-harm, and completed suicide as persons who have had no medical or surgical intervention.

---

[1]*Correction of a key study: No evidence of "gender-affirming" surgeries improving mental health.* Home. (2020, August 30). Retrieved May 17, 2022, from https://segm.org/ajp_correction_2020

In summary, on the issue of the efficacy of these surgeries, the scientific support is very weak, while the scientific evidence rejecting the hypothesis of efficacy is remarkably strong (See Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden; Cecilia Dhejne, Paul Lichtenstein, Marcus Boman, Anna L. V. Johansson, Niklas Långström, Mikael Landén; PLOS One February 22, 2011 https://doi.org/10.1371/journal.pone.0016885).

The surgical removal of the breasts, and the re-contouring of the chest through liposuction is a common procedure for women who seek to present as men. These operations are performed in both men and women, for a variety of reasons. They are generally very safe, and typically performed in the outpatient setting. It is important to understand that the only way of distinguishing cosmetic breast surgery from "medically necessary" surgery is based upon the diagnosis of underlying pathology. For example, breast reduction may be cosmetic, or it may be medically indicated. In both cases, the patient presents with a complaint that her breasts are too big. The distinction between cosmetic breast reduction and medically indicated breast reduction is based upon the presenting symptoms of orthopedic problems when working, such as chronic neck back and shoulder pain caused by the weight of the breasts. But even then, the weight of the removed tissue is factored into the objective verification that the surgery was "medically necessary." There is a vast body of medical and actuarial data that demonstrates the relationship between the weight of the breast tissue removed and the probability that back pain will be cured by performing a breast reduction.

The same issues are at stake in breast enhancement for men seeking to present as women. Cross-sex hormones will have caused varying degrees of gynecomastia (breast enlargement in men). Surgical enhancement procedures are exactly the same in both men and women.

Medically necessary surgery in women is based upon the diagnosis of an objective medical condition, such as Poland's syndrome (congenital absence of a breast), surgical absence of the breast following cancer care. In men, the objective diagnosis of gynecomastia might warrant surgery based upon medical necessity, but it would be the removal of tissue that has objective pathological features (breast gland proliferation in a man). A rare diagnosis of breast cancer in a man might warrant chest wall reconstruction after cancer care. On the other hand, cosmetic surgery of the breast is entirely about the subjective feelings of the patient, and that is all that we find in the case of the self-identified transgender patient.

In the case of transgender chest surgery, the diagnosis is based on the patient's subjective report of dysphoria, but the medical necessity is based on the expectation that surgery will relieve the patient of the risk of, among other things, major depression, self-harm behaviors, and suicide. None among the many papers typically cited by supporters of "transitioning treatments" address themselves to the question of medical necessity for either masculinizing surgery, or feminizing surgery. They only address technical issues, management of complications, and subjective outcomes that employ precisely the same language that is used to assess every

other cosmetic surgery of the breast. Such papers often begin with standard language about the suffering of self-identified transgender adolescents, and their risk of self-harm. They will claim that the reported surgeries somehow reduce the risk of suicide, or the frequency or severity of self-harm, but they never report actual results of improvement in the risk of suicide, or substance abuse, or cutting, or sexual risk taking. The claim of benefit is unsupported in the scientific literature.

In summary, the medical necessity of transgender chest surgery is not supported by scientific evidence and appears to be firmly in the category of cosmetic surgery. What is more, the surgeries when performed on natal females causes a life-long loss of function, placing those surgeries in the category of malpractice. No other cosmetic procedure is expected to produce major functional loss. Such a result would only be the result of a complication, or other surgical misadventure. To actually have a 100% certainty of loss when surgical consent is being obtained constitutes a complete neglect of one of the foundational principles in plastic surgery: Never sacrifice function for the sake of a cosmetic result.

# About the Author

Education and Training: I received my Bachelor of Arts in Biological Sciences at the University of California, Santa Barbara, 1979. There I was engaged in research in cell membrane physiology with Dr. Philip C. Laris, studying stoichiometry of the sodium: potassium ATPase pump. I received my M.D., Doctor of Medicine degree at the Uniformed Services University of the Health Sciences, 1983 at Bethesda, Md. I served my General Surgery Residency at the Naval Hospital Oakland/UC Davis East Bay Consortium, 1987-1991 and served as Chief Resident, Department of Surgery, Naval Hospital Oakland, 1990-1991. I also served a Plastic Surgery Residency at the University of Tennessee-Memphis, 1992-1994. My professional background, experience, and publications are described in more detail in my curriculum vitae, which is attached as Exhibit A to this declaration.

Board Certifications in Medicine: I have been Board Certified in Surgery (American Board of Surgery, 1992), in Plastic Surgery (American Board of Plastic Surgery, 1997; American Board of Plastic Surgery, 2008).

Medical Staff Appointments: I served as the Staff General Surgeon at the Naval Hospital Oakland, CA 1991-1992 and as Associate Professor of Surgery, UC Davis-East Bay, 1991-1992. I also served as a Plastic and Reconstructive Surgeon, Naval Medical Center, Portsmouth, Virginia, 1994-2002 and as Chairman, Department of Plastic and Reconstructive Surgery, Naval Hospital Portsmouth, Virginia, 1996-2002. I later served as Clinical Assistant Professor, Department of Surgery, Uniformed Services University of the Health Sciences, 1995-2002 and as Founding Director, Pediatric Cleft Palate and Craniofacial Deformities Clinic, Naval Hospital Portsmouth, Virginia, 1996-2002 also as the Founding Director, Wound Care Center, Naval Hospital Portsmouth, Virginia, 1995-2002. I have also served as a Staff Plastic Surgeon in Nebraska and Alabama.

U.S. Surgeon General Service: I served as a Specialty Leader, Plastic and Reconstructive Surgery, Office of the Surgeon General-USN, 1997-2002.

Faculty Appointments: I served as Teaching Faculty at Eastern Virginia Medical School, Division of Plastic Surgery, 1995-2002. I also served on the teaching faculty of the Via College of Osteopathic Medicine, 2017-2020.

Military Service: I served as an Aviation Officer Candidate, Naval Aviation Schools Command, NAS Pensacola, 1978 and was Commissioned an Ensign, MC, USNR 1979 and Commissioned as a Lieutenant, MC, USN 1983. I served as a Designated Naval Flight Surgeon, Naval Aerospace Medical Institute, 1985, and I was Assigned Marine Fighter/Attack Squadron-451, serving as Flight Surgeon, and serving as Radar Intercept Officer in the Marine F4S Phantom, accumulating 235 flight hours, and trained for qualification as an Air Combat Tactics Instructor. I was deployed to the Western Pacific as UDP forward deployed fighter squadron in Korea, Japan, and the Philippines. I served in the US Navy for 24 years, and I served in the USMC for 3 years. I retired with the rank of Captain, USN in 2002.

Publications - Peer Reviewed Medical Journals: Lappert PW. Peritoneal Fluid in Human Acute Pancreatitis. Surgery. 1987 Sep; 102(3):553-4; Toth B, Lappert P. Modified Skin Incisions for Mastectomy: The Need for Plastic Surgical Input in Preoperative Planning. J Plastic and Reconstructive Surgery. 1991; 87 (6): 1048-53; Lappert P. Patch Esophagoplasty. J Plastic and Reconstructive Surgery. 1993; 91 (5): 967-8; Smoot E C III, Bowen D G, Lappert P, Ruiz J A. Delayed development of an ectopic frontal sinus mucocele after pediatric cranial trauma. J Craniofacial Surg. 1995;6(4):327–331; Lappert PW. Scarless Fetal Skin Repair: "Unborn Patients" and "Fetal Material". J Plastic and Reconstructive Surgery. 1996 Nov; 98(6): 1125; Lappert PW, Lee JW. Treatment of an isolated outer table frontal sinus fracture using endoscopic reduction and fixation. Plastic and Reconstructive Surgery 1998; 102(5): 1642-5.

Publications - Medical Textbooks: Wound Management in the Military. Lappert PW, Weiss DD, Eriksson E. Plastic Surgery: Indications, Operations, and Outcomes, Vol. 1; 53-63. Mosby. St. Louis, MO 2000.

Operations and Clinical Experience: Consultations and Discussions: As a physician and surgeon, I have treated many thousands of patients in 7 states and 4 foreign nations. My practice has included Primary Care, Family Medicine, Aerospace Medicine, General Surgery, Reconstructive Surgery for combat injured, cancer reconstructive surgeries including extensive experience with microvascular surgery, Pediatric Congenital Deformity, and the care of chronic wounds. I have practiced in rural medicine, urban trauma centers, military field hospitals, university teaching hospitals, and as a solo private practitioner. In my private practice I have had occasion to treat many self-identified transgender patients for skin pathologies related to their use of high dose sex steroids, laser therapies for management of facial hair both in transitioners and detransitioners. I have performed breast reversal surgeries for detransitioning patients. My practice is rated as "LGBTQ friendly" on social media. I have consulted with families with children who are experiencing gender discordance. I have given many presentations to professional meetings of educators and counselors on the subject of transgender, and the present state of the science and treatment. I have discussed the scientific issues relevant to the case with many physicians and experts over a number of years and also discussed related issues with parents and others.

# Appendix Attachment

# 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division


**AUGUST DEKKER, et al.,**
            **Plaintiffs,**

**V.**                                               **Case No. 4:22-cv-00325-RH-MAF**

**SIMONE MARSTILLER, et al.,**
            **Defendants.**


## EXPERT DECLARATION OF

## GEETA NANGIA, MD


I, Geeta Nangia, MD, have been retained by counsel for Defendants in connection with the above captioned litigation.


1.    I have been asked by counsel for the Defendants to provide my expert opinion on the treatment and diagnosis of gender dysphoria in minors; the Florida Medicaid Generally Accepted Professional Medical Standards (GAPMS) Determination on the Treatment of Gender Dysphoria published by Florida's Agency for Health Care Administration (AHCA) in June 2022, along with its attachments; and Fla. Admin. Code. R. 59G-1.050 which prohibits Medicaid coverage of puberty blockers, hormone and hormone antagonists, sex reassignment surgeries, and any other procedures that alter primary or secondary sexual characteristics.

2.    I am over the age of 18. I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

## BACKGROUND AND QUALIFICATIONS

3.     I am a Board Certified Child and Adolescent Psychiatrist and Adult Psychiatrist.  I obtained my B.A. in Biochemistry and Molecular Biology from Boston University and my M.D. from Boston University School of Medicine.  My training in Psychiatry and Child and Adolescent Psychiatry was at The Medical University of South Carolina, where I completed my fellowship training in 2007.   I have been active in teaching medical students and residents throughout my career.

4.     I have worked in the field of Child and Adolescent Psychiatry as a community psychiatrist   in a wide range of settings over the last fifteen years, providing comprehensive psychiatric services for children and families.  I chose to work as a community psychiatrist because I desired to evaluate and treat a wide range of mental health disorders, and wanted to see young people in the context of their families and their community systems (i.e. schools, extracurriculars, local supports).  I have worked in both rural, urban, and suburban areas, in outpatient and inpatient settings, as well as in residential care.  I have been very active in school consultations and advocating on a community level for mental health accommodations for youth in school.  I have worked toward providing access to mental health care for youth who are underfunded, and who lack services due to barriers of access and cost.   I have always provided psychiatric evaluations and psychotherapy and medication management for children and youth, as well as providing family therapy.   I have been a part of multiple interdisciplinary teams.

5.     Much of my career has been spent focusing on educating, equipping, and supporting families of children who struggle with depression, anxiety, and other mental health issues

by stressing the importance of attachment between parents and children, helping children to find their homes as a safe place to connect, where they feel nurtured, supported, and loved.  It is connection and attachment to secure caregivers that form the foundation for healthy childhood development, allowing a child to progress through the developmental trajectory, and onward toward establishing a healthy identity.

6.      Most recently, after working in the primary care setting with one of the area's largest pediatric providers to provide behavioral health services for more complex pediatric mental health cases, I am working as the CEO of an organization called Known and Loved, while continuing community mental health care through my private practice. Known and Loved exists to provide educational support for children and families, with a focus on children who have been in foster or adoptive care.  Our Board is a group of physicians in multiple fields who desire to make a difference in the broader community for children and families.

7.      Over the course of my career seeing a broad range of psychiatric disorders in children and adolescents, I have treated over a thousand patients with gender dysphoria.  Given the nature of being a community psychiatrist,  I have the benefit of being involved with childrens' care not just in my office, but also with their families, schools, and outside support systems.  This provides me with the ability to have a more complete perspective on their development and the interventions that produce the best outcomes for their overall well being.   My medical opinion below is based upon my extensive broad based clinical experience as a community based Child and Adolescent Psychiatrist, my training, developmental and neurodevelopmental theory and data,  and review of the literature presented on this subject.

8.     My previous expert witness testimony has been in family court regarding abuse, custody, and recommended interventions for the mental health of minors.

9.     I have reviewed the Florida Medicaid Generally Accepted Professional Medical Standards (GAPMS) Determination on the Treatment of Gender Dysphoria published by Florida's Agency for Health Care Administration (AHCA) in June 2022, along with its attachments; and Fla. Admin. Code. R. 59G-1.050(7) which prohibits Medicaid coverage of puberty blockers, hormone and hormone antagonists, sex reassignment surgeries, and any other procedures that alter primary or secondary sexual characteristics.

10.    I am being compensated at an hourly rate of 350.00 for documentation and review, and 550.00 for deposition or trial testimony.   My compensation does not depend on the outcome of this litigation, my opinions, nor the testimony that I provide.

## OBSERVING THE RISING PREVALENCE OF GENDER DYSPHORIC YOUTH AND EVALUATING PRESENT TREATMENT MODELS

11.    Escalating Prevalence of Youth Presenting with Gender Dysphoria or as Transgender: I have been a physician since 2002.  Over the last decade, there has been a dramatic increase in the number of children and adolescents who experience gender dysphoria or who identify as transgender in my practice.  In my early years of practice from 2007-2010, the overall prevalence of transgender youth was less than one percent of my outpatient patient population in a traditional community setting in Pennsylvania. Between 2019-2022, the number of youth presenting with gender dypshoria or as transgender increased to thirty percent in a similar outpatient community setting in South Carolina.  A

study published by UCLA School of Law in June 2022 cites that the prevalence of transgender youth and young adults, ages 13-24 has doubled in the last five years. [1]

## IMPORTANCE OF ANALYZING CHANGES IN PATIENT PRESENTING CONCERNS

12. When the prevalence of a particular presentation increases, regardless of what presentation that is, physicians must ask themselves several important questions in order to provide the best quality care to patients. Important questions regarding the increased prevalence of gender dysphoria or transgenderism among youth must be raised.

13. One question that must be asked is regarding confounding factors: Is the prevalence rate impacted by factors that make the data unreliable?  (i.e. data can be affected by changes in the regions where measures are taken, or by differences in referral base, culture, faith, time period, social and physical environments, or concurrent medical/psychological presentations)?

   A. Comparing my own patient populations during the two time periods above, my area of practice has remained rural or suburban,, my referral base has consistently been pediatric primary care, and my clinic community setting has been outpatient, However, there have been changes over time in the social culture that my patients have encountered, and there has been a dramatic increase in psychiatric disorders amongst the general patient population that I see. Additionally, children have reported a heightened feeling of distance and lack of connection with their parents in recent years when presenting initially for care.

B. One explanation for social culture changing has been the advent and expansion of social media. Ways in which this may be affecting the prevalence of transgender youth are plentiful.  Social media enables the spread of information pertaining to many issues, including those related to sexual development, sexual orientation, and gender.  There has been a dramatic increase in the global public discourse surrounding LGBTQA issues amongst youth. There has been widespread content circulating on transgenderism, accompanied by passionate advocacy that is highly regarded by all ages.  Celebrities have highlighted LGBTQA issues, and have used various forms of media to promote and glamorize transgenderism.  On a local level, information sharing has led to the popularity of LGBTQA clubs at schools, community groups dedicated to raising awareness and acceptance, and enthusiastic support networks for those who identify as LGBTQ.  Support for transgenderism is now the new social norm.  Whereas children and youth used to feel more isolated if they identified as LGBTQ and face adverse social consequences for being open about their identity, they now are often embraced, cared for, and even praised for their courage and confidence in many settings.

C. Families have also shifted their response over time.  Parents in my patient population today more readily embrace their children with gender dysphoria today in comparison to a decade ago due to heightened awareness of the issue.  While harmful prejudice does still exist and members of the LGBTQA community still face discrimination, the change in response on every level from government, to schools, and to families, has been dramatic.  Colleagues of mine, as well as the

present literature, reflect this increasing acceptance and support of transgender and gender dysphoric youth.

D. While such changes can be viewed as positive by many, due to improvements in social justice and equity,  the concern when analyzing the data becomes that the remarkable increase in youth reporting gender dysphoria or transgenderism, may not be completely accurate.  Rather, the data may reflect youth who are seeking to be part of a community, who are seeking connection and engagement, who want to be affirmed and advocated for, and who are wanting to be part of a passionate and supportive social group.

14.    A second question that must be asked pertains to screening and assessments: Are screening tools or evaluations for gender dysphoria different now than they were previously?

A. With regard to screening tools, assessments, and evaluations in my own practice, I have always sought to provide comprehensive care that is non-discriminatory.  I have always asked my clients how they identify, and have created a welcoming environment for LGBTQA patients.  I am up to date on my awareness of the recommendations made by major medical organizations, ask open ended questions, and I understand and reflect appropriate terminology.  The breadth of information in the medical community has grown exponentially, and I am aware of and have read the literature in my field and much of it in primary care.

B. Most of my colleagues would also acknowledge that while screening tools have been modified or refined in recent years, they have provided safe and supportive environments for LGBTQA youth.

C. For this reason, I believe evaluations and screening tools to be mostly consistent and comprehensive, and less of a contributor to the increased prevalence of transgenderism or gender dysphoria.

15.   A third question that must be asked is regarding under or over reporting: Are patients more likely to report the presentation now versus in the past? If so, then what has led to further reporting?

A. Based on widespread information, advocacy, dialogue, acceptance, and approval today for transgender youth in comparison to a decade ago, it is likely that youth are more likely to report gender dysphoria openly. Stigma reduction has likely also contributed to this, and has been a benefit to those youth who had previously struggled silently with this issue in fear of social consequences.

B. However, there may also be a problemsome large amount of overreporting based on youth participating in what is called the "bandwagon effect". What I have seen in my clinical work is that many adolescents who previously never had gender dysphoria, but who have been struggling with peer acceptance, suddenly describe feelings of belonging to a group when identifying as transgender. They are often embraced by LGBTQA peers rather instantly and find support that they hadn't experienced before, including from online communities. Their former feelings of being unsure about fitting in seem to be absolved by their membership in a larger movement that is gaining a lot of international traction and attention. Such observation of my patients makes me weary of increasing numbers of youth becoming vulnerable to adopting a movement's ideologies, principles, and

behaviors merely in an effort to attain the reward of widespread affirmation and approval that the movement provides.

C. This "bandwagon effect", defined more specifically as the inclination of individuals to join in their preferences or behaviors with what they perceive to be emerging majorities or dominant positions in society, likely affects the prevalence of reporting that we are seeing. Indeed, with numbers doubling in the last five years, the present trajectory would also lead us to believe that gender dysphoria may be on target to reach much higher numbers.

D. As written cited in the GAPMS, the French National Academy of Medicine wrote: "Parents addressing their children's questions about transgender identity or associated distress should remain vigilant regarding the addictive role of excessive engagement with social media, which is both harmful to the psychological development of young people and is responsible for a very significant part of the growing sense of gender incongruence." [17]

## EVALUATING PSYCHOSOCIAL DEVELOPMENTAL THEORY AND NEUROLOGIC DEVELOPMENT DATA

16.   Do the well founded theories of psychosocial development and current neurologic data help explain the increased prevalence of gender dysphoria in youth? For this, physicians must consider theories of psychosocial development and pediatric neurological development data for children and adolescents.

17.   Fundamental Theory of Psychosocial Development:

A. Childhood and "Industry vs Inferiority":   According to the widely accepted theories of Erik Erikson, children are developing human beings.   Children go

through several stages of psychosocial development. They enter the stage of "industry vs. inferiority" between ages 5-12, wherein their major milestone is attaining the virtue of competence.  During this stage, a child's peer group becomes more important.  The child views his or her peers as being highly significant.  The child's self concept begins to form more closely around peer approval or disapproval. Children's reactions of feeling confident or proud, rejected and incapable, often form around their accomplishments and the responses of their peers.  If their efforts are reinforced by praise and reward, they feel industrious ("competent").  They exude a readiness to move past this stage and further along the developmental trajectory.  If, however, they feel rejected, or disapproved of, they feel inferior ("Incompetent"), causing a halt in development and an inability to move forward along the developmental trajectory. [2]

B.  Adolescence and "Identity vs Role Confusion": According to Erikson, adolescents ages 12-18 who successfully moved forward from the former phase of development, enter the stage of "Identity vs Role Confusion". During this stage, they are searching for a sense of self and identity.  They experience intense exploration of personal values, beliefs, and goals.  Adolescents begin to analyze and think more deeply about their own morality and ethics, and determine their individual identities based upon their life experiences.

C.  Body image is critical in this stage of development, and Erikson suggests that two identities are forming- "sexual" and "occupational". Erikson says that adolescents may feel uncomfortable about their bodies for some period of time until they can adapt and grow into the changes. Additionally, he says success in this stage leads

to the virtue of "fidelity", which he defines as the ability to commit oneself to others on the basis of accepting others even where there are differences. Adolescents have a desire to belong to society and to be productive. During this period, those adolescents who fail to form a sense of identity experience role confusion, feeling unsure where they fit into society in the long term.

D. Based on Erikson's model of the psychosocial stages, the idea that increased reporting of gender dysphoria may be due to adolescents finding identity, approval, and acceptance among the LGBTQ community becomes more plausible, particularly during a season of vulnerability, psychosexual identity formation, and a need for fidelity.

18. Neurologic Development of Children and Adolescents:

A. Adolescent Brain More Vulnerable to Decision Making in Emotionally Laden Situations and with Peer Involvement: The following are excerpts taken from "Brain Development During Adolescence" [3] *"One of the more influential neurobiological models to explain typical adolescent behavior was developed by the group of BJ Casey in New York. [4] The main premise of this model, based on neuroanatomical findings and data from functional imaging studies [5, 6, 7, 8], is that adolescence is a period of neural imbalance caused by the relatively early maturation of subcortical brain areas and the relatively delayed maturation of prefrontal control areas, with the result that, in emotional situations, the more mature limbic and reward systems gain the upper hand, so to speak, over the still relatively immature prefrontal control system. This should not be taken to imply that adolescents are by nature unable to make rational decisions. Rather, in*

*situations that are particularly emotionally laden (e.g., in the presence of other adolescents or when there is the prospect of a reward), the probability rises that rewards and emotions will affect behavior more strongly than rational decision-making processes[5,6,9]. This model has been tested in a series of experimental studies.   Recent findings show, however, that the continuing psychological and biological changes of adolescence exert a powerful influence on cerebral structure and function. The brain of the adolescent goes through a new phase of plasticity in which environmental factors can have major, lasting effects on cortical circuitry. This opens up new opportunities for education. For example, for the very reason that adolescents are so readily influenced by emotions, they stand to profit from learning experiences taking place in a positive emotional context that are intentionally designed to train emotional regulation. Given that risky behavior in adolescence has a neurobiological basis, attempts to suppress such behavior completely seem bound to fail. It would be more reasonable to enable adolescents to have emotional experiences in a safe environment, and to increase the social rewards associated with non-risky behaviors through regulatory legislation (e.g., prohibition of certain kinds of advertising) and the provision of emotionally positive models. For instance, the teenage lead character in a television soap opera might decide to opt out of a hard-drinking contest organized by friends.   Moreover, the protracted period of neural plasticity in adolescence also makes adolescents more vulnerable to harmful environmental influences [10]. "*

B. Also in 2013, Casey presented a lecture on *"The Teen Brain: Legal Responsibility"* [11]. Taking from her presentation, Casey's data shows that the prefrontal cortex (involved in decision making and planning) develops at a rate slower than the portions of the brain involved in actions and movement. Emotional systems that reside deep within the brain are still evolving well into adolescence and there is an imbalance between the deeper areas of the brain (ventral striatum and amygdala) and the prefrontal cortex which is more delayed in development. This incongruence is linked to difficulties with self regulation and impulse control in the adolescent brain. Further evidence of this is found when response time is studied by pairing stimuli with rewards and incentives. Without conscious awareness, people have quicker responses when they associate certain stimuli with positive outcomes or incentives. Individuals have slower responses to stimuli when there are fewer expected positive outcomes or rewards. Representation of rewards and incentives is found in the ventral striatum. Across development, studies show that adolescents activate this deeper region of the brain more than young children and adults. When greater activity is seen in the ventral striatum, it is correlated with a higher degree of risk taking behaviors or impulsivity. Another factor that influences response time and accuracy for the adolescent is the presence of peers. According to studies, when peers are present, adolescents make more errors in social cue interpretation and response time. They react more quickly to incentives, and are more drawn to danger and risk taking or impulsive behaviors. Their brain is activated in the areas of the ventral

striatum and their amygdalas show heightened activity relative to younger children and adults.

C.  Casey concludes that adolescents show impairment in overriding impulses in emotionally charged situations. The imbalance appears to reflect an imbalance between earlier developing emotional centers in the brain and those involved in self control.  Lastly, she states that diminished self control is transient and continues to develop in adulthood as these brain systems mature with experience.

D.  Of note, Casey is seen as a leader in the field of neurodevelopment.  While she has no opinion that I can find on matters of transgenderism in youth, and hence I make no statements linking her with this paper, I regard her work on the adolescent brain with a great deal of respect.  Evaluating the data that she presents is critical to the discussion of the increased reporting of gender dysphoria.

E.  Gender dysphoria is an emotionally charged subject that often presents at the precipice of adolescent development which is by its very nature an emotionally laden period.  Hence, one can conclude that adolescents may show impairment in overriding impulses that result from the brain imbalances that Casey speaks of.  In this case, the impulse may be to find acceptance and social affirmation of self.

F.  Additionally, Casey's data calls into question the decision making capacity of adolescents, during an emotionally laden time, to make treatment decisions regarding gender transition that are well thought out and rational rather than impulse driven.

## EVALUATING TREATMENT MODELS FOR GENDER DYSPHORIA

19.     Evaluating Treatment Models: If the measures of increasing prevalence of transgenderism and gender dysphoria are indeed increasing, how should the medical community respond? Are present treatment models for youth who experience gender dysphoria helpful, and which areas require attention and modification for best clinical outcomes?

   A.  Safe Settings: Comprehensive treatment models for youth presenting as transgender have received a great deal of focus in recent years, due to the rise in awareness and advocacy.  One such example includes the Fenway Community Health Model.[12] Models recommended by major medical organizations today often focus on providing an LGBTQA safe setting for youth to talk and have dialogue regarding their feelings, their beliefs, and the issues that they are dealing with.  There is an abundance of literature and supportive evidence that creating safe settings for youth with gender dysphoria is critical to their health and well being.

   B.  Affirmative Care Model and Gender Transition Therapies for Youth: Some models, including those endorsed by the AAP, advise that physicians ask youth about their gender specific pronouns, make efforts to not assume genders, and "affirm" the gender that the youth prefers.   "Affirming Care", as it is defined today by major medical organizations, means that youth are affirmed by therapists and medical providers to *be the gender they feel comfortable with*.  There are four

major flaws in the affirmative care model when it is applied to practical outpatient care for gender dysphoric youth:

1) First, the affirmative model neglects the adolescent's core internal conflict during the "Identity vs Role Confusion" stage of psychosocial development, during which the adolescent seeks to find belonging and affirmation.   By not taking into consideration that adolescents will be vulnerable to making decisions based on simply wanting to fit in, the affirmative care model assumes that adolescent decisions are to be deemed as sustaining, consistent, and evidentiary of the child's chosen gender for life.

2) Second, this model neglects the neurologic data that shows adolescents are likely to make more impulsive decisions to attain incentives or rewards during emotionally charged situations or when influenced by peers.   In the case of gender dysphoria, reward could be social approval that the adolescent is already seeking.   Therein, the affirmative model calls on physicians to hastily affirm adolescent gender when the adolescent's decisions may be impulse and reward driven rather than rooted in well thought out planning and rational processes.

3) Third, the affirmative model also does not take into consideration the fact that when confounding factors are dealt with in therapy, many adolescents change their minds regarding their gender preference.   Often, in my own clinical experience, when issues such as family dynamics, trauma, gender role experiences, attachment, and peer struggles are explored in therapy,

adolescents no longer report gender dysphoria.  If I were to prematurely "affirm" a child's preferred gender, I would risk causing irreparable harm by not exploring all of the other complex issues the adolescent faces that may be affecting gender preference.  As my colleagues' experiences and much literature also emphasizes the role of therapeutic exploration [13] it is clear that adolescents with gender dysphoria require tremendous diligence in mental health care and considerable time is required by providers for thorough therapeutic exploration prior to any decision to affirm a gender choice.

4) The fourth and last flaw in the affirmative model is that it prompts the clinician to move past therapeutic exploration, to treatments such as hormones, chest binders, and surgeries that can potentially cause harm to a child or adolescent's mind, body, and self concept.  Despite the voices in the medical community who state that such treatments are harmless and reversible, or even beneficial for mental health, the studies on long term outcomes and safety are lacking, and anecdotal data is growing that would point to such treatments as being potentially irreversible, highly impactful on reproductive ability, and life altering to the point of even causing suicidal thoughts due to shame and regret. The potential for harm is significant- both from a psychiatric standpoint and from a medical standpoint to the adolescent. [14]

20.    The longest follow up study of sexual reassignment surgeries extended for 30 years in Sweden, where transgenderism is highly accepted and supported.  Fifteen years into

the study, the suicide rate in those who had reassignment surgery was twenty times the rate in controls.[(14)] It cites, "The study identified increased mortality and psychiatric hospitalization compared to the matched controls. The mortality was primarily due to completed suicides (19.1-fold greater than in control Swedes), but death due to neoplasm and cardiovascular disease was increased 2 to 2.5 times as well. We note, mortality from this patient population did not become apparent until after 10 years. The risk for psychiatric hospitalization was 2.8 times greater than in controls even after adjustment for prior psychiatric disease (18 percent). The risk for attempted suicide was greater in male-to-female patients regardless of the gender of the control. Further, we cannot exclude therapeutic interventions as a cause of the observed excess morbidity and mortality." This study further demonstrates problems for the gender affirmative model. Additionally, it is necessary to consider this long term study in the discussion that arises regarding suggested higher suicide risk in those with gender dysphoria, and the assumption that is made stating that suicide rates will decline if gender affirming treatments are provided. Indeed, the results in this study after the ten year mark would contradict that assumption.

21.   In 2014, Hayes, Inc. reviewed the scientific literature and found that evidence on long-term results of sex reassignment was too sparse to support meaningful conclusions and gave these studies its lowest rating for quality. It stated, "Statistically significant improvements have not been consistently demonstrated by multiple studies for most outcomes. … Evidence regarding quality of life and function in male-to-female adults was very sparse. Evidence for less comprehensive measures of well-being in adult recipients of cross-sex hormone therapy was directly applicable to [gender dysphoric]

patients but was sparse and/or conflicting. The study designs do not permit conclusions of causality and studies generally had weaknesses associated with study execution as well. There are potentially long-term safety risks associated with hormone therapy but none have been proven or conclusively ruled out."

22.    In 2016, the Centers for Medicare and Medicaid Services addressed whether sex reassignment surgery would be covered under their plans.  It stated that it lacked evidence that it benefits patients. [15]  It cited, "Based on a thorough review of the clinical evidence available at this time, there is not enough evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria. There were conflicting (inconsistent) study results—of the best designed studies, some reported benefits while others reported harms. The quality and strength of evidence were low due to the mostly observational study designs with no comparison groups, potential confounding, and small sample sizes. Many studies that reported positive outcomes were exploratory type studies (case-series and case-control) with no confirmatory follow-up."

A follow up memo [16] stated, "Overall, the quality and strength of evidence were low due to mostly observational study designs with no comparison groups, subjective endpoints, potential confounding (a situation where the association between the intervention and outcome is influenced by another factor such as a co-intervention), small sample sizes, lack of validated assessment tools, and considerable lost to follow-up."

23.   My own clinical experience with youth who undergo hormone treatment for blocking pubertal development, or who utilize chest binders, is that many experience immense regret after bodily changes occur.  This regret sadly often translates into shame when adolescents decide to transition back to their biological sex, and this creates an entirely new layer of issues that then require therapeutic intervention.

## CONCLUSION

24.   As a physician, my concern is that we must, as a medical community, acknowledge that the rise in the prevalence of gender dysphoria is correlated with the rise of social LGBTQA advocacy and awareness movements.  Developmental theory supports that adolescence is a critical period of identity formation and wanting to belong, and a period of vulnerability. Neurodevelopmental models show us that youth are susceptible to impulse driven decisions, particularly in the presence of peers.  While advocacy and awareness are critical to building a stronger society, it must be understood that the vulnerability of the developing brain leads it to be drawn toward impulsive choices, and ideologies that gain quick traction and lead to social approval, connection, and affirmation are alluring during this period.  To provide children with the ability to make very serious medical choices that affect their overall health and self concept for the rest of their lives, including their reproductive capability, during a season of such tremendous neurodevelopmental growth and susceptibility is risky,  at best.

I conclude that I am in agreement with the Florida Medicaid Generally Accepted Professional Medical Standards (GAPMS) Determination on the Treatment of Gender Dysphoria published by Florida's Agency for Health Care Administration (AHCA) in June 2022 [18], along with its

attachments; and Fla. Admin. Code. R. 59G-1.050 which prohibits Medicaid coverage of puberty blockers, hormone and hormone antagonists, and sex reassignment surgeries. In my opinion, children under the age of eighteen should not receive these aforementioned treatments or any other medical interventions that hinder or change their natural development.

We must not let our desire to help youth with gender dypshoria cloud our clinical judgment and cause us to make hasty decisions about treatments that carry profound risk and for which our only reliable long term study is a 30 year follow up showing an increase in suicide and suicidal thoughts ten years post treatment [14].

We must simultaneously take steps to protect youth and treat them with respect by providing them with non-discriminatory care that focuses on kindness, respect, and safe settings for communication and therapeutic exploration, all while taking into consideration the complexity of the factors that influence them, and the risks of treatments for which we don't have the long term scientific data to support.

Pursuant to 28 U.S.C. 1746, I declare under the penalty of perjury that the foregoing is true and correct.

*Geeta Nangia, MD*

_____

Geeta Nangia MD

**References:**

[1] J Jerman R Flores K O'Neill  June 2022 *How Many Adults and Youth Identify as Transgender in the United States?* UCLA Williams Law Institute

[2] Erikson E. H . (1982). *The life cycle completed.* New York: W.W. Norton & Company.

[3] K Konrad (2013) *Brain Development During Adolescence* (Dtsh Arztebl Int 110 (25): 425–431

[4] Casey BJ, Jones RM, Hare TA: *The Adolescent Brain* Annals of the New York Academy of Sciences 2008; 1124: 111–26

[5] Galvan A, Hare TA, Parra CE, et al. *Earlier development of the accumbens relative to orbitofrontal cortex might underlie risk-taking behavior in adolescents. J Neurosc.* 2006;26:6885–6892.

[6] Galvan A, Hare T, Voss H, Glover G, Casey BJ. *Risk-taking and the adolescent brain: who is at risk?* Developmental Science. 2007;10:F8–F14.

[7] Geier CF, Terwilliger R, Teslovich T, Velanova K, Luna B. *Immaturities in reward processing and its influence on inhibitory control in adolescence.* Cerebral Cortex. 2010;20:1613–1629.

[8] Van Leijenhorst L, Zanolie K, Van Meel CS, Westenberg PM, Rombouts SA, Crone EA. *What motivates the adolescent? Brain regions mediating reward sensitivity across adolescence.* Cerebral Cortex. 2010;20:61–69.

[9] Chein J, Albert D, O'Brien L, Uckert K, Steinberg L. *Peers increase adolescent risk taking by enhancing activity in the brain's reward circuitry.* Developmental Science. 2011;14:F1–F10.

[10] Schneider M. *Puberty as a highly vulnerable developmental period for the consequences of cannabis exposure.* Addiction Biology. 2008;13:253–263.

[11] Casey BJ, April 2014 *The Teen Brain: Implications for Legal Responsibility,* Chicago, Law The McArthur Foundation Research Network on Law and Neuroscience.

[12] K Mayer, J Appelbaum, T Rogers June 2001 *The Evolution of the Fenway Community Health Model* American Journal of Public Health 91(6): 892–894.

[13] Garg G, Elshimy G, Marwaha R. *Gender Dysphoria*. [Updated 2022 Jul 18]. Treasure Island (FL): StatPearls Publishing; 2022 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK532313/13.

[14] Dhejne C, Lichtenstein P, Boman M, Johansson AL, Långström N, Landén M. *Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden.* PLoS One. 2011 Feb 22;6(2):e16885. doi: 10.1371/journal.pone.0016885. PMID: 21364939; PMCID: PMC3043071.

[15] June 2016 *Proposed Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* Centers for Medicaid and Medicare Services

[16] June 2016 *Memo for Gender Dysphoria and Gender Reassignment* Centers for Medicaid and Medicare Services

[17] Feb 2022 *Medicine and Gender Transidentity in Children and Adolescents* French National Academy of Medicine

[18] June 2022 *Florida Medicaid Generally Accepted Professional Medical Standards (GAPMS) Determination on the Treatment of Gender Dysphoria* Florida's Agency for Health Care Administration (AHCA)

# Geeta Nangia, M.D.

## Board Certified in Adult Psychiatry and Child & Adolescent Psychiatry

Phone (864) 318-9930• drnangia@jothgreenville.com

## EDUCATION

**Boston University School of Medicine**  **Boston, MA**
*Doctor of Medicine*  May 2002

**Boston University**  **Boston, MA**
*Bachelor of Arts Biochemistry, Molecular Biology*  May 1998

## INTERNSHIP AND RESIDENCY

**Medical University of South Carolina**  **Charleston, SC**
*Child and Adolescent Psychiatry Fellow*  June 2007

**Medical University of South Carolina**  **Charleston, SC**
*General Psychiatry Resident*  June 2006

## EXPERIENCE

**KNOWN AND LOVED**  **Greenville, SC**
**CEO**  **2021-present**
Educating, equipping, and supporting the growth of healthy families in our region. Providing mental health education and support to parents, with a special focus on foster and adoptive families. Helping parents to establish secure and healthy attachments with children, thereby improving their mental health outcomes.

**Journey of the Heart, LLC**  **Piedmont, SC**
**Child and Adolescent Psychiatrist**  **2022-present**
Providing behavioral health care for children and families, specializing in complex cases and trauma.

**Parkside Pediatrics Behavioral Health**  **Greenville, SC**
**Child & Adolescent Psychiatrist**  **2018-2022**
Providing behavioral health care for children and families. Consulting with pediatricians in primary care.

**Edward Via College of Osteopathic Medicine**  **Spartanburg, SC**
**Community Clinical Faculty and Lecturer**  **2015-2020**
Taught medical students about the principles of childhood development and clinical psychiatry.

| **Carolina Center for Behavioral Health** | **Greer, SC** |
| **Staff Psychiatrist** | **2015-2016** |

Staffed inpatient unit for children and adults of all ages who were in need of acute crisis stabilization and mental health services.

| **The Well Planted Child, LLC** | **Bellefonte, PA** |
| **Private Practice Consulting Psychiatrist** | **2014- 2015** |

Provided school based consultation services for children with behavioral and/or academic difficulties. Assisted teachers in developing effective classroom management strategies and in creating accommodations for children with special needs.

| **Centre County Christian Academy** | **Bellefonte, PA** |
| **Kindergarten Teacher** | **2014-2015** |

Volunteered to be a primary teacher for morning academics at a private Christian school for an academic year. Tested classroom modifications and strategies typically recommended by clinical mental health professionals to assess their efficacy. Provided consulting services for children with special needs or behavioral issues.

| **Diversified Treatment Alternatives** | **Lewisburg, PA** |
| **Child and Adolescent Psychiatrist** | **2012- 2015** |

Provided evaluation and treatment for children in two residential care facilities. Provided care for a high risk youth population with a special focus on sexual abuse, sexual perpetration, and addiction. Supervised treatment teams who were providing trauma focused treatment for children. Provided care for a partial hospitalization program. Led educational parenting groups on development and attachment.

| **Sunpointe Health** | **State College, PA** |
| **Child and Adolescent Psychiatrist** | **2011-2012** |
| **Adult Psychiatry Inpatient Attending Psychiatrist** | |

Provided inpatient adult psychiatric evaluation and treatment in an acute care setting at Mount Nittany Medical Center. Provided psychiatric consultation for children and for the BLAST Intermediate Unit which serves multiple school districts in the region. Taught medical students during their psychiatry rotation.

| **Palmetto Christian Psychiatry** | **Charleston, SC** |
| **Private Practice Psychiatrist** | **2010-2011** |

Provided psychiatric evaluation and treatment for individuals of all ages. Provided individual and family psychotherapy.

| **Susquehanna Health Medical Group** | **Williamsport, PA** |
| **Child and Adolescent Psychiatrist** | **2007-2010** |
| **Adult Psychiatry Inpatient Attending Psychiatrist** | |

Spearheaded The Department of Child Psychiatry at a local community hospital with a mission to serve children who otherwise did not have access to mental health care. Performed evaluations and treatment for children and adults with a

broad spectrum of mental health and developmental disorders. Actively conducted family therapy, psychodynamic therapy, cognitive behavioral therapy, play therapy, as well as group therapy. Provided medication management. Worked with outlying community agencies in all arenas, consulting with and for schools, social services, court systems, pediatricians and primary care physicians, wrap around services, and partial hospitalization programs to coordinate care for children. Taught in the family medicine residency program weekly. Supervised staff therapist and psychiatric nurse. Provided courtroom testimony in custody and abuse cases. Performed on call duties on the adult inpatient unit.

**Carolina Center for Behavioral Health**　　　　　　**Greer, SC**
**Staff Psychiatrist**　　　　　　　　　　　　　　　　**2006-2007**
Served in a weekend moonlighting position servicing an adult inpatient population while in fellowship training. Managed crisis calls, multiple levels of acuity, and geriatric patients on weekends during my fellowship.

**HONORS**

**Susquehanna Physician Appreciation Award, 2008**
**Family Medicine Residency Teaching Certificate 2008**
**Circle of Excellence in Teaching 2003**
**Ruth Hunter Johnson Prize in Psychiatry 2002**

**LICENSURES**

**Pennsylvania Medical License MD 431126 inactive**
**South Carolina Medical License MD 26215 active**

**CERTIFICATIONS**

**American Board of Psychiatry and Neurology, General Psychiatry**
**American Board of Psychiatry and Neurology, Child and Adolescent Psychiatry**

# Appendix Attachment

# 9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

Case No. 4:22-cv-00325-RH-MAF

## Expert Declaration of G. Kevin Donovan, M.D., M.A.

I, G. Kevin Donovan, M.D., M.A., hereby declare and state as follows:

     1.     I am over the age of 18. I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

     2.     I have been retained by counsel for defendants as an expert in connection with the above captioned litigation. The purpose of this report is to summarize a report that I prepared in support of the Agency for Healthcare Administration's Generally Accepted Professional Medical Standards on the Treatment of Gender Dysphoria. A copy of my report is attached and incorporated by reference as Exhibit "A" to this declaration. I also respond to criticisms of my report made by Dan H. Karasic, M.D.

## I.   Background and Qualifications

### Qualifications

3.      The information provided regarding my professional background, experiences, publications, and presentations are detailed in my curriculum vitae (CV). A true and correct copy of my most up-to-date CV is attached.

4.      I am a Professor Emeritus of Pediatrics at Georgetown University School of Medicine, and Director emeritus of the Pellegrino Center for Clinical Bioethics at Georgetown University. I have been on the Georgetown Medical School faculty since 2012. Prior to that, I was on the faculty at the University of Oklahoma medical school and Baylor College of Medicine, for over 30 years combined.

5.      I received my medical training at the University of Oklahoma, and Baylor College of Medicine, and further training in medical research at the National Institutes of Health in Bethesda Maryland.

6.      I trained in medical ethics at Georgetown University, Kennedy Institute of Ethics and completed my Masters in bioethics at the University of Oklahoma. I was the founding director of the Oklahoma Bioethics Center.

7.      I have chaired the Institutional Research Ethics Board (IRB) for 17 years, at SFH. This is the designated organization that oversees the safety of human subjects participating in medical research.

8.      My professional interests in bioethics include informed consent, shared decision-making, beginning of life issues, end-of-life issues, brain death, as well as medical research.

9.      I have studied and been consulted on issues surrounding transgender patients, both minors and adults, locally and nationally.

10.     For ethical as well as medical reasons, I have neither prescribed medications nor referred for surgery any patients that consider themselves transgender.

11.     Subsequently, none of my opinions are biased by professional income being generated by these activities nor by my professional reputation relying primarily on these diagnoses.

**Compensation**

12.     I am being compensated for my work on this matter at a rate of $350 per hour for my expert opinion and support services. My compensation in no way depends on the outcome of the litigation, the opinions I express, or testimony that I may provide.

**Basis for Opinions**

13.     In preparing my report, I have relied on by years of experience as a physician and medical ethicist, my review of the literature as documented in my report, and established principles of medical ethics.

14.     My perspective is valuable as an unbiased observer. It is analogous to our work on the evaluation of the issues surrounding the diagnosis of brain death: when questions have arisen about the diagnosis and practice in brain death, which is the primary pathway towards organ donation, it has been seen as preferable to have these issues examined and evaluated by unbiased observers more than by transplant surgeons or organ recipients.

15.     Likewise, it is difficult for one whose professional reputation and financial compensation has depended heavily on a single diagnosis to maintain sufficient distance to render a completely unbiased opinion about it.

**The Status of the Question**

16.     The biggest problem with a diagnosis of transgenderism is the conceptual one. When a biological male presents himself, declaring that he is in fact a woman, (or the reverse) the commonsense response is not to take this at face value. This would be true for any similar aberration. Our first response would not be to immediately clothe him in a dress, any more than we would attempt to clothe him in feathers if he believed he were a chicken. This would represent a misplaced and false compassion.

17.     Nevertheless, this is the approach now being taken by many psychiatrists and surgeons and endorsed by medical societies. Perhaps as a result,

the number of young Americans describing themselves as "transgender" has exploded over the past decade, increasing by a factor of 20 to 40, based on surveys by the Centers for Disease Control and Prevention.

18.     Concomitantly, there has also been a shift from a predominance of young males presenting early, 80% of whom would historically revert in their self-perception by the time they had completed puberty. We are now seeing much larger number of females. The two leading explanations for this unexplained phenomenon are greater social acceptance, or social contagion.

19.     Beyond a patient's self-perception, there is no biochemical, hormonal, radiological, or genetic basis for confirming or differentiating these individuals.

20.     The terminology applied to these patients has been changed from "transsexual" to gender identity disorder, to gender dysphoria, and now the term transgender is commonly favored. It is far broader, and can encompass any nonconformity with rigid traditional sex roles.

21.     The treatment approach is to provide puberty blockers for young prepubertal patients, followed by cross sex hormones, followed by various levels of surgical reconstruction as determined by the patient, including castration, penectomy, mastectomy, and hysterectomy.

22.     The enthusiasm for these interventions has progressed to the point where an initial psychological evaluation of the patient has often become minimal or almost nonexistent. Planned Parenthood clinics, which have become widely advertised providers of these hormonal interventions, have promised a prescription for patients after a single visit, sometimes within the same day.

23.     One justification for the willingness to initiate this process with such alacrity is the claimed expectation of great benefit with minimal harm. This is particularly true in the provision of puberty blockers for the youngest patients, who are told that the effects will be completely reversible. However, with further study it has come to light that complications such as arrested maturation, physiological changes, fertility challenges, hematological changes, and osteoporosis can all result from treatment with these puberty blockers and may be irreversible.

## RESPONSE TO DR. KARASIC

24.     My discussion of the ethics of providing transgender care has been criticized by Dr. Dan Karasic. He views Florida's actions in terminating Medicaid coverage of gender affirming care as problematic for those who were previously approved for that same coverage. He states "Florida's actions amount to forced detransition" and goes on to admit "there has been little research on those forced to detransition". He fails to see that those pathways upon which he has set patients for "gender affirming care" should have included protocols for the "detransitioning" that patients are already voluntarily seeking in increasing numbers. To place patients on such a one-way conveyor belt of treatment is to fail to account for all their needs, an ethical as well as a medical failure on their part. It would be analogous in the present opioid epidemic to treating a patient's pain with opioids but not knowing how to wean them off successfully. Were such an exit strategy in place, it could be used for all who needed it. This would include not just patients who lose their insurance coverage, but could also extend to patients who develop neurologic injury significant enough to cause a loss of "gender identity". Would a patient in an ICU or a nursing home situation continue to receive these treatments? To begin treatment of such patients without knowing how to successfully discontinue such treatment, and to not warn patients of this issue in advance, again reflects unfavorably on the issue of informed consent for the treatment of patients identifying as transgender.

## CONCLUSION

25.     The nature of true medical science is to form a hypothesis, test the proposed interventions, and evaluate the results both positive and negative, and to continue to be open to questioning the process going forward. In the present climate, this does not appear to be possible for the approach to patients claiming to be transgender. Questioning any part of the diagnosis or treatment approach has triggered a massive and vituperative response. Even those wanting to use only a psychotherapeutic approach without progressing to other stages have been condemned as attempting "conversion therapy". In extreme cases, this has been declared illegal.

26.     There is no obvious explanation for this lopsided state of affairs. There is unfortunately some precedent. In a previous generation, it was proposed and accepted for a time that serious mental illness could be treated by frontal lobotomy, i.e., drilling into the front of the brain. This was in fact done to the sister of Pres. John F. Kennedy, and she subsequently was rendered permanently mentally deficient. Enthusiasm for this approach waned, and it is rarely discussed today. Our responsibility is to ensure that we are not living in an analogous time, triggered by medical hubris.

27.     The greatest safeguard against this type of medical misadventure is to be completely open about what we know, and what we do not yet know. When certainty is lacking about the potential benefits and harms of a therapeutic approach, treatment should be conducted with fully informed consent and within the context of clinical trials. This should have been done before the widespread employment of hormonal and surgical interventions for what appears to be a primarily psychological problem. The greatest difficulty occurs when you find that you have your cart before the horse. You are not making progress when you are moving rapidly, but in the wrong direction.

I declare under penalty of perjury under the laws of the United States of America and the Florida that the foregoing is true and correct.  Executed this <u>2d</u> day of October, 2022.

//s/*G. Kevin Donovan, M.D., M.A.*

G. Kevin Donovan, M.D., M.A.

# GEORGETOWN UNIVERSITY SCHOOL OF MEDICINE

## *CURRICULUM VITAE*

Gerard Kevin Donovan, MD, MA

**PERSONAL INFORMATION:**

Home Address:     32 Westwind Dr.
                  Sand Springs, OK 74063

                  202-507-3825

Office Address:   Center for Clinical Bioethics
                  Georgetown University Medical Center
                  4000 Reservoir Road, NW, #D236
                  Washington, DC 20007
                  202-687-1122 (office)
                  202-687-8955 (fax)

**LICENSURE:**     State:  District of Columbia
                   License No:  CS1200608
                   Issue date:  01/01/2013

                   State of Oklahoma
                   License No:  10680
                   Initial date:  June 1975

**CERTIFICATION**  Board of Certification:  American Board of Pediatrics
                   Date of Certification:  1980 (Diplomate) Permanent

                   Sub-Specialty Board:  Pediatric Gastroenterology
                   Date of Certification:  1990
                   Date of re-certification: 1997, 2005

**EDUCATION:**     Undergraduate:      University of Notre Dame
                                       South Bend, IN
                                       1966-1970
                                       BA

                   Medical Education:  University of Oklahoma
                                       Oklahoma City, OK
                                       1970-1974
                                       MD

                   Graduate Education: University of Oklahoma
                                       Norman, OK
                                       1994
                                       MA in Bioethics

                   Internship

1

| | | |
|---|---|---|
| & Residency: | Baylor College of Medicine<br>Pediatrics<br>Houston, TX<br>1974-1977<br>Russell Blattner, M.D. | |
| Fellowship: | University of Oklahoma<br>Pediatric Gastroenterology<br>Oklahoma City, OK<br>1977-1979<br>Owen Rennert, M.D. | |
| Fellowship: | National Institutes of Health<br>Developmental Gastroenterology and<br>Nutrition, Neonatal and Pediatric Medicine<br>Branch, National Institute of Child Health<br>and Human Development<br>Bethesda, MD<br>1979-1980<br>Norman Kretchmer, M.D. | |

**PROFESSIONL EXPERIENCE**

Title:  Director, Pellegrino Center for Clinical Bioethics
Georgetown University Medical Center
Professor, Department of Pediatrics
Address:  4000 Reservoir Rd NW
Washington, DC 20007
Dates of Service:  2012-2020

Title:  Senior Clinical Scholar
Institution:  Kennedy Institute of Ethics
Georgetown University
Washington, D.C.
Dates of Service:  2015-2021

Title:  Director, Oklahoma Bioethics Center
Institution:  The University of Oklahoma
College of Medicine, Tulsa
Address:  4502 East 41st St; Tulsa, OK 74135
Date(s) of Service:  1990 to 2012

Title:  Professor and (Interim)Chair
Department of Pediatrics
The University of Oklahoma
College of Medicine, Tulsa,   2009-2011

2

|  | Professor and Vice-Chair |
| Institution: | The University of Oklahoma College of Medicine, Tulsa |
| Address: | 4502 East 41st St; Tulsa, OK 74135 |
| Date(s) of Service: | 1996 to 2012 |

| Title: | Chief, Division of Pediatric Gastroenterology and Nutrition |
| Institution: | The University of Oklahoma College of Medicine, Tulsa |
| Address: | 4502 East 41st St; Tulsa, OK 74135 |
| Date(s) of Service: | 2007 to 2012 |

| Title: | Chief, Division of Pediatric Gastroenterology Department of Pediatrics |
| Institution: | The University of Oklahoma College of Medicine, Tulsa |
| Address: | 4502 East 41st St; Tulsa, OK 74135 |
| Date(s) of Service: | 1982-2003 |

| Title: | Associate Professor (Tenured) Department of Pediatrics |
| Institution: | The University of Oklahoma College of Medicine, Tulsa |
| Address: | 4502 East 41st St; Tulsa, OK 74135 |
| Date(s) of Service: | 1988-1996 |

| Title: | Assistant Professor Department of Pediatrics |
| Institution: | The University of Oklahoma College of Medicine, Tulsa |
| Address: | 4502 East 41st St; Tulsa, OK 74135 |
| Date(s) of Service: | 1982-1988 |

| Title: | Assistant Professor Department of Pediatrics |
| Institution: | Baylor College of Medicine |
| Address: | Houston, TX |
| Date(s) of Service: | 1980-1982 |

| Title: | Clinical Associate |
| Institution: | National Institute of Child Health and Human Development, NIH |
| Address: | Bethesda, MD |
| Date(s) of Service: | 1979-1980 |

3

App. 647

**HONORS and AWARDS**

| | |
|---|---|
| Award: | Gold Lifetime Humanism Honor Society Award for Exemplary Demonstration of Respect for Human Beings through the Practice and Teaching of Medicine |
| Institution/Organization: | The Gold Foundation |
| Date: | August 2005 |

| | |
|---|---|
| Award: | Honored Member |
| Institution/Organization: | American Registry of Outstanding Professionals |
| Date: | 2005 |

| | |
|---|---|
| Award: | Humanism in Medicine Award: Recognizing the Integration of Humanism in the Delivery of Health Care to Patients and Their Families |
| Institution/Organization: | Healthcare Foundation of New Jersey/ Gold Humanism Society |
| Date: | 2000 |

| | |
|---|---|
| Award: | **Knighthood:** Knight Grand Cross Vatican |
| Institution/Organization: | Equestrian Order of the Holy Sepulcher of Jerusalem |
| Date: | 1994 |

| | |
|---|---|
| Award: | Listed |
| Institution/Organization: | Best Doctors in America Database |
| Date: | 2005 |

| | |
|---|---|
| Award: | Listed |
| Institution/Organization: | Who's Who in the Southwest |
| Date: | 1994 to Present |

| | |
|---|---|
| Award: | Listed |
| Institution/Organization: | Who's Who Worldwide |
| Date: | 1992 to Present |

| | |
|---|---|
| Award: | Founder's Award for Outstanding Contributions to Research and Medicine |
| Institution/Organization: | University of Tulsa, 1992 |

4

**PROFESSIONAL SOCIETY MEMBERSHIP:**

Society Name: American Academy of Pediatrics
Leadership Role (if appropriate): Fellow
Date(s) of Membership: 1980

Society Name: American Academy of Pediatrics
Leadership Role: Section on Gastroenterology
Date(s) of Membership: 1990-present

Society Name: American Academy of Pediatrics
Leadership Role (if appropriate): Section on Bioethics
Date(s) of Membership: 1989-2005

Society Name: American Academy of Pediatrics
Leadership Role: Bioethics Executive Committee
Date(s) of Membership: 1993-1996

Society Name: American Academy of Pediatrics
Leadership Role : Executive Committee Chair, Section of Bioethics
Date(s) of Membership: 1996-1998

Society Name: American Academy of Pediatrics
Leadership Role : Committee on Bioethics
Date(s) of Membership: 1999-2005

Society Name: American Medical Association
Dates of Membership:  1980-2011

Society Name: American Society for Law, Medicine & Ethics
Dates of Membership:  1995-2010

Society Name:  American Society for Bioethics and Humanities
Dates of Membership:  1997- 2019

Society Name:  Gold Humanism Honor Society
Dates of Membership:  2005 -

Society Name: Hastings Center, Associate Member
Dates of Membership:  1992 - present

Society Name: Kennedy Institute of Ethics, Lifetime Member
Dates of Membership:  1995 to present

Society Name: North American Society for Pediatric Gastroenterology
Hepatology and Nutrition Ethics Committee
Leadership Role (if appropriate):
Dates of Membership:  2004-2007

*5*

Society Name: Oklahoma Association for Healthcare Ethics
Leadership Role : First Vice President
Dates of Membership:  1999

Society Name: Oklahoma Genetics Advisory Council
Dates of Membership:  2008-2010

Society Name: Oklahoma Genetics Advisory Council
Leadership Role: Newborn Screening Programs & Pediatrics Committee
Dates of Membership:  2002

Society Name: Oklahoma State Medical Association
Leadership Role : Bioethics Committee 1988-2004
Dates of Membership:  1982-2012

Society Name: Oklahoma State Medical Association
Leadership Role : Council on Medical Services
Dates of Membership:  1984

Society Name:   Oklahoma State Medical Association
Leadership Role :  Geriatrics Task Force
Dates of Membership:  1998-2000

Society Name:  Medical Ethics and Competency Committee
Leadership Role:
Dates of Membership:  1988-2004

Society Name:  St.  Luke Society Physician's Guild
Leadership Role :  Member
Dates of Membership:  1988-92

Society Name:  St. Luke Society Physician's Guild
Leadership Role:President
Dates of Membership:  1988-90


Society Name: Tulsa County Medical Society
Dates of Membership:  1988-2012

Society Name: Tulsa County Medical Society
Leadership Role : Chairman, Committee on Ethics
Dates of Membership:  2005

Society Name: Tulsa County Medical Society
Leadership Role :   Member, Planning & Development Committee
Dates of Membership:  2005

Society Name: Tulsa County Medical Society

6

Leadership Role :  Chair, Ethics Committee
Dates of Membership:  1998-2002

Society Name: Tulsa County Medical Society
Leadership Role :  Member, Council on Medical Education
Dates of Membership:  1986-1988

Society Name: Tulsa County Medical Society
Leadership Role : Member ,Council on Medical Services
Dates of Membership:  1984-1985

Society Name: Tulsa County Medical Society
Leadership Role :  Member, Planning and Development Committee
Dates of Membership:  2001-2003

Society Name: Tulsa County Medical Society
Leadership Role:  Member, Scholarship Fund Board of Trustees
Dates of Membership:  1997-2004

Society Name: Tulsa County Medical Society
Leadership Role :  Delegate
Dates of Membership:  2007-present

Society Name: Tulsa County Medical Society
Leadership Role :  Alternate Delegate to OSMA
Dates of Membership:  1994, 2005-2006

**PUBLIC SERVICE**

Name of Editorial Board: Academic Medicine
Role/Status:  Consulting Editor
Date(s) of Service:  1995-2000

Name of Editorial Board:  AAP Grand Rounds
Role/Status:  Consulting Editor
Date(s) of Service:  1996-2001

Name of Editorial Board:  American Journal of Diseases of Children
Role/Status:  Reviewer
Date(s) of Service:  1994-1999

Name of Editorial Board:  Journal of Pediatric Gastroenterology and Nutrition
Role/Status:  Reviewer
Date(s) of Service:  1994-2000

Name of  Organization:  American Academy of Pediatrics
Role/Status:  Executive Committee- Bioethics Section
Date(s) of Service: 1992-2002

7

Name of Community Organization:  American Academy of Pediatrics
Role/Status:  Chair, Bioethics Section
Date(s) of Service: 1995-1998

Name of Organization:  American Academy of Pediatrics
Role/Status:  Liaison, Committee on Bioethics
Date(s) of Service:  1999-2010

Name of  Organization:  American Academy of Pediatrics
Role/Status:  Nominations Committee
Date(s) of Service:  2006-2007

Name of  Organization:  American Liver Foundation
Role/Status: Scientific Advisory Board—Oklahoma Chapter
Date(s) of Service:  1984-1990

Name Community Organization:  Crohn's and Colitis Foundation of America
Role/Status:  Board of Trustees—Oklahoma Chapter
Date(s) of Service:  1992-2010

Name of Community Organization:  Crohn's and Colitis Foundation of America
Role/Status:  Chairman, Medical Advisory Committee
Date(s) of Service:  1990-94

Name of Community Organization:  National Foundation for Ileitis and Colitis
Role/Status:  Scientific Advisory Board—Oklahoma Chapter
Date(s) of Service:  1982-88

Name of Organization:  North American Society for Pediatric Gastroenterology
Role/Status:  Hepatology and Nutrition, Ethics Committee
Date(s) of Service:  2004-2007

Name of Community Organization: Oklahoma Chapter of AAP
Role/Status:  Chair, Bioethics Committee
Date(s) of Service:  1999

Name of Community Organization:  Oklahoma Chapter of AAP
Role/Status:  Executive Committee
Date(s) of Service:  1988-1990

Name of Community Organization: Oklahoma Chapter of AAC
Role/Status:  Co-chairman for Membership
Date(s) of Service:  1984-1986

Name of Community Organization:  PEW National Roundtable—Campus
Education
Role/Status:  Invited participant—Clinical Education Forum
Date(s) of Service:  1997

8

Name of Editorial Board/Study Section/Community Organization: Southern
Society for Pediatric Research
Role/Status: Chair:  GI Section Meeting, New Orleans, LA
Date(s) of Service:  January 1987

Name of Editorial Board/Study Section/Community Organization: Southern
Society for Pediatric Research
Role/Status:  Research Paper Judge
Date(s) of Service:  1986

Name of Editorial Board/Study Section/Community Organization:  United Organ
Sharing Network (Lifeshare Transplant Donor Services of Oklahoma)
Role/Status:  Board of Directors--Oklahoma
Date(s) of Service: 1992-2006

Name of Editorial Board/Study Section/Community Organization:  Attorney
General of Oklahoma Task Force on EOL Issues
Role/Status:  member
Date(s) of Service:  2004-present

Name of Editorial Board/Study Section/Community Organization: Birthright Inc
of Tulsa
Role/Status:  Chairman, Board of Directors
Date(s) of Service:  1999-present

Name of Editorial Board/Study Section/Community Organization:  Catholic
Diocese of Tulsa
Role/Status:  Medical Ethics Consultant
Date(s) of Service:  2005-present

Name of Editorial Board/Study Section/Community Organization:  Catholic
Diocese of Tulsa
Role/Status:  Director of Healthcare Issues
Date(s) of Service:  2004-present

Name of Editorial Board/Study Section/Community Organization:  Hillcrest
HealthCare System
Role/Status:  Member, Medical Staff  Committee
Date(s) of Service:2006-2007

Name of Editorial Board/Study Section/Community Organization:  LifeShare
Transplant Donor Services of Oklahoma
Role/Status:  Board of Directors
Date(s) of Service:  2004-2006

Name of Editorial Board/Study Section/Community Organization:  LifeShare
Transplant Donor Services of Oklahoma
Role/Status: Advisory Board

*9*

Date(s) of Service:  2007

Name of Editorial Board/Study Section/Community Organization:  Oklahoma
Health Research Committee
Role/Status:  Member
Date(s) of Service:  1997-98

Name of Editorial Board/Study Section/Community Organization:  Oklahoma
Association for Healthcare Ethics, Inc.
Role/Status:  Charter Member and Second Vice President
Date(s) of Service:  1996-98

Name of Editorial Board/Study Section/Community Organization:  Oklahoma
Association for Healthcare Ethics, Inc.
Role/Status:  First Vice President
Date(s) of Service:  1999

Name of Editorial Board/Study Section/Community Organization:  Neighbor for
Neighbor Free Clinic
Role/Status: Volunteer
Date(s) of Service:  1982-2006

Name of Editorial Board/Study Section/Community Organization:  Indian
National Council, Boy Scouts of America
Role/Status:  Executive Council, Troop 173
Date(s) of Service:  1974-1990

Name of Editorial Board/Study Section/Community Organization:  Indian
National Council, Boy Scouts of America
Role/Status: Board of Review, Eagle District
Date(s) of Service: 1994

Name of Editorial Board/Study Section/Community Organization:  St. Luke's
Society Catholic Physicians Guild
Role/Status:  President
Date(s) of Service:  1990-1995

Name of Editorial Board/Study Section/Community Organization:    St. Mary's
Elementary School
Role/Status:  Sex education instructor
Date(s) of Service:  1986-1994

Name of Editorial Board/Study Section/Community Organization:  TCMS
Committee on Ethics
Role/Status:  Chairman
Date(s) of Service:2005-present

10

App. 654

Name of Editorial Board/Study Section/Community Organization:  TCMS
Role/Status: Delegates to the OSMA House of Delegates
Date(s) of Service:  2006-2009

Name of Editorial Board/Study Section/Community Organization:  TCMS
Planning & Development Committee
Role/Status:  Member
Date(s) of Service:  2005

Name of Editorial Board/Study Section/Community Organization:  U.S.
Immigration & Naturalization Service
Role/Status:  Civil Surgeon for Resident Alien Exams
Date(s) of Service:  1988-90

Name of Editorial Board/Study Section/Community Organization:  Metropolitan
Tulsa Chamber of Commerce
Role/Status: Medical Ethics Seminar Planning Committee
Date(s) of Service:  1991

Name of Editorial Board/Study Section/Community Organization:  University of
Tulsa Board of Visitors
Role/Status: Department of Philosophy
Date(s) of Service:  1994

**INVITED
LECTURES:**

## Lectures and Workshops – National  Pediatrics:

Title of Presentation:  "Ethical Issues in Pediatric Patient Management"
Institution/Society Name:  Specialty Pediatrics for the Primary Care Physician
Symposium, North Texas Hospital for Children at Medical City Dallas; Dallas TX
Date of Presentation:2004 May 22

Title of Presentation:  "Managing IBD: It's Treatment and Complications"
Institution/Society Name: Foundation for Clinical Research in Inflammatory
Bowel Disease, Symposium, Tulsa, OK
Date of Presentation:  2003 April 1

Title of Presentation: "Ethical Issues in Drug Use and Research in Children"
Institution/Society Name: American Academy of Pediatrics, Annual Meeting, San
Francisco
Date of Presentation: 2001 October 22

Title of Presentation:  "Ethics in Resuscitation and Critical Care"
Institution/Society Name: Saint Francis Health System, 22nd Annual Adult &
Pediatric Trauma Symposium,
Saint Francis Hospital, Tulsa, OK

11

App. 655

Date of Presentation: 2001 September 26

Title of Presentation:  "Feeding the Brain-Injured: Medical & Ethical Issues"
Institution/Society Name: Brain Injury Association of Oklahoma & The
Department of Pediatrics, University of Oklahoma, College of Medicine, Tulsa,
OK
Date of Presentation: 2001 September 14

Title of Presentation: "Care of Children Who Die and Their Families"
Institution/Society Name: Institute of Medicine, National Academy of Sciences,
Washington, DC
Date of Presentation:  2001 September 8

Title of Presentation: "What Goes Down Must Come Up: But Is It Reflux?"
Institution/Society Name: Oklahoma Chapter, American Academy of Pediatrics,
Tulsa, OK
Date of Presentation: 2001 May 3

Title of Presentation: "Reflux: Diagnosis & Treatment"
Institution/Society Name: Southern Medical Association Symposium, Kiawah, SC
Date of Presentation: 2000 July 11-15

Title of Presentation:
Institution/Society Name: Southern Medical Association Symposium, Kiawah, SC
Date of Presentation: 2000 July 11-15

Title of Presentation: "Hot Topics in Pediatric GI for the Year 2000"
Institution/Society Name: Southern Medical Association Symposium, Kiawah, SC
Date of Presentation: 2000 July 11-15

Title of Presentation: "Pediatric Nutrition: Update 2000"
Institution/Society Name: Southern Medical Association Symposium, Kiawah, SC
Date of Presentation: 2000 July 11-15

Title of Presentation: "Pediatric Ethics"
Institution/Society Name: Southern Medical Association Symposium, Kiawah, SC
Date of Presentation: 2000 July 11-15

Title of Presentation: "Acute and Chronic Abdominal Pain,"
Institution/Society Name: Osler Institute Pediatric Review Course, Dallas, TX
Date of Presentation: 1996 May 27

Title of Presentation: "Jaundice in Children"
Institution/Society Name: Osler Institute Pediatric Review Course, Dallas, TX
Date of Presentation: 1996 May 27

Title of Presentation: "Diarrhea and Vomiting"
Institution/Society Name: Osler Institute Pediatric Review Course, Dallas, TX
Date of Presentation: 1996 May 27

12

Title of Presentation: "Gastrointestinal Problems in Childhood"
Institution/Society Name: Osler Institute Pediatric Review Course, Dallas, TX
Date of Presentation: 1996 May 27

Title of Presentation: "Cost Effective Approaches to Management of Pediatric GI Problems"
Institution/Society Name: Oklahoma State Medical Association Annual Meeting, Tulsa, OK
Date of Presentation: 1996 April 26

Title of Presentation: "Chronic Recurrent Abdominal Pain in Childhood"
Institution/Society Name: Oklahoma State Medical Association Annual Meeting, Tulsa, OK
Date of Presentation: 1996 April 26

Title of Presentation: "Constipation and Encopresis in Infants and Children"
Institution/Society Name: Oklahoma State Medical Association Annual Meeting, Tulsa, OK
Date of Presentation: 1996 April 26

Title of Presentation: "Outpatient Diarrhea in Infants and Children"
Institution/Society Name: Oklahoma State Medical Association Annual Meeting, Tulsa, OK
Date of Presentation: 1996 April 26

Title of Presentation: "Grand Rounds on Incontinence"
Institution/Society Name: Southern Medical Association Assembly,  Kansas City, MO
Date of Presentation: 1995 November 16

Title of Presentation: "Cases Studies in Pediatric Emergency"
Institution/Society Name: Southern Medical Association Assembly,  Kansas City, MO
Date of Presentation: 1995 November 16

Title of Presentation: "Multispecialty Grand Rounds"
Institution/Society Name: Southern Medical Association Assembly,  Kansas City, MO
Date of Presentation: 1995 November 16

Title of Presentation: "Cholesterol and Infant Nutrition"
Institution/Society Name: Southern Medical Association Symposium, Destin, FL
Date of Presentation: 1993 June 4

Title of Presentation: "Jaundice in Infancy" (with Dr. Daniel Plunket)
Institution/Society Name: Southern Medical Association Symposium, Destin, FL
Date of Presentation: 1993 June 4

13

Title of Presentation: "Office Management of Diarrhea"
Institution/Society Name: Southern Medical Association Symposium, Hot
Springs, VA
Date of Presentation: 1992 May 1

Title of Presentation: "GER-Evaluation and Treatment"
Institution/Society Name: Southern Medical Association Symposium, Hot
Springs, VA
Date of Presentation: 1992 May 1

Title of Presentation: "Nutrition and Lipids in the Pediatric Patient"
Institution/Society Name: Southern Medical Association Symposium, Hot
Springs, VA
Date of Presentation: 1992 May 1

Title of Presentation: "Gastrostomy Tubes: Medical and Ethical Aspects"
Institution/Society Name: Current Problems in Pediatric Therapy: Pediatric
Postgraduate Course XVIII,  Fountainhead Lodge, Checotah, OK
Date of Presentation: 1992 April 11-12

Title of Presentation: "Medical and Ethical Considerations in Enteral Therapy"
Institution/Society Name: Current Problems in Pediatric Therapy: Pediatric
Postgraduate Course XVIII,  Fountainhead Lodge, Checotah, OK
Date of Presentation: 1992 April 11-12

Title of Presentation: "Office Management of Chronic Liver Disease in Children"
Institution/Society Name: Current Problems in Pediatric Therapy: Pediatric
Postgraduate Course XVIII,  Fountainhead Lodge, Checotah, OK
Date of Presentation: 1992 April 11-12

Title of Presentation: Moderator: "Inflammatory Bowel Disease: Contributory and
Legal Factors, Diagnosis and Patient Management"
Institution/Society Name: CCFA Chapter Medical Symposium
Date of Presentation: 1992  February 22

Title of Presentation: "Feeding the Impaired Infant: Gastroenterology and Ethics
Interface"
Institution/Society Name: American Academy of Pediatrics Seminar: Caring for
Children in the 90s, Oklahoma City, OK
Date of Presentation: 1991 November 9

Title of Presentation: "Formula Intolerance in Infancy"
Institution/Society Name: Pediatric Society of Puerto Rico, San Juan
Date of Presentation: February 1991
Title of Presentation:  "New Treatment for Inflammatory Bowel Disease"
Institution/Society Name: Pediatric Society of Puerto Rico, San Juan
Date of Presentation: February 1991

Title of Presentation:  "Feeding the Impaired Infant: Gastroenterology and Ethics

14

Interface"
Institution/Society Name: Pediatric Society of Puerto Rico, San Juan
Date of Presentation: February 1991

Title of Presentation: "Chronic Diarrhea in Childhood"
Institution/Society Name: University of Arkansas, Family Practice Seminar, Ft. Smith, AR
Date of Presentation: 1988 November 16

Title of Presentation: "Peptic Ulcers in Childhood"
Institution/Society Name: University of Arkansas, Family Practice Seminar, Ft. Smith, AR
Date of Presentation: 1988 November 16

Title of Presentation:  "Avoiding Litigation: the GI Patient"
Institution/Society Name: Current Problems in Pediatric Therapy: Pediatric Postgraduate Course XIII,   Fountainhead Lodge, Checotah, OK
Date of Presentation:  1987 April 26

Title of Presentation: "NEC: Old and New Aspects"
Institution/Society Name: Horizons in Perinatology Seminar, Tulsa, OK
Date of Presentation: 1986 April 16

Title of Presentation: "IBD: Its Effect on the Family"
Institution/Society Name: National Foundation for Ileitis/Colitis-Oklahoma Chapter, Tulsa, OK
Date of Presentation: 1986 January 14

Title of Presentation: "Hepatitis: New Aspects of an Old Disease"
Institution/Society Name: AAP, APG, & SAM Regional Meeting: Adolescent and Ambulatory Pediatric Advances, Tulsa, OK
Date of Presentation: 1985 September

Title of Presentation: "Chronic Diarrhea and Reflux"
Institution/Society Name: American Academy of Family Physicians: Annual Oklahoma Meeting, Tulsa, OK,
Date of Presentation: 1984 April

Title of Presentation: "GI Problems in Infants and Children"
Institution/Society Name: Public Health Service: Indian Hospital Educational Seminars, Tulsa and Oklahoma City, OK
Date of Presentation: 1984 March

Title of Presentation: "Medical Writers Workshop"
Institution/Society Name: SSPR, New Orleans, LA
Date of Presentation: 1984 January

Title of Presentation: "Inflammatory Bowel Disease in Childhood"
Institution/Society Name: National Foundation for Ileitis and Colitis, Oklahoma

15

Chapter
Date of Presentation: 1983 May 16

Title of Presentation: "Shwachman Syndrome" with V.V. Michaels
Institution/Society Name: Birth Defects Annual Meeting, San Diego, CA
Date of Presentation: 1980 June 5

Title of Presentation: "Effect of D-Galactose on Fluid Loss in SBP Intolerance"
Institution/Society Name: Society for Pediatric Research Symposium, New York, NY
Date of Presentation: 1978 April

## Lectures and Workshops:  Regional (Oklahoma) Pediatrics:

Title of Presentation:  "C. Difficile—Nor More Dangerous Than We Thought"
Institution/Society Name: Pediatric Grand Rounds
Date of Presentation: November 18,  2008

Title of Presentation: "Eosinophilic Esophagitis" (It's not just Reflux any more)
Institution/Society Name: Oklahoma Allergy & Asthma Society. Philbrook Museum of Art
Date of Presentation: April 26, 2008

Title of Presentation: "Vomiting and GETD"
Institution/Society Name: Pediatric Residents Academic Afternoon, SFH, Education Center
Date of Presentation: April 23, 2008

Title of Presentation: "GI Bleeds"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman Center
Date of Presentation: March 26, 2008

Title of Presentation: "Is it ever justified to withdraw nutrition and hydration in pediatrics?"
Institution/Society Name: Pediatric Grand Rounds, Hillcrest HealthCare System, Tulsa
Date of Presentation: March 26, 2008

Title of Presentation: "Eosinophilic Esophagitis" (It's not just Reflux anymore)
Institution/Society Name: Pediatric Grand Rounds, Hillcrest HealthCare System, Tulsa
Date of Presentation: January 23, 2008

Title of Presentation: "Informed Consent"
Institution/Society Name: Pediatric Resident Academic Afternoon. Schusterman Center
Date of Presentation: September 12, 2007

Title of Presentation: "Pillow Angel" Ethics:  Surgery and Hormonal Treatment for Growth Attenuation : presented with James Coldwell, MD and David Jelley, MD
Institution/Society Name:  Pediatric Grand Rounds
Date of Presentation: September 11, 2007

Title of Presentation: "IBS Lecture"
Institution/Society Name: Pediatric Residents Afternoon, SFH Education Center
Date of Presentation: September 5, 2007

Title of Presentation: "Colon and EGD"
Institution/Society Name: Pediatric Residents Academic Afternoon, SFH Education Center
Date of Presentation: June 20, 2007

Title of Presentation: "Pediatric Gastroenterology Board Recertification Prep"
Institution/Society Name: Oklahoma Chapter American Academy of Pediatrics (OKAAP)
Date of Presentation: June 1, 2007

Title of Presentation: "Celiac Disease"
Institution/Society Name: Pediatric Residents Academic Afternoon, SFH Education Center
Date of Presentation: May 23, 2007

Title of Presentation: "Ethical Dimensions of Routine Clinical Encounters"
Institution/Society Name: Pediatric Residents Academic Afternoon, SFH Heart Center-B
Date of Presentation: April 18, 2007

Title of Presentation: "IBS in Childhood" and "Case Studies re: Abdominal Pain"
Institution/Society Name:   Family Practice Academic Afternoon, OU Family Practice
Date of Presentation: February 2007

Title of Presentation: "TPN"
Institution/Society Name: Pediatric Residents Academic Afternoon, SFU Education Center
Date of Presentation: February 28, 2007

Title of Presentation: "What's New in IBS in Kids"
Institution/Society Name: Pediatric Grand Rounds
Date of Presentation: October 24, 2006

Title of Presentation:  "Fluids and Electrolytes" and "Dehydration" (2 hours)
Institution/Society Name: Pediatric Residents Academic Afternoon, SFH Education Center

17

Date of Presentation: July 5, 2006

Title of Presentation: "Truthfulness with the Patient"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman Center
Date of Presentation: May 24, 2006

Title of Presentation: "Futility and Withdrawal of Care"
Institution/Society Name: Pediatric Residents Academic Afternoon, SFH Education Center
Date of Presentation: April 26, 2006

Title of Presentation: "Accessing Healthcare: The Obligation to Treat"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman Center
Date of Presentation: February 22, 2006

Title of Presentation: "Sterilization of Minors with Mental Disabilities"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman Center
Date of Presentation: December 16, 2005

Title of Presentation: "Medical Learning Curves and Issue of Consent"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman Center
Date of Presentation: October 26, 2005

Title of Presentation: "Witnessing Incompetent OR Inappropriate Behavior, Medical Misconduct"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman Center
Date of Presentation: August 24, 2005

Title of Presentation: "Fluids & Electrolytes in the Pediatric Patient"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman Center
Date of Presentation: August 24, 2005

Title of Presentation: "Consent Issues: The Need for Assent by Minors"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman Center
Date of Presentation: April 27, 2005

Title of Presentation: "The Schiavo Case—Three Aras of Ethical Concern"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman Center
Date of Presentation: March 20, 2005

18

Title of Presentation: "Truthfulness in the Physician-Patient Relationship"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman
Center
Date of Presentation: August 25, 2004

Title of Presentation: "Nutrition and Hydration for Infants and Children" and
"Fluids and Electrolytes Practice"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman
Health Sciences Center
Date of Presentation: July 21, 2004

Title of Presentation: "Children as Research Subjects"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman
Health Sciences Center
Date of Presentation: May 26, 2004

Title of Presentation: "Barfology (GERD and Vomiting)
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman
Health Sciences Center
Date of Presentation: April 14, 2004

Title of Presentation: "Celiac Disease"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman
Health Sciences Center
Date of Presentation: December 10, 2003

Title of Presentation: "Withdrawing Care:  The Adolescent Decision Maker"
Institution/Society Name:  Pediatric Residents Academic Afternoon, Schusterman
Health Sciences Center
Date of Presentation: November, 12, 2003

Title of Presentation: "Total Parenteral Nutrition"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman
Health Sciences Center
Date of Presentation: September 17, 2003

Title of Presentation: "Fluids and Electrolytes in Pediatric Practice" and
"Nutrition and Hydration for Infants and Children"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman
Health Sciences Center
Date of Presentation: July 9, 2003

Title of Presentation: "Problems in Diagnoses of Abdominal Pain"
Institution/Society Name: : Pediatric Residents Academic Afternoon,
Schusterman Health Sciences Center
Date of Presentation: February 12, 2003

Title of Presentation:  ""Nutrition & Hydration/Fluids & Electrolytes for Children"
Institution/Society Name: : Pediatric Residents Academic Afternoon, Schusterman Health Sciences Center
Date of Presentation:  September 26, 2002

Title of Presentation:  "Diet, Nutrition & Overweight Children"
Institution/Society Name: Mini-Med School for the Public, Schusterman Health Sciences Center
Date of Presentation: September 10, 2002

Title of Presentation: "Nutrition & Hydration  for Children" and "Fluids & Electrolytes for Children"
Institution/Society Name: : Pediatric Residents Academic Afternoon, Schusterman Health Sciences Center
Date of Presentation:  July 3, 2002

Title of Presentation: "GERD"
Institution/Society Name: Student  Academic Afternoon, Schusterman Health Sciences Center
Date of Presentation:  June 26, 2002

Title of Presentation: "Issues in Genetics"
Institution/Society Name: Student Academic Afternoon, Schusterman Health Sciences Center
Date of Presentation:  May 2, 2002

Title of Presentation: "Refusal of Consent by Minors"
Institution/Society Name: Student Academic Afternoon, Schusterman Center
Date of Presentation:  April 24, 2002

Title of Presentation: "Witnessing Incompetent or Inappropriate Behavior"
Institution/Society Name:   Pediatric Grand Rounds, Schusterman Health Sciences Center
Date of Presentation: February 27, 2002

Title of Presentation: ""Obligation to Treat"
Institution/Society Name: Pediatric Grand Rounds, Schusterman Health Sciences Center
Date of Presentation: January 30, 2002

Title of Presentation:   "Religious-Cultural Issues in Treatment"
Institution/Society Name:  Pediatric Grand Rounds, Schusterman Health Sciences Center
Date of Presentation:  October 24, 2001

Title of Presentation: "Childhood Leukemia:  Medical and Ethical Issues"
Institution/Society Name: Pediatric Grand Rounds, Schusterman Health Sciences

20

Center
Date of Presentation: October 2, 2001

Title of Presentation: "Lying for Patient:  Ethical Issues"
Institution/Society Name: Student Academic Afternoon Schusterman Health
Sciences Center
Date of Presentation: September 27, 2001

Title of Presentation:  "Nutrition and Hydration in Pediatric Care"  and "Fluids
and Electrolytes in Pediatric Care"
Institution/Society Name: Student Academic Afternoon. Schusterman Health
Sciences Center
Date of Presentation: September 13, 2001

Title of Presentation: "Confidentiality and the Mature Minor"
Institution/Society Name: St. Francis Hospital, Tulsa, Pediatric Academic
Afternoon
Date of Presentation: April 25, 2000

Title of Presentation: "Palliative Care in Pediatric Practice"
Institution/Society Name:  Grand Rounds, St. Francis Hospital
Date of Presentation: April 17, 2000

Title of Presentation: "Withdrawal of Support from Impaired Newborns
Institution/Society Name: Neonatal Conference, St. Francis Hospital
Date of Presentation: April 17, 2000

Title of Presentation: "Fluids &Electrolytes in Nutrition for Children"
Institution/Society Name:  Student Academic Afternoon, Schusterman Health
Sciences Center, Tulsa
Date of Presentation: November 16, 2000

Title of Presentation: "Fluids  & Electrolytes in Nutrition  for Children"
Institution/Society Name:  Academic Afternoon—Students, OU Health Sciences
Center, Tulsa
Date of Presentation:  September 8, 1999

Title of Presentation: "Formula Intolerance"
Institution/Society Name: Academic Afternoon-Family Medicine, OU Health
Sciences Center
Date of Presentation:  May 25, 1999

Title of Presentation:  "Pediatric Gastritis"
Institution/Society Name: Hillcrest HealthCare System, Tulsa, Pediatric
Conference

21

Date of Presentation: April 30, 1999

Title of Presentation:  "Gastro-esophageal Reflux"
Institution/Society Name:  Clinic Conference, OU Health Sciences Center, Tulsa
Date of Presentation: February 25, 1999

Title of Presentation: "Pancreatitis in Children"
Institution/Society Name: Grand Rounds, OU Health Sciences Center, Tulsa
Date of Presentation:  January 27, 1999

Title of Presentation:   "Fluids and Electrolytes"
Institution/Society Name:   Grand Rounds, OU Health Sciences Center, Tulsa
Date of Presentation:   September 24, 1998

Title of Presentation:  "Wilson's Disease:  Hepato-lenticular Degeneration"
Institution/Society Name:  Grand Rounds, Children's Medical Center
Date of Presentation: February 3, 1998

Title of Presentation: Grand Rounds
Institution/Society Name: St. Francis Hospital
Date of Presentation:  December 17, 1997

Title of Presentation: "Treatment of GI Problems in Children"
Institution/Society Name: Grand Rounds Tulsa Regional Medical Center
Date of Presentation: November 23, 1997

Title of Presentation: "Anatomic Lesions in the Liver"
Institution/Society Name:  Grand Rounds, St. Francis Hospital
Date of Presentation:  November 8, 1995

Title of Presentation:   "Gastroenterology Potpourri"
Institution/Society Name: Grand Rounds, Hillcrest Medical Center
Date of Presentation: May 23, 1995

Title of Presentation: "The Pediatrician and the Child with Serious Chronic
Illness"
Institution/Society Name: Grand Rounds—Panelist, St. John 's Medical Center
Date of Presentation:  November 9, 1993

Title of Presentation:  "Gastrointestinal Problems of Pediatric Clients in Primary
Care"
Institution/Society Name:  OUHSC and UCAT Family Nurse Practitioners, Tulsa
(& Oklahoma City by Video)
Date of Presentation: October 25, 1993

Title of Presentation: "Hepato Lenticular Degeneration (Wilson's Disease):
Presenting as Chronic Fatigue Syndrome" with Dr Coldwell
Institution/Society Name: Pediatric Grand Rounds, Children's Medical Center

22

Date of Presentation:  September 7, 1993

Title of Presentation: "Pediatric Gastroenterology for Nurses"
Institution/Society Name: University of Tulsa Nursing Students
Date of Presentation: May 11, 1993

Title of Presentation: "The Many Faces of E-B Virus Infection: with Drs. Sharma
& Plunkett
Institution/Society Name: Grand Rounds, St. Francis Hospital
Date of Presentation:  February 15, 1993

Title of Presentation: "IBD in Children and Adolescents"
Institution/Society Name: CCFA Guest Speaker, Tulsa Regional Medical Center
Date of Presentation:  December 10, 1991

Title of Presentation:  "Hepatitis ABCDs"
Institution/Society Name: Hillcrest Medical Center
Date of Presentation:  August 27, 1991

Title of Presentation: "Pediatric Hyperalimentation"
Institution/Society Name: Hillcrest Burn Unit
Date of Presentation:  September 14, 1988

Title of Presentation: "Childhood Peptic Disease"
Institution/Society Name: Surgery Grand Rounds
Date of Presentation: March 3, 1988

Title of Presentation:  "Nutrition in Childhood and Adolescence"
Institution/Society Name:  Oklahoma City, OK
Date of Presentation: February 25, 1988

Title of Presentation: "Adolescent Nutrition"
Institution/Society Name: Family Practice Research Grant Program
Date of Presentation: June 30, 1987

Title of Presentation: "Failure to Thrive"
Institution/Society Name:  Dietetic Intern's Program, St. Francis Hospital
Date of Presentation:  May 21, 1987

Title of Presentation:  "Symptomatic Chilaiditi's Syndrome"
Institution/Society Name: Research Day, OU College of Medicine, Tulsa
Date of Presentation:  May 15, 1987

Title of Presentation: "Management of Diarrhea/Constipation:
Institution/Society Name:  Family Practice Lecture Series
Date of Presentation: December 16, 1986

Title of Presentation:  "Organ Transplantation"
Institution/Society Name: Grand Rounds, Hillcrest Medical Center

23

Date of Presentation: November 25, 1986

Title of Presentation: "CPC"'
Institution/Society Name: Grand Rounds, St. Francis Hospital
Date of Presentation:  July 15, 1986

Title of Presentation: "Nutritional Aspects of Liver Disease"
Institution/Society Name:  St. Francis Hospital
Date of Presentation: March 18, 1986

Title of Presentation:  "Early Diagnosis of Inflammatory Bowel Disease"
Institution/Society Name: Family Practice Continuing Education Seminar, Tulsa
Date of Presentation:  March 1986

Title of Presentation: "Short Gut Syndrome"
Institution/Society Name: Intensive Care Lecture Series, St. Francis Hospital
Date of Presentation:  January 9, 1986

Title of Presentation: "Hirschsprung's Disease"
Institution/Society Name: Grand Rounds
Date of Presentation:  November 26, 1985

Title of Presentation: "Tyrosinemia in Tulsa" (Donovan and Mayes)
Institution/Society Name: Grand Rounds
Date of Presentation: September 10, 1985

Title of Presentation: "Gastroesophageal Reflux"
Institution/Society Name: Respiratory Diagnostic Services
Date of Presentation:  June 1985

Title of Presentation:  "Liver Transplantation"
Institution/Society Name: American Liver Foundation, Tulsa Chapter
Date of Presentation:  May 16, 1985

Title of Presentation: "The Gastroenterology Patient"
Institution/Society Name: Staff Dietitian Internship Lecture
Date of Presentation: December 1984

Title of Presentation: "Problems in Infant Nutrition"
Institution/Society Name: University of Oklahoma Reunion Seminar, OUHSC
Date of Presentation:  November 1, 1984

Title of Presentation: "Failure to Thrive"
Institution/Society Name:  Grand Rounds (Donovan, Barber and Jones)
Date of Presentation: September 4, 1984

Title of Presentation: "Infant Feeding"
Institution/Society Name:  WIC Nurses Program
Date of Presentation: August 31, 1984

24

Title of Presentation: "Crohn's Disease"
Institution/Society Name: Grand Rounds
Date of Presentation: July 10, 1984

Title of Presentation: "Development of the GI Tract"
Institution/Society Name: Tulsa District Dietetic Association
Date of Presentation: May 1984

Title of Presentation: "Encopresis"
Institution/Society Name: Grand Rounds
Date of Presentation: March 6, 1984

Title of Presentation: "Dietary Aspects of GI Disease"
Institution/Society Name: Tulsa Dietetics Internship Lecture Series
Date of Presentation: November 15, 1983

Title of Presentation: "Pancreatitis"
Institution/Society Name: Grand Rounds
Date of Presentation: August 23, 1983

Title of Presentation: "Cholestatic Jaundice"
Institution/Society Name: Grand Rounds
Date of Presentation: March 15, 1983

Title of Presentation:  "Pediatric Hyperalimentation"
Institution/Society Name: Grand Rounds "Donovan and Newmark"
Date of Presentation:  November 16, 1982

Title of Presentation:  "Chronic Inflammatory Bowel Disease and Growth Failure"
Institution/Society Name: Grand Rounds
Date of Presentation: August 24, 1982

Title of Presentation: "Wilson's Disease"
Institution/Society Name: Children's Medical Center Genetics Seminar
Date of Presentation:  April 1, 1982

## Lectures and Workshops:  National and Regional Bioethics:

Title of Presentation:  "The Role of Bioethics Committees"
Institution/Society Name: Oklahoma Bioethics Conference, OU College of Nursing, Oklahoma City, OK
Date of Presentation: November 7, 2008

Title of Presentation:   "Is It Ever Justified to Withdraw Nutrition and Hydration in Pediatrics?"

25

Institution/Society Name:  Pediatric Academic Societies:  Bioethics Interest
Group, Toronto, Canada
Date of Presentation: May 7, 2007

Title of Presentation:   "Ethical Theories and Decision-Making"
Institution/Society Name: Oklahoma Bioethics Conference, OU College of
Nursing, Oklahoma City, OK
Date of Presentation: November 9,2007

Title of Presentation:   "Early Onset Alzheimer's:  Ethical Issues"
Institution/Society Name: The New Face of Alzheimer's Symposium,
Renaissance Convention Center, Tulsa, OK
Date of Presentation: June 12, 2007

Title of Presentation:   "Recertification Review Made Easy"
Institution/Society Name: Oklahoma AAP, Tulsa, OK
Date of Presentation: June 1, 2007

Title of Presentation:   "End-of-Life vs. Ending Life:  A Transatlantic
Perspective"
Institution/Society Name:  European Association of Centres of Medical Ethics
(EACME), Leuven, Belgium
Date of Presentation:  September 29, 2006

Title of Presentation:   "End of Life Decisions in Oklahoma—Ethics and the Law"
Institution/Society Name:  Norman Regional Hospital, Education Center,
Norman, OK
Date of Presentation:  August 24, 2006

Title of Presentation:   "Truthfulness with the Patient"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman
Center
Date of Presentation: May 24, 2006

Title of Presentation:   "Co-Chair:  Ethical Dilemmas in Pediatric Research are
Universal:  But the Perspectives Vary Between Cultures and Countries
Institution/Society Name: 2nd World Congress of Pediatric Gastroenterology,
Hepatology and Nutrition, Paris, France
Date of Presentation: July 2, 2004

Title of Presentation:   "Ethical Issues in Pediatric Patient Management"
Institution/Society Name: Specialty Pediatrics for the Primary Care Physician
Symposium, North Texas Hospital for Children at Medical City, Dallas TX
Date of Presentation: May 22, 2004

Title of Presentation:   "An Introduction to Bioethics & Hospital Ethics

26

Committees"
Institution/Society Name: Physicians CME, Norman Regional Hospital, Norman, OK
Date of Presentation: May 7, 2004

Title of Presentation:  "Ethics 101:  An Introduction to Bioethics"
Institution/Society Name: Oklahoma Association for Healthcare Ethics Annual Symposium, Oklahoma City, OK
Date of Presentation: November 21, 2003

Title of Presentation:  "Clergy Participation in End-of-Life Decision Making?
Institution/Society Name:  St. John Medical Center Clergy Educational Symposium, Tulsa, OK
Date of Presentation: September 18, 2003

Title of Presentation:  "Informed Consent in Research"
Institution/Society Name: Oklahoma Chapter, ACRP, Schusterman Center
Date of Presentation:  September 9, 2003

Title of Presentation:  "Withholding Care:  Futility & Quality of Life"
Institution/Society Name:  Medical City Dallas Lonestar Hospital, Dallas TX
CME Ethics Lecture
Date of Presentation: April 29,2003

Title of Presentation:   Robert M. Bird Society and Friends of the Bird Library
Annual Guest Lecture Commentator:  "Human Cloning for Therapeutic Purposes: Why Not?"
Institution/Society Name: Robert M. Bird Library, Oklahoma City, OK
Date of Presentation:  March 15, 2003

Title of Presentation:   "Should Everyone be Above Average?"
Institution/Society Name: Ethics Center of Oklahoma State University and VA Employee Education System, Tulsa, OK
Date of Presentation: February 21, 2003
Title of Presentation: "Ethical Issues in Drug Use and Research in Children"
Institution/Society Name: American Academy of Pediatrics, Annual Meeting, San Francisco, CA
Date of Presentation: October 22, 2001

Title of Presentation:   "Ethics in Resuscitation and Critical Care"
Institution/Society Name: St. Francis Health System, 22nd Annual Adult & Pediatric Trauma Symposium, St. Francis Hospital, Tulsa, OK
Date of Presentation:  September 26, 2001

Title of Presentation:   "Feeding the Brain-injured:  Medical and Ethical Issues"
Institution/Society Name:  Brain Injury Association of Oklahoma & the Dept of Pediatrics, University of  Oklahoma College of Medicine, Tulsa, OK
Date of Presentation:  September 14, 2001

Title of Presentation:   "Care of Children Who Die and their Families"
Institution/Society Name:  Institute of Medicine, National Academy of Sciences, Washington, DC
Date of Presentation: September 8, 2001

Title of Presentation:   "Competency in Ethics"  and "Complex Issues at the End-of-Life"
Institution/Society Name: Medical City Dallas Hospital, Dallas, TX, CME Ethics Conference and Staff Lectures
Date of Presentation: April 30, 2001

Title of Presentation:   Orientation for New Ethics Committee Members
Institution/Society Name:  Oklahoma Alliance for Better Care of the Dying, Oklahoma City, Annual Conference
Date of Presentation: December 1, 2000

Title of Presentation:   "Pediatric Ethics"
Institution/Society Name: Southern Medical Association, Annual Meeting, Kiawah, SC
Date of Presentation: July 11-15, 2000

Title of Presentation:   "Conflicts in Care:  When Families & Physicians Disagree"
Institution/Society Name:  Medical City Dallas Hospital, Dallas, TX CME Ethics Conference and Staff Lectures
Date of Presentation: May 16, 2000

Title of Presentation:   "Ethical Concerns in Prolonging versus Withdrawing Medical Support from a Terminally Ill Neonate" and "Diabetes in Pregnancy:  the Perinatal Impact"
Institution/Society Name: St. John Medical Center, Tulsa, 20th Annual Regional Perinatal Seminar
Date of Presentation: April 14, 2000

Title of Presentation:   "Ethical Challenges of the Genetic Revolution"
Institution/Society Name:  The Power of Ideas:  A weekly television interview, Norman OK, Program Consultant
Date of Presentation: February 3, 2000

Title of Presentation:   "Educating Physician on End-of-Life"
Institution/Society Name: OSMA Headquarters EPEC Seminar, Oklahoma City, OK
Date of Presentation: June 18, 1999

Title of Presentation:   "Ethical Issues in the Care of the Disabled Child"
Institution/Society Name:  Cook Children' Hospital, Pediatric Grand Rounds, Ft. Worth, TX
Date of Presentation: June 1, 1999

28

Title of Presentation:   "Medical Decisions for Minors:  When Should Children Make the Call?"
Institution/Society Name: Medical City Dallas Hospital, Pediatric Grand Rounds, Dallas, TX
Date of Presentation: February 9, 1999

Title of Presentation:   "Implications of Oklahoma's New DNR Law"
Institution/Society Name: Stillwater Medical Center, Physicians' Grand Rounds & CME, Stillwater, OK
Date of Presentation: June 10, 1998

Title of Presentation:   "Ethics un End-of-Life Decision Making"
Institution/Society Name: Presbyterian Hospital, Physician-Assisted Suicide Conference, Oklahoma City, OK
Date of Presentation: May 7, 1998

Title of Presentation:   "Ethical Issues in the Care of the Disabled Child"
Institution/Society Name: Columbia Hospital at Medical City Dallas, Pediatric Grand Grounds, Dallas, TX
Date of Presentation: April 28,1998

Title of Presentation:   "Ethical Dilemmas in Neonatal/Pediatric Nursing"
Institution/Society Name: St. Francis Health System, Second Annual Neonatal/Pediatric Nursing Symposium, Tulsa, OK
Date of Presentation: March 18, 1998

Title of Presentation:   "Ethical and Public Interest Issues in Public Health Care Institutions"
Institution/Society Name: Leadership Oklahoma, Health Care/Arts and Humanities, Tulsa, OK
Date of Presentation: March 6, 1998

Title of Presentation:   "Ethical Care at the End-of-Life"
Institution/Society Name: Panelist:  "Developing a Community Policy on Futile Care" Oklahoma Association for Healthcare Ethics Annual Fall Program, Oklahoma City, OK
Date of Presentation: November 14, 1997

Title of Presentation:   "Physician Assisted Suicide"
Institution/Society Name: Oklahoma Association for Healthcare Ethics Regional Forum, Tulsa, OK Panelist
Date of Presentation: June 17, 1997

Title of Presentation:   "Physician Assisted Suicide"
Institution/Society Name: Oklahoma Association for Healthcare Ethics Regional Forum, Enid, OK
Date of Presentation: June 24, 1997

29

Title of Presentation:   "Professional Ethics and Professionalism"
Institution/Society Name: IME, AAMC Group on Educational Affairs, San
Francisco, CA Abstract Presented
Date of Presentation: November 6-12, 1996

Title of Presentation:   Panel:  Ethical Issues I Genetics:  Therapy and Information
Management
Institution/Society Name: American Academy of Pediatrics Annual Meeting,
Boston, MA
Date of Presentation: October 27, 1996

Title of Presentation:   "Living Wills" (Moderator)
Institution/Society Name:  Oklahoma Association for Home Care Symposium on
Changing Times:  Future Trends in Homer Health Social Work, Tulsa, OK
Date of Presentation: May 14, 1996

Title of Presentation:   Moderator: "Bedside Bioethical Decision-making"
Institution/Society Name: American Academy of Pediatrics Spring Meeting,
Chicago, IL
Date of Presentation: April 13, 1996

Title of Presentation:   "Last Acts:  Care and Caring at the End-of-Life"
Institution/Society Name:  Robert Wood Johnson Foundation Conference,
Washington, DC
Date of Presentation: March 12, 1996

Title of Presentation:   "Conflict at the Cribside:  Ethical Dilemmas in the
Newborn"(Moderator)
Institution/Society Name:  American Academy of Pediatrics Annual Meeting, San
Francisco, CA
Date of Presentation:  October 14, 1995

Title of Presentation:   "Ethics in Pediatrics"
Institution/Society Name: Regional Symposium of Care of the Seriously Ill Child,
St. Francis Medical Center, Tulsa, OK
Date of Presentation: May 20,1995

Title of Presentation:   "Interfaith Leadership in Bioethics" (presenter and
moderator)
Institution/Society Name:  14th National Workshop on Christian-Jewish Relations,
Tulsa, OK
Date of Presentation: November 9, 1994

Title of Presentation:   "Honoring the Patient's Best Interest"
Institution/Society Name: Oklahoma State University, State Conference on
Aging:  Ethical Issues of Health Care, St. Francis Medical Center, Tulsa, OK
Date of Presentation: October 22, 1994

Title of Presentation:  "Ethical Issues in Pediatric Neurogastroenterology"
Institution/Society Name:  Symposium on Pediatric Neurogastroenterology,
Baptist Medical Center, Oklahoma City, OK
Date of Presentation:  August 20, 1994

Title of Presentation:   "Bioethics:  the Challenge of Today"
Institution/Society Name: OU Health Sciences Center, Alumni Days Program,
Oklahoma City, OK
Date of Presentation: May 1, 1993

Title of Presentation:   "Allocation of Care"
Institution/Society Name: Ethics Conference, Hastings Indian Hospital,
Tahlequah, OK
Date of Presentation: March 30, 1993

Title of Presentation:   "Baby Doe Revisited"
Institution/Society Name:  SMA Symposium, Destin, FL
Date of Presentation: June 4, 1993

Title of Presentation:   "The Micropreemie:  How Small is Too Small? And "21st
Century Neonatology:  Will Bioscience Outstrip Bioethics"
Institution/Society Name: Texas Perinatal Association Conference, Corpus
Christi, TX
Date of Presentation:  September 24-26, 1992

Title of Presentation:   "Gastrostomy Tubes:  Medical and Ethical Aspects" and
"Medical and Ethical Considerations in Enteral Therapy"
Institution/Society Name: Current Problems in Pediatrics: Pediatric Postgraduate
Course XVIII, Fountainhead Lodge, Checotah, OK
Date of Presentation: April 11, 1992

Title of Presentation:   "Feeding the Impaired Infant, Gastroenterology and Ethics
Interface"
Institution/Society Name: American Academy of Pediatrics Forum Caring for
Children in the 90s,Oklahoma City, OK
Date of Presentation: November 9, 1990

Title of Presentation:   "Living Willis and Advance Directives"
Institution/Society Name:  St Joseph's Hospital Conference, Ponca City, OK
Date of Presentation:  November 1991

Title of Presentation:   "Bioethics and Critical Care"  (workshop participants)
Institution/Society Name:  American Academy of Pediatrics, New Orleans, LA
Date of Presentation:  October 28, 1991

Title of Presentation:   "American Way of Dying" (participant)
Institution/Society Name: CHA Fifth Annual CHA Colloquium, St. Louis MO.
Date of Presentation:  May 1991

Title of Presentation:   Kennedy Institute of Ethics, Visiting Scholar
Institution/Society Name:  Georgetown University, Washington, DC
Date of Presentation:  1988-89

Title of Presentation:   Kennedy Institute of Ethics, XIV Intensive Bioethics
Course, participant
Institution/Society Name: Georgetown University, Washington, DC
Date of Presentation: June 1988

Title of Presentation:   Ethical Issues in Medicine Symposium (contributing
participant)
Institution/Society Name: Notre Dame IN
Date of Presentation: March 1988

Title of Presentation:  "Ethical and Social Concerns"
Institution/Society Name: New Horizons in Perinatology Regional Meeting
Date of Presentation:  October 1987

Title of Presentation:   "Ethical Issues in Medical Practice"
Institution/Society Name: Notre Dame, IN
Date of Presentation: March 1987

Title of Presentation:   "Organ Transplantation"
Institution/Society Name: CBS National Television Program
Date of Presentation: December 17, 1986

## Local (Oklahoma) Invited Presentations:  Bioethics

Title of Presentation: "Suicide by Advance Directive"
Institution/Society Name: OU Emergency Medicine Academic Session
Date of Presentation:  Nov. 19, 2009

Title of Presentation:   "Sound Ethical Arguments in Medicine"
Institution/Society Name: OU Peds Academic Session
Date of Presentation: Sept. 30, 2009

Title of Presentation:   "South Ethical Arguments in Medicine"
Institution/Society Name: OU Surgery Academic Session
Date of Presentation: Sept. 16, 2009

Title of Presentation:   "Sound Ethical Arguments in Medicine
Institution/Society Name: University of Oklahoma Family Medicine Academic
Session, Tulsa, OK
Date of Presentation: Sept. 15, 2009

Title of Presentation:   "The Physician and the Right of Conscience"
Institution/Society Name: University of Oklahoma OB/GYN AA, Schusterman

Learning Center
Date of Presentation: June 4, 2009

Title of Presentation:   "Sterilization of Minors with Mental Disabilities"
Institution/Society Name:  University of Oklahoma OB/GYN AA, Schusterman
Campus
Date of Presentation: February 5, 2009

Title of Presentation:   "The Faith Factor:  How Does Religion or Spirituality
Affect Medical Care?" (Meixel primary/Donovan secondary)
Institution/Society Name: Bioethics Dean's Conference, Schusterman Learning
Center
Date of Presentation: January 29, 2009

Title of Presentation:   "Ethical Decision-Making"
Institution/Society Name: Clinical Ethics Course (Norman) Spring Semester:
Ethical Decision-Making, Basic Sciences Ed Bldg. West Lecture Hall
Date of Presentation: January 21, 2009

Title of Presentation: "Sterilization of Minors with Developmental Disabilities"
Institution/Society Name:  Bioethics Dean's Conference, Schusterman Learning
Center
Date of Presentation: January 14, 2009

Title of Presentation:   "When is a Patient Dead? And Why Does it Matter?
(Brain Death)
Institution/Society Name:  Bioethics Dean's Conference, Schusterman Learning
Center
Date of Presentation: November 20, 2008

Title of Presentation:   "When is a Patient Dead? And Why does it Matter?"
(Brain Death)
Institution/Society Name:  OU Peds Academic Session, SFH Heart Center
Date of Presentation:  November 19, 2008

Title of Presentation:   "Ethics & Psychiatry—Confidentiality"
Institution/Society Name: OU Psych Academic Afternoon, Schusterman Center
Date of Presentation:  November 12, 2008

Title of Presentation:   "Autonomy"
Institution/Society Name: OU Psych Academic Afternoon, Schusterman Center
Date of Presentation:  November 5, 2008

Title of Presentation:   "End-of-Life Decisions—Ethics and the Law"
Institution/Society Name: OU Surgery Grand Rounds, Schusterman Center
Date of Presentation:  October 29, 2008

Title of Presentation:   "Introduction to Bioethics—Ethics 101"
Institution/Society Name: OU Psych Academic Afternoon, Schusterman Center
Date of Presentation: October 29, 2008

Title of Presentation:   "The Maternal-Fetal Relationship"
Institution/Society Name: University of Oklahoma OB/GYN Academic
Afternoon, Hillcrest
Date of Presentation: October 29, 2008

Title of Presentation:   "End of Life Decisions—Ethics and the Law"
Institution/Society Name:  University of Oklahoma Family Medicine AA, Family
Medicine, Tulsa
Date of Presentation: August 19, 2008

Title of Presentation:   "End of Life Decisions—Ethics and the Law"
Institution/Society Name:  University of Oklahoma OB/GYN Academic
Afternoon, Hillcrest
Date of Presentation: August 7, 2008

Title of Presentation:   "Communicating Bad News:  For Physicians and
Healthcare Professionals"
Institution/Society Name: St. Francis Hospital, EPEC Project, SFH Education
Center
Date of Presentation: July 16, 2008

Title of Presentation:   "Subtle and Not-so-Subtle Breaches in Confidentiality"
Institution/Society Name:  University of Oklahoma OB/GYN Academic
Afternoon, Hillcrest
Date of Presentation: June 12, 2008

Title of Presentation:  "Subtle and Not-so-Subtle Breaches in Confidentiality"
Institution/Society Name: University of Oklahoma Family Medicine AA, Family
Medicine, Tulsa
Date of Presentation: May 27, 2008

Title of Presentation:   "Physician-Industry Relationships:  Will you Respect me
in the Morning?"
Institution/Society Name: University of Oklahoma Internal Medicine Grand
Rounds
Date of Presentation: April 30, 2008

Title of Presentation:   "Surrogate Decision-Making in Pediatrics"  John's Story
Institution/Society Name: OU Peds Academic Session, SFH Heart Center
Date of Presentation:  April 23, 2008

Title of Presentation:  "Accessing Healthcare:  The Obligation to Treat"
Institution/Society Name:  University of Oklahoma OB/GYN Academic
Afternoon, Hillcrest
Date of Presentation: April 17, 2008

34

Title of Presentation:   "Informed Consent"
Institution/Society Name: University of Oklahoma Surgery Lecture
Date of Presentation: April 16, 2008

Title of Presentation:   "Nutrition, Hydration and the Catholic Patient—Terri
Schiavo in Perspective"
Institution/Society Name:  Diocese of Tulsa, Sts. Peter and Paul Parish
Date of Presentation:  March 31, 2008

Title of Presentation:   "Is is ever justified to withdraw nutrition & hydration in
pediatrics?"
Institution/Society Name:  University of Oklahoma Pediatrics Academic
Afternoon, SFH
Date of Presentation: March 26, 2008

Title of Presentation:   "Physician Assisted Suicide and Euthanasia"
Institution/Society Name: OSU/CHS Medical Ethics Grand Rounds
Date of Presentation: January 29, 2008

Title of Presentation:   "Ethical Theories and Decision-Making"
Institution/Society Name: University of Oklahoma, Norman, Patients, Physicians
and Society:  Clinical Ethics
Date of Presentation: January 23, 2008

Title of Presentation:   "Witnessing Incompetent, Inappropriate or Unethical
Behavior"
Institution/Society Name:  OU OB/BYN Academic Session, Hillcrest
Date of Presentation:  December 6, 2007

Title of Presentation:   "Ethical Theories and Decision-Making"
Institution/Society Name: University of Oklahoma, Tulsa College of Nursing
Date of Presentation:  November 9, 2007

Title of Presentation:   "Informed Consent"
Institution/Society Name: OU OB/GYN Academic Afternoon, Hillcrest
Date of Presentation:  October 18, 2007

Title of Presentation:   "Informed Consent"
Institution/Society Name: OU Pediatric Residents Academic Afternoon,
Schusterman Center
Date of Presentation: September 12, 2007

Title of Presentation:   "Pillow Angel" Surgery & Hormonal Treatment for
Growth Attenuation
Institution/Society Name: OU Pediatric Grand Rounds, SJMC
Date of Presentation: Sept. 11, 2007

Title of Presentation:   "Re-Introduction to Ethics"
Institution/Society Name: Bioethics Dean's Conference, Schusterman Center
Date of Presentation: August 30, 2007

Title of Presentation:   "Communicating Bad News"
Institution/Society Name: OU Pediatric Residents Academic Afternoon, Schusterman Center
Date of Presentation: June 27, 2007

Title of Presentation:   "Introduction to Bioethics"
Institution/Society Name:  OU Resident Orientation
Date of Presentation: June 26, 2007

Title of Presentation:   "Introduction to Bioethics"
Institution/Society Name: OU Resident Orientation
Date of Presentation: June 26, 2007

Title of Presentation:   "Professionalism and Gifts to Physicians from Pharmaceutical Industry"
Institution/Society Name:  OU OB/GYN Academic Afternoon, Hillcrest
Date of Presentation: May 3, 2007

Title of Presentation:   "Ethical Dimension of Routine Clinical Encounters"
Institution/Society Name:  OU Peds Academic Afternoon, SFH Heart Center
Date of Presentation: April 18, 2007

Title of Presentation:   "Ethics Part II, Case Discussions"
Institution/Society Name:  OU Internal Medicine Grand Rounds, SJMC
Date of Presentation: April 11, 2007

Title of Presentation:   "What if…?  Re:  Sex Selection
Institution/Society Name: Bioethics Dean's Conference, Schusterman Center
Date of Presentation: March 29, 2007

Title of Presentation:   "Organ Transplantation in Obstetrics and Gynecology"
Institution/Society Name:  OU OB/GYN Academic Afternoon, Hillcrest
Date of Presentation:  March 22, 2007

Title of Presentation:   "ACOG New Recommendations for Down Syndrome Call for Screening of All Pregnant Women"
Institution/Society Name: OU OB/GYN Academic Afternoon, Hillcrest
Date of Presentation:  March 1, 2007

Title of Presentation:   "Feeding the Brain Injured"
Institution/Society Name: OU Peds Academic Afternoon, SFH
Date of Presentation: February 21, 2007

Title of Presentation:  "Refusal of Treatment vs. Assisted Suicide—A Valid
Distinction?"
Institution/Society Name: Oklahoma State University College of Medicine,
OSUCOM, Tulsa
Date of Presentation: February 9, 2007

Title of Presentation:  "Ethics 101 – Introduction to Bioethics"
Institution/Society Name: OU Family Practice Academic Afternoon, Family
Medicine
Date of Presentation: February 6, 2007

Title of Presentation:  "Ethical Issues in Family Medicine"
Institution/Society Name: Bioethics Dean's Conference, Schusterman Center
Date of Presentation: January 25, 2007

Title of Presentation:  "Ethics of Maternal-Fetal Interventions"
Institution/Society Name: OU OB/GYN Academic Afternoon, Hillcrest
Date of Presentation:  January 18, 2007
Title of Presentation:  "Confidentiality"
Institution/Society Name: OU Psych Academic Afternoon, Schusterman Center
Date of Presentation:  Nov. 8, 2006

Title of Presentation:  "Autonomy"
Institution/Society Name: OU Psych Academic Afternoon, Schusterman Center
Date of Presentation:  Nov. 1, 2006

Title of Presentation:  "The Good Doctor"
Institution/Society Name: OU OB/GYN Academic Afternoon, Hillcrest
Date of Presentation:  October 27, 2006

Title of Presentation:  "Refusal of Treatment vs. Assisted Suicide—A Valid
Distinction?"
Institution/Society Name: Bioethics Dean's Conference, Schusterman Center
Date of Presentation: Oct. 26, 2006

Title of Presentation:  "The Question:  If she/he were your child, what would you
do?"
Institution/Society Name: OU Peds Academic Afternoon, SFH
Date of Presentation: Oct. 25, 2006

Title of Presentation:  "Ethics 101:  An Introduction to Bioethics"
Institution/Society Name: OU Psych Academic Afternoon, Schusterman Center
Date of Presentation: Oct. 18, 2006

Title of Presentation:  "End-of-Life Decisions in Oklahoma—Ethics and the
Law"
Institution/Society Name:  Norman Regional Hospital, Education Center,
Norman, OK
Date of Presentation:  August 24, 2006

37

Title of Presentation:   "Re-Introduction to Ethics" and "The Good Doctor"
Institution/Society Name:  Bioethics Dean's Conference, Schusterman Center
Date of Presentation: August 3, 2006

Title of Presentation:   "Truthfulness with the Patient"
Institution/Society Name: OU Peds Academic Afternoon, SFH
Date of Presentation: May 24, 2006

Title of Presentation:   "Assessing Healthcare:  The Obligation to Treat"
Institution/Society Name:  OU Peds Academic Afternoon, SFH
Date of Presentation:  Feb. 22, 2006

Title of Presentation:   "End-of-Life Decision-Making"
Institution/Society Name: OU OB'GYN Academic Afternoon, Hillcrest
Date of Presentation:  Feb. 17, 2006

Title of Presentation:   "Sterilization of Minors with Mental Disabilities"
Institution/Society Name:  Peds Academic Afternoon, SFH
Date of Presentation:  Dec. 16, 2005

Title of Presentation:   "Confidentiality & Professional Obligation of Students"
Institution/Society Name:  Residents/Students, Schusterman Center
Date of Presentation:  Oct. 27, 2005

Title of Presentation:   "Medical Learning Curves and Issue of Consent"
Institution/Society Name:  Peds Academic Afternoon, SFH
Date of Presentation:  Oct. 26, 2005

Title of Presentation:   "Surrogate Decision-Making" and "Intro to Ethics"
Institution/Society Name:  Residents/Students, Schusterman Center
Date of Presentation:  Sept. 29, 2005

Title of Presentation:   "End-of-Life Decision-Making"
Institution/Society Name: St. John Medical Center Symposium, ST. John Medical
Center
Date of Presentation: Sept. 22, 2005

Title of Presentation:   "Witnessing Incompetence OR Inappropriate Behavior"
Institution/Society Name:  Peds Academic Afternoon, SFH
Date of Presentation:  Aug. 24, 2005

Title of Presentation:   "Sterilization of Women with Mental Disabilities"
Institution/Society Name:  OB/GN Academic Afternoon, Hillcrest Hospital
Date of Presentation:  May 20, 2005

Title of Presentation:  "Consent Issues: the Need for Assent by Minors"
Institution/Society Name: Residents/Students, Schusterman Center
Date of Presentation:  April 27, 2005

38

Title of Presentation:   "Futility and Goals of Treatment"

Institution/Society Name:  OB/GYN Academic Afternoon, Hillcrest Hospital
Date of Presentation:  April 22, 2005

Title of Presentation:  "The Schiavo Case:  Three Areas of Ethical Concern"
Institution/Society Name:  Residents/Students, Schusterman Center
Date of Presentation:  March 20, 2005

Title of Presentation:  "End of Life Decision"
Institution/Society Name:  Tulsa County Medical Society, Invited
Physicians/TCMS Members
Date of Presentation: March 16, 2005

Title of Presentation:   "Ethical Decision Making"
Institution/Society Name: OB/GYN Academic Afternoon, Hillcrest Hospital
Date of Presentation:  February 17, 2005

Title of Presentation:   "Religious/Cultural Conflicts in Treatment Decisions"
Institution/Society Name:  Residents/Students, Schusterman Center
Date of Presentation: October 27, 2004

Title of Presentation:  "Confidentiality in Psychiatric Practice"
Institution/Society Name: Psychiatry Residents Schusterman Center
Date of Presentation: October 27, 2004

Title of Presentation:   "Autonomy in Psychiatric Practice"
Institution/Society Name:  Psychiatry Residents, Schusterman Center
Date of Presentation:  October 20, 2004

Title of Presentation:   End-of-Life Decision Making with Church Family
Members"
Institution/Society Name:  St. John 2nd Annual Clergy Symposium, St. John
Medical Center
Date of Presentation:  Sept. 30, 2004

Title of Presentation:   "Introduction to Medical Ethics in Psychiatric Practice"
Institution/Society Name:  Psychiatric Residents, Schusterman Center
Date of Presentation:  Sept. 23, 2004

Title of Presentation:   "Truthfulness in the Physician-Patient Relationship"
Institution/Society Name: Pediatric Residents Academic Afternoon, Schusterman
Center
Date of Presentation:  August 25, 2004

Title of Presentation:   "Children as Research Subjects"
Institution/Society Name:  Pediatric Residents Academic Afternoon, Schusterman
Center

39

Date of Presentation:  May 26, 2004

Title of Presentation: "Ethical and Religious Aspects of Suicide"
Institution/Society Name: Seger Seminar on Depression, Schusterman Center
Date of Presentation:  May 14, 2004

Title of Presentation:  "Ethical Issues in Organ Transplantation and Allocation"
Institution/Society Name: Student Academic Afternoon, Schusterman Center
Date of Presentation:  April 22, 2004

Title of Presentation:  "Ethical Decision Making in Obstetrics and Gynecology"
Institution/Society Name:  OB/GYN Residents, Hillcrest Medical Center
Date of Presentation:  April 16, 2004

Title of Presentation:  "Sticky Situations"
Institution/Society Name:  Student Academic Afternoon, Schusterman Center
Date of Presentation: March 25, 2004

Title of Presentation:  "Professional Ethics and Professionalism"
Institution/Society Name:  Department of Radiation Technology,  Health
Sciences Center, Oklahoma City, OK
Date of Presentation:  March 3, 2004

Title of Presentation:  "Reproductive Rights—The Unconscious Patient"
Institution/Society Name: Student Academic Afternoon, Schusterman Center
Date of Presentation: February 19, 2004

Title of Presentation:  "Maternal-Fetal Conflict—The Unconscious Patient"
Institution/Society Name:  OB/GYN Residents,  Hillcrest Medical Center
Date of Presentation:  February13, 2004

Title of Presentation: "Confidentiality"  (panelist)
Institution/Society Name: Medical Students II, Oklahoma
City College of  Medicine
Date of Presentation:  January 28, 2004

Title of Presentation:  "Dealing with Difficult Patients"
Institution/Society Name:  Pediatric Residents Academic Afternoon
Date of Presentation: January 28, 2004

Title of Presentation:  "Ethical Issues in Pediatric Practice"
Institution/Society Name:   Family Practice Residents Academic Afternoon
Date of Presentation:  January 20, 2004

Title of Presentation:  "Pain Management in Geriatrics" (moderator)
Institution/Society Name:  Student Academic Afternoon, Schusterman Center
Date of Presentation:  January 15, 2004

40

Title of Presentation:   "Ethical Issues in Genetics"
Institution/Society Name:   Student Academic Afternoon, Schusterman Center
Date of Presentation:  January 8, 2004

Title of Presentation:   "Professional Issues and Professionalism"
Institution/Society Name:  Medical Students II, Oklahoma City College of
Medicine
Date of Presentation :  January 7, 2004

Title of Presentation:   "The Case of Terri Schiavo:  Who Makes the Decision"
Institution/Society Name:  Student Academic Afternoon, Schusterman Center
Date of Presentation:  November 20, 2003

Title of Presentation:   "Gifts to Physicians from Industry"
Institution/Society Name:  Student Academic Afternoon, Schusterman Center
Date of Presentation:  Oct. 2, 2003

Title of Presentation:   "Clergy Participation in End-of-Life Decision Making with
Church Family Members"
Institution/Society Name: Local Clergy/Ministerial Seminar, St. John Medical
Center
Date of Presentation:  Sept. 18, 2003

Title of Presentation:   "Ethical Issues in Withholding Care:  Futility and Quality
of Life"
Institution/Society Name:  Surgery Resident Conference, St. John Medical Center
Date of Presentation:  Sept. 17, 2003

Title of Presentation:   "Gifts to Physicians from Industry"
Institution/Society Name:   Pediatric Residents Conference, Schusterman Center
Date of Presentation:  Sept. 17, 2003

Title of Presentation:   "Gifts to Physicians from Industry"
Institution/Society Name:   All Resident Conference, Schusterman Center
Date of Presentation:  Sept. 9, 2003

Title of Presentation:   "Gifts to Physicians from Industry"
Institution/Society Name:  All Resident Conference, Schusterman Center
Date of  Presentation:  August 27, 2003

Title of Presentation:   "Parental Request for Inappropriate Treatment"
Institution/Society Name: Pediatric  Academic Afternoon, Schusterman Center
Date of Presentation:  August 13, 2003

Title of Presentation:   "Ethics of Parental Refusal of Immunization"
Institution/Society Name:  Pediatric Academic Afternoon, Schusterman Center
Date of Presentation: June 25, 2003

41

Title of Presentation:   "Withholding Care:  Futility and Quality of Life"
Institution/Society Name:  IM Grand Rounds, St. John Medical Center, Tulsa
Date of Presentation:  May 7, 2003

Title of Presentation:   "Futility Issues in Pediatric Care"
Institution/Society Name:   Pediatric Academic Afternoon, Schusterman Center
Date of Presentation:  April 30, 2003

Title of Presentation:   "DNR in the Endoscopy Suite"
Institution/Society Name:  NEOS GI Nurses & Associates, St. Francis Health
System, Tulsa, OK
Date of Presentation:  April 26, 2003

Title of Presentation:   "Abortion:  Safe, Legal and Rare?"
Institution/Society Name:   Students Academic Afternoon, Schusterman Center
Date of Presentation:  March 13, 2003

Title of Presentation:   "Ethical, Legal & Social Implications of Genetics"
Institution/Society Name:  Student Academic Afternoon, Schusterman  Center
Date of Presentation:  February 20, 2003

Title of Presentation:   "Ethical Issues in Confidentiality"
Institution/Society Name: Student Academic Afternoon, Schusterman Center
Date of Presentation:  January 30, 2003

Title of Presentation:   "Introduction to Ethical Decision Making"
Institution/Society Name: Cascia Hall High School Students, Schusterman Center
Date of Presentation:  January 9, 2003

Title of Presentation:   "Ethical Decision Making"
Institution/Society Name: Medical Students, HSC Oklahoma City
Date of Presentation:  January 8, 2003

Title of Presentation:   "Subtle Breaches of Confidentiality"
Institution/Society Name:  Pediatric Academic Afternoon, Schusterman Center
Date of Presentation:  December 18, 2002

Title of Presentation:   "Obtaining Truly Informed Consent"
Institution/Society Name: Student Academic Afternoon, Schusterman Center
Date of Presentation:  December 12, 3002

Title of Presentation:   "Conflicts Between Clinicians:  Student Abuse"
Institution/Society Name: Student Academic Afternoon, Schusterman Center
Date of Presentation:  November 14, 2002

Title of Presentation:   "The Ethics of Deinstitutionalism"
Institution/Society Name: Psychiatry Academic Afternoon, Schusterman Center
Date of Presentation:  November 6, 2002

42

Title of Presentation:   "Training Issues/Learning Procedures"
Institution/Society Name: Pediatric Academic Afternoon, Schusterman Center
Date of Presentation:  October 30, 2002

Title of Presentation:   "Patient Autonomy & Competency"
Institution/Society Name: Psychiatry Academic Afternoon, Schusterman Center
Date of Presentation: October 23, 2002

Title of Presentation:   "Ethical Dimensions of Informed Consent"
Institution/Society Name:  OB/GYN Academic Morning, Schusterman Center
Date of Presentation: October 17, 2002

Title of Presentation:   "End-of-Life Issues"
Institution/Society Name:  Student Academic Afternoon, Schusterman Center
Date of Presentation:  October 27, 2002

Title of Presentation:  "Professional Boundaries"
Institution/Society Name:  Psychiatry Academic Afternoon, Schusterman Center
Date of Presentation: October 16, 2002

Title of Presentation:   "Responsibility to the Non-Compliant Patient"
Institution/Society Name:  Internal Medicine Grand Rounds, St. John Medical
Center
Date of Presentation:  October 1, 2002

Title of Presentation:   "Advance Directives"
Institution/Society Name: OB/GYN Academic Morning, Schusterman Center
Date of Presentation:  September 19, 2002

Title of Presentation:   "When Parents Refuse Consent"
Institution/Society Name: Pediatric Academic Afternoon, Schusterman Center
Date of Presentation: August 28, 2002

Title of Presentation:  "Doctor-Patient Relationship:  The Noncompliant Patient"
Institution/Society Name:  Surgery Grand Rounds, Schusterman Center
Date of Presentation:  August 27, 2002

Title of Presentation:   "The Role of Ethics Committees"
Institution/Society Name: Pediatric Academic Afternoon, Schusterman Center
Date of Presentation: July 24, 2002

Title of Presentation:   "Confidentiality with Adolescents"
Institution/Society Name:  Pediatric Academic Afternoon, Schusterman Center
Date of Presentation: June 26, 2002

Title of Presentation:   "Refusal of Consent by Minors"
Institution/Society Name:  Pediatric Academic Afternoon, Schusterman Center
Date of Presentation:  April 24, 2002

43

Title of Presentation:   "Medical-Legal Issues in Health Care"
Institution/Society Name: Medical Students, HSC Oklahoma City
Date of Presentation:  March 6, 2002

Title of Presentation:   "Witnessing Incompetent or Inappropriate Behavior"
Institution/Society Name:  Pediatric Academic Afternoon, Schusterman Center
Date of Presentation:  February 27, 2002

Title of Presentation:  Economic Issues in Healthcare"
Institution/Society Name: Medical Students, HSC Oklahoma City
Date of Presentation:  February 27, 2002

Title of Presentation:   "End-of-Life Issues in Cancer Care"
Institution/Society Name: Mini-Med School, Schusterman Center
Date of Presentation: February 26, 2002

Title of Presentation:  "Boundaries in Physician-Patient Relations"
Institution/Society Name: Student Academic Afternoon, Schusterman Center
Date of Presentation: February 14, 2002

Title of Presentation:   "Palliative Care Ethics"
Institution/Society Name: Medical Students, HSC Oklahoma City
Date of Presentation: January 23, 2002

Title of Presentation:   "Brain Death, Pregnancy and Post-Motherhood"
Institution/Society Name:  Student Academic Afternoon, Schusterman Center
Date of Presentation:  January 17, 2002

Title of Presentation:   "Introduction to Professional Ethics"
Institution/Society Name: Medical Students, HSC Oklahoma City
Date of Presentation: January 9, 2002

Title of Presentation:  "Stem Cell Research:  What's Involved?"
Institution/Society Name: Congregational Meeting, Hope Unitarian Church
Date of Presentation: December 9, 2001

Title of Presentation:   "The Ethics of Effective Pain Management"
Institution/Society Name:  Student Academic Afternoon, Schusterman Center
Date of Presentation:  December 6, 2001

Title of Presentation:   "Ethical Issues in Death & Dying"
Institution/Society Name: Student Body, Bishop Kelley High School
Date of Presentation:  November 27, 2001

Title of Presentation:   "Should Organs be Sold"
Institution/Society Name: Surgery Grand Rounds, St. Kohn's Medical Center
Date of Presentation:  November 8, 2001

44

Title of Presentation:   "Religious and Cultural Issues in Pediatric Treatment"
Institution/Society Name:  Pediatric Grand Rounds, Schusterman Center
Date of Presentation:  October 24, 2001

Title of Presentation:   "Lying for Patient:  Ethical Issues"
Institution/Society Name:  Student Academic Afternoon, Schusterman Health Sciences Center
Date of Presentation: September 27, 2001

Title of Presentation:  "Childhood Leukemia:  Medical and Ethical Issues"
Institution/Society Name:  Pediatric Grand Rounds, Schusterman Health Sciences Center
Date of Presentation:  October 2, 2001

Title of Presentation:   "Lying for Patients"
Institution/Society Name:  Student Academic Afternoon, Schusterman Center
Date of Presentation:  September 27, 2001

Title of Presentation:   "Health Care Reform and Physician Gatekeepers"
Institution/Society Name:  St. John Medical Center, Tulsa, Surgery Grand Rounds
Date of Presentation:  September 24, 2001

Title of Presentation:   "Confidentiality and the Mature Minor"
Institution/Society Name:  St. Francis Hospital, Tulsa, Pediatric Academic Afternoon
Date of Presentation: April 25, 2001

Title of Presentation:   "Palliative Care in Pediatric Practice"
Institution/Society Name: St. Francis Hospital, Tulsa, Pediatric Grand Rounds
Date of Presentation:  April 17, 2001

Title of Presentation:   "Withdrawal of Support from Impaired Newborns"
Institution/Society Name:  St. Francis Hospital, Tulsa, Neonatal Lecture
Date of Presentation:  April 17, 2001

Title of Presentation:   "Ethical Issues in Organ Transplantation"
Institution/Society Name:  St. John Medical Center, Tulsa, Surgery Grand Rounds
Date of Presentation:  April 9, 2001

Title of Presentation:   "Maternal-Fetal Conflict"
Institution/Society Name:  Health Sciences Center, Tulsa, Student Academic Afternoon
Date of Presentation:  March 22, 2001

Title of Presentation:   "Medical Errors:  Be Perfect or Be Punished"
Institution/Society Name:  St. John Medical Center, Tulsa, Surgery Grand Rounds
Date of Presentation:  March 12, 2001

45

Title of Presentation:   "Resolving Conflicts Between Parents and Children's Best Interests"
Institution/Society Name:  St. Francis Hospital, Tulsa Pediatric Academic Afternoon
Date of Presentation:  February 28, 2001

Title of Presentation:   "Ethical Issues Surrounding the Care of the Elderly"
Institution/Society name:  St. John Medical Center, Tulsa, Living a Long Life-Dying a Good Death:  A Symposium
Date of Presentation:  February 21, 2000

Title of Presentation:  "Autonomy and the Mature Minor"
Institution/Society Name: St. Francis Hospital, Tulsa, Pediatric Academic Afternoon
Date of Presentation:  October 25, 2000

Title of Presentation:   "End-of-Life Decision Making"
Institution/Society Name: OU Health Sciences Center, Tulsa, Student Bioethics Conference
Date of Presentation: October 5, 2000

Title of Presentation:   "On Our Own Terms:  Moyers on Dying: (panelist)
Institution/Society Name: Spann Conference Center, Doctor's Hospital, Tulsa
Date of Presentation:  September 21, 2000

Title of Presentation:   "Baby K:  Parent's Request for Futile Treatment"
Institution/Society Name:  St. Francis Hospital, Tulsa, Pediatric Academic Afternoon
Date of Presentation:  August 23, 2000

Title of Presentation:   "Justice:  Individual vs. Public Needs"
Institution/Society Name:  St. Francis Hospital, Tulsa, Pediatric Academic Afternoon
Date of Presentation:  May 24, 2000

Title of Presentation:   "Maternal-Fetal Conflict"
Institution/Society Name:  OU Health Sciences Center, Tulsa, Student Bioethics Conference
Date of Presentation:  May 4, 2000

Title of Presentation:   "Physician-Assisted Suicide"
Institution/Society Name: OU Health Sciences Center, Tulsa, Students Bioethics Conference
Date of Presentation:  April 6, 2000

Title of Presentation:   "Withholding Care:  Futility and Quality of Life"
Institution/Society Name:  St. Francis Hospital, Tulsa, Pediatric Academic Afternoon

46

Date of Presentation:  March 22, 2000

Title of Presentation:  "Ethical Issues in Social Work"
Institution/Society Name: St. Francis Hospital, Tulsa, Medical Social Workers
Date of Presentation:  March 21, 2000

Title of Presentation:   "End-of-Life Issues"
Institution/Society Name: OU Health Sciences Center, Tulsa, Family Practice
Academic Afternoon
Date of Presentation:  February 29, 2000

Title of Presentation:   "Do-Not-Resuscitate Decisions"
Institution/Society Name: Hillcrest HealthCare System, Tulsa, Community
Symposium
Date of Presentation:  February 26, 2000

Title of Presentation:   "Decisions at the End of Life"
Institution/Society Name:  St. Mary's Catholic Church, Tulsa, Family Life
Seminar
Date of Presentation:  February 24, 2000

Title of Presentation:   "Ethical Issues in Organ Transplantation"
Institution/Society Name:  OU Health Sciences Center, Tulsa, Student Bioethics
Conference
Date of Presentation: February 10, 2000

Title of Presentation: "Truthfulness in the Physician-Patient Relationship"
Institution/Society Name:  St. Francis Hospital, Tulsa, Pediatric Academic
Afternoon
Date of Presentation:  January 26, 2000

Title of Presentation:   "Lying to Patients"
Institution/Society Name:  OU Health Sciences Center, Tulsa, Student Bioethics
Conference
Date of Presentation:  December 2, 1999

Title of Presentation:   "Confidentiality in the Health System"
Institution/Society Name: St. Francis Hospital, Tulsa, Pediatric Academic
Afternoon
Date of Presentation: November 24, 1999

Title of Presentation:   "Pain Management"
Institution/Society Name:  OU Health Sciences Center, Tulsa, Student Bioethics
Conference
Date of Presentation:  October 7, 1999

Title of Presentation:   "Training Issues:  Learning Procedures"
Institution/Society Name:  St. Francis Hospital, Tulsa, Pediatric Academic
Afternoon

47

Date of Presentation:  September 22, 1999

Title of Presentation:  "Genetics and Genetic Testing"
Institution/Society Name:  St. John Hospital, Tulsa, Surgery Grand Rounds
Date of Presentation:  September 13, 1999

Title of Presentation:  "Physician-Assisted Suicide" and "Withholding,
Withdrawing Therapy and Medical Futility"
Institution/Society Name: OU Health Sciences Center, Tulsa, EPEC Seminar
Date of Presentation:  September 10-11, 1999

Title of Presentation:  "Understanding Oklahoma Law Concerning Advance
Directives, Living Wills and DNR"
Institution/Society Name: Bartlett memorial Medical Center, Sapulpa, Ethics
Conference
Date of Presentation:  August 17, 1999

Title of Presentation:  "Parental Refusal of Care"
Institution/Society Name:  OU Health Sciences Center, Tulsa, Pediatric Academic
Afternoon
Date of Presentation:  July 28, 1999

Title of Presentation:  "Advanced Care Planning and Legal Issues" and
"Physician-Assisted Suicide"
Institution/Society Name:  OU Health Sciences Center, Oklahoma City, EPEC
Seminar
Date of Presentation:  June 18, 1999

Title of Presentation:  "End-of-Life Decision Making"
Institution/Society Name: OU Health Sciences Center, Oklahoma City, Student
Summer Institute
Date of Presentation:  May 27, 1999

Title of Presentation:  "Issues in Informed Consent"
Institution/Society Name: OU Health Sciences Center, Tulsa, Surgery Grand
Rounds
Date of Presentation: May 20, 1999

Title of Presentation:  "Ethical Dilemmas in Neonatal/Perinatal Care"
Institution/Society Name:  St. Francis Hospital, Tulsa, Neonatal/Pediatric Care
Symposium
Date of Presentation:  May 14, 1999

Title of Presentation:  "Decision Making in the Neonatal Setting"
Institution/Society Name:  St. Francis Hospital, Tulsa, EOPC Grand Rounds
Date of Presentation:  March 10, 1999

Title of Presentation:  "Medical Decisions for Minors:  When Should Children
Make the Call?"

48

Institution/Society Name:  St. John Medical Center, Tulsa, Pediatric Grand
Rounds
Date of Presentation:  March 9, 1999

Title of Presentation:  "Communication with Patients:  Empathetic Models
Delivering Bad News"
Institution/Society Name:  St. John Medical Center, Tulsa, Surgery Grand Rounds
Date of Presentation:  March 9, 1999

Title of Presentation:   "Suffering and End-of-Life Care"
Institution/Society Name:  University of Tulsa, Newman Center, Tulsa, Faculty-
Student Symposium
Date of Presentation:  January 20, 1999

Title of Presentation:  "Ethical Considerations in Alzheimer's Disease"
Institution/Society Name:  Alzheimer's Association Oklahoma Chapter, Tulsa,
Symposium
Date of Presentation:  November 5, 1998

Title of Presentation:   "Ethical Decision Making in the Catholic Health System"
Institution/Society Name:  St. Francis Hospital, Tulsa EOPC Ethics Rounds
Date of Presentation:  September 2, 1998

Title of Presentation:   "Oklahoma's New DNR Law"
Institution/Society Name:  St. Francis Hospital, Tulsa, Pediatric Grand Rounds
Date of Presentation:  October 29, 1997

Title of Presentation:   "Ethical Issues in Pediatric Nursing"
Institution/Society Name:   St. Francis Hospital, Tulsa, Nursing Rounds
Date of Presentation: July 9, 1997

Title of Presentation: "Ethical Issues in Death and Dying"
Institution/Society Name: Children's Medical Center, Tulsa, Ethics Conference
Date of Presentation: June 26, 1997

Title of Presentation:   "Life and Death Issues:  the Catholic Perspective"
Institution/Society Name:   St. Mary's Church, Tulsa,  Family Life Seminar
Date of Presentation:  April 26, 1997

Title of Presentation:   "Medical/Surgical Ethics"
Institution/Society Name:   St. Francis Hospital, Tulsa, Grand Rounds
Date of Presentation: March 6, 1997

Title of Presentation:   "Assisted Suicide Roundtable"
Institution/Society Name: St. Francis Hospital, Tulsa, IEC
Date of Presentation:  November 6, 1996

Title of Presentation:   "Introduction and Overview of Medical Ethics:  Doctor-
Patient Relationship and Obligations of Professionals"

49

Institution/Society Name: OU College of Medicine, Tulsa, Grand Rounds
Date of Presentation:  September 27, 1996

Title of Presentation:   "Communicating With Families of Patients in High Risk Situations"
Institution/Society Name:  St. Francis Hospital, Tulsa, Ethics Rounds
Date of Presentation:  July 25, 1996

Title of Presentation:   "Organ Transplantation—the Child as Donor" (Panelist)
Institution/Society Name:  Children's Medical Center, Tulsa, Pediatric Grand Rounds
Date of Presentation:  July 25, 1996

Title of Presentation:   "Ethics in the Medical Field"
Institution/Society Name:  OU Pre-Medical Professions Club, Norman, OK
Date of Presentation:  February 28, 1996

Title of Presentation:   "Business Ethics in Health Care"
Institution/Society Name:  St. John Medical Center, Tulsa, Goodman Symposium
Date of Presentation:  February 9, 1996

Title of Presentation:   "Ethical Issues in Liver Transplantation"
Institution/Society Name:   St. Francis Hospital, Tulsa
Date of Presentation:  November 8, 1995

Title of Presentation:   "Ethical Issues in Organ Transplantation"
Institution/Society Name:  American Red Cross, Tulsa Chapter
Date of Presentation:  May 24, 1995

Title of Presentation:   "Sexual Ethics and Family Life"
Institution/Society Name:   St. Mary's Church, Tulsa, Benziger Family Life Program
Date of Presentation:  April 4, 1995

Title of Presentation:   "Human Genetics:  Issues and Concerns"
Institution/Society Name:  St. Francis Hospital, Tulsa Panel Discussion
Date of Presentation:  September 16, 1994

Title of Presentation:  "Acting on Health Care:  Catholic Views on Health Care Reform"
Institution/Society Name:  Christ the King Church, Tulsa
Date of Presentation:  April 17, 1994

Title of Presentation:   "The Problem of Futility"
Institution/Society Name:  St. Francis Hospital, Tulsa, Ethics Rounds
Date of Presentation:  April 6, 1994

Title of Presentation:   "Ethical Concerns of Nutritional Life Support"
Institution/Society Name:  St. Francis Hospital, Tulsa Ethics Rounds

50

Date of Presentation:  February 23, 1994

Title of Presentation:  "Health Care:  Worried Sick about the System?"
Institution/Society Name:  Helmerich  Center, Tulsa, Leadership Tulsa Seminar
Date of Presentation:  December 7, 1993

Title of Presentation:  "Ethical Issues in Perinatal Nursing"
Institution/Society Name:  St. Francis Hospital, Tulsa, Regional Nursing
Conference
Date of Presentation:  November 12, 1993

Title of Presentation:  "Catholic Morality"
Institution/Society Name:   St. Mary's Church, Tulsa
Date of Presentation:  October 17, 1993

Title of Presentation:  "Ethical Issues in the NICU"
Institution/Society Name:   St. Francis Hospital, Tulsa, EOPC Ethics Rounds
Date of Presentation:  October 6, 1993

Title of Presentation:  "Ethics and Economics:  Can Medical Ethics Survive
Health Care Reforms?"
Institution/Society Name: Hope Unitarian Church, Tulsa
Date of Presentation:  September 9, 1993

Title of Presentation:  "Ethics in Medical Practice"
Institution/Society Name:  St. Francis Hospital, Tulsa
Date of Presentation:  September 2, 1993

Title of Presentation:  "Ectopic Pregnancy—Current Treatment Options/Ethical
Considerations"
Institution/Society Name:  St. Francis Hospital, Tulsa
Date of Presentation:  September 1, 1993

Title of Presentation:  "Baby Doe Revisited"
Institution/Society Name:   St John Medical Center, Tulsa, Pediatric Grand
Rounds
Date of Presentation:  August 10, 1993

Title of Presentation:  "Biomedical Ethics"
Institution/Society Name:  OU College of Medicine, Tulsa
Date of Presentation: July 27, 1993

Title of Presentation:  "Termination of Treatment"
Institution/Society Name:  Temple Israel, Tulsa, Facing Tough Medical Decisions
Series
Date of Presentation: July 12, 1993

Title of Presentation:  "Bioethics—The Challenge of Today"
Institution/Society Name:  OU Medical Alumni Association, Oklahoma City, OK

51

Date of Presentation:  May 1, 1993


Title of Presentation:   "Emergency Room Ethics"
Institution/Society Name:  St. Francis Hospital, Tulsa, Ethics Rounds
Date of Presentation:  April 4, 1993

Title of Presentation:   "The Family's Role in Refusal of Care"
Institution/Society Name:  St. Francis Hospital, Tulsa, Ethics Rounds
Date of Presentation:  March 17, 1993

Title of Presentation: "Sexual Mores and Morality"
Institution/Society Name:   St. Mary's Church, Tulsa, Benziger Life Series
Date of Presentation:  March 8, 1993

Title of Presentation:   "Advance Directives:  Ethical Issues for Physicians"
Institution/Society Name:  Broken Arrow Medical Center, Broken Arrow, OK
Date of Presentation:  January 12, 1993

Title of Presentation:   "Ethical Considerations in Perinatology-VLBW"
Institution/Society Name:  St. Francis Hospital, Tulsa, New Horizons in
Perinatology Regional Conference
Date of Presentation:  November 5, 1992

Title of Presentation:   "The Norms of Catholic Morality for Adults"
Institution/Society Name:  St. Mary's Church, Tulsa
Date of Presentation:  October 16, 1992

Title of Presentation:   "Life and Dignity of the Human Person"
Institution/Society Name:  Beckerle Center, Tulsa, Catholic Social Teaching
Series
Date of Presentation:  October 16, 1992

Title of Presentation:   "Miss Evan's Boys"
Institution/Society Name: University of Tulsa, Panel Discussion-Ethics in
Research
Date of Presentation:  September 10, 1992

Title of Presentation:   "Function of the Hospital Ethics Committee"
Institution/Society Name: St. Francis Hospital, Tulsa, All Physicians Conference
Date of Presentation:  September 2, 1992

Title of Presentation:   "Ethical Considerations in Neonatal Care"
Institution/Society Name: University of Tulsa Nursing School
Date of Presentation:  April 22, 1992

Title of Presentation:   "Surgery in a Jehovah's Witness Infant"
Institution/Society Name:  St. Francis Hospital, Tulsa, Pediatric Grand Rounds
Date of Presentation:  April 15, 1992

52

Title of Presentation:   "Whose Life Is It, Anyway?"
Institution/Society Name:  St. Francis Hospital, Tulsa, Critical Care Ethics Rounds
Date of Presentation:  March 18, 1992

Title of Presentation:   "Ethical Issues in Dying and the PSDA"
Institution/Society Name:  American Association of Critical Care Nurses Seminar, Tulsa
Date of Presentation:  February 21, 1992

Title of Presentation:   "Death and Dying:  Moral and Religious Issues"
Institution/Society Name:  St. Antony's Orthodox Church, Tulsa, St. Anne Institute
Date of Presentation:  February 20. 1992

Title of Presentation:   "Food and Hydration Law:  Implications for the Clinical Setting"
Institution/Society Name:  St. Francis Hospital, Tulsa, Nursing Ethics Rounds
Date of Presentation:  February 19, 1992

Title of Presentation: "Principles of Medical Ethics"
Institution/Society Name:  St. John Medical Center, Tulsa, Goodman Symposium
Date of Presentation:  February 12, 1992

Title of Presentation:   "Withholding Nutrition and Hydration"
Institution/Society Name:   Tulsa District Dietetic Association
Date of Presentation:  February 11, 1992

Title of Presentation:   "Euthanasia and Physician-Assisted Suicide"
Institution/Society Name:   Oral Roberts University, Alpha Epsilon Delta Lecture
Date of Presentation:  February 6, 1992

Title of Presentation:   "Hospice Care:  Ethical Issues"
Institution/Society Name:   St. Francis Hospice, Tulsa
Date of Presentation:  January 16, 1992

Title of Presentation:   "Assisted Suicide and the Physician"
Institution/Society Name:  OUCOM Tulsa
Date of Presentation: December 11, 1991

Title of Presentation:   "Ethical Conflicts in Medicine" and "Bioethical Dilemmas in Religious Traditions"
Institution/Society Name:  OUCOM, Tulsa Mini course
Date of Presentation:  December 2-6, 1991

Title of Presentation:   "Ethical Aspects of Placebo Therapy:  Patient's Right to Know"
Institution/Society Name:  St. Francis Hospital, Tulsa, Grand Rounds

53

Date of Presentation:  November 21, 1991

Title of Presentation:  "HIV Testing"
Institution/Society Name:  OUCOM Tulsa
Date of Presentation: November 13, 1991

Title of Presentation:  "Ethics Consultations:  How and When?"
Institution/Society Name:   St. Francis Hospital, Tulsa Grand Rounds
Date of Presentation:  October 31, 1991

Title of Presentation:  "Is Anti-Abortion Pro-Life?"
Institution/Society Name:  St. Pius Church, Tulsa, Knights of Columbus
Date of Presentation:  October 20, 1991

Title of Presentation:   "The Dignity of Persons:  Ethical Requirements"
Institution/Society Name:  St. Pius Church, Tulsa, Catholic Social Teaching Panel
Date of Presentation: October 16, 1991

Title of Presentation:  "Bioethics and You"
Institution/Society Name:   St. Mary's Catholic School, Tulsa
Date of Presentation:  October 16, 1991

Title of Presentation:   "Needlestick Exposures to HIV:  Ethical Implications"
Institution/Society Name:  OUCOM Tulsa, Dean's Conference
Date of Presentation:  September 20, 1991

Title of Presentation:  "Perinatal Ethics"
Institution/Society Name:   St. Francis Hospital, Tulsa
Date of Presentation:  August 7, 1991

Title of Presentation:   "Ethical Aspects of Decision Making for Neonates"
Institution/Society Name:  St. Francis Hospital, Tulsa
Date of Presentation:  June 1991

Title of Presentation:   "Patients with AIDS"
Institution/Society Name: St. Francis Hospital, Tulsa
Date of Presentation:  June 1991

Title of Presentation:   "Ethical Dilemmas in Critical Care"
Institution/Society Name:  St. Francis Hospital, Tulsa, Continuing Education
Course for Critical Care Nurses
Date of Presentation:  May 8-9, 1991

Title of Presentation:   "Ethics in Health Care Administration"
Institution/Society Name: University Center at Tulsa, Colloquium for Master of
Public Health Students
Date of Presentation:  April 20, 1991

Title of Presentation:   "Genetic Engineering"

54

Institution/Society Name:  OSU College of Osteopathic Medicine, Tulsa
Date of Presentation:  April 4, 1991


Title of Presentation:  "Cystinosis:  Ethical Aspects of Management"
Institution/Society Name:  Children's Medical Center, Tulsa
Date of Presentation:  April 2, 1991

Title of Presentation:  "How You Got to be You"
Institution/Society Name: St. Mary's Catholic Church, Benzinger Family Life Class
Date of Presentation:  March 18, 1991

Title of Presentation:  "Doctors, Dollars and Decisions"
Institution/Society Name:  St. Francis Hospital, Tulsa, Symposium
Date of Presentation:  February 20, 1991

Title of Presentation:  "Is There a Christian Medical Ethic?"
Institution/Society Name:  Oral Roberts University, Tulsa, Alpha Epsilon Delta Pre-Medical Honor Society
Date of Presentation:  February 6, 1991

Title of Presentation:  "Medicine and Christian Service"
Institution/Society Name:  St. Mary's Catholic Church, Tulsa
Date of Presentation:  January 30, 1991

Title of Presentation:  "Impact of Medical Advances Affecting the Length of Life"
Institution/Society Name:  University of Tulsa Conference The Impact of Cruzan and OK HB 1482 on Medical Decision Making in Oklahoma
Date of Presentation:  October 5, 1990

Title of Presentation:  "Withholding and Withdrawing Care"
Institution/Society Name:  St. Francis Hospital, Tulsa Grand Rounds
Date of Presentation: October 1990

Title of Presentation:  "Brain Death Controversies"
Institution/Society Name:  Tulsa Regional Medical Center
Date of Presentation:  October 1990

Title of Presentation:  "Brain Death in Children:  Ethical Aspects"
Institution/Society Name:  OUCOM Tulsa, Pediatric Grand Rounds
Date of Presentation:  September 1990

Title of Presentation:  "Medical Ethics and the Catholic Physician"
Institution/Society Name:   St. John Medical Center, Tulsa
Date of Presentation:  September 1990

Title of Presentation:  "The Right to Die:  Do We have a Choice?"
Institution/Society Name:  Doctor's Hospital, Tulsa Panel Discussion
Date of Presentation:  May 16, 1990


Title of Presentation:  "Life or Death:  Who Decides?"
Institution/Society Name: PUCM Tulsa, Ethics Conference for Health Care
Professionals
Date of Presentation:  March 14, 1990

**UNIVERSITY, MEDICAL COLLEGE & HOSPITAL SERVICE:**

**Department/School/University:** Oklahoma University Health Sciences Center
Role/Function: Member
Committee Name: Palliative Care Committee
Date(s) of Service: 1999-2012

**Department/School/University:** The University of Oklahoma College of Medicine-Tulsa
Role/Function: Member
Committee Name: Admissions Board
Date(s) of Service: 2003-2012

**Department/School/University:** The University of Oklahoma College of Medicine-Tulsa
Role/Function: Member
Committee Name: Committee of Inquiry
Date(s) of Service: 2005-2012

**Department/School/University:** The University of Oklahoma College of Medicine-Tulsa
Role/Function:  Member
Committee Name: Promotion and Tenure Committee
Date(s) of Service: 2005-2009

**Department/School/University:** The University of Oklahoma College of Medicine-Tulsa, Department of Pediatrics
Role/Function: Member
Committee Name: Faculty Evaluation/Promotion Committee
Date(s) of Service: 1984-2012

**Department/School/University:** The University of Oklahoma College of Medicine-Tulsa, Office of the Dean
Role/Function: Chairman
Committee Name:, Dean's Conference Committee on Medical Ethics,
Date(s) of Service: 1987-2012

**Department/School/University:** The University of Oklahoma College of Medicine-Tulsa

56

Role/Function: Member
Committee Name: Educational Focus Group
Date(s) of Service: 1993-2012


**Department/School/University:** The University of Oklahoma College of
Medicine-Tulsa
Role/Function: Member
Committee Name: Institutional Review Board
Date(s) of Service: 1994 -2000

**Department/School/University:** The University of Oklahoma College of
Medicine-Tulsa, Dean's Office
Role/Function: Member
Committee Name: Institutional Study Group-Administration
Date(s) of Service: 1995

**Department/School/University:** The University of Oklahoma College of
Medicine-Tulsa, Department of Psychiatry
Role/Function: Member
Committee Name: Search Committee-Chair of the Department of Psychiatry,
Date(s) of Service: 1995-1996

**Department/School/University:** The University of Oklahoma College of
Medicine-Tulsa
Role/Function: Member
Committee Name: Dean's Search Committee
Date(s) of Service: 2001

**Department/School/University:** St. Francis Health System, Tulsa, OK
Role/Function: Co-Director
Committee Name: CME Online Tutorials Program
Date(s) of Service: 2005-2012

**Department/School/University:** St. Francis Health System, Tulsa, OK
Role/Function: Co-Chair
Committee Name: Institutional Ethics Committee
Date(s) of Service: 1995-2012

**Department/School/University:** St. Francis Health System, Tulsa, OK
Role/Function: Chair
Committee Name: Institutional Review Board
Date(s) of Service: 1991-2008

**Department/School/University:** St. Francis Health System, Tulsa, OK
Role/Function: Member
Committee Name: Nutritional Support Committee
Date(s) of Service: 1998-2012

**Department/School/University:** St. Francis Health System, Tulsa, OK – Eating
Disorders Unit
Role/Function: Member
Committee Name: Patient Care Committee
Date(s) of Service: 1985-2012

**Department/School/University:** St. Francis Health System, Tulsa, OK
Role/Function: Member
Committee Name: Endoscopy Committee
Date(s) of Service:1983-2012

**Department/School/University:** St. Francis Health System, Tulsa, OK
Role/Function: Member
Committee Name: Endoscopy Credentialing Committee
Date(s) of Service: 1990-2012

**Department/School/University:** Hillcrest Medical Center, Tulsa, OK
Role/Function: Member
Committee Name: Medical Ethics Committee
Date(s) of Service: 1990-2012

**TEACHING
ACTIVITIES:**          <u>**Medical School Courses**</u>
Name and Course Number: Bioethics
Role: Course Director/Professor
Number of Direct Contact Hours:
  Medical Students:  24 hours annually
  Residents:  35 hours annually
Year Taught: 1992-2012
Number of Students: 50-60 per year
Overall Evaluation Score: 4/5 (above average)

Name and Course Number: PEDS GI
Role:  Course Director/Professor
Number of Direct Contact Hours:
  Medical Students (Lecture): 12 hours annually
  Residents:  6 months annually
Year Taught: 1982-2012
Number of Students:  30 per year
Overall Evaluation Score: 4/5 (above average)

<u>**Medical School Clerkships**</u>
Name of Clerkship:  MSIII
Role: Clerkship Director

Number of Direct Contact Hours: 6 weeks
Year Taught: 1982-2012
Number of Students/Fellows: 30 annually
Overall Evaluation Score: 4/5 (above average)

Average number of Clinical Fellows you train per year = 0
Average number of Residents you train per year = 30
Average number of Medical Students you train per year = 50-60

**Teaching Recognition/Awards** – include both nominations and awards

Award Name:  Gold Foundation Lifetime Humanism Honor Award for Exemplary Demonstration of Respect for Human Beings through Practice and Teaching of Medicine
Year:  2005

Award Name:  Healthcare Foundation of New Jersey: Humanism in Medicine Award: Recognizing the Integration of Humanism in the Delivery of Health Care to Patients and Their Families
Date:  2000

**COLLABORATIVE ACTIVITIES**:

**Joint Grants**

Agency:  Wyeth Research (Kendle International)
Identifying Number: N/A
Title of Project: "A Multicenter, Randomized, Double-Blind Study of the Safety, Tolerability, and Clinical Outcomes of 2 Doses (20 and 40mg) of Oral Pantoprazole in Children (12 to 16 years old) with Symptomatic GERD"
Dates of Project Period: June 2003
Role on Project:  Investigator
Percent Effort:  5%
Total Dollar Amount: $36,800

Agency:  Glaxo-Wellcome
Identifying Number: N/A
Title of Project: "Alosetron in Childhood IBS"
Dates of Project Period: 1999-2000
Role on Project: Investigator
Percent Effort:  5%
Total Dollar Amount: $21,980.00

**SCHOLARSHIP AND RESEARCH**:

**RESEARCH GRANTS**

Agency:  Tulsa Medical Education Annual Grant
Identifying Number: N/A
Title of Project: Oklahoma Bioethics Center
Dates of Project Period: 1994-2012
Role on Project:  Director/Principal Investigator

59

Percent Effort:  25%
Total Dollar Amount: $67,500

Agency:  Carnation/Nestle
Identifying Number: N/A
Title of Project:  "Formula Intolerance in Acute Gastroenteritis"
Dates of Project Period:  1995
Role on Project: Principal Investigator
Percent Effort: 10%
Total Dollar Amount: $55,000

## PUBLICATIONS

### Original Papers in Refereed Journals

**Bioethics:**

1. **Donovan, GK**:  "The Disabled and Their Lives of Purpose."  The Linacre Quarterly, Vol. 74, No.3:263-267  AUGUST 2007      Online: JANUARY  2008
2. Fallat, M and **Donovan, GK**: **UPDATE** "Ethical and Legal Considerations in Pediatric Surgery", *emedicine*.medscape.com (from WebMD), April 24, 2006
3. Fallat ME, Glover J and AAP Committee on Bioethics.  "Professionalism in Pediatrics" Pediatrics, 2007; 120:e1123-e1133.
4. Seaman, Rachel M.H., **Donovan, GK** {mentoring co-author} "The Ethics and Economics of Consuming Canadian Drugs"  JOKLA State Med Assoc., Vol. 98, No. 1 JAN 2005 [mentored paper]
5. Diekema DS and AAP Committee on Bioethics. "Responding to Parental Refusals of Immunization of Children", Pediatrics, 2005; 115: 1428-1431.
6. Schneiderjan Stephanie and **Donovan, GK**.  "Ethics *versus* Education: Pelvic Exams on Anesthetized Women."  Journal Oklahoma State Medical Association, (8):386-8, AUG  2005
7. Fallat, Mary E., Deshpande, Jayant K; **Donovan, GK**.  "Do Not Resuscitate Orders for Pediatric Patients Who Require Anesthesia and Surgery."  American Academy of Pediatrics. (Clinical Report) 114 No. 6:1686-1692, Dec 2004.
8. Nelson RM and AAP Committee on Bioethics. "Ethical Issues with Genetic Testing in Pediatrics." Pediatrics, 107:1451-1455. 2001.
9. Committee on Bioethics.  "Institutional Ethics Committees", Pediatrics, 2001; 107: 205-209
10. Committee on Child Abuse and Neglect and Committee on Bioethics. "Forgoing Life-Sustaining Medical Treatment in Abused Children", Pediatrics, 2000; 106:1151-1153.
11. Committee on Bioethics and Committee on Hospital Care.  "Palliative Care for Children", Pediatrics, 2000; 106: 351-357.
12. Committee on School Health and Committee on Bioethics.  "Do Not Resuscitate Orders in School", Pediatrics, 2000; 105: 878-879.
13. Committee on Bioethics.  "Sterilization of Minors with Developmental Disabilities", Pediatrics, 1999, 104: 337-340.

14. Committee on Bioethics.  "Appropriate Boundaries in the Pediatrician-Family-Patient Relationship, Pediatrics, 1999, 104: 334-336  (Revised)
15. **Donovan, GK**: "Decisions at the End of Life: Catholic Tradition." Christian Bioethics, 3:188-203, 1997.
16. **Donovan, GK**: "Does Shooting Abortionists Reveal a Lack of Faith?" Linacre Quarterly, 61:1, 1994.
17. **Donovan, GK**: "Anencephalic Organ Donation in Oklahoma: Right Problem, Wrong Answer." Journal Oklahoma State Medical Association, 86:128-130, 1993.

**Pediatrics/GI:**

18. Dahshan A., Donovan KG.  "Bougienage versus Endoscopy for Esophageal Coin Removal in Children" Journal of Clinical Gastroenterology.  41(5):454-6, MAY 2007
19. Dahshan A., Donovan KG, "Severe Methemoglobinemia complicating topical benzocaine use during endoscopy in a toddler: a case report and review of the literature." Pediatrics.(4):e806-9 APRIL 2006
20. Dahshan A., Donovan GK. Halabi IM. Ranne R. Li M. Illig WP. "Helicobacter pylori and infantile hypertrophic pyloric stenosis: is there a possible relationship?"  Journal of Pediatric Gastroenterology & Nutrition. 42(3):262-4, MAR 2006
21. Dahshan Ahmed and **Donovan, GK**. "Isolated Superior Mesenteric Artery Thrombosis." Journal of Clinical Gastroenterology, 34:554-556, 2002.
22. Dahshan Ahmed and **Donovan, GK**. "Auto-Brewery Syndrome in a Child with Short Gut Syndrome": Case Report and Review of the Literature. Journal of Pediatric Gastroenterology and Nutrition, 33:214-215, 2001.
23. **Donovan, GK**: "Constipation and Encopresis in Children."  Dial Access Article, Southern Medical Association, 1999.
24. **Donovan, GK** and Yazdi AJ: "Endoscopic Diagnosis of Pylorus Stenosis."  Journal Oklahoma State Medical Association, 89:58-9, 1996.
25. **Donovan, GK**, Plunket DC and Block R: "Management of Pediatric Encopresis."  Practical Reviews in Pediatrics, (Audio Cassette Series) 18:10, 1995.
26. **Donovan, GK**: "Formula Intolerance in Infancy."  Buen Salud Journal, Puerto Rico, 1990.
27. **Donovan, GK**: "Hirschsprung's Disease: Diagnostic Pitfalls."  Practical Reviews in Pediatrics, (Audiocassette Series) 10:7, 1987.
28. **Donovan, GK** and Torres-Pinedo R: "Chronic Diarrhea and Soy Formulas-Inhibition of Diarrhea by Lactose."  American Journal of Diseases of Children, 141:1069-1071, 1987.
29. **Donovan, GK** and Torres-Pinedo R: "Diarrhee Chronique et Preparations a Base de Soja." American Journal of Diseases of Children. Edition Francaise, 6:426-429, 1987.
30. Sharma BB, **Donovan, GK**, et al: "CNS Infections Following Esophageal Dilation in Children."  Journal of Pediatrics, 110:572-574, 1987.
31. **Donovan, GK**: Guest Review. Practical Reviews in Pediatrics, (Audiocassette Series) 1985.
32. **Donovan, GK**: Guest Review. Practical Reviews in Pediatrics, (Audiocassette Series) 1984.

33. **Donovan, GK**: "Diagnosis of Atypical Hirschsprung's Disease." Journal
     Oklahoma State Medical
    Association, 81:731-32, 1980.
34. Michaels VV and **Donovan, GK**: "Shwachman Syndrome-Unusual
    Presentation as Asphyxiating Thoracic Dystrophy." Birth Defects,
    Original Article Series, 1982; 18(3B):129-34.
35.

## Reviews or Editorials in Refereed Journals

36. **Donovan, GK**:  "Does Withdrawal of Nutrition and Hydration Cause
    Death in Children?"  PEDIATRICS  **Online:** August 11, 2009 eLetter
37. Abstract Reviewer for Pediatric Academic Societies, February 2005
38. **Donovan, GK**.: Review: "Ethical Issues with Genetic Testing in
    Pediatrics." AAP Grand Rounds, February 2003.
39. Fallat, M and **Donovan, GK**: "Ethical and Legal Considerations in
    Pediatric Surgery." *e*medicine Journal, 3:1, January 23, 2002.
40. **Donovan, GK**:  "The New DNR Law: a Disaster for Oklahomans?"
    (Editorial Letter) Tulsa Word, Dec. 7, 1997.
41. **Donovan, GK**:  "Assisted Suicide: a Health Care Benefit?"  (Editorial
    Letter) JAMA, 274:1911, 1996.

## Books or Chapters in books, and publications in other journals

42. **Donovan, GK** and Pellegrino, Edmund D.: Chapter, "Virtue and Goals in
    Pediatrics," Pediatric Bioethics, Edited by Geoffrey Miller, Cambridge
    University Press, Chapter 1, pp.. 3-10, 2009
43. **Donovan, GK**: "The Physician-Patient Relationship."   Chapter Five in
    The Healthcare Professional as Friend and Healer: Building on the Work
    of Edmund D. Pellegrino.  Washington, DC: Georgetown University
    Press, 2000.
44. **Donovan, GK**: Nutrition/Hydration and P.V.S.: Ethical Considerations: A
    Thesis.  Norman: University of Oklahoma, 1994.

## Abstracts

45. **Donovan, GK**:  ""End-of-Life vs. Ending Life:  A Transatlantic
    Perspective"  International Conference: European Association of Centres
    of Medical Ethics (EACME),  Sept. 28-30, 2006, Leuven, Belgium
46. Ahmed Dahshan, M.D., FAAP and G. Kevin Donovan, M.D., FAAP:
    "Severe Methemoglobinemia Complicating Topical Benzocaine Use
    During Endoscopy in a Toddler: A Case Report and Review of Literature"
    Pediatrics, 117:4 April 2006, pp. e806-e809.

47. **Donovan, GK**: "Bougienage Versus Endoscopy for Esophageal Coin
    Removal in Children", presented ASGE Digestive Disease Week,
    Chicago, Illinois May 18, 2005

48. Fox MD, Jones CM, **Donovan, GK**, and McNulty M.  The Impact of
    Changes in allocation Policy on Pediatric Heart Transplantation in the
    United States.  Pediatric Academic Societies-Society for Pediatric
    Research Annual Meeting, May 2003.

49. Fox MD, Jones CM, **Donovan, GK**, and McNulty M.  The Impact of
    Changes in Allocation Policy on Pediatric Heart Transplantation in the
    United States.  Second Congress of the International Pediatric Transplant
    Association.  April 2003

50. Fox MD, Jones CM, **Donovan, GK**, and McNulty M.  An Ethical
    Analysis of the Prioritization of Pediatric Patients in Organ Allocation
    Policy.  Second Congress of the International Pediatric Transplant
    Association.  April 2003.

51. **Donovan, GK** and Kidwell M: "Benign Recurrent Intrahepatic
    Cholestasis: Relief of Pruritis with Carbamazepine." Gastroenterology,
    94:5, 1988.

52. **Donovan, GK** and Torres-Pinedo R: "Effect of D-Galactose on Fluid Loss
    in Soybean Protein Intolerance." Pediatric Research, 12:433, 1978.

**Videos and Websites**

53. Donovan, G.K. Consultant and Contributor:  Website: Preventive Ethics
    **http://www.ouhsc.edu/geriatricmedicine/Education/preventive_ethics/
    ethic**

54. A Self-Instructional Module in Geriatric Medicine

55. **Donovan, GK**: Consultant, The Power of Ideas: a Video Interview with
    Allen Buchanan, 2000.

56. **Donovan, GK**: The PSDA and the Ethics Committee, A Video. Tulsa: St.
    Francis Hospital, 1992.

**Georgetown University**
**2012-present**
**Director, Pellegrino Center for Clinical Bioethics and**
**Professor, Department of Pediatrics**

## Presentations:

### 2012 Presentations

Title of Presentation: Bioethics Class
Institution/Society Name:  Howard University
Date of Presentation:  September 5, 2012

Title of Presentation: Ethics Session for Plastic Surgery Residents
Institution/Society Name: Medstar Georgetown University Hospital
Date of Presentation:  August 23, 2012

Title of Presentation: Clinical Ethics
Institution/Society Name: Undergrad Bioethics Society Georgetown University
Date of Presentation:  November 29, 2012

### 2013 Presentations

Title of Presentation:  CPE on Health Care Ethics
Institution/Society Name: Medstar Georgetown University Hospital
Date of Presentation:  January 8, 2013

Title of Presentation: Taping for NBC Today Show  re Prenatal Testing
Institution/Society Name:  NBC
Date of Presentation:  January 16, 2013

Title of Presentation:  Ethics Session
Institution/Society Name:  Dept of Infectious Diseases Medstar Georgetown Hospital
Date of Presentation: January 17, 2013

Title of Presentation: "Killing or Allowing to Die?"
Institution/Society Name:  Medical Grand Rounds Medstar Georgetown Univ Hospital
Date of Presentation:  January 14, 2013

Title of Presentation:  "Cookie Friday"  Bioethics Talk
Institution/Society Name:  Bioethics Research Library, Georgetown University
Date of Presentation:  March 22, 2013

Title of Presentation: Telephone Interview on Case of NICU Babies and Oxygen Research
Institution/Society Name:  Miami Herald Newspaper
Date of Presentation:  April 2013

Title of Presentation:  "Doctors Speak Out" Advance Directives etc.
Institution/Society Name: Georgetown University Medical Center

64

Date of Presentation:  April 16, 2013

Title of Presentation:  Research on Babies in ICU -- Oxygen
Institution/Society Name:  Diane Rehm Radio Show
Date of Presentation:  April 17, 2013

Title of Presentation: "The Last of Life, for Which the First Was Made"
Institution/Society Name: Hal Israel Memorial Lecture, Temple B'Nai Israel Easton, MD
Date of Presentation:  Monday, April 29, 2013 7:30 p.m.

Title of Presentation: Interview for USA Today – "With Down Syndrome Diagnoses Comes a Wrenching Choice"
Institution/Society Name:  USA Today
Date of Presentation:  May 1, 2013 issue

Title of Presentation:  Doctors Speak Out Follow Up for GUMC Advance Directives
Institution/Society Name:  Somerset House, Bethesda, Maryland
Date of Presentation:  May 14, 2013

Title of Presentation: Clinical Ethics Lecture
Institution/Society Name:  KIE Intensive Bioethics Course, Georgetown University
Date of Presentation:  June 9, 2013

Title of Presentation: Leader for Small Group
Institution/Society Name:  KIE Intensive Bioethics Course, Georgetown University
Date of Presentation:  June 2013

Title of Presentation: Interview:  "Ethicists debate girls' second lung transplant"
Institution/Society Name: USA Today
Date of Presentation:  July 1, 2013

Title of Presentation: Quoted for transplant case in PA
Institution/Society Name:  Fox News Channel, Patti Ann Brown
Date of Presentation:  July 2, 2013

Title of Presentation:  Ethics Lecture
Institution/Society Name: Plastic and Reconstructive Surgery, Medstar GU Hospital
Date of Presentation:  July 11, 2013

Title of Presentation: Ethics Lecture for Hospitalists
Institution/Society Name:  Medstar Georgetown University Hospital
Date of Presentation:  July 17, 2013

Title of Presentation: Professionalism Panel for First Year Orientation
Institution/Society Name: Georgetown University School of Medicine
Date of Presentation:  August 9, 2013

Title of Presentation:  Our Aging Brain and Living and Leaving with Dignity
Institution/Society Name:  Chevy Chase Trust
Date of Presentation:  September 12, 2013

Title of Presentation: Panel (submitted by Mark Kuczewski) on Admitting Illegal Students to
Medical School
(Moderator)Institution/Society Name:   ASBH
Date of Presentation:  October 2013

Title of Presentation: Injured Hunters Choice – the Tim Bowers Case – End of Life
Institution/Society Name: Interview for WUSA Channel 9 TV in DC
Date of Presentation:  November 7 2013

Title of Presentation: Interview for End of Life Wishes aren't Always Met
Institution/Society Name:  Publication – Medical Ethics Advisor
Date of Presentation:  May 2013

Title of Presentation: Interview for article on "Ethics of Minors' Access to Emergency Contraception"
Institution/Society Name: Medical Ethics Advisor
Date of Presentation:  November 2013:  Vol. 29, No. 11, Pages 121-132.


## 2014 Presentations

Title of Presentation: "Was Pellegrino a Closet Principlist?"
Institution/Society Name:  First Annual Pellegrino Seminar, Georgetown University
Date of Presentation:  March 21, 2014

Title of Presentation: "A Parent Fights to Speed FDA Approval I Hopes of Saving Son's Life"  Interview
for WTOP Radio
Institution/Society Name: WTOP Radio News Interview
Date of Presentation:  March 26, 2014

Title of Presentation:  "Cast a Wide Net when Obtaining Feedback on Clinical Ethics Consults"
Institution/Society Name:  Medical Ethics Advisor, April 2014:  Vol. 30, No. 4, Pages 37-48 – Interview
Date of Presentation:  April 2014

Title of Presentation:  Grand Rounds:  End of Life Decision-Making
Institution/Society Name: St. Barnabas Hospital and Medical Center, New Jersey
Date of Presentation:  April 16, 2014

Title of Presentation:  "Saving Lives and Stamping Out Disease:  The Virtuous Physician in the Future
              of Healthcare"
Institution/Society Name:  11th Annual Pellegrino Ethics Lectureship in Surgery, GU
Date of Presentation:  May 6, 2014

66

Title of Presentation: " Pros and Cons of Doctors Sharing Notes"
Institution/Society Name:  Diane Rehm Radio Show
Date of Presentation:  May 22, 2014

Title of Presentation:  SUPPORT Study Panel
Institution/Society Name:  Clinical Research Network
Date of Presentation:  May 22, 2014

Title of Presentation: Panel on Alzheimer's Research and Discovery
Institution/Society Name:  Alumnae Reunion Weekend Georgetown Medical School
Date of Presentation: May 30, 2014

Title of Presentation:  Clinical Bioethics, Pre-IBC Workshop
Institution/Society Name:  Kennedy Institute of Ethics Annual Intensive Bioethics Course
Date of Presentation:  June 2, 2014

Title of Presentation:  Pro-Life to the very end….interview
Institution/Society Name: Our Sunday Visitor Newsweekly
Date of Presentation:  July 2014

Title of Presentation:  Patients' Wishes for End of Life Care Often Not Followed:  Here are reasons
why…interview
Institution/Society Name:  Medical Ethics Advisor
Date of presentation:  September 2014, Vol. 30 No 9 Pages 97-108

Title of Presentation:  O'Neill Institute Colloquium:  The West African Ebola Epidemic:  How can it be
Contained and How can we Prevent the Next One?
Institution/Society Name:  O'Neill Institute Georgetown University School of Law
Date of Presentation: September 3, 2014

Title of Presentation:  "Is the Church on the Wrong Side of History:  Bioethical Issues"
Institution/Society Name:  Blessed Sacrament Church Sunday Morning Lecture Series, Washington, DC
Date of Presentation: Sunday, September 14, 2014

Interviews and Presentations on Ebola – beginning August 2014:

USA Today
AP News
Diane Rehm Show
Paula Wolfson – WTOP
Andrew Pollack – NY Times
Helen Braswell – Canadian Press
Barry Bagnolo – CBS radio
CTV interview
Georgetown/O'Neill Center Conference on Ebola
Katherine Elliott – EWTV
Bloomberg News
Al Jazeera National
Al Jazeera International

67

Reuters—interview October 6, 2014 U.S. Ebola patient receives experimental drug from Chimerix
Reuters News Service
ETWN Interview

Title of Presentation: "Doctors, Documentation and the Professional Obligation:  Has Everything
    Changed?"
Institution/Society Name: White Mass Program for Catholic Medical Association Arlington, VA
Date of Presentation: October 19, 2014

Title of Presentation:  "Saving Memories:  The Fight Against Alzheimer's and Dementia"
Institution/Society Name:  Georgetown University School of Medicine Reunion
Date of Presentation:  October 24, 2014

Title of Presentation: "Ebola, epidemics and ethics – what we have learned"
Institution/Society Name: Cookie Friday, Kennedy Institute of Ethics, Georgetown University
Date of Presentation: October 24, 2014

Title of Presentation:  "Ethical Concerns When a Baby Dies:  Making Difficult Decisions"
Institution/Society Name:  Bereavement Certification Training for Healthcare Providers in Maternal-child
Health, MedStar Georgetown University Hospital, NICU Parents Advisory Board/Division of Neonatal-
Perinatal Medicine
Date of presentation:  Monday, December 15, 2014

### Presentations 2015

Title of Presentation:  "Ethical Issues from the Ebola Epidemic:  Learning our Lessons"
Institution/Society Name:  National Institutes of Health:  Inter-Institute Bioethics Interest Group
Date of Presentation:  January 5, 2015.

Title of Presentation:  Interview:  "The CEO Who Save a Life and Lost His Job"
Institution/Society Name:  Businessweek – publication
Date of Presentation:  January 22, 2015

Title of Presentation:  Interview re Measles Vaccines – Ethical Issues
Institution/Society Name:  EWTN network
Date of Presentation:  February 4, 2015

Title of Presentation:  "Ask the Professor:  Questions Re Measles Vaccine"
Institution/Society Name:  Georgetown University
Date of Presentation:  February 10, 2015

Title of Presentation:  "End of Life"
Institution/Society Name:  Held at St. Francis of Assisi Church, Derwood, MD, for Archdiocese
     Of Washington DC
Date of Presentation:  February 21, 2015

Title of Presentation:  Small Group Leader
Institution/Society Name:  30th Annual Medical Ethics Conference in Rome for the Center for
     Ethics and Culture. University of Notre Dame
Date of Presentation:  March 8-12, 2015

Title of Presentation:  Panelist for Alzheimer's and Dementia Panel
Institution/Society Name:  Georgetown University's John Carroll Alumni Weekend,
     Los Angeles, California
Date of Presentation:  April 16, 2015

Title of Presentations:  University of Valparaiso, Chile
Date of Presentations:  April 18-24, 2015
Presentations given:

       April 21, 2015 Ethics and Medicine Discussion for Dept of Philosophy

       April 22, 2015   Lecture for Opening of Academic Year in Medical School:
           "Ethics and Medicine, Is healthcare a right?"

       April 23, 2015 Panel on Abortion and Malformations

Title of Presentation:  "When is your Patient Dead?"
Institution/Society Name:  Kennedy Institute of Ethics Intensive Bioethics Course
(also small group instructor for the week)
Date of Presentation:  Friday, June 5, 2015

Title of Presentation:  Testimony on DC's Proposed Death with Dignity Law
Institution/Society Name:  DC Council Hearing
Date of Presentation:  July 10, 2015

Title of Presentation:  Professionalism Panel
Institution/Society Name: First Year Orientation for Georgetown School of Medicine
Date of Presentation:  August 7, 2015

Title of Presentation:  Introduction to Bioethics Pediatric Ethics Rounds
Institution/Society Name:  Georgetown University Medical Center
Date of Presentation:  Sept 1, 2015

Title of Presentation:  "From Hippocrates to Homicide; The Physician's Role in the Patients' Death"
Institution/Society Name:  University of Oklahoma – Tulsa and Oklahoma City
Date of Presentation:  September 14 and 15, 2015

69

Title of Presentation:  Panelist:  Film Screening – The Sum Total of our Memory:  Facing Alzheimer's Together
Institution/Society Name:  GUMC and the Kennedy Institute of Ethics
Date of Presentation:  Thursday, October 1, 2015

Title of Presentation:  Physician Assisted Suicide:  Redefining the Role of the Physician"
Institution/Society Name:  Georgetown ROMEOS
Date of Presentation:  October 9, 2015

Title of Presentation:  Off Label or On Target?  The Ethics of Investigational and Compassionate Uses
Institution/Society Name:  NASPGHAN (North American Society for Pediatric Gastroenterology
Date of Presentation:  October 7-11, 2015

## Presentations 2016

Title of Presentation:  "Right to Die"
Institution/Society Name:  PBS Religion and Ethics Newsweekly
Date of Presentation:  Aired January 10, 2016

Title of Presentation:  "Physician Assisted Suicide"
Institution/Society Name:  Baltimore City Medical Society/Bon Secours Hospital
Date of Presentation:  February 4, 2016.

Title of Presentation:  Interview for a published article: "An Education by Faith"
Institution/Society Name:  Georgetown University Medical Center Magazine
Date of Presentation:  Fall/Winter Issue 2015

Title of Presentation:  Interview:  "OB Care in Catholic Hospitals"
Institution/Society Name:  The Guardian
Date of Presentation:  February 17, 2016

Title of Presentation:  Testimony re Physician Assisted Suicide
Institution/Society Name:  Maryland State Assembly Annapolis, MD
Date of Presentation:  Friday, February 19, 2016

> Media Reports:
> **The Washington Post** Agonizing over the right to die with Kevin Donovan, Feb. 20, 2016.
>
> **ABC 2 Baltimore** 'Right to die" legislation gets lengthy, emotional hearing In Annapolis with Kevin Donovan, Feb. 20, 2016.
>
> **Baltimore Sun** Maryland lawmakers grapple with end-of-life bill with Kevin Donovan, Feb. 20, 2016.
>
> **WBAL TV Baltimore** Hearing on End of Life Act draws crowd of supporters, Opponents, with Kevin Donovan Feb. 20, 2016

70

**Fox News Radio** (national) Physician Assisted Suicide with Kevin Donovan, Feb. 20, 2016

**WBAL Radio Baltimore** Physician Assisted Suicide with Kevin Donovan, Fb. 20, 2016

**WUSA TV** Physician Assisted Suicide with Kevin Donovan, Feb. 20, 2016.

**The Daily Record**  (subscription)  Md. House considers assisted-death provision for Terminally ill with Kevin Donovan, Feb. 20, 2016

**Catholic Review**  Physician-assisted suicide sees first major public debate of 2016 With Kevin Donovan Feb. 20, 2016.

Title of Presentation:  End of Life Presentation
Institution/Society Name:  St. Francis Church, Derwood, Maryland
Date of Presentation: Saturday, Feb. 20, 2016

Title of Presentation:  "Bioethics and Fetal Tissue"  (testimony)
Institution/Society Name:  US House of Representatives, Committee on Energy and Commerce
Date of Presentation:  March 2, 2016

Title of Presentation:  Medical Ethics
Institution/Society Name:  2016 Notre Dame Medical Ethics Conference
Date of Presentation: March 18-19, 2016

Title of Presentation:  Physician Assisted Suicide
Institution/Society Name: MedStar Georgetown University Hospital Grand Rounds Dept. of Medicine
Date of Presentation: March 24, 2016

Title of Presentation:  Panel Participant:  Right to Life/End of Life
Institution/Society Name:  Georgetown Right to Life
Date of Presentation: April 18, 2016

Title of Presentation:  'Red Flags' in Kenyan Vaccine Controversy
Institution/Society Name:  Interview by French Journalist Anne Loussouarn
Date of Presentation:  April 6, 2016

Title of Presentation:  Limits of Intervention
Institution/Society Name:  2016 Richard A. Liebendorfer Ethics Symposium, St. John Medical Center, Tulsa, Oklahoma
Date of Presentation:  April 28, 2016

71

Title of Presentation:   Introduction to Decision-making and the Role of the Ethics Committee
Institution/Society Name:  Pre-Intensive Bioethics Course (KIE) Clinical Session
Date of Presentation: June 7, 2016

Title of Presentation:  Professionalism Panel
Institution/Society Name:  Georgetown University School of Medicine for Incoming First Year students
Date of Presentation:  August 4, 2016

Title of Presentation:  Pediatric Ethics Rounds -- Introduction
Institution/Society Name:  MGUH/Department of Pediatrics
Date of Presentation:  August 16, 2016

Title of Presentation:  Testimony to Yvette Alexander "Death with Dignity "Bill
Institution/Society Name: DC Council
Date of Presentation: August 18, 2016

Title of Presentation: Quoted in "From Epic Poet to Donald Trump's Doctor"
Institution/Society Name:  STAT news
Date of Presentation: August 30, 2016

Title of Presentation:  Quoted in "Clinton's Pneumonia Fuels Debate About Candidate Health Data"
Institution/Society Name:  AP Washington
Date of Presentation:  September 9, 2016

Title of Presentation:  Testimony re PAS (Physician Assisted Suicide)
Institution/Society Name:
Date of Presentation: September 9, 2016

Title of Presentation:  EOL or OLOL:  End of Life Issues in the Catholic Tradition
Institution/Society Name: Our Lady of Lourdes Catholic Church, District of Columbia
Date of Presentation:  September 13, 2016

Title of Presentation:  Testimony on "Death with Dignity Bill" D.C.  Congressman Grosso
Institution/Society Name:  DC City Council
Date of Presentation:  September 14, 2016

Title of Presentation:  Presentation on Physician Assisted Suicide
Institution/Society Name: MedChi, The Maryland State Medical Society House of Delegates Meeting
Date of Presentation: September 22, 2016

Title of Presentation:  Physician Assisted Suicide
Institution/Society Name:  Kojo Nnambi Show in Washington, DC Public Radio
Date of Presentation: October 10, 2016

Title of Presentation:  End of Life Panel
Institution/Society Name:  Archdiocese of Washington DC (at St. Edward the Confessor Church)
Date of Presentation:  October 24, 2016

72

Title of Presentation:   Interview re Physician Assisted Suicide
Institution/Society Name: Miikaela Lefrak, American University Radio, WAMU, DC
Date of Presentation:  November 17, 2016

Title of Presentation:  "Aid in Dying:  Physician Assisted Suicide?  Compassion and Conscience." (panel)
Institution/Society Name;  Prince George's County Medical Society
Date of Presentation:  December 13, 2016

## Presentations 2017

Title of Presentation: "Physician Assisted Suicide:  Dangers for US Health Care"
Institution/Society Name; U S House of Representatives (Rep. Brad R.Wenstrup)
Date of Presentation:  January 12, 2017

Title of Presentation:  "Bioethics and the Church" (2 days of lectures)
Institution/Society Name;  Winter Clergy Education Days 2017 Diocese of Tulsa, Oklahoma
Date of Presentation: January 30 – February 1, 2017

Title of Presentation:  "Aid in Dying and the End-of-Live Act:  Issues & Answers for the Policy Debate"
Institution/Society Name;  University of Baltimore Center for Medicine and Law
Date of Presentation: February 6, 2017

Title of Presentation:  "PAS"
Institution/Society Name;  Maryland Congressional Hearing
Date of Presentation:  February 16, 2017

Title of Presentation:  PAS
Institution/Society Name;  Heritage Foundation Washington DC
Date of Presentation:  February 27, 2017

Title of Presentation:  Grant Rounds – Decision-making in Clinical Ethics
Institution/Society Name; Medstar Montgomery Hospital, Olney, Maryland
Date of Presentation:  March 2, 2017

Title of Presentation: "End of Life Care in the District:  Campus Reacts to Death With Dignity Act -- Interview
Institution/Society Name;  The Georgetown Voice
Date of Presentation: March 3, 2017

Title of Presentation: Surrogate Decision-makers Face Ethical Questions if Patient has Dementia-- Interview
Institution/Society Name;  Medical Ethics Advisor
Date of Presentation:  April 2017

Title of Presentation:  Perinatal Ethics:  Viability and Futility
Institution/Society Name;  Virginia Hospital Center
Date of Presentation:  May 16, 2017

73

Title of Presentation:  Interview:   Story by Aneri Pattani re Charlie Gard Case
Institution/Society  Name:  New York Times
Date of Presentation:  July 3, 2017.

Title of Presentation:  Radio Interview re Charlie Gard Case
Institution/Society Name:  KCBS SF radio
Date of Presentation:  July 4, 2017 8:30 a.m.

Title of Presentation:  Interview:  "Saving Charlie Gard:  Fight for Terminally Ill British Child Goes on."
Institution/Society Name;  USA Today article by Kim Hielmgaard
Date of Presentation:   July 9, 2017

Title of Presentation:  "Physician Assisted Death and Euthanasia II" – Moderator
Institution/Society:  International Academy of Law and Mental Health, Prague
Date of Presentation:  July 11, 2017

Title of Presentation:  Death with dignity/physician assisted suicide
Institution/Society: Maryland Psychiatric Society
Date of Presentation: September 16, 2017

Title of Presentation:  Ethics Committees
Institution/Society:  Virginia Hospital Center
Date of Presentation:  October 5, 2017

Title of Presentation:   Interview re Program on Lives Worthy of Respect
Institution/Society:  National Catholic Register
Date of Presentation:  October 5, 2017

Title of Presentation: Grand Rounds:  "Is it Killing or Allowing to Die?"
Institution/Society: Medstar Montgomery County Hospital
Date of Presentation:  October 12, 2017

Title of Presentation: Interview for ETWN – Embryo Adoption
Institution/Society: ETWN – Eternal Word Network
Date of Presentation:  October 16, 2017  (Aired on 11/9/2017)

Title of Presentation:  Roundtable with GU Med School Class of 1962
Institution/Society:   Reunion Weekend
Date of Presentation:  Saturday, October 29, 2017

Title of Presentation:  Reflection for Retreat – inspiration and encouragement for Catholic physicians
Institution/Society:  DC CMA Guild (held at Franciscan Monastery)
Date of Presentation:  November 18, 2017

74

Presentations  2018

Title of Presentation:  Pro-Life at the End of Life
Institution/Society: 2018 Cardinal O'Connor Conference on Life Georgetown University
Date of Presentation:  January 20, 2018

Title of Presentation:  Pro-Life in Medicine (panel discussion)
Institution/Society:  Chooselife Georgetown University
Date of Presentation:  Feb. 20, 2018

Title of Presentation:  Quoted in HOYA regarding the new PCCB MA in Clinical Bioethics
Institution/Society:  The HOYA, Georgetown University
Date of Presentation:  Feb. 22, 2018

Title of Presentation:   Debate on Physician Assisted  Suicide
Institution/Society:  American Nurses Association, Silver Spring, Maryland
Date of Presentation:  March 5, 2018

Title of Presentation:  Braman Conference – panel discussion medicine and the Holocaust
Institution/Society: Center for Jewish Studies, Georgetown University
Date of Presentation:  March 18, 2018

Title of Presentation:   Interview:  DC Assisted Suicide Law
Institution/ Society:   Washington Post Newspaper
Date of Presentation:  April 10, 2018

Title of Presentation:  Ethical Issues in Cancer Care
Institution/Society: Georgetown School of Continuing Studies; Bayer Sponsorship
Date of Presentation:  April 25, 2018

Title of Presentation:  Introduction to the Field of Medicine
Institution/Society:  Georgetown Summer Programs for High School Students; GU School of Continuing Studies
Date of Presentation: June 18, 2018

Title of Presentation:  Controversies in Death & Dying
Institution/Society:  Center for Bioethics & Human Dignity, Conference on Bioethics & Being Human
Date of Presentation: Thursday, June 21, 2018

Title of Presentation:  Stem Cell Research
Institution/Society:  Congressional Briefing
Date of Presentation:  July 19, 2018

Title of Presentation:   Interview – Catholic hospitals' moral and ethical restrictions on certain types of reproductive health care
Institution/Society:  FiveThirtyEight news outlet
Date of Presentation:  July 30, 2018

Title of Presentation:  Keynote Lecture:  Stem Cells, Patients and Medical Responsibility
Institution/Society:  6th Annual Midwest Conference on Cell Therapy and Regenerative Medicine
Date:  Saturday, September 15, 2018

Title of Presentation:  Annual Ethics Seminar – Caring for Life:  Beginning and End of Life Issues
Institution/Society:  St. John's Medical Center, Tulsa, Oklahoma
Date:  October 8, 2018

Title of Presentation:  Ethics
Institution/society:  McCourt School of Georgetown University
Date of Presentation:  November 8, 2018

Title of Presentation:   AMA Testimony re PAS
Institution/Society:  American Medical Association
Date of Presentation  November 11, 2018

## Presentations 2019

Title of Presentation:  Reflections of a Christian Scholar
Institution/society:  Georgetown University campus in Doha, Qatar, Conference on Muslim and Christian
Perspectives on Palliative Care and End of Life
Date of Presentation:  January 22-23, 2019

Title of Presentation:  Testimony Maryland Legislature on PAS
Institution/Society:  Maryland State Legislature
Date of Presentation:  February 15, 2019

Title of Presentation:   Affirming Ethical Options for the Terminally Ill
Institution/Society:  Heritage Foundation, Washington, DC
Date of Presentation:  March 11, 2019

## Presentations 2020

Title of Presentation: DNR Orders and Reallocation of Ventilators
Institution/Society: CHA Webinar
Date of Presentation:  April 16, 2020

Title of Presentation: Catholic Ethics and the Challenge of COVID-19
Institution/Society: CHA Webinar
Date of Presentation:  April 23, 2020

Title of Presentation: Catholic Ethics and the Challenge of COVID-19
Institution/Society: CHA Webinar
Date of Presentation:  April 30, 2020

Title of Presentation: Catholic Ethics and the Challenge of COVID-19

76

Institution/Society: CHA Webinar
Date of Presentation:  April 30, 2020

Title of Presentation: Catholic Ethics and the Challenge of COVID-19
Institution/Society: CHA Webinar
Date of Presentation:  May 7, 2020

Title of Presentation: Catholic Ethics and the Challenge of COVID-19
Institution/Society: CHA Webinar
Date of Presentation:  May 14, 2020

Title of Presentation: Catholic Ethics and the Challenge of COVID-19
Institution/Society: CHA Webinar
Date of Presentation:  May 21, 2020

Title of Presentation: Personal Contact Tracing of COVID Patients
Institution/Society: CHA Webinar
Date of Presentation:  May 28, 2020

Title of Presentation: Catholic Ethics and the Challenge of COVID-19
Institution/Society: CHA Webinar
Date of Presentation:  June 11, 2020 with Myles Sheehan,SJ,MD

Title of Presentation: Can we justify FH genetic testing prior to the age of consent?
Institution/Society: NLA
Date of Presentation: December 10,2020

77