**PUBLICATIONS:**

1.  Donovan, GK.  "Ethical Decision-Making in the Elderly," Chapter in Reichel's Care of the Elderly, 7th Edition, 2014, Cambridge University Press, ed. Jan Busy-Whitehead et al. 2016.

2.  Donovan, GK.  "Nutrition and Hydration in Children," in Italian Encyclopedia of Bioethics, edited by Fr. Giovanni Russo, 2018

3.  Donovan, GK and Harvey, JC.  "Geriatric Bioethics,"  in Italian Encyclopedia of Bioethics,   edited by Fr. Giovanni Russo, 2018

4.  Donovan, GK.  "Ebola, Epidemics, and Ethics – What we have learned." *Philosophy, Ethics, Humanities and Medicine*. (on-line journal) September 2014m  9:15
        DOI: 10.1186/1747-5341-9-15
        URL:  http://www.peh-,ed.com/content/9/1/15.

5.  Donovan, GK. Editorial:   "Doctors, Documentation, and the Professional Obligation: Has everything changed?" *The Linacre Quarterly*, Volume 82, Number 3, August 2015.

6.   Donovan, GK.  "Death with Dignity Legislation:   Disgraceful for DC," The HOYA, Georgetown University, 2017 Published on-line December 7, 2016.

7.  Conley, WK. McAdams, DC. Donovan, GK. FitzGerald, KT.  "Beneficence *in Utero*. A Framework for Restricted Prenatal Whole-Genome Sequencing to Respect and Enhance the Well-Being of Children," *American Journal of Bioethics (AJOB),* Issue 1, 2017.

8.  Donovan, GK.  "Physician-Assisted Suicide and the Medical Profession."   October 26, 2015.  https://blogs.commons.georgetown.edu/pccb/2015/10/

9.  Donovan, GK.  "PAS:  Unwise, Uncontrollable, and Unnecessary."  February 23, 2016. https://blogs.commons.georgetown.edu/pccb/pas-unwise-uncontrollable-and-unnecessary/

10. Donovan, GK.  "The Catholic Moral Tradition on Pain and Symptom Management." In Palliative Care and Catholic Health Care—Two Millenna of Caring for the Whole Person, edited by Peter Cataldo, 2018.

11. Donovan, GK.  "PAS:  How Should Catholic Healthcare Respond?"  Healthcare Ethics USA, Spring 2017.

12.  Donovan, GK.  Book Review:  Manuel of Catholic Medical Ethics.  Editor, Willem Cardinal Ejk MD, PhD, STL, LM Hendriks, STD, JR Raymakers MD, PhD.  Connor Court Publishing.  ISBN 978-1-925138-16-).  Linacre Quarterly 2017)

13.  McAdams, DC, Conley, WK, FitzGerald KT, Donovan GK.  "How We Should Conceive of Creation:  Natural Birth as an Ethical guidepost for Neonatal Rescue." *The American Journal of Bioethics*.  Vol. 17, Issue 8, 2017.

14.  McAdams, DC, Conley, WK, Donovan, GK.  "Cogitas Ergo Es?  Metaphysical Humility in Disorders of Consciousness, *The American Journal of Bioethics*.  July-September, Vol. 8, No. 3, 2017.

15. Donovan, GK, FitzGerald, KT, Sulmasy, DP.  "The Role of Opportunistic Salpingectomy in Risk Reduction for Ovarian Cancer," The Catholic Health Association, 2018

16. Laidlaw, M, Cretella, M, Donovan, GK.  "The Right to Best Care for Children Does Not Include the Right to Medical Transition," *The American Journal of Bioethics*. February Vol. 19, Number 2, 2019.

17.  Nicolini, ME, Peteet, JR, Donovan GK, Kim, SYK.  "Euthanasia and assisted suicide of persons with psychiatric disorders:  the challenge of personality disorders," *Psychological Medicine,* Cambridge.org/psm, 04 Mar 2019 at 16:03:17.

18.Donovan, GK.  "Reflections by a Christian Scholar."  (IN PRESS – proceedings of the Conference at GU campus in Doha, Qatar – Muslim and Christian Scholars on Palliative Care and End of Life January 2019)

19.  Moffit, RD, Curlin, FA, Donovan, GK and Anderdson, RT.  "Affirming Ethical Options for the Terminally Ill."  The Heritage Foundation, Delivered March 11, 2019. Published in LECTURE, The Heritage Foundation, No. 309, May 17, 2019.

20.Donovan, GK.   "The deadly advocacy of doctor-assisted suicide."  Analysis/Opinion. The Washington Times online.  Wednesday, October 10, 2018.

21. Donovan, GK, Sotomayor, CS.  "Strangers in a Strange Land—How our founding principles & a bitter pill undo the assimilation of U.S. Catholics."  Linacre Q 2020 May;87(2):131-137

22.Donovan, GK, Wilson DP.  "Ethical Dilemmas in Pediatric Lipidology.  Endotext.

79

Pediatrics, Chapter 28, March 2020.

23. Donovan GK, Sheehan M. "Ethical Decision-making in the Elderly," Reichel's Care of the Elderly, 8th Edition, Cambridge University Press (IN PRESS – 2020)

24. Donovan GK, "CPR, DNR and the Patient's Good," Pellegrino's Clinical Compendium, (IN PRESS Catholic of University Press 2021)

25. Donovan, GK. "Ethical Issues in the Provision of Nutrition and Hydration," Pellegrino's Clinical Compendium, (IN PRESS Catholic University of America Press 2021)

26. Subramanian S, Donovan GK. "Chapter 101 Ethics in Prenatal/Neonatal Medicine," Handbook in Neonatology (IN PRESS India 2020)

80

**TEACHING:**

Health Care Ethics Required Course for First and Second Year Medical Students
Georgetown University Medical School – Director 2012-2013,Co-Director 2014-2020

Introduction to Health Care Selective—Spring 2013
Course Title:  Medical, Ethics, and Spiritual Issues in End of Life Patient Care
Co-teaching with Abigail Rian Evans, PhD, M.Div.

"Patients, Population and Policy" Course for Dept. of Family Medicine
Georgetown University Medical Center
Small group instructor Oct. 2012-February 2013

Contraception/Population and Demography Class, School of Nursing and Health Sciences (Faculty:  Dr. Hazel Denton), November 8, 2013

Central Nervous System  1 Module, Georgetown School of Medicine, "Determining Brain Death", January 14, 2014

Profession of Medicine Course for 1st and 2nd Year Medical Students, 2013, 2014, 2015, 2016, 2017, 2018 2019

Mentoring Visiting Scholars in the Pellegrino Center for Clinical Bioethics 2013, 2014, 2015, 2016, 2017, 2018

Mentoring 4th Year Medical Students in the Bioethics  Clerkship, 2015, 2016, 2017, 2018, 2019


**(Updated MedStar Georgetown Hospital Teaching—3rd and 4th yr students, residents and fellows -- list can be supplied upon request)**

81

## ON GOING ACTIVITIES:

Moderator Pediatric Ethics Rounds, MedStar Georgetown University Hospital
Monthly beginning 2012 -2020

Clinical Service in Pediatric GI – procedures, attending and seeing patients beginning January 2013-2019

Ethics Consult Service provided by the Pellegrino Center for Clinical Bioethics for MedStar Georgetown University Hospital beginning September 2012-2020

MGUH Ethics Committee

Student Humanities in Medicine Interest Group, Georgetown University Med School, 2012-2013

Moral Distress Conferences for nurses in MedStar Georgetown University Hospital

End-of-Life conferences with nurses in MedStar Georgetown University Hospital

Faculty advisor to:
> Medical Students for Life
> Gold Humanism Honor Society
> Student Catholic Medical Association

2nd Opinion Clinic for Pediatric Gastroenterology and Nutrition, MedStar GU Hospital -2019

Transplant listing meetings

82

## COMMITTEE ASSIGNMENTS AND BOARDS - GUMC

ACA – Affordable Care Act review committee – for GUMC 2012-13

Member Ethics Committee for MedStar Georgetown University Hospital 2012-present

Bioethics and Christian Theology Affinity Group, GU  2012-2013

Gold Humanism Committee, GU Med School 2012-2013,2014-2020

ERD Discussions GUMC 2012-2013

On-going discussions with Allen Roberts, MD and Thomas Fishbein, MD re uterine transplantation

**Search Committee** for MedStar Georgetown University Hospital Chaplain 2012-2013

Georgetown School of Medicine **Committee on Students** 2013-2019

Board of Advisors for Mission and Ministry 2013 -

Subcommittee , Transplant Ethics Committee 2013

Ruesch Center for the Cure of GI Cancers, Board of Advisors 2013-2019

Committee to Develop a Curriculum in Reflection, Formation, and Leadership 2024-present

LIFE MOOC, Advisory Board  2014-present

End of Life Committee 2014 - present

Service and Social Justice Working Group GUMC 2015-

Curricular Content Committee – 2016-2018

Global Health Initiative – 2017-

Ad Hoc Committee – MedStar/PCCB re PAS – 2017

LCME 2019 Co-Chair Self Study Committee 2017-2018

## SERVICE OUTSIDE OF GEORGETOWN UNIVERSITY MEDICAL SCHOOL

MEDCAC – Medical Evidence Development and **Advisory Committee, Center for Medicare and Medicare Services 2017**

**ASBH** Clinical Ethics Consultation Affairs (CECA) Committee (one year term) Oct. 2017-2018

**Center for Bioethics and Human Dignity** Advisory Committee, , Deerfield, IL 2017-2021

MedStar system Ethics Committee 2018-2020

GUMC-MedStar Committee on Research Development 2018-

MedStar Committee Launching PGx 2018-

**Uniform Law Commission:** Study Committee on Disposition of Human Embryos and Gametes at Divorce, Separation and Death,– 2019 –

**NIH** Human Fetal Tissue Research Ethics Advisory Board 2019

**SEARCH COMMITTEE,  Kennedy Institute of Ethics, Director 2019-2020**

84

**OTHER ACTIVITIES/ASSIGNMENTS**

Review of manuscript for the Kennedy Institute of Ethics Journal on "The Affordable Care Act and Community Benefit:  A Mandate Catholic Health Care can Embrace" submitted November13, 2012

Named Editor-in-Chief **Philosophy, Ethics and Humanities in Medicine** – web journal 2016-2018

 Grant on Advanced Directives, writer with Allen Roberts, MD ,Medstar Georgetown University Hospital 2013 ( *not awarded)*

Participated in Meeting of Jesuit Center Leadership Feb. 24, 25, 26, 2013

Host Committee – Med Students for Life Speaking Tour 2013

Interview for Magnet Site Visit Oct. 15, 16, 17, 2013

Participate  in MNE (Metabolism, Neurology, Endocrine) Middlesex discussion panel, September 30, 2013, Georgetown University Medical Center

Grant written to Scholl Foundation for $50,000 for fellowships – 2014

Professionalism Panel at First Year Orientation GU Med School, Aug. 8, 2014, 2015,2016,2017,2019


**AWARDS AND COMMENDATIONS;**

"*G. Kevin Donovan Award in Bioethics*" –named in 2012 in recognition of Dr. Donovan's contributions during his two decades of leadership of the Oklahoma Bioethics Center

Most-Cited Articles as of September 1, 2013 (MIND quarterly review of philosophy)
> G. Kevin Donovan, "Decisions at the End of Life:  Catholic Tradition"
> Christian Bioethics (1997) 3 (3) 188-203 doi: 10.1093/cb/3.3.188


Best Doctors in America/Washington Post Magazine 2013

Best Doctors in America—named in 2013-2014

Nominated for:

 Golden Apple Award – (teaching) Georgetown University Medical School - 2014

 American's Best Physicians, 2016

 Best Doctors in America 2017-2018

85

86

# EXHIBIT "A"

# Florida Medicaid Project: Treatment for Transgender Children

## Medical Experimentation without Informed Consent:

## An Ethicist's View of Transgender Treatment for Children

G. Kevin Donovan, MD, MA

5-12-2022

# Florida Medicaid Project: Treatment for Transgender Children

### Medical Experimentation without Informed Consent:
### An Ethicist's View of Transgender Treatment for Children

## I.   The Issue

Growing controversy attends the diagnosis and treatment of individuals identifying as transgender, particularly those who are still children or adolescents. As was recently pointed out, leading medical, mental health, and public health organizations support understanding gender-diverse youth and providing gender-affirming medical (hormonal) and other(surgical) care as the standard of care, including the American Academy of Pediatrics, American Psychological Association, Centers for Disease Control and Prevention, Society for Adolescent Health and Medicine, and the American Medical Association. Major nursing organizations—the American Nurses Association and the American Academy of Nursing— have made statements that young people's access to inclusive, safe, and competent health care is a human rights issue.  (Wolfe, I., & Goepferd, A. "Child Abuse in Texas." *The Hastings Center*. 14 Mar. 2022) However, this widespread support is not going unchallenged, even by those who have been providing medical interventions for these children and adolescents.

Recently, questions have arisen about the appropriateness of both the diagnosis, and the safety and efficacy of these interventions that have been strongly encouraged up until now. Currently, less than half of state Medicaid programs provide gender affirming care. (Mallory, C., & Tentindo,W. "Medicaid coverage of gender-affirming care." Williams Institute, UCLA School of Law. Oct 2019). The Florida Surgeon General has said that minors should not undergo gender transition procedures, puberty blockers and hormone treatments. "Florida Department of Health Releases Guidance on Treatment of Gender Dysphoria for Children and Adolescents." 20220420-Gender-Dysphoria-Press-Release | Florida Department of Health.) In Texas, the state attorney general issued a decision that gender-affirming medical treatments such as puberty-suppressing hormones fall under the definition of child abuse in Texas state law. In fact, 34 states have introduced legislation to limit hormonal and surgical interventions for such transgender patients. This aligns with similar reassessments and limitations in the United Kingdom, Sweden, Finland, and France. A new position statement from the Royal Australian and New Zealand College of Psychiatrists (RANZCP) stresses the importance of a mental health evaluation for people with gender dysphoria — in particular for children and adolescents — before any firm decisions are made on whether to prescribe hormonal treatments to transition or to perform surgeries, often referred to as "gender-affirming care." "There is a paucity of quality evidence on the outcomes of those presenting with gender dysphoria. In particular, there is a need for better evidence in relation to outcomes for children and young people," the guidance states.

Given the legitimate concerns about the diagnosis, treatment, and the paucity of supportive, scientific studies in regard to the interventions being offered to minors who identify as transgender, I will offer a view of these from the perspective of an ethicist and pediatrician. This will be done in the face of strong and sometimes heated opposition to any variance from the currently prevailing recommendations. Each category of currently recommended or potential treatments will be briefly considered within this framework. The evidence base for these will be reviewed, and an overall argument made that such interventions must be considered as medical experimentation, subject to the requirements of research in childhood with informed consent. Finally, I will conclude with an examination of the fundamental flaw of the transgender project in childhood, and how it is leading to inevitable and controversial challenges.

1

In order to do this, we must review the ethical requirements for medical research in childhood and the elements of **informed consent**. Because of numerous abuses in the past, a strong system of regulations and oversight has been developed for the protection of human subjects in the United States. This began with the Belmont Report: (https://www.hhs.gov/ohrp/regulations-and-policy/belmont-report/index.html) The report not only described the ethical principles listed below, but led to guidelines for research protections that are now codified in Federal regulations (Code of Federal Regulations, or 'CFR') and monitored by the U.S. Department of Health and Human Services (DHHS). These led to the establishment of IRBs (Institutional Review Boards) which are responsible for the protection of human subjects in federally funded research—IRBs are the Federally mandated committees that review research activities for the protection of human subjects. The Office for Human Research Protections (OHRP) provides leadership in the protection of the rights, welfare, and wellbeing of subjects involved in research conducted or supported by the DHHS. The OHRP helps ensure this by providing clarification and guidance, developing educational programs and materials, maintaining regulatory oversight, and providing advice on ethical and regulatory issues in biomedical and social-behavioral research. These measures have laid the ground rules for human research, in adults and children including the need for informed consent.

Although adults may be included in research, this should only be done with *fully informed consent*, and the requirements will differ for children and other vulnerable subjects. The bedrock of these protections lies in obtaining the informed consent from the participant. Informed consent to medical treatment and research involvement is fundamental to both ethics and law. The process requires that a *fully autonomous patient* have the ability to *understand relevant medical information* about the proposed interventions, including the *risks, benefits if any, and alternatives* (including doing nothing/non-participation). and consent *voluntarily* without *coercion*. This is rooted in respect for the **ethical principles** of **autonomy**, **beneficence**, and **justice**.

*Autonomy* is derived from respect for persons, which requires that we not only respect those who are fully autonomous but protect those individuals that are not fully autonomous. Vulnerable subjects such as children cannot legally or ethically participate in the consent process due to their age and maturity level. The rules for their involvement are set out by the Code of Federal Regulations (46 CFR 401-409). While consent cannot be given for another person, parents or guardians can give "permission" and children can give assent to the extent that they are able. The process of obtaining assent should be appropriate to the age, maturity, and psychological development of the child. The consent process must contain three ethically required components: *information*, *comprehension*, and *voluntariness*. Deficiencies in any of these categories would invalidate the process. The main contention here is that deficiencies in *all* these categories can be found in the current approach to minors who identify as transgender, and current attempts at treatment should not proceed as they are now practiced.

*Beneficence* is reflected in the complementary expressions of (1) do no harm and (2) maximize possible benefits and minimize possible harms. An assessment of risks and benefits will depend heavily on the delivery of accurate and complete information as described above. An assessment of risk will include both the probability and the severity of envisioned harms, both physical and psychological.

Finally, *justice* requires fairness in distribution of risks and benefits. It suggests that not only should like cases be treated alike, but different approaches are appropriate for different circumstances. This is highly relevant in the selection process for those being subjected to the various interventions while still minors.

Thus the process of informed consent must proceed with a correct diagnosis, the nature and purpose of recommended interventions, the known burdens and benefits of all options, including doing nothing or forgoing the intervention. While not able to do an exhaustive review of these elements as they apply to the main treatment approaches recommended for transgender minors, we can briefly examine each category to assess for obvious deficiencies. The issue of deficient information will be significant in each category, and questions of comprehension and voluntariness will be addressed at the end.

## II.   The Interventions

### Surgery

A variety of surgeries have been performed on transgender adults. These range from removal of both breasts (bilateral mastectomy) and associated chest reconstruction, nipple repositioning, dermal implant and tattooing, to gender surgery for trans men which includes construction of a penis (phalloplasty or metoidioplasty), construction of a scrotum (scrotoplasty) and testicular implants, or a penile implant. Removal of the womb (hysterectomy) and the ovaries and fallopian tubes (salpingo-oophorectomy) may also be considered. Surgery for trans women includes removal of the testes (orchidectomy), removal of the penis (penectomy), construction of a vagina (vaginoplasty), construction of a vulva (vulvoplasty), construction of a clitoris (clitoroplasty), as well as breast implants for trans women, facial feminisation surgery and hair transplants. Certainly there are multiple known risks to this long list of surgeries. These used to be described as "sex-change" operations: they are now termed "gender affirming surgeries." The semantic shift is important, as we will see.

Most, but not all, practitioners would delay undertaking these permanent alterations in minor children and adolescents. This may be as much for legal reasons as for medical considerations. However, the lack of sexual maturity in younger patients, especially if previously delayed by puberty blocking agents, makes the sparse tissue more difficult to work with and outcomes less favorable, with problems such as wound rupture more likely. These are not challenges that are routinely described to minors at the beginning of their treatment progression with puberty blocking agents or hormones. This deficit of information would be a major failing.

### Hormonal Treatment

Treatment with cross-sex hormones is a mainstay of gender affirming care. These result in the changes in body habitus, facies, voice tone, and hair development that transgender patients seek. They are described as "gender affirming", "life-saving" and "a human right" by their proponents. They have been prescribed by Planned Parenthood clinics and others after a first visit for gender dysphoria (https://www.plannedparenthood.org/planned-parenthood-greater-texas/patient-resources/transgender-healthcare). Surely no one would argue that such a precipitous practice has been accompanied by a full psychological evaluation, or disclosure of medical risks. Chief among these is the fact that the resulting bodily changes will not disappear, even if the initial desire for them changes. And this change is no unlikely development – upwards of 80% of minors who identify as transgender will reverse this identity by the time they reach their mid-20's if left untreated, and revert to their previous identification, albeit possibly with a same-sex attraction. It is more than simply changes in one's body that are at risk; sex hormones have an important and lasting effect on brain development and adolescent psychology. To not fully appreciate this fact, or to not have it delineated in the first place, is an egregious failure of informed consent.

## Puberty Blockers

Perhaps the greatest failure of informed consent, and non-disclosure of human experimentation outcomes, is found in the supposedly benign use of puberty blocking agents in minors. They are routinely and widely prescribed with the thought that this will "buy time" for those questioning their gender as minors. Children and their supportive parents are assured that they are a benign intervention whose effects are easily reversible, just in case the child decides not to transition. Some potential effect on the development of bone density may be mentioned. The extent of this danger is just now being appreciated, with severe and disabling osteoporosis described in at least one child in Sweden. This led to new guidelines for gender-affirming care issued in February by the National Board of Health and Welfare. It stated that, based on current knowledge: "the risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits, and that the treatments should be offered only in exceptional cases." However, the effect of puberty blocking agents (started in early adolescent development) on long-term sexual function seems to be largely unstudied. Current guidelines recommend starting puberty blockers at the earliest stage of sexual maturation in children (Tanner two). These will not only prevent the enlargement of penile tissue, it will desensitize the orgasmic potential for tissues later exposed to cross-sex hormones. Simply put, transgender adults treated in early adolescence with puberty blockers may never experience orgasm. When children with gender dysphoria are given these powerful hormones (around age 11) they are too young to appreciate the implications of what will happen.

It is not simply a matter of chronology. As children mature into adolescents and adults, their brains are also being formed and reformed under the influence of sex hormones. There is evidence for structural changes, and these are likely to be demonstrated in cognitive and behavioral changes. In fact, the development of the adolescent brain and the maturation of its rational and executive functions does not typically complete until one's early 20s. Although the deleterious effects on sexual development and function in adulthood from puberty blockers may be predicted, no one is entirely certain of the effects on other critical areas such as brain development and bone density. Carefully constructed and monitored studies have not been done. *Until they are, these off-label treatments with puberty blockers and cross sex hormones can only be considered experimental.* Experimental interventions should be done as carefully as any other research, and fully informed consent is the only ethical way to enter into such studies. Clearly, this is not the current practice.

## III.   The Fundamental Flaw

There appears to have been a headlong rush in the past decade towards the process of gender affirming care described above. After close scrutiny, it can only be seen as off label experimentation, despite the fact that informed consent practices do not conform to this reality. Given this, we must ask ourselves: how can experienced and ethical physicians so mislead others or be so misled themselves? In 2013, the American Psychiatric Association published their update of the Diagnostic and Statistical Manual of Mental Disorders, the DSM-5. In it the diagnosis of "gender identity disorder" was replaced with "gender dysphoria." This was done to "avoid stigma and ensure clinical care for individuals who see and feel themselves to be a different gender" other than the one to which they were born. The APA stated that "it is important to note the gender nonconformity is not in itself a mental disorder. The critical element of gender dysphoria is the presence of clinically significant distress associated with the condition." Dysphoria is a state of uneasiness, unhappiness, or dissatisfaction. With this change in terminology there was also a shift from seeking or correcting the underlying cause of the dysphoria, and a focus on transitioning to the preferred gender.

4

This revision has probably done more harm than good by accepting a self-diagnosis characterized by the belief that the patient (or their essence) is "trapped in the wrong body." This concept relies on the Cartesian duality, a body-self dichotomy. It reverts to the fallacious "ghost in the machine" concept. In reality, we cannot be trapped in the wrong body; we **are** our bodies, which are an integral and inseparable part of ourselves. To assert that there is a female self inside a male body (or the reverse), is to fail to achieve a full understanding that we are embodied persons, unified body and mind, if you will. A generation ago, sex and gender were taken to be synonyms for the same phenomena. Even now, a transgender female, no matter how much or how long of a hormonal therapeutic regimen they undergo, is still genetically male. Ignoring this fact has led to a contradiction, where sympathetic practitioners recommend "holistic care" while insisting on a fragmented concept of the self. This approach has been warmly embraced, even insisted upon, by many practitioners while viewed as nonsensical and even ludicrous by many laypersons.

Inevitably this has led to added difficulties. Even young patients are encouraged to begin puberty blockers and then hormones based on a self-diagnosis. Self-diagnosing psychiatric conditions is always fraught with the possibility of error. In this case, there can be no confirmatory lab tests, radiologic exams, or genetic findings. Moreover, the dysphoria can only be diagnosed and opened to treatment if it is causing significant trauma to the individual. The clinically significant distress manifests itself in underlying psychiatric diagnoses such as depression and suicidality. It is argued that embarking on affirmative treatment as early as possible is urgently needed to prevent further psychiatric complications, a contested assertion. Studies have shown that adult transgender persons continue to have evidence of depression and suicidality following treatment. The rate of suicide among post-operative transgender adults in a study from Sweden found an incidence 20 times greater than that of the general population. Such treatment may not be urgently needed to protect adolescents; it may not even be effective protection for their adult counterparts.

The claim of urgency coupled with an impulse toward nonjudgmental empathy for the disturbed patients has led to a frantic insistence on a single approach that may seem almost cult like in its insularity and opposition to outside challenges. Both parents (Trinko, K.(Nov. 19, 2018 "What It's Like to Lose Your Children to the 'Transgender Cult,' From a Mom Who Knows." *The Daily Signal*, 30 Oct. 2019) and teachers (Manning, M. for The Mail on Sunday. "Whistleblower Teacher Makes Shocking Claim That 'Most Are Autistic'." *Daily Mail Online*, Associated Newspapers, 19 Nov. 2018, https://www.dailymail.co.uk/news/article-6401593/Whistleblower-teacher-makes-shocking-claim-autistic.html.) report that their children or students are being wrongly encouraged at school to think of themselves as transgender. Sometimes this is the result of overenthusiastic acceptance or "love bombing". Sometimes it appears to influence the susceptible, as in autistic children. Sometimes transgender counseling is taking place even without the parents' knowledge, and this troubling approach has been supported in the literature with statements that adolescents should be legally empowered to obtain puberty-blocking without parental consent (Priest, M. Transgender Children and the Right to Transition: Medical Ethics When Parents Mean Well but Cause Harm. Am J Bioeth. 2019 Feb;19(2):45-59).

Inevitably, this has resulted in complications and conflicts. The media have been replete with reports of such things as contested accessibility of transgender females to such things as domestic abuse shelters, female prisons, and female sports competitions. Similar issues regarding bathroom accessibility in schools recently came to a boil in Virginia, when it came to light that a sexual assault by a self-described trans- female (with a penis) was repeated in another school after the perpetrator was transferred. (Poff, J. "Loudoun superintendent failed to inform state of school sexual assault." Washington Examiner, 4 May 2022.) These issues are far from any resolution by debate, discussion, or legislation. In fact, both sides of the debate have doubled down with insistence that the opposing viewpoint must not only be rejected but considered unethical and made illegal.

Some disturbing trends have developed resulting not only from this dichotomy of opinion about the proper treatment approach, but ultimately based in the acceptance of the mind-body dichotomy. There has been a change in the diagnosed population. As Abigail Schrier pointed out:

> For the nearly 100-year diagnostic history of gender dysphoria, it overwhelmingly afflicted boys and men, and it began in early childhood (ages two to four). According to the DSM-V, the latest edition of the historical rate of incidence was 0.01 percent of males (roughly one in 10,000).

> For decades, psychologists treated it with "watchful waiting" — that is, a method of psychotherapy that seeks to understand the source of a child's gender dysphoria, lessen its intensity, and ultimately help a child grow more comfortable in her own body. Now such an approach is disdained by the term "conversion therapy", and labelled as unethical, and even made illegal.

She continues:

> Since nearly seven in 10 children initially diagnosed with gender dysphoria eventually outgrew it, the conventional wisdom held that, with a little patience, most kids would come to accept their bodies. The underlying assumption was children didn't always know best. But in the last decade, watchful waiting has been supplanted by "affirmative care," which assumes children do know what's best. Affirmative care proponents urge doctors to corroborate their patients' belief that they are trapped in the wrong body. The family is pressured to help the child transition to a new gender identity — sometimes having been told by doctors or activists that, if they don't, their child may eventually commit suicide. From there, pressures build on parents to begin concrete medical steps to help children on their path to transitioning to the "right" body. That includes puberty blockers as a preliminary step. Typically, cross-sex hormones follow and then, if desired, gender surgery. (Shrier, A. "Top Trans Doctors Blow the Whistle on 'Sloppy' Care." Emmaus Road Ministries, 5 Oct. 2021)

These pressures apply not only to parents, but to the children themselves because of the strong emphasis on affirmative support for anyone declaring themselves transgender. As one mother described: "A lot of these kids have concurrent mental health issues, and they find a place to fit in because as soon as you say that you're trans, you get love-bombed," she reflects. "You get love-bombed online, you get love-bombed on at school … As soon as you say you're trans, you turn into a star. And kids are thirsty for that kind of affirmation." (Trinko, 2019)

Two phenomena may be associated with this. Strong affirmation for the diagnosis and hormonal treatment may be altering the natural course of the phenomenon in childhood. It may not only be easier to identify as transgender in today's environment; it may be more difficult to turn ones back on the diagnosis. This may help explain a recent report that found that an average of 5 years after their initial social transition, 7.3% of youth had retransitioned (changed gender identity) at least once. At the end of this period, most youth identified as binary transgender youth (94%), including 1.3% who retransitioned to another identity before returning to their binary transgender identity. 2.5% of youth identified as cisgender and 3.5% as nonbinary. Later cisgender identities were more common amongst youth whose initial social transition occurred before age 6 years; the retransition often occurred before age 10. Unlike previous studies of transgender youth, males were not predominant, but were outnumbered by 2 to 1. Moreover, this is a direct contradiction of previous data showing a high rate of reversion towards a sex/gender coherence in children as they mature. (Olson, Kristina R., Durwood, Lily, Horton, Rachel, Gallagher, Natalie M., & Devor, Aaron; Gender Identity 5 Years

After Social Transition. Pediatrics 2022: 10.1542/peds.2021-056082) We must ask if this represents a shift towards being trapped in a wrong diagnosis, rather than a child being trapped in a wrong body.

In fact, there has been another shift. Unlike in the past, we now see increased numbers of females identifying as transgender, and later in their adolescence. Sometimes this occurs in large cohorts within a single school or peer group, a phenomenon labelled "rapid onset gender dysphoria." Both these phenomena call into question the underlying cause for the concept of gender dysphoria. Rather than approaching it as an accurate self-diagnosis that must be affirmed and treated to change the outward sexual appearance, isn't there a better model? We may be making a fundamental mistake in approaching transgender phenomena, not as a disease or disorder, but at most a dysphoria that is a cause for affirmation. This contrasts with our approach to similar conditions claiming a mind- body divergence, such as anorexia nervosa or body integrity identity disorder. The former is familiar to most Americans. The latter is a rare mental disorder characterized by a desire to have a physical disability, claiming discomfort with being able-bodied and often resulting in a request for amputation of the body part that makes them uncomfortable. People with this condition may refer to themselves as "trans abled."

In all three of these conditions there is a claim for a mismatch between one's mental bodily image and physical body. All tend to find an onset in prepubescence and are frequently associated with other mental disturbances. "Affirmative care" is the only recommended standard for transgender patients. It is horribly disturbing to contemplate amputation of a healthy limb because of a mental disorder (although this has been done). No one would seriously consider surgery to limit caloric intake or weight gain for a patient with anorexia nervosa, in order to support and affirm her distorted body image. Nevertheless, sex change operations have been recast as "gender affirming surgeries", The change in language reflects the change in attitude that distorts the approach to treatment for a psychiatric, not medical/surgical, disorder.

Finally, what are we to make of this situation, as a medical profession, and as a society? This question cannot be answered until both the affected people and profession can overcome our collective hubris. It is not enough to admit we don't know all the answers. We must see that we are not yet certain of all the questions that must be answered. In such a situation, competing interests must not pretend to take the moral high ground when no one can be certain where it will be located. First and foremost, we must back off from our current approaches until questions can be answered with proper studies, done with sufficient patients, and sufficient controls, over a sufficient period of time. Any insistence on a single course of therapy without this information could prove to be the same type of morally unacceptable interventions that caused formal research protections to be created in the first place.

In the meantime, we must adopt a more respectful tone with those whom we disagree. As John Milton said, "Where there is much desire to learn, there of necessity will be much arguing, much writing, many opinions; for opinion in good men is but knowledge in the making." Most important of all, in order to protect the current and future well-being of these affected children, we must rely on the ancient principal of medical ethics "In the first place, do no harm." Until we can demonstrate the efficacy and safety of any proposed treatment or intervention, its usage must properly be considered a medical experimentation and require fully informed consent. Anything less is a betrayal of both our principles and our progeny.

_____

*About the author: Dr. Donovan's observations flow from his professional experience. He has been a Board-certified pediatrician for over 40 years, as an academic physician who rose to Vice-chair of the Department of Pediatrics and ultimately interim Chair at the University of Oklahoma in Tulsa. His professional role and interests expanded in the 1990's after he took a sabbatical in medical ethics at*

*Georgetown University under the world-famous Dr. Edmund Pellegrino, a founding father of modern bioethics. He subsequently went on to earn a master's degree in Bioethics and founded the first bioethics center in his home university, where he was responsible for ethics training and education for students and physicians. He also served as clinical ethics consultant for three teaching hospitals. He was chair of the Section on Bioethics for the American Academy of Pediatrics (AAP) for three years and then their first liaison member of the AAP Committee on Bioethics. He has also served as the chair for a hospital Intuitional Review Board for 17 years. Finally, he was asked to become Director for the Center for Clinical Bioethics at Georgetown University School of Medicine, where he served from 2012-2020. His duties included teaching, consultation, publishing papers and speaking on bioethics extensively at the local, national, and international level on four continents. He has been interviewed and quoted on National Broadcasting Company (NBC), National Public Radio (NPR), Eternal Word Television Network (EWTN), and Al Jazeera, as well as the New York Times and the Washington Post, among others. He was awarded the Humanism in Medicine award from the Gold Foundation, which recognizes physicians to have successfully integrated humanism into the delivery of care to their patients and families. He has also offered formal testimony on bioethical issues before state legislatures and the U.S. Congress.*

# Appendix Attachment

# 10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                                    Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## DECLARATION OF JOSEPH ZANGA, M.D.

I, Joseph Zanga, M.D., hereby declare and state as follows:

1.     I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this declaration and would testify completely to those facts if called to do so.

2.     While my curriculum vitae (attached) outlines my background and expertise, I here provide a few details as amplification.

3.     After graduating from college with a major in Biology and a minor in Philosophy and Theology (Ethics), I matriculated to Medical School where I quickly determined that my career path would be to care for children in the context of their families.

4.     After Medical School my Internship and Residency led me to an academic career beginning with a further year of education as a Fellow in Community Pediatrics. Though active in the direct care of children in the context of their families, my work in academic centers teaching premedical (college), medical, nursing and other students, pediatric and family medicine residents, as well as post-graduate physicians and others, made me a lifelong student of medicine in all its varied iterations. This is how I came to work with adolescents, work in and direct programs in Child

Abuse/Child Protective Services, build a Community Coalition to end human trafficking, and in all of these areas studied the physical, mental, and emotional development of children to young adulthood.

5.      I continue, even in retirement, to do so, serving for a time as Health and Safety Chair for a 3 county Boys and Girls Club and as a member of my County Community Resilience Collaborative, among other activities where my education and experience might be useful.

6.      I have been retained by the Defendants in the case to describe my experience with the American Academy of Pediatrics (AAP), to express my opinion regarding the AAP's decision-making process for positions taken by the AAP regarding gender dysphoria treatments, and to express my opinions about current, non-science-based approaches, to gender dysphoria in children and adolescents.  If called to testify in this matter, I would testify truthfully based on my almost 50 years of pediatric study about, experience with, and knowledge of, the health and being of children and adolescents.

7.      I am being compensated at an hourly rate of $400 per hour for my time preparing this declaration. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

8.      I have been a Fellow of the AAP for about 50 years having joined because of their role as a defender of the health and well-being of children. I joined because of the high regard in which it was held by my professors and colleagues. I joined to receive quality continuing education and become involved in the work it was doing on behalf of children. Over the years I've encouraged many pediatricians, and pediatricians-in-training to join. While still an AAP Fellow, and participant in AAP activities, I have become concerned about its direction in recent years.

9.      During these 50 years the AAP has grown from 30,000 or so members to about 67,000 members. (Please note that **Fellows** are Board Certified Pediatricians while **members** include students, Residents, pediatric dentists, and others working with children. Members also include

App. 743

pediatricians and others in Canada, Mexico, and other nations. There are more Board Certified Pediatricians in the USA than Fellows of the AAP. So the 67,000 members aren't all the US pediatricians.

10.     The AAP has also grown from a small office in Evanston, to a new, quite large, building in Itasca, and a smaller office in Washington, DC, with a combined staff compliment in the hundreds. Member dues are the bedrock of support but there is increasing funding from government, foundations, and the pharmaceutical industry.

11.     Distressing to me and other members is a bent towards what was termed "political correctness" in issues such as gender dysphoria.

12.     When an issue of concern impacting children is brought to its attention, the AAP considers the development of Policy to address it. The process usually begins with the Board of Directors (BOD) which refers the issue to a standing Committee (usually), Council, or Section Executive Committee to develop a Statement for publication. Committees have 10 to 15 members, the majority of whom are Fellows chosen by the BOD from AAP Chapter recommendations. There are also non-Fellow members who may or may not be Pediatricians. When completed, the Statement is referred back to the BOD for discussion, perhaps review by other relevant Committees, etc. for their opinion, and then a BOD vote. If a majority approves, the Policy is published as a product of the AAP, referencing the Committee, etc. and the principal author.

13.     The process is therefore internal and involves none of the other AAP Fellows/Members who are not Committee, etc. members. The voting Board is composed of 17 members with one elected by Fellows in each of the 10 AAP geographic Districts. There are 3 at-large members elected nationally and a 5 member Executive Committee, 4 elected nationally, and the employed CEO. There is no review or vote by the remainder of the AAP membership.

3

14.     From the above (#12 & #13) AAP Policy cannot be said to reflect opinions/beliefs of all, or even a large cross-section of, even AAP members. There is one potential exception to this and that is the Annual Leadership Forum (ALF). Occurring in the late Summer to early Autumn of each year, the ALF brings together Chapter officers, Committee (etc. Chairs, the BOD, and others to review Resolutions, submitted by AAP Fellows, Chapters, etc., requesting that the AAP take action on an issue. The Resolutions, if approved, are only advisory to the BOD but do call BOD attention to issues.

15.     With respect to the Gender Dysphoria issue, Resolutions were submitted to the ALF in 2021 and 2022. In 2021, Resolution 33 asked the AAP to study further the science of this children's issue currently presented as AAP policy. It was written with abundant referenced science and an extensive bibliography. In the Reference Committee (B) to which this resolution was assigned, it received 50 yes votes, 12 no votes, and perhaps 10 abstentions. At 80.65% it had about the highest support of any resolution in Reference B, yet the Committee "Had No Recommendation" (neither for nor against it being presented to the entire ALF) and the resolution then disappeared, never apparently brought to the main voting session. A similar resolution in 2022, simply again asking the AAP to study the issue, was rejected on procedural grounds and never presented at the ALF.

16.     Many wonder why this potential objection to the AAP position of transgender affirmation was treated so unscientifically and undemocratically. This is quite opposite my past experience with the AAP and the ALF (then called the ACF), as in the past there was always vigorous discussion of controversial issues. For the proposal on this issue, at least in 2021, there seemed to be little controversy. The Reference Committee members overwhelmingly wanted it presented to the ALF.

App. 745

17.     So why is the AAP so set in their defense of children/adolescents being allowed to begin transitioning at almost any age. Is this in the best interest of children? The simple answer is "no".

18.     My first written statement on the issue, after much research, *First Do No Harm* (attached), was published in my local medical society newsletter in July of 2018 and was updated and republished in the Spring 2020 AAP Senior Bulletin. What was written then is still true today. In outline form here are the continuing/expanded reasons for my concern:

a)   As I noted in #4 & #8 above, Pediatricians, guided by the AAP, have always provided care for children in the context of their families. Why is the AAP now not discouraging, or perhaps even encouraging, schools and others working with children to keep parents uninformed about transitioning ideation and actions?

b)   From the start of my pediatric education, I was taught that parents are the decisions makers for their children as children/adolescents are too immature and inexperienced to make potentially life altering decisions.

c)   In the 1990s, science verified what was long ago known and taught to pediatric trainees in the 1960s – 1980s, that the brains of children are incapable of making long term, life changing, decisions until their early to mid-20s.

d)   The AAP as always held firmly to this position from its origins as an organization. We expected that it would do so even more with science documenting the rightness of this approach.

e)   For the most part the AAP does teach that children need parental, and often pediatrician, guidance in important matters. We also articulate many "thou shalt nots" directly to youth. We tell them that they should not drink (alcohol), use tobacco products or other drugs, to avoid tanning beds, not operate or ride with

5

another on an ATV, and refrain from excessive media use, among other activities. We make clear that if a child, usually an adolescent, comes to us seeking diet advice or medication for a perceived body image problem (anorexia) our approach is to seek out the underlying problem and counsel, or refer for counseling, to correct the unreasonable thinking and "cure" the child. We do not "affirm" their body image problem and assist them in losing weight. We do not provide diet pills or weigh loss surgical procedures. There are other things we would not recommend no matter the request of the child or parents (growth hormone to improve sports performance, weight loss to wrestle in a lower weight category, are among these).

f) It is at least puzzling then that we do precisely that when a youth, incapable of making such a decision, requests to transition to the opposite sex. This is especially concerning when good studies have shown that the desire to do this disappears in most (80 – 90%) after passing through puberty or by late adolescence.

g) As this is our standard for care for almost all other issues it is distressing to me that the AAP recommends that we affirm a child's desire to transition, provide help to do so, and works to prohibit counseling to cure the desire at its root even to the extent of supporting the legal punishing of counselors who might provide that service. This despite knowing that appropriate counseling can work to dissipate gender dysphoria

h) In addition, the AAP seems to ignore the potential harms which might accrue, some of which may be impossible to know at present. We do know however:

    i. That puberty-delaying or gender-affirming hormone therapy, diminishes bone mineral density, at least in the short term.

App. 747

ii.    That many of the drugs used increase blood pressure, risk of obesity, cardiac disease, blood clots, strokes, diabetes, and cancers. They also have deleteriously effects on the (presently immature and malleable) brain. Unfortunately, for none of these do we have long term studies, though short term studies and projections from adult are not favorable. It is inappropriate medical care to experiment on youth in this fashion, waiting for years or decades to learn if we were right or wrong.

iii.   That even the easily observable immediate ill effects seem to be irreversible.

iv.    That the basic premise is scientifically impossible and dangerous. We are born with every cell of our body unmistakably male or female. That cannot be changed by drug or surgical manipulation, so no boy can ever be a girl or girl be a boy. Since we know that males and females respond to medications differently and present with illnesses in different ways (a heart attack, or Type 1 Diabetes where girls are more likely to have higher A1C levels than boys when first diagnosed and continued to have higher levels after treatment begins. Girls also need higher basal insulin and total insulin doses than boys, for instance), imitating the opposite sex can lead to improper treatment or a missed diagnosis

v.     That increasing numbers of those who have transitioned are attempting to retransition.

vi.    That rates of suicide are twenty times greater among adults who've used cross-sex hormones and/or have undergone sex reassignment surgery, even in Sweden which is among the most transgender

7

App. 748

affirming countries.

vii.   That several "developed" nations, including the United Kingdom, Sweden, Finland, and France have all taken steps to pull back on transgender medical treatments for seemingly gender-dysphoric children.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 27th day of September, 2022.

Respectfully submitted,

Joseph Zanga, M.D.

8

Joseph Robert Zanga, MD, FAAP

CURRICULUM VITAE

1.      Joseph Robert Zanga, MD, FAAP
2.      Chief of Pediatrics – Columbus Regional Health (Retired - July 2015)
3.      President, 1997–1998, American Academy of Pediatrics
4.      President, 2002 - 2007, American College of Pediatricians


1. PERSONAL INFORMATION:

   1.1 Business Address: 2031 Long Point Trail
                         Sanford, NC 27332
                         919 343 2003

   1.2 Married to:    Christine E. Zanga (1969)
       Children:      Catherine A. Zanga, JD (Deceased 2014)
                      Joseph R. Zanga, Jr., MD

2. LICENSURE:

   2.1 Licensed in the State of Georgia #062014 (Inactive)
   2.2 Licensed in the State of North Carolina #2003–00108

   2.3 Licensed in the State of Illinois #036–101427 (Inactive)
   2.4 Licensed in the State of Louisiana #12064R (Inactive)
   2.5 Licensed in the Commonwealth of Virginia #2282 (Inactive)
   2.6 Licensed in the State of New York #119949 (Inactive)

   2.7 Diplomat of the National Board of Medical Examiners
   2.8 American Board of Pediatrics, Certification #20986
   2.9 Pediatric Advanced Life Support (PALS) Provider and
       Instructor Credentialed, 1989, Re-credentialed, 1992, 1995

3. EDUCATION:
   3.1 Loyola University – Stritch School of Medicine, MD degree conferred June 1971
   3.2 Fordham University – New York City B.S. Biology awarded June 1966

4. POSTDOCTORAL TRAINING:

   4.1   Certificate in Health Care Management, Loyola University Chicago, June 20, 2001

   4.2   MCH/APA National Faculty Scholars Development Program, 1999–2001

   4.3   Ambulatory Pediatric Fellowship, 1974–75, Robert Haggerty, MD, Chair, and Evan
         Charney, MD, Program Director, at Strong Memorial Hospital of the University of
         Rochester, Rochester, New York

   4.4   Chief Residency in Pediatrics, 1973–74, William Laupus, MD, Chair, at the Medical
         College of Virginia, Richmond, Virginia (Now VCU School of Medicine)

   4.5   Pediatric Residency, 1972–73, William Laupus, MD, Chair, at the Medical College of
         Virginia, Richmond, Virginia (Now VCU School of Medicine)

   4.6   Pediatric Internship, 1971–72, David Yi–Yung Hsia, MD, Chair, at the Loyola
         University Medical Center, Maywood, Illinois

5. PAST ACADEMIC APPOINTMENTS:

Joseph Robert Zanga, MD, FAAP

5      Chief of Pediatrics – Columbus Regional Health (Retired - July 2015)
6           Clinical Professor of Pediatrics – Medical College of Georgia
7            Clinical Professor of Pediatrics – Philadelphia College of Osteopathic Medicine
             Clinical Professor of Pediatrics – Mercer University School of Medicine

5.1   Assistant Dean for Primary Care and Director, Office of Generalist Programs, East
      Carolina Brody School Of Medicine, Max and Catherine Joyner Endowed Professor in
      Primary Care, 2003(January)– Retired 2009 (December)

5.2   Chair, Department of Pediatrics, M. C. Clark Endowed Professor of Pediatrics, Loyola
      University, Stritch School of Medicine, 2000(January) –2002(December)

5.3   Vice Chair, Department of Pediatrics, Louisiana State University Medical Center
      1997(January)–1999(December)

5.4   Professor of Pediatrics and Emergency Medicine with Tenure, LSUMC (Associate
      Appointment, Tulane Medical School) 1997–1999

5.5   Professor of Pediatrics and Emergency Medicine with Tenure, Virginia Commonwealth
      University/Medical College of Virginia, 1996

5.6   Professor of Pediatrics with Tenure, Medical College of Virginia, 1987–1996

5.7   Chair, Division General Pediatrics and Emergency Care, Medical College of Virginia,
      1987–1996

5.8   Director, Virginia Injury Prevention Center, Medical College of Virginia,
      1987–1996

5.9   Director, Developmental/Behavioral Fellowship, Medical College of Virginia, 1986–
      1993

5.10  Director, Community Pediatric Fellowship, Medical College of Virginia, 1979–1993

5.11  Associate Professor of Pediatrics, Medical College of Virginia, 1978–1987
      (Tenure granted 1981)

5.12  Director, Section of Ambulatory and Emergency Care, Department of Pediatrics,
      Children's Medical Center, Medical College of Virginia, 1978–1987

5.13  Project Director, Health Underserved Rural Areas Program, Department of Pediatrics,
      University of Virginia Medical Center, 1976–1978

5.14  Assistant Professor of Pediatrics, University of Virginia, 1975–1978

5.15  Project Director, Children and Youth Project, Department of Pediatrics, University of
      Virginia Medical Center, 1975–1978

5.16  Coordinator, Ambulatory Pediatric Fellowship Program, University of Virginia School
      of Medicine, 1975–1978

5.17  Instructor in Pediatrics, University of Rochester, 1974–1975

6. MEMBERSHIPS:
   6.1 Georgia Chapter of the American Academy of Pediatrics, 2009 - 2019
           Board of Directors – Permanent Adviser
           Fall CME Program Committee, 2009 – 2019
                Chair – 2011, 2014

App. 751

Joseph Robert Zanga, MD, FAAP

Honorary President (Elected by the Board) June 2016 – June 2017
Georgia Pediatric Health Improvement Coalition Board, 2011 – 2017
Co-Chair IT/Telemedicine Committee, 2012 - 2017
6,2   Medical Association of Georgia, 2009 – Present (Life Member)
Task Force on Health Insurance and Medicare (2018)
Muscogee County Medical Society
Executive Committee and Chair Program Committee, 2010 - 2013
Elected Delegate to Medical Association of Georgia, 2011 – 2019
6.3   Georgia Alliance of Community Hospitals 2010 - 2014
6.4   American College of Pediatricians (Board of Director – 2002 – 2014)
Member Founding Board (2002)
President 2002–2007 (Re Elected 2005)

6.5   North Carolina Pediatric Society/NC Chapter of the American Academy of Pediatrics,
2003–2010, 2019-Present

6.6   American Medical Association, 1995-Present

Section on Medical Schools – BSOM elected faculty representative, 2004-2009

At-Large member, 2009 - 2011

Region 4 (Southeast) Medical Student Section – Elected Faculty Advisor, 2008 - 2010

6.7   North Carolina Medical Society, 2003–2010, 2019 - Present
Pitt County Medical Society Delegate, 2004-2009

Family and Public Health Committee, 2005-2009

6.8   Medical Institute for Sexual Health, Board of Directors, 2001–2005

Advisory Board – 2019 - Present

6.9   Ambulatory Pediatric Association, 1978–2013

6.10  American Academy of Pediatrics (Life Fellow)

Past Presidents' Advisory Committee (Founding Chair), 1998 - Present
Chair, Committee on Board Compensation 2000–2001
Chair, Executive Committee, Section on Bioethics, 1999–2003,
Section on Bioethics Nominating Committee, 2003–2005
**President  1997–1998**
Vice President/President Elect 1996–1997
Board of Directors, 1989–1998
Advisory Committees to the Board on Membership and 5 others, 1989 - 1995
Chair, Advisory Committee on Research, 1992
Chair, Advisory Committee on Membership, 1993
Chair, Advisory Committee on Development, 1994
Advisory Committee to the Board on Strategic Planning, 1992–1994, 1997–1998
Chair, District IV (Southeast), 1989–1995
Alternate District Chair, District IV, 1988–1989
Chair, Founding Chair, Section on School Health, 1987–1989
Council on Sections, 1987–1989
Committee on School Health, 1981–1987; Chair, 1983–1987
Council on Child and Adolescent Health, 1983–1987

Joseph Robert Zanga, MD, FAAP

Sections on: Bioethics, School Health

6.11 Virginia Pediatric Society/Virginia Chapter of the American Academy of Pediatrics
Honorary Life Member – Voted 1997
Chair, Council on Child and Adolescent Health 1988–1990
Chapter President – 1985–1988
Chapter Vice President – 1982–1985, Secretary–Treasurer: 1979–1982

7. AWARDS/HONORS:

7.0 *Master of the College* - American College of Pediatricians – October, 2017

7.1 Honorary President (2016 – 2917) – Georgia Chapter AAP – June 10, 2016

7.2 The Outstanding Clerkship Director – Mercer University School of Medicine Class of 2016, March 18, 2016

7.3 Columbus Regional Health Physician Recognition Award 2015 – Nominee for Physician of the Year in Teaching

7.4 Certificate of Appreciation – Columbus State University Competitive Premedical Studies Program. March 19, 2015

7.5 The Outstanding Pediatric Faculty Award – Mercer University School of Medicine Class of 2014, May 1, 2014 and Mercer Class of 2015, March 20, 2015

7.6 Excellence in Medical Education Award – Georgia Campus - Philadelphia College of Osteopathic Medicine, April 9, 2010

7.7 Outstanding Contribution Award (Teaching) – Georgia Campus - Philadelphia College of Osteopathic Medicine, 2009, 2010/2011

7.8 Elected to Rotary International, Rotary Club of Columbus (GA), 2009

7.9 New Student Organization of the Year Award, ECU Student Leadership Awards Banquet, April 27, 2008, for the Rural Health Care Volunteer Society (Faculty Adviser)

7.10 Guest of Honor and Keynote Speaker, Alpha Epsilon Delta Pre-Health Honor Society, Induction Ceremony, April 19, 2008

7.11 Keynote Speaker, The Schweitzer Fellows Celebration of Service (Induction Luncheon), 2007 and 2008

7.12 Dedication Award (Highest Honor), BSOM M2 Class, April 10, 2008

7.13 Best Doctors in America 2000-2012, North Carolina Top Doctors (Pediatrician) 2021

7.14 AMA Physician's Recognition Award with Commendations in CME. 2004 – 2008.

7.15 National Health Services Corps "Spirit of the Corps" Award presented at the 2007 Ambassador's Conference: Training to Serve, July 27-28, 2007, Memphis, Tennessee.

7.16 Guide to America's Top Pediatricians, 2004 – 2008, 2014 Editions.
Consumers' Research Council of America.

7.17 Title of Professor of Honour, Senate of the University of Medicine and Pharmacy of Targu Mures, Romania, September 12, 2005

7.18 Business North Carolina Magazine, Top Doctors, 2004, 2005

7.19 Award in Recognition – Brody (ECU) Rural Health Interest Group, April 7, 2003

Joseph Robert Zanga, MD, FAAP

7.20   Who's Who Among America's Teachers, 2002. 7th Edition

7.21   Visiting Professor, University of Hawaii Post Graduate
       Program at Chubu Hospital, Okinawa, Japan, January, 2002

7.22   Visiting Professor, University of Medicine and Pharmacy, Targu Mures, Romania
       Diploma of Honour, Awarded May 18, 2001

7.23   American Academy of Pediatrics, Section on School Health,
       Milton J.E. Senn Award, October, 2000

7.24   National Center for Missing and Exploited Children,
       Rainbow Award, February 27, 1999

7.25   APA National Pediatric Faculty Development Scholar Awards, 1999–2001

7.26   Community Service Award, School of Medicine, VCU/MCV, May 18, 1996

7.27   Virginia Governors School, Commonwealth of Virginia,
       Certificate of Commendation, August 4, 1995

7.28   Alpha Omega Alpha – Epsilon Chapter, 1991

7.29   Distinguished Service Award, Virginia Commonwealth University, 1988

7.30   Award for "Excellence in Medicine and Community Service,"
       National Italian–American Foundation, October 11, 1987

7.31   Award in Appreciation – Human Growth Foundation, October, 1986

7.32   Annual Award for Outstanding Service to the Brain Injured,
       MCV–VCU, Williamsburg, VA, June, 1985

7.33   American Academy of Pediatrics, Outstanding Service Citation, 1985

7.34   American Academy of Family Practice Teaching Recognition Certificate, 1980

7.35   Outstanding Pediatric Resident Award, 1973–74, Medical College of Virginia

7.36   Senior Award for Scholastic Excellence, June, 1971, Stritch School of Medicine


8.  COMMITTEES - Columbus Regional Health

    8.1 Columbus Regional Medical Group AOC, 2014 - 2015

    8.2 Family Advisory Council (Founding Chair), 2013 - 2015

    8.3 Continuing Medical Education Committee, 2009 – 2015

    8.4 Pediatric Executive Committee, 2009 – 2015

    8.5 Pediatric Strategic Planning Committee, 2009 – 2015

    8.6 Family Medicine Internal Review Committee, 2011- 2015

           Chair – Transitional Year Internal Review Committee, 2012


9.  COMMITTEES – ECU/BRODY/PCMH:

    9.1 Academic Affairs, 2002–2007

9.2 Faculty Sponsor, Rural Health Interest Group, 2002–2008

9.3 Faculty Sponsor, American Medical Student Association, 2002–2009

9.4 Brody Council Committee, 2003-2008

9.5 M1, M2, M3, M4 Curriculum Committees, 2003–2008

9.6 Executive Curriculum Committee, 2003–2008

9.7 MD/7 Advisory Committee, 2004–2008

9.8 Chair, Family Medicine Chair Search Committee, 2004–2005

9.9 Delegate to Section on Medical Schools, AMA, Elected by BSOM Faculty, 2004–2009

9.10    Medical Ethics Committee, University Health Systems of Eastern North Carolina, PCMH, 2006–2008

    9.10.1  Chair, Pediatrics Ethics Consultation Subcommittee, 2008

9.11    Board of Governor's Distinguished Professor for Teaching Awards Review Committee, 2007–2008

9.12    Promoting Healthful Eating to Prevent Weight Gain in Young Adults Advisory Board, 2007–2008

9.13    Search Committee for the Associate Vice Chancellor for International Affairs, 2008

10. COMMITTEES – LUMC:

10.1 Ronald McDonald Children's Hospital Committee of the Board, 1999; Chair, 2000–2002

10.2 Ronald McDonald House Board, 2000–2002

10.3 Medical Center Ethics Committee, 2000–2002

10.4 Medical Executive Committee, 1999–2002

10.5 Clinical Leadership Committee, 1999–2002

10.6 Marfan Syndrome Program Committee, Chair, 2000–2002

10.7 Committee on Academic Rank and Tenure, 2001–2002

11. COMMITTEES – MCV/VCU:

11.1 University Council, 1993–1996

11.2 Executive Committee, Virginia Center for the Advancement of Generalist Medicine (RWJ Generalist Grant), 1992–1996

11.3 Medical Director, Child Protection Committee, 1980–1992; Member, 1992–1996

11.4 University Tenure and Promotion Appeals Committee, 1990–1993

12. COMMITTEES – COMMUNITY:

12 Boys & Girls Clubs - Central Carolina – Board & Chair Safety Comm – 2020- 2022

12.1 Sanford, NC *Resilience Committee* – 7/2019 - Present

12.2 Sanford, NC, Crime Prevention and Youth Committee, 2019

Joseph Robert Zanga, MD, FAAP

12.2    Columbus Court Appointed Special Advocate (CASA) for Children, 2016 – 2019

12.3    Columbus Rotary *End Human Trafficking Now Coalition* 2015 - 2019

            Chair - November 2016 - 2019

12.4    Right from the Start – Building Strong Marriages and Families, Pastoral Institute,

            2015 -2017

12.5    Columbus State University Leadership Council, 2015 - 2019

            College of Letters and Science – Strategic Planning Committee, 2017 - 2018

12.6    Columbus State University Competitive Pre-Med Advisory Group, 2015- 2019

            Community Director (Founder) Primary Care Shadowing Program

12.7    Project Launch Committee, Georgia State and Local Health Dept, 2015 - 2019

12.8    Columbus Symphony Orchestra Board, 2015- 2019

            Finance Committee – 2017 – 2019

12.9    Columbus Child Fatality Review Team, 2012 - 2013

12.10   Live Healthy Columbus/Strong 4 Life Obesity Project Convener. Founding Chair.
Elected Chair, May 2011. Reelected, May 2012, Executive Committee 2013 – 2018

12.11   Georgia Pediatric Health Improvement Coalition Board (PHIC), Co-Chair
IT/Telemedicine Committee 2011 - 2017

12.12   Georgia Children's Health Alliance – Executive Committee – Appointed by Lt.
Governor Casey Cagle, 2010 - 2011

12.13   Family and Public Health Committee, North Carolina Medical Society, 2006–2009.

12.14   Member of the Board, Medical Institute, Austin, Texas, 2001-2006

12.15   Academic Advisory Board, Pfizer Scholars Grants for Faculty Development
            in Pediatric Health, 2000–2003

12.16   Chicago Rotary (Rotary One), Advisory Group on International Pediatric Health
            Services, 2000-2002

12.17   Reviewer, Center for Pediatric Emergency Medicine,
            National Child Protection Education Project, 2000–2003

12.18   Board of Directors, Vice President, Commonwealth Care of Virginia, Inc., 1995–1996

12.19   Board of Directors and Executive Committee, St. Joseph's Villa, 1993–1996
            Chair–Medical Advisory Committee, 1995–1996

12.20   Managed Care (Medallion) Medicaid Advisory Board,
            State Department Medical Assistance Services, 1992–1996

12.21   Virginia Bar Association Commission on the Needs of Children,
            Founding Member, 1986–1992

12.22   State Emergency Medical Services Advisory Council,
            Appointed by Governor Robb, 1982–1986
            Reappointed by Governor Baliles, 1986–1988

## 13. ADMINISTRATIVE EXPERIENCE:

13.1  Pediatric Clerkship Program Director, Mercer University School of Medicine, Columbus Campus, 2014 - 2015

13.2  Chief of Pediatrics, Columbus Regional Healthcare System, 2009 – 2015 (Retired)

13.3  Adjunct Professor in the Office of Interdisciplinary Health Sciences Education, Division of Health Sciences, Brody SOM, 2004–2008.

13.4  Director, Office of Generalist Programs, Brody SOM, 2002–2008

13.5  Faculty Mentor for Junior Faculty BSOM from: Pediatrics, IM, FM, 2003–2008

13.6  Medical Director, Ronald McDonald Children's Hospital, 1999–2002

13.7 Chair, Ambulatory Pediatric Division, LSUMC, and
Director Pediatric Emergency Medicine at Charity Hospital for LSU and Tulane, New Orleans, LA, 1997–1999

13.8 Chair, Division of General Pediatrics and Emergency Care, Medical College of Virginia, 1987–1996

13.9  Director, Section of Ambulatory and Emergency Care,
Children's Medical Center, Medical College of Virginia, 1978–1987

13.10  Medical Director – PruCare (MCO) of Richmond, 1987–1990
Chair, Physicians Advisory Committee
Chair, Quality Assurance Committee

Chair, Utilization Management Committee
Member, Executive Committee
Member, Pharmacy and Therapeutics Committee

13.11  Medical Coordinator, Richmond Juvenile Detention Home, 1986–1996

## 14. CONSULTANCIES:

14.1  Medical Advisory Board for the DiscoveryHealth.com Disease and Conditions Encyclopedia, DiscoveryHospital.com and HealthTeacher.com, 2007– 2009

14.2  National Advisory Child Health and Human Development Council, NIH/NICHD, 2006–2011

14.3  Chair, Lysosomal Storage Disorders (LSD) Education Initiative, 2004–2006
Chair, LSD Pediatric Education Development Project, 2004

14.4  National Advisory Council of the National Center for Primary Care,
David Satcher, MD, PhD, Director, 2003–2010 (reappointed 3 times)

14.5  Johnson & Johnson Consumer Products Co. Pediatric  Advisory Board, 2002–2005

14.6  Human Growth Foundation Medical Advisory Council, June, 1986–1991

## 15. BIBLIOGRAPHY:
### 15.1 Articles

Zanga, J.R.  "First Do No Harm" AAP Section on Seniors Bulletin. Spring 2020 Vol 29 (2); 20-21

Zanga, J. R. "First Do No Harm" Muscogee County Medical Society *Bulletin* June 2018

Vol. 63 (4); 18-19

Zanga, J. R. "The Medical Home" Muscogee County Medical Society *Bulletin* April 2014 Vol.59 (4);14-15

Zanga, J. R. "The 'Affordable' Care Act (ACA)" Muscogee County Medical Society *Bulletin* May 2013 Vol. 58(5); 6-7

June, P.L., Trumbull, D.A., Zanga, J.R. "Regarding 'The Partial Death of Abortion Rights' *Linacre Quarterly,* August 2010. Vol. 77(3); 245-246

Zanga, J. R. "The HPV Vaccine: Deciding for our Children." *Family North Carolina,* May/June 2007

Zanga, J.R., "The Adolescent Brain: Implications of Sexuality Education." *Linacre Quarterly*, February 2007. Vol. 74 (1);  68-75

Bissonette-Pitre, L., et al (...Zanga, J.R.) "Executive Summary: To Prevent and Protect: Report of the Task Force of the Catholic Medical Association on the sexual abuse of children and its prevention." *Linacre Quarterly*, November 2006; 293-296

Zanga, JR, Moskop, JC. Obesity in kids: when appeals to vanity fail. *Virtual Mentor*. October 2006. 8:659-662. Available at: http://www.ama-assn.org/ama/pub/category/16855.html

Collier DN, Zanga JR. Teaching residents and students to help patients and their families with obesity. *Virtual Mentor*. October 2006. 8:663-666. Available at: http://www.ama-assn.org/ama/pub/category/16856.html

Bissonette-Pitre, L., et al (...Zanga, J.R). "To Prevent and Protect: The Sexual Abuse of Children and its Prevention." CMA, 2006

Collier D, Perkin RM, Zanga JR. "Clinical Case 3: Obesity as Medical Neglect: Should Doctors Report?" *Virtual Mentor*, August,2003. http://www.ama–assn.org/ama/pub/category/10832.html

Savage R, Perkin RM, Zanga JR. Clinical case 4: Palliative Care for an Infant with Short Bowel Syndrome and Advanced Liver Disease. *Virtual Mentor*. August 2003 http://www.ama–assn.org/ama/pub/category/10830.html

Zanga, J.R., "One Must Get Involved." (Invited Article) *AAPI Journal*, 2:5, 1998

Bar-on, M. and Zanga, J.R.: "Bronchiolitis." *Primary Care*, 23:4, 1996

Bar-on, M. and Zanga, J.R: "Child Abuse: A Model for the Use of Structured Clinical Forms" *Pediatrics*, 98:1996

Zanga, J.R., "Case in Point." *Bioethically Speaking*, 4:9, 1996

Zanga, J.R.: "The New Plague – An Epidemic of Violence." *Pediatric Rounds: Growth Nutrition Development*, 3:8, 1994

Kroner, B.A.: Scott, R.B., Zanga, J.R.: "Poisoning in the Elderly: Characterization of Exposures Reported to a Poison Control Center." *J. Am. Ger. Soc.*  41:842, 1993

Zanga, J.R.: "Should There Be Universal Childhood Vaccination Against Hepatitis B?  Part 2: A Rebuttal." *Pediatric Nursing*, 19:5, 1993

Zanga, J.R.: "Child Abuse:  The Real Numbers." *Virginia Medical*, 119: 110–112, 1992

Zanga, J.R.: "Hepatitis B:  A Controversial Vaccine (or a Vaccine Controversy?)." *Pediatric Rounds: Growth Nutrition Development*, 1:6–8, 1992

Zanga, J.R. and Butts, F.M.: "Tympanometry in The Schools – Is It Worth the Effort?" *School Nurse* 7, 36–38, 1991

Hoekelman, R.A., Napolitano, L.V., Zanga, J.R.: "Getting More from Preadolescent Exams." *Patient Care* 15, 91–108, 1991

Zanga, J.R. and Oda, D.S.: "School Health Services." *Journal of School Health*, 57:413–416, 1987

Zanga, J.R.: "A Perspective from the Private Sector on the Health Care of the School Age Child." Conference Proceedings. *Health of School Age Children: Expectations for the Future.* University of Colorado, School of Nursing, 1984

Ogren, J.M. and Zanga, J.R.: "Sexual Abuse: Incidence, Complications, Evaluation and Therapy." *Virginia Medical*, 110:488, 1983

Zanga, J.R.: "What is the Risk of a Second Child Having Seizures?" "Is There Any Medication to Prevent Convulsions?" "Is Surgery Needed for an Umbilical Hernia?." in *500 Questions New Parents Ask*, Dell, New York, 1982

Zanga, J.R. and Becker, M.: "Dying on the Highways: Virginia's Children." *Virginia Medical*, 108:34,1981

Zanga, J.R.: "Importance of Immunization and Periodic Health Screening." Conference 14. Proceedings. December, 1980

Zanga, J.R.: "Tick Paralysis, Another Lethal Tick–Borne Disease." *Virginia Medical*, 106:443, 1979

Zanga, J.R.: "Immunizations: A Critical Problem in Preventive Health Care." *Virginia Medical,* 105: 436, 1978

Cunningham, D. and Zanga, J. R.: "Myiasis of the External Auditory Meatus." *J. Peds.*, 84:857, 1974

### 15.2 Letters

Zanga, J.R.: "Shots Are Not Abusive," *Peds* 60:384,1977

Zanga, J.R.: "Alternatives to the Intermountain Regional Poison Control Center," *Veterinary and Human Toxicology*, 22:394,1980

Zanga, J.R.: "Incentives for Technology – Intensive Medicine," *NEJM* 304:1307–C,1981

Zanga, J.R. and Bar–on, M.: "Don't Compromise the Medical Home," *Arch Pediatr Adolesc Med*,152:714,1998

Zanga, J.R.: "Removing Financial Barriers to Pediatric Care," *The New England Journal of Medicine*, 339:1,1998

Zanga, J.R.: "Sexual Abuse and Adolescent Pregnancy," *JAMA*, 281:6,1999

Zanga, J.R.: "Children and Adolescents should not Have Unrestricted Access to Morning–After Pill," *AM News*, 2/9/04

Zanga, J.R.: "Increasing Awareness of Genetic Disorders," *Contemporary Pediatrics*, 3/9/04

McConnell M., et all, Zanga J.R.: "The Effects of Marriage, Civil Union, and Domestic Partnership Laws on the Health and Well-being of Children," Pediatrics, November 2006, Vol. 118(5): p 2259

### 15.3    *American Academy of Pediatrics Publications:*

Zanga, J.R.: "Ethics Code Inconsistent Concerning Executions and Abortions." (Letter), *AMNews*, 2/28/05

Zanga, J.R.: "The Hospitality Counterpoint." Invited Commentary, <u>AAP News</u>, 1/1999

Zanga, J.R.: "Are There Moral Absolutes?" *Bioethics Newsletter*, Invited Commentary, January, 1999

Zanga, J.R.: "Preventive Health Care: Why it Needs to Be Studied." Child Health Care – *AAP Research Update*, 8:1, 1992

Zanga, J.R., et al: AAP Committee on School Health: "School–Based Health Clinics." *AAP News*, May, 1987

Dement, P.G., and Zanga, J.R., et al: AAP Committees on Sports Medicine and School Health "Physical Fitness and the Schools." *Pediatrics*, 80:449–450, 1987

Zanga, J.R., et al: AAP Committee on School Health: "Qualification and Utilization of Nursing Personnel Delivering Health Services in Schools." *Pediatrics*, 79:647–648, 1987

Zanga, J.R (Chair): Committee on School Health, AAP: "School Health: A Guide For Health Professionals." 2nd Edition, 1987

Zanga, J.R., et al: AAP Committee on School Health: "CPR Training in the School." *AAP News*, February, 1986

Zanga, J.R., et al: AAP Committee on School Health: "School Health Examinations." *AAP News*, February, 1986

Zanga, J.R., et al: AAP Committee on School Health and Burrell, P.A., et al: AAP Committee on Infectious Disease: "School Attendance of Children and Adolescents with HTLV III/LAV Infection." *Pediatrics*, 77:430–432,1986

Zanga, J.R., et al: AAP Committee on School Health: "Concepts of School Health Programs." *AAP News*, December, 1985

Zanga, J.R., et al: AAP Committee on School Health: "Home Instruction." *AAP News*, December, 1985

Zanga, J.R., et al: AAP Committee on School Health: "School Bus Safety." *AAP News*, February, 1985

Zanga, J.R., et al: AAP Committee on School Health: "Education to Strengthen the Family." *AAP News*, January, 1985

Zanga, J.R., et al: AAP Committee on School Health: "Health Education and Schools." *Pediatrics*, 75: 1160, 1985

Zanga, J.R., et al: AAP School Health Committee: "Guidelines for Urgent Care in School." *Pediatrics*, 74:148,1984

Joseph Robert Zanga, MD, FAAP

Zanga, J.R., et al: AAP School Health Committee: "Heat Stress and School Closings." *Pediatrics*, 74:313,1984

Zanga, J.R., et al: AAP Committee on School Health: "Alcohol Abuse Education in School." *AAP News*

Zanga, J.R., et al: AAP Committee on School Health: "Administration of Medication in School." *Pediatrics* 74:433, 1984

### 15.4   Books, Chapters, Monographs:

Zanga, J.R. Disorders of Temperature:  Hyper-and Hypothermia in:  Pediatric Hospital Medicine, 2nd Edition, 2008.  Perkin, R., Swift, J, Newton, D, and Anas, N. (eds Lippincott, Philadelphia), 2008, P101-104

Fitch, J.T., McIlhaney, J., Adam, M. Hagar, MD, and Zanga, J.R. (Contributors): "Sex, Condoms and STDs: What We Now Know." The Medical Institute for Sexual Health, 2002

Sanders, J. and Zanga, J.R., "Child and Adolescent Drownings in Virginia." *Potter and Perry's Fundamentals of Nursing*, Levin, M.A., Mosby–Year Book, Inc., Zanga, J.R.: "School Violence." *School Health Newsletter, AAP*, Fall, 1994

Bar–on, M., Foster, R., and Zanga, J.R.: "Hospital Protocol for The Recognition and Treatment of Child Abuse." *Virginia Department of Social Services*, 1993

Zanga, J.R. and Oda, D.S.: "School Health Services." *Readings in Community Health Nursing*, B.W. Spradley (MD) J.B. Lippincott Co., Philadelphia, 1991, P 435–443

Zanga, J.R., Blizzard, R, Falkner, F, and Muncie, H: "Monitoring and Evaluation of Growth and Growth Disorders in Primary Care Practice." *Clinical Courier*. SynerMed, NJ, August, 1990

Zanga, J.R.: "The School Age Child". *Ambulatory Pediatrics*, M. Greene and R. Haggerty (eds), W.B. Saunders Co., New York, 1990

Zanga, J.R. (ed): *Emergencies Pediatrics*. Interlivros Edicoes Ltda; Rio de Janeiro, 1988, Portuguese edition

Zanga, J.R. (ed): *Manual of Pediatric Emergencies*. Churchill Livingstone, Inc., New York, 1987 (Authored five chapters)

Spencer, C., Walker, D., and Zanga, J.R.: "School and the Handicapped Child." *Pediatric Clinics of North America*, October, 1986, p. 1251–1264

Zanga, J.R.: "Primary Care and Community Health Resources". *Pediatrics*, H. Maurer (ed), Churchill Livingstone, Inc., New York, 1983, p.155–167

### 15.5  Abstracts:

Bissonnette-Pitre, L., et al (…Zanga, J.R.). To Protect and Prevent: The Sexual Abuse of Children and its Prevention. The Catholic Medical Association, 2006.

Zanga, J.R.: "Mobile Health Care: Bringing Medical Care Home." The 23rd International Congress of Pediatrics, September 10, 2001

Gautier, K.B., Peck, G.Q., Ferrand, C., Collier, E.A., Sgritto, J., Kaye R.E., Zanga, J.R.: "Aerobic/Cross Training Program Improves Baseline Asthma and Fitness in Children."

*Southern Society for Pediatric Research*, 1997

Zanga, J.R.: "Cervical Spine Injury: A Rational Approach to Diagnosis." *Arch Pediatric Adolesc Med*, 150: p111, 1996

Sanders, J.K. and Zanga, J.R.: "Child and Adolescent Drownings in Virginia: A Population Based Study." APHA Annual Meeting, November 1,1994

Sanders, J.K. and Zanga, J.R.: "Injuries to Children: A Statewide System for Injury Surveillance in the Pediatric Office Setting." Second World Conference on Injury Control, Atlanta, GA., May 23, 1993

Sanders, J.K. and Zanga, J.R.: "Playground Safety Workshop." Second World Conference on Injury Control, Atlanta, GA, May 20, 1993

Sanders, J.K., Waring, E., and Zanga, J.R.: "Finding The Missing Data – A Statewide System For Injury Surveillance in The Pediatric Office." *American Journal of Diseases of Children*, 145: 416, 1991

Zanga, J.R.: "The Short Statured Child." Assoc. for the Care of Children's Health, Cleveland, Ohio, June 12–15, 1988

Henderson, E.L., Zanga, J.R., et al. "Physician Bias and The Interpretation of Rapid Tests For Group A Streptococcal Pharyngitis." *Am Jour Diseases of Children*, 142:405–406, 1988.

### 15.6   Posters and Media:

Zanga, J.R. Champions for Children. Muscogee County Medical Society Bulletin, 55, 6, May, 2010

Forrow, L., O'Donnell, J., Irons, T., Zanga, J.R.: "Ideas in Action: The Schweitzer Fellows Program." Poster Presentation at AAMC, November 7-9, 2004

Zanga. J.R. (Work Group Chair): "Identifying Lysosomal Storage Disorders in Pediatric Practice – The Importance of Early Diagnosis." Speaker Slide Kit, Genzyme, Inc. 2004

Sy, B. and Zanga, J.R.: "Subarachnoid Hemorrhage Secondary to Bleeding Carotid Aneurysm." NC Pediatric Society Resident Poster Session, August 17-20, 2006

Cuellar, J.G., Zanga,J.R.: "Hearts-N-Parks: Salud para su Corazon." NHMA, Washington, DC, 2006

Kaplan SA, Merritt KB, Zanga JR, et al: "Healthy Smile, Healthy Child: A Pilot Study." North Carolina Pediatric Society, August 17-19, 2007

Fischer H, Zargham S, and Zanga JR: "Effects of Media Education on Children's Perceptions of Health Issues." BSOM/ECU Summer Scholars Research Day, August 18, 2008

Fischer H, Zargham S, and Zanga JR: "Effects of Media Education on Children's Perceptions of Health Issues." AMA Medical Student Section Research Poster Session, AMA Interim Meeting, Orlando, Florida, November 8, 2008

### 15.7

Journal Reviewer, 2014 - Present. *Linacre Quarterly*

Joseph Robert Zanga, MD, FAAP

Journal Reviewer, 2007– 2013   *American Journal of Medical Genetics*

Journal Reviewer, 2006– 2014   *Journal of Palliative Care*

Journal Reviewer, 2005– 2013  *Journal of Medical Ethics (BMJ)*

Reviewer. *Ambulatory Pediatric Association's Educational Guidelines for Pediatric Residency*. (Revision), 2003

Editorial Advisory Board: *Children's Health and Safety Magazine*, 2000–2002

Journal Reviewer, 2000–2011. *Ambulatory Pediatrics*

Editor–in–Chief: *Pediatric Rounds: Growth Nutrition Development*, SynerMed, 1991-1995

Journal Reviewer, 1984–2011. *Pediatrics*

### 15.8   *Lectures: (Invited – Selected Topics)*

"The New Sexual Revolution: Protecting Children from the Dangers of Comprehensive Sex Education" Mathew Bulfin Educational Conference. Nashville, TN. February 26. 2022

"ACEs & Resilience: Biology of Stress & The Science of Hope" US HHS ACYF & FYSB Conference. *Creating a 2020 Vision*. June 4, 2020

"Telemedicine and School Based Health Centers" Muscogee County Schools SBHC Advisory Committee, June 21, 2018

"Is this the Face of Human Trafficking: Modern Slavery". Resident/Medical

Student Noon Conference. Midtown Medical Center. Columbus Ga. Ga,

February 20, 2018

"Human Trafficking – How We Can End It". Pediatric Grand Rounds – Bon Secours (St. Mary's Hospital) – Richmond, VA, October 31, 2017

"End Human Trafficking Now – Rotary's Role". Grand Rounds, Columbus Children's Hospital, Columbus, Ga, May 18, 2017

"The Future of Pediatrics". Columbus Children's Hospital, Columbus, Ga, Grand Rounds, June 23, 2016

"The Newborn Examination". Philadelphia College of Osteopathic Medicine, Atlanta, Ga, (4 hours for M2 Class), June 7, 2016

"Pediatric Emergencies". Philadelphia College of Osteopathic Medicine, Atlanta, Ga, (2 hours each for M1 & M2 Classes), April 5, 2016

"Community Roundtable Training on Domestic Minor Sex Trafficking - The Medical Issues". Columbus State University, April 19, 2016

"Evidence Based Medicine". Medical Society/Mercer Preceptor Conference, Columbus Regional/MMC, August 22, 2015

"Columbus – A Live Healthy City: Addressing Obesity as a Community." Carl Patrick Multidisciplinary Symposium, St Francis Hospital. Columbus, Ga, February 2, 2013

"Childhood Obesity and Diabetes." Columbus Diabetes University 2011, Columbus, Ga,

October 29, 2011

"The Obesity Conundrum." Georgia Perianesthesia Nurses Association, Peachtree City, Ga, September 17, 2011

"Live Healthy Columbus – Obesity." Partners in Education Conference, Columbus, Ga, September 7, 2011

"Special Populations: Caring for Chronically Ill Children." Columbus Metro Medical Response System, Fundamental Disaster Management, Columbus, Ga, September 29, 2010

"Five Things Children Would Change about Emergency Medicine." Pediatric Grand Rounds, Columbus Regional Healthcare System, Columbus, Ga, September 9, 2010

"Adolescent Brain Development: Legal and Societal Issues." Catholic Medical Association, Baltimore, Md, October 10, 2008

"Making the Case for Primary Care." 4th Annual NHSC Ambassadors Conference, Keynote Address,  Phoenix, Az,  July 26, 2008

"The Role of the Ambassador." 4th Annual NHSC Ambassadors Conference, Phoenix, Az, July 25, 2008

"Legal and Societal Issues in Adolescent Health." 7th National Meeting of the Medical Institute, Austin, Texas, July 9, 2008

"Freedom of Conscience in Clinical Practice." 7th National Meeting of the Medical Institute, Austin, Texas, July 8, 2008

"The NIH/NICHD:  An Overview." Critical Care Pediatric Research Network Committee, Bethesda, Md, March 26, 2008

"How you Gonna Keep 'em Down on the Farm?: Promoting Primary Care. AMA Section on Medical Schools, November 17, 2007

"Child Prostitution." National Advisory Council on Sexual Health, Sept 17, 2007

"Religion, Science, and Sexual Health." National Advisory Council on Sexual Health, Sept 17, 2007

"Internationalism in Medical Education." BSOM Medical Education Grand Rounds, January 11, 2007

"International Child Health: It's Not So Healthy." World Affairs Council of Eastern, NC. Great Decisions Program, 1/27/2007

"Encouraging Students to Primary Care Residencies: Bridging Supply to Meet Demand." SGSA, April 4, 2007, Little Rock, Arkansas

"Earth Day & 50th Anniversary Albert Schweitzer 'Declaration of Conscience.'" Town Commons Park, Greenville, NC. Sunday, April, 23, 2007

"Encouraging Students to Primary Care." National Health Services Corp Ambassador Conference, July 26-29, 2007, Memphis, Tennessee

"Vaccines and Sexual Health." National Advisory Council, National Center for Primary Care, Morehouse School of Medicine, May 8, 2007

"Five Things that Children Would Change about Emergency Medicine." BSOM, Peds

Emergency Grand Rounds. PCMH Auditorium, August 28, 2007

"Bringing International Health to Eastern North Carolina: Why Should Our Trainees Study Abroad?" World Affairs Councils of Eastern North Carolina, October 2006

"Sexuality and the Media." – National Advisory Council, National Center for Primary Care, Morehouse SOM, May 23, 2005

"Abstinence Education Programs." – Medical Institute Annual Conference, Moderator  and Commentator, Washington, DC, May 27, 2005

"Why is This Child Coughing?" – 27th Annual MCU/VCU Pediatric Primary Care Conference, Virginia Beach, VA. July 23, 2005

"Evaluation of Chronic Abdominal Pain." Workshop – 27th Annual MCU/VCU Pediatric Primary Care Conference, Virginia Beach, VA, July 23, 2005

 "Condom Integrity: Research Needs." – National Advisory Council, National Center for Primary Care, Morehouse SOM, July 26, 2005

"Why is this Child Coughing?" PRO BONO Course – Romania, American College of Chest Physicians and the University of Medicine and Pharmacy, Targu Mures, Romania, September 13, 2005

"Common Pediatric Illnesses Presenting as Rashes." PRO BONO Course – Romania, American College of Chest Physicians and the University of Medicine and Pharmacy, Targu Mures, Romania, September 13, 2005

"Evaluations of Fever in the Infant." PRO BONO Course – Romania, American    College of Chest Physicians and the University of Medicine and Pharmacy, Targu Mures, Romania, September 13, 2005

"The Role of the General Physician in Child Care." PRO BONO Course – Romania, American College of Chest Physicians and the University of Medicine and Pharmacy,  Targu Mures, Romania, September 13, 2005

"PICU Organization in the United States." PRO BONO Course – Romania, American College of Chest Physicians and the University of Medicine and Pharmacy, Targu Mures, Romania, September 13, 2005

 "Adolescent Brain: Implications of Sexuality Education." – Catholic Medical Association, 74th Annual Conference, Portland, OR, October 21, 2005

"The Declining Number of Generalists – Challenges in Medical Education." (with Bruce Johnson, MD), Workshop – Generalists in Medical Education Meeting, Washington, DC, November 5–6, 2005

"Health Disparities and the Uninsured." – AMSA Region 5 Conference, Durham, NC, March 6, 2004

"The Diagnosis of ADHD Pediatrician's Role." – International Pediatric Congress, Cancun, Mexico, August 17, 2004

"Primary Care of Infants." – International Pediatric Congress, Cancun, Mexico, 8/20/2004

"The Developing World is Close to Home." – UNCC AMSA Chapter, Charlotte, NC, September 10, 2004

"A Medical Practice Initiative." – National Advisory Council, National Center for

Joseph Robert Zanga, MD, FAAP

Primary Care, Morehouse SOM, September 21, 2004

"Lysosomal Storage Disorders." – The LSD Education Initiative, San Francisco, CA, October 9, 2004

"Sexuality Education in the Schools." – Section on School Health Symposium, AAP NCE, San Francisco, CA, October 10, 2004

"It Takes a Village: The Importance of Family in the Rearing of Children." – Annual Conference, Virginia Chapter, American Academy of Pediatrics, and the Children's Hospital of the King's Daughters, Williamsburg, VA, October 3–5, 2003

"The Telephone in Pediatric Practice." – Pediatric Grand Rounds, University of Illinois Medical School at Rockford, Rockford, IL, February 15, 2002

"Child Abuse." – Pediatric Grand Rounds, Alexian Brothers Medical Center, March 16, 2001

"The Future of Pediatrics." – Slovenian Pediatric Association, via Teleconference, March, 2001

"Child Abuse." – Annual Convocation, University of Medicine and Pharmacy, Targu–Mures, Romania, May 18–21, 2001

"The Role of the Department Chair." – International Pediatric Chairs Association Meeting, Beijing, China, September 8–9, 2001

"Pediatrics in the New Millennium." – Pediatric Grand Rounds, Jersey Shore Medical Center, Neptune, NJ, October 5, 2001

"Problems in the Practice of Pediatrics." – Department of Pediatrics Meeting, Elmhurst Hospital, Elmhurst, Illinois, March 28, 2000

"Child Abuse." – Pediatric Grand Rounds, Rush Medical School, 8/13, 2000

"Child Abuse." – Pediatric Grand Rounds, Lutheran General Children's Hospital, 8/22/2000

"Children of the World – An Underrepresented Minority" – The Shantilal C. Sheth Oration, 35th National Conference of The Indian Academy of Pediatrics, Kochi, India, January 8–11, 1998

"Development of Emergency Services in Pediatrics." – 35th National Conference of Indian Academy of Pediatrics, Kochi, India, January 8–11, 1998

"Child Abuse: The Pediatrician Role.", "Telephone in Pediatric Practice." and "Cervical Spine Trauma – A Rational Approach to Diagnosis." – 45th Annual Meeting of the Pediatric Section, Puerto Rico Medical Association, San Juan, Puerto Rico, February 13–16, 1998

"The Plight of Children and the Role of National Pediatric Organizations." – 18th Pan American Pediatric Congress, Santiago, Chile, April 27,1998

"Title XXI – What is the AAP Doing." – Pediatric Academic Societies' Annual Meeting, New Orleans, LA, May 4, 1998

"Presentation on the 10th Anniversary of the CHIP Program." Keynote Speaker. – Child Health Investment Partnership (CHIP) 10th Anniversary, Roanoke, Virginia, June

4,1998

"Child Abuse." – Louisiana Association of Nationally Registered Emergency Medical Technicians Educational Conference, Kenner, Louisiana, June 12–14, 1998.

"Minorities, Media and the AAP." – National Medical Association, Annual Meeting, New Orleans, Louisiana, August 1–5, 1998

"Pediatric AIDS, The Role of Pediatric Societies in Policy Making." – XX Congress of    the Federation of Pediatric Associations of Central America and the Caribbean, Panama City, Panama, November 16-18, 1998

"The Interconnectedness of Risky Behaviors." – Right Choices for Youth Conference, sponsored by Gov. George Bush, Austin, Texas – March 31, 1998

"Pediatrics Now and in the 21st Century." Visiting Professor – University of South Florida, February 6, 1997

"Pediatric Emergency Medicine in the USA." and "The Changing World of Academic Pediatrics." – Italian Pediatric Society, Bologna, Italy, June 13–16,1997

"AAP Update.", "Telephone in Pediatric Practice.", "Child Abuse." and "Guns and Children." – Seventh Annual Pediatric Symposium, Joe DiMaggio Children's Hospital, Fort Lauderdale, Florida, November 8–9, 1997

"Guns and Children: A Pediatric Epidemic." – Grand Rounds, All Children's Hospital,  St. Petersburg, Florida, December 12, 1997

"Health Care Reform." "Violence and Children – The Gun Epidemic." "Child Abuse – The Physician's Role." – Medical College of Georgia Annual Pediatric CME Conference, St. Simon Island, GA, July 18–20, 1994

"Adolescent Health: Strategies for Improving Health Status." speaker and panel moderator – Children's Defense Fund National Conference, Washington, DC, March 11, 1988

 "Meeting the Health Care Needs of Children in Schools." Keynote Address – National Association of School Nurses, Anaheim, CA, June 28, 1988

"School Based Clinics, Another View." – American Academy of Pediatrics Annual Meeting, New Orleans, LA, November 1–3, 1987

"Tort Reform." – American Academy of Pediatrics Annual Meeting, New Orleans, LA,  November 1–3, 1987

"School Based Health Clinics – Problems For the Future" and Panel Commentator for Research Papers on School Health Clinics – American Public Health Association Annual Meeting – Las Vegas, NV, September 29–30, 1986

"School Health" – Keynote address, Annual Conference on School Health, Yale University School of Medicine, New Haven, CT, March 20,1985

"Health Care for the School–Aged Child in the Next Decade." – National Conference on Health of the School Aged Child, April 12–14, 1984, Denver, CO

"Health Care of the School Aged Child" – National Maternal and Child Health Conference, Tyson's Corner, Virginia, March 17, 1982

"Health Education Process and Methodology: What It Is and How It's Done." – First National Conference on Rural Health Education, May 2–4, 1978, St. Louis, Missouri

Zanga, J.R. and Martinez, J.: "Pathologic Analysis on Werdnig–Hoffman Disease Presenting as Diaphragmatic Paralysis: Report of a Case." – Cuban Medical Association Congress, Miami, Florida, 1975

### 15.9  Other:  (Selected Items)

*CBS This Morning*, August 23, 1994 Video Parenting Magazine, Nationally syndicated, 15 segments, 2001–2003

"House Call" – Monthly segment of *Noon News*, WWBT–TV Channel 12, 1991–1996

Volunteer Medical Director, Camp Easter Seal East, 1985–1996

Consultant – Pediatric Program Organization, St. Joseph's Hospital, Phoenix, AZ, March 23–25,1994

*Good Morning America,* September, 1990

Consultant – National Institutes for Mental Health – To develop AIDS Publication for Primary Care Physician, 1986–1987

"A Visit With the Pediatrician" – Weekly segment of *Good Morning Virginia*, WXEX–TV, Channel 8. 1980–1985

Regular Pediatric Columnist – *Woman's World Magazine*, 1980–1984

## 16.  GRANTS AS PRINCIPAL INVESTIGATOR

"Caring for the Elderly: House Calls." Pitt Memorial Hospital Foundation, 2008-2009 $15,770

"Office of Generalist Programs." PCMH, Pitt County Memorial Hospital, 2002– 2008, $78,000 per year

"Childhood Injury Prevention for Family Daycare." DHHS, Maternal and Child Health Bureau, 1992–1993, $19,872

"Residency Training in General Internal Medicine and/or General Pediatrics." DHHS, U.S.

"Injury Prevention Grant." Virginia Department of Health, DMCH, 1987–1996, $185,000 per year

"Child Development Services." Virginia Department of Health, DMCH, 1988–1993, $165,000 per year

"Behavioral Pediatric Training Program." DHHS, Maternal and Child Health Services, 1986–1992, $630,000

"Virginia Auto Safety Alliance. Traffic Safety Now." 1986 and 1987, $300,000,

"Community Grant" US Public Health Service, 1985–1988, $475,000 plus indirect costs)

# Appendix Attachment

# 11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                                  Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

**Expert Declaration of Michael K. Laidlaw, MD**

I, Michael K. Laidlaw, M.D., hereby declare as follows:

1. I am over the age of eighteen and submit this expert declaration based on my personal knowledge and experience.

2. I am a board-certified endocrinologist. I received my medical degree from the University of Southern California in 2001. I completed my residency in internal medicine at Los Angeles County/University of Southern California Medical Center in 2004. I also completed a fellowship in endocrinology, diabetes and metabolism at Los Angeles County/University of Southern California Medical Center in 2006.

3. The information provided regarding my professional background and publications are detailed in my curriculum vitae. A true and correct copy of my curriculum vitae is attached as Exhibit A.

4. In my clinical practice as an endocrinologist, I evaluate and treat patients with hormonal and/or gland disorders. Hormone and gland disorders can cause or be associated with psychiatric symptoms, such as depression, anxiety, and other psychiatric symptoms. Therefore, I frequently assess and treat patients demonstrating psychiatric symptoms and determine whether their psychiatric symptoms are being caused by a hormonal issue, gland issue, or something else.

5. I have been retained by Defendants in the above-captioned lawsuit to provide an expert opinion on the efficacy and safety of sex reassignment treatment.

6. If called to testify in this matter, I would testify truthfully and based on my expert opinion. The opinions and conclusions I express herein are based on a reasonable degree of scientific certainty.

7. I am being compensated at an hourly rate of $450 per hour plus expenses for my time spent preparing this declaration, and to prepare for and provide testimony in this matter.  I am being compensated at an hourly rate of $650 for testimony at depositions or trial. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

8. My opinions contained in this report are based on: (1) my clinical experience as an endocrinologist; (2) my clinical experience evaluating individuals who have or have had gender incongruence including a detransitioner; (3) my knowledge of research and studies regarding the treatment of gender dysphoria, including for minors and adults; and (4) my review of the various declarations submitted by Plaintiffs

9. I was provided with and reviewed the following case-specific materials: The Florida Medicaid's "Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria"; the expert declaration of Johanna Olson-Kennedy; the expert declaration of Loren Schechter; the expert declaration of Dan H. Karasic; the expert declaration of Armand H. Matheny Antommaria;  the declaration of Brit Rothstein; the declaration of August Dekker; the declaration of Jane Doe; the declaration of Jade Ladue; files from Florida Medicaid.

10. In my professional opinion, treatment interventions on behalf of children and adults diagnosed with gender dysphoria must be held to the same scientific standards as other medical treatments. These interventions must be optimal, efficacious, and safe. Any treatment which alters biological development in children should be used with extreme caution. Except in the case of a fatal injury or disease, the minor will become an adult and present to the adult physician. The adult physician must be able to have a thorough understanding of any condition which alters the biological development of children and, in the case of the endocrinologist, be knowledgeable about the long term effects of hormones

on the human body, particularly when the hormones are being used in ways that alter development.

11. The following expresses my expert opinion regarding minors and adults who present with a disparity between their biological sex and internal feeling about their gender, specifically with regard to the use of social transition, medications which block normal pubertal development, the applications of hormones of the opposite sex, and surgical procedures that alter the genitalia and/or breasts for those individuals.

## I.    Background

## A. Endocrine Disorders

Before discussing gender dysphoria and gender affirmative therapy from the perspective of an endocrinologist, it is helpful to discuss the background of endocrine diseases. This background demonstrates the difference in gender dysphoria, which is a psychological diagnosis, and other conditions treated by endocrinologists, which are physical diagnoses.

Endocrinology is the study of glands and hormones. Endocrine disorders can be divided into three main types: those that involve hormone excess, those that involve hormone deficiency, and those that involve structural abnormalities of the glands such as cancers.

It is important for the endocrinologist to determine the cause of hormone gland excess or deficiency in order to devise an appropriate treatment plan. The plan will generally be to help bring the hormones back into balance and thus bring the patient back to health.

To give an example of hormone excess, hyperthyroidism is a term which means overactivity of the thyroid gland. In this condition excess thyroid hormone is produced by the thyroid gland. This results in various physical and psychological changes for the afflicted patient. Examples of physical changes can include tachycardia or fast heart rate, hand tremors, and weight loss. Examples of psychological symptoms include anxiety, panic attacks, and sometimes even psychosis.

An endocrinologist can recognize thyroid hormone excess in part by signs and symptoms, but can also confirm the diagnosis with laboratory testing that shows the thyroid hormones to be out of balance. Once this is determined and the degree of excess is known, then

treatments can be given to bring these levels back into balance to benefit the patient's health and to prevent other disease effects caused by excess hormone.

To give another example, consider a deficiency of insulin. Insulin is a hormone which regulates blood glucose levels. If there is damage to the pancreas such that insulin levels are very low, then blood glucose levels will rise. If the glucose levels rise to a certain abnormally high level, then this is considered diabetes. In the case of type 1 diabetes, insulin levels are abnormally low and therefore blood glucose levels are abnormally high leading to a variety of signs and symptoms. For example, the patient may have extreme thirst, frequent urination, muscle wasting, and weight loss. They may often experience lethargy and weakness.

In this case laboratory tests of glucose and insulin levels can confirm the diagnosis. Once diabetes is confirmed, the patient is then treated with insulin to help restore glucose balance in the body and prevent long-term complications of diabetes.

To give an example of a structural abnormality, a patient may have a lump on the thyroid gland in the neck. This may be further examined by an imaging test such as an ultrasound. A needle biopsy can be performed so that the cells can be examined under a microscope. A trained medical professional such as a pathologist can then examine the cells to determine if they are benign or cancerous. In the case of a thyroid cancer, a surgical procedure known as a thyroidectomy may be performed to remove the diseased thyroid gland in order to treat the cancer.

Noteworthy in the preceding three examples is that all three disease conditions are diagnosed by physical observations. In other words, a laboratory test of a hormone, an imaging test of an organ, an examination of cells under a microscope, or all three may be employed in the diagnosis of endocrine disease.

## B. Gender Dysphoria is a Psychological Diagnosis

Gender dysphoria, on the other hand, is not an endocrine diagnosis, it is in fact a psychological diagnosis. It is diagnosed purely by psychological methods of behavioral observation and questioning.

Likewise what is termed gender identity is a psychological concept. It has no correlate in the human body. In the letter to the editor I wrote with my colleagues, discussed above, we

wrote in our critique of the Endocrine Society Guidelines that "There are no laboratory, imaging, or other objective tests to diagnose a 'true transgender' child" (Laidlaw et al., 2019).

For example, one cannot do imaging of the human brain to find the gender identity. Likewise, there is no other imaging, laboratory tests, biopsy of tissue, autopsy of the brain, genetic testing, or other biological markers that can identify the gender identity. There is no known gene that maps to gender identity or to gender dysphoria. In other words, there is no objective physical measure to identify either gender identity or gender dysphoria.

This is in contrast to all other endocrine disorders which have a measurable physical change in either hormone levels or gland structure which can be confirmed by physical testing. Therefore, gender dysphoria is a purely psychological phenomenon and not an endocrine disorder. But as my colleagues and I wrote in our letter to the editor, it becomes an endocrine condition through gender affirmative therapy: "Childhood gender dysphoria (GD) is not an endocrine condition, but it becomes one through iatrogenic puberty blockade (PB) and high-dose cross-sex (HDCS) hormones. The consequences of this gender-affirmative therapy (GAT) are not trivial and include potential sterility, sexual dysfunction, thromboembolic and cardiovascular disease, and malignancy" (Laidlaw et al. 2019).

As a practicing endocrinologist and scientist, I have made a study of GD and its treatment for two reasons: 1) I want to be sure that my colleagues and I understand the science before we treat any patients with GD; and 2) I am concerned that the medical society that claims to speak for me and other endocrinologists has abandoned scientific principles in endorsing treatments for GD that have questionable scientific support.   The opinions expressed in this report are the result of my own experience, studies, education, and review of the scientific literature related to GD.

## C. Gender Dysphoria and Desistance

GD is a persistent state of distress that stems from the feeling that one's gender identity does not align with their physical sex (American Psychiatric Association, 2013). It has been a relatively rare condition in children and adolescents. However there have been very significant increases in referrals for this condition noted around the globe.

For example, in the UK, "The number of referrals to GIDS [Gender Identity Development Service] has increased very significantly in recent years. In 2009, 97 children and young

people were referred. In 2018 that number was 2519" (Bell v Tavistock Judgment, 2020). There is evidence that this increase may be in part due to social contagion and fueled by social media/internet use (Littman, 2018).

The French National Academy of Medicine wrote recently: "Parents addressing their children's questions about transgender identity or associated distress should remain vigilant regarding the addictive role of excessive engagement with social media, which is both harmful to the psychological development of young people and is responsible for a very significant part of the growing sense of gender incongruence" (SEGM, 2022).

In "a study of the Finnish gender identity service, '75% of adolescents [assessed] had been or were currently undergoing child and adolescent psychiatric treatment for reasons other than gender dysphoria' (Kaltiala-Heino, 2015). In fact, '68% had their first contact with psychiatric services due to other reasons than gender identity issues.' The same study also showed that 26% percent had an autistic spectrum disorder and that a disproportionate number of females (87%) were presenting to the gender clinics compared to the past" (Laidlaw in gdworkinggroup.org, 2018).

Desistance is a term indicating that the child, adolescent, or adult who initially presented with gender incongruence has come to experience a realignment of their internal sense of gender and their physical body. "Children with [gender dysphoria] will outgrow this condition in 61% to 98% of cases by adulthood. There is currently no way to predict who will desist and who will remain dysphoric" (Laidlaw et al., 2019; Ristori & Steensma, 2016).

Because there is no physical marker to diagnose gender identity, and because it is not possible to predict which child or adolescent will desist, it is not possible to know which young person will remain transgender identified as adults. Also, because the rate of desistance is so high, gender affirmative therapy will necessarily cause serious and irreversible harm to many children and adolescents who would naturally outgrow the condition if not affirmed.

Dr. Olson-Kennedy states that "[t]he studies pertaining to desistance upon which the GAPMS Memo relies pertain to prepubertal youth, not adolescents. In fact, contrary to the GAPMS Memo's assertion, studies show that if gender dysphoria is present in adolescence, it usually persists (DeVries, et al., 2011)." (Oslon-Kennedy decl, p. 22).

Dr. Olson-Kennedy confuses prepubertal (a medical term) with preadolescence (a psychological designation). Puberty which pertains to the phsyical development of the reproductive tract, breasts and associated secondary sex characterestics can begin as early as age 8 in girls and age 9 in boys. The studies which have examined desistance involved children aged twelve and under. For example table 1 in Ristori and Steensma 2016 shows multiple studies involving children. For the three most recent - Singh (2012), Wallien & Cohen-Kettenis (2008), and Drummond et al. (2008) - these involved age ranges from 3 to nearly 13 years old.[1] The desistance rate varied from 61 to 88%. Since the upper age was twelve (or slightly higher), this would include children in the age range of 8-12 years old many of whom were going through puberty based on their age and were therefore not Tanner stage 1 (pre-pubertal).[2] Therefore Dr. Olson-Kennedy's statement that "[t]he studies pertaining to desistance upon which the GAPMS Memo relies pertain to prepubertal youth" is incorrect.

### D. Biological Sex in Contrast to Gender Identity

A recognition and understanding of biological sex is critical to my practice as an endocrinologist because the endocrine physiology of men and women, boys and girls, differ.

Biological sex is the objective physical condition of having organs and body parts which correspond to a binary sex. There are only two physical sexes, male and female. The male is identified as having organs and tissues such as the penis, testicles and scrotum. The female sex is identified by having organs and tissues such as the labia, vagina, uterus, and ovaries. Biological sex is easily identified by physical observation such that adults and even young children can identify the biological sex of a newborn baby.

---

[1] "This study provided information on the natural histories of 25 girls with gender identity disorder (GID). Standardized assessment data in childhood (mean age, 8.88 years; range, 3-12 years)" (Drummond et al., 2008).
"The mean age of the participating gender-referred children was 10.47 years (SD = 1.27; range, 8.11–12.77)" (Wallien et al., 2009).
" Standardized assessment data in childhood (mean age, 7.49 years; range, 3–12 years) and at follow-up (mean age, 20.58 years; range, 13–39 years) were used to evaluate gender identity and sexual orientation outcome. At follow-up, 17 participants (12.2%) were judged to have persistent gender dysphoria." (Singh, 2012).

[2] To my knowledge the desistance literature does not examine Tanner stages of puberty as part of their studies. However one can infer based on the ages that many children had at least begun puberty (Tanner stage 2) or were at a more advanced stage of puberty.

This is in contrast to gender identity, which does not exist in any physical sense. It is a subjective identification known only once a patient makes it known. It cannot be identified by any physical means, cannot be confirmed by any outside observer, and can change over time.

It is also noteworthy that the physical organs described above as representing biological sex have a physical genetic correlate. In other words, it is a well-established scientific fact that two X chromosomes identify the cells correlating to a female person, and an X and a Y chromosome correlate to a male person.

Sex is clearly identified in 99.98% of cases by chromosomal analysis (Sax, 2002). Sex is also clearly recognized at birth in 99.98% of cases (Id.). Therefore, sex is a clear provable objective reality that can be identified through advanced testing such as karyotyping, or simple genital identification at birth by any layperson. The other 0.02% of cases have some disorder of sexual development (DSD).  DSDs do not represent an additional sex or sexes, but simply a disorder on the way to binary sex development (Chan et al., 2021).

### E. Human Sexual Development

### 1. Embryologic development

Another confirmation that there are only two biological sexes comes from what is known about embryologic development and fertilization. The biologic development of the human person begins with a gamete from a female termed an ovum or egg and a gamete from a biological male which is termed sperm. The fertilization of the egg by the sperm begins the process of human biological development. The cells of the fertilized ovum then multiply and the person undergoes the incredible changes of embryologic development.

It is noteworthy that the male sperm comes from the biological male and the female egg comes from the biological female. There is no other third or fourth or fifth type of gamete that exists to begin the development of the human person. This is consistent with the binary nature of human sex (Alberts et al., 2002).

The sex binary of the human embryo is further developed between roughly weeks 8 to 12 of human development. There are two primitive structures present within the developing embryo called the Wolffian duct and Mullerian ducts (Larsen et al., 2003). The Wolffian ducts develop into substructures of the genitalia including the vas deferens and epididymis

which belong exclusively to the male sex. For the female, the Mullerian ducts go on to form the uterus, fallopian tubes, cervix and upper one third of the vagina which belong exclusively to the female sex (Id.)

Significantly once the male structures are developed from Wolffian ducts, the Mullerian ducts are obliterated. This means that throughout the rest of embryological development the Mullerian ducts will not form into biological female structures. Likewise, in the female, the Wolffian ducts are destroyed by week 12 and will not form male structures at any point in the future (Id.).

Thus we can see in very early development that the sex binary is imprinted physically not only in the chromosomes, but also on the very organs that the body produces. Additionally, the potential to develop organs of the opposite sex is eliminated. Thus, in the human being there are only two physical tracts that one may progress along, the one being male and the other being female (Wilson and Bruno, 2022).

## 2. Pubertal Development

As mentioned previously, at the time of birth an infant's sex is easily identified through observation of the genitalia. Corresponding internal structures could also be confirmed through imaging if needed.

In early childhood, some low level of sex hormones are produced by the sex glands. The male testes produce testosterone. The female ovaries produce primarily the hormone estrogen. These sex glands remain quiescent for the most part, producing low levels of sex hormones until the time of pubertal development.

Puberty is a time of development of the sex organs, body, brain and mind. There are well known changes in physical characteristics of the male such as growth of facial hair, deepening of the voice, and increasing size of the testicles and penis. Importantly the testicles will develop sperm under the influence of testosterone and become capable of ejaculation. Because of these changes, the male will become capable of fertilizing an egg. The inability to produce sperm sufficient to fertilize an egg is termed infertility.

For the female, pubertal development includes changes such as breast development, widening of the pelvis, and menstruation. The female will also begin the process of ovulation which is a part of the menstrual cycle and involves the release of an egg or eggs

from the ovary. Once the eggs are released in a manner in which they can become fertilized by human sperm then the female is termed fertile. The inability to release ovum that can be fertilized is infertility (Kuohong and Hornstein, 2021).

### 3. Tanner stages of development

From a medical perspective it is important to know the stage of pubertal development of the developing adolescent. This can be determined through a physical examination of the body. The female will have changes in breast characteristics and pubic hair development. Similarly, the male will have changes in testicular size and pubic hair development. These findings can be compared to the Tanner staging system which will allow the stage of puberty to be known.

Tanner stages are divided into five. Stage 1 is the pre-pubertal state before pubertal development of the child begins. Stage 5 is full adult sexual maturity. Stages 2 through 4 are various phases of pubertal development (Greenspan and Gardner, 2004).

Awareness of the Tanner stage of the developing adolescent is also useful to assess for maturation of sex organ development leading to fertility. For girls, the first menstruation (menarche) occurs about two years after Tanner stage 2 and will typically be at Tanner stage 4 or possibly 3 (Emmanuel and Boker, 2022).  The first appearance of sperm (spermarche) will typically be Tanner stages 4 (Id.). If puberty is blocked or disrupted before reaching these critical stages, the sex glands will be locked in a premature state and incapable of fertility.

### 4. Biological Sex Cannot Be Changed

It is not possible for a person to change from one biological sex to the other, and there is no technology that allows a biological male to become a biological female or vice-versa. It is not technologically possible at this time to change sex chromosomes; these will remain in every cell throughout life. It is not technologically possible to transform sex glands from one to the other. In other words, there are no hormones or other means currently known to change an ovary into a testicle or a testicle into an ovary.

Furthermore, as noted earlier, several of the sex specific structures (such as the epidymis of the male or uterus of the female) are produced early in embryological development from around weeks 8 to 12. The primitive ducts which lead to these organs of the opposite sex

are obliterated. There is no known way to resuscitate these ducts and continue development of opposite sex structures.

It is also not possible to produce gametes of the opposite sex. In other words, there is not any known way to induce the testicles to produce eggs. Nor is there any known way to induce the ovaries to produce sperm. Therefore, creating conditions for a biological female to create sperm capable of fertilizing another ovum is impossible. The induction of opposite sex fertility is impossible.

In fact, as I will discuss, gender affirming therapy actually leads to infertility and potential sterilization.

### F. Iatrogenic Harms

The term iatrogenic is used in medicine to describe harms or newly created medical conditions that are the result of medications, surgeries, or even psychological treatments. In this section I will discuss the iatrogenic harms of "gender affirmative treatment," for females. Each of the four interventions which I will describe (social transition, blocking normal puberty, opposite sex hormones, and surgery) lead to iatrogenic harms to the patient. These harms will be described in detail below.  I speak of these harms because it is important to understand that once a patient begins GAT it is more likely the patient will continue on to surgery (de Vries et al., 2014).  Thus, GAT interrupts the natural desistence process and instead places the patient on a lifetime regimen of hormonal and surgical care. A good understanding of these harms is also critical to my practice as an endocrinologist, because if I did not understand these harms, I could not advise patients of the risks associated with GAT.

### G. Gender Affirmative Therapy

The approaches to gender dysphoria in minors may be divided into three main types. (Zucker, 2020). One is psychosocial treatment that helps the young person align their internal sense of gender with their physical sex. Another would be to "watch and wait" and allow time and maturity to help the young person align sex and gender through natural desistance. The third option, which is the focus of that which follows, is referred to as gender affirmative therapy.

Gender affirmative therapy (GAT) of adults and minors consists of psychosocial, medical, and surgical interventions that attempt to psychologically and medically alter the patient so that they come to believe they may become similar to the physical sex which aligns with their gender identity (but not their biological sex) and thereby reduce gender dysphoria. GAT consists of four main parts: 1) social transition, 2) blocking normal puberty or menstruation, 3) high dose opposite sex hormones, and 4) surgery of the genitalia and breasts.

The application of this medical therapy to minors is a fairly new intervention and is associated with a number of harms both known and unknown. GAT suffers from a lack of a quality evidence-base, poorly performed studies, and ongoing unethical human experimentation.

## 1. Social transition

The first stage of gender affirmative therapy is termed social transition. Social transition is a psychological intervention. The child may be encouraged to adopt the type of clothing and mannerisms or behaviors which are stereotypical of the opposite sex within a culture. For example, in the United States a boy might wear his hair long and wear dresses in order to socially transition. A girl may cut her hair short and wear clothes from the boys' section of a department store.

Social transition of the child has been noted by expert researcher in the field of child gender dysphoria, Ken Zucker, to itself be a form of iatrogenic harm (Zucker, 2020). This is because the social transition process may solidify the young person's belief that they are in fact the sex opposite of their biological sex.

From an endocrine point of view, it is understandable that a child having the outward appearance of the opposite sex, would believe that he or she is destined to go through puberty of the opposite sex as they have only a poor understanding of the internal structures of the body, the function of the sex glands, the role of the sex glands in fertility and so forth.

Therefore, it would be quite frightening for a boy who believes he is a girl to be turning into a man with all of the adult features that accompany manhood. Vice versa, the girl who has become convinced that she is a boy will be frightened by the physical changes brought on by womanhood.

In fact, it would appear that in the minds of the children and adolescents that they are anticipating a sort of disease state in the future by the hormone changes that will occur as a normal and natural part of human development. Until relatively recently in human history, it has not been possible to interfere with puberty through pharmaceutical means.

## 2. Medications which Block Pubertal Development

### a. Background

A second stage of gender affirmative therapy may involve blocking normal pubertal development. This may be done with puberty blocking medications that act directly on the pituitary.

In order to understand what is occurring in this process, it is helpful to be aware of normal hormone function during pubertal development.

There is a small pea-sized gland in the brain called the pituitary. It is sometimes referred to as the "master gland" as it controls the function of several other glands. One key function for our purposes is the control of the sex glands. There are two specific hormones produced by the pituitary referred to as luteinizing hormone (LH) and follicle stimulating hormone (FSH). These are responsible for sex hormone production and fertility. The LH and FSH act as signals to tell the sex glands begin or continue their function.

In the adult male, the production of LH will cause adult levels of testosterone to be produced by the testicles. In the adult female, the production of LH will cause adult levels of estrogen to be produced by the ovaries.

In early childhood, prior to the beginning of puberty, the pituitary function with respect to the sex glands is quiescent. However, during pubertal development LH will signal the testicle to increase testosterone production and this carries the boy through the stages of pubertal development into manhood. Likewise for the female, the interaction of LH with the ovaries increases estrogen production and carries the girl through the stages of development into womanhood.

There are conditions diagnosed by endocrinologists which involve a disruption of this normal communication between the pituitary and the sex glands. There is a medical condition called hypogonadotropic hypogonadism. The meaning of this term is that the pituitary is not sending the hormonal signals (LH and FSH) to the sex glands and therefore the sex glands are unable to make their sex hormones. The result is hormonal deficiencies of LH, FSH, and either testosterone or estrogen.

If this condition occurs during puberty, the effect will be to stop pubertal development. This is a disease state which is diagnosed and treated by the endocrinologist.

Medications such as GnRH agonists act on the pituitary gland to lower the pituitary release of LH and FSH levels dramatically. The result is a blockage of the signaling of the pituitary to the testicles or ovaries and therefore underproduction of the sex hormones. This will stop normal menstrual function for the female and halt further pubertal development. For the male this will halt further pubertal development. If the male had already reached spermarche, then production of new sperm will stop.

### b.  GnRH Agonist Medication Effects Vary by Use Case

There are a variety of uses for GnRH agonists. The use and outcome can be very different for different applications.

For example, the initial development of the medication called Lupron was for the treatment of prostate cancer. The idea being that blocking pituitary hormones will block the adult male's release of testosterone from the testicles. Since testosterone will promote the growth of prostate cancer, the idea is to lower testosterone levels to a very low amount and therefore prevent the growth and spread of prostate cancer. This is a labeled use of the medication. In other words, there is FDA approval for this use.

Another labeled use of GnRH agonist medication is for the treatment of central precocious puberty. In the disease state of central precocious puberty, pituitary signaling is activated at an abnormally young age, say age four, to begin pubertal development. In order to halt puberty which has begun at an abnormally early time, a GnRH agonist may be used. Here the action of the medication on the pituitary will disrupt the signaling to the sex glands, stop early sex hormone production, and therefore stop abnormal pubertal development.

Then, at a more normal time of pubertal development, say age 11, the medication is stopped and puberty is allowed to proceed. The end result is to restore normal sex gland function and timing of puberty. This is a labeled use for a GnRH agonist medication.

What about the use of puberty blockers such as Lupron in gender affirmative therapy? In these cases, we have physiologically normal children who are just beginning puberty or are somewhere in the process of pubertal development. They have healthy pituitary glands and sex organs. However, a puberty blocking medication is administered to stop normal pubertal development.

In this case the condition of hypogonadotropic hypogonadism described above (a medical disease) is induced by medication and is an iatrogenic effect of treating the psychological condition of gender dysphoria. GnRH agonist medications have not been FDA approved for this use.

### c.   Adverse Health Consequences of Blocking Normal Puberty

There are a number of serious health consequences that occur as the result of blocking normal puberty. The first problem is infertility. The Endocrine Society Guidelines recommend beginning puberty blockers as early as Tanner stage 2. As discussed earlier, this is the very beginning of puberty. Fertility development happens later generally in Tanner stage 4. One can see that if the developing person is blocked at Tanner stage 2 or 3 as advocated by the guidelines, this is prior to becoming fertile. The gonads will remain in an immature, undeveloped state.

Dr. Antommaria writes that "The [Endocrine Society] guideline recommends that informed consent for pubertal blockers and gender-affirming hormones include a discussion of the implications for fertility and options for fertility preservation (Antommaria decl, p.23). However, even though procedures to preserve fertility are available, studies show that less than 5% of adolescents receiving GAT even attempt fertility preservation (FP) (Nahata, 2017). Moreover, "ovarian tissue cryopreservation is still considered experimental in most centers and testicular tissue cryopreservation remains entirely experimental. These experimental forms of FP would be the only options in children [with puberty] blocked prior to spermarche and menarche and are high in cost and limited to specialized centers. Even with FP there is no guarantee of having a child" (Laidlaw, Cretella, et al., 2019).

Naturally, these children are at a developmental age where they are not thinking about adult related concepts such as having children as they are children themselves. This is only natural and to be expected. The medical problem imposed on them is that if they remain blocked in an early pubertal stage then even the addition of opposite sex hormones will not allow for the development of fertility. In fact, high dose opposite sex hormones may permanently damage the immature sex organs leading to sterilization. Certainly the removal of the gonads, which will be discussed later, will ensure sterilization.

Another problem with blocking puberty at an early stage is sexual dysfunction. The child will continue their chronological age progression toward adulthood and yet remain with undeveloped genitalia. This will lead to sexual dysfunction including potential erectile dysfunction and inability to ejaculate and orgasm for of the male. For the female with undeveloped genitalia potential sexual dysfunction may include painful intercourse and impairment of orgasm.

The impairment of sexual function was evident in the TLC reality show "I am Jazz". In the show Jazz who was identified male at birth has been given puberty blockers at an early pubertal stage. In an episode where Jazz visits a surgeon and has a discussion about sexual function, Jazz states: "I haven't experienced any sexual sensation." Regarding orgasm, Jazz says: "I don't know, I haven't experienced it"[3] (TLC, accessed 2022).

In addition to direct effects on the developing genitalia and fertility there are other important aspects of puberty that are negatively affected. For example, puberty is a time of rapid bone development. This time of development is critical in attaining what we call peak bone density or the maximum bone density that one will acquire in their lifetime (Elhakeem, 2019).

Any abnormal lowering of sex hormones occurring during this critical time will stop the rapid accumulation of bone and therefore lower ultimate adult bone density. If a person does not achieve peak bone density, they would be expected to be at future risk for osteoporosis and the potential for debilitating spine and hip fractures as adults. Hip fractures for the older patient very significantly increase the risk of major morbidity and death (Bentler, 2009). Allowing a "pause" in puberty for any period of time leads to an inability to attain peak bone density.

---

[3] Jazz's age is somewhere in the mid-teens during this episode.

Another consideration is maturation of the human brain. Much of what happens is actually unknown. However, "sex hormones including estrogen, progesterone, and testosterone can influence the development and maturation of the adolescent brain" (Arain, 2013). Therefore there are unknown, but likely negative consequences to blocking normal puberty with respect to brain development.

A third major problem with blocking normal puberty involves psychosocial development. Adolescence is a critical time of physical, mental, and emotional changes for the adolescent. It is important that they develop socially in conjunction with their peers. This is well recognized in the psychological literature: "For decades, scholars have pointed to peer relationships as one of the most important features of adolescence." (Brown, 2009). If one is left behind for several years under the impression that they are awaiting opposite sex puberty, they will miss important opportunities for socialization and psychological development. Psychosocial development will be necessarily stunted as they are not developing with their peers. This is a permanent harm as the time cannot be regained.

Aside from the multiple serious problems that are iatrogenically acquired by blocking normal puberty, there appear to be independent risks of the puberty blocking medication themselves. For example, one can read the labeling of a common puberty blocking medication called Lupron Depot-Ped and find under psychiatric disorders: "emotional lability, such as crying, irritability, impatience, anger, and aggression. Depression, including rare reports of suicidal ideation and attempt. Many, but not all, of these patients had a history of psychiatric illness or other comorbidities with an increased risk of depression" (Lupron, 2022). This is particularly concerning given the high rate of psychiatric comorbidity with gender dysphoria discussed previously.

### d. The Effect of Puberty Blockers on Desistance

As stated earlier a very high proportion of minors diagnosed with gender dysphoria will eventually desist or come to accept their physical sex. Puberty blockers have been shown to dramatically alter natural desistance.

In a Dutch study that included seventy adolescents who took puberty blockers, all seventy decided to go on to hormones of the opposite sex (de Vries, et al. 2011). In a follow-up study, the overwhelming majority went on to have sex reassignment surgery by either vaginoplasty for males or hysterectomy with ovariectomy for females (de Vries, et al. 2014). These surgeries resulted in sterilization. This is why puberty blockers, rather than

being a "pause" to consider aspects of mental health, are instead a pathway towards future sterilizing surgeries. The surgeries were consequential in another important way. One person who had a vaginoplasty died of post-surgical complications of necrotizing fasciitis which is a rapidly progressive and very severe infection of the soft tissues beneath the skin and which has a high mortality (Id.).

### e. Infertility as a result of Puberty Blockers in GAT

Dr. Antommaria states that "Florida Medicaid provides coverage for the use of puberty blockers to treat central precocious puberty, but now prohibits coverage for the use of puberty blockers to treat gender dysphoria, even though the use of puberty blockers to treat both conditions has comparable risks and is supported by comparable types of evidence" (Antommaria decl, p. 24). These statements fail to recognize the very different effects of PB medication in early childhood versus during adolescence.

Giving puberty blockers to a four year old with central precocious puberty will obviously not impair fertility, as the four year old has not yet become fertile. The child will at a later time have the puberty blocker discontinued and then normal pubertal development can proceed. Therefore when they are no longer taking the medication, they will gain natural fertility.

In contrast, puberty blocking medication given to minors in GAT occurs at precisely the time that the child will gain reproductive function. This will stop sperm production in the male and ovulation in the female (if these have already occurred, otherwise the functions will not even begin) which produces the infertile condition. Importantly, so long as the minor continues PB they will remain infertile. Should they continue on to opposite sex hormones as part of GAT then they will remain infertile. There is the additional possibility that cytotoxic effects of high dose opposite sex hormones will damage the immature gonads leading to permanent sterility.

### 3. Opposite Sex Hormones

The third stage of gender affirmative therapy involves using hormones of the opposite sex at high doses to attempt to create secondary sex characteristics in the person's body.

## a. Testosterone

Testosterone is an anabolic steroid of high potency. It is classified as a Schedule 3 controlled substance by the DEA: "Substances in this schedule have a potential for abuse less than substances in Schedules I or II and abuse may lead to moderate or low physical dependence or high psychological dependence" (DEA, 2022). A licensed physician with a valid DEA registration is required to prescribe testosterone.

I prescribe testosterone to men for testosterone deficiency. The state of testosterone deficiency can cause various problems including problems of mood, sexual function, libido, and bone density. Prescription testosterone is given to correct the abnormally low levels and bring them back into balance. The dose of testosterone must be carefully considered and monitored to avoid excess levels in the male as there are a number of serious concerns when prescribing testosterone.

Regarding the potential for abuse, the labeling reads "Testosterone has been subject to abuse, typically at doses higher than recommended for the approved indication...Anabolic androgenic steroid abuse can lead to serious cardiovascular and psychiatric adverse reactions...Abuse and misuse of testosterone are seen in male and female adults and adolescents...There have been reports of misuse by men taking higher doses of legally obtained testosterone than prescribed and continuing testosterone despite adverse events or against medical advice." (Actavis Pharma, 2018)

Adverse events with respect to the nervous system include: "Increased or decreased libido, headache, anxiety, depression, and generalized paresthesia." (Actavis Pharm, 2018)

With regard to ultimate height, "[t]he following adverse reactions have been reported in male and female adolescents: premature closure of bony epiphyses with termination of growth" (Actavis Pharma, Inc., 2018). What this means is that testosterone applied to the adolescent will cause premature closure of the growth plates, stopping further gains in height in the growing individual, and ultimately making the person shorter than they otherwise would have been.

With respect to the cardiovascular system of men using ordinary doses, "Long-term clinical safety trials have not been conducted to assess the cardiovascular outcomes of testosterone

replacement therapy in men" (Actavis Pharma, 2018). No clinical safety trials have been performed for women or adolescent girls to my knowledge.

"There have been postmarketing reports of venous thromboembolic events [blood clots], including deep vein thrombosis (DVT) [blood clot of the extremity such as the leg] and pulmonary embolism (PE) [blood clot of the lung which may be deadly], in patients using testosterone products, such as testosterone cypionate" (Actavis Pharma, 2018).

A very recently published study of adverse drug reactions (ADRs) as part of gender affirming hormone therapies in France states that "[o]ur data show a previously unreported, non-negligible proportion of cases indicating cardiovascular ADRs in transgender men younger than 40 years… In transgender men taking testosterone enanthate, all reported ADRs were cardiovascular events, with pulmonary embolism in 50% of cases" (Yelehe et al., 2022).

There are also serious concerns regarding liver dysfunction: "Prolonged use of high doses of androgens ... has been associated with development of hepatic adenomas [benign tumors], hepatocellular carcinoma [cancer], and peliosis hepatis [generation of blood-filled cavities in the liver that may rupture] —all potentially life-threatening complications" (Actavis Pharma, 2018).

In GAT, what is termed "cross sex hormones" is the use of hormones of the opposite sex to attempt to create secondary sex characteristics. To do so, very high doses of these hormones are administered. When hormone levels climb above normal levels they are termed supraphysiologic.

### b. Opposite Sex Hormones - Supraphysiologic Doses of Testosterone for Females

The female person does produce some smaller amount of testosterone relative to the male. The normal reference range for adult females depending on the lab is about 10 to 50 ng/dL. However, in female disease conditions these levels can be much higher. For example, in polycystic ovarian syndrome levels may range from 50 to 150 ng/dL. PCOS has been associated with insulin resistance (Dunaif, 1989), metabolic syndrome (Apridonidze, 2005) and diabetes (Joham, 2014).

In certain endocrine tumors such as adrenal carcinoma these levels may be substantially higher in the 300 to 1000 ng/dl range. Adrenal carcinoma is a serious medical condition and may be treated by surgery and potent endocrine medications.

Recommendations from the Endocrine Society's clinical guidelines related to GAT are to ultimately raise female levels of testosterone to 320 to 1000 ng/dL[4] which is on the same order as dangerous endocrine tumors for women as described above (Hembree, 2017). A simple calculation shows this level for the adult may be anywhere from 6 to 100 times higher than native female testosterone levels. In doing so they are creating a hormone imbalance known as hyperandrogenism. These extraordinarily high levels of testosterone are associated with multiple risks to the physical and mental health of the patient.

""Studies of transgender males taking testosterone have shown up to a nearly 5-fold increased risk of myocardial infarction relative to females not receiving testosterone" (Laidlaw et al.,2021; Alzahrani et al., 2019). A female can also develop unhealthy, high levels of red blood cells referred to as erythrocytosis. These high red blood cell counts in young women have been shown to be an independent risk factor for cardiovascular disease, coronary heart disease and death due to both (Gagnon, 1994).

Other permanent effects of testosterone therapy involve irreversible changes to the vocal cords. Abnormal amounts of hair growth which may occur on the face, chest, abdomen, back and other areas is known as hirsutism. Should the female eventually regret her decision to take testosterone, this body hair can be very difficult to remove. Male pattern balding of the scalp may also occur. Common sense suggests that changes of voice and hair growth could be psychologically troubling should the patient attempt to reintegrate into society as a female.

Changes to the genitourinary system include polycystic ovaries and atrophy of the lining of the uterus. The breasts have been shown to have an increase in fibrous breast tissue and a decrease in normal glandular tissue (Grynberg et al., 2010). Potential cancer risks from high dose testosterone include ovarian and breast cancer (Hembree, 2017).

---

[4] In the Endocrine Society's Guidelines there is no grading of evidence for the rationale of using such high supraphysiologic doses of opposite sex hormones for the female or male. There seems to be an underlying assumption that because the person believes to be the opposite sex then they acquire the sex specific laboratory ranges of the opposite sex. "The root cause of this flaw in thinking about diagnostic ranges was exemplified in a response letter by Rosenthal et al claiming that gender identity determines the ideal physiologic range of cross-sex hormone levels (5). Thus, a psychological construct, the 'gender identity', is imagined to affect physical reality and change a person's sex-specific laboratory reference ranges. This is clearly not the case, otherwise there would be no serious complications of high-dose androgen treatment in transgender males" (Laidlaw et al., 2021).

According to research regarding testosterone abuse, high doses of testosterone have been shown to predispose individuals towards mood disorders, psychosis, and psychiatric disorders. The "most prominent psychiatric features associated with AAS [anabolic androgenic steroids, i.e. testosterone] abuse are manic-like presentations defined by irritability, aggressiveness, euphoria, grandiose beliefs, hyperactivity, and reckless or dangerous behavior. Other psychiatric presentations include the development of acute psychoses, exacerbation of tics and depression, and the development of acute confusional/delirious states" (Hall, 2005). Moreover, "[s]tudies... of medium steroid use (between 300 and 1000 mg/week of any AAS) and high use (more than 1000 mg/week of any AAS) have demonstrated that 23% of subjects using these doses of steroids met the DSM-III-R criteria for a major mood syndrome (mania, hypomania, and major depression) and that 3.4% — 12% developed psychotic symptoms" (Hall, 2005).

### c. Estrogen

Estrogen is the primary sex hormone of the female. Prescription estrogen may be used if a woman has low estrogen levels due to premature failure of her ovaries. Estrogen is prescribed to bring these levels back into a normal range for the patient's age. Another labeled use of estrogen is to treat menopausal symptoms.

### d. Opposite Sex Hormones - Supraphysiologic Estrogen for Males

For the male, estrogen is being used at supraphysiologic doses. The high doses are used in an attempt to primarily affect an increase of male breast tissue development known as gynecomastia. Gynecomastia is the abnormal growth of breast tissue in the male. The occurrence of gynecomastia in the male is sometimes corrected by medication or more commonly by surgery if needed. Other changes of secondary sex characteristics may develop such as softening of the skin and changes in fat deposition and muscle development.

The doses of estrogen given to males for GAT are high and may vary from two to eight or more times higher than normal adult male levels. This produces the endocrine condition called hyperestrogenemia. Long-term consequences include increased risk of myocardial infarction and death due to cardiovascular disease (Irwig, 2018). Also "[t]here is strong

evidence that estrogen therapy for trans women increases their risk for venous thromboembolism[5] over 5 fold" (Irwig, 2018).

Breast cancer is a relatively uncommon problem of the male. However the risk of a male developing breast cancer has been shown to be 46 times higher with high dose estrogen (Christel et al., 2019).

It is clear that supraphysiologic doses of either testosterone for the female or estrogen for the male can have detrimental health consequences. This is only now being borne out in the literature for adults. However as more children and adolescents are put on these medications one would expect these consequences to become more frequent and to occur earlier in their lives.

## 4. Surgeries

The fourth stage of gender affirmative therapy is surgical alterations of the body of various kinds in an attempt to somehow mimic features of the opposite sex.

Individual surgical procedures can be a complex topic. It is helpful to first step back and consider conceptually what any surgery can and cannot accomplish.

In its basic form surgery is subtractive. In other words, a portion of tissue, an organ or organs are removed in order to restore health. For example, a diseased gallbladder may be surgically removed to help the patient get back to wellness. An infected appendix may be surgically removed to prevent worsening infection or even death. In both of these cases an unhealthy body part is surgically removed in order to restore health.

In some cases a diseased tissue or organ is removed so that a foreign replacement part may be substituted for an unhealthy organ or tissue. For example, a diseased heart valve may be replaced with a pig valve or a prosthetic heart valve. Another example is a failed liver may be replaced by liver transplant.

Though modern surgical techniques and procedures are astounding, there are very noteworthy limitations. Importantly, surgery cannot de novo create new organs. If a person's kidneys fail, the surgeon has no scientific method for creating a new set of kidneys

---

[5] Venous thromboembolism is a blood clot that develops in a deep vein and "can cause serious illness, disability, and in some cases, death" (CDC, 2022).

that can be implanted or grown within the patient. This conceptual background is helpful when considering various gender affirming surgeries.

There are a variety of gender affirming surgeries for females. These may include mastectomies, metoidioplasty, and phalloplasty.

### a. Mastectomy

Mastectomies are the surgical removal of the breasts. The procedure is used in GAT in an attempt to make the chest appear more masculine. The surgery results in a permanent loss of the ability to breastfeed and significant scarring of 7 to 10 inches. The scars are prone to widening and thickening due to the stresses of breathing and arm movement. Other potential complications include the loss of normal nipple sensation and difficulties with wound healing (American Cancer Society, 2022).

It is important to note that this operation cannot be reversed. The female will never regain healthy breasts capable of producing milk to feed a child (Mayo Clinic, Top Surgery, 2022).

Another important consideration is that compared to the removal of an unhealthy gallbladder or appendix, in the case of gender dysphoria the breasts are perfectly healthy and there is no organic disease process such as a cancer warranting their removal. The future woman who later desists is left with regret about what happened to her at an age before she could provide true informed consent. Functioning breasts cannot be created by a surgeon and restored to a patient in case of regret. She is left with permanent injury and loss of function with respect to her breasts.

### b. GAT Surgeries on the Male

GAT surgeries for the male include removal of the testicles alone to permanently lower testosterone levels. This is by nature a sterilizing procedure. Further surgeries may be done in an attempt to create a pseudo-vagina which is called vaginoplasty. In this procedure, the penis is surgically opened and the erectile tissue is removed. The skin is then closed and inverted into a newly created cavity in order to simulate a vagina. A dilator must be placed in the new cavity for some time so that it does not naturally close.

Potential surgical complications may include urethral strictures, infection, prolapse, fistulas and injury to the sensory nerves with partial or complete loss of erotic sensation (Mayo Clinic, Feminizing Surgery, 2022).

### c. GAT Surgeries of the Female Pelvis and Genitalia

Other types of surgery for females include those of the genitalia and reproductive tract. For example, the ovaries, uterus, fallopian tubes, cervix and the vagina may be surgically removed. Removal of the ovaries results in sterilization.

Importantly, removing female body parts does not produce a male. Rather, the female has had sex specific organs permanently destroyed with no hope of replacement, while remaining biologically female.

There have also been attempts to create a pseudo-penis. This procedure is known as phalloplasty. It is not possible to de novo create a new human penis. Instead, a roll of skin and subcutaneous tissue is removed from one area of the body, say the thigh or the forearm, and transplanted to the pelvis. An attempt is made to extend the urethra or urinary tract for urination through the structure. This transplanted tissue lacks the structures inherent in the male penis which allow for erection, therefore erectile devices such as rods or inflatable devices are placed within the tube of transplanted tissue in order to simulate erection (Hembree, 2017). The labia may also be expanded to create a simulated scrotum containing prosthetic objects to provide the appearance of testicles.

Complications may include urinary stricture, problems with blood supply to the transplanted roll of tissue, large scarring to the forearm or thigh, infections including peritonitis, and possible injury to the sensory nerve of the clitoris (Mayo Clinic, Masculinizing Surgery, 2022). A recent systematic review and meta-analysis of 1731 patients who underwent phalloplasty found very high rates of complications (76.5%) including a urethral fistula rate of 34.1% and urethral stricture rate of 25.4% (Wang, 2022).

### H. Life Threatening Physical Medical Conditions Versus Suicidal Ideation

Any child or adolescent who has suicidal ideation or has attempted suicide should receive immediate, appropriate psychiatric care. Psychologists and psychiatrists are trained in the recognition and treatment of suicidal ideation and prevention of suicide. A child or adolescent with gender dysphoria who also has suicidal ideation should not be treated any

differently. They require compassionate care and a full psychological evaluation of comorbidities such as depression, anxiety, and self-harming behaviors.

However, suicidal ideation or attempts are categorically different than other life-threatening situations, such as a rapidly expanding brain tumor or a severe infection. In these situations, a medication or a surgery is used to stop the progression of an organic physical condition. In contrast, the danger to the self with suicidal ideation relates to a condition of the mind.

Gender affirmative therapy does not treat any life-threatening physical condition. In fact, it creates a number of new medical conditions as described above. It is also not an appropriate treatment for suicidal ideation. Neither puberty blocking medications, nor testosterone, nor estrogen have been FDA approved for suicide prevention. Moreover, as noted above, the hormone imbalances generated by the medications used in GAT actually increase psychological conditions that lead to suicidal ideation and completed suicide.

## I. Informed Consent

Any person who is to take a medication, undergo a surgical procedure, or have a psychological intervention should understand the risks and benefits before proceeding. A discussion of these risks and benefits should be provided by medical professionals and then the person of sufficient intellectual capacity and maturity can consent to the treatment.

Naturally difficulties arise when a minor is involved in the process of medical decision-making. Their intellect, emotions, and judgment are not fully developed and they are not capable of fully appreciating permanent, life altering changes such as described above. Therefore, they cannot provide informed consent. They may sometimes "assent" to a procedure or medication with a parent or guardian making the final decision.

With respect to GAT, in my opinion, it is not possible for the parent or guardian to make a true informed consent decision for the child because of the poor quality of evidence of benefit, the known risks of harm, and the many unknown long-term risks of harm which could only truly be known after years and decades of gender affirmative therapy. A parent or guardian cannot consent to dubious treatments which result in irreversible changes to their child's body, infertility, sexual dysfunction, and in many cases eventual sterilization.

Because this age group is still undergoing brain development and they are immature with respect to intellect, emotion, judgment, and self-control, in my professional opinion there is a significant chance a young person may later regret the irreversible bodily changes that result from hormones or from removing an organ or organs that will no longer function and cannot be replaced.

I would also note that adolescents are more prone to high-risk behavior and less likely to fathom the risks and consequences of these decisions (Steinberg, 2008).

## J. The WPATH and The Endocrine Society

According to their declarations, the experts Dr. Johanna Olson-Kennedy, Dr. Loren Schechter, and Dr. Dan H. Karasic are members of WPATH. Dr. Schechter was "co-lead author of the surgical and postoperative care chapter" for SOC 8 (Schechter decl, p 4). Dr. Karasic was a lead author of the Mental Health chapter for SOC 8 (Karasic decl, p. 3).

WPATH's Standards of Care 7 were produced over a decade ago in 2011. They were prepared within their advocacy organization and are purported to be a "professional consensus about the psychiatric, psychological, medical, and surgical management of gender dysphoria" (WPATH, 2022). However, the "professional consensus" exists only within the confines of its organization. Furthermore, their Standards of Care 7, unlike the Endocrine Society's guidelines, do not have a grading system for either the strength of their recommendations or the quality of the evidence presented.

While the Endocrine Society has issued "Endocrine Treatment of Gender-Dysphoric / Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," these are only "guidelines." The Endocrine Society's guidelines (ESG) specifically state that their "guidelines cannot guarantee any specific outcome, nor do they establish a standard of care" (Hembree at al, 2017, p. 3895).

With respect to the makeup of authors of the ESG, nine out of ten authors were members of WPATH or worked on WPATH's scientific committees. Seven of those nine had at some time been in WPATH leadership including the WPATH presidency and board of directors (File: WPATH - Endocrine Society 2017 guidelines.pdf).

In the Endocrine Society's guidelines, the quality of evidence for the treatment of adolescents is rated "very low-quality evidence" and "low quality evidence". "The quality

of evidence for [puberty blocking agents] is noted to be low. In fact, all of the evidence in the guidelines with regard to treating children/adolescents by [gender affirmative therapy] is low to very low because of the absence of proper studies" (Laidlaw et al., 2019).

Unlike some other recommendations for adolescent GAT, the Endocrine Society's guidelines do not include any grading of the quality of evidence specifically for their justification of laboratory ranges of testosterone or estrogen or for adolescent mastectomy or other surgeries.

Endocrinologists W. Malone and P. Hruz and colleagues have written critically of the Endocrine Society's (ES) guidelines: "Unlike standards of care, which should be authoritative, unbiased consensus positions designed to produce optimal outcomes, practice guidelines are suggestions or recommendations to improve care that, depending on their sponsor, may be biased. In addition, the ES claim of effectiveness of these interventions is at odds with several systematic reviews, including a recent Cochrane review of evidence (5), and a now corrected population-based study that found no evidence that hormones or surgery improve long-term psychological well-being (6). Lastly, the claim of relative safety of these interventions ignores the growing body of evidence of adverse effects on bone growth, cardiovascular health, and fertility, as well as transition regret" (Malone et al., 2021).

In June of 2022, the Endocrine Society published "Enhancing the Trustworthiness of the Endocrine Society's Clinical Practice Guidelines" (McCartney et al., 2022). They wrote "In an effort to enhance the trustworthiness of its clinical practice guidelines, the Endocrine Society has recently adopted new policies and more rigorous methodologies for its guideline program." (Id.) They relate that in 2019, the ECRI Guidelines Trust "asked the Society for permission to include its guidelines in the ECRI Guidelines Trust database". However, after an evaluation by ECRI, the guideline related to osteoporosis "was the only guideline for which all recommendations were based on verifiable systematic evidence review with explicit descriptions of search strategy, study selection, and evidence summaries" (Id.). Therefore we can conclude that with regard to the recommendations from the ESG 2017 on Gender Dysphoria/Gender Incongruence not all recommendations were "based on verifiable systematic evidence review with explicit descriptions of search strategy, study selection, and evidence summaries". Furthermore, these ESG 2017 were highly subject to conflicts of interest. As related earlier, nine out of the 10 authors were members or worked on the scientific committees of the advocacy group WPATH. Additionally, the ESG 2017 document was endorsed by WPATH. The "Enhancing

Trustworthiness" article recommends the opposite composition of authors for guidelines: "A majority (>50%) of non-Chair GDP members must be free of relevant C/DOI [conflict/duality of interest]" (McCartney et al., 2022).

WPATH Standards of Care 8 (SOC 8) were just published Sep. 6, 2022 (Coleman et al., 2022) . In a correction to the SOC 8, all guidelines for minimum age of surgery were removed, meaning a minor of any age could be referred for any of the GAT surgeries listed previously (Correction IJTH, 2022). All guidelines for minimum age of oppposite sex hormones were also removed.

The correction reads: "On page S258, the following text was removed:
 'The following are suggested minimal ages when considering the factors unique to the adolescent treatment time frame for gender-affirming medical and surgical treatment for adolescents, who fulfil all of the other criteria listed above.
– Hormonal treatment: 14 years
– Chest masculinization: 15 years
– Breast augmentation, Facial Surgery: 16 years
– Metoidioplasty, Orchiectomy, Vaginoplasty,
– Hysterectomy, Fronto-orbital remodeling: 17 years
– Phalloplasty: 18 years'" (WPATH SOC 8 Correction, p. S261).

Of great concern is that the minimum age recommendations were retracted, it appears, in contradiction to the recommendation of their own expert consensus:
"On page S66, the following text was removed:
 'Age recommendations for irreversible surgical procedures were determined by a review of existing literature and the expert consensus of mental health providers, medical providers, and surgeons highly experienced in providing care to TGD adolescents.'" (WPATH SOC 8 Correction, p. S260).

Additionally, a chapter regarding eunuchs was inserted into SOC 8 that gives recommendations for how to induce hypogonadism in men who have the eunuch "gender identity"[6] by either orchiectomy [testicle removal] or chemical castration such as with GnRH analogues (Coleman et al., 2022)[7].

---

[6] The notion that there is a "eunuch gender identity" further invalidates the gender identity as a serious biological property of human beings: "Many eunuch individuals see their status as eunuch as their distinct gender identity with no other gender or transgender affiliation" (Coleman et al., 2022, p. S88).

[7] "Treatment options for eunuchs to consider include:

The SOC8 also used an aberrant form of the GRADE approach for systematic reviews that removed the grading of quality of evidence (which should be categorized as very low, low, moderate, and high quality).[8] Instead any recommendation of "recommend" is automatically assigned as high quality of evidence. SOC 8 also failed to provide evidence profile tables which should include "an explicit judgment of each factor that determines the quality of evidence for each outcome" (Guyatt et al., 2021).

Such a modification of GRADE is explicitly recommended against in the referenced GRADE document[9] and in so doing, in my opinion, invalidates all of the SOC 8 recommendations as being evidence-based.

For at least the reasons above, in my professional opinion WPATH SOC 8 represents a grave and immediate danger to minors, young adults, and adults and should not be followed by any physician, mental health care provider, or other medical professional.

## K. Harms of off-label treatments in GAT

Dr. Antommaria makes a faulty comparison between migraine headaches and gender dysphoria (Antommaria decl, p. 7). First, migraine headaches are a neurological condition with a potential vascular component and not a condition of the mind, nor found as a psychological diagnosis in the DSM-5. Second the treament of migraine headaches

---

• Hormone suppression to explore the effects of androgen deficiency for eunuch individuals wishing to become asexual, nonsexual,

or androgynous;

• Orchiectomy [testicle removal] to stop testicular production

of testosterone;

• Orchiectomy with or without penectomy to

alter their body to match their self-image;

• Orchiectomy followed by hormone replacement with testosterone or estrogen. " (Id.)

[8] From SOC 8 "The [recommendation] statements were classified as:

• Strong recommendations ("we recommend") are for

those interventions/therapy/strategies where:

• the evidence is of high quality" (Id., p. S250).

[9] From the GRADE guidelines: "Some organizations have used modified versions of the GRADE approach. We recommend against such modifications because the elements of the GRADE process are interlinked because modifications may confuse some users of evidence summaries and guidelines, and because such changes compromise the goal of a single system with which clinicians, policy makers, and patients can become familiar" (Guyatt et al., 2011).

with a medication such as sumitriptan or similar are labled indications for the condition unlike GnRH agonists and opposite sex hormones in GAT (FDA.gov sumitriptan). Third, the side effects of medications like sumitriptan do not alter or block normal human development such as the case with puberty blocking medication, or cause permanent alterations of the body such as with sex hormones, or lead to the permanent loss of healthy functioning organs such as occurs with surgeries which alter sex as a part of GAT.

Dr. Olson-Kennedy also draws a faulty comparison when she compares the off-label use of antibiotics or anti-histamines to blocking normal puberty, administering high-dose opposite sex hormones, or the permanent removal of healthy organs as part of GAT (Olson-Kennedy decl, p. 38 ). The health consequences are categorically different and the lifelong potential for permanent injury are extremely high in GAT.

### L. The Lack of Evidence of Effectiveness of GAT

There is much additional evidence that questions the long-term benefits of opposite sex hormones and gender reassignment surgery and in fact suggests serious harms.

#### 1. Sweden's Long-term study of 30 years of data by Dhejne

The most comprehensive study of its kind is from Sweden in 2011. The authors examined data over a 30-year time period (Dhejne, 2011). The Dhejne team made extensive use of numerous Swedish database registries and examined data from 324 patients in Sweden over 30 years who had taken opposite sex hormones and had undergone sex reassignment surgery. They used population controls matched by birth year, birth sex, and reassigned sex. When followed out beyond ten years, the sex-reassigned group had nineteen times the rate of completed suicides and nearly three times the rate of all-cause mortality and inpatient psychiatric care compared to the general population of Sweden.

#### 2. The Branstrom and Pachankis Retraction

Other published studies of GAT have been shown to have serious errors. For example, a major correction was issued by the American Journal of Psychiatry. The authors and editors of a 2020 study, titled "Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study" (Bränström study, 2020) retracted their original primary conclusion. Letters to the editor by twelve authors

including myself led to a reanalysis of the data and a corrected conclusion stating that in fact the data showed no improvement in mental health for transgender identified individuals after surgical treatment nor was there improvement with opposite sex hormones ("Correction", 2020; Van Mol et al., 2020).

The initial reports of this study claimed that the authors found treatment benefits with surgery, and this was shared widely in the media. For example, ABC News posted an article titled "Transgender surgery linked with better long-term mental health, study shows" (Weitzer, 2019). An NBC news/Reuters headline reads "Sex-reassignment surgery yields long-term mental health benefits, study finds" (Reuters, 2019).

However, after twelve authors from around the world including our team investigated the study in detail, a number of serious errors were exposed leading to a retraction (Kalin, 2020; Anckarsäter et al., 2020).

In our letter to the editor which I co-wrote with former Chairman of Psychiatry at Johns Hopkins Medical School, Paul McHugh, MD, we noted key missing evidence in the original Branstrom report when compared to the previous body of knowledge yielded from the Swedish Dhejne study.  We wrote that "[t]he study supports only weak conclusions about psychiatric medication usage and nothing decisive about suicidality. In overlooking so much available data, this study lacks the evidence to support its pro gender-affirmation surgery conclusion" (Van Mol, Laidlaw, et al., 2020).

In another letter, Professor Mikael Landen writes that "the authors miss the one conclusion that can be drawn: that the perioperative transition period seems to be associated with high risk for suicide attempt. Future research should use properly designed observational studies to answer the important question as to whether gender-affirming treatment affects psychiatric outcomes" (Landen, 2020).

In another letter to the editor, psychiatrist David Curtis noted that "[t]he study confirms the strong association between psychiatric morbidity and the experience of incongruity between gender identity and biological sex. However, the Branstrom study does not demonstrate that either hormonal treatment or surgery has any effect on this morbidity. It seems that the main message of this article is that the incidence of mental health problems and suicide attempts is especially high in the year after the completion of gender-affirming surgery" (Curtis, 2020).

In yet another critical letter, Dr. Agnes Wold states that "[w]hether these factors involve a causal relationship (i.e., that surgery actually worsens the poor mental health in individuals with gender dysphoria) cannot be determined from such a study. Nevertheless, the data presented in the article do not support the conclusion that such surgery is beneficial to mental health in individuals with gender dysphoria" (Wold, 2020).

### 3. Flawed studies based on the problematic 2015 US Transgender Survey

A 2021 study by Almazan and Keurghlian attempted to address mental health outcomes in relation to surgery as a part of GAT (Almazan & Keurghlian, 2021). This was not a randomized controlled study nor a prospective observational study. Rather the study relied upon the 2015 US Transgender Survey (USTS), which has been severely criticized for its serious limitations and weaknesses.

D'Angelo et al. have written about the 2015 USTS survey as part of the criticism of another flawed study in the journal Pediatrics by Jack Turban in 2020 titled "Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation" (Turban, 2020). They write in their critique of the USTS that it is "a convenience sampling, a methodology which generates low-quality, unreliable data." (Bornstein, Jager, & Putnick, 2013). Specifically, the participants were recruited through transgender advocacy organizations and subjects were asked to 'pledge' to promote the survey among friends and family. This recruiting method yielded a large but highly skewed sample...Their analysis is compromised by serious methodological flaws, including the use of a biased data sample, reliance on survey questions with poor validity, and the omission of a key control variable, namely subjects' baseline mental health status." They also state that "[s]tigmatizing non-'affirmative' psychotherapy for GD [gender dysphoria] as 'conversion' will reduce access to treatment alternatives for patients seeking non-biomedical solutions to their distress" (D'Angelo et al., 2021).

### 4. Mastectomy Surgery for Minors

Any serious look at long-term effects at surgical treatment would follow subjects out at least ten years. For example, an article was published recently examining patients who had mild calcium disorders due to a gland called the parathyroid. They compared a group of patients who had surgical removal of the parathyroid to a control group who had not. They examined data ten years after surgery was completed and concluded that parathyroid

surgery in this group "did not appear to reduce morbidity or mortality" in that patient group (Pretorius, 2022).

To my knowledge there exists no comparable studies of minors with gender dysphoria comparing those who had mastectomy surgery to a control group who had not. There are also no known studies of minors followed for 10 years or more to determine the long-term risks and benefits of mastectomy for gender dysphoria.

Good quality studies specifically showing that mastectomy surgery is safe, effective, and optimal for treating minors with gender dysphoria do not exist.  For example, there is a study titled "Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults Comparisons of Nonsurgical and Postsurgical Cohorts" (Olson-Kennedy, 2018). The study authors conclude that "[c]hest dysphoria was high among presurgical transmasculine youth, and surgical intervention positively affected both minors and young adults." However, there are a number of problems with this study. First, the term "chest dysphoria" is a creation of the study authors and is not found as a diagnosis or even referenced in the DSM-5. Second the "chest dysphoria scale" is a measuring tool created by the authors, but which the authors state "is not yet validated." (*Id*., p. 435) Third, the mastectomies were performed on girls as young as 13 and 14 years old and who thereby lacked the maturity and capacity of good judgment for truly informed consent for this life altering procedure. For this reason, in my professional opinion, the research and surgeries performed were flawed and unethical.

There exists another poorly designed study which suffers from similar methodological and ethical problems as the Olson-Kennedy study.  A 2021 study published in Pediatrics examined females aged 13-21 recruited from a gender clinic. Thirty young females had mastectomy procedures and sixteen had not. The average age at surgery was 16.4 years (Mehringer, 2021). The follow up time after surgery was only 19 months and no data is provided or analyzed about key psychiatric information such as comorbid psychological illnesses, self-harming behaviors, psychiatric hospitalizations, psychiatric medication use, or suicide attempts.

Information returned from the study surveys were all qualitative and included responses such as "[My chest dysphoria] made me feel like shit, honestly. It made me suicidal. I would have breakdowns". Another respondent stated, "I've been suicidal quite a few times over just looking at myself in the mirror and seeing [my chest]. That's not something that I should have been born with" (Mehringer, 2021). The omission of psychiatric data is a

major flaw in the study and also irresponsible given the obviously dangerous psychological states that some of these young people were in.

Since such a high proportion of subjects were using testosterone (83%), some of the responses could be attributed to adverse effects of testosterone. For example, as related earlier, high dose testosterone can manifest in irritability and aggressiveness. One study subject responded, "I get tingly and stuff and it kind of makes me want to punch something" (Mehringer, 2022).

The testosterone labeling also indicates nausea and depression as adverse reactions which are described by another study subject "There's a feeling of hopelessness, of desperation, of—almost makes me feel physically sick" (Actavis Pharma, Inc., 2018; Mehringer, 2022).

The study appears to have been designed, at least in part, to justify insurance companies paying for mastectomy procedure for minors with GD, even though they have provided no long-term statistical evidence of benefit: "These findings...underscore the importance of insurance coverage not being restricted by age" (Mehrniger, 2021). This also appears to be part of the aim of the flawed Olson-Kennedy study which stated "changes in clinical practice and in insurance plans' requirements for youth with gender dysphoria who are seeking surgery seem essential" (Olson-Kennedy, 2018). So these two studies, rather than being a thorough examination of the psychological and physical risks and benefits of mastectomy surgery over the long-term appear instead to exist, at least in part, to validate the need for insurance companies to insure the costs of these dubious procedures for minors.

### 5. Centers for Medicare and Medicaid Services

The Centers for Medicare and Medicaid Services ("CMS") has found "inconclusive" clinical evidence regarding gender reassignment surgery. Specifically, the CMS Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (CAG-00446N) (June 19, 2019) states: "The Centers for Medicare & Medicaid Services (CMS) is not issuing a National Coverage Determination (NCD) at this time on gender reassignment surgery for Medicare beneficiaries with gender dysphoria because the clinical evidence is inconclusive for the Medicare population."

Dr. Schecter states: "The result of CMS's review of the evidence is not applicable to other population groups" (Schecter decl, p. 39). However it does not make the converse true as

Dr. Schecter seems to imply. In other words, the CMS review does not therefore mean that there is conclusive evidence of benefit and lack of harm for the under 65 population. On the contrary, evidence of benefit is lacking and the risks and harms due to GAT are very high as I have described.

## 6. Nations and States Question and Reverse Course on GAT

Also noteworthy is that other nations are questioning and reversing course regarding gender affirmative therapy. For example in the *Bell v. Tavistock* Judgment in the UK, regarding puberty blockers in GAT, they concluded that "there is real uncertainty over the short and long-term consequences of the treatment with very limited evidence as to its efficacy, or indeed quite what it is seeking to achieve. This means it is, in our view, properly described as experimental treatment" (*Bell v. Tavistock* Judgment, 2020).

The case was appealed and although the medical decision making was returned to clinicians (rather than the courts), it was noted that great pains should be taken to ensure that the child and parents are properly informed before embarking on such treatments. In its conclusion the appeals court stated that "[c]linicians will inevitably take great care before recommending treatment to a child and be astute to ensure that the consent obtained from both child and parents is properly informed by the advantages and disadvantages of the proposed course of treatment and in the light of evolving research and understanding of the implications and long-term consequences of such treatment. Great care is needed to ensure that the necessary consents are properly obtained " (*Bell v. Tavistock* Appeal, Judgment, 2021).

In the bulletin of the Royal College of Psychiatrists in 2021, in a reevaluation of the evidence, Griffin and co-authors write, "As there is evidence that many psychiatric disorders persist despite positive affirmation and medical transition, it is puzzling why transition would come to be seen as a key goal rather than other outcomes, such as improved quality of life and reduced morbidity. When the phenomena related to identity disorders and the evidence base are uncertain, it might be wiser for the profession to admit the uncertainties. Taking a supportive, exploratory approach with gender-questioning patients should not be considered conversion therapy" (Griffin et al., 2021).

In 2020, Finland recognized that "[r]esearch data on the treatment of dysphoria due to gender identity conflicts in minors is limited," and recommended prioritizing psychotherapy for gender dysphoria and mental health comorbidities over medical gender

affirmation (Council for Choices in Healthcare in Finland, 2020). Additionally, "[s]urgical treatments are not part of the treatment methods for dysphoria caused by gender-related conflicts in minors".

In 2021, Sweden's largest adolescent gender clinic announced that it would no longer prescribe puberty blockers or cross-sex hormones to youth under 18 years outside clinical trials (SEGM, 2021). "In December 2019, the SBU (Swedish Agency for Health Technology Assessment and Assessment of Social Services) published an overview of the knowledge base which <u>showed a lack of evidence for both the long-term consequences of the treatments, and the reasons for the large influx of patients in recent years. These treatments are potentially fraught with extensive and irreversible adverse consequences such as cardiovascular disease, osteoporosis, infertility, increased cancer risk, and thrombosis.</u> This makes it challenging to assess the risk / benefit for the individual patient, and even more challenging for the minors or their guardians to be in a position of an informed stance regarding these treatments" (Gauffen and Norgren, 2021).

Dr Hilary Cass "was appointed by NHS England and NHS Improvement to chair the Independent Review of Gender Identity Services for children and young people in late 2020" (The Cass Review website, 2022). In her interim report dated February 2022, it states that "[e]vidence on the appropriate management of children and young people with gender incongruence and dysphoria is inconclusive both nationally and internationally" (Cass, 2022).

## M. Assessment of the patient with gender dysphoria

In light of the very serious medical concerns and potential harms of gender affirmative therapy, there are several criteria that I believe would be important to fulfill before applying the GAT model to a patient.

1. Minors should be evaluated to determine if they will follow the natural pattern of desistance which 50 to 98% of pediatric age children will follow[10].
2. Patients, parents and guardians should be made aware of other options for treatment of gender dysphoria including active psychosocial treatment or watching and waiting with support in order to help with natural desistance.

---

[10] From the DSM-5: "Rates of persistence of gender dysphoria from childhood into adolescence or adulthood vary…In natal males, persistence has ranged from 2.2% to 30%. In natal females, persistence has ranged from 12% to 50%" (American Psychiatric Association, 2013).

3. The patient should be provided an assessment by a qualified psychologist or psychiatrist who does not follow the WPATH GAT model. If underlying psychological conditions are diagnosed then these should be adequately evaluated and treated before proceeding to hormones and surgery.

4. If a medicalized approach with hormones such as testosterone or medications to stop menstruation is being considered then a clear description of the risks and benefits needs to be conveyed to the patient and if a  minor also the parent or guardian. It needs to be verified that they fully understand these risks.

5. If surgical procedures such as mastectomy, hysterectomy, ovariectomy, orchiectomy, or vaginoplasty are being considered then clear descriptions of the risks and benefits need to be conveyed to the patient, and if a minor, the parent or guardian.

However, even if a minor and their parents or guardian are made fully aware of the risks and benefits of hormones and surgeries, in my opinion, the minor does not have adequate maturity and judgment to make permanent changes to their body that may result in infertility/sterility and the permanent loss of organs such as breasts whose functions will not be fully utilized (such as breastfeeding) until adulthood.

## II. Medical Concerns Regarding Plaintiffs

































## III. Conclusion

The gender affirmative therapy model suffers from serious deficiencies in logic and lacks scientific foundation. The deep error hidden in this model is that one cannot in fact change sex. One cannot acquire the deep characteristics of biological sex in order to gain the complete sexual and reproductive functions of the opposite sex. This is not technologically possible.

Children and adolescents are of such immature minds that they are likely to believe that it is possible. In fact they may come to believe that their inherent, biologically necessary puberty is "terrifying" or needs to be stopped. Social transition serves to convince the child or adolescent that they can be the opposite sex. Puberty blockers sustain this state of mind by retaining a childlike state with respect to the genitalia and body habitus. High dose opposite sex hormones then cause medical conditions such as hirsutism and irreversible damage to the vocal cords in females and gynecomastia in males. These conditions serve to convince the young person that they are going through puberty of the opposite sex when in fact they are not developing sexually and are infertile.

---

[15] There are serious concerns regarding liver dysfunction with testosterone: "Prolonged use of high doses of androgens ... has been associated with development of hepatic adenomas [benign tumors], hepatocellular carcinoma [cancer], and peliosis hepatis [generation of blood-filled cavities in the liver that may rupture] —all potentially life-threatening complications" (Actavis Pharma, 2018).

There are known risks for both adults and minors, some of which I have described above, including cardiovascular disease, cancer, deficiencies in ultimate bone density, harms to sexual function, infertility, and for some permanent sterility. The child or adolescent cannot consent to these harms when they are not mature enough to fully comprehend what they mean. Long-term studies regarding the treatment effects specifically for minors with hormones and surgeries, using randomized controlled studies or even proper observational studies do not exist. The two adult plaintiffs and the two plaintiffs' children have comorbidities which make GAT particularly dangerous.

WPATH's newly released SOC 8 represents a grave and immediate danger to minors, young adults, and adults and should not be followed by any physician, mental health care provider, or other medical professional.

For the reasons set forth above, in my professional opinion as an endocrinologist, no child or adolescent should receive puberty blockers to block normal puberty, nor should they receive supraphysiologic doses of opposite sex hormones to attempt to alter secondary sex characteristics, nor should they have surgeries to remove or alter the breasts, genitalia or reproductive tracts as part of GAT. The child cannot consent or assent to these procedures. The parent or guardian also cannot consent to the life altering changes resulting from GAT. There exists insufficient evidence of benefit for adults, but serious concerns for risk of harm.

Finally, the June 2022 AHCA GAPMS report states: "Following a review of available literature, clinical guidelines, and coverage by other insurers and nations, Florida Medicaid has determined that the research supporting sex reassignment treatment is insufficient to demonstrate efficacy and safety" (FL Medicaid GAPMS, 2022). I strongly agree with that statement.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2nd day of October, 2022.

//s//*Michael K. Laidlaw, MD*
Michael K. Laidlaw, MD

## References

Actavis Pharma, Inc. Testosterone Cypionate injection. Actavis Pharma, Inc., 2018. Accessed May 8, 2022 via https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=d7b57b68-dca6-4df2-b3f2-7017d7b69f17&msclkid=4ed2db18cd5411ecba911bd6e4bded62

Alberts B, Johnson A, Lewis J, et al. "Sperm" in Molecular Biology of the Cell. 4th edition.  New York: Garland Science; 2002.

Almazan AN, Keuroghlian AS. "Association Between Gender-Affirming Surgeries and Mental Health Outcomes". JAMA Surgery 2021; 156(7): 611–618.

Alzahrani  T, Nguyen  T, Ryan  A, et  al. "Cardiovascular disease risk factors and myocardial infarction in the transgender population". Circ Cardiovasc Qual Outcomes. 2019;12(4):e005597

The American Cancer Society medical and editorial team.  "Mastectomy". American Cancer Society. https://www.cancer.org/cancer/breast-cancer/treatment/surgery-for-breast-cancer/mastectomy.html accessed 06/24/22

American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5). Arlington, VA, American Psychiatric Association, 2013.

Anckarsäter, H., (MD, Ph.D. ) and Gillberg, C., (M.D., Ph.D. ) "Methodological Shortcomings Undercut Statement in Support of Gender-Affirming Surgery". Am J Psychiatry 2020; 177:764– 765; doi: 10.1176/appi.ajp.2020.19111117.

Apridonidze T, Essah PA, Iuorno MJ, Nestler JE. "Prevalence and characteristics of the metabolic syndrome in women with polycystic ovary syndrome". J Clin Endocrinol Metab. 2005;90(4):1929. Epub 2004 Dec 28.

Arain, et al.  Neuropsychiatric Disease and Treatment. "Maturation of the adolescent brain".  Neuropsychiatric Disease and Treatment. 2013:9 449–461

Banikarim, C. "Primary Dysmneorrhea in Adolescents". UpToDate. Feb 10, 2021.

Bentler SE, Liu L, Obrizan M, Cook EA, Wright KB, Geweke JF, Chrischilles EA, Pavlik CE, Wallace RB, Ohsfeldt RL, Jones MP, Rosenthal GE, Wolinsky FD "The aftermath of hip fracture: discharge placement, functional status change, and mortality." Am J Epidemiol. 2009;170(10):1290. Epub 2009 Oct 4.

Bell & Mrs A v The Tavistock And Portman NHS Foundation Trust. Approved Judgment.[2020] EWHC 3274 (Admin) (01 December 2020). https://www.judiciary.uk/wp-content/uploads/2020/12/Bell-v-Tavistock-Judgment.pdf

Bell & Mrs A v The Tavistock And Portman NHS Foundation Trust. Appeal No. C1/2020/2142 (17 September 2021).

Bentler SE, Liu L, Obrizan M, Cook EA, Wright KB, Geweke JF, Chrischilles EA, Pavlik CE, Wallace RB, Ohsfeldt RL, Jones MP, Rosenthal GE, Wolinsky FD "The aftermath of hip fracture: discharge placement, functional status change, and mortality." Am J Epidemiol. 2009;170(10):1290. Epub 2009 Oct 4.

Bränström R, Pachankis JE. "Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study". Am J Psychiatry 2020; 177:727–734

Bränström R, Pachankis JE. "Toward Rigorous Methodologies for Strengthening Causal Inference in the Association Between Gender-Affirming Care and Transgender Individuals' Mental Health: Response to Letters". Am J Psychiatry 2020; 177:769–772; doi: 10.1176/appi.ajp.2020.20050599.

Brown BB & Larson J. Handbook of Adolescent Psychology. 3 Peer Relationships in Adolescence. John Wiley & Sons, Inc. 2009.

Cass, Hillary. The Cass Review Interim Report. Feb, 2022. https://cass.independent-review.uk/publications/interim-report/

The Cass Review. Website. The Chair. Accessed on-line April 29, 2022. https://cass.independent-review.uk/about-the-review/the-chair/

CDC. "What is Venous Thromboembolism?" Accessed online 04/27/2022.

https://www.cdc.gov/ncbddd/dvt/facts.html?msclkid=7406875bc6a411ecb67829f71b182f45

Chan Y, et al.  "Evaluation of the infant with atypical genital appearance (difference of sex development)" UpToDate. Feb 18, 2021.

Christel J M de Blok, et al. "Breast cancer risk in transgender people receiving hormone treatment: nationwide cohort study in the Netherlands" BMJ 2019; 365 doi: https://doi.org/10.1136/bmj.l1652 (Published 14 May 2019)

Coleman E, et al. "Standards of Care for the Health of Transgender and Gender Diverse People, Version 8". International Journal of Transgender Health. 06 Sep 2022. International Journal of Transgender Health. https://doi.org/10.1080/26895269.2022.2100644. https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644

"Correction to Bränström and Pachankis," Am J Psychiatry, 177:8 (Aug. 2020).

 Correction, International Journal of Transgender Health, 23:sup1, S259- S261, DOI: 10.1080/26895269.2022.2125695

Council for Choices in Healthcare in Finland, Medical treatment methods for dysphoria associated with variations in gender identity in minors— recommendation, June 11, 2020, https://bit.ly/Cohere_Finland_ GDAinMinorsRx.

Curtis, D. "Study of Transgender Patients: Conclusions Are Not Supported by Findings". Am J Psychiatry 2020; 177:766; doi: 10.1176/appi.ajp.2020.19111131 ;

de Vries AL, Steensma T, Doreleijers TA, Cohen-Kettenis PT. "Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study". J Sex Med. 2011 Aug;8(8):2276-83.

de Vries AL, McGuire JK, Steensma TD, Wagenaar EC, Doreleijers TA, Cohen-Kettenis PT. "Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment". Pediatrics (2014) 134 (4): 696–704.

DEA. Diversion Control Division. Controlled Substance Schedules. Accessed May 1, 2022. https://www.deadiversion.usdoj.gov/schedules/

D'Angelo R, et al. "One Size Does Not Fit All: In Support of Psychotherapy for Gender Dysphoria". Archives of sexual behavior 2021; 50(1): 7–16.

Dhejne, et al., "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden," PLoS One, vol. 6, issue 2 (Feb. 22, 2011)

Drummond KD, Bradley SJ, Peterson-Badali M, Zucker KJ. A follow-up study of girls with gender identity disorder. Dev Psychol. 2008 Jan;44(1):34-45. doi: 10.1037/0012-1649.44.1.34. PMID: 18194003.

Dunaif A, Segal KR, Futterweit W, Dobrjansky A. "Profound peripheral insulin resistance, independent of obesity, in polycystic ovary syndrome". Diabetes. 1989;38(9):1165.

Elhakeem A, et al. "Association Between Age at Puberty and Bone Accrual From 10 to 25 Years of Age". JAMA Network Open. 2019;2(8):e198918. doi:10.1001/jamanetworkopen.2019.8918

Emmanuel M & Bokor B. Tanner Stages. StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2022. https://www.ncbi.nlm.nih.gov/books/NBK470280/

FDA.gov, regarding celecoxib
https://www.accessdata.fda.gov/drugsatfda_docs/label/2008/020998s026lbl.pdf accessed 10/01/22

FDA.gov sumatriptan. "HIGHLIGHTS OF PRESCRIBING INFORMATION..IMITREX (sumatriptan)".
https://www.accessdata.fda.gov/drugsatfda_docs/label/2021/020080s054lbl.pdf accessed 10/01/2022.

Florida Department of Health website.  https://mqa-internet.doh.state.fl.us/MQASearchServices/HealthCareProviders accessed 09/29/22-10/01/22.

Gagnon DR, Zhang T, Brand FN, Kannel WB. "Hematocrit and the risk of cardiovascular disease—The Framingham Study: a 34-year follow-up". Am Heart J. 1994;127(3):674-682.

Gaufen D and Norgren S. "Policy Change Regarding Hormonal Treatment of Minors with Gender Dysphoria at Tema Barn - Astrid Lindgren Children's Hospital". 2021. https://segm.org/sites/default/files/Karolinska%20Guideline%20K2021-4144%20April%202021%20%28English%2C%20unofficial%20translation%29.pdf

Greenpsan FS & Gardner DG. Basic & Clinical Endocrinology, 7th edition. Puberty. Lange Medical Books/McGraw-Hill. 2004.

Griffin, L., Clyde, K., Byng, R., & Bewley, S. (2021). "Sex, gender and gender identity: A re-evaluation of the evidence". BJPsych Bulletin, 45(5), 291-299. doi:10.1192/bjb.2020.73

Grynberg M, Fanchin R, Dubost G, Colau J, Brémont-Weil C, Frydman R, Ayoubi J. "Histology of genital tract and breast tissue after long-term testosterone administration in a female-to-male transsexual population". Reprod Biomed Online. 2010 Apr;20(4):553-8.

Guyatt GH, Oxman AD, Schünemann HJ, Tugwell P, Knottnerus A. GRADE guidelines: a new series of articles in the Journal of Clinical Epidemiology. J Clin Epidemiol. 2011 Apr;64(4):380-2. doi: 10.1016/j.jclinepi.2010.09.011. Epub 2010 Dec 24. PMID: 21185693. https://www.jclinepi.com/article/S0895-4356(10)00330-6/fulltext

Hall Ryan CW, Hall Richard CW, Chapman MJ. "Psychiatric Complications of Anabolic Steroid Abuse". Psychosomatics 46:4, July-August 2005.

Hembree WC, et al., "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," The Journal of Clinical Endocrinology & Metabolism, Volume 102, Issue 11 (Nov. 1, 2017).

Irwig MS. "Cardiovascular health in transgender people." Rev Endocr Metab Disord. 2018;19(3):243–251.

Joham AE, Ranasinha S, Zoungas S, Moran L, Teede HJ. "Gestational diabetes and type 2 diabetes in reproductive-aged women with polycystic ovary syndrome". J Clin Endocrinol Metab. 2014 Mar;99(3):E447-52.

Kalin, N.H. "Reassessing Mental Health Treatment Utilization Reduction in Transgender Individuals After Gender-Affirming Surgeries: A Comment by the Editor on the Process by the Editor-in-Chief The American Journal of Psychiatry". Am J Psychiatry 2020; 177:7 64; doi: 10.1176/appi.ajp.2020.20060803

Kaltiala-Heino R, Sumia M, Työläjärvi M, Lindberg N. "Two years of gender identity service for minors: overrepresentation of natal girls with severe problems in adolescent development". Child and Adolescent Psychiatry and Mental Health (2015) 9:9.

Kuohong W and Hornstein MD. "Causes of female infertility". UpToDate. Jul 22, 2021.

Laidlaw MK. "Gender Dysphoria and Children: An Endocrinologist's Evaluation of 'I am Jazz'". Public Discourse, 5 Apr 2018.
https://www.thepublicdiscourse.com/2018/04/21220/

Laidlaw MK. "The Gender Identity Phantom", gdworkinggroup.org, Oct. 24, 2018.
http://gdworkinggroup.org/2018/10/24/the-gender-identity-phantom/

Laidlaw MK, Cretella M, Donovan K. "The Right to Best Care for Children Does Not Include the Right to Medical Transition". The American Journal of Bioethics. 19(2), Feb 2019.

Laidlaw MK, Van Meter Q, Hruz P, Van Mol W, & Malone W, "Letter to the Editor: Endocrine Treatment of Gender-Dsyphoria/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," J Clin Endocrinol Metab, 104(3) (March 2019).

Laidlaw MK, Van Mol A, Van Meter Q, Hansen JE. Letter to the Editor from M Laidlaw et al.: "Erythrocytosis in a Large Cohort of Trans Men Using Testosterone: A Long-Term Follow-Up Study on Prevalence, Determinants, and Exposure Years." The Journal of Clinical Endocrinology & Metabolism, Volume 106, Issue 12, December 2021, Pages e5275–e5276, https://doi.org/10.1210/clinem/dgab514

Landén, M. "The Effect of Gender-Affirming Treatment on Psychiatric Morbidity Is Still Undecided". Am J Psychiatry 2020; 177:767–768; doi: 10.1176/appi.ajp.2020.19111165.

Larsen PR, et al.  Williams Textbook of Endocrinology, 10th edition. Philadelphia, W.B. Saunders Company, 2003.

Littman L. "Rapid-onset gender dysphoria in adolescents and young adults: a study of parental reports". PLoS One. 2018;13(8): e0202330

Lupron Depot-Ped. Highlights of Prescribing Information. AbbVie Inc. Accessed May 1, 2022.  https://www.rxabbvie.com/pdf/lupronpediatric.pdf

Madsen MC, van Dijk D, Wiepjes CM, Conemans EB, Thijs A, den Heijer M. "Erythrocytosis in a Large Cohort of Trans Men Using Testosterone: A Long-Term Follow-Up Study on Prevalence, Determinants, and Exposure Years". J Clin Endocrinol Metab. 2021 May 13;106(6):1710-1717. doi: 10.1210/clinem/dgab089.


Malone, W. and Roman, S. "Calling Into Question Whether Gender-Affirming Surgery Relieves Psychological Distress". Am J Psychiatry 2020; 177:766–767; doi: 10.1176/appi.ajp.2020.19111149

Mayo Clinic. "Feminizing Surgery". https://www.mayoclinic.org/tests-procedures/feminizing-surgery/about/pac-20385102 Accessed 07/01/2022

Mayo Clinic. "Masculinizing Surgery".  https://www.mayoclinic.org/tests-procedures/masculinizing-surgery/about/pac-20385105 accessed 06/24/2022

Mayo Clinic.  "Top surgery for transgender men and nonbinary people". https://www.mayoclinic.org/tests-procedures/top-surgery-for-transgender-men/about/pac-20469462 accessed 06/24/2022.

McCartney CR, Corrigan MD, Drake MT, El-Hajj Fuleihan G, Korytkowski MT, Lash RW, Lieb DC, McCall AL, Muniyappa R, Piggott T, Santesso N, Schünemann HJ, Wiercioch W, McDonnell ME, Murad MH. Enhancing the Trustworthiness of the

Endocrine Society's Clinical Practice Guidelines. J Clin Endocrinol Metab. 2022 Jul 14;107(8):2129-2138. doi: 10.1210/clinem/dgac290. PMID: 35690966.

Mehringer JE, et al. "Experience of Chest Dysphoria and Masculinizing Chest Surgery in Transmasculine Youth".  Pediatrics (2021) 147 (3): e2020013300.

Nahata L, Tishelman AC, Caltabellotta NM, Quinn GP. "Low fertility preservation utilization among transgender youth". J Adolesc Health. 2017;61(1):40–44.

National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III). Third Report of the National Cholesterol Education Program (NCEP) Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults (Adult Treatment Panel III) final report. Circulation. 2002 Dec 17;106(25):3143-421. PMID: 12485966.

Olson-Kennedy J, Okonta V, Belzer M, Clark LF. Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults: Comparisons of Nonsurgical and Postsurgical Cohorts. JAMA Pediatr. 2018 May 1;172(5):431-436.

Palko. Recommendation of the Council for Choices in Health Care in Finland (PALKO / COHERE Finland). 2020.  https://genderreport.ca/wp-content/uploads/2021/04/Finland_Guidelines_Gender_Variance_In_Minors.pdf

Pretorius M, et al. "Mortality and Morbidity in Mild Primary Hyperparathyroidism: Results From a 10-Year Prospective Randomized Controlled Trial of Parathyroidectomy Versus Observation".  Ann Intern Med. 2022 Apr 19. doi: 10.7326/M21-4416. Online ahead of print.

Reuters. "Sex-reassignment surgery yields long-term mental health benefits, study finds". NBC News. Nov 8, 2019.  https://www.nbcnews.com/feature/nbc-out/sex-reassignment-surgery-yields-long-term-mental-health-benefits-study-n1079911

Ristori J, Steensma TD. Gender dysphoria in childhood. Int Rev Psychiatry. 2016;28(1):13-20. doi: 10.3109/09540261.2015.1115754. Epub 2016 Jan 12. PMID: 26754056.

Sarnak MJ, Levey AS, Schoolwerth AC, Coresh J, Culleton B, Hamm LL, McCullough PA, Kasiske BL, Kelepouris E, Klag MJ, Parfrey P, Pfeffer M, Raij L, Spinosa DJ, Wilson PW, American Heart Association Councils on Kidney in Cardiovascular Disease, High Blood Pressure Research, Clinical Cardiology, and Epidemiology and Prevention. "Kidney disease as a risk factor for development of cardiovascular disease: a statement from the American Heart Association Councils on Kidney in Cardiovascular Disease, High Blood Pressure Research, Clinical Cardiology, and Epidemiology and Prevention." Circulation. 2003;108(17):2154.

Sax L. "How Common is Intersex? A Response to Anne Fausto-Sterling," Journal of Sex Research 39:3 (August 2002), pp. 174-178.

Singh, D. (2012). A follow-up study of boys with gender identity disorder. Unpublished doctoral dissertation, University of Toronto.

Society for Evidence Based Gender Medicine (SEGM). Sweden's Karolinska Ends All Use of Puberty Blockers and Cross-Sex Hormones for Minors Outside of Clinical Studies (May 5, 2021), https://bit.ly/SEGM_SwedenStops Hormones.

Society for Evidence Based Gender Medicine (SEGM). National Academy of Medicine in France Advises Caution in Pediatric Gender Transition. ( Mar 3, 2022), https://segm.org/France-cautions-regarding-puberty-blockers-and-cross-sex-hormones-for-youth

Statement of Removal, International Journal of Transgender Health, 23:sup1, S259-S259. 2022. DOI: 10.1080/26895269.2022.2125695 https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2125695

Steinberg  L. "A social neuroscience perspective on adolescent risk-taking". Dev Rev. 2008;28(1):78-106.

TLC UK. Bottom Surgery | I am Jazz. Youtube. Accessed May 1, 2022. https://www.youtube.com/watch?v=lG-U8oFpa8o

Turban JL, King D, Carswell JM, et al. "Pubertal Suppression for Transgender Youth and Risk of Suicidal Ideation". Pediatrics 2020, 145 (2) e20191725.

Van Mol, A., Laidlaw, M. K., Grossman, M., McHugh, P.  "Gender-Affirmation Surgery Conclusion Lacks Evidence" Am J Psychiatry 177:8, August 2020 ajp.psychiatryonline.org 765.

Wang AMQ, Tsang V, Mankowski P, Demsey D, Kavanagh A, Genoway K. Outcomes Following Gender Affirming Phalloplasty: A Systematic Review and Meta-Analysis. Sex Med Rev. 2022 Aug 25:S2050-0521(22)00012-9. doi: 10.1016/j.sxmr.2022.03.002. Epub ahead of print. PMID: 36031521.

Wallien, M.S.C., Veenstra, R., Kreukels, B.P.C. et al. Peer Group Status of Gender Dysphoric Children: A Sociometric Study. Arch Sex Behav 39, 553–560 (2010). https://doi.org/10.1007/s10508-009-9517-3

Weitzer, D. "Transgender surgery linked with better long-term mental health, study shows". ABC News. Oct 8, 2019.  https://abcnews.go.com/Health/transgender-surgery-linked-long-term-mental-health-study/story?id=66125676

Wilson D and Bruno B. Embryology, Mullerian Ducts (Paramesonephric Ducts). StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2022. https://www.ncbi.nlm.nih.gov/books/NBK557727/

Wold, A. (M.D., Ph.D.) Gender-Corrective Surgery Promoting Mental Health in Persons With Gender Dysphoria Not Supported by Data Presented in Article, Am J Psychiatry 2020; 177:768; doi: 10.1176/appi.ajp.2020.19111170

WPATH member search.  https://www.wpath.org/member/search accessed 09/29/2022 and 10/01/2022.

Yelehe M. et al. "Adverse effects of gender-affirming hormonal therapy in transgender persons: Assessing reports in the French pharmacovigilance database." Fundamental and Clinical Pharmacology. June 2, 2022.

Zucker KJ. "Debate: Different strokes for different folks".  Child and Adolescent Mental Health, Volume 25, Issue 1 (Feb 2020).

EXHIBIT "A"

# Michael K. Laidlaw, M.D.

Endocrinology, Diabetes, and Metabolism

5180 Grove St.
Rocklin, CA 95677
Office: (916) 315-9100
Fax: (916) 315-0141
docdrlaidlaw@gmail.com

## EMPLOYMENT

| | |
|---|---|
| 2006-Present | Michael K Laidlaw, MD Inc. Private Practice – Endocrinology, Diabetes, and Metabolism. Rocklin, CA |

## EDUCATION

| | |
|---|---|
| 2004-2006 | Endocrinology and Metabolism Fellowship - Los Angeles County/University of Southern California Keck School of Medicine |
| 2001-2004 | Internal Medicine Residency - Los Angeles County/University of Southern California Keck School of Medicine |
| 1997-2001 | University of Southern California Keck School of Medicine Doctor of Medicine Degree May 2001 |
| 1990-1997 | San Jose State University Bachelor of Science Degree in Biology with a concentration in Molecular Biology, Cum Laude |

## LICENSURE

California Medical License – Physician and Surgeon: # A81060: Nov 6, 2002. Exp 5/31/2024.

## PROFESSIONAL AFFILIATIONS

Endocrine Society 2006-2022
American Board of Internal Medicine - Endocrinology, Diabetes, and Metabolism  –  2006
American Board of Internal Medicine - Internal Medicine  - 2005
National Board of Physicians and Surgeons - Endocrinology, Diabetes, & Metabolism 2018-2024
National Board of Physicians and Surgeons - Internal Medicine 2018-2024

## HONORS AND RECOGNITION

| | |
|---|---|
| 2010 | Endocrine Society Harold Vigersky Practicing Physician Travel Award |
| 2004-2005 | Vice President - Joint Council of Interns and Residents |
| 2002-2004 | Council Member – Joint Council of Interns and Residents |
| 1996, 1997 | Dean's Scholar, San Jose State University |
| 1995 | Golden Key National Honor Society |

## RESEARCH AND PUBLICATIONS

2021      <u>Publication</u> –  Michael K Laidlaw, Andre Van Mol, Quentin Van Meter, Jeffrey E Hansen. Letter to the Editor from M Laidlaw et al.: "Erythrocytosis in a Large Cohort of Trans Men Using Testosterone: A Long-Term Follow-Up Study on Prevalence, Determinants, and Exposure Years." The Journal of Clinical Endocrinology & Metabolism, Volume 106, Issue 12, December 2021, Pages e5275–e5276, https://doi.org/10.1210/clinem/dgab514

2020      <u>Publication</u> – Van Mol A, Laidlaw MK, Grossman M,  McHugh P. "Correction: Transgender Surgery Provides No Mental Health Benefit." Public Discourse, 13 Sep 2020. https://www.thepublicdiscourse.com/2020/09/71296/

2020      <u>Publication</u> – VanMol A, Laidlaw MK, Grossman M, McHugh P.. "Gender-affirmation surgery conclusion lacks evidence (letter)". Am J Psychiatry 2020; 177:765–766.

2020      <u>Publication</u> – Laidlaw MK. "The Pediatric Endocrine Society's Statement on Puberty Blockers Isn't Just Deceptive. It's Dangerous." Public Discourse. 13 Jan 2020. https://www.thepublicdiscourse.com/2020/01/59422/

2019      <u>Speech to the U.K. House of Lords</u> –  Laidlaw MK. "Medical Harms Associated with the Hormonal and Surgical Therapy of Child and Adolescent Gender Dysphoria". Parliament, London, U.K. 15 May 2019.

2019      <u>Publication</u> – Laidlaw MK, Cretella M, Donovan K. "The Right to Best Care for Children Does Not Include the Right to Medical Transition". The American Journal of Bioethics. Volume 19. Published online 20 Feb 2019. 75-77. https://doi.org/10.1080/15265161.2018.1557288

2018      <u>Publication</u> – Laidlaw MK, Van Meter QL, Hruz PW, Van Mol A, Malone WJ. Letter to the Editor: "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline." The Journal of Clinical Endocrinology & Metabolism, Volume 104, Issue 3, 1 March 2019, Pages 686–687, https://doi.org/10.1210/jc.2018-01925 (first published on-line 11/2018)

2018      <u>Publication</u> – Laidlaw MK. "The Gender Identity Phantom". gdworkinggroup.org, 24 Oct 2018. http://gdworkinggroup.org/2018/10/24/the-gender-identity-phantom/

2018      <u>Publication</u> – Laidlaw MK. "Gender Dysphoria and Children: An Endocrinologist's Evaluation of 'I am Jazz'". Public Discourse, 5 Apr 2018. https://www.thepublicdiscourse.com/2018/04/21220/

2013      <u>Abstract</u> –  Poster presentation Jun 2013. Endocrine Society Annual Meeting. A 12 Step Program for the Treatment of Type 2 Diabetes and Obesity.

2011      <u>Abstract</u> – Poster presentation Nov 2011. Journal of Diabetes Science and Technology. A Video Game Teaching Tool for the Prevention of Type 2 Diabetes and Obesity in Children and Young Adults.

2011      <u>Abstract</u> –  Journal of Diabetes Science and Technology. A Web-Based Clinical Software Tool to Assist in Meeting Diabetes Guidelines and Documenting Patient Encounters.

2008      <u>Abstract</u> - Accepted to Endocrine Society Annual Meeting 2008. Hypercalcemia with an elevated 1,25 dihydroxy-Vitamin D level and low PTH due to granulomatous disease.

| | |
|---|---|
| 2005-2006 | <u>Clinical Research</u> - University of Southern California – Utility of Thyroid Ultrasound in the Detection of Thyroid Cancer. Study involving the use of color flow/power doppler ultrasound and ultrasound guided biopsy to detect the recurrence of thyroid cancer in patients with total thyroidectomies. |
| 2005 | <u>Certification</u> - Certification in Diagnostic Thyroid Ultrasound and Biopsy – AACE 2005 |
| 2003 | <u>Certification</u> - Understanding the Fundamentals: Responsibilities and Requirements for the Protection of Human Subjects in Research. University of Southern California. 29 Sep 2003 - 29 Sep 2006 |
| 2002-2005 | <u>Clinical Research</u> - University of Southern California - Determining the Role of Magnesium in Osteoporosis. Study involved collecting and analyzing patient data related to patient characteristics, laboratory results, bone mineral density exams, nutrition analysis, and genetic analysis in order to determine a link between magnesium deficiency and osteoporosis. |
| 1996 | <u>Research Assistant</u> - San Jose State University - Role of the suprachiasmatic nucleus pacemaker in antelope ground squirrels. |
| 1995-1996 | <u>Research Assistant</u> - San Jose State University/NASA. Acoustic tolerance test and paste diet study for space shuttle rats. |

## EXPERT WITNESS WORK AND AMICUS BRIEFS

| | |
|---|---|
| 2022 | <u>Expert Witness Report</u> – Laidlaw MK. C. P., by and through his parents, Patricia Pritchard and Nolle Pritchard; and PATRICIA PRITCHARD, Plaintiff, vs. BLUE CROSS BLUE SHIELD OF ILLINOIS, Defendants. Case No. 3:20-cv-06145-RJB |
| 2022 | <u>Expert Witness Report</u> – Laidlaw MK. DISTRICT COURT OF TRAVIS COUNTY, TEXAS 459th JUDICIAL DISTRICT. PFLAG, INC., ET AL., Plaintiffs, v. GREG ABBOTT, ET AL., Defendants. NO. D-1-GN-22-002569. 3 July 2022. |
| 2022 | <u>Expert Witness Report #2</u> – Laidlaw MK. United States District Court for the District of Arizona. DH and John Doe, Plaintiffs, vs. Jami Snyder, Director of the Arizona Health Care Cost Containment System, in her official capacity, Defendant. Case No. 4:20-cv-00335-SHR. 24 Jun 2022. (Sealed under Protective Order). |
| 2022 | <u>Expert Witness Report</u> – Laidlaw MK. United States District Court for the Middle District of Alabama Northern Division. REV. PAUL A. EKNES-TUCKER, et al., Plaintiffs, v. KAY IVEY, in her official capacity as Governor of Alabama, et al., Defendants. Civil Action No. 2:22-cv-184-LCB. 2 May 2022. |
| 2021 | <u>Brief of Amicus Curiae</u> – Bursch, John J., McCaleb, Gary S., Van Meter, Quentin L., Laidlaw, Michael K., Van Mol, Andre, Hansen, Jeffrey E. Brief of Amicus Curiae. United States Court of Appeals for the Eight Circuit. DYLAN BRANDT, et al., Plaintiffs-Appellees v. LESLIE RUTLEDGE, in her official capacity as the Arkansas Attorney General, et. al. Defendants-Appellants. 23 Nov 2021. |
| 2020 | <u>Expert Witness</u> – JULIANA PAOLI v. JOSEPH HUDSON et al. heard in THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, COUNTY OF TULARE. CASE NO. 279126. 2021. |
| 2021 | <u>Brief of Amicus Curiae</u> – Bursch, John J., McCaleb, Gary S., Grossman, Miriam, Van Meter, Quentin L., Laidlaw, Michael K., Van Mol, Andre, Hansen, Jeffrey E. |

App. 837

Brief of Amicus Curiae.  United States Court of Appeals for the Eleventh Circuit. DREW ADAMS, Plaintiffs-Appellee v. SCHOOL BOARD OF ST. JOHNS COUNTY, FLORIDA, et. al. Defendants-Appellant. 26 Oct 2021.

2020    <u>Expert Witness Affidavit 1 & 2</u> – Laidlaw MK. Supreme Court of British Columbia. File No.  S2011599, Vancouver Registry. Between A.M. Plaintiff and Dr. F and Daniel McKee Defendants.  11/23/20 & 11/25/20.

2020    <u>Brief of Amicus Curiae</u> – Wenger, Randal L., McCaleb, Gary S., Grossman, Miriam, Laidlaw, Michael K., McCaleb, Gary S., Van Meter, Quentin L., Van Mol, Andre.  Brief of Amicus Curiae.  United States Court of Appeals for the Ninth Circuit. LINDSAY HECOX and JANE DOE, with her next friends Jean Doe and John Doe, Plaintiffs-Appellees v.  BRADLEY LITTLE, in his official capacity as Governor of the State of Idaho, et. al. Defendant-Appellant. 19 Nov 2020

2020    <u>Expert Witness Report</u> – Laidlaw MK. United States District Court for the District of Arizona. DH and John Doe, Plaintiffs, vs. Jami Snyder, Director of the Arizona Health Care Cost Containment System, in her official capacity, Defendant. Case No. 4:20-cv-00335-SHR.  27 Sep 2020.

2019    <u>Expert Witness Affidavit</u> – Laidlaw MK. Court of Appeal File No. CA45940, Vancouver Registry. B.C. Supreme Court File No. E190334, between A.B. Respondent/Claimant, and C.D. Appellant/Respondent, and E.F. Respondent/Respondent. 24 Jun 2019.

2018    <u>Brief of Amicus Curiae</u> – Alliance Defending Freedom, Campbell, James A., Grossman, Miriam, Laidlaw, Michael K., McCaleb, Gary S., Van Meter, Quentin L., Van Mol, Andre.  Brief of Amicus Curiae.  United States Court of Appeals for the Eleventh Circuit. Drew Adams, Plaintiff-Appellee, v. School Board of St. Johns County, Florida, Defendant-Appellant. 12/27/2018.

## PERSONAL

Languages: Conversational Spanish, French
Tutor: Biochemistry, computer science, High School mentor
Computers: Ruby, Rails, Javascript, C++, C, Java, and HTML programming

# Appendix Attachment

# 12

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                                                              Case No. 4:22-cv-00325-RH-MAF

SIMONE MARSTILLER, et al.,

     Defendants.

_____/

## DECLARATION OF KRISTOPHER E. KALIEBE, M.D.

I, Kristopher E. Kaliebe, M.D., hereby declare and state as follows:

1.      I am over the age of 18, of sound mind, and in all respects competent to testify. I have personal knowledge of the information contained in this declaration and would testify completely to those facts if called to do so.

2.      I, Kristopher Kaliebe, MD. am an associate professor at the University of South Florida in Tampa Florida.  I am Board Certified in Psychiatry, Child and Adolescent Psychiatry and Forensic Psychiatry.  I am a Distinguished Fellow at the American Academy of Child and Adolescent Psychiatry (AACAP).  My clinical work has been primarily in University based clinics, Federally Qualified Health Centers and juvenile corrections. I have extensive teaching experience including medical students, general psychiatry residents, child and adolescent psychiatry fellows and forensic psychiatry fellows.  My CV is attached.

3.      I have been retained by the Defendants in the case to describe my experience with gender dysphoria patients and opine as to the state of the evidence supporting gender dysphoria treatments.  I also have been asked to opine on the influence of activism and suppression of open inquiry which has distorted academic dialogue and made published research and expert

1

recommendations less trustworthy. If called to testify in this matter, I will testify truthfully based on my personal experience and knowledge.

      4.     My curriculum vitae contains a list of papers I have authored within the past 10 years. I have testified in deposition or trial in the following cases over the past four years:

**Civil Testimony:**

*In the Interest of RW, LL, AP Minor Children* Circuit Court of the 13th judicial circuit, Juvenile Division, Tampa FL   January 28, 2020

*Jeffrey Spivey, petitioner/father and Teresa Spivey N/K/A Teresa Cartwright, respondent/mother* Case No.: 2016 DR0471's, Circuit Court of the 12th judicial circuit in and for Manatee County Florida. February 28, 2020

*Re: The Marriage of Robyn Cohen McCarthy and John McCarthy* November 1, 2019 11th Judicial Circuit, Family Division, Dade County, Miami FL

**Criminal Testimony:**

*The State of Florida v. Bill Paul Marquardt* 5th Judicial Circuit, Sumner County, Florida, Bushnell Florida December 19, 2019

*The State of Florida v. Bill Paul Marquardt* 5th Judicial Circuit, Sumner County, Florida, Bushnell Florida August 24, 2022

*State of Florida v. Justin Mitchell Pennell*, 2020CF000159FAXWS, 6th Judicial Circuit in and for Pasco County, Florida March 23, 2022

**Civil Depositions:**

*Z.M.L., a minor, through her parents and guardians, -vs- D.R. Horton, Inc., a foreign corporation authorized to do business in Florida*, United States District Court, Middle Division of Florida, Tampa, May 6, 2021

*Julie Tarallo versus Blue Rock Partners, LLC et al.* in the Circuit Court for the 13th Judicial Circuit, Florida Civil Division. (2019-CA 012361.) June 3, 2022

*Carlton Collins, individually, and on behalf of his minor son, Connor Samuel Collins v. David R. Wallace, Sr., M.D.* Louisiana's 14th judicial district, Civil Suit: 2019 – 4128 – D, March 4th, 2022

**Criminal Deposition:**

*State of Florida v. Justin Mitchell Pennell*, 2020CF000159FAXWS, 6th Judicial Circuit of the State of Florida in and for Pasco County, March 11, 2022

5.      I am being compensated at an hourly rate of $400 per hour for my time preparing this declaration. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

6.      I was awarded my medical degree in 1999, and subsequently completed general psychiatry, child and adolescent psychiatry and forensic psychiatry training. This training including education in human biology, human sexuality, development, brain functioning, normal development and psychopathology. Gender dysphoria and gender dysphoria treatment was part my professional training. I have additional training in Cognitive Behavioral Therapy and trauma-focused therapies.  I have been providing psychotherapy and teaching psychotherapy to psychiatry trainees throughout my career. Since July 2005 I have worked as a university professor with primarily clinical psychiatric care and teaching duties. Since 2016 I have acted as a supervising physician at the University of South Florida's Silver Child Development Center. In this capacity my role is to function as a clinical supervisor and instructor. Child psychiatry residents and general psychiatry residents serve as the primary patient evaluators and clinicians.  I evaluate new patients directly, and after see patients directly as needed.  I oversee the resident's work products and function as the physician of record.  Within this clinic I have evaluated and treated, along with resident physicians, patients with gender dysphoria. In addition to these direct clinical experiences, part of my scope of duties within the Silver Child Development Center is training residents regarding the treatment of patients, including patients with gender dysphoria. In addition to direct clinical care, I have been consulted by a colleague for my opinion regarding what would be the appropriate forensic and clinical approach regarding providing a letter as requested by an endocrinologist regarding a youth considering puberty blockers on a path toward sex hormone treatment and potential surgeries.  Within the juvenile justice system I have been asked to provide a second opinion and coordinate care regarding a patient with gender dysphoria.

7.      My review of the research concludes that the evidence base for gender dysphoria treatments is mixed and generally low quality. The administration of sex hormones and performing of surgeries are medical interventions with substantial risks, and as these interventions target otherwise healthy tissue, a high degree of evidence and certainty is demanded before such a life altering intervention. Until recently cross sex hormone and surgeries for gender dysphoria have been exceedingly rare, thus there exists nominal long term data. It is especially challenging to evaluate this evidence base due to changing definitions and epidemiology.  The costs and benefits of medicalizing gender self-identification has not gone through academic inquiry with open rigorous academic review. Social affirmation can be considered a psychosocial treatment and also has an extremely limited evidence base as an intervention.

8.      There is not an evidence base to support strictly "affirmative" psychotherapy for gender dysphoria. Psychotherapy, in general, should aim to help individuals gain a deeper understanding of themselves, develop coping skills and provide a neutral, unbiased process. The binary of affirmative psychotherapy versus conversion therapy for gender dysphoria is a serious misunderstanding of the complexities of ethical and effective psychotherapy.  It is my opinion that insufficient data is available to make confident proclamation regarding the risks and benefits of treatment of gender dysphoria.

9.      Open inquiry is the ability to ask questions and share ideas without risk of censure.  It is fundamental to medical research and scientific progress. Within medicine and science the ability for constructive disagreement and the expression of divergent opinions has withered with regards to questions of biological sex, gender and gender medicine. Political and social pressures are not new to this line of research and clinical care and do not come from only one political pole or fraction of society.  Yet especially within the last decade, academia, including academic medicine has become more tribal, moralizing and more likely to attempt to silence divergent opinions.  This has led to a

4

suppression of research data, publication bias, and penalizing of divergent viewpoints. These dynamics have contributed to expert recommendations which exaggerate the strength of the evidence base for gender dysphoria.

10.     I witnessed these dynamics personally at the American Psychiatric Association conference in May 2022.  During a Clinical Perspectives where presenters opined that they questioned the evidence based supporting current practice regarding the treatment of transgender youth, a sizable crowd in the audience was disruptive. During the question and answer session, crowd members repeatedly made hostile ad-hominem statements towards the presenters while only a few questions responded to the evidence or viewpoints presented.  Similarly, in 2018 Lisa Littman, MD presented her research data at American Academy of Child and Adolescent Psychiatry conference and received similar personal enmity which caused a colleague to remark he has never seen a presenter at a conference treated with such hostility. Dr. Littman is the same researcher who after her peer reviewed research was published by the journal PLOS ONE, disregarding the typical rules of scientific discourse, PLOS ONE had a re-editing of the publication with a commentary added, despite no finding of error or misconduct. Another colleague had a related difficult experience with editors of the American Academy of Psychiatry and the Law Newsletter. The editors would not permit him to describe in his article the problematic behaviors of youth who declared themselves to be transgender, thus undermining the exchange of important clinical data.  Similarly, the 2022 American Academy of Child and Adolescent Psychiatry conference will feature at least 6 presentation related to gender dysphoria or transgender patients, none presenting new research. Yet a research Symposium which included a prominent international researcher, and was to feature detransitioners, was not accepted. Similarly, I submitted, with two other physicians, for a Special Interest Group which was to feature data on de-transitioning. This proposal was also not accepted.  Likewise, when I wrote a *Letter to the Editor* of the major forensic psychiatric journal which expressed skepticism about a commentary

embracing progressive political ideologies, he replied that my letter would not be published, in part, because some would find my criticism of this ideology offensive. These personal experiences mirror what I observe globally in the medical and psychiatric literature.  The viewpoints in the medical literature do mainly endorse support for gender affirmative care for gender dysphoria. Yet my personal interactions with thoughtful well regarded psychiatrists display a full range of views, and many consider automatic affirmation to be harmful and unsupported by science. Similarly, my assessment is that many Endocrinologists also believe their professional organization is too strongly influenced by gender ideology. Most physicians will not speak frankly in public on these issues for fear of reprisals. Attacking a physician as hateful is easily accomplished and can be instantly amplified online. These personal attacks are hard to defend, affect careers and can be personally devastating.

11.     Regarding professional organizations input regarding the treatment of gender dysphoria, it should be put in the context of their political activism.  Two recent press releases provide examples. The September 28th 2022 American Academy of Pediatrics (AAP) press release regarding the State of Oklahoma condemns any limits on gender affirming health care. Defending scope of practice is typical for medical associations.  Yet the press release frames these limits as discrimination based on gender identity. The AAP thus takes a polarized position by invoking moralized characterization of these limits, rather than calling for a respectful, nuanced science-based dialogue on how to best care for and support transgender and gender diverse youth. This statement sidesteps an opportunity to call for open independent review of the evidence base and a thorough review the logic behind current treatment affirmative approaches.  It also creates a serious contradiction.  Parents are often skeptical of medicalization of self-reported gender. The AAP statement invokes parental rights, but without clarifying if the AAP supports the many parents who do not want affirmation of their child's self-reported gender.

6

Similarly, the American Academy of Child and Adolescent Psychiatry's (AACAP) March 18th, 2022 press release reveals their leadership's strident position by remarking on an education bill, typically considered outside psychiatrists' area of expertise. AACAP promotes politicized derogatory phrasing by calling Florida's legislation the "Don't Say Gay or Trans" bill. The press release demonizes supporters of the bill as unconscionable and implies they "target and harm" LGBTQ+ youth". The press release claims that differences in gender identifications are "part of healthy physical, social, and emotional developmental processes." The press release does not explain why if these differences in gender identification are part of healthy development, why would they require puberty blockers, sex hormones or surgery. The American Academy of Child and Adolescent Psychiatry's leadership moralizes the debate, uses polarizing language and does not engage in forthright discussion which must include skepticism, not just affirmation.

These professional organizations admonish those who they claim pathologize, but will not acknowledge that it is an unanswered scientific question to what degree, and in what circumstances, discomfort with biological sex is related to mental illness. As in body dysmorphic disorder or anorexia, there are longstanding examples where non-acceptance of one's body is aptly pathologized. Holding the opinion that logic and the evidence base do not support medical interventions for gender dysphoria is not a moral failure or discrimination as they infer, this conclusion is the result of deliberative analysis.

12.     To conclude, I am presenting on the subject of misinformation at the October 2022 American Academy of Child and Adolescent Psychiatry conference Social Media Institute. My research into misinformation research leads me to determine that on the subject of gender dysphoria, academia, including academic medicine, has created conditions where perceived social justice, ideological and political priorities have undermined the creation of trustworthy science. Group-think and coercive tactics have led to the creation of misinformation. These dynamics have contributed to

7

subsequent misguided attempts of these professional organizations to suppress open inquiry, demand conformity of opinion and exaggerate the evidence base regarding gender dysphoria treatment.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3rd day of October, 2022.

Respectfully submitted,

Kristopher E. Kaliebe, M.D.

8

# CURRICULUM VITAE

## Kristopher Edward Kaliebe, MD

**Associate Professor**
**University of South Florida, Morsani College of Medicine, Tampa Florida**

**Address**

Psychiatry and Behavioral Neurosciences
3515 E. Fletcher Avenue, MDC 14
Tampa FL 33613
Office: 813974-5460
Cellular: 504782-9070
kkaliebe@usf.edu

**Citizenship**

*United States*

**Education**

**Graduate/Medical:** St. George's University
School of Medicine, Grenada, West Indies
Medical Doctor                                                    January 1995- June 1999

**Undergraduate:** Columbia College,
Columbia University
New York, NY,
Bachelor of Arts, Biochemistry                          September 1988-May 1992

**Postgraduate Training**

Clinical Fellowships:
Fellow, Forensic Psychiatry   (PGY6)
Louisiana State University Medical Center
1542 Tulane Ave., New Orleans, LA 70112            July 2004 to June 2005

Fellow, Child and Adolescent Psychiatry (PGY 4-5)
Louisiana State University Medical Center
1542 Tulane Ave., New Orleans, LA 70112            July 2002 to June 2004

Chief Resident in Child and Adolescent Psychiatry
- Acted as liaison between Child Psychiatry Fellows and Administration
- Coordinated with Program Director lecture and rotation schedules
                                                              July 2003 to June 2004

Residency:

Resident, Psychiatry (PGY 2-3)
University of Medicine and Dentistry-
New Jersey Medical School
185 S Orange Ave, Newark, NJ 07103                    July 2000- June 2002

Internship: (PGY 1)
University of Medicine and Dentistry-
New Jersey Medical School
185 S Orange Ave, Newark, NJ 07103                    July 1999- June 2000

Diplomate, American Board of Psychiatry and Neurology:

- Board Certification in General Psychiatry, awarded 2004, active

- Specialty Board Certification Child and Adolescent Psychiatry, awarded 2005, active

- Specialty Board Certification Forensic Psychiatry, awarded 2007, active


**Awards, Honors, Honorary Society Memberships:**

Department of Veterans Affairs Special Contribution Award for Clinical Service in Psychiatry
                                                    February 22, 2002

Outstanding Resident Award, Presented at the American Academy of Child and Adolescent Psychiatry, Miami, Florida,
                                                    October 17, 2003

Inducted into Berkeley Preparatory School Athletic Hall of Fame, Tampa, Florida,
                                                    November 7, 2003

Fellow, Louisiana State University Academy for the Advancement of Educational scholarship
                                                    October 2007 – 2016

*Best Doctors*, Louisiana in the subspecialty of Child and Adolescent Psychiatry
                                                    Awarded 2007, 2008, 2009,
                                                    2010, 2011, 2012, 2013,
                                                    2014, 2015 and 2016

*Best Doctors*, in Tampa Florida
                                                    2017, 2018, 2019, 2020,
                                                    2021, 2022

2

Awarded status as a Distinguished Fellow of the American Academy of Child and Adolescent Psychiatry

July 6, 2016

**Appointments:**

Associate Professor, University of South Florida Medical School, Department of Psychiatry.                                                    September 2016 to present

- Supervise one afternoon weekly of outpatient Child and Adolescent Psychiatry Silver Center Resident Clinic with USF General Psychiatry Residents and Child and Adolescent Psychiatry fellows who performed assessment, consultation, and treatment.

Tampa General Hospital Psychiatrist on Duty            September 2016 to present
Manage the night, weekend and holiday clinical responsibilities of Tampa General Hospital including the over 1000 bed hospital and a 24-hour emergency room. Usually done in partnership with a psychiatric resident from the University of South Florida.

Facility Psychiatrist.  Tampa Residential Facility            September 2016 to present
- Performed psychiatric evaluations and treatment in Florida's juvenile correctional system.  Tampa Residential Facility is the most intensive level of mental health and substance abuse treatment, subcontracted to Truecore Solutions.

Facility Psychiatrist.  Les Peters Academy Residential Facility
May 2017 to present
- Performed psychiatric evaluations and treatment in Florida's juvenile correctional system, subcontracted to Truecore Solutions.

Staff Psychiatrist, Orleans Parish Justice System            March 2018 to July 2018
- Performed telepsychiatric evaluations and treatment in Orleans Parish Prison correctional system, subcontracted to Correct Care Solutions.

Facility Psychiatrist.  Charles Britt Academy Residential Facility
November 2019 to July 2022
- Performed psychiatric evaluations and treatment in Florida's juvenile correctional system, subcontracted by Sequel.

Facility Psychiatrist. Columbus Youth Academy Residential Facility
June 2020 to present
- Performed psychiatric evaluations and treatment in Florida's juvenile correctional system, subcontracted by Sequel.

Louisiana State University Health Science Center Assistant Professor of Clinical Psychiatry                                                    July 2005 to June 2017

3

Louisiana State University Health Science Center Associate Professor of Clinical
Psychiatry                                               July 2016 - 2017

Mental Health Medical Director, St. Charles Community Health Center, Luling,
Louisiana                                                July 2005 to 2016
- Evaluated and treated a primarily Medicaid and underserved population of
  adult, child and adolescent patients in a Federally Qualified Health Care
  Center.

Coordinator for Child and Adolescent Integrated Mental and Behavioral Health Services,
Louisiana Mental and Behavioral Health Capacity Project
                                                September 2012 to July 2017
- Performed assessment, consultation, training, prevention, and education services
  to Federally Qualified Health Centers and community clinics in Coastal
  Louisiana.
- Evaluated and treat both on site and using remote video conferencing equipment
  (telehealth).

Staff Psychiatrist, Back-up coverage, Louisiana Juvenile Justice System    July 2016 to
September 2022
- Performed psychiatric evaluations and treatment in Louisiana's juvenile
  correctional system, subcontracted to Wellpath (formerly Correct Care Solutions).
- Back up on call coverage for on-site psychiatrists
- As needed evaluated and treated remote video conferencing equipment
  (telehealth).

Staff Psychiatrist, Louisiana Juvenile Justice System        July 2010 to July 2016
- Performed psychiatric evaluations and treatment in Louisiana's juvenile
  correctional system, subcontracted to Correct Care Solutions.
- Evaluated and treated both on site and using remote video conferencing
  equipment (telehealth).

Staff Psychiatrist on Duty                          October 2011 to July 2016
Children Hospital, Calhoun Campus. New Orleans, Louisiana
- Facilitated development of protocols and supervision regarding the training of
  Medical Students, General Psychiatry Residents and Child and Adolescent
  Psychiatric Fellows who utilize the Calhoun unit as primary training site for Child
  Psychiatry.
- Manage night and weekend clinical responsibilities for Children's Hospital
  emergency room and Inpatient Psychiatric Unit, including individually assessing
  all inpatients each weekend.

Staff Psychiatrist, Louisiana State University Juvenile Justice Program
                                                July 2005 to August 2010

4

- Performed psychiatric evaluations and treatment in Louisiana's juvenile correctional system at Bridge City Center for Youth and Jetson Center for Youth.
- Evaluated and treated both on site and using remote video conferencing equipment (telehealth).

Staff Psychiatrist, Florida Parish Juvenile Detention Center,

July 2007 to August 2010
- Performed psychiatric evaluations and treatment using remote video conferencing equipment (telehealth).

Medical Officer on Duty                                         July 2002 to July 2005
New Orleans Adolescent Hospital. New Orleans, Louisiana
•        Managed clinical responsibilities of Crisis Intervention Services, a 24-hour emergency mental health response team serving families, children and adolescents from the Southeast Louisiana region.
•        Managed two psychiatric inpatient units including a twenty bed adolescent and ten bed children's unit after hours on call.
•        On call physician for Crisis Respite, a short term residential facility for children and adolescents located on hospital grounds.

Psychiatrist on Duty                                         September 2003 to July 2005
New Orleans Veterans Administration Medical Center, New Orleans, Louisiana
- Managed clinical psychiatric responsibilities of a 450 bed hospital
- Managed clinical psychiatric responsibilities of a 27 bed inpatient psychiatric unit
- Managed clinical psychiatric responsibilities of 24-hour emergency room

Psychiatrist on Duty                                         September 2001 to June 2002
New Jersey Medical Center Veterans Administration
- East Orange Medical Center, East Orange, NJ
Managed clinical psychiatric responsibilities of 24 hour emergency room along with a 295 bed hospital, 30 Nursing Home and 30 Domiciliary beds.
- Lyons Hospital, Lyons, NJ
Managed clinical psychiatric responsibilities of 356 bed hospital.

**Teaching, Lecture**

Undergraduate Medical Student

BMS6920.002, BMS6920.001 University of South Florida:  Created five session elective: "Mind Body Medicine"  Developed as part of University of South Florida medical school elective curriculum from 2017-current.  Offered for up to 12 students as a credited elective including study guide, organizing readings, and experiential class learning.
                                                2017 to present

At Louisiana State University Health Science Center New Orleans:

5

4 one-hour lectures instructing all Medical Students (MS2) in Child and Adolescent mental health during Psychiatry Basic Science block

February 2004 to February 2016

LSU Physical therapy
Annual 2 two-hour lectures on a range of mental health topics annually

2012 to 2016

LSU Public Health
Annual 2 hour lecture on psychopharmacology to incoming Masters Level students in Public Health

2012 to 2016

**Graduate Medical Teaching**

MEL 8602 C65 M:  Child and Adolescent Psychiatry

Child and Adolescent Psychiatry Resident Teaching:

Arranged and co-instructed Forensics Lecture Series, bi-annually 10 lecture hours and 4 hours of individual lectures.

2016 to present.

Teach various topics within residency training. 1 lecture per year.

2016 to present.

University of South Florida General Psychiatry Residency:

Co-Produced elective track for 2 residents per year within University of South Florida Psychiatry Residency.  Supervision of Integrative Psychiatry residents within the University of South Florida's Integrative Psychiatry Track, biweekly sessions utilizing curriculum from the Andrew Weil Center for Integrative Medicine**.**

July 2020- present

Forensic Psychiatry Resident Teaching:

Teach child and corrections related forensic topics within residency training. 4 lectures per year.

2018 to present.

LSUHSC New Orleans, General Psychiatry Resident Teaching

- Created and taught one hour weekly (44 weeks per year) Cognitive Behavioral Therapy practicum for PGY 3 residents

2007 to 2016

6

- One hour lecture on evolution and mood disorder each year for PGY3 residents
                                                                    2010 to 2016

LSUHSC New Orleans Child and Adolescent Psychiatry Resident Teaching

- One-hour didactic lectures on psychopharmacology for 8 weeks and cognitive behavior therapy for 4 weeks bi-annually
                                                                    2008-2016
- Organized and taught majority of the year-long bi-weekly one hour didactic program entitled Special Topics including a wide range of topics including development, forensic psychiatry, evolution, anthropology, nutrition, effects of technology, electronic media, sleep, exercise and physical activity, wellness and systems of care.
                                                                    2008 to 2016


LSU- Kenner Family Practice Residency:
Once yearly didactic lectures for 1 to 2 hours for Kenner Family Practice Residents
                                                                    2009 to 2016

Created one session Mini-Course: "Optimizing Neurocognition through Nutrition." Developed and co-facilitated a module as part of Goldring Center for Culinary Medicine curriculum for medical students and other trainees with Annie Yeh, MD).  Offered as a 1 credit elective for Tulane medical students including study guide, organizing readings, online webinar to be viewed prior to class, case studies during class and test.
                                                                    2014

At Louisiana State University Health Science Center New Orleans: Core Clinical Psychiatry Rotation Lecture, 1 hour lecture presented to MS3 students every six weeks to 3rd year medical students covering Child Psychiatry Basics.
                                                            October 2003 to June 2005

At University of Medicine and Dentistry- New Jersey Medical School, Department of Psychiatry
•       Lecture: "The Media and Psychiatry" for General Psychiatry Residents, created as part of the Culture and Psychiatry Seminar
                                                            August 2001 and 2002


**Teaching, Supervisory**

At University of South Florida, Tampa Florida:

*Medical Student supervision*

University of South Florida -                             2017 to present
MEL 8109 L69 M

7

BCC 7154 002 M   Psychiatry / Neurology Clerkship.  Medical Students rotation through clinic one afternoon weekly of outpatient Child and Adolescent Psychiatry Silver Center Resident Clinic

Psychiatry Elective, 2 to 4 week Medical Student rotation through Child and Adolescent Psychiatry Silver Center Resident Clinic

*Graduate Medical Education Supervision*

Child and Adolescent Psychiatry Residency

Supervise one afternoon weekly of outpatient Child and Adolescent Psychiatry Silver Center Resident Clinic with USF Child and Adolescent Psychiatry residents who performed assessment, consultation, and treatment.

September 2016 to June 2021

Supervise one afternoon weekly of outpatient Child and Adolescent Psychiatry correctional psychiatry with USF Child and Adolescent Psychiatry residents who observe clinical care in juvenile correctional facilities.

September 2016 to present

General Psychiatry Residency:

Supervise one afternoon weekly of outpatient Child and Adolescent Psychiatry Silver Center Resident Clinic with USF General Psychiatry Residents who performed assessment, consultation, and treatment.

September 2016 to present

Forensic Psychiatry Resident Teaching

Supervision of forensic psychiatry trainees within the University of South Florida forensic psychiatry training program**.**  This includes review of resident competency evaluations along with co-evaluation of criminal defendants as individual cases arise.

2018 to present

At Louisiana State University Health Science Center New Orleans

LSU- Kenner Family Practice Residency:
- One month, once weekly half day mental health rotation at St Charles Community Health Center for all Kenner Family Practice Residents

2008 to 2016

Clerkship/Residency Directorship:

8

Child and Adolescent Psychiatry Fellowship Training Director, Louisiana State
University Medical Center.  Oversaw and supervised resident physician training
Managed administrative, evaluation and scheduling issues within the training program
Collaborated with Louisiana State University psychiatric faculty to develop policies and
procedures at various clinical site.

July 2010 to September 2012

Teaching Awards:

Association for Academic Psychiatry Honorary Fellow

October 2001- October 2002

Louisiana State University Child and Adolescent Psychiatry Department Outstanding
Teacher Award for the 2006-2007 academic year

Louisiana State University Child and Adolescent Psychiatry Department Outstanding
Teacher Award for the 2015-2016 academic year

*Peer to Peer: Institutional Grand Rounds*

 "The Minds, They are a Changin' – An Overview and Update on MDMA and Psilocybin
Grand Rounds University of South Florida Psychiatry Department, Tampa Florida
January 28 2022

"3 Simple Rules for Overcoming Obesity" University of South Florida Endocrinology
Department, Tampa Florida
November 9, 2021

"A hard pill to swallow: psychotropic medications in foster care", University of South
Florida, Department of Public Health, Tampa Florida
November 3, 2017

"Rules of Thumb: The importance of heuristic and cognitive biases in pediatric physical
and mental health" Grand Rounds Children's Hospital, New Orleans
July 30, 2014,

Grand Rounds, Louisiana State University Department of Psychiatry, "Rules of Thumb,
lifestyle interventions for mental health professionals." New Orleans, Louisiana
January 23, 2014

"Just say No, the Case against Stimulant Medication" Grand Rounds Children's Hospital,
New Orleans, Louisiana
May 19th, 2010

"Violence: Neurobiology, Risk Assessment and Beyond", Grand Rounds Louisiana State
University Department of Psychiatry, New Orleans, Louisiana

9

August 9, 2012

"Is ADHD a Nutritional Disorder", Grand Rounds Louisiana State University Department of Psychiatry, New Orleans, Louisiana

July 28, 2011

"Just say No, the Case Against Stimulant Medication", Grand Rounds Louisiana State University Department of Psychiatry, New Orleans, Louisiana

July 29th, 2010

Grand Rounds Department of Psychiatry, Louisiana State University School of Medicine, New Orleans, Louisiana "The Application of Darwinian Principles to Child Custody Evaluations", New Orleans, Louisiana

May 26th, 2005

"Attention Deficit Hyperactivity Disorder" Grand Rounds Department of Pediatrics, Louisiana State University School of Medicine, New Orleans, Louisiana

May 25th, 2005

"The Media, Our New Social World, How Should Pediatricians Respond?" Grand Rounds, Louisiana State University School of Medicine, Children's Hospital, New Orleans, Louisiana

June 2nd, 2004

"Attention Deficit Disorder" for Louisiana State University Health Science Center Juvenile Corrections Program Continuing Medical Education Presentation via telemedicine New Orleans, Louisiana

March 16th, 2004

"The Media, Relationships to Children and Psychiatry", Grand Rounds, Department of Psychiatry, Louisiana State University School of Medicine, New Orleans, Louisiana

June 4th, 2003

"The Media, Relationships to Children and Psychiatry", Grand Rounds, New Orleans Adolescent Hospital, New Orleans, Louisiana

March 28th 2003

**Lectures by Invitation**

"The Media, Relationships to Children and Psychiatry" Grand Rounds, University of West Virginia, Charleston, West Virginia,  Department of Psychiatry and Behavioral Science

April 10th 2003

10

"The Media and Child and Adolescent Psychiatry –An Evolving Relationship" Chair and Presenter, Media Theatre, Annual Conference of the American Academy of Child and Adolescent Psychiatry

October 21st, 2004

"The Media, Our New Social World, How Should Health Care Professionals Respond?" Continuing Medical Education Presentation Snowshoe Mountain Retreat, Snowshoe Mountain, West Virginia

September 19th, 2004

"The Application of Darwinian Principles to Child Custody Evaluations" Grand Rounds Department of Psychiatry, University of South Florida, Tampa, Florida

October 31st, 2005

"The Evaluation and Treatment of Traumatized Children and Adolescents with ADHD" Web Cast Presentation and Grand Rounds sponsored by the National Center for Child Traumatic Stress Network's Rural Consortium, New Orleans, Louisiana

January 25th, 2007

"Behavioral Disorder or Traumatized Child?" Louisiana Federation of Families for Children's Mental Health, Children's Mental Health Conference, Houma Louisiana

May 9th, 2008

"Behavioral Disorder or Traumatized Child?" Grand Rounds Tulane University Department of Child Psychiatry, New Orleans, Louisiana

March 13th, 2009

"Brother's Little Helper: The Simpsons Satirizes Stimulant Medication as a Response to Childhood Behavior Problems" Media Theatre, Annual meeting of the American Academy of Child and Adolescent Psychiatry, New York, New York  Kristopher Kaliebe MD, K. Dalope, MD

October 30, 2010

"Violence Risk Assessment" Louisiana Psychiatric Medical Association Annual Meeting, New Orleans, LA

March 2, 2013,

"Telepsychiatry in Juvenile Justice Settings" part of "Telepsychiatry: Challenges and Successes Across Settings." Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Orlando FL

October 22, 2013

"What are they Missing, When Electronic Media Displaces Sleep, Academics and Exercise" part of "Identifying and Treating Internet-Related Mental Health Problems: An Evidence-Based Approach" Clinical Perspectives. Annual meeting of the American Academy of Child and Adolescent Psychiatry, Toronto, Canada

11

October 24, 2014

"The Implications of the Pharmacological Treatment of Children" Michigan Drug Court Annual Conference, Lansing, Michigan

March 12, 2014

"Three rules to prevent and treat ADHD symptoms" as part of the Louisiana ADHD Symposium, organized by the Louisiana Department of Health and Hospitals ADHD Task Force, Baton Rouge, Louisiana

December 9, 2014

"Non-Pharmaceutical Interventions for ADHD", Invited Professorship: St George's University School of Medicine Complementary and Alternative Medicine Selective, St George's, Grenada, West Indies

August 28 – Sept. 3rd, 2014

"Screen Time and Childhood Behavior: Disruptive Influence or Easy Scapegoat" as part of "Caught in the Net, How Electronics effects Mental Illness" Chair and Presenter, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, San Diego, California

October 30, 2014

"The Management of Childhood Obesity" and "Disordered Eating in Children and Adolescents" Oregon Psychiatric Medical Association Conference, Portland, Oregon

February 27 and 28, 2015

"Rules of Thumb: 3 Simple Rules to Optimize Physical and Mental Health" National Alliance for the Mentally Ill Louisiana Annual Conference, New Orleans, Louisiana

April 17, 2015

"ADHD overdiagnosis in Louisiana, a child and adolescent psychiatrist's perspective" Preventing Overdiagnosis Conference, National Institutes of Health (NIH), Bethesda Maryland

September 2, 2015

"An alternative to diagnosis-based practice in pediatric mental health" Preventing Overdiagnosis Conference: National Institutes of Health NIH Bethesda Maryland

September 2, 2015

"Shell Shocked: Growing up in the Murder Capital of America". Discussant for Media Theatre, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Holly Peek, MD, Kristopher Kaliebe, MD San Antonio, Texas

October 29, 2015

"Screen Time and Childhood Behavior: Disruptive Influence or Easy Scapegoat" as part of "Caught in the Net, How Electronics effects Mental Illness"  Chair and Presenter,

Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry,  San Antonio, Texas

October 31, 2015

"What are they (we) Missing? When Electronic Media Displaces Sleep, Academics, and Exercise" Grand Rounds University of South Florida Psychiatry Department, Tampa Florida

November 12th, 2015

ADHD overdiagnosis in Louisiana, a child and adolescent psychiatrist's perspective, Louisiana Psychological Association, New Orleans, LA

May 20, 2016

"Rules of Thumb: 3 Simple Rules to Optimize Physical and Mental Health" Crohns and Colitis Association of America Regional Conference, New Orleans, LA,

June 12, 2016

"Evaluating and Assuring the Effective and Safe Use of Psychotropic Medications in Children" Webinar: National Council of Juvenile and Family Court Judges, with Judge Constance Cohen; Janie Huddleston and Dr. Joy Osofsky, Ph.D.

June 24, 2016,

"Psychotropic Medications 101: What Judges Need to Know for Effective Decision Making" Florida Child Protection Summit, with Melinda Sczepanski, Orlando FL

September 9, 2016

"Communicating With the Media and the Public as Child and Adolescent Psychiatrists Around Disaster and Highly Traumatic Events." Workshop, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Media Training Workshop, New York, New York

October 27, 2016

"Evolutionary Biology is a Basic Science for Child and Adolescent Psychiatry" Special Interest Group, Annual meeting of the American Academy of Child and Adolescent Psychiatry, New York, New York

October 28, 2016

"Is War Ever Really Over? War-Affected Youth From Home to Host ountry", Discussant, Clinical Perspectives. Annual meeting of the American Academy of Child and Adolescent Psychiatry, New York, New York

October 28, 2016

"Psychotropic Medications 101: The pertinent essentials for all involved in the child welfare system" Florida Child Protection Summit, with Melinda Sczepanski, Orlando, Florida

August 30, 2017

"Safe Use of Psychotropic Medications in Children." 2017 Safe Babies Court Teams Cross Sites Meeting, Fort Lauderdale, Florida

August 17, 2017

"Health Promotion in Pediatric Mental Health" Discussant, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Washington, DC
October 23, 2017

"New Technologies, New Laws, New Childhood" as part of "Clinical Guidelines for Navigating Media Use" Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Washington, DC

October 24, 2017

"Screen Time and Childhood Behavior: Disruptive Influence or Easy Scapegoat" as part of "Caught in the Net, How Electronics effects Mental Illness" Chair and Presenter, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Washington, DC

October 26, 2017

"The Business of News, the Role of Child and Adolescent Psychiatrists in the Media, and Risk Communication."   Member Services Forum, Annual meeting of the American Academy of Child and Adolescent Psychiatry: Washington, DC

October 27, 2017

"Caught in the net: a child psychiatrist's guide for navigating the internet age.", Workshop, International Association for Child and Adolescent Psychiatry and Allied Professions, Prague, Czechoslovakia

July 27, 2018

Chair, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, "Caught in the Net: How Digital Media Shapes Mental Illnesses in Youth and How Psychiatrists Should Respond." Seattle, Washington
October 24, 2018

"Self-Care in the Child Welfare System" YMCA/Safe Children Coalition Conference, with Catarlyn Glenn, Sarasota Florida

April 18, 2019

"Psychotropic Medications 101: The pertinent essentials for all involved in the child welfare system" Florida Child Protection Summit, with Catarlyn Glenn, Orlando Florida
December 17, 2019

"Caught in the Net: How Digital Media Interacts with Mental Illness in Children and Adolescents", Annual Conference of the Florida Psychiatric Society, Tampa, Florida
September 21, 2019

"Effective Strategies for Higher Education and Beyond" Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Mastering Information Flow for Transitional-Age Youth (TAY): as part of "Promoting Digital Citizenship in Transitional-Aged Youth (TAY) and College Students", Chicago, IL
October 19, 2019

"Caught in the Net: How Digital Media Interacts with Mental Illness", virtually presented at the Andrew Weil Center for Integrative Medicine, Tucson, Arizona
April 1, 2020

"A deeper dive into child and adolescent psychopharmacology for families and professionals involved in the child welfare system" Florida Child Protection Summit, with Catarlyn Glenn. Orlando, FL
September 3, 2020

"Screenagers: Next Chapter – How Online Behaviors Affect Depression and Anxiety Disorders in Adolescents", Media Theater (virtual) Annual meeting of the American Academy of Child and Adolescent Psychiatry
October 19, 2020.

"Helping Child Psychiatrists Navigate the Internet Age", "Career Focus: Setup Your Own Telepsychiatry Practice", "COVID-19 Related Psychiatric Issues"
Oasis Child and Adolescent Psychiatry Conference, Charleston, SC
May 17, 2021

"Conversation about health information, COVID, news, and related topics", discussant and breakout group leader, Digital Media and Mental Health Research Virtual Retreat
May 24th 2021

"The Social Dilemma: Helping Families Navigate the Pull, Pulse, and Power of Social Media", Media Theater, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Virtual
October 29, 2021

"Appealing Applications for Adolescent Mental Health: Social Media's Transformation During the COVID-19 Pandemic", Discussant, Clinical Perspective, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Virtual
October 25, 2021

"Angry Young Men, Common Threads in Different Types of Extremist Groups" as part of Political Extremism & Hate Group Recruitment of Adolescents", Clinical Perspective, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Virtual
October 26, 2021

"Angry Young Men: Boys and Adolescent Males with Disruptive and Aggressive Behavior", "Nutritional Child Psychiatry" Oasis Child and Adolescent Psychiatry Conference, Charleston, SC

May 1st / 2nd, 2022

"Sexts, Lies & Videogames: Adolescent Boys, the Internet, & Mental Health" Chair and presenter on violence and young men: Clinical Perspective, Annual Meeting of the American Academy of Psychiatry Annual Meeting, New Orleans, LA

May 25, 2022

**Clinical Activities or Innovation**

Licensure:

Louisiana State Medical License, expires December 31st, 2022
Florida Medical License, expires January 31st, 2024

Federal DEA Controlled Substances License          12/31/2023
Louisiana license for Controlled Dangerous Substances expires 10/1/2022
Certification: ECFMG Certificate 0-573-532-9

Forensic Training:

Florida Forensic Examiner Training completed through the University of South Florida Department of Mental Health Law and Policy

August 15-17, 2019

Certifications in Psychotherapy:

Basic Practicum in Rational Emotive Behavior Therapy completed at the Albert Ellis Institute in New York, NY

July 13, 2003

Advanced Practicum in Rational Emotive Behavior Therapy completed at the Albert Ellis Institute in New York, NY

July 20, 2003

Associate Fellowship in Rational Emotive Behavior Therapy completed at the Albert Ellis Institute in New York, NY,

July 15, 2005

Accelerated Resolution Therapy, Basic Training

April 1-3, 2017

Accelerated Resolution Therapy, Enhanced Training

Sept 31, October 1, 2018

16

Accelerated Resolution Therapy, Advanced Training

October 2,3, 2018

American Association of Medical Colleges Medical Education Research Certificate
October 13th, 2010

## Scholarly Activity

*Funded block grants*

Co-investigator on the Mental and Behavioral Health Capacity Project from September 2012 to June 2017

*Unfunded research*

Supervisor mentoring Medical Students:

University of South Florida IRB: Faculty Advisor Co Investigator May 2021

> What is the impact of coronavirus confinement on Japanese college students' mental health? Ivana Radosavljevic STUDY002335

University of South Florida IRB: Faculty Advisor Co Investigator May 2021
> Changes in college aged students' metabolic health due to Covid-19 confinement Matthew Udine, STUDY002341

PI as student supervisor, STUDY004118, IRB approved as Exempt Status, Palliative Care Patients' Attitudes & Openness to Psilocybin assisted Psychotherapy for Treatment of Existential Distress, Julia Wang

## Journal Publications:

Peer Reviewed

**Kaliebe, Kristopher** and Adrian Sondheimer. "The media: Relationships to psychiatry and children." *Academic Psychiatry* 26.3 (2002): 205-215.

**Kaliebe, Kristopher** "Rules of thumb: three simple ideas for overcoming the complex problem of childhood obesity." *Journal of the American Academy of Child & Adolescent Psychiatry* 53.4 (2014): 385-387.

**Kaliebe, Kristopher.** "Dr Kaliebe Replies", Journal of the American Academy of Child & Adolescent Psychiatry, (2014) 53:10 1134.

**Kaliebe, Kristopher** "The Future of Psychiatric Collaboration in Federally Qualified Health Centers." *Psychiatric Services* (2016): appi-ps.

17

**Kaliebe, Kristopher,** and Josh Sanderson. "A Proposal for Postmodern Stress Disorder." The American journal of medicine 129.7 (2016): e79.

Osofsky, Howard J., Anthony Speier, Tonya Cross Hansel, John H. Wells II, **Kristopher E. Kaliebe,** and Nicole J. Savage. "Collaborative Health Care and Emerging Trends in a Community-Based Psychiatry Residency Model." *Academic Psychiatry* (2016): 1-8.

Yeh, Y. Y. and **K. Kaliebe.** "Impact of Nutrition on Neurocognition." *Southern medical journal* 109.8 (2016): 454.

**K. Kaliebe** Expanding Our Reach: Integrating Child and Adolescent Psychiatry Into Primary Care at Federally Qualified Health Centers. J Am Acad Child Adolesc Psychiatry. 56.11 (2017)

Kass, R. and **Kaliebe, K.**, Stress and Inflammation: New Perspectives on Major Depressive Disorder. JAACAP Connect, p.22. Winter 2020

Case Reports, Technical Notes, Letters

Books, Textbook Chapters:

Weigle, P., Kaliebe, K., Dalope, K., Asamoah, T., & Shafi, R. M. A. (2021). 18 Digital Media Use in Transitional-Age Youth: Challenges and Opportunities. Transition-Age Youth Mental Health Care: Bridging the Gap Between Pediatric and Adult Psychiatric Care, 357.

Papers in Press:

Accepted for publication:  Prescribing Psychotropic Medications for Justice-Involved Juveniles, Journal of Correctional Health Care, A Tamburello,  J Penn, R Negron-Muñoz, **K  Kaliebe**

Invited Publications

"Telepsychiatry in Juvenile Justice Settings", **K Kaliebe**, J Heneghan, T Kim, Child and Adolescent Clinics of North America, 20 (2011) 113-123

American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Telepsychiatry and AACAP Committee on Quality Issues. Clinical Update: Telepsychiatry With Children and Adolescents. J Am Acad Child Adolesc Psychiatry. 2017 Oct; 56(10):875-893. Epub 2017 Jul 25. PMID: 28942810.

**Kaliebe, Kristopher** and Paul Weigle. "Child Psychiatry in the Age of the Internet." (2017).  Child and Adolescent Psychiatric Clinics of North America, April 2018Volume 27, Issue 2, Pages xiii–xv

Gerwin, Roslyn L., **Kristopher Kaliebe,** and Monica Daigle. "The Interplay Between Digital Media Use and Development." Child and Adolescent Psychiatric Clinics 27.2 (2018): 345-355.

**Other Research and Creative Achievements:**

Poster Presentations:

"Collaborative Child and Adolescent Psychiatry within Primary Care Clinics in Coastal Louisiana" Poster, Annual meeting of the American Academy of Child and Adolescent Psychiatry, **Kristopher Kaliebe MD**, Joy Osofsky, PhD; Howard Osofsky, MD, PhD; Lucy King, BA; Tonya Hansel, PhD,  San Antonio, TX

October 29, 2015

"Benefits of Integrating Young Child Psychiatric Services Into Primary Care Clinics in Underserved Communities" Poster, Annual meeting of the American Academy of Child and Adolescent Psychiatry, New York, NY Joy Osofsky, PhD; Howard Osofsky, MD, PhD; Lucy King, BA; Tonya Hansel, PhD, **Kristopher Kaliebe MD**

October 28, 2016

 "Integrating child and adolescent psychiatry into community based primary care networks", Poster, International Association for Child and Adolescent Psychiatry and Allied Professions, Prague, Czechoslovakia **Kristopher Kaliebe MD**

July 25, 2018

" The Prevalence of the Adverse Childhood Experiences (ACE) in Florida Youth Referred to the Department of Juvenile Justice"  Poster, Annual meeting of the American Academy of Psychiatry and the Law, Greg Iannuzzi, MD, Mark Greenwald, PhD**, Kristopher Kaliebe MD**

October 25, 2018

Other articles:

"LSU's *Breakfast Club* emphasizes education and recruitment into Child and Adolescent Psychiatry", American Academy of Child and Adolescent Psychiatry News,

January 2004

"Trix are for Kids!", American Academy of Child and Adolescent Psychiatry News,

May, 2013

Expanded Psychiatric Care Can Transform Federally Qualified Health Centers, American Psychiatric Association News,

......                                                     Published online June 17, 2016

News Stories on Suicide, Fictional Content may Increase Risk for Contagion, Hansa Bhargava and **Kristopher Kaliebe**,  American Academy of Pediatrics News, *Mastering the Media Column*,

Published online July 10, 2019

19

Webinars and creation of enduring materials:

*Rules for Optimal Health,* Webinar, University of South Florida Quality Parenting Initiative, Florida's Center for Child Welfare Information and Training Resources for Child Welfare Professionals, released

......                              December 11, 2017

Florida's Center for Child Welfare Information and Training Resources, webinars series on pediatric mental health for child welfare professionals and caregivers, Kristopher Kaliebe with Catarolyn Johnson;

......                             June 1, 8, 15, 22 and 29, 2020

"Don't just sit there- Adapt and Optimize in a post Covid world" University of South Florida Global Health Conversation Series, presented virtually

                                    September 22, 2020


**Service**

Membership in Professional Organizations:

Member, American Academy of Child and Adolescent Psychiatry (AACAP),
                            2000 to present

AACAP Media Committee member

                          2003 –2021

C0-Chair, AACAP Media Committee

                          2013-2021

Media Committee Liaison to the Complementary and Integrative Medicine Committee of the AACAP

                          2012 to 2019

Liaison to the Committee on Communications and Media of the American Academy of Pediatrics, from American Academy of Child and Adolescent Psychiatry (AACAP)

                          2015 to present

Member Association for Behavioral and Cognitive Therapies

                          2004 – 2016

Member American Academy of Psychiatry and the Law

                          2004 to present

Member Zero to Three

2017 to 2021

Member Louisiana Council for Child Psychiatry (LCCP)

2003 to 2016

Louisiana Council for Child Psychiatry (LCCP)

Secretary-Treasurer

March 2010-March 2014

President

March 2014- June 2016

Member, American Psychiatric Association

2000 - 2012 , 2021 to present

LSUHSC Psychiatry Interest Group Faculty advisor

2008 to 2012

University of South Florida Medical School Integrative Medicine Student Interest Group faculty advisor

January 2020 to present

University of South Florida Medical School Mindfulness and Meditation in Medicine Group faculty advisor

January 2022 to present

University of South Florida Interdisciplinary (university wide) Psychedelics Interest Group faculty advisor

March 2022 to present

**Editorial Posts and Activities:**
  **Journal editorships,  Reviewer**

LSUHSC Institutional Review Board alternate reviewer 2008-2012

Safety Committee Member, Accelerated Resolution Therapy for Treatment of Complicated Grief in Senior Adults, University of South Florida

2017-19

Expert reviewer for *Adolescent Psychiatry* Thematic Special Issue: Coming of Age Online: Challenges of Treating the Internet Generation: (2), 4, 2014

Expert reviewer for *Academic Psychiatry* Media Column          June 2018

21

| Expert Reviewer for *Pediatrics* | January 2021 |
|---|---|
| Expert reviewer for *Academic Psychiatry* Media Column | March 2022 |
| Expert Reviewer for *Harvard Review of Psychiatry* | May 2021 |

Co-editor: Kaliebe, Kristopher, and Paul Weigle. Youth Internet Habits and Mental Health, An Issue of Child and Adolescent Psychiatric Clinics of North America, E-Book. Vol. 27. No. 2. Elsevier Health Sciences.                     2018

Member, Planning Committee for the Digital Media and Mental Health Research Retreat hosted by the nonprofit Children and Screens.

May 24th, 25th 2021.

**Revised: October 2022**

# Appendix Attachment

# 13

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
## Tallahassee Division

AUGUST DEKKER, legally known as )
KORI DEKKER; BRIT ROTHSTEIN; )
SUSAN DOE, a minor, by and through )   Civil Action No.
her parents and next friends, JANE )    4:22-cv-00325-RH-MAF
DOE and JOHN DOE; and K.F., a )
minor, by and through his parent and )
next friend, JADE LADUE, )
)
*Plaintiffs,* )
v. )
)
SIMONE MARSTILLER, in her )
official capacity as Secretary of the )
Florida Agency for Health Care )
Administration; and FLORIDA )
AGENCY FOR HEALTH CARE )
ADMINISTRATION, )
*Defendants.* )
_____ )

Declaration of C.G. (pseudonym) In Support of Defendants' Opposition to
Plaintiffs' Motion for Preliminary Injunction

I, C.G. (pseudonym) declare as follows:

1.      I am over the age of 18 years and am not a party to this action. I have

actual knowledge of the following facts and if called upon to testify to them could

and would do so competently. I am submitting this Declaration in support of

Defendants' opposition to Plaintiffs' Complaint and Motion for a Preliminary

Injunction.

1

2.      Florida's Rule 59G-1.050(7) of the Florida Administrative Code disallows Medicaid coverage for medical and surgical interventions that "alter primary or secondary sexual characteristics."

3.      Florida's Rule will prevent manipulation and coercion on the part of health care providers. Most importantly, this Rule will protect vulnerable children and young people from grievous harm.

4.      Florida's new regulation will prevent the state funding of situations like mine in which a parent acceded to the requests of a vulnerable 15-year-old and placed me on the fast track to medical and surgical interventions which have left me at age 21 facing a lifetime of sterility with a mutilated body.

5.      Like many detransitioning young people, I was a gender non-conforming child who is on the autism spectrum and suffered with depression and anxiety. I was often bullied at school. I began seeing therapists when I was 6 years old.

6.      When I was about 8 years old, I began to think that I did not like stereotypical "boy stuff," such as athletics and rough play. Instead, I liked the ways girls behaved and was drawn to stereotypical "girl stuff."

7.      I did not socialize well with male peers and believed that if the behavior and habits of my male peers were what it meant to be a boy then maybe I was not a boy. Those feelings were confirmed by postings on transgender websites

2

that told me I was a girl if I liked "girl things." I also began conversing with trans-identifying people through phone apps.

8.     At age 14, I told a friend I was "trans" and wanted to be a girl. I believed that I was "a girl trapped in a boy's body."

9.     I told my parent, who quickly celebrated my "trans" identity and arranged for me to see a "gender affirming" therapist. The therapist immediately affirmed my "trans" identity without any psychological testing or exploration as to why I believed I was "trans." My parent also bought a whole new female wardrobe and cut off relatives and family friends who did not affirm my new female identity.

10.     My parent also arranged for me to see an endocrinologist who runs a gender clinic for children and young adults within a hospital in Providence, Rhode Island. The endocrinologist diagnosed me with gender dysphoria based only on my statements alone and immediately prescribed estrodial (estrogen) and spironolactone (a testosterone blocker) on the first visit.

11.     The endocrinologist told me that the hormones would feminize my body, but downplayed the side effects, saying things like, "There is a minor risk of blood clots, but it's not a big deal because you don't see cis women dropping dead of blood clots every day."

12.     I began the hormone regimen at age 15 with my parent's consent. My other parent eventually "came around" to support my female identity and transition.

13.    I experienced significant negative psychological effects from the hormones. I became depressed to the point that I was not getting out of bed. I became too anxious to go anywhere or talk to people and skipped school for months on end. I ended up dropping out of school.

14.    I also developed an eating disorder and addiction to the internet. I clearly was not functioning healthfully, but my parent and therapist continued to move me along the "gender affirmation path."

15.    I was scheduled for surgery when I was 17. Once the time for the surgety came closer I had fears and doubts about the surgery that I mentioned to my doctor, but she told me it was nothing to worry about and that soon I would have a brand new (vulgar word for female genitalia). I also expressed some of these fears to my parent but was similarly told that the surgeries would be good for me and that I had nothing to worry about. Soon after turning 18 I got on a plane to travel to Washington DC where my testicles and penis were removed, I was given a vaginoplasty to create an artificial vagina, and I received plastic surgery on my face.

16.    About a year into the treatments I started having doubts. I would talk myself out of the second thoughts.

17.    Whenever I wanted a higher dose of estrogen the doctor complied and glossed over any negative side effects. She also put me on progesterone to give my body a more feminine appearance. During the time that she treated me her demeanor

4

was wholly unprofessional. I later learned that the high dose of estrogen could have caused blood clots.

18.  I was never offered any alternatives to medication and surgery.

19.  No one attempted to explore any underlying reasons for my depression and discomfort with being male. No one suggested to me that I could become comfortable just being a "feminine" male.

20.  I was only told that I was "born this way." No medical professional asked deeper questions because apparently none thought they should.

21.  I realized that the treatments had not improved my life and returned to living as a male at age 20.

22.  I am 21 years old. My body is completely ruined. I do not have any good options. My body is going to be a "freak" no matter what I do.

23.  Even, as was true in my case, when parents consent to the treatments, these hormone and surgical treatments put kids and young people on a path of harm.

24.  I was not able to grow up in a healthy way. I have been deeply scarred by these treatments. My relationship with my parent, whom I wish would have protected me, is deeply strained.

25.  I know from experience that this path leads to depression, suicide, or ending up like me, physically marred and out of place with everyone. At times I do

5

not even feel like a person, but more like a freak. Even if some may feel they want the treatments as I did, these treatments lead nowhere good. I do not want to see other young people similarly harmed.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 3, 2022.

/s/ *C.G.*
C.G. (pseudonym)

# Appendix Attachment

# 14

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

| | |
|---|---|
| AUGUST DEKKER, legally known as ) | |
| KORI DEKKER; BRIT ROTHSTEIN; ) | |
| SUSAN DOE, a minor, by and through ) | Civil Action No. |
| her parents and next friends, JANE ) | 4:22-cv-00325-RH-MAF |
| DOE and JOHN DOE; and K.F., a ) | |
| minor, by and through his parent and ) | |
| next friend, JADE LADUE, ) | |
| ) | |
| *Plaintiffs*, ) | |
| v. ) | |
| ) | |
| SIMONE MARSTILLER, in her ) | |
| official capacity as Secretary of the ) | |
| Florida Agency for Health Care ) | |
| Administration; and FLORIDA ) | |
| AGENCY FOR HEALTH CARE ) | |
| ADMINISTRATION, ) | |
| *Defendants*. ) | |

Declaration of Camille Kiefel In Support of Defendants' Opposition to Plaintiffs'
Motion for Preliminary Injunction

I, Camille Kiefel, declare as follows:

1.      I am over the age of 18 years and am not a party to this action. I have

actual knowledge of the following facts and if called upon to testify to them could

and would do so competently. I am submitting this Declaration in support of De-

fendants' opposition to Plaintiffs' Motion for a Preliminary Injunction and Com-

plaint.

1

2.     Florida Administrative Code § 59G-1.050(7), which prohibits Medicaid coverage for medical and surgical interventions meant to "alter primary or secondary sexual characteristics," is a necessary and potentially life-saving regulation that will protect vulnerable young people from physical and mental harm, irreversible physical changes, and deep regret that I have experienced.

3.     The Florida regulation is particularly important to me in that my surgery was paid for by Medicaid. Had a regulation like Florida's been in place when I sought my surgery, it would have required me to pause before undergoing surgery and perhaps prevented me from the loss of health body parts I now regret.

4.     I suffered a series of traumatic events while growing up that distorted my view of the sexes. My parents went through a difficult divorce in which my mom was emotionally dysfunctional and spiteful, while my dad was more stable. In fifth or sixth grade, I began to wear girly preteen fashion and my dad told me how men his age talked about girls my age. My dad told me later that he was concerned about me being promiscuous. Then my friend was raped by her brother and the police interviewed me. I found the whole experience traumatic.

5.     I was diagnosed with ADHD and put on medication to which I reacted poorly. That made me further lose respect for my mom because she had put me on the medication.

2

6.     I then began to dress masculine. Previously an avid writer, I developed writer's block. I then focused on Anime.

7.     In high school, I changed my diet and stopped eating meat. I started to have depression. There is evidence that suggests a meatless diet can contribute to depression.

8.     In college I was ostracized by the "call out" culture, because in that culture if you are not part of a group then you are worthless.

9.     I have done all kinds of therapy over the course of 20 years, including talk therapy, hypnotherapy, EMDR (eye movement desensitization and repro-cessing), DBT (dialectical behavior therapy), TMS (transcranial magnetic stimula-tion therapy), Somatic Experiencing, and medications.

10.     In 2016, I started seeing a gender therapist and came out as nonbinary.

11.     I was still dealing with anxiety and depression and in 2020 I was on my second set of TMS, trans-cranial magnetic stimulation, treatments which helped some but not as much as I felt I needed. So, I turned to top surgery for an answer.

12.     I did not want to be a man or a woman but instead wanted out of all sex types. I had a double mastectomy with nipple grafts in August 2020, not to emulate either sex but to be non-binary.

13.    I had seen "female to non-binary" "top surgery" on the internet and believed it was an accepted, proven treatment. I did not realize at the time that it is experimental and had discomfort around my breasts due to trauma.

14.    I received two letters recommending surgery from two mental health professionals at gender clinics one in May 2020 and the second in July 2020. Although I had a number of mental health issues and years of treatment, these providers did not review or ignored my records nor did they do a psychological evaluation even though they acknowledged that I had trauma.

15.    I developed complications from the surgery. I developed "Raynaud's Syndrome" in which one's capillaries shrink and caused my extremities to get cold and discolored. This caused great discomfort. I also developed a burning sensation in back of my neck, tinnitus (ringing) in my ears, musculoskeletal issues, skin discoloration, most likely bone spurs, and insomnia.

16.    My suicidal ideation worsened. I became terribly sleep deprived and my anxiety worsened. I became deeply depressed and distraught over time after the surgery. I knew something was going wrong with my body. My mother had to lay down with me to help me sleep. I had many physical problems and made many trips to the ER. The doctors were stymied. My mother talked to me about psychiatric hospitalization.

17.     Rather than fixing my problems, the surgery made my physical and mental health worse.

18.     I began to focus on holistic treatments through my own research with the help of a naturopathic doctors, bodywork practitioners, and trained staff certified in functional hyperbaric medicine who did treatments that helped restore balance to my nervous system. The holistic treatments helped me a great deal, and as my physical health improved so did my mental health. I began a slow progression to reconnect with my female body and womanhood.

19.     I began looking at different information that offered different perspectives than I had received from internet transgender sources.

20.     I detransitioned in 2022 when, after the effective holistic treatments, I was at peace with the realization that I am a woman.

21.     I hate that I underwent the surgery. I can never breast feed if I have children. For many years I did not want a family because I felt so poorly physically and mentally. Now I want to marry and have kids. I can't fit clothing the same way again.

22.     I believed that I was doing everything I was supposed to do. Now I realize that I was having a number of physical and mental health problems that no professionals investigated or addressed before prescribing a treatment that caused me to lose a part of my body.

5

23.     Surgery is such a drastic, irreversible step. As I experienced, we do not truly know what these surgeries will do to the body – they are experimental. They are doing surgeries for a state that does not exist in nature. Those undergoing the surgeries are putting their bodies at risk and subjecting their bodies to trauma.

24.     I am quite concerned that doctors are not running the right lab tests or doing the right holistic medical assessments to find out what is truly causing gender dysphoric patients their dysphoria and the desire to surgically remove parts of their body.

25.     I have significant concerns about the experimental nature of the surgery. There is no biological blueprint for the surgery. There are no controlled studies. As I have experienced, because of the experimental and unpredictable nature of these surgeries the medical care one receives afterward is abysmal because they don't know what to do for you. These surgeries should not be funded by tax dollars.

I declare under penalty of perjury that the foregoing is true and corrected.

Executed on October 3, 2022.

/s/ *Camille Kiefel*
Camille Kiefel

# Appendix Attachment

# 15

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division**

| | | |
|---|---|---|
| AUGUST DEKKER, legally known as KORI DEKKER; BRIT ROTHSTEIN; SUSAN DOE, a minor, by and through her parents and next friends, JANE DOE and JOHN DOE; and K.F., a minor, by and through his parent and next friend, JADE LADUE, | ) ) ) ) ) ) ) ) | Civil Action No. 4:22-cv-00325-RH-MAF |
| *Plaintiffs*, | ) ) ) | |
| v. | ) ) | |
| SIMONE MARSTILLER, in her official capacity as Secretary of the Florida Agency for Health Care Administration; and FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION, | ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

**Declaration of Carol Freitas In Support of Defendants' Opposition to Plaintiffs'
Motion for Preliminary Injunction**

I, Carol Freitas, declare as follows:

  1. I am over the age of 18 years and am not a party to this action. I have

actual knowledge of the following facts and if called upon to testify to them could

and would do so competently. I am submitting this Declaration in support of

Defendants' opposition to Plaintiffs' Motion for Preliminary Injunction and

Complaint.

2. Florida's Rule 59G-1.050(7) of the Florida Administrative Code prohibits Medicaid coverage for medical and surgical interventions meant to "alter primary or secondary sexual characteristics." This rule is a much needed regulation that will protect dysphoric young people from focusing on treatments that may ultimately seriously harm their physical and emotional health and that overlook untreated mental health issues and negative social influences and displace other more effective and less intrusive options.

3. As a youth, I was what some describe as "gender non-conforming," but I lived in a household where gender expression was strictly aligned with cultural stereotypes. I was not allowed to wear boys' clothes or play boys' sports.

4. At puberty I realized I was same-sex attracted with crushes on girls. I became depressed and anxiety-ridden as fear what "being gay" might mean to how I lived my life and my family relationships. I later dropped out of high school.

5. At age 20 I began to meet other LGBT youth and my life stabilized. However, I also learned that many masculine females, like me, felt that they were "born in the wrong body" and were transitioning, so I adopted that persona.

6. I went to a gender therapist who diagnosed me with gender dysphoria and told me that transition was the only treatment that would alleviate my discomfort and anxiety.

7.      However, at that time there were gatekeeping standards for gender transition, which required that I first live as man for six months, including using a male name, showing a male appearance, and using male spaces. I had very large breasts and could not pass for a male in male spaces, so I did not pursue testosterone at that time. I viewed myself as a male trapped in the "wrong body," but my mental health otherwise was stable.

8.      In 2014, I revisited the idea of transitioning, believing it would make me feel better because I was undergoing trauma in various forms. My grandmother who had practically raised me died. I had suffered severe abuse and neglect in childhood, and in retrospect believe I was experiencing symptoms of PTSD from that. I had just become a new mother a couple of months before my brother-in-law committed suicide.

9.      I spiraled downward and wanted out. I couldn't commit suicide because I was a mother, so I returned to the idea of transition, believing it would help me feel better. By that time the requirements for testosterone had lessened. I went to Planned Parenthood for testosterone and was given it right away.  I was not given any information on uterine atrophy, vaginal atrophy, or other effects of testosterone and the staff did not talk about any of my emotional or mental health issues.

10.     Four months after starting testosterone, I went to a plastic surgeon for a double mastectomy.  I needed a letter from a therapist and received one from the

3

therapist who had affirmed me and originally recommended transition. As was true with testosterone, I was not given any information about the procedure. Instead, I had a consultation with the surgeon, who said "this is what we are going to do," drew on my chest, took pictures and asked me what I wanted out of the surgery. He said, "we'll create a masculine looking chest, you'll look great."

11.     During the first four months on testosterone menstruation stopped, my sex drive went way up, my voice deepened, and facial and body hair came in. As I continued on testosterone, my personality changed drastically and my verbal abilities declined. Testosterone lowered and muted my emotions and empathy, but also gave me a lot of energy and a sense of a high. My depression and anxiety worsened to the point that I was having such severe panic attacks that I could not leave home. I told my doctors that I thought the testosterone was making the anxiety worse, but they said no.

12.     I went to a psychiatrist to deal with the depression and I was provided with an anti-depressant that really worked. I felt mentally stable and able to address the trauma that led me to transition.

13.     Within a month of starting the anti-depressant, I realized that I had not needed to transition. It was the biggest mistake I had ever made. I did not detransition for a year because I couldn't believe that it was so easy, i.e., that anti-depressants alleviated my depression and enabled me to think clearly and reason better. This

4

allowed me to address my internalized homophobia and childhood abuse through therapeutic means.

14.   Meanwhile, my health began going downhill. Before going on testosterone, I had no health problems. After being on it for four years, I was pre-diabetic, had high cholesterol, and had a high red blood cell count to the point that doctors were recommending that I donate blood to reduce the volume.

15.   I stopped taking testosterone and four months later my blood work was back down to normal. I thought to myself "How do they [doctors] not know about this?" Going off testosterone allowed me to finally sleep. I felt like I never slept all the time that I was taking testosterone. Going off testosterone also helped with empathy and other emotions. My personal relationships, including my relationship with my wife, were better.

16.   I believe that healthcare providers did not ask me about mental health issues because they believed that those issues were caused by gender dysphoria and that transitioning would fix the problem. In fact, the opposite was true.

17.   Florida's Rule is necessary and essential because it will give gender dysphoric people the chance to work through and address their underlying issues such as depression, trauma, or PTSD effectively without doing their body harm and undermining their health. I would have been spared physical, psychological, and emotional losses if I had received a proper diagnosis and treatment for PTSD and

5

depression instead of undergoing years of medical and surgical interventions. Prioritizing treatments focused solely on gender dysphoria caused my doctors to miss the real mental health issues that should have been treated by other more effective, less destructive means.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 3, 2022.

/s/ *Carol Freitas*
Carol Freitas

6

# Appendix Attachment

# 16

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division**

AUGUST DEKKER, legally known as          )
KORI DEKKER; BRIT ROTHSTEIN;             )
SUSAN DOE, a minor, by and through       )      Civil Action No.
her parents and next friends, JANE       )      4:22-cv-00325-RH-MAF
DOE and JOHN DOE; and K.F., a            )
minor, by and through his parent and     )
next friend, JADE LADUE,                 )
                                         )
                          *Plaintiffs*,  )
v.                                       )
                                         )
SIMONE MARSTILLER, in her                )
official capacity as Secretary of the    )
Florida Agency for Health Care           )
Administration; and FLORIDA              )
AGENCY FOR HEALTH CARE                   )
ADMINISTRATION,                          )
                          *Defendants*.  )
_____  )

**Declaration Of Chloe Cole In Support Of Plaintiffs' Opposition to Defendants'
Motion For Preliminary Injunction.**

I, Chloe Cole, declare as follows:

1.      I am 18 years and am not a party to this action. I have actual knowledge

of the following facts and if called upon to testify to them could and would do so

competently. I am submitting this Declaration in support of Defendants' opposition

to Plaintiffs' Motion for a Preliminary Injunction and Complaint.

2.      Florida   Administrative   Code   §   59G-1.050(7),   which   prohibits

Medicaid coverage for medical and surgical interventions meant to "alter primary or

1

secondary sexual characteristics," is a necessary and potentially life-saving regulation that will protect vulnerable young people from the heartbreaking regret, irreversible physical changes, and emotional pain that I have experienced.

3.     Starting around the age of 12, I began to believe that I was transgender. This belief was not organic. All the media I consumed as a kid showed me how stupid and vulnerable being a girl was. All the sexualized images of women gave me an unrealistic expectation of womanhood.

4.     I spent a lot of time online and quickly saw all the praise coming out as "trans" got on Instagram and other social media. I was a bit awkward in school and had some trouble making friends.

5.     Like many dysphoric children, I also suffered from a variety of mental health conditions, such as ADHD, so I easily fell prey to the narrative that if I felt different, and did not want to be a highly sexualized girl, that I must be a boy.

6.     I obsessed over becoming a boy. I believed that all of my insecurities and anxiety would magically disappear once I transitioned. The mental health professionals did not try to dissuade me of this delusional belief.

7.     I was fast-tracked into medical transition after I was diagnosed with Gender dysphoria. In my home state of California, a child can pick their gender identity and a care provider cannot question that choice because it would be regarded as illegal conversion therapy. This wasn't a misdiagnosis, it was mistreatment.

2

8.      I was diagnosed with gender dysphoria by a "gender specialist" when I was 12. The gender specialist told my parents that children know their gender from a young age, and I know what's best for myself.  The specialist cited the suicide rate and said, "If you don't affirm your child she will commit suicide." The specialist asked them, if they would they rather have a "dead daughter or live son." My parents complied because they were not offered any other treatment solution for my distress. My distraught parents wanted me alive, so they listened to my doctors.

9.      I started receiving puberty blockers at age 13. A month later I was put on testosterone. I stayed on puberty blockers for a year and on testosterone for three years. At the time I received the hormones, the endocrinologist cited some of the risks, including vaginal atrophy and inability to have children. However, I did not really understand what that would mean and didn't realize that could involve other pelvic structures. I was in 8th grade. I had no concept of what it would someday mean to me as an adult to have children. I cannot imagine a doctor asking a child this and expecting them to make a mature judgment.

10.     While taking the hormones I began having severe hot flashes, like women in menopause. My entire body got very itchy. After a while I would sometimes hear loud cracks in my neck and back.

11.     The hormones caused atrophy of my urinary track. I suffered from urinary track infections and blood clots in my urine. I did not want to discontinue

3

testosterone because I wanted to continue to be treated as a boy. I also developed digestive problems.

12.   I also experienced a very heightened libido which was very difficult to deal with at such a young age. This caused me to make a lot of regrettable sexual decisions.

13.   The treatments seemed to worsen my mental health the longer I was on them. My anxiety got worse, and I became prone to making rash and regrettable decisions. And as discussed below, I also became suicidal.

14.   I was approved for a double mastectomy at 15. I had been binding my breasts for about two years. I had been groped by a classmate in 8th grade and wanted to make sure that did not happen again. From the time I began seeking a mastectomy to having my breasts removed was only six months. There was no psychological evaluation. I was simply referred to a surgeon by a gender specialist.

15.   During the surgery, the nerve endings and blood vessels in my breast tissue were severed and my nipples were removed and grafted onto another part of my chest to make my chest appear more masculine. So I will not have normal sensation.

16.   I have had serious complications from the surgery. After 2 years the skin at the surgical site started to regress and the top layer of skin is failing to heal.

The tissue continually emits fluid, such that I have to wear bandages. I was given the impression that the grafts would heal in nine months, but that is not true.

17.     The surgery has also affected me mentally as I am really struggling with the fact that I will not be able to breast feed my future children. I was told about this, but no teenager is able to grasp what that means.

18.     About 11 months after my surgery I began experiencing grief. I realized this was a mistake, that I had lost a part of my body that will mean that I will not be able to bond in an important way with any future children and might not be able to even have children.

19.     I started to become suicidal for the first time. I was not suicidal prior to the treatments. I was beginning to feel growing alienation. I began to experience increasing suicidal thoughts. Although I did not act on them, they were taking a toll on me.

20.     I broke down one night as it all came to a head and made the decision to stop the testosterone. I also dropped the male identification and began to identify again as a female.

21.     At first some things got worse as I had more UTIs, more blood clots in my urine, and worse digestive issues. I was very emotionally volatile, and my suicidal ideation got worse. I became very sick and lost a lot of weight. My overall

mental health got worse. I had to drop out of school and get a GED because I couldn't perform at school.

22.     Over time my body began to readjust. My features resoftened. The fat in my body and body shape began to return to a female form and I have regained the weight.

23.     Currently my mental health is stable. The treatments were just band aids for my mental health issues. I still struggle, but my depression and anxiety have improved.

24.     At no point in my journey did anyone explore why I did not want to be girl.

25.     More and more kids are falling for the false promise of happiness if they transition. Gender clinics in the United States are turning a blind eye to European countries, who are pumping the brakes on this experiment on youth.

26.     Fortunately, Florida regulators are not turning a blind eye. Enacting the regulation that bans Medicaid payment for these treatments is an important step in the state doing no harm to its citizens through these treatments. It should not have been an option for me to be prescribed hormone treatments that caused me harm and may have affected my fertility, or to have my healthy breasts removed at the age of 15. This regulation will help decrease the chance that it will be an option for

6

vulnerable teenage girls in Florida. Taxpayer money should not go toward paying for child mutilation and child sterilization.

27.    Even for adults, these treatments are at best cosmetic. They do not enhance function, but actually take away functions from the body. They are elective. The state should not be paying for treatments that actually remove or distort normal bodily functions, and yet do not bring long-term relief.

I declare under penalty of perjury that the foregoing is true and corrected.

Executed on October 3, 2022.

/s/ *Chloe Cole*
Chloe Cole

7

# Appendix Attachment

# 17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

AUGUST DEKKER, legally known as )
KORI DEKKER; BRIT ROTHSTEIN; )
SUSAN DOE, a minor, by and through )          Civil Action No.
her parents and next friends, JANE )          4:22-cv-00325-RH-MAF
DOE and JOHN DOE; and K.F., a )
minor, by and through his parent and )
next friend, JADE LADUE, )
                                   )
                        *Plaintiffs*, )
v.                                   )
                                   )
SIMONE MARSTILLER, in her )
official capacity as Secretary of the )
Florida Agency for Health Care )
Administration; and FLORIDA )
AGENCY FOR HEALTH CARE )
ADMINISTRATION, )
                        *Defendants.* )
_____ )

Declaration of KathyGrace Duncan In Support of Defendants' Opposition to
Plaintiffs' Motion for Preliminary Injunction

I, KathyGrace Duncan, declare as follows:

1.     I am over the age of 18 years and am not a party to this action. I have

actual knowledge of the following facts and if called upon to testify to them could

and would do so competently. I am submitting this Declaration in support of

Defendants' opposition to Plaintiffs' Motion for Preliminary Injunction and Complaint.

2.      Florida's Rule 59G-1.050(7) of the Florida Administrative Code (the "Challenged Exclusion") prohibits Medicaid coverage for medical and surgical interventions meant to "alter primary or secondary sexual characteristics." This Rule is an appropriate and necessary regulation that will protect young people and patients of any age from the regret of false promises, untreated trauma, and irreversible physical changes and lost previously healthy body parts.

3.      From a very young age, I was what is called today "gender non-conforming." I preferred male clothing, I thought I was a "boy" and I wanted to live as one.

4.      I grew up in a dysfunctional family in which my mother was often the victim of my father's emotional and verbal abuse. As a result I internalized the message that "my dad would love me if I were a boy."

5.      Sexual abuse by a family member between the ages of 10 and 12 further convinced me that being a girl meant being unsafe and unlovable.

6.      In sixth grade, I learned about female to male transsexuals. I believed that my distress was caused by not having the "right" body and the only way to live a normal life was to medically transition and become a heterosexual male.

7.     At age 19, I began living as a man named Keith and went to a therapist who formally diagnosed me with gender dysphoria. I began testosterone and a year later had a double mastectomy. At the time, I believed it was necessary so that what I saw in the mirror matched what I felt on the inside.

8.     I never viewed my condition as touching on mental health issues, and neither did the therapist who diagnosed me. The question of whether my self-perception and desire to transition was related to her mental health issues was never explored.

9.     After 11 years passing as a man and living what I thought was a relatively "happy" and stable life (which included having a number of girlfriends), I realized that I was living a lie built upon years of repressed pain and abuse. Hormones and surgery had not helped me resolve underlying issues of rejection, abuse, and sexual assault. I came to understand that my desire to live as a man was a symptom of deeper unmet needs.

10.    With the help of life coaches and a supportive community, I returned to my female identity and began addressing the underlying issues that had been hidden in my attempt to live as a man. I experienced depression that I had repressed for years and grieved over the irreversible changes to my body.

11.    If someone had walked with me through my feelings instead of affirming my desire to transition, then I would have been able to address my issues more effectively and not spend so many years making and recovering from a grave mistake.

12.    Florida's Rule is necessary and essential because it will give gender dysphoric young people (and even older adults) a chance to work through their feelings, which can be overwhelming and deeply confusing, and address their underlying issues effectively without being pulled onto the affirmation medical conveyor belt.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 3, 2022

/s/ *KathyGrace Duncan*
KathyGrace Duncan

# Appendix Attachment

# 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division**

AUGUST DEKKER, legally known as )
KORI DEKKER; BRIT ROTHSTEIN; )
SUSAN DOE, a minor, by and through )    Civil Action No.
her parents and next friends, JANE )    4:22-cv-00325-RH-MAF
DOE and JOHN DOE; and K.F., a )
minor, by and through his parent and )
next friend, JADE LADUE, )
                      )
          *Plaintiffs,* )
v. )
                      )
SIMONE MARSTILLER, in her )
official capacity as Secretary of the )
Florida Agency for Health Care )
Administration; and FLORIDA )
AGENCY FOR HEALTH CARE )
ADMINISTRATION, )
          *Defendants*. )

**Declaration of Sydney Wright In Support of Defendants' Opposition to Plaintiffs'
Motion for Preliminary Injunction**

I, Sydney Wright, declare as follows:

    1.    I am over the age of 18 years and am not a party to this action. I have

actual knowledge of the following facts. I am submitting this Declaration in

support of Defendants' opposition to Plaintiffs' Motion for a Preliminary Injunction.

    2.    Florida's Rule 59G-1.050(7) of the Florida Administrative Code (the

"Challenged Exclusion") prohibits Medicaid coverage for medical and surgical

interventions to "alter primary or secondary sexual characteristics." This Rule is

needed to protect vulnerable young people from being misled and from physical harm like what I experienced.

3.      I'm a 23-year-old woman who spent a year as a "transman" after taking mega doses of testosterone at age 18.

4.      I began to identify as transgender in 2017 during counseling after reading about transgenderism on the internet. I had not experienced feelings of gender dysphoria prior to this time.

5.      A neighborhood boy engaged in sexually touching with me from age 5 to 12.  This awakened sexual feelings at too young an age and caused me to feel unsafe.

6.      I was very tomboyish growing up and was sometimes bullied. I began having same-sex attractions as a teen. I was raised in a strict religious home, where homosexuality was frowned upon. When my father learned that I had same-sex attractions he kicked me out of his house (my parents divorced when I was 12) and I went to live with my mother.

7.      I was first introduced to transgenderism on social media at around age 18. I began to question if I was really a man because I was attracted to girls.

8.      I cut my long blond hair, which caused me to look more masculine. This made me want to move quickly through transition.

9.    I started seeing a counselor on June 13, 2017. I disclosed to the counselor that I had been sexually molested for years as a child, about my parents' contentious divorce, and about my dysfunctional relationship with both parents. I also disclosed that I was in a dysfunctional marriage to a physically abusive woman who bought and sold drugs.

10.    The counselor did not explore how any of this history might be contributing to my dysphoria, but simply asked some questions and diagnosed me with gender dysphoria and gave me a recommendation to a physician for testosterone treatment within five weeks of our first meeting.

11.    My frame of mind at the time, at age 18, was that I believed I might have been "born in the wrong body" and needed to correct it.  But I was also unsure, confused, and in need of guidance.  Had a professional told me the truth and helped me explore why I was distressed by being a girl (and a lesbian) in a nonjudgmental way, I would not have proceeded with testosterone.

12.    However, that was not the case, and I met with the doctor in Atlanta Georgia to whom the counselor referred me.  The visit lasted about 10 minutes.  He asked me for my "hormone letter," but did not open it or read it. He did not ask any questions to confirm that I had gender dysphoria or any questions concerning my medical history or past or present physical condition or symptoms.

13.    I told the doctor that I was nervous, and he simply asked, "Do you want to do this?" and told me I could pick up the testosterone that day. I asked the doctor if he would administer the injections in the office. He said no and told me to go home and look on You Tube to find out how to give myself the shots, indicating "There's no wrong way to do it." I later learned that the shots were supposed to be administered intramuscularly after administering them subcutaneously in my stomach which caused pain and bubbles to form under the skin.

14.    My voice began to deepen, which I have found out is going to be a permanent, irreversible change.

15.    I gained over 50 pounds and became pre-diabetic. When I mentioned this to the physician during a follow up appointment, he just told me to start working out.

16.    After about a year on testosterone, test results revealed that my blood was starting to thicken, my red blood cell count was too high, and I was developing a blood disorder that could lead to a heart attack or stroke if not controlled. I did some research and believe this was polycythemia. I began experiencing chest pains and was told I had developed a blood clot in my lungs because of the thickening blood. I also developed tachycardia.

17.    I began suffering excruciating and constant abdominal pain and could not eat. Testing did not reveal any disorders. I was later diagnosed with irritable bowel syndrome, which I continue to suffer with.

18.    The pain was becoming so excruciating that I became suicidal. My mental health was deteriorating as I was suffering from depression, irritability, insecurity, and exhaustion.

19.    The changes brought on by the testosterone caused my family tremendous emotional distress. Finally, my grandfather sat me down with tears in his eyes and asked me to stop what I was doing to myself. That was a saving grace. I would have let the treatment kill me before admitting that I had made a mistake. My grandfather's intervention saved my life.

20.    I stopped taking testosterone and resumed living as a female. My physical and mental health have improved, but I continue to suffer adverse effects from the treatments, including a deepened voice and digestive issues that I've been told will be permanent.

21.    I also suffer extreme regret for the choices I made as a teenager. I trusted the doctors' advice. They were the experts, who was I as a confused and scared 18-year-old not to listen to them?

22.    But telling an 18-year-old girl that mega-doses of testosterone would fix her mental health problems? They didn't even talk to me about other treatment

options. No doctor or therapist suggested I give myself time to grow up, or suggested counseling for what was causing my feelings - no doctor or therapist told me most young people outgrow their feelings of wanting to be the opposite sex. The only advice I got was to take mega-doses of testosterone.

23.     Unfortunately, there are more and more young people like me being deceived every day, being told that the solution to their insecurity and identity problems is to get a "sex change." The problem is a person's sex can't really be changed. You can take hormones and have cosmetic surgeries, but that doesn't really change your sex, or solve your problems. I wish I knew that when I was younger.

24.     Florida's Rule is a critical and necessary regulation that will help spare Florida citizens from being similarly misled and suffering the distress I am continuing to suffer because of the availability of medical interventions to young people like me. This Rule will save a lot of pain and may even save lives.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 3, 2022.

/s/ *Sydney Wright*
Sydney Wright

# Appendix Attachment

# 19

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

| | |
|---|---|
| AUGUST DEKKER, legally known as ) | |
| KORI DEKKER; BRIT ROTHSTEIN; ) | |
| SUSAN DOE, a minor, by and through ) | Civil Action No. |
| her parents and next friends, JANE ) | 4:22-cv-00325-RH-MAF |
| DOE and JOHN DOE; and K.F., a ) | |
| minor, by and through his parent and ) | |
| next friend, JADE LADUE, ) | |
| ) | |
| *Plaintiffs*, ) | |
| v. ) | |
| ) | |
| SIMONE MARSTILLER, in her ) | |
| official capacity as Secretary of the ) | |
| Florida Agency for Health Care ) | |
| Administration; and FLORIDA ) | |
| AGENCY FOR HEALTH CARE ) | |
| ADMINISTRATION, ) | |
| *Defendants*. ) | |
| ) | |

### Declaration of Zoe Hawes In Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction

I, Zoe Hawes, declare as follows:

1.     I am over the age of 18 years and am not a party to this action. I have actual knowledge of the following facts and if called upon to testify to them could and would do so competently. I am submitting this Declaration in support of Defendants' opposition to Plaintiffs' Complaint and Motion for Preliminary Injunction.

2.     Florida Administrative Code § 59G-1.050(7), which prohibits

1

Medicaid coverage for medical and surgical interventions meant to "alter primary or secondary sexual characteristics," is a necessary and potentially life-saving regulation that will protect vulnerable young people from the regret of false promises, deteriorating mental health and loss of life.

3.      I'm a 23-year-old wife and expectant mother who would have been deprived of motherhood if state funding of medical and surgical interventions had been available when I was a traumatized teenager looking for a quick fix to relieve my pain.

4.       A series of traumatic events, including my parents' divorce when I was 8 years old, my mother's mental health struggles, including her suicide attempts, and being molested by a classmate at school, left me with significant mental health problems by the age of 15.

5.      I was diagnosed with major depression, anxiety, complex PTSD and Obsessive-Compulsive Disorder by different doctors at mental hospitals. I saw several therapists and psychiatrists.

6.      When I was 16 years old, I was attracted to women and began researching the LGBTQ community online. I came across a book, "Some Assembly Required," which was a memoir of a female to male transgender young person. I was extremely depressed at the time and immediately resonated with the young person's story. It became the explanation I clung to for the pain in my life.

2

7.      My mom found a gender therapist who did the bare minimum required to be able to write a letter approving me for hormones. I saw her for three months, but she asked me very few questions. I was desperate to get the hormones, so I was willing to say anything to get the letter.  I was diagnosed with gender dysphoria and encouraged to pursue medical transition.

8.      Once I received the letter from the gender therapist, an Endocrinologist prescribed testosterone for me at age 16 with my mom's consent. At first, my mother did not know what to think, but I was so suicidal that she was willing to go along.

9.      I was on testosterone for nearly 4 years. At age 16, I was absolutely convinced that I was a male in a female body, and that transitioning from female to male was the only thing that would bring me peace.

10.     My body started to masculinize pretty quickly after I began testosterone injections. I developed a more male musculature. My hips seemed narrower. My jaw seemed more angular. Facial hair grew. Every change in my body that made me appear more masculine made me euphoric. I was quickly able to present socially as male without people recognizing I had been born female.

11.     I also became more angry and developed debilitating anxiety while on testosterone. I felt tired and gained a lot of weight. My mental health was

3

negatively affected by the testosterone. The initial euphoria would wear off and I would still have the same problems.

12.    I was introduced to the LGBTQ community. I joined an LGBTQ group for young people in my city, where I was "love bombed" and affirmed in my new identity. The group encouraged me to cut off anyone who did not affirm my male identity, new name, and new pronouns. I followed that advice and became estranged from my father and his family, who would not affirm the male identity. I did not talk to my father's family for over four years.

13.    I was also binding my breasts, which was causing chest pain and headaches.

14.    My mental health was terrible while I was on testosterone. I was hospitalized six times while on testosterone and in each case the doctors affirmed my male identity. I was also in outpatient programs multiple times. In 2018, I tried to commit suicide and was again hospitalized. Finally, I began to do the inner work I needed to do to start to heal.

15.    At age 20, I stopped taking testosterone and my body began to regain its female characteristics. I am no longer on any mental health medications or receiving therapy. I believe the gender dysphoria was brought on by trauma and culture – by people and medical professionals encouraging me to believe that becoming a man was an option and transitioning would bring me peace.

16.     I reconciled with my father's family, who remained an anchor to reality and affirmed me as the woman that I am and who have helped me on the long journey to learn what is means to be a woman, a daughter, and now a wife and mother.

17.     At the time that I was taking testosterone, between ages 16 and 20, I desperately wanted gender transition surgeries. I wanted a double mastectomy because I was binding and it was very uncomfortable, so much so that I once had threatened to take a knife to my chest. I also wanted a hysterectomy because at that age I did not want to have to worry about periods or ever getting pregnant.

18.     The only reason I did not get the surgeries was that I did not have the money to pay for them. If the state had been willing to pay for them through Medicaid, then I absolutely would have had them, and would have never found the peace with my female body I now enjoy and would not be able to experience being a mother or breastfeeding my son.

19.     If access to these treatments is easily affordable, then it could do great damage to a young person that may not be able to be undone.

20.     I am convinced that funding these treatments is funding a false chemical or surgical promise – that these chemicals or surgery will bring lasting peace to what is truly causing body dysphoria. This would mask a great deal of

mental illness. It would likely result in increased suicides, as these treatments almost did to me.

21.     By not having state funding available for these procedures, I was saved, as was my future child. This regulation will save lives.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 3, 2022.

/s/ *Zoe Hawes*
Zoe Hawes

6

# Appendix Attachment

# 20

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division**

AUGUST DEKKER, legally known as )
KORI DEKKER; BRIT ROTHSTEIN; )
SUSAN DOE, a minor, by and through )   Civil Action No.
her parents and next friends, JANE )   4:22-cv-00325-RH-MAF
DOE and JOHN DOE; and K.F., a )
minor, by and through his parent and )
next friend, JADE LADUE, )
                         )
               *Plaintiffs,* )
v. )
                         )
SIMONE MARSTILLER, in her )
official capacity as Secretary of the )
Florida Agency for Health Care )
Administration; and FLORIDA )
AGENCY FOR HEALTH CARE )
ADMINISTRATION, )
               *Defendants.* )
_____ )

Declaration of Yaacov Sheinfeld In Support of Defendants' Opposition to
Plaintiffs' Motion for Preliminary Injunction

I, Yaacov Sheinfeld, declare as follows:

     1.    I am over the age of 18 years and am not a party to this action. I have

actual knowledge of the following facts and if called upon to testify to them could

and would do so competently. I am submitting this Declaration in support of

Defendants' opposition to Plaintiffs' Complaint and Motion for Preliminary

Injunction.

2.      Florida's Rule 59G-1.050(7) of the Florida Administrative Code (the "Challenged Exclusion") states that Florida Medicaid does not cover services for the treatment of gender dysphoria.

3.      Florida's Rule will prevent manipulation and coercion on the part of health care providers and from that of their own distressed and confused children to comply with demands for medical and surgical interventions aimed at "affirming" a young person's professed discordant gender identity under threats of alienation or loss of a child to suicide. Most importantly, this law protects vulnerable children and young people from grievous harm and even death.

4.      Had a law like Florida's Rule been in effect Massachusetts my daughter might still be alive today.

5.      My daughter, S. had been in counseling for depression since age 15, but had never said anything about gender dysphoria to her counselor.

6.      At age 17, S.'s mother told me that S. was transgender.  I did not think it was a good idea to pursue transitioning, nevertheless, I told S. that I would help her in any other way.

7.      S. had suffered a lot of rejection in school and was seeking affirmation. Five of her friends announced that they were transgender. When S. said she was transgender too it was seen as fashionable and she finally had the peer acceptance she had not previously experienced in high school.

2