8. When S. went to college at age 18, unbeknownst to me, she began taking testosterone. When I met with her at school, I noticed she was very depressed.

9. A social worker who was also present at my meeting with S., Shannon Sennott, told me that S. was going to get a double mastectomy.

10. When I objected to her taking such a drastic step at such a young age, the social worker told me I was an "Israeli chauvinist", a typical chauvinist male, who doesn't love his child enough. Her approach was that this is what we're going to do and you need to just get on board.

11. The social worker assured me that everything would be fine if I just loved my daughter.

12. After this meeting S. refused to talk to me and began threatening that she would kill herself if she did not get the surgery she wanted. She had a double mastectomy at age 19.

13. I witnessed distressing physical and emotional changes in S. The changes in her because of the testosterone were so distressing that I even considered suicide at one time. S. gained and lost lots of weight, had pain all over her body, suffered from mood swings, could not concentrate, and described herself at times as "barely alive." At one point she was hospitalized in a psychiatric hospital for depression and suicidal thoughts.

14. S. was deeply depressed and taking a significant number of medications along with testosterone. It did not appear any medical professional was monitoring all these medications or even understood their possible interactions. I kept assuring her that I would do whatever I could to help her.

15. S.'s pain became so intense that she began taking Fentanyl.

16. S. was found dead on August 6, 2021 with Fentanyl and alcohol in her system. She was 28. S. had been identifying as a male and taking testosterone for ten years.

17. Florida's Rule and similar laws to not cover services for the treatment of gender dysphoria are critically important because young people, especially those with mental health issues such as S, cannot make clear decisions about their future, particularly when neither they nor their parents are provided with full information about the effects of these interventions. We know from research that the brain is not fully formed until a person reaches her mid-20s, so even a healthy 18-year-old does not have the mental maturity to make life-altering decisions such as taking cross-sex hormones or surgeries that will significantly alter their bodies and impact their mental health.

18. The medical interventions that were promoted to my daughter with a promise that they would relieve her problems, in fact, increased them and led to her death.

19.  Parents should not be put in the position to support decisions for their child that can result in infertility or other life-long harms, especially when the young person has mental health issues that are not being addressed.

20.  Florida's Rule protects parents from being coerced into supporting these decisions through manipulation and threats like the one leveled at me that my daughter would commit suicide if she did not get the intervention she demanded. Most importantly, it will save the lives of vulnerable young people like my daughter.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 3, 2022.

/s/ *Yaacov Sheinfeld*
Yaacov Sheinfeld

# Appendix Attachment

# 21

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
**Tallahassee Division**

| | |
|---|---|
| AUGUST DEKKER, legally known as KORI DEKKER; BRIT ROTHSTEIN; SUSAN DOE, a minor, by and through her parents and next friends, JANE DOE and JOHN DOE; and K.F., a minor, by and through his parent and next friend, JADE LADUE,<br><br>*Plaintiffs*,<br><br>v.<br><br>SIMONE MARSTILLER, in her official capacity as Secretary of the Florida Agency for Health Care Administration; and FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION,<br><br>*Defendants*. | Civil Action No.<br>4:22-cv-00325-RH-MAF |

Declaration of Julie Framingham In Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction

I, Julie Framingham, declare as follows:

1. I am over the age of 18 years and am not a party to this action. I have actual knowledge of the following facts and if called upon to testify to them could and would do so competently. I am submitting this Declaration in support of Defendants' opposition to Plaintiffs' Motion for Preliminary Injunction and Complaint.

1

App. 925

2. Florida's Rule 59G-1.050(7) of the Florida Administrative Code (the "Challenged Exclusion") states that Florida Medicaid does not does not provide coverage for hormonal and surgical interventions to "alter primary or secondary sexual characteristics."

3. Florida's Rule will protect vulnerable young people like my son from grievous harm. This rule will prevent the State from facilitating further harm to vulnerable young people like my son by paying for life-altering and irreversible treatments that will not address their underlying mental health issues and will likely cause such young people to forego needed mental health treatment.

4. My son, T., was an Eagle Scout, martial arts student who at age 22 decided he was transgender. After six years of social transitioning and hormone treatments T. has lost a great deal of weight, is anorexic and extremely underweight, sometimes not eating for days, and has significant mental health problems.

5. T. was depressed as a teenager. He kept his feelings inside and wouldn't see a therapist. T. was not comfortable with his looks and was seen as a geeky, small boy. He showed signs that he hated himself, including refusing to brush his teeth so that they rotted away.

6. There were trans-identified kids at T.'s high school but he showed no interest in them at that time. He attended community college in Tallahassee and

Florida State University, which were very progressive campuses. He was around others who were trans-identifying.

7. At age 19 or 20 T. began wearing girls' accessories. He saw a social worker in Tallahassee for a couple of months, and she gave him information about where to get hormone treatments.

8. He began taking estrogen and spirolactone (lowers testosterone). He got the prescriptions from an endocrinologist at Tallahassee Memorial Hospital and the FSU medical group. I do not know whether any of the practitioners did a psychological evaluation prior to prescribing hormones.

9. T. was binding his testicles for a time in an effort to appear more feminine. However, he developed health problems related to the binding in that it cut off oxygen and permitted infection to develop. As a result T. stopped binding and began to just wear loose-fitting clothing.

10. T. began seeing a therapist when he was 23. He said the therapist was very helpful with dealing with anxiety, but T. refused to talk with the therapist about this trans identity. T. had spent a lot of time online listening to trans advocates who affirmed his trans identity and he would not stay in therapy.

11. The therapist diagnosed T. with borderline personality disorder. Patients with borderline personality disorder often hate themselves and will engage

3

in self-harm. She explained that T. had let his teeth rot away because he hates himself.

12. T. has not undergone any surgeries because he hasn't been able to pay them.

13. T. has not received any treatment for his underlying borderline personality disorder. His father and I are concerned that if the state were to pay for surgery to remove his penis and testicles he will not get the treatment he needs for his actual underlying mental illness. That is a great concern because so long as he has untreated mental illness he will continue to engage in self-destructive behavior and to decline. The trans identification and hormone interventions operate as a vehicle for self-harm. Adding irreversible surgery on top of that would only compound the harm.

14. Florida's Rule 59G-1.050(7) will prevent the state from enabling vulnerable young people like my son to receive life-altering irreversible treatments that result in the loss of healthy body parts and bodily functions and yet will not actually treat what is causing their mental health problems. We are concerned that without this Rule underlying mental health issues such young people are experiencing will go untreated.

15. For T. and many others like him, the regulation would very likely save their lives and a life-time of regret.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 3, 2022.

*/s/ Julie Framingham*
Julie Framingham

# Appendix Attachment

# 22

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
**Tallahassee Division**

| | |
|---|---|
| AUGUST DEKKER, legally known as KORI DEKKER; BRIT ROTHSTEIN; SUSAN DOE, a minor, by and through her parents and next friends, JANE DOE and JOHN DOE; and K.F., a minor, by and through his parent and next friend, JADE LADUE, <br><br> *Plaintiffs,* <br><br> v. <br><br> SIMONE MARSTILLER, in her official capacity as Secretary of the Florida Agency for Health Care Administration; and FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION, <br><br> *Defendants.* | Civil Action No. 4:22-cv-00325-RH-MAF |

Declaration of Jeanne Crowley In Support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction

I, Jeanne Crowley[1] declare as follows:

1. I am over the age of 18 years and am not a party to this action. I have actual knowledge of the following facts and if called upon to testify to them could and would do so competently. I am submitting this Declaration in support of

---

[1] Declarant is submitting this Declaration using a pseudonym to protect the privacy of her children and other family members.

App. 931

Defendants' opposition to Plaintiffs' Complaint and Motion for Preliminary Injunction.

2. Florida's Rule 59G-1.050(7) of the Florida Administrative Code (the "Challenged Exclusion") states that Florida Medicaid does not does not provide coverage for hormonal and surgical interventions to "alter primary or secondary sexual characteristics."

3. This Rule is necessary to prevent parents such as myself from being subjected to coercion, manipulation, alienation from their child and help support parental rights to make medical and mental health decisions that will protect their children's developing bodies and long-term physical and mental health.

4. My husband and I were repeatedly told that the puberty blockers our pre-teen daughter, M., was clamoring for were the answer for her anxiety and distress about her changing body. We were advised that children like M. had high rates of suicide and self-harm and that puberty blockers would help by stopping the development of secondary sex characteristics that cause children distress and "give the children time to explore their identity."

5. Gender-affirming mental health and medical professionals assured us that acceding to our daughter's demand for puberty blockers was necessary for her mental health. We were repeatedly assured that the puberty blockers were nothing more than a "pause button" and completely reversible. We were not told that these

treatments could cause harm to our child's developing bones or that there were no clinical studies establishing them to be safe and effective as a "treatment" for gender dysphoria in children.

6.   Based on these assurances we consented to M. receiving a long-lasting puberty-blocking implant. Once the implant was in place, there was no follow up. I had to initiate contact with the clinic to replace the implant and get necessary lab work.

7.   M. previously had psychological evaluations that revealed depression, Autism Spectrum Disorder (ASD) with sensory issues, dyslexia, and dysgraphia. M. had also experienced social trauma. However, none of these issues was addressed by health care professionals once they determined M. had gender dysphoria. Nor did they offer any other treatment options.

8.   I learned through my own research that puberty blockers were shown to cause loss of bone density and diminished cognitive development. Healthcare professionals did not inform my husband and me about those harms. When we raised the issue, the doctors responded that they have been prescribing the blockers for many years to treat precocious puberty and the reported bone loss was "nothing to worry about."

9.   I had a bone density scan done for M. It revealed that M. has an 11 percent loss of bone density in one hip, 14 percent loss in the other, and a 7 percent

3

loss in the lumbar region. She has developed osteopenia at a time in her life when her bone density should be increasing and her body building a reservoir of strong developing bones as an important protection against osteoporosis in adulthood.

10. When my husband and I confronted the physician to have the puberty blocker implant removed, the doctor recommended that M. continue on to cross-sex hormones, *i.e.,* testosterone. We were not informed this would very likely *sterilize* our child. I declined, pointing out to the doctor that it is estrogen, not testosterone, that improves bone density.

11. Throughout the time that M. was on puberty blockers, we had difficulty finding a therapist to explore M.'s underlying mental health issues. Therapists were unwilling to address anything other than affirming M. as transgender. After we had the blocker removed M. worked with a psychotherapist that was willing to explore the underlying issues with M. However, she continues to have loss of bone density that will significantly affect her physical health and growth and having lasting effects possibly for the rest of her life.

12. The availability of these medical interventions for a pre-teen girl distressed by changes in her body meant that neither M. nor her healthcare providers would consider other alternatives.

13. Florida's Rule will help prevent coercive manipulation and potential harm against vulnerable children like our daughter and should be upheld for the protection of children and their families.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: October 3, 2022.

/s/ *Jeanne Crowley*
Jeanne Crowley (pseudonym)