**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

AUGUST DEKKER, et al.,

    *Plaintiffs*,

  v.

SIMONE MARSTILLER, et al.,

     *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

**SECOND DECLARATION OF ATTORNEY JENNIFER ALTMAN IN**
**SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Jennifer Altman, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over the age of eighteen and make this declaration from my own

personal knowledge. If called as a witness, I could and would testify competently to

the matters stated herein.

2. I am an attorney with Pillsbury Winthrop Shaw Pittman in Miami,

Florida, and I have been retained by Plaintiffs as co-counsel in the above-captioned

matter.

3. I make this Second Declaration in support of Plaintiffs' Motion for

Preliminary Injunction.

4. Attached as **Exhibit M** is a true and correct copy of the plaintiff's

Memorandum of Law in Support of Motion to Exclude the Expert Testimony of James M. Cantor, in *B.P.J. v. West Virginia State Bd. of Ed.*, Case No. 21-cv-00316, ECF 320 (S.D.W.V. May 12, 2022).

5.     Attached as **Exhibit N** is a true and correct copy of the plaintiffs' Memorandum of Law in Support of Motion to Exclude Expert Testimony of Dr. Patrick W. Lappert, in *Kadel et al. v. Folwell et al.*, Case No. 19-cv-00272, ECF 209 (M.D.N.C. Feb. 2, 2022).

6.     Attached as **Exhibit O** is a true and correct copy of a deposition transcript for Dr. Michael Laidlaw, in *C.P. et al. v. Blue Cross Blue Shield of Ill.*, Case No. 20-cv-06145 (W.D. Wash. Sept. 2, 2022).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 7, 2022

By: */s/ Jennifer Altman*

Jennifer Altman (Fl. Bar No. 881384)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| B.P.J. by her next friend and mother, HEATHER JACKSON, | |
| *Plaintiff*, | |
| v. | Civil Action No. 2:21-cv-00316 |
| WEST VIRGINIA STATE BOARD OF EDUCATION, HARRISON COUNTY BOARD OF EDUCATION, WEST VIRGINIA SECONDARY SCHOOL ACTIVITIES COMMISSION, W. CLAYTON BURCH in his official capacity as State Superintendent, DORA STUTLER in her official capacity as Harrison County Superintendent, and THE STATE OF WEST VIRGINIA, | Hon. Joseph R. Goodwin |
| *Defendants*, | |
| and | |
| LAINEY ARMISTEAD, | |
| *Defendant-Intervenor*. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE
THE EXPERT TESTIMONY OF JAMES M. CANTOR**

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE AND FACTUAL BACKGROUND ........................................... 1

LEGAL STANDARD ................................................................................................................. 3

ARGUMENT .............................................................................................................................. 5

A.  Dr. Cantor's Primary Opinions Have No Relevance To This Case Because
They Address Issues Beyond The Scope Of The Dispute. ................................................ 6

B.  Dr. Cantor Is Not Qualified To Offer Opinions About The Treatment Of Transgender
Adolescents In This Case. ................................................................................................ 7

    1.  Dr. Cantor Admits That He Is Not Qualified To Offer Opinions
On H.B. 3293 Or Transgender Athletes. ............................................................ 10

C.  Dr. Cantor's Testimony Is Methodologically Unreliable And Unsupported
By Science Or Medicine. ............................................................................................... 12

    1.  Dr. Cantor's Assertions That Transgender Adolescents Are Receiving
"Affirmation On Demand" And That Adolescents Transition Due
To The "Unrealistic Expectation That Transition Will Help Them Fit In"
Are Unsupported. ................................................................................................ 15

    2.  Dr. Cantor Testified That Transgender People Are One Of Three Things:
Autogynephilic, Homosexual, Or Mistaken. ...................................................... 17

    3.  Dr. Cantor's Opinion That No Professional Organization Has Articulated A
Meritorious Position Calling Into Question The Basis For The Act Directly
Contradicts The Fourth Circuit's Holding In *Grimm*. .................................... 18

    4.  Dr. Cantor Has Offered Harmful Opinions Related To Transgender
People And Has Been Removed From Respectable Scientific Societies
For Posting Disrespectful Material. .................................................................... 19

D.  Dr. Cantor's Report, Opinions, And Testimony Lack Probative Value And Are Thus
Inadmissible Under Federal Rule Of Evidence 403. ...................................................... 20

CONCLUSION ......................................................................................................................... 21

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Belk, Inc. v. Meyer Corp., U.S.*,
  679 F.3d 146 (4th Cir. 2012) ............................................................................2, 3

*Bourne ex rel. Bourne v. E.I. DuPont de Nemours & Co.*,
  85 F. App'x 964 (4th Cir. 2004) ...............................................................................6

*Cooper v. Smith & Nephew, Inc.*,
  259 F.3d 194 (4th Cir. 2001) ............................................................................3, 13

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)................................................................................... *passim*

*Dunn v. Sandoz Pharms. Corp.*,
  275 F.Supp.2d 672 (M.D.N.C. 2003) ...................................................................12

*Edmo v. Corizon, Inc.*,
  935 F.3d 757 (9th Cir. 2019) ...................................................................................1

*Edwards v. Ethicon, Inc.*,
  No. 12 Civ. 09972, 2014 WL 3361923 (S.D.W. Va. July 8, 2014)..........................7

*Grimm v. Gloucester Cnty. Sch. Bd*,
  972 F.3d 586 (4th Cir. 2020) .................................................................... *passim*

*Hartke v. McKelway*,
  526 F.Supp. 97 (D.D.C. 1981)............................................................................8, 9

*Knight v. Boehringer Ingelheim Pharms., Inc.*,
  323 F. Supp. 3d 837 (S.D.W.Va. 2018)...................................................................6

*Kopf v. Skyrm*,
  993 F.2d 374 (4th Cir. 1993) ....................................................................................7

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999)..................................................................................................4

*Lebron v. Sec'y of Fla. Dep't of Child. and Fams.*,
  772 F.3d 1352 (11th Cir. 2014) ...............................................................................8

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod.*
  *Liab. Litig. (No II) MDL 2502*,
  892 F.3d 624 (4th Cir. 2018) .................................................................................12

*Martinez v. Sakurai Graphic Sys. Corp., No. 04 C 1274*,
  2007 WL 2570362 (N.D. Ill. Aug. 30, 2007) ...........................................................8

*Mod. Auto. Network, LLC v. E. All. Ins. Co.*,
    416 F. Supp. 3d 529 (M.D.N.C. 2019) ..................................................................3, 8

*Nat'l Ass'n for Rational Sexual Offense L. v. Stein*,
    No. 17 Civ. 53, 2021 WL 736375 (M.D.N.C. Feb. 25, 2021) ............................................4, 13

*O'Conner v. Commonwealth Edison Co.*,
    807 F.Supp. 1376 (C.D. Ill. 1992) ....................................................................8

*Reliastar Life Ins. Co. v. Laschkewitsch*,
    No. 13 Civ. 210-BO, 2014 WL 1430729 (E.D.N.C. Apr. 14, 2014) .......................................8

*Sardis v. Overhead Door Corp.*,
    10 F.4th 268 (4th Cir. 2021) ............................................................. *passim*

*SAS Inst., Inc. v. World Programming Ltd.*,
    125 F. Supp. 3d 579 (E.D.N.C. 2015).................................................................4, 13

*Thomas J. Kline, Inc. v. Lorillard, Inc.*,
    878 F.2d 791 (4th Cir. 1989) ........................................................................3

*Wright v. United States*,
    280 F. Supp. 2d 472 (M.D.N.C. 2003) ................................................................7

**Statutes**

20 U.S.C. § 1681, et seq....................................................................................1

W. Va. Code § 18-2-25d(a)(5) (2021) .......................................................................6

**Other Authorities**

Federal Rule of Evidence 403................................................................................2, 5, 20

Fed. Rule of Evidence 702..................................................................................2, 3

Statement of Undisputed Material Facts ¶ 48, ECF No. 290........................................................6

Statement of Undisputed Material Facts ¶ 59, ECF No. 290.......................................................11

## STATEMENT OF THE CASE AND FACTUAL BACKGROUND

Plaintiff, a twelve-year-old girl who is transgender, challenges the legality of H.B. 3293, a law that categorically bars Plaintiff and any other female athletes who are transgender from participating on girls' and women's sports teams in West Virginia. B.P.J. contends that the law violates her rights under the Equal Protection Clause of the Fourteenth Amendment and discriminates against her based on sex in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.

As part of their defense of H.B. 3293, Defendants identified and disclosed an expert report from Dr. James M. Cantor. Dr. Cantor disagrees with the views of the mainstream medical community and offers testimony that providing gender-affirming care to transgender youth, including permitting social transition for children and puberty-delaying medication and hormone therapy when indicated for adolescents, does not produce better mental health outcomes and is not the accepted standard of care. As discussed below, Dr. Cantor's testimony about the proper medical treatment for transgender youth is not relevant to the claims in this litigation, Dr. Cantor is an adult psychiatrist who is not qualified to present himself as an expert on transgender youth, and his speculative opinions have no grounding in reliable scientific principles and methods.

As the Fourth Circuit recognized in *Grimm*, the standards of care for treating gender dysphoria "[d]eveloped by the World Professional Association for Transgender Health (WPATH), the Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People (7th Version 2012) . . . represent the consensus approach of the medical and mental health community." *Grimm v. Gloucester Cnty. Sch. Bd*, 972 F.3d 586, 595–96 (4th Cir. 2020), *as amended* (Aug. 28, 2020), *cert. denied,* 141 S. Ct. 2878 (2021). "There are no other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical

professional groups." *Id.*; *see also Edmo v. Corizon, Inc.*, 935 F.3d 757, 769 (9th Cir. 2019) (quoting *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125 (D. Idaho 2018)).

Each of Dr. Cantor's proffered opinions is excludable for one or more of three reasons. First, Dr. Cantor's opinions are irrelevant because the opinions he offers about treatment for transgender youth fall outside the scope of the parties' dispute, which is simply whether a law can categorically bar transgender girls and women from girls' and women's sports teams in West Virginia. Second, Dr. Cantor is not qualified to offer opinions about the treatment of pre-pubertal transgender children or transgender adolescents as he does not work with and has not meaningfully studied this population. Third, Dr. Cantor's remaining opinions must be excluded because they are unreliable—they are not based on scientific methodology but rather untested hypotheses, pure speculation, and beliefs that lack any support besides Dr. Cantor's own *ipse dixit*. Because Dr. Cantor's opinions should be excluded pursuant to *Daubert* standards, and because any probative value offered by his testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, and undue delay under Federal Rule of Evidence 403, this Court must exclude them. Dr. Cantor's testimony is not "relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). Dr. Cantor does not possess the "full range of experience and training" to provide expert testimony in this case. *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012), *as amended* (May 9, 2012) (quoting *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009)). And Dr. Cantor's testimony is not "the product of reliable principles and methods[.]" Fed. R. Evid. 702. Therefore, Dr. Cantor's proffered opinions do not qualify under Federal Rule of Evidence 702 as admissible expert testimony.

Plaintiff B.P.J. respectfully submits this memorandum of law in support of her motion to exclude the proffered expert testimony of James Cantor, Ph.D. from consideration at summary judgment or trial as inadmissible under Federal Rule of Evidence 702.

## LEGAL STANDARD

Federal Rule of Evidence 702 places "a special gatekeeping obligation" on a trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Daubert*, 509 U.S. at 597; *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021) (quoting *Nease v. Ford Motor Co.,* 848 F.3d 219, 230 (4th Cir. 2017)); *see* Fed. R. Evid. 702 advisory committee note to 2000 amendments (amendment "affirms the trial court's role as gatekeeper," and that "all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful"). The party offering the expert carries the burden of establishing the admissibility of testimony by a preponderance of the evidence. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001).

A trial court must also determine whether the proposed expert is qualified to render the proffered opinion. In doing so, a trial court considers an expert's professional qualifications and "full range of experience and training[.]" *Belk, Inc.*, 679 F.3d 162. If the purported expert lacks the knowledge, skill, experience, training, or education on the issue for which the opinion is proffered, the trial court must exclude the expert. *See, e.g., Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989); *Mod. Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 3d 529, 537 (M.D.N.C. 2019), *aff'd*, 842 F. App'x 847 (4th Cir. 2021). Even if the expert is deemed qualified, the trial court must consider the relevancy of the expert's testimony as "a precondition to admissibility." *Sardis,* 10 F.4th at 282 (quoting *Daubert*, 509 U.S. at 592). To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Id*. at 281 (quoting

3

*Belville v. Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019)) ("Simply put, if an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded.").

If the opinions offered by the expert are deemed relevant and the expert is qualified to offer testimony, a trial court will inquire if the opinion is based on a reliable foundation, which focuses on "the principles and methodology" employed by the expert to assess whether it is "based on scientific, technical, or other specialized *knowledge* and not on belief or speculation." *Id*. at 281 (citations omitted). When evaluating whether an expert's methodology is reliable, a court considers, among other things:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

*Id*.; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149–50 (1999); *Daubert*, 509 U.S. at 593–94. While trial courts have "broad latitude" to determine reliability, they must engage in the gatekeeping process and not simply "delegate the issue to the jury." *Sardis*, 10 F.4th at 281 (quoting *Nease,* 848 F.3d at 229). When addressing an expert whose methodology is grounded in experience, courts use three factors: "1) how the expert's experience leads to the conclusion reached; 2) why that experience is a sufficient basis for the opinion; and 3) how that experience is reliably applied to the facts of the case." *SAS Inst., Inc. v. World Programming Ltd*., 125 F. Supp. 3d 579, 589 (E.D.N.C. 2015), *aff'd* 874 F.3d 370 (4th Cir. 2017); *see also Nat'l Ass'n for Rational Sexual Offense L. v. Stein*, No. 17 Civ. 53, 2021 WL 736375, at *3 (M.D.N.C. Feb. 25, 2021).

Finally, because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it[,]" "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises *more* control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595 (emphasis added) (quoting Weinstein, Rule 702 of the Federal Rules of Evidence Is

4

Sound; It Should Not Be Amended, 138 F.R.D. 631 (1991).) "As such, 'the importance of [the] gatekeeping function cannot be overstated.'" *Sardis*, 10 F.4th at 283 (quoting *United States v. Barton,* 909 F.3d 1323, 1331 (11th Cir. 2018)).

## ARGUMENT

This is a discrimination case about the ability of girls and women who are transgender to participate on school-sponsored athletic teams. Although the fact that B.P.J. and many other girls and women who are transgender have had puberty-delaying medication or other endocrine care is relevant in responding to the State's argument that they have an athletic advantage rooted in physiology, Dr. Cantor does not purport to offer any testimony regarding these issues. And as this Court previously recognized in its decision issuing a preliminary injunction, "what is or should be the default treatment for transgender youth is not the question before the court." (Dkt. No. 67 (PI Op.) at 3 n.4.)

On their face, Dr. Cantor's opinions are irrelevant to the purported justifications of H.B. 3293. Dr. Cantor's opinion that providing gender-affirming care to transgender youth does not produce better mental health outcomes and is not the accepted standard of care is not relevant to this Court's consideration of whether West Virginia can categorically ban transgender girls and women from girls' and women's sports teams. In fact, even if the testimony about gender-affirming care provided to adolescents were relevant, Dr. Cantor offers irrelevant testimony about the treatment of prepubertal children and the treatment of adults. With respect to prepubertal children, Dr. Cantor's testimony and report focus on irrelevant debates about "desistance" and about the appropriateness of social transition for transgender youth. When discussing transgender adults, his testimony focuses on irrelevant and inaccurate theories about paraphilias and other causes of "transgenderism."

5

Dr. Cantor's testimony should thus be excluded.

**A.    Dr. Cantor's Primary Opinions Have No Relevance To This Case Because They Address Issues Beyond The Scope Of The Dispute.**

The "court must satisfy itself that the proffered testimony is relevant to the issue at hand, for that is 'a precondition to admissibility.'" *Sardis*, 10 F.4th at 282 (quoting *Daubert*, 509 U.S. at 592). To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Id*. at 281 (quoting *Nease,* 848 F.3d at 232–33). "[I]t is axiomatic that 'expert testimony which does not relate to any issue in the case is not relevant [and] non-helpful.'" *Knight v. Boehringer Ingelheim Pharms.*, *Inc.*, 323 F. Supp. 3d 837, 846 (S.D.W. Va. 2018) (quoting *Edwards v. Ethicon, Inc.*, No. 12 Civ. 09972, 2014 WL 3361923 (S.D.W. Va. July 8, 2014)). In order to be relevant, an opinion needs to "fit" with the facts at issue. *Bourne ex rel. Bourne v. E.I. DuPont de Nemours & Co.*, 85 F. App'x 964, 966 (4th Cir. 2004).

Dr. Cantor's opinions are simply not relevant to any purported justification Defendants have offered for H.B. 3293, which focus on athletic opportunities and notions of protecting women in sports. *See, e.g.*, W. Va. Code § 18-2-25d(a)(5) (2021) (offering sole justification of "promot[ing] equal athletic opportunities for the female sex"); (Dkt. No. 290 (Pl's Statement of Undisputed Facts ("SUF")) ¶ 48) (State's purported justifications are limited to "protect[ing]" women in sports and complying with Title IX). Indeed, Dr. Cantor disclaimed any intent to offer opinions about those issues. He is offering no opinion regarding the extent to which a person assigned male at birth purportedly has any athletic advantage, (Swaminathan Decl., Ex. B at 161:4-8; the extent to which transgender women or girls have any supposed athletic advantage, (*id*. at 223:3-10); or whether H.B. 3293 should apply to college athletics, (*id*. at 178:18-23.)

Instead, Dr. Cantor's opinions in this case focus on issues not relevant to this case: the standards of care for treatment of transgender youth. For example, Dr. Cantor proposes to offer the opinion that "[a]ffirmation of a transgender identity in minors who suffer from early-onset or adolescent-onset gender dysphoria is not an accepted 'standard of care.'" (Swaminathan Decl., Ex. A at 3 ¶ 8(e).) But this opinion is unrelated to any interest proffered by the State. (Pl's SUF ¶ 59.) And as this Court already has recognized, "what is or should be the default treatment for transgender youth is not the question before the court." (PI Op. at 3 n.4.) Accordingly, Dr. Cantor's disagreement with the established standard of care in this Circuit—untethered to any governmental interest proffered by Defendants—does not "fit" with the facts at issue and has no relevance here.[1]

## B. Dr. Cantor Is Not Qualified To Offer Opinions About The Treatment Of Transgender Adolescents In This Case.

To render expert testimony, the witness must possess the requisite "knowledge, skill, experience, training, or education" that would assist the trier of fact. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993); *Wright v. United States*, 280 F. Supp. 2d 472, 478 (M.D.N.C. 2003) ("A witness may testify as to his specialized knowledge so long as he is qualified as an expert based on any combination of knowledge, skill, experience, training, or education."). If not qualified, the expert's testimony is unreliable. *Reliastar Life Ins. Co. v. Laschkewitsch*, No. 13 Civ. 10-BO,

---

[1] Dr. Cantor's other opinions about adults are even farther afield. For example, Dr. Cantor opines on "adult-onset gender dysphoria" and mental health issues in transgender adults, which is completely irrelevant to the issue of whether a twelve-year-old transgender girl should be able to participate on the girls' cross-country team at her school. (Swaminathan Decl., Ex. A at 12–14); *see, e.g.*, *Edwards v. Ethicon, Inc.*, No. 12 Civ. 09972, 2014 WL 3361923, at *15 (S.D.W. Va. July 8, 2014) (excluding expert opinion about complications future patients might experience as irrelevant to the plaintiff's claims).

2014 WL 1430729, at *1 (E.D.N.C. Apr. 14, 2014); *see, e.g.*, *Mod. Auto. Network, LLC*, 416 F. Supp. 3d at 537 (affirming the district court's exclusion of an expert because they lacked experience relevant to the matters at issue); *Lebron v. Sec'y of Fla. Dep't of Child. & Fams.*, 772 F.3d 1352, 1369 (11th Cir. 2014) (holding expert witness was properly excluded who did not propose to testify about matters growing naturally and directly out of research he had conducted independent of the litigation).

Dr. Cantor is not qualified to offer his opinions regarding treatment protocols for transgender youth. "[A]n expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp., No. 04 C 1274*, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007); *see also Lebron*, 772 F.3d at 1369. "Generalized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge." *Martinez*, 2007 WL 2570362 at *2. "For example, no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F.Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994); *see also, e.g.*, *Hartke v. McKelway*, 526 F.Supp. 97, 100–101 (D.D.C. 1981), *aff'd*, 707 F.2d 1544 (D.C. Cir. 1983).

Dr. Cantor's primary area of expertise is the study of hypersexuality and paraphilias,[2] and nearly one hundred percent of his clinical practice focuses on adults. (Swaminathan Decl., Ex. B

---

[2] "The term 'paraphilia'…[m]ost broadly[] refers to the highly atypical sexual interest that dominate a person's life and interact with or prevent them from having an otherwise typical sexual life." (Swaminathan Decl., Ex. B at 139:20–25.)

at 140:5–141:24, 179:7-18.)  He has publicly stated that his "primary research opportunities have involved studying sex offenders, mostly pedophiles and persons with other atypical sexualities whose behaviors led them into the legal system." (Swaminathan Decl., Ex. E; Swaminathan Decl., Ex. B at 140:5–141:24.)

At his deposition, Dr. Cantor admitted that he is not an endocrinologist, has not personally diagnosed any child or adolescent with gender dysphoria, has never personally treated any child or adolescent for gender dysphoria, and does not provide psychotherapy counseling to children or adolescents with gender dysphoria.  (Swaminathan Decl., Ex. B at 179:1-14.)  None of Dr. Cantor's professional roles have involved significant contact—or in many cases, any contact—with children or adolescents.  During Dr. Cantor's fellowship at the Center for Addiction and Mental Health ("CAMH"), the average age of the patients he provided one-on-one therapy to was early 40s, the youngest being in their "late teens, early 20s." (*Id*. at 50:10-19.)  Approximately 80 percent of the patients that Dr. Cantor saw at CAMH had been adjudicated as sex offenders.  (*Id.* at 151:7-10.)  When Dr. Cantor assumed his next professional role at Queen Elizabeth Hospital in Montreal, he did not provide psychotherapy to children or adolescents—he "predominantly worked with adults who came in with depression and anxiety disorders[.]"  (*Id*. at 54:7-14.)  Subsequently, while completing his post-doctoral studies within the law and mental health program, Dr. Cantor did not work with children and adolescents with gender dysphoria.  (*Id*. at 61:4-8.)  Dr. Cantor then became Senior Scientist at CAMH, where even while supervising the work of his interns, Dr. Cantor testified that he never worked directly with children or adolescents with gender dysphoria.  (*Id*. at 68:22–69:2.)  His supervision of the CAMH interns never involved research around puberty-delaying treatment prescribed to transgender adolescents nor hormone therapy prescribed to transgender adults.  (*Id*. at 132:11-19.)  In fact, in Dr. Cantor's current private practice, he has only

9

treated "about six to eight patents ages 16 to 18," and was unable to identify whether these patients were transgender or had gender dysphoria. (*Id*. at 179:15-18, 180:8-13.)

Dr. Cantor admitted at his deposition—as he must—that he has almost no experience researching and writing about or administering mental health treatment to transgender adolescents. Indeed, in the list of 64 articles he has authored or co-authored, only one even mentions transgender children ("The Recalled Childhood Gender Identity"), and Dr. Cantor was not a primary author of the article and did not himself carry out any portion of the study. (Swaminathan Decl., Ex. B at 102:8-14.)

In sum, Dr. Cantor is not recognized as an expert in providing treatment to transgender children or adolescents, does not have the requisite qualifications to provide treatment to transgender children or adolescents, has never treated nor delivered any psychiatric care to transgender children or adolescents in his day-to-day practice, has never written about or researched the provision of care to transgender children and adolescents, and has extremely limited experience working with children and adolescents in any capacity. (*Id*. at 179:4-14.) For all these reasons, Dr. Cantor is not qualified under the *Daubert* standards to offer opinions on matters relating to the care of transgender children.

### 1. Dr. Cantor Admits That He Is Not Qualified To Offer Opinions On H.B. 3293 Or Transgender Athletes.

Astonishingly, Dr. Cantor admitted that he is not providing any testimony relating to the three purported governmental interests that the State of West Virginia ("State") asserts are advanced by H.B. 3293: 1) to protect women's sports; 2) to follow Title IX; and 3) to protect women's safety in female athletic sports. (Pl's SUF ¶ 59.) When asked whether he is "offering an expert opinion with respect to whether H.B. 3293 serves the interest of protecting women's

sports," Dr. Cantor responded he "[hadn't] been asked that, no." (Swaminathan Decl., Ex. B at 178:3-6.) When asked whether he is "offering an opinion with respect to whether H.B. 3293 serves the interest of following Title IX," Dr. Cantor responded that he "[hadn't] been asked that, no." (Swaminathan Decl., Ex. B at 178:7-10.) When asked whether he is "offering an opinion with respect to whether H.B. 3293 serves the interest of protecting women's safety in female athletic sports," Dr. Cantor again responded that he "[had not] been asked that, no." (Swaminathan Decl., Ex. B at 178:11-14.) When asked whether he has "any opinions on whether H.B. 3293 should apply to college athletes," Dr. Cantor responded that he has "no opinion in any direction." (Swaminathan Decl., Ex. B at 178:18-20.)

***

The opinions expressed by Dr. Cantor are insufficiently tied to the facts of this case so that they will aid a factfinder in determining whether a categorical ban on transgender girls and women participating on girl's and women's sports team is lawful, and should therefore be excluded as irrelevant.

**C.    Dr. Cantor's Testimony Is Methodologically Unreliable And Unsupported By Science Or Medicine.**

Expert testimony should only be admitted if its methodology is sufficiently reliable. *Sardis*, 10 F.4th at 281. Dr. Cantor's opinions fall far short of the reliability standard. Dr. Cantor's theory that "it remains entirely *plausible* that the psychotherapy [alone without] puberty blockers caused the improvements" in the mental health of transgender adolescents is pure speculation that has never been tested. (Swaminathan Decl., Ex. A at ¶ 54 (emphasis added).) But plausibility does not satisfy any standard for an expert opinion. Such speculative opinions should be excluded, especially given this Circuit's holding that "proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999); *see also Dunn v. Sandoz Pharms. Corp.*, 275 F.Supp.2d 672, 684 (M.D.N.C. 2003) ("[S]peculation is unreliable evidence and is inadmissible").

Dr. Cantor asserts without any evidence whatsoever that his views are accepted and shared by the amorphous and unspecific "scientific community." (Swaminathan Decl., Ex. B at 210:2-25.) Dr. Cantor asserts that "several scores" of people, comprised of individuals he is "in regular contact with," agree with his opinions as to withholding social transition in prepubertal children with gender dysphoria. (*Id*.) He admitted that his communications with these individuals, primarily sex researchers and sex therapists (none of whom specialize in care of transgender patients), are his "primary source" of evidence for the assertion that "practitioners support withholding social transition in prepubertal patients with gender dysphoria." (*Id.* at 211:4-15, 211:17-22.) Dr. Cantor's opinions thus are not rooted in science—they are personal opinions he

12

has formed through communications with groups of individuals who he is in routine contact with, and who are not practitioners specializing in the treatment of children and adolescents with gender dysphoria.[3]

Furthermore, Dr. Cantor fails to address how his experience and communications with other "sexologists"—which he claims are sufficient foundation for his opinions—leads to the conclusions he draws in this case. *See*, *e.g.*, *Cooper,* 259 F.3d at 200 (affirming the exclusion of an expert because he "asserted what amounted to a wholly conclusory finding based upon his subjective beliefs rather than any valid scientific method."); *SAS Inst.*, 125 F. Supp. 3d at 589; *see also Nat'l Ass'n. for Rational Sexual Offense L.*, 2021 WL 736375, at *3 (excluding expert where offering party failed to establish how expert's "experience leads to his conclusions nor how those experiences have been reliably applied to the facts").

Another unreliable opinion presented by Dr. Cantor is that "the majority" of prepubertal children who experience gender dysphoria will cease to be transgender. (Swaminathan Decl., Ex. B at 191:11-24; 212:19-213:3 ("[R]esearch has unanimously shown that the majority of children with gender dysphoria desist – that is, cease to experience such dysphoria by or during puberty."). Dr. Cantor's only support for this concept is "11 studies listed on [his] blog." (Swaminathan Decl., Ex. B at 206:12–207:11.) Upon closer inspection, these sources are woefully inadequate to support his assertion. All of his sources suffer from the same malady: they purported to show desistance among children who were identified as having gender dysphoria under prior versions of the

---

[3] Even Defendants' other experts disagree with Dr. Cantor. Dr. Cantor opposes allowing transgender children to live in accordance with their gender identity, (Swaminathan Decl., Ex. B at 210:2-25), but Defendants' proposed expert, Dr. Stephen Levine, "cooperate[s] with" social transition and even has supported "people who already had social transition . . . in the face of their parents' objection." (Swaminathan Decl., Ex. H (Levine Dep.) at 141:7-11.)

American Psychiatric Association's Diagnostic and Statistical Manual ("DSM"). Those versions included a now-obsolete and overly broad diagnosis for "Gender Identity Disorder in Children," which differs in key ways from the current DSM-5 diagnostic criteria for "Gender Dysphoria in Children." As another expert in this matter explained, the older Gender Identity Disorder diagnosis did not require a finding that the child had a gender identity different from the sex assigned at birth. (Swaminathan Decl., Ex. D at 324:16–325:4.) As a result, those older studies tended to mischaracterize gender-nonconforming children as transgender. Such studies cannot be relied on to draw conclusions regarding "desistance" in prepubertal youth diagnosed with gender dysphoria.

Similarly, Dr. Cantor criticizes studies showing positive outcomes for transgender children who access puberty-delaying treatment as unreliable because there is "no method of separating how much of its result was due to psychotherapy versus due to medical intervention." (*Id.* at 252:6-10.) But this criticism is not meaningful: these studies nonetheless indicate that gender-affirming care leads to positive outcomes for transgender youth. (*See e.g.*, Swaminathan Decl., Ex. B at 233:1-10, 229:16-22.)

Chief among Dr. Cantor's many unreliable opinions is his assertion that wide disagreement exists about the appropriate treatment for gender dysphoria and that the SOC are not accepted by his amorphous and unspecified "scientific community." (Swaminathan Decl., Ex. A at ¶ 8(c).) Contrary to Dr. Cantor's personal feelings, which were formed as discussed above through communications with "several scores" of people who do not specialize in care of transgender patients, there *is broad consensus* about the appropriate treatment for gender dysphoria. All major medical associations endorse and follow the treatment protocols established by the WPATH in the SOC Version 7. (Swaminathan Decl., Ex. E ¶ 27.) This factual reality calls into serious question the reliability of this proffered opinion.

Additionally, Dr. Cantor's testimony directly contradicts the Fourth Circuit's recognition that "we now have modern accepted treatment protocols for gender dysphoria," which have been "[d]eveloped by the World Professional Association for Transgender Health (WPATH) . . . [and] represent the consensus approach of the medical and mental health community[.]" *Grimm,* 972 F.3d at 595. The Fourth Circuit recognizes these treatment protocols "as *the authoritative standards of care,*" finding that "[t]here are no other competing, evidence-based standards . . . accepted by any nationally or internationally recognized medical professional groups." *Id.* at 595–96 (emphasis added) (quoting *Edmo,* 935 F.3d at 769).

### 1. Dr. Cantor's Assertions That Transgender Adolescents Are Receiving "Affirmation On Demand" And That Adolescents Transition Due To The "Unrealistic Expectation That Transition Will Help Them Fit In" Are Unsupported.

Dr. Cantor's most strikingly unreliable opinion is that "[b]ecause only a minority of gender dysphoric children persist in feeling gender dysphoric in the first place, 'transition-on-demand' . . . 'increases the probability of unnecessary transition and unnecessary medical risks.'" (Swaminathan Decl., Ex. B at 213:22–214:11.) Again, in making this broad and unfounded assertion, Dr. Cantor relies only on "those 11 studies" on his blog. (*Id.* at 215:17–217:19.) Dr. Cantor has no experience in his own practice with persistence or desistence in children with gender dysphoria, and he does not offer any support for this proposition from practitioners who actually treat gender dysphoria in children. (*Id.*)

When asked whether "any patient ever [came] to [him] asking for affirmation on demand," Dr. Cantor's response was "no." (*Id.* at 181:11-13.) When asked what his basis was for saying that providers are providing "affirmation on demand to children and adolescents with gender dysphoria," Dr. Cantor responded that his "only evidence" is from the following sources:

"Through several venues. I get that information from parents, from people, you know, in society who e-mail me asking for help. There's a large number of media reports of it happening through the world, U.S., Canada and Europe. And there's now been – there are now several governmental entities, mostly in Europe, are now beginning more formal . . . investigations of it." (*Id*. at 181:14-25; 184:5-10.)

When asked whether he had ever spoken to providers who claim to provide affirmation on demand to children and adolescents with gender dysphoria, his response was "no." (*Id*. at 182:17-21.) When asked whether any provider at CAMH (his former employer) provides affirmation on demand, his response was again "no." *Id*. at 183:16-24. In other words, Dr. Cantor was unable to identify a single instance of a provider providing affirmation on demand, and his "evidence" is woefully inadequate to support any conclusion that such practice is occurring. Similarly, Dr. Cantor was unable to identify any scientific literature that demonstrates that providers are providing affirmation on demand to children and adolescents with gender dysphoria. (*Id*. at 184:11-14.)

Another stark example of Dr. Cantor's opinions failing to meet methodological reliability is his assertion that "a child experiencing depression from social isolation might develop hope – and the unrealistic expectation – that transition will help them fit in, this time as and with the other sex." (Swaminathan Decl., Ex. A at ¶ 69; Ex. B at 218:18–219:20.) Dr. Cantor himself admitted at his deposition that this "hypothesis hasn't been . . . tested," and therefore has no probative value. (Swaminathan Decl., Ex B at 219:15-20.)

None of Dr. Cantor's unsubstantiated hypotheses justify denying treatment to transgender adolescents, which is not at issue in this case regardless.

2.      **Dr. Cantor Testified That Transgender People Are One Of Three Things: Autogynephilic, Homosexual, Or Mistaken.**

The Fourth Circuit has held conclusively that "just like being cisgender, being transgender is natural and is not a choice." *Grimm*, 972 F.3d at 594. The Fourth Circuit also acknowledges that "[b]eing transgender is also not a psychiatric condition, and implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." *Id.* (quotation marks omitted). By contrast, Dr. Cantor egregiously espouses that only three factors can "motivate a person to want to live as the other sex." (Swaminathan Decl., Ex. B at 143:8-10.) At his deposition, Dr. Cantor testified that "anyone who is transgender is transgender either due to autogynephilia,[4] homosexuality, or a mistake they've made as a . . . younger individual." (*Id.* at 145:7-15 ("[T]hat's the best summary we have of the – of the existing research").) Dr. Cantor asserted that homosexuality "can motivate a person to feel gender dysphoric" and "be the source of the desire to change." (*Id.* at 143:20-144:1.) In justifying his third theory, Dr. Cantor stated that young individuals "mistake the emotions that they're having to be gender dysphoria when they're actually motivated by something else, for example, a desire to not be associated with the sex that they would be biologically associated with." (*Id.* at 144:9-15.) Dr. Cantor's testimony is not only in direct conflict with Fourth Circuit precedent, but is a harmful, outlier opinion in the scientific community. Dr. Cantor does not believe that individuals can be transgender unless they fall into one of his three purported pathways. His views, which pathologize transgender people in stark contradiction to the Fourth Circuit's recognition that being transgender is a normal variation in human development, are irrelevant, harmful, and unfit for use by the Court.

---

[4] Autogynephilia refers to an extreme outlier hypothesis that transgender people become transgender out of a sense of sexual arousal. (*Id.* at 142:3-8.)

### 3. Dr. Cantor's Opinion That No Professional Organization Has Articulated A Meritorious Position Calling Into Question The Basis For The Act Directly Contradicts The Fourth Circuit's Holding In *Grimm*.

Dr. Cantor spends a great deal of time in his report critiquing the statements of preeminent medical and behavioral health organizations that recognize the standard of care for treating gender dysphoria. (Swaminathan Decl., Ex. A at ¶¶ 107–39.) Dr. Cantor's critiques, however, are misleading, misconstrue the current standards of care, and flout Circuit law. As just one example, Dr. Cantor quotes selectively from the Endocrine Society's clinical guidelines to misleadingly suggest that the guidelines recommend "address[ing] mental health issues *before* embarking on transition," and that they do "not endorse any affirmation-only approach." (Swaminathan Decl., Ex. A at ¶ 119–20 (emphasis added).) But this is incorrect. In fact, the guidelines affirmatively *recommend* that adolescents with gender dysphoria receive medical treatment and endorse "gender-affirming" care throughout. (*See, e.g.*, Swaminathan Decl., Ex. F at 3871 §§ 2.1-2.5 (recommending treatment with puberty-delaying medication and hormones).)

Dr. Cantor is additionally unqualified to opine on these professional organizations as he lacks any involvement with them. He testified that he is not a member of WPATH, has never advised the WPATH in any capacity, has never been involved in developing the SOC, and could not recall the most recent version of the SOC. (Swaminathan Decl., Ex. B at 203:1–204:24.) Similarly, Dr. Cantor is not a member of the Endocrine Society, was not involved in the development of the Endocrine Society guidelines in 2009 or in 2017, is not aware of the scientific literature conducted by the Endocrine Society in developing the guidelines, and does not hold himself out as an expert in how the guidelines were developed. (*Id.* at 201:8–202:19.)

18

Dr. Cantor's attack on these professional organizations also defies this Circuit's recognition that they constitute the "*leading* medical, public health, and mental health organizations" regarding treatment for transgender adolescents.  *Grimm*, 972 F.3d at 594 n.1 (emphasis added).  *Grimm* relied heavily on the amici curiae brief submitted by many of the same organizations to explain the treatment protocols for transgender adolescents, citing these organizations as "our foremost medical, mental health, and public health organizations."  *Id.* at 612; *see also id.* at 594–613 (citing the amici curiae brief nine times).

### 4. Dr. Cantor Has Offered Harmful Opinions Related To Transgender People And Has Been Removed From Respectable Scientific Societies For Posting Disrespectful Material.

Dr. Cantor is unfit to provide testimony in this case given his history of promulgating disturbing and offensive content about transgender people.[5]  In Dr. Cantor's blogpost, Sexology Today, for example, Dr. Cantor suggests that transgender people are "atypical," and writes that "only very few trans kids still want to transition by the time they are adults.  Instead, they generally turn out to be *regular* gay or lesbian folks."  (Swaminathan Decl. Ex. G; Ex. B at 187:17–188:9 (testifying that "non-regular gay or lesbian folks" are people "with a paraphilia or with a fetish that makes the determination of their sexual orientation a bit moot"); Ex. B at 188:15–189:1 (testifying that "if a child's gender dysphoria were to persist and they continued to want to transition by the time they are adults," that would be "atypical") (emphasis added).)

---

[5] Dr. Cantor was a member of the Society for the Scientific Study of Sexuality, a group dedicated to "forward[ing] and promot[ing] the conduct and dissemination of sex research," for twenty-seven years.  (Swaminathan Decl., Ex. A. at 96; Ex. B at 284:19-22; 287:11-13.)  After his twenty-seven-year membership, Dr. Cantor was suspended and removed from the society's online forum after its Board determined that Dr. Cantor had violated one of its guidelines by posting "disrespectful" content relating to transgender people.  (Swaminathan Decl., Ex. B. at 288:10-13 ("[T]hey told me what I said they deemed to be disrespectful"); 288:16-18 ("Q . . . [D]id what you say deal with issues relating to transgender people or gender dysphoric people? A. Yes.")

19

**D.     Dr. Cantor's Report, Opinions, And Testimony Lack Probative Value And Are Thus Inadmissible Under Federal Rule Of Evidence 403.**

Finally, the Court should exclude evidence if its introduction will result in unfair prejudice, confusion of the issues, or result in misleading testimony.  Fed. R. Evid. 403.  As noted above, Dr. Cantor offers no opinions on any factual dispute in this case, and, in any event, the opinions he offers are irrelevant and unreliable.  Consideration of his testimony would waste time and create confusion.  The testimony would also result in prejudice, as the testimony seeks to sow confusion about the veracity of Plaintiffs' gender identity, gender dysphoria diagnosis, and other experiences—issues unrelated to whether transgender girls and women should be allowed to participate on girls' and women's sports teams in West Virginia.  Accordingly, Dr. Cantor's testimony fails to satisfy the requirements of Federal Rule of Evidence 403 and should be excluded.

# CONCLUSION

WHEREFORE, based on the foregoing, Plaintiff respectfully request that this Court grant the instant motion and exclude all of Dr. Cantor's purported expert testimony because it is not admissible under *Daubert* and the Federal Rules of Evidence.

Dated: May 12, 2022

Respectfully submitted,
/s/ *Loree Stark*

Joshua Block*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad St.
New York, NY 10004
Phone: (212) 549-2569
jblock@aclu.org

Loree Stark (Bar No. 12936)
Nick Ward (Bar No. 13703)
AMERICAN CIVIL LIBERTIES UNION OF WEST
VIRGINIA FOUNDATION
P.O. Box 3952
Charleston, WV 25339-3952
Phone: (914) 393-4614
lstark@acluwv.org

Avatara Smith-Carrington*
LAMBDA LEGAL
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
Phone: (214) 219-8585
asmithcarrington@lambdalegal.org

Kathleen Hartnett*
Julie Veroff*
Zoë Helstrom*
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Phone: (415) 693-2000
khartnett@cooley.com

Carl Swaminathan*
Tara Borelli*
LAMBDA LEGAL
158 West Ponce De Leon Ave., Ste. 105
Decatur, GA 30030
Phone: (404) 897-1880
cSwaminathan@lambdalegal.org

Katelyn Kang*
Valeria M. Pelet del Toro*
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
Phone: (212) 479-6000
kkang@cooley.com

Sruti Swaminathan*
LAMBDA LEGAL
120 Wall Street, 19th Floor
New York, NY 10005
Phone: (212) 809-8585
sswaminathan@lambdalegal.org

Elizabeth Reinhardt*
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Phone: (617) 937-2305
ereinhardt@cooley.com
*Visiting Attorneys
Attorneys for Plaintiff

Andrew Barr*
COOLEY LLP
1144 15th St. Suite 2300
Denver, CO 80202-5686
Phone: (720) 566-4000
abarr@cooley.com

21

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

B.P.J. by her next friend and mother, HEATHER
JACKSON,

                          *Plaintiff*,

        v.

WEST VIRGINIA STATE BOARD OF
EDUCATION, HARRISON COUNTY BOARD
OF EDUCATION, WEST VIRGINIA
SECONDARY SCHOOL ACTIVITIES
COMMISSION, W. CLAYTON BURCH in his
official capacity as State Superintendent, DORA
STUTLER in her official capacity as Harrison
County Superintendent, and THE STATE OF
WEST VIRGINIA,

                          *Defendants*,

          and

LAINEY ARMISTEAD,

                    *Defendant-Intervenor*.

Civil Action No. 2:21-cv-00316

Hon. Joseph R. Goodwin

## CERTIFICATE OF SERVICE

I, Loree Stark, do hereby certify that on this 12th day of May, 2022, I electronically filed a true

and exact copy of ***Plaintiff's Memorandum of Law in Support of Motion to Exclude the Expert***

***Testimony of James M. Cantor*** with the Clerk of Court and all parties using the CM/ECF System.

                                   */s/ Loree Stark*
                                   Loree Stark
                                   West Virginia Bar No. 12936

# EXHIBIT N

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MAXWELL KADEL, *et al.*,

               *Plaintiffs*,

          v.

DALE FOLWELL, in his official capacity as
State Treasurer of North Carolina, *et al.*,

               *Defendants*.

Case No. 1:19-cv-00272-LCB-LPA

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
## TO EXCLUDE EXPERT TESTIMONY OF DR. PATRICK W. LAPPERT

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................... 1

LEGAL STANDARD ........................................................................................ 3

ARGUMENT...................................................................................................... 5

      I.     Dr. Lappert Is Not Qualified to Offer Any of His Purported
           Opinions. ............................................................................................ 5

           A.    Dr. Lappert Has Never Performed Gender-Affirming Surgery
               and Is Not Qualified to Opine on Such Procedures. .......................... 6

           B.    Dr. Lappert Has No Basis to Offer Opinions on Topics
               Outside of Plastic Surgery.................................................................. 9

      II.    Dr. Lappert's Opinions on Topics Outside of Gender-Affirming
           Surgery Do Not "Fit" the Disputed Issues, Are Unreliable, Or Both. ........ 11

           A.    Far from Being Generally Accepted, Dr. Lappert's Opinions
               Have Been Rejected by the Scientific Community.......................... 11

           B.    Dr. Lappert's Critiques of WPATH, Endocrine Society
               Guidelines, DSM-V, and Other Organizations' Positions Are
               Unreliable. ........................................................................................ 14

           C.    Dr. Lappert's Opinions About the Need for Randomized
               Clinical Trials Are Unreliable........................................................ 16

           D.    Dr. Lappert's Speculation About "Detransitioners," "Regret"
               and "Social Contagion" Is Unreliable. ............................................ 18

           E.    Dr. Lappert's Opinions About Risks Communicated to
               Plaintiffs Are Unreliable. ................................................................ 19

      III.   Dr. Lappert's Opinions Are Based on His Personal Beliefs Rather
           than Science............................................................................................... 20

CONCLUSION ............................................................................................. 23

Plaintiffs respectfully submit this memorandum of law in support of their motion to exclude the expert testimony of Dr. Patrick W. Lappert.

## INTRODUCTION[1]

Dr. Lappert holds himself out as being board-certified in both plastic surgery and general surgery.  He is neither:  his certification in plastic surgery lapsed in 2018, and he has not been board-certified in surgery since *2002*.   Moreover, in his entire career, Dr. Lappert has never performed a single surgical procedure to treat gender dysphoria—which is not surprising, since he considers those procedures to be "intentional mutilation" and "child abuse."   Dr. Lappert has no reliable basis to opine about gender-affirming surgery, and his purported expert opinions about those procedures should be excluded.

And Dr. Lappert's opinions outside of surgery are even more ripe for exclusion. Straying far afield from his surgical experience, Dr. Lappert gives a smorgasbord of opinions that he is not qualified to provide, and for which he has no basis.  For example, he criticizes how organizations like the World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have developed guidelines for diagnosis and treatment of gender dysphoria, despite admitting that he does not know the first thing about how those guidelines were created.  He speculates about whether puberty-blocking treatment is appropriate for adolescents, even though he is not an endocrinologist and he admits "that's not [his] area of expertise."  He criticizes the process by which patients are

---

[1] Unless otherwise noted, all emphasis is added, and all citations, alterations, and ellipsis are omitted.  Exhibits referenced herein are attached to the concurrently-filed Declaration of Dmitriy Tishyevich.

1

diagnosed with gender dysphoria, despite admitting that he has "very limited psychiatric / psychological knowledge," is not "a licensed mental healthcare provider of any kind," and is not qualified to make this diagnosis himself.  And he also offers rank speculation about patients with gender dysphoria who "detransition" or experience "regret," even though he concedes he has no reliable data to quantify these phenomena.  These and other of Dr. Lappert's many non-surgery opinions are both unreliable and irrelevant, and they should all be excluded accordingly.

Dr. Lappert's deposition also made clear that he is certainly not a dispassionate expert who will offer neutral "specialized knowledge" to "help the trier of fact to understand the evidence," as Rule 702 contemplates.  Far from it.  In addition to calling gender-affirming surgery "intentional mutilation," Dr. Lappert says that parents who talk to their children about gender identity issues are "sexualizing them" and "grooming" them for abuse.  He accuses doctors who provide gender-affirming treatment of being part of a "Transgender Treatment Industry" cabal—a term that he concedes is certainly not "commonly used" in his professional field, and is instead "idiosyncratic" to his report.  He has given inflammatory presentations on gender-affirming surgery, opining that performing these surgeries is a "moral violation" for physicians and that "changing a person's sex is a lie."  He tours the country, urging state legislatures to outlaw gender-affirming treatment for minors.  And he also thinks that states should "criminally prosecute doctors" that provide this critically-needed treatment—even though *every* reputable

2

medical organization in the country, including his own professional society, has said that such treatment is medically necessary and appropriate.

Even if Dr. Lappert's opinions were reliable under Rule 702 (and they are not), and even if they had any minimal probative value (and they do not), that value would be far outweighed by unfair prejudice and confusion of the issues under Rule 403. For these reasons, and as explained below, all of Dr. Lappert's opinions should be excluded.

## LEGAL STANDARD

Federal Rule of Evidence 702 places "a special gatekeeping obligation" on the trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021). As the Fourth Circuit recently reaffirmed, "the importance of the gatekeeping function cannot be overstated." *Sardis*, 10 F.4th at 283.

"The proponent of the testimony must establish its admissibility by a preponderance of proof." *Mod. Auto. Network, LLC v. E. All. Ins. Co.*, 416 F. Supp. 3d 529, 537 (M.D.N.C. 2019). The first step is to determine if the expert is qualified to give the proffered opinion, which requires examining the expert's professional qualifications and "full range of experience and training." *Belk, Inc. v. Meyer Corp.*, U.S., 679 F.3d 146, 162 (4th Cir. 2012). If the expert is not qualified, the testimony should be excluded. *See SMD Software, Inc. v. EMove, Inc.*, 945 F. Supp. 2d 628, 639 (E.D.N.C. 2013).

Even if the expert is qualified, the court must consider the relevancy of the expert's testimony as "a precondition to admissibility." *Sardis*, 10 F.4th at 282. To be relevant, the testimony must have "a valid scientific connection to the pertinent inquiry." *Id.* at 281. "If an opinion is not relevant to a fact at issue, *Daubert* requires that it be excluded." *Id.*

The opinion must also be based on a reliable foundation, with the inquiry focusing on the expert's "principles and methodology" to assess whether it is "based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Id.* at 281-82. In evaluating reliability, courts consider, among other things, whether: (1) the theory "can be and has been tested"; (2) has been "subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) "whether the technique is generally accepted in the scientific community." *Id.* at 281.

When an expert relies upon experience and training rather than a specific methodology, the application of the *Daubert* factors is more limited. *See Freeman v. Case Corp.*, 118 F.3d 1011, 1016 n.6 (4th Cir. 1997). In those cases, courts consider: "1) how the expert's experience leads to the conclusion reached; 2) why that experience is a sufficient basis for the opinion; and 3) how that experience is reliably applied to the facts of the case." *SAS Inst., Inc. v. World Programming Ltd.*, 125 F. Supp. 3d 579, 589 (E.D.N.C. 2015).

Finally, the Fourth Circuit has cautioned that although the trial court has "broad latitude" to determine reliability, it must still engage in the gatekeeping process and not simply "delegate the issue to the jury." *Sardis*, 10 F.4th at 281. Even rigorous cross-

4

examination is not a substitute for the court's gatekeeping role. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir. 2017).

## ARGUMENT

### I.    Dr. Lappert Is Not Qualified to Offer Any of His Purported Opinions.

An expert witness must have "knowledge, skill, experience, training, or education" that would assist the trier of fact. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). "[Q]ualifications alone do not suffice," however. *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999); *Patel ex rel. Patel v. Menard, Inc.*, 2011 WL 4738339, at *1 (S.D. Ind. Oct. 6, 2011). Even "a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant." *Clark*, 192 F.3d at 759 n.5.

Moreover, "an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp.*, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007); *Lebron v. Sec. of Fla. Dept. of Children and Families*, 772 F.3d 1352, 1369 (11th Cir. 2014).

Importantly, this qualification inquiry is subject-specific, because "[g]eneralized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge." *Martinez*, 2007 WL 2570362, at *2. "For example, no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved

certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994).  Dr. Lappert fails these requirements, for reasons below.

**A.    Dr. Lappert Has Never Performed Gender-Affirming Surgery and Is Not Qualified to Opine on Such Procedures.**

Dr. Lappert's report represents that he is "Board Certified in Surgery and Plastic Surgery." (Ex. 1 at 1.)  This is not true.  As he admitted, his "plastic surgery board certificate expired at the end of 2018." (Ex. 2 at 23.)  His "board certification in surgery" expired "in 2002"; thus, he has not "been board-certified in surgery" for "over nineteen years." (*Id.* at 31-32.)

These are not trivial fibs, because physicians are not allowed to hold themselves out as board-certified unless they actually have a ***current*** board certificate.  The American Board of Plastic Surgeons unequivocally prohibits such misrepresentations, stating that "when a physician misrepresents certification status," as Dr. Lappert did here, "ABPS may notify local credentialing bodies, licensing bodies, law enforcement agencies, and others." (*Id.* at 30; Ex. 3 at 3.)  And the American Board of Surgery takes a similarly dim view of such misrepresentations, as Dr. Lappert also acknowledged.  (Ex. 2 at 32 (agreeing it does not "surprise [him] that the [ABS] does not allow doctors to represent that they are board-certified in surgery unless they have a current board certificate.").)

Setting aside these misrepresentations about his credentials, Dr. Lappert is also not qualified to give expert opinions about gender-affirming surgery for a more basic reason: he has never even performed a single such procedure.  He admitted that he has "never

6

performed facial feminization surgery" or "facial masculinization surgery" for any transgender patient.  (*Id.* at 167.)  The same is true for "transfeminine top surgery" and "chest reconstruction surgery." (*Id.* at 167.)  He has also never "performed a vaginoplasty" nor "metoidioplasty." (*Id.* at 167-68.)  In short, Dr. Lappert has "***never*** performed ***any kind*** of gender-affirming surgery in transgender patients." (*Id.* at 168; *id.* at 151 ("I have never treated a patient with gender dysphoria surgically.").)  He was also emphatic that he would never perform such surgeries, because he personally does not "see them as beneficial" and thinks that they are "incorrect treatments." (*Id.* at 150.)

Dr. Lappert has not published any research on gender-affirming surgery either.  He agreed that he has "not published any original research in peer-reviewed literature within the ***last 23 years***" at all—and of the six total articles that he did publish a quarter-century ago, not one was on gender-affirming surgeries for patients with gender dysphoria. (*Id.* at 129; *see id.* at 130-134.)

As a substitute for first-hand experience, Dr. Lappert cites a handful of studies in his report about supposed complications from gender-affirming surgery.  But reading studies does not make one an expert.  That is just the sort of "generalized knowledge of a particular subject" that courts have rejected as a qualification under Rule 702.  *Martinez*, 2007 WL 2570362, at *2.  As with the disqualified expert in *Lebron* who "reached his opinion . . . by relying on studies," reading literature is not enough.  772 F.3d at 1369.

It is also telling that the Code of Ethics of the American Society of Plastic Surgeons ("ASPS") prohibits members from giving this kind of unfounded testimony.[2]  Section IV of that Code of Ethics says that "to help limit false, deceptive and/or misleading testimony, Members serving as expert witnesses **must**:   1.  Have ***recent and substantive experience*** (as defined in the Glossary of the Code) in the area in which they testify[.]"  (Ex. 4 at 6.) The Glossary, in turn, defines "recent and substantive experience" to mean (among other requirements) that the member "has performed the specific procedure in question within three (3) years of the date of being retained as an expert witness."  (*Id.* at 8.)

Dr. Lappert fails these requirements.  Far from having actually performed any of the gender-affirming procedures that he criticizes in his report (*see* Ex. 1 at 29-39)—***ever***, let alone within the last three years—Dr. Lappert was emphatic that he would never perform such surgeries because he does not "see them as beneficial."  (Ex. 2 at 150.)  To be sure, the ASPS Code of Ethics is not a substitute for the Court's Rule 702 inquiry.  But the fact that the ASPS prohibits members from providing these kinds of ill-informed expert opinions precisely to "help limit false, deceptive, and/or misleading [expert] testimony" from being offered in court (Ex. 4 at 6) should give the Court serious pause, to say the least, about allowing Dr. Lappert's testimony.

---

[2] Dr. Lappert resigned from ASPS around the time his board certification lapsed (Ex. 2 at 100-101), but he was a member from 1997 to 2017, and he agreed that ASPS is a "reputable organization" to which "93 or so percent of all plastic surgeons" in the country belong.  (*Id.* at 102-103.)

8

### B.   Dr. Lappert Has No Basis to Offer Opinions on Topics Outside of Plastic Surgery.

Dr. Lappert also offers a grab-bag of opinions on topics far outside his field of plastic surgery—including endocrinology (*e.g.*, opining whether puberty-blocking agents and cross-sex hormones like testosterone are appropriate treatments for gender dysphoria), psychiatry (*e.g.*, criticizing how patients are diagnosed with gender dysphoria), and more.

Dr. Lappert has no qualifications or any other basis to give any of these opinions, and they all should be excluded.  For example, he has no basis to opine about purported risks of puberty-blocking treatments, given that he agreed that he is "not an endocrinologist" and has "no specialized training or expertise in endocrinology."  (Ex. 2 at 153, 204.)  He also has "never prescribed any puberty-blocking drugs of any kind"; and indeed, he admitted: "I ***do not*** consider myself an expert in that area" and "that's not my area of expertise."  (*Id.* at 201, 203.)

The same is true for Dr. Lappert's opinions on cross-sex hormone treatments— given that he admits that he has "never prescribed cross-sex hormones for treatment of gender dysphoria," and that he has "no firsthand experience with advising [his] patients about potential risks and benefits" of such treatment.  (*Id.* at 214.)  Here, again, Dr. Lappert conceded that he does not "hold [himself] out as an expert in endocrinology," and that he does not plan to offer "any expert opinions in endocrinology in this case because that's outside [his] scope of expertise."  (*Id.* at 204.)  All of his purported opinions related to endocrinology should be excluded accordingly.

9

Dr. Lappert also has no qualifications—or any other basis—to opine about diagnosis or treatment of mental conditions. He admits that he has "very limited psychiatric/psychological knowledge"; he is "not a psychiatrist" or "a licensed mental healthcare provider of any kind"; and in his "professional day-to-day practice," he "do[es] not diagnose mental health conditions of any kind." (*Id.* at 68, 153-54.)[3]  Thus, as Dr. Lappert conceded, "for any patient that presents to [him] with a mental health condition," he would "send them to someone who is . . . trained in how to diagnose mental health conditions."). (*Id.* at 157.)  And after all of these admissions, he also conceded that he "do[es] not hold [himself] out as an expert in ***diagnosing*** mental health conditions outside, potentially, of body dysmorphic disorder," and that he also does "not have special[ized] training or expertise in ***treating*** mental health conditions." (*Id.* at 75.)

In short, while Dr. Lappert does not even have the relevant expertise to opine about gender-affirming surgery, he certainly does not have the expertise to "waltz into the courtroom" and mislead a factfinder with purported expert testimony about endocrinology, psychiatry, or anything else. *See Clark*, 192 F.3d at 759 n.5.  So at the very least, all of his opinions outside of plastic surgery should be excluded.

---

[3] Dr. Lappert said he feels qualified to identify a potential diagnosis of body dysmorphia, and to then "offer referral for psychiatric/psychological support and evaluation" to those patients. (Ex. 2 at 72.)  Body dysmorphic disorder is a distinct condition from gender dysphoria, however, that "is primarily characterized by an excessive preoccupation with a perceived defect or flaw in appearance that others cannot see or would judge as slight in appearance." (Ex. 17 at 1; Ex. 2 at 71 ("They see a defect that you don't see.").)

10

II.     **Dr. Lappert's Opinions on Topics Outside of Gender-Affirming Surgery Do Not "Fit" the Disputed Issues, Are Unreliable, Or Both.**

An expert's testimony should only be admitted if it is reliable.  And "proffered evidence that has a greater potential to mislead than to enlighten should be excluded."  *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018).

Even if the testimony is reliable, the court must still "satisfy itself that the proffered testimony is relevant to the issue at hand, for that is a precondition to admissibility." *Sardis*, 10 F.4th at 282.  "The test for relevance, or fit, considers whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Viva Healthcare Packaging USA Inc. v. CTL Packaging USA Inc.*, 197 F. Supp. 3d 837, 846 (W.D.N.C. 2016).

This case turns on whether Defendants' exclusion of coverage for gender-confirming health care treatments violates Plaintiffs' rights under the equal protection clause, Title VII, and Section 1557 of the Affordable Care Act.  Many of Dr. Lappert's opinions are both unreliable and irrelevant to this inquiry, as described below.

A.     **Far from Being Generally Accepted, Dr. Lappert's Opinions Have Been Rejected by the Scientific Community.**

General acceptance is a reliability factor, *Nease*, 848 F.3d at 229, and the fact that a particular theory "has been able to attract only minimal support within the community may properly be viewed with skepticism."  *Daubert*, 509 U.S. at 594.  Dr. Lappert asserts that gender-affirming surgical and hormonal treatments "have not been accepted by the relevant

scientific communities" (Ex. 1 at 40), but this is not true.  In fact, it is Dr. Lappert's opinions that are on the scientific fringe, to say the least.

Another court found as much just last year in addressing a challenge to Arkansas' state-law ban on gender-affirming treatment for minors, where Dr. Lappert had offered virtually identical opinions to support that ban.  *Brandt v. Rutledge*, 4:21-cv-450 (E.D. Ark.); Ex. 2 at 33-34; Ex. 5 (Lappert *Brandt* Declaration).  In *Brandt*, Dr. Lappert asserted that "'[g]ender affirming' treatments are experimental," which he agreed was "basically the same opinion that [he] offered in this case."  (Ex. 2 at 35.)  Drs. Hruz and Levine had also submitted similar declarations in *Brandt* in support of the ban.  (*See id.* at 33-34.)

The *Brandt* court preliminarily enjoined the ban on August 2, 2021 (Ex. 6), squarely rejecting these opinions.  That court recognized that "the consensus recommendation of medical organizations is that the **only** effective treatment for . . . gender dysphoria is to provide gender-affirming care," citing briefs from organizations like the American Medical Association, American Academy of Pediatrics, and many more.  (*Id.* at 6 n.3; Br. of Am. Med. Ass'n, et al. (ECF No. 131 (expressing same views in this case).)  *Brandt* also found that "gender-affirming treatment is supported by medical evidence that has been subject to rigorous study," and that "**every** major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people."  (Ex. 6 at 7-8.)

As Dr. Lappert admitted, *Brandt*'s findings were "contrary to the opinions that [he] offered."  (Ex. 2 at 39.)  And as he also agreed, "every major expert medical association

12

disagrees with [him] because they've all taken [the] position that this treatment is in fact medically necessary." (*Id.* at 40; *see also id.* (agreeing the same is true regarding Drs. Hruz and Levine).)  In fact, Dr. Lappert admits that there are at least "18 different professional medical organizations" that "take[] the view that's contrary to the opinions that [he] and Dr. Hruz and Dr. Levine are offering" here, testifying that "there's a consensus of consensus on this, exactly." (*Id.* at 42.)

That consensus also includes Dr. Lappert's own former association, the ASPS. While he says that gender-affirming surgery is experimental, the ASPS said the exact opposite in a February 2021 statement—stating that it "***firmly believes*** that plastic surgery services can help gender dysphoria patients align their bodies with whom they know themselves to be," and promising to "continue its efforts to advocate across state legislatures for full access to medically necessary transition care." (Ex. 8 at 3.)  So as Dr. Lappert admitted, the ASPS also "does not agree with [his] opinions that gender-affirming surgery is experimental." (Ex. 2 at 112-13.)

And it is not just professional medical associations either.  ***Every major insurer*** in the country also says that gender-affirming surgical and hormonal treatments are medically necessary, as Dr. Lappert also admitted.  (Ex. 2 at 334-38 & Ex. 9 at 2 (BCBS North Carolina policy, stating that "[s]ervices for gender affirming surgery and hormone therapy may be considered medically necessary when the criteria below are met"); Ex. 2 at 427-28 & Ex. 10 at 1 (similar for Aetna); Ex. 2 at 430-33 & Ex. 11 (similar for Cigna); Ex. 2 at 434-39 & Ex. 12 (similar for UnitedHealthCare).)

13

In short, this overwhelming consensus confirms that far from being generally accepted, Dr. Lappert's opinions are fringe and unreliable.

**B.    Dr. Lappert's Critiques of WPATH, Endocrine Society Guidelines, DSM-V, and Other Organizations' Positions Are Unreliable.**

Aware that his views are contrary to those of every major medical society and professional organization, Dr. Lappert tries to dismiss every single one of them as partisan—part of the same supposed "Transgender Treatment Industry" that he crusades against.   For example, he contends that the "WPATH, APA, AAP," and "AMA" all supposedly rely on a "non-scientific" methodology, and that the guidelines and position statements issued by every one of those organizations are "political" and are "not the product of a reliable scientific method."  (Ex. 1 at 10-11.)

These opinions are—again—not generally accepted, to put it mildly.  Just recently, the Fourth Circuit confirmed that the WPATH guidelines in particular "represent the consensus approach of the medical and mental health community" and "have been recognized by various courts, including [the Fourth Circuit], as the authoritative standards of care."  *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020).   "There are ***no*** other competing, evidence-based standards that are accepted by any nationally or internationally recognized medical professional groups," in fact.  *Id.* at 595-596.

Dr. Lappert's deposition further confirmed that his critiques are baseless *ipse dixit* because he admitted that he has no idea how any of these standards of care were actually developed, and on what scientific basis.  Take WPATH SOC Version 7 ("WPATH7"), for example.  Dr. Lappert admits that he has "not been involved with the development" of

14

WPATH7; he does not "know what kind of scientific literature [review] the WPATH conducted as part of drafting" WPATH7; he does not know what kind of "peer review" or "outside experts" or "public comments" the WPATH may have relied on in developing WPATH7, or how many "different drafts" the WPATH7 went through, or "what may have gone on during [WPATH] meetings or conferences" to discuss the development of WPATH7.  (Ex. 2 at 184-87.)  And after these admissions, Dr. Lappert unsurprisingly conceded that he is "***not an expert*** in how Version 7 of the WPATH was developed." (*Id.* at 188.)  The same is true for WPATH SOC Version 8.  (*Id.* at 189 (agreeing he does not "hold [himself] out as an expert on how Version 8" is being developed).)

The same is also true with respect to Dr. Lappert's critiques of other standards of care and position statements:

- Endocrine Society Guidelines for Treatment of Gender Dysphoria:  Dr. Lappert does not know when these guidelines "were initially published" or "last revised"; he was "not involved with the[ir] development"; he does not know "what kind of scientific literature review" went into that development; thus, he agrees he is "***not an expert*** in how the Endocrine Society developed the original 2009 guidelines" or "the 2017 updates" (Ex. 2 at 195-200);

- DSM-5:  Dr. Lappert has "not been involved with the development of DSM-5"; does not know "what kind of scientific literature review was done" during that development; does not know what went on during "different meetings or conferences" to "discuss that development"; thus, he "do[es] ***not*** have expert firsthand knowledge of how the DSM-5 was developed" (*id.* at 190-93);

- AMA Position Statement on Gender-Affirming Treatment:  Dr. Lappert "do[es] not know how the AMA came to issue this consensus statement" and has "no personal knowledge what scientific literature they reviewed"; thus, he has "***no idea*** . . . how the AMA came to reach this consensus statement" (*id.* at 47-48);

- <u>American Academy of Pediatrics Position Statement on Gender-Affirming Treatment</u>: has no "personal knowledge" of how the AAP adopted this statement (*id.* at 48).

In the end, Dr. Lappert agreed more broadly that he does "not have firsthand knowledge of how **any** of those organizations came to reach these positions," and that he "do[es] not know what scientific literature they relied on." (*Id.* at 49-50.) He should not be allowed to mislead a factfinder with these unfounded *ipse dixit* critiques. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### C.   Dr. Lappert's Opinions About the Need for Randomized Clinical Trials Are Unreliable.

A key component of Dr. Lappert's opinions is that surgical and hormone gender-affirming treatments are supposedly experimental because they are unsupported by results from randomized clinical trials ("RCTs"). (*See, e.g.*, Ex. 1 at 5 (arguing that "properly conducted [RCTs] and long-term treatment outcome studies" are necessary to make "experimental procedures actual, proven treatments"). But his deposition confirmed that these critiques are baseless because he agreed that:  (1) it is common for surgeons to perform procedures unsupported by RCT results; and (2) in any event, it is not possible to conduct RCTs for hormonal or surgical gender-affirming treatments.

<u>First</u>, RCTs in surgery are exceedingly rare.   The ASPS's Plastics and Reconstructive Surgery Journal—which Dr. Lappert agreed is the "premier peer-reviewed source for current information on reconstructive and cosmetic surgery" (Ex. 2 at 296)—confirms as much.  As a 2019 study found, in 2018, "only *2.1 percent* of all publications" in the ASPS Journal "were level 1 [*i.e.*, RCT] evidence"; "in 2008 and 2013, those

16

percentages were **0.3** and **1.7 percent** respectively," as he also agreed.  (*Id.* at 299, 302; Ex. 7 (Sugrue study)).  Given this paucity of RCTs, Dr. Lappert unsurprisingly conceded that surgeons in the real world do not actually wait for RCT results before deciding that a particular procedure is non-experimental.  (Ex. 2 at 294-95 (agreeing it is "not uncommon for plastic surgeons to perform procedures that are not supported by results from an RCT").)  In fact, he **himself** does not even "think it's necessary for a surgical procedure to be supported by results from a[n] . . . RCT before it can be considered effective."  (*Id.* at 285.)  Rule 702 demands that experts apply "the same level of intellectual rigor [in the courtroom] that characterizes the practice of an expert in the relevant field."  *Cooper*, 259 F.3d at 200.  Here, though, Dr. Lappert tries to impose an impossible RCT-based standard that he concedes surgeons in the real world—including himself—do not actually apply.

Second, it is not possible to perform RCTs for gender-affirming surgery or hormonal treatment.  Dr. Lappert conceded this too:  he agreed "it is not possible to perform RCTs for some surgical procedures because you can't blind the patient or the investigator to what the procedure is" (meaning, it is impossible to do the surgery without the patient and the investigator knowing that it was done)—including for "phalloplasty," "metoidioplasty," and more generally for all types of what is "colloquially known as bottom surgery."  (Ex. 2 at 315-16.)  He also agreed the same is true for "puberty-blocking hormones," since they cause "observable physical effects"; thus, "it's not possible to do an RCT for puberty-blocking hormones" either.  (*Id.* at 316-18.)  And he also conceded that the same is true for

17

cross-sex hormones, because those also cause "physical effects" and thus "it's not possible to design a double-blind RCT" for those treatments. (*Id.* at 318-19.)

Given all this, Dr. Lappert should not be permitted to offer his misleading opinion that gender-affirming surgery and hormone treatments are experimental in the absence of RCT support.

### D.     Dr. Lappert's Speculation About "Detransitioners," "Regret" and "Social Contagion" Is Unreliable.

Dr. Lappert also opines that some patients will "drop out of transitioning or reverse the process" (so-called "detransitioners"); others will experience "regret" after surgery; and yet others supposedly develop gender dysphoria as a result of "social contagion" like "peer group, social media, [and] YouTube role modeling." (Ex. 1 at 21-22, 40.)

None of this passes *Daubert* muster. To start, none of these opinions are even remotely connected to Dr. Lappert's experience as a plastic surgeon, given that he studiously avoids performing gender-affirming surgical procedures due to his personal beliefs, and has "never treated a single patient for gender dysphoria." (Ex. 2 at 150-51; *SAS Inst., Inc.*, 125 F. Supp. 3d at 589 (when an expert relies on experience, he must show how his "experience leads to the conclusion reached" and "why that experience is a sufficient basis for the opinion").)

Next, Dr. Lappert's own report makes clear that these are all speculative hypotheses at best. For instance, he admits that the extent of "social contagion" is unknown, writing: "a currently <u>unknown</u> percentage and number of patients reporting gender dysphoria are being manipulated by . . . social contagion and social pressure processes." (Ex. 1 at 40

18

(underlining in original).)  He also wrote the same thing about "desistance" and "regret," stating that these phenomena have "to my knowledge ***not been quantified or well-studied***." (*Id.* at 21 (emphasis in original).)

Dr. Lappert's deposition confirmed that these opinions are pure guesswork.  He conceded that he is "not aware of any peer-reviewed studies that quantifies the number of people" affected by social contagion, and that "we don't know the numbers."  (Ex. 2 at 367-38; *id.* at 373 ("At present, we're ***hypothesizing*** about the actual cause.").)  The same was true for his "regret" opinions.  (*Id.* at 329 (agreeing "there's no data available on the percentage of people" treated for "gender dysphoria who experience regret.").)

But "the courtroom is not the place for scientific guesswork, even of the inspired sort." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996); *accord, e.g.*, *Small v. WellDyne, Inc.*, 927 F.3d 169, 176-77 (4th Cir. 2019) (expert testimony "must not be based on belief or speculation").  Dr. Lappert's speculation about regret, de-transitioning, and social contagion should be excluded accordingly.

### E.     Dr. Lappert's Opinions About Risks Communicated to Plaintiffs Are Unreliable.

Dr. Lappert also purports to opine about what risks were or were not communicated to individual Plaintiffs before they started gender dysphoria treatment.  (*See, e.g.*, Ex. 1 at 50 (for C.B., asserting there is no evidence that "the parents were counseled concerning" risks of "off-label use of puberty blocker"); *id.* (opining there was a "failure to obtain proper informed consent" for Plaintiff "CT-F").)

There is no basis for these opinions either.  Dr. Lappert "did not meet with any of the plaintiffs" and has "never spoken" with any of them about what risks their doctors discussed.  (Ex. 2 at 417-18.)  He was "not present in any meetings that any of these plaintiffs may have had with their mental health professionals," or their "endocrinologists," or their "surgeons"; thus, outside of reviewing medical records, he has no idea "what was said or not said during those meetings." (*Id.* at 418-19.)  With no reliable basis to say what was or was not communicated during these meetings, Dr. Lappert should not be permitted to create confusion with this speculation.  *See, e.g.*, *Small*, 927 F.3d at 176-77.

## III.   Dr. Lappert's Opinions Are Based on His Personal Beliefs Rather than Science.

Reliability is a flexible inquiry, under which "courts must ensure that an expert's opinion is based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Sardis*, 10 F.4th at 281.  There is ample evidence that Dr. Lappert's opinions are so tainted by his strong personal views against gender-affirming care as to make those opinions unreliable.  To be clear, Plaintiffs do not seek to impugn whatever moral or religious views Dr. Lappert may hold.  But because those views plainly inform the opinions that he offers here—indeed, they seem to be the main driver of those opinions—they are something the Court should consider in assessing their reliability.

Dr. Lappert readily admits that he has "strong personal opinions on whether doctors should be providing gender-affirming treatment to minors." (Ex. 2 at 79.)  That's putting it mildly.  He has urged state legislatures in Utah, Arkansas, Alabama, and Texas (at least) to pass laws that would ban doctors from being able to provide this medical care for

20

adolescents.  (*Id.* at 57, 61-62; *id.* at 54-55 (agreeing he has "actively lobbied to get these kinds of bans passed").)  For example, he spoke in favor of the ban before the Alabama legislature and "publish[ed] an op-ed" that urged the legislature to protect what he called "gender-confused children."  (Ex. 2 at 77, 64, 76 & Ex. 14.)  He likewise threw his support behind a similar proposed ban in Utah—arguing to the legislature that "you can't change a person's sex," and that "all that is happening is that the patient is undergoing an intentional mutilation in order to create a counterfeit appearance of the other sex."  (Ex. 13 at 5).

Dr. Lappert was unapologetic about these opinions at his deposition.  He testified that he "absolutely" stands by them, and that he "absolutely" considers "gender reassignment surgery to be an intentional mutilation."  (Ex. 2 at 60.)  What's more, he also wants doctors who perform these gender-affirming surgeries to be "criminally prosecute[d]"—agreeing that he thinks "that's a good idea."  (*Id.* at 52.)

And even though Dr. Lappert was understandably more careful in how he phrased his expert report—avoiding inflammatory language that he uses outside of litigation, like calling gender-affirming care "intentional mutilation"—sometimes the mask slips.  For instance, his report accuses every single doctor and organization who oppose his views of being part of some made-up "Transgender Treatment Industry."  That is obviously not "a commonly used term in the field of treatment and diagnosis of gender dysphoria," as he admitted; instead, it is "idiosyncratic" to his report.  (*Id.* at 21-22.)

Dr. Lappert has also worked closely with the Alliance Defending Freedom ("ADF"), an organization he agreed has "moral objections" to gender-affirming healthcare.  (*Id.* at

21

83, 82.)  Among other things, he attended an ADF conference that discussed the "poverty of [experts] who are willing to testify" about these anti-gender-affirming treatments.  (*Id.* at 90-91.)  Attendees at that conference "were asked whether they would be willing as participate as expert witnesses"; not coincidentally, Dr. Lappert became an expert witness for the first time after attending that conference.  (*Id.* at 91.)

Dr. Lappert's report also unapologetically misgenders individual Plaintiffs— "referring to [them] in a way that doesn't align with their gender"—because in Dr. Lappert's view, he is "obliged to honor objective biological realities" (*id.* at 447), which is to say that he does not believe that a person's birth-assigned sex can ever be changed.  (*See also id.* at 448 ("I think it's essential that we stick to the biological reality that . . . biological sex is ***immutable***.").)

And then there are Dr. Lappert's many public interviews and presentations where he crusades against gender-affirming care.  These include, for example, his views that the religious conception of "the human person" "defines the 'end' of medical and surgical care." (Ex. 2 at 459.)  They also include his opinions that "changing a person's sex is a lie and also a moral violation for a physician," and that gender-affirming surgery is "diabolical in every sense of the word."  (*Id.* at 464 & Ex. 16 at 1, 7; Ex. 2 at 465 (agreeing that he "hold[s] those views").  And finally, these also include his inflammatory views that parents who "discuss[] gender identity issues with children" are "sexualizing them" (Ex. 2 at 462), and that these conversations are "grooming a generation" for abuse.  (*Id.* at 461 & Ex. 15 (Dr. Lappert's presentation titled "Transgender Surgery & Christian Anthropology") at 23;

22

*see also* Ex. 16 at 1, 2 (another interview with Dr. Lappert titled "Plastic surgeon: sex-change operation 'utterly unacceptable' and a form of 'child abuse'"; reporting that "regarding children, Lappert said, sexualizing them at a young age with these ideas is grooming them for later abuse.").)

These are obviously not neutral, well-reasoned scientific opinions by a dispassionate expert.  It is moral opprobrium masquerading as science, and it should be excluded as such.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Court should exclude Dr. Lappert's opinions in full.

Dated:  February 2, 2022

/s/ Amy E. Richardson
Amy E. Richardson
(N.C. Bar No. 28768)
Lauren E. Snyder
(N.C. Bar No. 54150)
HARRIS, WILTSHIRE & GRANNIS LLP
1033 Wade Avenue, Suite 100
Raleigh, NC 27605-1155
Phone: 919-429-7386 | Fax: 202-730-1301
arichardson@hwglaw.com

Deepika H. Ravi*
HARRIS, WILTSHIRE & GRANNIS LLP
1919 M Street N.W., 8th Floor,
Washington, D.C. 20036
Phone: 202-730-1300 | Fax: 202-730-1301
dravi@hwglaw.com

Michael W. Weaver*
Adam M. Safer*
MCDERMOTT WILL & EMERY
444 W. Lake St., Suite 4000
Chicago, IL 60606
Phone: 312-984-5820 | Fax: 312-984-7700
mweaver@mwe.com

Lauren H. Evans*
MCDERMOTT WILL & EMERY
500 N. Capitol St., NW
Washington, D.C. 20001
Phone: 202-756-8864 | Fax: 202-591-2900
levans@mwe.com

Respectfully submitted,

/s/ Dmitriy Tishyevich
Dmitriy Tishyevich*
Warren Haskel*
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 212-547-5534
Fax: 646-417-7668
dtishyevich@mwe.com

Tara Borelli*
Carl S. Charles*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1 West Court Square, Ste. 105
Decatur, GA 30030
Telephone: 404-897-1880
Facsimile: 404-506-9320
tborelli@lambdalegal.org

Omar Gonzalez-Pagan*
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
Telephone: 212-809-8585
Facsimile: 212-809-0055
ogonzalez-pagan@lambdalegal.org

David Brown*
TRANSGENDER LEGAL DEFENSE AND
EDUCATION FUND, INC.
520 8th Ave, Ste. 2204
New York, NY 10018
Telephone: 646-993-1680
Facsimile: 646-993-1686
dbrown@transgenderlegal.org

*Counsel for Plaintiffs*

\* Appearing by special appearance pursuant to L.R. 83.1(d).

24

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief is in compliance with Local Rule 7.3(d)(1) because the body of this brief, including headings and footnotes, does not exceed 6,250 words as indicated by Microsoft Word, the program used to prepare this document.

Dated:  February 2, 2022

/s/ Dmitriy Tishyevich
Dmitriy Tishyevich*
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY 10017
Telephone: 212-547-5534
Facsimile: 212-547-5444
dtishyevich@mwe.com

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all registered users.

Dated:  February 2, 2022

/s/ Dmitriy Tishyevich
Dmitriy Tishyevich
MCDERMOTT WILL & EMERY LLP
One Vanderbilt Avenue
New York, NY  10017-3852
Phone: 212-547-5534
Fax: 646-417-7668
dtishyevich@mwe.com

25

EXHIBIT O

Michael Laidlaw                                          September 2, 2022

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF F WASHINGTON

AT TACOMA

_____

C.P., by and through his parents,  )

Patricia Pritchard and Nolle       )

Pritchard and PATRICIA PRITCHARD,  )

       Plaintiffs,              )

  vs.                              ) No. 3:20-cv-06145-RJB

BLUE CROSS BLUE SHIELD OF          )

ILLINOIS,                          )

       Defendant.               )

_____

ZOOM VIDEO DEPOSITION UPON ORAL EXAMINATION

OF

MICHAEL LAIDLAW

_____

9:00 a.m.

September 2, 2022

REPORTED BY:  Pat Lessard, CCR #2104

Michael Laidlaw                                    September 2, 2022

                                                              Page 2
 1                   A P P E A R A N C E S
 2    FOR THE PLAINTIFFS:
 3          MS. ELEANOR HAMBURGER
 4          Sirianni, Youtz, Spoonemore & Hamburger
 5          3101 Western Avenue, Suite 350
 6          Seattle, Washington 98121
 7          206.223.0303
 8          ele@sylaw.com
 9          MR. OMAR GONZALEZ-PAGAN, pro hac vice
10          Lamda Legal Defense and Education Fund
11          120 Wall Street, 19th Floor
12          New York, NY 1005
13          212.809.9585
14          ogonzalez-pagan@lambdalegal.org
15
16    FOR THE DEFENDANT:
17          MS. GWENDOLYN PAYTON
18          Kilpatrick Townsend
19          1420 Fifth Avenue, Ste. 3700
20          Seattle, WA 98101
21          206.467.9600
22          gpayton@kilpatricktownsend.com
23
24    ALSO PRESENT:
25          MR. PATRICK NORTON, Videographer

Michael Laidlaw                                    September 2, 2022

                                                              Page 6

 1   MICHAEL LAIDLAW,          being duly sworn, testified

 2                            upon oath, as follows:

 3               E X A M I N A T I O N

 4   BY MR. GONZALEZ-PAGAN:

 5        Q.   All right.  I think we're good to proceed.

 6             Good morning, Dr. Laidlaw, thank you for

 7   joining us today.  It's afternoon for me; I'm in New

 8   York.

 9        A.   Okay.

10        Q.   Are you in California today?

11        A.   Correct.

12        Q.   Okay.  So as you might have heard, I

13   represent the plaintiffs in this matter and I will be

14   asking you some questions about your opinions in this

15   case.

16        A.   Okay.

17        Q.   First I just want to go over some ground

18   rules for the deposition which will make it easier for

19   everyone and most importantly for our court reporter.

20             You understand that you're under oath

21   today, is that correct?

22        A.   Yes.

23        Q.   We cannot speak at the same time because the

24   court reporter needs to be able to take down what each

25   of us says.

Michael Laidlaw                                    September 2, 2022

Page 28

1    where a researcher, say a medical doctor, is a

2    researcher, there are patients that collect data, say

3    temperature and blood tests, and then draw up a

4    journal article and have it published with all of

5    their observations and those sorts of thing.

6              If we could call that primary research, as

7    opposed to, say, a meta-analysis where there are a

8    number of different studies that have already been

9    done -- if you want to call those primary research --

10   and then someone comes up with a conclusion based on

11   those other studies.

12        Q.   (By Mr. Gonzalez-Pagan)  Thank you.  That's

13   very helpful.

14              So what I'm trying to do is for us to have

15   an understanding of what we're talking about so

16   that --

17        A.   Sure.

18        Q.   -- so we can have some questioning about it.

19        A.   Yes.

20        Q.   So I'm trying to establish a distinction

21   between original research, okay, where there's

22   collection of data, right --

23        A.   Yes.

24        Q.   -- and the observations being done by the

25   researcher, versus secondary research which is based

Michael Laidlaw                                    September 2, 2022

 1    on existing publications and preexisting data.

 2            I think that's the distinction that you were

 3    drawing in your answer as well, is that correct?

 4    A.    Yes.

 5    Q.    So would you be comfortable with that

 6    understanding, that shared understanding of -- do you

 7    know what I mean by primary research?

 8    A.    Yes, I understand your meaning.

 9    Q.    Have you performed any primary research?

10    A.    Yes.

11    Q.    On what?  On what matters?

12    A.    There were two studies.  One was a magnesium

13    study that had to -- we're looking for an association

14    of low magnesium leading to osteoporosis.

15            And the other study was regarding thyroid

16    cancer where we were looking at thyroid globulin tumor

17    markers and how they correlated with ultrasound

18    findings of the neck.

19    Q.    And when did you perform this research?

20    A.    This was during my -- it may have begun

21    during my -- I think it began during my residency and

22    then I continued into fellowship.

23    Q.    Have you performed any primary research

24    regarding gender dysphoria?

25    A.    No.

Michael Laidlaw                                    September 2, 2022

Page 30

```
 1       Q.   Have you performed any primary research
 2  relating to transgender people?
 3       A.   No.
 4       Q.   Have you performed any primary research
 5  relating to gender identity?
 6       A.   No.
 7       Q.   Do you have any peer-reviewed publications?
 8       A.   Yes.
 9       Q.   Do you have a copy of your CV with you?
10       A.   No.
11       Q.   I will show you what's been marked as
12  Exhibit 2.
13       A.   Okay.
14       Q.   And this is a copy of your CV, right?
15            Well, it's not showing yet.  This is a copy
16  of your CV, right?
17       A.   Yes.  It's the one we looked at earlier.
18       Q.   And you have here a section titled
19  "Research, Publications, and Expert Witness Work," is
20  that right?
21       A.   Yes.
22       Q.   And we can scroll through it but just go
23  area by area.
24            Can you tell me which the -- within the
25  screen showing right now which of these publications
```

Michael Laidlaw                                    September 2, 2022

                                                        Page 42

 1              THE VIDEOGRAPHER:  We're going off the

 2     record at 10:00 a.m.

 3                    (Recess.)

 4              THE VIDEOGRAPHER:  We're back on the record

 5     at 10:07 a.m.

 6        Q.   (By Mr. Gonzalez-Pagan)  We left off

 7     discussing your publications.  Do you recall that,

 8     Dr. Laidlaw?

 9        A.   Yes, I do.

10        Q.   Just to sum up, none of your publications

11     pertaining to gender dysphoria are based on original

12     primary research, is that correct?

13        A.   That's correct.

14        Q.   And with the exception of the piece in the

15     Journal of Bioethics none of your publications

16     pertaining to gender dysphoria are peer-reviewed?

17        A.   Well, a number are published in peer-reduced

18     journals.

19        Q.   Sorry.  The Letters to the Editor, is that

20     right?

21        A.   The Letters to the Editors are in

22     peer-reviewed journals, yes.

23        Q.   We've established that you have a private

24     practice dedicated to endocrinology, is that correct?

25        A.   That's correct.

Michael Laidlaw                                      September 2, 2022

Page 49

1   you're providing him to align his body with his sex

2   assigned at birth to be treatment for gender

3   dysphoria?

4        A.   No.   This is a treatment for testosterone

5   deficiency.

6        Q.   How long have you been seeing this person?

7        A.   I think I first saw him in May.

8        Q.   So then let me reask the prior question now

9   that we have some further clarification.

10       A.   Yes.

11       Q.   Beyond the patient for whom you provided

12   that one prescription of estrogen, have you provided

13   any patient with care as treatment for their gender

14   dysphoria?

15       A.   No.

16       Q.   Have you monitored any patient undergoing

17   gender affirming medical treatment?

18       A.   When you say "monitor," do you mean monitor

19   specifically for effects of that treatment?

20       Q.   Yes.   Or worked with, like a patient that is

21   undergoing medical care and you're overseeing in some

22   way their laboratories, their care.

23       A.   I've had patients with gender dysphoria that

24   I'm seeing for other reasons that I'm monitoring their

25   laboratory or imaging, stuff like that.

Michael Laidlaw                                    September 2, 2022

1      Q.   But you're not treating them yourself for

2    gender dysphoria, is that right?

3      A.   Correct.

4      Q.   Have you ever conducted a review of medical

5    necessity as an insurance company employee or as an

6    external reviewer?

7      A.   No.

8      Q.   All right.  Let's talk a little bit about

9    your report.

10     A.   Okay.

11     Q.   And by "a little," I mean the bulk of the

12   next conversation.

13     A.   Okay.  I kind of figured.

14     Q.   What did you do to prepare your report?

15     A.   To prepare my report?

16     Q.   Yes.

17     A.   Let's see.  I reviewed -- I reviewed the

18   materials from paragraph ten.

19          I looked at -- spent a lot of time with

20   medical records and the clinical visit notes and

21   laboratories and so forth of Dr. Hatfield and

22   Dr. Kyllo.

23          Yeah, I read through the expert declarations

24   and looked to build my report based on those items.

25     Q.   Does the report we have, your report which