**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division**

| | |
|---|---|
| AUGUST DEKKER, et al., | |
| *Plaintiffs*, | |
| v. | Case No. 4:22-cv-00325-RH-MAF |
| SIMONE MARSTILLER, et al., | |
| *Defendants*. | |

## SUPPLEMENTAL EXPERT DECLARATION OF LOREN S. SCHECHTER, M.D.

I, Loren Schechter, pursuant to 28 U.S.C. §1746, declare as follows:

1.     I have been retained by counsel for the Plaintiffs as an expert in the above-captioned lawsuit. I previously submitted an expert witness declaration [Dkt. No. 11-4] ("Schechter Dec.") in connection with Plaintiffs' motion for a preliminary injunction in this case.

2.     I submit this declaration to respond to points raised in the declaration of Patrick W. Lappert, M.D. [Dkt. No. 49-1 App. 557-90] ("Lappert Dec."), which Defendants submitted in connection with their response to Plaintiffs' motion for a preliminary injunction.

1

3.     My background, qualifications, and compensation for my services in this case, and the bases for my opinions in this case are described in my original declaration. In preparing this declaration, I was provided with and reviewed the following additional case-specific materials: Expert Declaration of Patrick W. Lappert, MD, with attachments.

4.     I have personal knowledge of the matters stated in this supplemental declaration.

5.     I note that since I submitted my prior declaration, WPATH has published version 8 of the Standards of Care.[1] While version 8 does contain important updates with respect to gender-affirming surgery, it does not change the substance of any of the opinions I expressed in my previous declaration.

6.     Dr. Lappert continues to misunderstand that gender dysphoria is a valid medical diagnosis. *See* Schechter Dec. ¶ 37. Because he does not accept gender dysphoria as a diagnosis, it is no surprise that Dr. Lappert disagrees that surgery is an appropriate reconstructive treatment. But his views on the appropriateness of surgery and other medical interventions to treat gender dysphoria fall far outside of the medical mainstream.

---

[1] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, Int'l J. of Transgender Health S1 (2022), https://www.tandfonline.com/doi/full/10.1080/26895269.2022.2100644.

**American Plastic Surgery Society Levels of Evidence**

7.      Dr. Lappert discusses the American Society of Plastic Surgeons Levels of Evidence extensively, suggesting that because there are Level IV and V studies supporting gender-affirming surgical procedures, these surgeries are not established as safe, effective, or accepted. Lappert Dec. ¶¶ 25-27, 55. As I described in my prior declaration, there are practical and ethical limitations on conducting studies in clinical medicine, especially in surgery. Schechter Dec. ¶¶ 54-56. That does not mean that studies with lower levels of evidence are not useful to inform clinical decision making.

8.      In fact, Dr. Lappert ignores that the quality of the evidence supporting gender-affirming surgeries is similar to that supporting many common plastic surgeries. For example, Dr. Lappert points to his experience performing surgery to treat cleft palate and craniofacial differences. Lappert Dec. ¶¶ 8, 10. However, there are only a small number of studies providing Level 1 evidence for that treatment.[2] Scientific ratings of evidence generally employ extremely high standards that are not satisfied for many commonly-

---

[2] *See, e.g.*, Jonathan M. Bekisz, *A Review of Randomized Controlled Trials in Cleft and Craniofacial Surgery*, 29 J. of Craniofacial Surgery 219 (2018).

prescribed treatments and procedures.[3] Such ratings do not mean that the treatment is unsupported in the literature and clinical practice, or that it is not medically necessary. The level of evidence does not always speak to the quality of the research, including because conducting prospective, randomized, double-blind, placebo-controlled studies is not always the optimal or appropriate choice for a particular research question, and in some areas, is not feasible or ethical. *See* Schechter Dec. ¶¶ 54-56.

9.      Dr. Lappert is also wrong to suggest that studies are the only way for surgeons to determine the appropriate course of treatment for a particular condition. Critical review of the scientific literature is certainly an important component as to how surgeons evaluate whether a particular procedure is generally safe and effective and whether it is appropriate or recommended for an individual patient. But in addition to considering the literature en masse, we must also account for our own clinical experience and that of our colleagues, as well as our patients' experiences and input. Here, the existing literature, taken as a whole, combined with my own experience and that of many colleagues,

---

[3] *See, e.g.*, Bernard T. Lee, et al., *Evidence-Based Clinical Practice Guideline: Autologous Breast Reconstruction with DIEP or Pedicled TRAM Abdominal Flaps*, Plastic and Reconstructive Surgery, 140(5):651e-664e (Nov. 2017); doi: 10.1097/PRS.0000000000003768.

indicates that gender affirming surgery is a safe and effective treatment for individuals with gender dysphoria.

10.     In fact, since I submitted my prior declaration, a higher level study has been published showing that in transgender and nonbinary adolescents and young adults, top surgery is associated with low complication rates and improved chest dysphoria, gender congruence, and body image satisfaction.[4] That study adds to the body of evidence supporting the use of gender affirming surgery in patients with gender dysphoria.

**Surgery, Like All Medicine, Is An Evolving Field**

11.     Dr. Lappert focuses on the evolution of treatment for gastric ulcers to support his claims that using Level 4 and 5 evidence to support surgical treatment "can result in grave missteps." Lappert Dec. ¶ 27. But as Dr. Lappert notes, once Level 1 and 2 studies demonstrated that gastric ulcers could be treated with medications, the standard of care changed. This is common in medicine. As the research and clinical evidence evolves, treatment evolves in turn.[5] For example, we previously counseled patients that the only way to lose weight was through dietary changes. Now, we use surgical interventions, such

---

[4] *See* Mon Ascha et al., Top Surgery and Chest Dysphria Among Transmasculine and Nonbinary Adolescents and Young Adults, JAMA Pediatrics (Sept. 26, 2022), doi:10.1001/jamapediatrics.2022.3424 .
[5] *See, e.g.,* Conor M. Sugrue et al., *Levels of Evidence in Plastic and Reconstructive Surgery Research: Have We Improved Over the Past 10 Years?,* 7 Plast. Reconstruct. Surg. Global Open e2408 (2019).

as bariatric surgery, to treat obesity in certain situations. Notably, Dr. Lappert does not – and cannot – point to any research showing that treatment other than gender-affirming care is effective for gender dysphoria.

**Reconstructive Surgeries**

12.     Dr. Lappert misconstrues the distinction between reconstructive and cosmetic surgery. He suggests that a mastectomy performed to treat gender dysphoria is cosmetic because it "will produce a degradation or loss of two essential human functions, namely: sexual arousal, and breast feeding." Lappert Dec. ¶¶ 42. Here, he makes at least two incorrect assumptions. First, research, as well as my clinical experience, shows that gender-affirming mastectomy is associated with an increase in sexual satisfaction.[6] Second, not all patients view breastfeeding as a desirable function. What is more, Dr. Lappert ignores that a mastectomy performed to treat breast cancer will likewise result in the inability to breast feed. So, his assertion that any procedure that causes a loss of function is cosmetic cannot be correct.

13.     Dr. Lappert later suggests that the difference between reconstructive surgery (which he states that insurance will cover)  and cosmetic

---

[6] *See, e.g.,* Cori A. Agarwal et al., *Quality of Life Improvement After Chest Wall Masculinization in Female-To-Male Transgender Patients: A Prospective Study Using the BREAST-Q and Body Uneasiness Test*, 71 Journal of Plastic, Reconstructive & Aesthetic Surgery 651-657 (2018).

surgery (which he states that insurance will not) turns on pathology reports, using breast reduction surgery and surgery to treat gynecomastia as examples. Lappert Dec. ¶¶ 47-48. But, for both of those procedures, the American Society of Plastic Surgeons states that symptomatology – not pathology reports – is the important determinant for insurance coverage.[7]

14.     As I described in my prior declaration, it is the underlying diagnosis that distinguishes a reconstructive procedure from a cosmetic one. Schechter Dec. ¶¶ 33-37. Gender-affirming surgery is considered medically necessary, reconstructive surgery when performed in accordance with the WPATH Standards of Care because it is clinically indicated to treat the underlying diagnosis of gender dysphoria. Schechter Dec. ¶¶ 34-35.

15.     Ultimately, Dr. Lappert classifies gender-affirming procedures as cosmetic because he does not believe that gender dysphoria is a valid diagnosis for which surgery is necessary, pointing to the lack of "objective" tests for the condition. Lappert ¶¶ 31, 42, 47-48. *See also* Lappert ¶ 51 (stating that the condition of a cancer patient "is far more grievous" than the condition of a

---

[7] *See* American Society of Plastic Surgeons, ASPS Recommended Insurance Coverage Criteria for Third-Party Payers, Reduction Mammaplasty (2021), https://www.plasticsurgery.org/documents/Health-Policy/Reimbursement/insurance-2021-reduction-mammaplasty.pdf; American Society of Plastic Surgeons, ASPS Recommended Insurance Coverage Criteria for Third-Party Payers, Gynecomastia, https://www.plasticsurgery.org/documents/Health-Policy/Positions/Gynecomastia_ICC.pdf.

person with gender dysphoria). That belief conflicts with the consensus of the
medical community. Schechter Dec. ¶¶ 22, 28.

16.    In addition, his reliance on "objective" tests is misplaced. What he
considers to be objective tests – an x-ray, pathology report, or lab value – are
open to interpretation. It is not uncommon to have conflicting opinions
regarding an x-ray or a pathology report. In addition, while various tests may be
considered in regards to establishing a diagnosis, the tests are usually
interpreted within the clinical context. For example, x-ray reports typically
include the phrase "clinical correlation is recommended." Finally, Dr. Lappert
ignores that once a diagnosis is established, treatment then depends on a
discussion with the patient. That discussion includes information from the
literature, but also includes other clinical considerations, such as the patient's
values, preferences, choices, and autonomy, which Dr. Lappert disregards. For
example, while Dr. Lappert references complex oropharyngeal reconstruction,
*see* Lappert Dec. ¶ 51, he fails to acknowledge that there are other methods for
treating and/or reconstructing this complex defect, as there are other techniques
for reconstructing genitalia to treat gender dysphoria. Thus, while Dr. Lappert
may be describing his preferred approach to patient care, that approach does not
reflect the clinical reality of medicine in 2022.

**Informed Consent and Mental Health**

17.    It is not uncommon for patients needing surgery for a wide variety of conditions to have been diagnosed with mental health conditions; this includes transgender patients. Dr. Lappert claims that surgery of any kind is inappropriate for someone with a behavioral health condition such as autism, depression, or anxiety. Lappert Dec. ¶¶ 43. But patients with these and other mental health conditions regularly and appropriately consent (and assent, as described below) to surgical care. Generally, these conditions do not prevent patients from understanding the procedure, the risks and complications of the procedure, and the benefits that they can reasonably expect to achieve from surgery. Rather, in some cases, surgeons and their colleagues will work with patients in a capacity referred to as "prehabilitation" to address mental health conditions and psychosocial considerations that could impact surgical results.[8] The WPATH Standards of Care are consistent with that approach. *See* Schechter Dec. ¶ 31.

18.    Dr. Lappert also misunderstands the informed consent process for minors, claiming they "by definition are not competent to consent." Lappert Dec. ¶ 43. When individuals under age 18 seek any surgery, including gender

---

[8] *See* James Durrand et al., *Prehabilitation*, 19 Clin. Med. 458-64 (2019).

affirming surgery, it is their parent or guardian that must provide informed consent. Of course, the adolescent must also assent to gender confirming surgery.

19. In sum, not all people with gender dysphoria need, want or are candidates for surgery. However, in appropriately-selected and prepared people, surgery is safe, effective, and medically necessary. *See* Schechter Dec. ¶ 26-28.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___6th___ day of October, 2022.

Loren S. Schechter, M.D.