IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

AUGUST DEKKER, et al.,

        *Plaintiffs*,

v.

SIMONE MARSTILLER, et al.,

        *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

**SUPPLEMENTAL EXPERT DECLARATION OF
DR. DAN H. KARASIC, M.D.**

I, Dan H. Karasic, M.D., hereby declare and state as follows:

1. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

2. I have personal knowledge of the matters stated in this supplemental declaration.

3. I submit this declaration to respond to points raised in the declarations of Dr. Andre Van Mol, Dr. Michael K. Laidlaw, Dr. James Cantor, Dr. G. Kevin Donovan, Dr. Geeta Nangia, and Dr. Kristopher Kaliebe, which Defendants submitted in connection with their response to Plaintiffs' motion for a preliminary injunction.

4. I have personal knowledge of the matters stated in this supplemental declaration.

5. I previously submitted an expert witness declaration [Dkt. 11-3] in support of Plaintiffs' motion for a preliminary injunction in this case.

6. My background, qualifications, and compensation for my services in this case, and the bases for my opinions in this case are described in my original declaration.

7. Since I submitted my prior declaration, WPATH has published version 8 of the *Standards of Care for the Health of Transgender and Gender Diverse People* ("WPATH SOC-8").[1]

8. The SOC-8 is based upon a more rigorous and methodological evidence-based approach than previous versions. (Coleman, et al., 2022). This evidence is not only based on the published literature (direct as well as background evidence) but also on consensus-based expert opinion. Its recommendations are evidence-based, informed by a systematic review of evidence and an assessment of the benefits and harms of alternative care options. The process for development of the SOC-8 incorporated recommendations on clinical practice guideline

---

[1] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, Int'l J. of Transgender Health S1 (2022), https://www.tandfonline.com/doi/full/10.1080/26895269.2022.2100644.

development from the National Academies of Medicine and The World Health Organization. Its recommendations were graded using a modified GRADE methodology (Guyatt, et al., 2011), considering the available evidence supporting interventions, risks and harms, and feasibility and acceptability.

9. While SOC-8 includes important updates, it does not change the substance of any of the opinions I expressed in my previous declaration. Indeed, SOC-8 continues to recommend the provision of medical interventions, such as puberty blockers, hormone therapy, and surgery, as medically appropriate and necessary treatments for gender dysphoria, based on an individual patient's needs.

## REBUTTAL TESTIMONY

10. The opinions expressed and critiques outlined in my original declaration apply to the various new declarations submitted in support of defendants' response to the motion for a preliminary injunction. Below, I outline some additional critiques based on my review of these declarations.

*Rebuttal to Dr. Van Mol*

11. In his declaration, Dr. Van Mol sets up a straw man of "self-diagnosis" and "affirmation on demand." Dr. Van Mol states that WPATH supports "self-diagnosis" and "treatment on demand." In fact, WPATH Standards of Care 8 requires a diagnosis when used in local contexts, which in the United States is

3

Gender Dysphoria under the DSM 5-TR. Diagnoses for care are made by clinicians caring for patients.

12. Dr. Van Mol provides no evidence of "affirmation on demand" leading to poor outcomes, citing instead papers in which patients with gender dysphoria were given DSM diagnoses by clinicians.

13. Dr. Van Mol mentions the *interim* report by Dr. Hillary Cass in the United Kingdom and the closure of the Tavistock clinic in the UK. He fails to mention that the report recommends more access to care, based on a regional rather than single centralized model for the entire country, and that two clinics will be opened to replace Tavistock, with more to come, with the intent of expanding access to care for transgender youth.

14. Dr. Van Mol's efforts to separate UK policy from WPATH SOC-8 recommendations are incorrect. SOC-8 benefitted from the leadership of several UK-based clinicians and academicians, like Dr. Jon Arcelus, MD, co-editor of SOC-8, Dr. Christina Richards, PhD, chapter lead of the Assessment chapter, and Dr. Walter Bouman, MD, who oversaw the SOC 8 process as WPATH president.

15. Dr. Van Mol cites an opinion in Bell v. Tavistock that was overturned on appeal regarding the legal capacity of minors to consent for medical treatment in the UK. In Florida and most other states, however, it is parents or legal guardians

4

who consent for minors' care. WPATH SOC-8 provides guidance on clinicians assessing the cognitive maturity for minors to assent for care, but consent is by parents or adult guardian.

16.   Dr. Van Mol cites Dhejne, et al. (2011), for the proposition that suicide rates were higher in the 324 patients who received gender affirming surgery from 1973-2003, than in the general population. However, Dr. Dhejne herself notes that the study does not compare those that had surgery with those that did not, so it really does not measure the effectiveness of care. In the last 15 years of the 30-year study, there was no statistical difference in suicide rates, and the total number of suicides over 30 years were 10 in trans people versus 5 in general population control.

17.   Dr. Van Mol relies heavily on statements by others who oppose gender-affirming care, rather than on data and studies themselves. These provide no counter to the many studies that provide evidence of the benefits of gender-affirming care, including those discussed or cited in my original declaration.

*Rebuttal to Dr. Laidlaw*

18.   Dr. Laidlaw states that Gender Dysphoria was a rare condition in children and adolescents. There is little data on the frequency of those meeting the Gender Dysphoria in Children criteria over time as the diagnosis has only existed in its current criteria since 2013. The current diagnosis of Gender Dysphoria in

Children was preceded by the diagnosis of Gender Identity Disorder of Childhood contained in prior versions of the DSM, like the DSM-IV, which included a broader population of gender diverse children.

19. Moreover, population surveys asking adolescents their gender identity are a recent phenomenon, and include larger numbers, but not evidence of substantial change when the same population has been surveyed over time. As WPATH SOC-8 notes, the Littman study of social contagion has significant limitations—only parents, not gender-dysphoric youth were surveyed, and recruited from websites concerned about social contagion, and the results have not been replicated.

20. Dr. Laidlaw also uses old studies of desistance in pre-pubertal youth to argue against treatment of youth in adolescence. The newest cited study (Singh 2012) includes data from youth in the Toronto clinic from as far back as the 1970s. These older studies included pre-pubertal gender diverse youth who only met broader, obsolete diagnostic criteria that did not require the youth to have a transgender identity, and included some youth who had no diagnosis at all. In any event, in the same clinics following these youth in Toronto and in Amsterdam, if gender dysphoria was present in adolescence, it was treated with puberty blockers and hormones.

21.     Regarding sexual functioning in those given puberty blockers early in development, van der Meulen, et al. (2022) reported that from long-term follow up of the Dutch cohort who received puberty blockers at Tanner stages 2 and 3, when surveyed as adults after gender affirming surgery, 81% of trans women were able to orgasm, a higher percentage than those who received gender-affirming treatment that started later in adolescence. Thus, from available data, the use of puberty blockers early in adolescence did not harm sexual functioning.

22.     Regarding fertility, effects of gender-affirming care on fertility are discussed with parents and the adolescent before starting gender-affirming care. Some youth and their parents choose to preserve fertility through sperm or ova and have financial resources to do so. This is part of the equation of weighing risks and benefits. Moreover, many trans people retain reproductive capacity and some bear children. While fertility concerns are taken seriously by youth, their parents, and treatment providers, these deeply personal decisions are made by families and their doctors, not the state.

23.     Lastly, Dr. Laidlaw purports to review the clinical cases of the plaintiffs, without having met or examined them. He attempts to make clinical recommendations, based on partial records, that they should not receive gender-affirming care. Dr. Laidlaw lacks the training and experience in transgender care or

mental health to make these recommendations. This is compounded by his making clinical recommendations for those who are not his patients and whom he has not examined, and by making false assumptions in each case. Making these clinical recommendations is highly speculative and inappropriate.

*Rebuttal to Dr. Cantor*

24. Dr. Cantor attempts to counter the statement in my declaration that the sole contemporary American longitudinal study, by Olson, et al. (2022) shows very low desistance rates. He uses a study by Singh, et al. (2021) to claim there is recent evidence of high desistance. In fact, though Singh was recently published, it is a study of feminine boys from as far back as 1975, with a mean year of evaluation of 1989. This overlaps with other reports of these feminine boys from the same Toronto clinic, who received the now obsolete Gender Identity Disorder of Childhood, if they received any diagnosis. While the feminine prepubertal boys in this study predominately identified as gay and bisexual men as adults, patients in the same clinic who had gender dysphoria continuing into adolescence were treated with puberty blockers and hormones.

25. Dr. Cantor disputes my statement that transgender identity is not a paraphilic disorder. Transgender identity is not a paraphilic disorder nor itself a mental disorder. The American Psychiatric Association, in its list of mental

disorders, states that the Gender Dysphoria diagnosis is based on "distress, not identity per se." (DSM-5, APA 2013). DSM-5 further states in the Paraphilic Disorders chapter that those with a paraphilic disorder "Do not report an incongruence between their experienced gender and assigned gender nor a desire to be of the other gender."

*Rebuttal to Dr. Donovan*

26.  Dr. Donovan replies to my ethical concerns about forced detransition by cutting off the current care received by transgender people on Medicaid by stating that gender-affirming care should include provisions for detransitioners. In fact, WPATH provides training on working with detransitioners, and has included detransition in SOC-8. However, this volitional detransition by choice, an uncommon occurrence that should be taken seriously by health professionals, is a very different ethical concern than forcing large numbers of poor and disabled people off care involuntarily. I am surprised that Dr. Donovan seems unable to distinguish between these very different circumstances.

*Rebuttal to Dr. Nangia*

27.  Dr. Nangia, who has practiced in State College, Pennsylvania and Greenville South Carolina, reports to have seen over a thousand youth with gender dysphoria or transgender identity in her 15 years of practice. These high numbers

are very suspect and are not typical for a general psychiatric practice. By comparison, the UCSF Child and Adolescent Gender Center, a specialty clinic providing gender-affirming medical care which attracts referrals from across the country and around the world, has only seen approximately 2,000 gender diverse and transgender youth in its 10 years of existence, and treated approximately 1,200 with puberty blockers and hormones. For Dr. Nangia to have cared for over 1,000 transgender and gender dysphoric youth, she would have to had one of the largest psychiatric practices caring for trans youth in the United States, and yet has not previously reported on this cohort. Notwithstanding her claim, I was unfamiliar with Dr. Nangia prior to reading her declaration and I have practiced as a psychiatrist in this field for over 30 years.[2]

28.     Without elaboration, Dr. Nangia claims her patients have not benefitted from gender-affirming care. Four of the largest gender clinics, UCSF, Children's Hospital of Los Angeles, Northwestern, and Boston Children's first reported at the WPATH Biennial Symposium in Montreal on a cohort of 315 transgender

---

[2] According to the Williams Institute, the estimated population of transgender youth (ages 13-17) is only 3,200 in South Carolina and 10,000 in Pennsylvania. (Herman, et al., 2022).  Pennsylvania has well-established and recognized multidisciplinary gender clinics like the ones at Children's Hospital of Philadelphia and UPMC Children's Hospital of Pittsburgh.  Similarly, South Carolina has a multidisciplinary pediatric transgender clinic at MUSC Children's Health.

adolescents that were followed for two years after starting gender-affirming hormones, who showed improvement on mental health measures and on body congruence. Again, without elaboration, Dr. Nangia reports that her patients have regretted gender-affirming medical treatment. A study of 209 gender-affirming mastectomies in transmasculine adolescents under 18, performed at Kaiser Permanente Northern California from 2013 to 2020, showed a regret rate of 1%. (Tang, et al., 2022).

29. Dr. Nangia mentions a doubling of estimates of the number of transgender youth by the Williams institute. This increase is in large part because of a change in methodology, from just using the Behavior Risk Factor Surveillance System (BRFSS) to using both the BRFSS and the Youth Risk Behavior Survey (YRBS). The YRBS is a survey of high school students that includes large urban school systems, including the San Francisco Unified School District. It has higher estimates than the BRFSS, which has been relatively stable over time.

## CONCLUSION

30. There is a large and growing body of evidence, as well as a consensus of experts in the just published WPATH Standards of Care Version 8, that demonstrate the benefits and medical necessity of gender affirming care to people with gender dysphoria.

11

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and corrected.

Executed this 6th day of October 2022.

                                                    Dan H. Karasic, M.D.

# EXHIBIT A

*Supplemental Bibliography*

**SUPPLEMENTAL BIBLIOGRAPHY**

American Psychiatric Association. (2013). Diagnostic and Statistical Manual of Mental Disorders (5th ed.). Arlington, VA: American Psychiatric Publishing.

Chen D, et al. Mental Health and Psychosocial Functioning in Transgender Adolescents Two Years After Gender-Affirming Hormone Treatment. Presented at WPATH Biennial Symposium, Montreal, Sept. 2022.

Coleman, E., et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, Int'l J. of Transgender Health S1 (2022), https://www.tandfonline.com/doi/full/10.1080/26895269.2022.2100644.

Dhejne C, Lichtenstein P, Boman M, Johansson ALV, Långström N, et al. (2011) Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden. PLOS ONE 6(2): e16885. https://doi.org/10.1371/journal.pone.0016885

Endocrinology & Diabetes, MUSC Children's Health, https://musckids.org/our-services/endocrinology-and-diabetes (last accessed Oct. 6, 2022).

Gender and Sexual Development Program, UPMC Children's Hospital of Pittsburgh, https://www.chp.edu/our-services/aya-medicine/gender-development (last accessed Oct. 6, 2022).

Gender and Sexuality Development Program, Children's Hospital of Philadelphia, https://www.chop.edu/centers-programs/gender-and-sexuality-development-program (last accessed Oct. 6, 2022).

Guyatt, G., Oxman, A. D., Akl, E. A., Kunz, R., Vist, G., Brozek, J., Norris, S., Falck-Ytter, Y., Glasziou, P., & deBeer, H. (2011). GRADE guidelines: 1. Introduction—GRADE evidence profiles and summary of findings tables. *Journal of Clinical Epidemiology*, *64*(4), 383–394. https://doi.org/10.1016/j.jclinepi.2010.04.026.

Herman, J.L., Flores, A.R., O'Neill, K.K. (2022). How Many Adults and Youth Identify as Transgender in the United States? The Williams Institute, UCLA School of Law

Olson, K. R., Durwood, L., Horton, R., Gallagher, N. M., & Devor, A. (2022). Gender Identity 5 Years After Social Transition. *Pediatrics*, *150*(2), e2021056082.

Singh D, Bradley SJ and Zucker KJ (2021) A Follow-Up Study of Boys With Gender Identity Disorder. *Front. Psychiatry* 12:632784. doi: 10.3389/fpsyt.2021.632784

Van der Meulen, I, Hannema, SE, de Vries, ALC. The effect of puberty suppression on sexual functioning in trans women after gender affirmative surgery: Can they orgasm? Presented at WPATH Biennial Symposium, Montreal, Sept. 2022.