Case 4:22-cv-00325-RH-MAF   Document 58-5   Filed 10/07/22   Page 1 of 16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

AUGUST DEKKER, et al.,

    *Plaintiffs*,

v.

SIMONE MARSTILLER, et al.,

    *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

**SUPPLEMENTAL EXPERT DECLARATION OF
DR. JOHANNA OLSON-KENNEDY, M.D., M.S.**

I, Johanna Olson-Kennedy, M.D., M.S., hereby declare and state as follows:

1. I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

2. I have personal knowledge of the matters stated in this supplemental declaration.

3. I submit this declaration to respond to points raised in the declarations of Dr. Michael M. Laidlaw, M.D., Dr. Andrew Van Mol, M.D., and Dr. James Cantor (attachments 4, 6, and 11 to Defendants' Appendix), which Defendants submitted in connection with their response to Plaintiffs' motion for a preliminary injunction.

4. I have personal knowledge of the matters stated in this supplemental declaration.

5. I previously submitted an expert witness declaration [Dkt. 11-2] in support of Plaintiffs' motion for a preliminary injunction in this case.

6. My background, qualifications, and compensation for my services in this case, and the bases for my opinions in this case are described in my original declaration.

7. Since I submitted my prior declaration, WPATH has published version 8 of the *Standards of Care for the Health of Transgender and Gender Diverse People* ("SOC8").[1] Importantly, SOC8 is based on the best available science and expert professional consensus in transgender health; its recommendation statements were developed based on data derived from independent systematic literature reviews, background reviews, and expert opinions; and its grading of recommendations was based on the available evidence supporting interventions, a discussion of risks and harms, as well as the feasibility and acceptability of these.

8. While SOC8 contains important updates with respect to gender-affirming surgery, it does not change the substance of any of the opinions I expressed

---

[1] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, Int'l J. of Transgender Health S1 (2022), https://www.tandfonline.com/doi/full/10.1080/26895269.2022.2100644.

in my previous declaration. Indeed, SOC8 continues to recommend the provision of medical interventions, such as puberty blockers, hormone therapy, and surgery as treatment for gender dysphoria, based on an individual patient's needs.

9. In preparing this supplemental declaration, I relied on my training and years of research and clinical experience, as set out in my curriculum vitae attached to my original declaration, and on the materials listed therein; the materials referenced in my original declaration and listed in the bibliography attached thereto; and on the materials referenced herein and the supplemental bibliography attached as Exhibit A.  reserve the right to revise and supplement the opinions expressed in this report or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.

## REBUTTAL TESTIMONY

*Rebuttal to Dr. Laidlaw*

10. Dr. Laidlaw utilizes many of the same arguments against gender affirmation that are presented in the reports that were attached to GAPMS Memo and which I have addressed in my original declaration.  These include his arguments about the high desistence rates of children, the inability of adolescents and their parents to make informed decisions, social contagion theory, lack of good quality

3

data, blockers and social transition as gateways to gender affirming medical treatment and an overemphasis on the secondary sex characteristics as reproductive tools.

11. Dr. Laidlaw does not include the most recent study examining persistence, that also has the largest sample size: Kristina R. Olson, Lily Durwood, Rachel Horton, Natalie M. Gallagher, Aaron Devor; Gender Identity 5 Years After Social Transition, Pediatrics, August 2022; 150 (2): e2021056082. 10.1542/peds.2021-056082. This study demonstrated that 94% of the transgender youth in this study continued to have a transgender identity five years after enrollment.

12. From his declaration, it is evident that Dr. Laidlaw does not work with transgender youth, nor does he have a good understanding of the care, as illustrated by the points below.

13. In many places throughout his report, Dr. Laidlaw references the use of "high dose" hormones. Nowhere does he provide a definition of "high dose."

14. Dr. Laidlaw writes: "There are also serious concerns regarding liver dysfunction: "Prolonged use of high doses of androgens ... has been associated with development of hepatic adenomas [benign tumors], hepatocellular carcinoma [cancer], and peliosis hepatis [generation of blood-filled cavities in the liver that may

4

rupture] —all potentially life-threatening complications" (Actavis Pharma, 2018). (Laidlaw Dec. at 20.)  The source document Dr. Laidlaw relies on describes these side effects of liver dysfunction as related to the use of 17alpha-AAS, Methyltestosterone, Oxandrolone, Oxymetholone and Stanozolol.  These are not medications routinely used in gender-affirming care. Masculinization is achieved with testosterone esters, most commonly, testosterone cypionate. Someone who practices this medicine would know this.

15.   Similarly, Dr. Laidlaw writes: "Moreover, "[s]tudies ... of medium steroid use (between 300 and 1000 mg/week of any AAS) and high use (more than 1000 mg/week of any AAS) have demonstrated that 23% of subjects using these doses of steroids met the DSM-III-R criteria for a major mood syndrome (mania, hypomania, and major depression) and that 3.4% — 12% developed psychotic symptoms." (Laidlaw Dec. at 22.)  Again, if he was familiar with the care, he would be aware that testosterone doses for masculinization are not even close to the "medium" dosing described above.  In fact, most commonly patients are being prescribed 60-100 mg a week.

16.   Dr. Laidlaw repeatedly presents irrelevant data in order to create confusion and incite fear.  He presents source data with very few subjects, or quotes studies with statistics that sound alarming, but does not accurately represent the

5

absolute risk of potential side effects. Additionally, he fails to mention the positive medical side effects of hormones.

17. For example, Dr. Laidlaw writes that "Breast cancer is a relatively uncommon problem of the male. However the risk of a male developing breast cancer has been shown to be 46 times higher with high dose estrogen." (Laidlaw Dec. at 23.) The source document he relies on says on its first page that "The absolute risk of breast cancer in transgender people remains low, and therefore following breast cancer screening guidelines for cisgender people seems sufficient for transgender people using hormone treatment."

18. Breast cancer risk is higher among transgender women compared to cisgender males, but lower than cisgender women. The fact that transgender individuals adopt a similar health risk profile to their cisgender counterparts is not surprising. Accordingly, transgender men have a lower risk of breast cancer than cisgender men.

19. Neither a practitioner in gender care, nor a researcher, Dr. Laidlaw further demonstrates his lack of understanding about transgender adolescent development when he writes about the apparent "impairment of sexual function" by relying on an episode of the TLC reality show "I am Jazz," where the protagonist of the show, Jazz, visited a surgeon and discussed sexual function. (Laidlaw Dec. at

6

16). If Dr. Laidlaw had experiencing caring for transgender youth, he would not distill the experiences of all transgender girls treated with puberty-delaying medication in early puberty to two sentences from a reality TV show on TLC. Many transgender girls have difficulty with masturbation because of a disconnection between themselves and their genitals. It takes conversation and education to help patients develop comfort with self-pleasure. Many patients do get over this discomfort and have both sexual sensation and orgasm.

20. Dr. Laidlaw further asserts that the psychosocial development of transgender youth treated with puberty blockers "will be necessarily stunted as they are not developing with their peers" and that "[t]his is a permanent harm as the time cannot be regained." (Laidlaw Dec. at 17.) This assertion completely discounts the understanding that pubertal trajectories vary between individuals.

21. Pubertal development has a wide variation among individuals. Puberty in people assigned male at birth typically begins anywhere from age 9 to age 14, and sometimes does not complete until past 18. For people assigned female at birth, puberty typically ranges from age 8 to age 17.

22. If a 13-year-old cisgender female had not yet started puberty, we would not give them exogenous hormones so that they were peer concordant with the

majority of their peers simply because they are on the later side of the normal range for puberty commencement.

23. Protocols used for the treatment of transgender youth tend to put the start of puberty using exogenous hormones in the latter third of typical puberty for the sex consistent with their identity, but nothing outside of the typica range.

24. Dr. Laidlaw also asserts that "there are unknown, but likely negative consequences to blocking normal puberty with respect to brain development." Dr. Laidlaw's assertion based on pure supposition. What is known is that untreated gender dysphoria has a tremendously negative impact on the quality of life and functioning of adolescents.

25. Finally, it should be noted that Dr. Laidlaw's commentary regarding the specific course of care of the plaintiffs is not reliable and highly suspect. It is inappropriate for Dr. Laidlaw to offer a recommendation about the specific course of care for plaintiffs when he has neither met nor treated these patients and is basing his recommendations on an incomplete and partial view of their medical history. Moreover, Dr. Laidlaw does not appear to be experienced in the provision of gender-affirming care and does not offer any recommendation for the treatment of people's gender dysphoria, including plaintiffs.

26. More specifically, in his comments about plaintiffs, Dr. Laidlaw makes references to doses of testosterone but only mentions the concentration of the suspension (200 mg/mL) not the *actual* dose. Dr. Laidlaw also repeatedly points out the coexistence of mental health concerns, including anxiety, depression, and ADHD. These are very common diagnoses in adolescents at large, and it is well-documented that youth with gender dysphoria have even higher rates of anxiety and depression likely *as a result of* their gender dysphoria. Moreover, there is no reason that youth with coexisting anxiety, depression and ADHD should be denied care related to gender dysphoria.

27. Dr. Laidlaw also unabashedly declares professionals "unfit" to provide both diagnoses of gender dysphoria and medical treatment of gender dysphoria. This is not only an appalling display of unprofessionalism, it demonstrates his lack of understanding about how multidisciplinary teams function in the care of transgender youth. He has no personal knowledge of these providers' training and leans on his own "hierarchy of professionals" that places medical doctors at the top to deem whether or not people are qualified to be doing the work they are doing. This declaration from a provider who clearly does not practice in this field of medicine is unprecedented.

28. Dr. Laidlaw's suggestion that medical services related to gender dysphoria for plaintiffs, who he has not met nor treated, should be discontinued is misinformed and dangerous.

29. Dr. Laidlaw is not an expert in the care of transgender youth, nor is he an investigator in transgender care or any other topic. His CV consists largely of letters to the editor, speeches advocating against transgender youth care, and providing unsubstantiated "expert testimony" in cases such as these.

*Rebuttal to Dr. Van Mol*

30. Much of Dr. Van Mol's declarations draws upon the existing testimony from others, such as Dr. Stephen Levine and Dr. James Cantor. Dr. Van Mol does not care for transgender patients, and has a clear bias given his listed credentials.

31. The American College of Pediatricians, the Council on Adolescent Sexuality and the Christian Medical & Dental Associations and the Alliance Defending Freedom have historically opposed transgender rights, including access to gender-affirming care, and LGBTQ rights more broadly.

32. Dr. Van Mol refers to the closing of the Tavistock Clinic in the United Kingdom as a justification for denying care to youth with gender dysphoria in Florida. But the closure is not intended to end the provision of gender-affirming care (as Dr. Van Mol and Dr. Laidlaw) would have one believe. It was based on

10

issues such as long waitlists that were documented by Dr. Hillary Cass's "independent review of gender identity services for children and young people" in the United Kingdom.

33. To the contrary, the closure is based on a recommendation by Dr. Hillary Cass to move to a "regionalised service delivery model," that is meant to "*improve access*, networked care, research capacity and workforce development." Simply put, gender-affirming care for youth with gender dysphoria is not being discontinued. Indeed, England's National Health Service has stated that, "The aim is to close the Tavistock clinic [the Gender and Identity Development Service (Gids)] by spring 2023, moving to the new provider model through specialist children hospitals" and noted that the youth "being seen by the Tavistock (and those on waiting lists) will be transferred to a new provider over the course of that time."

34. Dr. Van Mol also repeats the assertion that the use of psychological treatment for patients with gender dysphoria is not proven to be inferior to medical interventions, which is outlandish given the decades of research, scientific study, and clinical experience we now have. In 1966, Harry Benjamin noted in "The Transsexual Phenomenon" that while transsexualism is primarily considered a psychiatric disorder, it is refractory to psychiatric intervention. Over the past 50 years, mental health professionals who have attempted to treat gender dysphoria with

11

psychological interventions that have been unsuccessful.  (Olson-Kennedy Dec. at ¶¶ 110-11.)

35. Dr. Van Mol also presents the same arguments about gender-affirming care, particularly for youth, is purportedly experimental and that there is no good quality evidence because of the lack of an untreated control group. I have addressed these concerns in my original declaration.  (Olson-Kennedy Dec. at ¶¶ 68-88.)  Dr. Van Mol's assertion here is based on the belief that the control group would have access to psychological interventions.  But as, as stated above, this is not true and has proven to be unsuccessful.  Additionally, participants would have to choose to be in a study in which they could receive no medical intervention.  There are distinct issues that I have outlined in my previous testimony regarding the feasibility of RCTs in this context.

36. Finally, Dr. Van Mol omits the importance of clinician experience and patient values in the construct of evidence-based medicine, as noted in my original declaration (Olson-Kennedy Dec. at ¶¶ 85-88).

*Rebuttal to Dr. Cantor*

37. In my original declaration, I discussed at length the challenges of using a grading system to identify research as "high quality" and of the importance of clinical experience and patient values in the practice of evidence-based medicine. I

am not disputing that the research discussed by Dr. Cantor does not reach a grading of high quality, but that RCTs (the "gold standard" of high-quality evidence) are not feasible based on the challenges posed in adolescent gender care research.

38. Dr. Cantor reasserts that mental health therapy alone can improve the mental health of patients with gender dysphoria. (Cantor Dec. ¶ 33.) But gender dysphoria is characterized by the clinically significant distress that results from the incongruence between a person's gender identity and sex assigned at birth. No study has demonstrated that mental health therapy alone is a successful mechanism to manage gender dysphoria.

39. Dr. Cantor also takes issue with my discussion of Harry Benjamin's work based on the fact that the seminal text *The Transsexual Phenomenon* does not mention children. But the Rule at issue in this case prohibits coverage of gender-affirming care for adults and minors alike. Moreover, while I did not represent the quote was referring to children, in fact, Harry Benjamin did care for adolescents. (Dear Doctor Benjamin; Letters from Transsexual Youth, International Journal of Transgenderism Vol 10, 2008) There is no reference to whether or not youth are included in his sentiment, but given that he did care for adolescents, it is likely that he includes them in this sentiment.

## CONCLUSION

40. The testimony of Dr. Van Mol and Dr. Laidlaw exposes that neither of these defendants have experience in the care of transgender adolescents.

41. While it is true that the field of transgender youth care is a growing field, there is ample clinical experience and data to demonstrate the positive impact of medical interventions in the care of youth with gender dysphoria, and to cut off access to this care would have a detrimental impact on a very vulnerable population.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and corrected.

Executed this 7th day of October 2022.

_____
Johanna Olson-Kennedy, M.D., M.S.

14

# EXHIBIT A

*Supplemental Bibliography*

**SUPPLEMENTAL BIBLIOGRAPHY**

American Psychiatric Association. (2013). Diagnostic and Statistical Manual of Mental Disorders (5th ed.). Arlington, VA: American Psychiatric Publishing.

Coleman, E., et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, Int'l J. of Transgender Health S1 (2022), https://www.tandfonline.com/doi/full/10.1080/26895269.2022.2100644.

Darryl B. Hill (2008) Dear Doctor Benjamin: Letters from Transsexual Youth (1963–1976), International Journal of Transgenderism, 10:3-4, 149-170, DOI: 10.1080/15532730802297348

de Blok C J M, Wiepjes C M, Nota N M, van Engelen K, Adank M A, Dreijerink K M A et al. (2019). Breast cancer risk in transgender people receiving hormone treatment: nationwide cohort study in the Netherlands. *BMJ,* 365 :l1652 doi:10.1136/bmj.l1652

Olson, K. R., Durwood, L., Horton, R., Gallagher, N. M., & Devor, A. (2022). Gender Identity 5 Years After Social Transition. *Pediatrics*, *150*(2), e2021056082.

Euling, S. Y., Herman-Giddens, M. E., Lee, P. A., Selevan, S. G., Juul, A., Sørensen, T. I., Dunkel, L., Himes, J. H., Teilmann, G., & Swan, S. H. (2008). Examination of US puberty-timing data from 1940 to 1994 for secular trends: panel findings. *Pediatrics*, *121 Suppl 3*, S172–S191.

Andrew Gregory, NHS to close Tavistock gender identity clinic for children, The Guardian (July 28, 2022), https://www.theguardian.com/society/2022/jul/28/nhs-closing-down-london-gender-identity-clinic-for-children.

The Cass Review, Entry 8 – Beyond the Headlines, https://cass.independent-review.uk/entry-8-beyond-the-headlines/ (last accessed Oct. 7, 2022).

Wyshak, Grace, PhD and Frisch, Rose E., Evidence for a Secular Trend in Age of Menarche, April 29, 1982, N Engl J Med 1982; 306:1033-1035.