**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

```
AUGUST DEKKER, et al.,          )
                                )
              Plaintiffs,       ) Case No: 4:22cv325
                                )
          v.                    ) Tallahassee, Florida
                                ) October 12, 2022
SIMONE MARSTILLER, et al.,      )
                                ) 9:33 AM
              Defendants.       )
_____ )
```

**TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE ROBERT L. HINKLE**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 120)**

```
Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
                         111 North Adams Street
                         Tallahassee, Florida 32301
                         megan.a.hague@gmail.com
```

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

APPEARANCES:

For Plaintiffs:            Lambda Legal
                           By:  OMAR GONZALEZ-PAGAN
                                Attorney at Law
                                ogonzalez-pagan@lambdalegal.com
                           120 Wall Street
                           19th Floor
                           New York, New York 10005

                           Pillsbury, Winthrop, Shaw, Pittman, LLP
                           By:  JENNIFER ALTMAN
                                Attorney at Law
                                jennifer.altman@pillsburylaw.com
                           600 Brickell Avenue
                           Suite 3100
                           Miami, Florida 33131

                           Lambda Legal
                           By:  CARL S. CHARLES
                                Attorney at Law
                                ccharles@lambdalegal.org
                           1 West Court Square
                           Suite 105
                           Decatur, Georgia 30030

                           Southern Legal Counsel Inc
                           By:  SIMONE M. CHRISS
                                CHELSEA LEE DUNN
                                Attorney at Law
                                simone.chriss@southernlegal.org
                                chelsea.dunn@southernlegal.org
                           1229 NW 12th Avenue
                           Gainesville, Florida 32601

                           Florida Health Justice Project
                           By:  KATHERINE JEAN ANN DEBRIERE
                                Attorney at Law
                                debriere@floridahealthjustice.org
                           3900 Richmond Street
                           Jacksonville, Florida 32205

                           National Health Law Program
                           By:  CATHERINE ANNE MCKEE
                                Attorney at Law
                                mckee@healthlaw.org
                           1512 East Franklin Street
                           Chapel Hill, North Carolina 27514

<u>APPEARANCES (continued)</u>:

For Defendants:            Holtzman Vogel Baren, et al.
                           By:  MOHAMMAD OMAR JAZIL
                                GARY VERGIL PERKO
                                MICHAEL BEATO
                                Attorneys at Law
                                mjazil@holtzmanvogel.com
                                garyp@holtzmanvogel.com
                                michaelb@holtzmanvogel.com
                           119 South Monroe Street
                           Suite 500
                           Tallahassee, Florida 32301

1          **P R O C E E D I N G S**

2          (Call to Order of the Court at 9:33 AM on Wednesday,

3     October 12, 2022.)

4               THE COURT:  Good morning.  Please be seated.

5               We're here on the plaintiffs' motion for a preliminary

6     injunction.  I've read all of the papers.  I've read the record.

7     I think I'm up to speed.

8               The plaintiffs submitted evidence but did not indicate

9     they wish to call any live witnesses.  Defense has indicated it

10    wishes to call live witnesses.  Unless either side has something

11    you want to tell me first, we can go straight to the witnesses.

12              Is there anything on the plaintiffs' side you want to

13    tell me before we do that?

14              MR. GONZALEZ-PAGAN:  No, Your Honor.  We're ready to

15    proceed with the witnesses if defendants are.

16              THE COURT:  All right.  And for the defense?

17              MR. GONZALEZ-PAGAN:  Your Honor, we would just note

18    that we would have a standing objection regarding the relevance

19    regarding the lay witnesses, and we filed a motion to that

20    effect as well.

21              THE COURT:  And I read the motion and the response.

22    I'm not going to exclude the witnesses wholesale.  The -- if the

23    testimony is relevant, it's not a very high standard.

24              Yes.

25              MR. PERKO:  May it please the Court, the defense would

Direct Examination – Dr. Laidlaw

1    like to call Dr. Michael K. Laidlaw --

2              THE COURT:  All right.

3              MR. PERKO:  -- by remote -- or video.

4              THE COURT:  All right.  And for what it's worth, I've

5    read Dr. Laidlaw's declaration, so I've seen some of what he has

6    to say.

7              MR. PERKO:  Good morning, Dr. Laidlaw.  Can you hear

8    me?

9              THE WITNESS:  I can hear you okay.

10             THE COURT:  I need to speak with him first.

11             Dr. Laidlaw, are you there in a room by yourself?

12             THE WITNESS:  I am.

13             THE COURT:  All right.  You should be by yourself

14   while you're testifying.  If anyone else comes into the room

15   where you are, if you'd stop and let me know, we'll address it.

16             If you would, please, raise your right hand.

17   **DR. MICHAEL K. LAIDLAW, DEFENSE WITNESS, DULY SWORN**

18             THE COURT:  Please tell us your full name, and spell

19   your last name for the record for our record.

20             THE WITNESS:  Michael K. Laidlaw.  That's spelled

21   L-a-i-d, as in David, L-a-w.

22             THE COURT:  All right.  And the lawyers will have some

23   questions for you.

24             MR. PERKO:  Thank you, Your Honor.

25                          DIRECT EXAMINATION

Direct Examination – Dr. Laidlaw

1   BY MR. PERKO:

2   Q.   Dr. Laidlaw, could you please briefly describe your

3   educational background?

4   A.   Sure.  I got a bachelor's degree of science in biology,

5   concentration in molecular cell biology, at San José State

6   University.  I received a medical doctor degree from University

7   of Southern California in 2001.  I went on to train in an

8   internal medical residency at the same location and did a –– for

9   three years and did a two-year fellowship afterwards in

10  endocrinology, diabetes and metabolism, and took and passed

11  board certifications in both of those areas.

12  Q.   Could you briefly describe your professional experiences in

13  obtaining your degrees?

14  A.   Yes.  Since that time, since 2006, I've been in private

15  practice in endocrinology, primarily outpatient but some

16  inpatient work, in Rocklin, California.

17  Q.   Can you describe us –– or tell us what endocrinology

18  entails?

19  A.   Yeah.  Endocrinology involves the study of disorders of

20  glands and hormones, structural gland disorders such as cancer

21  or tumors, and then hormonal imbalances such as high hormone

22  levels of, say, the thyroid or testosterone or estrogen or low

23  levels of these hormones and the consequences –– physical and

24  mental consequences that occur from these hormones.  And so I

25  diagnosis and treat these conditions.

Voir dire Examination – Dr. Laidlaw

1   Q.   Are you a member of any professional associations?

2   A.   I am a member of the Endocrine Society.

3        MR. PERKO:  Your Honor, at this time we'd proffer

4   Dr. Laidlaw as an expert in endocrinology.

5        MR. CHARLES:  Objection, Your Honor.  I'd like to voir

6   dire the witness.

7        THE COURT:  You may certainly voir dire the witness.

8        MR. CHARLES:  May it please the Court, Your Honor.  My

9   name is Carl Charles for the plaintiffs.

10                    VOIR DIRE EXAMINATION

11  BY MR. CHARLES:

12  Q.   Dr. Laidlaw, can you hear me?

13  A.   Yes.

14  Q.   Okay.  Dr. Laidlaw, you wrote a declaration that was filed

15  in this case; correct?

16  A.   Correct.

17  Q.   And as a part of that declaration, you submitted a CV

18  entitled "Exhibit A"?

19  A.   Yes.

20  Q.   And you're not a practicing psychiatrist; is that correct,

21  Dr. Laidlaw?

22  A.   That is correct.

23  Q.   You are not a licensed mental health care provider; is that

24  correct?

25  A.   That's correct.

Voir dire Examination – Dr. Laidlaw

```
1   Q.   And you're not a psychologist; is that correct?
2   A.   That is correct.
3   Q.   And, Dr. Laidlaw, you're not an obstetrician; is that
4   correct?
5   A.   That is correct.
6   Q.   And, Dr. Laidlaw, you're not a gynecologist; is that
7   correct?
8   A.   That is correct.
9   Q.   And you're not a surgeon, Dr. Laidlaw; is that correct?
10  A.   That's correct.
11  Q.   And you're not a pediatric endocrinologist; is that
12  correct?
13  A.   That is correct.
14  Q.   Less than 5 percent of your patients are under the age of
15  18; is that correct?
16  A.   Yes.
17  Q.   And you're not a bioethicist; is that correct?
18  A.   I have no formal training other than an IRB certification
19  many years ago.
20  Q.   Okay.  So you don't practice as a bioethicist; is that
21  correct?
22  A.   That's correct.
23  Q.   And you haven't done any primary research on fertility; is
24  that correct?
25  A.   No primary research on fertility; that's correct.
```

Voir dire Examination – Dr. Laidlaw

1  Q.   And you haven't done any primary research on sterility; is

2  that correct?

3  A.   That is correct.

4  Q.   And you haven't written any articles which have been

5  subjected to a confirmed peer-review process about fertility; is

6  that correct?

7  A.   I -- specifically about fertility -- I don't know what the

8  peer review -- I had a paper in *The American Journal of*

9  *Bioethics.*  I don't know what the peer-review process was.

10  Q.   Okay.  So you -- again, you have not written any articles

11  which have been subjected to a peer review for process which you

12  can confirm about fertility; is that correct?

13  A.   Not that I can confirm.

14  Q.   And you haven't written any articles that have been

15  subjected to a confirmed peer-review process about sterility; is

16  that correct?

17  A.   Correct.

18  Q.   And you haven't performed any primary research about

19  medical ethics; is that correct?

20  A.   That's correct.

21  Q.   And you haven't written any confirmed peer-reviewed

22  publications about medical ethics; is that correct?

23  A.   I have not independent -- there is the article that I

24  mentioned.  I have not independently confirmed the peer-review

25  process.

Voir dire Examination – Dr. Laidlaw

1  Q.    Okay.  You cannot confirm that that article has been peer

2  reviewed?

3  A.    I cannot confirm.

4  Q.    And you have not performed any primary research about

5  informed consent; is that correct?

6  A.    That's correct.

7  Q.    And you have not written any articles confirmed to be peer

8  reviewed regarding parents' ability to consent for treatment for

9  their minor children; is that correct?

10 A.    I have not written a peer reviewed article on that topic.

11 Q.    And none of the publications listed in your CV attached to

12 your declaration are based on original primary research; is that

13 correct?

14 A.    That's correct.

15 Q.    And you haven't done any primary research about transgender

16 people; is that correct?

17 A.    Just to clarify, when you say "primary research," you're

18 talking about using human subjects in the research -- as part of

19 the research rather than a review of the literature; is that

20 correct?

21 Q.    You haven't done any original primary research about

22 transgender people; is that correct?

23 A.    In the context of working with human subjects, that is

24 correct.

25 Q.    And that includes any research about children and

Voir dire Examination – Dr. Laidlaw

1  adolescents; isn't that correct?

2  A.    Yes.  With regard to human subjects, that is correct.

3  Q.    And you haven't received any grants to support research

4  into endocrine treatments for gender dysphoria; is that correct?

5  A.    That is correct.

6  Q.    And you have not done any original primary research about

7  the treatment of gender dysphoria; is that correct?

8  A.    Not with human subjects; that's correct.

9  Q.    And you haven't performed any original primary research

10  into the frequency of gender -- into how frequently gender

11  dysphoria occurs; is that correct?

12  A.    I have not done primary research involving which -- human

13  subjects on that matter.

14  Q.    And you haven't -- and you have not done any original

15  primary research about the phenomenon of desistance; is that

16  correct?

17  A.    I have not done primary research with human subjects on

18  that condition -- for that condition.

19  Q.    And you've never diagnosed anyone with gender dysphoria; is

20  that correct?

21  A.    That is correct.

22  Q.    And you've previously testified under oath that you've only

23  provided care to one transgender patient related to the

24  treatment of gender dysphoria; is that correct?

25  A.    I have worked with patients with gender incongruence in the

Voir dire Examination – Dr. Laidlaw

1    context of my practice, but as far as providing hormones, there

2    was -- someone with gender dysphoria, there was one.

3    Q.   And it was only to provide that patient with a refill of

4    estrogen; is that correct?

5    A.   There was an evaluation.  There was an office visit, and

6    there was necessity for a refill of estrogen in that case.

7    Q.   Okay.  And so you did not deny the patient the refill of

8    the estrogen?

9    A.   That's correct.

10   Q.   So you have utilized the Endocrine Society guidelines for

11   the treatment of gender dysphoria once; is that correct?

12   A.   This was -- this preceded the Endocrine Society guidelines.

13   Q.   What year was the treatment of that patient?

14   A.   It was in the early 2000s.  It was prior to -- it was prior

15   to 2009, which is when the first Endocrine Society guidelines

16   were published.

17   Q.   In your private practice, Dr. Laidlaw, you do not contract

18   with California Medicaid insurance; is that correct?

19   A.   That's correct.

20   Q.   And you have not spoken with any transgender Florida

21   Medicaid beneficiaries; is that correct?

22   A.   Yeah, not that I'm aware of.

23   Q.   And that would include the plaintiffs in this matter; is

24   that correct?

25   A.   That's correct.

Voir dire Examination – Dr. Laidlaw

1   Q.   And that would also include the parents of the minor
2   plaintiffs in this case; is that correct?
3   A.   Yeah, I have not spoken directly with them.  That is
4   correct.
5   Q.   And you have not evaluated any transgender Florida Medicaid
6   beneficiaries for any endocrine issues; is that correct?
7   A.   That's correct.
8   Q.   And you have not evaluated any of the plaintiffs for issues
9   related to the endocrine treatment they are receiving for their
10  gender dysphoria; is that correct?
11  A.   I have evaluated medical records that were provided to me.
12  Q.   Right.  But you have not evaluated those individuals for
13  the purposes of the endocrine treatment they are receiving as
14  treatment for their gender dysphoria?
15  A.   When you say "evaluate," I presume you mean a direct
16  history and physical evaluation.  I have not done that.
17  Q.   And you have not spoken with any of the plaintiffs' current
18  treating medical providers; is that correct?
19  A.   That's correct.
20  Q.   So you have not spoken with their qualified mental health
21  care professionals; is that correct?
22  A.   That's correct.
23  Q.   And you have not spoken with any of their primary care
24  physicians; is that correct?
25  A.   That's correct.

Voir dire Examination – Dr. Laidlaw

1  Q.   And you have not spoken with any of the plaintiffs' current

2  treating endocrinologists; is that correct?

3  A.   That's correct.

4  Q.   And you have not reviewed the entirety of these

5  individuals' medical records; is that correct?

6  A.   That is correct.

7        MR. CHARLES:  Your Honor, if I may have just one

8  moment to confer with counsel?

9        THE COURT:  You may.

10      (Discussion was held.)

11       MR. CHARLES:  Your Honor, I would make a proffer at

12  this time that due to Dr. Laidlaw's lack of experience treating

13  gender dysphoria or writing or publishing in this area, due to

14  his lack of evaluation of the plaintiffs or the complete review

15  of their medical records, that he not be able to testify further

16  as to the contents of his declaration at this time.

17       THE COURT:  The objection is overruled.  There are

18  subjects on which he may be able to testify.  If you have

19  objections to individual questions, you may object as they

20  arise.

21       MR. CHARLES:  Thank you, Your Honor.

22       THE COURT:  Mr. Perko, you may proceed.

23       MR. PERKO:  Thank you, Your Honor.

24

25

```
 1              CONTINUED DIRECT EXAMINATION
 2    BY MR. PERKO:
 3    Q.   Dr. Laidlaw, you submitted a declaration in this matter,
 4    didn't you?
 5    A.   I did.
 6    Q.   And have you reviewed the declarations -- rebuttal
 7    declarations that the plaintiffs submitted in response to your
 8    declaration?
 9    A.   Yes.
10    Q.   And do you stand by the opinions in your declaration,
11    notwithstanding those rebuttal reports?
12    A.   Yes, I do stand by those opinions.
13    Q.   What were your opinions expressed in your declaration based
14    on?
15    A.   My opinions are based on my education and clinical
16    experience in endocrinology, my work with gender incongruent
17    patients in the context of my practice, including a
18    detransitioner, my extensive evaluation of the scientific
19    literature regarding the treatment of gender dysphoria, gender
20    incongruence for adults and minors, and also my review of all
21    the plaintiffs' declarations and the medical records provided to
22    me.
23    Q.   Dr. Laidlaw, you stated that you had limited experience
24    with gender dysphoria.  But have you reviewed the literature
25    with regard to gender dysphoria in the gender-affirming care?
```

Direct Examination - Dr. Laidlaw

1  A.   I have reviewed the literature extensively over the last at

2  least four years.

3  Q.   And why is that?

4  A.   Well, for a few reasons.  One is that these treatments that

5  they advocate for involve hormones and raising hormone levels to

6  sometimes very high levels or very low levels.  So I've taken an

7  interest in the risk-and-benefit ratio of these types of

8  treatments, and this is something I do every day in

9  endocrinology.

10      Furthermore, before my colleagues and I are to follow any

11  sort of treatment protocol, I think it's essential that these

12  studies and so forth are evaluated to determine the risk-benefit

13  profile before any of us use these treatments.

14  Q.   And, Dr. Laidlaw, what exactly is gender dysphoria?

15  A.   Gender dysphoria is -- well, there's a couple of terms that

16  would be helpful.  Gender identity is a person's internal or

17  mental sense of being male or female or perhaps some other

18  designation, and there's an incongruence or mismatch in these

19  cases with their physical body.  For example, a person may

20  identify as a female but have been born with a male body, and so

21  there is resulting distress and impairment of function.  There's

22  different definitions from there on as to how long it lasts and

23  slight differences for adults versus children and adolescents.

24  Q.   And is gender dysphoria an endocrine disorder?

25  A.   It's not an endocrine disorder.  It's a disorder found in

Direct Examination - Dr. Laidlaw

1   the DSM-V, *Diagnostic and Statistical Manual of Mental*

2   *Disorders.*

3   Q.   Are there any objective tests for diagnosing gender

4   dysphoria?

5   A.   There are no objective tests insofar as you can't do a

6   scan or -- a brain scan, for example, or a blood test, a genetic

7   test, or other biomarkers cannot test and confirm gender

8   dysphoria.

9   Q.   Dr. Laidlaw, what is desistance?

10  A.   Desistance is a condition where someone had -- once had

11  gender dysphoria or gender incongruence and then over time lost

12  or changed that condition such that some go on to fully identify

13  their internal sense of gender identity that is equivalent with

14  their physical body that they were born with.

15  Q.   And what is detransition?

16  A.   Detransition is a further step that one may take who has

17  desisted or is in the process of desisting such that they are --

18  you might think of it as reserving the process that they went

19  through in transition.  So they may stop the hormones that they

20  were taking.  They may dress in a manner more typical of the sex

21  of their nation.  They may opt to reverse surgeries and so forth

22  to align their identity with their physical body and their

23  perception in society.

24  Q.   So, Dr. Laidlaw, would you consider gender identity to be

25  immutable?

Direct Examination - Dr. Laidlaw

1   A.   No.

2   Q.   And why is that?

3   A.   Well, I think that it's proved by the desistance,

4   particularly with young people.   Children have high desistance

5   rates.   There are many detransitioners who are adults, including

6   one patient of mine, which proves that this gender identity is

7   not immutable.

8   Q.   Doctor, switching gears a little bit, you say in your

9   declaration that hormone treatment for gender dysphoria can lead

10  to infertility.

11       Is that always the case?

12       MR. CHARLES:   Objection, Your Honor.

13       The witness has already stated he's not qualified to

14  opine about this subject.

15       MR. PERKO:   I don't believe that's the case,

16  Your Honor.   He's talking about hormone therapy, and he's an

17  endocrinologist.

18       THE COURT:   I'll overrule the objection.   I'm going to

19  be the finder of fact.

20       When Dr. Laidlaw has knowledge because of his actual

21  medical practice, as opposed to having read some stuff over the

22  last four years, you might want to point it out, because he's

23  not going to persuade me very much -- he may persuade me, but

24  he's less likely to persuade me when all he is telling me is

25  what he has read and not what he has applied in his practice.

Direct Examination – Dr. Laidlaw

1          MR. PERKO:  Yes, Your Honor.

2     BY MR. PERKO:

3     Q.    Can you answer the question, Dr. Laidlaw?

4     A.    Could you repeat the question, please?

5     Q.    You state in your declaration that hormone treatment for

6     gender dysphoria can lead to infertility.  Is that always the

7     case?

8     A.    That is not always the case.  It depends at what stage of

9     puberty the gender dysphoria treatment was initiated.  For

10    example, in late stages of puberty or adulthood, a person may

11    take hormones of the opposite sex, for example, and then

12    withdraw those hormones and then later regain fertility, where

13    they were once infertile while taking those hormones.  But if

14    puberty is stopped in a very early stage, say before ovulation

15    takes place for a female or sperm production takes place for a

16    male, then while they're taking these hormones they will remain

17    in an infertile state.

18    Q.    Dr. Laidlaw --

19          THE COURT:  That -- for example, how does he know

20    that?

21    BY MR. PERKO:

22    Q.    How do you know that, Doctor?

23    A.    Well, that's based on -- I mean, part of endocrinology is

24    sexual development.  We deal with gonads -- male/female gonads,

25    reproductive issues, infertility issues.  For example, I see

Direct Examination – Dr. Laidlaw

1  woman with polycystic ovarian syndrome who have high
2  testosterone levels which leads to infertility that in some
3  cases I treat with Metformin.  So infertility is part of our,
4  you know, daily workup.
5       And understanding what happens to children, as they get
6  older, they could develop infertility as children and present as
7  adults, for example, because of their endocrine disorders.  The
8  thing with the treatment that they're advising is that they're
9  inducing the infertility through their hormones that they're
10  prescribing rather than it developing natally in the body, but
11  the situation is the same.
12  Q.   Dr. Laidlaw, are you familiar with the standards of care
13  for gender dysphoria developed by the World Professional
14  Association for Transgender Health, or WPATH?
15  A.   Yes.
16  Q.   And why are you familiar with those?
17  A.   For a couple of reasons.  This is -- there's a recently
18  published "Standards of Care 8" by WPATH.  These relate to our
19  Endocrine Society guidelines last published in 2017 that were
20  created with mainly WPATH authors.  So I've studied these
21  documents in order to understand what the effects of these
22  treatments would be on any of my patients before I were to
23  endeavor to follow their recommendations.
24  Q.   And do you follow the WPATH standards of care?
25  A.   I do not.

Direct Examination - Dr. Laidlaw

```
 1  Q.   Why not?

 2  A.   Could you repeat?

 3  Q.   Why not?

 4  A.   Why not was the question?

 5       Well, for -- one thing is that they're not standards of

 6  care.  They're standards of care that exist within their own

 7  organization, but they're not widely accepted standards of care.

 8  In fact, the Endocrine Society, which worked with WPATH on their

 9  own set of guidelines, says explicitly that they're not

10  standards of care.  So these -- I see these as an opinion on

11  what should be done with these patients but not the exclusive

12  rule.

13  Q.   And you mentioned the Endocrine Society's guidelines.  Do

14  you follow the Endocrine Society guidelines?

15  A.   I have read the guidelines extensively.  They have ratings

16  for the quality of evidence which you can read, which are low,

17  very low quality, or absent evidence.  There are some useful

18  facts in those guidelines, but again, I think their

19  determination to use high doses of hormones and block normal

20  puberty has more risks than benefits.  So I do not follow the

21  recommendations of those guidelines.

22  Q.   Dr. Laidlaw, switching gears again, in your report, you

23  talked about your review of medical records for the plaintiffs.

24       What specifically did you review?

25  A.   I was provided case notes for two patients.  There was an
```

Direct Examination - Dr. Laidlaw

1    Excel spreadsheet with dates of service, diagnostic and

2    procedure codes.  And then for two other patients there were

3    medical records provided in association with authorizations for

4    medications and, I think, procedures.

5    Q.   Dr. Laidlaw, the plaintiffs' expert rebuttal reports

6    criticize you for making conclusions based on your review of the

7    medical records.

8         Could you please respond to those criticisms?

9    A.   Well, as I said, I've spent quite a bit of time evaluating

10   guidelines and papers on gender dysphoria to make a

11   determination if the risks exceed the benefits for these

12   patients.  So going into it, I believe already that the risks

13   exceed the benefits.

14        However, when reviewing the records, I can also see

15   medications, whether it be contraindications or concerns.  I can

16   see diagnoses where the application of high doses of hormones

17   are blocking puberty could compound the patient's problems.  So

18   the risk level I determined was heightened for these plaintiffs

19   based on that limited review.

20   Q.   And did you rely on your professional experience in making

21   those conclusions?

22   A.   Yes, I relied on my professional experience in

23   endocrinology to make those decisions.

24   Q.   Without getting into specifics, Dr. Laidlaw, what did you

25   conclude based on your review of the medical records?

1    A.   I concluded that the risks outweighed the benefits for

2    hormone social transition and surgery for the plaintiffs or

3    minors.

4             MR. PERKO:  May I confer with Counsel, Your Honor?

5             THE COURT:  You may.

6         (Discussion was held.)

7             MR. PERKO:  We have no further questions, Your Honor.

8             THE COURT:  Cross-examine.

9             MR. CHARLES:  Yes, Your Honor.

10            If I may just have a moment.

11        (Pause in proceedings.)

12                      CROSS-EXAMINATION

13   BY MR. CHARLES:

14   Q.   Okay.  Dr. Laidlaw, can you hear me?

15   A.   Yes.

16   Q.   You testified that you have determined that based on a

17   review of incomplete medical records that gender-affirming care

18   for the plaintiffs could compound their problems; is that right?

19   A.   Yes.

20   Q.   You're not referring to endocrine problems, are you?

21   A.   Endocrine problems are a part of it, yes.

22   Q.   Okay.  So what is the endocrine problem you're referring

23   to?

24   A.   Issues of hypogonadotropic hypogonadism, hyperandrogenism,

25   hyperestrogenemia, and consequential infertility growth

 1   abnormalities that occur from those.

 2   Q.   You said that was part of it; is that correct?

 3   A.   Yes.

 4   Q.   And the other part of it is nonendocrine problems.  What

 5   are you referring to?

 6   A.   Referring to issues with patients' underlying psychological

 7   conditions that could be worsened by hormone manipulation.

 8   Q.   But you not a psychiatrist; is that correct?

 9   A.   No, but I have to make these evaluations every day to

10   determine if my hormone prescription --

11   Q.   Dr. Laidlaw, I understand --

12          THE COURT:  Wait.  Wait.  Wait.  When he's answering,

13   you have to let him answer the question.

14          MR. CHARLES:  Yes, Your Honor.

15          THE WITNESS:  I have to assess if the hormones that

16   I'm providing are going to exacerbate or cause psychological

17   conditions.

18   BY MR. CHARLES:

19   Q.   But as a nonpsychiatrist, you don't know if those hormones

20   are going to exacerbate any psychiatric conditions?

21   A.   They can affect -- I mean, there's warnings on the

22   medications themselves that they can affect psychiatric

23   conditions.

24   Q.   And you're not a psychologist, right, Dr. Laidlaw?

25   A.   That's correct.

Cross-Examination – Dr. Laidlaw

1    Q.   Psychological conditions?

2    A.   I do not make diagnoses, but we're trained in psychology

3    and psychiatry.  It's part of our medical licensing.

4    Q.   Okay.  But you are not a practicing psychologist?

5    A.   That's correct.

6    Q.   And you're not a practicing psychiatrist?

7    A.   That's correct.

8    Q.   And you have not met with any of the plaintiffs in this

9    matter --

10        THE COURT:  Mr. Charles, I sat through the voir dire.

11   I'm not going to sit through it again on cross.  You get one

12   chance to ask some questions.  You've asked those.  Let's ask

13   some new ones.

14        MR. CHARLES:  Thank you, Your Honor.

15   BY MR. CHARLES:

16   Q.   Dr. Laidlaw, you stated you don't follow the WPATH

17   standards of care; is that right?

18   A.   Yes.

19   Q.   But you testified earlier you don't treat gender dysphoria;

20   is that correct?

21   A.   I don't treat gender dysphoria with hormones and surgeries.

22   Q.   Dr. Laidlaw, are you aware that your opposition to

23   gender-affirming care for the treatment of gender dysphoria in

24   youth and adults is contrary to the vast majority of medical

25   associations' recommendations?

Cross-Examination – Dr. Laidlaw

```
1   A.   Yes.
2   Q.   Dr. Laidlaw, can you see the screen share that I've just
3   enabled?
4   A.   Yes, I can.
5           MR. CHARLES:  Your Honor, can you see that as well?
6           THE COURT:  I can.  It's hiding under the table up
7   here, but I've got it.
8           MR. CHARLES:  Okay.
9   BY MR. CHARLES:
10  Q.   Dr. Laidlaw, are you aware that the American Academy of
11  Child and Adolescent Psychiatry supports gender-affirming care
12  for youth?
13  A.   I haven't looked at that specifically.
14  Q.   Okay.  And looking at the document here, I'll --
15          MR. CHARLES:  Let me ensure -- Defense Counsel, can
16  you view this document?
17          MR. PERKO:  Yes.
18          MR. CHARLES:  Okay.  So I'd like to enter this as
19  Exhibit P1.
20  BY MR. CHARLES:
21  Q.   This is the -- Dr. Laidlaw, this is the "American Academy
22  of Child and Adolescent Psychiatry Statement Responding to
23  Efforts to Ban Evidence-Based Care for Transgender and
24  Gender-Diverse Youth."
25          Do you see that?
```

Cross-Examination – Dr. Laidlaw

1    A.    Yes.

2    Q.    And it's dated November 8, 2019?

3    A.    Yes.

4    Q.    And if you could, just read aloud for me that highlighted

5    portion, please.

6    A.    Sure.

7          *Many reputable professional organizations, including the*

8    *American Psychological Association, the American Psychiatric*

9    *Association, the American Academy of Pediatrics, and the*

10   *Endocrine Society, which represent tens of thousands of*

11   *professionals across the United States, recognize natural*

12   *variations in gender identity and expression and have published*

13   *clinical guidance that promotes nondiscriminatory, supportive*

14   *interventions for gender-diverse youth based on the current*

15   *evidence base.  These interventions may include, and are not*

16   *limited to, social gender transition, hormone-blocking agents,*

17   *hormone treatment, and affirmative psychotherapeutic modalities.*

18         *The American Academy of Child and Adolescent Psychiatry*

19   *supports the use of current evidence-based clinical care with*

20   *minors.  AACAP strongly opposes any efforts -- legal,*

21   *legislative, and otherwise -- to block access to these*

22   *recognized interventions.*

23   Q.    Thank you.

24         THE COURT:  You apparently asked to have this admitted

25   into evidence.  I don't think I've seen this, so this may not

Cross-Examination – Dr. Laidlaw

1    have been in the record previously.

2           MR. CHARLES:  Just one moment, Your Honor.

3           It wasn't, Your Honor, but I do have copies I can

4    provide to the Court to so enter.

5           THE COURT:  Didn't I require disclosures before today?

6    If I didn't, it would certainly depart from the standard of care

7    for judges.

8           MR. CHARLES:  I apologize, Your Honor.  I wasn't -- I

9    didn't see that designation so -- in your order.

10          THE COURT:  I may not have.

11          Do you object to the admission of this?

12          MR. PERKO:  Yes, Your Honor, for the reasons you just

13   stated.

14          Also, I would suggest that it's really irrelevant to

15   this witness's testimony because it talks about the American

16   Psychological Association.  He's already testified he's not a

17   psychologist.

18          THE COURT:  You can't have it both ways.

19          I'll admit it subject to going back and looking at the

20   scheduling orders and --

21       (Discussion was held.)

22   BY MR. CHARLES:

23   Q.   Dr. Laidlaw, is what you just read consistent with your

24   understanding of the position of these organizations?

25   A.   Are you talking about the AACAP?

Cross-Examination - Dr. Laidlaw

1   Q.   Yes, let's start with that one.

2   A.   Well, I'm just reading it now for the first time, so it

3   must be -- it was 2019 -- unless they have changed their

4   opinion.

5   Q.   Okay.  But you don't have any --

6           THE COURT:  Let me just back up.  I'm going to exclude

7   the exhibit.  I did require things to be disclosed, and you

8   can't come up to the hearing and bring up a new exhibit that you

9   didn't timely disclose.

10          MR. CHARLES:  Okay.

11          THE COURT:  So Plaintiffs' 1 is excluded.

12          The scheduling order is ECF No. 32.

13          MR. CHARLES:  Okay.  Thank you, Your Honor.

14          Ms. Markley, you can unpublish, please.  Thank you.

15  BY MR. CHARLES:

16  Q.   Dr. Laidlaw, are you aware that the American Academy of

17  Family Physicians supports gender-affirming care for youth and

18  adults?

19  A.   Supports gender-affirming care for youth and adults?

20  Q.   Yes.  Do you need to me to repeat?  Did you hear that?

21  A.   They probably do.  I don't know their exact statement.

22  Q.   Okay.  Are you aware that the American Academy of Family

23  Physicians published a policy statement in July of 2022,

24  approved by their board of directors, entitled "Care for the

25  Transgender and Gender Nonbinary Patient"?

Cross-Examination - Dr. Laidlaw

1  A.   I have not read that particular document -- Family Practice

2  Document.

3  Q.   Okay.  Are you aware that the American Academy of Family

4  Physicians supports gender-affirming care as an

5  evidence-informed intervention that can promote permanent health

6  equity for gender-diverse individuals?

7            MR. PERKO:  Your Honor, I would object for the same

8  reasons.  He's essentially reading from an exhibit that was not

9  disclosed.

10            THE COURT:  He's now exploring the witness's knowledge

11  of the situation in the field.  The objection is overruled.

12  BY MR. CHARLES:

13  Q.   Dr. Laidlaw --

14  A.   I'm not a family practice physician, so I don't keep up

15  with --

16  Q.   Just a moment.  Sorry.  Let me start over.

17  A.   -- the literature of that organization.

18  Q.   I'm sorry.  Can you please repeat that?

19  A.   I said I'm not a family practice physician; I'm an

20  endocrinologist, so I don't keep up with whatever they're

21  publishing.

22  Q.   Okay.  So I -- let me just ask you one more question about

23  that brief -- or policy statement.  Excuse me.

24       Are you aware that the American Academy of Family

25  Physicians asserts the full spectrum of gender-affirming health

Cross-Examination – Dr. Laidlaw

1  care should be legal and should remain a treatment decision

2  between a physician and their patient?

3  A.   I'm not surprised.

4  Q.   Can -- so does that mean you are or are not aware?

5  A.   I don't read the Family Practice documents, unless they are

6  provided to me.

7  Q.   Dr. Laidlaw, are you aware the American Academy of

8  Pediatrics supports gender-affirming care for youth?

9  A.   Yes.

10  Q.   Dr. Laidlaw, are you aware that the American College of

11  Obstetricians and Gynecologists has recommendations and

12  conclusions that support gender-affirming care for youth and

13  adults?

14  A.   I'm not -- again, I'm not surprised, but I don't read their

15  literature regularly for that purpose.

16  Q.   Okay.  Are you aware that the American College of

17  Obstetricians and Gynecologists has conclusions that

18  gender-affirming hormone therapy is not effective contraception?

19  A.   That gender-affirming therapy is not effective

20  contraception?

21  Q.   Correct.

22  A.   I have read that.  I'm not sure if it was theirs or someone

23  else who is publishing that.  I'm aware of that concept.

24  Q.   Can you repeat your answer?  I didn't understand you.

25  A.   I said I haven't read their statements specifically, but

1   I'm aware of the concept or proposition that gender-affirming

2   hormones are not effective contraception.

3   Q.   Okay.  So you're not aware of the American College of

4   Obstetricians and Gynecologists conclusion that it is not

5   effective contraception?

6   A.   I have not read their particular conclusion.

7   Q.   Are you aware that the American College of Physicians, the

8   largest medical specialty society in the world with 160,000

9   internal medicine and subspecialty members, supports public and

10  private health care coverage of gender-affirming care?

11  A.   I'm not aware that all 160,000 members voted to approve

12  such a thing, but I'm aware that they have issued a statement

13  like that.

14  Q.   You are aware they issued such a statement?

15  A.   Yes.

16  Q.   Are you aware that in 2022, the American College of

17  Physicians issued a brief supporting access to gender-affirming

18  care and opposing discriminatory policies enforced against LGBTQ

19  people and objected, in particular, to the interference with the

20  physician-patient relationship and the penalization of

21  evidence-based care?

22  A.   I may have read that particular statement from that

23  organization.

24  Q.   Are you aware that the American Medical Association

25  supports gender-affirming medical care for youth and adults?

Cross-Examination - Dr. Laidlaw

1    A.    Yes.

2    Q.    Are you aware that in April of 2021, the American Medical

3    Association wrote a letter to the National Governors Association

4    objecting to the interference with health care of transgender

5    children?

6    A.    I believe I had come across that headline.

7    Q.    Are you aware that the American Medical Association, in

8    conjunction with GLMA, has issued a brief in support of public

9    and private insurance coverage of gender-affirming care?

10   A.    I'm not a member of the American Medical Association.  I

11   think only 20 percent of physicians in the nation are even a

12   member.  So I don't follow everything they say, but I do believe

13   I read that document.

14   Q.    Do you have evidence to support your assertion that only 20

15   percent of medical practitioners in the United States are

16   members of the AMA?

17   A.    I don't have a piece of paper with evidence, but that's my

18   general understanding.  I'm not a member.

19   Q.    But you don't have any evidence today to point to to

20   support that assertion?

21   A.    No.

22   Q.    Are you aware that in 2022, the American Medical

23   Association reaffirmed it's resolution in support of private and

24   public health care coverage for the treatment of gender

25   dysphoria as recommended by a patient's physician in Resolution

1    Number 158.950?

2    A.    I have not read that resolution.

3    Q.    Are you aware, Dr. Laidlaw, that the American Psychological

4    Association has guidelines that support access to

5    gender-affirming care for youth and adults?

6    A.    Yes.

7    Q.    Are you aware that the American Psychological Association

8    opposes gender-identity change efforts as a broad practice

9    described as a range of techniques used by mental health

10   professionals and nonprofessionals with the goal of changing

11   gender identity, gender expression, or associated components of

12   these, to be in alignment with gender role behaviors

13   stereotypically associated with their sex assigned at birth?

14   A.    Yes, I am aware.

15   Q.    Are you aware that the American Psychiatric Association

16   supports gender-affirming medical care for youth specifically?

17   A.    Yes.

18   Q.    Are you aware that the American Psychiatric Association has

19   a position statement from 2018, supporting access to care for

20   transgender and gender-variant individuals broadly?

21   A.    Yes, I believe so.

22   Q.    Are you aware that the Endocrine Society and the Pediatric

23   Endocrine Society take the position that there is a durable

24   biological underpinning to gender identity that should be

25   considered in policy determinations?

Cross-Examination - Dr. Laidlaw

1    A.    I would have to read -- I have not read that particular

2    statement from the Endocrine Society.  I would like to see that

3    before I make a -- conclude anything.

4    Q.    Okay.  Are you aware this determination was included in a

5    position statement published in December of 2020?

6    A.    I have read that position statement.

7    Q.    And are you aware that the Endocrine Society and the

8    Pediatric Endocrine Society take the position that medical

9    intervention for transgender youth and adults is effective,

10   relatively safe when appropriately monitored, and has been

11   established as the standard of care?

12   A.    Well, they wrote that it was not the standard of care in

13   2017, so they're contradicting themselves.

14   Q.    Dr. Laidlaw, are you aware that that statement is contained

15   in the transgender health position statement issued

16   December 2020?

17   A.    I believe I read that.

18   Q.    And are you aware that the Endocrine Society and the

19   Pediatric Endocrine Society take the position that federal and

20   private insurers should cover such interventions as prescribed

21   by a physician, as well as the appropriate medical screenings

22   that are recommended for all body tissues that a person may

23   have?

24   A.    I believe I read something along those lines.

25   Q.    Are you aware that the Pediatric Endocrine Society supports

1    gender-affirming care for youth?

2    A.   Yes.

3    Q.   Are you aware they published a position statement to that

4    effect in April of 2021?

5    A.   Yes.  I wrote an article describing why their conclusions

6    are false or incorrect.

7    Q.   Are you aware the Pediatric Endocrine Society recommends an

8    affirmative model of care that supports one's gender identity

9    and follows a multidisciplinary approach that includes

10   involvement of mental health professionals, patients and their

11   families.  Puberty suppression and/or gender-affirming hormone

12   therapy is recommended within this evidence-based approach on a

13   case-by-case basis as medically necessary and potentially

14   lifesaving.

15       Are you aware that was contained in the Pediatric Endocrine

16   Society statement?

17   A.   I am aware that it's contained.  I don't agree with it,

18   but, yes, I'm aware.

19           THE COURT:  If we're leading up to something, you can

20   go ahead with all of this.  If all you're doing is publishing

21   stuff I've already read --

22           MR. CHARLES:  No, Your Honor.

23           THE COURT:  You're welcome to make a closing argument

24   later and to go through all of this, but if -- this is an

25   incredibly inefficient way to publish material.

Cross-Examination – Dr. Laidlaw

```
 1              MR. CHARLES:  Your Honor --

 2              THE COURT:  So if that's all we are doing, let's move

 3    on.

 4              MR. CHARLES:  Thank you, Your Honor.  I'm -- I do have

 5    a final comment for Dr. Laidlaw related to --

 6              THE COURT:  I've been patient through all that, and if

 7    you're setting up another question, that's fine.

 8              MR. CHARLES:  Okay.  Thank you, Your Honor.

 9              Just two more documents.  I appreciate your patience.

10    BY MR. CHARLES:

11    Q.   Dr. Laidlaw, are you aware the Society for Adolescent

12    Health and Medicine supports gender-affirming care for youth?

13    A.   No.

14    Q.   Are you aware the Society for Adolescent Health and

15    Medicine issued a statement in opposition to state legislation

16    barring evidence-based treatment?

17    A.   No.

18    Q.   And, Dr. Laidlaw, are you aware that the World Medical

19    Association, which includes 115 national medical associations,

20    supports gender-affirming care?

21    A.   No.

22    Q.   So, Dr. Laidlaw, you're aware that your opinions related to

23    gender-affirming care are in contrast to all of those medical

24    associations' statements that we just reviewed?

25              MR. PERKO:  Objection, Your Honor.
```

Redirect Examination - Dr. Laidlaw

```
 1              THE COURT:  Overruled.
 2              THE WITNESS:  Yeah.  Sorry.  Could you repeat the
 3    question?
 4    BY MR. CHARLES:
 5    Q.   You are aware that your opinions against gender-affirming
 6    care for the treatment of gender dysphoria are contrary to the
 7    positions of the medical associations' statements we just
 8    reviewed?
 9    A.   Yes.
10              MR. CHARLES:  Just one moment, Your Honor.
11         (Discussion was held.)
12              MR. CHARLES:  No further questions, Your Honor.
13              THE COURT:  Redirect?
14              MR. PERKO:  Very briefly, Your Honor.
15              May it please the Court.
16                       REDIRECT EXAMINATION
17    BY MR. PERKO:
18    Q.   Dr. Laidlaw, you testified that you consider mental health
19    effects of hormone therapy in your practice; is that correct?
20    A.   That is correct.
21    Q.   Okay.  And why do you consider the potential mental health
22    effects of hormone therapy in your practice?
23              MR. CHARLES:  Objection, Your Honor.
24              THE COURT:  Overruled.
25              THE WITNESS:  To give you maybe a more concrete
```

Redirect Examination - Dr. Laidlaw

1    example, the thyroid is a gland that makes thyroid hormone.

2    When people have very high levels of thyroid hormone, we call

3    that hyperthyroidism.  They can have physical effects like fast

4    heart rates, heart palpitations, tremors, but they can also have

5    mental effects like anxiety and even psychosis.  This can occur

6    because their body develops too much thyroid hormone, or they

7    may be taking too high of a dose of thyroid hormone.

8            So I have to distinguish if a mental health condition

9    is related to a hormone imbalance versus a native psychological

10   condition, or both sometimes.

11   BY MR. PERKO:

12   Q.   Dr. Laidlaw, one final question.

13        How many patients a year do you treat with hormone

14   treatments?

15   A.   For hormone treatments?

16   Q.   Yes.

17   A.   Well, all of them, for the most part.  I'd have to make an

18   estimate.  I see about 50 patient visits a week 50 weeks or so

19   out of the year.

20            MR. PERKO:  Thank you, Your Honor.  No further

21   questions.

22            THE COURT:  Dr. Laidlaw, I want to ask you a question,

23   and to do it, I need to define a couple of terms.  These may not

24   be the best definitions.  They are my definition for purposes of

25   my question.

1     I'm going to refer to natal identity as the identity

2  at birth, and then I'm going to refer to gender identity as a

3  person's perceived identity, the identity the person believes is

4  the correct identity for the person.

5     Here's my question.  In your opinion, is it ever

6  appropriate for any medical professional in any specialty to

7  support a person's decision to live in the person's gender

8  identity instead of in the person's natal identity?

9     THE WITNESS:  Ever under any circumstances, is that

10  what you are saying?

11     I think my determination is that, in general, the

12  risks of the hormones that are required and surgeries outweigh

13  the benefits for the majority of people.  I recognize there's

14  some small degree of adults, perhaps, who are living this way.

15  There are risks to mental health and things like that.  So I'm

16  not opposed to personal autonomy, but I am concerned about risks

17  versus benefits, particularly for minors and youth.

18     THE COURT:  So is the answer no?

19     THE WITNESS:  I guess no.

20     THE COURT:  Questions to follow up on mine?

21     MR. PERKO:  No, Your Honor.

22     MR. CHARLES:  No, Your Honor.

23     THE COURT:  Thank you, Dr. Laidlaw.  That concludes

24  your testimony.

25     THE WITNESS:  Thank you.

1          (Dr. Laidlaw exited the Zoom video conference.)

2              THE COURT:  Please call your next witness.

3              MR. BEATO:  Your Honor, we call Zoe Hawes as our next

4    witness.

5              MR. PERKO:  Your Honor, we don't have any additional

6    witnesses remotely.

7              THE COURT:  We are trying to turn it off.

8          (Ms. Hawes entered the courtroom.)

9              THE COURTROOM DEPUTY:  Please remain standing and

10   raise your right hand.

11             **ZOE HAWES, DEFENSE WITNESS, DULY SWORN**

12             THE COURTROOM DEPUTY:  Please be seated.

13             Please state your full name, and spell your last name

14   for the record.

15             THE WITNESS:  Zoe Hawes, H-a-w-e-s.

16                         DIRECT EXAMINATION

17   BY MR. BEATO:

18   Q.   Good morning, Ms. Hawes.  Michael Beato on behalf of the

19   defendants.

20        Did you submit a declaration in this case?

21   A.   Yes.

22        (Pause in proceedings.)

23             MR. BEATO:  Your Honor, may I approach the witness to

24   give her her declaration?

25             THE COURT:  No.  Just ask her a question before you

Direct Examination – Ms. Hawes

 1    show her her declaration.

 2            MR. BEATO:  Of course, Your Honor.

 3    BY MR. BEATO:

 4    Q.   Ms. Hawes, your declaration states that you suffered from

 5    many mental health issues as a teenager.  What were those

 6    issues?

 7    A.   Yes.  So by the age of 15, I was diagnosed with anxiety and

 8    major depressive disorder.  I was later diagnosed with gender

 9    dysphoria, PTSD, and OCD.

10    Q.   You state in your declaration that you met with people.

11            THE COURT:  Look, if a general statement and -- we'll

12    have a trial later in the case, and so here's my statement to

13    both sides -- and some of the lawyers have heard me say this

14    before -- I'm the finder of fact.  If you want me to believe

15    what a witness says, your chances are much better if you ask a

16    nonleading question and the witness testifies.  If you tell the

17    witness what to say and the witness says yes, it's rarely

18    persuasive.

19            So you can do it any way you want, but let me just

20    tell you that to the extent that you're just going to read her

21    what she said before -- first, I'll sustain an objection to that

22    question, if there is one, and if there's not, it's not very

23    likely to persuade me.

24            MR. BEATO:  Yes, Your Honor.

25

Direct Examination - Ms. Hawes

 1  BY MR. BEATO:

 2  Q.   Ms. Hawes, what gender-affirming treatments did you

 3  receive?

 4  A.   I started testosterone at the age of 16.

 5  Q.   For how long did you receive this treatment?

 6  A.   About four years.

 7  Q.   What are the physical effects of receiving this treatment?

 8  A.   I -- first my menstrual cycle stopped, and then gradually

 9  my body started to change, facial hair growth, my voice lowered.

10  Q.   How was your mental health at this time?

11  A.   Not great.  I -- anxiety became debilitating to where I

12  dropped out of school.  I was unable to keep a job, and I was

13  very -- still very suicidal and was in and out of the hospital

14  six times.

15  Q.   Did you seek any other treatments for gender dysphoria at

16  this time?

17  A.   I was planning and hoping to get a double mastectomy and

18  hysterectomy.

19  Q.   When did you stop taking testosterone?

20  A.   At the age of 20.

21  Q.   And why did you stop taking testosterone?

22  A.   I -- after a suicide attempt, I realized that my peace was

23  not going to come from changing my body, and I began to work on

24  my inner self and not trying to fix the physical.

25  Q.   What happened after you stopped taking testosterone?

Direct Examination - Ms. Hawes

```
 1   A.   Gradually my body started to refeminize.  I started to have

 2   more peace.

 3   Q.   And can you describe your mental and physical health now?

 4   A.   Much, much better.  I've been able to keep a job and --

 5   yeah.

 6   Q.   Have you experienced any significant life incidents

 7   stopping taking testosterone?

 8   A.   Can you repeat the question?

 9   Q.   Sure.  Or let me rephrase.

10        Your declaration says that you're married and are expecting

11   a son?

12            MR. GONZALEZ-PAGAN:  Objection.  Leading.

13            THE WITNESS:  Yes.

14            THE COURT:  That much is okay.  Overruled.

15   BY MR. BEATO:

16   Q.   How long have you been married?

17   A.   Almost two years.

18   Q.   And when are you expecting a son?

19   A.   At the end of January.

20   Q.   Congratulations.

21   A.   Thank you.

22   Q.   My final question is why did you not receive the gender

23   transition surgeries?

24   A.   I -- at the time we could not afford it.  I really, really

25   wanted it and thought it would bring lasting peace.  But I
```

1    couldn't afford it, and my insurance would not pay for it.

2                MS. CHRISS:  Objection.  Calls for speculation.

3                THE COURT:  Overruled.

4                MR. BEATO:  One moment, Your Honor.

5                No further questions.

6                THE COURT:  Cross-examine.

7                        CROSS-EXAMINATION

8    BY MS. CHRISS:

9    Q.   Good afternoon, Ms. Hawes.

10               THE COURT:  Introduce yourself to me.  I didn't take

11   appearances to begin with, and so I apologize.  But tell me --

12               MS. CHRISS:  I apologize, Your Honor.  Thank you.

13               My name is Simone Chriss, and I represent the

14   plaintiffs in this matter.

15   BY MS. CHRISS:

16   Q.   Thank you for being here, Ms. Hawes.

17        In order to keep this succinct and sufficient for the

18   Court, most of the questions that I'm going to ask you are

19   being -- will be in yes or -- can be answered by yes or no;

20   okay?

21   A.   Okay.

22   Q.   Great.  Ms. Hawes, you don't live in the state of Florida;

23   correct?

24   A.   Correct.

25   Q.   And you don't receive health insurance through Florida's

1    Medicaid program; correct?

2    A.   Correct.

3    Q.   You've never received health insurance through Florida

4    Medicaid?

5    A.   Correct.

6    Q.   And you've never received any treatment in the state of

7    Florida?

8    A.   Correct.

9    Q.   Are you aware that this case concerns a rule related to

10   Florida's Medicaid program?

11   A.   Yes.

12   Q.   Were you contacted by anyone, Ms. Hawes, to provide

13   testimony in this case?

14   A.   Yes.

15   Q.   And who were you contacted by?

16   A.   Vernadette (phonetic).  I don't know the last name.  I'm

17   sorry.

18   Q.   Who is that person?

19   A.   I know she's an attorney.

20   Q.   And what were you asked to do in this case?

21   A.   I was invited to share my story.

22   Q.   And you filed a declaration in this case; correct?

23   A.   Yes, ma'am.

24   Q.   Who prepared the initial draft of that declaration?

25   A.   I am not sure.  I think Vernadette, but I'm not positive.

Cross-Examination – Ms. Hawes

1  Q.   Were you compensated for your time in this case?

2  A.   No.

3  Q.   Ms. Hawes, you stated that you were on testosterone for

4  almost four years; is that correct?

5  A.   Yes.

6  Q.   And you're now an expectant mother?

7  A.   Yes.

8  Q.   You're are not a mental health provider; is that correct?

9  A.   Correct.

10  Q.   And you're not a health care provider?

11  A.   Correct.

12  Q.   And you don't have a medical degree?

13  A.   Correct.

14  Q.   And you don't know any of the plaintiffs in this case?

15  A.   Correct.

16  Q.   So you can only speak to your personal experience with

17  accessing medical care outside of Florida; correct?

18  A.   Yes.

19  Q.   You don't know whether the plaintiffs in this case have

20  benefited from the treatment that they received; is that

21  correct?

22  A.   I don't know them, so correct.

23         MS. CHRISS:  Your Honor, may I have a moment to

24  confer?

25         THE COURT:  You may.

1          (Discussion held.)

2                MS. CHRISS:  No further questions, Your Honor.

3          Thank you.

4                THE COURT:  Redirect?

5                MR. BEATO:  No further questions, Your Honor.

6                THE COURT:  Ms. Hawes, before you started testosterone

7    treatment, tell me what kind of medical care you got for the

8    gender dysphoria issues or gender-related issues.  What kind of

9    doctor?  Where?  How much time?

10               THE WITNESS:  I saw a therapist in Norman, Oklahoma,

11   and she was some kind of certified gender therapist.  I'm not

12   sure of the precise title on that.  But she was qualified to do

13   what she was doing, and I saw her about three, four months.  We

14   went over childhood history, everything that led me to believe

15   that I was male, and she was agreeing with what I was saying and

16   feeling, and so after three or four months she signed off on

17   starting testosterone.

18               THE COURT:  The therapist, do you know if it was a

19   medical doctor?

20               THE WITNESS:  The one who signed the document saying I

21   was ready to start testosterone was a therapist, but I was

22   referred to an endocrinologist that had handled that before.

23               THE COURT:  And the therapist is a licensed social

24   worker?  Do you know what education level --

25               THE WITNESS:  She was licensed.  I'm not sure what

1    degree or anything like that.

2             THE COURT:  You don't know if she was a medical

3    doctor?

4             THE WITNESS:  Correct.  I don't think she was, like, a

5    doctor.

6             THE COURT:  How much time did you spend with the

7    endocrinologist?

8             THE WITNESS:  I had one consultation visit before

9    starting testosterone.

10            THE COURT:  And did you talk to the endocrinologist

11   about the gender-identity issues --

12            THE WITNESS:  Yes.

13            THE COURT:  -- or just about the drug and the

14   treatment?

15            THE WITNESS:  She knew what I was coming in with and

16   asked me brief questions about if I'm sure, and I had to sign a

17   paper saying I understood, like, what I was getting into.

18            THE COURT:  So brief questions.  What?  15 minutes?

19   30 minutes?  Two hours?  How long?

20            THE WITNESS:  Maybe, like, 45 minutes of just sharing.

21            THE COURT:  Some of that included what testosterone

22   does?

23            THE WITNESS:  Yeah.

24            THE COURT:  I take it some discussion of risks --

25            THE WITNESS:  Yeah.

```
 1            THE COURT:  -- and so forth?

 2            Questions just to follow up on mine?

 3            MR. BEATO:  No, Your Honor.

 4            MS. CHRISS:  No, Your Honor.  Thank you.

 5            THE COURT:  All right.  Thank you, Ms. Hawes.  You may

 6   step down.

 7        (Ms. Hawes exited the courtroom.)

 8            THE COURT:  Please call your next witness.

 9            MR. JAZIL:  Your Honor, Yaacov Sheinfeld is the final

10   witness.

11        (Mr. Sheinfeld entered the witness stand.)

12            THE COURT:  Right up here, sir.

13            THE COURTROOM DEPUTY:  Please remain standing and

14   raise your right hand.

15        YAACOV SHEINFELD, DEFENSE WITNESS, DULY SWORN

16            THE COURTROOM DEPUTY:  Please be seated.

17            Please state and spell your full name for the record.

18            THE WITNESS:  Yaacov Sheinfeld.

19            THE COURTROOM DEPUTY:  Could you spell it, please?

20            THE WITNESS:  Y-a-a-c-o-v S-h-e-i-n-f-e-l-d.

21                       DIRECT EXAMINATION

22   BY MR. JAZIL:

23   Q.  Good morning, Mr. Sheinfeld.

24        You submitted a declaration in this case --

25   A.  Yes.
```

Direct Examination – Mr. Sheinfeld

1   Q.   -- is that correct?

2        And your declaration talks about the experience of you and

3   your daughter dealing with transition; is that correct?

4   A.   Yes, I did.

5   Q.   Did your daughter see a therapist?

6   A.   Yes, about since the age of 14, 15.

7   Q.   Why did she start seeking therapy at the age of 14, 15?

8   A.   It was evident that she had issues relating to anxiety and

9   depression.

10  Q.   When did she tell you that she wanted to transition?

11  A.   She was about 17 and a half, 17 and 10 months.  I'm sorry

12  about the exact time because it's been about ten years ago.

13  Q.   Was she still suffering with the depression, anxiety that

14  you mentioned at that time?

15  A.   Absolutely.

16  Q.   Did your daughter take any testosterone hormones?

17  A.   Yes.  After seeing a therapist in North Hampton where she

18  went to college, she was put on a regimen of testosterone and

19  medication.

20  Q.   What was her age when she started taking the testosterone?

21  A.   I submitted your firm a printout from CVS which contains

22  hundreds of -- hundreds of drugs.

23       MS. ALTMAN:  Your Honor, I would object.  It's hearsay

24  at this point.

25       THE COURT:  Well, it probably is.  If he doesn't

1    remember, he doesn't remember.

2              THE WITNESS:  Thank you.

3              As a father --

4              THE COURT:  Wait.  He's going to ask you another

5    question.

6              THE WITNESS:  Okay.

7              Go ahead.

8    BY MR. JAZIL:

9    Q.   So the question was do you just remember the age she was?

10   A.   Yes.

11   Q.   What was her age when she started taking the testosterone?

12   A.   Probably 18, 18 and a half.

13   Q.   Now, in your declaration, you also discuss a meeting with a

14   social worker.

15        Can you briefly tell us what happened at that meeting?

16   A.   Okay.  This is in North Hampton.  And in a 45-minute time

17   span it was clear to me that the social worker would not

18   consider my total objection to this journey.  She dismissed my

19   concerns.  She disregarded them, told me to join this journey

20   and just accept my daughter and love her, and everything would

21   be okay.

22   Q.   What happened after that meeting?

23   A.   I was very angry.  Could you specify the question, please?

24   Q.   Did she -- did your daughter get any other gender-affirming

25   treatments after that meeting?

Direct Examination - Mr. Sheinfeld

```
1   A.   I'm sure she did.

2            MS. ALTMAN:  Your Honor, objection.  I believe it's

3   hearsay.

4            THE COURT:  It probably is.

5            Sustained.

6   BY MR. JAZIL:

7   Q.   Do you know whether your daughter got any surgeries after

8   that?

9   A.   Of course she did.  The exact date is unknown to me, but

10  she did.  She had a double mastectomy.  I think it was around

11  the age of 18 and a half.  And the reason why I think is because

12  all her medical treatment was kept away from me.  Nobody told me

13  anything.

14  Q.   So after the surgery, from your perspective, was there --

15  what was your daughter's mental health from your perspective

16  after the surgery?

17           MS. ALTMAN:  Your Honor, objection.  He just testified

18  that all of the mental health was kept away from him.

19           THE COURT:  Overruled.

20  BY MR. JAZIL:

21  Q.   So after the surgery, from your perspective, what effect

22  did the surgery and the other treatments have on your daughter's

23  mental health?

24           THE COURT:  Well, I'll sustain an objection to that

25  question.  You can ask what he observed, what he saw, what he
```

Direct Examination - Mr. Sheinfeld

```
1    heard her say about her mental situation.  But he's not going to
2    give a diagnosis.
3             MR. JAZIL:  Yes, Your Honor.
4    BY MR. JAZIL:
5    Q.   What did you observe?
6    A.   I observed a -- my daughter -- rest her soul -- I saw no
7    improvement.  I saw deterioration of her soul and body, her
8    mental health.  Her body went through all these changes.  They
9    were very difficult for me to accept.  And her depression was
10   still evident.  All the drugs she took, hundreds of them, had
11   side effects of -- all kinds of effects on her body, her voice,
12   her demeanor, and she wasn't any happier.  I can tell you that.
13   There was no improvement in her accepting who she is.
14   Q.   Mr. Yaacov, reading your declaration, it announced your
15   daughter passed away.  When did she pass away?
16   A.   October 6, 2021.
17   Q.   Briefly tell us the circumstances of her death.
18   A.   She was found dead in a hotel room alone at the Best
19   Western in West Orange with fentanyl in her system.
20            THE COURT:  He has some.
21   A.   She committed suicide.
22   BY MR. JAZIL:
23   Q.   Mr. Sheinfeld, I'm sorry for your loss.
24            MR. JAZIL:  I have no further questions.  Thank you.
25            THE COURT:  Cross-examine.
```

```
1              MS. ALTMAN:  Good morning, Your Honor.  May it please
2    the Court, my name is Jennifer Altman.
3                          CROSS-EXAMINATION
4    BY MS. ALTMAN:
5    Q.   Sir, whenever you're ready.
6    A.   I'm ready.
7    Q.   First of all, on behalf of the plaintiffs, we all certainly
8    do apologize for your loss.  It is certainly unfathomable.
9         I'm going to ask you some questions, and I apologize if
10   they are indelicate under the circumstances, but you have
11   submitted a declaration here.
12        Virtually all, if not all of them, are yes-or-no questions,
13   and for efficiency, I would ask that you try and answer in that
14   manner.
15        Are you transgender?
16   A.   No.
17   Q.   Have you ever been diagnosed with gender dysphoria?
18   A.   No.
19   Q.   Have you ever been treated for gender dysphoria?
20   A.   No.
21   Q.   Is it fair to assume you've never been denied treatment for
22   gender dysphoria?
23   A.   No.
24   Q.   Have you ever spoken with any of the treating physicians
25   for the transgender plaintiffs in this action?
```

Cross-Examination – Mr. Sheinfeld

1    A.    No.

2    Q.    Do you have a medical degree?

3    A.    No.

4    Q.    Do you have a master's degree in behavioral health?

5    A.    No.

6    Q.    Do you have a doctorate in any specialty relating to

7    psychology?

8    A.    No.

9    Q.    Do you have a bachelor of science or any other degree in

10   psychology?

11   A.    No, but I do have another degree.  I have a degree in

12   architectural -- in architecture.

13   Q.    Have you ever treated an individual with gender dysphoria?

14   A.    No.

15   Q.    Would you agree with me, sir, that you have no clinical,

16   educational, or academic training on the treatment of gender

17   dysphoria?

18            THE WITNESS:  Your Honor, can I elaborate on that?

19            THE COURT:  Well, just answer the question she asked.

20            THE WITNESS:  Well, it can't be just yes or no.  I

21   have to elaborate on that.

22   BY MS. ALTMAN:

23   Q.    Do you need me to repeat the question?

24   A.    Yes, please.

25   Q.    You would agree with me, sir, that you have no clinical,

Cross-Examination - Mr. Sheinfeld

1  educational, or academic training on the treatment of gender

2  dysphoria?

3  A.   Yes, but it doesn't render me as somebody who is

4  incompetent or somebody without logic to render my decision.

5  Q.   Do you understand my question?

6         THE COURT:  Well, look, you asked an argumentive

7  question; he gets to give an argumentive answer.

8  BY MS. ALTMAN:

9  Q.   Do you understand the question, sir?

10  A.   I do understand the question.

11  Q.   Do you have any clinical, educational, or academic

12  experience?

13  A.   Educational, yes.

14  Q.   Okay.  Can you describe for the Court what your educational

15  experience is in the treatment of gender dysphoria?

16  A.   I think that we are dealing with a genuine feeling of

17  certain individuals who do not agree with their assigned birth

18  assignment, quote/unquote, but I think there is huge underlying

19  issues of these individuals that --

20  Q.   Sir, did you understand the question?

21         THE COURT:  Wait, wait.  Let him finish his answer.

22         When you ask an argumentive question for no reason

23  other than to make your argument, he gets to make his argument

24  in response.  If you want to just ask factual questions, I'll

25  make him give you the factual answer, but it has to be something

1    that has some factual purpose in the case.

2            MS. ALTMAN:  Understood, Your Honor, but my question

3    was his educational experience.

4            THE COURT:  And you asked that solely for the reason

5    of making an argument.  He has a degree in architecture.  He has

6    no degree in any mental health area.  When the only reason to

7    ask a question is to make an argument, you have to listen to the

8    argument that comes back.

9            MS. ALTMAN:  Fair enough, Your Honor.

10           THE COURT:  You may finish your answer, Mr. Sheinfeld.

11           THE WITNESS:  Thank you, Your Honor.

12           So I'm not here to render any decisions about other

13   individuals who may have genuine feelings of discomfort with

14   their body.  All I know is -- what's your name, please?

15   BY MS. ALTMAN:

16   Q.   Ms. Altman.

17   A.   Ms. Altman.

18   Q.   Yes, sir.

19   A.   All I know is that the system -- and I call the system, you

20   know, the world, the Internet, her friends -- influenced her

21   into a journey that killed her.  She's dead.  I buried her a

22   year ago, and I'm very angry, because they all failed her.  My

23   daughter did not deserve this.  So that's my educational,

24   quote/unquote, answer to you.

25   Q.   Understood.

1    Your daughter died of an overdose of fentanyl and alcohol;

2   correct?

3   A.    Yes, yes.

4   Q.    Sir, were you involved in any of the meetings, discussions,

5   or analysis performed by AHCA that led to the drafting and

6   implementation of Rule 59G-1.050?

7   A.    I don't even know what that is.

8   Q.    Have you reviewed Florida's rule banning gender-affirming

9   care?

10  A.    No, I've not.

11  Q.    Do you believe someone can be transgender?

12  A.    I think that in rare medical cases of maybe biological

13  organs of some individual who may have both organs -- in some

14  rare cases I could see the need for medical intervention that is

15  basically taking care of that issue.

16       But for the most part, I see it as a contagion of -- of --

17  it's hard to explain, and I don't have enough time to explain

18  myself.  But I feel like this is a social -- why do we have

19  7,000 percent increase in the last ten years of transgender

20  population to feel discomfort with their body?  7,000 percent.

21  We need to ask ourself why this is happening.

22  Q.    Do you believe someone can have gender dysphoria?

23  A.    I believe in rare cases maybe, yes.

24  Q.    Were you contacted by anyone to prepare or, rather, to

25  provide testimony in this case?

Cross-Examination – Mr. Sheinfeld

1    A.    Yes.

2    Q.    Who were you contacted by?

3    A.    I was contacted by the firm that is representing the State

4    of Florida.

5    Q.    And who prepared your draft declaration that you submitted

6    in this case?

7    A.    Well, I submitted my verbal, through the phone, testimony,

8    and I was just told about the proceeding, what's going to happen

9    here in this courtroom, today.  I am not indoctrinized or was

10   told what to do, if this is what you're after.

11   Q.    Sir, if I understood your testimony correctly, you said

12   your daughter was 18 and a half when she was put on

13   testosterone; is that correct?

14   A.    Yes.

15   Q.    So she was an adult?

16   A.    Yes.  By legal term, yes.

17   Q.    And she was also an adult when she made the decision --

18   when your child made the decision to transition; is that

19   correct?

20   A.    When you call someone an adult, you assume that they are.

21   You think that they are, but she was not an adult.

22   Q.    Was your child --

23   A.    Of legal age?

24   Q.    -- of legal age?

25   A.    Yes.

Cross-Examination - Mr. Sheinfeld

1  Q.   And how often did you see your child from, let's say, 18 to

2  the point at which she died, annually?

3  A.   My dear child did not speak to me for two years because I

4  had a very hard time accepting her decision and what happened.

5  It was of his choice not to talk to me.  So this is part of the

6  whole journey.  So it wasn't my choice not to talk to Sophia.

7  It was her choice.

8  Q.   Understood.

9       When was that period of time, from what year to what year?

10  A.   I would say --

11  Q.   18 to 20?

12  A.   18 to 20, yeah.

13  Q.   After that, from age 20 going forward, did you see your

14  daughter?

15  A.   Oh, yeah.  We reconciled, thank God.  My other daughter was

16  instrumental in that.  And we had a loving relationship, and I

17  accepted Sophia to the degree that I could call her Sam, and to

18  the best of my ability, I conformed to what she wanted me to do

19  because my choice was either have no relationship with her or

20  have the relationship according to what Sam wanted.  So as a

21  parent, I had no choice in the matter.

22  Q.   And if my question wasn't clear -- I'm trying to understand

23  how frequently you saw your child once you reconciled.

24  A.   I would say it was random because she was in college on and

25  off between Rutgers University and her own life.  She moved

1   quite a bit.  At that point she was Sam.  So when I say "she," I

2   mean Sam.

3       I would say every two weeks she would come to my house.  In

4   the whole COVID time of 2020, she was in my house for three or

5   four months.

6   Q.   Did you know your child was using fentanyl?

7   A.   I had no idea.  That was at the very end, I assume.

8       If I may elaborate?

9       Go ahead.

10  Q.   Sir, do you recall -- in paragraph 3 of your declaration,

11  you state:  *Florida's Rule will prevent manipulation and*

12  *coercion on the part of health care providers and from that*

13  *their own distressed and confused children to comply with*

14  *demands for medical and surgical intervention aimed at*

15  *'affirming' a young person's professed discordant gender*

16  *identity under threats of alienation or loss of a child to*

17  *suicide.*

18      Did I read that portion of your declaration correctly?

19  A.   Say it again and slower.  Excuse me.  I can't hear you very

20  well.

21  Q.   Yeah.

22      In paragraph 3 of your declaration, you state:  *Florida's*

23  *Rule will prevent manipulation and coercion on the part of*

24  *health care providers and from that of their own distressed and*

25  *confused children to comply with demands for medical and*

Cross-Examination - Mr. Sheinfeld

1   *surgical intervention aimed at 'affirming' a young person's*
2   *professed discordant gender identity under threats of alienation*
3   *or loss of a child to suicide.*
4        Do you recall making that statement in your declaration?
5   A.   No, I don't recall making that declaration.  I'm not aware
6   of all the Florida law regarding this sublaw or declaration.
7   Q.   Did you review your declaration before you signed it?
8   A.   Yes.
9   Q.   Sir, your child never stopped identifying as male; correct?
10  A.   I don't know how to answer that.
11  Q.   You don't know how to answer the question?
12  A.   No.
13  Q.   At the time of your child's death, was your child going by
14  the name Sam?
15  A.   Yes.
16            MS. ALTMAN:  I have no further questions, Your Honor.
17            THE COURT:  Redirect?
18            MR. JAZIL:  No, Your Honor.  Thank you.
19            THE COURT:  Thank you, Mr. Sheinfeld.  You may step
20  down.  You are free to go about your business.  Thank you, sir.
21            THE WITNESS:  Thank you.
22       (Mr. Sheinfeld exited the courtroom.)
23            THE COURT:  Further evidence for the defense?
24            MR. JAZIL:  No, Your Honor.  Thank you.
25            THE COURT:  Rebuttal evidence for the plaintiffs?

```
1              MR. GONZALEZ-PAGAN:  Nothing beyond what's in the
2    record, Your Honor.
3              THE COURT:  All right.  We can probably take a break
4    before we have argument.  Let's take 15.
5              How long do you want for argument?
6              MR. GONZALEZ-PAGAN:  Your Honor, I think -- I leave it
7    to the Court, depending on the Court's questions, but I think I
8    can present in less than 30 minutes, I'm sure.
9              MR. JAZIL:  Your Honor, 30 minutes is fine for the
10   defense as well.
11             THE COURT:  Let's shoot for 30 minutes a side.
12             Let's take a 15-minute break.  We'll start back at
13   11:25 by that clock.
14        (Recess taken at 11:11 AM.)
15        (Resumed at 11:27 AM.)
16             THE COURT:  Please be seated.
17             I'll hear from the plaintiffs.
18             MR. GONZALEZ-PAGAN:  Good morning.
19             THE COURT:  Tell me how you want to split up your
20   time.
21             MR. GONZALEZ-PAGAN:  Your Honor, if I could reserve,
22   like, five minutes for rebuttal.
23             THE COURT:  All right.  So we'll set the timer at 25
24   minutes.
25             MR. GONZALEZ-PAGAN:  Thank you, your Honor.
```

1              Good morning, Your Honor.  Omar Gonzalez-Pagan for the

2    plaintiffs, and may it please the Court.

3              Central both to the idea of the rule of law and to our

4    own Constitution's guarantee of equal protection is the

5    principle that government and each of its parts remain open on

6    impartial terms to all who seek its assistance.  Your Honor,

7    that is *Romer v. Evans.*

8              We are in court today representing four transgender

9    Medicaid beneficiaries, two of them through their parents,

10   seeking to stop the limitation of a rule that denies Medicaid

11   coverage to a population simply because of who they are.  The

12   rule with an incredibly broad brush, categorically excludes from

13   coverage medical care for the treatment of gender dysphoria

14   which only transgender people suffer, and any care that purports

15   to be for, quote, "sex reassignment," close quote, or, quote,

16   alters sexual characteristics," close quote.  This rule does not

17   target or specify any particular medication or procedure as

18   experimental, because they are not, but, rather, it deems all

19   gender-affirming care when used to treat gender dysphoria to be

20   experimental because the State does not like the outcome of that

21   care, that being the alignment between a transgender person's

22   body characteristics and their identity.

23             The reason the rule does not target any particular

24   procedure or treatment as experimental is because these are

25   common services and procedures used to treat other conditions.

1   Their side effects and risks are well known, and the physical

2   changes that the State complaint of are, in most instances, the

3   desired outcome of the treatment, the masculinization of the

4   body for a transgender male and the feminization of the body for

5   a transgender female.

6          The exclusion, Your Honor, is unlawful, and

7   unconstitutional.  We're asking that it be preliminarily

8   enjoined on the basis that it violates the Equal Protection

9   Clause of the Fourteenth Amendment and Section 1557 of the

10  Affordable Care Act.  It facially discriminates on the basis of

11  sex.  On its face it speaks purely in sex terms.  This is one of

12  the many reasons why *Geduldig* is not applicable here,

13  Your Honor.

14         The regulation speaks of gender dysphoria, which is

15  charactered by the distress arising from an encumbrance between

16  one's sex assigned at birth and one's gender identity.  It

17  targets procedures that lead to sex reassignment or alter sexual

18  characteristics.  It seeks to impose sex stereotypes.  The

19  exclusion is based on the notion that only those assigned male

20  at birth can and should have access to masculinizing hormones or

21  procedures and only those assigned female at birth can and

22  should have access to feminizing hormones and procedures.

23         THE COURT:  Let me back up and put this in a framework

24  here.

25         You start by saying this is not experimental, and I

1  understand the vast majority of medical associations certainly

2  take your side of the equation.  There are some doctors who take

3  the opposite view.

4       But let's try to frame the issue.  If this is

5  experimental -- and we can talk about what that means in more

6  detail, but some things are experimental.  If this is

7  experimental, you lose; right?

8       MR. GONZALEZ-PAGAN:  Not necessarily, Your Honor.

9       THE COURT:  Well, explain to me how you get around

10  *Rush versus Parham,* a binding circuit decision.  Didn't it say

11  in just so many terms -- I mean, it deals with gender surgery in

12  that case, but gender-affirming care, and it says, Vacate the

13  district court's decision in favor of the plaintiff.  Remand.

14  The question on remand:  Is this experimental and is it

15  medically necessary for this plaintiff?

16       MR. GONZALEZ-PAGAN:  Correct, Your Honor.

17       THE COURT:  So -- and there was an equal protection

18  claim in that case.  So plainly the circuit said, If it's

19  experimental, the plaintiffs lose.  Now, why isn't that

20  controlling here; if this is experimental, you lose?

21       MR. GONZALEZ-PAGAN:  For a couple of reasons,

22  Your Honor.

23       *Rush v. Parham* specifically stands for the

24  unremarkable proposition that a state Medicaid program can,

25  according -- following the criteria of the statute and their own

1    regulations, not cover experimental services or procedures.

2           Why *Rush v. Parham* doesn't apply here, there's a few

3    reasons.  A, this doesn't target specific services or

4    procedures, Your Honor.  This actually allows those services and

5    procedures to be provided for and be covered under the state's

6    Medicaid program in other circumstances, and that was --

7           THE COURT:  The same is true in *Rush versus Parham*.

8    It was a mastectomy, for God's sake.  It was plainly covered --

9    I think it was Georgia.  It was plainly covered under the

10   Medicaid statute in Georgia, and the only question was is it

11   covered for a transgender person.

12          MR. GONZALEZ-PAGAN:  Yes, Your Honor.  But at that

13   point in time, also *Rush* -- what *Rush v. Parham* stands for is

14   the actual -- it's the guiding -- the guiding -- the guidance

15   necessary for the Court to adjudicate whether it's experimental,

16   that being on Footnote 11 of *Rush v. Parham,* Your Honor, where

17   that Fifth Circuit at the time specifically noted that the

18   clearest articulation of the considerations that go into

19   determining whether a particular service is experimental is

20   whether the service has come to be generally accepted by the

21   professional medical community as an effective, proven treatment

22   for the condition for which it is being used.

23          THE COURT:  Absolutely.  But I started off by saying

24   there's a question in the case whether it's experimental, and as

25   *Rush* says, that's a factual question.  So today, or in due

1    course, I'll make a determination whether it is reasonable for

2    the State to decide this is experimental.

3              MR. GONZALEZ-PAGAN:  Correct.

4              THE COURT:  That's what that case says.

5              But my question is something else.  My question is not

6    did the State reasonably decide this was experimental.  My

7    question is this:  If the State reasonably decided it was

8    experimental, don't you lose?  And it seems to me this is a very

9    easy question, and the answer is yes.  But if you've got an

10   argument to the contrary, I need you to tell me it, but don't

11   jump back and say it's not experimental.

12             MR. GONZALEZ-PAGAN:  Absolutely, your Honor.

13             THE COURT:  You've got to come to grips with this

14   question.

15             MR. GONZALEZ-PAGAN:  Yes.  And the answer is no.

16             *Rush v.* -- the Affordable Care Act, which this Court

17   needs to give both enforcement and implementation to all of the

18   statutory provisions both of the Social Security Act as it

19   pertains to the Medicaid Act and the Affordable Care Act -- the

20   Affordable Care Act specifically prohibits the design -- the

21   benefit design of coverage plans, health plans in a manner that

22   is discriminatory on the basis of sex.

23             So even if it were to be experimental, it cannot be

24   done with --

25             THE COURT:  Wait.

1          MR. GONZALEZ-PAGAN:  -- reference to sex.

2          THE COURT:  You think the Affordable Care Act says a

3    state must cover an experimental procedure for transgenders even

4    though it does not have to cover experimental treatments for

5    anyone else?

6          MR. GONZALEZ-PAGAN:  No, Your Honor, I won't go that

7    far.  What I would say is that the Affordable Care Act says that

8    in the design of the health plan, and here the regulation, the

9    plan is not allowed to use sex as a criteria that has a

10   discriminatory effect.

11         And here their regulation at issue is -- which is,

12   again, categorically with a broad brush, as to all care --

13   medical care for a condition.  This is not a particular

14   treatment or procedure that is being deemed to be experimental;

15   it's all care for a condition.  It is designed exclusively on

16   the basis of sex.  If they were to say and have gone through the

17   analysis of, like, X procedure doesn't apply, X medication

18   doesn't apply, that's a different question, Your Honor.

19         THE COURT:  I thought --

20         MR. GONZALEZ-PAGAN:  That would fit within *Rush v.*

21   *Parham,* but not --

22         THE COURT:  Maybe I don't understand it, but I thought

23   that's exactly what they did do.

24         MR. GONZALEZ-PAGAN:  No, Your Honor.

25         THE COURT:  Well, let me ask you this.  If someone

1   presents to a mental health professional, a psychiatrist, for

2   treatment of gender dysphoria, is that covered?

3           MR. GONZALEZ-PAGAN:  The mental health care is

4   covered, Your Honor.

5           THE COURT:  Okay.  So the State hasn't said you can't

6   get treatment for gender dysphoria.  What the statement has said

7   is you can't get hormone treatment, puberty blockers, or sex

8   reassignment surgery, particular kinds of surgery.

9           So, what, they didn't list them carefully enough?

10  Instead of listing a few things, they needed to make it a longer

11  list?

12          MR. GONZALEZ-PAGAN:  Well, Your Honor, I think because

13  it goes to the question of how it was drafted and the outcome

14  that was already preordained, there is a conflation of risk and

15  side effects of all of these treatments, and it painted with a

16  broad brush all of this care.  And I think if you were to parse

17  them all out, it is a house of cards that falls.  Right?  They

18  speak of infertility and sterility as a side effect, but that

19  doesn't apply to hormones or puberty blockers and most

20  surgeries.

21          THE COURT:  We're back to the factual question of

22  whether this decision is reasonable.

23          MR. GONZALEZ-PAGAN:  Yes.

24          THE COURT:  But here's what I want to get to for

25  today.  And I tell both sides, I'm a

1    follow-the-circuit-decisions guy.  I mean, the circuit has a

2    prior panel rule.  When the prior panel makes a decision, a

3    later panel has to follow it.  And that's even more true for

4    district judges.

5            So when there is a binding Eleventh Circuit decision

6    or a Fifth Circuit pre-*Bonner* decision dealing with an issue and

7    it's right on the issue, I'm going to follow it, maybe more than

8    the subsequent panel does.

9            MR. GONZALEZ-PAGAN:  Understood, Your Honor.

10           THE COURT:  So I'm going to follow *Rush v. Parham*.

11           But here's the question as it applies to today.  So if

12   the law of the circuit is the State doesn't have to cover

13   experimental treatments, if the State refuses to pay for a

14   treatment and it's not experimental, then under *Rush*, I can

15   enter an injunction and say, Pay for the treatment.  But if the

16   State reasonably concludes that the treatment is experimental,

17   then I can't.  And it's not an equal protection violation,

18   because it wasn't an equal protection violation in *Rush v.*

19   *Parham.*

20           MR. GONZALEZ-PAGAN:  Well, your Honor, I would quibble

21   with that in that the Fifth Circuit in no point actually dealt

22   with the equal protection claim in *Rush v. Parham.*

23           THE COURT:  Well, let's push on that a little bit.

24   There was an equal protection claim.  It says so right in the

25   decision.

1              MR. GONZALEZ-PAGAN:  Correct.

2              THE COURT:  They reversed the decision in the

3    plaintiff's favor and remanded for a determination of whether

4    the State reasonably decided this was experimental.

5              MR. GONZALEZ-PAGAN:  Correct.

6              THE COURT:  How can that not be a holding that if it's

7    experimental, the plaintiff loses?  Basically that's what the

8    circuit told the district court:  You make a fact-finding

9    whether this is a reasonable determination that it's

10   experimental, and if it was a reasonable determination, the

11   plaintiff loses.

12             MR. GONZALEZ-PAGAN:  Your Honor, I would go to

13   page 1153 of *Rush v. Parham* -- just before 1154, so at the end

14   of 1153 -- and note the issues that were decided on summary

15   judgment and which were dealt with with the -- by the circuit

16   court on appeal.

17             Those were, first, whether the state Medicaid program

18   could categorically deny funding of a medically necessary

19   service because it was decided purely on the statutory grounds

20   at that point in time; and, B, whether the Department of Medical

21   Assistance abused its discretion in finding that the surgery was

22   not indicated for *Rush.*

23             Those were the issues that were decided by the

24   district court that went up on appeal, because it was decided

25   purely on statutory grounds.

1        The Fifth Circuit did not weigh in on the protection

2   claim that was in the complaint because it wasn't decided at

3   that point in time.  And once the circuit court said, Under the

4   Medicaid Act, the State is allowed to not provide coverage for

5   experimental care, then that is a factual question that goes

6   down to the district court.

7        That is separate and apart from the confines of the

8   Constitution that was not decided by the Fifth Circuit in *Rush*

9   *v. Parham.*  And it was touched on by the district court

10  thereafter because it not only had guidance on how to deal with

11  the statutory claim, but the Constitution has limits as to --

12  that supplant and are supreme over these federal statutes.

13       And here the way that the regulation was drafted, the

14  way that it classifies it is purely a sex-based classification,

15  and the question of whether the care is experimental then goes

16  to the justifications of tailoring, but not as to whether it is

17  presumptively unconstitutional under the Equal Protection

18  Clause.  And I would argue the same under the ACA.

19       THE COURT:  Well, here's where -- I take your

20  answer -- and I'll go back and read *Rush* yet again.  I've read

21  it a number of times already.

22       Here's where I'm going.  I told you I'm a

23  follow-the-prior-panel guy.  I also believe in *Ashwander*, the

24  Brandeis concurrence, I guess it is.  When I don't need to get

25  to a constitutional question, I don't get to the constitutional

question; I just apply the statute.

So here's the premise -- and I get it from what you tell me that you disagree with part of this.  But here's the premise.  If it's constitutional for a state to exclude experimental treatments under Medicaid -- and I know you say it's not, but assume for me for a minute that I rule that it's -- that I would think it's constitutional to exclude experimental treatments.  Then it seems to me that if you win this case under the Medicaid statute because this is not experimental, then you win this case, and there's no reason to get to the constitutional question.

On the other hand, if you lose this case under the Medicaid statute because the treatment is experimental, then you also lose under the Constitution.

So the Medicaid decision is going to control the outcome every time.  And if that's so, there's no reason for me to get to the constitutional question and I've just got a Medicaid question, my difficulty today is you didn't ask for a preliminary injunction under the statute.

So I guess what's wrong with that analysis and why not?  And if the answer is -- and this is the only answer I can imagine -- you don't want an answer today under the Medicaid statute, you're going for the home run.  You don't want the single.  You want the home run.  And the home run is to tell the legislature, Don't go banning this because it's

1    unconstitutional.

2         But that's not my question.  I've got these four

3    people and payment under Medicaid.  And so are you just trying

4    to make me get to the constitutional issue, or why else would

5    you not have moved under the Medicaid statute?

6         MR. GONZALEZ-PAGAN:  Your Honor, I believe some of the

7    Medicaid claims that we brought -- and I'll be honest, in *Rush*

8    *v. Parham* and the subsequent caption of *Rush v. Johnson* is

9    somewhat unclear as to what were -- the claims under Medicaid

10   that were being brought, but the comparability and EPSDT claims

11   that we brought we believe probably would benefit from some more

12   factual development.

13        But that is separate and apart from the question of

14   whether an injunction can be entered today, because Your Honor's

15   question, just assuming for the sake of this conversation that

16   we are having, the premise about experimental or not under the

17   Medicaid Act because there is no -- the question then becomes

18   one of tailoring; right.  We know here -- and that can be done

19   also with regards to the ACA claim and not have to reach the

20   constitutional claim; right.  We have a statutory claim that

21   permits the Court to reach there.

22        But there is sex discrimination here, and then the

23   question is in that interaction was this permitted or not?  And

24   what -- not only was it permitted, but was it tailored in a way

25   that is permissible within the confines of benefit assignments

1    articulated by the ACA and the constitutional claim.

2              And here we can posit a number of ways in which the

3    deeming of experimental all gender-affirming medical treatment

4    is not reasonable.  It's not rational.  It's not, let alone, an

5    exceedingly persuasive justification that is being furthered

6    substantially by the regulation because it actually paints with

7    such a broad brush.  It runs counter to the very guidance,

8    binding guidance, from the Fifth Circuit in *Rush v. Parham* about

9    how do they find something to be experimental.

10             And it also, as noted in the expert -- our expert

11   declarations, ignores the reality that this is care that's being

12   provided by Florida Medicaid, undisputedly has been provided

13   before, has been provided in this -- has a history that goes --

14   and I can point to paragraph 22 of Dr. Antommaria's declaration

15   in docket No. 11-5 noting that gender-affirming care has a long

16   history.  The provision of hormone therapy goes as far back as

17   90 years, and gender-affirming surgery goes as far back as 70

18   years.

19             I will also note that *Rush v. Parham*, the facts of

20   that case all predate even the first iteration of the WPATH

21   standards of care, clinical guidelines that are widely accepted

22   by the medical community that were first published in 1979.

23             And I would add that, as noted with the colloquy with

24   defendant's designated expert, most medical organizations

25   support a provision of this care.  And, in fact, if one were to

1    look at the defendant Agency for Health Care Administration's

2    GAPMS memo, Your Honor, one can see that a plurality -- sorry;

3    having a problem with that word -- of state Medicaid programs

4    explicitly cover this care, and 80 percent of them either

5    explicitly cover it or treat it on a case-by-case basis.

6         The reality is that this rule as it stands here today

7    stands in stark contrast to not only the medical establishment

8    but how care is provided in the United States and the world.  No

9    country has banned or prohibited this care.

10         THE COURT:  Let's move on to the -- a different part

11    of this, and that's these individual plaintiffs.

12         You would agree, would you not, that sometimes this

13    care gets botched -- not for these plaintiffs, but sometimes

14    this care gets botched?

15         MR. GONZALEZ-PAGAN:  Your Honor, I would agree with

16    the commonsensical supposition that sometimes medical care, as

17    in all medical care, is not provided up to the clinical

18    guidelines standard of care.

19         THE COURT:  Sometimes the surgeon cuts off the wrong

20    arm.  I got it.

21         They've presented some declarations, and it's not a

22    large number compared to the universe, certainly, of people who

23    have gotten gender-affirming care, but they've presented some.

24    It seems pretty clear that there are some providers who haven't

25    followed the guidelines and have jumped to puberty blockers and

1    hormone therapy without going through the kinds of careful

2    attention that the guidelines call for.

3              You would agree with that, wouldn't you?

4              MR. GONZALEZ-PAGAN:  Your Honor, I would agree for the

5    sake of argument.  I would not agree with that as a factual

6    basis.  I would argue that many of these declarants actually

7    have other reasons for why they stopped identifying as

8    transgender, if they ever did, and why they stopped the care.

9    For example, I will note the testimony earlier today about

10   Ms. Hawes wanting to work on her inner self.  And I will note

11   that several other people, like Ms. Chloe Coe noted, for

12   example, that it was her religion that led her to the path that

13   she's on now.

14             So I will not argue that all of -- that these

15   declarations in toto show that this care has not been provided.

16   I will agree, Your Honor, that there are instances in which it

17   hasn't been provided according to standard of care, as with all

18   medical care in the United States.

19             THE COURT:  It's okay for the state Medicaid folks to

20   evaluate any given request for payment to determine whether the

21   provider deviated from the standard of care?

22             MR. GONZALEZ-PAGAN:  Absolutely, Your Honor.

23             THE COURT:  True?

24             MR. GONZALEZ-PAGAN:  And that is what was the case

25   until this rule.  This rule eliminates that.

1          Whether or not --

2          THE COURT:  Got it.  No, I understand.

3          So here we are in a preliminary injunction hearing.

4    You're asking me to order the State to pay for the care the

5    plaintiffs wish to have; true?  That's what you've asked for.

6    You want an injunction that says, Pay for it?

7          MR. GONZALEZ-PAGAN:  What we're saying, Your Honor, is

8    an injunction that says, Do not implement the rule that was

9    rushed through the summer that actually disrupts the care, not

10   only of our plaintiffs but of thousands of transgender Medicaid

11   beneficiaries.

12         THE COURT:  What --

13         MR. GONZALEZ-PAGAN:  They clearly dispute a status

14   quo.

15         THE COURT:  What do you want the injunction to say?

16         MR. GONZALEZ-PAGAN:  That the rule is left without --

17   cannot be enforced and is left without effect while the case is

18   pending and that the State goes back to its existing policy of

19   evaluating medical necessity on a case-by-case basis.

20         THE COURT:  So what does that do for the plaintiffs?

21         MR. GONZALEZ-PAGAN:  Well, as we know from the history

22   from their care and the fact that Medicaid indisputably has

23   covered their care that in their instances some of them are

24   already preauthorized for that care.  And I would point to

25   Mr. Rothstein having a surgery that has been preauthorized by

1    the agency that's scheduled for December but now will not be

2    covered.

3              THE COURT:  But you're not asking for an injunction

4    that says, Provide the care to these plaintiffs?

5              MR. GONZALEZ-PAGAN:  I would ask for an injunction

6    that is a prohibitory injunction that stops the enforcement of

7    the rule and, therefore, permits a case-by-case analysis of

8    medical necessity claims as they come in, as has always been the

9    case in the Agency for Health Care Administration.

10             Your Honor, what happened in those instances is that

11   plans which AHCA contracts with would apply their own medical

12   criteria, which support and allow this care.

13             THE COURT:  What makes you think that if I enter an

14   injunction that says, You can't enforce this rule, then the

15   responsible state authority won't say to one of these

16   plaintiffs, Your care is not medically necessary, and we're not

17   going to provide it?

18             MR. GONZALEZ-PAGAN:  Your Honor, what I would argue is

19   that the injunctions say that the State cannot implement or

20   enforce this rule and it reverts back to its existing practice

21   prior to August 21, 2022.

22             And in those circumstances, if, and only if, the plan

23   with which they contract, which apply the medical necessity

24   criteria, were to determine that it wasn't medically necessary,

25   there will be an appeal internally within the Medicaid system

 1     over that.

 2             THE COURT:  All right.  We've run you out of time.

 3     I'll let you keep the rest for your rebuttal, and I'll hear from

 4     the other side.

 5             MR. GONZALEZ-PAGAN:  Thank you, Your Honor.

 6             MR. JAZIL:  Thank you, Your Honor.  May it please the

 7     Court.

 8             I'd like to start with the *Rush* case, Your Honor.  I

 9     note that the Court said*:  We hold that a State may adopt a*

10     *definition of medical necessity that places reasonable limits on*

11     *a physician's discretion,* so that was the holding in the case.

12             As the Court is discussing the holding and what needs

13     to be done on remand, the district court on remand needed to

14     determine whether its determination -- whether the State's

15     determination that transsexual surgery is experimental is

16     reasonable as one of the questions that the district court had

17     to ask and --

18             THE COURT:  So that question's for me?

19             MR. JAZIL:  Yeah.

20             THE COURT:  Whether today or at the final trial, my

21     mandate under *Rush versus Parham* is to decide whether the

22     State's rule refusing to pay for these treatments is reasonable.

23             MR. JAZIL:  Your Honor, there is additional gloss in

24     the case.  The Eleventh Circuit goes on -- pardon me.  The

25     former Fifth Circuit goes on to say that*:  To show such*

1    *reasons* -- this is discussing what the plaintiff needs to do on

2    remand -- *we think Rush was required to present convincing*

3    *evidence that no other form of treatment would improve her*

4    *condition.*

5            And, Your Honor, my point is this:  That was on --

6            THE COURT:  Fair enough.  That's what makes it

7    necessary.

8            MR. JAZIL:  -- Section B.

9            And, Your Honor, my further point is this*:  Rush*

10   doesn't exist in isolation*.  Rush* should be read together with

11   *Dobbs*, and *Dobbs* talked about how where you have classifications

12   based on medical treatment or medical conditions, rational basis

13   applies.  In *Dobbs* there was a section -- the bulk of the case

14   deals with the substantive due process issues, but the Supreme

15   Court did address what it called another home for the argument

16   that there is a constitutional right, and it was equal

17   protection, and then they went with the rational basis.

18           THE COURT:  Look, everybody likes dealing with the

19   big, sexy issues, *Dobbs* and equal protection.  I'm right, aren't

20   I, that this case just turns on the Medicaid statute?  If it's

21   experimental, then you win, and if it's not experimental, you

22   lose under the Medicaid statute and we never get to the

23   constitutional issue.

24           MR. JAZIL:  You are correct about that.  The doctrine

25   of constitutional avoidance would dictate the result there.

1          THE COURT:  I do want to ask about -- while I'm

2     thinking about it -- and we're probably jumping ahead here --

3          MR. JAZIL:  Yes, Your Honor.

4          THE COURT:  -- but partly they say, Strike down the

5     whole rule, and part of what you said is, Oh, you can only give

6     relief to these four plaintiffs because there's no class.  So

7     here's my question:

8          I get a lot of these cases -- or a good number of

9     these cases.  You're in a number of them.

10          MR. JAZIL:  Yes, Your Honor.

11          THE COURT:  So when I get a case like this challenging

12     State action, and the plaintiffs move to certify a class, what

13     the State says, I think, every time is, Don't certify a class.

14     We're going to abide by whatever rule you make for these

15     plaintiffs.  There's no reason to certify a class.  And then

16     when they file an individual action, the State comes in and

17     says, No, there's no class action.

18          So, look, you can't have it both ways.  I guess you

19     can say that was then and this is now, but it's the position you

20     took, for example, in prior cases.  I can cite them for you.

21     Which is it?

22          MR. JAZIL:  Fair enough, Your Honor.  And the position

23     we've taken here is that a universal injunction would be

24     inappropriate to provide the relief to the four named plaintiffs

25     And, Your Honor, there's a recent Eleventh Circuit case.  It's

1    called *Georgia versus President of the U.S.*, 46 F.4th 1283,

2    where the Court talks about nationwide injunctions, and it talks

3    about --

4              THE COURT:  I got it and read it the day it came out,

5    but -- but my question is which is it?  Because if you're -- if

6    you're telling me the State of Florida's position henceforth is

7    just an injunction for the individual plaintiffs, we're never

8    again going to say in response to the motion to certify a class

9    that you don't need to certify a class because we're going to

10   follow what you said -- if that's what you're telling me, fine;

11   you get to change your position, but you don't get to change it

12   every time depending on what position the plaintiffs take.

13             MR. JAZIL:  Fair enough, Your Honor.  And I can't

14   standing here take a categorical position for the State in all

15   future cases.  I don't have the authority to do that,

16   Your Honor.  I apologize, but --

17             THE COURT:  I get it.  That's fair enough.  They

18   probably -- probably not be pleased if you came back and told

19   them, By the way, I made a promise for the next case.

20             MR. JAZIL:  Yes, Your Honor.

21             THE COURT:  I just finished one, and I think I've got

22   another one pending where the same issue comes up, and I got the

23   State on both sides.

24             MR. JAZIL:  Fair enough, Your Honor.  But at its core,

25   the point that Judge Grand, Judge Edmondson and I think

1    Judge Anderson all agreed on in the *Georgia* case that I
2    referenced was, Hey, at the very least, you have to provide only
3    the relief that would give the plaintiffs what it is they're
4    seeking, because anything beyond that runs into potential
5    Article 3 issues on case in controversy.
6            THE COURT:  I got it, and that's what I've always
7    done, so you can go back and check my decisions.
8            MR. JAZIL:  Yes, Your Honor.  So that's -- that's on
9    the universal nationwide injunction side.  And my friend also
10   brought up, I guess, a distinction between prohibitory and
11   mandatory injunctions, as I understood it, and I thought them to
12   be seeking both prohibitory and mandatory relief where they're
13   seeking to prohibit the State from implementing its categorical
14   exclusions and mandating that the State approve these
15   treatments, despite the fact that the State has now gone through
16   the GAPMS process which lays out what state policy is on, you
17   know, whether or not these treatments ought to be approved.
18           Whether that state policy is applied categorically or
19   on an individual-by-individual basis, GAPMS itself would still
20   be there.  It would still be a guiding principle to these
21   determinations, Your Honor.  So I think what they're asking for
22   is both prohibitory and mandatory, so I just wanted to at least
23   get my understanding of the relief before the Court.
24           Your Honor, I'd also like to focus on the broader
25   question of irreparable harm.  It's their burden to establish

1    irreparable harm.  It's their burden to establish irreparable

2    harm for the four individual plaintiffs.  We've got declarations

3    from the four individual plaintiffs, but we don't have any of

4    the treating physicians for any of the four individual

5    plaintiffs providing any opinions to this Court.

6            We have Dr. Laidlaw who is an endocrinologist who

7    prescribes hormones and puberty blockers.

8            THE COURT:  And has an opinion about sex reassignment

9    surgery.  What is his expertise to talk about these surgeries?

10           MR. JAZIL:  Your Honor, he's someone who's tracking

11   the literature.  He is advising people who go into his clinic.

12   And I take Your Honor's point that if it's something that he's

13   not experienced with as a clinician, you're going to give it

14   little weight.

15           THE COURT:  And he's a doctor who says a person with

16   gender dysphoria should not be treated in a way affirmative of

17   the person's perceived gender by any medical professional.  So a

18   psychiatrist, psychologist, therapist should never say to a

19   natal male, for example, that it's okay to live as a female.

20           Now, how far off the standard, the general view in the

21   medical profession, is that?

22           MR. JAZIL:  Your Honor, two points on that:  One, his

23   answer there was a little confusing.  He -- and Your Honor asked

24   a follow-up question to him.  When he initially gave an answer,

25   he said, I could think of possibly some instances where it would

1    be appropriate, and when there was a follow-up question, he said

2    no.

3             So, Your Honor, I note that the testimony wasn't the

4    clearest.  Further, I note, Your Honor, that in our rule we are

5    not excluding all gender-affirming care.  We have a long list.

6             THE COURT:  I got it.  But the best doctor you could

7    find to call into court -- and, look, I asked him the question

8    because I thought that would be his answer based on his

9    declaration and his testimony.

10            Here's the guy who couldn't use the pronoun that

11   somebody preferred, who couldn't refer to somebody by their

12   preferred gender.  I mean, I respect his -- he's a well-trained

13   endocrinologist, but here's a person that's that far off from

14   the accepted view, even by the State, even the State.  Like you

15   just said, even your rule does not suggest that it would be

16   improper for a mental health professional to work with somebody

17   in an affirmative way.

18            So, I mean, you do scratch your head when that's the

19   best you can do.

20            MR. JAZIL:  And, Your Honor, his testimony related

21   to -- the use and effects of certain of these hormones is

22   crucial to why he was up there.  In addition, Your Honor, I

23   would note that Attachment E to the GAPMS report has another

24   expert report from Quentin Van Meter who is a pediatric

25   endocrinologist who is on the clinical faculty of both Morehouse

1    and Emory University, and his perspective is also there for the

2    Court.  So this is not the only endocrinologist whose

3    perspective we're providing, and we do also have Dr. Cantor.  We

4    have Dr. Nagia, who's a psychiatrist, and others, so he is not

5    the only one.

6            THE COURT:  I read every one of them.

7            I do want to ask you some questions about the process

8    that you went through.

9            MR. JAZIL:  Yes, Your Honor.

10           THE COURT:  First, the background question about the

11   State-administered process, been a long time since I've been

12   involved in a rule challenge in state court, so I really don't

13   know the procedure, and I haven't gone back and looked it up.

14           In the federal system, if an agency adopts a rule, but

15   the procedure is fatally flawed, then the Court vacates the rule

16   and remands it to the agency, and the agency then goes forward

17   and tries to fix the problem.

18           That -- is that how it works in the state court?

19           MR. JAZIL:  From the perspective of the challenger

20   it's even better.  As soon as a challenge is filed to the rule,

21   the rule does not go into effect.

22           THE COURT:  And when -- and I take it it gets a DOAH

23   officer initially?

24           MR. JAZIL:  Yes, Your Honor.

25           THE COURT:  A DOAH administrative law judge.

1          And so then does the judge evaluate the process or

2    just the substance?  So if the procedure is just biased, if it's

3    clear when you look at it that there was a preordained result

4    and not an honest effort to go through the process, does the

5    judge then invalidate the rule or can the judge say, Well, you

6    know, it's a bad process, but the rule is okay, substantively,

7    and uphold the rule, or do you vacate the rule?

8          MR. JAZIL:  Your Honor, the DOAH judge does get to

9    take a look at the process, and I believe the DOAH judge gets to

10   undo the entire rule if the process is flawed.

11         THE COURT:  So tell me, how do you support a process

12   that goes out and finds five experts -- I think it's five.

13   Clearly, the minority view could be right.  I mean, I get it.

14   And they are certainly entitled to express their views, and the

15   agency is certainly entitled to take it into account.  But they

16   go out and get five people who are decidedly out of the

17   mainstream, nobody in the mainstream.  They have a hearing and

18   they line up all the lay speakers who are opposed, one after the

19   next.  So somebody has organized this.  And that's how they do

20   it.

21         And when anybody speaks with some expertise on the

22   other side of the issue, they've got somebody there at the

23   hearing to rebut it instantly.  So if you speak on the

24   preordained side, you get to just speak, but if you speak

25   against the preordained view -- or the allegedly preordained

 1  view, you've got somebody right there harking back at you

 2  immediately.

 3           How does that work?

 4           MR. JAZIL:  So, Your Honor, two points there.

 5           One, not everyone who was instrumental to the GAPMS

 6  report is someone who is active in this field.  I note that

 7  Dr. Rumina Brignardello-Peterson is not someone who has taken a

 8  side on either end of this debate.

 9      Second, Your Honor, the hearing was public.  Whoever came,

10  came.  There was a panel of experts there to respond to issues

11  as they came up, but written testimony was also considered, and

12  it was provided.  So you have the -- I'll call it the Yale

13  letter by lawyers and physicians was submitted as well.  For

14  example, the various medical associations provided their written

15  comments through that process as well.

16           THE COURT:  But I'm right that the State recruited

17  five?

18           MR. JAZIL:  Yes, Your Honor, the State recruited five.

19           THE COURT:  All -- all well out of the mainstream, all

20  on the same side of the issue?

21           MR. JAZIL:  Your Honor, I'd say four on the same side

22  of the issue.  I disagree with the notion that they are out of

23  the mainstream.  If we are defining the mainstream as the

24  American medical groups, that's one thing, but we do cite in our

25  paper the Europeans who have gone the other way.

1              THE COURT:  And I have to say, you cite it, and the

2    report cites it.  Every one of those allows this treatment,

3    every one of them.  So you keep saying these are people on the

4    other side, but they are on the plaintiffs' side in terms of the

5    final result if every one of those countries will pay for this

6    medical care if it's appropriate in the individual circumstance

7    on a case-by-case basis.  That's right, isn't it?

8              MR. JAZIL:  Well, I believe, Your Honor, there's a

9    tilt towards exceptional circumstances in some of those

10   countries.

11             THE COURT:  It's gotten harder, and they've slowed it

12   down, and you heard my comments earlier.  It seems pretty clear

13   to me from reading some of your declarations that there are

14   people that are not doing this very well.  There are

15   professionals that are not doing this very well.  So I get it.

16             But every one of those states will pay for this in an

17   appropriate circumstance; isn't that right?

18             MR. JAZIL:  In an exceptional circumstance,

19   Your Honor.

20             THE COURT:  But in the GAPMS report, it makes it

21   sound -- and in your briefs it makes it sound like these states

22   have decided not -- these countries have decided not to pay for

23   it.  That's just not so.

24             MR. JAZIL:  And, Your Honor, the Florida APA also has

25   out clauses that's for exceptional circumstances.  This is not

1    something where we're suspending the general law in the state.

2    120.542 is the APA provision that deals with variances and

3    waivers from generally applicable rules, for example.

4           THE COURT:  Well, can one of these plaintiffs -- for

5    example, we've got a 28-year-old plaintiff -- I may mess up the

6    details off the top of my head.  I think we have got a

7    28-year-old plaintiff who was approved for surgery by the State,

8    had it scheduled -- has it scheduled, I think, and -- so is that

9    an exceptional circumstance?  You already approved it.  Can that

10   28-year-old get the surgery?

11          MR. JAZIL:  Your Honor, if that 28-year-old -- so, for

12   example, under 120.542, if that 28-year-old shows that there

13   is -- I believe the standard is undue hardship and the purposes

14   of the rules will be furthered through this variance and waiver

15   process, they can submit that.  There's a time clock under the

16   120.542 process by which the agency has to act or else the

17   variance is granted as a matter of course.

18          It's possible that that person could qualify.  That

19   person would need to submit the requisite paperwork that -- for

20   example, there would have to be something from their treating

21   physician, which isn't present here.  If that something from the

22   treating physician says, I've looked at this person.  I believe

23   that this is the only way to go about doing this, that could be

24   something that's attached to that variance and waiver as a

25   consideration that could get this person the treatment they

1    think they need based on a case-by-case basis.

2            But that doesn't foreclose the State from having a

3    categorical rule that's generally applicable that says, We

4    believe that in most instances the puberty blockers, the

5    cross-sex hormones, and the surgeries are inappropriate.  I

6    think the two can coexist, which is what I think the European

7    experience has taught us.

8            THE COURT:  So what you're telling me is the

9    plaintiffs misunderstand it, and frankly, when I walked into the

10   room, I misunderstood it?  This is not a flat ban?  There is a

11   route by which they can get their care permitted and paid for?

12           MR. JAZIL:  Yes, Your Honor.  As with all rules --

13           THE COURT:  One of their lawyers is going to be in

14   touch with you before you walk out of this room today to try to

15   get you to help facilitate that process, I'm confident.

16           MR. JAZIL:  And, Your Honor, I make that point --

17           THE COURT:  And that may be.  If there can be an

18   exceptional circumstance, you've got a 28-year-old who had

19   already been approved and has it scheduled, scheduled it after

20   the State approved it.  So they may want to talk to you about

21   that, and you know --

22           MR. JAZIL:  Fair enough, Your Honor.

23           THE COURT:  That's not my bailiwick, but I heard what

24   you said.

25           MR. JAZIL:  And the issue before this Court is -- you

1    know, the crux of the issue for irreparable harm before this

2    Court is will these four plaintiffs suffer irreparable harm, and

3    the question is what evidence does the Court have to provide

4    this unusual and drastic remedy.  The evidence before the Court

5    specific to these four plaintiffs showing that they have

6    suffered irreparable harm is just their declarations.  It's not

7    the declarations of their treating physicians.  It's not the

8    declarations -- it's not the live testimony from these folks

9    talking about why it is they need it and why it is --

10          THE COURT:  Yeah.  In fairness, I'm going to treat

11   their declarations the same as the live testimony.

12          MR. JAZIL:  Fair enough, your Honor.

13          THE COURT:  That's the procedure we all agreed to.

14          MR. JAZIL:  So the Ninth Circuit case *Doe,* which

15   affirmed the district court's denial of irreparable harm,

16   disagreed with the district court on all the legal issues but at

17   its core agreed with the district court that, Look, if you're

18   going to try to show irreparable harm for the folks that are

19   seeking this extraordinary remedy, you need to have someone

20   that's treating them in front of you.  Otherwise, you don't

21   carry that burden.  So I just underscore on that point,

22   Your Honor, irreparable harm.

23          And, Your Honor, I know we've talked about the

24   European experience.  We've talked about Florida's experts.

25   There is also a comment in our papers from the acting director

1    of the NIH when he was recently testifying in front of the

2    Senate.  He did not say that this is -- he was talking about

3    puberty blockers and cross-sex hormones, not the surgeries.  He

4    did not say these things are the medical go-to's in the area.

5    He said that the NIH has only funded observational studies, and

6    the long-term effects of puberty blockers on gender transition

7    are unclear.  So, Your Honor, I highlight that just to round out

8    the discussion of experts.

9            Your Honor, I would also note the Swedish study that

10   went 30 years, looked at 324 folks, and came to the conclusion

11   that if the idea is to prevent suicides and to prevent early

12   deaths in these folks, that simply doesn't happen.

13           THE COURT:  Let me ask about that.  And I've read

14   every declaration in the case and the report and the comments.

15   I've been through all that.  If the -- I don't think the studies

16   themselves are in the record and -- because I don't think I

17   would have missed them if they had been, but I can tell you I

18   have not read the studies.

19           And, for whatever reason, we've got people on both

20   sides who have an agenda, and they spin it their way, and I

21   don't think I've had any doctor that gives a really good

22   impartial analysis of the studies.  But I haven't read the

23   studies, so I'm not sure of that.

24           But here's what I -- here is the question that jumped

25   off the page to me that I don't know that anybody has asked.  So

1   that study, I think, is the one that said you look down the

2   road, and the suicides are higher among the people that got this

3   treatment than in the control group.  And I take it the control

4   group is the population.  And so these are people who often had

5   other mental health diagnoses but certainly encountered gender

6   dysphoria and probably the reaction that -- sometimes the

7   bigotry, the discrimination that that leads to.  So I would not

8   be surprised if the suicide rate among those people was higher,

9   even if the treatment was enormously successful.

10          And, look, if -- if a doctor replaces a heart valve

11   and then you look ten years later how are those people doing and

12   you compare it to the general population, I can tell you more of

13   them are going to have died from heart problems because they had

14   a bad heart valve and they had the surgery.

15          So that's my question.  Is the -- are you just

16   comparing people to the general population?  If so, that doesn't

17   tell me much.  Or is the control group something else?

18          MR. JAZIL:  Your Honor, I believe the control group

19   was the general population and -- fair point, Your Honor.

20          THE COURT:  I don't know -- if the life expectancy is

21   a little lower, I don't know how that plugged in.  That's a

22   little different than the mental health issue.

23          But, you know, the -- here's my take on it -- and I'll

24   get you to tell me whether this is right or wrong.  My take on

25   it is, no, there are not great studies.  It's an enormously

1  difficult thing to study.  There are certainly no randomized
2  clinical trials.  That's just makeweight stuff on your side of
3  the case.  Of course there are no randomized clinical studies,
4  can't be one.  So, yeah, the studies aren't great.  It's a hard
5  thing to study.  And it's -- with any change in medication or
6  change in circumstances, it takes awhile.
7        We have no long-term studies of COVID.  Nobody has had
8  the disease for more than two or three years.  So how are people
9  doing after ten years with COVID?  We don't have a study.  Of
10  course not.
11        So my take on it is the studies aren't great.  They
12  are what they are.  Clinicians' views matter.  If you get honest
13  clinicians, they know something.
14        MR. JAZIL:  Fair point, your Honor.
15        And I think what Your Honor is echoing are some of the
16  comments the federal government made in the HHS 2020 rule where
17  it said the medical community is on either end of the spectrum
18  on this, and we don't have a clear answer about whether or not
19  gender-affirming care is something that we can mandate at this
20  time.  That's what the federal government said.
21        THE COURT:  You do know it -- that some people who
22  have gotten gender-affirming care have done well with it and
23  have been happy with it.
24        You know that, don't you?
25        MR. JAZIL:  Yes, Your Honor.

1        THE COURT:  And so -- I mean, some of your experts

2    seem to say, Well, they say they are happy.  Well, if they say

3    they are happy, they are probably happy.

4        MR. JAZIL:  It -- And, Your Honor, again, that goes to

5    the point I made earlier.  We're not imposing a categorical bar

6    on gender-affirming care.  We've concluded that this is a mental

7    health condition, and for this mental health condition, mental

8    health treatment works.  We don't think the puberty blockers,

9    cross-sex hormones or the surgeries do.

10        And with the medical community being divided, as the

11    HHS pointed out and as Your Honor pointed out, the tie should go

12    to the State.  The State gets to chose in that instance, I would

13    submit, which way to pivot and which way to create the

14    categorical rule, which is what we're doing through the

15    exclusion.  And that categorical rule is not inconsistent with

16    the European experience, which is now trending towards an

17    exceptional circumstance model.  That categorical rule is not

18    inconsistent with the NIH acting director's statements saying

19    that we have no long-term studies on this.  We've just started

20    funding observational studies on this.

21        So even if Florida is the outlier, as they paint us to

22    be, which I think is incorrect, what Your Honor has pointed out

23    is the doctors are on both sides of this issue.  And in that

24    instance, Your Honor, I would submit that both under *Dobbs* and

25    *Rush v. Parham*, it's reasonable for the State to pick one of

1    those two alternates to go with and make policy with.  And that

2    is what the State is doing here.

3              So on the substantial likelihood for success prong, we

4    should prevail and --

5              THE COURT:  Why wouldn't the better rule be what

6    you've essentially described here today, maybe with a little --

7    a little less insistence, but essentially why shouldn't the rule

8    be for puberty blockers, hormone therapy, or surgery, there has

9    to be good medical care and opinion and comply with the

10   conditions and show a real need and evaluate each case to make

11   sure you don't have cases like the ones that you've got in your

12   declarations?  Why wouldn't that -- if there's already an

13   exception built in, why not put it in this rule so these people

14   would know it?

15             MR. JAZIL:  Well -- so Your Honor's suggestion is to

16   build an exception into the rule itself and not rely on the

17   broader APA exception under 125.14?

18             THE COURT:  Well, and more than just the exceptional

19   reasons that -- I don't know if anybody knows what those

20   exceptional reasons are going to be.  But if it is true that

21   sometimes puberty blockers can be approved, then why not say

22   that in the rule?

23             MR. JAZIL:  Well, Your Honor, I don't think it needs

24   to be spelled out in the rule.  If the rule is a categorical

25   rule and you're justifying that based on this broad study that's

1   looking to see what the categorical rule should be, then I don't

2   think you need a specific exception in the rule when you have

3   the 120 exception available.

4           Also, Your Honor, Your Honor said something that, so

5   long as someone is providing the appropriate care consistent

6   with the appropriate standards of care -- in that part,

7   Your Honor, the appropriate standards of care, that's also in

8   flux.

9           We've been provided and we've talked about, my friends

10  for the plaintiffs, the standards provided by WPATH, for

11  example.  WPATH has standards.  The Endocrine Society has

12  guidelines.  We don't have a set of standards that necessarily

13  apply, the standards of care that necessarily apply in this

14  instance.  And there's another agency, the Department of Health,

15  that is in the process of hearing from folks and coming up with

16  appropriate standards of care for gender dysphoria.

17          So -- pardon me, Your Honor -- on the standards of

18  care side, that is a separate process, and I would just note

19  that for the Court.

20          THE COURT:  All right.  I've run you out of time.

21          What else do you need to tell me?

22          MR. JAZIL:  Well, Your Honor, I would simply ask that

23  the preliminary injunction be denied.

24          Thank you.

25          THE COURT:  All right.  Rebuttal?

1          MR. GONZALEZ-PAGAN:  Thank you, Your Honor.

2          Just briefly, I would like to start with the reference

3    to the waiver variance regulation, Your Honor.  I will note that

4    everybody has been proceeding because it is, but this is a

5    categorical ban on coverage.

6          THE COURT:  Don't -- let me just tell you, you are

7    representing four plaintiffs who have just had the State tell me

8    that there is a possible exception.  You really don't want to

9    argue that the State is wrong, do you?

10         MR. GONZALEZ-PAGAN:  Your Honor, I -- I will -- I -- I

11   will confer with my co-counsel that's experienced with state APA

12   claims.  And, Your Honor, I just don't think this is an accurate

13   statement by the State, and so it's a representation here by

14   counsel here in court; but if they want to stipulate that they

15   will move case by case for people moving forward, that's

16   different than a statement here in court saying that a

17   categorical ban on coverage has some waiver invariance based on

18   this completely separate rule that, as I understand it, has

19   never been applied in this context when the State deems that it

20   is experimental.  Because the waiver of variance has to go --

21   has to still be consistent with the purpose of the rule.

22         THE COURT:  I hear ya.  I just wonder why you wouldn't

23   say --

24         MR. GONZALEZ-PAGAN:  I'm happy to enter into a

25   stipulation --

1          THE COURT:  -- thank you very much.  I'm happy to find

2    out there's an exception.  Please put it in the ruling so that

3    my later judicial estoppel claim will be squarely established.

4          MR. GONZALEZ-PAGAN:  I'm happy for that to be built

5    into a ruling, Your Honor, and I'm happy for that to be entered

6    as a stipulation.  But I think it is farfetched for us to accept

7    that based on counsel's representation today when it has never

8    been argued in any of the papers anywhere at all that this is

9    something that applies and that somehow this is not a ban on

10   coverage.

11         But I think, you know, if the State wants to proceed

12   that way and lead with that effect, the provision, and actually

13   move on a case-by-case basis via a stipulation, that is a

14   completely different matter, and we're willing to entertain it,

15   Your Honor.

16         I will also note that Your Honor kept asking and

17   expressing the concern about, well, if the State deemed this to

18   be experimental, would it affect the other claims.  And I would

19   posit that there is still a valid equal protection and/or 1557

20   claims because it depends on how is it applied and also the

21   provenance of the rule.

22         If the State excludes some experimental services but

23   not others -- and that is part of *Rush v. Parham*, Your Honor,

24   where it noted that if the State provided for the experimental

25   care in some circumstances versus others, they couldn't do a

1    categorical ban --

2              THE COURT:  Look, I think I understand what you just

3    said, and I think I agree with you.  If there were comparable

4    services, comparably experimental -- so here's surgery for

5    transgender individuals and here's surgery for something having

6    nothing to do with gender dysphoria and you can say these are

7    comparable in all relevant respects, they are equally

8    experimental, and the State paid for the one and didn't pay for

9    the other, then you've got a viable equal protection claim.

10             MR. GONZALEZ-PAGAN:  Yes, Your Honor.  And I would

11   posit --

12             THE COURT:  Point me to the experimental services not

13   for transgender individuals or not for gender dysphoria that the

14   State pays for.

15             MR. GONZALEZ-PAGAN:  Your Honor, the basis for them

16   deeming this experimental in large part relies on the quality of

17   the evidence, which I will note, Your Honor, that low quality --

18   the terminology "low quality," as many of our experts have

19   explained, is a term of art within the context of scientific

20   literature.

21             THE COURT:  I got it.

22             MR. GONZALEZ-PAGAN:  But based on the fact that

23   there's no randomized control trials or what they would deem

24   high quality, there's a number of other care that is provided

25   coverage for that doesn't meet that bar.  I will note --

1          THE COURT:  Absolutely, absolutely.  There are a lot

2    of things that you can't get that high quality evidence for.  I

3    get that, but that wasn't my question.

4          MR. GONZALEZ-PAGAN:  Yes.  The question was comparable

5    treatments that don't meet that bar that are comparable to the

6    ones here, and I will note, for example --

7          THE COURT:  That are experimental in the same way as

8    this one is.

9          MR. GONZALEZ-PAGAN:  Yes.  And the reason they are

10   claimed as experimental is because of the quality of the

11   evidence.

12          I will note, for example, the use of hormone --

13   post-menopausal hormone therapy which is -- note the use of

14   surgery for cranial facial injuries.  They use statins to treat

15   high cholesterol, gallbladder surgery, and the use of surgery

16   for cleft palates are all examples of similar procedures in many

17   instances, like facial feminization surgery, for example, or the

18   use of hormone therapy that are similar and have similar quality

19   bases of the evidence.

20          THE COURT:  All right.

21          MR. GONZALEZ-PAGAN:  And I will point to --

22          THE COURT:  Here's where you don't persuade me.

23          First, for statins, I would have guessed that there

24   are randomized trials, but maybe not.

25          But to say that the analysis of statins to treat high

cholesterol is comparable and so it has to be treated by the
State the same as the use of puberty blockers for gender
dysphoria, you just don't get off the dime with me.  They are
markedly different treatments for markedly different conditions
with markedly different analyses.  And nobody would say, Well,
because you do this with statins, you have to do the same thing
with puberty blockers.  It's just a completely different medical
analysis.

MR. GONZALEZ-PAGAN:  But under the equal protection
principle it is the same, Your Honor.  And I would point to
several of the cases, including *Brandt* from the Eighth Circuit;
including *Fain* from West Virginia, a Medicaid case; *Flack* in
Wisconsin; and even *Eknes-Tucker* in Alabama, all of which engage
in that analysis, because the reality is that even here the
competitor -- you don't have to go even that far, Your Honor.
These are services that are provided to achieve the same outcome
but to non-transgender people.  Hormones are provided in order
to achieve an outcome that is consistent with the person's
identity.

THE COURT:  Look, you're right.  Medicaid will pay for
statins to treat high cholesterol.  Medicaid will not pay for
statins to treat gender dysphoria, or lots of other things,
because statins don't treat all those other things.

There's nothing wrong with the State saying, I will
approve a treatment for this, but not for that.

1          MR. GONZALEZ-PAGAN:  Actually, Your Honor, there is.

2          And there's a comparability argument to be made there

3     which we did not move on the preliminary injunction under

4     Medicaid.  But that same analysis can be portended into the

5     equal protection and sexual orientation and Section 1557 claims.

6          But I think what state Medicaid here is covering and

7     has been covering requires an individualized medical

8     determination.  That has always been the rule under the Medicaid

9     program.  And the rule as adopted here prohibits that,

10    short-circuits that, and disrupts that.  I would note that at

11    the end of the day --

12         THE COURT:  Are there no other procedures that the

13    State flatly prohibits -- or not prohibits -- refuses to pay

14    for?

15         MR. GONZALEZ-PAGAN:  Your Honor, I could give an

16    example of the case of KG, which had to do with a particular

17    form of therapy for the autism population, and in that case that

18    was found to be both unlawful -- and the State deemed it to be

19    experimental and it was found unlawful, and it was enjoined

20    statewide.

21         THE COURT:  I got it.  And, look, I told you if I

22    decide as a matter of fact that the State's characterization of

23    this treatment as experimental is not reasonable, you're going

24    to win the case.

25         MR. GONZALEZ-PAGAN:  Your Honor, I would just like

1  to --

2          THE COURT:  So the fact that some other judge decided

3  some other treatment was not experimental, that -- you don't

4  need to cite that to me because I'm already on your side on that

5  issue.

6          MR. GONZALEZ-PAGAN:  Understood, Your Honor.

7          I would just briefly correct the record and note a

8  particular part of the argument here, which has to do with both

9  equal protection and to *Romer* but also the pretextual nature of

10 the rule here.

11         Your Honor already pointed out what seemed to be not

12 an unbiased assessment by the State as to the quality of the

13 evidence or effectiveness of the treatment in this case, but to

14 have a preordained outcome in mind and seeking only a particular

15 view.  That is only but one indicia of what we consider to be

16 pretextual animus here, as that term of art is known within the

17 constitutional context.

18         I would also note that Dr. Brignardello, who counsel

19 pointed out as an exception that doesn't have a view on this --

20 that's not true.  And we pointed to that in our papers, that as

21 a member of SEGM, a particular organization that opposes this

22 care, she's an active member of that.

23         I will note -- but I will note here that it's not

24 only --

25         THE COURT:  I think she also limited her analysis to

1    people under 25, but --

2            MR. GONZALEZ-PAGAN:  Correct, Your Honor.

3            But I will note that that is only but one indicia.

4    Another indicia here of that is that all of the concerns, if

5    we're to read the GAPMS memo, if we were to read all of their

6    so-called expert reports, Your Honor, all of them keep a focus

7    on, well, the ability to consent and whether this is effective

8    or whether this has been proven effective with regards to

9    minors.

10           But the rule is not drafted that way.  The rule is

11   seeking to prohibit care for all transgender people in the

12   state, because the outcome of having transgender people having

13   their body be aligned with their identity, having that be

14   covered by Medicaid is something that they do not want.

15           THE COURT:  Yeah, they don't prohibit the treatment;

16   they refuse to pay for the treatment.

17           MR. GONZALEZ-PAGAN:  Correct, Your Honor.

18           But for many of our plaintiffs and most transgender

19   Medicaid beneficiaries, they are one and the same.  These are

20   people who don't have the medical -- the financial resources.

21   By definition for them to be on Medicaid, most of them need to

22   be extremely medium/low income.  They wouldn't be able to access

23   the care otherwise.  It constitutes an absolute bar on access to

24   the care.

25           Your Honor, for those and other reasons stated --

1          THE COURT:  I did mess up my questions earlier, as I

2     look at my note.  I was talking about a 28-year-old person.

3     That person has had top surgery.  It's just talking about

4     testosterone.

5          MR. GONZALEZ-PAGAN:  Yes.  I think Your Honor was

6     referring to Brit Rothstein, Your Honor, who is 20 years old.

7          THE COURT:  The -- so for the 28-year-old, the -- he

8     needs testosterone at a cost of 60 to $65 a month.  That's a lot

9     for a person that doesn't have much money.  I'm not sure that's

10    irreparable harm.

11         MR. GONZALEZ-PAGAN:  Well, Your Honor, we've

12    established and cited to a number of cases that the loss of

13    coverage does constitute irreparable harm and --

14         THE COURT:  Well, it certainly can, sure, if you can't

15    pay it.

16         MR. GONZALEZ-PAGAN:  Well -- and I believe Mr. Dekker

17    has testified that he can't.  He lives on a monthly income of

18    about $841, Your Honor.

19         THE COURT:  I got it.  $60 is hard.

20         MR. GONZALEZ-PAGAN:  It's an incredibly high

21    percentage of that and impossible for him to afford.

22         The same holds true in regards to the surgery with

23    regards to --

24         THE COURT:  Before you mention other names -- by the

25    way, I don't know how many of these names are public.

1          MR. GONZALEZ-PAGAN:  The names I'm mentioning are

2    public, Your Honor.

3          THE COURT:  All right.  Good.

4          MR. GONZALEZ-PAGAN:  And, Your Honor, I can point to

5    K.F., one of the minor plaintiffs.  His family lives under the

6    poverty line, and they cannot afford this care.  They've

7    testified in their declaration that the cost for the puberty

8    blocker could be between 3,000 to $3,600 every three months.

9    They don't have that kind of money, and it would mean the

10   absolute loss of access to this care.

11         THE COURT:  All right.  Anything else?

12         MR. GONZALEZ-PAGAN:  No, Your Honor.

13         For the reasons already -- well, Your Honor, if I may,

14   one brief moment to confer.

15         THE COURT:  All right.

16      (Discussion was held.)

17         MR. GONZALEZ-PAGAN:  Again, no, Your Honor.  We thank

18   the Court for its time, and we'll rest on our papers and the

19   arguments here today.

20         THE COURT:  All right.  Thank you.

21         Give me just a minute.

22      (Pause in proceedings.)

23         THE COURT:  Let me tell you what the ruling is going

24   to be and give you a very brief summary.  The ruling is not

25   going to reach the fundamental issue in the case.  The

1   fundamental issue that eventually will determine the outcome in

2   the case is whether the State has reasonably determined that the

3   treatments at issue are experimental.

4            Under Florida Statute, Section 409.905:  *The agency*

5   *shall not pay for services that are clinically unproven,*

6   *experimental, or for purely cosmetic purposes.*

7            Under *Rush v. Parham* the question is whether the State

8   has reasonably determined that these services are clinically

9   unproven or experimental.  There is evidence on both sides of

10  that question.

11           I deny the motion for a preliminary injunction for a

12  different reason.  The controlling law, as I just summarized it,

13  is statutory.  If this treatment is clinically unproven or

14  experimental within the meaning of the statute, or if the State

15  has reasonably determined that, then excluding payment is not

16  unconstitutional unless the State doesn't follow the statute as

17  a custom or practice.  There are other instances when the State

18  does pay for clinically unproven or experimental treatments.

19  And if that's the case, then the fact there's a statute that's

20  only applied against these plaintiffs and not against others

21  would give rise to an equal protection claim and a whole new

22  layer of analysis.  There's no evidence of that in this record.

23           Discrimination under the Affordable Care Act is

24  essentially the same.  The analysis tracks what I just gave you.

25           So, basically, this comes down to a Medicaid statute.

1   The plaintiffs didn't move for a preliminary injunction based on

2   a Medicaid statute under the *Ashwander* principle, the

3   constitutional avoidance principle.  I'm not going to reach out

4   to decide the constitutional case in a case that's actually

5   going to be controlled by the statute, and this case is an

6   illustration of why that rule is there.  A constitutional ruling

7   probably would apply not just to the payment question but to the

8   question whether a State can prohibit the practice.  The State

9   of Florida has not tried to do that.  That constitutional

10  question is not presented here, and there's no reason for me to

11  address it.

12          The other reason for denying a preliminary injunction

13  is that the record does not include medical records for these

14  plaintiffs.  Before I entered an injunction that would lead to a

15  requirement or it might lead to a requirement to provide service

16  to these plaintiffs, the record would need to include medical

17  opinions that this treatment is indeed necessary, that these

18  plaintiffs are going to suffer irreparable harm from the denial

19  of care.  Perhaps I could make that finding based just on their

20  declarations alone, but my finding is that those declarations

21  are not sufficient to establish irreparable harm for these

22  plaintiffs at this time based on this record.

23          You've noticed from all of that that I haven't

24  decided, as I said earlier, the critical question in the case.

25  That will await further proceedings.  This should not take long.

1    This is not quite an administrative review, but it's not that

2    far off from it.

3            Tell me how long do you think -- I probably should

4    have asked before I told you I was going to deny the preliminary

5    injunction because answers change depending on which side thinks

6    they won the preliminary injunction motion.

7            How long do you think you need to present this case

8    fully?  And if the answer is "I don't know," I guess I can just

9    tell you to go talk to each other.  But if you can give me a

10   rough ballpark at this point, it will help.

11           MR. JAZIL:  Your Honor, I'm happy to confer with my

12   colleagues for the other side and get back to the Court.

13           THE COURT:  It seems to me that you want to find out

14   about the plaintiffs and their doctors and that's about it;

15   right?  I mean, you had all you had when you adopted the rule.

16           MR. JAZIL:  Yes, Your Honor.  I suppose -- there's a

17   footnote in *Rush v. Parham* that discusses -- well, in my mind it

18   opens up the possibility of additional evidence to provide to

19   the Court on whether or not this is or isn't experimental,

20   but --

21           THE COURT:  At least tentatively I think that's right.

22   I think the question is for me to decide based on the federal

23   trial whether the State's determination is reasonable or not,

24   and I think *Rush* says that's not an administrative review of

25   what the State knew at the time.  It's the question at the --

1   based on the evidence presented at the trial.  So, yes, I think

2   that's right.

3          MR. JAZIL:  That's right.

4          THE COURT:  And that goes back to my questions about

5   the Florida administrative procedure.  In a rule challenge in

6   state court, they might be stuck with the record they put

7   together to adopt the rule, but I don't think that's the case

8   here.

9          MR. GONZALEZ-PAGAN:  Your Honor, if I may, I just have

10  a question on the Court's ruling.

11         Will the Court include in its order for representation

12  as to what counsel has stated here today that there is a waiver

13  procedure?

14         THE COURT:  Yes, I will.

15         MR. GONZALEZ-PAGAN:  Thank you, Your Honor.

16         THE COURT:  I hope I express it accurately.  I'll try

17  to have it in -- an accurately narrow statement of the

18  availability of an exception.

19         MR. JAZIL:  Thank you, Your Honor.

20         THE COURT:  You gave me a cite, and I didn't --

21         MR. JAZIL:  Yes, Your Honor.  It's 120.542.

22         THE COURT:  120.54(2)?

23         MR. JAZIL:  No, Your Honor.  It's, I think, 120.542.

24         Your Honor, with the Court's indulgence, I have one

25  other issue.  The trial date is set for August 7th.  I'm in a

1    trial in the Southern District of Florida that week.

2            MR. GONZALEZ-PAGAN:  Sorry, Your Honor.  If we can

3    confer just briefly on the time?

4        (Pause in proceedings.)

5            THE COURT:  While you were talking, Mr. Jazil said

6    that he wanted to raise a question about the time of the trial.

7    The initial scheduling order apparently set it for August 7th.

8    Let me tell you how that got done, and surely we can change it,

9    and we probably ought to move it earlier.

10           The way that gets done is when the defense appears in

11   a case, I issue an initial scheduling order.  It generally sets

12   the discovery deadline.  It sets the deadline for the 26(f)

13   attorney conference.  Then it sets a discovery deadline, and it

14   sets a trial.  Those are just routinely set for the same

15   distance out, unless there is something very unusual about the

16   case.

17           So August 7th would have been -- the same time would

18   have been set for trial for any case that got filed, and in this

19   case it probably ought to be sooner than that.  I mean, this one

20   is -- it doesn't seem to me that there's much to be -- much to

21   be done.

22           MR. GONZALEZ-PAGAN:  Your Honor, if I may, we are

23   happy to confer with counsel.  I think there's a 26(f)

24   conference that's coming up in 12 days, but we are happy to

25   confer much earlier than that to come up with a proposed

1    schedule.  I agree with the Court, I don't believe we need a

2    year to do this, and certainly we are talking between a couple

3    to four months for a schedule.

4            THE COURT:  Yeah, that's on the right track.  I mean,

5    the -- unless the defense is looking for more experts or the

6    plaintiff is looking for more experts -- if you've already got

7    them -- I assume the defense is going to want to get the medical

8    records and the information about the plaintiffs, and then -- I

9    don't know if you want to depose each other's experts.  You

10   probably do, although you might want to save it for cross, but

11   that's up to you.  So you need time to do those things, get the

12   26(a)(2) reports.

13           But it's -- this is -- nobody is trying to figure out

14   some complicated factual issue other than the complicated

15   factual issue that's the core of the case and that you've

16   already looked at in detail.

17           So, yeah, let's just leave it this way.  Talk to each

18   other.  Twelve days off -- and, again, that would have been the

19   standard time.  You're all in the same city today.  It might be

20   great to talk to each other right now.  The room is available.

21   I don't -- I'm not using this room the rest of the day.  You're

22   welcome to it and -- or go to lunch and meet at somebody's

23   office and talk about -- if you can get through those things,

24   good -- and talk about it.  I'll be available as soon as you

25   are.  Sooner is probably better.  It's better for everybody to

```
 1    get the issue resolved sooner and especially for the four

 2    plaintiffs.

 3              And talk about the class question.  There's not a

 4    class allegation in the complaint.  I assume there's no

 5    interest -- that you don't plan --

 6              And, Mr. Jazil, I think the answer is that if they try

 7    this case and I rule that the rule is invalid, then you can

 8    appeal that, but in the meantime, I would probably just comply

 9    with it.  But talk to your client and decide what you want to

10    do.  If you can goad them into a class action, we're just going

11    to have a whole lot more work for the lawyers and the judge and

12    probably not much of a different outcome.  So talk about all of

13    those things at your 26(f) meeting.

14              MR. JAZIL:  Sure.

15              THE COURT:  I'll try to get you a written order.  I

16    would like to say more than I have and address a couple of these

17    things.  It's -- as somebody said, I've got a preliminary

18    injunction docket working at the moment.  I've had three or four

19    of these.  I've got several other things going, so it's going to

20    be a little hard for me to spend the time I need to sit and

21    write something down, but I may try to get something.  Don't

22    hold your breath.

23              I will at least get you a prompt order that confirms

24    the ruling so that you've got a written order if you wish to

25    appeal, which certainly it's an appealable order.  Perhaps the
```

1    Supreme Court will tell us otherwise here in the next day or

2    two -- in the next few days.  It seems to me this certainly

3    would be an appealable order, and I'll get you a written order

4    so that if you wish to appeal, you can.

5            What else, if anything, do we need to address today?

6            Thank you all.  We are adjourned.

7        (Proceedings concluded at 12:57 PM on Wednesday, October

8    12, 2022.)

9                        * * * * * * * *

10           I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
11   Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy is noted within the
12   transcript.

13

14   /s/ Megan A. Hague                    10/12/2022

15   Megan A. Hague, RPR, FCRR, CSR        Date
     Official U.S. Court Reporter
16                        I N D E X

17   DEFENDANT'S WITNESSES                          PAGE

18   DR. MICHAEL K. LAIDLAW
     Direct Examination By Mr. Perko                  6
19   Voir Dire Examination By Mr. Charles             7
     Cont. Direct Examination By Mr. Perko           15
20   Cross-Examination By Mr. Charles                23
     Redirect Examination By Mr. Perko               38
21
     ZOE HAWES
22   Direct Examination By Mr. Beato                 41
     Cross-Examination                               45
23
     YAACOV SHEINFELD
24   Direct Examination By Mr. Jazil                 50
     Cross-Examination By Ms. Altman                 55
25

1              **E X H I B I T S**

2

    PLAINTIFFS' EXHIBITS              OFFERED    RECEIVED
3
    P1     American Academy of Child         26
4           and Adolescent Psychiatry
            Statement Responding to
5           Efforts to ban
            Evidence-Based Care for
6           Transgender and Gender
            Diverse Youth
7

8   OTHER RECORD MADE                             PAGE

9   Closing Argument By Mr. Gonzalez-Pagan          64
    Closing Argument By Mr. Jazil                    82
10  Rebuttal Closing Argument By  Mr. Gonzalez-Pagan  102

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25