**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

AUGUST DEKKER, et al.,          )
                                )
            Plaintiffs,         ) Case No: 4:22cv325
                                )
        v.                      ) Tallahassee, Florida
                                ) January 26, 2023
JASON WEIDA, et al.,            )
                                ) 10:35 AM
            Defendants.         )
_____ )

**TRANSCRIPT OF TELEPHONIC MOTION PROCEEDINGS**
**BEFORE THE HONORABLE ROBERT L. HINKLE**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1 through 62)**

Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
                         111 North Adams Street
                         Tallahassee, Florida 32301
                         megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

APPEARANCES:

For Plaintiffs:          Lambda Legal
                         By:  OMAR GONZALEZ-PAGAN
                              Attorney at Law
                              ogonzalez-pagan@lambdalegal.com
                         120 Wall Street
                         19th Floor
                         New York, New York 10005

                         Southern Legal Counsel, Inc.
                         By:  CHELSEA LEE DUNN
                              Attorney at Law
                              chelsea.dunn@southernlegal.org
                         1229 NW 12th Avenue
                         Gainesville, Florida 32601

                         Florida Health Justice Project
                         By:  KATHERINE JEAN ANN DEBRIERE
                              Attorney at Law
                              debriere@floridahealthjustice.org
                         3900 Richmond Street
                         Jacksonville, Florida 32205

                         Pillsbury, Winthrop, Shaw, Pittman, LLP
                         By:  JOSEPH LITTLE
                              Attorney at Law
                              joe.little@pillsburylaw.com
                         500 Capitol Mall
                         Suite 1800
                         Sacramento, California 95814


For Defendants:          Holtzman Vogel
                         By:  MOHAMMAD OMAR JAZIL
                              Attorney at Law
                              mjazil@holtzmanvogel.com
                         119 South Monroe Street
                         Suite 500
                         Tallahassee, Florida 32301

**P R O C E E D I N G S**

1

2     (Call to Order of the Court at 10:35 AM on Thursday,

3  January 26, 2023.)

4     THE COURT:  Good morning.  This is Judge Hinkle.  We

5  are starting a little late because Mr. Jazil had a hearing in

6  another court and it ran over, and I understand that.  So here

7  we go.

8         I've read the motion and been through the attachments

9  and read the declaration that the defense submitted in response,

10  Mr. Brackett's declaration.  I've got a couple of preliminary

11  matters, and then we can work through the various production

12  requests.

13        Let me start just on terminology.  There will

14  certainly be some discussion of the GAPMS report.  I'm going to

15  pronounce that "GAPMS," treat the P as silent.  I don't know how

16  you people have been doing it, but it just seems to make it one

17  syllable -- it works better -- and in the transcript it will

18  show up as all caps G-A-P-M-S, but be pronounced as if the P is

19  silent.

20        Then the one issue that seems to me to address before

21  we start going through the individual items, if I have it right,

22  the defense asserts that communications with experts who

23  submitted reports prior to issuance of the GAPMS report are

24  within the work product privilege because litigation was

25  anticipated.  Essentially, if I have it right, the defense says,

1   we didn't -- we didn't get these reports for use in promulgating

2   the rule, for use in deciding what the rule should be.  We got

3   the reports -- we communicated with these experts because we

4   anticipated litigation.  That's what I draw from Mr. Brackett's

5   declaration.

6          Mr. Jazil, let me tell you, I have two responses to

7   that.  The first one doesn't make much difference and the second

8   one goes right to the heart of it.  The first one that doesn't

9   make much difference is this:  Mr. Brackett says, Well, we knew

10  there was going to be litigation because they told us at that

11  the hearing.  Well, what they told you at the hearing doesn't

12  explain what you did before the hearing.  And so the fact that

13  somebody said at the hearing that if you promulgate this rule

14  there is going to be litigation, doesn't tell one anything about

15  why experts were retained earlier.  That doesn't make a lot of

16  difference.

17         The second problem, though, seems to me to be of

18  importance.  If what you're telling me is, We didn't retain

19  these people to decide what the rule should be; we just retained

20  them because we thought there might be a lawsuit later, then I

21  want to make sure that this is what you're going to tell an

22  administrative law judge at ACHA if there is a rule challenge.

23  Because it seems to me that position is virtually an admission

24  that you violated the governing rule that deals with how you

25  promulgate these standards.

1              Administrative Code Rule 59G-1.01 says that to

2    determine whether health service is consistent with generally

3    accepted medical standards, the agency shall consider -- shall

4    consider -- and then there is a list of various things, and one

5    is recommendations or assessments by clinical or technical

6    experts in the subject or field.

7              Well, if what you are telling me is that's not what

8    you did, then it seems to me you just basically admitted that

9    you didn't properly promulgate the rule.

10             So let's start by having you tell me how it is that

11   you can withhold these materials without admitting that you

12   violated the rule.

13             MR. JAZIL:  Yes, Your Honor.

14             And, Your Honor, I want to make clear that the reports

15   were submitted for a dual purpose:  One was to support the

16   rulemaking; the other was to help give us grounding in any

17   future administrative rule challenge or federal district court

18   rule challenge.  That's number one, Your Honor.  It was a dual

19   purpose.  It was not a single purpose.

20             Secondly, Your Honor, there was a letter from the

21   Department of Justice, March 31st, 2022, where the Department of

22   Justice wrote to the States and said that, We are reminding you

23   that you've got to provide all these gender-affirming care

24   services, and if you don't, you might violate a host of federal

25   statutes.  And that was submitted along with Mr. Brackett's

1    declaration, and it was part of the GAPMS process, Your Honor.

2              So there was a statement during the rule hearing that

3    what we are doing is unconstitutional, that what we are doing

4    violates the law.  But separate and apart from that, there was a

5    letter from the Department of Justice suggesting that if the

6    states, including Florida, don't follow through on providing

7    certain of these services, we might be in violation of federal

8    law.  So there was a predicate document before the hearing which

9    suggested that litigation was over the horizon.

10              And, Your Honor, secondly, to answer your question,

11   there was a dual purpose for the reports.  The reports from the

12   experts support the conclusion that Mr. Brackett, the author of

13   the GAPMS memo, reached.  And -- pardon me, Your Honor, I'm

14   getting over COVID.  And the dual purpose, Your Honor, so it was

15   for rulemaking in the subsequent litigation which was sure to

16   follow on this highly charged issue.  So I note that.

17              And, Your Honor, furthermore, under Florida law, as I

18   understand it, I can claim work product protection for something

19   if it is done for dual purposes.  Under federal law, Your Honor,

20   in the Eleventh Circuit, my understanding of the law is that

21   there is no consensus view on whether or not something can be

22   produced for dual purpose or must primarily be produced for

23   litigation for the federal work product privilege to apply.

24              So I hope I've answered Your Honor's questions.

25              THE COURT:  What was the primary purpose for which you

1    dealt with those experts?

2            MR. JAZIL:  Your Honor, the primary purpose was to

3    buttress the rule, the rule which was delving into an issue --

4    that complicated issue of scientific debate.  So that was --

5            THE COURT:  Had you already decided what the rule was

6    going to be, or were you going to listen to these people?

7            MR. JAZIL:  Your Honor, we were going to listen to

8    these people.  They were hired to provide their expert

9    perspective on this.  And Mr. Brackett considered that as the

10   author of the GAPMS report.

11           THE COURT:  All right.  Tell me how Dr. Van Mol, who I

12   think is the person who was at the public hearing and

13   responded -- kind of rebutted anybody who spoke against the

14   proposed rules -- how are his notes of that hearing protected?

15           He's a doctor.  He's there at the public hearing.

16   He's asserting a position that apparently is taken into account.

17   They give him, seemingly, unlimited time to respond to the

18   speakers -- each time was limited.  So he has unlimited time to

19   respond; he apparently takes notes, and you claim those are

20   privileged.

21           How are those notes protected?

22           MR. JAZIL:  Your Honor, Mr. Van -- Dr. Van Mol was

23   hired, as I understand it, early in the process to go through

24   the scientific literature and help the agency just ferret

25   through some issues.  He is not an author of one of the GAPMS

1   expert reports.  He was there at the hearing and he -- during

2   that hearing, there were also materials submitted, as Your Honor

3   notes, through a public portal.  There was the document that was

4   called the Yale document, for instance.  And there are notes

5   from both Dr. Van Mol and others just debating a response to

6   some of those points.

7           And those we thought would be properly protected by

8   the work product because they were helping us anticipate how

9   best to respond to arguments that would come up in future

10  litigation.

11          THE COURT:  All right.  I overrule the privilege and

12  work product objection on all of that.

13          You are going to turn it all over.

14          MR. JAZIL:  Understood, Your Honor.

15          THE COURT:  When we get to the litigation, the work

16  product is essentially governed by Rule 26(b)(4)(C), I suppose

17  it is, and that deals with the communications between you and

18  the doctor or the doctors, the various experts.  And so there

19  are very limited areas in which communications between the

20  lawyer and the expert get produced.

21          And I guess I should make sure with the other side

22  before I say it that way.  So tell me who is going to speak for

23  the plaintiff and then tell me whether you disagree with the

24  proposition that communications between Mr. Jazil and the other

25  lawyers, on the one hand, and the experts, on the other -- the

1  experts that are assisting with this litigation and may testify

2  in this litigation, whether those communications are subject to

3  disclosure only as set out in 26(b)(4)(C).

4          MS. DUNN:  Yes, Your Honor, this is Chelsea Dunn on

5  behalf of the plaintiffs.

6          We would agree the -- the communications with these

7  outside consultants that we are seeking, you know, to remove the

8  assertions of privilege from are those that are prelitigation,

9  the ones that Your Honor is speaking of.  We would agree that

10 the postlitigation communications with anyone retained for the

11 purposes of litigation would be covered by Rule 26(b).

12         THE COURT:  All right.  So where am I going to set

13 that date?

14         Because it does seem clear to me that at some point it

15 becomes clear there is going to be litigation and they -- I

16 don't know that the date the complaint is filed is the date.

17 What would the plaintiff have the date be that we shift?  I

18 guess part of it may be why doesn't he answer once the rule

19 comes out, we're finished promulgating the rule, and from that

20 point forward it's a litigation issue?

21         MS. DUNN:  Your Honor, I think that would make sense,

22 and we would propose that date as being August 21st, which is

23 the day that it was fully implemented and became effective.

24         THE COURT:  Mr. Jazil, does that date work?

25         MR. JAZIL:  Your Honor, in my mind -- perhaps the rule

1   hearing date would be more appropriate when it was noted that

2   litigation will follow.

3          And I apologize, Your Honor.  I don't remember the

4   rule hearing date off the top of my head.  I believe it was in

5   July.

6          THE COURT:  I think it was -- yeah, I think it was

7   July the 8th.

8          But you told people at the hearing that they could

9   submit written material.  You cut off speakers and said, If you

10  got anything else to say, you can put it in writing.  Surely you

11  planned to read that stuff and take it into account before you

12  made your final rule decision, or at least you were obligated

13  to.

14         So at that point aren't you still in the rule

15  promulgation phase?

16         MR. JAZIL:  Yes, Your Honor, we are.  And we are

17  obligated to review and consider the comments.

18         THE COURT:  All right.  So August 21st sounds like it

19  works.  That's the date when that will shift over.

20         MR. JAZIL:  Yes, sir.

21         THE COURT:  Then the other -- or the second overriding

22  issue I wanted to address, the defense says just 2022 -- here's

23  my understanding of the factual background.  And, again,

24  straighten me out -- both sides know a whole lot more about this

25  case than I do at this point.

1          If I understand it, when this came up in 2022, the

2    Secretary -- and I think maybe at that point it was

3    Ms. Marstiller; I'm not sure I remember correctly -- said, Well,

4    we don't have a policy on this, and it turns out that was wrong.

5    There was a policy promulgated back in, I believe, 2016, maybe

6    in the works in 2015 and promulgated in 2016, somewhere along in

7    there.  And so I understand the idea that this came back up in

8    2022, and so that's when we ought to be talking about, but it

9    also seems to me to be relevant to know what happened back in

10   2015 and 2016.

11          And so I have a question for each side.  And the

12   question for the defense is going to be:  Why isn't it relevant

13   what happened in 2015 and 2016?  And then my question for the

14   plaintiff is going to be:  What about 2017 through 2021?  What

15   do we really need during that period, and probably not the

16   extensive searches that the plaintiffs have asked for.

17          So let me start on the defense side.  What do you do

18   with the prior policy and what was done back in 2015 and 2016?

19          MR. JAZIL:  Your Honor, I go back to what the Court

20   said is a controlling issue here:  It's whether, based on

21   current medical knowledge, the State's determination that these

22   treatments are experimental is reasonable.  What happened in

23   2015 and '16 and '17 and '18 and '19 and '20 does not go to the

24   current medical knowledge.

25          As we discussed at the preliminary injunction hearing,

1   when I asked the question of is this akin to an administrative

2   review case, Your Honor said based on our discussion of *Rush*

3   that it wasn't and that the Court would consider new evidence,

4   expert testimony presented, perhaps, for the first time at trial

5   to show whether or not based on current medical knowledge the

6   State's exclusions make sense.

7          And if that's the polestar that's guiding the Court,

8   the parties, and this accelerated schedule, then I respectfully

9   submit, Your Honor, that those prior GAPMS reports are available

10  to the plaintiffs; they can make whatever arguments they'd like

11  about how the State, perhaps, changed its position, but that's

12  not the central issue in the case.  And given the central issue

13  in the case, going that far back simply adds burden to the State

14  as it's trying to prepare its defense on an accelerated

15  timeline.

16         THE COURT:  Well, it seems to me that confuses the

17  difference between evidence that's controlling and evidence

18  that's relevant.  If you want to know why the apple falls to the

19  ground, you might start with Newton.  You might not need Newton,

20  but it's not irrelevant.

21         And so -- and, also, while it's possible for something

22  to get more experimental than it used to be, usually the

23  progression works the other way around.  So the science that was

24  known in 2016 usually doesn't become unknown in 2022.  New

25  science comes out and it may turn out that the 2016 science is

1   wrong, but that doesn't mean it's irrelevant if you are trying

2   to understand this stuff.

3           On the other side, tell me why you need anything from

4   2017 to 2021?  You may want to know what they were paying for in

5   that period and there may be an easier way to find that out or

6   whether the same policy was in effect, but you are really asking

7   for some pretty broad searches that turn up a lot of gigabytes

8   of information.

9           Can't we narrow it some?

10          MS. DUNN:  Yes, Your Honor.

11          Just to provide the Court with some additional

12  information, in recent discovery we have learned that in

13  addition to the 2016 GAPMS memo that we submitted as an exhibit

14  to this motion, the defendants have also engaged in the GAPMS

15  process with regard to two of the other treatments at issue,

16  including cross-sex hormones and gender-confirming surgeries.

17          We have received drafts of memos that were written by

18  someone in AHCA, but -- or by someone employed by the

19  defendants.  We don't have discovery -- the discovery that we

20  received from defendants doesn't give us enough information

21  around these draft reports to understand who wrote them, what

22  the GAPMS process related to these looked like, and, you know,

23  the information that we need to determine how the agency was

24  able to reach such differing results.

25          So I don't think I mentioned this, but all those draft

1    memos came out the opposite side of this 2022 GAPMS memo on the

2    treatment of gender dysphoria that's at issue in this case.  So,

3    you know, the sources that were relied on, the process that was

4    undertaken, whether or not there were outside consultants used,

5    any documents and communications that are related to the

6    processes, you know, that were employed in those GAPMS reports

7    are incredibly relevant and proportional to the needs of the

8    case.

9            We understand, you know, as Your Honor mentioned, that

10   some of our requests, including, you know, our search terms for

11   the defendants' email communications database, do return large

12   quantities of information.  But I would point out to the Court

13   that since we received the defendants' written responses to our

14   discovery request on December 19th of 2022, we have been

15   actively asking defendants to give us more information about

16   these searches so that we can properly narrow them in order to

17   be manageable.

18           Not only have we offered a list of custodians without

19   receiving any information from defendants about the size and,

20   you know, breadth of these searches, we've offered a list of

21   custodians and the defendants have ignored, you know, that list.

22           (Indiscernible crosstalk.)

23           MS. DUNN:  -- with those parameters.

24           THE COURT:  Yeah, let's come back to that in a little

25   bit.

1              On the time frame, these other analyses that you are

2    talking about weren't just in 2015, '16.  There had been some

3    more recent than that but prior to the shift in direction in

4    2022?

5              MS. DUNN:  We believe that these occurred in 2016 or

6    2017, but we don't have definitive dates, which is one of the

7    reasons we don't think the limitation can be any later than

8    2016, unless defendants are able to give us more information

9    about these processes so that we can, you know, better define a

10   narrow -- what we are looking for at this point.  2016 is

11   probably as -- you know, as close to today as we would be able

12   to limit that because of those documents that we've uncovered.

13             THE COURT:  All right.

14             MS. DUNN:  And, Your Honor, I'm sorry.  If I could

15   point out one more thing?

16             We are not totally certain what requests we made that

17   prompted the defendants to produce those documents because

18   defendants haven't provided discovery in a manner where we can

19   tell what is being, you know, produced in response to what

20   inquiry.  But we believe that the only reason those memos were

21   overturned -- or turned over is because they were circulated by

22   email during the 2022 GAPMS process for the memo at issue in

23   this case.

24             And so we don't know what other relevant documents

25   might be in their files from earlier years if those documents

 1    weren't actually, you know, reviewed and circulated by email

 2    this year.  And so that is, I think, one of the issues that

 3    demonstrates how unreasonable this time limitation is.

 4          THE COURT:  All right.  The other overriding issue I

 5    had a question about -- I don't know how much difference it

 6    makes, but apparently the plaintiffs' position is that

 7    communication from an employee in the Department of Health with

 8    the lawyer at AHCA or vice versa can't be privileged.

 9          And my question is why can't they have essentially the

10    equivalent of a -- what in a criminal context would be called a

11    joint defense privilege?

12          MS. DUNN:  Your Honor, you're referencing the emails

13    they have -- that are exchanged with the Governor's offices and

14    the Department of Health, the other state agencies?

15          THE COURT:  Yeah, I don't -- I thought you were

16    talking about the exchanges between AHCA and Health, but the

17    same thing I guess would apply with the Governor's office.

18          I'm not getting into the question of whether any

19    particular documents are or are not privileged, but, for

20    example, a communication between the Secretary or Assistant

21    Secretary, some manager at the Department of Health with the

22    General Counsel to the Governor, seems to me that could be

23    privileged.  And it seems to me that if Mr. Jazil just

24    represents one of those agencies and not the other, it still

25    could be that communications between him and somebody at the

```
 1   other agency could be privileged.  Certainly AHCA and the
 2   Department of Health have corresponding interests.
 3           MS. DUNN:  Your Honor, we -- with regard to those
 4   communications, I think the common interest doctrine would --
 5   requires them to have a common legal interest.  And we would
 6   suggest that these emails are involving what is maybe more --
 7   probably more described as a joint policy strategy.  And the
 8   fact that --
 9           THE COURT:  Let me stop you for just a minute.  It's
10   getting harder sometimes to hear you.
11           MS. DUNN:  Okay.
12           THE COURT:  I don't know what kind of speaker you are
13   on, but if you can get closer and pick up the phone -- you know
14   how those things go -- anything that can improve the quality
15   will make it easier for me.
16           MS. DUNN:  Absolutely.  Is this better, Your Honor?
17   I'm holding the phone now.  I'm no longer on speaker.
18           THE COURT:  Much better.
19           MS. DUNN:  Okay.  So we -- excuse me.
20           So with regard to the communications with the other
21   state agencies, we believe that these communications would more
22   properly represent a joint policy strategy rather than a common
23   legal interest.  Just because communications happen or a
24   strategy between two entities happens to include a concern over
25   litigation doesn't necessarily mean that it rises to a level of
```

```
1    a common legal interest.  And I -- at least from the information
2    that we have in this privileged log, defendants have not
3    demonstrated that these communications were in furtherance of
4    litigation or rose to that level of a common legal interest.
5              There is no, I guess, threat that either the
6    Governor's office or the Department of Health would have been
7    subject to any sort of litigation over the promulgation of the
8    challenged exclusion.
9              THE COURT:  Well, you don't have an attorney-client
10   privilege just because there's litigation.  You have an
11   attorney-client privilege even when there is not litigation, so
12   I get it.
13             Look, conversation between the Secretary and the
14   Governor is not within the attorney-client privilege, period.
15   But a communication between the Secretary and the General
16   Counsel to the Governor, if the Secretary is asking for legal
17   advice and the General Counsel is providing it, that seems to me
18   to be privileged.
19             And setting aside the question about the Governor's
20   General Counsel -- the Governor outranks the Secretary.  But
21   even with two parallel entities, it does seem to me that if, for
22   example, a lawyer for the Department of Health is the expert on
23   some question and somebody at AHCA asks that person for legal
24   advice, that could well be privileged.
25             So I don't know that that answers any specific
```

1    question as we go through this, but I guess what I'm telling you

2    is I reject the plaintiffs' blanket assertion that a

3    communication between a state employee and a state lawyer cannot

4    be privileged just because the agency that employs the employee

5    is different from the agency that employs the lawyer.

6         MS. DUNN:  Understood, Your Honor.

7         And I think we would not disagree that if those

8    communications were for the purposes of giving or receiving

9    legal advice that they could be shielded from the

10   attorney-client privilege.  But in many of the instances where

11   those types of communications are being described in the

12   privileged log, that -- the fact that that is, perhaps, the

13   underlying substance of the communication is not clear and so --

14        THE COURT:  Got it.  Got it.  Fair enough.

15        And if we have to go through all the individual

16   privileged items, we'll get to that down the road.  But let's

17   get to -- to whether these items may affect more documents.

18        I think what I propose to do at this point is just go

19   through the list.  And I'm working off of the motion itself,

20   which is ECF No. 81.  The plaintiffs have broken it down into

21   groupings, and we're -- so the first was Request 3:

22   *Communications between the defendants and the Department of*

23   *Health about the guideline titled "Treatment of Gender Dysphoria*

24   *for Children and Adolescents" released on April 20, 2022.*

25        Mr. Jazil, I kind of scratch my head and say, What's

1  wrong with that?

2         MR. JAZIL:  Pardon me, Your Honor.  I'm pulling those

3  up.

4         THE COURT:  I'm working out of ECF 81 and starting on

5  page 7.

6         MR. JAZIL:  Yes, Your Honor.

7         Your Honor, our response -- or our amended response to

8  the request for production of documents notes that some of that

9  communication could be covered by the attorney-client privilege

10  because it's all communications between defendants and the

11  Department of Health.  I'll represent to the Court that lawyers

12  for AHCA and lawyers for the Department of Health have been

13  talking about these issues.  And that's the first objection that

14  was listed there.

15         Secondly, Your Honor, we made the point that, given

16  the instructions, this was a pretty broad request.  It went all

17  the way back from January to -- January of 2015 to the present.

18         THE COURT:  Wait.  Wait.  Wait.  This is about a

19  document that was released on April 20, 2022.  If you've got

20  people that were communicating in writing about this in 2015,

21  you've got some of the great forecasters in the history of the

22  world.  This is communications about a specific document.

23         Look, this is not hard.  There should have been no

24  objection to this other than privilege, if there are indeed

25  privileged documents that that would capture.

1    So, look, this one is granted and you are going to pay

2    fees.  I mean, this was -- this was not hard.

3         The next one is *Communications between the defendants*

4    *and the Governor's office about the same document.*

5         If anything is privileged, it's privileged.  But I

6    don't get how communication about that could otherwise be

7    objectionable.

8         MR. JAZIL:  And, Your Honor, just to clarify, anything

9    that wasn't privileged, we have turned over.  We are not

10   withholding documents related to this.

11   (Indiscernible crosstalk.)

12        THE COURT:  Let me -- let me tell you how this goes.

13   And you may have heard this before.  Other people have.

14        When a lawyer says, I object to this request; it's

15   overly broad, blah, blah, blah; subject to and without waiving

16   the foregoing objection, we are turning over documents -- and

17   that's -- and that's similar -- that's the gist of what you've

18   just said and what you've said in these papers.

19        Now, let me tell you how an unscrupulous lawyer could

20   use that kind of response and the reason why generally I

21   overrule that kind of objection and compel the production unless

22   there is something else about it that calls for a different

23   result.  Suppose you have an ordinary car crash case.  The

24   question is who -- it's an intersection collision.  The question

25   is who had the green light and whose light was red.

1          And the plaintiff says, Turn over all documents about

2     the crash.

3          And the defense lawyer, the unscrupulous defense

4     lawyer, says, Overbroad.  Vague, blah, blah, blah; subject to

5     and without waiving the objection, we are turning over

6     documents.

7          Well, it turns out the defense wrote -- defendant

8     wrote a letter to his brother and said, I ran the red light, but

9     I think I'm going to get away with it.  And so the defense

10    lawyer doesn't turn it over because the defense lawyer made an

11    objection that it was ambiguous and overly broad.

12         And then if the defense lawyer gets caught, the

13    defense lawyer can say, Well, I didn't have to turn it over; I

14    objected.

15         Now, I'm not suggesting anybody is doing that, but,

16    look, when there's an unobjectionable request for production,

17    and there is a plainly unfounded objection, and then there is a

18    motion to compel, it's no response -- it's no answer for me for

19    the defense to say, Well, we turned over the documents.

20         I'm going to enter an order compelling you to turn

21    over the documents.  If you have already turned them over, you

22    don't have to do it again, but if you haven't turned them over,

23    you have to turn them over.

24         So I'm going to grant No. 4.

25         Five, I don't understand why there's an objection to

 1    that.  Isn't that pretty clearly discoverable?

 2             MR. JAZIL:  Your Honor, again, if there were no

 3    lawyers on it who were advising Secretary Marstiller and

 4    Tom Wallace, it was turned over.

 5             THE COURT:  All right.  Well, I'm going to grant the

 6    motion to compel.

 7             And let me tell you, the fact that there is a lawyer

 8    copied on a communication doesn't make it privileged.  It might

 9    be privileged, but it's often not.

10             Two business people can't send business communications

11    to one another and shield them from discovery by copying the

12    lawyer.  There are nuances there.  The Supreme Court, just

13    yesterday or the day before, dismissed as improvidently granted

14    a case that poked around that issue.  I don't know that we've

15    got anything covered where that's the issue here, but when we

16    get to -- if we have to wind up going through the privileged

17    documents, the copying of a lawyer on a document between two

18    business people doesn't make it privileged.  If the primary

19    purpose of the document is to get legal advice, then one would

20    expect it to be written to the lawyer as opposed to be written

21    to the other businessperson.

22             Again, not a hard-and-fast rule, but that's generally

23    what would happen.  But if you looked at any particular

24    document, you can usually make a good determination of whether

25    it's privileged or not, and there will be questions around the

1  edges.

2          No. 8:  *Documents relating to steps the defendant*

3  *undertook to ensure that recipients continued to receive*

4  *treatment at the time the challenged exclusion became effective.*

5          Mr. Jazil, what's wrong with that?

6          MR. JAZIL:  Your Honor, again, nothing is wrong with

7  that request.  And, again, we've produced material so long as it

8  wasn't covered by the attorney-client privilege, and we limited

9  the date range to January 1 to the present.

10          THE COURT:  Well, again, that doesn't seem to me that

11  there could be anything before January 1.  That one there

12  couldn't be anything, I don't think, until significantly after

13  January 1, 2022, just by the nature of the request.

14          MR. JAZIL:  Yes, Your Honor.  I understand that, but

15  I'm going back to the instructions that were provided for the

16  request for production that said, Unless there is a specific

17  time limit placed here, we want you to go back -- almost to '15,

18  I believe.

19          THE COURT:  How could that have anything to do with

20  this request?

21          MR. JAZIL:  Your Honor, it shouldn't and it doesn't,

22  but the instructions that I'm operating under for the request

23  for production say that, Unless I put out a time frame, I want

24  you to go back.  So those would be --

25          THE COURT:  If they had --

```
 1           MR. JAZIL:  -- objectionable.

 2           THE COURT:  If they had given you an instruction that

 3    said, I want you to get all of the documents that you have that

 4    are in Ukraine on the battlefield, it wouldn't be burdensome

 5    because you would know there are no documents in Ukraine on the

 6    battlefield.

 7           On to the next one.

 8           Paragraph 10:  Draft and final correspondence from

 9    defendants to Medicaid recipients.

10           There's going to be some private information there.  I

11    guess let me ask the plaintiffs.

12           Ms. Dunn, how are we going to -- what do you propose

13    to do about the confidentiality issues here?

14           MS. DUNN:  I believe that would be governed by the

15    protective order that was issued in this case.

16           THE COURT:  It would be, but, look, there's a -- you

17    know, there's one person in Ocala, somewhere in the middle of

18    the state, doesn't have anything to do with this litigation and

19    has gotten treatment from Medicaid.  And so, of course, the

20    Medicaid people have those records.

21           But now you're involved in litigation, and I'm not

22    sure that person necessarily wants the plaintiffs' lawyers to

23    know who he is.

24           MS. DUNN:  Certainly, Your Honor.  We would have no

25    objection if the defendants wish to produce documents that were
```

1   redacted to protect that kind of -- you know, the identity of

2   the person receiving the communication.  Or, you know, we would

3   also accept samples of these communications.  So if every, you

4   know, Medicaid recipient on the insurance plan Humana received

5   the same correspondence, one example of that correspondence,

6   either, you know, the form letter or a redacted copy of that

7   letter that went out, I think would suffice.

8           THE COURT:  All right.  You don't need the details

9   about some particular treatment or whatever.  Got it.

10          All right.  So, Mr. Jazil, if I give you a choice of

11  either providing redacted correspondence on an exemplar of any

12  such correspondence -- your choice -- does that work?

13          MR. JAZIL:  Your Honor, it works for us.  I will go

14  back to the agency, but my understanding is any such document

15  that we have, we have produced already.

16          THE COURT:  All right.  And what was done about the

17  identities?  I guess you produced it; there is a confidentiality

18  order, so presumably it's being maintained as confidential.

19          MR. JAZIL:  Yes, Your Honor.  And we have a

20  confidentiality order anytime someone's personal medical

21  information has come up.  For example, it came up in the

22  variances that the agencies previously granted.  We just

23  redacted that information because we provided it before the

24  entry of the protective order.

25          So we've done our best to redact that information.

```
 1              THE COURT:  All right.  And I've got good lawyers who

 2    understand the privacy interest here, so just be careful to

 3    protect privacy interests as much as you can.

 4              11, the same thing.

 5              13 --

 6              MR. JAZIL:  Your Honor, this --

 7              THE COURT:  This goes back to the general issue we

 8    discussed at the outset.

 9              MR. JAZIL:  Yes, Your Honor.

10              13 and 14, the only things that we've withheld are

11    things that we've contended were work product.  And now, given

12    further guidance from the Court, we know them not to be so, and

13    we'll provide those to the plaintiffs.

14              THE COURT:  Okay.  14 I think is the same thing.

15              MR. JAZIL:  Yes, Your Honor.

16              THE COURT:  15 I think is the same thing.

17              MR. JAZIL:  Yes, Your Honor.

18              THE COURT:  17, same thing.

19              MR. JAZIL:  Yes, Your Honor.

20              THE COURT:  25 is different information, but the same

21    thing.  More likely that that also fetches documents that are

22    indeed privileged.  For example, if the Secretary sent Mr. Jazil

23    a note and said, How do we do this? then that seems to me to be

24    right in the dead center of the attorney-client privilege.

25              On the other hand, if two of the businesspeople at the
```

1    department send memos back and forth about, How are we going to

2    do this? then that ought to be produced.

3            MR. JAZIL:  Your Honor, for 25 things where someone

4    was not soliciting legal advice from us were produced.  Here's

5    one where we limited the time period to January 1 to

6    September 7th.  Based on the back and forth that we've just had,

7    there's some discussion about materials from 2015, '16, '17,

8    '18, that could touch on these challenged exclusions where the

9    State may have drafted something saying that it was going to

10   cover them.

11           We knew of these discussions in prior GAPMS memos.  We

12   have turned those over.  I don't know whether Your Honor would

13   like for us to do an inquiry beyond the January 1 to the

14   September 7th time frame that we've laid out in our response.

15           THE COURT:  Well, in 25, that doesn't deal with 2015

16   or 2016.  I guess I can go back and read the definition, but I

17   would have thought the challenged exclusion was the new rule

18   saying we are not covering these things.

19           And so I would understand this request to be for

20   documents related to the new rule, so nothing in 2015 and 2016

21   could possibly relate to that.  Probably the time period that's

22   covered goes from promulgation of the rule forward, although

23   certainly somebody could have been working on policies and

24   procedures before that.

25           But until this came up in, what, March of 2022, it's

1    hard to imagine there would be any documents that would be

2    responsive to 25.  There are other requests, but we'll get to

3    the things you are talking about.

4              MR. JAZIL:  Yes, Your Honor.

5              THE COURT:  26, again, same thing; turn them over.

6              *All documents related to the planning, coordination,*

7    *and content of the July 8th hearing,* that's granted.  That's the

8    discussion we had before.

9              And, look, I've read the rather remarkable email

10   exchange between Mr. English and Dr. Cogle.  At least according

11   to that email, this rule wasn't handled the way this kind of

12   issue is typically handled.  When I say "this rule," this GAPMS

13   memo was not done the same way others were, and the plaintiffs

14   understandably want to know why.  And documents related to the

15   planning, coordination and content of that hearing may show why.

16   The critical issue is not whether that hearing was conducted in

17   the usual course, whether it was or wasn't done properly, but

18   those things are relevant.

19             42, again, that seems proper.  I grant that.

20             43; Mr. Jazil, you want to tell me a reason why that

21   shouldn't be turned over?

22             MR. JAZIL:  Your Honor, if we have the documents,

23   we've turned them over for 43.

24             THE COURT:  Okay.  All right.

25             Then on 52, let me start on this one on the

 1   plaintiffs' side.  Here is my issue with this.

 2           This doesn't seem to be related to subject matter.  It

 3   was just communications between the defendants and a lot of

 4   people, and those communications might have something do with

 5   this lawsuit; they might not.

 6           MS. DUNN:  Yes, Your Honor.

 7           I think -- I don't think we would object to a

 8   limitation on this request to relate to the substance of this

 9   lawsuit.  Although, you know, I will just note that the majority

10   of the individuals identified in defendants' initial disclosures

11   were the same consultants and vendors that they used in the

12   promulgation of the rule, the same individuals that provided the

13   attachments to the GAPMS report, the same individuals who maybe

14   appeared at or testified at that July 8th hearing.  And so --

15           THE COURT:  But didn't you capture those

16   communications with one of the other requests?

17           MS. DUNN:  Yes, we did.

18           THE COURT:  Yeah.  I'm going to deny 52.

19           54 -- (audio feed glitch/indiscernible).  Read

20   literally, paragraph 54 would ask the defense to provide a copy

21   of the Federal Rules of Civil Procedure; wouldn't it?

22           What do you think 54 gets that you haven't asked for

23   somewhere else?

24           MS. DUNN:  If there are any documents that defendants

25   have relied upon in answering our -- yes, in providing their

1   answers to our request for admissions, to the extent that those

2   haven't been provided through our other requests, that's --

3   that's what we are asking for.

4           THE COURT:  Yeah, this is -- I know you are a careful

5   lawyer; you are trying to make sure you asked for what you

6   wanted.  But, again, I think, literally, if they looked at

7   Rule 26 to see what it said, then that was something they

8   considered in deciding what to do or they looked at a few court

9   decisions in deciding whether they could deny an allegation, and

10  you've literally asked them to provide a court decision.

11          I think that's just too broad, so I'll deny 54.

12          Same thing on 55.

13          I understand what you were trying to do.  You are

14  trying to make sure you didn't miss anything.  I doubt you

15  missed anything.

16          Then we roll over to the next group, Defendants' --

17  Plaintiffs' Request No. 6:  *The data that was relied on by the*

18  *defendants in developing and promulgating the GAPMS memo.*

19          Mr. Jazil, that seems pretty clearly proper.  What's

20  wrong with it?

21          MR. JAZIL:  Your Honor, nothing is wrong with it.  We

22  have provided everything that we've relied on.  We note that the

23  citations are included in the memo itself.  And as Mr. Brackett

24  said in his declaration, that's all he relied on as he wrote the

25  report.

1          THE COURT:  Yeah, here's the problem.  They don't want

2     to know just what you relied on.  They want to know what you got

3     and ignored.

4          Aren't they entitled to know what information you had

5     and ignored?

6          MR. JAZIL:  And, Your Honor, we've provided that to

7     them.  We provided the GAPMS memo with citations.  We provided

8     the rulemaking file, which has the other material that they

9     provided, the plaintiffs and other organizations.  So we've

10    exhausted the universe of material that we got as part of this

11    rulemaking process and that we've handed over.

12         THE COURT:  All right.  So when I compel production,

13    you are not going to have anything to produce.  But, again, if

14    you've produced everything they asked for, there shouldn't be an

15    objection.

16         7 is the same.

17         And 16, I think, is the same.

18         That takes us around to No. 19.  I've clicked over to

19    page 11 on ECF No. 81.  This looks okay to me.

20         Again, part of the responses may be privileged, and I

21    can't for the life of me understand how communications between

22    the defendants and a Florida Medicaid managed care plan and

23    other utilization review entity could be privileged.  It seems

24    to me that ought to be provided.

25         Mr. Jazil, is this the same thing?  Is this something

1    you have already done?

2            MR. JAZIL:  Yes, Your Honor, we have provided this.

3            There is one exception.  The Humana plan provided us

4    material yesterday that we just haven't had a chance to look at.

5    As you'll note from our meet-and-confer letter, we've been

6    stamping "Confidential/Attorneys Eyes Only" just to expedite the

7    process of providing this material to plaintiffs.  This is not

8    attorney-client privilege in some instances.  It's just

9    confidential information from companies might be included or

10   confidential information about patients might be included.

11           MS. DUNN:  Your Honor --

12           THE COURT:  All right --

13           MS. DUNN:  -- if I could just -- oh, I'm sorry.  I

14   didn't mean to...

15           THE COURT:  That's all right.  Go ahead.

16           MS. DUNN:  We believe, based on the response and what

17   we've reviewed thus far in discovery, that these documents have

18   only been provided from the year of January 1st, 2022.  So this

19   is something where we think -- this is not the type of request

20   that is limited to, you know, the rule promulgation and beyond.

21           This request is important to receive -- to search for

22   and locate those communications from earlier than 2022, because

23   it is important to -- when we look to how the defendant was

24   approaching coverage of these relevant treatments prior to the

25   rule promulgation, these communications are important to that.

1          THE COURT:  Yeah, fair enough.  That's right.

2          And, Mr. Jazil, that's the same discussion we had

3     earlier about the time frame.

4          MR. JAZIL:  Your Honor, that's right.  I have a

5     concern here where in many instances we are asking these plans

6     to provide us this information and then giving this off to the

7     plaintiffs.  I would have to go back to the relevant plans, ask

8     for the information, provide it -- review it, stamp it, provide

9     to it the plaintiffs before the discovery cutoff.

10          Would it be, perhaps, just simpler --

11       (Indiscernible crosstalk.)

12          THE COURT:  Well, let me -- hold that thought.  Let me

13     come back to it.

14          But what -- you mean to tell me there are

15     communications between you and, for example, Humana or another

16     managed plan and to get a copy of the communication, you have to

17     ask them for it because you don't have it?

18          MR. JAZIL:  Your Honor, that is what the agency has

19     done to facilitate this.  We asked the plans for any

20     communications, any policies that they might have based on

21     Medicaid's coverage for the defendants and --

22          THE COURT:  They all have a contract with the State so

23     they said, Yes, sir, Boss, and they went and looked for it.

24          MR. JAZIL:  Yes, Your Honor.  That's exactly what

25     they've done.

1          And, Your Honor, we are not trying to hide the ball on

2     these issues.  You mentioned the Dr. Cogle-Jeff English email

3     exchange, for instance, but we are providing this material.  If

4     we have it, we turn it over.  So --

5          THE COURT:  Let me tell you one thing that occurred to

6     me with respect to that.  I, of course, wasn't involved in the

7     document production, so I don't know.  One possibility that

8     occurred to me was that that -- well, not just that, but some of

9     the older stuff -- we got older stuff, I guess, is what I was

10    more concerned about.  I thought maybe that the information

11    about the 2016 GAPMS process got turned over because it got

12    attached to things from 2022 that were being produced.  And that

13    if there are memos, other materials, from 2016 that did not get

14    attached to 2022 memos, those things haven't been produced.

15         MR. JAZIL:  No, Your Honor, that's not entirely the

16    case.  We produced a draft GAPMS memo that dealt with surgeries

17    that someone happened to find in an office, a hard copy that's

18    nowhere on the document management system for the agency.  And,

19    you know, in good faith we provided that report.  We don't know

20    who the author is.

21         So we are -- again, Your Honor, if we come across

22    anything that's GAPMS related that deals with these excluded

23    services, we are providing it.  We are not, you know, trying to

24    hide the ball here.

25         THE COURT:  All right.  You started to suggest a

 1   stipulation with respect to paragraph 19.

 2              MR. JAZIL:  Yes, Your Honor.

 3              If the point is that the agency paid for and covered

 4   these treatments prior to the rule, we'll stipulate to that

 5   fact.  And if that's what all these managed care plans were

 6   supposedly communicating to the agency, that should then become

 7   irrelevant because the agency was paying for and covering these

 8   prior to the rule being adopted.

 9              THE COURT:  So, yeah, Ms. Dunn, does that take care of

10   the problem?  What else are you trying to prove with this stuff?

11              MS. DUNN:  Well, Your Honor, I'm not sure it does

12   fully.  And, you know, we are, obviously, willing to consider

13   such compromises and stipulations, and that's something we have

14   raised with defendants.

15              I think for this particular request -- and this also

16   relates to 21 and 24, which I'm sure we'll talk about in a

17   moment.  It's not just the fact that Medicaid was covering these

18   treatments.  It's that the coverage of these treatments

19   implemented evidence based -- implemented criteria based on the

20   evidence -- evidence-based clinical practice guidelines that

21   AHCA is required to consider in engaging in the GAPMS process.

22              And so all of these managed care plans and AHCA itself

23   may have had policies or guidelines that set forth certain

24   criteria for coverage, and those criteria for coverage might

25   then, you know, in turn reference certain clinical practice

1   guidelines or other sorts of sources which are the same sources

2   that we contend AHCA may have ignored in this -- the GAPMS

3   process, the 2022 GAPMS process, at issue today.

4           So to the extent that in the past AHCA has determined

5   these are credible sources and/or communicated with their agents

6   about the need to implement criteria based on these sources and

7   this medical evidence, I think that is very relevant and it's

8   probative to the issues -- to the controlling issues in this

9   case.

10          THE COURT:  Mr. Jazil, one other question about it, I

11  guess.  One of the things you are required to consider in this

12  process is utilization trends.

13          Doesn't -- don't these materials show -- or at least

14  aren't they relevant to utilization trends?

15          MR. JAZIL:  Forgive me, Your Honor.  I don't -- I

16  don't follow.  Utilization trends as in -- pardon me.

17          I'm sorry, Your Honor.  I didn't mean to interrupt

18  you.

19          THE COURT:  You didn't interrupt me.

20          MR. JAZIL:  Oh, sorry, Your Honor.

21          I didn't follow the question, Your Honor.  Utilization

22  trends for how often these treatments --

23          THE COURT:  Well -- and in the GAPMS process, as I

24  understand it from the rule, one of the factors in the

25  (indiscernible/someone coughing) utilization trends the -- and

1   one of the things some of your experts say is there's a

2   significant increase in the number of people asserting that they

3   are transgender.  Some of this historic material may be relevant

4   on issues like those.

5           I guess it might tell me something if the number of

6   claims for trans treatment went up substantially from 2015 to

7   2022.  It might tell me something else if the request for trans

8   treatments from 2015 to '22 were flat.  It might not tell me

9   much, and there are a lot of other things that would go into

10  those trends, but it does seem to me to be potentially relevant.

11          MR. JAZIL:  I understand, Your Honor.

12          And if I understand it correctly, it's some

13  information detailing how many people are on the cross-sex

14  hormones, the puberty blockers, and are having surgeries would

15  be relevant to information as part of the process.

16          And, Your Honor, I can represent to the Court I have

17  sought that information from my own client and they don't have a

18  record of how many people are on the puberty blockers, the

19  cross-sex hormones, and the surgery.

20          So if this is information that's looking to

21  utilization trends, as I've described it, the agency does not

22  have that information, Your Honor.  And if we did, we would

23  produce it.  And if we somehow manage to create it between now

24  and trial, we will share that with the Court and the plaintiffs.

25          And forgive me, Your Honor.  My voice is fading a

1    little bit.

2            THE COURT:  Well, I was going to ask you -- you did a

3    pretty remarkable job for somebody that's coming off being ill.

4    And I know you were in a federal proceeding before we started

5    this one.  You doing okay?  Do you want to take a break?  We can

6    break for lunch.

7            We got a little more to go.  We are pretty far along,

8    but you tell me.  Mahomes is going to play this weekend, but I'm

9    not looking for that kind of effort out of the lawyers.  We can

10   work around your health.  How you doing?

11           MR. JAZIL:  I appreciate that, Your Honor.  Today is

12   the first day I've had a negative COVID test, so if Your Honor

13   would indulge me with just a five-minute break, perhaps I can

14   just get some hot tea and go from there.

15           THE COURT:  Let's do that.  Let's take ten minutes.

16   My computer says 11:44.  Let's start back at 11:55.

17           MR. JAZIL:  Thank you, Your Honor.

18           THE COURT:  Stand down until then.

19           MS. DUNN:  Thank you.

20       (Recess taken at 11:44 AM.)

21       (Resumed at 11:55 AM.)

22           THE COURT:  This is Judge Hinkle.  I'm back.  They

23   tell me everybody else is back, so we'll go forward.

24           I did want to note, I will include in the order that's

25   going to be entered after this hearing a Rule 502 provision so

1  that -- Mr. Jazil, you said you'd gotten information yesterday.

2  You can turn that over without waiving a privilege under the

3  terms set out in 502(d).  We promulgated that rule to allow

4  people to turn things over without trying to put eyes on every

5  document before it was done so that things could move forward

6  without delay and without undermining anybody's substantive

7  interest.

8          Then I looked ahead.  I think what has been said at

9  this point handles most of the rest except for paragraph 33 --

10  Request 33, and that's the one with all the search terms and we

11  need to talk about custodians and narrowing searches and so

12  forth, so we'll come back to that one.

13          But before we do that, let me just start with the

14  defense side.  Mr. Jazil, tell me why I should not grant the

15  motion for the remaining paragraphs?  It's paragraphs 21 and 24,

16  35 through 39, 40, and 47.

17          Some of that will be communications with experts that

18  will be governed by what we said earlier in the hearing about

19  Rule 26 and which communications with experts are covered.  So I

20  understand that those requests on their face could capture

21  communications between the defense lawyers and the experts in

22  connection with this lawsuit, but those will generally be

23  subject to the work product privilege except in the narrow

24  categories set out in 26(b)(4).

25          So recognizing that some of that will be work product,

1    Mr. Jazil, is there any reason that the requests shouldn't be

2    granted for those other paragraphs I listed?

3              MR. JAZIL:  No, Your Honor.

4              And, again, I note that where we made an objection and

5    withheld a document, it was only on privilege and work product

6    grounds, and we've gotten further guidance from the Court.

7    Everything else that we've had, we have produced.  And this goes

8    for all the requests that we've discussed today.

9              THE COURT:  All right.  And so then let's double back

10   to 33.  The plaintiffs had put forth a number of search terms

11   and the defense has given some information about how many

12   gigabytes of information that those terms might capture.  Here's

13   what I'm interested in and I'll get your responses.

14             It seems to me the burden can be cut down by limiting

15   the number of custodians.  I can't tell, from what I've seen, at

16   least, whether you have deduplicated this stuff, whether you've

17   limited emails to threading.  I don't have any information on

18   how many unique hits are generated by each of the terms, so at

19   this point it's a little hard to tell.

20             I guess, Mr. Jazil, the volume you gave me, has it

21   been deduplicated?  Have had you threaded the emails?  What do

22   these numbers mean?

23             MR. JAZIL:  Your Honor, I'll confess to not being as

24   up to speed on the e-discovery issues as you, but I do not know

25   whether they have been deduplicated or dethreaded.  I know that

1  in some instances there are email domain names such as

2  @eog.myflorida.com and @floridahealth.gov that returned -- I

3  can't tell whether the scan count -- it was scanned down by

4  set -- it suggests that it's three documents or two documents,

5  but we can -- perhaps plaintiffs and the defense are sharing an

6  e-discovery vendor such as DISCO or Relativity, and this may be

7  something where a shared vendor might provide greater insight.

8           THE COURT:  Ms. Dunn, the document, the number of

9  gigabytes they have given is a big number.  One of the very good

10  nationally known lawyers who deals in big document cases on a

11  regular basis spoke at the Duke conference, the Advisory

12  Committee on Civil Rules, that the standing committee put on at

13  Duke, gosh, it must be ten years ago now.  One of the things

14  they suggested was he made -- tried to make an agreement in

15  every case that they'd have no more than seven custodians, at

16  least to start.

17           If I told you, Pick seven custodians, wouldn't that be

18  enough?

19           MR. JAZIL:  Your Honor, that was to me?

20           THE COURT:  No, that was to Ms. Dunn.  I was hoping we

21  hadn't lost her.

22           Well --

23           MR. GONZALEZ-PAGAN:  Your Honor, this is Omar --

24           MS. DUNN:  I'm sorry.  I'm sorry.  I apologize.  I was

25  on mute and didn't realize it.  Talking to myself.

1          THE COURT:  It has happened to all of us.

2          MS. DUNN:  So I think seven custodians as a starting

3    point is possible.  We did, I think, provide a list slightly

4    longer than that to defendants, but not significantly longer.

5          One of the -- there are a couple of things that we

6    have tried to work with defendants on this issue, one of them

7    being we have been seeking information just like what they filed

8    with the Court for weeks.  And it looks like these searches were

9    done in the middle of December and yet defendants never provided

10   us with this information so that we could begin the process of

11   trying to figure out how to narrow down our search terms.

12         We've also proposed scheduling a meeting between the,

13   you know, the IT representatives for the two different parties

14   to determine if there are ways to make this more manageable,

15   whether or not, as Your Honor noted, things have been

16   deduplicated, if there are either distinct hits or if there are

17   threads that can be, you know, whittled out.  Those are all

18   things we would want to be doing to narrow our search, but we

19   have not been able to bring defendants to the table to have

20   these discussions.

21         The other thing is that we have asked for all these

22   documents in natives, which usually decreases the amount of

23   storage space that they would take up, but defendants have only

24   been producing things to us in PDF.  And this list, as you see,

25   is noting a conversion to PDF.  So we would be happy to take

 1   these documents in native format if that is something that would

 2   make the production more manageable and, in fact, would probably

 3   prefer that.

 4           THE COURT:  What can you tell me about who is doing

 5   the IT function on your side and on the other side and whether

 6   getting those people together works?  It doesn't sound to me

 7   like I can make an intelligent decision right now saying, Here

 8   are the terms; here are the searches; produce all those

 9   documents.  It may be the best I can do today is say, Here's the

10   process; you need to get going, and you need to get it going

11   quickly.

12           What can you tell me about whether that's the right

13   approach and who's involved in the IT process and what the

14   process ought to be?

15           MS. DUNN:  From our end, Your Honor, I

16   unfortunately -- the IT representatives that we are using are

17   not through my organization.  They are through our -- one of our

18   partner -- our co-counsel's firms.  If you would just give me a

19   moment.

20           If Joe Little is on the line, he may be able to speak

21   more specifically.

22           MR. LITTLE:  I'm here, Your Honor.  This is Joe Little

23   with Pillsbury.

24           Basically, as with many larger law firms, we have our

25   own in-house robust IT department.  They handle large

1    e-discovery matters all the time, so they have very, very wide

2    bandwidth to meet with IT representatives from AHCA to figure

3    out what's the easiest way to get these documents produced that

4    wouldn't be too burdensome for AHCA.  So we are pretty much

5    ready to roll with that whenever.

6          THE COURT:  So if I said within a week there needs to

7    be a meeting with folks most familiar with the IT issues in the

8    case, work to narrow custodians and limit the burden, that's

9    something you can work with, or you need more guidance out of me

10   than that?

11         MS. DUNN:  Your Honor, I think that's a -- from our

12   perspective, I think that's a very good starting point.  I'm

13   hopeful we can resolve -- I'm hopeful we can make significant

14   progress.  I feel confident we can make significant progress if

15   we actually had these, you know, respective parties meet.

16         I would suggest earlier.  As Your Honor knows, we are

17   quickly coming up on the end of fact discovery, needing to

18   schedule, you know, some additional fact depositions of agency

19   witnesses, and, in our view, a week may be even a little too

20   long.  We could be ready to meet, you know, as soon as -- as

21   soon as the defendants are.

22         THE COURT:  Mr. Jazil, what can you tell me about how

23   quickly you might be ready?

24         MR. JAZIL:  Your Honor, we're happy to meet as soon as

25   the IT staff for the agency is available.

1              I note that I have a legal team of three, so I'm at a

2      bit of a numerical disadvantage.  The seven-custodian limitation

3      coupled with some kind of temporal litigation might also get us

4      a long way to, perhaps, narrowing the scope of things.

5              I don't know if Your Honor has a perspective on the

6      temporal limitation.

7              THE COURT:  Yeah.  I'm inclined to think that 2015 and

8      2016 may be important years, but it depends some on how much

9      stuff we are capturing.

10              This is not an easy one to handle because many of

11      these search terms are going to show up in lots of documents

12      that are just not of interest in the litigation.  I haven't

13      spent hours thinking about this, but it -- nothing occurs to me

14      immediately where I could say, Oh, if you look at this term, you

15      are going to find everything you need.  And so it's going to

16      take some -- probably going to take some trial and error finding

17      out how many unique hits you get for the various terms and which

18      ones produce how much burden.  It is the kind of thing that the

19      IT people can look at pretty quickly, and narrowing custodians

20      may help a good bit.

21              And so there really needs to be some attention to

22      getting it down to the custodians you really need and figuring

23      out what you really need.  Nobody wants to -- neither side wants

24      to spend a whole lot of time dealing with documents that don't

25      have anything to do with the case.  But you do want to find the

documents that bear on what was done in 2016 and why, and then

what was done in 2022 and why, and that probably requires

looking at both those dates.  It may require looking at dates

inbetween; it may not.

If you -- if the people get together and you can do

some kind of screening function to figure out what do you get

from 2017 through 2021, you may not get anything very valuable

at all during that period.  And so that may be one where the

bang is not worth the buck.  On the other hand, I suspect 2016

there may be things.  Again, I don't know how much that proves,

but it is certainly relevant, what they did when there was a

GAPMS process before.

Yeah, arrange a meeting.  I hear you saying a week may

be too long.  It's hard to get busy people.  A week is -- a week

is prudent.  I'm not going to try to tell anybody to do it

faster.  If they could get together faster, they should.  You

need to get it started because it's going to be a lot of work

for both sides, and the sooner you can get it narrowed down, the

better.  So I'll require that kind of meeting and then look at

it in good faith on both sides, and we'll go from there.

I think that takes care of the motion.  Let me look

back at my notes about other general issues and make sure there

is nothing else.

I can't really tell from the privilege log -- let me

make a couple of observations about it.  I can't tell, but it

1   could be that you've got separate items listed.  So, for

2   example, if there's an email from client to lawyer, it's

3   privileged.  But there may be four more lines on the privilege

4   chart -- on the privilege log listing attachments to the email.

5   Well, the email may be privileged, but the four other documents,

6   just because they are sent to a lawyer doesn't make them

7   privileged.  If they would have been -- if you would have had to

8   produce them if they weren't sent to the lawyer, then you'd have

9   to produce them even after they are sent to the lawyer.

10          Some of those may just be duplications.  If somebody

11   sent an email to a lawyer and said, Here are four documents,

12   well, the four documents were probably requested otherwise.  So

13   if they've already been produced, then those four attachments

14   may take up a line on the privilege log.  But it doesn't matter

15   whether they are produced or not because they are already

16   produced somewhere else.  So 543, or however many items it is on

17   the privilege log, may not indicate that that number of

18   documents were withheld as privileged.

19          A lot of documents are going to be covered by the

20   rulings I made overruling the work product and privilege

21   objections by category.  Beyond that, the log has the kind of

22   information one would ordinarily get.  Sometimes I can't tell

23   who these people are or who the lawyer was or why it's

24   privileged.

25          Let me lay out a possible approach and then you can

1    tell me if this doesn't work.  I think what I'm inclined to do

2    is to require the defense to provide an amended privilege log

3    that deletes the stuff from which I've overruled the privilege

4    objection, deletes unprivileged documents that are on that list

5    separately just because they were attachments -- if there are

6    any of them.  I'm not sure that's what was going on, but if

7    that's going on, take those off the privilege list so that you

8    just actually have now a good list of items on which you still

9    claim privilege.

10          And then I'm inclined to say to the -- if the

11   plaintiff is still not -- the plaintiffs are still not

12   satisfied, I'm inclined to say to the parties, Plaintiffs, pick

13   15 items off the list; Defense, submit them in camera under

14   seal; I'll look at them and decide where we go from there.  And

15   if, as sometimes happens this way, they are all privileged, then

16   it's a pretty good indication that everything is okay and that

17   nothing more needs to be done.  If it turns out that out of the

18   15, 5 of them aren't privileged at all, then we've got more work

19   to do.

20          Mr. Jazil, does that work?

21          MR. JAZIL:  Yes, Your Honor.

22          One clarification:  If there's an attachment to an

23   email that is a case, a case that, you know, perhaps we are

24   concerned about or a case that, you know, we think could be the

25   key to the whole proceeding, is it okay to keep that particular

1   case, that particular ruling, or a statute that's been attached

2   to a legal analysis on the privilege log or should we disclose

3   the case itself, the statute itself?

4           THE COURT:  I think that's privileged.  If you sent a

5   letter to General Counsel and said, Here's the Eleventh Circuit

6   decision that I think is a winner for us, I don't think the

7   other side gets to see that.  That's your mental impression and

8   so that's okay.

9           MS. DUNN:  Your Honor, I think what --

10          THE COURT:  There is going to be some other time you

11  have to disclose it.  And we've already, you know, had one

12  surprise in this case where at preliminary injunction you are

13  saying, Oh, you know, there is a general exception.  I do better

14  when I'm not surprised.  So if you've got a case that you think

15  is controlling, it needs to in the trial brief, if not before

16  that.

17          But I hear you and I don't -- your exchanges with

18  General Counsel on legal strategy, those are protected.

19          Ms. Dunn, isn't that right?

20          MS. DUNN:  I agree with that, Your Honor.  I think the

21  documents we -- the context in which we would be concerned about

22  them claiming privilege is if, for example, one of their

23  third-party consultants who is not an attorney had sent some

24  case to the defendants.  I'm not sure that that's -- in my view

25  that would not count, would not qualify under either of the

1   privileges.  And to the extent Mr. Jazil is referencing cases

2   sent by those individuals, I think our position would be that

3   those would not be covered.

4         But I certainly agree with Your Honor's --

5       (Indiscernible crosstalk.)

6         THE COURT:  I don't know that that's going to happen

7   and I'd have to spend a little time thinking about that, but

8   that's an expert work product issue that's separate, I think,

9   from what we are talking about here.

10        MS. DUNN:  Well, if they were being exchanged during

11   the rule promulgation process --

12        THE COURT:  Yes, whatever was exchanged during the

13   rule promulgation with those experts needs to be turned over.

14        MS. DUNN:  Okay.  Thank you.

15        THE COURT:  All right.  So I'll put in some process

16   along those lines.

17        There was an objection along in there somewhere that I

18   didn't go back over as we got to it, but the plaintiffs are

19   correct that it is no objection that a document is publicly

20   available.  It's ordinarily not sufficient to provide a

21   hyperlink, but you can't object and say you can go get that

22   information from the public.  If you've got it, you need to turn

23   it over.

24        Same thing for works -- we may have covered this --

25   works that were cited in the GAPMS memo.  You know, if the GAPMS

 1    memo cites some study, you need to turn the study over.

 2    Presumably you have it.  And if you don't have it, you can say

 3    you don't have it, but that probably has some evidentiary value

 4    too.

 5            I think that's all I have.  While we are here,

 6    Ms. Dunn, is there anything else you think we need to do from

 7    your side?

 8            MS. DUNN:  I do have two quick things, Your Honor.  I

 9    just wanted to clarify the Court's ruling on Request Nos. 35 to

10    39.  I wasn't sure that -- I know you mentioned some of these.

11    And I think 40 and 47 would maybe be covered by the normal

12    disclosures, you know, Rule 26 expert disclosure provisions.

13    But I think the responses to Request Nos. 35 to 39 are separate,

14    so I just wondered -- I wanted to clarify the Court's ruling.

15            THE COURT:  You want all of those --

16        (Indiscernible crosstalk.)

17            THE COURT:  I'm going to grant the motion to compel,

18    but, again, it's subject to the privilege claim and work

19    product.

20            MS. DUNN:  Of course.  Thank you.

21            The other issue we wanted to --

22            THE COURT:  I --

23            MS. DUNN:  Oh, I'm sorry.

24            THE COURT:  No, go ahead.

25            MS. DUNN:  The other issue we wanted to raise

1    depending on the Court's ruling, as it appears that there will

2    be potentially be additional documents forthcoming from

3    defendants -- we wanted to raise the current scheduling order

4    and the -- you know, the near -- very near-looming fact

5    discovery deadline of February 7th.

6           We would be comfortable if -- we would ask the Court

7    for an extension on that fact discovery deadline and would be

8    comfortable making fact discovery coextensive with the beginning

9    of expert discovery in order to ensure that we are able to

10   obtain these documents and have some time to review them before

11   scheduling our final agency depositions.

12          THE COURT:  Yeah.  Before I get Mr. Jazil's response

13   and find out a particular date, let me give you my usual

14   approach.

15          Discovery deadlines are really more for the benefit of

16   the lawyers than for my benefit.  What I care about is I've got

17   the case set for trial and I plan to try it when it's set.  I

18   can give you a long explanation for that, but, look, that's --

19   it's just better all the way around if we have firm trial dates

20   and keep them.

21          If you are taking depositions the night before trial,

22   as my mother used to say, No skin off my nose.  You can work as

23   hard as you want, but it's just better if you are not doing

24   that.  It's better if you have a good clean period before the

25   trial just to prepare for trial.

1            So if both sides are okay with moving the discovery

2    deadline, it's okay with me.  I'm worried about the deadline to

3    move for summary judgment so that I've got time to deal with any

4    summary judgment motion, we've got time to brief it, and I've

5    got time to prepare, and then if we have to have a hearing, I

6    can have a hearing.  And sometimes it takes awhile to master all

7    of this and get a ruling out.  I need to have time to do all

8    that, but that's just the summary judgment deadline.

9            There's some depositions that can be taken after

10   summary judgment motions are in.  There's a lot of depositions

11   that don't affect the summary judgment issues.  So I don't

12   really care if it's something both sides agree to, but you do

13   want to make it easy on yourself.  The sooner you can finish,

14   the better you are.  I don't want to be doubling back with

15   having to redepose experts because the facts weren't in, that

16   kind of thing.

17           But as long as we meet those parameters, we can adjust

18   the schedule as needed.  And so if you want to say we'll move

19   the fact discovery deadline, that's probably okay.  If you want

20   to limit it to matters that need to be done because of the

21   additional document production, we can do that.  Sometimes

22   that's more messy than it needs to be.

23           Mr. Jazil, what says the defense on the fact discovery

24   deadline?

25           MR. JAZIL:  Your Honor, I don't oppose moving the fact

1    discovery deadline.  But like you -- well, not like you,

2    Your Honor -- but just from my perspective, I'd rather we not

3    move it too far because there's a lot of work that needs to be

4    done on the expert side in this case.

5              And, again, Your Honor, I'm at a numerical

6    disadvantage.  If fact discovery is going on contemporaneously

7    with the expert discovery, I just don't have the bandwidth to

8    cover both.  And given the accelerated nature of the case, I

9    would suggest a week would be appropriate for now.

10             THE COURT:  Why don't we do this.  Why don't we leave

11   the schedule right where it is on the understanding that if

12   there's really a need to alter it because of the additional

13   document production, then we'll do it, and we'll move it as

14   little as we need to, and we'll make it work.

15             MR. JAZIL:  Yes, Your Honor.

16             And on that note, in the first federal proceeding I

17   had this morning, I note that the District Court in D.C. granted

18   in part our request for discovery from the medical

19   organizations.  And that Court was concerned about the discovery

20   deadline in this case because the D.C. District Court has

21   directed the nonparties to make productions to us and has stayed

22   open the potential of depositions of those parties.  So I don't

23   want the Court to be blindsided, but that was the resolution of

24   the early proceeding and --

25             THE COURT:  Oh, I didn't realize -- so your earlier

 1  hearing was related to this case?

 2          MR. JAZIL:  Yes.

 3          THE COURT:  There's a discovery dispute going on in

 4  D.C.?

 5          MR. JAZIL:  Yes, Your Honor.

 6          And so the Court granted in part and denied in part

 7  and held in abeyance the motion to quash that was filed by the

 8  parties.  So the nonparties in that case, frankly, have asked

 9  for, and I don't think unreasonably so, a little bit more time

10  to produce documents to us.  The Court has set a deadline of

11  February 2nd for them to make the productions.

12          So I'd like to just put that on the Court's radar so

13  the Court is aware.

14          THE COURT:  All right.  Well, I'm glad to hear that

15  one of my colleagues in D.C. has that under control and I will

16  leave that to the judge there.

17          And I'll leave this schedule in place and plan to

18  accommodate what we need to.

19          MS. DUNN:  Your Honor, just as a practical matter kind

20  of with the things we know that need to happen, if I can just

21  raise this to the Court?  And if your decision is still not to

22  move the discovery deadline, I understand.

23          So I think one thing is we would want to ask the Court

24  to give defendants as firm deadline by which to produce the

25  outstanding documents that have been ordered today.  But kind of

1    just a bigger note on the timeline from here, plaintiffs have

2    scheduled the agency 30(b)(6) deposition for next week with the

3    goal of having at least a few days after that deposition to

4    ensure that there are no additional documents or additional

5    depositions that need to be scheduled based on what we learn

6    from the 30(b)(6).

7            But at this point, without a complete production of

8    documents, it doesn't seem likely we'll be able to resolve and

9    wrap up that 30(b)(6) deposition on that timeline.  And so

10   having to delay that deposition any further prejudices the

11   plaintiffs' ability to follow up on any information learned in

12   that deposition if we keep the fact discovery timeline where it

13   is.

14           THE COURT:  When is the 30(b)(6) deposition?

15           MS. DUNN:  It's scheduled for February 2nd, a week

16   from today.

17           THE COURT:  If you keep that date on the understanding

18   that if you need to ask additional questions based on any new

19   production, you can do it, does that work?

20           MS. DUNN:  It -- well, Your Honor, I mean, it works to

21   the extent that -- it just seems that it would be very difficult

22   to -- for plaintiffs to receive -- not -- I guess initially it

23   might, in part, depend on what deadline -- or if there is a

24   deadline being set for the defendants to produce.

25           THE COURT:  Yeah, Mr. Jazil, when can you -- a lot of

1   this stuff you say you've already produced, although I think

2   when you say you have produced it, you produced it for a limited

3   time period, which for many of these requests there won't be

4   anything older because of the nature of the requests.  But

5   because you are going to have some searching to do for older

6   things --

7          (Indiscernible crosstalk.)

8          THE COURT:  What should be the date for production?

9          MR. JAZIL:  Your Honor, with respect to the

10  communications with the experts that predate August 21st, I

11  think that's pretty easy for us to do and we can get that out in

12  a matter of days, by Monday.

13         As it relates to the custodian searches and emails, I

14  just don't have an answer for how long that Request 33 would

15  take.  And I think that's the one that is going to require the

16  bulk of the work.  We can commit to having our IT staffs be

17  available as early as tomorrow to get a sense of what that looks

18  like, but it's that Request 33 that I just don't know the answer

19  to.

20         THE COURT:  Right.  And that -- knowing that date will

21  require the additional meeting.  But if your IT people can be

22  available tomorrow at least for a preliminary meeting, good.

23         And then we talked earlier about a week.  Make sure

24  everything gets finished up within the week, which I think is

25  February 2nd.

1          MS. DUNN:  I think, considering that timeline, you

2     know, plaintiffs would likely prefer to postpone the 30(b)(6)

3     deposition by at least a few days in order to be able to review

4     those documents.

5          At this point I think expert rebuttal reports are due

6     in early March, and the parties have set aside the dates of

7     March -- I'm sorry; I had my calendar up -- I think March 6th

8     through March 17th for expert depositions.  So I do understand

9     that, you know, we don't want to -- that there are reasons to

10    have fact discovery done before really getting into expert

11    discovery, but I think a small amount of overlap under these

12    circumstances doesn't seem very unreasonable considering that

13    those rebuttal reports and the parties kind of agreed reserved

14    dates for expert depositions are still weeks off.

15         THE COURT:  All right.  How about this.  The expert

16    documents that dealt with the rules, the ones that were the

17    subject of my ruling earlier on the privilege and work product

18    protection, Mr. Jazil says they can produce those by Monday.

19    That's January 30.

20         The IT staffs are to have at least a preliminary

21    meeting by tomorrow and then finish meeting -- make sure they

22    have a comprehensive meeting by February 2nd.  Hopefully, they

23    can get it all done tomorrow, but that may be optimistic.

24         Produce all the documents I've ordered to be produced,

25    other than the paragraph 33 documents by February 2nd.  That's a

1  week from today.

2          Extend the fact discovery deadline to February 14.

3          Extend the 26(a)(2) deadline to February 19.  That

4  makes it after the fact discovery deadline.  And I haven't

5  looked at further 26(a)(2) deadlines.  I didn't look back at the

6  order to see if this is simultaneous or plaintiffs, defense,

7  plaintiffs, how that's set up, but --

8          MS. DUNN:  Your Honor --

9          THE COURT:  -- looking at it and figuring it out, the

10 idea would be to leave the rest of the schedule as is.

11         MR. GONZALEZ-PAGAN:  Your Honor, this is Omar

12 Gonzalez-Pagan.

13         Just to briefly provide some information, the first

14 26(a)(2) deadline is not until February 28th.

15         THE COURT:  All right.  I looked at an old order.

16         MR. GONZALEZ-PAGAN:  We had corrected --

17    (Indiscernible crosstalk.)

18         THE COURT:  Oh, yeah.  Okay.  That was the one I

19 messed up and now I messed it up again.  Fair enough.

20         So that takes -- so that doesn't need to be moved.  So

21 if we just move fact discovery to February 14, the 26(a)(2)

22 deadline can stay where it is.

23         All right.  Does that work?

24         MS. DUNN:  I believe so.

25         THE COURT:  All right.  Mr. Jazil, that seem to work

1    on your side?

2              MR. JAZIL:  Yes, Your Honor, everything works on our

3    side.  We are going to do our absolute best to get any

4    additional documents we come across to the plaintiffs within a

5    week.

6              THE COURT:  Don't just do your best; do it.

7              MR. JAZIL:  I understand, Your Honor.  Yes.

8              THE COURT:  Because we all know your best is good

9    enough.

10             Very good.  All right.  I'll get an order out

11   confirming all this.  It might not go today.  I've got more

12   about to be going on, but I'll get something out as promptly as

13   I can confirming all of this.

14             MR. JAZIL:  Your Honor -- Your Honor, if I may?

15             Your Honor, earlier in the proceeding Your Honor

16   mentioned that you'd be imposing fees.  I would respectfully ask

17   for reconsideration of that.

18             Your Honor, the only 583 documents we withheld were

19   the ones in our privilege log, and we've been working in good

20   faith over the holiday, et cetera, to produce these materials.

21   And we -- as the Jeff English email suggested, we have not been

22   trying to hide the ball.

23             So I'll stop there, Your Honor, and just beg the

24   Court's indulgence.

25             THE COURT:  Fair enough.  I'll think about it.

1          I take the rule seriously.  And ordinarily it provides

2    that the party's conduct that necessitated the motion pays the

3    fees.  So I'll give it some thought, and you'll know what I

4    think when I get the order out.

5               MR. JAZIL:  Thank you.

6               THE COURT:  Anything else on the defense side?

7               MR. JAZIL:  No, Your Honor.  Thank you.

8               THE COURT:  Ms. Dunn, anything else on the plaintiffs'

9    side?

10              MS. DUNN:  No.  Thank you, Your Honor.

11              THE COURT:  All right.  Thank you all.

12              We are adjourned.

13          (Proceedings concluded at 12:37 PM on Thursday, January 26,

14    2023.)

15                          *  *  *  *  *  *  *  *

16          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
17    Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy is noted within the
18    transcript.

19

20    /s/ Megan A. Hague                       2/28/2023

21    Megan A. Hague, RPR, FCRR, CSR           Date
     Official U.S. Court Reporter
22

23

24

25