IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, *et al.*,

*Plaintiffs*,

v.

Case No. 4:22-cv-00325-RH-MAF

JASON WEIDA, *et al.*,

*Defendants*.

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR PROTECTIVE ORDER

Defendants cannot hide Secretary Jason Weida behind the apex doctrine to avoid his giving critical testimony in this case. In fact, the apex doctrine does not apply here at all. Plaintiffs seek to depose now-Secretary Weida about events occurring more than four months before his becoming Interim Secretary. In other words, his now being an agency head is irrelevant while Plaintiffs seek to only depose him about his involvement in the underlying events preceding his appointment. Defendants cannot promote a highly salient witness out of sitting for a deposition.

1

Moreover, testimony elicited and documents produced in this litigation now clearly indicate that Mr. Weida had perhaps the most prominent role in ACHA's promulgation of Fla. Admin. Code R. 59G-1.035(7)(a) (the "Challenged Exclusion"). Mr. Weida personally chose who would serve as consultants for AHCA's June 2, 2022 report that concluded that gender-affirming care was investigational (the "GAPMS Report") and the rule hearing on July 8, 2022. He had many private conversations with these consultants (and perhaps others) where he shaped the contents of their reports and where they appear to have influenced AHCA's approach to prohibiting gender-affirming care through Medicaid. Indeed, one of AHCA's consultants described Mr. Weida as his "primary contact for th[e] report." (Ex. 1, 153:23-154:3.) Within AHCA, Mr. Weida was the face of the anti-transgender push, controlling the organization's messaging. These circumstances show that now-Secretary Weida has unique, personal information related to Plaintiffs' claims.

This testimony is highly relevant to Plaintiffs' claims. Specifically, Plaintiffs believe that the evidence sought will demonstrate that Defendants engaged in a biased and arbitrary process with a predetermined endpoint to exclude coverage of gender-affirming care. This evidence is relevant to Plaintiffs claims under the Medicaid Act, as it is probative of the fact that the excluded gender-affirming

services are *not* experimental. It is also relevant to Plaintiffs discrimination claims, as it is probative of Defendants' discriminatory animus and pretextual justifications for the Challenged Exclusion.

Finally, no reasonable alternative exists to elicit this information. The Court limited depositions to only ten (10) by each side. Plaintiffs therefore may only use a limited number of depositions and are not seeking to expand on that number. Moreover, after having already deposed three AHCA employees, served thorough written discovery requests, and reviewed tens of thousands of documents, it is now clear that only through Mr. Weida's deposition can Plaintiffs discover this critical information. Engaging with Defendants in further written discovery and deposing more lower-level AHCA witnesses would be inefficient, insufficient, and inadequate for the purposes of this information.

For these reasons, the Court should deny Defendants' Motion.

## I.     The Apex Doctrine Should Not Apply Here.

Plaintiffs dispute that now-Secretary Weida may invoke the apex doctrine under these circumstances. Mr. Weida did not become Interim Secretary until January 2023. Dkt. 115 at 3. Plaintiffs only seek to depose Mr. Weida about his

4855-8785-5447.v4

personal involvement with the GAPMS Process[1] and the Challenged Exclusion prior to his becoming Interim Secretary.  This involvement preceded Mr. Weida's appointment by many months.

The apex doctrine "may be invoked only when the deponent has been noticed for deposition *because of* his … position."  *Rotstain v. Trustmark Nat'l Bank*, No. 3:09-CV-2384-N-BQ, 2020 WL 12968651, at *6 (N.D. Tex. Mar. 10, 2020) (emphasis added; citing *Simon v. Bridewell*, 950 S.W.2d 439, 442 (Tex. App. 1997) ("For example, if the president of a Fortune 500 corporation personally witnesses a fatal car accident, he cannot avoid a deposition sought in connection with a resulting wrongful death action because of his 'apex' status.")).

Here, Plaintiffs do not seek to depose Mr. Weida based on the fact that he is now AHCA Secretary, nor on his overseeing any agency actions in such capacity. To the contrary, Plaintiffs seek to depose Mr. Weida based on his unique and personal knowledge pre-dating his appointment as AHCA Secretary.  As discussed in further detail below, Mr. Weida has special, personal, and unique knowledge of the GAPMS Process and the Challenged Exclusion's promulgation.  Because of this

---

[1] "GAPMS Process" refers to Defendants' process for determining if a treatment is consistent with "Generally Accepted Professional Medical Standards" (GAPMS) pursuant to Fla. Admin. Code R. 59G-1.035.

4

knowledge and involvement, Plaintiffs would still seek Secretary Mr. Weida's deposition today even if he had never become Secretary or were not employed by AHCA at present.  His current job title and associated duties should at most affect the parameters under which the deposition takes place, not whether it goes forward at all.  For these reasons, the apex doctrine does not apply, and Defendants have not otherwise shown good cause for avoiding Mr. Weida's deposition.[2]

---

[2] Defendants' contention that Mr. Weida would be shielded from a deposition under the apex doctrine based on his former roles as Chief of Staff or Assistant Deputy Secretary has no merit.  For one, Defendants cannot argue that "Plaintiffs could have *attempted* to depose were Cody Farrill (who was then the Agency's Chief of Staff), Tom Wallace (who was and continues to be a Deputy Secretary for the Agency)," but then also argue that Mr. Weida is shielded under the apex doctrine for the same or lesser roles.  For another, "[t]he apex doctrine protects only a limited category of government official—those at the 'apex.'"  *Florida v. United States*, No. 3:21CV1066/TKW/ZCB, 2022 WL 4021934, at *2 (N.D. Fla. Sept. 2, 2022).  "Thus, the threshold question is whether the official seeking to avoid a deposition is sufficiently high-ranking" and "[t]he official bears the burden of making that showing."  *Id.*  At the relevant time here, Mr. Weida was the Assistant Deputy Secretary for Medicaid Policy and Quality. In that role, he purportedly reported to the Deputy Secretary for Medicaid Policy, Quality, and Operations, who in turn reported to the Secretary for AHCA. (Ex. 2.)  The fact that there were layers between Mr. Weida and the AHCA Secretary shows that he was not sufficiently high ranking to be covered by the apex doctrine.  *Florida*, 2022 WL 4021934, at *2.  In fact, both Tom Wallace and Cody Farrill, who Defendants suggest as alternatives, report directly to the AHCA Secretary and are therefore closer to the pinnacle of the agency than Mr. Weida was during the time in question.

4855-8785-5447.v4

## II.     Plaintiffs Seek to Discover Unique Information That Is Personal to Mr. Weida.

Even if this Court agrees that the apex doctrine applies here, the circumstances justify taking Mr. Weida's deposition regardless.  High ranking government officials may be deposed when the deposition seeks unique, personal knowledge and information.  *See, e.g.*, *Karnoski v. Trump*, No. C17-1297 MJP, 2020 WL 5231313, at *6 (W.D. Wash. Sept. 2, 2020) (non-party Secretary of Defense could be deposed regarding improprieties in military transgender ban process when he was personally involved in the process and his fondness towards anti-transgender advocates suggested that animus influenced decision-making); *Nat'l Rifle Ass'n of Am. v. Cuomo*, No. 118CV566TJMCFH, 2019 WL 2918045, at *5 (N.D.N.Y. Mar. 20, 2019) (deposition of agency head required when no other agency person participated in the communications at issue; "Ms. Vullo's specific rationale for her alleged actions is at issue in this case such that her deposition testimony may be the only way to address these 'critical blanks' in the record."); *United States v. City of New York*, No. 07-CV-2067 (NGG) (RLM), 2009 WL 2423307, at *2-3 (E.D.N.Y. Aug. 5, 2009) (authorizing the Mayor's deposition where his congressional testimony "suggest[ed] his direct involvement in the events at issue"); *Am. Broad. Cos. v. U.S. Info. Agency*, 599 F. Supp. 765, 768-69 (D.D.C. 1984) (US Information Agency head

could be deposed in FOIA litigation regarding his causing the subject documents to be created); *D.C. Fed'n of Civic Ass'ns v. Volpe*, 316 F. Supp. 754, 760 nn.12 & 36 (D.D.C. 1970) (deposition and trial testimony required from the Secretary of Transportation when he personally made key decisions for construction project at issue), *rev'd on other grounds sub nom. D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231 (D.C. Cir. 1971).

Here, Mr. Weida has unique knowledge about how the Challenged Exclusion came to be promulgated. The weight of the evidence indicates that Mr. Weida personally oversaw much of the GAPMS Process. Perhaps most importantly, Mr. Weida appears to have personally selected the GAPMS consultants and served as the consultants' primary contact. For example, Matthew Brackett, as the agency's 30(b)(6) witness, testified that the decision to contract with the consultants to prepare their reports was made solely by Mr. Weida and that the determination that the consultants had the appropriate backgrounds to write the reports was made by Mr. Weida and General Counsel Tamayo. (Ex. 3, at 129:1-14.) In fact, consultant Andre Van Mol, M.D. seems to have shared Mr. Brackett's belief given that Dr. Van Mol reached out directly to Mr. Weida asking to bring on yet another anti-transgender expert. (Ex. 4.) Dr. Van Mol himself was referred to Mr. Weida by Michelle

4855-8785-5447.v4

Cretella, M.D., who Mr. Weida apparently tried to recruit at the beginning of the GAPMS Process.  (Ex. 5.)

Beyond selecting the consultants, Secretary Mr. Weida appears to have been personally responsible for wrangling in the consultants' reports and even determining some aspects of their contents.  (*Id.* [Andre Van Mol, M.D.: "Once I know what information you need, I can fairly promptly assemble supporting citations."]; Exs. 6 - 7 [Quentin Van Meter, M.D.: "*Does this cover some of what you need from me?*"; "*I wanted to be sure this is the direction you wanted me to go with the document*."]; Ex. 8 [G. Kevin Donovan, M.D.: "*I hope it meets your needs.*"]; Ex. 9 [Romina Brignardello-Petersen, Ph.D. asks Mr. Weida if she can limit the scope of her report given time constraints, to which Mr. Weida responds by asking for a private call]; Ex. 10 [James Cantor, Ph.D. and Mr. Weida appear to have a phone call to discuss report revisions]; Ex. 11 [Patrick Lappert, M.D.].)  For example, Dr. Van Meter testified that Mr. Weida was the "primary contact" for his report, and it was Mr. Weida who instructed Dr. Van Meter "to write a report … to make criticisms of some of the most standard defenses for using medical, social and surgical affirmation in minors."  (Ex. 1, 136:7-17, 153:23-154:2.)  Mr. Weida was also who provided Dr. Van Meter with feedback "about the language of [his] report."  (*Id.* at 140:10-15.)

8

Moreover, Mr. Weida participated in private conversations with consultants that appeared to guide the GAPMS Process and the Challenged Exclusion's promulgation. (Ex. 12 [Mr. Weida asks consultant Quentin Van Meter, M.D. for help finding anti-transgender advocates in advance of the July 8 rulemaking hearing]; Ex. 13 [Mr. Weida seeks to re-connect with non-retained consultant Ema Syrulnik regarding AHCA's "next steps" following the GAPMS Report's publication after having already met before its publication]; Ex. 14 [consultant Andre Van Mol, M.D. thanks Mr. Weida for a recent discussion and forwards to Mr. Weida several articles regarding "Financing the [transgender] movement and its tactics"]; Ex. 15 [consultant Miriam Grossman, M.D. admits her lack of research qualifications and solicits Mr. Weida's opinion as to how she can help, and Mr. Weida responds with suggestions]; Ex. 16 [Dr. Grossman asks Mr. Weida if he is interested in the "debate over informed consent," but Mr. Weida instead asks her to opine on written materials he mailed her]; Ex. 17 [Dr. Van Mol discusses with Mr. Weida and Dr. Van Meter the Alliance Defending Freedom's assessment of Dr. Stephen Levine's testimony vis-à-vis Dr. Cantor's testimony].)

Finally, Mr. Weida also possesses unique knowledge about various other aspects of the GAPMS and rulemaking process that justify his deposition. When the Florida Surgeon General published anti-transgender guidance on April 20, 2022, Mr.

Weida was invited to (and may have attended) an upcoming Drug Utilization Board meeting to field questions regarding gender dysphoria.  (Ex. 18.)  Around this same time, Mr. Weida was personally directing AHCA pharmaceutical staff how to respond to inquiries regarding gender-affirming care.  (Ex. 19.)  Next, the day after the June 2 GAPMS Report's release, Mr. Weida appears to have attended a meeting with unspecified persons where an array of gender-affirming care procedures were discussed.  (Ex. 20.)  Moreover, Mr. Weida appears to have unilaterally decided not to send an entire plan transmittal regarding the implementation of the Challenged Exclusion even though the transmittal went through several rounds of drafting.  (Ex. 3, at 214:25-215:9, 219:8-11.)   Finally, Mr. Weida appears to have personally handled AHCA's response to initial public records requests regarding gender dysphoria during the GAPMS Report's preparation.  (Ex. 21.)

This *known* evidence demonstrates that Mr. Weida possesses unique, personal knowledge that no other witness in this matter also possesses.  Only Mr. Weida himself can explain his interactions with the GAPMS consultants of which there were at least seven, and his tight control over the GAPMS Process.  A deposition

4855-8785-5447.v4

broaching these subjects is likely to elicit unique, personal information from Mr. Weida.[3]

### III.  Plaintiffs have a special need to depose Mr. Weida in proving their case.

Defendants argue that Mr. Weida's testimony should only be allowed if it "essential" to Plaintiffs' case. Def's Memo ISO PO at 7.  But this is not the correct test in the Eleventh Circuit. Rather, Plaintiffs need only show a "special need" for the information they seek. *In re USA*, *In re USA*, 624 F.3d 1368, 1381 (11th Cir. 2010). This case presents the Court with, at least, two crucial questions: (1) whether gender-affirming care is experimental, such that it could be appropriately excluded from Medicaid coverage, *Rush v. Parham*, 625 F.2d 1150, 1156 (5th Cir. 1980); *K.G. ex rel. Garrido v. Dudek*, 864 F. Supp. 2d 1314, 1321 (S.D. Fla. 2012), *aff'd in part, rev'd in part sub nom. Garrido v. Dudek*, 731 F.3d 1152 (11th Cir. 2013); and (2) whether the process Florida underwent to exclude coverage of such care in its Medicaid program made "classifications that are 'arbitrary or irrational' and that

---

[3] As further evidence of Mr. Weida's participation in AHCA's efforts to withdraw coverage of gender-affirming care, the name "Mr. Weida" appears in 912 documents produced in this litigation that are dated between January 1, 2022 and August 21, 2022, the date of the Challenged Exclusion's enactment.  Within this timeframe, Mr. Weida appears as the author on 167 documents.  (Gonzalez-Pagan Decl., ¶ 4.)

4855-8785-5447.v4

reflect a 'bare desire to harm a politically unpopular group,'" *Glenn v. Brumby*, 663 F.3d 1312, 1315 (11th Cir. 2011) (*quoting City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446-47 (1985)). The testimony of Mr. Weida on issues like those discussed above in Section II will answer both of these key questions, and Plaintiffs' attempts to seek that information through other, less intrusive means have been fruitless.

As to the <u>first question</u>, the parties agree that a fundamental component of their Medicaid Act claims is whether, "based on *current medical knowledge*, the State reasonably determined that certain treatments for gender dysphoria are experimental."[4]  Dkt. 115 at 8; *see Rush*, 625 F.2d at 1156-57; *K.G.,* 864 F. Supp. at 1320.  Defendants accuse Plaintiffs of misreading *Garrido* to stand for the proposition that they would win their Medicaid Act claims by showing that Defendants engaged in "a less-than-perfect process that reached the right reasonable

---

[4] Notably, Plaintiffs have brought claims under the EPSDT and comparability requirements of the Medicaid Act, while the decision in *Rush* is based on the reasonable standards provision. *See Rush*, 625 F.2d at 1155-56.  Failure to cover a service that was reasonably deemed experimental could run afoul of the comparability provision of the Medicaid Act in certain circumstances. The comparability provision requires states to provide coverage that is equal in amount, duration, and scope to all categorically needy beneficiaries. *See* 42 U.S.C. § 1396a(a)(10(B). Thus, it does not permit a state to arbitrarily cover the same services for some diagnoses or conditions, but not for others.  *See* 42 C.F.R. § 440.230(c).

4855-8785-5447.v4

decision." Dkt. 115 at 9.  This is not Plaintiffs' position.  Rather, the court in *Garrido* construed *Rush* as holding that a state's use of an "arbitrary, capricious, and unreasonable" process to determine whether or not a service is experimental is *evidence* that the conclusion is equally unreasonable.  *K.G.*, 864 F. Supp. 2d at 1322. That interpretation is consistent with *Rush*. 625 F.2d at 1156–57, which emphasized that the appropriate inquiry is "whether [the state's] determination that transsexual surgery is experimental is reasonable," according to current medical opinion.[5]

Under *Garrido*, evidence that Mr. Weida caused AHCA to engage in an unreasonable process is probative of the soundness of AHCA's final conclusion, that gender-affirming care is experimental. As the District Court in *Garrido* reasoned:

> No analyst and/or nurse in AHCA ever reviewed any "reliable evidence" about ABA, no one assessed whether ABA was covered by other states' Medicaid programs, Medicare, or commercial insurance, no one consulted with any physician about ABA, and no memorandum regarding ABA was ever prepared by an analyst and reviewed by AHCA's management. Instead, [the Medicaid Director] . . . upon a cursory review of [limited] materials, decided that ABA was experimental.

---

[5] Further, this issue was not addressed by the Eleventh Circuit on review, so the trial court's analysis remains valid.  *See Garrido v. Dudek*, 731 F.3d 1152, 1153 (11th Cir. 2013) ("This appeal concerns the scope of the permanent injunction and declaratory judgment.").

13

*K.G.*, 864 F. Supp. 2d at 1324.  The evidence in *Garrido* demonstrated that the Medicaid Director's determination that ABA was experimental was not reasonable, because she failed to consider the evidence required by the Florida Code, and her determination conflicted with "reliable evidence," as defined by Florida law, [which] conclusively shows that ABA is not 'experimental.'" *Id.* at 1326.

Similarly, here, Mr. Weida directed an unreasonable process with a predetermined endpoint to exclude coverage of gender-affirming care. Evidence of this process is probative of Plaintiffs' contention that the result is not supported by reliable evidence, and ultimately, that the three categories of services at issue are not experimental according to current medical opinion.  *See Rush*, 625 F.2d at 1157 n. 13.

As to the second question, whether AHCA' decision and process to eliminate coverage for gender-affirming care as a "sham and a pretext for discrimination," is plainly probative of Plaintiffs' discrimination claims.  *Flowers v. Mississippi*, 139 S. Ct. 2228, 2249 (2019) (citations omitted).

Here, Plaintiffs make, among other claims, a facial challenge to the Challenged Exclusion under the Equal Protection Clause of the Fourteenth Amendment.  And because the Challenged Exclusion *facially discriminates on the basis of sex and transgender status*, it is Defendants who bear the burden of

14

providing an "exceedingly persuasive justification" for the Challenged Exclusion. *United States v. Virginia*, 518 U.S. 515, 531 (1996). "The justification must be genuine, not hypothesized or invented *post hoc*" and "it must not rely on overbroad generalizations." *Id.* at 533.

Thus, the *actual motivations* driving the decision-making surrounding the GAPMS Process and the Challenged Exclusion are highly relevant. And as explained above, it is Mr. Weida who can best provide answers to these questions. Indeed, he is the only person who can answer some of these questions.

Similarly, the Equal Protection Clause does not tolerate policies that are based on "irrational prejudice," *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985), or that reflect a "desire to harm a politically unpopular group." *Romer v. Evans*, 517 U.S. 620, 634–35 (1996) (cleaned up). In their opposition to Plaintiffs' Motion for Preliminary Injunction, Defendants argued:

> Other than bald assertions of pretext, Plaintiffs offer no factual allegations (supported by evidence) that the State's rule is motivated by anything other than genuine concern for the health and safety of its people, including persons suffering from gender dysphoria. And in the absence of any such evidence, the State is entitled to the presumption of good faith. Any unsupported attempt to cast a disagreement over the appropriate treatment for gender dysphoria, as well as the strength of the evidence for so-called "gender-affirming care," as evidence of discriminatory animus should be rejected.

4855-8785-5447.v4

Dkt.49 at 18 n. 2 (citations omitted).  Defendants cannot on the one hand argue that Plaintiffs have failed to establish such a claim because they have not proffered evidence of discriminatory animus against transgender people, while on the other hand attempting to prevent Plaintiffs from discovering exactly the kind of evidence of Defendants' discriminatory animus that they suggest is necessary to make such a claim. Testimony from Dr. Van Meter indicates that when he was given his task by Mr. Weida, the outcome of the GAPMS Report had already been decided.  Ex. 1, 137:4-9.  The evidence Plaintiffs seek from Mr. Weida is necessary to show that he devised a sham process with a predetermined outcome in order to exclude coverage of necessary health care services, and to establish his discriminatory intent.

For these reasons, Plaintiffs have a special—indeed, essential—need to depose Mr. Weida.

## IV.   Plaintiffs have reasonably exhausted other means of seeking this information.

In any event, Plaintiffs have tried, and failed, to obtain the testimony they seek from Mr. Weida through other, less intrusive means. Plaintiffs have engaged in significant written discovery to obtain information about the process used to develop the Challenged Exclusion. Plaintiffs have served Special Interrogatories, Requests for Admission, and Requests for Production in addition to serving document

16

subpoenas.  While the discovery process has to date yielded several important documents and elicited valuable testimony, it has also pointed to critical information gaps related to Mr. Weida's participation.  As described above in Section II, the evidence suggests that Mr. Weida is perhaps the person at AHCA most responsible for the conduct of the GAPMS Process and AHCA's turning a blind eye to reliable sources of information.  Defendants would somehow have Plaintiffs elicit this information through other means.

Plaintiffs are limited to ten depositions total in this litigation, and this limit applies even to depositions of Defendants' bullpen of experts.  Dkt. 67 at 2. Defendants designated ten (10) experts pursuant to Rule 26(a)(2) and used at least seven (7) consultants in the GAPMS process.  Only three (3) of the Defendants' designated experts overlap with the consultants used during the GAPMS process. Plaintiffs have thus, by necessity, sought to use their depositions in an efficient manner.

By the time Plaintiffs decided that there was a special need for Mr. Weida's testimony, prior to the close of fact discovery, Plaintiffs had already employed substantial written discovery and undertaken fact depositions, including that of AHCA's agency representative, to obtain the information they seek. Even if it were possible for Plaintiffs to obtain equally probative information through other means

17

or sources, and it is not, there is no telling how many AHCA employees Plaintiffs would have to depose to discover the information that Mr. Weida possesses.  In fact, it would have been not just inefficient, but also fruitless to waste the seven then-remaining depositions at the time on a fishing expedition for information that Mr. Weida uniquely possesses.  What is more, such an endeavor would have deprived Plaintiffs of an opportunity to depose *some* of Defendants' designated experts, many of whom have never served as an expert pertaining to gender dysphoria or transgender people until now.  Now that expert depositions are complete, Plaintiffs have one remaining deposition available to them, that of Mr. Weida, which Plaintiffs noticed for March 10, 2023.

AHCA has provided three employees for depositions to date, none of whom have been either able or willing to speak in detail on Mr. Weida's influence and its effect on the process.  Notably, Defendants' designated Rule 30(b)(6) witness Matthew Brackett was unable to give anything other than speculative responses regarding how Mr. Weida chose consultants and caused the GAPMS Report to be prepared.  He testified that *the decision to contract with the consultants to prepare their reports was made solely by Mr. Weida* and that the determination that the consultants had the appropriate backgrounds to write the reports was made by Mr. Weida and General Counsel Tamayo.  (Ex. 3, 129:1-14.)  In addition, as for why Mr.

18

Weida caused AHCA to withhold a draft notice it planned to send to all plans following the Challenged Exclusion's enactment, Mr. Brackett was unable to articulate an intelligible response.  (Ex. 3, 214:25-215:9, 219:8-11 [testifying that Mr. Mr. Weida's decision was "pretty self-explanatory"].)  In sum, Plaintiffs should not have to keep fishing for this information elsewhere when time is of the essence and a ten-deposition limit exists, especially when AHCA's purportedly most knowledgeable witness testified that Mr. Weida has the answers to some of Plaintiffs' questions.

Relatedly, Defendants now posit that Plaintiffs could obtain this same information from AHCA General Counsel Andrew Sheeran.  Plaintiffs once sought to depose Mr. Sheeran with significant hesitation given the difficulties in deposing a lawyer who had given legal advice at certain points to a Defendant-client. Indeed, Defendants' counsel responded by threatening to appeal any order compelling his deposition.  (Gonzalez-Pagan Decl., ¶ 5.)  Ultimately, Plaintiffs decided that Mr. Weida possessed superior, unique knowledge about many process-related issues, and that his clear involvement in key events made his deposition less objectionable

19

and more elucidating than Mr. Sheeran's. (*Ibid.*)[6]  Indeed, as evident from Section II, Mr. Sheeran's testimony would have been no substitute the testimony sought from Mr. Weida, which seeks to elicit *unique* information known only to him.

Moreover, as for Defendants' point that written discovery could have mooted[7] or can now moot the need for this deposition's taking, it is well recognized that written discovery is generally a poor substitute for an apex deposition.  *See, e.g.*, *Nat'l Rifle Ass'n of Am. v. Cuomo*, No. 118CV566TJMCFH, 2019 WL 2918045, at *4 (N.D.N.Y. Mar. 20, 2019) ("Were plaintiff to ask through interrogatories the kinds of questions it seeks to ask in a deposition setting, it likely would be met with several routine objections, ultimately resulting in parties returning to the Court to again address the matter of Ms. Vullo's deposition."); *Gibson v. Carmody*, No. 89 CIV. 5358 (LMM), 1991 WL 161087, at *1 (S.D.N.Y. Aug. 14, 1991) ("The

---

[6] Defendants also offer the names of Pharmacist Nai Chen and Program Director Devona Pickle.  Though Plaintiffs acknowledge that documents suggest these persons had some degree of involvement in the Challenged Exclusion's promulgation, the documents also suggest that it would be wasteful to pursue these depositions given the limited nature of their roles.

[7] To the extent that Defendants argue that Plaintiffs should have served written discovery on Mr. Weida himself as a party, Mr. Weida became Interim Secretary shortly after the deadline for written discovery had passed in December.

4855-8785-5447.v4

submission of written questions, as suggested by the City, is an inadequate, and perhaps ultimately wasteful, substitute for an oral deposition.").

In fact, Defendants have already provided follow-up written responses to certain questions asked by Plaintiffs of the Rule 30(b)(6) witness Matthew Brackett during that deposition.  Defendants' follow-up responses were unavailing.  For example, when asked who AHCA considered but did not ultimately select as a consultant, AHCA responded: "Agency staff engaged in verbal communications with individuals that were referred by Dr. Michelle Cretella and do not recall the names of those individuals that were consulted."  (Ex. 22, at 2.)  Throughout this litigation, Plaintiffs attempts to elicit information from Defendants in writing has been largely futile, further justifying the need to depose Mr. Weida.

In sum, Plaintiffs have diligently pursued discovery and depositions in this matter, the sum of which now indicates that Mr. Weida alone made key decisions about the process to exclude coverage of gender-affirming care from Florida Medicaid.

## V.   Plaintiffs' Deposition Notice Was Timely.

The deadline for fact discovery in this matter was March 10, 2023.  (Dkt. 107.) On March 8, 2023, after deposing three agency witnesses and extensive review of documents produced by Defendants (the production of with was delayed both by

21

Defendants' causing needless motion practice and then technical limitations on Defendants' side), it became apparent to Plaintiffs' counsel that it would be both necessary and appropriate to depose Mr. Weida.  Plaintiffs noticed the deposition that same day for March 10, 2023 (the factual discovery cut-off) and sent a follow-up email to Defendants clarifying the deposition could take place in the near future when Mr. Weida's schedule could accommodate it.  (Exs. 23 - 24.)

This Court indicated at the January 26, 2023 hearing on Plaintiffs' Motion to Compel that it would be acceptable for depositions to be conducted after the deadline had passed.  (Ex. 25, 53:15-54:22 ("If you are taking depositions the night before trial, as my mother used to say, No skin off my nose. … There's some depositions that can be taken after summary judgment motions are in.").)  While Plaintiffs could have sought to extend the fact discovery deadline in conjunction with serving the notice, which Defendants almost certainly would have opposed, Plaintiffs considered it more prudent to serve the notice within the bounds of the factual discovery deadline and to then work with Defendants on the date and parameters of the deposition (something Plaintiffs' Counsel has repeatedly offered to do).  Given the special need for Mr. Weida's deposition, the fact that the deposition was noticed *before* the factual discovery cut off, and that trial is still six (6) weeks away, the request to depose Mr. Mr. Weida is timely.

## VI.    CONCLUSION

For the reasons stated above, the Court should deny the instant Motion.

4855-8785-5447.v4

Dated: March 29, 2023

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**\*
**Gary J. Shaw**\*
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com

**Joe Little**\*
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle**\*
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**\*
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

Respectfully Submitted,

*/s/ Omar Gonzalez-Pagan*

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan**\*
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**\*
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

*\* Admitted pro hac vice*
*Counsel for Plaintiffs*

24

4855-8785-5447.v4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 29th day of March 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

*/s/ Omar Gonzalez-Pagan*
Attorney for Plaintiffs

## <u>CERTIFICATE OF WORD COUNT</u>

As required by Local Rule 7.1(F), I certify that this Opposition contains 4,865 words.

*/s/ Omar Gonzalez-Pagan*
Attorney for Plaintiffs

4855-8785-5447.v4