Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF FLORIDA
 3
 4   AUGUST DEKKER, et al.,           )
 5                                    ) Case No.
 6        Plaintiffs,                 )
 7                                    ) 4:22-cv-00325-RH-MAF
 8        vs.                         )
 9                                    )
10   JASON WEIDA, et al.,             )
11                                    )
12        Defendants.                 )
13              March 17, 2023    10:03 am    Zoom
14            DEPOSITION OF:  Dr. Quentin Van Meter
15        This deposition was taken remotely via Zoom.
16         Signature of this deposition is reserved.
17
18                    SHARON F. MCCLAIN
19                     C.C.R. - B-2243
20                      P.O. Box 1036
21                   Gainesville, GA  30503
22   (770) 718-5145
23
24
25
```

Page 134

1 and the agency was asked as well. I can tell you having
2 found the email that is a request to you to help out, but
3 was that request done verbally? Was it by phone?
4    A.   I'm not sure I understood your question.
5    Q.   You said that the first thing you do when
6 somebody writes to you requesting your testimony or
7 assistance or consulting help is that you send your CV
8 and your fee schedule, is that right?
9    A.   That's correct. It is within a period of time
10 depending on if I'm very busy in the office and I've got
11 an immense amount of work to do both in the office and
12 late into the evening related to patient care it might be
13 a day or two delay, but it's the first ...
14    Q.   Oh no, yeah. It will be like next week, right?
15 All I mean is that's one of the first things you do once
16 you are contacted?
17    A.   Yes, it is.
18    Q.   So, you sent your CV and fee schedule on April
19 13, and I don't have an email to you asking you for help
20 before then. So, my question is how did you come in
21 contact with the Agency for Healthcare Administration in
22 Florida?
23    A.   I honestly don't recall. I thought it was
24 through email.
25    Q.   When were you officially retained as a

Page 135

1 consultant to the Agency for Healthcare Administration?
2    A.   I do not recall that either.
3    Q.   The email that we discussed was with Andrew
4 Sheeran. Did you communicate with other people at AHCA?
5 By AHCA I mean A-H-C-A, the Agency for Healthcare
6 Administration?
7    A.   I believe I communicated with Mr. Weida, an
8 attorney, and there may have been a second person whose
9 name I do not recall.
10    Q.   And you communicated with Matthew Brackett?
11    A.   I do not recall.
12    Q.   Did you communicate with Cole Gearin?
13    A.   With whom? I'm sorry?
14    Q.   Cole Gearin.
15    A.   I don't recognize that name.
16    Q.   Did you communicate with Nai Chan?
17    A.   Again, that name does not ring a bell.
18    Q.   But you did communicate with Mr. Sheeran and
19 Mr. Weida, is that right?
20    A.   Yes.
21    Q.   Your communications were both telephonic and by
22 email, is that correct?
23    A.   Yes.
24    Q.   After April 13, after you sent your CV and your
25 fee schedule, what happened? What was the next step?

Page 136

1    A.   The next step was to review their concerns and
2 what they needed from me, and I then spent time, a number
3 of hours, and I cataloged them in an invoice which I
4 think I can probably find for you doing research,
5 reviewing any publications that they wanted me to review
6 and creating my report.
7    Q.   What was the conversation? What were you asked
8 to do?
9    A.   I was asked to write a report of essentially
10 the history of transgender health in the United States,
11 the sort of progression of sort of the ideology as it
12 rose to take prominence in the field of transgender
13 health and to make criticisms of some of the most
14 standard defenses for using medical, social and surgical
15 affirmation in minors.
16    Q.   Who asked you to do that in your report?
17    A.   I believe it was Mr. Weida.
18    Q.   And at that point in time had a decision been
19 made that coverage would no longer be provided?
20    A.   No, there was going to be a hearing in front of
21 invited people that would be pro or con, the public
22 comments and professional people's comments, and I was
23 invited to that hearing.
24    Q.   Understood, but at that point in time when you
25 were given this task, there was a GAPMS report that was

Page 137

1 going to be issued, right, and your report was going to
2 be in support of that, is that correct?
3    A.   That's correct.
4    Q.   So, the outcome of the GAPMS report, was that
5 already decided when you were asked to write your
6 attachment?
7    A.   I believe it had a purpose of preventing
8 funding for things that had not been based on scientific
9 proof.
10    Q.   Thank you. So, there was this phone
11 conversation with Mr. Weida asking you, giving you your
12 task if you will for this assignment. When was that?
13    A.   When did this occur?
14    Q.   Yes.
15    A.   Between April 13 and when I came to the hearing
16 which I think was on the 8th of July.
17    Q.   It would have been before you wrote your
18 report, is that right?
19    A.   No, the report was already written.
20    Q.   Which report was already written?
21    A.   Exhibit E.
22    Q.   But the assignment -- I'm asking about the call
23 when they asked you to write the report. When did that
24 occur?
25    A.   That would have been shortly after they

Page 138

1  received my CV and decided to use me to write an expert
2  report.
3      Q.  How many times between April 13 and June 2 did
4  you speak on the phone with somebody from AHCA?
5      A.  Very few times.  It was more often an email
6  exchange.
7      Q.  Did you speak more than two times with somebody
8  on the phone?
9      A.  I may have spoken more than two times.
10     Q.  More than five?
11     A.  Probably not.
12     Q.  So, somewhere between two and five times you
13 spoke on the phone between April 13 and June 2?
14     A.  Yes, most of the interactions and
15 communications were written by email.
16     Q.  Did you communicate between April 13 and August
17 21 with any counsel at the firm Holtzman and Vogel, and
18 when I ask you this question, I'm very specific.  I'm
19 asking about communications up to August 21, 2022.  I'm
20 not asking about anything thereafter.  Did you
21 communicate with attorneys at Holtzman and Vogel?
22     A.  I do not recall when I did, but I can find that
23 information from you with a review of my emails.
24     Q.  Did you communicate with Moha Jazil?  Is that a
25 name that comes to mind?

Page 139

1      A.  Again, I don't recall that name.
2      Q.  Did you communicate with Gary Perko?
3      A.  Yes, I did.
4      Q.  Did you communicate by phone with Gary Perko?
5      A.  Before the 23rd of August, again, I will have
6  to find out when it was that I first was contacted, and
7  it's very likely that if I was contacted by email that I
8  would have had some sort of telephonic communication with
9  Mr. Perko.
10     Q.  Just for clarity of the record, I'm only asking
11 you up to August 21st?
12     A.  Correct.
13     Q.  Did you ever speak with somebody at the
14 Department of Health in relation to the GAPMS project?
15     A.  I do not recall any conversation.
16     Q.  Did you ever speak with someone at the Florida
17 Governor's office?
18     A.  No, I did not.
19     Q.  We've been discussing Attachment E which was
20 submitted in support of the GAPMS determination.  When
21 did you finish the first draft of your report?
22     A.  I would have to go back to emails to determine
23 that.
24     Q.  You received feedback on your report, is that
25 right?

Page 140

1      A.  I believe I did.
2      Q.  From whom did you receive feedback on your
3  report?
4      A.  The one most prevalent was I think Mr. Perko
5  and maybe Mr. ...
6      Q.  Did you receive -- go ahead.  Sorry.
7      A.  Actually this is before the 21st of August, is
8  that correct?
9      Q.  Yes, I'm only asking before the 21st of August?
10     A.  I don't recall specifically what kind of
11 feedback I got.  I got feedback about the language of my
12 report, and I took that and edited it appropriately to
13 clarify certain things that I had originally written.  I
14 do not recall the individual.  It would likely have been
15 Mr. Weida.
16     Q.  I'm going to show you what's been marked as
17 Exhibit 17.  Exhibit 17.  Do you see the screen?
18     A.  Yes.
19     Q.  This is an invitation for a Microsoft Team's
20 meeting, is that right?
21     A.  Yes.
22     Q.  It's for May 2, 2022, is that right?
23     A.  That's correct.
24              (Plaintiff's Exhibit No. 17 was
25              marked for identification.)

Page 141

1  BY MR. GONZALEZ-PAGAN:
2      Q.  Subject Florida call and required FMV includes
3  k-i-d-e-n-d-o @comcast.net.  Is that right?
4      A.  That's correct.
5      Q.  That's your email, is that correct?
6      A.  That's correct.
7      Q.  So, there was a meeting on May 2, 2022, is that
8  right?
9      A.  Yes, that would indicate that, yes.
10     Q.  And the meeting included yourself, James
11 Cantor, Patrick Lappert, Jason Weida and a number of
12 other folks at AHCA, is that right?
13     A.  That's what it says, yes.
14     Q.  What was discussed at this meeting on May 2,
15 2022?
16     A.  It was an instructional session on the purpose
17 of the report, the design, who would be involved.  It was
18 a guidance of what things that should be included in the
19 report and what should be not included in the report that
20 would be somehow viewed as inflammatory or inappropriate.
21 It served as just a guideline.  This is what the report
22 is.  I believe it was a discussion of what the plan and
23 the goal was overall.  It was more instructive than
24 interactive with the participants on the call.
25     Q.  Let's break that down a little.  You said it

Page 150

1  what the DeHaynie study showed.
2       A.   One of the things it showed.
3       Q.   I guess I have a question for you.  A, do you
4  know what the rate of suicide would have been absent the
5  care?
6       A.   I don't.
7       Q.   So, it could have been higher, even higher?
8       A.   It could have been.
9       Q.   I think there's an assumption built into your
10 critique, and I just want to piece it out that it ignores
11 that you are taking out people out of their context.
12 Like just because somebody is receiving care doesn't mean
13 that they're being taken out of their context in which
14 let's be real being transgender is not the most socially
15 acceptable thing in the world?
16      A.   I'm not sure I understand your question or can
17 verify that what you said is indeed valid.
18      Q.   I'm just saying that you're comparing
19 transgender people, the rate of suicide rate between
20 transgender people versus the general population, and the
21 stressors in life that transgender people face are just
22 not the same as the general population?
23      A.   In the country of Sweden transgenderism and
24 stigma for that is the lowest probably of anywhere in the
25 world.  There might still be some residual stigma.  The

Page 151

1  society of in the country of Sweden at large, minority
2  stress theory for them does not apply to any real extent.
3       Q.   What literature do you point to to say that
4  minority stressors don't apply in Sweden?
5       A.   I can't tell you it doesn't apply in every
6  single case, but in general of anywhere in the world to
7  live as a transgender person the society is reported and
8  referenced in literature to be the most accepting society
9  and country in the world.
10      Q.   Again, to what do you cite for that
11 proposition?
12      A.   It's mentioned in a number of referenced
13 articles that are in support of or look critically at the
14 issue of minority stress in transgender patients.  It's
15 quoted again and again, and again I could find those
16 references for you and provide them if you wish.
17      Q.   But that wasn't included in your report, either
18 of them?
19      A.   No.
20      Q.   Let me ask you this.  Even if Sweden were --
21 just an assumption.  Let's take it as true for purposes
22 of the conversation that Sweden is the most accepting
23 concentration of people in the world.  That doesn't mean
24 that it is accepting of transgender people, right?  It
25 just means it's more accepting than other places?

Page 152

1       A.   I suppose you could say that, yes.
2       Q.   It doesn't mean that there's no discrimination
3  against transgender people in Sweden?
4       A.   I have no reference that I can quote that says
5  that that is not true.
6       Q.   Let's turn to the next exhibit, Exhibit 19.
7  Can you see my screen?
8       A.   Yes, I can.
9       Q.   Is this an invoice like the ones that you were
10 referring to earlier?
11      A.   Yes.
12      Q.   And it delineates a date of June 13, 2022; this
13 is an invoice that you submitted, is that right?
14      A.   That's correct.
15           (Plaintiff's Exhibit No. 19 was
16           marked for identification.)
17 BY MR. GONZALEZ-PAGAN:
18      Q.   It delineates that there was a teleconference
19 with AHCA staff that was 45 minutes on May 1 and that you
20 spent one hour writing the initial draft of your report
21 on May 8.  Is that all that you spent writing your
22 report, one hour?
23      A.   That one day and then continued writing and
24 rewriting the draft report on the subsequent, the 12th of
25 May, the three and a half hours.

Page 153

1       Q.   So, this is what I wanted to ask.  Did you
2  receive feedback between the 8th and the 12th, or this
3  was just two days of ...
4       A.   I believe I just worked on it on the 8th and
5  the 12th and then sent it in for commentary.
6       Q.   That was that email that we saw of May 14th?
7       A.   Yes.
8       Q.   And then you received commentary, and you spent
9  two and a half hours making revisions, is that right?
10      A.   And putting in the references and that revision
11 of draft report writing references, that was the
12 additional two and a half hours.  That's a really
13 significant task to go back and look in the references to
14 be sure that they match.  There are mismatches that
15 happen when you add a new reference, and the reference
16 numbers in the thing may or may not change forward, and
17 you will have double references or something that
18 accidentally is a reference for another part of the topic
19 that belongs to another part of the report but actually
20 was not aligned, and I try to go through and make sure
21 that does not happen.  So, that happens before the final
22 draft is turned in.
23      Q.   When you sent your email, you sent them
24 directly to Mr. Weida, right?
25      A.   Yes.

Page 154

1  Q.  Was he your primary contact for this report?
2  A.  Yes.
3  Q.  I'm going to show you what's been marked as
4  Exhibit 20.  Can you see my screen?
5  A.  Yes, I can.
6  Q.  There's a typo there, but it should say AHCA
7  hearing on general Medicaid policy rule July 20, '22.  Do
8  you see that?
9  A.  I do.
10 Q.  There's a Bates stamp says FDOH_000020148.  Do
11 you see that?
12 A.  I do.
13          (Plaintiff's Exhibit No. 20 was
14           marked for identification.)
15 BY MR. GONZALEZ-PAGAN:
16 Q.  And it says that it was updated on July 26,
17 2022.  Is that right?
18 A.  That's what it says.
19 Q.  It states that you were part of a cabinet that
20 reviewed the amendment to Rule 59G-1.050 general Medicaid
21 policy.  Do you see that?
22 A.  I do.
23 Q.  What was your role as part of the cabinet?
24 A.  I did not know I was part of a cabinet.  So, I
25 can't describe that to you.

Page 155

1  Q.  Did you ever review or receive a draft of the
2  GAPMS report that was published on June 2, 2022, prior to
3  it being published?
4  A.  I received another document.  Let me see.  I
5  had pulled this previously.  I thought I had it right
6  here.  It was different.  It had a different thrust, and
7  I don't think it was -- I can't recall, and I'm not sure
8  why I don't have it right here on my desk, but there was
9  another document that came in in a spiral binder.  It
10 looked more like a technical report than the final
11 report, but I don't have it.
12 Q.  That was prior to June 2?
13 A.  I don't know.
14 Q.  Did you provide input to the document that you
15 received?
16 A.  Did I provide input?
17 Q.  Yes.
18 A.  As my Exhibit E is in there.  That was my
19 provision of information.
20 Q.  Let's turn to the next exhibit, Exhibit 21.
21 Let's share the screen.  This is an email thread with you
22 and Devona Pickle, is that correct?
23 A.  Correct.
24 Q.  At the bottom of the first page it has a Bates
25 stamp of Defendants 000239790, is that right?

Page 156

1  A.  That's correct.
2  Q.  And in the middle of the page there's an email
3  that you sent on July 9, 2022, to Devona Pickle that is a
4  bit of like an outline of an invoice if you will, is that
5  right?
6  A.  That's correct.
7  Q.  And it says that you spent two hours of phone
8  conferences.  What were those?  Is that right, two hours
9  of phone conferences?
10 A.  Two hours of phone conferences.
11          (Plaintiff's Exhibit No. 21 was
12           marked for identification.)
13 BY MR. GONZALEZ-PAGAN:
14 Q.  How many phone conferences were there?
15 A.  Essentially two, and they were nearly an hour
16 long each one, more than 45 minutes and at least up to an
17 hour.
18 Q.  What was discussed at those two one-hour phone
19 conferences?
20 A.  I can't recall specifically.
21 Q.  Who participated in those two one-hour phone
22 conferences?
23 A.  Again, I cannot define.  I know I obviously was
24 there.  I would assume that Mr. Weida was there, and
25 beyond that I cannot tell you.  I do not recall it being

Page 157

1  with any other individuals than just me and my report.
2  Q.  You don't recall what was discussed with Mr.
3  Weida on that phone conference?
4  A.  I remember some was about logistics, about
5  arrangements that needed to be made for, you know, what
6  time we should arrive or depart from Tallahassee,
7  descriptions of how the hearing would very likely
8  progress, those kinds of things among others, and then
9  probably talked about my draft report.
10 Q.  You didn't discuss logistics for two hours
11 though, right?
12 A.  No, not two hours.  You asked me everything I
13 could remember.  So, I'm just telling you what I
14 remember.
15 Q.  No, no, I understand.  I just want to make
16 sure, but there's stuff that you cannot remember that was
17 discussed during those two hours?
18 A.  That's correct.
19 Q.  Let's turn to the next exhibit.  This is
20 Exhibit 22.  Can you see that?
21 A.  Yes.
22 Q.  This is an email from you to Andrea Van Mol,
23 Jason Weida, Miriam Grossman, Josefina Tamayo, Moha Jazil
24 at Holtzman Vogel and Gary Perko at Holtzman Vogel, is
25 that right?

40 (Pages 154 - 157)

Page 198

1 to be transgender?
2    A.   Absolutely.
3    MR. GONZALEZ-PAGAN:  Let's take a two-minute
4 break.  I just want to check that I'm done, and if
5 not, we're done.
6    MR. PRATT:  Sounds good.
7    COURT REPORTER:  We are off the record at 4:40
8 pm.
9    (Off the record for a short break.)
10   (Back on the record.)
11   COURT REPORTER:  We're back on the record at
12 4:42 pm.
13   MR. GONZALEZ-PAGAN:  Mr. Van Meter, thank you
14 for your time today.  I appreciate your availability
15 and you answering my questions.  I'm done with my
16 questions for today.  I appreciate you being
17 available throughout the day.
18   DR. VAN METER:  Thank you.
19   MR. PRATT:  Good afternoon, Dr. Van Meter.
20 Thank you again for being here this afternoon.  We
21 appreciate it.
22   DR. VAN METER:  Thank you very much.
23             DIRECT EXAMINATION
24   BY MR. PRATT:
25   Q.   I have just some very, very brief questions for

Page 199

1 you.  How long have you been a practicing physician
2 again?
3    A.   Since 1976.  That's 47 years I believe if I'm
4 counting up right.
5    Q.   Over the course of your career how many
6 children would you estimate that you have treated?
7    A.   It would be a wild guess.  I honestly don't.
8 Numbers of thousands of children, somewhere less than
9 100,000 probably.
10   Q.   And in treating and recommending treatments for
11 your patients including any transgender patients, do you
12 independently exercise your best medical judgment?
13   A.   I do.
14   Q.   Do you generally care for your patient's well-
15 being?
16   A.   That is my whole focus.
17   Q.   Just switching gears a tiny bit, do you recall
18 Mr. Gonzales-Pagan asking you several questions earlier
19 regarding that case you were struck from as an expert
20 witness?
21   A.   Yes.
22   Q.   Is my understanding correct that the reasons
23 you were struck from that case are under seal or
24 otherwise confidential?
25   A.   Yes.

Page 200

1    MR. PRATT:  I have no further questions at this
2 time unless Mr. Gonzales-Pagan has any follow-ups.
3    MR. GONZALEZ-PAGAN:  I do not.  Thank you.
4    COURT REPORTER:  All right, we are off the
5 record at 4:44 pm.
6    (Whereupon, the deposition in the above-
7 entitled matter was concluded at approximately 4:44
8 pm.)

Page 201

            C E R T I F I C A T E
STATE OF GEORGIA     )
COUNTY OF HALL       )

     I, Sharon F. McClain, do hereby certify
that I reported the above and foregoing on March 17,
2023; and it is a true and accurate transcript of the
testimony captioned herein.
     I further certify that I am neither kin nor
counsel to any of the parties herein, nor have any
interest in the cause named herein.
     Any disassembling of this transcript is
strictly forbidden and nullified certification.
     WITNESS my hand and official seal this the
20th day of March, 2023.

                          *Sharon McClain*
                    Sharon McClain, CCR, B-2243

Page 202

1      D I S C L O S U R E
2      STATE OF GEORGIA
3      COUNTY OF HALL
4          Pursuant to Official Code of Georgia
5      Annotated 9-11-28, I make the following disclosure:
6          I, Sharon F. McClain, was hired by
7      Plaintiff to provide court reporting services for
8      this proceeding.
9          Financial arrangements between myself and
10     the parties to this proceeding are: the usual and
11     customary fees charged by me for the original and one
12     copy, copies to the other parties, and any direct
13     expenses for the production of same. A financial
14     discount will not be given to any party to this
15     proceeding.
16         Further, I have not entered into any
17     contractual arrangement, financial or otherwise, with
18     any person or entity in this matter and thereby am
19     taking this matter in full compliance with O.C.G.A.
20     Section 15-14-37.
21         I hereby certify that the above disclosure
        statement is true and correct and that copies have
22     been furnished to all counsel and/or parties.
23     DATED: March 20, 2023.
24
                        *Sharon McClain*
25

Page 203

1      WITNESS CERTIFICATION
2      I hereby certify:
3          That I have read and examined the contents of
4      the foregoing testimony as given by me at the time
5      and place hereon indicated, and;
6          That to the best of my knowledge and belief, the
7      foregoing pages are a complete and accurate record of
8      all the testimony given by me at said time, except as
9      noted on the attached Errata Sheet hereto.
10         I have _____ have not _____ made
11     changes/corrections.
12
13            _____
14                  Dr. Quentin Van Meter
15
16     Sworn to and subscribed
17     before me this ____ day
18     of _____, 2023.
19
20     _____
21     Notary Public
22
23     My Commission Expires:
24
25     _____(SEAL)

Page 204

1
2                 ERRATA SHEET
3      Upon reading and examining my testimony as herein
4      transcribed, I make the following additions, changes,
5      and/or corrections, with the accompanying and
6      corresponding reason(s) for same:
7      Page   Line        Is Amended to Read
8      ____|_____|_____
9      ____|_____|_____
10     ____|_____|_____
11     ____|_____|_____
12     ____|_____|_____
13     ____|_____|_____
14     ____|_____|_____
15     ____|_____|_____
16     ____|_____|_____
17     ____|_____|_____
18     ____|_____|_____
19     ____|_____|_____
20     ____|_____|_____
21     ____|_____|_____
22     ____|_____|_____
23
24
25                        _____

Page 205