Page 125

```
                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF FLORIDA


                    CASE NO.  4:22-cv-00325-RH-MAF


   AUGUST DEKKER, et al.,
        Plaintiffs,
   vs.
   JASON WEIDA, et al.,
        Defendants
   _____/
                                   Volume 2, Pgs. 125 - 261
   VIDEOTAPED DEPOSITION OF: MATTHEW BRACKETT
   AT THE INSTANCE OF:       THE PLAINTIFFS
   DATE:                     FEBRUARY 8, 2023
   TIME:                     COMMENCED: 1:30 P.M.
   LOCATION:                 AGENCY FOR HEALTH CARE
                             ADMINISTRATION
                             2727 MAHAN DRIVE
                             TALLAHASSEE, FLORIDA 32308

   REPORTED BY:              DANA W. REEVES
                             Court Reporter and
                             Notary Public in and for
                             State of Florida at Large
```

Page 126

APPEARANCES:

REPRESENTING THE PLAINTIFF:

KATY DeBRIERE, ESQ.
Florida Health Justice Project
3900 Richmond Street
Jacksonville, Florida 32205

SIMONE CHRISS, ESQ.
CHELSEA DUNN, ESQ.
Southern Legal Counsel, Inc.
1229 NW 12th Avenue
Gainesville, Florida 32601

SHANI RIVAUX, ESQ.
Pillsbury, Winthrop, Shaw, Pittman, LLP
600 Brickell Avenue, Suite 3100
Miami, Florida 33131

OMAR GONZALEZ-PAGAN, ESQ.
Lambda Legal Defense and Education Fund, Inc.
120 Wall Street, 19th Floor
New York, NY 10005

CATHERINE MCKEE, ESQ.
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514

REPRESENTING THE DEFENDANT:

MOHAMMAD O. JAZIL, ESQ.
GARY V. PERKO, ESQ.
Holtzman, Vogel, Barantorchinsky & Josefiak
119 S. Monroe Street, Suite 500
Tallahassee, Florida 32301

ALSO PRESENT:
RL Minnich, Videographer

Page 127

INDEX TO WITNESS

MATTHEW BRACKETT                                   PAGE
Examination by Ms. DeBriere                         128
Examination by Mr. Jazil                            253
Further Examination by Ms. DeBriere                 255

INDEX TO EXHIBITS

NO.        DESCRIPTION                              MARKED
Exhibit 13  Medicaid coverage for children            153
            state list
Exhibit 14  Medicaid policy Routing and               163
            Tracking Form
Exhibit 15  Molina Health Care Notice of              202
            Adverse Benefits
Exhibit 16  August 22, 2022 email                     215
Exhibit 17  August 22, 2022 SMMC policy               215
            transmittal
Exhibit 18  Florida Medicaid health care alert        222
            sign off form
Exhibit 19  June 3rd, 2022 series of emails           227
Exhibit 20  Florida Statute 120.542                   234
Exhibit 21  GAPMS queue                               249
Exhibit 22  Health and Human Services document        253
Exhibit 23  Treatment of gender dysphoria for         253
            children and adolescents

*Uh-uh is a negative response
*Uh-huh is a positive response

Page 128

D E P O S I T I O N

Whereupon,

MATTHEW BRACKETT

was called as a witness, having been previously duly sworn to speak the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

VIDEOGRAPHER: This is beginning of video three. The time is 1:30 p.m. We're on the record.

EXAMINATION

BY MS. DEBRIERE::

Q  So prior to break, we were talking a little bit about Dr. Van Mol and Dr. Grossman's involvement in the 2022 GAPMS. How did AHCA identify them to participate in the July 8th rule hearing that was related to?

A  So the -- are we talking about the rule hearing?

Q  Yes, related to the June 2022 GAPMS.

A  So since we had already been working with them in relation to the GAPMS project, because Dr. Grossman is a psychiatrist, and Dr. Van Mol is a family -- family practice practitioner, that's based on their backgrounds and their knowledge of the existing evidence, that was our basis for selecting them to be on the panel for the July 8th hearing.

Page 129

Q  And turning back to the individuals who wrote reports for the June 2022 GAPMS, who made the decision to contract with them to prepare those reports?

A  So after establishing each one, we wanted to -- their backgrounds and their suitability to provide reports, that decision was made by, I think, now Secretary Weida.

Q  And who was involved in determining whether they had the appropriate backgrounds to write the reports?

A  So I think those individuals who were working with the experts, I think that was, of course, now Secretary Weida, I think at our time, General Counsel Josephina Tamayo.

Q  Okay. Anybody else?

A  I don't --

Q  Were you involved?

A  I was not.

Q  Was Nai Chen involved?

A  He was not.

Q  Was Dede Pickle involved?

A  She was not.

Q  Okay. So now Secretary Weida and Josephina Tamayo were the two people who decided whether the consultants who read the reports were qualified to do

Page 130
1  so?
2       MR. JAZIL: Object to form.
3       THE WITNESS: So are you asking that whether or
4   not those two only assessed their credentials?
5  BY MS. DEBRIERE::
6   Q   Yes.
7   A   I mean, yeah.  I mean, they assessed their
8  credentials and looked at their background and
9  experience and knowledge.
10  Q   Were those the only two people that assessed
11 their credentials before deciding whether to engage
12 them?
13  A   In regarding the Agency, I mean, the -- Andrew
14 Sheeran may have been involved.  So it's possible a
15 couple others with the principal decision to rely on
16 those experts was theirs.
17  Q   Okay.  And so just to be clear, you were not
18 involved in that decision?
19  A   I was not involved in that decision.
20  Q   And Nai Chen was not involved in that
21 decision?
22  A   That's correct.
23  Q   And Dede Pickle was not involved in that
24 decision?
25  A   Correct.

Page 131
1   Q   When making that decision, did AHCA
2  investigate whether any of the consultants had a stance
3  related to the treatment of gender dysphoria?
4   A   We, of course, were looking for those that
5  had -- were knowledgeable about the existing literature
6  of gender dysphoria, and those who would, for the
7  supplemental reports, would take an evidence-based
8  approach.
9   Q   Did it -- so those were the only two criteria
10 that you used to determine which consultants you would
11 engage with?
12  A   Correct.
13  Q   And so opposition to gender-affirming care was
14 not a factor in who you chose?
15  A   We were specifically looking -- I think we
16 might be talking semantics on what we consider
17 opposition, but we were looking for individuals who were
18 going to make reports and recommendations based on the
19 existing evidence.
20  Q   Okay.  Was whether the vendor had experienced
21 treating -- I'm sorry.  Was whether the consultant had
22 experienced treating gender dysphoria a factor?
23  A   Not so much a factor that would outweigh the
24 knowledge of the existing literature and the evidence,
25 since this was going to be a -- the GAPMS process really

Page 132
1  takes into account peer-reviewed literature.  It takes
2  into account evidence-based clinical guidelines, et
3  cetera, so those are our primary -- our primary factors
4  in evaluating the experts and their ability to
5  contribute to this report.
6   Q   Would people who actually provide treatment in
7  gender dysphoria be most familiar with peer-reviewed
8  literature as it relates to their practice?
9   A   Well, that is a complicated question.  They
10 don't necessarily have to be.  It's possible to -- I
11 mean, it is possible -- I mean, it is hypothetically
12 speaking, someone could engage in treatment of these
13 individuals and run and follow anecdotes.
14  Q   So it's not important to AHCA that the
15 consultants with whom you engaged had actual experience
16 treating gender dysphoria?
17  A   So based on how the GAPMS rule is written, the
18 needs of the report, we really -- the primary ask was
19 for individuals who were steeped in the evidence.
20  Q   But didn't necessarily have actual real life
21 experience treating gender dysphoria?
22  A   Right, that wasn't a primary consideration.
23  Q   Okay.  For -- was AHCA aware that all the
24 consultants with which you engaged took a stance to
25 oppose mainstream medical organizations' stance on

Page 133
1  gender-affirming care?
2       MR. JAZIL: Object to form.
3       THE WITNESS: So are you talking about in
4   opposition or in contradiction?
5  BY MS. DEBRIERE::
6   Q   Contradiction.
7   A   We -- whether contradiction or alignment
8  really was irrelevant, it really was taking a look and
9  making evidence-based conclusions.
10  Q   Speaking to Dr. Brignardello-Petersen -- I'm
11 sorry.  I'll start here actually.  In deciding on
12 whether to use these consultants, was any input provided
13 from the Alliance Defending Freedom?
14  A   No.
15  Q   What about the Heritage Foundation?
16  A   No.
17  Q   Liberty Council?
18  A   No.
19  Q   Society for Evidence-Based Gender Medicine?
20  A   We may have gotten Romina's name from that
21 organization.
22  Q   Okay.  And what about the Family Christian
23 Coalition?
24  A   No.
25  Q   Did you get anybody else's name from the

Veritext Legal Solutions
800-726-7007                                                    305-376-8800

Page 210

1  think they do.
2    Q   Okay. Is there any way you can get
3  confirmation of that answer?
4    A   I mean, we could obviously pull up a copy of
5  the final order and see if that information is included.
6    Q   If we had a copy of an AHCA final order, would
7  that be sufficient to determine, and it did not list it,
8  would that --
9    A   I'll defer to our attorneys, if that's
10 sufficient.
11       MR. JAZIL: That'd be sufficient. If you have
12    one, you can show it to him.
13       MS. DEBRIERE: Well, we can pull one up, can't
14    we?
15       MS. CHRISS: Just one?
16       MS. DEBRIERE: Yeah. Yeah. Why not. Yeah, as
17    long as their name's blocked out, which really
18    shouldn't matter here because we're dealing with an
19    AHCA employee.
20       THE WITNESS: Yeah. I mean, I'm cleared to
21    review PHI and recipient information. It shouldn't
22    be a problem.
23       MS. DEBRIERE: Do you want another one? I can
24    send you another one. Bear with me one second.
25       I'm going to forward you this email. And

Page 211

1  it's -- I can tell you what the name of the
2  document is. It's the last document, 23. That
3  should be the last one. Chelsea's copied on that
4  one, too.
5       THE WITNESS: Okay.
6       MS. DEBRIERE: Okay. Okay. So feel free to
7  just scroll through it and see if you see any
8  reference -- oh I'm sorry, it isn't a touchscreen?
9       THE WITNESS: I don't know where the scroll
10 bar.
11      MS. CHRISS: It's just -- just use two fingers
12    and just go like that.
13      MS. DEBRIERE: Oh, it's a Mac.
14      MS. CHRISS: I'm sorry.
15      THE WITNESS: Okay. There it goes. Yeah.
16    Ipads and iPhones I'm good with, Mac's I never got
17    comfortable with.
18      MS. DEBRIERE: The next exhibit I'm going to do
19    is emails related to the policy transmittal and the
20    policy transmittal itself, if that helps.
21      MS. DUNN: Yep.
22      THE WITNESS: So are we talking about the --
23    that last paragraph on the final page that's, like,
24    notice of judicial review?
25 BY MS. DEBRIERE::

Page 212

1    Q   Yes. So does that relate to the variance
2  waiver process?
3    A   I mean, it doesn't point out the variance
4  processes as described in section -- or Chapter 120. I
5  think that's more if they want to appeal to the next
6  level -- next court level. I don't think that's in
7  response to the variance process. That's a different
8  process.
9    Q   Okay. Thank you. So it does not mention the
10 variance waiver process --
11      MR. JAZIL: Would it be possible just to read
12    off the --
13      MS. DEBRIERE: Yes, absolutely. So it says at
14    the bottom: Notice of a right to judicial review.
15    A party who is adversely affected by this final
16    order is entitled to judicial review, shall be
17    instituted by filing the original notice of appeal
18    with the Agency clerk of AHCA, and a copy along
19    with the filing fee prescribed by law with the
20    District Court of Appeal and appellate district
21    where the Agency maintains its headquarters or
22    where a party resides. Review proceedings shall be
23    conducted in accordance with the Florida appellate
24    rules. The Notice of Appeal must be filed within
25    30 days at the rendition of the order to be

Page 213

1  reviewed.
2       THE WITNESS: Our various processes doesn't
3    involve appellate courts, so it would not be an
4    appellate case, so it's a different affair.
5  BY MS. DEBRIERE::
6    Q   Thank you. Okay. Did AHCA work with Florida
7  Medicaid managed care plans to implement the exclusion
8  set forth in 59G-1.050(7) in any way?
9    A   No. I mean, the publication's in the Florida
10 Administrative Register, that was to provide ample
11 notice -- public notice that the rule's changing, the
12 managed care plans are responsible for keeping up with
13 changes to manage -- to AHCA's coverage policies and
14 administrative policies.
15   Q   What about plan transmittal? Are you maybe
16 forgetting those?
17   A   We do not do a plan transmittal for this. Are
18 you referring to a policy transmittal?
19   Q   Yes.
20   A   We did not send out a policy transmittal.
21   Q   Okay. Okay. So we have what's marked as
22 Exhibit 16 and Exhibit 17. Exhibit 16 is some emails
23 from Dede Pickle to Jason Weida, cc'ing Ann Dalton. And
24 those are dated August 22, 2022. I believe that's where
25 they start. Also involved are you, Matt, and Ashley

| Page 214 | Page 216 |
|---|---|
| 1  Peterson.  Also, I just want to note that Exhibit 17 is | 1    A    We were asked to. |
| 2  an SMMC policy transmittal dated August 22nd, 2022. | 2    Q    By who? |
| 3          (Whereupon, Exhibit Nos. 16 - 17 were marked | 3    A    I think Ann Dalton asked Dede to work on it. |
| 4  for identification.) | 4    Q    Okay.  And later -- well, let's look to -- |
| 5  BY MS. DEBRIERE:: | 5  Ashley Peterson says on August 22, 2022 at 10:35 a.m.: |
| 6     Q    Getting back to the list of questions.  So did | 6  I added one thing to help clarify that these drugs will |
| 7  AHCA not send the plan policy transmittal out, Exhibit | 7  still be provided, just not for gender dysphoria. |
| 8  17? | 8  Please let me know if you think this is unnecessary or |
| 9     A    We did not send them out. | 9  adds confusion. |
| 10    Q    Why? | 10         So at least Ashley thought there was some |
| 11    A    Pretty much because all it's doing is | 11  clarity that could be provided to plans on the |
| 12  reproducing what was already stated in the rule.  The | 12  implementation of the exclusion. |
| 13  rules -- the rule -- the policy changes already in rule, | 13         MR. JAZIL:  Object to form. |
| 14  that was announced through the FAR.  Policy | 14         THE WITNESS:  Okay.  There's several emails. |
| 15  transmittal's a little superfluous at this point. | 15    Which one are you -- |
| 16    Q    Why draft an entire plan transmittal and then | 16  BY MS. DEBRIERE:: |
| 17  not send it out? | 17    Q    This one is from Ashley to Dede, copying you. |
| 18    A    Which this happens frequently.  Sometimes we | 18    A    August 22nd, 11:04 a.m.  That's Dede -- |
| 19  will draft something and later decide not to -- not to | 19    Q    10:35 a.m. |
| 20  use it, or not to utilize that content in favor of | 20    A    Okay. |
| 21  different strategy.  So, in this case, since the rule -- | 21    Q    It's DEF_0002587. |
| 22  since the rule change itself was pretty self-explanatory | 22    A    Okay.  I think it was just a minor, minor |
| 23  and pretty direct, just we later deemed wasn't | 23  technical catch.  I mean, when we worked on this, I |
| 24  necessary. | 24  mean, we were just fine tuning the drafts. |
| 25    Q    Who made the decision not to send out the | 25    Q    And further up Ann wants to include the 60-day |

| Page 215 | Page 217 |
|---|---|
| 1  policy transmittal? | 1  language in the alert, which has been later included. |
| 2    A    I think that would have been -- that would | 2    What is the 60-day language? |
| 3  have been Secretary Weida. | 3    A    That would be the bottom paragraph of the |
| 4    Q    Only Secretary Weida?  Is it Weida or Weida? | 4  policy transmittal. |
| 5    A    Weida.  I mean, as Assistant Deputy Secretary, | 5    Q    Okay.  And that you're referring to starts |
| 6  he would be within his purview to decide whether or not | 6  with:  To ensure the safe discontinuation of puberty |
| 7  to send something out -- or to send something out, but | 7  blockers or hormone and hormone antagonists for the |
| 8  given that the rule itself was self-explanatory, and we | 8  treatment of gender dysphoria? |
| 9  just decided that a policy transmittal wasn't necessary. | 9    A    Uh-huh. |
| 10    Q    All right.  In the email exchanges -- I think | 10    Q    Then the managed care plan must notify its |
| 11  it's on the second page -- oh, and Jason Weida, at this | 11  subcontractors, providers, enrollees receiving active |
| 12  time that he made this decision, was not the | 12  treatment and changes in coverage, and they must honor |
| 13  Secretary -- AHCA's Secretary, correct?  At the time | 13  any current prior authorization of prescribed outpatient |
| 14  this was sent, Mr. Weida was not the AHCA Secretary, | 14  drugs for the treatment of gender dysphoria through 60 |
| 15  correct? | 15  days after the date of this policy transmittal.  So that |
| 16    A    Right, he was Assistant Deputy Secretary for | 16  means that under the 60-day rule for continuity of care, |
| 17  Policy and Quality. | 17  the managed care plans were to continue coverage of the |
| 18    Q    On the last page, it looks like you were the | 18  prescribed outpatient drugs for the treatment of gender |
| 19  person who drafted the first policy transmittal, is that | 19  dysphoria, correct? |
| 20  correct? | 20    A    Only for those existing prior authorizations |
| 21    A    Yes.  Yeah, I mean, Dede and I, it was a | 21  had already been approved. |
| 22  collaborative effort between the two of us.  We were, of | 22    Q    Okay.  So that meant that AHCA was -- or that |
| 23  course, working on each other's language. | 23  Florida Medicaid was covering this drugs? |
| 24    Q    Why did you think Dede -- why did you and Dede | 24    A    Yeah, just for the sake of honoring existing |
| 25  think it was important to draft a policy transmittal? | 25  PA's. |

Page 218

1  Q   Was it not important that the plans know that
2  they should maintain continuity of care?
3  A   It's actually in the contract. I mean, when
4  you refer to continuity of care, can you clarify what
5  you mean by continuity of care?
6  Q   In this instance, I'm talking about the
7  continued coverage for 60 days of those prescribed
8  outpatient drugs for the treatment of gender dysphoria.
9  A   As far as the continuity of care went, I mean,
10 there -- as far as medically necessary services,
11 enrollees are always going to have access to those. So
12 when it comes to the continuity of care, whether or --
13 Q   They're not going to have access to services
14 that have been previously covered, but now are excluded,
15 correct?
16 A   That'd be correct.
17 Q   Okay. So the 60-day continuity of care
18 ensures that after that categorical exclusion is
19 adopted, those individuals continue to access that care
20 for 60 days?
21 A   This, of course, was a draft. It was never
22 sent out.
23 Q   At some point, AHCA thought that the 60-day
24 period of continuity of care should apply in this
25 situation, correct?

Page 219

1  A   Since this was a draft and it was not -- not
2  officially sent out, this is not -- since it is draft
3  language, it is not an official transmittal, we sent out
4  to the health plan, so this does not formally represent
5  the views of the Agency. This is a -- this is a draft
6  that we created, deliberated upon and decided not to
7  send out.
8  Q   Who decided?
9  A   That would, of course, been leadership. That
10 would have been -- would have gone to Assistant Deputy
11 Secretary Weida.
12 Q   And he was the only one who was involved in
13 that decision, correct?
14 A   I mean, since he oversees the bureau policy,
15 that's -- which means policy transmittal, yes, he had --
16 is within his -- is within his job description and his
17 responsibilities and rights to veto sending out a policy
18 transmittal.
19 Q   Okay. Since the policy transmittal was not
20 sent out, then is it AHCA's position that those who had
21 a current prior authorization at the time that
22 categorical exclusion was adopted, was not entitled to
23 the 60-day continuity of care period -- were not
24 entitled?
25 A   So once the rule went into effect, that was,

Page 220

1  of course, the notice of the plans that the coverage for
2  these services has to stop.
3  Q   Immediately?
4  A   Well, I mean, that's based on what the rules
5  say, yeah.
6  Q   Okay. So they -- that means that the plans
7  were not to implement this 60-day period of continuity
8  of care as described in this transmittal?
9  A   Right, we didn't provide notice of -- them of
10 this.
11 Q   Okay. And it was AHCA's position that
12 Medicaid beneficiaries were not entitled to that?
13 A   That's correct.
14 Q   Okay. You previously noted how people on
15 hormones may go through withdrawal, there was something
16 as part of your 2022 GAPMS request. Why wasn't that
17 important to communicate to the plans?
18 A   Well, because withdrawal is not gender
19 dysphoria. It's a different -- that's a different --
20 it'd be a different diagnosis altogether.
21 Q   But in the decision to no longer cover drugs
22 that may cause withdrawal, was it important to
23 communicate to the plans or providers that they may need
24 to help facilitate transition off those drugs that would
25 no longer be covered?

Page 221

1  A   We were leaving that to the health plans to
2  manage independently, as well as the providers of these
3  services.
4      MS. DEBRIERE: Do we have a document titled
5   Florida Medicaid health alert? You just -- under
6   DEF_000258815. I feel like I've had the same Bates
7   stamp number. So we're marking as Exhibit 18, the
8   Florida Medicaid health care alert sign-off form.
9       (Whereupon, Exhibit No. 18 was marked for
10  identification.)
11      THE WITNESS: I'm familiar with that. I
12  drafted it.
13 BY MS. DEBRIERE::
14 Q   That would definitely have been one of my
15 questions.
16 A   No, I'm listed on there as the analyst who
17 drafted it.
18 Q   And there's Dede and Ann.
19 A   Yeah.
20 Q   Okay. Did this healthcare alert go out to all
21 providers?
22 A   That provider alert did not go out.
23 Q   And the provider alert on the back, it lists
24 that same language to ensure the safe discontinuation of
25 puberty blockers or hormones and hormone antagonists for

25 (Pages 218 - 221)

Page 258

CERTIFICATE OF OATH

STATE OF FLORIDA  )
COUNTY OF LEON    )

I, the undersigned authority, certify that the above-named witness personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 21st day of February, 2023.

_____._____
DANA W. REEVES
NOTARY PUBLIC
COMMISSION #GG970595
EXPIRES MARCH 22, 2024

Page 259

CERTIFICATE OF REPORTER
STATE OF FLORIDA  )
COUNTY OF LEON    )

I, DANA W. REEVES, Professional Court Reporter, certify that the foregoing proceedings were taken before me at the time and place therein designated; that my shorthand notes were thereafter translated under my supervision; and the foregoing pages, numbered 128 through 257, are a true and correct record of the aforesaid proceedings.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 21st day of February, 2023.

_____._____
DANA W. REEVES
NOTARY PUBLIC
COMMISSION #GG970595
EXPIRES MARCH 22, 2024

Page 260

Gary V. Perko, Esq.
gperko@holtzmanvogel.com

February 21, 2023

RE:  August Dekker, et al. vs. Jason Weida, et al.
     February 8, 2023/Matthew Brackett/5696545

The above-referenced transcript is available for review. The witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason on the attached Errata Sheet. The witness should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com and copies will be emailed to all ordering parties.  It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.  If the witness fail(s) to do so, the transcript may be used as if signed.

Yours,
Veritext Legal Solutions
*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

Page 261

August Dekker, et al. vs. Jason Weida, et al.
February 8, 2023/Matthew Brackett
     E R R A T A  S H E E T
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____  _____
    Matthew Brackett            DATE