UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

       Plaintiffs,

v.                                                   Case No. 4:22-cv-00325-RH-MAF

JASON WEIDA, et al.,

       Defendants.

_____/

## PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF SOPHIE SCOTT, PH.D., AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403 and 702, Plaintiffs respectfully move this Court to exclude the expert report, opinions, and testimony of Defendants' proposed expert Professor Sophie Scott *in its entirety*. Professor Scott is not a qualified expert on gender dysphoria or its treatment, and her opinions and testimony are neither relevant nor reliable under Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. Her opinions and testimony are likewise inadmissible because any probative value they may have (and they have none) is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence. *See* Fed. R. Evid. 403.

**WHEREFORE**, Plaintiffs respectfully request an order excluding Professor Scott's report, expert opinions and testimony in their entirety.

## MEMORANDUM OF LAW

Professor Scott is not qualified to offer the opinions stated in her report. She opines that puberty delaying medication administered to teenagers "*may have*" unknown, negative effects on brain development. Report, ¶ 15 (**Exhibit A**). She also believes without any scientific support that it is "very possible" that teenagers cannot "fully grasp the implications of puberty blocking treatment." *Id*. ¶ 16. But Professor Scott is not qualified to give these opinions because she has never treated patients with gender dysphoria (at any age) given that she is not a medical provider of any kind, nor has she administered or studied the effects of puberty delaying treatment in any clinical or academic setting. She has never written on these subjects either— except on Twitter.

Aside from her lack of qualifications, Professor Scott's opinions are inadmissible because they are entirely speculative and lack any reliable or testable foundation or methodology. There is no existing data to support her ultimate conclusions, which means her opinions are based on impermissible "leaps of faith." The data that does exist directly contradicts her conclusions, but, strikingly, she never mentions this data in her report. Her opinions moreover are based solely on her unqualified review of other studies, and they are far outside the scientific mainstream. The Court should therefore exercise its gatekeeping function under Rule 702 and exclude Professor Scott's testimony. *See Rink v Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

### A.   Legal Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and Rule 702, district courts must perform a "gatekeeping" role "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability[.]" *Rink*, 400 F.3d at 1291; *Kilpatrick v. Berg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) ("The trial court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

To do so, the Court must engage in a rigorous inquiry to determine whether:

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*E.g.*, *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc), *cert. denied*, 544 U.S. 1063 (2005). The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence. *Rink*, 400 F.3d at 1292.

### B.   Professor Scott is Not Qualified To Offer An Expert Opinion on Any Issue in the Case.

A witness may be qualified as an expert by virtue of her "knowledge, skill,

3

experience, training, or education." Fed. R. Evid. 702. However, "[e]xpertise in one field does not qualify a witness to testify about others." *Lebron v. Secretary of Florida Dept. of Children and Families*, 772 F.3d 1352, 1368 (11th Cir. 2014) (holding that a psychiatrist was properly prevented from opining on rates of drug use because he had never conducted research on the subject, and instead relied on studies to form his opinion).

A scientist, however well credentialed, cannot be "the mouthpiece of a scientist in a different specialty." *Id*. at 1369 (quoting *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)); *TB Food USA, LLC v. American Mariculture, Inc*., 2021 WL 4962969, at *4 (M.D. Fla. October 26, 2021) ("[A]n expert must have at least some minimum training, education, experience, knowledge, or skill pertaining to the particular subject matter of his proposed testimony.") (cleaned up). "Merely reading literature in a scientific field does not qualify a witness—even an educated witness—as an expert." *Kadel v. Folwell*, 2022 WL 3226731, at *9, 13 (M.D.N.C. August 10, 2022) (excluding Dr. Lappert's expert opinion about puberty delaying medication because he is a surgeon, not an endocrinologist, and he never treated a patient with hormone therapies). If an expert witness does not intend to testify about matters growing directly out of "research [s]he had conducted independent of the litigation," the expert should be disqualified. *Lebron*, 772 F.3d at 1369 (quoting Fed. R. Evid. 702).

4

Professor Scott is the Director of University College London's Institute of Cognitive Neuroscience. Report ¶ 6.[1] Her main area of research is "speech, laughter and sound." Tr. 48:25 – 49:4 ("Q. All of these publications are about speech, laughter and sound. Isn't that right? A. There are a few other things. But yeah, that's the majority. That is my main area of research.") (**Exhibit B**). She is proffered as an expert based on her "training and experience as a neuroscientist," her reading and assessment of "the relevant neuroscientific literature on brain development, and the potential effects of [puberty delaying medication] on the developing brain." Report, ¶ 4. However, she has no experience with the provision of puberty delaying medication, gender-affirming medical care or medical treatment of gender dysphoria. She has never published any papers or studies on gender dysphoria, gender-affirming care or puberty delaying medication. Nor has she published any reviews of such studies in her entire career. Tr. 49:5-12 ("Q. Are any of [your publications] about gender-affirming care? A. No. Q. Are any of these publications specific to gender dysphoria? A. No. Q. Any about puberty blockers? No.").

Professor Scott is not a medical doctor, a psychiatrist or a clinical psychologist; she has no medical training. Tr. 34:25 – 35:4; Tr. 35:13-14. She does

_____

[1] According to Professor Scott, cognitive neuroscience is "a scientific field that examines the relationships between human behaviour to the human brain, and how these can be affected by age, disease and individual differences." Report, ¶ 6; Tr. 37:6-10 ("A neuroscientist is somebody who studies brains…[H]e's studying it in a purely basic science position. They're not treating people. They're not prescribing things.").

not treat patients. Tr. 44:22-23. She has never studied gender dysphoria in a clinical setting, nor has she ever administered puberty delaying medication or studied their effects, let alone in humans. Tr. 31:18-24 (Q. So you've never conducted any clinical studies yourself related to gender dysphoria? A. No. Q. What about the effects of gender-affirming care? A. Nope."). Nor has anyone at Professor Scott's place of employment, the Institute for Cognitive Neuroscience ever studied gender dysphoria or the effects of gender-affirming medical care either, meaning Professor Scott has not overseen any such study. Tr. 31:6-8 ("Q. Has anyone at the Institute ever conducted any clinical studies related to gender dysphoria? A. No, not that I'm aware of."; Tr. 31:25-32:2 (Q. Has the Institute ever studied the effects of puberty blockers? A. No.").

Without *any* qualifications, training or experience related to gender dysphoria or puberty delaying medication, Professor Scott is not qualified to give an expert opinion on these subjects. *See Kadel*, 2022 WL 3226731, at *13.[2] Nor is she

---

[2] *See also, e.g.*, *Fernandez v United States*, 2020 WL 3105925, at *5 (N.D. Fla. June 4, 2020) (excluding an expert because the Plaintiff offered "no information indicating that he has any experience or specialized knowledge regarding medicine generally or any of the branches of medical science which might be relevant to causation); *Doctors Licensure Group, Inc. v. Continental Casualty Company*, 2011 WL 13182969, at *4 (N.D. Fla. September 26, 2011) (excluding a proffered expert on accounting because he was "not an accountant" and had "virtually no experience in accounting"); *Webb v. Carnival Corporation*, 321 F.R.D. 420, 429 (S.D. Fla. 2017) ("Because Mr. Jaques has no experience in toxicology, responsible alcohol vending policies, nor medicine, and has never served onboard the California Dream, he is unqualified to opine on the Decedent's level of intoxication[.]").

qualified to opine on studies related to gender dysphoria or puberty delaying medication conducted by others. *See Dura Automotive*, 285 F.3d at 614 ("[A] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

This is so particularly here where Professor Scott's opinions and so-called review of literature did not "grow[] naturally and directly out of research [s]he had conducted independent of the litigation." *Lebron*, 772 F.3d at 1369 (cleaned up); *see also* Fed. R. Evid. 702, Advisory Comm. Notes (2000 Amendments). Here, Professor Scott reviewed the literature and developed her opinions in connection with litigation in the UK, namely, *Bell v. Tavistock*, and now seeks to transpose those opinions here without still having done any independent work in the area. Tr. 52:7-18 ("Q. Why did you think that you had an opinion to give in this case? A. *Because I provided an opinion before for the Keira Bell case.* And I discussed that a lot with Paul Conrathe at the time for all the reasons you said. I'm not a clinician. *I haven't worked in this area.* … And I did some reading into the literature, … ."); Tr. 53:6-9 ("Q. So you formed your opinion about puberty blockers in adolescents while you were working on the Bell case? A. Yeah.").

In *Kadel*, a case similar to this one about insurance coverage for gender-affirming medical care, the court excluded a proposed expert (Dr. Lappert) because "[h]e is not a psychiatrist, psychologist, or mental health professional, nor has he

ever diagnosed a patient with gender dysphoria,"[3] and "[h]e is not an endocrinologist, nor has he ever treated a patient with hormone therapies." *Kadel*, 2022 WL 3226731, at *13. Here, Professor Scott, who unlike the excluded expert in *Kadel*, has no medical degree and has never provided medical or mental health care, is likewise "not qualified to render opinions about the diagnosis of gender dysphoria, its possible causes, … the efficacy of puberty blocking medication or hormone treatments, the appropriate standard of informed consent for mental health professionals or endocrinologists, or any opinion on the non-surgical treatments obtained by Plaintiffs." *Id.* Her opinions should be excluded *in toto*.

### C.   Professor Scott's Opinions are Unreliable.

An expert's reliability concerns whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Kilpatrick*, 613 F.3d at 1335. When evaluating whether an expert's methodology is reliable, the Court considers, among other things:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

---

[3] While Dr. Scott has an undergraduate degree where she minored in psychology, she is not certified as psychologist, and admits she's "not clinically qualified." Tr. 35:8-17. In her words, she is "a basic scientist." *Id.*

*Frazier*, 387 F.3d at 1262. The court must undertake an independent analysis of each step in the logic leading to the expert's conclusions, and if any step in the logic is deemed unreliable, the expert's entire opinion must be excluded. *Hendrix v Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009) (citing *McClain v. Metabolife Int'l., Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005)). Likewise, if the expert's opinions are vague or based on "leaps of faith unsupported by good science," then those opinions should be excluded as well. *Id*. at 579; *McDowell v. Brown*, 392 F.3d 1283, 1299, 1301 (11th Cir. 2004) (characterizing the experts' opinions as "too vague" and "more of a guess than a scientific theory."); *Rosen v. Ciba-Geigy Corp*., 78 F.3d 316, 319 (7th Cir. 1996) ([T]he courtroom is not the place for scientific guesswork, even of the inspired sort.").

1. <u>Professor Scott's Opinions Lack Reliability Because They Are Based on Flawed Reasoning or Methodology</u>.

Professor Scott's Report does not provide any basis for her "concern" about puberty delaying medication or her speculations about a teenager's ability to grasp its implications. The reason for this is simple: Professor Scott does not know what the effects of puberty delaying medication are on the brain, and she does not know whether teenagers can fully grasp its implications. She does not know what these implications are herself, and accordingly, all her opinions are hypothetical and unmoored from facts or data.

a. *Puberty Delaying Medication*

Her report is full of statements about the alleged lack of studies pertinent to the effects of puberty delaying medication. Report, ¶ 7 ("My concern is that we do not yet have enough evidence about the best ways to identify the individuals for whom [puberty delaying medication] are appropriate."); Report, ¶ 15 ("All the papers I can find suggest that we need much more data on the long-term brain effects of [puberty delaying medication] when administered around puberty, [and] the effects this can have on behaviour[.]"). Without any evidence (and with no experience or training in the subject), Professor Scott can only guess the effects of these treatments. Report, ¶ 15 ("As puberty is associated with very marked changes in the structure of the brain…the use of puberty blockers *may* have serious consequences for the development of the human brain.") (emphasis added); Report, ¶ 16 ("We need more research to be able to determine the *potential* for puberty blockers to be effective in alleviating some aspects of gender dysphoria[.]") (emphasis added). Guessing is not permitted under Rule 702. *McDowell*, 392 F.3d at 1301 (noting that while an expert may "draw conclusions from existing data," drawing "conclusions where there was no existing data" amounted to a "mere guess" that "fails the tests for expert opinion"); *Magical Farms, Inc. v. Land O'Lakes, Inc*., 2007 WL 4727225, at *2 (N.D. Ohio March 8, 2007) ("Dr. Ames' report is replete with statements like, 'suggest the possibility,' 'may have,' and 'I would be concerned,' all of which fail to rise to the level of a reasonable degree of certainty required by courts.").

To substantiate her untrained guesswork, Professor Scott briefly discusses—in a single paragraph—just five articles related to puberty delaying medication. *See* Report, ¶ 15. Only one of the articles is an original study pertaining to humans, namely, children with precocious puberty (Mul et al., 2001). *See* Report, ¶ 15; Scott Bibliography. Two other articles are not studies themselves, but rather a single commentary piece (Hayes, 2017) and a review of literature (Wojniusz et al., 2016), both pertaining to the treatment of precocious puberty. *See* Report, ¶ 15; Scott Bibliography. Finally, the other two studies pertain to sheep not people. *See* Report, ¶ 15; Scott Bibliography.[4] None of the studies pertain the use of puberty delaying medications for gender dysphoria in adolescents.

Notwithstanding the above, Professor Scott's discussion is nothing more than a recitation of findings from the above papers. She does not say anything about the methodologies behind those studies, whether they have been peer reviewed, or whether or how they are applicable to the context of using puberty delaying medications as treatment of gender dysphoria in adolescents. In fact, she disclaims them away after discussing them, saying "we cannot say if the results are due to direct effects of [puberty delaying medication] on the brain, heart and behaviour, or if they are secondary to this[.]" Report, ¶ 15. Without any qualifications or training in

---

[4] *But see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997) (offering animal studies showing one type of cancer in mice to establish causation of another type of cancer in humans is "simply too great an analytical gap between the data and the opinion offered").

these areas, her use of these articles to support her opinions about puberty delaying medication is completely unreliable and the type of hypothetical guesswork prohibited by Rule 702. *Lebron*, 772 F.3d at 1368 ("Expertise in one field does not qualify a witness to testify about others."); *Dura Automotive*, 285 F.3d at 614 ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

Most disturbingly, however, and demonstrative of her extremely flawed methodology, is the fact that she does not discuss any of the original studies that exist pertaining to the use of puberty delaying medications on transgender adolescents. There are at least three original, peer-reviewed studies that have looked specifically into the effects of puberty delaying medications on brain structure and function in transgender adolescents. *See* Corrected Edmiston Rebuttal Report, at ¶¶ 26, 29 (**Exhibit C**) (discussing Heesewijk et al., 2022; Soleman et al., 2016; Staphorsius et al., 2015). Indeed, none of these have found any significant effects of treatment on the brain. *Id.* Plaintiffs do not refer to these studies to argue the merits, but rather to starkly illustrate the flawed nature of Professor Scott's methodology. How can Professor Scott opine of the effects of puberty delaying medications on transgender adolescents' brains when she does not discuss any of the original, peer-reviewed studies looking at that question? The answer is she cannot.

Simply put, Professor Scott's concern over puberty delaying medication as a

treatment for gender dysphoria stems from her own lack of knowledge.[5] Not only

does she not cite, let alone discuss, the most relevant studies in this area, but

throughout her testimony, she repeatedly used the words "we don't know," when

referring to the effects of puberty delaying medication. Tr. 24:11-14 ("[W]hat

evidence we do have suggests that there are effects on the brain of delaying puberty.

And we don't know what that might mean further down the line. We just don't

know."); Tr. 68:20-21 ("Q. But you can't say here that these puberty blockers have

any harmful effects on the brain? A. But we know that they change the brain and we

don't know that that's not harmful."). Her concern is completely unreliable however

because it ignores what we do know about puberty delaying medication. In other

_____

[5] It could be argued that Professor Scott's opinions really stem not out of just concern
or lack of knowledge, but rather from personal feelings and biases about
transgender people. Professor Scott is an active Twitter user. She often uses this
platform to comment on a wide variety of topics outside her field of expertise,
including transgender issues and treatments for gender dysphoria. In one tweet
about a children's book for transgender youth and their families—that she did not
read—she called the book a "cheap shot" and "reductive" because it "says that girls
who like bugs and wear super hero capes and who don't like pink dresses are in fact
boys." [**Exhibit E**]; Tr. 163:6-10; Tr. 164:12-16 ("Q. The book is about addressing
that issue with your family. You didn't read the book? A. Well, that was – I've just
quoted off the bits I saw. This is – you've asked me why I said it and that's why I
said it."). Her rash comments about a children's book she did not read suggest a
bias against the trans community.

In another tweet, Professor Scott showed disdain for a scholarship application that
allowed applicants to "self-identify" as female. She wrote "Of God" in response to
a tweet about the scholarship application. [**Exhibit F**] While her explanation speaks
for itself, in summary, she believes that the trans community should be sectioned
off from the cis community in what she calls "positive discrimination." Tr. 166:11
– 167:10.

words, her opinion ignores the research we have done on these treatments, none of which shows any significant effects on the brain. *See* Corrected Edmiston Rebuttal Report, ¶¶ 26, 29-30. In sum, Professor Scott's overall discussion about these studies is completely unreliable and should be excluded *in toto*.

>    b.  *Decision-making*

Her concerns about a teenager's ability to grasp the implications of treatment is equally unreliable because the steps in her "analysis" are disconnected. In paragraphs 8-13 of the Report, Professor Scott explains how the brain develops over childhood and adolescence. Then, at paragraph 14, she says this pattern of brain development "*suggests*" that teenagers are prone to risky decision-making more than adults. From there she somehow concludes it is "very possible" that teenagers are unable to "fully grasp the implications of puberty blocking treatment." Report, ¶ 16.

There are several problems with this "analysis." First, her conclusion about teenagers being prone to risky behavior because of brain development is a guess, just like her concerns over puberty delaying medication. She cannot say with any certainty (or authority) that the pattern of brain development during adolescence leads to more risky behavior in teenagers. The same is true for her ultimate opinion about a teenager's ability to grasp the implications of these treatments. She does not cite a single study that supports this opinion. *McDowell*, 392 F.3d at 1301 (drawing "conclusions where there was no existing data" amounted to a "mere guess" that "fails the tests for expert opinion").

14

*Second*, there is a disconnect between the two steps in her analysis. Professor Scott never explains how a tendency toward risky behavior effects a teenager's ability to understand the implications of that behavior. In other words, she never explains how her conclusion about risky behavior leads to her concern over whether teenagers can grasp the implications of puberty delaying treatment. She There is thus a large "analytical gap" in her methodology that renders her ultimate conclusion unreliable. *See Joiner*, 522 U.S. at 146.

For her opinions to be reliable, Professor Scott must have "knowledge," which requires "more than subjective belief or unsupported assumptions." *Daubert*, 509 U.S. at 590. Professor Scott does not have the requisite knowledge for either of her opinions. To assume that her opinions are correct (despite a lack of evidence and experience) would be to rely on her *ipse dixit* based on conjecture to judge the reliability of her conclusion. *See Bowers v Norfolk Southern Corp.*, 537 F.Supp.2d 1343, 1355 (M.D. Ga. 2007) (" The Court cannot rely on [the expert's] *ipse dixit* to judge the reliability of his conclusion[.]").

2.  Professor Scott's Opinions are Vague and Imprecise.

Despite her "concerns" over the "potential effects" of puberty delaying medication, *see* Report, ¶¶ 4, 7, Professor Scott does not believe these treatments should be denied to all teenagers with gender dysphoria. She begins her report by saying it is "entirely possible that the use of puberty blockers is appropriate in some exceptional cases of gender dysphoria in prepubescent and adolescent individuals."

Report, ¶ 7. She repeated that sentiment in her deposition. Tr. 13:10-13 ("I think it's entirely possible that there are people, young people who this is an entirely appropriate course of treatment potentially."). When asked about whether she approves of complete bans pertaining to gender-affirming care, like the Challenged Exclusion in this case, Professor Scott could not give a straight answer. On the one hand, she acknowledged that all-inclusive bans on coverage are a bad idea. Tr. 13:22-23 ("I don't think it's a good idea to ban treatment in a blanket way."; Tr. 14:21-23 ("I think it should be something that's worked out in terms of a scientific and medical approach."). On the other hand, she understood she was offering an opinion in support of one such blanket ban. Tr. 12:21 – 13:8. When asked whether she would vote for or against the Challenged Exclusion in this case, she said she would "abstain like a coward." Tr. 16:17.

Opinions like these are too vague and imprecise to be sufficiently reliable. Professor Scott cannot identify when, or under what circumstances, puberty delaying medication may be appropriate for teenagers. She thus cannot say when the unknown risks of these treatments outweigh their benefits. Where she draws the line is completely unknown, making her opinion vague and imprecise. *See Ward v Carnival Corporation*, 2018 WL 11383459, at *6 (S.D. Fla. July 31, 2018) (excluding expert testimony because it was "unclear precisely what [the expert] was claiming.").

Her opinion about a teenager's decision-making ability is equally imprecise. Professor Scott is not certain whether all teenagers are prone to risky behavior, which

16

is the sole basis for her opinion. Tr. 141:9-19 (Q. Is [riskiness] common for all adolescents?" A. Well, I mean adolescence is very variable like all humans."). Her opinion is also based on research related to decision-making in a "hot context," Report, ¶ 14, which ignores the body of research and peer-reviewed literature on the contextual nature of decision-making in adolescence. Corrected Edmiston Rebuttal Report at ¶ 18 (discussing eleven (11) peer-reviewed papers on the contextual nature of adolescent decision-making). She also omits all literature on decision-making in the medical context and particularly decision-making about treatment of gender dysphoria occurring over several years. These cavernous omissions render her opinion about decision-making in the "hot" context both imprecise and misleading by leaving out the proper context.

   3.  Professor Scott's Opinions are Far Outside the Mainstream

   General acceptance in the relevant scientific community is an important element to the reliability inquiry. See *Allison v. McGahn Medical*, 184 F.3d 1300, 1313 (11th Cir. 1999). Not only is widespread acceptance an important factor in assessing the reliability of an expert's opinions, but the fact that a known theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594. Here, Professor Scott's opinions about the propriety of puberty delaying treatment is far outside the mainstream of medical and scientific opinion. In fact, her views have been explicitly rejected by every relevant scientific and medical community. Professor Scott says she is "slightly

17

worried" about using puberty delaying medication to treat even precocious puberty, the indication for which it was originally developed and for which it is approved by the FDA. Tr. 78:7-8; *see id*. 78:14-18 (expressing concerns about using puberty delaying treatment for any purpose because it is not "necessarily . . . safe" and "the data is not 100 percent clear that it doesn't have an effect" on cognitive function); Tr. 156:19-21 ("[M]y primary concern is about puberty blockers and giving them in adolescents and the risk associated with that."). Professor Scott claims she "doesn't know" whether her "concerns with puberty blockers for precocious puberty [are] shared by the medical community." Tr. 78:19-22. In fact, they are not shared, and indeed, run counter to the opinions of mainstream scientists and clinicians. See Corrected Edmiston Report, ¶ 38; Shumer Rebuttal Report ¶¶ 7, 54, 64 (**Exhibit D**); Dekker P.I. Hrg. Tr., at 29:16- 36:18 [ECF 62] (noting that the majority of major medical associations support gender-affirming care for adolescents and adults); *see also, e.g.*, *Brandt v. Rutledge*, 551 F.Supp.3d 882, 890 (E.D. Ark. 2021) ("The consensus recommendation of medical organizations is that the only effective treatment for individuals at risk of or suffering from gender dysphoria is to provide gender-affirming care [include puberty delaying treatment].") (emphasis added), *aff'd*, 47 F.4th at 671. Because Professor Scott's opinions about puberty delaying treatment are "not generally accepted by the scientific community, and [are] unsupported by other studies" her testimony is unreliable. *Allison*, 184 F.3d at 1319.

18

**D.    Professor Scott's Opinions Will Not Assist the Trier of Fact.**

Expert testimony is helpful to the trier of fact if it explains subjects that are beyond the understanding of the average lay person. *Frazier*, 387 F.3d at 1262. The testimony must offer more than what lawyers can argue in closing arguments. *Id*. Expert testimony is not helpful if it fails to "fit" with the facts of the case. *McDowell*, 392 F.3d at 1299. This happens when a large analytical leap must be made between the facts and the opinion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (offering animal studies showing one type of cancer in mice to establish causation of another type of cancer in humans is considered "too great an analytical gap").

Professor Scott's expert testimony will not assist the trier of fact for several reasons. *First*, her opinion about the ability of teenagers to fully grasp their decision to undergo treatment does not "fit" the facts of the case. She references these decisions as if they were made by the adolescent patient alone, that is, without any advice or assistance from medical professionals or other adults. Report, ¶ 16 ("All the evidence we have suggests that the complex, emotionally charged decisions required to engage with this treatment are not yet acquired as a skill at this age, both in terms of brain maturation and in terms of behaviour."). But the reality is that all decisions about whether to administer gender-affirming care are made by a group of individuals including the patient's family and healthcare providers. And, for individuals under 18, these decisions are ultimately made by the patient's parent or legal guardian. Professor Scott acknowledged this point in her deposition. Tr. 146:5-

10 (Q. But we're not talking about teenagers deciding about gender-affirming care themselves in this case, right? A. No. I understand that this would be something where the consent is not with the teenager."). Accordingly, her opinion on teenager decision-making is irrelevant to the facts of the case. *See Kadel*, 2022 WL 3226731, at *14 (excluding Dr. Lappert's opinion on informed consent in the context of gender dysphoria because the patient's father gave consent).

   *Second*, this same opinion is well within the understanding of the average lay person, and it is certainly something counsel can argue in closing. Professor Scott concedes this point in her report when she describes the following as a "lay understanding of what neuroscience is now confirming." She says: "teenage brains on the whole are structurally and functionally different from adult brains, and this affects both their engaging with risky behaviour, and their understanding of the implications of risky behaviour." Report, ¶ 8. She confirmed the same in her deposition. Tr. 143:7-11 ("Q. Do you need to be an expert in neuroscience to understand that teenagers on the whole engage in risky behavior? A. No. Like I said in my report, it's something that all cultures recognize."). Since there already exists a "lay understanding" of her opinion about teenage behavior that "all cultures recognize," her opinion will not assist the trier of fact in this case. It is well-established that untestable "common sense" does not satisfy Rule 702's requirements. *See Fedor v. Freightliner, Inc.*, 193 F.Supp.2d 820, 832 (E.D. Pa. 2002) ("Generalized common sense does not rise to the level of expert opinion solely

20

because it is offered by someone with an academic pedigree.").

*Third*, her opinion about the unknown effects of puberty delaying medication is also within the understanding of the average person. The Court does not need an expert to explain the things we do not know. These can easily be explained in closing argument. *See Frazier*, 387 F.3d at 1262 ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.").

*Fourth*, as noted above, her opinion about puberty delaying medication is based in part on animal studies without any connection to the treatment of gender dysphoria in humans. Report, ¶ 15; Tr. 71:11-15. Professor Scott does not even attempt to link these animal studies to humans, and as a result, such studies do not offer any support for her conclusions about the human brain. Therefore, they do not assist the trier of fact. *Joiner*, 522 U.S. at 146; *Kilpatrick*, 613 F.3d at 1338.

## CONCLUSION

WHEREFORE, based on the foregoing, Plaintiffs respectfully request that the Court grant the instant Motion and exclude Professor Scott's expert report, opinions and testimony in their entirety under *Daubert* and the Federal Rules of Evidence.

\*     \*     \*

Respectfully submitted this 7th day of April, 2023.

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

By: */s/ Jennifer Altman*
**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsburylaw.com
shani.rivaux@pillsburylaw.com

**William C. Miller**\*
**Gary J. Shaw**\*
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Joe Little**\*
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle**\*
3701 Wilshire Boulevard, Suite 315 Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**\*
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan**\*
120 Wall Street, 19th Floor New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**\*
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

\* *Admitted pro hac vice.*

## CERTIFICATE OF WORD COUNT

According to Microsoft Word, the word-processing system used to prepare this Motion and Memorandum, there is a combined total of 5,455 words in the Motion and the Memorandum of Law.

/s/ Gary J. Shaw
_____
Gary J. Shaw

## CERTIFICATE OF SATISFACTION OF
## ATTORNEY-CONFERENCE REQUIREMENT

Pursuant to Local Rule 7.1(B), counsel for the Plaintiffs conferred with counsel for the Defendants on April 5, 2023. Counsel for Defendants indicated that same day that Defendants oppose the relief sought.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by email on April 7, 2023, on all counsel of record:

Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
HOLTZMAN VOGEL BARANTORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301

**COUNSEL FOR DEFENDANTS**

/s/ Gary J. Shaw
_____
**ATTORNEY FOR PLAINTIFFS**

23