IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                            Case No. 4:22-cv-00325-RH-MAF

JASON WEIDA, et al.,

     Defendants.

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

Defendants Secretary Weida and the Florida Agency for Health Care Administration (individually, "AHCA," and collectively with Secretary Weida, the "State") move for summary judgment under Federal Rule of Civil Procedure 56 and Local Rule 56.1 on all four counts in Plaintiffs' complaint. *See* Doc.1.

For the reasons stated in the memorandum that follows, the State asks this Court to grant its motion. An index to the exhibits that the State references in its motion are included on pages 37 to 39.

Dated: April 7, 2023

Respectfully submitted by:

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Gary V. Perko (FBN 855898)
gperko@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
Holtzman Vogel Baran
Torchinsky & Josefiak PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2023, I electronically filed the foregoing with the

Clerk of Court by using CM/ECF, which automatically serves all counsel of record for

the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## INTRODUCTION

"[B]ased on current medical opinion," Florida's "determination" that certain treatments for gender dysphoria are "experimental is reasonable." *Rush v. Parham*, 625 F.2d 1150, 1157 n.13 (5th Cir. 1980). Since the preliminary-injunction hearing in this case, Norway has joined the growing list of countries that have found the support for "hormonal and surgical" treatments to be "insufficient," and their "long-term effects" to be "little known." Exhibit 1 (Norway Healthcare Investigation Board report). If Florida is wrong, then so too are Norway, Finland, Sweden, the United Kingdom, France, Australia, and New Zealand.

The expert reports appended to this summary judgment further support the State's position that the use of puberty blockers, cross-sex hormones, and surgeries for the treatment of gender dysphoria is experimental. Among others:

- **Dr. Stephen Levine**, a psychiatrist from Case Western Reserve University and an early proponent of gender-affirming care, provides a comprehensive discussion of the literature and the need for caution in administering the excluded treatments. Exhibit 12.
- **Dr. Paul Hruz**, a researcher and clinician at Washington University School of Medicine, does the same from the perspective of an endocrinologist. Exhibit 13.
- **Dr. Sophie Scott**, a neuroscientist from the United Kingdom, explains that the effects of certain chemicals on the human brain simply aren't well known; the first step in the road to surgical transition (the use of puberty blockers) is experimental. Exhibit 18.
- And, of course, the State's rulemaking process included a report from **Dr. Brignardello-Petersen**, a researcher who specializes in conducting systematic reviews of academic literature. Having never published on the issue of gender dysphoria, she took a fresh look

and found the literature supporting the excluded treatments to be based on low-quality evidence. Doc.49-1 at 59.

By contrast, Plaintiffs and their experts cite WPATH's standards of care and the Endocrine Society's guidelines as the measuring stick for current medical opinion. Though WPATH and the Endocrine Society have resisted the State's discovery efforts to seek information concerning the guidelines and standards, their guidelines and standards acknowledge the problems with the excluded treatments: limited empirical data, lack of long-term studies, likelihood of adverse health effects, and reliance on low-quality evidence. Plaintiffs' experts use sleight of hand to address these problems: Dr. Antommaria, for example, suggests that low-quality evidence means something other than what it says. Plaintiffs' experts also attempt to make WPATH (whose members worked on the Endocrine Society guidelines) into the preeminent medical organization on the issue. WPATH acknowledges, however, that it's an advocacy organization where non-medical experts can work on the standards.

Under the circumstances, there isn't enough to create a genuine issue of material fact concerning the controlling question in this case: the reasonableness of the State's determination. At best, Plaintiffs' experts present their preferred approach to treating gender dysphoria, which includes the use of experimental treatments. Yet that doesn't establish that the State's reticence is unreasonable.

It follows that Plaintiffs can't succeed on their *Rush*-related Medicaid claims (Count III and IV). Section 1983 also doesn't create a mechanism to enforce Medicaid

claims. Nor can Plaintiffs succeed under the Equal Protection Clause (Count I) or the Affordable Care Act's anti-discrimination provision (Count II). That's because the State's health, safety, and welfare enactments are entitled to a "strong presumption of validity." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2282 (2022). Plaintiffs can't overcome the presumption by stacking low-quality scientific evidence on itself. To allow them to do so would confuse impassioned advocacy with dispassionate science and replace State-prescribed caution with private preference.

## STATEMENT OF THE CASE & FACTS

*Rush* explains that it's "a simple matter of logic that the district court's determination should be based on current medical knowledge, regardless of the prevailing knowledge at the time [that the State issued its GAPMS Report or Rule 59G-1.050(7)]." 625 F.2d at 1157 n.13. Still, for the sake of completeness, it's important to trace (1) the steps leading up to the State's decision to exclude reimbursement for certain treatments for one psychiatric condition, (2) the litigation that has ensued, and (3) the state of current medical opinion.

### I.     The Federal Government's Stance

The State's assessment of the excluded treatments for gender dysphoria was a response to the federal government's actions. On March 2, 2022, the U.S. Department for Health and Human Services issued a notice and guidance on care. Exhibit 2 (HHS notice and guidance). HHS stated that it "stands with transgender and gender nonconforming youth and their families—and the significant majority of expert medical

associations—in unequivocally stating that gender affirming care for minors, when medically appropriate and necessary, improves their physical and mental health." *Id.* HHS followed the notice and guidance with a department-issued factsheet that touted the benefits of hormone therapy and surgeries as effective treatments for minors with gender dysphoria. Exhibit 3 (HHS fact sheet). Little scientific support was included. The Department of Justice then threatened states that limited access to such treatments. Exhibit 4 (DOJ letter).

The federal government's 2022 position was an apparent departure from its prior position. In 2016, the Centers for Medicare and Medicaid Services declined to make a determination "on gender reassignment surgery for Medicaid beneficiaries with gender dysphoria because the clinical evidence is inconclusive for the Medicare population." Exhibit 5 at 1 (CMS memo). It reached that decision "[b]ased on an extensive assessment of the clinical evidence," concluding "there is not enough high-quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively." *Id.* at 48. That 2016 determination memorandum has never been superseded by another.

In 2020, HHS declined to "take a definitive view on any of the medical questions raised" "about treatments for gender dysphoria" due to the "lack of high-quality scientific evidence supporting" treatments for gender dysphoria like "sex-reassignment surgeries" and to the reliance on "*advocacy group* (WPATH) rather than on independent

scientific fact-finding." Nondiscrimination in Health & Health Education Programs or Activities, 85 Fed. Reg. 37,160, 37,186-87 (Jun. 19, 2020) (emphasis added). And, as recently as May of 2022, the National Institutes of Health's acting director told the U.S. Senate that the long-term effects of puberty blockers for gender transition are unclear, and that the institutes have only funded *observational* studies in the area. *See* A Review of the President's FY 2023 Funding Request and Budget Justification for the National Institutes of Health, Sen. Comm. on Appropriations (May 17, 2022), https://bit.ly/3QTkaJD (1:12:49–1:14:55).

## II.      The State's Need to Assess the Science

Against this backdrop, the State decided to assess for itself whether the federal government's new position, which contradicts the still-operative 2016 CMS determination, was "actually[,] sufficiently supported" by quality science. Exhibit 6 (91:20–92:4) (Brackett February 8 deposition). The Florida Department of Health and AHCA were tasked with conducting an independent, evidence-based review of the treatments for gender dysphoria. *Id.* (90:5-11–91:1) (AHCA was tasked to "take a" "detailed look at the available medical evidence, or at least the peer-reviewed literature, and to see what it says.").

The Florida DOH acted first. On April 20, 2022, it released a factsheet in response to HHS's factsheet. Notably, the Florida DOH concluded that minors "should not be prescribed puberty blockers or hormone therapy" and that "reassignment surgery should not be a treatment option for children or adolescents."

Exhibit 7 (FDOH fact sheet). The Florida DOH based this conclusion on the "low-quality evidence" supporting gender-affirming care and the international consensus on this issue. *Id.*; *see also* Exhibit 6 (91:2-11).

Referencing the Florida DOH factsheet, AHCA's then-Secretary Marstiller directed Deputy Secretary Wallace to begin the GAPMS process to assess whether the State should reimburse under Medicaid certain treatments for gender dysphoria. *See* Exhibit 8. No one "instruct[ed] AHCA to ensure that Florida Medicaid would not cover treatment for gender dysphoria." Exhibit 6 (90:12-16). This was to be an independent review, and it was to be a GAPMS review, which "provides the best opportunity to go through" medical "literature on a large scale and to make a conclusion" on whether a treatment is clinically unproven or experimental. *Id.* (93:3-12); *see also* Fla. R. Admin. 59G-1.035 (GAPMS Rule adopted in 2015); Fla. Stat. § 409.905(9) (barring payment for services that are "clinically unproven" or "experimental").

Ann Dalton, the AHCA Bureau Chief of Medicaid Policy, recommended that Matt Brackett draft the GAPMS Report. Exhibit 9 (84:2-4, 85:22-15, 86:8-25) (Dalton deposition). She also recommended that two other employees, Devona Pickle, an AHCA program director, and Nai Chen, a pharmacist, assist Mr. Brackett. *Id.* (84:2-4, 86:8-25); Exhibit 6 (96:11-15).

According to Ms. Dalton, Mr. Brackett would be a good drafter, because he "worked with the bureau a long time and previously had the position" "primarily responsible for GAPMS." Exhibit 9 (84:11-23). She called his GAPMS-related

knowledge "extensive." *Id.* (86:15-25). Ms. Dalton also stated that Ms. Pickle had "been with the bureau and agency a very long time," *id.* (84:12-23), and that she previously worked "very closely" with Mr. Brackett and Ms. Pickle, *id.* (86:15-25). Ms. Dalton admitted that she hadn't worked with Mr. Chen as much as other members of the team, but she knew all three to have been part of the Canadian Prescription Drug Importation Program, a multifaceted and important policy initiative. *Id.* (25:6–26:2, 27:18–28:6, 83:19–85:15); *see also* Exhibit 10 (program press release). While the three were busy with this drug-importation program in 2021, by 2022, they had more "bandwidth" to devote to another important policy like the gender dysphoria GAPMS. Exhibit 9 (84:11–85:6).

## III.     Drafting the GAPMS Report

Ms. Dalton's staffing recommendations were approved, and work began on the GAPMS Report on April 20, 2022. *Id.* (157:22-24). Mr. Brackett drafted the GAPMS Report, with Ms. Pickle and Mr. Chen providing secondary assistance. *Id.* (96:11-15).

"When" Mr. Brackett "started working on [the GAPMS Report]," he "did not know where the evidence would take" him. *Id.* (115:13-17). He read and assessed all eighty-eight articles ultimately cited in the GAPMS Report. *Id.* (158:8-13). "[T]he more and more" he "read the articles that focused on the mental health benefits, the methods and so forth" of hormone therapies and surgeries, "the more" he "realized that all those articles left way too many unanswered questions." *Id.* (115:18–116:3).

Among the questions was a lack of available material on the "long-term" consequences of the excluded treatments. *Id.* (117:1-20). Another was the reliance on

"anonymous surveys" and "whether or not these responses [on the surveys] are credible," especially without "longitudinal history of the[] individuals." *Id.* Even if studies weren't anonymous, Mr. Brackett noted that they often had "sample sizes" that "were very, very small" or made observations over only a "one- or two-year period[]." *Id.* There were still more questions about the "potential causes and associations with gender dysphoria" like "autism, trauma, neglect, abuse, abandonment," and other comorbidities. *Id.*

Mr. Brackett also read materials from organizations, such as WPATH and various medical organizations. *Id.* (117:21–120:7). He gave this material due weight: "their conclusions required thoughtful analysis and probing of the evidence" because AHCA "take[s] the recommendations of clinical organizations very seriously." *Id.* (118:12-19). "[B]ut," Mr. Brackett added, "we also do reserve the right to question those recommendations and we did review those and we did analyze them." *Id.* After reviewing the organizations' recommendations, Mr. Brackett concluded that "very weak evidence" backed their support for gender-affirming care. *Id.* (118:20–120:7).

In addition, AHCA hired Dr. Grossman and Dr. Van Mol to assist Mr. Brackett. Outside consultants aren't usually hired for GAPMS reports, but AHCA hires them for other tasks. *Id.* (104:6-10, 137:10-17) (providing examples). The doctors didn't write or draft any section of the GAPMS Report; that task was Mr. Brackett's alone. *Id.* (98:10-21). They provided Mr. Brackett verbal feedback and research leads as he worked through the materials recommended by organizations such as WPATH. *Id.* (98:3-21,

104:6-20, 109:3-23, 145:17–146:5). Mr. Brackett spoke with the doctors approximately four or five times for a handful of hours. *Id.* (158:17–159:5).

At the same time Mr. Brackett was drafting the GAPMS Report, AHCA asked medical professionals to provide additional perspective, such as a review of the evidence supporting the excluded treatments. *Id.* (131:1–132:19). The experts were Dr. Romina Brignardello-Petersen, Dr. James Cantor, Dr. Quentin Van Meter, Dr. Patrick Lappert, and Dr. G. Kevin Donovan. *See* Doc.49-1 at 5-245.

AHCA didn't make substantive edits to the experts' reports; at most, style and grammar edits were made. Exhibit 6 (145:4-16). There was a possibility that the experts "disagreed with one another" or disagreed with the GAPMS Report, especially if Mr. Brackett had reached "a different conclusion." *Id.* (165:8-21).

This was especially true of Dr. Brignardello-Petersen's work. She's a Canadian researcher with a Ph.D. in clinical epidemiology and health care research, who conducted a systematic review of relevant medical studies through April 2022. Doc.49-1 at 59. That review could have cut against Mr. Brackett's review of the literature. But after reviewing "the best available evidence regarding the effects of" gender-dysphoria treatments, she "found low and very low certainty evidence suggesting improvements in gender dysphoria, depression, anxiety, and quality of life." Doc.49-1 at 62.

With a near-final draft ready in mid-May, AHCA finalized the GAPMS Report on June 2, 2022. Exhibit 6 (84:19-21, 146:20-25). Expert reports from Dr. Brignardello-Petersen and others were attached. Doc.49-1 at 5-245.

11

## IV.     Adopting Rule 59G-1.050(7) for the Exclusions

Florida's Administrative Procedures Act requires that "each agency statement of general applicability that implements, interprets, or prescribes law or policy" be "adopted pursuant to the requirements of s. 120.54." Fla. Stat. § 120.52(16), (20). AHCA thus initiated the rulemaking process to exclude puberty blockers, cross-sex hormones, and gender-reassignment surgeries as treatments for gender dysphoria. *See* Exhibit 6 (164:23–165:7).

AHCA issued a notice of proposed rulemaking on June 2. *Id.* (165:22–166:4). Rulemaking can "move very quickly," and because the GAPMS Report was completed (and DOJ had threatened litigation), the process moved along. *Id.* (170:4–171:5).

AHCA solicited public comments as part of the process. It received around 600 comments, and the agency read every one. *Id.* (189:12-16). Many attacked the agency rather than its position, *id.* (192:14-21), but the agency thoroughly considered comments from medical organizations and clinicians who took issue with the substance of the agency's position, *id.* (192:22–193:12). Cases and studies identified in the comments were also reviewed. *Id.* (194:1-16). In particular, the agency searched for new evidence that could "mortal[ly] wound" the GAPMS Report, and therefore the proposed rule, and looked for "contradictory evidence" or "modern, high-quality evidence" that supported the use of the excluded treatments. *Id.* (197:20–198:17). As Mr. Brackett put it, "we want[ed] to make sure that we had not left any stones unturned." *Id.*

AHCA also held a public rulemaking hearing on July 8, 2022. There the agency heard impassioned public testimony from all sides of the issue, Doc.49-2 at 82 ¶¶ 24-25, and AHCA employees Jason Weida, Shena Grantham, and Mr. Brackett, served as panelists. Exhibit 6 (176:13-25). Dr. Van Mol, Dr. Grossman, and Dr. Van Meter also served as panelists for good measure, *id.* (128:18-25), because at this point, the State's position on the excluded treatments expressly conflicted with the federal government's position. The State finalized Rule 59G-1.050(7), and it became effective August 21.

Of course, as with all rules, case-by-case variances and waivers are available. *See* Fla. Stat. § 120.542; Fla. Admin. Rules 28-104.001 – 28-104.006. "Variances and waivers *shall* be granted when the person subject to [a] rule demonstrates that the purpose of the underlying statute will be or has been achieved by other means by the person" and when "substantial hardship" or violation of "principles of fairness" are shown. Fla. Stat. § 120.542(2) (emphasis added). "The agency's decision to grant or deny the petition shall be supported by competent substantial evidence," and that decision is subject to a de novo hearing before an administrative law judge, who is then responsible for the fact-finding in the matter. *Id.* § 120.542(8) (referencing hearings under §§ 120.569 and 120.57). To date, AHCA has yet to receive a request for a variance or waiver from its generally applicable rule excluding certain treatments for gender dysphoria; no one has yet said that the excluded treatments are *not* experimental as to a particular set of circumstances unique to the requestor.

## V.        The Litigation Begins (and Continues in Other Courts)

Plaintiffs filed their complaint on September 7, 2022. Doc.1. They moved for a preliminary injunction on September 12, 2022. Doc.11. This Court held a hearing on the motion on October 12, 2022, Doc.61, and then denied the motion. Doc.64.

In the order denying the preliminary injunction motion, based on *Rush*, this Court stated that the "controlling" "question" in this case is "whether, based on current medical knowledge, the state's determination that [the excluded] treatments are experimental is reasonable." Doc.64 at 4. In its colloquy with counsel during the preliminary injunction hearing, and again consistent with *Rush*, this Court said that the *Rush*-related review is "not an administrative review of what the State knew at the time" about current medical opinion. Exhibit 11 (hearing transcript).

To assess the current state of medical opinion, on November 8, 2022, the State served subpoenas for depositions and documents on WPATH, the Endocrine Society, and the American Academy of Pediatrics. *E.g.*, *In re Subpoenas Served on Am. Acad. of Pediatrics, et al.*, No. 23-MC-00004 (D.D.C. 2023) (herein "D.C.Doc.") D.C.Doc.1-4. Days later, the State served document subpoenas on fifteen medical organizations that track WPATH and Endocrine Society's perspective. D.C.Doc.1-19.

The eighteen organizations moved the D.C. District Court to quash the subpoenas on First Amendment grounds. D.C.Doc.1. On January 26, 2023, the district court agreed that the State should be entitled to assess whether these organizations represent the so-called medical consensus. Among other things, the court required the

production of documents "sufficient to show how" each organization established its position on treatments for gender dysphoria. D.C.Doc.18. The court held the deposition requests in abeyance.

On February 9, 2023, the eighteen organizations produced a total of 387 documents. Six produced less than five documents each. None adequately responded to the question of *how* they established their guidelines or policy positions.

This response prompted another hearing. After the February 27, 2023 hearing, the court held that the *how* included "the process" used to adopt any "guidelines or policy positions" and "the substantive materials and opinions" "considered." D.C.Doc.26. The latter category covered documents "sufficient to show" "why a particular study was relied upon or rejected," and "whether any dissenting views" were "acknowledged," "considered," and "why such views were rejected." *Id.* The court also ordered WPATH, the Endocrine Society, and the American Academy of Pediatrics to sit for limited depositions. *Id.*

The D.C. Circuit stayed the district court's order on the evening of March 8, 2023. *See In re Subpoenas Served on Am. Acad. of Pediatrics, et al.*, No. 23-7025 (D.C. Cir. Mar. 8, 2023). It did so without explanation and hours before the depositions were to begin. The medical organizations' appeal remains pending. And this discovery dispute serves as the basis of the separate motion in limine filed before this Court.

## VI.     The Experimental Nature of the Excluded Treatments

The continued reluctance of the organizations to share how they crafted their

preferred treatment protocols is significant, especially when Plaintiffs and their experts rely extensively on the WPATH standards of care and the Endocrine Society's guidelines. That said, the experimental nature of the excluded treatments is clear from the material that's available. Before discussing the material, however, a brief discussion of gender dysphoria is provided.

## A. Gender dysphoria and the State's Choices

Gender dysphoria is the distressing incongruence between an individual's *biological sex* and *gender identity*. Exhibit 12 ¶ 28 (Levine report); Exhibit 13 ¶ 54 (Hruz report). Biological sex is "determined at conception" at the chromosomal level, and it "structures [an] individual's biological reproductive capabilities." Exhibit 12 ¶¶ 20-21; *see also* Exhibit 13 ¶¶ 13-18. While sex is biologically based, gender "is a human phenomenon." Exhibit 12 ¶ 22 (quoting Endocrine Society). Gender is the traits society associates with biological males and biological females. *Id.* ¶¶ 19-27 (quoting Endocrine Society); Exhibit 13 ¶ 19. Gender identity is an individual's subjective sense of his or her gender. Exhibit 12 ¶¶ 24-27; Exhibit 13 ¶ 20. Unlike sex, gender identity is mutable. *See* Exhibit 13 ¶ 58; Exhibit 14 at 43 (WPATH standards of care) ("[P]eople may spend some time in a gender identity or presentation before they discover it does not feel comfortable and later adapt it or shift to an earlier identity or representation.").

Gender dysphoria is a psychiatric diagnosis. Exhibit 12 ¶ 36. There are no laboratory tests, imaging, or biopsies that can help establish a diagnosis. Exhibit 13 ¶¶ 57-58; *see also* Exhibit 15 ¶ 24 (Laidlaw redacted report).

For those with gender dysphoria, however, behavioral health services can help. *See, e.g.*, Exhibit 12 ¶¶ 42-49; Exhibit 16 ¶ 136 (Kaliebe report). Florida continues reimbursing for these services. Doc.49-2 at 84 ¶ 28 (providing list). But, unlike behavioral services, surgeries, puberty blockers, and cross-sex hormones alter primary and secondary sex characteristics. They come with risks and their efficacy is suspect.

Drs. Hruz, Laidlaw, and Van Meter all discuss the concerns associated with puberty blockers and cross-sex hormones. Exhibit 13 ¶¶ 67-87; Exhibit 15 ¶¶ 66-40, ¶¶ 149-58; Exhibit 17 ¶ 20 (Van Meter rebuttal report). Dr. Hruz explains that puberty blockers suppress natural puberty. Exhibit 13 ¶¶ 67-68. But he cautions that after "an extended period of pubertal suppression," you can't "turn back the clock" and "reverse changes in the normal coordinated pattern of adolescent psychological development and puberty." *Id.* ¶ 75. Evidence to the contrary is "very weak." *Id.* ¶ 78. Puberty blockers and cross-sex hormones also come with a laundry list of potential health consequences, including issues with bone density, fertility, cancer, and brain maturation. *Id.* ¶¶67-87.

Dr. Scott provides a neuroscientist's perspective on puberty blockers, which are the first step on the road to physical transition. She explains that the current science doesn't support puberty-blocking treatments for minors and that such science is needed, given the "considerable changes" that are happening to brain development during and after puberty. Exhibit 18 ¶¶ 12-13 (Scott report). She states that "more research" is needed to justify this treatment. *Id.* ¶ 16. Current studies suggest that

puberty blockers could lead to negative (and perhaps "irreversible") effects: lower IQ scores, lower heart rates, greater emotional reactivity, higher anxiety, greater avoidance behavior, and more risk-taking behavior. *Id.* ¶ 15.

Dr. Lappert, a plastic surgeon, worries that surgical treatments to cut healthy tissue are firmly in the realm of cosmetic surgeries. Exhibit 19 ¶¶ 47-50 (Lappert report). These treatments introduce the prospect of complications and pose ethical concerns because, unlike other cosmetic procedures, the goal is to induce "functional loss" of the breasts and genitalia. *Id.* ¶¶ 47-50.

There are also mental-health consequences to hormone therapies and surgeries. Dr. Levine, a psychiatrist, comments that "[g]ender transition routinely leads to isolation from at least a significant portion of one's family in adulthood" and can impact future romantic relationships. Exhibit 12 ¶¶ 198-99. That can negatively affect mental health. Dr. Levine also responds to claims of *positive* mental health outcomes and *lower* suicidality after hormone therapies: many of those claims are simply backed by low-quality evidence. *Id.* ¶¶ 134-73. And Dr. Levine notes that those with gender dysphoria likely have mental health comorbidities—anxiety disorders, ADHD, autism spectrum disorder, OCD, for example. *Id.* ¶¶ 43, 134. As such, it remains unclear whether hormone therapies and surgeries will resolve underlying mental-health concerns.

### B. *Plaintiffs' Reliance on WPATH and the Endocrine Society*

**1.** In disagreeing with the State, Plaintiffs and their experts rely almost exclusively on WPATH's standards of care, Exhibit 14, and the Endocrine Society's clinical

practice guideline, Exhibit 20 (Endocrine Society guidelines). Dr. Olson-Kennedy claims that the WPATH standards of care are "the best available science and expert professional consensus" on treatments for gender dysphoria. Exhibit 21 ¶¶ 10-11, 47 (Olson-Kennedy report). Dr. Shumer states that as "a board-certified pediatric endocrinologist, [he] follow[s] the Endocrine Society Clinical Practice Guidelines and the WPATH Standards of Care when treating [his] patients." Exhibit 22 ¶¶ 38, 48-56 (Shumer report). Plaintiffs' other experts also rely on WPATH and the Endocrine Society. *E.g.*, Exhibit 23 ¶¶ 9, 31 (Baker report); Exhibit 24 ¶¶ 17-23 (Antommaria report); Exhibit 25 ¶¶ 27, 34 (Karasic report); Exhibit 26 ¶¶ 8, 24, 26, 50-51 (Schechter report). That's not surprising because most of the Plaintiffs' experts are members of or are linked to WPATH. Exhibit 26 ¶ 7 (co-lead author of standards-of-care chapter); Exhibit 25 ¶¶ 8-9 (lead author of standards-of-care chapter and former board member); Exhibit 21 ¶ 11 (member); Exhibit 27 ¶ 13 (Edmiston rebuttal report) (contributing author of standards-of-care chapter and former member); Exhibit 28 ¶ 11 (Janssen rebuttal report) ("member of revision committees" for standards-of-care chapters).

The feedback loop between medical professionals and these two organizations is problematic. That's especially so when other organizations (like the American Medical Association) simply adopt WPATH and the Endocrine Society's perspective as their own, *e.g.*, Exhibit 22 ¶ 55, and when those organizations refuse to reveal the bases of their standards in response to discovery requests.

19

**2.** Specifically, WPATH acknowledges that it's an *advocacy* organization focused on transgender health care. Exhibit 14 at 7. Its method of revising the standards of care exacerbates the potential for bias. *First*, both medical professionals *and* non-medical professionals are responsible for revisions. *Id.* at 250; Exhibit 29 (WPATH standards-of-care-revision team criteria). *Second*, for medical professionals to contribute, they must be "[l]ongstanding WPATH Full Member[s] in good standing," "[w]ell recognized advocate[s] for WPATH and the [standards of care]," and "[w]ell known expert[s] in transgender health." Exhibit 29.

In other words, the "best available science and expert professional consensus" on medical treatments for gender dysphoria, Exhibit 21 ¶ 10, comes from a self-selecting group of members of one organization, who are noted advocates for the organization, who all strive to preserve the conclusions reached in previous standards of care, and who may not be medical professionals. Exhibit 14 at 7; Exhibit 29. Dr. Levine calls this an "echo-chamber" that can't "claim[] to speak for the medical profession." Exhibit 12 ¶¶ 53, 71. And Dr. Levine is no transgender-skeptic. He's a medical professional who has "recommended or supported social transition, cross-sex hormones, and surgery for particular patients" with gender dysphoria and was himself a former high-ranking member of WPATH's predecessor organization, the Harry Benjamin International Gender Dysphoria Association. *Id.* ¶¶ 5, 6, 66.

Federal courts also recognize that WPATH's standards don't reflect the medical consensus on the issue. *See, e.g., Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019) (The

"WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate over sex reassignment surgery"); *Kosilek v. Spencer*, 774 F.3d 63, 88 (1st Cir. 2014) (en banc) ("Prudent medical professionals" "reasonably differ in their opinions regarding [WPATH's] requirements.").

WPATH is clearly critical of Florida's decision to exclude reimbursement for certain gender dysphoria treatments. It has also been critical of the federal government and other countries like Japan and the United Kingdom. And WPATH took issue with the *New York Times*'s coverage of the treatments for gender dysphoria. *See* Exhibit 31 (WPATH press release); Exhibit 32 (same); Exhibit 33 (WPATH letter to Japanese officials); Exhibit 34 (WPATH press release); Exhibit 35 (same).

**3.** Bias and advocacy aside, WPATH's standards must concede that the excluded treatments don't rest on a solid scientific foundation *and* that the treatments pose the potential for negative and irreversible consequences. For instance, Chapter 5's Assessment for Adults states:

- The "empirical evidence base for the assessment of" transgender and gender diverse adults "is limited." Exhibit 14 at 34-35.
- "Each gender-affirming surgical intervention has specific risks and potentially unfavorable consequences," including "loss of fertility." *Id.* at 40, 43.
- "Gender-affirming hormone treatments have been shown to impact reproductive functions and fertility, although the consequences are heterogenous for people of all birth-assigned sexes." *Id.* at 41.

**4.** Like WPATH's standards of care, the Endocrine Society can't speak for the medical community either. In 2017, an Endocrine-Society-appointed panel created its clinical practice guidelines for treating gender dysphoria. Exhibit 20. The guidelines were co-sponsored by WPATH. *Id.* at 1. The panelists responsible for the guidelines had ties to WPATH. Exhibit 13 ¶ 95.

The guidelines themselves used the Grading of Recommendations Assessment, Development and Evaluation or GRADE approach—the same methodology utilized by Dr. Brignardello-Petersen. Exhibit 30 at 12-13 (GRADE handbook); 49-1 at 60. GRADE rates the evidence quality for a treatment recommendation: evidence is either high, moderate, low, or very-low quality. Exhibit 30 at 12-13; Exhibit 24 ¶ 19. With higher-quality evidence comes more confidence that treatments will produce the intended result. Exhibit 30 at 13. With low-quality evidence, or even very-low-quality evidence, such confidence is either "limited" or "little." *Id.* Evidence can be of lower quality based on an underlying study's risk of bias, limitations in study design, inconsistency of results, or imprecision and indirectness of evidence. *Id.*

Plaintiffs' expert, Dr. Antommaria, concedes that of the twenty-eight recommendations in the Endocrine Society's guideline, three are backed by moderate-quality evidence, fourteen are backed by low-quality evidence, five are backed by very-low-quality evidence, and six are backed by no evidence at all. Exhibit 24 ¶ 23; Exhibit 20 at 2-8; Exhibit 30 at 40. Notably:

- Low-quality evidence backs the following: "[w]e suggest that clinicians begin pubertal hormone suppression after girls and boys first exhibit physical changes of puberty." Exhibit 20 at 3.
- Very-low-quality evidence backs the recommendation that "there may be compelling reasons to initiate sex hormone treatment prior to the age of 16 years," "*even though there are minimal published studies of gender-affirming hormone treatments administered before age 13.5 to 14 years.*" *Id.* (emphasis added).
- And the recommendation that "clinicians approve genital gender-affirming surgery only after completion of at least 1 year of consistent and compliant hormone treatment" is backed by no evidence at all. *Id.* at 4 (ungraded good practice statement).

These recommendations thus support the State's conclusion concerning the quality of the evidence supporting the excluded treatments.

Dr. Antommaria responds that treatment recommendations, especially for children, are "infrequently based" on high-quality evidence. Exhibit 24 ¶ 23. Among other things, he cites obesity recommendations for children. *Id.* But recommendations for obesity and other ailments are qualitatively different from those for gender dysphoria; the latter includes treatments with permanent, potentially negative consequences while the former advises that kids eat better and exercise.

## C. Policy Choices Concerning Acceptable Risk

To be sure, there's agreement among the experts that the excluded treatments can have permanent, potentially negative, health consequences. Dr. Olson-Kennedy admits, for example, that "deepening of the voice" and "breast tissue development" are "irreversible" consequences of hormone therapy. Exhibit 21 ¶ 32**.** Dr. Shumer mentions potential fertility issues with hormone therapy. Exhibit 22 ¶ 81. Dr. Edmiston

agrees with Dr. Scott that "[t]here is not a large literature on the effects of GnRHa treatment on the brain in humans," and that "[t]here is a small body of literature on the effects of gender-affirming hormone care on the brain in transgender adolescents." Exhibit 27 ¶¶ 29, 31.  And some of WPATH's concessions are noted above.

What's left then is a dispute about the magnitude of potential harm and tolerable risk limits. On these policy issues, the State of Florida remains firmly tethered to the international consensus.

Finland's National Science Review concluded that "[i]n light of available evidence, gender reassignment of minors is an experimental practice." Exhibit 13 ¶ 124. Finland reached this conclusion after noting that "there are no medical treatments (for transitioning) that can be considered evidence-based" and that the "reliability of the existing studies with no control groups is highly uncertain," especially considering the potential "risks" of such treatments, such as bone-growth and neurological issues. *Id.*

Sweden reached a similar conclusion. Its board of health said that "the risks of puberty blockers and gender-affirming treatment are likely to outweigh the expected benefits of these treatment[s]" in minors, and that such treatments should be provided only in rare cases and ideally as part of experimental trials. *Id.* ¶ 125.

The United Kingdom went further still. Its National Institute of Health and Care Excellence reviewed studies that support hormone therapy for gender-dysphoric minors. *Id.* ¶ 126. The institute concluded that "all small, uncontrolled observational studies" for puberty blockers "are of very low certainty using modified GRADE" and

they "reported physical and mental health comorbidities and concomitant treatments very poorly." *Id.* As for cross-sex hormones, the institute stated that evidence of their effectiveness was also of a "very low" quality. *Id.* The United Kingdom's Cass Report, which reviewed gender-identity services in the country, stated that there's a "lack of consensus and open discussion about the nature of gender dysphoria and therefore about the appropriate clinical response." *Id.*

Others agree. France's Académie Nationale de Médecine says that "great medical caution" must be taken "given the vulnerability, particularly psychological, of this population [gender-dysphoric minors] and the many undesirable effects, and even serious complications, that some of the available therapies can cause." Doc.53 at 11. The Royal Australian and New Zealand College of Psychiatrists has said that there's a "paucity of quality evidence on the outcomes of those presenting with gender dysphoria." Doc.53 at 11. And, as noted above, Norway has also found the support for the excluded treatments to be "insufficient," and their "long-term effects" to be "little known." Exhibit 1.

Under the circumstances, the State's choices are reasonable.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Disputes are "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

25

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). Facts are "material" if they "might affect the outcome of the suit under the governing law." *Id.*

## ARGUMENT

The State is entitled to summary judgment under *Rush* and, separately, Plaintiffs cannot use § 1983 as the vehicle for their Medicaid claims. The State is also entitled to summary judgment on the constitutional and Affordable Care Act claims.

## I.      The State's Decision Is Reasonable Under *Rush v. Parham*

**A.** Plaintiffs assert that the State violated two of Medicaid's reimbursement requirements: the early and periodic screening, diagnostic, and treatment service (EPSDT) requirement, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(C), 1396d(a)(4)(B), and 1396d(r)(5), and the comparability requirement. 42 U.S.C. § 1396a(a)(10)(B)(i); *see* Doc.1, Counts III & IV**.** But the State need not reimburse payments for experimental treatments. *Rush*, 625 F.2d at 1150. Whether the State's determination concerning the excluded treatments is "reasonable" is governed by "current medical opinion, regardless of the prevailing knowledge at the time" the State adopted the exclusions. *Id.* at 1157 n.13. *Rush*'s standard is thus closer to a rational-basis standard than a mean-ends tailoring standard, which makes sense, because courts aren't medical policymakers.

The State meets *Rush*'s deferential standard. As detailed above, the weight of the scientific literature does not support the use of puberty blockers, cross-sex hormones, and surgeries to treat gender dysphoria. Caution is instead the watchword. There's no certainty that the excluded treatments are reversible. *E.g.*, Exhibit 13 ¶¶67-87; Exhibit

19 ¶ 49. The chances are great that those prescribed the treatments suffer from other comorbidities. Exhibit 12 ¶¶ 43, 134. For most, behavioral therapies will help them through this psychiatric condition. *Id.* ¶¶ 42-49; Exhibit 16 ¶ 136. For the exceptional few who can establish that their circumstances warrant it, variances and waivers are available under § 120.542. This approach aligns with the growing global consensus.

And it aligns with CMS's guidance that States "are not required to provide any items or services" the State determines "are not safe and effective or which are considered experimental." *See* CMS, U.S. Dep't of Health & Human Servs., State Medicaid Manual, ch.5, § 5122, //www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021927.

True, Plaintiffs' experts provide an alternative approach to treatment. At best, however, it's just that: an alternative perspective that can't supersede the State's decision to take a more cautious approach. *See, e.g., Jacobson v. Massachusetts*, 197 U.S. 11, 39 (1905). At worst, it's the product of an untested and flawed approach sanctioned only by WPATH and the Endocrine Society. Either way, this alternative approach falls short of creating a genuine issue of material fact under *Rush*. The State's conclusion concerning the excluded treatments is reasonable.

**B.** Nor can Plaintiffs establish comparability. Medicaid requires that services "made available" to an eligible person "shall not be less in amount, duration, or scope" than services "made available to any other" eligible person." 42 U.S.C. § 1396a(a)(10)(B)(i). Thus, there must be some "equivalence between" "Florida-

27

Medicaid-eligible service[s] and" the excluded treatments for gender dysphoria. Doc.64 at 4-5. For example, a mastectomy is an effective and appropriate treatment for breast cancer, where diseased breast tissue is removed from the body. Exhibit 19 ¶¶ 49, 52, 54. The efficacy of mastectomies for breast cancer treatment says nothing about their efficacy for gender-dysphoria treatment. More broadly, accepting a false equivalency between a treatment approved for a specific malady and gender dysphoria is inappropriate. Plaintiffs' expert reports contain little to no information on this front. Plaintiffs can't show an equivalence.

## II.     There's No Medicaid Cause of Action Under 42 U.S.C. § 1983

**A.** Nor can Plaintiffs enforce their Medicaid-related EPSDT or comparability claims through § 1983. *See* Doc.1 at ¶¶ 277, 280. Section 1983 allows for vindication of federally protected *rights* guaranteed by the *requirements* of federal law. *See Collins v. City of Harker Heights*, 503 U.S. 115, 119 (1992).

Broadly speaking, Medicaid dangles a carrot in front of the States. States that meet the criteria in 42 U.S.C. § 1396a receive federal funds. If State plans fall short of Medicaid's requirements after accepting funds, then the HHS Secretary "in his discretion" can "limit payments" to unaffected categories of a Medicaid plan until he is "satisfied" that the State has come back into compliance. 42 U.S.C. § 1396c. While HHS is partially funding a non-compliant Medicaid plan, the affected State can decide whether to accept partial reductions or change its policy. *NFIB v. Sebelius*, 132 S. Ct. 2566, 2607 (2012); *see also id.* at 2642 n.27 (Ginsburg, J., concurring in part, concurring

in judgment in part, and dissenting in part). Notably, HHS has taken no action to defund the State's Medicaid program based on the conduct at issue here.

Neither the Supreme Court nor the Eleventh Circuit has specifically addressed whether the EPSDT or comparability provisions create federally enforceable rights. Though other courts have allowed the use of § 1983 to enforce these provisions, they did so based on the erroneous assumption that "obligations on participating states" are enough. *Smith v. Benson*, 703 F. Supp. 2d 1262, 1273 (S.D. Fla. 2010) (quoting *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 605 (5th Cir. 2004)); *see also Cruz v. Zucker*, 116 F. Supp. 3d 334, 345 (S.D.N.Y. 2015). They aren't. Only an "unambiguously conferred right," not an obligation, can "support a cause of action brought under § 1983." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).[1]

In sum, Counts III and IV present no rights to enforce under federal law. Because § 1983 "does not provide a remedy for abuses that do not violate federal law," *Collins*, 503 U.S. at 119, Plaintiffs can't use it as a vehicle to pursue their Medicaid claims.

**B.** Relatedly, equity doesn't permit Plaintiffs' Medicaid claims. To be sure, courts of equity have "long" granted injunctions to prevent "illegal executive action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). But that power is "subject to express and implied statutory limitations." *Id.* A "[c]ourt[] of equity can no

---

[1] The question of whether statutes like Medicaid can ever give rise to privately enforceable rights under § 1983 is currently before the U.S. Supreme Court in *Health and Hospital Corporation of Marion County v. Talevski*, No.21-806, which was argued November 8, 2022.

more disregard statutory and constitutional requirements and provisions than can courts of law." *I.N.S. v. Pangilinan*, 486 U.S. 875, 883 (1988) (quotation omitted).

In *Armstrong*, the Supreme Court concluded that in enacting another section of the Medicaid Act—§ 1396a(30)(A)—Congress had impliedly foreclosed equitable remedies for two reasons. *First*, "the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements—for the State's 'breach' of the Spending Clause contract—is the withholding of Medicaid funds by the Secretary of Health and Human Services." *Armstrong*, 575 U.S. at 328. *Second*, the clause at issue, which "mandate[d] that state plans provide for payments that are 'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of" "care and services[,]' was "judicially unadministrable" because it was "broad[]" and lacked "specific[s]." *Id.* As the Court explained, that vague duty evinced Congressional intent for an "exclusive" agency remedy that could bring to bear administrative "expertise" and "uniformity." *Id.*

That rationale fits Plaintiffs' theory hand in glove. For one, no one doubts that the Medicaid Act provisions Plaintiffs hope to enforce are only textually enforceable by the Secretary. 42 U.S.C. § 1396c. And Plaintiffs' chosen statutes are just as broad and non-specific as the one in *Armstrong*; they tell States, for example, in Plaintiffs' own words, to provide "all services necessary to 'correct or ameliorate' a physical or mental health condition," Doc.1 ¶ 276, without defining necessity.

### III.     The State's Decision Is Constitutional Under the Equal Protection Clause

**A.** Plaintiffs' equal-protection claim fails as well. The State's health, safety, and welfare actions are subject to a "strong presumption of validity." *Dobbs*, 142 S. Ct. at 2284 (cleaned up). They "must be sustained if there is a rational basis on which" the State "could have thought that it would serve legitimate state interests." *Id.*

Rule 59G-1.050(7) is a health, safety, and welfare regulation that makes a distinction based on a medical diagnosis: the excluded treatments are generally unavailable to those with gender dysphoria but are available to those with other diagnoses (like breast cancer or precocious puberty). The distinction furthers the State's interest in protecting its citizens from unnecessary and experimental treatments that are grounded in low-quality evidence and that threaten to cause permanent harm like sterilization and infertility. Rational-basis review is easily met. *Dobbs*, 142 S. Ct. at 2268; *Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020); *Jacobson*, 197 U.S. at 25.

**B.** Plaintiffs ask for some heightened level of scrutiny to apply because, in their estimation, Rule 59G-1.050(7) makes facially discriminatory distinctions based on sex or transgender status. The problems with this argument are threefold.

*First*, the en banc Eleventh Circuit in *Adams v. School Board of St. Johns County* foreclosures the sex-based discrimination argument. In that case, the court held that a school board's sex-based bathroom-assignment policy doesn't violate the Equal Protection Clause. 57 F.4th 791, 796 (11th Cir. 2022) (en banc). The court elaborated

that sex-based discrimination is discrimination based on biological sex. *Id.* at 807-08. After all, the Equal Protection Clause protects immutable characteristics, like biological sex. *Id.* (citing *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973)). Exhibit 12 ¶¶ 19-27; Exhibit 13 ¶ 19. That stands in strong contrast to gender identity, which is mutable and isn't afforded heightened constitutional protection. 57 F.4th at 807-08.

The *Adams* school-board policy made a distinction on the basis of biological sex: mainly, biologically male students use one bathroom, biologically female students use another bathroom, or a sex-neutral bathroom is available. *Id.* at 802. "This is a sex-based classification," the Eleventh Circuit held. *Id.* at 801.

That's different from Rule 59G-1.050(7). The rule doesn't make a distinction based on biological sex. The State's rule makes a distinction based on a medical diagnosis—gender dysphoria—which applies to biological males and biological females. *See Lange v. Houston County*, 608 F. Supp. 3d 1340, 1354 (M.D. Ga. 2022); *see also Geduldig v. Aiello*, 417 U.S. 484, 497 n.20 (1974).

Regardless of biological sex, the State will not reimburse gender-affirming care: puberty blockers, hormones or hormone antagonists, sex reassignment surgeries, or any procedures that alter primary or secondary sexual characteristics. Therefore, rational basis—and not heighted scrutiny—applies, and rational basis is still satisfied.

*Second*, the *Adams* court explained what constitutes unconstitutional discrimination based on transgender status. Notably, the court didn't hold that transgender status is a quasi-suspect class. It said that "we have grave 'doubt' that

transgender persons constitute a quasi-suspect class" and that "the Supreme Court has rarely deemed a group a quasi-suspect class." 57 F.4th at 803 n.5 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442-46 (1985)). Transgender individuals thus aren't entitled to heightened constitutional review per se. *Id.*

Whether to apply heightened review then turns on a *Geduldig v. Aiello* "identity" analysis. In *Adams*, the Eleventh Circuit asked if there was either an "identity" or "lack of identity" between the school-board bathroom policy and transgender status; an "identity" between the two would demonstrate unconstitutional discrimination, but a "lack of identity" would demonstrate a lack of unconstitutional discrimination. *Id.* at 809 (quoting 417 U.S. at 497).

In conducting the analysis, the *Adams* court observed what "group" was affected by the bathroom policy and what "group" wasn't affected. The court found that the affected group consisted of transgender students who wanted to use a bathroom that didn't align with their biological sex. The unaffected group consisted of non-transgender students and transgender students who wanted to use bathrooms that aligned with their biological sex. *Id.* at 809. Because transgender students were in both groups, there was a "lack of identity" between the policy and transgender status. Thus, the policy didn't discriminate based on transgender status. *Id.*

So too here. Rule 59G-1.050(7) creates two groups. The group affected by the rule is comprised of transgender individuals who suffer from gender dysphoria. The group unaffected by the rule is comprised of non-transgender individuals and

transgender individuals *who don't* suffer from gender dysphoria. Under *Adams* and *Geduldig*, there's a "lack of identity" between the rule and transgender status.

*Third*, Plaintiffs can't prove that the State engaged in purposeful discrimination that violates the Equal Protection Clause. "[A] disparate impact alone does not violate the Constitution. Instead, a disparate impact on a group offends the Constitution when an otherwise neutral policy is motivated by 'purposeful discrimination.'" *Id.* at 810 (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 274 (1979)). In their facial challenge, Plaintiffs can't prove that the State promulgated its rule "because of" and not "in spite of" its allegedly adverse effect on transgender individuals. *Feeney*, 442 U.S. at 274.

In sum, rational basis applies. That test is met.

## III.   The State's Decision Complies with the Affordable Care Act

Finally, the State's actions comply with the ACA. Under Section 1557 of the ACA, "an individual shall not, on the ground prohibited under" "title IX of the Education Amendments of 1972," "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity." 42 U.S.C. § 18116. Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681.

As in the constitutional context, the en banc Eleventh Circuit recently held that, as a statutory matter, "sex" in Title IX means biological sex. 57 F.4th at 812-14 (disavowing reliance on *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020)). For the reasons

discussed above, the State didn't discriminate on the basis of sex. The State thus complied with the ACA.

## **CONCLUSION**

The State asks this Court to grant its motion for summary judgment.

Dated: April 7, 2023

Respectfully submitted by:

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Gary V. Perko (FBN 855898)
gperko@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938
*Counsel for Defendants*

## **CERTIFICATE OF WORD COUNT**

As required by Local Rule 7.1(F) and 56.1(E), I certify that this motion contains 7,951 words.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2023, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

      Plaintiffs,

v.                               Case No. 4:22-cv-00325-RH-MAF

JASON WEIDA, et al.,

      Defendants.

_____/

**INDEX TO EXHIBITS**

      The State provides this index to assist this Court with identifying and finding exhibits in their summary-judgment motion.

| Exhibit Number | Exhibit Description[2] |
|---|---|
| Exhibit 1 | Norway Healthcare Investigation Board Report |
| Exhibit 2 | U.S. Health and Human Services Notice and Guidance on Care |
| Exhibit 3 | U.S. Health and Human Services Fact Sheet on Gender-Affirming Care |
| Exhibit 4 | U.S. Department of Justice Letter to State Attorneys General |
| Exhibit 5 | Centers for Medicare and Medicaid Services Decision Memo for Gender Dysphoria and Gender Reassignment Surgery |
| Exhibit 6 | Deposition of Matt Brackett (February 8, 2022) (Combined Volumes) |

---

[2] An unredacted version of Exhibit 15 will be submitted to the court clerk; Plaintiffs are already in position of the unredacted version. And though Exhibit 36 is marked confidential, the parties conferred and agreed that it should not be marked confidential.

| Exhibit 7 | Florida Department of Health Fact Sheet on Treatments for Gender Dysphoria |
|---|---|
| Exhibit 8 | Letter from then-Secretary Marstiller to Deputy Secretary Wallace |
| Exhibit 9 | Deposition of Ann Dalton |
| Exhibit 10 | Press Release, Governor Ron DeSantis Urges Swift Approval of Florida's Canadian Prescription Drug Importation Program |
| Exhibit 11 | Preliminary Injunction Hearing Transcript (Excerpt) |
| Exhibit 12 | Expert Report of Dr. Levine |
| Exhibit 13 | Expert Report of Dr. Hruz |
| Exhibit 14 | WPATH Standards of Care, Version 8 |
| Exhibit 15 | Redacted Expert Report of Dr. Laidlaw |
| Exhibit 16 | Expert Report of Dr. Kaliebe |
| Exhibit 17 | Rebuttal Expert Report of Dr. Van Meter |
| Exhibit 18 | Expert Report of Dr. Scott |
| Exhibit 19 | Expert Report of Dr. Lappert |
| Exhibit 20 | Endocrine Society Guidelines on Treatments for Gender Dysphoria |
| Exhibit 21 | Expert Report of Dr. Olson-Kennedy |
| Exhibit 22 | Expert Report of Dr. Shumer |
| Exhibit 23 | Expert Report of Dr. Baker |
| Exhibit 24 | Expert Report of Dr. Antommaria |
| Exhibit 25 | Expert Report of Dr. Karasic |
| Exhibit 26 | Expert Report of Dr. Schechter |
| Exhibit 27 | Rebuttal Expert Report of Dr. Edmiston |
| Exhibit 28 | Rebuttal Expert Report of Dr. Janssen |
| Exhibit 29 | WPATH Standards-of-Care-Revision Team Criteria |
| Exhibit 30 | Grading of Recommendations Assessment, Development and Evaluation Handbook |
| Exhibit 31 | WPATH's Press Release Regarding Florida Department of Health |
| Exhibit 32 | WPATH's Press Release on National and International Issues |
| Exhibit 33 | WPATH's Letter to Japanese Officials |
| Exhibit 34 | WPATH's Press Release Regarding *New York Times* Article |

| | |
|---|---|
| Exhibit 35 | WPATH Press Release on United Kingdom Matter |
| Exhibit 36 | Deposition of Dr. Edmiston |