Page 1

1                UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF FLORIDA

2

3                     CASE NO.  4:22-cv-00325-RH-MAF

4

5    AUGUST DEKKER, et al.,

6         Plaintiffs,

7    vs.

8    JASON WEIDA, et al.,

9         Defendants

10   _____/

11                          Volume 1, Pgs. 1 - 124

12   VIDEOTAPED DEPOSITION OF: MATTHEW BRACKETT

13   AT THE INSTANCE OF:     THE PLAINTIFFS

14   DATE:                   FEBRUARY 8, 2023

15   TIME:                   COMMENCED: 10:00 A.M.

16   LOCATION:               AGENCY FOR HEALTH CARE

                             ADMINISTRATION

17                           2727 MAHAN DRIVE

                             TALLAHASSEE, FLORIDA 32308

18

     REPORTED BY:            DANA W. REEVES

19                           Court Reporter and

                             Notary Public in and for

20                           State of Florida at Large

21

22

23

24

25

Page 2

```
 1    APPEARANCES:
 2              REPRESENTING THE PLAINTIFF:
 3              KATY DeBRIERE, ESQ.
                Florida Health Justice Project
 4              3900 Richmond Street
                Jacksonville, Florida 32205
 5
                SIMONE CHRISS, ESQ.
 6              CHELSEA DUNN, ESQ.
                Southern Legal Counsel, Inc.
 7              1229 NW 12th Avenue
                Gainesville, Florida 32601
 8
                SHANI RIVAUX, ESQ.
 9              Pillsbury, Winthrop, Shaw, Pittman, LLP
                600 Brickell Avenue, Suite 3100
10              Miami, Florida 33131
11              OMAR GONZALEZ-PAGAN, ESQ.
                Lambda Legal Defense and Education
12              Fund, Inc.
                120 Wall Street, 19th Floor
13              New York, NY 10005
14              CATHERINE MCKEE, ESQ.
                1512 E. Franklin Street, Suite 110
15              Chapel Hill, NC 27514
16
17
                REPRESENTING THE DEFENDANT:
18
                MOHAMMAD O. JAZIL, ESQ.
19              GARY V. PERKO, ESQ.
                Holtzman, Vogel, Barantorchinsky & Josefiak
20              119 S. Monroe Street, Suite 500
                Tallahassee, Florida 32301
21
22
23              ALSO PRESENT:
                RL Minnich, Videographer
24
25
```

Page 3

1                        INDEX TO WITNESS

2

3   MATTHEW BRACKETT                              PAGE

4   Examination by Ms. DeBriere                     5

5

6                        INDEX TO EXHIBITS

7

8   NO.            DESCRIPTION                   MARKED

9   Exhibit 1    Notice of deposition                  7
    Exhibit 2    Florida Medicaid policy              16
10  Exhibit 3    Cross-Sex Hormone Therapy GAPMS       21
    Exhibit 4    DEF_000145170                         32
11  Exhibit 5    April 19, 2022 GAPMS                  57
    Exhibit 6    June 23, 2017 GAPMS                   60
12  Exhibit 7    DEF_000288776                         71
    Exhibit 8    Gender confirmation surgery GAPMS     80
13  Exhibit 9    Native document                       83
    Exhibit 10   Native document                       83
14  Exhibit 11   June 2, 2022 GAPMS                    85
    Exhibit 12   After the fact request form under    100
15               35K

16

17

18

19  *Uh-uh is a negative response
    *Uh-huh is a positive response

20

21

22

23

24

25

```
 1                    D E P O S I T I O N
 2            VIDEOGRAPHER: This is the video-recorded
 3       deposition of corporate representative for Agency
 4       for Healthcare Administration, in the matter of
 5       August Decker, et al. vs. Jason Weida, et al.  Case
 6       No. 4:22-cv-00325, RH-MAF.  This deposition is
 7       being held at 2727 Mahan Drive in Tallahassee,
 8       Florida.  Today's date is February 8th, 2023 and
 9       the time is 10:08 a.m.  The court reporter is Dana
10       Reeves.  My name is RL Minnich.  I'm the
11       videographer.  Would counsel please introduce
12       themselves and the court reporter please swear in
13       the witness?
14            MS. DEBRIERE: Yes, Katy DeBriere and I
15       represent the plaintiffs.
16            MS. CHRISS: Simone Chriss and I also represent
17       the plaintiffs.
18            MS. DUNN: Chelsea Dunn.  I also represent the
19       plaintiffs.
20            MR. JAZIL: Mohammad Jazil for the defense.
21            MS. DEBRIERE: And we have a few people on the
22       Zoom link from the plaintiff's side.  That would be
23       Catherine McKee and Omar Gonzalez-Pagan.
24            MR. PERKO: And Gary Perko on behalf of the
25       defendants on the Zoom link.
```

1        MS. DEBRIERE: And Shani Rivaux has joined us

2     from the plaintiff's side as well.

3        COURT REPORTER: All right, sir, if you would

4     raise your right hand, please.

5   Whereupon,

6                      MATTHEW BRACKETT

7   was called as a witness, having been first duly sworn to

8   speak the truth, the whole truth, and nothing but the

9   truth, was examined and testified as follows:

10       THE WITNESS: I do.

11       COURT REPORTER: Thank you.

12                     EXAMINATION

13  BY MS. DEBRIERE::

14     Q    All right.  So we're just going to mark

15  exhibits as they're discussed, if that's okay with you,

16  Matt.

17     A    That's fine.

18     Q    As we walk through those exhibits, I'm going

19  to read off the Bates numbers on the bottom of each

20  page.  So those are just the -- that line of numbers I'm

21  reading out loud as we discuss exhibits, and that should

22  help you track what page I'm on as we're discussing

23  them.  So we're going to go ahead and mark the notice of

24  deposition as Exhibit 1.  I saw that you brought the

25  copy with you, as well, Mr. Brackett.

```
                                                    Page 6
 1              (Whereupon, Exhibit No. 1 was marked for
 2     identification.)
 3              MR. JAZIL: Is this the court reporter's copy?
 4              MS. CHRISS: The witness' copy that can become
 5        the court reporter's copy.
 6     BY MS. DEBRIERE::
 7        Q    Okay.  So just some preliminary stuff before
 8     we go over this notice.  I'm going to be using the
 9     acronym GAPMS quite a bit.  That stands for Generally
10     Accepted Professional Medical Standards, and is the
11     acronym that refers to the process described at Florida
12     Administrative Code Rule 59-G-1.035.  When I refer to
13     the GAPMS or GAPMS process, do you understand what I
14     mean?
15        A    Yes.
16        Q    I will also use the term gender dysphoria,
17     which is defined as discomfort or distress that is
18     caused by a discrepancy between a person's gender
19     identity and that person's sex assigned at birth and the
20     associated gender role and/or primary and secondary sex
21     characteristics.  Can we agree that when I say gender
22     dysphoria, that's the definition I'm using?
23        A    Yes.
24        Q    I will also be using a phrase categorical
25     exclusion of treatment for gender dysphoria, which
```

1   refers to the exclusion in Florida Administrative Code

2   Rule 59-G-1.050(7).  Do you understand that that phrase

3   refers to all the services in that particular portion of

4   the rule when I say categorical exclusion?

5        A    I do.

6        Q    And then I will also be using the term EPSDT

7   services, which stands for Early Periodic -- Early and

8   Periodic Screening Diagnostic and Treatment Services.

9   When I say EPSDT, do you know what I mean?

10       A    Yes.

11       Q    Have you ever been deposed before?

12       A    Yes, I have.

13       Q    Okay.  So if there's at any point that you

14  don't understand my question, what I want you to do is I

15  want you to stop and ask me to rephrase it.  I don't

16  want you to try to attempt to ask -- answer the question

17  if you don't understand it.  Okay?

18       A    Okay.

19       Q    I have a problem sometimes of speaking over

20  someone else, I don't know if you have the same problem,

21  but what we need to try to do is just give each other

22  space to pause in between the questions so we're not

23  speaking over each other.  Okay?

24       A    I'm fine with that.

25       Q    Okay.  Verbal answers.  Sounds like, you know,

1    you speak very clearly, so we shouldn't have a problem,

2    but obviously -- although we do have a videographer

3    here, it's better to speak your answer out loud.

4        A    I do understand.  Articulating hand gestures,

5    the court reporter cannot get those into the

6    transcripts.

7        Q    Exactly.  All right, if you need to take a

8    break for any reason, totally fine, just let me know.  I

9    do ask that you answer my question before we take a

10   break.

11       A    Okay.

12       Q    And then are you on any medications or other

13   substances that could impact your memory today?

14       A    No.

15       Q    And state your name for the record.

16       A    So my full name is John Matthew Brackett.

17       Q    Okay.  And it's your understanding that you're

18   representing the Florida Agency for Health Care

19   Administration in a 30(b)(6) deposition?

20       A    That's correct.

21       Q    Okay.  What topics, looking at the notice,

22   which is Exhibit 1, notice of 30(b)(6) deposition, what

23   topics were you designated for?  Were they all of them

24   here?

25       A    Yes.

1      Q    And you're prepared to testify on behalf of

2   the Agency on each of these topics?

3      A    Yes.

4      Q    Have you seen the 30(b)(6) deposition topics?

5      A    You mean as those listed in the -- yes, I have

6   seen them.

7      Q    And who provided them to you?

8      A    Those were provided to me by our outside

9   counsel.

10     Q    Okay.  And did you consent to acting as the

11  agency representative?

12     A    Yes, I did.

13     Q    What did you do to -- excuse me.  What did you

14  do to prepare for today?

15     A    Mostly just familiarize myself with areas and

16  topics that are on the list that are not familiar to my

17  current job role, and that's pretty much it.  So pretty

18  much standard operating procedures here at the Agency

19  that are -- that might fall under different divisions or

20  different teams, et cetera.  And just kind of, like,

21  reviewed some of our coverage policies, some of our

22  rules and some of our own materials.

23     Q    Okay.  Who did you speak to?

24     A    Principally, consulted with Andrew Sheeran and

25  for any questions that involved managed care, I

1   consulted my supervisor Devona Pickle.

2       Q    Did you gather information from anyone, anyone

3   besides counsel?

4       A    I gathered a little bit of information from

5   Devona Pickle, since one of the questions directly

6   involved her role in the process.

7       Q    Okay.  I saw that you brought a document with

8   you today, it looks like maybe you reviewed that to

9   prepare.  What is that?

10      A    So that is pertinent to the question.  I can

11  provide you the exact one.  Yeah, I think -- yeah,

12  question three.  It was -- since that asked about the

13  process of how we looked at other states' Medicaid

14  programs, which that spreadsheet was -- Devona Pickle

15  administered that role of the GAPMS process.  And since

16  that question was on there, I did ask her to provide me

17  with what she used to -- and the research methods used

18  to go through each state Medicaid program to find out

19  what their coverage criteria is, or if they have a

20  statement prohibiting coverage, or if they just don't

21  have any statement whatsoever.

22          MS. DEBRIERE: Okay.  And, Mo, do you know if

23      that was produced to us in discovery?

24          MR. JAZIL: I don't believe it was.  So we'll

25      make copies and get it to you.

1    BY MS. DEBRIERE::

2         Q    How long did it take you to prepare for the

3    deposition today?

4         A    Well, given that we received these questions

5    about a week ago, I'd probably say I spent probably off

6    and on -- I mean, in between other projects, probably

7    I'd say three, maybe four working days.

8         Q    Okay.  A little bit about you.  Describe your

9    educational background.

10        A    So I received a -- my -- started off, I got my

11   AA at Tallahassee Community College.  I received my

12   Bachelor of Arts in history at Florida University, 2003.

13   I graduated magna cum laude.  Received my Master of Arts

14   in History from Florida University in 2005.  During my

15   time in graduate school, I did spend a few extra years

16   working on a PhD, which I decided not to finish, but

17   during my grad school years, I presented research papers

18   on numerous topics at numerous conferences.  And I also

19   published scholarly articles in the Florida Historical

20   Quarterly and Southern Studies and Interdisciplinary

21   Journal of the South.

22        Q    The conferences, what were those about?

23        A    The conferences ranged.  They could -- they

24   were, I think, either conference on Florida history,

25   conferences on environmental history.  I think there

1    were, like, graduate symposiums.  So often they're also,

2    like, regional conferences.  The topics I represented on

3    ranged from anything from environmental history to

4    public health history.

5         Q     And your PhD, what -- what were you attempting

6    to get it in?

7         A     So I was actually looking at getting my PhD in

8    the history of medicine and public health.  And

9    actually, I was -- my dissertation topic was on

10   tuberculosis, on how during the late 19th century, how

11   kind of the infancy of public health agencies and how

12   public health was actually becoming a common concept and

13   how -- and, of course, with the emerging sciences --

14   well, pretty much with the discovery of microbiology and

15   discovery of the tuberculosis bacteria, how all that was

16   coming together to affect changes in the south in public

17   health, and looking at also how, since tuberculosis was

18   very common, on how that shapes southern identity.

19        Q     Okay.  And what's your current position at the

20   Agency for Health Care Administration?

21        A     So my current position is Program Consultant.

22   I work on the Canadian Drug Importation Program

23   primarily.

24             MS. DEBRIERE: And, Court Reporter, just to

25        note, we're going to refer to the Agency for Health

```
 1      Care Administration's throughout as either AHCA or

 2      the Agency.

 3  BY MS. DEBRIERE::

 4      Q    Prior to your role with the Canadian Drug

 5  Importation Program -- did I get that right?

 6      A    Yeah, close enough.

 7      Q    What was your role at the Agency?

 8      A    My role at the Agency, I was the Program

 9  Administrator over the Specialized Services and

10  Behavioral Health teams.  Of course, we oversaw the

11  development and, of course, updating of policies, such

12  as durable medical equipment, community behavioral

13  health, non-emergency transportation, school-based

14  services, hospice.  There's actually quite a lengthy

15  list.

16      Q    And how long did you do that for?

17      A    I was in that position for three and a half

18  years.

19      Q    Okay.  And prior to that, were you at the

20  Agency?

21      A    Yes, I was.

22      Q    And what was your role then?

23      A    I was a Government Analyst II.  And during

24  that time period, that was from January 2017 to November

25  2017, I was -- my role specifically tasked with
```

1  completing the Generally Accepted Professional Medical

2  Standards reports.

3       Q   And prior to that time, were you at the

4  Agency?

5       A   Yes.

6       Q   And what did you do then?

7       A   I would -- I worked in the Office of the

8  Deputy Secretary for Health Quality Assurance.

9       Q   So your time in the Bureau of Medicaid policy

10  was from December 2017 to --

11       A   January 2017 to November 2017.  But my job --

12  but becoming a program administrator, I was still in the

13  same bureau.

14       Q   So GAPMS -- working on GAPMS was January 2017

15  to November 2017, and then you shifted to another role

16  in Bureau and Medicaid Policy?

17       A   Yes.

18       Q   And that was in December of 2017 through --

19       A   November 2017 through April of 2021.

20       Q   And so since May of 2021 or April 2021 you've

21  been with the Canadian Drug --

22       A   April 2021.

23       Q   Okay.  Let's look at the Florida definition of

24  medical necessity.  And that is in the Florida Medicaid

25  Definitions Policy, which I'm sure you're intimately

```
 1    familiar, at Section 2.83, and it's incorporated by

 2    reference into rule by Florida Administrative Code Rule

 3    59-G-1.010.

 4              MR. JAZIL: Simone, would you happen to have an

 5         extra copy?

 6              MS. CHRISS: Yes.

 7              MR. JAZIL: I'd rather just not lean over his

 8         shoulder.

 9              MS. DEBRIERE: You know what, Mo, you can use

10         mine.  I basically have it committed to memory.

11              MR. JAZIL: Thank you.

12              MS. DEBRIERE: So we'll go ahead and mark this

13         policy as Exhibit 2.

14              (Whereupon, Exhibit No. 2 was marked for

15    identification.)

16    BY MS. DEBRIERE::

17         Q    And, Mr. Brackett, if you want to turn to it,

18    it's 2.83.

19         A    Okay.

20         Q    What's the purpose of the Medical Necessity

21    standard listed here?

22         A    So is -- kind of clarify -- can you clarify

23    what's meant by purpose?

24         Q    What does AHCA use that medical necessity

25    standard for?
```

 1      A    So these prongs for medical necessity, as

 2  defined, these are our guidelines for determining

 3  whether or not Florida Medicaid should cover a service.

 4      Q    Okay.  Is it correct to say that the standard

 5  is used to determine whether Medicaid service should be

 6  prior authorized?

 7      A    I don't -- I don't -- I don't think so.

 8      Q    Okay.  Tell me why.

 9      A    Because for medical necessity, being medically

10  necessary, this is generally -- this is a criteria for

11  whether or not Medicaid should cover a service.  The

12  prior authorization process is just mostly more clinical

13  review to determine whether or not delivery of that

14  service, coverage of that service corresponds to the

15  definition of medical necessity.

16      Q    Okay.  So when you're doing a prior

17  authorization review, you do determine whether or not

18  the service corresponds to the definition of medical

19  necessity?

20      A    So since our subcontractors and our managed

21  care plans do our prior authorizations, they do have to

22  make sure that the -- that with the service they're

23  prior authorizing would, if subjected to the medical

24  necessity guidelines and definition, yeah, they have to

25  make sure it corresponds.

1     Q    Okay.  And that's part of the prior

2   authorization process?

3     A    That's part of the prior authorization

4   process, yes.

5     Q    If a Medicaid service is found to be

6   experimental by AHCA, would AHCA or its contractors,

7   subcontractors like a managed care plan, still review

8   whether the service meets any other portion of AHCA's

9   medical necessity rule?

10     A    No.

11     Q    Okay.  Why not?

12     A    Because it does have to meet the five prongs

13   of medical necessity, and one of those prongs is it has

14   to be in alignment with GAPMS.

15     Q    Okay.  So if it's not in alignment with GAPMS,

16   would you analyze it under any other portion of that

17   definition?

18     A    No, we wouldn't.

19     Q    If a Medicaid service has not been determined

20   experimental, using like GAPMS process, can a Medicaid

21   managed care plan use the portion of the medical

22   necessity standard that reads, be consistent with

23   Generally Accepted Professional Medical Standards?

24     A    Once the Agency deemed that it's not

25   consistent, and often these requests usually come to us

1   from the plans, the plan is not going to cover it.

2        Q    Okay.  Is the plan able to make an independent

3   determination of whether those services are experimental

4   in nature, or must that come from -- decision come from

5   AHCA?

6        A    It does not necessarily have to come from

7   AHCA.  We do grant our managed care plans a great deal

8   of flexibility when it comes down to the services they

9   wish to cover, but sometimes when they get a service

10  that they're not sure about, they do often -- sometimes

11  will ask us to do a GAPMS review of it to determine

12  whether or not that -- if they should cover it.  So

13  sometimes we're kind of more of a reference point, but

14  the plans function pretty independently in these areas.

15       Q    Okay.  So the plan can make an independent

16  determination as to whether or not a service is

17  experimental or investigational?

18       A    No.  Whether or not to cover -- we don't allow

19  them to do -- we don't allow them to do independent

20  GAPMS reviews, if that's what you're asking.

21       Q    What I'm asking is looking at the prong about

22  whether this service is consistent with GAPMS, whether

23  the plan can deny coverage of a service on that basis

24  without AHCA's initial determination?

25       A    No, they need to consult with us before

1   they -- they need to consult with us before they use

2   experimental and investigational as a basis for denial,

3   which they will -- we do get requests from the health

4   plans.

5          Q    Okay.  All right.  So moving on to what's

6   Bates-stamped as defendant DEF_000126105.  This is the

7   GAPMS report on cross-sex hormone therapy, which is

8   dated --

9               MS. CHRISS: May '22.

10  BY MS. DEBRIERE::

11         Q    May 20th, 2022.

12              VIDEOGRAPHER: Counsel, can you put that mic

13         on, please?  They placed it right beside you.

14              MS. DEBRIERE: Yes.  Yes.

15              VIDEOGRAPHER: The one to your right.  Thank

16         you.

17              MS. DEBRIERE: I should have worn my suit

18         jacket tonight.

19              THE WITNESS: It might get hot here shortly, so

20         I may be taking mine off.

21              MS. DEBRIERE: Should I mark this as 3?

22              MS. CHRISS: Yes, the one for him.

23              MS. DEBRIERE: I think we got it split up.  I'm

24         sorry.  Mo, do you want to copy?

25              MR. JAZIL: Sure.  Do you really have all these

Page 20

```
 1        committed to memory?
 2             MS. DEBRIERE: Well, not this one, no, no, but
 3        somewhat.
 4             MR. JAZIL: Here's the last one, Katy.
 5             MS. DEBRIERE: Thanks.
 6             MR. JAZIL: That's pretty impressive if you do.
 7             MS. DEBRIERE: Well, not these, but definitely,
 8        you know, you practice Medicaid in Florida for
 9        seven years, you know what the medical necessity
10        definition is.
11             (Whereupon, Exhibit No. 3 was marked for
12      identification.)
13             MS. DEBRIERE: All right.  Not a day past seven
14        years, either.
15      BY MS. DEBRIERE::
16        Q    Okay.  So looking at -- do you have a copy,
17      Mr. Brackett?
18        A    Yes.
19        Q    Okay.  Looking at -- if you'll flip to what's
20      marked as DEF_000126112, it's page eight.
21        A    Okay.
22        Q    Starting under coverage policy, there's some
23      discussion about federal regulations, and then moving
24      through to the Florida Medicaid section that ends on the
25      top of page 10, if you could just review that for me.
```

1      A      Okay.

2      Q      So is this an accurate portrayal of the

3   standard to determine Florida Medicaid coverage for

4   prescription drugs?

5      A      Yes, this is.

6      Q      Do all prescription drugs require prior

7   authorization to be reimbursed by Florida Medicaid?

8      A      I can't speak fully to that one.  I don't -- I

9   don't believe so, but often our managed care plans, we

10  grant them a lot more flexibility when it comes down to

11  prior authorizations, so they may require prior

12  authorization for every drug.  But as far as, like,

13  every single drug, as far as the fee for service system

14  goes, I'm not a hundred percent certain, but I believe

15  that we do not require prior authorization for every

16  single drug.

17     Q      Okay.  Do you know if anybody at the Agency

18  would have a hard answer to that question?

19     A      One of our staff pharmacists probably would.

20     Q      So can you briefly describe the process a

21  Medicaid recipient undertakes in seeking prior

22  authorization for a drug?

23     A      Usually, that's taken by the provider usually,

24  or in the case of pharmacy, I'm not sure who would

25  submit the prior authorization.  I don't think that

Page 22

1   that's -- process is not initiated by the recipient

2   themselves, it's usually initiated by the provider.  Of

3   course, it goes through, like, a one-two level review

4   process.  That first level is usually done by, like, a

5   nurse or an RN.  They just determine whether or not it's

6   medically necessary.  If it is, then that one level

7   stops.  If it's a denial, it has to go -- I think it

8   goes to a second-level review.

9       Q    Okay.  And what is -- what is involved in that

10  review?  What is being reviewed?

11      A    Well, I'm not intimately familiar with it

12  because we used it a long, long time ago, prior to SM's.

13  We did that stuff in-house.  That was before my time

14  with the Agency, but now that's outsourced to EQ Health

15  Solutions in the fee-for-service system.  But they do

16  review the medical records, et cetera, and then, I

17  think, any other materials that are submitted by the

18  doctor, so --

19      Q    Do they compare it to coverage policies or

20  guidelines?

21      A    Well, for children, I don't -- it wouldn't be

22  necessary to because of EPSDT, but for adults, I don't

23  know.  That's information that we would have to ask our

24  vendors.  I assume they would, but that's an assumption.

25      Q    Okay.  Tell me a bit more about what you mean

1    by coverage guidelines when it needs to be reviewed for

2    children because of EPSDT.

3         A    Well, because of EPSDT, in which, since you're

4    familiar with all this, of course, even regardless of

5    what something says on the coverage policies -- because

6    our coverage policies and our fee schedules are very

7    prescriptive, they list out what services can be

8    covered, what services can't be covered.  Our fee

9    schedules, of course, outline the amount of money that

10   we pay for each service and our perimeter service gaps,

11   most importantly, the service gaps.  So for children, if

12   it's deemed medically necessary, and usually it does

13   have to go through the prior authorization process for

14   an EPSDT consideration, if it's determined medically

15   necessary, regardless of whether it's on a fee schedule

16   or not, or in excess of our fee schedule, or if it's not

17   listed in that coverage policies, because of EPSDT

18   requirements from the feds, we do have to cover it.

19        Q    Okay.  Okay.  And how do you define medical

20   necessity for EPSDT?

21        A    It's the same as listed in definitions policy.

22        Q    Okay.  What would be the process for obtaining

23   Medicaid coverage for a drug where prior authorization

24   is not required?

25        A    Well, so the thing about Medicaid coverage for

Page 24

1   drugs is that we do cover all drugs that are FDA

2   approved.  So if -- unless it has a prior authorization

3   requirement and if that FDA approved covered drug can be

4   covered by Medicaid.

5        Q    Okay.  What if it's not FDA approved?

6        A    If it's not FDA approved or if it's -- so are

7   we talking about, like, complete non-FDA approval or are

8   we talking about like our off-label usage?

9        Q    Actually, let's back up.  So if it's FDA

10  approved, does that mean it does not need to go through

11  the prior authorization process for Medicaid to

12  authorize it?

13       A    If it's not FDA approved, we -- I mean, we're

14  not going to cover it if it's not FDA approved.

15       Q    Okay.  If it is FDA approved, does the

16  Medicaid recipients still have to undertake the prior

17  authorization process to --

18       A    If it's FDA approved, and it's a drug that

19  we've required prior authorization, then, yes.

20       Q    Okay.  If it's a drug that does not require

21  prior authorization, what does that process look like

22  for coverage?

23       A    I generally -- I think it just -- the pharmacy

24  fills the prescription, they file a claim, agency pays

25  the claim and the dispensing fee.

Page 25

1      Q    Okay.  So there's no review in medical

2   necessity under that --

3      A    Providing the drug does not -- does not have

4   prior authorization criteria, yes.

5      Q    Okay.  So if it's a drug that does not require

6   authorization, AHCA does not determine if it's being

7   prescribed for a medically necessary use; is that

8   correct?

9      A    Can you repeat that?

10     Q    Yep.  If a drug does not require prior

11  authorization, AHCA does not -- AHCA or its contractors

12  does not undertake a determination as to whether it's

13  being prescribed for a medically necessary use?

14          MR. JAZIL: Object to form.

15          THE WITNESS: We covered -- we cover services

16      that are medically necessary.  So if it's -- that

17      would be in violation of policy if drugs are being

18      covered -- if drugs are being prescribed and

19      covered, when for -- when medical records and the

20      documentation -- when medical necessity is not

21      being met, that is that -- no, we would not cover

22      in those circumstances.

23  BY MS. DEBRIERE::

24     Q    How would you make that determination that you

25  would not cover if you're not doing a prior

1    authorization review?

2         A     So generally when issues like that, when

3    providers are billing Medicaid for services that are not

4    medically necessary, that's usually when our Medicaid --

5    Medicaid program Integrity, they start getting involved

6    in looking at -- looking at such claims.

7         Q     How would that rise to the surface of

8    triggering an investigation with Medicaid Integrity?

9         A     Well, there are lots of tip-offs.  I mean, we

10   do have a -- we do have a fraud hotline.  So somebody

11   could report a provider for fraud.  There -- it could be

12   result from an on-site survey.  Our Bureau of Recipient

13   Provider Assistance does -- they often do Medicaid

14   surveys on providers.  It could also potentially result

15   from a -- one of our health quality assurance surveys,

16   if they're going in and looking at, like, their

17   compliance with licensure rules.  So it really depends

18   on where the fraud's detected.  So there are multiple

19   avenues for reporting Medicaid fraud.

20        Q     Does AHCA have a pharmacy coverage policy for

21   every prescription drug?

22        A     We do have our outpatient prescribed drugs

23   services coverage policy.  And that, of course, is for

24   our covered outpatient drug benefit.

25        Q     Does that policy list every potential

Page 27

1    prescription drug prescribed under -- prescribed to a

2    Florida Medicaid recipient?

3         A    No.  So -- because Florida Medicaid covers any

4    drug that's FDA approved, when these medical necessity

5    guidelines, that's kind of an encompassing umbrella.

6    And then, of course, we do have the preferred drug list

7    which is assembled by the Pharmaceutical and

8    Therapeutics Committee.  We always just call P&T, so --

9    but because the list is so vast we don't actually

10   reproduce it in any kind of a form.  So the prescribed

11   drug services policy, the way it's worded is supposed to

12   be all-encompassing, but there are exclusions in Section

13   5.2 of non-covered service -- of drugs that we won't

14   cover under certain circumstances.

15        Q    Okay.  So it lists some drugs you won't cover,

16   but it doesn't list all the drugs you will potentially

17   cover?

18        A    Right.  But it's also -- but it's not -- it

19   doesn't specifically state drugs, it's just -- it's more

20   specific to conditions.  Like we don't say we won't

21   cover -- well, let me use it -- Viagra, but we say that

22   we will not cover drugs for ED.

23        Q    Okay.  So there's some general descriptions of

24   what you won't -- will and won't cover?

25        A    Yes.

Page 28

1      Q    Is there a pharmacy -- is there an AHCA

2   pharmacy coverage policy for estradiol?  And I'm happy

3   to spell it for you if you need it.

4      A    Oh, are we talking about estradiol.

5      Q    Estradiol.  Thank you.

6      A    No, we don't have specific coverage policies

7   for specific drugs.  And by estradiol, I mean, that's

8   an -- that's a kind of name brand estrogen.

9      Q    Okay.  And how about for medroxyprogesterone

10   acetate, or Provera?

11      A    We don't have specific coverage policies for

12   those.

13      Q    Okay.  How about micronized progesterone?

14      A    Those would all be encompassed under the

15   prescribed drug services policy.

16      Q    Okay, but not specifically named?

17      A    We don't specifically name drugs.

18      Q    I'm just going to run down the list.  Spiro --

19   and you're going to correct me when I say it wrong --

20   Spironolactone.

21      A    Spironolactone.  That one, I mean, once again,

22   the previous answer applies.  It's enveloped by our

23   prescribed drug services coverage policy.  We don't

24   have, like, an individual policy addressing that

25   specific drug.

Page 29

1        Q     Okay.  Finasteride.

2        A     I think that's close enough.  Same as before

3   it's covered -- it's enveloped by the prescribed drug

4   services coverage policy.  We do not have an individual

5   coverage policy for that drug.

6        Q     Dutasteride.

7        A     We do not have an individual coverage policy

8   for that drug, but it is covered.  It is -- it is

9   addressed through the prescribed drug services coverage

10  policy.

11       Q     Okay.  Testosterone.

12       A     The same as before, we don't have an

13  individual coverage policy for it, but it is covered

14  through the prescribed drug services coverage policy.

15       Q     Testosterone enanthate.

16       A     Same as before, as in, we don't have a

17  specific coverage policy, but it is covered through the

18  prescribed drug services coverage policy.

19       Q     Okay.  Two more.  Testosterone undecanoate.

20       A     We do not have an individual coverage policy

21  for that, but it is enveloped by our prescribed drug

22  services policy.

23       Q     Gonadotropin-releasing hormone antagonists.

24       A     Gonadotropin, yeah.  So, yeah, we do not have

25  an individual coverage policy for GnRH.  And that, of

Page 30

```
1   course, would be covered through the prescribed drug
2   services coverage policy, is how it would be addressed.
3        Q    Okay.  You do not have a policy, a pharmacy
4   policy for GnRH antagonists?
5        A    Not promulgated into rule.
6        Q    Okay.  Do you have any coverage policies -- I
7   didn't realize that when I asked whether there was a
8   coverage policy that you interpreted that to mean that
9   it had to be promulgated into rule.  Do you have any
10  coverage policies regarding these drugs that are not
11  promulgated into rule?
12       A    As far as the policy goes, we don't really
13  have a policy so for it -- so much.  There was a
14  guideline produced, I think, in 2016 that was given to
15  Magellan for guidance on the prior authorization
16  process, but as far as a policy goes, no, we don't
17  have -- we don't have a specific policy for these drugs.
18       Q    Okay.  So there was some guidance that AHCA
19  provided to Magellan regarding GnRH antagonists.
20            MS. DEBRIERE: Simone, can I have that coverage
21       guidance?
22            MS. CHRISS: This one?
23            MS. DEBRIERE: Yes, please.  Thank you.  We'll
24       mark that as Exhibit 4.  You definitely need a copy
25       of this one.
```

```
 1              (Whereupon, Exhibit No. 4 was marked for
 2      identification.)
 3              THE WITNESS: I've seen it enough times.
 4      BY MS. DEBRIERE::
 5         Q    Well, so is that what you're referring to when
 6      you said the guidance provided to Magellan?
 7         A    Yes.
 8         Q    That's all I needed to know.  Okay.  So I'm
 9      sure we'll come back to that.  And so you referenced FDA
10      approval in Medicaid coverage earlier.  When making
11      decisions about individual claims for coverage for
12      Medicaid recipients, does AHCA or its contractor
13      determine whether the use the drug is being prescribed
14      for is FDA approved?
15         A    Well, absolutely, yes.  I mean -- I mean, if
16      it doesn't have FDA approval, I mean, it's still -- I
17      mean, it's either not FDA-approved, it's still going
18      through clinical trials.  It's not FDA-approved, then
19      no, it's not eligible for coverage.
20         Q    Okay.  How does AHCA do that on an
21      individualized basis?
22         A    So for an individualized basis, generally this
23      is a prior authorization process, the request is put in.
24      The recipients, or health care plan enrollees, the
25      specific condition is evaluated and determination of
```

1   medical necessity is made.

2       Q    Okay.  What if the drug does not require prior

3   authorization, then how does AHCA determine whether the

4   use it's being prescribed for is FDA-approved?

5       A    That would normally have to involve a

6   retrospective claims review.

7       Q    Okay.  So at the time it'd be covered, but

8   then AHCA would go back and look to see if it should

9   have been covered?

10      A    That's correct.

11      Q    And how do they do that?

12      A    How do they do that?

13      Q    Yeah.

14      A    I don't know the specifics, generally either

15  MPI or another bureau.  Often people in the field will

16  often look at review claims, and this has happen

17  frequently, that if claims are found to be paid in error

18  or paid for services that were not necessarily -- not

19  medically necessary, but the Agency does have the

20  ability and frequently does gather recoupments on

21  providers.

22      Q    Okay.  MPI stands for --

23      A    Medicaid Program Integrity.

24      Q    So that's like a fraud investigation?

25      A    Yes, there are two fraud investigation teams

```
 1    of the state.  For MPI, they're specifically here for
 2    Medicaid.  Every Medicaid program in the country is
 3    required to have a program integrity team, but we also
 4    have Medicaid Fraud Control Unit over at the Attorney
 5    General's Office.
 6         Q    Okay.  Just turning back quickly to Exhibit 4,
 7    why is this not considered a coverage policy?
 8         A    Because coverage policies are generally --
 9    well, first of all, it's not promulgated in a rule.  So
10    all of our coverage policies go through the rulemaking
11    process, which is, of course, allows for public input
12    and everything like that.  This is mostly more -- these
13    are guidelines developed in-house and provided to our
14    PBM subcontractor.
15         Q    Okay.  For use in determining whether or not
16    to prescribe GN -- strike that.
17              Are there other coverage guidelines like this
18    not promulgated into rule for other drugs?
19         A    For other -- I am not aware of whether or not
20    we have any other guidelines like this.
21         Q    Okay.  What about for cross-sex hormone
22    therapy?
23         A    There was -- to my knowledge, there was no
24    guidance or for cross-sex hormones.
25         Q    Okay.  So going back to the MPI post-claim
```

1   reviews, how often does that happen?  Can you quantify?

2       A    I don't have enough numbers of how often it

3   happens, because obviously we have thousands of Medicaid

4   providers.  Then we do hear about cases of recoupment,

5   so I couldn't tell you what the percentage of providers

6   that had to pay back to the Agency money, but I can

7   tell -- I can definitely tell -- like, I know -- well,

8   for instance, I know -- like, I think Miami-Dade or

9   Broward County have -- like, their school district

10  actually they had -- after they had received a Federal

11  Audit from HHS, they ended up having to pay back, I

12  think, a million or so dollars in funds because they

13  were delivering services that weren't properly

14  documented and weren't meeting that medical necessity

15  criteria.  So as far as the larger numbers go, I don't

16  have those.

17      Q    Is there somewhere publicly the public can

18  access that information, or where we can access that

19  information?

20      A    So a public records request can always be put

21  in.  We don't have that information available on our

22  website, but anyone can put in a public records request

23  and find out, like, how often recoupments do occur.

24      Q    Do you know what a drug compendium is?

25      A    Yes.  Yeah, I'm aware of three.

1      Q     Which three are you aware of?

2      A     Drug Index is one.  There are two others whose

3    names do not -- whose names I do not recall immediately

4    offhand.  I believe they are listed.  And, of course,

5    they do usually consist of, like, a very large amount of

6    information on each specific drug, and it talks about,

7    like, appropriate uses and so forth.  So, for each of

8    these compendia -- and I -- they are -- we do utilize

9    them when evaluating whether or not we can use an

10   FDA-approved drug for an off-label purpose.

11     Q     Okay. Do you know if those three compendia are

12   Drug Text Information System, United States

13   Pharmacopoeia Drug Information and American Hospital

14   Formulate -- Formulary Service Drug --

15     A     That sounds correct.

16     Q     And those are the three compendia listed in

17   the Federal Medicaid Act?

18     A     Yes.

19     Q     Okay.  So when I'm using compendium, or

20   compendia for next set of questions, I'm referring only

21   to those three listed in the Federal Medicaid Act.

22     A     Okay, that's fine.

23     Q     For drugs that do not require prior

24   authorization, when making decisions about individual

25   claims for coverage, does AHCA or its contractors

```
 1   determine whether the use that drug is being prescribed
 2   for is supported by citation in one of the compendia?
 3        A    So is this for drugs that do not require prior
 4   authorization, or drugs that do require prior
 5   authorization?
 6        Q    Do not require.
 7        A    We really don't because we don't require prior
 8   authorization.  We're not able to check.
 9        Q    So that means where AHCA does not require
10   prior authorization for a Medicaid recipient to obtain
11   coverage of a particular drug, it covers the drug
12   without knowing in advance whether the use it's being
13   prescribed for is supported by citation in one of the
14   compendia?
15        A    If we're not requiring prior authorization,
16   there's no way for us to know in advance.
17        Q    Okay.  So I know you mentioned it earlier.
18   I'm just going to reference it on my computer, and that
19   is the prescription drug list.  And the website link --
20   I'll turn it so both you and counsel can see it, without
21   spilling my drinks.  That URL is
22   HTTPS://AHCA.myflorida -- Florida is spelled out --
23   .com//Medicaid/prescribed_drug/pharm -- P-H-A-R-M --
24   _thera -- T-H-E-R-A -- /PDF/PDL.pdf.  So I'm showing you
25   what is AHCA's preferred drug list.  Do you recognize
```

Page 37

1    it?

2         A    Yes, I recognize that.

3         Q    What is the PDL?

4         A    So the preferred drug list -- so even though

5    we have everything that's FDA-approved, our

6    Pharmaceutical and Therapeutics Committee, they do place

7    drugs on the preferred drug list.  I don't know the --

8    necessarily all the details.  I think often it has to do

9    with the ability for the agency to obtain rebates and so

10   forth, so -- but they do put this together.  It is

11   publicly available on our website.  And, of course, it

12   does -- it does, of course, have age -- it does have

13   age, minimum age, maximum age, clinical care required.

14             I would like to clarify, though.  I know for

15   our -- in our Medicaid Management Information System,

16   which we often dub as FMMIS, we do program for procedure

17   codes and so forth, corresponding diagnosis codes.  So

18   if a claim does not correspond to a diagnosis code,

19   and -- that claim can be denied automatically in the

20   system.

21        Q    Okay.  Okay.

22        A    Which, I'm sorry, I forgot --

23        Q    No, no, no.  It's helpful.  I just want to

24   make a note of it.

25        A    And we do program our system with ICD-10

1   codes, so we do have a build in our system for claims to

2   deny if they don't necessarily correspond to a specific

3   diagnosis code.

4        Q    And that's regardless of whether the drug

5   requires prior authorization?

6        A    If it's prior authorized, the prior -- there's

7   a different process for entering claims into the system

8   that are prior authorized.  So I think if it was prior

9   authorized, that would override the automatic denials,

10  but I would have to confirm that, but I believe that's

11  how the system does work.

12       Q    So FMMIS can be programmed to deny a certain

13  service if it's associated with a particular diagnostic

14  code, and that's done automatically?

15       A    That's automatic.  Yeah.  Claims can deny

16  automatically in the system, so we do have a fail-safe

17  there.

18       Q    Okay.  And that's even if the drug does not

19  require prior authorization?

20       A    That's correct.

21       Q    Okay.

22       A    So I know it's definitely the case for the

23  procedure codes that I administered when I was over --

24  when I was over specialized services.  I'm going to

25  assume that we have the same in place for NDC's,

1   National Drug Codes.

2       Q    Okay.  Because the services you were

3   previously working on were not prescription drugs, is

4   that correct, they were other Medicaid services?

5       A    No, they were a little of everything.

6       Q    Do you have a diagnostic code for every drug

7   in the system?

8       A    I can't speak to that at the moment.

9       Q    Okay.  Is there some way we can find that

10  information out?

11      A    Yeah, we can -- we can find that out for you.

12           MS. DEBRIERE: Okay.  Can we flag that as a

13      question, follow-up question?

14  BY MS. DEBRIERE::

15      Q    If a drug is on the PDL, does it mean it's on

16  the fee schedule?

17      A    So we don't -- so with drugs, and this is one

18  of the things with having worked -- working on the

19  Canadian Drug Importation Program is that drug pricing

20  is not a transparent process, so we don't actually list

21  rates, we just list what we cover, or we list what's on

22  the PDL.  We don't actually say what we'll reimburse.

23      Q    Okay, but if it's listed on the PDL, even if

24  the rate's not on the fee schedule, AHCA is going to

25  cover it?

1      A      Yeah.

2      Q      Okay.  Does the PDL apply to managed care plan

3  coverage of prescription drugs?

4      A      Yes, that's actually -- well, yes, actually.

5  I think -- I think -- I believe it does.  That we

6  wouldn't -- I would need to verify, but as far as --

7  like, I know that's the way our pharmacy benefit works.

8  So with pharmacy benefit managers, generally the law

9  ensures subcontract, that's the pharmacy benefit

10  managers, who handle both their prior authorization of

11  drugs and also negotiating rebates with manufacturers to

12  help, of course, lower expenses.  And so -- but for

13  Medicaid, the SMC health plans, they have PBM's that

14  they're really only there for the prior authorization

15  process of prescription drugs.  So their PBM's do not

16  negotiate rebates.  All that's done on the Agency side.

17  So the agencies have contracted PBM, which is another

18  branch of Magellan.  They're the ones that negotiate all

19  the rebates.

20      Q      Okay.  Just for clarity of the record, PBM

21  stands for --

22      A      Pharmacy Benefit Manager.

23      Q      Okay.  And then SMC PBM's, they're using the

24  PDL to determine whether or not to authorize coverage

25  for a prescription drug?

1      A     Well, since with Medicaid we'll cover anything

2   that's FDA-approved, they're going to be reviewing

3   primarily medical necessity.

4      Q     Okay.  Are they going to match up the request

5   for drug coverage to the PDL?

6      A     I don't know if they do that or not.

7      Q     Okay.  So you don't know if Medicaid managed

8   care plans rely on the PDL to authorize coverage?

9      A     I don't.  I can't speak to that.

10      Q     All right.  Let's look at a few specific

11   drugs.  Say this one for me again.

12      A     Estradiol.

13      Q     Estradiol.  Thank you.  Okay.  So the PDL

14   indicates that AHCA covers estradiol in each of these

15   formulations, there's many listed here, for at least one

16   indication, but we don't know what the indication is, or

17   at least the PDL doesn't indicate it, correct?

18      A     That's correct.

19      Q     Okay, but AHCA does not cover estradiol to

20   treat gender dysphoria?

21      A     That's correct.

22      Q     For what uses or indications does AHCA

23   authorize coverage for estradiol?

24      A     So for -- well, when estradiol needs to be

25   covered, generally, as I speak very generally, of

Page 42

```
 1    course, usually it's used for hormonal imbalances, but I
 2    mean, but still we go back -- we defer back to the
 3    medical necessity guidelines.
 4         Q    So what does the no -- let's look at the very
 5    first list -- listed formulation of estradiol, which is
 6    associated with Climara 0.025-milligrams-per-day patch.
 7    And looking over at the clinical PA required, it says
 8    no.  What does that mean?
 9         A    That means if the provider wants to prescribe
10    it, that, of course, they can prescribe it without
11    having to have a clinical review process.
12         Q    So that means no prior authorization is ever
13    required?
14         A    Not under fee-for-service.  Managed care
15    plans, however, they have the flexibility to make it go
16    through prior authorization.
17         Q    Okay.  So in fee-for-service, estradiol will
18    be covered without AHCA or its contractor first
19    determining for what purpose it's being used?
20         A    Right, not until the claim comes in.
21         Q    Okay.  So that would mean that Medicaid could
22    cover this drug if it were prescribed for
23    non-FDA-approved uses?
24         A    That's, of course, where our claim system
25    comes in.  So our claim -- our claim system was
```

 1   programmed -- and, of course, I'm speaking generally of

 2   our CPT codes, et cetera, that if it doesn't -- if the

 3   diagnosis code doesn't align with what's in the system,

 4   that can come back as a denial.

 5        Q    Okay.  So for estradiol, let's use this as an

 6   example, but not a hypothetical, in real life.

 7        A    Okay.

 8        Q    If estradiol is prescribed for treatment of

 9   gender dysphoria, is FMMIS programmed to automatically

10   deny that claim?

11        A    I would have to confirm with our -- with our

12   Medicaid fiscal agent operations to make sure -- to know

13   whether or not that the system has been updated for --

14   to deny that.

15        Q    Is it possible to program a system to do that?

16        A    To program it to deny it?

17        Q    Based on -- based on the diagnostic code --

18        A    From my experience, it's pretty -- it's a

19   pretty simple affair to update the system to -- when

20   we -- because we are uploading new and deleting

21   diagnosis codes or uploading new procedure codes, I

22   mean, it's generally a pretty straightforward process.

23        Q    Okay.  Can you provide us a list of those

24   diagnostic codes at some point?

25        A    For estradiol?

1      Q   I think -- well the diagnostic codes would

2  be -- are you using CPT codes?  What are you using?

3      A   So we use ICD-10 for --

4      Q   ICD.  Okay.

5      A   -- because it's going to be primarily -- those

6  are going to be like your -- well, those are your

7  service codes.  Those aren't drug codes.

8      Q   Okay.  So you use -- for your diagnostic

9  codes, it's associated with ICD-10?

10     A   That's correct.

11     Q   Okay.  So, looking at testosterone, this

12  indicates that -- we've got to get there first, don't

13  we?  So this indicates that AHCA covers testosterone,

14  and each of these formulations listed on the PDL for at

15  least one indication, although based on the PDL, we

16  don't know which indications for which it covers; is

17  that correct?

18     A   Yeah.  I mean, there's a very large number of

19  FDA-approved clinical indications for testosterone.

20     Q   Okay.  Just for clarity, AHCA will never cover

21  testosterone when used to treat gender dysphoria, is

22  that correct?

23     A   Yes.

24     Q   And it looks like, at least some of these

25  formulations, including, for example, Andrew Durham,

1   four milligrams, 24-hour patch, that there is a clinical

2   prior authorization that's required.  Is that correct?

3        A    Yes.  Yeah.  Based on the PDL?  Yes, there

4   would be a PA required.

5        Q    For what uses or indications does AHCA provide

6   prior authorization or approve coverage?

7        A    So that goes back to our definition of medical

8   necessity.

9        Q    Okay.  Would it also be governed by AHCA's

10  drug criteria?  And I'll just -- I'll pull that up.  So

11  when I say AHCA's drug criteria, I'm referring to that

12  criteria listed at https://AHCA --

13  A-H-C-A --.myflorida.com/Medicaid/prescribed_ drug/drug

14  _criteria.shtml.

15          And so would the drug criteria -- I'm looking

16  at the screen.  It says testosterone criteria updated

17  6-16-2022.  Would the indications for which testosterone

18  will be prior authorized -- prior authorized, would it

19  be contained in this criteria?

20       A    It would be contained in that criteria.

21  That's correct.

22       Q    Okay. Is this list exhaustive of all

23  prescription drugs that AHCA will cover?

24       A    I think -- I mean, I haven't seen the entire

25  list, so -- but, I mean, for any drugs that we deem that

```
 1   criteria is necessary, I imagine that would be an
 2   exhaustive list.
 3        Q    Okay.  This applies in fee-for-service,
 4   correct?
 5        A    Those would apply for fee-for-service, yes.
 6        Q    How about for managed care?
 7        A    Managed care plans would need to be able to --
 8   they would -- they would need to mirror their criteria
 9   and align it with the agency's.
10        Q    So it can't -- my understanding is the managed
11   care plan criteria cannot be more restrictive than what
12   AHCA --
13        A    That's correct.  So they can be less
14   restrictive, they can't be more restrictive.
15        Q    Okay.  Would the drug criteria listed here at
16   the link to testosterone provide all the instances in
17   which testosterone would be covered after prior
18   authorization review?
19        A    On the criteria?
20        Q    Uh-huh?
21        A    After --
22        Q    Yes.
23        A    Well, I would -- I'd have to -- I haven't
24   actually had a chance to physically look at the
25   criteria, so -- but I would assume that what we have the
```

1   criteria is accurate, especially given that it was

2   updated in June 2022.

3        Q    Okay.  Turning back to EPSDT briefly.  If the

4   drug was being prescribed to a child under age 21, when

5   AHCA or its contractor was undertaking the prior

6   authorization process, could AHCA or that contract --

7   would AHCA or that contractor deviate from this criteria

8   if the drug was otherwise prescribed for a medically

9   necessary use?

10       A    I have trouble following that question.

11            MR. JAZIL: Object to form.

12   BY MS. DEBRIERE::

13       Q    So where testosterone was prescribed to a

14   child under 21.

15       A    Okay.

16       Q    And EPSDT applies, then could AHCA or its

17   contractor in its prior authorization review deviate

18   from the criteria listed here?  If medically necessary.

19       A    As long as it meets medical necessity

20   criteria, whether or not there's criteria involved and

21   it meets -- if it's for an off-label use and it meets

22   our off-label criteria, I mean, under EPSDT, I mean,

23   yes, Florida Medicaid can cover it, but -- I mean, that

24   would, of course, require significantly in-depth review,

25   et cetera, but, I mean, hypothetically speaking, yes.

1    Q    And one of the requirements -- just to circle

2    back -- one of the requirement under that medical

3    necessity review is that the prescribed drug cannot be

4    for an experimental or investigational use, correct?

5    A    That's correct.

6    Q    All right.  Just turning quickly back to FMMIS

7    programming of the ICD-10 codes, what ICD-10 codes are

8    programmed into the system for estradiol?

9    A    What ICD-10 codes?

10   Q    Yes.

11   A    We would have to check the system.  I would --

12   because I know pharmacy codes are set up a little

13   differently than our procedure codes.  So I'm kind of

14   using the procedure code as analogous to the drug codes,

15   but we would need to speak with one of our pharmacists.

16        MS. DEBRIERE: Can we flag that as a follow-up

17        question, too?  I had one more.  So if you -- can

18        we take a break for two minutes?  I just want to

19        confer -- or we can do longer if you need a second

20        to go to the bathroom.

21        THE WITNESS: If you need a break, you can go

22        ahead and take the break.  That's fine.

23        MS. DEBRIERE: Thank you.  Okay.

24        VIDEOGRAPHER: This concludes video one.  The

25        time is 11:05 a.m.

1          (Brief recess.)

2          VIDEOGRAPHER: This is the beginning of video

3      two.  The time is 11:08 a.m.

4   BY MS. DEBRIERE::

5      Q    All right.  So turning back to the preferred

6   drug list, AHCA's preferred drug list, and looking at

7   the formulation of testosterone cypionate -- did I say

8   that correctly?

9      A    I really don't know.

10      Q    The PDL indicates that AHCA covers

11   testosterone cypionate for at least one indication,

12   although it doesn't say what indication, correct?

13      A    Not on the PDL, no.

14      Q    Does it say it anywhere?  Is there anywhere we

15   can find that information?

16      A    Unless there's that criteria, unless we have a

17   criteria listed on the website, generally, no, that's

18   like one of the things -- I mean, we do have our claim

19   system set up, which -- but like all that information

20   is -- I mean, I suppose it could be obtained through

21   public records request.  That's usually the process.

22      Q    Okay.  So AHCA will never cover testosterone

23   cypionate, or any formulation of testosterone for

24   treatment of gender dysphoria, is that correct?

25      A    That's correct.

1     Q    So looking at the formulation of testosterone

2    cypionate of testosterone CYP 1000 milligrams per 10

3    milliliters, that indicates there's no clinical prior

4    authorization required, correct?

5     A    That's correct.

6     Q    So that means that AHCA will cover the drug or

7    reimburse for the drug without determining for what use

8    it's being prescribed?

9     A    Well, based on my understanding of how our

10   system works, through my experience is that the claim

11   would deny.

12    Q    Because why?

13    A    Because the diagnosis code that'd be

14   associated with that drug would trigger the system to do

15   a denial.

16    Q    Okay.  So you're looking not at the indication

17   of the -- what indication the drug's being prescribed

18   for, but instead you're looking at the diagnostic code?

19    A    So -- that's correct.  Part of the process

20   requires the procedure code, diagnostic code and place

21   of service.  Of course, those are for our health

22   services, but those three all have to be programmed into

23   the system.  So say you're delivering a -- doing a

24   checkup in a other setting, or you're doing like a

25   setting that's not approved by us, it's not in our

 1    policy, that claim would deny.

 2         Q    Okay.  What if it wasn't for the treatment of

 3    gender dysphoria?  What if it was for a diagnostic code

 4    that was not programmed to automatically deny?

 5         A    If it was for -- so if it was for a diagnosis

 6    code that was not programmed to deny?

 7         Q    Right.

 8         A    If it's programmed in the system -- we

 9    don't -- so we program the codes that it will approve.

10    So all the other codes, it's not loaded in the system

11    would automatically deny.  So each -- so there'll be a

12    set of ICD-10 codes that are -- that would link up with

13    a particular service.  As long as the diagnostic code

14    corresponds to that service, the claim will pay.

15         Q    Okay.  So with the formulation of testosterone

16    cypionate that we've been discussing that no clinical

17    prior authorization is required, if the diagnostic code

18    is programmed into the system, then it's going to

19    automatically approve without looking at the indication

20    for which the drug is prescribed?

21         A    Provide that the claim form is -- it's a clean

22    claim and all the pertinent information corresponds with

23    the physician requirements, they will pay.

24         Q    What is involved in a clean claim?

25         A    No errors.

Page 52

1       Q     Errors of what?

2       A     Someone might type in the wrong code by

3    accident.  Maybe they -- human error.

4       Q     Okay.  But you're -- but in that clean claim,

5    there's no requirement to submit the indication for

6    which it's being prescribed or AHCA undertaking a review

7    of that?

8       A     I mean, we do do retrospective review of

9    claims.

10       Q     At the time the coverage is being requested.

11       A     Okay.  Can we go back a little bit?

12       Q     Yeah, yeah.  Yeah.  So looking at this

13    formulation of testosterone cypionate, where no clinical

14    prior authorization is required, when the claim is

15    submitted and -- when the claim is submitted, AHCA is

16    not doing a review of whether the indication it's being

17    prescribed for -- sorry.  Scratch that.

18            Looking at testosterone cypionate, in the

19    formulation that we've been discussing where no clinical

20    prior authorization was required, when the claim is

21    submitted, AHCA -- neither AHCA nor its contractors does

22    a review to determine for what indication the drug is

23    being prescribed for?

24       A     Right, there'd be no manual clinical review

25    process or prior authorization process, if that's what

1   you're asking.

2        Q    And when you said AHCA will only cover drugs

3   that are FDA-approved, does that mean that AHCA never

4   covers off-label use of a drug?

5        A    We do have a -- no, we definitely would

6   never -- we have a procedure for covering FDA-approved

7   drugs for non-approved clinical indications, AKA

8   off-label use.  We do have a procedure for that.  So we

9   wouldn't necessarily -- no, we would never say never.

10  That's --

11       Q    Okay.  I thought you said earlier that AHCA

12  will only cover FDA-approved drugs?

13       A    Right.  But, I mean, like, let's say there's a

14  drug that -- okay.  Let's say it's been manufactured by

15  European pharmaceutical or, you know, it's a

16  pharmaceutical and it hasn't gone through the FDA review

17  process, brand new drug.  It's not FDA-approved.  It's

18  really not even approved -- it's not even approved for

19  sale on the market.  We won't cover those.

20       Q    Okay.  Okay.  But you will cover drugs that

21  are FDA-approved for uses that in and of themselves are

22  not FDA-approved, for off-label uses?

23       A    Yes, we have a procedure for that.

24       Q    Okay.  Do you ever program into the system the

25  use of a drug for a condition for which the drug is not

1    FDA-approved?

2         A    I can't speak to a hundred percent for that,

3    but it seems it'd be counter to the process we have in

4    place for reviewing off-label use for drugs.

5         Q    Okay.  And what is that process?

6         A    So, it's a three-prong process.  Step one is

7    that there has to be a trial period for FDA-approved

8    drugs for that clinical indication to have tried to have

9    been used.  And, of course, if the FDA-approved drugs

10   for that kind of indication are not successful, then

11   the -- then it moves to the second prong, which, you

12   know, that requires like phase-three clinical trials

13   having had to be completed on that drug.  Then the third

14   step is that the peer-review literature and one of the

15   three drug compendia that we mentioned earlier has to

16   pass the list or support it.

17        Q    So you're looking at when determining whether

18   or not you'll authorize coverage for a prescribed drug,

19   you're looking at more than just whether the indication

20   for which it's being prescribed is listed in the

21   compendia?

22        A    Yes, it's a little bit more comprehensive,

23   correct.

24        Q    Yeah.  And so first you look at the individual

25   Medicaid recipient and you determine whether or not they

1   tried other drugs?

2        A    That's correct, yeah.

3        Q    Okay.

4        A    It would be an individualized basis.

5        Q    Okay.  And then the second step was what?

6        A    A phase-three -- the drug had to have

7   completed phase three clinical trials.

8        Q    And then the third step is you look to see if

9   the indication that's being prescribed for is listed in

10  the compendia plus --

11       A    Plus support in the peer-reviewed literature.

12       Q    Okay.  Let's look back at Exhibit 3.

13            MS. DEBRIERE: Simone, do you have that handy?

14       That's the cross-sex hormone therapy GAPMS.

15            MS. CHRISS: You should still have those two

16       versions.

17            MS. DEBRIERE: I might have it.  I have a

18       notice of deposition and I have a cross-sex hormone

19       therapy.  Here it is.

20  BY MS. DEBRIERE::

21       Q    Is there anywhere on this GAPMS that describes

22  the process for the criteria used?

23       A    It's on page nine, if you're referring to the

24  off-label use.

25       Q    Okay.  And that starts with the criteria that

1    utilized under the Florida Medicaid program and

2    authorization for drugs for off-label purposes are as

3    follows?

4         A    Uh-huh.

5         Q    Okay.  And that's what you just described to

6    me?

7         A    Yes.

8         Q    Yeah.  Okay.  All right.  Turning to past

9    GAPMS regarding gender dysphoria.

10        A    Okay.

11        Q    We are aware, plaintiff's counsel is aware of

12   three pre-2022, at least draft GAPMS reports regarding

13   Medicaid coverage of the treatment for gender dysphoria.

14   One we've already marked as Exhibit 3, and that is the

15   May 20th, 2022 version of the GAPMS for cross-sex

16   hormone therapy.  We actually know of two other

17   versions, one dated June 23rd, 2017 and one dated April

18   19th, 2022.  So we're going to mark the June 23rd one as

19   Exhibit 5?

20             MS. DUNN: Yes.

21             (Whereupon, Exhibit No. 5 was marked for

22   identification.)

23             THE WITNESS: Yeah.  I have to apologize for

24        the auto-dating on those documents, so I can

25        probably give you more accurate dates --

Page 57

```
1    BY MS. DEBRIERE::

2         Q    Yeah, let's get the documents in front of you,

3    and then that's exactly what we were wondering about.

4    It can get confusing.

5         A    I can give you more --

6         Q    That would be -- that's exactly what we're

7    after.  We appreciate that.

8              MR. JAZIL: They're identical except for the

9         date, right?

10             MS. DEBRIERE: Yes.  Yeah -- well, that's not

11        true.  Yeah --

12             THE WITNESS: Well, I have this one.  I mean,

13        it's fine.  There's one -- there should be one for

14        surgeries.

15             MS. DEBRIERE: No, no.  We're just looking at

16        the versions of cross-sex hormone therapy right

17        now.  We have three different versions, at least,

18        that we've found so far.

19             MR. JAZIL: Thank you.

20   BY MS. DEBRIERE::

21        Q    Okay.  So let's first look at the one with the

22   June 23rd date.

23        A    Okay.

24        Q    June 23rd, 2017.  Who authored the version of

25   this report?
```

1      A    So listed in our assignment writing and

2  tracking page in SharePoint, the author of this was

3  Sarah Craig.

4      Q    Okay.  And do we have that routing form?

5           MR. JAZIL: You should.

6           THE WITNESS: They should have it.  We -- I did

7      produce it for everybody.

8  BY MS. DEBRIERE::

9      Q    Okay.  And then that was back in 2017 when she

10 authored this?

11     A    She authored it in 2016.  This is actually --

12 so to provide a little context.

13     Q    Please.

14     A    So in 2016, this was before I came to the

15 Bureau of Medicaid Policy, there wasn't -- there wasn't

16 a GAPMS position.  Because they were accumulating a lot

17 of services, a lot of requests for coverage, they

18 created two GAPMS positions in the fall of 2016.  They

19 were filled in January 2017.  So GAPMS reports often

20 went to subject matter experts.  So that's -- so in 2016

21 when this one was completed, the person who completed

22 it, their primary job was not GAPMS.

23     Q    Okay.  What was Sarah Craig a subject matter

24 expert in?

25     A    She was one of our pharmacists.

1    Q    Okay.  And right now, just for clarity of the

2    record, we're looking at June 23rd, 2017.  That's

3    labeled Exhibit 6.

4         (Whereupon, Exhibit No. 6 was marked for

5    identification.)

6    BY MS. DEBRIERE::

7    Q    Who -- so saying that, let's move on to the

8    April 19th, 2022, which is labeled as Exhibit 5, who

9    authored this report -- or made the revisions, I should

10   say, in the April 19th, 2022 version?

11   A    The only person I'm aware of who worked on

12   this one was Sarah Craig.  Since this was done before my

13   entrance into the Bureau, and she's the only author

14   listed in our system.

15   Q    And were any changes made on the April 19th,

16   2022?

17   A    No.  That may have been a day when it was

18   pulled out to be printed.

19   Q    Okay.  Why would it have been pulled out to be

20   printed?

21   A    I think -- because there had been some

22   questions about the history of whether the Agency had

23   previously done any work on this subject.

24   Q    Okay.  And why did those questions arise?

25   A    Those questions had arisen as part of the

Page 60

 1    request process for the GAPMS report we did, and that

 2    was approved on June 2nd.

 3         Q    And that's related to the treatment of gender

 4    dysphoria?

 5         A    That's correct.

 6         Q    Okay.  Does Sarah Craig still work at the

 7    Agency?

 8         A    Sarah Craig, I think, left in 2020.

 9         Q    Okay.  Do you know where she went?

10         A    I do not.

11         Q    Were there any changes -- looking back at

12    Exhibit 3, which is dated May 20th, 2022, there are some

13    revisions on this one.

14         A    Okay.

15         Q    For example, Beth Kidder is crossed out and

16    Ashley Peterson's name is put in.  And the subject line

17    is crossed out and there's just some edits and comments.

18    And it looks like some text was added, for example, on

19    page three.

20         A    I was not privy to any edits or changes being

21    made after -- I was not privy to any changes being made

22    to that document.

23         Q    Okay.  Well, just to be clear, you're here as

24    the Agency representative and not in your individual

25    capacity, so you should have some knowledge about any

1    revisions to these reports, based on your designation as

2    the Agency representative.  Can you not speak in that

3    capacity to it?

4         A    As far as the work goes during the time period

5    that we were working on the June 2nd GAPMS?

6         Q    Uh-huh.

7         A    That -- the work for the determination of the

8    transgender dysphoria in relation to consistency with

9    GAPMS, that task was specifically designated to myself,

10   and Nai Chen and Devona Pickle in supporting roles.

11        Q    Okay.  Right now, though, I'm just asking

12   about revisions made to the May 20th, 2022 version.  You

13   do not know who made these revisions, is that correct?

14        A    I do not know who made those revisions,

15   because -- as the Agency witness.  Nobody was requiring

16   revisions to that document.

17        Q    But there were revisions made based on what

18   I'm looking at.

19        A    Whoever did so was doing so on their own

20   accord.

21        Q    Okay.  Who had access to this document?

22        A    Well, given that any -- actually, anybody has

23   access to that document because the documents -- it's

24   available on our SharePoint site.  It doesn't require a

25   password.  Anyone in the bureau, anyone who's

Page 62

1    knowledgeable of our repository could go through and

2    pull up that document.

3         Q    Okay.  Could it have been Ashley Peterson who

4    made the revisions?

5         A    It's possible.  We would have to find out from

6    our IT department.

7         Q    Okay.  I think we do need that information.

8    And then who's GS?  There's some comments on the side

9    there on the front page, Exhibit 3.  It says GS 1.

10        A    Well, GS would be initials.  Would usually

11   like last name first, first name second.  I might --

12   might occur to me later on.  I can't --

13        Q    Would it be Sheena Grantham?

14        A    It's possible.  I don't know.

15        Q    Okay.  Can you track who has access to this

16   document?

17        A    Yeah, our IT department can track whoever had

18   made edits to that.

19        Q    Okay.  Okay.  So we can find out the answer to

20   that question?

21        A    Yes.

22             MS. DEBRIERE: Let's flag that.

23   BY MS. DEBRIERE::

24        Q    Was this report ever finalized?

25        A    To my knowledge, and I did actually do some

1   history -- do historical digging on this one.  Since our

2   pharmacy manager at the time, and I do need to add it

3   because I forgot to add, that I did consult Arlene

4   Elliot, who was the pharmacy manager at the time that

5   this report was initially prepared, I did confer with

6   her to determine whether or not it was finalized.  And

7   what I mean by finalized, it went through the review

8   process and was signed off by the deputy secretary.  She

9   let me know that it had not.

10       Q    Okay.  Do you know why or why not?  Why was it

11  never finalized?

12       A    Well, generally, and this is often the case

13  with GAPMS reports, is that because it's -- well,

14  Medicaid is a -- it's very busy -- we're a very busy

15  division.  We have lots of requests, lots of asks, lots

16  of projects, and often GAPMS reports, usually, for those

17  of us who like to be very detailed and very analytical,

18  we, you know, it's -- it's a craft.  It's almost like

19  each one is like a seminar paper or scholarly article.

20  It takes time to read and review.  And usually it's --

21  and sometimes often, because unless somebody's asking

22  for it, or if it's deemed a low priority, often it

23  just -- it just often waits.  And that may have been

24  why.  That's speculation, though.

25       Q    Okay.

1      A      But it's not surprising that a GAPMS draft is

2   out there and didn't complete the review process.

3   Solely it's because there's just too many other projects

4   going on.

5      Q      And GAPMS is generally low priority?

6      A      It depends.

7      Q      What does it depend on?

8      A      Depends on the situation, because often when

9   the managed care plan requests for the GAPMS, that's

10   usually -- those usually have to be addressed quickly.

11      Q      Okay.  Let's set expedited GAPMS aside.  Just

12   traditional GAPMS, are they generally low priority?

13      A      A traditional GAPMS?  Well, like I said --

14   like I said, it often depends on the context.  It

15   depends on the request.  Sometimes it could be --

16   sometimes it's a stakeholder who made their voice known

17   downtown.  Sometimes -- I mean, it really depends on the

18   context.

19      Q      Okay.  When you're referencing downtown, what

20   do you mean by that?

21      A      The Capitol.

22      Q      Okay.  So sometimes GAPMS will get bumped up

23   if the Capitol is the person who's raising --

24      A      It just depends on the situation/I just don't

25   want to commit to an absolute answer saying that they're

1    all low priority, because not every single circumstance

2    or every single GAPMS means that it will be.

3         Q    Okay, but with the cross-sex hormone therapy

4    GAPMS, you're guessing that one reason why it was never

5    finalized is because it was low priority?

6         A    That's a guess in relation to my experience

7    when I had the role.

8         Q    Okay.  And what was your experience when you

9    had the role?

10        A    When I -- when I had the role, I had it for

11   about 10 months, and I think I drafted ten reports and

12   two of them made through the review process.  Those two

13   I reviewed in January.  They weren't finalized and

14   signed off on until July of that year.  So often, it was

15   more trying to -- you know, reminding supervisors at

16   different levels to review them so they can move

17   forward.  And given how busy everything was, especially

18   with legislative session going on or other special

19   projects taking precedence, often if it could be done --

20   put on hold until the next day or later, it was.

21        Q    Okay.  And so for the two of the ten reports

22   that were finalized, it took seven months for the

23   reports to be finalized, reviewed and finalized?

24        A    Yes.

25        Q    Prior to its adoption, prior to AHCA's

```
 1   adoption of the categorical exclusion of treatment for
 2   gender dysphoria, did Florida Medicaid -- were there any
 3   instances where Florida Medicaid ever authorized
 4   coverage for cross-sex hormone therapy to treat gender
 5   dysphoria?
 6        A    Were there any circumstances?  The Agency
 7   didn't have a policy or criteria regarding cross-sex
 8   hormones or, like, hormones for that clinical
 9   indication.
10        Q    So that wasn't quite my question.  My question
11   is prior to the adoption of the categorical exclusion of
12   treatment for gender dysphoria, were there any
13   instances, so --
14        A    Under -- so, well --
15        Q    Did Florida Medicaid ever cover treatment of
16   gender -- use of -- did Florida Medicaid ever authorize
17   coverage for cross-sex hormone therapy to treat gender
18   dysphoria?
19        A    So by Florida Medicaid, are you referring to
20   the Agency?
21        Q    AHCA or any of its contractors, Medicaid
22   managed care plans or EQ Health or --
23        A    Under fee-for-service, that was -- no, it was
24   not an approved clinical indication.  Obviously, with
25   managed care plans, since they have the flexibility to
```

Page 67

1    cover services that, you know, that are not necessarily

2    clarified in our coverage policies so -- I mean, it's

3    possible that we could have done that, yes.

4         Q    Okay.  So, to be clear, in fee -- under

5    fee-for-service, prior to the adoption of the

6    categorical exclusion for the treatment of gender

7    dysphoria, there was never an instance of Florida

8    Medicaid covering cross-sex hormone therapies to treat

9    gender dysphoria?

10        A    Are you referring to the fee-for-service?

11        Q    Fee-for-service only.

12        A    We don't necessarily have that information

13   available.

14        Q    Why?

15        A    Well, not offhand.

16        Q    Why?

17        A    Well, going -- because we want to go back

18   several years.  We're assessing an extensive data pull.

19        Q    Or even just six months prior to August 21st,

20   2022.

21        A    So I think we did do a data pull for the past

22   year.  And that data pull, of course, show the results

23   of what services we were covering, had the number of

24   recipients with the diagnosis for gender dysphoria, and

25   those who received treatment.  So I'll defer to that

Page 68

1    data.

2         Q    So we don't have that data in front of us.

3    And, again, you were produced as the 30(b)(6)

4    representative, so what did that data show?

5         A    That data did show that some -- that there

6    were a handful of recipients who were receiving the

7    services.

8         Q    In fee-for-service?

9         A    I think fee-for-service.  I think managed

10   care.

11        Q    Okay.  So there were times, prior to the

12   adoption of the categorical exclusion for the treatment

13   of gender dysphoria, that Florida Medicaid covered

14   cross-sex hormone therapy for treatment of gender

15   dysphoria?

16        A    Cumulatively for the whole program, yes, there

17   were.

18        Q    Okay.  So another previous GAPMS regarding

19   gender dysphoria is the GAPMS entitled puberty

20   suppression therapy, and that begins at DEF_ 000288776.

21   Although, for clarity of the record, I do want to say we

22   received multiple versions of this document, as well.

23             MS. DEBRIERE: Do we have the final one, by any

24        chance?  I'm positive it was my mistake in terms of

25        listing exhibits.

1              MS. DUNN: The one that was signed?

2              MS. DEBRIERE: Yeah.

3              MS. DUNN: That's a whole different -- it has a

4        different name.

5              MS. DEBRIERE: I'm sorry, guys.  That's my

6        fault.  My fault.

7              MR. JAZIL: Counsel, do you want him to clarify

8        that date issue?  I think he mentioned it as you

9        were --

10             MS. DEBRIERE: Oh, yeah, I thought he did.  I'm

11       sorry if -- please, go ahead and clarify the date

12       issue.

13             THE WITNESS: So both of these GAPMS were

14       initiated in 2016.

15  BY MS. DEBRIERE::

16       Q    Okay.  When you say both of these GAPMS,

17  you're referring to --

18       A    Referring to the one on the cross-sex hormone

19  therapy.

20       Q    Okay.

21       A    And the one on the puberty suppression.

22       Q    Okay.  Let's not talk about the puberty

23  suppression one just yet, because I want to get the

24  right exhibit into the record first.

25       A    Okay, but as far as the date goes, these were

1    projects from 2016.

2         Q    Okay.  Okay.

3              MR. JAZIL: Counsel, if you'd like me to just

4         make additional copies of that, I'm sure we can.

5              MS. DEBRIERE: So there are multiple versions

6         that were provided to us of this document.  We are

7         looking for another version that has a signature on

8         it, although I'm sure Mr. Brackett can speak to it

9         being finalized.  But just to make everyone's life

10        easier in the long run, we are going to try to --

11        yeah, this is great.  Okay.

12             Chelsea, should we mark it?

13             MS. DUNN: Yeah.  Do you want that Exhibit 7?

14             MS. DEBRIERE: Are we on 7?  Okay.

15             (Whereupon, Exhibit No. 7 was marked for

16        identification.)

17   BY MS. DEBRIERE::

18        Q    All right.  We have only one copy of this, and

19   it's DEF_000288776, entitled puberty suppression

20   therapy, dated September 14th, 2016.  And the reason we

21   were -- and that's going to be marked as Exhibit 7.  The

22   reason we wanted that one is because if you turn to the

23   back page, it's signed by Mr. Senior.  So we assume then

24   that's the final report?

25        A    This would be the final report if he signed

Page 71

1    it.

2         Q    Okay.  So it was adopted by the Agency?

3         A    The recommendations in this GAPMS were -- yes,

4    they would be adopted.

5         Q    Who authored this report?

6         A    So in the --in our system, our SharePoint

7    system, that was the individual listed for this report

8    was Monique Johnson.

9         Q    Okay.  And who was Ms. Johnson?  What was her

10   subject matter expertise?

11        A    So she was a program administrator and she

12   oversaw the primary care services team, which is

13   primarily like surgeries, inpatient -- inpatient

14   services, dental services.  Like, I think like surgical

15   procedures, things like that.  Of course, child health

16   checkup procedures.  Generally be like primary care and

17   preventive, anything that would fall into those

18   categories.

19        Q    Why would she then look at puberty suppression

20   therapy?

21        A    So this was, at the time before we had the

22   defined GAPMS individuals, so I can only speculate as to

23   why she was selected.  It may have been she had

24   bandwidth at the time to do it, but since there was no

25   one who actually did GAPMS full time, I don't -- I can't

1    speak as to -- because I'm not that familiar with her

2    background, I can't -- and, of course, this was 2016,

3    but more or less, there may have been a number of

4    reasons for why she was selected for this.

5         Q    Okay.  Why wouldn't it have gone to a

6    pharmacist?

7         A    We don't have the -- an answer for that.

8         Q    Was Ms. Johnson a pharmacist or pharmacy tech

9    or had any --

10        A    I think she was an RN.

11        Q    Okay.

12             MR. JAZIL: Counsel, just so the record's

13        clear, this copy of Exhibit 7 has highlights on it.

14        Did you --

15             MS. DEBRIERE: It would have not been -- it

16        would have been highlighted by us.  Is that right?

17        Yeah.  So my apologies.

18             MS. DUNN: It's the only copy we have, but we

19        can potentially print a clean copy.

20             MS. DEBRIERE: And it's Bates-stamped.

21             MR. JAZIL: It's fine.  I just want the record

22        to be clear that it's highlighted and the

23        highlights were added by counsel for plaintiffs,

24        not the witness.

25             MS. DEBRIERE: Yes.  Thank you for that, Mo.

Page 73

 1    BY MS. DEBRIERE::

 2         Q    Okay.  So going back to Exhibit 4, pubertal

 3    suppression -- yep.  This is the special services

 4    criteria.  This was developed only six days after the

 5    puberty suppression therapy GAPMS report.  Is that

 6    correct?

 7         A    You mean the criteria?

 8         Q    Yes.  Yes.  Exhibit 4.

 9         A    Based -- I'm going to defer to the dates on

10    this, because it predates my time in the Bureau of

11    Medicaid Policy.  So if the dates say 30 days, then that

12    would be --

13         Q    The dates say six days.

14         A    The dates say six days?

15         Q    Yeah.

16         A    I'll defer to that.

17         Q    Okay.  Are these two documents related?

18         A    Can you provide some context on what related

19    means?

20         Q    Is one based off another?

21         A    It seems -- it would appear that following the

22    completion and approval of the GAPMS process, that this

23    document was completed, routed and then approved, based

24    on the time stamps.

25         Q    Okay.  So was the special services criteria at

1    Exhibit 3, was it drafted based on the information

2    contained in the GAPMS report related to puberty

3    suppression therapy?

4              MR. JAZIL: Exhibit 4?

5              MS. DEBRIERE: Did I say 3?  I'm sorry.

6         Exhibit 4.  Thank you, Mo.

7              THE WITNESS: It looks like it's fairly

8         consistent.

9              MS. DEBRIERE: Okay.

10             THE WITNESS: Based on the EPSDT consideration

11        portion.

12   BY MS. DEBRIERE::

13        Q    So based on your understanding of office

14   operations, then it's likely that the special services

15   criteria was drafted in response to the puberty

16   suppression therapy GAPMS?

17        A    Yes.

18        Q    Okay.  And this is the -- this policy, Exhibit

19   4, is the criteria that AHCA used prior to its adoption

20   of the categorical exclusion of treatment for gender

21   dysphoria to determine whether gonadotropin-releasing

22   hormone analog would be prior authorized for pubertal

23   suppression and treating gender dysphoria, correct?

24        A    Yes, correct.

25        Q    Okay.  Between the time this policy was

Page 75

1    adopted, which was October 6th, 2016, and the time AHCA

2    adopted the categorical exclusion of treatment for

3    gender dysphoria in August of 2022, if an individual's

4    condition met the criteria laid out in this policy, then

5    Florida Medicaid would cover the cost of the drug for

6    pubertal suppression and the treatment of gender

7    dysphoria, is that correct?

8        A    Providing that the criteria, and prior to the

9    challenge exclusion, yes.

10       Q    Okay.  Between October 6, 2016, and the time

11   AHCA adopted its categorical exclusion of treatment for

12   gender dysphoria, how many times did AHCA authorize the

13   drug set forth in this policy for the treatment of

14   gender dysphoria?

15       A    We would have to defer at least -- at least

16   prior to the challenge exclusion being implemented, we'd

17   have to defer that data for that time period, but we'd

18   have to go all the way back to 2016 as far as the data

19   goes, at least in fee-for-service, to determine how many

20   recipients actually received the -- actually received

21   authorization for it.

22       Q    Do you have any knowledge of any time period

23   in which fee-for-service covered it, based on the

24   criteria in this policy?

25       A    So this -- so once this policy -- so once this

1   criteria was released to Magellan, Magellan was our PBM

2   for fee-for-service.  So they did the prior

3   authorizations for fee-for-service.  So Magellan would

4   review each case individually.

5        Q    Okay.  Do you know how many times Magellan

6   authorized it based on the criteria?

7        A    I do not have those numbers.

8        Q    Okay.  Can we get those numbers?

9        A    We can try to find them.  We can try to get

10  those numbers.  It's a very long time period.

11       Q    But it is your understanding that in certain

12  instances, Magellan did authorize it?

13       A    We would have to -- we would have to look at

14  those numbers.

15       Q    Okay.  Because previously, when we were

16  discussing cross-sex hormone therapy, you did know that

17  in some instances fee-for-service had covered the drug

18  to treat gender dysphoria, but you don't have that same

19  information for pubertal suppression?

20       A    That's speaking more about Medicaid,

21  cumulatively as far as the differences between

22  fee-for-service and managed care encounters, I would

23  have to take a look at the data to get the exact numbers

24  of what was in the fee-for-service system versus the

25  encounters for the managed care were.  But we would --

1   have we would have to go ahead and get this information

2   from Magellan going back to find out exactly how many

3   times that they get pre-authorization requests versus

4   how many approval/how many denials.

5        Q    Okay.  Let's just look quickly at exhibit --

6   it's going to take me a second to find it.

7             MS. DEBRIERE: Simone, is the list of Medicaid

8        recipients and discussion of their

9        authorizations -- yeah.  I don't know.  Yeah,

10       that's it.  Not surgery, though.  There should be a

11       drug one.  Maybe I'm wrong.  They probably didn't

12       include it.

13  BY MS. DEBRIERE::

14       Q    Mr. Brackett, while we're looking for that,

15  let's go back to the notice of deposition.  In the

16  deposition topics, we do list the number of Florida

17  Medicaid recipients who -- participants who have sought

18  any form of care for gender dysphoria from January 1st,

19  2015 until the enactment of the challenged exclusion.

20  And so as we're sitting here today, you're telling me

21  you can't answer whether -- or how many times AHCA or

22  one of its contractors authorized coverage of pubertal

23  suppression therapy for treatment of gender dysphoria,

24  is that correct?

25       A    That's correct, as of now, but we can get that

Page 78

1    information.

2         Q    And you will provide us that information?

3         A    We will obtain that information.

4         Q    Okay.

5              MS. DEBRIERE: So I think that given that there

6         are a few places where we have follow-up questions

7         I do, at this point, just want to say that once

8         those questions are answered, we're going to

9         reserve some time for this deposition so that we

10        can do follow-up questions based on the information

11        that's provided to us, because right now there's

12        some holes that Mr. Brackett is not able to fill,

13        and once that information is provided to us, of

14        course, we will probably have follow-up questions.

15        So we just need to reserve some time for --

16             MR. JAZIL: Okay.  And just so the record's

17        clear, I think I provided objections to the last

18        set of depo topics.  There may have been an

19        objection to this particular topic, going back to

20        2015, but we'll work with you.  If we can gather

21        the information, we'll provide it.

22             MS. DEBRIERE: Okay.

23   BY MS. DEBRIERE::

24        Q    So looking at the final GAPMS report related

25   to treatment of gender dysphoria, it's entitled gender

```
1    confirmation surgery.
2              MS. DEBRIERE: Oh, gosh.  Do we have it from
3         the past deposition?  I'm sorry.  We had, like,
4         over 50 exhibits and clearly it's completely my
5         fault not putting them in the list.  We can always
6         pull back around to them and print it out at lunch,
7         too.  There it is.  Okay.  We're going to mark this
8         one as Exhibit 8, and it's entitled GAPMS gender
9         confirmation surgery, dated July 19th, 2017.
10             (Whereupon, Exhibit No. 8 was marked for
11   identification.)
12   BY MS. DEBRIERE::
13        Q    And this one does have markups on it that are
14   not our markups, they're from the Agency.  Who authored
15   this report?
16        A    So this report is authored by Rebecca Buceo.
17        Q    Okay.  When?
18        A    This was authored in the summer of 2017.
19        Q    How do you know who was authored by?
20        A    I was in the bureau at the time and was
21   present when the project was being assigned out.
22        Q    Okay.  Why weren't you assigned the project?
23        A    I was actually being assigned -- I was working
24   on another project related to designated state health
25   programs and getting approval for those through the
```

1    Centers for Medicaid -- Medicare and Medicaid Services.

2    So I was actually on a kind of a legislative priority

3    project.  And so I was not assigned to this one.

4         Q    It's my understanding that there's only one

5    hard copy of this report, is that correct?

6         A    That's correct.

7         Q    Okay.  Whose office was it found in?

8         A    So, I -- this report, I did -- it was in a

9    binder with -- so this report was found in Rebecca

10   Buceo's old office.  So she had an office in the bureau.

11   I know she maintained her GAPMS materials there.

12        Q    Okay.  And what else was in that binder?

13        A    I think some of the research articles she

14   used.

15        Q    Is that it?

16        A    That was it.

17        Q    Okay.  Is Rebecca Buceo still with AHCA?

18        A    No, she's not.

19        Q    When did she leave?

20        A    I believe she left in 2019.

21        Q    Okay.  And what was her subject matter

22   expertise?

23        A    She had a behavioral health background.  That

24   was her -- that was her subject matter expertise.

25        Q    Did she have any expertise in surgery?

 1        A     Not professionally, no.

 2        Q     What about not professionally?

 3        A     In other words, she's never worked as a

 4   surgeon or anything like that.  But, I mean -- but I

 5   mean -- or in the formal education in that area.

 6        Q     Okay.  But did she have any experience with

 7   surgery that would help her inform the drafting of this

 8   GAPMS?

 9        A     I couldn't speak to that.

10        Q     Did AHCA ever rely on the conclusions in this

11   report?

12        A     So this report did not get past her immediate

13   supervisor, so, no.

14        Q     Okay.  Prior to its adoption of the

15   categorical exclusion of treatment for gender dysphoria,

16   did Florida Medicaid ever cover gender confirmation

17   surgery for the treatment of gender dysphoria?

18        A     Under fee-for-service, to the best of my

19   knowledge, we didn't.  In managed care, there were a few

20   instances where the managed care plan did approve the

21   procedure.

22             MS. DEBRIERE: Okay.  Can we look at those

23        exhibits now?  The -- I forget what they're called.

24        They're a weird name.  ATTB, ATTA.  It's a weird

25        name.  It wouldn't come to me.

1    BY MS. DEBRIERE::

2        Q    Okay.  So I'm handing you -- these were

3    natives, so they were not Bates-stamped, but I'm handing

4    you documents produced to plaintiffs in discovery.  They

5    were also not labeled, and I just want to ask you some

6    questions about what they mean.  We'll mark that as

7    exhibit -- actually, I'll take those copies.  I'm sorry.

8    Well mark this as Exhibit 9 and 10.  And, I'm sorry,

9    because they're natives, they don't have Bates stamps.

10              (Whereupon, Exhibit Nos. 9 - 10 were marked

11    for identification.)

12    BY MS. DEBRIERE::

13        Q    So looking at Exhibit 9 first, which is two

14    pages total, front and back.

15              MS. DEBRIERE: Seems like they -- yeah, it

16         printed out -- I see.  Do I put it together?  What

17         do we do?

18    BY MS. DEBRIERE::

19        Q    Let's look at under service type, outpatient

20    surgery.  Line item status is approve.  Does that mean

21    that Florida Medicaid approved outpatient surgery?

22        A    Yes, that would mean it was approved.

23        Q    Okay.  And the product description was

24    mastectomy with a primary diagnosis code of F649?

25        A    Uh-huh.

1       Q    So that means that the outpatient surgery was

2    approved for a mastectomy for a diagnosis code of F649,

3    is that correct?

4       A    That's correct.

5       Q    Okay. And F649, what is that diagnosis code?

6       A    That's gender dysphoria.

7       Q    Do you know if -- can you tell by this

8    document whether -- it appears that it was approved by

9    children's medical services under product roll-up.

10      A    So based on these two -- so based on these

11   two, I can't tell if the recipient is in managed care or

12   if they're in fee-for-service.  So in Exhibit 10 --

13      Q    Yeah.

14      A    -- this looks like this would be managed care.

15      Q    Okay.  And how do you know that?

16      A    Because it has, like, the member effective

17   category.

18      Q    Okay.  If the title of both of these documents

19   had the term CMS on it, would that mean that it's

20   managed care?

21      A    Children's Medical Services is overseen by

22   Sunshine Health.  So, yes, it's managed care.

23      Q    And looking at Exhibit 10, the Medicaid ID,

24   does that correspond to individual Medicaid recipients?

25      A    Each Medicaid recipient has a unique Medicaid

1    ID assigned to them.  That's correct.

2         Q    Okay.  And these documents are indicating that

3    there were authorizations of surgeries for primary

4    diagnosis codes of F640 and F649, is that correct?

5         A    Yeah, that's correct.

6         Q    Okay.  And F640 is a diagnostic code for what?

7         A    So F64, generally, there is a decimal point

8    after the 4.  So it was F64.  The way ICD-10 codes work,

9    it's kind of like a taxonomy.  So F64, categorically, is

10   gender dysphoria.  So F64.9 would be like a -- like a

11   subcategory of that general diagnosis.

12        Q    So these documents are showing that, at least

13   in managed care, prior to the categorical exclusion --

14   prior to AHCA's adoption of the categorical exclusion

15   for the treatment of gender dysphoria, there were times

16   in which Florida Medicaid covered surgery to treat

17   gender dysphoria; is that correct?

18        A    That would be correct.

19        Q    Okay.  Let's turn to the June 2022 GAPMS.  We

20   have this exhibit.  And Exhibit 11 will be the June 2nd,

21   2022 GAPMS related to the treatment of gender dysphoria.

22             (Whereupon, Exhibit No. 11 was marked for

23   identification.)

24   BY MS. DEBRIERE::

25        Q    I'm going to refer to this throughout as the

1    June 2022 GAPMS.

2         A    That's fine.

3         Q    When was the request to initiate this GAPMS

4    made?

5         A    So the formal request was made on April 20th.

6    That was the date of the Secretary's letter.

7         Q    Were there any informal requests prior to that

8    time?

9         A    There were some informal, I guess, indicators

10   of, you know, trying -- when they were trying to

11   determine whether or not we had bandwidth, you know, and

12   so there was some informal indicators that this project

13   would be coming down the pipeline because they were

14   trying to figure out who to do it.  So we were aware of

15   the Secretary's letter it would be coming to us.

16        Q    Okay.  When you say they were trying to figure

17   out.  Who is they?

18        A    Our Agency leadership.

19        Q    And who is that comprised of?

20        A    So that was primarily for the Bureau of

21   Medicaid Policy, Ann Dalton was our bureau -- is still

22   our bureau chief at the time.

23        Q    So Ann Dalton had knowledge of the potential

24   for this project coming down prior to April 20th, 2022;

25   is that correct?

1    A    Yes.

2    Q    Okay.  Who else in leadership was aware that

3  this would be coming to AHCA prior to April 20th, 2022?

4    A    At the time, Secretary Weida was serving as

5  Assistant Deputy Secretary.  He did have knowledge.

6    Q    Okay.  Anybody else?

7    A    To my --to my knowledge, those two were the

8  ones with the knowledge of this project.

9    Q    Okay.  When did you have knowledge of the

10  project?

11    A    Just probably a few days before we were given

12  the letter.

13    Q    Okay.  So, like, April 17th?

14    A    Something around there.  Yeah, I don't

15  remember the exact date.

16    Q    Okay.  Who did you gain the knowledge -- who

17  did AHCA leadership gain the knowledge from?

18    A    As far as the project goes, the decision to do

19  a GAPMS to my -- so that was to do a GAPMS report, that

20  was determined by our legal as the best route to

21  evaluate the medical necessity for treatments for gender

22  dysphoria.  It was that -- it was subjected to the GAPMS

23  process.

24    Q    Okay.  And which counsel was that?

25    A    Andrew Sheeran, who's now our General Counsel.

Page 87

1     Q    Okay.  And who contacted -- was Mr. Sheeran

2    the first point of contact related to what eventually

3    became the June 2022 GAPMS?

4     A    No, I don't think he would have been the first

5    point of contact.

6     Q    Who would have been the first point of

7    contact?

8     A    Generally, our first point of contact would

9    have been our General Counsel at the time.

10    Q    And that was?

11    A    Josephina Tamayo.

12    Q    Okay.  And who contacted Josephina Tamayo

13    about this project?

14    A    So this project, about the GAPMS in

15    particular --

16    Q    No.

17    A    -- or about requesting a Medicaid review?

18    Q    Requesting a Medicaid review.

19    A    So that, of course, that did come down from

20    the Governor's office.

21    Q    Okay.  Who in the Governor's office made the

22    request?

23    A    So that is -- so it was a multi-party meeting.

24    So the three staffers from the Governor's office that

25    were involved were, I think, Katie Strickland, Ryan

Page 88

1    Newman and Maureen Farino.

2         Q    Okay.  What other agencies were involved?

3         A    As far as the decision for Medicaid's review?

4         Q    No, as far as that initial request coming from

5    the Governor's office.  You said there was a multi-party

6    meeting.

7         A    Well, between AHCA's staff and Governor's

8    office staff.

9         Q    I see.  Okay.  What other AHCA staff were

10   present at that meeting besides Ms. Tamayo?

11        A    I think at that meeting, I think Deputy

12   Secretary Weida may have been present, I think the

13   General Counsel, I think, Andrew Sheeran, may have been

14   present as well.

15        Q    Okay.  Anybody else present at that meeting,

16   besides those people that you just named?

17        A    I can't name them with any specificity.

18        Q    Okay.  Were they from other agencies other

19   than the Governor's office or AHCA?

20        A    So in regards specifically to this project?

21        Q    Are there other projects we should be aware

22   of?

23        A    Well, I -- there were, I think, some people

24   present from the Department of Health.

25        Q    Regarding what project?

Page 89

```
 1      A    But that was regarding their review of

 2   treatments for gender dysphoria.

 3      Q    Based on actions related to the Board of

 4   Medicine or based on CMS guidance?

 5      A    What do you mean -- when you say CMS, are you

 6   referring to Children's Medical Services or --

 7      Q    No.  Centers for Medicare.  Great question.

 8      A    That guidance was actually not by CMS, it was

 9   from HHS.

10      Q    Excuse me, HHS.

11      A    It was in regard to that guidance.

12      Q    Okay.  So there was some presence of

13   Department of Health there, as well, but not related to

14   Medicaid?

15      A    Right.

16      Q    Okay.  And what was the date of that initial

17   meeting?

18      A    I don't have -- know the date offhand.  I

19   think it was like early April.

20      Q    Okay.  And at that meeting, it had not yet

21   been determined that AHCA would use the GAPMS process to

22   evaluate whether treatment for gender dysphoria was

23   experimental, is that correct?

24      A    I think that -- yes, I believe that is

25   correct, based on -- based on the information we've
```

1  gathered, is that the decision is to route it to the

2  GAPMS process was done after that conversation.

3      Q    Okay.  So what was the Governor's office

4  request for the meeting?

5      A    The Governor's office request was to -- in

6  response to the HHS documents, the Department of Justice

7  documents, Department of Education documents regarding

8  gender dysphoria, designing treatments for gender

9  dysphoria, the evidence for gender dysphoria, it was

10  that the Department of Health and AHCA both undertake

11  reviews.

12      Q    Did the Governor's office instruct AHCA to

13  find -- did the Governor's office instruct AHCA to

14  ensure that Florida Medicaid would not cover treatment

15  for gender dysphoria?

16      A    No.

17      Q    Okay.  Did the Governor's office make any

18  specific requests about Florida Medicaid coverage as it

19  related to the treatment of gender dysphoria?

20      A    The Governor's office wanted the Agency to

21  undertake the review.

22      Q    But what type of review did it want the Agency

23  to undertake?

24      A    It wanted to take a look at -- a detailed look

25  at the available medical evidence, or at least the

1   peer-reviewed literature, and to see what it says.

2        Q    Okay.  You referenced earlier the Florida

3   Department of Health's investigation on the HHS fact

4   sheet.  What did that investigation find?

5        A    So the Department of Health's fact sheet, of

6   course, provide some cursory information, like go into

7   some snapshots of some literature out there, you know,

8   stating that the evidence for support -- that was

9   supporting gender dysphoria treatment was too weak for

10  this to be considered a standard treatment for that

11  condition.

12       Q    Okay.  And so at the time of this initial

13  meeting in early April, when there was a discussion of

14  DOH's findings, at that point there was a conclusion

15  that the information or evidence to support treatment of

16  gender dysphoria was weak?

17            MR. JAZIL: Object to form.

18            MS. DEBRIERE: I can strike that.

19  BY MS. DEBRIERE::

20       Q    Why did the Governor's office want AHCA to

21  review Medicaid coverage for treatments of gender

22  dysphoria?

23       A    So in response to these documents, there were

24  questions about whether or not the evidence supported

25  what HHS, DOJ and DOE was -- at least the United States

Page 92

1    DOJ, United States DOE, the claims they were making.

2    They wanted to do a review to see whether or not this --

3    the evidence that's supporting was -- actually

4    sufficiently supported those claims.

5         Q    Did the Governor have a specific position on

6    whether HHS' findings were accurate, prior to AHCA's

7    review?

8              MR. JAZIL: Object to form.

9              THE WITNESS: No.

10   BY MS. DEBRIERE::

11        Q    Did DOH have a position on whether HHS'

12   findings were accurate prior to AHCA's review?

13             MR. JAZIL: Object to form.

14             THE WITNESS: Can you rephrase that question?

15   BY MS. DEBRIERE::

16        Q    Yeah.  Did DOH -- at that initial meeting,

17   what conclusions had DOH drawn about the HHS report?

18        A    So DOH, they didn't -- they didn't release

19   their opinions until April 20th, the day we got the

20   letter.

21        Q    Okay.  But had they -- at that meeting, had

22   they formulated those opinions?

23        A    To my -- based on the information given to me,

24   they had not yet formulated those.

25        Q    So why did AHCA general counsel decide that

1    the best process to undertake the review was the GAPMS

2    process?

3         A    Because, well, I'm speaking based on our -- on

4    how policy works is that, of course, the medical

5    necessity definition does have a prong saying that the

6    service has to be consistent with generally accepted

7    professional medical standards.  So the best way to do a

8    review to either -- to determine whether or not

9    something is consistent with GAPMS is to do that,

10   undertake that review process, and that really provides

11   the best opportunity to go through the literature on a

12   large scale and to make a conclusion.

13        Q    Okay.  To your knowledge, had there ever been

14   a time previous where a GAPMS was used to determine the

15   experimental nature of services previously covered by

16   Florida Medicaid?

17        A    To my knowledge, there was not.

18        Q    So this is the first time the GAPMS process

19   was used to determine whether services that were already

20   being covered by Florida Medicaid were experimental?

21        A    To my knowledge, yes.

22        Q    The folks at the initial early April meeting,

23   did they reach out to HHS to get the info they relied on

24   before conducting their own review?

25        A    Are you talking about the Florida Department

Page 94

1    of Health folks?

2        Q    Or the Governor's office, anyone involved in

3    that meeting.

4        A    No, we -- with the releases, the document

5    releases from those -- from those federal agencies was

6    sufficient.

7        Q    So AHCA did not reach out to HHS either?

8        A    No, we had their documents.  We didn't -- we

9    didn't have any need to question them on them.

10       Q    In the letter you're referring to from

11   Secretary Marstiller dated April 20th, 2022, is that

12   correct?

13       A    Uh-huh.

14       Q    That's the letter that directed Tom Wallace,

15   the Director -- I'm sorry --

16       A    State Medicaid Director, Deputy Secretary.

17       Q    Thank you.  That was the letter directing him

18   to undertake GAPMS related to treatment of gender

19   dysphoria, right?

20       A    Yes.

21       Q    Why did Secretary Marstiller's letter say that

22   she was making the request in response to DOH guidance

23   rather than a request from the Governor?

24       A    Because the DOH guidance had just been

25   published.

1    Q    Okay.  But she was asking Mr. Wallace to

2    undertake that GAPMS process because it was a request

3    from the Governor's office, correct?

4    A    A request for the state agencies to look at

5    the existing evidence and making recommendations, that

6    initially came from the Governor's office.  Since I

7    wasn't physically -- since I personally was not present

8    for those meetings, I can't exactly speak to the

9    sequence, but DOH would undertake its review.  And, of

10   course, once they published their guidance, we undertook

11   ours.

12   Q    Okay.  Just to be clear, there's a few times

13   that you said to your knowledge, but, again, you're

14   testifying as an Agency representative?

15   A    Yes.

16   Q    So this is to the knowledge of the Agency,

17   correct?

18   A    To the knowledge of the Agency, yes.

19   Q    When did AHCA begin work on the 2022 GAPMS?

20   What date?

21   A    We started work on April 20th.

22   Q    You didn't do anything prior to that?

23   A    No.  I mean, I may have done, like, an article

24   search, just to see what was out there, but as far as

25   any large-scale work goes, no, we didn't do -- we didn't

Page 96

1    do anything like that.

2         Q    Okay.  And, again, just to be clear, no one at

3    the Agency, because you're in the capacity as an Agency

4    representative.  So my question is not just about

5    whether you started anything related to the 2022 GAPMS.

6         A    The Agency did not -- did not start work until

7    April 20th.

8         Q    Who worked on the 2022 GAPMS at the Agency?

9         A    You mean the June 2022 GAPMS?

10        Q    Yes.

11        A    So I was primarily the author.  It was myself,

12   Devona Pickle prepared the maps of the United State

13   Medicaid programs.  Nai Chen prepared the maps for the

14   internet -- for the European countries to classify who

15   covered what, but that was it.  It was the three of us.

16        Q    Okay.  And I apologize.  Can you just one more

17   time run through what everybody's roles were?  You were

18   the primary author.  Mr. Chen worked on the maps.

19        A    Worked on the maps for Western Europe.

20        Q    Okay.  And what did Dede Pickle do?

21        A    The maps for the State Medicaid programs.

22        Q    Okay.  And as primary author -- so you wrote

23   everything else except for the maps in the state

24   Medicaid coverage, then?

25        A    That's correct.

1      Q    Okay.  And did you have any assistance?

2      A    It's -- GAPMS are a solitary project, any

3  extensive research project is, because once you immerse

4  yourself in the literature, it's very difficult to have

5  assistance because you're trying to get up to -- you

6  have to transplant knowledge from yourself to them.

7  It's actually just easier to do it, to kind of sail the

8  waters on your own.  And this is coming from speaking

9  from experience on, like, a myriad of research projects,

10 from scholarly articles, master's theses for, like,

11 works -- other works for the Agency, previous GAPMS

12 reports.  Once you under -- once you reach a certain

13 understanding of that knowledge, it comes a point where

14 you -- it makes sense -- it's more efficient for you to

15 do it in a solitary fashion.

16     Q    Okay.  So you were the only one involved in

17 outlining and reviewing the literature that became the

18 June 2022 GAPMS?

19     A    Yes.

20     Q    Okay.  Was there anyone else at the Agency --

21 so you didn't work with Mr. Chen on the literature or --

22     A    Nai, he did -- he occasionally he'd find an

23 article and give it to me, but other than give me the

24 occasional article, that was -- that was it.  I went

25 through, reviewed the article, like, broke it down.  As

Page 98

```
 1   far as any content or analysis, he just gave me copies
 2   of articles.
 3        Q    Okay.  Okay.  And so no one else at the
 4   Agency -- did anybody else at the Agency take on that
 5   role to where they were sending you articles or anything
 6   related to that?  I guess what I'm trying to determine
 7   is whether anyone else assisted you with drafting?
 8        A    Nobody assisted me with the drafting.
 9        Q    Inside or outside the Agency?
10        A    We did have a few consultations with some of
11   our contracted experts --
12        Q    Were they a verbal consultations?
13        A    They were verbal.
14        Q    Only verbal?
15        A    Yeah, but as far as drafting went, they
16   weren't involved in that process.
17        Q    Okay.  So they didn't write any of the main
18   report?
19        A    They did not write any of the main report.
20        Q    Or outline it or anything?
21        A    No.
22        Q    Okay.  Looking at -- I have another exhibit,
23   the Van Mol ATF.  We're going to mark this as Exhibit --
24   Exhibit 12.  What is wrong with me today?  And it's
25   entitled Agency for Health Care Administration
```

1   after-the-fact request form under 35k.

2            (Whereupon, Exhibit No. 12 was marked for

3   identification.)

4   BY MS. DEBRIERE::

5        Q    So, reason for occurrences, where I'm reading

6   and second sentence to the last, due to the need to

7   start work quickly, all of the purchase order elements

8   were not available until May 6th.  Why was there a need

9   to start work quickly?

10       A    Since this is -- since we did have a request,

11  and since we were writing in response to the Department

12  of Health, which had already had published their

13  findings, the Agency, of course, we considered this a

14  priority project, and this was mostly that's -- that's

15  pretty much, it was a priority project.

16       Q    I'm sorry.  Why was it a priority project?

17       A    It was priority project because in relation

18  to -- in relation to the Department Health guidelines,

19  which had been released, then, of course, because, you

20  know, as the state of Florida wanted to respond to the

21  HHS documents, which had also been released, because we

22  didn't want a significant amount of time, like, five or

23  six or seven months to elapse before the Agency had

24  gotten its response out.

25       Q    Okay.  So you wanted to make sure that there

1    would be a quick response to the HHS guidance?

2         A    Yes.

3         Q    Okay.  When I say a decision tree checklist

4    for GAPMS, do you know what I mean?

5         A    Are you referring to, like, to a checklist?

6         Q    Yes.

7         A    Yes, I do know what you're referring to.

8         Q    Okay.  Did AHCA do a decision tree checklist

9    for this report?

10        A    So that decision tree checklist, that was a --

11   is an internal process, and each person who does GAPMS

12   often kind of brought their own unique perspective or

13   unique approach to them, since these are research

14   projects and there's not really a formula for it, but I

15   believe -- I think Jeffrey English, I think, helped to

16   develop a checklist, which I think he used when making

17   evaluations.  I kind of have my own mental checklist

18   when I did them.  And also, actually, I actually wanted

19   to kind of help refine, to help cut down the number of

20   GAPMS requests we had.  As we started going through

21   requests, we started realizing, well, some of these

22   really aren't GAPMS, these are just coverage

23   determinations.

24        Q    What -- How did you know that?

25        A    Generally -- okay, well, FDA approval for the

1   clinical indication.

2       Q    Okay.

3       A    If a national coverage determination's been

4   released by Medicare, things like that.

5       Q    Okay.  What about if it was already listed on

6   AHCA's fee schedule?

7       A    Not necessarily.

8       Q    Why?

9       A    Because -- just because it's listed on AHCA's

10  fee schedule, it does not necessarily mean that it's --

11  wouldn't be experimental or investigational for another

12  clinical indication.

13      Q    So based on the checklist, if it was listed on

14  the fee schedule, that one isn't going to determine

15  whether or not it should go through GAPMS?

16      A    It shouldn't, no.  And that was -- when I --

17  when I did GAPMS, that was not part of my criteria.

18      Q    After the checklist was developed, how many

19  GAPMS did you do?

20      A    The checklist was developed well after I had

21  left that role.

22      Q    Okay.  So -- but we know you did the June 2022

23  GAPMS, so at least one right?

24      A    Uh-huh.

25      Q    Okay.  After the checklist was developed, for

1    any other time that AHCA undertook a GAPMS, was a

2    checklist completed?

3        A    I think there were some completed checklists

4    that I was able to find in our PDM, but that was after

5    the fact.  When I embarked on this one, I was not aware

6    a checklist even existed.  Not that I didn't apply kind

7    of a mental checklist when I was going through it to

8    check to see if there were certain elements in there

9    that would either come to the conclusion that this

10   shouldn't be that way through GAPMS or not.

11       Q    What was your mental checklist?

12       A    FDA approval for a clinical indication, which

13   would mean that there was already substantiating

14   research for it, which had been done by federal agency,

15   which would kind of render GAPMS point moot, or a

16   national coverage determination by Medicare.  And the

17   national coverage determination is pretty much -- it's

18   like a Medicare GAPMS, and it's -- there aren't that

19   many NCD's out there because there's a risk involved in

20   getting an NCD, but if -- but Medicare NCD's are backed

21   by substantial amounts of research.  So if there's an

22   NCD out there supporting a treatment and mandating

23   coverage for a specific service, and all the research

24   they do behind it, it kind of also -- it renders doing

25   the GAPMS moot.

Page 103

```
1      Q    Okay.  Any other -- anything else on your
2   checklist?
3      A    No, those were the two items I usually look
4   for.
5      Q    So that's it.  And then if they didn't pass
6   those two tests, they went to a GAPMS?
7      A    Went to a GAPMS.
8      Q    Okay.  So -- I'm sorry.  I just need to find
9   my place in the outline.  When was the checklist
10  developed?  Remind me.  2017?
11     A    No, the checklist would have been developing
12  in 2019.
13     Q    2019.  Okay.  During the 2022 -- the start of
14  the 22 -- 2022 GAPMS, you mentioned that you were having
15  conversations with the Governor -- or there was an
16  initial meeting with the Governor's office when the
17  request was made and DOH was also present?
18     A    Prior to the request being made.
19     Q    After the request was made, was there any
20  communication with the Governor's office?
21     A    No.
22     Q    After the request was made, was there any
23  communication with the Department of Health?
24     A    No.
25     Q    What about HHS?
```

Page 104

1       A       No.

2       Q       And what about Alliance Defending Freedom?

3       A       No.

4       Q       Liberty Counsel?

5       A       No.

6       Q       Okay.  What consultants were used by AHCA in

7       the development of the GAPMS.

8       A       So during the development, we have a few

9       verbal conversations with Doctors Miriam Grossman and

10      Andre Van Mol.

11      Q       Okay.  And what did those conversations

12      entail?

13      A       Well, Dr. Van Mol, he just offered suggestions

14      for articles and research for us to look at.  He did

15      provide us with a bibliography for our consideration, as

16      far as -- mostly just leads on research to help save

17      time in finding resources.  And Dr. Grossman, of course,

18      she provide us with some history of gender dysphoria

19      treatments, and gave us more reviews of some scientific

20      techniques.

21      Q       How did you get connected with Dr. Van Mol?

22      A       So Dr. Van Mol, like all of our experts, who

23      also provide published reports, so the process for those

24      was that we did get a name at the very outset of the

25      process, which was Michelle Cretella.  And by contacting

Page 105

1   her, she led us to other providers -- or other

2   practitioners who had expertise in the fields, and

3   that's how AHCA made contact with these individuals.

4        Q    So Michelle was the only person who connected

5   AHCA to the consultants it relied on for the 20 -- June

6   2022 GAPMS?

7        A    Yeah.

8        Q    Okay.  And who Michelle?

9        A    Michelle -- Dr. Michelle Cretella?

10       Q    Uh-huh.

11       A    She's a physician.  I think she has some

12  affiliations with, like, a couple of -- I think American

13  College of Pediatrics, I think.  I'm not sure what her

14  other affiliations are.

15       Q    How did you find her?

16       A    Well, her name was passed on to us from the

17  Department of Health.

18       Q    Okay.  What's her relationship with to the

19  Department of Health?

20       A    I -- the Agency does not know what her

21  relation to the Department of Health is.

22       Q    Okay.  So you just accepted this

23  recommendation by the Department of Health as the person

24  who would connect you to the consultants you would use

25  to develop the 2022 GAPMS?

1        A     Yes.

2        Q     You didn't do any outside research on whether

3   you should seek out other consultants?

4        A     Well, we were vouching for our -- for the

5   consultants.  I mean and so we did want individuals who

6   had expertise in their respective fields of medicine,

7   and who also were going to take an evidence-based

8   approach.

9        Q     Okay.  Who at Department of Health recommended

10  Dr. Cretella?

11       A     Don't -- we don't have the name of the

12  individual.

13       Q     Because it was sent in an anonymous email?

14  Why don't you have the name?

15       A     We can get that information for you.

16       Q     So you don't have the name, but the Agency has

17  the name, correct?

18       A     The Agency might have a name.  We need to

19  confirm that.

20       Q     And who at the Agency was this communication

21  sent to?  I mean, how was it communicated?

22       A     To my knowledge, it was verbal.  It was a

23  verbal exchange.

24       Q     Okay.  So who at AHCA was part of that

25  conversation?

1    A    So I think when it came down to, you know,

2  reaching out to experts and determining who the experts

3  we should use were, I think Andrew Sheeran and Jason

4  Weida were involved.

5    Q    Okay.  So it was either Andrew Sheeran or

6  Jason Weida who received that information from the

7  Department of Health related to Dr. Cretella?

8    A    Yes.

9    Q    Could it have been anybody else at the Agency?

10   A    I don't think so.  I mean --

11   Q    It seems like you have a name in mind.

12   A    Well, I mean, there were other senior leaders.

13 The Secretary may have been given the name, or Chief of

14 Staff may have been given the name, so, but --

15   Q    Who was the chief of staff?

16   A    Cody Farrell.

17   Q    And who was the person who spoke with Dr.

18 Cretella about her recommendations?

19   A    I think -- I think Andrew Sheeran and Jason

20 spoke about that -- spoke to them about the

21 recommendations.

22   Q    And she recommended everyone, is that correct?

23   A    Well, she -- from what I gathered, there was,

24 like, recommendations.  She gave some names.  And not

25 everyone she recommended, of course, we decided to go

1   with.  So there were some that we did turn down.

2        Q    Who did you turn down?

3        A    We can get that -- we can get that -- we can

4   get those names for you.

5        Q    With Dr. Cretella, was there any consideration

6   given to the associations, the medical associations of

7   which she was a member?

8        A    No.

9        Q    Okay.  So you didn't look to see if she was

10  associated with any particular medical association?

11       A    No.

12       Q    You just went off the recommendation of

13  Department of Health?

14       A    Yes.

15       Q    Was Dr. Cretella paid for her assistance

16  with -- to AHCA?

17       A    No.

18       Q    So DOH didn't pay her or anything?

19       A    Well, I don't know at DOH, that's a question

20  for the Department of Health.  AHCA did not -- we did

21  not establish a financial arrangement with her.

22       Q    Okay.  Are you -- are you personally aware of

23  any financial arrangement between Dr. Cretella and

24  Department of Health?

25       A    No.

1      Q     Okay.  I'm sorry.  Who did you turn down?

2      A     We would have to get those for you.

3      Q     Okay.  And so Dr. Grossman and Dr. Van Mol

4  just gave you some article leads, and that's all?

5      A     Gave some article leads, some background

6  information.  Yeah, it was -- I mean, as far as

7  providing us with content to include in the report, they

8  did not.

9      Q     Why not?

10     A     Because it was an independent assessment by

11  the Agency.

12     Q     Okay.  Did -- but they didn't write any of the

13  reports that were in the attachments to the June 2022

14  GAPMS either?

15     A     Right?

16     Q     Why not?

17     A     I think because we had experts.  We already

18  had a psych -- one psychologist who was writing one.  We

19  already had -- we, of course, we had physicians for,

20  like, plastic surgery.  We had a bioethicist, as well.

21  Since those bases were covered, we felt they would best

22  benefit us by helping provide guide -- guidance with

23  research.

24     Q     Were they ever given the option of writing a

25  report for one of the attachments?

Page 110

1    A    No, we didn't ask them to write a report.

2    Q    Okay.  Did they ask if they could write a

3  report?

4    A    No, they did not.

5    Q    How did you identify Dr. Romina

6  Brignardello-Petersen?

7    A    So through the contacts we were making, her

8  name was passed on to us as someone at McMaster

9  University who had some experience in doing evidence

10  evaluation.

11    Q    Did Dr. Cretella pass on that name?

12    A    As far as the actual contact that gave us that

13  name?

14    Q    Uh-huh.

15    A    Dr. Cretella was kind of the head of the tree

16  of the contacts.  We would have to go back and get that

17  information on who gave us the exact name for Dr.

18  Brignardello-Petersen.

19    Q    Okay.  But Dr. Cretella was the one who -- so

20  what -- if Dr. Cretella didn't recommend Dr.

21  Brignardello-Petersen, who would have?

22    A    We would have to get that information for you.

23    Q    Would it have been another physician?

24    A    Yes, it likely -- yes, it would have probably

25  been another physician.

1    Q    What other physicians provided recommendations

2    for consultants?

3    A    We would have to get that information.

4    Q    What all physicians did you talk to you prior

5    to -- or in the process of drafting the --

6    A    So in the process of drafting the report, we

7    really -- we talked to Doctors Grossman, Van Mol.  There

8    were a couple conference calls with the experts who

9    provided the reports, but those weren't about our

10   report, that was just mostly more -- that was talking to

11   them about them doing their reports.

12   Q    Okay.  So who recommended Dr. Cantor?

13   A    We -- that may have been Dr. Cretella who had

14   recommended him.  We would need to confirm that.

15   Q    Okay.  So, again, just pointing to topic 24 in

16   the notice of deposition, we asked for an Agency

17   representative who was knowledgeable as to --

18        MS. DEBRIERE: No, no.  I just don't know

19        what -- I have no idea where it is.

20   BY MS. DEBRIERE::

21   Q    So looking at topic 24, and we asked very

22   specifically about the identification of Dr.

23   Brignardello-Petersen, Dr. Cantor, Dr. Van Meter, Dr.

24   Lappert, Dr. Donovan, in the inclusion of the written

25   assessment.  So I don't know what to say.  I mean, it

1   seems like you're not able to answer the question.

2          MR. JAZIL: So, counsel, the topic says the

3       process by which AHCA prepared the memo, and I read

4       that to mean the process by which we identify these

5       experts.  And so he's detailed the process.  It was

6       an initial consultation with one physician, and

7       then it was -- one person recommends another,

8       recommends another.  And I think he said that a lot

9       of these were oral.  To the extent that we have any

10      written records of who specifically said, hire Dr.

11      Romina Brignardello-Petersen, we'll supplement the

12      production with that.

13          MS. DEBRIERE: Other than written records, Mo,

14      can you get us -- can you just do an investigation

15      of who spoke with these individuals and collected

16      this?

17          MR. JAZIL: So who -- so I think he's answered

18      that, it was General Counsel's Office, and it's now

19      Secretary Weida, who spoke to these individuals.

20      If the question is who specifically recommended

21      each expert --

22          MS. DEBRIERE: Yes.

23          MR. JAZIL: -- I'll ask.  And if there's a

24      written record, it would have been turned over to

25      you already.  If there's an oral record, beyond

Page 113

1    what he's talked about, well --

2         MS. DEBRIERE: If someone knows.  Because if

3         someone knows at the Agency --

4         MR. JAZIL: -- you know, Bob talked to Jill,

5         Jill talked to Jane, Jane talked to Jason and said,

6         hey, hire Brignardello-Petersen, I'll get that

7         information for you.

8         MS. DEBRIERE: Thank you.

9    BY MS. DEBRIERE::

10        Q    Whose decision was it to engage with Dr. Van

11   Meter?  I'm sorry.  Who recommended Dr. Van Meter?  I

12   apologize.

13        A    That's information we would have to --

14        Q    So you don't know who recommended any of these

15   individuals other than Dr. Cretella?

16        A    Right.

17        Q    Okay.  When did AHCA first become aware of the

18   HHS fact sheet on gender-affirming care in young people?

19        A    We became aware of it, since we do follow HHS

20   publications, much of our staff in Medicaid, so forth,

21   they are actually on -- they receive automatic updates,

22   so we became aware of them as they came out.

23        Q    What was AHCA's independent reaction to the

24   fact sheet?

25        A    Well, as the Agency initially didn't -- didn't

Page 114

1    have a reaction.  There was -- we didn't -- we don't

2    react publicly to HHS documents.

3         Q    Okay.  So did AHCA -- you stated in your

4    declaration filed with the court on January 23rd -- are

5    you aware of what I'm talking about?  I can get you a

6    copy, if not.

7         A    I should be aware of it.  I've reviewed it.

8         Q    Okay.  That litigation was highly likely

9    because in drafting the GAPMS report, the GAPMS

10   determination might conflict with federal standards.  Do

11   you remember saying that?

12        A    Yeah.  If I -- yeah, I mean, it's written and

13   signed off on, then, yes.

14        Q    Okay.  With what federal standards, did you

15   think it might conflict?

16        A    Well, it might -- it would probably conflict

17   with that guidance that was released from HHS.

18        Q    Any other federal standards?

19        A    No.

20        Q    Why did you think it would conflict with the

21   guidance from HHS?

22        A    Because the guidance from HHS, the conclusions

23   we made -- that we made following an independent

24   assessment, conflicted with the HHS guidance.  The HHS

25   guidance did state that these were, like, medically

1   necessary treatments, that evidence supporting them, so

2   that they would alleviate mental health systems

3   symptoms, et cetera.  Our concluded -- our conclusions

4   and our assessment of literature deemed otherwise, so we

5   knew that there would be a potential conflict.

6       Q    At what point did you realize that there would

7   be a potential conflict?

8       A    When we -- during the drafting process.  So we

9   realized that the evidence was inadequate to support the

10  claims that HHS was making, or that -- that's when we

11  realized that there would be -- there would be a

12  conflict.

13      Q    Okay.  Did you anticipate that the GAPMS

14  report would conclude that the relevant services were

15  experimental?

16      A    When I started working on it, I did not know

17  where the evidence would take me.

18      Q    At what point did you realize that you were

19  going to conclude that the services were experimental?

20      A    As -- the more and more I read the articles

21  that focused on the mental health benefits, the methods

22  and so forth, the more I realized that all those

23  articles left way too many unanswered questions.

24  This -- there was also -- there wasn't any evidence

25  available to answer those outstanding questions.  I

Page 116

1   realized that I couldn't -- that there was not going to

2   be -- that the conclusion was going to be, no, it was

3   not consistent.

4        Q    Okay.  So your analysis of those services.  So

5   I think one of your concerns related to the treatment of

6   services for gender dysphoria that is now excluded under

7   59-G-1.050(7), was that the services were not supported

8   by randomized controlled trials, is that correct?

9        A    That was one element of many elements.

10       Q    Okay.  Does AHCA ever require that -- does

11  every -- does AHCA require that every treatment or

12  procedure it covers be supported by randomized

13  controlled trials?

14       A    So to contextualize that question, every

15  medical service is unique.  So we don't apply a uniform

16  set of standards to every single medical service,

17  because every single medical service is for a specific

18  condition, every medical service carries its own pros

19  and cons, risks versus benefits.  So we don't

20  necessarily -- we don't have a one-size-fits-all model

21  for evaluating each and every medical service.

22       Q    You mentioned unanswered questions as you were

23  reviewing the literature for treatment of gender

24  dysphoria, or the services you were analyzing.  What

25  were those?

1        A     So those are iterated in the GAPMS report, but

2   generally like -- well, number one, long-term.  And

3   other unanswered questions, like a lot of these studies

4   were based on anonymous surveys.  How are we supposed to

5   know whether or not these responses are credible, if we

6   don't have any longitudinal history of these

7   individuals?  I mean, one of the things that we came up

8   with when we were doing the literature review is the

9   etiology.  There are lots of potential causes and

10  associations with gender dysphoria, not -- not including

11  but not limited to autism, trauma, neglect, abuse,

12  abandonment, things like that.  So because there was so

13  many unanswered questions, I mean, how are we supposed

14  to know whether or not a one-time survey is going to

15  accurately capture all of that, especially if it's

16  done -- being taken by anonymous people, or if the

17  survey -- or for those that weren't anonymous, the

18  sample sizes were very, very small.  So and, of course,

19  you're talking about one- or two-year periods.  These --

20  the changes prompted by these treatments are permanent.

21       Q     Did you adopt any of the conclusions about

22  treatment for gender dysphoria relied upon by the

23  American Academy of Child and Adolescent Psychiatry?

24       A     The American College of -- can you repeat

25  that?

1     Q     American Academy of Child and Adolescent

2     Psychiatry.  I think it's AACAP.

3     A     No, I don't recall we -- us using their

4     recommendations.

5     Q     What about the American Academy of Family

6     Physicians?

7     A     No, we didn't use theirs.

8     Q     What about the American Academy of Pediatrics?

9     A     We did do an evaluation of theirs.

10    Q     Did you rely on them, their conclusions?

11    A     So what do you mean by --

12    Q     Did you -- did you lend credence to their

13    conclusions?

14    A     Yeah, yeah.  It was -- their conclusions

15    required thoughtful analysis and probing of the

16    evidence.  We do take the recommendations of clinical

17    organizations very seriously, but we also do reserve the

18    right to question those recommendations and we did

19    review those and we did analyze them.

20    Q     And after you reviewed and analyzed them, did

21    you adopt them?

22    A     No, we found that they were based on very weak

23    evidence.

24    Q     Okay.  What about the American College of

25    Obstetricians and Gynecologists?

Page 119

1        A    No.  I mean -- I mean, there -- we didn't --

2    so, aside from AAP, we did notice, like most of the

3    recommendations, guidelines, were very, very similar,

4    very straightforward, and they usually are based on

5    Endocrine Society and WPATH guidelines.

6        Q    And did you adopt the recommendations from the

7    Endocrine Society and the Pediatric Endocrine Society?

8        A    No, we did not.  We did review those in close

9    detail, though, and analyze them.

10       Q    What about -- I'm sorry.  The other WPATH?

11       A    Yes.  So the World Professional Association

12   for Transgender Health, we did closely review their

13   guidelines.  We did -- we did analyze them.  And, of

14   course, we do discuss them in lengthy detail in multiple

15   areas of the GAPMS report.

16       Q    And ultimately you disagreed with their

17   standards?

18       A    Ultimately, yes.

19       Q    What about the American Psychiatric

20   Association?

21       A    I think we actually didn't make reference to

22   them in the GAPMS report.

23       Q    Did you adopt their conclusions related to the

24   treatment of gender dysphoria?

25       A    No, we did not.

Page 120

```
 1        Q    What about the American Psychological
 2    Association?
 3        A    No, we did not.
 4        Q    American Medical Association?
 5        A    We did not.
 6        Q    When you say we, you mean --
 7        A    The Agency.
 8             VIDEOGRAPHER: Excuse me, counsel.  Sometime
 9        soon, I need to take a short --
10             MS. DEBRIERE: Oh, yes.
11             VIDEOGRAPHER: -- to start the next video.  Do
12        you want to take a break?  We could take a -- do
13        you want to take a 30-minute lunch break or --
14             THE WITNESS: I'm good with that, yeah.
15             VIDEOGRAPHER: Okay.  This concludes video two.
16        The time is 12:42 p.m.
17             (Whereupon, the deposition resumes in Volume
18        2.)
19
20
21
22
23
24
25
```

Page 121

1                        CERTIFICATE OF OATH

2

3

4

5   STATE OF FLORIDA  )

6   COUNTY OF LEON     )

7

8

9           I, the undersigned authority, certify that the

10  above-named witness personally appeared before me and

11  was duly sworn.

12

13          WITNESS my hand and official seal this 21st

14  day of February, 2023.

15

16

17

18

19          _____

20          DANA W. REEVES
            NOTARY PUBLIC

21          COMMISSION #GG970595
            EXPIRES MARCH 22, 2024

22

23

24

25

Page 122

1                    CERTIFICATE OF REPORTER
2    STATE OF FLORIDA    )
     COUNTY OF LEON      )
3
4            I, DANA W. REEVES, Professional Court
5    Reporter, certify that the foregoing proceedings were
6    taken before me at the time and place therein
7    designated; that my shorthand notes were thereafter
8    translated under my supervision; and the foregoing
9    pages, numbered 5 through 120, are a true and correct
10   record of the aforesaid proceedings.
11           I further certify that I am not a relative,
12   employee, attorney or counsel of any of the parties, nor
13   am I a relative or employee of any of the parties'
14   attorney or counsel connected with the action, nor am I
15   financially interested in the action.
16           DATED this 21st day of February, 2023.
17
18
19
20           _____._____
21           DANA W. REEVES
             NOTARY PUBLIC
22           COMMISSION #GG970595
             EXPIRES MARCH 22, 2024
23
24
25

Page 123

1    Gary V. Perko, Esq.
     gperko@holtzmanvogel.com

2

3                         February 21, 2023

4

5    RE:    August Dekker, et al. vs. Jason Weida, et al.

6           February 8, 2023/Matthew Brackett/5696545

7

     The above-referenced transcript is available for review.

8    The witness should read the testimony to verify its
     accuracy. If there are any changes, the witness should

9    note those with the reason on the attached Errata Sheet.
     The witness should, please, date and sign the Errata

10   Sheet and email to the deposing attorney as well as to
     Veritext at Transcripts-fl@veritext.com and copies will

11   be emailed to all ordering parties.  It is suggested
     that the completed errata be returned 30 days from

12   receipt of testimony, as considered reasonable under
     Federal rules*, however, there is no Florida statute to

13   this regard.  If the witness fail(s) to do so, the
     transcript may be used as if signed.

14

15   Yours,

16   Veritext Legal Solutions

17   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e).

18

19

20

21

22

23

24

25

Page 124

1   August Dekker, et al. vs. Jason Weida, et al.

2   February 8, 2023/Matthew Brackett

3                    E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it

20  are true.

21

22  _____      _____

23          Matthew Brackett                      DATE

24

25

[& - 3900]                                                                    Page 125

| & |
| --- |
| **&**   2:19 |

**0**

**0.025**   42:6
**000126105**   19:6
**000126112**
   20:20
**000145170**   3:10
**000288776**   3:12
   68:20 70:19
**00325**   1:3 4:6

**1**

**1**   1:11,11 3:9
   5:24 6:1 8:22
   62:9
**1.010.**   15:3
**1.035.**   6:12
**1.050**   7:2 116:7
**1.310**   123:17
**10**   3:13 20:25
   37:25 44:3,9
   48:7,7,9 50:2
   51:12 65:11
   82:8,10 83:12
   83:23 84:8
**100**   3:14
**1000**   50:2
**10005**   2:13
**10:00**   1:15
**10:08**   4:9
**11**   3:14 84:20,22
**110**   2:14
**119**   2:20

**11:05**   48:25
**11:08**   49:3
**12**   3:14 98:24
   99:2
**120**   2:12 122:9
**1229**   2:7
**124**   1:11
**12:42**   120:16
**12th**   2:7
**14th**   70:20
**1512**   2:14
**16**   3:9
**17th**   86:13
**19**   3:11
**19th**   2:12 12:10
   56:18 59:8,10
   59:15 79:9
**1st**   77:18

**2**

**2**   3:9,14 15:13
   15:14 120:18
**2.83**   15:1
**2.83.**   15:18
**20**   105:5
**2003**   11:12
**2005**   11:14
**2015**   77:19
   78:20
**2016**   30:14
   58:11,14,18,20
   69:14 70:1,20
   72:2 75:1,10,18
**2017**   3:11 13:24
   13:25 14:10,11
   14:11,14,15,18

14:19 56:17
   57:24 58:9,19
   59:2 79:9,18
   103:10
**2019**   80:20
   103:12,13
**2020**   60:8
**2021**   14:19,20
   14:20,22
**2022**   3:11,14
   19:11 47:2
   56:12,15,18
   59:8,10,16
   60:12 61:12
   67:20 75:3
   84:19,21 85:1
   85:24 86:3 87:3
   94:11 95:19
   96:5,8,9 97:18
   101:22 103:13
   103:14 105:6,25
   109:13
**2023**   1:14 4:8
   121:14 122:16
   123:3,6 124:2
**2024**   121:21
   122:22
**20th**   19:11
   56:15 60:12
   61:12 85:5,24
   86:3 92:19
   94:11 95:21
   96:7
**21**   3:10 47:4,14
   123:3

**21st**   67:19
   121:13 122:16
**22**   19:9 103:14
   121:21 122:22
**23**   3:11
**23rd**   56:17,18
   57:22,24 59:2
   114:4
**24**   45:1 111:15
   111:21
**2727**   1:17 4:7
**27514**   2:15
**29229**   121:18
   122:19
**2nd**   60:2 61:5
   84:20

**3**

**3**   3:10 19:21
   20:11 55:12
   56:14 60:12
   62:9 74:1,5
**30**   8:19,22 9:4
   68:3 73:11
   120:13 123:11
   123:17
**3100**   2:9
**32**   3:10
**32205**   2:4
**32301**   2:20
**32308**   1:17
**32601**   2:7
**33131**   2:10
**35k**   3:15 99:1
**3900**   2:4

**4**

**4** 3:10 30:24
31:1 33:6 73:2,8
74:4,6,19 84:8
**4:22** 1:3 4:6

**5**

**5** 3:4,11 56:19
56:21 59:8
122:9
**5.2** 27:13
**50** 79:4
**500** 2:20
**5696545** 123:6
**57** 3:11
**59** 6:12 7:2 15:3
116:7

**6**

**6** 3:11 8:19,22
9:4 59:3,4 68:3
75:10
**6-16-2022** 45:17
**60** 3:11
**600** 2:9
**6th** 75:1 99:8

**7**

**7** 3:9,12 7:2
70:13,14,15,21
72:13 116:7
**71** 3:12

**8**

**8** 1:14 3:12 79:8
79:10 123:6
124:2

**80** 3:12
**83** 3:13,13
**85** 3:14
**8th** 4:8

**9**

**9** 3:13 82:8,10
82:13

**a**

**a.m.** 1:15 4:9
48:25 49:3
**aa** 11:11
**aacap** 118:2
**aap** 119:2
**abandonment**
117:12
**ability** 32:20
37:9
**able** 18:2 36:8
46:7 78:12
102:4 112:1
**above** 121:10
123:7
**absolute** 64:25
**absolutely**
31:15
**abuse** 117:11
**academy** 117:23
118:1,5,8
**accepted** 6:10
14:1 17:23 93:6
105:22
**access** 34:18,18
61:21,23 62:15

**accident** 52:3
**accord** 61:20
**accumulating**
58:16
**accuracy** 123:8
**accurate** 21:2
47:1 56:25 92:6
92:12
**accurately**
117:15
**acetate** 28:10
**acronym** 6:9,11
**act** 35:17,21
**acting** 9:10
**action** 122:14
122:15
**actions** 89:3
**actual** 110:12
**actually** 12:7,9
12:12 13:14
24:9 27:9 34:10
39:20,22 40:4,4
46:24 56:16
58:11 61:22
62:25 71:25
75:20,20 79:23
80:2 82:7 89:8
92:3 97:7
100:18,18
113:21 119:21
**add** 63:2,3
**added** 60:18
72:23
**additional** 70:4

**addressed** 29:9
30:2 64:10
**addressing**
28:24
**administered**
10:15 38:23
**administration**
1:16 4:4 8:19
12:20 98:25
**administration's**
13:1
**administrative**
6:12 7:1 15:2
**administrator**
13:9 14:12
71:11
**adolescent**
117:23 118:1
**adopt** 117:21
118:21 119:6,23
**adopted** 71:2,4
75:1,2,11
**adoption** 65:25
66:1,11 67:5
68:12 74:19
81:14 84:14
**adults** 22:22
**advance** 36:12
36:16
**affair** 43:19
**affect** 12:16
**affiliations**
105:12,14
**affirming**
113:18

**aforesaid**
122:10
**age**  37:12,13,13
37:13 47:4
**agencies**  12:11
40:17 88:2,18
94:5 95:4
**agency**  1:16 4:3
8:18 9:2,11,18
12:20,25 13:2,7
13:8,20 14:4
17:24 21:17
22:14 24:24
32:19 34:6 37:9
40:16 59:22
60:7,24 61:2,15
66:6,20 71:2
79:14 85:18
90:20,22 95:14
95:16,18 96:3,3
96:6,8 97:11,20
98:4,4,9,25
99:13,23 102:14
105:20 106:16
106:18,20 107:9
109:11 111:16
113:3,25 120:7
**agency's**  46:9
**agent**  43:12
**ago**  11:5 22:12
**agree**  6:21
**ahca**  13:1 15:24
17:6,6 18:5,7
25:6,11,11
26:20 28:1

30:18 31:12,20
32:3,8 35:25
36:9 39:24
41:14,19,22
42:18 44:13,20
45:5,12,23
46:12 47:5,6,7
47:16 49:10,22
50:6 52:6,15,21
52:21 53:2,3,11
66:21 74:19
75:1,11,12
77:21 80:17
81:10 86:3,17
88:9,19 89:21
90:10,12,13
91:20 92:25
94:7 95:19
100:8 102:1
104:6 105:3,5
106:24 108:16
108:20 112:3
113:17 114:3
116:10,11
**ahca's**  17:8
18:24 36:25
45:9,11 49:6
65:25 84:14
88:7 92:6,12
101:6,9 113:23
**ahca.myflorida**
36:22
**ahead**  5:23
15:12 48:22
69:11 77:1

**aka**  53:7
**al**  1:5,8 4:5,5
123:5,5 124:1,1
**align**  43:3 46:9
**alignment**  17:14
17:15
**alleviate**  115:2
**alliance**  104:2
**allow**  18:18,19
**allows**  33:11
**american**  35:13
105:12 117:23
117:24 118:1,5
118:8,24 119:19
120:1,4
**amount**  23:9
35:5 99:22
**amounts**  102:21
**analog**  74:22
**analogous**  48:14
**analysis**  98:1
116:4 118:15
**analyst**  13:23
**analytical**  63:17
**analyze**  17:16
118:19 119:9,13
**analyzed**  118:20
**analyzing**
116:24
**andre**  104:10
**andrew**  9:24
44:25 86:25
88:13 107:3,5
107:19

**ann**  85:21,23
**anonymous**
106:13 117:4,16
117:17
**answer**  7:16 8:3
8:9 21:18 28:22
62:19 64:25
72:7 77:21
112:1 115:25
**answered**  78:8
112:17
**answers**  7:25
**antagonists**
29:23 30:4,19
**anticipate**
115:13
**anybody**  21:17
61:22 86:6
88:15 98:4
107:9
**apologies**  72:17
**apologize**  56:23
96:16 113:12
**appear**  73:21
**appearances**  2:1
**appeared**
121:10
**appears**  83:8
**applies**  28:22
46:3 47:16
**apply**  40:2 46:5
102:6 116:15
**appreciate**  57:7
**approach**
100:13 106:8

**appropriate**
35:7
**approval** 24:7
31:10,16 73:22
77:4 79:25
100:25 102:12
**approve** 45:6
51:9,19 81:20
82:20
**approved** 24:2,3
24:5,6,10,13,14
24:15,18 27:4
31:14,17,18
32:4 35:10 37:5
41:2 42:23
44:19 50:25
53:3,6,7,12,17
53:18,18,21,22
54:1,7,9 60:2
66:24 73:23
82:21,22 83:2,8
**april** 3:11 14:19
14:20,22 56:17
59:8,10,15 85:5
85:24 86:3,13
89:19 91:13
92:19 93:22
94:11 95:21
96:7
**area** 81:5
**areas** 9:15 18:14
119:15
**arisen** 59:25
**arlene** 63:3

**arrangement**
108:21,23
**article** 63:19
95:23 97:23,24
97:25 109:4,5
**articles** 11:19
80:13 97:10
98:2,5 104:14
115:20,23
**articulating** 8:4
**arts** 11:12,13
**ashley** 60:16
62:3
**aside** 64:11
119:2
**asked** 10:12
30:7 111:16,21
**asking** 18:20,21
53:1 61:11
63:21 95:1
**asks** 63:15
**assembled** 27:7
**assessing** 67:18
**assessment**
109:10 111:25
114:24 115:4
**assigned** 6:19
79:21,22,23
80:3 84:1
**assignment** 58:1
**assistance** 26:13
97:1,5 108:15
**assistant** 86:5
**assisted** 98:7,8

**associated** 6:20
38:13 42:6 44:9
50:14 108:10
**association**
108:10 119:11
119:20 120:2,4
**associations**
108:6,6 117:10
**assume** 22:24
38:25 46:25
70:23
**assumption**
22:24
**assurance** 14:8
26:15
**atf** 98:23
**atta** 81:24
**attached** 123:9
**attachments**
109:13,25
**attb** 81:24
**attempt** 7:16
**attempting** 12:5
**attorney** 33:4
122:12,14
123:10
**audit** 34:11
**august** 1:5 4:5
67:19 75:3
123:5 124:1
**author** 58:2
59:13 96:11,18
96:22
**authored** 57:24
58:10,11 59:9

71:5 79:14,16
79:18,19
**authority** 121:9
**authorization**
16:12,17 17:2,3
21:7,12,15,22
21:25 23:13,23
24:2,11,17,19
24:21 25:4,6,11
26:1 30:15
31:23 32:3
35:24 36:4,5,8
36:10,15 38:5
38:19 40:10,14
42:12,16 45:2,6
46:18 47:6,17
50:4 51:17
52:14,20,25
56:2 75:21 77:3
**authorizations**
16:21 21:11
76:3 77:9 84:3
**authorize** 24:12
40:24 41:8,23
54:18 66:16
75:12 76:12
**authorized** 16:6
38:6,8,9 45:18
45:18 66:3
74:22 76:6
77:22
**authorizing**
16:23
**autism** 117:11

**auto** 56:24
**automatic** 38:9
38:15 113:21
**automatically**
37:19 38:14,16
43:9 51:4,11,19
**available** 34:21
37:11 61:24
67:13 90:25
99:8 115:25
123:7
**avenue** 2:7,9
**avenues** 26:19
**aware** 33:19
34:25 35:1
56:11,11 59:11
85:14 86:2
88:21 102:5
108:22 113:17
113:19,22 114:5
114:7

**b**

**b** 8:19,22 9:4
68:3
**bachelor** 11:12
**back** 24:9 31:9
32:8 33:6,25
34:6,11 42:2,2
43:4 45:7 47:3
48:2,6 49:5
52:11 55:12
58:9 60:11
67:17 70:23
73:2 75:18 77:2
77:15 78:19

79:6 82:14
110:16
**backed** 102:20
**background**
11:9 72:2 80:23
109:5
**bacteria** 12:15
**bandwidth**
71:24 85:11
**barantorchinsky**
2:19
**based** 13:13
43:17,17 44:15
45:3 50:9 61:1
61:17 73:9,20
73:23 74:1,10
74:13 75:23
76:6 78:10
83:10,10 89:3,4
89:25,25 92:23
93:3 101:13
106:7 117:4
118:22 119:4
**bases** 109:21
**basically** 15:10
**basis** 18:23 19:2
31:21,22 55:4
**bates** 5:19 19:6
72:20 82:3,9
**bathroom** 48:20
**becoming** 12:12
14:12
**beginning** 49:2
**begins** 68:20

**behalf** 4:24 9:1
**behavioral**
13:10,12 80:23
**believe** 10:24
21:9,14 35:4
38:10 40:5
80:20 89:24
100:15
**benefit** 26:24
40:7,8,9,22
109:22
**benefits** 115:21
116:19
**best** 81:18 86:20
93:1,7,11
109:21
**beth** 60:15
**better** 8:3
**beyond** 112:25
**bibliography**
104:15
**billing** 26:3
**binder** 80:9,12
**bioethicist**
109:20
**birth** 6:19
**bit** 6:9 10:4 11:8
22:25 52:11
54:22
**board** 89:3
**bob** 113:4
**bottom** 5:19
**brackett** 1:12
3:3 5:6,25 8:16
15:17 20:17

70:8 77:14
78:12 123:6
124:2,23
**branch** 40:18
**brand** 28:8
53:17
**break** 8:8,10
48:18,21,22
120:12,13
**brickell** 2:9
**brief** 49:1
**briefly** 21:20
47:3
**brignardello**
110:6,18,21
111:23 112:11
113:6
**broke** 97:25
**brought** 5:24
10:7 100:12
**broward** 34:9
**buceo** 79:16
80:17
**buceo's** 80:10
**build** 38:1
**bumped** 64:22
**bureau** 14:9,13
14:16 26:12
32:15 58:15
59:13 61:25
73:10 79:20
80:10 85:20,21
85:22
**busy** 63:14,14
65:17

| c |
| --- |

**c** 45:13
**call** 27:8
**called** 5:7 81:23
**calls** 111:8
**canadian** 12:22
13:4 14:21
39:19
**cantor** 111:12
111:23
**capacity** 60:25
61:3 96:3
**capitol** 64:21,23
**capture** 117:15
**care** 1:16 8:18
9:25 12:20 13:1
16:21 17:7,21
18:7 21:9 31:24
37:13 40:2 41:8
42:14 46:6,7,11
64:9 66:22,25
68:10 71:12,16
76:22,25 77:18
81:19,20 83:11
83:14,20,22
84:13 98:25
113:18
**carries** 116:18
**case** 1:3 4:5
21:24 38:22
63:12 76:4
**cases** 34:4
**categorical** 6:24
7:4 66:1,11 67:6
68:12 74:20

75:2,11 81:15
84:13,14
**categorically**
84:9
**categories** 71:18
**category** 83:17
**catherine** 2:14
4:23
**caused** 6:18
**causes** 117:9
**centers** 80:1
89:7
**century** 12:10
**certain** 21:14
27:14 38:12
76:11 97:12
102:8
**certificate** 121:1
122:1
**certify** 121:9
122:5,11
**cetera** 9:20
22:16 43:2
47:25 115:3
**challenge** 75:9
75:16
**challenged**
77:19
**chance** 46:24
68:24
**change** 124:4,7
124:10,13,16
**changes** 12:16
59:15 60:11,20
60:21 117:20

123:8
**chapel** 2:15
**characteristics**
6:21
**check** 36:8
48:11 102:8
**checklist** 100:3
100:5,8,10,16
100:17 101:13
101:18,20,25
102:2,6,7,11
103:2,9,11
**checklists** 102:3
**checkup** 50:24
71:16
**chelsea** 2:6 4:18
70:12
**chen** 61:10
96:13,18 97:21
**chief** 85:22
107:13,15
**child** 47:4,14
71:15 117:23
118:1
**children** 22:21
23:2,11
**children's** 83:9
83:21 89:6
**chriss** 2:5 4:16
4:16 6:4 15:6
19:9,22 30:22
55:15
**circle** 48:1
**circumstance**
65:1

**circumstances**
25:22 27:14
66:6
**citation** 36:2,13
**civil** 123:17,17
**claim** 24:24,25
33:25 37:18,19
42:20,24,25,25
43:10 49:18
50:10 51:1,14
51:21,22,24
52:4,14,15,20
**claims** 26:6
31:11 32:6,16
32:17 35:25
38:1,7,15 52:9
92:1,4 115:10
**clarified** 67:2
**clarify** 15:22,22
37:14 69:7,11
**clarity** 40:20
44:20 59:1
68:21
**classify** 96:14
**clean** 51:21,24
52:4 72:19
**clear** 60:23 67:4
72:13,22 78:17
95:12 96:2
**clearly** 8:1 79:4
**climara** 42:6
**clinical** 16:12
31:18 37:13
42:7,11 44:19
45:1 50:3 51:16

52:13,19,24
53:7 54:8,12
55:7 66:8,24
101:1,12 102:12
118:16
**close** 13:6 29:2
119:8
**closely** 119:12
**cms** 83:19 89:4
89:5,8
**code** 6:12 7:1
15:2 37:18 38:3
38:14 39:6 43:3
43:17 48:14
50:13,18,20,20
51:3,6,13,17
52:2 82:24 83:2
83:5 84:6
**codes** 37:17,17
38:1,23 39:1
43:2,21,21,24
44:1,2,7,7,9
48:7,7,9,12,13
48:14 51:9,10
51:12 84:4,8
**cody** 107:16
**collected** 112:15
**college** 11:11
105:13 117:24
118:24
**com** 36:23
**come** 17:25 18:4
18:4,6 31:9 43:4
81:25 87:19
102:9

**comes** 18:8
21:10 42:20,25
97:13
**coming** 12:16
85:13,15,24
86:3 88:4 97:8
**commenced**
1:15
**comments** 60:17
62:8
**commission**
121:21 122:22
**commit** 64:25
**committed**
15:10 20:1
**committee** 27:8
37:6
**common** 12:12
12:18
**communicated**
106:21
**communication**
103:20,23
106:20
**community**
11:11 13:12
**compare** 22:19
**compendia** 35:8
35:11,16,20
36:2,14 54:15
54:21 55:10
**compendium**
34:24 35:19
**complete** 24:7
64:2

**completed**
54:13 55:7
58:21,21 73:23
102:2,3 123:11
**completely** 79:4
**completing** 14:1
**completion**
73:22
**compliance**
26:17
**comprehensive**
54:22
**comprised**
85:19
**computer** 36:18
**concept** 12:12
**concerns** 116:5
**conclude** 115:14
115:19
**concluded**
115:3
**concludes** 48:24
120:15
**conclusion**
91:14 93:12
102:9 116:2
**conclusions**
81:10 92:17
114:22 115:3
117:21 118:10
118:13,14
119:23
**condition** 31:25
53:25 75:4
91:11 116:18

**conditions**
27:20
**conducting**
93:24
**confer** 48:19
63:5
**conference**
11:24 111:8
**conferences**
11:18,22,23,25
12:2
**confirm** 38:10
43:11 106:19
111:14
**confirmation**
3:12 79:1,9
81:16
**conflict** 114:10
114:15,16,20
115:5,7,12
**conflicted**
114:24
**confusing** 57:4
**connect** 105:24
**connected**
104:21 105:4
122:14
**cons** 116:19
**consent** 9:10
**consideration**
23:14 74:10
104:15 108:5
**considered** 33:7
91:10 99:13
123:12

consist  35:5
consistency
  61:8
consistent  17:22
  17:25 18:22
  74:8 93:6,9
  116:3
consult  18:25
  19:1 63:3
consultant
  12:21
consultants
  104:6 105:5,24
  106:3,5 111:2
consultation
  112:6
consultations
  98:10,12
consulted  9:24
  10:1
contact  87:2,5,7
  87:8 105:3
  110:12
contacted  87:1
  87:12
contacting
  104:25
contacts  110:7
  110:16
contained  45:19
  45:20 74:2
content  98:1
  109:7
context  58:12
  64:14,18 73:18

contextualize
  116:14
contract  47:6
contracted
  40:17 98:11
contractor
  31:12 42:18
  47:5,7,17
contractors
  17:6 25:11
  35:25 52:21
  66:21 77:22
control  33:4
controlled
  116:8,13
conversation
  90:2 106:25
conversations
  103:15 104:9,11
copies  10:25
  70:4 82:7 98:1
  123:10
copy  5:25 6:3,4
  6:5 15:5 19:24
  20:16 30:24
  70:18 72:13,18
  72:19 80:5
  114:6
corporate  4:3
correct  8:20
  16:4 25:8 28:19
  32:10 35:15
  38:20 39:4
  41:17,18,21
  44:10,17,22

  45:2,21 46:4,13
  48:4,5 49:12,24
  49:25 50:4,5,19
  54:23 55:2 60:5
  61:13 73:6
  74:23,24 75:7
  77:24,25 80:5,6
  83:3,4 84:1,4,5
  84:17,18 85:25
  89:23,25 94:12
  95:3,17 96:25
  106:17 107:22
  116:8 122:9
correctly  49:8
correspond
  37:18 38:2
  83:24
corresponding
  37:17
corresponds
  16:14,18,25
  51:14,22
cost  75:5
counsel  2:6 4:11
  9:9 10:3 19:12
  36:20 56:11
  69:7 70:3 72:12
  72:23 86:24,25
  87:9 88:13
  92:25 104:4
  112:2 120:8
  122:12,14
counsel's
  112:18

counter  54:3
countries  96:14
country  33:2
county  34:9
  121:6 122:2
couple  105:12
  111:8
course  12:13
  13:10,11 22:3
  23:4,9 26:23
  27:6 30:1 33:11
  35:4 37:11,12
  40:12 42:1,10
  42:24 43:1
  47:24 50:21
  54:9 67:22
  71:15 72:2
  78:14 87:19
  91:6 93:4 95:10
  99:13,19 104:17
  107:25 109:19
  117:18 119:14
court  1:1,19 4:9
  4:12 5:3,11 6:3
  6:5 8:5 12:24
  114:4 122:4
cover  16:3,11
  18:1,9,12,18
  23:18 24:1,14
  25:15,21,25
  27:14,15,17,21
  27:22,24 39:21
  39:25 41:1,19
  42:22 44:20
  45:23 47:23

49:22 50:6 53:2
53:12,19,20
66:15 67:1 75:5
81:16 90:14
**coverage** 9:21
10:19,20 16:14
18:23 20:22
21:3 22:19 23:1
23:5,6,17,23,25
24:22 26:20,23
28:2,6,11,23
29:4,5,7,9,13,14
29:17,18,20,25
30:2,6,8,10,20
31:10,11,19
33:7,8,10,17
35:25 36:11
40:3,24 41:5,8
41:23 45:6
52:10 54:18
56:13 58:17
66:4,17 67:2
77:22 90:18
91:21 96:24
100:22 101:3
102:16,17,23
**covered** 23:8,8
24:3,4 25:15,18
25:19 26:24
27:13 29:3,8,13
29:17 30:1 32:7
32:9 41:25
42:18 46:17
68:13 75:23
76:17 84:16

93:15,20 96:15
109:21
**covering** 53:6
67:8,23
**covers** 27:3
36:11 41:14
44:13,16 49:10
53:4 116:12
**cpt** 43:2 44:2
**craft** 63:18
**craig** 58:3,23
59:12 60:6,8
**created** 58:18
**credence** 118:12
**credible** 117:5
**cretella** 104:25
105:9 106:10
107:7,18 108:5
108:15,23
110:11,15,19,20
111:13 113:15
**criteria** 10:19
16:10 25:4
34:15 45:10,11
45:12,15,16,19
45:20 46:1,8,11
46:15,19,25
47:1,7,18,20,20
47:22 49:16,17
55:22,25 66:7
73:4,7,25 74:15
74:19 75:4,8,24
76:1,6 101:17
**criteria.shtml.**
45:14

**cross** 3:10 19:7
33:21,24 55:14
55:18 56:15
57:16 65:3 66:4
66:7,17 67:8
68:14 69:18
76:16
**crossed** 60:15
60:17
**cum** 11:13
**cumulatively**
68:16 76:21
**current** 9:17
12:19,21
**cursory** 91:6
**cut** 100:19
**cv** 1:3 4:6
**cyp** 50:2
**cypionate** 49:7
49:11,23 50:2
51:16 52:13,18

**d**

**d** 4:1
**dade** 34:8
**dalton** 85:21,23
**dana** 1:18 4:9
121:20 122:4,21
**data** 67:18,21
67:22 68:1,2,4,5
75:17,18 76:23
**date** 1:14 4:8
57:9,22 69:8,11
69:25 85:6
86:15 89:16,18
95:20 123:9

124:23
**dated** 19:8
56:17,17 60:12
70:20 79:9
94:11 122:16
**dates** 56:25 73:9
73:11,13,14
**dating** 56:24
**day** 20:13 42:6
59:17 65:20
92:19 121:14
122:16
**days** 11:7 73:4
73:11,13,14
86:11 123:11
**deal** 18:7
**debriere** 2:3 3:4
4:14,14,21 5:1
5:13 6:6 10:22
11:1 12:24 13:3
15:9,12,16
19:10,14,17,21
19:23 20:2,5,7
20:13,15 25:23
30:20,23 31:4
39:12,14 47:12
48:16,23 49:4
55:13,17,20
57:1,10,15,20
58:8 59:6 62:22
62:23 68:23
69:2,5,10,15
70:5,14,17
72:15,20,25
73:1 74:5,9,12

77:7,13 78:5,22
78:23 79:2,12
81:22 82:1,12
82:15,18 84:24
91:18,19 92:10
92:15 99:4
111:18,20
112:13,22 113:2
113:8,9 120:10
**december** 14:10
14:18
**decide** 92:25
**decided** 11:16
107:25
**decimal** 84:7
**decision** 18:4
86:18 88:3 90:1
100:3,8,10
113:10
**decisions** 31:11
35:24
**decker** 4:5
**declaration**
114:4
**declare** 124:19
**dede** 96:20
**deem** 45:25
**deemed** 17:24
23:12 63:22
115:4
**def** 3:10,12 19:6
20:20 68:20
70:19
**defendant** 2:17
19:6

**defendants** 1:9
4:25
**defending** 104:2
**defense** 2:11
4:20
**defer** 42:2 67:25
73:9,16 75:15
75:17
**define** 23:19
**defined** 6:17
16:2 71:22
**definitely** 20:7
30:24 34:7
38:22 53:5
**definition** 6:22
14:23 16:15,18
16:24 17:17
20:10 45:7 93:5
**definitions**
14:25 23:21
**dekker** 1:5
123:5 124:1
**deleting** 43:20
**delivering** 34:13
50:23
**delivery** 16:13
**denial** 19:2 22:7
43:4 50:15
**denials** 38:9
77:4
**denied** 37:19
**dental** 71:14
**deny** 18:23 38:2
38:12,15 43:10
43:14,16 50:11

51:1,4,6,11
**department**
62:6,17 88:24
89:13 90:6,7,10
91:3,5 93:25
99:11,18 103:23
105:17,19,21,23
106:9 107:7
108:13,20,24
**depend** 64:7
**depends** 26:17
64:6,8,14,15,17
64:24
**depo** 78:18
**deposed** 7:11
**deposing** 123:10
**deposition** 1:12
3:9 4:3,6 5:24
8:19,22 9:4 11:3
55:18 77:15,16
78:9 79:3
111:16 120:17
**depth** 47:24
**deputy** 14:8
63:8 86:5 88:11
94:16
**describe** 11:8
21:20
**described** 6:11
56:5
**describes** 55:21
**description** 3:8
82:23
**descriptions**
27:23

**designated** 8:23
61:9 79:24
122:7
**designation**
61:1
**designing** 90:8
**detail** 119:9,14
**detailed** 63:17
90:24 112:5
**details** 37:8
**detected** 26:18
**determination**
18:3,16,24
25:12,24 31:25
61:7 102:16,17
114:10
**determination's**
101:3
**determinations**
100:23
**determine** 16:5
16:13,17 18:11
21:3 22:5 25:6
31:13 32:3 36:1
40:24 52:22
54:25 63:6
74:21 75:19
85:11 93:8,14
93:19 98:6
101:14
**determined**
17:19 23:14
86:20 89:21
**determining**
16:2 33:15

42:19 50:7
54:17 107:2
**develop**  100:16
105:25
**developed**  33:13
73:4 101:18,20
101:25 103:10
**developing**
103:11
**development**
13:11 104:7,8
**deviate**  47:7,17
**devona**  10:1,5
10:14 61:10
96:12
**diagnosis**  37:17
37:18 38:3 43:3
43:21 50:13
51:5 67:24
82:24 83:2,5
84:4,11
**diagnostic**  7:8
38:13 39:6
43:17,24 44:1,8
50:18,20 51:3
51:13,17 84:6
**differences**
76:21
**different**  9:13
9:20 38:7 57:17
65:16 69:3,4
**differently**
48:13
**difficult**  97:4

**digging**  63:1
**directed**  94:14
**directing**  94:17
**directly**  10:5
**director**  94:15
94:16
**disagreed**
119:16
**discomfort**  6:17
**discovery**  10:23
12:14,15 82:4
**discrepancy**
6:18
**discuss**  5:21
119:14
**discussed**  5:15
**discussing**  5:22
51:16 52:19
76:16
**discussion**
20:23 77:8
91:13
**dispensing**
24:25
**dissertation**
12:9
**distress**  6:17
**district**  1:1,1
34:9
**division**  63:15
**divisions**  9:19
**doctor**  22:18
**doctors**  104:9
111:7

**document**  3:13
3:13 10:7 60:22
61:16,21,23
62:2,16 68:22
70:6 73:23 83:8
94:4 124:19
**documentation**
25:20
**documented**
34:14
**documents**
56:24 57:2
61:23 73:17
82:4 83:18 84:2
84:12 90:6,7,7
91:23 94:8
99:21 114:2
**doe**  91:25 92:1
**doh**  92:11,16,17
92:18 94:22,24
95:9 103:17
108:18,19
**doh's**  91:14
**doing**  16:16
25:25 50:23,24
52:16 61:19
102:24 110:9
111:11 117:8
**doj**  91:25 92:1
**dollars**  34:12
**donovan**  111:24
**downtown**
64:17,19
**dr**  104:13,17,21
104:22 105:9

106:10 107:7,17
108:5,15,23
109:3,3 110:5
110:11,15,17,19
110:20,20
111:12,13,22,23
111:23,23,24
112:10 113:10
113:11,15
**draft**  56:12 64:1
**drafted**  65:11
74:1,15
**drafting**  81:7
98:7,8,15 111:5
111:6 114:9
115:8
**drawn**  92:17
**drinks**  36:21
**drive**  1:17 4:7
**drug**  12:22 13:4
14:21 21:12,13
21:16,22 23:23
24:3,18,20 25:3
25:5,10 26:21
26:24 27:1,4,6
27:11 28:15,23
28:25 29:3,5,8,9
29:14,18,21
30:1 31:13 32:2
34:24 35:2,6,10
35:12,13,14
36:1,11,11,19
36:23,25 37:4,7
38:4,18 39:1,6
39:15,19,19

40:25 41:5
42:22 44:7
45:10,11,13,13
45:15 46:15
47:4,8 48:3,14
49:6,6 50:6,7,14
51:20 52:22
53:4,14,17,25
53:25 54:13,15
54:18 55:6 75:5
75:13 76:17
77:11
**drug's** 50:17
**drugs** 21:4,6
24:1,1 25:17,18
26:22 27:13,15
27:16,19,22
28:7,17 30:10
30:17 33:18
35:23 36:3,4
37:7 39:3,17
40:3,11,15
41:11 45:23,25
53:2,7,12,20
54:4,8,9 55:1
56:2
**dub** 37:16
**due** 99:6
**duly** 5:7 121:11
**dunn** 2:6 4:18
4:18 56:20 69:1
69:3 70:13
72:18
**durable** 13:12

**durham** 44:25
**dutasteride**
29:6
**dysphoria** 6:16
6:22,25 41:20
43:9 44:21
49:24 51:3 56:9
56:13 60:4 61:8
66:2,5,12,18
67:7,9,24 68:13
68:15,19 74:21
74:23 75:3,7,12
75:14 76:18
77:18,23 78:25
81:15,17 83:6
84:10,15,17,21
86:22 89:2,22
90:8,9,9,15,19
91:9,16,22
94:19 104:18
116:6,24 117:10
117:22 119:24

**e**

**e** 2:14 4:1 36:24
123:17,17 124:3
124:3,3
**earlier** 31:10
36:17 53:11
54:15 91:2
**early** 7:7,7
89:19 91:13
93:22
**easier** 70:10
97:7

**ed** 27:22
**edits** 60:17,20
62:18
**education** 2:11
81:5 90:7
**educational**
11:9
**effective** 83:16
**efficient** 97:14
**eight** 20:20
**either** 11:24
13:1 20:14
31:17 32:14
93:8 94:7 102:9
107:5 109:14
**elapse** 99:23
**element** 116:9
**elements** 99:7
102:8 116:9
**eligible** 31:19
**elliot** 63:4
**email** 106:13
123:10
**emailed** 123:11
**embarked** 102:5
**emergency**
13:13
**emerging** 12:13
**employee**
122:12,13
**enactment**
77:19
**enanthate** 29:15
**encompassed**
28:14

**encompassing**
27:5,12
**encounters**
76:22,25
**ended** 34:11
**endocrine** 119:5
119:7,7
**ends** 20:24
**engage** 113:10
**english** 100:15
**enrollees** 31:24
**ensure** 90:14
**ensures** 40:9
**entail** 104:12
**entering** 38:7
**entire** 45:24
**entitled** 68:19
70:19 78:25
79:8 98:25
**entrance** 59:13
**enveloped** 28:22
29:3,21
**environmental**
11:25 12:3
**epsdt** 7:6,9
22:22 23:2,3,14
23:17,20 47:3
47:16,22 74:10
**eq** 22:14 66:22
**equipment**
13:12
**errata** 123:9,9
123:11
**error** 32:17 52:3

**errors** 51:25
52:1
**especially** 47:1
65:17 117:15
**esq** 2:3,5,6,8,11
2:14,18,19
123:1
**establish** 108:21
**estradiol** 28:2,4
28:5,7 41:12,13
41:14,19,23,24
42:5,17 43:5,8
43:25 48:8
**estrogen** 28:8
**et** 1:5,8 4:5,5
9:20 22:16 43:2
47:25 115:3
123:5,5 124:1,1
**etiology** 117:9
**europe** 96:19
**european** 53:15
96:14
**evaluate** 86:21
89:22
**evaluated** 31:25
**evaluating** 35:9
116:21
**evaluation**
110:10 118:9
**evaluations**
100:17
**eventually** 87:2
**everybody** 58:7
**everybody's**
96:17

**everyone's** 70:9
**evidence** 90:9
90:25 91:8,15
91:24 92:3 95:5
106:7 110:9
115:1,9,17,24
118:16,23
**exact** 10:11
76:23 86:15
110:17
**exactly** 8:7 57:3
57:6 77:2 95:8
**examination** 3:4
5:12
**examined** 5:9
**example** 43:6
44:25 60:15,18
**except** 57:8
96:23
**excess** 23:16
**exchange**
106:23
**excluded** 116:6
**exclusion** 6:25
7:1,4 66:1,11
67:6 68:12
74:20 75:2,9,11
75:16 77:19
81:15 84:13,14
**exclusions**
27:12
**excuse** 9:13
89:10 120:8
**exhaustive**
45:22 46:2

**exhibit** 3:9,9,10
3:10,11,11,12
3:12,13,13,14
3:14 5:24 6:1
8:22 15:13,14
20:11 30:24
31:1 33:6 55:12
56:14,19,21
59:3,4,8 60:12
62:9 69:24
70:13,15,21
72:13 73:2,8
74:1,4,6,18 77:5
79:8,10 82:7,8
82:10,13 83:12
83:23 84:20,20
84:22 98:22,23
98:24 99:2
**exhibits** 3:6
5:15,18,21
68:25 79:4
81:23
**existed** 102:6
**existing** 95:5
**expedited** 64:11
**expenses** 40:12
**experience**
43:18 50:10
65:6,8 81:6 97:9
110:9
**experimental**
17:6,20 18:3,17
19:2 48:4 89:23
93:15,20 101:11
115:15,19

**expert** 58:24
112:21
**expertise** 71:10
80:22,24,25
105:2 106:6
**experts** 58:20
98:11 104:22
107:2,2 109:17
111:8 112:5
**expires** 121:21
122:22
**extensive** 67:18
97:3
**extent** 112:9
**extra** 11:15 15:5

**f**

**f64** 84:7,8,9
**f64.9** 84:10
**f640** 84:4,6
**f649** 82:24 83:2
83:5 84:4
**fact** 3:14 91:3,5
99:1 102:5
113:18,24
**facts** 124:19
**fail** 38:16
123:13
**fairly** 74:7
**fall** 9:19 58:18
71:17
**familiar** 9:16
15:1 22:11 23:4
72:1
**familiarize** 9:15

**family** 118:5
**far** 21:12,13
  30:12,16 34:15
  40:6 57:18 61:4
  69:25 75:18
  76:21 86:18
  88:3,4 95:24
  98:1,15 104:16
  109:6 110:12
**farino** 88:1
**farrell** 107:16
**fashion** 97:15
**fault** 69:6,6 79:5
**fda** 24:1,3,5,6,7
  24:9,13,14,15
  24:18 27:4 31:9
  31:14,16,17,18
  32:4 35:10 37:5
  41:2 42:23
  44:19 53:3,6,12
  53:16,17,21,22
  54:1,7,9 100:25
  102:12
**february** 1:14
  4:8 121:14
  122:16 123:3,6
  124:2
**federal** 20:23
  34:10 35:17,21
  94:5 102:14
  114:10,14,18
  123:12,17
**feds** 23:18
**fee** 21:13 22:15
  23:6,8,15,16

  24:25 39:16,24
  42:14,17 46:3,5
  66:23 67:4,5,10
  67:11 68:8,9
  75:19,23 76:2,3
  76:17,22,24
  81:18 83:12
  101:6,10,14
**felt** 109:21
**field** 32:15
**fields** 105:2
  106:6
**figure** 85:14,16
**file** 24:24
**filed** 114:4
**fill** 78:12
**filled** 58:19
**fills** 24:24
**final** 68:23
  70:24,25 78:24
**finalized** 62:24
  63:6,7,11 65:5
  65:13,22,23,23
  70:9
**financial** 108:21
  108:23
**financially**
  122:15
**finasteride** 29:1
**find** 10:18 34:23
  39:9,11 49:15
  62:5,19 76:9
  77:2,6 90:13
  91:4 97:22
  102:4 103:8

  105:15
**finding** 104:17
**findings** 91:14
  92:6,12 99:13
**fine** 5:17 7:24
  8:8 35:22 48:22
  57:13 72:21
  85:2
**finish** 11:16
**first** 5:7 22:4
  33:9 42:5,18
  44:12 54:24
  57:21 62:11,11
  69:24 82:13
  87:2,4,6,8 93:18
  113:17
**fiscal** 43:12
**fits** 116:20
**five** 17:12 99:22
**fl** 123:10
**flag** 39:12 48:16
  62:22
**flexibility** 18:8
  21:10 42:15
  66:25
**flip** 20:19
**floor** 2:12
**florida** 1:1,17
  1:20 2:3,4,7,10
  2:20 3:9 4:8
  6:11 7:1 8:18
  11:12,14,19,24
  14:23,24 15:2
  16:3 20:8,24
  21:3,7 27:2,3

  36:22 47:23
  56:1 66:2,3,15
  66:16,19 67:7
  68:13 75:5
  77:16 81:16
  82:21 84:16
  90:14,18 91:2
  93:16,20,25
  99:20 121:5
  122:2 123:12,17
**fmmis** 37:16
  38:12 43:9 48:6
**focused** 115:21
**folks** 93:22 94:1
**follow** 39:13
  48:16 78:6,10
  78:14 113:19
**following** 47:10
  73:21 114:23
**follows** 5:9 56:3
**foregoing** 122:5
  122:8 124:19
**forget** 81:23
**forgot** 37:22
  63:3
**form** 3:14 25:14
  27:10 47:11
  51:21 58:4
  77:18 91:17
  92:8,13 99:1
**formal** 81:5
  85:5
**formula** 100:14
**formulary**
  35:14

formulate  35:14
formulated
  92:22,24
formulation
  42:5 49:7,23
  50:1 51:15
  52:13,19
formulations
  41:15 44:14,25
forth  35:7 37:10
  37:17 75:13
  113:20 115:22
forward  65:17
found  17:5
  32:17 57:18
  80:7,9 118:22
four  11:7 45:1
franklin  2:14
fraud  26:10,11
  26:19 32:24,25
  33:4
fraud's  26:18
freedom  104:2
frequently
  32:17,20
front  57:2 62:9
  68:2 82:14
full  8:16 71:25
fully  21:8
function  18:14
fund  2:12
funds  34:12
further  122:11

g

g  6:12 7:2 15:3
  116:7
gain  86:16,17
gainesville  2:7
gapms  3:10,11
  3:11,12,14 6:9
  6:13,13 10:15
  14:14,14 17:14
  17:15,20 18:11
  18:20,22 19:7
  55:14,21 56:9
  56:12,15 58:16
  58:18,19,22
  60:1 61:5,9
  63:13,16 64:1,5
  64:9,11,12,13
  64:22 65:2,4
  68:18,19 69:13
  69:16 71:3,22
  71:25 73:5,22
  74:2,16 78:24
  79:8 80:11 81:8
  84:19,21 85:1,3
  86:19,19,22
  87:3,14 89:21
  90:2 93:1,9,14
  93:18 94:18
  95:2,19 96:5,8,9
  97:2,11,18
  100:4,11,20,22
  101:15,17,19,23
  102:1,10,15,18
  102:25 103:6,7
  103:14 104:7

  105:6,25 109:14
  114:9,9 115:13
  117:1 119:15,22
gaps  23:10,11
gary  2:19 4:24
  123:1
gather  10:2
  32:20 78:20
gathered  10:4
  90:1 107:23
gender  3:12
  6:16,18,20,21
  6:25 41:20 43:9
  44:21 49:24
  51:3 56:9,13
  60:3 66:2,4,12
  66:16,17 67:6,9
  67:24 68:13,14
  68:19 74:20,23
  75:3,6,12,14
  76:18 77:18,23
  78:25,25 79:8
  81:15,16,17
  83:6 84:10,15
  84:17,21 86:21
  89:2,22 90:8,8,9
  90:15,19 91:9
  91:16,21 94:18
  104:18 113:18
  116:6,23 117:10
  117:22 119:24
general  27:23
  84:11 86:25
  87:9 88:13
  92:25 112:18

general's  33:5
generally  6:9
  14:1 16:10
  17:23 24:23
  26:2 31:22
  32:14 33:8 40:8
  41:25,25 43:1
  43:22 49:17
  63:12 64:5,12
  71:16 84:7 87:8
  93:6 100:25
  117:2
gestures  8:4
getting  12:7
  26:5 79:25
  102:20
gg970595
  121:21 122:22
give  7:21 56:25
  57:5 97:23,23
given  11:4 30:14
  47:1 61:22
  65:17 78:5
  86:11 92:23
  107:13,14 108:6
  109:24
gn  33:16
gnrh  29:25 30:4
  30:19
go  5:23 6:8
  10:18 15:12
  22:7 23:13
  24:10 32:8
  33:10 34:15
  42:2,15 48:20

48:21 52:11
62:1 67:17
69:11 75:18
77:1,15 91:6
93:11 101:15
107:25 110:16
**goes** 21:14 22:3
22:8 30:12,16
45:7 61:4 69:25
75:19 86:18
95:25
**going** 5:14,18
5:23 6:8 12:25
18:1 24:14
26:16 28:18,19
31:17 33:25
36:18 38:24
39:24 41:2,4
44:5,6 51:18
56:18 64:4
65:18 67:17
70:10,21 73:2,9
77:2,6 78:8,19
79:7 84:25
98:23 100:20
101:14 102:7
106:7 115:19
116:1,2 117:14
**gonadotropin**
29:23,24 74:21
**gonzalez** 2:11
4:23
**good** 120:14
**gosh** 79:2

**gotten** 99:24
**governed** 45:9
**government**
13:23
**governor** 92:5
94:23 103:15
**governor's**
87:20,21,24
88:5,7,19 90:3,5
90:12,13,17,20
91:20 94:2 95:3
95:6 103:16,20
**gperko** 123:1
**grad** 11:17
**graduate** 11:15
12:1
**graduated**
11:13
**grant** 18:7
21:10
**grantham** 62:13
**great** 18:7 70:11
89:7
**grossman** 104:9
104:17 109:3
111:7
**gs** 62:8,9,10
**guess** 65:6 85:9
98:6
**guessing** 65:4
**guidance** 30:15
30:18,21 31:6
33:24 89:4,8,11
94:22,24 95:10
100:1 109:22

114:17,21,22,24
114:25
**guide** 109:22
**guideline** 30:14
**guidelines** 16:2
16:24 22:20
23:1 27:5 33:13
33:17,20 42:3
99:18 119:3,5
119:13
**guys** 69:5
**gynecologists**
118:25

**h**

**h** 36:23,24
45:13 124:3
**half** 13:17
**hand** 5:4 8:4
121:13
**handful** 68:6
**handing** 82:2,3
**handle** 40:10
**handy** 55:13
**happen** 15:4
32:16 34:1
**happens** 34:3
**happy** 28:2
**hard** 21:18 80:5
**head** 110:15
**health** 1:16 2:3
8:18 12:4,8,11
12:12,17,20,25
13:10,13 14:8
19:3 22:14
26:15 31:24

40:13 50:21
66:22 71:15
79:24 80:23
83:22 88:24
89:13 90:10
94:1 98:25
99:12,18 103:23
105:17,19,21,23
106:9 107:7
108:13,20,24
115:2,21 119:12
**health's** 91:3,5
**healthcare** 4:4
**hear** 34:4
**held** 4:7
**help** 5:22 40:12
81:7 100:19,19
104:16
**helped** 100:15
**helpful** 37:23
**helping** 109:22
**hey** 113:6
**hhs** 34:11 89:9
89:10 90:6 91:3
91:25 92:6,11
92:17 93:23
94:7 99:21
100:1 103:25
113:18,19 114:2
114:17,21,22,24
114:24 115:10
**highlighted**
72:16,22
**highlights** 72:13
72:23

highly  114:8
hill  2:15
hire  112:10
  113:6
historical  11:19
  63:1
history  11:12,14
  11:24,25 12:3,4
  12:8 59:22 63:1
  104:18 117:6
hold  65:20
holes  78:12
holtzman  2:19
holtzmanvoge...
  123:1
hormonal  42:1
hormone  3:10
  19:7 29:23
  33:21 55:14,18
  56:16 57:16
  65:3 66:4,17
  67:8 68:14
  69:18 74:22
  76:16
hormones  33:24
  66:8,8
hospice  13:14
hospital  35:13
hot  19:19
hotline  26:10
hour  45:1
house  22:13
  33:13
https  36:22
  45:12

huh  3:19 46:20
  56:4 61:6 82:25
  94:13 101:24
  105:10 110:14
human  52:3
hundred  21:14
  54:2
hypothetical
  43:6
hypothetically
  47:25

**i**

icd  37:25 44:3,4
  44:9 48:7,7,9
  51:12 84:8
idea  111:19
identical  57:8
identification
  6:2 15:15 20:12
  31:2 56:22 59:5
  70:16 79:11
  82:11 84:23
  99:3 111:22
identify  110:5
  112:4
identity  6:19
  12:18
ii  13:23
imagine  46:1
imbalances  42:1
immediate
  81:12
immediately
  35:3

immerse  97:3
impact  8:13
implemented
  75:16
importantly
  23:11
importation
  12:22 13:5
  39:19
impressive  20:6
inadequate
  115:9
include  77:12
  109:7
including  44:25
  117:10
inclusion
  111:24
incorporated
  15:1
independent
  18:2,15,19
  109:10 113:23
  114:23
independently
  18:14
index  3:1,6 35:2
indicate  41:17
indicates  41:14
  44:12,13 49:10
  50:3
indicating  84:2
indication  41:16
  41:16 44:15
  49:11,12 50:16

50:17 51:19
  52:5,16,22 54:8
  54:10,19 55:9
  66:9,24 101:1
  101:12 102:12
indications
  41:22 44:16,19
  45:5,17 53:7
indicators  85:9
  85:12
individual
  28:24 29:4,7,13
  29:20,25 31:11
  35:24 54:24
  60:24 71:7
  83:24 106:12
individual's
  75:3
individualized
  31:21,22 55:4
individually
  76:4
individuals
  71:22 105:3
  106:5 112:15,19
  113:15 117:7
infancy  12:11
info  93:23
inform  81:7
informal  85:7,9
  85:12
information
  10:2,4 22:23
  34:18,19,21
  35:6,12,13

37:15 39:10
49:15,19 51:22
62:7 67:12 74:1
76:19 77:1 78:1
78:2,3,10,13,21
89:25 91:6,15
92:23 106:15
107:6 109:6
110:17,22 111:3
113:7,13
**initial**  18:24
88:4 89:16
91:12 92:16
93:22 103:16
112:6
**initially**  63:5
95:6 113:25
**initials**  62:10
**initiate**  85:3
**initiated**  22:1,2
69:14
**inpatient**  71:13
71:13
**input**  33:11
**inside**  98:9
**instance**  1:13
34:8 67:7
**instances**  46:16
66:3,13 76:12
76:17 81:20
**instruct**  90:12
90:13
**integrity**  26:5,8
32:23 33:3

**interdisciplina...**
11:20
**interested**
122:15
**internal**  100:11
**internet**  96:14
**interpreted**  30:8
**intimately**  14:25
22:11
**introduce**  4:11
**investigation**
26:8 32:24,25
91:3,4 112:14
**investigational**
18:17 19:2 48:4
101:11
**involve**  32:5
**involved**  9:25
10:6 22:9 26:5
47:20 51:24
87:25 88:2 94:2
97:16 98:16
102:19 107:4
**issue**  69:8,12
**issues**  26:2
**it'd**  32:7 54:3
**item**  82:20
**items**  103:3
**iterated**  117:1

**j**

**jacket**  19:18
**jacksonville**  2:4
**jane**  113:5,5
**january**  13:24
14:11,14 58:19

65:13 77:18
114:4
**jason**  1:8 4:5
107:3,6,19
113:5 123:5
124:1
**jazil**  2:18 4:20
4:20 6:3 10:24
15:4,7,11 19:25
20:4,6 25:14
47:11 57:8,19
58:5 69:7 70:3
72:12,21 74:4
78:16 91:17
92:8,13 112:2
112:17,23 113:4
**jeffrey**  100:15
**jill**  113:4,5
**job**  9:17 14:11
58:22
**john**  8:16
**johnson**  71:8,9
72:8
**joined**  5:1
**josefiak**  2:19
**josephina**  87:11
87:12
**journal**  11:21
**july**  65:14 79:9
**june**  3:11,14
47:2 56:17,18
57:22,24 59:2
60:2 61:5 84:19
84:20 85:1 87:3
96:9 97:18

101:22 105:5
109:13
**justice**  2:3 90:6

**k**

**katie**  87:25
**katy**  2:3 4:14
20:4
**kidder**  60:15
**kind**  9:20 12:11
15:22 18:13
27:5,10 28:8
48:13 54:10
80:2 84:9 97:7
100:12,17,19
102:6,15,24
110:15
**knew**  115:5
**know**  7:9,20,25
8:8 10:22 15:9
20:8,9 21:17
22:23 31:8
32:14 34:7,8,24
35:11 36:16,17
37:7,14 38:22
40:7 41:6,7,16
43:12 44:16
48:12 49:9
53:15 54:12
56:16 60:9
61:13,14 62:14
63:9,10,18
65:15 67:1 76:5
76:16 77:9
79:19 80:11
83:7,15 85:10

85:11 89:18
91:7 99:20
100:4,7,24
101:22 105:20
107:1 108:19
111:18,25 113:4
113:14 115:16
117:5,14
**knowing** 36:12
**knowledge**
33:23 60:25
62:25 75:22
81:19 85:23
86:5,7,8,9,16,17
93:13,17,21
95:13,16,18
97:6,13 106:22
**knowledgeable**
62:1 111:17
**known** 64:16
**knows** 113:2,3

**l**

**label** 24:8 35:10
47:21,22 53:4,8
53:22 54:4
55:24 56:2
**labeled** 59:3,8
82:5
**laid** 75:4
**lambda** 2:11
**lappert** 111:24
**large** 1:20 35:5
44:18 93:12
95:25

**larger** 34:15
**late** 12:10
**laude** 11:13
**law** 40:8
**leaders** 107:12
**leadership**
85:18 86:2,17
**leads** 104:16
109:4,5
**lean** 15:7
**leave** 80:19
**led** 105:1
**left** 60:8 80:20
101:21 115:23
**legal** 2:6,11
86:20 123:16
**legislative** 65:18
80:2
**lend** 118:12
**lengthy** 13:14
119:14
**leon** 121:6 122:2
**letter** 85:6,15
86:12 92:20
94:10,14,17,21
**level** 22:3,4,6,8
**levels** 65:16
**liberty** 104:4
**licensure** 26:17
**life** 43:6 70:9
**likely** 74:14
110:24 114:8
**limited** 117:11
**line** 5:20 60:16
82:20 124:4,7

124:10,13,16
**link** 4:22,25
36:19 46:16
51:12
**list** 9:16 13:15
23:7 26:25 27:6
27:9,16 28:18
36:19,25 37:4,7
39:20,21,21
42:5 43:23
45:22,25 46:2
49:6,6 54:16
77:7,16 79:5
**listed** 9:5 15:21
23:17,21 35:4
35:16,21 39:23
41:15 42:5
44:14 45:12
46:15 47:18
49:17 54:20
55:9 58:1 59:14
71:7 101:5,9,13
**listing** 68:25
**lists** 27:15
**literature** 54:14
55:11 91:1,7
93:11 97:4,17
97:21 115:4
116:23 117:8
**litigation** 114:8
**little** 10:4 11:8
39:5 48:12
52:11 54:22
58:12

**llp** 2:9
**loaded** 51:10
**location** 1:16
**long** 11:2 13:16
22:12,12 47:19
51:13 70:10
76:10 117:2
**longer** 48:19
**longitudinal**
117:6
**look** 14:23
24:21 32:8,16
41:10 42:4
46:24 54:24
55:8,12 57:21
71:19 76:13,23
77:5 81:22
82:19 90:24,24
95:4 103:3
104:14 108:9
**looked** 10:13
**looking** 8:21
12:7,17 18:21
20:16,19 26:6,6
26:16 42:7
44:11 45:15
49:6 50:1,16,18
51:19 52:12,18
54:17,19 57:15
59:2 60:11
61:18 70:7
77:14 78:24
82:13 83:23
98:22 111:21

**looks** 10:8 44:24
  60:18 74:7
  83:14
**lot** 21:10 58:16
  58:17 112:8
  117:3
**lots** 26:9 63:15
  63:15,15 117:9
**loud** 5:21 8:3
**low** 63:22 64:5
  64:12 65:1,5
**lower** 40:12
**lunch** 79:6
  120:13

**m**

**m** 36:23
**made** 32:1 59:9
  59:15 60:21,21
  61:12,13,14,17
  62:4,18 64:16
  65:12 85:4,5
  87:21 103:17,18
  103:19,22 105:3
  114:23,23
**maf** 1:3 4:6
**magellan** 30:15
  30:19 31:6
  40:18 76:1,1,3,5
  76:12 77:2
**magna** 11:13
**mahan** 1:17 4:7
**main** 98:17,19
**maintained**
  80:11

**make** 10:25
  16:22,25 18:2
  18:15 25:24
  37:24 42:15
  43:12 70:4,9
  90:17 93:12
  99:25 119:21
**makes** 97:14
**making** 31:10
  35:24 92:1
  94:22 95:5
  100:16 110:7
  115:10
**managed** 9:25
  16:20 17:7,21
  18:7 21:9 40:2
  41:7 42:14 46:6
  46:7,10 64:9
  66:22,25 68:9
  76:22,25 81:19
  81:20 83:11,14
  83:20,22 84:13
**management**
  37:15
**manager** 40:22
  63:2,4
**managers** 40:8
  40:10
**mandating**
  102:22
**manual** 52:24
**manufactured**
  53:14
**manufacturers**
  40:11

**maps** 96:12,13
  96:18,19,21,23
**march** 121:21
  122:22
**mark** 5:14,23
  15:12 19:21
  30:24 56:18
  70:12 79:7 82:6
  82:8 98:23
**marked** 3:8 6:1
  15:14 20:11,20
  31:1 56:14,21
  59:4 70:15,21
  79:10 82:10
  84:22 99:2
**market** 53:19
**markups** 79:13
  79:14
**marstiller** 94:11
**marstiller's**
  94:21
**mastectomy**
  82:24 83:2
**master** 11:13
**master's** 97:10
**match** 41:4
**materials** 9:22
  22:17 80:11
**matt** 5:16
**matter** 4:4
  58:20,23 71:10
  80:21,24
**matthew** 1:12
  3:3 5:6 8:16
  123:6 124:2,23

**maureen** 88:1
**maximum** 37:13
**mckee** 2:14 4:23
**mcmaster** 110:8
**mean** 6:14 7:9
  9:5 11:6 22:25
  24:10,13 26:9
  28:7,21 30:8
  31:15,15,16,17
  39:15 42:2,8,21
  43:22 44:18
  45:24,25 47:22
  47:22,23,25
  49:18,20 52:8
  53:3,13 57:12
  63:7 64:17,20
  67:2 73:7 81:4,5
  82:6,20,22
  83:19 89:5
  95:23 96:9
  100:4 101:10
  102:13 106:5,21
  107:10,12 109:6
  111:25 112:4
  114:12 117:7,13
  118:11 119:1,1
  120:6
**means** 36:9 42:9
  42:12 50:6 65:2
  73:19 83:1
**meant** 15:23
**medicaid** 3:9
  10:13,18 14:9
  14:16,24 16:3,5
  16:11 17:5,19

17:20 20:8,24
21:3,7,21 23:23
23:25 24:4,11
24:16 26:3,4,5,8
26:13,19 27:2,3
31:10,12 32:23
33:2,2,4 34:3
35:17,21 36:10
36:23 37:15
39:4 40:13 41:1
41:7 42:21
43:12 45:13
47:23 54:25
56:1,13 58:15
63:14 66:2,3,15
66:16,19,21
67:8 68:13
73:11 75:5
76:20 77:7,17
80:1,1 81:16
82:21 83:23,24
83:25,25 84:16
85:21 87:17,18
89:14 90:14,18
91:21 93:16,20
94:16 96:13,21
96:24 113:20
**medicaid's** 88:3
**medical** 6:10
13:12 14:1,24
15:20,24 16:1,9
16:15,18,23
17:9,13,21,23
20:9 22:16
23:19 25:1,19

25:20 27:4 32:1
34:14 41:3 42:3
45:7 47:19 48:2
83:9,21 86:21
89:6 90:25 93:4
93:7 108:6,10
116:15,16,17,18
116:21 120:4
**medically** 16:9
22:6 23:12,14
25:7,13,16 26:4
32:19 47:8,18
114:25
**medicare** 80:1
89:7 101:4
102:16,18,20
**medications**
8:12
**medicine** 12:8
89:4 106:6
**medroxyprog...**
28:9
**meet** 17:12
**meeting** 34:14
87:23 88:6,10
88:11,15 89:17
89:20 90:4
91:13 92:16,21
93:22 94:3
103:16
**meetings** 95:8
**meets** 17:8
47:19,21,21
**member** 83:16
108:7

**memo** 112:3
**memory** 8:13
15:10 20:1
**mental** 100:17
102:7,11 115:2
115:21
**mentioned**
36:17 54:15
69:8 103:14
116:22
**met** 25:21 75:4
**meter** 111:23
113:11,11
**methods** 10:17
115:21
**miami** 2:10 34:8
**mic** 19:12
**michelle** 104:25
105:4,8,9,9
**microbiology**
12:14
**micronized**
28:13
**milligrams** 42:6
45:1 50:2
**milliliters** 50:3
**million** 34:12
**mind** 107:11
**mine** 15:10
19:20
**minimum** 37:13
**minnich** 2:23
4:10
**minute** 120:13

**minutes** 48:18
**miriam** 104:9
**mirror** 46:8
**mistake** 68:24
**mo** 10:22 15:9
19:24 72:25
74:6 112:13
**model** 116:20
**mohammad**
2:18 4:20
**mol** 98:23
104:10,13,21,22
109:3 111:7
**moment** 39:8
**money** 23:9
34:6
**monique** 71:8
**monroe** 2:20
**months** 65:11
65:22 67:19
99:23
**moot** 102:15,25
**move** 59:7 65:16
**moves** 54:11
**moving** 19:5
20:23
**mpi** 32:15,22
33:1,25
**multi** 87:23 88:5
**multiple** 26:18
68:22 70:5
119:14
**myflorida.com**
45:13

| | | | |
|---|---|---|---|
| **myriad** 97:9 | 25:16 26:4 | 81:3 | **nw** 2:7 |
| **n** | 32:19 46:1 47:9 | **new** 2:13 43:20 | **ny** 2:13 |
| **n** 4:1 | 47:18 115:1 | 43:21 53:17 | **o** |
| **nai** 61:10 96:13 | **necessity** 14:24 | **newman** 88:1 | **o** 2:18 4:1,1 |
| 97:22 | 15:20,24 16:1,9 | **nine** 55:23 | **oath** 121:1 |
| **name** 4:10 8:15 | 16:15,19,24 | **non** 13:13 24:7 | **object** 25:14 |
| 8:16 28:8,17 | 17:9,13,22 20:9 | 27:13 42:23 | 47:11 91:17 |
| 60:16 62:11,11 | 23:20 25:2,20 | 53:7 | 92:8,13 |
| 69:4 81:24,25 | 27:4 32:1 34:14 | **normally** 32:5 | **objection** 78:19 |
| 88:17 104:24 | 41:3 42:3 45:8 | **northern** 1:1 | **objections** |
| 105:16 106:11 | 47:19 48:3 | **nos** 82:10 | 78:17 |
| 106:14,16,17,18 | 86:21 93:5 | **notary** 1:19 | **obstetricians** |
| 107:11,13,14 | **need** 7:21 8:7 | 121:20 122:21 | 118:25 |
| 110:8,11,13,17 | 18:25 19:1 | **note** 12:25 | **obtain** 36:10 |
| **named** 28:16 | 24:10 28:3 | 37:24 123:9 | 37:9 78:3 |
| 88:16 121:10 | 30:24 40:6 46:7 | **notes** 122:7 | **obtained** 49:20 |
| **names** 35:3,3 | 46:8 48:15,19 | **notice** 3:9 5:23 | **obtaining** 23:22 |
| 107:24 108:4 | 48:21 62:7 63:2 | 6:8 8:21,22 | **obviously** 8:2 |
| **national** 39:1 | 78:15 94:9 99:6 | 55:18 77:15 | 34:3 66:24 |
| 101:3 102:16,17 | 99:8 103:8 | 111:16 119:2 | **occasional** |
| **native** 3:13,13 | 106:18 111:14 | **november** 13:24 | 97:24 |
| **natives** 82:3,9 | 120:9 | 14:11,15,19 | **occasionally** |
| **nature** 18:4 | **needed** 31:8 | **number** 44:18 | 97:22 |
| 93:15 | **needs** 23:1 | 67:23 72:3 | **occur** 34:23 |
| **nc** 2:15 | 41:24 | 77:16 100:19 | 62:12 |
| **ncd** 102:20,22 | **negative** 3:19 | 117:2 | **occurrences** |
| **ncd's** 102:19,20 | **neglect** 117:11 | **numbered** | 99:5 |
| **ndc's** 38:25 | **negotiate** 40:16 | 122:9 | **october** 75:1,10 |
| **necessarily** 18:6 | 40:18 | **numbers** 5:19 | **offered** 104:13 |
| 32:18 37:8 38:2 | **negotiating** | 5:20 34:2,15 | **offhand** 35:4 |
| 53:9 67:1,12 | 40:11 | 76:7,8,10,14,23 | 67:15 89:18 |
| 101:7,10 116:20 | **neither** 52:21 | **numerous** 11:18 | **office** 14:7 33:5 |
| **necessary** 16:10 | **never** 44:20 | 11:18 | 74:13 80:7,10 |
| 22:6,22 23:12 | 49:22 53:3,6,9,9 | **nurse** 22:5 | 80:10 87:20,21 |
| 23:15 25:7,13 | 63:11 65:4 67:7 | | 87:24 88:5,8,19 |

90:3,5,12,13,17
90:20 91:20
94:2 95:3,6
103:16,20
112:18
**official**  121:13
**offs**  26:9
**oh**  28:4 69:10
79:2 120:10
**okay**  5:15 6:7
7:13,17,18,23
7:25 8:11,17,21
9:10,23 10:7,22
11:8 12:19
13:19 14:23
15:19 16:4,8,16
17:1,11,15 18:2
18:15 19:5
20:16,19,21
21:1,17 22:9,25
23:19,19,22
24:5,15,20 25:1
25:5 27:15,23
28:9,13,16 29:1
29:11,19 30:3,6
30:18 31:8,20
32:2,7,22 33:6
33:15,21,25
35:11,19,22
36:17 37:21,21
38:18,21 39:2,9
39:12,23 40:2
40:20,23 41:4,7
41:13,19 42:17
42:21 43:5,7,23

44:4,8,11,20
45:9,22 46:3,15
47:3,15 48:23
49:22 50:16
51:2,15 52:4,11
53:11,14,20,20
53:24 54:5 55:3
55:5,12,25 56:5
56:8,10 57:21
57:23 58:4,9,23
59:1,19,24 60:6
60:9,14,23
61:11,21 62:3,7
62:15,19,19
63:10,25 64:11
64:19,22 65:3,8
65:21 67:4
68:11,18 69:16
69:20,22,25
70:2,2,11,14
71:2,9 72:5,11
73:2,17,25 74:9
74:18,25 75:10
76:5,8,15 77:5
78:4,16,22 79:7
79:17,22 80:7
80:12,17,21
81:6,14,22 82:2
82:23 83:5,15
83:18 84:2,6,19
85:16 86:2,6,9
86:13,16,24
87:1,12,21 88:2
88:9,15,18
89:12,16,20

90:3,17 91:2,12
92:21 93:13
95:1,12 96:2,16
96:20,22 97:1
97:16,20 98:3,3
98:17,22 99:25
100:3,8,25
101:2,5,22,25
103:1,8,13
104:6,11 105:8
105:18,22 106:9
106:24 107:5
108:9,22 109:1
109:3,12 110:2
110:19 111:12
111:15 113:17
114:3,8,14
115:13 116:4,10
118:24 120:15
**old**  80:10
**omar**  2:11 4:23
**once**  17:24
28:21 75:25,25
78:7,13 95:10
97:3,12,12
**ones**  40:18 86:8
**operating**  9:18
**operations**
43:12 74:14
**opinions**  92:19
92:22
**opportunity**
93:11
**option**  109:24

**oral**  112:9,25
**order**  99:7
**ordering**  123:11
**organizations**
118:17
**outline**  23:9
98:20 103:9
**outlining**  97:17
**outpatient**
26:22,24 82:19
82:21 83:1
**outset**  104:24
**outside**  9:8 98:9
106:2
**outsourced**
22:14
**outstanding**
115:25
**override**  38:9
**oversaw**  13:10
71:12
**overseen**  83:21
**own**  9:22 61:19
93:24 97:8
100:12,17
116:18

**p**

**p**  4:1 36:23
**p&t**  27:8
**p.m.**  120:16
**pa**  42:7 45:4
**pagan**  2:11 4:23
**page**  3:3 5:20,22
20:20,25 55:23
58:2 60:19 62:9

70:23 124:4,7
124:10,13,16
**pages** 82:14
122:9
**paid** 32:17,18
108:15
**paper** 63:19
**papers** 11:17
**part** 17:1,3
50:19 59:25
101:17 106:24
**participants**
77:17
**particular** 7:3
36:11 38:13
51:13 78:19
87:15 108:10
**parties** 122:12
122:13 123:11
**party** 87:23
88:5
**pass** 54:16
103:5 110:11
**passed** 105:16
110:8
**password** 61:25
**past** 20:13 56:8
67:21 79:3
81:12
**patch** 42:6 45:1
**pause** 7:22
**pay** 23:10 34:6
34:11 51:14,23
108:18

**pays** 24:24
**pbm** 33:14
40:17,20 76:1
**pbm's** 40:13,15
40:23
**pdf** 36:24
**pdl** 37:3 39:15
39:22,23 40:2
40:24 41:5,8,13
41:17 44:14,15
45:3 49:10,13
**pdl.pdf.** 36:24
**pdm** 102:4
**pediatric** 119:7
**pediatrics**
105:13 118:8
**peer** 54:14
55:11 91:1
**penalties** 124:19
**people** 4:21
32:15 88:16,23
113:18 117:16
**percent** 21:14
54:2
**percentage** 34:5
**perimeter** 23:10
**period** 13:24
54:7 61:4 75:17
75:22 76:10
**periodic** 7:7,8
**periods** 117:19
**perjury** 124:19
**perko** 2:19 4:24
4:24 123:1

**permanent**
117:20
**person** 58:21
59:11 64:23
100:11 105:4,23
107:17 112:7
**person's** 6:18,19
**personally** 95:7
108:22 121:10
**perspective**
100:12
**pertinent** 10:10
51:22
**petersen** 110:6
110:18,21
111:23 112:11
113:6
**peterson** 62:3
**peterson's**
60:16
**pgs** 1:11
**pharm** 36:23
**pharmaceutical**
27:7 37:6 53:15
53:16
**pharmacist** 72:6
72:8
**pharmacists**
21:19 48:15
58:25
**pharmacopoeia**
35:13
**pharmacy** 21:24
24:23 26:20
28:1,2 30:3 40:7

40:8,9,22 48:12
63:2,4 72:8
**phase** 54:12
55:6,7
**phd** 11:16 12:5
12:7
**phrase** 6:24 7:2
**physically** 46:24
95:7
**physician** 51:23
105:11 110:23
110:25 112:6
**physicians**
109:19 111:1,4
118:6
**pickle** 10:1,5,14
61:10 96:12,20
**pillsbury** 2:9
**pipeline** 85:13
**pittman** 2:9
**place** 37:6 38:25
50:20 54:4
103:9 122:6
**placed** 19:13
**places** 78:6
**plaintiff** 2:2
**plaintiff's** 4:22
5:2 56:11
**plaintiffs** 1:6,13
4:15,17,19
72:23 82:4
**plan** 17:7,21
18:1,2,15,23
31:24 40:2
46:11 64:9

81:20
**plans**   16:21 18:1
18:7,14 19:4
21:9 40:13 41:8
42:15 46:7
66:22,25
**plastic**   109:20
**please**   4:11,12
5:4 19:13 30:23
58:13 69:11
123:9
**plus**   55:10,11
**point**   7:13 18:13
43:24 78:7 84:7
87:2,5,6,8 91:14
97:13 102:15
115:6,18
**pointing**   111:15
**policies**   9:21
13:11 22:19
23:5,6,17 28:6
28:11 30:6,10
33:8,10 67:2
**policy**   3:9 14:9
14:16,25 15:13
20:22 23:21
25:17 26:20,23
26:25 27:11
28:2,15,23,24
29:4,5,7,10,13
29:14,17,18,20
29:22,25 30:2,3
30:4,8,12,13,16
30:17 33:7 51:1
58:15 66:7

73:11 74:18,25
75:4,13,24,25
85:21 93:4
**portion**   7:3 17:8
17:16,21 74:11
**portrayal**   21:2
**position**   12:19
12:21 13:17
58:16 92:5,11
**positions**   58:18
**positive**   3:19
68:24
**possible**   43:15
62:5,14 67:3
**post**   33:25
**potential**   26:25
85:23 115:5,7
117:9
**potentially**
26:14 27:16
72:19
**practice**   20:8
**practitioners**
105:2
**pre**   56:12 77:3
**precedence**
65:19
**predates**   73:10
**preferred**   27:6
36:25 37:4,7
49:5,6
**preliminary**   6:7
**prepare**   9:14
10:9 11:2

**prepared**   9:1
63:5 96:12,13
112:3
**prescribe**   33:16
42:9,10
**prescribed**   25:7
25:13,18 26:22
27:1,1,10 28:15
28:23 29:3,9,14
29:18,21 30:1
31:13 32:4 36:1
36:13,23 42:22
43:8 45:13 47:4
47:8,13 48:3
50:8,17 51:20
52:6,17,23
54:18,20 55:9
**prescription**
21:4,6 24:24
26:21 27:1
36:19 39:3 40:3
40:15,25 45:23
**prescriptive**
23:7
**presence**   89:12
**present**   2:23
79:21 88:10,12
88:14,15,24
95:7 103:17
**presented**   11:17
**pretty**   9:17,17
12:14 18:14
20:6 43:18,19
43:22 99:15
102:17

**preventive**
71:17
**previous**   28:22
68:18 93:14
97:11
**previously**   39:3
59:23 76:15
93:15
**pricing**   39:19
**primarily**   12:23
41:3 44:5 71:13
85:20 96:11
**primary**   6:20
58:22 71:12,16
82:24 84:3
96:18,22
**principally**   9:24
**print**   72:19 79:6
**printed**   59:18
59:20 82:16
**prior**   13:4,19
14:3 16:6,12,16
16:21,23 17:1,3
21:6,11,11,15
21:21,25 22:12
23:13,23 24:2
24:11,16,19,21
25:4,10,25
30:15 31:23
32:2 35:23 36:3
36:4,7,10,15
38:5,6,6,8,8,19
40:10,14 42:12
42:16 45:2,6,18
45:18 46:17

47:5,17 50:3
51:17 52:14,20
52:25 65:25,25
66:11 67:5,19
68:11 74:19,22
75:8,16 76:2
81:14 84:13,14
85:7,24 86:3
92:6,12 95:22
103:18 111:4
**priority** 63:22
64:5,12 65:1,5
80:2 99:14,15
99:16,17
**privy** 60:20,21
**probably** 11:5,5
11:6 21:19
56:25 77:11
78:14 86:11
110:24 114:16
**probing** 118:15
**problem** 7:19
7:20 8:1
**procedure**
37:16 38:23
43:21 48:13,14
50:20 53:6,8,23
81:21 116:12
123:17,17
**procedures** 9:18
71:15,16
**proceedings**
122:5,10
**process** 6:11,13
10:6,13,15

16:12 17:2,4,20
21:20 22:1,4
23:13,22 24:11
24:17,21 30:16
31:23 33:11
38:7 39:20
40:15 42:11
43:22 47:6
49:21 50:19
52:25,25 53:17
54:3,5,6 55:22
60:1 63:8 64:2
65:12 73:22
86:23 89:21
90:2 93:1,2,10
93:18 95:2
98:16 100:11
104:23,25 111:5
111:6 112:3,4,5
115:8
**produce** 58:7
**produced** 10:23
30:14 68:3 82:4
**product** 82:23
83:9
**production**
112:12
**professional**
6:10 14:1 17:23
93:7 119:11
122:4
**professionally**
81:1,2
**progesterone**
28:13

**program** 10:18
12:21,22 13:5,8
14:12 26:5
32:23 33:2,3
37:16,25 39:19
43:15,16 51:9
53:24 56:1
68:16 71:11
**programmed**
38:12 43:1,9
48:8 50:22 51:4
51:6,8,18
**programming**
48:7
**programs** 10:14
79:25 96:13,21
**prohibiting**
10:20
**project** 2:3
79:21,22,24
80:3 85:12,24
86:8,10,18
87:13,14 88:20
88:25 97:2,3
99:14,15,16,17
**projects** 11:6
63:16 64:3
65:19 70:1
88:21 97:9
100:14
**prompted**
117:20
**promulgated**
30:5,9,11 33:9
33:18

**prong** 18:21
54:6,11 93:5
**prongs** 16:1
17:12,13
**properly** 34:13
**pros** 116:18
**provera** 28:10
**provide** 10:11
10:16 43:23
45:5 46:16
51:21 58:12
73:18 78:2,21
91:6 104:15,18
104:23 109:22
**provided** 9:7,8
30:19 31:6
33:13 70:6
78:11,13,17
111:1,9
**provider** 21:23
22:2 26:11,13
42:9
**providers** 26:3
26:14 32:21
34:4,5 105:1
**provides** 93:10
**providing** 25:3
75:8 109:7
**psych** 109:18
**psychiatric**
119:19
**psychiatry**
117:23 118:2
**psychological**
120:1

psychologist
109:18
pubertal  73:2
74:22 75:6
76:19 77:22
puberty  68:19
69:21,22 70:19
71:19 73:5 74:2
74:15
public  1:19 12:4
12:8,11,12,16
33:11 34:17,20
34:22 49:21
121:20 122:21
publications
113:20
publicly  34:17
37:11 114:2
published  11:19
94:25 95:10
99:12 104:23
pull  45:10 62:2
67:18,21,22
79:6
pulled  59:18,19
purchase  99:7
purpose  15:20
15:23 35:10
42:19
purposes  56:2
put  19:12 31:23
34:20,22 37:10
60:16 65:20
82:16

putting  79:5

**q**

quality  14:8
26:15
quantify  34:1
quarterly  11:20
question  7:14
7:16 8:9 10:10
10:12,16 21:18
39:13,13 47:10
48:17 62:20
66:10,10 89:7
92:14 94:9 96:4
108:19 112:1,20
116:14 118:18
questions  7:22
9:25 10:5 11:4
35:20 59:22,24
59:25 78:6,8,10
78:14 82:6
91:24 115:23,25
116:22 117:3,13
quick  100:1
quickly  33:6
48:6 64:10 77:5
99:7,9
quite  6:9 13:14
66:10

**r**

r  36:23,24 124:3
124:3
raise  5:4
raising  64:23

randomized
116:8,12
ranged  11:23
12:3
rate's  39:24
rates  39:21
rather  15:7
94:23
reach  93:23
94:7 97:12
reaching  107:2
react  114:2
reaction  113:23
114:1
read  5:19 63:20
112:3 115:20
123:8 124:19
reading  5:21
99:5
reads  17:22
real  43:6
realize  30:7
115:6,18
realized  115:9
115:11,22 116:1
realizing  100:21
really  19:25
26:17 30:12
36:7 40:14 49:9
53:18 64:17
93:10 100:14,22
111:7
reason  8:8 65:4
70:20,22 99:5
123:9 124:6,9

124:12,15,18
reasonable
123:12
reasons  72:4
rebates  37:9
40:11,16,19
rebecca  79:16
80:9,17
recall  35:3
118:3
receipt  123:12
receive  113:21
received  11:4,10
11:11,13 34:10
67:25 68:22
75:20,20 107:6
receiving  68:6
recess  49:1
recipient  21:21
22:1 26:12 27:2
36:10 54:25
83:11,25
recipients  24:16
31:12,24 67:24
68:6 75:20 77:8
77:17 83:24
recognize  36:25
37:2
recommend
110:20
recommendati...
105:23 108:12
recommendati...
71:3 95:5
107:18,21,24

111:1 118:4,16
118:18 119:3,6
**recommended**
106:9 107:22,25
111:12,14
112:20 113:11
113:14
**recommends**
112:7,8
**record** 8:15
40:20 59:2
68:21 69:24
72:21 112:24,25
122:10
**record's** 72:12
78:16
**recorded** 4:2
**records** 22:16
25:19 34:20,22
49:21 112:10,13
**recoupment**
34:4
**recoupments**
32:20 34:23
**reeves** 1:18 4:10
121:20 122:4,21
**refer** 6:12 12:25
84:25
**reference** 15:2
18:13 36:18
119:21
**referenced** 31:9
91:2 123:7
**referencing**
64:19

**referring** 31:5
35:20 45:11
55:23 66:19
67:10 69:17,18
89:6 94:10
100:5,7
**refers** 6:11 7:1,3
**refine** 100:19
**regard** 89:11
123:13
**regarding** 30:10
30:19 56:9,12
66:7 68:18
88:25 89:1 90:7
**regardless** 23:4
23:15 38:4
**regards** 88:20
**regional** 12:2
**regulations**
20:23
**reimburse**
39:22 50:7
**reimbursed**
21:7
**related** 60:3
73:17,18 74:2
78:24 79:24
84:21 87:2 89:3
89:13 90:19
94:18 96:5 98:6
107:7 116:5
119:23
**relation** 61:8
65:6 99:17,18
105:21

**relationship**
105:18
**relative** 122:11
122:13
**release** 92:18
**released** 76:1
99:19,21 101:4
114:17
**releases** 94:4,5
**releasing** 29:23
74:21
**relevant** 115:14
**relied** 93:23
105:5 117:22
**rely** 41:8 81:10
118:10
**remember**
86:15 114:11
**remind** 103:10
**reminding**
65:15
**render** 102:15
**renders** 102:24
**repeat** 25:9
117:24
**rephrase** 7:15
92:14
**report** 19:7
26:11 57:25
59:9 60:1 62:24
63:5 70:24,25
71:5,7 73:5 74:2
78:24 79:15,16
80:5,8,9 81:11
81:12 86:19

92:17 98:18,19
100:9 109:7,25
110:1,3 111:6
111:10 114:9
115:14 117:1
119:15,22
**reported** 1:18
**reporter** 1:19
4:9,12 5:3,11
8:5 12:24 122:1
122:5
**reporter's** 6:3,5
**reporting** 26:19
**reports** 14:2
56:12 58:19
61:1 63:13,16
65:11,21,23
97:12 104:23
109:13 111:9,11
**repository** 62:1
**represent** 4:15
4:16,18
**representative**
4:3 9:11 60:24
61:2 68:4 95:14
96:4 111:17
**represented**
12:2
**representing**
2:2,17 8:18
**reproduce**
27:10
**request** 3:14
31:23 34:20,22
41:4 49:21 60:1

64:15 85:3,5
87:22 88:4 90:4
90:5 94:22,23
95:2,4 99:1,10
103:17,18,19,22
**requested** 52:10
**requesting**
87:17,18
**requests** 17:25
19:3 58:17
63:15 64:9 77:3
85:7 90:18
100:20,21
**require** 21:6,11
21:15 24:20
25:5,10 32:2
35:23 36:3,4,6,7
36:9 38:19
47:24 61:24
116:10,11
**required** 23:24
24:19 33:3
37:13 42:7,13
45:2,4 50:4
51:17 52:14,20
118:15
**requirement**
24:3 48:2 52:5
**requirements**
23:18 48:1
51:23
**requires** 38:5
50:20 54:12
**requiring** 36:15
61:15

**research** 10:17
11:17 80:13
97:3,9 100:13
102:14,21,23
104:14,16 106:2
109:23
**reserve** 78:9,15
118:17
**resources**
104:17
**respective** 106:6
**respond** 99:20
**response** 3:19
3:19 74:15 90:6
91:23 94:22
99:11,24 100:1
**responses** 117:5
**restrictive** 46:11
46:14,14
**result** 26:12,14
**results** 67:22
**resumes** 120:17
**retrospective**
32:6 52:8
**returned** 123:11
**review** 16:13,17
17:7 18:11
20:25 22:3,8,10
22:16 25:1 26:1
32:6,16 42:11
46:18 47:17,24
48:3 52:6,8,16
52:22,24 53:16
54:14 63:7,20
64:2 65:12,16

76:4 87:17,18
88:3 89:1 90:21
90:22 91:21
92:2,7,12 93:1,8
93:10,24 95:9
117:8 118:19
119:8,12 123:7
**reviewed** 9:21
10:8 22:10 23:1
55:11 65:13,23
91:1 97:25
114:7 118:20
**reviewing** 41:2
54:4 97:17
116:23
**reviews** 18:20
34:1 90:11
104:19
**revisions** 59:9
60:13 61:1,12
61:13,14,16,17
62:4
**rh** 1:3 4:6
**richmond** 2:4
**right** 5:3,4,14
8:7 13:5 19:5,13
19:15 20:13
27:18 41:10
42:20 48:6 49:5
51:7 52:24
53:13 56:8 57:9
57:16 59:1
61:11 69:24
70:18 72:16
78:11 89:15

94:19 101:23
109:15 113:16
118:18
**rise** 26:7
**risk** 102:19
**risks** 116:19
**rivaux** 2:8 5:1
**rl** 2:23 4:10
**rn** 22:5 72:10
**role** 6:20 9:17
10:6,15 13:4,7,8
13:22,25 14:15
65:7,9,10 98:5
101:21
**roles** 61:10
96:17
**roll** 83:9
**romina** 110:5
112:11
**route** 86:20 90:1
**routed** 73:23
**routing** 58:4
**rule** 6:12 7:2,4
15:2,2 17:9 30:5
30:9,11 33:9,18
123:17,17
**rulemaking**
33:10
**rules** 9:22 26:17
123:12
**run** 28:18 70:10
96:17
**ryan** 87:25

**s**

**s** 2:20 4:1 123:13 124:3
**safe** 38:16
**sail** 97:7
**sale** 53:19
**sample** 117:18
**sarah** 58:3,23 59:12 60:6,8
**save** 104:16
**saw** 5:24 10:7
**saying** 59:7 64:25 93:5 114:11
**says** 23:5 42:7 45:16 62:9 91:1 112:2
**scale** 93:12 95:25
**schedule** 23:15 23:16 39:16,24 101:6,10,14
**schedules** 23:6,9
**scholarly** 11:19 63:19 97:10
**school** 11:15,17 13:13 34:9
**sciences** 12:13
**scientific** 104:19
**scratch** 52:17
**screen** 45:16
**screening** 7:8
**seal** 121:13
**search** 95:24

**second** 22:8 48:19 54:11 55:5 62:11 77:6 99:6
**secondary** 6:20
**secretary** 14:8 63:8 86:4,5 88:12 94:11,16 94:21 107:13 112:19
**secretary's** 85:6 85:15
**section** 15:1 20:24 27:12
**see** 32:8 36:20 55:8 82:16 88:9 91:1 92:2 95:24 102:8 108:9
**seek** 106:3
**seeking** 21:21
**seems** 54:3 73:21 82:15 107:11 112:1
**seen** 9:4,6 31:3 45:24
**selected** 71:23 72:4
**seminar** 63:19
**sending** 98:5
**senior** 70:23 107:12
**sense** 97:14
**sent** 106:13,21
**sentence** 99:6

**september** 70:20
**sequence** 95:9
**seriously** 118:17
**service** 16:3,5 16:11,14,14,18 16:22 17:5,8,19 18:9,16,22,23 21:13 22:15 23:10,10,11 27:13 35:14 38:13 42:14,17 44:7 46:3,5 50:21 51:13,14 66:23 67:5,10 67:11 68:8,9 75:19,23 76:2,3 76:17,22,24 81:18 82:19 83:12 93:6 102:23 116:15 116:16,17,18,21
**services** 7:3,7,8 13:9,14 18:3,8 23:7,8 25:15 26:3,23 27:11 28:15,23 29:4,9 29:14,18,22 30:2 32:18 34:13 38:24 39:2,4 50:22 58:17 67:1,23 68:7 71:12,14 71:14 73:3,25 74:14 80:1 83:9

**september** 70:20 83:21 89:6 93:15,19 115:14 115:19 116:4,6 116:7,24
**serving** 86:4
**session** 65:18
**set** 35:20 48:12 49:19 51:12 64:11 75:13 78:18 116:16
**setting** 50:24,25
**seven** 20:9,13 65:22 99:23
**several** 67:18
**sex** 3:10 6:19,20 19:7 33:21,24 55:14,18 56:15 57:16 65:3 66:4 66:7,17 67:8 68:14 69:18 76:16
**shani** 2:8 5:1
**shapes** 12:18
**sharepoint** 58:2 61:24 71:6
**shaw** 2:9
**sheena** 62:13
**sheeran** 9:24 86:25 87:1 88:13 107:3,5 107:19
**sheet** 91:4,5 113:18,24 123:9 123:10

shifted  14:15
short  120:9
shorthand
  122:7
shortly  19:19
shoulder  15:8
show  67:22 68:4
  68:5
showing  36:24
  84:12
side  4:22 5:2
  40:16 62:8
sign  123:9
signature  70:7
  121:18 122:19
signed  63:8
  65:14 69:1
  70:23,25 114:13
  123:13
significant
  99:22
significantly
  47:24
similar  119:3
simone  2:5 4:16
  15:4 30:20
  55:13 77:7
simple  43:19
single  21:13,16
  65:1,2 116:16
  116:17
sir  5:3
site  26:12 61:24
sitting  77:20

situation  64:8
  64:24
six  67:19 73:4
  73:13,14 99:23
size  116:20
sizes  117:18
sm's  22:12
small  117:18
smc  40:13,23
snapshots  91:7
society  119:5,7
  119:7
solely  64:3
solitary  97:2,15
solutions  22:15
  123:16
somebody  26:10
somebody's
  63:21
somewhat  20:3
soon  120:9
sorry  19:24
  37:22 52:17
  69:5,11 74:5
  79:3 82:7,8
  94:15 99:16
  103:8 109:1
  113:11 119:10
sought  77:17
sounds  7:25
  35:15
south  11:21
  12:16
southern  2:6
  11:20 12:18

space  7:22
speak  5:8 8:1,3
  9:23 21:8 39:8
  41:9,25 48:15
  54:2 61:2 70:8
  72:1 81:9 95:8
speaking  7:19
  7:23 43:1 47:25
  76:20 93:3 97:8
special  65:18
  73:3,25 74:14
specialized  13:9
  38:24
specific  27:20
  28:6,7,11,25
  29:17 30:17
  31:25 35:6 38:2
  41:10 90:18
  92:5 102:23
  116:17
specifically
  13:25 27:19
  28:16,17 33:1
  61:9 88:20
  111:22 112:10
  112:20
specificity  88:17
specifics  32:14
speculate  71:22
speculation
  63:24
spell  28:3
spelled  36:22
spend  11:15

spent  11:5
spilling  36:21
spiro  28:18
spironolactone
  28:20,21
split  19:23
spoke  107:17,20
  107:20 112:15
  112:19
spreadsheet
  10:14
staff  21:19 88:7
  88:8,9 107:14
  107:15 113:20
staffers  87:24
stakeholder
  64:16
stamped  19:6
  72:20 82:3
stamps  73:24
  82:9
standard  9:18
  15:21,25 16:4
  17:22 21:3
  91:10
standards  6:10
  14:2 17:23 93:7
  114:10,14,18
  116:16 119:17
stands  6:9 7:7
  32:22 40:21
start  26:5 96:6
  99:7,9 103:13
  120:11

**started** 11:10
95:21 96:5
100:20,21
115:16
**starting** 20:22
**starts** 55:25
**state** 1:20 8:15
10:18 27:19
33:1 79:24
94:16 95:4
96:12,21,23
99:20 114:25
121:5 122:2
**stated** 114:3
124:19
**statement** 10:20
10:21
**states** 1:1 10:13
35:12 91:25
92:1
**stating** 91:8
**status** 82:20
**statute** 123:12
**step** 54:6,14
55:5,8
**stop** 7:15
**stops** 22:7
**straightforward**
43:22 119:4
**street** 2:4,12,14
2:20
**strickland** 87:25
**strike** 33:16
91:18

**studies** 11:20
117:3
**stuff** 6:7 22:13
**subcategory**
84:11
**subcontract**
40:9
**subcontractor**
33:14
**subcontractors**
16:20 17:7
**subject** 58:20,23
59:23 60:16
71:10 80:21,24
**subjected** 16:23
86:22
**submit** 21:25
52:5
**submitted** 22:17
52:15,15,21
**substances** 8:13
**substantial**
102:21
**substantiating**
102:13
**successful** 54:10
**sufficient** 94:6
**sufficiently** 92:4
**suggested**
123:11
**suggestions**
104:13
**suit** 19:17
**suite** 2:9,14,20

**summer** 79:18
**sunshine** 83:22
**supervision**
122:8
**supervisor** 10:1
81:13
**supervisors**
65:15
**supplement**
112:11
**support** 54:16
55:11 91:8,15
115:9
**supported** 36:2
36:13 91:24
92:4 116:7,12
**supporting**
61:10 91:9 92:3
102:22 115:1
**suppose** 49:20
**supposed** 27:11
117:4,13
**suppression**
68:20 69:21,23
70:19 71:19
73:3,5 74:3,16
74:23 75:6
76:19 77:23
**sure** 14:25
16:22,25 18:10
19:25 21:24
31:9 43:12 70:4
70:8 99:25
105:13

**surface** 26:7
**surgeon** 81:4
**surgeries** 57:14
71:13 84:3
**surgery** 3:12
77:10 79:1,9
80:25 81:7,17
82:20,21 83:1
84:16 109:20
**surgical** 71:14
**surprising** 64:1
**survey** 26:12
117:14,17
**surveys** 26:14
26:15 117:4
**swear** 4:12
**sworn** 5:7
121:11
**symposiums**
12:1
**symptoms** 115:3
**system** 21:13
22:15 35:12
37:15,20,25
38:1,7,11,16
39:7 42:24,25
43:3,13,15,19
48:8,11 49:19
50:10,14,23
51:8,10,18
53:24 59:14
71:6,7 76:24
**systems** 115:2

| t | | | |
|---|---|---|---|
| **t** 4:1 36:24 124:3,3 | **telling** 77:20 | **therapy** 3:10 | 118:2 119:21 |
| **take** 8:7,9 11:2 48:18,22 76:23 77:6 82:7 90:24 98:4 106:7 115:17 118:16 120:9,12,12,13 | **ten** 65:11,21 | 19:7 33:22 | **third** 54:13 55:8 |
| **taken** 21:23 117:16 122:6 | **term** 6:16 7:6 83:19 117:2 | 55:14,19 56:16 | **thought** 53:11 69:10 |
| **takes** 63:20 | **terms** 68:24 | 57:16 65:3 66:4 | **thoughtful** 118:15 |
| **talk** 69:22 111:4 | **testified** 5:9 | 66:17 68:14,20 | **thousands** 34:3 |
| **talked** 111:7 113:1,4,5,5 | **testify** 9:1 | 69:19 70:20 | **three** 10:12 11:7 13:17 34:25 35:1,11,16,21 50:22 54:6,12 54:15 55:6,7 56:12 57:17 60:19 87:24 96:15 |
| **talking** 24:7,8 28:4 93:25 111:10 114:5 117:19 | **testifying** 95:14 | 71:20 73:5 74:3 74:16 76:16 77:23 | |
| **talks** 35:6 | **testimony** 123:8 123:12 | **theses** 97:10 | |
| **tallahassee** 1:17 2:20 4:7 11:11 | **testosterone** 29:11,15,19 44:11,13,19,21 45:16,17 46:16 46:17 47:13 49:7,11,22,23 50:1,2 51:15 52:13,18 | **thing** 23:25 | **time** 1:15 4:9 11:15 13:24 14:3,9 22:12,13 32:7 48:25 49:3 52:10 61:4 63:2 63:4,20 71:21 71:24,25 73:10 73:24 74:25 75:1,10,17,22 76:10 78:9,15 79:20 85:8,22 86:4 87:9 91:12 93:14,18 96:17 99:22 102:1 104:17 117:14 120:16 122:6 |
| **tamayo** 87:11 87:12 88:10 | | **things** 39:18 49:18 71:15 101:4 117:7,12 | |
| **task** 61:9 | | **think** 10:11 11:24,25 16:7 19:23 21:25 22:7,17 24:23 29:2 30:14 34:8 34:12 37:8 38:8 40:5,5 44:1 45:24 59:21 60:8 62:7 65:11 67:21 68:9,9 69:8 71:14 72:10 78:5,17 80:13 87:4,25 88:11,11,12,13 88:23 89:19,24 100:15,15,16 102:3 105:11,12 105:13 107:1,3 107:10,19,19 109:17 112:8,17 114:15,20 116:5 | |
| **tasked** 13:25 | | | |
| **taxonomy** 84:9 | **tests** 103:6 | | |
| **team** 33:3 71:12 | **text** 35:12 60:18 | | |
| **teams** 9:20 13:10 32:25 | **thank** 5:11 15:11 19:15 28:5 30:23 41:13 48:23 57:19 72:25 74:6 94:17 113:8 | | |
| **tech** 72:8 | | | |
| **techniques** 104:20 | **thanks** 20:5 | | |
| **tell** 16:8 22:25 34:5,7,7 83:7,11 | **that'd** 50:13 | | **times** 31:3 68:11 75:12 76:5 77:3 77:21 84:15 95:12 |
| | **theirs** 118:7,9 | | |
| | **thera** 36:24 | | |
| | **therapeutics** 27:8 37:6 | | |
| | **therapies** 67:8 | | |

**tip** 26:9
**title** 83:18
**today** 8:13 9:14
    10:8 11:3 77:20
    98:24
**today's** 4:8
**together** 12:16
    37:10 82:16
**tom** 94:14
**tonight** 19:18
**took** 65:22
**top** 20:25
**topic** 12:9 78:19
    111:15,21 112:2
**topics** 8:21,23
    9:2,4,16 11:18
    12:2 77:16
    78:18
**total** 82:14
**totally** 8:8
**track** 5:22 62:15
    62:17
**tracking** 58:2
**traditional**
    64:12,13
**transcript** 123:7
    123:13
**transcripts** 8:6
    123:10
**transgender**
    61:8 119:12
**translated**
    122:8
**transparent**
    39:20

**transplant** 97:6
**transportation**
    13:13
**trauma** 117:11
**treat** 41:20
    44:21 66:4,17
    67:8 76:18
    84:16
**treating** 74:23
**treatment** 6:25
    7:8 43:8 49:24
    51:2 56:13 60:3
    66:1,12,15 67:6
    67:25 68:12,14
    74:20 75:2,6,11
    75:13 77:23
    78:25 81:15,17
    84:15,21 89:22
    90:14,19 91:9
    91:10,15 94:18
    102:22 116:5,11
    116:23 117:22
    119:24
**treatments**
    86:21 89:2 90:8
    91:21 104:19
    115:1 117:20
**tree** 100:3,8,10
    110:15
**trial** 54:7
**trials** 31:18
    54:12 55:7
    116:8,13
**tried** 54:8 55:1

**trigger** 50:14
**triggering** 26:8
**trouble** 47:10
**true** 57:11 122:9
    124:20
**truth** 5:8,8,9
**try** 7:16,21
    70:10 76:9,9
**trying** 65:15
    85:10,10,14,16
    97:5 98:6
**tuberculosis**
    12:10,15,17
**turn** 15:17
    36:20 70:22
    84:19 108:1,2
    109:1
**turned** 112:24
**turning** 33:6
    47:3 48:6 49:5
    56:8
**two** 22:3 29:19
    32:25 35:2
    48:18 49:3
    55:15 56:16
    58:18 65:12,12
    65:21 73:17
    82:13 83:10,11
    86:7 103:3,6
    117:19 120:15
**type** 52:2 82:19
    90:22

**u**

**uh** 3:19,19,19
    46:20 56:4 61:6
    82:25 94:13
    101:24 105:10
    110:14
**ultimately**
    119:16,18
**umbrella** 27:5
**unanswered**
    115:23 116:22
    117:3,13
**undecanoate**
    29:19
**under** 3:14 9:19
    17:16 20:22
    25:2 27:1,14
    28:14 42:14
    47:4,14,22 48:2
    56:1 66:14,23
    67:4 81:18
    82:19 83:9
    97:12 99:1
    116:6 122:8
    123:12 124:19
**undersigned**
    121:9
**understand**
    6:13 7:2,14,17
    8:4
**understanding**
    8:17 46:10 50:9
    74:13 76:11
    80:4 97:13

**undertake**
24:16 25:12
90:10,21,23
93:1,10 94:18
95:2,9
**undertakes**
21:21
**undertaking**
47:5 52:6
**undertook**
95:10 102:1
**uniform** 116:15
**unique** 83:25
100:12,13
116:15
**unit** 33:4
**united** 1:1 35:12
91:25 92:1
96:12
**university** 11:12
11:14 110:9
**update** 43:19
**updated** 43:13
45:16 47:2
**updates** 113:21
**updating** 13:11
**uploading** 43:20
43:21
**url** 36:21
**usage** 24:8
**use** 6:16 15:9,24
17:21 19:1 25:7
25:13 27:21
31:13 32:4
33:15 35:9 36:1

36:12 43:5 44:3
44:8 47:9,21
48:4 50:7 53:4,8
53:25 54:4
55:24 66:16
89:21 105:24
107:3 118:7
**used** 10:17,17
16:5 22:12 42:1
42:19 44:21
54:9 55:22
74:19 80:14
93:14,19 100:16
104:6 123:13
**uses** 35:7 41:22
42:23 45:5
53:21,22
**using** 6:8,22,24
7:6 17:20 35:19
40:23 44:2,2
48:14 118:3
**usually** 17:25
21:23,23 22:2,4
23:12 26:4 35:5
42:1 49:21
62:10 63:16,20
64:10,10 103:3
119:4
**utilize** 35:8
**utilized** 56:1

| v |
| --- |

**v** 2:19 123:1
**van** 98:23
104:10,13,21,22
109:3 111:7,23

113:10,11
**vast** 27:9
**vendors** 22:24
**verbal** 7:25
98:12,13,14
104:9 106:22,23
**verify** 40:6
123:8
**veritext** 123:10
123:16
**veritext.com**
123:10
**version** 56:15
57:24 59:10
61:12 70:7
**versions** 55:16
56:17 57:16,17
68:22 70:5
**versus** 76:24
77:3 116:19
**viagra** 27:21
**video** 4:2 48:24
49:2 120:11,15
**videographer**
2:23 4:2,11 8:2
19:12,15 48:24
49:2 120:8,11
120:15
**videotaped** 1:12
**violation** 25:17
**vogel** 2:19
**voice** 64:16
**volume** 1:11
120:17

**vouching** 106:4
**vs** 1:7 4:5 123:5
124:1

| w |
| --- |

**w** 1:18 121:20
122:4,21
**waits** 63:23
**walk** 5:18
**wall** 2:12
**wallace** 94:14
95:1
**want** 7:14,15,16
15:17 19:24
37:23 48:18
64:25 67:17
68:21 69:7,23
70:13 72:21
78:7 82:5 90:22
91:20 99:22
106:5 120:12,13
**wanted** 70:22
90:20,24 92:2
99:20,25 100:18
**wants** 42:9
**waters** 97:8
**way** 27:11 36:16
39:9 40:7 75:18
84:8 93:7
102:10 115:23
**we've** 24:19
44:12 51:16
52:19 56:14
57:18 89:25
**weak** 91:9,16
118:22

**[website - zoom]**                                        Page 160

website   34:22
  36:19 37:11
  49:17
week   11:5
weida   1:8 4:5
  86:4 88:12
  107:4,6 112:19
  123:5 124:1
weird   81:24,24
went   58:20 60:9
  63:7 97:24
  98:15 103:6,7
  108:12
western   96:19
whatsoever
  10:21
winthrop   2:9
wish   18:9
witness   3:1 4:13
  5:7,10 6:4 19:19
  25:15 31:3
  48:21 56:23
  57:12 58:6
  61:15 69:13
  72:24 74:7,10
  92:9,14 120:14
  121:10,13 123:8
  123:8,9,13
wondering   57:3
worded   27:11
words   81:3
work   12:22
  38:11 59:23
  60:6 61:4,7
  78:20 84:8

95:19,21,25
  96:6 97:21 99:7
  99:9
worked   14:7
  39:18 59:11
  81:3 96:8,18,19
working   11:7,16
  14:14 39:3,18
  61:5 79:23
  115:16
works   40:7
  50:10 93:4
  97:11,11
world   119:11
worn   19:17
wpath   119:5,10
write   98:17,19
  109:12 110:1,2
writing   58:1
  99:11 109:18,24
written   111:24
  112:10,13,24
  114:12
wrong   28:19
  52:2 77:11
  98:24
wrote   96:22

**y**

yeah   10:11,11
  13:6 16:24
  29:24,24 32:13
  34:25 38:15
  39:11 40:1
  44:18 45:3
  52:12,12,12

54:24 55:2 56:8
  56:23 57:2,10
  57:11 62:17
  69:2,10 70:11
  70:13 72:17
  73:15 77:9,9
  82:15 83:13
  84:5 86:14
  92:16 98:15
  105:7 109:6
  114:12,12
  118:14,14
  120:14
year   65:14
  67:22 117:19
years   11:15,17
  13:18 20:9,14
  67:18
yep   25:10 73:3
york   2:13
young   113:18

**z**

zoom   4:22,25

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 125

1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF FLORIDA
2

3                    CASE NO.  4:22-cv-00325-RH-MAF

4

5    AUGUST DEKKER, et al.,

6        Plaintiffs,

7    vs.

8    JASON WEIDA, et al.,

9        Defendants

10   _____/

11                       Volume 2, Pgs. 125 - 261

12   VIDEOTAPED DEPOSITION OF: MATTHEW BRACKETT

13   AT THE INSTANCE OF:     THE PLAINTIFFS

14   DATE:                   FEBRUARY 8, 2023

15   TIME:                   COMMENCED: 1:30 P.M.

16   LOCATION:               AGENCY FOR HEALTH CARE
                             ADMINISTRATION
17                           2727 MAHAN DRIVE
                             TALLAHASSEE, FLORIDA 32308
18
     REPORTED BY:            DANA W. REEVES
19                           Court Reporter and
                             Notary Public in and for
20                           State of Florida at Large

21

22

23

24

25

Page 126

```
 1    APPEARANCES:
 2            REPRESENTING THE PLAINTIFF:
 3            KATY DeBRIERE, ESQ.
              Florida Health Justice Project
 4            3900 Richmond Street
              Jacksonville, Florida 32205
 5
              SIMONE CHRISS, ESQ.
 6            CHELSEA DUNN, ESQ.
              Southern Legal Counsel, Inc.
 7            1229 NW 12th Avenue
              Gainesville, Florida 32601
 8
              SHANI RIVAUX, ESQ.
 9            Pillsbury, Winthrop, Shaw, Pittman, LLP
              600 Brickell Avenue, Suite 3100
10            Miami, Florida 33131
11            OMAR GONZALEZ-PAGAN, ESQ.
              Lambda Legal Defense and Education
12            Fund, Inc.
              120 Wall Street, 19th Floor
13            New York, NY 10005
14            CATHERINE MCKEE, ESQ.
              1512 E. Franklin Street, Suite 110
15            Chapel Hill, NC 27514
16
17
              REPRESENTING THE DEFENDANT:
18
              MOHAMMAD O. JAZIL, ESQ.
19            GARY V. PERKO, ESQ.
              Holtzman, Vogel, Barantorchinsky & Josefiak
20            119 S. Monroe Street, Suite 500
              Tallahassee, Florida 32301
21
22
23            ALSO PRESENT:
              RL Minnich, Videographer
24
25
```

Page 127

1                    INDEX TO WITNESS

2

3    MATTHEW BRACKETT                              PAGE

4    Examination by Ms. DeBriere                   128

5    Examination by Mr. Jazil                      253

6    Further Examination by Ms. DeBriere           255

7

8                    INDEX TO EXHIBITS

9

10    NO.          DESCRIPTION              MARKED

11   Exhibit 13   Medicaid coverage for children        153
                  state list

12   Exhibit 14   Medicaid policy Routing and           163
                  Tracking Form

13   Exhibit 15   Molina Health Care Notice of          202
                  Adverse Benefits

14   Exhibit 16   August 22, 2022 email                 215

     Exhibit 17   August 22, 2022 SMMC policy           215
15                transmittal

     Exhibit 18   Florida Medicaid health care alert    222
16                sign off form

     Exhibit 19   June 3rd, 2022 series of emails       227

17   Exhibit 20   Florida Statute 120.542               234

     Exhibit 21   GAPMS queue                           249

18   Exhibit 22   Health and Human Services document    253

     Exhibit 23   Treatment of gender dysphoria for     253

19                children and adolescents

20

21

22

23     *Uh-uh is a negative response
       *Uh-huh is a positive response

24

25

Page 128

1                    D E P O S I T I O N

2        Whereupon,

3                        MATTHEW BRACKETT

4        was called as a witness, having been previously duly

5        sworn to speak the truth, the whole truth, and nothing

6        but the truth, was examined and testified as follows:

7                   VIDEOGRAPHER: This is beginning of video

8              three.   The time is 1:30 p.m. We're on the record.

9                            EXAMINATION

10       BY MS. DEBRIERE::

11            Q    So prior to break, we were talking a little

12       bit about Dr. Van Mol and Dr. Grossman's involvement in

13       the 2022 GAPMS.  How did AHCA identify them to

14       participate in the July 8th rule hearing that was

15       related to?

16            A    So the -- are we talking about the rule

17       hearing?

18            Q    Yes, related to the June 2022 GAPMS.

19            A    So since we had already been working with them

20       in relation to the GAPMS project, because Dr. Grossman

21       is a psychiatrist, and Dr. Van Mol is a family -- family

22       practice practitioner, that's based on their backgrounds

23       and their knowledge of the existing evidence, that was

24       our basis for selecting them to be on the panel for the

25       July 8th hearing.

1     Q    And turning back to the individuals who wrote

2    reports for the June 2022 GAPMS, who made the decision

3    to contract with them to prepare those reports?

4     A    So after establishing each one, we wanted

5    to -- their backgrounds and their suitability to provide

6    reports, that decision was made by, I think, now

7    Secretary Weida.

8     Q    And who was involved in determining whether

9    they had the appropriate backgrounds to write the

10   reports?

11    A    So I think those individuals who were working

12   with the experts, I think that was, of course, now

13   Secretary Weida, I think at our time, General Counsel

14   Josephina Tamayo.

15    Q    Okay.  Anybody else?

16    A    I don't --

17    Q    Were you involved?

18    A    I was not.

19    Q    Was Nai Chen involved?

20    A    He was not.

21    Q    Was Dede Pickle involved?

22    A    She was not.

23    Q    Okay.  So now Secretary Weida and Josephina

24   Tamayo were the two people who decided whether the

25   consultants who read the reports were qualified to do

Page 130

1    so?

2              MR. JAZIL: Object to form.

3              THE WITNESS: So are you asking that whether or

4         not those two only assessed their credentials?

5    BY MS. DEBRIERE::

6         Q    Yes.

7         A    I mean, yeah.  I mean, they assessed their

8    credentials and looked at their background and

9    experience and knowledge.

10        Q    Were those the only two people that assessed

11   their credentials before deciding whether to engage

12   them?

13        A    In regarding the Agency, I mean, the -- Andrew

14   Sheeran may have been involved.  So it's possible a

15   couple others with the principal decision to rely on

16   those experts was theirs.

17        Q    Okay.  And so just to be clear, you were not

18   involved in that decision?

19        A    I was not involved in that decision.

20        Q    And Nai Chen was not involved in that

21   decision?

22        A    That's correct.

23        Q    And Dede Pickle was not involved in that

24   decision?

25        A    Correct.

Page 131

```
 1        Q    When making that decision, did AHCA
 2   investigate whether any of the consultants had a stance
 3   related to the treatment of gender dysphoria?
 4        A    We, of course, were looking for those that
 5   had -- were knowledgeable about the existing literature
 6   of gender dysphoria, and those who would, for the
 7   supplemental reports, would take an evidence-based
 8   approach.
 9        Q    Did it -- so those were the only two criteria
10   that you used to determine which consultants you would
11   engage with?
12        A    Correct.
13        Q    And so opposition to gender-affirming care was
14   not a factor in who you chose?
15        A    We were specifically looking -- I think we
16   might be talking semantics on what we consider
17   opposition, but we were looking for individuals who were
18   going to make reports and recommendations based on the
19   existing evidence.
20        Q    Okay.  Was whether the vendor had experienced
21   treating -- I'm sorry.  Was whether the consultant had
22   experienced treating gender dysphoria a factor?
23        A    Not so much a factor that would outweigh the
24   knowledge of the existing literature and the evidence,
25   since this was going to be a -- the GAPMS process really
```

Page 132

1    takes into account peer-reviewed literature.  It takes

2    into account evidence-based clinical guidelines, et

3    cetera, so those are our primary -- our primary factors

4    in evaluating the experts and their ability to

5    contribute to this report.

6        Q    Would people who actually provide treatment in

7    gender dysphoria be most familiar with peer-reviewed

8    literature as it relates to their practice?

9        A    Well, that is a complicated question.  They

10   don't necessarily have to be.  It's possible to -- I

11   mean, it is possible -- I mean, it is hypothetically

12   speaking, someone could engage in treatment of these

13   individuals and run and follow anecdotes.

14       Q    So it's not important to AHCA that the

15   consultants with whom you engaged had actual experience

16   treating gender dysphoria?

17       A    So based on how the GAPMS rule is written, the

18   needs of the report, we really -- the primary ask was

19   for individuals who were steeped in the evidence.

20       Q    But didn't necessarily have actual real life

21   experience treating gender dysphoria?

22       A    Right, that wasn't a primary consideration.

23       Q    Okay.  For -- was AHCA aware that all the

24   consultants with which you engaged took a stance to

25   oppose mainstream medical organizations' stance on

Page 133

1    gender-affirming care?

2              MR. JAZIL: Object to form.

3              THE WITNESS: So are you talking about in

4         opposition or in contradiction?

5    BY MS. DEBRIERE::

6         Q    Contradiction.

7         A    We -- whether contradiction or alignment

8    really was irrelevant, it really was taking a look and

9    making evidence-based conclusions.

10        Q    Speaking to Dr. Brignardello-Petersen -- I'm

11   sorry.  I'll start here actually.  In deciding on

12   whether to use these consultants, was any input provided

13   from the Alliance Defending Freedom?

14        A    No.

15        Q    What about the Heritage Foundation?

16        A    No.

17        Q    Liberty Council?

18        A    No.

19        Q    Society for Evidence-Based Gender Medicine?

20        A    We may have gotten Romina's name from that

21   organization.

22        Q    Okay.  And what about the Family Christian

23   Coalition?

24        A    No.

25        Q    Did you get anybody else's name from the

Page 134

1    Society for Evidence-Based Gender Medicine?

2         A    Because the -- because it was verbal

3    conversations, so don't -- don't think so, but the kind

4    of details -- because there's a lot of verbal

5    conversations and no written record, so --

6         Q    Maybe?

7         A    It could be a maybe at best.

8         Q    And did the Family Christian Coalition

9    recommend any of -- or play any role in the

10   recommendation of the consultants --

11        A    No.

12        Q    -- with AHCA engaged?  What about the Florida

13   Citizens Alliance?

14        A    No.

15        Q    The Florida Department of Health?

16        A    Well, the Florida Department of Health passed

17   along to the name of Dr. Michelle Cretella.  So, yes.

18        Q    What about the Governor's office?

19        A    No.

20        Q    The Surgeon General Ladapo?

21        A    Well, he would be acting in his capacity as,

22   of course, the agency head for the Department of Health.

23   So the Department of Health, cumulatively, gave us that

24   name.

25        Q    Did he personally?

Page 135

1      A    There was a conversation, like, once with our
2  general counsel Tamayo at the time with Dr. Ladapo, but
3  we don't recall whether or not the name was given during
4  that conversation.
5      Q    I think you touched on this a bit earlier, so
6  I apologize for circling back around, but did AHCA
7  consider using any other consultants in the development
8  of the June 2022 GAPMS?
9      A    By any other --
10     Q    Other than those that wrote the reports or
11 Grossman or Dr. Van Mol?
12     A    There were those who were contacted.  Of
13 course, there was -- it was all verbal conversations,
14 but not necessarily -- not necessarily considered to
15 write a report either.
16     Q    And do you remember who you were -- who you
17 contacted?
18     A    Since it was all through verbal conversations,
19 it was eight months ago, it wasn't through written
20 correspondence, the -- we're not really aware of all
21 those details.
22     Q    And who was the one who did the contacting?
23     A    The contacting was done, I think -- I think by
24 Andrew Sheeran.  He's now our General Counsel.  I think
25 Josephina Tamayo -- Tamayo.  Sorry.  I think she also

Page 136

1   was involved in contacting them.

2        Q    Okay.  And those were all phone calls?

3        A    These were verbal conversations, yes.

4        Q    So no communication by email?

5        A    No.

6        Q    Did you use the folks who ended up not

7   offering the reports -- aside from Dr. Van Mol and Dr.

8   Grossman and the individuals who authored the reports,

9   did you use the people that you contacted in any other

10  capacity?

11       A    No.

12       Q    And what was the scope of the agreement

13  between AHCA and each consultant?

14       A    So each consultant, of course, they provide us

15  their hourly rate.  We wrote up purchase agreements that

16  those amounts cannot exceed $35,000 because of the

17  nature of the procurement.

18       Q    Can you speak a little bit more to that?  I'm

19  not -- I'm unfamiliar with the way that -- the

20  regulations that govern that.

21       A    So if it were to exceed $35,000, it would have

22  to be a competitive procurement, and that's why -- so

23  the -- so we, of course, we enter in agreements with

24  each of these experts.  The amounts paid to them cannot

25  exceed 35,000.

1      Q    Okay.  What was each vendor -- in procurement

2  of consultants, was this the usual procedure?  I'm

3  sorry.  In contracting.

4      A    Yeah, this is the procedure that we can

5  follow.

6      Q    That you can follow, but is it the usual

7  procedure?

8      A    Well, I mean, what is defined by a usual

9  procedure?  I mean --

10     Q    How many times in prior GAPMS have you

11  contracted with a consultant to develop the GAPMS?

12     A    Well, we haven't, but then there are

13  instances -- I know with coverage determinations, et

14  cetera, that sometimes we will actually send stuff for a

15  physician review, like over at EQ Health Solutions.  So

16  it's not unusual for us to ask for medical experts or

17  clinical expertise on a prospectus.

18     Q    Had you ever previously contracted and paid

19  the person for that clinical expertise?

20     A    No, we had not.

21     Q    What was the total budget allocated to the

22  development of the GAPMS?

23     A    You know, 35,000 times seven.  That'd be

24  210 -- 245,000.

25     Q    So each consultant is capped at --

Page 138

1     A    That was the cap of the budget.

2     Q    And is that 34,999, or 35 straight?

3     A    I'm leaning towards 34,999, so we can subtract

4  $7 from that amount.

5     Q    Okay.  Has each consultant been paid in full

6  for that work?

7     A    Each consultant has been paid in full for the

8  work they completed.

9     Q    Okay.  Some of those consultants now, though,

10  are acting as experts in this case and being reimbursed

11  for that, as well?

12     A    Those would be under separate agreements.

13     Q    Okay.  In the example you just gave about

14  using outside physician consultants for the other GAPMS,

15  did AHCA pay those other consultants?

16     A    For other GAPMS?  Those consultants are

17  usually salaried or have hourly rates from our

18  subcontractors.

19     Q    Okay.  Okay.  But you didn't enter into any

20  kind of vendor agreement with them?

21     A    No, they're already employed by one of our

22  subcontractors.

23     Q    Okay.  Did all of the $35,000 paid to the

24  vendor -- paid to the consultants come directly from

25  AHCA?

Page 139

1        A    Yes.

2        Q    Was AHCA reimbursed by anyone else for those

3   consultant payments?

4        A    No.

5        Q    Other than through its subcontractors, has

6   AHCA ever previously retained outside consultants to

7   undertake a review of the evidence-based clinical

8   practice guidelines for GAPMS?

9        A    Well, previously, we did actually have -- of

10  course, we discontinued it, but we did have PAYS, which

11  was back -- and we had it throughout 2017 -- which was a

12  course and evidence review guide program that I had to

13  subscribed to.  We did have that and often referenced

14  that in the early days, but after the amount of time,

15  and because it was an expensive subscription, we

16  discontinue it.

17       Q    So that was a subscription service.  Do you --

18  can you recall any time that you engaged with an outside

19  consultant, other than those employed by your

20  subcontractors?

21       A    No.

22       Q    What about to undertake a review of

23  professional literature?

24       A    No.

25       Q    To actively participate by making a

1    recommendation or assessment as to the experimental or

2    investigational nature of the service?

3          A    No.

4          Q    Why didn't you use the subcontractors -- AHCA

5    subcontractors, why didn't you rely on their expertise

6    in developing the June 2022 GAPMS?

7          A    Because of this GAPMS and because of the

8    nature of the subject.  We did anticipate litigation

9    after -- once the report was done and once we were

10   working on it.  So because of that anticipation, we

11   needed to have experts that were -- that did have a

12   degree of expertise in this field.  Our subcontractors,

13   their practices are more like general practitioners, or

14   may be specialized in other areas, and they wouldn't be

15   able to adapt quickly enough to the learning curve to

16   provide a valuable assessment.

17         Q    So you were concerned about attacks litigation

18   might have on the integrity of that report itself?

19         A    Can you repeat that?

20         Q    Well, you said that because you anticipated

21   litigation, that's why you engaged with consultants who

22   had expertise, in particular --

23         A    The Agency needed as robust a report as

24   possible.  So because we needed such a robust report,

25   and because of the HHS guidance, the Department of

Page 141

1    Health, so the fact that there were published documents

2    out there, the Agency did need to come up with a

3    response that we needed to disseminate as robust as

4    possible, and that's why we engaged with the outside

5    experts.

6         Q    Why is gender-affirming care different from

7    any other Medicaid service?

8         A    Well, I'm going to defer to GAPMS process and

9    our GAPMS report.  For -- for the response to that is

10   that gender-affirming care, of course, we are looking

11   at, like, a treatment model that has very weak and

12   low-quality evidence supporting it.  And because we did

13   a review and assessment of the literature, because there

14   are a lot of claims made, especially by HHS, in

15   particular, about its efficacy, because of its nature,

16   because of -- and because of the low-quality evidence,

17   that's how we deemed it.  I mean, it is a different sort

18   of care than we can consider traditional.

19        Q    The GAPMS process is used to determine whether

20   a Medicaid service is experimental, right?

21        A    Yes.

22        Q    So then that question is presented in any

23   Medicaid service you're evaluating under GAPMS?

24        A    That's right.

25        Q    So why is gender-affirming care different?

1    A    I'm going to defer to the conclusions we drew

2    in the GAPMS report.

3    Q    Why did you anticipate litigation before you

4    even reached a decision?

5    A    Well, I think that's because, I mean, this is

6    often a very touchy subject.  It's something that's

7    frequently seen in the mainstream media.  And, of

8    course -- of course, the documents from HHS.  It is a

9    high-profile issue.  It's considered by many to be

10   controversial.  So that should -- that's kind of why we

11   did anticipate potential litigation resulting from

12   whatever determination we made.

13   Q    Why didn't you need gender dysphoria experts

14   from the prior gender dysphoria GAPMS?

15   A    For the prior ones?

16   Q    Uh-huh.

17   A    So for the prior ones, I think at the time --

18   I mean, we have to take it in context at the time, and,

19   of course, these were done piecemeal, these were all

20   separate reports, not one large one.  So in the

21   course -- at the time because this wasn't viewed as far

22   as a potential hot topic, there wasn't the HHS guidance

23   at the time, that's -- I think the best explanation as

24   far as to why we decided not to engage with consultants.

25   Q    HHS releases guidance all the time, though,

Page 143

1    about coverage?

2        A    Uh-huh.  That's correct.  It does.

3        Q    Did you anticipate litigation for the 2016

4    GAPMS memo on puberty suppression therapy?

5        A    The staff of the Agency who were present for

6    that determination are no longer with the Agency, so we,

7    in our current capacity, can't speak to that.

8        Q    Did you undertake any research to derive an

9    answer for that question?

10       A    No, we didn't.

11       Q    Did you look at any past memos related to

12   whether or not the GAPMS might have litigation

13   initiated?

14       A    It's always a concern with every coverage

15   determination and every GAPMS we do because inevitably,

16   if we do say no to a service, there's going to be

17   disappointed party.  So it is a consideration we always

18   have in place that there might be litigation.

19       Q    Well, then that brings me back to the question

20   as to why gender-affirming -- why this GAPMS is

21   different?

22       A    Well, this brings us back to the present

23   circumstances behind how much attention the subject's

24   been drawing in the media.  The -- and it goes back also

25   to the HHS guidance, which was making claims based on

Page 144

1   evidence that we determined was insufficient.

2       Q    So I only listen to NPR, I'll be honest.  I

3   don't watch any news.  What media?  Where's this a hot

4   topic in the media?

5       A    Oh, I mean, let's see here.  I mean, we can

6   name a lot of sources.  I also -- I do listen to NPR

7   myself.  So NPR actually does periodically have an

8   article on it.  Then, of course, let's see here, there's

9   quite a few other sources of things listed here.  CNN,

10  MSNBC, ABC, NBC.  Your major outlets.  New York Times.

11  The Guardian.

12      Q    How long has the media coverage been going on

13  for?

14      A    So as far as media coverage goes, well, the

15  media coverage, there's always been smatterings of it

16  here and there, but I think when -- as far as it

17  becoming a consistent theme probably the past year.  But

18  that's not me speaking on behalf of the Agency, that's

19  me speaking from personal observation.

20      Q    Okay.  Fair enough.  Did AHCA share any of the

21  draft consultant reports with external entities?

22      A    We did not.

23      Q    The Governor's office?

24      A    We did not.

25      Q    Department of Health?

1       A     We did not.

2       Q     No one?

3       A     No, they stayed internal.

4       Q     Did AHCA provide any material to the

5    consultants to review in drafting their reports?

6       A     No, we did not.

7       Q     Did AHCA edit the reports of the consultants?

8       A     There was some copy editing for style and

9    grammar.  Other than that, no, we did not make edits to

10   the content.

11      Q     So no substantive edits?

12      A     No substantive edits.

13      Q     And that includes Lappert's report?

14      A     That includes Dr. Lappert's report.

15      Q     And Dr. Donovan's report?

16      A     And that's for Dr. Donovan.

17      Q     And did any of the consultants provide edits

18   to the AHCA GAPMS report?

19      A     So after we finished the draft, we did send

20   drafts to Doctors Grossman and Dr. Van Wol and they

21   provided some feedback, but none of the feedback met --

22   were made -- resulted in drastic changes.  I think -- I

23   think Dr. Van Mol suggested we -- there's one more

24   article we could discuss, and we added some content in

25   there regarding that.  They did help us correct some

1    terminology errors.  There are some -- so there are some

2    technical edits that were made.  But as far as anything

3    substantive, my first draft, I mean, was largely intact

4    by -- from the first draft process to when we had the

5    final draft.

6         Q    Okay.  And you were the only person involved

7    in making the first draft?

8         A    I can articulate a little bit more on how that

9    went.  So while the experts -- while the experts were

10   composing their reports, I was composing mine.  And once

11   we had their reports, then that was -- then we did

12   add -- we added some snippets from their reports in our

13   report to make it more, I guess you could say,

14   cumulative.

15        Q    Okay.  So only after the consultants who wrote

16   a report, those reports were done, then you pulled some

17   of that information into your --

18        A    Correct.  So my section was complete when we

19   started receiving their reports.

20        Q    Okay.  Okay.  What was the date of your first

21   draft?

22        A    I think the date of my first draft -- let's

23   see here -- want to say early to mid May.

24        Q    Okay.  So, like, second week of May-ish?

25        A    Somewhere around there, yeah.

Page 147

1      Q    Going back to the edits that the consultants

2   provided to your report, what terminology had to be

3   corrected?

4      A    What was it?  I mean, it was some medical

5   terminology.  I don't remember the specifics.  I mean,

6   it was very, like, miniscule changes.

7      Q    Where they red lines in, like, a Word

8   document?

9      A    No, the edits were given to me verbally and I

10   made them -- sometimes I made them right there when we

11   were talking to them.

12      Q    Okay.  You stated in your declaration filed

13   with the court on January 25th, 2023, that the only

14   sources you relied on for the June 2022 GAPMS, were

15   those cited in the works cited section of the report; is

16   that a correct statement?

17      A    That's correct.

18      Q    So that means that the only sources that you

19   consulted or considered -- or cited in the June 2022

20   GAPMS report?

21      A    During the -- yeah, during the writing of the

22   GAPMS, those were the sources consulted.

23      Q    Nothing else?

24      A    During the drafting of the report, nothing

25   else.

Page 148

1        Q     What about after?

2        A     Afterwards, more out of intellectual

3    curiosity, I did want to try to see what else was out

4    there, but that was more for personal intellectual

5    curiosity than it was for professional purposes.

6        Q     Okay.  What were those things that you

7    reviewed?

8        A     Articles by Jack Turban.

9        Q     Can you spell his last name?

10       A     T-U-R-B-A-N.

11       Q     I'm not familiar.

12       A     Well, it's -- he is cited in our report, but

13   he also is -- he's frequently quoted a lot, so I was

14   curious to see what other in print articles he had

15   produced.

16       Q     Quoted in what?

17       A     He's often cited in, like, news stories,

18   media.

19            MS. DEBRIERE: Simone just got a note that

20        folks are having trouble hearing me.

21   BY MS. DEBRIERE::

22       Q     All right.  When you were considering whether

23   the services listed at 59-G-1.050(7) were experimental,

24   did you evaluate whether excluding those services would

25   be budget neutral?

1       A     No, we did not.

2       Q     Did you consider whether private insurance

3    covers the services excluded by 59-G-1.050(7)?

4       A     For this one we didn't, but primarily when we

5    do GAPMS, we really aren't interested in public and

6    private insurers.  We're primarily interested in state

7    Medicaid programs and Medicare since, like, Florida

8    Medicaid, they're public payers.  So primarily, we

9    really want to know what the public payers say.

10   Usually, our lowest priority for GAPMS is to provide

11   analyses of what private payers pay.  And generally,

12   often we need those to supplement if we're unable to get

13   that many policies from Medicaid programs across the

14   nation, but since it's -- for this GAPMS, we actually

15   surveyed all 50 states, then we had adequate information

16   from that.  Most GAPMS reports, usually we get maybe 10

17   or 12 when it comes down to coverage policies, it's --

18   it's pretty much what we can find in a certain amount of

19   time.  But for this one, we've -- since Dede Pickle was

20   working on it independent, she was able to survey all

21   50.

22      Q     And why is it covered under private insurance

23   informative of whether or not a service is experimental?

24      A     Can you repeat that?

25      Q     Uh-huh.  Why don't you rely on -- why don't

Page 150

1    you consider private insurance coverage to be

2    something -- I'm having trouble formulating what should

3    be a simple question.

4           Why don't you look at private insurance

5    coverage when you're determining whether or not a

6    service is experimental?

7       A    Well, private insurance works differently.  I

8    mean, Florida Medicaid, like Medicare, is a

9    taxpayer-funded health care system.  Private insurers,

10   since they're privately funded, there's a great deal

11   more latitude, what they can cover and what they don't

12   have to cover, and they're more subject to the

13   competition of the market, as opposed to Medicaid

14   programs.  So we -- while we do -- some often will look,

15   but often it's -- we often try to find what private

16   payers pay for following what we get from Medicare and

17   Medicaid.  So, I mean, when it comes down to it, we can,

18   but it's not an absolute requirement, and we really do

19   want to find out what the Medicaid programs are paying

20   for.  That's our first and foremost criteria for looking

21   at the coverage of -- other payers coverage.

22      Q    So it's not apples to apples, because in

23   Medicaid and Medicare, you've got state taxpayer dollars

24   to consider, correct?

25      A    That's correct.

1    Q    Okay.  But when you undertook the June 2022

2  GAPMS, you did not evaluate whether or not excluding

3  those services would be budget neutral?

4    A    No, we didn't for this one, but we -- but

5  that's also not necessarily unique to this, as well.

6    Q    So in other GAPMS, you've not evaluated the

7  budget neutrality of the service, whether or not you're

8  going to cover it?

9    A    That's correct.  In the GAPMS I did in 2017,

10  for, I think, like the nitrous oxide of -- pretty much

11  like an adjuvant to this, kind of jumped-up asthma test,

12  we didn't do a cost budget analysis because, like, we

13  weren't going to cover, it's not going to affect

14  anything.

15    Q    So then you did evaluate whether it was budget

16  neutral.  You won't be covering it, so, therefore, it

17  was neutral?

18    A    Well, we just -- we just don't -- we just

19  don't do one, because, I mean, we're not covering it.

20  So it comes down to if we were going to make a coverage

21  determination, that's when you do a fiscal analysis.  So

22  a coverage determination is definitely turned into a

23  fiscal -- it needs -- it needs a fiscal analysis,

24  because we're -- need to find out whether or not we're

25  going to be able to stay within our budget.

1     Q    I see.  I see.  So in this instance, because

2     we are talking about the only GAPMS that excluded a

3     service previously covered, did you do anything to

4     determine whether or not that would cost or save the

5     state money?

6     A    No.

7     Q    I think you have -- you brought information

8     with you today about this.  How did you collect state

9     Medicaid program coverage data?

10    A    So on that spreadsheet, so Dede Pickle, she

11    went across the -- yeah.  So she --

12          MR. JAZIL: Do you want to mark it as an

13          exhibit?

14          (Whereupon, Exhibit No. 13 was marked for

15    identification.)

16          THE WITNESS: She surveyed 50 states and I

17          think territories -- even up in the territories --

18          and was looking to see what their stances were on

19          gender-affirming care, to see whether or not they

20          had statements saying that they will cover it or

21          policy saying that they wouldn't.  And then

22          there -- those that just didn't have a policy

23          available, or had no policy in place.

24    BY MS. DEBRIERE::

25          Q    So Dede Pickle was the one who put together

Page 153

1    the spreadsheet?

2        A    Yes.

3        Q    Okay.  And where did she look to find this

4    information in each state?

5        A    Well, she went to their state Medicaid web

6    pages, looked at their -- like, their coverage guides or

7    materials in each state Medicaid -- Medicaid programs.

8    There can likely be idiosyncrasies.  I mean, some

9    have -- some are like ours, have a ton of coverage

10   policies, others are like Texas, Texas has one gigantic

11   coverage policy, which actually does -- despite the fact

12   it's huge, it's actually kind of more efficient.

13   It's -- you can get everything from there.  But

14   that's -- that's what they do in Texas.  Everything's

15   bigger in Texas.  But she went and looked at all of the

16   different state -- various state Medicaid programs and

17   saw what their policies were and saw what was available.

18   And, of course, put the findings in the GAPMS report.

19       Q    Did she only do an online search?

20       A    Yeah, it was only an online search.

21       Q    Did she contact any of the Medicaid programs?

22       A    No.

23       Q    Did she look at any of the policy reporters?

24       A    No, we -- no, we didn't use policy reporter

25   for this GAPMS.

Page 154

1        Q    So just looking at the state's Medicaid Agency
2    websites?
3        A    For the Medicaid, yes.  But, generally,
4    without having worked in Medicaid, one of our research
5    criteria for across all kinds of reports and projects is
6    that we do want to see what other states do.  And so
7    that gives us a great deal of familiarity of how to
8    navigate other states' programs.  And one of our side
9    projects is the statewide Medicaid managed care program.
10   And, of course, we're always looking to see what other
11   states are doing.  So we get a great deal familiar with
12   how to navigate the web pages of other states.
13       Q    So at least half the states' Medicaid programs
14   explicitly cover pubertal suppression treatment for
15   gender dysphoria, is that correct?
16       A    Based on -- based on the findings of the map.
17   So what -- so I will defer to the findings on the map.
18       Q    Only ten exclude?
19       A    Defer to the findings as stated in the map.
20       Q    Okay.  How about we do this:  Based on the
21   findings in the map, only 10 states explicitly exclude
22   pubertal suppression therapy.  How did you take that
23   into account when you reached the conclusions that you
24   did about the services being experimental, that
25   particular service being experimental?

1      A     As far as that goes, it's informational, but

2   there was -- there was a divide between states that do

3   cover and states that don't.  Primarily when making the

4   determination we focus -- we really focused on the

5   evidence and what the evidence said about treatments for

6   gender dysphoria since the Medicaid program -- since

7   there is -- seems like there's an absence of policies

8   for a lot of states.  There are some states that come

9   out and say yes, and then there are some states that say

10  no.  There is a -- there's a divide and you can even

11  potentially say like there could be a debate between

12  amongst the 50 states plus territories of whether or not

13  coverage is appropriate.

14     Q     But you did say earlier on that you -- whether

15  a service is covered under the other state Medicaid

16  programs is usually a factor that you weigh heavily in

17  determining whether a service is experimental.

18            MR. JAZIL: Object to form.

19            THE WITNESS: So when it comes down to it --

20        it's like, so often, it's not just other Medicaid

21        programs, but also Medicaid programs are similar to

22        Florida.  There are some Medicaid programs -- I'll

23        name two -- New York and California that are --

24        that cover things very, very liberally, as far as

25        services.  Like, these added everything in their

1           fee schedules, where Florida Medicaid -- and

2           Florida Medicaid prides itself on being a very

3           fiscally responsible Medicaid program.  So often we

4           try to see what states that are similar to our

5           Medicaid program, what they do.  But we also do

6           see, we see overwhelming amounts of coverage from

7           states like us and states across the union, then

8           that does factor in our decision, but for in this

9           circumstance, because there is a split, if we were

10          going to have to more -- rely more so on the

11          evidence, than the notion that all these states

12          cover services, there -- it's not -- it's not

13          unanimous at all.

14     BY MS. DEBRIERE::

15          Q     Did you ever contact the states that

16     explicitly exclude and ask them why they explicitly

17     exclude?

18          A     We did not.

19          Q     Did you ever call those states that have no

20     coverage statement one way or another and ask them?

21          A     We didn't reach out to states.  I mean, their

22     policy's online.  I mean, that -- I mean, their

23     published policy is sufficient to give us the responses

24     we need to look at -- to look at it.  Even for other

25     GAPMS, we don't contact other states.

Page 157

1      Q    Did you analyze how much Florida Medicaid

2   spends on -- spent on treatment for gender dysphoria

3   prior to the categorical exclusion?

4      A    No, we did not.

5      Q    Do you have any plans to reevaluate your

6   findings in the GAPMS report based on the September 2022

7   release of the WPS standards of care version eight?

8      A    So in the immediate term, well, we don't,

9   so -- but, I mean, we can reopen the GAPMS later on,

10  there is -- there is a process for that.  But generally,

11  I mean, these standards of care, I mean, based on the

12  release of one set of new standards of care, I mean, for

13  the time being we don't have any immediate plans, not

14  based on the release of one new update.

15     Q    Okay.  How long did you personally work on

16  that initial draft of the June 2022 GAPMS report?

17     A    Oh, I was working on it pretty much until the

18  day it came out.

19     Q    And you started that second week in May?

20     A    Well, no, that was after I had the very first

21  initial draft done.

22     Q    Okay.  So tell me when you first started

23  working on it.

24     A    April 20th.

25     Q    Okay.  So from April 20th until when it came

1   out.  Published on what -- well, we know that it was

2   first reviewed by your higher-ups on June 1st.  So April

3   20th to June 1st?

4       A    Yeah, that's sufficient.

5       Q    Okay.  And you worked with Nai Chen and Dede

6   Pickle.

7       A    Uh-huh.

8       Q    Did you read all of the articles in the

9   work-cited section?

10      A    I read every single document in that works

11  cited section.

12      Q    88 articles?

13      A    All of them.

14      Q    Okay.  Were you able to read everything,

15  understand it, and draft a report in --

16      A    Yes.

17      Q    How often during that time period did you

18  communicate with the consultants?

19      A    Oh, I think between four and five times.

20      Q    And four or five times over that entire time

21  period?

22      A    Yeah, during those time periods, yes, we

23  have -- periodically have, like, a one-hour discussion

24  with them.

25      Q    So you talked to them about five hours total

Page 159

1    over that time period?

2         A     I think that's a valid estimate, yes.

3         Q     Okay.  Do you think it's more than that, like

4    more like 10 hours?

5         A     No.

6         Q     Okay.  Turning back really quickly to the

7    amount of -- the cost of treatment for gender dysphoria.

8    How much was spent on the coverage of gender dysphoria

9    versus how much was spent -- strike that.

10            Do you know how much, prior to the adoption of

11   the categorical exclusion, how much annually AHCA spent

12   on the coverage of gender dysphoria?

13        A     We did not.

14        Q     Are you able to obtain that information?

15        A     Our data analytics between managed care plans

16   paid per claim, and anything in fee-for-service, our

17   data bureau could probably muster that up.

18        Q     Is there a way that we should ask for that

19   information to make the question clearer?

20        A     You'd want to -- you would -- to put in a

21   request we would need diagnosis code, we'd need NDC, and

22   we would need CPT codes.

23        Q     And what's NDC?

24        A     National Drug Code.

25        Q     Okay.  And then for surgery, what would you

1    need?

2         A    You would need the corresponding CPT code.

3         Q    Okay.  So you need the diagnostic code, the

4    NDC for drug coverage, and the CPT code?

5         A    And the time -- the date ranges.

6         Q    And the date ranges.  Okay.  And then you

7    could tell us how much AHCA -- or the Florida Medicaid

8    program paid in coverage of -- treatment for gender

9    dysphoria over a given period of time.  Okay.  When you

10   were communicating with the consultants about drafting

11   the June 2022 GAPMS report, what kinds of questions did

12   you ask?

13        A    Generally, questions about -- mostly just

14   questions about, like, articles, like studies, making

15   sure we have our bases covered, things like that.  We

16   wanted to make sure we didn't miss anything, or there's

17   anything glaring we -- because it isn't a piece of

18   academic work it is, it is -- mainly it's like a thesis

19   or a dissertation, because we make a case, we have to

20   support that case.  So we want to make sure we have our

21   bases covered.

22        Q    What were the consultants' positions on WPATH?

23        A    Their positions were that -- I think they

24   identified -- all they did was identified it as an

25   advocacy group, like a combination of clinical

1    professionals, plus advocates, community activists can

2    join it.  So that -- it's kind of a hybrid organization,

3    that they explained that to us.  So that was pretty much

4    all the information they gave.

5         Q    And you felt like that was an adequate

6    explanation of what WPATH was?

7         A    Yes.

8         Q    What about the Endocrine Society?  What was

9    their position on?

10        A    Their position was the Endocrine Society.  I

11   mean, it is an established clinical organization.  They

12   felt like the other guidelines, they had released

13   guidelines, but the Endocrine Society was transparent in

14   releasing their guidelines.  They did clarify that their

15   recommendations were based on weak or very weak

16   evidence.  They also clarified that their guidelines

17   were not a standard of care, that they were just

18   guidelines.

19        Q    And that's the Endocrine Society.  Who does

20   that -- or your consultancy, who did that?

21        A    The Endocrine Society.  So the Endocrine

22   Society, in the text of their guidelines, they do

23   identify each line of the treatment model, like the

24   puberty suppression, the cross-sex hormones and

25   surgeries.  Primarily the hormones is the Endocrine

Page 162

1  Society, but they are very clear that it's either low-

2  or very-low-quality evidence that supports it, and they

3  also do put that disclaimer on there, this is not a

4  standard of care.

5      Q    What was your -- what was the consultants'

6  position on the American Psychiatric Association's

7  recommendations for gender-affirming care?

8      A    It didn't come up in the conversations.

9      Q    Okay.  How about the AAP?

10     A    The AAP was that the evidence available to

11  support the AAP's positions wasn't sufficient.

12     Q    Okay.  What about the AMA?

13     A    We didn't talk about the AMA.

14         MS. DEBRIERE: Okay.  So I would like to -- do

15     you have the exhibit of the Medicaid policy routing

16     and tracking form for the June 2002 GAPMS?

17         MR. JAZIL: Can you re-mark on this --

18         MS. DEBRIERE: Yes, please.  I think -- I need

19     a bigger one.

20         (Whereupon, Exhibit No. 14 was marked for

21  identification.)

22         THE WITNESS: Yeah, that new formulation makes

23     it taste just like the real thing.

24         VIDEOGRAPHER: It's pretty good.

25         MR. JAZIL: See, we're finding common ground.

Page 163

```
1           THE WITNESS: Wasn't, like, Coca-Cola and all
2       their peace commercials, they were holding hands
3       around the world?  That was from the '70s, I think.
4   BY MS. DEBRIERE::
5       Q    Okay.  So I'm handing you what's been marked
6   as Plaintiff's Exhibit 14.  It's the Medicaid policy
7   Routing and Tracking Form for the June 2022 GAPMS.
8   There's a start date column there.  What's that mean?
9       A    That's a start with the routing process.  So
10  generally, for this, usually -- usually they try to
11  provide like a window.  We always have, like, a window
12  of review.  So for this, we enter the dates in the
13  system.  The GAPMS is routed to first -- well, actually,
14  since my supervisor Dede was out, I was her delegate, so
15  I did sign on her behalf.  Then it went to Ann Dalton
16  who signed.  And, of course, Secretary Weida, of course,
17  signed in his role, and then went to Deputy Secretary
18  Wallace.
19      Q    Okay.  So start date's when the document hits
20  their desk?
21      A    Yes.
22      Q    Okay.  And then end date's when they've
23  reviewed it and passed it on?
24      A    Yes.
25      Q    Okay.  Date received is going to measure the
```

Page 164

1   date that it hit their desk, but they didn't necessarily

2   pick it up and start reviewing it?  I'm trying to

3   understand what's the difference between --

4        A    Date received should be when they got it.

5        Q    Okay.  And the start date's when they start

6   reviewing it?  What's the difference there?

7        A    Start date, end date -- yeah, that should be.

8        Q    And the approval column means that the GAPMS

9   was approved by each person that checked the box and

10  initial by it?

11       A    That's correct.

12       Q    Okay.  So the June 2022 GAPMS report, which is

13  46-pages long and contains five separate reports from

14  AHCA consultants, it was reviewed and approved by each

15  person on this list in one day?

16       A    Yes.

17       Q    And all four people on this list reviewed and

18  approved the June 2022 GAPMS report in the span of two

19  days?

20       A    Uh-huh, that's correct.

21       Q    Oh, I see there MB for DVP.

22       A    Yeah.

23       Q    Why choose to adopt the 2022 GAPMS report into

24  rule?

25       A    Because -- so since we had determined it to be

Page 165

```
 1    experimental and investigational, so we decided that we
 2    didn't need to make the -- based on the evidence, based
 3    on what the GAPMS said, the categorical exclusion
 4    promulgating the rule is necessary.
 5         Q    Okay.  So you adopted into rule because it was
 6    a categorical exclusion?
 7         A    It was going to be, yes.
 8         Q    When was that decision made?
 9         A    The decision that was made -- the decision to
10    make -- to make a new categorical exclusion, of course,
11    that was not going to be made until after we had
12    completed the GAPMS report and signed off on, because
13    obviously, had either the experts had they disagreed
14    with one another, or if I'd come up with a different
15    conclusion, can't make a categorical exclusion unless
16    everyone was in sync.  So it was one of those things
17    where had -- had the expert opinions disagreed with each
18    other, had I come up with a contradictory conclusion,
19    there -- you had -- we had to wait until after the
20    report was done before we'd sign whether or not to
21    proceed with the categorical exclusion.
22         Q    And when was the decision made to adopt it
23    into rule?  Was that at the same time that you decided
24    to make it a categorical exclusion?
25         A    That was made after we had had the report
```

1    signed and done.

2         Q    Okay.  Sorry.  I need to be more specific.

3    What date was that decision made?

4         A    Well, I think it was probably made June 2nd.

5         Q    Okay.  And who made that decision?

6         A    That would have probably have come down from

7    Secretary Marstiller, that would have come down from

8    now-Secretary Weida, and it would have come from our

9    General Counsel, Josephina Tamayo?

10        Q    Why would it have come from those people?

11        A    So -- because, of course, with our General

12   Counsel, with our Secretary, I mean, they do make the

13   decisions for the Agency.  It's not out of the -- I

14   mean, it is typical in their role to make a decision to

15   promulgate something into rule.

16        Q    Would that generally, though, be handled by

17   the Bureau of Medicaid policy?

18        A    Sometimes.  It depends on -- depends on the

19   nature of the rule change.  Depends on where -- where

20   it's originating from.

21        Q    How often has that decision come from the

22   Medicaid Secretary?

23        A    So let's -- so to talk about the rulemaking

24   process a little bit.

25        Q    Yeah.

Page 167

1    A    So rule -- proposes for rule changes come from

2    all different directions and --

3    Q    Let's back up.  Instead of talking generally

4    about rule changes, let's talk about changes to coverage

5    policies.

6    A    Those can be made by our Deputy Secretary.

7    Those can come from the Secretary.  I mean, anyone

8    who --

9    Q    How often does that happen?

10   A    We can't speak to how often it happens.  I

11   mean, it does happen.

12   Q    Had it happened more with the Bureau of

13   Medicaid policy?

14   A    You mean, those in Medicaid policy who

15   initiated these changes?

16   Q    More often than not?

17   A    I actually would probably say not.

18   Q    Oh, okay.  I'm just -- I'm surprised because

19   we learned from Ms. Dalton that the -- both the

20   rulemaking process and the coverage policy units are

21   housed within the Bureau of Medicaid policy.

22   A    Well, that's correct, they are, but often

23   they're responding to directives given to them from

24   either senior leadership or legislative changes.

25   Q    Okay.

Page 168

1      A    So, yeah, while they are the ones that

2  implement and write and craft the new policies or update

3  the policies, they're often not the ones that are

4  piloting these new policies.

5      Q    Or initiating the decision as to whether or

6  not --

7      A    Precisely.

8      Q    -- or adopt them into rule?

9      A    Correct.

10     Q    So you said that it was the decision to adopt

11 into rule was made on June 2nd, is that correct?

12     A    That's correct.

13     Q    Okay.  And the notice of rule development,

14 that was issued on June 3rd, correct?

15     A    Yeah.

16     Q    I swear.

17     A    Yeah, I'm deferring to the record on that.

18     Q    Sure.

19     A    The rulemaking process is highly documents, so

20 I'm going to be deferring to the documentation for the

21 rulemaking process.

22     Q    Okay.  So it took less than 24 hours for AHCA

23 to decide to adopt the conclusion in the 2022 GAPMS

24 report into a rule?  And even less than that, because

25 you made it the same day that the report was released,

Page 169

1    correct?

2        A    Yes.

3        Q    And at that time, you also knew which section

4    of 59-G it was going to go into?

5        A    Yes, we did.

6        Q    And who had to sign off on that decision?

7        A    So all of our -- so whenever we adopt a rule,

8    it does go through a lengthy routing process.  So it

9    does start -- the process starts in the Bureau of

10   Medicaid Policy, starts with the rules -- we have a

11   rules unit.  That gets signed off on, then it goes to

12   the AHCA administrator authorities section, they have to

13   sign off.  Then after that it goes to the Bureau Chief

14   of Medicaid Policy.  Of course, likewise, they have to

15   review and sign off.  Then it goes to the Assistant

16   Deputy Secretary of Policy and Quality.  They have to

17   sign.  Then, of course, the Deputy Secretary for

18   Medicaid has to sign.  General Counsel's Office has to

19   sign.  And then the Secretary is privy to all the

20   changes.  And if Secretary decides like, wait, wait, we

21   can't do this or, no, there's a problem, yeah, that

22   sometimes can result in a frustrating headache, because

23   it takes a lot of work to get something that far.

24       Q    Well, so the decision to adopt a categorical

25   exclusion to rule was made on June 2nd and the Notice of

Page 170

1    Proposed Rule was made on June 3rd.  So it was routed
2    through that entire process in less than 24 hours?
3         A    Are we talking about the GAPMS or the rule?
4         Q    The rule?
5         A    Yes.  And that -- and that's not unusual
6    sometimes for -- for the process to move very quickly.
7         Q    Okay.  Because you just made it sound like it
8    was a very lengthy process.
9         A    It is with the number of people, but it's --
10   the rule content is very -- it's a very small addition.
11   It's not like a brand new coverage policy, because
12   often -- it depends on the nature of the rules.  Like
13   one addition, that can move fast.  Sometimes with --
14   like, for instance, in my experience as a program
15   administrator, we completely overhauled the community
16   behavioral health policies.  That was five new coverage
17   policies.  So that, of course, is going to require a
18   much lengthier review process rather than a quick
19   amendment to a rule.  So it really depends on the nature
20   of the rule.  If it's a very lengthy coverage policy,
21   yeah, that can take some more time if it's -- but if
22   it's like adding a few bullets or amending a line, that
23   can -- that can move along much faster because the
24   review time's just not -- a lengthy review process is
25   not necessary.

Page 171

```
 1        Q    Or deciding to eliminate three types of
 2   services that were previously covered by Florida
 3   Medicaid?
 4        A    Correct.  And, of course, but -- and, of
 5   course, we have the GAPMS memo to substantiate that.
 6        Q    Okay.  Okay.  So speaking to the rule, it bans
 7   Medicaid coverage for -- puberty blockers or cross-sex
 8   hormone therapy and surgery if done so to treat gender
 9   dysphoria, correct?
10        A    That's correct.
11        Q    But not to treat other diagnoses?
12        A    Not to treat other diagnoses.  Only for the
13   diagnosis of gender dysphoria.
14        Q    Okay.  Is this the only time that GAPMS has
15   been used to categorically eliminate coverage of
16   treatment for a particular diagnosis?
17        A    For the one -- I think pretty much since the
18   institution of the GAPMS process, I think this was a
19   first.
20        Q    Once the decision was made to adopt the
21   conclusions of the 2022 GAPMS report into rule, who was
22   in charge of that process?
23        A    So our rule promulgation process, Cole
24   Gerring, he oversees the rule promulgation process for
25   our coverage policies and administrative rules for
```

Page 172

1    Medicaid.

2         Q    Does he head the Rules Unit under the Bureau

3    of Medicaid policy?

4         A    Yes, he does.

5         Q    Who drafted the actual language for the rule?

6         A    I believe -- I believe he drafted the

7    language.

8         Q    Did anybody revise it or have any input

9    that --

10        A    There was input.  So I mean, there were some

11   discussions.  I remember we did have a meeting with

12   everyone to -- between, I think, like, Sheena Grantham,

13   myself, I think Dede Pickle, I think Secretary Weida, I

14   think like Sheena Grantham from General Counsel's

15   office, since rules are her area.  I think there were

16   there was a -- there was a discussion on making sure

17   this was the finalized content we wanted.

18        Q    And how long did that discussion take?

19        A    About an hour.

20        Q    Okay.  And what kinds of topics were discussed

21   during that?

22        A    Just determining how granular we should get,

23   mostly.

24        Q    Okay.  Okay.  Was there any conversation about

25   whether adopting this categorical exclusion might

Page 173

1    violate comparability under the Federal Medicaid Act?

2        A    No.

3        Q    What about EPSDT?

4        A    No, because since we already have the -- we've

5    already had the GAPMS report to substantiate the

6    overriding EPSDT guideline -- guidance and requirements.

7        Q    Because Florida Medicaid does not have to

8    cover a service under EPSDT if it's experimental?

9        A    That's correct.

10       Q    I had another question.  Talking about how

11   granular to get with the language, was there any

12   conversation about what the Federal Medicaid Act

13   requires in terms of prescription drug coverage?

14       A    I don't think so.  Not during that

15   conversation.

16       Q    Any other conversations had about that?

17       A    As far as the federal requirements for

18   prescription drug coverage?  No, I don't think we had

19   any conversations like that.

20       Q    Okay.  Any other conversations about

21   comparability under the Federal Medicaid Act?

22       A    No.

23       Q    So comparability under the Federal Medicaid

24   Act was not taken into consideration when adopting the

25   categorical exclusion?

1      A    No.

2      Q    Who planned the public hearing regarding the

3   proposed language in 59G-1.050(7)?

4      A    So for the public hearing, since we did

5   anticipate a larger than normal crowd, we -- so I think

6   that was a joint effort between Cole Gerring I think,

7   Chief -- now Chief of Staff Brock Juarez, then Chief of

8   Staff Cody Farrell, and I think -- I think Secretary

9   Weida also had a little bit of input when it came down

10  to selecting the venue and making sure that we had

11  adequate staff and then also arranging for security as

12  well.

13     Q    Why did you feel a need for security?

14     A    Because of this -- the controversial nature of

15  the change and how those with opinions on it -- those

16  with feelings about it, I mean, they are deep-seated.  I

17  mean, there's -- so because of the sensitivities

18  involved, we just felt that it would be best in the

19  event -- and we did think it was unlikely, but in the

20  event that someone might get upset or unruly, to have

21  security.

22     Q    Why did you pick the venue you picked?

23     A    Size and location.

24     Q    What factors did you take into consideration

25  for size and location?

1      A    That we would have adequate seating.  That, of

2  course -- of course, location where it was, being

3  downtown, so --

4      Q    Downtown being an easier location to get to?

5      A    Yes.

6      Q    Why did the location need to be easy to get

7  to?

8      A    Because, I mean, since -- I mean, you know, we

9  do government in the Sunshine, we wanted the hearing to

10  be accessible to as many people as possible, so we

11  wanted to be able to fill as many seats as we could.

12  The facilities here at AHCA weren't going to be

13  sufficient for that.  The Department of Transportation

14  auditorium was a very, very good venue, not just -- not

15  just to be able to provide those of us who were on the

16  panel visibility to the audience, but also just because

17  of the seating capacity.  So it just was an ideal venue

18  compared to what we had available at the Agency.

19      Q    Where do you normally hold rule hearings?

20      A    We usually hold them here.

21      Q    Why were you concerned about adequacy of

22  seating?

23      A    Because we did expect a large turnout.

24      Q    Why did you expect a large turnout?

25      A    Because of the amount of coverage that the

1    GAPMS report had received, because of everything that

2    we'd been seeing, as far as -- per previous news stories

3    prior to the release, we just knew that this was a

4    sensitive subject.  A lot of people have a deep-seated

5    conviction about it one way or the other, and we just

6    anticipated a large turnout.

7         Q    In the planning of the public hearing, did

8    AHCA communicate with the Governor's office at all?

9         A    No.

10        Q    Did AHCA communicate with Department of Health

11   at all?

12        A    No.

13        Q    Who participated in the public hearing from

14   AHCA?

15        A    So the participants from AHCA were myself,

16   Sheena Grantham, whose General Counsel's office,

17   Secretary Weida.  Those are the -- those are the three

18   of us who were on the panel for AHCA.  And, of course, I

19   think Cole Gerring handled the administrative procedures

20   and then I think to help -- help with crowd control, we

21   had, I think, Brock Juarez and some of the staff from

22   communications also helped arrange in making sure that

23   there's adequate seating, and just kind of serve -- just

24   helping out in any way, or any capacity that was

25   necessary, as needed.

1      Q     Did anybody at AHCA help facilitate the
2   attendance at the hearing?
3      A     There -- I think there's a speaker sign-in
4   sheet at the entrance.  I think that -- like, I think
5   one of the Agency staff under Brock at the time was --
6   was allowing people to sign in.
7      Q     Were there any particular people that were
8   encouraged to be at the hearing?
9      A     No.
10      Q     Are you aware of the Governor's office
11   encouraging anybody to attend the hearing, anybody in
12   particular?
13      A     No.  No.
14      Q     Did anybody pay someone to attend the hearing?
15      A     So for our -- for our experts, Dr. Grossman,
16   Dr. Van Meter and Dr. Van Mol, they were compensated for
17   their time spent at the hearing, or their time
18   traveling -- for Dr. Van Mol and Dr. Van Meter, their
19   time traveling and their travel expenses.  So we did
20   reimburse them, but that was it.
21      Q     Did that include the same agreement with the
22   $35,000 cap or was that a separate agreement?
23      A     I don't think it was a separate agreement,
24   because the three of them had not come anywhere close to
25   exhausting their caps.

1    Q    Did AHCA provide any materials to those

2  consultants prior to the hearing to review for the

3  hearing?

4    A    On the day of the hearing we gave -- we gave

5  them each bound copies of the report, but those

6  materials were already available online, so -- but we

7  just -- we just gave him paper copies or to reference

8  but nothing -- no other additional materials.

9    Q    You didn't provide them any other materials

10  other than the GAPMS -- the June 2022 GAPMS?

11    A    That's correct.

12    Q    To review prior to the hearing?

13    A    Correct.

14    Q    Did you have any meetings with the consultants

15  prior to the hearing to prepare for the hearing?

16    A    We had a couple -- there were a couple Zoom

17  calls.

18    Q    How long did those last?

19    A    About an hour?

20    Q    What kind of things were discussed during

21  those meetings?

22    A    Mostly the format.  You know, we were talking

23  about, like, of course, Dr. Grossman, who was not going

24  to be able to travel.  So we were talking about

25  technological arrangements.  I think with Doctors Van

1    Meter and Van Mol, we were mostly talking about travel

2    arrangements and, like, where they'd sit and so forth,

3    so I mean --

4         Q    Did you offer any questions that they might

5    anticipate from the audience and how they should

6    respond?

7         A    To our experts?  We didn't.

8         Q    And why was it necessary to have the

9    consultants there?

10        A    So -- well, since -- because we were actually

11   anticipating a crowd that was going to be largely

12   opposed to the challenge exclusion, we wanted to be able

13   to respond promptly and articulately to any comments

14   that were provided.

15        Q    If you wanted to respond promptly and

16   articulately to any comments that were provided, what

17   was the purpose of having a public hearing?

18        A    So the public hearing is to, of course, gather

19   feedback, but we also knew that we were likely going to

20   have either some type maybe medical professionals or

21   advocacy groups, or other advocates, and we did want to

22   be able to provide them with a little bit of engagement

23   to show that we do take their comments into

24   consideration, that we do think about them, that we do

25   engage with them.

Page 180

1      Q    Did the consultants respond to any comments by
2  a supporter of the rule?
3      A    I don't think they did, actually.
4      Q    How about those that were opposed to the rule?
5      A    There was really -- I think Dr. Van Meter
6  responded once.  I think Dr. Van Mol responded once.
7  And Dr. Grossman didn't respond to anything.
8      Q    And that was -- both of those responses were
9  in response to individuals who were speaking in
10 opposition to the rule?
11     A    Yes.
12     Q    Have you ever participated in another rule
13 hearing where there is direct and prompt response to
14 public comment?
15     A    Yes.  Yeah, we do.  Yeah, I mean, I've
16 participated in numerous rule hearings here at the
17 Agency.  We do respond to comments.
18     Q    When you say we, do you mean the office staff?
19     A    Office staff, yes.
20     Q    What about consultants with which AHCA has
21 contracted?
22     A    We -- we generally don't -- we generally
23 don't.  It's a -- it was a unique experience for this
24 case, but we generally don't have contracted consultants
25 at our hearings.

1     Q   And where did the slogan, Let Kids Be Kids

2  come from?

3     A   So that came from within, I think, our own

4  Agency, our Communications Department or the Chief of

5  Staff's office.

6     Q   Was there any input in developing that from

7  outside entities?

8     A   No.

9     Q   So AHCA is wholly responsible for that slogan?

10    A   Yes.

11    Q   Was AHCA responsible for the printing off of

12  the stickers that had the slogan contained on it that

13  were being passed out at the hearing?

14    A   No.

15    Q   Do you know who was responsible for that?

16    A   We do not know where those came from.

17    Q   Is it normal to have slogans of an Agency

18  passed out at a rule hearing?  Have you ever seen that

19  before?

20    A   I have not seen that before, so -- but we --

21  that was not something that the Agency had anticipated,

22  and we certainly were not responsible for the passing

23  out of stickers with a slogan on it.

24    Q   Did outside counsel appear at the public

25  hearing?  Did AHCA outside counsel appear at the --

1      A    Yes, they did.

2      Q    Why?

3      A    Because, of course, sensitive nature.  I mean,

4  there were -- there were attorneys also -- there was --

5  because there was counsel that -- you know, who are

6  representing the plaintiffs who were also there.  We do

7  anticipate litigation, so it was -- we did see to it

8  that we had outside counsel there to gather information

9  and be able to observe the procedures.

10     Q    So AHCA had -- at the point of the public

11 hearing, AHCA had retained outside counsel to defend

12 against any potential litigation that the rule invited?

13     A    Yes.

14     Q    What was outside counsel's role at the

15 hearing?

16     A    Outside counsel's role, I think -- I think

17 just calling up the speakers as they came.  I think they

18 actually -- we had them helping out with the -- with the

19 hearing process and procedures.

20     Q    What kind of -- well, okay.  Did AHCA give the

21 consultants any instructions to prepare for the hearing?

22     A    Basic ones.  Most of -- I think, you know,

23 like to when responding that, you know, we would prompt

24 them to respond.  Basic -- very basic instructions.

25     Q    And so the instruction was that when AHCA

Page 183

1   wanted someone to -- one of the consultants to respond,

2   you would prompt them to?

3        A    So, yes.  And during the hearing, Secretary

4   Weida would defer either to Dr. Van Meter or he would

5   defer to Dr. Van Mol when he needed -- when a response

6   was needed from one of them.

7        Q    Okay.  Just going back to the slogan really

8   quick, who in AHCA came up with that Let Kids Be Kids

9   slogan?

10       A    I think -- I think it was a -- I think it was

11  a team effort.  I think, like, it was Cody Farrell and,

12  I think, Brock Juarez.  I think they worked on the Let

13  Kids be Kids slogan.

14       Q    Anybody else?

15       A    No, it would have been primarily them.

16       Q    Who directed them to develop the slogan, or

17  was it their idea?

18       A    So the orders would have been given verbally.

19  We don't know, like, exactly how they were told to do

20  that specific slogan.

21       Q    When was the -- when was the slogan developed?

22       A    It was developed, I think, in the days

23  preceding the release of the report.

24       Q    When was the final draft of your report done?

25       A    So the final draft -- so the final draft as

Page 184

1    far as -- so the very, very final draft, like the last
2    finishing touches, as much as copy edits, was done that
3    week of the 2nd, but as far as the substantive
4    components of the report, that was done probably a few
5    weeks prior to the release.
6         Q    So when was the slogan developed?
7         A    Slogan was developed -- I think they did --
8    were working on it, like, the week before the release.
9         Q    Is it normal for AHCA to develop a slogan for
10   the conclusions found in a GAPMS report?
11        A    No, this is -- this was a first.
12        Q    Why develop a slogan?
13        A    Well, we do develop slogans for whenever we do
14   have -- do releases, or whenever we have new programs.
15   For instance, Canadian Prescription Drug Importation, we
16   do have a slogan for that.  We do have a web page
17   dedicated to prescription drug transparency pricing.  So
18   we do have -- often to correspond with our press
19   releases, we often will do a logo.
20        Q    But you just said it's not normal for a slogan
21   to be developed for GAPMS.  So why do it in this
22   instance?
23        A    So because HHS had already -- had made
24   announcements with the publication of their documents,
25   Department of Health had done theirs, we, of course,

Page 185

1   likewise, because we were publishing this document, was

2   to, of course, create the website and to, of course,

3   create some graphics along with that website.

4        Q    So was the slogan meant to draw attention to a

5   particular message that the Agency was trying to send?

6        A    No, I mean, other than that, we did the report

7   and we did was evidence-based and concluded these

8   treatments were experimental and investigational.

9        Q    For children and adults, right?

10       A    For children and adults.

11       Q    And why was it Let Kids be Kids?

12       A    Because -- so for adults with -- when it comes

13   to Medicaid, states -- because you don't have the EPSDT

14   consideration, states can be much more -- have much more

15   discretion in denying coverage.  They have a lot more

16   latitude to be able to deny coverage, so -- but for

17   services that are intended for pediatrics, or are under

18   EPSDT considerations, that's partially -- partially why

19   not -- like one of the services that we evaluated was

20   puberty suppression, adults aren't going to use that.

21       Q    But the conclusion of the GAPMS report was

22   that all treatment for gender dysphoria was experimental

23   for kids and adults?

24       A    That's correct.

25       Q    The slogan's just targeted at kids?

Page 186

1        A     Yes, that's correct.

2        Q     Why?

3        A     So it comes back down to the EPSDT

4   considerations.  Because like -- well, for starters, I

5   mean, when it comes to adult coverage, that's a totally

6   different category.  But for kids, especially with

7   puberty suppression and especially with the cross-sex

8   hormones, because of the experimental and

9   investigational nature, that's probably why we -- why

10   the Agency embarked on a, I guess, child-based kind of

11   graphic for its web page.

12        Q     What does it mean Let Kids be Kids?

13        A     I think, well, as far as semantics go, I think

14   that could mean something different to everybody.

15        Q     What did AHCA by it?

16        A     Let kids be free to explore their own

17   identities and figure out who they are.

18        Q     What are some examples of other slogans AHCA's

19   used for its programs?

20        A     Well, lower prescription drug costs.

21        Q     That's a slogan that we can find?

22        A     Yeah.  I mean, that's one we've been using for

23   a while.  I was using as -- under my signature on my

24   email, so things -- yeah, but, I mean, there are

25   slogans.  I think like prescription drug transparency.

1   I mean, that's part of, you know, the state's mission is

2   when it's coming up with new programs -- and obviously

3   it's not isolated to AHCA, I mean, every agency's going

4   to have slogans and graphics for their new programs.  I

5   mean, if you look at the Department of Children and

6   Families, they're promoting Hope Florida in a big

7   capacity.  So for a lot of these -- so for a lot of

8   these programs that they want to have -- they want them

9   to be now such high profile, of course there's going to

10  be graphics and slogans.

11       Q    Prescription Drug Transparency is not very

12  catchy, I'll say.  Why create a web page dedicated to

13  supposedly fact-checking Health and Human Services?  Is

14  that normal?

15       A    No, it's not, but following -- but the thing

16  is following the review of the evidence and how our

17  findings really did contradict what was in HHS

18  documents, because we really wanted to demonstrate --

19  because we do understand, it's a GAPMS report, it's 46

20  pages.  Not many people are going to take the time to

21  read it.  So we wanted to kind of put it -- we wanted to

22  put the case in more simplistic layman's terms and make

23  it accessible to the audience to show that, hey, yeah,

24  this is a sensitive report.  Yeah, if you got an hour

25  and a half and you understand medical terminology and

Page 188

1    literature, you might have fun reading it, but for quick

2    information, we wanted to provide a resource, because

3    HHS had made all these claims regarding gender dysphoria

4    treatment, we want to make it accessible to everybody

5    that they could look at it and five minutes later

6    understand the gist of what we were saying in the GAPMS

7    report.

8         Q    Prior to the July 8th public hearing, did AHCA

9    communicate with anyone from the Christian Family

10   Coalition?

11        A    No.

12        Q    Anyone from Florida Citizens Alliance?

13        A    No.

14        Q    Including Pastor Rick Stevens?

15        A    No.

16        Q    Anyone from Warriors of Faith, the Florida

17   Chapter?

18        A    No.

19        Q    Including Troy Peterson?

20        A    No.

21        Q    Anyone from Protect our Children Project?

22        A    No.

23        Q    That includes Pastor Ernie Rivera?

24        A    That's correct.

25        Q    Okay.  Anyone from Florida Prayer Network?

Page 189

1        A     No.

2        Q     And that includes Pam Olsen?

3        A     Correct.

4        Q     Anyone from Partners for Ethical Care?

5        A     No.

6        Q     What about Chloe Cole?

7        A     No.

8        Q     Sophia Galvin.

9        A     No.

10       Q     Anyone from the Rainbow Redemption Project?

11       A     No.

12       Q     How many comments did AHCA receive in response

13    to the proposed changes to 59G-1.050?

14       A     600 or so.

15       Q     Oh, that's all?  Did AHCA read them all?

16       A     We did.

17       Q     Who at AHCA reviewed them?

18       A     It was a combination.  So, like, I think Cole

19    Gerring, Nai Chen, myself, I remember we did sit down

20    once and we started going through all the emails.  Most

21    of them were very brief, maybe like one or two lines,

22    not substantive whatsoever.  For the more substantive

23    ones, those I did careful reviews of.

24       Q     So it's three people.  You, Nai Chen and Cole

25    Gerring?

Page 190

1          A     Uh-huh.

2          Q     Okay.  And you split them up amongst each

3     other?

4          A     We read them together.

5          Q     What process did you use to decide whether or

6     not to incorporate the input into the final rule?

7          A     We wanted to look at the -- we looked at the

8     content of every -- of every single comment.  A lot of

9     the comments were just saying don't do this, or

10    something -- or something very sensationalist.  So a lot

11    of the comments we really couldn't take into

12    consideration because there wasn't -- there wasn't --

13    there was no substance behind them.  So there were some

14    comments that were -- we did receive some feedback

15    from -- I think we got something -- we got -- we got a

16    lengthy comment from American Academy of Pediatrics.  We

17    got a very lengthy one from Yale University.  We got

18    feedback from the Endocrine Society.  I think one of

19    UF's gender clinic physicians wrote us up, not a

20    terribly long comment, but wrote us a comment.  So we

21    did want to take a look at the substantive onces.  But

22    we did them into -- we did take into consideration every

23    comment submitted to us.

24         Q     Did you receive any comments from the people

25    who had Medicaid coverage for treatment of gender

1    dysphoria?

2         A    During the comment review, there wasn't any --

3    we didn't -- we didn't notice any comments from those

4    offhand, but, of course, that was over six months ago.

5    So we -- because of the volume of comments, we did have

6    to read them fairly quickly.

7         Q    Had you received a comment from anyone who was

8    receiving Medicaid coverage for treatment of gender

9    dysphoria, how would you have factored that into your

10   ultimate determination?

11        A    Well, we would -- we would have looked at it.

12   We would look at the content.  We were wondering, like,

13   what kind of services they were receiving and so forth,

14   but it depends on what the comment was.  If they

15   provided a case for why they were getting it, you know,

16   but we didn't -- we didn't receive anything like that.

17        Q    For those people who lost Medicaid coverage

18   for treatment of gender dysphoria, or were going --

19   stood to lose based on the categorical exclusion, during

20   any of this process, was there any consideration given

21   to the inability to access that care?

22        A    There was.  We did have questions.  We wanted

23   to make sure that if we were to discontinue individuals

24   who were receiving, particularly cross-sex hormones, we

25   wanted to -- we did have questions like, would there be

1  withdrawal?  What would -- would they need some -- would

2  they be weaned off the medication?  How would -- how

3  would the Agency take that into consideration?  And we

4  actually kind of realized that if, say, if they do need

5  to discontinue testosterone because of the categorical

6  exclusion and their doctor deems, well, they're going to

7  need some small doses to wean themselves off, but we

8  also realized that necessarily wouldn't be for gender

9  dysphoria, that would be because of withdrawal symptoms,

10  and that would be a different diagnosis.

11      Q    Did you give that guidance to any treating

12  professionals or Medicaid recipients?

13      A    No, we didn't.

14      Q    Okay.  Why was it necessary to review the

15  comments quickly?

16      A    It wasn't necessary to; it was just -- I mean,

17  most of the comments were because the nature, they

18  were -- most of them were sensationalist, a lot of them

19  just hurled insults at us, a lot of them ad hominem

20  attacks, things like that.  We just kind of went through

21  a lot of them very fast.

22      Q    So that wasn't quite my question.  It sounds

23  like you were able to review them quickly.

24      A    I think I want to rephrase as we were able to.

25  We weren't really in a hurry.  Because, obviously, like,

1   we got a 47-page comment from Yale University.  That was

2   not a five-minute skim, obviously.  So there were those

3   we deemed to be substantive comments that warranted

4   in-depth attention, and then there were those we deemed

5   non-substantive comments and just read.  They're like --

6   yeah, we received some ones that were using, I will say,

7   the colorful metaphors.  And then we don't -- I mean,

8   obviously, not going to pay attention to those, so --

9   but the substantive ones that where they're putting

10  together, like, an argument or making points, being

11  something that we have to take back and think over, we

12  did invest time in those, yes.

13       Q    Were there any discussions about the comments

14  between you and Cole and Mr. Chen?

15       A    As far as the discussions go, no, most of

16  discussions were like, okay, let's move on to that one,

17  that one's just insulting us or that one's -- that one's

18  expletive-laden, let's move on.  So when we got the

19  substantive ones, of course, those were -- those were

20  handled differently.

21       Q    How were they handled differently?

22       A    So those, because they were going to take

23  in-depth review is not something that's going to be a

24  group activity.  Of course, we printed those out and

25  started reviewing with a fine-tooth comb.

1      Q     Did AHCA review the underlying cases and

2   studies cited in those substantive comments?

3      A     Yeah.

4      Q     Okay.  How did they factor those in to the

5   ultimate determination?

6      A     So we did take a look.  So we checked to see

7   what studies that Yale University and the AAP brought

8   into it.  And we looked at two responses from the Yale

9   University, not just the response that they made to us,

10  because Yale University frequently cited their response

11  to Texas and Arkansas, we pulled that up as well and

12  did -- and analyzed that.  So we looked to see what

13  articles they were citing and we were -- so we checked

14  to see whether our GAPMS report or any of the expert

15  reports also did evaluations of those studies to see

16  that -- make sure that we were in alignment.

17     Q     Okay.  Do you remember any particular

18  underlying cases or studies?

19     A     There's -- I think there's one by Jack Turban

20  that they cited.  I think there was one that we did cite

21  in GAPMS review.  We didn't discuss it at length, this

22  was by Tordoff, et al.  And we looked at that.  And, of

23  course, but we also captured those in Dr.

24  Brignardello-Petersen's piece that they were evaluated

25  as, like, being very low-quality or in a critical risk

Page 195

1      of bias.

2           Q    Okay.  How did you determine whether -- okay.

3      Turning to the implementation.  Sorry.

4           A    Okay.

5           Q    Hold on.  One second.  Something breaking is

6      coming in.  Did you review any comments that reference

7      court cases?

8           A    We did see some comments that referenced, I

9      think, like Bostock v. Clayton.  I mean, there were some

10     cases referenced in the comments, but, of course, I

11     mean, we were primarily interested in -- we were looking

12     for comments that were providing -- that were either

13     providing examples of literature or anything that was

14     going to contradict the GAPMS report.  In other words,

15     we were looking -- we were looking for anything that, I

16     guess you could say, delivered, like, a mortal wound or

17     something like that, something that would foreseeably

18     cause us to have to go back and make revisions or cause

19     us to have to retract the rule, or something that -- or

20     a comment that we couldn't just dismiss or a comment

21     that we couldn't explain.  So those were what we were

22     looking for.

23          Q    What types of information provided by the

24     public would have mortally wounded your conclusion?

25          A    So a mortal wound would have come from a

1    quality study, or a number of quality studies.

2         Q    And define a quality study.

3         A    So something that -- well, a quality study,

4    well, I mean, that -- that's a pretty broad definition

5    of what you're asking for, and there are different ways

6    a quality study can come about, but something that, of

7    course, lengthy longitudinal histories on participants,

8    either has adequate control groups.  And this is not an

9    all-inclusive list.  These are just examples.  Also

10   follows participants for a lengthy period.

11        Q    Well, what's the difference between that and a

12   lengthy longitudinal study?

13        A    Long -- when it comes to a longitudinal

14   history, what we mean by longitudinal history, and this

15   is often for behavioral health, is that longitudinal

16   history is necessary to really ascertain the full

17   impacts of somebody's mental health conditions.  Because

18   it's -- because mental health, it's not necessarily like

19   an acute illness or a chronic condition diagnosis.  So,

20   like there's treatment histories, medications and --

21   like, in other words, and, of course, like activities of

22   daily living, how that all is affected.  So it's usually

23   something that has to be obtained over a number of

24   years.

25              So, mental health longitudinal histories, but

Page 197

```
 1    we also were finding in the studies that we evaluate for
 2    the GAPMS process that they lacked participants'
 3    longitudinal histories.  If they even -- if they even
 4    did -- provided any histories or any -- identified the
 5    recipients or the participants at all.  I mean, there
 6    were so many studies where they were -- I think there
 7    was one that we came across, and this was during the
 8    comment period, that was just a massive survey and they
 9    were trying to give gift cards to participants.  And, of
10    course, people were just completing it, but it was like
11    a one-time snapshot, and it's subjective self-reports.
12    So I mean, there are a myriad examples that we can say
13    for high-quality evidence, and not to mention RCT's, as
14    well.  So --
15         Q    What does that stand for?
16         A    Randomized control trials.  So there -- so,
17    yeah, so that was what we were looking for, evidence
18    that -- evidence that would hold up to questioning, and
19    that's not what we were finding.
20         Q    So in undertaking the review of the comments,
21    the only thing you were looking for is anything that
22    would, in your definition, cause a mortal wound to your
23    conclusion in the GAPMS?
24         A    That was among one of the things we were
25    looking for.
```

1          Q    What else were you looking for?

2          A    I mean, we were looking -- we were looking

3     for -- I mean, we, of course, we were looking to see if

4     there's anything that would directly conflict with the

5     GAPMS report.  That was one thing, because the rule's

6     foundation was the GAPMS report.  So that's the big

7     reason why we were looking for contradictory evidence or

8     evidence that would be like, well, wait a second, we say

9     it's all -- you know, because our primary argument is

10    it's low-quality evidence and therefore experimental,

11    experimental investigational.  That basis doesn't

12    sustain itself if all of a sudden there's modern,

13    high-quality evidence out there.  So we want to make

14    sure that we had not left any stones unturned.  But we

15    were just -- you know, I mean, we -- this things we

16    weren't -- that was the primary thing we were looking

17    for.

18              Other things -- I mean, we also, I mean,

19    anything that spoke to the legality of it, but I mean,

20    of course, we wouldn't necessarily evaluate that.  We'd

21    turn that over to legal, but anything that was

22    looking -- that was looking at the legality of what we

23    were doing.  So I mean -- so, I mean, there were

24    different angles.  I think when I was looking at it

25    through my personal lens, that was what I was looking

Page 199

1    for.

2         Q    Are you aware that similar exclusions have

3    been found unconstitutional in other federal districts?

4         A    I am aware at the district level that there

5    have been some -- some exclusions that have been tossed,

6    yes.

7         Q    All right.  Turning to the implementation --

8              MR. JAZIL: We've been going for an hour and a

9         half.  Could we do a five-minute break?

10             MS. DEBRIERE: Sure.

11             VIDEOGRAPHER: This concludes video three.  The

12        time is 3:00 p.m.

13             (Brief recess.)

14             VIDEOGRAPHER: This is beginning of video four.

15        The time is 3:08 p.m. we're on the record.

16   BY MS. DEBRIERE::

17        Q    Just after that break, and I should have asked

18   this earlier, just after that break, did you have any

19   conversations with anyone during that break?

20        A    During --

21        Q    Just this recent break?  Did you have

22   conversations with anyone?

23        A    I mean, talked about, like, personality types

24   on 16 personalities, just had a conversation, but as far

25   as the case goes, no.

Page 200

1        Q      Okay.  What about at lunch?

2        A      Just a quick touch-base with our attorneys.

3        Q      Okay.  How long did you talk?

4        A      15 minutes.

5        Q      Okay.  All right.  Turning to implementation

6    of the rule with managed care plans.  Did Florida

7    Medicaid managed care plans -- well, we've already

8    answered that.  What's the purpose of Inter-Qual?

9        A      Inter-Qual?

10       Q      Uh-huh.

11       A      I don't have the answer to that.

12       Q      Okay.  Are you familiar with it at all?

13       A      I'm not familiar with Inter-Qual.

14       Q      Did AHCA develop, or help develop language for

15   notices of adverse benefit determinations in order to

16   incorporate the categorical exclusion of treatment for

17   gender dysphoria?

18       A      No.

19       Q      AHCA didn't assist at all in developing the

20   language for those denials for terminations?

21       A      No, managed care plans were -- handled those

22   themselves.

23       Q      Okay.  Did AHCA review any of the language

24   that managed care plans submitted to AHCA for review?

25       A      No.

Page 201

1      Q    Same question for notices of outcome relied on

2  by EQ Health?

3      A    No, AHCA wasn't directly involved in those.

4      Q    Did they review the notices of outcome

5  language?

6      A    No.

7      Q    Okay.  What about Magellan?

8      A    Magellan?  No.

9      Q    Did AHCA develop or help develop language for

10  any other types of notices used to notify a Medicaid

11  recipient of a denial or termination of treatment for

12  gender dysphoria?

13      A    No.

14      Q    All right.  Can I have the notice of adverse

15  benefit determination, and that's Bates-stamped

16  Defendant_ 000292335, I think.  We'll check?  Did I get

17  it right?  I don't think I did.  I'll read the correct

18  Bates-stamp on -- so this is going to be the Molina

19  Health Care Notice of Adverse Benefit Determination.

20  I'm not going to name the Medicaid recipient.  And the

21  date stamp appears to be cut off, but it is dated

22  October 26th, 2022, and the initials for the recipient

23  are AS.

24          (Whereupon, Exhibit No. 15 was marked for

25  identification.)

1           MR. JAZIL: Counsel, can we agree that this

2      should be confidential, attorney's eyes only?

3           MS. DEBRIERE: Absolutely.

4           MR. JAZIL: Do you mind if I write that on top

5      of the --

6           MS. DEBRIERE: Not at all.  Not at all.  So the

7      previous Bates stamp I gave was not correct, but

8      the Bates stamp on this exhibit is cut off, so I

9      can't provide the actual number, but I think I've

10      sufficiently described it.  And, of course, it will

11      be Exhibit 15.

12 BY MS. DEBRIERE::

13      Q    All right.  This particular notice of adverse

14 benefit determination is from Molina.  In that second

15 page there, it runs through AHCA's medical necessity

16 definition, correct?

17      A    Yes, that's consistent.

18      Q    And that's consistent across notices of

19 adverse benefit determinations?

20      A    So each health plan is a little idiosyncratic

21 in how they do NABD's.  We'd have -- we'd have to verify

22 with managed care plans.  I mean, the contracts does

23 provide specific requirements when it comes down NABD's

24 and sending them.

25           MS. DEBRIERE: Mo, do you know if you guys have

Page 203

```
 1        produced an NABD template to us?
 2              MR. JAZIL: We've never --
 3              MS. DEBRIERE: I know they exist.  They should
 4        be pretty easy to --
 5              MR. JAZIL: I'll check.  What's that stand for,
 6        again?
 7              THE WITNESS: Notice of Adverse Benefit
 8        Determination.  It's a long phrase for a denial.
 9   BY MS. DEBRIERE::
10        Q    Or termination or reduction?
11        A    Or termination, or reduction.
12        Q    Or partial reduction.
13        A    It's --
14        Q    Okay.  So this particular notice of adverse
15   benefit determination is to an actual Medicaid
16   recipient, correct?
17        A    Yes.
18        Q    And it looks like it's been it's denying a
19   request for coverage of testosterone cypionate.
20        A    That's correct.
21        Q    Okay.  And what is the reason for the denial?
22        A    The box for other authority non-covered
23   benefits is checked off.
24        Q    Why isn't the, request service is not a
25   covered benefit, checked off?
```

1      A     We would have to ask that question of the

2    plans.

3      Q     Okay.  So you don't require some kind of

4    uniform response to not -- that plans must provide when

5    there's a non-covered benefit?

6      A     We're not aware of one.  There -- I don't

7    think there's one mentioned in the contract.

8      Q     Okay, but I guess my other question is, would

9    it be equally sufficient, had they checked off, must

10   meet accepted medical standards and not be experimental?

11     A     They could have checked that box.  They could

12   have checked, the requested service is not a covered

13   benefit.  They could have checked other boxes, as well.

14     Q     Okay, but it is accurate to say that it is not

15   a covered benefit?

16     A     Yeah, that is accurate.

17     Q     Is any plan allowed to currently cover

18   treatment for gender dysphoria of the services listed

19   and 59G-1.050(7)?

20     A     For any plan right now currently?

21     Q     Yes.

22     A     No.  No plan can cover them.

23     Q     Since the adoption of the categorical

24   exclusion of treatment for gender dysphoria, how many

25   notices of adverse benefit determination have been sent

1    to Medicaid beneficiaries that denied coverage for

2    services on the basis of --

3         A     So for MMA plans, so we did a little looking

4    into this -- so for managed medical assistance, which

5    most of these recipients, given their ages, are going to

6    be on MMA, we do not actually require the MMA plans to

7    submit reports regarding how many NABD's that they

8    actually mail out to their enrollees.  Long-term care,

9    that process is different.  We do require them for

10   long-term care to mail those to report to the Agency how

11   many NABD's they are sending out, but for MMA we

12   currently don't have that as a requirement.

13        Q     Okay.  So is that -- does the same hold true

14   for notice of appeal plan -- plan appeal resolutions?

15        A     As far as that goes, I don't think -- I don't

16   think we're collecting information from the plans on

17   those.

18        Q     Okay.  So generally, not just as related to

19   treatment of gender dysphoria?

20        A     Generally.

21        Q     What about notice of outcomes?

22        A     Notice of outcomes, I don't think we're

23   collecting them from those informations either.

24        Q     Okay.  Just generally, do any of those notices

25   include reference to the variance in waiver process

1    described at Florida Statute 120.542?

2         A    No.  I mean, we definitely -- I mean, so

3    looking at this, this is in compliance with what we do,

4    we require them to have, which is an appeals process.

5    So, no, we don't -- we do not require the plans to

6    include the procedures for variances.

7         Q    Okay.  So those procedures are not listed in

8    notices of denial?

9         A    That would be correct.

10        Q    Okay.  How many grievances have been submitted

11   to AHCA regarding a claim related to AHCA's adoption of

12   the categorical exclusion of treatment for gender

13   dysphoria?

14        A    So that information, we do have a complaint

15   hub for recipients and providers who'd like to submit

16   complaints, be given the -- when the questions came in,

17   we, of course, have to reach out because our complaint

18   hub is actually down in Fort Myers, so it's not -- it's

19   not here locally, so that's information we're still in

20   the process of obtaining.

21        Q    And once you obtain that, you'll provide it to

22   us?

23             MR. JAZIL: Yes.

24             MS. DEBRIERE: Can you put that as a follow-up?

25   BY MS. DEBRIERE::

1      Q    How many -- how many appeals of Notice of

2   Adverse Benefit Determination denying care on the basis

3   of the exclusion have there been?

4      A    As far as appeals going up to the fair hearing

5   level, I think that's zero.

6      Q    Okay.  What about -- yeah, so that would

7   include both notice of plan appeal resolutions as well

8   as notice of outcome?

9      A    Yeah.

10     Q    Okay.  Prior to August 21st, 2022, did AHCA

11  ever reverse a decision made by AHCA or by a plan to

12  deny pubertal suppression therapy for the treatment of

13  gender dysphoria?

14     A    We did not.

15     Q    You never reversed a decision to deny?

16     A    To deny?

17     Q    Yeah.

18     A    No, we never did.  Sorry.  I misunderstood the

19  question.

20     Q    Okay.  I just want to make sure you're

21  understanding.  So prior to the adoption of the

22  categorical exclusion, did AHCA ever reverse a decision

23  to deny puberty suppression therapy for the treatment of

24  gender dysphoria?

25     A    So if a plan reviewed for medical necessity

Page 208

1   criteria decided, no, it didn't meet the criteria and

2   issued denial, no, we never reversed it.

3        Q    What about upon a fair hearing review?

4        A    Are we talking about, like, since 2015?

5        Q    Well, I'm asking ever, but if 2015 is a

6   helpful marker.

7        A    I don't have that information offhand.

8        Q    Is that information you can obtain?

9        A    I think we can.

10       Q    Prior to August 21st, 2022, did AHCA ever

11  reverse a decision to deny cross-sex hormone therapy for

12  the treatment of gender dysphoria?  And by reverse I

13  include at the fair hearing level.

14       A    That's information that we would have to

15  obtain.

16       Q    Same question for surgery in furtherance of

17  the treatment for gender dysphoria.

18       A    At the fair hearing level, we would have to

19  obtain that.

20       Q    So you will tell us the number of times, if

21  ever, that AHCA reversed a decision at the fair hearing

22  level to provide treatment in furtherance of -- services

23  and treatment for gender dysphoria?

24       A    We can confirm it.  It's probably zero.

25       Q    Okay.

1     A    As far as overturning a decision that was

2   already a denial, it's probably going to be zero, but we

3   just want to confirm.

4     Q    Okay.  I'll tell you, we have different

5   information.

6     A    Okay.

7     Q    How many AHCA fair hearings have been provided

8   where the categorical exclusion of treatment for gender

9   dysphoria was an issue?

10     A    Well, can you repeat that?

11     Q    How many AHCA fair hearings have occurred

12   where the subject at issue was the categorical exclusion

13   of treatment for gender dysphoria?  So where the rule

14   exclusion --

15     A    We'll have to obtain those numbers.

16     Q    Did any -- do final orders in general

17   reference the variance and waiver process described at

18   Florida Statute 120.542?

19     A    You'll have to slow down and ask the question

20   a little bit --

21     Q    Sure.  Sure.  The final orders that are issued

22   at the end of any AHCA Medicaid fair hearing, do those

23   written final orders contain any reference to the

24   variance and waiver process at Florida Statute 120.542?

25     A    I don't think the final orders do.  I don't

Page 210

1    think they do.

2        Q    Okay.  Is there any way you can get

3    confirmation of that answer?

4        A    I mean, we could obviously pull up a copy of

5    the final order and see if that information is included.

6        Q    If we had a copy of an AHCA final order, would

7    that be sufficient to determine, and it did not list it,

8    would that --

9        A    I'll defer to our attorneys, if that's

10   sufficient.

11           MR. JAZIL: That'd be sufficient.  If you have

12      one, you can show it to him.

13           MS. DEBRIERE: Well, we can pull one up, can't

14      we?

15           MS. CHRISS: Just one?

16           MS. DEBRIERE: Yeah.  Yeah.  Why not.  Yeah, as

17      long as their name's blocked out, which really

18      shouldn't matter here because we're dealing with an

19      AHCA employee.

20           THE WITNESS: Yeah.  I mean, I'm cleared to

21      review PHI and recipient information.  It shouldn't

22      be a problem.

23           MS. DEBRIERE: Do you want another one?  I can

24      send you another one.  Bear with me one second.

25           I'm going to forward you this email.  And

1      it's -- I can tell you what the name of the

2      document is.  It's the last document, 23.  That

3      should be the last one.  Chelsea's copied on that

4      one, too.

5              THE WITNESS: Okay.

6              MS. DEBRIERE: Okay.  Okay.  So feel free to

7      just scroll through it and see if you see any

8      reference -- oh I'm sorry, it isn't a touchscreen?

9              THE WITNESS: I don't know where the scroll

10     bar.

11             MS. CHRISS: It's just -- just use two fingers

12     and just go like that.

13             MS. DEBRIERE: Oh, it's a Mac.

14             MS. CHRISS: I'm sorry.

15             THE WITNESS: Okay.  There it goes.  Yeah.

16     Ipads and iPhones I'm good with, Mac's I never got

17     comfortable with.

18             MS. DEBRIERE: The next exhibit I'm going to do

19     is emails related to the policy transmittal and the

20     policy transmittal itself, if that helps.

21             MS. DUNN: Yep.

22             THE WITNESS: So are we talking about the --

23     that last paragraph on the final page that's, like,

24     notice of judicial review?

25   BY MS. DEBRIERE::

1      Q     Yes.  So does that relate to the variance

2    waiver process?

3      A     I mean, it doesn't point out the variance

4    processes as described in section -- or Chapter 120.  I

5    think that's more if they want to appeal to the next

6    level -- next court level.  I don't think that's in

7    response to the variance process.  That's a different

8    process.

9      Q     Okay.  Thank you.  So it does not mention the

10   variance waiver process --

11           MR. JAZIL: Would it be possible just to read

12           off the --

13           MS. DEBRIERE: Yes, absolutely.  So it says at

14           the bottom:  Notice of a right to judicial review.

15           A party who is adversely affected by this final

16           order is entitled to judicial review, shall be

17           instituted by filing the original notice of appeal

18           with the Agency clerk of AHCA, and a copy along

19           with the filing fee prescribed by law with the

20           District Court of Appeal and appellate district

21           where the Agency maintains its headquarters or

22           where a party resides.  Review proceedings shall be

23           conducted in accordance with the Florida appellate

24           rules.  The Notice of Appeal must be filed within

25           30 days at the rendition of the order to be

Page 213

1      reviewed.

2           THE WITNESS: Our various processes doesn't

3      involve appellate courts, so it would not be an

4      appellate case, so it's a different affair.

5  BY MS. DEBRIERE::

6      Q    Thank you.  Okay.  Did AHCA work with Florida

7  Medicaid managed care plans to implement the exclusion

8  set forth in 59G-1.050(7) in any way?

9      A    No.  I mean, the publication's in the Florida

10 Administrative Register, that was to provide ample

11 notice -- public notice that the rule's changing, the

12 managed care plans are responsible for keeping up with

13 changes to manage -- to AHCA's coverage policies and

14 administrative policies.

15     Q    What about plan transmittal?  Are you maybe

16 forgetting those?

17     A    We do not do a plan transmittal for this.  Are

18 you referring to a policy transmittal?

19     Q    Yes.

20     A    We did not send out a policy transmittal.

21     Q    Okay.  Okay.  So we have what's marked as

22 Exhibit 16 and Exhibit 17.  Exhibit 16 is some emails

23 from Dede Pickle to Jason Weida, cc'ing Ann Dalton.  And

24 those are dated August 22, 2022.  I believe that's where

25 they start.  Also involved are you, Matt, and Ashley

Page 214

1    Peterson.  Also, I just want to note that Exhibit 17 is

2    an SMMC policy transmittal dated August 22nd, 2022.

3                (Whereupon, Exhibit Nos. 16 - 17 were marked

4    for identification.)

5    BY MS. DEBRIERE::

6        Q    Getting back to the list of questions.  So did

7    AHCA not send the plan policy transmittal out, Exhibit

8    17?

9        A    We did not send them out.

10       Q    Why?

11       A    Pretty much because all it's doing is

12   reproducing what was already stated in the rule.  The

13   rules -- the rule -- the policy changes already in rule,

14   that was announced through the FAR.  Policy

15   transmittal's a little superfluous at this point.

16       Q    Why draft an entire plan transmittal and then

17   not send it out?

18       A    Which this happens frequently.  Sometimes we

19   will draft something and later decide not to -- not to

20   use it, or not to utilize that content in favor of

21   different strategy.  So, in this case, since the rule --

22   since the rule change itself was pretty self-explanatory

23   and pretty direct, just we later deemed wasn't

24   necessary.

25       Q    Who made the decision not to send out the

Page 215

1    policy transmittal?

2        A    I think that would have been -- that would

3    have been Secretary Weida.

4        Q    Only Secretary Weida?  Is it Weida or Weida?

5        A    Weida.  I mean, as Assistant Deputy Secretary,

6    he would be within his purview to decide whether or not

7    to send something out -- or to send something out, but

8    given that the rule itself was self-explanatory, and we

9    just decided that a policy transmittal wasn't necessary.

10       Q    All right.  In the email exchanges -- I think

11   it's on the second page -- oh, and Jason Weida, at this

12   time that he made this decision, was not the

13   Secretary -- AHCA's Secretary, correct?  At the time

14   this was sent, Mr. Weida was not the AHCA Secretary,

15   correct?

16       A    Right, he was Assistant Deputy Secretary for

17   Policy and Quality.

18       Q    On the last page, it looks like you were the

19   person who drafted the first policy transmittal, is that

20   correct?

21       A    Yes.  Yeah, I mean, Dede and I, it was a

22   collaborative effort between the two of us.  We were, of

23   course, working on each other's language.

24       Q    Why did you think Dede -- why did you and Dede

25   think it was important to draft a policy transmittal?

Page 216

1      A     We were asked to.

2      Q     By who?

3      A     I think Ann Dalton asked Dede to work on it.

4      Q     Okay.  And later -- well, let's look to --

5  Ashley Peterson says on August 22, 2022 at 10:35 a.m.:

6  I added one thing to help clarify that these drugs will

7  still be provided, just not for gender dysphoria.

8  Please let me know if you think this is unnecessary or

9  adds confusion.

10          So at least Ashley thought there was some

11  clarity that could be provided to plans on the

12  implementation of the exclusion.

13              MR. JAZIL: Object to form.

14              THE WITNESS: Okay.  There's several emails.

15       Which one are you --

16  BY MS. DEBRIERE::

17      Q     This one is from Ashley to Dede, copying you.

18      A     August 22nd, 11:04 a.m.  That's Dede --

19      Q     10:35 a.m.

20      A     Okay.

21      Q     It's DEF_0002587.

22      A     Okay.  I think it was just a minor, minor

23  technical catch.  I mean, when we worked on this, I

24  mean, we were just fine tuning the drafts.

25      Q     And further up Ann wants to include the 60-day

Page 217

1   language in the alert, which has been later included.

2   What is the 60-day language?

3       A    That would be the bottom paragraph of the

4   policy transmittal.

5       Q    Okay.  And that you're referring to starts

6   with:  To ensure the safe discontinuation of puberty

7   blockers or hormone and hormone antagonists for the

8   treatment of gender dysphoria?

9       A    Uh-huh.

10      Q    Then the managed care plan must notify its

11  subcontractors, providers, enrollees receiving active

12  treatment and changes in coverage, and they must honor

13  any current prior authorization of prescribed outpatient

14  drugs for the treatment of gender dysphoria through 60

15  days after the date of this policy transmittal.  So that

16  means that under the 60-day rule for continuity of care,

17  the managed care plans were to continue coverage of the

18  prescribed outpatient drugs for the treatment of gender

19  dysphoria, correct?

20      A    Only for those existing prior authorizations

21  had already been approved.

22      Q    Okay.  So that meant that AHCA was -- or that

23  Florida Medicaid was covering this drugs?

24      A    Yeah, just for the sake of honoring existing

25  PA's.

Page 218

1      Q    Was it not important that the plans know that

2    they should maintain continuity of care?

3      A    It's actually in the contract.  I mean, when

4    you refer to continuity of care, can you clarify what

5    you mean by continuity of care?

6      Q    In this instance, I'm talking about the

7    continued coverage for 60 days of those prescribed

8    outpatient drugs for the treatment of gender dysphoria.

9      A    As far as the continuity of care went, I mean,

10   there -- as far as medically necessary services,

11   enrollees are always going to have access to those.  So

12   when it comes to the continuity of care, whether or --

13     Q    They're not going to have access to services

14   that have been previously covered, but now are excluded,

15   correct?

16     A    That'd be correct.

17     Q    Okay.  So the 60-day continuity of care

18   ensures that after that categorical exclusion is

19   adopted, those individuals continue to access that care

20   for 60 days?

21     A    This, of course, was a draft.  It was never

22   sent out.

23     Q    At some point, AHCA thought that the 60-day

24   period of continuity of care should apply in this

25   situation, correct?

1      A    Since this was a draft and it was not -- not

2   officially sent out, this is not -- since it is draft

3   language, it is not an official transmittal, we sent out

4   to the health plan, so this does not formally represent

5   the views of the Agency.  This is a -- this is a draft

6   that we created, deliberated upon and decided not to

7   send out.

8      Q    Who decided?

9      A    That would, of course, been leadership.  That

10  would have been -- would have gone to Assistant Deputy

11  Secretary Weida.

12     Q    And he was the only one who was involved in

13  that decision, correct?

14     A    I mean, since he oversees the bureau policy,

15  that's -- which means policy transmittal, yes, he had --

16  is within his -- is within his job description and his

17  responsibilities and rights to veto sending out a policy

18  transmittal.

19     Q    Okay.  Since the policy transmittal was not

20  sent out, then is it AHCA's position that those who had

21  a current prior authorization at the time that

22  categorical exclusion was adopted, was not entitled to

23  the 60-day continuity of care period -- were not

24  entitled?

25     A    So once the rule went into effect, that was,

Page 220

1    of course, the notice of the plans that the coverage for

2    these services has to stop.

3            Q    Immediately?

4            A    Well, I mean, that's based on what the rules

5    say, yeah.

6            Q    Okay.  So they -- that means that the plans

7    were not to implement this 60-day period of continuity

8    of care as described in this transmittal?

9            A    Right, we didn't provide notice of -- them of

10   this.

11           Q    Okay.  And it was AHCA's position that

12   Medicaid beneficiaries were not entitled to that?

13           A    That's correct.

14           Q    Okay.  You previously noted how people on

15   hormones may go through withdrawal, there was something

16   as part of your 2022 GAPMS request.  Why wasn't that

17   important to communicate to the plans?

18           A    Well, because withdrawal is not gender

19   dysphoria.  It's a different -- that's a different --

20   it'd be a different diagnosis altogether.

21           Q    But in the decision to no longer cover drugs

22   that may cause withdrawal, was it important to

23   communicate to the plans or providers that they may need

24   to help facilitate transition off those drugs that would

25   no longer be covered?

Page 221

1    A    We were leaving that to the health plans to

2    manage independently, as well as the providers of these

3    services.

4              MS. DEBRIERE: Do we have a document titled

5         Florida Medicaid health alert?  You just -- under

6         DEF_000258815.  I feel like I've had the same Bates

7         stamp number.  So we're marking as Exhibit 18, the

8         Florida Medicaid health care alert sign-off form.

9              (Whereupon, Exhibit No. 18 was marked for

10   identification.)

11             THE WITNESS: I'm familiar with that.  I

12        drafted it.

13   BY MS. DEBRIERE::

14   Q    That would definitely have been one of my

15   questions.

16   A    No, I'm listed on there as the analyst who

17   drafted it.

18   Q    And there's Dede and Ann.

19   A    Yeah.

20   Q    Okay.  Did this healthcare alert go out to all

21   providers?

22   A    That provider alert did not go out.

23   Q    And the provider alert on the back, it lists

24   that same language to ensure the safe discontinuation of

25   puberty blockers or hormones and hormone antagonists for

Page 222

1    the treatment of gender dysphoria, or allow transition

2    to payment to non-Medicaid funding sources.  You

3    incorporated the reference to the 60-day continuity of

4    care period.  You drafted that one.  Did you include

5    that 60-day language?

6         A    Yeah.  I -- yeah, I did include that.

7         Q    Why did you think it was important to include?

8         A    Because at the time we were -- we were

9    creating a provider alert in sync with -- in sync with

10   the policy transmittal, so we wanted to make sure that

11   they used the same language and addressed the same

12   things.

13        Q    And why wasn't this sent out?

14        A    Because -- because, well, we've deemed that

15   the notice of the rule is sufficient, and that once the

16   rule had said that AHCA will no longer cover these

17   services, we could no longer cover those services.  I

18   mean, the rule was clear-cut.  It's very -- I mean,

19   language is pretty -- pretty straight to the point and

20   direct.

21        Q    Who made the decision not to send this out?

22        A    That would have come from Assistant Deputy

23   Secretary Weida at the time.

24        Q    Did you agree with that decision?

25        A    I thought it was sufficient.  I actually

1    thought given that we put the rule out there, the rule

2    is very straightforward, noticing, like, we had the

3    providers, health plans, adequate notice was given.

4         Q    Did Ms. Dalton agree with the decision not to

5    send any of this out?

6         A    I can't speak to Ms. Dalton.  She and I didn't

7    confer on our opinions of whether to -- we didn't confer

8    on how we felt about it.

9         Q    Was there any stated opposition to not sending

10   these out?

11        A    Not that I'm aware of, no.

12        Q    So in managing withdraw, how would a plan or

13   provider know how to navigate that if AHCA wasn't -- if

14   AHCA notified them that they weren't going to cover the

15   service that was needed to help titrate individuals off

16   of their hormones or puberty suppression therapy?

17        A    So it comes back down to practitioners

18   delivering treatment to their -- to their patients.

19   Once again, it comes down to how, like -- you know, when

20   they know that they can't treat for gender dysphoria

21   anymore, and they know that the individual might

22   suffer -- might suffer withdrawal symptoms from

23   testosterone.  We, of course, did see some conflicting

24   information on that one, whether they would experience

25   symptoms or not, or estrogen, or if there were

1   withdrawal symptoms, you'd be treating the withdrawal.

2   And, of course practitioners, we do trust the medical

3   professionals to know what condition they're treating,

4   when the -- because they do so every day when their

5   course -- when they're, of course, diagnoses.  And, of

6   course, when the medical coders come in there to do the

7   billing, it's --

8        Q    If transition involved smaller dosages of

9   hormones over time to treat gender dysphoria, how was

10  the provider and the plan to know that they could

11  continue to prescribe that?

12       A    It would be coming through a different

13  diagnosis code.  And since we only said that for -- we

14  only said in the rule only for the diagnosis of gender

15  dysphoria.  So if they're -- so if they're taking on

16  some small doesn't testosterone because of withdrawal,

17  that's a different -- that's a different diagnosis

18  altogether.

19       Q    How would they know what diagnosis code to

20  use?

21       A    So, practitioners and providers often don't --

22  aren't that familiar with the coding system.  That's

23  where their coders do to figure out.  So their coders,

24  of course, review the medical records and, of course,

25  put in the CPT codes, they put in the ICD-10 codes, the

Page 225

1    place of service.  So usually the claims process is

2    usually done either by often, like, a clearing house or

3    individual coders that sometimes just rotate like a

4    circuit through different physicians offices and so

5    forth.

6         Q    So when we're talking about the safe

7    discontinuation of a medication, wouldn't the prudent

8    thing to do would be to notify providers and plans of

9    the options they had to ensure that individuals who

10   could no longer access this treatment could at least

11   come off of it as safely as possible?

12        A    Given that physicians deal with that kind of

13   situation, for other diagnoses and medical services, we

14   just didn't feel it was necessary.  That's one area we

15   were going to, like, leave it.  Practitioner discretion

16   was how to withdraw their patients from testosterone or

17   estrogen, if it was even necessary at all.

18        Q    Did any managed care plan ask questions about

19   how to implement the categorical exclusion of

20   gender-affirming care?

21        A    I don't think we received any questions for

22   managed care plans.

23        Q    What about from providers?

24        A    I don't think we received any provider

25   questions either.

1       Q     Did any plan communicate that they will

2     continue coverage in spite of the categorical exclusion?

3       A     Definitely no.

4       Q     Could a plan do that?

5       A     Well, they hypothetically can --

6       Q     Would Florida Medicaid allow them to do that?

7       A     No, we would not.

8       Q     I'm showing you what's marked as -- well, I

9     will be in a second -- what is marked as DEF_ 000169125.

10    It's the template member handbook -- actually, let's

11    skip that one.  I'm sorry.  I'm sorry.

12           MS. DUNN: Oh, I'm sorry, we have numbers that

13           aren't lining up with --

14           MS. DEBRIERE: Yeah, let's actually -- let's

15           move to the emails from Susan Williams between her

16           and Magellan.  I'm not sure what the Bates stamp

17           is.  Okay.  Thank you.

18           (Whereupon, Exhibit No. 19 was marked for

19    identification.)

20    BY MS. DEBRIERE::

21      Q     And that's marked as 19 and it's a series of

22    emails between Susan Williams, Jessica Forbes at AHCA,

23    Ashley Peterson, and the first date on the document is

24    June 3rd, 2022.  The subject is for treatment of gender

25    dysphoria for children and adolescents.

Page 227

1    A    Well, this was -- well, we received this prior

2    to the promulgation of the challenge exclusion.

3    Q    You did.  So, Stephanie McGriff over at

4    Magellan says, Hi, Ashley and Susan, attached are the

5    internal criteria not publicly posted.  CCM that the

6    implemented all meds with the gender code equals B, both

7    in the subsequent updated denial letter that includes

8    the non-discriminatory verbiage.  What are the internal

9    criteria she's referring to?

10    A    So it looks like the email chain started on

11    April 20th, following the release of the Department of

12    Health's guidelines.  So there were 14 impressions to

13    AHCA at that time.  We had just initiated the GAPMS

14    process for these treatments.

15    Q    Yeah.  In fact -- so looking at the email from

16    Alicia King Wilson dated April 20th -- so that would be

17    the day that the Florida Department of Health released

18    its guidance, right?

19    A    Yes.

20    Q    And Secretary Marstiller directed Tom Wallace

21    just to start the GAPMS process.

22    A    Yes.

23    Q    It says:  Leslie noted MMA does have an

24    internal gender dysphoria criteria, which is attached.

25    This internal document serves for a GnRH analog used to

1   delay puberty in adolescence with gender dysphoria, but

2   it does not speak to use of hormone therapy.  This

3   document was provided by the Agency due to a fear of

4   hearing requests received from Lupron for recipient with

5   this diagnosis.  All requests for use of the drug at

6   that time to delay puberty were to be vetted by AHCA

7   before a final determination is made.  Can you explain

8   that a little bit more?  What does it mean that AHCA had

9   to vet all determinations?  What determinations was AHCA

10   vetting?

11       A    I don't -- I mean, it's tough to fully

12   understand the context of this email.  I mean, the

13   context level is light throughout the chain, because I

14   mean, Magellan does handle the prior authorization of

15   clinical reviews for drugs in the fee-for-service

16   system.

17       Q    Okay, but it says that this document was

18   provided the Agency due to a fair hearing request

19   received from Lupron first, recipient with this

20   diagnosis, all requests required vetting by AHCA before

21   a final determination was made.  So, I mean, I interpret

22   that to mean that anytime Magellan received a request

23   for Lupron to treat gender dysphoria, AHCA had to vet it

24   before a decision as to coverage would be reached.  Am I

25   wrong?

1      A    No, that's what it sounds like.  The

2   pharmacy -- the pharmacy processes may involve -- as far

3   as like the pharmacist job descriptions go -- I mean, as

4   far as like vetting, that's the kind of the questions

5   like, are they -- because we don't do in-house prior

6   authorizations or clinical determinations anymore.  We

7   haven't done those since SMC went into a fact.

8      Q    Was a special exception made for the coverage

9   of hormone therapy to treat gender -- I'm sorry -- for

10  the treatment of puberty suppressant?

11     A    No.  No.  Yeah.

12     Q    So not to your knowledge --

13     A    I'm just trying to figure out what they mean

14  by vetting.  Like, in other words, does this mean --

15  like, is Magellan sending the determination back to AHCA

16  for yes or no approval?

17     Q    Yeah.

18     A    So they could be doing that.

19     Q    But you don't know?

20     A    Don't know.

21     Q    Can we find that information out?

22     A    We might be able to, because like -- because

23  it's only a few emails, and we're trying to go over the

24  process.  I mean, it is possible that we could ask

25  people who do oversee this area.  I mean, they might

1    give us some information, but they may not be able to

2    describe the exact context of the email because, I mean,

3    sometimes things get lost in translation.

4         Q     Does Susan Williams still work here?

5         A     Yes, she does.

6         Q     Does Ashley Peterson still work here?

7         A     Ashley Peterson recently left us.

8         Q     What's recent?

9         A     Last week.

10        Q     Find another opportunity?

11        A     Yeah.

12        Q     How about Kelly Reuben?

13        A     Kelly Reuben's still here.

14        Q     Jessica Forbes.

15        A     Jessica Forbes is still with the Agency.

16        Q     Shantice Green.

17        A     No, she's not here anymore.

18        Q     She find another opportunity?

19        A     I believe so, yes.

20        Q     All right.  So, as a reminder, all gender

21   codes were removed from programming as directed by the

22   Agency in 2017.  What does that mean?

23        A     I'm not sure because I'm not sure what they

24   mean by CCM.  Generally, when we do -- when we make

25   systems updates, it's either done through a file

1    maintenance or a customer service request to Gainwell

2    Technologies oversees the FMMIS, so --

3         Q    You were familiar with the programming of the

4    ICD-10 codes, but you're not familiar with programming

5    of the gender codes?

6         A    Well, no, I'm familiar with the -- how

7    diagnosis codes are programmed in the system, but this

8    CCM acronym I'm not familiar with.

9         Q    What is a gender code?

10        A    You mean a gender code?  Well, what they mean

11   by gender codes, I'm assuming that means the ICD-10 Code

12   F64.  That's -- that's assuming that's what that means.

13        Q    What's a B for both?

14        A    Maybe that's written reference to male and

15   female.

16        Q    What is the significance of that?  Why does it

17   matter if it's -- what are the options?  B for both and

18   then, what, M for male, F for female?

19        A    That could -- I mean, that's what I'm assuming

20   based on -- based on this email chain.  I mean, it's a

21   little difficult because -- I mean, there's a lot of

22   extrapolation and it's -- much of it's open to

23   interpretation, so --

24        Q    Sorry, I lost my place.  Please prepare a CCM

25   to remove gender code from all the NDC's.  What are

Page 232

1    NDC's?  You said that?

2         A    National drug codes.  So that's almost like --

3    kind of like a procedure code, because each drug has a

4    corresponding NDC.  So the system doesn't recognize drug

5    names or recognize national drug codes.

6         Q    Okay.  And that was actually -- that

7    instruction was provided to someone -- Arlene Elliot

8    sent that instruction to someone back in 2017, to remove

9    the gender code.  Do you have any idea why Magellan and

10   AHCA were talking about this on June 3rd?

11        A    No.  We hadn't announced that we were going to

12   do a categorical exclusion yet.

13        Q    Okay.  I think this is just a place where

14   we're going to need to reserve some time for deposition

15   after you're able to do some adequate research on what

16   the information this email contains, and then we can do

17   some follow-up questioning.  Okay.

18             You mentioned earlier, were there any

19   communications from the plans about the exclusion prior

20   to its adoption?

21        A    What do you mean?  Do the plans have any -- do

22   we discuss with the plans prior?  No.

23        Q    All right.  Turning to waivers and variances

24   under Chapter 120, are you familiar with that process?

25        A    Oh, yes, I am.

Page 233

1      Q    Okay.  I'm going to hand you a copy of the

2   statute, Section 120.542.  We'll mark that as Exhibit

3   20.

4           (Whereupon, Exhibit No. 20 was marked for

5   identification.)

6   BY MS. DEBRIERE::

7      Q    Are you familiar with the statute?

8      A    Yes, I'm familiar with it.

9      Q    Based on your understanding, what is the

10  purpose?

11     A    So the purpose of this is because, of course,

12  agencies are granted rulemaking authority.  And because

13  agencies now -- and, of course, the rulemaking process,

14  I mean, it's public, transparent, but there are times

15  that there may be an exception that's required, so it's

16  kind of like the check and balances that if a variance

17  is required on a rule that -- like a party could apply

18  to that agency that administers that rule for

19  consideration of a variance.

20     Q    Does the purpose of the underlying rule have

21  to -- the spirit of it have to be met in granting the

22  variance or waiver?

23     A    What's meant by the spirit?

24     Q    I'm trying to look for the specific language.

25  So under subpart two, variance and waiver shall be

1    granted when the person subject to this rule

2    demonstrates the purpose of the underlying statute -- I

3    guess in this case it would be a rule -- or what statute

4    will we be referencing?

5         A    Well, in legal terminology, I mean,

6    differences between rule and statute, I mean, statutes,

7    of course, are approved by the legislature, goes to the

8    Governor, and the rules are done under the authority of

9    the statutes.  So, I mean, like agencies are authorized

10   to grant variances and waivers to requirements of the

11   rules consistent with the section and with rules adopted

12   under the authority of the section.  So, I mean, they do

13   call out rules, specific.  Then, of course, this applies

14   to all state agencies, so --

15        Q    Who makes a determination at AHCA whether a

16   petitioner has established a substantial hardship under

17   the statute?

18        A    Those come through our General Counsel's

19   office.  So if somebody wants to request a variance,

20   they do so through our agency clerk.

21        Q    And how is the determination itself made?

22        A    So the agency clerk will reach out to

23   individuals to, of course, who have pertinent knowledge

24   about the -- about the circumstances of the request of

25   the variance, will ask for input.  And, of course, the

Page 235

1    determination's made.  It rides up to the Secretary.

2    The Secretary has to do the final approval for a

3    variance.

4         Q    So same question as to determining whether

5    principle -- principles of fairness are violated, who

6    makes that determination?

7         A    So when it comes to waivers and variances,

8    that's same process.  Goes to the agency clerk.  Then,

9    of course, does an investigation, consults with

10   individuals who are knowledgeable about the pertinent

11   subject, and then it goes up to the Secretary.

12        Q    Has AHCA developed any criteria to guide its

13   determination of whether to grant a variance or waiver

14   from the categorical exclusion of gender-affirming care?

15        A    No.  No, we haven't.  Variances are determined

16   on a very individualized basis.

17        Q    So, again, turning back to the -- ensuring the

18   purpose of the underlying statute, 120.542 specifically

19   states that variance and waivers shall be granted when

20   the person subject to the rule demonstrates that the

21   purpose of the underlying statute will be or has been

22   achieved by other means for the person.  So that means

23   the granting of the variance or waiver shows that the

24   purpose of the underlying statute will be or has been

25   achieved by granting it.  What statute -- in reviewing

Page 236

1    any request for a variance or waiver from 159G-1.050(7),

2    how would you demonstrate that the purpose -- well, what

3    statute will be at issue, first of all?

4         A    Well, for the statute -- I mean, would be

5    Chapter 409.  Those are the Florida Medicaid -- that

6    consists of the Florida Medicaid statute, so --

7         Q    What specific -- what specific provision of

8    409 would you be looking at?

9         A    I mean, we'd be looking at -- well, for the

10   variance, we'd probably be looking at, like, I mean,

11   somewhere under 409.9, probably under covered services

12   or optional services.

13        Q    Okay.  So how -- if someone requested a waiver

14   or variance from 59G-1.050(7), under what circumstances

15   would AHCA authorize coverage of the services listed in

16   that rule?

17        A    Well, we can't speak to those because I don't

18   think -- we haven't gotten a request for variances on

19   this yet.  So like it says, a highly individualized

20   process.  We will be looking at in-depth at the

21   recipient, looking at all the records available, and, of

22   course, discussing things with various experts and so

23   forth.  But each request is individualized.  So because

24   each request is individualized and focuses on the

25   specific individual, we can't project on what grounds we

1   would grant a variance under.

2       Q    Well, so the June -- the categorical exclusion

3   of treatment for gender dysphoria was adopted because

4   the certain -- AHCA found that those services were

5   experimental, correct?  And Florida Medicaid cannot

6   cover services that are experimental?

7       A    That's correct.

8       Q    So in what situation could AHCA grant a waiver

9   or variance covering services that AHCA has found to be

10  experimental?

11      A    Well, I mean, based on the rule we wouldn't.

12  I mean, based on the rule, we would deny the variance,

13  but because each variance, it's individualized requests,

14  we would have to go through and evaluate each one

15  individually.

16      Q    Would the person have to establish that the

17  service they're requesting is not experimental?

18      A    We will not be placing the burden on the

19  recipient.

20      Q    Who would the burden be on?

21      A    Well, that would be on -- it'd be an

22  individualized process, evaluating all the -- all --

23  whatever medical records that we can get a hold of.

24  That's -- that's process that we use in the past, but

25  based on the rule, I mean, yeah, we say that these

Page 238

1    would -- you have a categorical exclusion.  While we --

2    while the variance process is available, but because we

3    have a categorical exclusion, we do declare the services

4    to be experimental, investigational due to

5    very-low-quality evidence that -- yeah, I mean, we would

6    deny variance, but because variance reviews are

7    individualized, we don't want to speak in absolute terms

8    on the variance process.  But for -- because, I mean,

9    there's all kinds of questions that could come up in the

10   review of the medical records.  Maybe it was a -- maybe

11   it was a misdiagnosis.  Maybe something else could come

12   up.  That's pretty much why.  So --

13        Q    Okay.

14        A    Everything is different and --

15        Q    If a person sought a waiver of the application

16   of 59G-1.050(7) so they can receive Medicaid coverage

17   for a mastectomy that is specifically to treat their

18   gender dysphoria, under what circumstances would that

19   waiver be granted?

20        A    For -- under what circumstances?

21        Q    Yeah.

22        A    Well, I mean, we did declare this service to

23   be experimental investigational.

24        Q    So they could not get a waiver, correct?  The

25   waiver would be denied?

Page 239

1        A     Based on the very general, hypothetical
2    situation that you provided, straight out just for
3    gender dysphoria, they got denied by their insured so
4    they request a variance.
5        Q     Yeah.
6        A     Based on our rule language, yeah, it'd be
7    denial.
8        Q     And someone is entitled to a fair hearing when
9    Medicaid coverage is denied, correct?
10       A     Yes, they are.
11       Q     Given that the Agency has found the services
12   in 1.057 -- 59G-1.050(7) to be experimental, and
13   therefore never medically necessary, correct?
14       A     Correct.
15       Q     Could someone ever prevail at a fair hearing
16   where they sought coverage of the services for gender
17   dysphoria?
18       A     Well, based on our rule, based on our
19   findings, no.
20       Q     Could someone use the variance or waiver
21   process to get around the final decision issued after
22   the fair hearing?
23       A     Well, I mean, they can request a variance, but
24   then they would go through the process, but based on our
25   rule and our findings, no.

Page 240

1      Q    How often do Medicaid beneficiaries file
2  variance requests?
3      A    So in the research for this case, we found 10
4  requests, and that's since going back to about 2015,
5  2016.
6      Q    Okay.  So between 2015, 2016 to present, there
7  has been 10 requests?
8      A    That's correct.
9      Q    Okay.  These variances -- and I have copies of
10 all of them, if you'd like to reference them.  They
11 request that a service that AHCA affirmatively covers.
12 So there's -- there's a few types of variances we found
13 in our review.  There's situations in which AHCA
14 affirmatively covers the service, but the individual
15 wants an amount greater -- in a greater amount or
16 duration.
17     A    Yeah, I'm familiar with that one.  It's --
18 there was a variance request -- and it was actually
19 several various requests, because they were granted for
20 six months at a time.  We're talking about our recipient
21 under our I-budget waiver.  So, of course, our I-budget
22 waiver -- and no, it isn't, it's codified in rule.  So,
23 of course, there was a service limit on these behavior
24 assistance services at the time.  They were requesting
25 additional behavior assistance services.  So while -- so

Page 241

1    because we already covered the service, and they're just

2    looking for additional services, you know, and that

3    that's -- that's flexibility that we can grant because

4    we haven't actually gone through -- the service they are

5    requesting, we have not codified as a categorical

6    exclusion, and we've not deemed that service be

7    experimental investigational.

8         Q    Okay.  And that's true for all the services

9    that are contained in the variances --

10        A    Yeah, from what I could tell, they're pretty

11   much all I-budget.

12        Q    Okay.  And they -- none of the services that

13   they were requesting some kind of variance on had been

14   categorically excluded, correct?

15        A    Correct.

16        Q    Okay.  And none of them have been determined

17   experimental?

18        A    Right.

19        Q    Okay.  Do you know of every Medicaid recipient

20   who made a request for a variance, if they were

21   represented by counsel?

22        A    No, we don't know if they were all represented

23   by counsel or not.

24        Q    Because I did notice that the recipients were

25   all listed.

Page 242

1        A     Yeah, the recipients were listed.   The

2     information is referred to the agency clerk.   Then the

3     Agency does its internal processes.

4        Q     Do you know what pro se means?

5        A     No.

6        Q     So, in any of the requests for variances to

7     the Medicaid recipient, him or herself, do any of the

8     direct request for the variance, or did they need

9     assistance?

10       A     Given the complexities of request and

11    legalities of it, I would -- I think it's safe to say

12    that they had some assistance, although it's not

13    required.

14       Q     Okay.   Between April of 2022 and August 21st

15    of 2022, did anyone at AHCA ever discuss the variance or

16    waiver process for use in challenging a denial based on

17    the categorical exclusion of treatment for gender

18    dysphoria?

19       A     No.

20       Q     All right.   Turning to our specific clients,

21    at anytime prior to August 21st, 2022, did Florida

22    Medicaid cover any of the services listed at

23    59G-1.050(7) for the treatment of gender dysphoria and

24    that actually --

25       A     You're talking about --

Page 243

1      Q      Everyone.

2      A      You're talking about after the hard date when

3   the ruling took effect?

4      Q      Anytime prior to that, did Florida Medicaid

5   cover any of the services listed at 59G-1.05 --

6      A      Prior to the effective date, yes.

7      Q      Okay.  So they covered puberty blockers?

8      A      Yes.  Well, for that small handful of

9   recipients we pulled the data on, yes.

10      Q      They cover cross-sex hormone therapy for the

11   treatment of gender dysphoria?

12      A      Yeah.  I mean, as far as data showed.

13      Q      Did they cover surgery for the treatment of

14   gender dysphoria?

15      A      From our data revealed, yes.

16      Q      At any time prior to August 21st, 2022, did

17   Florida Medicaid cover any of the services listed at

18   59G-1.050(7) for August Dekker?

19      A      We did go through our -- we did go through

20   there the recipient's histories, yeah.

21      Q      Did Florida Medicaid cover puberty blockers

22   for August Dekker to treat gender dysphoria?

23      A      For August Dekker?

24      Q      Yes.

25      A      Puberty blockers?

Page 244

1    Q    Yes.

2    A    I don't believe so, no.

3    Q    Did Florida Medicaid cover hormone therapy for

4  August Dekker in treatment of gender dysphoria?

5    A    For August Dekker, yes.  I think -- I think

6  his managed care plan, Humana was providing him those.

7    Q    And he's still currently eligible for Florida

8  Medicaid?

9    A    Last time we checked he was still Medicaid

10  eligible.

11    Q    Okay.  And he's still enrolled in Humana, or

12  did he switch to another plan?

13    A    Well, we haven't -- we haven't verified

14  since -- we did have an enrollment period and recipients

15  are eligible to switch plans during that enrollment

16  period.

17    Q    In the coverage of hormones for treatment of

18  August Dekker's gender dysphoria, how long -- for how

19  long did AHCA authorize that treatment?  For how long

20  did Florida Medicaid cover that treatment?

21    A    I don't know the exact length.  We would have

22  to go back and take a look at the records we received

23  from Humana on the case.

24    Q    More than six months?

25    A    I think it was more than six months.

Page 245

1      Q    More than a year?

2      A    That's where it gets hazy.

3      Q    Was coverage for hormones to treat gender

4   dysphoria terminated for August Dekker after August

5   21st?

6      A    According to rule, yes, it would be

7   terminated.

8      Q    Did Florida Medicaid cover surgery for August

9   Dekker and treatment of gender dysphoria?

10     A    Yes.

11     Q    When?

12     A    So that would have been prior to the -- that

13   would have been prior to the challenge exclusion being

14   implemented.  Then to clarify, that was -- is -- the

15   managed care plan was covering that outside our state

16   plan benefits.

17     Q    How do you know that?

18     A    Because our state plan does not -- does not

19   specify the service as being -- as being mandated for

20   coverage.  In other words, if Humana had denied the

21   service, well, it would have just been a denial because

22   it's not a -- Medicaid doesn't -- we don't have that in

23   our state plan.  Managed care plans have to cover all

24   state plan services.  Sex change operations are not a

25   state plan covered service.

1      Q     Surgery is a state plan covered service?

2      A     Surgery, yes, but for -- but not for this --

3  necessarily this condition.

4      Q     Does the state plan specify for what

5  conditions services are provided?

6      A     No, it doesn't break down the diagnosis codes,

7  but this was one -- was the plan's discretion.  The plan

8  could have said yes.  The plan could have said no.  It

9  was up to the plan.

10      Q     Were federal Medicaid match dollars used to

11  pay for August Dekker's surgery?

12      A     So capitation rates that we pay to the plans

13  are per-member per-month rate.  That is a combination of

14  federal matching dollars and state revenue.

15      Q     Okay.  At any time prior to August 21st, 2022,

16  did Florida Medicaid cover any of the services listed at

17  59G-1.050(7) for Brit Rothstein?

18      A     Based on the -- based on the records that we

19  pulled, based on the recipient's individual histories

20  that we were -- we were able to locate, looked like,

21  yes, we did.

22      Q     Okay.  Did Florida Medicaid ever cover puberty

23  blockers for Mr. Rothstein?

24      A     So for Mr. Rothstein -- so for Mr.

25  Rothstein -- I -- so.  Sorry.  I think he's one of the

1   adult plaintiffs?

2        Q    Yes.  Yes.  And you said that he -- I'm

3   sorry -- pulled in a lot of directions.

4        A    We did cover services that we did determine to

5   be experimental investigational prior to the challenge

6   exclusion.

7        Q    And no longer cover them, correct?

8        A    Yes, because of the challenge exclusion.

9        Q    Same question for KF.

10       A    Since -- with KF, we did have a hard time

11  since for the minors we didn't have, like, their full

12  identification information.  Trying to locate their

13  records in the system, I think there were encounters,

14  based on information we had, that did show they were

15  receiving GnRH.

16       Q    Okay.  For the treatment of gender dysphoria?

17       A    Yeah.

18       Q    Okay.  And that includes Susan Doe, as well?

19       A    Based on what we could find, looked like

20  they -- that there had been some coverage.

21       Q    And they're -- KF is still currently eligible

22  for Florida Medicaid, is that correct?

23       A    We would have -- I think -- I think they would

24  be, because we haven't been doing these determinations

25  because of COVID.  So, yes, they would still be

Page 248

```
 1   Medicaid-eligible.  That would go for all the
 2   plaintiffs.
 3            MS. DEBRIERE: Okay.  Let's -- can we take a
 4        five-minute break?
 5            MR. JAZIL: Sure.
 6            VIDEOGRAPHER: Okay.  This concludes video
 7        four.  The time is 4:15 p.m.
 8            (Brief recess.)
 9            VIDEOGRAPHER: This is the beginning of video
10        five.  The time is 4:30 p.m.  We're on the record.
11   BY MS. DEBRIERE::
12        Q    All right.  Turning back quickly to plaintiff
13   August Dekker, did Humana violate Florida Medicaid
14   policy by covering his surgery for treatment of gender
15   dysphoria?
16        A    No, they did not at the time.
17        Q    Okay.  And then I just want to talk about a
18   few more exhibits.  One labeled -- we've marked as
19   Exhibit 21, and that is the GAPMS queue that was
20   provided to us.
21            (Whereupon, Exhibit No. 21 was marked for
22   identification.)
23   BY MS. DEBRIERE::
24        Q    And it looks like the most recent date on that
25   queue was maybe an update to one of the GAPMS in 2019.
```

Page 249

1      That's as far as it goes.  Are all -- are these the only
2      GAPMS that are currently pending?
3           A    So the requests came in to pull the most
4      recent GAPMS queue.
5           Q    Yeah.
6           A    So at this -- when I went through our -- we
7      have a GAPMS folder that's on our shared drive.  I did
8      look through to see what -- we have a folder for the
9      GAPMS queues.  I did pull the most recent one.  This was
10     the most recent one that had been updated that was in
11     there --
12          Q    I'm sorry.  Go ahead.
13          A    This does -- this does consist of a lot of
14     GAPMS reports, which I do remember drafting some of
15     those as well, but this was our most recent one.
16          Q    And have there been GAPMS reports created
17     after 2018?
18          A    Yeah, I think there have been.
19          Q    Why aren't they on this list?
20          A    I'm not -- I'm not sure why they wouldn't be
21     included on this list.  This list should be updated on
22     regular basis, so I'm not sure why they wouldn't be
23     included on this, or on the list on the share drive,
24     because the GAPMS queue is really is not so much for the
25     GAPMS analyst, because GAPMS analysts generally have a

1    pretty good idea of what's outstanding, what's pending,

2    and what's been turned in.  It's more for leadership --

3    or their supervisor to pull and take a look at when

4    necessary, so I'm not sure why this hasn't been listed

5    to update in this current.

6         Q    So whoever's working in GAPMS at the time has

7    a good understanding of which GAPMS are pending.

8         A    When I was -- when I had the role, I could

9    tell you exactly where all my reports were, what their

10   status was and where they stood in the queue.  So, yeah,

11   I kind of had all committed to memory.

12        Q    Okay.  Would that be true of anyone holding

13   that GAPMS position?

14        A    As far as pulling it from memory, I couldn't

15   vouch for the other employees as to their memories, when

16   it came down to their reports that are outstanding.

17        Q    But they should have a good sense?

18        A    They should have a good sense of what's

19   pending and what's been turned in.

20        Q    Can you provide us a list of what's pending

21   that's not listed on this queue?

22        A    So I think -- so I think the ones that are

23   still pending aren't -- I think there were, like,

24   reopened reports.  I think we had gotten requests from

25   the manufacturers of Atheno, was the asthma tests that I

1    discussed earlier.  That was one I had to have

2    finalized.  We've gotten a request for them to -- for us

3    to review it, provided that they don't send some more

4    evidence and more studies that have been done after our

5    original report.  So I think that one was reopened.

6    That one should still be pending.  Then there was

7    specially modified low-protein foods.  That was another

8    one that I had written up.  We had gotten requests to

9    reopen that one that, and to reevaluate that service.  I

10   think there was another one, which was the -- which was

11   a bone growth stimulator called Exigent.  I think that

12   one is still outstanding and pending.  Now, those are

13   just some examples of ones I can think are still

14   pending.

15        Q    Were there any new requests made after

16   December of 2018?

17        A    Yeah.  I mean, there have been some new

18   requests for either, like, expedited GAPMS or full

19   GAPMS.  I mean, we do get the service requests in fairly

20   frequently, so --

21        Q    Because it would be odd if any new requests

22   hadn't come in almost five years --

23        A    Correct.  Yeah.

24        Q    Okay.  But there's no way -- all right.  And

25   then I just want to put into the record, because we've

Page 252

1    been referring to it quite a bit, we'll Mark it as

2    Exhibit 22, and that is the document from Health and

3    Human Services that we've referenced multiple times

4    during the deposition.  Is that the one you're referring

5    to?

6          A    That's correct.  This is it.

7               (Whereupon, Exhibit No. 22 was marked for

8    identification.)

9    BY MS. DEBRIERE::

10         Q    Thank you.  And then the guidance from the

11   Florida Department of Health regarding treatment of

12   gender dysphoria for children and adolescents dated

13   April 20th, 2022.  That's Exhibit 23.  Is that the

14   document that we've been referring to when we're talking

15   about DOH guidance?

16         A    Yes, it is.

17              (Whereupon, Exhibit No. 23 was marked for

18   identification.)

19              MS. DEBRIERE: And then -- I think that's it

20         for my questions.  The only thing I wanted to put

21         on the record, Mo, is we are at what time,

22         Videographer?

23              VIDEOGRAPHER: Do you mean the whole run time

24         or --

25              MS. DEBRIERE: Just the questioning time.

Page 253

1        Yeah, the time that we've been live and active on

2        the record.

3             VIDEOGRAPHER: Five hours, eight minutes plus

4        five and a half minutes.

5             MS. DEBRIERE: Okay.  So want to just say that

6        we have an hour and 45 minutes of questioning --

7             MR. JAZIL: Sure.

8             MS. DEBRIERE: -- to reserve?

9             MR. JAZIL: And so the depo is open.  I'd like

10       to ask questions at the end.  So I'll just reserve

11       that until after our second session, is that okay,

12       or would you like for me to --

13            MS. DEBRIERE: Can I confer with my team

14       quickly?  Okay.

15            VIDEOGRAPHER: We will remain on the record?

16            MS. DEBRIERE: We'll go off the record.

17            VIDEOGRAPHER: Okay.  Off the record at 4:36

18       p.m.

19            (Discussion off the record.)

20            VIDEOGRAPHER: We're back on the record.  The

21       time is 4:37 p.m.

22            MS. DEBRIERE: And plaintiff's counsel is all

23       finished with their questioning.

24                         EXAMINATION

25   BY MR. JAZIL::

Page 254

1      Q      This is Mohammed Jazil for the defense.  I'll

2   try to be brief, recognizing we have time limitations

3   here.  Mr. Brackett, I'd like to have you look at

4   Exhibit 3 again.

5      A      Okay.

6      Q      Exhibit 3 has a date on it, May 20th, 2022.  I

7   want the record to be clear, why is that date not

8   accurate?

9      A      This date isn't accurate because that date

10  is -- automatically sets to the date you print it out.

11     Q      And what sets that date?

12     A      The template is automatically set to enter in

13  this current date that you're viewing the document.  So

14  it automatically updates the second you open it.

15     Q      And that's the template in the AHCA document?

16     A      That is our template, yeah.

17     Q      And when was this GAPMS report created?

18     A      This GAPMS was originally created in 2016.

19     Q      Thank you.  You discussed with my friend the

20  variance and waiver process.  Do you recall that

21  testimony?

22     A      Yes.

23     Q      You testified that the variance and waiver

24  process is individualized.  Do you recall that

25  testimony?

1      A    Yes, I do.

2      Q    Once a variance and waiver request comes in,

3  it goes to the clerk is what you testified to, if my

4  understanding is correct?

5      A    Yes.

6      Q    And then the clerk routes it to whom?

7      A    The clerk gathers information and it has to be

8  routed up to the secretary.

9      Q    Is it routed directly to the Secretary or is

10  there any other office that it goes through first?

11      A    I'd have to take a look at the variances

12  again.  It might be -- I think it probably have to route

13  through General Counsel before it goes to the Secretary.

14      Q    Okay.  And is the General Counsel's office

15  responsible for the formulating the Agency's position on

16  legal issues?

17      A    Yes.

18      Q    Does that include the variance and waiver

19  process?

20      A    Yes.

21          MR. JAZIL: I have no further questions.

22                    FURTHER EXAMINATION

23  BY MS. DEBRIERE::

24      Q    Just one redirect.  Very brief.  On Exhibit 3,

25  which is the GAPMS memo dated May 20th, 2022, that was

1   the date it was printed out.  It also appears changes

2   were made on that date, is that correct?

3        A    Based on the comments in the edits, yeah, it

4   looks like somebody had made changes to that document on

5   that date.

6        Q    But you don't know who that person is?

7        A    SG, I'm -- I can't speak to who SG is.

8        Q    But you will find that information out for us?

9        A    We can -- we can figure out who, but we

10  would -- probably want to verify with IT.

11            MS. DEBRIERE: Okay.  That's all.

12            MR. JAZIL: So, counsel, while we're still on

13       the record, he's still under oath, so I'm not going

14       to obviously talk to him about any issues that

15       might come up, but with your consent, I'd like to

16       at least work with him to gather the additional

17       information that's being sought.  Is that

18       appropriate?

19            MS. DEBRIERE: I mean, I would assume that

20       would be your process.

21            MR. JAZIL: He is under oath, and so I'm

22       obviously not going to try to, you know --

23            MS. DEBRIERE: I see.  I see.

24            MR. JAZIL: -- work with him while -- work with

25       him on his testimony, I say, as I try to gather

Page 257

1     additional information, so I'll make that clear on

2     the record.

3              VIDEOGRAPHER: Anyone else?  Anybody by Zoom?

4              MS. DEBRIERE: No.

5              VIDEOGRAPHER: Okay.  This concludes the

6     February 8th, 2023 portion of the video-recorded

7     deposition of Corporate Representative for Agency

8     for Health Care Administration.  The time is 4:40

9     p.m.

10             COURT REPORTER: Are you going to be ordering

11    this?

12             MS. DEBRIERE: Yes.

13             COURT REPORTER: All right.  And Mo has

14    requested a rough draft.  I told him I could get it

15    to him tomorrow.  Do you guys -- would you guys

16    like one, as well?

17             MS. DEBRIERE: Yes, please.

18             (Whereupon, the deposition was concluded at

19    4:40 p.m., and the witness did not waive reading

20    and signing.)

21

22

23

24

25

Page 258

1                      CERTIFICATE OF OATH

2

3

4

5     STATE OF FLORIDA   )

6     COUNTY OF LEON     )

7

8

9            I, the undersigned authority, certify that the

10    above-named witness personally appeared before me and

11    was duly sworn.

12

13           WITNESS my hand and official seal this 21st

14    day of February, 2023.

15

16

17

18

19    _____._____

20    DANA W. REEVES
      NOTARY PUBLIC
21    COMMISSION #GG970595
      EXPIRES MARCH 22, 2024

22

23

24

25

Page 259

1              CERTIFICATE OF REPORTER
2     STATE OF FLORIDA    )
      COUNTY OF LEON      )

3

4         I, DANA W. REEVES, Professional Court
5     Reporter, certify that the foregoing proceedings were
6     taken before me at the time and place therein
7     designated; that my shorthand notes were thereafter
8     translated under my supervision; and the foregoing
9     pages, numbered 128 through 257, are a true and correct
10    record of the aforesaid proceedings.
11        I further certify that I am not a relative,
12    employee, attorney or counsel of any of the parties, nor
13    am I a relative or employee of any of the parties'
14    attorney or counsel connected with the action, nor am I
15    financially interested in the action.
16        DATED this 21st day of February, 2023.
17

18

19

20    _____._____
21    DANA W. REEVES
      NOTARY PUBLIC
22    COMMISSION #GG970595
      EXPIRES MARCH 22, 2024
23

24

25

Page 260

1    Gary V. Perko, Esq.
     gperko@holtzmanvogel.com

2

3                        February 21, 2023

4

5    RE:    August Dekker, et al. vs. Jason Weida, et al.
6           February 8, 2023/Matthew Brackett/5696545

7

     The above-referenced transcript is available for review.
8    The witness should read the testimony to verify its
     accuracy. If there are any changes, the witness should
9    note those with the reason on the attached Errata Sheet.
     The witness should, please, date and sign the Errata
10   Sheet and email to the deposing attorney as well as to
     Veritext at Transcripts-fl@veritext.com and copies will
11   be emailed to all ordering parties.  It is suggested
     that the completed errata be returned 30 days from
12   receipt of testimony, as considered reasonable under
     Federal rules*, however, there is no Florida statute to
13   this regard.  If the witness fail(s) to do so, the
     transcript may be used as if signed.

14

15   Yours,
16   Veritext Legal Solutions
17   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e).

18
19
20
21
22
23
24
25

Page 261

1   August Dekker, et al. vs. Jason Weida, et al.

2   February 8, 2023/Matthew Brackett

3                    E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it

20  are true.

21

22  _____   _____

23            Matthew Brackett                  DATE

24

25

[& - 257]

**&**

**&** 126:19

**0**

**000169125**
226:9
**0002587** 216:21
**000258815**
221:6
**000292335**
201:16
**00325** 125:3

**1**

**1.05** 243:5
**1.050** 148:23
149:3 174:3
189:13 204:19
213:8 236:1,14
238:16 239:12
242:23 243:18
246:17
**1.057** 239:12
**1.310** 260:17
**10** 149:16
154:21 159:4
224:25 231:4,11
240:3,7
**10005** 126:13
**10:35** 216:5,19
**110** 126:14
**119** 126:20
**11:04** 216:18
**12** 149:17
**120** 126:12
212:4 232:24

**120.542** 127:17
206:1 209:18,24
235:18
**120.542.** 233:2
**1229** 126:7
**125** 125:11
**128** 127:4 259:9
**12th** 126:7
**13** 127:11
152:14
**14** 127:12
162:20 163:6
227:12
**15** 127:13 200:4
201:24 202:11
**1512** 126:14
**153** 127:11
**159g** 236:1
**16** 127:14
199:24 213:22
213:22 214:3
**163** 127:12
**17** 127:14
213:22 214:1,3
214:8
**18** 127:15 221:7
221:9
**19** 127:16
226:18,21
**19th** 126:12
**1:30** 125:15
128:8
**1st** 158:2,3

**2**

**2** 125:11
**20** 127:17 233:3
233:4
**2002** 162:16
**2015** 208:4,5
240:4,6
**2016** 143:3
240:5,6 254:18
**2017** 139:11
151:9 230:22
232:8
**2018** 249:17
251:16
**2019** 248:25
**202** 127:13
**2022** 127:14,14
127:16 128:13
128:18 129:2
135:8 140:6
147:14,19 151:1
157:6,16 160:11
163:7 164:12,18
164:23 168:23
171:21 178:10
201:22 207:10
208:10 213:24
214:2 216:5
220:16 226:24
242:14,15,21
243:16 246:15
252:13 254:6
255:25
**2023** 125:14
147:13 257:6

258:14 259:16
260:3,6 261:2
**2024** 258:21
259:22
**20th** 157:24,25
158:3 227:11,16
252:13 254:6
255:25
**21** 127:17
248:19,21 260:3
**210** 137:24
**215** 127:14,14
**21st** 207:10
208:10 242:14
242:21 243:16
245:5 246:15
258:13 259:16
**22** 127:14,14,18
213:24 216:5
252:2,7 258:21
259:22
**222** 127:15
**227** 127:16
**22nd** 214:2
216:18
**23** 127:18 211:2
252:13,17
**234** 127:17
**24** 168:22 170:2
**245,000** 137:24
**249** 127:17
**253** 127:5,18,18
**255** 127:6
**257** 259:9

**25th** 147:13
**261** 125:11
**26th** 201:22
**2727** 125:17
**27514** 126:15
**29229** 258:18
259:19
**2nd** 166:4
168:11 169:25
184:3

**3**

**3** 254:4,6 255:24
**30** 212:25
260:11,17
**3100** 126:9
**32205** 126:4
**32301** 126:20
**32308** 125:17
**32601** 126:7
**33131** 126:10
**34,999** 138:2,3
**35** 138:2
**35,000** 136:16
136:21,25
137:23 138:23
177:22
**3900** 126:4
**3:00** 199:12
**3:08** 199:15
**3rd** 127:16
168:14 170:1
226:24 232:10

**4**

**409** 236:5,8
**409.9** 236:11
**45** 253:6
**46** 164:13
187:19
**47** 193:1
**4:15** 248:7
**4:22** 125:3
**4:30** 248:10
**4:37** 253:21

**5**

**50** 149:15,21
152:16 155:12
**500** 126:20
**5696545** 260:6
**59** 148:23 149:3
169:4
**59g** 174:3
189:13 204:19
213:8 236:14
238:16 239:12
242:23 243:5,18
246:17

**6**

**60** 216:25 217:2
217:14,16 218:7
218:17,20,23
219:23 220:7
222:3,5
**600** 126:9
189:14

**7**

**7** 138:4 148:23
149:3 174:3
204:19 213:8
236:1,14 238:16
239:12 242:23
243:18 246:17
**70s** 163:3

**8**

**8** 125:14 260:6
261:2
**88** 158:12
**8th** 128:14,25
188:8 257:6

**a**

**a.m.** 216:5,18,19
**aap** 162:9,10
194:7
**aap's** 162:11
**abc** 144:10
**ability** 132:4
**able** 140:15
149:20 151:25
158:14 159:14
175:11,15
178:24 179:12
179:22 182:9
185:16 192:23
192:24 229:22
230:1 232:15
246:20
**above** 258:10
260:7

**absence** 155:7
**absolute** 150:18
238:7
**absolutely**
202:3 212:13
**academic**
160:18
**academy** 190:16
**accepted** 204:10
**access** 191:21
218:11,13,19
225:10
**accessible**
175:10 187:23
188:4
**accordance**
212:23
**account** 132:1,2
154:23
**accuracy** 260:8
**accurate** 204:14
204:16 254:8,9
**achieved** 235:22
235:25
**acronym** 231:8
**act** 173:1,12,21
173:24
**acting** 134:21
138:10
**action** 259:14
259:15
**active** 217:11
253:1
**actively** 139:25

activists  161:1

activities  196:21

activity  193:24

actual  132:15
  132:20 172:5
  202:9 203:15

actually  132:6
  133:11 137:14
  139:9 144:7
  149:14 153:11
  153:12 163:13
  167:17 179:10
  180:3 182:18
  192:4 205:6,8
  206:18 218:3
  222:25 226:10
  226:14 232:6
  240:18 241:4
  242:24

acute  196:19

ad  192:19

adapt  140:15

add  146:12

added  145:24
  146:12 155:25
  216:6

adding  170:22

addition  170:10
  170:13

additional
  178:8 240:25
  241:2 256:16
  257:1

addressed
  222:11

adds  216:9

adequacy
  175:21

adequate
  149:15 161:5
  174:11 175:1
  176:23 196:8
  223:3 232:15

adjuvant
  151:11

administers
  233:18

administration
  125:16 257:8

administrative
  171:25 176:19
  213:10,14

administrator
  169:12 170:15

adolescence
  228:1

adolescents
  127:19 226:25
  252:12

adopt  164:23
  165:22 168:8,10
  168:23 169:7,24
  171:20

adopted  165:5
  218:19 219:22
  234:11 237:3

adopting  172:25
  173:24

adoption  159:10
  204:23 206:11

207:21 232:20

adult  186:5
  247:1

adults  185:9,10
  185:12,20,23

adverse  127:13
  200:15 201:14
  201:19 202:13
  202:19 203:7,14
  204:25 207:2

adversely
  212:15

advocacy
  160:25 179:21

advocates  161:1
  179:21

affair  213:4

affect  151:13

affected  196:22
  212:15

affirmatively
  240:11,14

affirming
  131:13 133:1
  141:6,10,25
  143:20 152:19
  162:7 225:20
  235:14

aforesaid
  259:10

agencies  233:12
  233:13 234:9,14

agency  125:16
  130:13 134:22
  140:23 141:2

143:5,6 144:18
  154:1 166:13
  175:18 177:5
  180:17 181:4,17
  181:21 185:5
  186:10 192:3
  205:10 212:18
  212:21 219:5
  228:3,18 230:15
  230:22 233:18
  234:20,22 235:8
  239:11 242:2,3
  257:7

agency's  187:3
  255:15

ages  205:5

ago  135:19
  191:4

agree  202:1
  222:24 223:4

agreement
  136:12 138:20
  177:21,22,23

agreements
  136:15,23
  138:12

ahca  128:13
  131:1 132:14,23
  134:12 135:6
  136:13 138:15
  138:25 139:2,6
  140:4 144:20
  145:4,7,18
  159:11 160:7
  164:14 168:22

169:12 175:12
176:8,10,14,15
176:18 177:1
178:1 180:20
181:9,11,25
182:10,11,20,25
183:8 184:9
186:15 187:3
188:8 189:12,15
189:17 194:1
200:14,19,23,24
201:3,9 206:11
207:10,11,22
208:10,21 209:7
209:11,22 210:6
210:19 212:18
213:6 214:7
215:14 217:22
218:23 222:16
223:13,14
226:22 227:13
228:6,8,9,20,23
229:15 232:10
234:15 235:12
236:15 237:4,8
237:9 240:11,13
242:15 244:19
254:15
**ahca's** 186:18
202:15 206:11
213:13 215:13
219:20 220:11
**ahead** 249:12
**al** 125:5,8
194:22 260:5,5

261:1,1
**alert** 127:15
217:1 221:5,8
221:20,22,23
222:9
**alicia** 227:16
**alignment** 133:7
194:16
**alliance** 133:13
134:13 188:12
**allocated**
137:21
**allow** 222:1
226:6
**allowed** 204:17
**allowing** 177:6
**altogether**
220:20 224:18
**ama** 162:12,13
**amending**
170:22
**amendment**
170:19
**american** 162:6
190:16
**amount** 138:4
139:14 149:18
159:7 175:25
240:15,15
**amounts** 136:16
136:24 156:6
**ample** 213:10
**analog** 227:25
**analyses** 149:11

**analysis** 151:12
151:21,23
**analyst** 221:16
249:25
**analysts** 249:25
**analytics** 159:15
**analyze** 157:1
**analyzed** 194:12
**andrew** 130:13
135:24
**anecdotes**
132:13
**angles** 198:24
**ann** 163:15
213:23 216:3,25
221:18
**announced**
214:14 232:11
**announcements**
184:24
**annually** 159:11
**answer** 143:9
200:11 210:3
**answered** 200:8
**antagonists**
217:7 221:25
**anticipate** 140:8
142:3,11 143:3
174:5 179:5
182:7
**anticipated**
140:20 176:6
181:21
**anticipating**
179:11

**anticipation**
140:10
**anybody** 129:15
133:25 172:8
177:1,11,11,14
183:14 257:3
**anymore** 223:21
229:6 230:17
**anytime** 228:22
242:21 243:4
**apologize** 135:6
**appeal** 205:14
205:14 207:7
212:5,17,20,24
**appeals** 206:4
207:1,4
**appear** 181:24
181:25
**appearances**
126:1
**appeared**
258:10
**appears** 201:21
256:1
**appellate**
212:20,23 213:3
213:4
**apples** 150:22
150:22
**application**
238:15
**applies** 234:13
**apply** 218:24
233:17

approach 131:8
appropriate
  129:9 155:13
  256:18
approval 164:8
  229:16 235:2
approved 164:9
  164:14,18
  217:21 234:7
april 157:24,25
  158:2 227:11,16
  242:14 252:13
area 172:15
  225:14 229:25
areas 140:14
argument
  193:10 198:9
arkansas
  194:11
arlene 232:7
arrange 176:22
arrangements
  178:25 179:2
arranging
  174:11
article 144:8
  145:24
articles 148:8
  148:14 158:8,12
  160:14 194:13
articulate 146:8
articulately
  179:13,16
ascertain
  196:16

ashley 213:25
  216:5,10,17
  226:23 227:4
  230:6,7
aside 136:7
asked 199:17
  216:1,3
asking 130:3
  196:5 208:5
assessed 130:4,7
  130:10
assessment
  140:1,16 141:13
assist 200:19
assistance 205:4
  240:24,25 242:9
  242:12
assistant 169:15
  215:5,16 219:10
  222:22
association's
  162:6
assume 256:19
assuming
  231:11,12,19
asthma 151:11
  250:25
atheno 250:25
attached 227:4
  227:24 260:9
attacks 140:17
  192:20
attend 177:11
  177:14

attendance
  177:2
attention
  143:23 185:4
  193:4,8
attorney 259:12
  259:14 260:10
attorney's 202:2
attorneys 182:4
  200:2 210:9
audience 175:16
  179:5 187:23
auditorium
  175:14
august 125:5
  127:14,14
  207:10 208:10
  213:24 214:2
  216:5,18 242:14
  242:21 243:16
  243:18,22,23
  244:4,5,18
  245:4,4,8
  246:11,15
  248:13 260:5
  261:1
authored 136:8
authorities
  169:12
authority
  203:22 233:12
  234:8,12 258:9
authorization
  217:13 219:21
  228:14

authorizations
  217:20 229:6
authorize
  236:15 244:19
authorized
  234:9
automatically
  254:10,12,14
available
  152:23 153:17
  162:10 175:18
  178:6 236:21
  238:2 260:7
avenue 126:7,9
aware 132:23
  135:20 177:10
  199:2,4 204:6
  223:11

## b

b 148:10 227:6
  231:13,17
back 129:1
  135:6 139:11
  143:19,22,24
  147:1 159:6
  167:3 183:7
  186:3 193:11
  195:18 214:6
  221:23 223:17
  229:15 232:8
  235:17 240:4
  244:22 248:12
  253:20
background
  130:8

**backgrounds**
128:22 129:5,9
**balances** 233:16
**bans** 171:6
**bar** 211:10
**barantorchinsky**
126:19
**base** 200:2
**based** 128:22
131:7,18 132:2
132:17 133:9,19
134:1 139:7
143:25 154:16
154:16,20 157:6
157:11,14
161:15 165:2,2
185:7 186:10
191:19 220:4
231:20,20 233:9
237:11,12,25
239:1,6,18,18
239:24 242:16
246:18,18,19
247:14,19 256:3
**bases** 160:15,21
**basic** 182:22,24
182:24
**basis** 128:24
198:11 205:2
207:2 235:16
249:22
**bates** 201:15,18
202:7,8 221:6
226:16

**bear** 210:24
**becoming**
144:17
**beginning** 128:7
199:14 248:9
**behalf** 144:18
163:15
**behavior** 240:23
240:25
**behavioral**
170:16 196:15
**believe** 172:6,6
213:24 230:19
244:2
**beneficiaries**
205:1 220:12
240:1
**benefit** 200:15
201:15,19
202:14,19 203:7
203:15,25 204:5
204:13,15,25
207:2
**benefits** 127:13
203:23 245:16
**best** 134:7
142:23 174:18
**bias** 195:1
**big** 187:6 198:6
**bigger** 153:15
162:19
**billing** 224:7
**bit** 128:12 135:5
136:18 146:8
166:24 174:9

179:22 209:20
228:8 252:1
**blocked** 210:17
**blockers** 171:7
217:7 221:25
243:7,21,25
246:23
**bone** 251:11
**bostock** 195:9
**bottom** 212:14
217:3
**bound** 178:5
**box** 164:9
203:22 204:11
**boxes** 204:13
**brackett** 125:12
127:3 128:3
254:3 260:6
261:2,23
**brand** 170:11
**break** 128:11
199:9,17,18,19
199:21 246:6
248:4
**breaking** 195:5
**brickell** 126:9
**brief** 189:21
199:13 248:8
254:2 255:24
**brignardello**
133:10 194:24
**brings** 143:19
143:22
**brit** 246:17

**broad** 196:4
**brock** 174:7
176:21 177:5
183:12
**brought** 152:7
194:7
**budget** 137:21
138:1 148:25
151:3,7,12,15
151:25 240:21
240:21 241:11
**bullets** 170:22
**burden** 237:18
237:20
**bureau** 159:17
166:17 167:12
167:21 169:9,13
172:2 219:14

**c**

**california**
155:23
**call** 156:19
234:13
**called** 128:4
251:11
**calling** 182:17
**calls** 136:2
178:17
**canadian**
184:15
**cap** 138:1
177:22
**capacity** 134:21
136:10 143:7
175:17 176:24

187:7
**capitation**
246:12
**capped** 137:25
**caps** 177:25
**captured**
194:23
**cards** 197:9
**care** 125:16
127:13,15
131:13 133:1
141:6,10,18,25
150:9 152:19
154:9 157:7,11
157:12 159:15
161:17 162:4,7
189:4 191:21
200:6,7,21,24
201:19 202:22
205:8,10 207:2
213:7,12 217:10
217:16,17 218:2
218:4,5,9,12,17
218:19,24
219:23 220:8
221:8 222:4
225:18,20,22
235:14 244:6
245:15,23 257:8
**careful** 189:23
**case** 125:3
138:10 160:19
160:20 180:24
187:22 191:15
199:25 213:4

214:21 234:3
240:3 244:23
**cases** 194:1,18
195:7,10
**catch** 216:23
**catchy** 187:12
**categorical**
157:3 159:11
165:3,6,10,15
165:21,24
169:24 172:25
173:25 191:19
192:5 200:16
204:23 206:12
207:22 209:8,12
218:18 219:22
225:19 226:2
232:12 235:14
237:2 238:1,3
241:5 242:17
**categorically**
171:15 241:14
**category** 186:6
**catherine**
126:14
**cause** 195:18,18
197:22 220:22
**cc'ing** 213:23
**ccm** 227:5
230:24 231:8,24
**certain** 149:18
237:4
**certainly** 181:22
**certificate** 258:1
259:1

**certify** 258:9
259:5,11
**cetera** 132:3
137:14
**chain** 227:10
228:13 231:20
**challenge**
179:12 227:2
245:13 247:5,8
**challenging**
242:16
**change** 166:19
174:15 214:22
245:24 261:4,7
261:10,13,16
**changes** 145:22
147:6 167:1,4,4
167:15,24
169:20 189:13
213:13 214:13
217:12 256:1,4
260:8
**changing**
213:11
**chapel** 126:15
**chapter** 188:17
212:4 232:24
236:5
**charge** 171:22
**check** 201:16
203:5 233:16
**checked** 164:9
194:6,13 203:23
203:25 204:9,11
204:12,13 244:9

**checking** 187:13
**chelsea** 126:6
**chelsea's** 211:3
**chen** 129:19
130:20 158:5
189:19,24
193:14
**chief** 169:13
174:7,7,7 181:4
**child** 186:10
**children** 127:11
127:19 185:9,10
187:5 188:21
226:25 252:12
**chloe** 189:6
**choose** 164:23
**chose** 131:14
**chriss** 126:5
210:15 211:11
211:14
**christian** 133:22
134:8 188:9
**chronic** 196:19
**circling** 135:6
**circuit** 225:4
**circumstance**
156:9
**circumstances**
143:23 234:24
236:14 238:18
238:20
**cite** 194:20
**cited** 147:15,15
147:19 148:12
148:17 158:9,11

194:2,10,20
**citing** 194:13
**citizens** 134:13
  188:12
**civil** 260:17,17
**claim** 159:16
  206:11
**claims** 141:14
  143:25 188:3
  225:1
**clarified** 161:16
**clarify** 161:14
  216:6 218:4
  245:14
**clarity** 216:11
**clayton** 195:9
**clear** 130:17
  162:1 222:18
  254:7 257:1
**cleared** 210:20
**clearer** 159:19
**clearing** 225:2
**clerk** 212:18
  234:20,22 235:8
  242:2 255:3,6,7
**clients** 242:20
**clinic** 190:19
**clinical** 132:2
  137:17,19 139:7
  160:25 161:11
  228:15 229:6
**close** 177:24
**cnn** 144:9
**coalition** 133:23
  134:8 188:10

**coca** 163:1
**code** 159:21,24
  160:2,3,4
  224:13,19 227:6
  231:9,10,11,25
  232:3,9
**coders** 224:6,23
  224:23 225:3
**codes** 159:22
  224:25,25
  230:21 231:4,5
  231:7,11 232:2
  232:5 246:6
**codified** 240:22
  241:5
**coding** 224:22
**cody** 174:8
  183:11
**cola** 163:1
**cole** 171:23
  174:6 176:19
  189:6,18,24
  193:14
**collaborative**
  215:22
**collect** 152:8
**collecting**
  205:16,23
**colorful** 193:7
**column** 163:8
  164:8
**comb** 193:25
**combination**
  160:25 189:18
  246:13

**come** 138:24
  141:2 155:8
  162:8 165:14,18
  166:6,7,8,10,21
  167:1,7 177:24
  181:2 195:25
  196:6 222:22
  224:6 225:11
  234:18 238:9,11
  251:22 256:15
**comes** 149:17
  150:17 151:20
  155:19 185:12
  186:3,5 196:13
  202:23 218:12
  223:17,19 235:7
  255:2
**comfortable**
  211:17
**coming** 187:2
  195:6 224:12
**commenced**
  125:15
**comment**
  180:14 190:8,16
  190:20,20,23
  191:2,7,14
  193:1 195:20,20
  197:8
**comments**
  179:13,16,23
  180:1,17 189:12
  190:9,11,14,24
  191:3,5 192:15
  192:17 193:3,5

193:13 194:2
  195:6,8,10,12
  197:20 256:3
**commercials**
  163:2
**commission**
  258:21 259:22
**committed**
  250:11
**common** 162:25
**communicate**
  158:18 176:8,10
  188:9 220:17,23
  226:1
**communicating**
  160:10
**communication**
  136:4
**communicatio...**
  176:22 181:4
  232:19
**community**
  161:1 170:15
**comparability**
  173:1,21,23
**compared**
  175:18
**compensated**
  177:16
**competition**
  150:13
**competitive**
  136:22
**complaint**
  206:14,17

complaints
  206:16
complete   146:18
completed
  138:8 165:12
  260:11
completely
  170:15
completing
  197:10
complexities
  242:10
compliance
  206:3
complicated
  132:9
components
  184:4
composing
  146:10,10
concern   143:14
concerned
  140:17 175:21
concluded
  185:7 257:18
concludes
  199:11 248:6
  257:5
conclusion
  165:15,18
  168:23 185:21
  195:24 197:23
conclusions
  133:9 142:1
  154:23 171:21

184:10
condition
  196:19 224:3
  246:3
conditions
  196:17 246:5
conducted
  212:23
confer   223:7,7
  253:13
confidential
  202:2
confirm   208:24
  209:3
confirmation
  210:3
conflict   198:4
conflicting
  223:23
confusion   216:9
connected
  259:14
consent   256:15
consider   131:16
  135:7 141:18
  149:2 150:1,24
consideration
  132:22 143:17
  173:24 174:24
  179:24 185:14
  190:12,22
  191:20 192:3
  233:19
considerations
  185:18 186:4

considered
  135:14 142:9
  147:19 260:12
considering
  148:22
consist   249:13
consistent
  144:17 202:17
  202:18 234:11
consists   236:6
consultancy
  161:20
consultant
  131:21 136:13
  136:14 137:11
  137:25 138:5,7
  139:3,19 144:21
consultants
  129:25 131:2,10
  132:15,24
  133:12 134:10
  135:7 137:2
  138:9,14,15,16
  138:24 139:6
  140:21 142:24
  145:5,7,17
  146:15 147:1
  158:18 160:10
  160:22 162:5
  164:14 178:2,14
  179:9 180:1,20
  180:24 182:21
  183:1
consulted
  147:19,22

consults   235:9
contact   153:21
  156:15,25
contacted
  135:12,17 136:9
contacting
  135:22,23 136:1
contain   209:23
contained
  181:12 241:9
contains   164:13
  232:16
content   145:10
  145:24 170:10
  172:17 190:8
  191:12 214:20
context   142:18
  228:12,13 230:2
continue   217:17
  218:19 224:11
  226:2
continued   218:7
continuity
  217:16 218:2,4
  218:5,9,12,17
  218:24 219:23
  220:7 222:3
contract   129:3
  204:7 218:3
contracted
  137:11,18
  180:21,24
contracting
  137:3

**contracts**
202:22
**contradict**
187:17 195:14
**contradiction**
133:4,6,7
**contradictory**
165:18 198:7
**contribute**
132:5
**control**  176:20
196:8 197:16
**controversial**
142:10 174:14
**conversation**
135:1,4 172:24
173:12,15
199:24
**conversations**
134:3,5 135:13
135:18 136:3
162:8 173:16,19
173:20 199:19
199:22
**conviction**
176:5
**copied**  211:3
**copies**  178:5,7
240:9 260:10
**copy**  145:8
184:2 210:4,6
212:18 233:1
**copying**  216:17
**corporate**  257:7

**correct**  130:22
130:25 131:12
143:2 145:25
146:18 147:16
147:17 150:24
150:25 151:9
154:15 164:11
164:20 167:22
168:9,11,12,14
169:1 171:4,9
171:10 173:9
178:11,13
185:24 186:1
188:24 189:3
201:17 202:7,16
203:16,20 206:9
215:13,15,20
217:19 218:15
218:16,25
219:13 220:13
237:5,7 238:24
239:9,13,14
240:8 241:14,15
247:7,22 251:23
252:6 255:4
256:2 259:9
**corrected**  147:3
**correspond**
184:18
**correspondence**
135:20
**corresponding**
160:2 232:4
**cost**  151:12
152:4 159:7

**costs**  186:20
**council**  133:17
**counsel**  126:6
129:13 135:2,24
166:9,12 181:24
181:25 182:5,8
182:11 202:1
241:21,23
253:22 255:13
256:12 259:12
259:14
**counsel's**
169:18 172:14
176:16 182:14
182:16 234:18
255:14
**county**  258:6
259:2
**couple**  130:15
178:16,16
**course**  129:12
131:4 134:22
135:13 136:14
136:23 139:10
139:12 141:10
142:8,8,19,21
144:8 153:18
154:10 163:16
163:16 165:10
166:11 169:14
169:17 170:17
171:4,5 175:2,2
176:18 178:23
179:18 182:3
184:25 185:2,2

187:9 191:4
193:19,24
194:23 195:10
196:7,21 197:10
198:3,20 202:10
206:17 215:23
218:21 219:9
220:1 223:23
224:2,5,5,6,24
224:24 233:11
233:13 234:7,13
234:23,25 235:9
236:22 240:21
240:23
**court**  125:1,19
147:13 195:7
212:6,20 257:10
257:13 259:4
**courts**  213:3
**cover**  150:11,12
151:8,13 152:20
154:14 155:3,24
156:12 173:8
204:17,22
220:21 222:16
222:17 223:14
237:6 242:22
243:5,10,13,17
243:21 244:3,20
245:8,23 246:16
246:22 247:4,7
**coverage**  127:11
137:13 143:1,14
144:12,14,15
149:17 150:1,5

150:21,21
151:20,22 152:9
153:6,9,11
155:13 156:6,20
159:8,12 160:4
160:8 167:4,20
170:11,16,20
171:7,15,25
173:13,18
175:25 185:15
185:16 186:5
190:25 191:8,17
203:19 205:1
213:13 217:12
217:17 218:7
220:1 226:2
228:24 229:8
236:15 238:16
239:9,16 244:17
245:3,20 247:20
covered 149:22
152:3 155:15
160:15,21 171:2
203:22,25 204:5
204:12,15
218:14 220:25
236:11 241:1
243:7 245:25
246:1
covering 151:16
151:19 217:23
237:9 245:15
248:14
covers 149:3
240:11,14

covid 247:25
cpt 159:22
160:2,4 224:25
craft 168:2
create 185:2,3
187:12
created 219:6
249:16 254:17
254:18
creating 222:9
credentials
130:4,8,11
cretella 134:17
criteria 131:9
150:20 154:5
208:1,1 227:5,9
227:24 235:12
critical 194:25
cross 161:24
171:7 186:7
191:24 208:11
243:10
crowd 174:5
176:20 179:11
cumulative
146:14
cumulatively
134:23
curiosity 148:3
148:5
curious 148:14
current 143:7
217:13 219:21
250:5 254:13

currently
204:17,20
205:12 244:7
247:21 249:2
curve 140:15
customer 231:1
cut 201:21
202:8 222:18
cv 125:3
cypionate
203:19

d

d 128:1
daily 196:22
dalton 163:15
167:19 213:23
216:3 223:4,6
dana 125:18
258:20 259:4,21
data 152:9
159:15,17 243:9
243:12,15
date 125:14
146:20,22 160:5
160:6 163:8,25
164:1,4,7,7
166:3 201:21
217:15 226:23
243:2,6 248:24
254:6,7,9,9,10
254:11,13 256:1
256:2,5 260:9
261:23
date's 163:19,22
164:5

dated 201:21
213:24 214:2
227:16 252:12
255:25 259:16
dates 163:12
day 157:18
164:15 168:25
178:4 216:25
217:2,16 218:17
218:23 219:23
220:7 222:3,5
224:4 227:17
258:14 259:16
days 139:14
164:19 183:22
212:25 217:15
218:7,20 260:11
deal 150:10
154:7,11 225:12
dealing 210:18
debate 155:11
debriere 126:3
127:4,6 128:10
130:5 133:5
148:19,21
152:24 156:14
162:14,18 163:4
199:10,16 202:3
202:6,12,25
203:3,9 206:24
206:25 210:13
210:16,23 211:6
211:13,18,25
212:13 213:5
214:5 216:16

221:4,13 226:14
226:20 233:6
248:3,11,23
252:9,19,25
253:5,8,13,16
253:22 255:23
256:11,19,23
257:4,12,17
**december**
251:16
**decide** 168:23
190:5 214:19
215:6
**decided** 129:24
142:24 165:1,23
208:1 215:9
219:6,8
**decides** 169:20
**deciding** 130:11
133:11 171:1
**decision** 129:2,6
130:15,18,19,21
130:24 131:1
142:4 156:8
165:8,9,9,22
166:3,5,14,21
168:5,10 169:6
169:24 171:20
207:11,15,22
208:11,21 209:1
214:25 215:12
219:13 220:21
222:21,24 223:4
228:24 239:21

**decisions**
166:13
**declaration**
147:12
**declare** 238:3
238:22 261:19
**dede** 129:21
130:23 149:19
152:10,25 158:5
163:14 172:13
213:23 215:21
215:24,24 216:3
216:17,18
221:18
**dedicated**
184:17 187:12
**deemed** 141:17
193:3,4 214:23
222:14 241:6
**deems** 192:6
**deep** 174:16
176:4
**def** 216:21
221:6 226:9
**defend** 182:11
**defendant**
126:17 201:16
**defendants**
125:9
**defending**
133:13
**defense** 126:11
254:1
**defer** 141:8
142:1 154:17,19

183:4,5 210:9
**deferring**
168:17,20
**define** 196:2
**defined** 137:8
**definitely**
151:22 206:2
221:14 226:3
**definition** 196:4
197:22 202:16
**degree** 140:12
**dekker** 125:5
243:18,22,23
244:4,5 245:4,9
248:13 260:5
261:1
**dekker's** 244:18
246:11
**delay** 228:1,6
**delegate** 163:14
**deliberated**
219:6
**delivered**
195:16
**delivering**
223:18
**demonstrate**
187:18 236:2
**demonstrates**
234:2 235:20
**denial** 201:11
203:8,21 206:8
208:2 209:2
227:7 239:7
242:16 245:21

**denials** 200:20
**denied** 205:1
238:25 239:3,9
245:20
**deny** 185:16
207:12,15,16,23
208:11 237:12
238:6
**denying** 185:15
203:18 207:2
**department**
134:15,16,22,23
140:25 144:25
175:13 176:10
181:4 184:25
187:5 227:11,17
252:11
**depends** 166:18
166:18,19
170:12,19
191:14
**depo** 253:9
**deposing** 260:10
**deposition**
125:12 232:14
252:4 257:7,18
**depth** 193:4,23
236:20
**deputy** 163:17
167:6 169:16,17
215:5,16 219:10
222:22
**derive** 143:8
**describe** 230:2

described
  202:10 206:1
  209:17 212:4
  220:8
description
  127:10 219:16
descriptions
  229:3
designated
  259:7
desk   163:20
  164:1
despite   153:11
details   134:4
  135:21
determination
  142:12 143:6,15
  151:21,22 155:4
  191:10 194:5
  201:15,19
  202:14 203:8,15
  204:25 207:2
  228:7,21 229:15
  234:15,21 235:6
  235:13
determination's
  235:1
determinations
  137:13 200:15
  202:19 228:9,9
  229:6 247:24
determine
  131:10 141:19
  152:4 195:2
  210:7 247:4

determined
  144:1 164:25
  235:15 241:16
determining
  129:8 150:5
  155:17 172:22
  235:4
develop   137:11
  183:16 184:9,12
  184:13 200:14
  200:14 201:9,9
developed
  183:21,22 184:6
  184:7,21 235:12
developing
  140:6 181:6
  200:19
development
  135:7 137:22
  168:13
diagnoses
  171:11,12 224:5
  225:13
diagnosis
  159:21 171:13
  171:16 192:10
  196:19 220:20
  224:13,14,17,19
  228:5,20 231:7
  246:6
diagnostic
  160:3
difference   164:3
  164:6 196:11

differences
  234:6
different   141:6
  141:17,25
  143:21 153:16
  165:14 167:2
  186:6,14 192:10
  196:5 198:24
  205:9 209:4
  212:7 213:4
  214:21 220:19
  220:19,20
  224:12,17,17
  225:4 238:14
differently
  150:7 193:20,21
difficult   231:21
direct   180:13
  214:23 222:20
  242:8
directed   183:16
  227:20 230:21
directions   167:2
  247:3
directives
  167:23
directly   138:24
  198:4 201:3
  255:9
disagreed
  165:13,17
disappointed
  143:17
disclaimer
  162:3

discontinuation
  217:6 221:24
  225:7
discontinue
  139:16 191:23
  192:5
discontinued
  139:10
discretion
  185:15 225:15
  246:7
discriminatory
  227:8
discuss   145:24
  194:21 232:22
  242:15
discussed
  172:20 178:20
  251:1 254:19
discussing
  236:22
discussion
  158:23 172:16
  172:18 253:19
discussions
  172:11 193:13
  193:15,16
dismiss   195:20
disseminate
  141:3
dissertation
  160:19
district   125:1,1
  199:4 212:20,20

| | | | |
|---|---|---|---|
| **districts** 199:3 | **dr** 128:12,12,20 | 184:15,17 | 222:1 223:20 |
| **divide** 155:2,10 | 128:21 133:10 | 186:20,25 | 224:9,15 226:25 |
| **doctor** 192:6 | 134:17 135:2,11 | 187:11 228:5 | 227:24 228:1,23 |
| **doctors** 145:20 | 136:7,7 145:14 | 232:2,3,4,5 | 237:3 238:18 |
| 178:25 | 145:15,16,20,23 | **drugs** 216:6 | 239:3,17 242:18 |
| **document** | 177:15,16,16,18 | 217:14,18,23 | 242:23 243:11 |
| 127:18 147:8 | 177:18 178:23 | 218:8 220:21,24 | 243:14,22 244:4 |
| 158:10 163:19 | 180:5,6,7 183:4 | 228:15 | 244:18 245:4,9 |
| 185:1 211:2,2 | 183:5 194:23 | **due** 228:3,18 | 247:16 248:15 |
| 221:4 226:23 | **draft** 144:21 | 238:4 | 252:12 |
| 227:25 228:3,17 | 145:19 146:3,4 | **duly** 128:4 | |
| 252:2,14 254:13 | 146:5,7,21,22 | 258:11 | **e** |
| 254:15 256:4 | 157:16,21 | **dunn** 126:6 | **e** 126:14 128:1 |
| 261:19 | 158:15 183:24 | 211:21 226:12 | 260:17,17 261:3 |
| **documentation** | 183:25,25 184:1 | **duration** 240:16 | 261:3,3 |
| 168:20 | 214:16,19 | **dvp** 164:21 | **earlier** 135:5 |
| **documents** | 215:25 218:21 | **dysphoria** | 155:14 199:18 |
| 141:1 142:8 | 219:1,2,5 | 127:18 131:3,6 | 232:18 251:1 |
| 168:19 184:24 | 257:14 | 131:22 132:7,16 | **early** 139:14 |
| 187:18 | **drafted** 172:5,6 | 132:21 142:13 | 146:23 |
| **doe** 247:18 | 215:19 221:12 | 142:14 154:15 | **easier** 175:4 |
| **doh** 252:15 | 221:17 222:4 | 155:6 157:2 | **easy** 175:6 |
| **doing** 154:11 | **drafting** 145:5 | 159:7,8,12 | 203:4 |
| 198:23 214:11 | 147:24 160:10 | 160:9 171:9,13 | **edit** 145:7 |
| 229:18 247:24 | 249:14 | 185:22 188:3 | **editing** 145:8 |
| **dollars** 150:23 | **drafts** 145:20 | 191:1,9,18 | **edits** 145:9,11 |
| 246:10,14 | 216:24 | 192:9 200:17 | 145:12,17 146:2 |
| **donovan** 145:16 | **drastic** 145:22 | 201:12 204:18 | 147:1,9 184:2 |
| **donovan's** | **draw** 185:4 | 204:24 205:19 | 256:3 |
| 145:15 | **drawing** 143:24 | 206:13 207:13 | **education** |
| **dosages** 224:8 | **drew** 142:1 | 207:24 208:12 | 126:11 |
| **doses** 192:7 | **drive** 125:17 | 208:17,23 209:9 | **effect** 219:25 |
| **downtown** | 249:7,23 | 209:13 216:7 | 243:3 |
| 175:3,4 | **drug** 159:24 | 217:8,14,19 | **effective** 243:6 |
| | 160:4 173:13,18 | 218:8 220:19 | **efficacy** 141:15 |

efficient   153:12
effort   174:6
  183:11 215:22
eight   135:19
  157:7 253:3
either   135:15
  162:1 165:13
  167:24 179:20
  183:4 195:12
  196:8 205:23
  225:2,25 230:25
  251:18
eligible   244:7,10
  244:15 247:21
  248:1
eliminate   171:1
  171:15
elliot   232:7
else's   133:25
email   127:14
  136:4 186:24
  210:25 215:10
  227:10,15
  228:12 230:2
  231:20 232:16
  260:10
emailed   260:11
emails   127:16
  189:20 211:19
  213:22 216:14
  226:15,22
  229:23
embarked
  186:10

employed
  138:21 139:19
employee
  210:19 259:12
  259:13
employees
  250:15
encounters
  247:13
encouraged
  177:8
encouraging
  177:11
ended   136:6
endocrine   161:8
  161:10,13,19,21
  161:21,25
  190:18
engage   130:11
  131:11 132:12
  142:24 179:25
engaged   132:15
  132:24 134:12
  139:18 140:21
  141:4
engagement
  179:22
enrolled   244:11
enrollees   205:8
  217:11 218:11
enrollment
  244:14,15
ensure   217:6
  221:24 225:9

ensures   218:18
ensuring   235:17
enter   136:23
  138:19 163:12
  254:12
entire   158:20
  170:2 214:16
entities   144:21
  181:7
entitled   212:16
  219:22,24
  220:12 239:8
entrance   177:4
epsdt   173:3,6,8
  185:13,18 186:3
eq   137:15 201:2
equally   204:9
equals   227:6
ernie   188:23
errata   260:9,9
  260:11
errors   146:1
especially
  141:14 186:6,7
esq   126:3,5,6,8
  126:11,14,18,19
  260:1
establish   237:16
established
  161:11 234:16
establishing
  129:4
estimate   159:2
estrogen   223:25
  225:17

et   125:5,8 132:2
  137:13 194:22
  260:5,5 261:1,1
ethical   189:4
evaluate   148:24
  151:2,15 197:1
  198:20 237:14
evaluated   151:6
  185:19 194:24
evaluating
  132:4 141:23
  237:22
evaluations
  194:15
event   174:19,20
everybody
  186:14 188:4
everything's
  153:14
evidence   128:23
  131:7,19,24
  132:2,19 133:9
  133:19 134:1
  139:7,12 141:12
  141:16 144:1
  155:5,5 156:11
  161:16 162:2,10
  165:2 185:7
  187:16 197:13
  197:17,18 198:7
  198:8,10,13
  238:5 251:4
exact   230:2
  244:21

exactly   183:19
  250:9
examination
  127:4,5,6 128:9
  253:24 255:22
examined   128:6
example   138:13
examples
  186:18 195:13
  196:9 197:12
  251:13
exceed   136:16
  136:21,25
exception   229:8
  233:15
exchanges
  215:10
exclude   154:18
  154:21 156:16
  156:17
excluded   149:3
  152:2 218:14
  241:14
excluding
  148:24 151:2
exclusion   157:3
  159:11 165:3,6
  165:10,15,21,24
  169:25 172:25
  173:25 179:12
  191:19 192:6
  200:16 204:24
  206:12 207:3,22
  209:8,12,14
  213:7 216:12

218:18 219:22
  225:19 226:2
  227:2 232:12,19
  235:14 237:2
  238:1,3 241:6
  242:17 245:13
  247:6,8
exclusions
  199:2,5
exhausting
  177:25
exhibit   127:11
  127:12,13,14,14
  127:15,16,17,17
  127:18,18
  152:13,14
  162:15,20 163:6
  201:24 202:8,11
  211:18 213:22
  213:22,22 214:1
  214:3,7 221:7,9
  226:18 233:2,4
  248:19,21 252:2
  252:7,13,17
  254:4,6 255:24
exhibits   127:8
  248:18
exigent   251:11
exist   203:3
existing   128:23
  131:5,19,24
  217:20,24
expect   175:23
  175:24

expedited
  251:18
expenses   177:19
expensive
  139:15
experience
  130:9 132:15,21
  170:14 180:23
  223:24
experienced
  131:20,22
experimental
  140:1 141:20
  148:23 149:23
  150:6 154:24,25
  155:17 165:1
  173:8 185:8,22
  186:8 198:10,11
  204:10 237:5,6
  237:10,17 238:4
  238:23 239:12
  241:7,17 247:5
expert   165:17
  194:14
expertise   137:17
  137:19 140:5,12
  140:22
experts   129:12
  130:16 132:4
  136:24 137:16
  138:10 140:11
  141:5 142:13
  146:9,9 165:13
  177:15 179:7
  236:22

expires   258:21
  259:22
explain   195:21
  228:7
explained   161:3
explanation
  142:23 161:6
explanatory
  214:22 215:8
expletive   193:18
explicitly
  154:14,21
  156:16,16
explore   186:16
external   144:21
extrapolation
  231:22
eyes   202:2

**f**

f   231:18
f64   231:12
facilitate   177:1
  220:24
facilities   175:12
fact   141:1
  153:11 187:13
  227:15 229:7
factor   131:14,22
  131:23 155:16
  156:8 194:4
factored   191:9
factors   132:3
  174:24
facts   261:19

**fail**  260:13
**fair**  144:20
  207:4 208:3,13
  208:18,21 209:7
  209:11,22
  228:18 239:8,15
  239:22
**fairly**  191:6
  251:19
**fairness**  235:5
**faith**  188:16
**familiar**  132:7
  148:11 154:11
  200:12,13
  221:11 224:22
  231:3,4,6,8
  232:24 233:7,8
  240:17
**familiarity**
  154:7
**families**  187:6
**family**  128:21
  128:21 133:22
  134:8 188:9
**far**  142:21,24
  144:14,16 146:2
  155:1,24 169:23
  173:17 176:2
  184:1,3 186:13
  193:15 199:24
  205:15 207:4
  209:1 214:14
  218:9,10 229:2
  229:4 243:12
  249:1 250:14

**farrell**  174:8
  183:11
**fast**  170:13
  192:21
**faster**  170:23
**favor**  214:20
**fear**  228:3
**february**  125:14
  257:6 258:14
  259:16 260:3,6
  261:2
**federal**  173:1,12
  173:17,21,23
  199:3 246:10,14
  260:12,17
**fee**  156:1 159:16
  212:19 228:15
**feedback**  145:21
  145:21 179:19
  190:14,18
**feel**  174:13
  211:6 221:6
  225:14
**feelings**  174:16
**felt**  161:5,12
  174:18 223:8
**female**  231:15
  231:18
**field**  140:12
**figure**  186:17
  224:23 229:13
  256:9
**file**  230:25
  240:1

**filed**  147:12
  212:24
**filing**  212:17,19
**fill**  175:11
**final**  146:5
  183:24,25,25
  184:1 190:6
  209:16,21,23,25
  210:5,6 211:23
  212:15 228:7,21
  235:2 239:21
**finalized**  172:17
  251:2
**financially**
  259:15
**find**  149:18
  150:15,19
  151:24 153:3
  186:21 229:21
  230:10,18
  247:19 256:8
**finding**  162:25
  197:1,19
**findings**  153:18
  154:16,17,19,21
  157:6 187:17
  239:19,25
**fine**  193:25
  216:24
**fingers**  211:11
**finished**  145:19
  253:23
**finishing**  184:2
**first**  146:3,4,7
  146:20,22

150:20 157:20
  157:22 158:2
  163:13 171:19
  184:11 215:19
  226:23 228:19
  236:3 255:10
**fiscal**  151:21,23
  151:23
**fiscally**  156:3
**five**  158:19,20
  158:25 164:13
  170:16 188:5
  193:2 199:9
  248:4,10 251:22
  253:3,4
**fl**  260:10
**flexibility**  241:3
**floor**  126:12
**florida**  125:1,17
  125:20 126:3,4
  126:7,10,20
  127:15,17
  134:12,15,16
  149:7 150:8
  155:22 156:1,2
  157:1 160:7
  171:2 173:7
  187:6 188:12,16
  188:25 200:6
  206:1 209:18,24
  212:23 213:6,9
  217:23 221:5,8
  226:6 227:17
  236:5,6 237:5
  242:21 243:4,17

243:21 244:3,7
244:20 245:8
246:16,22
247:22 248:13
252:11 258:5
259:2 260:12,17
**fmmis** 231:2
**focus** 155:4
**focused** 155:4
**focuses** 236:24
**folder** 249:7,8
**folks** 136:6
148:20
**follow** 132:13
137:5,6 206:24
232:17
**following** 150:16 187:15
187:16 227:11
**follows** 128:6
196:10
**foods** 251:7
**forbes** 226:22
230:14,15
**foregoing** 259:5
259:8 261:19
**foremost** 150:20
**foreseeably** 195:17
**forgetting** 213:16
**form** 127:12,16
130:2 133:2
155:18 162:16
163:7 216:13

221:8
**formally** 219:4
**format** 178:22
**formulating** 150:2 255:15
**formulation** 162:22
**fort** 206:18
**forth** 179:2
191:13 213:8
225:5 236:23
**forward** 210:25
**found** 184:10
199:3 237:4,9
239:11 240:3,12
**foundation** 133:15 198:6
**four** 158:19,20
164:17 199:14
248:7
**franklin** 126:14
**free** 186:16
211:6
**freedom** 133:13
**frequently** 142:7 148:13
194:10 214:18
251:20
**friend** 254:19
**frustrating** 169:22
**full** 138:5,7
196:16 247:11
251:18

**fully** 228:11
**fun** 188:1
**fund** 126:12
**funded** 150:9,10
**funding** 222:2
**further** 127:6
216:25 255:21
255:22 259:11
**furtherance** 208:16,22

**g**

**g** 148:23 149:3
169:4
**gainesville** 126:7
**gainwell** 231:1
**galvin** 189:8
**gapms** 127:17
128:13,18,20
129:2 131:25
132:17 135:8
137:10,11,22
138:14,16 139:8
140:6,7 141:8,9
141:19,23 142:2
142:14 143:4,12
143:15,20
145:18 147:14
147:20,22 149:5
149:10,14,16
151:2,6,9 152:2
153:18,25
156:25 157:6,9
157:16 160:11
162:16 163:7,13

164:8,12,18,23
165:3,12 168:23
170:3 171:5,14
171:18,21 173:5
176:1 178:10,10
184:10,21
185:21 187:19
188:6 194:14,21
195:14 197:2,23
198:5,6 220:16
227:13,21
248:19,25 249:2
249:4,7,9,14,16
249:24,25,25
250:6,7,13
251:18,19
254:17,18
255:25
**gary** 126:19
260:1
**gather** 179:18
182:8 256:16,25
**gathers** 255:7
**gender** 127:18
131:3,6,13,22
132:7,16,21
133:1,19 134:1
141:6,10,25
142:13,14
143:20 152:19
154:15 155:6
157:2 159:7,8
159:12 160:8
162:7 171:8,13
185:22 188:3

190:19,25 191:8
191:18 192:8
200:17 201:12
204:18,24
205:19 206:12
207:13,24
208:12,17,23
209:8,13 216:7
217:8,14,18
218:8 220:18
222:1 223:20
224:9,14 225:20
226:24 227:6,24
228:1,23 229:9
230:20 231:5,9
231:10,11,25
232:9 235:14
237:3 238:18
239:3,16 242:17
242:23 243:11
243:14,22 244:4
244:18 245:3,9
247:16 248:14
252:12
**general** 129:13
134:20 135:2,24
140:13 166:9,11
169:18 172:14
176:16 209:16
234:18 239:1
255:13,14
**generally**
149:11 154:3
157:10 160:13
163:10 166:16

167:3 180:22,22
180:24 205:18
205:20,24
230:24 249:25
**gerring** 171:24
174:6 176:19
189:19,25
**getting** 191:15
214:6
**gg970595**
258:21 259:22
**gift** 197:9
**gigantic** 153:10
**gist** 188:6
**give** 156:23
182:20 192:11
197:9 230:1
**given** 135:3
147:9 160:9
167:23 183:18
191:20 205:5
206:16 215:8
223:1,3 225:12
239:11 242:10
**gives** 154:7
**glaring** 160:17
**gnrh** 227:25
247:15
**go** 169:4,8
186:13 193:15
195:18 211:12
220:15 221:20
221:22 229:3,23
237:14 239:24
243:19,19

244:22 248:1
249:12 253:16
**goes** 143:24
144:14 155:1
169:11,13,15
199:25 205:15
211:15 234:7
235:8,11 249:1
255:3,10,13
**going** 131:18,25
141:8 142:1
143:16 144:12
147:1 151:8,13
151:13,20,25
156:10 163:25
165:7,11 168:20
169:4 170:17
175:12 178:23
179:11,19 183:7
185:20 187:3,9
187:20 189:20
191:18 192:6
193:8,22,23
195:14 199:8
201:18,20 205:5
207:4 209:2
210:25 211:18
218:11,13
223:14 225:15
232:11,14 233:1
240:4 256:13,22
257:10
**gonzalez** 126:11
**good** 162:24
175:14 211:16

250:1,7,17,18
**gotten** 133:20
236:18 250:24
251:2,8
**govern** 136:20
**government**
175:9
**governor** 234:8
**governor's**
134:18 144:23
176:8 177:10
**gperko** 260:1
**grammar** 145:9
**grant** 234:10
235:13 237:1,8
241:3
**granted** 233:12
234:1 235:19
238:19 240:19
**grantham**
172:12,14
176:16
**granting** 233:21
235:23,25
**granular** 172:22
173:11
**graphic** 186:11
**graphics** 185:3
187:4,10
**great** 150:10
154:7,11
**greater** 240:15
240:15
**green** 230:16

grievances
206:10
grossman
128:20 135:11
136:8 145:20
177:15 178:23
180:7
grossman's
128:12
ground 162:25
grounds 236:25
group 160:25
193:24
groups 179:21
196:8
growth 251:11
guardian
144:11
guess 146:13
186:10 195:16
204:8 234:3
guidance
140:25 142:22
142:25 143:25
173:6 192:11
227:18 252:10
252:15
guide 139:12
235:12
guideline 173:6
guidelines 132:2
139:8 161:12,13
161:14,16,18,22
227:12

guides 153:6
guys 202:25
257:15,15

**h**

h 261:3
half 154:13
187:25 199:9
253:4
hand 233:1
258:13
handbook
226:10
handful 243:8
handing 163:5
handle 228:14
handled 166:16
176:19 193:20
193:21 200:21
hands 163:2
happen 167:9
167:11
happened
167:12
happens 167:10
214:18
hard 243:2
247:10
hardship
234:16
hazy 245:2
head 134:22
172:2
headache
169:22

headquarters
212:21
health 125:16
126:3 127:13,15
127:18 134:15
134:16,22,23
137:15 141:1
144:25 150:9
170:16 176:10
184:25 187:13
196:15,17,18,25
201:2,19 202:20
219:4 221:1,5,8
223:3 227:17
252:2,11 257:8
health's 227:12
healthcare
221:20
hearing 128:14
128:17,25
148:20 174:2,4
175:9 176:7,13
177:2,8,11,14
177:17 178:2,3
178:4,12,15,15
179:17,18
180:13 181:13
181:18,25
182:11,15,19,21
183:3 188:8
207:4 208:3,13
208:18,21
209:22 228:4,18
239:8,15,22

hearings 175:19
180:16,25 209:7
209:11
heavily 155:16
help 145:25
176:20,20 177:1
200:14 201:9
216:6 220:24
223:15
helped 176:22
helpful 208:6
helping 176:24
182:18
helps 211:20
heritage 133:15
hey 187:23
hhs 140:25
141:14 142:8,22
142:25 143:25
184:23 187:17
188:3
hi 227:4
high 142:9
187:9 197:13
198:13
higher 158:2
highly 168:19
236:19
hill 126:15
histories 196:7
196:20,25 197:3
197:4 243:20
246:19
history 196:14
196:14,16

hit 164:1
hits 163:19
hold 175:19,20
  195:5 197:18
  205:13 237:23
holding 163:2
  250:12
holtzman
  126:19
holtzmanvoge...
  260:1
hominem
  192:19
honest 144:2
honor 217:12
honoring
  217:24
hope 187:6
hormone 171:8
  208:11 217:7,7
  221:25 228:2
  229:9 243:10
  244:3
hormones
  161:24,25 186:8
  191:24 220:15
  221:25 223:16
  224:9 244:17
  245:3
hot 142:22
  144:3
hour 158:23
  172:19 178:19
  187:24 199:8
  253:6

hourly 136:15
  138:17
hours 158:25
  159:4 168:22
  170:2 253:3
house 225:2
  229:5
housed 167:21
hub 206:15,18
huge 153:12
huh 127:23
  142:16 143:2
  149:25 158:7
  164:20 190:1
  200:10 217:9
human 127:18
  187:13 252:3
humana 244:6
  244:11,23
  245:20 248:13
hurled 192:19
hurry 192:25
hybrid 161:2
hypothetical
  239:1
hypothetically
  132:11 226:5

i
icd 224:25 231:4
  231:11
idea 183:17
  232:9 250:1
ideal 175:17
identification
  152:15 162:21

201:25 214:4
  221:10 226:19
  233:5 247:12
  248:22 252:8,18
identified
  160:24,24 197:4
identify 128:13
  161:23
identities
  186:17
idiosyncrasies
  153:8
idiosyncratic
  202:20
illness 196:19
immediate
  157:8,13
immediately
  220:3
impacts 196:17
implement
  168:2 213:7
  220:7 225:19
implementation
  195:3 199:7
  200:5 216:12
implemented
  227:6 245:14
important
  132:14 215:25
  218:1 220:17,22
  222:7
importation
  184:15

impressions
  227:12
inability 191:21
include 177:21
  205:25 206:6
  207:7 208:13
  216:25 222:4,6
  222:7 255:18
included 210:5
  217:1 249:21,23
includes 145:13
  145:14 188:23
  189:2 227:7
  247:18
including
  188:14,19
inclusive 196:9
incorporate
  190:6 200:16
incorporated
  222:3
independent
  149:20
independently
  221:2
index 127:1,8
individual
  223:21 225:3
  236:25 240:14
  246:19
individualized
  235:16 236:19
  236:23,24
  237:13,22 238:7
  254:24

**individually**
237:15
**individuals**
129:1,11 131:17
132:13,19 136:8
180:9 191:23
218:19 223:15
225:9 234:23
235:10
**inevitably**
143:15
**information**
146:17 149:15
152:7 153:4
159:14,19 161:4
182:8 188:2
195:23 205:16
206:14,19 208:7
208:8,14 209:5
210:5,21 223:24
229:21 230:1
232:16 242:2
247:12,14 255:7
256:8,17 257:1
**informational**
155:1
**informations**
205:23
**informative**
149:23
**initial** 157:16,21
164:10
**initials** 201:22
**initiated** 143:13
167:15 227:13

**initiating** 168:5
**input** 133:12
172:8,10 174:9
181:6 190:6
234:25
**instance** 125:13
152:1 170:14
184:15,22 218:6
**instances**
137:13
**instituted**
212:17
**institution**
171:18
**instruction**
182:25 232:7,8
**instructions**
182:21,24
**insufficient**
144:1
**insulting** 193:17
**insults** 192:19
**insurance** 149:2
149:22 150:1,4
150:7
**insured** 239:3
**insurers** 149:6
150:9
**intact** 146:3
**integrity** 140:18
**intellectual**
148:2,4
**intended** 185:17
**inter** 200:8,9,13

**interested** 149:5
149:6 195:11
259:15
**internal** 145:3
227:5,8,24,25
242:3
**interpret** 228:21
**interpretation**
231:23
**invest** 193:12
**investigate**
131:2
**investigation**
235:9
**investigational**
140:2 165:1
185:8 186:9
198:11 238:4,23
241:7 247:5
**invited** 182:12
**involve** 213:3
229:2
**involved** 129:8
129:17,19,21
130:14,18,19,20
130:23 136:1
146:6 174:18
201:3 213:25
219:12 224:8
**involvement**
128:12
**ipads** 211:16
**iphones** 211:16
**irrelevant** 133:8

**ish** 146:24
**isolated** 187:3
**issue** 142:9
209:9,12 236:3
**issued** 168:14
208:2 209:21
239:21
**issues** 255:16
256:14
**it'd** 220:20
237:21 239:6

**j**

**jack** 148:8
194:19
**jacksonville**
126:4
**january** 147:13
**jason** 125:8
213:23 215:11
260:5 261:1
**jazil** 126:18
127:5 130:2
133:2 152:12
155:18 162:17
162:25 199:8
202:1,4 203:2,5
206:23 210:11
212:11 216:13
248:5 253:7,9
253:25 254:1
255:21 256:12
256:21,24
**jessica** 226:22
230:14,15

**job** 219:16
229:3
**join** 161:2
**joint** 174:6
**josefiak** 126:19
**josephina**
129:14,23
135:25 166:9
**juarez** 174:7
176:21 183:12
**judicial** 211:24
212:14,16
**july** 128:14,25
188:8
**jumped** 151:11
**june** 127:16
128:18 129:2
135:8 140:6
147:14,19 151:1
157:16 158:2,3
160:11 162:16
163:7 164:12,18
166:4 168:11,14
169:25 170:1
178:10 226:24
232:10 237:2
**justice** 126:3

**k**

**katy** 126:3
**keeping** 213:12
**kelly** 230:12,13
**kf** 247:9,10,21
**kids** 181:1,1
183:8,8,13,13
185:11,11,23,25

186:6,12,12,16
**kind** 134:3
138:20 142:10
151:11 153:12
161:2 176:23
178:20 182:20
186:10 187:21
191:13 192:4,20
204:3 225:12
229:4 232:3
233:16 241:13
250:11
**kinds** 154:5
160:11 172:20
238:9
**king** 227:16
**knew** 169:3
176:3 179:19
**know** 137:13,23
149:9 158:1
159:10 175:8
178:22 181:15
181:16 182:5,22
182:23 183:19
187:1 191:15
198:9,15 202:25
203:3 211:9
216:8 218:1
223:13,19,20,21
224:3,10,19
229:19,20 241:2
241:19,22 242:4
244:21 245:17
256:6,22

**knowledge**
128:23 130:9
131:24 229:12
234:23
**knowledgeable**
131:5 235:10

**l**

**labeled** 248:18
**lacked** 197:2
**ladapo** 134:20
135:2
**laden** 193:18
**lambda** 126:11
**language** 172:5
172:7 173:11
174:3 200:14,20
200:23 201:5,9
215:23 217:1,2
219:3 221:24
222:5,11,19
233:24 239:6
**lappert's** 145:13
145:14
**large** 125:20
142:20 175:23
175:24 176:6
**largely** 146:3
179:11
**larger** 174:5
**latitude** 150:11
185:16
**law** 212:19
**layman's**
187:22

**leadership**
167:24 219:9
250:2
**leaning** 138:3
**learned** 167:19
**learning** 140:15
**leave** 225:15
**leaving** 221:1
**left** 198:14
230:7
**legal** 126:6,11
198:21 234:5
255:16 260:16
**legalities** 242:11
**legality** 198:19
198:22
**legislative**
167:24
**legislature**
234:7
**length** 194:21
244:21
**lengthier**
170:18
**lengthy** 169:8
170:8,20,24
190:16,17 196:7
196:10,12
**lens** 198:25
**leon** 258:6 259:2
**leslie** 227:23
**letter** 227:7
**level** 199:4
207:5 208:13,18
208:22 212:6,6

228:13
**liberally** 155:24
**liberty** 133:17
**life** 132:20
**light** 228:13
**likely** 153:8
  179:19
**likewise** 169:14
  185:1
**limit** 240:23
**limitations**
  254:2
**line** 161:23
  170:22 261:4,7
  261:10,13,16
**lines** 147:7
  189:21
**lining** 226:13
**list** 127:11
  164:15,17 196:9
  210:7 214:6
  249:19,21,21,23
  250:20
**listed** 144:9
  148:23 204:18
  206:7 221:16
  236:15 241:25
  242:1,22 243:5
  243:17 246:16
  250:4,21
**listen** 144:2,6
**lists** 221:23
**literature** 131:5
  131:24 132:1,8
  139:23 141:13

188:1 195:13
**litigation** 140:8
  140:17,21 142:3
  142:11 143:3,12
  143:18 182:7,12
**little** 128:11
  136:18 146:8
  166:24 174:9
  179:22 202:20
  205:3 209:20
  214:15 228:8
  231:21
**live** 253:1
**living** 196:22
**llp** 126:9
**locally** 206:19
**locate** 246:20
  247:12
**location** 125:16
  174:23,25 175:2
  175:4,6
**logo** 184:19
**long** 144:12
  157:15 164:13
  172:18 178:18
  190:20 196:13
  200:3 203:8
  205:8,10 210:17
  244:18,19,19
**longer** 143:6
  220:21,25
  222:16,17
  225:10 247:7
**longitudinal**
  196:7,12,13,14

196:15,25 197:3
**look** 133:8
  143:11 150:4,14
  153:3,23 156:24
  156:24 187:5
  188:5 190:7,21
  191:12 194:6
  216:4 233:24
  244:22 249:8
  250:3 254:3
  255:11
**looked** 130:8
  153:6,15 190:7
  191:11 194:8,12
  194:22 246:20
  247:19
**looking** 131:4
  131:15,17
  141:10 150:20
  152:18 154:1,10
  195:11,15,15,22
  197:17,21,25
  198:1,2,2,3,7,16
  198:22,22,24,25
  205:3 206:3
  227:15 236:8,9
  236:10,20,21
  241:2
**looks** 203:18
  215:18 227:10
  248:24 256:4
**lose** 191:19
**lost** 191:17
  230:3 231:24

**lot** 134:4 141:14
  144:6 148:13
  155:8 169:23
  176:4 185:15
  187:7,7 190:8
  190:10 192:18
  192:19,21
  231:21 247:3
  249:13
**low** 141:12,16
  162:1,2 194:25
  198:10 238:5
  251:7
**lower** 186:20
**lowest** 149:10
**lunch** 200:1
**lupron** 228:4,19
  228:23

---

## m

**m** 231:18
**mac** 211:13
**mac's** 211:16
**made** 129:2,6
  141:14 142:12
  145:22 146:2
  147:10,10 165:8
  165:9,11,22,25
  166:3,4,5 167:6
  168:11,25
  169:25 170:1,7
  171:20 184:23
  188:3 194:9
  207:11 214:25
  215:12 222:21
  228:7,21 229:8

234:21 235:1
241:20 251:15
256:2,4
**maf** 125:3
**magellan** 201:7
201:8 226:16
227:4 228:14,22
229:15 232:9
**mahan** 125:17
**mail** 205:8,10
**mainstream**
132:25 142:7
**maintain** 218:2
**maintains**
212:21
**maintenance**
231:1
**major** 144:10
**make** 131:18
145:9 146:13
151:20 159:19
160:16,19,20
165:2,10,10,15
165:24 166:12
166:14 187:22
188:4 191:23
194:16 195:18
198:13 207:20
222:10 230:24
257:1
**makes** 162:22
234:15 235:6
**making** 131:1
133:9 139:25
143:25 146:7

155:3 160:14
172:16 174:10
176:22 193:10
**male** 231:14,18
**manage** 213:13
221:2
**managed** 154:9
159:15 200:6,7
200:21,24
202:22 205:4
213:7,12 217:10
217:17 225:18
225:22 244:6
245:15,23
**managing**
223:12
**mandated**
245:19
**manufacturers**
250:25
**map** 154:16,17
154:19,21
**march** 258:21
259:22
**mark** 152:12
162:17 233:2
252:1
**marked** 127:10
152:14 162:20
163:5 201:24
213:21 214:3
221:9 226:8,9
226:18,21 233:4
248:18,21 252:7
252:17

**marker** 208:6
**market** 150:13
**marking** 221:7
**marstiller** 166:7
227:20
**massive** 197:8
**mastectomy**
238:17
**match** 246:10
**matching**
246:14
**material** 145:4
**materials** 153:7
178:1,6,8,9
**matt** 213:25
**matter** 210:18
231:17
**matthew** 125:12
127:3 128:3
260:6 261:2,23
**mb** 164:21
**mcgriff** 227:3
**mckee** 126:14
**mean** 130:7,7,13
132:11,11 137:8
137:9 141:17
142:5,18 144:5
144:5 146:3
147:4,5 150:8
150:17 151:19
153:8 156:21,22
156:22 157:9,11
157:11,12
161:11 163:8
166:12,14 167:7

167:11,14
172:10 174:16
174:17 175:8,8
179:3 180:15,18
182:3 185:6
186:5,12,14,22
186:24 187:1,3
187:5 192:16
193:7 195:9,11
196:4,14 197:5
197:12 198:2,3
198:15,18,18,19
198:23,23
199:23 202:22
206:2,2 210:4
210:20 212:3
213:9 215:5,21
216:23,24 218:3
218:5,9 219:14
220:4 222:18,18
228:8,11,12,14
228:21,22 229:3
229:13,14,24,25
230:2,22,24
231:10,10,19,20
231:21 232:21
233:14 234:5,6
234:9,12 236:4
236:9,10 237:11
237:12,25 238:5
238:8,22 239:23
243:12 251:17
251:19 252:23
256:19

**means** 147:18
164:8 217:16
219:15 220:6
231:11,12
235:22,22 242:4
**meant** 185:4
217:22 233:23
**measure** 163:25
**media** 142:7
143:24 144:3,4
144:12,14,15
148:18
**medicaid**
127:11,12,15
141:7,20,23
149:7,8,13
150:8,13,17,19
150:23 152:9
153:5,7,7,16,21
154:1,3,4,9,13
155:6,15,20,21
155:22 156:1,2
156:3,5 157:1
160:7 162:15
163:6 166:17,22
167:13,14,21
169:10,14,18
171:3,7 172:1,3
173:1,7,12,21
173:23 185:13
190:25 191:8,17
192:12 200:7
201:10,20
203:15 205:1
209:22 213:7

217:23 220:12
221:5,8 222:2
226:6 236:5,6
237:5 238:16
239:9 240:1
241:19 242:7,22
243:4,17,21
244:3,8,9,20
245:8,22 246:10
246:16,22
247:22 248:1,13
**medical** 132:25
137:16 147:4
179:20 187:25
202:15 204:10
205:4 207:25
224:2,6,24
225:13 237:23
238:10
**medically**
218:10 239:13
**medicare** 149:7
150:8,16,23
**medication**
192:2 225:7
**medications**
196:20
**medicine** 133:19
134:1
**meds** 227:6
**meet** 204:10
208:1
**meeting** 172:11
**meetings** 178:14
178:21

**member** 226:10
246:13
**memo** 143:4
171:5 255:25
**memories**
250:15
**memory** 250:11
250:14
**memos** 143:11
**mental** 196:17
196:18,25
**mention** 197:13
212:9
**mentioned**
204:7 232:18
**message** 185:5
**met** 145:21
233:21
**metaphors**
193:7
**meter** 177:16,18
179:1 180:5
183:4
**miami** 126:10
**michelle** 134:17
**mid** 146:23
**mind** 202:4
**mine** 146:10
**miniscule** 147:6
**minnich** 126:23
**minor** 216:22
216:22
**minors** 247:11
**minute** 193:2
199:9 248:4

**minutes** 188:5
200:4 253:3,4,6
**misdiagnosis**
238:11
**mission** 187:1
**misunderstood**
207:18
**mma** 205:3,6,6
205:11 227:23
**mo** 202:25
252:21 257:13
**model** 141:11
161:23
**modern** 198:12
**modified** 251:7
**mohammad**
126:18
**mohammed**
254:1
**mol** 128:12,21
135:11 136:7
145:23 177:16
177:18 179:1
180:6 183:5
**molina** 127:13
201:18 202:14
**money** 152:5
**monroe** 126:20
**month** 246:13
**months** 135:19
191:4 240:20
244:24,25
**mortal** 195:16
195:25 197:22

mortally  195:24
move  170:6,13
  170:23 193:16
  193:18 226:15
msnbc  144:10
multiple  252:3
muster  159:17
myers  206:18
myriad  197:12

**n**

n  128:1 148:10
nabd  203:1
nabd's  202:21
  202:23 205:7,11
nai  129:19
  130:20 158:5
  189:19,24
name  133:20,25
  134:17,24 135:3
  144:6 148:9
  155:23 201:20
  211:1
name's  210:17
named  258:10
names  232:5
nation  149:14
national  159:24
  232:2,5
nature  136:17
  140:2,8 141:15
  166:19 170:12
  170:19 174:14
  182:3 186:9
  192:17

navigate  154:8
  154:12 223:13
nbc  144:10
nc  126:15
ndc  159:21,23
  160:4 232:4
ndc's  231:25
  232:1
necessarily
  132:10,20
  135:14,14 151:5
  164:1 192:8
  196:18 198:20
  246:3
necessary  165:4
  170:25 176:25
  179:8 192:14,16
  196:16 214:24
  215:9 218:10
  225:14,17
  239:13 250:4
necessity  202:15
  207:25
need  141:2
  142:13 149:12
  151:24 156:24
  159:21,21,22
  160:1,2,3
  162:18 165:2
  166:2 174:13
  175:6 192:1,4,7
  220:23 232:14
  242:8
needed  140:11
  140:23,24 141:3

176:25 183:5,6
  223:15
needs  132:18
  151:23,23
negative  127:23
network  188:25
neutral  148:25
  151:3,16,17
neutrality  151:7
never  203:2
  207:15,18 208:2
  211:16 218:21
  239:13
new  126:13
  144:10 155:23
  157:12,14
  162:22 165:10
  168:2,4 170:11
  170:16 184:14
  187:2,4 251:15
  251:17,21
news  144:3
  148:17 176:2
nitrous  151:10
non  193:5
  203:22 204:5
  222:2 227:8
normal  174:5
  181:17 184:9,20
  187:14
normally
  175:19
northern  125:1
nos  214:3

notary  125:19
  258:20 259:21
note  148:19
  214:1 260:9
noted  220:14
  227:23
notes  259:7
notice  127:13
  168:13 169:25
  191:3 201:14,19
  202:13 203:7,14
  205:14,21,22
  207:1,7,8
  211:24 212:14
  212:17,24
  213:11,11 220:1
  220:9 222:15
  223:3 241:24
notices  200:15
  201:1,4,10
  202:18 204:25
  205:24 206:8
noticing  223:2
notified  223:14
notify  201:10
  217:10 225:8
notion  156:11
npr  144:2,6,7
number  170:9
  196:1,23 202:9
  208:20 221:7
numbered
  259:9
numbers  209:15
  226:12

**numerous** 180:16

**nw** 126:7

**ny** 126:13

**o**

**o** 126:18 128:1,1

**oath** 256:13,21 258:1

**object** 130:2 133:2 155:18 216:13

**observation** 144:19

**observe** 182:9

**obtain** 159:14 206:21 208:8,15 208:19 209:15

**obtained** 196:23

**obtaining** 206:20

**obviously** 165:13 187:2 192:25 193:2,8 210:4 256:14,22

**occurred** 209:11

**october** 201:22

**odd** 251:21

**offer** 179:4

**offering** 136:7

**offhand** 191:4 208:7

**office** 134:18 144:23 169:18 172:15 176:8,16 177:10 180:18

180:19 181:5
234:19 255:10
255:14

**offices** 225:4

**official** 219:3 258:13

**officially** 219:2

**oh** 144:5 157:17 158:19 164:21 167:18 189:15 211:8,13 215:11 226:12 232:25

**okay** 129:15,23 130:17 131:20 132:23 133:22 136:2 137:1 138:5,9,13,19 138:19,23 144:20 146:6,15 146:20,20,24 147:12 148:6 151:1 153:3 154:20 157:15 157:22,25 158:5 158:14 159:3,6 159:25 160:3,6 160:9 162:9,12 162:14 163:5,19 163:22,25 164:5 164:12 165:5 166:2,5 167:18 167:25 168:13 168:22 170:7 171:6,6,14 172:20,24,24

173:20 182:20
183:7 188:25
190:2 192:14
193:16 194:4,17
195:2,2,4 200:1
200:3,5,12,23
201:7 203:14,21
204:3,8,14
205:13,18,24
206:7,10 207:6
207:10,20
208:25 209:4,6
210:2 211:5,6,6
211:15 212:9
213:6,21,21
216:4,14,20,22
217:5,22 218:17
219:19 220:6,11
220:14 221:20
226:17 228:17
232:6,13,17
233:1 236:13
238:13 240:6,9
241:8,12,16,19
242:14 243:7
244:11 246:15
246:22 247:16
247:18 248:3,6
248:17 250:12
251:24 253:5,11
253:14,17 254:5
255:14 256:11
257:5

**olsen** 189:2

**omar** 126:11

**once** 135:1 140:9,9 146:10 171:20 180:6,6 189:20 206:21 219:25 222:15 223:19 255:2

**onces** 190:21

**one's** 193:17,17 193:17

**ones** 142:15,17 168:1,3 182:22 189:23 193:6,9 193:19 250:22 251:13

**online** 153:19 153:20 156:22 178:6

**open** 231:22 253:9 254:14

**operations** 245:24

**opinions** 165:17 174:15 223:7

**opportunity** 230:10,18

**oppose** 132:25

**opposed** 150:13 179:12 180:4

**opposition** 131:13,17 133:4 180:10 223:9

**optional** 236:12

**options** 225:9 231:17

**order** 200:15
210:5,6 212:16
212:25
**ordering** 257:10
260:11
**orders** 183:18
209:16,21,23,25
**organization**
133:21 161:2,11
**organizations**
132:25
**original** 212:17
251:5
**originally**
254:18
**originating**
166:20
**outcome** 201:1
201:4 207:8
**outcomes**
205:21,22
**outlets** 144:10
**outpatient**
217:13,18 218:8
**outside** 138:14
139:6,18 141:4
181:7,24,25
182:8,11,14,16
245:15
**outstanding**
250:1,16 251:12
**outweigh**
131:23
**outhauled**
170:15

**overriding**
173:6
**oversee** 229:25
**oversees** 171:24
219:14 231:2
**overturning**
209:1
**overwhelming**
156:6
**own** 181:3
186:16
**oxide** 151:10

**p**

**p** 128:1
**p.m.** 125:15
128:8 199:12,15
248:7,10 253:18
253:21 257:9,19
**pa's** 217:25
**pagan** 126:11
**page** 127:3
184:16 186:11
187:12 193:1
202:15 211:23
215:11,18 261:4
261:7,10,13,16
**pages** 153:6
154:12 164:13
187:20 259:9
**paid** 136:24
137:18 138:5,7
138:23,24
159:16 160:8
**pam** 189:2

**panel** 128:24
175:16 176:18
**paper** 178:7
**paragraph**
211:23 217:3
**part** 187:1
220:16
**partial** 203:12
**partially** 185:18
185:18
**participants**
176:15 196:7,10
197:2,5,9
**participate**
128:14 139:25
**participated**
176:13 180:12
180:16
**particular**
140:22 141:15
154:25 171:16
177:7,12 185:5
194:17 202:13
203:14
**particularly**
191:24
**parties** 259:12
259:13 260:11
**partners** 189:4
**party** 143:17
212:15,22
233:17
**passed** 134:16
163:23 181:13
181:18

**passing** 181:22
**past** 143:11
144:17 237:24
**pastor** 188:14
188:23
**patients** 223:18
225:16
**pay** 138:15
149:11 150:16
177:14 193:8
246:11,12
**payers** 149:8,9
149:11 150:16
150:21
**paying** 150:19
**payment** 222:2
**payments** 139:3
**pays** 139:10
**peace** 163:2
**pediatrics**
185:17 190:16
**peer** 132:1,7
**penalties** 261:19
**pending** 249:2
250:1,7,19,20
250:23 251:6,12
251:14
**people** 129:24
130:10 132:6
136:9 164:17
166:10 170:9
175:10 176:4
177:6,7 187:20
189:24 190:24
191:17 197:10

220:14 229:25
**period** 158:17
158:21 159:1
160:9 196:10
197:8 218:24
219:23 220:7
222:4 244:14,16
**periodically**
144:7 158:23
**periods** 158:22
**perjury** 261:19
**perko** 126:19
260:1
**person** 137:19
146:6 164:9,15
215:19 234:1
235:20,22
237:16 238:15
256:6
**personal** 144:19
148:4 198:25
**personalities**
199:24
**personality**
199:23
**personally**
134:25 157:15
258:10
**pertinent**
234:23 235:10
**petersen** 133:10
**petersen's**
194:24
**peterson** 188:19
214:1 216:5

226:23 230:6,7
**petitioner**
234:16
**pgs** 125:11
**pharmacist**
229:3
**pharmacy** 229:2
229:2
**phi** 210:21
**phone** 136:2
**phrase** 203:8
**physician**
137:15 138:14
**physicians**
190:19 225:4,12
**pick** 164:2
174:22
**picked** 174:22
**pickle** 129:21
130:23 149:19
152:10,25 158:6
172:13 213:23
**piece** 160:17
194:24
**piecemeal**
142:19
**pillsbury** 126:9
**piloting** 168:4
**pittman** 126:9
**place** 143:18
152:23 225:1
231:24 232:13
259:6
**placing** 237:18

**plaintiff** 126:2
248:12
**plaintiff's** 163:6
253:22
**plaintiffs** 125:6
125:13 182:6
247:1 248:2
**plan** 202:20
204:17,20,22
205:14,14 207:7
207:11,25
213:15,17 214:7
214:16 217:10
219:4 223:12
224:10 225:18
226:1,4 244:6
244:12 245:15
245:16,18,23,24
245:25 246:1,4
246:7,8,9
**plan's** 246:7
**planned** 174:2
**planning** 176:7
**plans** 157:5,13
159:15 200:6,7
200:21,24
202:22 204:2,4
205:3,6,16
206:5 213:7,12
216:11 217:17
218:1 220:1,6
220:17,23 221:1
223:3 225:8,22
232:19,21,22
244:15 245:23

246:12
**play** 134:9
**please** 162:18
216:8 231:24
257:17 260:9
**plus** 155:12
161:1 253:3
**point** 182:10
212:3 214:15
218:23 222:19
**points** 193:10
**policies** 149:13
149:17 153:10
153:17 155:7
167:5 168:2,3,4
170:16,17
171:25 213:13
213:14
**policy** 127:12,14
152:21,22,23
153:11,23,24
156:23 162:15
163:6 166:17
167:13,14,20,21
169:10,14,16
170:11,20 172:3
211:19,20
213:18,20 214:2
214:7,13,14
215:1,9,17,19
215:25 217:4,15
219:14,15,17,19
222:10 248:14
**policy's** 156:22

**portion** 257:6
**position** 161:9
  161:10 162:6
  219:20 220:11
  250:13 255:15
**positions** 160:22
  160:23 162:11
**positive** 127:23
**possible** 130:14
  132:10,11
  140:24 141:4
  175:10 212:11
  225:11 229:24
**posted** 227:5
**potential** 142:11
  142:22 182:12
**potentially**
  155:11
**practice** 128:22
  132:8 139:8
**practices** 140:13
**practitioner**
  128:22 225:15
**practitioners**
  140:13 223:17
  224:2,21
**prayer** 188:25
**preceding**
  183:23
**precisely** 168:7
**prepare** 129:3
  178:15 182:21
  231:24
**prescribe**
  224:11

**prescribed**
  212:19 217:13
  217:18 218:7
**prescription**
  173:13,18
  184:15,17
  186:20,25
  187:11
**present** 126:23
  143:5,22 240:6
**presented**
  141:22
**press** 184:18
**pretty** 149:18
  151:10 157:17
  161:3 162:24
  171:17 196:4
  203:4 214:11,22
  214:23 222:19
  222:19 238:12
  241:10 250:1
**prevail** 239:15
**previous** 176:2
  202:7
**previously**
  128:4 137:18
  139:6,9 152:3
  171:2 218:14
  220:14
**pricing** 184:17
**prides** 156:2
**primarily** 149:4
  149:6,8 155:3
  161:25 183:15
  195:11

**primary** 132:3,3
  132:18,22 198:9
  198:16
**principal**
  130:15
**principle** 235:5
**principles** 235:5
**print** 148:14
  254:10
**printed** 193:24
  256:1
**printing** 181:11
**prior** 128:11
  137:10 142:14
  142:15,17 157:3
  159:10 176:3
  178:2,12,15
  184:5 188:8
  207:10,21
  208:10 217:13
  217:20 219:21
  227:1 228:14
  229:5 232:19,22
  242:21 243:4,6
  243:16 245:12
  245:13 246:15
  247:5
**priority** 149:10
**private** 149:2,6
  149:11,22 150:1
  150:4,7,9,15
**privately**
  150:10
**privy** 169:19

**pro** 242:4
**probably**
  144:17 159:17
  166:4,6 167:17
  184:4 186:9
  208:24 209:2
  236:10,11
  255:12 256:10
**problem** 169:21
  210:22
**procedure**
  137:2,4,7,9
  232:3 260:17,17
**procedures**
  176:19 182:9,19
  206:6,7
**proceed** 165:21
**proceedings**
  212:22 259:5,10
**process** 131:25
  141:8,19 146:4
  157:10 163:9
  166:24 167:20
  168:19,21 169:8
  169:9 170:2,6,8
  170:18,24
  171:18,22,23,24
  182:19 190:5
  191:20 197:2
  205:9,25 206:4
  206:20 209:17
  209:24 212:2,7
  212:8,10 225:1
  227:14,21
  229:24 232:24

233:13 235:8
236:20 237:22
237:24 238:2,8
239:21,24
242:16 254:20
254:24 255:19
256:20
**processes**  212:4
213:2 229:2
242:3
**procurement**
136:17,22 137:1
**produced**
148:15 203:1
**professional**
139:23 148:5
259:4
**professionals**
161:1 179:20
192:12 224:3
**profile**  142:9
187:9
**program**  139:12
152:9 154:9
155:6 156:3,5
160:8 170:14
**programmed**
231:7
**programming**
230:21 231:3,4
**programs**  149:7
149:13 150:14
150:19 153:7,16
153:21 154:8,13
155:16,21,21,22

184:14 186:19
187:2,4,8
**project**  126:3
128:20 188:21
189:10 236:25
**projects**  154:5,9
**promoting**
187:6
**prompt**  180:13
182:23 183:2
**promptly**
179:13,15
**promulgate**
166:15
**promulgating**
165:4
**promulgation**
171:23,24 227:2
**proposed**  170:1
174:3 189:13
**proposes**  167:1
**prospectus**
137:17
**protect**  188:21
**protein**  251:7
**provide**  129:5
132:6 136:14
140:16 145:4,17
149:10 163:11
175:15 178:1,9
179:22 188:2
202:9,23 204:4
206:21 208:22
213:10 220:9
250:20

**provided**
133:12 145:21
147:2 179:14,16
191:15 195:23
197:4 209:7
216:7,11 228:3
228:18 232:7
239:2 246:5
248:20 251:3
**provider**  221:22
221:23 222:9
223:13 224:10
225:24
**providers**
206:15 217:11
220:23 221:2,21
223:3 224:21
225:8,23
**providing**
195:12,13 244:6
**provision**  236:7
**prudent**  225:7
**psychiatric**
162:6
**psychiatrist**
128:21
**pubertal**  154:14
154:22 207:12
**puberty**  143:4
161:24 171:7
185:20 186:7
207:23 217:6
221:25 223:16
228:1,6 229:10
243:7,21,25

246:22
**public**  125:19
149:5,8,9 174:2
174:4 176:7,13
179:17,18
180:14 181:24
182:10 188:8
195:24 213:11
233:14 258:20
259:21
**publication**
184:24
**publication's**
213:9
**publicly**  227:5
**published**  141:1
156:23 158:1
**publishing**
185:1
**pull**  210:4,13
249:3,9 250:3
**pulled**  146:16
194:11 243:9
246:19 247:3
**pulling**  250:14
**purchase**
136:15
**purpose**  179:17
200:8 233:10,11
233:20 234:2
235:18,21,24
236:2
**purposes**  148:5
**purview**  215:6

**put** 152:25
153:18 159:20
162:3 187:21,22
206:24 223:1
224:25,25
251:25 252:20
**putting** 193:9

**q**

**qual** 200:8,9,13
**qualified** 129:25
**quality** 141:12
141:16 162:2
169:16 194:25
196:1,1,2,3,6
197:13 198:10
198:13 215:17
238:5
**question** 132:9
141:22 143:9,19
150:3 159:19
173:10 192:22
201:1 204:1,8
207:19 208:16
209:19 235:4
247:9
**questioning**
197:18 232:17
252:25 253:6,23
**questions**
160:11,13,14
179:4 191:22,25
206:16 214:6
221:15 225:18
225:21,25 229:4
238:9 252:20

253:10 255:21
**queue** 127:17
248:19,25 249:4
249:24 250:10
250:21
**queues** 249:9
**quick** 170:18
183:8 188:1
200:2
**quickly** 140:15
159:6 170:6
191:6 192:15,23
248:12 253:14
**quite** 144:9
192:22 252:1
**quoted** 148:13
148:16

**r**

**r** 148:10 261:3,3
**rainbow** 189:10
**randomized**
197:16
**ranges** 160:5,6
**rate** 136:15
246:13
**rates** 138:17
246:12
**rather** 170:18
**rct's** 197:13
**reach** 156:21
206:17 234:22
**reached** 142:4
154:23 228:24
**read** 129:25
158:8,10,14

187:21 189:15
190:4 191:6
193:5 201:17
212:11 260:8
261:19
**reading** 188:1
257:19
**real** 132:20
162:23
**realized** 192:4,8
**really** 131:25
132:18 133:8,8
135:20 149:5,9
150:18 155:4
159:6 170:19
180:5 183:7
187:17,18
190:11 192:25
196:16 210:17
249:24
**reason** 198:7
203:21 260:9
261:6,9,12,15
261:18
**reasonable**
260:12
**recall** 135:3
139:18 254:20
254:24
**receipt** 260:12
**receive** 189:12
190:14,24
191:16 238:16
**received** 163:25
164:4 176:1

191:7 193:6
225:21,24 227:1
228:4,19,22
244:22
**receiving**
146:19 191:8,13
191:24 217:11
247:15
**recent** 199:21
230:8 248:24
249:4,9,10,15
**recently** 230:7
**recess** 199:13
248:8
**recipient** 201:11
201:20,22
203:16 210:21
228:4,19 236:21
237:19 240:20
241:19 242:7
**recipient's**
243:20 246:19
**recipients**
192:12 197:5
205:5 206:15
241:24 242:1
243:9 244:14
**recognize** 232:4
232:5
**recognizing**
254:2
**recommend**
134:9
**recommendati...**
134:10 140:1

recommendati...
131:18 161:15
162:7
record 128:8
134:5 168:17
199:15 248:10
251:25 252:21
253:2,15,16,17
253:19,20 254:7
256:13 257:2
259:10
recorded 257:6
records 224:24
236:21 237:23
238:10 244:22
246:18 247:13
red 147:7
redemption
189:10
redirect 255:24
reduction
203:10,11,12
reevaluate
157:5 251:9
reeves 125:18
258:20 259:4,21
refer 218:4
reference 178:7
195:6 205:25
209:17,23 211:8
222:3 231:14
240:10
referenced
139:13 195:8,10
252:3 260:7

referencing
234:4
referred 242:2
referring
213:18 217:5
227:9 252:1,4
252:14
regard 260:13
regarding
130:13 145:25
174:2 188:3
205:7 206:11
252:11
register 213:10
regular 249:22
regulations
136:20
reimburse
177:20
reimbursed
138:10 139:2
relate 212:1
related 128:15
128:18 131:3
143:11 205:18
206:11 211:19
relates 132:8
relation 128:20
relative 259:11
259:13
release 157:7,12
157:14 176:3
183:23 184:5,8
227:11

released 161:12
168:25 227:17
releases 142:25
184:14,19
releasing
161:14
relied 147:14
201:1
rely 130:15
140:5 149:25
156:10
remain 253:15
remember
135:16 147:5
172:11 189:19
194:17 249:14
reminder
230:20
remove 231:25
232:8
removed 230:21
rendition
212:25
reopen 157:9
251:9
reopened
250:24 251:5
repeat 140:19
149:24 209:10
rephrase 192:24
report 132:5,18
135:15 140:9,18
140:23,24 141:9
142:2 145:13,14
145:15,18

146:13,16 147:2
147:15,20,24
148:12 153:18
157:6,16 158:15
160:11 164:12
164:18,23
165:12,20,25
168:24,25
171:21 173:5
176:1 178:5
183:23,24 184:4
184:10 185:6,21
187:19,24 188:7
194:14 195:14
198:5,6 205:10
251:5 254:17
reported 125:18
reporter 125:19
153:24 257:10
257:13 259:1,5
reporters
153:23
reports 129:2,3
129:6,10,25
131:7,18 135:10
136:7,8 142:20
144:21 145:5,7
146:10,11,12,16
146:19 149:16
154:5 164:13
194:15 197:11
205:7 249:14,16
250:9,16,24
represent 219:4

representative
  257:7
represented
  241:21,22
representing
  126:2,17 182:6
reproducing
  214:12
request  159:21
  203:19,24
  220:16 228:18
  228:22 231:1
  234:19,24 236:1
  236:18,23,24
  239:4,23 240:11
  240:18 241:20
  242:8,10 251:2
  255:2
requested
  204:12 236:13
  257:14
requesting
  237:17 240:24
  241:5,13
requests  228:4,5
  228:20 237:13
  240:2,4,7,19
  242:6 249:3
  250:24 251:8,15
  251:18,19,21
require  170:17
  204:3 205:6,9
  206:4,5
required  228:20
  233:15,17

242:13
requirement
  150:18 205:12
requirements
  173:6,17 202:23
  234:10
requires  173:13
research  143:8
  154:4 232:15
  240:3
reserve  232:14
  253:8,10
resides  212:22
resolutions
  205:14 207:7
resource  188:2
respond  179:6
  179:13,15 180:1
  180:7,17 182:24
  183:1
responded
  180:6,6
responding
  167:23 182:23
response  127:23
  127:23 141:3,9
  180:9,13 183:5
  189:12 194:9,10
  204:4 212:7
responses
  156:23 180:8
  194:8
responsibilities
  219:17

responsible
  156:3 181:9,11
  181:15,22
  213:12 255:15
result  169:22
resulted  145:22
resulting  142:11
retained  139:6
  182:11
retract  195:19
returned  260:11
reuben  230:12
reuben's  230:13
revealed  243:15
revenue  246:14
reverse  207:11
  207:22 208:11
  208:12
reversed  207:15
  208:2,21
review  137:15
  139:7,12,22
  141:13 145:5
  163:12 169:15
  170:18,24,24
  178:2,12 187:16
  191:2 192:14,23
  193:23 194:1,21
  195:6 197:20
  200:23,24 201:4
  208:3 210:21
  211:24 212:14
  212:16,22
  224:24 238:10
  240:13 251:3

260:7
reviewed  132:1
  132:7 148:7
  158:2 163:23
  164:14,17
  189:17 207:25
  213:1
reviewing  164:2
  164:6 193:25
  235:25
reviews  189:23
  228:15 238:6
revise  172:8
revisions  195:18
rh  125:3
richmond  126:4
rick  188:14
rides  235:1
right  132:22
  141:20,24
  147:10 148:22
  185:9 199:7
  200:5 201:14,17
  202:13 204:20
  212:14 215:10
  215:16 220:9
  227:18 230:20
  232:23 241:18
  242:20 248:12
  251:24 257:13
rights  219:17
risk  194:25
rivaux  126:8
rivera  188:23

**rl** 126:23
**robust** 140:23
  140:24 141:3
**role** 134:9
  163:17 166:14
  182:14,16 250:8
**romina's** 133:20
**rotate** 225:3
**rothstein**
  246:17,23,24,25
**rough** 257:14
**route** 255:12
**routed** 163:13
  170:1 255:8,9
**routes** 255:6
**routing** 127:12
  162:15 163:7,9
  169:8
**rule** 128:14,16
  132:17 164:24
  165:4,5,23
  166:15,19 167:1
  167:1,4 168:8
  168:11,13,24
  169:7,25 170:1
  170:3,4,10,19
  170:20 171:6,21
  171:23,24 172:5
  175:19 180:2,4
  180:10,12,16
  181:18 182:12
  190:6 195:19
  200:6 209:13
  214:12,13,13,21
  214:22 215:8

217:16 219:25
222:15,16,18
223:1,1 224:14
233:17,18,20
234:1,3,6
235:20 236:16
237:11,12,25
239:6,18,25
240:22 245:6
260:17,17
**rule's** 198:5
  213:11
**rulemaking**
  166:23 167:20
  168:19,21
  233:12,13
**rules** 169:10,11
  170:12 171:25
  172:2,15 212:24
  214:13 220:4
  234:8,11,11,13
  260:12
**ruling** 243:3
**run** 132:13
  252:23
**runs** 202:15

**s**

**s** 126:20 128:1
  260:13 261:3
**safe** 217:6
  221:24 225:6
  242:11
**safely** 225:11
**sake** 217:24

**salaried** 138:17
**save** 152:4
**saw** 153:17,17
**saying** 152:20
  152:21 188:6
  190:9
**says** 212:13
  216:5 227:4,23
  228:17 236:19
**schedules** 156:1
**scope** 136:12
**scroll** 211:7,9
**se** 242:4
**seal** 258:13
**search** 153:19
  153:20
**seated** 174:16
  176:4
**seating** 175:1,17
  175:22 176:23
**seats** 175:11
**second** 146:24
  157:19 195:5
  198:8 202:14
  210:24 215:11
  226:9 253:11
  254:14
**secretary** 129:7
  129:13,23
  163:16,17 166:7
  166:8,12,22
  167:6,7 169:16
  169:17,19,20
  172:13 174:8
  176:17 183:3

215:3,4,5,13,13
215:14,16
219:11 222:23
227:20 235:1,2
235:11 255:8,9
255:13
**section** 146:18
  147:15 158:9,11
  169:3,12 212:4
  233:2 234:11,12
**security** 174:11
  174:13,21
**see** 144:5,8
  146:23 148:3,14
  152:1,1,18,19
  154:6,10 156:4
  156:6,6 162:25
  164:21 182:7
  194:6,12,14,15
  195:8 198:3
  210:5 211:7,7
  223:23 249:8
  256:23,23
**seeing** 176:2
**seems** 155:7
**seen** 142:7
  181:18,20
**selecting** 128:24
  174:10
**self** 197:11
  214:22 215:8
**semantics**
  131:16 186:13
**send** 137:14
  145:19 185:5

210:24 213:20
214:7,9,17,25
215:7,7 219:7
222:21 223:5
251:3
**sending** 202:24
205:11 219:17
223:9 229:15
**senior** 167:24
**sensationalist**
190:10 192:18
**sense** 250:17,18
**sensitive** 176:4
182:3 187:24
**sensitivities**
174:17
**sent** 204:25
215:14 218:22
219:2,3,20
222:13 232:8
**separate** 138:12
142:20 164:13
177:22,23
**september**
157:6
**series** 127:16
226:21
**serve** 176:23
**serves** 227:25
**service** 139:17
140:2 141:7,20
141:23 143:16
149:23 150:6
151:7 152:3
154:25 155:15

155:17 159:16
173:8 203:24
204:12 223:15
225:1 228:15
231:1 237:17
238:22 240:11
240:14,23 241:1
241:4,6 245:19
245:21,25 246:1
251:9,19
**services** 127:18
148:23,24 149:3
151:3 154:24
155:25 156:12
171:2 185:17,19
187:13 191:13
204:18 205:2
208:22 218:10
218:13 220:2
221:3 222:17,17
225:13 236:11
236:12,15 237:4
237:6,9 238:3
239:11,16
240:24,25 241:2
241:8,12 242:22
243:5,17 245:24
246:5,16 247:4
252:3
**session** 253:11
**set** 157:12 213:8
254:12
**sets** 254:10,11
**seven** 137:23

**several** 216:14
240:19
**sex** 161:24
171:7 186:7
191:24 208:11
243:10 245:24
**sg** 256:7,7
**shani** 126:8
**shantice** 230:16
**share** 144:20
249:23
**shared** 249:7
**shaw** 126:9
**sheena** 172:12
172:14 176:16
**sheeran** 130:14
135:24
**sheet** 177:4
260:9,10
**shorthand**
259:7
**show** 179:23
187:23 210:12
247:14
**showed** 243:12
**showing** 226:8
**shows** 235:23
**side** 154:8
**sign** 127:16
163:15 165:20
169:6,13,15,17
169:18,19 177:3
177:6 221:8
260:9

**signature**
186:23 258:18
259:19
**signed** 163:16
163:17 165:12
166:1 169:11
260:13
**significance**
231:16
**signing** 257:20
**similar** 155:21
156:4 199:2
**simone** 126:5
148:19
**simple** 150:3
**simplistic**
187:22
**single** 158:10
190:8
**sit** 179:2 189:19
**situation** 218:25
225:13 237:8
239:2
**situations**
240:13
**six** 191:4 240:20
244:24,25
**size** 174:23,25
**skim** 193:2
**skip** 226:11
**slogan** 181:1,9
181:12,23 183:7
183:9,13,16,20
183:21 184:6,7
184:9,12,16,20

185:4 186:21
slogan's  185:25
slogans  181:17
    184:13 186:18
    186:25 187:4,10
slow  209:19
small  170:10
    192:7 224:16
    243:8
smaller  224:8
smatterings
    144:15
smc  229:7
smmc  127:14
    214:2
snapshot  197:11
snippets  146:12
society  133:19
    134:1 161:8,10
    161:13,19,21,22
    162:1 190:18
solutions  137:15
    260:16
somebody
    234:19 256:4
somebody's
    196:17
sophia  189:8
sorry  131:21
    133:11 135:25
    137:3 166:2
    195:3 207:18
    211:8,14 226:11
    226:11,12 229:9
    231:24 246:25

247:3 249:12
sort  141:17
sought  238:15
    239:16 256:17
sound  170:7
sounds  192:22
    229:1
sources  144:6,9
    147:14,18,22
    222:2
southern  126:6
span  164:18
speak  128:5
    136:18 143:7
    167:10 223:6
    228:2 236:17
    238:7 256:7
speaker  177:3
speakers  182:17
speaking  132:12
    133:10 144:18
    144:19 171:6
    180:9
special  229:8
specialized
    140:14
specially  251:7
specific  166:2
    183:20 202:23
    233:24 234:13
    236:7,7,25
    242:20
specifically
    131:15 235:18
    238:17

specifics  147:5
specify  245:19
    246:4
spell  148:9
spends  157:2
spent  157:2
    159:8,9,11
    177:17
spirit  233:21,23
spite  226:2
split  156:9
    190:2
spoke  198:19
spreadsheet
    152:10 153:1
staff  143:5
    174:7,8,11
    176:21 177:5
    180:18,19
staff's  181:5
stamp  201:18
    201:21 202:7,8
    221:7 226:16
stamped  201:15
stance  131:2
    132:24,25
stances  152:18
stand  197:15
    203:5
standard
    161:17 162:4
standards  157:7
    157:11,12
    204:10

start  133:11
    163:8,9,19
    164:2,5,5,7
    169:9 213:25
    227:21
started  146:19
    157:19,22
    189:20 193:25
    227:10
starters  186:4
starts  169:9,10
    217:5
state  125:20
    127:11 149:6
    150:23 152:5,8
    153:4,5,7,16,16
    155:15 234:14
    245:15,18,23,24
    245:25 246:1,4
    246:14 258:5
    259:2
state's  154:1
    187:1
stated  147:12
    154:19 214:12
    223:9 261:19
statement
    147:16 156:20
statements
    152:20
states  125:1
    149:15 152:16
    154:6,8,11,12
    154:13,21 155:2
    155:3,8,8,9,12

156:4,7,7,11,15
156:19,21,25
185:13,14
235:19
**statewide**  154:9
**status**  250:10
**statute**  127:17
206:1 209:18,24
233:2,7 234:2,3
234:6,17 235:18
235:21,24,25
236:3,4,6
260:12
**statutes**  234:6,9
**stay**  151:25
**stayed**  145:3
**steeped**  132:19
**stephanie**  227:3
**stevens**  188:14
**stickers**  181:12
181:23
**stimulator**
251:11
**stones**  198:14
**stood**  191:19
250:10
**stop**  220:2
**stories**  148:17
176:2
**straight**  138:2
222:19 239:2
**straightforward**
223:2
**strategy**  214:21

**street**  126:4,12
126:14,20
**strike**  159:9
**studies**  160:14
194:2,7,15,18
196:1 197:1,6
251:4
**study**  196:1,2,3
196:6,12
**stuff**  137:14
**style**  145:8
**subcontractors**
138:18,22 139:5
139:20 140:4,5
140:12 217:11
**subject**  140:8
142:6 150:12
176:4 209:12
226:24 234:1
235:11,20
**subject's**  143:23
**subjective**
197:11
**submit**  205:7
206:15
**submitted**
190:23 200:24
206:10
**subpart**  233:25
**subscribed**
139:13
**subscription**
139:15,17
**subsequent**
227:7

**substance**
190:13
**substantial**
234:16
**substantiate**
171:5 173:5
**substantive**
145:11,12 146:3
184:3 189:22,22
190:21 193:3,5
193:9,19 194:2
**subtract**  138:3
**sudden**  198:12
**suffer**  223:22,22
**sufficient**
156:23 158:4
162:11 175:13
204:9 210:7,10
210:11 222:15
222:25
**sufficiently**
202:10
**suggested**
145:23 260:11
**suitability**  129:5
**suite**  126:9,14
126:20
**sunshine**  175:9
**superfluous**
214:15
**supervision**
259:8
**supervisor**
163:14 250:3

**supplement**
149:12
**supplemental**
131:7
**support**  160:20
162:11
**supporter**  180:2
**supporting**
141:12
**supports**  162:2
**supposedly**
187:13
**suppressant**
229:10
**suppression**
143:4 154:14,22
161:24 185:20
186:7 207:12,23
223:16
**sure**  160:15,16
160:20 168:18
172:16 174:10
176:22 191:23
194:16 198:14
199:10 207:20
209:21,21
222:10 226:16
230:23,23 248:5
249:20,22 250:4
253:7
**surgeon**  134:20
**surgeries**
161:25
**surgery**  159:25
171:8 208:16

243:13 245:8
246:1,2,11
248:14
**surprised**
167:18
**survey** 149:20
197:8
**surveyed**
149:15 152:16
**susan** 226:15,22
227:4 230:4
247:18
**sustain** 198:12
**swear** 168:16
**switch** 244:12
244:15
**sworn** 128:5
258:11
**symptoms** 192:9
223:22,25 224:1
**sync** 165:16
222:9,9
**system** 150:9
163:13 224:22
228:16 231:7
232:4 247:13
**systems** 230:25

**t**

**t** 128:1 148:10
261:3,3
**take** 131:7
142:18 154:22
170:21 172:18
174:24 179:23
187:20 190:11

190:21,22 192:3
193:11,22 194:6
244:22 248:3
250:3 255:11
**taken** 173:24
259:6
**takes** 132:1,1
169:23
**talk** 162:13
166:23 167:4
200:3 248:17
256:14
**talked** 158:25
199:23
**talking** 128:11
128:16 131:16
133:3 147:11
152:2 167:3
170:3 173:10
178:22,24 179:1
208:4 211:22
218:6 225:6
232:10 240:20
242:25 243:2
252:14
**tallahassee**
125:17 126:20
**tamayo** 129:14
129:24 135:2,25
135:25 166:9
**targeted** 185:25
**taste** 162:23
**taxpayer** 150:9
150:23

**team** 183:11
253:13
**technical** 146:2
216:23
**technological**
178:25
**technologies**
231:2
**tell** 157:22
160:7 208:20
209:4 211:1
241:10 250:9
**template** 203:1
226:10 254:12
254:15,16
**ten** 154:18
**term** 157:8
205:8,10
**terminated**
245:4,7
**termination**
201:11 203:10
203:11
**terminations**
200:20
**terminology**
146:1 147:2,5
187:25 234:5
**terms** 173:13
187:22 238:7
**terribly** 190:20
**territories**
152:17,17
155:12

**test** 151:11
**testified** 128:6
254:23 255:3
**testimony**
254:21,25
256:25 260:8,12
**testosterone**
192:5 203:19
223:23 224:16
225:16
**tests** 250:25
**texas** 153:10,10
153:14,15
194:11
**text** 161:22
**thank** 212:9
213:6 226:17
252:10 254:19
**that'd** 137:23
210:11 218:16
**theirs** 130:16
184:25
**theme** 144:17
**therapy** 143:4
154:22 171:8
207:12,23
208:11 223:16
228:2 229:9
243:10 244:3
**thesis** 160:18
**thing** 162:23
187:15 197:21
198:5,16 216:6
225:8 252:20

**things**  144:9
  148:6 155:24
  160:15 165:16
  178:20 186:24
  192:20 197:24
  198:15,18
  222:12 230:3
  236:22
**think**  129:6,11
  129:12,13
  131:15 134:3
  135:5,23,23,24
  135:25 142:5,17
  142:23 144:16
  145:22,23
  146:22 151:10
  152:7,17 158:19
  159:2,3 160:23
  162:18 163:3
  166:4 171:17,18
  172:12,13,13,14
  172:15 173:14
  173:18 174:5,6
  174:8,8,19
  176:19,20,21
  177:3,4,4,23
  178:25 179:24
  180:3,5,6 181:3
  182:16,16,17,22
  183:10,10,10,11
  183:12,12,22
  184:7 186:13,13
  186:25 189:18
  190:15,18
  192:24 193:11

194:19,20 195:9
  197:6 198:24
  201:16,17 202:9
  204:7 205:15,16
  205:22 207:5
  208:9 209:25
  210:1 212:5,6
  215:2,10,24,25
  216:3,8,22
  222:7 225:21,24
  232:13 236:18
  242:11 244:5,5
  244:25 246:25
  247:13,23,23
  249:18 250:22
  250:22,23,24
  251:5,10,11,13
  252:19 255:12
**thought**  216:10
  218:23 222:25
  223:1
**three**  128:8
  171:1 176:17
  177:24 189:24
  199:11
**time**  125:15
  128:8 129:13
  135:2 139:14,18
  142:17,18,21,23
  142:25 149:19
  157:13 158:17
  158:20,22 159:1
  160:5,9 165:23
  169:3 170:21
  171:14 177:5,17

177:17,19
  187:20 193:12
  197:11 199:12
  199:15 215:12
  215:13 219:21
  222:8,23 224:9
  227:13 228:6
  232:14 240:20
  240:24 243:16
  244:9 246:15
  247:10 248:7,10
  248:16 250:6
  252:21,23,25
  253:1,21 254:2
  257:8 259:6
**time's**  170:24
**times**  137:10,23
  144:10 158:19
  158:20 208:20
  233:14 252:3
**titled**  221:4
**titrate**  223:15
**today**  152:8
**together**  152:25
  190:4 193:10
**told**  183:19
  257:14
**tom**  227:20
**tomorrow**
  257:15
**ton**  153:9
**took**  132:24
  168:22 243:3
**tooth**  193:25

**top**  202:4
**topic**  142:22
  144:4
**topics**  172:20
**tordoff**  194:22
**tossed**  199:5
**total**  137:21
  158:25
**totally**  186:5
**touch**  200:2
**touched**  135:5
**touches**  184:2
**touchscreen**
  211:8
**touchy**  142:6
**tough**  228:11
**towards**  138:3
**tracking**  127:12
  162:16 163:7
**traditional**
  141:18
**transcript**  260:7
  260:13
**transcripts**
  260:10
**transition**
  220:24 222:1
  224:8
**translated**
  259:8
**translation**
  230:3
**transmittal**
  127:15 211:19
  211:20 213:15

213:17,18,20
214:2,7,16
215:1,9,19,25
217:4,15 219:3
219:15,18,19
220:8 222:10
**transmittal's**
214:15
**transparency**
184:17 186:25
187:11
**transparent**
161:13 233:14
**transportation**
175:13
**travel** 177:19
178:24 179:1
**traveling**
177:18,19
**treat** 171:8,11
171:12 223:20
224:9 228:23
229:9 238:17
243:22 245:3
**treating** 131:21
131:22 132:16
132:21 192:11
224:1,3
**treatment**
127:18 131:3
132:6,12 141:11
154:14 157:2
159:7 160:8
161:23 171:16
185:22 188:4

190:25 191:8,18
196:20 200:16
201:11 204:18
204:24 205:19
206:12 207:12
207:23 208:12
208:17,22,23
209:8,13 217:8
217:12,14,18
218:8 222:1
223:18 225:10
226:24 229:10
237:3 242:17,23
243:11,13 244:4
244:17,19,20
245:9 247:16
248:14 252:11
**treatments**
155:5 185:8
227:14
**trials** 197:16
**trouble** 148:20
150:2
**troy** 188:19
**true** 205:13
241:8 250:12
259:9 261:20
**trust** 224:2
**truth** 128:5,5,6
**try** 148:3 150:15
156:4 163:10
254:2 256:22,25
**trying** 164:2
185:5 197:9
229:13,23

233:24 247:12
**tuning** 216:24
**turban** 148:8
194:19
**turn** 198:21
**turned** 151:22
250:2,19
**turning** 129:1
159:6 195:3
199:7 200:5
232:23 235:17
242:20 248:12
**turnout** 175:23
175:24 176:6
**two** 129:24
130:4,10 131:9
155:23 164:18
189:21 194:8
211:11 215:22
233:25
**type** 179:20
**types** 171:1
195:23 199:23
201:10 240:12
**typical** 166:14

| u |
|---|

**u** 148:10
**uf's** 190:19
**uh** 127:23,23,23
142:16 143:2
149:25 158:7
164:20 190:1
200:10 217:9
**ultimate** 191:10
194:5

**unable** 149:12
**unanimous**
156:13
**unconstitutional**
199:3
**under** 138:12
141:23 149:22
155:15 172:2
173:1,8,21,23
177:5 185:17
186:23 217:16
221:5 232:24
233:25 234:8,12
234:16 236:11
236:11,14 237:1
238:18,20
240:21 256:13
256:21 259:8
260:12 261:19
**underlying**
194:1,18 233:20
234:2 235:18,21
235:24
**undersigned**
258:9
**understand**
158:15 164:3
187:19,25 188:6
228:12
**understanding**
207:21 233:9
250:7 255:4
**undertake**
139:7,22 143:8

**undertaking**
  197:20
**undertook**
  151:1
**unfamiliar**
  136:19
**uniform**  204:4
**union**  156:7
**unique**  151:5
  180:23
**unit**  169:11
  172:2
**united**  125:1
**units**  167:20
**university**
  190:17  193:1
  194:7,9,10
**unnecessary**
  216:8
**unruly**  174:20
**unturned**
  198:14
**unusual**  137:16
  170:5
**update**  157:14
  168:2  248:25
  250:5
**updated**  227:7
  249:10,21
**updates**  230:25
  254:14
**ups**  158:2
**upset**  174:20
**use**  133:12
  136:6,9  140:4

153:24  185:20
190:5  211:11
214:20  224:20
228:2,5  237:24
239:20  242:16
**used**  131:10
  141:19  171:15
  186:19  201:10
  222:11  227:25
  246:10  260:13
**using**  135:7
  138:14  186:22
  186:23  193:6
**usual**  137:2,6,8
**usually**  138:17
  149:10,16
  155:16  163:10
  163:10  175:20
  196:22  225:1,2
**utilize**  214:20

**v**

**v**  126:19  195:9
  260:1
**valid**  159:2
**valuable**  140:16
**van**  128:12,21
  135:11  136:7
  145:20,23
  177:16,16,18,18
  178:25  179:1
  180:5,6  183:4,5
**variance**  205:25
  209:17,24  212:1
  212:3,7,10
  233:16,19,22,25

234:19,25  235:3
235:13,19,23
236:1,10,14
237:1,9,12,13
238:2,6,6,8
239:4,20,23
240:2,18  241:13
241:20  242:8,15
254:20,23  255:2
255:18
**variances**  206:6
  232:23  234:10
  235:7,15  236:18
  240:9,12  241:9
  242:6  255:11
**various**  153:16
  213:2  236:22
  240:19
**vendor**  131:20
  137:1  138:20,24
**venue**  174:10,22
  175:14,17
**verbal**  134:2,4
  135:13,18  136:3
**verbally**  147:9
  183:18
**verbiage**  227:8
**verified**  244:13
**verify**  202:21
  256:10  260:8
**veritext**  260:10
  260:16
**veritext.com**
  260:10

**version**  157:7
**versus**  159:9
**vet**  228:9,23
**veto**  219:17
**vetted**  228:6
**vetting**  228:10
  228:20  229:4,14
**video**  128:7
  199:11,14  248:6
  248:9  257:6
**videographer**
  126:23  128:7
  162:24  199:11
  199:14  248:6,9
  252:22,23  253:3
  253:15,17,20
  257:3,5
**videotaped**
  125:12
**viewed**  142:21
**viewing**  254:13
**views**  219:5
**violate**  173:1
  248:13
**violated**  235:5
**visibility**  175:16
**vogel**  126:19
**volume**  125:11
  191:5
**vouch**  250:15
**vs**  125:7  260:5
  261:1

| w | wanted 129:4 | websites 154:2 | 220:18,22 |
|---|---|---|---|
| w 125:18 258:20 | 160:16 172:17 | week 146:24 | 223:22 224:1,1 |
| 259:4,21 | 175:9,11 179:12 | 157:19 184:3,8 | 224:16 |
| wait 165:19 | 179:15 183:1 | 230:9 | witness 127:1 |
| 169:20,20 198:8 | 187:18,21,21 | weeks 184:5 | 128:4 130:3 |
| waive 257:19 | 188:2 190:7 | weida 125:8 | 133:3 152:16 |
| waiver 205:25 | 191:22,25 | 129:7,13,23 | 155:19 162:22 |
| 209:17,24 212:2 | 222:10 252:20 | 163:16 166:8 | 163:1 203:7 |
| 212:10 233:22 | wants 216:25 | 172:13 174:9 | 210:20 211:5,9 |
| 233:25 235:13 | 234:19 240:15 | 176:17 183:4 | 211:15,22 213:2 |
| 235:23 236:1,13 | warranted | 213:23 215:3,4 | 216:14 221:11 |
| 237:8 238:15,19 | 193:3 | 215:4,4,5,11,14 | 257:19 258:10 |
| 238:24,25 | warriors 188:16 | 219:11 222:23 | 258:13 260:8,8 |
| 239:20 240:21 | watch 144:3 | 260:5 261:1 | 260:9,13 |
| 240:22 242:16 | way 136:19 | weigh 155:16 | wol 145:20 |
| 254:20,23 255:2 | 156:20 159:18 | went 146:9 | wondering |
| 255:18 | 176:5,24 210:2 | 152:11 153:5,15 | 191:12 |
| waivers 232:23 | 213:8 251:24 | 163:15,17 | word 147:7 |
| 234:10 235:7,19 | ways 196:5 | 192:20 218:9 | words 195:14 |
| wall 126:12 | we've 149:19 | 219:25 229:7 | 196:21 229:14 |
| wallace 163:18 | 173:4 186:22 | 249:6 | 245:20 |
| 227:20 | 199:8 200:7 | whatsoever | work 138:6,8 |
| want 146:23 | 203:2 222:14 | 189:22 | 157:15 158:9 |
| 148:3 149:9 | 241:6 248:18 | whoever's 250:6 | 160:18 169:23 |
| 150:19 152:12 | 251:2,25 252:3 | wholly 181:9 | 213:6 216:3 |
| 154:6 159:20 | 252:14 253:1 | williams 226:15 | 230:4,6 256:16 |
| 160:20 179:21 | weak 141:11 | 226:22 230:4 | 256:24,24 |
| 187:8,8 188:4 | 161:15,15 | wilson 227:16 | worked 154:4 |
| 190:21 192:24 | wean 192:7 | window 163:11 | 158:5 183:12 |
| 198:13 207:20 | weaned 192:2 | 163:11 | 216:23 |
| 209:3 210:23 | web 153:5 | winthrop 126:9 | working 128:19 |
| 212:5 214:1 | 154:12 184:16 | withdraw | 129:11 140:10 |
| 238:7 248:17 | 186:11 187:12 | 223:12 225:16 | 149:20 157:17 |
| 251:25 253:5 | website 185:2,3 | withdrawal | 157:23 184:8 |
| 254:7 256:10 | | 192:1,9 220:15 | 215:23 250:6 |

**works**  147:15
  150:7 158:10
**world**  163:3
**wound**  195:16
  195:25 197:22
**wounded**
  195:24
**wpath**  160:22
  161:6
**wps**  157:7
**write**  129:9
  135:15 168:2
  202:4
**writing**  147:21
**written**  132:17
  134:5 135:19
  209:23 231:14
  251:8
**wrong**  228:25
**wrote**  129:1
  135:10 136:15
  146:15 190:19
  190:20

**y**

**yale**  190:17
  193:1 194:7,8
  194:10
**yeah**  130:7
  137:4 146:25
  147:21 152:11
  153:20 158:4,22
  162:22 164:7,22
  166:25 168:1,15
  168:17 169:21
  170:21 180:15

180:15 186:22
186:24 187:23
187:24 193:6
194:3 197:17
204:16 207:6,9
207:17 210:16
210:16,16,20
211:15 215:21
217:24 220:5
221:19 222:6,6
226:14 227:15
229:11,17
230:11 237:25
238:5,21 239:5
239:6 240:17
241:10 242:1
243:12,20
247:17 249:5,18
250:10 251:17
251:23 253:1
254:16 256:3
**year**  144:17
  245:1
**years**  196:24
  251:22
**yep**  211:21
**york**  126:13
  144:10 155:23

**z**

**zero**  207:5
  208:24 209:2
**zoom**  178:16
  257:3

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.