Page 1

1                UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF FLORIDA
2
                     TALLAHASSEE DIVISION
3
                        CASE NO.:  4:22-cv-00325-RH-MAF
4
    AUGUST DEKKER, et al.,
5
         Plaintiffs,
6
    vs.
7
    JASON WEIDA,
8
         Defendant.
9
    _____/
10
    DEPOSITION OF:      ANN DALTON
11
    DATE:               TUESDAY, JANUARY 24, 2023
12
    TIME:               10:04 A.M. - 6:05 P.M.
13
    PLACE:              AGENCY FOR HEALTH CARE
14                      ADMINISTRATION
                        2727 MAHAN DRIVE
15                      TALLAHASSEE, FLORIDA 32308
16  STENOGRAPHICALLY
    REPORTED BY:        GREG T. SMITH
17
18
19
20
21
22
23
24
25

```
 1   A P P E A R A N C E S:
 2   KATHERINE J. DEBRIERE, ESQUIRE
     OF: FLORIDA HEALTH JUSTICE PROJECT
 3       3900 RICHMOND STREET
         JACKSONVILLE, FLORIDA 32205
 4       (352) 278-6059, FAX-(800) 435-7352
         DEBRIERE@FLORIDAHEALTHJUSTICE.ORG
 5       APPEARING ON BEHALF OF THE PLAINTIFFS
 6   SIMONE M. CHRISS, ESQUIRE
     OF: SOUTHERN LEGAL COUNSEL
 7       1229 NORTHWEST 12TH AVENUE
         GAINESVILLE, FLORIDA 32601
 8       (352) 271-8890, FAX-(352) 271-8890
         SIMONE.CHRISS@SOUTHERNLEGAL.ORG
 9       APPEARING ON BEHALF OF THE PLAINTIFFS
10   CHELSEA L. DUNN, ESQUIRE
     OF: SOUTHERN LEGAL COUNSEL
11       1229 NORTHWEST 12TH AVENUE
         GAINESVILLE, FLORIDA 32601
12       (352) 271-8890, FAX-(352) 271-8890
         CHELSEA.DUNN@SOUTHERNLEGAL.ORG
13       APPEARING ON BEHALF OF THE PLAINTIFFS
14   SHANI RIVAUX, ESQUIRE
     OF: PILLSBURY WINTHROP SHAW PITTMAN
15       600 BRICKELL AVENUE
         SUITE 3100
16       MIAMI, FLORIDA 33131
         (786) 913-4882, FAX-(786) 913-4901
17       SHANI.RIVAUX@PILSBURYLAW.COM
         APPEARING TELEPHONICALLY ON BEHALF OF THE PLAINTIFFS
18
     JENNIFER ALTMAN, ESQUIRE
19   OF: PILLSBURY WINTHROP SHAW PITTMAN
         600 BRICKELL AVENUE
20       SUITE 3100
         MIAMI, FLORIDA 33131
21       (786) 913-4882, FAX-(786) 913-4901
         SHANI.RIVAUX@PILSBURYLAW.COM
22       APPEARING TELEPHONICALLY ON BEHALF OF THE PLAINTIFFS
23
24
25
```

```
1   A P P E A R A N C E S:
2   CATHERINE MCKEE, ESQUIRE
    OF: NATIONAL HEALTH LAW PROGRAM
3       1512 FRANKLIN STREET
        SUITE 110
4       CHAPEL HILL, NORTH CAROLINA 27514
        (919) 968-6308, FAX-(919) 968-6308
5       MCKEE@HEALTHLAW.ORG
        APPEARING TELEPHONICALLY ON BEHALF OF THE PLAINTIFFS
6
    GARY V. PERKO, ESQUIRE
7   OF: HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK
        119 SOUTH MONROE STREET
8       SUITE 500
        TALLAHASSEE, FLORIDA 32301
9       (850) 391-0502, FAX-(850) 741-1023
        GPERKO@HOLTZMANVOGEL.COM
10      APPEARING ON BEHALF OF THE DEFENDANTS
11  ANDREW T. SHEERAN, ESQUIRE
    OF: FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION
12      2727 MAHAN DRIVE
        MS #3
13      TALLAHASSEE, FLORIDA 32308
        (850) 412-3670, FAX-(850) 922-9162
14      ANDREW.SHEERAN@ACHA.MYFLORIDA.COM
        APPEARING ON BEHALF OF THE DEFENDANTS
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    I N D E X
 2  TESTIMONY OF ANN DALTON
 3       DIRECT EXAMINATION BY MS. DEBRIERE.................6
 4  CERTIFICATE OF OATH..................................176
 5  CERTIFICATE OF REPORTER..............................177
 6  ERRATA SHEET.........................................178
 7  NOTIFICATION LETTER..................................179
 8
 9                  INDEX OF EXHIBITS
10  PLAINTIFF'S EXHIBITS
11  EXHIBIT 1        NOTICE OF DEPOSITION....................8
12  EXHIBIT 2        RULE 59G-1.050.........................9
13  EXHIBIT 3        RULE 59G-1.010........................59
14  EXHIBIT 4        GAPMS REPORT ON CROSS-SEX HORMONE
                     THERAPY...............................64
15
    EXHIBIT 5        RULE 59G-1.035........................77
16
    EXHIBIT 6        2016 GAPMS ROUTING FORM...............92
17
    EXHIBIT 7        2022 GAPMS REPORT.....................94
18
    EXHIBIT 8        AFTER THE FACT REQUEST FORM FOR
19                   DR. VAN METER........................103
20  EXHIBIT 9        GAPMS DECISION TREE CHECKLIST........104
21  EXHIBIT 10       AFTER THE FACT REQUEST FORM FOR
                     DR. VAN MOL..........................133
22
    EXHIBIT 11       LETTER FROM SECRETARY MARSTILLER, DATED
23                   4/10/22..............................149
24  EXHIBIT 12       EMAIL CHAIN BETWEEN AHCA AND
                     MAGELLAN.............................166
25
```

1    EXHIBIT 13      EMAIL CHAIN BETWEEN MS. PICKLE AND

                     MR. WEIDA...........................169

2

     EXHIBIT 14      SMMC POLICY TRANSMITTAL RE: NON-COVERAGE

3                    OF GENDER DYSPHORIA TREATMENTS.......170

4    EXHIBIT 15      FLORIDA MEDICAID HEALTH CARE ALERT

                     SIGN-OFF FORM........................170

5

6                         ------

7                  S T I P U L A T I O N S

8         It is hereby stipulated and agreed by and between

9    the counsel for the respective parties and the deponent

10   that the reading and signing of the deposition

11   transcript be reserved.

12                        ------

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2          THE COURT REPORTER:  Do you swear or affirm

3      that the testimony you are about to give will be the

4      truth, the whole truth, and nothing but the truth?

5          THE WITNESS:  Yes.

6                        ANN DALTON,

7          having first been duly sworn, was examined and

8      testified as follows:

9                    DIRECT EXAMINATION

10   BY MS. DEBRIERE:

11      Q.   Ms. Dalton, have you ever had your deposition

12   taken before?

13      A.   Yes.

14      Q.   Okay.  So I'm just going to walk through some

15   preliminary issues and go over some basic instructions

16   that you've probably heard a million times, and then

17   I'll get started with the questioning.

18      A.   Okay.

19          MS. DUNN:  Sorry.  Before we start, can we

20      introduce everybody who is on the phone.

21          MS. DEBRIERE:  Absolutely.  Thank you, Chelsea.

22          Before we start, we want to introduces folks on

23      the phone.

24          MS. DUNN:  I think there's one person who is

25      currently muted.  Someone just joined.

1          Shani, are you there?

2          MS. RIVAUX:  Good morning.  This is Shani

3     Rivaux.

4          MS. DEBRIERE:  Anyone else, Chelsea?

5          MS. DUNN:  There is one person.  I just don't

6     know who it is.

7          MS. DEBRIERE:  Is anybody else there?

8          MS. DUNN:  It's a 305 number.  So it's Miami.

9          MS. CHRISS:  That's Jennifer.

10          MS. DEBRIERE:  Okay.  Jennifer Altman is the

11     other person.

12          MS. DUNN:  If folks on the line could mute

13     their phones just so we don't have any background

14     noise, that would be helpful.  Thanks.

15          MS. DEBRIERE:  So we're just going to mark

16     exhibits as they're discussed.  I'll be showing you

17     papers to read off, and we'll just mark them as we

18     move through.  As I mark those exhibits, I'm going

19     to read something called a Bates number; that just

20     helps us track what pages we're on when we discuss

21     things.  If there's a Bates number, it's probably

22     going to start with "DEF," then underscore, then the

23     Bates number.

24          I'd like to go ahead and mark the notice of

25     deposition as Exhibit 1.  There's no Bates number on

1      that one.

2          MS. DUNN:  And Catherine McKee just joined the

3      line as well.

4          MS. DEBRIERE:  It's just the notice that brings

5      you here today.

6          (Plaintiff's Exhibit No. 1 was marked for

7  identification.)

8  BY MS. DEBRIERE:

9     Q.   So I'm going to be using the acronym GAPMS

10  quite a bit.  Do you know what that stands for?

11     A.   Yes.

12          MS. DEBRIERE:  And, Court Reporter, it's

13      G-A-P-M-S.

14  BY MS. DEBRIERE:

15     Q.   And it stands for generally accepted

16  professional medical standards; which is set forth in

17  59G-1.035.  You probably don't have that memorized.

18  That's okay.

19          I will use the term "gender dysphoria," which

20  is defined as discomfort or distress that is caused by a

21  discrepancy between a person's gender identity and that

22  person's sex assigned at birth and the associated gender

23  role and/or primary and secondary sex characteristics.

24  When I use that term, can we just agree that's the

25  definition I'm using?

1       A.   Okay.

2       Q.   I'm also going to be using the phrase

3    "categorical exclusion of gender affirming care."  And

4    that's just the exclusion set out in 59G-1.050, Subpart

5    7.  That's why we're here for today, for that exclusion

6    of gender affirming care.  Do you understand what I mean

7    when I say that?

8            MR. PERKO:  I'm going to object to the form.

9            You can answer.

10           THE WITNESS:  Yes.

11   BY MS. DEBRIERE:

12      Q.   Well, I do want to make sure you understand

13   what I'm talking about.  Would you like to see a copy of

14   the rule before we can agree on use of that phrase?

15   Because as I use it, I do want to make sure we're

16   talking the same thing.

17      A.   Yeah.

18           MS. DEBRIERE:  So we'll mark this as Exhibit 2.

19      It's a copy of 59G-1.050.

20           (Plaintiff's Exhibit No. 2 was marked for

21   identification.)

22   BY MS. DEBRIERE:

23      Q.   If you scroll down to Subpart 7 -- scroll down;

24   you're not a computer.  If you follow down to Subpart

25   7 --

1           MR. PERKO:  It's on the back of the page.

2    BY MS. DEBRIERE:

3       Q.   So when I'm using the phrase "categorical

4    exclusion of gender affirming care," I'm referring to

5    that Subpart 7.  Can we agree that that's the phrase

6    that encompasses that portion of the rule?

7           MR. PERKO:  I'm going to object to form.

8           But you can answer.

9           MS. DEBRIERE:  Well, I think we do need --

10        Gary, I understand where you're coming from.  But I

11        think we just need to figure out a way to

12        shorthand --

13           MR. PERKO:  That's fine.

14           MS. DEBRIERE:  -- that reference.

15           MR. PERKO:  I'm just objecting to the use of

16        "gender affirming care."

17           MS. DEBRIERE:  Okay.  How about "treatment for

18        just gender dysphoria"?  Would you --

19           MR. PERKO:  That's fine.

20    BY MS. DEBRIERE:

21       Q.   So we're going to use "categorical exclusion of

22    treatment for gender dysphoria."  And when I use that

23    phrase -- categorical exclusion of treatment for gender

24    dysphoria -- I'm referring to that Subpart 7.  Can we

25    agree to that?

Page 11

1      A.    Okay.

2      Q.    I'm also going to use the term "EPSDT

3    services"; which is an acronym for early and periodic

4    screening, diagnostic, and treatment services.   When I

5    say "EPSDT," do you know what I mean when I say that?

6      A.    Yes.

7      Q.    So my name is Katy DeBriere.   And I represent

8    the plaintiffs August Dekker, Brit Rothstein, and Susan

9    Doe and K.F.

10          I know you've been deposed before.   I'm just

11   going to go over some very brief instructions, just as a

12   refresher.

13          If I ask a question ask and you don't

14   understand it, don't try to, you know, understand what

15   I'm saying and try to answer the question.   Instead,

16   just stop me and tell me to rephrase so that you

17   understand the question.   That's no problem at all.

18     A.    Yes.

19     Q.    And speaking one at a time -- I have a horrible

20   habit of speaking over people.   But we need to try and

21   do our best to speak one at a time, so the court

22   reporter can get down everything we say.   I don't think

23   you're going to have that problem, but I will.   So

24   please just let me finish my question before you answer.

25   And I will do my best to do the same when you're

Page 12

1    providing an answer back to me; okay?

2         A.   Yes.

3         Q.   Verbal answers -- again, it's clear that you

4    understand.  But as we move through, the court reporter

5    can't record things like "uh-huh," or "huh-uh."  So if

6    you could just use "yes," or "no," or words whenever you

7    are responding to a question; okay?

8         A.   Yes.

9         Q.   If you need to take a break for any reason,

10   please feel free to ask me.  Stop me; tell me you need

11   to take a break.  That's not going to be a problem at

12   all.  The only thing I ask is that you finish answering

13   your question before we do.

14        A.   Yes.

15        Q.   Okay.  Are you on any medications or other

16   substances that can impact your memory today?

17        A.   No.

18        Q.   Can you state your name.

19        A.   Ann Dalton.

20        Q.   And, Ms. Dalton, what did you do to prepare for

21   today?

22        A.   I met with my attorneys.

23        Q.   Okay.  And how long did you meet with them for?

24        A.   45 minutes.

25        Q.   Okay.  Did you review any documents?

```
 1      A.    No.

 2      Q.    Okay.  Can you describe your educational

 3  background for me.

 4      A.    I have master's degree in music from Florida

 5  State University and a bachelor's degree in music from

 6  Northern Kentucky University.

 7      Q.    What's your current position at the Agency for

 8  Health Care Administration?

 9          MS. DEBRIERE:  And, Court Reporter, probably

10      throughout the deposition we'll be using "AHCA";

11      which is the acronym -- AHCA.  Or I might reference

12      "the agency" at times.  And when I reference "the

13      agency," I mean the Agency for Health Care

14      Administration.

15  BY MS. DEBRIERE:

16      Q.    So what is your current position at AHCA?

17      A.    I'm the bureau chief of the Bureau of Medicaid

18  Policy.

19      Q.    How long have you worked in that role?

20      A.    Since -- officially, since August 2021.

21      Q.    Okay.  What did you do prior to that role?

22      A.    I was an AHCA administrator in the Bureau of

23  Medicaid Policy.

24      Q.    What does that mean to be an AHCA

25  administrator?
```

1      A.    I was a manager of a team -- the Program

2   Authority Section in the Bureau of Medicaid Policy.

3      Q.    What kind of responsibilities does that entail?

4      A.    The Program Authorities Section was responsible

5   for submitting and maintaining the Medicaid waivers, the

6   Medicaid state plan with the federal partners at CMS;

7   the promulgation of administrative rules; and the PACE

8   program.

9      Q.    And how long were you in that role for?

10     A.    Since August 2018.

11     Q.    What did you do prior to that?

12     A.    I was a program administrator over a section in

13  the Bureau of Medicaid Policy.

14     Q.    And what responsibilities does that entail?

15     A.    That section was titled Program Policy.  And it

16  was responsible for the Children's Health Insurance

17  Program or CHIP Program; the provider enrollment policy;

18  the eligibility rule; and a few other rule areas that I

19  can't remember.

20     Q.    What do you mean by eligibility rule?  What's

21  that?

22     A.    The -- I don't remember the exact rule number.

23  But it is the rule that outlines the eligibility

24  criteria for recipients in the Medicaid program.

25     Q.    Okay.  Is that related to what category of

1  Medicaid someone would fall under in order to be

2  eligible for Medicaid?

3      A.   I believe so.

4      Q.   Okay.  And how long were you in that position

5  for?

6      A.   From January 2018 to August of 2018.

7      Q.   And what did you do prior to that?

8      A.   I worked at the Department of Elder Affairs as

9  a senior management analyst in the Long Term Services

10  and Supports Bureau.

11      Q.   And how long were you in that role for?

12      A.   From August 2017 to January 2018.

13      Q.   Did that role require any knowledge about

14  Medicaid?

15      A.   Yes.

16      Q.   And did that role require any knowledge about

17  rulemaking?

18      A.   Not the promulgation process itself, per

19  Chapter 120; but the development of rule language, yes.

20      Q.   Okay.  And when did you start at DOEA?

21      A.   June 2012.

22      Q.   Okay.  And so what other positions did you hold

23  there between June 2012 and when you became the senior

24  program management analyst?

25      A.   I held various analyst positions within the

1    same unit.

2        Q.   Okay.  And did those other positions require

3    knowledge of Medicaid?

4        A.   Yes.

5        Q.   And did those other positions require knowledge

6    about rule promulgation?

7        A.   The same as the senior management analyst would

8    have.

9        Q.   In your current role at AHCA, who is your

10   direct supervisor?

11       A.   Currently Brian Meyer is my direct supervisor.

12       Q.   And who is that person's supervisor?

13       A.   Jason Weida.

14       Q.   And what is Brian Meyer's position at the

15   agency?

16       A.   These changes are recent.  And I'm not sure of

17   the exact title of his position.

18       Q.   How is his position in relation to Tom Wallace?

19   Or I should ask:  What is Tom Wallace's position at the

20   agency?

21       A.   He's a deputy secretary at the agency.

22       Q.   Does Brian Meyer supervise him?

23       A.   No, I believe they're the same position.

24       Q.   Okay.

25       A.   But, again, these are recent changes, and I'm

Page 17

```
 1   not quite sure of the exact title.
 2        Q.   What was Brian Meyer's role before he changed
 3   into the role he currently is in?
 4        A.   He was assistant deputy secretary of
 5   operations.
 6        Q.   Okay.  Is Brian within the Bureau of Medicaid
 7   Policy?
 8        A.   No.
 9        Q.   Okay.  Is he within any specific bureau at the
10   agency?
11        A.   No.
12        Q.   Describe your current role at the agency for
13   me.  What are the responsibilities?
14        A.   I oversee the Bureau of Medicaid Policy.  The
15   Bureau of Medicaid Policy is responsible for the federal
16   authorities; which are the contracts between us and the
17   federal government that manage the Medicaid program in
18   Florida.  Promulgates -- we oversee the promulgation of
19   all the rules and rule class 59G; which are the Medicaid
20   rules.  Oversee the coverage policy development; those
21   coverage policies are promulgated in administrative
22   rule, but outline the specific services and the criteria
23   for reimbursement.
24             The administration of the CHIP program is also
25   part of the bureau's responsibility.  And the managed
```

1   care plan contracts -- the drafting of those contracts

2   and policy actions related to the managed care program.

3       Q.   What are coverage policies?

4       A.   Coverage policies are documents that contain

5   the information needed by providers and recipients that

6   describes the service and also provides the information

7   that they would need to be reimbursed -- providers would

8   need to be reimbursed for a service.  It describes who

9   can provide the service, who can receive the service,

10  and then any service criteria or details around that

11  service.

12      Q.   What do you mean "service criteria"?  Can you

13  explain that further.

14      A.   A description of the service and then any

15  exclusions, if there are any, pertaining to that

16  service.  It's different for each coverage policy.

17      Q.   Okay.  And what are coverage handbooks?

18      A.   "Handbooks" is a term that we used to use at

19  the agency.  A lot of the coverage polices were -- they

20  are now separate coverage policies, but they were

21  contained in bigger handbooks that have since been kind

22  of broken down to be more service specific.  And so the

23  term that we use now to describe the information that

24  was previously contained in the handbooks is "coverage

25  policy."

1      Q.    Are the handbooks promulgated into rule?

2      A.    Yes.

3      Q.    And does the agency still rely on those

4    handbooks in determining service eligibility?

5      A.    If the information from a handbook was moved to

6    a coverage policy, the coverage policy would be

7    promulgated in the rule and the handbook would no longer

8    be part of that rule.

9      Q.    Can you give a recent example of the handbook

10   information moving into a coverage policy rule.

11     A.    It's not that recent, but it's the first one

12   that comes to my mind -- is the Home Health Handbook was

13   broken down into three coverage policies, I believe,

14   around 2016.  And those three policies are the Home

15   Health Services Coverage Policy, Personal Care Services

16   Coverage Policy, and the Private Duty Nursing Services

17   Coverage Policy.

18     Q.    Okay.  And this will seem like a simple

19   question.  But where do those coverage policies -- can

20   the public access those coverage policies?

21     A.    Yes.

22     Q.    And where would they access those coverage

23   policies?

24     A.    The agency has an external web page specific to

25   all the coverage policies, fee schedules, reimbursement

1    policies.

2         Q.   And the policies that are on that public facing

3    website, are they all inclusive of the policies on which

4    the agency relies for determining coverage?  Strike that

5    question.

6              Is it an exhaustive -- is what is contained on

7    the agency's website, is it an exhaustive list of

8    Medicaid coverage policies?

9         A.   All the policies promulgated in class 59G.  And

10   the rules or links to the FAR notice are on our website,

11   yes.

12        Q.   Are there any coverage policies not on the

13   website on which AHCA relies to determine coverage of

14   Medicaid services?

15        A.   Not that I'm aware of.

16        Q.   What is a fee schedule?

17        A.   A fee schedule is the document that provides

18   information on billing codes, the description associated

19   with a code, and the amount that Medicaid will reimburse

20   for fee for service.

21        Q.   What is fee for service?

22        A.   Fee for service is a delivery system where the

23   State pays providers directly -- reimburses them

24   directly for the service provided.

25        Q.   Is that in contrast to managed care?

1      A.    It's a different delivery model.

2      Q.    If a Medicaid service is listed on the fee

3   schedule, does that mean Medicaid covers it?

4           I'll strike that.  I think I can ask a question

5   that well help here.

6           If a Medicaid service is on the fee schedule,

7   does that mean Medicaid does not categorically exclude

8   it?

9           MR. PERKO:  Object to form.

10          MS. DEBRIERE:  You can go ahead and answer if

11      you understand.  If you don't understand, please

12      feel free to ask me to rephase.

13          THE WITNESS:  I don't think I understand.

14   BY MS. DEBRIERE:

15      Q.    If a Medicaid service is listed on a fee

16   schedule, does that mean that Medicaid is willing to pay

17   for it if the recipient meets all eligibility criteria

18   for that service?

19      A.    So the fee schedules have to be used in

20   conjunction with the coverage policy.  So, like I said,

21   the fee schedule contains the coding that the provider

22   needs to use in order to get reimbursed, and, in most

23   cases, the amount and description.  But the parameters

24   of who can receive the service -- what kind of providers

25   can get reimbursed for the service -- that's in the

Page 22

1    coverage policy.

2        Q.   Okay.  What would it mean if a Medicaid service

3    was not on the fee schedule?

4        A.   So the fee schedule document and the term as we

5    would use "fee schedule" does not include all of the

6    services.  Some of those are going to be found in the

7    reimbursement methodology rules, if there's not a

8    specific fee equated to a specific code.  So there's

9    also reimbursement methodology rules and documents as

10   well.

11       Q.   Are there services -- Medicaid services on the

12   fee schedule that AHCA will not cover?

13       A.   I don't know if there's any.  But it would

14   be -- any information about how the services covered

15   would be included -- either on the fee schedule or in

16   the coverage policy.

17       Q.   Okay.  Do your responsibilities currently

18   include developing coverage policies for the Florida

19   Medicaid program?

20       A.   I oversee the teams that are responsible for

21   that, yes.

22       Q.   And who are those individuals?  Or let's start

23   with:  Who are the teams?

24       A.   The team primarily responsible for the majority

25   of the coverage policies is the team managed by Jesse

1  Bottcher; he's the AHCA administrator.  And he has three

2  program administrators who report directly to him.

3      Q.    And who are those people?

4      A.    Christine Polacheck [phonetic], and she

5  oversees the specialized services section.  John Matson,

6  he's the manager over at the primary and preventative

7  services section.  And then Tim Beaner is the manager

8  over the behavioral health and behavioral analysis

9  section.

10     Q.    Are those the only teams over which you manage?

11 Or are there other teams?

12     A.    I have five AHCA administrator direct reports.

13     Q.    Okay.

14     A.    And then one program administrator direct

15 report.  So I have six direct management team reports.

16     Q.    So who are the other ones?

17     A.    Catherine Mcgrath is the AHCA administrator

18 over the program authority section.  Ashley Peterson is

19 the AHCA administrator over at the pharmacy policy

20 section.  One of them is vacant -- the managed care

21 contract AHCA administrator position.  Devona Pickle,

22 she is the AHCA administrator over the Canadian

23 Prescription Drug Importation team.  And Jesse Bottcher.

24 And then Lakeva Campbell [phonetic] is a program

25 administrator over the administrative unit who does the

1    administrative functions of the bureau.

2         Q.    Who works under Jesse Bottcher?

3         A.    That was Christine Polacheck, John Matson, and

4    Tim Beaner.

5         Q.    And do you know who Mr. Jeff English is?

6         A.    Yes.

7         Q.    And who is his supervisor?

8         A.    His current supervisor is Cole Giering.

9         Q.    Who is Mr. Giering's supervisor?

10        A.    Catherine Mcgrath.

11        Q.    And Mr. Bottcher -- does he supervise the

12   person who undertakes GAPMS analysis?

13        A.    The position that is designated to do the GAPMS

14   is under Jesse Bottcher.

15        Q.    Okay.  And who does Ms. Peterson supervise?

16        A.    The pharmacy policy team, which consists mostly

17   of pharmacists within the bureau.

18        Q.    How many pharmacists are there?

19        A.    In Ashley's section, there are currently three.

20        Q.    Do you know the names of any of those people?

21        A.    Yes.  Jessica Forbes, Kelly Rubin, Susan

22   Williams.

23        Q.    Are you familiar with a person named Nai Chen?

24        A.    Yes.

25        Q.    And who is his supervisor?

```
 1      A.   D.D. Pickle.
 2      Q.   And was Mr. Chen ever involved in the pharmacy
 3  policy?  Did Mr. Chen ever work for the pharmacy policy
 4  unit?
 5      A.   No.
 6      Q.   How long has Mr. Chen been in that position?
 7      A.   I don't remember.
 8      Q.   More than a year?
 9      A.   Yes.
10      Q.   More than two years?
11      A.   I'm not sure.
12      Q.   Okay.  Does Mr. Chen in his position have any
13  responsibilities over pharmacy coverage policies?
14      A.   None that are currently promulgated.
15      Q.   What about policies that are not promulgated?
16      A.   I don't know if there's going to be the need
17  for a coverage policy or what types of administrative
18  rule we're going to need to implement the Canadian
19  Prescription Drug Importation Program once that's
20  federally approved -- which is why I answered how I did.
21      Q.   Are there any other pharmacy related activities
22  that Mr. Chen engaged in the past year?
23      A.   Yes.
24      Q.   What are those?
25      A.   His -- he's part of the Canadian Prescription
```

1   Drug Importation Program team.  And there has been

2   pharmacy related activity regarding the SIP approval.

3        Q.   What does SIP stand for?  Or you can just

4   describe it if that's easier.

5        A.   It's the proposal or the importation program

6   plan that the federal government authorized states to

7   submit or request approval of in order to develop an

8   importation program.  And this was submitted to the FDA.

9        Q.   What does the Canadian Prescription Drug

10  Importation unit do?

11       A.   Their primary responsibility is to implement

12  the Canadian Prescription Drug Importation Program that

13  was statutorily authorized -- and I think it was in

14  2019 -- which includes seeking that federal approval

15  from the FDA and any implementation activities in

16  managing the contract with LifeScience Logistics -- the

17  agency's vendor who assists with that program.

18       Q.   And did Mr. Chen over the past year have any

19  responsibilities related to pharmacy activities that did

20  not involve the Canadian Prescription Drug Importation

21  Program?

22       A.   Yes.

23       Q.   And what were those?

24       A.   I can't recall all the specific assignments.

25  But he has helped with several research projects.  I

```
 1   think he has assisted Ashley's team with some questions
 2   or answering questions.  And he's been available to
 3   assist with just different research projects.
 4       Q.   Was he involved at all with the categorical
 5   exclusion of treatment for gender dysphoria in
 6   developing the pharmacy coverage decisions related to
 7   that?
 8       A.   So when you ask that, you're specifically
 9   talking about the rule?
10       Q.   I'm talking about the rule and the ways in
11   which AHCA is implementing the rule.
12       A.   I don't know to the extent -- I know that he
13   assisted with research for the GAPMS report.
14       Q.   Okay.  And by GAPMS report, is that the report
15   that is related to the categorical exclusion for
16   treatment of gender dysphoria?
17       A.   Yes.
18       Q.   Why did Mr. Chen assist the pharmacy unit with
19   the GAPMS report instead of the other pharmacists in the
20   pharmacy policy unit?  I'll strike that.
21            Why did Mr. Chen -- does the Canadian
22   Prescription Drug Importation unit focus on pharmacy
23   policies unrelated to the Canadian Prescription Drug
24   Importation Program typically?
25       A.   Since there's been such a long delay with the
```

Page 28

1   federal approval of the Canadian Prescription Drug

2   Importation Program, that team has assisted with various

3   other projects within the bureau.

4        Q.   Okay.  Is that why Mr. Chen assisted with the

5   GAPMS report for the exclusion of the treatment for

6   gender dysphoria?

7        A.   Yes.

8        Q.   What types of services does AHCA develop

9   coverage policies for?  Actually -- I'm sorry; strike

10   that.  I apologize.

11        What does the Pharmacy Policy unit do?

12        A.   Their job entails a lot of duties.  Primarily

13   they host and oversee the PNT and DUR meetings -- public

14   meetings and the boards associated with that.  They

15   oversee the coverage policies specific to pharmacy.

16   They assist with any contract language for the managed

17   care contacts for pharmacy.  They oversee the contract

18   for our PBM contractor Magellan.  Those are the primary

19   duties.

20        Q.   What does PBM stand for?

21        A.   Pharmacy benefits manager.

22        Q.   And what is that?

23        A.   PBMs can have various duties.  But the contract

24   that I'm referring to is our rebate negotiation

25   contract.

Page 29

1      Q.    Okay.  And you said that PBM contract is with

2   Magellan; is that correct?

3      A.    Yes.

4      Q.    Okay.  What's DUR?

5      A.    Drug Utilization Review Board.

6      Q.    And I think you used one other acronym when you

7   were discussing the public facing pharmacy meetings.

8      A.    PNT.

9      Q.    And what does that stand for?

10     A.    I believe it's pharmaceuticals and

11  therapeutics.

12     Q.    Okay.  And what is that?

13     A.    All the responsibilities of that board are

14  outlined in statute.

15     Q.    Okay.

16     A.    I can't think off the top of my head.  But they

17  meet quarterly.  And we host those meetings and schedule

18  them.

19     Q.    Okay.  A few more questions about Mr. Chen.

20           Is Mr. Chen a pharmacist?

21     A.    I believe so.

22     Q.    And is he the only pharmacist in the Canadian

23  Prescription Drug Importation Program unit?

24     A.    None of the other members of that team are

25  pharmacists.

1  Q. So Mr. Chen is the only one?

2  A. Yes.

3  Q. Okay.  Did any other pharmacist assist with the

4 2022 GAPMS relating to exclusion of treatment for gender

5 dysphoria?

6  A. I don't know.

7  Q. What types of services does AHCA develop

8 coverage policies for?

9  A. The coverage policies are -- outline the

10 services that the State covers through the state plan --

11 Medicaid state plan or Medicaid waivers.  So those are

12 just any Medicaid related service.

13  Q. Does AHCA develop coverage policies for

14 surgeries?

15  A. Yes.

16  Q. How about for prescription drugs?

17  A. Yes.

18  Q. Does AHCA develop coverage policies for every

19 Medicaid service?

20  A. I don't know.

21  Q. Have you ever had a situation where a Medicaid

22 recipient requests coverage for a service and there is

23 no policy?

24  A. I personally have not, no.

25  Q. Okay.  And what process does AHCA use to decide

Veritext Legal Solutions

800-726-7007                   305-376-8800

Page 31

1   whether to provide coverage of a Medicaid service?

2        A.    That really depends on the specifics of what

3   that service is.

4        Q.    Does every service have a different process?

5        A.    The process could vary based on what the

6   service is that we are determining coverage for.

7        Q.    Do you use the same process for developing

8   pharmacy policy coverage?

9        A.    I can't speak to the process or approach of the

10  analysts.  The process of promulgating the coverage

11  policies into rule is always going to be in accordance

12  with Chapter 120.

13       Q.    During your time at AHCA, have you developed --

14  have you been involved in developing or has your team --

15  those you supervise -- been involved in developing new

16  coverage policies to cover services?

17       A.    Yes.

18       Q.    Can you remember a specific service that you

19  did that for?

20       A.    Yes.  We are currently in the process with

21  promulgating the iBudget Waiver handbook.  And as part

22  of the updates to the handbook, one of those is to

23  develop a new life skills development for Level 4

24  service.  As part of that process, we also worked with

25  our federal partners at CMS to get a waiver amendment

1   approved.  That's a very recent example of a new service

2   being developed.

3       Q.   Do you have an example of a state plan service

4   that you developed coverage for that's under current

5   development?

6       A.   Yes.  We recently added some Puro Meno products

7   to the DME fee schedule.

8       Q.   And so in that instance, did you establish a

9   coverage policy for those specific items of DME?

10      A.   We did a coverage determination to determine if

11  and how they could be included as a covered service as

12  part of the DME service.

13      Q.   And what is DME?

14      A.   Durable medical equipment.

15      Q.   And that includes medical supplies?

16      A.   Yes.

17      Q.   And Puro Meno would be a medical supply?

18      A.   Yes.

19      Q.   And you, to cover that service, incorporated it

20  onto the fee schedule?

21      A.   Yes.

22      Q.   Did you do --

23           Okay.  How did you assess whether to decide to

24  incorporate Puro Meno into the fee schedule?

25      A.   So I can't speak to all the steps that the

1    analyst -- the specific steps that they took.  But just

2    speaking overall, determined if we had the legislative

3    and state plan authority to cover it; determined if it

4    was -- if there would be a fiscal impact.

5              And we approach coverage like that example to,

6    you know, try and make sure it's budget neutral since we

7    are -- our coverage is driven by our general

8    appropriations and our state general appropriations act.

9    And then determined if and what types of updates would

10   be needed to any of the Medicaid rules.  That's the

11   general process for determining that kind of coverage.

12       Q.   So to make a coverage determination you look at

13   your legislative authority -- authority under the state

14   plan -- and you do a fiscal analysis and hope for budget

15   neutrality.  You check to see if there's any updates to

16   Medicaid rules.  Anything else?

17       A.   Making sure that it's an allowable service

18   under Medicaid, as well; which would entail that it

19   meets all federal, state rules and regulations for

20   coverage.  But, like I said, all the details of the

21   research that the team does -- I can't speak to exactly

22   everything that they read or looked at.

23       Q.   And if in that coverage determination you

24   decide to cover that service, do you then incorporate it

25   into the fee schedule?

Page 34

1    A.    In the example I gave, that's what we did, yes.

2    Q.    Are there any situations where you would not

3    incorporate it into the fee schedule?

4    A.    Yes.

5    Q.    What are those circumstances?

6    A.    That would vary depending on what the actual

7    request or coverage benefit is that we're looking.

8    Q.    Can you think of an example?

9    A.    Yes.  Last legislative session, I believe it

10   was, there was a specific language regarding the

11   coverage of human donor milk and milk derivatives for

12   inpatient use.  Because it was under inpatient, that is

13   a -- the reimbursement for that is different and isn't

14   included in a fee schedule.

15   Q.    Okay.  That makes sense.

16         Once this coverage determination is made, do

17   your responsibilities include reviewing that to

18   determine whether to approve the decision?

19   A.    Yes.

20   Q.    And how do you go about doing that?

21   A.    We usually meet with the team.  We do a

22   walkthrough, have discussions around the proposal and

23   the recommendation.  And then we put together --

24   depending on what the change is, put together a document

25   to get approval from management -- upper management.

Page 35

1      Q.   Does that document have a specific title -- the
2  same title every time?
3      A.   No.
4      Q.   How would you identify that document?
5      A.   So if a fee schedule change was needed, there
6  is a formal routing process for the rule promulgation
7  process that would be routed through management and
8  signed off on.
9      Q.   Okay.  Are there other documents that would be
10  routed through management to be signed off on?
11      A.   Yes.
12      Q.   And what are the titles of those documents?
13      A.   It depends on the situation.  For example, we
14  also have a steering committee at the agency for the
15  division of Medicaid.  And we call that a decision point
16  that would be to the steering committee.
17      Q.   Okay.
18      A.   And the Medicaid director or agency leadership
19  is part of that committee.  And so that is also a way
20  for us to get approval.
21      Q.   For those coverage determinations that you
22  reviewed and put together in a document for
23  administrative review, who in the administration reviews
24  that document?
25      A.   Depends on what that is.  So for administrative

1  rule -- that needs to be signed off by several agency

2  leadership; including the general counsel, the agency

3  secretary for a proposed rule.  So it would depend on

4  what the final document is who the final signatory would

5  be.

6      Q.   Distinct from implementation of the coverage

7  determination, is there a review by the administration

8  of just whether to cover the Medicaid service?

9      A.   It depends on what the specific circumstances

10  are.

11     Q.   Okay.  Can you think of an example of the

12  administration reviewing a determination of whether to

13  cover a service?

14     A.   Can you be more specific?  So the waiver

15  example I used a while back would be signed to submit

16  the waiver -- the iBudget waiver -- with the changes.

17  That would have been signed by the Medicaid director

18  prior to submission to federal CMS.

19     Q.   How long have you been involved in the process

20  of doing coverage determination?

21     A.   Since my time at AHCA.

22     Q.   Okay.  So since -- I'm trying to take notes

23  here.  So since August of 2018?

24     A.   January of 2018.

25     Q.   January of 2018.  Thank you.

1          And when you're making coverage determinations,
2     you coordinate with AHCA rules unit if a rule change is
3     needed; is that right?
4          A.    Yes.
5          Q.    Okay.   Under what bureau does the AHCA rules
6     unit fall?
7          A.    Under the Bureau of Medicaid Policy.
8          Q.    Okay.   So under your unit?
9          A.    In the bureau.
10         Q.    I'm sorry.   Under you're bureau?
11         A.    Yes.
12         Q.    And you coordinate with AHCA's pharmacy policy
13    unit; which falls under your -- the pharmacy policy unit
14    falls under your bureau as well; is that right?
15         A.    Yes.
16         Q.    Okay.   Do you coordinate with other bureaus in
17    developing coverage determinations?
18         A.    Yes.
19         Q.    Which ones?
20         A.    All the bureaus in the division work closely
21    together.   And there have been some recent changes with
22    that structure.   But speaking prior to those changes,
23    the Bureau of Medicaid Program Finance would be probably
24    be the primary bureau; because they assist with
25    determining or setting our fee schedules and our rates

Page 38

1   and the methodologies and doing fiscal impact

2   analyses -- data analytics -- Medicaid data analytics.

3           As part of the whole development package, we

4   talk to all the bureaus because plan management

5   operations can be affected if there is an update to the

6   contracts.  The Bureau of Medicaid Quality who monitors

7   and oversees the provision of services through those

8   contracts -- and they have various other duties.  But

9   depending on what the change is, we would communicate

10  with most of the bureaus within the division.

11      Q.   Okay.  You just mentioned some recent changes

12  in terms of that structure.  What are those recent

13  changes?

14      A.   The Bureau of Medicaid Finance and Medicaid

15  Data Analytics are reporting directly to Tom.  And Plan

16  Management Operations, Quality, and Policy are reporting

17  directly to Brian Meyer.

18      Q.   And why is that a change?

19      A.   Previously I had been reporting directly to Tom

20  Wallace.

21      Q.   Is Brian Meyer's position a new one?

22      A.   I don't know all the details of those changes.

23      Q.   Okay.  Who made the decision to make those

24  changes?

25      A.   I don't know.

```
 1      Q.   Okay.  Who oversees the rules unit?
 2      A.   Cole Giering is program administrator of the
 3  rules unit.
 4      Q.   How long has he been in that position?
 5      A.   I'm not sure exactly.  But it was since I've
 6  been bureau chief.
 7      Q.   Okay.  So --
 8      A.   August of 2021.
 9      Q.   Thank you.
10           Do you coordinate -- in making coverage
11  determinations, do you coordinate with the chief medical
12  officer for AHCA?
13      A.   Yes.
14      Q.   Who is that?
15      A.   Dr. Christopher Cogal.
16      Q.   Can you describe how you coordinate with him,
17  what that process looks like.
18      A.   Again, it really depends on the specific
19  question or policy we're reviewing.  But it would
20  consist of meetings or discussions.
21      Q.   What types of things would you discuss?
22      A.   So, for example -- I'm going to go back to the
23  two examples of recent activity.  So he wasn't involved
24  in the iBudget Waiver changes at all.  But for the human
25  donor milk, he assisted when we had originally done the
```

1   legislative bill analysis when the legislation was first

2   proposed.  And so for the development of how to

3   implement the changes, he was consulted.  I don't know

4   the specific conversation, but I do know that he was

5   involved in that process.

6        Q.   On what kind of expertise do you rely on him

7   for?  What kind of input does he provide in the process?

8   Is it medical in nature?

9        A.   I don't know.

10       Q.   Okay.

11       A.   To the extent -- I know he's an available

12   resource for the team.  But I don't know to the extent

13   that -- of his involvement.

14       Q.   When he gets involved, is it through a formal

15   process?  Or is it just a decision to reach out and ask

16   him for advice?  How would you characterize it?

17       A.   From my experience at the bureau level, it's

18   been more informal.  I know that there have been -- he's

19   been formally asked to review bill analysis or -- but

20   how that process works, I don't know.

21       Q.   Okay.  Are there people under you who are more

22   likely to communicate with Dr. Cogal?

23       A.   I believe there's staff that communicate with

24   him more than others, yes.

25       Q.   What staff are those?

Page 41

1      A.   Ashley Peterson has been meeting with him on

2   some projects lately.  Again, it really depends on the

3   project.  But we are working with him on continuous

4   glucose monitoring -- questions around coverage there.

5   And Jesse Bottcher and his team.

6      Q.   When you say Jesse Bottcher and his team, would

7   that include the GAPMS process?

8      A.   His team is responsible for it.

9      Q.   In coordinating with Dr. Cogal -- in the

10  coordination between Mr. Bottcher's team and Dr. Cogal,

11  would that include the GAPMS process?

12     A.   I don't know the extent to which he is involved

13  in that.

14     Q.   Okay.  To your knowledge, has he ever been

15  involved in that?

16     A.   I don't know specifically.

17     Q.   Have you and Dr. Cogal and anyone from

18  Mr. Bottcher's team ever met to discuss the GAPMS

19  process?

20     A.   The process, yes.  When I first took the role,

21  we had met to talk through the process.  But I can't

22  remember the specific conversation.

23     Q.   Okay.  Switching gears a bit.  When I use the

24  term "Florida Medicaid managed care plan," do you know

25  what it means?

Page 42

1      A.    Yes.

2      Q.    What does that term mean?

3      A.    Those are the managed care plans that the

4  agency contracts with to provide the services through

5  the managed care delivery model.

6      Q.    Do Medicaid managed care plans have their own

7  coverage policies?

8      A.    The agency's coverage policies are incorporated

9  into the managed care plan contracts by reference.  And

10  there are requirements outlined in the contract with how

11  the managed care plans have to provide services.

12      Q.    Are you aware of managed care plans having

13  their own policies that incorporate Florida Medicaid's

14  policies?

15      A.    I don't know.

16      Q.    Have you ever seen a copy of a Florida Medicare

17  managed care plan document that discusses the coverage

18  of a Florida Medicaid service?

19      A.    I reviewed the plans' member handbooks or

20  enrollee handbooks.  And I've seen their resources

21  available on their websites that weigh out what they

22  cover.  I can't remember if I've ever seen an official

23  document titled "Coverage Policy."

24      Q.    So my question is:  Have you ever seen a

25  document from a Medicaid managed care plan -- formal or

1  informal, it doesn't matter -- with information that

2  contains the criteria used to determine if Florida

3  Medicaid will cover a service?

4      A.   I believe that information is in the handbooks.

5  But I can't recall any specific documents drafted by the

6  plans.

7      Q.   What unit would be responsible for

8  communicating with managed care plans about their

9  coverage of Florida Medicaid services?

10     A.   That would depend if they had a question for

11  the agency on the agency's coverage of a covered service

12  or a contractually required service.  Those most likely

13  would be sent to Medicaid policy.

14     Q.   Okay.

15     A.   To review.

16         MS. DEBRIERE:  Okay.  Yes.  Definitely.  Just a

17     couple more questions, if that's okay.

18  BY MS. DEBRIERE:

19     Q.   Are you okay Ms. Dalton?

20     A.   Yes.

21     Q.   Who would review those questions?  Who

22  specific -- like, what specific individuals?

23     A.   It would depend on what the question was.

24     Q.   Okay.  If the managed care plan doesn't have a

25  question, is there any process that exists that just

1    involves overseeing whether a Medicaid managed care plan

2    is covering a Florida Medicaid service?

3         A.    The Bureau of Plan Management Operations is the

4    bureau that oversees the adherence to the contract.  All

5    the contract managers for the individual plans are

6    housed there.  So if it was a compliance question on if

7    the managed care plan was following the requirements in

8    the contract, that would be Plan Management Operations

9    most likely who would be the first point of contact for

10   the plans.

11        Q.    Okay.  Can MCOs create their own guidelines for

12   implementing AHCA coverage policies?

13        A.    I don't know.

14        Q.    Who would know that?

15        A.    It would be in the contracts.

16        Q.    Okay.

17        A.    The parameters around what their materials are

18   allowed to contain and if the materials have to be

19   reviewed and approved by the agency.

20        Q.    Okay.  And that would be the Bureau of Planned

21   Management Operations who does that -- takes on that

22   role?  And if not, then who?

23        A.    I believe it would depend on what the materials

24   being reviewed are.  Just like with reporting -- there

25   are different report owners in different bureaus within

Page 45

1   the division of Medicaid that review compliance with

2   the -- the plan's compliance with the contracts.  But

3   the first point of contact for submitting those

4   materials and making sure that they're submitted would

5   be through Plan Management Operations.

6        Q.   And who is that bureau chief?  Remind me.

7        A.   Pam Hall.

8        Q.   Okay.  One last question.  Are you aware that

9   MCOs have their own guidelines for specific types of

10  Medicaid services?

11       A.   I can't speak to that.  I don't know.

12       Q.   Do you know who would know?

13       A.   Are you asking if it's a required -- or if

14  they're allowed to --

15       Q.   No.  I'm just asking if you're aware.  So are

16  you aware that they have their own --

17            MR. PERKO:  Asked and answered.

18            MS. DEBRIERE: -- criteria guidelines?

19            THE WITNESS:  I would have to review the

20       contract.

21  BY MS. DEBRIERE:

22       Q.   Okay.  So is that a no, you are not aware as we

23  sit here today without having anything in front of you?

24       A.   Correct.  I don't know without seeing a

25  specific example or reviewing the contract.

Page 46

```
 1        Q.   Okay.  Do you want to take a break?
 2        A.   Yes.
 3             (Brief recess.)
 4   BY MS. DEBRIERE:
 5        Q.   Ms. Dalton, just briefly -- when we took a
 6   break, did you discuss this deposition with anyone?
 7        A.   No.
 8        Q.   Did you discuss it with your attorneys?
 9        A.   Just briefly.
10        Q.   Okay.  When I use the term "quality improvement
11   organizations" or QIOs, do you know what I mean?
12        A.   Yes.
13        Q.   What does that term mean?
14        A.   Quality improvement organization.
15        Q.   Yeah.  Is eQHealth a QIO?
16        A.   Yes.
17        Q.   And what do they do?
18        A.   I don't know the whole scope.  But their main
19   function in their contract with the agency is the -- to
20   do prior authorization for fee for service services.
21        Q.   Okay.  What does prior authorization mean?
22        A.   It's a utilization management tool to ensure
23   that the services are in their scope, authorized, and
24   appropriate.
25        Q.   By "appropriate," what do you mean?
```

1      A.    That the service that's being requested is

2   allowable and delivered within the parameters of the

3   Medicaid program.

4      Q.    Who makes the request for prior authorization?

5      A.    I don't know the details of how the process

6   works.

7      Q.    Okay.  By parameters, do you mean the

8   parameters set by AHCA's coverage policies?

9      A.    Yes.  And administrative rule.

10     Q.    Okay.  Is administrative rule distinct from a

11   coverage policy?

12     A.    Yes.  Not all of the administrative rules

13   incorporate a coverage policy by reference.

14     Q.    Okay.  So an example of that would be the

15   definition of medical necessity -- would be an

16   administrative rule that sets out the parameters for

17   coverage but does not include a specific coverage

18   policy?

19     A.    The definition of medical necessity is actually

20   in the definitions policy -- which is a document

21   incorporated by reference into the text of the

22   administrative rule.

23     Q.    Okay.  Do QIOs like eQHealth -- do they have

24   their own coverage criteria they rely on?

25     A.    Yes.

1      Q.   Do you coordinate with QIOs regarding those

2   coverage criteria?

3      A.   I personally do not.

4      Q.   Does anybody on your team?

5      A.   The eQHealth contract is housed in the Bureau

6   of Medicaid Quality.

7      Q.   Okay.

8      A.   So they would be a lead in managing of that

9   contract and communicating with the vendor.  But I do

10  know that we have communicated with them in the past --

11  the Bureau of Medicaid Policy has.

12     Q.   What types of things have you communicated

13  about in the past?

14     A.   The first example that comes to mind is

15  recently the agency opened the definitions rule policy

16  and did communicate that that rule was being opened with

17  eQHealth.

18     Q.   Okay.  Are MCOs and QIOs bound by AHCA's

19  coverage policies?

20          MR. PERKO:  I'm going to object to form.

21          You can answer.

22          THE WITNESS:  As I stated before, the contract

23      for the managed care plans incorporates the coverage

24      policies by reference.  And the plans are not

25      allowed to be more restrictive than the coverage

1      policies.  I don't know the specific language off

2      the top of my head with the requirements of how they

3      adhere to the policies.  But that is in the

4      contract.

5   BY MS. DEBRIERE:

6      Q.   Okay.  So the MCO's obligation to adhere to

7   AHCA's coverage policies is set forth in the contract?

8      A.   Yes.

9      Q.   Okay.  What about QIOs?

10     A.   I don't know the specific language off the top

11  of my head.  But that information is also in the

12  contracts on how the managed care plans' contracted QIO

13  vendors are expected to operate.

14     Q.   Okay.  Is there a formal approval process for

15  the QIO's coverage criteria?

16     A.   I don't know.

17     Q.   Is Magellan a QIO?

18     A.   I don't know.

19     Q.   Okay.  Does Magellan conduct prior

20  authorization of Florida Medicaid services?

21     A.   I don't know.

22     Q.   Does Magellan review the request of a Medicaid

23  recipient to authorize prescription drug services in the

24  Fee for Service program?

25     A.   I don't know.

1    Q.   Do you know what -- do you know if Magellan

2    plays any role in determining coverage of pharmacy

3    services under Florida Medicaid?

4    A.   I believe the agency has a contract with them

5    to adjudicate the claims.  But I don't know the scope of

6    that contract.

7    Q.   What do you mean by adjudicate the claims?

8    A.   I don't know the whole scope of that process or

9    the contract.

10   Q.   When you just use that phrase, what did you

11   mean by that?

12   A.   That they're involved in the reimbursement

13   process.

14   Q.   Okay.  And would the reimbursement process

15   involve determining the eligibility for the service

16   itself?

17   A.   I don't know the extent of that process.

18   Q.   Would anybody at AHCA know or be able to answer

19   that question?

20   A.   I don't know.

21   Q.   Moving back to coverage determinations

22   undertaken by your bureau, who is the final

23   decisionmaker as to whether AHCA will adopt that

24   coverage determination?

25   A.   Can you repeat the question.

1      Q.   So earlier we were talking about your bureau

2   undertaking coverage determinations of Florida Medicaid

3   services; correct?

4      A.   Yes.

5      Q.   Who is -- before AHCA or anyone at AHCA can act

6   on that determination, who is the final decisionmaker?

7      A.   Again, it depends on the circumstances.  And I

8   can only speak to the signatory of who needs to be -- to

9   officially sign off.  But the example I used before for

10  a federal authority submission, that would be whoever

11  was designated from the agency as the Medicaid director

12  or the Medicaid state plan approver.

13     Q.   Okay.

14     A.   And then administrative rule to actually

15  complete the promulgation process.  That's actually

16  signed off by the head of the agency, which here would

17  be our secretary.

18     Q.   Okay.  When coverage policies are promulgated,

19  are there multiple drafts of those policies?  Are there

20  ever multiple drafts of those policies?

21     A.   Can you repeat the question.

22     Q.   When you're developing a coverage policy, are

23  there multiple drafts?

24     A.   It would it depend on what the change was.

25     Q.   So there are times when coverage policies have

Page 52

1   multiple drafts?

2        A.   Yes.

3        Q.   And how do you track any changes to those

4   policies during the drafting process?

5        A.   So specific to the coverage policy, we

6   typically use a document called a revisions template;

7   which tracks the changes being proposed.

8        Q.   Okay.  Is there a limit to the people who can

9   make changes to the revisions document?

10            I'm sorry; the revision just tracks who has

11  made the changes; is that right?

12       A.   So it tracks what the old policy said, what the

13  new changes are, if there's a reason for the change.

14  I'm not sure if it includes who the requester of the

15  change is.

16       Q.   Okay.  Does it record who is making the change?

17       A.   I can't recall if that's on the template.

18       Q.   Is anybody at AHCA allowed to make a change?

19       A.   So for most of the coverage policies, there's a

20  subject matter expert assigned to that program area who

21  any changes would filter through.  And then they have to

22  work with the rules unit who is actually making the

23  changes to the coverage policy and promulgating that

24  through the rulemaking process.

25       Q.   Okay.  Just switching quickly to some specific

Page 53

```
 1   Medicaid services.  Are coverage policies regarding
 2   surgery adopted into rule?
 3        A.   Yes.
 4        Q.   And are they in handbooks or a handbook?
 5        A.   I don't believe it's one specific handbook.
 6        Q.   Do you remember the names of any of the
 7   handbooks they are contained in?
 8        A.   We have a transplant services coverage policy.
 9        Q.   Okay.
10        A.   Which I would consider inclusive of surgical.
11   We have an inpatient services coverage policy.  Without
12   seeing the list of policies, I can't recall off the top
13   of my head.
14        Q.   Give me one second.
15             Would coverage policies about surgeries be in
16   the Ambulatory and Surgical Center Services Policy?
17        A.   I don't know the content of that policy off the
18   top of my head.
19        Q.   Okay.  You said inpatient hospital services
20   would contain surgery policies?
21        A.   I don't know all the content in the policy
22   without looking at it.  But it...
23        Q.   If it mentions surgery in the handbook, is it
24   going to have a coverage policy related to it?
25             How would you know if a handbook covered
```

1  surgery or contained a surgery coverage policy in it?

2      A.   I would have to read the handbook.  Depending

3  on what the specific question was, what type of surgery.

4      Q.   Okay.  What about prescription drug coverage

5  policies?  Are those adopted into rule?

6      A.   I believe there is a rule specific to pharmacy

7  policies and prescription drugs, yes.

8      Q.   Okay.  And then I'm just going to flip my

9  computer around here and go to this page.  We're looking

10  at what's titled Agency for Health Care Administration

11  Drug Criteria.

12  AHCA.myFlorida.com/Medicaid/prescribed_drug_criteria.

13  shtml.

14          And I assume, Ms. Dalton, I'm seeing here --

15  are you just seeing a list of drug criteria?

16      A.   Yes.

17      Q.   Is this an exhaustive list of the drug criteria

18  that AHCA relies on?

19      A.   I don't know.

20      Q.   Who would know that?

21      A.   Ashley Peterson and her team may be able to

22  confirm.

23      Q.   Okay.  And why wouldn't this be an exhaustive

24  list?

25          MR. PERKO:  Object to form.

1           THE WITNESS:  I'm not personally very familiar

2      with this page.

3           MR. PERKO:  Counsel, for the record, can we

4      read the URL.

5           MS. DEBRIERE:  Absolutely.  Well, I think I --

6      Gary, do I not know what a URL is?

7           MR. PERKO:  The website address.

8           MS. DEBRIERE:  So I think we read most of it.

9      But I can start with

10     https://AHCA.myFlorida.com/Medicaid/prescribed_drug/

11     drug_criteria.shtml.

12          MR. PERKO:  Thank you.

13          MS. DEBRIERE:  Absolutely.

14   BY MS. DEBRIERE:

15     Q.   Do you know what categorical exclusion means?

16          MR. PERKO:  I'm going to object to form.  I

17     guess I'm a bit confused, Counsel.  You already

18     defined what categorical exclusion means at the

19     beginning of this deposition.

20          MS. DEBRIERE:  Well, that's categorical

21     exclusion -- you're right, Counsel.  It contained

22     the statement "categorical exclusion"; just

23     categorical exclusion of a very specific set of

24     services.  The treatment for --

25          MR. PERKO:  That wasn't the definition at the

Page 56

1    beginning.  But go ahead.
2  BY MS. DEBRIERE:
3      Q.   How about this, Ms. Dalton:  Can you provide an
4  example of a categorical exclusion under Medicaid?
5      A.   I can't think of an example.  I'm familiar with
6  the term.  I cannot think of an example.
7      Q.   Okay.  I'm trying to think of one too.
8           Does AHCA -- does Florida Medicaid cover
9  private duty nursing service for individuals over the
10 age of 21?
11     A.   Not through the state plan.
12     Q.   Okay.  Do they cover it through home and
13 community based services with a Medicaid waiver?
14     A.   Yes.
15     Q.   Okay.  And if Florida Medicaid does not cover
16 private duty nursing services for individuals over 21
17 under the Medicaid state plan, is that a categorical
18 exclusion?
19     A.   Yes.
20     Q.   And does the agency categorically exclude any
21 Medicaid service for beneficiaries under the age of 21?
22     A.   Can you repeat the question.
23     Q.   I'm sorry.  Bear with me one second,
24 Ms. Dalton.  I'll come back to that.
25          Do your responsibilities include ensuring that

1  coverage policies meet the standards under EPSDT?

2      A.   The Bureau of Medicaid Policy doesn't oversee

3  the monitoring of the adherence to the policies or the

4  provision of services.  In terms of ensuring that the

5  policy language complies with the federal EPSDT

6  requirements, yes.

7      Q.   And how do you ensure that compliance when

8  developing coverage policies?

9      A.   It depends on the specific coverage policy.

10  But the majority of the service specific coverage

11  policies include language incorporating EPSDT by

12  reference and language from the federal regulation.

13      Q.   Generally speaking, what is that EPSDT

14  requirement?

15      A.   That the State must provide all medically

16  necessary services to children ages under 21.

17      Q.   Does the State have to provide a service under

18  EPSDT to a Medicaid recipient under 21 if that service

19  is experimental?

20          MR. PERKO:  Object to form.

21  BY MS. DEBRIERE:

22      Q.   Do you know what I mean when I say

23  experimental?

24      A.   Yes.

25      Q.   So same question.  Does the State have to

1   provide coverage to children under age 21 if that health

2   service is considered experimental?

3            MR. PERKO:  Object to form.

4            THE WITNESS:  The State is allowed to develop

5       its own definition of medically necessary or medical

6       necessity; which Florida has done and promulgated in

7       administrative rule.  And part of that definition

8       does include the parameters by which a service would

9       not be determined medically necessary; and,

10      therefore, not required under the EPSDT.

11  BY MS. DEBRIERE:

12      Q.   Okay.  And that definition of medical necessity

13  includes the requirement that the service not be

14  experimental; correct?

15      A.   I cannot recall the exact definition off the

16  top of my head.  But that is in -- promulgated in the

17  definition coverage policy.

18      Q.   When you say that is --

19      A.   The definition of medical necessity.

20           MS. DEBRIERE:  Okay.  We can mark -- I have a

21      copy of the rule so you can reference it.  We can

22      mark that as Exhibit 3.  And that's 59G-1.010.

23           We might have forgotten to put a copy in.  If

24      we did, it's my fault.

25           MS. DUNN:  I have a copy right here.

Page 59

```
 1              (Plaintiff's Exhibit No. 3 was marked for
 2      identification.)
 3              MS. DUNN:  Yeah.  It's right there.  Last
 4         definition on that page.
 5              THE WITNESS:  It doesn't seem to be the
 6         whole --
 7              MS. DUNN:  It's not.
 8              MS. DEBRIERE:  It's not.  We ended it at "N,"
 9         because it's a very large coverage policy and we are
10         trying to save some trees.
11      BY MS. DEBRIERE:
12         Q.   So if you look at the definition of "medically
13      necessary" or "medical necessity," does that contain a
14      requirement that the service not be experimental?
15         A.   Yes.
16         Q.   And so under EPSDT, can the agency deny a
17      medical service to a child under 21 if they deem it to
18      be experimental?
19         A.   Yes.
20         Q.   Okay.  Who is responsible for compliance with
21      EPSDT?  Is it a specific person?
22         A.   I don't know who is responsible.
23         Q.   Is it someone within your bureau regarding
24      EPSDT as it relates to the development of coverage
25      policies?
```

1      A.    There isn't a specific person in my bureau, no.

2      Q.    Are there any written guidelines about ensuring

3    compliance with EPSDT with developing coverage policies?

4      A.    Can you repeat.

5      Q.    Are there any written guidelines relied on to

6    determine whether a coverage policy complies with EPSDT,

7    other than that contained in the Federal Medicaid Act?

8      A.    I don't know specific -- all the specific

9    documents that the analysts rely on when developing the

10   coverage policy.  But as part of that process, the

11   expectation is to review the federal guidelines and

12   statute and other rules and regulations of governing the

13   Medicaid program to ensure that the coverage policy

14   adheres to the Medicaid program federally and state.

15     Q.    And that's an expectation of the staff within

16   your bureau?

17     A.    Yes.  It's the common practice when approaching

18   research regarding changes to the policy -- a policy.

19     Q.    Okay.  When I use the term "comparability," do

20   you know what I mean as it's laid out in regulations

21   implemented in the Federal Medicaid Act?

22     A.    You may have to give me some more context.

23     Q.    So under the Federal Medicaid Act, there is a

24   requirement that state agencies who administer Medicaid

25   do so in a way that all Medicaid recipients receive

1   comparable services.  Are you familiar with that

2   requirement?

3       A.   Vaguely sounds familiar.

4       Q.   Is your bureau required to be familiar with

5   that requirement in developing coverage policies?

6       A.   I can't speak to that without more information.

7       Q.   Okay.  Is there anyone who can speak to the

8   requirement -- is there anyone who can speak to ensuring

9   that the policy comply with comparability under the

10  Federal Medicaid Act?

11      A.   So, again, I think it really would depend on

12  what the specific question is regarding or which

13  specific coverage policy.  As I said before, a lot of

14  the coverage policies have a specific subject matter

15  expert with knowledge of that service area.  So it just

16  really would depend.

17      Q.   Okay.  I'm just going to make myself a note.

18           What is the purpose -- turning back to Exhibit

19  3 and the definition of medical necessity -- what's the

20  purpose of AHCA's medical necessity standard?

21           MR. PERKO:  Object to form.

22  BY MS. DEBRIERE:

23      Q.   Does AHCA's medical necessity standard have a

24  purpose?

25           MR. PERKO:  Object to form.

1           THE WITNESS:  I don't know what you mean.

2    BY MS. DEBRIERE:

3        Q.   What is the purpose of the definition of

4    medical necessity?

5           MR. PERKO:  Object to form.

6    BY MS. DEBRIERE:

7        Q.   What do you use it for?

8        A.   The definition is relied on a lot.  Most of the

9    service specific coverage policies refer and incorporate

10   by reference the definitions policy and make a statement

11   that the service must be medically necessary as part of

12   the requirement for reimbursement.

13       Q.   If a Medicaid recipient makes a request for a

14   Medicaid service, in order for that service to be

15   authorized, does it have to be medically necessary?

16       A.   Yes.

17       Q.   Do managed care plans rely on AHCA's medical

18   necessity standard in their prior authorization process?

19       A.   I can't recall the exact contract language.

20   But, yes.

21       Q.   And what about QIOs?

22       A.   I don't know.

23       Q.   Regardless of the method in which Medicaid is

24   delivering the service -- fee for service or managed

25   care -- in order for that surface to be authorized, does

Page 63

1    it have to be medically necessary?

2         A.   I don't know the details of the actual

3    authorization process.  I do know that the expectation

4    from policy prospective is that the services have to be

5    provided in accordance with the agency's coverage

6    policies and administrative rules.

7         Q.   And that includes the definition of medical

8    necessity?

9         A.   Yes.

10        Q.   If AHCA finds that a Medicaid service is

11   experimental, would AHCA or a contractor or managed care

12   plan still review whether service meets other portions

13   of AHCA's medical necessity definition?

14        A.   I don't know the extent of their review.

15        Q.   What about your review at AHCA for fee service?

16        A.   Again, I don't know eQHealth or QIO vendors'

17   process.

18        Q.   Do all Florida Medicaid services require prior

19   authorization?

20        A.   I don't know.  I don't believe so.

21        MS. DEBRIERE:  Okay.  Can I have what we'll

22        mark as Exhibit 4, which is the GAPMS Report on

23        Cross-Sex Hormone Therapy, dated May -- I believe we

24        did the May version.

25             So what I'm showing you is Bates stamped

1          beginning at Defendant 00126105.  I should pull out
2          my own copy.
3              And that continues through, Court Reporter --
4          this one is not Bates stamped.  It's weird.  This
5          one doesn't have a copy.  This copy is not Bates
6          stamped.  But it is entitled Cross-Sex Hormone
7          Therapy GAPMS Determination Report With
8          Recommendation.
9              That's very odd.  Very odd.  I don't think it's
10         a huge deal.
11             (Plaintiff's Exhibit No. 4 was marked for
12     identification.)
13     BY MS. DEBRIERE:
14         Q.   So on the last two pages, Ms. Dalton, starting
15     at "Coverage policy" -- and it starts, "Federal
16     regulations."
17             "Federal regulations for Medicaid..." and
18     continues on through the definition of medical
19     necessity --
20             MR. PERKO:  Can you give a page number.
21             MS. DEBRIERE:  Oh, yes.  Thank you, Gary.
22             So page 8, 9, and a tiny bit of the top of 10.
23             THE WITNESS:  I'm there.
24     BY MS. DEBRIERE:
25         Q.   Take all the time you need to read it.  And

1    afterwards, if you can tell me if this is an accurate

2    portrayal of the standard used to determine Florida

3    Medicaid coverage for prescription drugs.

4            MR. PERKO:  Do you have another copy?

5            Thank you.

6    BY MS. DEBRIERE:

7        Q.   I think it starts at the top of page 8 --

8    middle of page 8.  So reviewing that standard, is that

9    what's used to determine whether Florida Medicaid will

10   cover a prescription drug?

11       A.   Can you direct me more to where you're

12   referring.  I read both pages 8 and 9, and I don't think

13   I can speak to the specifics of all this information.

14       Q.   Okay.  When reviewing whether to cover a

15   prescription drug, does AHCA look at -- here on page 8

16   it says AHCA is -- "The program is required to asses

17   data on drug use against predetermined standards

18   consistent with the following compendia."  And then it

19   lists three types of compendia and the peer reviewed

20   medical literature.  Is that an accurate statement of

21   AHCA policy?

22       A.   I don't know.

23       Q.   Who would know that?

24       A.   I don't know if I can speak for them.  But I

25   would ask one of the pharmacists.

Page 66

1      Q.   Would you ask Ashley Peterson?  Or would you

2  ask one of the pharmacists that works under her?

3      A.   I specifically would go to Ashley, as she's my

4  direct report.  And then she would research the question

5  for me.

6      Q.   Okay.  Would research involve asking one of her

7  pharmacists?

8      A.   I don't know.  I can't speak for her process.

9      Q.   So going to page 9, top of the page says, "In

10  order to be reimbursed by Medicaid, a drug must be

11  medically necessary."

12          Is that the same as the definition contained in

13  the 59G-1.010 that we just reviewed -- Exhibit 3?

14      A.   I don't understand what you mean by the same.

15      Q.   Does medically necessary mean the same as the

16  definition in the definitions policy?

17      A.   I would think so.

18      Q.   Okay.  And it is, "Either prescribed for

19  medically accepted indications and dosages found in the

20  drug labeling or drug compendia in the Medicaid Act or

21  prior authorized by a qualified clinical specialist

22  approved by that agency."

23          Is this an accurate recitation of the standard

24  AHCA uses to authorize prescription drug coverage?

25      A.   I don't know.

Page 67

1     Q.   Would Ashley Peterson know that information --

2     her or her team?

3     A.   I would think so, yes.

4     Q.   Okay.  The next thing it says, "The criteria

5     that are utilized under the Florida Medicaid program in

6     the authorization of drugs for off-label purposes are as

7     follows."  And then it lists three criteria.

8          Reading over that statement, are these

9     currently the criteria AHCA uses in authorizing drugs

10    for off label purposes?

11    A.   Again, I don't know.

12    Q.   Would Ashley Peterson know the answer to that

13    question?

14    A.   I would think her team would, yes.

15    Q.   Is this the type of information -- looking at

16    this, is this the type of information that would be

17    contained in a coverage policy adopted in rule?

18    A.   I'm not sure.

19    Q.   Why aren't you sure?  What's throwing you about

20    it?

21    A.   I don't know the content of the rules off the

22    top of my head.

23    Q.   But I think my question is a little different.

24    So does this appear to be the type of information that

25    would be contained in a coverage policy adopted into

Page 68

1    rule?

2        A.   I can't speak to that.  I don't know because of

3    the reason I stated.  I will say the coverage policies

4    traditionally do not repeat regulation or requirements

5    or information that are found elsewhere; for example, in

6    Florida statute or in federal regulation.  And each

7    coverage policy is structured somewhat similarly, but

8    does contain very different information.  So I don't

9    know if this is information that's found off the top of

10   my head in one of our policies.

11       Q.   Okay.  I think you -- do all prescription drugs

12   require prior authorization to be reimbursed by

13   Medicaid?

14       A.   I don't know.

15       Q.   Who would know that?

16       A.   I would think Ashley Peterson and her team.  Or

17   it might be available on the information on our website

18   regarding pharmacy policy and authorization criteria.

19       Q.   Okay.  So Ms. Peterson would be familiar with

20   authorization criteria for prescription drugs?

21       A.   Yes.  Or she would know where to look.

22       Q.   Okay.  Specifically related to pharmacy

23   coverage policies, how are they developed?

24       A.   The coverage of the pharmacy services is a

25   little different than the other coverage policies.  I

Page 69

1   don't know all the details that go from the analysts

2   into the developments.  But because there is different

3   statutory requirements -- Florida statutory requirements

4   around pharmacy services, including the PNT and DUR

5   board -- the process for overseeing the coverage of

6   pharmacy services is a little different.

7        Q.   In reviewing whether a prescription drug

8   requires a coverage policy -- strike that.

9             Do you use the GAPMS process to determine

10  pharmacy coverage -- to determine whether coverage of a

11  prescription drug is experimental?

12       A.   I don't know specifically for determining if a

13  prescription drug is experimental.  I don't know.

14       Q.   When you develop coverage policies in your

15  bureau, does that include a determination as to whether

16  a service is experimental?

17       A.   So the coverage policies are drafted specific

18  to the covered services that we've been approved to

19  provide.

20       Q.   Okay.

21       A.   By the federal government.  So that is the

22  driving factor on how we would initially approach the

23  coverage and organize or draft a coverage policy

24  asserting a service that we are authorized to provide.

25       Q.   So separate and apart from developing coverage

1    policies, the responsibilities of your bureau also

2    include determining whether a service is experimental;

3    is that correct?

4         A.   So that would be part of the GAPMS process that

5    is outlined in administrative rule.

6         Q.   Okay.  Do you use the GAPMS process for

7    prescription drugs?

8         A.   Without researching or consulting others on the

9    team for a specific example, I don't know the interplay

10   between the different authorities and how that works.

11        Q.   Which team is responsible for the GAPMS

12   process?

13        A.   That position is within the Medicaid -- Bureau

14   of Medicaid Policy.

15        Q.   Earlier speaking about teams under the bureau,

16   which teams is responsible for the GAPMS process?

17        A.   Jesse Bottcher is the manager over the position

18   that is primarily responsible for the GAPMS process.

19        Q.   Are there any other teams that are primarily

20   responsible for the GAPMS process?  Or is it only

21   Jesse's team?

22        A.   So in terms of listing that as a primary

23   responsibility on a job description, that would be

24   Jesse's team.

25        Q.   Should the people on Jesse's team be aware of

Page 71

1    every GAPMS process that's undertaken?

2            MR. PERKO:  I'm going to object to form.

3            You can answer.

4            THE WITNESS:  So as the bureau chief of Policy,

5        I do try to keep staff within the bureau aware of

6        everything that's happening within the bureau --

7        especially when a determination has been made.

8        Jesse's team would definitely need to be aware,

9        because there could be potential impacts with a

10       specific service coverage policy.  But I do think

11       every circumstance is different.  So I can't say

12       just in a general statement to your question.

13   BY MS. DEBRIERE:

14       Q.   Would it be typical for Jesse's team to not be

15   aware of a GAPMS report being developed?

16       A.   I can't say if it would be typical.  I have not

17   overseen very many GAPMS in my time as bureau chief.

18       Q.   So as the bureau chief with Jesse's team being

19   primarily responsible for GAPMS, would you as that chief

20   endeavor to ensure that Jesse's team was aware of all

21   GAPMS reports being written?

22       A.   Yes.  We meet the managers on -- my direct

23   reports and I meet regularly at least twice a week for

24   an hour and discuss projects that are going on with each

25   team and provide updates.  So the ongoing bureau

Page 72

1    activities are regularly discussed with the management

2    team.

3         Q.    Okay.  Do you know what a drug compendium is?

4         A.    I recognize the term, but don't think I can

5    define it.

6         Q.    Do you know which compendia are listed in the

7    Federal Medicaid Act?

8         A.    No.

9         Q.    I'm just going to screen share again.  I'm

10   showing right now on my screen -- the URL is

11   https://AHCA.myFlorida.com/Medicaid/prescribed_drug/

12   pharm_thera/pdf/PDL.pdf.  The title of this document is

13   Preferred Drug List, Effective January 21st, 2023.

14            Do you know what the preferred drug list is?

15        A.    Yes.

16        Q.    What is it?

17        A.    It's list of drugs developed that the managed

18   care plans must adhere to.  And it has to do with rebate

19   negotiations and is recommended by the PMT committee.

20        Q.    Perhaps you just answered this.  But who

21   develops the PDL?

22        A.    The agency.

23        Q.    What is the PMT committee's role in it?

24        A.    Per statute, they make recommendations to the

25   agency.

```
 1      Q.   Okay.  Does the DUR have any role in developing
 2  the PDL?
 3      A.   I don't know.  I don't believe so.
 4      Q.   And this PDL applies to managed care plans; is
 5  that correct?
 6      A.   And fee for service.
 7      Q.   Okay.  So on here -- I'm going to have to do
 8  Control+F.  Pardon; one second.
 9           It's very small.  So tell me if you need to
10  make it any bigger.
11           Okay.  On here you will see the drug
12  estradiol -- e-s-t-r-a-d-i-o-l -- listed.  And there is
13  many versions here starting at it looks like this line
14  continuing all the way down until we hit norethindrone
15  AC.  So the fact that estradiol is lied on the PDL, does
16  that mean Florida Medicaid will cover it if the
17  eligibility criteria are met?  Excuse me.  Scratch that.
18           Since estradiol is listed on this PDL, does it
19  mean that Florida Medicare will cover it?
20           MR. PERKO:  Object to form.
21           THE WITNESS:  I don't know.
22  BY MS. DEBRIERE:
23      Q.   If any drug is listed on the PDL, does that
24  mean Florida Medicaid will cover it?
25      A.   I don't know the interplay between the PDL and
```

1    the other rules and regulations covering pharmacy
2    services.
3         Q.   Okay.  Over in this column at the top of page,
4    it reads "Clinical PA required."  And it also has a
5    column for a minimum and a maximum age.  What does
6    clinical PA required mean?
7         A.   Operationally, I don't know.
8         Q.   Do you know it in any other version?
9         A.   I understand the words.  But I don't know in
10   the context of the program or the PA process what that
11   means.
12        Q.   What does "PA" stand for?
13        A.   Prior authorization.
14        Q.   Okay.  Is it possible that clinical PA -- so if
15   we scroll down to estradiol -- this version with a
16   minimum of an age of zero, maximum age of 999 -- and it
17   says "no" under the column of clinical PA required, do
18   you know what that means?
19        A.   No.
20        Q.   Who would know that?
21        A.   Ashley Peterson and her team are lead on this.
22        Q.   Do you know what it means to have a minimum age
23   column?  Why that's significant or why it's on there?
24        A.   Specific to this document, no.
25        Q.   Same with maximum age?

1      A.   No, I don't know the reason why it's on there.

2      Q.   Since you've been at the agency -- January

3 2018?

4      A.   Yes.

5      Q.   How many GAPMS processes have you been involved

6 in?

7      A.   Two completed.  And maybe one or two

8 discussions.

9      Q.   How many pending?

10      A.   I don't know.

11      Q.   Do you know currently how many GAPMS are

12 pending?

13      A.   Clarify "pending."

14      Q.   Why don't you tell me what you meant by

15 completed.

16      A.   Two that have been signed by agency leadership.

17      Q.   Okay.  And how many reports are in the stage of

18 being written and not yet signed?

19      A.   I don't know.

20      Q.   To be clear, though, as bureau chief you meet

21 weekly with Jesse Bottcher and his team who are

22 primarily responsible for GAPMS.

23      A.   I meet weekly with Jesse Bottcher and my team.

24      Q.   Okay.

25      A.   I don't regularly meet with the individual

Page 76

1    teams, but with the managers.

2         Q.    When you meet with Jesse, do you discuss GAPMS?

3         A.    Not routinely.  We have before.

4         Q.    What are the other responsibilities of Jesse's

5    team?

6         A.    The three managers under Jesse each have units

7    that are responsible for the developments of the service

8    specific coverage policies.  His team also oversees the

9    eligibility policy and the provider enrollment policy,

10   updates all the fee schedules -- so works closely with

11   fiscal agent operations to ensure updates are made to

12   the MMIS system and with Medicaid program financing the

13   development of fee schedules.  And that's the bulk of

14   their responsibilities.

15        Q.    So when you're meeting with Jesse weekly, what

16   are you discussing about his team?

17        A.    It depends on what -- the highest priority

18   assignments are usually up first; things that are due

19   that week.

20        Q.    Okay.  So you do not routinely discuss GAPMS --

21   that was your testimony just a second ago?

22        A.    Yes.  I wouldn't say that it's a subject that

23   we discuss at every meeting or routinely at our

24   individual meetings, no.

25        Q.    And you organize what you discuss based on what

1   has the highest priority?

2       A.   Yes, typically.

3       Q.   Okay.  How familiar with you with the GAPMS

4   process?

5       A.    In terms of all the research and everything

6   that goes into developing, I'm not as familiar.  But I

7   am familiar with the routing process, the rule, the

8   authority for that process.

9       Q.   Okay.  So just generally, what does AHCA use

10  the GAPMS process for?

11      A.   So if the agency receives a request for

12  coverage -- typically that's how the process would be

13  initiated.  If the coverage was determined to not be

14  something that the agency could proceed with -- possibly

15  adding to the fee schedule or incorporating into a

16  service definition -- then the GAPMS process would be

17  used.

18      Q.   Okay.  How is the GAPMS process initiated?

19      A.   I believe it's a rule how to.

20      Q.   Would it be helpful if you had the rule in

21  front of you?

22      A.   Yes.

23           MS. DEBRIERE:  Okay.  Let's mark that as

24      Exhibit 5.  That's Rule 59G-1.035.

25           (Plaintiff's Exhibit No. 5 was marked for

1    identification.)

2    BY MS. DEBRIERE:

3        Q.    So how is GAPMS initiated?

4        A.    A request is submitted to the health services

5    research inbox in the Medicaid Policy Bureau.

6        Q.    Who can submit a request to that inbox?

7              MR. PERKO:  Object to form.

8              THE WITNESS:  I believe anyone can.

9    BY MS. DEBRIERE:

10       Q.    Okay.  Is that the only way that a request is

11   submitted for AHCA to undertake a GAPMS?

12       A.    No.

13       Q.    What are other ways?

14       A.    So in the contracts with the plans, there's

15   also language on how a managed care plan can submit a

16   request to the agency for review -- not necessarily

17   through the health services inbox.  I can't recall the

18   exact direction.  But there's also the opportunity for

19   the clients to request a review.

20       Q.    When that review is requested, is it -- is the

21   standard process used?  Is the standard GAPMS process

22   used?

23       A.    I'm not sure.  I believe it may be expedited.

24   But I'm not sure to the specifics of the process.

25       Q.    Who would be most familiar with that process?

1      A.    Either Jesse Bottcher or Jeffrey English.

2      Q.    Okay.  So you mentioned managed care plans can

3   submit a request -- or anyone can submit a request

4   through the health services inbox.  Are there any other

5   ways that a request can be submitted to the agency to

6   undertake a GAPMS?

7      A.    Yes.

8      Q.    And what are those ways?

9      A.    I don't know all the ways.  But I can't think

10  of us not approaching the process if we received a

11  request outside of getting it specifically through the

12  health services research inbox.

13     Q.    How often --

14     A.    Which is -- I'm hesitating because I couldn't

15  see us not -- like, refusing to complete the process if

16  it was received another way.

17     Q.    How often does that happen?

18     A.    So, like I said before, in my time as bureau

19  chief, there haven't very many finalized GAPMS.  Or that

20  process has not been a part of my day-to-day work.  So

21  I'm not sure.

22     Q.    Okay.  So you cannot recall another way that a

23  GAPMS request came to the agency, other than through a

24  managed care plan or the health services inbox?

25     A.    So for the most recent GAPMS report, that was a

1    request from -- I believe it was the secretary.  But I

2    don't know if it went through the inbox specifically or

3    not.

4         Q.   Okay.  So that's another way that the GAPMS

5    process can be requested -- is through the secretary?

6         A.   That's the way that it has been.

7         Q.   Okay.  How many times?

8         A.   I don't know.

9         Q.   And when you say the most recent GAPMS report,

10   do you mean the GAPMS report related to gender

11   dysphoria?

12        A.   Yes.

13        Q.   When that request came in through the

14   secretary, did the secretary identify why she was making

15   that request?

16            And, I'm sorry, do you mean Secretary

17   Marstiller?

18        A.   Yes.

19        Q.   Okay.  Did she identify why she was making that

20   request?

21        A.   I can't recall the contents of the specific

22   request.

23        Q.   Did the request come -- who did the request

24   from Marstiller go to?

25        A.   I don't know.

Page 81

1      Q.    How did you find out about it?

2      A.    I just can't remember if I was sent the letter

3   in an email.  But it was then discussed by my manager.

4      Q.    And that manager was?  Is?

5      A.    At the time was Jason Weida, who is the

6   assistant deputy secretary.

7      Q.    And did you receive the letter from Secretary

8   Marstiller before that discussion occurred?

9      A.    Yes.

10      Q.    And how long between receiving the letter and

11   having -- how long past between receiving that letter

12   and having that conversation with Mr. Weida?

13      A.    I don't remember.

14      Q.    Was it, like, hours?  A day?  Several days?

15   Within the same week?

16      A.    I don't remember.

17      Q.    Okay.  Was that discussion just between you and

18   Mr. Weida?  Or were there other people?

19      A.    I don't remember in the initial conversation if

20   there was anybody with me.

21      Q.    Okay.  Was it -- where did it take place?

22      A.    I believe it was in Jason's office.

23      Q.    Okay.  Did Jason ask you to come to his office

24   to have the conversation?  How were you notified of the

25   meeting?

1      A.   I don't remember.  We had standing meetings in

2   his office; he was my -- or I was his direct report.  So

3   I don't remember if it was part of that when we were

4   talking about assignments and priorities or separate.  I

5   can't remember.

6      Q.   What was Mr. Weida's position at the time at

7   the agency?

8      A.   He was the assistant deputy secretary for

9   Medicaid policy and quality.

10     Q.   And then who is in that position prior to him?

11     A.   I think Shevaun Harris.

12     Q.   Okay.

13     A.   There was a gap in between.  But I think she

14  was the last person.

15     Q.   Okay.  And who took that position after

16  Mr. Weida?

17     A.   That position is currently vacant.

18     Q.   Okay.  And has Brian Meyer ever held that

19  position?

20     A.   No.

21     Q.   Okay.  Prior to your meeting with Mr. Weida but

22  after your received the request from Secretary

23  Marstiller, did you communicate with anybody else about

24  the request?

25     A.   Can you repeat the question.

1      Q.    Between the time that you received the request

2   from Secretary Marstiller -- the letter -- and meeting

3   with Mr. Weida, did you have a conversation with anyone

4   else about the request?

5      A.    I don't believe so.

6      Q.    Okay.  Were you surprised to see the request?

7      A.    No.

8      Q.    Why not?

9      A.    Medicaid Policy -- I think we're unique in that

10  bureau because no one day is exactly the same.  There's

11  always something new coming out from the federal

12  government, from legislative action, from leadership.

13  So I think that's kind of part of the job of being the

14  bureau chief of Medicaid policy.

15     Q.    Okay.  What was -- when you met with Mr. Weida,

16  did you develop a plan about how to honor the

17  Secretary's request?

18     A.    Yes.

19     Q.    And what was that plan?

20     A.    The team that was going to work on it was the

21  Canadian Prescription Drug Importation Plan team;

22  following the regular GAPMS process in terms of research

23  and report and development.

24     Q.    Did you identify who was going to be on that

25  team?

1    A.   Yes.

2    Q.   And who did you identify?

3    A.   Matt Brackett, Nai Chen, and D.D. Pickle.

4    Q.   As part of that plan -- and to be clear, the

5  secretary's request was specifically a request to

6  undertake a GAPMS investigation?

7    A.   Yes; to review through that process.

8    Q.   Okay.  And the team identified was Brackett,

9  Chen -- and I forgot the --

10   A.   Their manager, D.D. Pickle.

11   Q.   D.D. Pickle.  Thank you.

12        So you previously testified that the team

13 primarily responsible for GAPMS was led by Jesse

14 Bottcher.  Why was Jesse Bottcher not part of the team

15 to undertake this GAPMS?

16   A.   So there was several factors considered.  Matt

17 Brackett has worked with the bureau a long time and

18 previously had the position responsible for -- primarily

19 responsible for the GAPMS.  D.D. Pickle has also been

20 with the bureau and agency a very long time.  So I would

21 say that the historical knowledge, the bandwidth --

22 having bandwidth to focus on completing the GAPMS --

23 were probably the two biggest factors.

24   Q.   When you say bandwidth, what do you mean?

25   A.   So that team -- their primary responsibility is

Page 85

1   the Canadian Prescription Drug Importation Program,

2   which is not approved federally.  So our ability to move

3   forward with the day-to-day operations and

4   implementation of that program is stalled.  Due to that,

5   that team has been available to assist in other areas

6   within the bureau when needed.

7        Q.   Was the team that's primarily responsible for

8   GAPMS -- were they overwhelmed with doing GAPMS at the

9   time?

10       A.   I don't know.

11       Q.   But you used the fact that Mr. Brackett and

12  D.D.'s team generally would have a lot of time to work

13  on GAPMS as a deciding factor to pick the team for this

14  report; is that right?

15       A.   Yes.

16       Q.   But you didn't first check whether the team

17  that's primarily responsible for GAPMS would have the

18  time to do the report?

19       A.   No.

20       Q.   Okay.  How long has Mr. Chen been with the

21  agency?

22       A.   I don't remember.

23       Q.   Would you classify him -- as you did Ms. Pickle

24  and Mr. Brackett -- as being with the agency for a long

25  time?

1      A.   No.

2      Q.   So he did not have that historical knowledge

3   that Mr. Brackett and Ms. Pickle have with the agency?

4      A.   No.

5      Q.   And that was a deciding factor in picking the

6   team?

7      A.   Yes.

8      Q.   When you met with Mr. Weida to pick this team,

9   did Mr. Weida suggest the names or did you?

10      A.   I believe I did.

11      Q.   Okay.  Other than the length of time at the

12   agency and bandwidth, what criteria -- did Mr. Weida

13   give you any criteria in terms of picking the team?

14      A.   I don't think so, no.

15      Q.   Did you use any other factors other than the

16   length of time at the agency and bandwidth to select

17   this team?

18      A.   I think it's still the same as historical

19   knowledge.  But I have worked very closely with D.D.

20   and Matt in my various positions.  I knew Matt had some

21   knowledge of previous similar requests, as well

22   extensive knowledge of the standard GAPMS process.  And

23   it was a team of three that was available.  So I think

24   that still kind of historical knowledge and bandwidth

25   were really the biggest factors.

1    Q.   You said Mr. Brackett had experience with

2  previous similar requests.  What were those previous

3  similar requests?

4    A.   I believe there was a GAPMS request in the past

5  before my time with the agency that had to do with

6  hormone treatment.

7    Q.   Would it be -- and it was hormone treatment.

8  When you say a similar request, was it for GAPMS?

9    A.   Yes.

10   Q.   Would it have been the cross-sex hormone

11 therapy GAPMS that is Exhibit 4?

12   A.   No.

13   Q.   How do you know?

14   A.   The date on this.  The one I was thinking of

15 was much earlier before my time.

16   Q.   Before your time -- do you have any sense of

17 when that might be?

18   A.   Maybe 2016 or 2017.

19   Q.   Do you know who the Governor of Florida was in

20 2016 or 2017?  I'm sorry.  It's not a test, I promise.

21        Was it Rick Scott?

22   A.   Yes.

23   Q.   Okay.  And was the interim secretary at the

24 time at AHCA, was it Justin Senior?

25   A.   Yes.

Page 88

1      Q.   And was Beth Kidder there at that time at AHCA?

2      A.   Yes.

3      Q.   And all of those people are listed on this

4  Exhibit 4 --

5      A.   So my document has Beth Kidder crossed out and

6  looks to be a draft document from May 20th, 2022.

7      Q.   Is there a name that replaced Beth Kidder on

8  that?

9      A.   Ashley Peterson.

10     Q.   Okay.  Do you know when Ashley Peterson joined

11 AHCA?

12     A.   I believe it was 2021.

13     Q.   Okay.  And is it --

14          MR. PERKO:  Counsel, it's 1:30.  Are we going

15     to stop for lunch?

16          MS. DEBRIERE:  We can if you want to.

17          MR. PERKO:  Do you want to?  It's up to you.

18          THE WITNESS:  At some point.

19          MS. DEBRIERE:  That's fine.  Can I just finish

20     up here real quick.

21 BY MS. DEBRIERE:

22     Q.   So is it possible that this document was

23 created in 2017?

24     A.   I'm looking at a document that has track

25 changes that appear to be since then.  But I don't know.

1     Q.    Why do those track changes appear to be since

2    then?

3     A.    Since the date was updated to May 20th, 2022.

4     Q.    Okay.  There's some editing in the column.

5    It's very faint.  Can you see it?

6     A.    Yes.

7     Q.    And the initials of editor appear to be GS.

8     A.    Yes.

9     Q.    Do you have any idea who that would be?

10     A.    No.

11     Q.    Do you know anybody here with the initials GS?

12     A.    I'm sure somebody here has those initials, but

13    I don't know off the top of my head.

14     Q.    So Mr. Brackett was involved with a GAPMS

15    related to cross-sex hormone therapy, but it wasn't

16    necessarily this one; is that right?

17     A.    I don't know the level of his involvement, but

18    I know that he had some knowledge or knew about it.

19     Q.    Okay.  Did he do any other GAPMS related to the

20    treatment of gender dysphoria?

21     A.    I don't know.

22     Q.    Mr. Chen -- did he have any previous experience

23    with GAPMS?

24     A.    I don't know.

25     Q.    Ms. Pickle -- has she had any previous

Page 90

1    experience with GAPMS?

2        A.    I don't know.

3        Q.    And you've explained why Mr. Brackett,

4    Ms. Pickle, and Mr. Chen were selected for the team.

5    Why was Mr. Bottcher not selected?

6        A.    I can't recall all the details of the decision.

7    But Jesse Bottcher's team is one of the busiest in the

8    bureau, and has a lot of time sensitive work that they

9    are constantly working on.  So I think that had

10   something to do with it, since he is the manager of an

11   entire section.

12       Q.    I think you had previously testified there

13   weren't a lot of GAPMS pending at the time this request

14   come through; is that right?

15       A.    I didn't know the bandwidth or the workload.

16       Q.    Okay.  You didn't know the bandwidth.  So you

17   didn't know if, for example, Mr. English had the

18   bandwidth to handle the GAPMS report?

19       A.    No.

20       Q.    Do you want to take a break?

21       A.    Yes.

22             (Brief recess.)

23   BY MS. DEBRIERE:

24       Q.    Previously before break we were talking about

25   the selection of Mr. Brackett to be on the GAPMS report

1  team for gender dysphoria.  And you mentioned that he

2  had drafted previous similar GAPMS in the past.  And I

3  believe you used the example of cross-sex hormones.

4        Were there any other similar requests that he

5  drafted related to gender dysphoria in the past?

6        MR. PERKO:  Object to form.

7        THE WITNESS:  Just to clarify, I'm not sure if

8     he drafted it.

9        MS. DEBRIERE:  I'm sorry; yes.

10        THE WITNESS:  I know he had some historical

11     knowledge of previous GAPMS.

12        MS. DEBRIERE:  Okay.

13        THE WITNESS:  So can you repeat your question.

14  BY MS. DEBRIERE:

15     Q.   Did he have hysterical knowledge of previous

16  GAPMS related to gender dysphoria?

17     A.   Outside of the one that I referred to earlier?

18     Q.   No, including that one.

19     A.   Yes, I believe he had some historical knowledge

20  of previous GAPMS.

21     Q.   Other than the one you referenced earlier, are

22  you aware of any other GAPMS that he was involved in

23  related to gender dysphoria?

24     A.   I don't know the extent of all the GAPMS he was

25  involved in.

Page 92

1      Q.   Also earlier when you were discussing your

2   responsibilities under GAPMS, you mentioned routing.

3      A.   Yes.

4      Q.   Can you describe that a little bit.

5      A.   As the bureau chief of Bureau of Medicaid

6   Policy, any official documents that leave the bureau are

7   usually reviewed by me.  And so routing process is the

8   hierarchy of reviewers through wherever the final

9   reviewer or signatory or approver.  That's what I was

10  referring to by routing process.

11     Q.   Okay.  Does every GAPMS report have a routing

12  process?

13     A.   Yes.

14          MS. DEBRIERE:  Okay.  Can I have the 2016 GAPMS

15      routing form.  And we'll mark it as Exhibit 6.

16          MS. DUNN:  I can tell from this exhibit that

17      when we printed these the Bates numbering got cut

18      off.  So I will look it up and read --

19          MS. DEBRIERE:  That's a bummer.

20          MS. DUNN:  I know.

21          (Plaintiff's Exhibit No. 6 was marked for

22  identification.)

23  BY MS. DEBRIERE:

24     Q.   Okay.  So do you recognize this document?

25     A.   Not this specific document.  But this appears

Page 93

1    to be a policy routing and tracking form.

2        Q.    And is that form the same as the form you

3    currently use to track -- to route and track?

4        A.    Sometimes.

5        Q.    What other forms do you use?

6        A.    Prior to the pandemic, we used this form

7    primarily.  Since returning to the office there have

8    been different variations of routing and tracking forms

9    developed for different teams or documents -- types of

10   documents.

11       Q.    Do you use the same routing and tracking form

12   for GAPMS?

13       A.    So I've only approved two GAPMS in my time.

14   And I can't remember if this was the -- this format was

15   what was used to route it to me.

16       Q.    Okay.  But there was a form used to route it to

17   you when you approved -- when you approved your two

18   GAPMS?

19       A.    I believe so.

20       Q.    Okay.  And on this GAPMS form, it says prepared

21   by Monique Johnson.  What does it mean to be prepared

22   by?  Was the form prepared by Ms. Johnson?  Or was the

23   GAPMS report prepared by Ms. Johnson?

24       A.    I don't know.

25            MS. DEBRIERE:  Okay.  Could I see the 2022

```
 1      GAPMS.  This will be Exhibit 7.
 2          (Plaintiff's Exhibit No. 7 was marked for
 3   identification.)
 4   BY MS. DEBRIERE:
 5      Q.   So I'm handing you -- and Gary will want to
 6   take a look at it too -- again, the first page of the
 7   document is entitled "Medicaid Policy Routing and
 8   Tracking Form."  If you go through the entire document,
 9   it should also include the June 20, 2022, GAPMS report
10   on treatment of gender dysphoria.
11          MR. PERKO:  I believe it was June 2nd.
12          MS. DEBRIERE:  June 2nd.  Excuse me.
13   BY MS. DEBRIERE:
14      Q.   So looking at the document -- the first page,
15   is this the Medicaid Policy Routing and Tracking Form
16   that was associated with the GAPMS report on the
17   treatment of gender dysphoria?
18      A.   Yes.
19      Q.   How do you know?
20      A.   These are my initials.
21      Q.   Okay.  So you've seen this before?
22      A.   Yes.
23      Q.   I do want to point out "prepared by" here.
24   What does that mean?
25      A.   That Matt Brackett prepared the routing
```

1   package.

2        Q.   Okay.  Did he also prepare the GAPMS report

3   itself?

4        A.   Yes.

5        Q.   Do you know if the person who prepares the

6   routing and tracking form -- if they are the person who

7   also prepares the GAPMS report?

8        A.   Can you repeat the question.

9        Q.   The person who prepares the Medicaid Policy

10  Routing and Tracking Form, do they also prepare the

11  GAPMS report itself?

12       A.   I don't know how all the team members are

13  instructed to fill out the report or -- I'm sorry --

14  fill out the tracking form.

15       Q.   Is there any other way to determine who has

16  prepared a GAPMS report?

17       A.   I don't know.  But speaking in general

18  assignments -- these forms are used for other

19  assignments.  And there are a lot of assignments that

20  are done collaboratively.  So, yeah.  I don't know

21  specifically how else you would know just looking at

22  documentation.

23       Q.   Would that information be contained on an AHCA

24  shared drive?

25       A.   It's possible.

1     Q.   Okay.  Is there a reason the GAPMS report

2   doesn't identify an author on the report?

3     A.   I don't know.

4     Q.   Okay.  A couple other things.  On the section

5   line here, it says Canadian Prescription Drug

6   Importation Program.  But we have established this was

7   the routing and tracking form for the GAPMS report

8   related to the treatment of gender dysphoria.  Are those

9   two things related?

10     A.   So the Canadian Prescription Drug Importation

11   Program is the section of who developed the report.  And

12   it lets us know how the hierarchy of the routing should

13   go through the management levels within the bureau and

14   outside.

15     Q.   So it was the Canadian Prescription Drug

16   Importation unit who prepared the GAPMS report on the

17   treatment for gender dysphoria?

18     A.   So that's what I would interpret this

19   section -- why it's listed there next to this section.

20   It's the section responsible for routing and lets us

21   know the hierarchy of the management.

22     Q.   Okay.  And then just looking down at the

23   "Reviewed by and Routing Timelines," the start date is

24   June 1st, 2022, for everybody except Mr. Wallace; who

25   has a date of June 2nd, 2022.  And the end date is June

Page 97

1  1st, 2022, except for Mr. Wallace.  Does that indicate

2  that you Mr. Weida and Ms. Pickle all reviewed the

3  report and signed off on it on the same day?

4       A.   That the official routing and the signature

5  occurred on the same day, yes.

6       Q.   What do you mean by official routing?

7       A.   So the date that this form and the final

8  routing package was ready for signature.

9       Q.   And what was continued in the final routing

10 package?

11      A.   I believe it was just the report.

12      Q.   Okay.  So the final report -- what was being

13 tracked through this routing and tracking form?

14      A.   Yes.

15      Q.   Were there any attachments to the final report

16 that were also reviewed?

17      A.   The expert witness reports were also reviewed.

18 But I can't remember if they were included in this

19 routing package at the same time.

20      Q.   Who reviewed those final expert reports?

21      A.   I don't remember.

22      Q.   Did you review them?

23      A.   I don't remember if I reviewed them all.  But I

24 had seen them -- at least some of them.  I can't

25 remember if I reviewed them all formally.

1      Q.   Okay.  Turning just back to the general GAPMS

2   process.  Is the GAPMS process ever initiated to assess

3   existing coverage of Medicaid services?

4      A.   Can you repeat the question.

5      Q.   Is the GAPMS process ever used to assess

6   existing coverage of Medicaid services?

7      A.   I don't know specifically.

8      Q.   Okay.  Who would know that?

9      A.   Are you asking if it ever has or ever would?

10     Q.   Ever would.

11          Would Ms. Pickle know that?

12     A.   So my personal experience with the GAPMS

13   process is somewhat limited.  But it is such a unique

14   process.  I feel it's hard to answer that without each

15   situation or each request that we would get would be

16   unique, because that process is dealing with questions

17   that fall outside of something that's easily answered

18   policy question.

19          MS. DEBRIERE:  Have we entered the GAPMS rule

20      into evidence yet?  Can we do that now.  And that's

21      to be 59G-1.0 -- I thought we had.  Oh, it's 5.

22      Okay.  Sorry.  That's my fault.

23          MR. PERKO:  That's fine.

24   BY MS. DEBRIERE:

25     Q.   So a couple questions about the language of the

 1   rule.  First under (1)(b), "health services" is defined
 2   as diagnostic tests, therapeutic procedures, or medical
 3   devices or technologies.
 4           Under what category would prescription drugs
 5   fall in this definition?
 6       A.   I don't know.
 7       Q.   You are familiar with the GAPMS rule, though;
 8   correct?
 9       A.   Yes.  I've read the GAPMS rule.
10       Q.   Would prescription drugs fall under any of
11   these categories?
12           MR. PERKO:  Object to form.
13           THE WITNESS:  I don't know.  I wasn't part of
14       the original drafting of this rule text.  So in
15       order to interpret the policy, I would need to do
16       research.
17   BY MS. DEBRIERE:
18       Q.   Who would you ask?
19       A.   I would probably start with Ashley Peterson.
20       Q.   Okay.  And going down to 3, the second
21   sentence -- "The public may request that a health
22   service be considered for coverage under the Florida
23   Medicaid program by submitting a request."
24           What does this sentence mean to you?
25       A.   There's much room for interpretation.  It says

Page 100

1   the public may request a public health service be

2   considered for coverage.

3       Q.   Does this sentence mean that the public may

4   request that Florida Medicaid consider whether to

5   exclude a service previously covered?

6           MR. PERKO:  I'm going to object to form.

7           THE WITNESS:  So I think it could.  Not only do

8       we update the coverage policies to include new

9       services, but we do change the scope of a service as

10      part of that process.  So if there was a question

11      that was not clear within the scope of the service,

12      I can see how that might apply.

13          Or the example that you used earlier with a

14      service that's only provided to under 21.  If that

15      service was -- if we received a request to make that

16      service available for over 21.  So I can think of

17      examples where it wouldn't have to be a new service.

18  BY MS. DEBRIERE:

19      Q.   Does this rule cover a public's request to take

20  a service away?

21          MR. PERKO:  Object to form.

22          THE WITNESS:  I don't know.

23  BY MS. DEBRIERE:

24      Q.   Okay.  Who would know?

25      A.   Public -- that would be a legal interpretation

Page 101

1     or policy interpretation that would need consultation

2     with the agency for me to answer.

3          Q.   As the bureau chief of Medicaid Policy, you're

4     responsible for developing coverage policies; correct?

5          A.   I oversee the teams that develop coverage

6     policies, yes.

7          Q.   And you are responsible for overseeing the

8     teams that develop administrative rules to implement

9     those coverage policies; correct?

10         A.   Yes.

11         Q.   So you would be responsible for understanding

12    how rules that implement coverage policies should be

13    interpreted.

14              MR. PERKO:  Object to form.

15    BY MS. DEBRIERE:

16         Q.   Is it your responsibility to understand the

17    content of this rule?

18         A.   Yes.

19         Q.   Okay.  But you can't tell me how to interpret

20    that second sentence in Subpart 3?

21         A.   So if we received a request and I wasn't clear

22    on the authority, there's several steps I would take to

23    confirm that the agency's position is we have

24    authority -- which would be to review any other

25    applicable laws or regulations; would be to consult with

Page 102

1    my team and with agency management and perhaps with

2    legal if I was not sure whether a specific question or

3    scenario that was received.  We may not have the

4    authority to take an action.

5        Q.   So when reading the second sentence in Subpart

6    3 -- "The public may request a health service be

7    considered for coverage" -- in order to understand what

8    that sentence means, would you undertake any of the

9    steps you just described?

10       A.   It would depend on the exact question.  If I

11   wasn't clear with what the request was and how that

12   authority applied, then I would take further steps to

13   make sure that I understood how the rule applied to the

14   request.

15       Q.   Did you do that for -- okay.  Okay.  Let me

16   make a note.

17            In the legal consultation part, it trigged me

18   to remember just a housekeeping question.  At lunch did

19   you speak with your attorneys --

20       A.   No.

21       Q.   -- about the deposition?

22       A.   No.

23       Q.   Okay.  Does the GAPMS process typically look at

24   an individual service when you're undertaking analysis?

25       A.   I don't know.

1         MS. DEBRIERE:  Okay.  Can I have either the

2     Van Mol or Van Meter ATF.  It doesn't matter.  And

3     we'll mark that as Exhibit 8.

4         (Plaintiff's Exhibit No. 8 was marked for

5  identification.)

6  BY MS. DEBRIERE:

7     Q.   So at the top of the page you have a -- did you

8  approve this document?

9     A.   Yes.

10     Q.   Okay.  So under "Reason for Occurrence," it

11  says, "On April 20th, 2022, the Bureau of Medicaid

12  Policy received a request for a time-sensitive analysis

13  of service coverage.  While such requests are typically

14  for a single service or good --" Is that a correct

15  statement?

16     A.   I don't know.

17     Q.   But you wrote this?

18     A.   No.  I signed this.

19     Q.   Okay.  Were you the one making the request?

20     A.   No.

21     Q.   Who was making the request?

22     A.   Devona Pickle.

23     Q.   Okay.  Before you sign something, do you have

24  to agree with the language contained therein?

25     A.   Yes.

1    Q.   So at the time you signed this, you agreed with
2  the statement that such requests are typically for a
3  single service or good?
4    A.   Yes.
5    Q.   Okay.  But now you don't know if GAPMS are
6  typically used for a single service or good?
7    A.   My experience with GAPMS is limited.  And I
8  trust the expertise of my staff.  And one of the reasons
9  I asked or had recommended that this team be responsible
10  was because of their historic knowledge of the GAPMS
11  process.
12    Q.   And when you say that, that includes D.D.
13  Pickle; correct?  You trust her expertise on the GAPMS
14  process?
15    A.   Yes.
16    Q.   Okay.  Are you aware of a standard operating
17  procedure used for the GAPMS process?
18    A.   I've heard mention of it.  But I don't believe
19  I've ever seen it.
20    Q.   Who did you hear mention of it from?
21    A.   I can't remember.  Either Matt or Jesse.
22         MS. DEBRIERE:  Okay.  Can I have what we'll
23    mark as Exhibit 9, which is the GAPMS Decision Tree
24    Checklist.
25              (Plaintiff's Exhibit No. 9 was marked for

Page 105

1    identification.)

2    BY MS. DEBRIERE:

3        Q.   Do you recognize this document, Ms. Dalton?

4        A.   I believe I've seen this before.

5        Q.   Do you know what it's used for?

6        A.   I believe this was developed to determine if a

7    request just goes through the coverage determination

8    process or should be handled as a GAPMS.

9        Q.   Okay.  And tell me the difference between a

10   coverage determination and something that needs to go

11   through the GAPMS.

12       A.   I don't know everything that goes into how that

13   decision is concluded.  But in general, a coverage

14   determination is when it's very clear that the agency

15   has the authority to add a service and that it meets all

16   of the agency's rules and -- for example, an optional

17   state plan service that the agency currently doesn't

18   cover but is clearly allowed through federal CMS would

19   be a coverage determination.  Where the GAPMS process is

20   driven by the rule you referenced earlier that describes

21   when it's not clearly meeting all the requirements and

22   laid out in the current coverage policies.

23       Q.   So much earlier in the deposition you gave an

24   example of a coverage determination of a medical supply

25   for -- was it Amino Foods?

 1      A.    Puro Meno.

 2      Q.    Puro Meno Foods.  Why didn't you use the GAPMS

 3   process for that?  Did you use the GAPMS process for

 4   that?

 5      A.    No.

 6      Q.    Why not?

 7      A.    Because the agency already covered similar

 8   products.

 9      Q.    Okay.  Was that the only factor in determining

10   whether to assess it using GAPMS?

11      A.    I don't remember the conversations with the

12   team when I was briefed on the recommendation.

13      Q.    Was a GAPMS Decision Tree Checklist done for

14   Puro Meno Foods?

15      A.    I don't believe so.  I never saw one, no.

16      Q.    Okay.  Who undertakes the process to fill out

17   the decision tree?

18      A.    I don't know.

19            MS. DEBRIERE:  I apologize.  Can we take just a

20      two-minute break.

21            MR. PERKO:  Sure.

22            (Brief recess.)

23   BY MS. DEBRIERE:

24      Q.    Do you know how to interpret the answers on a

25   decision tree checklist?

1      A.    No, I don't believe I've ever seen one filled

2   out.

3      Q.    Okay.  There's a space here that says "GAPMS

4   Topic."  What would go in that space?  Do you know?

5      A.    I don't know.

6      Q.    Would a decision tree checklist be generated

7   for every GAPMS request that comes in?

8      A.    I don't know.

9      Q.    Who would know that?

10     A.    I don't know.  I don't know if this is still

11  the internal process.  I don't know.

12     Q.    Who would know whether it was still the

13  internal process?

14     A.    Jesse Bottcher.

15     Q.    Okay.  Would the members of Jesse Bottcher's

16  team also know?

17     A.    No, I don't think anyone currently on his team

18  would know.

19     Q.    How about anybody previously on his team -- I'm

20  sorry; back up.

21           So no one on Jesse Bottcher's team is in charge

22  of the GAPMS process?

23     A.    The GAPMS position is currently vacant.

24     Q.    Would anybody who was in charge of the GAPMS

25  process at some point know whether the decision tree

Page 108

```
 1    checklist is used in the GAPMS process?
 2         A.    I don't know.
 3         Q.    And there's only one position that would know
 4    that, and that is currently vacant; correct?
 5         A.    I believe so, yes.
 6         Q.    And what is that position called?
 7         A.    I believe it's a Government Analyst II.
 8         Q.    And so there's just that one position in charge
 9    of knowing the GAPMS process?
10         A.    As far as I know, yes.
11         Q.    Okay.  We touched on this a bit earlier.  Does
12    AHCA use the GAPMS process for prescription drugs?
13         A.    I don't know.
14         Q.    When you were giving an example of similar
15    requests that Mr. Brackett handled for GAPMS, the
16    example you gave was cross hormone therapy; correct?
17              MR. PERKO:  Object to form.
18              THE WITNESS:  I believe that was the example I
19         gave.
20    BY MS. DEBRIERE:
21         Q.    And what is cross-sex hormone?  What is a
22    hormone?
23         A.    I don't think I can recite the clinical
24    definition.
25         Q.    Is the hormone a prescribed drug?
```

Page 109

1      A.    I believe so.

2      Q.    So then you're aware of one instance in which

3   GAPMS was used for determining -- for assessing a

4   prescription drug?

5      A.    Yes.

6      Q.    But you don't know generally if GAPMS is used

7   to assess prescription drugs?

8      A.    My knowledge of GAPMS is limited.  So to speak

9   in generalities -- but I do see where in 2016 there was

10   the GAPMS on hormone suppression.

11      Q.    Okay.  Is GAPMS the only method AHCA relies on

12   to determine whether a Medicaid service is experimental?

13      A.    I don't know.  I know we have a clinical trials

14   coverage policy.  So there may be circumstances where

15   it's clear that coverage would be -- that coverage

16   policy or the clinical trials rule would apply.  And I

17   don't know all the details of how the QIO vendors --

18   what that process, all that entails.

19      Q.    Whether the QIO venders would determine whether

20   something is experimental?

21      A.    Or if it was clear the clinical trial policy

22   would apply instead.  So I don't know to the extent of

23   if there could possibly be.

24      Q.    What is the clinical trials policy?

25      A.    It's a rule that outlines the agency's coverage

Page 110

1    for recipients participating in a clinical trial.

2        Q.    And what does that type of authorization

3    entail?

4        A.    I don't know the specifics.

5        Q.    Is GAPMS the only method that AHCA relies on to

6    determine whether a Medicaid service is experimental and

7    therefore should be excluded?

8        A.    Can you repeat the question.

9        Q.    Is GAPMS the only method that AHCA relies on to

10   determine whether a Medicaid service is experimental and

11   therefore should not be covered?

12       A.    I don't know the specifics.  But if, for

13   example, a pharmaceutical is not FDA approved, there

14   would be perhaps, like, a different process where it

15   wouldn't have to go through the process.

16       Q.    What is the significance of a drug being FDA

17   approved for the purposes of coverage?

18       A.    I don't know the details.

19       Q.    What do you know about it?

20       A.    I believe there's federal requirements on if a

21   drug is not FDA approved -- there is certain coverage

22   requirements.

23       Q.    Do you know if that relates to the compendia we

24   were earlier talking about?

25       A.    I don't know.

Page 111

1     Q.    Okay.  If AHCA is determining whether a
2  production drug is experimental, does AHCA consider
3  whether the drug is FDA approved?
4     A.    I believe so.
5     Q.    If a particular use for a drug has been FDA
6  approved, can AHCA deem the drug experimental for that
7  use?
8     A.    Can you repeat the question.
9     Q.    If a particular use for a drug has been FDA
10  approved, can AHCA deem that drug experimental for that
11  use?
12         MR. PERKO:  I'm going to object to form.
13         THE WITNESS:  I don't know.
14  BY MS. DEBRIERE:
15     Q.    But FDA approval bears on a determination as to
16  whether AHCA will cover a drug; is that correct?
17     A.    Yes, I think it's considered.
18     Q.    If it's not -- if a drug is not FDA approved,
19  are there circumstances under which AHCA will still
20  cover the drug?
21     A.    I don't know.  But I think there is federal
22  regulations around what's allowable.
23     Q.    In the Federal Medicaid Act?
24     A.    I believe.
25     Q.    You mentioned just a second ago, a clinical

1   trials coverage policy.  Where does that policy live?

2        A.    In Rule Class 59G on our website.

3        Q.    If it's not there where would we find it?

4        A.    In the Florida Administrative Code.

5        Q.    It should be in Chapter 59G?

6        A.    But it should be on our website.

7        Q.    Okay.  And it is adopted as a rule?

8        A.    Yes.

9        Q.    Okay.  Once AHCA reaches a decision through the

10  GAPMS process, describe the implementation of that

11  decision.

12       A.    So, again, in my experience -- I've only been

13  bureau chief for two finalized decisions that were

14  different.  And I can't remember all the steps to

15  implementation.  But once a determination of any

16  coverage is made, then there's a process of how to

17  notify the public.  There's a process for notifying the

18  plans of changes if it affects the plans.  There's a

19  process of making sure that the -- any other associated

20  rules that may be impacted are updated.

21       Q.    Anything else?

22       A.    If a training is needed, it depends on what it

23  is.  But there could be other.

24       Q.    Who would you train?

25       A.    So, again, just speaking generally -- the

Page 113

1    managed care plans; the public; if it's fee for service,

2    the providers; especially if it has to do with submitted

3    claims.

4        Q.   What are the two final reports that you have

5    overseen as bureau chief?

6        A.   So it was the GAPMS that we're discussing

7    today.

8        Q.   And, again, that's the one that relates to

9    treatment of gender dysphoria?

10       A.   Yes.  And then the -- I can't remember the

11   exact name of the other GAPMS.  But it was through a

12   managed care plan request.

13       Q.   Was it an expedited GAPMS?

14       A.   I don't believe so.

15       Q.   Do you remember what the service was at issue?

16       A.   I do not.

17       Q.   Okay.  And the process for an expedited GAPMS,

18   that's different from the traditional GAPMS process?

19       A.   I'm not sure of the differences outside of the

20   timeframe.

21       Q.   Is it different as to how you would inform the

22   public about it?

23       A.   I don't know.  I can't recall what steps we

24   took after notifying the plans of the final decision.

25       Q.   Okay.  Through the traditional GAPMS process --

Page 114

1    do you have any GAPMS right now that are in the final

2    stages?

3         A.    No.

4         Q.    Okay.  And you don't know how many requests are

5    currently pending?

6         A.    I don't know.

7         Q.    So the last GAPMS that was finalized was in

8    June of 2022?

9         A.    Yes.

10        Q.    Okay.  And now we're in February of 2023.  And

11   there's no GAPMS that are ready for finalization at this

12   point?

13        A.    I don't know what stages of development they

14   are.

15        Q.    Okay.  Is there anything on your desk to

16   review?

17        A.    I don't know.  I don't remember if I have

18   anything pending.

19        Q.    Okay.  When you were meeting with Mr. Weida

20   about the June 2022 GAPMS report related to the

21   treatment for gender dysphoria, that report had not been

22   drafted; correct?

23        A.    Sorry.  Can you repeat that.

24        Q.    Yeah.  Absolutely.  So earlier you spoke to

25   meeting with Mr. Weida once you received the request

1   from the secretary to undertake the GAPMS for treatment

2   of gender dysphoria; do you remember?

3       A.   Yes.

4       Q.   During that meeting had the GAPMS report been

5   drafted yet?  I know it seems like a silly question.

6   But I'm asking at face value.

7            At the time you met with Mr. Weida, had the

8   GAPMS report been drafted yet?

9       A.   The GAPMS report I was discussing with him?

10  No.

11      Q.   Okay.  But you have a good memory of that

12  report before it was even drafted; is that right?  You

13  were able to recount details to me about discussing that

14  report about before it had been drafted; is that right?

15      A.   Throughout the process there had been

16  discussions.  But I don't know if I remember all the

17  details.

18      Q.   What I'm wondering is just why that report

19  sticks out in your mind, but now you can't recount any

20  other GAPMS reports that are pending.  Is there a reason

21  for that?

22      A.   I have a lot of documentS in my queue at any

23  one time.  And it's really on the onus of the analyst --

24  part of their job responsibilities -- to make sure

25  assignments are completed and finalized and routed and

1    closed.  So because there was discussion and updates on

2    the status and progress of the report -- and it was not

3    that long ago -- I remember having conversations about

4    the report.

5         Q.   There are GAPMS reports pending right now,

6    though; right?

7         A.   I don't know.  I don't know what the GAPMS

8    queue is right now.

9         Q.   Okay.  So you don't know if there's anything in

10   the queue right now?

11        A.   Correct.

12        Q.   But you do remember details about the GAPMS

13   report related to treatment of gender dysphoria?

14        A.   Details on the process?

15        Q.   Yeah.

16        A.   Yes.

17        Q.   Okay.  When I say "rulemaking process," do you

18   understand what I'm referring to?

19        A.   Yes.

20        Q.   And do your current responsibilities at AHCA

21   include the rulemaking process?

22        A.   Yes.

23        Q.   Can you describe those responsibilities.

24        A.   I review drafts of the coverage policy and the

25   documents that go along with the rule promulgation

1   process.  I sometimes participate in the public meetings

2   and review provider alerts or other notices associated

3   with the process.

4        Q.   Anything else?

5        A.   Not that I can think of.

6        Q.   Okay.  Do you ever review public comment

7   associated with the rule?

8        A.   It depends.

9        Q.   So you have before?

10        A.   More in my old role as the AHCA administrator.

11        Q.   Okay.  Can you remind me the dates you were in

12   that role.

13        A.   August 2018 to August 2021.

14        Q.   And in your previous roles at AHCA as well as

15   DOEA, you had rulemaking responsibilities; is that

16   right?

17        A.   DOEA was more of the drafting of the policy and

18   not the promulgation process.

19        Q.   Okay.

20        A.   And then AHCA has been more on the promulgation

21   process -- administrative process.

22        Q.   So you'd say you had experience with Florida

23   agency rulemaking?

24        A.   Yes.

25        Q.   When I say "rule workshop," do you understand

Page 118

1   what I'm referring to?

2        A.   Yes.

3        Q.   When I say "rule hearing," do you understand

4   what I'm referring to?

5        A.   Yes.

6        Q.   What is the difference?

7        A.   Chapter 120 has different public meetings

8   outlined in different stages of the process.  The

9   workshop as we use it here is primarily for the rule

10  development stage of the administrative process.  And

11  the hearing occurs at the proposed rule stage.

12       Q.   Okay.  When you say the development of the

13  rule, does that mean generally the rule language itself

14  has not yet been drafted or proposed?

15       A.   It depends.

16       Q.   Okay.  So is there a difference between

17  workshop and hearing?

18       A.   They're both public meetings meant to garner

19  input from the public and make the public aware of the

20  changes.  But per Chapter 120, there are differences

21  because of the different stages of the process.

22       Q.   Okay.  Why was there no public workshop held

23  for the rule development of the change to Rule 1.050

24  excluding the treatment for gender dysphoria?

25       A.   I don't know.

Page 119

1      Q.    Were you here were when that happened?

2            You were?

3      A.    Yes.

4      Q.    Okay.  While here, have you had public comment

5   on rule workshops for other rules?

6      A.    Can you repeat the question.

7      Q.    Since you've been here at AHCA, have you -- let

8   me ask this question:  When the rule was developed to

9   exclude treatment of gender dysphoria per 1.050, were

10  the you bureau chief for Medicaid Policy?

11     A.    When the rule was promulgated?

12     Q.    Well, when you were having the -- when you

13  noticed the proposed rule and had the rule hearing.

14     A.    For this specific rule?

15     Q.    Yes.

16     A.    Yes.

17     Q.    Okay.  In your role as bureau chief, have you

18  ever -- in your role as bureau chief, have you been

19  involved in rule workshops for other rules?

20     A.    Yes.

21     Q.    So why weren't you involved in the rule

22  workshop for the exclusion of treatment for gender

23  dysphoria; do you know?

24     A.    I can't remember.  I believe I was out of town.

25     Q.    Okay.  If you weren't out of town, would you

1    have been involved in it?

2         A.   I don't remember the discussion around that.

3    But I'm not always involved in the workshops or rules.

4         Q.   How is that determined?

5         A.    It depends on the circumstances and the content

6    of the rule.  But I can't remember the specific

7    conversation when that was determined.

8         Q.   Was there a public workshop for the exclusion

9    of the treatment for gender dysphoria?  There was only a

10   public hearing; correct?

11        A.   I know there was only one public meeting.  I

12   can't remember.

13        Q.   Generally what's the process for planning a

14   rule hearing?

15        A.   We determine a date, a location, and who will

16   be in attendance.  And the date and location is included

17   in the notice.

18        Q.   And when you say who will be in attendance, who

19   does that mean?

20        A.   Who the subject matter experts or other agency

21   staff will conduct the public meeting.

22        Q.   Okay.  And what do you mean by subject matter

23   expert?

24        A.   So I think I described it a little before how

25   for most of the coverage areas there is a specific

Page 121

1    analyst responsible for the development of that policy.

2    So, for example, if there was a change to respiratory

3    services, whoever that suggest matter expert or analyst

4    is would typically be present at the workshop since they

5    have the in-depth knowledge on the changes being

6    proposed.

7        Q.   Is that person always a person employed by the

8    agency?

9        A.   The subject matter expert for all our coverage

10   policies are individuals employed with the agency.

11       Q.   Okay.  Are there any written protocols

12   regarding the planning of a rule hearing?

13       A.   I know we've developed process maps and

14   procedures.  But I don't know the details of planning a

15   hearing specifically and how detailed those documents

16   are on that process.

17       Q.   What's a process map?  What does that entail or

18   detail?

19       A.   There's a graphic that was created before my

20   time that -- it's a real nice layout of the

21   administrative rulemaking process.

22       Q.   Okay.

23       A.   And so it has -- it's a graphic, and it's one

24   page.  So it's easy to put on your wall.

25       Q.   And your responsibilities include sometimes

Page 122

1   attending rule hearings?

2       A.   Yes.

3       Q.   Since you've been the bureau chief, how many

4   rule hearings have you attended?

5       A.   I don't think I've attended any hearings.

6       Q.   As a State agency employee -- either at DOEA or

7   AHCA -- how many rule hearings have you attended?

8       A.   So at DOEA I attended several AHCA rule

9   hearings in the audience.  In my previous position with

10  the agency, I think it was only a handful.

11      Q.   Does that mean five?

12      A.   Yes; I'd say five or less.

13      Q.   Okay.  Who else from AHCA attends rule

14  hearings?  Let me ask this:  Are there AHCA staff who

15  attend rule hearings as part of their job description --

16  they have to be at every rule hearing?

17      A.   I don't know if that's actually in the job

18  descriptions.  But Cole and his team -- since they set

19  up the workshop or hearing or the public meeting --

20  their responsibilities include making sure they have the

21  speaker list, making sure that everybody is escorted

22  into the building, that the speakers can be heard.  So

23  they're in attendance for all of the public meetings.

24      Q.   Okay.  And do you know if they have any

25  protocol off which they operate -- written protocol for

Page 123

1    conducting the hearing?

2        A.   I believe there's an internal process and

3    process map.  But I don't know the details off the top

4    of my head what's included in that document.

5        Q.   Is it the rules unit that is in possession of

6    that document?

7        A.   I would think so, yes.

8        Q.   Okay.  In your experience, aside from the

9    agency who attends the hearing?

10       A.   From the public?

11       Q.   I mean, I think that would be the only other

12   option; right?

13            What types of people from the public?

14            MR. PERKO:  Object to form.

15            THE WITNESS:  That would really depend on what

16       the change is and who is impacted.

17   BY MS. DEBRIERE:

18       Q.   In your experience attending public hearings --

19   rule hearings -- are there typically more than 25 people

20   from the public that show up at the rule hearing?

21       A.   I would say yes.  Especially since the hearings

22   are now -- have a virtual option.  The majority of them

23   are virtual and in person.

24       Q.   Are there typically more than 25 people who

25   show up in person?

Page 124

1      A.   So I haven't participated in all of them.  In

2   the last few that I participated in, there was not 25.

3      Q.   In the last one you participated in how many

4   were there?

5      A.   Less than ten.

6      Q.   Does AHCA ever invite specific persons from the

7   public to attend the rule hearings?

8      A.   Yes.

9      Q.   And how do they do that invite?

10      A.   A provider alert is sent out to the providers.

11   Usually that goes along with the FAR notice that was

12   posted and the public was noticed.  If it's a sister

13   agency, it might be by email.  So if we believe a rule

14   might impact a sister agency, we might reach out

15   specifically.

16      Q.   So other than posting the public notice and the

17   FAR provider alerts and emails to potentially impacted

18   sister agencies, is there any other way the agency

19   invites specific people to attend the hearing?

20      A.   I believe we sent calendar invites before.

21      Q.   To what people?  How did you decide on sending

22   calendar invites?

23      A.   The specific example I'm thinking of is a

24   sister agency for the iBudget handbook.  We invited ADP

25   to participate and sent them a meeting invite so they

Page 125

1   can block that time.

2        Q.   Okay.  Have you ever invited Medicaid

3   recipients other than through the public notice to

4   attend a rule hearing?

5        A.   I don't know, outside of the public notice

6   process.

7        Q.   In your experience?

8        A.   I personally have not.

9        Q.   Okay.  Do any State agencies in hosting a rule

10  hearing, do they arrange for transportation for

11  individuals from the public to attend that hearing?

12           MR. PERKO:  Object to form.

13           THE WITNESS:  I can't speak for any other

14       agency.  I don't know.

15  BY MS. DEBRIERE:

16       Q.   What about at DOEA?  Did that ever happen?

17       A.   I don't believe I ever participated in an

18  actual public meeting hosted by DOEA.

19       Q.   That's right.  You said that.

20           What about AHCA?  Are you aware of AHCA ever

21  arranging transportation for individuals from the public

22  to attend a hearing?

23       A.   Not that I'm aware of.

24       Q.   Are you aware of anyone from the public being

25  paid to attend a hearing?

Page 126

1      A.   No.

2      Q.   Are you aware of anyone who is a subject matter

3  expert being paid to attend a hearing?

4      A.   I know we've reimbursed the subject matter

5  experts.  But I'm not sure if that was specifically --

6  attending the hearing was specifically included.

7      Q.   And these are subject matter experts that are

8  employed with the agency?

9      A.   I don't know how that process works.  But

10  they're not full-time employees with the agency.  I

11  believe it's like consultants.

12      Q.   Okay.  What's the average length of a hearing?

13      A.   I don't know the average.  I know our public

14  meetings typically range between 30 minutes and two

15  hours.

16      Q.   Okay.  On average how many comments do agencies

17  receive for a rule hearing?  Is there an average?

18          MR. PERKO:  Object to form.

19          THE WITNESS:  I don't know.

20  BY MS. DEBRIERE:

21      Q.   Do you think 100 comments is a lot of public

22  comments to receive at a hearing?

23          MR. PERKO:  Same objection.

24          THE WITNESS:  I really don't know.

25  BY MS. DEBRIERE:

Page 127

1      Q.   In your experience, does a State agency ask

2   outside legal counsel to attend and perhaps in rule

3   hearings?

4      A.   Can you repeat the question.

5      Q.   In your experience, does a State agency

6   normally ask that outside legal counsel attend a rule

7   hearing?

8      A.   I don't know.

9      Q.   When you planned this last rule hearing, did

10   you ask outside legal counsel to attend?

11      A.   Can you specify which hearing.

12      Q.   Yeah.  There was a hearing a couple of weeks

13   ago on the change to the medical necessity definition.

14      A.   Yes.  The workshop.

15      Q.   Workshop.  Did you ask outside legal counsel to

16   attend that workshop?

17      A.   I personally did not.

18      Q.   Did outside legal counsel attend that workshop?

19      A.   I don't believe so.

20      Q.   And have you ever attended a rule hearing where

21   outside legal counsel was asked to participate in?

22      A.   I can't recall if that circumstance has ever

23   happened.

24      Q.   So it's not usually -- it's not the standard

25   course of things for outside legal counsel to attend?

Page 128

1      A.    Correct.

2      Q.    All right.  Turning to the exclusion for

3   treatment of gender dysphoria under Rule 59G-1.050.

4   Prior to the adoption of this exclusion, did any

5   coverage policies regarding any of the services listed

6   there -- sorry.  Strike that.

7          Prior to the adoption of the exclusions set

8   forth -- I'm not sure you're looking at the right rule.

9   59G-1.050.  Exhibit 2.  It would help me to tell you the

10  exhibit number.  And then it's Subpart 7.

11         So prior to the adoption of that rule -- that

12  Subpart 7 -- did any coverage policies exist regarding

13  the services that are now subject to that exclusion?

14     A.    Can you repeat that question.

15         MS. DEBRIERE:  Court Reporter, can you read

16     back that last question.

17         (The preceding question was read back by the

18  reporter.)

19         THE WITNESS:  There was not a specific coverage

20     policy for services for the treatment of gender

21     dysphoria.

22  BY MS. DEBRIERE:

23     Q.    Does that mean those services were never

24  covered to treat gender dysphoria by Florida Medicaid?

25     A.    I don't believe there was any policy language

Page 129

1   that specifically outlined coverage of the services

2   listed in this section.

3        Q.   If there was no specific policy language, does

4   that then mean those services were not covered to treat

5   gender dysphoria by Florida Medicaid?

6        A.   I don't know the extent to what providers were

7   reimbursed for providing the services.

8        Q.   So even if there wasn't a coverage policy

9   specifically related to these services, it's possible

10  that Florida Medicaid was covering the services for the

11  treatment of gender dysphoria?

12       A.   It's possible Florida Medicaid reimbursed for

13  these.

14       Q.   Are there circumstances in which AHCA might not

15  have an explicit or affirmative coverage policy, but

16  would consider a request for a service on a case-by-case

17  basis?

18       A.   Can you repeat the question.

19       Q.   Are there circumstance in which AHCA might not

20  have an explicit coverage policy regarding those

21  services -- or any service -- but would consider a

22  request for a service on a case-by-case basis?

23       A.   I don't know specifically if it's case-by-case

24  basis.  But I believe that the plans -- that some of the

25  request from the managed care plans may be specific to a

Page 130

1    request for a specific coverage.  So when plans request

2    for a GAPMS to be provided, it could be being driven by

3    a specific case.

4         Q.   Okay.  So even though a coverage policy does

5    not exist regarding the coverage of a specific service,

6    there are circumstances in which AHCA might still cover

7    that service?

8         A.   Yes.

9              And I apologize.  On your last question I think

10   I heard you specific about GAPMS, which is what I

11   answered.  So I apologize.

12        Q.   That's okay.  No, that's fine.  You're

13   referring to not the last question, but the question

14   before that; is that right?

15        A.   Yes.

16        Q.   Okay.  But your response on that last question,

17   you understood the question?

18        A.   Yes.

19        Q.   Okay.  Will Florida Medicaid cover an EPSDT

20   service if that service is experimental?

21        A.   So in order for an EPSDT service to be covered,

22   it has to meet the definition of medical necessity.

23        Q.   And that medical necessity definition includes

24   the requirement that the service not be experimental?

25        A.   Yes.

1     Q.   Okay.  So you received a request from Secretary

2  Marstiller via email to engage in a GAPMS regarding

3  treatment for gender dysphoria; correct?

4     A.   I can't remember if it was email.

5     Q.   Right.  But you received the request somehow?

6     A.   Yes.

7     Q.   And roughly when was that; do you remember?

8     A.   I don't remember.

9     Q.   And then the next step was speaking with

10  Mr. Weida about the letter?

11     A.   Yes.

12     Q.   And developing the plan as to who was going

13  to --

14     A.   Yes.  Developing how the process would work.

15     Q.   Were all the decisions reached in that one

16  meeting with Mr. Weida?

17          MR. PERKO:  Object to form.

18          THE WITNESS:  No.

19  BY MS. DEBRIERE:

20     Q.   Okay.  So after that meeting with Mr. Weida,

21  what happened next?

22     A.   I can't remember the exact timeline of events.

23  I know we met at some point with the Canadian

24  Prescription Drug Importation team.

25     Q.   And they were the ones who were put in charge

Page 132

1   of doing this GAPMS?

2       A.   Yes.

3       Q.   Okay.

4       A.   And there was several conversations following

5   that.

6       Q.   Were those conversations limited to yourself,

7   Mr. Brackett, Mr. Chen, and Ms. Pickle?  Or were there

8   other people involved?

9       A.   I can't remember the chronology.  I know after

10  the report and then into the rulemaking Cole Giering was

11  brought into the conversation.  Legal counsel -- there

12  was conversations with the experts.

13      Q.   Who were the experts?

14      A.   I can't remember all their names.  I don't know

15  if we have that list here.

16      Q.   Did you ever personally speak with any of the

17  experts?

18      A.   No.

19      Q.   Are all the experts listed here on what would

20  be will be your Exhibit 7 on page 45?

21      A.   I believe so, yes.

22      Q.   Was a Dr. Von Mol ever involved as an expert?

23      A.   I believe so.

24           MS. DEBRIERE:  And let me just mark this as

25      Exhibit 10.

1          (Plaintiff's Exhibit No. 10 was marked for

2    identification.)

3    BY MS. DEBRIERE:

4        Q.   And this is a document -- an After the Fact

5    Request Form Under 35K.  This form is indicating what?

6        A.   Consultant services for vendor name Andre

7    Van Mol.

8        Q.   And what kind of consulting services did

9    Dr. Van Mol provide?

10       A.   I don't know all the details of that -- what

11   the contractor provided.  But it was as part of the

12   GAPMS process.

13       Q.   Okay.  Why was it time sensitive?  It indicates

14   on that form it was time sensitive.  Why?

15       A.   I don't know why the request was time

16   sensitive.

17       Q.   Who would know that?

18       A.   I don't know.

19       Q.   Okay.  At any time throughout the process did

20   you feel like there was an urgency to the development of

21   the report and rule?

22       A.   Yes.  The time sensitive nature was

23   communicated.

24       Q.   By?

25       A.   I don't know remember if it was in the original

Page 134

1    request or if it was later in conversations with

2    leadership.  I can't remember exactly who.  But I think

3    the expectation to follow the process but work as

4    quickly as possible was apparent.

5         Q.   Okay.  But you cannot provide me an explanation

6    as to why it was identified as time sensitive?

7         A.   Correct.

8         Q.   I believe we already marked ATF to

9    Dr. Van Meter as Exhibit 8.

10              Dr. Van Mol -- do you know if he attended the

11   rule hearing for the exclusion of treatment for gender

12   dysphoria?

13        A.   I don't know.

14        Q.   Okay.  What does this document, Exhibit 8,

15   indicate to you?

16        A.   An approval for consultant services for vendor

17   named Quintan Van Meter.

18        Q.   Okay.  And what kind of services did he provide

19   in exchange for that reimbursement?

20        A.   Consultant services.

21        Q.   Consulting on what?

22        A.   As part of the GAPMS process.

23        Q.   Do you know what specific stages he provided

24   consultation on?

25        A.   I don't.

1    Q.   Do you know whose idea it was to use him?

2    A.   I don't.

3    Q.   Do you know whose idea it was to retain any of

4  the outside experts?

5    A.   No.

6    Q.   Was it internal to AHCA, that decision?  Did

7  someone at AHCA decide to retain outside experts?

8    A.   I don't know.

9    Q.   Who would have made that decision?

10       MR. PERKO:  Asked and answered.

11       THE WITNESS:  I don't know.

12  BY MS. DEBRIERE:

13    Q.   Are you aware of AHCA retaining outside experts

14  for any other GAPMS report?

15    A.   I don't know.

16    Q.   Other than Dr. Van Meter and Dr. Van Moll --

17  I'm sorry.

18       Was there a Dr. Grossman involved in the

19  process?

20    A.   Yes.

21    Q.   And what was Dr. Grossman's role?

22    A.   I believe it was the same -- consultant

23  services.

24    Q.   For the development of the report?

25    A.   Yes.

1    Q.   Okay.  Do you know if they were reimbursed to

2    participate in the hearing?

3    A.   I don't know.

4    Q.   Okay.  Were any of the -- other than

5    Dr. Van Mol and Dr. Van Meter -- was

6    Dr. Brignardello-Petersen reimbursed by AHCA for

7    consultant services related to the development of the

8    exclusion of treatment for gender dysphoria?

9    A.   I don't know off the top of my head.

10    Q.   What about Dr. James Cantor?

11    A.   I don't know off the top of my head without

12    consulting if there was an invoice.

13    Q.   Is that true for all the experts?

14    A.   I can't remember how exactly the contracts --

15    the contracted services were reimbursed.

16    Q.   Were they reimbursed?

17    A.   They were.

18    Q.   Looking at Van Meter's form -- why did you sign

19    that form for a $34,000 reimbursement if you didn't know

20    what Van Meter was doing?

21         MR. PERKO:  I'm going to object to form.

22         THE WITNESS:  So I know that Van Meter was

23    consulting as part of the project.  I just don't

24    know throughout the process all the specific details

25    of that consultation.

Page 137

1    BY MS. DEBRIERE:

2        Q.    Would you assume each expert listed was

3    similarly compensated for the amount that Dr. Van Meter

4    and Van Mol were compensated?

5        A.    I'm not going to assume.  Just looking at the

6    two invoices, they are very different.

7        Q.    In what ways?

8        A.    This one has a not to exceed amount.  And then

9    this one has as dollar amount.

10       Q.    Okay.  Is that the only way they're different?

11       A.    No.

12       Q.    How else are they different?

13       A.    The one for Quinton Van Meter has specific

14   information regarding his MFMP registration.

15       Q.    What is MFMP?

16       A.    My Florida Market Place.

17       Q.    Okay.  Any other ways that they're different?

18       A.    Some of the other language is different.  The

19   dates are different.  But aside from that, no.

20       Q.    How often do you approve an After the Fact

21   Request Form for reimbursement of outside expertise?

22       A.    Not often.

23       Q.    How many times have you done it for expertise

24   not related to the treatment of gender dysphoria?

25       A.    I can't recall if I actually approved the

1    invoice; but I believe there was a consultant for the

2    Canadian Prescription Drug Importation Program at one

3    point.  And I just can't remember the time.

4         Q.   Is that the only time you can remember?

5         A.   Yes.

6         Q.   Okay.  So when you were approving these forms

7    that don't come across your desk often, do they strike

8    you as something that needed careful review?

9         A.   The invoice itself?

10        Q.   The reason for reimbursement.

11        A.   Yes.  But the invoice itself seems pretty

12   straightforward that a reimbursement based on services

13   provided -- that had already been provided would be

14   signed.

15        Q.   Did you do a carful review of the reason for

16   reimbursement?

17             MR. PERKO:  Object to form.

18             THE WITNESS:  I guess I'm not sure what you

19        mean by careful review.  I personally was not

20        involved in all of the consultation services

21        provided.  But I did meet with the team and knew

22        that services were provided.

23   BY MS. DEBRIERE:

24        Q.   Prior to you receiving this request for

25   reimbursement, did you know these experts were being

Page 139

1    relied on for consultation?

2        A.    Yes.

3        Q.    Did you have to approve that request?

4        A.    I don't know if there was a request initiating

5    the services.  I don't remember.

6        Q.    Was there a need to approve the decision to

7    rely on outside experts?

8            MR. PERKO:  Object to form.

9    BY MS. DEBRIERE:

10       Q.    Was there a requirement that consulting with

11   outside experts be approved prior to the consultation?

12           MR. PERKO:  Object to form.

13           THE WITNESS:  Can you repeat that question.

14   BY MS. DEBRIERE:

15       Q.    Was there -- who consulted with the outside

16   experts?

17       A.    Again, I don't know the extent of what the

18   consultation services were or who all was part of that.

19       Q.    In order for them to -- in order for the team

20   to develop the GAPMS report -- who wrote it -- in order

21   for them to consult with outside experts, did it require

22   your approval?

23       A.    I don't recall ever approving them.

24       Q.    And the team relying on outside experts to

25   write the GAPMS report on gender dysphoria, did it

Page 140

1    require the approval of D.D. Pickle?

2            MR. PERKO:  Object to form.

3            THE WITNESS:  I can't recall how the formal

4        process was initiated.

5            And I do want to say relying on experts --

6        there was a lot of additional research done as well

7        as part of the GAPMS process.  So I wanted to

8        clarify that.

9    BY MS. DEBRIERE:

10       Q.   But part of writing the report was consulting

11   with these outside experts; correct?

12       A.   Yes.

13       Q.   And you don't know who made the decision to

14   consult with those experts; is that right?

15       A.   Correct.

16       Q.   Whoever made the decision -- we don't know who

17   that is.  But whoever made the decision, did they

18   require approval before they could implement that

19   decision?

20           MR. PERKO:  Object to form.

21           THE WITNESS:  I don't know.

22   BY MS. DEBRIERE:

23       Q.   Okay.  As the bureau chief who oversees the

24   team who wrote this GAPMS report, did you have an

25   expectation that they would come to you for approval to

Page 141

1    consult with outside experts that would then be paid?

2        A.    Can you repeat that.

3        Q.    As the bureau chief, the person who oversees

4    the team that wrote the GAPMS report on treatment for

5    gender dysphoria, did you have an expectation that they

6    first ask you permission before they consulted with

7    outside experts who charged for their services?

8        A.    No.

9        Q.    Why didn't you have that expectation?

10       A.    I can't really answer that, as I was not part

11   of the decision to consult with the experts.

12       Q.    Who was part of the decision?

13       A.    I don't know.

14       Q.    But you know you were not part of it.  Okay.

15             At the bottom of the After the Request Form, it

16   states -- for Dr. Van Mol, which is Exhibit 10 -- it

17   states supervisor approval is required.  What does that

18   mean?

19       A.    In the routing hierarchy for approval.

20       Q.    Approval of what?

21       A.    For invoices for My Florida Marketplace.  I'm

22   the direct supervisor of D.D. Pickle.

23       Q.    So your approval is required for D.D. Pickle to

24   pay this bill?

25       A.    Yes.

1      Q.   Okay.  But your approval was not required for

2    D.D. Pickle to incur this bill?

3           MR. PERKO:  Object to form.

4           THE WITNESS:  I don't remember if there was a

5       formal approval to initiate the services.

6    BY MS. DEBRIERE:

7      Q.   Did you have to have approval to authorize this

8    payment to Dr. Van Mol?

9      A.   I can't remember.  I don't know where this goes

10   next in the routing.

11     Q.   Okay.  Did you ask permission to approve this

12   from anyone?

13     A.   I can't remember a specific conversation.  But

14   I knew it was approved by the agency to consult with --

15   to have the consultant services.

16     Q.   Okay.  Related to that, the last sentence is --

17   how did you know that?

18     A.   How did I know what?  Can you repeat that.

19     Q.   I think you had responded that you knew the

20   agency had approved it.  And so my question was:  How

21   did you know that?

22     A.   I don't remember the specific conversation.

23   But I do know that it was approved by leadership.

24     Q.   And how do you know that?

25     A.   There must have been a conversation.  I just

Page 143

1   can't remember an exact -- if there was an exact

2   conversation or a document I signed.  I can't remember.

3       Q.   Okay.  Do you remember who you had the

4   conversation with or had the document signed by?

5       A.   I don't remember.

6       Q.   The last sentence under that first paragraph,

7   it says, "Verification of the availability of funding

8   and approval from executive leadership was obtained

9   prior to any work being conducted for this project."

10          Who was that executive leadership?

11      A.   The majority of my discussions were with my

12  direct supervisor.  But Tom Wallace ultimately signed

13  the report.  And I don't know outside of that who all

14  was involved.

15      Q.   Do you need a break?

16      A.   Yeah.

17          (Brief recess.)

18  BY MS. DEBRIERE:

19      Q.   Who decided the amount in those forms?

20      A.   I don't know how the amount was negotiated.

21      Q.   Did you follow up on the amount being

22  requested -- ask any questions about it?

23      A.   I can't remember if I asked any questions.

24  But, again, as it states on the form -- the availability

25  of funding approval for leadership.

1      Q.   So you think whoever that leadership was had

2  approved that amount?

3      A.   I don't know how the reimbursement for the

4  services was negotiated.

5      Q.   Okay.  So you didn't ask any questions about

6  the amount or what it was being used for?

7           MR. PERKO:  Object to form.

8           THE WITNESS:  I knew what it was being used

9      for.  But I can't remember if I asked any questions

10     about the amount.

11          MS. DEBRIERE:  Okay.

12          THE WITNESS:  I can't recall any.

13 BY MS. DEBRIERE:

14     Q.   Are there any subject matter experts for the

15 services listed in that exclusion that are full-time

16 employees with the agency?

17          MR. PERKO:  Object to form.

18          THE WITNESS:  I don't believe so, since the

19     services outlined in the policy were not clearly

20     outlined in any existing coverage policy that would

21     have had any subject matter expert assigned to the

22     coverage policy.

23 BY MS. DEBRIERE:

24     Q.   Do you have a subject matter expert in surgery?

25     A.   I don't know if it's one person or more than

Page 145

1    one.  We have an area that's responsible for the

2    coverage policies we talked about earlier that contain

3    coverage for surgical procedures.

4         Q.   So you have a subject matter expert for

5    outpatient hospital services?

6         A.   Yes.

7         Q.   And do you have a subject matter expert for

8    inpatient hospital services?

9         A.   I don't know if it's the same person.

10        Q.   Okay.  But do you have a subject matter expert

11   in inpatient, it just might be the same person?

12        A.   There's a team responsible for oversight of

13   those policies, yes.

14        Q.   Was that team involved in the development of

15   this GAPMS report?

16        A.   Not to my knowledge.  But I can't speak to all

17   of the research and activities that were part of the

18   completion of the project.

19        Q.   Who is that team -- that team that are the

20   suggest matter experts in inpatient and outpatient

21   hospital services?

22        A.   That would be John Matson under Jesse Bottcher

23   who is responsible for primary and preventive surgeries,

24   including dental.

25        Q.   Okay.  You had mentioned before the break that

1   you had communications about the development of the

2   GAPMS report with legal counsel; is that correct?

3       A.   I believe so.  I can't remember if it was part

4   of the report or part of the rule.  I know for sure with

5   the rulemaking process that legal is involved in that

6   process normally.  And they were in this instance as

7   well.

8       Q.   Did that legal include outside counsel?

9       A.   I don't know.  I don't remember meeting with

10  outside counsel.

11      Q.   Okay.  You don't remember with meeting with

12  Holtzman & Vogel, the law firm?

13      A.   No.

14      Q.   Did you communicate with any other State

15  agencies like the Florida Department of Health about the

16  GAPMS report?

17      A.   I personally did not.

18      Q.   Did anybody at the Agency for Health Care

19  Administration?

20      A.   I don't know.

21      Q.   Did you communicate -- were there any

22  communications between AHCA and the Governor about the

23  development of this report?

24      A.   I don't know.

25      Q.   Did you personally communicate with the

Page 147

1   Governor's office about the development of this report?
2       A.   No.
3       Q.   Did you personally communicate with the
4   Governor's office about the exclusion of treatment for
5   gender dysphoria?
6       A.   No.
7       Q.   Were there any communications between AHCA and
8   people that provided public comment at the hearing?
9       A.   I'm sorry; can you repeat the question.
10      Q.   Were there any communications between AHCA --
11  prior to the hearing, were there any communications
12  between AHCA and the people who provided public comment
13  at the hearing?
14      A.   I don't know.
15      Q.   Did you personally communicate with anyone who
16  provided public content at the hearing prior to the
17  hearing?
18      A.   No.
19      Q.   Was anyone at AHCA aware that specific people
20  would provide public content at the hearing prior to the
21  hearing?
22      A.   I don't know.
23      Q.   Were you aware that there were any specific
24  members of the public who would provide public comment
25  at the hearing prior to the hearing?

1    A.   No.

2    Q.   The person who is identified as authoring the

3  GAPMS report on gender dysphoria is Matt Brackett;

4  correct?

5    A.   Yes, he was the primary author.

6    Q.   Do you recall a meeting between you, Mr. Weida,

7  and Mr. Bottcher discussing who the author of the report

8  would be?

9    A.   I don't remember if Jesse was in any of the

10  conversations.

11    Q.   Okay.  Did Jesse ever express a concern to you

12  about someone -- anyone on his team drafting the GAPMS

13  report on gender dysphoria treatment?

14    A.   Prior to?

15    Q.   At any time.

16    A.   Can you say that again.

17    Q.   Did Mr. Bottcher ever express to you concerns

18  over someone on his team drafting the GAPMS report on

19  the treatment for gender dysphoria?

20    A.   Not that I can recall.

21    Q.   Was the GAPMS decision tree used before you

22  decided to undertake the GAPMS analysis that is

23  contained in the June 2022 report?

24    A.   I don't know.

25    Q.   Who would have that information?

1          Did Secretary Marstiller in her letter to Tom

2     Wallace -- did she direct Tom Wallace to undertake the

3     GAPMS process?

4               MR. PERKO:  Object to form.

5               THE WITNESS:  I can't recall the details of the

6          letter.

7               MS. DEBRIERE:  Me neither.  Do we have a copy?

8               MS. CHRISS:  It's the last page right there.

9          It's Attachment A.

10              MS. DEBRIERE:  Oh.  It's the very back of

11         Exhibit --

12              MR. PERKO:  It's not attached to ours.

13              MS. DEBRIERE:  Okay.

14              MS. DUNN:  Why don't you pull it off and mark

15         it as a separate exhibit.

16              MS. DEBRIERE:  So we'll mark the letter from

17         Simone Marstiller dated April 10th, 2022, as Exhibit

18         11.  And that's Attachment A to the June 2022, GAPMS

19         report related to the treatment for gender

20         dysphoria.

21              (Plaintiff's Exhibit No. 11 was marked for

22    identification.)

23    BY MS. DEBRIERE:

24         Q.   So in this letter is Secretary Marstiller

25    directing Mr. Wallace to undertake the GAPMS process?

Page 150

1          MR. PERKO:  Object to form.

2          THE WITNESS:  Yes.

3   BY MS. DEBRIERE:

4      Q.   Do you think that Secretary Marstiller

5   undertook a decision tree prior to writing this letter

6   and sending it to Mr. Wallace?

7          MR. PERKO:  Object to form.

8          THE WITNESS:  I don't know.

9   BY MS. DEBRIERE:

10     Q.   Has the secretary of AHCA ever personally

11  completed a decision tree on the GAPMS process?

12     A.   I don't know.

13     Q.   Would it be unusual if the secretary of AHCA

14  completed a decision tree on the GAPMS process?

15     A.   I don't know.

16     Q.   Looking at the GAPMS report itself, does it

17  contain a fiscal analysis?

18     A.   I don't know off the top of my head.

19     Q.   Yeah.  No, take your time.

20     A.   No, I do not see a fiscal analysis.

21     Q.   Do you see anything related to cost

22  effectiveness?

23     A.   No.

24     Q.   Do you know why that was not included?

25     A.   No.

Page 151

1    Q.   Is budget neutrality in reaching a GAPMS

2    decision important?

3              MR. PERKO:  Object to form.

4              THE WITNESS:  I don't know.  I know that that's

5         something when determining a coverage determination

6         that is taken into consideration.  But specific to

7         the GAPMS process, I don't know.

8    BY MS. DEBRIERE:

9    Q.   Okay.  Who would know that?  Would the person

10   responsible for writing GAPMS reports know that?

11   A.   Yes.  Or Jesse Bottcher or Matt Brackett.

12   Q.   Or Jeff English?

13   A.   Yes.

14   Q.   Who decided which services would be assessed in

15   the GAPMS report?

16   A.   I don't know.

17   Q.   So typically a request comes in from the public

18   for a specific service.  In this instance, the request

19   came from the secretary; correct?

20   A.   Yes.

21   Q.   So would it have been the secretary who decided

22   which services should be assessed?

23   A.   I can't recall how the decision was made.  I do

24   know that that was part of conversations we had during

25   this process.  But I can't recall exactly how the

Page 152

1    decision was finalized.

2         Q.   Was there ever a discussion about narrowing the

3    types of services to be included?

4         A.   I don't recall specifically.  I know that the

5    coverage of behavioral health services was something

6    that was always covered.  But outside of that

7    specifically, I can't remember.

8         Q.   Was there ever any discussion about undertaking

9    the GAPMS process for a set of services simultaneously

10   as opposed to a single service?

11        A.   Can you clarify.

12        Q.   In the discussions about writing the report or

13   assessing the services, were there ever any concerns

14   raised about undertaking the process for a set of

15   services as opposed to a single one?

16        A.   I don't recall specifically.

17        Q.   Was there any discussion about EPSDT?

18        A.   I can't remember if it was specific to the

19   development of the report or the rulemaking more

20   specifically.  But I believe there was.

21        Q.   And what was discussed?

22             MR. PERKO:  I'm going to object for a second.

23        Did that include counsel?  Did those discussions

24        include counsel?

25             THE WITNESS:  Yes.

Page 153

1           MR. PERKO:  And who was that?

2           THE WITNESS:  I don't remember.

3           MR. PERKO:  But it did include counsel?

4           THE WITNESS:  I believe it was a discussion on

5      the rulemaking with counsel.

6           MR. PERKO:  I'm going to instruct the witness

7      not to answer.

8  BY MS. DEBRIERE:

9      Q.   Were all discussions had in front of counsel

10 about EPSDT?

11     A.   I don't remember.

12     Q.   How about comparability?

13          MR. PERKO:  I'll ask you the same thing.

14          THE WITNESS:  Can you remind me what you're

15     referencing when you say comparability.  I think you

16     mentioned that at the very beginning of the day.

17          MS. DEBRIERE:  Comparability is a requirement

18     under the Federal Medicaid Act in the administration

19     of the coverage of the Medicaid services.

20          THE WITNESS:  I don't recall.

21 BY MS. DEBRIERE:

22     Q.   Were there communications with the Centers for

23 Medicare and Medicaid Services about AHCA's decision to

24 assess whether the services listed in the exclusion were

25 experimental?

Page 154

1    A.   I don't know.  I personally did not have any

2    conversations.

3    Q.   Who communicates with CMS about those kinds of

4    things?

5    A.   Those kinds of things, you mean changes in

6    coverage?

7    Q.   Does CMS ever reach out to AHCA about concerns

8    they have about an action that they're taking related to

9    Medicaid coverage?

10   A.   Yes.

11   Q.   Who would be the point person at AHCA to have

12   those conversations?

13   A.   So if an update to a federal authority were

14   needed, that would be either Catherine Mcgrath or

15   myself.

16   Q.   Okay.  You would not have had -- have you had

17   any conversations with CMS about the GAPMS report

18   related to the treatment of gender dysphoria?

19   A.   No.

20   Q.   Has Catherine?

21   A.   Not to my knowledge.

22   Q.   Have you had any conversations with CMS about

23   the exclusion of the treatment for gender dysphoria as

24   contained in Rule 59G-1.050?

25   A.   I have not.

1     Q.   Has Catherine?

2     A.   Not to my knowledge.

3     Q.   Has anybody else at AHCA?

4     A.   I don't know.

5     Q.   Okay.  You mentioned a second ago that you

6    weren't sure if you were talking about EPSDTs as it

7    related to the report or the rulemaking.  When you make

8    that distinction, are you referring the writing of the

9    report versus the adoption of the rule?

10    A.   Yes.

11    Q.   Okay.  How was it decided that the conclusions

12   from the GAPMS report should be adopted into rule?

13    A.   I'm trying to remember the specific

14   conversations.  But I do believe those were

15   conversations with counsel as well.

16    Q.   Okay.  The expedited GAPMS that you were

17   involved in from start to finish, was that decision

18   adopted into rule?

19    A.   It was just one other GAPMS.  And I don't

20   believe any rule update was needed for that one.

21    Q.   Why was a rule update needed for this GAPMS

22   report?

23        MR. PERKO:  If that's discussion with counsel,

24    I will instruct you not to answer.

25        THE WITNESS:  Because there was not any policy

1      language that clearly explained the coverage, it was
2      determined that developing policy language was the
3      best approach.  Anything past that was -- how that
4      process went was conversation with counsel.
5   BY MS. DEBRIERE:
6      Q.   How often in your day-to-day in making
7   decisions in your job do you have to consult with legal
8   counsel?
9      A.   Often.
10     Q.   Okay.  So does that mean -- okay.  Like, every
11  day?
12     A.   I would say the majority of days.
13     Q.   Okay.
14     A.   And I'll just specify.  I have some sort of
15  contact or interaction with legal counsel.
16     Q.   On most days?
17     A.   Yes.  And, again, because the rule promulgation
18  does require review and some other documents we route
19  are managed care contracts also route through legal.
20  Just to give you examples of why it's quite often.
21     Q.   They're all contacts with legal counsel about
22  things related to the doing of your job?
23     A.   The development of policy and -- yes.
24     Q.   Okay.  So there was -- you said there was --
25  the reason that it needed to be adopted into rule is

Page 157

1   because there was no clear coverage policy on the

2   services at issue; is that correct?

3        A.   I can't remember all the factors that went into

4   the decision.  But I believe that was one of the factors

5   when it was assessed that there was no coverage policy

6   specific to the treatment of gender dysphoria.

7        Q.   Were there existing coverage guidelines?

8        A.   Not to my knowledge.

9        Q.   At the time were you aware of existing pharmacy

10  policies related to the treatment of gender dysphoria?

11       A.   At what time?  Can you specify.

12       Q.   It was 2017/2016.

13       A.   I was not with the agency in 2016.  So I would

14  not have been part of any development of policy at that

15  time.

16       Q.   But when you were deciding whether to adopt

17  this exclusion into the rule, did you do any review of

18  existing coverage guidelines or past coverage decisions?

19       A.   I believe we did.  But I can't recall the

20  specifics.

21       Q.   Did you review past GAPMS reports regarding the

22  treatment of gender dysphoria?

23       A.   I believe we did.

24       Q.   And why weren't they enough to establish the

25  coverage policy?

1          MR. PERKO:  Object to form.

2          THE WITNESS:  I don't know.

3    BY MS. DEBRIERE:

4    Q.    59G-1.050, Subpart 7 -- it bans Medicaid

5    coverage for puberty blockers, hormones and surgery if

6    done so to treat gender dysphoria; correct?

7    A.    It covers that Medicaid does not cover those

8    services for the treatment of gender dysphoria; correct.

9    Q.    Does it distinguish between adults and

10   children?

11   A.    No.

12   Q.    So the exclusion applies equally to both

13   children and adults; is that correct?

14   A.    Yes.

15   Q.    Okay.  And it excludes Medicaid coverage for

16   puberty blockers and hormones and surgery to treat

17   gender dysphoria, but it does not exclude Medicaid

18   coverage for those services to treat other diagnoses; is

19   that correct?

20   A.    Correct.

21   Q.    And I just forgot you answer; I apologize.

22   Were you involved in the rule hearing held on July 8th

23   regarding the exclusion set forth in 1.050?

24   A.    No.

25   Q.    Were you aware that outside legal counsel

Page 159

1    participated in that hearing?

2        A.   I don't know if I was made aware prior to

3    today.  I can't remember.

4        Q.   At rule hearings you've been in in the past, do

5    the State agencies have a panel of subject matter

6    experts who respond to public comment during the

7    hearing?

8        A.   I can't cite the specific language, but it's

9    actually required per Chapter 120 that the agency has

10   subject matter experts who can speak to the contents of

11   whatever is being discussed at a public meeting

12   available.

13       Q.   Other than the July 8th hearing, are you aware

14   of any time that any agency has retained outside subject

15   matter experts to participate on that panel?

16       A.   I'm not aware of any.

17       Q.   To your knowledge is this the only time AHCA

18   has created a slogan to advertise the conclusion in its

19   GAPMS memo?

20           MR. PERKO:  Object to form.

21   BY MS. DEBRIERE:

22       Q.   Are you aware of the slogan "Let kids be kids"?

23       A.   I've seen the website, yes.

24       Q.   In your experience has AHCA ever designed a

25   website page for any other rule adoption?

Page 160

1    A.   I can't remember if it was specific to rule

2    adoption.  But I can think of a couple of examples where

3    we created web pages for policy updates; for example,

4    for home and community based settings rule that was an

5    administrative rule as well as a federal rule.  There's

6    a specific external web page for updates regarding that

7    and information on that rule.

8         When we received the American Rescue Act

9    funding approval, we created a web page with information

10   on that funding and what those funding could be used

11   for.  So I feel like it's pretty common for us to update

12   our external website when there's important information

13   to communicate.

14   Q.   In those other examples, did AHCA ever develop

15   a slogan to go along with those web pages?

16   A.   Not in the examples that I used, I don't think.

17   Q.   Did they issue press releases?

18   A.   The American Rescue Act funding may have had

19   one.  But I can't remember.

20   Q.   Okay.  Just going back quickly.  My co-counsel

21   has pointed out to me that in Chapter 120 it says that

22   at the rule hearing agency staff must be available but

23   not an expert.  Do you think maybe you were confusing

24   that requirement that an expert needs to be available

25   under 120?

1    A.   I think it says an agency staff with knowledge.

2    Q.   Okay.  "Ensure that staff are available to

3  explain the agency's proposal and to respond to

4  questions or comments regarding the rule."  Is that the

5  provision you were --

6    A.   Yes.

7    Q.   -- thinking of?  Okay.

8         Typically when AHCA decides not to cover a

9  particular service, where is that information included?

10         MR. PERKO:  Object to form.

11         THE WITNESS:  I think it depends on the policy.

12      Each policy has different exclusions, if there are

13      any, with the service.  Or most of the coverage

14      policies include a section specific to exclusions.

15         MS. DEBRIERE:  Most of the policies?  Is that

16      what you said?  I apologize.

17         THE WITNESS:  Most of the coverage policies.

18  BY MS. DEBRIERE:

19    Q.   Okay.  And those coverage policies are service

20  specific policies?

21    A.   The examples I was thinking of, yes, were

22  service specific coverage policies and include -- I

23  can't remember exactly what section in the example of

24  where to find that in the coverage policy.  But, yes, it

25  would include exclusion specific to the coverage that's

1    being described in the policy.

2        Q.    Okay.  The exclusion on the treatment of gender

3    dysphoria, is it in a service specific coverage policy?

4        A.    No.  This is a general Medicaid policy.  But it

5    does include coverage information including what Florida

6    Medicaid reimburses for and what it does not.

7        Q.    Does it speak to the exclusion of any other

8    services under Florida Medicaid but those services

9    excluded for the treatment of gender dysphoria?

10       A.    Yes.

11       Q.    Which ones?

12       A.    No. 4 is an example.  (4)(b), that speaks to

13   that Florida Medicaid does not cover continuous services

14   after the emergency has been alleviated.

15       Q.    Is that a specific service?  Or is that the

16   length of time for any service?

17       A.    I apologize.  It's emergency service.  It's

18   under the section for emergency Medicaid.

19       Q.    But, again, is that speaking to the coverage of

20   any service deemed emergency?

21       A.    It's specific to emergency services provided to

22   aliens who meet all Florida Medicaid eligibility

23   requirements except for citizenship.

24       Q.    It says an exclusion under Subpart 7 speaks

25   specifically to the exclusion of sex reassignment

Page 163

1   surgeries; correct?

2       A.    Services for the treatment of gender dysphoria.

3       Q.    But only three services.

4       A.    Four.

5       Q.    What are examples of procedures that alter

6   primary or secondary sexual characteristics that are not

7   related to surgery?

8       A.    I don't know.

9       Q.    Just going back to the surgery, why not include

10  that in service specific policies that discuss surgery?

11      A.    Can you repeat the question.

12      Q.    Looking at the exclusion of sex reassignment

13  surgeries, why was that not included in the coverage

14  policies related to surgeries that we discussed earlier?

15      A.    I don't recall the specific conversation on how

16  it was decided that this was the most appropriate

17  policy.  And I do believe that most of that conversation

18  was with counsel.

19      Q.    So same question for puberty blockers.  Why

20  wouldn't you include that in a pharmacy coverage policy?

21      A.    I don't know.

22      Q.    And Subpart 7's subject line is "Gender

23  Dysphoria"; correct?

24      A.    Yes.

25      Q.    And that's a diagnosis?

1    A.   I don't know clinically the definition.

2    Q.   We've been talking about the treatment of

3    gender dysphoria; right?

4    A.   Yes.

5    Q.   So in order to exclude treatment of gender

6    dysphoria, it would be the exclusion of a treatment for

7    a diagnosis; correct?

8    A.   Yes.  But I can't speak to the specifics of the

9    diagnosis or what that means in clinical terms.

10   Q.   Okay.  For the July 8th hearing, do you know

11   how many public comments were submitted?

12   A.   I don't know.

13   Q.   Do you know if it was more than 100?

14        MR. PERKO:  Asked and answered.

15        THE WITNESS:  I know it was a lot.

16   BY MS. DEBRIERE:

17   Q.   Okay.  And do you know how long it took AHCA to

18   review and consider the comments before adopting the

19   final rule?

20   A.   I don't know the length of time.  But I know

21   that all the public comments were reviewed.

22   Q.   Who reviewed them?

23   A.   I know Cole Giering did.  I don't know if

24   anybody else -- if anybody else did.

25   Q.   Okay.  So after the July 8th hearing up until

Page 165

1   the final adoption of the rule, other than reviewing and

2   considering public comment, what else did AHCA do before

3   adopting the rule?

4        A.   Can you repeat the question.

5        Q.   So after the July 8th hearing up until the

6   final adoption of the rule, other than reviewing public

7   comment, what other activities did AHCA undertake in

8   deciding to adopt the rule?

9        A.   I don't know.  I can't remember specific to

10  this rule.  But after it's been determined there's no

11  changes needed to the rule, the filing for adoption

12  would be the next step.

13       Q.   How do you reach that decision that no changes

14  should be made?

15            MR. PERKO:  Object to form.

16            THE WITNESS:  There's various factors involved

17       in that decision.  And it really depends on the

18       specific circumstances.

19            MS. DEBRIERE:  Okay.  I don't know what it

20       would be labeled, but do you have an exhibit -- it's

21       an email from Ms. McGriff to Magellan.

22            MS. CHRISS:  Yes.  The email exchange between

23       Magellan and AHCA.

24            MS. DEBRIERE:  Thank you.

25            Court Reporter, just for your reference what we

Page 166

1      just marked as Exhibit 12 is Bates stamped

2      DEF_00288753 to 000288756.

3           (Plaintiff's Exhibit No. 12 was marked for

4   identification.)

5   BY MS. DEBRIERE:

6      Q.   So Magellan is emailing several people at AHCA.

7   And she says, "Attached are the internal criteria not

8   publicly posted."

9           What are the internal criteria?

10     A.   I don't know.

11     Q.   Does Magellan rely on internal criteria for the

12  coverage of Medicaid services?

13     A.   I don't know.

14     Q.   What does "CCM" mean?  It's right after that

15  sentence.  "Attached are the internal criteria 'not

16  publicly posted' CCM."

17     A.   I don't know.

18     Q.   What does gender code mean?

19     A.   I don't know.

20     Q.   Do you know hot had significance of "B for

21  both" is?

22     A.   I do not.

23     Q.   Who is Linda Simone Moore?

24     A.   Who?

25     Q.   So there's a sender up top here -- I'm sorry.

Page 167

1    Leslie.

2         A.    Moore-Simons.

3         Q.    I need reading glasses.  Leslie Moore-Simons.

4    That's exactly right.

5         A.    I don't know.

6         Q.    Okay.  Who is Susan Williams?

7         A.    She works for Ashley Peterson in the pharmacy

8    unit in the Bureau of Medicaid Policy.

9         Q.    Okay.  And who is Arlene Elliott?  I'll just

10   note the date that Arlene's email was sent was

11   8/21/2017.

12        A.    Currently Arlene Elliott is in a different

13   division at the Agency for Health Care Administration.

14   But at this time, she was the AHCA administrator over

15   the pharmacy policy section of the Bureau of Medicaid

16   Policy.

17        Q.    And what unit is she in now?

18        A.    I don't know.  She's no longer in the division

19   of Medicaid.

20        Q.    What division is she in?

21        A.    I believe it's Health Quality Assurance.

22        Q.    Do you know when she left her position in the

23   Bureau of Medicaid Policy?

24        A.    I believe it was spring or summer 2021.  I'm

25   not sure the exact date.

1    Q.   Okay.  Earlier in the exchange -- and yet dated

2    later -- is the email dated April 20th, 2022, from Elica

3    King-Wilson at Magellan.  And she's included some

4    language which she underlined and bolded.  And it says,

5    "All requests require vetting by AHCA before a final

6    determination is made."

7          And it appears this is related to a final

8    determination as to whether -- well, it says -- Leslie

9    noted, "MMA does have an internal gender dysphoria

10   criteria, which is attached."

11         MMA stands for?

12   A.   I don't know in what context she's using it.

13   Q.   Okay.

14   A.   But to me, MMA would normally stand for managed

15   medical assistance.

16   Q.   I assume you're confused because this is coming

17   from Magellan which is not a managed medical assistance

18   program; is that right?

19   A.   Yes.  So I don't know if that's what she's

20   referring to.

21   Q.   And it says, "This internal document serves for

22   GnRH analog use to delay puberty in adolescents with

23   gender dysphoria."  This document was provided by AHCA

24   due to a fair hearing request received for Lupron for a

25   recipient with this diagnosis" -- meaning gender

Page 169

1   dysphoria.  And it goes on with the underlying language

2   that all of those requests -- coverage of Lupron for

3   gender dysphoria -- need to be vetted by AHCA before a

4   final determination is made.

5           Were you familiar with that process at all?

6       A.   No.  I don't know what process they were

7   referring to.

8       Q.   Would Ashley Peterson know?

9       A.   I don't know.  But she does work closely with

10  Magellan.

11      Q.   Okay.  Did AHCA work with managed care plans to

12  implement the exclusion in 1.050?

13      A.   They were notified.  But the specifics of how

14  that communication happened, I can't recall.

15          MS. DEBRIERE:  Okay.  Can I have the SMMC

16      Policy Transmittal relating to the Non-Coverage of

17      Gender Dysphoria Treatment.

18          MS. DUNN:  Do you want the policy or the

19      emails?

20          MS. DEBRIERE:  Could you do both.

21          MS. DUNN:  Do you want them together?

22          MS. DEBRIERE:  That would be great.  But

23      separate exhibits.

24          (Plaintiff's Exhibit No. 13 was marked for

25      identification.)

1           (Plaintiff's Exhibit No. 14 was marked for

2     identification.)

3     BY MS. DEBRIERE:

4       Q.   So right now we're looking at an email that's

5     Bates stamped DEF_000258835 to 000258838.  It's an email

6     from D.D. Pickle CC-ing you.  And it's to Jason Weida.

7             In this -- I'm sorry.  Looking specifically at

8     an email dated August 22, 2022, from D.D. to Ashley

9     Peterson and Matt Brackett.  It states, "Ashley, Ann

10    wants to include the 60-day language in the alert?"

11            What alert is D.D. Pickle referring to?

12      A.   I believe it was the provider alert.

13      Q.   And what's a provider alert?

14      A.   It's the main way -- one of the main ways we

15    communicate information to our providers and external

16    stakeholders.

17           (Plaintiff's Exhibit No. 15 was marked for

18    identification.)

19    BY MS. DEBRIERE:

20      Q.   I'm handing you a document that's marked as

21    Exhibit 15, called Florida Medicaid Health Care Alert

22    Sign-Off Form, starting at Bates stamp DEF_000258839.

23           Is this the provider alert you were referring

24    to?

25      A.   Yes.  It looks to be a provider alert regarding

Page 171

```
 1    the coverage of treatment for gender dysphoria.
 2              MS. DEBRIERE:  Okay.  And then what was the
 3         transmittal?
 4              MS. DUNN:  It was 14.
 5    BY MS. DEBRIERE:
 6         Q.   No. 14 -- can you look at that document.  And
 7    that's Bates stamped DEF_000258833.
 8              What is this document?
 9         A.   It looks to be a draft -- a policy transmittal.
10         Q.   And who does that go to?
11         A.   This specific one is marked to be sent to the
12    medical assistance and specialty plans.
13         Q.   Is that the final that was sent?
14         A.   It does not appear so, no.
15         Q.   Okay.  How do you know that?
16         A.   The policy transmittal number is not completed
17    and it's not signed.
18         Q.   Okay.  Going back to the provider alert, was
19    that the final that was sent?
20         A.   I can't tell from this document if this was the
21    final that was sent.
22         Q.   Okay.  Would you be able to tell from any of
23    the versions whether it was the final?
24         A.   Seeing the actual email alert would be how I
25    would make sure.  My team actually does not send out the
```

Page 172

1    final provider alerts.  So that's typically how I would

2    look at the final version.

3         Q.   Okay.  And the policy transmittals and the

4    provider alerts -- are those available on the agency's

5    website?  The finals?

6         A.   Yes.

7         Q.   Okay.  So turning back to that email exchange

8    where D.D. mentions you by name.

9              What is 60-day language?

10        A.   I believe she's referring to the continuity of

11   care.

12        Q.   What is continuity of care?

13        A.   It's a contract requirement for the plans to

14   provide services for a period of time.  I don't know if

15   it's specific to when they change plans.  I can't recall

16   the exact contract language, but it's a contract

17   provision.

18        Q.   And are services previously being covered

19   supposed to be continue being covered for 60 days

20   according to the 60-day language?

21        A.   I can't recall the exact parameters of the

22   requirement.

23        Q.   Do you recall why --

24             MR. PERKO:  Counsel, we're getting on seven

25        hours here.

1    BY MS. DEBRIERE:

2        Q.    Do you recall why the 60-day language -- you

3    wanted the 60-day language included in this alert?

4        A.    I can't remember the conversation around this.

5    And I can't speak for D.D.

6        Q.    Well, D.D. is speaking for you; right?

7              The subject is "GD Policy Transmittal";

8    correct?

9        A.    Yes.

10       Q.    And what does "GD" stand for?

11       A.    Based on the attachments, I would conclude that

12    it is for gender dysphoria.

13       Q.    Okay.  And this would be discussion had after

14    the rule was adopted excluding coverage of services for

15    the treatment of gender dysphoria; correct?

16       A.    Can you repeat that question.

17       Q.    The date of this email is after the rule was

18    adopted to exclude coverage of services for treatment of

19    gender dysphoria.

20       A.    I believe so.

21       Q.    You don't recall why you thought it was

22    important to have the 60-day language included in the

23    alert?

24       A.    I don't recall the specifics of the

25    conversation.  But I believe it was to ensure if there

Page 174

1   was any current reimbursement or authorization that

2   would apply.

3        Q.   Current authorization of treatment of gender

4   dysphoria?

5        A.   Of the services listed in Rule 1.050, No. 7.

6        Q.   Did any plans state to AHCA that they would

7   continue coverage of the services excluded in the rule

8   even though that rule had been adopted?

9        A.   I don't know.

10       Q.   Who would know that?

11       A.   I don't know who it would have gone to.  If

12   there was a question, the communications typically go

13   through the contract managers.

14       Q.   Okay.  Do you know if all plans have

15   implemented the exclusion contained in the rule?

16       A.   I don't know.

17       Q.   Are you familiar with the variance and waiver

18   process under Chapter 120?

19       A.   Yes.

20       Q.   Okay.  What is the purpose of that statute?

21            MR. PERKO:  Object to form; calls for a legal

22       conclusion.

23   BY MS. DEBRIERE:

24       Q.   What it the purpose of the variance and waiver

25   process?

Page 175

1            MR. PERKO:  Object to form.

2            THE WITNESS:  I don't know.

3            MR. PERKO:  Counsel, we're getting on seven

4       hours here.

5            MS. DEBRIERE:  All right.  Let me just consult

6       with my team for just a second.

7            (Brief recess.)

8            MS. DEBRIERE:  We'll all set with direct.

9            Thank you for your time, Ms. Dalton.

10            MR. PERKO:  I don't have any questions.

11            THE COURT REPORTER:  Would you like to read or

12       waive?

13            THE WITNESS:  Read.

14            THE COURT REPORTER:  Would you like to order at

15       this time?

16            MS. DEBRIERE:  Yes.

17            THE COURT REPORTER:  Would anybody like to

18       order a copy?

19            MR. PERKO:  Yes.

20            (This deposition was concluded at 6:05 p.m.)

21                            – – –

22

23

24

25

Page 176

1                      CERTIFICATE OF OATH

2

3    STATE OF FLORIDA:

4    COUNTY OF LEON:

5

6        I, GREG T. SMITH, Notary Public, State of Florida,

7    do hereby certify that ANN DALTON personally appeared

8    before me on January 24, 2023 and was duly sworn and

9    produced her ID badge as identification.

10       Signed this 30TH day of JANUARY, 2023.

11

12

13

14           *Greg T. [signature]*

15

             GREG T. SMITH

16

             Notary Public, State of Florida

17           My Commission No.:  GG933698

             Expires:  March 21, 2024

18

19

20

21

22

23

24

25

Page 177

1                    CERTIFICATE OF REPORTER

2    STATE OF FLORIDA:

3    COUNTY OF LEON:

4

5        I, GREG T. SMITH, Notary Public, State of Florida,

6    certify that I was authorized to and did

7    stenographically report the deposition of ANN DALTON;

8    that a review of the transcript was requested; and that

9    the foregoing transcript, pages 6 through 175, is a true

10   and accurate record of my stenographic notes.

11       I further certify that I am not a relative,

12   employee, or attorney, or counsel of any of the parties,

13   nor am I a relative or employee of any of the parties'

14   attorneys or counsel connected with the action, nor am I

15   financially interested in the action.

16

17       DATED this 30TH day of JANUARY, 2023.

18

19

20

         GREG T. SMITH

21

22

23

24

25

Page 178

1    KATHERINE J. DEBRIERE, ESQUIRE

     DEBRIERE@FLORIDAHEALTHJUSTICE.ORG

2

3                                    January 30, 2023

4    RE: Dekker, August v Marstiller, Simone

     1-24-23 Ann Dalton, Job# 5662663

5

6        The above-referenced transcript is available for

7    review.

8        (The witness/You) should read the testimony to

9    verify its accuracy. If there are any changes,

10   (the witness/you) should note those with the reason

11   on the attached Errata Sheet.

12       (The witness/You) should, please, date and sign the

13   Errata Sheet and email to the deposing attorney as well as

14   to Veritext at Transcripts-fl@veritext.com and copies will

15   be emailed to all ordering parties.

16       It is suggested that the completed errata be returned 30

17   days from receipt of testimony, as considered reasonable

18   under Federal rules*, however, there is no Florida statute

19   to this regard.

20       If the witness fails to do so, the transcript may be used

21   as if signed.

22                   Yours,

23                   Veritext Legal Solutions

24

      *Federal Civil Procedure Rule 30(e)/Florida Civil Procedure

25     Rule 1.310(e).

Page 179

1   Dekker, August v Marstiller, Simone

    1-24-23 Ann Dalton, Job# 5662663

2

3                   E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19

20  Under penalties of perjury, I declare that I have

    read the foregoing document and that the facts

21  stated in it are true.

22

23  _____    _____

        (WITNESS NAME)              DATE

24

25

**[& - 30th]**                                                           Page 180

**&**

**&**   3:7 146:12

**0**

**000258833**
   171:7
**000258835**
   170:5
**000258838**
   170:5
**000258839**
   170:22
**000288756**
   166:2
**00126105**   64:1
**00288753**   166:2
**00325**   1:3

**1**

**1**   4:11 7:25 8:6
   99:1
**1-24-23**   178:4
   179:1
**1.0**   98:21
**1.010**   66:13
**1.010.**   58:22
**1.010.................**
   4:13
**1.035.**   8:17
   77:24
**1.035.................**
   4:15
**1.050**   9:4 118:23
   119:9 154:24
   158:4,23 169:12
   174:5

**1.050.**   9:19
   128:3,9
**1.050.................**
   4:12
**1.310**   178:25
**10**   4:21 64:22
   132:25 133:1
   141:16
**100**   126:21
   164:13
**103**   4:19
**104**   4:20
**10:04**   1:12
**10th**   149:17
**11**   4:22 149:18
   149:21
**110**   3:3
**119**   3:7
**12**   4:24 166:1,3
**120**   15:19 31:12
   118:7,20 159:9
   160:21,25
   174:18
**1229**   2:7,11
**12th**   2:7,11
**13**   5:1 169:24
**133**   4:21
**14**   5:2 170:1
   171:4,6
**149**   4:23
**15**   5:4 170:17,21
**1512**   3:3
**166**   4:24
**169**   5:1

**170**   5:3,4
**175**   177:9
**176**   4:4
**177**   4:5
**178**   4:6
**179**   4:7
**1:30**   88:14
**1st**   96:24 97:1

**2**

**2**   4:12 9:18,20
   128:9
**20**   94:9
**2012**   15:21,23
**2016**   4:16 19:14
   87:18,20 92:14
   109:9 157:13
**2017**   15:12
   87:18,20 88:23
**2017/2016**
   157:12
**2018**   14:10 15:6
   15:6,12 36:23
   36:24,25 75:3
   117:13
**2019**   26:14
**2021**   13:20 39:8
   88:12 117:13
   167:24
**2022**   4:17 30:4
   88:6 89:3 93:25
   94:9 96:24,25
   97:1 103:11
   114:8,20 148:23
   149:17,18 168:2
   170:8

**2023**   1:11 72:13
   114:10 176:8,10
   177:17 178:3
**2024**   176:17
**20th**   88:6 89:3
   103:11 168:2
**21**   56:10,16,21
   57:16,18 58:1
   59:17 100:14,16
   176:17
**21st**   72:13
**22**   170:8
**22779**   176:15
   177:20
**24**   1:11 176:8
**25**   123:19,24
   124:2
**271-8890**   2:8,8
   2:12,12
**2727**   1:14 3:12
**27514**   3:4
**278-6059**   2:4
**2nd**   94:11,12
   96:25

**3**

**3**   3:12 4:13
   58:22 59:1
   61:19 66:13
   99:20 101:20
   102:6
**30**   126:14 178:3
   178:16,24
**305**   7:8
**30th**   176:10
   177:17

**[3100 - adheres]**                                                    Page 181

**3100**   2:15,20
**32205**   2:3
**32301**   3:8
**32308**   1:15 3:13
**32601**   2:7,11
**33131**   2:16,20
**34,000**   136:19
**352**   2:4,8,8,12
   2:12
**35k**   133:5
**3900**   2:3
**391-0502**   3:9

**4**

**4**   4:14 31:23
   63:22 64:11
   87:11 88:4
   162:12,12
**4/10/22**   4:23
**412-3670**   3:13
**435-7352**   2:4
**45**   12:24 132:20
**4:22**   1:3

**5**

**5**   4:15 77:24,25
   98:21
**500**   3:8
**5662663**   178:4
   179:1
**59g**   4:12,13,15
   8:17 9:4,19
   17:19 20:9
   58:22 66:13
   77:24 98:21
   112:2,5 128:3,9

154:24 158:4

**6**

**6**   4:3,16 92:15
   92:21 177:9
**60**   170:10 172:9
   172:19,20 173:2
   173:3,22
**600**   2:15,19
**64**   4:14
**6:05**   1:12
   175:20

**7**

**7**   4:17 9:5,23,25
   10:5,24 94:1,2
   128:10,12
   132:20 158:4
   162:24 174:5
**7's**   163:22
**741-1023**   3:9
**786**   2:16,16,21
   2:21

**8**

**8**   4:11,18 64:22
   65:7,8,12,15
   103:3,4 134:9
   134:14
**8/21/2017**
   167:11
**800**   2:4
**850**   3:9,9,13,13
**8th**   158:22
   159:13 164:10
   164:25 165:5

**9**

**9**   4:20 64:22
   65:12 66:9
   104:23,25
**913-4882**   2:16
   2:21
**913-4901**   2:16
   2:21
**919**   3:4,4
**92**   4:16
**922-9162**   3:13
**94**   4:17
**968-6308**   3:4,4
**999**   74:16

**a**

**a.m.**   1:12
**ability**   85:2
**able**   50:18 54:21
   115:13 171:22
**above**   178:6
**absolutely**   6:21
   55:5,13 114:24
**ac**   73:15
**accepted**   8:15
   66:19
**access**   19:20,22
**accordance**
   31:11 63:5
**accuracy**   178:9
**accurate**   65:1
   65:20 66:23
   177:10
**acha.myflorid...**
   3:14

**acronym**   8:9
   11:3 13:11 29:6
**act**   33:8 51:5
   60:7,21,23
   61:10 66:20
   72:7 111:23
   153:18 160:8,18
**action**   83:12
   102:4 154:8
   177:14,15
**actions**   18:2
**activities**   25:21
   26:15,19 72:1
   145:17 165:7
**activity**   26:2
   39:23
**actual**   34:6 63:2
   125:18 171:24
**actually**   28:9
   47:19 51:14,15
   52:22 122:17
   137:25 159:9
   171:25
**add**   105:15
**added**   32:6
**adding**   77:15
**additional**
   140:6
**address**   55:7
**adhere**   49:3,6
   72:18
**adherence**   44:4
   57:3
**adheres**   60:14

adjudicate   50:5
  50:7
administer
  60:24
administration
  1:14 3:11 13:8
  13:14 17:24
  35:23 36:7,12
  54:10 146:19
  153:18 167:13
administrative
  14:7 17:21
  23:25 24:1
  25:17 35:23,25
  47:9,10,12,16
  47:22 51:14
  58:7 63:6 70:5
  101:8 112:4
  117:21 118:10
  121:21 160:5
administrator
  13:22,25 14:12
  23:1,12,14,17
  23:19,21,22,25
  39:2 117:10
  167:14
administrators
  23:2
adolescents
  168:22
adopt   50:23
  157:16 165:8
adopted   53:2
  54:5 67:17,25
  112:7 155:12,18

156:25 173:14
  173:18 174:8
adopting   164:18
  165:3
adoption   128:4
  128:7,11 155:9
  159:25 160:2
  165:1,6,11
adp   124:24
adults   158:9,13
advertise
  159:18
advice   40:16
affairs   15:8
affected   38:5
affects   112:18
affirm   6:2
affirmative
  129:15
affirming   9:3,6
  10:4,16
age   56:10,21
  58:1 74:5,16,16
  74:22,25
agencies   60:24
  124:18 125:9
  126:16 146:15
  159:5
agency   1:13
  3:11 13:7,12,13
  13:13 16:15,20
  16:21 17:10,12
  18:19 19:3,24
  20:4 35:14,18
  36:1,2 42:4

43:11 44:19
  46:19 48:15
  50:4 51:11,16
  54:10 56:20
  59:16 66:22
  72:22,25 75:2
  75:16 77:11,14
  78:16 79:5,23
  82:7 84:20
  85:21,24 86:3
  86:12,16 87:5
  101:2 102:1
  105:14,17 106:7
  117:23 120:20
  121:8,10 122:6
  122:10 123:9
  124:13,14,18,24
  125:14 126:8,10
  127:1,5 142:14
  142:20 144:16
  146:18 157:13
  159:9,14 160:22
  161:1 167:13
agency's   20:7
  26:17 42:8
  43:11 63:5
  101:23 105:16
  109:25 161:3
  172:4
agent   76:11
ages   57:16
ago   76:21
  111:25 116:3
  127:13 155:5

agree   8:24 9:14
  10:5,25 103:24
agreed   5:8
  104:1
ahca   4:24 13:10
  13:11,16,22,24
  16:9 20:13
  22:12 23:1,12
  23:17,19,21,22
  27:11 28:8 30:7
  30:13,18,25
  31:13 36:21
  37:2,5 39:12
  44:12 50:18,23
  51:5,5 52:18
  54:18 56:8
  63:10,11,15
  65:15,16,21
  66:24 67:9 77:9
  78:11 87:24
  88:1,11 95:23
  108:12 109:11
  110:5,9 111:1,2
  111:6,10,16,19
  112:9 116:20
  117:10,14,20
  119:7 122:7,8
  122:13,14 124:6
  125:20,20
  129:14,19 130:6
  135:6,7,13
  136:6 146:22
  147:7,10,12,19
  150:10,13 154:7
  154:11 155:3

159:17,24
160:14 161:8
164:17 165:2,7
165:23 166:6
167:14 168:5,23
169:3,11 174:6
**ahca's** 37:12
47:8 48:18 49:7
61:20,23 62:17
63:13 153:23
**ahca.myflorid...**
54:12 55:10
72:11
**ahead** 7:24
21:10 56:1
**al** 1:4
**alert** 5:4 124:10
170:10,11,12,13
170:21,23,25
171:18,24 173:3
173:23
**alerts** 117:2
124:17 172:1,4
**aliens** 162:22
**alleviated**
162:14
**allowable** 33:17
47:2 111:22
**allowed** 44:18
45:14 48:25
52:18 58:4
105:18
**alter** 163:5
**altman** 2:18
7:10

**ambulatory**
53:16
**amendment**
31:25
**american** 160:8
160:18
**amino** 105:25
**amount** 20:19
21:23 137:3,8,9
143:19,20,21
144:2,6,10
**analog** 168:22
**analyses** 38:2
**analysis** 23:8
24:12 33:14
40:1,19 102:24
103:12 148:22
150:17,20
**analyst** 15:9,24
15:25 16:7 33:1
108:7 115:23
121:1,3
**analysts** 31:10
60:9 69:1
**analytics** 38:2,2
38:15
**andre** 133:6
**andrew** 3:11
**andrew.sheeran**
3:14
**ann** 1:10 4:2 6:6
12:19 170:9
176:7 177:7
178:4 179:1

**answer** 9:9 10:8
11:15,24 12:1
21:10 48:21
50:18 67:12
71:3 98:14
101:2 141:10
153:7 155:24
158:21
**answered** 25:20
45:17 72:20
98:17 130:11
135:10 164:14
**answering**
12:12 27:2
**answers** 12:3
106:24
**anybody** 7:7
48:4 50:18
52:18 81:20
82:23 89:11
107:19,24
146:18 155:3
164:24,24
175:17
**apart** 69:25
**apologize** 28:10
106:19 130:9,11
158:21 161:16
162:17
**apparent** 134:4
**appear** 67:24
88:25 89:1,7
171:14
**appeared** 176:7

**appearing** 2:5,9
2:13,17,22 3:5
3:10,14
**appears** 92:25
168:7
**applicable**
101:25
**applied** 102:12
102:13
**applies** 73:4
158:12
**apply** 100:12
109:16,22 174:2
**approach** 31:9
33:5 69:22
156:3
**approaching**
60:17 79:10
**appropriate**
46:24,25 163:16
**appropriations**
33:8,8
**approval** 26:2,7
26:14 28:1
34:25 35:20
49:14 111:15
134:16 139:22
140:1,18,25
141:17,19,20,23
142:1,5,7 143:8
143:25 160:9
**approve** 34:18
103:8 137:20
139:3,6 142:11

**approved** 25:20 32:1 44:19 66:22 69:18 85:2 93:13,17 93:17 110:13,17 110:21 111:3,6 111:10,18 137:25 139:11 142:14,20,23 144:2

**approver** 51:12 92:9

**approving** 138:6 139:23

**april** 103:11 149:17 168:2

**area** 52:20 61:15 145:1

**areas** 14:18 85:5 120:25

**arlene** 167:9,12

**arlene's** 167:10

**arrange** 125:10

**arranging** 125:21

**ashley** 23:18 41:1 54:21 66:1 66:3 67:1,12 68:16 74:21 88:9,10 99:19 167:7 169:8 170:8,9

**ashley's** 24:19 27:1

**aside** 123:8 137:19

**asked** 40:19 45:17 104:9 127:21 135:10 143:23 144:9 164:14

**asking** 45:13,15 66:6 98:9 115:6

**asserting** 69:24

**asses** 65:16

**assess** 32:23 98:2,5 106:10 109:7 153:24

**assessed** 151:14 151:22 157:5

**assessing** 109:3 152:13

**assigned** 8:22 52:20 144:21

**assignments** 26:24 76:18 82:4 95:18,19 95:19 115:25

**assist** 27:3,18 28:16 30:3 37:24 85:5

**assistance** 168:15,17 171:12

**assistant** 17:4 81:6 82:8

**assisted** 27:1,13 28:2,4 39:25

**assists** 26:17

**associated** 8:22 20:18 28:14 94:16 112:19 117:2,7

**assume** 54:14 137:2,5 168:16

**assurance** 167:21

**atf** 103:2 134:8

**attached** 149:12 166:7,15 168:10 178:11

**attachment** 149:9,18

**attachments** 97:15 173:11

**attend** 122:15 124:7,19 125:4 125:11,22,25 126:3 127:2,6 127:10,16,18,25

**attendance** 120:16,18 122:23

**attended** 122:4 122:5,7,8 127:20 134:10

**attending** 122:1 123:18 126:6

**attends** 122:13 123:9

**attorney** 177:12 178:13

**attorneys** 12:22 46:8 102:19 177:14

**audience** 122:9

**august** 1:4 11:8 13:20 14:10 15:6,12 36:23 39:8 117:13,13 170:8 178:4 179:1

**author** 96:2 148:5,7

**authoring** 148:2

**authorities** 14:4 17:16 70:10

**authority** 14:2 23:18 33:3,13 33:13 51:10 77:8 101:22,24 102:4,12 105:15 154:13

**authorization** 46:20,21 47:4 49:20 62:18 63:3,19 67:6 68:12,18,20 74:13 110:2 174:1,3

**authorize** 49:23 66:24 142:7

**authorized** 26:6 26:13 46:23 62:15,25 66:21 69:24 177:6

**authorizing**
  67:9
**availability**
  143:7,24
**available** 27:2
  40:11 42:21
  68:17 85:5
  86:23 100:16
  159:12 160:22
  160:24 161:2
  172:4 178:6
**avenue** 2:7,11
  2:15,19
**average** 126:12
  126:13,16,17
**aware** 20:15
  42:12 45:8,15
  45:16,22 70:25
  71:5,8,15,20
  91:22 104:16
  109:2 118:19
  125:20,23,24
  126:2 135:13
  147:19,23 157:9
  158:25 159:2,13
  159:16,22

**b**

**b** 99:1 162:12
  166:20
**bachelor's** 13:5
**back** 10:1 12:1
  36:15 39:22
  50:21 56:24
  61:18 98:1
  107:20 128:16

128:17 149:10
  160:20 163:9
  171:18 172:7
**background**
  7:13 13:3
**badge** 176:9
**bandwidth**
  84:21,22,24
  86:12,16,24
  90:15,16,18
**bans** 158:4
**baran** 3:7
**based** 31:5
  56:13 76:25
  138:12 160:4
  173:11
**basic** 6:15
**basis** 129:17,22
  129:24
**bates** 7:19,21,23
  7:25 63:25 64:4
  64:5 92:17
  166:1 170:5,22
  171:7
**beaner** 23:7
  24:4
**bear** 56:23
**bears** 111:15
**beginning** 55:19
  56:1 64:1
  153:16
**behalf** 2:5,9,13
  2:17,22 3:5,10
  3:14

**behavioral** 23:8
  23:8 152:5
**believe** 15:3
  16:23 19:13
  29:10,21 34:9
  40:23 43:4
  44:23 50:4 53:5
  54:6 63:20,23
  73:3 77:19 78:8
  78:23 80:1
  81:22 83:5
  86:10 87:4
  88:12 91:3,19
  93:19 94:11
  97:11 104:18
  105:4,6 106:15
  107:1 108:5,7
  108:18 109:1
  110:20 111:4,24
  113:14 119:24
  123:2 124:13,20
  125:17 126:11
  127:19 128:25
  129:24 132:21
  132:23 134:8
  135:22 138:1
  144:18 146:3
  152:20 153:4
  155:14,20 157:4
  157:19,23
  163:17 167:21
  167:24 170:12
  172:10 173:20
  173:25

**beneficiaries**
  56:21
**benefit** 34:7
**benefits** 28:21
**best** 11:21,25
  156:3
**beth** 88:1,5,7
**bigger** 18:21
  73:10
**biggest** 84:23
  86:25
**bill** 40:1,19
  141:24 142:2
**billing** 20:18
**birth** 8:22
**bit** 8:10 41:23
  55:17 64:22
  92:4 108:11
**block** 125:1
**blockers** 158:5
  158:16 163:19
**board** 29:5,13
  69:5
**boards** 28:14
**bolded** 168:4
**bottcher** 23:1
  23:23 24:2,11
  24:14 41:5,6
  70:17 75:21,23
  79:1 84:14,14
  90:5 107:14
  145:22 148:7,17
  151:11
**bottcher's** 41:10
  41:18 90:7

107:15,21
**bottom** 141:15
**bound** 48:18
**brackett** 84:3,8
  84:17 85:11,24
  86:3 87:1 89:14
  90:3,25 94:25
  108:15 132:7
  148:3 151:11
  170:9
**break** 12:9,11
  46:1,6 90:20,24
  106:20 143:15
  145:25
**brian** 16:11,14
  16:22 17:2,6
  38:17,21 82:18
**brickell** 2:15,19
**brief** 11:11 46:3
  90:22 106:22
  143:17 175:7
**briefed** 106:12
**briefly** 46:5,9
**brignardello**
  136:6
**brings** 8:4
**brit** 11:8
**broken** 18:22
  19:13
**brought** 132:11
**budget** 33:6,14
  151:1
**building** 122:22
**bulk** 76:13

**bummer** 92:19
**bureau** 13:17,17
  13:22 14:2,13
  15:10 17:6,9,14
  17:15 24:1,17
  28:3 37:5,7,9,10
  37:14,23,24
  38:6,14 39:6
  40:17 44:3,4,20
  45:6 48:5,11
  50:22 51:1 57:2
  59:23 60:1,16
  61:4 69:15 70:1
  70:13,15 71:4,5
  71:6,17,18,25
  75:20 78:5
  79:18 83:10,14
  84:17,20 85:6
  90:8 92:5,5,6
  96:13 101:3
  103:11 112:13
  113:5 119:10,17
  119:18 122:3
  140:23 141:3
  167:8,15,23
**bureau's** 17:25
**bureaus** 37:16
  37:20 38:4,10
  44:25
**busiest** 90:7

## c

**c** 2:1 3:1 6:1
**calendar** 124:20
  124:22

**call** 35:15
**called** 7:19 52:6
  108:6 170:21
**calls** 174:21
**campbell** 23:24
**canadian** 23:22
  25:18,25 26:9
  26:12,20 27:21
  27:23 28:1
  29:22 83:21
  85:1 96:5,10,15
  131:23 138:2
**cantor** 136:10
**care** 1:13 3:11
  5:4 9:3,6 10:4
  10:16 13:8,13
  18:1,2 19:15
  20:25 23:20
  28:17 41:24
  42:3,5,6,9,11,12
  42:17,25 43:8
  43:24 44:1,7
  48:23 49:12
  54:10 62:17,25
  63:11 72:18
  73:4 78:15 79:2
  79:24 113:1,12
  129:25 146:18
  156:19 167:13
  169:11 170:21
  172:11,12
**careful** 138:8,19
**carful** 138:15
**carolina** 3:4

**case** 1:3 129:16
  129:16,22,22,23
  129:23 130:3
**cases** 21:23
**categorical** 9:3
  10:3,21,23 27:4
  27:15 55:15,18
  55:20,22,23
  56:4,17
**categorically**
  21:7 56:20
**categories** 99:11
**category** 14:25
  99:4
**catherine** 3:2
  8:2 23:17 24:10
  154:14,20 155:1
**caused** 8:20
**cc** 170:6
**ccm** 166:14,16
**center** 53:16
**centers** 153:22
**certain** 110:21
**certificate** 4:4,5
  176:1 177:1
**certify** 176:7
  177:6,11
**chain** 4:24 5:1
**change** 34:24
  35:5 37:2 38:9
  38:18 51:24
  52:13,15,16,18
  100:9 118:23
  121:2 123:16
  127:13 172:15

179:4,7,10,13
179:16
**changed** 17:2
**changes** 16:16
16:25 36:16
37:21,22 38:11
38:13,22,24
39:24 40:3 52:3
52:7,9,11,13,21
52:23 60:18
88:25 89:1
112:18 118:20
121:5 154:5
165:11,13 178:9
**chapel** 3:4
**chapter** 15:19
31:12 112:5
118:7,20 159:9
160:21 174:18
**characteristics**
8:23 163:6
**characterize**
40:16
**charge** 107:21
107:24 108:8
131:25
**charged** 141:7
**check** 33:15
85:16
**checklist** 4:20
104:24 106:13
106:25 107:6
108:1
**chelsea** 2:10
6:21 7:4

**chelsea.dunn**
2:12
**chen** 24:23 25:2
25:3,6,12,22
26:18 27:18,21
28:4 29:19,20
30:1 84:3,9
85:20 89:22
90:4 132:7
**chief** 13:17 39:6
39:11 45:6 71:4
71:17,18,19
75:20 79:19
83:14 92:5
101:3 112:13
113:5 119:10,17
119:18 122:3
140:23 141:3
**child** 59:17
**children** 57:16
58:1 158:10,13
**children's** 14:16
**chip** 14:17
17:24
**chriss** 2:6 7:9
149:8 165:22
**christine** 23:4
24:3
**christopher**
39:15
**chronology**
132:9
**circumstance**
71:11 127:22
129:19

**circumstances**
34:5 36:9 51:7
109:14 111:19
120:5 129:14
130:6 165:18
**cite** 159:8
**citizenship**
162:23
**civil** 178:24,24
**claims** 50:5,7
113:3
**clarify** 75:13
91:7 140:8
152:11
**class** 17:19 20:9
112:2
**classify** 85:23
**clear** 12:3 75:20
84:4 100:11
101:21 102:11
105:14 109:15
109:21 157:1
**clearly** 105:18
105:21 144:19
156:1
**clients** 78:19
**clinical** 66:21
74:4,6,14,17
108:23 109:13
109:16,21,24
110:1 111:25
164:9
**clinically** 164:1
**closed** 116:1

**closely** 37:20
76:10 86:19
169:9
**cms** 14:6 31:25
36:18 105:18
154:3,7,17,22
**code** 20:19 22:8
112:4 166:18
**codes** 20:18
**coding** 21:21
**cogal** 39:15
40:22 41:9,10
41:17
**cole** 24:8 39:2
122:18 132:10
164:23
**collaboratively**
95:20
**column** 74:3,5
74:17,23 89:4
**come** 56:24
80:23 81:23
90:14 138:7
140:25
**comes** 19:12
48:14 107:7
151:17
**coming** 10:10
83:11 168:16
**comment** 117:6
119:4 147:8,12
147:24 159:6
165:2,7
**comments**
126:16,21,22

161:4 164:11,18
164:21
**commission**
176:17
**committee**
35:14,16,19
72:19
**committee's**
72:23
**common** 60:17
160:11
**communicate**
38:9 40:22,23
48:16 82:23
146:14,21,25
147:3,15 160:13
170:15
**communicated**
48:10,12 133:23
**communicates**
154:3
**communicating**
43:8 48:9
**communication**
169:14
**communicatio...**
146:1,22 147:7
147:10,11
153:22 174:12
**community**
56:13 160:4
**comparability**
60:19 61:9
153:12,15,17

**comparable**
61:1
**compendia**
65:18,19 66:20
72:6 110:23
**compendium**
72:3
**compensated**
137:3,4
**complete** 51:15
79:15
**completed** 75:7
75:15 115:25
150:11,14
171:16 178:16
**completing**
84:22
**completion**
145:18
**compliance** 44:6
45:1,2 57:7
59:20 60:3
**complies** 57:5
60:6
**comply** 61:9
**computer** 9:24
54:9
**concern** 148:11
**concerns** 148:17
152:13 154:7
**conclude** 173:11
**concluded**
105:13 175:20
**conclusion**
159:18 174:22

**conclusions**
155:11
**conduct** 49:19
120:21
**conducted**
143:9
**conducting**
123:1
**confirm** 54:22
101:23
**confused** 55:17
168:16
**confusing**
160:23
**conjunction**
21:20
**connected**
177:14
**consider** 53:10
100:4 111:2
129:16,21
164:18
**consideration**
151:6
**considered** 58:2
84:16 99:22
100:2 102:7
111:17 178:17
**considering**
165:2
**consist** 39:20
**consistent** 65:18
**consists** 24:16
**constantly** 90:9

**consult** 101:25
139:21 140:14
141:1,11 142:14
156:7 175:5
**consultant**
133:6 134:16,20
135:22 136:7
138:1 142:15
**consultants**
126:11
**consultation**
101:1 102:17
134:24 136:25
138:20 139:1,11
139:18
**consulted** 40:3
139:15 141:6
**consulting** 70:8
133:8 134:21
136:12,23
139:10 140:10
**contact** 44:9
45:3 156:15
**contacts** 28:17
156:21
**contain** 18:4
44:18 53:20
59:13 68:8
145:2 150:17
**contained** 18:21
18:24 20:6 53:7
54:1 55:21 60:7
66:12 67:17,25
95:23 103:24
148:23 154:24

174:15
**contains** 21:21
43:2
**content** 53:17
53:21 67:21
101:17 120:5
147:16,20
**contents** 80:21
159:10
**context** 60:22
74:10 168:12
**continue** 172:19
174:7
**continued** 97:9
**continues** 64:3
64:18
**continuing**
73:14
**continuity**
172:10,12
**continuous** 41:3
162:13
**contract** 23:21
26:16 28:16,17
28:23,25 29:1
42:10 44:4,5,8
45:20,25 46:19
48:5,9,22 49:4,7
50:4,6,9 62:19
172:13,16,16
174:13
**contracted**
49:12 136:15
**contractor**
28:18 63:11

133:11
**contracts** 17:16
18:1,1 38:6,8
42:4,9 44:15
45:2 49:12
78:14 136:14
156:19
**contractually**
43:12
**contrast** 20:25
**control** 73:8
**conversation**
40:4 41:22
81:12,19,24
83:3 120:7
132:11 142:13
142:22,25 143:2
143:4 156:4
163:15,17 173:4
173:25
**conversations**
106:11 116:3
132:4,6,12
134:1 148:10
151:24 154:2,12
154:17,22
155:14,15
**coordinate** 37:2
37:12,16 39:10
39:11,16 48:1
**coordinating**
41:9
**coordination**
41:10

**copies** 178:14
**copy** 9:13,19
42:16 58:21,23
58:25 64:2,5,5
65:4 149:7
175:18
**correct** 29:2
45:24 51:3
58:14 70:3 73:5
99:8 101:4,9
103:14 104:13
108:4,16 111:16
114:22 116:11
120:10 128:1
131:3 134:7
140:11,15 146:2
148:4 151:19
157:2 158:6,8
158:13,19,20
163:1,23 164:7
173:8,15
**cost** 150:21
**counsel** 2:6,10
5:9 36:2 55:3,17
55:21 88:14
127:2,6,10,15
127:18,21,25
132:11 146:2,8
146:10 152:23
152:24 153:3,5
153:9 155:15,23
156:4,8,15,21
158:25 160:20
163:18 172:24
175:3 177:12,14

**county** 176:4
177:3
**couple** 43:17
96:4 98:25
127:12 160:2
**course** 127:25
**court** 1:1 6:2
8:12 11:21 12:4
13:9 64:3
128:15 165:25
175:11,14,17
**cover** 22:12
31:16 32:19
33:3,24 36:8,13
42:22 43:3 56:8
56:12,15 65:10
65:14 73:16,19
73:24 100:19
105:18 111:16
111:20 130:6,19
158:7 161:8
162:13
**coverage** 5:2
17:20,21 18:3,4
18:16,17,19,20
18:24 19:6,6,10
19:13,15,16,17
19:19,20,22,25
20:4,8,12,13
21:20 22:1,16
22:18,25 25:13
25:17 27:6 28:9
28:15 30:8,9,13
30:18,22 31:1,6
31:8,10,16 32:4

32:9,10 33:5,7
33:11,12,20,23
34:7,11,16
35:21 36:6,20
37:1,17 39:10
41:4 42:7,8,17
42:23 43:9,11
44:12 47:8,11
47:13,17,17,24
48:2,19,23,25
49:7,15 50:2,21
50:24 51:2,18
51:22,25 52:5
52:19,23 53:1,8
53:11,15,24
54:1,4 57:1,8,9
57:10 58:1,17
59:9,24 60:3,6
60:10,13 61:5
61:13,14 62:9
63:5 64:15 65:3
66:24 67:17,25
68:3,7,23,24,25
69:5,8,10,10,14
69:17,23,23,25
71:10 76:8
77:12,13 98:3,6
99:22 100:2,8
101:4,5,9,12
102:7 103:13
105:7,10,13,19
105:22,24
109:14,15,15,25
110:17,21 112:1
112:16 116:24

120:25 121:9
128:5,12,19
129:1,8,15,20
130:1,4,5
144:20,22 145:2
145:3 151:5
152:5 153:19
154:6,9 156:1
157:1,5,7,18,18
157:25 158:5,15
158:18 161:13
161:17,19,22,24
161:25 162:3,5
162:19 163:13
163:20 166:12
169:2,16 171:1
173:14,18 174:7
**covered** 22:14
32:11 43:11
53:25 69:18
100:5 106:7
110:11 128:24
129:4 130:21
152:6 172:18,19
**covering** 44:2
74:1 129:10
**covers** 21:3
30:10 158:7
**create** 44:11
**created** 88:23
121:19 159:18
160:3,9
**criteria** 14:24
17:22 18:10,12
21:17 43:2

45:18 47:24
48:2 49:15
54:11,12,15,17
67:4,7,9 68:18
68:20 73:17
86:12,13 166:7
166:9,11,15
168:10
**criteria.shtml.**
55:11
**cross** 4:14 63:23
64:6 87:10
89:15 91:3
108:16,21
**crossed** 88:5
**current** 13:7,16
16:9 17:12 24:8
32:4 105:22
116:20 174:1,3
**currently** 6:25
16:11 17:3
22:17 24:19
25:14 31:20
67:9 75:11
82:17 93:3
105:17 107:17
107:23 108:4
114:5 167:12
**cut** 92:17
**cv** 1:3

| d |
| --- |

**d** 4:1 6:1 73:12
**d.d.** 25:1 84:3
84:10,11,19
86:19 104:12

140:1 141:22,23
142:2 170:6,8
170:11 172:8
173:5,6
**d.d.'s** 85:12
**dalton** 1:10 4:2
6:6,11 12:19,20
43:19 46:5
54:14 56:3,24
64:14 105:3
175:9 176:7
177:7 178:4
179:1
**data** 38:2,2,15
65:17
**date** 1:11 87:14
89:3 96:23,25
96:25 97:7
120:15,16
167:10,25
173:17 178:12
179:23
**dated** 4:22
63:23 149:17
168:1,2 170:8
177:17
**dates** 117:11
137:19
**day** 79:20,20
81:14 83:10
85:3,3 97:3,5
153:16 156:6,6
156:11 170:10
172:9,20 173:2
173:3,22 176:10

177:17
**days** 81:14
  156:12,16
  172:19 178:17
**deal** 64:10
**dealing** 98:16
**debriere** 2:2,4
  4:3 6:10,21 7:4
  7:7,10,15 8:4,8
  8:12,14 9:11,18
  9:22 10:2,9,14
  10:17,20 11:7
  13:9,15 21:10
  21:14 43:16,18
  45:18,21 46:4
  49:5 55:5,8,13
  55:14,20 56:2
  57:21 58:11,20
  59:8,11 61:22
  62:2,6 63:21
  64:13,21,24
  65:6 71:13
  73:22 77:23
  78:2,9 88:16,19
  88:21 90:23
  91:9,12,14
  92:14,19,23
  93:25 94:4,12
  94:13 98:19,24
  99:17 100:18,23
  101:15 103:1,6
  104:22 105:2
  106:19,23
  108:20 111:14
  123:17 125:15

126:20,25
128:15,22
131:19 132:24
133:3 135:12
137:1 138:23
139:9,14 140:9
140:22 142:6
143:18 144:11
144:13,23 149:7
149:10,13,16,23
150:3,9 151:8
153:8,17,21
156:5 158:3
159:21 161:15
161:18 164:16
165:19,24 166:5
169:15,20,22
170:3,19 171:2
171:5 173:1
174:23 175:5,8
175:16 178:1,1
**decide** 30:25
  32:23 33:24
  124:21 135:7
**decided** 143:19
  148:22 151:14
  151:21 155:11
  163:16
**decides** 161:8
**deciding** 85:13
  86:5 157:16
  165:8
**decision** 4:20
  34:18 35:15
  38:23 40:15

90:6 104:23
105:13 106:13
106:17,25 107:6
107:25 112:9,11
113:24 135:6,9
139:6 140:13,16
140:17,19
141:11,12
148:21 150:5,11
150:14 151:2,23
152:1 153:23
155:17 157:4
165:13,17
**decisionmaker**
  50:23 51:6
**decisions** 27:6
  112:13 131:15
  156:7 157:18
**declare** 179:20
**deem** 59:17
  111:6,10
**deemed** 162:20
**def** 7:22 166:2
  170:5,22 171:7
**defendant** 1:8
  64:1
**defendants** 3:10
  3:14
**define** 72:5
**defined** 8:20
  55:18 99:1
**definitely** 43:16
  71:8
**definition** 8:25
  47:15,19 55:25

58:5,7,12,15,17
58:19 59:4,12
61:19 62:3,8
63:7,13 64:18
66:12,16 77:16
99:5 108:24
127:13 130:22
130:23 164:1
**definitions**
  47:20 48:15
  62:10 66:16
**degree** 13:4,5
**dekker** 1:4 11:8
  178:4 179:1
**delay** 27:25
  168:22
**delivered** 47:2
**delivering** 62:24
**delivery** 20:22
  21:1 42:5
**dental** 145:24
**deny** 59:16
**department**
  15:8 146:15
**depend** 36:3
  43:10,23 44:23
  51:24 61:11,16
  102:10 123:15
**depending** 34:6
  34:24 38:9 54:2
**depends** 31:2
  35:13,25 36:9
  39:18 41:2 51:7
  57:9 76:17
  112:22 117:8

118:15 120:5
161:11 165:17
**deponent** 5:9
**deposed** 11:10
**deposing** 178:13
**deposition** 1:10
4:11 5:10 6:11
7:25 13:10 46:6
55:19 102:21
105:23 175:20
177:7
**depth** 121:5
**deputy** 16:21
17:4 81:6 82:8
**derivatives**
34:11
**describe** 13:2
17:12 18:23
26:4 39:16 92:4
112:10 116:23
**described** 102:9
120:24 162:1
**describes** 18:6,8
105:20
**description**
18:14 20:18
21:23 70:23
122:15
**descriptions**
122:18
**designated**
24:13 51:11
**designed** 159:24
**desk** 114:15
138:7

**detail** 121:18
**detailed** 121:15
**details** 18:10
33:20 38:22
47:5 63:2 69:1
90:6 109:17
110:18 115:13
115:17 116:12
116:14 121:14
123:3 133:10
136:24 149:5
**determination**
32:10 33:12,23
34:16 36:7,12
36:20 50:24
51:6 64:7 69:15
71:7 105:7,10
105:14,19,24
111:15 112:15
151:5 168:6,8
169:4
**determinations**
35:21 37:1,17
39:11 50:21
51:2
**determine** 20:13
32:10 34:18
43:2 60:6 65:2,9
69:9,10 95:15
105:6 109:12,19
110:6,10 120:15
**determined**
33:2,3,9 58:9
77:13 120:4,7
156:2 165:10

**determining**
19:4 20:4 31:6
33:11 37:25
50:2,15 69:12
70:2 106:9
109:3 111:1
151:5
**develop** 26:7
28:8 30:7,13,18
31:23 58:4
69:14 83:16
101:5,8 139:20
160:14
**developed** 31:13
32:2,4 68:23
71:15 72:17
93:9 96:11
105:6 119:8
121:13
**developing**
22:18 27:6 31:7
31:14,15 37:17
51:22 57:8 60:3
60:9 61:5 69:25
73:1 77:6 101:4
131:12,14 156:2
**development**
15:19 17:20
31:23 32:5 38:3
40:2 59:24
76:13 83:23
114:13 118:10
118:12,23 121:1
133:20 135:24
136:7 145:14

146:1,23 147:1
152:19 156:23
157:14
**developments**
69:2 76:7
**develops** 72:21
**devices** 99:3
**devona** 23:21
103:22
**diagnoses**
158:18
**diagnosis**
163:25 164:7,9
168:25
**diagnostic** 11:4
99:2
**difference** 105:9
118:6,16
**differences**
113:19 118:20
**different** 18:16
21:1 27:3 31:4
34:13 44:25,25
67:23 68:8,25
69:2,6 70:10
71:11 93:8,9
110:14 112:14
113:18,21 118:7
118:8,21 137:6
137:10,12,17,18
137:19 161:12
167:12
**direct** 4:3 6:9
16:10,11 23:12
23:14,15 65:11

66:4 71:22 82:2
141:22 143:12
149:2 175:8
**directing**
149:25
**direction** 78:18
**directly** 20:23
20:24 23:2
38:15,17,19
**director** 35:18
36:17 51:11
**discomfort** 8:20
**discrepancy**
8:21
**discuss** 7:20
39:21 41:18
46:6,8 71:24
76:2,20,23,25
163:10
**discussed** 7:16
72:1 81:3
152:21 159:11
163:14
**discusses** 42:17
**discussing** 29:7
76:16 92:1
113:6 115:9,13
148:7
**discussion** 81:8
81:17 116:1
120:2 152:2,8
152:17 153:4
155:23 173:13
**discussions**
34:22 39:20

75:8 115:16
143:11 152:12
152:23 153:9
**distinct** 36:6
47:10
**distinction**
155:8
**distinguish**
158:9
**distress** 8:20
**district** 1:1,1
**division** 1:2
35:15 37:20
38:10 45:1
167:13,18,20
**dme** 32:7,9,12
32:13
**document** 20:17
22:4 34:24 35:1
35:4,22,24 36:4
42:17,23,25
47:20 52:6,9
72:12 74:24
88:5,6,22,24
92:24,25 94:7,8
94:14 103:8
105:3 123:4,6
133:4 134:14
143:2,4 168:21
168:23 170:20
171:6,8,20
179:20
**documentation**
95:22

**documents**
12:25 18:4 22:9
35:9,12 43:5
60:9 92:6 93:9
93:10 115:22
116:25 121:15
156:18
**doe** 11:9
**doea** 15:20
117:15,17 122:6
122:8 125:16,18
**doing** 34:20
36:20 38:1 85:8
132:1 136:20
156:22
**dollar** 137:9
**donor** 34:11
39:25
**dosages** 66:19
**dr** 4:19,21 39:15
40:22 41:9,10
41:17 132:22
133:9 134:9,10
135:16,16,18,21
136:5,5,6,10
137:3 141:16
142:8
**draft** 69:23 88:6
171:9
**drafted** 43:5
69:17 91:2,5,8
114:22 115:5,8
115:12,14
118:14

**drafting** 18:1
52:4 99:14
117:17 148:12
148:18
**drafts** 51:19,20
51:23 52:1
116:24
**drive** 1:14 3:12
95:24
**driven** 33:7
105:20 130:2
**driving** 69:22
**drug** 23:23
25:19 26:1,9,12
26:20 27:22,23
28:1 29:5,23
49:23 54:4,11
54:12,15,17
55:10,11 65:10
65:15,17 66:10
66:20,20,24
69:7,11,13 72:3
72:11,13,14
73:11,23 83:21
85:1 96:5,10,15
108:25 109:4
110:16,21 111:2
111:3,5,6,9,10
111:16,18,20
131:24 138:2
**drugs** 30:16
54:7 65:3 67:6,9
68:11,20 70:7
72:17 99:4,10
108:12 109:7

**due** 76:18 85:4
168:24
**duly** 6:7 176:8
**dunn** 2:10 6:19
6:24 7:5,8,12
8:2 58:25 59:3,7
92:16,20 149:14
169:18,21 171:4
**dur** 28:13 29:4
69:4 73:1
**durable** 32:14
**duties** 28:12,19
28:23 38:8
**duty** 19:16 56:9
56:16
**dysphoria** 5:3
8:19 10:18,22
10:24 27:5,16
28:6 30:5 80:11
89:20 91:1,5,16
91:23 94:10,17
96:8,17 113:9
114:21 115:2
116:13 118:24
119:9,23 120:9
128:3,21,24
129:5,11 131:3
134:12 136:8
137:24 139:25
141:5 147:5
148:3,13,19
149:20 154:18
154:23 157:6,10
157:22 158:6,8
158:17 162:3,9

163:2,23 164:3
164:6 168:9,23
169:1,3,17
171:1 173:12,15
173:19 174:4

**e**

**e** 2:1,1 3:1,1 4:1
6:1,1 73:12
178:24,25 179:3
179:3,3
**earlier** 51:1
70:15 87:15
91:17,21 92:1
100:13 105:20
105:23 108:11
110:24 114:24
145:2 163:14
168:1
**early** 11:3
**easier** 26:4
**easily** 98:17
**easy** 121:24
**editing** 89:4
**editor** 89:7
**educational**
13:2
**effective** 72:13
**effectiveness**
150:22
**either** 22:15
66:18 79:1
103:1 104:21
122:6 154:14
**elder** 15:8

**elica** 168:2
**eligibility** 14:18
14:20,23 19:4
21:17 50:15
73:17 76:9
162:22
**eligible** 15:2
**elliott** 167:9,12
**email** 4:24 5:1
81:3 124:13
131:2,4 165:21
165:22 167:10
168:2 170:4,5,8
171:24 172:7
173:17 178:13
**emailed** 178:15
**emailing** 166:6
**emails** 124:17
169:19
**emergency**
162:14,17,18,20
162:21
**employed** 121:7
121:10 126:8
**employee** 122:6
177:12,13
**employees**
126:10 144:16
**encompasses**
10:6
**endeavor** 71:20
**ended** 59:8
**engage** 131:2
**engaged** 25:22

**english** 24:5
79:1 90:17
151:12
**enrollee** 42:20
**enrollment**
14:17 76:9
**ensure** 46:22
57:7 60:13
71:20 76:11
161:2 173:25
**ensuring** 56:25
57:4 60:2 61:8
**entail** 14:3,14
33:18 110:3
121:17
**entails** 28:12
109:18
**entered** 98:19
**entire** 90:11
94:8
**entitled** 64:6
94:7
**epsdt** 11:2,5
57:1,5,11,13,18
58:10 59:16,21
59:24 60:3,6
130:19,21
152:17 153:10
**epsdts** 155:6
**eqhealth** 46:15
47:23 48:5,17
63:16
**equally** 158:12
**equated** 22:8

**equipment**
32:14
**errata** 4:6
178:11,13,16
**escorted** 122:21
**especially** 71:7
113:2 123:21
**esquire** 2:2,6,10
2:14,18 3:2,6,11
178:1
**establish** 32:8
157:24
**established** 96:6
**estradiol** 73:12
73:15,18 74:15
**et** 1:4
**events** 131:22
**everybody** 6:20
96:24 122:21
**evidence** 98:20
**exact** 14:22
16:17 17:1
58:15 62:19
78:18 102:10
113:11 131:22
143:1,1 167:25
172:16,21
**exactly** 33:21
39:5 83:10
134:2 136:14
151:25 161:23
167:4
**examination** 4:3
6:9

**examined** 6:7
**example** 19:9
32:1,3 33:5 34:1
34:8 35:13
36:11,15 39:22
45:25 47:14
48:14 51:9 56:4
56:5,6 68:5 70:9
90:17 91:3
100:13 105:16
105:24 108:14
108:16,18
110:13 121:2
124:23 160:3
161:23 162:12
**examples** 39:23
100:17 156:20
160:2,14,16
161:21 163:5
**exceed** 137:8
**except** 96:24
97:1 162:23
**exchange**
134:19 165:22
168:1 172:7
**exclude** 21:7
56:20 100:5
119:9 158:17
164:5 173:18
**excluded** 110:7
162:9 174:7
**excludes** 158:15
**excluding**
118:24 173:14

**exclusion** 9:3,4
9:5 10:4,21,23
27:5,15 28:5
30:4 55:15,18
55:21,22,23
56:4,18 119:22
120:8 128:2,4
128:13 134:11
136:8 144:15
147:4 153:24
154:23 157:17
158:12,23
161:25 162:2,7
162:24,25
163:12 164:6
169:12 174:15
**exclusions**
18:15 128:7
161:12,14
**excuse** 73:17
94:12
**executive** 143:8
143:10
**exhaustive** 20:6
20:7 54:17,23
**exhibit** 4:11,12
4:13,14,15,16
4:17,18,20,21
4:22,24 5:1,2,4
7:25 8:6 9:18,20
58:22 59:1
61:18 63:22
64:11 66:13
77:24,25 87:11
88:4 92:15,16

92:21 94:1,2
103:3,4 104:23
104:25 128:9,10
132:20,25 133:1
134:9,14 141:16
149:11,15,17,21
165:20 166:1,3
169:24 170:1,17
170:21
**exhibits** 4:9,10
7:16,18 169:23
**exist** 128:12
130:5
**existing** 98:3,6
144:20 157:7,9
157:18
**exists** 43:25
**expectation**
60:11,15 63:3
134:3 140:25
141:5,9
**expected** 49:13
**expedited** 78:23
113:13,17
155:16
**experience**
40:17 87:1
89:22 90:1
98:12 104:7
112:12 117:22
123:8,18 125:7
127:1,5 159:24
**experimental**
57:19,23 58:2
58:14 59:14,18

63:11 69:11,13
69:16 70:2
109:12,20 110:6
110:10 111:2,6
111:10 130:20
130:24 153:25
**expert** 52:20
61:15 97:17,20
120:23 121:3,9
126:3 132:22
137:2 144:21,24
145:4,7,10
160:23,24
**expertise** 40:6
104:8,13 137:21
137:23
**experts** 120:20
126:5,7 132:12
132:13,17,19
135:4,7,13
136:13 138:25
139:7,11,16,21
139:24 140:5,11
140:14 141:1,7
141:11 144:14
145:20 159:6,10
159:15
**expires** 176:17
**explain** 18:13
161:3
**explained** 90:3
156:1
**explanation**
134:5

**explicit** 129:15
129:20
**express** 148:11
148:17
**extensive** 86:22
**extent** 27:12
40:11,12 41:12
50:17 63:14
91:24 109:22
129:6 139:17
**external** 19:24
160:6,12 170:15

**f**

**f** 73:8
**face** 115:6
**facing** 20:2 29:7
**fact** 4:18,21
73:15 85:11
133:4 137:20
**factor** 69:22
85:13 86:5
106:9
**factors** 84:16,23
86:15,25 157:3
157:4 165:16
**facts** 179:20
**fails** 178:20
**faint** 89:5
**fair** 168:24
**fall** 15:1 37:6
98:17 99:5,10
**falls** 37:13,14
**familiar** 24:23
55:1 56:5 61:1,3
61:4 68:19 77:3

77:6,7 78:25
99:7 169:5
174:17
**far** 20:10 108:10
124:11,17
**fault** 58:24
98:22
**fax** 2:4,8,12,16
2:21 3:4,9,13
**fda** 26:8,15
110:13,16,21
111:3,5,9,15,18
**february** 114:10
**federal** 14:6
17:15,17 26:6
26:14 28:1
31:25 33:19
36:18 51:10
57:5,12 60:7,11
60:21,23 61:10
64:15,17 68:6
69:21 72:7
83:11 105:18
110:20 111:21
111:23 153:18
154:13 160:5
178:18,24
**federally** 25:20
60:14 85:2
**fee** 19:25 20:16
20:17,20,21,22
21:2,6,15,19,21
22:3,4,5,8,12,15
32:7,20,24
33:25 34:3,14

35:5 37:25
46:20 49:24
62:24 63:15
73:6 76:10,13
77:15 113:1
**feel** 12:10 21:12
98:14 133:20
160:11
**figure** 10:11
**filing** 165:11
**fill** 95:13,14
106:16
**filled** 107:1
**filter** 52:21
**final** 36:4,4
50:22 51:6 92:8
97:7,9,12,15,20
113:4,24 114:1
164:19 165:1,6
168:5,7 169:4
171:13,19,21,23
172:1,2
**finalization**
114:11
**finalized** 79:19
112:13 114:7
115:25 152:1
**finals** 172:5
**finance** 37:23
38:14
**financially**
177:15
**financing** 76:12
**find** 81:1 112:3
161:24

finds 63:10
fine 10:13,19
88:19 98:23
130:12
finish 11:24
12:12 88:19
155:17
firm 146:12
first 6:7 19:11
40:1 41:20 44:9
45:3 48:14
76:18 85:16
94:6,14 99:1
141:6 143:6
fiscal 33:4,14
38:1 76:11
150:17,20
five 23:12
122:11,12
fl 178:14
flip 54:8
florida 1:1,15
2:2,3,7,11,16,20
3:8,11,13 5:4
13:4 17:18
22:18 41:24
42:13,16,18
43:2,9 44:2
49:20 50:3 51:2
56:8,15 58:6
63:18 65:2,9
67:5 68:6 69:3
73:16,19,24
87:19 99:22
100:4 112:4

117:22 128:24
129:5,10,12
130:19 137:16
141:21 146:15
162:5,8,13,22
170:21 176:3,6
176:16 177:2,5
178:18,24
floridahealthj...
2:4 178:1
focus 27:22
84:22
folks 6:22 7:12
follow 9:24
134:3 143:21
following 44:7
65:18 83:22
132:4
follows 6:8 67:7
foods 105:25
106:2,14
forbes 24:21
foregoing 177:9
179:20
forgot 84:9
158:21
forgotten 58:23
form 4:16,18,21
5:4 9:8 10:7
21:9 48:20
54:25 55:16
57:20 58:3
61:21,25 62:5
71:2 73:20 78:7
91:6 92:15 93:1

93:2,2,6,11,16
93:20,22 94:8
94:15 95:6,10
95:14 96:7 97:7
97:13 99:12
100:6,21 101:14
108:17 111:12
123:14 125:12
126:18 131:17
133:5,5,14
136:18,19,21
137:21 138:17
139:8,12 140:2
140:20 141:15
142:3 143:24
144:7,17 149:4
150:1,7 151:3
158:1 159:20
161:10 165:15
170:22 174:21
175:1
formal 35:6
40:14 42:25
49:14 140:3
142:5
formally 40:19
97:25
format 93:14
forms 93:5,8
95:18 138:6
143:19
forth 8:16 49:7
128:8 158:23
forward 85:3

found 22:6
66:19 68:5,9
four 163:4
franklin 3:3
free 12:10 21:12
front 45:23
77:21 153:9
full 126:10
144:15
function 46:19
functions 24:1
funding 143:7
143:25 160:9,10
160:10,18
further 18:13
102:12 177:11

## g

g 6:1 8:13
gainesville 2:7
2:11
gap 82:13
gapms 4:14,16
4:17,20 8:9
24:12,13 27:13
27:14,19 28:5
30:4 41:7,11,18
63:22 64:7 69:9
70:4,6,11,16,18
70:20 71:1,15
71:17,19,21
75:5,11,22 76:2
76:20 77:3,10
77:16,18 78:3
78:11,21 79:6
79:19,23,25

80:4,9,10 83:22
84:6,13,15,19
84:22 85:8,8,13
85:17 86:22
87:4,8,11 89:14
89:19,23 90:1
90:13,18,25
91:2,11,16,20
91:22,24 92:2
92:11,14 93:12
93:13,18,20,23
94:1,9,16 95:2,7
95:11,16 96:1,7
96:16 98:1,2,5
98:12,19 99:7,9
102:23 104:5,7
104:10,13,17,23
105:8,11,19
106:2,3,10,13
107:3,7,22,23
107:24 108:1,9
108:12,15 109:3
109:6,8,10,11
110:5,9 112:10
113:6,11,13,17
113:18,25 114:1
114:7,11,20
115:1,4,8,9,20
116:5,7,12
130:2,10 131:2
132:1 133:12
134:22 135:14
139:20,25 140:7
140:24 141:4
145:15 146:2,16

148:3,12,18,21
148:22 149:3,18
149:25 150:11
150:14,16 151:1
151:7,10,15
152:9 154:17
155:12,16,19,21
157:21 159:19
**garner** 118:18
**gary** 3:6 10:10
55:6 64:21 94:5
**gd** 173:7,10
**gears** 41:23
**gender** 5:3 8:19
8:21,22 9:3,6
10:4,16,18,22
10:23 27:5,16
28:6 30:4 80:10
89:20 91:1,5,16
91:23 94:10,17
96:8,17 113:9
114:21 115:2
116:13 118:24
119:9,22 120:9
128:3,20,24
129:5,11 131:3
134:11 136:8
137:24 139:25
141:5 147:5
148:3,13,19
149:19 154:18
154:23 157:6,10
157:22 158:6,8
158:17 162:2,9
163:2,22 164:3

164:5 166:18
168:9,23,25
169:3,17 171:1
173:12,15,19
174:3
**general** 33:7,8
33:11 36:2
71:12 95:17
98:1 105:13
162:4
**generalities**
109:9
**generally** 8:15
57:13 77:9
85:12 109:6
112:25 118:13
120:13
**generated** 107:6
**getting** 79:11
172:24 175:3
**gg933698**
176:17
**giering** 24:8
39:2 132:10
164:23
**giering's** 24:9
**give** 6:3 19:9
53:14 60:22
64:20 86:13
156:20
**giving** 108:14
**glasses** 167:3
**glucose** 41:4
**gnrh** 168:22

**go** 6:15 7:24
11:11 21:10
34:20 39:22
54:9 56:1 66:3
69:1 80:24 94:8
96:13 105:10
107:4 110:15
116:25 160:15
171:10 174:12
**goes** 77:6 105:7
105:12 124:11
142:9 169:1
**going** 6:14 7:15
7:18,22 8:9 9:2
9:8 10:7,21 11:2
11:11,23 12:11
22:6 25:16,18
31:11 39:22
48:20 53:24
54:8 55:16
61:17 66:9 71:2
71:24 72:9 73:7
83:20,24 88:14
99:20 100:6
111:12 131:12
136:21 137:5
152:22 153:6
160:20 163:9
171:18
**good** 7:2 103:14
104:3,6 115:11
**governing** 60:12
**government**
17:17 26:6
69:21 83:12

[government - hosting]                                             Page 199

108:7
**governor** 87:19
146:22
**governor's**
147:1,4
**gperko** 3:9
**graphic** 121:19
121:23
**great** 169:22
**greg** 1:16 176:6
176:15 177:5,20
**grossman**
135:18
**grossman's**
135:21
**gs** 89:7,11
**guess** 55:17
138:18
**guidelines** 44:11
45:9,18 60:2,5
60:11 157:7,18

**h**

**h** 179:3
**habit** 11:20
**hall** 45:7
**handbook** 19:5
19:7,9,12 31:21
31:22 53:4,5,23
53:25 54:2
124:24
**handbooks**
18:17,18,21,24
19:1,4 42:19,20
43:4 53:4,7

**handful** 122:10
**handing** 94:5
170:20
**handle** 90:18
**handled** 105:8
108:15
**happen** 79:17
125:16
**happened** 119:1
127:23 131:21
169:14
**happening** 71:6
**hard** 98:14
**harris** 82:11
**head** 29:16 49:2
49:11 51:16
53:13,18 58:16
67:22 68:10
89:13 123:4
136:9,11 150:18
**health** 1:13 2:2
3:2,11 5:4 13:8
13:13 14:16
19:12,15 23:8
54:10 58:1 78:4
78:17 79:4,12
79:24 99:1,21
100:1 102:6
146:15,18 152:5
167:13,21
170:21
**healthlaw.org**
3:5
**hear** 104:20

**heard** 6:16
104:18 122:22
130:10
**hearing** 118:3
118:11,17
119:13 120:10
120:14 121:12
121:15 122:16
122:19 123:1,9
123:20 124:19
125:4,10,11,22
125:25 126:3,6
126:12,17,22
127:7,9,11,12
127:20 134:11
136:2 147:8,11
147:13,16,17,20
147:21,25,25
158:22 159:1,7
159:13 160:22
164:10,25 165:5
168:24
**hearings** 122:1
122:4,5,7,9,14
122:15 123:18
123:19,21 124:7
127:3 159:4
**held** 15:25
82:18 118:22
158:22
**help** 21:5 128:9
**helped** 26:25
**helpful** 7:14
77:20

**helps** 7:20
**hesitating** 79:14
**hierarchy** 92:8
96:12,21 141:19
**highest** 76:17
77:1
**hill** 3:4
**historic** 104:10
**historical** 84:21
86:2,18,24
91:10,19
**hit** 73:14
**hold** 15:22
**holtzman** 3:7
146:12
**holtzmanvoge...**
3:9
**home** 19:12,14
56:12 160:4
**honor** 83:16
**hope** 33:14
**hormone** 4:14
63:23 64:6 87:6
87:7,10 89:15
108:16,21,22,25
109:10
**hormones** 91:3
158:5,16
**horrible** 11:19
**hospital** 53:19
145:5,8,21
**host** 28:13 29:17
**hosted** 125:18
**hosting** 125:9

hot  166:20
hour  71:24
hours  81:14
  126:15 172:25
  175:4
housed  44:6
  48:5
housekeeping
  102:18
https  55:10
  72:11
huge  64:10
huh  12:5,5
human  34:11
  39:24
hysterical  91:15

**i**

ibudget  31:21
  36:16 39:24
  124:24
idea  89:9 135:1
  135:3
identification
  8:7 9:21 59:2
  64:12 78:1
  92:22 94:3
  103:5 105:1
  133:2 149:22
  166:4 169:25
  170:2,18 176:9
identified  84:8
  134:6 148:2
identify  35:4
  80:14,19 83:24
  84:2 96:2

identity  8:21
ii  108:7
impact  12:16
  33:4 38:1
  124:14
impacted
  112:20 123:16
  124:17
impacts  71:9
implement
  25:18 26:11
  40:3 101:8,12
  140:18 169:12
implementation
  26:15 36:6 85:4
  112:10,15
implemented
  60:21 174:15
implementing
  27:11 44:12
important  151:2
  160:12 173:22
importation
  23:23 25:19
  26:1,5,8,10,12
  26:20 27:22,24
  28:2 29:23
  83:21 85:1 96:6
  96:10,16 131:24
  138:2
improvement
  46:10,14
inbox  78:5,6,17
  79:4,12,24 80:2

include  22:5,18
  34:17 41:7,11
  47:17 56:25
  57:11 58:8
  69:15 70:2 94:9
  100:8 116:21
  121:25 122:20
  146:8 152:23,24
  153:3 161:14,22
  161:25 162:5
  163:9,20 170:10
included  22:15
  32:11 34:14
  97:18 120:16
  123:4 126:6
  150:24 152:3
  161:9 163:13
  168:3 173:3,22
includes  26:14
  32:15 52:14
  58:13 63:7
  104:12 130:23
including  36:2
  69:4 91:18
  145:24 162:5
inclusive  20:3
  53:10
incorporate
  32:24 33:24
  34:3 42:13
  47:13 62:9
incorporated
  32:19 42:8
  47:21

incorporates
  48:23
incorporating
  57:11 77:15
incur  142:2
index  4:9
indicate  97:1
  134:15
indicates  133:13
indicating  133:5
indications
  66:19
individual  44:5
  75:25 76:24
  102:24
individuals
  22:22 43:22
  56:9,16 121:10
  125:11,21
inform  113:21
informal  40:18
  43:1
information
  18:5,6,23 19:5
  19:10 20:18
  22:14 43:1,4
  49:11 61:6
  65:13 67:1,15
  67:16,24 68:5,8
  68:9,17 95:23
  137:14 148:25
  160:7,9,12
  161:9 162:5
  170:15

ing   170:6
initial   81:19
initially   69:22
initials   89:7,11
  89:12 94:20
initiate   142:5
initiated   77:13
  77:18 78:3 98:2
  140:4
initiating   139:4
inpatient   34:12
  34:12 53:11,19
  145:8,11,20
input   40:7
  118:19
instance   32:8
  109:2 146:6
  151:18
instruct   153:6
  155:24
instructed
  95:13
instructions
  6:15 11:11
insurance   14:16
interaction
  156:15
interested
  177:15
interim   87:23
internal   107:11
  107:13 123:2
  135:6 166:7,9
  166:11,15 168:9
  168:21

interplay   70:9
  73:25
interpret   96:18
  99:15 101:19
  106:24
interpretation
  99:25 100:25
  101:1
interpreted
  101:13
introduce   6:20
introduces   6:22
investigation
  84:6
invite   124:6,9
  124:25
invited   124:24
  125:2
invites   124:19
  124:20,22
invoice   136:12
  138:1,9,11
invoices   137:6
  141:21
involve   26:20
  50:15 66:6
involved   25:2
  27:4 31:14,15
  36:19 39:23
  40:5,14 41:12
  41:15 50:12
  75:5 89:14
  91:22,25 119:19
  119:21 120:1,3
  132:8,22 135:18

138:20 143:14
  145:14 146:5
  155:17 158:22
  165:16
involvement
  40:13 89:17
involves   44:1
issue   113:15
  157:2 160:17
issues   6:15
items   32:9

**j**

j   2:2 178:1
jacksonville   2:3
james   136:10
january   1:11
  15:6,12 36:24
  36:25 72:13
  75:2 176:8,10
  177:17 178:3
jason   1:7 16:13
  81:5,23 170:6
jason's   81:22
jeff   24:5 151:12
jeffrey   79:1
jennifer   2:18
  7:9,10
jesse   22:25
  23:23 24:2,14
  41:5,6 70:17
  75:21,23 76:2,6
  76:15 79:1
  84:13,14 90:7
  104:21 107:14
  107:15,21

145:22 148:9,11
  151:11
jesse's   70:21,24
  70:25 71:8,14
  71:18,20 76:4
jessica   24:21
job   28:12 70:23
  83:13 115:24
  122:15,17 156:7
  156:22 178:4
  179:1
john   23:5 24:3
  145:22
johnson   93:21
  93:22,23
joined   6:25 8:2
  88:10
josefiak   3:7
july   158:22
  159:13 164:10
  164:25 165:5
june   15:21,23
  94:9,11,12
  96:24,25,25
  114:8,20 148:23
  149:18
justice   2:2
justin   87:24

**k**

k.f.   11:9
katherine   2:2
  178:1
katy   11:7
keep   71:5

**kelly** 24:21
**kentucky** 13:6
**kidder** 88:1,5,7
**kids** 159:22,22
**kind** 14:3 18:21
  21:24 33:11
  40:6,7 83:13
  86:24 133:8
  134:18
**kinds** 154:3,5
**king** 168:3
**knew** 86:20
  89:18 138:21
  142:14,19 144:8
**know** 7:6 8:10
  11:5,10,14
  22:13 24:5,20
  25:16 27:12,12
  30:6,20 33:6
  38:22,25 40:3,4
  40:9,11,12,18
  40:20 41:12,16
  41:24 42:15
  44:13,14 45:11
  45:12,12,24
  46:11,18 47:5
  48:10 49:1,10
  49:16,18,21,25
  50:1,1,5,8,17,18
  50:20 53:17,21
  53:25 54:19,20
  55:6,15 57:22
  59:22 60:8,20
  62:1,22 63:2,3
  63:14,16,20

65:22,23,24
66:8,25 67:1,11
67:12,21 68:2,9
68:14,15,21
69:1,12,13 70:9
72:3,6,14 73:3
73:21,25 74:7,8
74:9,18,20,22
75:1,10,11,19
79:9 80:2,8,25
85:10 87:13,19
88:10,25 89:11
89:13,17,18,21
89:24 90:2,15
90:16,17 91:10
91:24 92:20
93:24 94:19
95:5,12,17,20
95:21 96:3,12
96:21 98:7,8,11
99:6,13 100:22
100:24 102:25
103:16 104:5
105:5,12 106:18
106:24 107:4,5
107:8,9,10,10
107:11,12,16,18
107:25 108:2,3
108:10,13 109:6
109:13,13,17,22
110:4,12,18,19
110:23,25
111:13,21
113:23 114:4,6
114:13,17 115:5

115:16 116:7,7
116:9 118:25
119:23 120:11
121:13,14
122:17,24 123:3
125:5,14 126:4
126:9,13,13,19
126:24 127:8
129:6,23 131:23
132:9,14 133:10
133:15,17,18,25
134:10,13,23
135:1,3,8,11,15
136:1,3,9,11,19
136:22,24
138:25 139:4,17
140:13,16,21
141:13,14 142:9
142:17,18,21,23
142:24 143:13
143:20 144:3,25
145:9 146:4,9
146:20,24
147:14,22
148:24 150:8,12
150:15,18,24
151:4,4,7,9,10
151:16,24 152:4
154:1 155:4
158:2 159:2
163:8,21 164:1
164:10,12,13,15
164:17,20,20,23
164:23 165:9,19
166:10,13,17,19

166:20 167:5,18
167:22 168:12
168:19 169:6,8
169:9 171:15
172:14 174:9,10
174:11,14,16
175:2
**knowing** 108:9
**knowledge**
  15:13,16 16:3,5
  41:14 61:15
  84:21 86:2,19
  86:21,22,24
  89:18 91:11,15
  91:19 104:10
  109:8 121:5
  145:16 154:21
  155:2 157:8
  159:17 161:1

**l**

**l** 2:10 5:7 73:12
**label** 67:6,10
**labeled** 165:20
**labeling** 66:20
**laid** 60:20
  105:22
**lakeva** 23:24
**language** 15:19
  28:16 34:10
  49:1,10 57:5,11
  57:12 62:19
  78:15 98:25
  103:24 118:13
  128:25 129:3
  137:18 156:1,2

159:8 168:4
169:1 170:10
172:9,16,20
173:2,3,22
**large** 59:9
**lately** 41:2
**law** 3:2 146:12
**laws** 101:25
**layout** 121:20
**lead** 48:8 74:21
**leadership**
35:18 36:2
75:16 83:12
134:2 142:23
143:8,10,25
144:1
**leave** 92:6
**led** 84:13
**left** 167:22
**legal** 2:6,10
100:25 102:2,17
127:2,6,10,15
127:18,21,25
132:11 146:2,5
146:8 156:7,15
156:19,21
158:25 174:21
178:23
**legislation** 40:1
**legislative** 33:2
33:13 34:9 40:1
83:12
**length** 86:11,16
126:12 162:16
164:20

**leon** 176:4 177:3
**leslie** 167:1,3
168:8
**letter** 4:7,22
81:2,7,10,11
83:2 131:10
149:1,6,16,24
150:5
**level** 31:23
40:17 89:17
**levels** 96:13
**lied** 73:15
**life** 31:23
**lifescience** 26:16
**likely** 40:22
43:12 44:9
**limit** 52:8
**limited** 98:13
104:7 109:8
132:6
**linda** 166:23
**line** 7:12 8:3
73:13 96:5
163:22 179:4,7
179:10,13,16
**links** 20:10
**list** 20:7 53:12
54:15,17,24
72:13,14,17
122:21 132:15
**listed** 21:2,15
72:6 73:12,18
73:23 88:3
96:19 128:5
129:2 132:19

137:2 144:15
153:24 174:5
**listing** 70:22
**lists** 65:19 67:7
**literature** 65:20
**little** 67:23
68:25 69:6 92:4
120:24
**live** 112:1
**location** 120:15
120:16
**logistics** 26:16
**long** 12:23
13:19 14:9 15:4
15:9,11 25:6
27:25 36:19
39:4 81:10,11
84:17,20 85:20
85:24 116:3
164:17
**longer** 19:7
167:18
**look** 33:12
59:12 65:15
68:21 92:18
94:6 102:23
171:6 172:2
**looked** 33:22
**looking** 34:7
53:22 54:9
67:15 88:24
94:14 95:21
96:22 128:8
136:18 137:5
150:16 163:12

170:4,7
**looks** 39:17
73:13 88:6
170:25 171:9
**lot** 18:19 28:12
61:13 62:8
85:12 90:8,13
95:19 115:22
126:21 140:6
164:15
**lunch** 88:15
102:18
**lupron** 168:24
169:2

**m**

**m** 2:6 8:13
**made** 34:16
38:23 52:11
71:7 76:11
112:16 135:9
140:13,16,17
151:23 159:2
165:14 168:6
169:4
**maf** 1:3
**magellan** 4:24
28:18 29:2
49:17,19,22
50:1 165:21,23
166:6,11 168:3
168:17 169:10
**mahan** 1:14
3:12
**main** 46:18
170:14,14

**maintaining** 14:5

**majority** 22:24 57:10 123:22 143:11 156:12

**make** 9:12,15 33:6,12 38:23 52:9,18 61:17 62:10 72:24 73:10 100:15 102:13,16 115:24 118:19 155:7 171:25

**makes** 34:15 47:4 62:13

**making** 33:17 37:1 39:10 45:4 52:16,22 80:14 80:19 103:19,21 112:19 122:20 122:21 156:6

**manage** 17:17 23:10

**managed** 17:25 18:2 20:25 22:25 23:20 28:16 41:24 42:3,5,6,9,11,12 42:17,25 43:8 43:24 44:1,7 48:23 49:12 62:17,24 63:11 72:17 73:4 78:15 79:2,24 113:1,12 129:25

156:19 168:14 168:17 169:11

**management** 15:9,24 16:7 23:15 34:25,25 35:7,10 38:4,16 44:3,8,21 45:5 46:22 72:1 96:13,21 102:1

**manager** 14:1 23:6,7 28:21 70:17 81:3,4 84:10 90:10

**managers** 44:5 71:22 76:1,6 174:13

**managing** 26:16 48:8

**map** 121:17 123:3

**maps** 121:13

**march** 176:17

**mark** 7:15,17,18 7:24 9:18 58:20 58:22 63:22 77:23 92:15 103:3 104:23 132:24 149:14 149:16

**marked** 8:6 9:20 59:1 64:11 77:25 92:21 94:2 103:4 104:25 133:1 134:8 149:21

166:1,3 169:24 170:1,17,20 171:11

**market** 137:16

**marketplace** 141:21

**marstiller** 4:22 80:17,24 81:8 82:23 83:2 131:2 149:1,17 149:24 150:4 178:4 179:1

**master's** 13:4

**materials** 44:17 44:18,23 45:4

**matson** 23:5 24:3 145:22

**matt** 84:3,16 86:20,20 94:25 104:21 148:3 151:11 170:9

**matter** 43:1 52:20 61:14 103:2 120:20,22 121:3,9 126:2,4 126:7 144:14,21 144:24 145:4,7 145:10,20 159:5 159:10,15

**maximum** 74:5 74:16,25

**mcgrath** 23:17 24:10 154:14

**mcgriff** 165:21

**mckee** 3:2,5 8:2

**mco's** 49:6

**mcos** 44:11 45:9 48:18

**mean** 9:6 11:5 13:13,24 14:20 18:12 21:3,7,16 22:2 42:2 46:11 46:13,21,25 47:7 50:7,11 57:22 60:20 62:1 66:14,15 73:16,19,24 74:6 80:10,16 84:24 93:21 94:24 97:6 99:24 100:3 118:13 120:19 120:22 122:11 123:11 128:23 129:4 138:19 141:18 154:5 156:10 166:14 166:18

**meaning** 168:25

**means** 41:25 55:15,18 74:11 74:18,22 102:8 164:9

**meant** 75:14 118:18

**medicaid** 5:4 13:17,23 14:2,5 14:6,13,24 15:1 15:2,14 16:3

17:6,14,15,17
17:19 20:8,14
20:19 21:2,3,6,7
21:15,16 22:2
22:11,19 30:11
30:11,12,19,21
31:1 33:10,16
33:18 35:15,18
36:8,17 37:7,23
38:2,6,14,14
41:24 42:6,18
42:25 43:3,9,13
44:1,2 45:1,10
47:3 48:6,11
49:20,22 50:3
51:2,11,12 53:1
54:12 55:10
56:4,8,13,15,17
56:21 57:2,18
60:7,13,14,21
60:23,24,25
61:10 62:13,14
62:23 63:10,18
64:17 65:3,9
66:10,20 67:5
68:13 70:13,14
72:7,11 73:16
73:24 76:12
78:5 82:9 83:9
83:14 92:5 94:7
94:15 95:9 98:3
98:6 99:23
100:4 101:3
103:11 109:12
110:6,10 111:23

119:10 125:2
128:24 129:5,10
129:12 130:19
153:18,19,23
154:9 158:4,7
158:15,17 162:4
162:6,8,13,18
162:22 166:12
167:8,15,19,23
170:21
**medicaid's**
42:13
**medical** 8:16
32:14,15,17
39:11 40:8
47:15,19 58:5
58:12,19 59:13
59:17 61:19,20
61:23 62:4,17
63:7,13 64:18
65:20 99:2
105:24 127:13
130:22,23
168:15,17
171:12
**medically** 57:15
58:5,9 59:12
62:11,15 63:1
66:11,15,19
**medicare** 42:16
73:19 153:23
**medications**
12:15
**meet** 12:23
29:17 34:21

57:1 71:22,23
75:20,23,25
76:2 130:22
138:21 162:22
**meeting** 41:1
76:15,23 81:25
82:21 83:2
105:21 114:19
114:25 115:4
120:11,21
122:19 124:25
125:18 131:16
131:20 146:9,11
148:6 159:11
**meetings** 28:13
28:14 29:7,17
39:20 76:24
82:1 117:1
118:7,18 122:23
126:14
**meets** 21:17
33:19 63:12
105:15
**member** 42:19
**members** 29:24
95:12 107:15
147:24
**memo** 159:19
**memorized** 8:17
**memory** 12:16
115:11
**meno** 32:6,17,24
106:1,2,14
**mention** 104:18
104:20

**mentioned**
38:11 79:2 91:1
92:2 111:25
145:25 153:16
155:5
**mentions** 53:23
172:8
**met** 12:22 41:18
41:21 73:17
83:15 86:8
115:7 131:23
**meter** 4:19
103:2 134:9,17
135:16 136:5,20
136:22 137:3,13
**meter's** 136:18
**method** 62:23
109:11 110:5,9
**methodologies**
38:1
**methodology**
22:7,9
**meyer** 16:11,22
38:17 82:18
**meyer's** 16:14
17:2 38:21
**mfmp** 137:14,15
**miami** 2:16,20
7:8
**middle** 65:8
**milk** 34:11,11
39:25
**million** 6:16
**mind** 19:12
48:14 115:19

**minimum** 74:5
74:16,22
**minute** 106:20
**minutes** 12:24
126:14
**mma** 168:9,11
168:14
**mmis** 76:12
**model** 21:1 42:5
**mol** 4:21 103:2
132:22 133:7,9
134:10 136:5
137:4 141:16
142:8
**moll** 135:16
**monique** 93:21
**monitoring** 41:4
57:3
**monitors** 38:6
**monroe** 3:7
**moore** 166:23
167:2,3
**morning** 7:2
**move** 7:18 12:4
85:2
**moved** 19:5
**moving** 19:10
50:21
**multiple** 51:19
51:20,23 52:1
**music** 13:4,5
**mute** 7:12
**muted** 6:25

**n**

**n** 2:1 3:1 4:1 5:7
6:1 59:8
**nai** 24:23 84:3
**name** 11:7
12:18 88:7
113:11 133:6
172:8 179:23
**named** 24:23
134:17
**names** 24:20
53:6 86:9
132:14
**narrowing**
152:2
**national** 3:2
**nature** 40:8
133:22
**necessarily**
78:16 89:16
**necessary** 57:16
58:5,9 59:13
62:11,15 63:1
66:11,15
**necessity** 47:15
47:19 58:6,12
58:19 59:13
61:19,20,23
62:4,18 63:8,13
64:19 127:13
130:22,23
**need** 10:9,11
11:20 12:9,10
18:7,8 25:16,18
64:25 71:8 73:9

99:15 101:1
139:6 143:15
167:3 169:3
**needed** 18:5
33:10 35:5 37:3
85:6 112:22
138:8 154:14
155:20,21
156:25 165:11
**needs** 21:22
36:1 51:8
105:10 160:24
**negotiated**
143:20 144:4
**negotiation**
28:24
**negotiations**
72:19
**neither** 149:7
**neutral** 33:6
**neutrality** 33:15
151:1
**never** 106:15
128:23
**new** 31:15,23
32:1 38:21
52:13 83:11
100:8,17
**nice** 121:20
**noise** 7:14
**non** 5:2 169:16
**norethindrone**
73:14
**normally** 127:6
146:6 168:14

**north** 3:4
**northern** 1:1
13:6
**northwest** 2:7
2:11
**notary** 176:6,16
177:5
**note** 61:17
102:16 167:10
178:10
**noted** 168:9
**notes** 36:22
177:10
**notice** 4:11 7:24
8:4 20:10
120:17 124:11
124:16 125:3,5
**noticed** 119:13
124:12
**notices** 117:2
**notification** 4:7
**notified** 81:24
169:13
**notify** 112:17
**notifying**
112:17 113:24
**number** 7:8,19
7:21,23,25
14:22 64:20
128:10 171:16
**numbering**
92:17
**nursing** 19:16
56:9,16

**[o - okay]**

| **o** |
| --- |

**o** 5:7 6:1 73:12
**oath** 4:4 176:1
**object** 9:8 10:7
  21:9 48:20
  54:25 55:16
  57:20 58:3
  61:21,25 62:5
  71:2 73:20 78:7
  91:6 99:12
  100:6,21 101:14
  108:17 111:12
  123:14 125:12
  126:18 131:17
  136:21 138:17
  139:8,12 140:2
  140:20 142:3
  144:7,17 149:4
  150:1,7 151:3
  152:22 158:1
  159:20 161:10
  165:15 174:21
  175:1
**objecting** 10:15
**objection**
  126:23
**obligation** 49:6
**obtained** 143:8
**occurred** 81:8
  97:5
**occurrence**
  103:10
**occurs** 118:11
**odd** 64:9,9

**office** 81:22,23
  82:2 93:7 147:1
  147:4
**officer** 39:12
**official** 42:22
  92:6 97:4,6
**officially** 13:20
  51:9
**oh** 64:21 98:21
  149:10
**okay** 6:14,18
  7:10 8:18 9:1
  10:17 11:1 12:1
  12:7,15,23,25
  13:2,21 14:25
  15:4,20,22 16:2
  16:24 17:6,9
  18:17 19:18
  22:2,17 23:13
  24:15 25:12
  27:14 28:4 29:1
  29:4,12,15,19
  30:3,25 32:23
  34:15 35:9,17
  36:11,22 37:5,8
  37:16 38:11,23
  39:1,7 40:10,21
  41:14,23 43:14
  43:16,17,19,24
  44:11,16,20
  45:8,22 46:1,10
  46:21 47:7,10
  47:14,23 48:7
  48:18 49:6,9,14
  49:19 50:14

51:13,18 52:8
  52:16,25 53:9
  53:19 54:4,8,23
  56:7,12,15
  58:12,20 59:20
  60:19 61:7,17
  63:21 65:14
  66:6,18 67:4
  68:11,19,22
  69:20 70:6 72:3
  73:1,7,11 74:3
  74:14 75:17,24
  76:20 77:3,9,18
  77:23 78:10
  79:2,22 80:4,7
  80:19 81:17,21
  81:23 82:12,15
  82:18,21 83:6
  83:15 84:8
  85:20 86:11
  87:23 88:10,13
  89:4,19 90:16
  91:12 92:11,14
  92:24 93:16,20
  93:25 94:21
  95:2 96:1,4,22
  97:12 98:1,8,22
  99:20 100:24
  101:19 102:15
  102:15,23 103:1
  103:10,19,23
  104:5,16,22
  105:9 106:9,16
  107:3,15 108:11
  109:11 111:1

112:7,9 113:17
  113:25 114:4,10
  114:15,19
  115:11 116:9,17
  117:6,11,19
  118:12,16,22
  119:4,17,25
  120:22 121:11
  121:22 122:13
  122:24 123:8
  125:2,9 126:12
  126:16 130:4,12
  130:16,19 131:1
  131:20 132:3
  133:13,19 134:5
  134:14,18 136:1
  136:4 137:10,17
  138:6 140:23
  141:14 142:1,11
  142:16 143:3
  144:5,11 145:10
  145:25 146:11
  148:11 149:13
  151:9 154:16
  155:5,11,16
  156:10,10,13,24
  158:15 160:20
  161:2,7,19
  162:2 164:10,17
  164:25 165:19
  167:6,9 168:1
  168:13 169:11
  169:15 171:2,15
  171:18,22 172:3
  172:7 173:13

174:14,20
**old** 52:12
  117:10
**once** 25:19
  34:16 112:9,15
  114:25
**ones** 23:16
  37:19 131:25
  162:11
**ongoing** 71:25
**onus** 115:23
**opened** 48:15,16
**operate** 49:13
  122:25
**operating**
  104:16
**operationally**
  74:7
**operations** 17:5
  38:5,16 44:3,8
  44:21 45:5
  76:11 85:3
**opportunity**
  78:18
**opposed** 152:10
  152:15
**option** 123:12
  123:22
**optional** 105:16
**order** 15:1
  21:22 26:7
  62:14,25 66:10
  99:15 102:7
  130:21 139:19
  139:19,20 164:5

175:14,18
**ordering** 178:15
**organization**
  46:14
**organizations**
  46:11
**organize** 69:23
  76:25
**original** 99:14
  133:25
**originally** 39:25
**outline** 17:22
  30:9
**outlined** 29:14
  42:10 70:5
  118:8 129:1
  144:19,20
**outlines** 14:23
  109:25
**outpatient**
  145:5,20
**outside** 79:11
  91:17 96:14
  98:17 113:19
  125:5 127:2,6
  127:10,15,18,21
  127:25 135:4,7
  135:13 137:21
  139:7,11,15,21
  139:24 140:11
  141:1,7 143:13
  146:8,10 152:6
  158:25 159:14
**overall** 33:2

**oversee** 17:14
  17:18,20 22:20
  28:13,15,17
  57:2 101:5
**overseeing** 44:1
  69:5 101:7
**overseen** 71:17
  113:5
**oversees** 23:5
  38:7 39:1 44:4
  76:8 140:23
  141:3
**oversight**
  145:12
**overwhelmed**
  85:8
**own** 42:6,13
  44:11 45:9,16
  47:24 58:5 64:2
**owners** 44:25

**p**

**p** 2:1,1 3:1,1 5:7
  6:1 8:13
**p.m.** 1:12
  175:20
**pa** 74:4,6,10,12
  74:14,17
**pace** 14:7
**package** 38:3
  95:1 97:8,10,19
**page** 10:1 19:24
  54:9 55:2 59:4
  64:20,22 65:7,8
  65:15 66:9,9
  74:3 94:6,14

103:7 121:24
132:20 149:8
159:25 160:6,9
179:4,7,10,13
179:16
**pages** 7:20
  64:14 65:12
  160:3,15 177:9
**paid** 125:25
  126:3 141:1
**pam** 45:7
**pandemic** 93:6
**panel** 159:5,15
**papers** 7:17
**paragraph**
  143:6
**parameters**
  21:23 44:17
  47:2,7,8,16 58:8
  172:21
**pardon** 73:8
**part** 17:25 19:8
  25:25 31:21,24
  32:12 35:19
  38:3 58:7 60:10
  62:11 70:4
  79:20 82:3
  83:13 84:4,14
  99:13 100:10
  102:17 115:24
  122:15 133:11
  134:22 136:23
  139:18 140:7,10
  141:10,12,14
  145:17 146:3,4

151:24 157:14
**participate**
117:1 124:25
127:21 136:2
159:15
**participated**
124:1,2,3
125:17 159:1
**participating**
110:1
**particular**
111:5,9 161:9
**parties**  5:9
177:12,13
178:15
**partners**  14:6
31:25
**past**  25:22 26:18
48:10,13 81:11
87:4 91:2,5
156:3 157:18,21
159:4
**pay**  21:16
141:24
**payment**  142:8
**pays**  20:23
**pbm**  28:18,20
29:1
**pbms**  28:23
**pdf**  72:12
**pdl**  72:21 73:2,4
73:15,18,23,25
**pdl.pdf.**  72:12
**peer**  65:19

**penalties**  179:20
**pending**  75:9,12
75:13 90:13
114:5,18 115:20
116:5
**people**  11:20
23:3 24:20
40:21 52:8
70:25 81:18
88:3 123:13,19
123:24 124:19
124:21 132:8
147:8,12,19
166:6
**period**  172:14
**periodic**  11:3
**perjury**  179:20
**perko**  3:6 9:8
10:1,7,13,15,19
21:9 45:17
48:20 54:25
55:3,7,12,16,25
57:20 58:3
61:21,25 62:5
64:20 65:4 71:2
73:20 78:7
88:14,17 91:6
94:11 98:23
99:12 100:6,21
101:14 106:21
108:17 111:12
123:14 125:12
126:18,23
131:17 135:10
136:21 138:17

139:8,12 140:2
140:20 142:3
144:7,17 149:4
149:12 150:1,7
151:3 152:22
153:1,3,6,13
155:23 158:1
159:20 161:10
164:14 165:15
172:24 174:21
175:1,3,10,19
**permission**
141:6 142:11
**person**  6:24 7:5
7:11 24:12,23
59:21 60:1
82:14 95:5,6,9
121:7,7 123:23
123:25 141:3
144:25 145:9,11
148:2 151:9
154:11
**person's**  8:21,22
16:12
**personal**  19:15
98:12
**personally**
30:24 48:3 55:1
125:8 127:17
132:16 138:19
146:17,25 147:3
147:15 150:10
154:1 176:7
**persons**  124:6

**pertaining**
18:15
**petersen**  136:6
**peterson**  23:18
24:15 41:1
54:21 66:1 67:1
67:12 68:16,19
74:21 88:9,10
99:19 167:7
169:8 170:9
**pharm**  72:12
**pharmaceutical**
110:13
**pharmaceuticals**
29:10
**pharmacist**
29:20,22 30:3
**pharmacists**
24:17,18 27:19
29:25 65:25
66:2,7
**pharmacy**  23:19
24:16 25:2,3,13
25:21 26:2,19
27:6,18,20,22
28:11,15,17,21
29:7 31:8 37:12
37:13 50:2 54:6
68:18,22,24
69:4,6,10 74:1
157:9 163:20
167:7,15
**phone**  6:20,23
**phones**  7:13

phonetic   23:4
  23:24
phrase   9:2,14
  10:3,5,23 50:10
pick   85:13 86:8
picking   86:5,13
pickle   5:1 23:21
  25:1 84:3,10,11
  84:19 85:23
  86:3 89:25 90:4
  97:2 98:11
  103:22 104:13
  132:7 140:1
  141:22,23 142:2
  170:6,11
pillsbury   2:14
  2:19
pilsburylaw.c...
  2:17,21
pittman   2:14,19
place   1:13 81:21
  137:16
plaintiff's   4:10
  8:6 9:20 59:1
  64:11 77:25
  92:21 94:2
  103:4 104:25
  133:1 149:21
  166:3 169:24
  170:1,17
plaintiffs   1:5
  2:5,9,13,17,22
  3:5 11:8
plan   14:6 18:1
  26:6 30:10,11

32:3 33:3,14
  38:4,15 41:24
  42:9,17,25
  43:24 44:1,3,7,8
  45:5 51:12
  56:11,17 63:12
  78:15 79:24
  83:16,19,21
  84:4 105:17
  113:12 131:12
plan's   45:2
planned   44:20
  127:9
planning   120:13
  121:12,14
plans   42:3,6,11
  42:12,19 43:6,8
  44:5,10 48:23
  48:24 49:12
  62:17 72:18
  73:4 78:14 79:2
  112:18,18 113:1
  113:24 129:24
  129:25 130:1
  169:11 171:12
  172:13,15 174:6
  174:14
plays   50:2
please   11:24
  12:10 21:11
  178:12
pmt   72:19,23
pnt   28:13 29:8
  69:4

point   35:15 44:9
  45:3 88:18
  94:23 107:25
  114:12 131:23
  138:3 154:11
pointed   160:21
polacheck   23:4
  24:3
polices   18:19
policies   17:21
  18:3,4,20 19:13
  19:14,19,20,23
  19:25 20:1,2,3,8
  20:9,12 22:18
  22:25 25:13,15
  27:23 28:9,15
  30:8,9,13,18
  31:11,16 42:7,8
  42:13,14 44:12
  47:8 48:19,24
  49:1,3,7 51:18
  51:19,20,25
  52:4,19 53:1,12
  53:15,20 54:5,7
  57:1,3,8,11
  59:25 60:3 61:5
  61:14 62:9 63:6
  68:3,10,23,25
  69:14,17 70:1
  76:8 100:8
  101:4,6,9,12
  105:22 121:10
  128:5,12 145:2
  145:13 157:10
  161:14,15,17,19

161:20,22
  163:10,14
policy   5:2 13:18
  13:23 14:2,13
  14:15,17 17:7
  17:14,15,20
  18:2,16,25 19:6
  19:6,10,15,16
  19:17 21:20
  22:1,16 23:19
  24:16 25:3,3,17
  27:20 28:11
  30:23 31:8 32:9
  37:7,12,13
  38:16 39:19
  42:23 43:13
  47:11,13,18,20
  48:11,15 51:22
  52:5,12,23 53:8
  53:11,16,17,21
  53:24 54:1 57:2
  57:5,9 58:17
  59:9 60:6,10,13
  60:18,18 61:9
  61:13 62:10
  63:4 64:15
  65:21 66:16
  67:17,25 68:7
  68:18 69:8,23
  70:14 71:4,10
  76:9,9 78:5 82:9
  83:9,14 92:6
  93:1 94:7,15
  95:9 98:18
  99:15 101:1,3

103:12 109:14
109:16,21,24
112:1,1 116:24
117:17 119:10
121:1 128:20,25
129:3,8,15,20
130:4 144:19,20
144:22 155:25
156:2,23 157:1
157:5,14,25
160:3 161:11,12
161:24 162:1,3
162:4 163:17,20
167:8,15,16,23
169:16,18 171:9
171:16 172:3
173:7
**portion**   10:6
**portions**   63:12
**portrayal**   65:2
**position**   13:7,16
15:4 16:14,17
16:18,19,23
23:21 24:13
25:6,12 38:21
39:4 70:13,17
82:6,10,15,17
82:19 84:18
101:23 107:23
108:3,6,8 122:9
167:22
**positions**   15:22
15:25 16:2,5
86:20

**possession**
123:5
**possible**   74:14
88:22 95:25
129:9,12 134:4
**possibly**   77:14
109:23
**posted**   124:12
166:8,16
**posting**   124:16
**potential**   71:9
**potentially**
124:17
**practice**   60:17
**preceding**
128:17
**predetermined**
65:17
**preferred**   72:13
72:14
**preliminary**
6:15
**prepare**   12:20
95:2,10
**prepared**   93:20
93:21,22,23
94:23,25 95:16
96:16
**prepares**   95:5,7
95:9
**prescribed**
54:12 55:10
66:18 72:11
108:25

**prescription**
23:23 25:19,25
26:9,12,20
27:22,23 28:1
29:23 30:16
49:23 54:4,7
65:3,10,15
66:24 68:11,20
69:7,11,13 70:7
83:21 85:1 96:5
96:10,15 99:4
99:10 108:12
109:4,7 131:24
138:2
**present**   121:4
**press**   160:17
**pretty**   138:11
160:11
**preventative**
23:6
**preventive**
145:23
**previous**   86:21
87:2,2 89:22,25
91:2,11,15,20
117:14 122:9
**previously**
18:24 38:19
84:12,18 90:12
90:24 100:5
107:19 172:18
**primarily**   22:24
28:12 70:18,19
71:19 75:22
84:13,18 85:7

85:17 93:7
118:9
**primary**   8:23
23:6 26:11
28:18 37:24
70:22 84:25
145:23 148:5
163:6
**printed**   92:17
**prior**   13:21
14:11 15:7
36:18 37:22
46:20,21 47:4
49:19 62:18
63:18 66:21
68:12 74:13
82:10,21 93:6
128:4,7,11
138:24 139:11
143:9 147:11,16
147:20,25
148:14 150:5
159:2
**priorities**   82:4
**priority**   76:17
77:1
**private**   19:16
56:9,16
**probably**   6:16
7:21 8:17 13:9
37:23 84:23
99:19
**problem**   11:17
11:23 12:11

procedure
  104:17 178:24
  178:24
procedures  99:2
  121:14 145:3
  163:5
proceed  77:14
process  15:18
  30:25 31:4,5,7,9
  31:10,20,24
  33:11 35:6,7
  36:19 39:17
  40:5,7,15,20
  41:7,11,19,20
  41:21 43:25
  47:5 49:14 50:8
  50:13,14,17
  51:15 52:4,24
  60:10 62:18
  63:3,17 66:8
  69:5,9 70:4,6,12
  70:16,18,20
  71:1 74:10 77:4
  77:7,8,10,12,16
  77:18 78:21,21
  78:24,25 79:10
  79:15,20 80:5
  83:22 84:7
  86:22 92:7,10
  92:12 98:2,2,5
  98:13,14,16
  100:10 102:23
  104:11,14,17
  105:8,19 106:3
  106:3,16 107:11

107:13,22,25
108:1,9,12
109:18 110:14
110:15 112:10
112:16,17,19
113:17,18,25
115:15 116:14
116:17,21 117:1
117:3,18,21,21
118:8,10,21
120:13 121:13
121:16,17,21
123:2,3 125:6
126:9 131:14
133:12,19 134:3
134:22 135:19
136:24 140:4,7
146:5,6 149:3
149:25 150:11
150:14 151:7,25
152:9,14 156:4
169:5,6 174:18
174:25
processes  75:5
produced  176:9
production
  111:2
products  32:6
  106:8
professional
  8:16
program  3:2
  14:1,4,8,12,15
  14:17,17,24
  15:24 17:17,24

18:2 22:19 23:2
23:14,18,24
25:19 26:1,5,8
26:12,17,21
27:24 28:2
29:23 37:23
39:2 47:3 49:24
52:20 60:13,14
65:16 67:5
74:10 76:12
85:1,4 96:6,11
99:23 138:2
168:18
progress  116:2
project  2:2 41:3
  136:23 143:9
  145:18
projects  26:25
  27:3 28:3 41:2
  71:24
promise  87:20
promulgated
  17:21 19:1,7
  20:9 25:14,15
  51:18 58:6,16
  119:11
promulgates
  17:18
promulgating
  31:10,21 52:23
promulgation
  14:7 15:18 16:6
  17:18 35:6
  51:15 116:25
  117:18,20

156:17
proposal  26:5
  34:22 161:3
proposed  36:3
  40:2 52:7
  118:11,14
  119:13 121:6
prospective
  63:4
protocol  122:25
  122:25
protocols
  121:11
provide  18:9
  31:1 40:7 42:4
  42:11 56:3
  57:15,17 58:1
  69:19,24 71:25
  133:9 134:5,18
  147:20,24
  172:14
provided  20:24
  63:5 100:14
  130:2 133:11
  134:23 138:13
  138:13,21,22
  147:8,12,16
  162:21 168:23
provider  14:17
  21:21 76:9
  117:2 124:10,17
  170:12,13,23,25
  171:18 172:1,4
providers  18:5
  18:7 20:23

21:24 113:2
124:10 129:6
170:15
**provides**  18:6
20:17
**providing**  12:1
129:7
**provision**  38:7
57:4 161:5
172:17
**puberty**  158:5
158:16 163:19
168:22
**public**  19:20
20:2 28:13 29:7
99:21 100:1,1,3
100:25 102:6
112:17 113:1,22
117:1,6 118:7
118:18,19,19,22
119:4 120:8,10
120:11,21
122:19,23
123:10,13,18,20
124:7,12,16
125:3,5,11,18
125:21,24
126:13,21 147:8
147:12,16,20,24
147:24 151:17
159:6,11 164:11
164:21 165:2,6
176:6,16 177:5
**public's**  100:19

**publicly**  166:8
166:16
**pull**  64:1 149:14
**puro**  32:6,17,24
106:1,2,14
**purpose**  61:18
61:20,24 62:3
174:20,24
**purposes**  67:6
67:10 110:17
**put**  34:23,24
35:22 58:23
121:24 131:25

**q**

**qio**  46:15 49:12
49:17 63:16
109:17,19
**qio's**  49:15
**qios**  46:11 47:23
48:1,18 49:9
62:21
**qualified**  66:21
**quality**  38:6,16
46:10,14 48:6
82:9 167:21
**quarterly**  29:17
**question**  11:13
11:15,17,24
12:7,13 19:19
20:5 21:4 39:19
42:24 43:10,23
43:25 44:6 45:8
50:19,25 51:21
54:3 56:22
57:25 61:12

66:4 67:13,23
71:12 82:25
91:13 95:8 98:4
98:18 100:10
102:2,10,18
110:8 111:8
115:5 119:6,8
127:4 128:14,16
128:17 129:18
130:9,13,13,16
130:17 139:13
142:20 147:9
163:11,19 165:4
173:16 174:12
**questioning**
6:17
**questions**  27:1,2
29:19 41:4
43:17,21 98:16
98:25 143:22,23
144:5,9 161:4
175:10
**queue**  115:22
116:8,10
**quick**  88:20
**quickly**  52:25
134:4 160:20
**quintan**  134:17
**quinton**  137:13
**quite**  8:10 17:1
156:20

**r**

**r**  2:1 3:1 6:1
73:12 179:3,3

**raised**  152:14
**range**  126:14
**rates**  37:25
**reach**  40:15
124:14 154:7
165:13
**reached**  131:15
**reaches**  112:9
**reaching**  151:1
**read**  7:17,19
33:22 54:2 55:4
55:8 64:25
65:12 92:18
99:9 128:15,17
175:11,13 178:8
179:20
**reading**  5:10
67:8 102:5
167:3
**reads**  74:4
**ready**  97:8
114:11
**real**  88:20
121:20
**really**  31:2
39:18 41:2
61:11,16 86:25
115:23 123:15
126:24 141:10
165:17
**reason**  12:9
52:13 68:3 75:1
96:1 103:10
115:20 138:10
138:15 156:25

178:10 179:6,9
179:12,15,18
**reasonable**
178:17
**reasons**  104:8
**reassignment**
162:25 163:12
**rebate**  28:24
72:18
**recall**  26:24
43:5 52:17
53:12 58:15
62:19 78:17
79:22 80:21
90:6 113:23
127:22 137:25
139:23 140:3
144:12 148:6,20
149:5 151:23,25
152:4,16 153:20
157:19 163:15
169:14 172:15
172:21,23 173:2
173:21,24
**receipt**  178:17
**receive**  18:9
21:24 60:25
81:7 126:17,22
**received**  79:10
79:16 82:22
83:1 100:15
101:21 102:3
103:12 114:25
131:1,5 160:8
168:24

**receives**  77:11
**receiving**  81:10
81:11 138:24
**recent**  16:16,25
19:9,11 32:1
37:21 38:11,12
39:23 79:25
80:9
**recently**  32:6
48:15
**recess**  46:3
90:22 106:22
143:17 175:7
**recipient**  21:17
30:22 49:23
57:18 62:13
168:25
**recipients**  14:24
18:5 60:25
110:1 125:3
**recitation**  66:23
**recite**  108:23
**recognize**  72:4
92:24 105:3
**recommendati...**
34:23 64:8
106:12
**recommendati...**
72:24
**recommended**
72:19 104:9
**record**  12:5
52:16 55:3
177:10

**recount**  115:13
115:19
**refer**  62:9
**reference**  10:14
13:11,12 42:9
47:13,21 48:24
57:12 58:21
62:10 165:25
**referenced**
91:21 105:20
178:6
**referencing**
153:15
**referred**  91:17
**referring**  10:4
10:24 28:24
65:12 92:10
116:18 118:1,4
130:13 155:8
168:20 169:7
170:11,23
172:10
**refresher**  11:12
**refusing**  79:15
**regard**  178:19
**regarding**  26:2
34:10 48:1 53:1
59:23 60:18
61:12 68:18
121:12 128:5,12
129:20 130:5
131:2 137:14
157:21 158:23
160:6 161:4
170:25

**regardless**
62:23
**registration**
137:14
**regular**  83:22
**regularly**  71:23
72:1 75:25
**regulation**
57:12 68:4,6
**regulations**
33:19 60:12,20
64:16,17 74:1
101:25 111:22
**reimburse**
20:19
**reimbursed**
18:7,8 21:22,25
66:10 68:12
126:4 129:7,12
136:1,6,15,16
**reimbursement**
17:23 19:25
22:7,9 34:13
50:12,14 62:12
134:19 136:19
137:21 138:10
138:12,16,25
144:3 174:1
**reimburses**
20:23 162:6
**related**  14:25
18:2 25:21 26:2
26:19 27:6,15
30:12 53:24
68:22 80:10

89:15,19 91:5
91:16,23 96:8,9
114:20 116:13
129:9 136:7
137:24 142:16
149:19 150:21
154:8,18 155:7
156:22 157:10
163:7,14 168:7
**relates** 59:24
110:23 113:8
**relating** 30:4
169:16
**relation** 16:18
**relative** 177:11
177:13
**releases** 160:17
**relied** 60:5 62:8
139:1
**relies** 20:4,13
54:18 109:11
110:5,9
**rely** 19:3 40:6
47:24 60:9
62:17 139:7
166:11
**relying** 139:24
140:5
**remember**
14:19,22 25:7
31:18 41:22
42:22 53:6 81:2
81:13,16,19
82:1,3,5 85:22
93:14 97:18,21

97:23,25 102:18
104:21 106:11
112:14 113:10
113:15 114:17
115:2,16 116:3
116:12 119:24
120:2,6,12
131:4,7,8,22
132:9,14 133:25
134:2 136:14
138:3,4 139:5
142:4,9,13,22
143:1,2,3,5,23
144:9 146:3,9
146:11 148:9
152:7,18 153:2
153:11 155:13
157:3 159:3
160:1,19 161:23
165:9 173:4
**remind** 45:6
117:11 153:14
**repeat** 50:25
51:21 56:22
60:4 68:4 82:25
91:13 95:8 98:4
110:8 111:8
114:23 119:6
127:4 128:14
129:18 139:13
141:2 142:18
147:9 163:11
165:4 173:16
**rephase** 21:12

**rephrase** 11:16
**replaced** 88:7
**report** 4:14,17
23:2,15 27:13
27:14,14,19
28:5 44:25
63:22 64:7 66:4
71:15 79:25
80:9,10 82:2
83:23 85:14,18
90:18,25 92:11
93:23 94:9,16
95:2,7,11,13,16
96:1,2,7,11,16
97:3,11,12,15
114:20,21 115:4
115:8,9,12,14
115:18 116:2,4
116:13 132:10
133:21 135:14
135:24 139:20
139:25 140:10
140:24 141:4
143:13 145:15
146:2,4,16,23
147:1 148:3,7
148:13,18,23
149:19 150:16
151:15 152:12
152:19 154:17
155:7,9,12,22
177:7
**reported** 1:16
**reporter** 4:5 6:2
8:12 11:22 12:4

13:9 64:3
128:15,18
165:25 175:11
175:14,17 177:1
**reporting** 38:15
38:16,19 44:24
**reports** 23:12
23:15 71:21,23
75:17 97:17,20
113:4 115:20
116:5 151:10
157:21
**represent** 11:7
**request** 4:18,21
26:7 34:7 47:4
49:22 62:13
77:11 78:4,6,10
78:16,19 79:3,3
79:5,11,23 80:1
80:13,15,20,22
80:23,23 82:22
82:24 83:1,4,6
83:17 84:5,5
87:4,8 90:13
98:15 99:21,23
100:1,4,15,19
101:21 102:6,11
102:14 103:12
103:19,21 105:7
107:7 113:12
114:25 129:16
129:22,25 130:1
130:1 131:1,5
133:5,15 134:1
137:21 138:24

139:3,4 141:15
151:17,18
168:24
**requested** 47:1
78:20 80:5
143:22 177:8
**requester** 52:14
**requests** 30:22
86:21 87:2,3
91:4 103:13
104:2 108:15
114:4 168:5
169:2
**require** 15:13
15:16 16:2,5
63:18 68:12
139:21 140:1,18
156:18 168:5
**required** 43:12
45:13 58:10
61:4 65:16 74:4
74:6,17 141:17
141:23 142:1
159:9
**requirement**
57:14 58:13
59:14 60:24
61:2,5,8 62:12
130:24 139:10
153:17 160:24
172:13,22
**requirements**
42:10 44:7 49:2
57:6 68:4 69:3,3
105:21 110:20

110:22 162:23
**requires** 69:8
**rescue** 160:8,18
**research** 26:25
27:3,13 33:21
60:18 66:4,6
77:5 78:5 79:12
83:22 99:16
140:6 145:17
**researching**
70:8
**reserved** 5:11
**resource** 40:12
**resources** 42:20
**respective** 5:9
**respiratory**
121:2
**respond** 159:6
161:3
**responded**
142:19
**responding** 12:7
**response** 130:16
**responsibilities**
14:3,14 17:13
22:17 25:13
26:19 29:13
34:17 56:25
70:1 76:4,14
92:2 115:24
116:20,23
117:15 121:25
122:20
**responsibility**
17:25 26:11

70:23 84:25
101:16
**responsible**
14:4,16 17:15
22:20,24 41:8
43:7 59:20,22
70:11,16,18,20
71:19 75:22
76:7 84:13,18
84:19 85:7,17
96:20 101:4,7
101:11 104:9
121:1 145:1,12
145:23 151:10
**restrictive** 48:25
**retain** 135:3,7
**retained** 159:14
**retaining**
135:13
**returned** 178:16
**returning** 93:7
**review** 12:25
29:5 35:23 36:7
40:19 43:15,21
45:1,19 49:22
60:11 63:12,14
63:15 78:16,19
78:20 84:7
97:22 101:24
114:16 116:24
117:2,6 138:8
138:15,19
156:18 157:17
157:21 164:18
177:8 178:7

**reviewed** 35:22
42:19 44:19,24
65:19 66:13
92:7 96:23 97:2
97:16,17,20,23
97:25 164:21,22
**reviewer** 92:9
**reviewers** 92:8
**reviewing** 34:17
36:12 39:19
45:25 65:8,14
69:7 165:1,6
**reviews** 35:23
**revision** 52:10
**revisions** 52:6,9
**rh** 1:3
**richmond** 2:3
**rick** 87:21
**right** 37:3,14
52:11 55:21
58:25 59:3
72:10 85:14
89:16 90:14
114:1 115:12,14
116:5,6,8,10
117:16 123:12
125:19 128:2,8
130:14 131:5
140:14 149:8
164:3 166:14
167:4 168:18
170:4 173:6
175:5
**rivaux** 2:14 7:2
7:3

**role** 8:23 13:19
 13:21 14:9
 15:11,13,16
 16:9 17:2,3,12
 41:20 44:22
 50:2 72:23 73:1
 117:10,12
 119:17,18
 135:21
**roles** 117:14
**room** 99:25
**rothstein** 11:8
**roughly** 131:7
**route** 93:3,15,16
 156:18,19
**routed** 35:7,10
 115:25
**routinely** 76:3
 76:20,23
**routing** 4:16
 35:6 77:7 92:2,7
 92:10,11,15
 93:1,8,11 94:7
 94:15,25 95:6
 95:10 96:7,12
 96:20,23 97:4,6
 97:8,9,13,19
 141:19 142:10
**rubin** 24:21
**rule** 4:12,13,15
 9:14 10:6 14:18
 14:18,20,22,23
 15:19 16:6
 17:19,22 19:1,7
 19:8,10 25:18

27:9,10,11
31:11 35:6 36:1
36:3 37:2 47:9
47:10,16,22
48:15,16 51:14
53:2 54:5,6 58:7
58:21 67:17
68:1 70:5 77:7
77:19,20,24
98:19 99:1,7,9
99:14 100:19
101:17 102:13
105:20 109:16
109:25 112:2,7
116:25 117:7,25
118:3,9,11,13
118:13,23,23
119:5,8,11,13
119:13,14,19,21
120:6,14 121:12
122:1,4,7,8,13
122:15,16
123:19,20 124:7
124:13 125:4,9
126:17 127:2,6
127:9,20 128:3
128:8,11 133:21
134:11 146:4
154:24 155:9,12
155:18,20,21
156:17,25
157:17 158:22
159:4,25 160:1
160:4,5,5,7,22
161:4 164:19

165:1,3,6,8,10
165:11 173:14
173:17 174:5,7
174:8,15 178:24
178:25
**rulemaking**
 15:17 52:24
 116:17,21
 117:15,23
 121:21 132:10
 146:5 152:19
 153:5 155:7
**rules** 14:7 17:19
 17:20 20:10
 22:7,9 33:10,16
 33:19 37:2,5
 39:1,3 47:12
 52:22 60:12
 63:6 67:21 74:1
 101:8,12 105:16
 112:20 119:5,19
 120:3 123:5
 178:18

**s**

**s** 2:1 3:1 5:7,7
 6:1 8:13 73:12
 179:3
**save** 59:10
**saw** 106:15
**saying** 11:15
**says** 65:16 66:9
 67:4 74:17
 93:20 96:5
 99:25 103:11
 107:3 143:7

160:21 161:1
162:24 166:7
168:4,8,21
**scenario** 102:3
**schedule** 20:16
 20:17 21:3,6,16
 21:21 22:3,4,5
 22:12,15 29:17
 32:7,20,24
 33:25 34:3,14
 35:5 77:15
**schedules** 19:25
 21:19 37:25
 76:10,13
**scope** 46:18,23
 50:5,8 100:9,11
**scott** 87:21
**scratch** 73:17
**screen** 72:9,10
**screening** 11:4
**scroll** 9:23,23
 74:15
**second** 53:14
 56:23 73:8
 76:21 99:20
 101:20 102:5
 111:25 152:22
 155:5 175:6
**secondary** 8:23
 163:6
**secretary** 4:22
 16:21 17:4 36:3
 51:17 80:1,5,14
 80:14,16 81:6,7
 82:8,22 83:2

87:23 115:1
131:1 149:1,24
150:4,10,13
151:19,21
**secretary's**
83:17 84:5
**section** 14:2,4
14:12,15 23:5,7
23:9,18,20
24:19 90:11
96:4,11,19,19
96:20 129:2
161:14,23
162:18 167:15
**see** 9:13 33:15
73:11 79:15
83:6 89:5 93:25
100:12 109:9
150:20,21
**seeing** 45:24
53:12 54:14,15
171:24
**seeking** 26:14
**seem** 19:18 59:5
**seems** 115:5
138:11
**seen** 42:16,20
42:22,24 94:21
97:24 104:19
105:4 107:1
159:23
**select** 86:16
**selected** 90:4,5
**selection** 90:25

**send** 171:25
**sender** 166:25
**sending** 124:21
150:6
**senior** 15:9,23
16:7 87:24
**sense** 34:15
87:16
**sensitive** 90:8
103:12 133:13
133:14,16,22
134:6
**sent** 43:13 81:2
124:10,20,25
167:10 171:11
171:13,19,21
**sentence** 99:21
99:24 100:3
101:20 102:5,8
142:16 143:6
166:15
**separate** 18:20
69:25 82:4
149:15 169:23
**serves** 168:21
**service** 18:6,8,9
18:9,10,11,12
18:14,16,22
19:4 20:20,21
20:22,24 21:2,6
21:15,18,24,25
22:2 30:12,19
30:22 31:1,3,4,6
31:18,24 32:1,3
32:11,12,19

33:17,24 36:8
36:13 42:18
43:3,11,12 44:2
46:20 47:1
49:24 50:15
56:9,21 57:10
57:17,18 58:2,8
58:13 59:14,17
61:15 62:9,11
62:14,14,24,24
63:10,12,15
69:16,24 70:2
71:10 73:6 76:7
77:16 99:22
100:1,5,9,11,14
100:15,16,17,20
102:6,24 103:13
103:14 104:3,6
105:15,17
109:12 110:6,10
113:1,15 129:16
129:21,22 130:5
130:7,20,20,21
130:24 151:18
152:10 161:9,13
161:19,22 162:3
162:15,16,17,20
163:10
**services** 11:3,4
15:9 17:22
19:15,15,16
20:14 22:6,11
22:11,14 23:5,7
28:8 30:7,10
31:16 38:7 42:4

42:11 43:9
45:10 46:20,23
49:20,23 50:3
51:3 53:1,8,11
53:16,19 55:24
56:13,16 57:4
57:16 61:1 63:4
63:18 68:24
69:4,6,18 74:2
78:4,17 79:4,12
79:24 98:3,6
99:1 100:9
121:3 128:5,13
128:20,23 129:1
129:4,7,9,10,21
133:6,8 134:16
134:18,20
135:23 136:7,15
138:12,20,22
139:5,18 141:7
142:5,15 144:4
144:15,19 145:5
145:8,21 151:14
151:22 152:3,5
152:9,13,15
153:19,23,24
157:2 158:8,18
162:8,8,13,21
163:2,3 166:12
172:14,18
173:14,18 174:5
174:7
**session** 34:9
**set** 8:16 9:4 47:8
49:7 55:23

**[set - specific]**                                                    Page 219

122:18 128:7
152:9,14 158:23
175:8
**sets** 47:16
**setting** 37:25
**settings** 160:4
**seven** 172:24
175:3
**several** 26:25
36:1 81:14
84:16 101:22
122:8 132:4
166:6
**sex** 4:14 8:22,23
63:23 64:6
87:10 89:15
91:3 108:21
162:25 163:12
**sexual** 163:6
**shani** 2:14 7:1,2
**shani.rivaux**
2:17,21
**share** 72:9
**shared** 95:24
**shaw** 2:14,19
**sheeran** 3:11
**sheet** 4:6 178:11
178:13
**shevaun** 82:11
**shorthand**
10:12
**show** 123:20,25
**showing** 7:16
63:25 72:10

**shtml** 54:13
**sign** 5:4 51:9
103:23 136:18
170:22 178:12
**signatory** 36:4
51:8 92:9
**signature** 97:4,8
176:15 177:20
**signed** 35:8,10
36:1,15,17
51:16 75:16,18
97:3 103:18
104:1 138:14
143:2,4,12
171:17 176:10
178:21
**significance**
110:16 166:20
**significant**
74:23
**signing** 5:10
**silly** 115:5
**similar** 86:21
87:2,3,8 91:2,4
106:7 108:14
**similarly** 68:7
137:3
**simone** 2:6
149:17 166:23
178:4 179:1
**simone.chriss**
2:8
**simons** 167:2,3
**simple** 19:18

**simultaneously**
152:9
**single** 103:14
104:3,6 152:10
152:15
**sip** 26:2,3
**sister** 124:12,14
124:18,24
**sit** 45:23
**situation** 30:21
35:13 98:15
**situations** 34:2
**six** 23:15
**skills** 31:23
**slogan** 159:18
159:22 160:15
**small** 73:9
**smith** 1:16
176:6,15 177:5
177:20
**smmc** 5:2
169:15
**solutions** 178:23
**somebody** 89:12
**somewhat** 68:7
98:13
**sorry** 6:19 28:9
37:10 52:10
56:23 80:16
87:20 91:9
95:13 98:22
107:20 114:23
128:6 135:17
147:9 166:25
170:7

**sort** 156:14
**sounds** 61:3
**south** 3:7
**southern** 2:6,10
**southernlegal....**
2:8,12
**space** 107:3,4
**speak** 11:21
31:9 32:25
33:21 45:11
51:8 61:6,7,8
65:13,24 66:8
68:2 102:19
109:8 125:13
132:16 145:16
159:10 162:7
164:8 173:5
**speaker** 122:21
**speakers** 122:22
**speaking** 11:19
11:20 33:2
37:22 57:13
70:15 95:17
112:25 131:9
162:19 173:6
**speaks** 162:12
162:24
**specialist** 66:21
**specialized** 23:5
**specialty** 171:12
**specific** 17:9,22
18:22 19:24
22:8,8 26:24
28:15 31:18
32:9 33:1 34:10

35:1 36:9,14
39:18 40:4
41:22 43:5,22
43:22 45:9,25
47:17 49:1,10
52:5,25 53:5
54:3,6 55:23
57:9,10 59:21
60:1,8,8 61:12
61:13,14 62:9
69:17 70:9
71:10 74:24
76:8 80:21
92:25 102:2
119:14 120:6,25
124:6,19,23
128:19 129:3,25
130:1,3,5,10
134:23 136:24
137:13 142:13
142:22 147:19
147:23 151:6,18
152:18 155:13
157:6 159:8
160:1,6 161:14
161:20,22,25
162:3,15,21
163:10,15 165:9
165:18 171:11
172:15
**specifically** 27:8
41:16 66:3
68:22 69:12
79:11 80:2 84:5
95:21 98:7

121:15 124:15
126:5,6 129:1,9
129:23 152:4,7
152:16,20
162:25 170:7
**specifics** 31:2
65:13 78:24
110:4,12 157:20
164:8 169:13
173:24
**specify** 127:11
156:14 157:11
**spoke** 114:24
**spring** 167:24
**staff** 40:23,25
60:15 71:5
104:8 120:21
122:14 160:22
161:1,2
**stage** 75:17
118:10,11
**stages** 114:2,13
118:8,21 134:23
**stakeholders**
170:16
**stalled** 85:4
**stamp** 170:22
**stamped** 63:25
64:4,6 166:1
170:5 171:7
**stand** 26:3
28:20 29:9
74:12 168:14
173:10

**standard** 61:20
61:23 62:18
65:2,8 66:23
78:21,21 86:22
104:16 127:24
**standards** 8:16
57:1 65:17
**standing** 82:1
**stands** 8:10,15
168:11
**start** 6:19,22
7:22 15:20
22:22 55:9
96:23 99:19
155:17
**started** 6:17
**starting** 64:14
73:13 170:22
**starts** 64:15
65:7
**state** 12:18 13:5
14:6 20:23
30:10,10,11
32:3 33:3,8,13
33:19 51:12
56:11,17 57:15
57:17,25 58:4
60:14,24 105:17
122:6 125:9
127:1,5 146:14
159:5 174:6
176:3,6,16
177:2,5
**stated** 48:22
68:3 179:21

**statement** 55:22
62:10 65:20
67:8 71:12
103:15 104:2
**states** 1:1 26:6
141:16,17
143:24 170:9
**status** 116:2
**statute** 29:14
60:12 68:6
72:24 174:20
178:18
**statutorily**
26:13
**statutory** 69:3,3
**steering** 35:14
35:16
**stenographic**
177:10
**stenographica...**
1:16 177:7
**step** 131:9
165:12
**steps** 32:25 33:1
101:22 102:9,12
112:14 113:23
**sticks** 115:19
**stipulated** 5:8
**stop** 11:16 12:10
88:15
**straightforward**
138:12
**street** 2:3 3:3,7
**strike** 20:4 21:4
27:20 28:9 69:8

128:6 138:7
**structure** 37:22
38:12
**structured** 68:7
**subject** 52:20
61:14 76:22
120:20,22 121:9
126:2,4,7
128:13 144:14
144:21,24 145:4
145:7,10 159:5
159:10,14
163:22 173:7
**submission**
36:18 51:10
**submit** 26:7
36:15 78:6,15
79:3,3
**submitted** 26:8
45:4 78:4,11
79:5 113:2
164:11
**submitting** 14:5
45:3 99:23
**subpart** 9:4,23
9:24 10:5,24
101:20 102:5
128:10,12 158:4
162:24 163:22
**substances**
12:16
**suggest** 86:9
121:3 145:20
**suggested**
178:16

**suite** 2:15,20 3:3
3:8
**summer** 167:24
**supervise** 16:22
24:11,15 31:15
**supervisor**
16:10,11,12
24:7,8,9,25
141:17,22
143:12
**supplies** 32:15
**supply** 32:17
105:24
**supports** 15:10
**supposed**
172:19
**suppression**
109:10
**sure** 9:12,15
16:16 17:1
25:11 33:6,17
39:5 45:4 52:14
67:18,19 78:23
78:24 79:21
89:12 91:7
102:2,13 106:21
112:19 113:19
115:24 122:20
122:21 126:5
128:8 138:18
146:4 155:6
167:25 171:25
**surface** 62:25
**surgeries** 30:14
53:15 145:23

163:1,13,14
**surgery** 53:2,20
53:23 54:1,1,3
144:24 158:5,16
163:7,9,10
**surgical** 53:10
53:16 145:3
**surprised** 83:6
**susan** 11:8
24:21 167:6
**swear** 6:2
**switching** 41:23
52:25
**sworn** 6:7 176:8
**system** 20:22
76:12

**t**

**t** 1:16 3:11 5:7,7
73:12 176:6,15
177:5,20 179:3
179:3
**take** 12:9,11
36:22 46:1
64:25 81:21
90:20 94:6
100:19 101:22
102:4,12 106:19
150:19
**taken** 6:12
151:6
**takes** 44:21
**talk** 38:4 41:21
**talked** 145:2
**talking** 9:13,16
27:9,10 51:1

82:4 90:24
110:24 155:6
164:2
**tallahassee** 1:2
1:15 3:8,13
**team** 14:1 22:24
22:25 23:15,23
24:16 26:1 27:1
28:2 29:24
31:14 33:21
34:21 40:12
41:5,6,8,10,18
48:4 54:21 67:2
67:14 68:16
70:9,11,21,24
70:25 71:8,14
71:18,20,25
72:2 74:21
75:21,23 76:5,8
76:16 83:20,21
83:25 84:8,12
84:14,25 85:5,7
85:12,13,16
86:6,8,13,17,23
90:4,7 91:1
95:12 102:1
104:9 106:12
107:16,17,19,21
122:18 131:24
138:21 139:19
139:24 140:24
141:4 145:12,14
145:19,19
148:12,18
171:25 175:6

**teams** 22:20,23
  23:10,11 70:15
  70:16,19 76:1
  93:9 101:5,8
**technologies**
  99:3
**telephonically**
  2:17,22 3:5
**tell** 11:16 12:10
  65:1 73:9 75:14
  92:16 101:19
  105:9 128:9
  171:20,22
**template** 52:6
  52:17
**ten** 124:5
**term** 8:19,24
  11:2 15:9 18:18
  18:23 22:4
  41:24 42:2
  46:10,13 56:6
  60:19 72:4
**terms** 38:12
  57:4 70:22 77:5
  83:22 86:13
  164:9
**test** 87:20
**testified** 6:8
  84:12 90:12
**testimony** 4:2
  6:3 76:21 178:8
  178:17
**tests** 99:2
**text** 47:21 99:14

**thank** 6:21
  36:25 39:9
  55:12 64:21
  65:5 84:11
  165:24 175:9
**thanks** 7:14
**thera** 72:12
**therapeutic**
  99:2
**therapeutics**
  29:11
**therapy** 4:14
  63:23 64:7
  87:11 89:15
  108:16
**thing** 9:16 12:12
  67:4 153:13
**things** 7:21 12:5
  39:21 48:12
  76:18 96:4,9
  127:25 154:4,5
  156:22
**think** 6:24 10:9
  10:11 11:22
  21:4,13 26:13
  27:1 29:6,16
  34:8 36:11 55:5
  55:8 56:5,6,7
  61:11 64:9 65:7
  65:12 66:17
  67:3,14,23
  68:11,16 71:10
  72:4 79:9 82:11
  82:13 83:9,13
  86:14,18,23

90:9,12 100:7
  100:16 107:17
  108:23 111:17
  111:21 117:5
  120:24 122:5,10
  123:7,11 126:21
  130:9 134:2
  142:19 144:1
  150:4 153:15
  160:2,16,23
  161:1,11
**thinking** 87:14
  124:23 161:7,21
**thought** 98:21
  173:21
**three** 19:13,14
  23:1 24:19
  65:19 67:7 76:6
  86:23 163:3
**throwing** 67:19
**tim** 23:7 24:4
**time** 1:12 11:19
  11:21 31:13
  35:2 36:21
  64:25 71:17
  79:18 81:5 82:6
  83:1 84:17,20
  85:9,12,18,25
  86:11,16 87:5
  87:15,16,24
  88:1 90:8,13
  93:13 97:19
  103:12 104:1
  115:7,23 121:20
  125:1 126:10

133:13,14,15,19
  133:22 134:6
  138:3,4 144:15
  148:15 150:19
  157:9,11,15
  159:14,17
  162:16 164:20
  167:14 172:14
  175:9,15
**timeframe**
  113:20
**timeline** 131:22
**timelines** 96:23
**times** 6:16 13:12
  51:25 80:7
  137:23
**tiny** 64:22
**title** 16:17 17:1
  35:1,2 72:12
**titled** 14:15
  42:23 54:10
**titles** 35:12
**today** 8:5 9:5
  12:16,21 45:23
  113:7 159:3
**together** 34:23
  34:24 35:22
  37:21 169:21
**tom** 16:18,19
  38:15,19 143:12
  149:1,2
**took** 33:1 41:20
  46:5 82:15
  113:24 164:17

**tool** 46:22
**top** 29:16 49:2
  49:10 53:12,18
  58:16 64:22
  65:7 66:9 67:22
  68:9 74:3 89:13
  103:7 123:3
  136:9,11 150:18
  166:25
**topic** 107:4
**torchinsky** 3:7
**touched** 108:11
**town** 119:24,25
**track** 7:20 52:3
  88:24 89:1 93:3
  93:3
**tracked** 97:13
**tracking** 93:1,8
  93:11 94:8,15
  95:6,10,14 96:7
  97:13
**tracks** 52:7,10
  52:12
**traditional**
  113:18,25
**traditionally**
  68:4
**train** 112:24
**training** 112:22
**transcript** 5:11
  177:8,9 178:6
  178:20
**transcripts**
  178:14

**transmittal** 5:2
  169:16 171:3,9
  171:16 173:7
**transmittals**
  172:3
**transplant** 53:8
**transportation**
  125:10,21
**treat** 128:24
  129:4 158:6,16
  158:18
**treatment** 10:17
  10:22,23 11:4
  27:5,16 28:5
  30:4 55:24 87:6
  87:7 89:20
  94:10,17 96:8
  96:17 113:9
  114:21 115:1
  116:13 118:24
  119:9,22 120:9
  128:3,20 129:11
  131:3 134:11
  136:8 137:24
  141:4 147:4
  148:13,19
  149:19 154:18
  154:23 157:6,10
  157:22 158:8
  162:2,9 163:2
  164:2,5,6
  169:17 171:1
  173:15,18 174:3
**treatments** 5:3

**tree** 4:20 104:23
  106:13,17,25
  107:6,25 148:21
  150:5,11,14
**trees** 59:10
**trial** 109:21
  110:1
**trials** 109:13,16
  109:24 112:1
**trigged** 102:17
**true** 136:13
  177:9 179:21
**trust** 104:8,13
**truth** 6:4,4,4
**try** 11:14,15,20
  33:6 71:5
**trying** 36:22
  56:7 59:10
  155:13
**tuesday** 1:11
**turning** 61:18
  98:1 128:2
  172:7
**twice** 71:23
**two** 25:10 39:23
  64:14 75:7,7,16
  84:23 93:13,17
  96:9 106:20
  112:13 113:4
  126:14 137:6
**type** 54:3 67:15
  67:16,24 110:2
**types** 25:17 28:8
  30:7 33:9 39:21
  45:9 48:12

  65:19 93:9
  123:13 152:3
**typical** 71:14,16
**typically** 27:24
  52:6 77:2,12
  102:23 103:13
  104:2,6 121:4
  123:19,24
  126:14 151:17
  161:8 172:1
  174:12

**u**

**u** 5:7
**uh** 12:5,5
**ultimately**
  143:12
**under** 15:1 24:2
  24:14 32:4
  33:13,18 34:12
  37:5,7,8,10,13
  37:14 40:21
  50:3 56:4,17,21
  57:1,16,17,18
  58:1,10 59:16
  59:17 60:23
  61:9 66:2 67:5
  70:15 74:17
  76:6 92:2 99:1,4
  99:10,22 100:14
  103:10 111:19
  128:3 133:5
  143:6 145:22
  153:18 160:25
  162:8,18,24
  174:18 178:18

179:20
**underlined**
168:4
**underlying**
169:1
**underscore** 7:22
**understand** 9:6
9:12 10:10
11:14,14,17
12:4 21:11,11
21:13 66:14
74:9 101:16
102:7 116:18
117:25 118:3
**understanding**
101:11
**understood**
102:13 130:17
**undertake**
78:11 79:6 84:6
84:15 102:8
115:1 148:22
149:2,25 165:7
**undertaken**
50:22 71:1
**undertakes**
24:12 106:16
**undertaking**
51:2 102:24
152:8,14
**undertook**
150:5
**unique** 83:9
98:13,16

**unit** 16:1 23:25
25:4 26:10
27:18,20,22
28:11 29:23
37:2,6,8,13,13
39:1,3 43:7
52:22 96:16
123:5 167:8,17
**united** 1:1
**units** 76:6
**university** 13:5
13:6
**unrelated** 27:23
**unusual** 150:13
**update** 38:5
100:8 154:13
155:20,21
160:11
**updated** 89:3
112:20
**updates** 31:22
33:9,15 71:25
76:10,11 116:1
160:3,6
**upper** 34:25
**urgency** 133:20
**url** 55:4,6 72:10
**use** 8:19,24 9:14
9:15 10:15,21
10:22 11:2 12:6
18:18,23 21:22
22:5 30:25 31:7
34:12 41:23
46:10 50:10
52:6 60:19 62:7

65:17 69:9 70:6
77:9 86:15 93:3
93:5,11 106:2,3
108:12 111:5,7
111:9,11 118:9
135:1 168:22
**used** 18:18
21:19 29:6
36:15 43:2 51:9
65:2,9 77:17
78:21,22 85:11
91:3 93:6,15,16
95:18 98:5
100:13 104:6,17
105:5 108:1
109:3,6 144:6,8
148:21 160:10
160:16 178:20
**uses** 66:24 67:9
**using** 8:9,25 9:2
10:3 13:10
106:10 168:12
**usually** 34:21
76:18 92:7
124:11 127:24
**utilization** 29:5
46:22
**utilized** 67:5

**v**

**v** 3:6 178:4
179:1
**vacant** 23:20
82:17 107:23
108:4

**vaguely** 61:3
**value** 115:6
**van** 4:19,21
103:2,2 133:7,9
134:9,10,17
135:16,16 136:5
136:5,18,20,22
137:3,4,13
141:16 142:8
**variance** 174:17
174:24
**variations** 93:8
**various** 15:25
28:2,23 38:8
86:20 165:16
**vary** 31:5 34:6
**venders** 109:19
**vendor** 26:17
48:9 133:6
134:16
**vendors** 49:13
63:16 109:17
**verbal** 12:3
**verification**
143:7
**verify** 178:9
**veritext** 178:14
178:23
**veritext.com**
178:14
**version** 63:24
74:8,15 172:2
**versions** 73:13
171:23

| | | | |
|---|---|---|---|
| **versus** 155:9 | **way** 10:11 35:19 | **weigh** 42:21 | **wondering** |
| **vetted** 169:3 | 60:25 73:14 | **weird** 64:4 | 115:18 |
| **vetting** 168:5 | 78:10 79:16,22 | **went** 80:2 156:4 | **words** 12:6 74:9 |
| **virtual** 123:22 | 80:4,6 95:15 | 157:3 | **work** 25:3 37:20 |
| 123:23 | 124:18 137:10 | **williams** 24:22 | 52:22 79:20 |
| **vogel** 3:7 146:12 | 170:14 | 167:6 | 83:20 85:12 |
| **von** 132:22 | **ways** 27:10 | **willing** 21:16 | 90:8 131:14 |
| **vs** 1:6 | 78:13 79:5,8,9 | **wilson** 168:3 | 134:3 143:9 |
| | 137:7,17 170:14 | **winthrop** 2:14 | 169:9,11 |
| **w** | **we've** 69:18 | 2:19 | **worked** 13:19 |
| | 121:13 126:4 | **witness** 6:5 9:10 | 15:8 31:24 |
| **waive** 175:12 | 164:2 | 21:13 45:19 | 84:17 86:19 |
| **waiver** 31:21,25 | **web** 19:24 160:3 | 48:22 55:1 58:4 | **working** 41:3 |
| 36:14,16,16 | 160:6,9,15 | 59:5 62:1 64:23 | 90:9 |
| 39:24 56:13 | **website** 20:3,7 | 71:4 73:21 78:8 | **workload** 90:15 |
| 174:17,24 | 20:10,13 55:7 | 88:18 91:7,10 | **works** 24:2 |
| **waivers** 14:5 | 68:17 112:2,6 | 91:13 97:17 | 40:20 47:6 66:2 |
| 30:11 | 159:23,25 | 99:13 100:7,22 | 70:10 76:10 |
| **walk** 6:14 | 160:12 172:5 | 108:18 111:13 | 126:9 167:7 |
| **walkthrough** | **websites** 42:21 | 123:15 125:13 | **workshop** |
| 34:22 | **week** 71:23 | 126:19,24 | 117:25 118:9,17 |
| **wall** 121:24 | 76:19 81:15 | 128:19 131:18 | 118:22 119:22 |
| **wallace** 16:18 | **weekly** 75:21,23 | 135:11 136:22 | 120:8 121:4 |
| 38:20 96:24 | 76:15 | 138:18 139:13 | 122:19 127:14 |
| 97:1 143:12 | **weeks** 127:12 | 140:3,21 142:4 | 127:15,16,18 |
| 149:2,2,25 | **weida** 1:7 5:1 | 144:8,12,18 | **workshops** |
| 150:6 | 16:13 81:5,12 | 149:5 150:2,8 | 119:5,19 120:3 |
| **wallace's** 16:19 | 81:18 82:16,21 | 151:4 152:25 | **write** 139:25 |
| **want** 6:22 9:12 | 83:3,15 86:8,9 | 153:2,4,6,14,20 | **writing** 140:10 |
| 9:15 46:1 88:16 | 86:12 97:2 | 155:25 158:2 | 150:5 151:10 |
| 88:17 90:20 | 114:19,25 115:7 | 161:11,17 | 152:12 155:8 |
| 94:5,23 140:5 | 131:10,16,20 | 164:15 165:16 | **written** 60:2,5 |
| 169:18,21 | 148:6 170:6 | 175:2,13 178:8 | 71:21 75:18 |
| **wanted** 140:7 | **weida's** 82:6 | 178:10,12,20 | 121:11 122:25 |
| 173:3 | | 179:23 | |
| **wants** 170:10 | | | |

| | |
|---|---|
| **wrote**  103:17 139:20 140:24 141:4 | |
| **x** | |
| **x**  4:1 | |
| **y** | |
| **yeah**  9:17 46:15 59:3 95:20 114:24 116:15 127:12 143:16 150:19 | |
| **year**  25:8,22 26:18 | |
| **years**  25:10 | |
| **z** | |
| **zero**  74:16 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.