```
                    UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF FLORIDA
                       TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,          )
                                )
            Plaintiffs,         ) Case No: 4:22cv325
                                )
       v.                       ) Tallahassee, Florida
                                ) October 12, 2022
SIMONE MARSTILLER, et al.,      )
                                ) 9:33 AM
            Defendants.         )
_____  )

       TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
           BEFORE THE HONORABLE ROBERT L. HINKLE
             UNITED STATES CHIEF DISTRICT JUDGE
                    (Pages 1 through 120)
```

Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
                         111 North Adams Street
                         Tallahassee, Florida 32301
                         megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

```
 1  Q.   Psychological conditions?
 2  A.   I do not make diagnoses, but we're trained in psychology
 3  and psychiatry.  It's part of our medical licensing.
 4  Q.   Okay.  But you are not a practicing psychologist?
 5  A.   That's correct.
 6  Q.   And you're not a practicing psychiatrist?
 7  A.   That's correct.
 8  Q.   And you have not met with any of the plaintiffs in this
 9  matter --
10            THE COURT:  Mr. Charles, I sat through the voir dire.
11  I'm not going to sit through it again on cross.  You get one
12  chance to ask some questions.  You've asked those.  Let's ask
13  some new ones.
14            MR. CHARLES:  Thank you, Your Honor.
15  BY MR. CHARLES:
16  Q.   Dr. Laidlaw, you stated you don't follow the WPATH
17  standards of care; is that right?
18  A.   Yes.
19  Q.   But you testified earlier you don't treat gender dysphoria;
20  is that correct?
21  A.   I don't treat gender dysphoria with hormones and surgeries.
22  Q.   Dr. Laidlaw, are you aware that your opposition to
23  gender-affirming care for the treatment of gender dysphoria in
24  youth and adults is contrary to the vast majority of medical
25  associations' recommendations?
```

```
1    A.   Yes.
2    Q.   Dr. Laidlaw, can you see the screen share that I've just
3    enabled?
4    A.   Yes, I can.
5              MR. CHARLES:  Your Honor, can you see that as well?
6              THE COURT:  I can.  It's hiding under the table up
7    here, but I've got it.
8              MR. CHARLES:  Okay.
9    BY MR. CHARLES:
10   Q.   Dr. Laidlaw, are you aware that the American Academy of
11   Child and Adolescent Psychiatry supports gender-affirming care
12   for youth?
13   A.   I haven't looked at that specifically.
14   Q.   Okay.  And looking at the document here, I'll --
15             MR. CHARLES:  Let me ensure -- Defense Counsel, can
16   you view this document?
17             MR. PERKO:  Yes.
18             MR. CHARLES:  Okay.  So I'd like to enter this as
19   Exhibit P1.
20   BY MR. CHARLES:
21   Q.   This is the -- Dr. Laidlaw, this is the "American Academy
22   of Child and Adolescent Psychiatry Statement Responding to
23   Efforts to Ban Evidence-Based Care for Transgender and
24   Gender-Diverse Youth."
25        Do you see that?
```

1  A.   Yes.
2  Q.   And it's dated November 8, 2019?
3  A.   Yes.
4  Q.   And if you could, just read aloud for me that highlighted
5  portion, please.
6  A.   Sure.
7       *Many reputable professional organizations, including the*
8  *American Psychological Association, the American Psychiatric*
9  *Association, the American Academy of Pediatrics, and the*
10 *Endocrine Society, which represent tens of thousands of*
11 *professionals across the United States, recognize natural*
12 *variations in gender identity and expression and have published*
13 *clinical guidance that promotes nondiscriminatory, supportive*
14 *interventions for gender-diverse youth based on the current*
15 *evidence base.  These interventions may include, and are not*
16 *limited to, social gender transition, hormone-blocking agents,*
17 *hormone treatment, and affirmative psychotherapeutic modalities.*
18      *The American Academy of Child and Adolescent Psychiatry*
19 *supports the use of current evidence-based clinical care with*
20 *minors.  AACAP strongly opposes any efforts -- legal,*
21 *legislative, and otherwise -- to block access to these*
22 *recognized interventions.*
23 Q.   Thank you.
24           THE COURT:  You apparently asked to have this admitted
25 into evidence.  I don't think I've seen this, so this may not

1  have been in the record previously.
2          MR. CHARLES:  Just one moment, Your Honor.
3          It wasn't, Your Honor, but I do have copies I can
4  provide to the Court to so enter.
5          THE COURT:  Didn't I require disclosures before today?
6  If I didn't, it would certainly depart from the standard of care
7  for judges.
8          MR. CHARLES:  I apologize, Your Honor.  I wasn't -- I
9  didn't see that designation so -- in your order.
10         THE COURT:  I may not have.
11         Do you object to the admission of this?
12         MR. PERKO:  Yes, Your Honor, for the reasons you just
13 stated.
14         Also, I would suggest that it's really irrelevant to
15 this witness's testimony because it talks about the American
16 Psychological Association.  He's already testified he's not a
17 psychologist.
18         THE COURT:  You can't have it both ways.
19         I'll admit it subject to going back and looking at the
20 scheduling orders and --
21     (Discussion was held.)
22 BY MR. CHARLES:
23 Q.   Dr. Laidlaw, is what you just read consistent with your
24 understanding of the position of these organizations?
25 A.   Are you talking about the AACAP?

```
 1   Q.   Yes, let's start with that one.
 2   A.   Well, I'm just reading it now for the first time, so it
 3   must be -- it was 2019 -- unless they have changed their
 4   opinion.
 5   Q.   Okay.  But you don't have any --
 6            THE COURT:  Let me just back up.  I'm going to exclude
 7   the exhibit.  I did require things to be disclosed, and you
 8   can't come up to the hearing and bring up a new exhibit that you
 9   didn't timely disclose.
10            MR. CHARLES:  Okay.
11            THE COURT:  So Plaintiffs' 1 is excluded.
12            The scheduling order is ECF No. 32.
13            MR. CHARLES:  Okay.  Thank you, Your Honor.
14            Ms. Markley, you can unpublish, please.  Thank you.
15   BY MR. CHARLES:
16   Q.   Dr. Laidlaw, are you aware that the American Academy of
17   Family Physicians supports gender-affirming care for youth and
18   adults?
19   A.   Supports gender-affirming care for youth and adults?
20   Q.   Yes.  Do you need to me to repeat?  Did you hear that?
21   A.   They probably do.  I don't know their exact statement.
22   Q.   Okay.  Are you aware that the American Academy of Family
23   Physicians published a policy statement in July of 2022,
24   approved by their board of directors, entitled "Care for the
25   Transgender and Gender Nonbinary Patient"?
```

1  A.   I have not read that particular document -- Family Practice
2  Document.
3  Q.   Okay.  Are you aware that the American Academy of Family
4  Physicians supports gender-affirming care as an
5  evidence-informed intervention that can promote permanent health
6  equity for gender-diverse individuals?
7           MR. PERKO:  Your Honor, I would object for the same
8  reasons.  He's essentially reading from an exhibit that was not
9  disclosed.
10          THE COURT:  He's now exploring the witness's knowledge
11 of the situation in the field.  The objection is overruled.
12 BY MR. CHARLES:
13 Q.   Dr. Laidlaw --
14 A.   I'm not a family practice physician, so I don't keep up
15 with --
16 Q.   Just a moment.  Sorry.  Let me start over.
17 A.   -- the literature of that organization.
18 Q.   I'm sorry.  Can you please repeat that?
19 A.   I said I'm not a family practice physician; I'm an
20 endocrinologist, so I don't keep up with whatever they're
21 publishing.
22 Q.   Okay. So I -- let me just ask you one more question about
23 that brief -- or policy statement.  Excuse me.
24      Are you aware that the American Academy of Family
25 Physicians asserts the full spectrum of gender-affirming health

1   care should be legal and should remain a treatment decision
2   between a physician and their patient?
3   A.   I'm not surprised.
4   Q.   Can -- so does that mean you are or are not aware?
5   A.   I don't read the Family Practice documents, unless they are
6   provided to me.
7   Q.   Dr. Laidlaw, are you aware the American Academy of
8   Pediatrics supports gender-affirming care for youth?
9   A.   Yes.
10  Q.   Dr. Laidlaw, are you aware that the American College of
11  Obstetricians and Gynecologists has recommendations and
12  conclusions that support gender-affirming care for youth and
13  adults?
14  A.   I'm not -- again, I'm not surprised, but I don't read their
15  literature regularly for that purpose.
16  Q.   Okay.  Are you aware that the American College of
17  Obstetricians and Gynecologists has conclusions that
18  gender-affirming hormone therapy is not effective contraception?
19  A.   That gender-affirming therapy is not effective
20  contraception?
21  Q.   Correct.
22  A.   I have read that.  I'm not sure if it was theirs or someone
23  else who is publishing that.  I'm aware of that concept.
24  Q.   Can you repeat your answer?  I didn't understand you.
25  A.   I said I haven't read their statements specifically, but

1    I'm aware of the concept or proposition that gender-affirming
2    hormones are not effective contraception.
3    Q.   Okay.  So you're not aware of the American College of
4    Obstetricians and Gynecologists conclusion that it is not
5    effective contraception?
6    A.   I have not read their particular conclusion.
7    Q.   Are you aware that the American College of Physicians, the
8    largest medical specialty society in the world with 160,000
9    internal medicine and subspecialty members, supports public and
10   private health care coverage of gender-affirming care?
11   A.   I'm not aware that all 160,000 members voted to approve
12   such a thing, but I'm aware that they have issued a statement
13   like that.
14   Q.   You are aware they issued such a statement?
15   A.   Yes.
16   Q.   Are you aware that in 2022, the American College of
17   Physicians issued a brief supporting access to gender-affirming
18   care and opposing discriminatory policies enforced against LGBTQ
19   people and objected, in particular, to the interference with the
20   physician-patient relationship and the penalization of
21   evidence-based care?
22   A.   I may have read that particular statement from that
23   organization.
24   Q.   Are you aware that the American Medical Association
25   supports gender-affirming medical care for youth and adults?

1  A.    Yes.

2  Q.    Are you aware that in April of 2021, the American Medical

3  Association wrote a letter to the National Governors Association

4  objecting to the interference with health care of transgender

5  children?

6  A.    I believe I had come across that headline.

7  Q.    Are you aware that the American Medical Association, in

8  conjunction with GLMA, has issued a brief in support of public

9  and private insurance coverage of gender-affirming care?

10 A.    I'm not a member of the American Medical Association.  I

11 think only 20 percent of physicians in the nation are even a

12 member.  So I don't follow everything they say, but I do believe

13 I read that document.

14 Q.    Do you have evidence to support your assertion that only 20

15 percent of medical practitioners in the United States are

16 members of the AMA?

17 A.    I don't have a piece of paper with evidence, but that's my

18 general understanding.  I'm not a member.

19 Q.    But you don't have any evidence today to point to to

20 support that assertion?

21 A.    No.

22 Q.    Are you aware that in 2022, the American Medical

23 Association reaffirmed it's resolution in support of private and

24 public health care coverage for the treatment of gender

25 dysphoria as recommended by a patient's physician in Resolution

1   Number 158.950?
2   A.   I have not read that resolution.
3   Q.   Are you aware, Dr. Laidlaw, that the American Psychological
4   Association has guidelines that support access to
5   gender-affirming care for youth and adults?
6   A.   Yes.
7   Q.   Are you aware that the American Psychological Association
8   opposes gender-identity change efforts as a broad practice
9   described as a range of techniques used by mental health
10  professionals and nonprofessionals with the goal of changing
11  gender identity, gender expression, or associated components of
12  these, to be in alignment with gender role behaviors
13  stereotypically associated with their sex assigned at birth?
14  A.   Yes, I am aware.
15  Q.   Are you aware that the American Psychiatric Association
16  supports gender-affirming medical care for youth specifically?
17  A.   Yes.
18  Q.   Are you aware that the American Psychiatric Association has
19  a position statement from 2018, supporting access to care for
20  transgender and gender-variant individuals broadly?
21  A.   Yes, I believe so.
22  Q.   Are you aware that the Endocrine Society and the Pediatric
23  Endocrine Society take the position that there is a durable
24  biological underpinning to gender identity that should be
25  considered in policy determinations?

1   A.    I would have to read -- I have not read that particular
2   statement from the Endocrine Society.  I would like to see that
3   before I make a -- conclude anything.
4   Q.    Okay.  Are you aware this determination was included in a
5   position statement published in December of 2020?
6   A.    I have read that position statement.
7   Q.    And are you aware that the Endocrine Society and the
8   Pediatric Endocrine Society take the position that medical
9   intervention for transgender youth and adults is effective,
10  relatively safe when appropriately monitored, and has been
11  established as the standard of care?
12  A.    Well, they wrote that it was not the standard of care in
13  2017, so they're contradicting themselves.
14  Q.    Dr. Laidlaw, are you aware that that statement is contained
15  in the transgender health position statement issued
16  December 2020?
17  A.    I believe I read that.
18  Q.    And are you aware that the Endocrine Society and the
19  Pediatric Endocrine Society take the position that federal and
20  private insurers should cover such interventions as prescribed
21  by a physician, as well as the appropriate medical screenings
22  that are recommended for all body tissues that a person may
23  have?
24  A.    I believe I read something along those lines.
25  Q.    Are you aware that the Pediatric Endocrine Society supports

```
 1   gender-affirming care for youth?
 2   A.   Yes.
 3   Q.   Are you aware they published a position statement to that
 4   effect in April of 2021?
 5   A.   Yes.  I wrote an article describing why their conclusions
 6   are false or incorrect.
 7   Q.   Are you aware the Pediatric Endocrine Society recommends an
 8   affirmative model of care that supports one's gender identity
 9   and follows a multidisciplinary approach that includes
10   involvement of mental health professionals, patients and their
11   families.  Puberty suppression and/or gender-affirming hormone
12   therapy is recommended within this evidence-based approach on a
13   case-by-case basis as medically necessary and potentially
14   lifesaving.
15        Are you aware that was contained in the Pediatric Endocrine
16   Society statement?
17   A.   I am aware that it's contained.  I don't agree with it,
18   but, yes, I'm aware.
19             THE COURT:  If we're leading up to something, you can
20   go ahead with all of this.  If all you're doing is publishing
21   stuff I've already read --
22             MR. CHARLES:  No, Your Honor.
23             THE COURT:  You're welcome to make a closing argument
24   later and to go through all of this, but if -- this is an
25   incredibly inefficient way to publish material.
```

1           MR. CHARLES:  Your Honor --
2           THE COURT:  So if that's all we are doing, let's move
3  on.
4           MR. CHARLES:  Thank you, Your Honor.  I'm -- I do have
5  a final comment for Dr. Laidlaw related to --
6           THE COURT:  I've been patient through all that, and if
7  you're setting up another question, that's fine.
8           MR. CHARLES:  Okay.  Thank you, Your Honor.
9           Just two more documents.  I appreciate your patience.
10 BY MR. CHARLES:
11 Q.   Dr. Laidlaw, are you aware the Society for Adolescent
12 Health and Medicine supports gender-affirming care for youth?
13 A.   No.
14 Q.   Are you aware the Society for Adolescent Health and
15 Medicine issued a statement in opposition to state legislation
16 barring evidence-based treatment?
17 A.   No.
18 Q.   And, Dr. Laidlaw, are you aware that the World Medical
19 Association, which includes 115 national medical associations,
20 supports gender-affirming care?
21 A.   No.
22 Q.   So, Dr. Laidlaw, you're aware that your opinions related to
23 gender-affirming care are in contrast to all of those medical
24 associations' statements that we just reviewed?
25          MR. PERKO:  Objection, Your Honor.

```
1              THE COURT:  Overruled.
2              THE WITNESS:  Yeah.  Sorry.  Could you repeat the
3    question?
4    BY MR. CHARLES:
5    Q.   You are aware that your opinions against gender-affirming
6    care for the treatment of gender dysphoria are contrary to the
7    positions of the medical associations' statements we just
8    reviewed?
9    A.   Yes.
10             MR. CHARLES:  Just one moment, Your Honor.
11        (Discussion was held.)
12             MR. CHARLES:  No further questions, Your Honor.
13             THE COURT:  Redirect?
14             MR. PERKO:  Very briefly, Your Honor.
15             May it please the Court.
16                       REDIRECT EXAMINATION
17   BY MR. PERKO:
18   Q.   Dr. Laidlaw, you testified that you consider mental health
19   effects of hormone therapy in your practice; is that correct?
20   A.   That is correct.
21   Q.   Okay.  And why do you consider the potential mental health
22   effects of hormone therapy in your practice?
23             MR. CHARLES:  Objection, Your Honor.
24             THE COURT:  Overruled.
25             THE WITNESS:  To give you maybe a more concrete
```

```
 1   This is not quite an administrative review, but it's not that
 2   far off from it.
 3            Tell me how long do you think -- I probably should
 4   have asked before I told you I was going to deny the preliminary
 5   injunction because answers change depending on which side thinks
 6   they won the preliminary injunction motion.
 7            How long do you think you need to present this case
 8   fully?  And if the answer is "I don't know," I guess I can just
 9   tell you to go talk to each other.  But if you can give me a
10   rough ballpark at this point, it will help.
11            MR. JAZIL:  Your Honor, I'm happy to confer with my
12   colleagues for the other side and get back to the Court.
13            THE COURT:  It seems to me that you want to find out
14   about the plaintiffs and their doctors and that's about it;
15   right?  I mean, you had all you had when you adopted the rule.
16            MR. JAZIL:  Yes, Your Honor.  I suppose -- there's a
17   footnote in Rush v. Parham that discusses -- well, in my mind it
18   opens up the possibility of additional evidence to provide to
19   the Court on whether or not this is or isn't experimental,
20   but --
21            THE COURT:  At least tentatively I think that's right.
22   I think the question is for me to decide based on the federal
23   trial whether the State's determination is reasonable or not,
24   and I think Rush says that's not an administrative review of
25   what the State knew at the time.  It's the question at the --
```

```
 1   based on the evidence presented at the trial.  So, yes, I think
 2   that's right.
 3            MR. JAZIL:  That's right.
 4            THE COURT:  And that goes back to my questions about
 5   the Florida administrative procedure.  In a rule challenge in
 6   state court, they might be stuck with the record they put
 7   together to adopt the rule, but I don't think that's the case
 8   here.
 9            MR. GONZALEZ-PAGAN:  Your Honor, if I may, I just have
10   a question on the Court's ruling.
11            Will the Court include in its order for representation
12   as to what counsel has stated here today that there is a waiver
13   procedure?
14            THE COURT:  Yes, I will.
15            MR. GONZALEZ-PAGAN:  Thank you, Your Honor.
16            THE COURT:  I hope I express it accurately.  I'll try
17   to have it in -- an accurately narrow statement of the
18   availability of an exception.
19            MR. JAZIL:  Thank you, Your Honor.
20            THE COURT:  You gave me a cite, and I didn't --
21            MR. JAZIL:  Yes, Your Honor.  It's 120.542.
22            THE COURT:  120.54(2)?
23            MR. JAZIL:  No, Your Honor.  It's, I think, 120.542.
24            Your Honor, with the Court's indulgence, I have one
25   other issue.  The trial date is set for August 7th.  I'm in a
```