August Dekker

***vs.***

Jason Weida

CONFIDENTIAL - ATTORNEY"S EYES ONLY

Deposition of:

E. Kale Edmiston, Ph.D

March 23, 2023

Vol 1



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
CASE NO. 4:22-CV-00325-RH-MAF

AUGUST DEKKER, et al.,

    Plaintiffs,

v.

JASON WEIDA, et al.,

    Defendants.
_____/


VIDEO-RECORDED DEPOSITION OF E. KALE EDMISTON, Ph.D.


Thursday, March 23, 2023
10:07 a.m. - 11:43 a.m.


VIA ZOOM


Stenographically Reported By:
Barbie Gallo, RMR-CRR
www.lexitaslegal.com
888-811-3408

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 2

```
1   APPEARANCES:
2   On behalf of the Plaintiffs:
       PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
3      600 Brickell Avenue
       Suite 3100
4      Miami, Florida 33131
       (786) 913-4900
5      BY:  SHANI RIVAUX, ESQUIRE
       shani.rivaux@pillsbury.com
6
       AND
7
       PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
8      1200 17th Street N.W.
       Washington, D.C. 20036
9      (202) 663-8000
       BY:  GARY J. SHAW, ESQUIRE
10     gary.shaw@pillsburylaw.com
11
    On behalf of the Defendants:
12     HOLTZMAN VOGEL
       119 South Monroe Street
13     Suite 500
       Tallahassee, Florida 32301
14     (850) 270-5938
       BY:  MICHAEL BEATO, ESQUIRE
15     mbeato@holtzmanvogel.com
16     AND
17     LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
       120 Wall Street
18     19th Floor
       New York, NY 10005
19     (212) 809-8585
       BY:  OMAR GONZALEZ-PAGAN, ESQUIRE
20     ogonzalez-pagan@lambdalegal.org
21
    ALSO PRESENT:
22     Zack Bennington, paralegal
       Randy Wright, videographer
23
24
25
```

Page 3

```
1              INDEX OF PROCEEDINGS
   WITNESS:                              PAGE
2
          E X A M I N A T I O N S
3
   WITNESS                               PAGE
4  E. KALE EDMISTON, Ph.D.
     DIRECT EXAMINATION                    6
5      BY MR. BEATO
   CERTIFICATE OF OATH                    67
6  CERTIFICATE OF REPORTER                68
   READ & SIGN LETTER TO WITNESS          69
7  ERRATA SHEET                           70
8
           E X H I B I T S
9
   NUMBER        DESCRIPTION            PAGE
10 Exhibit 1   CORRECTED EXPERT REBUTTAL  11
               REPORT OF E. KALE EDMISTON,
11             PH.D.
   Exhibit 2   WPATH SOC (6 PAGES)        23
12             "ESTABLISHING THE SOC 8
               REVISION COMMITTEE AND MEET
13             THE CHAIRS AND LEAD EVIDENCE
               TEAM."
14             DEKKERFL WPATH 000381 -
               DEKKERFL WPATH 000386
15 Exhibit 3   SOC8 CONTRIBUTORS (29 PAGES) 24
   Exhibit 4   WPATH SOC8 (260 PAGES)     30
16             DEKKERFL WPATH 000001 -
               DEKKERFL WPATH 000260
17
18
19
20
21
22
23
24
25
```

Page 4

```
1   Thereupon,
2   the following proceedings began at 10:07 a.m.:
3               *   *   *
4       THE VIDEOGRAPHER:  We are now on the record.
5   The time is 10:07 a.m.  This is the
6   video-recorded deposition of Dr. Kale Edmiston
7   in the matter of August Dekker et al. versus
8   Jason Weida, et al.
9       This deposition is being held remotely via
10  Zoom meetings on March 23rd, 2023.  The
11  videographer is Randy Wright, and the
12  stenographer is Barbie Gallo, both in
13  association with Lexitas.
14      Will counsel please announce their
15  appearance for the record.
16      MR. BEATO:  Good morning.  This is
17  Michael Beato on behalf of the defense.
18      MS. RIVAUX:  Good morning.  This is
19  Shani Rivaux with Pillsbury, Winthrop, Shaw,
20  Pittman on behalf of the plaintiffs, and with me
21  is Gary Shaw.
22      MR. GONZALEZ:  This is Omar Gonzalez on
23  behalf of the plaintiffs.  I'm with Lamda Legal.
24      THE VIDEOGRAPHER:  Will the court reporter
25  please swear in the witness.
```

Page 5

```
1       THE STENOGRAPHER:  Do we need an appearance
2   from Mr. Bennington?
3       If you would, Doctor --
4       MR. BENNINGTON:  I'm --
5       THE STENOGRAPHER:  I'm sorry.
6       MR. BENNINGTON:  That's okay.
7       Good morning.  I'm a paralegal appearing
8   here from Holtzman Vogel.
9       THE STENOGRAPHER:  Dr. Edmiston, do you
10  consent to my administering the oath to you
11  remotely this morning since we are not all in
12  person?
13      THE WITNESS:  Yes.
14      THE STENOGRAPHER:  If you would raise your
15  right hand, I'll swear you in.  Do you swear the
16  testimony you're about to give in this matter
17  will be the truth, the whole truth and nothing
18  but the truth so help you God.
19      THE WITNESS:  Yes.
20      THE STENOGRAPHER:  Thank you.
21  THEREUPON,
22          E. KALE EDMISTON, Ph.D.,
23  Being by me first duly sworn to tell the whole truth,
24  as hereinafter certified, testified as follows:
25
```

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 6

DIRECT EXAMINATION

1  DIRECT EXAMINATION
2  BY MR. BEATO:
3      Q.    All right.  Perfect.
4      Good morning, Doctor.  Again, my name is
5  Michael Beato, and I represent the defendants in this
6  case.  Before we begin, let me ask you, have you ever
7  been deposed before?
8      A.    No.
9      Q.    Okay.  So let me go over some ground rules.
10  So, number one, for the benefit of the court reporter
11  when answering a question, please verbally state "yes"
12  or "no" if the question so desires instead of nodding
13  "yes" or "no."
14     A.    (Nodding head).
15     Q.    Also, a deposition is not an endurance
16  contest.  If you need a break at any time, please let
17  me know, and I think we can accommodate that.
18         Moreover, for the benefit of the court
19  reporter, we can endeavor to limit crosstalk, so I will
20  not speak when you're speaking and vice versa.  And if
21  you don't understand any of my questions, please let me
22  know.  I'm more than happy to clarify or restate the
23  question.
24         With that said, let me ask you some
25  preliminary questions.  Are there any notes or

Page 7

1  documents in front of you right now?
2      A.    I have my -- my report in front of me right
3  now.
4      Q.    Perfect.  Any other documents?
5      A.    I have a tablet, but I can put it away.
6      Q.    I'm just curious.
7         Have you talked to anyone about this
8  deposition?
9         MS. RIVAUX:  I'm going to object to form.
10        Go ahead, you can answer.
11     A.    I -- my -- my partner is aware that I'm
12  doing it.
13  BY MR. BEATO:
14     Q.    Okay.  What is your current occupation?
15     A.    I am an associate professor.
16     Q.    At what university?
17     A.    UMass Chan School of Medicine.
18     Q.    When did you start this job?
19     A.    September.
20     Q.    And you are a professor of what area?
21     A.    Psychiatry.
22     Q.    What does your job entail?
23     A.    My job entails conducting research and
24  mentoring students.
25     Q.    What specific research?

Page 8

1      A.    I conduct research in anxiety and
2  depression.
3      Q.    Where do you currently live?
4      A.    I live in Worcester, Massachusetts.
5      Q.    And could you describe to me your
6  educational background?
7      A.    Yeah, I completed a bachelor's degree at
8  Hampshire College, and from there I worked at a
9  neuroscience or psychiatry lab at the Yale School of
10  Medicine.
11        Then I went on to earn a Ph.D. in
12  neuroscience from Vanderbilt University.  And then
13  after that, I did two post docs, one at China Medical
14  University and the other at university of Pittsburgh.
15     Q.    Thank you, Doctor.
16        And this is a standard deposition question.
17  Are you taking any medications that would affect your
18  memory today?
19     A.    No.
20     Q.    Perfect.  So for the purposes of this
21  deposition I'm going to define the firm
22  "gender-affirming care" as puberty blockers, cross-sex
23  hormones, surgeries and treatments to alter primary or
24  secondary sex characteristics for gender dysphoria.
25  Does that work for you, Doctor?

Page 9

1      A.    I think those are all very different things,
2  so I would actually appreciate specificity.
3      Q.    Okay.  Fair enough.  But in terms of the
4  blanket term, it's our understanding that it would
5  incorporate those four different treatments.  When
6  greater specificity is warranted, I can clarify.
7      A.    Okay.
8      Q.    Are you a psychiatrist?
9      A.    No.
10     Q.    Are you a neurologist?
11     A.    No.
12     Q.    Are you an endocrinologist?
13     A.    No.
14     Q.    Are you a surgeon?
15     A.    No.
16     Q.    In your medical opinion, what is your
17  definition of gender dysphoria?
18     A.    Well, I don't have a medical opinion because
19  I'm trained as a scientist, not a medical provider.
20     Q.    All right.  So what is your going definition
21  of gender dysphoria?
22     A.    I would probably -- probably lean on the
23  language that's used in the DSM-5.
24     Q.    And what is your definition of gender
25  identity?

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 10

1    A.    A sense of one's self as being a particular
2    gender.
3    Q.    Can one change one's gender identity
4    throughout one's life?
5              MS. RIVAUX:  Objection.  Form.
6    BY MR. BEATO:
7    Q.    You can answer.
8    A.    I don't really feel that it's my place to
9    determine that for another person.
10   Q.    Fair enough.
11         So based on your previous answers you
12   haven't diagnosed anyone with gender dysphoria?
13   A.    No.
14   Q.    Never prescribed puberty blockers for an
15   individual with gender dysphoria?
16   A.    No.  I have a Ph.D., not an M.D.
17   Q.    So cross-sex hormone surgeries, haven't
18   prescribed or performed that for an individual with
19   gender dysphoria?
20   A.    No.
21             MS. RIVAUX:  Objection.  Form.
22   BY MR. BEATO:
23   Q.    So now I'm going to pull up a document.
24   Hopefully this works.  I am not good with technology,
25   so please bear with me, Doctor.

Page 11

1              Tell me if you see this document.
2    A.    Yes.
3    Q.    Okay.  Perfect.  What is this document?
4    A.    That is my rebuttal report.
5              MR. BEATO:  So, court reporter, I'm going to
6          mark this as Exhibit 1.
7          (Defendants' Exhibit Number 1 for i.d.)
8    BY MR. BEATO:
9    Q.    So, Doctor, does this document fairly and
10   accurately state your expert opinions in this case?
11   A.    Yes.
12   Q.    Are all of the studies and evidence you
13   relied on contained in the bibliography in this report?
14   A.    Yes.
15   Q.    So I'm scrolling down on page 1.  The title
16   says "corrected."  Why is this a corrected copy?
17             MS. RIVAUX:  Objection.  You can answer.
18   A.    Can you sort of -- can you restate that?
19   BY MR. BEATO:
20   Q.    Oh, sure.  What does the title of this
21   document say?
22   A.    Corrected Expert Rebuttal Report of
23   E. Kale Edmiston, Ph.D.
24   Q.    Thank you, Doctor.  And why does it say
25   "corrected"?

Page 12

1    A.    Because it was corrected.
2    Q.    Did you submit an earlier version of an
3    expert rebuttal report in this case?
4    A.    Yes.
5    Q.    What is the difference between Exhibit 1,
6    the corrected one, and the previous one?
7    A.    The previous one cited a Soleman 2013 study
8    where I should have cited a Soleman 2016 study, and
9    there are two instances where that's the case.
10   Q.    Thank you, Doctor.
11         Could you just quickly specify, do you
12   recall which paragraphs?
13   A.    Paragraphs 26 and 29.
14   Q.    Okay.  Excellent memory, by the way.  It's
15   impressive.
16         So here's another question.  Have you
17   conducted any empirical research on gender dysphoria?
18   A.    Can you define what you mean by "empirical"?
19   Q.    What does empirical research mean to you?
20   A.    All -- if you mean by empirical, original
21   research with data than I've collected, I have.  But I
22   have not -- my publications have been reviews of the
23   extant literature.
24   Q.    So to clarify, you have original research
25   with data; is that correct?

Page 13

1    A.    I'm sorry?
2    Q.    I apologize, Doctor.  So am I correct so for
3    empirical research on gender dysphoria you have
4    original research with data?
5              MS. RIVAUX:  Objection.  Form.
6              You can answer.
7    A.    I have done studies related to gender
8    dysphoria, but those studies haven't been published to
9    date.
10   BY MR. BEATO:
11   Q.    So could you -- oh, I apologize, Doctor.
12   A.    I've also -- but I have published studies
13   that have reviewed the literature on specific topics
14   related to gender dysphoria.
15   Q.    Thank you for the clarification.  Could you
16   describe those for us?
17             MS. RIVAUX:  Objection.  Form.
18             You can answer.
19   A.    Yeah.  What do you mean by "describe"?
20   BY MR. BEATO:
21   Q.    Can you explain what you are studying in
22   those studies you referenced?
23   A.    So there is review study that I published
24   some years ago that reviews the primary care literature
25   among transgender people.  There is a review paper that

E. Kale Edmiston, Ph.D                  CONFIDENTIAL
March 23, 2023

Page 14

1  is currently in press that reviews the neuro -- the
2  sort of biological basis for a trans identity.  And
3  then I have another paper that has been submitted
4  related to adolescent decision making and brain
5  development as it pertains to gender dysphoria.
6      Q.    Thank you.  Are those documents mentioned in
7  your bibliography?
8      A.    They are.  There's also another paper that
9  I'm revising that's in the bibliography as well that is
10  about development and mental health in trans
11  adolescents.
12      Q.    In your opinion, what makes a treatment
13  experimental?
14          MS. RIVAUX:  Objection.  Form.
15      A.    I would say that that designation is outside
16  of -- that's not my responsibility to determine, but I
17  would say that -- I'll leave it at that.
18  BY MR. BEATO:
19      Q.    Okay.  And you collect research, Professor?
20      A.    Yes.
21      Q.    And you deal with -- do you deal with
22  studies that are high quality and low quality?
23      A.    Yes.
24          MS. RIVAUX:  Objection.  Form.
25

Page 15

1  BY MR. BEATO:
2      Q.    So what is -- so what makes evidence low
3  quality?
4      A.    There are a lot of different reasons why a
5  study might be low quality.  However, all studies have
6  limitations, and so as a scientist my job is to review
7  all of the literature and look at it as a whole because
8  any one study will necessarily have limitations, so you
9  can't look at any one study to sort of draw a
10  definitive conclusion.
11      Q.    So in your answer, Doctor, you mentioned
12  limitations.  What are the limitations that you're
13  thinking of?
14      A.    I mean, I think any study can have
15  limitations, and there are so many different sorts of
16  limitations.  It can be related to study design or
17  available data.  No one study can do everything, so,
18  you know, resources are always finite.
19      Q.    Understood.  Could you think of any other
20  limitations besides those two?
21      A.    It -- there are -- I mean, there are
22  numerous possible limitations.  That's sort of the
23  nature of science, so I couldn't possibly begin to list
24  every limitation or every possible limitation of a
25  scientific study.

Page 16

1      Q.    Okay.  And, Doctor, how did you learn about
2  this case?
3      A.    I was aware of the law from the news, and I
4  assumed that there would be a challenge to it.  And
5  then I was approached by Lambda Legal, and that's how I
6  learned about this specific case.
7      Q.    And in preparing your expert rebuttal
8  report, what defendants' reports did you read?
9      A.    I read Dr. Scott's and Biggs', Dr. Levine's,
10  several others.  I don't recall all of them at this
11  time.
12      Q.    So I'm going down on Exhibit 1 to page 3,
13  paragraph 7 which I'm highlighting.  Doctor, could you
14  read the highlighting.  Don't read the highlight, but
15  can you see the highlighting?  It doesn't make the text
16  darker?
17      A.    Yes.
18      Q.    Perfect.
19          Is that an accurate statement, Doctor?
20      A.    Yes.
21      Q.    Did you rely on the WPATH Standards of Care
22  8 in making conclusions in your expert report?
23          MS. RIVAUX:  Objection.  Form.
24      A.    I relied on my expertise on the topic.
25

Page 17

1  BY MR. BEATO:
2      Q.    Is it your opinion that WPATH sets the
3  professional standards of care for treatments for
4  gender dysphoria?
5          MS. RIVAUX:  Objection.  Form.
6          You can answer.
7      A.    They are one organization.  There are other
8  medical organizations that also have standards of care.
9  BY MR. BEATO:
10      Q.    And what are those medical organizations?
11      A.    Well, the Endocrine Society comes to mind.
12      Q.    Did you review any Endocrine Society
13  documents in making this expert report?
14      A.    No.
15      Q.    In paragraph 7, it states that you were a
16  chapter author for the Assessment chapter; is that
17  correct?
18      A.    Yes.
19      Q.    Does the Assessment chapter involve
20  treatments for adults?
21          MS. RIVAUX:  Objection.  Form.
22      A.    The Assessment chapter outlines the
23  assessment process for adults.
24  BY MR. BEATO:
25      Q.    Does your expert report concern treatment

Page 18

```
 1   for adults?
 2        A.    No.
 3              MS. RIVAUX:  Objection.  Form.
 4   BY MR. BEATO:
 5        Q.    Do your conclusions reached in the
 6   Assessment chapter fairly and accurately describe your
 7   opinions and conclusions about gender-affirming care?
 8              MS. RIVAUX:  Objection.  Form.
 9        A.    The Assessment chapter is a consensus
10   document of many experts.
11   BY MR. BEATO:
12        Q.    Is that a "yes"?
13              MS. RIVAUX:  Objection.  Form.
14        A.    I -- you know, my -- I stand by the
15   standards of care as the gold standard for treatment
16   guidelines.
17   BY MR. BEATO:
18        Q.    Why do you say that?
19              MS. RIVAUX:  Objection.  Form.
20              You can answer.
21        A.    Yeah, because it -- because of the process
22   through which it was created.
23   BY MR. BEATO:
24        Q.    And what was the process in which it was
25   created?
```

Page 19

```
 1              MS. RIVAUX:  Objection.  Form.
 2              I'm also going to object to the extent that
 3   it would address any issues that are covered by
 4   the stay that you -- in this case that you do
 5   not go into any of that.
 6              So I'm assuming, Michael, that you're not
 7   asking anything that's privileged information as
 8   it relates to that.
 9              MR. BEATO:  So let me ask you -- let me ask
10   you, Shani, is it plaintiffs' position that I
11   cannot ask any WPATH-specific question to the
12   doctor?
13              MS. RIVAUX:  No, I'm not suggesting you
14   can't ask WPATH questions, but just you can't go
15   into the issues that are currently addressed in
16   the order that stays the discovery relating to
17   internal processes of WPATH.  So as long as it's
18   not going into that, it's fine just depending on
19   the question, but I guess that's the concern
20   that I have is just not to violate that court
21   order or to violate any nondisclosure agreement.
22   You can ask anything that's about public
23   information but nothing internal or private to
24   WPATH that would violate that court order or
25   require Dr. Edmiston to violate his
```

Page 20

```
 1   confidentiality agreement.
 2              MR. BEATO:  So, for example, asking about
 3   how the doctor went about and revised the
 4   assessment chapter to Standard of Care 8 I
 5   cannot, according to plaintiffs, I cannot ask
 6   questions relating to that?
 7              MS. RIVAUX:  Ask -- say that again.  I'm not
 8   sure I understood.
 9              MR. BEATO:  Sure.  I'll break it down.  So
10   in paragraph 7 the doctor states that the doctor
11   was an author for the Assessment chapter for
12   Standards of Care 8.  And in revising the
13   standards of care, specifically the Assessment
14   chapter, I cannot ask any questions as to what
15   was the consensus; how did you come up with
16   revisions; what was the process like, I
17   cannot --
18              MS. RIVAUX:  I -- so I think it's going to
19   be tough to -- I'm not giving you any blanket
20   prohibition or objection, so it may be easier
21   just to go question by question.
22              But I think to the extent it doesn't reveal
23   information that seeks confidential information,
24   then that's fine.  So I think the limitation and
25   the instruction is just not to reveal
```

Page 21

```
 1   confidential information.
 2              MR. BEATO:  Okay.  I'm a little --
 3              MS. RIVAUX:  If you want to ask -- ask the
 4   question, and then we can, you know -- to the
 5   extent it doesn't seek information, my
 6   instruction is going to be to the extent it
 7   doesn't reveal confidential information or
 8   information that would otherwise be barred by
 9   the current stay and order, then Dr. -- then
10   Dr. Edmiston can certainly answer the question.
11              MR. BEATO:  Sure.  And I'm happy to seek
12   additional court guidance on this particular
13   issue too.
14              MS. RIVAUX:  I'm sorry?
15              MR. BEATO:  I'm happy to seek additional
16   court guidance on this issue too because we
17   believe it goes to credibility.
18              MS. RIVAUX:  Right.  Well, I think here
19   really the issue is he's here to take about his
20   expert report, not WPATH.  And if there's
21   specific questions that you want to ask about
22   it, you know, we could go about it individually.
23   But, as I mentioned, there's a stay in place as
24   it relates to specific areas relating to WPATH
25   that you're aware of, and, you know, there's a
```

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

**Page 22**

```
 1     confidentiality agreement.  So to the extent
 2     that it doesn't violate those, you can ask the
 3     questions.  And if we need to seek additional
 4     guidance from the court, we certainly can do
 5     that.
 6          MR. BEATO:  Okay.  How about -- okay.  How
 7     about this?  I ask my questions.  You can
 8     instruct the witness not to answer any questions
 9     you believe he should not answer.
10          MS. RIVAUX:  Okay.
11          MR. BEATO:  Okay.  Perfect.
12 BY MR. BEATO:
13     Q.    So, Doctor, how does the -- well, let me
14 take a step back before I take a step forward.
15          Does WPATH standards of care have a process
16 in which those standards of care are revised?
17          MS. RIVAUX:  Objection.  Form.
18          You can answer.
19     A.    What do you mean by "revised"?
20 BY MR. BEATO:
21     Q.    So in terms of making a new version.
22     A.    Oh.  So the shift -- the drafting of
23 version 8?
24     Q.    Precisely.  Perfectly.
25     A.    All right.  Yes.
```

**Page 23**

```
 1     Q.    What is that process?
 2          MS. RIVAUX:  Objection.  Form.
 3          You can answer to the extent it doesn't
 4     violate your confidentiality agreement or the
 5     stay entered by the Appellate Court relating to
 6     the subpoenas to WPATH.
 7     A.    I would refer you to the WPATH SOC8 website
 8 which outlines that process.
 9     (Defendant's Exhibit Number 2 for i.d.)
10 BY MR. BEATO:
11     Q.    So I'm going to pull up another document.
12 I'm mark this as Exhibit 2.  So I will scroll down.
13 It's six pages.  And I will ask if this document looks
14 familiar to you.
15     A.    No, I have not seen it before.
16     Q.    Could you read the title for me?
17     A.    "Establishing the SOC8 Revision Committee
18 and Meet the Chairs and Lead Evidence Team."
19     Q.    And I can represent that this was on the
20 website.
21          So I'm going to page 3.  Doctor, were you a
22 chapter lead when the Assessment chapter was being
23 revised or reviewed?
24          MS. RIVAUX:  Objection.  Form.
25     A.    I was a chapter co-author.
```

**Page 24**

```
 1 BY MR. BEATO:
 2     Q.    What's the difference between the two?
 3     A.    A chapter lead, I don't believe I can answer
 4 a specific question about roles.
 5     Q.    Okay.  Based on what counsel said?
 6     A.    Yes.
 7     Q.    Who was the chapter lead during the revision
 8 process for the Assessment chapter?
 9     A.    Christina.  I'm sure she's listed on the
10 website.
11     (Defendant's Exhibit Number 3 for i.d.)
12 BY MR. BEATO:
13     Q.    I'm going to pull up another document.  This
14 is Exhibit 3.  It's a little bit longer than the other
15 one, but I'm going to scroll down.  I will also
16 represent that this is from the WPATH website.
17          Does this document look familiar to you,
18 Doctor?
19     A.    No.
20     Q.    So I'm scrolling down to page 12, and I'll
21 represent that there are individuals under the
22 Assessment of Adults With Gender Diversity/Dysphoria.
23          Doctor, do these individuals look familiar
24 to you?
25     A.    Yes.
```

**Page 25**

```
 1          MS. RIVAUX:  Objection.  Form.
 2 BY MR. BEATO:
 3     Q.    How do you know these individuals?
 4          MS. RIVAUX:  Objection.  Form.
 5          You can answer.
 6     A.    I worked with them to write the chapter.
 7 BY MR. BEATO:
 8     Q.    Are there any individuals who worked with
 9 you who are not listed here?
10          MS. RIVAUX:  Objection.  Form.  And
11     objection to the extent you can't answer without
12     violating a confidentiality agreement or any
13     stay in this case.
14     A.    The authors list for SOC8 is very long.
15 Many different people were involved in it, and the
16 document was written collaboratively.
17 BY MR. BEATO:
18     Q.    And earlier in the deposition you said that
19 the standards of care is a consensus document.  What
20 does that mean?
21     A.    I would refer you to the process, the
22 consensus process that is outlined on the website.
23     Q.    Can you describe the process just generally?
24     A.    There --
25          MS. RIVAUX:  I'm going to object, again,
```

**Page 26**

1  only to the extent that you can answer the
2  question -- I mean to the extent the question is
3  asking generalities and not asking specifics
4  into the process or things that would be
5  violated, then that's fine, you can answer.
6  BY MR. BEATO:
7     Q.  Let me clarify.  Generally speaking.
8     A.  Yes, there was a lit review that was
9  conducted externally, and then there were grievance
10 statements, and then the authors all had to build a
11 consensus around the statements.
12    Q.  Understood.
13        Doctor, are you a member of WPATH?
14    A.  I was.  I believe my membership -- I might
15 be overdue on my dues, but, yes, I was at one time.
16    Q.  When did you start being a member of WPATH?
17    A.  I don't recall at this time exactly.
18    Q.  Ballpark range?
19    A.  Probably around probably 2017, I would
20 guess.
21    Q.  And so this is another general question.
22 Looking at Exhibit Number 3 for the individuals listed
23 here -- and, again, you recall working with these
24 individuals?
25    A.  Yes.

**Page 27**

1     Q.  Are any of them endocrinologists, to your
2  memory?
3         MS. RIVAUX:  Objection.  Form.
4     A.  No.
5  BY MR. BEATO:
6     Q.  Are any of them surgeons?
7         MS. RIVAUX:  Objection.  Form.
8     A.  There are endocrinologists and surgeons
9  involved in SOC8 for the hormone and surgery chapters
10 of SOC8.
11 BY MR. BEATO:
12    Q.  And how would you describe each of these
13 individual's areas of expertise?
14        MS. RIVAUX:  Objection.  Form.
15    A.  I think that the document describes their
16 areas of expertise.
17 BY MR. BEATO:
18    Q.  Fair enough.  So I'm going back to Exhibit
19 Number 2, and I'm scrolling down to page 4, chapter
20 stakeholder members.  Again, this is on the public
21 website.  Does WPATH when it's revising its standards
22 of care, to your knowledge, employ the help of
23 nonmedical professionals in that process?
24        MS. RIVAUX:  Objection.  I'm going to give
25     the same instruction.  And also just to the

**Page 28**

1  extent that Dr. Edmiston is also not here,
2  doesn't speak on behalf of WPATH.  But to the
3  extent that Dr. Edmiston has personal knowledge
4  that doesn't violate any confidentiality
5  agreement or the order, then you may answer.
6     A.  Can you define "medical professional"?
7  BY MR. BEATO:
8     Q.  Sure.  So, for example, an M.D., an
9  endocrinologist, psychiatrist, someone who's gone to
10 medical school.
11    A.  There are certainly people involved in
12 drafting the standards of care who have expertise who
13 did not go to medical school because obviously there
14 are lots of different manners to become educated and
15 gain expertise on this topic.
16    Q.  And this topic is?
17    A.  Transgender healthcare.
18    Q.  And you mentioned or counsel mentioned a
19 confidentiality agreement.
20    A.  Yes.
21    Q.  As a member of WPATH you signed a
22 confidentiality agreement?
23    A.  No, as a --
24        MS. RIVAUX:  Objection.  Form.
25        Sorry.

**Page 29**

1  BY MR. BEATO:
2     Q.  I'm sorry.
3         MS. RIVAUX:  I'm raising an objection only
4     to the extent you're not going to violate any
5     agreement.
6  BY MR. BEATO:
7     Q.  No, do not violate anything.  I'm just
8  asking what's with the confidentiality?
9     A.  The chapter authors all signed it.
10    Q.  I see.
11    A.  We were asked to.  I don't know what anyone
12 else did.
13    Q.  Understood.  So WPATH asked you to sign that
14 confidentiality agreement?
15        MS. RIVAUX:  Objection to form.
16    A.  I signed a confidentiality statement.
17 BY MR. BEATO:
18    Q.  Understood.  And, again, Doctor, we're just
19 building the record.  I don't want you to violate
20 anything or make you feel uncomfortable in answering
21 any questions.
22        So let me scroll up on Exhibit 2.  I know,
23 Doctor, you said you weren't a chapter lead.  But
24 looking at the criteria for chapter leads, WPATH full
25 member in good standing.  What do you think that means?

Page 30

1          MS. RIVAUX:  Objection.  Form.
2     A.   I assume it means that you're a member of
3  WPATH.
4  BY MR. BEATO:
5     Q.   A well-recognized advocate for WPATH and the
6  standards of care?
7          MS. RIVAUX:  Objection.  Form.
8     A.   I'm not sure what you're asking me.  Are you
9  asking me what a -- like what the word "recognized"
10 means?  I'm not sure what you're asking.
11 BY MR. BEATO:
12    Q.   Sure, what does recognize mean in this
13 context, in your opinion?
14         MS. RIVAUX:  Objection to form.
15    A.   That -- that you are known to people in this
16 area.
17 BY MR. BEATO:
18    Q.   Understood.
19         So, Doctor, we're going to move away from
20 the process questions.
21         So now let me see if I can move this.
22         (Defendant's Exhibit Number 4 for i.d.)
23 BY MR. BEATO:
24    Q.   I'm now going to introduce this as
25 Exhibit 4.  Doctor, does this look familiar?

Page 31

1     A.   Yes.
2     Q.   What is this document?
3     A.   This is the Standards of Care 8.
4     Q.   Excellent.
5          So -- well, let me ask you this.
6          Do you think WPATH is an advocacy
7  organization?
8          MS. RIVAUX:  Objection.  Form.
9     A.   No.
10 BY MR. BEATO:
11    Q.   Why?
12         MS. RIVAUX:  Objection, form.
13         You can answer.
14    A.   The purpose of WPATH is to gather the
15 scientific evidence and expertise of scientists and
16 clinicians to -- to develop the standards of care and
17 to disseminate research.
18 BY MR. BEATO:
19    Q.   And what kind of evidence does WPATH
20 collect?
21         MS. RIVAUX:  Objection.  Form.
22    A.   So, again, I would refer you to the website
23 which outlines the process for drafting the standards
24 of care.
25

Page 32

2     Q.   And in terms of the chapter that you
3  assisted with authoring, which chapter is that?
4          MS. RIVAUX:  Objection.  Form.
5     A.   I am co-author of the Assessment of Adults
6  chapter.
7  BY MR. BEATO:
8     Q.   And that is Chapter 5?
9     A.   Yes.
10    Q.   I am now going on Exhibit 4 to page 33.  I'm
11 scrolling to the -- now I'm on page 34.  I'm scrolling
12 to the bottom of page 34.  Doctor, I just have a few
13 questions.
14         If you look at 5.4, it says, "We suggest..."
15 and 5.5, "We recommend..."
16    A.   Um-hum.
17    Q.   Is there a difference between "suggest" and
18 "recommend" here?
19    A.   Yes.
20    Q.   What is that difference?
21    A.   They are different words.
22    Q.   Okay.  Do they convey anything differently?
23 So there is -- strike that.
24         So they're used synonymously?
25    A.   No.

Page 33

1     Q.   So what are their differences?
2     A.   The WPATH document has graded evidence, so
3  the language there is specific to the strength of
4  evidence.
5     Q.   And what kind of evidence grading systems
6  does WPATH use?
7     A.   I'm sorry.  Can you repeat the question?
8     Q.   Sure.  So what kind of evidence grading
9  system does WPATH use?
10         So, for example, I believe the Endocrine
11 Society uses the GRADE system.
12    A.   I would refer you to the website for that
13 information.
14    Q.   Understood.  So now I'm going to go back to
15 page 33, Doctor.  One moment, Doctor.
16         33, I'm highlighting a section.  It begins,
17 "For TGD..." and goes all the way to "... required."
18         So, Doctor, I highlighted this sentence.
19 Just so the record is clear, what does TGD mean in this
20 chapter?
21    A.   I would suggest that you scroll up to the
22 top.  It will be defined there.
23    Q.   Right up here (indicating)?
24    A.   Yes.
25    Q.   Transgender and gender diverse?

Page 34

1    A.   Yes.
2    Q.   So in this highlighted section can you
3  elaborate on that sentence?
4         MS. RIVAUX:  Objection.  Form.
5    A.   No.
6  BY MR. BEATO:
7    Q.   It says what it says?
8    A.   If you have a specific question, I'm happy
9  to, you know -- if you have a specific question.  But
10 I -- I don't know what you -- you'll have to ask me a
11 specific question.
12 BY MR. BEATO:
13   Q.   Sure.  So when it says "...less common
14 treatments..." what does less common treatments mean?
15        MS. RIVAUX:  Objection.  Form.  You can
16   answer.
17   A.   I think if an adult was to ask for an
18 intervention that was nonstandard.
19 BY MR. BEATO:
20   Q.   As an example, what would that be?
21   A.   I wouldn't really want to speculate.
22   Q.   Can you provide an example, though?
23        MS. RIVAUX:  I'm going to object on the
24   grounds of scope, but you can go ahead and
25   answer.

Page 35

1    A.   Yeah, I mean, it's a -- it is a bit outside
2  of the scope of, you know, my rebuttal.  Sometimes
3  people ask for -- they might ask for a surgical
4  intervention that's nonstandard for as an example.
5  BY MR. BEATO:
6    Q.   And limited research evidence, what does
7  that mean?
8         MS. RIVAUX:  Objection.  I'm going to object
9    on both form and scope here, but you can answer.
10   A.   I mean, somebody -- it's -- there's always a
11 possibility that someone might request an intervention
12 that hasn't been researched before or has been
13 researched very little.
14 BY MR. BEATO:
15   Q.   Can you provide an example, Doctor?
16        MS. RIVAUX:  Objection.  Form and scope.
17        You can answer.
18   A.   I think the same -- the same answer.  So if
19 someone were to ask -- if an adult were to ask for a
20 nonstandard surgical intervention, for example.
21 BY MR. BEATO:
22   Q.   Scrolling to page 34, I'm highlighting
23 another sentence beginning with, "The statements
24 below..." and ending with "...consensus of professional
25 best practice."

Page 36

1         Doctor, what does the phrase "consensus of
2  best" -- strike that -- "consensus of professional best
3  practice" mean?
4         MS. RIVAUX:  Objection.  Form and scope.
5         You can answer.
6    A.   Yeah, I mean, again, I would refer you to
7  the WPATH website where they outline a lot of sort of
8  the process and the specific terminology that they use
9  in this document.
10 BY MR. BEATO:
11   Q.   With that in mind, could you today provide
12 me with what your opinion as an author of this section,
13 what consensus of professional best practice means?
14        MS. RIVAUX:  Objection to both form and
15   scope.
16        You can answer.
17   A.   The consensus of ex -- people with expertise
18 on the topic.
19 BY MR. BEATO:
20   Q.   And how would you define expertise on the
21 topic?
22        MS. RIVAUX:  Objection.  Form and scope.
23        But you can answer.
24   A.   I would, again, refer you to the WPATH
25 website where they talk about the -- they outline the

Page 37

1  sort of selection process for authors and how they
2  determine expertise.
3  BY MR. BEATO:
4    Q.   Okay.  So I'm going back to Exhibit -- bear
5  with me.  This is now Exhibit 3.  Again, we're still on
6  page 12 and 13.  Do all of these individuals support
7  gender-affirming care?
8         MS. RIVAUX:  Objection.  Form; scope.
9         And to the extent it doesn't violate your
10   confidentiality agreement or the stay, you can
11   answer and if you know.
12   A.   These individuals support the care that
13 is -- has an evidence -- that -- you know, your
14 question is very broad because gender-affirming care is
15 very broad.
16 BY MR. BEATO:
17   Q.   It is.
18   A.   And the SOC8 guidelines recommend an
19 individualized approach to care.  So I think everyone
20 involved in -- for those individuals they support
21 quality healthcare.
22   Q.   Going back to Exhibit 4, this sentence,
23 Doctor, "The empirical evidence base for the,"
24 scrolling to page 35 -- "assessment of TGD adults is
25 limited."

**Page 38**

1    My question is, in the sentence, what does
2  "empirical evidence base" mean?
3         MS. RIVAUX:  Objection.  Form and scope.
4    You can answer.
5    A.    So I would have to re-read the chapter in
6  context.  I do not want to define what a specific word
7  means in a specific sentence without reading the
8  context in which it occurs.
9  BY MR. BEATO:
10   Q.    Fair enough.  And would that same answer be
11  true for "limited" in this sentence?
12   A.    Yes.
13        MS. RIVAUX:  Objection.  Form; scope.
14  BY MR. BEATO:
15   Q.    Doctor, I apologize.  I did not hear an
16  answer.
17   A.    Oh.  Yes.
18   Q.    Let's go to the next page.  This sentence,
19  Doctor, "Some TGD individuals will have the capacity to
20  grant consent immediately during the assessment."
21        What does that mean?
22        MS. RIVAUX:  Objection.  Form and scope.
23   A.    This is about the assessment of adults and
24  is about the assessment process being individualized.
25

**Page 39**

1  BY MR. BEATO:
2    Q.    So in an individualized scenario, can an
3  individual be given puberty blockers for gender
4  dysphoria after one medical treatment?
5         MS. RIVAUX:  Objection.  Form.
6    A.    I would ask you to restate the question with
7  a little bit more specificity.
8  BY MR. BEATO:
9    Q.    Fair question, Doctor.  Fair question.
10        Let me -- let me go back to these questions.
11        Scrolling down to the next page, statement
12  5.3A, Doctor, what does this sentence mean?
13        MS. RIVAUX:  Objection.  Form and scope.
14   A.    So this is a sentence from the adult chapter
15  that says "To access GAMSTs, a TGD person's gender
16  incongruence must be marked and sustained."
17        So that means that part of the assessment
18  process is to determine sort of the duration of the
19  feelings of gender incongruence and the degree to which
20  they are distracting or upsetting or troubling.
21  BY MR. BEATO:
22   Q.    Scrolling a little bit further down, while
23  marked and sustained gender incongruence is present,
24  going all the way down to access gender-affirming care,
25  Doctor, what does that sentence mean?

**Page 40**

1         MS. RIVAUX:  I'm going to object to form and
2    scope.
3    A.    That if a person -- it just means that --
4  it's not -- there's not some threshold of suffering
5  that someone -- you know, that someone needs to suffer
6  a certain amount before they're allowed to access
7  healthcare.
8  BY MR. BEATO:
9    Q.    Okay.  Moving to page --
10        Well, actually, Doctor, we've been going for
11  about an hour.  Would you like a five-minute break?
12   A.    No, I'm okay.
13   Q.    Okay.  Okay.  And, once again, if you'd like
14  a break at any time, please let me know.  More than
15  happy to accommodate.
16   A.    Sure.
17   Q.    So this is on Page 38 highlighting the
18  sentence -- oops, no -- I -- I apologize.
19        Page 39, "in rare cases..." Doctor, in this
20  sentence what does "rare cases" mean?
21        MS. RIVAUX:  Objection.  Form and scope.
22   A.    So in rare cases would mean a nontypical
23  instance.
24  BY MR. BEATO:
25   Q.    And in the context of this sentence what

**Page 41**

1  would that nontypical instance be?
2         MS. RIVAUX:  Objection.  Form and scope.
3    A.    So I would have to review the Hembree
4  citation there.  I mean, one example could be if
5  someone had an estrogen receptor positive cancer.
6  BY MR. BEATO:
7    Q.    And generally speaking, Doctor, when you
8  were authoring this section, did you read all of these
9  cases that are mentioned in this chapter?
10        MS. RIVAUX:  Objection.  Form; scope.
11        And to the extent it doesn't violate any of
12    the stay order that we discussed or the
13    confidentiality order, you may answer.
14   A.    I have reviewed much of this literature.  If
15  you have a specific question about a specific paper,
16  then I would request that you give me a break to review
17  the specific paper.
18  BY MR. BEATO:
19   Q.    Understood.  And perfectly reasonable.  I
20  just had a broad general question.
21        And within the literature that you have
22  reviewed when authoring this chapter, do you know if
23  any of those studies were low evidence?
24        MS. RIVAUX:  Objection.  Form; scope.
25        You can answer.

Page 42

1    A.   I think that you would have to describe what
2  you mean by "low evidence." I recall you asked me that
3  question before, and I answered that all studies have
4  limitations, and that's why we look at the literature
5  as a whole to draw conclusions.
6        I'm sure you're aware, there's quite a bit
7  of evidence cited in SOC8. I'm not sure off the top of
8  my head how many citations there are, but it's quite a
9  few.
10 BY MR. BEATO:
11   Q.   So earlier in the deposition I think you
12 provided examples of low-quality evidence or
13 limitations. Do you recall saying study design could
14 lead to evidence being low quality?
15        MS. RIVAUX: Objection. Form.
16   A.   I believe I said that that is an example of
17 a limitation. I didn't -- I do not think I said that
18 it was an example of low quality.
19 BY MR. BEATO:
20   Q.   Okay. And -- okay. And as of right now,
21 you do not recall if any of those citations mentioned
22 in Chapter 5 have low-quality evidence?
23        MS. RIVAUX: Objection. Form; scope.
24   A.   I -- I take -- I sort of -- I challenge the
25 premise of the idea of low quality. I am instead

Page 43

1  talking about the limitations that occur with any
2  scientific study, which is why we do lots of different
3  studies to draw conclusions.
4        So I sort of -- or not sort of. I object to
5  the premise of the question.
6  BY MR. BEATO:
7    Q.   So still on page 39, sentence, "Because of
8  the possible harm..." all the way down to "...is
9  important," Doctor, what does this sentence mean?
10        MS. RIVAUX: Objection. Form and scope.
11   A.   Again, I would ask that if you want me to
12 discuss specific sentences from a very large document
13 that I would be given time to review the document in
14 its entirety to ensure that I am fully representing the
15 context of any particular sentence.
16 BY MR. BEATO:
17   Q.   Fair enough. And, again, you authored this
18 document, or at least this chapter in the Standards of
19 Care 8?
20        MS. RIVAUX:
21   A.   I --
22        MS. RIVAUX: Objection to form; scope and
23        the other restrictions that we've talked about
24        before relating to your confidentiality
25        agreement and the stay order in place.

Page 44

1    A.   Yes, I was a co-author of SOC8.
2  BY MR. BEATO:
3    Q.   And this chapter?
4    A.   Yes.
5    Q.   Any other chapters, Doctor?
6        MS. RIVAUX: Objection. Form; scope; and
7        same objections relating to the confidentiality
8        agreement and the violation of -- and any -- and
9        not to violate the stay in place.
10   A.   I would, again, refer you to the WPATH
11 website which outlines the process by which this
12 document was drafted. It was written via consensus and
13 was drafted collaboratively.
14 BY MR. BEATO:
15   Q.   Okay. So I don't think you answered my
16 question. Did you -- again, noting the objections, did
17 you contribute in authoring any other chapters in
18 WPATH?
19        MS. RIVAUX: I'm going to object to form;
20        scope.
21        Again, do not violate your confidentiality
22        agreement or the stay that's in place.
23   A.   Yeah, that would -- that would -- discussing
24 that would be in violation of the confidentiality
25 agreement.

Page 45

1  BY MR. BEATO:
2    Q.   All right. I'll move on.
3        Doctor, to the best of your knowledge in
4  Chapter 5, does Chapter 5 discuss any negative health
5  risks of gender-affirming care?
6        MS. RIVAUX: Objection. Form; scope.
7        You can answer.
8    A.   The Assessment chapter discusses the types
9  of assessments that are necessary to determine
10 eligibility and readiness for gender-affirming care.
11 BY MR. BEATO:
12   Q.   Does it also talk about risks involved?
13        MS. RIVAUX: Objection. Form and scope.
14        You can answer.
15   A.   I would ask what you mean by "talk about."
16 It outlines what assessments need to be or should be
17 done to determine the readiness for care.
18 BY MR. BEATO:
19   Q.   And if I understand this correctly, part of
20 the assessments involve evaluating benefits and risks?
21        MS. RIVAUX: Objection. Form and scope.
22        You can answer.
23   A.   Broadly, yes.
24 BY MR. BEATO:
25   Q.   And in evaluating the risks, does that

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 46

1    also -- in evaluating -- sorry.
2           In evaluating risks, do you also have to
3    weigh irreversible potential medical consequences?
4           MS. RIVAUX:  Objection.  Form; scope.
5           You can answer.
6    A.    This is very standard healthcare.  All
7    healthcare interventions have outcomes associated with
8    them, and this is no different from any other type of
9    health intervention.
10   BY MR. BEATO:
11   Q.    So, Doctor, I would like to take a
12   five-minute break if you don't mind.
13   A.    Sure.
14          MR. BEATO:  Would you mind if we reconvene,
15          just because I like base-five numbers, how about
16          11:15?
17          THE WITNESS:  Sounds good.
18          MR. BEATO:  Thank you very much.
19          THE VIDEOGRAPHER:  Stand by.  We're going
20          off video record.  The time is 11:08 a.m.
21   (A recess was taken from 11:08 a.m. to 11:16 a.m.)
22          THE VIDEOGRAPHER:  We are back on the video
23          record.  The time is 11:16 a.m.
24   BY MR. BEATO:
25   Q.    All right.  So, Doctor, let me ask you this.

Page 47

1    And let me pull up Exhibit 1, the expert rebuttal
2    report.  Did you base any of your expert opinions on
3    the WPATH Standards of Care Version 8?
4           MS. RIVAUX:  Objection.  Form.  You can
5           answer.
6           MR. BEATO:  Counsel, can I have the basis
7           for the objection?
8           MS. RIVAUX:  It was confusing the way you
9           worded the question.
10          MR. BEATO:  Okay.  I could rephrase.
11   BY MR. BEATO:
12   Q.    Doctor, did you use WPATH's Standard of Care
13   Version 8 recommendations as a basis for your expert
14   report opinions?
15   A.    I suppose I would ask what you mean by
16   "use."  I have expertise and I reviewed the relevant
17   literature.
18   Q.    So I'm scrolling down to page 4, paragraph
19   13.  I highlight, "My opinions are based..." and I go
20   down to "...including my work as a contributing author
21   of WPATH Standards of Care 8."
22          Doctor, is paragraph 13 a fair and accurate
23   representation of your opinion?
24   A.    Yes.
25   Q.    Is the confidentiality from WPATH, is that

Page 48

1    preventing you from answering some of the WPATH
2    questions in this case?
3           MS. RIVAUX:  Objection.  Form; scope; and,
4           again, the same objections relating to the
5           confidentiality agreement and the stay order.
6    A.    I'm adhering to the confidentiality
7    agreement that I signed.
8    BY MR. BEATO:
9    Q.    Understood.
10          And, Doctor, again, in your expert report do
11   you opine on adult treatment?
12   A.    In the rebuttal.
13   Q.    Right.  Apologies.  I can be clear.  Let me
14   rephrase.
15          Doctor, in your expert rebuttal report, do
16   you discuss adult treatment?
17   A.    It -- the primary point or one of the
18   primary points of my report was related to adolescent
19   brain development.
20   Q.    Understood.  So where specifically do you
21   mention adults in your expert rebuttal report?
22   A.    I would have to review, but I believe by and
23   large the report is regarding adolescents because that
24   is what is pertinent.
25   Q.    And if you need time to review this report,

Page 49

1    let me know.  So, again, your report concerns
2    adolescent treatment; is that correct?
3    A.    Yes.
4    Q.    Now, Doctor, regarding adolescent treatment
5    and gender-affirming care, is there a lot of literature
6    out there on the treatment?
7           MS. RIVAUX:  Objection.  Form.
8           MR. BEATO:  Basis for objection?
9           MS. RIVAUX:  It's a really broad, ambiguous
10          question.  There's a lot of literature out
11          there.  It's just, you know, just a broad,
12          ambiguous question.
13   BY MR. BEATO:
14   Q.    Okay.  Let me rephrase.
15          Doctor, is there a good, a great deal of
16   evidence on the effects of gender-affirming care on
17   adolescents?
18          MS. RIVAUX:  Objection.  Form.
19          MR. BEATO:  Basis, Counsel.
20          MS. RIVAUX:  Same thing.  I think it's
21          ambiguous to say whether there's a great deal.
22          I think it's ambiguous.  But he may answer.
23   BY MR. BEATO:
24   Q.    I will scroll down to, we're still on
25   Exhibit 1, page 21.

E. Kale Edmiston, Ph.D          CONFIDENTIAL
March 23, 2023

---

Page 50

1           Doctor, could you read this sentence for me?
2      A.   "In contrast, there is a great deal of
3 evidence supporting the mental health benefits of GnRHa
4 treatment for transgender adolescents."
5      Q.   Doctor, is "great deal," is that vague?
6           MS. RIVAUX:  Objection.  Form.
7           MR. BEATO:  Basis?
8           MS. RIVAUX:  What's the relevance?
9           MR. BEATO:  The doctor wrote it.
10          MS. RIVAUX:  Okay.  So you can ask him about
11      what he means by it.
12 BY MR. BEATO:
13     Q.   What do you mean by "a great deal"?
14     A.   So in this instance I'm looking at the
15 literature, the decades of use of GnRHa treatment and
16 the expertise of, my own expertise, the expertise of my
17 colleagues.  There's a great deal -- again, there's a
18 great deal of evidence to support this, right.  So I'm
19 thinking broadly about evidence from clinical
20 experience of my colleagues as well as the research
21 literature.
22     Q.   Okay.  When you say "research literature,"
23 what do you mean?
24     A.   Publications like peer-reviewed
25 publications.

---

Page 51

1      Q.   Can you provide me examples of those?
2      A.   I would refer to you my bibliography.  I
3 think there's quite a few citations.
4      Q.   Can you name one off the top of your head?
5      A.   There's a de Vries paper.
6      Q.   And, again, Doctor, if I'm reading this
7 correctly, "In contrast, there's a great deal of
8 evidence supporting the mental health benefits of GnRHa
9 treatment for transgender adolescents."
10          Again, that's accurate?
11     A.   Yeah, so the sentence that is -- so the
12 sentence begins with the phrase, "In contrast."  The
13 sentence prior to it says, "There is little to support
14 the defendants' designated experts' speculation about
15 the negative effects of GnRHa treatment on the brain."
16 So I stand by the sentence as written.
17     Q.   Understood.  I will scroll up to page 16,
18 paragraph 31.  I highlighted the first sentence.
19 Doctor, could you please read that sentence?
20     A.   Yes, "There is a small body of literature on
21 the effects of gender-affirming hormone care on the
22 brain in transgender adolescents."
23          So am I correct in assuming that you're
24 trying to suggest that these two sentences are in
25 conflict with each other?

---

Page 52

1      Q.   No.
2      A.   Oh, okay.  Great.
3      Q.   Let's go to paragraph 5.  I'm sorry.  I
4 misspoke.  Page 5.  Bear with me, Doctor.  Sorry.  So
5 in chapter -- strike that.  Sorry.
6           In paragraph 16, I believe you're responding
7 to one of Dr. Scott's statements; is that correct?
8      A.   Yes.
9      Q.   I'm highlighting one sentence, I believe
10 it's the second sentence, "That is, literature
11 indicates that there are highly specific circumstances
12 in which adolescents are more likely to engage in risky
13 or impulsive behavior."
14          Doctor, my question is, did you provide a
15 citation for that assertion?
16     A.   I do later on.
17     Q.   Where is that?
18     A.   I believe it's -- yeah, paragraph 18.
19     Q.   And all those cases stand for that
20 proposition?
21     A.   So those are references that describe the
22 context -- the contextual nature of decision making and
23 adolescents.
24     Q.   And I'm scrolling back to page 5.  Bear with
25 me.  The sentence, "However, none of these examples are

---

Page 53

1 relevant to the issue at hand: Protracted medical
2 decision making made in the context of adult guidance
3 and consultation with a medical professional."
4           Doctor, my question is, what does protracted
5 mean here?
6      A.   Drawn out.
7      Q.   So in this context, what period of time are
8 we talking about?
9      A.   I'm sorry.  They're doing some work outside
10 of my office and it's a little loud.  Can you repeat
11 the question?
12     Q.   No problem whatsoever.  No problem.  And,
13 again, if there's like a -- something going on in the
14 background, more than happy to do that.
15          So in the final sentence of paragraph 16,
16 "However, none of these treatments are relevant to the
17 issue at hand: Protracted medical decision making made
18 in the context of adult guidance and consultation with
19 a medical professional," what does "protracted" mean?
20 Like what kind of -- here's the question.  What kind of
21 period of time are we looking at?
22     A.   So it could be -- you know, I think that it
23 varies, which is why SOC8 recommends an individualized
24 approach.  It could be eight months or even years for
25 some people.

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 54

1    Q.    Okay.  Do you have a citation or a study or
2    some basis for that proposition?
3    A.    I believe in the next paragraph I cite the,
4    I think it's a Bauer study.  Yeah, the Bauer 2022 study
5    which outlines the time between an adolescent realizing
6    that they're trans and then them coming out to a
7    healthcare provider.
8    Q.    All right.  So the this sentence -- okay.
9    Understood.  So that citation for that's -- okay.
10   Thank you, Doctor.  That's all I wanted.
11   A.    Um-hum.
12   Q.    Give me one second.
13         Let's go to Paragraph 25.  I think this is
14   on page 10, still on Exhibit 1.  I'm highlighting the
15   second sentence in Paragraph 25, "Case studies are the
16   lowest quality of evidence."  Could you elaborate on
17   that, Doctor?
18   A.    Yeah, a case study is a study of a single
19   individual, so they are generally not regarded as the
20   type of evidence that we would want to use to make --
21   to inform, you know, standards of care policy, you
22   know, the -- because it's just regarding a single
23   person, so generally, you know, we don't think of those
24   as being generalizable.
25   Q.    Understood.  And what limitations come with

Page 55

1    case studies?
2    A.    Well, it's a study of a single person, so we
3    don't know if we can extrapolate the findings to the
4    broader population.
5    Q.    Are there any other limitations inherent
6    with case studies, or it's just the focus of an
7    individual on one person, to your knowledge?
8    A.    I would say that's probably the primary
9    limitation of a case study is just the, you know,
10   questionable generalized ability of them.
11   Q.    Understood.
12         In your knowledge, do you know if WPATH
13   references any case studies in its standards of care?
14   A.    I don't know off the top of my head, but I
15   do know that WPATH cites a large body of literature
16   that includes empirical studies, longitudinal studies,
17   cross-sectional studies, cohort studies, unlike
18   Dr. Levine who did not cite any valid literature.
19   Q.    And in terms of the literature, does it
20   pertain to adolescent treatments with gender dysphoria?
21         MS. RIVAUX:  Objection.  Form.
22         MR. BEATO:  Basis?
23         MS. RIVAUX:  I didn't understand the
24   question.
25         MR. BEATO:  Sure, I'll back up.  I can take

Page 56

1    a step back before taking a step forward.
2    BY MR. BEATO:
3    Q.    So, Doctor, you said that in the standards
4    of care, in WPATH there's a lot of longitudinal
5    peer-reviewed literature, correct?
6    A.    I said that there is a variety of different
7    types of evidence that are informing recommendations as
8    a whole, so that could include longitudinal cohort,
9    cross-sectional.
10   Q.    Could that also include case studies?
11   A.    It may, yes.
12   Q.    And in terms of the longitudinal cohort
13   literature that you mentioned, does that literature
14   reference or relate to adolescent treatment concerning
15   gender-affirming care?
16   A.    There have been longitudinal adolescent
17   studies.  If you're asking me to speak to a specific
18   one, I would want to take a break and review it.
19   Q.    Understood.  Without speaking in depth about
20   it, could you identify them for me off the top of your
21   head, or are they mentioned in your bibliography?
22   A.    They are mentioned in my bibliography.
23   Q.    To your mind, does your bibliography
24   reference all of those longitudinal cohort adolescent
25   related studies that you're thinking of right now?

Page 57

1    A.    I cite the -- so I did a targeted literature
2    review, and I cite the studies that I was -- that I
3    identified that looked at mental health outcomes in
4    transgender youth.  I would hesitate to claim that I
5    have cited every longitudinal study of transgender
6    youth, but I did do a thorough literature review.
7    Q.    Fair enough.  Fair enough.  Are there any
8    additional reports that should be in your bibliography?
9    A.    Not that I'm aware of.
10   Q.    Let me go to paragraph 27 highlighting the
11   first sentence, "Both Dr. Levine and Dr. Laidlaw state
12   that the effects of GnRHa treatment on the brain are
13   both 'unknown' and 'likely negative.'"
14         Does WPATH comment on the effects of GnRH --
15   I'm going to get it wrong, Doctor.  I apologize.
16         Does WPATH opine on the effects of GnRHa
17   treatment on the brain?
18   A.    Not that I recall, but I would want to
19   review the entire document before making a definitive
20   statement.
21   Q.    Is there a great deal of evidence on the
22   subject?
23   A.    There is --
24         MS. RIVAUX:  Objection.
25         THE WITNESS:  Sorry.

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 58

1    MS. RIVAUX:  You can answer.
2    MR. BEATO:  And what's the basis for the
3  objection?
4    MS. RIVAUX:  I'm not sure when you're saying
5  "there's a great deal of evidence on the
6  subject" what the subject in particular you were
7  referring to.
8    MR. BEATO:  The effects of GnRHa treatment
9  on the brain.
10    MS. RIVAUX:  Do you want to rephrase -- the
11  way -- to me, the way it came out was a
12  little -- is a little bit ambiguous.  If you
13  want to rephrase it that way, that's fine.
14    MR. BEATO:  No problem whatsoever.  I'm just
15  asking for the basis of the objection so I can
16  ask a better question.
17    MS. RIVAUX:  Yeah, that's fine.
18    MR. BEATO:  Perfect.
19  BY MR. BEATO:
20    Q.    So, Doctor, is there a great deal of
21  evidence on the effects of GnRHa treatment on the
22  brain?
23    A.    There is -- there is evidence.  There are
24  studies that look at GnRHa treatment on the brain.
25    Q.    How many studies are you thinking of right

Page 59

1  now?
2    A.    In humans -- well, also, I guess it would
3  depend.  If you mean in humans, in transgender
4  adolescents, I believe there's three neuroimaging
5  studies.  There are also animal studies as well.
6    Q.    With, for example, I think, sheep?
7    A.    Yes, there are some studies of sheep.
8    Q.    Sheep and mice?
9    A.    And a primate study also.
10    Q.    And for those -- if I remember this --
11  please correct me if I'm wrong.  For those three human
12  studies, what were the results of those studies?
13    A.    I outlined those in the report.  Those
14  studies used different imaging modalities.  They found
15  differences in brain structure function that were
16  associated with sex assigned at birth; others that were
17  associated with gender identity.
18    But when they ran correlations to determine
19  associations between GnRHa treatment and brain
20  structure function, they did not find any -- there were
21  no significant findings.
22    Q.    Okay.  So no significant findings of
23  benefits in the treatments?
24    A.    No significant findings of any association.
25    Q.    Understood.  And for the animal studies, the

Page 60

1  sheep, mice and primates, what were the results of
2  those studies?
3    A.    Well, as I outlined in my rebuttal as well
4  as the paper, the review paper that I wrote that I
5  cited, the problem with a lot of the animal literature
6  is that they don't use the correct reference group for
7  comparing.  So a lot of those studies report
8  differences with GnRH treatment, but really their
9  difference is between natal sex, so we would expect a
10  medication that delays puberty to have sex-specific
11  effects.  That is the desired outcome of the treatment.
12    Q.    And I have no additional questions regarding
13  the report.  I do have additional follow-up questions,
14  though.
15    Earlier in the deposition you stated that
16  you were aware of the law in place in Florida.
17    A.    (Nodding head).
18    Q.    By the way, it's not a law; it's a
19  regulation, but understood, understood.
20    A.    All right.
21    Q.    How did you hear about it, the at-issue
22  regulation?
23    A.    I don't recall.
24    Q.    Understood.  If you could think back, was it
25  social media, the news or you don't remember?

Page 61

1    A.    I don't remember.  I don't recall at this
2  time.
3    Q.    And for your expert report, did you review
4  the at-issue regulations?
5    A.    I reviewed, as I believe is stated at the
6  beginning of the report, I reviewed the Florida
7  Medicaid opinion.
8    Q.    The so-called GAPMS report?
9    A.    Yes.
10    Q.    But not the at-issue regulation?
11    A.    No, I did not review the text of it.
12    Q.    But you were aware of the at-issue
13  regulation through something?
14    A.    (Nodding head).
15    Q.    Okay.  What is your opinion on the GAPMS
16  report?
17    MS. RIVAUX:  Objection.  Scope.
18    A.    I would ask that you just be a little bit
19  more specific.
20  BY MR. BEATO:
21    Q.    Sure.  So in writing this expert report, you
22  reviewed the GAPMS report with the accompanying
23  attachments, correct?
24    A.    Um-hum, yes.
25    Q.    As a professor, as a scientist, what are

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 62

1   your opinions of the GAPMS report?
2               MS. RIVAUX:  Objection.  Scope.
3               You can answer.
4        A.   I was surprised that it didn't seem to cite
5   a lot of relevant literature.
6   BY MR. BEATO:
7        Q.   What literature would you have cited?
8        A.   All the literature that I cited in my
9   rebuttal.
10       Q.   And in hearing about the at-issue
11  regulation, how do you feel about the regulation?
12              MS. RIVAUX:  Objection.
13  BY MR. BEATO:
14       Q.   What is your opinion as to the regulation?
15              MS. RIVAUX:  Objection.  Scope.
16       A.   I believe that healthcare decisions should
17  be made between patients and providers and their
18  families and based on expert medical evidence and
19  standards of care.
20              MR. BEATO:  Doctor, I have no further
21       questions.
22              Counsel can ask some follow-up questions.
23              MS. RIVAUX:  I don't have any follow-up
24       questions.
25              MR. BEATO:  All right.  Doctor, you're done.

Page 63

1               THE WITNESS:  All right.  Thank you.
2               MR. BEATO:  Thank you, Doctor.  I know
3       you're probably busy.  And thank you for making
4       yourself available and taking time to answer
5       these questions.  It's really appreciated.
6               MS. RIVAUX:  Do you want to give him the
7       instruction about reading or waiving?
8               MR. BEATO:  Could you do that, Counsel?
9               MS. RIVAUX:  Sure.  So, Dr. Edmiston, you
10      have the right to read your report and make any
11      changes to the extent that there were any errors
12      in the transcription or you can waive that.
13      Otherwise, you'd get a copy.  If you choose to
14      read it, you'll have 30 days when you get it to
15      review it to make any changes.  There will be a
16      form in which you can make any correction.  And
17      then that gets sent back and a corrected copy
18      will get circulated to everybody.
19              THE WITNESS:  Yeah, I'd like to read it.
20              MS. RIVAUX:  Okay.
21              MR. BEATO:  And, Doctor, just to be super
22      cautious because I know you have a
23      confidentiality agreement, I don't want to
24      violate that at all.  If you said something
25      inadvertently that, you know, maybe you probably

Page 64

1   shouldn't have said, should this deposition be
2   under seal?  We can send the court reporter the
3   protective order.  I just want to make sure.
4               MS. RIVAUX:  Yeah, you know what?  Why don't
5       we do it that way, and then if there's any
6       reason to unseal it or to seal any specific
7       portion, we can go ahead and do that.  And then
8       we can -- you know, if there's anything -- so
9       until Dr. Edmiston has an opportunity to review
10      it, and then we can mark things confidential as
11      appropriate later on.  I appreciate that.  Thank
12      you.
13              MR. BEATO:  No problem.  Doctor, I
14      understand.  You're put in a tough position,
15      right.  You have -- you got something signed.  I
16      respect that.  I wasn't trying to make you feel
17      uncomfortable or get around that, so I just want
18      to make sure everything is good.
19              I will ask, though, for an expedited
20      transcript.
21              And, Doctor, I want to make sure you have
22      sufficient time to review it, but at the same
23      time we want to get this finalized as soon as
24      possible.
25              THE WITNESS:  I appreciate that.

Page 65

1               MR. BEATO:  So, Zack, are you on there?  We
2       can send over the court reporter the protective
3       order.
4               THE STENOGRAPHER:  I just want to remind you
5       we're still on video record.
6               MR. BEATO:  That's fine.  This can all be on
7       the record.  That's fine.
8               Okay.  I think we're -- I think we're good.
9       Thank you for your time, Doctor.
10              THE WITNESS:  You're welcome.
11              THE VIDEOGRAPHER:  This is the videographer.
12      Would anyone like to order a copy of the video?
13              MR. BEATO:  A copy of the video, I don't
14      need a copy of the video.
15              THE VIDEOGRAPHER:  And Ms. Rivaux?
16              MS. RIVAUX:  I don't -- I don't think we
17      need a copy of the video at this time.  But for
18      the transcript, we'd like it at the same time,
19      please.
20              MR. BEATO:  Yes, expedited.
21              THE VIDEOGRAPHER:  Is there a date for that?
22      Just as soon as possible or --
23              MS. RIVAUX:  As soon as possible.
24              THE VIDEOGRAPHER:  Okay.
25              MR. BEATO:  Thank you very much.

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 66

```
 1              THE VIDEOGRAPHER:  And then I'll go ahead
 2       and take us off the video record.  We're going
 3       off the record in the video deposition of
 4       Dr. Kale Edmiston.  We're going off the record
 5       on March 23rd, 2023 at 11:43 a.m.
 6       (Thereupon, the proceedings concluded at
 7       11:43 a.m.)
 8       (The witness did not waive signature.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 67

CERTIFICATE OF OATH

THE STATE OF FLORIDA          )

COUNTY OF PALM BEACH COUNTY  )

    I, the undersigned authority, certify that

E. KALE EDMISTON, Ph.D. remotely appeared before me and

was duly sworn on the 23rd day of March 2023.

Signed this 23rd day of March 2023.

_____

    BARBIE GALLO, RMR-CRR

    Notary Public - State of Florida

    My Commission No. GG939757

    My Commission Expires: December 15, 2023

Page 68

CERTIFICATE OF REPORTER

THE STATE OF FLORIDA )

COUNTY OF PALM BEACH )

    I, Barbie Gallo, RMR-CRR, Registered Merit

Reporter-Certified Realtime Reporter, certify that I

was authorized to and did stenographically report the

deposition of E. KALE EDMISTON, Ph.D., pages 1 through

69; that a review of the transcript was requested; and

that the transcript is a true and complete record of my

stenographic notes.

    I further certify that I am not a relative,

employee, attorney, or counsel of any of the parties,

nor am I a relative or employee of any of the parties'

attorney or counsel connected with the action, nor am I

financially interested in the action.

    DATED this 23rd day of March 2023.

                _____

                Barbie Gallo, RMR-CRR

Page 69

Thursday, March 23rd, 2022
E. Kale Edmiston, Ph.D. c/o Shani Rivaux
Pillsbury, Winthrop, Shaw, Pittman, LLP
600 Brickell Avenue
Suite 3100
Miami, Florida 33131
(786) 913-4900
shani.rivaux@pillsbury.com
IN RE:  DEKKER vs WEIDA
CASE NO.:  CASE NO. 4:22-CV-00325-RH-MAF
Please take notice that on the 23rd day of March 2023,
you gave your deposition in the above cause.  At that
time you did not waive your signature.
The above-addressed attorney has ordered a copy of this
transcript and will make arrangements with you to read
their copy.  Please execute the Errata Sheet, which can
be found at the back of the transcript, and have it
returned to us for distribution to all parties.
If you do not read and sign the deposition within 30
days, the original, which has already been forwarded to
the ordering attorney, may be filed with the Clerk of
the Court.
If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter and
return it to the address listed below.
Very truly yours,
Barbie Gallo, RMR-CRR
Phipps Reporting, Inc.
1551 Forum Place, Suite 200-E
West Palm Beach, Florida 33401
I do hereby waive my signature.

_____

E. KALE EDMISTON, Ph.D.

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

```
                                          Page 70
                    ERRATA SHEET
       DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
                 IN RE: DEKKER vs WEIDA
         CASE NO.:  CASE NO. 4:22-CV-00325-RH-MAF
         WITNESS:  E. KALE EDMISTON, PH.D.
                TAKEN:  03/23/2023
PAGE    LINE       CHANGE          REASON FOR CHANGE
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

    Under penalties of perjury, I declare that I have
read the foregoing document and that the facts stated
in it are true.

_____    _____
Date                  E. KALE EDMISTON, Ph.D.
```

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023                                                                1

---

**1**

**1**
  3:10  11:6, 7, 15
  12:5  16:12
  47:1  49:25
  54:14
**10**
  54:14
**10:07**
  4:2, 5
**11**
  3:10
**11:08**
  46:20, 21
**11:15**
  46:16
**11:16**
  46:21, 23
**11:43**
  66:5, 7
**12**
  24:20  37:6
**13**
  37:6  47:19, 22
**16**
  51:17  52:6
  53:15
**18**
  52:18

---

**2**

**2**
  3:11  23:9, 12
  27:19  29:22
**2013**
  12:7
**2016**
  12:8

**2017**
  26:19
**2022**
  54:4
**2023**
  4:10  66:5
**21**
  49:25
**23**
  3:11
**23rd**
  4:10  66:5
**24**
  3:15
**25**
  54:13, 15
**26**
  12:13
**260**
  3:15
**27**
  57:10
**29**
  3:15  12:13

---

**3**

**3**
  3:15  16:12
  23:21  24:11, 14
  26:22  37:5
**30**
  3:15  63:14
**31**
  51:18
**33**
  32:10  33:15, 16
**34**
  32:11, 12  35:22
**35**

**37:24
38**
  40:17
**39**
  40:19  43:7

---

**4**

**4**
  3:15  27:19
  30:22, 25  32:10
  37:22  47:18

---

**5**

**5**
  32:8  42:22
  45:4  52:3, 4, 24
**5.3A**
  39:12
**5.4**
  32:14
**5.5**
  32:15

---

**6**

**6**
  3:4, 11
**67**
  3:5
**68**
  3:6
**69**
  3:6

---

**7**

**7**
  16:13  17:15
  20:10
**70**

**3:7**

---

**8**

**8**
  3:12  16:22
  20:4, 12  22:23
  31:3  43:19
  47:3, 13, 21

---

**A**

**a.m.**
  4:2, 5  46:20,
  21, 23  66:5, 7
**ability**
  55:10
**access**
  39:15, 24  40:6
**accommodate**
  6:17  40:15
**accompanying**
  61:22
**accurate**
  16:19  47:22
  51:10
**accurately**
  11:10  18:6
**additional**
  21:12, 15  22:3
  57:8  60:12, 13
**address**
  19:3
**addressed**
  19:15
**adhering**
  48:6
**administering**
  5:10
**adolescent**
  14:4  48:18

49:2, 4  54:5
55:20  56:14,
16, 24

**adolescents**
14:11  48:23
49:17  50:4
51:9, 22  52:12,
23  59:4

**adult**
34:17  35:19
39:14  48:11, 16
53:2, 18

**adults**
17:20, 23  18:1
24:22  32:5
37:24  38:23
48:21

**advocacy**
31:6

**advocate**
30:5

**affect**
8:17

**agreement**
19:21  20:1
22:1  23:4
25:12  28:5, 19,
22  29:5, 14
37:10  43:25
44:8, 22, 25
48:5, 7  63:23

**ahead**
7:10  34:24
64:7  66:1

**allowed**
40:6

**alter**
8:23

**ambiguous**
49:9, 12, 21, 22
58:12

**amount**
40:6

**animal**
59:5, 25  60:5

**announce**
4:14

**answering**
6:11  29:20
48:1

**answers**
10:11

**anxiety**
8:1

**Apologies**
48:13

**apologize**
13:2, 11  38:15
40:18  57:15

**appearance**
4:15  5:1

**appearing**
5:7

**Appellate**
23:5

**appreciated**
63:5

**approach**
37:19  53:24

**approached**
16:5

**area**
7:20  30:16

**areas**
21:24  27:13, 16

**assertion**
52:15

**assessment**
17:16, 19, 22, 23
18:6, 9  20:4,
11, 13  23:22

24:8, 22  32:5
37:24  38:20,
23, 24  39:17
45:8

**assessments**
45:9, 16, 20

**assigned**
59:16

**assisted**
32:3

**associate**
7:15

**association**
4:13  59:24

**associations**
59:19

**assume**
30:2

**assumed**
16:4

**assuming**
19:6  51:23

**at-issue**
60:21  61:4, 10,
12  62:10

**attachments**
61:23

**August**
4:7

**author**
17:16  20:11
36:12  47:20

**authored**
43:17

**authoring**
32:3  41:8, 22
44:17

**authors**
25:14  26:10
29:9  37:1

**aware**
7:11  16:3
21:25  42:6
57:9  60:16
61:12

**B**

**bachelor's**
8:7

**back**
22:14  27:18
33:14  37:4, 22
39:10  46:22
52:24  55:25
56:1  60:24
63:17

**background**
8:6  53:14

**Ballpark**
26:18

**Barbie**
4:12

**barred**
21:8

**base**
37:23  38:2
47:2

**base-five**
46:15

**based**
10:11  24:5
47:19  62:18

**basis**
14:2  47:6, 13
49:8, 19  50:7
54:2  55:22
58:2, 15

**Bauer**
54:4

**bear**

10:25  37:4
52:4, 24

**Beato**
3:5  4:16, 17
6:2, 5  7:13
10:6, 22  11:5,
8, 19  13:10, 20
14:18  15:1
17:1, 9, 24
18:4, 11, 17, 23
19:9  20:2, 9
21:2, 11, 15
22:6, 11, 12, 20
23:10  24:1, 12
25:2, 7, 17  26:6
27:5, 11, 17
28:7  29:1, 6, 17
30:4, 11, 17, 23
31:10, 18  32:1,
7  34:6, 12, 19
35:5, 14, 21
36:10, 19  37:3,
16  38:9, 14
39:1, 8, 21
40:8, 24  41:6,
18  42:10, 19
43:6, 16  44:2,
14  45:1, 11, 18,
24  46:10, 14,
18, 24  47:6, 10,
11  48:8  49:8,
13, 19, 23  50:7,
9, 12  55:22, 25
56:2  58:2, 8,
14, 18, 19  61:20
62:6, 13, 20, 25
63:2, 8, 21
64:13  65:1, 6,
13, 20, 25

**began**
4:2

**begin**
6:6  15:23

**beginning**
35:23  61:6

**begins**
33:16  51:12

**behalf**
4:17, 20, 23
28:2

**behavior**
52:13

**benefit**
6:10, 18

**benefits**
45:20  50:3
51:8  59:23

**Bennington**
5:2, 4, 6

**bibliography**
11:13  14:7, 9
51:2  56:21, 22,
23  57:8

**Biggs"**
16:9

**biological**
14:2

**birth**
59:16

**bit**
24:14  35:1
39:7, 22  42:6
58:12  61:18

**blanket**
9:4  20:19

**blockers**
8:22  10:14
39:3

**body**
51:20  55:15

**bottom**
32:12

**brain**

14:4  48:19
51:15, 22
57:12, 17  58:9,
22, 24  59:15, 19

**break**
6:16  20:9
40:11, 14  41:16
46:12  56:18

**broad**
37:14, 15  41:20
49:9, 11

**broader**
55:4

**broadly**
45:23  50:19

**build**
26:10

**building**
29:19

**busy**
63:3

—————————

C

**cancer**
41:5

**capacity**
38:19

**care**
8:22  13:24
16:21  17:3, 8
18:7, 15  20:4,
12, 13  22:15, 16
25:19  27:22
28:12  30:6
31:3, 16, 24
37:7, 12, 14, 19
39:24  43:19
45:5, 10, 17
47:3, 12, 21
49:5, 16  51:21
54:21  55:13

56:4, 15  62:19

**case**
6:6  11:10
12:3, 9  16:2, 6
19:4  25:13
48:2  54:15, 18
55:1, 6, 9, 13
56:10

**cases**
40:19, 20, 22
41:9  52:19

**cautious**
63:22

**CERTIFICATE**
3:5, 6

**certified**
5:24

**Chairs**
3:13  23:18

**challenge**
16:4  42:24

**Chan**
7:17

**change**
10:3

**chapter**
17:16, 19, 22
18:6, 9  20:4,
11, 14  23:22, 25
24:3, 7, 8  25:6
27:19  29:9, 23,
24  32:2, 3, 6, 8
33:20  38:5
39:14  41:9, 22
42:22  43:18
44:3  45:4, 8
52:5

**chapters**
27:9  44:5, 17

**characteristics**
8:24

China
  8::13

choose
  63::13

Christina
  24::9

circulated
  63::18

circumstances
  52::11

citation
  41::4  52::15
  54::1,,9

citations
  42::8,,21  51::3

cite
  54::3  55::18
  57::1,,2  62::4

cited
  12::7,,8  42::7
  57::5  60::5
  62::7,,8

cites
  55::15

claim
  57::4

clarification
  13::15

clarify
  6::22  9::6  12::24
  26::7

clear
  33::19  48::13

clinical
  50::19

clinicians
  31::16

co-author
  23::25  32::5
  44::1

cohort
  55::17  56::8,,12,,
  24

collaboratively
  25::16  44::13

colleagues
  50::17,,20

collect
  14::19  31::20

collected
  12::21

College
  8::8

comment
  57::14

Committee
  3::12  23::17

common
  34::13,,14

comparing
  60::7

completed
  8::7

concern
  17::25  19::19

concerns
  49::1

concluded
  66::6

conclusion
  15::10

conclusions
  16::22  18::5,,7
  42::5  43::3

conduct
  8::1

conducted
  12::17  26::9

conducting
  7::23

confidential
  20::23  21::1,,7
  64::10

confidentiality
  20::1  22::1  23::4
  25::12  28::4,,19,,
  22  29::8,,14,,16
  37::10  41::13
  43::24  44::7,,21,,
  24  47::25  48::5,,
  6  63::23

conflict
  51::25

confusing
  47::8

consensus
  18::9  20::15
  25::19,,22  26::11
  35::24  36::1,,2,,
  13,,17  44::12

consent
  5::10  38::20

consequences
  46::3

consultation
  53::3,,18

contained
  11::13

contest
  6::16

context
  30::13  38::6,,8
  40::25  43::15
  52::22  53::2,,7,,
  18

contextual
  52::22

contrast
  50::2  51::7,,12

contribute
  44::17

contributing
  47::20

CONTRIBUTORS
  3::15

convey
  32::22

copy
  11::16  63::13,,17
  65::12,,13,,14,,17

correct
  12::25  13::2
  17::17  49::2
  51::23  52::7
  56::5  59::11
  60::6  61::23

corrected
  3::10  11::16,,22,,
  25  12::1,,6
  63::17

correction
  63::16

correctly
  45::19  51::7

correlations
  59::18

counsel
  4::14  24::5
  28::18  47::6
  49::19  62::22
  63::8

court
  4::24  6::10,,18
  11::5  19::20,,24
  21::12,,16  22::4
  23::5  64::2  65::2

covered
  19::3

created
  18::22,,25

credibility
  21::17

criteria
  29:24
cross-sectional
  55:17 56:9
cross-sex
  8:22 10:17
crosstalk
  6:19
curious
  7:6
current
  7:14 21:9

_____

          D

darker
  16:16
data
  12:21,25 13:4
  15:17
date
  13:9 65:21
days
  63:14
de
  51:5
deal
  14:21 49:15,21
  50:2,5,13,17,
  18 51:7 57:21
  58:5,20
decades
  50:15
decision
  14:4 52:22
  53:2,17
decisions
  62:16
defendant's
  23:9 24:11
  30:22

defendants
  6:5
defendants'
  11:7 16:8
  51:14
defense
  4:17
define
  8:21 12:18
  28:6 36:20
  38:6
defined
  33:22
definition
  9:17,20,24
definitive
  15:10 57:19
degree
  8:7 39:19
Dekker
  4:7
DEKKERFL_WPATH_
000001
  3:16
DEKKERFL_WPATH_
000260
  3:16
DEKKERFL_WPATH_
000381
  3:14
DEKKERFL_WPATH_
000386
  3:14
delays
  60:10
depend
  59:3
depending
  19:18
deposed

6:7
deposition
  4:6,9 6:15 7:8
  8:16,21 25:18
  42:11 60:15
  64:1 66:3
depression
  8:2
depth
  56:19
describe
  8:5 13:16,19
  18:6 25:23
  27:12 42:1
  52:21
describes
  27:15
DESCRIPTION
  3:9
design
  15:16 42:13
designated
  51:14
designation
  14:15
desired
  60:11
desires
  6:12
determine
  10:9 14:16
  37:2 39:18
  45:9,17 59:18
develop
  31:16
development
  14:5,10 48:19
diagnosed
  10:12
difference

12:5 24:2
  32:17,20 60:9
differences
  33:1 59:15
  60:8
differently
  32:22
DIRECT
  3:4 6:1
discovery
  19:16
discuss
  43:12 45:4
  48:16
discussed
  41:12
discusses
  45:8
discussing
  44:23
disseminate
  31:17
distracting
  39:20
diverse
  33:25
Diversity/
dysphoria
  24:22
docs
  8:13
doctor
  5:3 6:4 8:15,
  25 10:25 11:9,
  24 12:10 13:2,
  11 15:11 16:1,
  13,19 19:12
  20:3,10 22:13
  23:21 24:18,23
  26:13 29:18,23
  30:19,25 32:12

33:15, 18  35:15
36:1  37:23
38:15, 19  39:9,,
12,, 25  40:10, 19
41:7  43:9  44:5
45:3  46:11,, 25
47:12,, 22
48:10,, 15  49:4,,
15  50:1,, 5,, 9
51:6,, 19  52:4,,
14  53:4  54:10,,
17  56:3  57:15
58:20  62:20,, 25
63:2,, 21  64:13,,
21  65:9

**document**
10:23  11:1,, 3,,
9,, 21  18:10
23:11,, 13
24:13,, 17
25:16, 19  27:15
31:2  33:2  36:9
43:12,, 13,, 18
44:12  57:19

**documents**
7:1,, 4  14:6
17:13

**drafted**
44:12,, 13

**drafting**
22:22  28:12
31:23

**draw**
15:9  42:5  43:3

**Drawn**
53:6

**DSM-5**
9:23

**dues**
26:15

**duly**
5:23

**duration**
39:18

**dysphoria**
8:24  9:17,, 21
10:12,, 15,, 19
12:17  13:3,, 8,,
14  14:5  17:4
39:4  55:20

---

### E

**earlier**
12:2  25:18
42:11  60:15

**earn**
8:11

**easier**
20:20

**Edmiston**
3:4,, 10  4:6
5:9,, 22  11:23
19:25  21:10
28:1,, 3  63:9
64:9  66:4

**educated**
28:14

**educational**
8:6

**effects**
49:16  51:15,, 21
57:12,, 14,, 16
58:8,, 21  60:11

**elaborate**
34:3  54:16

**eligibility**
45:10

**empirical**
12:17,, 18,, 19,, 20
13:3  37:23
38:2  55:16

**employ**

27:22

**endeavor**
6:19

**ending**
35:24

**Endocrine**
17:11,, 12  33:10

**endocrinologist**
9:12  28:9

**endocrinologists**
27:1,, 8

**endurance**
6:15

**engage**
52:12

**ensure**
43:14

**entail**
7:22

**entails**
7:23

**entered**
23:5

**entire**
57:19

**entirety**
43:14

**ERRATA**
3:7

**errors**
63:11

**Establishing**
3:12  23:17

**estrogen**
41:5

**et al**
4:7,, 8

**evaluating**
45:20,, 25  46:1,,

2

**evidence**
3:13  11:12
15:2  23:18
31:15,, 19  33:2,,
4,, 5,, 8  35:6
37:13,, 23  38:2
41:23  42:2,, 7,,
12,, 14,, 22  49:16
50:3,, 18,, 19
51:8  54:16,, 20
56:7  57:21
58:5,, 21,, 23
62:18

**EXAMINATION**
3:4  6:1

**examples**
42:12  51:1
52:25

**Excellent**
12:14  31:4

**Exhibit**
3:10, 11,, 15
11:6,, 7  12:5
16:12  23:9,, 12
24:11,, 14  26:22
27:18  29:22
30:22,, 25  32:10
37:4,, 5,, 22  47:1
49:25  54:14

**expect**
60:9

**expedited**
64:19  65:20

**experience**
50:20

**experimental**
14:13

**expert**
3:10  11:10,, 22
12:3  16:7,, 22
17:13,, 25  21:20

E. Kale Edmiston, Ph.D
March 23, 2023

CONFIDENTIAL

7

47:1, 2, 13
48:10, 15, 21
61:3, 21 62:18

**expertise**
16:24 27:13, 16
28:12, 15 31:15
36:17, 20 37:2
47:16 50:16

**experts**
18:10

**experts"**
51:14

**explain**
13:21

**extant**
12:23

**extent**
19:2 20:22
21:5, 6 22:1
23:3 25:11
26:1, 2 28:1, 3
29:4 37:9
41:11 63:11

**externally**
26:9

**extrapolate**
55:3

—————————

F

**fair**
9:3 10:10
27:18 38:10
39:9 43:17
47:22 57:7

**fairly**
11:9 18:6

**familiar**
23:14 24:17, 23
30:25

**families**

62:18

**feel**
10:8 29:20
62:11 64:16

**feelings**
39:19

**final**
53:15

**finalized**
64:23

**find**
59:20

**findings**
55:3 59:21, 22, 24

**fine**
19:18 20:24
26:5 58:13, 17
65:6, 7

**finite**
15:18

**firm**
8:21

**five-minute**
40:11 46:12

**Florida**
60:16 61:6

**focus**
55:6

**follow-up**
60:13 62:22, 23

**form**
7:9 10:5, 21
13:5, 17 14:14,
24 16:23 17:5,
21 18:3, 8, 13,
19 19:1 22:17
23:2, 24 25:1,
4, 10 27:3, 7, 14
28:24 29:15
30:1, 7, 14

31:8, 12, 21
32:4 34:4, 15
35:9, 16 36:4,
14, 22 37:8
38:3, 13, 22
39:5, 13 40:1,
21 41:2, 10, 24
42:15, 23
43:10, 22 44:6,
19 45:6, 13, 21
46:4 47:4 48:3
49:7, 18 50:6
55:21 63:16

**forward**
22:14 56:1

**found**
59:14

**front**
7:1, 2

**full**
29:24

**fully**
43:14

**function**
59:15, 20

—————————

G

**gain**
28:15

**Gallo**
4:12

**GAMSTS**
39:15

**GAPMS**
61:8, 15, 22
62:1

**Gary**
4:21

**gather**
31:14

**gender**
8:24 9:17, 21,
24 10:2, 3, 12,
15, 19 12:17
13:3, 7, 14 14:5
17:4 24:22
33:25 39:3, 15,
19, 23 55:20
59:17

**gender-affirming**
8:22 18:7
37:7, 14 39:24
45:5, 10 49:5,
16 51:21 56:15

**general**
26:21 41:20

**generalities**
26:3

**generalizable**
54:24

**generalized**
55:10

**generally**
25:23 26:7
41:7 54:19, 23

**give**
5:16 27:24
41:16 54:12
63:6

**giving**
20:19

**Gnrh**
57:14 60:8

**Gnrha**
50:3, 15 51:8,
15 57:12, 16
58:8, 21, 24
59:19

**God**
5:18

**gold**

18:15
Gonzalez
    4:22
good
    4:16, 18  5:7
    6:4  10:24
    29:25  46:17
    49:15  64:18
    65:8
GRADE
    33:11
graded
    33:2
grading
    33:5, 8
grant
    38:20
great
    49:15, 21  50:2,
    5, 13, 17, 18
    51:7  52:2
    57:21  58:5, 20
greater
    9:6
grievance
    26:9
ground
    6:9
grounds
    34:24
group
    60:6
guess
    19:19  26:20
    59:2
guidance
    21:12, 16  22:4
    53:2, 18
guidelines
    18:16  37:18

H

Hampshire
    8:8
hand
    5:15  53:1, 17
happy
    6:22  21:11, 15
    34:8  40:15
    53:14
harm
    43:8
head
    6:14  42:8  51:4
    55:14  56:21
    60:17  61:14
health
    14:10  45:4
    46:9  50:3  51:8
    57:3
healthcare
    28:17  37:21
    40:7  46:6, 7
    54:7  62:16
hear
    38:15  60:21
hearing
    62:10
held
    4:9
Hembree
    41:3
hereinafter
    5:24
hesitate
    57:4
high
    14:22
highlight
    16:14  47:19

highlighted
    33:18  34:2
    51:18
highlighting
    16:13, 14, 15
    33:16  35:22
    40:17  52:9
    54:14  57:10
highly
    52:11
Holtzman
    5:8
hormone
    10:17  27:9
    51:21
hormones
    8:23
hour
    40:11
human
    59:11
humans
    59:2, 3

I

i.d.
    11:7  23:9
    24:11  30:22
idea
    42:25
identified
    57:3
identify
    56:20
identity
    9:25  10:3  14:2
    59:17
imaging
    59:14

immediately
    38:20
important
    43:9
impressive
    12:15
impulsive
    52:13
inadvertently
    63:25
include
    56:8, 10
includes
    55:16
including
    47:20
incongruence
    39:16, 19, 23
incorporate
    9:5
INDEX
    3:1
indicating
    33:23
individual
    10:15, 18  39:3
    54:19  55:7
individual"s
    27:13
individualized
    37:19  38:24
    39:2  53:23
individually
    21:22
individuals
    24:21, 23  25:3,
    8  26:22, 24
    37:6, 12, 20
    38:19

**inform**
    54:21

**information**
    19:7, 23  20:23
    21:1, 5, 7, 8
    33:13

**informing**
    56:7

**inherent**
    55:5

**instance**
    40:23  41:1
    50:14

**instances**
    12:9

**instruct**
    22:8

**instruction**
    20:25  21:6
    27:25  63:7

**internal**
    19:17, 23

**intervention**
    34:18  35:4, 11,
    20  46:9

**interventions**
    46:7

**introduce**
    30:24

**involve**
    17:19  45:20

**involved**
    25:15  27:9
    28:11  37:20
    45:12

**irreversible**
    46:3

**issue**
    21:13, 16, 19
    53:1, 17

**issues**
    19:3, 15

_____

            **J**
_____

**Jason**
    4:8

**job**
    7:18, 22, 23
    15:6

_____

            **K**
_____

**Kale**
    3:4, 10  4:6
    5:22  11:23
    66:4

**kind**
    31:19  33:5, 8
    53:20

**knowledge**
    27:22  28:3
    45:3  55:7, 12

_____

            **L**
_____

**lab**
    8:9

**Laidlaw**
    57:11

**Lambda**
    16:5

**Lamda**
    4:23

**language**
    9:23  33:3

**large**
    43:12  48:23
    55:15

**law**
    16:3  60:16, 18

**lead**
    3:13  23:18, 22
    24:3, 7  29:23
    42:14

**leads**
    29:24

**lean**
    9:22

**learn**
    16:1

**learned**
    16:6

**leave**
    14:17

**Legal**
    4:23  16:5

**LETTER**
    3:6

**Levine**
    55:18  57:11

**Levine"s**
    16:9

**Lexitas**
    4:13

**life**
    10:4

**limit**
    6:19

**limitation**
    15:24  20:24
    42:17  55:9

**limitations**
    15:6, 8, 12, 15,
    16, 20, 22  42:4,
    13  43:1  54:25
    55:5

**limited**
    35:6  37:25
    38:11

**list**

    15:23  25:14

**listed**
    24:9  25:9
    26:22

**lit**
    26:8

**literature**
    12:23  13:13, 24
    15:7  41:14, 21
    42:4  47:17
    49:5, 10  50:15,
    21, 22  51:20
    52:10  55:15,
    18, 19  56:5, 13
    57:1, 6  60:5
    62:5, 7, 8

**live**
    8:3, 4

**long**
    19:17  25:14

**longer**
    24:14

**longitudinal**
    55:16  56:4, 8,
    12, 16, 24  57:5

**looked**
    57:3

**lot**
    15:4  36:7
    49:5, 10  56:4
    60:5, 7  62:5

**lots**
    28:14  43:2

**loud**
    53:10

**low**
    14:22  15:2, 5
    41:23  42:2, 14,
    18, 25

**low-quality**
    42:12, 22

lowest
54:16

**M**

M.D.
10:16  28:8
made
53:2, 17  62:17
make
16:15  29:20
54:20  63:10,
15, 16  64:3, 16,
18, 21
makes
14:12  15:2
making
14:4  16:22
17:13  22:21
52:22  53:2, 17
57:19  63:3
manners
28:14
March
4:10  66:5
mark
11:6  23:12
64:10
marked
39:16, 23
Massachusetts
8:4
matter
4:7  5:16
means
29:25  30:2, 10
36:13  38:7
39:17  40:3
50:11
media
60:25

Medicaid
61:7
medical
8:13  9:16, 18,
19  17:8, 10
28:6, 10, 13
39:4  46:3
53:1, 3, 17, 19
62:18
medication
60:10
medications
8:17
Medicine
7:17  8:10
Meet
3:12  23:18
meetings
4:10
member
26:13, 16  28:21
29:25  30:2
members
27:20
membership
26:14
memory
8:18  12:14
27:2
mental
14:10  50:3
51:8  57:3
mention
48:21
mentioned
14:6  15:11
21:23  28:18
41:9  42:21
56:13, 21, 22
mentoring
7:24

mice
59:8  60:1
Michael
4:17  6:5  19:6
mind
17:11  36:11
46:12, 14  56:23
misspoke
52:4
modalities
59:14
moment
33:15
months
53:24
morning
4:16, 18  5:7, 11
6:4
move
30:19, 21  45:2
Moving
40:9

**N**

natal
60:9
nature
15:23  52:22
necessarily
15:8
negative
45:4  51:15
negative."
57:13
neuro
14:1
neuroimaging
59:4
neurologist

9:10
neuroscience
8:9, 12
news
16:3  60:25
nodding
6:12, 14  60:17
61:14
nondisclosure
19:21
nonmedical
27:23
nonstandard
34:18  35:4, 20
nontypical
40:22  41:1
notes
6:25
noting
44:16
number
3:9  6:10  11:7
23:9  24:11
26:22  27:19
30:22
numbers
46:15
numerous
15:22

**O**

oath
3:5  5:10
object
7:9  19:2  25:25
34:23  35:8
40:1  43:4
44:19
objection
10:5, 21  11:17

13:5, 17  14:14,
24  16:23  17:5,
21  18:3, 8, 13,
19  19:1  20:20
22:17  23:2, 24
25:1, 4, 10, 11
27:3, 7, 14, 24
28:24  29:3, 15
30:1, 7, 14
31:8, 12, 21
32:4  34:4, 15
35:8, 16  36:4,
14, 22  37:8
38:3, 13, 22
39:5, 13  40:21
41:2, 10, 24
42:15, 23
43:10, 22  44:6
45:6, 13, 21
46:4  47:4, 7
48:3  49:7, 8, 18
50:6  55:21
57:24  58:3, 15
61:17  62:2, 12,
15

**objections**
44:7, 16  48:4

**occupation**
7:14

**occur**
43:1

**occurs**
38:8

**office**
53:10

**Omar**
4:22

**one"s**
10:1, 3, 4

**oops**
40:18

**opine**
48:11  57:16

**opinion**
9:16, 18  14:12
17:2  30:13
36:12  47:23
61:7, 15  62:14

**opinions**
11:10  18:7
47:2, 14, 19
62:1

**opportunity**
64:9

**order**
19:16, 21, 24
21:9  28:5
41:12, 13  43:25
48:5  64:3
65:3, 12

**organization**
17:7  31:7

**organizations**
17:8, 10

**original**
12:20, 24  13:4

**outcome**
60:11

**outcomes**
46:7  57:3

**outline**
36:7, 25

**outlined**
25:22  59:13
60:3

**outlines**
17:22  23:8
31:23  44:11
45:16  54:5

**overdue**
26:15

**P**

**pages**
3:11, 15  23:13

**paper**
13:25  14:3, 8
41:15, 17  51:5
60:4

**paragraph**
16:13  17:15
20:10  47:18, 22
51:18  52:3, 6,
18  53:15  54:3,
13, 15  57:10

**paragraphs**
12:12, 13

**paralegal**
5:7

**part**
39:17  45:19

**partner**
7:11

**patients**
62:17

**peer-reviewed**
50:24  56:5

**people**
13:25  25:15
28:11  30:15
35:3  36:17
53:25

**Perfect**
6:3  7:4  8:20
11:3  16:18
22:11  58:18

**perfectly**
22:24  41:19

**performed**
10:18

**period**

**person**
5:12  10:9  40:3
54:23  55:2, 7

**person"s**
39:15

**personal**
28:3

**pertain**
55:20

**pertains**
14:5

**pertinent**
48:24

**Ph.d.**
3:4, 11  5:22
8:11  10:16
11:23

**phrase**
36:1  51:12

**Pillsbury**
4:19

**Pittman**
4:20

**Pittsburgh**
8:14

**place**
10:8  21:23
43:25  44:9, 22
60:16

**plaintiffs**
4:20, 23  20:5

**plaintiffs"**
19:10

**point**
48:17

**points**
48:18

**policy**
54:21

population
55:4

portion
64:7

position
19:10 64:14

positive
41:5

possibility
35:11

possibly
15:23

post
8:13

potential
46:3

practice
35:25 36:3, 13

Precisely
22:24

preliminary
6:25

premise
42:25 43:5

preparing
16:7

prescribed
10:14, 18

present
39:23

press
14:1

preventing
48:1

previous
10:11 12:6, 7

primary
8:23 13:24
48:17, 18 55:8

primate
59:9

primates
60:1

prior
51:13

private
19:23

privileged
19:7

problem
53:12 58:14
60:5 64:13

proceedings
3:1 4:2 66:6

process
17:23 18:21, 24
20:16 22:15
23:1, 8 24:8
25:21, 22, 23
26:4 27:23
30:20 31:23
36:8 37:1
38:24 39:18
44:11

processes
19:17

professional
17:3 28:6
35:24 36:2, 13
53:3, 19

professionals
27:23

professor
7:15, 20 14:19
61:25

prohibition
20:20

proposition
52:20 54:2

protective
64:3 65:2

protracted
53:1, 4, 17, 19

provide
34:22 35:15
36:11 51:1
52:14

provided
42:12

provider
9:19 54:7

providers
62:17

psychiatrist
9:8 28:9

psychiatry
7:21 8:9

puberty
8:22 10:14
39:3 60:10

public
19:22 27:20

publications
12:22 50:24, 25

published
13:8, 12, 23

pull
10:23 23:11
24:13 47:1

purpose
31:14

purposes
8:20

put
7:5 64:14

_____

**Q**

_____

quality

14:22 15:3, 5
37:21 42:14,
18, 25 54:16

question
6:11, 12, 23
8:16 12:16
19:11, 19 20:21
21:4, 10 24:4
26:2, 21 33:7
34:8, 9, 11
37:14 38:1
39:6, 9 41:15,
20 42:3 43:5
44:16 47:9
49:10, 12 52:14
53:4, 11, 20
55:24 58:16

questionable
55:10

questions
6:21, 25 19:14
20:6, 14 21:21
22:3, 7, 8 29:21
30:20 32:13
39:10 48:2
60:12, 13
62:21, 22, 24
63:5

quickly
12:11

_____

**R**

_____

raise
5:14

raising
29:3

ran
59:18

Randy
4:11

range

26:18

**rare**
40:19, 20, 22

**re-read**
38:5

**reached**
18:5

**read**
3:6  16:8, 9, 14
23:16  41:8
50:1  51:19
63:10, 14, 19

**readiness**
45:10, 17

**reading**
38:7  51:6  63:7

**realizing**
54:5

**reason**
64:6

**reasonable**
41:19

**reasons**
15:4

**rebuttal**
3:10  11:4, 22
12:3  16:7  35:2
47:1  48:12, 15,
21  60:3  62:9

**recall**
12:12  16:10
26:17, 23  42:2,
13, 21  57:18
60:23  61:1

**receptor**
41:5

**recess**
46:21

**recognize**
30:12

**recognized**
30:9

**recommend**
32:15, 18  37:18

**recommendations**
47:13  56:7

**recommends**
53:23

**reconvene**
46:14

**record**
4:4, 15  29:19
33:19  46:20, 23
65:5, 7  66:2, 3,
4

**refer**
23:7  25:21
31:22  33:12
36:6, 24  44:10
51:2

**reference**
56:14, 24  60:6

**referenced**
13:22

**references**
52:21  55:13

**referring**
58:7

**regarded**
54:19

**regulation**
60:19, 22
61:10, 13
62:11, 14

**regulations**
61:4

**relate**
56:14

**related**
13:7, 14  14:4

15:16  48:18
56:25

**relates**
19:8  21:24

**relating**
19:16  20:6
21:24  23:5
43:24  44:7
48:4

**relevance**
50:8

**relevant**
47:16  53:1, 16
62:5

**relied**
11:13  16:24

**rely**
16:21

**remember**
59:10  60:25
61:1

**remind**
65:4

**remotely**
4:9  5:11

**repeat**
33:7  53:10

**rephrase**
47:10  48:14
49:14  58:10, 13

**report**
3:10  7:2  11:4,
13, 22  12:3
16:8, 22  17:13,
25  21:20  47:2,
14  48:10, 15,
18, 21, 23, 25
49:1  59:13
60:7, 13  61:3,
6, 8, 16, 21, 22
62:1  63:10

**reporter**
3:6  4:24  6:10,
19  11:5  64:2
65:2

**reports**
16:8  57:8

**represent**
6:5  23:19
24:16, 21

**representation**
47:23

**representing**
43:14

**request**
35:11  41:16

**require**
19:25

**required**
33:17

**research**
7:23, 25  8:1
12:17, 19, 21, 24
13:3, 4  14:19
31:17  35:6
50:20, 22

**researched**
35:12, 13

**resources**
15:18

**respect**
64:16

**responding**
52:6

**responsibility**
14:16

**restate**
6:22  11:18
39:6

**restrictions**
43:23

E. Kate Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023                                                                    14

results
  59:12  60:1
reveal
  20:22, 25  21:7
review
  13:23, 25  15:6
  17:12  26:8
  41:3, 16  43:13
  48:22, 25  56:18
  57:2, 6, 19  60:4
  61:3, 11  63:15
  64:9, 22
reviewed
  13:13  23:23
  41:14, 22  47:16
  61:5, 6, 22
reviews
  12:22  13:24
  14:1
revised
  20:3  22:16, 19
  23:23
revising
  14:9  20:12
  27:21
revision
  3:12  23:17
  24:7
revisions
  20:16
risks
  45:5, 12, 20, 25
  46:2
risky
  52:12
Rivaux
  4:18, 19  7:9
  10:5, 21  11:17
  13:5, 17  14:14,
  24  16:23  17:5,
  21  18:3, 8, 13,

19  19:1, 13
20:7, 18  21:3,
14, 18  22:10, 17
23:2, 24  25:1,
4, 10, 25  27:3,
7, 14, 24  28:24
29:3, 15  30:1,
7, 14  31:8, 12,
21  32:4  34:4,
15, 23  35:8, 16
36:4, 14, 22
37:8  38:3, 13,
22  39:5, 13
40:1, 21  41:2,
10, 24  42:15, 23
43:10, 20, 22
44:6, 19  45:6,
13, 21  46:4
47:4, 8  48:3
49:7, 9, 18, 20
50:6, 8, 10
55:21, 23  57:24
58:1, 4, 10, 17
61:17  62:2, 12,
15, 23  63:6, 9,
20  64:4  65:15,
16, 23
roles
  24:4
rules
  6:9

_____
          S
_____

scenario
  39:2
school
  7:17  8:9
  28:10, 13
science
  15:23
scientific
  15:25  31:15

43:2
scientist
  9:19  15:6
  61:25
scientists
  31:15
scope
  34:24  35:2, 9,
  16  36:4, 15, 22
  37:8  38:3, 13,
  22  39:13  40:2,
  21  41:2, 10, 24
  42:23  43:10, 22
  44:6, 20  45:6,
  13, 21  46:4
  48:3  61:17
  62:2, 15
Scott"s
  16:9  52:7
scroll
  23:12  24:15
  29:22  33:21
  49:24  51:17
scrolling
  11:15  24:20
  27:19  32:11
  35:22  37:24
  39:11, 22  47:18
  52:24
seal
  64:2, 6
secondary
  8:24
section
  33:16  34:2
  36:12  41:8
seek
  21:5, 11, 15
  22:3
seeks
  20:23

selection
  37:1
send
  64:2  65:2
sense
  10:1
sentence
  33:18  34:3
  35:23  37:22
  38:1, 7, 11, 18
  39:12, 14, 25
  40:18, 20, 25
  43:7, 9, 15  50:1
  51:11, 12, 13,
  16, 18, 19  52:9,
  10, 25  53:15
  54:8, 15  57:11
sentences
  43:12  51:24
September
  7:19
sets
  17:2
sex
  8:24  59:16
  60:9
sex-specific
  60:10
Shani
  4:19  19:10
Shaw
  4:19, 21
sheep
  59:6, 7, 8  60:1
SHEET
  3:7
shift
  22:22
sign
  3:6  29:13

E. Kale Edmiston, Ph.D
March 23, 2023

signature
66:8

signed
28:21  29:9, 16
48:7  64:15

significant
59:21, 22, 24

single
54:18, 22  55:2

small
51:20

so-called
61:8

SOC
3:11, 12

SOC8
3:15  23:7, 17
25:14  27:9, 10
37:18  42:7
44:1  53:23

social
60:25

Society
17:11, 12  33:11

Soleman
12:7, 8

sort
11:18  14:2
15:9, 22  36:7
37:1  39:18
42:24  43:4

sorts
15:15

Sounds
46:17

speak
6:20  28:2
56:17

speaking
6:20  26:7  41:7

56:19

specific
7:25  13:13
16:6  21:21, 24
24:4  33:3
34:8, 9, 11  36:8
38:6, 7  41:15,
17  43:12  52:11
56:17  61:19
64:6

specifically
20:13  48:20

specificity
9:2, 6  39:7

specifics
26:3

speculate
34:21

speculation
51:14

stakeholder
27:20

stand
18:14  46:19
51:16  52:19

standard
8:16  18:15
20:4  46:6
47:12

standards
16:21  17:3, 8
18:15  20:12, 13
22:15, 16  25:19
27:21  28:12
30:6  31:3, 16,
23  43:18  47:3,
21  54:21  55:13
56:3  62:19

standing
29:25

start

7:18  26:16

state
6:11  11:10
57:11

stated
60:15  61:5

statement
16:19  29:16
39:11  57:20

statements
26:10, 11  35:23
52:7

states
17:15  20:10

stay
19:4  21:9, 23
23:5  25:13
37:10  41:12
43:25  44:9, 22
48:5

stays
19:16

stenographer
4:12  5:1, 5, 9,
14, 20  65:4

step
22:14  56:1

strength
33:3

strike
32:23  36:2
52:5

structure
59:15, 20

students
7:24

studies
11:12  13:7, 8,
12, 22  14:22
15:5  41:23
42:3  43:3

54:15  55:1, 6,
13, 16, 17
56:10, 17, 25
57:2  58:24, 25
59:5, 7, 12, 14,
25  60:2, 7

study
12:7, 8  13:23
15:5, 8, 9, 14,
16, 17, 25  42:13
43:2  54:1, 4, 18
55:2, 9  57:5
59:9

studying
13:21

subject
57:22  58:6

submit
12:2

submitted
14:3

subpoenas
23:6

suffer
40:5

suffering
40:4

sufficient
64:22

suggest
32:14, 17  33:21
51:24

suggesting
19:13

super
63:21

support
37:6, 12, 20
50:18  51:13

supporting
50:3  51:8

E. Kale Edmiston, Ph.D
CONFIDENTIAL
March 23, 2023
16

suppose
47::15

surgeon
9::14

surgeons
27::6,,8

surgeries
8::23  10::17

surgery
27::9

surgical
35::3,,20

surprised
62::4

sustained
39::16,,23

swear
4::25  5::15

sworn
5::23

synonymously
32::24

system
33::9,,11

systems
33::5

—————————

**T**

—————————

tablet
7::5

taking
8::17  56::1  63::4

talk
36::25  45::12,,15

talked
7::7  43::23

talking
43::1  53::8

targeted
57::1

Team
3::13  23::18

technology
10::24

term
9::4

terminology
36::8

terms
9::3  22::21  32::2
55::19  56::12

testified
5::24

testimony
5::16

text
16::15  61::11

TGD
33::17,,19  37::24
38::19  39::15

thing
49::20

things
9::1  26::4  64::10

thinking
15::13  50::19
56::25  58::25

threshold
40::4

time
4::5  6::16  16::11
26::15,,17  40::14
43::13  46::20,,23
48::25  53::7,,21
54::5  61::2  63::4
64::22,,23  65::9,,
17,,18

title

11::15,,20  23::16

today
8::18  36::11

top
33::22  42::7
51::4  55::14
56::20

topic
16::24  28::15,,16
36::18,,21

topics
13::13

tough
20::19  64::14

trained
9::19

trans
14::2,,10  54::6

transcript
64::20  65::18

transcription
63::12

transgender
13::25  28::17
33::25  50::4
51::9,,22  57::4,,5
59::3

treatment
14::12  17::25
18::15  39::4
48::11,,16  49::2,,
4,,6  50::4,,15
51::9,,15  56::14
57::12,,17  58::8,,
21,,24  59::19
60::8,,11

treatments
8::23  9::5  17::3,,
20  34::14  53::16
55::20  59::23

troubling
39::20

true
38::11

truth
5::17,,18,,23

type
46::8  54::20

types
45::8  56::7

—————————

**U**

—————————

Um-hum
32::16  54::11
61::24

UMASS
7::17

uncomfortable
29::20  64::17

understand
6::21  45::19
55::23  64::14

understanding
9::4

understood
15::19  20::8
26::12  29::13,,18
30::18  33::14
41::19  48::9,,20
51::17  54::9,,25
55::11  56::19
59::25  60::19,,24

university
7::16  8::12,,14

unknown
57::13

unlike
55::17

unseal
64::6

E. Kale Edmiston, Ph.D
March 23, 2023

CONFIDENTIAL

17

upsetting
   39:20

_____

**V**

_____

vague
   50:5

valid
   55:18

Vanderbilt
   8:12

varies
   53:23

variety
   56:6

verbally
   6:11

versa
   6:20

version
   12:2  22:21, 23
   47:3, 13

versus
   4:7

vice
   6:20

video
   46:20, 22  65:5,
   12, 13, 14, 17
   66:2, 3

video-recorded
   4:6

violate
   19:20, 21, 24, 25
   22:2  23:4  28:4
   29:4, 7, 19  37:9
   41:11  44:9, 21
   63:24

violated
   26:5

violating
   25:12

violation
   44:8, 24

Vogel
   5:8

Vries
   51:5

_____

**W**

_____

waive
   63:12  66:8

waiving
   63:7

wanted
   54:10

warranted
   9:6

website
   23:7, 20  24:10,
   16  25:22  27:21
   31:22  33:12
   36:7, 25  44:11

Weida
   4:8

weigh
   46:3

well-recognized
   30:5

whatsoever
   53:12  58:14

Winthrop
   4:19

Worcester
   8:4

word
   30:9  38:6

worded
   47:9

words
   32:21

work
   8:25  47:20
   53:9

worked
   8:8  25:6, 8

working
   26:23

works
   10:24

WPATH
   3:11, 15  16:21
   17:2  19:14, 17,
   24  21:20, 24
   22:15  23:6, 7
   24:16  26:13, 16
   27:21  28:2, 21
   29:13, 24  30:3,
   5  31:6, 14, 19
   33:2, 6, 9  36:7,
   24  44:10, 18
   47:3, 21, 25
   48:1  55:12, 15
   56:4  57:14, 16

WPATH"s
   47:12

WPATH-SPECIFIC
   19:11

Wright
   4:11

write
   25:6

writing
   61:21

written
   25:16  44:12
   51:16

wrong
   57:15  59:11

wrote
   50:9  60:4

_____

**Y**

_____

Yale
   8:9

years
   13:24  53:24

youth
   57:4, 6

_____

**Z**

_____

Zack
   65:1

Zoom
   4:10