IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                                                         Case No. 4:22-cv-00325-RH-MAF

JASON WEIDA, et al.,

     Defendants.

_____/

## THE STATE'S OMNIBUS MOTION IN LIMINE

Defendants Secretary Weida and the Florida Agency for Health Care Administration (individually, "AHCA," and collectively with Secretary Weida, the "State") move this Court to exclude from trial several pieces of Plaintiffs' evidence. Specifically, the State asks this Court to (1) exclude all mention of World Professional Association for Transgender Health ("WPATH"), the Endocrine Society ("ES"), and Plaintiffs' preferred medical organizations, and the organizations' standards of care, guidelines, and policy positions on treatments for gender dysphoria; (2) exclude the testimony of Plaintiffs' expert Dr. Edmiston; and (3) exclude Plaintiffs' experts' opinions that are based on the organizations' standards of care, guidelines, and policy positions on treatments for gender dysphoria. Alternatively, the State should be able to explore the extent of *any* experts' knowledge of and contributions to WPATH's standards of care and ES's guidelines. This should include questions about *how* WPATH

created its standards, especially when four of Plaintiffs' disclosed experts authored portions of those same standards and then relied on them.

Dated: April 7, 2023

Respectfully submitted by:

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Gary V. Perko (FBN 855898)
gperko@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938
*Counsel for Defendants*

## LOCAL RULE 7.1(B) CERTIFICATION

The undersigned certifies that he attempted in good faith to resolve the issues raised in this motion through a meaningful conference with Plaintiffs' counsel on April 6, 2023.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 7, 2023, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## MEMORANDUM

Plaintiffs' litigation strategy is simple. In their complaint, in their expert reports, and during the preliminary injunction hearing, Plaintiffs tie the professional standards of care on treatments for gender dysphoria to standards promulgated by third-party organizations, mainly, WPATH's standards of care and ES's clinical guidelines.

Yet when the State tries to seek any meaningful discovery relating to these organizations and their standards of care, clinical guidelines, or positions on gender-affirming care, the State is prevented from obtaining it. It doesn't matter the discovery request: third-party document-production subpoenas; third-party deposition subpoenas; or deposition questions to Plaintiffs' expert—an author of a WPATH standards-of-care chapter—about his *expressed* reliance on his authorship of that WPATH chapter in forming his expert opinion. The State has been consistently thwarted by the organizations and by Plaintiffs from obtaining this discovery.

The unfair prejudice here is obvious: Plaintiffs will rely on evidence that the State can't test, question, or obtain. To prevent unfair prejudice, this Court should (1) exclude from trial all mention of WPATH, ES, and Plaintiffs' preferred medical organizations, and the organizations' standards of care, guidelines, and policy positions on treatments for gender dysphoria; (2) exclude the testimony of Plaintiffs' expert Dr. Edmiston because Plaintiffs prevented him from answering deposition questions related to his rebuttal expert report; and (3) exclude Plaintiffs' experts' opinions that are based on the

organizations' standards of care, guidelines, and policy positions on treatments for gender dysphoria.

## BACKGROUND

To provide this Court with context, the State will first explain the extent of Plaintiffs' reliance on their preferred organizations in this litigation thus far. Then the State will briefly explain why it questions this reliance. The State will describe its thwarted third-party discovery in the D.C. District Court and D.C. Circuit Court. And the State will conclude by describing Plaintiffs' experts' reliance on the organizations in their expert reports.

## I.      Plaintiffs Rely on the Organizations

As this Court is aware, Plaintiffs challenge a State rule that denies Medicaid reimbursement for certain treatments for gender dysphoria—puberty blockers, cross sex hormones, surgeries, and procedures that alter primary and secondary sex characteristics. These treatments are referred to as gender-affirming care.

In framing this case, this Court relied on binding circuit precedent, *Rush v. Parham*, 625 F.2d 1150 (5th Cir. 1980), and narrowed the central issue to "whether, based on current medical knowledge," the State "reasonabl[y]" "determined" that the at-issue treatments are "experimental." Doc.64 at 4-5.

Plaintiffs maintain that their preferred organizations represent the medical consensus on treatments for gender dysphoria. In their complaint, they stated that the at-issue treatments are "the prevailing standard of care, accepted and supported by

every major medical organization in the United States." Doc.1 ¶ 2. Plaintiffs specifically contend that WPATH and ES establish the professional standards of care on this issue. Doc.1 ¶¶ 37-40, 47, 89; *see also* Doc.102-14 (WPATH standards of care); Doc.102-20 (ES guidelines).

Plaintiffs continued their reliance on the organizations during the preliminary injunction hearing. There, the State put its expert witness, Dr. Laidlaw, on the stand. To discredit him, Plaintiffs asked Dr. Laidlaw if he was "aware that" his "opposition to gender-affirming care for the treatment of gender dysphoria in youth and adults is contrary to the vast majority of medical associations' recommendations?" Doc.102-11 (25:22-25) (preliminary-injunction-hearing transcription). Plaintiffs pursued this line of questioning for over ten transcript pages, marching through different medical organizations' guidelines and policy statements. *Id.* (25:22 – 38:15). Those groups included the American Academy of Child and Adolescent Psychiatry, the American Academy of Family Physicians, the American College of Obstetricians and Gynecologists, the American Medical Association, and Pediatric Endocrine Society. *Id.* Consider a portion of the long march:

> **Plaintiffs' Counsel**: Dr. Laidlaw, are you aware that the American Academy of Family Physicians supports gender-affirming care for youth and adults?
> **Dr. Laidlaw**: Supports gender-affirming care for youth and adults? . . . They probably do. I don't know their exact statement.
> **Plaintiffs' Counsel:** Okay. Are you aware that the American Academy of Family Physicians published a policy statement in July of

2022, approved by their board of directors, entitled "Care for the Transgender and Gender Nonbinary Patient"?

**Dr. Laidlaw:** I have not read that particular document – Family Practice Document.

**Plaintiffs' Counsel:** Okay. Are you aware that the American Academy of Family Physicians supports gender-affirming care as an evidence-informed intervention that can promote permanent health equity for gender-diverse individuals?

. . .

**Plaintiffs' Counsel**: Dr. Laidlaw, are you aware the American Academy of Pediatrics supports gender-affirming care for youth?

. . .

**Plaintiffs' Counsel**: Dr. Laidlaw, are you aware that the American College of Obstetricians and Gynecologists has recommendations and conclusions that support gender-affirming care for youth and adults?

*Id.*

## II.   The State Was Prevented from Obtaining Discovery from the Organizations

**A.** Nearly five months ago, on November 8, 2022, the State served three organizations—WPATH, ES, and the American Academy of Pediatrics ("AAP")—with a subpoena for depositions and document production. Mainly, the subpoena sought documents concerning how the organizations established their guidelines or policy positions on gender-affirming care. *E.g.*, *In re Subpoenas Served on Am. Acad. of Pediatrics*, 1:23-mc-00004-CJN (D.D.C. 2023) (herein "D.C.Doc.") Doc.1-4 at 2-16. Depositions were also sought, and the topics mirrored the document requests. On December 2, 2022, WPATH, ES, and AAP responded and objected to the deposition requests and requested documents. *E.g.*, D.C.Doc.1-22 at 2-25.

7

On November 15, 2022, the State served fifteen other organizations with subpoenas for documents only.[1] *E.g.*, D.C.Doc.1-19 at 2-15. The documents sought were the same as the documents sought for WPATH, ES, and AAP. On December 19, 2022, the remaining organizations responded and objected to the document requests. D.C.Doc.1-25 at 2-20.

Both the State and the organizations conducted several good-faith meet and confers. The State agreed to narrow several document requests, and the State agreed that the organizations could mark documents as confidential and redact member names, member lists, and other member-specific identifying information in produced documents. Still, the organizations contended that neither depositions nor document productions should occur.

**B.** On January 13, 2023, all eighteen organizations filed a motion to quash the State's subpoenas. D.C.Doc.1. They alleged, in relevant part, that the subpoenas encroached on their First Amendment rights. D.C.Doc.1-1. On January 20, 2023, the State responded, D.C.Doc.11, and on January 25, 2023, the organizations replied, D.C.Doc.14.

---

[1] The organizations were American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American College of Obstetricians and Gynecologists, American College of Physicians, American Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, National Association of Pediatric Nurse Practitioners, North Central Florida Council of Child & Adolescent Psychiatry, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, and Society of Pediatric Nurses.

On January 26, 2023, the district court held a hearing on the motion. During the hearing, the district court granted in part, denied in part, and held in abeyance in part the motion. After considering the organizations' First Amendment rights, and after considering the State's need for discovery, the district court narrowed the requests for documents as follows:

> **Request No. 1**. Documents sufficient to show the [organization's] total number of members.
>
> **Request No. 2**. Documents sufficient to show how it establishes guidelines or, if it does not establish guidelines, policy positions.
>
> **Request No. 3**. Its guidelines or policy position (if any) on gender-affirming care for gender dysphoria.
>
> **Request No. 4**. Documents sufficient to show how it established guidelines or, if it has not established guidelines, its policy position (if any) on gender-affirming care for gender dysphoria.
>
> **Request No. 5**. Any official communications with its membership concerning its guidelines or, if it has not established guidelines, its policy position (if any) on gender-affirming care for gender dysphoria.

D.C.Doc.18. The district court ordered the organizations to produce documents responsive to these requests. As for the depositions, the district court held that decision in abeyance, reasoning that a sufficient document production might negate the need for depositions.

**C.** On February 9, 2023, the eighteen organizations produced a total of 387 documents. Six of the organizations produced less than five documents each. None adequately responded to modified Request 4, which required the production of documents sufficient to show *how* the organizations established guidelines or, if they

have not established guidelines, their policy positions (if any) on gender-affirming care for gender dysphoria.

During ensuing meet and confers, the State and the organizations took different positions on this issue. For the State, documents showing *how* a medical organization establishes guidelines and policy positions would include communications with decisionmakers on the guidelines and policy positions, drafts of the guidelines and policy positions themselves, and any internal dissent from members about the guidelines and policy positions. In other words, documents responsive to this modified request should be substantive in nature.

The organizations took the opposite position. They said that documents responsive to modified Request 4 need only be procedural in nature—documents evidencing what procedures the organizations complied with when establishing their guidelines and policy positions on treatment for gender dysphoria.

Moreover, the State and the organizations disagreed on the necessity and the scope of conducting WPATH, ES, and AAP depositions.

**D.** On February 27, the district court held a hearing on these discovery disputes and provided further clarification. Regarding modified Request 4, the district court explained that:

> In producing documents sufficient to show "how" the [organizations] established guidelines or policy positions on gender-affirming care for the treatment of gender dysphoria, the [organizations] shall produce documents sufficient to show both (a) the process by which any such guidelines or policy positions were adopted, and (b) the substantive

materials and opinions that were considered and relied upon, as well as the materials and opinions that were considered and rejected, in adopting the guidelines or policy positions. This includes, but is not limited to, documents that would be sufficient to show what studies were considered in adopting the guidelines or policy positions and why a particular study was relied upon or rejected. It also includes documents that would be sufficient to show whether any dissenting views were otherwise acknowledged, whether such views were considered in adopting guidelines or policy positions, and why such views were rejected.

D.C.Doc.26. And regarding the WPATH, ES, and AAP depositions, the district court ordered the three organizations to sit for limited depositions and discuss the following:

a. The organization's total number of members.

b. How the organization establishes guidelines or policy positions.

c. The organization's guidelines or policy position on gender-affirming care for gender dysphoria.

d. How the organization established its guidelines or policy position on gender-affirming care for gender dysphoria (as clarified by this Order and the Court's oral instructions).

e. Official communications with the organization's membership concerning its guidelines or policy position on gender-affirming care for gender dysphoria.

D.C.Doc.26.

**E.** On March 2, 2023, the organizations moved to stay the district court's discovery orders. D.C.Doc.27. They again argued that the orders encroached upon their First Amendment rights. D.C.Doc.27-1. On March 3, 2023, the State responded, arguing that the organizations' First Amendment concerns were misplaced, given the State's agreement to redact member names and member-specific information, and given the district court's modification of the State's original subpoenas. D.C.Doc. 30-1. The

11

State also argued that the district court correctly weighed the organizations' First Amendment rights against the State's need for discovery. D.C.Doc.30-1.

On March 3, 2023, the district court denied the stay and extended the document production and deposition deadlines to March 10. D.C.Doc.31. The organizations appealed the district court's decisions and sought a stay before the D.C. Circuit Court. On May 8, 2023, two days before the end of the extended fact-discovery deadline in this case, and one day before two scheduled organizational depositions, the D.C. Circuit Court stayed the district court's order. No. 23-7025 (D.C. Cir. Mar. 8, 2023).

## III.  Plaintiffs' Experts Rely on the Organizations, and the State Was Prevented from Obtaining Discovery About Expert Opinions

Like Plaintiffs, Plaintiffs' experts rely on these organizations; their experts are generally members of these organizations. Doc.102-25 ¶¶ 8-9 (Karasic report) (lead author of WPATH standards-of-care chapter and former board member); Doc.102-26 ¶ 7 (Schechter report) (co-lead author of WPATH standards-of-care chapter); Doc.102-21 ¶ 11 (Olson-Kennedy) (WPATH member); Doc.102-27 ¶ 13 (Edmiston rebuttal report) (contributing author of standards-of-care chapter and former member); Doc.102-28 ¶ 11 (Janssen rebuttal report) ("member of revision committees" for standards-of-care chapters); Doc.102-24 ¶ 12 (Antommaria report) (AAP member).

All of Plaintiffs' experts agree that WPATH's standards of care and ES's guidelines set the professional standards of care on treatments for gender dysphoria. For example, Dr. Olson-Kennedy avers that the WPATH standards of care are "the

best available science and expert professional consensus" on treatments for gender dysphoria. Doc.102-21 ¶¶ 10-11, 47. Dr. Shumer states that as "a board-certified pediatric endocrinologist, [he] follow[s] the Endocrine Society Clinical Practice Guidelines and the WPATH Standards of Care when treating [his] patients." Doc.102-22 ¶¶ 38, 48-56. Plaintiffs' remaining experts make the same claims. Doc.102-23 ¶¶ 9, 31 (Baker report); Doc.102-24 ¶¶ 17-23; Doc.102-25 ¶¶ 27, 34; Doc.102-26 ¶¶ 8, 24, 26, 50-51 (Schechter report); Doc.102-28 ¶¶ 55-60; Doc.102-27 ¶ 20.

A word count of the experts' reports and exhibits reveals that the term "WPATH" is mentioned over 200 times. "Endocrine Society" is mentioned over 90 times. All but one of Plaintiffs' experts reference WPATH's standards of care and ES guidelines in their bibliographies, which form part of their expert opinions. Doc.102-23 ¶ 24, Ex. A at 3; Doc.102-24 ¶ 5, Ex. A at 4, 7; Doc.102-26 ¶ 17, Ex. B at 2-3; Doc.102-22 ¶ 20, Ex. B at 2-3; Doc.102-25 ¶ 19, Ex. B at 2, 4; Doc.102-21 ¶ 17, Ex. B at 2, 4; Doc.102-28 ¶ 19, Ex. B at 2, 4.

And what's more, some of Plaintiffs' experts were authors of WPATH's standards of care—and rely on their authorship as a basis for part of their expert opinions:

- Dr. Schechter: "My opinions contained in this report are based on," in part, "my review and familiarity with relevant peer-reviewed literature," including being a "co-lead author of the surgery and post-operative care chapter of the WPATH Standards of Care Version 8." Doc.102-26 ¶ 17 & n.1.

- Dr. Karasic: "In preparing this report, I have relied on my training and years of research and clinical experience, as set out in my curriculum vitae, and on the materials listed therein, as documented in my curriculum vitae, which is attached hereto as Exhibit A," including his authorship of a WPATH standards-of-care chapter. Doc.102-25 ¶ 18, Ex. A at 18.
- Dr. Janssen: "My opinions are based on," in part, "my knowledge of the clinical practice guidelines for the treatment of gender dysphoria, including my work as a contributing author of WPATH SOC 8." Doc.102-28 ¶ 18.
- Dr. Edmiston: "My opinions are based on," in part, "my knowledge of the clinical practice guidelines for the treatment of gender dysphoria, including my work as a contributing author of WPATH SOC 8." Doc.102-27 ¶ 13.

Yet, when the State deposed Dr. Edmiston and tried to ask him about his authorship of a WPATH standards-of-care chapter—which formed part of his expert opinion, Doc.102-27 ¶ 13—Plaintiffs' counsel instructed Dr. Edmiston to not answer these questions, to the extent that the answers wouldn't "violate" the stay granted by the D.C. Circuit Court or violate a heretofore unknown confidentiality agreement imposed on WPATH standards-of-care authors. Doc.102-36 (18:5 – 48:7) (Edmiston deposition transcript).[2] Specifically, Plaintiffs' counsel contended that the State:

> [C]an't go into the issues that are currently addressed in the [D.C. Circuit Court] order that stays the discovery relating to internal processes of WPATH. So as long as it's not going into that, it's fine just depending on the question, but I guess that's the concern that I have is just not to violate that court order or to violate any nondisclosure agreement. You can ask anything that's about public information but nothing internal or private to WPATH that would violate that court order or require Dr. Edmiston to violate his confidentiality agreement.

---

[2] Although the deposition transcript is marked confidential, the parties conferred and agreed that it should not be marked confidential.

*Id.* (19:13 – 20:1).

Under Plaintiffs' counsel direction, Dr. Edmiston's deposition was hardly illuminating. Consider the following exchanges:

> **The State**: What is that process [the process to revise and author WPATH's standards of care]?
>
> **Plaintiffs' Counsel**: Objection. Form. You can answer to the extent it doesn't violate your confidentiality agreement or the stay entered by the Appellate Court relating to the subpoenas to WPATH.
>
> **Dr. Edmiston**: I would refer you to the WPATH SOC8 website which outlines that process.
>
> . . .
>
> **The State**: [After providing Dr. Edmiston with a publicly available list of Chapter 5 authors (taken from WPATH's webpage)] Are there any individuals who worked with you who are not listed here?
>
> **Plaintiffs' Counsel**: Objection. Form. And objection to the extent you can't answer without violating a confidentiality agreement or any stay in this case.
>
> **Dr. Edmiston**: The authors list for SOC8 is very long. Many different people were involved in it, and the document was written collaboratively.
>
> . . .
>
> **The State**: . . . Do all of these individuals [listed authors of Chapter 5] support gender-affirming care?
>
> **Plaintiffs' Counsel**: Objection. Form; scope. And to the extent it doesn't violate your confidentiality agreement or the stay, you can answer and if you know.
>
> **Dr. Edmiston**: These individuals support the care that is – has an evidence – that – you know, your question is very broad because gender-affirming care is very broad.
>
> **The State**: It is.
>
> **Dr. Edmiston**: And the SOC8 guidelines recommend an individualized approach to care. So I think everyone involved in – for those individuals they support quality healthcare.

. . .

> **The State**: And generally speaking, Doctor, when you were authoring this section [Chapter 5], did you read all of these cases [studies] that are mentioned in this chapter?

> **Plaintiffs' Counsel**: Objection. Form; scope. And to the extent it doesn't violate any of the stay order that we discussed or the confidentiality order, you may answer.

> **Dr**. **Edmiston**: I have reviewed much of this literature. If you have a specific question about a specific paper, then I would request that you give me a break to review the specific paper.

. . .

> **The State**: . . . did you contribute in authoring any other chapters in WPATH?

> **Plaintiffs' Counsel**: I'm going to object to form; scope. Again, do not violate your confidentiality agreement or the stay that's in place.

> **Dr. Edmiston**: Yeah, that would – that would – discussing that would be in violation of the confidentiality agreement.

*Id.* (18:5 – 48:7).

## IV.   The State Questions the Reliability of These Organizations

Unlike Plaintiffs, the State asserts that WPATH and ES don't speak for the medical community, and that other organizations, like the AAP, might not actually speak for its membership on gender-affirming care.

In its summary-judgment motion, the State explains why these organizations' standards of care, guidelines, and policy statements on gender-affirming care are unreliable. For the purpose of this motion, however, the State briefly notes its concerns with these organizations.

In short, WPATH and ES are advocacy organizations that also promulgate medical recommendations for gender-affirming care. Doc.102-14; Doc.102-20. Consider how WPATH revises its standards of care: both medical professionals *and* non-medical professionals are responsible for revisions. Doc.102-14 at 250; Doc.102-29 (WPATH standards-of-care-revision team criteria). And for medical professionals to contribute, they must be "[l]ongstanding WPATH Full Member[s] in good standing," "[w]ell recognized advocate[s] for WPATH and the [standards of care]," and "[w]ell known expert[s] in transgender health." Doc.102-29.

In other words, the "best available science and expert professional consensus" on medical treatments for gender dysphoria, Doc.102-21 ¶ 10, comes from a self-selecting group of members of one organization, who are noted advocates for the organization, who all strive to preserve the conclusions reached in previous standards of care, and who may not be medical professionals. Doc.102-14 at 7; Doc.102-29.

Federal courts also recognize that WPATH's standards don't reflect the medical consensus on the issue. *See, e.g.*, *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019) (The "WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate over sex reassignment surgery"); *Kosilek v. Spencer*, 774 F.3d 63, 88 (1st Cir. 2014) (en banc) ("Prudent medical professionals" "reasonably differ in their opinions regarding [WPATH's] requirements.").

ES isn't any better. Its guidelines were co-sponsored by WPATH, Doc.102-20 at 1, and guidelines drafters had extensive ties to WPATH, Doc.102-13 ¶ 95 (Hruz report).

Both organizations also rely on low-quality evidence and admit their preferred treatments can lead to potentially negative, irreversible consequences. WPATH's standards of care states that:

- The "empirical evidence base for the assessment of" transgender and gender diverse adults "is limited." Doc.102-14 at 34-35.
- "Each gender-affirming surgical intervention has specific risks and potentially unfavorable consequences," including "loss of fertility." *Id.* at 40, 43.
- "Gender-affirming hormone treatments have been shown to impact reproductive functions and fertility, although the consequences are heterogenous for people of all birth-assigned sexes." *Id.* at 41.

ES's guidelines expressly state that some of their recommendations are backed by low-quality evidence (and worse):

- Low-quality evidence backs the following recommendation: "[w]e suggest that clinicians begin pubertal hormone suppression after girls and boys first exhibit physical changes of puberty." Doc.102-20 at 3.
- Very-low-quality evidence backs the guideline's recommendation that "there may be compelling reasons to initiate sex hormone treatment prior to the age of 16 years," "*even though there are minimal published studies of gender-affirming hormone treatments administered before age 13.5 to 14 years.*" *Id.* (emphasis added).
- And the recommendation that "clinicians approve genital gender-affirming surgery only after completion of at least 1 year of consistent and compliant hormone treatment" is backed by no evidence at all. *Id.* at 4 (ungraded good practice statement).

Not only that, it's not clear whether Plaintiffs' preferred medical organizations can speak for its members. Earlier in this litigation, the State produced a declaration from Dr. Zanga, an AAP member. *See* Doc.49-5 at 21 (Zanga declaration). He stated

that AAP likely suppressed member-led resolutions that questioned the organization's position on gender-affirming care. *Id.* If these organizations don't speak for their own members, then surely they can't speak for the medical community.

Again, a more thorough explanation will be provided in the State's summary-judgment motion. But at base, the State questions how these organizations reached their conclusions on gender-affirming care and whether these organizations can speak for the medical community or even their own members. To answer these questions, the State sought discovery.

## LEGAL STANDARD

District courts have several tools to ensure fair trials. Under Federal Rule of Evidence 403, a court can "exclude relevant evidence if its probative value is substantially outweighed by a danger" of "unfair prejudice." Fed. R. Evid. 403. And under Federal Rule of Evidence 702, a court must ensure that expert opinion is reliable and relevant. Fed. R. Evid. 702; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc).

## ARGUMENT

As this Court has stated, this case could be decided on *Rush v. Parham* grounds: if current medical opinion disagrees with the State's decision, then the State loses this case. Doc.64 at 4-5. Plaintiffs and their experts point to WPATH, ES, and other organizations as constituting current medical opinion. Five months of hard-fought litigation in three different courts have yielded not one iota of meaningful evidence

pertaining to WPATH, ES, and the other organizations. Allowing Plaintiffs and their experts rely on WPATH, ES, and the other organizations' perspectives during trial would unfairly prejudice the State and sanction unreliable expert testimony.

## I.    The State Will Be Unfairly Prejudiced Under Rule 403

Beginning broadly, and most obviously, Plaintiffs would be relying on evidence that the State sought but wasn't able to obtain or test. If called to the stand, Dr. Olson-Kennedy will testify that the WPATH standards of care "are the best available science and expert professional consensus" on treatments for gender dysphoria. Doc.102-21 ¶¶ 10-11, 24, 47. If called, Dr. Shumer will state that as "a board-certified pediatric endocrinologist, [he] follow[s] the Endocrine Society Clinical Practice Guidelines and the WPATH Standards of Care when treating [his] patients." Doc.102-22 ¶¶ 38, 48-56. Plaintiffs' other experts will testify similarly. *See supra.* Plaintiffs will likely use these organizations' standards of care, guidelines, and positions on gender-affirming care as a means to disqualify the State's experts and paint them as being outside of mainstream medical opinion.

The State has been prevented from obtaining any evidence from these organizations that could test whether Plaintiffs (and their experts) can properly rely on these organizations. Simply put, the State doesn't know how these organizations created their standards of care, guidelines, and positions on gender-affirming care. The State doesn't know whether these positions were taken due to impassioned politics or serious science. The State doesn't know if the organizations' positions actually speak for all

their members, most of their members, or some small subset of their members—let alone the medical community as a whole. *See* Doc.49-5 at 21 (Zanga declaration).

Put differently, the adversarial process is thwarted by the State's lack of discovery. The State can't meaningfully subject Plaintiffs' evidence and experts to "thorough and sharp cross examination," which is "vital to our adversary system." *Republic of Ecuador v. Hinchee*, 741 F.3d 1185, 1192 (11th Cir. 2013). It's unfairly prejudicial for Plaintiffs to rely on this evidence when the State was prevented from obtaining it, and that outweighs any probative value of that evidence. *See, e.g., Adams v. United States*, 2009 WL 192225, at *2 (D. Idaho July 1, 2009) (a party shouldn't be "effectively foreclosed" "from inquiring" into evidence); *Jeld-Wen, Inc. v. Nebula Glass Int'l, Inc.*, 2007 WL 1228373, at *3 (S.D. Fla. Apr. 24, 2007) (it's unfairly prejudicial to "prohibit[]" a party "in blanket fashion from obtaining evidence" "to refute" the other party's "claims"); *Red Barn Motors, Inc. v. NextGear Cap., Inc.*, 2020 WL 919464, at *4 (S.D. Ind. Feb. 26, 2020) (it's unfairly prejudicial when a party "did not have any opportunity to conduct discovery"); *Capron v. Thompson*, 2001 WL 36102187, at *8-9 (D. Wyo. Mar. 1, 2001) (it's unfairly prejudicial when a party doesn't have the ability to effectively cross-examine an expert witness).

## II.   Plaintiffs Withheld Evidence

The D.C. Circuit Court largely prevented the State from conducting third-party discovery in this case. But Plaintiffs also prevented the State from obtaining evidence. During Dr. Edmiston's deposition, Plaintiffs' counsel specifically instructed him to not

answer a number of WPATH questions, to the extent that the answers wouldn't "violate" the stay granted by the D.C. Circuit Court or violate a confidentiality agreement. Doc.102-36 (18:5 – 48:7). As a result, the State was prevented from adequately probing into the grounds of his expert opinion and his credibility. Not only that, the State was again prevented from probing into how WPATH creates its standards of care. For these reasons, at the very least, Dr. Edmiston's trial testimony should be excluded.

And will the D.C. Circuit's stay be used as a basis to prevent the State from asking substantive questions of Plaintiffs' experts about either WPATH and ES—which each expert agrees establishes the medical consensus on treatments for gender dysphoria? *See supra*. Will the State be prevented from asking substantive questions about Plaintiffs' experts' authorship of standards-of-care chapters? *See supra*. Based on the position taken by Plaintiffs during Dr. Edmiston's deposition, the answers appear to be "yes."

## III.    The Lack of Discovery Leads to *Daubert* Issues

Moreover, the State's inability to obtain discovery (or potential trial testimony) leads to *Daubert* issues. As the Eleventh Circuit stated, "the objective of" *Daubert*'s gatekeeping requirement "is to ensure the *reliability* and *relevancy* of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant field." *Frazier*, 387 F.3d at 1260 (emphasis added, citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

"In determining the admissibility of expert testimony under" Federal Rule of Evidence 702, district courts consider whether "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Id.* at 1260 (cleaned up).

District courts may consider whether an expert theory or technique can be tested, *id.* at 1262, may consider whether the scientific community agrees with the theory or technique, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993), and may consider "published sources" that are "generally accepted by the medical community in defining the applicable standard of care," *United States v. Azmat*, 805 F.3 1018, 1042 (11th Cir. 2015).

Of course, that's the information that the State has sought and doesn't have. Without this information, this Court can't properly determine whether Plaintiffs' experts and their experts' reliance on WPATH, ES, and other organizations satisfies Rule 702 or *Daubert*. This Court should therefore exclude Plaintiffs' experts' opinions that are based on WPATH's, ES's, and the other organizations' standards of care, guidelines, and policy positions on treatments for gender dysphoria.

Even if this Court doesn't agree with these *Daubert* concerns, this Court should still exclude evidence "by applying Rule 403." *Frazier*, 387 F.3d at 1263.

## IV.   Need to Ask Questions in Deposition and Trial

Alternatively, at the very least, the State should be able to explore the extent of *any* experts' knowledge of and contributions to WPATH's standards of care and ES's guidelines. Two points are significant here.

*First*, additional deposition testimony is appropriate. Under Federal Rule of Civil Procedure 30(c)(2), an attorney "may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." Fed. R. Civ. P. 30(c)(2). "When an attorney instructs a deponent not to answer a question based on one of the reasons enumerated in Rule 30(c)(2)," the attorney must "*immediately* seek a protective order from the relevant court, unless one was obtained prior to the deposition or the examining counsel *on the record* agrees to withdraw the objectionable question." *Mitnor Corp. v. Club Condos*, 339 F.R.D. 312, 319 (N.D. Fla. 2021) (emphasis in the original). An "objecting" attorney "violates Rule 30(c)(2) when" the attorney "instructs a deponent not to answer a question and fails to move for a protective order." *Id.* 319-20; *see also id.* at 319 n. 5 (explaining that a "motion to compel does not absolve the deponent's attorney from"

the "duty to move for a protective order after" the attorney "instructs the deponent not to answer a question").

Here, Plaintiffs' counsel improperly instructed Dr. Edmiston not to answer multiple, highly-relevant, and non-privileged questions regarding a key facet of Plaintiffs' claims in this case. Plaintiffs never sought a protective order to shield Dr. Edmiston's testimony on the grounds that a stay in another proceeding, in another court, to which he's not a party, and to which Plaintiffs aren't parties, applies to him. That conduct violated discovery rules and warrants this Court's prompt intervention compelling, at a minimum, additional deposition testimony.

*Second*, at trial, the State should be allowed to ask Dr. Edmiston—and Plaintiffs' other experts—about *how* and *why* WPATH's standards of care (and ES's guidelines) were adopted and *how* and *why* they serve as the so-called gold standard for current medical opinion on treatments for gender dysphoria. Otherwise, Plaintiffs' experts could shield the bases for the opinions and unfairly impede the State's defense.

## CONCLUSION

For the reasons expressed above, this Court should grant the State's motion.

Dated: April 7, 2023                              Respectfully submitted by:

                                        /s/ Mohammad O. Jazil
                                        Mohammad O. Jazil (FBN 72556)
                                        mjazil@holtzmanvogel.com
                                        Gary V. Perko (FBN 855898)
                                        gperko@holtzmanvogel.com
                                        Michael Beato (FBN 1017715)
                                        mbeato@holtzmanvogel.com

zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938
*Counsel for Defendants*

## LOCAL RULE 7.1(B) CERTIFICATION

The undersigned certifies that he attempted in good faith to resolve the issues raised in this motion through a meaningful conference with Plaintiffs' counsel on April 6, 2023.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## LOCAL RULE 7.1(F) CERTIFICATION

The undersigned certifies that this motion contains 5,478 words, excluding the case style and certifications.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2023, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil