IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, *et al.*,

               *Plaintiffs*,

        v.

JASON WEIDA, *et al.*,

               *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

## PLAINTIFFS' MOTION TO PARTIALLY EXCLUDE EXPERT TESTIMONY OF DR. PATRICK W. LAPPERT AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403, and Rule 702, Plaintiffs move to partially exclude certain testimony of Defendants' expert Dr. Patrick W. Lappert, M.D., on the grounds that he fails to meet the qualification, reliability, and helpfulness requirements imposed by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Specifically, Dr. Lappert's testimony should be limited to his area of expertise: the field of plastic surgery. To the extent that any of Dr. Lappert's purported opinions beyond plastic surgery hold any probative value (they do not), it is far outweighed by unfair prejudice and confusion of the issues and therefore the testimony should

be excluded pursuant to Fed. R. Evid 403.  In support of this motion, Plaintiffs state as follows:

## FACTUAL BACKGROUND

On February 17, 2023, Defendants served their expert witness disclosures for Dr. Lappert and thereafter provided his rebuttal opinions.[1]   His rebuttal opinions were primarily directed to the reports of Dr. Loren S. Schechter, M.D., and Dr. Johanna Olson-Kennedy, M.D., M.S.  Lappert Rebuttal ¶ 1.

In his reports, Dr. Lappert opines on numerous subjects that fall well outside the scope of his experience in plastic surgery, including the nature, causes, and diagnosis of gender dysphoria, non-surgical treatments for gender dysphoria, the quality of the evidence supporting medical treatments for gender dysphoria, and the development of clinical practice guidelines by professional medical associations of which he is not even a member.  *See generally*, Lappert Rep.; Lappert Rebuttal.

However, as a retired plastic surgeon, Dr. Lappert is not qualified to offer expert testimony on these matters.  Indeed, in a prior case in the Middle District of North Carolina involving a challenge to a categorical exclusion of gender-affirming health services from coverage through a state-sponsored health plan, the District Court precluded the vast majority of Dr. Lappert's proffered opinions based on his

---

[1] *See* Declaration of William Miller ("Miller Dec.") ¶¶ 4-5; Ex. A, Expert Declaration of Patrick W. Lappert, M.D. ("Lappert Rep."); Ex. B, Rebuttal Expert Report of Patrick W. Lappert, M.D. ("Lappert Rebuttal").

lack qualifications and the unreliability of his testimony, limiting his testimony solely to those opinions related to the field of plastic surgery.  *Kadel v. Folwell*, Case No. 1:19CV272, 2022 WL 3226731, *13-14 (M.D.N.C. Aug. 10, 2022).[2]  Notably, the Court also found that the available evidence "call[ed] Lappert's bias and reliability ***into serious question***."  *Id*. at *12 (emphasis added).

Similarly, in *Brandt v. Rutledge*, the court curtailed Dr. Lappert's testimony even further, limiting Dr. Lappert to offering opinions solely "to his practice," "to what he has personally done in his practice," and "his actual interaction with patients and what the outcomes were." Miller Dec. ¶ 6; Ex. C, Excerpts of *Brandt v. Rutledge* Trial Transcript ("*Brandt* Tr."), at 1058:25, 1059:11-15.  Indeed, the court sustained objections that sought to elicit Dr. Lappert's testimony about what the clinical practice guidelines pertaining to gender-affirming medical treatment entail and any specific risks for transgender individuals because Dr. Lappert "is not an expert in gender-affirming care" and such testimony "is outside the scope of the doctor's practice." *Brandt* Tr. 1058:4-10, 1067:10-14.

This Court should do the same.  Dr. Lappert lacks the necessary qualifications to so testify regarding any subject matter beyond the field of plastic surgery,

---

[2] Specifically, the court in *Kadel* held that Dr. Lappert was "limited to testifying to (1) the risks associated with the surgeries at issue in this case; (2) his anecdotal experience treating patients seeking to "de-transition"; and (3) the WPATH recommended role of the surgeon in treating gender dysphoria as compared to the role of the surgeon in other surgical contexts."  2022 WL 3226731, at *15.

including as to the nature, causes, or diagnosis of gender dysphoria, non-surgical treatments for gender dysphoria, the quality of evidence supporting medical treatments for gender dysphoria, and the development of clinical practice guidelines for the treatment of gender dysphoria, and any such testimony is otherwise unreliable, unhelpful, or its probative value is outweighed by potential prejudice.

## LEGAL STANDARD

Federal Rule of Evidence 702 places "a special gatekeeping obligation" on the trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  As articulated by the Eleventh Circuit, "[t]he importance of Daubert's gatekeeping requirement cannot be overstated." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

In determining admissibility under Rule 702, courts must engage in a "rigorous" inquiry to determine whether (1) the expert is qualified to testify regarding the matters they intend to address; (2) the methodology employed by the expert to reach their conclusions is sufficiently reliable, as determined by the inquiry mandated under *Daubert*; and (3) the testimony assists the trier of fact to understand the evidence or determine a fact at issue.  *Id.*, at 1260; *see also City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998), *cert. denied*, 528 U.S. 812 (1999).  These considerations of "qualification," "reliability," and "helpfulness"

are "distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). Crucially, the party offering the expert testimony has the "burden of establishing qualification, reliability, and helpfulness." *Frazier*, 387 F.3d at 1260.

## **ARGUMENT**

### I.   **Dr. Lappert Is Not Qualified to Offer a Significant Portion of His Purported Opinions**

"A witness may be qualified as an expert by virtue of his 'knowledge, skill, experience, training, or education." *Quiet Technology DC-8, Inc.*, 326 F.3d at 1342. But "expertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014) (holding that a psychiatrist was properly prevented from opining on rates of drug use in an economically vulnerable population because he had never conducted research on the subject and instead relied on studies to form his opinion). "A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." *Id.* (quoting *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)). Indeed, even "a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999).

If a designated expert witness does not "propose to testify about matters growing naturally and directly out of research he had conducted independent of the litigation," the expert should be disqualified. *Lebron*, 772 F.3d at 1369 (quoting Fed. R. Evid. 702 (cleaned up)). Simply put, "an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp.*, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007).

Indeed, the qualification inquiry is subject-specific because "[g]eneralized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge." *Id.*, at *2. "For example, no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994). Here, Dr. Lappert's opinions topics relating to plastic surgery fail to meet the most basic standard for admissibility and must be excluded.

## A.   Dr. Lappert is Not Qualified to Offer Opinions on Topics Other Than Plastic Surgery

Dr. Lappert offers a clutter of opinions far afield from his experience as a plastic surgeon, including regarding the fields of endocrinology, psychology,

6

psychiatry, and treatment guidelines issued within those specialties.  But Dr. Lappert lacks the necessary qualifications, or any other basis, to offer an expert opinion in these areas.[3]  To be clear, Dr. Lappert has previously testified he "do[es] not claim to be an expert in the treatment of gender dysphoria." *Brandt* Tr. 1042:13-15.

Recognizing Dr. Lappert's lack of expertise on precisely the same subjects on which he purports to opine in this case, the court in *Kadel* precluded Dr. Lappert from providing expert testimony on matters outside the realm of plastic surgery and his anecdotal experiences as a surgeon.  *See* 2022 WL 3226731 at *12-15.  Similarly, at trial, the Court in *Brandt* limited his testimony solely "to his practice," "to what he has personally done in his practice," and "his actual interaction with patients and what the outcomes were." *Brandt* Tr. 1058:25, 1059:11-15. The Court should adopt the same approach here.

For example, Dr. Lappert proselytizes on the efficacy of hormone therapy as a treatment for gender dysphoria, and on the reliability of peer-reviewed medical

---

[3] Although Plaintiffs do not move to exclude Dr. Lappert's opinions, however fringe, within his own field, it must be noted that he has conceded that he has "never performed any kind of gender-affirming surgery in transgender patients." Miller Dec. ¶ 7; Ex. D, Excerpts of Sept. 30, 2021 Deposition Transcript ("Lappert Tr."), at 168; *id.* at 151 ("I have never treated a patient with gender dysphoria surgically.").  He has also emphatically stated that he would never perform such surgeries, because in his personal view he does not "see them as beneficial" and thinks they are "incorrect treatments." *Id.* at 150.  Indeed, Dr. Lappert believes that "in all instances" gender-affirming genital surgery is "an irreversible mutilation[.]"  Lappert Rep. ¶ 42.

publications, and in particular clinical practice guidelines issued by the Endocrine Society (the nationally recognized professional society for endocrinologists), cited as support for the use of such treatments. *See* Lappert Rep. ¶¶ 33, 38-42. Dr. Lappert further purports to opine on the nature of, and differences between, gender and sex. *Id.* ¶¶ 31-32. But Dr. Lappert has previously conceded that he is "not an endocrinologist" and has "no specialized training or expertise in endocrinology." Lappert Tr., at 153, 204; *see also Brandt* Tr. 1040:22-25 ("Q And you're not an endocrinologist? A I am not. Q You're not an expert in endocrinology? A I am not.").

Dr. Lappert likewise admitted that he has "never prescribed cross-sex hormones for treatment of gender dysphoria," and that he has "no firsthand experience with advising [his] patients about potential risks and benefits" of such treatment. Lappert Tr., at 214. He has acknowledged that he does not "hold [himself] out as an expert in endocrinology," and indicated in a prior case that he did not plan to offer "any expert opinions in endocrinology . . . because that's outside [his] scope of expertise." Lappert Tr., at 204. Accordingly, as previously held in *Kadel*, all of Dr. Lappert's purported opinions relating to endocrinology should be excluded. *Kadel*, 2022 WL 3226731 at *13.

Dr. Lappert likewise is not qualified to opine regarding the development or efficacy of the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-V"), the diagnosis of gender dysphoria, or the treatment of gender dysphoria

by a mental health provider.  *See, e.g.*, Lapper Rep. ¶¶ 46, 74-76, 93-94.  The reasoning in *Kadel* applies equally here.  Dr. Lappert "is not a psychiatrist, psychologist, or mental health professional, nor has he ever diagnosed a patient with gender dysphoria," but he nonetheless provides opinions in these areas.  *Kadel*, 2022 WL 3226731 at *13.  Dr. Lappert himself has acknowledged that he "do[es] not hold [himself] out as an expert in diagnosing mental health conditions[,]" and that he also does "not have special[ized] training or expertise in treating mental health conditions."  Lappert Tr., at 75; *see also Brandt* Tr. 1041:6-8 ("Q You don't claim to be an expert in the diagnosis of gender dysphoria? A Expertise, no. … .").  He further admitted that he has never been involved in the development of the DSM-V, and does not know "what kind of scientific literature review was done" during that development or what went on during "different meetings or conferences" to "discuss that development[;]" thus, Dr. Lappert "do[es] ***not have expert firsthand knowledge*** of how the DSM-V was developed."  Lappert Tr., at 190-93 (emphasis added).

In sum, Dr. Lappert's ability to read and regurgitate information pertaining to the treatment of gender dysphoria does not qualify him as an expert.  Because Dr. Lappert's purported opinions about matters within the fields of psychology, psychiatry, and endocrinology are outside of his training and expertise, such opinions should be precluded, as they were in *Kadel* and *Brandt*.  *See Kadel*, 2022 WL 3226731 at *12-15; *see also, e.g.*, *Lebron*, 772 F.3d at 1368-69.

**B.     Dr. Lappert is Not Qualified to Opine on the Quality of the Studies Supporting Gender-Affirming Care**

Aware that his views on gender dysphoria and gender-affirming care are contradicted by the position of every major medical society and professional organization in the country, Dr. Lappert goes to great lengths to attempt to undermine the validity and basis of a select few of the multitude of medical studies that support the safety and efficacy of gender-affirming care by pointing out what he perceives as methodological flaws. *See, e.g.*, Lappert Rep ¶¶ 38-41, 58-67, 85-87; Lappert Rebuttal ¶¶ 8, 11-12, 16-22. He repeatedly contends that the existing studies do not constitute "quality evidence," and as a result, gender-affirming care is experimental or unsupported by reliable science. *See* Lappert Rep. ¶¶ 24-25, 57, 59, 106; Lappert Rebuttal ¶ 25. But once again, such opinions are far afield from Dr. Lappert's professional experience.

As the court in *Kadel* noted, Dr. Lappert is "not a statistician or epidemiologist, and there is no evidence . . . that he has any experience, specialized training, or knowledge about crafting a research study, analyzing data, or conducting a clinical trial." *Kadel*, 2022 WL 3226731 at *13. Given his lack of personal experience with the study of gender-affirming care, the court in *Brandt* similarly limited his testimony to "to what he has personally done in his practice, not what the evidence shows." *Brandt* Tr. 1059:9-13. Indeed, Dr. Lappert's prior publications (seven in total) include case reports and opinion essays, and he has not published in

a peer-reviewed journal in over ***twenty-five years***.   *See* Lappert Rep., at 69 (curriculum vitae).  His curriculum vitae notes a brief academic career, but that role appears limited to overseeing clinical practitioners and did not involve conducting research or clinical trials of any kind.  *See id*., at 68; *see also Kadel*, 2022 WL 3226731 at *13.

In sum, as the court in *Kadel* noted, "[j]ust as an epidemiologist or statistician would not be qualified to perform surgery, a surgeon with little to no research experience is not qualified to opine of the veracity of statistical studies." *Kadel*, 2022 WL 3226731 at *13.  Accordingly, Dr. Lappert's proffered opinions regarding the validity or veracity of studies pertaining to gender-affirming care or gender dysphoria should be excluded.

## II.   Dr. Lappert's Opinions on Topics Other than Plastic Surgery are Also Either Unreliable, Unhelpful, or Both

As a rule, an expert's testimony should only be admitted if it is sufficiently reliable.  "To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *In re 3M Combat Arms Earplug Products Liab. Litig.*, 3:19MD2885, 2022 WL 1262203, at *1 (N.D. Fla. Apr. 28, 2022).  The reliability requirement in Rule 702 is "the centerpiece of any determination of admissibility." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002).  "At this stage, the court must undertake an independent analysis of each step in the logic leading to

the expert's conclusions; if the analysis is deemed unreliable at any step the expert's entire opinion must be excluded." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009), *aff'd sub nom.  Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010).

To satisfy the helpfulness requirement, the proffered testimony must have a justified scientific relationship to the facts at issue. *Daubert*, 509 U.S. at 591.  Thus, helpfulness, "goes primarily to relevance." *Daubert*, 509 U.S. at 580.  Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). "The relationship must be an appropriate 'fit' with respect to the offered opinion and the facts of the case." *Id.*  Where the court determines that proffered expert testimony does not "fit" the facts of the case, it is properly excluded.  *See id.*, at 1301.

Here, Plaintiffs' case turns primarily on two issues, among others, (1) whether the Agency employed a process that was reasonable and (2) whether gender-affirming medical care is experimental or investigational.  Many of Dr. Lappert's opinions are both unreliable and unhelpful to the issues before this Court, as detailed below.

A.   **Dr. Lappert's Opinions are Rejected by the Vast Majority of the Scientific and Medical Community and Lack Credible Support**

General acceptance in the relevant scientific community is an important element to the reliability inquiry. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1313 (11th Cir. 1999).  Moreover, the fact that a known theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594.  Here, Dr. Lappert's opinions about the effectiveness and propriety of gender-affirming care, which he is not qualified to present, are far outside the mainstream of medical and scientific opinion and have been explicitly rejected by every relevant scientific and medical community.  While undoubtedly Dr. Lappert "has strong beliefs," the fact that his opinions are "not generally accepted by the scientific community, and [are] unsupported by other studies" means that "his testimony is based more on personal opinion than on scientific knowledge," making it unreliable. *Allison*, 184 F.3d at 1319.

Dr. Lappert cites virtually no evidentiary support for his critiques of medical studies substantiating the need for gender-affirming care. *See generally*, Lappert Rep.; Lappert Rebuttal.  And to the contrary, the evidence shows that Dr. Lappert's opinions regarding the supposedly "experimental" nature of gender-affirming care are on the scientific fringe. *See, e.g.*, Lappert Rep. ¶¶ 23, 97-98; Lappert Rebuttal ¶¶ 21-22, 25 n. 3.  For example, in a recent case addressing a challenge to Arkansas' state-law ban on gender-affirming treatment for minors, Dr. Lappert offered

substantially similar opinions in support of the ban, contending that "[g]ender affirming' treatments are experimental[.]" *See Brandt v. Rutledge*, 551 F.Supp.3d 882 (E.D. Ark. 2021); Lappert Tr., at 33-35; Miller Dec. ¶ 8; Ex. E, Declaration of Dr. Lappert in *Brandt v. Rutledge*.

Nevertheless, the *Brandt* court preliminarily enjoined the ban, recognizing that "the consensus recommendation of medical organizations is that the only effective treatment for . . . gender dysphoria is to provide gender-affirming care," citing briefs from organizations like the American Medical Association, American Academy of Pediatrics, and many more. *Brandt*, 551 F.Supp.3d at 890 n.3. *Brandt* also found that "gender-affirming treatment is supported by medical evidence that has been subject to rigorous study," and that "every major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people." *Id.*, at 891; *see also Fain v. Crouch*, Case No. 3:20-0740, 2022 WL 3051015, *10 ("[m]any of the major medical organizations have opposed the blanket denial of this medically necessary [gender-affirming] care.").

Dr. Lappert himself has previously acknowledged that "every major expert medical association disagrees with [him] because they've all taken [the] position that this treatment is in fact medically necessary." Lappert Tr., at 40. Dr. Lappert's own

former association, the American Society of Plastic Surgeons[4] ("ASPS") (whose categorizations of evidence for prognostic and therapeutic studies Dr. Lappert repeatedly relies upon in critiquing the studies and evidence in support of gender-affirming care) issued a statement in February 2021 stating that it "firmly believes that plastic surgery services can help gender dysphoria patients align their bodies with whom they know themselves to be," and promising to "continue its efforts to advocate across state legislatures for full access to medically necessary transition care." Miller Dec. ¶ 9; Ex. F, Feb. 25, 2021 ASPS Statement. So as Dr. Lappert has admitted, the ASPS also "does not agree with [his] opinions that gender affirming surgery is experimental." Lappert Tr., at 112-13. In short, the overwhelming consensus confirms that, far from being generally accepted, Dr. Lappert's opinions regarding gender-affirming care are unsupported and unreliable.

**B. Dr. Lappert's Critiques of the WPATH Standards of Care, the Endocrine Society Guidelines, and Other Organizations' Positions Are Unreliable**

Given that his views are unsupported by any reliable scientific evidence, and indeed run contrary to the position of every major medical society and professional organization, Dr. Lappert attempts to discredit the clinical guidelines and standards of care espoused by these respected organizations, including the World Professional

---

[4] Dr. Lappert's report misidentifies his own former professional organization as the "American Society of Plastic Surgery." *E.g.*, Lappert Rep. ¶ 24.

Association for Transgender Health ("WPATH") and the Endocrine Society.  For example, Dr. Lappert asserts that "the WPATH standard of medical necessity is not supported in reliable scientific evidence" and he purports to "examine how such guidelines are developed."  Lappert Rep. ¶¶ 36, 51; *see also, e.g.,* Lappert Rebuttal ¶ 8 (contending that the "evidence cited in support of the WPATH Standard reveals a lack of evidence even to support a weak recommendation in a treatment guideline.").

But Dr. Lappert has previously conceded that he was "not involved with the development" of WPATH guidelines, he did not "know what kind of scientific literature [review] the WPATH conducted as part of drafting" the guidelines, or what other forms of "peer review," "outside experts," or "public comments" the WPATH may have relied on in developing their guidelines.  Lappert Tr., at 184-87.  To the point, Dr. Lappert admitted that he is "***not an expert***" in the development of either versions 7 or 8 of the WPATH standards of care.  *Id.*, at 188-89.  The court in *Kadel* agreed, precluding Dr. Lappert's views on the WPATH standards as "unscientific opinion and speculation."  *Kadel*, 2022 WL 3226731 at *14.  So did the court in *Brandt*, which sustained an objection to an attempt to elicit testimony from Dr. Lappert as to what the WPATH guidelines mean.  *Brandt* Tr. 1058:4-10.

Dr. Lappert similarly opines that the "scientific evidence used to support the Endocrine Society's special treatment guidelines for gender dysphoric/gender

incongruent persons appears to be of low to very low quality[.]"  Lappert Rep. ¶ 38.

Yet Dr. Lappert has admitted that he does not know when these guidelines "were

initially published" or "last revised;" he was "not involved with the[ir] development;"

he does not know "what kind of scientific literature review" went into that

development; thus, he agreed he is "not an expert in how the Endocrine Society

developed the original 2009 guidelines" or "the 2017 updates."  Lappert Tr., at 195-

200.

At bottom, Dr. Lappert has no expertise or understanding of the development

of the WPATH or Endocrine Society guidelines, and therefore his criticism of the

evidence in support of these standards is unreliable.  *See Kadel*, 2022 WL 3226731

at *14.  Consequently, he should not be permitted to mislead a factfinder with his

baseless *ipse dixit* critiques.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### C.  Dr. Lappert's Opinions Regarding Informed Consent, "Desistance," and Changes in Demographics are Unreliable, Unhelpful, and Irrelevant.

Dr. Lappert dedicates a portion of his report to his opinions on whether

patients diagnosed with gender dysphoria can provide "meaningful consent" to

gender-affirming treatment, and he makes a number of claims regarding statistics

pertaining to the supposed "resolution" of the condition of "transgenderism" absent

gender-affirming care, and changes in the rates of diagnosis and makeup of the

population of individuals diagnosed with gender dysphoria.  *E.g.*, Lappert Rep. ¶¶

69-70, 73.  But these purported opinions are unreliable, unhelpful, and irrelevant to the issues before the Court.

*First*, Dr. Lappert has failed to support his opinions regarding "informed consent" with any credible evidence or data.   *See generally*, Lappert Rep. Accordingly, his conclusions regarding informed or meaningful consent are speculative and unreliable and should be excluded.  *See Jones v. Otis Elevator Co*., 861 F.2d 655, 662 (11th Cir. 1988) ("relevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation."); *see also Hendrix*, 255 F.R.D. at 578; *Kadel*, 2022 WL 3226731, at \*14 (concluding that Dr. Lappert's opinions regarding informed consent to gender-affirming care were "irrelevant" and "not admissible.").

*Second*, Dr. Lappert's opinions that gender dysphoria may resolve on its through his mischaracterizing description of "watchful waiting" (e.g., Lappert Rep. ¶¶ 93, 94, 98) are based on a severely flawed reading of the literature, which renders his opinions unreliable, and regardless, such opinions are also irrelevant. Specifically, Dr. Lappert cites a single article by Zucker et al. in support of this proposition.  But that study pertains to (1) *preadolescent/prepubertal* youth not *adolescents after the onset of puberty* and (2) who were diagnosed with *gender identity disorder* under the DSM-III or the DSM-IV not *gender dysphoria* under the

DSM-V.  It is therefore inapplicable and irrelevant in this context, where the changes from the DSM-IV diagnosis of gender identity disorder to the DSM-V diagnosis of gender dysphoria in 2013 made "the diagnosis more restrictive and conservative" to reduce "false positives."  *See* Miller Dec. ¶ 10; Ex. G, Memo Outlining Evidence for Change for Gender Identity Disorder, at 904-05.

Dr. Lappert's assertions are also flawed because they misrepresent Dr. Zucker's work.  Indeed, Dr. Zucker authored the chapter in "Gender Dysphoria and Gender Incongruence" in the medical textbook *Lewis's Child and Adolescent Psychiatry, Fifth Edition*, published in 2018.  *See* Miller Dec. ¶ 11, Ex. H, Excerpt of *Lewis's Child and Adolescent Psychiatry, Fifth Edition*.  That chapter states that: (1) "it appears that the vast majority of transgender adolescents persist in their transgender identity," *id.* at 638; and (2) "Once children have reached puberty, transgender identity persists in the vast majority of cases, and medical intervention is often considered[.]" *Id.* at 640.  Given that this case pertains to gender-affirming medical treatments which are not provided until after the *onset of puberty*, Dr. Lappert's opinions, premised on his flawed reading and understanding of the "desistance" literature, are irrelevant and unreliable.

***Third***, Dr. Lappert's opinions regarding a change of demographics are wholly unreliable and irrelevant.  Lappert Rep. ¶ 73.  He cites no scientific or peer-reviewed literature.  To the contrary, he cites solely to a non-medical, non-scientific book by

an anti-transgender activist.[5]  But Rule 703 requires that "[t]he facts or data … upon which an expert bases an opinion or inference" must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," Fed. R. Evid. 703, and the book upon which Dr. Lappert relies is *not* the type of material reasonably relied upon by experts in any field of medicine. Moreover, Dr. Lappert's opinion is irrelevant.  Gender dysphoria is a real and recognized condition that requires treatment – whether the demographics have changed has no bearing on that or the questions before the Court.

### D.    Dr. Lappert's Commentary on Gender-Affirming Care Provided in Other Countries is Unreliable and Unhelpful

Dr. Lappert also offers opinion regarding the treatment of gender dysphoria and the provision of gender-affirming care in certain European countries, including the United Kingdom, Sweden, Finland, France, and Italy, and cites developments in those countries as evidence in support of his opinions proffered in this case.  *See* Lappert Rep. ¶¶ 104-05; Lappert Rebuttal ¶ 24.  But, according to the curriculum vitae he supplied, Dr. Lappert is not licensed to practice in any of those countries.  *See* Lappert Rep., at 67-69.   His report and rebuttal report likewise offer no

---

[5] Abigail Shrier is not a doctor but an anti-transgender activist and opinion columnist.  She has described transgender rights as a "war on women" and has advocated against what she considers to be a "transgender craze."  GLAAD, GLAAD Accountability Project: Abigail Shrier, https://www.glaad.org/gap/abigail-shrier (accessed Apr. 6, 2023).

indication that Dr. Lappert has personal knowledge regarding the policies regarding gender-affirming care issued in those countries or how those policies were developed.  *See generally*, Lappert Rep.; Lappert Rebuttal.  Dr. Lappert also either wholly fails to cite any facts or data in support of his opinions regarding developments in these countries, or the data he cites is insufficient to support those opinions.  *See* Lappert Rep. ¶¶ 104-05; Lappert Rebuttal ¶¶ 24-25.  Consequently, the Court should exclude Dr. Lappert's testimony regarding such opinions.  *See Jones*, 861 F.2d at 662.

### III.   Dr. Lappert's Opinions are Based on His Personal Beliefs and Not Science

Reliability is a flexible inquiry, under which "courts must ensure that an expert's opinion is based on scientific, technical, or other specialized knowledge and not on belief or speculation."  *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021); *see also Jones*, 861 F.2d at 662 ("relevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation.").  Here, there is abundant evidence that Dr. Lappert's opinions are so tainted by his strong personal views against gender-affirming care as to render those opinions unreliable. Although Plaintiffs of course do not seek to impugn any moral or religious views that Dr. Lappert may hold, those views plainly inform the opinions he proffers in this case (and indeed appear to be the primary motivation for those opinions), and

therefore the Court must consider those views in assessing the reliability of Dr. Lappert's conclusions.

Dr. Lappert has previously testified that he has "strong personal opinions on whether doctors should be providing gender-affirming treatment to minors." Lappert Tr., at 78.  That is an understatement.  He has previously lobbied state legislatures in, at a minimum, Utah, Arkansas, Alabama, Texas to pass laws or regulations that would ban doctors from providing gender-affirming medical care to adolescents.  *See id.*, at 57, 61-62; *id.* at 54-55 (agreeing he has "actively lobbied to get these kinds of bans passed").  In Alabama he spoke in favor of a ban on gender-affirming care for adolescents, and "publish[ed] an op-ed" that urged the legislature to protect what he called "gender-confused children."  *Id.*, at 76, 63-64.  He argued to the Utah legislature that "you can't change a person's sex," and that "all that is happening is that the patient is undergoing an intentional mutilation in order to create a counterfeit appearance of the other sex."  *Id.*, at 57-60.

Dr. Lappert also affirmed in deposition testimony that he "absolutely" considers "gender reassignment surgery to be an intentional mutilation."  *Id.*, at 60.  He further testified that he would like to see doctors who perform these gender-affirming surgeries to be "criminally prosecute[d] – confirming that he thinks "that's a good idea."  *Id.*, at 52.  Dr. Lappert went so far as to confirm in his report in this

case that "in all instances" gender-affirming genital surgery is "an irreversible mutilation[.]"  Lappert Rep. ¶ 42.

Dr. Lappert has also worked hand in hand with the Alliance Defending Freedom ("ADF"), an organization he agrees has "moral objections" to gender-affirming healthcare.  Lappert Tr., at 81.  Among other things, he attended an ADF conference that discussed the "poverty of [experts] who are willing to testify" about these anti-gender-affirming treatments. *Id.*, at 90-91.  Attendees at that conference "were asked whether they would be willing as participate as expert witnesses[;]" not coincidentally, Dr. Lappert became an expert witness for the first time after attending that conference.  *Id.*, at 91; *see also Brandt* Tr. 1080:5-1081:11. In this sense, Dr. Lappert is the definition of a manufactured "expert witness" who "developed his opinions expressly for purposes of testifying" in an area that he did not otherwise specialize in.  *Lebron*, 772 F.3d at 1369.

Dr. Lappert's public interviews and presentations reinforce his vehement opposition to any form of gender-affirming care.  These include, for example, his views that the religious conception of "the human person" "defines the 'end' of medical and surgical care."  Lappert Tr., at 459. They also include his opinions that "changing a person's sex is a lie and also a moral violation for a physician," and that gender-affirming surgery is "diabolical in every sense of the word."  *Id.*, at 464-65; *see also* Miller Dec. ¶ 12; Ex. I, Article titled *Plastic surgeon: Sex-change operation*

*'utterly unacceptable' and a form of 'child abuse'* ("LifeSite Article"), at 1, 7;

Lappert Tr., at 465 (agreeing that he "hold[s] those views"). And finally, these also

include his inflammatory views that parents who "discuss[] gender identity issues

with children" are "sexualizing them" (Lappert Tr., at 462), and that these

conversations are "grooming a generation" for abuse. *Id.* at 461; Miller Dec. ¶ 13;

Ex. J, Presentation by Dr. Lappert titled "Transgender Surgery & Christian

Anthropology," at 24; *see also* LifeSite Article, at 1, 2 (reporting that "regarding

children, Lappert said, sexualizing them at a young age with these ideas is grooming

them for later abuse.").

As the court in *Kadel* found, these positions call "Lappert's bias and

credibility into serious question." *Kadel*, 2022 WL 3226731, at *12.

## IV. Dr. Lappert's Opinions Lack Probative Value and are Therefore Neither Helpful to the Fact-Finder Nor Admissible Under Fed. R. Evid. 403

Finally, the Court should exclude the opinions and testimony of Dr. Lappert

outside the field of plastic surgery because introduction of those opinions will result

in unfair prejudice, confusion of the issues, or in misleading testimony. Fed. R.

Evid. 403. As articulated above, Dr. Lappert's non-surgical opinions are irrelevant

to the issues in this case, and are otherwise speculative, unhelpful, and unreliable.

His testimony outside of his discipline would also result in prejudice, as it would

sow confusion about the propriety of gender-confirming care based on speculation

and irrelevant, misleading, and biased opinions. Accordingly, to the extent not

excluded for the reasons detailed above, Dr. Lappert's opinions outside of plastic surgery should be precluded under Rule 403.

## CONCLUSION

For the foregoing reasons, the Court should exclude any opinion proffered by Dr. Lappert outside the field of plastic surgery and limit his testimony to the provision of surgical care generally.

Dated: April 7, 2023

Respectfully Submitted,

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

*/s/ William C. Miller*
**William C. Miller***
**Gary J. Shaw***
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**Joe Little***
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan***
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles***
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle**\*
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**\*
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
mckee@healthlaw.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

\* *Admitted pro hac vice*
*Counsel for Plaintiffs*

## CERTIFICATE OF WORD COUNT

As required by Local Rule 7.1(F), I certify that this Motion and Incorporated Memorandum of Law contains 5,753 words.

*/s/ William C. Miller*
Attorney for Plaintiffs

## CERTIFICATE OF SATISFACTION OF ATTORNEY-CONFERENCE REQUIREMENT

Pursuant to Local Rule 7.1(B), counsel for Plaintiffs and counsel for Defendants conferred regarding the instant motion during a Zoom conference on April 6, 2023.  Defendants indicated they do not consent to the relief requested herein.

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April, 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

*/s/ William C. Miller*
Attorney for Plaintiffs