# EXHIBIT C

```
 1              IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF ARKANSAS
 2                        CENTRAL DIVISION

 3   DYLAN BRANDT, et al.,

 4                  Plaintiffs,
        v.                              No. 4:21CV00450 JM
 5
                                        November 29, 2022
 6                                      Little Rock, Arkansas
                                        8:03 AM
 7   LESLIE RUTLEDGE, et al.,

 8                  Defendants.

 9          TRANSCRIPT OF BENCH TRIAL - VOLUME 6
         BEFORE THE HONORABLE JAMES M. MOODY, JR.,
10                UNITED STATES DISTRICT JUDGE
                  _____
11
     APPEARANCES:
12
     On Behalf of the Plaintiffs:
13
         MR. CHASE STRANGIO, Attorney at Law
14       MS. LESLIE COOPER, Attorney at Law
         MR. JAMES D. ESSEKS, Attorney at Law
15         American Civil Liberties Union
           125 Broad Street, Suite 1800
16         New York, New York  10004-2400

17       MS. BREEAN WALAS, Attorney at Law
           Walas Law Firm, PLLC
18         Post Office Box 4591
           Bozeman, Montana  59772
19

20       MR. AVIV S. HALPERN, Attorney at Law
         MS. LAURA KABLER OSWELL, Attorney at Law
21         Sullivan & Cromwell, LLP
           1870 Embarcadero Road
22         Palo Alto, California  94303

23

24   Appearances continuing...

25
```

Karen Dellinger, RDR, CRR, CCR
United States Court Reporter
Karen_Dellinger@ARED.uscourts.gov (501)604-5125

```
 1
 2    APPEARANCES CONTINUED:
 3    On Behalf of the Plaintiffs:
 4        MR. ARUN BODAPATI, Attorney at Law
          MS. LAUREN M. GOLDSMITH, Attorney at Law
 5          Sullivan & Cromwell, LLP
            125 Broad Street, Suite 2424
 6          New York, NY 10004-2498
 7        MR. DANIEL J. RICHARDSON, Attorney at Law
            Sullivan & Cromwell LLP
 8          1700 New York Avenue
            Washington, DC 20006
 9
          MR. GARY L. SULLIVAN, Attorney at Law
10          ACLU of Arkansas
            Legal Division
11          904 West 2nd Street, Suite One
            Little Rock, AR 72201
12
          MS. SHARON ELIZABETH ECHOLS, Attorney at Law
13          Gill Ragon Owen P.A.
            425 West Capitol Avenue
14          Suite 3800
            Little Rock, AR 72201-2413
15
16    On Behalf of the Defendants:
17        MR. DYLAN JACOBS, Attorney at Law
          MR. MICHAEL CANTRELL, Attorney at Law
18        MS. AMANDA LAND, Attorney at Law
          MS. HANNAH TEMPLIN, Attorney at Law
19          Arkansas Attorney General's Office
            323 Center Street, Suite 200
20          Little Rock, Arkansas  72201
21
22
23        *Proceedings reported by machine stenography.  Transcript
      prepared utilizing computer-aided transcription.*
24
25
```

```
 1                INDEX - VOLUME 6 (11/29/22)
 2   WITNESSES FOR THE DEFENDANTS:  Direct   Cross   Redirect   Recross
 3   DANIEL REGNERUS                970,979   1025    1033
 4   PATRICK LAPPERT                1037,1043 1080    1081
 5
 6   VOIR DIRE BY PLAINTIFFS:
 7   DANIEL REGNERUS                   972
 8   PATRICK LAPPERT                  1040
```

1  people didn't really have a problem with the data.
2           MR. JACOBS:  No further questions, Your Honor.
3           MR. RICHARDSON:  Nothing more from us, Your Honor.
4           THE COURT:  Thank you, Doctor.  We'll let you
5  disconnect and be about your business.
6           THE WITNESS:  All right.  Thank you, Your Honor.
7           MR. JACOBS:  We've got another witness if the
8  Court's ready for it or I don't know what time you were
9  planning to break for lunch today.
10          THE COURT:  Probably 1:00, so let's get an hour into
11 it and we'll proceed from there.
12          MR. JACOBS:  Defense will call Dr. Patrick Lappert.
13      **PATRICK LAPPERT, DEFENDANTS' WITNESS, DULY SWORN**
14                      DIRECT EXAMINATION
15 BY MS. TEMPLIN:
16 Q    Good morning, Dr. Lappert.  Could you state your name and
17 spell it for the court reporter?
18 A    Patrick Walter Lappert.  L-a-p-p-e-r-t.
19 Q    Dr. Lappert, what is your profession?
20 A    I'm a physician surgeon.
21 Q    What type of surgeon?
22 A    Plastic and reconstructive surgery.
23 Q    How long have you been a plastic surgeon?
24 A    I did my training in 1992, so 30 years.
25 Q    What do plastic surgeons do?

1  A      It is.
2         MS. TEMPLIN:  Your Honor, depending on whether the
3  plaintiffs wish to voir dire the witness, otherwise we would
4  seize questioning on his qualifications and rest on the CV.
5         MS. OSWELL:  Your Honor, we do have voir dire
6  questions for this witness.  As the Court knows, we have moved
7  to exclude this witness on testifying beyond the scope of his
8  expertise as a plastic surgeon.  With the Court's permission,
9  we do have a few questions to establish the basis of our
10 objections.
11        THE COURT:  Briefly.
12                 VOIR DIRE EXAMINATION
13 BY MS. OSWELL:
14 Q     Good morning, Dr. Lappert.  My name is Laura Oswell.  I'm
15 an attorney for the plaintiffs in this case.
16        Doctor, you're not a psychiatrist, correct?
17 A     That's correct.
18 Q     You're not a psychologist either, are you?
19 A     That's correct.
20 Q     You do not claim to be an expert in mental health?
21 A     No, I don't.
22 Q     And you're not an endocrinologist?
23 A     I am not.
24 Q     You're not an expert in endocrinology?
25 A     I am not.

1  Q    You don't claim to be an expert in pediatrics?
2  A    I do not.
3  Q    You don't hold yourself out to others as an expert in
4  medical ethics or bioethics, do you?
5  A    I do not.
6  Q    You don't claim to be an expert in the diagnosis of
7  gender dysphoria?
8  A    Expertise, no.  I'm familiar with the process of
9  diagnosis, but I'm not an expert.
10 Q    You have never diagnosed any person with gender
11 dysphoria, have you?
12 A    I have, but in the course of my practice, persons come to
13 me with issues relating to their appearance, but they ascribe
14 to their gender presentation so I have made that diagnosis and
15 excluded them from surgical intervention.
16 Q    Could we quickly just take a look at your testimony in
17 this matter?  You were deposed, Dr. Lappert, in this case on
18 May 6th of this year; is that correct?
19 A    Correct.
20 Q    We're going to take a quick look at your testimony.  It
21 will be up on the screen just a moment here.  Here we go.
22 Direct you to page 150, line 18.  Question here is:  "Have you
23 ever diagnosed someone of gender dysphoria?  Answer:  Are you
24 talking about like making a formal diagnosis and sending an
25 insurance document?  Answer:  No."

1     Did I read that correctly?
2  A  You read it correctly, yes.
3  Q  Thank you. You have not conducted or published research
4  on gender dysphoria or transgender people. Is that correct?
5  A  That's correct.
6  Q  You agree that gender dysphoria is not your area of care,
7  correct?
8  A  Correct.
9  Q  Your only education or training in gender dysphoria was
10 one weekend class at the California Society for Plastic
11 Surgery, wasn't it?
12 A  Correct.
13 Q  You do not claim to be an expert in the treatment of
14 gender dysphoria, do you?
15 A  I do not.
16 Q  And you only hold yourself out as an expert in plastic
17 and reconstructive surgery, correct?
18 A  Correct.
19 Q  Thank you.
20    Your Honor, I know in your order on our motion to
21 exclude, you asked us to take our objections question by
22 question. We would plan to do so in accordance with the
23 Court's instruction.
24         THE COURT: Thank you.
25 BY MS. TEMPLIN:

1  A   Well, for example, the risk of pinning someone's ears
2  back because their ears are prominent, that's about as low risk
3  surgery as I could imagine.  There's no risk of function lost,
4  there's little or no risk of local problems even.  So that
5  would be a very low risk procedure.  On the other hand, doing
6  an operation that involves the transfer of large flaps of
7  tissue and the removal of natal tissues, there's a lot at risk
8  there.  For example, in the case of transgender surgery, you're
9  talking about hazarding a fundamental human function, which is
10 capacity for sexual embrace and reproduction.  That's a huge
11 thing to put in jeopardy compared to a cosmetic ear surgery.
12 Q   You're not a psychiatrist, but as a plastic surgeon, are
13 you familiar with what gender dysphoria is?
14 A   Yes, I am.
15 Q   How are you familiar with that?
16 A   I follow the literature.  I've reviewed the DSM.
17 Q   Are you familiar with the WPATH guidelines on treating
18 patients who are seeking gender reassignment surgery?
19 A   I am.
20 Q   What do those guidelines recommend?
21 A   Well, first of all, they recommend affirmation.  The
22 basic position of the WPATH documents is affirmation.  They
23 have portions of their what they call the WPATH Standards of
24 Care that discuss psychological, psychiatric support, but
25 there's little to nothing in there about the process of

1  diagnosis, which is a very troubling thing.  The diagnosis is
2  what the patient presents with.  So the recommendation, the
3  default position of the WPATH documents is affirmation.
4  Q    For specifically in the surgical context, what would that
5  mean?
6            MS. OSWELL:  Your Honor, we object to this line of
7  questioning on the grounds that the witness is not an expert in
8  gender-affirming care and was not included in his expert
9  report.
10           THE COURT:  Sustained.
11 BY MS. TEMPLIN:
12 Q    Dr. Lappert, can you predict whether a transgender
13 patient would be satisfied with the outcome of cosmetic
14 surgery?
15 A    I cannot.
16 Q    Is there evidence on this?
17           MS. OSWELL:  Objection, Your Honor.  Again, outside
18 the scope of the testimony.  The doctor has testified that he
19 has not performed any sort of gender-affirming care surgery.
20           MS. TEMPLIN:  Your Honor, Dr. Lappert has also
21 testified that as a plastic surgeon, he has to take into
22 account his patient's goals and whether it would be effective
23 and whether that expertise -- we believe he has the expertise
24 to discuss that.
25           THE COURT:  I'm going to limit it to his practice.

1    THE WITNESS: Could you repeat the question?
2    BY MS. TEMPLIN:
3    Q    Yes. In your practice, can you predict whether a
4    transgender person who comes to you -- have you been able to
5    predict whether that person would be satisfied with --
6             THE COURT: He's already answered that question.
7             MS. TEMPLIN: Apologies.
8    BY MS. TEMPLIN:
9    Q    In your review of the evidence as part of your practice,
10   what does the evidence show?
11            THE COURT: No, ma'am. I just said that he can
12   testify to what he has personally done in his practice, not
13   what the evidence shows. So he can testify to his actual
14   interaction with patients and what the outcomes were, but I'm
15   going to limit it to that.
16            MS. TEMPLIN: Can I ask him about certain studies
17   that may have been referred to in his expert report or is that
18   also outside the scope of permissible testimony, Your Honor?
19            THE COURT: I don't know what your question is so I
20   can't answer that question. I can tell you what I'm limiting
21   to you the question that's before the witness now. He can
22   answer to the extent that he has hands-on experience with that,
23   but your next question I'll just have to field as it comes.
24   BY MS. TEMPLIN:
25   Q    Okay. I'll try that question then. Dr. Lappert, are you

1  observation and then it can get to the point of pain.  So
2  capsular contracture is the most common thing and it most
3  likely results from incidental infection with bacteria, maybe a
4  failure of technique during surgery, maybe a failure of
5  manufacture of the implant.  Sometimes it can become so severe
6  that the implant has to be removed because of peri-implant
7  infections.  So those are the two most common complications.
8  And then you have less common things like failure of the wound
9  closure.  Typically not a problem.
10 Q    Are there any special difficulties with performing breast
11 augmentation on a transgender individual?
12           MS. OSWELL:  Objection, Your Honor.  This is outside
13 the scope of the doctor's practice.
14           THE COURT:  Sustained.
15 BY MS. TEMPLIN:
16 Q    Have you ever performed a vaginoplasty?
17 A    No.
18 Q    Are there similar procedures you've performed on
19 nontransgender individuals that would utilize these techniques?
20 A    Yes.
21 Q    Can you explain?
22 A    Perineal reconstruction and vaginal reconstruction
23 following cancer care and trauma.  For example, in the
24 reconstruction, I had a patient who was one of the victims of
25 the bombing of the USS Cole when I was on active duty in the

1     (Proceedings commenced in open court at 12:50 p.m.)
2         THE COURT:  Ready when you're ready.
3                    CROSS-EXAMINATION
4  BY MS. OSWELL:
5  Q.   Dr. Lappert, just a few questions for you.
6       The American Society of Plastic Surgeons considers
7  gender-affirming surgeries to be reconstructive not
8  cosmetic, correct?
9  A.   Right.
10 Q.   And changing topics, you attended two meetings in
11 Arizona on the subject of transgender organized by the
12 Alliance Defending Freedom.  Is that correct?
13 A.   That's correct.
14 Q.   It's an organization otherwise known as ADF for
15 short.
16 A.   I'm sorry?
17 Q.   Refer to that organization as ADF for short.
18 A.   That's correct.
19 Q.   The first meeting you attended took place in 2017.
20 A.   I think that's correct, yes.
21 Q.   And ADF is not a professional scientific
22 organization, is it?
23 A.   Not to my understanding.  I don't know them real
24 well, but my understanding is they're advocacy --
25 Christian-based advocacy legal organization.

Valarie D. Flora, FCRR, TX-CSR, AR-CCR
United States Court Reporter
Valarie_Flora@ared.uscourts.gov (501) 604-5105

1  Q.   Okay.  And at that meeting in 2017, there was a
2  fairly long discussion about the lack of people who are
3  willing to testify and the difficulty of finding expert
4  witnesses on transgender issues, wasn't there?
5  A.   I believe there was.
6  Q.   And people at that meeting were asked whether they
7  would be willing to participate as expert witnesses,
8  weren't they?
9  A.   Yes.
10 Q.   Both you and Dr. Hruz attended that meeting, correct?
11 A.   That's correct.
12          MS. OSWELL:  Pass the witness, thank you.
13                  REDIRECT EXAMINATION
14 BY MS. TEMPLIN:
15 Q.   Just a couple follow-up questions, Dr. Lappert.
16      As you were just asked about, the association of
17 plastic surgeons classifies gender-transition surgery as
18 reconstructive.
19      Do you agree with that classification?
20 A.   I do not.  It's contrary to every other case that we
21 work on.  It's an exceptional case, I should say.
22 Q.   And is it common for you to attend professional
23 conferences with other people, other doctors, medical
24 professionals, to discuss medical issues?
25 A.   Yes, it is.