# EXHIBIT D



Deposition of:

**Patrick Lappert, M.D.**

*September 30, 2021*

In the Matter of:

**Kadel, et al vs. Folwell**

Veritext Legal Solutions

800-734-5292 | calendar-dmv@veritext.com |

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4

5

6

7      CIVIL ACTION NO.:  1:19-cv-272-LCB-LPA

8

9      MAXWELL KADEL, et al.

10              Plaintiffs

11

12      v.

13

14      DALE FOLWELL, et al.

15              Defendants

16

17

18        REMOTE VIDEOTAPED VIDEOCONFERENCE

19            DEPOSITION TESTIMONY OF:

20            PATRICK LAPPERT, M.D.

21          September 30, 2021

22

23

Page 2

1                  A P P E A R A N C E S

2

3     FOR THE PLAINTIFFS (via remote

4     videoconference):

5

6     Dmitriy Tishyevich, Esq.

7     MCDERMOTT, WILL & EMERY

8     One Vanderbilt Avenue

9     New York, New York  10017

10    dtishyevich@mwe.com

11

12    Tara L. Borelli, Esq.

13    LAMBDA LEGAL DEFENSE AND EDUCATION FUND

14    158 West Ponce de Leon Avenue, Suite 105

15    Decatur, Georgia  30030

16    tborelli@lambdalegal.com

17

18    Omar Gonzalez-Pagan, Esq.

19    LAMBDA LEGAL DEFENSE AND EDUCATION FUND

20    120 Wall Street, 19th Floor

21    New York, New York  1005

22    ogonzalez-pagan@lambdalegal.com

23

Page 3

```
 1      FOR THE DEFENDANTS (via remote
 2      videoconference):
 3
 4      John G. Knepper, Esq.
 5      LAW OFFICE OF JOHN G. KNEPPER LLC
 6      1720 Carey Avenue, Suite 590
 7      Cheyenne, Wyoming  82001
 8      john@knepperllc.com
 9
10      Kevin G. Williams, Esq.
11      BELL, DAVIS & PITT
12      100 North Cherry Street, Suite 600
13      Winston-Salem, North Carolina  27101
14      kwilliams@belldavispitt.com
15
16
17      ALSO PRESENT (via remote
18      videoconference):
19
20      Andrew Baker, Videographer
21
22
23
```

Page 9

1              I, Lane C. Butler, a Court

2       Reporter and Notary Public, State of

3       Alabama at Large, acting as Notary,

4       certify that on this date, pursuant to

5       the Federal Rules of Civil Procedure,

6       there came before me via remote

7       videoconference from Decatur, Alabama,

8       commencing at approximately 8:30 a.m.

9       Central, on the 30th day of September,

10      2021, PATRICK LAPPER, M.D., witness in

11      the above cause, for oral examination,

12      whereupon the following proceedings were

13      had:

14

15              THE VIDEOGRAPHER:  Good morning.

16      We are going on the record at 8:31 a.m.,

17      Thursday, September 30th, 2021.  This is

18      Media Unit 1 of the videorecorded

19      deposition of Dr. Patrick Lappert as

20      taken by counsel for plaintiff in the

21      matter of Kadel, et al. v. Folwell, et

22      al., filed in the United States District

23      Court for the Middle District of North

Page 10

1     Carolina, Civil Action No.

2     1:19-cv-272-LCB-LPA.

3            This deposition is being

4     recorded remote via Zoom located in

5     Decatur, Alabama.  My name is Andrew

6     Baker from the firm Veritext Legal

7     Solutions.  I am the videographer.  The

8     court reporter is Lane Butler, also from

9     Veritext Legal Solutions.

10           Will counsel now state their

11    appearance and affiliations for the

12    record.  The court reporter will swear in

13    the witness.  Thank you.  We may proceed.

14           MR. TISHYEVICH:  This is Dmitriy

15    Tishyevich from McDermott, Will & Emery,

16    LLP, for plaintiffs.

17           MR. KNEPPER:  My name is John

18    Knepper.  I represent three of the

19    defendants in this matter: the North

20    Carolina State Health Plan for Teachers

21    and State Employees; Dale Folwell, the

22    treasurer for the State of North

23    Carolina; and Dee Jones, the executive

1    administrator of the North Carolina State

2    Health Plan.  I'll be defending Dr.

3    Lappert's deposition.

4

5              PATRICK LAPPERT, M.D.,

6         having first been duly sworn,

7      was examined and testified as follows:

8

9    EXAMINATION BY MR. TISHYEVICH:

10        Q.    Good morning, Doctor.

11        A.    Good morning, sir.

12        Q.    State your full name for the

13   record.

14        A.    Patrick Walter Lappert.

15        Q.    Any reason you're not able to

16   give complete and truthful testimony

17   today?

18        A.    There is no reason.

19        Q.    You've been retained as an

20   expert by defendants in this case;

21   correct?

22        A.    I have.

23        Q.    You've prepared an expert

1    serving as an expert in another case,

2    Brandt v. Rutledge.   B-R-A-N-D-T.

3    Correct?

4        A.   Yes.

5        Q.   That's a case pending in federal

6    court in Arkansas; right?

7        A.    Correct.

8        Q.    In that case, you were retained

9    by the defendants, by the State of

10   Arkansas; right?

11       A.    Yes.

12       Q.    Dr. Hruz, who is one of the

13   defendants -- strike that.  Dr. Hruz, who

14   is one of the experts in this case, is

15   also serving as an expert for defendants

16   in that Brandt case; right?

17       A.    That's my understanding, yes.

18       Q.    And the same is true for Dr.

19   Levine; right?

20       A.    I didn't know about Dr. Levine,

21   but.

22       Q.   And you submitted an expert

23   declaration in that Brandt case in July

1      of this year; correct?

2          A.   I believe that was when I

3      submitted it, yes.

4          Q.   All right.   Let's look at it.

5      And let me know when you get the exhibit,

6      Doctor.

7      (Exhibit 3 was marked for identification

8      and is attached.)

9          A.   Here it is.   Let's see.   All

10     right.

11         Q.   All right.   Page 1 says,

12     "Declaration of Dr. Patrick Lappert."

13     That's you; right?

14         A.   Yes.

15         Q.   Fair to say that there is at

16     least some overlap between the opinions

17     that you're offering in this case and the

18     opinions that you're offering in that

19     Brandt case; right?

20             MR. KNEPPER:   Form.

21         A.   Well, given that the subject

22     matter is the same, I would expect some

23     overlap, yes, sir.

Page 35

1      Q.   Go to page 5 of that

2   declaration.

3      A.   All right.  I'm there.

4      Q.   You say under Section II,

5   "'Gender affirming' treatments are

6   experimental."  Right?

7      A.   Yes.

8      Q.   It's basically the same opinion

9   that you offered in this case; right?

10     A.   Yes, sir.

11     Q.   Go to page 29 of your

12   declaration.  See there's a paragraph 63?

13     A.   Yes, sir.

14     Q.   And toward the end of that

15   paragraph, you talk about the national

16   reviews in England, Sweden, and Finland

17   and other reviews like Cochrane, Griffin,

18   and Carmichael.  You see that?

19     A.   Yes, sir.

20     Q.   You relied -- you relied on all

21   those studies for your opinions in this

22   case as well; right?

23     A.   I did.

Page 40

1          Q.    Look at the next sentence.   It
2     says, "Every major expert medical
3     association recognizes that
4     gender-affirming care for transgender
5     minors may be medically appropriate and
6     necessary to improve the physical and
7     mental health of transgender people."
8              That's what it says; right?
9          A.    That's what it says, yes, sir.
10         Q.    That's also contrary to the
11    opinions that you and Dr. Hruz and Dr.
12    Levine are offering in both these cases;
13    right?
14         A.    Yes, it certainly is.
15         Q.    In fact, according to this
16    order, every major expert medical
17    association disagrees with you because
18    they've all taken a position that this
19    treatment is in fact medically necessary;
20    right?
21              MR. KNEPPER:   Objection to form.
22         A.    Apparently so, yes.
23         Q.    All right.   Look at page 6.

Page 52

1    medical treatment to anyone under

2    eighteen; correct?

3        A.   Yes.

4        Q.   You yourself support these kind

5    of state law bans; right?

6            MR. KNEPPER:  Objection, form,

7    scope.

8        A.   I do support a control over

9    these kinds of therapies, yes, I do.

10       Q.   Well, not -- not just control,

11   because Arkansas says it will criminally

12   prosecute doctors that do it; right?

13       A.   Right.

14           MR. KNEPPER:  Objection to form,

15   scope.

16       Q.   And you think that's a good

17   idea; right?

18       A.   I do.

19           MR. KNEPPER:  Objection to form,

20   scope.

21       Q.   You think that other states

22   outside of Arkansas should be passing

23   similar bans; right?

Page 57

1          Q.    Go to page 17.

2          A.    Okay.

3          Q.    The bottom of the page says,

4     "Patrick Lappert, M.D."

5          A.    Yes.

6          Q.    That's you; right?

7          A.    Yes.

8          Q.    So at some point earlier this

9     year, you were providing information to

10    the Utah State Legislature to support the

11    potential enactment of a ban on

12    gender-affirming healthcare for minors;

13    right?

14               MR. KNEPPER:   Objection, form.

15          A.    Yes.

16          Q.    Look at the fourth name from the

17    bottom on page 17.

18          A.    Fourth name -- I'm sorry?

19          Q.    Fourth name from the bottom.

20          A.    Paul Hruz.  Yes.

21          Q.    That's the same Dr. Hruz who's

22    an expert in this case; right?

23          A.    Yes.

1        Q.    Go to page 18.   The second name

2    from the top is Stephen B. Levine M.D.;

3    right?

4        A.    Yes.

5        Q.    Same Dr. Levine who is an expert

6    in this case; right?

7        A.    Yes.   I think so, yes.

8        Q.    And the next name is Paul

9    McHugh, M.D.; right?

10       A.    Yes.

11       Q.    The same Dr. McHugh who is an

12   expert in this case; right?

13       A.    Yes.

14       Q.    All four of you were providing

15   information to the Utah State Legislature

16   to support this potential ban; right?

17            MR. KNEPPER:   Objection to form.

18       A.    Yes.

19       Q.    How did you get involved with

20   providing this information to the Utah

21   State Legislature?

22       A.    I don't recall.   My -- my

23   suspicion is I may have been contacted by

Page 59

1    e-mail or some other such thing.  In

2    fact, I'm fairly confident it was an

3    e-mail request for assistance, probably.

4        Q.    Do you remember who the e-mail

5    was from?

6        A.    I do not.

7        Q.    Do you remember who at the Utah

8    State Legislature or anyone affiliated

9    with them you were communicating with in

10   this respect?

11       A.    I don't remember, no.

12       Q.    All right.   Let's see what you

13   were telling the state legislature in

14   this report.  Go to page 5.   See there's

15   a section near the top titled "Sex

16   reassignment surgeries"?

17       A.    Yes.

18       Q.    There's some language in quotes

19   -- in quotes and italicized.  Do you see

20   that?

21       A.    I do.

22       Q.    And the first portion of the

23   paragraph says: '"Sex reassignment

1    surgery' is a massive misrepresentation

2    of what these operations actually do.

3    You can't change a person's sex.  All

4    that is happening is that the patient is

5    undergoing an intentional mutilation in

6    order to create a counterfeit appearance

7    of the other sex."

8         Do you see that?

9    A.   I do.

10   Q.   And underneath, it says,

11   "Patrick Lappert, M.D."  Right?

12   A.   Yes.

13   Q.   These are your words, Dr.

14   Lappert; right?

15   A.   Yes.

16   Q.   You consider gender reassignment

17   surgery to be an intentional mutilation;

18   right?

19   A.   I do.  Absolutely.

20        MR. KNEPPER:  Form.

21   Q.   And calling gender reassignment

22   surgery, quote, intentional mutilation,

23   is that commonly accepted terminology in

1    this field, Doctor?

2         A.    I expect not.

3         Q.    And then you say that when a

4    patient undergoes gender reassignment

5    surgery, all that is happening is, quote,

6    a counterfeit appearance of the other

7    sex; right?

8         A.    Yes.

9         Q.    This phrase, "counterfeit

10   appearance," do you think that's an

11   appropriate term for a doctor to use?

12        A.    Absolutely.

13        Q.    And you stand by these words;

14   right?

15        A.    I do.

16        Q.    All right.  So, we've talked

17   about Arkansas, we've talked about Utah.

18   Now, I know there is currently a number

19   of other states that are considering

20   passing similar bans.  Outside of Utah,

21   have you done any work whatsoever in

22   connection with these potential bans in

23   other states?

Page 62

```
 1              MR. KNEPPER:  Objection, form,
 2      scope.
 3          A.    I have.
 4          Q.    Which states?
 5          A.    Alabama, Texas.
 6          Q.    What else?
 7          A.    Texas.  I don't know if there
 8      were any in the Northwest or not.  I
 9      think that's all of them.  I may be
10      wrong, but I think that's all.  Alabama
11      and Texas I would just add to your list.
12          Q.    Okay.
13          A.    There may been something in
14      Arizona.  I'm not certain about Arizona
15      as well, but --
16          Q.    Now let me introduce another
17      exhibit.  Okay.  Let me know when you get
18      this one.
19      (Exhibit 6 was marked for identification
20      and is attached.)
21          A.    I've got it.
22          Q.    All right.  This article is
23      titled, "Alabama bill that would
```

1    criminalize treatment for transgender

2    minors headed to full Alabama Senate."

3    You see that?

4        A.   I do.

5        Q.   Alabama, your home state, was

6    considering a ban very similar to

7    Arkansas just this year; correct?

8        A.   Actually over the last couple of

9    years.

10       Q.   Okay.  The first paragraph says,

11   "The Alabama Senate Health Committee on

12   Wednesday approved a bill that would

13   outlaw puberty-blocking medications and

14   gender-affirming care for minors,

15   giving" -- "giving it a favorable report

16   in an 11-2 vote."  You see that?

17       A.   I do.

18       Q.   Then it says, "An Alabama House

19   committee heard testimony in a public

20   hearing on a companion bill, but the

21   committee did not vote on the" -- "on the

22   measure."  You see that?

23       A.   I do.

Page 64

1      Q.    You testified in support of this

2    bill; right?

3      A.    Yes, sir.

4      Q.    Go to page 2.

5      A.    Okay.

6      Q.    Look at the second paragraph

7    from the bottom.

8      A.    Second from the bottom.  Yes.

9      Q.    It says, "Dr. Patrick Lappert, a

10   Decatur plastic surgeon, spoke in favor

11   of the bill."

12         That's you; right?

13     A.    That's right.

14     Q.    Go to page 3.

15     A.    Okay.

16     Q.    And look at the third paragraph.

17   It says that you've "spoken against the

18   use of medicine and surgery for

19   transgender people as a Catholic deacon

20   in his local diocese."  See that?

21     A.    Yes.

22     Q.    You don't deny that you've

23   spoken against the use of medical and

Page 71

1      of, psychologically, the -- the quality

2      of the -- sort of a transformative power

3      of cosmetic surgery.

4                And then the third criteria

5      would be that they -- they see something

6      that you don't see.  They see a defect

7      that you don't see.  And that's probably

8      the key diagnostic criteria.  For

9      example, a man who presents seeking a

10     modification to his nose who has evidence

11     of living a life of social isolation who

12     is adamant that by changing his -- the

13     appearance of his nose, he will -- he

14     will have a much better life.  And

15     hearing that, of course, the alarm bells

16     go off and then examining the patient and

17     seeing that there's no objectively

18     definable deformity, only a normal

19     variation that one would expect to see on

20     a man's face.

21               Those are all red flags.  And --

22     and based upon that, it is -- it

23     is definitely the -- has been

Page 72

1    historically the recommendation of the

2    likes of Dr. Mark Gorney and other

3    leaders in the American Society of

4    Plastic Surgery to not offer surgery, but

5    rather to offer referral for

6    psychiatric/psychological support and

7    evaluation.

8        Q.   These diag- -- these diagnostic

9    criteria that you mentioned, where do

10   they come from?

11       A.   They -- I think you can find

12   much of that in the DSM book, if -- if --

13   if that's the route you want to go.  You

14   find it in the literature.  There are --

15   there are references in the scientific

16   literature about it dating back to I

17   think the 1920s.  I included some of

18   those, I think, in my discussion, if not

19   on this one, in the Arkansas case.

20            But -- but there have been

21   papers published through the years that

22   describe the condition and make

23   recommendations about care, and again,

Page 75

1      course, who presents for body

2      modification.  That -- that's a fairly

3      readily and obvious one.

4            But no, I'm not a -- I'm not

5      formally trained in psychiatry or

6      psychology.

7         Q.   You do not have -- you do not

8      hold yourself out as an expert in

9      diagnosing mental health conditions

10     outside, potentially, of body dysmorphic

11     disorder; right?

12        A.   Correct.

13        Q.   You do not have specialist

14     training or expertise in treating mental

15     health conditions; right?

16        A.   No.

17        Q.   You would refer that person to a

18     qualified mental health professional;

19     right?

20        A.   I would.  I would.

21        Q.   Because you yourself are not a

22     qualified mental health professional;

23     correct?

Page 76

1        A.    Correct.

2        Q.    All right.   You've also

3    published an op-ed in May of this year

4    supporting this Alabama ban; correct?

5        A.    Yes.

6        Q.    And you said that Alabama

7    legislators should enact this ban because

8    they have a duty to protect the

9    vulnerable population of gender-confused

10    children.   Does that sound familiar?

11        A.    Yes.

12        Q.    So again, earlier you said you

13    had a preference for professional

14    societies dealing with this, but you're

15    out there publishing op-eds calling on

16    state legislatures to pass these bans;

17    right?

18                MR. KNEPPER:   Objection, form.

19        A.    Right.   Yes, sir.

20        Q.    All right.   How about Texas?

21    Tell me what work you've done supporting

22    this kind of a ban in Texas?

23        A.    It's been similar.   I've been in

1    because it's the same problem, the same

2    science, the same language.  All of it's

3    the same.

4        Q.   So earlier, we saw that in

5    addition to you, Dr. Hruz and Dr. Levine

6    and Dr. McHugh were also involved with

7    those Utah legislative efforts; right?

8            MR. KNEPPER:  Objection, form.

9        A.   I -- I don't know their

10   involvement in -- in Texas.  I'm -- I'm

11   not aware.

12       Q.   Yeah.  Do you know whether any

13   of them have been involved with any of

14   these efforts in any other state?

15       A.   I don't.  I don't know.

16       Q.   Okay.  Fair to say that you have

17   some strong personal opinions on whether

18   doctors should be providing

19   gender-affirming treatment to minors?

20           MR. KNEPPER:  Objection to form.

21       A.   Very fair to -- very fair to

22   say, yes.

23           MR. TISHYEVICH:  Let's go off

Page 81

```
 1    a -- the opinion that the present state
 2    of transgender medicine and surgery is
 3    not in the interest of the patients or
 4    the families.
 5        Q.    The ADF has moral objections to
 6    doctors performing this kind of surgery
 7    and treatment; right?
 8            MR. KNEPPER:   Objection, form,
 9    scope.
10        A.    I would -- I would characterize
11    the ADF's position as more than just a
12    moral objection.   It's both moral and
13    objective scientific objections.
14            So the -- the -- the sense I got
15    from that conference was that most of the
16    invited speakers came to speak about --
17    for example, Dr. Hruz was there, and he
18    spoke about endocrinology and the
19    endocrinol- -- endocrinologic basis for
20    sex/gender.   And he spoke about the
21    effects of -- the endocrinological
22    effects, the objective changes that are
23    caused by, for example, puberty-blocking
```

1     heart of the presentation was what's the

2     state of the science and where is the

3     reliable science coming from and what is

4     it -- what is it showing us, so.  But

5     they also -- the audience wanted to have

6     an understanding of what these plastic

7     surgery interventions were.  So there was

8     an extensive discussion of the

9     particulars of the surgeries, the details

10    about the surgeries, the typical outcomes

11    of the surgeries, so.

12        Q.    I want to -- strike that.

13              One of the topics of discussion

14    at that meeting was about the need to

15    have expert witnesses for litigation;

16    right?

17              MR. KNEPPER:  Objection, form,

18    scope.

19        A.    I remember -- I remember a

20    fairly long discussion about the poverty

21    of people who are willing to testify

22    because of the risk that they take in

23    testifying.  That was a -- that was a

Page 91

1    fairly long discussion.  And the
2    difficulty that that -- that people have
3    in finding expert witnesses because of
4    the risks they place themselves in, in
5    testifying.
6        Q.   And people at that meeting were
7    asked whether they would be willing to
8    participate as expert witnesses; right?
9        A.   Yes.
10       Q.   Before that meeting, you had
11   never testified as an expert witness?
12       A.   Before this moment, I never
13   testified as an expert witness.
14       Q.   Who made the introductory
15   remarks at the beginning of this meeting?
16           MR. KNEPPER:  Objection, form,
17   scope.
18       A.   I'm trying to remember.  It was
19   a -- it was an attorney whose first name
20   is Jeff, and I'm trying to remember what
21   his last name was.  But he seemed to be
22   the -- the -- kind of the emcee, if you
23   will.  Yeah, Jeff.  I'll see if, in the

1     language used by the other professional

2     organizations, and essentially, the

3     language takes the position that surgical

4     intervention for a subjective problem is

5     medically indicated.  And that's the

6     difficulty that I'm having here, is that

7     in this document the ASPS does not --

8     does not provide medical scientific

9     support.  They essentially admit that the

10    surgery is for help with a psychological

11    problem of perception on the part of the

12    patient.  So essentially what -- what the

13    ASPS firmly believes in is the use of

14    surgery to manage a psychological

15    problem.  And -- and this is -- this is

16    consonant with the -- with the -- the

17    consensus opinions that were offered by

18    the other professional organizations that

19    you listed earlier.

20         Q.   The AS- -- ASPS does not agree

21    with your opinions that gender-affirming

22    surgery is experimental; correct?

23              MR. KNEPPER:  Objection, form.

1      A.    They don't -- let's see, do they
2    say anything about experimental in here?
3    No, they don't.   So yeah, I would agree.
4      Q.    Do you agree?   Yeah.
5      A.    I would agree, yeah, sure.
6      Q.    Look at the last sentence.   It
7    says, "ASPS will continue its efforts to
8    advocate across state legislatures for
9    full access to medically necessary
10   transition care."  Do you see that?
11     A.    Yeah.   I don't find that
12   statement at all surprising.   No.
13     Q.    Yeah.
14     A.    I do see that, yeah.   Not
15   surprising.   This is legislative --
16     Q.    The ASPS --
17     A.    -- legislative advocacy by the
18   ASPS.
19     Q.    The ASPS considers transition
20   care to be medically necessary; right?
21          MR. KNEPPER:  Objection, form.
22     A.    Again, that returns -- returns
23   to that -- that inherent and

1        A.    Right.   That's -- that's my
2     understanding, yes.
3        Q.    You personally have never been
4     part of this kind of a multidisciplinary
5     team for any patient with gender
6     dysphoria; correct?
7        A.    No.   I have always -- I have
8     always turned away personal -- for per-
9     -- well, my understanding of those
10    procedures has caused me to reject
11    offering them to my patients because I
12    don't see them as beneficial.   So
13    clearly, I wouldn't want to participate
14    in a multidisciplinary team that's
15    offering therapies that I consider to be
16    incorrect treatments for a condition that
17    deserves our care, so.
18       Q.    All right.
19       A.    If you want, I can give you a
20    shorter answer.   No.
21       Q.    Yeah, let's -- you personally
22    have never treated a single patient for
23    gender dysphoria; correct?

1      A.    I have never treated a patient

2   with gender dysphoria surgically.

3      Q.    Okay.

4      A.    Other than the detransitioner.

5   I -- I suspect they were still suffering

6   from dysphoria even though they were

7   detransitioning, but I didn't treat them

8   with surgery to -- per se for that

9   condition the way the transgender teams

10  do.  Yeah.

11     Q.    When you were providing laser

12  hair removal to trans women, is that

13  providing gender-affirming care?

14          MR. KNEPPER:  Objection, form.

15     A.    I don't get into the affirmation

16  side of the treatment.  I'm simply

17  providing a service to -- to people who

18  -- who I want to have as friends.

19  Believe it or not, it's true.  I -- I

20  don't turn anyone away whose -- whose

21  request is -- is within the scope of what

22  I consider moral practice of medicine and

23  surgery, so.

Page 153

1    transition, acne doesn't enter into it.

2    But certainly laser hair removal, yeah.

3        Q.   You personally have never sat in

4    any meetings between a provider and a

5    patient where the doctor was trying to

6    diagnose whether the patient has gender

7    dysphoria; correct?

8        A.   Correct.

9        Q.   You have never sat in any

10   meetings between a provider and a patient

11   discussing their potential treatment

12   options for gender dysphoria; correct?

13       A.   No.

14       Q.   All right.  You're not an

15   endocrinologist; right?

16       A.   Correct.

17       Q.   You're not a psychiatrist;

18   right?

19       A.   Correct.

20       Q.   You're not a licensed mental

21   healthcare provider of any kind; right?

22       A.   Correct.

23       Q.   In your professional day-to-day

Page 168

```
 1        vaginoplasty for a transgender patient?
 2             A.    No.
 3             Q.    You have never performed a
 4        metoidioplasty for any transgender
 5        patient?
 6             A.    No.
 7             Q.    You've never performed what's
 8        colloquially known as bottom surgery for
 9        any transgender patient; correct?
10             A.    Correct.
11             Q.    Fair to say you've never
12        performed any kind of gender-affirming
13        surgery in transgender patients; right?
14             A.    Correct.
15             Q.    And fair to say you don't have
16        recent and substantive experience in
17        performing gender-affirming -- -affirming
18        surgery for transgender patients;
19        correct?
20                   MR. KNEPPER:   Form.
21             A.    I have -- I have substantive
22        experience with all the actual -- the
23        nature of the particular operations but
```

```
 1        Q.   The latest publicly available
 2   standard of care is Version 7; correct?
 3        A.   Correct.
 4        Q.   And that was published in 2012;
 5   right?
 6        A.   That's right.
 7        Q.   All right.  Before you wrote
 8   your report, did you sit down and review
 9   the Standards of Care, Version 7 that
10   you're criticizing?
11        A.   Yes, I did.
12        Q.   All right.  You yourself are not
13   part of the WPATH; correct?
14        A.   No, I am not.
15        Q.   You've never been part of the
16   WPATH; right?
17        A.   I would never be part of the
18   WPATH.
19        Q.   You've never advised the WPATH
20   in any capacity; right?
21        A.   They've never asked my opinion.
22   No.
23        Q.   You've never advised the WPATH
```

Page 184

1     in any capacity; correct?

2          A.    I have not.

3          Q.    You personally have not been

4     involved with the development of WPATH's

5     Standards of Care, Version 7; correct?

6          A.    Correct.

7          Q.    You don't know what year the

8     WPATH started working on Version 7;

9     right?

10         A.    My understanding was it was in

11    2007, but I could be wrong.  I think it

12    was 2007.  I think it was a five-year

13    process, but I could be wrong on that.

14         Q.    You don't know for sure?

15         A.    I don't know for sure.

16         Q.    You don't know how many

17    different work groups at the WPATH were

18    involved with working on Version 7;

19    correct?

20              MR. KNEPPER:   Objection, form.

21         A.    In reading the -- the

22    introduction to the document, the number

23    nine pops into my mind, but I can't swear

Page 185

1        to that.

2            Q.    Okay.   You don't know what kind

3        of scientific literature the WPATH

4        conducted as part of drafting Version 7;

5        right?

6            A.    As far as naming the particular

7        papers that they may have reviewed, I

8        can't do that for you because those

9        are -- that happens in closed committee.

10       I -- all I can say to you is my -- based

11       upon my reading of the product and the

12       verbiage that it's used, my suspicion is

13       that it's pretty heavily weighted towards

14       the American literature and -- and does

15       not bring in particular document -- well,

16       being that it was published in 2012, the

17       big inflection point in 2011 probably

18       wasn't available to the committee when

19       they were writing that document.

20               So given that the document is

21       already out of date and it's -- and the

22       subsequent WPATH 8, no one knows when

23       it's going to come out, yeah, it's --

1    it's almost -- it's almost irrelevant

2    because of the change in the literature

3    that happened since it was published, so.

4    In particular, the 2011 article by

5    Dhejne, Cecilia Dhejne, and -- and others

6    that kind of changed the view of the

7    scientific evidence.

8            So yeah, it's an out-of-date

9    document by the standards of what are

10   called standards of care.  It's not a

11   standards of care document.  It's a --

12   it's a treatment guideline document is

13   really what it is, and it's a poorly

14   supported treatment guideline at that,

15   so -- gosh, I wandered off.

16           Did I -- did I answer your

17   question?

18       Q.   Yeah, you anticipated my

19   objection.

20           MR. TISHYEVICH:  Which, again,

21   I'll move to strike most of that as

22   nonresponsive.

23       Q.   Because here's my question.  You

1    don't personally know what kind of

2    scientific literature the WPATH conducted

3    as part of drafting Version 7; correct?

4           MR. KNEPPER:  Objection, form.

5       A.   No.  Again, a closed session, so

6    I don't know what documents they used.

7       Q.   You don't know what kind of

8    outside experts the WPATH may have

9    consulted in drafting Version 7; right?

10      A.   No.

11      Q.   You don't know what kind of peer

12   review the WPATH may have conducted as

13   part of developing Version 7; right?

14          MR. KNEPPER:  Objection, form.

15      A.   No.

16      Q.   You don't know what kind of

17   public comments the WPATH may have

18   solicited as part of developing Version

19   7.

20          MR. KNEPPER:  Objection, form.

21      Q.   Right?

22      A.   No.

23      Q.   You don't know how many

1    different drafts the Version 7 went

2    through before it was finalized; right?

3        A.    No.

4        Q.    You don't know how many

5    different meetings or conferences the

6    WPATH had to discuss the development of

7    Version 7; right?

8        A.    Correct.

9        Q.    You have no idea what may have

10   gone on during those meetings or

11   conferences; correct?

12           MR. KNEPPER:   Objection, form.

13       A.    No.   I was not a part of the

14   conferences that produced the product.

15       Q.    Yeah, you are not an expert in

16   how Version 7 of the WPATH was developed;

17   right?

18       A.    Correct.

19       Q.    And we can go through all these

20   questions again individually for Version

21   8, but maybe we can shortcut this.

22       A.    Well, no one knows what's in

23   Version 8 except the people who are in

1    the committee.  It's a -- it's a
2    privileged document.  There's no one in
3    plastic surgery who knows it apart from
4    the people who serve as members of the
5    WPATH, so that would be the case.
6        Q.    Okay.
7        A.    It's a -- it -- yeah.
8        Q.    So just so we have it on the
9    record, you don't hold yourself out as an
10   expert on how Version 8 of the WPATH
11   Standards of Care are currently being
12   developed; fair?
13       A.    Fair.
14       Q.    Okay.  We talked earlier about
15   the DSM; right?
16       A.    Yes.
17       Q.    In your day-to-day practice, you
18   don't use the DSM-5; correct?
19       A.    No.
20       Q.    But you do know the DSM-5 is
21   widely used by psychiatrists; correct?
22       A.    Yes.
23       Q.    The DSM-5 was published in 2013;

Page 190

1     correct?
2          A.    I don't know the publication
3     date, but it sounds about right.
4          Q.    Do you know that it was
5     developed by the American Psychiatric
6     Association?
7          A.    Yes.
8          Q.    You're not a member of the APA;
9     right?
10         A.    Correct.
11         Q.    You personally have not been
12    involved with the development of DSM-5;
13    right?
14         A.    No.
15         Q.    You don't know how many
16    different working groups were involved
17    with developing the DSM-5; right?
18              MR. KNEPPER:  Objection, form.
19         A.    Correct.
20         Q.    You don't know how many
21    different members those working groups
22    had; right?
23              MR. KNEPPER:  Objection, form.

1          A.    No.

2          Q.    Or how they were selected;

3     right?

4               MR. KNEPPER:  Objection, form.

5          A.    Correct.

6          Q.    You don't know how many

7     different authors contributed to the

8     development of DSM-5; correct?

9          A.    Correct.

10              MR. KNEPPER:  Objection, form.

11         Q.    You don't know what kind of

12    scientific literature review was done by

13    different work groups as part of

14    developing the DSM-5; correct?

15              MR. KNEPPER:  Objection, form.

16         A.    Correct.

17         Q.    You don't know what kind of

18    public comments the APA may have

19    solicited in developing the DSM-5;

20    correct?

21              MR. KNEPPER:  Objection, form.

22         A.    Correct.

23         Q.    You don't know how many

1    different drafts the DSM-5 went through

2    before it was finalized; correct?

3          MR. KNEPPER:  Objection, form.

4      A.    Correct.

5      Q.    You don't know how many

6    different meetings or conferences or

7    telephonic conferences the working groups

8    had to discuss the development of the

9    DSM-5; right?

10         MR. KNEPPER:  Objection, form.

11     A.    Right.

12     Q.    You have no idea what was

13   discussed during any of those meetings;

14   right?

15     A.    Right.

16     Q.    Let me ask you specifically

17   about the Sexual and Gender Identity

18   Disorders Work Group.  First of all,

19   before today, did you know that the APA

20   had a Sexual and Gender Identity

21   Disorders Work Group as part of the

22   development of the DSM-5?

23         MR. KNEPPER:  Objection, form.

1      A.   Yes.

2      Q.   Do you know how many members

3  were in that work group?

4      A.   No.

5      Q.   You don't know --

6           MR. KNEPPER:  Objection.

7      Q.   -- how those members were

8  selected; right?

9           MR. KNEPPER:  Objection to form.

10     A.   Correct.

11     Q.   You don't know their expertise;

12 right?

13     A.   Correct.

14     Q.   You do not have expert firsthand

15 knowledge of how the DSM-5 was developed;

16 fair?

17          MR. KNEPPER:  Objection, form.

18     A.   Fair.

19     Q.   Are you aware that the DSM-4

20 used the term "gender identity disorder"

21 instead of "gender dysphoria"?

22     A.   Yes.

23     Q.   Do you know the reason for that

1      faces is that having done that, there's

2      no mechanism for providing the services

3      that they felt that the patients needed,

4      so there had to be a diagnose -- a

5      diagnostic code in order to get

6      thirty-part -- third-party payers to pay.

7      So it's a de-pathologize but maintain a

8      diagnostic -- diagnostic code.  That's my

9      understanding of it.

10             Again, I wasn't there.  But

11     again, reading the writings of people who

12     could only have gleaned it from having

13     been present because it's closed session,

14     that's my understanding.

15         Q.   Understood.  All right.  Do you

16     know what the Endo- -- Endocrine Society

17     guidelines for treatment of

18     gender-dysphoric or gender-incongruent

19     persons are?

20         A.   Do I know what they are?

21         Q.   Yeah.

22         A.   Yes.

23         Q.   Do you know when they were

1    initially published?

2        A.    No.

3        Q.    Do you know when they were last

4    revised?

5        A.    I think it was just a couple of

6    years ago, but I don't know the exact

7    date.

8        Q.    If I tell you it's 2017, does

9    that sound right?

10       A.    That wouldn't -- it wouldn't

11   surprise me if that were true.  I -- just

12   within the last couple of years.  I think

13   theirs are current, and the expectation

14   is that these standards of care or

15   treatment guidelines will have a

16   five-year revision.  So given that

17   they're current, they couldn't be any

18   older than, say, 2017.  So I suspect that

19   -- yeah.

20       Q.    All right.  Did you review the

21   latest available version of those

22   Endocrine Society guidelines before

23   forming your opinions in this case?

1          A.    Yes.   I have read them, yes.

2          Q.    Okay.   You yourself are not part

3     of the Endocrine Society; right?

4          A.    Correct.

5          Q.    Have never been part of that

6     society; right?

7          A.    Correct.

8          Q.    You've never advised the

9     Endocrine Society in any capacity;

10     correct?

11          A.    Correct.

12          Q.    You personally were not involved

13     with the development of these original

14     guidelines; correct?

15          A.    That's correct.

16          Q.    Not personally involved with the

17     development of the updated guidelines in

18     2017; right?

19          A.    Correct.

20          Q.    Do you know how many people at

21     the Endocrine Society were involved with

22     those 2017 updates?

23          A.    I do not know that number.

Page 198

1      Q.   And you don't know how they were

2    selected to work on the 2017 updates;

3    correct?

4      A.   Correct.

5      Q.   You personally don't know what

6    kind of scientific literature review the

7    Endocrine Society conducted in developing

8    those updates; correct?

9            MR. KNEPPER:  Objection to form.

10     A.   Correct.

11     Q.   You don't know what kind of

12   outside experts they may have used;

13   right?

14     A.   What kind of outside experts?  I

15   would imagine they were all

16   endocrinologists.  Or are you asking did

17   they have plastic surgeon input or --

18     Q.   Do you know specifically whether

19   the Endocrine Society used any outside

20   experts in updating the -- in

21   implementing the 2017 updates?

22     A.   Well --

23           MR. KNEPPER:  Objection, form.

1           A.   I can only infer that they

2      would, because such -- such statements,

3      in order to be valid, demand review by

4      outside parties to -- to obviate

5      conflicts of interest, whether financial

6      or professional.  Those are all issues

7      when generating standards of care, so of

8      necessity, they would have had to have

9      had outside experts to come in, yes.

10          Q.   Okay.  Do you know what kind of

11     public comments the Endocrine Society may

12     have solicited as part of developing the

13     2017 updates?

14          A.   I don't.

15               MR. KNEPPER:  Objection to form.

16          Q.   You don't know how many

17     different drafts there were of those 2017

18     updates before they were finalized;

19     right?

20          A.   No.

21               MR. KNEPPER:  Objection to form.

22          A.   No, I don't.

23          Q.   Again, you haven't been to any

1    meetings or conferences or telephonic

2    conferences where those 2017 updates were

3    discussed, where the development of those

4    2017 updates was discussed; correct?

5         MR. KNEPPER:  Objection to form.

6    A.    Correct.

7    Q.    You don't know what went on

8    during those meetings or conferences;

9    right?

10        MR. KNEPPER:  Objection, form.

11   A.    I do not.

12   Q.    You -- you're not an expert in

13   how the Endocrine Society developed the

14   original 2009 guidelines for treating

15   gender dysphoria; correct?

16        MR. KNEPPER:  Objection to form.

17   A.    That's not -- that's not my area

18   of expertise.  That's correct.

19   Q.    Right.  And you're also not an

20   expert in how the Endocrine Society then

21   developed the 2017 updates back to those

22   guidelines; correct?

23   A.    Correct.

Page 204

1      endocrinologists, yes.

2          Q.   Right.  You have no specialized

3      training or expertise in endocrinology;

4      correct?

5          A.   Correct.

6          Q.   You don't hold yourself out as

7      an expert in endocrinology; correct?

8          A.   No, I do not.

9          Q.   You're not planning on offering

10     any expert opinions in endocrinology in

11     this case because that's outside your

12     scope of expertise; right?

13         A.   Yes.

14             MR. KNEPPER:  Objection to form.

15         Q.   All right.  Earlier, you said

16     you have never prescribed

17     puberty-blocking agents to anyone, so I

18     take it you have no experience, no

19     firsthand experience with advising your

20     patients about potential risks and

21     benefits of puberty blockers; right?

22             MR. KNEPPER:  Objection, form.

23         A.   Well, I have talked to patients

Page 214

1          A.    Yes.

2          Q.    For transgender women, estrogen

3     is a hormone that's typically prescribed;

4     right?

5          A.    Yes.

6          Q.    For transgender men,

7     testosterone is the hormone that's

8     typically prescribed; right?

9          A.    Right.

10         Q.    You've never prescribed

11    cross-sex hormones for treatment of

12    gender dysphoria to anyone; correct?

13         A.    Correct.

14         Q.    You have no firsthand experience

15    with advising your patients about

16    potential risks and benefits of cross-sex

17    hormones when used for treatment of

18    gender dysphoria; correct?

19         A.    Correct.

20         Q.    You personally don't know what

21    doctors who do prescribe estrogen or

22    testosterone to their patients for gender

23    dysphoria tell those patients about the

```
 1    Okay.
 2       Q.    So the first two bullets say,
 3    "Why must we consider first the nature of
 4    the human person?"   Then it says,
 5    "Defines the 'end' of medical and
 6    surgical care."
 7       A.    Yes.
 8       Q.    What does it mean that it
 9    "defines the 'end' of medical and
10    surgical care"?
11             MR. KNEPPER:   Objection, form,
12    scope.
13       A.    Okay.  So that's a -- that's a
14    term that dates back to Aristotelian
15    philosophy.  And what it has to do is
16    what is the purpose or what is the
17    ultimate arc of a particular thing.  So
18    the "end" meaning what are you seeking to
19    accomplish, what is the final goal of
20    that -- of that medical or surgical
21    treatment.
22             So -- and the examples I use are
23    you have to have an understanding, for
```

1        Q.    The top left says, "Shaping the
2    Conversation, & Grooming a Generation."
3        A.    Right.
4        Q.    You see that?
5        A.    Right.
6        Q.    What do you mean by "grooming a
7    generation"?
8        A.    Grooming is a -- is a process by
9    which ideas are introduced that make
10   subsequent actions possible, so that's
11   what -- that's what grooming is, yeah.
12       Q.    Grooming is sometimes used to
13   refer to preparing to -- strike that.
14            Grooming is sometimes used as
15   preparing children for sexual abuse.
16   Isn't that true?
17       A.    That's one of the --
18            MR. KNEPPER:   Objection, form,
19   scope.
20       A.    That's one of the uses of
21   grooming, yeah, but it's not exclusive
22   use of grooming.  Yeah.  And I discuss
23   this in this -- in this slide.  Yes, I

Page 462

1    do.

2        Q.    And you think that discussing

3    gender identity issues with children

4    means sexualizing them; right?

5        A.    Yes, I do.   Absolutely, I do.

6            MR. KNEPPER:   Objection, form,

7    scope.

8        Q.    And you think that discussing

9    gender identity issues with children

10   means grooming them for potential later

11   sexual abuse; right?

12           MR. KNEPPER:   Objection, form,

13   scope.

14       A.    No.   No.   What we're talking

15   about here is grooming them for -- for

16   future -- what's the word I would want to

17   choose carefully?   It's preparing them

18   for these interventions is what it does.

19   It lays the groundwork for it by

20   sexualizing their thoughts in a way

21   that's -- is not consonant with their

22   best interest.   That's what this slide is

23   about, so --

1    may be sexual but not necessarily sexual.

2    And so this is -- one of the things I

3    talk about in that slide is -- is for the

4    people who are care providers,

5    counselors, school administrators, to be

6    alert to that possibility.

7              So I'm sorry, we were going to

8    move on to the next one.

9         Q.    Do you have the next exhibit?

10        A.    And that is Exhibit 34?

11        Q.    Yeah.

12        A.    Okay.

13        Q.    All right.   This is a printout

14   from LifeSite, and the title is "Plastic

15   surgeon: Sex-change operation 'utterly

16   unacceptable' and a form of 'child

17   abuse.'"   Right?

18        A.    Yes.

19        Q.    And it says, "Dr. Patrick

20   Lappert, a Catholic deacon in Alabama,

21   says changing a person's sex is a lie and

22   also a moral violation for a physician."

23   Right?

Page 465

1          A.    Yes.

2          Q.    And you hold those views --

3          A.    I do.

4          Q.    -- correct?

5          A.    I do.

6               MR. KNEPPER:   Objection, form,

7     scope.

8          Q.    Go to page 2.

9          A.    Okay.

10         Q.    This was published in September

11    2019; right?

12         A.    Yes.

13         Q.    This is reporting on you

14    appearing on a broadcast of something

15    called the "Relevant Radio's Trending

16    With Timmerie."

17         A.    Yes.

18         Q.    Right?

19         A.    Yes.

20         Q.    You made that appearance; right?

21         A.    On the radio, yes.

22         Q.    Okay.  Look -- look to the fifth

23    paragraph on page 2.

```
                                        Page 492
 1              C E R T I F I C A T E
 2    STATE OF ALABAMA    )
 3    COUNTY OF JEFFERSON )
 4            I hereby certify that the above
 5    and foregoing proceeding was taken down
 6    by me by stenographic means, and that the
 7    content herein was produced in transcript
 8    form by computer aid under my
 9    supervision, and that the foregoing
10    represents, to the best of my ability, a
11    true and correct transcript of the
12    proceedings occurring on said date at
13    said time.
14            I further certify that I am
15    neither of counsel nor of kin to the
16    parties to the action; nor am I in
17    anywise interested in the result of said
18    case.
19            /s/ Lane C. Butler
20            LANE C. BUTLER, RPR, CRR, CCR
21            CCR# 418 -- Expires 9/30/22
22            Commissioner, State of Alabama
23            My Commission Expires:  2/11/25
```

Page 493

1    John G. Knepper, Esquire

2    john@knepperllc.com

3                           October 13, 2021

4    RE:    Kadel, Et Al v. Folwell

5         9/30/2021, Patrick Lappert, M.D. (#4814384)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of transcript.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 494

1    Kadel, Et Al v. Folwell

2    Patrick Lappert, M.D. (#4814384)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____   _____

24   Patrick Lappert, M.D.                        Date

25

Page 495

1    Kadel, Et Al v. Folwell

2    Patrick Lappert, M.D. (#4814384)

3                  ACKNOWLEDGEMENT OF DEPONENT

4        I, Patrick Lappert, M.D., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Patrick Lappert, M.D.                    Date

13   *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                      _____ DAY OF _____, 20____.

16

17

18                      _____

19                      NOTARY PUBLIC

20

21

22

23

24

25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.