1                UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF FLORIDA
2

                    CASE NO.:  4:22-cv-00325-RH-MAF
3

    AUGUST DEKKER, et al.,
4

        Plaintiff(s),
5

    -vs-
6

    JASON WEIDA, et al.,
7

        Defendant(s).
8    _____/
9

10                       ZOOM
11

12                   DATE:  Tuesday, March 21, 2023
                    TIME:  10:02 a.m. - 3:44 p.m.
13

14      *****PORTIONS OF TRANSCRIPT MARKED CONFIDENTIAL*****

15

                DEPOSITION OF MICHAEL BIGGS, PH.D.
16

17

18

19

20

21

22            Taken on behalf of the PLAINTIFFS before
23    Jennifer L. Bush, RPR, FPR, FPR-C, Notary Public in and
24    for the State of Florida at Large, pursuant to Notice of
25    Taking Deposition in the above cause.

```
1                    A P P E A R A N C E S
2     APPEARING ON BEHALF OF THE PLAINTIFF(S):
3
                  Jennifer Altman, Esquire
4                 Marcus Leonard, Esquire
                  Shani Rivaux, Esquire
5                 Ana Gonzalez
                  Pillsbury Winthrop Shaw Pittman LLP
6                 600 Brickell Avenue, Suite 3100
                  Miami, FL 33131
7                 786-913-4900
                  Jennifer.altman@pillsburylaw.com
8
                  Omar Gonzalez-Pagan, Esquire
9                 Lambda Legal Defense & Education
                  Fund, Inc.
10                120 Wall Street, 19th Floor
                  New York, NY 10005
11                212-809-8585
                  Ogonzalez-pagan@lambdalegal.org
12
                  Carl S. Charles, Esquire
13                1 West Court Square, Suite 105
                  Decatur, GA 30030
14                404-897-1880
                  Ccharles@lambdalegal.org
15
                  Simone Chriss, Esquire
16                Chelsea Dunn, Esquire
                  Southern Legal Counsel, Inc.
17                1229 NW 12th Avenue
                  Gainesville, FL 32601
18                352-271-8890
                  Simone.chriss@southernlegal.com
19
20    APPEARING ON BEHALF OF THE DEFENDANT(S):
21
                  Michael Beato, Esquire
22                Holtzman Vogel Barantorchinsky &
                  Josefiak PLLC
23                119 S Monroe Street, Suite 500
                  Tallahassee, FL 32301
24                Mbeato@holtzmanvogel.com
25
```

Page 3

1                           I N D E X

2

3    THE WITNESS:

4    MICHAEL BIGGS, PH.D.

5                           DIRECT   CROSS   REDIRECT   RECROSS

6    BY MS. ALTMAN             4                  237

7    BY MR. BEATO                     236

8

9                                                      Page

10    CERTIFICATE OF NOTARY PUBLIC                     239

11    ERRATA SHEET                                     240

12    CERTIFICATE OF OATH OF WITNESS                   241

13    CERTIFICATE OF REPORTER                          242

14    READ LETTER                                      243

15

16                    PLAINTIFFS' EXHIBITS

17    Exhibit        Description                       Page

18     Exhibit 1    Notice of Deposition                22

19     Exhibit 2    Report                              23

20

21

22

23

24

25

Page 4

 1  WHEREUPON,

 2                     MICHAEL BIGGS, PH.D.,

 3  called as a witness on behalf of the PLAINTIFFS, after

 4  having been first duly sworn, was examined and testified

 5  as follows:

 6                     THE WITNESS:  I do.

 7                     DIRECT EXAMINATION

 8  BY MS. ALTMAN.

 9          Q.   All right.  Well, good afternoon, sir.  I

10  know for us it's morning but for you it is afternoon.

11  Can you hear me okay?

12          A.   I can, yes.

13          Q.   So I tend to have a loud voice.  If for any

14  reason you think I'm yelling at you, I want to warn you

15  in advance I'm not.  I do tend to have a loud voice, and

16  I am using the computer audio.  So just keep that in

17  mind.

18               Also keep in mind that if you can't hear me

19  or the questions break up, certainly ask me or tell me

20  what the electronic situation is and I'm happy to try and

21  nullify it.

22               So I'm going to take your deposition today.

23  My name is Jennifer Altman.  I'm with the law firm of

24  Pillsbury Winthrop Shaw Pittman.  Have you had your

25  deposition taken before?

1        A.    No, I haven't.

2        Q.    So let me give you a few of the ground

3   rules that we're going to hopefully live by today.  I'm

4   going to ask you questions and you are going to answer

5   them.  I'm not trying to trick you.  So that means if you

6   don't understand a question, simply ask me to rephrase

7   it.  I'm happy to do so.

8              If you don't hear a question, simply tell

9   me you didn't hear it and I'm happy to repeat it for you.

10  If you answer a question, I'm going to assume that you

11  understood the question, is that fair?

12       A.    Yep.

13       Q.    So you just hit on without --

14  unintentionally one of the garden-variety rules of depos.

15  You can't shake your head no or shake your head yes.  The

16  wonderful court reporter on my screen over to the right

17  can't take down nods or head shaking.  You need to answer

18  out loud audibly.

19             That means if it's a yes, it's a yes.  If

20  it's a no, it's a no.  Uh-huh is not an answer because

21  that could be yes or no.  So please always answer the

22  question out loud for the court reporter's benefit.

23             Also for the court reporter 's benefit, who

24  is going to be working really hard today to make sure the

25  transcript is accurate, you may be able to predict the

1   question that I'm going to ask you, or you may feel it

2   incumbent upon you to start answering a question because

3   you want to either clarify something or bring something

4   up.

5               For the court reporter's benefit, you

6   always need to wait until I've completed my question

7   fully, take a pause because Michael may want to object,

8   put an objection on the record, and then answer the

9   question.  That way we'll have a clean record for the

10  Court.  Does that make sense to you?

11       A.    Yes.

12       Q.    Okay.  You are nodding a lot.  But make

13  sure you say yes or no.

14       A.    Yes.

15       Q.    If you need to take a break, I'm happy to

16  accommodate you.  I can't do so when there is a question

17  pending, so keep that in mind in terms of timing any

18  breaks that you think you'll need.  Does that make sense?

19       A.    Yes.

20       Q.    And, sir, have you ever been -- have you

21  ever been charged with or convicted for any crime of

22  malfeasance, fraud, any kind of misstatements?

23       A.    No.

24       Q.    And are you taking any drugs today that

25  would impact your ability to fully and robustly answer

1   the questions that I'm about to ask you?

2          A.    No.

3          Q.    All right.  So let's get started.  So are

4   you a medical doctor?

5          A.    No.

6          Q.    Have you gone to medical school?

7          A.    No.

8          Q.    Have you had any medical training

9   whatsoever?

10         A.    No.

11         Q.    Have you ever treated anyone with gender

12   dysphoria?

13         A.    No.

14         Q.    Have you ever prescribed treatment for

15   anyone with gender dysphoria?

16         A.    No.

17         Q.    Do you perform medical research relating to

18   gender dysphoria?

19         A.    Yes.

20         Q.    What medical research do you perform

21   relating to gender dysphoria, sir?

22         A.    One example would be getting data --

23   getting data on the suicide rate of transgender

24   adolescence at the London clinic.

25                MS. ALTMAN:  Someone needs to mute their

Page 8

1        phone, please.  Thank you.

2   BY MS. ALTMAN:

3        Q.    Getting data on suicide rates, and I didn't

4   hear the rest of it, sir.

5        A.    Suicide rates of children attending their

6   pediatric clinic, gender clinic in London, called the

7   Tavistock, and publishing that research.

8        Q.    Okay.  So you didn't conduct the research,

9   did you, sir?

10       A.    Yes, I conducted the research.  I submitted

11  freedom of information requests to get the numbers that I

12  used in the article.

13       Q.    Uh-huh.  What -- what actual research, sir,

14  did you perform in order to determine the basis or

15  reasoning for any suicides that you allegedly studied?

16       A.    There was no information on the reason --

17  on the reasons for the suicides.  It was the number --

18            (Audio interference.)

19            THE WITNESS:  -- I was doing research on.

20            (Reporter asks for clarification.)

21            MS. ALTMAN:  Yes, sir -- yes, ma'am.  Can

22       you hear him okay?

23            MS. REPORTER:  Yes, I can.  It was just

24       that the word "the number" blurbed out.  That's

25       all.

```
                                              Page 9

 1              MS. ALTMAN:  No problem.

 2    BY MS. ALTMAN:

 3         Q.   Sir, so again, you didn't perform any

 4    analysis to determine the basis for any suicides that

 5    occurred at the Tavistock clinic, did you?

 6         A.   I performed the analysis to estimate the

 7    suicide rate.

 8         Q.   Right.  You -- you got a number from

 9    someone using a Freedom of Information Act, right?

10         A.   Yes.

11         Q.   Okay.  Freedom of Information Act request,

12    correct?

13         A.   Yes.

14         Q.   And you multiplied a number by the number

15    of individuals treated, correct?

16         A.   I also had to ascertain the number of

17    individuals treated, which was a required extensive

18    Freedom of Information Act requests.

19         Q.   Right.  So you issued some Freedom of

20    Information Act request, but that's not my question.

21    What analysis did you perform into the reasons that

22    anyone in your Freedom of Information Act requests

23    committed suicide?

24         A.   My research was not on the reasons.  It was

25    on the rate of suicides, the number of suicides as
```

1    proportion of patient -- of patient time spent in the

2    clinic.

3         Q.    Okay.  And we're going to -- and we're

4    going to get to that research later.  But I just want to

5    be clear on the record.  As you sit here today, you have

6    no basis on which you can testify as to the reasons why

7    any individuals from the Tavistock clinic committed

8    suicide, correct?

9         A.    That's correct.  Just a correction.  It is

10   Tavistock, T-A-V-I-S-T-O-C-K.

11        Q.    Okay.  Sorry if I'm pronouncing it wrong.

12   I will do better.  But your answer is the same, correct?

13        A.    Yes.

14        Q.    Okay.  Excellent.  Have you performed any

15   clinical studies relating to gender dysphoria?

16        A.    Could you define "clinical"?

17        Q.    What do you understand that word to mean,

18   sir?

19        A.    Do you mean that whether I was acting in a

20   clinical capacity?

21        Q.    Do you understand the word "clinical" to

22   mean acting in a clinical capacity, sir?

23        A.    That could be one interpretation, yes.

24        Q.    Okay.  And so I want you to then use that

25   interpretation and tell me whether or not you've

1    performed any clinical studies -- studies relating to

2    gender dysphoria?

3           A.    No.

4           Q.    Do you believe gender dysphoria exists?

5           A.    Yes.

6           Q.    Do you believe people can be transgender?

7           A.    Yes.

8           Q.    Do you believe that being transgender is a

9    choice?

10          A.    I'm struggling to answer that question.

11          Q.    Why?

12          A.    Because in some ways, everything is a

13   choice, isn't it?

14          Q.    No.  Do you have an answer for the

15   question, sir?

16          A.    I don't -- I think in some cases it might

17   be a choice and some cases it's not.

18          Q.    Okay.  Do you believe people can have

19   gender -- gender identity that is not aligned with their

20   gender assigned at birth?

21          A.    Yes.

22          Q.    Do you believe that a trans -- transgender

23   male is a boy?

24          A.    Yes.

25          Q.    Do you believe that a transgender female is

Page 12

```
 1   a girl?
 2           A.    Yes.
 3           Q.    Do you believe the medical professionals
 4   are in the best position to determine proper health care
 5   treatment?
 6           A.    Sometimes.
 7           Q.    And by your "sometimes," I assume you mean
 8   sometimes not?
 9           A.    Sometimes not, correct.
10           Q.    Okay.  What would be the scenarios under
11   which a health -- a medical professional would not be in
12   the best position to determine proper health care
13   treatment?
14           A.    If their treatment was based on faulty
15   research.
16           Q.    Anything else?
17           A.    That would be the main -- of course it
18   could also be if they had a financial incentive to offer
19   certain treatments.
20           Q.    Are you being paid for your time today,
21   sir?
22           A.    Yes.
23           Q.    Do you have a financial incentive to
24   testify consistent with the defendants' position in this
25   case?
```

1          A.    No.

2          Q.    So why would your character be any better

3    or worse than a medical professional who is making

4    medical decisions who has a financial interest in the

5    treatment?

6          A.    I think the sums -- the amount of money

7    matters.  And I didn't say that medical professionals

8    always had -- were influenced by financial incentives,

9    but sometimes they might be.

10          Q.    Well, as you sit here today, do you have an

11    example of any individual that you are aware of, relevant

12    to this case, that you think is financially incented

13    (sic) to perform a certain treatment?

14          A.    No.

15          Q.    Okay.  So you are just using that sometimes

16    that's the case, correct?

17          A.    Yes.

18          Q.    Do you believe that -- that experts

19    sometimes have a financial incentive to testify in a

20    particular way?

21          A.    Sometimes, yes.

22          Q.    Okay.  You would agree with me, would you

23    not, sir, that a medical professional is in the best

24    position -- the best position to determine the

25    appropriate care to be rendered to transgender

1   individuals, right?

2           A.      Sometimes.

3           Q.      And the -- the sometimes not is the same

4   answer you gave a moment ago?

5           A.      Yes.  If it's based on -- if a medical

6   judgment is based on faulty research.

7           Q.      Would you agree with me, sir -- I'm sorry,

8   were you done or no?  I apologize.

9           A.      I'm done.

10          Q.      Okay.  You would agree with me, sir, that

11  it's -- it's medical professionals that -- that should be

12  conducting medical research, correct?

13          A.      I think academics of all -- if they have

14  the skills and competence should be conducting important

15  research, including medical research.

16          Q.      Sir, you are not suggesting to the Court

17  that a academic is qualified to render medical opinions,

18  are you?

19          A.      Opinions on an individual patient, no.

20          Q.      Well, what -- what about a class of

21  patients, sir, are you suggesting to this Court that a

22  academic has the capacity to render medical opinions?

23          A.      That really depends on whether that -- for

24  example, the academic could come up with good arguments,

25  good data, published in a peer review journal, for

1    example.

2          Q.    But that -- they can't perform medical or

3    clinical research, can they, sir?

4          A.    Well, they can perform scientific research.

5          Q.    Based on other people's research, right,

6    you can report on other people's research.  You don't

7    perform the research yourself, correct?

8          A.    Not taking measurements, for example, no,

9    that's certainly true.

10         Q.    Well, let's use an example here, sir.

11   You've not performed any medical research, have you?

12         A.    Well, I gave you an example earlier of my

13   suicide paper, which I believe would come under the

14   category of medical research.  I can give you another

15   example on bone density, if you'd like.

16         Q.    Okay.  Why don't you give me that example.

17   I won't stipulate that I think your example on suicide

18   complies but let's try bone density.

19         A.    So bone density was published by the same

20   gender clinic.  Information on bone density was released

21   thanks to my complaints to the health research authority

22   in Britain.  They released the data and I was able to

23   publish a short letter to the editor in the Journal of

24   Pediatric Endocrinology and Metabolism that analyzed the

25   distribution of bone density after two years on

```
 1   gonadotropin-releasing hormone agonists.
 2          Q.    Okay.  We're going to get to that study
 3   later.  But with regard to that, again, all you did was
 4   make a Freedom of Information Act request to the
 5   Tavistock clinic, correct?
 6          A.    No, I made a complaint -- I made a
 7   complaint to the health research authority.  The health
 8   research authority forced the researchers to release that
 9   data.
10          Q.    Okay.  And it was their data, sir --
11          A.    Yes.
12          Q.    -- that you relied upon, correct?
13          A.    Yes.
14          Q.    And so you didn't perform any actual
15   clinical or medical research.  You relied on the data
16   that was compiled by someone else, correct?
17          A.    I did not perform the bone density scans,
18   that's correct.
19          Q.    And -- and you are not qualified to read a
20   bone density scan, are you, sir?
21                MR. BEATO:  Object to form.
22                But, Dr. Biggs, you can answer that
23          question.
24                THE WITNESS:  What I analyzed was Z-scores
25          which are based on normal distribution.  It's very
```

Page 17

1          standard statistics.

2     BY MS. ALTMAN:

3          Q.    Did you understand my question?

4          A.    Yes, and I -- yes.

5          Q.    Okay.  My question was, you are not

6     qualified to review a bone density scan, correct, sir?

7          A.    The bone density is converted into a

8     Z-score which is based on a normal distribution and met

9     the standard statistics of a normal distribution.

10              So the original bone density score, I could

11    not -- that would not be within my ambit.  When it is

12    converted into a Z-score, normalized for aging sakes,

13    then I -- that is within the ambit of myself or anybody

14    else who is qualified who understands statistics.

15         Q.    So, again, the answer to my question is you

16    are not qualified to read the scan, correct?

17              MR. BEATO:  Object to form.

18              But, Dr. Biggs, you can answer that

19         question.

20              THE WITNESS:  Correct.

21    BY MS. ALTMAN:

22         Q.    Okay.  Thank you.  Do your -- do your

23    personal beliefs in any way impact your opinions in this

24    case?

25         A.    My personal beliefs are based on what

1    I've -- what -- the research that I've done.  So, of

2    course, that then in turn contributes to my opinions.

3            Q.    Okay.  Other than the -- the two instances

4    you mentioned and the research that you've done, which

5    we're going to get to in a little bit, I'm just trying to

6    understand where you -- whether you have any other

7    personal beliefs that impact your testimony here today.

8            A.    Yes.

9            Q.    Okay.  And what are those personal beliefs

10   that impact your testimony here today?

11           A.    Those personal beliefs are that gays --

12   being gay and lesbian or being a feminine boy or a

13   masculine girl are entirely normal variations on human

14   experience and do not require medicalization.

15           Q.    What about transgender individuals?

16           A.    Sorry, what about -- can you -- can you --

17           Q.    Yes -- yeah, you said gays and lesbians, if

18   I wrote this down correctly, are normal variations and do

19   not require medicalization, did I hear you correctly?

20           A.    Yes.

21           Q.    Okay.  And so my question is, what about

22   transgender individuals, do they require medical --

23   medicalization?

24           A.    They might or they might not.

25           Q.    Okay.  Tell me the circumstances, sir, in

```
 1   which you are qualified to determine when a transgender

 2   individual requires medicalization?

 3           A.    Well, it's partly, of course, their choice

 4   and it's partly whether they can consent as an adult to

 5   treatments.

 6           Q.    Did you understand my question, sir?  My

 7   question is, tell me how you are qualified to determine

 8   when a transgender individual requires medicalization?

 9           A.    It's my belief that lifelong medical

10   intervention requires an adult to consent to that --

11   that -- that serious significant step.

12           Q.    So maybe third time is the charm.  Did you

13   understand my question?  My question is, please tell me

14   how you are qualified to determine --

15               MR. BEATO:  Counsel -- counsel -- counsel,

16           he already answered the question twice.

17               MS. ALTMAN:  He actually didn't answer the

18           question at all, Michael.

19               MR. BEATO:  He did answer the question.

20               MS. ALTMAN:  Michael, he didn't answer the

21           question.  You get to object to the form.

22   BY MS. ALTMAN:

23           Q.    Sir, my question is, how is it that you are

24   qualified to determine when a transgender individual

25   requires medicalization?
```

1            MR. BEATO:  Object to form.

2            Dr. Biggs, you can answer that question.

3            THE WITNESS:  I've already answered it.

4   BY MS. ALTMAN:

5       Q.   Really, what was your answer, sir, how you

6   are qualified to determine when a transgender

7   individual's entitled to medicalization?

8            MR. BEATO:  Object to form.

9            Dr. Biggs, you can answer that question.

10            THE WITNESS:  I believe that the -- the --

11        the lifelong medical intervention that comes with,

12        let's say, cross-sex hormones is something that an

13        adult can consent to make a good choice when they

14        are presented with the cost and the benefits of

15        that treatment.

16   BY MS. ALTMAN:

17       Q.   Sir, my question is about your

18   qualification, not your beliefs, your qualifications.  My

19   question was and is, what qualifies you to make

20   determinations as to when a transgender individual

21   receives medical care?

22            MR. BEATO:  Object to form.

23            Dr. Biggs, you can answer that question.

24            THE WITNESS:  I'm making a statement, a

25        general statement about principles of treatment

1        and consent.  I'm not choosing whether one
2        particular individual can or cannot get treatment.
3    BY MS. ALTMAN:
4        Q.    But that's not my question, sir.  My
5    question is not about them.  It's about you.  What is
6    your qualifications, what are your qualifications to make
7    a statement that a transgender individual sometimes or
8    sometimes not requires medicalization?
9               MR. BEATO:  Object to form.
10              Dr. Biggs, you can answer that question.
11              THE WITNESS:  I won't.
12   BY MS. ALTMAN:
13       Q.    You won't what?
14       A.    I -- I -- I have answered to the best of my
15   ability that question.
16       Q.    So as you sit here today, you can't tell
17   the Court what qualifications, if any, you have to make
18   determinations as to when a transgender individual
19   requires medicalization, correct?
20              MR. BEATO:  Object to form.
21              Dr. Biggs, you can answer that question.
22              THE WITNESS:  I'm -- I -- I've said what
23          I've -- what I -- what I want to say on that
24          question.
25   BY MS. ALTMAN:

Page 22

1          Q.    Okay.  Sir, you were retained by the

2     experts in this case, correct?

3          A.    Yes.

4          Q.    What -- and today, as I understand it, you

5     are here to provide testimony relating to your opinions,

6     correct?

7          A.    Yes.

8          Q.    And we're going to mark as Exhibit 1 to

9     this deposition the deposition notice.  And Ana is going

10    to bring that up just so that you can see it.  Maybe she

11    is.  Maybe she's not?

12               MS. GONZALEZ:  I need -- I'm sorry.  I need

13          somebody to give me my -- the hostess disabled my

14          screen sharing, so they need to allow me to do it.

15               MS. REPORTER:  It's enabled.

16               MS. GONZALEZ:  Okay.

17               (Plaintiffs' Exhibit 1 is marked for

18    Identification.)

19    BY MS. ALTMAN:

20          Q.    All right.  Sir, do you see what we've put

21    up on the screen, which we'll mark as Exhibit 1 for

22    identification?

23          A.    Yes.

24          Q.    And have you seen a copy of this before?

25          A.    Yes.

1          Q.    And it's this notice of your deposition

2     that has brought you here today, correct?

3          A.    Yes.

4          Q.    And we're going to also mark --

5                MS. ALTMAN:  Thank you very much, Ana.

6     BY MS. ALTMAN:

7          Q.    Sir, did you prepare an expert report in

8     this matter?

9          A.    Yes.

10         Q.    And we're going to bring that up and we're

11    going to mark that as Exhibit 2 to your deposition.

12               (Plaintiffs' Exhibit 2 is marked for

13    Identification.)

14               THE WITNESS:  Yes.

15    BY MS. ALTMAN:

16         Q.    And do you recognize this?  And Ana will

17    scroll through it for you just so that you can see it.

18         A.    Yes.

19         Q.    And if you can confirm for the record, sir,

20    that this is indeed the expert report that you prepared

21    on behalf of the defendants in this case.  And we'll mark

22    this as Exhibit 2 for identification.

23         A.    Yeah, insofar as all I've seen on the

24    screen looks like my deposition.

25         Q.    Your report, sir?

1         A.    The report, sorry, report, yes.

2         Q.    Okay.  Sir, did anyone assist you in

3    writing this report?

4         A.    No.

5         Q.    Did anyone write any portion of the report

6    for you?

7         A.    No.

8         Q.    Did you share the report with anyone before

9    it was finalized?

10         A.    No.

11         Q.    Did you review any of the defendants' other

12    experts' reports before you finalized your own?

13         A.    No.

14         Q.    Have you reviewed any of the deposition

15    testimony of experts in this case?

16         A.    No.

17         Q.    Okay.  And we're going to get back to your

18    report later.  But that was your --

19              MS. ALTMAN:  If we go to the last page,

20         Ana, with his signature.  Up one, up one, there

21         you go.

22    BY MS. ALTMAN:

23         Q.    That's your signature, sir, on page 22?

24         A.    Yes.

25         Q.    Okay.  And -- and in it you see above it

Page 25

1   that you swore under the penalty of perjury that the

2   statements and opinions contained therein are your own,

3   correct?

4           A.    Correct, yes.

5           Q.    Okay.

6           MS. ALTMAN:  Thank you, Ana.  We'll be

7           using it later, so we can just put them aside for

8           now.

9   BY MS. ALTMAN:

10          Q.    Sir, you wrote your doctorate, your Ph.D.

11  in the rise and decline of a mass movement, American

12  workers and strike wave of 1886; is that right?

13          A.    Yes.

14          Q.    And you would agree with me that that has

15  nothing to do with gender dysphoria, correct?

16          A.    Yes.

17          Q.    And you would agree with me it has nothing

18  to do with transgenderism, correct?

19          A.    Yes.

20          Q.    And you don't treat patients who suffer

21  from gender dysphoria, correct?

22          A.    No, I don't.

23          MS. ALTMAN:  Somebody needs to mute their

24          phone, please.  Thank you.  Somebody.

25  BY MS. ALTMAN:

Page 26

```
 1           Q.    You are not an ethicist, are you?

 2           A.    No.

 3           Q.    You are not a clinician of any kind,

 4    correct?

 5           A.    Correct.

 6           Q.    You are not a bioethicist, correct?

 7           A.    Correct.

 8           Q.    You are not an endocrinologist, correct?

 9           A.    Correct.

10           Q.    You are not a psychiatrist, correct?

11           A.    Correct.

12           Q.    You are not a psychologist, correct?

13           A.    Correct.

14           Q.    You are not a surgeon, correct?

15           A.    Correct.

16           Q.    You are not engaged in the drafting of

17    health care policy, are you, sir?

18           A.    No.

19           Q.    You are not a pharmacist; isn't that right?

20           A.    I'm not a pharmacist.

21           Q.    And you've never worked under a pharmacist;

22    isn't that correct?

23           A.    Correct.

24           Q.    And we've discussed, at least as I

25    understand from your testimony, you have no medical
```

Page 27

1   training, correct?

2           A.      Correct.

3           Q.      You have no training or experience in

4   endocrinology, correct?

5           A.      Correct.

6           Q.      No clinical experience in providing gender

7   affirming care, correct?

8           A.      Correct.

9           Q.      You have no mental health training,

10  correct, sir?

11          A.      Correct.

12          Q.      You are not a licensed nurse, are you?

13          A.      I'm not a licensed nurse.

14          Q.      And you are not licensed to practice

15  medicine in any country in the world, right?

16          A.      Correct.

17          Q.      Now, sir, you would agree with me that you

18  first began considering issues relating to gender

19  dysphoria in 2016 or 2017, do I understand that

20  correctly?

21          A.      I believe 2017.

22          Q.      So about five years or so, correct?

23          A.      Yes, that would be six years, yes, I think.

24          Q.      I guess depending on when it was in 2017,

25  but I'll give you -- I'll give you six years, no worries.

1          What independent research have you

2     performed on gender dysphoria as opposed to simply

3     critiquing other people's research and articles?

4          A.    So I would say that my independent research

5     was the article on suicide rates at the Tavistock, which

6     we've discussed; the analysis of bone density; and the

7     article -- my most recent article on the Dutch part on

8     the history and -- on the Dutch Protocol.

9          Q.    Well, we talked about the suicide rates and

10    the bone density and we're going to talk about them a

11    little more later.

12               But with regard to the Dutch Protocol, what

13    you did was merely analyze what they did; isn't that

14    correct?

15         A.    It was an extensive literature of

16    historical account, yes.

17         Q.    Right.  You reviewed what they did,

18    correct, and gave your spin on it; isn't that right?

19         A.    That's not how I would -- would -- would

20    refer to an extent -- a literature review and -- and

21    analysis and historical account.

22         Q.    Okay.  But it's a literature review of

23    what -- of someone else's work, correct?

24         A.    Correct.

25         Q.    And it's a historical account of someone

1  else's work, correct?

2  　　　　A.　　Correct.

3  　　　　Q.　　You didn't perform any of the underlying

4  clinical research, did you, sir?

5  　　　　A.　　No.

6  　　　　Q.　　Have you gone back personally and

7  interviewed any of the cohorts that were involved in the

8  Dutch Protocol?

9  　　　　A.　　I have talked to two patients from the

10 Dutch -- from the Dutch clinic subsequent -- subsequent

11 to that article.

12 　　　　Q.　　So after the article, you spoke to them?

13 　　　　A.　　Yes.

14 　　　　Q.　　So when you published the article, you

15 would agree with me, you had not spoken to anyone that

16 participated in the Dutch Protocol, correct?

17 　　　　A.　　Well, there is one -- the -- the article

18 acknowledges some input at the end from one Dutch

19 patient, but the -- most of the article was completed

20 before I met that person.

21 　　　　Q.　　Okay.  And so who are the two patients that

22 you say you spoke to?

23 　　　　A.　　I'm not going to name them.

24 　　　　Q.　　Sir, you are under oath, obligated by law

25 to tell the truth and to answer my questions.  Who are

1   the two patients?  We're happy to mark this part of the

2   transcript as confidential.  There is a protective order

3   in place.

4           A.   Okay.  One is called ███████, ██████

5   ██████

6           Q.   And the other?

7           A.   Is called █████, ████████, and I don't

8   have his sir name to hand.

9           Q.   Okay.  Do you have it somewhere in your

10  office?

11          A.   I do -- I could get that, yes.

12          Q.   Well, did you list your interviews of these

13  individuals in your -- your research or -- or attachments

14  to your report as something that informed your decisions

15  in this case and your opinions in this case?

16          A.   The article and the Dutch Protocol has a

17  footnote acknowledging feedback from a Dutch de- -- one

18  Dutch detransitioner.  There is a footnote in there, I

19  believe as an exhibit in my report.

20          Q.   And which of the two that you just

21  mentioned is the detransitioner?

22          A.   ███.

23          Q.   When did you speak to this individual?

24          A.   Six months ago.

25          Q.   Do you have notes of your conversation with

1    this individual?

2            A.    No.

3            Q.    Did you take notes of your conversation

4    with this individual?

5            A.    No.

6            Q.    Did you record the conversation?

7            A.    No.

8            Q.    Does your conversation with this person

9    influence your testimony or opinions in this case?

10           A.    It provides background.

11           Q.    Other than background, sir?

12           A.    No, not other than background.

13           Q.    So, again, with regard to the Dutch

14   Protocol, just so that we're on the same page, you

15   reviewed other people's clinical work and other people's

16   research and reported on it, correct?

17           A.    Correct.

18           Q.    You didn't perform any of the underlying

19   studies or tests, did you, sir?

20           A.    No.

21           Q.    Did you interview any of the -- the

22   physicians or medical professionals that were involved in

23   that study?

24           A.    No.

25           Q.    Did anyone stop you from doing that?

Page 32

1          A.     No.

2          Q.     Did anyone stop you from interviewing any

3    of the other individuals that participated in that study?

4          A.     No.

5          Q.     You were trying to do in-depth and

6    independent research, sir.  Any reason why you didn't

7    reach out to the authors of the study or any of the other

8    participants in the study to get a robust analysis of the

9    import of the research and the historical, I guess,

10   recreation of the Dutch Protocol?

11         A.     As an academic, we rely on what is

12   published in the literature.  Including, of course -- and

13   that includes, let's say, journalist interviews with

14   the -- with the clinicians.  That's also part of the

15   literature --

16         Q.     Is it your testimony -- just so I

17   understand the scope of what an academic does, is it your

18   testimony under oath that academics don't interview

19   individuals to get background or other information to

20   ensure that what they are publishing is accurate?

21         A.     There is a wide variety of academic

22   research.  Some is statistical; some is based on

23   hypnography.  This particular case was based on the

24   published literature.

25         Q.     Okay.  But you are not suggesting that --

Page 33

1    that all academics would not interview, whether it be

2    doctors, physicians, statisticians or others that perform

3    clinical research, are you?

4            A.    No.

5            Q.    Have you performed any scientific studies?

6            A.    Yes, the articles that I've already

7    discussed earlier.  I would consider those scientific.

8            Q.    You are referring to the -- the bone

9    density, the suicidality, and the Dutch Protocol?

10           A.    Well, the bone density and the suicidality,

11   yes.

12           Q.    Okay.  And you believe those qualify as

13   scientific studies, sir?

14           A.    Yes.

15           Q.    Okay.  And we'll get in more detail with

16   them later.

17                 You are not a scientist, are you?

18           A.    I would consider myself a social scientist.

19           Q.    Well, you are a sociologist, correct?

20           A.    Yes.

21           Q.    Have you ever conducted any peer-reviewed

22   studies?

23           A.    Yes.

24           Q.    And what peer-reviewed studies have you

25   conducted?

1        A.    The four peer-reviewed studies, which are

2   listed in my expert report, are the study on suicide.

3        Q.    Uh-huh.

4        A.    The -- the comparison of Dutch and English

5   gonadotropin-releasing hormone agonist.  The critique of

6   Turban, all three, were published in Archives of Sexual

7   Behavior.  And all three were peer-reviewed.  And the

8   fourth would be the article we just discussed on the

9   Dutch Protocol, which is published in the Journal of Sex

10   & Marital Therapy, also peer-reviewed.

11        Q.    Okay.  Sir, you would agree with me that

12   because an article -- I'm sorry, strike that.

13        Because a journal is peer-reviewed, doesn't

14   mean that your work was peer-reviewed, correct?

15        A.    No, this is -- that's -- that's incorrect.

16   All of those four that I listed were peer reviewed.

17        Q.    That wasn't my question, sir.  My question

18   was, you would agree with me that just because an article

19   or a letter to the editor appears in a peer-reviewed

20   journal, doesn't mean they are peer reviewed, correct?

21        A.    Correct.

22        Q.    Okay.  What is your specific bases for

23   claiming that your study on suicide was peer-reviewed?

24        A.    Because I received reviewers' reports from

25   my peers, and I had to revise and resubmit the articles

1   to meet their objections.  And on the second round of

2   revisions, it was accepted.  That is what peer review

3   means.

4           Q.    And we're going to talk about those later.

5   I just want to get your testimony on each of these now.

6   And your article regarding the comparison of Dutch and

7   other GnRH --

8           A.    Again, it was sent to three or four peer

9   reviewers.  The editor said that I had to meet their

10  objections and their criticisms.  And then I submitted

11  the revised version, along with my response to their

12  criticisms, and it was ultimately accepted.  That's what

13  peer review means.

14          Q.    Well, so we'll talk about what peer review

15  means.  Right now I just want to get your answers to my

16  question, thanks.

17               And the -- the third one, was that the bone

18  density?

19          A.    The third was the critique of what Turbans

20  were on puberty blockers and suicide.

21          Q.    Okay.

22          A.    And very helpfully, the editor included the

23  first footnote on this article.  This article was peer

24  reviewed by three reviewers and the editor.  But it was

25  the same process as I just -- as I explained previously.

1            The same peers, they sent back critiques.

2   I had to meet those objections.  And it was ultimately --

3   after revision, it was published.

4            Q.    You would agree with me that the study on

5   suicide and the -- the second one, the comparison of the

6   Dutch GnRH don't contain such a footnote, correct?

7            A.    They don't contain such a footnote,

8   correct.

9            Q.    Right.  And your testimony is the only

10  basis on which you could support a position that they

11  were indeed peer-reviewed, correct?

12           A.    That's incorrect.  I could give you the

13  reviewers' reports.

14           Q.    Did you include those with your production

15  in this case?

16           A.    No.

17           Q.    And the fourth one, sir?

18           A.    The fourth one is the Journal of Sex &

19  Marital Therapy, the Dutch Protocol.

20           Q.    Same question, sir, what is the basis on

21  which you --

22           A.    It was sent --

23           Q.    Let me just finish the question.

24                 -- have evidence of this publication was

25  peer-reviewed?

Page 37

1        A.    Was sent off to review by two or three, I
2   can't quite recall, but it was two or three of --
3   reviewers.  They sent back criticisms and suggestions.  I
4   revised the paper in light of their criticisms and
5   suggestions.  And it was then accepted for publication.
6        Q.    And with regard to at least numbers one,
7   two, and four that we've been talking about, the -- the
8   fact that you deemed them being peer-reviewed because you
9   responded to certain responses and criticisms does not
10  necessarily mean they were indeed peer-reviewed within
11  the medical community; isn't that right, sir?
12       A.    I disagree completely with that, with your
13  assertion.
14       Q.    So it is your testimony under oath that you
15  believe that -- that your articles number -- the first
16  one, the second one and the fourth one qualify as
17  peer-reviewed studies?
18       A.    Yes.
19       Q.    Is that your testimony?
20       A.    Yes, indeed, yes.
21       Q.    And we're going to get back to those
22  articles later.  But have you participated in any
23  scientific studies about the efficacy of gender-affirming
24  care?
25       A.    No.

1          Q.    Have you interviewed any transgender
2     individuals who benefited from gender-affirming care?
3          A.    No.
4          Q.    Has anyone stopped you from interviewing
5     any transgender individuals who benefited from
6     gender-affirming care?
7          A.    No.
8          Q.    Has anyone stopped you from participating
9     in any scientific studies about the efficacy of
10    gender-affirming care?
11         A.    No.
12         Q.    Did you ask to interview the plaintiffs in
13    this case?
14         A.    No.
15         Q.    Did you interview or speak with anyone from
16    WPATH before issuing your opinions in this case?
17         A.    No.
18         Q.    Have you ever interviewed or spoken with
19    anyone from WPATH in order to formulate your opinions
20    regarding puberty blockers?
21         A.    No.
22         Q.    Have you spoken to or interviewed anyone
23    with a contrary point of view before issuing your
24    opinions in this case?
25         A.    Well, I've spoken to many people with

Page 39

```
 1   contrary points of view, yes.
 2            Q.    Okay.  Who have you spoken with?
 3            A.    Not -- not in the -- you know, in the last,
 4   let's say, you know, month or two months or something.
 5            Q.    Well, what about the last six months, who
 6   have you spoken to that holds contrary views to yours
 7   about puberty blockers?
 8            A.    Probably not in the last six months, no.
 9            Q.    What about the last year?
10            A.    Yes, I've spoken to people -- individuals,
11   yes.
12            Q.    Okay.  Who?
13            A.    A doctoral student of mine.
14            Q.    Who?
15            A.    Rema -- well, a former doctoral student of
16   mine called Rema Maja (Phonetic).
17            Q.    Anyone else?
18            A.    No.
19            Q.    Any reason, sir, you don't, as an academic,
20   seek out people who have contrary views so that you can
21   have a full and robust analysis of particular issues?
22            A.    Well, we seek out contrary views when we
23   look at the published literature.  I mean, that's what we
24   do.  We look at, you know, contrary views as -- as
25   published.
```

1        Q.    Okay.  So, for the record, what contrary

2    literature have you looked at in the past year?

3        A.    Well, almost everything I -- a lot of the

4    material that I cite would have contrary points of view.

5        Q.    Okay.  And when you say that you cite, you

6    mean in connection with your report in this case?

7        A.    Yes.

8        Q.    Okay.  Anything else?

9        A.    No.

10        Q.    Did you participate in the drafting of the

11    GAPMS memo at issue in this case?

12        A.    No.

13        Q.    Did you participate in the drafting of the

14    rule at issue in this case?

15        A.    No.

16        Q.    Did you refer to the DSM-5 as part of your

17    work?

18        A.    Yes.

19        Q.    And describe for the record, sir, how

20    specifically you refer to it and what ways you utilized

21    the DSM-5 in your opinions -- in forming your opinions in

22    this case?

23        A.    Well, the DSM-5 provides the -- the

24    accepted definitions of gender dysphoria.

25        Q.    Okay.  How did you use that definition,

 1    sir, in your opinions in this case?

 2          A.    Well, I think I -- I believe I cited in my

 3    article on the Dutch Protocol, which was one of the

 4    exhibits.

 5          Q.    Okay.  And how did that inform your

 6    opinions in this case?

 7          A.    It provides a good --

 8          Q.    The definition of gender dysphoria, how did

 9    the DSM-5 definition of gender dysphoria inform your

10    opinions in this case?

11          A.    It demonstrates that gender dysphoria is

12    based on the patient's beliefs and desires.

13          Q.    Is that all it says, sir?

14          A.    Yes.

15          Q.    It's just a patient's belief and desire --

16          A.    Well, there are certain particular --

17          Q.    Let me just -- we agreed I get to finish

18    the question and then you get to answer.  So I'm going to

19    try not to interrupt you.  You could try not to interrupt

20    me as well.

21          Sir, is it your testimony that gender --

22    someone being gender dysphoria is solely based on their

23    belief and desire?

24          A.    Yes.

25          Q.    Anything else that informs whether or not

1  somebody is suffering from gender dysphoria other than

2  their belief and desire?

3          A.    Clinical -- clinically significant

4  impairment or distress.

5          Q.    Anything else?

6          A.    No.

7          Q.    You would agree that it is outside your

8  area of expertise to interpret the DSM-5, correct,

9  because you are not a clinician; isn't that right?

10                (Simultaneously speaking.)

11                MR. BEATO:  Object to form.

12                And, Dr. Biggs, you can answer that

13          question.

14                (Simultaneously speaking.)

15                MS. REPORTER:  Wait a minute.  Hold on.

16          What was the objection?

17                MR. BEATO:  Form.

18                And, Dr. Biggs, you can answer that

19          question.

20                THE WITNESS:  Correct, I'm not a clinician.

21  BY MS. ALTMAN:

22          Q.    Right.  And, therefore, it is outside your

23  expertise to interpret the DSM-5; isn't that right?

24          A.    I can interpret what is written in the

25  DSM-5.

Page 43

1        Q.     You are not a clinician, sir, correct?

2        A.     Correct.

3        Q.     So by "interpret it," you mean you can read

4    the words on the page, is that your definition?

5        A.     I can read, interpret, and analyze, yes.

6        Q.     Well, sir, you are not a clinician who is

7    qualified to analyze the DSM-5, are you?

8        A.     I'm qualified to analyze the DSM-5.  I'm

9    not a clinician.

10       Q.     And what qualifies you to do that, sir?

11       A.     My academic training.

12       Q.     Anything else?

13       A.     No.

14       Q.     Now, sir, you would agree with me that a

15   letter to the editor is not the same thing as an actual

16   peer-reviewed publication, correct?

17       A.     I disagree with you.

18       Q.     And what's the basis for your disagreement,

19   sir?

20       A.     My disagreement is based on the fact that

21   my -- in almost all journals -- in all journals, apart

22   from one that I know of, that is correct, namely a

23   literature by definition is not peer-reviewed.

24              Archives of Sexual Behavior is peculiar in

25   that it calls what -- another journal would be called a

Page 44

1   research note or a short article, which would be

2   peer-reviewed.  For some reason, the Archives of Sexual

3   Behavior calls that a letter to the editor.  I do not

4   know the --

5          Q.    Okay.

6          A.    -- category for a short research note or

7   short article.

8          Q.    Apologies.  I didn't mean to interrupt you.

9          But above the four studies that you claim

10  were peer-reviewed, only one of them has a footnote

11  indicating that it was peer-reviewed, right?

12         A.    Correct.  But just to add -- add to that,

13  no article -- peer-reviewed articles never have a

14  footnote saying if they are peer-reviewed.  And in -- and

15  in any -- in other journals.

16         So the absence of a -- the absence of a

17  footnote indicating it is peer-reviewed is not evidence

18  that it was not peer-reviewed.

19         Q.    Agreed.  So let's -- as you sit here today

20  under oath, what actual evidence do you have that they

21  are deemed peer-reviewed letters to the evidence -- and

22  let me finish the question, because it -- you might think

23  I'm done.  I understand, and I don't want you to repeat

24  your testimony, that you received comments from people

25  and that you incorporated those comments and then it was

Page 45

1   published.

2                My question is, what actual evidence do you

3   have that that constitutes peer-reviewed?

4        A.    That is the definition of peer-reviewed.  I

5   know the difference between something that's not

6   peer-reviewed and not -- and something that is

7   peer-reviewed because other letters to the editors which

8   are published in other journals were not peer-reviewed,

9   and I've never claimed them to be peer-reviewed.

10       Q.    Right.  And I think your definition, using

11  it loosely, has said if you get comments from people and

12  are required to incorporate them before publishing, that

13  constitutes peer-reviewed.

14               Do I understand your definition correctly?

15               MR. BEATO:  Object to the form.

16               Dr. Biggs, you can answer that question.

17               THE WITNESS:  Yes; that's right.

18  BY MS. ALTMAN:

19       Q.    Okay.  Other than that belief, that anyone

20  that provides commentary or suggestions or criticisms to

21  your report and you review them, and then your letter to

22  the editor is published, in your mind, that constitutes

23  peer review, is that fair?

24       A.    With -- one addition should be made, and

25  that is that you are not -- you have to meet those

1   objections.  And it is not clear whether it will be

2   ultimately published or not.  So you get criticisms but

3   you have -- you -- you don't know, when you try to

4   reshape the article based on those criticisms, you've got

5   no guarantee whether the editor might say, well, you

6   haven't done enough to meet those.

7        Q.    Understood.  I just want to make sure we're

8   speaking the same language.  That your definition of peer

9   review is that the Archive of Sexual Behavior provided

10  you with some criticisms, suggestions from a few of your

11  colleagues, you -- you reviewed those, incorporated them,

12  and ultimately, your letters to the editor were

13  published, correct?

14       A.    Correct.

15       Q.    And I just want to make sure,

16  definitionally, that is your definition of peer-reviewed,

17  correct?

18       A.    Correct.

19       Q.    And beyond that, just so we don't leave the

20  deposition today with any questions about it, you have no

21  other evidence that your letters to the editor were

22  peer-reviewed, correct?

23       A.    Correct.

24       Q.    And you would agree with me that journals

25  don't peer review every type of publication, correct?

1        A.    Correct.

2        Q.    What patient-based independent research did

3   you undertake to write these articles, these letters to

4   the editor?

5        A.    There was no patient-based research.

6        Q.    Have you engaged in any clinical trials?

7        A.    No.

8        Q.    Have you ever had any of your letters to

9   the editor or other writings rejected by a medical

10  association publication on gender dysphoria?

11       A.    Yes.

12       Q.    And can you explain which --

13       A.    I -- for example, I had a letter to the

14  editor to Pediatrics that was rejected.

15       Q.    What was it about?

16       A.    It was a comment on a study of cross-sex

17  hormones.

18       Q.    And is that study on cross-sex hormones

19  something that you've included in your materials in this

20  case?

21       A.    No.

22       Q.    Why not?

23       A.    Because I wanted to focus entirely on

24  puberty blockers.

25             MS. ALTMAN:  Counsel, we would ask that

1          that be produced.

2     BY MS. ALTMAN:

3          Q.    Any other letters to the editor or

4     submissions that you -- on gender dysphoria or

5     transgenderism or cross-sex hormones or puberty blockers

6     that have been rejected by any medical association

7     publication?

8          A.    Well, certainly I have an article on

9     surgeries that was rejected by Archives of Sexual

10    Behavior.

11         Q.    What kind of surgery?

12         A.    Gender -- transgender-related surgeries.

13         Q.    Was that article included in your

14    bibliography, sir?

15         A.    No.  Well, it wasn't an article.

16         Q.    What was it?

17         A.    Well, it's -- an article that implies it's

18    been published.  It's not been published, so it is like

19    it's a rejected paper.

20         Q.    Okay.  I'm sorry.  Was your rejected paper

21    listed in your bibliography?

22         A.    No.

23         Q.    Okay.  Why not?

24         A.    Because I wanted to focus on puberty

25    suppression.

1          MS. ALTMAN:  Michael, we would ask that
2      that rejected -- what did you refer to it as?
3      Rejected paper --
4          THE WITNESS:  Paper.
5          MS. ALTMAN:  -- be produced to us.
6          MR. BEATO:  So just to clarify, you would
7      like us to produce to you an article that he did
8      not cite in his bibliography and in his expert
9      report?
10         MS. ALTMAN:  Correct.  Two articles,
11     actually -- or rejected papers.
12         MR. BEATO:  I will consult with my
13     colleagues, thank you.
14         MS. ALTMAN:  No problem.
15  BY MS. ALTMAN:
16     Q.    Any other articles or rejected papers, sir?
17     A.    I think -- I -- as I recall now, I believe
18  that is -- that is all.
19     Q.    Okay.  Well, if you think of any others
20  during the deposition, please let me know, okay?
21     A.    Yes.
22     Q.    Okay.  Thank you.  Have you made any
23  commentary submission on gender-affirming medical care?
24     A.    Sorry, I didn't understand the question.
25     Q.    Yeah, have you -- have you provided or

1    written any commentary submissions on gender-affirming

2    medical care?

3            A.    What is commentary submission?

4            Q.    Have you done any -- other than letters to

5    the editor and what you refer to as peer-reviewed letters

6    to the editor, and other than what you've already

7    testified, is there anything else that you have written

8    on gender dysphoria that's not otherwise listed in your

9    bibliography?

10           A.    No.

11           Q.    Do you consider the archive on sexual

12   health to be a peer-reviewed medical journal?

13           A.    It's a peer-reviewed journal.  I believe

14   it's under -- might be classified under psychology or

15   sexology.

16           Q.    Right.  So I'm asking, do -- you would

17   agree with me it is not a peer-reviewed medical journal,

18   correct?

19           A.    Correct.

20           Q.    Have you -- have any of your writings

21   related to gender dysphoria been published in a

22   peer-reviewed medical journal?

23           A.    Yes.

24           Q.    And which ones are those?

25           A.    The -- the -- the journal of pediatric and

```
 1    endocrino- -- pediatric and endo- -- pediatric and --
 2    yeah, pediatric and endocrinology -- pediatric medicine
 3    and endo- -- endocrinology.  There's -- one on bone
 4    density was published in that medical journal.  That
 5    particular letter was not peer-reviewed but it is a
 6    peer-reviewed journal.
 7          Q.    Okay.  Anything else?
 8          A.    No -- no, I should correct that.  Another
 9    letter to the editor, which was not peer-reviewed, was
10    published in The Journal of Sexual Medicine.
11          Q.    Which one was that?
12          A.    It is a comment on the -- the Costa study.
13    It is -- it is cited in my report.
14          Q.    Okay.  Which one -- just say it again, the
15    comment on what, I'm sorry?
16          A.    It's a -- it's a comment on a -- an article
17    by Costa, et al.
18          Q.    Okay.
19          A.    Again, I should emphasize, that was not
20    peer-reviewed but it is a peer-reviewed journal.
21          Q.    Anything else?
22          A.    No.
23          Q.    You had a submission on Turbans and
24    credible assumptions about sex, does that sound familiar?
25          A.    Yes.
```

Page 52

```
 1          Q.    Was that rejected by any publication?
 2          A.    Yes.  I should -- that -- I -- thank you
 3    for reminding me of that.  That was rejected from a --
 4          Q.    You are welcome.
 5          A.    -- pediatric -- I'm not -- I wouldn't want
 6    to give you -- mislead you by giving you the journal but
 7    it was rejected by one journal, yes.
 8          Q.    Anything else?
 9          A.    No, I do not believe so.
10          Q.    Now, sir, in your report, you don't -- you
11    also don't mention that you participated in a panel
12    before the Florida Board of Medicine, do you?
13          A.    No, I did not.  I did not think that was
14    relevant.
15          Q.    Right.  You didn't include it on your CV
16    either, right?
17          A.    Possibly not.
18          Q.    Why?
19          A.    Because it was a eight-minute presentation
20    and that's not really significant enough to be included
21    on my CV.
22          Q.    Well, for what it's worth, I think it was
23    12 minutes because I've listened to it.  But I could be
24    wrong.
25                But you would agree with me that it -- it's
```

1   relevant because it's the very issue for which we're here

2   today; isn't that correct?

3                    MR. BEATO:  Object to form.

4                    THE WITNESS:  Correct.

5                    MR. BEATO:  Dr. Biggs, you can answer that

6            question.

7                    THE WITNESS:  Correct.

8   BY MS. ALTMAN:

9            Q.    Okay.  So is there any reason why you chose

10  not to disclose the fact that you were a panelist in the

11  Florida Board of Medicine meeting held in October?

12           A.    No.  I was told explicitly in preparing my

13  report that I had to say which -- what legal cases I had

14  participated in and it did not -- it did not occur to me

15  that that could be counted as a -- as a legal case.

16           Q.    Who asked you to participate in that?

17           A.    It was one of the members of the board of

18  medicine.

19           Q.    Who?

20           A.    Patrick -- Patrick -- I'm afraid I'm

21  blanking on the surname.

22           Q.    Okay.  Were you paid for your time?

23           A.    No.

24           Q.    And you would agree with me that your

25  testimony before the board of medicine was essentially

```
 1   the same as the opinions you are rendering in this case,
 2   correct?
 3           A.    Very similarly, yes.
 4           Q.    Okay.  And you also testified and answered
 5   questions at a committee -- the Health and Human Services
 6   committee, right?
 7           A.    No, I don't -- oh, yes, sorry, yes, I did.
 8   Yes, yes, you're right.  Yes.
 9           Q.    Okay.  And you didn't list that in your
10   bibliography or CV either, correct?
11           A.    No, correct.
12           Q.    Who asked you to participate in that?
13           A.    I believe somebody from the Health and
14   Human Services e-mailed me and asked me if I would
15   participate.  I'm afraid I can't recall their name.
16           Q.    Were you paid for that?
17           A.    No.
18           Q.    You volunteer a lot of your time, sir, to
19   this issue, correct?
20           A.    Well, one was 12 minutes and the other one
21   was, I don't know, same amount of time.
22           Q.    You had prepared materials for those
23   meetings?
24           A.    Yes, but I believe as an academic, if
25   you've done research in the public interest of your
```

1    research, then you should be willing to -- that's part of

2    the job description.

3             Q.    And you would agree with me that both the

4    board of medicine meeting that I referred to and the

5    committee meeting relating to the Health and Human

6    Services, they're aligned with the defendants in this

7    case in terms of the work that they are trying to do,

8    correct?

9             A.    Yes, correct.

10            Q.    And you're being paid by the defendants in

11   this case for your time today?

12            A.    Yes.

13            Q.    And you were paid for your work in

14   connection with preparing your report?

15            A.    Yes.

16            Q.    How many hours in total have you expended

17   in your analysis and in preparing your report in this

18   case?

19            A.    I'm not -- probably about -- I think my --

20   preparing my report was like eight hours, but I

21   couldn't -- I don't have the exact figures to hand.  And

22   preparing rebuttals to three -- the rebuttals that I -- I

23   received was another six hours.  Preparation for this

24   deposition was maybe another two hours.

25            Q.    And when did you prepare for this

Page 56

1  deposition?

2         A.    I prepared for it yesterday.

3         Q.    Did you meet with anyone?

4         A.    No.

5         Q.    Did you speak to anyone from the defendants

6  or their counsel?

7         A.    We had a five-minute discussion on just the

8  procedures with Michael I think on -- it was on Friday.

9         Q.    And the Michael you are referring to is the

10 Michael Beato that's here on this call?

11        A.    Yes, indeed, yes.

12        Q.    Other than your five-minute meeting with

13 Mr. Beato and you said you spent two hours yesterday,

14 correct?

15        A.    Yes.

16        Q.    What did you do to prepare yesterday?

17        A.    I reviewed my -- my -- my statement.  And I

18 looked at several of the references that were in the

19 rebuttals.

20        Q.    Okay.  And we're going to get back to that

21 in a second.

22              A minute ago you mentioned there was a

23 Patrick who you couldn't remember his last name.  Does

24 the last name Hunter sound familiar?

25        A.    That sounds familiar, yes.

1          Q.     Okay.  And is he the same Patrick Hunter
2    that's also involved with SEGM and Genspect?
3          A.     I don't know about Genspect, but SEGM, yes,
4    definitely.  Yes, that's him.
5          Q.     Okay.  And for -- for the Court's benefit,
6    can you describe the work of SEGM, the way -- the way you
7    pronounced it?
8          A.     So SEGM, S-E-G-M, the Society for
9    Evidence-Based Gender Medicine, is a group of concerned
10   clinicians, doctors, researchers who are concerned about
11   the basis for medical care of children, in particular,
12   who identify as transgender.
13         Q.     Well, they are not just concerned about it
14   they are against it, correct?
15         A.     Not against -- no, we're -- we're against
16   what we see as unjustified -- medically unjustified care.
17   We're in favor of care of people with gender dysphoria.
18         Q.     Okay.  And the "we," you included yourself,
19   correct?
20         A.     I'm on the board of advisors, yes.
21         Q.     Correct.  And we're going to talk about
22   that later but I think you described it as being against
23   medically unjustified care, correct?
24         A.     Yes, correct.
25         Q.     And I don't want to beat the dead horse but

```
 1    it's not within your purview to determine what is
 2    medically justified or not, correct?
 3              MR. BEATO:  Object to form.
 4              Dr. Biggs, you can answer that question.
 5    BY MS. ALTMAN:
 6         Q.   Let -- I'll -- I'll withdraw it and I'll
 7    ask it different.
 8              Sir, it's -- you've already agreed, you're
 9    not a medical doctor, correct?
10         A.   Correct.
11         Q.   Okay.  And it's not within your purview to
12    determine what is medically justified or not, correct?
13         A.   I disagree with that because I believe that
14    anyone who can look at the empirically researched
15    literature, published literature and can make their own
16    evaluation based on their reading of the literature.
17         Q.   Meaning -- I'll give you that.  You can
18    read the literature and draw your own personal
19    conclusion, right?
20         A.   Correct.
21         Q.   But you are not qualified to make a medical
22    determination as to what is justified; isn't that right?
23              MR. BEATO:  Object to form.
24              Dr. Biggs, you can answer the question.
25              THE WITNESS:  Correct.
```

1    BY MS. ALTMAN:

2          Q.    Okay.  When did you get on the board of

3    SEGM?

4          A.    I can't give you the exact date.  Two years

5    ago, three years ago.

6          Q.    How did you have occasion to decide to join

7    that board?

8          A.    I believe I was invited by somebody but I

9    can't quite remember who invited me.

10         Q.    You would agree that -- that SEGM is an

11   advocacy group, correct, for their -- for their position,

12   correct?

13         A.    Correct.  Like WPATH in that regard.

14         Q.    Well, I asked you earlier whether or not

15   you met with anyone from WPATH and you said no, correct?

16         A.    Correct.

17         Q.    And I think you also testified that you've

18   never even tried to reach with any -- reach out or meet

19   with anyone from WPATH, correct?

20         A.    Correct.

21         Q.    Have you ever been qualified as an expert

22   in the United States?

23         A.    No.

24         Q.    Have you ever testified as an expert in the

25   United States?

1          A.     No.

2          Q.     Have you ever been qualified as an expert

3     ever?

4          A.     Well, I have testified as an expert witness

5     in -- in one court case in United Kingdom and one court

6     case in Australia.

7          Q.     Okay.  Let's talk about those for a minute.

8     The one you referenced, the first one is the Keira Bell

9     matter; is that correct?

10          A.     Correct.

11          Q.     And you refer to it on page 2 of your

12     report as Keira Bell and Mrs. A versus Tavistock NHS

13     Trust, correct?

14          A.     Yes.

15          Q.     And what was the subject matter of your

16     testimony in that case?

17          A.     It was about the puberty blockers in

18     general and the -- the Tavistock's concealing of

19     information about their research on puberty blockers in

20     particular.

21          Q.     Now, that case was ultimately reversed,

22     correct?

23          A.     Correct.

24          Q.     And ultimately, an Appellate Court ruled in

25     favor of Tavistock, correct?

Page 61

1        A.    Correct.

2        Q.    And with regard to your testimony, were you

3   actually qualified by that Court as an expert in the

4   efficacy of puberty blockers?

5        A.    I don't know.  I don't know -- I know that

6   my -- my report was submitted.  I know that my report was

7   referred to by -- by the barrister in their proceedings.

8   I know it was part of the bundle that was submitted to

9   the judges.

10       Q.    But you don't know whether or not the Court

11  ever qualified you as an expert on the efficacy of

12  puberty blockers, correct, sir?

13       A.    Correct.

14       Q.    And perhaps I missed it but did you produce

15  that report in this case?

16       A.    No.

17       Q.    Why not?

18       A.    Because I was superseded by -- that was

19  quite a few years older.  My -- the expert report that I

20  provided is much more comprehensive and based on much

21  more research and later -- later -- later publications.

22       Q.    Is that the only reason you didn't produce

23  it, sir?

24       A.    Yes.

25       Q.    And what year was that?

1          A.    I -- I don't recall.  I know that the case

2     was during the -- just after -- must have been 2021, I

3     believe, but I'm not swearing to that.

4          Q.    And so what post -- we're in -- I hope I

5     found one thing we can agree on today.  We're in the year

6     2023, right?

7          A.    Correct.

8          Q.    March of 2023, correct?  What research have

9     you reviewed post 2021 up through today that has altered,

10    impact, or otherwise changed your opinions than those you

11    offered in the Tavistock case?

12               You mentioned that you looked at additional

13    research.  I just want to understand what you looked at

14    between 2021, so all of 2022 and the three months that is

15    2023, what new research have you looked at?

16         A.    Well, for example, the -- the study on

17    mice, I believe, is -- postdates my Tavistock testimony.

18         Q.    Anything else?

19         A.    Dutch.  I mean, many -- many, many Dutch --

20    of the Dutch articles have come out since then.

21         Q.    Anything else?

22         A.    I can't -- I'm not -- I can't go through

23    and -- and give you every list, every article that has

24    come out between 2021 and 2023, but my bibliography is --

25    should include all of those.

Page 63

1          Q.     Right.   Well, I don't want to rely on your

2     bibliography.   I want to understand what you personally

3     relied on in rendering your opinions in this case that

4     came out post your -- your work in the Tavistock matter.

5          A.     Well, I've -- I've explained -- I mean,

6     several articles from the -- from the -- from the

7     Netherlands.

8          Q.     Uh-huh.

9          A.     There were, for example, another -- it was

10    an article from an Australian clinic that demon- -- that

11    showed -- that had very, very high rates, I think some

12    near 97, 98 percent of -- of children who started

13    releasing hormone agonists continued on to cross-sex

14    hormones.   That would be an example.

15         Q.     Okay.   Well, let's talk about that for --

16    for just a second.

17               Did you interview any of the children that

18    started on GnRH that were referenced in that Australian

19    article?

20         A.     No.

21         Q.     Did you do any analysis of -- of what --

22    what medical or psychological factors influenced

23    determinations as to whether or not they went on to

24    cross-sex hormones?

25         A.     No.

1      Q.    Did you do any kind of clinical studies to

2    determine whether or not those individuals were indeed

3    transgender?

4      A.    No.

5      Q.    Have you done any kind of clinical studies

6    of -- associated with the Australian article that you

7    represented that 97 to 98 percent of children who went on

8    GnRH went on to take cross-sex hormones?

9      A.    No.

10      Q.    Now, sir, you indicate in your report that

11    you testified, if I understand you correctly, in another

12    matter which you identify as expert witness statement for

13    name suppressed Australian family court, 2022, do you

14    recall that in your report?

15      A.    Correct.

16      Q.    What is that?  Putting the name aside for

17    the minute, what was the nature of your testimony, what

18    were you asked to do?

19      A.    It was one of six experts asked by the

20    Australian family court to -- to discuss the case of a

21    child, age 11, who was wanting the -- the mother wanted

22    the child to get puberty blockers, the father did not.

23    And so the conflict came to the Australian family court.

24      Q.    What were you asked to do?

25      A.    I was asked to provide my -- my evidence on

1   the -- the efficacy and side effects of -- of puberty

2   blockers.

3            Q.    And were you qualified as an expert in that

4   case?

5            A.    I don't believe that the Australian family

6   court system either qualifies or not qualifies experts.

7            Q.    Did you testify in the Australian court?

8            A.    Again, the Australian system does not have

9   testimony from the experts.  So I had -- we had an expert

10  conference of -- all the experts on both sides had a

11  meeting to decide where we agreed and where we disagreed.

12  But as in the Keira Bell case, experts did not -- do not

13  testify.

14           Q.    Okay.  So were you deposed -- I guess not,

15  because you said you've never been deposed before.

16           A.    Yeah, correct.

17           Q.    So the two matters in which you've been

18  engaged -- just want to make sure I understand it

19  correctly -- to your knowledge, you weren't qualified as

20  an expert in either case, correct?

21           A.    Correct.

22           Q.    And neither case you gave testimony,

23  correct?

24           A.    Correct.

25           Q.    Neither case you gave a deposition,

1  correct?

2          A.    Correct.

3          Q.    And in the latter case of the Australian

4  family, you said there was an expert conference of the

5  experts on both sides?

6          A.    Correct.

7          Q.    And do the experts make a recommendation to

8  the court?

9          A.    The -- our aim was to -- to decide where we

10 agreed and where we disagreed.

11         Q.    Right.  And so my question is, did you --

12 the six of you, if I got the number right, collectively

13 make a recommendation to the court?

14         A.    No, because we agreed.  But we agreed on

15 where we disagreed, if you like.

16         Q.    Okay.  Was there any -- any recommendation

17 that you provided to the court in that case?

18         A.    Other than my -- my -- my -- the report

19 that I submitted, no.

20         Q.    Okay.  So you did submit a report in that

21 case?

22         A.    Yes, yes.

23         Q.    And that was in 2022, correct?

24         A.    Correct.

25         Q.    And you haven't included that in your

```
 1   materials in this case, correct?

 2          A.    Correct.

 3          Q.    In -- in each of those matters, the

 4   Tavistock matter and the Australian family matter, were

 5   the individuals in those cases suffering from gender

 6   dysphoria?

 7          A.    Yes.

 8          Q.    In both cases?

 9          A.    Yes.

10          Q.    And if I understood you correctly, the

11   expertise for which you were retained in the Tavistock

12   matter was to provide your opinions on -- on puberty

13   blockers; is that correct?

14          A.    Correct.

15          Q.    And I think the second basis for your

16   opinions was, according to you, the failure to have

17   provided certain information or disclose certain

18   information, correct?

19          A.    Correct.

20          Q.    Now, in that case, the appeals court

21   determined that medical professionals are -- are indeed

22   qualified to determine whether or not an individual

23   provides consent, correct?

24          A.    Yes.

25          Q.    Now, sir, if I recall correctly, on the
```

1    Health and Human Services committee, there were other

2    individuals who testified or spoke -- were speakers along

3    with you, correct?

4           A.    Correct.

5           Q.    One of them was Dr. Laidlaw, correct?

6           A.    Yes.

7           Q.    One of them was Dr. Levine, right?

8           A.    Yes.

9           Q.    Another was Chloe Cole, a detransitioner;

10   isn't that right?

11          A.    Yes.

12          Q.    Was anyone present to speak on behalf of --

13   of those that support gender-affirming care?

14          A.    I can't recall.

15          Q.    As you sit here today, are you aware of

16   anyone that -- that was invited to speak about the

17   provision of gender-affirming care?

18          A.    I believe the chair of the committee said

19   that he had invited a surgeon in Florida with a very

20   Irish name, I'm afraid it is not on the tip of my tongue,

21   and that she had -- Galica, is it -- Galica her surname?

22   -- and she had refused to attend.

23          Q.    Anything else that you recall about those

24   that believe gender-affirming care is appropriate in

25   terms of their invitation to speak at that committee

Page 69

1    meeting?

2          A.    No, I'm afraid I'm not -- I'm not aware of

3    anything.

4          Q.    Fair enough.  But you would agree with me

5    that no one did speak on the provision of

6    gender-affirming care in a positive way, correct?

7          A.    I believe not.

8          Q.    Now, sir, you would agree with me that

9    Dr. Laidlaw, Dr. Levine also are against providing

10   gender-affirming care, in particular to minors, correct?

11         A.    Correct.

12         Q.    Do you have any opinions on puberty

13   blockers that -- and I know the answer to this but I'm

14   going to ask it anyway -- as it pertains to adults?

15         A.    No.

16         Q.    Do you have any opinions on the provision

17   of cross-sex hormones as it pertains to adults?

18         A.    No.

19         Q.    Do you have any opinions with regard to

20   cross-sex or -- or surgical procedures as it pertains to

21   adults?

22         A.    No.

23         Q.    Now, at that committee meeting --

24               MR. BEATO:  I apologize, Ms. Altman.  I

25         just note that we've been going for about an hour

1          and 30 minutes.  Do you mind if somewhere we work
2          in just a brief five-minute break?  I -- I don't
3          mean to interrupt.
4                  MS. ALTMAN:  Oh, no, it is okay.  Happy to
5          do it right now.  That's fine.  So five minutes.
6          It is 11:24, why don't we regroup at 11:30.
7                  (A brief recess was taken from 11:24 a.m.
8   to 11:31 a.m.)
9   BY MS. ALTMAN:
10         Q.    Sir, just to -- to put a finer point on it,
11  other than the opinions in your report on puberty
12  blockers, you are not offering any opinions on cross-sex
13  hormones, correct?
14         A.    Correct.
15         Q.    You are not offering any opinion on the
16  medical care to be received by adults, correct?
17         A.    Correct.
18         Q.    Sir, do you know who finances SEGM?
19         A.    No.
20         Q.    You have no knowledge whatsoever as to who
21  finances that organization?
22         A.    No, I don't.
23         Q.    Do you know how many members it has?
24         A.    I don't believe it has members.
25         Q.    What do you think it has; if they are not

Page 71

1   members, what would you call it?

2         A.    Well, there is a board of advisors.  I

3   don't know how many people are on the board of advisors,

4   maybe 20, 12.  I really don't know.

5         Q.    Do you meet?

6         A.    There is a common library of articles in

7   Zotero, in a software called Zotero.

8         Q.    I assume these articles are all anti

9   providing gender-affirming care to individuals; is that

10  correct?

11              MR. BEATO:  Objection -- object to form.

12              Dr. Biggs, you can answer that question.

13              THE WITNESS:  No, that's incorrect.  It is

14        the literature of rela- -- relevant to gender

15        care.

16  BY MS. ALTMAN:

17        Q.    Okay.  And so you would -- your -- it's

18  your testimony that the literature relevant to gender

19  care is both those that propose it and those that are

20  against it?

21        A.    Yes.

22        Q.    Okay.  And do individuals upload

23  information into that database?

24        A.    Yes.

25        Q.    And would that be individuals that are on

Page 72

1    the board of advisors or can anyone update or upload

2    information into that database?

3              A.    I don't know.  I just use it, so I assume

4    that there are maybe five people who can -- who can

5    upload information.  I'm not -- I'm not aware of the

6    details.

7              Q.    Do you know who the five people are?

8              A.    No.

9              Q.    Can you upload information into that

10   database?

11             A.    I don't know if I have uploading permission

12   or not.  I've never uploaded anything.

13             Q.    But you indicated that you do use it; is

14   that correct?

15             A.    Yes, if I can come across a reference,

16   then -- and then I can look in the second database to get

17   the article quickly.

18             Q.    Sir, your opinions in this case are limited

19   to puberty blockers, correct?

20             A.    Yes.

21             Q.    And, again, you are not -- you are not

22   providing any opinions relating to gender dysphoria

23   specifically as it pertains to adults, correct?

24             A.    Correct.

25             Q.    Now, sir, at the committee meeting for the

1    Health and Human Services, you -- you stated that you

2    read published literature regarding gender-affirming care

3    and determined that it was of poor quality, do you recall

4    that testimony?

5              A.    Yes.

6              Q.    What literature specifically did you review

7    that you believe is of poor quality?

8              A.    There -- well, one of the landmark studies

9    would be the de Vries, et al., 2011 and the de Vries, et

10   al., 2014, which was the -- the first cohort of -- well,

11   they started out with 70 children who were -- who got

12   puberty blockers in the Netherlands.

13             Q.    And it's -- it is your position that --

14   that those -- that published literature was of poor

15   quality, is that your testimony?

16             A.    Yes.

17             Q.    Based on what qualifications, sir, do you

18   have to make a determination that those -- the published

19   literature was of poor quality?

20             A.    Well, it's The National Institute For

21   Clinical Excellence, called NICE, N-I-C-E, in Britain has

22   reviewed -- has reviewed the literature -- that

23   literature with reference to the GRADE system, G-R-A-D-E,

24   of -- of research, where -- where the research is of high

25   quality and low quality, and has assessed those studies

Page 74

1   of -- as being of very low quality.

2          Q.    So you've not done any studies to determine

3   whether it's of poor quality or low quality.  You are,

4   again, citing to someone else's analysis, correct?

5          A.    I've also considered the -- the literature

6   myself.

7          Q.    When you just answered my question, sir,

8   you referred to NICE's evaluation of whether or not using

9   their grading system it was of low quality; isn't that

10  right?

11         A.    Yes.

12         Q.    Okay.  And that's what you were relying

13  upon when you were before the Health and Human Services

14  committee when you represented that the published

15  literature was of poor quality?

16         A.    It's partly -- that's one -- that's one

17  contributor to my judgment.  I also base it on the -- my

18  own review of the literature.  So another example of poor

19  quality would be very high rates of attrition that are

20  not explained.

21         Q.    Well, let's just focus on that for a

22  second.  You didn't try and reach out to the individuals

23  that -- that you claim were no longer available or didn't

24  participate in order to determine their results, did you?

25         A.    Correct.

1        Q.     So you are just saying the -- the mere fact
2   that there was what you refer to as a significant amount
3   of attrition, in your opinion, makes -- makes it of poor
4   quality; is that correct?
5        A.     Yes, that's one factor, yes.
6        Q.     Okay.  But as far as you know, those
7   individuals could all be very happy, well adjusted, not
8   suffering from depression or anxiety or any other
9   disease, correct?
10       A.     Correct.
11       Q.     You don't know one way or another?
12       A.     Correct.
13       Q.     So you have no way to dispute the results
14   of those -- the two studies you mentioned, de Vries 2011
15   and 2014, correct?
16       A.     Correct -- no, actually, hold on.  Can I --
17   can I change my answer there?  One -- one -- one example
18   was the -- one of the major findings was the gender
19   dysphoria was eliminated after -- after the -- after the
20   medical procedures.  And that is based on the scale,
21   which they changed the scale halfway through the study.
22       Q.     Okay.  So that doesn't tell you, sir, that
23   gender dysphoria wasn't eliminated.  All you could say is
24   that they changed the scale, correct?
25       A.     Yes --

1                MR. BEATO:  Object to form.

2                Dr. Biggs, you can answer that question.

3     BY MS. ALTMAN:

4          Q.    Right?

5          A.    There was no evidence either way.

6          Q.    Right.  So you can't say the evidence is

7     bad or good, correct?

8          A.    If researchers change the scale halfway

9     through a study, that is a sign of very poor research.

10         Q.    Well, sir, while it may be, in your

11    opinion, a sign of very poor research, what it isn't a

12    sign of is individuals who originally had gender

13    dysphoria who no longer suffer from gender dysphoria,

14    correct?

15         A.    Correct.

16         Q.    And you can't testify and you have no

17    information from which you could testify or provide

18    opinions about whether or not any of these individuals

19    indeed were -- received relief from -- from their gender

20    dysphoria because of the medical treatments that they

21    received, correct?

22         A.    Largely correct.  I mean, the -- the child

23    who died as a result of surgery, I don't believe that

24    they were cured of their gender dysphoria.

25         Q.    Okay.  Well, let's talk about that

Page 77

1    individual for a minute.  You would agree with me, sir,

2    that that individual, if I'm remembering the one that you

3    referred to in your report, died of a surgical procedure,

4    correct?

5           A.    Yes, correct.

6           Q.    And you would agree with me that the --

7    the -- to your knowledge, you have no basis on which to

8    opine that puberty blockers had any causation whatsoever

9    in that individual's death; is that right?

10          A.    I disagree because puberty blockers meant

11   that the -- the individual had to go through a more

12   dangerous form of vaginoplasty.

13          Q.    Okay.  But, sir, puberty blockers was not

14   the causation of that individual's death, correct?

15          A.    It was indirect -- an indirect cause.

16          Q.    Sir, you understand my question.  The

17   person died of a complication from surgery; isn't that

18   right?

19          A.    Correct, but the chance of a surgical

20   complication was increased because of the particular type

21   of procedure they had to undergo because of puberty

22   blockers.

23          Q.    Sir, what medical basis do you have to make

24   that statement?  Are you a surgeon?

25          A.    Because the surgeons who -- who performed

1    that operation stated that that was the reason why they

2    had to undergo that more complicated surgery.

3            Q.    Are you a surgeon?

4            A.    No.

5            Q.    Did you review the surgical notes from that

6    case?

7            A.    I reviewed the article.

8            Q.    I didn't ask if you reviewed the article.

9    I understand the confusion.  My question is, did you

10   review the surgical notes of that patient from that case?

11           A.    No.

12           Q.    Did you do any analysis whatsoever of the

13   medical treatment, meaning looking at the actual medical

14   records, of the individual that died in that case?

15           A.    No.

16           Q.    Did you speak to the doctors directly to

17   determine what happened in that particular case to that

18   particular patient?

19           A.    No, they -- they -- there was no need to

20   speak to them because they published an article which

21   described what happened.

22           Q.    So the answer to my question is no, you

23   didn't, right?

24           A.    Correct.

25           Q.    Okay.  Have you ever spoken to a surgeon

1    who provides surgery, gender-affirming surgery, to

2    determine how that procedure is performed today?

3              A.    No.

4              Q.    Have you spoken to any surgeon that

5    performs bottom surgery today to determine what impact,

6    if any, puberty blockers has on their ability to provide

7    such surgery?

8              A.    No.

9              Q.    Sir, are -- are you suggesting or

10   representing to the Court that you've read all of the

11   published literature on the provision of gender-affirming

12   care?

13             A.    No, not all of it, no.

14             Q.    Other than what you've testified with

15   regards to the two de Vries studies, is there any other

16   literature that you reviewed that you believe is of poor

17   quality?

18             A.    I guess there is other research.  For

19   example, there is a study by Tordoff, which again had a

20   very high rate of attrition which was unexplained,

21   Tordoff 2022, I believe.

22             Q.    Okay.  And, sir, the fact that there is a

23   high rate of attrition doesn't mean that the underlying

24   merits of the study were incorrect; isn't that right?

25             A.    Well, the higher the rates of attrition,

1    the worse the -- the study because the less inferences

2    can be drawn from it.

3         Q.    Well, I'm talking about the actual care,

4    sir.  Just because there is a high rate of attrition

5    doesn't mean that the results of the care that are

6    reported in that study are not correct, are not reliable;

7    isn't that right?

8         A.    Well, we don't know the results for the --

9    the patients who were -- who -- who were not measured,

10   who did not come back to the clinic, correct.

11        Q.    You don't know one way or the other, right?

12        A.    Correct.

13        Q.    And you can't surmise that -- that their

14   results were bad, can you?

15        A.    Correct.

16        Q.    And -- or the other way around, right, you

17   just don't know?

18        A.    Correct.

19        Q.    And you didn't do anything yourself to

20   reach out to any of the individuals that were part of the

21   Tordoff study that -- that had left the study or weren't

22   reporting back to determine what their -- their results

23   were, did you?

24        A.    Correct.

25        Q.    And I assume you would agree with me that

1    medical professionals are in a better position to

2    ascertain and weigh the reliability of studies and

3    research in the area of gender dysphoria, correct, sir?

4           A.    Correct.

5           Q.    And you are not suggesting to this Court

6    that as between yourself and a medical director, that you

7    are in a better position to evaluate research than they

8    would be, right?

9           A.    I think one's ability to evaluate should be

10   based on, you know, one's publications, for example.

11          Q.    Okay.  And in the committee meeting, the

12   Health and Human Services committee meeting, you said you

13   have published original research of your own, do you

14   recall making that statement?

15          A.    Yes.

16          Q.    Is that the research that we discussed

17   earlier with regard to suicidality and bone density?

18          A.    Yes.

19          Q.    Is there anything else?

20          A.    No.

21          Q.    That you were referring to?

22          A.    No.

23          Q.    What statistical methodology did you employ

24   in your -- your analysis of suicidality?

25          A.    Calculating a -- calculating a rate.  So

1  you have a denominator and numerator.  The denominator is

2  the number of deaths and the -- sorry, the numerator is

3  the number of deaths and the denominator is the number of

4  years -- individual years at risk.

5          Q.    So simple math, right?

6          A.    Yes.

7          Q.    But -- but what you also testified and --

8  and extrapolated that somehow this suicide rate, as

9  compared to healthy teenagers, was greater than 1

10 percent, correct?

11         A.    I don't recognize what you are saying in

12 the question.

13         Q.    Okay.  You don't recall saying that in your

14 report and at the -- at the Health and Human Services

15 meeting?

16         A.    I believe what I said was that the suicide

17 rate of the -- of clinic referred adolescence to the

18 Tavistock was, by my best estimate, about five or six

19 times higher than comparable in the overall population.

20         Q.    Well, let's just make sure we're talking

21 about the same thing so that there is no confusion.  So

22 I'm looking at page 5 and 6 of your report.  And, again,

23 you were referring to the teenager that died of

24 fasciitis, correct?

25         A.    Can I -- I'm just consulting my -- can I --

1          Q.    Well, I'm going to read you the relevant

2     portion but feel free to pick up your report or we can

3     pull it up on the screen.  But I'm at the bottom of page

4     5 --

5               MR. BEATO:  Would it be best to pull it up

6          on the screen, just so everyone is reading the

7          same thing?

8               MS. ALTMAN:  Yes.  I'm going to wake Ana

9          up.

10              Ana, if you can go to page 5 of the report,

11         Exhibit 2, that would be --

12              MS. GONZALEZ:  I'm here.  Let me just share

13         the screen again and I'll take you to it.

14              MS. ALTMAN:  Bottom of page 5.

15              MS. GONZALEZ:  Okay.  I'm there.

16    BY MS. ALTMAN:

17         Q.    Okay, sir, do you see at the bottom of

18    page 5?

19         A.    Yes.

20         Q.    And if we can go on to page 6.  There you

21    go, top of page 6.  Did I not read that correctly?  "In a

22    cohort of healthy teenagers, a death rate exceeding 1

23    percent is alarming."

24         A.    Yes.

25         Q.    Do you see that now?

Page 84

1          A.    Yes, yes.

2          Q.    Okay.  And so you referred in your -- in

3    your statistical methodology, you compared the death rate

4    to a cohort of healthy teenagers; isn't that right?

5          A.    I'm sorry, when I was -- when I was

6    replying earlier, I thought you were talking about

7    my suicide -- the study of suicide at Tavistock.

8          Q.    Oh, okay.  So now that we're -- again,

9    that's why we pulled it up, to make sure we're on the

10   same page.  Do you see your opinion in this case?

11         A.    Yes, yes.

12         Q.    Okay.  And here you say, "In a cohort of

13   healthy teenagers, a death rate exceeding 1 percent is

14   alarming."

15         A.    Yes.

16         Q.    I read that right?

17         A.    Correct.

18         Q.    Okay.  And so you would agree with me that

19   individuals suffering from gender dysphoria are not

20   necessarily healthy teenagers, are they?

21         A.    They are physically -- often physically

22   healthy.

23         Q.    Do you know, sir?  Did you do any analysis

24   to determine whether or not the death rate, using the

25   example that you gave, which we'll go into why I don't

Page 85

1  agree with it, but did you do any analysis to determine

2  what the death rate of those suffering from gender

3  dysphoria is?

4        A.    We do -- the Amsterdam gender clinic does

5  have a very good -- does actually keep extremely good

6  records of the number of patients it sees and their death

7  rate.  And that's -- the death rate is certainly much

8  lower than 1 percent, normally, of its -- of its clinical

9  referred patients.

10        Q.    Well, what is it?

11        A.    I don't have the figures at hand.

12        Q.    Okay.  So as you sit here today, you don't

13  know what the death rate is of those that suffer with

14  gender dysphoria, correct?

15        A.    Correct.

16        Q.    And, sir, with regard to this 1 percent

17  that you calculated as some reliable measure of the death

18  rate, you are basing it on one patient who died from a

19  failed surgical proceeding; isn't that right?

20        A.    Correct.

21        Q.    They didn't die from puberty blockers, from

22  the administration of puberty blockers, did they?

23        A.    The administration of puberty blockers

24  increased the risk of dying in surgery because of the

25  effect of -- on -- of the vagio- -- the --

Page 86

1          Q.    I -- and I heard when you said that before,

2    sir.  But you would agree with me that giving puberty

3    blockers did not cause this individual to die.  They had

4    a failed result from a surgical procedure; isn't that

5    right?

6          A.    Correct.

7          Q.    And giving cross-sex hormones was not the

8    cause of death of this individual, correct?

9          A.    Correct.

10         Q.    And so you would agree with me, sir, that

11   your statement in your report is grossly misleading to

12   suggest to this Court that there is a 1 percent death

13   rate in this particular study because an individual died

14   from a surgical complication; isn't that right?

15              MR. BEATO:  Object to form.

16              But, Dr. Biggs, you can answer that.

17              THE WITNESS:  I disagree with that

18              characterization.  70 -- there were 70 patients in

19              the study and one died.  So that's a death rate

20              exceeding -- in that study, a death rate exceeding

21              1 percent.

22   BY MS. ALTMAN:

23         Q.    And that's -- that's the sole basis for

24   your opinion that the -- that it's an exceedingly high

25   death rate?

Page 87

1              A.     In that study, yes.

2              Q.     Yeah.  And in that study, sir, that study

3    wasn't designed to analyze the efficacy or return rate of

4    surgical procedures, was it?

5              A.     It was designed to look at the Dutch

6    Protocol, which was three -- which had three components;

7    puberty blockers, cross-sex hormones, and then surgeries

8    up to 18.

9              Q.     Okay.  And so it's your -- it's your

10   position, based upon your statistical analysis of

11   dividing the numerator and the denominator, that -- that

12   the death rate is greater than 1 percent, correct?

13             A.     In that study, yes.  I'm not claiming that

14   that is extrapolating that -- other situations or

15   other -- other groups of patients.

16             Q.     Okay.  But that -- your report doesn't say

17   that, does it?

18             A.     It is implied by the -- the wording of

19   the -- of that sentence.

20             Q.     No, sir.  What -- what your sentence says,

21   "In a cohort of healthy teenagers, a death rate exceeding

22   1 percent is alarming."  Isn't that what your sentence

23   says in your report?

24             A.     Yes, but it is clearly based on a

25   discussion of those 70 -- of those 70 patients.

1      Q.    But those 70 patients were not healthy

2  teenagers.  They were those that suffered from gender

3  dysphoria; isn't that correct?

4      A.    Yes, but they're physically health -- they

5  were physically healthy.

6      Q.    How do you know that, sir, what did you

7  look at in order to make this statement you just made?

8      A.    There was no -- they would not have been

9  given gonadotropin-releasing hormone agonist if they --

10  if they were not physically healthy.

11      Q.    Have you done any research or analysis to

12  determine whether or not this statement you just made on

13  the record under oath is accurate?

14      A.    That is based on my reading of the 2011 and

15  2014 articles by de Vries, et al.

16      Q.    Okay.  So other than reading those two

17  articles, my question is, have you done any study or

18  analysis to determine whether or not any of the

19  individuals in that 70-person study suffered from

20  comorbidity?

21      A.    No.

22      Q.    Have you done any analysis whatsoever in

23  either of those studies to determine whether or not any

24  of those individuals had -- had other health issues or

25  concerns?

1          A.     No.

2          Q.     Sir, if there are 70 people in a study

3    about puberty blockers and one dies in a car accident,

4    does that mean the death rate as a result of the puberty

5    blockers is greater than 1 percent?

6          A.     No.

7          Q.     And just to -- to make sure I -- I put a

8    pin -- a fine pin in this, in your report, what your

9    statement is, is unrelated really to the 70-person study

10   because you make a blanket general statement that "in a

11   cohort of healthy teenagers, a death rate exceeding 1

12   percent is alarming," did I read that statement -- that

13   sentence correctly?

14         A.     Yes, you read that sentence correctly, yes.

15         Q.     Now, sir, with regard to puberty blockers,

16   what specific studies or analysis have you personally

17   performed or participated in performing?

18         A.     May we have the full screen again, if we're

19   finished with that expert -- or do you want to keep it?

20         Q.     You mean you would like to take away the

21   expert report?

22         A.     No, just -- I mean, it just -- just it

23   might be easier just so I can see.

24         Q.     Sure, sure, sure.  I just want to make sure

25   I understood your request.

1           A.    So --
2           Q.    And, actually, before you answer that
3    question, I have a different question for you.
4                 Do you have anything other than our names
5    and our pictures up on your screen in front of you?
6           A.    No.
7           Q.    Are you reading from any e-mails?
8           A.    No.
9           Q.    Are you reading from any texts?
10          A.    No.
11          Q.    Are you receiving, reviewing, or reading
12   any e-mails, texts, or other information about your
13   testimony in this case today?
14          A.    Absolutely not.
15          Q.    Okay.  Excellent.  So do you have any
16   materials in front of you?
17          A.    Yes, I have the printed-out deposition --
18   or sorry, the report, report, expert report.
19          Q.    No worries.  Anything else?
20          A.    No.
21          Q.    Anything else up on your screen?
22          A.    No.
23          Q.    Okay.  So now I go back to my question.
24   With regard to puberty blockers, what specific studies or
25   analysis have you personally performed or participated in

Page 91

1    performing?

2           A.    I have not personally performed any studies

3    on -- on puberty blockers.

4           Q.    Have you participated in performing any

5    studies on puberty blockers?

6           A.    No.

7           Q.    Now, sir, I did listen to your testimony

8    before the Health and Human Services committee, and one

9    of the things you said during that committee meeting is

10   that puberty-blocking drugs perform, and I quote,

11   "chemical castration," do you recall that testimony?

12          A.    Yes.

13          Q.    And is that an opinion that you are

14   rendering in this case, that puberty blockers perform

15   chemical castration?

16          A.    Well, if they block the -- the production

17   of sex hormones.

18          Q.    Well, you didn't say that, sir, you said

19   chemical castration.

20          A.    Correct.

21          Q.    You would agree with me those are two

22   different things.  One sounds pretty ominous, right?

23               MR. BEATO:  Object to form.

24               But, Dr. Biggs, you can answer that.

25               THE WITNESS:  Yes, castration is -- does

Page 92

1          sound ominous, yes.

2     BY MS. ALTMAN:

3          Q.    Correct.  But you chose to use those words

4     in the Health and Human Services committee meeting,

5     right, "chemical castration"?

6          A.    Yes.

7          Q.    Because you wanted to send a particular

8     message, right?

9          A.    Correct.

10          Q.    You could have said they blocked the

11     production of sex hormones, right?

12          A.    Correct.

13          Q.    And you could have also said that once you

14     stop taking puberty blockers, the production of sex

15     hormones reignites, correct?

16          A.    Yes.

17          Q.    But you didn't do that, did you, sir?

18          A.    No.

19          Q.    Why?

20          A.    Because in 93 or 95 or 98 percent of cases,

21     the child will continue on to cross-sex hormones.

22     It's -- it's very unusual for a child to stop taking

23     hormone agonists.

24          Q.    But, sir, the puberty blockers does not, in

25     fact, create or -- or result in chemical castration;

Page 93

1    isn't that correct?

2          A.    Correct.

3          Q.    But that's not what you said to the Health

4    and Human Services committee, right?  I assure you, I've

5    listened to your testimony.

6          A.    Correct.

7          Q.    You said that puberty blockers performed

8    chemical castration.  That's not correct, is it, sir?

9          A.    Well, that is the terminology that is used

10   when the drugs are used for, let's say, people -- a man

11   with severe sexual disorders.

12         Q.    But we're not talking about that, sir, and

13   you weren't talking about that before the Health and

14   Human Services committee, were you, about a pedophile,

15   right?

16         A.    That's the same drugs, it's the same drugs

17   being used in the same dose.

18         Q.    Sir, do -- are puberty blocker -- puberty

19   blockers used for gender dysphoria in perpetuity?

20         A.    Not normally, no.

21         Q.    Okay.  So we're not talking about the same

22   thing, are we, sir?

23         A.    They are also not used in perpetuity

24   necessarily for -- for men with severe sexual deviation.

25         Q.    Sir, why did you not tell the Health and

```
 1    Human Services committee that puberty blockers merely
 2    block the production of sex hormones until you stop using
 3    them?
 4            A.    Because I wanted to draw the parallel with
 5    their use in -- in prisons and mental institutions.
 6            Q.    Is that where you believe people with
 7    gender -- gender dysphoria belong, in prisons and mental
 8    institutions?
 9                  MR. BEATO:  Object to form.
10                  Dr. Biggs, you can answer that.
11                  THE WITNESS:  No.
12    BY MS. ALTMAN:
13            Q.    Then why would you draw that parallel?
14            A.    I draw that parallel because the same drugs
15    are being used in -- to -- to chemically castrate sex
16    offenders as a -- used for gender dysphoric youth.
17            Q.    And they are also used for precocious
18    puberty, right?
19            A.    Yes.
20            Q.    And they are also used for endometriosis,
21    correct?
22            A.    Correct.
23            Q.    Well, why didn't you draw one of those
24    parallels?
25            A.    Because for endometriosis, for example,
```

1    they would be used for a much shorter period of time than

2    they are used for -- for gender dysphoric youths --

3    youth.

4           Q.    What about for puberty -- for precocious

5    puberty, sir, they can be used for years in precocious

6    puberty?

7           A.    Precocious puberty means -- use of -- the

8    use for precocious puberty means blocking an abnormally

9    early puberty in order to allow natural puberty to

10   commence at the -- at the sort of more appropriate time,

11   which is very different from stopping natural puberty

12   altogether.

13          Q.    Sir, the reason you chose to use the words

14   "chemical castration" was because you wanted the

15   committee in that particular case to see puberty blockers

16   utilized in some way as -- as a lethal medication rather

17   than its actual use in treatment of gender dysphoria;

18   isn't that right?

19          A.    No, I disagree that -- that the -- that

20   puberty blockers are ever a lethal -- a lethal

21   medication.  I mean, that's -- that's not how I would

22   cast -- how I would characterize puberty blockers, as

23   lethal.

24          Q.    Really?  Well, then I'm sorry.  Then I

25   guess we can go back to your greater percent -- greater

1   than 1 percent death rate a few minutes ago when you

2   attributed this one death to puberty blockers.

3               So which one is it, is it lethal or is it

4   not lethal?

5         A.    Lethal suggests that it has a very, very

6   high rate of -- of -- of death or, indeed, inevitably

7   causes death.  That is not my -- that has never -- not

8   and never been my -- my -- my position.

9         Q.    It hasn't.  Even when you said in your

10  report "in a cohort of healthy teenagers, a death rate

11  exceeding 1 percent is alarming"?

12        A.    Alarming, yes.

13        Q.    Alarming, okay.  So -- so back to your --

14  your testimony.  What do you mean by the terminology that

15  you use, chemical castration?  What did you mean by that

16  when you said that to the committee?

17        A.    I wanted to draw the parallel between the

18  use of the same -- the same drug in the same dose to

19  children who are suffering from gender dysphoria to the

20  use of men with severe sexual deviation.

21        Q.    Do you think people who suffer from gender

22  dysphoria have -- are sexual deviants?

23        A.    Absolutely not.

24        Q.    Do you believe people who are transgender

25  are sexual deviants?

1          A.    Absolutely not.

2          Q.    But yet you chose to make that parallel

3    before the Health and Human Services committee, right?

4          A.    Correct.  The parallel is saying that maybe

5    we should take -- think twice before providing the same

6    sort of drugs that -- with those effects to young

7    children as we do to men with sexual deviation.

8          Q.    Uh-huh.  And the people that should think

9    twice, though, are those people that are qualified to

10   render medical opinions, right?

11         A.    I think everybody should think twice about

12   it.

13         Q.    Uh-huh.  Other than what you've testified

14   on the record and what's contained in your report, what

15   is the specific bases for your testimony that providing

16   puberty blockers is equivalent to chemical castration?

17         A.    It's my review -- review -- reading of the

18   two articles -- or three articles reviewing the use of

19   gonadotropin-releasing hormone agonist for sex offenders

20   or for men with -- with severe deviation.  One of the

21   articles is Dutch, one of them is American, and one is

22   English.

23         Q.    Anything else?

24         A.    No.

25         Q.    As a sociologist, sir, what qualifications

1    do you have to make such a statement?

2          A.    I read the -- I read those articles and I

3    looked at the -- the drugs that were being used and the

4    dose that they were being used, and I compared those to

5    the -- to the literature on gender dysphoria.

6          Q.    And any other basis, sir, on which you

7    believe you are qualified to make such a statement?

8          A.    No.

9          Q.    What studies have you performed on this

10   issue other than reading other people's research on the

11   subject?

12         A.    None.

13         Q.    Now, sir, you would agree with me that GnRH

14   merely suppresses certain hormones while the person is

15   taking the medication; and that once they stop the

16   medication, they typically begin producing the hormones

17   that were suppressed, correct?

18         A.    Correct.

19         Q.    And you are not rendering an opinion in

20   this case to the contrary, are you?

21         A.    No.

22         Q.    And you are not offering an opinion on the

23   medical efficacy of puberty blockers for those with

24   gender dysphoria, are you?

25         A.    I'm not sure I understand the question.

Page 99

1        Q.    I'm happy to rephrase it.  Are you offering

2   any opinions in this case on the medical efficacy of

3   gender-affirming care?

4        A.    I'm offering opinions on -- on puberty

5   blockers, yes.

6        Q.    Okay.  And, specifically, other than what

7   you've testified on the record, do you have any other

8   opinions about puberty blockers other than what you've

9   already testified on the record?

10       A.    No.

11       Q.    And you are not qualified, sir, to render

12   any opinion on whether or not there are any medical side

13   effects to puberty blockers, are you?

14       A.    No.

15       Q.    And as you sit here today, you have no

16   medical training or experience that would qualify you to

17   render any such opinions; isn't that right?

18       A.    Correct.

19       Q.    Now, you would agree with me, and I believe

20   you've already acknowledged, that puberty suppressors are

21   prescribed to children with precocious puberty, right?

22       A.    Yes.

23       Q.    Precocious puberty occurs in children,

24   correct?

25       A.    Yes.

1          Q.     Sometimes as young as 5, I believe,
2     according to your own testimony, correct?
3          A.     Yes.
4          Q.     And for how many years might those children
5     take puberty blockers?
6          A.     I believe up until the age of around 9.
7          Q.     So it could be as much as four or five
8     years, correct?
9          A.     Correct.
10          Q.     And you would agree that that's a standard
11     protocol for precocious puberty if in a five-year-old,
12     might be to give them puberty blockers, correct?
13          A.     Yes -- yes.
14          Q.     And you agree that when a child stops
15     taking the puberty blockers, he or she should begin
16     normal puberty as usual, correct?
17          A.     Yes.
18          Q.     I would assume, sir, since you are not a
19     doctor or a pharmacist, you've never prescribed
20     puberty -- puberty suppressors for children experiencing
21     precocious puberty, have you?
22          A.     Correct.
23          Q.     And you are unqualified to do so, correct?
24          A.     Correct.
25          Q.     Have you performed any research in the area

Page 101

1    of providing puberty suppressors to children with

2    precocious puberty?

3            A.    No.

4            Q.    You seem to be very interested in the

5    provision of puberty suppressors to children.  Why have

6    you not engaged in any research of providing children

7    with precocious puberty -- puberty suppressors?

8            A.    Well, that's not -- just not a topic that

9    I've investigated, except insofar as it pertains to

10   gender dysphoria.

11           Q.    Well, it's the same thing, right, it's

12   providing puberty blockers to children, right?  Different

13   diagnoses but both to children, correct?

14           A.    At a different -- at a different age as

15   well.

16           Q.    One, generally teenagers, one younger,

17   correct?

18           A.    Precocious puberty, let's say, a child may

19   start puberty at 5 and they would be stopped until 8 or

20   9, and then they would allow their normal puberty to

21   continue to -- to emerge.

22                 Whereas for gender dysphoria, you are

23   stopping and you will not -- typically, in 93 and 95 and

24   98 percent of cases, you will -- the child will never

25   experience puberty.

1          Q.    Well, sir, you would agree with me that --

2    that it would be up to the minor, their parents, and

3    their medical professionals whether or not they would go

4    on to take cross-sex hormones; isn't that right?

5          A.    Correct.

6          Q.    It's not up to you to decide that, is it?

7          A.    Certainly not up to me, correct.

8          Q.    Okay.  And you would agree with me that --

9    that the child, the parent, and the medical professional

10   is in the best position to make those determinations,

11   correct?

12         A.    Well, it would have to be based on the

13   evidence, right.

14         Q.    But -- but not you, right?

15         A.    Not me personally but on the -- on the

16   evidence.

17         Q.    Right.  And it's not your testimony, as --

18   as you are providing to the Court, that the medical

19   professionals that are treating these individuals aren't

20   as facile with the medical literature as you are?

21              MR. BEATO:  Object to form.

22   BY MS. ALTMAN:

23         Q.    That's all right.  It was a bad question,

24   I'm going to withdraw it.

25              Sir, it is not your testimony or your

Page 103

```
1    opinion in this case that medical professionals -- well,
2    strike that.
3                It is not your testimony, sir, that you are
4    the only individual that's reviewing medical literature
5    with regard to the treatment of gender dysphoria and
6    puberty blockers, is it?
7          A.    No; that's correct.
8          Q.    You would agree with me that other
9    individuals, even myself, could read the same literature
10   that you are reading and draw conclusions from it,
11   correct?
12         A.    Correct.
13         Q.    And -- and, in fact, they might draw
14   different conclusions than you, correct?
15         A.    Yes.
16         Q.    Have you ever provided an opinion that
17   giving GnRH to children for precocious puberty will
18   impact their -- impact their brain development?
19         A.    No.
20         Q.    Have you ever provided an opinion that
21   giving GnRH to children for precocious puberty will
22   impact their bone density?
23         A.    No.
24         Q.    Have you ever provided an opinion that
25   giving GnRH to children for precocious puberty is a -- is
```

1  equivalent to the chemical castration?

2          A.    No.

3          Q.    But these are all opinions that -- that

4  you've rendered in this case when that same drug is given

5  for gender dysphoria, correct?

6          A.    Correct.

7          Q.    You believe providing puberty blockers for

8  precocious puberty will impact a child's mental health?

9          A.    I have no opinion on that.

10          Q.    Have you -- have you performed any

11  independent research whatsoever with regard to providing

12  puberty blockers to children with precocious puberty?

13          A.    No.

14          Q.    Do you believe that providing puberty

15  blockers to children for precocious puberty will impact a

16  young child's sexual function?

17          A.    I have no opinions on that.

18          Q.    But you do have an opinion on it when it

19  comes to providing that same drug for those with gender

20  dysphoria, right?

21          A.    Yes.

22          Q.    And those opinions are encapsulated in your

23  report in this case, correct?

24          A.    Correct.

25          Q.    Are you qualified to determine when a child

1  has precocious puberty?

2          A.     No.

3          Q.     Would you agree with me or do you agree

4  with me that you are not qualified to opine on the

5  physiological differences in administering GnRH to a

6  five-year-old with precocious puberty versus a

7  13-year-old who is evidencing gender dysphoria, correct,

8  sir?

9          A.     Correct.

10         Q.     Who diagnoses precocious puberty?

11         A.     An endocrinologist.

12         Q.     Who diagnoses gender dysphoria?

13         A.     It would usually be a psychologist.

14         Q.     You would agree with me that in neither

15  case it is a sociologist, right?

16         A.     Correct.

17         Q.     Who determines the course of treatment for

18  a child with precocious puberty?

19         A.     An endocrine -- endocrinologist.

20         Q.     Who determines the course of treatment for

21  a child with gender dysphoria?

22         A.     It would be a psychologist, perhaps with a

23  endocrinologist as well.

24         Q.     You would agree with me it is not a

25  sociologist, correct?

1        A.    Correct.

2        Q.    In your testimony, you told the Health and

3   Human Services committee that taking GnRH decreases bone

4   density, right?

5        A.    Yes.

6        Q.    But, sir, you are not qualified to render

7   an opinion on the medical impact of using puberty

8   blockers with regards to bone density; as you've already

9   testified, all you've done is read other people's

10  research, correct?

11       A.    No.   I've conducted my own statistical

12  analysis of the bone density that was produced by data

13  from the -- from the Tavistock.

14       Q.    And that's what we talked about earlier,

15  right, those were other people's scans and analysis, and

16  then you just relied on that, correct, you didn't do the

17  scans yourself?

18       A.    I did not do the scans myself.

19       Q.    Right.  So you are relying upon, you know,

20  the -- the quality of somebody else's work, correct?

21       A.    Correct.

22       Q.    Good or bad?

23       A.    Correct.

24       Q.    What education, skill, or training do you

25  have that would enable you to provide opinions on the

Page 107

1    medical consequences of using puberty blockers?

2         A.    Well, I have a Ph.D. in -- from Harvard

3    for -- which gives me an ability to look at quantitative

4    research and to analysis literature.

5         Q.    And your Ph.D., sir, was not in anything

6    related to the treatment of gender dysphoria, correct?

7         A.    Correct.

8         Q.    And it wasn't anything related to the use

9    of puberty blockers, was it?

10        A.    Correct.

11        Q.    And, sir, you would agree with me that if

12   there were any side effects from taking puberty blockers,

13   they would be the same whether someone takes it for

14   precocious puberty or gender dysphoria, correct?

15        A.    Well, that would depend on what age they

16   took it and for how long.

17        Q.    Okay.  But you would agree with me,

18   depending upon what age they are and how long they took

19   it, the side effects could be the same, correct?

20        A.    Yes.

21        Q.    Have you ever advocated that puberty

22   blockers not be given to children for precocious puberty?

23        A.    No.

24        Q.    And you are not suggesting to this Court

25   that it has an impact on bone density only when it is

Page 108

1   given for gender dysphoria, are you?

2        A.    No.

3        Q.    Could have an impact in precocious puberty,

4   right?

5        A.    It could, yes.  That's not my --

6        Q.    And -- and it would be up to medical

7   professionals -- not yourself as a sociologist -- if

8   giving puberty blockers, to monitor the patient to whom

9   they are given, correct?

10       A.    Correct.

11       Q.    And they would do testing, correct?

12       A.    Correct.

13       Q.    And if they saw issues, vis-à-vis decreases

14   in bone density, they could take medical intervention as

15   a result of that, correct?

16       A.    Yes.

17       Q.    And that's true whether they were given for

18   precocious puberty or gender dysphoria, correct?

19       A.    Yes.  But the -- the crucial difference is

20   the age at which you are doing -- doing the intervention.

21       Q.    Because you believe that at -- at a -- at

22   an older age, the level of hormones increase -- the

23   increase in hormones has a greater impact on bone

24   density, is that your position?

25       A.    Bone density is laid down in adolescence,

1   yes.  So that's the -- that's the most important time in

2   which you are laying down the -- the bone density for

3   which you are using -- you are -- for life -- you know,

4   you are then using it for the rest -- for the rest of

5   your life.

6          Q.    And you would agree with me, sir, that

7   those that are prescribing puberty blockers for those

8   with gender dysphoria during adolescence have the ability

9   to monitor those patients, correct?

10          A.    They do have the ability to monitor the

11   patients, yes.

12          Q.    And they have the ability to utilize

13   medical intervention if they see decreases or impact on

14   bone density, correct?

15          A.    I don't know that there is any medical

16   intervention for decreases in bone density.  The only --

17   they are recommending taking vitamin D and more

18   weightbearing exercise.  I suppose vitamin D is medical

19   intervention.

20          Q.    Well, you just named two of them right

21   there, right?

22          A.    Yes.

23          Q.    Okay.  And there might be others.  You

24   don't know because you are not a medical doctor, correct?

25          A.    Correct.

Page 110

1        Q.    Now, in your testimony before the

2   committee, you referenced -- and I believe this is also

3   in your report -- one individual who had -- at 15 had

4   osteoporosis, do you recall that?

5        A.    Yes.

6        Q.    Did you review that individual's medical

7   records to determine the origin or diagnosis of that

8   person's osteoporosis?

9        A.    No.

10        Q.    You would agree with me that -- that many

11   teenagers who are not -- do not suffer from gender

12   dysphoria and don't take puberty blockers can have

13   osteoporosis, correct?

14        A.    Yes.

15        Q.    And yet you chose to suggest to the Health

16   and Human Services committee that this one individual,

17   because they had osteoporosis, it was in some way related

18   to puberty blockers, even though you had absolutely no

19   basis to make that statement; isn't that correct?

20              MR. BEATO:  Object to form.

21              Dr. Biggs, you can answer that question.

22              THE WITNESS:  Are we -- are you referring

23          to the English child that I mentioned or the

24          Swedish child?

25   BY MS. ALTMAN:

Page 111

1          Q.    The 15-year-old child.  I don't have -- I

2    can pull up your audio from the Health and Human

3    Services.  I honestly don't remember if she was Swedish

4    or English.  But regardless, you didn't do any

5    investigation whatsoever to determine whether or not

6    there was a pre-existing condition or reason for the

7    osteoporosis; isn't that right?

8          A.    The Swedish clinicians were so concerned

9    about this case that it changed their policy on giving

10   puberty blockers.  So the Swedish had made that

11   determination.

12         Q.    Did you understand my question?

13         A.    Yes.

14         Q.    Did you understand my question?

15         A.    Yes.

16         Q.    Do you need me to ask it again?

17         A.    Sure.

18         Q.    Okay.  My question is, you didn't do any

19   independent research or analysis to determine whether or

20   not the 15-year-old that you referenced in your testimony

21   before the Health and Human Services committee had any

22   pre-existing condition or other reason that she suffered

23   from osteoporosis; isn't that right?

24         A.    I did not, no.  I was repeating what the

25   Swedish clinicians had found.

Page 112

```
 1          Q.    Right.  You were repeating somebody else's
 2     research, correct?
 3          A.    Yes.
 4          Q.    Okay.  And you didn't do any independent
 5     study or analysis to determine whether or not that
 6     particular individual that you represented to the Health
 7     and Human Services committee in a way as to suggest that
 8     the osteoporosis was derived from giving the puberty
 9     blockers.  You did not do any independent analysis to
10     determine whether that's correct; isn't that right?
11          A.    Yes.
12                MR. BEATO:  Object to form.
13                But, Dr. Biggs, you can answer the
14          question.
15     BY MS. ALTMAN:
16          Q.    I think he said I was right, correct?
17          A.    Yes.
18          Q.    As you sit here today, you don't have any
19     basis to testify under oath that the individual you noted
20     to the committee was diagnosed with osteoporosis because
21     of receiving puberty blockers; isn't that true?
22          A.    I was reporting what the Swedish -- the
23     Swedish doctors had found.
24          Q.    Right.  And so what I said was true,
25     correct, you have no basis under which to testify to this
```

Page 113

1   Court or to have testified before the committee under

2   oath that the individual you noted was diagnosed with

3   osteoporosis as a result of receiving puberty blockers,

4   correct?

5           A.    No, I disagree with that characterization.

6   I did have a basis for my statement.  The statement --

7   the basis was based on the -- the conclusions drawn from

8   the -- by the Swedish clinicians.

9           Q.    And you don't know, as you sit here today,

10  whether or not anyone, whether it is in the Swedish

11  clinicians or the English ones, whether or not they did

12  any independent analysis to determine whether or not the

13  15-year-old's osteoporosis was caused from factors other

14  than or in addition to puberty blockers; isn't that

15  correct?

16          A.    Yes.

17          Q.    And, sir, even though -- well, strike that.

18                You would agree with me that there is no

19  consensus on any long-term impact on bone density with

20  regards to the use of GnRH alone or with cross-sex

21  hormones; isn't that correct?

22          A.    No, there is a consensus.

23          Q.    Of the long-term impact?  What is the

24  consensus, sir, in your opinion?

25          A.    Well, the consensus is that puberty

Page 114

1    blockers will reduce bone density or bone density will

2    not accrue as fast as it should, so it will reduce

3    relative to the age and sex.  And then in some cases it

4    will increase again with cross-sex hormones.  But it will

5    not increase -- it will remain below the level relative

6    to age and sex than it was at the commencement.

7         Q.    Okay.  And other than what you just said,

8    do you have any other opinions on that subject?

9         A.    No.

10        Q.    And so if I understood you correctly, you

11   agree with me that providing cross-sex hormones, at that

12   point an individual's bone density would accrete, perhaps

13   not at the same level, but would continue to accrete

14   while they are taking cross-sex hormones, correct?

15        A.    Yes, but they do not reach the level at

16   which they -- they remain below where they were in terms

17   of relevant to age and sex.

18        Q.    Okay.  And you don't know -- as you sit

19   here today, you have no ability to opine or provide an

20   opinion on whether or not that will have any long-term

21   detrimental impact on any individual's life, correct?

22        A.    Well, we know that the lower your Z-score,

23   typically below 2.5, the more likely you are to have

24   osteoporosis in later life.

25        Q.    And as you sit here today, sir, you can't

Page 115

1   testify or provide an opinion on how many individuals who

2   took puberty blockers and then cross-sex hormones will

3   suffer with osteoporosis later in life, correct?

4           A.      Correct.

5           Q.      You have no basis to provide an opinion in

6   this court on that subject, correct?

7           A.      Well, this is -- if we know that people

8   that -- that have a Z-score minus 2.5 are very high --

9   are very likely to have a very high risk of osteoporosis

10  than -- in -- later in life, then we know that if we have

11  a group of people with a large number below minus 2.5,

12  then the risk of them developing osteoporosis later in

13  life is elevated.

14          Q.      Okay.  And my question is, as you sit here

15  today, do you know how many people with a Z of less than

16  minus 2.5, who took puberty blockers and cross-sex

17  hormones, suffer from osteoporosis?

18          A.      No, there is no published study on that.

19          Q.      Okay.  Have you taken any steps to conduct

20  a published -- conduct and then publish a study on that?

21          A.      No.

22          Q.      But it sounds like it is something

23  important to you, correct?

24          A.      Yes, yes.

25          Q.      And you are espousing that concern in the

Page 116

1    Health and Human Services committee and in your report in

2    this case, correct?

3         A.    Yes.

4         Q.    Well, sir, what have you done to study it?

5         A.    I don't have access to the patients to

6    study it.  But I believe that that's an -- that is an

7    urgent thing for, for example, the Tavistock gender

8    clinic to have -- to study.

9         Q.    Okay.  And what have you done to try and

10   create interest in studying this issue?

11        A.    Publishing a letter to the editor in the

12   journal of pediatric and endocrinology and metabolism

13   showing that the -- that the initial results of puberty

14   suppression after two years are very -- unusually high

15   number of children have low bone density.

16        Q.    And anything else that you've done other

17   than publish your letter to the editor?

18        A.    That's the main thing I've done, yes.

19        Q.    And you haven't independently studied this,

20   correct?

21        A.    Correct.

22        Q.    Sir, you would agree with me that it is a

23   medical doctor, not a sociologist, who determines whether

24   or not GnRH should be used with a patient, correct?

25        A.    For an individual patient, yes.

1          Q.    Sir, what is the basis of your statement

2     that you made at the Health and Human Services committee,

3     what is the scientific basis for the statement that the

4     purpose of treating someone with puberty suppressors who

5     has been diagnosed with gender dysphoria is, and I quote,

6     "to begin taking cross-sex hormones for the rest of their

7     lives."

8               What is the scientific basis for that

9     statement that you made to the committee?

10         A.    Because that is the explicit stages of

11    the -- in the Dutch protocol.  First stage is puberty

12    suppression, second stage is cross-sex hormones, and the

13    third stage is surgery.

14         Q.    Well, sir, that's not the statement you

15    made.  And I just want to make sure we unpack it.  You

16    told the committee that the purpose of someone taking

17    puberty suppressors for gender dysphoria is to begin

18    taking cross-sex hormones for the rest of their lives.

19    What is your scientific basis for that statement?

20         A.    This is the rationale that was advocated by

21    the Dutch clinicians, like Peggy Cohen-Kettenis and

22    Gooren and Henrietta Delemarre-van de Waal -- quite a

23    mouthful -- of why puberty blockers were -- why they

24    advocated for puberty blockers.

25         Q.    But I didn't ask what their scientific

1  basis is.  I asked what yours was.  What is your

2  scientific basis for making that statement to the Health

3  and Human Services committee?

4          A.    Reading the explicit statements by the

5  advocates for puberty blockers.

6          Q.    The Dutch Protocol?

7          A.    Yes.

8          Q.    And that was how long ago?

9          A.    Well, the -- that was in -- well, that --

10  published many things from the 1990s to -- down to today.

11          Q.    Okay.  And -- but your specific rationale

12  for that statement was the Dutch Protocol, correct?

13          A.    Yes.

14          Q.    Okay.  And that's one study, correct?

15          A.    The Dutch Protocol is a generic term to

16  describe the use of puberty -- early puberty suppression

17  followed by cross-sex hormones.

18          Q.    Right.  And you --

19          A.    When it was adopted in America, it was

20  known as the Dutch Protocol.  When it was adopted in

21  Britain, it was known as the Dutch Protocol.  That's the

22  generic name for it.

23          Q.    I got that.  And so my question, though,

24  sir, is a little more nuance.  And that is, you made a

25  statement that the purpose of taking puberty suppressors

Page 119

1    in those -- in those diagnosed with gender dysphoria, is

2    to begin taking cross-sex hormones for the rest of their

3    lives.  That's what you said.

4              And, sir, you would not be in a position to

5    determine for any specific patient on any specific day in

6    any -- with any specific doctor what the purpose that

7    they were prescribed puberty suppressors was; isn't that

8    right?

9              MR. BEATO:  Object to form.

10             But, Dr. Briggs, you can answer that.

11   BY MS. ALTMAN:

12        Q.   Do you understand the question?

13        A.   Yes, but the -- the rationale of this is to

14   enable the individual to pass better to prevent the

15   development of secondary sex characteristics.  So --

16        Q.   Sir, you don't know what anyone's

17   individual purpose is in taking puberty suppressors;

18   isn't that right?  That's between an individual, their

19   family, if they are a minor, and their physician; isn't

20   that correct?  You can't jump into the mind of any

21   particular person and determine what their purpose for

22   taking puberty blockers is; isn't that right?

23             MR. BEATO:  Object to form.

24             Dr. Biggs, you can answer that question.

25             THE WITNESS:  I certainly can't jump into

1            the mind of any particular person, correct.

2    BY MS. ALTMAN:

3            Q.    And so you make these broad sweeping

4    statements that the purpose of taking puberty blockers is

5    to take -- is so that they can take cross-sex hormones

6    for the rest of their life.  But that's up to the

7    individual, isn't that correct, and their physician and

8    their family; isn't that right?

9                    MR. BEATO:  Object to form.

10                   But, Dr. Biggs, you can answer that

11            question.

12                   THE WITNESS:  Yeah, I mean, we know that

13            not -- from 93, 95, 97, 98 percent of children who

14            go on puberty blockers will continue to cross-sex

15            hormones.

16    BY MS. ALTMAN:

17            Q.    Did you understand my question?

18            A.    Yes, and I answered it.

19            Q.    No.  You told me the percentages of people

20    that you believe will go on to cross-sex hormones.  You

21    didn't answer my question, which was, the decision of

22    whether or not to take puberty blockers and the decision

23    whether or not to take cross-sex hormones is not one for

24    you to make.  It is between a patient, their physician,

25    and their parents; isn't that correct?

Page 121

1          A.    Correct.

2          Q.    And you would agree with me that the

3     purpose of taking puberty blockers at a time when a

4     person is experiencing distress due to gender dysphoria

5     is actually to alleviate the distress for the child;

6     isn't that correct?

7          A.    That's possibly the short-term aim, yes.

8          Q.    Sir, have you reviewed any studies that

9     attributed a greater than 1 percent death rate in healthy

10    teenagers for those taking puberty blockers?

11         A.    No.

12         Q.    What is the death rate of children

13    diagnosed with gender dysphoria who are prohibited from

14    receiving gender-affirming care?

15         A.    I don't believe we know that -- those

16    figures.

17         Q.    Sorry about that.

18               What research have you performed on the

19    impact of children with gender dysphoria who are

20    prevented from reading -- from receiving gender-affirming

21    care?

22         A.    I've not conducted such research.

23         Q.    Since you professed to be interested in the

24    subject matter, why have you not undertaken any

25    independent research into what medical interventions can

Page 122

1   assist those with -- those suffering from gender
2   dysphoria?
3           A.   Can you repeat the question, sorry.
4           Q.   Sure.  You seem to be interested in -- if I
5   understand what your report is in this case and your
6   testimony before the Health and Human Services committee,
7   and the two cases in which you indicate in your report
8   that you participated in, you seem to be interested in
9   puberty suppressors and those with gender dysphoria.
10              Did I get that right?
11          A.   Yes.
12          Q.   Okay.  And so, since you seem to be
13  interested in the subject matter, why have you not
14  undertaken any independent research into what medical
15  interventions can assist those suffering from gender
16  dysphoria?
17          A.   I'm concerned about puberty blockers and
18  that's the thing that I've been focused on.
19          Q.   But we talked about -- talked about it
20  earlier.  You are very concerned about puberty blockers
21  but only as it pertains to gender dysphoria, not as it
22  pertains to precocious puberty, correct?
23          A.   Yes.
24          Q.   What is the death rate of children
25  diagnosed with gender dysphoria?

1          A.    I don't think we have figures -- any

2    figures -- any sort of figures that would be, you know,

3    generalizable across different situations.

4          Q.    In your testimony before the Health and

5    Human Services committee, you acknowledge that "puberty

6    suppressors for gender dysphoria have been provided for

7    more than a quarter of a century," that's a quote; isn't

8    that correct?

9          A.    Yes.

10         Q.    As you sit here today, are you aware of a

11   single death caused by an individual who was diagnosed

12   with gender dysphoria and was also taking puberty

13   suppressors?

14         A.    Well, the individual we discussed earlier

15   who died of the necrotizing fasciitis, that I would -- I

16   think that was an indirect consequence of puberty

17   blockers.

18         Q.    Anyone else?

19         A.    No.

20         Q.    And what about, as you sit here today, are

21   you aware of a single death caused by anyone who

22   initially took puberty blockers and then cross-sex

23   hormones and that their death was a consequence of taking

24   cross-sex hormones and puberty blockers?

25         A.    No.

Page 124

1           Q.    Now, you told the committee that one of the

2    more serious concerns of taking puberty suppression

3    medication along with cross-sex hormones is the impact on

4    sexual function, correct?

5           A.    Yes.

6           Q.    Sir, again, you are not qualified to render

7    an opinion on whether or not puberty suppressors impact

8    sexual function; isn't that correct?

9           A.    Well, I can render an opinion by quoting

10   Dr. Marci Bowers, for example.

11          Q.    So you can -- it is your opinion that you

12   can give an opinion based on someone else's opinion?

13          A.    Well, that's Marci Bowers' experience, yes.

14   Not just --

15          Q.    Well, it is not your experience, is it,

16   sir?

17          A.    No.

18          Q.    And you don't have any basis under which

19   you can provide any testimony to this Court that taking

20   puberty blockers impacts sexual function; isn't that

21   correct?

22          A.    That would -- basis for that would be my

23   reading of the literature, again.

24          Q.    Okay.  Have you conducted any studies or

25   research with regard to sexual function other than

Page 125

1    reading Marci Bowers?

2              A.    No.

3              Q.    Conducted any peer-reviewed studies?

4              A.    No.

5              Q.    And I think you also mentioned in your

6    testimony before the Health and Human Services committee

7    that there is an unknown impact on emotional, cognitive

8    development, do you recall saying that?

9              A.    Yes.

10             Q.    And you say that in your report as well,

11   correct?

12             A.    Yes.

13             Q.    And so this unknown emotional, cognitive

14   development, if it's unknown, it means you don't know

15   whether there is such an impact; isn't that right?

16             A.    Correct.

17             Q.    So you are just kind of throwing it out

18   there for open discussion?

19             A.    Well --

20                   (Simultaneously speaking.)

21   BY MS. ALTMAN:

22             Q.    -- whether or not that might be the case?

23             A.    The Dutch clinicians have continued to

24   emphasize that they have known -- no idea of what the

25   cognitive and emotional effects will be.  And they can --

1     they state that many times over -- in many articles.

2          Q.    They do.  And so you've repeated that, and

3     I appreciate that.  But as we sit here today, sir, "they

4     have no idea" means there could be none, right?

5          A.    Correct.

6          Q.    But, nonetheless, you include that in your

7     report and you talked about it at the Health and Human

8     Services committee, right?

9          A.    Yes, but I think randomized clinical trials

10    on animals provide good evidence.  And this is the best

11    evidence because it is based on randomized clinical --

12    randomized trials, that there are broad -- broad impacts

13    of puberty suppression on emotional, cognitive

14    development in nonhuman animals.

15         Q.    Is that the mice study that you referred to

16    in your report?

17         A.    Mice, sheep, and also there is a primate

18    study as well.  I don't remember exactly which -- what

19    type of primate --

20         Q.    Did you rely on that primate study in

21    forming your opinions in this case?

22         A.    Not the prime -- the primate study I know

23    about from one of the rebuttals.

24         Q.    Right.  Again, you didn't rely on that in

25    rendering your opinions in this case, correct?

1          A.    Correct.

2          Q.    You have not personally performed any

3    studies on any impact on the emotional, cognitive

4    development, correct?

5          A.    Correct.

6          Q.    And there is no studies, that you are aware

7    of, that there is any impact on cognitive IQ, either,

8    right?

9          A.    There are some studies on cognition.

10         Q.    What studies are you referring to?

11         A.    There was one by the Dutch clinicians about

12   the tower of London exercise and the tower -- and they

13   showed that puberty blocked -- children with puberty

14   blockers did perform less well on executive functioning

15   than the controlled group.  But it was a very small

16   sample.

17         Q.    How small?

18         A.    I don't remember off the top of my head.

19   It wasn't significant.  But it was a...

20         Q.    It was not significant -- statistically

21   significant, correct?

22         A.    It was statistically significant.

23         Q.    It was significant, okay.  And you say you

24   don't recall the name of the study?

25         A.    The first author was Stufforsus (Phonetic),

Page 128

1    I think some Dutch name like that.

2            Q.    Is it cited in your report?

3            A.    I can't remember whether I cited that

4    particular article.

5            Q.    Did you rely on it for your opinions in

6    this case?

7            A.    Yes, because I've cited it in the -- I

8    believe I've cited it in my article with the Dutch

9    Protocol.  I've certainly known about that study for a

10   while.

11           Q.    Okay.  Now, as you sit here today, sir, you

12   are not qualified and cannot render an opinion to this

13   Court that GnRH has any negative impact on cognitive

14   development; isn't that right?

15                 It's just a question, it's an open

16   question, right?

17           A.    I believe that the animal studies strongly

18   are suggestive that blocking normal puberty for quite a

19   few years will have cognitive and emotional effects.

20   Effects on --

21           Q.    You believe that based on reading other

22   people's work, right?

23           A.    Yes.

24           Q.    Not any independent research of your own,

25   correct?

1        A.    Correct.

2        Q.    Sir, have you reviewed the Tower of London

3   study?

4        A.    I've read it, yes.

5        Q.    Have you read Dr. Edmiston's rebuttal

6   report in this case?

7        A.    Yes.

8        Q.    And you would agree with me that he says

9   that the Tower of London study shows no effect on -- of

10  GnRH on executive function, do you agree with that?

11       A.    No, I disagree.

12       Q.    No, did you see that in his report, is my

13  question?

14       A.    I did see it, yes.

15       Q.    Okay.  So you two have a difference of

16  opinion, right?

17       A.    Yes.

18       Q.    Okay.  And you would agree with me,

19  reasonable people can disagree, correct?

20       A.    No.  I went back to look at the abstract

21  and the abstract says very clearly that there was a

22  difference.

23       Q.    You would agree with me, Dr. Edmiston is a

24  medical doctor?

25       A.    Yes.

1          Q.     And you are not, right?

2          A.     Correct.

3          Q.     And you would agree with me that the impact

4    on emotional, cognitive development would be the same

5    whether it is prescribed for precocious puberty or gender

6    dysphoria; isn't that right?

7          A.     Well, it's -- it's prescribed at completely

8    different ages for those two conditions.

9          Q.     Do you understand my question?

10         A.     I don't believe the two are directly

11   comparable because precocious -- GnRH for precocious

12   puberty is prescribed much -- at much younger ages than

13   GnRH for --

14         Q.     Fair enough.  What impact does GnRH have on

15   the emotional, cognitive development with those

16   precocious puberty?

17         A.     I don't think we have -- well, I think

18   there are a few studies that -- again, very small, that

19   suggest that may be deleterious effects on IQ for

20   precocious puberty.

21         Q.     Okay.  But doctors haven't stopped

22   prescribing GnRH for those with precocious puberty

23   because of those studies you just mentioned, have they?

24         A.     I believe there is more caution now, but

25   I'm not an expert, so I wouldn't like to really state my

Page 131

1   claim on that.

2          Q.    You don't know one way or another, right?

3          A.    Correct.

4          Q.    And you haven't analyzed it, correct?

5          A.    Correct.

6          Q.    And as you just said, you are not an

7   expert, right?

8          A.    Not -- I have not reviewed extensively the

9   literature on precocious puberty, no.

10         Q.    Right.  Or on the impact of GnRH on

11  individuals who were diagnosed with gender -- with

12  precocious puberty who are taking it, correct?

13         A.    For precocious puberty, correct, yes.

14         Q.    I think I said that, precocious puberty,

15  correct, okay.

16                Now, you mentioned a recent randomized test

17  on mice that were -- GnRH was provided to mice and it

18  showed high level of stress and anxiety, correct?

19         A.    Yes.

20         Q.    You didn't perform that study, did you,

21  sir?

22         A.    No.

23         Q.    Have you ever asked an individual diagnosed

24  with gender dysphoria what psychological impact taking

25  puberty blockers has had on him or her?

1          A.    Yes.

2          Q.    And is that the one individual you

3    mentioned earlier from the Dutch Protocol, I forget their

4    name?

5          A.    Yes.

6          Q.    Anyone else?

7          A.    Yes.

8          Q.    Who?  I think it was -- ████████ was the

9    one you mentioned earlier?

10         A.    Yes.  Keira Bell.

11         Q.    Okay.  Anybody else?

12         A.    No.

13         Q.    So two people, right?

14         A.    Yes.

15         Q.    Has anyone stopped you from speaking to

16   individuals with gender dysphoria who are taking puberty

17   suppressors, which you profess to be interested in, from

18   finding out the specific impact that it's had on them?

19         A.    No.

20         Q.    Now, if I understood your testimony before

21   the Health and Human Services committee, you said that

22   "puberty blockers should only be offered in a proper

23   randomized controlled trial," do you recall saying that?

24         A.    Yes.

25         Q.    Do you believe that's true for those with

1  precocious puberty also?

2         A.    Yes.  In fact, there have been some

3  randomized control trials used for precocious puberty.

4         Q.    And what were the results of those?

5         A.    The results were that it has very -- the

6  only rationale for treatment for precocious puberty is

7  the effect on height.  And unless you start very young,

8  that the -- the actual gains in height from block --

9  stopping -- from stopping precocious puberty are minimal.

10        Q.    Okay.  Anything else?

11        A.    No.  Not --

12        Q.    Now, sir, could you explain to me how can

13  you conduct a -- to use your words, a proper randomized

14  control trial if the medical care has been prohibited?

15        A.    You can't.

16        Q.    But you think that's what's necessary in

17  order to utilize puberty blockers for those with gender

18  dysphoria, is a proper randomized control trial, right,

19  that's what you told the Health and Human Services

20  committee?

21        A.    Yes.  I believe that puberty blockers

22  should be offered only as part of a randomized control

23  trial, yes.

24        Q.    Uh-huh.  And in order to do a proper

25  randomized control trial, you need to be able to provide

Page 134

1    such care, correct?

2            A.    Yes.

3            Q.    Sir, you also spoke at the Florida Board of

4    Medicine meeting relating to the development of rules

5    regarding gender-affirming care on October 28, 2022,

6    correct?

7            A.    Yes.

8            Q.    And I don't know if you saw the agenda for

9    that meeting, but you are identified as an MD?

10           A.    That was not my -- that was a mistake,

11   yeah.

12           Q.    Right.  I just -- did you correct them on

13   that?  Did you --

14           A.    This is the first time I've heard -- the

15   first time I've heard of it.

16           Q.    Okay.  And you were listed on that agenda,

17   if you are aware, as a subject matter expert, do -- are

18   you aware of that?

19           A.    I did not -- I don't believe I saw the

20   agenda.

21           Q.    Okay.  But do you consider yourself a

22   subject matter expert?

23           A.    Yes, based on my publications, yes.

24           Q.    And the subject matter which you are an

25   expert is reading other people's research and then

Page 135

1   reporting on it, is that the subject matter in which you

2   are an expert?

3                    MR. BEATO:  Object to form.

4                    But, Dr. Biggs, you can answer that

5               question.

6                    THE WITNESS:  I wouldn't agree with that

7               characterization.  I believe that I've done

8               original research on, for example, suicide and on

9               bone density.  And I believe that my, you know,

10              publications stand on their own.

11  BY MS. ALTMAN:

12       Q.    Sir, who invited you to attend the Florida

13  Board of Medicine meeting?

14       A.    I believe it was Patrick.  I thought we

15  covered that.  Did we not cover that?

16       Q.    Well, you said that he invited you to the

17  Health and Human Services committee.  Did he also invite

18  you to the Florida Board of Medicine meeting?

19       A.    I don't -- I don't believe that I said

20  that.  I believe that I said that he invited me to the

21  board of medicine.  But I -- for the Health and Human

22  Services, I just got an e-mail from whoever was

23  organizing that, I believe.  Maybe --

24       Q.    Okay.  So just to make sure I'm on the same

25  page with you, Patrick Hunter invited you to the Florida

Page 136

1   Board of Medicine meeting, and you got an e-mail for the

2   Health and Human Services committee meeting, but you

3   don't recall who it is from?

4           A.      Correct.

5           Q.      Were you paid for your time at the Florida

6   Board of Medicine?

7           A.      I believe I've already said no.

8           Q.      What expertise do you have with regard to

9   the medical treatment of gender dysphoria?

10          A.      The expertise is the articles that I've

11  published.

12          Q.      Well, that's -- that's with regard to

13  puberty blockers?

14          A.      Yes.  And suicide.

15          Q.      My question was broader.  What expertise do

16  you have with regard to the medical treatment of gender

17  dysphoria?

18          A.      Well, my expertise is concentrated in those

19  areas.

20          Q.      And at the meeting, do you recall you

21  provided a statement in research on gender dysphoria,

22  according to the meeting minutes, do you agree with that?

23          A.      Yes.

24          Q.      And your statement at the Florida Board of

25  Medicine meeting essentially, if not verbatim, mirrored

1    the testimony that you gave at the Health and Human

2    Services committee; isn't that correct?

3         A.    Yes.

4         Q.    And it's essentially mirrored your report

5    in this case, correct?

6         A.    Similar, yes.

7         Q.    And I didn't do a side-by-side comparison,

8    but based upon my review of both of your testimony at the

9    committee and your testimony, which I heard the audio of

10   at the Florida Board of Medicine, it appeared as though

11   you were reading from the identical script in both

12   instances; is that correct?

13        A.    Yes.  That's probably roughly correct, yes.

14        Q.    Prior to your statement at the Florida

15   Board of Medicine meeting, had you performed any

16   independent research with regard to gender dysphoria that

17   you were asked to speak about at the meeting?

18        A.    No.

19        Q.    And, again, I'm not asking you to repeat

20   anything we've talked about on the record.  But you

21   didn't perform any independent research on gender

22   dysphoria for your statements that you made at the

23   Florida Board of Medicine meeting, did you?

24        A.    Correct.

25        Q.    And all of your research is merely

Page 138

1    reviewing the research of others and then opining on it,

2    isn't that correct, other than we'll get back to your

3    suicidality report and your bone density, correct?

4                A.    Correct.

5                Q.    And your letter to the editor, okay.

6                Is there any instance in which you believe

7    in individual suffering with gender dysphoria should

8    receive GnRH?  Do you have an opinion on that?

9                A.    Well, do you mean under 18 or in general?

10               Q.    I'm asking if you have an opinion on that.

11               A.    For those under 18, I believe that they

12   should -- or under 16, they should have -- they could

13   access GnRH as part of a proper randomized clinical

14   trial.

15               Q.    So under 16, part of a proper randomized

16   trial, correct?

17               A.    Clinical trial, yes.

18               Q.    Right, okay.  Older than 16, do you have an

19   opinion on that?

20               A.    Well, possibly -- over 18, GnRH is

21   sometimes used as a -- it's called a testosterone blocker

22   but it -- to go with estrogen.  And, as I said, I don't

23   have any opinions on, you know, what adults can consider.

24               Q.    So we kind of got lost in the question

25   there.  And I apologize, I'm sure it is my fault.  You

1    said less than 16, proper randomized control trial,

2    right?  Clinica trial, correct?

3           A.    Yes.

4           Q.    Yes, you've got to answer out loud.  Sorry

5    about that.

6           A.    Yes.

7           Q.    And then my question was 16 -- between 16

8    and one, not over 18, what about the people -- the sloth

9    of people between 16 and 18, what do they get?  If under

10   16 has to be part of a randomized controlled clinical

11   trial, what about the people between 16 and 18?

12          A.    I believe that in some circumstances they

13   may be able to access if they have -- if they are told,

14   you know, about the cost as well as the benefits of that

15   treatment.

16          Q.    Okay.  So you would agree with me then that

17   someone between the age of 16 and 18, so long as their

18   medical provider consults with them, along with their

19   parents, and discusses the risks versus the rewards of

20   that treatment, that they should be entitled to receive

21   that treatment, correct?

22          A.    Yes.

23          Q.    All right.

24                MS. ALTMAN:  Now is probably a good time

25          for a lunch break.  I know for you it is probably

Page 140

1           a dinner break.  We can try -- let's see, it is

2           four hours.  It's 1 o'clock here so it's 5 o'clock

3           there, am I right?

4                     THE WITNESS:  Yes.

5                     MS. ALTMAN:  Okay.

6                     Michael, how long would you like to take?

7                     MR. BEATO:  Oh, gosh, I defer to Dr. Biggs,

8           what do you think an appropriate time would be?

9                     THE WITNESS:  Half an hour.

10                    MS. ALTMAN:  Fine with me.  So it's

11          1 o'clock here, 5 o'clock there.  So 5:30, 1:30

12          for the rest of us.

13                    (A lunch recess is taken at 12:58 p.m. to

14     1:33 p.m.)

15     BY MS. ALTMAN:

16          Q.    Sir, did you have a nice short break?

17          A.    Yes, yes, good to have a break.

18                    MS. ALTMAN:  Okay.  Michael, and I know you

19          had asked -- I should have probably said this

20          before we got back on the record, but you had

21          asked how long I think I'll go.  I think on the

22          outside, like the longest would probably be two

23          hours.

24                    MR. BEATO:  Oh, okay.  Okay.

25                    MS. ALTMAN:  Fingers crossed.  Trying to be

1          as efficient as possible.  All right.  Well, let's

2          see.

3   BY MS. ALTMAN:

4          Q.    Sir, before -- during the break, did you

5   speak with anyone?

6          A.    My girlfriend to ask her for a coffee.

7          Q.    Other than that, did you speak with anyone

8   about your testimony or about this case?

9          A.    No.

10         Q.    Okay, good.  And did she bring you the

11  coffee?

12         A.    She did indeed, yes, yes.

13         Q.    Okay, excellent.  Excellent.  So you are

14  ready to go.  Good.

15               So I think you mentioned, if I understood

16  you correctly, that there were randomized controlled

17  trials relating to central precocious puberty, and in

18  particular with regard to the impact on height, do you

19  recall that?

20         A.    Yes.

21         Q.    What study specifically have you reviewed

22  on that subject?

23         A.    I don't have that information to hand.

24         Q.    Do you know when those studies were

25  published?

Page 142

1          A.     In the last ten years, I believe.

2          Q.     Would they postdate 2019?

3          A.     I couldn't say but possibly not.

4          Q.     Are you familiar with a study Treatment of

5     Central Precocious Puberty?

6          A.     What's the author?

7          Q.     I will tell you one second.   Erica

8     E-U-G-S-T-E-R?

9          A.     That author is not familiar.

10          Q.     And that study, sir, was published in

11     2019 -- one second.  I just lost my e-mail.  And in that

12     study, the author, who -- it was a survey of the

13     literature up in to 2019.

14               And I'll quote what she says, "The main

15     goal of treatment in children with CPP is the

16     preservation of height potential.  Although this sounds

17     straightforward, any consideration of height outcomes

18     must acknowledge several limitations."

19               "One is no randomized control studies

20     examining the effect of treatment versus no treatment on

21     height in CPP has ever been conducted, to this author's

22     knowledge."

23               Does that impact your testimony, sir, where

24     you testified that there were indeed random controlled

25     trials?

Page 143

```
 1          A.     No, because --
 2                 MR. BEATO:  Object to form.
 3                 Dr. Biggs, you can answer that.
 4                 THE WITNESS:  I did cite them in the
 5          Dutch -- I did cite at least one randomized
 6          control trial on height in my Dutch Protocol
 7          article.
 8   BY MS. ALTMAN:
 9          Q.     Okay.  We'll get to that.  So you would
10   take issue with this author's statement?
11          A.     Or perhaps it was an article since 2019.
12          Q.     And as you sit here today, you don't know?
13          A.     No.
14          Q.     Okay.  Sir, you appeared on the podcast,
15   Gender:  A Wider Lens, do you recall that?
16          A.     Yes.
17          Q.     And the title of the program in which you
18   appeared was called Medicalization of Children With
19   Gender Identity:  Impact of Puberty Blockers, and that
20   was in February of 2023, correct?
21          A.     Yes.
22          Q.     And that podcast, Gender:  A Wider Lens, is
23   supported by Genspect, correct?
24          A.     Yes.
25          Q.     And Genspect is an organization that holds
```

1    itself out as an alternative to WPATH; isn't that right?

2            A.    That sounds correct, yes.

3            Q.    And Genspect believes that gender identity

4    ideology has caused damage and harm; isn't that right?

5            A.    Probably, yes.  I could -- yes.

6            Q.    Do you believe that?

7            A.    I believe in many cases, yes.

8            Q.    And those cases are, as we've discussed

9    today, nothing different, correct?

10           A.    Sorry, could you repeat the question.

11           Q.    Yeah, my -- my point was -- and my question

12   was unartful, I apologize.  The bases on which you

13   believe gender identity ideology has caused damages and

14   harm are those that you have elucidated in your report?

15           A.    Yes.

16           Q.    Okay.  Nothing other than that is what I'm

17   trying to understand, correct?

18           A.    Well, I believe -- there are some other

19   issues, for example, putting rapists in women's prisons

20   that may be under the umbrella of gender identity --

21   gender ideology, but I think that's -- yeah, I didn't

22   know if that's what you were...

23           Q.    Well, what do you understand gender

24   identity ideology to be referring to?

25           A.    Well, it's not a phrase that I myself use,

Page 145

1    but I believe it would be suggesting that, for example,

2    that people have a certain -- a gendered soul, which is

3    more important than their biological physical body.  And

4    that that gendered soul sort of takes precedence over

5    their -- the reality of their -- of the sex body.

6            Q.    Sir, are you suggesting that it is lesser

7    than?

8            A.    Well, it's certainly unobservable, like a

9    soul.  I'm not saying that -- yeah...

10                 It is like a soul, right, it is not

11   observable.

12           Q.    Well, not observable to you but it's

13   observable to the person that's experiencing it, isn't

14   that correct, sir?

15           A.    Yes, yes.

16           Q.    So the fact that you don't see it doesn't

17   mean it doesn't exist, right?

18           A.    Yes, exactly.  Just as I don't see a

19   Christian soul and I don't know if the Christian soul

20   exists but it is very real to the Christian.

21           Q.    Sir, during the podcast, you refer to F.G.,

22   the letters of F.G., and you said was previously

23   identified as B., who was part of an original study and

24   who was followed up on in her 30s.

25                 Do you recall giving that statement during

```
 1   your podcast -- during the podcast?

 2           A.    Yes.

 3           Q.    And if I understood you correctly, you

 4   indicated she did not have a good outcome.  That she was

 5   ashamed of her genitals and could not hold a

 6   relationship, referencing a 2014 follow-up study, do you

 7   recall that?

 8           A.    Yes.

 9           Q.    And I believe you also referenced that in

10   your report, correct?

11           A.    Yes.

12           Q.    But that -- that was one person out of an

13   entire group, correct?

14           A.    That was the first individual, that was the

15   first individual who had ever been given puberty blockers

16   as a treatment for gender dysphoria, yes.

17           Q.    Right.  But did you do anything to follow

18   up on any of the others to determine what their outcomes

19   were?

20           A.    Well, that person was the only person who

21   was the subject of the case study, which made puberty

22   blockers -- made puberty -- introduced puberty blockers

23   to the -- to their medical community.

24           Q.    Right.  But I'm asking what steps you took,

25   since you are interested in the subject matter of puberty
```

Page 147

1   blockers, to understand what the case studies would be of

2   the other individuals, what specific actions have you

3   taken to undertake that analysis?

4           A.    Well, there is only -- that's the one

5   individual who was the subject of a case study.  The

6   others are -- come in groups, like the cohort of 17,

7   which was discussed earlier, referred to in de Vries, et

8   al., 2011 and 2014.

9           Q.    You would agree with me, would you not,

10  that one example can't be extrapolated to an entire

11  group, correct, that wouldn't be statistically sound?

12          A.    Yes.

13          Q.    Now, during the podcast and before the

14  Florida Human Health and Services Committee, you said

15  that GnRH for the treatment of gender dysphoria would

16  only be appropriate after proper clinical trials and

17  randomized control group.  Remember, we talked about that

18  a little bit earlier, correct?

19          A.    (Nodding head yes.)

20          Q.    Yes?  You have to answer out loud.

21          A.    Yes.

22          Q.    Sorry.

23                Has any organization that you are a part of

24  attempted to perform such randomized -- proper clinical

25  trials with randomized control groups?

Page 148

1          A.    No, but I know that the Cass inquiry

2     were -- is looking into that.

3          Q.    Okay.  And why haven't you urged any of the

4     groups that you are a part of to conduct clinical trials

5     with randomized control groups?

6          A.    Well, the -- SEGM is probably the most

7     relevant example, we don't have the resources to.  But,

8     of course, we advocate.  Or many of us would advocate.

9          Q.    Well -- and, again, maybe I missed it, but

10    did you -- when you were testifying or speaking at the

11    Florida Board of Medicine, did you encourage them not to

12    ban gender-affirming care so that they could conduct

13    clinical trials with randomized control groups?  Because

14    I listened to your statement, I didn't hear that.  Did

15    you do it off the record and maybe I missed it?

16         A.    I think the implication of saying that

17    puberty blockers should be offered only as part of a

18    clinical trial is a recommendation that those doctors and

19    institutions that are currently offering puberty blockers

20    should do so as part of a clinical -- randomized clinical

21    trial.

22         Q.    But you understood, sir, at the time that

23    you were testifying before the board of medicine that

24    Florida had already imposed a ban on gender-affirming

25    care; isn't that correct?

1            MR. BEATO:  Object to form.

2            Dr. Biggs, you can answer that question.

3            THE WITNESS:  The rule that was being

4        discussed, as I understood it, was to mean that --

5        that would remove the license of somebody who was

6        doing -- providing these kinds of treatments

7        outside of the kind of research that would be

8        constituted as a randomized clinical trial.

9   BY MS. ALTMAN:

10           Q.    Have you -- did you -- have you read the

11   rule at issue in this case?

12           A.    Issue in this case now, Dekker versus --

13           Q.    The case for which you are providing expert

14   opinion, have you read that -- the rule that's at issue?

15           A.    I have read the reports on the rule but I

16   don't think I've read the rule itself.

17           Q.    Okay.  And so you don't know one way or

18   another what the impact of the rule is, correct?

19           A.    I don't know the details, no.

20           Q.    Okay.  Well, would it surprise you that --

21   that the rule prohibits those who receive Medicaid from

22   receiving any kind of gender-affirming care whatsoever,

23   whether they are a child or an adult, does that surprise

24   you?

25           A.    No.  No, that's my understanding.

Page 150

1      Q.    Right.  And so when you were before the
2  Florida medicine, you understood that the rule in place
3  was prohibiting the payment for care for those who are on
4  Medicaid for gender-affirming care of any kind, whether
5  they are a child or an adult, correct?

6      A.    I was not aware of that Florida rule when I
7  presented to the board of medicine because I was
8  addressing the proposition before the Florida Board of
9  Medicine.

10     Q.    Okay.  And do you understand that -- well,
11 strike that.

12           What do you understand the board of
13 medicine rule now is with regard to providing such care?

14     A.    It enables -- it means that doctors can
15 lose their license if they provide this care outside of a
16 research setting.

17     Q.    And are you aware of any clinical trials
18 and randomized control groups that the state of Florida,
19 the Agency for Health Care Administration has undertaken?

20     A.    No, but I would not -- I presume it
21 wouldn't be up to the Agency.  It would be up to
22 university clinicians to undertake these trials.

23     Q.    And is it your understanding that they
24 could undertake these trials without any risk whatsoever
25 to their license, is that your understanding?

1          A.     Yes.

2          Q.     Are you aware that there is research

3     indicating that there are benefits to treating

4     individuals with gender dysphoria with puberty blockers?

5          A.     Yes.

6          Q.     So as you sit here today, you understand

7     that there are both risks and benefits to taking GnRH,

8     correct, for gender dysphoria?

9          A.     Yes.

10          Q.     And you would agree with me that it is

11     incumbent upon a medical professional, dealing with each

12     individual patient, to explain to that patient the risks

13     and rewards of taking puberty blockers, correct?

14          A.     I believe that that sort of discussion must

15     be based on a rigorous review of the costs and the

16     benefits, yes.

17          Q.     Okay.  And -- but you would agree with me,

18     that's not for you to opine on, correct?

19          A.     Well, I believe it is up to me not to opine

20     on but to publish articles or to uncover the results of

21     experiments, like at the Tavistock, which was suppressed

22     by the clinicians.  And I believe that it is the duty --

23     incumbent upon somebody like me to publish the results of

24     those -- of those investigations to inform the way that

25     patients and their parents and clinicians undertake

Page 152

```
 1   there.
 2         Q.    And you did that, right, you -- you put out
 3   your Freedom of Information Act request and you published
 4   on the subject, correct?
 5         A.    Yes.
 6         Q.    And -- and the import of your publication
 7   is that a medical professional, a parent, and a child can
 8   read that research and draw their own conclusions as to
 9   how they want to proceed, correct?
10         A.    Yes.
11         Q.    Now, sir, during the podcast, the Gender:
12   A Wider Lens podcast, you acknowledge that suicide rates
13   are five to six times higher for transgender teenagers
14   than non-transgender teenagers, do you recall making that
15   statement?
16         A.    Yes, that's based on -- I should say that's
17   based the -- on my research that was done on the
18   Tavistock, yes.
19         Q.    Okay.  And I just want to juxtapose that
20   with, you don't say that in your report, do you, sir, to
21   the Court?
22         A.    I believe I do -- I believe I do.  I can --
23         Q.    You think your report -- you say somewhere
24   that suicide rates for transgender teenagers is five to
25   six times higher than non-transgender teenagers?
```

Page 153

1      A.    If I don't in my report, it was with one of

2  the exhibits that was with the report.

3      Q.    And, sir, in your report, what you do say

4  is that individuals who -- who report suicide attempts or

5  suicidal ideation don't really want to kill themselves.

6  They are just crying out for help, isn't that what you

7  say?

8      A.    I don't believe that's a fair

9  characterization of what I say.  What I say is that it

10  would be -- you cannot just simply take suicidal

11  ideation, extrapolate to that suicide intelligence.

12      Q.    Sir, it is not within your wheelhouse to

13  diagnose somebody who has suicidal ideation, is it?

14      A.    No.

15      Q.    And it is not within your wheelhouse to

16  determine whether or not someone who -- who reports a

17  suicide attempt really means it or not, correct?

18      A.    Not in the individual case, no.

19      Q.    Well, not in any individual case, correct,

20  sir?

21      A.    Not in the individual case, no.

22      Q.    Not in any individual case, correct, sir?

23           MR. BEATO:  Object to form.

24           Dr. Biggs, you can answer that question.

25           THE WITNESS:  Yes.

1    BY MS. ALTMAN:

2            Q.    And you -- you didn't mean to imply in your

3    expert report that you, as a sociologist, have any

4    complications to opine on the mental state of an

5    individual and whether they really want to kill

6    themselves or not; isn't that right?

7            A.    Correct.

8            Q.    And you would agree you have no such

9    qualifications, correct?

10           A.    Correct.

11           Q.    What was the -- what is the point in your

12   report of -- of that -- that, for lack of a better word,

13   opinion -- of that opinion that most who suffer from

14   gender dysphoria who -- who report a suicide attempt

15   don't really want to kill themselves, what is the basis

16   for you to provide that opinion?

17           A.    The point is to combat a particular

18   argument that is often used to advocate for

19   medicalization, saying that -- rather cliche, is it is

20   better to have a live son than a dead daughter or vice

21   versa.

22               And so by exaggerating, the possibility of

23   suicide, it means that individuals or patients and their

24   families more -- have an exaggerated degree of the risk

25   of suicide if they don't take the medication that

Page 155

1    influences their views on whether they should or

2    shouldn't take the medication.

3          Q.    Well, regardless of whether or not you

4    think it is exaggerated, you've acknowledged that

5    transgender individuals have a five or six times greater

6    risk of suicide; isn't that right?

7          A.    Yes, there is a difference between absolute

8    rates and relative rates.  Absolute rate, fortunately, is

9    very low.  The relative rate is, as you say -- at least

10   what I've calculated from the Tavistock, five or six

11   times higher.

12         Q.    Okay.  And in that regard, sir, I hope you

13   would agree with me that -- that even one suicide is bad,

14   right?

15         A.    Yes, absolutely.

16         Q.    And you are not suggesting to the Court

17   that we don't pay attention to whether a child is

18   transgender or not to any inclination that they might

19   commit suicide.  You are not suggesting we just disregard

20   it because we think they don't really mean it, are you?

21         A.    No, absolutely correct.

22         Q.    So I guess I'm just trying to understand

23   what the import of including that opinion in your report

24   is, what does it add to your conclusions in this case?

25         A.    It adds, as I said, an important caveat to

Page 156

1   an argument that is often made to push for the

2   medicalization of children, which is they would kill

3   themselves unless they get these drugs.  What I was

4   pointing out, based on my research, is that the absolute

5   rate of suicide is thankfully low, at least from what

6   I've -- from the Tavistock clinic.

7        Q.   From one study in one jurisdiction, right?

8        A.   It's the largest pediatric clinic in the

9   world, but yes, one -- one clinic.

10       Q.   You understood my question?

11       A.   Yes.

12       Q.   Yeah, okay.  It's one clinic, correct?

13       A.   Yes.

14       Q.   Based on data from one fixed period of

15  time?

16       A.   Yes, a span over ten years, right.

17       Q.   Right.  And when was that published?

18       A.   Sorry?

19       Q.   When was the results finalized?

20       A.   When was my article published?

21       Q.   Uh-huh.

22       A.   I believe it's 2021, I think.

23       Q.   Okay.  And, sir -- well, strike that.

24            Do you believe that medical doctors who are

25  providing gender-affirming care, that they are attempting

1   to convert cisgender individuals to be transgender?

2        A.    No.  But I don't know quite what a

3   cisgender individual is.

4        Q.    You don't know what, I'm sorry?

5        A.    I don't know what you mean by a cisgender

6   individual.  That's why it took a while to answer that

7   question.

8        Q.    A non-transgender individual, a non -- not

9   homosexual, not lesbian, a heterosexual person, do you

10  believe that doctors who render gender-affirming care are

11  trying to convert cisgender individuals to be

12  transgender?

13       A.    No.

14       Q.    Do you think that they are trying to

15  convert those who are gay or lesbian to be transgender?

16       A.    I don't believe they are intending to do

17  that, no.

18       Q.    Okay.  Now, sir, on your website you

19  include a blog post that you author, and I'm going to

20  read the title of it.  "The astonishing admission in the

21  health research authority report the purpose of puberty

22  blockers is to commit children to permanent physical

23  transition."

24              Do you recall that blog post?

25       A.    Yes, yes.

1          Q.     And we talked about this a little earlier

2     in connection with another similar statement that you've

3     made.  But in this case, you made it on a blog post on

4     your website.

5                    And in your blog post, you state that the

6     researchers made what you referred to as "an astonishing

7     admission," and you go on to state that "the admission is

8     the purpose -- that the purpose of puberty blockers is to

9     commit children to permanent physical transition."

10                   That's what you say, do you recall that

11    statement?

12         A.     Yes.

13         Q.     And we talked about it in another context

14    earlier, but I want to then read to you this statement

15    from which you drew that conclusion on your blog post.

16    So I'm going to read that to you.

17                   The actual statement that you quote in your

18    blog post says, "It would have reduced confusion if the

19    purpose of the treatment had been described as being

20    offered specifically to children demonstrating a strong

21    and persistent gender identity dysphoria at an early

22    stage in puberty, such that suppression of puberty would

23    allow subsequent cross-sex hormone treatment without the

24    need to surgically reverse or otherwise mask the unwanted

25    physical effects of puberty in the birth gender."

Page 159

1          Do you recall that quote?

2     A.    Yes.

3     Q.    Now, that quote, sir, does not say that the

4     purpose of puberty blockers is to ensure transition to

5     cross-sex hormones, correct?

6     A.    Well, the purpose is to enable or allow.

7     Q.    No, sir, what it says is, for those

8     individuals that persist and are transgender, allowing

9     them to not have fully developed, which would require

10    more complex surgery, is a benefit to those individuals;

11    isn't that what it says?

12          MR. BEATO:  Object to form.

13          Dr. Biggs, you can answer that.

14          THE WITNESS:  Yes, they -- the -- what I

15          was pointing to is that that statement is a clear

16          statement that the purpose of puberty blockers is

17          the first stage in a course of treatment that will

18          continue on to cross-sex hormones.

19    BY MS. ALTMAN:

20    Q.    Sir, that is not what it says.  What it

21    says is, for those individuals that choose to go on to

22    cross-sex hormones, puberty blockers will ensure that

23    they have less surgical intervention than those that

24    don't have their puberty blockers; isn't that what the

25    import of the paragraph is?

Page 160

1          A.    Yes.  And we know that in that particular

2     study, I believe you are referring to the 44 children in

3     the Tavistock trial, 40 -- out of the 44, 43 went on

4     cross-sex hormones.

5          Q.    But that isn't the point, sir, is it?  Of

6     the 43, that was their choice because they were -- by

7     choice I mean they were transgender, not that that is a

8     choice.  But those individuals that were transgender

9     chose to go on to cross-sex hormones, which would be

10    expected if you are transgender, correct, sir?

11         A.    Well, they were diagnosed with gender

12    dysphoria.  I don't believe that in the protocol there

13    was any mention of them being transgender.  I think the

14    diagnosis was gender dysphoria or gender identity

15    disorder, whichever was the one prevailing.

16         Q.    Do you know whether or not the 43

17    individuals you referred to are indeed transgender, sir?

18         A.    I would assume so but I wouldn't know.  But

19    I --

20         Q.    You've not undertaken any analysis to

21    understand that, have you?

22         A.    Well, this was a treatment this was

23    intended to treat gender dysphoria.

24         Q.    Correct.  And for those individuals that --

25    that were indeed transgender, they would go on to

Page 161

1  cross-sex hormones.

2            But there was nothing in that paragraph

3  that I read to you that said the purpose of puberty

4  blockers is to make their way for a lifelong, you know,

5  experience on cross-sex hormones; isn't that correct,

6  sir?

7       A.   I don't agree with that interpretation.

8       Q.   Well, sir, I'm not interpreting it.  You're

9  actually the one that interpreted it.  I'm reading

10  these -- the written word, as it is written.

11            You have extrapolated from that a purpose

12  of giving gender -- puberty blockers that is nowhere in

13  the paragraph that you reference?

14       A.   I believe that's an unfair characterization

15  of the way that even clinicians would describe the

16  benefits of puberty blockers.

17       Q.   Well, it may be a benefit of puberty

18  blockers but that's not what you said, sir.  You said the

19  purpose of puberty blockers, not that a side benefit of

20  puberty blockers is, that for those that go on to

21  cross-sex hormones, the surgical intervention may be

22  lessoned.  That's not what you said.

23            What you said on your blog post, and you've

24  said it at other times, is that the purpose of puberty

25  blockers is essentially only to transition someone to

Page 162

1    cross-sex hormones, correct?

2                    MR. BEATO:  Object to form.

3                    Dr. Biggs, you can answer that question.

4                    THE WITNESS:  Yes.  And that's why I use

5              the -- that's why the first articles refer to

6              juvenile transsexuals.  Precisely the logic was

7              you give puberty blockers, you stop the

8              development of secondary sex characteristics, and

9              then the patient will go on to cross-sex hormones

10             and surgeries.

11   BY MS. ALTMAN:

12             Q.   No, the patient may go on, correct, sir,

13   may go on.  You don't know?

14                    MR. BEATO:  Object to form.

15   BY MS. ALTMAN:

16             Q.   It is individual specific, correct?

17             A.    Individual specific but 93, 95, 97, 98

18   percent will go on --

19             Q.    Which is it, 93, 95 or 97?

20             A.    It depends on which studies you look at.  I

21   cite I think four of them from different clinics,

22   Australian, Britain, the Netherlands, and Belgium in my

23   witness statement -- report, I believe.

24             Q.    And, indeed, that section goes on to say --

25   of the paragraph that you quote, it specifically says,

Page 163

1    "For children demonstrating a strong and persistent

2    gender identity dysphoria at an early age in puberty,

3    such that the suppression of puberty would allow

4    subsequent cross-sex hormone treatment without the need

5    to surgically reverse or otherwise mask unwanted physical

6    effects of puberty."

7              The language is very clear.  It's for those

8    children demonstrating a strong and persistent gender

9    identity dysphoria, isn't that what it says?

10        A.    Yes.

11        Q.    Now, you say in your report, sir, that

12   there is no objective physical diagnosis for gender

13   dysphoria, do you recall making that statement?

14        A.    Yes.

15        Q.    Are you suggesting to the Court that you

16   don't believe gender dysphoria exists?

17        A.    No.

18        Q.    And you'd agree with me that there are many

19   medical conditions for which there is no objective

20   physical diagnosis; isn't that right?

21        A.    Yes.

22        Q.    And that doesn't mean the condition doesn't

23   exist, does it?

24        A.    No.

25        Q.    Since you are opining on what treatment

1    transgender adolescents should not receive, do you have

2    an opinion on what treatment they should receive, are you

3    offering such an opinion in this case?

4              A.    I don't -- I mean, I did not offer an

5    opinion in my expert report, no.

6              Q.    Okay.  Are you aware of any research that

7    demonstrates the negative impact on adolescents when they

8    are not prescribed treatment for gender dysphoria?

9              A.    Yes.

10             Q.    Are you offering an opinion on that in this

11   case?  Have you been asked to offer an opinion in this

12   case on that?

13             A.    Specifically on puberty blockers, yes.

14             Q.    That's not what I said.  Let me read my

15   question again.

16             Are you aware of any research that

17   demonstrates negative -- the negative impact on

18   adolescents when they are not prescribed treatment for

19   gender dysphoria?  My question was not limited to puberty

20   blockers.

21             A.    I'm aware of studies that attempt to

22   demonstrate that, yes.

23             Q.    Have you been asked to offer an opinion in

24   this case on that?

25             A.    No, I don't believe -- no.

1        Q.     You are not providing an opinion in this
2   case on the GAPMS report, are you?
3        A.     No.
4        Q.     You are not providing an opinion on the
5   rule in this case, correct?
6        A.     No.  Correct.
7        Q.     You are not -- you are not providing an
8   opinion about the process that AHCA followed when
9   arriving at its rule, are you?
10        A.     Correct.
11        Q.     You are not providing an opinion on the
12   diagnosis of those specific plaintiffs in this case,
13   correct?
14        A.     Correct.
15        Q.     You don't have an opinion about the proper
16   medical treatment for the plaintiffs in this case,
17   correct?
18        A.     Correct.
19        Q.     You haven't reviewed their medical records,
20   correct?
21        A.     Correct.
22        Q.     And you don't review medical records as
23   part of your job as a sociologist generally, correct,
24   sir?
25        A.     Yes.

1    Q.    Yes; that's correct, right?

2    A.    Correct.  Yes, correct.

3    Q.    You've never met with any of the plaintiffs

4  in this case?

5    A.    No.

6    Q.    You've never asked to meet with any of the

7  plaintiffs in this case, correct?

8    A.    Correct.

9    Q.    You've never met or asked to meet any of

10  the medical providers of any of the plaintiffs in this

11  case, correct?

12    A.    Correct.

13    Q.    And you are not offering an opinion on the

14  qualification of any of the medical providers that treat

15  any of the plaintiffs in this case, correct?

16    A.    Correct.

17    Q.    As a sociologist, generally speaking, do

18  you -- do you utilize the standards of care for

19  gender-affirming care?  Is that part of what you would

20  do, generally speaking, as a sociologist?

21    A.    No.

22    Q.    And the same question about the American

23  Medical Association's position on the standard of care,

24  is that something you would generally utilize as a

25  sociologist in your work?

1          A.     No.

2          Q.     And the same is true, sir, with regard to

3     the WPATH standard of care and the Endocrine Society

4     guidelines.  Those are not things that you would

5     typically utilize in your work as a sociologist, correct?

6          A.     Correct.

7          Q.     And you had no role in drafting the WPATH

8     standards of care, correct?

9          A.     Correct.

10         Q.     You've never provided a diagnosis of gender

11    dysphoria, correct?

12         A.     Correct.

13         Q.     You've never provided a diagnoses for any

14    medical condition, correct, sir?

15         A.     Correct.

16         Q.     You've never provided a treatment plan for

17    any medical condition whatsoever, correct?

18         A.     Correct.

19         Q.     And you are not qualified to provide a

20    medical diagnosis for any medical condition, correct?

21         A.     Correct.

22         Q.     You've never prescribed drugs of any kind

23    to anyone who is experiencing gender dysphoria, correct?

24         A.     Correct.

25         Q.     What did you do to prepare your report?

Page 168

1          A.    I read the literature and -- I mean, the

2    report was the culmination of quite a few years of

3    research in this area that was -- resulted in the -- my

4    publications.  And so I prepared a report I believe is

5    the evidence for or against the use of puberty blockers

6    for gender dysphoria.

7          Q.    Does the report contain all the opinions

8    you intended to provide in this matter?

9          A.    Yes.

10         Q.    You indicated a moment ago that you read

11   the literature and that the report is a culmination of

12   reviewing all the literature.

13               Is there any literature that you reviewed

14   that you have not identified in your report as having

15   been a basis for the opinions you are offering?

16         A.    I don't believe so, no.

17         Q.    Does the report contain all the work you

18   needed to render your opinions in this case?

19         A.    Yes.

20         Q.    Were you provided or did you otherwise have

21   all of the things that you needed to render your opinions

22   in this case?

23         A.    Yes.

24         Q.    If not, what else would you have needed?

25         A.    I said I had everything I needed.

1          Q.    I know and I'm asking you to think if there

2     is anything else that you would have needed, could have

3     considered in order to render full, complete, and robust

4     opinions in this case?

5          A.    I don't believe so, no.

6          Q.    So you don't believe, by example, having

7     conducted any research yourself or -- or spoken to any

8     transgender individuals or people from WPATH or people

9     who have the guidelines published from the endocrine

10    society, none of those things would have helped you

11    inform your opinions in this case?

12         A.    No, I don't believe so, no.

13         Q.    Is there any work left undone to finalize

14    your opinions in this case?

15         A.    No.

16         Q.    Any work that you wanted to do that you

17    haven't done?

18         A.    No, not for this case, no.

19         Q.    Have you been engaged in any other case as

20    a testifying expert?

21         A.    No.  Well, apart from the two I mentioned,

22    the one in Australia and the one in the UK.

23         Q.    Without telling me what case, regardless,

24    without disclosing, have you been engaged as a consulting

25    expert in any other cases on gender dysphoria or puberty

Page 170

1   blockers?

2          A.    No.

3          Q.    Other than what's identified, is there

4   anything else that you reviewed in connection with

5   rendering your opinions?

6          A.    No.

7          Q.    Was there any information that you got from

8   defense counsel, either related to the individual

9   plaintiffs or their caregivers, or any information that

10  you got from defense counsel that you did not otherwise

11  have for review?

12         A.    No.  The only thing I had was -- the only

13  thing they sent me is some -- about three or -- maybe

14  five rebuttals which mentioned my evidence.

15         Q.    Did you review those?

16         A.    Yes, I looked at those.

17         Q.    Okay.  Thank you.  When did you write your

18  report?

19         A.    January, Feb -- February, I think.

20         Q.    Of 2023?

21         A.    Yes.

22         Q.    And you testified already you did not show

23  a draft of your report to anyone, correct?

24         A.    Correct.

25         Q.    What did you learn about the lawsuit for

Page 171

1    which you have been retained as an expert?

2         A.    I'm not sure.  It must have been -- yeah,

3    I -- to be honest, I can't recall now.  Possibly

4    November, but...

5         Q.    Well, you testified or spoke at the board

6    of medicine meeting in October of 2022.  Does that orient

7    you as to when you may have been contacted about

8    providing expert testimony in this case?

9         A.    Perhaps in January, yeah -- yeah, I'm

10   really not clear about the date.

11        Q.    Do you have -- regardless of whether you

12   are clear about the date, do you have any kind of

13   approximation for how long ago was it, a year ago, six

14   months ago, eight months ago?

15        A.    It was a few -- I think it was either sort

16   of -- either the end of last year or the beginning of

17   this year.

18        Q.    Okay.  So if I understand you correctly,

19   you believe you were contacted to provide testimony in

20   this case sometime in the late fall of 2022 or early

21   2023; is that correct?

22        A.    Yes.

23        Q.    Yeah, you can't nod.  Yeah, okay.

24        A.    Yes, that's right.

25        Q.    Thank you.  Okay.

Page 172

```
 1              And who contacted you about being an expert
 2    in this case?
 3              A.    It was one of the lawyers at Holtzman
 4    Vogel.
 5              Q.    Do you know how they got your name?
 6              A.    I -- no, I don't know but I would assume it
 7    was from my appearances in Florida to the Florida Board
 8    of Medicine.
 9              Q.    Do you recall who from the law firm
10    contacted you?
11              A.    It might be Gary Perko.
12              Q.    Did they ask you your opinions before
13    having you testify in this case?
14              MR. BEATO:  So, Mr. Biggs, I'm going to
15          instruct you not to answer any other questions
16          regard -- excuse me, regarding our communications.
17          That's privileged information.
18              I'm instructing him not to answer that
19          question.
20              MS. ALTMAN:  Hold on, Michael.  My question
21          only called for a yes or no.  It wasn't the
22          substance of the conversation.
23              MR. BEATO:  Still, I think that verges into
24          the substance of the conversation.  I'm
25          instructing him not to answer any more questions
```

1           relating to that.

2                   MS. ALTMAN:  Okay.  We can talk about it

3           later.

4                   MR. BEATO:  Sure.

5    BY MS. ALTMAN:

6           Q.   You already testified you were not involved

7    with the rulemaking of the GAPMS process, correct?

8           A.   Correct.

9           Q.   But what you say in your report is, "After

10   reading the scientific literature, I became increasingly

11   concerned about the lack of robust evidence."

12          A.   Yes.

13          Q.   Do you recall putting that in your report

14   at paragraph 5?

15          A.   Yes.

16          Q.   Okay.  And what specific literature did you

17   review that caused you to be concerned?

18          A.   Well, the -- my initial concern was reading

19   the case study of the individual B. or F.G.  And the

20   second was reading the sort of gold standard Dutch study

21   of de Vries, et al., at 2011 and 2014, which I was very

22   surprised to see how little evidence there was to justify

23   puberty blockers.  That was many years ago.  But that was

24   what initially interested me.

25          Q.   Anything else that caused you to have great

Page 174

1   concern?

2          A.    Yes.  The fact that I discovered that the

3   Tavistock clinic in London had done an experiment or

4   study -- wasn't a proper experiment -- it was a study of

5   early puberty suppression that was designed to replicate

6   the Dutch study, and that they had never published any of

7   the results.

8          Q.    Anything else?

9          A.    No, those are the main things that led me

10  into this.

11         Q.    Okay.  And we've already talked about you

12  are aware of literature studies, findings that have a

13  different conclusion than the ones you rely on, correct?

14         A.    Yes.

15         Q.    In paragraph 6 you state, and I quote, "I

16  have conducted original research on the use of GnRH

17  puberty suppressors," do you recall making that statement

18  in your report?

19         A.    Yes.

20         Q.    And what original research did you conduct?

21         A.    Well, I was the first to publish the

22  results of the -- that English study into -- designed to

23  replicate the Dutch -- the Dutch study.

24         Q.    But you didn't conduct the original

25  research, sir, you just wrote about what someone else

1  did, correct?

2         A.    It was only due to my efforts that that

3  research saw the light of day.  And I was the first

4  person to publish on it.

5         Q.    And congratulations.  I'm not trying to

6  undermine or demean what you've done, I just want to make

7  sure the record is clear.  Because the statement you made

8  in your report is you conducted original research.  And

9  you, in fact, did not conduct original research, sir.

10 Someone else conducted original research and you wrote

11 about it, correct?

12               MR. BEATO:  Object to form.

13               Dr. Biggs, you can answer that question.

14               THE WITNESS:  I believe that what I've done

15         constitutes original research.

16 BY MS. ALTMAN:

17        Q.    And the sole original research that you

18 believe you've conducted is publishing the English study

19 that was trying to mimic the Dutch study, correct?

20        A.    That's one -- that was one.  Another one

21 would be the analysis of bone density.

22        Q.    Which, again, you were reporting on someone

23 else's work, correct?

24        A.    I was doing original analysis based on data

25 that I myself had elicited -- elicited from the

Page 176

1    Tavistock.

2            Q.    No, sir.  Someone else created the data and

3    then you provided your analysis of that data, correct?

4                  (Simultaneously speaking.)

5                  MR. BEATO:  Object to form.

6                  Dr. Biggs, you can answer the question.

7    BY MS. ALTMAN:

8            Q.    Go ahead, sir.

9                  MR. BEATO:  What's the answer to the

10           question, Mr. Biggs, just for the record?

11                 THE WITNESS:  Yes, I conducted the

12           statistical analysis, correct.

13   BY MS. ALTMAN:

14           Q.    Right, of someone else's data, correct?

15           A.    Yes.

16           Q.    Have you engaged in any kind of clinical

17   study with patients that involved GnRH treatments?

18           A.    Sorry, what do you mean by "critical

19   study" -- oh, you are saying clinical study?

20           Q.    Yes, sir.

21           A.    No.

22           Q.    Have you been involved directly in any

23   longitudinal studies?

24           A.    No.

25           Q.    Any observational studies?

1          A.    No.

2          Q.    Is there any study whatsoever where you

3    have been the primary investigator of data that you

4    collected?

5          A.    No.

6          Q.    Have you published an original article that

7    underwent a peer-review process analyzing data from a

8    clinical study that you performed with patients treated

9    by GnRH analogs?

10         A.    No.

11         Q.    So we've kind of gone over this, and I

12   don't want to retread it.  I just want to point out in

13   paragraph 7 of your report, you make the same similar

14   statement about "puberty suppression is designed to stop

15   normal puberty in order to prepare the child for taking

16   hormones of the opposite sex."

17              Do you recall making that statement in your

18   report?

19         A.    Yes.

20         Q.    And we've kind of gone back and forth,

21   debated what that means and whether or not that's an

22   accurate statement.  I'm assuming your testimony isn't

23   going to be any different about what you wrote in

24   paragraph 7 than what it is going to be about what you

25   said on your blog post and what you said to the Health

```
 1   and Human Services division, right -- committee, rather?
 2           A.    Yes.
 3           Q.    Okay.  I just don't want to go over things
 4   that we don't need to.
 5                 In -- in -- in paragraph 9, you say, "GnRH
 6   is never tested in any randomized clinical trial," do you
 7   recall saying that?
 8           A.    Yes.
 9                 MR. BEATO:  Would it be helpful -- I
10           apologize for interjecting -- would it be helpful
11           to, when we're quoting Dr. Biggs' report, to put
12           it on the screen just so everyone sees what's
13           being said?
14                 MS. ALTMAN:  We can, if you want.  He said
15           he had it there, so I wasn't going to --
16                 THE WITNESS:  As long as I can refer to it,
17           then that's fine.
18                 MS. ALTMAN:  Sure, if you want.
19                 But, Michael, if you want it to put on the
20           screen, we're happy to do that too.
21                 MR. BEATO:  I would prefer that.  It just
22           makes things easier so we're all looking at one
23           screen --
24                 MS. ALTMAN:  You are making me wake Ana up.
25                 Ana, are you out there?  Thank you.
```

1          MR. BEATO:  Thank you, Ana.

2          MS. ALTMAN:  Paragraph 9.  There you go.

3    BY MS. ALTMAN:

4          Q.    Do you see this statement, sir,

5    paragraph 9, "Puberty suppression as a treatment for

6    gender dysphoria was never tested in any randomized

7    clinical trial, nor were there any preliminary

8    experiments on nonhuman animals"?

9          A.    Yes.

10         Q.    What specifically did you rely upon in

11   making that -- those two statements?

12         A.    The fact that there has -- that there has

13   never been published any -- any randomized clinical

14   trials using puberty suppression as a treatment for

15   gender dysphoria.  And the fact that the Dutch

16   endocrinologist, Henrietta Delemarre-van de Waal,

17   actually worked in the laboratory with rats, but she did

18   not do any permanent experiments with rats even though

19   she had the laboratory there.

20         Q.    Anything else that you rely upon in making

21   those two statements?

22         A.    No.

23         Q.    And in paragraph 10, which is on the next

24   page, you make this statement, "The reported improvement

25   in gender dysphoria is flawed because the researchers

Page 180

1   switched the questionnaire used to construct the

2   measure."

3              Did I read that right?

4        A.    Paragraph 10 or paragraph 11?

5        Q.    Let's see.  I thought it was in ten.

6        A.    No, it is not in ten.

7        Q.    All right.  Hold on.  Let me put that one

8   to the side and I'll go back to that in a minute, how

9   about that?

10             But regardless -- and I'm going to go back

11  to the report in a second -- switching the questionnaires

12  doesn't explain how -- that the conclusion would be wrong

13  or improper, does it, sir?

14       A.    Yes, it does, because if you ask -- if you

15  start off with a male, a boy who says he's -- one of the

16  questions will be, "Are you distressed about having

17  erections?"  And he'll say, "Yes, I am because I'm gender

18  dysphoric," that makes sense, right, so he's gender

19  dysphoria.

20             And then after surgery you say, "Do you

21  hate menstruation?"  Now, of course, whether -- if you

22  ask me whether I hate menstruation, I would say no.  But

23  it's not because I've been cured of gender dysphoria,

24  it's just because I don't menstruate.  So the question

25  is -- obviously can be answered in the negative.

1           That's the kind -- those are the -- that's

2      the reason why the scales -- switching the scales makes a

3      huge difference.

4           Q.   Well, but you don't know, sir, do you,

5      whether or not -- switching the scales, whether or not

6      the individual recipient even answered that question, do

7      you?  You didn't look at the actual survey results, did

8      you?

9           A.   But that is one of the questions that are

10     used in making their gender dysphoria scale.

11          Q.   But that wasn't my question.  My question

12     is, you didn't go back and look at the underlying

13     questionnaires to determine whether or not individuals

14     properly and correctly responded to questions that would

15     be associated with their specific gender, did you?

16          A.   Well, the Dutch clinicians asked males a

17     series of questions, including "are you uncomfortable or

18     does" -- "are you very bothered by menstruation?"

19          Q.   Right.  My question to you is, you don't

20     know whether or not any particular individual answered

21     that question or how they answered that question,

22     correct?

23          A.   I know they would have answered that

24     question because that was required to -- for the scale.

25     I don't know how any particular individual answered that

Page 182

1    question, no.

2           Q.    Right.  And what I'm just trying to get at

3    is you didn't go back and look at the underlying results,

4    you relied upon somebody else's reporting of these

5    results, correct?

6           A.    Yes, I relied upon the published articles

7    by de Vries, et al., yes.

8           Q.    And you didn't conduct any of your own,

9    correct?

10          A.    Correct.

11          Q.    Meaning that if you thought it would be

12   more appropriate to ask the questions in a different way,

13   you've not taken upon yourself to engage in a study that

14   asks the questions in a way that you believe would have

15   been more appropriate, correct?

16          A.    Correct.

17          Q.    And I think it is in paragraph 13 but let's

18   just go down there.  Hopefully I have it right.

19                In paragraph 13 do you say, "The suspicion

20   must be that at least some of these children could have

21   grown up to be typical gays and lesbians without

22   requiring lifetime medical treatment, and without loss of

23   fertility and sexual function"?

24                Do you recall making that statement?

25          A.    Yes.

Page 183

1      Q.   Okay.  And you base your opinion on your

2  suspicion; isn't that right, sir?

3      A.   Yes, that's what the sentence reads, yes.

4      Q.   Right.  It's your suspicion.  You have no

5  evidence whatsoever to make that statement; isn't that

6  correct?

7      A.   The evidence is in the preceding sentence,

8  the first 70 adolescents, the vast majority were

9  homosexual, and only one was heterosexual.  The others

10 were bisexual.

11     Q.   Well, but that doesn't necessarily

12 eliminate the fact that they could be transgender,

13 correct?

14     A.   Correct.

15     Q.   Right.  And so I go back to my point, which

16 is throughout your report, you were -- you used words

17 like -- and we'll get to it -- "suspicion," "belief,"

18 words that are not scientific.  They are your musings

19 about what may or may not be.

20          That particular quote is the last sentence

21 on paragraph 13 where you say, "The suspicion must be at

22 least some of these individuals could have grown up to be

23 typical gays and lesbians."  But that's your musings

24 about it, that's not science, correct, sir?

25          MR. BEATO:  Object to form.

 1              Dr. Biggs, you can answer that question.

 2              THE WITNESS:  I think that's synonymous

 3         with a credible hypothesis or, you know, potential

 4         hypothesis.  The word "suspicion" is just saying

 5         that, yeah, I'm -- I cannot prove it.  There is no

 6         proof, but I believe it is a plausible conjecture

 7         or plausible hypothesis.

 8  BY MS. ALTMAN:

 9         Q.    So it is conjecture and hypothesis, not

10  opinion, right, sir?

11         A.    Yes, I -- yes.

12         Q.    Are you aware of any study that's ever

13  demonstrated that gender affirmation in childhood leads

14  to a child being transgender who otherwise may not have

15  been?

16         A.    Well, that would be unobservable because we

17  wouldn't know what the outcome was.

18         Q.    So you would agree with me that you have no

19  evidence to support that, correct?

20              You are not aware of any study that

21  supports that, correct?

22         A.    Correct.

23         Q.    That gender affirmation in childhood leads

24  to a child being transgender who otherwise may not have

25  been, correct?

Page 185

1          A.     Correct.

2          Q.     And you are not opining, sir, that puberty

3   blockers somehow make someone transgender and prevents

4   them from being a typical gay or lesbian, are you?

5          A.     Yes, I am.

6          Q.     You are?  That's your testimony, sir, under

7   oath, that if you take puberty blockers, by definition,

8   you won't become a typical gay or lesbian?

9          A.     Well, in some cases I believe that children

10  who are taking puberty blockers and turned into what was

11  originally called juvenile transsexuals could have grown

12  up to be feminine boys, gay men, or butch lesbians.

13  That's -- that's my belief, yes.

14         Q.     And your -- that's your -- that's what I

15  think you called conjecture, right, your speculation

16  because you have no evidence to support that, correct?

17         A.     There is evidence to support that.  There

18  is not proof.  There is not demonstration.  But I would

19  also say -- point out that the Dutch clinicians in an

20  article by Anacker, et al. 2023 acknowledged that

21  possibly gonadotropin-releasing hormone agonists can

22  become a self-fulfilling prophecy.  That's not the exact

23  words but that's what they acknowledge as one -- as a

24  credible possibility.

25         Q.     A credible possibility?

1          A.    Yes.

2          Q.    But that's not science, sir, it's just a

3   hypothetical, correct?

4          A.    No.  This was a statement in -- by the

5   Dutch clinicians in a published and a peer-reviewed

6   journal.  I don't remember off the top of my head what

7   journal it was.  So they were entertaining this as a

8   possibility.

9          Q.    As a possibility, correct?

10         A.    Yes.

11         Q.    Not a scientific truism, correct, sir?

12         A.    How science deals with possibilities.

13         Q.    Okay.

14         A.    And probabilities.

15         Q.    Sir, in paragraph 13 of your report, you

16   also make the following statement:  "All this evidence

17   predates the promotion of transgenderism in health care

18   and schools and on social media."

19                Do you see where you wrote that?

20         A.    Yes.

21         Q.    Okay.  And you go on to refer to "the

22   manifesto for the Dutch Protocol fails to mention

23   homosexuality and does not cite any of the studies of

24   feminine boys."

25                Did I read that right?

1          A.    Yes.

2          Q.    Now, it -- starting with the first

3     sentence, "All this evidence predates the promotion of

4     transgenderism in health care and schools and on social

5     media."  What evidence do you have that transgenderism is

6     being promoted in health care, schools, and on social

7     media, what specific evidence do you rely upon for that

8     statement?

9          A.    Well, social media was not around then, so

10    clearly there was no promotion on social media.  Schools,

11    there is widespread evidence, for example, the use of the

12    book about Jazz Jennings.  And on media, you could use

13    Jazz Jennings as perhaps the best example of that.

14               In terms of health care, more and more of

15    the possibility of being transgender in, for example --

16    and the growth of the gender clinics -- of the gender

17    clinics like the gender clinic in Tavistock.

18         Q.    Well, how is that promoting transgenderism?

19         A.    Well, it's -- it's suggesting to children

20    that this is a possible and perhaps even a desirable way

21    of being.

22         Q.    Isn't it just, sir, accepting those who are

23    transgender for who they are?

24               Nobody is converting people to be

25    transgender, are they?

1              MR. BEATO:  Object to the form.

2              Dr. Biggs, you can answer that question.

3              THE WITNESS:  I would -- I'm quite happy

4         with the phrase that I use there.  I do believe

5         that there is more and more publicity to being

6         given -- to being a transgender identity as a

7         potential way of being and a -- and perhaps even a

8         desirable way of being.

9    BY MS. ALTMAN:

10         Q.    Well, do you think it is an undesirable way

11   of being?

12         A.    I believe that there are -- what is

13   undesirable is becoming a lifelong medical patient.

14         Q.    And what is the basis, the medical basis

15   for your statement, the scientific basis for the

16   statement you just made?

17         A.    Well, I don't think -- I don't -- who wants

18   to be a lifelong medical patient?  I don't think -- yeah,

19   I don't think that's a desirable -- a desirable outcome,

20   if it can be avoided.

21         Q.    So that's just more of your suspicions and

22   musings and conjecture.  I'm asking whether or not you

23   have actual -- any scientific support for the statements

24   that are in your report?

25              MR. BEATO:  Object to the form.

1            Dr. Biggs, you can answer that question.

2            THE WITNESS:  That statement, I don't

3        believe, is in my report.  It is just simply what

4        you've asked me -- asked me about now.

5    BY MS. ALTMAN:

6        Q.    Well, no, I read to you the statement

7    that's in your report, that there is -- apparently, there

8    is -- people are promoting transgenderism in health care,

9    schools, and on social media.  And I asked you for the

10   evidence that you have to support that statement?

11       A.    Yes, I've said that I think -- believe

12   there is abundant evidence in -- for example, if you look

13   at searches on Google trans.  If you look at the --

14       Q.    What specific searches -- sir, what

15   specific searches, what specific evidence did you rely

16   upon when you made that statement in your report.  I'm

17   asking you the specific evidence that you relied upon?

18       A.    If you search for various combinations and

19   permutations of the word "transsexual child,"

20   "transgender child," "trans child," "trans kid," "trans

21   children" and so on, you can see a massive peak in that,

22   particularly after 2005 but more particularly after 2010.

23       Q.    Okay.  So, sir, it is not my responsibility

24   to conduct these searches.  I'm asking you what specific

25   scientific basis do you have before you made that

Page 190

1    statement in this report, what -- did you do those

2    searches, if so, are they -- are the results listed in

3    your bibliography?

4              MR. BEATO:  Object to form.

5              Dr. Biggs, you can answer those questions.

6              THE WITNESS:  I did do those searches.  The

7         results are not listed in my -- in the

8         bibliography because I thought it was --

9    BY MS. ALTMAN:

10        Q.    Why not?

11        A.    It was so obvious that the increase in the

12   prominence of transgenderism in health care and schools

13   and social media would be obvious.

14        Q.    Sir, did you look at all of the possible

15   reasons why being transgender is more at the forefront

16   today, like perhaps US states that are banning

17   transgender health care -- just as an example, throwing

18   it out there -- and then putting that in the media.  Did

19   you look at that, maybe that's the reason why people are

20   more frequent to be discussing the issue?

21        A.    Well, bans on health care have only been

22   around for a couple of years.  I'm talking about a

23   long -- long-term trend from -- I think I did 1990 to

24   2020.  So it's -- yeah, that's the basis of it.

25        Q.    So other than your Google searches, is

1   there anything else that you relied upon in making that

2   statement in your report?

3          A.    Just to clarify, it wasn't a Google search.

4   It was a search of Google's corpus and the entire body of

5   printed material in -- in the English language.

6          Q.    Right.  The one -- the things that you did

7   not list in your report as resources, correct?

8          A.    Yes.

9          Q.    Sir, do you believe it's -- that it is easy

10   to be transgender, it is appealing to be transgender?

11          A.    I believe in some cases it can be

12   appealing, yes.

13          Q.    What about in others?

14          A.    In other cases, it is not.

15          Q.    You are not making a -- you are not

16   providing a general opinion that people are jumping on

17   the transgender bandwagon because it is so easy and it is

18   being promoted, are you?

19          A.    No.  I believe that sometimes it makes

20   sense of an individual's predicament of suffering or

21   distress about their body, about their gender roles.

22          Q.    And it might make sense just because they

23   are transgender, right?

24          A.    Yes, it might.

25          Q.    Right.  And you don't know in any

1    particular case whether that's true, right?

2         A.    Not in any individual case, no.

3         Q.    Now, sir, in paragraph 14 of your report,

4    you spend a lot of time talking about that -- the overlap

5    between gender dysphoria and autistic spectrum

6    conditions, do you recall writing about that in your

7    report?

8         A.    Yes.

9         Q.    Sir, you would agree with me that being

10   transgender and being on the spectrum are not mutually

11   exclusive, correct?

12        A.    Correct.

13        Q.    Sir, on the studies pertaining to feminine

14   boys, you agree that all of those studies pertain to

15   preadolescence, mostly prepubertal children under the age

16   of 12, correct?

17        A.    Yes.

18        Q.    And you would also agree that being gender

19   nonconforming is not the same thing as being transgender,

20   correct?

21        A.    It's not necessarily the same, no.

22        Q.    And you would also agree by definition

23   those studies don't indicate a desistance rate for people

24   who are actually transgender abandoning a transgender

25   identity, correct?

Page 193

1          A.     Well, the study by Green on Sissy Boys that

2     I cite was -- they specifically identified children,

3     boys, who they thought were going to be transsexual,

4     they -- they refer to pre-transsexual.  So they are

5     trying to find the most feminine, most dysphoric

6     children, dysphoric male children.

7          Q.     Well, that doesn't mean that they were

8     though, correct, sir?

9          A.     Well, the -- they were identifying the most

10    feminine boys they could find who were -- who they

11    thought would be certain to develop into transsexuals or

12    very highly likely to develop into transsexuals.

13         Q.     Right.  But, again, that's subjective,

14    correct, sir?  It is somebody else's, you know, views on

15    whether or not they may or may not be, correct?

16         A.     Yes.

17         Q.     Now, sir, again, back to your opinions or

18    musings about gender dysphoria and autistic spectrum

19    conditions.  As I just asked you, being autistic and

20    having gender dysphoria are not mutually exclusive,

21    correct?

22         A.     Correct.

23         Q.     And you make this statement, "Children on

24    the autistic spectrum are more likely to face

25    difficulties fitting in with their same sex peers, which

Page 194

1    makes a transgender identity obviously appealing as both

2    an explanation and a solution."  And that's at -- the

3    bottom of page 9 and goes on to page 10.

4                 Do you recall making that statement?

5          A.    Yes.

6          Q.    Is it -- have you done any studies, sir, as

7    to whether or not autistic children or children on the

8    spectrum have difficulty fitting in with both their same

9    sex peers and opposite sex of peers -- peers?

10         A.    That was reporting the article that was in

11   the previous sentence.  So I'm having -- do we have the

12   right page there?

13         Q.    Yeah.  Well, that's --

14         A.    In the previous -- the last -- yeah, I was

15   reporting on something that was quoted on a literature

16   reviewed by van der Miesen, Hurley and de Vries, 2016,

17   that quotes -- I'm paraphrasing the evidence that this

18   literature review was producing.

19                Which said, essentially, particularly de

20   Vries is one of the clinicians who emphasized this, that

21   children on the autistic spectrum are more likely to face

22   difficulties fitting in with their same sex peers.  And

23   the original study was, I think, de Vries -- de Vries, et

24   al., 2010, the original article that I don't cite that --

25   because I'm citing the literature review.

1          Q.    Right.  So a couple things.  Number one, it

2    is not quoted, correct, there is no quotes around that.

3    It's a statement by you, correct?

4          A.    It's a -- but it's a paraphrase of the

5    evidence that I provided.

6          Q.    Well, it is not attributed to anyone,

7    correct, sir?  At the end of the sentence, there's not a

8    footnote, there is not a quote or reference to anybody

9    else's study, right?

10              MR. BEATO:  Object to the form.

11              Dr. Biggs, you can answer that question.

12              THE WITNESS:  Yes.

13    BY MS. ALTMAN:

14          Q.    And, sir, my question is, you make this

15    statement, you make this statement, not anybody else,

16    "Children on the autistic spectrum are more likely to

17    face difficulties fitting in with their same sex peers."

18              And my question to you is, have you done

19    any analysis whatsoever into whether or not children on

20    the autistic spectrum have difficulty fitting in with

21    anyone, whether it is their same sex peers or their

22    opposite sex peers?

23          A.    No, I haven't conducted an original

24    research on that -- on that question, no.

25          Q.    Okay.  And so, sir, you don't know whether

Page 196

1    or not the fact that -- whether it is same sex or

2    opposite sex peers, that children on the autistic

3    spectrum are, air quotes, becoming transgender because

4    they don't -- they don't feel that they fit in with their

5    peers.  You don't have any evidence to support that,

6    correct, sir?

7              A.   Well, apart from my reading of the Dutch

8    clinicians like de Vries, correct.

9              Q.   Right.  But I'm asking you, though, what

10   research or studies you've done to support the statement

11   in this report?  Other than --

12             A.   I haven't done my own original research on

13   that, no.

14             Q.   And perhaps I'm misreading what you are

15   saying.  But, I mean, the implication of what you are

16   saying is that autistic spectrum individuals are

17   pretending to be transgender to fit in.

18                  Is that what you are trying to convince

19   this Court?

20                  MR. BEATO:  Object to the form.

21                  Dr. Biggs, you can answer that question.

22                  THE WITNESS:  No, that's not -- that's not

23          how I would characterize it at all.  I don't

24          believe they're pretending.  I believe they're

25          making sense, as we all do, of their experiences.

```
 1            And that this label helps them make sense of their
 2            experiences, and also to provide a potential
 3            solution for them.
 4    BY MS. ALTMAN:
 5            Q.    Well, is being transgender a label?
 6            A.    Yes, among other things, yes.
 7            Q.    And so label for what, sir?
 8            A.    Well, it is a label for a particular
 9    identity, just like Christian or British or sociologist,
10    these are the ways in which we interact with the social
11    world.
12            Q.    Now, you go on to say in the end of that
13    paragraph, "From a sample of over 700 referrals to the
14    G-I-D-S, GIDS, in 2012" -- so ten years ago -- "and
15    2015" -- so less than ten years ago -- "14 to 15 percent
16    were diagnosed with autism" -- you say ASC -- but autism
17    spectrum conditions -- "and this was more than ten times
18    greater than the rate for students in England," which you
19    then cite to.
20            Do you recall that statement in your
21    report?
22            A.    Yes.
23            Q.    And you go on to say, "The proportion among
24    those subjected to GnRH could be even higher."  What's
25    the scientific basis or the evidence for that statement?
```

1          A.     Can I -- I think this may be on page 10.

2    Can we scroll forward --

3          Q.     It is on page 10, yes.

4          A.     The evidence for that is in the -- the next

5    sentence, because in the first study that was done by the

6    Tavistock kids, of the first 30 patients, almost half of

7    them had autistic spectrum traits.

8          Q.     Well, again, we discussed a few minutes

9    ago, they are not mutually exclusive, right, somebody

10   could be both -- have autistic spectrum disorder and also

11   be transgender, correct?

12         A.     Yes, yes.

13         Q.     In -- in paragraph 20 of your report, you

14   say, "Because of the risk of suicide" -- "because the

15   risk of suicide increases greatly from prepubescence to

16   late adolescence, altering normal cognitive and emotional

17   development with GnRH could reduce the risk of suicide by

18   preventing the child from maturing."

19                Did I read that right?

20         A.     Yes.

21                MR. BEATO:  Let me just pause here.

22                Ana, could you please scroll down --

23                MS. GONZALEZ:  Okay.  Sorry.

24                (Simultaneously speaking.)

25                MR. BEATO:  Page 13, please.  Thank you.

Page 199

1           Sorry for the interruption, just wanted

2      to...

3           MS. ALTMAN:  No, no worries.

4  BY MS. ALTMAN:

5      Q.    "Because of the risk of suicide," do you

6  see that, sir, second sentence in paragraph 20?

7      A.    Yes.

8      Q.    What's the basis, the evidential basis for

9  that statement, sir?

10      A.    Well, that's an inference from the way that

11  suicide is much higher, for example, in a 18-year-old

12  than it is in a 10-year-old.  We're talking about sort of

13  the general population.  So if we're able to sort of --

14  if you, like, freeze a 12-year-old at a sort of mental

15  state of being 12, then one of the logical consequences

16  of that will be less likely to -- to commit suicide than

17  they would be otherwise.

18      Q.    So the answer to my question is that you

19  don't have any evidential basis for that statement in

20  your report, correct?

21      A.    Correct.

22      Q.    It is just an inference that you've drawn?

23      A.    Yes.  Yes.  And, in fact, the next says,

24  "As yet, there is no evidence; however," so exactly,

25  that's the case.

Page 200

1          Q.    But you were engaged to provide opinions in

2      this case, not -- not inferences or musings or

3      suspicions.  You were engaged to provide opinions based

4      on scientific evidence, correct, sir?

5                     MR. BEATO:  Object to form.

6                     Dr. Biggs, you can answer the question.

7                     THE WITNESS:  I mean, the way science works

8              is by entertaining different possibilities and

9              different probabilities.

10                     In that case, I think quite fairly, I said

11             that it could be the case.  It is not implausible

12             on a theoretical basis that puberty blockers do

13             reduce suicidality.  However, there was no robust

14             empirical evidence that that is the case.

15                     So I think that gives the full panel of

16             potential impacts of puberty blockers.

17     BY MS. ALTMAN:

18          Q.    Sir, you would agree with me that your

19     opinions are contrary to the WPATH standards of care?

20          A.    Yes.

21          Q.    And they are contrary to the American

22     Medical Association?

23          A.    Yes.

24          Q.    And they are contrary to the American

25     Academy of Pediatrics?

Page 201

1          A.     Yes.

2          Q.     And they are contrary to the Endocrine

3    Society guidelines?

4          A.     Yes.

5          Q.     And are you aware that your opinion is

6    contrary to the standards of care for gender-affirming

7    care in the United States generally?

8          A.     Established clinical practice as its

9    developed, yes.

10         Q.     And you don't know, in this particular

11   case, whether the treatments that the plaintiffs were

12   receiving have been helpful or not, correct?

13         A.     Correct.

14         Q.     And I hope you would agree that the

15   efficacy of puberty suppressors is best left to the

16   experts in the field, meaning, endocrinologists,

17   psychiatrists, and psychologists, correct?

18              MR. BEATO:  Object to form.

19              Dr. Biggs, you can answer that question.

20              THE WITNESS:  I believe that there should

21         be a robust empirical debate in the literature,

22         signed literature that robustly scrutinizes the

23         evidence for the efficacy and safety of puberty

24         blocks.

25   BY MS. ALTMAN:

1      Q.    And I get that.  And the robust empirical

2   discussion should occur between medical practitioner,

3   endocrinologist, psychiatrist, psychologist, correct?

4      A.    No.  It should occur between everybody who

5   has something to say about this, including -- and can

6   publish their work in a peer-reviewed journal.

7      Q.    Including yourself; is that right?

8      A.    Correct.

9      Q.    And I think I asked you this earlier, but

10  just in case, you don't have any clinical experience with

11  puberty blockers, do you?

12          MR. BEATO:  Objection to form, asked and

13      answered.

14          Dr. Biggs, you can respond.

15          THE WITNESS:  Correct.

16  BY MS. ALTMAN:

17      Q.    Yeah, I wasn't trying to ask you the same

18  question again, so I apologize if I did.

19          Now, sir, you've been quoted as making this

20  statement, and I just want to understand it.  This is a

21  direct quote.  It was in sex and gender.  "I do not,

22  however, believe that gender identity supersedes sex any

23  more than I believe that Jesus was the son of God."

24          "Therefore, I oppose any attempt by the

25  university to establish an official doctrine on gender,

Page 203

1    just as I would oppose the imposition of a single

2    religion or one particular position on Israel,

3    Palestine."

4              Did I read -- do you remember making that

5    statement?

6         A.    Yes.

7         Q.    Okay.  And what does that mean, "I do not,

8    however, believe that gender identity supersedes sex"?

9         A.    I do not believe that gender identity or

10   someone's subjectively perceived understanding of

11   themselves should be -- weigh more in society than --

12   than their physical sex.

13        Q.    Well, would you agree that it should at

14   least be weighed the same?

15        A.    No -- well, depends on the case -- depends

16   on cases -- depends on the case.  If you are talking

17   about, for example, should a rapist be put in a women's

18   prison -- a male who has used his penis to rape a woman

19   should be put in a women's prison because his gender

20   identity is that of a woman.  I would say, in that case,

21   for example, no.  His physical biological sex should take

22   precedence.

23        Q.    Sir, have you ever been a prison warden?

24              MR. BEATO:  Object to form.

25              Dr. Biggs, you can answer the question.

1          THE WITNESS:  No, I haven't.

2    BY MS. ALTMAN:

3          Q.    And have you done any research into

4    whatever standards and guidelines are utilized by prisons

5    in determining where prisoners are placed?

6          A.    Yes.

7          Q.    You have?  And is any of that published

8    literature referenced in your bibliography?

9          A.    Of this -- of my expert report, no, because

10   it wasn't relevant to the -- what I was being asked to

11   do.

12         Q.    And where would that published literature

13   be that you've written on this subject?

14         A.    The article is in the -- is in the general

15   controversial ideas.

16         Q.    Okay.

17         A.    It is specifically about England, England

18   and Wales.

19         Q.    Okay.  And when was that published?

20         A.    I believe 2022.

21         Q.    Okay.  Sir, you wrote a chapter in a book

22   titled, "Inventing transgender children and young

23   people."  Do you recall that?

24         A.    Yes.

25         Q.    Do you think that you can invent

Page 205

1    transgender people or children?

2           A.    Well, I believe that these labels or social

3    categories are -- vary across cultures and over -- vary

4    over time, like being lesbian or being African American

5    versus, you know, other -- other sorts of identities.

6    So, yes, I believe, in a manner of speaking, that

7    identities are invented, like sociologist or lesbian or

8    so on.

9           Q.    You think being a lesbian is invented?

10          A.    I believe that the -- the identifying as a

11   lesbian as such is -- is a social construct, and that

12   those have genealogies which we can explore, yes.

13          Q.    And you think being transgender is

14   invented?

15          A.    In a way that is very common parlance in

16   the social sciences, we talk about the way that

17   constructs change over time and they vary across

18   cultures.

19          Q.    Well, what does that mean, sir?  I mean,

20   you've testified earlier you agree that transgender

21   people exist, so what does it mean, that they are being

22   invented?

23          A.    Well, I believe Christians exist but I --

24   there is also societies in which there was no such thing

25   as a Christianity, right, there's no such thing as a

Page 206

1   Christian.

2             So there was nobody in 1900 identified as

3   transgender because that -- that label had -- that

4   category had not been created yet.

5             Q.    Uh-huh.  So your -- if I understand you

6   correctly, you are just suggesting that the name for it

7   has changed?

8             A.    And the way it is theorized, the way -- the

9   conceptualization of it, yes.

10            Q.    Well, how are we conceptualizing it, how

11  are you conceptualizing it?

12            A.    Well, I'm conceptualizing it as a -- kind

13  of a -- as a social identity, which -- which involves, in

14  many cases, a medical physical intervention.

15            Q.    Well, as a social identity, is that

16  different from an actual identity?

17            A.    Identities are generally social.

18            Q.    So all identities are social?

19            A.    Yes.

20            MR. BEATO:  Counsel, I know we're

21            approaching upon the one hour and 30-minute point.

22            Would it be best --

23            MS. ALTMAN:  Happy to take a break,

24            Michael.

25            MR. BEATO:  Perfect.

Page 207

1              MS. ALTMAN:  As long as you want.

2              MR. BEATO:  So how about we meet -- I don't

3         know --

4              MS. ALTMAN:  As long as you want.  3:10?

5              MR. BEATO:  I'm sorry?

6              MS. ALTMAN:  3:10 on -- I have 2:57.  So

7         3:10.  You want to do 13 minutes, you want to do

8         15 minutes, what do you want to do?

9              MR. BEATO:  How about 3:05, if that works

10        with you, Dr. Biggs.

11             MS. ALTMAN:  3:05.

12             THE WITNESS:  3:05, yep, that's good.

13             MR. BEATO:  I didn't mean to interrupt your

14        train of thought.  Just want to get a quick little

15        break.

16             MS. ALTMAN:  No problem.

17             MR. BEATO:  Thank you very much.

18             (A brief recess was taken from 2:57 p.m. to

19   3:04 p.m.)

20   BY MS. ALTMAN:

21        Q.   So, sir, in paragraph 22 you say, "There

22   are anecdotal reports of children experiencing increased

23   suicidal feelings after GnRHa," did I read that

24   correctly?

25             Do you need for us to pull it up on the

Page 208

1    screen or do you recall making that statement?

2              A.    I recall that.

3         Q.    Okay.

4              MR. BEATO:  And for my benefit, can we --

5         Ana, could you put that on the screen again for my

6         benefit?

7              MS. GONZALEZ:  I'm sorry, what paragraph

8         was that?  I was copying her e-mail.

9              MS. ALTMAN:  P 2, 22.

10             MS. GONZALEZ:  Page 22?

11             MS. ALTMAN:  Yes, ma'am.

12             MR. BEATO:  Paragraph 22.

13             MS. GONZALEZ:  Oh, paragraph 22.

14             MS. ALTMAN:  I'm sorry, yes, paragraph 22.

15             MR. BEATO:  Thank you, Ana.

16             MS. GONZALEZ:  You are welcome.

17   BY MS. ALTMAN:

18        Q.    All right.  Dr. Biggs, first of all,

19   anecdotal reports of children experience increased

20   suicidal feelings of -- feelings after GnRHa is not

21   scientific evidence, can we agree on that?

22        A.    Reports of adverse events are part of the

23   medical -- part of the important documentation and

24   medical -- medical research.

25        Q.    Well, sir, you are not -- the only thing

1   you cite to that is this Brik 2020, correct, of one --

2                   (Simultaneously speaking.)

3   BY MS. ALTMAN:

4           Q.    Let me just finish.

5                   Of one teenager who stopped treatment

6   because of the increase in mood problems and suicidal

7   thoughts and confusion attributed to GnRH treatment,

8   correct?

9           A.    There is a -- in the next -- I think --

10  believe the subsequent sentence, there is another case.

11          Q.    Right.  So there is two instances.  And --

12  and in the first instance, the child was obviously

13  monitored, which is what you would do when you put

14  someone on any medication, correct?

15                  You would -- as a medical practitioner, you

16  would evaluate how that person is -- is doing clinically

17  on the medication, correct?

18                  MR. BEATO:  Object to the form.

19                  (Simultaneously speaking.)

20                  MR. BEATO:  Dr. Biggs, can you please

21          repeat your answer?

22                  THE WITNESS:  Yes.  So medical

23          practitioners certainly should be monitoring

24          children who are on puberty blockers, definitely.

25  BY MS. ALTMAN:

Page 210

1      Q.    Okay.  But that's -- so that's a reason to

2  monitor care, not to ban it; isn't that right, sir?

3      A.    Yes.

4      Q.    Now, sir, in paragraph 24 on page 16, and

5  going on to page 17, as well, in paragraphs 26 and 27, so

6  paragraphs 24, 26, 27, you consistently use your -- your

7  interpretation rather than science.

8           For example, in paragraph 24 you refer to

9  "One obvious explanation is that clinicians were

10 following the WPATH health recommendations against

11 commencing medical intervention when an adolescent is

12 experiencing an acute mental health crisis."

13          And so you are providing your explanation

14 but that doesn't make it the actual explanation, does it,

15 sir?

16              MR. BEATO:  Object to form.

17              Dr. Biggs, you can answer that question.

18              THE WITNESS:  Correct.  Though, that was

19          not my explanation.  It would be the -- of any

20          scientist worth -- any scientist worth his or her

21          salt would suggest that that is a potential

22          explanation.

23 BY MS. ALTMAN:

24      Q.    It's one explanation, not necessarily the

25 explanation, correct?

Page 211

1         A.      Absolutely correct.

2         Q.      Right.  And in paragraph 26, the first

3     sentence, "The Dutch pioneers warned at the outset that

4     patients 'could' end up with a decreased bone density,

5     which is associated with a high risk of osteoporosis."

6              So, again, it could happen, that doesn't

7     mean it will happen, correct?

8         A.      Yes.

9         Q.      And then further down in the paragraph you

10    say, "In addition, children given GnRHa already have

11    unusually low bone density, perhaps due to the high

12    prevalence of eating disorders."

13             So now, if I read your statement, which is

14    not referencing any evidence whatsoever, now you are

15    musing about whether or not people have low -- already

16    have low bone density because they have a high prevalence

17    of eating disorders, right, sir?

18                  MR. BEATO:  Object to form.

19                  Dr. Biggs, you can answer that question.

20                  THE WITNESS:  My apologies for not

21             providing a citation.  I thought that this would

22             have been sort of common knowledge.

23                  One citation I could have used is

24             Olson-Kennedy, who states in her NIH --

25             Olson-Kennedy is not the first author but one of

1          the coauthors of this article which is on bone

2          density on 95 children who were given GnRH, and

3          they're in an NIH-funded study.

4                And suggested that they -- the data were

5          from this 95, that they have unusually low bone

6          density due to -- probably due to eating

7          disorders.

8   BY MS. ALTMAN:

9          Q.    "Probably" was the word you just used?

10         A.    I couldn't -- I cannot quoting what they

11   are saying, but one of the recommendations was that

12   clinicians must always ask about eating disorders because

13   they suggested that calorific deficiency was what was

14   causing this usually low bone density.

15         Q.    And that would be part of a clinician's

16   job, right, before they put an individual on any

17   medication, they should do a thorough clinical

18   examination of the patient, correct?

19         A.    They certainly should do a thorough

20   clinical examination, yes, you are correct.

21         Q.    Right.  And that, again, is a reason to do

22   a thorough clinical analysis but not to ban care,

23   correct?

24                MR. BEATO:  Object to form.

25                You can answer that, Dr. Biggs.

1              THE WITNESS:  Well, this is one of the

2         reasons why, in this particular population of

3         children with -- starting out with on average -- a

4         lower bone density than average, the risks of

5         decreasing that density is going to be more

6         pronounced.

7              So it's -- it's a statistical fact that's

8         important -- is very important in evaluating the

9         costs and the benefits of the treatment.

10   BY MS. ALTMAN:

11        Q.   Which is why the clinicians and medical

12   professionals should monitor the care, correct?

13        A.   Certainly, they -- clinicians should

14   monitor the care, yes.

15        Q.   Right.  That's not a reason to ban care,

16   correct, sir?

17        A.   It's not -- by itself, it does not say that

18   the care should be banned, correct.

19        Q.   And at the bottom of page 17, paragraph 7,

20   again, you use the word "Anecdotally, a British female

21   patient who started GnRH at age 12 then experienced four

22   broken bones at the age of 16," correct?

23        A.   Correct.

24        Q.   Did I read that right?  Right?

25        A.   Yes.

Page 214

1        Q.    And, sir, as you sit here today, you don't

2   know why this one individual at the age of 16 had four

3   broken bones, do you?

4        A.    No.

5        Q.    And, again, on page 19, paragraph 29, you

6   said, second or third sentence, referring to the Dutch --

7   "Dutch clinicians initially promoted puberty suppression

8   as providing space for therapeutic exploration of gender

9   identity without the pressure of physical changes

10  accompanying puberty."

11              Did I read that right?

12       A.    Yes.

13       Q.    And that makes sense, does it not, sir?

14       A.    It was one -- it was a plausible outcome,

15  yes, yes.

16       Q.    And the bottom of paragraph 30, again, you

17  use the word "suspicion."  "The suspicion is that puberty

18  suppression reinforced gender dysphoria."  Do you recall

19  making that statement in your report?

20       A.    Yes.

21       Q.    Whose suspicion are you referring to there,

22  sir?

23       A.    Can I see -- let me --

24       Q.    Page 20, the first -- there you go.

25       A.    I'm just looking at what comes -- precedes

Page 215

1    that.

2          Q.    Sure.

3                MR. BEATO:  Ana, could you go to page 19,

4          please.

5                THE WITNESS:  That's okay.  No, I've seen

6          it on my paper copy.

7                That is I think any reasonable observer --

8          or any scientific observer would suspect that is

9          one -- one potential possibility, yes.

10   BY MS. ALTMAN:

11         Q.    Not to the exclusion of other

12   possibilities, correct, sir?

13         A.    Absolutely.

14         Q.    So this is just, again, one possible

15   scenario, a hypothetical, but it could be something else

16   completely, correct?

17         A.    Yes.

18         Q.    And, sir, we talked about social constructs

19   earlier, and you would agree with me that being male or

20   female is also a social construct, correct?

21         A.    No, I disagree on that.

22         Q.    You do.  How so?

23         A.    I believe what male and female are

24   biological -- are biological concepts, not sociological

25   concepts.

1          Q.     And what's your basis for that statement?

2          A.     Reading of the literature around sex.

3          Q.     What literature specifically are you

4    referring to?

5          A.     Evolutionary literature on the evolution of

6    sex.

7          Q.     Is that a specific periodical that you are

8    referring to, the evolution of sex?

9          A.     No, I'm referring to a sort of literature,

10   a large scientific --

11                 (Phone interruption.)

12                 (Reporter asks for clarification.)

13                 THE WITNESS:  Literature about why sex

14          evolved.

15   BY MS. ALTMAN:

16          Q.     And what specific literature are you

17   referring to?

18          A.     Well, I'm not -- I'm not going to cite

19   particular articles, but the reason.  This is a --

20   there's a huge literature on why sex evolved.  And sex

21   has been around for many millions of years.  And it so

22   long predates humans and long predates culture, human

23   culture.

24          Q.     Based on your -- that's your reading of

25   this sex evolution history, that's your conclusion from

1  it; is that correct?

2          A.    Correct.

3          Q.    Now, sir, you've been linked to some

4  transphobic tweets, you -- are you aware of that?

5                  MR. BEATO:  Object to form.

6                  Dr. Biggs, you can answer that question.

7                  THE WITNESS:  Yes.

8  BY MS. ALTMAN:

9          Q.    And it's correct, sir, have you been

10  tweeting under the pseudonym Henry Wimbush?

11          A.    I used -- that was a student of my Twitter

12  account, yes -- or my -- yes.

13          Q.    And I know you talked a lot today about how

14  you want a free and open discourse and people should be

15  able to, you know, give their opinions on various

16  matters.  And in keeping to that, why did you hide behind

17  a pseudonym, why didn't you use your name?

18                  MR. BEATO:  Object to form.

19                  Dr. Biggs, you can answer that question.

20                  THE WITNESS:  Because I believe that

21          evidence shouldn't be based on who -- on the

22          status or the credentials of the person saying it.

23          It should be based on the logic and empirical

24          evidence of the statement -- incorporating the

25          statement.

Page 218

1    BY MS. ALTMAN:

2         Q.    Well, why would you think it would be any

3    less impactful or important if you used your own name

4    versus Henry Wimbush?

5         A.    As I said, I don't believe that views

6    should be judged by the -- the identity of the person or

7    the credentials of the person making those statements but

8    on the content of the statement themselves.

9         Q.    So you believe -- it's most appropriate to

10   hide behind a keyboard, is that what I'm hearing you say?

11             MR. BEATO:  Object to form.

12             Dr. Biggs, you can answer that question.

13             THE WITNESS:  I think there is a long

14        history of pseudonymity.  I mean, the

15        federalist -- I believe The Federalist Papers, the

16        authors of The Federalist Papers chose to hide

17        behind a keyboard, as you might say.

18   BY MS. ALTMAN:

19        Q.    Well, is there any particular reason why

20   you didn't use your real name, sir?

21        A.    I think I've already explained why I

22   have -- why I made that decision.

23        Q.    Now, you were exposed in an article in The

24   Oxford Student, right?

25             MR. BEATO:  Object to form.

1             Dr. Biggs, you can answer that question.

2             THE WITNESS:  Correct.

3   BY MS. ALTMAN:

4        Q.    And I just want to ask you about some of

5   your tweets.  One of them is, and I'm quoting,

6   "Transphobia is a word created by fascists and used by

7   cowards to manipulates morons."

8             Do you recall sending out that tweet?

9        A.    Yes.

10        Q.    What does that mean?

11        A.    So it is a very famous quote by Peter

12   Hitchens, an atheist.  And he used the -- originally, of

13   course, the quote was about Islamophobia.  And as an

14   atheist, he was objecting to the way his atheism -- or

15   his criticism, let's say, of Islam would be denounced as

16   being Islamophobic.

17             And I was -- I think the tweet indicates

18   that a similar -- there can be a similar silencing of

19   discourse around using the word "transphobia."

20        Q.    Well, so you changed the quote.  It is not

21   a direct quote, correct, sir?

22        A.    No.  Exactly.  But it's obviously -- to the

23   learned audience, it's obvious what the reference is.

24   I'm ripping off.  It's ripping off somebody else's very

25   famous quote.

1      Q.   Right.  No, and I apologize.  Perhaps I'm

2   not the learned audience that you were trying to reach,

3   but I still have some questions about it because I don't

4   understand.

5           What is it you were trying to communicate

6   to the reader, sir, by saying -- are you concerned that

7   people perceive -- would perceive you or anyone else as

8   transphobic?

9              MR. BEATO:  Object to form.

10             Dr. Biggs, you can answer that question.

11             THE WITNESS:  I believe that important

12         public policy debates around sex and gender are

13         sometimes stifled by accusations of transphobia,

14         yes.

15  BY MS. ALTMAN:

16     Q.   Well, has anyone accused you of being

17  transphobic?

18     A.   Yes.

19     Q.   Who has accused you of that?

20     A.   Well, I believe that The Oxford Student

21  article you mentioned does.  I can't quote chapter and

22  verse but I believe that's the -- at least the -- the

23  implication.

24     Q.   Well, sir, that -- the tweet that you --

25  that they wrote about occurred before the article, right?

1          A.     Yes.

2          Q.     Right.  So they were only interpreting what

3     you were -- you or Mr. Wimbush was putting out into the

4     universe, correct?

5          A.     Yes.

6          Q.     So they had no reason -- they were not

7     predetermined to be against your tweets.  You put that

8     information out into the universe, correct?

9          A.     Yes.

10         Q.     And so why is "transphobia" a word created

11    by fascists?

12         A.     Well, it is a play on words suggesting that

13    there is an authoritarian streak in some forms of the

14    transgender movement, and that includes the

15    short-circuiting of important debates, such as the one I

16    mentioned earlier about sort of, for example, should a

17    rapist be put in a women's prison by short-circuiting of

18    that proper democratic debate through accusations of

19    transphobia.

20         Q.     Well, you would agree with me, sir, I

21    assume, that for every opinion that the person that holds

22    the opinion -- strike that.

23              You would agree with me, a actual debate or

24    discussion isn't one-sided.  And so the fact that one

25    person believes a person who is a transgender female

Page 222

1    should not be put in a women's prison, there is someone

2    else that might feel differently, correct?

3                    MR. BEATO:  Object to form.

4                    You can answer, Dr. Biggs.

5                    THE WITNESS:  Yes.

6    BY MS. ALTMAN:

7         Q.    Right.  And both can coexist, meaning the

8    person that has the opposite opinion is entitled to that

9    opinion, correct?

10        A.    They should be entitled.

11        Q.    Right.  You are not trying to stifle the

12   debate that you claim you want, are you?

13        A.    No, of course not.

14        Q.    Okay.  Now, I believe you've also made a

15   tweet that claims "transitioning makes you LESS

16   attractive," do you recall that?

17        A.    I don't recall that.  But if you've read

18   it, I -- that may be the case.

19        Q.    And the less is in all caps.  Do you

20   believe that transitioning makes somebody less

21   attractive?

22        A.    I believe transitioning is likely to reduce

23   your potential pool of sexual partners or romantic

24   partners, yes.

25        Q.    Well, that's not what this says.  This

Page 223

```
 1   doesn't say transitioning reduces your pool of potential
 2   sexual partners, does it?
 3               MR. BEATO:  Object to form.
 4               You can answer, Dr. Biggs.
 5               THE WITNESS:  I really do not recall the
 6          particular reply or the Twitter thread that --
 7          that that was -- that tweet was embedded in.  But
 8          I believe that my -- to my -- best of my
 9          interpretation now, that is the import of that --
10          of that statement.
11   BY MS. ALTMAN:
12          Q.    Okay.  So is it your testimony here today
13   you weren't trying to imply that transitioning makes
14   someone physically less attractive, all caps?
15          A.    It reduces their chance that that
16   individual will find -- reduces the potential pool of
17   romantic and sexual partners to that individual.
18          Q.    Why?
19          A.    Because, for example, if I'm a heterosexual
20   man and I transition into a woman, if I have breast
21   augmentation and I take estrogen, and I want to find
22   lesbians, female homosexuals to have sex with, that's
23   going to be a relatively small proportion of the lesbian
24   population who will be interested in me as a potential
25   wife or girlfriend.
```

Page 224

1          Q.    Why would you assume that that would be the
2    only pool of people that might be your opportunity for a
3    sexual partner?
4          A.    I believe that that would be one obvious --
5    not the only pool but a significant pool that one
6    would -- might be hoping that one could, you know, swim
7    in, as it were.
8          Q.    Well, based on what is your analysis of
9    what pool a transgender female wants to swim in?
10         A.    I couldn't cite particular chapter and
11   verse of literature, but I believe there are surveys of
12   who trans people -- their ideal partner would be or what
13   kind of person they are looking for.  And a very large
14   number of males who transition, particularly later in
15   life, are looking for lesbian -- lesbian partners.
16         Q.    What particular important social commentary
17   were you trying to make with this tweet, I mean, why were
18   you concerned --
19              MR. BEATO:  Object to form.
20   BY MS. ALTMAN:
21         Q.    Why are you concerned with what sexual
22   partners a person has who has transitioned?
23              MR. BEATO:  Object to form.
24              You can answer, Dr. Biggs.
25              THE WITNESS:  I'm afraid I genuinely can't

1         remember the context of that tweet.

2    BY MS. ALTMAN:

3         Q.    Okay.  Well, do you recall a tweet

4    generally about many cis-gay youth have inappropriately

5    transitioned to become straight?

6         A.    I can't remember the particular one but I

7    understand what -- what you are getting at.

8         Q.    Well, no, what -- what are you getting at?

9         A.    The suspicion that I think is in my report,

10   that children who could grow up without being medicalized

11   to become either feminine boys, gay boys, or masculine

12   lesbians have been -- adopted a transgender identity

13   which puts them on the path to -- for lifelong

14   medicalization.  An example would be the very first

15   patient who took gender -- GnRH, B. or F.G.

16        Q.    Sir, do you believe gender-affirming care

17   is akin to eugenics?

18             MR. BEATO:  Object to form.

19             You can answer, Dr. Biggs.

20             THE WITNESS:  I believe that it is -- yeah,

21        within a robust debate in public policy, that --

22        that's not an unfair characterization.

23   BY MS. ALTMAN:

24        Q.    Well, I don't know -- I didn't ask about

25   robust public policy.  I asked you if you believe that

Page 226

1    gender-affirming care is akin to eugenics?

2              MR. BEATO:  Object to form.

3              You can answer, Dr. Biggs.

4              THE WITNESS:  Certainly it is creating,

5         particularly when -- it is creating a class of

6         individuals who are not -- who are going to have

7         either no chance or very little chance of

8         giving -- of having children.  So it is

9         essentially like sterilizing some individuals.

10   BY MS. ALTMAN:

11        Q.   Well, when you say "no chance" or "very

12   little chance" of having children, are you specifically

13   referring to whether or not they can physically carry a

14   child as opposed to having children through other means,

15   surrogate, adoption, fill in the blank?

16        A.   Yes, exactly, yes.

17        Q.   And so if I understand you correctly, you

18   think that because someone may not be able to -- to have

19   a child, if they were to go through transition, that that

20   is in some way akin to eugenics, is that your testimony?

21              MR. BEATO:  Object to form.

22              THE WITNESS:  Yes.  Could we -- could we

23         remove the deposition so I can just see -- see you

24         a bit better?  It just helps me to pick up the

25         questions.

```
 1              MS. ALTMAN:  Sure.

 2              MR. BEATO:  The expert report.

 3              THE WITNESS:  Sorry, the expert witness

 4         statement, yes.

 5              MS. ALTMAN:  Ana -- she's got it.  There

 6         you go.  Okay.  And I'm almost done, if that

 7         helps, so...

 8              THE WITNESS:  Yes.

 9    BY MS. ALTMAN:

10         Q.   So in what way -- I'm just trying to

11    understand, in what way this is like eugenics, sir?

12              MR. BEATO:  Object to form.

13              You can answer, Dr. Biggs.

14              THE WITNESS:  So eugenics was a program of

15         sterilizing certain people who are seen as

16         inferior in order to promote the health of the

17         race.  And the analogy that was being drawn here

18         is that contemporary medical practices are also

19         sterilizing some children, or putting them on a

20         path to sterilization, in which case they wouldn't

21         be -- ironically, treating them is almost like an

22         inferior type of individual who shouldn't be

23         allowed to reproduce.

24              And that was banned, that's why it was

25         being objected to.
```

Page 228

1  BY MS. ALTMAN:

2        Q.    Well, you would agree with me, sir, that

3  people who are transgender are choosing their own path,

4  whereas eugenics is someone else charting a course for

5  them, correct?

6              MR. BEATO:  Object to form.

7  BY MS. ALTMAN:

8        Q.    Someone else made a decision that they are

9  in some way inferior and making a decision for that

10 person or group of people versus being transgender, which

11 is, we all agree, I think you -- yourself agree, is

12 something that's innate to the person, correct?

13             MR. BEATO:  Object to form.

14             You can answer, Dr. Biggs.

15             THE WITNESS:  I never believe -- and I do

16        not believe I stated that transgen- -- being a

17        transgender was innate.  I don't believe I've ever

18        said that.

19 BY MS. ALTMAN:

20       Q.    Well, you believe people can be

21 transgender, correct?

22       A.    Correct.

23       Q.    You've testified to that earlier, correct?

24       A.    Correct.

25       Q.    Okay.  And so are you now suggesting it's

1    not innate, that somebody is superimposing it on someone?

2                    MR. BEATO:  Object to form.

3                    You can answer, Dr. Biggs.

4                    THE WITNESS:  Well, I believe someone can

5              be a Christian.  I don't believe that Christianity

6              is innate in the individual.

7    BY MS. ALTMAN:

8         Q.    Well, sir, are you -- are you correlating

9    Christianity with being transgender, I just want to make

10   sure I'm following?

11                   MR. BEATO:  Object to form.

12                   THE WITNESS:  I'm just giving you analogy

13             on how to explain -- how I can -- obviously,

14             transgender people exist without necessarily

15             claiming that being transgender is an innate

16             property of the individual.

17   BY MS. ALTMAN:

18        Q.    Right.  And I'm just trying to understand.

19   Is it your testimony under oath that you believe that's a

20   correct analogy?

21                   MR. BEATO:  Object to the form.

22   BY MS. ALTMAN:

23        Q.    That neither of the two things are innate?

24                   MR. BEATO:  Object to form.

25                   THE WITNESS:  Yes, it's a helpful analogy.

1         I mean, like any other analogy, it has limitation.

2    BY MS. ALTMAN:

3         Q.    Well, I thought we went through this

4    earlier.  And, again, I don't want to retread.  But, sir,

5    I thought we agreed that -- and I'm going to give you the

6    benefit of your testimony -- you thought that in some

7    instances transgender could be a choice, but that in many

8    other instances, it is not a choice, correct, do you

9    recall that testimony?

10        A.    Yes.

11        Q.    Okay.  And you -- that's your testimony,

12   right?

13        A.    Yes.

14        Q.    And so at least in your world, there is at

15   least some subset of people that are transgender and it

16   is not a choice, correct?

17        A.    Well, it may not be their choice, it may be

18   the choice, for example, of their parents, for example.

19        Q.    But it may be their choice and it may not

20   be their choice, it may be innate, correct?

21             MR. BEATO:  Object to form.

22             You can answer, Dr. Biggs.

23             THE WITNESS:  I mean, a child who is

24        brought up in a pious Christian home and Christian

25        school and sent to Bible every -- Bible study and

1          church and very -- given a very religious
2          upbringing, I would say that child did not really
3          have a choice to be a Christian.  But I don't
4          believe that Christianity is somehow sort of
5          physically innate in them in the way that blue
6          eyes would be, for example.
7    BY MS. ALTMAN:
8          Q.    Well, sir, we want to -- you keep focusing
9    on children.  Let's try and unpack it a little by not
10   talking about children for a minute.
11             You would agree with me that there are
12   adults that -- that live their life as one gender and
13   ultimately come to terms with the fact that they have a
14   gender identity different from their gender at birth,
15   correct?
16         A.    Yes, yes.
17         Q.    So let's not talk about parents and
18   Christians and whatever else you want to talk about.  I'm
19   talking about adults now.
20             Would you agree with me, sir, that there
21   are transgender individuals, that it is not a choice, it
22   is innate to them?
23         A.    I think maybe we have a different
24   understanding of innate.
25         Q.    Okay.  Well, what's your understanding of

Page 232

1   innate, sir?

2          A.     Innate is something that would -- would

3   be -- would arise regardless of the cultural context.

4          Q.     What does that mean, sir?  Are you trying

5   to say that every transgender person arises because of

6   the cultural context, is that your testimony?

7                 MR. BEATO:  Object to the form.

8   BY MS. ALTMAN:

9          Q.     Whatever that means?

10                MR. BEATO:  Object to form.

11                THE WITNESS:  I'm suggesting that there are

12                different societies.  Different cultures have

13                different ways of understanding gender.  And,

14                obviously, our society, our culture at this moment

15                has an understanding which is encapsulated in the

16                label "transgender."  But that is not universal or

17                across -- across different societies, different

18                cultures.

19  BY MS. ALTMAN:

20         Q.     Meaning what?  That it is your testimony

21  under oath that there are people in other societies and

22  other cultures that -- that have no individuals that are

23  transgender, is that what you want this Court to believe?

24                MR. BEATO:  Object to form.

25                THE WITNESS:  They might understand

Page 233

1          their -- their experience in quite different ways.

2          For example, they would not be seeking cross-sex

3          hormones, for example.

4    BY MS. ALTMAN:

5          Q.    Who is the they in your sentence?

6          A.    No individuals and -- before 1900 were

7    seeking cross-sex hormones.

8          Q.    Sir, you are here to provide your opinions

9    today.  I'm happy to talk to you at length if you'd like

10   during your deposition about the 1900s.  But I'm just

11   trying to understand your testimony here today about

12   what -- what it is today.

13             Is it your opinion under oath that being

14   transgender is a choice?

15             MR. BEATO:  Object to form.

16             You can answer, Dr. Biggs.

17             THE WITNESS:  In some cases, yes.

18   BY MS. ALTMAN:

19         Q.    And in some cases?

20         A.    In some cases no.

21         Q.    Okay.  Thank you very much.  And I think I

22   asked you this earlier, but just in case, other than

23   talking to -- to Michael for five minutes, did you

24   discuss your deposition testimony with anyone else?

25         A.    No.

Page 234

1          Q.    And I think you also answered you've not

2    read any of the other depositions in this case, correct?

3          A.    Correct.  Expert witness -- yeah, expert

4    reports.

5          Q.    Yes, sir.

6          A.    Correct.

7          Q.    Do you --

8          A.    Except the rebuttals, except the five

9    rebuttals to -- five rebuttals to expert reports.

10          Q.    Right.  And my question, I'm sorry, was

11    about deposition transcripts.  Have you read any

12    deposition transcripts?

13          A.    No.

14          Q.    No.  Did hormone treatments exist before

15    the 1900s?

16          A.    No.

17          Q.    Did we even understand hormones before the

18    1900s?

19          A.    No.

20          Q.    So using your analogy before in referencing

21    that before the 1900s, you know, transgender was not a

22    thing, that really isn't a good analogy because it didn't

23    exist, correct, the use of cross-sex hormones?

24                MR. BEATO:  Object to the form.

25                You can answer, Dr. Biggs.

```
 1              THE WITNESS:  Yes, I think medical --
 2         certain medical technologies make certain --
 3         certain identities more -- more likely or more --
 4         more attractive.
 5              MS. ALTMAN:  Let me just look at the report
 6         real quick, sir, and make sure I don't have any
 7         other questions.  I'm either just about done or
 8         done.  So just give me one second.
 9    BY MS. ALTMAN:
10         Q.   Sir, on the bottom of page 13 of your
11    report, I don't think we need to bring the report up, I
12    just have a quick question.
13              You cite to -- it says, "In the Belgian
14    clinic which experienced the exceptionally high suicide
15    rate," then there is a period and a lowercase,
16    "subsequent correspondence reveals that suicide was" --
17    and I'm quoting -- "suicide was related to many more
18    psychological problems than G.D., and occurred mostly a
19    few years after the start of hormonal treatment."
20              And you cite to an e-mail from Gaia Van
21    Cauwenberg, C-A-U-W-E-N-B-E-R-G, to Avi, A-V-I, Ring,
22    R-I-N-G, an e-mail dated May 27, 2022.
23              Is that your evidence that you are relying
24    upon for that statement, is an e-mail from this one
25    individual to another, or did you have other evidence for
```

1   that proposition?

2         A.    That's the evidence.  And that -- the --

3   Van Cauwenberg is one of the authors of that articles --

4   of the article that talks about the high suicide rate in

5   the Belgian clinic.

6         Q.    Okay.

7               MS. ALTMAN:  I don't have any more

8         questions, sir.

9               Michael.

10               MR. BEATO:  And thank you again, Dr. Biggs,

11         for your -- for your testimony.  I just have two

12         questions for you.

13                    CROSS-EXAMINATION

14   BY MR. BEATO:

15         Q.    The first question is, do you think that

16   the subject matter of gender-affirming care is

17   controversial?

18         A.    Yes.

19         Q.    Then why did you decide to weigh in and

20   opine into this controversial subject matter?

21         A.    Because I believed that the empirical

22   evidence did not justify the kind of certainty that was

23   being presented in the practice of gender clinics, like

24   the Tavistock in London, and in the sort of media

25   discussion of the care for transgender children and

Page 237

1    adolescents.

2              MR. BEATO:  No further questions.

3              MS. ALTMAN:  You want to tell him his right

4         to read or waive or do you want me to do it?

5              MR. BEATO:  You can do it.

6              MS. ALTMAN:  So you have the right to read

7         your transcript.  Can't make substantive changes

8         but you can read it.  Maybe you said yes, the

9         court reporter wrote no or something else.  So you

10        have the right to read or waive your transcript.

11             THE WITNESS:  How long would I have to

12        do -- to read and -- and approve that transcript?

13             MS. ALTMAN:  30 seconds -- no, I think it's

14        30 days.

15             THE WITNESS:  I will take -- I would

16        rather -- I probably would like to read it, then.

17             MS. ALTMAN:  Okay.

18             And then I just have one real quick

19        redirect question.

20                   REDIRECT EXAMINATION

21   BY MS. ALTMAN:

22        Q.   Have you weighed in on whether surgeries

23   should be provided to intersex infants?

24        A.   No, I haven't, but I have a strong view

25   that they shouldn't be unless absolutely medically

Page 238

1    necessary.

2              MS. ALTMAN:  So, Ms. Bush, he is going to

3         read it, I think.  Did I get that right?

4              THE WITNESS:  Yes.  Yes, please.

5              MS. ALTMAN:  Okay.  I believe we are

6         ordering on an expedited basis.  So we will take a

7         copy -- the original, I guess.  And we want it on

8         an expedited basis.

9              MS. REPORTER:  And when is that, when do

10        you want it by?  As soon as I can get it to you?

11             MS. ALTMAN:  Right, but faster than that.

12             MS. REPORTER:  Do you have a specific time

13        frame in mind?

14             MS. ALTMAN:  Well, I mean, we're -- I mean,

15        as soon as possible.  As soon as you can humanly

16        get it here.

17             MS. REPORTER:  That's fine.

18             And then, Michael, do you want a copy?

19             MR. BEATO:  Yes, please.

20             (The proceeding is adjourned at 3:44 p.m.)

21

22

23

24

25

Page 239

1                    CERTIFICATE OF NOTARY PUBLIC

2

3    STATE OF FLORIDA

4    COUNTY OF _____

5

6              I, MICHAEL BIGGS, PH.D., certify that I

7    have read the foregoing transcript of my deposition and

8    that the statements contained therein, together with any

9    additions or corrections made on the attached Errata

10   Sheet are true and correct.

11

12             Dated this _____ day of _____, 20__.

13

14                   _____

                     MICHAEL BIGGS, PH.D.

15

16             The foregoing certificate was subscribed to

17   before me this _____ day of _____, 20__, by

18   the witness who has produced a _____ as

19   identification and who did not take an additional oath.

20

21                   _____

                     NOTARY PUBLIC

22

23

24

25

Page 240

1                      ERRATA SHEET

2     IN RE:  DEKKER VS. WEIDA, ET AL.

3     DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE:

4     Page No.       Line No.    Change        Reason

5     _____/_____/_____/_____

6     _____/_____/_____/_____

7     _____/_____/_____/_____

8     _____/_____/_____/_____

9     _____/_____/_____/_____

10    _____/_____/_____/_____

11    _____/_____/_____/_____

12    _____/_____/_____/_____

13    _____/_____/_____/_____

14    _____/_____/_____/_____

15    _____/_____/_____/_____

16    _____/_____/_____/_____

17    _____/_____/_____/_____

18    _____/_____/_____/_____

19    _____/_____/_____/_____

20    _____/_____/_____/_____

21    _____/_____/_____/_____

22    _____/_____/_____/_____

23    I have read my deposition in this matter and entered any

      changes in form or substance as reflected above.

24

              _____   _____

25            DATE        MICHAEL BIGGS, PH.D.

Page 241

1                    CERTIFICATE OF OATH OF WITNESS

2

3     STATE OF FLORIDA           )

4     COUNTY OF ST. LUCIE        )

5

6              I, the undersigned Notary Public, in and

7     for the State of Florida, hereby certify that MICHAEL

8     BIGGS, PH.D. personally appeared before me and was duly

9     sworn.

10

11             WITNESS MY HAND and official seal in the

12    City of Fort Pierce, County of St. Lucie, State of

13    Florida this March 24, 2023.

14

15

16

17

18                        Jennifer L. Bush, RPR, FPR

19                        Notary Public

                          State of Florida at Large.

20                        My Commission: #HH 002112

                          My commission expires:  9/24/24

21

22

23

24

25

Page 242

1                    CERTIFICATE OF REPORTER

2

3     STATE OF FLORIDA          )

4     COUNTY OF ST. LUCIE       )

5               I, Jennifer L. Bush, Registered Registered

6     Registered Professional Reporter, do hereby certify that

7     I was authorized to and did stenographically report the

8     deposition of MICHAEL BIGGS, PH.D.; and that a review of

9     the transcript was requested; and that pages 1 through

10    243, inclusive, are a true record of my stenographic

11    notes.

12              I further certify that I am not a relative,

13    employee, attorney or counsel of any of the parties, nor

14    am I a relative or employee of any of the parties,

15    attorneys or counsel connected with the action, nor am I

16    financially interested in the action.

17

18              Dated this March 24, 2023.

19

20              *Jennifer Bush*

                Jennifer Bush, RPR, FPR

21

22

23

24              The foregoing certification of the
      transcript does not apply to any reproduction of the same
      by and means unless under the direct control and/or

25    direction of the certifying reporter.

Page 243

1                    VERITEXT LEGAL SOLUTIONS
                         ONE BISCAYNE TOWER
2              2 SOUTH BISCAYNE BLVD., SUITE 2250
                         MIAMI, FL 33131
3                        800-726-7007
4
   March 24, 2023
5
   MICHAEL BIGGS, PH.D.
6  C/O Michael Beato, Esquire
   Holtzman Vogel Barantorchinsky & Josefiak PLLC
7  119 S Monroe Street, Suite 500
   Tallahassee, FL 32301
8
   RE:  DEKKER VS. WEIDA, ET AL.
9  Deposition of MICHAEL BIGGS, PH.D.
10 Dear Dr. Biggs:
11             This letter is to advise you that the
   transcript of the deposition listed above is completed
12 and is awaiting reading and signing.  Depending on the
   length of the transcript, you should allow yourself
13 sufficient time.
14             If the reading and signing has not been
   completed prior to the time of trial, we shall conclude
15 that you have waived the reading and signing of the
   deposition transcript.
16
               Your prompt attention to this matter is
17 appreciated.
18 Sincerely,
19
20
21 Jennifer L. Bush, RPR, FPR
22 CC:  All counsel on appearance page
23
24
25

**&**

**&** 2:9,22 34:10 36:18 243:6

**0**

**002112** 241:20
**00325** 1:2

**1**

**1** 2:13 3:18 22:8 22:17,21 82:9 83:22 84:13 85:8,16 86:12 86:21 87:12,22 89:5,11 96:1,11 121:9 140:2,11 242:9
**10** 179:23 180:4 194:3 198:1,3 199:12
**10005** 2:10
**105** 2:13
**10:02** 1:12
**11** 64:21 180:4
**119** 2:23 243:7
**11:24** 70:6,7
**11:30** 70:6
**11:31** 70:8
**12** 52:23 54:20 71:4 192:16 199:14,15 213:21
**120** 2:10
**1229** 2:17
**12:58** 140:13

**12th** 2:17
**13** 105:7 182:17 182:19 183:21 186:15 198:25 207:7 235:10
**14** 192:3 197:15
**15** 110:3 111:1 111:20 113:13 197:15 207:8
**16** 138:12,15,18 139:1,7,7,9,10 139:11,17 210:4 213:22 214:2
**17** 147:6 210:5 213:19
**18** 87:8 138:9,11 138:20 139:8,9 139:11,17 199:11
**1886** 25:12
**19** 214:5 215:3
**1900** 206:2 233:6
**1900s** 233:10 234:15,18,21
**1990** 190:23
**1990s** 118:10
**19th** 2:10
**1:33** 140:14

**2**

**2** 3:19 23:11,12 23:22 60:11 83:11 208:9 243:2

**2.5** 114:23 115:8 115:11,16
**20** 71:4 198:13 199:6 214:24 239:12,17
**2005** 189:22
**2010** 189:22 194:24
**2011** 73:9 75:14 88:14 147:8 173:21
**2012** 197:14
**2014** 73:10 75:15 88:15 146:6 147:8 173:21
**2015** 197:15
**2016** 27:19 194:16
**2017** 27:19,21 27:24
**2019** 142:2,11 142:13 143:11
**2020** 190:24 209:1
**2021** 62:2,9,14 62:24 156:22
**2022** 62:14 64:13 66:23 79:21 134:5 171:6,20 204:20 235:22
**2023** 1:12 62:6,8 62:15,24 143:20 170:20 171:21

185:20 241:13 242:18 243:4
**21** 1:12
**212-809-8585** 2:11
**22** 3:18 24:23 207:21 208:9,10 208:12,13,14
**2250** 243:2
**23** 3:19
**236** 3:7
**237** 3:6
**239** 3:10
**24** 210:4,6,8 241:13 242:18 243:4
**240** 3:11
**241** 3:12
**242** 3:13
**243** 3:14 242:10
**26** 210:5,6 211:2
**27** 210:5,6 235:22
**28** 134:5
**29** 214:5
**2:57** 207:6,18

**3**

**30** 70:1 198:6 206:21 214:16 237:13,14
**3003** 241:18 242:20
**30030** 2:13
**30s** 145:24

**[3100 - acknowledged]**                                    Page 245

| | | | |
|---|---|---|---|
| **3100**  2:6 | **600**  2:6 | **a** | **academics** |
| **32301**  2:23 | **7** | | 14:13 32:18 |
| 243:7 | | **a.m.**  1:12 70:7,8 | 33:1 |
| **32601**  2:17 | **7**  177:13,24 | **abandoning** | **academy**  200:25 |
| **33131**  2:6 243:2 | 213:19 | 192:24 | **accepted**  35:2 |
| **352-271-8890** | **70**  73:11 86:18 | **ability**  6:25 | 35:12 37:5 |
| 2:18 | 86:18 87:25,25 | 21:15 79:6 81:9 | 40:24 |
| **3:04**  207:19 | 88:1,19 89:2,9 | 107:3 109:8,10 | **accepting** |
| **3:05**  207:9,11 | 183:8 | 109:12 114:19 | 187:22 |
| 207:12 | **700**  197:13 | **able**  5:25 15:22 | **access**  116:5 |
| **3:10**  207:4,6,7 | **786-913-4900** | 133:25 139:13 | 138:13 139:13 |
| **3:44**  1:12 | 2:7 | 199:13 217:15 | **accident**  89:3 |
| 238:20 | **8** | 226:18 | **accommodate** |
| **4** | **8**  101:19 | **abnormally** | 6:16 |
| **4**  3:6 | **800-726-7007** | 95:8 | **accompanying** |
| **40**  160:3 | 243:3 | **above**  1:25 | 214:10 |
| **404-897-1880** | **9** | 24:25 44:9 | **account**  28:16 |
| 2:14 | **9**  100:6 101:20 | 240:23 243:11 | 28:21,25 217:12 |
| **43**  160:3,6,16 | 178:5 179:2,5 | **absence**  44:16 | **accrete**  114:12 |
| **44**  160:2,3 | 194:3 | 44:16 | 114:13 |
| **4:22**  1:2 | **9/24/24**  241:20 | **absolute**  155:7,8 | **accrue**  114:2 |
| **5** | **93**  92:20 101:23 | 156:4 | **accurate**  5:25 |
| **5**  40:16,21,23 | 120:13 162:17 | **absolutely** | 32:20 88:13 |
| 41:9 42:8,23,25 | 162:19 | 90:14 96:23 | 177:22 |
| 43:7,8 82:22 | **95**  92:20 101:23 | 97:1 110:18 | **accusations** |
| 83:4,10,14,18 | 120:13 162:17 | 155:15,21 211:1 | 220:13 221:18 |
| 100:1 101:19 | 162:19 212:2,5 | 215:13 237:25 | **accused**  220:16 |
| 140:2,11 173:14 | **97**  63:12 64:7 | **abstract**  129:20 | 220:19 |
| **500**  2:23 243:7 | 120:13 162:17 | 129:21 | **acknowledge** |
| **5:30**  140:11 | 162:19 | **abundant** | 123:5 142:18 |
| **6** | **98**  63:12 64:7 | 189:12 | 152:12 185:23 |
| **6**  82:22 83:20,21 | 92:20 101:24 | **academic**  14:17 | **acknowledged** |
| 174:15 | 120:13 162:17 | 14:22,24 32:11 | 99:20 155:4 |
| | | 32:17,21 39:19 | 185:20 |
| | | 43:11 54:24 | |

**[acknowledges - agree]**

**acknowledges**
29:18
**acknowledging**
30:17
**act** 9:9,11,18,20
9:22 16:4 152:3
**acting** 10:19,22
**action** 242:15
242:16
**actions** 147:2
**actual** 8:13
16:14 43:15
44:20 45:2
78:13 80:3
95:17 133:8
158:17 181:7
188:23 206:16
210:14 221:23
**actually** 19:17
49:11 61:3
75:16 85:5 90:2
121:5 161:9
179:17 192:24
**acute** 210:12
**add** 44:12,12
155:24
**addition** 45:24
113:14 211:10
**additional**
62:12 239:19
**additions** 239:9
**addressing**
150:8
**adds** 155:25

**adjourned**
238:20
**adjusted** 75:7
**administering**
105:5
**administration**
85:22,23 150:19
**admission**
157:20 158:7,7
**adolescence**
7:24 82:17
108:25 109:8
198:16
**adolescent**
210:11
**adolescents**
164:1,7,18
183:8 237:1
**adopted** 118:19
118:20 225:12
**adoption** 226:15
**adult** 19:4,10
20:13 149:23
150:5
**adults** 69:14,17
69:21 70:16
72:23 138:23
231:12,19
**advance** 4:15
**adverse** 208:22
**advise** 243:11
**advisors** 57:20
71:2,3 72:1
**advocacy** 59:11

**advocate** 148:8
148:8 154:18
**advocated**
107:21 117:20
117:24
**advocates** 118:5
**affirmation**
184:13,23
**affirming** 27:7
37:23 38:2,6,10
49:23 50:1
68:13,17,24
69:6,10 71:9
73:2 79:1,11
99:3 121:14,20
134:5 148:12,24
149:22 150:4
156:25 157:10
166:19 201:6
225:16 226:1
236:16
**afraid** 53:20
54:15 68:20
69:2 224:25
**african** 205:4
**afternoon** 4:9
4:10
**age** 64:21 100:6
101:14 107:15
107:18 108:20
108:22 114:3,6
114:17 139:17
163:2 192:15
213:21,22 214:2

**agency** 150:19
150:21
**agenda** 134:8,16
134:20
**ages** 130:8,12
**aging** 17:12
**ago** 14:4 30:24
56:22 59:5,5
96:1 118:8
168:10 171:13
171:13,14,14
173:23 197:14
197:15 198:9
**agonist** 34:5
88:9 97:19
**agonists** 16:1
63:13 92:23
185:21
**agree** 13:22
14:7,10 25:14
25:17 27:17
29:15 34:11,18
36:4 42:7 43:14
46:24 50:17
52:25 53:24
55:3 59:10 62:5
69:4,8 77:1,6
80:25 84:18
85:1 86:2,10
91:21 98:13
99:19 100:10,14
102:1,8 103:8
105:3,3,14,24
107:11,17 109:6
110:10 113:18

114:11 116:22
121:2 129:8,10
129:18,23 130:3
135:6 136:22
139:16 147:9
151:10,17 154:8
155:13 161:7
163:18 184:18
192:9,14,18,22
200:18 201:14
203:13 205:20
208:21 215:19
221:20,23 228:2
228:11,11
231:11,20
**agreed**  41:17
  44:19 58:8
  65:11 66:10,14
  66:14 230:5
**ahca**  165:8
**ahead**  176:8
**aim**  66:9 121:7
**air**  196:3
**akin**  225:17
  226:1,20
**al**  1:3,6 51:17
  73:9,10 88:15
  147:8 173:21
  182:7 185:20
  194:24 240:2
  243:8
**alarming**  83:23
  84:14 87:22
  89:12 96:11,12
  96:13

**aligned**  11:19
  55:6
**allegedly**  8:15
**alleviate**  121:5
**allow**  22:14
  95:9 101:20
  158:23 159:6
  163:3 243:12
**allowed**  227:23
**allowing**  159:8
**altered**  62:9
**altering**  198:16
**alternative**
  144:1
**altman**  2:3 3:6
  4:8,23 7:25 8:2
  8:21 9:1,2 17:2
  17:21 19:17,20
  19:22 20:4,16
  21:3,12,25
  22:19 23:5,6,15
  24:19,22 25:6,9
  25:23,25 42:21
  45:18 47:25
  48:2 49:1,5,10
  49:14,15 53:8
  58:5 59:1 69:24
  70:4,9 71:16
  76:3 83:8,14,16
  86:22 92:2
  94:12 102:22
  110:25 112:15
  119:11 120:2,16
  125:21 135:11
  139:24 140:5,10

140:15,18,25
141:3 143:8
149:9 154:1
159:19 162:11
162:15 172:20
173:2,5 175:16
176:7,13 178:14
178:18,24 179:2
179:3 184:8
188:9 189:5
190:9 195:13
197:4 199:3,4
200:17 201:25
202:16 204:2
206:23 207:1,4
207:6,11,16,20
208:9,11,14,17
209:3,25 210:23
212:8 213:10
215:10 216:15
217:8 218:1,18
219:3 220:15
222:6 223:11
224:20 225:2,23
226:10 227:1,5
227:9 228:1,7
228:19 229:7,17
229:22 230:2
231:7 232:8,19
233:4,18 235:5
235:9 236:7
237:3,6,13,17
237:21 238:2,5
238:11,14

**altogether**
  95:12
**ambit**  17:11,13
**america**  118:19
**american**  25:11
  97:21 166:22
  200:21,24 205:4
**amount**  13:6
  54:21 75:2
**amsterdam**  85:4
**ana**  2:5 22:9
  23:5,16 24:20
  25:6 83:8,10
  178:24,25 179:1
  198:22 208:5,15
  215:3 227:5
**anacker**  185:20
**analogs**  177:9
**analogy**  227:17
  229:12,20,25
  230:1 234:20,22
**analysis**  9:4,6
  9:21 28:6,21
  32:8 39:21
  55:17 63:21
  74:4 78:12
  81:24 84:23
  85:1 87:10
  88:11,18,22
  89:16 90:25
  106:12,15 107:4
  111:19 112:5,9
  113:12 147:3
  160:20 175:21
  175:24 176:3,12

195:19 212:22
224:8
**analyze**  28:13
43:5,7,8 87:3
**analyzed**  15:24
16:24 131:4
**analyzing**  177:7
**anecdotal**
207:22 208:19
**anecdotally**
213:20
**animal**  128:17
**animals**  126:10
126:14 179:8
**answer**  5:4,10
5:17,20,21 6:8
6:25 10:12
11:10,14 14:4
16:22 17:15,18
19:17,19,20
20:2,5,9,23
21:10,21 29:25
41:18 42:12,18
45:16 53:5 58:4
58:24 69:13
71:12 75:17
76:2 78:22
86:16 90:2
91:24 94:10
110:21 112:13
119:10,24
120:10,21 135:4
139:4 143:3
147:20 149:2
153:24 157:6

159:13 162:3
172:15,18,25
175:13 176:6,9
184:1 188:2
189:1 190:5
195:11 196:21
199:18 200:6
201:19 203:25
209:21 210:17
211:19 212:25
217:6,19 218:12
219:1 220:10
222:4 223:4
224:24 225:19
226:3 227:13
228:14 229:3
230:22 233:16
234:25
**answered**  19:16
20:3 21:14 54:4
74:7 120:18
180:25 181:6,20
181:21,23,25
202:13 234:1
**answering**  6:2
**answers**  35:15
**anti**  71:8
**anxiety**  75:8
131:18
**anybody**  17:13
132:11 195:8,15
**anyone's**  119:16
**anyway**  69:14
**apart**  43:21
169:21 196:7

**apologies**  44:8
211:20
**apologize**  14:8
69:24 138:25
144:12 178:10
202:18 220:1
**apparently**
189:7
**appealing**
191:10,12 194:1
**appeals**  67:20
**appearance**
243:22
**appearances**
172:7
**appeared**
137:10 143:14
143:18 241:8
**appearing**  2:2
2:20
**appears**  34:19
**appellate**  60:24
**apply**  242:24
**appreciate**
126:3
**appreciated**
243:17
**approaching**
206:21
**appropriate**
13:25 68:24
95:10 140:8
147:16 182:12
182:15 218:9

**approve**  237:12
**approximation**
171:13
**archive**  46:9
50:11
**archives**  34:6
43:24 44:2 48:9
**area**  42:8 81:3
100:25 168:3
**areas**  136:19
**argument**
154:18 156:1
**arguments**
14:24
**arises**  232:5
**arriving**  165:9
**article**  8:12 28:5
28:7,7 29:11,12
29:14,17,19
30:16 34:8,12
34:18 35:6,23
35:23 41:3 44:1
44:7,13 46:4
48:8,13,15,17
49:7 51:16
62:23 63:10,19
64:6 72:17 78:7
78:8,20 128:4,8
143:7,11 156:20
177:6 185:20
194:10,24
204:14 212:1
218:23 220:21
220:25 236:4

**articles** 28:3 33:6 34:25 37:15,22 44:13 47:3 49:10,16 62:20 63:6 71:6 71:8 88:15,17 97:18,18,21 98:2 126:1 136:10 151:20 162:5 182:6 216:19 236:3
**asc** 197:16
**ascertain** 9:16 81:2
**ashamed** 146:5
**aside** 25:7 64:16
**asked** 53:16 54:12,14 59:14 64:18,19,24,25 118:1 131:23 137:17 140:19 140:21 164:11 164:23 166:6,9 181:16 189:4,4 189:9 193:19 202:9,12 204:10 225:25 233:22
**asking** 50:16 137:19 138:10 146:24 169:1 188:22 189:17 189:24 196:9
**asks** 8:20 182:14 216:12

**assertion** 37:13
**assessed** 73:25
**assigned** 11:20
**assist** 24:2 122:1 122:15
**associated** 64:6 181:15 211:5
**association** 47:10 48:6 200:22
**association's** 166:23
**assume** 5:10 12:7 71:8 72:3 80:25 100:18 160:18 172:6 221:21 224:1
**assuming** 177:22
**assumptions** 51:24
**assure** 93:4
**astonishing** 157:20 158:6
**atheism** 219:14
**atheist** 219:12 219:14
**attached** 239:9
**attachments** 30:13
**attempt** 153:17 154:14 164:21 202:24
**attempted** 147:24

**attempting** 156:25
**attempts** 153:4
**attend** 68:22 135:12
**attending** 8:5
**attention** 155:17 243:16
**attorney** 242:13
**attorneys** 242:15
**attractive** 222:16,21 223:14 235:4
**attributed** 96:2 121:9 195:6 209:7
**attrition** 74:19 75:3 79:20,23 79:25 80:4
**audibly** 5:18
**audience** 219:23 220:2
**audio** 4:16 8:18 111:2 137:9
**augmentation** 223:21
**august** 1:3
**australia** 60:6 169:22
**australian** 63:10,18 64:6 64:13,20,23 65:5,7,8 66:3 67:4 162:22

**author** 127:25 142:6,9,12 157:19 211:25
**author's** 142:21 143:10
**authoritarian** 221:13
**authority** 15:21 16:7,8 157:21
**authorized** 242:7
**authors** 32:7 218:16 236:3
**autism** 197:16 197:16
**autistic** 192:5 193:18,19,24 194:7,21 195:16 195:20 196:2,16 198:7,10
**available** 74:23
**avenue** 2:6,17
**average** 213:3,4
**avi** 235:21
**avoided** 188:20
**awaiting** 243:12
**aware** 13:11 68:15 69:2 72:5 123:10,21 127:6 134:17,18 150:6 150:17 151:2 164:6,16,21 174:12 184:12 184:20 201:5 217:4

**b**

**b** 145:23 173:19 225:15 235:21

**back** 24:17 29:6 36:1 37:3,21 56:20 80:10,22 90:23 95:25 96:13 129:20 138:2 140:20 177:20 180:8,10 181:12 182:3 183:15 193:17

**background** 31:10,11,12 32:19

**bad** 76:7 80:14 102:23 106:22 155:13

**ban** 148:12,24 210:2 212:22 213:15

**bandwagon** 191:17

**banned** 213:18 227:24

**banning** 190:16

**bans** 190:21

**barantorchinsky** 2:22 243:6

**barrister** 61:7

**base** 74:17 183:1

**based** 12:14 14:5,6 15:5 16:25 17:8,25

32:22,23 41:12 41:22 43:20 46:4 47:2,5 57:9 58:16 61:20 73:17 75:20 81:10 87:10,24 88:14 102:12 113:7 124:12 126:11 128:21 134:23 137:8 151:15 152:16 152:17 156:4,14 175:24 200:3 216:24 217:21 217:23 224:8

**bases** 34:22 97:15 144:12

**basing** 85:18

**basis** 8:14 9:4 10:6 36:10,20 43:18 57:11 67:15 77:7,23 86:23 98:6 110:19 112:19 112:25 113:6,7 115:5 117:1,3,8 117:19 118:1,2 124:18,22 154:15 168:15 188:14,14,15 189:25 190:24 197:25 199:8,8 199:19 200:12 216:1 238:6,8

**beat** 57:25

**beato** 2:21 3:7 16:21 17:17 19:15,19 20:1,8 20:22 21:9,20 42:11,17 45:15 49:6,12 53:3,5 56:10,13 58:3 58:23 69:24 71:11 76:1 83:5 86:15 91:23 94:9 102:21 110:20 112:12 119:9,23 120:9 135:3 140:7,24 143:2 149:1 153:23 159:12 162:2,14 172:14 172:23 173:4 175:12 176:5,9 178:9,21 179:1 183:25 188:1,25 190:4 195:10 196:20 198:21 198:25 200:5 201:18 202:12 203:24 206:20 206:25 207:2,5 207:9,13,17 208:4,12,15 209:18,20 210:16 211:18 212:24 215:3 217:5,18 218:11 218:25 220:9

222:3 223:3 224:19,23 225:18 226:2,21 227:2,12 228:6 228:13 229:2,11 229:21,24 230:21 232:7,10 232:24 233:15 234:24 236:10 236:14 237:2,5 238:19 243:6

**becoming** 188:13 196:3

**began** 27:18

**beginning** 171:16

**behalf** 1:22 2:2 2:20 4:3 23:21 68:12

**behavior** 34:7 43:24 44:3 46:9 48:10

**belgian** 235:13 236:5

**belgium** 162:22

**belief** 19:9 41:15,23 42:2 45:19 183:17 185:13

**beliefs** 17:23,25 18:7,9,11 20:18 41:12

**believe** 11:4,6,8 11:18,22,25 12:3 13:18

15:13 20:10
27:21 30:19
33:12 37:15
41:2 49:17
50:13 52:9
54:13,24 58:13
59:8 62:3,17
65:5 68:18,24
69:7 70:24 73:7
76:23 79:16,21
82:16 94:6
96:24 98:7
99:19 100:1,6
104:7,14 108:21
110:2 116:6
120:20 121:15
128:8,17,21
130:10,24
132:25 133:21
134:19 135:7,9
135:14,19,20,23
136:7 138:6,11
139:12 142:1
144:6,7,13,18
145:1 146:9
151:14,19,22
152:22,22 153:8
156:22,24
157:10,16 160:2
160:12 161:14
162:23 163:16
164:25 168:4,16
169:5,6,12
171:19 175:14
175:18 182:14

184:6 185:9
188:4,12 189:3
189:11 191:9,11
191:19 196:24
196:24 201:20
202:22,23 203:8
203:9 204:20
205:2,6,10,23
209:10 215:23
217:20 218:5,9
218:15 220:11
220:20,22
222:14,20,22
223:8 224:4,11
225:16,20,25
228:15,16,17,20
229:4,5,19
231:4 232:23
238:5
**believed**   236:21
**believes**   144:3
  221:25
**bell**   60:8,12
  65:12 132:10
**belong**   94:7
**benefit**   5:22,23
  6:5 57:5 159:10
  161:17,19 208:4
  208:6 230:6
**benefited**   38:2,5
**benefits**   20:14
  139:14 151:3,7
  151:16 161:16
  213:9

**best**   12:4,12
  13:23,24 21:14
  82:18 83:5
  102:10 126:10
  187:13 201:15
  206:22 223:8
**better**   10:12
  13:2 81:1,7
  119:14 154:12
  154:20 226:24
**beyond**   46:19
**bible**   230:25,25
**bibliography**
  48:14,21 49:8
  50:9 54:10
  62:24 63:2
  190:3,8 204:8
**biggs**   1:15 3:4
  4:2 16:22 17:18
  20:2,9,23 21:10
  21:21 42:12,18
  45:16 53:5 58:4
  58:24 71:12
  76:2 86:16
  91:24 94:10
  110:21 112:13
  119:24 120:10
  135:4 140:7
  143:3 149:2
  153:24 159:13
  162:3 172:14
  175:13 176:6,10
  178:11 184:1
  188:2 189:1
  190:5 195:11

196:21 200:6
201:19 202:14
203:25 207:10
208:18 209:20
210:17 211:19
212:25 217:6,19
218:12 219:1
220:10 222:4
223:4 224:24
225:19 226:3
227:13 228:14
229:3 230:22
233:16 234:25
236:10 239:6,14
240:25 241:8
242:8 243:5,9
243:10
**bioethicist**   26:6
**biological**   145:3
  203:21 215:24
  215:24
**birth**   11:20
  158:25 231:14
**biscayne**   243:1
  243:2
**bisexual**   183:10
**bit**   18:5 147:18
  226:24
**blank**   226:15
**blanket**   89:10
**blanking**   53:21
**block**   91:16
  94:2 133:8
**blocked**   92:10
  127:13

**blocker** 93:18
138:21
**blockers** 35:20
38:20 39:7
47:24 48:5
60:17,19 61:4
61:12 64:22
65:2 67:13
69:13 70:12
72:19 73:12
77:8,10,13,22
79:6 85:21,22
85:23 86:3 87:7
89:3,5,15 90:24
91:3,5,14 92:14
92:24 93:7,19
94:1 95:15,20
95:22 96:2
97:16 98:23
99:5,8,13 100:5
100:12,15
101:12 103:6
104:7,12,15
106:8 107:1,9
107:12,22 108:8
109:7 110:12,18
111:10 112:9,21
113:3,14 114:1
115:2,16 117:23
117:24 118:5
119:22 120:4,14
120:22 121:3,10
122:17,20
123:17,22,24
124:20 127:14

131:25 132:22
133:17,21
136:13 143:19
146:15,22,22
147:1 148:17,19
151:4,13 157:22
158:8 159:4,16
159:22,24 161:4
161:12,16,18,19
161:20,25 162:7
164:13,20 168:5
170:1 173:23
185:3,7,10
200:12,16
202:11 209:24
**blocking** 91:10
95:8 128:18
**blocks** 201:24
**blog** 157:19,24
158:3,5,15,18
161:23 177:25
**blue** 231:5
**blurbed** 8:24
**blvd** 243:2
**board** 52:12
53:11,17,25
55:4 57:20 59:2
59:7 71:2,3 72:1
134:3 135:13,18
135:21 136:1,6
136:24 137:10
137:15,23
148:11,23 150:7
150:8,12 171:5
172:7

**body** 145:3,5
191:4,21
**bone** 15:15,18
15:19,20,25
16:17,20 17:6,7
17:10 28:6,10
33:8,10 35:17
51:3 81:17
103:22 106:3,8
106:12 107:25
108:14,23,25
109:2,14,16
113:19 114:1,1
114:12 116:15
135:9 138:3
175:21 211:4,11
211:16 212:1,5
212:14 213:4
**bones** 213:22
214:3
**book** 187:12
204:21
**bothered**
181:18
**bottom** 79:5
83:3,14,17
194:3 213:19
214:16 235:10
**bowers** 124:10
124:13 125:1
**boy** 11:23 18:12
180:15
**boys** 185:12
186:24 192:14
193:1,3,10

225:11,11
**brain** 103:18
**break** 4:19 6:15
70:2 139:25
140:1,16,17
141:4 206:23
207:15
**breaks** 6:18
**breast** 223:20
**brickell** 2:6
**brief** 70:2,7
207:18
**briggs** 119:10
**brik** 209:1
**bring** 6:3 22:10
23:10 141:10
235:11
**britain** 15:22
73:21 118:21
162:22
**british** 197:9
213:20
**broad** 120:3
126:12,12
**broader** 136:15
**broken** 213:22
214:3
**brought** 23:2
230:24
**bundle** 61:8
**bush** 1:23 238:2
241:18 242:5,20
243:21
**butch** 185:12

| c | | | |
|---|---|---|---|
| **c** 1:23 2:1 10:10 | 149:22 150:3,4 | 84:10 90:13 | 233:17,19,20 |
| 73:21 235:21 | 150:13,15,19 | 91:14 95:15 | **cass** 148:1 |
| 243:6 | 156:25 157:10 | 98:20 99:2 | **cast** 95:22 |
| **calculated** | 166:18,19,23 | 103:1 104:4,23 | **castrate** 94:15 |
| 85:17 155:10 | 167:3,8 186:17 | 105:15 111:9 | **castration** 91:11 |
| **calculating** | 187:4,6,14 | 116:2 122:5 | 91:15,19,25 |
| 81:25,25 | 189:8 190:12,17 | 125:22 126:21 | 92:5,25 93:8 |
| **call** 56:10 71:1 | 190:21 200:19 | 126:25 128:6 | 95:14 96:15 |
| **called** 4:3 8:6 | 201:6,7 210:2 | 129:6 137:5 | 97:16 104:1 |
| 30:4,7 39:16 | 212:22 213:12 | 141:8 146:21 | **categories** 205:3 |
| 43:25 71:7 | 213:14,15,18 | 147:1,5 149:11 | **category** 15:14 |
| 73:21 138:21 | 225:16 226:1 | 149:12,13 | 44:6 206:4 |
| 143:18 172:21 | 236:16,25 | 153:18,19,21,22 | **causation** 77:8 |
| 185:11,15 | **caregivers** | 155:24 158:3 | 77:14 |
| **calls** 43:25 44:3 | 170:9 | 164:3,11,12,24 | **cause** 1:25 |
| **calorific** 212:13 | **carl** 2:12 | 165:2,5,12,16 | 77:15 86:3,8 |
| **capacity** 10:20 | **carry** 226:13 | 166:4,7,11,15 | **caused** 113:13 |
| 10:22 14:22 | **case** 1:2 12:25 | 168:18,22 169:4 | 123:11,21 144:4 |
| **caps** 222:19 | 13:12,16 17:24 | 169:11,14,18,19 | 144:13 173:17 |
| 223:14 | 22:2 23:21 | 169:23 171:8,20 | 173:25 |
| **car** 89:3 | 24:15 30:15,15 | 172:2,13 173:19 | **causes** 96:7 |
| **care** 12:4,12 | 31:9 32:23 | 192:1,2 199:25 | **causing** 212:14 |
| 13:25 20:21 | 36:15 38:13,16 | 200:2,10,11,14 | **caution** 130:24 |
| 26:17 27:7 | 38:24 40:6,11 | 201:11 202:10 | **cauwenberg** |
| 37:24 38:2,6,10 | 40:14,22 41:1,6 | 203:15,16,20 | 235:21 236:3 |
| 49:23 50:2 | 41:10 47:20 | 209:10 222:18 | **caveat** 155:25 |
| 57:11,16,17,23 | 53:15 54:1 55:7 | 227:20 233:22 | **cc** 243:22 |
| 68:13,17,24 | 55:11,18 60:5,6 | 234:2 | **ccharles** 2:14 |
| 69:6,10 70:16 | 60:16,21 61:15 | **cases** 11:16,17 | **central** 141:17 |
| 71:9,15,19 73:2 | 62:1,11 63:3 | 53:13 67:5,8 | 142:5 |
| 79:12 80:3,5 | 64:20 65:4,12 | 92:20 101:24 | **century** 123:7 |
| 99:3 121:14,21 | 65:20,22,25 | 114:3 122:7 | **certain** 12:19 |
| 133:14 134:1,5 | 66:3,17,21 67:1 | 144:7,8 169:25 | 13:13 37:9 |
| 148:12,25 | 67:20 72:18 | 185:9 191:11,14 | 41:16 67:17,17 |
| | 78:6,10,14,17 | 203:16 206:14 | 98:14 145:2 |

193:11 227:15
235:2,2,3
**certainly**  4:19
15:9 48:8 85:7
102:7 119:25
128:9 145:8
209:23 212:19
213:13 226:4
**certainty**
236:22
**certificate**  3:10
3:12,13 239:1
239:16 241:1
242:1
**certification**
242:23
**certify**  239:6
241:7 242:6,12
**certifying**
242:25
**chair**  68:18
**chance**  77:19
223:15 226:7,7
226:11,12
**change**  75:17
76:8 205:17
240:4
**changed**  62:10
75:21,24 111:9
206:7 219:20
**changes**  214:9
237:7 240:3,23
**chapter**  204:21
220:21 224:10

**character**  13:2
**characteristics**
119:15 162:8
**characterization**
86:18 113:5
135:7 153:9
161:14 225:22
**characterize**
95:22 196:23
**charged**  6:21
**charles**  2:12
**charm**  19:12
**charting**  228:4
**chelsea**  2:16
**chemical**  91:11
91:15,19 92:5
92:25 93:8
95:14 96:15
97:16 104:1
**chemically**
94:15
**child**  64:21,22
76:22 92:21,22
100:14 101:18
101:24 102:9
104:25 105:18
105:21 110:23
110:24 111:1
121:5 149:23
150:5 152:7
155:17 177:15
184:14,24
189:19,20,20
198:18 209:12
226:14,19

230:23 231:2
**child's**  104:8,16
**childhood**
184:13,23
**children**  8:5
57:11 63:12,17
64:7 73:11
96:19 97:7
99:21,23 100:4
100:20 101:1,5
101:6,12,13
103:17,21,25
104:12,15
107:22 116:15
120:13 121:12
121:19 122:24
127:13 142:15
143:18 156:2
157:22 158:9,20
160:2 163:1,8
182:20 185:9
187:19 189:21
192:15 193:2,6
193:6,23 194:7
194:7,21 195:16
195:19 196:2
204:22 205:1
207:22 208:19
209:24 211:10
212:2 213:3
225:10 226:8,12
226:14 227:19
231:9,10 236:25
**chloe**  68:9

**choice**  11:9,13
11:17 19:3
20:13 160:6,7,8
230:7,8,16,17
230:18,19,20
231:3,21 233:14
**choose**  159:21
**choosing**  21:1
228:3
**chose**  53:9 92:3
95:13 97:2
110:15 160:9
218:16
**chriss**  2:15
**christian**  145:19
145:19,20 197:9
206:1 229:5
230:24,24 231:3
**christianity**
205:25 229:5,9
231:4
**christians**
205:23 231:18
**church**  231:1
**circuiting**
221:15,17
**circumstances**
18:25 139:12
**cis**  225:4
**cisgender**  157:1
157:3,5,11
**citation**  211:21
211:23
**cite**  40:4,5 49:8
143:4,5 162:21

186:23 193:2
194:24 197:19
209:1 216:18
224:10 235:13
235:20
**cited** 41:2 51:13
128:2,3,7,8
**citing** 74:4
194:25
**city** 241:12
**claim** 44:9
74:23 131:1
222:12
**claimed** 45:9
**claiming** 34:23
87:13 229:15
**claims** 222:15
**clarification**
8:20 216:12
**clarify** 6:3 49:6
191:3
**class** 14:20
226:5
**classified** 50:14
**clean** 6:9
**clear** 10:5 46:1
159:15 163:7
171:10,12 175:7
**clearly** 87:24
129:21 187:10
**cliche** 154:19
**clinic** 7:24 8:6,6
9:5 10:2,7 15:20
16:5 29:10
63:10 80:10

82:17 85:4
116:8 156:6,8,9
156:12 174:3
187:17 235:14
236:5
**clinica** 139:2
**clinical** 10:15,16
10:20,21,22
11:1 15:3 16:15
27:6 29:4 31:15
33:3 42:3 47:6
64:1,5 73:21
85:8 126:9,11
138:13,17
139:10 147:16
147:24 148:4,13
148:18,20,20
149:8 150:17
176:16,19 177:8
178:6 179:7,13
201:8 202:10
212:17,20,22
**clinically** 42:3
209:16
**clinician** 26:3
42:9,20 43:1,6,9
**clinician's**
212:15
**clinicians** 32:14
57:10 111:8,25
113:8,11 117:21
125:23 127:11
150:22 151:22
151:25 161:15
181:16 185:19

186:5 194:20
196:8 210:9
212:12 213:11
213:13 214:7
**clinics** 162:21
187:16,17
236:23
**coauthors** 212:1
**coexist** 222:7
**coffee** 141:6,11
**cognition** 127:9
**cognitive** 125:7
125:13,25
126:13 127:3,7
128:13,19 130:4
130:15 198:16
**cohen** 117:21
**cohort** 73:10
83:22 84:4,12
87:21 89:11
96:10 147:6
**cohorts** 29:7
**cole** 68:9
**colleagues**
46:11 49:13
**collected** 177:4
**collectively**
66:12
**combat** 154:17
**combinations**
189:18
**come** 14:24
15:13 62:20,24
72:15 80:10
147:6 231:13

**comes** 20:11
104:19 214:25
**commence**
95:10
**commencement**
114:6
**commencing**
210:11
**comment** 47:16
51:12,15,16
**commentary**
45:20 49:23
50:1,3 224:16
**comments** 44:24
44:25 45:11
**commission**
241:20,20
**commit** 155:19
157:22 158:9
199:16
**committed** 9:23
10:7
**committee** 54:5
54:6 55:5 68:1
68:18,25 69:23
72:25 74:14
81:11,12 91:8,9
92:4 93:4,14
94:1 95:15
96:16 97:3
106:3 110:2,16
111:21 112:7,20
113:1 116:1
117:2,9,16
118:3 122:6

**[committee - consistently]**                                    Page 256

123:5 124:1
125:6 126:8
132:21 133:20
135:17 136:2
137:2,9 147:14
178:1
**common** 71:6
205:15 211:22
**communicate**
220:5
**communicatio...**
172:16
**community**
37:11 146:23
**comorbidity**
88:20
**comparable**
82:19 130:11
**compared** 82:9
84:3 98:4
**comparison**
34:4 35:6 36:5
137:7
**competence**
14:14
**compiled** 16:16
**complaint** 16:6
16:7
**complaints**
15:21
**complete** 169:3
**completed** 6:6
29:19 243:11,14
**completely**
37:12 130:7

215:16
**complex** 159:10
**complicated**
78:2
**complication**
77:17,20 86:14
**complications**
154:4
**complies** 15:18
**components**
87:6
**comprehensive**
61:20
**computer** 4:16
**concealing**
60:18
**concentrated**
136:18
**concepts** 215:24
215:25
**conceptualizat...**
206:9
**conceptualizing**
206:10,11,12
**concern** 115:25
173:18 174:1
**concerned** 57:9
57:10,13 111:8
122:17,20
173:11,17 220:6
224:18,21
**concerns** 88:25
124:2
**conclude** 243:14

**conclusion**
58:19 158:15
174:13 180:12
216:25
**conclusions**
103:10,14 113:7
152:8 155:24
**condition** 111:6
111:22 163:22
167:14,17,20
**conditions**
130:8 163:19
192:6 193:19
197:17
**conduct** 8:8
115:19,20
133:13 148:4,12
174:20,24 175:9
182:8 189:24
**conducted** 8:10
33:21,25 106:11
121:22 124:24
125:3 142:21
169:7 174:16
175:8,10,18
176:11 195:23
**conducting**
14:12,14
**conference**
65:10 66:4
**confidential**
1:14 30:2
**confirm** 23:19
**conflict** 64:23

**confusion** 78:9
82:21 158:18
209:7
**congratulations**
175:5
**conjecture**
184:6,9 185:15
188:22
**connected**
242:15
**connection** 40:6
55:14 158:2
170:4
**consensus**
113:19,22,24,25
**consent** 19:4,10
20:13 21:1
67:23
**consequence**
123:16,23
**consequences**
107:1 199:15
**consider** 33:7
33:18 50:11
134:21 138:23
**consideration**
142:17
**considered** 74:5
169:3
**considering**
27:18
**consistent** 12:24
**consistently**
210:6

**[constituted - correct]**

**constituted**
149:8
**constitutes** 45:3
45:13,22 175:15
**construct** 180:1
205:11 215:20
**constructs**
205:17 215:18
**consult** 49:12
**consulting**
82:25 169:24
**consults** 139:18
**contacted** 171:7
171:19 172:1,10
**contain** 36:6,7
168:7,17
**contained** 25:2
97:14 239:8
**contemporary**
227:18
**content** 218:8
**context** 158:13
225:1 232:3,6
**continue** 92:21
101:21 114:13
120:14 159:18
**continued** 63:13
125:23
**contrary** 38:23
39:1,6,20,22,24
40:1,4 98:20
200:19,21,24
201:2,6
**contributes**
18:2

**contributor**
74:17
**control** 133:3,14
133:18,22,25
139:1 142:19
143:6 147:17,25
148:5,13 150:18
242:24
**controlled**
127:15 132:23
139:10 141:16
142:24
**controversial**
204:15 236:17
236:20
**conversation**
30:25 31:3,6,8
172:22,24
**convert** 157:1
157:11,15
**converted** 17:7
17:12
**converting**
187:24
**convicted** 6:21
**convince** 196:18
**copy** 22:24
215:6 238:7,18
**copying** 208:8
**corpus** 191:4
**correct** 9:12,15
10:8,9,12 12:9
13:16 14:12
15:7 16:5,12,16
16:18 17:6,16

17:20 21:19
22:2,6 23:2 25:3
25:4,15,18,21
26:4,5,6,7,8,9
26:10,11,12,13
26:14,15,22,23
27:1,2,4,5,7,8
27:10,11,16,22
28:14,18,23,24
29:1,2,16 31:16
31:17 33:19
34:14,20,21
36:6,8,11 42:8
42:20 43:1,2,16
43:22 44:12
46:13,14,17,18
46:22,23,25
47:1 49:10
50:18,19 51:8
53:2,4,7 54:2,10
54:11,19 55:8,9
56:14 57:14,19
57:21,23,24
58:2,9,10,12,20
58:25 59:11,12
59:13,15,16,19
59:20 60:9,10
60:13,22,23,25
61:1,12,13 62:7
62:8 64:15
65:16,20,21,23
65:24 66:1,2,6
66:23,24 67:1,2
67:13,14,18,19
67:23 68:3,4,5

69:6,10,11
70:13,14,16,17
71:10 72:14,19
72:23,24 74:4
74:25 75:4,9,10
75:12,15,16,24
76:7,14,15,21
76:22 77:4,5,14
77:19 78:24
80:6,10,12,15
80:18,24 81:3,4
82:10,24 84:17
85:14,15,20
86:6,8,9 87:12
88:3 91:20 92:3
92:9,12,15 93:1
93:2,6,8 94:21
94:22 97:4
98:17,18 99:18
99:24 100:2,8,9
100:12,16,22,23
100:24 101:13
101:17 102:5,7
102:11 103:7,11
103:12,14 104:5
104:6,23,24
105:7,9,16,25
106:1,10,16,20
106:21,23 107:6
107:7,10,14,19
108:9,10,11,12
108:15,18 109:9
109:14,24,25
110:13,19 112:2
112:10,16,25

**[correct - creating]**

113:4,15,21
114:14,21 115:3
115:4,6,23
116:2,20,21,24
118:12,14
119:20 120:1,7
120:25 121:1,6
122:22 123:8
124:4,8,21
125:11,16 126:5
126:25 127:1,4
127:5,21 128:25
129:1,19 130:2
131:3,4,5,12,13
131:15,18 134:1
134:6,12 136:4
137:2,5,12,13
137:24 138:2,3
138:4,16 139:2
139:21 143:20
143:23 144:2,9
144:17 145:14
146:10,13
147:11,18
148:25 149:18
150:5 151:8,13
151:18 152:4,9
153:17,19,22
154:7,9,10
155:21 156:12
159:5 160:10,24
161:5 162:1,12
162:16 165:5,6
165:10,13,14,17
165:18,20,21,23

166:1,2,2,7,8,11
166:12,15,16
167:5,6,8,9,11
167:12,14,15,17
167:18,20,21,23
167:24 170:23
170:24 171:21
173:7,8 174:13
175:1,11,19,23
176:3,12,14
181:22 182:5,9
182:10,15,16
183:6,13,14,24
184:19,21,22,25
185:1,16 186:3
186:9,11 191:7
192:11,12,16,20
192:25 193:8,14
193:15,21,22
195:2,3,7 196:6
196:8 198:11
199:20,21 200:4
201:12,13,17
202:3,8,15
209:1,8,14,17
210:18,25 211:1
211:7 212:18,20
212:23 213:12
213:16,18,22,23
215:12,16,20
217:1,2,9 219:2
219:21 221:4,8
222:2,9 228:5
228:12,21,22,23
228:24 229:20

230:8,16,20
231:15 234:2,3
234:6,23 239:10
**correction**   10:9
**corrections**
239:9
**correctly**   18:18
18:19 27:20
45:14 64:11
65:19 67:10,25
83:21 89:13,14
114:10 141:16
146:3 171:18
181:14 206:6
207:24 226:17
**correlating**
229:8
**correspondence**
235:16
**cost**   20:14
139:14
**costa**   51:12,17
**costs**   151:15
213:9
**counsel**   2:16
19:15,15,15
47:25 56:6
170:8,10 206:20
242:13,15
243:22
**counted**   53:15
**country**   27:15
**county**   239:4
241:4,12 242:4

**couple**   190:22
195:1
**course**   12:17
18:2 19:3 32:12
105:17,20 148:8
159:17 180:21
219:13 222:13
228:4
**court**   1:1 2:13
5:16,22,23 6:5
6:10 14:16,21
21:17 60:5,5,24
61:3,10 64:13
64:20,23 65:6,7
66:8,13,17
67:20 79:10
81:5 86:12
102:18 107:24
113:1 115:6
124:19 128:13
152:21 155:16
163:15 196:19
232:23 237:9
**court's**   57:5
**cover**   135:15
**covered**   135:15
**cowards**   219:7
**cpp**   142:15,21
**create**   92:25
116:10
**created**   176:2
206:4 219:6
221:10
**creating**   226:4,5

**credentials**
217:22 218:7
**credible** 51:24
184:3 185:24,25
**crime** 6:21
**crisis** 210:12
**critical** 176:18
**criticism** 219:15
**criticisms** 35:10
35:12 37:3,4,9
45:20 46:2,4,10
**critique** 34:5
35:19
**critiques** 36:1
**critiquing** 28:3
**cross** 3:5 20:12
47:16,18 48:5
63:13,24 64:8
69:17,20 70:12
86:7 87:7 92:21
102:4 113:20
114:4,11,14
115:2,16 117:6
117:12,18
118:17 119:2
120:5,14,20,23
123:22,24 124:3
158:23 159:5,18
159:22 160:4,9
161:1,5,21
162:1,9 163:4
233:2,7 234:23
236:13
**crossed** 140:25

**crucial** 108:19
**crying** 153:6
**culmination**
168:2,11
**cultural** 232:3,6
**culture** 216:22
216:23 232:14
**cultures** 205:3
205:18 232:12
232:18,22
**cured** 76:24
180:23
**currently**
148:19
**cv** 1:2 52:15,21
54:10

**d**

**d** 3:1 30:5 73:23
109:17,18
197:14
**damage** 144:4
**damages** 144:13
**dangerous**
77:12
**data** 7:22,23 8:3
14:25 15:22
16:9,10,15
106:12 156:14
175:24 176:2,3
176:14 177:3,7
212:4
**database** 71:23
72:2,10,16
**date** 1:12 59:4
171:10,12

240:25
**dated** 235:22
239:12 242:18
**daughter**
154:20
**day** 119:5 175:3
239:12,17
**days** 237:14
**de** 30:17 73:9,9
75:14 79:15
88:15 117:22
147:7 173:21
179:16 182:7
194:16,19,23,23
196:8
**dead** 57:25
154:20
**dealing** 151:11
**deals** 186:12
**dear** 243:10
**death** 77:9,14
83:22 84:3,13
84:24 85:2,6,7
85:13,17 86:8
86:12,19,20,25
87:12,21 89:4
89:11 96:1,2,6,7
96:10 121:9,12
122:24 123:11
123:21,23
**deaths** 82:2,3
**debate** 201:21
221:18,23
222:12 225:21

**debated** 177:21
**debates** 220:12
221:15
**decatur** 2:13
**decide** 59:6
65:11 66:9
102:6 236:19
**decision** 120:21
120:22 218:22
228:8,9
**decisions** 13:4
30:14
**decline** 25:11
**decreased** 211:4
**decreases** 106:3
108:13 109:13
109:16
**decreasing**
213:5
**deemed** 37:8
44:21
**defendant** 1:7
2:20
**defendants**
12:24 23:21
24:11 55:6,10
56:5
**defense** 2:9
170:8,10
**defer** 140:7
**deficiency**
212:13
**define** 10:16
**definitely** 57:4
209:24

**[definition - development]**                                           Page 260

**definition** 40:25
  41:8,9 43:4,23
  45:4,10,14 46:8
  46:16 185:7
  192:22
**definitionally**
  46:16
**definitions**
  40:24
**degree** 154:24
**dekker** 1:3
  149:12 240:2
  243:8
**delemarre**
  117:22 179:16
**deleterious**
  130:19
**demean** 175:6
**democratic**
  221:18
**demon** 63:10
**demonstrate**
  164:22
**demonstrated**
  184:13
**demonstrates**
  41:11 164:7,17
**demonstrating**
  158:20 163:1,8
**demonstration**
  185:18
**denominator**
  82:1,1,3 87:11
**denounced**
  219:15

**density** 15:15,18
  15:19,20,25
  16:17,20 17:6,7
  17:10 28:6,10
  33:9,10 35:18
  51:4 81:17
  103:22 106:4,8
  106:12 107:25
  108:14,24,25
  109:2,14,16
  113:19 114:1,1
  114:12 116:15
  135:9 138:3
  175:21 211:4,11
  211:16 212:2,6
  212:14 213:4,5
**depend** 107:15
**depending**
  27:24 107:18
  243:12
**depends** 14:23
  162:20 203:15
  203:15,16
**depos** 5:14
**deposed** 65:14
  65:15
**deposition** 1:15
  1:25 3:18 4:22
  4:25 22:9,9 23:1
  23:11,24 24:14
  46:20 49:20
  55:24 56:1
  65:25 90:17
  226:23 233:10
  233:24 234:11

  234:12 239:7
  240:23 242:8
  243:9,11,15
**depositions**
  234:2
**depression** 75:8
**depth** 32:5
**der** 194:16
**derived** 112:8
**describe** 40:19
  57:6 118:16
  161:15
**described** 57:22
  78:21 158:19
**description** 3:17
  55:2
**designed** 87:3,5
  174:5,22 177:14
**desirable**
  187:20 188:8,19
  188:19
**desire** 41:15,23
  42:2
**desires** 41:12
**desistance**
  192:23
**detail** 33:15
**details** 72:6
  149:19
**determination**
  58:22 73:18
  111:11
**determinations**
  20:20 21:18
  63:23 102:10

**determine** 8:14
  9:4 12:4,12
  13:24 19:1,7,14
  19:24 20:6 58:1
  58:12 64:2
  67:22 74:2,24
  78:17 79:2,5
  80:22 84:24
  85:1 88:12,18
  88:23 104:25
  110:7 111:5,19
  112:5,10 113:12
  119:5,21 146:18
  153:16 181:13
**determined**
  67:21 73:3
**determines**
  105:17,20
  116:23
**determining**
  204:5
**detransitioner**
  30:18,21 68:9
**detrimental**
  114:21
**develop** 193:11
  193:12
**developed** 159:9
  201:9
**developing**
  115:12
**development**
  103:18 119:15
  125:8,14 126:14
  127:4 128:14

130:4,15 134:4
162:8 198:17
**deviants** 96:22
96:25
**deviation** 93:24
96:20 97:7,20
**diagnose** 153:13
**diagnosed**
112:20 113:2
117:5 119:1
121:13 122:25
123:11 131:11
131:23 160:11
197:16
**diagnoses**
101:13 105:10
105:12 167:13
**diagnosis** 110:7
160:14 163:12
163:20 165:12
167:10,20
**die** 85:21 86:3
**died** 76:23 77:3
77:17 78:14
82:23 85:18
86:13,19 123:15
**dies** 89:3
**difference** 45:5
108:19 129:15
129:22 155:7
181:3
**differences**
105:5
**different** 58:7
90:3 91:22

95:11 101:12,14
101:14 103:14
123:3 130:8
144:9 162:21
174:13 177:23
182:12 200:8,9
206:16 231:14
231:23 232:12
232:12,13,17,17
233:1
**differently**
222:2
**difficulties**
193:25 194:22
195:17
**difficulty** 194:8
195:20
**dinner** 140:1
**direct** 3:5 4:7
202:21 219:21
242:24
**direction**
242:25
**directly** 78:16
130:10 176:22
**director** 81:6
**disabled** 22:13
**disagree** 37:12
43:17 58:13
77:10 86:17
95:19 113:5
129:11,19
215:21
**disagreed** 65:11
66:10,15

**disagreement**
43:18,20
**disclose** 53:10
67:17
**disclosing**
169:24
**discourse**
217:14 219:19
**discovered**
174:2
**discuss** 64:20
233:24
**discussed** 26:24
28:6 33:7 34:8
81:16 123:14
144:8 147:7
149:4 198:8
**discusses**
139:19
**discussing**
190:20
**discussion** 56:7
87:25 125:18
151:14 202:2
221:24 236:25
**disease** 75:9
**disorder** 160:15
198:10
**disorders** 93:11
211:12,17 212:7
212:12
**dispute** 75:13
**disregard**
155:19

**distress** 42:4
121:4,5 191:21
**distressed**
180:16
**distribution**
15:25 16:25
17:8,9
**district** 1:1,1
**dividing** 87:11
**division** 178:1
**doctor** 7:4 58:9
100:19 109:24
116:23 119:6
129:24
**doctoral** 39:13
39:15
**doctorate** 25:10
**doctors** 33:2
57:10 78:16
112:23 130:21
148:18 150:14
156:24 157:10
**doctrine** 202:25
**documentation**
208:23
**doing** 8:19
31:25 108:20,20
149:6 175:24
209:16
**dose** 93:17
96:18 98:4
**dr** 16:22 17:18
20:2,9,23 21:10
21:21 42:12,18
45:16 53:5 58:4

**[dr - early]**

58:24 68:5,7
69:9,9 71:12
76:2 86:16
91:24 94:10
110:21 112:13
119:10,24
120:10 124:10
129:5,23 135:4
140:7 143:3
149:2 153:24
159:13 162:3
175:13 176:6
178:11 184:1
188:2 189:1
190:5 195:11
196:21 200:6
201:19 202:14
203:25 207:10
208:18 209:20
210:17 211:19
212:25 217:6,19
218:12 219:1
220:10 222:4
223:4 224:24
225:19 226:3
227:13 228:14
229:3 230:22
233:16 234:25
236:10 243:10
**draft** 170:23
**drafting** 26:16
40:10,13 167:7
**draw** 58:18 94:4
94:13,14,23
96:17 103:10,13

152:8
**drawn** 80:2
113:7 199:22
227:17
**drew** 158:15
**drug** 96:18
104:4,19
**drugs** 6:24
91:10 93:10,16
93:16 94:14
97:6 98:3 156:3
167:22
**dsm** 40:16,21,23
41:9 42:8,23,25
43:7,8
**due** 121:4 175:2
211:11 212:6,6
**duly** 4:4 241:8
**dunn** 2:16
**dutch** 28:7,8,12
29:8,10,10,16
29:18 30:16,17
30:18 31:13
32:10 33:9 34:4
34:9 35:6 36:6
36:19 41:3
62:19,19,20
87:5 97:21
117:11,21 118:6
118:12,15,20,21
125:23 127:11
128:1,8 132:3
143:5,6 173:20
174:6,23,23
175:19 179:15

181:16 185:19
186:5,22 196:7
211:3 214:6,7
**duty** 151:22
**dying** 85:24
**dysphoria** 7:12
7:15,18,21
10:15 11:2,4
25:15,21 27:19
28:2 40:24 41:8
41:9,11,22 42:1
47:10 48:4 50:8
50:21 57:17
67:6 72:22
75:19,23 76:13
76:13,20,24
81:3 84:19 85:3
85:14 88:3
93:19 94:7
95:17 96:19,22
98:5,24 101:10
101:22 103:5
104:5,20 105:7
105:12,21 107:6
107:14 108:1,18
109:8 110:12
117:5,17 119:1
121:4,13,19
122:2,9,16,21
122:25 123:6,12
130:6 131:24
132:16 133:18
136:9,17,21
137:16,22 138:7
146:16 147:15

151:4,8 154:14
158:21 160:12
160:14,23 163:2
163:9,13,16
164:8,19 167:11
167:23 168:6
169:25 179:6,15
179:25 180:19
180:23 181:10
192:5 193:18,20
214:18
**dysphoric** 94:16
95:2 180:18
193:5,6

**e**

**e** 2:1,1 3:1 30:4
54:14 57:8
73:21,23 90:7
90:12 135:22
136:1 142:8,8
142:11 208:8
235:20,21,21,22
235:24
**earlier** 15:12
33:7 59:14
81:17 84:6
106:14 122:20
123:14 132:3,9
147:7,18 158:1
158:14 202:9
205:20 215:19
221:16 228:23
230:4 233:22
**early** 95:9
118:16 158:21

163:2 171:20
174:5
**easier** 89:23
178:22
**easy** 191:9,17
**eating** 211:12
211:17 212:6,12
**editor** 15:23
34:19 35:9,22
35:24 43:15
44:3 45:22 46:5
46:12,21 47:4,9
47:14 48:3 50:5
50:6 51:9
116:11,17 138:5
**editors** 45:7
**edmiston**
129:23
**edmiston's**
129:5
**education** 2:9
106:24
**effect** 85:25
129:9 133:7
142:20
**effects** 65:1 97:6
99:13 107:12,19
125:25 128:19
128:20 130:19
158:25 163:6
**efficacy** 37:23
38:9 61:4,11
65:1 87:3 98:23
99:2 201:15,23

**efficient** 141:1
**efforts** 175:2
**eight** 52:19
55:20 171:14
**either** 6:3 52:16
54:10 65:6,20
76:5 88:23
127:7 170:8
171:15,16
225:11 226:7
235:7
**electronic** 4:20
**elevated** 115:13
**elicited** 175:25
175:25
**eliminate**
183:12
**eliminated**
75:19,23
**else's** 28:23 29:1
74:4 106:20
112:1 124:12
175:23 176:14
182:4 193:14
195:9 219:24
**elucidated**
144:14
**embedded**
223:7
**emerge** 101:21
**emotional** 125:7
125:13,25
126:13 127:3
128:19 130:4,15
198:16

**emphasize**
51:19 125:24
**emphasized**
194:20
**empirical**
200:14 201:21
202:1 217:23
236:21
**empirically**
58:14
**employ** 81:23
**employee**
242:13,14
**enable** 106:25
119:14 159:6
**enabled** 22:15
**enables** 150:14
**encapsulated**
104:22 232:15
**encourage**
148:11
**endo** 51:1,3
**endocrine**
105:19 167:3
169:9 201:2
**endocrino** 51:1
**endocrinologist**
26:8 105:11,19
105:23 179:16
202:3
**endocrinologi...**
201:16
**endocrinology**
15:24 27:4 51:2
51:3 116:12

**endometriosis**
94:20,25
**engage** 182:13
**engaged** 26:16
47:6 65:18
101:6 169:19,24
176:16 200:1,3
**england** 197:18
204:17,17
**english** 34:4
97:22 110:23
111:4 113:11
174:22 175:18
191:5
**ensure** 32:20
159:4,22
**enter** 240:3
**entered** 240:23
**entertaining**
186:7 200:8
**entire** 146:13
147:10 191:4
**entirely** 18:13
47:23
**entitled** 20:7
139:20 222:8,10
**equivalent**
97:16 104:1
**erections** 180:17
**erica** 142:7
**errata** 3:11
239:9 240:1
**espousing**
115:25

**esquire** 2:3,4,4
2:8,12,15,16,21
243:6
**essentially**
53:25 136:25
137:4 161:25
194:19 226:9
**establish** 202:25
**established**
201:8
**estimate** 9:6
82:18
**estrogen** 138:22
223:21
**et** 1:3,6 51:17
73:9,9 88:15
147:7 173:21
182:7 185:20
194:23 240:2
243:8
**ethicist** 26:1
**eugenics** 225:17
226:1,20 227:11
227:14 228:4
**evaluate** 81:7,9
209:16
**evaluating**
213:8
**evaluation**
58:16 74:8
**events** 208:22
**everybody**
97:11 202:4
**evidence** 36:24
44:17,20,21

45:2 46:21 57:9
64:25 76:5,6
102:13,16
126:10,11 168:5
170:14 173:11
173:22 183:5,7
184:19 185:16
185:17 186:16
187:3,5,7,11
189:10,12,15,17
194:17 195:5
196:5 197:25
198:4 199:24
200:4,14 201:23
208:21 211:14
217:21,24
235:23,25 236:2
236:22
**evidencing**
105:7
**evidential** 199:8
199:19
**evolution** 216:5
216:8,25
**evolutionary**
216:5
**evolved** 216:14
216:20
**exact** 55:21 59:4
185:22
**exactly** 126:18
145:18 199:24
219:22 226:16
**exaggerated**
154:24 155:4

**exaggerating**
154:22
**examination** 4:7
212:18,20
236:13 237:20
**examined** 4:4
**examining**
142:20
**example** 7:22
13:11 14:24
15:1,8,10,12,15
15:16,17 47:13
62:16 63:9,14
74:18 75:17
79:19 81:10
84:25 94:25
116:7 124:10
135:8 144:19
145:1 147:10
148:7 169:6
187:11,13,15
189:12 190:17
199:11 203:17
203:21 210:8
221:16 223:19
225:14 230:18
230:18 231:6
233:2,3
**exceeding** 83:22
84:13 86:20,20
87:21 89:11
96:11
**exceedingly**
86:24

**excellence** 73:21
**excellent** 10:14
90:15 141:13,13
**except** 101:9
234:8,8
**exceptionally**
235:14
**exclusion**
215:11
**exclusive**
192:11 193:20
198:9
**excuse** 172:16
**executive**
127:14 129:10
**exercise** 109:18
127:12
**exhibit** 3:17,18
3:19 22:8,17,21
23:11,12,22
30:19 83:11
**exhibits** 3:16
41:4 153:2
**exist** 145:17
163:23 205:21
205:23 229:14
234:14,23
**existing** 111:6
111:22
**exists** 11:4
145:20 163:16
**expected** 160:10
**expedited** 238:6
238:8

expended  55:16
experience
  18:14 27:3,6
  99:16 101:25
  124:13,15 161:5
  202:10 208:19
  233:1
experienced
  213:21 235:14
experiences
  196:25 197:2
experiencing
  100:20 121:4
  145:13 167:23
  207:22 210:12
experiment
  174:3,4
experiments
  151:21 179:8,18
expert  23:7,20
  34:2 49:8 59:21
  59:24 60:2,4
  61:3,11,19
  64:12 65:3,9,20
  66:4 89:19,21
  90:18 130:25
  131:7 134:17,22
  134:25 135:2
  149:13 154:3
  164:5 169:20,25
  171:1,8 172:1
  204:9 227:2,3
  234:3,3,9
expertise  42:8
  42:23 67:11

136:8,10,15,18
experts  13:18
  22:2 24:12,15
  64:19 65:6,9,10
  65:12 66:5,7
  201:16
expires  241:20
explain  47:12
  133:12 151:12
  180:12 229:13
explained  35:25
  63:5 74:20
  218:21
explanation
  194:2 210:9,13
  210:14,19,22,24
  210:25
explicit  117:10
  118:4
explicitly  53:12
exploration
  214:8
explore  205:12
exposed  218:23
extensive  9:17
  28:15
extensively
  131:8
extent  28:20
extrapolate
  153:11
extrapolated
  82:8 147:10
  161:11

extrapolating
  87:14
extremely  85:5
eyes  231:6

**f**

f.g.  145:21,22
  173:19 225:15
face  193:24
  194:21 195:17
facile  102:20
fact  37:8 43:20
  53:10 75:1
  79:22 92:25
  103:13 133:2
  145:16 174:2
  175:9 179:12,15
  183:12 196:1
  199:23 213:7
  221:24 231:13
factor  75:5
factors  63:22
  113:13
failed  85:19
  86:4
fails  186:22
failure  67:16
fair  5:11 45:23
  69:4 130:14
  153:8
fairly  200:10
fall  171:20
familiar  51:24
  56:24,25 142:4
  142:9

families  154:24
family  64:13,20
  64:23 65:5 66:4
  67:4 119:19
  120:8
famous  219:11
  219:25
far  75:6
fasciitis  82:24
  123:15
fascists  219:6
  221:11
fast  114:2
faster  238:11
father  64:22
fault  138:25
faulty  12:14
  14:6
favor  57:17
  60:25
feb  170:19
february  143:20
  170:19
federalist
  218:15,15,16
feedback  30:17
feel  6:1 83:2
  196:4 222:2
feelings  207:23
  208:20,20
female  11:25
  213:20 215:20
  215:23 221:25
  223:22 224:9

feminine 18:12
185:12 186:24
192:13 193:5,10
225:11
fertility 182:23
field 201:16
figures 55:21
85:11 121:16
123:1,2,2
fill 226:15
finalize 169:13
finalized 24:9
24:12 156:19
finances 70:18
70:21
financial 12:18
12:23 13:4,8,19
financially
13:12 242:16
find 193:5,10
223:16,21
finding 132:18
findings 75:18
174:12
fine 70:5 89:8
140:10 178:17
238:17
finer 70:10
fingers 140:25
finish 36:23
41:17 44:22
209:4
finished 89:19
firm 4:23 172:9

first 4:4 27:18
35:23 37:15
60:8 73:10
117:11 127:25
134:14,15
146:14,15
159:17 162:5
174:21 175:3
183:8 187:2
198:5,6 208:18
209:12 211:2,25
214:24 225:14
236:15
fit 196:4,17
fitting 193:25
194:8,22 195:17
195:20
five 27:22 56:7
56:12 70:2,5
72:4,7 82:18
100:7,11 105:6
152:13,24 155:5
155:10 170:14
233:23 234:8,9
fixed 156:14
fl 2:6,17,23
243:2,7
flawed 179:25
floor 2:10
florida 1:1,24
52:12 53:11
68:19 134:3
135:12,18,25
136:5,24 137:10
137:14,23

147:14 148:11
148:24 150:2,6
150:8,18 172:7
172:7 239:3
241:3,7,13,19
242:3
focus 47:23
48:24 74:21
focused 122:18
focusing 231:8
follow 146:6,17
followed 118:17
145:24 165:8
following
186:16 210:10
229:10
follows 4:5
footnote 30:17
30:18 35:23
36:6,7 44:10,14
44:17 195:8
forced 16:8
forefront
190:15
foregoing 239:7
239:16 242:23
forget 132:3
form 16:21
17:17 19:21
20:1,8,22 21:9
21:20 42:11,17
45:15 53:3 58:3
58:23 71:11
76:1 77:12
86:15 91:23

94:9 102:21
110:20 112:12
119:9,23 120:9
135:3 143:2
149:1 153:23
159:12 162:2,14
175:12 176:5
183:25 188:1,25
190:4 195:10
196:20 200:5
201:18 202:12
203:24 209:18
210:16 211:18
212:24 217:5,18
218:11,25 220:9
222:3 223:3
224:19,23
225:18 226:2,21
227:12 228:6,13
229:2,11,21,24
230:21 232:7,10
232:24 233:15
234:24 240:23
former 39:15
forming 40:21
126:21
forms 221:13
formulate 38:19
fort 241:12
forth 177:20
fortunately
155:8
forward 198:2
found 62:5
111:25 112:23

**four** 34:1,16
35:8 37:7 44:9
100:7 140:2
162:21 213:21
214:2
**fourth** 34:8
36:17,18 37:16
**fpr** 1:23,23
241:18 242:20
243:21
**frame** 238:13
**fraud** 6:22
**free** 83:2 217:14
**freedom** 8:11
9:9,11,18,19,22
16:4 152:3
**freeze** 199:14
**frequent** 190:20
**friday** 56:8
**front** 90:5,16
**fulfilling** 185:22
**full** 39:21 89:18
169:3 200:15
**fully** 6:7,25
159:9
**function** 104:16
124:4,8,20,25
129:10 182:23
**functioning**
127:14
**fund** 2:9
**funded** 212:3
**further** 211:9
237:2 242:12

**g**

**g** 57:8 73:23
142:8 197:14
235:21,22
**g.d.** 235:18
**ga** 2:13
**gaia** 235:20
**gainesville** 2:17
**gains** 133:8
**galica** 68:21,21
**gapms** 40:11
165:2 173:7
**garden** 5:14
**gary** 172:11
**gay** 18:12
157:15 185:4,8
185:12 225:4,11
**gays** 18:11,17
182:21 183:23
**gender** 7:11,15
7:18,21 8:6
10:15 11:2,4,19
11:19,20 15:20
25:15,21 27:6
27:18 28:2
37:23 38:2,6,10
40:24 41:8,9,11
41:21,22 42:1
47:10 48:4,12
49:23 50:1,8,21
57:9,17 67:5
68:13,17,24
69:6,10 71:9,14
71:18 72:22
73:2 75:18,23

76:12,13,19,24
79:1,11 81:3
84:19 85:2,4,14
88:2 93:19 94:7
94:7,16 95:2,17
96:19,21 98:5
98:24 99:3
101:10,22 103:5
104:5,19 105:7
105:12,21 107:6
107:14 108:1,18
109:8 110:11
116:7 117:5,17
119:1 121:4,13
121:14,19,20
122:1,9,15,21
122:25 123:6,12
130:5 131:11,24
132:16 133:17
134:5 136:9,16
136:21 137:16
137:21 138:7
143:15,19,22
144:3,13,20,21
144:23 146:16
147:15 148:12
148:24 149:22
150:4 151:4,8
152:11 154:14
156:25 157:10
158:21,25
160:11,14,14,23
161:12 163:2,8
163:12,16 164:8
164:19 166:19

167:10,23 168:6
169:25 179:6,15
179:25 180:17
180:18,23
181:10,15
184:13,23
187:16,16,17
191:21 192:5,18
193:18,20 201:6
202:21,22,25
203:8,9,19
214:8,18 220:12
225:15,16 226:1
231:12,14,14
232:13 236:16
236:23
**gendered** 145:2
145:4
**genealogies**
205:12
**general** 20:25
60:18 89:10
138:9 191:16
199:13 204:14
**generalizable**
123:3
**generally**
101:16 165:23
166:17,20,24
201:7 206:17
225:4
**generic** 118:15
118:22
**genitals** 146:5

**[genspect - guess]**                                    Page 268

**genspect** 57:2,3
  143:23,25 144:3
**genuinely**
  224:25
**getting** 7:22,23
  8:3 225:7,8
**gids** 197:14
**girl** 12:1 18:13
**girlfriend** 141:6
  223:25
**give** 5:2 15:14
  15:16 22:13
  27:25,25 36:12
  52:6 58:17 59:4
  62:23 100:12
  124:12 162:7
  217:15 230:5
  235:8
**given** 88:9 104:4
  107:22 108:1,9
  108:17 146:15
  188:6 211:10
  212:2 231:1
**gives** 107:3
  200:15
**giving** 52:6 86:2
  86:7 103:17,21
  103:25 108:8
  111:9 112:8
  145:25 161:12
  226:8 229:12
**gnrh** 35:7 36:6
  63:18 64:8
  98:13 103:17,21
  103:25 105:5

106:3 113:20
  116:24 128:13
  129:10 130:11
  130:13,14,22
  131:10,17 138:8
  138:13,20
  147:15 151:7
  174:16 176:17
  177:9 178:5
  197:24 198:17
  209:7 212:2
  213:21 225:15
**gnrha** 207:23
  208:20 211:10
**go** 24:19,21
  62:22 77:11
  83:10,20,21
  84:25 90:23
  95:25 102:3
  120:14,20
  138:22 140:21
  141:14 158:7
  159:21 160:9,25
  161:20 162:9,12
  162:13,18 176:8
  178:3 179:2
  180:8,10 181:12
  182:3,18 183:15
  186:21 197:12
  197:23 214:24
  215:3 226:19
  227:6
**goal** 142:15
**god** 202:23

**goes** 162:24
  194:3
**going** 4:22 5:3,4
  5:4,10,24 6:1
  10:3,4 16:2 18:5
  22:8,9 23:4,10
  23:11 24:17
  28:10 29:23
  35:4 37:21
  41:18 56:20
  57:21 69:14,25
  83:1,8 102:24
  157:19 158:16
  172:14 177:23
  177:24 178:15
  180:10 193:3
  210:5 213:5
  216:18 223:23
  226:6 230:5
  238:2
**gold** 173:20
**gonadotropin**
  16:1 34:5 88:9
  97:19 185:21
**gonzalez** 2:5,8
  22:12,16 83:12
  83:15 198:23
  208:7,10,13,16
**good** 4:9 14:24
  14:25 20:13
  41:7 76:7 85:5,5
  106:22 126:10
  139:24 140:17
  141:10,14 146:4
  207:12 234:22

**google** 189:13
  190:25 191:3
**google's** 191:4
**gooren** 117:22
**gosh** 140:7
**grade** 73:23
**grading** 74:9
**great** 173:25
**greater** 82:9
  87:12 89:5
  95:25,25 108:23
  121:9 155:5
  197:18
**greatly** 198:15
**green** 193:1
**grossly** 86:11
**ground** 5:2
**group** 57:9
  59:11 115:11
  127:15 146:13
  147:11,17
  228:10
**groups** 87:15
  147:6,25 148:4
  148:5,13 150:18
**grow** 225:10
**grown** 182:21
  183:22 185:11
**growth** 187:16
**guarantee** 46:5
**guess** 27:24 32:9
  65:14 79:18
  95:25 155:22
  238:7

**[guidelines - hormones]** Page 269

**guidelines** 167:4
169:9 201:3
204:4

**h**

**half** 140:9 198:6
**halfway** 75:21
76:8
**hand** 30:8 55:21
85:11 141:23
241:11
**happen** 211:6,7
**happened** 78:17
78:21
**happy** 4:20 5:7
5:9 6:15 30:1
70:4 75:7 99:1
178:20 188:3
206:23 233:9
**hard** 5:24
**harm** 144:4,14
**harvard** 107:2
**hate** 180:21,22
**he'll** 180:17
**head** 5:15,15,17
127:18 147:19
186:6
**health** 12:4,11
12:12 15:21
16:7,7 26:17
27:9 50:12 54:5
54:13 55:5 68:1
73:1 74:13
81:12 82:14
88:4,24 91:8
92:4 93:3,13,25

97:3 104:8
106:2 110:15
111:2,21 112:6
116:1 117:2
118:2 122:6
123:4 125:6
126:7 132:21
133:19 135:17
135:21 136:2
137:1 147:14
150:19 157:21
177:25 186:17
187:4,6,14
189:8 190:12,17
190:21 210:10
210:12 227:16
**healthy** 82:9
83:22 84:4,13
84:20,22 87:21
88:1,5,10 89:11
96:10 121:9
**hear** 4:11,18 5:8
5:9 8:4,22 18:19
148:14
**heard** 86:1
134:14,15 137:9
**hearing** 218:10
**height** 133:7,8
141:18 142:16
142:17,21 143:6
**held** 53:11
**help** 153:6
**helped** 169:10
**helpful** 178:9,10
201:12 229:25

**helpfully** 35:22
**helps** 197:1
226:24 227:7
**henrietta**
117:22 179:16
**henry** 217:10
218:4
**heterosexual**
157:9 183:9
223:19
**hh** 241:20
**hide** 217:16
218:10,16
**high** 63:11
73:24 74:19
79:20,23 80:4
86:24 96:6
115:8,9 116:14
131:18 211:5,11
211:16 235:14
236:4
**higher** 79:25
82:19 152:13,25
155:11 197:24
199:11
**highly** 193:12
**historical** 28:16
28:21,25 32:9
**history** 28:8
216:25 218:14
**hit** 5:13
**hitchens** 219:12
**hold** 42:15
75:16 146:5
172:20 180:7

**holds** 39:6
143:25 221:21
**holtzman** 2:22
172:3 243:6
**holtzmanvoge...**
2:24
**home** 230:24
**homosexual**
157:9 183:9
**homosexuality**
186:23
**homosexuals**
223:22
**honest** 171:3
**honestly** 111:3
**hope** 62:4
155:12 201:14
**hopefully** 5:3
182:18
**hoping** 224:6
**hormonal**
235:19
**hormone** 16:1
34:5 63:13 88:9
92:23 97:19
158:23 163:4
185:21 234:14
**hormones** 20:12
47:17,18 48:5
63:14,24 64:8
69:17 70:13
86:7 87:7 91:17
92:11,15,21
94:2 98:14,16
102:4 108:22,23

113:21 114:4,11
114:14 115:2,17
117:6,12,18
118:17 119:2
120:5,15,20,23
123:23,24 124:3
159:5,18,22
160:4,9 161:1,5
161:21 162:1,9
177:16 233:3,7
234:17,23
**horse** 57:25
**hostess** 22:13
**hour** 69:25
140:9 206:21
**hours** 55:16,20
55:23,24 56:13
140:2,23
**huge** 181:3
216:20
**huh** 5:20 8:13
34:3 63:8 97:8
97:13 133:24
156:21 206:5
**human** 18:13
54:5,14 55:5
68:1 73:1 74:13
81:12 82:14
91:8 92:4 93:4
93:14 94:1 97:3
106:3 110:16
111:2,21 112:7
116:1 117:2
118:3 122:6
123:5 125:6

126:7 132:21
133:19 135:17
135:21 136:2
137:1 147:14
178:1 216:22
**humanly** 238:15
**humans** 216:22
**hunter** 56:24
57:1 135:25
**hurley** 194:16
**hypnography**
32:23
**hypothesis**
184:3,4,7,9
**hypothetical**
186:3 215:15

### i

**idea** 125:24
126:4
**ideal** 224:12
**ideas** 204:15
**ideation** 153:5
153:11,13
**identical** 137:11
**identification**
22:18,22 23:13
23:22 239:19
**identified** 134:9
145:23 168:14
170:3 193:2
206:2
**identify** 57:12
64:12
**identifying**
193:9 205:10

**identities** 205:5
205:7 206:17,18
235:3
**identity** 11:19
143:19 144:3,13
144:20,24
158:21 160:14
163:2,9 188:6
192:25 194:1
197:9 202:22
203:8,9,20
206:13,15,16
214:9 218:6
225:12 231:14
**ideology** 144:4
144:13,21,24
**impact** 6:25
17:23 18:7,10
62:10 79:5
103:18,18,22
104:8,15 106:7
107:25 108:3,23
109:13 113:19
113:23 114:21
121:19 124:3,7
125:7,15 127:3
127:7 128:13
130:3,14 131:10
131:24 132:18
141:18 142:23
143:19 149:18
164:7,17
**impactful** 218:3
**impacts** 124:20
126:12 200:16

**impairment**
42:4
**implausible**
200:11
**implication**
148:16 196:15
220:23
**implied** 87:18
**implies** 48:17
**imply** 154:2
223:13
**import** 32:9
152:6 155:23
159:25 223:9
**important** 14:14
109:1 115:23
145:3 155:25
208:23 213:8,8
218:3 220:11
221:15 224:16
**imposed** 148:24
**imposition**
203:1
**improper**
180:13
**improvement**
179:24
**inappropriately**
225:4
**incented** 13:12
**incentive** 12:18
12:23 13:19
**incentives** 13:8
**inclination**
155:18

include   36:14
    52:15 62:25
    126:6 157:19
included   35:22
    47:19 48:13
    52:20 57:18
    66:25
includes   32:13
    221:14
including   14:15
    32:12 155:23
    181:17 202:5,7
inclusive   242:10
incorporate
    45:12
incorporated
    44:25 46:11
incorporating
    217:24
incorrect   34:15
    36:12 71:13
    79:24
increase   108:22
    108:23 114:4,5
    190:11 209:6
increased   77:20
    85:24 207:22
    208:19
increases
    198:15
increasingly
    173:10
incumbent   6:2
    151:11,23

independent
    28:1,4 32:6 47:2
    104:11 111:19
    112:4,9 113:12
    121:25 122:14
    128:24 137:16
    137:21
independently
    116:19
indicate   64:10
    122:7 192:23
indicated   72:13
    146:4 168:10
indicates   219:17
indicating   44:11
    44:17 151:3
indirect   77:15
    77:15 123:16
individual
    13:11 14:19
    19:2,8,24 20:20
    21:2,7,18 30:23
    31:1,4 67:22
    77:1,2,11 78:14
    82:4 86:3,8,13
    103:4 110:3,16
    112:6,19 113:2
    116:25 119:14
    119:17,18 120:7
    123:11,14
    131:23 132:2
    138:7 146:14,15
    147:5 151:12
    153:18,19,21,22
    154:5 157:3,6,8

162:16,17 170:8
    173:19 181:6,20
    181:25 192:2
    212:16 214:2
    223:16,17
    227:22 229:6,16
    235:25
individual's
    20:7 77:9,14
    110:6 114:12,21
    191:20
individuals   9:15
    9:17 10:7 14:1
    18:15,22 30:13
    32:3,19 38:2,5
    39:10 64:2 67:5
    68:2 71:9,22,25
    74:22 75:7
    76:12,18 80:20
    84:19 88:19,24
    102:19 103:9
    115:1 131:11
    132:16 147:2
    151:4 153:4
    154:23 155:5
    157:1,11 159:8
    159:10,21 160:8
    160:17,24 169:8
    181:13 183:22
    196:16 226:6,9
    231:21 232:22
    233:6
inevitably   96:6
infants   237:23

inference
    199:10,22
inferences   80:1
    200:2
inferior   227:16
    227:22 228:9
influence   31:9
influenced   13:8
    63:22
influences   155:1
inform   41:5,9
    151:24 169:11
information
    8:11,16 9:9,11
    9:18,20,22
    15:20 16:4
    32:19 60:19
    67:17,18 71:23
    72:2,5,9 76:17
    90:12 141:23
    152:3 170:7,9
    172:17 221:8
informed   30:14
informs   41:25
initial   116:13
    173:18
initially   123:22
    173:24 214:7
innate   228:12
    228:17 229:1,6
    229:15,23
    230:20 231:5,22
    231:24 232:1,2
input   29:18

inquiry   148:1
insofar   23:23
   101:9
instance   138:6
   209:12
instances   18:3
   137:12 209:11
   230:7,8
institute   73:20
institutions   94:5
   94:8 148:19
instruct   172:15
instructing
   172:18,25
intelligence
   153:11
intended   160:23
   168:8
intending
   157:16
interact   197:10
interest   13:4
   54:25 116:10
interested   101:4
   121:23 122:4,8
   122:13 132:17
   146:25 173:24
   223:24 242:16
interference
   8:18
interjecting
   178:10
interpret   42:8
   42:23,24 43:3,5

interpretation
   10:23,25 161:7
   210:7 223:9
interpreted
   161:9
interpreting
   161:8 221:2
interrupt   41:19
   41:19 44:8 70:3
   207:13
interruption
   199:1 216:11
intersex   237:23
intervention
   19:10 20:11
   108:14,20
   109:13,16,19
   159:23 161:21
   206:14 210:11
interventions
   121:25 122:15
interview   31:21
   32:18 33:1
   38:12,15 63:17
interviewed
   29:7 38:1,18,22
interviewing
   32:2 38:4
interviews
   30:12 32:13
introduced
   146:22
invent   204:25
invented   205:7
   205:9,14,22

inventing
   204:22
investigated
   101:9
investigation
   111:5
investigations
   151:24
investigator
   177:3
invitation   68:25
invite   135:17
invited   59:8,9
   68:16,19 135:12
   135:16,20,25
involved   29:7
   31:22 57:2
   173:6 176:17,22
involves   206:13
iq   127:7 130:19
irish   68:20
ironically
   227:21
islam   219:15
islamophobia
   219:13
islamophobic
   219:16
israel   203:2
issue   40:11,14
   53:1 54:19
   98:10 116:10
   143:10 149:11
   149:12,14
   190:20

issued   9:19
issues   27:18
   39:21 88:24
   108:13 144:19
issuing   38:16,23

**j**

j   30:4,7
january   170:19
   171:9
jason   1:6
jazz   187:12,13
jennifer   1:23
   2:3 4:23 241:18
   242:5,20 243:21
jennifer.altman
   2:7
jennings   187:12
   187:13
jesus   202:23
   ■   30:4,22
   132:8
job   55:2 165:23
   212:16
join   59:6
josefiak   2:22
   243:6
journal   14:25
   15:23 34:9,13
   34:20 36:18
   43:25 50:12,13
   50:17,22,25
   51:4,6,10,20
   52:6,7 116:12
   186:6,7 202:6

**journalist** 32:13
**journals** 43:21
  43:21 44:15
  45:8 46:24
**judged** 218:6
**judges** 61:9
**judgment** 14:6
  74:17
**jump** 119:20,25
**jumping** 191:16
**jurisdiction**
  156:7
**justified** 58:2,12
  58:22
**justify** 173:22
  236:22
**juvenile** 162:6
  185:11
**juxtapose**
  152:19

**k**

**k** 10:10 30:7
**keep** 4:16,18
  6:17 85:5 89:19
  231:8
**keeping** 217:16
**keira** 60:8,12
  65:12 132:10
**kennedy** 211:24
  211:25
**kettenis** 117:21
**keyboard**
  218:10,17
**kid** 189:20

**kids** 198:6
**kill** 153:5 154:5
  154:15 156:2
**kind** 6:22 26:3
  48:11 64:1,5
  125:17 138:24
  149:7,22 150:4
  167:22 171:12
  176:16 177:11
  177:20 181:1
  206:12 224:13
  236:22
**kinds** 149:6
**kingdom** 60:5
**know** 4:10 39:3
  39:4,24 43:22
  44:4 45:5 46:3
  49:20 54:21
  57:3 61:5,5,5,6
  61:8,10 62:1
  69:13 70:18,23
  71:3,4 72:3,7,11
  75:6,11 80:8,11
  80:17 81:10
  84:23 85:13
  88:6 106:19
  109:3,15,24
  113:9 114:18,22
  115:7,10,15
  119:16 120:12
  121:15 123:2
  125:14 126:22
  131:2 134:8
  135:9 138:23
  139:14,25

  140:18 141:24
  143:12 144:22
  145:19 148:1
  149:17,19 157:2
  157:4,5 160:1
  160:16,18 161:4
  162:13 169:1
  172:5,6 181:4
  181:20,23,25
  184:3,17 191:25
  193:14 195:25
  201:10 205:5
  206:20 207:3
  214:2 217:13,15
  224:6 225:24
  234:21
**knowledge**
  65:19 70:20
  77:7 142:22
  211:22
**known** 118:20
  118:21 125:24
  128:9
  ▮▮▮▮▮ 30:7

**l**

**l** 1:23 30:5
  241:18 242:5
  243:21
**label** 197:1,5,7,8
  206:3 232:16
**labels** 205:2
**laboratory**
  179:17,19
**lack** 154:12
  173:11

**laid** 108:25
**laidlaw** 68:5
  69:9
**lambda** 2:9
**lambdalegal.org**
  2:11,14
**landmark** 73:8
**language** 46:8
  163:7 191:5
**large** 1:24
  115:11 216:10
  224:13 241:19
**largely** 76:22
**largest** 156:8
**late** 171:20
  198:16
**law** 4:23 29:24
  172:9
**lawsuit** 170:25
**lawyers** 172:3
**laying** 109:2
**leads** 184:13,23
**learn** 170:25
**learned** 219:23
  220:2
**leave** 46:19
**led** 174:9
**left** 80:21
  169:13 201:15
**legal** 2:9,16
  53:13,15 243:1
**length** 233:9
  243:12
**lens** 143:15,22
  152:12

**leonard** 2:4
**lesbian** 18:12
　157:9,15 185:4
　185:8 205:4,7,9
　205:11 223:23
　224:15,15
**lesbians** 18:17
　182:21 183:23
　185:12 223:22
　225:12
**lesser** 145:6
**lessoned** 161:22
**lethal** 95:16,20
　95:20,23 96:3,4
　96:5
**letter** 3:14 15:23
　34:19 43:15
　44:3 45:21
　47:13 51:5,9
　116:11,17 138:5
　243:11
**letters** 44:21
　45:7 46:12,21
　47:3,8 48:3 50:4
　50:5 145:22
**level** 108:22
　114:5,13,15
　131:18
**levine** 68:7 69:9
**library** 71:6
**license** 149:5
　150:15,25
**licensed** 27:12
　27:13,14

**life** 109:3,5
　114:21,24 115:3
　115:10,13 120:6
　224:15 231:12
**lifelong** 19:9
　20:11 161:4
　188:13,18
　225:13
**lifetime** 182:22
**light** 37:4 175:3
**likely** 114:23
　115:9 193:12,24
　194:21 195:16
　199:16 222:22
　235:3
**limitation** 230:1
**limitations**
　142:18
**limited** 72:18
　164:19
**line** 240:4
**linked** 217:3
**list** 30:12 54:9
　62:23 191:7
**listed** 34:2,16
　48:21 50:8
　134:16 190:2,7
　243:11
**listen** 91:7
**listened** 52:23
　93:5 148:14
**literature** 28:15
　28:20,22 32:12
　32:15,24 39:23
　40:2 43:23

58:15,15,16,18
71:14,18 73:2,6
73:14,19,22,23
74:5,15,18
79:11,16 98:5
102:20 103:4,9
107:4 124:23
131:9 142:13
168:1,11,12,13
173:10,16
174:12 194:15
194:18,25
201:21,22 204:8
204:12 216:2,3
216:5,9,13,16
216:20 224:11
**little** 18:5 28:11
　118:24 147:18
　158:1 173:22
　207:14 226:7,12
　231:9
**live** 5:3 154:20
　231:12
**lives** 117:7,18
　119:3
**llp** 2:5
**logic** 162:6
　217:23
**logical** 199:15
　■■■ 7:24 8:6
　30:4 127:12
　129:2,9 132:8
　174:3 236:24
**long** 107:16,18
　113:19,23

114:20 118:8
139:17 140:6,21
171:13 178:16
190:23,23 207:1
207:4 216:22,22
218:13 237:11
**longer** 74:23
　76:13
**longest** 140:22
**longitudinal**
　176:23
**look** 39:23,24
　58:14 72:16
　87:5 88:7 107:3
　129:20 162:20
　181:7,12 182:3
　189:12,13
　190:14,19 235:5
**looked** 40:2
　56:18 62:12,13
　62:15 98:3
　170:16
**looking** 78:13
　82:22 148:2
　178:22 214:25
　224:13,15
**looks** 23:24
**loosely** 45:11
**lose** 150:15
**loss** 182:22
**lost** 138:24
　142:11
**lot** 6:12 40:3
　54:18 192:4
　217:13

**[loud - mean]**

**loud** 4:13,15
 5:18,22 139:4
 147:20
**low** 73:25 74:1,3
 74:9 116:15
 155:9 156:5
 211:11,15,16
 212:5,14
**lower** 85:8
 114:22 213:4
**lowercase**
 235:15
**lucie** 241:4,12
 242:4
**lunch** 139:25
 140:13

**m**

**m** 57:8
**ma'am** 8:21
 208:11
**made** 16:6,6
 45:24 49:22
 88:7,12 111:10
 117:2,9,15
 118:24 137:22
 146:21,22 156:1
 158:3,3,6 175:7
 188:16 189:16
 189:25 218:22
 222:14 228:8
 239:9
**maf** 1:2
**mail** 135:22
 136:1 142:11
 208:8 235:20,22

235:24
**mailed** 54:14
**mails** 90:7,12
**main** 12:17
 116:18 142:14
 174:9
**maja** 39:16
**major** 75:18
**majority** 183:8
**make** 5:24 6:10
 6:12,18 16:4
 20:13,19 21:6
 21:17 46:7,15
 58:15,21 65:18
 66:7,13 73:18
 77:23 82:20
 84:9 88:7 89:7
 89:10,24 97:2
 98:1,7 102:10
 110:19 117:15
 120:3,24 135:24
 161:4 175:6
 177:13 179:24
 183:5 185:3
 186:16 191:22
 193:23 195:14
 195:15 197:1
 210:14 224:17
 229:9 235:2,6
 237:7
**makes** 75:3,3
 178:22 180:18
 181:2 191:19
 194:1 214:13
 222:15,20

223:13
**making** 13:3
 20:24 81:14
 118:2 152:14
 163:13 174:17
 177:17 178:24
 179:11,20
 181:10 182:24
 191:1,15 194:4
 196:25 202:19
 203:4 208:1
 214:19 218:7
 228:9
**male** 11:23
 180:15 193:6
 203:18 215:19
 215:23
**males** 181:16
 224:14
**malfeasance**
 6:22
**man** 93:10
 223:20
**manifesto**
 186:22
**manipulates**
 219:7
**manner** 205:2
**march** 1:12 62:8
 241:13 242:18
 243:4
**marci** 124:10,13
 125:1
**marcus** 2:4

**marital** 34:10
 36:19
**mark** 22:8,21
 23:4,11,21 30:1
**marked** 1:14
 22:17 23:12
**masculine** 18:13
 225:11
**mask** 158:24
 163:5
**mass** 25:11
**massive** 189:21
**material** 40:4
 191:5
**materials** 47:19
 54:22 67:1
 90:16
**math** 82:5
**matter** 23:8
 60:9,15 63:4
 64:12 67:4,4,12
 121:24 122:13
 134:17,22,24
 135:1 146:25
 168:8 236:16,20
 240:23 243:16
**matters** 13:7
 65:17 67:3
 217:16
**maturing**
 198:18
**mbeato** 2:24
**md** 134:9
**mean** 10:17,19
 10:22 12:7

34:14,20 37:10
39:23 40:6 43:3
44:8 62:19 63:5
70:3 76:22
79:23 80:5 89:4
89:20,22 95:21
96:14,15 120:12
138:9 145:17
149:4 154:2
155:20 157:5
160:7 163:22
164:4 168:1
176:18 193:7
196:15 200:7
203:7 205:19,19
205:21 207:13
211:7 218:14
219:10 224:17
230:1,23 232:4
238:14,14
**meaning** 58:17
78:13 182:11
201:16 222:7
232:20
**means** 5:5,19
35:3,13,15 95:7
95:8 125:14
126:4 150:14
153:17 154:23
177:21 226:14
232:9 242:24
**meant** 77:10
**measure** 85:17
180:2

**measured** 80:9
**measurements**
15:8
**media** 186:18
187:5,7,9,10,12
189:9 190:13,18
236:24
**medicaid**
149:21 150:4
**medical** 7:4,6,8
7:17,20 12:3,11
13:3,4,7,23 14:5
14:11,12,15,17
14:22 15:2,11
15:14 16:15
18:22 19:9
20:11,21 26:25
31:22 37:11
47:9 48:6 49:23
50:2,12,17,22
51:4 57:11 58:9
58:21 63:22
67:21 70:16
75:20 76:20
77:23 78:13,13
81:1,6 97:10
98:23 99:2,12
99:16 102:3,9
102:18,20 103:1
103:4 106:7
107:1 108:6,14
109:13,15,18,24
110:6 116:23
121:25 122:14
129:24 133:14

136:9,16 139:18
146:23 151:11
152:7 156:24
163:19 165:16
165:19,22
166:10,14,23
167:14,17,20,20
182:22 188:13
188:14,18
200:22 202:2
206:14 208:23
208:24,24
209:15,22
210:11 213:11
227:18 235:1,2
**medicalization**
18:14,19,23
19:2,8,25 20:7
21:8,19 143:18
154:19 156:2
225:14
**medicalized**
225:10
**medically** 57:16
57:23 58:2,12
237:25
**medication**
95:16,21 98:15
98:16 124:3
154:25 155:2
209:14,17
212:17
**medicine** 27:15
51:2,10 52:12
53:11,18,25

55:4 57:9 134:4
135:13,18,21
136:1,6,25
137:10,15,23
148:11,23 150:2
150:7,9,13
171:6 172:8
**meet** 35:1,9 36:2
45:25 46:6 56:3
59:18 71:5
166:6,9 207:2
**meeting** 53:11
55:4,5 56:12
65:11 69:1,23
72:25 81:11,12
82:15 91:9 92:4
134:4,9 135:13
135:18 136:1,2
136:20,22,25
137:15,17,23
171:6
**meetings** 54:23
**members** 53:17
70:23,24 71:1
**memo** 40:11
**men** 93:24
96:20 97:7,20
185:12
**menstruate**
180:24
**menstruation**
180:21,22
181:18
**mental** 27:9
94:5,7 104:8

154:4 199:14
210:12
**mention** 52:11
160:13 186:22
**mentioned** 18:4
30:21 56:22
62:12 75:14
110:23 125:5
130:23 131:16
132:3,9 141:15
169:21 170:14
220:21 221:16
**mere** 75:1
**merely** 28:13
94:1 98:14
137:25
**merits** 79:24
**message** 92:8
**met** 17:8 29:20
59:15 166:3,9
**metabolism**
15:24 116:12
**methodology**
81:23 84:3
**miami** 2:6 243:2
**mice** 62:17
126:15,17
131:17,17
**michael** 1:15
2:21 3:4 4:2 6:7
19:18,20 49:1
56:8,9,10 140:6
140:18 172:20
178:19 206:24
233:23 236:9

238:18 239:6,14
240:25 241:7
242:8 243:5,6,9
**miesen** 194:16
**millions** 216:21
**mimic** 175:19
**mind** 4:17,18
6:17 45:22 70:1
119:20 120:1
238:13
**mine** 39:13,16
**minimal** 133:9
**minor** 102:2
119:19
**minors** 69:10
**minus** 115:8,11
115:16
**minute** 42:15
52:19 56:7,12
56:22 60:7
64:17 70:2 77:1
180:8 206:21
231:10
**minutes** 52:23
54:20 70:1,5
96:1 136:22
198:8 207:7,8
233:23
**mirrored**
136:25 137:4
**mislead** 52:6
**misleading**
86:11
**misreading**
196:14

**missed** 61:14
148:9,15
**misstatements**
6:22
**mistake** 134:10
**moment** 14:4
168:10 232:14
**money** 13:6
**monitor** 108:8
109:9,10 210:2
213:12,14
**monitored**
209:13
**monitoring**
209:23
**monroe** 2:23
243:7
**month** 39:4
**months** 30:24
39:4,5,8 62:14
171:14,14
**mood** 209:6
**morning** 4:10
**morons** 219:7
**mother** 64:21
**mouthful**
117:23
**movement**
25:11 221:14
**multiplied** 9:14
**musing** 211:15
**musings** 183:18
183:23 188:22
193:18 200:2

**mute** 7:25 25:23
**mutually**
192:10 193:20
198:9

**n**

**n** 2:1 3:1 30:5,5
30:7 73:21
235:21,22
**name** 4:23
29:23 30:8
54:15 56:23,24
64:13,16 68:20
118:22 127:24
128:1 132:4
172:5 206:6
217:17 218:3,20
**named** 109:20
**names** 90:4
**national** 73:20
**natural** 95:9,11
**nature** 64:17
**near** 63:12
**necessarily**
37:10 84:20
93:24 183:11
192:21 210:24
229:14
**necessary**
133:16 238:1
**necrotizing**
123:15
**need** 5:17 6:6,15
6:18 22:12,12
22:14 78:19
111:16 133:25

158:24 163:4
178:4 207:25
235:11
**needed** 168:18
168:21,24,25
169:2
**needs** 7:25
25:23
**negative** 128:13
164:7,17,17
180:25
**neither** 65:22,25
105:14 229:23
**netherlands**
63:7 73:12
162:22
**never** 26:21
44:13 45:9
59:18 65:15
72:12 96:7,8
100:19 101:24
166:3,6,9
167:10,13,16,22
174:6 178:6
179:6,13 228:15
**new** 2:10 62:15
**nhs** 60:12
**nice** 73:21
140:16
**nice's** 74:8
**nih** 211:24
212:3
**nod** 171:23
**nodding** 6:12
147:19

**nods** 5:17
**non** 152:14,25
157:8,8
**nonconforming**
192:19
**nonhuman**
126:14 179:8
**normal** 16:25
17:8,9 18:13,18
100:16 101:20
128:18 177:15
198:16
**normalized**
17:12
**normally** 85:8
93:20
**northern** 1:1
**notary** 1:23
3:10 239:1,21
241:6,19
**note** 44:1,6
69:25
**noted** 112:19
113:2
**notes** 30:25 31:3
78:5,10 242:11
**notice** 1:24 3:18
22:9 23:1
**november** 171:4
**nuance** 118:24
**nullify** 4:21
**number** 8:17,24
9:8,14,14,16,25
37:15 66:12
82:2,3,3 85:6

115:11 116:15
195:1 224:14
**numbers** 8:11
37:6
**numerator** 82:1
82:2 87:11
**nurse** 27:12,13
**nw** 2:17
**ny** 2:10

**o**

**o** 10:10 30:5,5
243:6
**o'clock** 140:2,2
140:11,11
**oath** 3:12 29:24
32:18 37:14
44:20 88:13
112:19 113:2
185:7 229:19
232:21 233:13
239:19 241:1
**object** 6:7 16:21
17:17 19:21
20:1,8,22 21:9
21:20 42:11
45:15 53:3 58:3
58:23 71:11
76:1 86:15
91:23 94:9
102:21 110:20
112:12 119:9,23
120:9 135:3
143:2 149:1
153:23 159:12
162:2,14 175:12

176:5 183:25
188:1,25 190:4
195:10 196:20
200:5 201:18
203:24 209:18
210:16 211:18
212:24 217:5,18
218:11,25 220:9
222:3 223:3
224:19,23
225:18 226:2,21
227:12 228:6,13
229:2,11,21,24
230:21 232:7,10
232:24 233:15
234:24
**objected** 227:25
**objecting**
219:14
**objection** 6:8
42:16 71:11
202:12
**objections** 35:1
35:10 36:2 46:1
**objective**
163:12,19
**obligated** 29:24
**observable**
145:11,12,13
**observational**
176:25
**observer** 215:7
215:8
**obvious** 190:11
190:13 210:9

219:23 224:4
**obviously**
  180:25 194:1
  209:12 219:22
  229:13 232:14
**occasion** 59:6
**occur** 53:14
  202:2,4
**occurred** 9:5
  220:25 235:18
**occurs** 99:23
**october** 53:11
  134:5 171:6
**offenders** 94:16
  97:19
**offer** 12:18
  164:4,11,23
**offered** 62:11
  132:22 133:22
  148:17 158:20
**offering** 70:12
  70:15 98:22
  99:1,4 148:19
  164:3,10 166:13
  168:15
**office** 30:10
**official** 202:25
  241:11
**ogonzalez** 2:11
**oh** 54:7 70:4
  84:8 140:7,24
  176:19 208:13
**okay** 4:11 6:12
  8:8,22 9:11 10:3
  10:11,14,24

11:18 12:10
13:15,22 14:10
15:16 16:2,10
17:5,22 18:3,9
18:21,25 22:1
22:16 24:2,17
24:25 25:5
28:22 29:21
30:4,9 32:25
33:12,15 34:11
34:22 35:21
39:2,12 40:1,5,8
40:25 41:5 44:5
45:19 48:20,23
49:19,20,22
51:7,14,18 53:9
53:22 54:4,9
56:20 57:1,5,18
58:11 59:2 60:7
63:15 65:14
66:16,20 70:4
71:17,22 74:12
75:6,22 76:25
77:13 78:25
79:22 81:11
82:13 83:15,17
84:2,8,12,18
85:12 87:9,16
88:16 90:15,23
93:21 96:13
99:6 102:8
107:17 109:23
111:18 112:4
114:7,18 115:14
115:19 116:9

118:11,14
122:12 124:24
127:23 128:11
129:15,18
130:21 131:15
132:11 133:10
134:16,21
135:24 138:5,18
139:16 140:5,18
140:24,24
141:10,13 143:9
143:14 144:16
148:3 149:17,20
150:10 151:17
152:19 155:12
156:12,23
157:18 164:6
170:17 171:18
171:23,25 173:2
173:16 174:11
178:3 183:1
186:13,21
189:23 195:25
198:23 203:7
204:16,19,21
208:3 210:1
215:5 222:14
223:12 225:3
227:6 228:25
230:11 231:25
233:21 236:6
237:17 238:5
**old** 100:11
105:6,7 111:1
111:20 199:11

199:12,14
**old's** 113:13
**older** 61:19
  108:22 138:18
**olson** 211:24,25
**omar** 2:8
**ominous** 91:22
  92:1
**once** 92:13
  98:15
**one's** 81:9,10
**ones** 50:24
  113:11 174:13
**open** 125:18
  128:15 217:14
**operation** 78:1
**opine** 77:8
  105:4 114:19
  151:18,19 154:4
  236:20
**opining** 138:1
  163:25 185:2
**opinion** 70:15
  75:3 76:11
  84:10 86:24
  91:13 98:19,22
  99:12 103:1,16
  103:20,24 104:9
  104:18 106:7
  113:24 114:20
  115:1,5 124:7,9
  124:11,12,12
  128:12 129:16
  138:8,10,19
  149:14 154:13

**[opinion - paragraphs]**                    Page 280

154:13,16
155:23 164:2,3
164:5,10,11,23
165:1,4,8,11,15
166:13 183:1
184:10 191:16
201:5 221:21,22
222:8,9 233:13
**opinions** 14:17
14:19,22 17:23
18:2 22:5 25:2
30:15 31:9
38:16,19,24
40:21,21 41:1,6
41:10 54:1
62:10 63:3
67:12,16 69:12
69:16,19 70:11
70:12 72:18,22
76:18 97:10
99:2,4,8,17
104:3,17,22
106:25 114:8
126:21,25 128:5
138:23 168:7,15
168:18,21 169:4
169:11,14 170:5
172:12 193:17
200:1,3,19
217:15 233:8
**opportunity**
224:2
**oppose** 202:24
203:1

**opposed** 28:2
226:14
**opposite** 177:16
194:9 195:22
196:2 222:8
**order** 8:14 30:2
38:19 74:24
88:7 95:9
133:17,24 169:3
177:15 227:16
**ordering** 238:6
**organization**
70:21 143:25
147:23
**organizing**
135:23
**orient** 171:6
**origin** 110:7
**original** 17:10
81:13 135:8
145:23 174:16
174:20,24 175:8
175:9,10,15,17
175:24 177:6
194:23,24
195:23 196:12
238:7
**originally** 76:12
185:11 219:12
**osteoporosis**
110:4,8,13,17
111:7,23 112:8
112:20 113:3,13
114:24 115:3,9
115:12,17 211:5

**outcome** 146:4
184:17 188:19
214:14
**outcomes**
142:17 146:18
**outset** 211:3
**outside** 42:7,22
140:22 149:7
150:15
**overall** 82:19
**overlap** 192:4
**own** 24:12 25:2
58:15,18 74:18
81:13 100:2
106:11 128:24
135:10 152:8
182:8 196:12
218:3 228:3
**oxford** 218:24
220:20

**p**

**p** 2:1,1 208:9
**p.m.** 1:12
140:13,14
207:18,19
238:20
**pagan** 2:8,11
**page** 3:9,17
24:19,23 31:14
43:4 60:11
82:22 83:3,10
83:14,18,20,21
84:10 135:25
179:24 194:3,3
194:12 198:1,3

198:25 208:10
210:4,5 213:19
214:5,24 215:3
235:10 240:4
243:22
**pages** 242:9
**paid** 12:20
53:22 54:16
55:10,13 136:5
**palestine** 203:3
**panel** 52:11
200:15
**panelist** 53:10
**paper** 15:13
37:4 48:19,20
49:3,4 215:6
**papers** 49:11,16
218:15,16
**paragraph**
159:25 161:2,13
162:25 173:14
174:15 177:13
177:24 178:5
179:2,5,23
180:4,4 182:17
182:19 183:21
186:15 192:3
197:13 198:13
199:6 207:21
208:7,12,13,14
210:4,8 211:2,9
213:19 214:5,16
**paragraphs**
210:5,6

**[parallel - people]**

**parallel** 94:4,13
94:14 96:17
97:2,4
**parallels** 94:24
**paraphrase**
195:4
**paraphrasing**
194:17
**parent** 102:9
152:7
**parents** 102:2
120:25 139:19
151:25 230:18
231:17
**parlance** 205:15
**part** 28:7 30:1
32:14 40:16
55:1 61:8 80:20
133:22 138:13
138:15 139:10
145:23 147:23
148:4,17,20
165:23 166:19
208:22,23
212:15
**participants**
32:8
**participate**
40:10,13 53:16
54:12,15 74:24
**participated**
29:16 32:3
37:22 52:11
53:14 89:17
90:25 91:4

122:8
**participating**
38:8
**particular**
13:20 21:2
32:23 39:21
41:16 51:5
57:11 60:20
69:10 77:20
78:17,18 86:13
92:7 95:15
112:6 119:21
120:1 128:4
141:18 154:17
160:1 181:20,25
183:20 192:1
197:8 201:10
203:2 213:2
216:19 218:19
223:6 224:10,16
225:6
**particularly**
189:22,22
194:19 224:14
226:5
**parties** 242:13
242:14
**partly** 19:3,4
74:16
**partner** 224:3
224:12
**partners** 222:23
222:24 223:2,17
224:15,22

**pass** 119:14
**past** 40:2
**path** 225:13
227:20 228:3
**patient** 10:1,1
14:19 29:19
47:2,5 78:10,18
85:18 108:8
116:24,25 119:5
120:24 151:12
151:12 162:9,12
188:13,18
212:18 213:21
225:15
**patient's** 41:12
41:15
**patients** 14:21
25:20 29:9,21
30:1 80:9 85:6,9
86:18 87:15,25
88:1 109:9,11
116:5 151:25
154:23 176:17
177:8 198:6
211:4
**patrick** 53:20
53:20 56:23
57:1 135:14,25
**pause** 6:7
198:21
**pay** 155:17
**payment** 150:3
**peak** 189:21
**peculiar** 43:24

**pediatric** 8:6
15:24 50:25
51:1,1,2,2 52:5
116:12 156:8
**pediatrics** 47:14
200:25
**pedophile** 93:14
**peer** 14:25
33:21,24 34:1,7
34:10,13,14,16
34:19,20,23
35:2,8,13,14,23
36:11,25 37:8
37:10,17 43:16
43:23 44:2,10
44:11,13,14,17
44:18,21 45:3,4
45:6,7,8,9,13,23
46:8,16,22,25
50:5,12,13,17
50:22 51:5,6,9
51:20,20 125:3
177:7 186:5
202:6
**peers** 34:25 36:1
193:25 194:9,9
194:9,22 195:17
195:21,22 196:2
196:5
**peggy** 117:21
**penalty** 25:1
**pending** 6:17
**penis** 203:18
**people** 11:6,18
38:25 39:10,20

44:24 45:11
57:17 71:3 72:4
72:7 89:2 93:10
94:6 96:21,24
97:8,9 115:7,11
115:15 120:19
129:19 132:13
139:8,9,11
145:2 169:8,8
187:24 189:8
190:19 191:16
192:23 204:23
205:1,21 211:15
217:14 220:7
224:2,12 227:15
228:3,10,20
229:14 230:15
232:21

**people's** 15:5,6
28:3 31:15,15
98:10 106:9,15
128:22 134:25

**perceive** 220:7,7

**perceived**
203:10

**percent** 63:12
64:7 82:10
83:23 84:13
85:8,16 86:12
86:21 87:12,22
89:5,12 92:20
95:25 96:1,11
101:24 120:13
121:9 162:18
197:15

**percentages**
120:19

**perfect** 206:25

**perform** 7:17,20
8:14 9:3,21
13:13 15:2,4,7
16:14,17 29:3
31:18 33:2
91:10,14 127:14
131:20 137:21
147:24

**performed** 9:6
10:14 11:1
15:11 28:2 33:5
77:25 79:2
89:17 90:25
91:2 93:7 98:9
100:25 104:10
121:18 127:2
137:15 177:8

**performing**
89:17 91:1,4

**performs** 79:5

**period** 95:1
156:14 235:15

**periodical** 216:7

**perjury** 25:1

**perko** 172:11

**permanent**
157:22 158:9
179:18

**permission**
72:11

**permutations**
189:19

**perpetuity**
93:19,23

**persist** 159:8

**persistent**
158:21 163:1,8

**person** 29:20
31:8 77:17
88:19 89:9
98:14 119:21
120:1 121:4
145:13 146:12
146:20,20 157:9
175:4 209:16
217:22 218:6,7
221:21,25,25
222:8 224:13,22
228:10,12 232:5

**person's** 110:8

**personal** 17:23
17:25 18:7,9,11
58:18

**personally** 29:6
63:2 89:16
90:25 91:2
102:15 127:2
241:8

**pertain** 192:14

**pertaining**
192:13

**pertains** 69:14
69:17,20 72:23
101:9 122:21,22

**peter** 219:11

**ph.d.** 1:15 3:4
4:2 25:10 107:2

107:5 239:6,14
240:25 241:8
242:8 243:5,9

**pharmacist**
26:19,20,21
100:19

**phone** 8:1 25:24
216:11

**phonetic** 39:16
127:25

**phrase** 144:25
188:4

**physical** 145:3
157:22 158:9,25
163:5,12,20
203:12,21
206:14 214:9

**physically** 84:21
84:21 88:4,5,10
223:14 226:13
231:5

**physician**
119:19 120:7,24

**physicians**
31:22 33:2

**physiological**
105:5

**pick** 83:2
226:24

**pictures** 90:5

**pierce** 241:12

**pillsbury** 2:5
4:24

**pillsburylaw.c...**
2:7

**pin** 89:8,8
**pioneers** 211:3
**pious** 230:24
**pittman** 2:5
4:24
**place** 30:3 150:2
**placed** 204:5
**plaintiff** 1:4 2:2
**plaintiffs** 1:22
3:16 4:3 22:17
23:12 38:12
165:12,16 166:3
166:7,10,15
170:9 201:11
**plan** 167:16
**plausible** 184:6
184:7 214:14
**play** 221:12
**please** 5:21 8:1
19:13 25:24
49:20 198:22,25
209:20 215:4
238:4,19
**pllc** 2:22 243:6
**podcast** 143:14
143:22 145:21
146:1,1 147:13
152:11,12
**point** 38:23
70:10 114:12
144:11 154:11
154:17 160:5
177:12 183:15
185:19 206:21

**pointing** 156:4
159:15
**points** 39:1 40:4
**policy** 26:17
111:9 220:12
225:21,25
**pool** 222:23
223:1,16 224:2
224:5,5,9
**poor** 73:3,7,14
73:19 74:3,15
74:18 75:3 76:9
76:11 79:16
**population**
82:19 199:13
213:2 223:24
**portion** 24:5
83:2
**portions** 1:14
**position** 12:4,12
12:24 13:24,24
36:10 59:11
73:13 81:1,7
87:10 96:8
102:10 108:24
119:4 166:23
203:2
**positive** 69:6
**possibilities**
186:12 200:8
215:12
**possibility**
154:22 185:24
185:25 186:8,9
187:15 215:9

**possible** 141:1
187:20 190:14
215:14 238:15
**possibly** 52:17
121:7 138:20
142:3 171:3
185:21
**post** 62:4,9 63:4
157:19,24 158:3
158:5,15,18
161:23 177:25
**postdate** 142:2
**postdates** 62:17
**potential** 142:16
184:3 188:7
197:2 200:16
210:21 215:9
222:23 223:1,16
223:24
**practice** 27:14
201:8 236:23
**practices** 227:18
**practitioner**
202:2 209:15
**practitioners**
209:23
**pre** 111:6,22
193:4
**preadolescence**
192:15
**precedence**
145:4 203:22
**precedes** 214:25
**preceding** 183:7

**precisely** 162:6
**precocious**
94:17 95:4,5,7,8
99:21,23 100:11
100:21 101:2,7
101:18 103:17
103:21,25 104:8
104:12,15 105:1
105:6,10,18
107:14,22 108:3
108:18 122:22
130:5,11,11,16
130:20,22 131:9
131:12,13,14
133:1,3,6,9
141:17 142:5
**predates** 186:17
187:3 216:22,22
**predetermined**
221:7
**predicament**
191:20
**predict** 5:25
**prefer** 178:21
**preliminary**
179:7
**preparation**
55:23
**prepare** 23:7
55:25 56:16
167:25 177:15
**prepared** 23:20
54:22 56:2
168:4

**[preparing - property]**                                    Page 284

**preparing** 53:12
  55:14,17,20,22
**prepubertal**
  192:15
**prepubescence**
  198:15
**prescribed** 7:14
  99:21 100:19
  119:7 130:5,7
  130:12 164:8,18
  167:22
**prescribing**
  109:7 130:22
**present** 68:12
**presentation**
  52:19
**presented** 20:14
  150:7 236:23
**preservation**
  142:16
**pressure** 214:9
**presume** 150:20
**pretending**
  196:17,24
**pretty** 91:22
**prevailing**
  160:15
**prevalence**
  211:12,16
**prevent** 119:14
**prevented**
  121:20
**preventing**
  198:18

**prevents** 185:3
**previous** 194:11
  194:14
**previously**
  35:25 145:22
**primary** 177:3
**primate** 126:17
  126:19,20,22
**prime** 126:22
**principles** 20:25
**printed** 90:17
  191:5
**prior** 137:14
  243:14
**prison** 203:18
  203:19,23
  221:17 222:1
**prisoners** 204:5
**prisons** 94:5,7
  144:19 204:4
**privileged**
  172:17
**probabilities**
  186:14 200:9
**probably** 39:8
  55:19 137:13
  139:24,25
  140:19,22 144:5
  148:6 212:6,9
  237:16
**problem** 9:1
  49:14 207:16
**problems** 209:6
  235:18

**procedure** 77:3
  77:21 79:2 86:4
**procedures** 56:8
  69:20 75:20
  87:4
**proceed** 152:9
**proceeding**
  85:19 238:20
**proceedings**
  61:7
**process** 35:25
  165:8 173:7
  177:7
**produce** 49:7
  61:14,22
**produced** 48:1
  49:5 106:12
  239:18
**producing**
  98:16 194:18
**production**
  36:14 91:16
  92:11,14 94:2
**profess** 132:17
**professed**
  121:23
**professional**
  12:11 13:3,23
  102:9 151:11
  152:7 242:6
**professionals**
  12:3 13:7 14:11
  31:22 67:21
  81:1 102:3,19
  103:1 108:7

  213:12
**program** 143:17
  227:14
**prohibited**
  121:13 133:14
**prohibiting**
  150:3
**prohibits**
  149:21
**prominence**
  190:12
**promote** 227:16
**promoted** 187:6
  191:18 214:7
**promoting**
  187:18 189:8
**promotion**
  186:17 187:3,10
**prompt** 243:16
**pronounced**
  57:7 213:6
**pronouncing**
  10:11
**proof** 184:6
  185:18
**proper** 12:4,12
  132:22 133:13
  133:18,24
  138:13,15 139:1
  147:16,24
  165:15 174:4
  221:18
**properly** 181:14
**property** 229:16

prophecy
185:22
proportion 10:1
197:23 223:23
propose 71:19
proposition
150:8 236:1
protective 30:2
protocol 28:8,12
29:8,16 30:16
31:14 32:10
33:9 34:9 36:19
41:3 87:6
100:11 117:11
118:6,12,15,20
118:21 128:9
132:3 143:6
160:12 186:22
prove 184:5
provide 22:5
64:25 67:12
76:17 79:6
106:25 114:19
115:1,5 124:19
126:10 133:25
150:15 154:16
167:19 168:8
171:19 197:2
200:1,3 233:8
provided 46:9
49:25 61:20
66:17 67:17
103:16,20,24
123:6 131:17
136:21 167:10

167:13,16
168:20 176:3
195:5 237:23
provider 139:18
providers
166:10,14
provides 31:10
40:23 41:7
45:20 67:23
79:1
providing 27:6
69:9 71:9 72:22
97:5,15 101:1,6
101:12 102:18
104:7,11,14,19
114:11 149:6,13
150:13 156:25
165:1,4,7,11
171:8 191:16
210:13 211:21
214:8
provision 68:17
69:5,16 79:11
101:5
pseudonym
217:10,17
pseudonymity
218:14
psychiatrist
26:10 202:3
psychiatrists
201:17
psychological
63:22 131:24
235:18

psychologist
26:12 105:13,22
202:3
psychologists
201:17
psychology
50:14
puberty 35:20
38:20 39:7
47:24 48:5,24
60:17,19 61:4
61:12 64:22
65:1 67:12
69:12 70:11
72:19 73:12
77:8,10,13,21
79:6 85:21,22
85:23 86:2 87:7
89:3,4,15 90:24
91:3,5,10,14
92:14,24 93:7
93:18,18 94:1
94:18 95:4,5,6,7
95:8,9,9,11,15
95:20,22 96:2
97:16 98:23
99:4,8,13,20,21
99:23 100:5,11
100:12,15,16,20
100:20,21 101:1
101:2,5,7,7,12
101:18,19,20,25
103:6,17,21,25
104:7,8,12,12
104:14,15 105:1

105:6,10,18
106:7 107:1,9
107:12,14,21,22
108:3,8,18
109:7 110:12,18
111:10 112:8,21
113:3,14,25
115:2,16 116:13
117:4,11,17,23
117:24 118:5,16
118:16,25 119:7
119:17,22 120:4
120:14,22 121:3
121:10 122:9,17
122:20,22 123:5
123:12,16,22,24
124:2,7,20
126:13 127:13
127:13 128:18
130:5,12,16,20
130:22 131:9,12
131:13,14,25
132:16,22 133:1
133:3,6,9,17,21
136:13 141:17
142:5 143:19
146:15,21,22,22
146:25 148:17
148:19 151:4,13
157:21 158:8,22
158:22,25 159:4
159:16,22,24
161:3,12,16,17
161:19,20,24
162:7 163:2,3,6

164:13,19 168:5
169:25 173:23
174:5,17 177:14
177:15 179:5,14
185:2,7,10
200:12,16
201:15,23
202:11 209:24
214:7,10,17
**public**   1:23 3:10
54:25 220:12
225:21,25 239:1
239:21 241:6,19
**publication**
36:24 37:5
43:16 46:25
47:10 48:7 52:1
152:6
**publications**
61:21 81:10
134:23 135:10
168:4
**publicity**   188:5
**publish**   15:23
115:20 116:17
151:20,23
174:21 175:4
202:6
**published**   14:25
15:19 29:14
32:12,24 34:6,9
36:3 39:23,25
45:1,8,22 46:2
46:13 48:18,18
50:21 51:4,10

58:15 73:2,14
73:18 74:14
78:20 79:11
81:13 115:18,20
118:10 136:11
141:25 142:10
152:3 156:17,20
169:9 174:6
177:6 179:13
182:6 186:5
204:7,12,19
**publishing**   8:7
32:20 45:12
116:11 175:18
**pull**   83:3,5
111:2 207:25
**pulled**   84:9
**purpose**   117:4
117:16 118:25
119:6,17,21
120:4 121:3
157:21 158:8,8
158:19 159:4,6
159:16 161:3,11
161:19,24
**pursuant**   1:24
**purview**   58:1,11
**push**   156:1
**put**   6:8 22:20
25:7 70:10 89:7
152:2 178:11,19
180:7 203:17,19
208:5 209:13
212:16 221:7,17
222:1

**puts**   225:13
**putting**   64:16
144:19 173:13
190:18 221:3
227:19

## q

**qualification**
20:18 166:14
**qualifications**
20:18 21:6,6,17
73:17 97:25
154:9
**qualified**   14:17
16:19 17:6,14
17:16 19:1,7,14
19:24 20:6 43:7
43:8 58:21
59:21 60:2 61:3
61:11 65:3,19
67:22 97:9 98:7
99:11 104:25
105:4 106:6
124:6 128:12
167:19
**qualifies**   20:19
43:10 65:6,6
**qualify**   33:12
37:16 99:16
**quality**   73:3,7
73:15,19,25,25
74:1,3,3,9,15,19
75:4 79:17
106:20
**quantitative**
107:3

**quarter**   123:7
**question**   5:6,8
5:10,11,22 6:1,2
6:6,9,16 9:20
11:10,15 16:23
17:3,5,15,19
18:21 19:6,7,13
19:13,16,18,19
19:21,23 20:2,9
20:17,19,23
21:4,5,10,15,21
21:24 34:17,17
35:16 36:20,23
41:18 42:13,19
44:22 45:2,16
49:24 53:6 58:4
58:24 66:11
71:12 74:7 76:2
77:16 78:9,22
82:12 88:17
90:3,3,23 98:25
102:23 110:21
111:12,14,18
112:14 115:14
118:23 119:12
119:24 120:11
120:17,21 122:3
128:15,16
129:13 130:9
135:5 136:15
138:24 139:7
144:10,11 149:2
153:24 156:10
157:7 162:3
164:15,19

166:22 172:19
172:20 175:13
176:6,10 180:24
181:6,11,11,19
181:21,21,24
182:1 184:1
188:2 189:1
195:11,14,18,24
196:21 199:18
200:6 201:19
202:18 203:25
210:17 211:19
217:6,19 218:12
219:1 220:10
234:10 235:12
236:15 237:19
**questionnaire**
180:1
**questionnaires**
180:11 181:13
**questions** 4:19
5:4 7:1 29:25
46:20 54:5
172:15,25
180:16 181:9,14
181:17 182:12
182:14 190:5
220:3 226:25
235:7 236:8,12
237:2
**quick** 207:14
235:6,12 237:18
**quickly** 72:17
**quite** 37:2 59:9
61:19 117:22

128:18 157:2
168:2 188:3
200:10 233:1
**quote** 91:10
117:5 123:7
142:14 158:17
159:1,3 162:25
174:15 183:20
195:8 202:21
219:11,13,20,21
219:25 220:21
**quoted** 194:15
195:2 202:19
**quotes** 194:17
195:2 196:3
**quoting** 124:9
178:11 212:10
219:5 235:17

**r**

**r** 2:1 30:7 73:23
142:8 235:21,22
**race** 227:17
**random** 142:24
**randomized**
126:9,11,12
131:16 132:23
133:3,13,18,22
133:25 138:13
138:15 139:1,10
141:16 142:19
143:5 147:17,24
147:25 148:5,13
148:20 149:8
150:18 178:6
179:6,13

**rape** 203:18
**rapist** 203:17
221:17
**rapists** 144:19
**rate** 7:23 9:7,25
79:20,23 80:4
81:25 82:8,17
83:22 84:3,13
84:24 85:2,7,7
85:13,18 86:13
86:19,20,25
87:3,12,21 89:4
89:11 96:1,6,10
121:9,12 122:24
155:8,9 156:5
192:23 197:18
235:15 236:4
**rates** 8:3,5 28:5
28:9 63:11
74:19 79:25
152:12,24 155:8
155:8
**rather** 95:16
154:19 178:1
210:7 237:16
**rationale**
117:20 118:11
119:13 133:6
**rats** 179:17,18
**reach** 32:7
59:18,18 74:22
80:20 114:15
220:2
**read** 3:14 16:19
17:16 43:3,5

58:18 73:2
79:10 83:1,21
84:16 89:12,14
98:2,2 103:9
106:9 129:4,5
149:10,14,15,16
152:8 157:20
158:14,16 161:3
164:14 168:1,10
180:3 186:25
189:6 198:19
203:4 207:23
211:13 213:24
214:11 222:17
234:2,11 237:4
237:6,8,10,12
237:16 238:3
239:7 240:23
**reader** 220:6
**reading** 58:16
83:6 88:14,16
90:7,9,11 97:17
98:10 103:10
118:4 121:20
124:23 125:1
128:21 134:25
137:11 161:9
173:10,18,20
196:7 216:2,24
243:12,14,15
**reads** 183:3
**ready** 141:14
**real** 145:20
218:20 235:6
237:18

reality 145:5
really 5:24
  14:23 20:5
  52:20 71:4 89:9
  95:24 130:25
  153:5,17 154:5
  154:15 155:20
  171:10 223:5
  231:2 234:22
reason 4:14
  8:16 32:6 39:19
  44:2 53:9 61:22
  78:1 95:13
  111:6,22 181:2
  190:19 210:1
  212:21 213:15
  216:19 218:19
  221:6 240:4
reasonable
  129:19 215:7
reasoning 8:15
reasons 8:17
  9:21,24 10:6
  190:15 213:2
rebuttal 129:5
rebuttals 55:22
  55:22 56:19
  126:23 170:14
  234:8,9,9
recall 37:2
  49:17 54:15
  62:1 64:14
  67:25 68:14,23
  73:3 81:14
  82:13 91:11

110:4 125:8
127:24 132:23
136:3,20 141:19
143:15 145:25
146:7 152:14
157:24 158:10
159:1 163:13
171:3 172:9
173:13 174:17
177:17 178:7
182:24 192:6
194:4 197:20
204:23 208:1,2
214:18 219:8
222:16,17 223:5
225:3 230:9
receive 138:8
139:20 149:21
164:1,2
received 34:24
44:24 55:23
70:16 76:19,21
receives 20:21
receiving 90:11
112:21 113:3
121:14,20
149:22 201:12
recent 28:7
131:16
recess 70:7
140:13 207:18
recipient 181:6
recognize 23:16
82:11

recommendati...
  66:7,13,16
  148:18
recommendati...
  210:10 212:11
recommending
  109:17
record 6:8,9
  10:5 23:19 31:6
  40:1,19 88:13
  97:14 99:7,9
  137:20 140:20
  148:15 175:7
  176:10 242:10
records 78:14
  85:6 110:7
  165:19,22
recreation
  32:10
recross 3:5
redirect 3:5
  237:19,20
reduce 114:1,2
  198:17 200:13
  222:22
reduced 158:18
reduces 223:1
  223:15,16
refer 28:20
  40:16,20 49:2
  50:5 60:11 75:2
  145:21 162:5
  178:16 186:21
  193:4 210:8

reference 72:15
  73:23 161:13
  195:8 219:23
referenced 60:8
  63:18 110:2
  111:20 146:9
  204:8
references
  56:18
referencing
  146:6 211:14
  234:20
referrals 197:13
referred 55:4
  61:7 74:8 77:3
  82:17 84:2 85:9
  126:15 147:7
  158:6 160:17
referring 33:8
  56:9 81:21
  82:23 110:22
  127:10 144:24
  160:2 214:6,21
  216:4,8,9,17
  226:13
reflected 240:23
refused 68:22
regard 16:3
  28:12 31:13
  37:6 59:13 61:2
  69:19 81:17
  85:16 89:15
  90:24 103:5
  104:11 124:25
  136:8,12,16

137:16 141:18
150:13 155:12
167:2 172:16
**regarding** 35:6
38:20 73:2
134:5 172:16
**regardless**
111:4 155:3
169:23 171:11
180:10 232:3
**regards** 79:15
106:8 113:20
**registered** 242:5
242:5,6
**regroup** 70:6
**reignites** 92:15
**reinforced**
214:18
**rejected** 47:9,14
48:6,9,19,20
49:2,3,11,16
52:1,3,7
**rela** 71:14
**related** 48:12
50:21 107:6,8
110:17 170:8
235:17
**relating** 7:17,21
10:15 11:1 22:5
27:18 55:5
72:22 134:4
141:17 173:1
**relationship**
146:6

**relative** 114:3,5
155:8,9 242:12
242:14
**relatively**
223:23
**release** 16:8
**released** 15:20
15:22
**releasing** 16:1
34:5 63:13 88:9
97:19 185:21
**relevant** 13:11
52:14 53:1
71:14,18 83:1
114:17 148:7
204:10
**reliability** 81:2
**reliable** 80:6
85:17
**relied** 16:12,15
63:3 106:16
182:4,6 189:17
191:1
**relief** 76:19
**religion** 203:2
**religious** 231:1
**rely** 32:11 63:1
126:20,24 128:5
174:13 179:10
179:20 187:7
189:15
**relying** 74:12
106:19 235:23
**rema** 39:15,16

**remain** 114:5,16
**remember**
56:23 59:9
111:3 126:18
127:18 128:3
147:17 186:6
203:4 225:1,6
**remembering**
77:2
**reminding** 52:3
**remove** 149:5
226:23
**render** 14:17,22
97:10 99:11,17
106:6 124:6,9
128:12 157:10
168:18,21 169:3
**rendered** 13:25
104:4
**rendering** 54:1
63:3 91:14
98:19 126:25
170:5
**repeat** 5:9 44:23
122:3 137:19
144:10 209:21
**repeated** 126:2
**repeating**
111:24 112:1
**rephrase** 5:6
99:1
**replicate** 174:5
174:23
**reply** 223:6

**replying** 84:6
**report** 3:19 15:6
23:7,20,25 24:1
24:1,3,5,8,18
30:14,19 34:2
40:6 45:21 49:9
51:13 52:10
53:13 55:14,17
55:20 60:12
61:6,6,15,19
64:10,14 66:18
66:20 70:11
77:3 82:14,22
83:2,10 86:11
87:16,23 89:8
89:21 90:18,18
90:18 96:10
97:14 104:23
110:3 116:1
122:5,7 125:10
126:7,16 128:2
129:6,12 137:4
138:3 144:14
146:10 152:20
152:23 153:1,2
153:3,4 154:3
154:12,14
155:23 157:21
162:23 163:11
164:5 165:2
167:25 168:2,4
168:7,11,14,17
170:18,23 173:9
173:13 174:18
175:8 177:13,18

178:11 180:11
183:16 186:15
188:24 189:3,7
189:16 190:1
191:2,7 192:3,7
196:11 197:21
198:13 199:20
204:9 214:19
225:9 227:2
235:5,11,11
242:7
**reported** 31:16
80:6 179:24
**reporter** 3:13
5:16,23 8:20,23
22:15 42:15
216:12 237:9
238:9,12,17
242:1,6,25
**reporter's** 5:22
6:5
**reporting** 80:22
112:22 135:1
175:22 182:4
194:10,15
**reports** 24:12
34:24 36:13
149:15 153:16
207:22 208:19
208:22 234:4,9
**represented**
64:7 74:14
112:6
**representing**
79:10

**reproduce**
227:23
**reproduction**
242:24
**request** 9:11,20
16:4 89:25
152:3
**requested** 242:9
**requests** 8:11
9:18,22
**require** 18:14
18:19,22 159:9
**required** 9:17
45:12 181:24
**requires** 19:2,8
19:10,25 21:8
21:19
**requiring**
182:22
**research** 7:17
7:20 8:7,8,10,13
8:19 9:24 10:4
12:15 14:6,12
14:15,15 15:3,4
15:5,6,7,11,14
15:21 16:7,8,15
18:1,4 28:1,3,4
29:4 30:13
31:16 32:6,9,22
33:3 44:1,6 47:2
47:5 54:25 55:1
60:19 61:21
62:8,13,15
73:24,24 76:9
76:11 79:18

81:3,7,13,16
88:11 98:10
100:25 101:6
104:11 106:10
107:4 111:19
112:2 121:18,22
121:25 122:14
124:25 128:24
134:25 135:8
136:21 137:16
137:21,25 138:1
149:7 150:16
151:2 152:8,17
156:4 157:21
164:6,16 168:3
169:7 174:16,20
174:25 175:3,8
175:9,10,15,17
195:24 196:10
196:12 204:3
208:24
**researched**
58:14
**researchers**
16:8 57:10 76:8
158:6 179:25
**reshape** 46:4
**resources** 148:7
191:7
**respond** 202:14
**responded** 37:9
181:14
**response** 35:11
**responses** 37:9

**responsibility**
189:23
**rest** 8:4 109:4,4
117:6,18 119:2
120:6 140:12
**resubmit** 34:25
**result** 76:23
86:4 89:4 92:25
108:15 113:3
**resulted** 168:3
**results** 74:24
75:13 80:5,8,14
80:22 116:13
133:4,5 151:20
151:23 156:19
174:7,22 181:7
182:3,5 190:2,7
**retained** 22:1
67:11 171:1
**retread** 177:12
230:4
**return** 87:3
**reveals** 235:16
**reverse** 158:24
163:5
**reversed** 60:21
**review** 14:25
17:6 24:11
28:20,22 35:2
35:13,14 37:1
45:21,23 46:9
46:25 73:6
74:18 78:5,10
97:17,17 110:6
137:8 151:15

165:22 170:11
170:15 173:17
177:7 194:18,25
242:8
**reviewed** 24:14
28:17 31:15
33:21,24 34:1,7
34:10,13,14,16
34:19,20,23
35:24 36:11,25
37:8,10,17
43:16,23 44:2
44:10,11,13,14
44:17,18,21
45:3,4,6,7,8,9
45:13 46:11,16
46:22 50:5,12
50:13,17,22
51:5,6,9,20,20
56:17 62:9
73:22,22 78:7,8
79:16 121:8
125:3 129:2
131:8 141:21
165:19 168:13
170:4 186:5
194:16 202:6
**reviewers** 34:24
35:9,24 36:13
37:3
**reviewing** 90:11
97:18 103:4
138:1 168:12
**revise** 34:25

**revised** 35:11
37:4
**revision** 36:3
**revisions** 35:2
**rewards** 139:19
151:13
**rh** 1:2
**right** 4:9 5:16
7:3 9:8,9,19
14:1 15:5 22:20
25:12 26:19
27:15 28:17,18
35:15 36:9
37:11 42:9,22
42:23 44:11
45:10,17 50:16
52:15,16 54:6,8
58:19,22 62:6
63:1 66:11,12
68:7,10 70:5
74:10 76:4,6
77:9,18 78:23
79:24 80:7,11
80:16 81:8 82:5
84:4,16 85:19
86:5,14 91:22
92:5,8,11 93:4
93:15 94:18
95:18 97:3,10
99:17,21 101:11
101:12 102:4,13
102:14,17,23
104:20 105:15
106:4,15,19
108:4 109:20,21

111:7,23 112:1
112:10,16,24
118:18 119:8,18
119:22 120:8
122:10 125:15
126:4,8,24
127:8 128:14,16
128:22 129:16
130:1,6 131:2,7
131:10 132:13
133:18 134:12
138:18 139:2,23
140:3 141:1
144:1,4 145:10
145:17 146:17
146:24 150:1
152:2 154:6
155:6,14 156:7
156:16,17
163:20 166:1
171:24 176:14
178:1 180:3,7
180:18 181:19
182:2,18 183:2
183:4,15 184:10
185:15 186:25
191:6,23,25
192:1 193:13
194:12 195:1,9
196:9 198:9,19
202:7 205:25
208:18 209:11
210:2 211:2,17
212:16,21
213:15,24,24

214:11 218:24
220:1,25 221:2
222:7,11 229:18
230:12 234:10
237:3,6,10
238:3,11
**rigorous** 151:15
**ring** 235:21
**ripping** 219:24
219:24
**rise** 25:11
**risk** 82:4 85:24
115:9,12 150:24
154:24 155:6
198:14,15,17
199:5 211:5
**risks** 139:19
151:7,12 213:4
**rivaux** 2:4
**robust** 32:8
39:21 169:3
173:11 200:13
201:21 202:1
225:21,25
**robustly** 6:25
201:22
**role** 167:7
**roles** 191:21
**romantic**
222:23 223:17
**roughly** 137:13
**round** 35:1
**rpr** 1:23 241:18
242:20 243:21

**rule**  40:14 149:3
   149:11,14,15,16
   149:18,21 150:2
   150:6,13 165:5
   165:9
**ruled**  60:24
**rulemaking**
   173:7
**rules**  5:3,14
   134:4

**s**

**s**  1:4,7 2:1,2,12
   2:20,23 5:23
   10:10 57:8
   142:8 197:14
   243:7
**safety**  201:23
**sakes**  17:12
**salt**  210:21
**sample**  127:16
   197:13
**saw**  108:13
   134:8,19 175:3
**saying**  44:14
   75:1 82:11,13
   97:4 125:8
   132:23 145:9
   148:16 154:19
   176:19 178:7
   184:4 196:15,16
   212:11 217:22
   220:6
**says**  41:13 87:20
   87:23 129:8,21
   142:14 158:18

159:7,11,20,21
   162:25 163:9
   180:15 199:23
   222:25 235:13
**scale**  75:20,21
   75:24 76:8
   181:10,24
**scales**  181:2,2,5
**scan**  16:20 17:6
   17:16
**scans**  16:17
   106:15,17,18
**scenario**  215:15
**scenarios**  12:10
**school**  7:6
   230:25
**schools**  186:18
   187:4,6,10
   189:9 190:12
**science**  183:24
   186:2,12 200:7
   210:7
**sciences**  205:16
**scientific**  15:4
   33:5,7,13 37:23
   38:9 117:3,8,19
   117:25 118:2
   173:10 183:18
   186:11 188:15
   188:23 189:25
   197:25 200:4
   208:21 215:8
   216:10
**scientist**  33:17
   33:18 210:20,20

**scope**  32:17
**score**  17:8,10,12
   114:22 115:8
**scores**  16:24
**screen**  5:16
   22:14,21 23:24
   83:3,6,13 89:18
   90:5,21 178:12
   178:20,23 208:1
   208:5
**script**  137:11
**scroll**  23:17
   198:2,22
**scrutinizes**
   201:22
**seal**  241:11
**search**  189:18
   191:3,4
**searches**  189:13
   189:14,15,24
   190:2,6,25
**second**  35:1
   36:5 37:16
   56:21 63:16
   67:15 72:16
   74:22 117:12
   142:7,11 173:20
   180:11 199:6
   214:6 235:8
**secondary**
   119:15 162:8
**seconds**  237:13
**section**  162:24
**see**  22:10,20
   23:17 24:25

57:16 83:17,25
   84:10 89:23
   95:15 109:13
   129:12,14 140:1
   141:2 145:16,18
   173:22 179:4
   180:5 186:19
   189:21 199:6
   214:23 226:23
   226:23
**seek**  39:20,22
**seeking**  233:2,7
**seem**  101:4
   122:4,8,12
**seen**  22:24
   23:23 215:5
   227:15
**sees**  85:6 178:12
**segm**  57:2,3,6,8
   59:3,10 70:18
   148:6
**self**  185:22
**send**  92:7
**sending**  219:8
**sense**  6:10,18
   180:18 191:20
   191:22 196:25
   197:1 214:13
**sent**  35:8 36:1
   36:22 37:1,3
   170:13 230:25
**sentence**  87:19
   87:20,22 89:13
   89:14 183:3,7
   183:20 187:3

194:11 195:7
198:5 199:6
209:10 211:3
214:6 233:5
**series** 181:17
**serious** 19:11
124:2
**services** 54:5,14
55:6 68:1 73:1
74:13 81:12
82:14 91:8 92:4
93:4,14 94:1
97:3 106:3
110:16 111:3,21
112:7 116:1
117:2 118:3
122:6 123:5
125:6 126:8
132:21 133:19
135:17,22 136:2
137:2 147:14
178:1
**setting** 150:16
**several** 56:18
63:6 142:18
**severe** 93:11,24
96:20 97:20
**sex** 20:12 34:9
36:18 47:16,18
48:5 51:24
63:13,24 64:8
69:17,20 70:12
86:7 87:7 91:17
92:11,14,21
94:2,15 97:19

102:4 113:20
114:3,4,6,11,14
114:17 115:2,16
117:6,12,18
118:17 119:2,15
120:5,14,20,23
123:22,24 124:3
145:5 158:23
159:5,18,22
160:4,9 161:1,5
161:21 162:1,8
162:9 163:4
177:16 193:25
194:9,9,22
195:17,21,22
196:1,2 202:21
202:22 203:8,12
203:21 216:2,6
216:8,13,20,20
216:25 220:12
223:22 233:2,7
234:23
**sexology** 50:15
**sexual** 34:6
43:24 44:2 46:9
48:9 50:11
51:10 93:11,24
96:20,22,25
97:7 104:16
124:4,8,20,25
182:23 222:23
223:2,17 224:3
224:21
**shake** 5:15,15

**shaking** 5:17
**shani** 2:4
**share** 24:8
83:12
**sharing** 22:14
**shaw** 2:5 4:24
**sheep** 126:17
**sheet** 3:11
239:10 240:1
**short** 15:23 44:1
44:6,7 121:7
140:16 221:15
221:17
**shorter** 95:1
**show** 170:22
**showed** 63:11
127:13 131:18
**showing** 116:13
**shows** 129:9
**sic** 13:13
**side** 65:1 99:12
107:12,19 137:7
137:7 161:19
180:8
**sided** 221:24
**sides** 65:10 66:5
**sign** 76:9,11,12
**signature** 24:20
24:23 241:18
242:20
**signed** 201:22
**significant**
19:11 42:3
52:20 75:2
127:19,20,21,22

127:23 224:5
**signing** 243:12
243:14,15
**silencing** 219:18
**similar** 137:6
158:2 177:13
219:18,18
**similarly** 54:3
**simone** 2:15
**simone.chriss**
2:18
**simple** 82:5
**simply** 5:6,8
28:2 153:10
189:3
**simultaneously**
42:10,14 125:20
176:4 198:24
209:2,19
**sincerely** 243:18
**single** 123:11,21
203:1
**sir** 4:9 6:20 7:21
8:4,9,13,21 9:3
10:18,22 11:15
12:21 13:23
14:7,10,16,21
15:3,10 16:10
16:20 17:6
18:25 19:6,23
20:5,17 21:4
22:1,20 23:7,19
23:25 24:2,23
25:10 26:17
27:10,17 29:4

| | | | |
|---|---|---|---|
| 29:24 30:8 | 134:3 135:12 | 215:18 217:3,9 | 187:9,10 189:9 |
| 31:11,19 32:6 | 140:16 141:4 | 218:20 219:21 | 190:13 197:10 |
| 33:13 34:11,17 | 142:10,23 | 220:6,24 221:20 | 205:2,11,16 |
| 36:17,20 37:11 | 143:14 145:6,14 | 225:16 227:11 | 206:13,15,17,18 |
| 39:19 40:19 | 145:21 148:22 | 228:2 229:8 | 215:18,20 |
| 41:1,13,21 43:1 | 152:11,20 153:3 | 230:4 231:8,20 | 224:16 |
| 43:6,10,14,19 | 153:12,20,22 | 232:1,4 233:8 | **societies** 205:24 |
| 48:14 49:16 | 155:12 156:23 | 234:5 235:6,10 | 232:12,17,21 |
| 52:10 54:18 | 157:18 159:3,7 | 236:8 | **society** 57:8 |
| 58:8 61:12,23 | 159:20 160:5,10 | **sissy** 193:1 | 167:3 169:10 |
| 64:10 67:25 | 160:17 161:6,8 | **sit** 10:5 13:10 | 201:3 203:11 |
| 69:8 70:10,18 | 161:18 162:12 | 21:16 44:19 | 232:14 |
| 72:18,25 73:17 | 163:11 165:24 | 68:15 85:12 | **sociological** |
| 74:7 75:22 | 167:2,14 174:25 | 99:15 112:18 | 215:24 |
| 76:10 77:1,13 | 175:9 176:2,8 | 113:9 114:18,25 | **sociologist** |
| 77:16,23 79:9 | 176:20 179:4 | 115:14 123:10 | 33:19 97:25 |
| 79:22 80:4 81:3 | 180:13 181:4 | 123:20 126:3 | 105:15,25 108:7 |
| 83:17 84:23 | 183:2,24 184:10 | 128:11 143:12 | 116:23 154:3 |
| 85:16 86:2,10 | 185:2,6 186:2 | 151:6 214:1 | 165:23 166:17 |
| 87:2,20 88:6 | 186:11,15 | **situation** 4:20 | 166:20,25 167:5 |
| 89:2,15 91:7,18 | 187:22 189:14 | **situations** 87:14 | 197:9 205:7 |
| 92:17,24 93:8 | 189:23 190:14 | 123:3 | **software** 71:7 |
| 93:12,18,22,25 | 191:9 192:3,9 | **six** 27:23,25 | **sole** 86:23 |
| 95:5,13 97:25 | 192:13 193:8,14 | 30:24 39:5,8 | 175:17 |
| 98:6,13 99:11 | 193:17 194:6 | 55:23 64:19 | **solely** 41:22 |
| 100:18 102:1,25 | 195:7,14,25 | 66:12 82:18 | **solution** 194:2 |
| 103:3 105:8 | 196:6 197:7 | 152:13,25 155:5 | 197:3 |
| 106:6 107:5,11 | 199:6,9 200:4 | 155:10 171:13 | **solutions** 243:1 |
| 109:6 113:17,24 | 200:18 202:19 | **skill** 106:24 | **somebody** 22:13 |
| 114:25 116:4,22 | 203:23 204:21 | **skills** 14:14 | 25:23,24 42:1 |
| 117:1,14 118:24 | 205:19 207:21 | **sloth** 139:8 | 54:13 59:8 |
| 119:4,16 121:8 | 208:25 210:2,4 | **small** 127:15,17 | 106:20 112:1 |
| 124:6,16 126:3 | 210:15 211:17 | 130:18 223:23 | 149:5 151:23 |
| 128:11 129:2 | 213:16 214:1,13 | **social** 33:18 | 153:13 182:4 |
| 131:21 133:12 | 214:22 215:12 | 186:18 187:4,6 | 193:14 198:9 |

219:24 222:20
229:1
**someone's**
203:10
**son**  154:20
202:23
**soon**  238:10,15
238:15
**sorry**  10:11 14:7
18:16 22:12
24:1 34:12
48:20 49:24
51:15 54:7 82:2
84:5 90:18
95:24 121:17
122:3 139:4
144:10 147:22
156:18 157:4
176:18 198:23
199:1 207:5
208:7,14 227:3
234:10
**sort**  95:10 97:6
123:2 145:4
151:14 171:15
173:20 199:12
199:13,14
211:22 216:9
221:16 231:4
236:24
**sorts**  205:5
**soul**  145:2,4,9
145:10,19,19
**sound**  51:24
56:24 92:1

147:11
**sounds**  56:25
91:22 115:22
142:16 144:2
**south**  243:2
**southern**  2:16
**southernlegal....**
2:18
**space**  214:8
**span**  156:16
**speak**  30:23
38:15 56:5
68:12,16,25
69:5 78:16,20
137:17 141:5,7
**speakers**  68:2
**speaking**  42:10
42:14 46:8
125:20 132:15
148:10 166:17
166:20 176:4
198:24 205:6
209:2,19
**specific**  34:22
89:16 90:24
97:15 118:11
119:5,5,6
132:18 147:2
162:16,17
165:12 173:16
181:15 187:7
189:14,15,15,17
189:24 216:7,16
238:12

**specifically**
40:20 72:23
73:6 99:6
141:21 158:20
162:25 164:13
179:10 193:2
204:17 216:3
226:12
**spectrum**  192:5
192:10 193:18
193:24 194:8,21
195:16,20 196:3
196:16 197:17
198:7,10
**speculation**
185:15
**spend**  192:4
**spent**  10:1 56:13
**spin**  28:18
**spoke**  29:12,22
68:2 134:3
171:5
**spoken**  29:15
38:18,22,25
39:2,6,10 78:25
79:4 169:7
**square**  2:13
**st**  241:4,12
242:4
**stage**  117:11,12
117:13 158:22
159:17
**stages**  117:10
**stand**  135:10

**standard**  17:1,9
100:10 166:23
167:3 173:20
**standards**
166:18 167:8
200:19 201:6
204:4
**start**  6:2 101:19
133:7 180:15
235:19
**started**  7:3
63:12,18 73:11
213:21
**starting**  187:2
213:3
**state**  1:24 126:1
130:25 150:18
154:4 158:5,7
174:15 199:15
239:3 241:3,7
241:12,19 242:3
**stated**  73:1 78:1
228:16
**statement**  20:24
20:25 21:7
56:17 64:12
77:24 81:14
86:11 88:7,12
89:9,10,12 98:1
98:7 110:19
113:6,6 117:1,3
117:9,14,19
118:2,12,25
136:21,24
137:14 143:10

145:25 148:14
152:15 158:2,11
158:14,17
159:15,16
162:23 163:13
174:17 175:7
177:14,17,22
179:4,24 182:24
183:5 186:4,16
187:8 188:15,16
189:2,6,10,16
190:1 191:2
193:23 194:4
195:3,15,15
196:10 197:20
197:25 199:9,19
202:20 203:5
208:1 211:13
214:19 216:1
217:24,25 218:8
223:10 227:4
235:24
**statements** 25:2
118:4 120:4
137:22 179:11
179:21 188:23
218:7 239:8
**states** 1:1 59:22
59:25 190:16
201:7 211:24
**statistical** 32:22
81:23 84:3
87:10 106:11
176:12 213:7

**statistically**
127:20,22
147:11
**statisticians**
33:2
**statistics** 17:1,9
17:14
**status** 217:22
**stenographic**
242:10
**stenographica...**
242:7
**step** 19:11
**steps** 115:19
146:24
**sterilization**
227:20
**sterilizing** 226:9
227:15,19
**stifle** 222:11
**stifled** 220:13
**stipulate** 15:17
**stop** 31:25 32:2
92:14,22 94:2
98:15 162:7
177:14
**stopped** 38:4,8
101:19 130:21
132:15 209:5
**stopping** 95:11
101:23 133:9,9
**stops** 100:14
**straight** 225:5
**straightforward**
142:17

**streak** 221:13
**street** 2:10,23
243:7
**stress** 131:18
**strike** 25:12
34:12 103:2
113:17 150:11
156:23 221:22
**strong** 158:20
163:1,8 237:24
**strongly** 128:17
**struggling**
11:10
**student** 39:13
39:15 217:11
218:24 220:20
**students** 197:18
**studied** 8:15
116:19
**studies** 10:15
11:1,1 31:19
33:5,13,22,24
34:1 37:17,23
38:9 44:9 64:1,5
73:8,25 74:2
75:14 79:15
81:2 88:23
89:16 90:24
91:2,5 98:9
121:8 124:24
125:3 127:3,6,9
127:10 128:17
130:18,23
141:24 142:19
147:1 162:20

164:21 174:12
176:23,25
186:23 192:13
192:14,23 194:6
196:10
**study** 16:2
31:23 32:3,7,8
34:2,23 36:4
47:16,18 51:12
62:16 75:21
76:9 79:19,24
80:1,6,21,21
84:7 86:13,19
86:20 87:1,2,2
87:13 88:17,19
89:2,9 112:5
115:18,20 116:4
116:6,8 118:14
126:15,18,20,22
127:24 128:9
129:3,9 131:20
141:21 142:4,10
142:12 145:23
146:6,21 147:5
156:7 160:2
173:19,20 174:4
174:4,6,22,23
175:18,19
176:17,19,19
177:2,8 182:13
184:12,20 193:1
194:23 195:9
198:5 212:3
230:25

**studying**  116:10
**stufforsus**
  127:25
**subject**  60:15
  98:11 114:8
  115:6 121:24
  122:13 134:17
  134:22,24 135:1
  141:22 146:21
  146:25 147:5
  152:4 204:13
  236:16,20
**subjected**
  197:24
**subjective**
  193:13
**subjectively**
  203:10
**submission**
  49:23 50:3
  51:23
**submissions**
  48:4 50:1
**submit**  66:20
**submitted**  8:10
  35:10 61:6,8
  66:19
**subscribed**
  239:16
**subsequent**
  29:10,10 158:23
  163:4 209:10
  235:16
**subset**  230:15

**substance**
  172:22,24
  240:23
**substantive**
  237:7
**suffer**  25:20
  76:13 85:13
  96:21 110:11
  115:3,17 154:13
**suffered**  88:2,19
  111:22
**suffering**  42:1
  67:5 75:8 84:19
  85:2 96:19
  122:1,15 138:7
  191:20
**sufficient**
  243:13
**suggest**  86:12
  110:15 112:7
  130:19 210:21
**suggested**  212:4
  212:13
**suggesting**
  14:16,21 32:25
  79:9 81:5
  107:24 145:1,6
  155:16,19
  163:15 187:19
  206:6 221:12
  228:25 232:11
**suggestions**
  37:3,5 45:20
  46:10

**suggestive**
  128:18
**suggests**  96:5
**suicidal**  153:5
  153:10,13
  207:23 208:20
  209:6
**suicidality**  33:9
  33:10 81:17,24
  138:3 200:13
**suicide**  7:23 8:3
  8:5 9:7,23 10:8
  15:13,17 28:5,9
  34:2,23 35:20
  36:5 82:8,16
  84:7,7 135:8
  136:14 152:12
  152:24 153:4,11
  153:17 154:14
  154:23,25 155:6
  155:13,19 156:5
  198:14,15,17
  199:5,11,16
  235:14,16,17
  236:4
**suicides**  8:15,17
  9:4,25,25
**suite**  2:6,13,23
  243:2,7
**sums**  13:6
**superimposing**
  229:1
**superseded**
  61:18

**supersedes**
  202:22 203:8
**support**  36:10
  68:13 184:19
  185:16,17
  188:23 189:10
  196:5,10
**supported**
  143:23
**supports**  184:21
**suppose**  109:18
**suppressed**
  64:13 98:17
  151:21
**suppresses**
  98:14
**suppression**
  48:25 116:14
  117:12 118:16
  124:2 126:13
  158:22 163:3
  174:5 177:14
  179:5,14 214:7
  214:18
**suppressors**
  99:20 100:20
  101:1,5,7 117:4
  117:17 118:25
  119:7,17 122:9
  123:6,13 124:7
  132:17 174:17
  201:15
**sure**  5:24 6:13
  46:7,15 65:18
  82:20 84:9 89:7

89:24,24,24,24
98:25 111:17
117:15 122:4
135:24 138:25
171:2 173:4
175:7 178:18
215:2 227:1
229:10 235:6
**surgeon**   26:14
68:19 77:24
78:3,25 79:4
**surgeons**   77:25
**surgeries**   48:9
48:12 87:7
162:10 237:22
**surgery**   48:11
76:23 77:17
78:2 79:1,1,5,7
85:24 117:13
159:10 180:20
**surgical**   69:20
77:3,19 78:5,10
85:19 86:4,14
87:4 159:23
161:21
**surgically**
158:24 163:5
**surmise**   80:13
**surname**   53:21
68:21
**surprise**   149:20
149:23
**surprised**
173:22

**surrogate**
226:15
**survey**   142:12
181:7
**surveys**   224:11
**suspect**   215:8
**suspicion**
182:19 183:2,4
183:17,21 184:4
214:17,17,21
225:9
**suspicions**
188:21 200:3
**swearing**   62:3
**swedish**   110:24
111:3,8,10,25
112:22,23 113:8
113:10
**sweeping**   120:3
**swim**   224:6,9
**switched**   180:1
**switching**
180:11 181:2,5
**swore**   25:1
**sworn**   4:4 241:9
**synonymous**
184:2
**system**   65:6,8
73:23 74:9

**t**

**t**   10:10,10 30:4
142:8
**take**   4:22 5:17
6:7,15 31:3 64:8
83:13 89:20

97:5 100:5
102:4 108:14
110:12 120:5,5
120:22,23 140:6
143:10 153:10
154:25 155:2
185:7 203:21
206:23 223:21
237:15 238:6
239:19
**taken**   1:22 4:25
70:7 115:19
140:13 147:3
182:13 207:18
**takes**   107:13
145:4
**talk**   28:10 35:4
35:14 57:21
60:7 63:15
76:25 173:2
205:16 231:17
231:18 233:9
**talked**   28:9 29:9
106:14 122:19
122:19 126:7
137:20 147:17
158:1,13 174:11
215:18 217:13
**talking**   37:7
80:3 82:20 84:6
93:12,13,21
190:22 192:4
199:12 203:16
231:10,19
233:23

**talks**   236:4
**tallahassee**   2:23
243:7
**tavistock**   8:7
9:5 10:7,10 16:5
28:5 60:12,25
62:11,17 63:4
67:4,11 82:18
84:7 106:13
116:7 151:21
152:18 155:10
156:6 160:3
174:3 176:1
187:17 198:6
236:24
**tavistock's**
60:18
**technologies**
235:2
**teenager**   82:23
209:5
**teenagers**   82:9
83:22 84:4,13
84:20 87:21
88:2 89:11
96:10 101:16
110:11 121:10
152:13,14,24,25
**tell**   4:19 5:8
10:25 18:25
19:7,13 21:16
29:25 75:22
93:25 142:7
237:3

telling   169:23
ten   142:1
    156:16 180:5,6
    197:14,15,17
tend   4:13,15
term   113:19,23
    114:20 118:15
    121:7 190:23
terminology
    93:9 96:14
terms   6:17 55:7
    68:25 114:16
    187:14 231:13
test   131:16
tested   178:6
    179:6
testified   4:4
    50:7 54:4 59:17
    59:24 60:4
    64:11 68:2
    79:14 82:7
    97:13 99:7,9
    106:9 113:1
    142:24 170:22
    171:5 173:6
    205:20 228:23
testify   10:6
    12:24 13:19
    65:7,13 76:16
    76:17 112:19,25
    115:1 172:13
testifying
    148:10,23
    169:20

testimony   18:7
    18:10 22:5
    24:15 26:25
    31:9 32:16,18
    35:5 36:9 37:14
    37:19 41:21
    44:24 53:25
    60:16 61:2
    62:17 64:17
    65:9,22 71:18
    73:4,15 90:13
    91:7,11 93:5
    96:14 97:15
    100:2 102:17,25
    103:3 106:2
    110:1 111:20
    122:6 123:4
    124:19 125:6
    132:20 137:1,8
    137:9 141:8
    142:23 171:8,19
    177:22 185:6
    223:12 226:20
    229:19 230:6,9
    230:11 232:6,20
    233:11,24
    236:11
testing   108:11
testosterone
    138:21
tests   31:19
texts   90:9,12
thank   8:1 17:22
    23:5 25:6,24
    49:13,22 52:2

170:17 171:25
    178:25 179:1
    198:25 207:17
    208:15 233:21
    236:10
thankfully
    156:5
thanks   15:21
    35:16
theoretical
    200:12
theorized   206:8
therapeutic
    214:8
therapy   34:10
    36:19
thing   43:15 62:5
    82:21 83:7
    93:22 101:11
    116:7,18 122:18
    170:12,13
    192:19 205:24
    205:25 208:25
    234:22
things   91:9,22
    118:10 167:4
    168:21 169:10
    174:9 178:3,22
    191:6 195:1
    197:6 229:23
think   4:14 6:18
    11:16 13:6,12
    14:13 15:17
    27:23 41:2
    44:22 45:10

49:17,19 52:13
    52:22 55:19
    56:8 57:22
    59:17 63:11
    67:15 70:25
    81:9 96:21 97:5
    97:8,11,11
    112:16 123:1,16
    125:5 126:9
    128:1 130:17,17
    131:14 132:8
    133:16 140:8,21
    140:21 141:15
    144:21 148:16
    149:16 152:23
    155:4,20 156:22
    157:14 160:13
    162:21 169:1
    170:19 171:15
    172:23 182:17
    184:2 185:15
    188:10,17,18,19
    189:11 190:23
    194:23 198:1
    200:10,15 202:9
    204:25 205:9,13
    209:9 215:7
    218:2,13,21
    219:17 225:9
    226:18 228:11
    231:23 233:21
    234:1 235:1,11
    236:15 237:13
    238:3

**third** 19:12
35:17,19 117:13
214:6
**thorough**
212:17,19,22
**thought** 84:6
135:14 180:5
182:11 190:8
193:3,11 207:14
211:21 230:3,5
230:6
**thoughts** 209:7
**thread** 223:6
**three** 34:6,7
35:8,24 37:1,2
55:22 59:5
62:14 87:6,6
97:18 170:13
**throwing**
125:17 190:17
**time** 1:12 10:1
12:20 19:12
53:22 54:18,21
55:11 95:1,10
109:1 121:3
134:14,15 136:5
139:24 140:8
148:22 156:15
192:4 205:4,17
238:12 243:13
243:14
**times** 82:19
126:1 152:13,25
155:5,11 161:24
197:17

**timing** 6:17
**tip** 68:20
**title** 143:17
157:20
**titled** 204:22
**today** 4:22 5:3
5:24 6:24 10:5
12:20 13:10
18:7,10 21:16
22:4 23:2 44:19
46:20 53:2
55:11 62:5,9
68:15 79:2,5
85:12 90:13
99:15 112:18
113:9 114:19,25
115:15 118:10
123:10,20 126:3
128:11 143:12
144:9 151:6
190:16 214:1
217:13 223:12
233:9,11,12
**together** 239:8
**told** 53:12 106:2
117:16 120:19
124:1 133:19
139:13
**tongue** 68:20
**took** 107:16,18
115:2,16 123:22
146:24 157:6
225:15
**top** 83:21
127:18 186:6

**topic** 101:8
**tordoff** 79:19,21
80:21
**total** 55:16
**tower** 127:12,12
129:2,9 243:1
**train** 207:14
**training** 7:8
27:1,3,9 43:11
99:16 106:24
**traits** 198:7
**trans** 11:22
189:13,20,20,20
224:12
**transcript** 1:14
5:25 30:2 237:7
237:10,12 239:7
240:3 242:9,24
243:11,12,15
**transcripts**
234:11,12
**transgen** 228:16
**transgender**
7:23 11:6,8,22
11:25 13:25
18:15,22 19:1,8
19:24 20:6,20
21:7,18 38:1,5
48:12 57:12
64:3 96:24
152:13,14,24,25
155:5,18 157:1
157:8,12,15
159:8 160:7,8
160:10,13,17,25

164:1 169:8
183:12 184:14
184:24 185:3
187:15,23,25
188:6 189:20
190:15,17
191:10,10,17,23
192:10,19,24,24
194:1 196:3,17
197:5 198:11
204:22 205:1,13
205:20 206:3
221:14,25 224:9
225:12 228:3,10
228:17,21 229:9
229:14,15 230:7
230:15 231:21
232:5,16,23
233:14 234:21
236:25
**transgenderism**
25:18 48:5
186:17 187:4,5
187:18 189:8
190:12
**transition**
157:23 158:9
159:4 161:25
223:20 224:14
226:19
**transitioned**
224:22 225:5
**transitioning**
222:15,20,22
223:1,13

**transphobia**
219:6,19 220:13
221:10,19
**transphobic**
217:4 220:8,17
**transsexual**
189:19 193:3,4
**transsexuals**
162:6 185:11
193:11,12
**treat** 25:20
160:23 166:14
**treated** 7:11
9:15,17 177:8
**treating** 102:19
117:4 151:3
227:21
**treatment** 7:14
12:5,13,14 13:5
13:13 20:15,25
21:2 78:13
95:17 103:5
105:17,20 107:6
133:6 136:9,16
139:15,20,21
142:4,15,20,20
146:16 147:15
158:19,23
159:17 160:22
163:4,25 164:2
164:8,18 165:16
167:16 179:5,14
182:22 209:5,7
213:9 235:19

**treatments**
12:19 19:5
76:20 149:6
176:17 201:11
234:14
**trend** 190:23
**trial** 132:23
133:14,18,23,25
138:14,16,17
139:1,2,11
143:6 148:18,21
149:8 160:3
178:6 179:7
243:14
**trials** 47:6 126:9
126:12 133:3
141:17 142:25
147:16,25 148:4
148:13 150:17
150:22,24
179:14
**trick** 5:5
**tried** 59:18
**true** 15:9 108:17
112:21,24
132:25 167:2
192:1 239:10
242:10
**truism** 186:11
**trust** 60:13
**truth** 29:25
**try** 4:20 15:18
41:19,19 46:3
74:22 116:9
140:1 231:9

**trying** 5:5 18:5
32:5 55:7
140:25 144:17
155:22 157:11
157:14 175:5,19
182:2 193:5
196:18 202:17
220:2,5 222:11
223:13 224:17
227:10 229:18
232:4 233:11
**tuesday** 1:12
**turban** 34:6
**turbans** 35:19
51:23
**turn** 18:2
**turned** 185:10
**tweet** 219:8,17
220:24 222:15
223:7 224:17
225:1,3
**tweeting** 217:10
**tweets** 217:4
219:5 221:7
**twice** 19:16 97:5
97:9,11
**twitter** 217:11
223:6
**two** 15:25 18:3
29:9,21 30:1,20
37:1,2,7 39:4
49:10 55:24
56:13 59:4
65:17 75:14
79:15 88:16

91:21 97:18
109:20 116:14
122:7 129:15
130:8,10 132:13
140:22 169:21
179:11,21
209:11 229:23
236:11
**type** 46:25
77:20 126:19
227:22
**typical** 182:21
183:23 185:4,8
**typically** 98:16
101:23 114:23
167:5

**u**

**u** 142:8 235:21
**uh** 5:20 8:13
34:3 63:8 97:8
97:13 133:24
156:21 206:5
**uk** 169:22
**ultimately** 35:12
36:2 46:2,12
60:21,24 231:13
**umbrella**
144:20
**unartful** 144:12
**uncomfortable**
181:17
**uncover** 151:20
**under** 12:10
15:13 25:1
26:21 29:24

**[under - using]** Page 302

32:18 37:14
44:20 50:14,14
88:13 112:19,25
113:1 124:18
138:9,11,12,15
139:9 144:20
185:6 192:15
217:10 229:19
232:21 233:13
242:24
**undergo** 77:21
78:2
**underlying** 29:3
31:18 79:23
181:12 182:3
**undermine**
175:6
**undersigned**
241:6
**understand** 5:6
10:17,21 17:3
18:6 19:6,13
22:4 26:25
27:19 32:17
44:23 45:14
49:24 62:13
63:2 64:11
65:18 77:16
78:9 98:25
111:12,14
119:12 120:17
122:5 130:9
144:17,23 147:1
150:10,12 151:6
155:22 160:21

171:18 202:20
206:5 220:4
225:7 226:17
227:11 229:18
232:25 233:11
234:17
**understanding**
149:25 150:23
150:25 203:10
231:24,25
232:13,15
**understands**
17:14
**understood**
5:11 46:7 67:10
89:25 114:10
132:20 141:15
146:3 148:22
149:4 150:2
156:10
**undertake** 47:3
147:3 150:22,24
151:25
**undertaken**
121:24 122:14
150:19 160:20
**underwent**
177:7
**undesirable**
188:10,13
**undone** 169:13
**unexplained**
79:20
**unfair** 161:14
225:22

**unintentionally**
5:14
**united** 1:1 59:22
59:25 60:5
201:7
**universal**
232:16
**universe** 221:4
221:8
**university**
150:22 202:25
**unjustified**
57:16,16,23
**unknown** 125:7
125:13,14
**unobservable**
145:8 184:16
**unpack** 117:15
231:9
**unqualified**
100:23
**unrelated** 89:9
**unusual** 92:22
**unusually**
116:14 211:11
212:5
**unwanted**
158:24 163:5
**upbringing**
231:2
**update** 72:1
**upload** 71:22
72:1,5,9
**uploaded** 72:12

**uploading** 72:11
**urged** 148:3
**urgent** 116:7
**use** 10:24 15:10
40:25 72:3,13
92:3 94:5 95:7,8
95:13,17 96:15
96:18,20 97:18
107:8 113:20
118:16 133:13
144:25 162:4
168:5 174:16
187:11,12 188:4
210:6 213:20
214:17 217:17
218:20 234:23
**used** 8:12 93:9
93:10,17,19,23
94:15,16,17,20
95:1,2,5 98:3,4
116:24 133:3
138:21 154:18
180:1 181:10
183:16 203:18
211:23 212:9
217:11 218:3
219:6,12
**using** 4:16 9:9
13:15 25:7
45:10 74:8
84:24 94:2
106:7 107:1
109:3,4 179:14
219:19 234:20

**usual** 100:16
**usually** 105:13
  212:14
**utilize** 109:12
  133:17 166:18
  166:24 167:5
**utilized** 40:20
  95:16 204:4

**v**

**v** 10:10 235:21
**vaginoplasty**
  77:12
**vagio** 85:25
**van** 117:22
  179:16 194:16
  235:20 236:3
**variations** 18:13
  18:18
**variety** 5:14
  32:21
**various** 189:18
  217:15
**vary** 205:3,3,17
**vast** 183:8
**verbatim**
  136:25
**verges** 172:23
**veritext** 243:1
**versa** 154:21
**verse** 220:22
  224:11
**version** 35:11
**versus** 60:12
  105:6 139:19
  142:20 149:12

205:5 218:4
  228:10
**vice** 154:20
**view** 38:23 39:1
  40:4 237:24
**views** 39:6,20
  39:22,24 155:1
  193:14 218:5
**vis** 108:13,13
**vitamin** 109:17
  109:18
**vogel** 2:22 172:4
  243:6
**voice** 4:13,15
**volunteer** 54:18
**vries** 73:9,9
  75:14 79:15
  88:15 147:7
  173:21 182:7
  194:16,20,23,23
  196:8
**vs** 1:5 240:2
  243:8

**w**

**w** 235:21
**waal** 117:22
  179:16
**wait** 6:6 42:15
**waive** 237:4,10
**waived** 243:15
**wake** 83:8
  178:24
**wales** 204:18
**wall** 2:10

**want** 4:14 6:3,7
  10:4,24 21:23
  35:5,15 44:23
  46:7,15 52:5
  57:25 62:13
  63:1,2 65:18
  89:19,24 117:15
  152:9,19 153:5
  154:5,15 158:14
  175:6 177:12,12
  178:3,14,18,19
  202:20 207:1,4
  207:7,7,8,14
  217:14 219:4
  222:12 223:21
  229:9 230:4
  231:8,18 232:23
  237:3,4 238:7
  238:10,18
**wanted** 47:23
  48:24 64:21
  92:7 94:4 95:14
  96:17 169:16
  199:1
**wanting** 64:21
**wants** 188:17
  224:9
**warden** 203:23
**warn** 4:14
**warned** 211:3
**wave** 25:12
**way** 6:9 13:20
  17:23 57:6,6
  69:6 75:11,13
  76:5 80:11,16

95:16 110:17
  112:7 131:2
  149:17 151:24
  161:4,15 182:12
  182:14 187:20
  188:7,8,10
  199:10 200:7
  205:15,16 206:8
  206:8 219:14
  226:20 227:10
  227:11 228:9
  231:5
**ways** 11:12
  40:20 197:10
  232:13 233:1
**we've** 22:20
  26:24 28:6 37:7
  69:25 137:20
  144:8 174:11
  177:11,20
**website** 157:18
  158:4
**weida** 1:6 240:2
  243:8
**weigh** 81:2
  203:11 236:19
**weighed** 203:14
  237:22
**weightbearing**
  109:18
**welcome** 52:4
  208:16
**went** 63:23 64:7
  64:8 129:20
  160:3 230:3

**[west - yeah]**                                                Page 304

**west**  2:13
**whatsoever**  7:9
  70:20 77:8
  78:12 88:22
  104:11 111:5
  149:22 150:24
  167:17 177:2
  183:5 195:19
  211:14
**wheelhouse**
  153:12,15
**whichever**
  160:15
**wide**  32:21
**wider**  143:15,22
  152:12
**widespread**
  187:11
**wife**  223:25
**willing**  55:1
**wimbush**
  217:10 218:4
  221:3
**winthrop**  2:5
  4:24
**withdraw**  58:6
  102:24
**witness**  3:3,12
  4:3,6 8:19 16:24
  17:20 20:3,10
  20:24 21:11,22
  23:14 42:20
  45:17 49:4 53:4
  53:7 58:25 60:4
  64:12 71:13

86:17 91:25
94:11 110:22
119:25 120:12
135:6 140:4,9
143:4 149:3
153:25 159:14
162:4,23 175:14
176:11 178:16
184:2 188:3
189:2 190:6
195:12 196:22
200:7 201:20
202:15 204:1
207:12 209:22
210:18 211:20
213:1 215:5
216:13 217:7,20
218:13 219:2
220:11 222:5
223:5 224:25
225:20 226:4,22
227:3,3,8,14
228:15 229:4,12
229:25 230:23
232:11,25
233:17 234:3
235:1 237:11,15
238:4 239:18
241:1,11
**woman**  203:18
203:20 223:20
**women's**  144:19
203:17,19
221:17 222:1

**wonderful**  5:16
**word**  8:24 10:17
  10:21 154:12
  161:10 184:4
  189:19 212:9
  213:20 214:17
  219:6,19 221:10
**wording**  87:18
**words**  43:4 92:3
  95:13 133:13
  183:16,18
  185:23 221:12
**work**  28:23 29:1
  31:15 34:14
  40:17 55:7,13
  57:6 63:4 70:1
  106:20 128:22
  166:25 167:5
  168:17 169:13
  169:16 175:23
  202:6
**worked**  26:21
  179:17
**workers**  25:12
**working**  5:24
**works**  200:7
  207:9
**world**  27:15
  156:9 197:11
  230:14
**worries**  27:25
  90:19 199:3
**worse**  13:3 80:1
**worth**  52:22
  210:20,20

**wpath**  38:16,19
  59:13,15,19
  144:1 167:3,7
  169:8 200:19
  210:10
**write**  24:5 47:3
  170:17 240:3
**writing**  24:3
  192:6
**writings**  47:9
  50:20
**written**  42:24
  50:1,7 161:10
  161:10 204:13
**wrong**  10:11
  52:24 180:12
**wrote**  18:18
  25:10 174:25
  175:10 177:23
  186:19 204:21
  220:25 237:9

|  x  |
| --- |
**x**  3:1

|  y  |
| --- |
**yeah**  18:17
  23:23 49:25
  51:2 65:16 87:2
  120:12 134:11
  144:11,21 145:9
  156:12 171:2,9
  171:9,23,23
  184:5 188:18
  190:24 194:13
  194:14 202:17

225:20 234:3

**year**   39:9 40:2
61:25 62:5
100:11 105:6,7
111:1,20 113:13
171:13,16,17
199:11,12,14

**years**   15:25
27:22,23,25
59:4,5 61:19
82:4,4 95:5
100:4,8 116:14
128:19 142:1
156:16 168:2
173:23 190:22
197:14,15
216:21 235:19

**yelling**   4:14

**yep**   5:12 207:12

**yesterday**   56:2
56:13,16

**york**   2:10

**young**   97:6
100:1 104:16
133:7 204:22

**younger**   101:16
130:12

**youth**   94:16
95:3 225:4

**youths**   95:2

**z**

**z**   16:24 17:8,12
114:22 115:8,15

**zoom**   1:10

**zotero**   71:7,7

**à**

**à**   108:13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.