IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| **AUGUST DEKKER,** *et al.,*<br><br>        Plaintiffs,<br><br>v.<br><br>**JASON WEIDA,** *et al.,*<br><br>        Defendants. | Case No. 4:22-cv-00325-RH-MAF |

## BRIEF OF FORMER CIVIL RIGHTS OFFICIALS
## AS AMICUS CURIAE IN SUPPORT OF
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Daniel D. Mauler
(*pro hac vice* forthcoming)
214 Massachusetts Avenue, NE
Washington, DC 20002
202-617-6975
dan.mauler@heritage.org
D.C. Bar No.:  977757

Andy Bardos
Florida Bar No. 822671
GrayRobinson, P.A.
301 South Bronough Street,
Suite 600
Tallahassee, Florida 32301
850-577-9090
Andy.Bardos@gray-robinson.com

# **TABLE OF CONTENTS**

IDENTITY AND INTEREST OF AMICUS ................................................................ 3

INTRODUCTION ............................................................................................................ 6

SUMMARY OF HARMS .............................................................................................. 8

ARGUMENT ................................................................................................................. 12

I.    A Ruling for Plaintiffs Would Expand the Definition of Discrimination
"On the Basis of Sex" Beyond Statutory Bounds. ............................................ 12

    A.   "Sex" under Section 1557 Means Biological Sex. ............................... 12

    B.   "Sex Discrimination" under Title IX Refers to
Biological Sex ......................................................................................... 14

    C.   *Bostock* did not Amend Title IX or Section 1557, and
*Bostock* does not Support Plaintiffs' Claims. ................................... 17

    D.   A Ruling for Plaintiffs Cannot Avoid the Question
of Whether a Person's Sex is Defined by Biology. ......................... 21

II.   The Plaintiffs Seek to Impose a Medical Standard of Care Absent
Medical Consensus, and Contrary to the Direction of the Medical Field. ......... 24

    A.   There is No Consensus on Gender Transition
Interventions in the Medical Profession. ......................................... 25

    B.   The Federal Government Has Recognized the Lack
of Medical Consensus .......................................................................... 32

    C.   A Ruling for Plaintiff Would Conflict with an
Injunction in *Franciscan Alliance v. Burwell.* .............................. 33

    D.   A Ruling for Plaintiffs would Open up a Pandora's
Box of Ancillary Problems .................................................................. 34

       1.   Harm to Insurance Markets ......................................................... 34

       2.   Harm to Health Care Professionals ............................................ 36

CONCLUSION ............................................................................................................. 37

## IDENTITY AND INTEREST OF AMICUS[1]

*Amici* are former civil rights officials and litigators with several decades of relevant collective experience including specific experience with enforcement of Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) and the drafting and promulgation of the current Section 1557 regulations (45 C.F.R. pt. 92). For the sake of proper application of civil rights law, *Amici* write to rebut Plaintiffs' claims that cross-sex surgeries and hormones are medically necessary for transgender identifying minors and that Section 1557 requires the state of Florida to provide Medicaid subsidization or coverage for such interventions.[2]

*Amicus* Roger Severino is a Harvard Law School graduate who was Legal Counsel for the Becket Fund for Religious Liberty (2003-08), a Trial Attorney for the U.S. Department of Justice Civil Rights Division (2008-15), and Director of the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) (2017-21). As OCR Director, he led a team of approximately 250 staff across eleven locations nationwide and was responsible for the enforcement of Section 1557 and the drafting of its implementing regulations.

---

[1] No party or counsel for any party has authored this brief in whole or in part, nor made any monetary contribution to fund the preparation or submission of this brief.

[2] Plaintiffs' other claims are not addressed in this brief.

*Amicus* Rachel N. Morrison is a graduate from Pepperdine University School of Law and was an Attorney at the Equal Employment Opportunity Commission (2019-21). She is currently a Fellow and the Director of the HHS Accountability Project at the Ethics and Public Policy Center.

*Amicus* Maya Noronha is a graduate of Georgetown University Law Center who worked at the U.S. Department of Health and Human Services from 2017 to 2021 as a Senior Adviser and Regulatory Reform officer at the HHS Office for Civil Rights. *Amicus* was the contact person for the Section 1557 regulation proposed in 2018 and finalized in 2020.

*Amicus* Louis Brown Jr. is a Howard University School of Law graduate who served as legislative counsel in the U.S. House of Representatives from fall 2011 to early 2013 where he was a Member's primary staffer before the Committee on the Judiciary. *Amicus* also served at the HHS Office for Civil Rights from 2017 to 2019 where his roles included serving as Principal Adviser for Civil Rights and Acting Deputy Director of the Civil Rights Division. At HHS OCR he oversaw civil rights enforcement, protecting the dignity and rights of all patients and human service recipients.

*Amicus* Christine Pratt is a graduate from the University of Florida Levin College of Law. From 2019 to 2020, she served as an attorney advisor at the U.S. Department of Education at the Office of the General Counsel. From 2020 to 2021, she was Senior Advisor of the Conscience and Religious Freedom Division at the Office for Civil

Rights at the U.S. Department of Health and Human Services. There, she supervised a staff of ten attorneys who investigated and enforced federal laws that protected conscience and religious freedom rights in health care. She presently serves as counsel at the First Liberty Institute, where she represents individuals and organizations seeking to exercise their religion in schools, the workplace (including under Title VII), and the public square.

*Amicus* Marie Connelly Meszaros is a graduate from Notre Dame Law School who served as Senior Advisor at the HHS Office for Civil Rights from 2018 to 2012.

## **INTRODUCTION**

If Congress wanted to make Medicaid cover sterilizing cross-sex hormones and surgeries in transgender-identifying minors, it could have, but it did not. Lacking clear Congressional authorization, Plaintiffs instead turn to Section 1557 of the Affordable Care Act (ACA) which prohibits "sex" discrimination—through incorporation of Title IX—in certain federally funded health programs and activities, to impose a new standard of care for Medicaid using experimental treatments on minors. Plaintiffs' arguments are not minor errors. Rather, they are so fundamentally inconsistent with health care civil rights law as to turn it on its head.

Plaintiffs contend that "discrimination on the basis of nonconformity with sex stereotypes, transgender status, gender, gender identity, gender transition, and sex characteristics" are all forms of discrimination prohibited by Section 1557. Cmplt. ¶ 268. They also contend that Defendants, "[b]y categorically excluding 'services for the treatment of *gender* dysphoria,' including '*[s]ex* reassignment surgeries' and any 'procedures that alter primary or secondary *sexual* characteristics,' . . . has discriminated against Plaintiffs on the basis of sex in violation of Section 1557." Cmplt. ¶ 272 (emphasis in original). These arguments are premised entirely on the contention that Plaintiffs, as minors, *must* receive experimental surgeries and drugs with permanent physical and psychological ramifications, as a matter of medical necessity. As explained below, Plaintiffs are wrong on all counts.

According to the Complaint, before starting second grade, one biologically male child plaintiff declared "I need to be a girl," to which the child's parents responded by consulting a therapist who claimed their seven-year-old boy "knows exactly who she is and that any problems stemmed from when people question [the child's] identity." Cmplt. ¶ 191. Following the therapist's advice, the parents "followed [the child's] lead" and consented to off-label administration of the drug Lupron to prevent plaintiffs' male child body from developing into a male adolescent body. Cmplt. ¶ 197. After artificially blocking puberty for two-and-a-half years, the child's endocrinologist now believes high-dose feminizing hormones may be appropriate "in a year or two," which would be three- to four-and-a-half years *after* the child's puberty would have begun if left to occur naturally. Cmplt. ¶ 199. The tragedy of this story is that the child's gender dysphoria could have, and likely would have, resolved had Defendants' action to block such experimentation on children occurred a few years sooner. Because there is no objective diagnostic test, not even in theory, that can predict which *particular child* will, despite appropriate psychological treatments and therapy, continue to feel distress over their natural bodies after puberty, medical necessity of such permanent, harmful, and sterilizing interventions for minor children cannot be established as a matter of law.

## SUMMARY OF HARMS

A ruling for Plaintiffs would radically remake American health care by replacing science-based medicine with ideology-driven mandates. To accept Plaintiff's premises contradicts long-standing scientific understandings of human biology and thereby endangers public health. The Plaintiffs' arguments cannot be easily cabined to Medicaid because Section 1557 applies to all federally funded health programs or activities. As such, a decision for Plaintiffs would eventually drive out hospitals and medical providers that cannot in good conscience perform sterilizing surgeries on children because they too receive substantial federal funding, especially to serve poor and rural communities.

Moreover, a ruling for Plaintiffs will predictably result in the infliction of devastating permanent physical and psychological harm to children whose doctors will reasonably feel bound to place them on puberty blockers and cross-sex hormones and to sterilize them through the removal of healthy reproductive organs for fear of being sued for "gender identity discrimination" under Section 1557. The risks of inflicting severe physical and psychological trauma to families by not only encouraging, but mandating, medical "transition" and social conversion of children, ostensibly to the other sex, cannot be understated and includes an elevated risk of suicide.[3] For these

---

[3] *See Protecting Our Children: How Radical Gender Ideology is Taking Over Public Schools & Harming Kids*, HERITAGE FOUNDATION (Mar. 7, 2022),

reasons, the Defendants have ample grounds to prevent the many other grave harms identified in this brief when such harms are not only not mandated by Congress, but go against the very statute the Plaintiffs rely on.

While the Court may rule for Plaintiffs and wish to remain circumspect about issues outside of Medicaid, any holding for Plaintiffs that gives them the remedy they seek under Section 1557 would, by necessity, obliterate sex-based distinctions in health care. If the state cannot rely on biological realities as a way to protect minors from dangerous medical interventions, it cannot cite to those same realities in other areas of health care.

Functionally, a provider (or insurer) would have to treat a patient or a customer according to their self-identified sex in all respects and at all times, which includes the counter-scientific recognition and "affirmance" that men can get pregnant. This would hold without any requirement that a person so identifying has undergone any "transition" treatments or surgeries, dresses or acts in any particular manner, has

---

https://www.heritage.org/gender/event/protecting-our-children-how-radical-gender-ideology-taking-over-public-schools-harming (testimony of mother whose daughter took her own life after and because of medical gender "transition"); *see also* Jay P. Greene, *Puberty Blockers, Cross-Sex Hormones, and Youth Suicide*, HERITAGE FOUNDATION (June 13, 2022), https://www.heritage.org/sites/default/files/2022-06/BG3712_0.pdf, (demonstrating invalidity of leading studies purporting to find that "gender-affirming" interventions prevent suicide *contra* findings using superior research design that show that easing access to puberty blockers and cross-sex hormones by minors without parental consent increases suicide rate.).

procured a legal name or birth certificate change, or even has any diagnosis of gender dysphoria. This is so because, as Plaintiffs argue, it is not a gender dysphoria diagnosis or legal name change that matters here but that Defendants violate Section 1557 because they allegedly "target[] only transgender persons." Pls. Mem. ISO Prelim. Inj. at 4.

A ruling for Plaintiffs would necessarily redefine "sex" discrimination to include discrimination on the basis of gender identity, despite the fact that neither Plaintiffs or transgender identifying persons at large are being denied health care or benefits by Defendants *because of* their self-declared status as "transgender." A ruling for Plaintiffs would impose a new purported standard of care based on subjective self-identification into medicine and impose a requirement for coverage of and participation in gender transition interventions under cover of nondiscrimination.

As recently as 2020, the U.S. Department of Health and Human Services (HHS) Office for Civil Rights (OCR) reviewed all available evidence and found no denials of access based on gender identity remotely sufficient to justify judicial intervention here.[4] HHS recently tried to depart from these findings and issued contradicting "guidance" stating that OCR was investigating and enforcing Section 1557 in a manner similar to what the Plaintiffs seek. Specifically, the guidance document stated that "Categorically

_____

[4] 85 Fed. Reg. 37160, 37198.

refusing to provide treatment to an individual based on their gender identity is prohibited discrimination . . . [and] restricting an individual's ability to receive medically necessary care, including gender-affirming care, from their health care provider solely on the basis of their sex assigned at birth or gender identity likely violates Section 1557."[5] The court should be aware that this guidance was subsequently enjoined.[6]

---

[5] Office for Civil Rights, U.S. Dep't Health & Hum. Servs., HHS Notice and Guidance on Gender Affirming Care, Civil Rights, and Patient Privacy 1 (Mar. 2, 2022), https://www.hhs.gov/sites/default/files/hhs-ocr-notice-and-guidance-gender-affirming-care.pdf.

[6] *Texas v. Equal Emp't Opportunity Comm'n*, No. 2:21-cv-194, at *32 (N.D. Tex. Oct. 1, 2022).

**ARGUMENT**

I.    **A Ruling for Plaintiffs Would Expand the Definition of Discrimination "On the Basis of Sex" Beyond Statutory Bounds.**

Plaintiffs' claim that discrimination on the basis of "nonconformity with sex stereotypes, transgender status, gender, gender identity, gender transition, and sex characteristics" are all forms of discrimination prohibited by Section 1557. Cmplt. ¶ 268. This does not comport with governing statutes. Statutory language, logic, medicine, and history support the view that "sex" means "biological sex" under Title IX, and by extension Section 1557, not "gender identity."

### A. "Sex" under Section 1557 Means Biological Sex.

Section 1557 guarantees that no individual can be denied benefits in a federally run or federally funded health program or activity based "on the ground prohibited under," and the enforcement mechanisms from, four existing federal civil rights laws: Title VI of the Civil Rights Act of 1964 (race, color, national origin), Title IX of the Education Amendments of 1972 (sex), the Age Discrimination Act of 1975 (age), and Section 504 of the Rehabilitation Act of 1973 (disability).[7]

Looking to the ACA's statutory text and original public meaning, it is clear that Section 1557 does not extend to gender identity. If Congress wanted to prohibit such discrimination, it would have used the term as it did elsewhere such as in the federal

---

[7] 42 U.S.C. § 18116.

hate crimes act.[8] The Plaintiffs do not (and cannot) cite to any legislative history in support of their expanded definition of sex discrimination. Indeed, to accept Plaintiffs' expansive redefinition of Section 1557 to include "gender identity" would rewrite the law and create a "major question" that raises serious constitutional problems concerning the separation of powers under *West Virginia v. EPA*.[9]

Notably, despite much discussion of sex discrimination, Plaintiffs never appropriately define "sex." It would be impossible for this court to define what constitutes discrimination "on the basis of sex" to include "sex stereotypes, transgender status, gender, gender identity, gender transition, and sex characteristics" without first defining sex. Cmplt. ¶ 268. Without knowing what "sex" is, one cannot know what sex discrimination is and certainly not transgender or gender identity discrimination (what indeed does it mean to be born in a male body but actually "be" a female?).

Because Section 1557 incorporates Title IX's prohibition against sex discrimination, the Court must look to what sex discrimination means under Title IX.

---

[8] When Congress passed the ACA in March 2010, the term "gender dysphoria" was not in use. The DSM-IV, as in use in 2010, referred to the term as "gender identity disorder."

[9] No. 20-1530 (U.S. Jun. 30, 2022).

### B. "Sex Discrimination" under Title IX Refers to Biological Sex.

Section 1557 incorporates Title IX, which provides, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."[10] As such, analysis of Section 1557's definition of "sex" starts with an analysis of "sex" under Title IX.

Title IX prohibits discrimination based on sex in education programs or activities that receive federal financial assistance.[11] Title IX and its accompanying regulations clearly recognize the fact of biological sexual difference and presuppose "sex" as a binary classification—male or female. This is shown by the following unambiguous references:

- Title IX provisions are not to be construed as prohibiting an educational institution "from maintaining separate living facilities for the different sexes"[12];

- "an institution which admits only students of one sex to being an institution which admits students of both sexes"[13];

---

[10] 20 U.S.C. § 1681(a).

[11] Office for Civil Rights, U.S. Dep't Educ., *Title IX and Sex Discrimination* (last modified Jan. 10, 2020),
https://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html.

[12] 20 U.S.C. § 1686.

[13] 20 U.S.C. § 1681(a)(2).

- references to "men's" and "women's" associations as well as organizations for "boys" and "girls" in the context of organizations "the membership of which has traditionally been limited to persons of one sex"[14];

- references to "boys'" and "girls'" conferences[15];

- "separation of students by sex within physical education classes or activities"[16];

- "classes in elementary and secondary schools that deal primarily with human sexuality may be conducted in separate sessions for boys and girls"[17]; and

- "separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport."[18]

Title IX's specific language, based on an understanding of sex as binary (male or female), permits and accommodates separate facilities for males and females (toileting, locker rooms, *etc.*) and certain kinds of sex-specific activities and athletic competitions *in fulfillment of* its statutory intent to ensure equality between males and females. *See, e.g.,* *Adams v. Sch. Bd. of St Johns Cnty.*, 57 F.4th 791, 815 (11th Cir. 2022) (en banc) ("[W]e read 'sex' in Title IX to mean 'biological sex,' as we must.").

While advancing equality between the sexes, Title IX permits separation "on the basis of sex" specifically to take account of biological differences between males and females. At the time Title IX was passed and implemented, no one—not legislators,

---

[14] 20 U.S.C. § 1681(a)(6)(B).

[15] 20 U.S.C. § 1681(a)(7)(A).

[16] 34 CFR § 106.34

[17] 34 CFR § 106.34.

[18] 34 CFR § 106.41.

psychologists, or the average person—would have understood "sex" to mean "gender identity." Nor would prohibiting discrimination on the basis of sex have been understood to apply to "gender identity": the term was largely unknown in 1972, beyond the esoteric subfields of psychiatry and psychology, and connoted a psychological disconnect from the sexed body.

Efforts by Plaintiffs to shoehorn "gender identity" into Title IX's protections against "sex discrimination" undercut the very purpose of Title IX, which was intended to ensure female equality, opportunity, safety, and privacy. Redefining "sex" to mean "gender identity" completely erases those protections and disadvantages *females* who rely on sex-based (not "gender-identity"-based) protections to ensure their safety, privacy, and educational opportunities (including athletic opportunities). Title IX's sex-based distinctions are grounded in common sense, historical perspective, and biology: they recognize that women's safety is often threatened by the intrusion of males into private spaces where the interest in personal privacy is most heightened (e.g., spaces for toileting, showering, and sleeping) and women's progress and equality are obstructed in specific arenas, such as interscholastic athletics, where biological differences between the sexes come into play. Title IX aims to protect reasonable sex-based distinctions, not obliterate them.

"Gender identity" or "transgender status" is irrelevant when it comes to Title IX's enumeration of specific exceptions to the rule against "sex" discrimination—only

biological sex matters. And the fact remains that males who identify as "transgender girls" or "transwomen" are still biologically male and should be regarded as such for purposes of Title IX and by incorporation, Section 1557.

Consequently, redefining "sex" (a biological reality) to include "gender identity" (a contradictory self-perception) violates the express intent of Title IX, which expressly permits sex-based distinctions in particular circumstances. In practical terms, interpreting discrimination protections "on the basis of sex" to privilege "gender identity" would effectively gut Title IX and Section 1557 of meaningful protections for females, and threatens to erase women's sex-based rights under the law.

### C. *Bostock* did not Amend Title IX or Section 1557, and *Bostock* does not Support Plaintiffs' Claims.

In support of its arguments, Plaintiffs cite the Supreme Court's 2020 *Bostock v. Clayton County* decision, and several federal court decisions that favor its position. Plaintiffs, however, cannot rely on the decision to support "gender identity" as being the protected class potentially at issue when Bostock limited its holding to "transgender status" and did not adopt gender identity as a protected basis. Plaintiffs nevertheless also argue that it is impossible to discriminate against a transgender identifying person in health care without discriminating against that individual based on sex after *Bostock*. Pls. Mem. ISO Prelim. Inj. at 22.

But *Bostock* was not a Title IX nor a Section 1557 case. Rather, in *Bostock* the Supreme Court held that under Title VII of the Civil Rights Act of 1964 "an employer

who fires someone simply for being homosexual or transgender has discharged or otherwise discriminated against that individual 'because of such individual's sex.'"[19] Title VII is the federal law that prohibits sex (and race, color, religion, national origin) discrimination in employment, a completely different context from education and Title IX. Notably, *Bostock*'s Title VII analysis does not apply to Title IX (and thus Section 1557) because, as explained above, Title IX has a different sex-specific structure and, unlike Title VII, specifically uses language based on a biological binary, as detailed above.

The *Bostock* court used the term "transgender status," and did not adopt "gender identity" as a protected class. Thus, Plaintiffs cannot rely on *Bostock* to support the inclusion of the term "gender identity" within the definition of "sex discrimination." The *Bostock* court premised its decision on the assumption that "sex" refers only to the "biological distinctions between male and female."[20] To be consistent with *Bostock*, the Court must assume "sex" refers to "biological distinctions between male and female" *and* that "sex" is incompatible with a gender spectrum, fluidity, or subjective self-definition (as the Plaintiffs seek).

---

[19] 140 S. Ct. at 1737.

[20] *Id.* at 1739.

As a federal district court judge just explained, complainants similar to Plaintiffs here "misread *Bostock* by melding 'status' and 'conduct' into one catchall protected class covering all conduct correlating to 'sexual orientation and gender identity.' Justice Gorsuch expressly did not do that."[21] For example, the court rejected the conclusion that *Bostock* supports the claim that "'denial of … care solely on the basis of [a patient's] sex assigned at birth or gender identity likely violates Section 1557.'"[22]

Further, *Bostock* was a limited holding. The Supreme Court specifically cabined its decision to the hiring and firing context under Title VII, stating it was not addressing other laws or even other Title VII issues, such as sex-specific bathrooms, locker rooms, and dress codes.[23] While the court acknowledged concerns by some that its decision could make sex-segregated bathrooms, locker rooms, and dress codes "unsustainable" and "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination," the court did not address those concerns.[24] The court explained that such questions were for "future cases" and the court would not prejudge any such questions because "none of th[o]se other laws [we]re before [them]."[25] Likewise, this

---

[21] *Texas v. Equal Emp't Opportunity Comm'n*, No. 2:21-cv-194, at *6 (N.D. Tex. Oct. 1, 2022).

[22] *Id.* at *18.

[23] 140 S. Ct. at 1753.

[24] *Id.* at 1753.

[25] *Id.*

Court should not prejudge those questions that the Supreme Court left unanswered, especially as it relates to sex-specific treatments in the health care context. The Supreme Court was clear that *Bostock* did not decide any issue beyond hiring and firing based on "transgender status" under Title VII, and this Court should consider *Bostock*'s limitations.

The Sixth Circuit had it right when it stated, "*Bostock* extends no further than Title VII."[26] As the *en banc* Eleventh Circuit put it in *Adams v. School Board of St. Johns County*,[27] "the school is not the workplace"—and, *Amici* contend, neither is the doctor's office or the surgeon's table. That the Defendants specifically acted to protect children with gender dysphoria from unnecessary, harmful, and life-altering treatments is showing extra government *solicitude* for people who identify as transgender, not animus. Proper state authorities that have defunded electroshock therapy for children with behavioral disabilities, for example, have not thereby discriminated against children with such disabilities, but instead acted in their best interests, even when parents have adamantly wanted such treatment for their children. So too here.

---

[26] *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021).

[27] No. 18-13592 (Dec. 30, 2022) (*en banc*).

### D. A Ruling for Plaintiffs Cannot Avoid the Question of Whether a Person's Sex is Defined by Biology.

Even the decision in *Bostock*, on which the Plaintiffs heavily rely, explicitly assumed that "sex" referred "only to biological distinctions between male and female."[28] It would be difficult if not impossible for a ruling for Plaintiffs to avoid specifying precisely what sex in medicine and science means and how it relates to medical necessity with respect to gender dysphoria treatments. The concept of gender dysphoria is meaningless without sex, just as "gender transition" as a proposed medical solution is rendered meaningless without sex. What would a person be transitioning to and from exactly? If the Plaintiffs cannot answer such a basic question with any semblance of scientific and medical rigor, there is no basis to mandate coverage of such "gender transition" interventions and procedures in any context, and certainly not as a medical necessity. Moreover, not only should Plaintiffs answer the question what sex is in medicine to prevail, they must answer it correctly, logically, and in accordance with science.

Scientifically, and in many ways colloquially, a person's sex is defined as "male or female according to their reproductive organs and functions assigned by the

---

[28] *Bostock*, 140 S. Ct. at 1739 (2020).

chromosomal complement."[29] Sex is imprinted in every cell of the person's body and cannot change.[30] Even HHS's National Institutes of Health (NIH) matter-of-factly states that "every cell has a sex"[31] and, as of this filing, still requires its 80,000 research grant applicants to account for sex as a biological variable in all animal and human studies.[32] This is because NIH knows that a person's immutable sexual biology explains in significant part why men and women respond differently to medication, vary in their experience and manifestation of pain, and have disparate susceptibility to illnesses, from heart disease and cancer to psychological conditions such as depression and anxiety. Sex in medicine and research cannot be replaced by subjective "gender identity." Male and female are not part of an ever-multiplying spectrum nor are they merely placeholders assigned at birth.

In contrast, the case for "transitioning" as the medical solution to gender dysphoria rests on the notion that transgender identity is innate—that a person can simply be born as "a man trapped in a woman's body," or vice versa. Therefore,

---

[29] Institute of Medicine 2001. *Exploring the Biological Contributions to Human Health: Does Sex Matter?*. Washington, DC: The National Academies Press, at p. 1. Available at https://doi.org/10.17226/10028.

[30] *Id.*

[31] National Institutes of Health, Sex as a Biological Variable (March 18, 2021). https://www.youtube.com/watch?v=oshnZrAKkiY&feature=youtu.be.

[32] Consideration of Sex as a Biological Variable in NIH-funded Research, NOT-OD-15-102 (June 9, 2015). https://grants.nih.gov/grants/guide/notice-files/not-od-15-102.html.

adjusting that person's hormone balance and restructuring the anatomy, to align the body with the inner sense of identity, should make things right.

The basics of sex determination are relatively clear. Sex, in terms of male or female, is identified by the organization of the organism for sexually reproductive acts. *Langman's Medical Embryology* concisely explains how the sex of a new organism is determined at fertilization: "An X-carrying sperm produces a female (XX) embryo, and a Y carrying sperm produces a male (XY) embryo. Hence, the chromosomal sex of the embryo is determined at fertilization." A new human organism of a particular sex is created at that moment. Scientists now know that "the *presence* of a Y chromosome determines maleness and its *absence* determines femaleness." This is because the Y chromosome ordinarily carries the SRY ("sex-determining region on Y") gene. The SRY gene contains a transcription factor known as the testis-determining factor (TDF), which directs the formation of the male gonads.

Sex as a status—male or female—is a recognition of the organization of a body designed for dimorphic sexual reproduction. More than simply being *identified* on the basis of such organization, sex is a *coherent concept* only on the basis of that organization. The fundamental conceptual distinction between a male and a female is the organism's organization for sexual reproduction. The conceptual distinction between male and female based on reproductive organization provides the only coherent way to classify the two sexes.

The subjective, psychological, and arbitrary nature of "gender identity" renders it an unstable basis for medical determinations or treatment decisions that, by nature, must consider objective facts about the person's whole body (including sex). Given the fluid, feeling-based premise of "gender identity," it is especially unsuitable for determining whether a person has experienced "sex" discrimination in any aspect of health care.

## II.   The Plaintiffs Seek to Impose a Medical Standard of Care Absent Medical Consensus, and Contrary to the Direction of the Medical Field.

Redefining of sex, as Plaintiffs argue, to include "gender identity" under Section 1557 will wreak havoc in the health care field. Nearly all aspects of medical practice will become subject to scrutiny, and necessary medical protocols will suddenly become suspect, liable to be labeled a "pretext" for unlawful discrimination. Plaintiffs are attempting to force the state of Florida, and by necessary implication, Florida medical providers and institutions, to accept "gender affirming care" as the presumptive and authoritative standard of care covering treatments for children experiencing gender dysphoria. Plaintiffs ground their claims about "gender-affirming care" in publications by the World Association for Transgender Health (WPATH) and the Endocrine Society, in spite of the weak evidentiary basis of those documents (a point addressed in subsequent paragraphs). Plaintiffs' end-run attempt to use a non-discrimination statute to establish the "gender-affirming" protocol as a medically appropriate treatment—or

even the *only* medically appropriate treatment—for many gender dysphoria cases exceeds statutory authority and the plain language of Section 1557, which nowhere mentions standards of care.

### A. There is No Consensus on Gender Transition Interventions in the Medical Profession.

Moreover, there is no consensus within the medical profession regarding an authoritative standard of care for gender dysphoria, especially with respect to minors. This lack of medical consensus is reflected historically, internationally, and in actions by the federal government and various states, and the continuing public controversy surrounding the use of transitioning interventions on minors. Until recently, responding to a child's gender dysphoria with "watchful waiting" or family therapy was not controversial because, in the overwhelming majority of cases, the child's gender incongruence resolved by puberty.[33] In contrast, the use of medical gender transition interventions for minors has been controversial since its inception—and remains so.

Dutch researchers who pioneered the use of puberty suppression as a transitioning treatment for minors acknowledge persistent skepticism towards their work, including from providers concerned that gender dysphoria "can only be diagnosed with certainty in adulthood," and fearful of "disapproval of the peer group,

---

[33] Devita Singh et al., *A Follow-Up Study of Boys with Gender Identity Disorder*, Front. Psychiatry 632784 (2021), https://pubmed.ncbi.nlm.nih.gov/33854450/.

reactions of the correctional medical boards, or litigation."[34] Although a 2014 Dutch study reported positive psychological functioning for fifty-five patients who received medical transitioning treatments as adolescents and surgery as adults,[35] subsequent studies failed to replicate those positive outcomes,[36] and many have criticized the study's methodology.[37] The Endocrine Society's 2017 guidelines rely on the Dutch study but acknowledge the overall "low" and "very low" quality of supporting evidence generally[38] and note new concerns emerging since 2009, including "effects of prolonged delay of puberty in adolescents on bone health, gonadal function, and the brain."[39]

---

[34] Peggy Cohen-Kettenis et al., *The Treatment of Adolescent Transsexuals: Changing* Insight, J. Sexual Med. 1892, 1893 (2008), https://doi.org/10.1111/j.1743-6109.2008.00870.x.

[35] Annelou L.C. de Vries et al., *Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment*, 134 Pediatrics 696, 702 (2014), https://pubmed.ncbi.nlm.nih.gov/25201798/.

[36] Polly Carmichael et al., *Short-Term Outcomes of Pubertal Suppression in a Selected Cohort of 12 to 15 Year Old Young People with Persistent Gender Dysphoria in the UK*, 16 PLoS ONE (2021), https://doi.org/10.1371/journal.pone.0243894 (failing to replicate Dutch study).

[37] Stephen B. Levine et al., *Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults*, J. Sex & Marital Therapy 9 (2022), https://www.tandfonline.com/doi/full/10.1080/0092623X.2022.2046221.

[38] Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 *J. Clinical Endocrinology & Metabolism* 3869, 3880 (2017), https://doi.org/10.1210/jc.2017-01658.

[39] *Id.* at 3874.

In 2019, Boston Children's Hospital opened the first pediatric center for gender surgery, solely dedicated to removing minors' breasts, ovaries, testicles, and genitals as part of medicalized transition.[40] The surgery center reflects gender medicine's bold extension of transitioning treatments to younger and younger adolescents—controversial decisions unsupported by consensus.[41]

Many countries that initially embraced transitioning treatments, including for minors, are now reconsidering. For example, Sweden's National Board of Health and Welfare commissioned an extensive evidence review and concluded in 2022 "that the risks of anti-puberty and sex-confirming hormone treatment for those under 18 currently outweigh the possible benefits."[42] Finland likewise has reversed course.

---

[40] *Center for Gender Surgery: Conditions & Procedures*, Boston Children's Hospital, https://www.childrenshospital.org/programs/center-gender-surgery-program/conditions-and-treatments.

[41] *See* Hembree et al., *supra* note 38, at 3872; Christine & Dan Karasic, *Age Is Just a Number: WPATH-Affiliated Surgeons' Experiences and Attitudes Toward Vaginoplasty in Transgender Females Under 18 Years of Age in the United States*, 14 J. Sex Med. 624, 625 (2017), https://pubmed.ncbi.nlm.nih.gov/28325535/ (urging lowering of recommended age for surgeries); Elizabeth R. Boskey & Judith A. Johnson, *Ethical Issues Considered when Establishing a Pediatric Gender Surgery Center*, 143 Pediatrics 1, 2 (2019), https://pediatrics.aappublications.org/content/143/6/e20183053.figures-only.

[42] Support, Investigation and Hormone Treatment for Gender Incongruence in Children and Adolescents - Partial Update of Knowledge Support (2022), https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-2-7774.pdf; *see also* Lisa Nainggolan,

Following an extensive literature review, the Finish Health Authority issued new guidelines that prioritize psychotherapy as the first-line treatment for gender dysphoric minors.[43]

In the United Kingdom, whistleblower complaints exposed the inadequate psychological care for gender dysphoric minors at the National Health Service's (NHS) gender clinic.[44] A landmark case against the NHS in 2020 by "de-transitioner" Keira Bell found that minors lacked capacity to consent to transitioning treatments that cause sterility and impair sexual function. The NHS initially suspended the use of puberty blockers and instituted new procedures to ensure better psychological care.[45] (The decision was later reversed on procedural grounds.)

---

*Hormonal Tx of Youth with Gender Dysphoria Stops in Sweden*, Medscape (2021), https://www.medscape.com/viewarticle/950964.

[43] Recommendation of the Council for Choices in Health Care in Finland (PALKO / COHERE Finland): Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors (2020), *available at* https://segm.org/sites/default/files/Finnish_Guidelines_2020_Minors_Unofficial% 20Translation.pdf. COHERE Finland works in conjunction with the Ministry of Social Affairs and Health.

[44] Lauren Lewis, *NHS's Only Gender Service for Children Believes All Girls Who Don't Like 'Pink Ribbons and Dollies' Must Be Transgender, Whistleblower Claims*, Daily Mail (Nov. 22, 2021), https://www.dailymail.co.uk/news/article-10231507/NHSs-gender-service-children-believes-girls-dont-like-pink-transgender.html.

[45] Becky McCall, *NHS Makes Child Gender Identity Service Changes After High Court Ruling*, Medscape (Dec. 4, 2020), https://www.medscape.com/viewarticle/941781.

Two separate evidence reviews assessing the impact of puberty suppressing drugs and cross-sex hormones to treat gender dysphoria were published in 2021 by the UK's National Institute for Health and Care Excellence (NICE). The NICE evidence review found little evidence of benefit and substantial risk of harm from "gender affirming" treatment in minors.[46] A 2022 independent review commissioned by NHS England (the "Cass report"), found that "[a]t present the professional community does not have a shared understanding about the meaning of gender dysphoria in young people," its cause, or best treatment approaches.[47] The report notes that "[m]uch of the research base is observational," with little "longer term follow up data," resulting in a "weak evidence base."[48] The lack of evidence and the "unsafe" care delivered to gender dysphoric adolescents resulted in a decision by the UK National Health Service to close the Tavistock gender clinic (GIDS) by spring 2023. The UK medical authorities intend to disperse care to local and regional authorities, reducing waiting lists and ensuring the

---

[46] Nat'l Inst. for Health & Care Excellence, Evidence Review: Gonadotrophin Releasing Hormone Analogues for Children and Adolescents with Gender Dysphoria (2021); Nat'l Inst. for Health & Care Excellence, Evidence Review: Gender-Affirming Hormones for Children and Adolescents with Gender Dysphoria (2021) [hereinafter "NICE Evidence Review" collectively].

[47] Hilary Cass, *Review of Gender Identity Services for Children and Young People*, BMJ 376 (2022), https://www.bmj.com/content/376/bmj.o629.

[48] *Id.*

adolescents receive comprehensive mental health care, while the Cass evidence review continues.[49]

Psychotherapists in Australia and New Zealand recently issued a new policy statement emphasizing mental health treatment for gender dysphoric minors, rather than "gender affirmation." They stressed the importance of assessing the "psychological state and context in which gender dysphoria has arisen," before any treatment decisions are made.[50] In February 2022, France's National Academy of Medicine warned medical professionals that the increase in young people seeking transitioning treatments may be due to social contagion and urged "great medical caution."[51]

---

[49] Hurd, D., 'Not Safe': Britain's Tavistock Sex-change Clinic Closed After Damning Report, CBN News, July 29, 2022, https://www1.cbn.com/cbnnews/world/2022/july/not-safe-britains-tavistock-sex-change-clinic-for-children-closed-after-damning-report.

[50] Position Statement, The Royal Australian and New Zealand College of Psychiatrists, *Recognising and Addressing the Mental Health Needs of People Experiencing Gender Dysphoria/Gender Incongruence* (Aug. 2021), https://www.ranzcp.org/news-policy/policy-and-advocacy/position-statements/gender-dysphoria.

[51] Press Release, French National Academy of Medicine, Medicine and Gender Transidentity in Children and Adolescents (Feb. 25, 2022), https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/?lang=en.

In short, within the international medical community, "gender-affirming care," for minors in particular, is not backed by a supportive consensus, and support for it has been crumbling.

This lack of consensus is also reflected among U.S. medical professionals. In the months leading up to its 2022 national conference, the American Academy of Pediatrics (AAP) was accused by some of its own members of "censoring" concerns over the use of gender-affirming medical and surgical interventions for minors, amid a rising outcry from clinicians and parents.[52] Parent-organized protests at gender clinics across the U.S., including at Boston Children's Hospital's flagship program, underscore the rising numbers of Americans who believe minors should never undergo irreversible medical or surgical "gender-affirming" treatments.[53]

---

[52] Abigail Anthony, *American Academy of Pediatrics Accused of Censoring Concerns about 'Gender-Affirming' Care,* National Review, July 29, 2022. https://www.nationalreview.com/2022/07/american-academy-of-pediatrics-accused-of-censoring-concerns-about-gender-affirmative-care/.

[53] Mary Harrington, *Boston Children's Hospital's transgender insanity reveals how unhinged elites make money off our kids*, NY Post, August 24, 2022, https://nypost.com/2022/08/24/boston-childrens-hospitals-transgender-insanity-elites-profit-from-kids/.

## B. The Federal Government Has Recognized the Lack of Medical Consensus.

Despite the efforts under the current administration to push gender transition interventions for minors, the federal government has never formally determined that such medical treatments are the appropriate standard of care.

As recently as June 2020, HHS regulations acknowledged that "there is no medical consensus to support one or another form of treatment for gender dysphoria."[54] The Department explained that prior HHS regulations regarding gender-transition surgeries "relied excessively on the conclusions of an advocacy group (WPATH) rather than on independent scientific fact-finding," such as the CMS factfinding for its most recent National Coverage Determination.[55] After its factfinding, CMS declined to issue a National Coverage Determination on gender-transition surgeries for Medicare beneficiaries with gender dysphoria "because the clinical evidence is inconclusive."[56] "Based on an extensive assessment of the clinical evidence," CMS determined that "there is not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries

---

[54] 85 Fed. Reg. 37160, 37198.

[55] *Id.*

[56] CMS Decision Memo for Gender Dysphoria and Gender Reassignment Surgery, CAG–00446N (Aug. 30, 2016) [hereinafter "CMS Decision Memo"], https://www.cms.gov/medicare-coverage-database/view/ncacal-decision-memo.aspx?proposed=N&NCAId=282.

[which include non-seniors] with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively."[57]

Similarly, a 2018 U.S. Department of Defense report on gender dysphoria found that there is "considerable scientific uncertainty and overall lack of high quality scientific evidence demonstrating the extent to which transition-related treatments, such as cross-sex hormone therapy and sex reassignment surgery—interventions which are unique in psychiatry and medicine—remedy the multifaceted mental health problems associated with gender dysphoria."[58] Indeed, none of the drugs used to block puberty and induce cross-sex masculine or feminine features are approved as safe or effective for such uses by the U.S. Food and Drug Administration, and the NIH only began investigating the long-tern outcomes of transitioning treatments for youth in 2015.[59]

### C. A Ruling for Plaintiff Would Conflict with an Injunction in *Franciscan Alliance v. Burwell*.

In 2016, a federal district court in *Franciscan Alliance v. Burwell* entered a nationwide preliminary injunction against enforcement of the Section 1557 regulations in so far as they were purporting to prohibit discrimination based on "gender identity."[60]

---

[57] *Id.*

[58] Dep't of Defense, Report and Recommendations on Military Service by Transgender Persons 5 (Feb. 22, 2018).

[59] *See* Juliana Bunim, First U.S. Study of Transgender Youth Funded by NIH, U.C. San Francisco (Aug. 17, 2015), https://perma.cc/URA6-CERX.

[60] 227 F. Supp. 3d 660, 695 (N.D. Tex. 2016).

The court held that it would violate the Administrative Procedure Act to expand the scope of sex discrimination under Title IX to encompass gender identity.[61] Section 1557, of course, granted HHS explicit authority to prohibit "sex" discrimination in certain HHS funded programs. Yet an existing nationwide injunction *to this day* prevents HHS from reinterpreting sex discrimination to cover gender identity in the health care context. A ruling for Plaintiffs would necessarily contradict this holding.

### D. A Ruling for Plaintiffs would Open up a Pandora's Box of Ancillary Problems.

A victory for Plaintiffs would extend beyond Medicaid coverage of cross-sex hormones and surgeries for minors. *Amici* urge the Court to consider the following issues and questions.

### 1. Harm to Insurance Markets

Accepting Plaintiffs' argument that gender identity discrimination supposedly exists for the mere lack of surgery sought by transgender identifying people would open the door to a host of follow-on health insurance litigation. For example, not providing insurance coverage for medical interventions for gender transition purposes could be discrimination based on gender identity simply because those same interventions are covered for other reasons. If a biological male who identifies as a woman can receive insurance coverage for breast augmentation to alleviate psychological distress, then why

---

[61] *Id.* at 689.

can't a biological female who identifies as a woman receive insurance coverage for breast augmentation to alleviate psychological distress? The only discriminatory factor would seem to be the gender identity of the biological woman. Thus, every person, male or female, would be entitled to *every* surgical intervention offered to transgender identifying people to alleviate distress if a therapist or psychologist deems it medically necessary to provide similar relief of psychological distress for a non-binary identifying person. This logic would apply to every covered cross-sex surgical intervention currently offered for those who identify as transgender, including:

- Blepharoplasty (eye and lid modification)
- Face/forehead and/or neck tightening
- Facial bone remodeling for facial feminization
- Genioplasty (chin width reduction)
- Rhytidectomy (cheek, chin, and neck)
- Cheek, chin, and nose implants
- Lip lift/augmentation
- Mandibular angle augmentation/creation/reduction (jaw)
- Orbital recontouring
- Rhinoplasty (nose reshaping)
- Laser or electrolysis hair removal; and
- Breast/chest augmentation, reduction, construction.[62]

---

[62] COLORADO BENEFITS FOR HEALTH CARE COVERAGE, https://www.cms.gov/CCIIO/Resources/DataResources/ehb (listing of Colorado's "Essential Health Benefits" for covered "gender affirming care").

## 2. Harm to Health Care Professionals

It is clear that once a foothold is established in insurance markets, beginning with Medicaid, the next step is to require doctors to perform cross-sex "transition" surgeries and to prescribe puberty blockers and cross-sex hormones, including for minor children, against their medical judgement. If a doctor is technically competent at performing a hysterectomy (say, to cure cancer), he or she will be *required*—under Plaintiffs' view of Section 1557—to perform one on a minor based on a psychologist's determination of medical necessity. Similarly, doctors that receive federal funds will face Section 1557 lawsuits if they fail to address patients by their preferred pronouns regardless of their patient's biology and regardless of the religious beliefs or moral convictions of the doctors. This will lead to a significant number of Florida doctors choosing not to enter the health care profession, or specific specialties, because of these new burdens. It will also impact a significant number of faith-based hospitals and providers who will be driven out of the field of medicine under a barrage of Section 1557 lawsuits. A ruling for Plaintiffs will lead to significant harms to health care professionals, the medical profession, and access to health care.

## CONCLUSION

For all the above reasons, *Amici* urge the Court to rule for Defendants, the rule of law, and for the thousands of children who will be spared a lifetime of unnecessary and irreversible harm if the Court allows Defendants' actions to stand.

Respectfully Submitted,
Roger Severino
Rachel N. Morrison
Maya Noronha
Louis Brown Jr.
Christine Pratt
Marie Connelly Meszaros
*By Counsel*

/s/ Daniel D. Mauler
Daniel D. Mauler
(*pro hac vice* forthcoming)
214 Massachusetts Avenue, NE
Washington, DC 20002
202-617-6975
dan.mauler@heritage.org
D.C. Bar No.:  977757

/s/ Andy Bardos
Andy Bardos
Florida Bar No. 822671
GrayRobinson, P.A.
301 South Bronough Street,
Suite 600
Tallahassee, Florida 32301
850-577-9090
Andy.Bardos@gray-robinson.com

*Counsel for Amici*