IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER*, et al.,*

                    *Plaintiffs*,

         v.

JASON WEIDA, *et al.*,

                     *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

## PLAINTIFFS' MOTION TO EXCLUDE
## EXPERT TESTIMONY OF MICHAEL LAIDLAW

Pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403, and 702, Plaintiffs respectfully move this court to exclude the expert testimony of Defendants' proposed expert, Dr. Michael Laidlaw. As explained more fully below, Dr. Laidlaw is not a qualified expert and his opinions and testimony are neither reliable nor helpful to the trier of fact pursuant to the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. His opinions and testimony are likewise inadmissible pursuant to Fed. R. Evid. 403. As grounds, Plaintiffs state:

1.     Defendants propose Dr. Laidlaw, an adult endocrinologist, as their expert and submitted a report with their Rule 26 Disclosures. (Exhibit 1, Laidlaw Expert Report.)

2.     According to Dr. Laidlaw's expert report, he was retained in this case to provide "expert opinion on the efficacy and safety of sex reassignment treatment." (Ex. 1, ¶ 5).

3.     Yet Dr. Laidlaw's expert reports also contain opinions about the causes, diagnosis, and treatment of gender dysphoria, including the use of puberty-delaying medication, hormone treatment, and surgery, the propriety of the physician-recommended treatment received by the Plaintiffs, as well as their physical and mental health. (Ex. 1, Exhibit 2, Laidlaw Rebuttal Report, Exhibit 3, Laidlaw Declaration in support of Defendants' Opposition to Preliminary Injunction).

4.     Dr. Laidlaw also submitted a declaration in support of Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction. (Ex. 3).

5.     Defendants have not met their burden of establishing that Dr. Laidlaw is qualified to proffer an opinion on the assessment of gender dysphoria generally, or regarding his alleged concerns related to the assessment of Plaintiffs in particular, nor have they established that Dr. Laidlaw is qualified to testify about the appropriateness of surgery to treat gender dysphoria generally, or the

appropriateness of any surgeries received by Plaintiffs in the past or any surgical procedures they might undergo in the future. Dr. Laidlaw is not a mental health professional or a surgeon, has never provided treatment for gender dysphoria, he has never conducted any original research on the issue nor published any peer-reviewed literature on these matters, has never diagnosed a patient with gender dysphoria, and has only treated one patient with gender dysphoria nearly two decades ago.

6.     Defendants similarly have not met their burden of showing that Dr. Laidlaw's opinions are reliable. The opinions offered in his reports and testimony on the effectiveness of gender-affirming care, the harms it may pose, "desistence," informed consent, and WPATH fall outside of his qualifications, are based on speculation and ipse dixit, and lack any reliable scientific methodology.

7.     Nor have Defendants met their burden of showing that Dr. Laidlaw's opinions are relevant. Dr. Laidlaw offers opinions and testimony regarding the number of people diagnosed with gender dysphoria, human sexual development, the difference between gender identity and biological sex (including whether biological sex can be changed), social transition, and the policies of other counties. None of this testimony has a connection to the existing data or issues in this case and are therefore not helpful to the trier of fact.

8.     The probative value of Dr. Laidlaw's testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence.

**WHEREFORE**, Plaintiffs Request that the Court enter an Order excluding Dr. Laidlaw's opinions in this case, except as they relate to the risks associated with puberty suppressing medication and hormone therapy, including those contained in his expert declaration (Ex. 1), and rebuttal declaration (Ex. 2), and prohibit Defendants from relying on testimony for any purpose other than describing the risks associated with puberty suppressing medication and hormone therapy for any purpose during trial.

## MEMORANDUM OF LAW

The vast majority of Dr. Laidlaw's opinions and testimony lack any indicia of admissibility required under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and the Federal Rules of Evidence. This testimony should be excluded because Dr. Laidlaw is not qualified to serve as an expert witness on matters beyond the scope of his expertise as an adult endocrinologist, and his opinions and testimony are not reliable, helpful to the trier of fact, or probative of the issues in this case.

## I.    LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *Daubert* requires district courts, pursuant to Rule 702, to perform a critical "gatekeeping" function concerning the admissibility of expert scientific evidence, ensuring that the testimony or evidence is both relevant and reliable. *Daubert*, 509 U.S. at 597; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The importance of Daubert's gatekeeping requirement cannot be overstated.").

In determining the admissibility of expert testimony under Rule 702, courts engage in a "rigorous" three-part inquiry and must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, at 1260; *see also City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998), *cert. denied*, 528 U.S. 812 (1999). The Eleventh Circuit refers to these three considerations separately as "qualification," "reliability," and "helpfulness" and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The party offering the expert testimony has the "burden of establishing qualification, reliability, and helpfulness." *Frazier*, 387 F.3d at 1260.

To be sure, "[i]mplementing Rule 702, *Daubert* requires district courts to ensure that any and all scientific testimony or evidence admitted is both relevant and reliable." *Claire v. Fla. Dep't of Mgmt. Servs.*, 2021 WL 5982330, at *1 (N.D. Fla. Oct. 20, 2021). "[T]he trial judge must determine [this] ***at the outset***." *Daubert*, 509 U.S. at 592. (emphasis added). "Rule 702 applies whether the trier of fact is a judge or a jury." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020); *see also Kadel v. Folwell*, 2022 WL 3226731, at **5-17 (M.D.N.C. Aug. 10, 2022) (granting motions to exclude in the context of summary judgment).

Finally, because of the potentially misleading effect of expert evidence, *see Daubert*, 509 U.S. at 595, on occasion expert opinions that otherwise meet admissibility requirements may still be excluded under Fed. R. Evid. 403.

Here, Defendants have failed to demonstrate that the majority of Dr. Laidlaw's proffered testimony is relevant and meets the requirements of Rule 702 as interpreted by *Daubert*, or the requirements of Rule 403. It should be excluded.

## II.   DR. LAIDLAW'S OPINIONS THAT GO BEYOND HIS QUALIFICATIONS AS AN ADULT ENDOCRINOLOGIST SHOULD BE EXCLUDED.

It is axiomatic that "[a] witness may be qualified as an expert by virtue of his 'knowledge, skill, experience, training, or education." *Quiet Technology DC-8, Inc.*, 326 F.3d at 1342; Fed. R. Evid. 702.  However, credentials are not dispositive when determining qualification, particularly where an expert offers testimony in areas outside of their knowledge, skill, experience, training, or education. "Expertise in one field does not qualify a witness to testify about others." *Lebron v. Secretary of Florida Dept. of Children and Families*, 772 F.3d 1352, 1368 (11th Cir. 2014) (holding that a psychiatrist was properly prevented from opining on rates of drug use in an economically vulnerable population because he had never conducted research on the subject, and instead relied on studies to form his opinion). If a potential expert witness does not "propose to testify about matters

growing naturally and directly out of research he had conducted independent of the litigation," that testimony should be disqualified. *Lebron*, 772 F.3d at 1369 (quoting Fed. R. Evid. 702 (cleaned up)).

Dr. Laidlaw offers numerous opinions related to areas of medicine far afield from his experience and training as an endocrinologist. He is unqualified to offer these opinions, since "no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F.Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994). Here, Dr. Laidlaw, an adult endocrinologist,[1] is not qualified to render most of the opinions he proffers. Dr. Laidlaw: (1) has never conducted any original, peer-reviewed research about gender identity, transgender people, or gender dysphoria, Exhibit 4, PI Hearing Transcript, at 10:15- 11:13; Exhibit 5, Deposition of Dr. Laidlaw in *C.P. v. Blue Cross*, at 29:23-30:6; (2) has not published any scientific, peer-reviewed literature on gender dysphoria or transgender people, Ex. 5 at 42:10-42:22;[2] (3) has never diagnosed a patient with gender dysphoria, Ex. 4 at 11:19-

---

[1] Dr. Laidlaw testified that fewer than 5% of his patients are under 18. Ex. 4 at 8:14-16.

[2] Dr. Laidlaw's only publications relating to gender dysphoria in a peer-reviewed journal are letters to the editor not based on any original research or scientific

11:21; Ex. 5 at 45:21-46:3; (4) has only treated one patient with gender dysphoria (nearly two decades ago, prior to the existence of the DSM-5's gender dysphoria diagnosis), Ex. 4 at 11:22-12:16; Ex. 5 at 43:11-43:17; (5) is not a psychiatrist, a psychologist, nor mental health care provider of any kind, Ex. 4 at 7:20-8:2; Ex 5 at 184:8-11; and (6) is not a surgeon and has never provided gender-affirming surgery, Ex. 4 at 8:9-10, 87:8-14; Ex. 5 at 184:12-13.

**One.** Dr. Laidlaw is not a mental health care provider, and is therefore unqualified to opine on the "[a]ssessment of the patient with gender dysphoria." (Ex. 1 ¶¶ 228-29; Ex 2 ¶¶ 15-16), or the appropriate treatment for people with suicidal ideation (Ex. 1 ¶¶ 176-78; Ex. 2 ¶¶ 78-85). For the same reasons, he is unqualified to testify as to the Plaintiffs' mental health. (Ex. 1 ¶¶ 141, 231-33, 238-42, 249-50, 253-55, 267-70, 272, 274-75, 279-84, 291-93, 294-99, 305).

The district court's decision in *Kadel v. Folwell* is most illustrative here. Like Dr. Laidlaw, Dr. Hruz, the endocrinologist at issue in *Kadel,* "offer[ed] a wide range of conclusions that fall into five main categories: mental healthcare, medical and surgical care, informed consent, criticism of medical associations, and political criticisms." *Kadel,* 2022 WL 3226731, at *8. The *Kadel* court excluded

---

study, and which he cannot confirm are subjected to peer-review. Ex. 4 at 9:21-11:18; Ex. 5 at 31:14-39:23.

most of his proffered testimony and limited the testimony "to a discussion of the

risks associated with prescribing hormone treatments to adolescents and adults,"

the only possible area of expertise for Dr. Hruz, as well as his colleague, Dr.

Laidlaw. *Id.*, at *10.

      *Kadel* found that, given his lack of experience in those areas, Dr. Hruz was

"not qualified to offer expert opinions on the diagnosis of gender dysphoria, the

DSM, gender dysphoria's potential causes, the likelihood that a patient will

'desist,' or the efficacy of mental health treatments." *Id*., at *9. The *Kadel* Court

emphasized that Dr. Hruz was "not a psychiatrist, psychologist, or mental

healthcare professional," and "ha[d] never diagnosed a patient with gender

dysphoria, treated gender dysphoria, treated a transgender patient, conducted any

original research about gender dysphoria diagnosis or its causes, or published any

scientific, peer-reviewed literature on gender dysphoria." *Id*.

      **Two.** Like Dr. Hruz, Dr. Laidlaw "is not a surgeon and has no experience

with surgery for gender dysphoria and, therefore, is not qualified to testify to the

risks associated with surgery or the standard of care used by surgeons for obtaining

informed consent for surgery." *Kadel*, 2022 *WL 3226731*, at *9; *see* Ex. 4 at 8:9-

10, 87:8-87:9; Ex. 5 at 47:16- 47:17.[3] Dr. Laidlaw bases his opinions solely on his review of literature (Ex. 4 at 15:24-16:2). Simply reading about these issues does not qualify Dr. Laidlaw as an expert, however. *See* Ex. 4 at 18:20-18:25; Fed. R. Ev. 702. "Merely reading literature in a scientific field does not qualify a witness— even an educated witness—as an expert." *Kadel*, 2022 WL 3226731, at *9; *see also Lebron*, 772 F.3d at 1369; *Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

\*   \*   \*

In sum, Dr. Laidlaw is not qualified to serve as an expert on the diagnosis of or mental health or surgical treatment paradigms for gender dysphoria. He is "not qualified by background, training, or expertise to opine" about these issues. *Lebron*, 772 F.3d at 1369. At most, Dr. Laidlaw can testify as "to the risks associated with puberty blocking medication and hormone therapy," but much of

---

[3] Notwithstanding that he is not a surgeon of any kind and has no clinical or research experience with surgeries used to treat gender dysphoria, Dr. Laidlaw opines broadly about surgery (Ex. 1. ¶¶ 160-75; Ex. 2 ¶¶ 60-68, Ex. 3 at 23-25), as well as more specifically about two Plaintiffs' chest surgeries (Ex. 1 ¶¶ 257-59, 270, 295-300), and the potential for one Plaintiff to successfully undergo surgery in the future (Ex. 1 ¶ 290). Not only is Dr. Laidlaw unqualified to offer these opinions, but such testimony is wholly unreliable given Dr. Laidlaw's lack of expertise, skill, and experience with surgery.

11

his testimony on these subjects is not reliable, as described below. *See Kade*l, 2022 WL 3226731, at *10.

### III.   THE MAJORITY OF DR. LAIDLAW'S EXPERT OPINION IS WHOLLY UNRELIABLE.

An expert's testimony should only be admitted if it is sufficiently reliable. "To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *In re 3M Combat Arms Earplug Products Liab. Litig.*, 3:19MD2885, 2022 WL 1262203, at *1 (N.D. Fla. Apr. 28, 2022). The requirement of reliability found in Rule 702 is "the centerpiece of any determination of admissibility." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002). "At this stage, the court must undertake an independent analysis of each step in the logic leading to the expert's conclusions; if the analysis is deemed unreliable at any step the expert's entire opinion must be excluded." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010).

In making this determination the court can consider a variety of factors, including whether the purported expert's theory has been subjected to peer review and publication, and whether the theory has been generally accepted in the scientific community. *See Daubert*, 509 U.S. at 593-94; *Rink v. Cheminova, Inc.*, 400 F.3d

1286, 1291-92 (11th Cir. 2005).[4]  To be reliable, the expert's testimony must always be based on "good grounds," *Daubert,* 509 U.S. at 590, and must represent more than scientifically unsupported "leaps of faith." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002). As such, courts must assess "whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014). "In evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293, n.7.

Here, Dr. Laidlaw offers several opinions that fail to meet any indicia of reliability. His proffered opinions are not consistent with generally accepted scientific consensus, but are based entirely on rank speculation, unfounded assumptions, and bias. These opinions should be excluded.

---

[4] Other factors which may be relevant include (1) the nature of the field of claimed expertise, (2) the source of the expert's knowledge, (3) the expert's level of care in using the knowledge, and (4) the expert's consideration of alternative hypotheses. *Hendrix*, 255 F.R.D. at 578-79.

**A. Dr. Laidlaw's opinions about the effectiveness of gender-affirming medical care are not generally accepted and are unreliable.**

General acceptance in the relevant scientific community is an important element to the reliability inquiry. *See Allison*, 184 F.3d at 1313. Not only is widespread acceptance an important factor in assessing the reliability of an expert's opinions, but the fact that a known theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594. Here, Dr. Laidlaw's opinions about the effectiveness and propriety of gender-affirming medical care are far outside the mainstream of medical and scientific opinion and have been explicitly rejected by every relevant scientific and medical community. Nor do his opinions stem from any accepted scientific methodology, rather, they are frequently contradicted by existing scientific literature.

Dr. Laidlaw falsely testifies that the "'professional consensus' [supporting gender-affirming medical care] exists only within the confines of" WPATH (Ex. 1 ¶ 185; *see also* Ex. 2 ¶ 28, Ex. 3 at 27, 29-30). Dr. Laidlaw offers no evidence to support this contention, and instead attempts to legitimize his opinions by nitpicking at and mischaracterizing a few of the studies that fall within the broad consensus of clinicians, scientists, and researchers in finding that the three services at issue in this case are effective in treating gender dysphoria. Specifically:

14

- Dr. Laidlaw cites Dhejne (2011) for the proposition that the study showed that gender-affirming care was not effective (Ex. 1 ¶ 202 & Ex. 3 at 31). This characterization flatly contradicts the study's own conclusion that "surgery and hormonal therapy alleviates gender dysphoria" (Exhibit 6, Dhejne et al. (2011), at e16885).

- Dr. Laidlaw emphasizes the fact that Branstrom & Pachankis (2020) issued corrections after Dr. Laidlaw and others wrote letters to the editor of the journal in which it was published (Ex. 1 ¶¶ 203-09 & Ex. 3 at 31-33). Dr. Laidlaw suggests that the article was completely retracted or repudiated, which is not true. Rather, a corrected version was published which changed the conclusion from "the longitudinal association between gender-affirming surgery and lower use of mental health treatment lends support to the decision to provide gender-affirming surgeries to transgender individuals who seek them" to "the longitudinal association between gender-affirming surgery and reduced likelihood of mental health treatment lends support to the decision to provide gender-affirming surgeries to transgender individuals who seek them." (Exhibit 7, Bränström & Pachankis (2020), at 734, 727).

- Dr. Laidlaw also maligns studies based on the 2015 US Transgender Survey because it was not a randomized control study but used convenience sampling (Ex. 1 ¶¶ 210-11; Ex. 2 at ¶ 71; Ex. 3 at 33). While there are inherent limitations to convenience sampling, it is an important methodology to capture information about large cohorts. Importantly, Dr. Laidlaw does not point to any studies that contradict the findings of the 2015 USTS. And in fact, many of its findings were recently confirmed by a Kaiser Family Foundation / Washington Post survey that used a random sampling methodology, conducted in 2022 (Exhibit 8, Parks et al. (2023), at 8).

- Dr. Laidlaw similarly denigrates various studies on mastectomy for minors (Ex. 1 ¶¶ 212-19 & Ex. 3 at 33-35). He makes various complaints about the methodology used by these studies, but again, does not show that these methodological flaws render the studies completely unreliable, and he fails to point to any studies that reach contrary conclusions. No study is perfect, but the collection of imperfect studies finding similar results creates scientific consensus. Dr. Laidlaw's opinions fall outside of that consensus.

- Dr. Laidlaw also spends considerable time discussing a 2016 Center for Medicare & Medicaid Services (CMS) review of gender-affirming surgery coverage in Medicare (Ex. 1 ¶¶ 220-21, Ex. 2 at 35-36). But again, Dr. Laidlaw overstates his case. The decision memo decided not to "make a national coverage determination on surgical remedies" for gender dysphoria, and instead allow local Medicare decision-makers to "make the determination of whether or not to cover gender reassignment surgery based on whether gender reassignment surgery is reasonable and necessary for the individual beneficiary after considering the individual's specific circumstances" (Exhibit 9, 2016 CMS Decision Memo, at 2). In other words, the CMS Memo **_mandated_** Medicare to cover gender-affirming surgery when clinically appropriate, but allowed local decision-makers discretion to establish medically necessity criteria for surgery, rather than establishing one uniform set of national criteria, *see id.* Dr. Laidlaw completely ignores the prior, 2014 decision, of an Administrative Appeals Board in the U.S. Department of Health & Human Services (which CMS falls within) to remove a ban on coverage of gender-affirming surgery in Medicare, finding "a consensus among researchers and mainstream medical organizations that [gender-

17

affirming] surgery is an effective, safe and medically necessary treatment

for" gender dysphoria (Exhibit 10, 2014 Department Appeals Board

Decision, at 20). That 2014 decision explicitly found that gender-

affirming surgery was safe, effective, and not experimental (*id.* at 11, 15,

21).

Indeed, Dr. Laidlaw acknowledges that his "opposition to gender-affirming

care for the treatment of gender dysphoria in youth and adults is contrary to the

vast majority of medical associations' recommendations" (Ex. 4 at 25:22-26:1).

This includes the following: American Medical Association, American

Psychological Association, American Psychiatric Association, Endocrine Society,

Pediatric Endocrine Society, American Academy of Pediatrics, American

Academy of Family Physicians, American College of Obstetricians and

Gynecologists, American College of Physicians, (Ex. 4 at 29:16- 36:18). *See e.g.,*

*Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps*., 12 F.4th 422,

427–28 (4th Cir. 2021), *as amended* (Dec. 2, 2021) (noting the WPATH Standards

of Care "have been adopted by health organizations across the country" and that

gender-affirming treatments, including hormone therapy and surgical care, "are

safe, effective, and often medically necessary"), *cert. denied*, 142 S. Ct. 861

(2022); *Edmo v. Corizon, Inc*., 935 F.3d 757, 771 (9th Cir. 2019) (the provision of

gender-affirming medical care, consistent with the WPATH Standards of Care, represents "the ***broad medical consensus*** in the area of transgender health care," which "requires providers to individually diagnose, assess, and treat individuals' gender dysphoria.") (emphasis added); *see also Brandt v. Rutledge*, 551 F.Supp.3d 882, 890 (E.D. Ark. 2021) ("The ***consensus*** recommendation of medical organizations is that the only effective treatment for individuals at risk of or suffering from gender dysphoria is to provide gender-affirming care.") (emphasis added), *aff'd*, 47 F.4th at 671; *Flack v. Wisconsin Dep't of Health Servs*., 395 F.Supp.3d 1001, 1018 (W.D. Wis. 2019); Exhibit 16, Nat'l Academies of Science, Engineering, and Medicine (2020), at 361 ("A major success of [WPATH's] guidelines has been identifying evidence and ***establishing expert consensus that gender-affirming care is medically necessary*** and, further, that withholding this care is not a neutral option. A number of professional medical organizations have joined WPATH in recognizing that gender-affirming care is medically necessary for transgender people because it reduces distress and promotes well-being, while withholding care increases distress and decreases well-being.") (emphasis added) (citations omitted).

Dr. Laidlaw's opinions regarding the effectiveness of gender-affirming medical care are wholly outside the mainstream, and he can cite to no authoritative

sources in support of his opinion. While undoubtedly Dr. Laidlaw "has strong beliefs," the fact that his opinions are "not generally accepted by the scientific community, and [are] unsupported by other studies" means that "his testimony is based more on personal opinion than on scientific knowledge," making it unreliable. *Allison*, 184 F.3d at 1319. These opinions should be excluded.

**B. Several of Dr. Laidlaw's opinions about the supposed harms caused by gender-affirming treatment to Plaintiffs deliberately misrepresent the facts and evidence, and are therefore unreliable**

Dr. Laidlaw offers several opinions about the potential for infertility and bone density loss resulting from the use of puberty-delaying medication in general, and as to the Plaintiffs in this litigation specifically (Ex. 1 ¶¶ 92-97, 100-09; Ex. 2 ¶¶ 35-43, 52-54). These opinions are entirely unreliable. In the first place, as discussed above, since he does not practice pediatric endocrinology, and has only ever treated one adult for gender dysphoria, Dr. Laidlaw's opinions with respect to the harms posed by puberty-delaying treatment for youth should be regarded with skepticism, (Ex. 4 at 8:14-16, 11:22-12:16 & Ex. 5 at 43:11-43:17 (fewer than 5% of Dr. Laidlaw's patients are under 18, and he has only treated one patient for gender dysphoria, more than a decade ago)).

In any event, Dr. Laidlaw's testimony that puberty-delaying medications "alter or block normal human development," deliberately misrepresents the facts and

data in order to obfuscate rather than elucidate (Ex. 1 ¶ 199). While usually the factual basis of an expert opinion goes to credibility, "it is possible for an experts' omission of articles to render his or her opinion inadmissible on reliability grounds." *Huggins v. Stryker Corp.*, 932 F.Supp.2d 972, 994 (D. Minn. 2013). Such is the case here where Dr. Laidlaw omits key information, or worse, misrepresents facts that if properly disclosed would contradict his opinions and undermine their foundation. It is appropriate to exclude expert testimony, like these opinions of Dr. Laidlaws, that is "confusing or misleading." *Hull v. Merck & Co.*, 758 F.2d 1474, 1478 (11th Cir. 1985).

**One.** Dr. Laidlaw misconstrues the effect of puberty-delaying treatments on fertility. He speculates at length about the potential impacts of these treatments on fertility in general, and on named Plaintiffs in particular (Ex. 1 ¶¶ 92-97, 246-47, 280, 287; Ex. 2 ¶¶ 35-43). In doing so, he ignores multiple studies that have made clear that these treatments do not have long-term implications on fertility (*e.g.,* Exhibit 11, Guaraldi et al. (2016) at R83; Exhibit 12, Marinerie et al. (2021), at 529). Dr. Laidlaw correctly points out that progression through puberty – at some point – is needed for biological reproduction (Ex. 1 ¶¶ 92-97; Ex. 2 ¶¶ 35-43). But Dr. Laidlaw then reaches far beyond this well-established fact to posit that gender-

affirming hormones could possibly damage immature gonads (Ex. 1 ¶¶ 92, 94, 97), providing no data or studies to support his speculation.[5]

**Two.** Dr. Laidlaw speculates about the impact of puberty-delaying treatment on bone density – again, both in general, and for the Plaintiffs specifically (Ex. 1 ¶¶ 100-09, 250, 266, 289; Ex. 2 ¶¶ 52-54). His analysis of the studies regarding the impacts of these medications on bone density completely ignores that youth given puberty-delaying medications will take those medications for a relatively short period of time, and then either resume puberty associated with their birth-assigned sex, or begin hormone treatment, either of which will ameliorate any impact on bone density caused by puberty suppressing medications. Not to mention, that exact same concerns with respect to bone density are present for youth who take these medications to treat precocious puberty, a use Dr. Laidlaw approves (Ex. 1 ¶¶ 100-09).

\*     \*     \*

The Court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.  Here, Dr.

---

[5] Dr. Laidlaw's testimony ignores that as long as a person retains their gonads, they have the potential for fertility. And he does not account for the fact that the same risks with respect to fertility are present when these medications are used to treat other conditions, which he approves (*See* Ex. 1 ¶¶ 74-75 (discussing the use of these medications to treat prostate cancer and precocious puberty)).

Laidlaw has misrepresented or omitted information that goes to the heart of his opinions and calls into question the reliability of his opinions.   By omitting key information, or worse, misrepresenting facts that if properly disclosed would contradict his opinions and undermine their foundation, Dr. Laidlaw's testimony is not reliable but "misleading" and "quite speculative, and . . . [s]uch potentially confusing testimony is at odds with the purposes of expert testimony." *Hull*, 758 F.2d at 1478, 1477.

### C. Dr. Laidlaw's other opinions about the harms posed by gender-affirming medical care are based solely on ipse dixit and conjecture and are unreliable.

Dr. Laidlaw also raises, without any research or evidentiary support, the specter of several other harms that could be posed by puberty suppressing treatment. These include his musings about treatment's potential impact on future sexual function, for which he offers no evidence or citations to support other than anecdotal reports from a reality television show (Ex. 1 ¶¶ 98-99). They also include Dr. Laidlaw's conjecture about the "unknown, but likely negative consequences … with respect to brain development," for which he can offer no evidence or reasoning to support his speculation that any consequences would be "likely negative" (Ex. 1 ¶ 110).

These opinions are the epitome of ipse dixit that courts routinely exclude as unreliable.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[T]he unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1261; *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1246 (11th Cir. 2005) ("[P]resumptions do not make for reliable opinions."). This is one of those circumstances in which "there is simply too great an analytical gap between the data and the opinion proffered." *Id.; see also McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions.")

**D. Dr. Laidlaw's opinions about desistence are completely unreliable.**

Again, Dr. Laidlaw does not diagnose or treat gender dysphoria, has not conducted any original research on gender dysphoria, gender identity, gender non-conformity in children/youth, or transgender people's experience. *See* Section II, *supra*. Yet, he opines extensively on gender dysphoria and desistence (Ex. 1 ¶¶ 28-

24

35; Ex. 2 ¶¶ 19-21; Ex. 3 at 5-7). To be sure, Dr. Laidlaw offers a theory that can

be (and has been) subjected to peer review and publication, based on generally

accepted techniques. *See Frazier*, 387 F.3d at 1262. But Dr. Laidlaw's gloss on the

peer reviewed literature that has been published based on generally accepted

techniques draws a conclusion exactly opposite to what that literature

demonstrates: contrary to the literature, he opines that the majority of youth

diagnosed with gender dysphoria will, by adulthood, "desist" (that is, their gender

identity will change to align with their birth-assigned sex). This testimony is

incorrect and not reliable.

A closer examination of Dr. Laidlaw's testimony reveals that he bases these

opinions on a single review of antiquated studies showing that a majority of

preadolescent children diagnosed with gender identity disorder—an outmoded

diagnosis distinct from gender dysphoria with different diagnostic criteria—

"desisted" from their gender nonconformity or cross-gender behavior (Ex. 1 ¶¶ 28-

35; Ex. 2 ¶¶ 19-21; Ex. 3 at 5-7).[6] Yet Dr. Laidlaw's opinions stretch far beyond

---

[6] Dr. Laidlaw also cites his own, non-peer reviewed "commentary" (i.e., opinion) article on this topic, co-authored with two well-known critics of providing medical care to people with gender dysphoria, one of whom has also been retained by Defendants as an expert in this case. However, this commentary cites the same Ristoria & Steensma review as the source for its statistics (Exhibit 17, Laidlaw et al. (2019), at 76). The article is co-authored by Michelle Cretella, who has been

the "explicit[] findings, conclusions, and implications" of the Ristoria & Steensma

review he cites to improperly "extrapolate from this information a finding,

conclusion, or implication [that] authors themselves did not make." *In re Abilify*

*(Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1351 (N.D. Fla. 2018).

The Ristoria & Steensma review examined outcomes from 10 studies on children

with gender dysphoria or gender identity disorder conducted from 1968 to 2012

(Exhibit 13, Ristoria & Steensma (2016), at Table 1). It acknowledges that:

> The lower persistence rates in the earlier studies, compared to the more
> recent studies after 2000, may be the result of the inclusion of less extreme
> cases in the earlier studies than in later studies.  For example, before . . .
> 1980 there was no formal diagnosis of GD for children. It could therefore be
> that the children included in the studies before 1980 would in retrospect not
> meet the full criteria for a diagnosis. Also, the recent studies consisted of
> clinically referred samples of children, which was not the case for the earlier
> studies.

*Id.* at 15-16. Despite the fact that the very paper on which he relies to claim that as

many as 98% of children who present with gender dysphoria later "desist" makes

clear that it supports no such conclusion, Dr. Laidlaw states that, "[b]ecause the

---

criticized by the Society for Adolescent Health and Medicine for "pushing political
and ideological agendas not based on science and facts" (Exhibit 18, Sct'y Adol.
Health & Med. (2017), at 4). The other co-author is Kevin Donovan, whom
Defendants have retained as an expert in this case, and who has described not only
"transgender conversion surgeries" but "homosexual marriage," "homosexual
behavior," contraception, cohabitation, and divorce, as "sinful" (Exhibit 19,
Donovan & Sotomayor (2020), at 135).

rate of desistance is so high, gender affirmative therapy will necessarily cause serious and irreversible harm to many children and adolescents who would naturally outgrow the condition if not affirmed" (Ex. 1 ¶ 33). This opinion is based on faulty propositions. *See, e.g., Kilpatrick v. Breg, Inc*., 613 F.3d 1329, 1338 (11th Cir. 2010) (study that explicitly limited its findings to rabbits could not be the basis of expert testimony regarding humans); *McClain v. Metabolife Int'l, Inc*., 401 F.3d 1233, 1247 (11th Cir. 2005) (expert could not reasonably rely on a study to prove causation where the study concluded that the supplement at issue "*may* pose health risks to *some* persons" and the authors had specifically written "a letter to the editor explaining that the study did not prove causation") (emphasis in original).

In fact, Dr. Laidlaw has previously admitted that the "desistance" studies on which he relies speak only to preadolescent youth who were diagnosed with gender identity disorder under the DSM-III or the DSM-IV, and do not pertain to "desistance" of youth diagnosed with gender dysphoria under the DSM-5 (Ex. 5 at 103:4-104:4). He has similarly admitted that he is unaware of any studies documenting "desistance" among adolescents (people over the age of 12) or adults (*id*. at 109:2-109:14. Dr. Laidlaw's attempts to rehabilitate his asserted desistence rates in his Rebuttal Report do not hold water. He notes that the three most recent

studies included in the Ristoria & Steensma review he relies on included children aged 3 to 13, and that those studies showed desistance rates of 61-88% (Ex. 2 ¶ 21). From that information he extrapolates that "this would include children in the age range of 8-12 years old, many of whom were already adolescents going through puberty based on their age and were therefore not pre-pubertal. Therefore we can infer that a high proportion of adolescents do in fact desist" (*id.* (citation omitted)). But of course, this is pure speculation and guesswork. Dr. Laidlaw fails to acknowledge that it is just as likely that the desistence rates of older youth were much lower than those of younger children. And the studies included in the Ristoria & Steensma review, the most recent of which is over 10 years old (and some of which rely on data from the 1950s, 1960s, and 1970s), do not comport with more recent literature, which has uniformly found that youth who have a diagnosis of gender dysphoria in adolescence overwhelmingly continue to identify as transgender as they age (Exhibit 14, Olson et al. (2022), at 4; Exhibit 15, de Vries et al. (2011), at 1).[7] In any event, the fact that younger, preadolescent

---

[7] Notably, Thomas D Steensma, who co-authored the study on which Dr. Laidlaw improperly cites for the proposition that most youth with gender dysphoria "desist" in their gender identity, also co-authored the de Vries study, which looked 70 youth in the Netherlands referred for treatment of gender dysphoria between 2000 and 2008, found that all of them decided to continue their medical transition after 1-2 years, confirming that "young adolescents who had been carefully diagnosed

children may have a concept of their gender identity that is still changing is of no consequence to whether medical interventions are appropriate for adolescents and adults, for whom research confirms gender dysphoria usually persists (Ex. 14; Ex. 15).[8] Dr. Laidlaw's opinions with respect to desistence do not use a "reliable and sound" methodology, and the one study on which he purports to rely does not support his "ultimate conclusion." *Kilpatrick*, 613 F.3d at 1337; *Rink*, 400 F.3d at 1293 (using unsound underlying data results in "flawed methodology"). This testimony should be excluded.

### E. Dr. Laidlaw's opinions about informed consent are unreliable

Dr. Laidlaw does not offer any new information or evidence to support his opinion that:

> [I]t is not possible for the parent or guardian to make a true informed consent decision for the child because of the poor quality of evidence of benefit, the known risks of harm, and the many unknown longterm risks of harm which could only truly be known after years and decades of gender affirmative therapy. A parent or guardian cannot consent to dubious treatments which result in irreversible changes to their child's body, infertility, sexual dysfunction, and in many cases eventual sterilization.

---

show persisting gender dysphoria into late adolescence or young adulthood." Ex. 15 at 2281.

[8] In addition, "a discussion of risks to prepubescent children is irrelevant to this case and would likely serve only to confuse." *Kadel*, 2022 WL 3226731, at *9.

(Ex. 1 ¶ 181; *see also id.* ¶¶ 179-83, 307-08, 310; Ex. 3, at 26-27; Ex. 2 ¶¶ 86-90).

Instead, his opinions regarding informed consent are simply cumulative of the

same unreliable opinions he offers regarding the effectiveness and potential harm

caused by gender-affirming treatments. They completely misrepresent the concept

of informed consent, which can, and does allow people (including parents and

guardians making decisions about their children's medical care) to authorize

necessary care, even when it may result in irreversible changes to the body,

including impacts on fertility and sexual function, when they have been educated

about "the burdens, risks, and expected benefits of all options, including forgoing

treatment" such that they are able to "make an independent, voluntary decision"

about treatment (Exhibit 20, AMA Code of Medical Ethics, at § 2.1.1). Indeed, it is

common for parents to make these decisions, even when not all the risks of a

particular intervention are fully known. For example, many antidepressants have

both known and unknown impacts on fertility, yet they are commonly prescribed,

including to youth.[9] Dr. Laidlaw's opinions on informed consent lack any

---

[9] *See, e.g.,* Exhibit 21, Beeder & Samplaski (2020), at 45 ("At this point, it is difficult for clinicians to counsel patients on the effect that these medications might have on their fertility. We would recommend an informed discussion with patients attempting parenthood and taking these medications. Checking a baseline semen analysis and sperm DNA fragmentation might provide some level of guidance."); Exhibit 22, Casilla-Lennon et al. (2016), at 314.e1 ("Our data suggest that

"grounding in the methods and procedures of science," such that they are nothing "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. They amount to nothing more than "unscientific speculation offered by a genuine scientist," and should be excluded. *Allison,* 184 F.3d at 1317 (*quoting Rosen v. Ciba–Geigy Corp*., 78 F.3d 316, 318 (7th Cir. 1996)).

### F.  Dr. Laidlaw's opinions about WPATH are unreliable

Dr. Laidlaw's opinions about the WPATH Standards of Care for gender-affirming medical care should similarly be disregarded as unreliable. In particular he offers the completely unfounded, and therefore unreliable "professional opinion WPATH SOC 8 represents a grave and immediate danger to minors, young adults, and adults and should not be followed by any physician, mental health care provider, or other medical professional" (Ex. 1 ¶ 198; *see also id.* ¶¶ 184-85, 192-98, 309; Ex. 3 at 27, 29-30; Ex. 2 ¶¶ 28-30).[10] Dr. Laidlaw is not privy to the actual

_____

antidepressants may reduce the probability of a woman with a history of depression to conceive naturally. Future studies are needed to differentiate the extent to which this association is due to the antidepressant itself versus the underlying depression.").

[10] When pressed on the basis for his opinions regarding WPATH in another case, Dr. Laidlaw did not cite any literature, study, or publication but rather stated that it was based on his opinion that "one would expect them [WPATH] not to exclusively follow one, say, politically based point of view," and that (again, in his opinion) WPATH is not "open to a variety of points of view" Ex. 5 at 89:7-89:18. When pressed further for his basis for this opinion, Dr. Laidlaw simply stated that

internal conversations of WPATH, has not participated in WPATH conferences, is not a member of WPATH, and has not participated in any of its internal discussions (Ex. 5 at 90:1-90:16). He therefore lacks knowledge "of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co*., 861 F.2d 655, 662 (11th Cir. 1988). In short, Dr. Laidlaw does not have "any experience with . . . WPATH. . . upon which to base his criticisms," nor does he cite to any meaningful data or evidence to support them, making his speculation as WPATH's credibility completely unreliable. *Kadel,* 2022 WL 3226731, at *10.

### G. Dr. Laidlaw's testimony is motivated by bias, rendering it unreliable

"In evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293, n.7. Here, Dr. Laidlaw has already confirmed the basis for all his opinions offered: He opposes affirmation of a transgender person's identity in any circumstances (Ex. 4 at 87:15-87:21; *id.* at 39:22-40:19). In other words, the entire basis for all his opinions offered rests on his non-scientific opposition to treatment for gender dysphoria, especially for

---

his opinion is based on a conversation with one psychologist and the fact that WPATH published the Standards of Care. *Id.*, at 92:2-92:12.

children. *But see Brandt,* 551 F. Supp. at 891 ("[G]ender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people."). While Plaintiffs are cognizant of the fact that bias in an expert witness's testimony is usually an issue of credibility as opposed to one of admissibility, when an expert's opinions are based on bias as opposed to scientific or medical knowledge, then the question of bias becomes one of reliability and admissibility. Indeed, reliability is a flexible inquiry wherein "courts must ensure that an expert's opinion is based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Sardis v. Overhead Door Corp.,* 10 F.4th 268, 281 (4th Cir. 2021). Here, there is ample evidence that Dr. Laidlaw's testimony is so permeated and tainted by his unscientific views and personal bias as to render it unreliable. *Cf. Sanchez v. Esso Standard Oil de Puerto Rico, Inc.,* No. CIV 08-2151, 2010 WL 3809990, at *4 (D.P.R. Sept. 29, 2010).

## IV.    DR. LAIDLAW OFFERS SEVERAL UNHELPFUL AND IRRELEVANT OPINIONS.

"The gatekeeping inquiry must be tied to the facts of a particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quotations omitted). The proponent of the expert testimony bears the burden of proving that the

testimony is relevant and "logically advances a material aspect" of the case. *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) (citations omitted). Here, Dr. Laidlaw offers several opinions that simply are not relevant to this inquiry as they will not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Ev. 702(a); *Id.* 401, 402 & 403; *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (cleaned up).

The primary issues before this Court, among others, are: (1) whether medical treatment for gender dysphoria is experimental, such that it could be appropriately excluded from Medicaid coverage, *Rush v. Parham*, 625 F.2d 1150, 1156 (5th Cir. 1980); *K.G. ex rel. Garrido v. Dudek*, 864 F. Supp. 2d 1314, 1321 (S.D. Fla. 2012), *aff'd in part, rev'd in part sub nom. Garrido v. Dudek*, 731 F.3d 1152 (11th Cir. 2013); and (2) whether the process Florida underwent to exclude coverage of such care in its Medicaid program made "classifications that are 'arbitrary or irrational' and that reflect a 'bare desire to harm a politically unpopular group,'" *Glenn v. Brumby*, 663 F.3d 1312, 1315 (11th Cir. 2011) (*quoting City of Cleburne v. Cleburne Living Ctr., Inc*., 473 U.S. 432, 446-47 (1985)). Because this case is about gender-affirming medical care, much of the testimony offered by Dr. Laidlaw has no bearing on the issues:

34

- He offers unsupported musings on the increased number of people diagnosed with gender dysphoria (Ex. 1 ¶¶ 29-31; *see* Ex. 3 at 5-6). His ideas in this regard are based only on his conjecture, and ignore several plausible alternative explanations for the increased number of people diagnosed with gender dysphoria. In any event, the number of people diagnosed with gender dysphoria (increasing or not) is simply not pertinent to the question of what treatment for the condition is medically appropriate, or whether refusing to cover treatment is discriminatory.  Dr. Laidlaw does not and cannot dispute that gender dysphoria is a legitimate medical condition (Ex. 4 at 16:14-23).

- Similarly, Dr. Laidlaw takes pains to establish that gender dysphoria is a psychological condition and not an endocrine one (Ex. 1 ¶¶ 23-26; Ex. 2 ¶¶ 13-14; *see* Ex. 3 at 4-5). But again, it is not relevant to the issues in this case whether gender dysphoria is a psychological condition, an endocrine condition, or a health condition. Dr. Laidlaw does not and cannot dispute that gender dysphoria is a legitimate condition for which treatment is indicated (Ex. 4 at 16:14-23).

- He provides speculation about human sexual development (Ex. 1 ¶¶ 41-55; *see* Ex. 3 at 8-11). Again, human sexual development is entirely irrelevant to the legal questions presented in this case.

- He opines, without citing studies or data, as to the difference between gender identity and "biological sex," including as to whether "biological sex" can be changed (Ex. 1 ¶¶ 36-40, 53-55, 306; Ex. 2 ¶¶ 3-12; *see* Ex. 3 at 5-7). But this case is not about changing one's sex. It is about treatment for gender dysphoria. His unsupported speculation is irrelevant.

- His ideas about "social transition" are also irrelevant, since this case does not address social transition, but medical treatment for gender dysphoria (Ex. 1 ¶¶ 61-65; *see* Ex. 3 at 12-13).

- Dr. Laidlaw's opinions about the policies of other countries are similarly irrelevant, since what other countries cover in their state health care programs has no relation to Florida Medicaid's obligation to cover services under U.S. Law (Ex. 1 ¶¶ 29-31, 222-27; Ex. 2 ¶¶ 72-77; *see* Ex. 3 at 36-37).[11]

---

[11] Dr. Laidlaw does not have first-hand knowledge of these countries' policies, and misrepresents them, since none of the identified countries wholly exclude coverage for gender-affirming medical care. *See Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 671 (8th Cir. 2022) (discussing Finland's policy); Ex. 4 at 106:2-108:5.

Because each of these opinions offered lacks any "valid scientific connection to the disputed facts in the case," they should be excluded. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

### V.   THE OPINION OF DR. LAIDLAW LACKS PROBATIVE VALUE AND IS THEREFORE NEITHER HELPFUL TO THE FACT-FINDER NOR ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 403.

Finally, the Court should exclude the majority of the opinion and testimony of Dr. Laidlaw because its introduction will result in unfair prejudice, confusion of the issues, or in duplicative or misleading testimony. Fed. R. Evid. 403. As articulated above, the majority of opinions offered by Dr. Laidlaw are irrelevant, speculative, and unreliable. In addition, Defendants have proffered two other endocrinologists to provide testimony in this case, and making Dr. Laidlaw's proposed testimony largely "cumulative or needlessly time consuming." *Hendrix*, 255 F.R.D. at 579. His testimony would also result in prejudice, as the testimony seeks to sow confusion about the propriety of gender-confirming care based on speculation, irrelevant, misleading, and biased opinions.

## CONCLUSION

For the foregoing reasons, the Court should exclude the reports, opinions, and testimony of Dr. Laidlaw, except as they relate to "to the risks associated with puberty blocking medication and hormone therapy." *Kadel*, 2022 WL 3226731, at *10.

Dated: April 7, 2023

Respectfully Submitted,

*/s/ Abigail Coursolle*

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**\*
**Gary J. Shaw**\*
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com

**Joe Little**\*
500 Capitol Mall, Suite 1800
Sacramento, CA 95814

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan**\*
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**\*
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue

38

(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle\***
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee\***
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

\* *Admitted pro hac vice*
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of April, 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

## <u>CERTIFICATE OF SATISFACTION OF</u><br><u>ATTORNEY-CONFERENCE REQUIREMENT</u>

Pursuant to Local Rule 7.1(B), counsel for Plaintiffs and counsel for Defendants conferred regarding the instant motion during a Zoom conference on April 6, 2023. Defendants indicated they do not consent to the relief requested herein

## <u>CERTIFICATE OF WORD COUNT</u>

According to Microsoft Word, the word-processing system used to prepare this Motion and Memorandum, there is a combined total of 7,381 words in the Motion and the Memorandum of Law.

*/s/ Abigail K. Coursolle*<br>
Attorney for Plaintiffs
