# EXHIBIT 4

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

```
AUGUST DEKKER, et al.,          )
                                )
              Plaintiffs,       ) Case No: 4:22cv325
                                )
         v.                     ) Tallahassee, Florida
                                ) October 12, 2022
SIMONE MARSTILLER, et al.,      )
                                ) 9:33 AM
              Defendants.       )
_____ )
```

### TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
### BEFORE THE HONORABLE ROBERT L. HINKLE
### UNITED STATES CHIEF DISTRICT JUDGE
### (Pages 1 through 120)

Court Reporter:          MEGAN A. HAGUE, RPR, FCRR, CSR
                         111 North Adams Street
                         Tallahassee, Florida 32301
                         megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

<u>APPEARANCES</u>:

For Plaintiffs:          Lambda Legal
                         By:  OMAR GONZALEZ-PAGAN
                              Attorney at Law
                              ogonzalez-pagan@lambdalegal.com
                         120 Wall Street
                         19th Floor
                         New York, New York 10005

                         Pillsbury, Winthrop, Shaw, Pittman, LLP
                         By:  JENNIFER ALTMAN
                              Attorney at Law
                              jennifer.altman@pillsburylaw.com
                         600 Brickell Avenue
                         Suite 3100
                         Miami, Florida 33131

                         Lambda Legal
                         By:  CARL S. CHARLES
                              Attorney at Law
                              ccharles@lambdalegal.org
                         1 West Court Square
                         Suite 105
                         Decatur, Georgia 30030

                         Southern Legal Counsel Inc
                         By:  SIMONE M. CHRISS
                              CHELSEA LEE DUNN
                              Attorney at Law
                              simone.chriss@southernlegal.org
                              chelsea.dunn@southernlegal.org
                         1229 NW 12th Avenue
                         Gainesville, Florida 32601

                         Florida Health Justice Project
                         By:  KATHERINE JEAN ANN DEBRIERE
                              Attorney at Law
                              debriere@floridahealthjustice.org
                         3900 Richmond Street
                         Jacksonville, Florida 32205

                         National Health Law Program
                         By:  CATHERINE ANNE MCKEE
                              Attorney at Law
                              mckee@healthlaw.org
                         1512 East Franklin Street
                         Chapel Hill, North Carolina 27514

<u>APPEARANCES (continued)</u>:

For Defendants:          Holtzman Vogel Baren, et al.
                         By:  MOHAMMAD OMAR JAZIL
                              GARY VERGIL PERKO
                              MICHAEL BEATO
                              Attorneys at Law
                              mjazil@holtzmanvogel.com
                              garyp@holtzmanvogel.com
                              michaelb@holtzmanvogel.com
                         119 South Monroe Street
                         Suite 500
                         Tallahassee, Florida 32301

# PAGE BREAK

1  Q.   Are you a member of any professional associations?

2  A.   I am a member of the Endocrine Society.

3       MR. PERKO:  Your Honor, at this time we'd proffer

4  Dr. Laidlaw as an expert in endocrinology.

5       MR. CHARLES:  Objection, Your Honor.  I'd like to voir

6  dire the witness.

7       THE COURT:  You may certainly voir dire the witness.

8       MR. CHARLES:  May it please the Court, Your Honor.  My

9  name is Carl Charles for the plaintiffs.

10                  VOIR DIRE EXAMINATION

11 BY MR. CHARLES:

12 Q.   Dr. Laidlaw, can you hear me?

13 A.   Yes.

14 Q.   Okay.  Dr. Laidlaw, you wrote a declaration that was filed

15 in this case; correct?

16 A.   Correct.

17 Q.   And as a part of that declaration, you submitted a CV

18 entitled "Exhibit A"?

19 A.   Yes.

20 Q.   And you're not a practicing psychiatrist; is that correct,

21 Dr. Laidlaw?

22 A.   That is correct.

23 Q.   You are not a licensed mental health care provider; is that

24 correct?

25 A.   That's correct.

Voir dire Examination – Dr. Laidlaw

```
1   Q.    And you're not a psychologist; is that correct?

2   A.    That is correct.

3   Q.    And, Dr. Laidlaw, you're not an obstetrician; is that

4   correct?

5   A.    That is correct.

6   Q.    And, Dr. Laidlaw, you're not a gynecologist; is that

7   correct?

8   A.    That is correct.

9   Q.    And you're not a surgeon, Dr. Laidlaw; is that correct?

10  A.    That's correct.

11  Q.    And you're not a pediatric endocrinologist; is that

12  correct?

13  A.    That is correct.

14  Q.    Less than 5 percent of your patients are under the age of

15  18; is that correct?

16  A.    Yes.

17  Q.    And you're not a bioethicist; is that correct?

18  A.    I have no formal training other than an IRB certification

19  many years ago.

20  Q.    Okay.  So you don't practice as a bioethicist; is that

21  correct?

22  A.    That's correct.

23  Q.    And you haven't done any primary research on fertility; is

24  that correct?

25  A.    No primary research on fertility; that's correct.
```

Voir dire Examination – Dr. Laidlaw

1   Q.   And you haven't done any primary research on sterility; is

2   that correct?

3   A.   That is correct.

4   Q.   And you haven't written any articles which have been

5   subjected to a confirmed peer-review process about fertility; is

6   that correct?

7   A.   I -- specifically about fertility -- I don't know what the

8   peer review -- I had a paper in *The American Journal of*

9   *Bioethics.*  I don't know what the peer-review process was.

10  Q.   Okay.  So you -- again, you have not written any articles

11  which have been subjected to a peer review for process which you

12  can confirm about fertility; is that correct?

13  A.   Not that I can confirm.

14  Q.   And you haven't written any articles that have been

15  subjected to a confirmed peer-review process about sterility; is

16  that correct?

17  A.   Correct.

18  Q.   And you haven't performed any primary research about

19  medical ethics; is that correct?

20  A.   That's correct.

21  Q.   And you haven't written any confirmed peer-reviewed

22  publications about medical ethics; is that correct?

23  A.   I have not independent -- there is the article that I

24  mentioned.  I have not independently confirmed the peer-review

25  process.

Voir dire Examination – Dr. Laidlaw

1   Q.   Okay.  You cannot confirm that that article has been peer
2   reviewed?
3   A.   I cannot confirm.
4   Q.   And you have not performed any primary research about
5   informed consent; is that correct?
6   A.   That's correct.
7   Q.   And you have not written any articles confirmed to be peer
8   reviewed regarding parents' ability to consent for treatment for
9   their minor children; is that correct?
10  A.   I have not written a peer reviewed article on that topic.
11  Q.   And none of the publications listed in your CV attached to
12  your declaration are based on original primary research; is that
13  correct?
14  A.   That's correct.
15  Q.   And you haven't done any primary research about transgender
16  people; is that correct?
17  A.   Just to clarify, when you say "primary research," you're
18  talking about using human subjects in the research -- as part of
19  the research rather than a review of the literature; is that
20  correct?
21  Q.   You haven't done any original primary research about
22  transgender people; is that correct?
23  A.   In the context of working with human subjects, that is
24  correct.
25  Q.   And that includes any research about children and

Voir dire Examination – Dr. Laidlaw

1    adolescents; isn't that correct?

2    A.    Yes.  With regard to human subjects, that is correct.

3    Q.    And you haven't received any grants to support research

4    into endocrine treatments for gender dysphoria; is that correct?

5    A.    That is correct.

6    Q.    And you have not done any original primary research about

7    the treatment of gender dysphoria; is that correct?

8    A.    Not with human subjects; that's correct.

9    Q.    And you haven't performed any original primary research

10   into the frequency of gender -- into how frequently gender

11   dysphoria occurs; is that correct?

12   A.    I have not done primary research involving which -- human

13   subjects on that matter.

14   Q.    And you haven't -- and you have not done any original

15   primary research about the phenomenon of desistance; is that

16   correct?

17   A.    I have not done primary research with human subjects on

18   that condition -- for that condition.

19   Q.    And you've never diagnosed anyone with gender dysphoria; is

20   that correct?

21   A.    That is correct.

22   Q.    And you've previously testified under oath that you've only

23   provided care to one transgender patient related to the

24   treatment of gender dysphoria; is that correct?

25   A.    I have worked with patients with gender incongruence in the

Voir dire Examination – Dr. Laidlaw

1  context of my practice, but as far as providing hormones, there

2  was -- someone with gender dysphoria, there was one.

3  Q.   And it was only to provide that patient with a refill of

4  estrogen; is that correct?

5  A.   There was an evaluation.  There was an office visit, and

6  there was necessity for a refill of estrogen in that case.

7  Q.   Okay.  And so you did not deny the patient the refill of

8  the estrogen?

9  A.   That's correct.

10 Q.   So you have utilized the Endocrine Society guidelines for

11 the treatment of gender dysphoria once; is that correct?

12 A.   This was -- this preceded the Endocrine Society guidelines.

13 Q.   What year was the treatment of that patient?

14 A.   It was in the early 2000s.  It was prior to -- it was prior

15 to 2009, which is when the first Endocrine Society guidelines

16 were published.

17 Q.   In your private practice, Dr. Laidlaw, you do not contract

18 with California Medicaid insurance; is that correct?

19 A.   That's correct.

20 Q.   And you have not spoken with any transgender Florida

21 Medicaid beneficiaries; is that correct?

22 A.   Yeah, not that I'm aware of.

23 Q.   And that would include the plaintiffs in this matter; is

24 that correct?

25 A.   That's correct.

PAGE

BREAK

```
 1              CONTINUED DIRECT EXAMINATION
 2   BY MR. PERKO:
 3   Q.   Dr. Laidlaw, you submitted a declaration in this matter,
 4   didn't you?
 5   A.   I did.
 6   Q.   And have you reviewed the declarations -- rebuttal
 7   declarations that the plaintiffs submitted in response to your
 8   declaration?
 9   A.   Yes.
10   Q.   And do you stand by the opinions in your declaration,
11   notwithstanding those rebuttal reports?
12   A.   Yes, I do stand by those opinions.
13   Q.   What were your opinions expressed in your declaration based
14   on?
15   A.   My opinions are based on my education and clinical
16   experience in endocrinology, my work with gender incongruent
17   patients in the context of my practice, including a
18   detransitioner, my extensive evaluation of the scientific
19   literature regarding the treatment of gender dysphoria, gender
20   incongruence for adults and minors, and also my review of all
21   the plaintiffs' declarations and the medical records provided to
22   me.
23   Q.   Dr. Laidlaw, you stated that you had limited experience
24   with gender dysphoria.  But have you reviewed the literature
25   with regard to gender dysphoria in the gender-affirming care?
```

Direct Examination - Dr. Laidlaw

```
 1   A.   I have reviewed the literature extensively over the last at
 2   least four years.
 3   Q.   And why is that?
 4   A.   Well, for a few reasons.  One is that these treatments that
 5   they advocate for involve hormones and raising hormone levels to
 6   sometimes very high levels or very low levels.  So I've taken an
 7   interest in the risk-and-benefit ratio of these types of
 8   treatments, and this is something I do every day in
 9   endocrinology.
10        Furthermore, before my colleagues and I are to follow any
11   sort of treatment protocol, I think it's essential that these
12   studies and so forth are evaluated to determine the risk-benefit
13   profile before any of us use these treatments.
14   Q.   And, Dr. Laidlaw, what exactly is gender dysphoria?
15   A.   Gender dysphoria is -- well, there's a couple of terms that
16   would be helpful.  Gender identity is a person's internal or
17   mental sense of being male or female or perhaps some other
18   designation, and there's an incongruence or mismatch in these
19   cases with their physical body.  For example, a person may
20   identify as a female but have been born with a male body, and so
21   there is resulting distress and impairment of function.  There's
22   different definitions from there on as to how long it lasts and
23   slight differences for adults versus children and adolescents.
24   Q.   And is gender dysphoria an endocrine disorder?
25   A.   It's not an endocrine disorder.  It's a disorder found in
```

PAGE

BREAK

1    A.    No.

2    Q.    And why is that?

3    A.    Well, I think that it's proved by the desistance,

4    particularly with young people.  Children have high desistance

5    rates.  There are many detransitioners who are adults, including

6    one patient of mine, which proves that this gender identity is

7    not immutable.

8    Q.    Doctor, switching gears a little bit, you say in your

9    declaration that hormone treatment for gender dysphoria can lead

10   to infertility.

11        Is that always the case?

12        MR. CHARLES:  Objection, Your Honor.

13        The witness has already stated he's not qualified to

14   opine about this subject.

15        MR. PERKO:  I don't believe that's the case,

16   Your Honor.  He's talking about hormone therapy, and he's an

17   endocrinologist.

18        THE COURT:  I'll overrule the objection.  I'm going to

19   be the finder of fact.

20        When Dr. Laidlaw has knowledge because of his actual

21   medical practice, as opposed to having read some stuff over the

22   last four years, you might want to point it out, because he's

23   not going to persuade me very much -- he may persuade me, but

24   he's less likely to persuade me when all he is telling me is

25   what he has read and not what he has applied in his practice.

PAGE

BREAK

Cross-Examination – Dr. Laidlaw

1    Q.   Psychological conditions?

2    A.   I do not make diagnoses, but we're trained in psychology

3    and psychiatry.  It's part of our medical licensing.

4    Q.   Okay.  But you are not a practicing psychologist?

5    A.   That's correct.

6    Q.   And you're not a practicing psychiatrist?

7    A.   That's correct.

8    Q.   And you have not met with any of the plaintiffs in this

9    matter --

10        THE COURT:  Mr. Charles, I sat through the voir dire.

11   I'm not going to sit through it again on cross.  You get one

12   chance to ask some questions.  You've asked those.  Let's ask

13   some new ones.

14        MR. CHARLES:  Thank you, Your Honor.

15   BY MR. CHARLES:

16   Q.   Dr. Laidlaw, you stated you don't follow the WPATH

17   standards of care; is that right?

18   A.   Yes.

19   Q.   But you testified earlier you don't treat gender dysphoria;

20   is that correct?

21   A.   I don't treat gender dysphoria with hormones and surgeries.

22   Q.   Dr. Laidlaw, are you aware that your opposition to

23   gender-affirming care for the treatment of gender dysphoria in

24   youth and adults is contrary to the vast majority of medical

25   associations' recommendations?

PAGE

BREAK

1   Q.   Yes, let's start with that one.

2   A.   Well, I'm just reading it now for the first time, so it

3   must be -- it was 2019 -- unless they have changed their

4   opinion.

5   Q.   Okay.  But you don't have any --

6            THE COURT:  Let me just back up.  I'm going to exclude

7   the exhibit.  I did require things to be disclosed, and you

8   can't come up to the hearing and bring up a new exhibit that you

9   didn't timely disclose.

10           MR. CHARLES:  Okay.

11           THE COURT:  So Plaintiffs' 1 is excluded.

12           The scheduling order is ECF No. 32.

13           MR. CHARLES:  Okay.  Thank you, Your Honor.

14           Ms. Markley, you can unpublish, please.  Thank you.

15   BY MR. CHARLES:

16   Q.   Dr. Laidlaw, are you aware that the American Academy of

17   Family Physicians supports gender-affirming care for youth and

18   adults?

19   A.   Supports gender-affirming care for youth and adults?

20   Q.   Yes.  Do you need to me to repeat?  Did you hear that?

21   A.   They probably do.  I don't know their exact statement.

22   Q.   Okay.  Are you aware that the American Academy of Family

23   Physicians published a policy statement in July of 2022,

24   approved by their board of directors, entitled "Care for the

25   Transgender and Gender Nonbinary Patient"?

1  A.   I have not read that particular document -- Family Practice

2  Document.

3  Q.   Okay.  Are you aware that the American Academy of Family

4  Physicians supports gender-affirming care as an

5  evidence-informed intervention that can promote permanent health

6  equity for gender-diverse individuals?

7       MR. PERKO:  Your Honor, I would object for the same

8  reasons.  He's essentially reading from an exhibit that was not

9  disclosed.

10      THE COURT:  He's now exploring the witness's knowledge

11 of the situation in the field.  The objection is overruled.

12 BY MR. CHARLES:

13 Q.   Dr. Laidlaw --

14 A.   I'm not a family practice physician, so I don't keep up

15 with --

16 Q.   Just a moment.  Sorry.  Let me start over.

17 A.   -- the literature of that organization.

18 Q.   I'm sorry.  Can you please repeat that?

19 A.   I said I'm not a family practice physician; I'm an

20 endocrinologist, so I don't keep up with whatever they're

21 publishing.

22 Q.   Okay.  So I -- let me just ask you one more question about

23 that brief -- or policy statement.  Excuse me.

24      Are you aware that the American Academy of Family

25 Physicians asserts the full spectrum of gender-affirming health

1   care should be legal and should remain a treatment decision

2   between a physician and their patient?

3   A.   I'm not surprised.

4   Q.   Can -- so does that mean you are or are not aware?

5   A.   I don't read the Family Practice documents, unless they are

6   provided to me.

7   Q.   Dr. Laidlaw, are you aware the American Academy of

8   Pediatrics supports gender-affirming care for youth?

9   A.   Yes.

10  Q.   Dr. Laidlaw, are you aware that the American College of

11  Obstetricians and Gynecologists has recommendations and

12  conclusions that support gender-affirming care for youth and

13  adults?

14  A.   I'm not -- again, I'm not surprised, but I don't read their

15  literature regularly for that purpose.

16  Q.   Okay.  Are you aware that the American College of

17  Obstetricians and Gynecologists has conclusions that

18  gender-affirming hormone therapy is not effective contraception?

19  A.   That gender-affirming therapy is not effective

20  contraception?

21  Q.   Correct.

22  A.   I have read that.  I'm not sure if it was theirs or someone

23  else who is publishing that.  I'm aware of that concept.

24  Q.   Can you repeat your answer?  I didn't understand you.

25  A.   I said I haven't read their statements specifically, but

1   I'm aware of the concept or proposition that gender-affirming

2   hormones are not effective contraception.

3   Q.   Okay.  So you're not aware of the American College of

4   Obstetricians and Gynecologists conclusion that it is not

5   effective contraception?

6   A.   I have not read their particular conclusion.

7   Q.   Are you aware that the American College of Physicians, the

8   largest medical specialty society in the world with 160,000

9   internal medicine and subspecialty members, supports public and

10  private health care coverage of gender-affirming care?

11  A.   I'm not aware that all 160,000 members voted to approve

12  such a thing, but I'm aware that they have issued a statement

13  like that.

14  Q.   You are aware they issued such a statement?

15  A.   Yes.

16  Q.   Are you aware that in 2022, the American College of

17  Physicians issued a brief supporting access to gender-affirming

18  care and opposing discriminatory policies enforced against LGBTQ

19  people and objected, in particular, to the interference with the

20  physician-patient relationship and the penalization of

21  evidence-based care?

22  A.   I may have read that particular statement from that

23  organization.

24  Q.   Are you aware that the American Medical Association

25  supports gender-affirming medical care for youth and adults?

Cross-Examination - Dr. Laidlaw

1   A.    Yes.

2   Q.    Are you aware that in April of 2021, the American Medical

3   Association wrote a letter to the National Governors Association

4   objecting to the interference with health care of transgender

5   children?

6   A.    I believe I had come across that headline.

7   Q.    Are you aware that the American Medical Association, in

8   conjunction with GLMA, has issued a brief in support of public

9   and private insurance coverage of gender-affirming care?

10  A.    I'm not a member of the American Medical Association.  I

11  think only 20 percent of physicians in the nation are even a

12  member.  So I don't follow everything they say, but I do believe

13  I read that document.

14  Q.    Do you have evidence to support your assertion that only 20

15  percent of medical practitioners in the United States are

16  members of the AMA?

17  A.    I don't have a piece of paper with evidence, but that's my

18  general understanding.  I'm not a member.

19  Q.    But you don't have any evidence today to point to to

20  support that assertion?

21  A.    No.

22  Q.    Are you aware that in 2022, the American Medical

23  Association reaffirmed it's resolution in support of private and

24  public health care coverage for the treatment of gender

25  dysphoria as recommended by a patient's physician in Resolution

```
1    Number 158.950?

2    A.   I have not read that resolution.

3    Q.   Are you aware, Dr. Laidlaw, that the American Psychological

4    Association has guidelines that support access to

5    gender-affirming care for youth and adults?

6    A.   Yes.

7    Q.   Are you aware that the American Psychological Association

8    opposes gender-identity change efforts as a broad practice

9    described as a range of techniques used by mental health

10   professionals and nonprofessionals with the goal of changing

11   gender identity, gender expression, or associated components of

12   these, to be in alignment with gender role behaviors

13   stereotypically associated with their sex assigned at birth?

14   A.   Yes, I am aware.

15   Q.   Are you aware that the American Psychiatric Association

16   supports gender-affirming medical care for youth specifically?

17   A.   Yes.

18   Q.   Are you aware that the American Psychiatric Association has

19   a position statement from 2018, supporting access to care for

20   transgender and gender-variant individuals broadly?

21   A.   Yes, I believe so.

22   Q.   Are you aware that the Endocrine Society and the Pediatric

23   Endocrine Society take the position that there is a durable

24   biological underpinning to gender identity that should be

25   considered in policy determinations?
```

1   A.    I would have to read -- I have not read that particular

2   statement from the Endocrine Society.  I would like to see that

3   before I make a -- conclude anything.

4   Q.    Okay.  Are you aware this determination was included in a

5   position statement published in December of 2020?

6   A.    I have read that position statement.

7   Q.    And are you aware that the Endocrine Society and the

8   Pediatric Endocrine Society take the position that medical

9   intervention for transgender youth and adults is effective,

10  relatively safe when appropriately monitored, and has been

11  established as the standard of care?

12  A.    Well, they wrote that it was not the standard of care in

13  2017, so they're contradicting themselves.

14  Q.    Dr. Laidlaw, are you aware that that statement is contained

15  in the transgender health position statement issued

16  December 2020?

17  A.    I believe I read that.

18  Q.    And are you aware that the Endocrine Society and the

19  Pediatric Endocrine Society take the position that federal and

20  private insurers should cover such interventions as prescribed

21  by a physician, as well as the appropriate medical screenings

22  that are recommended for all body tissues that a person may

23  have?

24  A.    I believe I read something along those lines.

25  Q.    Are you aware that the Pediatric Endocrine Society supports

1  gender-affirming care for youth?

2  A.   Yes.

3  Q.   Are you aware they published a position statement to that

4  effect in April of 2021?

5  A.   Yes.  I wrote an article describing why their conclusions

6  are false or incorrect.

7  Q.   Are you aware the Pediatric Endocrine Society recommends an

8  affirmative model of care that supports one's gender identity

9  and follows a multidisciplinary approach that includes

10  involvement of mental health professionals, patients and their

11  families.  Puberty suppression and/or gender-affirming hormone

12  therapy is recommended within this evidence-based approach on a

13  case-by-case basis as medically necessary and potentially

14  lifesaving.

15      Are you aware that was contained in the Pediatric Endocrine

16  Society statement?

17  A.   I am aware that it's contained.  I don't agree with it,

18  but, yes, I'm aware.

19          THE COURT:  If we're leading up to something, you can

20  go ahead with all of this.  If all you're doing is publishing

21  stuff I've already read --

22          MR. CHARLES:  No, Your Honor.

23          THE COURT:  You're welcome to make a closing argument

24  later and to go through all of this, but if -- this is an

25  incredibly inefficient way to publish material.

# PAGE BREAK

Redirect Examination - Dr. Laidlaw

1   example, the thyroid is a gland that makes thyroid hormone.

2   When people have very high levels of thyroid hormone, we call

3   that hyperthyroidism.  They can have physical effects like fast

4   heart rates, heart palpitations, tremors, but they can also have

5   mental effects like anxiety and even psychosis.  This can occur

6   because their body develops too much thyroid hormone, or they

7   may be taking too high of a dose of thyroid hormone.

8           So I have to distinguish if a mental health condition

9   is related to a hormone imbalance versus a native psychological

10  condition, or both sometimes.

11  BY MR. PERKO:

12  Q.   Dr. Laidlaw, one final question.

13       How many patients a year do you treat with hormone

14  treatments?

15  A.   For hormone treatments?

16  Q.   Yes.

17  A.   Well, all of them, for the most part.  I'd have to make an

18  estimate.  I see about 50 patient visits a week 50 weeks or so

19  out of the year.

20           MR. PERKO:  Thank you, Your Honor.  No further

21  questions.

22           THE COURT:  Dr. Laidlaw, I want to ask you a question,

23  and to do it, I need to define a couple of terms.  These may not

24  be the best definitions.  They are my definition for purposes of

25  my question.

1            I'm going to refer to natal identity as the identity

2    at birth, and then I'm going to refer to gender identity as a

3    person's perceived identity, the identity the person believes is

4    the correct identity for the person.

5            Here's my question.  In your opinion, is it ever

6    appropriate for any medical professional in any specialty to

7    support a person's decision to live in the person's gender

8    identity instead of in the person's natal identity?

9            THE WITNESS:  Ever under any circumstances, is that

10   what you are saying?

11           I think my determination is that, in general, the

12   risks of the hormones that are required and surgeries outweigh

13   the benefits for the majority of people.  I recognize there's

14   some small degree of adults, perhaps, who are living this way.

15   There are risks to mental health and things like that.  So I'm

16   not opposed to personal autonomy, but I am concerned about risks

17   versus benefits, particularly for minors and youth.

18           THE COURT:  So is the answer no?

19           THE WITNESS:  I guess no.

20           THE COURT:  Questions to follow up on mine?

21           MR. PERKO:  No, Your Honor.

22           MR. CHARLES:  No, Your Honor.

23           THE COURT:  Thank you, Dr. Laidlaw.  That concludes

24   your testimony.

25           THE WITNESS:  Thank you.

# PAGE BREAK

1    irreparable harm.  It's their burden to establish irreparable

2    harm for the four individual plaintiffs.  We've got declarations

3    from the four individual plaintiffs, but we don't have any of

4    the treating physicians for any of the four individual

5    plaintiffs providing any opinions to this Court.

6              We have Dr. Laidlaw who is an endocrinologist who

7    prescribes hormones and puberty blockers.

8              THE COURT:  And has an opinion about sex reassignment

9    surgery.  What is his expertise to talk about these surgeries?

10             MR. JAZIL:  Your Honor, he's someone who's tracking

11   the literature.  He is advising people who go into his clinic.

12   And I take Your Honor's point that if it's something that he's

13   not experienced with as a clinician, you're going to give it

14   little weight.

15             THE COURT:  And he's a doctor who says a person with

16   gender dysphoria should not be treated in a way affirmative of

17   the person's perceived gender by any medical professional.  So a

18   psychiatrist, psychologist, therapist should never say to a

19   natal male, for example, that it's okay to live as a female.

20             Now, how far off the standard, the general view in the

21   medical profession, is that?

22             MR. JAZIL:  Your Honor, two points on that:  One, his

23   answer there was a little confusing.  He -- and Your Honor asked

24   a follow-up question to him.  When he initially gave an answer,

25   he said, I could think of possibly some instances where it would

# PAGE BREAK

Michael Laidlaw                                    September 2, 2022

Page 106

1      A.   Yes.

2      Q.   Do you know whether the report pertaining to

3  the United Kingdom was peer-reviewed?

4      A.   Which report are you referring to?

5      Q.   You refer to a Kass review within your

6  report, is that right?

7      A.   Yes.

8      Q.   Do you know whether that was peer-reviewed?

9      A.   My assumption is yes.

10      Q.   It's actually a preliminary report, is that

11  right?

12      A.   The one I refer to, I don't know if the

13  final reports come out or not.

14      Q.   Okay.  Are you certain that it was

15  peer-reviewed?

16      A.   I'm certain that the NIH -- sorry, NHS, is

17  involved with the reports.  So, you know, then again,

18  it depends how you define peer-reviewed.  I presume if

19  the NHS is involved then they have peers looking at

20  the report before it's published.  That's just my

21  assumption.

22      Q.   Peer-review has a particular meaning within

23  the scientific literature, does it not?

24      A.   If you're talking about publication in a

25  scientific journal?

Michael Laidlaw                                          September 2, 2022

Page 107

1       Q.    Yes.

2       A.    Then an article is submitted, appropriate

3   peers are selected, have a look and decide whether,

4   you know, the arguments are valid or, you know, the

5   data is valid.  That sort of thing.

6       Q.    Essentially the publication goes out to

7   external reviewers who may have some expertise in the

8   area and may have some comments or not on the

9   publication, is that right?

10      A.    That's my understanding.

11      Q.    Okay.  Do you know whether it happened with

12  the Kass review?

13      A.    I don't know.  I'm not part of the review.

14      Q.    Do you know whether the report from Sweden

15  was peer-reviewed?

16      A.    Well, if it's not in a scientific

17  publication -- and what my -- the reason that I think

18  these are important is because peers within their

19  public health system have looked at it and decided it

20  should be published.  So it's not a scientific --

21      Q.    I understand that.  I guess I'm asking an

22  underlying threshold question for my edification which

23  is --

24      A.    It's --

25      Q.    -- whether they were externally

Michael Laidlaw                                    September 2, 2022

Page 108

 1  peer-reviewed or not.

 2          MS. PAYTON:  Please don't talk over each

 3  other.

 4      A.   Because it's not published in a journal it

 5  would not have a journal type peer review.

 6      Q.   (By Mr. Gonzalez-Pagan)  Does that hold true

 7  also for the report pertaining to Finland?

 8      A.   That's my assumption.

 9      Q.   Do you know what the percentage of

10  desistance is among transgender adolescents?

11      A.   Now, if you could -- I think that's a

12  difficult question to answer because when did they

13  come to -- when did they come to see a medical or

14  psychological health professional.  When did they come

15  to seek treatment and how long had they had the

16  dysphoria.

17          So are you asking me someone who's had

18  dysphoria since age four and presents at age 13, for

19  example?

20      Q.   Well, I guess what I'm asking is you made a

21  statement about desistance on your report --

22      A.   Uh-huh.

23      Q.   -- and you referenced particular studies --

24      A.   Yes.

25      Q.   -- and we've established that those studies

# PAGE

# BREAK

1    Supreme Court will tell us otherwise here in the next day or

2    two -- in the next few days.  It seems to me this certainly

3    would be an appealable order, and I'll get you a written order

4    so that if you wish to appeal, you can.

5              What else, if anything, do we need to address today?

6              Thank you all.  We are adjourned.

7        (Proceedings concluded at 12:57 PM on Wednesday, October

8    12, 2022.)

9                          * * * * * * * *

10             I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
11   Any redaction of personal data identifiers pursuant to the
     Judicial Conference Policy on Privacy is noted within the
12   transcript.

13

14   /s/ Megan A. Hague                    10/12/2022

15   Megan A. Hague, RPR, FCRR, CSR         Date
     Official U.S. Court Reporter
16                            I N D E X

17   DEFENDANT'S WITNESSES                            PAGE

18   DR. MICHAEL K. LAIDLAW
     Direct Examination By Mr. Perko                    6
19   Voir Dire Examination By Mr. Charles               7
     Cont. Direct Examination By Mr. Perko             15
20   Cross-Examination By Mr. Charles                  23
     Redirect Examination By Mr. Perko                 38
21
     ZOE HAWES
22   Direct Examination By Mr. Beato                   41
     Cross-Examination                                 45
23
     YAACOV SHEINFELD
24   Direct Examination By Mr. Jazil                   50
     Cross-Examination By Ms. Altman                   55
25

1          **E X H I B I T S**

2

PLAINTIFFS' EXHIBITS                    OFFERED   RECEIVED

3

P1      American Academy of Child         26

4          and Adolescent Psychiatry
           Statement Responding to

5          Efforts to ban
           Evidence-Based Care for

6          Transgender and Gender
           Diverse Youth

7

8    OTHER RECORD MADE                              PAGE

9    Closing Argument By Mr. Gonzalez-Pagan          64
     Closing Argument By Mr. Jazil                   82

10   Rebuttal Closing Argument By  Mr. Gonzalez-Pagan  102

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25