IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, *et al.,*

        *Plaintiffs*,

v.

JASON WEIDA, *et al.,*

        *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

**PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF**
**DR. PAUL W. HRUZ AND SUPPORTING MEMORANDUM OF LAW**

# **TABLE OF CONTENTS**

Page

MEMORANDUM OF LAW ................................................................................ 2

LEGAL STANDARD ........................................................................................ 2

ARGUMENT ................................................................................................... 3

   I.    Dr. Hruz is not qualified to offer an expert opinion on the diagnosis and
      the mental health treatment of gender dysphoria.................................... 3

   II.   Dr. Hruz's opinions and testimony are not relevant to this case. ......................... 8

       A.    Dr. Hruz's opinions about "desistance" are irrelevant................................. 9

       B.    Dr. Hruz's opinions about an "international response" in other
             countries is irrelevant. ................................................................ 10

       C.    Dr. Hruz's musings about the causes of gender dysphoria are
             irrelevant................................................................................. 11

       D.    Dr. Hruz's Opinions about WPATH Standards of Care are irrelevant. ...... 12

       E.    Dr. Hruz's Hypothetical and Speculative opinions are irrelevant.............. 13

   III.  Dr. Hruz's opinions and testimony are unreliable. ................................................. 14

       A.    Dr. Hruz's opinions are unreliable because they are based on
             untested hypotheses and speculation........................................... 16

       B.    Dr. Hruz's opinions are unreliable because they are misleading and
             therefore do not serve to enlighten the trier of fact. ..................... 16

       C.    Dr. Hruz's opinions are unreliable because they are not generally
             accepted in the scientific and medical community. ...................... 22

       D.    Dr. Hruz's opinions are unreliable because they have no support and
             are based on ipse dixit. ............................................................. 24

   IV.  Dr. Hruz's opinions are so tainted by his personal bias as to render his
       opinions unreliable.............................................................................. 25

   V.   Dr. Hruz's opinions lack probative value and are therefore inadmissible
       under Federal Rule of Evidence 403. ................................................. 29

   CONCLUSION ............................................................................................. 30

Pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403, and Rule 702, Plaintiffs move to partially exclude certain testimony of Defendants' expert Dr. Paul Hruz, on the grounds that he fails to meet the qualification, reliability, and helpfulness requirements imposed by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

Dr. Hruz is a pediatric endocrinologist. Many of the opinions he purports to offer in this case have previously been excluded. *See Kadel v. Folwell,* No. 1:19CV272, 2022 WL 3226731, at *9-10 (M.D.N.C. Aug. 10, 2022). He has no experience treating or diagnosing gender dysphoria; he has never provided gender-affirming care, has never done any original research on the issue, has never published any peer-reviewed literature on the matter, and holds opinions that are purely speculative and far afield from the mainstream of the medical and scientific communities. Indeed, as he does here, in *Kadel,* Dr. Hruz "offer[ed] a wide range of conclusions that fall into five main categories: mental healthcare, medical and surgical care, informed consent, criticism of medical associations, and political criticisms." *Kadel,* 2022 WL 3226731, at *8. Despite the broad ranging categories on which he was offered to testify, after reviewing his qualifications, the *Kadel* Court limited Dr. Hruz's testimony to "the risks associated with puberty blocking medication and hormone therapy." *Id.* at *9.

The Court here should similarly impose the same limitation on Dr. Hruz's

testimony.   Accordingly, Dr. Hruz is not a qualified expert on gender dysphoria or its treatment, and his opinions and testimony are neither relevant nor reliable. Additionally, his opinions and testimony are likewise inadmissible because any probative value they may have (and they have none) is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence. *See* Fed. R. Evid. 403. In support of this motion, Plaintiffs state as follows:

## MEMORANDUM OF LAW

## LEGAL STANDARD

Federal Rule of Evidence 702 places gatekeeping obligation on a trial court, to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The importance of Daubert's gatekeeping requirement cannot be overstated."). In determining the admissibility of expert testimony under Rule 702, courts engage in a "rigorous" three-part inquiry and must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, at 1260; *see also City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d

548, 562 (11th Cir. 1998), *cert. denied*, 528 U.S. 812 (1999).

The Eleventh Circuit refers to these three considerations separately as "qualification," "reliability," and "helpfulness" and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The party offering the expert testimony has the "burden of establishing qualification, reliability, and helpfulness." *Frazier*, 387 F.3d at 1260.  As detailed below, Dr. Hruz's proposed opinions fail to meet these requirements and should be excluded.

## **ARGUMENT**

### I.  **Dr. Hruz is not qualified to offer an expert opinion on the diagnosis and the mental health treatment of gender dysphoria.**

A witness must be "qualified to testify competently regarding the matter he intends to address." *Frazier*, at 1260.  "A witness may be qualified as an expert by virtue of his 'knowledge, skill, experience, training, or education." *Quiet Technology DC-8, Inc.*, 326 F.3d at 1342. However, credentials are not dispositive when determining qualification. Each of the three analytical prongs (including qualifications) is assessed in reference to the matter to which the expert seeks to testify—i.e., "to the task at hand." *Daubert*, 509 U.S. at 597. It is for that reason that "expertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014)

(holding that a psychiatrist was properly prevented from opining on rates of drug use in an economically vulnerable population because he had never conducted research on the subject, and instead relied on studies to form his opinion). Rather, an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Id.* at 1369. "A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). If a proposed expert witness does not "propose to testify about matters growing naturally and directly out of research he had conducted independent of the litigation," such expert should be disqualified. *Lebron*, 772 F.3d at 1369 (quoting Fed. R. Evid. 702 (cleaned up)).

Therefore "[d]etermining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Banuchi v. City of Homestead*, 606 F.Supp.3d 1262, 1272 (S.D. Fla. 2022) (cleaned up). Here, Dr. Hruz does not have the medical specialty required to discuss the diagnosis and treatment for gender dysphoria, particularly the diagnosis and assessment of gender dysphoria and non-endocrine treatments that are wholly outside his expertise as an endocrinologist.

The Court in *Kadel* succinctly determined based on Dr. Hruz's deposition

testimony that:

> Hruz is not qualified to offer expert opinions on the diagnosis of gender dysphoria, the DSM, gender dysphoria's potential; causes, the likelihood that a patient will "desist," or the efficacy of mental health treatments. He has never diagnosed a patient with gender dysphoria, treated gender dysphoria, treated a transgender patient, conducted any original research about gender dysphoria diagnosis or its causes, or published any scientific, peer reviewed literature on gender dysphoria.

*Kadel,* 2022 WL 3226731, at \*9; Ex. A at ¶142 Hruz Expert Report[1] ("I have never personally engaged in the delivery of gender affirming medical interventions to children with gender dysphoria"); Ex. C at 88:18-89:8, 89:17-25 (Dr. Hruz discussing his lack of qualifications and treatment for gender dysphoria); Ex. E at 24:11-24:14, 25:20-25:23. Indeed, Dr. Hruz has also not sat in on a meeting with a patient discussing the treatment options for gender dysphoria. Ex. C at 40:6-40:11. Nor has he conducted any original research about transgender people or gender dysphoria. Ex. C at 35:5-36:1; Ex. E at 62:25-63:9; Ex. F at 25:24-28:13. He has not published any scientific, peer-reviewed literature on gender dysphoria or transgender people either. Ex. C at 42:14-49:19; Ex. E at 61:17-64:7, 295:19-

---

[1] Unless otherwise specified, all exhibits cited herein are attached to the contemporaneously filed Declaration of Shani Rivaux.

295:23.[2] Dr. Hruz is neither a psychiatrist[3], a psychologist, nor a mental health care provider of any kind qualified to diagnose gender dysphoria or to opine on the reliability of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"). Ex. C at 112:9-11, 55:23-56:15; Ex. E at 41:21-42:2, 42:11-42:18.

Like the Court in *Kadel,* this Court should exclude Dr. Hruz on these topics due to his lack of expertise. *See Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science."). Instead, Dr. Hruz bases his opinions solely on his review of literature and conversations he has had with others. The fact that Dr. Hruz has read about gender dysphoria and

---

[2] Dr. Hruz's only publication relating to gender dysphoria in a peer-reviewed journal is a letter to the editor not based on any original research or scientific study, and for which it is unclear if letters to the editor are subjected to peer-review. Ex. C at 43:9-45:15. *See also* Ex. P (noting that letters to the editor are typically not peer reviewed). His other publications pertaining to gender dysphoria are all in non-scientific, non-medical, non-peer-reviewed journals affiliated with religious organizations.

[3] In his rebuttal report, Dr. Hruz claims that his opinions are supported by his "professional experience as a psychiatrist." Ex. B at ¶3. However, none of his qualifications or his prior testimony have demonstrated any credentials of a psychiatrist.

transgender people does not qualify him as an expert on these issues, however. That is precisely the sort of "generalized knowledge of a particular subject" that courts have rejected as a qualification under Rule 702. As with the disqualified expert in *Lebron* who "reached his opinion instead by relying on studies," this is insufficient to serve as an expert witness. *Lebron*, 772 F.3d at 1369.

Aside from his lack of expertise, Dr. Hruz is the definition of a manufactured "expert witness" as his involvement originates from and dates back to a conference by the Alliance Defending Freedom ("ADF")[4] organized specifically to cultivate professional "experts" who would testify against the gender-affirmation of transgender people. Ex. C at 241:10-246:20; Ex. E at 92:21-93:24; Ex. F at 147:11-21; *cf.* Ex. O at 84:3-85:12, 90:13-91:13 (Dr. Lappert testifying that he attended the same ADF conference as Dr. Hruz in 2017 where the "poverty of [experts] who are willing to testify" against gender-confirming policies was discussed and that attendees "were asked whether they would be

---

[4] ADF is well-known for pushing anti-LGBT policies across the country and internationally. *See*, *e.g.*, Nico Lang, *A Hate Group Is Reportedly Behind 2021's Dangerous Wave of Anti-Trans Bills*, them. (Feb. 19, 2021), https://bit.ly/3HEqCR9; Julie Compton, *Activists take aim at anti-LGBTQ 'hate group,' Alliance Defending Freedom*, NBC News (Nov. 14, 2018), https://nbcnews.to/3oEe9Es. The Southern Poverty Law Center has designated ADF a hate group. *See* S. Poverty Law Ctr., *Why is Alliance Defending Freedom a Hate Group?* (Apr. 10, 2020), https://bit.ly/3HE6LS1 (accessed Nov. 19, 2021).

willing to participate as expert witnesses"); Ex. Q at 169:18-171:4. Like the disqualified expert in *Lebron*, Dr. Hruz "developed his opinions expressly for purposes of testifying" in an area outside his specialty. *Lebron*, 772 F.3d at 1369.

In sum, Dr. Hruz is not qualified to serve as an expert on the diagnosis or the mental health treatment paradigms for gender dysphoria and his testimony should be limited to "the risks associated with puberty blocking medication and hormone therapy." *Kadel,* 2022 WL 3226731, at *9.

## II.  Dr. Hruz's opinions and testimony are not relevant to this case.

To satisfy the helpfulness requirement, the testimony must have a justified scientific relationship to the facts at issue. *Daubert*, 509 U.S. at 591. Thus, helpfulness, "goes primarily to relevance." *Id.* at 580. Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). "The relationship must be an appropriate 'fit' with respect to the offered opinion and the facts of the case." *Id.* The "court must satisfy itself that the proffered testimony is relevant to the issue at hand, for that is a precondition to admissibility." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir. 2021) (cleaned up). "The touchstone of this inquiry is the concept of relevance." *Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021). Thus, "expert testimony which does not relate to any issue in the case is not relevant and non-helpful." *Knight v. Boehringer Ingelheim*

*Pharms., Inc.*, 323 F.Supp.3d 837, 846 (S.D. W.Va. 2018). In order to be relevant, an opinion needs to "fit" with the facts at issue. *Simmons v. Augusta Aviation, Inc.*, 596 F. Supp. 3d 1363, 1374 (S.D. Ga. 2022) "To satisfy this requirement, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case." *Id.* Testimony that "offers nothing more than what lawyers for the parties can argue in closing arguments" or that consists of "subjective portrayals of factual information" "generally will not help the trier of fact." *Giusto v. Int'l Paper Co.*, 2021 WL 3603374, at *4 (N.D. Ga. Aug. 13, 2021).

This case is about whether Defendants' exclusion of coverage for medically necessary gender-affirming health care treatments violates Plaintiffs' rights.  Many of Dr. Hruz's opinions are not relevant to this inquiry as they do not have a "valid scientific connection to the pertinent inquiry" *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir.2009).  His opinions do not "fit" because they are not sufficiently tied to the facts of the case so that they will aid a factfinder.

A. *Dr. Hruz's opinions about "desistance" are irrelevant.*

Take for example Dr. Hruz's opinions about purported "desistance" rates as a reason to question the provision of gender-confirming care. Another subject matter area in which the *Kadel* Court excluded Dr. Hruz's testimony.  *Kadel*, 2022

WL 3226731, at *9. Dr. Hruz spends considerable time on (and builds most of his testimony questioning the propriety of gender-affirming health care upon) antiquated studies showing that a majority of *prepubertal* children diagnosed with *gender identity disorder*—an outmoded diagnosis *distinct from gender dysphoria* with different diagnostic criteria—"desisted" from their gender nonconformity or cross-gender behavior. *See*, *e.g.*, Ex. A at ¶¶63-64; 141. But not only are such opinions based on faulty propositions, they simply do not fit the facts of this case.

Dr. Hruz's testimony that focuses on the risks associated with providing hormone therapy to prepubescent children—children who have not begun puberty—is not relevant. Ex. C at 125:23-126:5. By his own admission, "no medical and surgical interventions are initiated until after the onset of puberty" under any model of treatment. *Id.* But again, no hormonal or surgical care is recommended for or provided to *prepubertal* children, nor are any of the plaintiffs prepubertal children. Accordingly, Dr. Hruz's opinions regarding "desistance" are thus irrelevant to this case.

B. *Dr. Hruz's opinions about an "international response" in other countries is irrelevant.*

Dr. Hruz's opinions about a purported "international response" regarding the provision of gender-confirming care in Finland, Sweden, and the United Kingdom are both misleading and wholly irrelevant. Ex. A at ¶¶123-126; Ex. D at 91-96. In the first place, Dr. Hruz has offered no firsthand knowledge of other

countries' policies, so he is not qualified to testify about them. And his testimony is false, or at best, misleading, since, each of these countries *provides and covers* some gender-confirming hormonal and surgical treatment for gender dysphoria for adolescents and adults, whereas AHCA excludes treatment completely from Medicaid coverage. *See*, *e.g.*, Ex. C at 183:23-184:4, 185:3-10, 189:14-190:7; *see also Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 671 (8th Cir. 2022) ("Similarly, the WPATH Standards of Care and the Finnish council both recommend that cross-sex hormones be considered only where the adolescent is experiencing persistent gender dysphoria, other mental health conditions are well-managed, and the minor is able to meet the standards to consent to the treatment."). Moreover, how care is provided and covered in countries with nationalized health care systems is not relevant to whether gender-confirming care should be covered by Medicaid in Florida.[5]

   C. *Dr. Hruz's musings about the causes of gender dysphoria are irrelevant.*

   Dr. Hruz opines, without any evidence, that gender dysphoria *may be* caused by social contagion and social pressure. Ex. A at ¶¶ 31, 91, 116-118; Ex. D at 40-43, 99.  But whether gender dysphoria is caused by social contagion is both wholly

---

[5] For example, in Sweden standards of care are developed through legislation and thus part of a political process, which contrasts with the process in the Florida. *See* Socialstyrelsen, *About the National Board of Health and Welfare*, https://www.socialstyrelsen.se/en/about-us/ (accessed Nov. 19, 2021) (noting that standards are based on legislation).

unsupported, as described below, and irrelevant to the case at hand. It is undisputed that gender dysphoria is a recognized medical condition that necessitates medical treatment. *See*, *e.g.*, Ex. C at 57:24-58:9 ("Q. Would you agree there are transgender people in this world? A. … That's undeniable that … there are individuals that have this experience of discordance between their gender identity and their sex."); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594-95 (4th Cir. 2020). Likewise his musings about as to the difference between gender identity and "biological sex," including as to whether "biological sex" can be changed, are immaterial since this case is about access to gender-affirming care, not changing sex. Ex. A at ¶¶ 14, 58, 66. Because each of these opinions offered lacks any "valid scientific connection to the disputed facts in the case," they should be excluded. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

D. *Dr. Hruz's Opinions about WPATH Standards of Care are irrelevant.*

Dr. Hruz opines that WPATH should be disregarded as an "advocacy group" and that its recommendations "represent ideological positions devoid of rigorous scientific evidence"[6] and that the Endocrine Society Guidelines should be rejected because some of the committee members are also WPATH members. Ex. A at ¶¶

---

[6] Without any support, Dr. Hruz also claims that the American Academy of Pediatrics is a "politically influenced, non-science association." Ex. A at ¶140.

88-97. However, Dr. Hruz has not demonstrated any personal knowledge regarding the internal conversations at WPATH, has not participated in WPATH conferences, is not a member of WPATH and therefore lacks knowledge "of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co*., 861 F.2d 655, 662 (11th Cir. 1988). In short, Dr. Hruz does not have "any experience with . . . WPATH. . . upon which to base his criticisms[ and] is therefore not qualified to testify about the credibility of th[at] organization[]." *Kadel,* 2022 WL 3226731, at *10.

   E.  *Dr. Hruz's Hypothetical and Speculative opinions are irrelevant.*

Finally, and perhaps most crucially, essentially all of Dr. Hruz's opinions are irrelevant because they are not based on fact, let alone "fit" within the facts of case. Dr. Hruz's report in this case is substantially similar to the report he submitted in *Kadel*. *Compare* Ex. A and Ex. D.  Two years ago, when asked about his opinions in the report submitted in *Kadel*, he testified that they were hypotheses. More specifically, he testified that the entirety of his opinions is based on *hypotheses*, meaning they are based on speculation. Ex. C at 154:4-8 ("A. You know, all along here, … I've been stating, and I hope very clearly, that much of my opinion is based upon hypotheses and alternative hypotheses, because there is no definitive answer to this question."); *id.* at 57:1-3 ("A. Because I present many things in my report as hypotheses. And without making definitive statements.").

Indeed, Dr. Hruz purportedly has no view as to what modality of treatment should be provided to transgender people suffering gender dysphoria. *Id.* at 61:21-62:2. Such "speculation is unreliable evidence and is inadmissible." *Dunn*, 275 F.Supp.2d at 684; *see Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).  In other words, Dr. Hruz lacks knowledge "of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988). And opinions based on "subjective belief or unsupported speculation" should be rejected. *Daubert*, 509 U.S. at 589-590.

*   *   *

The opinions expressed by Dr. Hruz are insufficiently tied to the facts of this case so that they will aid a factfinder and should be excluded as irrelevant.

### III.   Dr. Hruz's opinions and testimony are unreliable.

An expert's testimony should only be admitted if it is sufficiently reliable. "To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *In re 3M Combat Arms Earplug Products Liab. Litig.*, 3:19MD2885, 2022 WL 1262203, at *1 (N.D. Fla. Apr. 28, 2022). The requirement of reliability found in Rule 702 is "the centerpiece of any determination of admissibility." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002). "At this stage,

14

the court must undertake an independent analysis of each step in the logic leading to the expert's conclusions; if the analysis is deemed unreliable at any step the expert's entire opinion must be excluded." *Hendrix v. Evenflo Co., Inc*., 255 F.R.D. 568, 578 (N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010). In making this determination the court can consider a variety of factors, including whether the purported expert's theory has been tested, whether it has been subjected to peer review and publication, and whether the theory has been generally accepted in the scientific community. *See Daubert*, 509 U.S. at 593-94; *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).[7]  To be reliable the expert's testimony must always be based on "good grounds." *Daubert,* 509 U.S. at 590. Moreover, *Daubert* requires that reliable expert testimony be more than scientifically unsupported "leaps of faith." *Rider v. Sandoz Pharm. Corp*., 295 F.3d at 1202.  Here, Dr. Hruz's opinions fail all indicia of reliability. Dr. Hruz's proffered opinions are based on nothing more than rank speculation, "untested" theories, uncorroborated anecdotes, and assumptions that are obsolete, flawed, unethical, and expressed opinions based upon "unsettled science." What is more, some of his opinions are patently false.

---

[7]  Other factors which may be relevant include (1) the nature of the field of claimed expertise, (2) the source of the expert's knowledge, (3) the expert's level of care in using the knowledge, and (4) the expert's consideration of alternative hypotheses. Hendrix, 255 F.R.D. at 578-79.

A. *Dr. Hruz's opinions are unreliable because they are based on untested hypotheses and speculation.*

As noted above, **Dr. Hruz's opinions are hypotheses**; hypotheses that he himself has not tested or studied. *See, e.g.,* Ex. A at ¶¶31; 76; 90-91; 116-118; 130-131. And "[w]hile hypothesis is essential in the scientific community because it leads to advances in science, speculation in the courtroom cannot aid the fact finder in making a determination." *Dunn v. Sandoz Pharms. Corp.*, 275 F.Supp.2d 672, 684 (M.D.N.C. 2003). "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996). Indeed, "[w]here an expert's opinion testimony is founded on an unsupported premise, it gives rise to an inference that is based on speculation and has no evidentiary value." *Walker v. Blitz USA, Inc.*, 663 F. Supp. 2d 1344, 1364 (N.D. Ga. 2009). At bottom, such speculation is unreliable evidence and is inadmissible.

B. *Dr. Hruz's opinions are unreliable because they are misleading and therefore do not serve to enlighten the trier of fact.*

In addition, some of Dr. Hruz's opinions are misleading at best, or flat out false. For example:

*One.* Dr. Hruz opines that the literature around gender-affirming care is "in a state insufficient to enable sound conclusions about the efficacy of "affirming treatments." Ex. A at ¶¶93; 122; 142; Ex. D at 100 ("treatments – hormones and

surgery – for gender dysphoria and 'transitioning' have not been accepted by the relevant scientific communities (biology, genetics, neonatolgy [sic], medicine, psychology, etc.).”). Not true. It is the official, consensus, evidence-based position of the National Academies of Science, Engineering, and Medicine that, "[a] major success of these guidelines has been identifying evidence and establishing expert consensus that gender-affirming care is medically necessary and, further, that withholding this care is not a neutral option." Ex. H at 361;[8] Ex. C at 205:20-206:22. Indeed, "[a] number of professional medical organizations have joined WPATH in recognizing that gender affirming care is medically necessary for transgender people." Ex. H at 361. This includes, among others, the American Medical Association, American Psychiatric Association, American Psychological Association, American Academy of Family Physicians, American Academy of Pediatrics, American College of Obstetricians and Gynecologists, and the Endocrine Society. *Id.*; Ex. E at 58:21-61:9. It also includes Dr. Hruz's own employer, Washington University in St. Louis. Ex. C at 85:14-86:11.

**Two.** In his report, Dr. Hruz presented a number of modalities of treatment for the care of patients with gender dysphoria, including: (1) "conversion" or "reparative therapy"; (2) "watchful waiting"; and (3) the "affirming" approach, as

---

[8] Ex. H, a report of the National Academies, is self-authenticating as a publication issued by a public authority, Fed. R. Evid. 902(5), and is appropriate for judicial notice, *United States v. Doe*, 962 F.3d 139, 147 n.6 (4th Cir. 2020).

if these did not endorse the provision of gender-affirming medical care for adolescents and adults. Ex. A at ¶¶54-65; Ex. D at 49-50. In doing so, Dr. Hruz opined that the approach advocated by Dr. Kenneth Zucker and the "watchful waiting" model use "modern psychotherapeutic approaches to address suicidal ideation in children with gender dysphoria." Ex. A at ¶¶63-64; *see also* Ex. D at 50-51 (Dr. Hruz explaining that treatment "involve[] no medical treatment and is currently the best scientifically supported intervention."). But Dr. Hruz misrepresents these approaches by failing to explain that Dr. Zucker's approach and the "watchful waiting" model, which recommends the provision of gender-affirming medical care if a patient's gender dysphoria persists into adolescence. Ex. G; Ex. C at 121:6-12, 125:11-17. For example, with regards to Dr. Zucker, his approach has been described as follows by the APA:

> For adolescent patients (including those who first came to the clinic as young children), Dr. Zucker follows the Standards of Care Guidelines of the World Professional Association for Transgender Health. The treatment options include helping patients make a satisfactory transition to the opposite sex, including the institution of hormonal treatment to facilitate transition. In some cases, treatment may include helping an interested adolescent obtain sex-reassignment surgery.

Ex. R; Ex. G at 61. Indeed, "All of the three models of care … share in common the administration of hormonal treatment in adolescence." *Id.* at 64.

**Three.** In that same vein Dr. Hruz falsely presented "reparative therapy" as if it was an accepted modality of treatment. Ex. A at ¶60. Nothing could be further

from the truth, however.  The provision of conversion/reparative therapy represents a fringe view completely contrary to the mainstream medical and scientific community in the United States. As Dr. Hruz has previously acknowledged in deposition, the American Psychiatric Association and the American Psychological Association oppose "reparative therapy" or gender identity change efforts as unethical and harmful. Ex. C at 164:1-170:8. The same position adopted by the National Academies. *Id.* at 176:9-177:24; Ex. H at 361-363. Indeed, per the American Psychological Association's Resolution on Gender Identity Change Efforts, "individuals who have experienced pressure or coercion to conform to their sex assigned at birth or therapy that was biased toward conformity to one's assigned sex at birth have reported harm resulting from these experiences such as emotional distress, loss of relationships, and low self-worth." Ex. S. What is more, Dr. Hruz cites to no authority—let alone any original, peer-reviewed study, in support of this so-called approach to treatment.[9]

**Four.** Dr. Hruz's misrepresents "desistance" rates as a reason to question the provision of gender-confirming care. This is a subject matter area in which the *Kadel* Court excluded Dr. Hruz's testimony.  *Kadel v. Folwell,* 2022 WL 3226731 at *9.

---

[9] Hruz cites to Dr. Ken Zucker's work as supportive of this therapeutic approach. However, as outlined above, Dr. Hruz grossly misrepresents Dr. Zucker's approach. What is more, the citation to Dr. Zucker is to an opinion article not any peer-reviewed original research.

Dr. Hruz spends considerable time on (and builds most of his testimony questioning the propriety of gender-affirming health care upon) antiquated studies showing that a majority of *prepubertal* children diagnosed with *gender identity disorder*—an outmoded diagnosis *distinct from gender dysphoria* with different diagnostic criteria—"desisted" from their gender nonconformity or cross-gender behavior. Ex. A at ¶¶ 63-64. But, his presentation of this literature is extremely misleading since, not only due to his reliance on outdated studies, but also because he ignores the more recent literature which has uniformly found that youth who have a diagnosis of gender dysphoria in adolescence overwhelmingly continue to identify as transgender as they age.[10]   Moreover, as Dr. Hruz has previously admitted that absolutely no gender-affirming medical or surgical care is provided to *prepubertal* children. Ex. C at 125:23-126:5. That is true for each of the treatment paradigms Dr. Hruz discusses (apart from "conversion" or "reparative therapy"), a fact Dr. Hruz did not disclose.

---

[10] *See, e.g.,* Kristina R. Olson, *Gender Identity 5 Years After Social Transition*, 150 Ped. e2021056082 (2022) (of 300 youth with gender dysphoria, at the end of the five years, 94% of participants still identified as transgender); Annelou L C de Vries et al., *Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study*, 8 J. Sex. Med. 2276 (2011). Notably, Thomas D Steensma, who co-authored the study on which Dr. Laidlaw improperly cites for the proposition that most youth with gender dysphoria "desist" in their gender identity, also co-authored the de Vries study, which looked 70 youth in the Netherlands referred for treatment of gender dysphoria between 2000 and 2008, found that all of them decided to continue their medical transition after 1-2 years, confirming that "young adolescents who had been carefully diagnosed show persisting gender dysphoria into late adolescence or young adulthood." *Id.* at 2281.

*Id.* at 119:22-140:12. His opinions are therefore not only misleading, but also irrelevant, since this case is about the coverage for medically necessary gender-affirming medical care, and none of the plaintiffs are prepubertal children.

*Five.* Dr. Hruz provides no scientific bases for his conclusions that "A currently unknown percentage and number of patients reporting gender dysphoria suffer from mental illness(es) that complicate and may distort their judgments and perceptions of gender identity" or that "A currently unknown percentage and number of patients reporting gender dysphoria may be manipulated by a social contagion and social pressure processes, including peer group, social media, YouTube role modeling, and parental pressures." Ex. A at ¶¶ 130-131. But "Hruz is not a statistician and does not discuss in his report how he came to those conclusions, what data he relied upon, or what methodology he applied to that data." *Kadel*, 2022 WL 3226731, at *9. "This testimony will therefore be excluded as unreliable." *Id.*

\*   \*   \*

The Court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Here, Dr. Hruz has misrepresented or omitted information that goes to the heart of his opinions and calls into question the reliability of his opinions. While usually the factual basis of an expert opinion goes to credibility, "it is possible for an experts'

21

omission of articles to render his or her opinion inadmissible on reliability grounds." *Huggins v. Stryker Corp.*, 932 F.Supp.2d 972, 994 (D. Minn. 2013). Such is the case here where Dr. Hruz omits key information, or worse, misrepresents facts that if properly disclosed would contradict his opinions and undermine their foundation. In such circumstances, the "potential to mislead" rather "than to enlighten" is too great. *In re Lipitor*, 892 F.3d at 632.

C. *Dr. Hruz's opinions are unreliable because they are not generally accepted in the scientific and medical community.*

General acceptance in the relevant scientific community is also relevant to the reliability inquiry. *Nease*, 848 F.3d at 229. Not only is widespread acceptance an important factor in assessing the reliability of an expert's opinions, but the fact that a known technique or theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594. Here, Dr. Hruz's opinions are outside the mainstream of medical and scientific opinion and have been explicitly rejected by these relevant communities.

The provision of gender-confirming care has been accepted and endorsed, *inter alia*, by the: American Medical Association; American Psychiatric Association; American Psychological Association; Endocrine Society; Pediatric Endocrine Society; American Academy of Pediatrics; National Academies of Science, Engineering, and Medicine; and Dr. Hruz's own employer. Ex. C at 164:5-11; Ex. E at 70:25-71:22; *id.* 57:11-59:14; Ex. H at 361-363. The Fourth

Circuit has described it as "the consensus approach of the medical and mental health community." *Grimm*, 972 F.3d at 595; *Edmo v. Corizon, Inc*., 935 F.3d 757, 771 (9th Cir. 2019) (the provision of gender-affirming care, consistent with the WPATH Standards of Care, represents "the ***broad medical consensus*** in the area of transgender health care," which "requires providers to individually diagnose, assess, and treat individuals' gender dysphoria.") (emphasis added); *see also Brandt v. Rutledge*, 551 F.Supp.3d 882, 890 (E.D. Ark. 2021) ("The consensus recommendation of medical organizations is that the only effective treatment for individuals at risk of or suffering from gender dysphoria is to provide gender-affirming care."), *aff'd*, 47 F.4th 661 (8th Cir. 2022); *Flack v. Wisconsin Dep't of Health Servs*., 395 F.Supp.3d 1001, 1018 (W.D. Wis. 2019).

In fact, another federal district court found as much when it enjoined Arkansas' state law seeking to ban gender-confirming treatment for minors. *See Brandt*, 551 F.Supp.3d 882. In doing so, the *Brandt* court explicitly found that: (a) "Gender-affirming treatment is *supported by medical evidence* that has been *subject to rigorous study*;" and (b) "*Every major expert medical association* recognizes that gender-affirming care for transgender minors may be *medically appropriate and necessary* to improve the physical and mental health of transgender people." *Id.* at 891 (emphasis added). Notably, Dr. Hruz filed an expert declaration in the *Brandt* case that is virtually identical to the report he filed in this

case. As such, the *Brandt* court's findings stand as a stark repudiation of Dr. Hruz's opinion that gender-affirming care is "experimental" and "not medically necessary." Ex. A at ¶¶137-138; Ex. D at 17.  It is for these reasons that the Court in *Kadel* excluded much of Dr. Hruz's opinions in that case on these issues. *Kadel v. Folwell,* 2022 WL 3226731at *9.

Conversely, Dr. Hruz's opinions in support of reparative therapy or gender identity change efforts has also been rejected by the general scientific community, among others. Ex. C at 164:1-170:8; Ex. E at 118:7-19, 237:1-23. *See also King v. Governor of the State of New Jersey*, 767 F.3d 216, 221–22 (3d Cir. 2014); *Pickup v. Brown*, 740 F.3d 1208, 1223–24 (9th Cir. 2014). This again shows that Dr. Hruz's opinions are wildly outside the mainstream and his failure to notify the Court of the rejection of these purported alternative treatment renders his testimony unreliable.

D. *Dr. Hruz's opinions are unreliable because they have no support and are based on ipse dixit.*

As noted herein, Dr. Hruz's opinions are based on untested hypotheses and do not have any factual support. For example, Dr. Hruz opines that gender dysphoria *may be* caused by social contagion and social pressure. Ex. A at ¶131. But he offers no evidence for this hypothesis, which he admits has not been tested. *Id.* Of course, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only

by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

And this is one of those circumstances in which "there is simply too great an

analytical gap between the data and the opinion proffered." *Id*. In fact, the only

study to have looked at this hypothesis found no support for the hypothesis. Ex. N.

\* \* \*

Given that Dr. Hruz's opinions fail to meet the most basic indicia of

reliability, the Court should exclude Dr. Hruz's opinions and testimony as

unreliable.

## IV. Dr. Hruz's opinions are so tainted by his personal bias as to render his opinions unreliable.

While Plaintiffs are cognizant of the fact that bias in an expert witness's

testimony is usually an issue of credibility as opposed to one of admissibility, when

an expert's opinions are based on bias as opposed to scientific or medical

knowledge, then the question of bias becomes one of reliability and admissibility.

Indeed, reliability is a flexible inquiry wherein "courts must ensure that an expert's

opinion is based on scientific, technical, or other specialized knowledge and not

on belief or speculation." *Sardis*, 10 F.4th at 281. Here, there is ample evidence

that Dr. Hruz's testimony is so permeated and tainted by his unscientific views and

personal bias as to render it unreliable. *See Kadel*, 2022 WL 3226731, at \*9

("Plaintiffs have offered evidence that calls Hruz's motivations—and thereby, his

reliability—into serious question."); *cf. Sanchez v. Esso Standard Oil de Puerto*

25

*Rico, Inc.*, No. CIV 08-2151, 2010 WL 3809990, at *4 (D.P.R. Sept. 29, 2010).

More specifically, Dr. Hruz's testimony appears to be motivated by his personal and religious views regarding transgender people. To be clear, Plaintiffs do not seek to impugn or malign whatever moral or religious views Dr. Hruz may hold. However, to the extent Dr. Hruz's moral and religious views have influenced his purported expert opinions— indeed, they seem to be the motivating factor— that is something the Court must be aware of and should consider as it assesses the reliability of his testimony.

In his report, Dr. Hruz discusses meeting with Dr. Norman Spack, a noted pediatric endocrinologist and the co-founder of Boston Children's Hospital Gender Management Service Program, as someone he consulted when he first began to study issues relating to gender dysphoria from a scientific standpoint. Ex. Ex. A at ¶9; D at 6. But Dr. Spack's account of this encounter is quite different. Dr. Spack asserts that "Dr. Hruz did not discuss or mention that his issues or concerns were based on science." Ex. K at ¶ 13. To the contrary, Dr. Hruz expressed to Dr. Spack that he had "a significant problem with the entire issue" and "whole idea of transgender," and that for him, it was "a matter of [his] faith." *Id.* at ¶¶ 11-12. When confronted with Dr. Spack's account, Dr. Hruz notably did not deny he made such statements. Ex. C at 247:10-251:4.

Similarly, Dr. Hruz misrepresents the nature of his conversations with

"dozens of parents of children with gender dysphoria" as that of seeking "to understand the unique difficulties experienced by this patient population." Ex. A at ¶9; Ex. D at 6. One of these parents gives quite a different account of meeting with Dr. Hruz, however. Dr. Hruz met with Kim Hutton, the mother of a transgender child, in 2013. Ex. E 102:24-103:9, 126:12-129:25. Dr. Hruz says he met with the parent of a transgender child who was affiliated with an organization called TransParent, during a "very early investigative phase" of his study of gender dysphoria. Ex. E 103:25-104-7, 102:24-103:9.   By Ms. Hutton's account, the nature of Dr. Hruz's conversation with her revealed that that he was firmly opposed to gender-affirming care, as well as opposed to a having a Transgender Center at St. Louis Children's Hospital, and that this opposition was rooted in his personal moral and religious views. Indeed, Dr. Hruz reportedly told Ms. Hutton, "there will never be a pediatric gender center at St. Louis Children's Hospital. I won't allow it." Ex. L at 30:8-30:11. Dr. Hruz also told Ms. Hutton that her "child was not normal and would never be normal," Ex. L at 28:20-28:23; that "the idea of doing surgeries on transgender people is -- is wrong," *id.* at 21:21-27:24; and repeatedly encouraged Ms. Hutton to "read Pope John Paul II's writings on gender," because it would explain everything. *id.* at 29:17-29:20. And in response to Ms. Hutton's statement that transgender children "are at a 41 percent risk of suicide if they don't have acceptance and -- and care from their parents and -- and

if they don't get their medical needs met," Dr. Hruz responded that, "Some children are born in this world to suffer and die." *Id.* at 29:21-30:4. As a result, Ms. Hutton left her conversation with Dr. Hruz—a conversation Dr. Hruz says he "was approaching [] in a purely investigative manner," Ex. E at 126:16-127:3— "perplexed" due to "the religious tone of the conversation," which she "figured [] would at least be based on science." Ex. L at 37:11-37:19.

The bias illuminated by Dr. Spack's and Ms. Hutton's testimony is further confirmed by the nature of Dr. Hruz's publications and presentations on this issue. With one exception, all of Dr. Hruz's publications pertaining to gender dysphoria have been in religiously affiliated, non-scientific publications. Ex. C at 42:10-49:19. Similarly, aside from a handful of grand rounds, Dr. Hruz has not made any presentations about this topic at scientific conferences, *id.* at 90:17-93:3; instead, presenting on this topic to religious organizations. For instance, in November 2017, Dr. Hruz gave a presentation at the Saint John Paul II Bioethics Center at the Holy Apostles College & Seminary, where he referred to being transgender as something that "probably goes back to some of the early heresies in the church," and to pictures of transgender people as "disturbing." Ex. E at 83:5-85:20. When confronted with these statements, Dr. Hruz did not disavow or deny making them. *Id.* And in February 2018, Dr. Hruz presented at an "International Conference on Gender, Sex and Education" that was billed as "the world's first great public

objection to totalitarian LGBTI laws," "a conference to oppose gender ideology," and "against the LGBTI doctrine… taking hold of Western Countries." Ex. M; Ex. C at 93:4-97:10.

The foregoing, coupled with Dr. Hruz's departure with generally accepted medical and scientific standards, demonstrates that Dr. Hruz's purported expert testimony lacks any indicia of reliability. And while the Federal Rules of Evidence state that "[e]vidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility," Fed. R. Evid. 610, the Advisory Committee Notes to Rule 610 make clear that "an inquiry for the purpose of showing interest or bias because of them is not within the prohibition." Advisory Committee Notes to Rule 610. Indeed, "[w]ithout this critical information," the Court would be "deprived of the necessary facts from which it could appropriately draw inferences about [Dr. Hruz's] reliability." *State v. Heinz*, 485 A.2d 1321, 1328 (Conn. App. 1984). Here, it is evident that Dr. Hruz has not been candid regarding his experiences or the bases for his "opinions." The record evidence demonstrates a clear bias by Dr. Hruz against transgender people generally, which infects his reliability as a purported expert witness in this case.

## V.   Dr. Hruz's opinions lack probative value and are therefore inadmissible under Federal Rule of Evidence 403.

Finally, because of the potentially misleading effect of expert evidence, *see Daubert*, 509 U.S. at 595, on occasion expert opinions that otherwise meet

admissibility requirements may still be excluded under Fed. R. Evid. 403. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible expert testimony is substantially outweighed by its potential to confuse or mislead the jury, or if the testimony is cumulative or needlessly time consuming. *See, e.g., Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477 (11th Cir.1985) (admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed. R. Evid. 702"); *Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1316 (11th Cir. 2005) (affirming exclusion of expert testimony as cumulative). Consequently, "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises *more* control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (cleaned up).

Accordingly, the Court should exclude Dr. Hruz's opinions because its introduction will result in unfair prejudice, confusion of the issues, or in misleading testimony. Fed. R. Evid. 403. Dr. Hruz offers opinions that are irrelevant to the issues in this case, and, in any event, the opinions he offers are speculative and unreliable. The testimony would also result in prejudice, as the testimony seeks to sow confusion about the propriety of gender- confirming care based on speculation, irrelevant, misleading, or biased opinions.

## **CONCLUSION**

For the foregoing reasons, the Court should exclude Dr. Hruz's report,

opinions, and testimony and limit his opinions to those permitted in *Kadel*.

Respectfully submitted this <u>7th day</u> of April, 2023.

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**
By: */s/ Shani Rivaux*
**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsburylaw.com
shani.rivaux@pillsburylaw.com

**William C. Miller***
**Gary J. Shaw***
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Joe Little***
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**
**Abigail Coursolle***
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee***
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan***
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles***
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (FBN 124062)
**Chelsea Dunn** (FBN 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

* *Admitted pro hac vice.*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of April 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

## <u>CERTIFICATE OF WORD COUNT</u>

As required by Local Rule 7.1(F), I certify that this Memorandum of Law contains 7,463 words.

*/s/ Shani Rivaux*
Counsel for Plaintiffs