# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

        *Plaintiffs*,

v.

JASON WEIDA, et al.,

        *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

## REBUTTAL EXPERT REPORT OF
## <u>KRISTOPHER KALIEBE, M.D.</u>

I, Kristopher Kaliebe, M.D., declare that the facts contained herein are true and correct to the best of my knowledge and belief, and that the opinions expressed herein represent my own.

1.     I have been asked by counsel for the Defendants to respond to the expert reports of Dan Karasic, M.D.  My qualifications, publications, prior expert testimony, and compensation are discussed in my prior expert report served on February 17, 2023, and my curriculum vitae, which is attached to that report.

2.     The bases for my opinions expressed in this report are my review of Dr. Karasic's report, my professional experience as a psychiatrist, and my knowledge of the pertinent scientific literature, including those publications listed in the attached bibliography.

## Response to Dr. Karasic

3.     In Section 8 of his report, Dr. Karasic claims that the World Professional Association for Transgender Health (WPATH) created "internationally accepted guidelines designed to promote the health and welfare of transgender, transsexual, and gender variant persons."  While WPATH has created guidelines, it would be inaccurate to describe these as "internationally accepted".  WPATH is a special interest society and highly influenced by ideological and political considerations.  WPATH is not a medical organization and the Standards

of Care (SOC) WPATH created are developed by self-appointed experts.  As I will detail below, WPATH does not use the best standards of examining evidence.  As a special interest society with non-professional members, WPATH has a particularly high risk of bias because WPATH's membership is ideologically in favor of affirmative medical care.

4.     WPATH members' professional and personal prestige can be affected negatively within WPATH if they acknowledge facts that undermine the evidence base supporting affirmative care.  This dynamic is amplified as WPATH has a role as an advocacy group.  This dual role as advocacy group and developer of guidelines creates a conflict of interest and undermines trust in their guidelines. Many of the creators of WPATH SOC derive their professional prestige and income from providing transgender care and are not impartial.  Furthermore, as WPATH long ago staked its reputation on the ethics and evidence base of affirmative treatment, this organization cannot be expected to undertake a fair review of the evidence.

5.     In fact, whenever WPATH guidelines are reviewed they are noted to have significant problems, as was found in a recent systematic review. (Dahlen 2021).  Dahlen et al. noted that WPATH SOC7 "contains no list of key recommendations nor auditable quality standards" and WPATH SOC 7 cannot be

considered "gold standard".  The WPATH review scored poorly on editorial independence, applicability, and rigor of development.

6.      The SOC 7 and 8 guidelines are frequently referenced.  Gender affirming medicine is a new area of medicine and WPATH is the most prominent international organization creating guidelines.  I am not aware of which countries have adopted SOC 8 outright, but it is clear the SOC 8 guidelines are at odds with the stated policies of most countries.  As multiple countries who have undertaken thoughtful reviews are realizing harms associated with gender affirming care, they are turning away from the approach suggested by WPATH SOC 8.  Therefore the guidelines should not be thought of as "internationally accepted".

7.      In Section 22 Dr. Karasic provides his opinion endorsing the phrase "sex assigned at birth".  This misleading phrase distorts scientific reality by making the claim that biological sex can be "assigned".  The sex of the infant is already a fact, and can be noted by lay persons or physicians, but it cannot be assigned.  Dr. Karasic invokes this distorting phrasing in an apparent attempt to frame biological sex as a faulty construct and thus create the impression that better frameworks exist.

8.      Dr. Karasic further goes on to display an ideological rather than scientific view by reiterating the claim the biological sex, biological male, and biological female are "imprecise and should be avoided".  This is again a claim

based on ideology, and especially dubious when compared with the non-biological and subjective idea of gender identity.  Dr. Karasic repeatedly references self-identified gender which is a much more imprecise and poorly defined construct than biological sex.  If a medical doctor disputes the reality of male and female sexes in the sexually dimorphic species of humans, it displays an influence of ideology over science.

9.     Biological sexes of male and female have been fundamental facts of life for our pre-human ancestors and early humans prior to large scale societies.

10.     In paragraph 23 of his report, Dr. Karasic claims that gender identity has a biological basis. This is not referenced, and can only be accurate in the most reductionist framework, and that all human experiences are on some level biological. This is conjecture which is at odds with large variations in gender identity evidence of heavy influences of generational factors, ideology and cultural influence (Marianowicz-Szczygiel 2022, Littman 2018).

11.     He further makes a claim that "gender identity is not a product of external influences and not subject to voluntary change."  The statement is at odds with recent explosive growth in young people voicing a gender nonconforming identity. There is currently not enough knowledge to have any confidence in this statement; we know that gender identity frequently does change, and it appears quite likely that external influences do play a sizable role.

12.     Dr. Karasic indicates medical authorities claim that "efforts to change gender identity are ineffective, can cause harm and are unethical".   This opinion reflects an ideology that conflates sexual orientation and gender identity.  Dr. Karasic is further making an extraordinary claim that it is unethical to help a person come to accept the reality of their biological sex.  Approaches to get patients to accept and live comfortably with their bodies has a longstanding tradition in mental health treatments.  Body positivity and body acceptance are laudable goals and should be compared against the use of hormones and surgeries in order to determine which is a more effective and humane treatment.

13.     Logic demands that self-acceptance should be the mainstream approach, especially among youth who are still developing all aspects of themselves, including their self-concept with regard to sex and gender.  Further research may well find psychotherapies or mind-body approaches with better results than gender affirmation through hormones and surgery.  That research needs to be done but, unfortunately, many within the gender medicine community have used authoritarian rhetoric to quash open discussion and research into the full range of logical approaches.

14.     In paragraph 26 of his report, Dr. Karasic notes that gender dysphoria causes distress and those with gender dysphoria typically have comorbid mental health problems. This is accurate; however in most cases it appears that individuals

who express gender dysphoria usually already have significant psychopathology. Dr. Karasic also claims that gender dysphoria is highly amenable to treatment and the treatment is highly effective.  As noted by multiple systematic reviews, the evidence is mixed and of low quality. (Brignardello-Peterson 2022, PALKO / COHERE Finland 2020, Cass Review 2020, Sweden NBHW 2022). Therefore, there is not evidence to support Dr. Karasic's framing of gender dysphoria being "highly amenable" or the treatments being "highly effective".

15.    Dr. Karasic claims that the risks decline when transgender individuals live according to their gender identity, but he does not specify what risks increase and which risks decrease.  The evidence that gender affirming hormone treatments reduce psychopathology is only supported by low-quality evidence and hormone treatments have not been reliably shown to reduce suicidality. These are the conclusions of multiple reviews, including WPATH's own.  (Baker 2021)

16.    Dr. Karasic claims that with medically indicated care, gender dysphoria resolves.  As shown by the various systematic reviews cited previously, this is a complex area where more study is needed.  In childhood, most gender dysphoria spontaneously resolves without treatment.  This appears less so in adults, yet many aspects of gender dysphoria remain poorly understood.  There has never been adequate study of the full range of treatment options for gender dysphoria in adults, so this is an unanswered question.

17.     Without better studies, it will remain unclear what other treatments could also resolve gender dysphoria.  Especially with the massive recent rise in youth with gender dysphoria, we clearly need studies to evaluate the costs, benefits and risks involved with all treatments, including medicalization.  Dr. Karasic appears to dismiss the possibility that patients expressing gender dysphoria can come to accept and be satisfied with the bodies they reside in.  We will need to research various treatments to better understand which approaches best resolve gender dysphoria.  We do not currently know which approaches have the best balance of risks and benefits. This is especially important when it involves still developing minors.

18.     In paragraph 28 of his report, Dr. Karasic claims that WPATH SOC 8 incorporates recommendations on clinical practice guideline development.  This is partially true.  In fact, SOC 8 did commission systematic reviews.

19.     The British Medical Journal Investigations Unit undertook analysis of the evidence for transgender treatments including the WPATH SOC 8.  (BMJ 2023;380:p382). The BMJ investigators interviewed Gordan Guyatt, MD, an internationally recognized leader on systematic reviews and, in fact, the co-developer and first author of the original GRADE guidelines.  BMJ also interviewed expert Mark Helfand, professor of medical informatics and clinical epidemiology at Oregon Health and Science University.  Helfand noted that

"*WPATH's recommendations lack a grading system to indicate the quality of the evidence—one of several deficiencies.*"

20.     This same BMJ article notes: "*Both Guyatt and Helfand noted that a trustworthy guideline would be transparent about all commissioned systematic reviews: how many were done and what the results were.*" It reports that: "*Helfand noted that the review incorporated elements of an evidenced based guideline. Helfand also noted several instances in which the strength of evidence presented to justify a recommendation was 'at odds with what their own systematic reviewers found.'*"

21.     My review of SOC 8 mirrors what is observed by these distinguished experts: WPATH SOC did not clearly document what reviews were attempted, raising the possibility that unfavorable reviews were stopped or buried upon unfavorable results.  Burying unfavorable studies is most common when those commissioning the research have a vested interest in positive results.  Relatedly, this seems to have occurred when those at the Tavestock Clinic unsuccessfully attempted to replicate the Dutch model (Biggs 2022).  WPATH SOC 8 obscures the most important element required for a trustworthy clinical practice guideline: the assessment of the strength of the evidence used to make recommendations. Hiding the strength of evidence hides critical data from readers trying to make sense of SOC 8's recommendations.  Again from the BMJ investigation: "*For*

*minors, WPATH contends that the evidence is so limited that "a systematic review regarding outcomes of treatment in adolescents is not possible." But Guyatt counters that 'systematic reviews are always possible,' even if few or no studies meet the eligibility criteria. If an entity has made a recommendation without one, he says, 'they'd be violating standards of trustworthy guidelines.'"* (BMJ 2023;380:p382).

22.     My analysis mirrors that of Drs. Guyatt and Helfand, the authors of WPATH SOC 8 have violated the standards of trustworthy guidelines.  WPATH SOC 8 leadership must know a systematic review is possible, but seem to claim that that it is not. One can only surmise that WPATH avoided a systematic review on minors because they were aware the results would be unfavorable, and subsequently provided a deceptive excuse.

23.     The BMJ investigators also detail how WPATH SOC 8 violate typical standards for a systematic review: "*For example, one of the commissioned systematic reviews found that the strength of evidence for the conclusions that hormonal treatment 'may improve' quality of life, depression, and anxiety among transgender people was 'low,' and it emphasised the need for more research, 'especially among adolescents.' The reviewers also concluded that 'it was impossible to draw conclusions about the effects of hormone therapy' on death by suicide.*"

24.     The BMJ investigation article continues: "*Despite this, WPATH recommends that young people have access to treatments after comprehensive assessment, stating that the 'emerging evidence base indicates a general improvement in the lives of transgender adolescents.'*"

25.     The review concludes that there is low-quality evidence that hormone treatment "may improve" quality of life, depression, and anxiety, and it is impossible to draw conclusions about suicide.  That is the WPATH's own systematic review, but WPATH ignores these results and claims there is "strong evidence".  The article continues:

> *And more globally, WPATH asserts, "There is strong evidence demonstrating the benefits in quality of life and well-being of gender-affirming treatments, including endocrine and surgical procedures," procedures that "are based on decades of clinical experience and research; therefore, they are not considered experimental, cosmetic, or for the mere convenience of a patient. They are safe and effective at reducing gender incongruence and gender dysphoria." Those two statements are each followed by more than 20 references, among them the commissioned systematic review. This stood out to Helfand as obscuring which conclusions were based on evidence versus opinion. He says, "It's a very strange thing to feel that they had to cite some of*

*the studies that would have been in the systematic review or*

*purposefully weren't included in the review, because that's what the*

*review is for."*

26.     For many reasons I agree with these prestigious scholars, Drs Helfand and Guyatt, that WPATH used deceptive practices in the SOM 8 and WPATH's guidelines do not meet the standard for a trustworthy clinical practice guideline.

27.     In paragraph 30, Dr Karasic quotes WPATH SOC 8: "Gender identity change efforts (gender reparative or gender conversion programs aimed at making the person cisgender) are widespread, cause harm to TGD people, and (like efforts targeting sexual orientation) are considered unethical." (Coleman, et al., 2022).

28.     As mentioned above, an ideology has become popular which takes the authoritarian stance that the mental health and medical community should never explore any effort to help those with gender dysphoria to accept their bodies and biological sex.  This is not science-based, but rather seems to be part of an organized effort to promote gender affirming care. Elsewhere in mental health and medicine, studying multiple treatment approaches and comparing the results is standard practice. This creates an extraordinary situation where low-quality evidence is being promoted and the only solution. WPATH and others are attempting to shut down exploration and research on a wide range of feasible and clinically appropriate approaches to gender dysphoria.

29.    I'm reminded of major depressive disorder and the pharmaceutical

industries' manipulations to promote antidepressants.  When funders support

research, multiple mechanisms cause the research to obtain a result desired by the

funders. (Sismondo 2008).  Most psychiatrists who created the depression

treatment guidelines were being paid by the pharmaceutical industry.  Not

surprisingly when research obtained unfavorable or neutral results on

antidepressant medications, thus results were often never submitted, were delayed

(known as time lag bias) or buried in an obscure journal. (Turner 2008).  It wasn't

just financial incentives, but doctors' egos combined with desires to relieve

suffering, and this distorted science.  Similarly, the WPATH, Trevor Project or

other advocacy organizations may serve valuable needs, but advocacy groups

cannot be considered scientifically neutral when involved in collecting data or

financially supporting research.

30.    Dr. Karasic notes that a clinical practice guideline from the Endocrine

Society (the Endocrine Society Guidelines) provides similar protocols for

treatment of gender dysphoria. (Hembree, et al., 2017).  The Endocrine Society did

create a clinical practice guideline using GRADE, and in doing so revealed that all

of their treatment recommendations for adolescents are based on *low* or *very low*

quality evidence.  Yet, in opposition to what would be expected by a clinical

practice guideline, the Endocrine Society decided to make aggressive treatment recommendations in the face of low-quality evidence.

31.     Again British Medical Journal Investigations Unit's review of evidence for transgender care solicited clinical practice guideline experts to opine.

*Guyatt, who co-developed GRADE, found "serious problems" with the Endocrine Society guidelines, noting that the systematic reviews didn't look at the effect of the interventions on gender dysphoria itself, arguably "the most important outcome." He also noted that the Endocrine Society had at times paired strong recommendations—phrased as "we recommend"—with weak evidence. In the adolescent section, the weaker phrasing "we suggest" is used for pubertal hormone suppression when children "first exhibit physical changes of puberty"; however, the stronger phrasing is used to "recommend" GnRHa treatment.*

32.     Guyatt noted that strong recommendations accompanying low-quality evidence are discouraged by GRADE.  Guyatt even emailed the Endocrine Society asking why the recommendations are stronger than the evidence, but the Endocrine Society refused to provide a specific answer.  (BMJ 2023;380:p382).  My review echoes Dr Guyatt's concerns regarding the trustworthiness of the Endocrine Society Guidelines.

33.     Dr. Karasic claims that "Each of these guidelines are evidence-based". I do not believe this is an accurate statement as I have shown. Again, the British Medical Journal Investigations Unit's review of evidence for transgender care solicited Dr. Helfand.  Dr. Helfand took issue with the claims of WPATH and Endocrine Society because they overstate the evidence, and in fact are based on factors other than research evidence: *"consensus based guidelines are not unwarranted, says Helfand.  'But don't call them evidence based.'"* (BMJ 2023;380:p382).

34.     These guidelines are based mainly on "expert consensus" and "clinical experience" which can fool physicians into believing various treatments were effective. Without high quality research it is impossible to determine long-term outcomes, the cause of the positive response they observe, or to track negative outcomes or dropouts from treatment.  These factors which could create an observed positive response could include social factors, therapeutic support and placebo effects, which are all particularly relevant (Clayton 2022).

35.     In paragraph 34, Dr. Karasic notes that WPATH SOC and Endocrine Society Guidelines are cited in statements from major medical organizations.  Yet this is within a highly ideological and politicized context where self-appointed and biased "experts" in gender medicine have systematically adopted the role of "content expert" in an area of medicine where most physicians believe practice is

ideological, experimental, and has a questionable evidence base.  The medical professional organizations have been coopted by exaggerated claims of evidence and moralized statements which silences most physicians despite their doubts. Once American medical professional organizations' leadership endorsed affirmative care as both evidence-based and ethical, these organizations chose advocacy over science. Their journals are no longer scientifically neutral. I have directly observed efforts to quash scholarly debate via presenter intimidation at meetings and via the silencing of dissenting voices in medical journals.  The highly politicized and ideological nature of gender dysphoria care has distorted scholarly dialogue within American professional medical organizations and medical journals, creating a false impression of medical consensus.

36.     Most physicians have doubts about a gender medicine, a highly ideological and politicized topic with low-quality evidence. Gender medicine has seen an explosive rise of patients (Marianowicz-Szczygiel 2022) and is dependent on a "felt sense".  Furthermore, this felt sense of gender identity is claimed to be immutable and biologically determined, despite the fact that the data and our lived experiences show psychosocial influences.  Proponents of gender affirming care consistently distort the strength of evidence; many make celebratory proclamations and actively dissuade colleagues or society from pursuing full range of treatment options.  These medical treatments are directed at normal tissue where typically a

higher degree of caution would be granted.  Again, these treatments are for a "felt

sense", and it is well-established that human beings have an immense ability to

fool themselves, over-trust their emotions and be socially influenced.

37.     In paragraph 36, Dr. Karasic claims that providing gender affirming

care reduces "depression, posttraumatic stress disorder, and suicidality."  Yet the

WPATH's own review, along with many other reviews cited above, show there is

not sufficient evidence to support that hormone treatments reduce suicidality.

38.     In paragraph 37, Dr. Karasic opines that "For patients for whom

gender-affirming medical care is indicated, no alternative treatments have been

demonstrated to be effective."  This is an interesting use of language, because there

is no dispute that systematic reviews show gender affirming care to be supported

by only low-quality evidence.  Thus it remains unclear if gender-affirming care

itself is effective. Furthermore, until other types of care are studied, we do not

know if there are safer or more successful approaches to resolve gender dysphoria.

Unfortunately, there is not high-quality evidence to guide the treatment of gender

dysphoria.

39.     Dr. Karasic refers readers to the American Psychological

Association(APA) statement that gender identity change efforts provide no benefit

and instead do harm. (American Psychological Association, 2021).  It is accurate

that  this referenced APA document states: "GICE (gender identity change efforts)

16

are not supported by empirical evidence as effective practices for changing gender identity and are associated with psychological and social harm".  The cited studies which purport to support this claim do not and rather cite a few instances of decades-old small uncontrolled studies and other articles filled with opinion, theory, and ideology (the Japanese and Dutch language references not review).  In fact this document cited a 10-Year Research Review in the Journal of the American Academy of Child and Adolescent Psychiatry (Bradley 1997) which acknowledges this extreme lack of research, in large part to the extreme rarity of patients -- between 1978 and 1995 the author's clinic received only 52 adolescents. The authors acknowledge their eclectic therapy with adolescents did not tend to modify cross-gender feelings, yet the authors also acknowledged case reports of success in psychotherapy.  (Loeb 1992, Loeb 1996, Zucker 1995).

40.     In paragraphs 39-46, Dr. Karasic provides his description of the treatments endorsed by WPATH and Endocrine Society, including treatments for adolescents.  Dr. Karasic does not mention the low quality of evidence supporting these treatments.  He makes the claim puberty blockers are reversible, which is not accurate. (Jorgensen, 2022, Clayton, 2022).

41.     Dr Karasic opines that "The treatment protocols for gender dysphoria are comparable to those for other mental health and medical conditions."  In my opinion, these treatments are not comparable.  Affirmative treatments for gender

dysphoria mostly arise from ideological perspective on gender, not from a medical or mental health tradition.  No other treatment for a mental health condition calls for surgery or hormonal treatment on healthy tissue.

42.     In paragraph 49, Dr Karasic details the WPATH recommendations for assessment of adults, which do not clarify which specific patient populations are acceptable for treatment.  He notes that "*medical or surgical treatment should only be recommended when 'gender incongruence is marked and sustained,' when there is capacity for consent, when other conditions that might affect outcomes have been assessed*" yet all of these avoid any actual statement of an specifics.  Readers are left to guess what would make a patient inappropriate for treatment, what precisely is "marked and sustained" and which markers of capacity for consent should be utilized, what type of assessment is needed for "other conditions" is needed.  A trustworthy guideline would provide specific actionable parameters for treatment.

43.     In paragraph 51, Dr Karasic claims that "Affirming care for transgender youth does not mean steering them in any particular direction, but rather supporting them through their period of exploration of gender expression and increasing self-awareness of their identity".  Yet "affirming" does steer transgender youth toward remaining transgender and thus is not neutral.  Gender identity can be fluid and the brain is still developing into the early twenties.  The

affirming approach creates pressures for youth to adopt and maintain transgender status.  Throughout history humans have been recognized by their biological sex, and social affirmation of self-assigned gender identity has never been used at scale. Thus proponents of affirming children and adolescents propose a grand social experiment with unknown costs and benefits.  Dr. Karasic claims that some youth "need" medical interventions, and it can be agreed that some youth would prefer these treatments.  Yet it is frequently the responsibility of the medical community to prevent patient-driven care with low-quality evidence and significant risk for harm.  Affirming medical interventions for minors are still experimental; they cannot be called a "need".

44. In paragraph 52, Dr. Karasic reports details of the Endocrine Society Guideline, and in doing so displays the imprecise and imprudent mental health recommendations made by these endocrinologists. The Endocrine Society Guideline do recommend a full assessment, but also make no specific contra-indications for hormones or surgeries.  This leaves it entirely up to practitioners to guess what needs "treatment" or referral.  Even in "severe psychopathology" it says "clinicians should assist the adolescent in managing these other issues." This shows the Endocrine Society is unwilling to specifically state which problems under which circumstances would prevent hormones and surgeries.

The Endocrine Society do not even use medical language, suggesting providers "assist" an adolescent with severe psychopathology in "managing" their "issues".  Most importantly, they refuse to state any parameters for contra-indicate to affirming hormones and surgeries. Thus enthusiasts for affirming care can read these guidelines in any way they prefer, and use hormones and surgeries even in youth with extremely high risk of poor outcomes. In the context of massive increase of patients reporting gender dysphoria and low-quality evidence I believe this set of recommendations are irresponsible.

45.     In paragraph 53, Dr. Karasic notes how the leadership of many professional organizations have come out in support of hormones and surgeries for gender dysphoric patients. I have detailed in my prior report to the court how politicized these issues have become and how many physicians currently feel unable to voice their concerns due to fears of retribution. Support for affirming care initially coalesced in small committees filled with self-selected enthusiasts. These advocates convinced the medical leadership to support affirming care in large part by framing medicalized treatments for gender dysphoria as a "rights" and "discrimination" issue rather than an examination of evidence.  This successfully moralized and tribalized gender medicine and thereby stifled open exchange and silenced skepticism within medical journals. As these medical

organizations had put their prestige and influence behind this type of care, those overseeing conference programs, newsletters, press statements and the editors of journals systematically distorted scholarly dialogue by promoting affirming treatments.  Moralizing and advocacy silenced concerned physicians, but most didn't even know their organizations had staked out such extreme stances. Thus the membership of these professional medical organizations have never had an opportunity to observe, or participate in, open and honest dialogue regarding the evidence for transgender care. As such, the support of these organizations reflects mostly a tribal mentality and the politicizing of gender affirming care.  It does not reflect memberships which have had a sober review of the evidence base and decided celebratory support of gender affirming care is warranted.

46.     In paragraph 54, Dr. Karasic reports "There is substantial evidence that gender-affirming medical and surgical care is effective in treating gender dysphoria. This evidence includes scientific studies assessing mental health outcomes for transgender people who are treated with these interventions, including adolescents, and decades of clinical experience." Dr. Karasic again overstates the depth and quality of evidence supporting hormones and surgeries.

47.     In paragraph 55, Dr. Karasic claims that "The research and studies supporting the necessity, safety, and effectiveness of medical and surgical care for gender dysphoria are the same type of evidence-based data that the medical

21

community routinely relies upon when treating other medical conditions."   As already cited above, the concept of gender dysphoria, as well as its assessment and treatment, has not undergone the typical rigorous scholarly debate expected in the field of medicine.  Proponents have been able to exaggerate the evidence base, and medical organizations have quashed scholarly dialogue.  This is very different than other scholarly topics. As such the research relied upon and the consensus recommendations are highly subject to bias and ideological influence.

48.     In paragraphs 56-60, Dr. Karasic provides his opinion as to the evidence supporting affirmative care. He selected a number of positive studies to support this viewpoint including one review.  This amalgam of studies and his personal experience cannot be relied upon to claim affirmative treatments are evidence-based.  Sweden, England, and Finland have all reviewed the evidence and reorganized their approach. These are countries with medical systems that have better tracking, more organized care, and compassionate attitudes toward gender non-conforming persons.  Many American states are also recognizing that it is particularly important to protect developing young people.  As the Finish review stated (PALKO / COHERE Finland 2020): "The first-line treatment for gender dysphoria is psychosocial support and, as necessary, psychotherapy and treatment of possible comorbid psychiatric disorders."

49.     In paragraph 61, Dr. Karasic reports "As part of the treatment process for gender dysphoria, patients provide informed consent to their care." Yet Dr. Karasic is not a child psychiatrist, nor a forensic psychiatrist, so he may not be aware of the nuances related to informed consent in teenagers.  Firstly, there is longstanding literature showing that minors do not have fully developed emotional and cognitive skills. Teens are particularly susceptible to peer influence, and can be impulsive, emotionally volatile, and reactive to stress. (Icenogle, 2019). Thus the average adolescent does not have the same self-control or foresight as a mature adult. Considering some combination of autism, ADHD, depression, trauma, anxiety, self-harm and emerging personality disorders present in most gender dysphoric teens, this issue of consent is much more concerning.  Furthermore, many gender medicine enthusiasts downplay risks associated with affirmative treatment, placing children and families at significant risk (Levine 2022).

50.     In fact, the 2022 American Psychological Association Resolution on the Imposition of Death as a Penalty for Persons Aged 18 Through 20, Also Known As the Late Adolescent Class goes into significant detail regarding their position on brain immaturity through at least age 21:

*WHEREAS developmental neuroscience, including research on both the structure and function of brain development, establishes that significant maturation of the brain continues through at least age 20, especially in the*

*key brain systems implicated in a person's capacity to evaluate behavioral*

*options, make rational decisions about behavior, meaningfully consider the*

*consequences of acting and not acting in a particular way, and to act*

*deliberately in stressful or highly charged emotional environments, as well*

*as continued development of personality traits (e.g., emotional stability and*

*conscientiousness) and what is popularly known as 'character'.*

I removed the many citations, which can be found in the document.

51.    The APA Resolution continues:

*WHEREAS it is clear the brains of 18- to 20-year-olds are continuing to*

*develop in key brain systems related to higher-order executive functions and*

*self-control, such as planning ahead, weighing consequences of behavior,*

*and emotional regulation. Their brain development cannot be distinguished*

*reliably from that of 17-year-olds with regard to these key brain systems.*

52.    Thus it is clear the American Psychological Association understands that the entire cohort of minors submitting to irreversible hormones and surgeries have under-developed abilities to understand the risks and meaningfully consider the consequences.  I agree with the American Psychological Association that these deficits maintain up until at least age 21, and the courts should take these impairments seriously.

24

53.     In paragraph 68, Dr Karasic provides his opinion on the harms of denying gender-affirming care. In paragraph 77, he discusses increases in insurance coverage. I discuss both below.

54.     The prospect of aligning people's bodies to fit their view of themselves remains a controversial concept within medicine, especially with regard to developing youth.  Changing patients' bodies to fit their view of themselves is not a medical service that has been routinely provided at scale. There is a confounding factor of large increases of adolescent onset gender dysphoria patients flooding clinics who surely don't match the previous populations studied. Recall that just a few decades ago the Toronto gender clinic in 17 years had only 52 adolescent patients compared with 275 child patients (Bradley 1997).  Only very recently is medicalized gender affirmation for youth being provided.  Not providing these services would be a continuation of prudent long-standing practices in American medicine.  With such low-quality evidence and so much controversy, it is reasonable for medical systems to wait for further higher-quality data along with rigorous scholarly dialogue on the risks and benefits of transgender care.  Dr. Karasic correctly indicates that there are risks of not providing affirmative care.  But there are also significant risk of providing affirmative care. Within medical journals, a rigorous weighing of the risks versus benefits of transgender care has not been explored.

55.     I note that in paragraph 73, Dr Karasic cites a recent NIH-funded study where in just the span of 2 years, and only 315 patients receiving affirmative care, there were 2 completed suicides (Chen 2023). This displays an extremely high rate of completed suicide when receiving hormones and other affirming care. The journal title and press statement seemed to ignore the most important outcome measure of all.

56.     In paragraph 88, Dr Karasic cites continuation of gender dysphoria in a carefully selected cohort of 70 with minimal co-morbidities who received affirmative treatments. (De Vries 2011).  He also cites another review from the Netherlands of those in treatment. (van der Loos 2022). These treatment groups indicates that those adolescents provided hormones and other affirming treatment tend to continue to express gender dysphoria.  Yet this information does not provide information about the natural history of standard adolescents with gender dysphoria.  It certainly appears medical endorsement and support of the concept of gender dysphoria continues it, since gender dysphoria appear to be extremely rare when the medicalization bureaucracy and/or societal messages are absent.

57.     In paragraph 93, when referencing Dr. Cantor, Dr. Karasic correctly reports that United Kingdom is currently considering changes which decentralize care and increase access. Yet Dr. Karasic did not provide the context of how the United Kingdom's Gender Identity Service was flooded with unexpected patients,

provided haphazard care, and became the center of controversy due to de-transitioners.

58.     Also not mentioned is the controversy related to the Tavistock Clinic Gender Identity Service's attempted replication study of the Dutch model of treatment of adolescents.  Preliminary presentations at the WPATH conference were negative.  A recent review compares the British data to the Dutch data, displaying the worse British results and a failure to replicate the original findings which spurred interest worldwide in early transition. (Biggs 2022). This study was never published. Considering the ideology and personal prestige intermixed with gender medicine, it is likely the unfavorable results were quietly hoped to disappear so that the narrative about great results from early hormone treatment would not be disrupted.

59.     Dr. Karasic seems to indicate there are no significant changes in the United Kingdom.  Yet due to public concerns, the UK government commissioned an analysis of gender affirming care.  The October 2020 review of evidence by the national health service of England as part of Hillary Cass's Independent Review into gender identity services for children and young people. The executive summary details the findings (Cass Review 2020):

'The key limitation to identifying the effectiveness and safety of gender-affirming hormones for children and adolescents with gender dysphoria is the lack of reliable comparative studies."

"All the studies included in the evidence review are uncontrolled observational studies, which are subject to bias and confounding and were of very low certainty."

"A fundamental limitation of all the uncontrolled studies included in this review is that any changes in scores from baseline to follow-up could be attributed to a regression-to-the-mean."

"Most studies included in this review did not report comorbidities (physical or mental health) and no study reported concomitant treatments in detail. Because of this it is not clear whether any changes seen were due to gender-affirming hormones or other treatments the participants may have received."

"Furthermore, participant numbers are poorly reported in some studies, with high numbers lost to follow-up or outcomes not reported for some participants. The authors provide no explanation for this incomplete reporting."

"A*ny potential benefits of gender-affirming hormones must be weighed against the largely unknown long-term safety profile of these treatments in children and adolescents with gender dysphoria.*"

60.     So Dr. Karasic chose to ignore the important conclusions from the review in England, that providers of gender care for youth are using "very low" quality evidence.

61.     In paragraph 94, Dr Karasic references the Swedish and Finnish national health authorities when critiquing Dr. Cantor, but fails to acknowledge their reviews of the evidence which led to restricting care.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on March 8, 2023.

/s/Kristopher Kaliebe
_____
Kristopher Kaliebe, M.D.

29

## Bibliography

American Psychological Association. (2021). APA resolution on gender identity change efforts. American Psychological Association: Washington, DC, USA.

BMJ 2023;380:p382

https://www.bmj.com/company/newsroom/gender-dysphoria-in-young-people-is-rising-and-so-is-professional-disagreement/ retrieved March 5, 2023

Bradley, S. J., & Zucker, K. J. (1997). Gender Identity Disorder: A Review of the Past 10 YearsG. Journal of the American Academy of Child & Adolescent Psychiatry, 36(7), 872-880.

Baker KE, Wilson LM, Sharma R, Dukhanin V, McArthur K, Robinson KA. Hormone therapy, mental health, and quality of life among transgender people: a systematic review. J Endocr Soc 2021;5:bvab011.

Biggs, M. (2022). The Dutch protocol for Juvenile transsexuals: Origins and evidence. Journal of sex & marital therapy, 1-21.

Chen, D., Berona, J., Chan, Y. M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., ... & Olson-Kennedy, J. (2023). Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. New England Journal of Medicine, 388(3), 240-250.

Clayton, A., Malone, W. J., Clarke, P., Mason, J., & D'Angelo, R. (2022). Commentary: The Signal and the Noise—questioning the benefits of puberty blockers for youth with gender dysphoria—a commentary on Rew et al.(2021). Child and adolescent mental health, 27(3), 259-262.

Clayton, A. (2022). Gender-affirming treatment of gender dysphoria in youth: A perfect storm environment for the placebo effect—the Implications for research and clinical practice. Archives of Sexual Behavior, 1-12.

Dahlen S, Connolly D, Arif I, et alInternational clinical practice guidelines for gender minority/trans people: systematic review and quality assessmentBMJ Open 2021;11:e048943. doi: 10.1136/bmjopen-2021-048943

Jorgensen, S. C., Hunter, P. K., Regenstreif, L., Sinai, J., & Malone, W. J. (2022). Puberty blockers for gender dysphoric youth: A lack of sound science. Journal of the American College of Clinical Pharmacy, 5(9), 1005-1007.

Loeb L ( 1992). Analysis of the transference neurosis in a child with transsexual symptoms.} Am Psychoanal Assoc 40:587-605

Loeb L (1996), Childhood gender- ident ity disorders. In: Sexual Deviation,3rd ed, Rosen I. ed. Oxford. England: Oxford University Press.pp 134-157

Care of Children and Adolescents with Gender Dysphoria, 2022 from the Swedish National Board of Health and Welfare

https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-3-7799.pdf

de Vries, A. L., Steensma, T. D., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. The journal of sexual medicine, 8(8), 2276–2283.

Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria, prepared by NICE in October 2020. Downloaded from https://cass.independent-review.uk/wp-content/uploads/2022/09/20220726_Evidence-review_Gender-affirming-hormones_For-upload_Final.pdf

Recommendation of the Council for Choices in Health Care in Finland (PALKO / COHERE Finland) Medical Treatment Methods for Dysphoria Related to Gender Variance In Minors, 2020 https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474

Brignardello-Peterson, R., & Wiercioch, W. (2022). Effects of gender affirming therapies in people with gender dysphoria: Evaluation of the best available evidence. Agency for Health Care Administration Florida Medicaid

Generally Accepted Professional Medical Standards Determination on the
Treatment of Gender Dysphoria Attachment C.

Guyatt, G., Oxman, A. D., Akl, E. A., Kunz, R., Vist, G., Brozek, J., ... &
Schünemann, H. J. (2011). GRADE guidelines: 1. Introduction—GRADE
evidence profiles and summary of findings tables. Journal of clinical
epidemiology, 64(4), 383-394.

Icenogle, G., Steinberg, L., Duell, N., Chein, J., Chang, L., Chaudhary, N.,
... & Bacchini, D. (2019). Adolescents' cognitive capacity reaches adult levels
prior to their psychosocial maturity: Evidence for a "maturity gap" in a
multinational, cross-sectional sample. Law and human behavior, 43(1), 69.

Levine, S. B., Abbruzzese, E., & Mason, J. W. (2022). Reconsidering
informed consent for trans-identified children, adolescents, and young adults.
Journal of Sex & Marital Therapy, 48(7), 706-727.

Sismondo, S. (2008). Pharmaceutical company funding and its
consequences: a qualitative systematic review. Contemporary clinical trials, 29(2),
109-113.

Turner, E. H., Matthews, A. M., Linardatos, E., Tell, R. A., & Rosenthal, R.
(2008). Selective publication of antidepressant trials and its influence on apparent
efficacy. New England Journal of Medicine, 358(3), 252-260.

van der Loos, M. A. T. C., Hannema, S. E., Klink, D. T., den Heijer, M., & Wiepjes, C. M. (2022). Continuation of gender-affirming hormones in transgender people starting puberty suppression in adolescence: a cohort study in the Netherlands. The Lancet. Child & adolescent health, 6(12), 869–875.

Zucker KJ. Bradley SJ (1995). Gender Identity Disorder and Psychosexual Problems in Children and Adolescents. New York: Guilford

American Psychological Association Resolution on the Imposition of Death as a Penalty for Persons Aged 18 Through 20, Also Known As the Late Adolescent Class, accessed 3/6/203 https://www.apa.org/about/policy/resolution-death-penalty.pdf