IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, *et al.*,

        *Plaintiffs*,

        v.

JASON WEIDA, *et al.*,

        *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

## PLAINTIFFS' MOTION TO EXCLUDE
## <u>EXPERT TESTIMONY OF JOSEPH ZANGA, M.D.</u>

Pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403, and 702, Plaintiffs respectfully move this court to exclude the expert testimony of Defendants' proposed expert, Dr. Joseph Zanga. As explained more fully below, Dr. Zanga is not a qualified expert and his opinions and testimony are neither reliable nor helpful to the trier of fact pursuant to the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. His opinions and testimony are likewise inadmissible pursuant to Fed. R. Evid. 403. As grounds, Plaintiffs state:

1.     Defendants have designated Dr. Zanga, a retired pediatrician, as an expert and submitted a report along with their Rule 26 Disclosures. (Ex. A, Zanga Expert Report.)[1]

2.     Dr. Zanga's expert report contains opinions about (1) his general grievances with the American Academy of Pediatrics (AAP), including his concerns regarding two particular AAP resolutions about which he has no personal or first-hand knowledge, and (2) unsupported opinions about the treatment of gender dysphoria.

3.     Dr. Zanga's expert report includes no citations and no bibliography, and during his deposition he was unable to cite to a single peer-reviewed or credible source that he relied upon in forming his opinions. In fact, following an inquiry from Plaintiffs' counsel as to whether Dr. Zanga forgot to provide a bibliography, Defendants stated that Dr. Zanga's opinions are based solely on "his personal knowledge and experience." Ex. C, Email from Gary Perko on March 8, 2023 ("There is no bibliography for Dr. Zanga's report as his opinions are based on his personal knowledge and experience."); *See also,* Ex. B at 13:21-14:2.

4.     Defendants have not met their burden of establishing that Dr. Zanga is qualified to proffer an opinion on the treatment of gender dysphoria, nor any topic

---

[1] Unless otherwise specified, all exhibits cited herein are attached to the contemporaneously filed Declaration of Simone Chriss.

at issue in this case. Dr. Zanga has never provided treatment for gender dysphoria (Ex. B, at 34:23-35:18; 41:9-12), and he has never conducted any original research nor published any peer-reviewed literature on the issue (*id.* at 40:1-22; 71:3-72:8).

5.     Defendants similarly have not met their burden of showing that Dr. Zanga's opinions are reliable or relevant. The opinions offered in his reports are based on speculation and unconfirmed anecdotes and lack any reliable scientific methodology. Moreover, his opinions lack sufficient connection to the existing data and are therefore not helpful to the trier of fact.

6.     The probative value of Dr. Zanga's testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence.

**WHEREFORE**, Plaintiffs Request that the Court enter an Order excluding Dr. Zanga's opinions and testimony, in ***their entirety***, and prohibit Defendants from relying on it for any purpose during trial.

## MEMORANDUM OF LAW

Dr. Zanga's opinions and testimony lack any indicia of admissibility required under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and the Federal Rules of Evidence, and should be excluded in their entirety.

## LEGAL STANDARD

"The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by *Daubert* [*v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)] and its progeny." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "District courts are [thus] charged with [a] gatekeeping function." *Id.*; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The importance of *Daubert*'s gatekeeping requirement cannot be overstated.").

In conducting their gatekeeping function, courts must "engage in a rigorous three-part inquiry" and determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The Eleventh Circuit refers to these three considerations separately as "qualification," "reliability," and "helpfulness" and has emphasized they are "distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Rink*, 400 F.3d at 1292.

To be sure, "[i]mplementing Rule 702, *Daubert* requires district courts to ensure that any and all scientific testimony or evidence admitted is both relevant and reliable." *Claire v. Fla. Dep't of Mgmt. Servs.*, 2021 WL 5982330, at *1 (N.D. Fla. Oct. 20, 2021). "[T]he trial judge must determine [this] ***at the outset***." *Daubert*, 509 U.S. at 592 (emphasis added). The court's gatekeeping role and the test for admissibility of expert testimony are applicable even at a bench trial or at the summary judgment stage. *See*, *e.g.*, *Rink,* 400 F.3d 1286 (granting motions to exclude in the context of summary judgment); *Kadel v. Folwell*, 2022 WL 3226731, at **5-17 (M.D.N.C. Aug. 10, 2022) (same); *Lo v. United States*, 2022 WL 1014902, at *12 (W.D. Wash. Apr. 5, 2022) (excluding unqualified expert evidence in the context of a bench trial); *cf. UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833 (3d Cir. 2020). (holding the district court abused its discretion in a bench trial when it "ignored rule [702]'s clear mandate" by "sidestepping Rule 702 altogether and declining to perform any assessment of [expert]'s testimony before trial").

Finally, because of the potentially misleading effect of expert evidence, *see Daubert*, 509 U.S. at 595, on occasion expert opinions that otherwise meet admissibility requirements may still be excluded under Fed. R. Evid. 403.

**ARGUMENT**

I.  **DR. ZANGA'S TESTIMONY RELATED TO THE AAP IS NOT EXPERT TESTIMONY, BUT LAY WITNESS TESTIMONY.**

Dr. Zanga spends much of his expert report offering information about the structure of the AAP and attacking how the AAP has handled any objections to its position on gender-affirming care. *See* Ex. A ¶¶ 9-17. His testimony is not expert testimony under Federal Rule of Evidence 702, as it is does not involve "scientific, technical, or other specialized knowledge" that will help the Court understand the evidence in this case. Fed. R. Evid. 702(a); *cf*. 701(c) (opinion testimony by lay witnesses is not based on scientific, technical, or other specialized knowledge). Rather, his testimony involves non-scientific, non-technical, non-specialized knowledge that he gained through his involvement with the AAP or anecdotal hearsay that was relayed to him by others. *See* Ex. A ¶¶ 9-10, 12-16. But testimony based on "the particularized knowledge that the witness has by virtue of his or her position in the business" is lay opinion testimony. Fed. R. Evid. 701 Advisory Committee Note - 2000 Amendments. And Dr. Zanga cannot be designated as an expert witness simply to introduce testimony "based on limited personal accounts and information relayed to [him] by an unspecified number of third parties." *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 684183, at *2 (N.D. Fla. Feb. 11, 2021). To do so, "would be to sanction [his] use as a vehicle for introducing

hearsay testimony." *Id.* In short, his testimony about the AAP does not result "from a process of reasoning which can be mastered only by specialists in the field," *United States v. Holland*, 722 F. App'x 919, 928 (11th Cir. 2018), and thus, is not properly considered expert testimony.

## II. QUALIFICATION: DR. ZANGA IS NOT QUALIFIED TO OFFER EXPERT OPINIONS ON THE TREATMENT OF GENDER DYSPHORIA IN CHILDREN AND ADOLESCENTS.

"A witness may be qualified as an expert by virtue of his 'knowledge, skill, experience, training, or education." *Quiet Technology DC-8, Inc.*, 326 F.3d at 1342; Fed. R. Evid. 702. "Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Banuchi v. City of Homestead*, 606 F.Supp.3d 1262, 1272 (S.D. Fla. 2022) (cleaned up). This is particularly true in medicine where "no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F.Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994); *see also*, *e.g.*, *Hartke v. McKelway*, 526 F.Supp. 97, 100-101 (D.D.C. 1981).

However, credentials are not dispositive when determining qualification. A proposed expert's qualifications must be assessed in reference to the matter to which

the expert seeks to testify—i.e., "to the task at hand." *Daubert*, 509 U.S. at 597. It is for that reason that "expertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014) (holding that a psychiatrist was properly prevented from opining on rates of drug use in an economically vulnerable population because he had never conducted research on the subject, and instead relied on studies to form his opinion). If a proposed expert witness does not "propose to testify about matters growing naturally and directly out of research he had conducted independent of the litigation," such expert should be disqualified. *Lebron*, 772 F.3d at 1369 (quoting Fed. R. Evid. 702 (cleaned up)).

Dr. Zanga, a retired pediatrician, seeks to offer opinions on the nature of gender dysphoria and the appropriate treatment for the condition. Ex. A ¶¶ 18(a)-(h). He is not qualified to render these opinions, however.

According to Dr. Zanga, and as acknowledged by Defendants, his opinions are based solely on his "personal knowledge and experience." Ex. C, Email from Gary Perko on March 8, 2023; *see also,* Ex. B at 13:21-14:2. But Dr. Zanga has no training and absolutely no experience providing treatment for gender dysphoria. Ex. B, at 34:23-35:18; 41:9-12. He has never prescribed puberty blocking medications to treat gender dysphoria (*id.* at 39:14-16), nor to treat any condition (*id.* at 107:2-

5). He has never prescribed hormones to treat gender dysphoria (*id.* at 39:22-25).
Over the course of his career, Dr. Zanga saw a grand total of "two or three"
transgender patients more than a decade ago. (*Id.* at 34:23-35:18; 41:9-12). He did
not provide any treatment for their gender dysphoria, instead referring them to
mental health professionals. (*Id.* at 40:25 – 41:12).

Similarly, Dr. Zanga has never conducted any research on the development of
gender identity (*id.* at 40:1-3), on the etiology of gender dysphoria (*id.* at 40:4-12),
or the treatment of gender dysphoria (Ex. A, Exhibit A (Dr. Zanga's CV)). He has
never published a peer-reviewed article related to gender identity, gender dysphoria,
or transgender individuals (Ex. B, at 40:13-22; 71:3-72:8).

In fact, his first and only "written statement on the issue" was published first
in 2018 in a local medical society newsletter for Muscogee County, Georgia, and
then was later reprinted in an AAP Senior Bulletin, neither of which are peer-
reviewed publications. Ex. A, at ¶ 18; Ex. B, at 71:3-72:8. And despite this article
being the only source referenced in Dr. Zanga's entire expert report, the article itself
contains no citations or sources. Ex. D. Dr. Zanga is wholly unfamiliar with the
scientific literature on gender dysphoria. During his deposition, he was unable to cite
to a single peer-reviewed or credible source that he relied upon in writing his expert
report or forming his opinions. Ex. B, at 11:16-14:13; 20:19-21:25; 52:17-19; 54:1-

8; 56:8-13; 57:10-19; 58:3-5; 61:17-62:7; 74:22-75:9; 95:4-16; 99:16-19; 100:1-17;
101:8-102:7; 104:13-105:3; 106:21-107:1; 107:14-108:6; 110:1-111:11; 114:5-
115:20.

Not surprisingly, given his lack of relevant clinical and research experience,
Dr. Zanga has very little knowledge about the nature of gender dysphoria and
treatment of the condition. For example, Dr. Zanga does not seem to know at what
stage of puberty GnRH analogs are prescribed for adolescents with gender
dysphoria. (*Id.* at 99:20-101:2) (stating that GnRHa is provided to patients "prior to
onset of puberty" and that it "could be Tanner stage 1"). Dr. Zanga's opinions about
the treatment of gender dysphoria are based solely on what he has "absorbed" and
"read" over his career. (*Id.* at 14:6-8). But "merely reading literature in a scientific
field does not qualify a witness—even an educated witness—as an expert." *Kadel,*
2022 WL 3226731 at *9. This is especially true where, as here, he relies on non-
scientific sources such as "Time Magazine," "local newspaper," "AOL news sites"
and "a website called Freedoms Journal." Ex. B, at 21:20-25. Accordingly, Dr.
Zanga is not qualified to offer expert opinions the treatment of gender dysphoria.

In sum, Defendants have failed to put forward any meaningful information
demonstrating that Dr. Zanga is qualified "by knowledge, skill, experience, training,

or education" to provide opinions and testimony about treatment for gender dysphoria in children and adolescents.

## III.   RELIABILITY: DR. ZANGA'S EXPERT OPINIONS ARE UNRELIABLE.

An expert's testimony should only be admitted if it is sufficiently reliable. "To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *In re 3M Combat Arms Earplug Products Liab. Litig.*, 3:19MD2885, 2022 WL 1262203, at *1 (N.D. Fla. Apr. 28, 2022). Courts must assess "whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014). "In evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293, n.7.

Here, Dr. Zanga's report is completely devoid of any of the hallmarks of reliable expert testimony. In other words, Dr. Zanga's report, opinions, and testimony is "unsupported by reliable principles and methods and lack[s] hallmarks of scientific rigor: peer-reviewed research, studies, or experiments in support of his

opinions." *United States v. Geanakos*, 2017 WL 4883294, at \*3 (E.D. Cal. Oct. 30, 2017).

### A. Dr. Zanga's opinions are based on unsubstantiated and improper speculation and are therefore unreliable.

Here, Dr. Zanga's proffered testimony is not reliable, as it is based on speculation and conjecture rather than scientifically valid principles and methodology. His report is full of unsubstantiated guesswork and vague assertions without any evidentiary or factual support. Ex. A, at ¶ 12 ("the process *usually* begins"); ¶ 15 ("the resolution then disappeared, never *apparently* brought to the main voting session"); ¶ 18(a) ("[w]hy is the AAP now not discouraging, *or perhaps even encouraging*, schools and others working with children to keep parents uninformed about transitioning ideation and actions?"); ¶ 18(h)(iii) ("ill effects *seem to be* irreversible"). Rule 702 requires more than guesswork and vague unsubstantiated assertions. *Daubert,* 509 U.S. at 590 (requiring "more than subjective belief or unsupported speculations"); *Magical Farms, Inc. v. Land O' Lakes, Inc.,* 2007 WL 4727225, at \*2 (N.D. Ohio March 8, 2007) ("Dr. Ames' report is replete with statements like, 'suggest the possibility,' 'may have,' and 'I would be concerned,' all of which fail to rise to the level of a reasonable degree of certainty required by courts.").

**B. Dr. Zanga's (non-expert, lay) opinions regarding the AAP are unreliable.**

Dr. Zanga offers two primary opinions about the AAP – neither of which are really expert opinions based on "the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Frazier*, 387 F.3d at 1260. Dr. Zanga opines that the AAP's position on gender-affirming care is the product of "political correctness" and it has treated questions raised about that position "unscientifically and undemocratically." Ex. A, at ¶¶ 11, 16. To the extent that the Court views these opinions as expert (as opposed to lay) opinions, they are completely unreliable, as they are not based on sufficient facts or data and are not the product of any valid scientific methodology.

To be sure, Dr. Zanga has had significant involvement with the AAP in the past. However, he has not held a leadership position within the AAP since he founded an opposing organization in 2002. He was not involved in the development or approval of the AAP's position statement on gender-affirming care for children and adolescents. And, while he focuses his criticisms on how the AAP dealt with resolutions that he alleges were offered at the AAP Annual Leadership Forums in 2021 and 2022, he has no personal knowledge of those resolutions or how they were actually handled. Ex. B, at 56:8-14 (Q: "Is it fair to say you have no first-hand knowledge of the proceedings that we're discussing here?" A: "I was not there,

you're right." Q: "And do you have any documentation of the information that you were provided when you asked?" A: "No, I – I do not store every piece of information that I get."). He did not attend the conferences at issue (*id.* at 51:25-52:5; 66:13-19); he did not assist in the drafting of the resolutions or know who drafted the resolutions (*id.* at 52:6-10; 52:24-53:8; 53:24-25; 64:9-16); he could not verify the substance of what the resolutions stated (*id.* at 52:17-19; 54:1-8); and he was unable to identify even the resolution numbers or names (*id.* at 61:7-62:7).

Dr. Zanga's "reliance on anecdotal evidence" is a "red flag[] that caution[s] against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).

## C. <u>Dr. Zanga's opinions regarding the appropriate treatment of GD are unreliable.</u>

Dr. Zanga's opinions regarding the nature of and appropriate treatment for gender dysphoria lack the markers of reliability necessary for them to be admitted as expert testimony. Here too, his opinions are not based on sufficient facts or data, and he has not applied any recognized scientific methodology. Dr. Zanga stated that his opinions are based on his "personal knowledge and experience." However, as noted above, he has only interacted with two or three transgender patients over the course of his career (unrelated to their gender dysphoria), and he has never provided any treatment for gender dysphoria. Ex. B, at 34:23-35:18; 41:9-12. And, while he

claims that he has read the relevant literature, he provided no citations to any of that literature in his expert report, and during his deposition, he could not name a single study to support any of his opinions. Ex. B, at 11:16-14:13; 20:19-21:25; 52:17-19; 54:1-8; 56:8-13; 57:10-19; 58:3-5; 61:17-62:7; 74:22-75:9; 95:4-16; 99:16-19; 100:1-17; 101:8-102:7; 104:13-105:3; 106:21-107:1; 107:14-108:6; 110:1-111:11; 114:5-115:20.

Such "anecdotal information … is scientifically unreliable and not supported by any epidemiologic or other scientifically reliable studies." *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 571 (W.D. Pa. 2003); *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1252, 1253-54 (11th Cir. 2005). For example, while Dr. Zanga opines on the "potential harms" of gender-affirming care, (Ex. A ¶ 18(h)), he could not cite any sources supporting his various assertions about the specific harms. (Ex. B, at 106:21-107:1, 107:14-108:6; 110:1-111:11, 114:5-115:20).

Dr. Zanga also appears to be unaware of the differences between a person with an intersex condition (disorder of sex development) and someone who is transgender. Ex. D ("Hanne Gaby Odiele, ***a true intersex person*** speaks forcefully about the harmful physical and emotional effects of the surgical procedures physicians told her were necessary."). In fact, Dr. Zanga appears to conflate the two

separate conditions to such a degree that he changed out "*intersex person*" with "*transsexual people*" in a different iteration of the article. *Compare* Ex. D ("a *true intersex person* speaks forcefully about the harmful physical and emotional effects of the surgical procedures physicians told her were necessary") *with* Ex. E ("a number of *transsexual people* have spoken forcefully about the harmful physical and emotional effects of the medical and surgical procedures physicians told them were necessary.")

Dr. Zanga also opines that the appropriate treatment for gender dysphoria is counseling, which he states can "dissipate gender dysphoria" (Ex. A, at ¶ 18(g)), yet was unable to provide a single source or citation to support this position. (Ex. B, at 103:4-11; 104:13-105:3). He is also not a psychiatrist, psychologist, or mental health provider.

Dr. Zanga claims that "increasing numbers" of people "who have transitioned are attempting to retransition," (Ex. A, at ¶¶ 18(h)(v)), but could provide no support for that assertion, stating that it comes from "the non-medical literature." (Ex. B, at 114:5-11.). Similarly, Dr. Zanga claims that "rates of suicide are 20 times greater among adults who've used cross-sex hormones" (Ex. A, at ¶¶ 18(h)(vi)), but, again, could provide no support, stating it comes "[m]ostly from the European literature…[a]nd no, I cannot give you a specific citation." Ex. B, at 114:12-21.

Dr. Zanga refers to vague "European literature" and vague "actions" taken by "the United Kingdom, Sweden, Finland, and France" for support, yet is unable to name a single source or citation to support his positions. (*Id.* at 101:8-102:7). Moreover, Dr. Zanga failed to disclose that these countries *provide and cover* gender-affirming medical treatment for gender dysphoria for adolescents in certain circumstances and for adults, without any restriction, whereas Defendants exclude coverage for treatments for both these populations categorically.[2] Ex. J; *see also Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 671 (8th Cir. 2022).

### D. **Dr. Zanga's opinions are unreliable because they are not generally accepted in the scientific and medical community.**

General acceptance in the relevant scientific community is also relevant to the reliability inquiry. *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017). Not only is widespread acceptance an important factor in assessing the reliability of an expert's opinions, but the fact that a known technique or theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594.

---

[2] In fact, Dr. Zanga did not know that the rule that is the subject matter of the litigation for which he is a proffered expert witness excluded coverage for adults. Ex. B, at 116:6-16 (when asked if he was aware that the rule at issue in this case bans coverage for all transgender individuals, including adults and minors, he stated "I do not believe that's the case.")

Dr. Zanga's opinions regarding transgender people are contrary to, and squarely at odds with, the generally accepted opinions of the medical and scientific community. For example, he suggests that a transgender person asserting their gender identity is akin to a person asserting that they are a chimpanzee. Ex. D. Dr. Zanga also believes that transgender people are merely "imitating the opposite sex." Ex. A, ¶ 18(h)(iv); Ex. B, at 111:21-25. As such, he is opposed to social transition in childhood, adolescence, and even adulthood (Ex. B, at 94:18-95:3; 99:3-19), and believes that the provision of gender-affirming care is "child abuse," (Ex. B, at 42:12-15; *see also* Ex. I). And, he has endorsed what has become known as "conversion therapy" or "reparative therapy." Ex. H ("Those who seek therapy or spiritual counseling can achieve various levels of freedom from SSA [same-sex attraction])."

These extreme views on gender identity and gender-affirming care fall far outside of the medical and scientific mainstream and have been rejected by every major national or international medical association. *See, e.g.,* Ex. K, APA Resolution on Gender Identity Change Efforts (2021); Ex. L, ACAAP Position Statement on Conversion Therapy; *King v. Governor of the State of New Jersey*, 767 F.3d 216, 221–22 (3d Cir. 2014) (noting the "reports, articles, resolutions, and position statements from reputable mental health organizations opposing"

18

conversion/reparative therapy and that "[m]any of these sources emphasized that such efforts are ineffective and/or carry a significant risk of harm"); *Pickup v. Brown*, 740 F.3d 1208, 1223–24 (9th Cir. 2014) (noting "the well-documented, prevailing opinion of the medical and psychological community that [conversion/reparative therapy] has not been shown to be effective and that it creates a potential risk of serious harm to those who experience it").

### E. Dr. Zanga's opinions are so tainted by his personal bias as to render his opinions unreliable.

Reliability is a flexible inquiry wherein courts must ensure that an expert's opinion is based on scientific, technical, or other specialized knowledge and not on personal beliefs or speculation. *See Frazier*, 387 F.3d 1244, 1262. Here, there is ample evidence that Dr. Zanga's testimony about both the AAP and the appropriateness of gender-affirming care is so permeated and tainted by his personal bias and religious views as to render it unreliable. *Cf. Sanchez v. Esso Standard Oil de Puerto Rico, Inc.*, 2010 WL 3809990, at *4 (D.P.R. Sept. 29, 2010).

Dr. Zanga has long held extreme and unscientific views about LGBTQ+ people. For example, he has long opposed, and engaged in activism against, "same-sex attraction" and "homosexual" parenting. In fact, his extreme views on the subject of homosexuals are what led him to create the American College of Pediatricians ("ACPeds"). Ex. B, at 32:24-33:6; 118:5-17; *see also* 119:13-16 (founding ACPeds

was "based on [his] opposition to the AAP's position on same-sex parenting"); Ex. G, "Pediatricians' Groups Differ on Attitudes Toward Homosexual Parenting". The AAP policy statement at issue, which was published by the AAP in 2003, "urge[d] states to extend the status of legal parent to same-sex partners, as well as marriage-equivalent status to homosexual and lesbian couples." (*Id.*) Dr. Zanga characterized the AAP's position on equality in legal recognition to be a "pro-homosexual stance" and made clear that he and his fellow ACPeds members "do not want the media, the government, or the public to think that all pediatricians agree with the AAP's policies on controversial issues." (*Id.*). Dr. Zanga has described ACPeds as "essentially a Judeo-Christian, traditional-values organization" whose "core beliefs" include that "the traditional family unit, headed by an opposite-sex couple, poses far fewer risk factors in the adoption and raising of children." (*Id.*).

As the founder, past president, and current member of ACPeds, Dr. Zanga has authored, reviewed, and endorsed a number of ACPeds position statements that reveal his deep biases towards LGBTQ+ people. *See, e.g.,* Ex. F ("[T]he American College of Pediatricians believes it is inappropriate, potentially hazardous to children, and dangerously irresponsible to change the age-old prohibition on same-sex parenting, whether by adoption, foster care, or reproductive manipulation."); Ex. H (claiming that homosexuality is not a "normal variant of human sexuality" but

rather a pathology, and that homosexuality is associated with "promiscuity, inability to maintain sexual fidelity, partner abuse and psychological and medical illness associated with the lifestyle").

Notably, many of the opinions Dr. Zanga expressed in his expert report are similar to the opinions he has expressed previously about gay and lesbian people, merely redirected at the transgender community. For example, he has claimed that both same-sex attraction and gender incongruence "disappear" over time with the assistance of counseling. *Compare* (Ex. A, ¶ 18(f), (g)) *and* (Ex. H). Likewise, he has criticized the idea that social conditions and attitudes have any effect on gay or transgender individuals and their health. *Compare* (Ex. A, ¶ 18(g)) *and* (Ex. D).

The record evidence demonstrates a clear bias by Dr. Zanga against LGBTQ+ people generally, and transgender people specifically (*see* Section III.E, *supra*), which infects his reliability as a purported expert witness in this case. Thus, his testimony should be excluded.

## IV.   HELPFULNESS: DR. ZANGA'S EXPERT OPINIONS ARE UNHELPFUL AND ARE NOT RELEVANT TO THIS CASE.

To satisfy the helpfulness requirement, the testimony must have a justified scientific relationship to the facts at issue. *Daubert*, 509 U.S. at 591. Thus, helpfulness, "goes primarily to relevance." *Id.* at 580; *see also Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) ("[t]he touchstone of this inquiry is the concept

of relevance."). Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). "The relationship must be an appropriate 'fit' with respect to the offered opinion and the facts of the case." *Id.*; *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir.2009) ("if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry' it should be excluded because there is no 'fit.'").

In addition to being unreliable, a number of the opinions that Dr. Zanga offers are completely unrelated to the issue in this case.[3] For example, Dr. Zanga laments that "schools and others working with children" are not talking with parents about a child's "transitioning ideation and actions." Ex. A, ¶ 18(a). Even assuming for the sake of argument that his statement is accurate, it does not go to the question of whether excluding coverage of gender-affirming care from Medicaid violates federal law nor whether that care is experimental or investigational. Dr. Zanga also opines that children, adolescents, and even adults in their 20s should not be making decisions about their own medical care. Ex. A, ¶¶ 18(b)-(f)); Ex. B, at 97:13-99:19. But again, the Challenged Exclusion does not affect the age at which patients can

---

[3] Notably, Dr. Zanga does not seem to understand the issue in this case. When asked if he was aware that the rule at issue bans coverage for all transgender individuals, including adults and minors, he responded "I do not believe that's the case." Ex. B, at 116:6-16.

consent to their own medical care. Likewise, Dr. Zanga opines about the appropriateness of social transition, (*see* Ex. A, ¶ 18(h)); (Ex. B, at 97:13-99:19; 94:18-95:16) while the Challenged Exclusion is not about social transition.

Dr. Zanga's opinions have no valid scientific connection to the pertinent inquiry. He opines on unfounded concerns about the treatment of gender dysphoria, yet lacks basic understanding about, and experience with, this type of treatment. For example, Dr. Zanga opines on puberty blocking medications, yet does not know when puberty blocking medication is administered (Ex. B, at 99:20-100:17); he does not know at what Tanner stage puberty blocking medication is prescribed (*id.* at 100:18-101:2); and he could not provide any citation to or support for the statements in his report about the treatment provided to minors.

Dr. Zanga sets forth various irrelevant opinions about the American Academy of Pediatrics (Ex. A, ¶¶ 8-17, 18(a), (d), (g), (h)), opinions that are unsupported by any facts or evidence and about which he has no first-hand knowledge. Ex. B, at 56:8-14 (Q: "Is it fair to say you have no first-hand knowledge of the proceedings that we're discussing here?" A: "I was not there, you're right." Q: "And do you have any documentation of the information that you were provided when you asked?" A: "No, I do not store every piece of information that I get.")

Likewise, Dr. Zanga's opinions about the provision of medical treatment for gender dysphoria in "several 'developed' nations," including the United Kingdom, Sweden, and Finland, are as misleading as they are wholly irrelevant. Ex. A, at ¶ 18(h)(vii). How care is provided and covered in countries with nationalized health care systems is not relevant to whether coverage of gender-affirming medical care should be provided by Medicaid in Florida.

In sum, Dr. Zanga's opinions are not relevant to this case, as they will not help the trier of fact to understand the evidence or to determine a fact in issue.

## V.  DR. ZANGA'S REPORT, OPINIONS, AND TESTIMONY LACK ANY PROBATIVE VALUE AND ARE THUS INADMISSIBLE UNDER RULE 403.

Finally, the Court should exclude Dr. Zanga's opinions because their introduction will result in unfair prejudice, confusion of the issues, or in misleading testimony. Fed. R. Evid. 403. "Rule 403's major function is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir. 2014) (internal quotation marks and citations omitted).

Dr. Zanga's opinions have little to no probative value and thus should be excluded under Rule 403.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should exclude Dr. Zanga's opinions and testimony, including those set forth in his report, in full.

Dated this 7th day of April.

Respectfully Submitted,

*/s/ Simone Chriss*
Simone Chriss

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**\*
**Gary J. Shaw**\*
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com

**Joe Little**\*
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan**\*
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**\*
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**Abigail Coursolle\***
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee\***
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

\* *Admitted pro hac vice*
*Counsel for Plaintiffs*

## LOCAL RULE 7.1(B) CERTIFICATION

The undersigned certifies that he attempted in good faith to resolve the issues raised in this motion through a meaningful conference with Defendants' counsel, including through a meet and confer Zoom conference on April 6, 2023.

*/s/ Simone Chriss*
Simone Chriss
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

## <u>CERTIFICATE OF WORD COUNT</u>

As required by Local Rule 7.1(F), I certify that this Memorandum of Law contains 5,394 words.

<u>/s/ Simone Chriss        </u>
Simone Chriss
Counsel for Plaintiffs
