Page 1

1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF FLORIDA

2
                   TALLAHASSEE DIVISION

3

4    AUGUST DEKKER, et al.,      )
                                 )
5                                )
                                 )
          Plaintiffs,            )
6                                )
     vs.                         ) Case No. 4:22-cv-00325-RH-MAF
7                                )
     JASON WEIDA, et al.,        )
8                                )
                                 )
9            Defendants.         )
                                 )

10

11

12

13

14          Remote Deposition of JOSEPH ZANGA, M.D.

15               (Taken by Plaintiffs)

16               Sanford, North Carolina

17               Friday, March 24, 2023

18

19

20

21

22

23

24               Reported in Stenotype by
               Lauren M. McIntee, RPR, CRR

25      Transcript produced by computer-aided transcription

Page 2

```
 1              APPEARANCES
 2     ON BEHALF OF THE PLAINTIFFS:
 3              Simone Chriss, Esquire (via Zoom)
                Chelsea Dunn, Esquire (via Zoom)
 4              Southern Legal Counsel
                1229 NW 12th Avenue
 5              Gainesville, Florida 32601
                (352) 271-8890
 6              Simone.Chriss@southernlegal.org
                Chelsea.Dunn@southernlegal.org
 7
                -and-
 8
                Omar Gonzalez-Pagan, Esquire (via Zoom)
 9              Lambda Legal Defense and Education Fund, Inc.
                120 Wall Street, 19th Floor
10              New York, New York 10005
                (212) 809-8585
11              Ogonzalez-pagan@lambdalegal.org
12              -and-
13              Catherine McKee, Esquire (via Zoom)
                National Health Law Program
14              1512 E. Franklin Street, Suite 110
                Chapel Hill, North Carolina 27514
15              (919) 968-6308
                Mckee@healthlaw.org
16
       ON BEHALF OF THE DEFENDANTS:
17
                Joshua Pratt, Esquire (via Zoom)
18              Holtzman Vogel Baran Torchinsky & Josefiak, PLLC
                119 South Monroe Street, Suite 500
19              Tallahassee, Florida 32301
                (850) 270-5938
20              Jpratt@holtzmanvogel.com
21          REMOTE DEPOSITION OF JOSEPH ZANGA, M.D., a witness
22     called on behalf of Plaintiffs, before Lauren M.
23     McIntee, Court Reporter and Notary Public, in and for
24     the State of North Carolina, in Sanford, North Carolina,
25     on Friday, March 24, 2023, commencing at 10:05 a.m.
```

```
 1    any facts or data that you considered when you were
 2    writing your report?
 3         A.    Not that I recall.
 4         Q.    Did counsel for defendants provide you with
 5    any assumptions that you relied on in writing your
 6    report?
 7         A.    No.
 8         Q.    And did anyone else provide you with any
 9    information that you considered when writing your
10    report?
11         A.    What do you mean "anybody else providing me
12    information"?
13         Q.    Did you consult with anyone, anyone at all
14    while you were writing this report?
15         A.    No.
16         Q.    When you were writing your report, did you
17    review any documents?
18         A.    Yes.
19         Q.    Okay.  What documents did you review?
20         A.    I reviewed information about the American
21    Academy of Pediatrics Annual Chapter Forum or Annual
22    Leadership Forum it's now called.  I reviewed my report,
23    opinion information submitted to the local chapter of
24    the American -- of the Ped- -- excuse me, of the Medical
25    Society of Georgia where I was writing at the time, and
```

1    also to the section of the American Academy of

2    Pediatrics for publication.

3        Q.    Okay.  So before we move on, you said you

4    reviewed information about the AAP Annual Leadership

5    Forum.  What documents specifically did you review?

6        A.    The documents from the AAP website as to

7    the -- the manner in which the forum is conducted, about

8    the reference committees, and rules for submission of

9    resolutions to the chapter forum.

10        Q.    And did you cite those documents in your

11    expert report?

12        A.    I don't believe so.

13        Q.    And why not?

14        A.    Wasn't necessary.

15        Q.    Can you explain what you mean, that it wasn't

16    necessary?

17        A.    The documents were available for almost

18    anyone to read.  And I wasn't commenting on the

19    documents, but I was commenting on the result of the

20    actions at the Annual Chapter Forum -- Annual Leadership

21    Forum.

22        Q.    And for the report you mentioned that you

23    reviewed that you submitted to the Medical Society of

24    Georgia, what -- what document is that?

25        A.    That's the -- my document entitled "First, Do

Page 13

1    No Harm."

2         Q.    And I understand -- is it correct that there

3    are two iterations of that document?

4         A.    Yes.

5         Q.    And which did you review for purposes of

6    creating for this report?

7         A.    Actually, both of them.

8         Q.    Did you review any other documents other than

9    the information on the AAP website about the Annual

10   Leadership Forum and the report that you submitted to

11   the Medical Society of Georgia?

12        A.    Not specifically for this -- for my report

13   here.

14        Q.    When you say "not specifically," can you just

15   clarify what you mean?

16        A.    I'm a -- I'm a pediatrician.  I'm a

17   scientist.  I'm a teacher.  I am constantly reviewing

18   information.  I read multiple journals, medical

19   journals, as well as non-medical journals that comment

20   on medical issues.  So I'm constantly reading, studying.

21        Q.    Did you provide a bibliography for your

22   report in this case?

23        A.    No.

24        Q.    And why did you not provide a bibliography

25   for this?

Page 14

1       A.    Because I wasn't citing any specific material

2   on any journal or article or text or other document.

3       Q.    But did -- did you rely on any of the

4   documents that you just mentioned as support for the

5   opinions that you provided in this report?

6       A.    I relied on no one specific or two specific

7   documents.  I relied on what I have absorbed over my

8   career and what I have read over my career.

9       Q.    Are you aware that when we asked defendants'

10  counsel for a bibliography with regard to your report,

11  they informed us that your opinions were based on your

12  personal knowledge and experience?

13      A.    Yes.

14      Q.    And is that an accurate representation?

15      A.    Yes.

16      Q.    Dr. Zanga, how did you first become aware of

17  this case?

18      A.    I believe I was contacted by the firm and

19  asked if I would be willing to lend an opinion.

20      Q.    And when you say "the firm," what firm are

21  you referring to?

22      A.    That's the Holtzman -- Holtzman firm.  I

23  don't have the whole name committed to memory.

24      Q.    No problem.  And do you recall who from the

25  Holtzman Vogel firm contacted you?

1          What did you do to prepare for your

2    deposition today?

3          A.    I reviewed my article, "First, Do No Harm,"

4    and gave a great deal of thought to the kind of things I

5    had read over the course of years, to patients I have

6    seen, related to what I wrote in the "First, Do No

7    Harm," and really just continued reading the kinds of

8    things that I have been reading from both medical and

9    non-medical sources.

10         Q.    Did you review any of the plaintiffs' expert

11   rebuttal reports in this case?

12         A.    I briefly had occasion yesterday to look at I

13   think three rebuttal reports --

14         Q.    And which ones were those --

15         A.    -- specific -- excuse me?

16         Q.    I apologize.  I didn't mean to interrupt.  I

17   was asking which ones.

18         A.    I didn't mean to interrupt you.

19         I do not have their names in front of me, and

20   frankly, I have them on my computer, but I'm afraid if I

21   try and find them on my computer, I'm going to lose you.

22         Q.    No worries.  That's okay.

23         Did you review any articles in preparing for

24   your deposition today?

25         A.    No.  No.

1    Q.    You had mentioned a moment ago that you --

2    that you reviewed some of the medical sources and

3    non-medical sources that you typically review.  Can you

4    tell me what medical sources you reviewed?

5    A.    Okay.  Let's try it.  Materials written by

6    the American Academy of Pediatrics, literature on, both

7    direct from the source and commentaries on nations

8    outside the United States that have made restrictions on

9    the -- on transgender accommodation, information about

10   genetics, about brain development, about differences in

11   males and females beside -- outside the external

12   appearance.

13   Q.    Okay.  When you said you "reviewed

14   commentaries on nations outside the US that restricted

15   transgender accommodations," what do you mean

16   by "transgender accommodation"?

17   A.    The articles pertain to pauses in the then

18   generally accepted approach to dealing with children who

19   had transgender ideation.

20   Q.    Okay.  Let me rephrase my question.  What --

21   what would you -- how do you define the word -- the

22   phrase "transgender accommodation"?  What did you mean

23   by that?

24   A.    If a child has transgender ideation, some of

25   the literature describes how we accommodate to affirm,

1    if you wish, that ideation.

2         Q.    How to accommodate, okay.  And would it be

3    fair to say you're referring to medical treatment?

4         A.    In general, that's the thrust of one side of

5    the question.

6         Q.    And can you tell me specifically what

7    literature you're referring to when you say you reviewed

8    commentaries on nations outside the US that restrict

9    transgender accommodation?

10        A.    There are probably 50 or more articles that

11   I've read over the last 20 years that information from

12   which I have stored in my library, in my head, and use

13   when I need to when writing or speaking about this --

14   this question.

15        Q.    And can you name the sources specifically?

16        A.    Well, I mentioned the American Academy of

17   Pediatrics.  I did review what they have written on this

18   subject.

19        Q.    Thank you.  And as for the, you mentioned

20   reviewing information about genetics, brain development,

21   and -- well, I'm sorry.  I'll take them one at a time.

22   Regarding information on genetics, what sources did you

23   review?

24        A.    Oh, gosh.  I cannot name for you a specific

25   source.

Page 21

1      Q.    What about for the information you reviewed

2   on brain development?

3      A.    Yes.  I went back over the information,

4   publications by Jay Giedd, and I don't know how to spell

5   that, who was the earliest investigator, using

6   functional MRI to determine when children were capable

7   of making life-changing decisions.

8      Q.    Okay.  Jay Giedd, thank you.  And what about

9   the information you reviewed regarding the differences

10  between males and females other than external factors?

11     A.    Oh, no, there's nothing -- there's no one

12  specific thing that I could point you to.

13     Q.    Okay.  Thank you.  And do you know whether

14  the resource or the materials that you reviewed on these

15  topics were peer-reviewed?

16     A.    I know that the material that I have

17  imprinted in my brain are from peer-reviewed resources

18  with the exception of non-medical reports about

19  transgender -- transgender issues.

20     Q.    What sort of non-medical reports do you

21  review regarding transgender issues?

22     A.    I regularly read Time Magazine.  I read, you

23  know, local newspaper.  I peruse what's on the AOL news

24  sites.  There's a, oh -- there's a website called

25  Freedoms Journal.  Those are all I can think of offhand.

1        Q.      When was the last time you were engaged in

2    the active practice of pediatrics?

3        A.      Probably in 2018.

4        Q.      Okay.  And what were you doing at that time?

5        A.      It could have been 2019.  Sorry.  I was

6    providing coverage for a local pediatrician in Columbus.

7        Q.      When you say "coverage," you mean seeing --

8        A.      I was -- I was in her office seeing patients

9    while she was away on vacation.

10       Q.      And do you have an active license to practice

11   medicine?

12       A.      I am licensed currently, active license in

13   the State of North Carolina.  I do not have active

14   licenses in the other states.

15       Q.      Are you currently a member of any

16   professional medical associations or organizations?

17       A.      I am a member of the American Academy of

18   Pediatrics and a member of the North Carolina Medical

19   Society.  I am still on a mailing list for the Muskogee

20   County Medical Society in Georgia as well as the Medical

21   Association of Georgia and -- as both as an emeritus

22   member.  And I am a member of the American College of

23   Pediatricians.

24       Q.      We will come back to those in a bit.  You

25   were the first president of the American College of

1   Pediatricians; is that correct?

2        A.    Yes.

3        Q.    And are you -- you mentioned that you're

4   still an active member.  What -- what is your role

5   currently?

6        A.    Member and occasional advisor to the board.

7        Q.    Okay.  All right.  We will come back to

8   the -- these organizations in a bit.  In terms of your

9   work history, just to get a better understanding of your

10  career, you completed your ambulatory pediatric

11  fellowship in 1995; is that correct?

12       A.    If that's what my CV says, yes, I did.

13       Q.    And is that the same thing that you

14  referenced in your report where you say "this led me to

15  an academic career beginning with a further year of

16  education as a fellow in community pediatrics"?

17       A.    Yes.

18       Q.    Can you explain the focus of that fellowship?

19       A.    Yes.  The focus was to develop an expertise

20  as a primary care physician in an office-based practice,

21  while at the same time being an advocate for the health

22  and well-being of children in the immediate community

23  and larger community outside the specific city or county

24  in which I resided, dealing with problems in food

25  deserts and food supplies, school issues for the -- the

Page 34

1    children, family -- family concerns with or for their

2    children, and providing teaching for medical students,

3    interns, and residents in medicine as well as in -- in

4    certain nursing -- nursing venues.

5         Q.    So Dr. Zanga, you've never been board

6    certified in psychiatry; is that correct?

7         A.    That's correct.

8         Q.    And you've never been board certified in

9    endocrinology; is that correct?

10        A.    That is correct.

11        Q.    You've never been board certified in

12   adolescent medicine; is that correct?

13        A.    I probably could have been.  I set up the

14   adolescent program at the University of Virginia, but

15   no, you're right.

16        Q.    No board certification.  And you've never

17   been board certified in plastic surgery; is that

18   correct?

19        A.    That is correct.

20        Q.    And lastly, you've never been board certified

21   in neurology; is that correct?

22        A.    That is correct.

23        Q.    When you were practicing medicine and seeing

24   patients, did you treat any transgender patients?

25        A.    Yes.

1          Q.     How many transgender patients?

2          A.     Probably two or three.

3          Q.     And how old were these patients?

4          A.     How old?

5          Q.     Yes.

6          A.     Young to mid adolescence.

7          Q.     And --

8          A.     Young, meaning out of -- just into their

9    adolescence to 15, 16 years of age.

10          Q.     Okay.  And when was this?

11          A.     This was actually in my last few years of

12   practice.  So in the, you know, early -- early to --

13   2000 to 2010, '11, '12.

14          Q.     What did you treat them for?

15          A.     Well, in general, I treated them for cold,

16   sore throats, and runny noses, for development issues,

17   and ultimately as they gained trust in me, the question

18   of their transgender ideation.

19          Q.     And when you say you "treated them for their

20   transgender ideation," what -- what does that mean?

21          A.     It means I talked to them and to their

22   parents about what this meant to or for them and some

23   timelines, and because I'm not a psychiatrist, I offered

24   to continue to meet with the children -- child and

25   family, discuss this issue further, but requested that

1     Q.    Okay.  So you would agree that you weren't in

2     the best position to recommend a course of action

3     regarding gender dysphoria for these patients?

4     A.    If they asked me, I would tell them, but I

5     deferred generally, exclusively in these cases, to the

6     mental health professional.

7     Q.    When you say "if they asked you, you would

8     tell them," you would tell them what?

9     A.    To generalize, I would tell them that I found

10    their dilemma interesting, their concerns not unique,

11    and that this is something that needs careful thought,

12    consideration over a period of time, and that time is

13    variable depending upon the individual and family.

14    Q.    Did you ever prescribe GnRH agonists to treat

15    gender dysphoria in these patients?

16    A.    No.

17    Q.    And why not?

18    A.    Because they and I were not convinced that

19    that was the right course.  In addition, there are

20    complications associated with those medications, and I

21    did not presume to enforce that on vulnerable children.

22    Q.    And did you ever prescribe hormone therapy

23    for the treatment of gender dysphoria for any of your

24    patients?

25    A.    No, for the same reasons.

1          Q.     Did -- have you ever conducted research on

2     the development of gender identity?

3          A.     Conducted, no.

4          Q.     Have you ever conducted research on the

5     etiology of gender dysphoria?

6          A.     Could you explain what "ideology" means?

7          Q.     I'm sorry, etiology.

8          A.     Etiology.

9          Q.     Etiology, thank you.

10         A.     Thank you.

11         Q.     Etiology.

12         A.     I have not conducted research, no.

13         Q.     Have you ever published a peer-reviewed

14    article on the development of gender identity?

15         A.     No.

16         Q.     Have you ever published a peer-reviewed

17    article on the assessment of treatment of gender

18    dysphoria?

19         A.     To the extent that I included that in

20    my "First, Do No Harm," no.  Or yes, depending upon

21    whether you consider that dealing with the treatment of

22    gender dysphoria.

23         Q.     Are you -- is it your position that the --

24    strike that.  I'll come back to that.

25                Would you agree that you have no clinical

1    experience in the treatment of gender dysphoria?

2         A.    What do you mean, "experience in the

3    treatment of gender dysphoria"?

4         Q.    So with the few individuals you mentioned

5    previously, transgender patients that you had, you

6    referred them to a mental health provider; is that

7    correct?

8         A.    Correct.

9         Q.    And so you don't have experience in treating

10   their gender dysphoria?

11        A.    I did not specifically provide the treatment

12   for their gender dysphoria, correct.

13        Q.    Okay.  In your expert report, you discussed

14   your work in direct programs and child abuse and Child

15   Protective Services, as you mentioned earlier.  Why did

16   you think it was important to note that experience for

17   this report?

18        A.    In dealing with questions of child abuse and

19   neglect, and maybe more specifically neglect, but it did

20   fall into the abuse category as well, parents sometimes

21   did or didn't do things to or for their children, which

22   could be considered abuse or neglect.  Providing or not

23   providing insulin for a diabetic patient, asthma therapy

24   for a child with asthma, blowing smoke in the children's

25   faces when they have asthma, things such as that are

```
 1   considered abusive or neglectful.
 2        Q.    Understood.  But for the context of this
 3   report, which is focused on the -- the -- AHCA's, the
 4   defendants' exclusion of coverage for treatment of
 5   gender dysphoria, how is that experience relevant here?
 6        A.    The medications that we use for delaying of
 7   puberty for the transition to a different sex are
 8   potentially deleterious to the health, long-term health
 9   and wellbeing of the child.
10        Q.    Let me ask --
11        A.    Until we have definitive -- go ahead.
12        Q.    So would you have -- do you consider
13   treatment for gender dysphoria to be child abuse or
14   neglect?
15        A.    Yes.
16        Q.    Okay.  We've been going for about an hour, so
17   if it's okay with everyone, maybe we'll just take a
18   five-minute break and then reconvene.  Does that sound
19   okay to you, Dr. Zanga?
20        A.    Five minutes is fine.  When will you -- when
21   are you predicting lunch?
22        Q.    Maybe about an hour after that.  Or what --
23        A.    So around 11 -- about 12:15?
24        Q.    Maybe closer to 12:30, does that work for
25   you?
```

1    other hand, it could be referred to the committee on

2    bioethics, and that's a decision of the board.  So yes

3    and no.

4         Q.    Moving down to Paragraph 13 where you talk

5    about, the voting board is composed of 17 members with

6    one elected by fellows in each of the 10 AAP geographic

7    districts.  There are three members elected nationally

8    and a 5-member executive committee, etc.  Would -- you

9    would agree that most of the AAP's board of directors

10   are elected by its membership, right?

11        A.    Yes.

12        Q.    And this includes anyone elected as president

13   elect, which includes the president and president elect?

14        A.    In AAP elections, fewer than 40 percent of

15   the fellows vote, cast a vote.  And as I mentioned

16   previously in my statement, when the AAP says they have

17   70 -- 67,000 members, that's exactly true.  They have

18   67,000 members.  Not all of them are fellows.

19             The section -- excuse me, yeah, the resident

20   section, the medical student section, section on

21   dentistry, and a number of others are not AAP fellows.

22   They are simply members.  And only fellows vote.  So of

23   the 67,000, there's probably fewer than 60,000 who are

24   voting members or fellows of the academy, and fewer than

25   40 percent of them vote in any AAP elections.

1      Q.    But they're not voting in these elections by
2  choice, right?
3      A.    I don't understand the question.
4      Q.    Are they permitted to vote in the elections?
5      A.    Every fellow of the American Academy of
6  Pediatrics is permitted and encouraged to vote.
7      Q.    Okay.  So the AAP isn't excluding them from
8  voting.  Simply only 40 percent of them choose do choose
9  to vote?
10     A.    Fewer than 40 percent.
11     Q.    Okay.  But all are permitted to vote?
12     A.    Correct.
13     Q.    Okay.  So the board of directors is a
14 representative body, correct?
15     A.    To the extent that people have voted for
16 them, yes.
17     Q.    Let's look at Paragraph 14 here where you
18 discuss the Annual Leadership Forum and the resolution
19 process.  Do you know if the resolution process is the
20 same as it was when you were president?
21     A.    It's a little larger than it was.  More
22 people are involved, but the -- and there have been some
23 rule changes, but according to what we hear at the Past
24 Presidents Advisory Committee, it is the same.
25     Q.    And moving down to Paragraph 15 where you

1    talk about the resolution submitted to the ALF in 2021

2    and 2022, did you attend the ALF in both of those years?

3         A.    No.

4         Q.    Did you attend in either of those years?

5         A.    No.

6         Q.    Did you assist in the drafting of Resolution

7    Number 33?

8         A.    No.

9         Q.    Do you know who drafted it?

10        A.    I did, but do not know now.  Do not recall.

11        Q.    Did Resolution 33 ask the AAP rescind its

12   2018 policy statement on transgender and gender-diverse

13   children?

14        A.    No.  It was -- it was asked to study the --

15   as I said, study the science of the issue.  This is a

16   children issue, currently presented as AAP policy.

17        Q.    Did you include a citation to or access to

18   Resolution 33 in your expert report?

19        A.    No.

20        Q.    Do chapters, committees, or sections ever

21   endorse resolutions?

22        A.    In general, currently, that is the only way a

23   resolution can be considered.

24        Q.    And did a chapter, committee, or section

25   endorse Resolution Number 33?

1     A.    Yes.

2     Q.    One moment.

3           Which -- which chapter, committee, or section

4   endorsed Resolution Number 33?

5     A.    I cannot tell you.

6     Q.    You don't -- don't know?

7     A.    It's not something I committed to memory,

8   correct.

9     Q.    Generally, who is on the various reference

10  committees?

11     A.    The committee proper, four or five members,

12  are selected by the chapter forum or chapter --

13  annual -- Leadership Forum Committee, which is a formal

14  committee of the American Academy of Pediatrics.  One of

15  those people is chosen, excuse me, as the chair of the

16  committee.  The reference committees are attended by the

17  attendees at the Annual Leadership Forum, and they

18  self-select for the reference committees that they wish

19  to attend.

20     Q.    And who decides which committees review which

21  resolutions?

22     A.    The board, or the issues with the Annual

23  Chapter Forum, Annual Leadership Forum Committee.

24     Q.    Were you on Reference Committee B?

25     A.    I did not attend the meeting, so no.

1     Q.    Is there a way for us to verify the substance

2    of Resolution 33?

3     A.    You might be able to ask the American Academy

4    of Pediatrics to give you that.

5     Q.    You don't have a copy of it?

6     A.    I do -- if I did, I do not have a copy any

7    longer.  I may have received it by the way online from

8    the AAP.

9     Q.    And how do you know which -- or how -- strike

10   that.

11          How do you know how the members of Reference

12   Committee B voted on Resolution 33?

13    A.    That, I got from the American Academy of

14   Pediatrics.

15    Q.    And how did you get that from them?

16    A.    I asked.

17    Q.    Who did you ask specifically?

18    A.    I might have asked through membership, but I

19   may have simply, because I'm a past president, I may

20   have contacted the staff person for the -- who provided

21   support for the annual -- for the, excuse me, for the

22   Past Presidents Advisory Committee who obtained that

23   information and got it to me.  She's no longer with the

24   academy.

25    Q.    And why did you ask about the voting on this

1    particular resolution?

2         A.    Because I read about it when it occurred, and

3    I was curious as to why a resolution received 50 yes

4    votes, only 12 no votes, and what is sounded like was 10

5    abstentions.  So that's a significant majority.  And in

6    looking at the resolutions in Reference B, as I cited

7    here on 15, it had the highest support of any resolution

8    in Reference B.

9         Q.    So my question was, I understand that you're

10   telling me the information you received concerned you,

11   but what led you to request that information?  Because

12   you didn't know the numbers, the breakdown of the votes

13   prior to asking.

14        A.    Because as a member of the academy, I receive

15   information about the resolutions.  And as I said, we

16   get a report from the -- at the Past Presidents Advisory

17   Committee after the leadership forum, and I was curious

18   that a resolution simply asking for further study was --

19   disappeared.  It was not brought to the -- the main body

20   of the forum despite the fact that it received such

21   support in the reference committee.

22        Q.    We're going to come back in a moment to what

23   you just mentioned, the resolution disappearing.  But

24   quickly, was the "she" that you referred to earlier when

25   you said you requested the information from someone and

Page 56

1    you couldn't remember her name, was that potential

2    Michelle Cretella?

3         A.    Oh, no, no, no.

4         Q.    No?

5         A.    Michelle is with the American College of

6    Pediatricians, not with the American Academy of

7    Pediatrics.

8         Q.    Is it fair to say you have no first-hand

9    knowledge of the proceedings that we're discussing here?

10        A.    I was not there, you're right.

11        Q.    And do you have any documentation of the

12   information that you were provided when you asked?

13        A.    No, I -- I do not store every piece of

14   information that I get.  I use what I need to use and

15   file it in a round file.

16        Q.    So looking at Paragraph 16 here -- or I

17   apologize, Paragraph 15.  You say -- I'm sorry,

18   Paragraph 16.  I was right the first time.  Where you

19   say that there seem to be little controversy about the

20   resolution.  Do you mean within Reference Committee B?

21        A.    That's the only place it was discussed, yes.

22        Q.    And what's the basis for that statement?

23        A.    If 50 people -- excuse me.  If 85 percent of

24   the voting people in Reference B voted to have it

25   presented to the main body of the ALF, that says to me

1    that there was a significant support for further

2    discussion of that resolution.

3         Q.    But again, the basis for your knowledge on

4    these things is, you asked others and they relayed to

5    you?  You weren't -- you weren't there to experience

6    this first-hand, correct?

7         A.    I asked for an official report of the

8    proceedings for Reference B, and I received that.  So

9    that's about as official as you can get.

10        Q.    And did you cite to that official response in

11   your report?

12        A.    The statistics that I presented were from

13   that report.  Otherwise, I could not have presented

14   those statistics.

15        Q.    Right.  But those statistics that you relied

16   upon came from a report, and you did not cite that

17   report in your expert report, correct?

18        A.    There was no citation of that.  There was no

19   footnote, you're correct.

20        Q.    And are you saying there's no footnote, as in

21   you did not reference it in here or there is no -- there

22   is no official report that exists?

23        A.    There is an official report that exists.

24        Q.    Okay.

25        A.    I told you that you can get that, you should

1    be able to get that report from the American Academy of

2    Pediatrics.

3          Q.    Right, okay.  But you did not cite that in

4    your report or provide it in a bibliography?

5          A.    No.

6          Q.    Okay.  Going back to Paragraph 15 where you

7    say that the reference committee had no recommendation

8    neither for nor against it being presented to the entire

9    ALF.  Do you know why Reference Committee B had no

10   recommendation?

11         A.    No.  I tried to find out that information,

12   and it was not provided to me.  However, my experience

13   over a long time, because I get these reports every year

14   after the ALF, that has never occurred where the

15   majority of the reference committee wanted it presented

16   to the main body and it was not.

17         Q.    But you don't know the basis for why the

18   reference committee had no recommendation?

19         A.    No.  That -- that is not recorded, to my

20   knowledge, anywhere.  And as I said, I questioned and

21   received no comment, no information.

22         Q.    You go on to say that the resolution then

23   disappeared, never apparently brought to the main voting

24   section.  What do you mean by that?

25         A.    I don't know how else I can say it.  It --

1    there was a Resolution 33.  It was supported by 80, over

2    80 percent of the attendees in Reference B.  Therefore,

3    it should have been presented to the body of the Annual

4    Chapter Forum; in other words, the attendees of the

5    forum who were in other reference committees, so that

6    they could discuss it.  But it never appeared on the

7    final agenda for the Annual Leadership Forum, never

8    brought to the main voting section.

9        Q.    Generally --

10       A.    For --

11       Q.    Apologies.  Go ahead.

12       A.    No, go ahead.

13       Q.    Generally, if a reference committee has no

14   recommendation, is the resolution brought to the main

15   voting section -- session?

16       A.    With 85 percent of the people supporting it,

17   it -- yes, it would have been brought to the -- it's

18   only if the reference committee said, no, do not present

19   this, would it not have been presented.

20       Q.    I am going to show you what we're going to

21   mark as Exhibit 3.

22             (Whereupon, Exhibit 3 was marked for

23        identification.)

24   BY MS. CHRISS:

25       Q.    All right.  Do you recognize this document?

Page 60

1        A.      Yes.

2        Q.      Okay.  So if we could mark as Exhibit 3 the

3   American Academy of Pediatrics statement titled "AAP

4   continues to support care of transgender youths as more

5   states push restrictions."  And if we could scroll down

6   to -- are you aware that the AAP has stated that the

7   resolution was soundly defeated by the voting members at

8   the AAP leadership conference?

9        A.      Could you show me that, please?

10       Q.      Yes.  So it states that it was "not endorsed

11  by any chapter, committee, council, section or district.

12  Only 57 out of the AAP's 67,000 members commented in

13  support of the resolution.  Ultimately, the resolution

14  was soundly defeated by the voting members at the AAP

15  leadership conference."

16       A.      That's a -- obviously, a different

17  resolution.  It's not the one calling for a study of the

18  issue.  This is a -- this is a resolution whose title

19  deals with prescribing.  It was very specific.  At the

20  bottom of your -- of your scroll, in 2021, submitted a

21  resolution and any member -- submitted a resolution as

22  part of the Annual Leadership Conference, titled

23  "Addressing alternatives to the use of hormone therapies

24  for gender dysphoric youth."  That's not the resolution

25  calling for a study of the issue.  It was also not

Page 61

1    endorsed by any chapter, committee, council, or section.

2    Therefore, it was not even considered at the AAP.

3         Q.    So are you saying this article is discussing

4    the other resolution that you cited in your --

5         A.    Discussing -- discussing a different

6    resolution.

7         Q.    So you cited to Resolutions 27 and 33 in your

8    expert report; is that correct?

9         A.    The -- in 2021, Resolution 33.  And then in

10   the other resolution in 2022 whose number you apparently

11   have and I don't, was not considered because there was a

12   rule change and it had to be -- it could not be

13   submitted by a member.  It had to be submitted and

14   endorsed.  In the past, a member could submit a

15   resolution, and the Annual Leadership Forum Committee

16   decided whether it could be presented or not.

17        Q.    Okay.  So taking a step back for a moment,

18   because there aren't references or citations in your

19   report, I just want to be sure that -- that -- can you

20   tell me at least the name of Resolution Number 33?

21        A.    I do not have that written.  It asks the AAP

22   to study further the science of this children's issue

23   currently presented as AAP policy.

24        Q.    And do you have any way of verifying to us

25   that that was what Resolution 33 was about?

1        A.    I could call the AAP and ask them.  I guess I

2    could do that.  But that's the information -- that's the

3    information by the way that I was given by the AAP, that

4    this was what the resolution called for.

5        Q.    Okay.  But you have no documentation that you

6    could provide to authenticate that?

7        A.    At this moment, no.

8        Q.    Okay.  So then let's assume that this, this

9    article is talking about the 2021 resolution that you

10   mentioned or the -- hold on one moment.  Apologies.  So

11   this is a different 2021 resolution related to gender

12   dysphoria, is your position here?

13       A.    It appears so.

14       Q.    Okay.  And you're aware that this resolution

15   then was defeated by the voting member, soundly by the

16   voting member, the AAP leadership conference, correct?

17       A.    Please ask that question again.

18       Q.    I said, so you're -- are you aware of the

19   fact that this 2021 resolution related to gender

20   dysphoria was soundly defeated by the voting members at

21   the AAP Leadership Conference?

22       A.    No.  It says that it was not endorsed by any

23   chapter, committee, council, section or district.  And

24   the -- what this says -- yes, you're correct.  It says

25   ultimately this resolution was soundly defeated by the

1    voting members of the AAP Leadership Conference.  The

2    information that I have is that it never made it to the

3    Annual Leadership main body, Leadership Forum main body.

4    And that was information from the AAP.

5            Q.    Okay.  And are you aware, based on this

6    information also from the AAP, that it says only 57 out

7    of the AAP 67,000 members commented in support, and then

8    further down that it says the resolution was

9    overwhelmingly voted down in a clear statement that the

10   majority of AAP leaders and experts believe that

11   gender-affirming care is evidence-based, medically

12   necessary care?

13           A.    I've lost you.

14           Q.    Apologies.  I wish I could highlight --

15           A.    No --

16           Q.    There, I can.

17           A.    No, it's not that I'm -- not that I'm -- here

18   we go.  I touched something on the screen --

19           Q.    Oh, you literally lost us.

20           A.    -- and everything disappeared.

21           Q.    No problem.  Apologies.  The -- the line that

22   I read is the one highlighted here, that it was

23   overwhelmingly voted down in a clear statement that the

24   majority of AAP leaders and experts believe that

25   gender-affirming care is evidence-based, medically

Page 64

1   necessary care.

2        A.    Okay.  I do not have information related to

3   that effect.  And by the way, you asked about the 57

4   people who made comment.  That doesn't surprise me.

5   Very few people made comment.

6        Q.    And that's because very few people choose to

7   do so, correct?

8        A.    That's correct.

9        Q.    Okay.  So you go on -- we'll go back to

10  Exhibit 2.  You go on to say a similar resolution in

11  2022 was rejected on procedural grounds and never

12  presented to the ALF.  Do you -- did you draft that

13  resolution?

14       A.    No.

15       Q.    Do you know who drafted it?

16       A.    I did know.  I do not have that name.

17       Q.    Did the 2022 resolution ask the AAP to

18  rescind its 2018 policy statement on transgender and

19  gender-diverse children?

20       A.    No.  It asked the AAP to study the issue.

21       Q.    And how do you know that -- scratch that.

22             I'm now going to show you what will be marked

23  as Plaintiff's Exhibit 4.  Do you recognize this

24  document?

25             (Whereupon, Exhibit 4 was marked for

Page 65

1          identification.)

2          A.    Yes, I do.

3    BY MS. CHRISS:

4          Q.    What does this appear to be?

5          A.    This appears to be a report or commentary,

6    comment, article on the I guess then president of the

7    American Academy of Pediatrics.

8          Q.    Okay.  If we could scroll down.  Are you

9    aware that the five pediatricians who authored the

10   resolution in 2022 were unable to recruit a sponsor?

11         A.    Yes.  That was why it was not considered.

12         Q.    Okay.  And you're aware that the resolution

13   didn't advance because it didn't receive a second vote

14   on the floor?

15         A.    Yes.

16         Q.    And isn't it true that other resolutions

17   pertaining to gender-affirming care were considered

18   during the 2022 meeting?

19         A.    I -- no, I don't know that.

20         Q.    If I told you that at the 2022, meeting a

21   resolution was adopted by the same body that called for

22   expanding education and training for pediatricians on

23   gender-affirming care, would that sound right to you?

24         A.    It would not surprise me.

25         Q.    So turning back to your report.  In

1    Paragraph 16, you talk about your past experience with

2    the AAP and the ALF, then called the ACF.  You say,

3    "It's quite opposite, your past appearance with the AAP

4    and ALF, as in the past there was always vigorous

5    discussion of controversial issues."  Are you referring

6    to when you were president in 1997 to 1998?

7         A.    I started going to the Annual Chapter Forum

8    when it was called the Annual Chapter Forum, probably

9    ten years or more before that, and continued to attend

10   that meeting for a number of years thereafter as a

11   section chair and for other reasons, and there was

12   always vigorous discussion of controversial issues.

13        Q.    And can I just ask, when did you last attend

14   the ALF or ACF?

15        A.    I -- I can't tell you that.

16        Q.    Would you say last -- in the last 10 years?

17        A.    In the last 10 years I have probably not -- I

18   have not attended the Annual Chapter Forum.  I receive

19   reports on it every year.

20        Q.    But you haven't attended for the last

21   10 years.  Would you say you've attended in the last

22   20 years?

23        A.    Yes.

24        Q.    What kinds of controversial issues are you

25   referring to that were vigorously discussed previously?

1     A.    It means exactly what it says, transitioning.

2     Q.    And --

3     A.    There are, as you pointed out, there are a

4  number of things that are considered transitioning, and

5  I'm using the global term rather than specific.  It can

6  mean any transitioning.

7     Q.    So my question is, what do you, as the author

8  of this statement, mean when you use the

9  word "transitioning"?

10     A.    Any transitioning.

11     Q.    Does that contemplate then social transition?

12     A.    If you consider that transitioning, and I do,

13  yes.

14     Q.    Okay, you do.  Great.  Okay.  So let's turn

15  to what will be marked as Exhibit 5.

16          (Whereupon, Exhibit 5 was marked for

17     identification.)

18  BY MS. CHRISS:

19     Q.    Is this -- do you recognize this document?

20  Sorry.  Let me go to the page with your report.

21     A.    Is this from the -- this from the Georgia

22  chapter or, excuse me, Muskogee County Medical

23  Society --

24     Q.    Yes.

25     A.    -- is that correct?

Page 71

1      Q.    Yes.  Is this the report --

2      A.    Yes, it is.

3      Q.    Okay.  And is this the report that you were

4    referencing in your -- in your expert report?

5      A.    Yes.  "First, Do No Harm," that's correct.

6      Q.    And this is an article in interest of the --

7    what was the publication that you said?

8      A.    I believe it's the Muskogee County Medical

9    Society, the local medical society of the community in

10   which I lived and worked in Georgia.

11     Q.    In your expert report, you said that this was

12   your, quote, first written statement on the issue.  What

13   issue are you referring to?

14     A.    Could you enlarge it?

15     Q.    Absolutely.

16     A.    And the issue that I would be referring to is

17   the thing I address throughout this, and that is the

18   issue of gender dysphoria and transitioning.

19     Q.    Okay.  And so this would --

20     A.    With children.

21     Q.    Okay.  And this was the first time that you

22   wrote about your first written statement on the issue of

23   gender dysphoria in children?

24     A.    I believe so, yes.

25     Q.    And you specify children.  Have you written

1    other things about gender dysphoria in adults?

2         A.    Not as far as I know.

3         Q.    Okay.  This was published in the -- the local

4    medical society newsletter.  Is that a peer-reviewed

5    publication?

6         A.    Not in the -- yes and no.  Again, it's -- it

7    is reviewed by the editors of the newsletter.  I

8    won't -- I don't consider that journal peer review.

9         Q.    All right.  And then you stated in your

10   report that this was updated and republished in the

11   spring 2020 AAP senior bulletin; is that correct?

12        A.    That is correct.

13        Q.    Is there a difference between this version

14   and the 2020 version?

15        A.    There may have been a few word changes, but

16   it's basically the same article.

17        Q.    Okay.  I know it says Exhibit 7, but we're

18   going to label this Exhibit 6 because that's what we're

19   on.

20              (Whereupon, Exhibit 6 was marked for

21         identification.)

22   BY MS. CHRISS:

23        Q.    Is this the updated version that -- that was

24   published?

25        A.    I don't remember seeing that picture with the

1   publication of my -- my paper.

2        Q.    Do you see your name here as the author?

3   Apologies.  I'll blow it up.

4        A.    Yes, I do.

5        Q.    And is this the title of your article?

6        A.    No.

7        Q.    "First, Do No Harm, thinking through

8   trans-" --

9        A.    "First, Do No Harm."  I never put "Thinking

10  through transgender issues."

11       Q.    Okay.  Well, looking at it, does this appear

12  to be the substance of the article that you published?

13       A.    From below the picture, again, I cannot read

14  the article.  It seems to be what I wrote.

15       Q.    Okay.

16       A.    I cannot, however, because I cannot read it,

17  swear that it is.

18       Q.    So let's do this, then.  I'm going to pull

19  up -- I wasn't trying to do three -- three of these, but

20  this is the exact version that was sent to us by Gary

21  Perko, counsel for defendants.

22       A.    Uh-huh.

23       Q.    Would you agree that this is the correct

24  version, the version of this report that -- that you

25  feel comfortable saying is your work?

1        A.    Yes.

2        Q.    All right.  I'm sorry, so can we mark this as

3    Exhibit 7?  Should have just left it as it was.

4              (Whereupon, Exhibit 7 was marked for

5         identification.)

6    BY MS. CHRISS:

7        Q.    Was this statement ever published at any

8    point in a peer-reviewed publication?

9        A.    Only to the extent that I described to you

10   before.

11       Q.    Okay.  So no.  You say in your report that

12   you wrote this article, quote, after much research.

13   What kind of research did you do?

14       A.    Over the course of years, as I said earlier,

15   I've reviewed everything I can find on the subject.  I

16   know I have reviewed at least 40 or 50 mostly

17   peer-reviewed publications, some additional

18   government-related or government-published materials.

19   And those are medical-related issues or journals,

20   papers.  And then, you know, whatever I read in the --

21   in the lay literature.

22       Q.    And where are those references cited that you

23   relied on in writing this article?

24       A.    They are right here in my head.

25       Q.    Okay.  So there's no place where we can

Page 75

1    review those references, citations?

2         A.    This is an opinion piece.

3         Q.    Right.

4         A.    Based on my -- based on my research and

5    experience.

6         Q.    And did you take any notes while you did your

7    research?

8         A.    No.  Or if I did, likely did, I don't have

9    them anymore.

10        Q.    In your statement you say, "While it's" --

11   let's go to this part.  Beginning here (gestures).

12    "While it's always been true, and non-controversial,

13   that little boys sometimes dress in little girls clothes

14   and little girls sometimes would rather play with trucks

15   than dolls, it has never before meant that their sex

16   designation was wrong."  On what do you rely in support

17   of this statement?

18        A.    The statement speaks for itself.

19        Q.    So you have no sources for the basis of that

20   opinion?

21        A.    I guess I could find some references to

22   little boys dressing as girls and little girls being

23   more happy playing with trucks than dolls, but that's

24   something that we have all experienced as we have gone

25   through childhood and raising children of our own and

Page 94

1        A.    No.

2        Q.    And is that, I assume, because the person did

3   not have a medical condition to treat?

4        A.    Because the patient did not have a medical

5   condition to treat.

6        Q.    Moving down to Paragraph F of your report, do

7   you believe that gender dysphoria is a medical

8   condition?

9        A.    I believe it is a mental health condition.

10       Q.    So you do believe it is a health condition?

11       A.    Depends on how you define "health."

12       Q.    Again, the --

13       A.    It is not a physical health condition.  It is

14   a mental health condition.

15       Q.    And mental health conditions are still health

16   conditions, right?

17       A.    It is a mental health condition.

18       Q.    When you say in this Subparagraph F that,

19   "when a youth requests to transition to the opposite

20   sex," what do you mean by that?

21       A.    It means what it says.  It says that a youth

22   incapable of making such a decision requests to

23   transition to the opposite sex.

24       Q.    And earlier when we were discussing what you

25   meant by "transition" when you used that term

1    throughout, you indicated that it would include social

2    transition; is that correct?

3         A.    Yes.

4         Q.    And when you say "good studies have shown

5    that the desire to do this disappears in most, 80 to

6    90 percent, after passing through puberty or by late

7    adolescence," what good studies are you referring to?

8         A.    The studies that I have read over the course

9    of 20 years.

10        Q.    And can you -- did you cite to those studies

11   in this report?

12        A.    I did not cite those studies.

13        Q.    Can you name those studies for me now?

14        A.    No.

15        Q.    Can you name one?

16        A.    No.

17        Q.    If an adolescent has gender dysphoria at the

18   onset of puberty -- scratch that.  I keep saying

19   "scratch that."  Strike that.

20              Okay.  Let's go to 18G here.  You said, "As

21   this is our standard for care for almost all other

22   issues," the start of that sentence, do you see that?

23        A.    Yes, I do.

24        Q.    What are you referring to when you

25   say "this"?

1      A.     When a child comes to us for body image

2   problem, anorexia, bulimia, we -- we do not affirm that.

3   When a child comes and says, I think it's a good idea

4   for me to drink and smoke and drive recklessly, we do

5   not affirm that.  When a child says, I look so much

6   better with a tan than I do with, you know, my north

7   pasty skin, we don't affirm that.

8             So here a child comes and says, you know,

9   I've been a boy most of my life, but I really think I'm

10   a girl, there's no reason that at that moment we should

11   affirm it.

12      Q.     And are there standards of care or

13   peer-reviewed medical literature indicating that it is

14   effective treatment for a child to drink alcohol, use a

15   tanning bad, take weight loss pills, the things that you

16   mentioned?

17      A.     Again, I don't understand that question.

18      Q.     Is there any peer-reviewed medical literature

19   or standards of care that have been developed that say

20   that any of the things you just mentioned, using a

21   tanning bed, taking weight loss pills, drinking alcohol,

22   that those are effective treatment for the treatment of

23   any condition?

24      A.     If a child is experiencing extreme distress

25   because all of his friends are drinking, smoking,

1   whatever, and feels that the only way he can fit in, she

2   fit in, is to do those things, then I guess you could

3   say, yeah, the -- you know, the treatment to ameliorate

4   his distress, her distress, is to say, yeah, go ahead

5   and have some drinks or smokes with your friends.

6        Q.   And can you point me to any literature or

7   peer-reviewed studies or standards of care that support

8   that approach?

9        A.   Absolutely not.

10        Q.   Okay.  So you discussed that, you know,

11   studies -- that children can't make this decision and

12   shouldn't be affirmed.  Is there -- let me start that

13   sentence over.  You mentioned that this disappears, you

14   know, after passing through puberty or by late

15   adolescence.  When is the period of time which you

16   consider it is appropriate for the individual to begin

17   receiving treatment for their gender dysphoria?

18        A.   In general, when they reach adulthood.  As I

19   answered your question earlier, I have no concerns.  It

20   is not my place to say anything about adult care, but it

21   is my place to say something about the care of children

22   and adolescents.

23        Q.   So does that mean at age 18?

24        A.   At that point, I would have to assess the

25   maturity of the child to make that decision.  The

Page 98

1    statements, the science says that it's early to mid 20s

2    before they are capable of making those kinds of

3    decisions.  So I would begin an assessment at age 18 or

4    so.

5         Q.    So when you said you are not opining on or

6    you have no concern with adults receiving this

7    treatment, you don't mean adults as in over the age of

8    18?  You mean adults --

9         A.    Depending -- depending upon their level of

10   maturity at age 18.

11        Q.    Which you would assess?

12        A.    Which I or a mental health professional would

13   assess.  There are many laws in this nation and

14   elsewhere that don't consider a person an adult until

15   21.  The American Academy of Pediatrics indeed says that

16   these are children until their early 20s.

17        Q.    So your statement, and just to clarify

18   earlier when you say you don't have concerns about

19   treatment of gender dysphoria in adults, you mean adults

20   in their 20s who you have assessed and deem --

21        A.    I --

22        Q.    That's okay.

23        A.    I will start assessing them.  If they come to

24   me at 18, I will ask questions, as I said before.  I

25   will likely send them to a mental health professional,

1    but I will not -- I will not stand in their way if this
2    is what they decide to do.
3         Q.    What is the age at which you would deem it
4    appropriate for a child to socially transition?
5         A.    I would consider starting at 18, depending
6    upon their maturity.
7         Q.    Okay.  And again just to be sure that we're
8    using the same -- the term in the same way, social
9    transition, I do not mean any medical interventions.
10        A.    The problem that people are ignoring is the
11   fact that a child's brain from the time of conception
12   until the mid 20s is very plastic.  And the more you
13   affirm, which is what social transitioning is part of,
14   the more likely it is that the child will persist in
15   this transgender ideation.
16        Q.    And do you have any studies or peer-reviewed
17   literature to support that position?
18        A.    Again, yes.  Do I have the citation to give
19   you today?  No, I do not.
20        Q.    Okay.  Looking at G again.  You are aware
21   that no medical treatment is recommended prior to the
22   onset of puberty, correct?
23        A.    I know that there is medical treatment
24   prescribed to delay the onset of puberty.  So your --
25   I -- there's no way I can exactly answer your question.

1      Q.    So would -- can we agree that

2  puberty-blocking medication would be administered at the

3  onset of puberty?

4      A.    No.  Puberty-blocking medication is often

5  provided to the patient prior to the onset of puberty to

6  prevent the onset of puberty.

7      Q.    And do you have any --

8      A.    Delay the onset of puberty.

9      Q.    -- again, any -- any studies, scientific

10  research, peer-reviewed literature to support the

11  statement that puberty-blocking medication is given to

12  children before the onset of puberty?

13     A.    Yes, there is such literature.  I cannot cite

14  for you that literature.

15     Q.    And that literature is not in your report,

16  correct?

17     A.    I have not referenced it in my report.

18     Q.    At what Tanner stage is that medication

19  prescribed?

20     A.    At the onset of puberty or before.

21     Q.    So what Tanner stage would that be?

22     A.    No, I'm not going to -- I'm not going to give

23  you a Tanner stage.  It's one of those things, you know

24  it when you see it.  And it could be Tanner Stage 1,

25  Tanner Stage 2, but certainly before menstruation and

 1   other secondary sex characteristics in the male would be

 2   the time that puberty blockers would be prescribed.

 3        Q.   Dr. Zanga, you said the AAP works to prohibit

 4   counseling to cure the desire at its root, even to the

 5   extent of supporting the legal punishing of counselors

 6   who might provide that service, correct?

 7        A.   Correct.

 8        Q.   And what do you mean by "cure the desire at

 9   its root"?

10        A.   As some of, particularly the European

11   literature says, what we should be doing for these

12   children is providing counseling with respect to

13   watchful waiting.  And that's what we should be working

14   toward in all of our medical activities, is to work with

15   these children and their families on watchful waiting.

16        Q.   What European literature are you referring

17   to?

18        A.   From England, Sweden, Finland, France, and

19   probably a few others.

20        Q.   And what are the -- what are the studies that

21   you're referring to from those studies?

22        A.   Mostly reports from the governments of those

23   countries.

24        Q.   And can you provide me the citation for any

25   of those?

1      A.    If you would like me to send you some of

2    those, I'm sure you probably have them in your file.

3      Q.    But you did not rely on them or cite to them

4    in this report?

5      A.    I have not cited them in this report.  I have

6    used them in -- as part of my review over the last

7    20 years.

8      Q.    And are you aware -- apologies.

9      A.    Go ahead.

10     Q.    Are you aware that in the -- the rules

11   surrounding the -- the creation of an expert witness

12   report such as yours, that there is a requirement that

13   you provide the facts and information upon which your

14   opinions are based?

15     A.    I've never had to do that before in any

16   deposition that I have provided.

17     Q.    Did your counsel -- apologies.  Did

18   defendants' counsel in this case inform you of the rules

19   surrounding your creation of your expert report?

20     A.    They asked me for my expert report and

21   accepted my expert report.  No.

22     Q.    So they didn't tell you that you needed to

23   cite your -- the basis for your -- the facts and

24   information that you --

25     A.    They did not --

1     Q.     -- upon which your opinions are based?   Okay.

2     A.     They did not tell me to include a

3   bibliography, no.

4     Q.     Okay.  So you claim that appropriate

5   counseling can work to dissipate to gender dysphoria.

6   What's the basis for that statement?

7     A.     Again, mental health literature that I have

8   read and, interestingly, the fact that pro-transition

9   groups/people are working so hard to prevent -- prevent

10   this kind of counseling from taking place, that it has

11   to be effective if somebody wants to stop it.

12     Q.     Again, can you provide any sources to support

13   the basis for that statement?

14     A.     Well, I know 19 states in 2020, and I think

15   it's probably up to a few more than that now, prohibit

16   any kind of counseling that would delay transition, try

17   and convince the children that they don't need to or

18   shouldn't transition.  Watchful waiting is discouraged.

19   And even the international association that deals with

20   transgender issues says on, I believe it's Page 20, that

21   they do not recommend this watchful waiting, this --

22   this counseling about gender transition.

23     Q.     Are you aware of studies that have

24   demonstrated that this type of counseling to dissuade

25   individuals from a particular sexual orientation or

1    gender identity has been found to be harmful and

2    damaging?

3         A.    Actually, what I have found is the concept

4    that this counseling is not so much counseling as

5    aversive therapy, the old kind of, you know, medication

6    or electric shock treatments or whatever that

7    psychiatrists, mental health professionals once used to

8    dissuade people from behaviors they considered

9    deleterious.  There are almost no articles that say that

10   what the particular Europeans are proposing of watchful

11   waiting and counseling are dangerous or even

12   ineffective.

13        Q.    Dr. Zanga, can you cite to a single study

14   showing that counseling alone is an effective treatment

15   for adolescents with gender dysphoria?

16        A.    I have read such, yes.

17        Q.    And can you cite to that?

18        A.    Again, if you'd like me to send you some

19   citations and the attorneys for whom I am presenting

20   this, I've presented this deposition say that's

21   appropriate, I'll be happy to do that.

22        Q.    Mr. Pratt and I can touch base on this

23   afterwards.

24              Okay.  So is there any -- is there any study

25   you can cite to, to show that counseling alone is an

1    effective treatment with adults with gender dysphoria?

2        A.    I do not deal with adults, so no.  I can

3    probably find that, but no, I cannot.

4        Q.    Have you previously advocated for therapy as

5    treatment for same-sex attraction?

6        A.    Not that I can recall.

7        Q.    Do you recall an article that you were

8    involved in from the American Academy of Pediatrics

9    titled "Empowering parents of gender discordant and

10   same-sex attracted children"?

11       A.    I know I review, because I am an editor, I

12   have reviewed probably that article and a number of

13   others.  So yes, I guess I am aware of it.

14       Q.    And are you aware that in that article, that

15   the American College of Pediatricians put out that it

16   stated that same-sex attraction may be prevented when

17   gender identity disorder is treated successfully?

18       A.    If it says that, and there are the references

19   that are statements -- the American College of

20   Pediatricians usually has, then yes, I accept that.

21       Q.    Paragraph H here states that puberty-delaying

22   or gender-affirming hormone therapy diminishes bone

23   mineral density, at least in the short term.  What do

24   you mean by that statement?

25       A.    Again, exactly what it says.  We know that

1    this, these medications do prevent bone marrow -- bone

2    mineralization, bone deposition, and actually at a very

3    critical time.  Adolescence, young adolescence is a time

4    when we really develop strength in our bones to avoid

5    osteoporosis in the future.

6           We don't know what will happen to some of

7    these young people who are using these hormones for a

8    variety of reasons, what will happen to them 30,

9    40 years hence.  Will they be developing osteoporosis

10   more often than we do now, people do now?  Do they

11   reacquire bone at the efficient -- sufficient rate to

12   make their bones healthy?  We know that in the short

13   term, it seems to happen.  We do not know the long term.

14        Q.    And are you -- is it your position that

15   testosterone and estrogen hormone therapies reduce bone

16   mineral density?

17        A.    Most of the hormones that are used in gender

18   transition, but particularly progesterone hormones are

19   the ones that are most deleterious to bone mineral --

20   bone mineralization.

21        Q.    And with regard to puberty-delaying and

22   gender-affirming hormone therapy, meaning testosterone

23   and estrogen, do you have any citations upon which that

24   opinion is based?

25        A.    Again, yes, I do.  No, I don't have them with

1    me today.

2         Q.    And when you were practicing medicine, did

3    you prescribe GnRH A to any patient?

4         A.    Not that I can recall.  I'd have no reason

5    to.

6         Q.    Is that not a treatment that is provided for

7    various diagnoses or conditions?

8         A.    Sometimes when I encounter some of those

9    conditions, I get consultation from someone who is an

10   expert in endocrinology or, excuse me, in -- excuse me,

11   lunch.  An expert in OB-GYN, if it happens to be a woman

12   obviously, girl.  So no, I don't generally prescribe

13   those kinds of things.

14        Q.    Okay.  You state that, here in Subsection 2,

15   that many of the drugs used increase blood pressure,

16   risk of obesity, cardiac disease, blood clots, strokes,

17   diabetes, and cancers.  To what drugs are you referring?

18        A.    To the drugs that are used in delay of

19   puberty and in treatment of or dealing with gender

20   transition.

21        Q.    And again --

22        A.    Any of those drugs -- some of those drugs

23   have been pinpointed as drugs that would increase the

24   probability or possibility of the things that I've

25   mentioned.

1        Q.    And do you have any --

2        A.    Again --

3        Q.    I have to ask.

4        A.    You have to ask and I have to answer.  Happy

5    to send you some of this stuff, but don't have it here

6    in front of me.

7        Q.    And are the risks for hormones that you --

8    that you associate with hormones any different because

9    the hormones are being used to treat gender dysphoria?

10       A.    Some of them being used to treat other things

11   and general -- and gender dysphoria have the same

12   problem.  But we're talking about gender dysphoria right

13   now, and that's what I'm commenting on.

14       Q.    Right.  Thank you.  So, but these risks do

15   exist when those prescriptions are used to treat other

16   conditions as well?

17       A.    When to treat -- when used to treat, yes,

18   conditions that require their treatment.

19       Q.    Right.  Okay.  When you were practicing

20   medicine, did you ever prescribe testosterone to a

21   patient?

22       A.    No.

23       Q.    Is it your opinion that we have no long-term

24   studies on the use of testosterone?

25       A.    We have long-term studies on the use of

1  testosterone in adults.  I have not found any long-term

2  studies in adolescence because there aren't long-term

3  people yet.

4       Q.    And similarly, are you aware of long-term

5  studies on the use of estrogen?

6       A.    Again, we don't have sufficient studies on

7  the use of estrogens.  Although it's very interesting

8  that with respect to adults -- I do read some things

9  about adults.  The treatment of menopausal symptoms

10  using hormones is a controversial issue right now.  Some

11  saying yes, some saying no.  So there is some concern

12  about use of estrogens even in adult population.

13       Q.    Did you ever prescribe estrogen to patient?

14       A.    Probably a long time ago.  Yeah, not even a

15  long time ago.  For girls with difficult menstruation, I

16  would also -- I would often prescribe hormone

17  contraceptives when nothing else worked for a short

18  term.  And generally, that was all that was needed.

19       Q.    Okay.  And were you concerned about the risks

20  that you mentioned with regard to treatment for gender

21  dysphoria with the patient who you prescribed estrogen

22  to that you just mentioned?

23       A.    For a short term.  And that's the key.  I was

24  not putting them on it for years.  Usually a few months,

25  five or six months.

Page 110

```
 1        Q.    You also state that many of the drugs used
 2   also have deleteriously effects -- did I read that
 3   wrong?
 4        A.    Deleterious effects.
 5        Q.    -- deleterious effects on the presently
 6   immature and malleable brain.  To which drugs are you
 7   referring?
 8        A.    According to the literature, which I cannot
 9   give you a specific citation for, almost any or all of
10   these do have a deleterious effect on the developing
11   brain.  In fact, almost any medicine we prescribe can
12   have.
13        Q.    And again, these are not cited in your
14   report, correct?
15        A.    They are not.  Not cited in my report.
16        Q.    When you say "short-term studies and
17   projections from adults are not favorable," again is
18   there a -- do you have any citations or bases for this
19   opinion?
20        A.    Sure.  I mentioned already the issue of
21   estrogens in menopausal women.  There's also a whole set
22   of studies done on using testosterone for a variety of
23   things in adult men and questions raised about the
24   safety and efficacy of testosterone treatment, yes.
25        Q.    And are any --
```

Page 111

1          A.     No, I do not have a citation that I can give

2     you right now.

3          Q.     In Paragraph 3, the ease -- where you say

4     that "even the easily observable immediate ill effects

5     seem to be irreversible," you are referring to hormones

6     in GnRH analogs, correct?

7          A.     Yes.

8          Q.     And you cite no sources for this proposition,

9     correct?

10         A.     No, I do not.  I have not cited an article or

11    articles.

12         Q.     And Subsection 4, when you say, "The basic

13    premise is scientifically impossible and dangerous,"

14    what basic premise are you referring to here?

15         A.     We've already discussed this, but it is

16    science from probably Gregor Mendel that boys are XY and

17    girls are XX in their chromosomes.  No matter what we do

18    to their external appearance, their attitudes, whatever,

19    we cannot change the chromosomal makeup.  Boys will

20    always be boys, and girls will always be girls.

21         Q.     And so you, in your opinion as stated at the

22    end of this sentence, "Individuals who identify as

23    transgender are imitating the opposite sex."  Is that

24    your position?

25         A.     Yes.

1          Q.     And --

2          A.     Because -- go ahead.

3          Q.     No.  Go ahead, Dr. Zanga.

4          A.     Yes.

5          Q.     Returning to your article do no harm, "First,

6     Do No Harm," where you say... Apologies.  There's

7     different versions.  Hold on, one moment.  Just to save

8     time, I'll just ask you.  Do you recall in this article

9     stating that a child can no more make him or herself

10    someone of the opposite sex than they could become

11    chimpanzees?

12         A.     Yes.

13         Q.     And what do you -- do you support that

14    statement?

15         A.     Well, up until now, I don't know that anyone

16    has come to a physician or elsewhere as a human and

17    asked to be made into a chimpanzee.  I do know that

18    right now that's impossible.  I also know that unless we

19    can figure out a way, and who knows, maybe in your

20    lifetime somebody will figure out a way to manipulate

21    chromosomes to change all those XXs into XYs or XYs into

22    XXs, but for now and the foreseeable future, can't do

23    that.

24              So a girl who has had her external appearance

25    surgically modified or even modified by various

1    constraints and dress, is still a girl.  She is still in

2    every cell of her body XX, not XY.  And she has most of

3    the attributes of the XX, not the XY.

4         Q.    So I understand you're making the comparison

5    that someone who identifies as transgender who has been

6    diagnosed with gender dysphoria, the comparison to one

7    can't make himself into a chimpanzee, but just to be

8    clear, you've never diagnosed a child or a person with

9    gender dysphoria, correct?

10        A.    No, I have.  I told you that.  I sent them

11   to -- to mental health counseling or professionals.

12        Q.    So I believe your prior statement was, you

13   confirmed their diagnosis of gender dysphoria, but have

14   you provided an initial diagnosis of gender dysphoria

15   for a patient?

16        A.    What I said was, the child or parent gives me

17   that diagnosis.  The child comes in and says, hi, I may

18   look like a boy, but I think I'm a girl.  You know,

19   they're diagnosing their -- their question, problem,

20   condition.  Or parents say, you know, he or she has

21   always identified really with the opposite sex.  And

22   they are -- they make the diagnosis.  In medicine, the

23   key is taking a history.  Physical examination is

24   important, but we usually get the diagnosis from the

25   history.

Page 114

1      Q.    But the doctor provides the actual diagnosis,

2  correct?

3      A.    The diagnosis writes the diagnosis down,

4  correct.  And I have done that.

5      Q.    Turning back to your report.  We are getting

6  to the end of it here.  What -- where you say in

7  Paragraph V, "The increasing numbers of those who have

8  transitioned are attempting to retransition."  Again, do

9  you have a citation to support this opinion?

10      A.    No.  That's mostly in the non-medical

11  literature.  So no, I do not.

12      Q.    Same question with 6.  What is the basis for

13  your statement in this paragraph that the rates of

14  suicide are 20 times greater among adults who've used

15  cross-sex hormones, etc.?

16      A.    Mostly from the European literature, and I

17  believe mostly from the Swedish literature.  And no, I

18  cannot give you a specific citation.

19      Q.    And there's no citation in your report,

20  correct?

21      A.    And it's not written in my report.

22      Q.    Same for 7, what is the basis for your

23  statement in this paragraph that several developed

24  nations have taken steps to pull back on transgender

25  medical treatments?

1      A.    Yes.  No, I can't give you a specific

2  reference.  I would have to -- I would have to own a

3  library with more shelves than you have behind you to

4  catalog all of the reports that I have read about all of

5  the things that I have treated and dealt with in

6  50 years of practicing pediatrics.  No, I do not have

7  that.

8      Q.    For purposes of this report, what we are

9  concerned with is the citations for simply what you

10  alleged in this report, the basis for the citations for

11  those statements.  Okay.  Thank you.

12          And can you -- can you discuss or name any

13  specific policies that France has changed pertaining to

14  the coverage of provision of gender dysphoria

15  treatments?

16      A.    I believe most of these countries have said

17  that with certain exceptions, one for example says if

18  the children are part of a research study, some of this

19  is permitted, but otherwise we expect counseling and

20  watchful waiting.

21      Q.    And Sweden, medical treatments for gender

22  dysphoria for adolescents are still provided and covered

23  by the government in certain circumstances, as you just

24  alluded to, correct?

25      A.    I believe that's correct, yes.

Page 116

1      Q.    And in Sweden, there's been no change with

2   regard to medical treatments for gender dysphoria for

3   adults, correct?

4      A.    That is correct.  And remember, I'm not

5   commenting on adults.

6      Q.    Correct, but are you -- I guess I should have

7   asked this earlier.  Are you aware that the rule at

8   issue in this case bans coverage of this treatment for

9   all transgender individuals, minors and adults?

10      A.    I do not believe that's the case.

11      Q.    Okay.

12      A.    I'm concerned with children, not adults.

13      Q.    Right.

14      A.    I know that they're saying slow down, hold

15   off, do some other non-surgical/medical things for

16   children.

17      Q.    And are you -- I'll scratch that.

18            Are you aware that in both Finland and the

19   United Kingdom as well medical treatment for gender

20   dysphoria in adolescents is still provided and covered

21   by the government in certain circumstances?

22      A.    I know specifically that in England, if

23   they're part of a research study, research protocol, it

24   can be provided.  I do not know of other, any other

25   circumstances.

1    Q.    And you're aware that no changes occurred

2  with regard to these medical treatments for transgender

3  adults, correct?

4    A.    I haven't studied the adult issue.  It's not

5  my concern.

6    Q.    Would you be opposed to a rule that excluded

7  these treatments for adults?

8    A.    I have no opinion.

9    Q.    Have you spoken with doctors who are

10  providing gender-affirming care in either the UK,

11  Sweden, Finland, or France?

12    A.    No.

13    Q.    And have you ever practiced medicine in any

14  of those countries?

15    A.    Excuse me, about?

16    Q.    I said have you ever --

17    A.    Say again.

18    Q.    Have you practiced medicine in any of those

19  countries?

20    A.    No.

21    Q.    Dr. Zanga, if we could just take maybe a

22  five-minute break, I'm getting pretty close to being

23  done.  Is that okay?

24    A.    Okay.

25         MS. CHRISS:  Great.  Is that okay with you,

1      Mr. Pratt?

2                MR. PRATT:  Sounds good.  Thank you.

3                (Recess taken 2:11 p.m. to 2:19 p.m.)

4      BY MS. CHRISS:

5          Q.    Okay.  So we are at the moment done going

6      through your report.  I'm going to turn now to ask you

7      some questions about the American College of

8      Pediatricians.  You were a founding member of that

9      organization; is that correct?

10         A.    Yes.

11         Q.    And what was your role in the founding of the

12     group?

13         A.    I worked with several people who were

14     interested in forming an organization that would deal

15     with science in regard to children's health.  And I held

16     the -- I was chair of the organizational meetings and

17     was then elected as their first president.

18         Q.    And why did you form this group?

19         A.    We were, a number of us, concerned that the

20     American Academy of Pediatrics was in certain areas

21     moving away from science and promoting things that were,

22     as I said earlier, politically correct, and that was not

23     healthful or helpful to children and their families.  So

24     we decided to do what other organizations have done.

25     The Society For Adolescent Medicine, the Endocrine

1    Association, a variety of other pediatric-oriented

2    groups that are -- often work with the academy, but are

3    separate from the academy, and have their own officers

4    and position statements and policies.  And that's what

5    we are.

6         Q.    Was one of the bases upon which you formed

7    the -- do you refer to it as ACOP?  How do you refer to

8    the American College of Pediatricians?

9         A.    Go ahead.  I'm sorry.

10        Q.    No, I've seen it referred to as like ACOP and

11   also ACPeds?

12        A.    ACPeds.  A-C-P-E-D-S, is the abbreviation.

13        Q.    Okay.  Is one of the reasons that you helped

14   found the ACPeds based on your opposition to the AAP's

15   position on same-sex parenting?

16        A.    That was the seminal event, yes.

17        Q.    And what do you mean by -- what do you mean

18   by "seminal"?

19        A.    It was building.  There were a number of

20   things that, and I don't remember all of them, but

21   one person in particular was very concerned about what

22   the academy was saying with respect to same-sex

23   parenting.  Interestingly, I was chair or member of the

24   AAP's Section Executive Committee Bioethics at the time.

25             The academy did send that statement to us and