# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

AUGUST DEKKER, *et al.*,

        *Plaintiffs*,

      v.

JASON WEIDA, *et al.*,

        *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. QUENTIN VAN METER**

# **TABLE OF CONTENTS**

INTRODUCTION AND STATEMENT OF THE CASE ......................................1

LEGAL STANDARD.................................................................................2

ARGUMENT .........................................................................................4

  I.   Qualification – Dr. Van Meter is not qualified to offer expert opinions on the diagnosis, treatment, or causes of gender dysphoria. ......................................4

  II.     Reliability – Dr. Van Meter's opinions and testimony are unreliable. .......11

    A. *Dr. Van Meter's opinions are unreliable because they are based on untested hypotheses and speculation. ..........................................................12*

    B. *Dr. Van Meter's opinions are unreliable because they are misleading and therefore do not serve to enlighten the trier of fact.....................................16*

    C. *Dr. Van Meter's opinions are unreliable because they are based on facts or data not typically relied on by physician, scientists. ....................................21*

    D. *Dr. Van Meter's opinions are unreliable because they are not generally accepted in the scientific and medical community. ......................................22*

    E. *Dr. Van Meter's opinions are so tainted by his personal bias as to render his opinions unreliable. ................................................................................23*

  III.  Helpfulness – Dr. Van Meter's opinions and testimony are not relevant to this case........................................................................................27

    A.  *Dr. Van Meter's opinions about "desistance" are irrelevant. ..................28*

    B. *Dr. Van Meter's opinions about supposed controversies in other countries are irrelevant. ...................................................................................29*

    C. *Dr. Van Meter's musings about the causes of gender dysphoria are irrelevant.................................................................................................30*

  IV.  Dr. Van Meter's opinions lack probative value and are therefore inadmissible under Rule 403. ........................................................................31

CONCLUSION ....................................................................................31

Plaintiffs respectfully submit this memorandum of law in support of their motion to exclude the expert testimony of Dr. Quentin Van Meter.[1]

## INTRODUCTION AND STATEMENT OF THE CASE

Plaintiffs are transgender Medicaid beneficiaries who have been diagnosed with gender dysphoria. In August 2022, Defendants adopted a rule, Florida Administrative Code 59G-1.050(7) (the "Challenged Exclusion"), prohibiting Medicaid coverage of services for the treatment of gender dysphoria. Defendants adopted the Challenged Exclusion after undergoing a process with a predetermined outcome that concluded that the provision of medical services for the treatment of gender dysphoria, including puberty blockers, hormone therapy, and surgery, "do not conform to GAPMS [("generally accepted professional medical standards")] and are experimental and investigational." Defendants thus deny equal treatment to Plaintiffs based on sex because they are transgender.

In response, Defendants have put forward as a rebuttal expert, Dr. Quentin Van Meter, a pediatric endocrinologist who has no experience regarding the treatment of gender dysphoria and who has never studied gender identity or gender dysphoria, nor published any scientific, peer-reviewed literature on gender dysphoria or transgender people based on original research. However, Dr. Van Meter

---

[1] Unless otherwise specified, all exhibits cited herein are attached to the contemporaneously filed Declaration of Omar Gonzalez-Pagan.

is not a qualified expert on gender dysphoria or its treatment, and his opinions and testimony are neither relevant nor reliable, under Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. Indeed, his testimony has been previously excluded by a court, which found he was "discredited as an expert." Ex. D.

Accordingly, and for the reasons set forth below, the Court should exclude the expert report, opinions, and testimony of Dr. Van Meter.  At minimum, based on Dr. Van Meter's lack of qualifications and the unreliability and unhelpfulness of his testimony and opinions, the Court should exclude any portions of the expert report, opinions, and testimony of Dr. Van Meter that go beyond "the risks associated with puberty blocking medication and hormone therapy" in patients under 18 in a broad sense, though not specifically as treatment for gender dysphoria. *See Kadel v. Folwell*, 2022 WL 3226731, at *9 (M.D.N.C. Aug. 10, 2022).

## LEGAL STANDARD

"The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by *Daubert* and its progeny." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "District courts are [thus] charged with [a] gatekeeping function." *Id.*; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The importance of *Daubert*'s gatekeeping requirement cannot be overstated.").

In conducting their gatekeeping function, courts must "engage in a rigorous three-part inquiry" and determine whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The Eleventh Circuit refers to these three considerations separately as "qualification," "reliability," and "helpfulness" and has emphasized they are "distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Rink*, 400 F.3d at 1292.

To be sure, "[i]mplementing Rule 702, *Daubert* requires district courts to ensure that any and all scientific testimony or evidence admitted is both relevant and reliable." *Claire v. Fla. Dep't of Mgmt. Servs.*, 2021 WL 5982330, at *1 (N.D. Fla. Oct. 20, 2021). "[T]he trial judge must determine [this] ***at the outset***." *Daubert*, 509 U.S. at 592 (emphasis added). "Rule 702 applies whether the trier of fact is a judge or a jury." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020). Even rigorous cross-examination is not a substitute for the court's gatekeeping role. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir.

2017). As such, the court's gatekeeping role and the test for admissibility of expert testimony are applicable even at a bench trial or at the summary judgment stage. *See*, *e.g.*, *Rink*, 400 F.3d at 1294 (finding no abuse of discretion by the district court in motions to exclude in the context of summary judgment); *Kadel*, 2022 WL 3226731, at **5-17 (granting motions to exclude in the context of summary judgment); *Lo v. United States*, 2022 WL 1014902, at *12 (W.D. Wash. Apr. 5, 2022) (excluding unqualified expert evidence in the context of a bench trial); *cf. UGI Sunbury*, 949 F.3d at 833 (holding the district court abused its discretion in a bench trial when it "ignored rule [702]'s clear mandate" by "sidestepping Rule 702 altogether and declining to perform any assessment of [expert]'s testimony before trial").

Finally, because of the potentially misleading effect of expert evidence, *see Daubert*, 509 U.S. at 595, on occasion expert opinions that otherwise meet admissibility requirements may still be excluded under Fed. R. Evid. 403.

## ARGUMENT

### I. Qualification – Dr. Van Meter is not qualified to offer expert opinions on the diagnosis, treatment, or causes of gender dysphoria.

An expert witness may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Banuchi v. City of Homestead*, 606 F.Supp.3d 1262, 1272 (S.D. Fla. 2022) (cleaned up). "Whether [an

expert] is qualified is a threshold question, and vigorous cross-examination is no substitute." *Griffin v. Coffee Cnty.*, 608 F.Supp.3d 1363, 1373 (S.D. Ga. 2022), *objections overruled*, 2022 WL 2805037 (S.D. Ga. July 18, 2022). If not qualified, the expert's testimony is unreliable. *See Reliastar Life Ins. Co. v. Laschkewitsch*, 2014 WL 1430729, at *1 (E.D.N.C. Apr. 14, 2014).

However, "qualifications alone do not suffice." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999); *see also Patel ex rel. Patel v. Menard, Inc.*, 2011 WL 4738339, at *1 (S.D. Ind. Oct. 6, 2011). Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under … *Daubert*." *Clark*, 192 F.3d at 759 n.5.

Moreover, "an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp.*, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007); *see also Lebron v. Sec. of Fla. Dept. of Children and Families*, 772 F.3d 1352, 1369 (11th Cir. 2014) ("Expertise in one field does not qualify a witness to testify about others."). "Generalized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge." *Martinez*, 2007 WL 2570362, at *2.

This is particularly true in medicine where "no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F.Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994); *see also*, *e.g.*, *Hartke v. McKelway*, 526 F.Supp. 97, 100-101 (D.D.C. 1981). For example, a clinical psychologist may not be necessarily qualified to testify about stress worsening a preexisting heart condition, and a pediatrician experienced as a children's accident preventionist may not be qualified to testify to the conduct of an adult driver. *See Diviero v. Uniroyal Goodrich Tire Co.*, 919 F.Supp. 1353, 1355–56 (D. Ariz. 1996) (citing *Kloepfer v. Honda Motor Co.*, 898 F.2d 1452, 1458–59 (10th Cir. 1990), and *Edmonds v. Illinois Central Gulf Railroad*, 910 F.2d 1284, 1287 (5th Cir. 1990), as examples).

Here, Dr. Van Meter, a pediatric endocrinologist by training, is not qualified to render most of the opinions he proffers. Indeed, he has previously been disqualified from testifying about some of the same subjects on which he seeks to opine in this case. *See* Ex. D. The district court's decision in *Kadel v. Folwell* is most illustrative here. Like Dr. Van Meter, the pediatric endocrinologist at issue in *Kadel*[2] "offer[ed] a wide range of conclusions that fall into five main categories: mental

---

[2] The pediatric endocrinologist at issue in *Kadel* was Dr. Paul W. Hruz, who has also been disclosed as an expert by Defendants in this case.

healthcare, medical and surgical care, informed consent, criticism of medical associations, and political criticisms." *Kadel*, 2022 WL 3226731, at *8. The *Kadel* court excluded most of the endocrinologist's proffered testimony and limited the testimony "to a discussion of the risks associated with prescribing hormone treatments to adolescents and adults," the only possible area of that endocrinologist's expertise. *Id.*, at *35.

The Court should conclude the same for Dr. Van Meter, who: (1) has never conducted any original, peer-reviewed research about gender identity, transgender people, or gender dysphoria, Ex. B, at 28:6-23; (2) has not published any scientific, peer-reviewed literature on gender dysphoria or transgender people based on original research, Ex. B, at 29:2-23, 32:3-7;[3] (3) has never diagnosed or treated a patient for gender dysphoria, Ex. B, at 37:13-25; and (4) is not a psychiatrist, a psychologist, nor mental health care provider of any kind qualified to diagnose gender dysphoria or to opine on the efficacy of psychotherapy or counseling to treat gender dysphoria. Ex. B, at 37:24-25, 35:22-24; Curriculum vitae attached to Ex. A.

---

[3] More specifically, Dr. Van Meter has published two letters to the editor, which he does not know if they are not peer-reviewed, *see* Ex. B, at 32:3-7, and a single opinion piece in the *non-medical* journal "Issues in Law & Medicine." "Issues in Law & Medicine" is a "professional journal" targeted to the broader audience of "attorneys, health care professionals, educators and administrators on legal, medical, and ethical." Ex. E. Indeed, its editor-in-chief is an attorney. Ex. F.

Like Dr. Hruz in *Kadel*, Dr. Van Meter "is not qualified to offer expert opinions on the diagnosis of gender dysphoria, the DSM, gender dysphoria's potential causes, the likelihood that a patient will 'desist,' or the efficacy of mental health treatments." *Kadel*, 2022 WL 3226731, at *9. Dr. Van Meter "is not a psychiatrist, psychologist, or mental healthcare professional." *Id.*; *see also* Ex. B, at 37:24-25; Curriculum vitae attached to Ex. A. "He has never diagnosed a patient with gender dysphoria, treated gender dysphoria, … conducted any original research about gender dysphoria diagnosis or its causes, or published any *scientific*, *peer-reviewed* literature on gender dysphoria." *Kadel*, 2022 WL 3226731, at *9 (emphasis added); *see* Ex. B, at 28:6-23, 29:2-23, 32:3-7. Additionally, Dr. Van Meter "is not a surgeon and has no experience with surgery for gender dysphoria and, therefore, is not qualified to testify to the risks associated with surgery or the standard of care used by surgeons for obtaining informed consent for surgery." *Kadel*, 2022 WL 3226731, at *9.

By and large, Dr. Van Meter bases his opinions on his review of other people's scholarship. But "[m]erely reading literature in a scientific field does not qualify a witness—even an educated witness—as an expert." *Kadel*, 2022 WL 3226731, at *9; *see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted

to be the mouthpiece of a scientist in a different specialty. That would not be responsible science.").

Nor can Dr. Van Meter claim to be qualified based on his conversation with the families of twenty (20) transgender minor patients, to whom he has provided no treatment for gender dysphoria but rather has served as an alleged information hub to "parents who are not willing to consent to any medical intervention just by design." Ex. B, at 32:19-24; 36:24-37:11. But "reliance on anecdotal evidence" is a "red flag[] that caution[s] against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).

Simply put, Dr. Van Meter only possesses precisely the sort of "generalized knowledge of a particular subject" that courts have rejected as a qualification under Rule 702.  As with the disqualified expert in *Lebron* who "reached his opinion instead by relying on studies," this is not a sufficient qualification to serve as an expert witness.  772 F.3d at 1369.

Indeed, Dr. Van Meter is the definition of a manufactured "expert witness" as his involvement originates from and dates back to a conference by the Alliance Defending Freedom ("ADF")[4] in 2017 organized specifically to cultivate

---

[4] ADF is well-known for pushing anti-LGBT policies across the country and internationally. *See*, *e.g.*, Nico Lang, *A Hate Group Is Reportedly Behind 2021's Dangerous Wave of Anti-Trans Bills*, them. (Feb. 19, 2021), https://bit.ly/3HEqCR9; Julie Compton, *Activists take aim at anti-LGBTQ 'hate group,' Alliance Defending Freedom*, NBC News (Nov. 14, 2018), https://nbcnews.to/3oEe9Es.

professional "experts" who would testify against the gender-affirmation of transgender people.  Ex. B, at 169:20-171:4; *cf.* Ex. G, at 84:3-85:12, 90:13-91:13 (Dr. Lappert testifying that he attended the same ADF conference as Dr. Hruz in 2017 where the "poverty of [experts] who are willing to testify" against gender-confirming policies was discussed and that attendees "were asked whether they would be willing as participate as expert witnesses"). Indeed, prior to 2017, Dr. Van Meter had never provided "any expert testimony regard transgender issues." Ex. B, at 171-1:4. Thus, like the disqualified expert in *Lebron*, Dr. Van Meter "developed his opinions expressly for purposes of testifying" in an area that he did not otherwise specialize in and his testimony did not "grow[] naturally and directly out of research he had conducted independent of the litigation." *Lebron*, 772 F.3d at 1369.

In sum, Dr. Van Meter is not qualified to serve as an expert on the diagnosis, treatment paradigms, or causes for gender dysphoria. He is "not qualified by background, training, or expertise to opine" about any of these factual issues. *Lebron*, 772 F.3d at 1369. As a trial court in Texas has already concluded:

> Dr. Quentin L. Van Meter, M.D., is discredited as an expert to give testimony and discuss on his opinions regarding the legal question of whether an adolescent transgender child should be administered puberty blockers and whether affirmation of an incongruent gender child is harmful or not.

Ex. D.

At most, Dr. Van Meter may testify broadly "to the risks associated with puberty blocking medication and hormone therapy" in patients under 18, though not specifically as treatment for gender dysphoria. *Kadel*, 2022 WL 3226731, at *9.[5]

## II.   Reliability – Dr. Van Meter's opinions and testimony are unreliable.

. An expert's testimony should only be admitted if it is sufficiently reliable. The requirement of reliability found in Rule 702 is "the centerpiece of any determination of admissibility." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002). "To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *In re 3M Combat Arms Earplug Products Liab. Litig.*, 3:19MD2885, 2022 WL 1262203, at *1 (N.D. Fla. Apr. 28, 2022). It must be based on "good grounds," *Daubert,* 509 U.S. at 590, and cannot be based on "leaps of faith." *Rider*, 295 F.3d at 1202.

Thus, when determining the reliability of proposed expert testimony, courts "consider, to the extent possible: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Quiet*

---

[5] During his deposition, Dr. Van Meter limited his opinions just to persons under 18. Ex. B, at 75:10-12; 193:2-5.

*Tech.*, 326 F.3d at 1341. Other factors which may be relevant include (1) the nature of the field of claimed expertise, (2) the source of the expert's knowledge, (3) the expert's level of care in using the knowledge, and (4) the expert's consideration of alternative hypotheses. *See Hendrix v. Evenflo Co., Inc*., 255 F.R.D. 568, 578-79 (N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010).

"At this stage, the court must undertake an independent analysis of each step in the logic leading to the expert's conclusions; if the analysis is deemed unreliable at any step the expert's entire opinion must be excluded." *Id.* at 578. And "proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018).

Here, Dr. Van Meter's opinions fail all indicia of reliability. Dr. Van Meter's proffered opinions are based on nothing more than rank speculation, "untested" theories, uncorroborated anecdotes, and assumptions that are obsolete, flawed, unethical, and expressed opinions based upon "unsettled science." What is more, some of his opinions are patently false.

A. *Dr. Van Meter's opinions are unreliable because they are based on untested hypotheses and speculation.*

"While hypothesis is essential in the scientific community because it leads to advances in science, speculation in the courtroom cannot aid the fact finder in

making a determination." *Dunn v. Sandoz Pharms. Corp.*, 275 F.Supp.2d 672, 684 (M.D.N.C. 2003). "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996). Indeed, such "speculation is unreliable evidence and is inadmissible." *Dunn*, 275 F.Supp.2d at 684; *see Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). "Where an expert's opinion testimony is founded on an unsupported premise, it gives rise to an inference that is based on speculation and has no evidentiary value." *Walker v. Blitz USA, Inc.*, 663 F.Supp.2d 1344, 1364 (N.D. Ga. 2009).

Here, several of Dr. Van Meter's opinions are based on speculation, unsupported premises, or mere guesswork.  Take the following examples:

*One.*  Dr. Van Meter opines that "[t]he pause in U.S. transgender clinics [i.e., the length of use of puberty blockers before other medical interventions for transgender adolescents] is *often* for as little as a month." Ex. A, at ¶ 20 (emphasis added). However, this is mere speculation by Dr. Van Meter based on his purported conversations with two families who were seen at a single clinic in Georgia (and who turned to him because they were predisposed to oppose the care). Ex. B, at 77:5-16. He has not cited to any study or data for this opinion, however. Ex. B, at 78:3-5.

*Two.*  Dr. Van Meter's implication that there are people who have "died as a result of their efforts to transition" is similarly based on rank speculation. Ex. A, at

¶ 22. He provides no evidence to support the statement, and indeed, when asked as to whether people died "because of the care," Dr. Van Meter stated: "I can't speak to that." Ex. B, at 95:3-7, 95:19-21.

**Three.**   When speaking of a published longitudinal study showing the effectiveness of hormone therapy in improving adolescents' mental health and wellbeing, but during the course of which two subjects died by suicide, Dr. Van Meter opines that "[a]ny independent review board would have halted the study in its tracks." Ex. A, at ¶ 22. However, Dr. Van Meter admits such opinion is based on speculation. Ex. B, at 101:22-102:2.

**Fourth.**  Dr. Van Meter opines that "patients were convinced they had gender dysphoria because of the online influence to which they were exposed" and that "social media now presents" "troubled adolescents, struggling for acceptance by peers or for some sense of celebrity" with being transgender as "a one-size-fits-all solution which offers acceptance and celebrity instantly." Ex. A, at ¶ 28. To be clear, Dr. Van Meter speculates that adolescents become "transgendered" because it "is a very shiny object to the patient" and "they have not been accepted but they feel they will be much more accepted and special amongst their peers" if they transition, and "that is the celebrity they're looking for." Ex. B, at 106:4-8. When asked if he believed "that *some people choose to be transgender because it's going to make*

*them popular*," Dr. Van Meter responded: "It makes them feel accepted. Yes, I am saying that." Ex. B, 106:20-24.

Dr. Van Meter cites to no published data or literature to support his opinion because there is none. Ex. B, at 104:25-105:5. And to the extent Dr. Van Meter's opinion is based on a select few anecdotes, it is a circumstance where "there is simply too great an analytical gap between the data and the opinion proffered," such that the expert testimony must be excluded. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997).

**Fifth.**  Dr. Van Meter repeatedly opines that counseling and psychotherapy are sufficient to resolve a transgender adolescent's gender incongruence based on a single paper by Dr. Kenneth Zucker. *See*, *e.g.*, Ex. A, at ¶¶ 13, 28, 30, 34, 41; *see also* Ex. B, at 108:3-22. But this is a wholly unsupported premise. The Zucker paper Dr. Van Meter cites states the opposite of Dr. Van Meter's conclusion: "From a developmental perspective, we take a very different approach when we work with adolescents with GID than when we work with children with GID. This is because we believe that there is much less evidence that GID can remit in adolescents than in children." Ex. H. Dr. Van Meter's opinion is unsupported, and therefore speculative and unreliable.

B. *Dr. Van Meter's opinions are unreliable because they are misleading and therefore do not serve to enlighten the trier of fact.*

In addition, many of Dr. Van Meter's opinions are misleading at best, or flat out false. Take the following examples:

***One.*** Dr. Van Meter repeatedly opines that medical treatment should not be provided to adolescents because they will ultimately desist. Ex. A, at ¶¶ 13, 16, 30. This is false. For this proposition, Dr. Van Meter cites to "11 published studies." *Id.*, at ¶ 13. But as Dr. Van Meter admits, the "desistance" studies on which he relies speak only to *preadolescent/prepubertal* youth who were diagnosed with *gender identity disorder* under the DSM-III or the DSM-IV, and do not pertain to "desistance" in preadolescent/prepubertal youth diagnosed with *gender dysphoria* under the DSM-5. Ex. B, at 59:18-61:9. Indeed, the underlying data of the studies upon which he relies included gender non-conforming children who never identified as a sex different from their birth-assigned sex in the first place. In other words, they included children who were never transgender. And Dr. Van Meter acknowledged during his deposition that the changes from the DSM-IV diagnosis of gender identity disorder to the DSM-5 diagnosis of gender dysphoria in 2013 involved more than a change in nomenclature but rather changes in the diagnostic criteria that made "the diagnosis more restrictive and conservative" to reduce "false positives." Ex. B, at 117:16-118:2; Ex. I, at 904-05.

Furthermore, Dr. Van Meter admits that the studies pertain to "desistance" among *preadolescent/prepubertal* children and not adolescents or adults. Ex. B, at 61:6-9. But again, no hormonal or surgical care is recommended for or provided to *prepubertal* children, nor are any of the plaintiffs prepubertal children. Ex. B, at 62:3-5. By contrast, Dr. Van Meter testified that he is not aware of any peer-reviewed scientific articles looking specifically at the desistance rate of adolescents or adults with gender dysphoria and that "[i]t is thought that if they persist with their gender incongruence into adulthood that they tend to stay there." Ex. B, 65:10-14, 66:1-5. Moreover, Dr. Van Meter testified that "one would most likely find accepted standards of care in published textbooks" and the chapter of a medical textbook co-authored by Dr. Zucker, whom Dr. Van Meter considers an authority on this issue, states that "[o]nce children have reached puberty, transgender identity persists in the vast majority of cases, and medical intervention is often considered." Ex. B, at 124:16-20, 125:17-19, 126:8-14; Ex. J, at 638, 640.

*Two.* In seeking to undermine the extensive body of literature supporting the efficacy and safety of gender-affirming medical care, Dr. Van Meter dismisses the studies by stating that "no reputable editor would accept such studies for publication in peer-reviewed journals." Ex. A, at ¶ 28. Of course, as he must admit, these studies have all been published in peer-reviewed scientific, medical journals. Ex. B, at 122:20-22, 123:24-124:5. But in Dr. Van Meter's mind, widely recognized, peer-

17

reviewed medical journals like the Journal of the American Medical Association (JAMA), Journal of Pediatrics, International Journal of Pediatric Endocrinology, Journal of Adolescent Health, and Journal of Sexual Medicine are not reputable because they published these studies. Ex. B, at 122:23-123:17. Of course, just because this is Dr. Van Meter's opinion, it does not make it so. *Frazier*, 387 F.3d at 1262; *id.* at 1284 (Barkett, J., concurring) ("While experience may be sufficient to qualify a person as an expert, the *ipse dixit* of an expert in a given field is simply not enough to establish the reliability of a particular opinion.").

**Three.**  Dr. Van Meter repeatedly opines about the lack of FDA approval for the use of puberty blockers as treatment for gender dysphoria. *E.g.*, Ex. A, at ¶¶ 21, 36. However, Dr. Van Meter failed to disclose and discuss the Food and Drug Administration's position that, "once the FDA approves a drug, healthcare providers generally may prescribe the drug for an unapproved use when they judge that it is medically appropriate for their patient," Ex. K at 2, and that the American Academy of Pediatrics does not consider the use of "off-label" drugs to "imply an improper, illegal, contraindicated, or investigational use," Ex. L at 1.

**Four.**  Dr. Van Meter misrepresents the modalities of treatment for the care of patients with gender dysphoria. Specifically, Dr. Van Meter opines that "wait-and-see has been used by others to describe waiting until completion of puberty at the age of consent [before providing any medical treatment], since by that time the

vast majority of patients have desisted." Ex. A, at ¶ 16. While not included in his report, upon questioning, Dr. Van Meter disclosed that he was referring to Dr. Zucker at the Center for Addiction and Mental Health in Toronto, Canada and the so-called "Dutch protocol." Ex. B, at 72:24-73:19. However, Dr. Van Meter misrepresented the approach to treatment at both institutions. In fact, both Dr. Zucker's approach and the Dutch "watchful waiting" model recommend the provision of gender-affirming medical care if a patient's gender dysphoria persists into adolescence. Ex. B, at 74:5-18, 113:14-25; Ex. M, at 61-62, 64-66. Indeed, the chapter of a medical textbook co-authored by Dr. Zucker states that "[f]or those children who continue to have strong cross-sex identification in adolescence, pubertal blockade, and cross-sex hormone therapy to align patients' bodies with their identities have been shown to improve mental health outcomes." Ex. B, at 126:8-14; Ex. J at 641.[6]

**Five.**   Dr. Van Meter opines that "there is no biologic basis for gender identity." Ex. A, at ¶ 8. He cites to the DSM-5 for this proposition, but could not explain how the DSM-5 supported this bold assertion other than to say "there is a statement fluidity and the desistance rates." Ex. B, at 45:13-18. However, as Dr. Van Meter had to acknowledge, scientific, peer-reviewed literature shows the oppositive.

---

[6] Notably, Dr. Zucker was a co-authored of the WPATH Standards of Care, Version 7, which recommended medical treatment for gender dysphoria in the form of puberty blockers, hormone therapy, and surgery. Ex. B, at 57:11-18.

Specifically, peer-reviewed, scientific literature states that "there is empirical evidence that there is a biological basis for a person's gender identity." Ex. B, at 47:15-24; Ex. N.

*Six.*   Dr. Van Meter's criticism of the Standards of Care for the Health of Transgender and Gender Diverse People, Version 8 (SOC 8) published by the World Professional Association for Transgender Health (WPATH) holds no water. Specifically, Dr. Van Meter states (wrongly) that SOC 8 did not discuss or include contrary viewpoints, such as those by "internationally recognized experts in the field of human sexuality" like Dr. Zucker and Dr. Paul McHugh. Ex. A, at ¶ 11. This is false. At his deposition, Dr. Van Meter had to acknowledge that SOC 8, which has over 70 pages of references to peer-reviewed literature, cites to at least 16 peer-reviewed articles authored by Dr. Zucker, and that Dr. McHugh has not published any original peer-reviewed research with regards to gender dysphoria. Ex. B, at 53:8-54:14, 55:11-14; Ex. T (WPATH Standards of Care 8), at S178-S246.

*            *            *

The Court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589.  Here, Dr. Van Meter has misrepresented or omitted information that goes to the heart of his opinions and calls into question the reliability of his opinions.  While usually the factual basis of an expert opinion goes to credibility, "it is possible for an experts'

omission of articles to render his or her opinion inadmissible on reliability grounds." *Huggins v. Stryker Corp.*, 932 F.Supp.2d 972, 994 (D. Minn. 2013).  Such is the case here where Dr. Van Meter omits key information, or worse, misrepresents facts that if properly disclosed would contradict his opinions and undermine their foundation. In such circumstances, the "potential to mislead" rather "than to enlighten" is too great.  *In re Lipitor*, 892 F.3d at 632.

    C.  <u>*Dr. Van Meter's opinions are unreliable because they are based on facts or data not typically relied on by physician, scientists.*</u>

Rule 703 requires that "[t]he facts or data … upon which an expert bases an opinion or inference" must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703. Throughout his report, Dr. Van Meter bases a number of his opinions on anecdotal evidence, namely, on the 20 families with a minor with gender dysphoria with whom he has spoken. *E.g.*, Ex. B, at 77:5-16 (pertaining to ¶ 20); 103:1-9, 105:15-18 (pertaining to ¶ 28); Ex. A, at ¶ 29. But such "anecdotal information … is scientifically unreliable and not supported by any epidemiologic or other scientifically reliable studies." *Soldo v. Sandoz Pharms. Corp.*, 244 F.Supp.2d 434,

571 (W.D. Pa. 2003); *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1252, 1253-54 (11th Cir. 2005).[7]

Similarly, Dr. Van Meter mostly cites to unpublished, non-peer-reviewed reports and (more concerningly) newspaper articles and blog posts in support of his opinions. *See*, *e.g.*, Ex. A (references 11, 27, 32-38, 50, 52, 54, 56, 58-61). To be sure, such unpublished, non-peer-reviewed reports, news articles, and blog posts *are not* the types of materials reasonably relied upon by experts in any field of medicine. Dr. Van Meter's report therefore is "unsupported by reliable principles and methods and lack[s] hallmarks of scientific rigor: peer-reviewed research, studies, or experiments in support of his opinions." *United States v. Geanakos*, 2017 WL 4883294, at *3 (E.D. Cal. Oct. 30, 2017).

### D. *Dr. Van Meter's opinions are unreliable because they are not generally accepted in the scientific and medical community.*

General acceptance in the relevant scientific community is also relevant to the reliability inquiry. *Nease*, 848 F.3d at 229. Not only is widespread acceptance an important factor in assessing the reliability of an expert's opinions, but the fact that a known technique or theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594.

---

[7] In *Soldo*, the excluded expert's testimony was based on anecdotal evidence contained *in published case reports*. Here, Dr. Van Meter has not even attempted to publish his anecdotal evidence as case reports. Ex. B, at 84:21-85:9, 85:15-17.

Here, Dr. Van Meter's opinions are outside the mainstream of medical and scientific opinion and have been explicitly rejected by these relevant communities.

The provision of gender-affirming medical care has been accepted and endorsed, *inter alia*, by the: American Medical Association; American Psychiatric Association; American Psychological Association; Endocrine Society; Pediatric Endocrine Society; American Academy of Pediatrics; and the National Academies of Science, Engineering, and Medicine. *See* Ex. O at 361.

In fact, another federal district court found as much when it enjoined Arkansas' state law seeking to ban gender-confirming treatment for minors. *See Brandt v. Rutledge*, 551 F.Supp.3d 882 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022). In doing so, the *Brandt* court explicitly found that: (a) "Gender-affirming treatment is *supported by medical evidence* that has been *subject to rigorous study*;" and (b) "*Every major expert medical association* recognizes that gender-affirming care for transgender minors may be *medically appropriate and necessary* to improve the physical and mental health of transgender people." *Id.* at 891 (emphasis added). The *Brandt* court's findings stand as a stark repudiation of Dr. Van Meter's opinion that the provision of gender-affirming medical care to adolescents with gender dysphoria is an "experiment," for which "there is clearly no consensus of opinion." Ex. A, at ¶¶ 11, 21-22.

E. *Dr. Van Meter's opinions are so tainted by his personal bias as to render his opinions unreliable.*

While Plaintiffs are cognizant of the fact that bias in an expert witness's testimony is usually an issue of credibility as opposed to one of admissibility, when an expert's opinions are based on bias and prejudice as opposed to scientific or medical knowledge, then the question of bias becomes one of reliability and admissibility.  Indeed, reliability is a flexible inquiry wherein courts must ensure that an expert's opinion is based on scientific, technical, or other specialized knowledge and not on personal beliefs or speculation. *See Frazier*, 387 F.3d 1244, 1262 ("Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial."); *see also* Fed. R. Evid. 702 advisory committee's note (2000 amends.) ("The trial judge in *all* cases of proffered expert testimony must find that it is *properly grounded, well-reasoned, and not speculative* before it can be admitted." (emphasis added)). Here, there is ample evidence that Dr. Van Meter's testimony is so permeated and tainted by his unscientific views and personal bias as to render it unreliable.  *Cf. Sanchez v. Esso Standard Oil de Puerto Rico, Inc.*, 2010 WL 3809990, at *4 (D.P.R. Sept. 29, 2010).

More specifically, Dr. Van Meter's testimony appears to be motivated by his personal and religious views regarding transgender people. One need only look at Dr. Van Meter's writings and testimony to see that it is permeated with bias and prejudice.  Take the following statements by Dr. Van Meter:

- When asked "Do you believe that people who are transgender make a choice to be transgender?" Dr. Van Meter responded, "Absolutely." Ex. B, at 197:24-198:2;

- Dr. Van Meter testified that "being transgender is not normal," Ex. B, at 191:25-192:2;

- Dr. Van Meter opposes the use of the term "cisgender" because using it "only validates transgender as a healthy variance which it is clearly not," Ex. B, at 188:3-7; Ex. Q; and

- Dr. Van Meter considers gender affirmation to be "medical abuse," Ex. B, at 186:12-15.[8]

What is more, after the enactment of an Idaho law restricting transgender people's ability to update their birth certificates, Dr. Van Meter responded in an email chain, "God is with us!" Ex. B, 180:24-181:4; Ex. P. At his deposition, Dr. Van Meter explained that his advocacy against gender-affirming care and his medical practice are "impossible to separate" from his "religious faith." Ex. B, at 181:5-20. Indeed, he has advocated for restricting access or outright prohibiting gender-affirming medical care in various states. Ex. B, at 182:20-22.

---

[8] Under Dr. Van Meter's leadership, the American College of Pediatricians, which only has 700 members and should be confused with the American Academy of Pediatrics, has published position statements endorsing conversion therapy for homosexual youth and opposing same-sex parenting. Ex. A, at 128:3-17, 130:16-131:20; Exs. R and S.

To be clear, Plaintiffs do not seek to impugn or malign whatever moral or religious views Dr. Van Meter may hold.  However, to the extent Dr. Van Meter's moral and religious views have influenced his purported expert opinions—indeed, they seem to be the motivating factor—that is something the Court must be aware of and should consider as it assesses the reliability of his testimony.

The foregoing, coupled with Dr. Van Meter's departure with generally accepted medical and scientific standards, demonstrates that Dr. Van Meter's purported expert testimony lacks any indicia of reliability.  And while the Federal Rules of Evidence state that "[e]vidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility," Fed. R. Evid. 610, the Advisory Committee Notes to Rule 610 make clear that "an inquiry for the purpose of showing interest or bias because of them is not within the prohibition." Advisory Committee Notes to Rule 610. Indeed, "[w]ithout this critical information," the Court would be "deprived of the necessary facts from which it could appropriately draw inferences about [Dr. Van Meter's] reliability." *State v. Heinz*, 485 A.2d 1321, 1328 (Conn. App. 1984). The record evidence demonstrates a clear bias by Dr. Van Meter against transgender people generally, which infects his reliability as a purported expert witness in this case

\*   \*   \*

26

Given that Dr. Van Meter's opinions fail to meet the most basic indicia of reliability, the Court should exclude Dr. Van Meter's opinions and testimony as unreliable.

### III. Helpfulness – Dr. Van Meter's opinions and testimony are not relevant to this case.

. Helpfulness "goes primarily to relevance." *Daubert*, 509 U.S. at 580; *see also Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) ("The touchstone of this inquiry is the concept of relevance."). Under the helpfulness prong, the "court must satisfy itself that the proffered testimony is relevant to the issue at hand, for that is a precondition to admissibility." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir. 2021) (cleaned up). Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). Thus, "expert testimony which does not relate to any issue in the case is not relevant and non-helpful." *Knight v. Boehringer Ingelheim Pharms., Inc.*, 323 F.Supp.3d 837, 846 (S.D. W.Va. 2018).

In order to be relevant, an opinion needs to "fit" with the facts at issue. *Simmons v. Augusta Aviation, Inc.*, 596 F.Supp.3d 1363, 1374 (S.D. Ga. 2022) "To satisfy this requirement, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case." *Id.* Testimony that "offers nothing more than what lawyers

27

for the parties can argue in closing arguments" or that consists of "subjective portrayals of factual information" "generally will not help the trier of fact." *Giusto v. Int'l Paper Co.*, 2021 WL 3603374, at *4 (N.D. Ga. Aug. 13, 2021).

This case is about whether Defendants' exclusion of coverage for medical treatments for gender dysphoria violates Plaintiffs' rights under the equal protection clause, Section 1557 of the Affordable Care Act, and the Medicaid Act. Dr. Van Meter's opinions are not relevant to this inquiry as they will not help the trier of fact to understand the evidence or to determine a fact in issue. His opinions do not "fit" because they are not sufficiently tied to the facts of the case so that they will aid a factfinder.

A. *Dr. Van Meter's opinions about "desistance" are irrelevant.*

Take for example Dr. Van Meter's opinions about purported "desistance" rates as a reason to question the provision of medical treatment for gender dysphoria. Dr. Van Meter spends considerable time on (and builds most of his testimony questioning the propriety of gender-affirming medical care upon) antiquated studies showing that a majority of *preadolescent/prepubertal* children diagnosed with *gender identity disorder*—an outmoded diagnosis *distinct from gender dysphoria* with different diagnostic criteria—"desisted" from their gender nonconformity or cross-gender behavior. *See*, *e.g.*, Ex. A, at ¶¶ 13, 30, 41. But, as Dr. Van Meter admitted, absolutely no medical or surgical treatment is recommended or provided

28

to *prepubertal* children. Ex. B, at 62:3-5. And, as Dr. Van Meter acknowledges, this case is about the coverage for medical treatment for gender dysphoria. Ex. B, at 61:14-20. Dr. Van Meter's opinions regarding "desistance" are thus irrelevant to this case.

> B. *Dr. Van Meter's opinions about supposed controversies in other countries are irrelevant.*

Likewise, Dr. Van Meter's opinions about "controversies" regarding the provision of medical treatment for gender dysphoria in other countries are both misleading and wholly irrelevant. Ex. A, at ¶ 21. Dr. Van Meter failed to disclose that each of these countries *provides and covers* gender-affirming medical treatment for gender dysphoria for adolescents in certain circumstances and for adults without any restriction, whereas Defendants exclude coverage for treatments for both these populations categorically. *See*, *e.g.*, Ex. B, at 91:6-7, 91:21-23; *see also* Ex. C; *Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 671 (8th Cir. 2022) ("Similarly, the WPATH Standards of Care and the Finnish council both recommend that cross-sex hormones be considered only where the adolescent is experiencing persistent gender dysphoria, other mental health conditions are well-managed, and the minor is able to meet the standards to consent to the treatment."). Moreover, how care is provided and covered in countries with nationalized health care systems

is not relevant to whether coverage of gender-affirming medical care should be provided by Medicaid in Florida.[9]

C. *Dr. Van Meter's musings about the causes of gender dysphoria are irrelevant.*

Dr. Van Meter opines, without any evidence, that gender dysphoria *may be* caused by social contagion and social pressure. Ex. A, at ¶¶ 28-29. He also opines that adolescents *choose* to be transgender because supposedly social media presents being transgender as "a one-size-fits-all solution which offers acceptance and celebrity instantly." *Id.*, at ¶ 28. But whether gender dysphoria is caused by social contagion is both wholly unsupported, as described below, and irrelevant to the case at hand. It is undisputed that gender dysphoria is a recognized medical condition that necessitates medical treatment.  *See, e.g.*, Ex. B, at 121:25-122:2 ("Q. … Gender dysphoria is a real condition? A. It is a real condition."); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594-95 (4th Cir. 2020).

*              *              *

The opinions expressed by Dr. Van Meter are insufficiently tied to the facts of this case so that they will aid a factfinder and should be excluded as irrelevant.

---

[9] For example, in Sweden standards of care are developed through legislation and thus part of a political process. *See* Socialstyrelsen, *About the National Board of Health and Welfare*, https://www.socialstyrelsen.se/en/about-us/ (accessed Apr. 7, 2023) (noting that standards are based on legislation).

IV.   **Dr. Van Meter's opinions lack probative value and are therefore inadmissible under Rule 403.**

Finally, the Court should exclude Dr. Van Meter's opinions because their introduction will result in unfair prejudice, confusion of the issues, or in misleading testimony.  Fed. R. Evid. 403.  Dr. Van Meter offers no opinions relevant to the issues in this case, and, in any event, the opinions he offers are unfounded, speculative, and unreliable. The testimony would also result in prejudice, as the testimony seeks to sow confusion about the propriety of gender-confirming care based on speculation, irrelevant, misleading, or biased opinions.

## CONCLUSION

For the foregoing reasons, the Court should exclude Dr. Van Meter's report, opinions, and testimony. At a minimum, the Court should limit Dr. Van Meter's opinions and testimony solely to "the risks associated with puberty blocking medication and hormone therapy" in patients under 18 in a broad sense, and not specifically as treatment for gender dysphoria. *Kadel*, 2022 WL 3226731, at *9.

Dated this 7th day of April 2023.

Respectfully Submitted,

*/s/ Omar Gonzalez-Pagan*

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**\*
**Gary J. Shaw**\*
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com

**Joe Little**\*
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle**\*
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**\*
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan**\*
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**\*
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

\* *Admitted pro hac vice*

*Counsel for Plaintiffs*

## **LOCAL RULE 7.1(B) CERTIFICATION**

The undersigned certifies that he attempted in good faith to resolve the issues raised in this motion through a meaningful conference with Defendants' counsel, including through a meet and confer Zoom conference on April 6, 2023.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
*Counsel for Plaintiffs*

## **LOCAL RULE 7.1(F) WORD COUNT CERTIFICATION**

As required by Local Rule 7.1(F), I certify that this Memorandum contains 7,425 words.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
*Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of April 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
*Counsel for Plaintiffs*