Page 1

1      UNITED STATES DISTRICT COURT

2        NORTHERN DISTRICT OF FLORIDA

3

4    AUGUST DEKKER, et al.,            )

5                                      ) Case No.

6        Plaintiffs,                   )

7                                      ) 4:22-cv-00325-RH-MAF

8        vs.                           )

9                                      )

10   JASON WEIDA, et al.,              )

11                                     )

12       Defendants.                   )

13            March 17, 2023    10:03 am    Zoom

14           DEPOSITION OF:  Dr. Quentin Van Meter

15        This deposition was taken remotely via Zoom.

16          Signature of this deposition is reserved.

17

18                    SHARON F. MCCLAIN

19                    C.C.R. - B-2243

20                    P.O. Box 1036

21                Gainesville, GA  30503

22   (770) 718-5145

23

24

25

Page 2

```
 2
  1                    APPEARANCES

  2

  3      For the Plaintiff:    OMAR GONZALEZ-PAGAN

  4                            LAMBDA LEGAL DEFENSE AND

  5                               EDUCATION FUND, INC.

  6                            120 Wall Street

  7                            19th Floor

  8                            New York, NY 10005

  9

 10      (logged in @ 10:30)   JENNIFER ALTMAN, Esq.

 11                            Pillsbury, Winthrop, Shaw,

 12                               Pittman, LLP

 13                            600 Brickell Ave.

 14                            Suite 3100

 15                            Miami, FL 33131

 16

 17                            SIMONE CHRISS, Esq.

 18                            Southern Legal Counsel, Inc.

 19                            1229 NW 12th Ave.

 20                            Gainesville, FL 32601

 21

 22      (logged in @ 1:15)    JOE LITTLE, Esq.

 23                            500 Capital Mall, Suite 1800

 24                            Sacramento, CA 95814
```

Page 3

3
1                          APPEARANCES CONT.

2

3          For the Defendant:     JOSHUA PRATT, Esq.

4                                 Holtzman, Vogel, Baran,

5                                    Torchinsky & Josefiak, PLLC

6                                 119 S. Monroe St.

7                                 Suite 500

8                                 Tallahassee, FL 32301

9

10

11                                 INDEX

12     WITNESS                                      PAGE

13     Dr. Quentin Van Meter

14          Cross Examination by Mr. Gonzalez-Pagan  10

15          Direct Examination by Mr. Pratt . . . . 198

16

17

18

19

20

21

22

23

24

Page 4

```
 4
 1                      EXHIBITS

 2   EXHIBIT

 3   NUMBER            DESCRIPTION            MARKED

 4   Exhibit 1    Expert Report - 3/10/23  . . . .    11

 5   Exhibit 2    Notice of Deposition . . . . . .    11

 6   Exhibit 3    Order Striking Expert Dr. Van Meter  26

 7   Exhibit 6    Journal of Neuroendocrinology Art.   46

 8   Exhibit 7    Standards of Care for Transgender

 9                    & Gender Diverse 8th Version  .    53

10   Exhibit 8    Standards of Care for Transgender

11                    & Gender Diverse 7th Version  .    57

12   Exhibit 9    Journal of Homosexuality Article .  109

13   Exhibit 10   5/23/08 statement - Am. Psychiatric 113

14   Exhibit 11   Journal Archives of Sexual Behavior

15                    Article . . . . . . . . . . .    115

16   Exhibit 13   Lewis's Child & Adolescent

17                    Psychiatry textbook excerpt . .  125

18   Exhibit 14   Psychotherapy for Unwanted Homosexual

19                    Attraction Among Youth article   128

20   Exhibit 15   Homosexual Parenting, A Scientific

21                    Analysis Article . . . . . . .    130

22   Exhibit 16   Email Chain - Bates Def. 001593749  132

23   Exhibit 17   Microsoft Teams invite 5/2/22 . .   140

24
```

```
1     5
       1                    EXHIBITS CONT.
2
       2      EXHIBIT
3
       3      NUMBER      DESCRIPTION                    MARKED
4
       4      Exhibit 18  Email to Jason Weida  . . . . .    147
5
       5      Exhibit 19  Invoice of 6/13/22 . . . . . .     152
6
       6      Exhibit 20  Bates FDOH_000020148 - AHCA hearing
7
       7                     On general Medicaid policy . .    154
8
       8      Exhibit 21  Email thread - Bates Def. 000239790 156
9
       9      Exhibit 22  Email thread 7/20/22 . . . . . .    158
10
      10      Exhibit 23  Comment Summary for Rule 59G-1.050  163
11
      11      Exhibit 24  Bates EOG_002234 - Calendar Invite  164
12
      12      Exhibit 25  Bates EOG_002281 . . . . . . . .    164
13
      13      Exhibit 26  Email chain - Bates Grossman0058    166
14
      14      Exhibit 27  Bates 000292118 Email . . . . . .   168
15
      15      Exhibit 28  Email Bates Grossman0054  . . . .   171
16
      16      Exhibit 29  Email 3/30/20 . . . . . . . . . .   180
17
      17      Exhibit 30  Email chain 3/19/20 . . . . . . .   182
18
      18      Exhibit 31  Email chain 10/30/19  . . . . . .   187
19
      19      Exhibit 32  Email chain 2/4/20  . . . . . . .   187
20
      20
21
      21
22
      22
23
      23
24
25      24
```

28

1   Gloucester County School Board case, is  that right?

2        A.      That's correct.

3        Q.      That was in 2019, is that right?

4        A.      That's right.  It wasn't testimony in court.

5   It was a deposition.

6        Q.      In that deposition you testified that you have

7   not done any scientific research related to

8   transsexualism, gender dysphoria or gender identity

9   disorder, is that correct?

10       A.      That's correct.

11       Q.      You also testified that you have not done any

12  scientific research related to transgender people, is

13  that correct?

14       A.      That's correct.

15       Q.      And you testified that you have not done any

16  scientific research related to gender identity issues, is

17  that correct?

18       A.      Correct.

19       Q.      And all of that remains true today, is that

20  right?

21       A.      Yes, I have not been involved in a designed

22  research study of transgender treatment or transgender

23  patients.

24       Q.      On your CV on I believe it's page 5 of your CV

25  you list a number of publications, is that right?

29

1       A.      Let me get to page 5.  Yes.

2       Q.      Of these only three are pertaining to gender

3   dysphoria or transgender people, is that correct?

4       A.      Let me review to make sure I am speaking

5   correctly.  For some reason, the copy I have it does not

6   look like it's a complete list.  So, if you can read to

7   me the ones that -- I'm looking at my most recent

8   addition.  Let me just go to the top to be sure it is.

9   Yes.

10       Q.      Let me just show you five of your CV as

11   contained in Exhibit 1, is that right?

12       A.      So, the publication Mike Laidlaw and I and

13   others that's a letter to the editor.  There is my

14   article on bringing transparency to the treatment of

15   transgender persons, and Mike Laidlaw and our letter to

16   the editor on the erythrocytoisis in a cohort of

17   transgender men.  So, those three.  There are three of

18   them of all of those that deal with transgender as an

19   issue.

20       Q.      Are there any other beyond those three

21   publications, the two letters to the editor and the

22   article in Issues?

23       A.      No, no.

24       Q.      None of those three are original peer-reviewed

25   research, is that correct?

32

1    stated is actually their policy.  It's conjecture on my

2    part.

3         Q.    Sitting here today you can say that they've

4    been reviewed by an editor, but you do not know if they

5    were true peer-reviewed in the sense that we have

6    discussed it?

7         A.    That's correct.

8         Q.    Thank you.  And in the article for Issues in

9    Law and Medicine, do you know whether that was true peer-

10   reviewed?

11        A.    Yes, it was true peer-reviewed.

12        Q.    You mentioned earlier that you have a number of

13   patients, transgender patients.  How many transgender

14   patients do you have?

15        A.    It's now about 20 patients.

16        Q.    How many transgender patients have you ever

17   worked with?

18        A.    Those are the cases I'm speaking of.

19        Q.    So, in your whole experience you've worked with

20   20 transgender individuals as patients?

21        A.    That's correct.

22        Q.    You didn't provide medical treatment to any of

23   these patients, is that right?

24        A.    That's correct.

25        Q.    Given that you're a pediatric endocrinologist

35

1    permission to be able to communicate with the counselors

2    they are seeing.  The parents sign a release form so that

3    I can do so, and I am sort of coordinating an ongoing

4    review just to have someplace for the parents and the

5    patients to come back to, sort of a medical home, as this

6    process is moving forward.  In that way I'm sort of a

7    primary care hub for them so that all of the things that

8    need to go on that we recommend are being monitored so

9    that I can make sure that they're not lost to follow-up.

10        Q.    What do you mean lost to follow-up?

11        A.    Where we don't know what's going on.  They

12   don't come back for follow-up.  It's difficult to do

13   that.  It requires responsibility on the part of the

14   parents to make appointments or to keep appointments that

15   are made.  So, we try to keep track of those so that we

16   don't lose the ability to monitor how they are

17   progressing and how they are resolving their mental

18   health issues.  So, again it's a primary care type of an

19   issue in the sense that we are a clearinghouse to follow

20   these patients and make sure that they are adequately

21   receiving the counseling that they need.

22        Q.    You're not a mental health provider, is that

23   right?

24        A.    I am not.

25        Q.    And you said you speak to the counselors for

36

1   these patients, is that right?

2      A.      That's correct.

3      Q.      Do you make referrals?

4      A.      I do.  Well, I will say I give information on

5   how to contact.  In terms of insurance some of these

6   individuals have to have a referral from their primary

7   care provider, and I'm not viewed as a primary care

8   provider by insurance.  So, some insurance companies will

9   allow a specialist to cross refer to other specialists in

10   the pediatric world, but some require that the

11   pediatrician who is listed in their insurance policy has

12   to make that decision about a referral.  So, I will

13   recommend individuals, counselors, in the geographic

14   region where the patient lives that are convenient to

15   their home address; and if necessary, I will talk to

16   their primary care provider and indicate by letter that

17   this is what I recommend; would they be willing to make

18   the referral.

19      Q.      So, you said that you serve as a primary care

20   hub for these patients, but they actually have actual

21   primary care providers that are not you, is that right?

22      A.      That is correct.

23      Q.      Let me just ask this a little bit more plainly.

24   Are you working with these 20 families to ensure that

25   they do not receive or go down the path of obtaining

37

1  medical treatment for gender dysphoria?

2      A.    I check on what's happening, where they are

3  going, what decisions they've made.  The cases that come

4  to me are most often parents who are not willing to

5  consent to any medical intervention just by design.  I

6  mean my reputation is known in the transgender community

7  is if you want to have full access to medical care, this

8  is not the endocrinologist you need to go to.  So, it's

9  a matter of selection, preselection if you will, of

10  families that come to me where it has to do with parental

11  consent, either one or both of the parents.

12      Q.    So, let me just ask a little bit more

13  specifically.  You do not treat this patient's gender

14  dysphoria, is that correct?

15      A.    No, that's an issue for their mental health

16  providers.

17      Q.    So, you have never provided treatment for

18  gender dysphoria?

19      A.    No, I have not.

20      Q.    You've never provided treatment for gender

21  identity disorder?

22      A.    No, I have not.  Those are both mental health

23  issues, specifically mental health issues that are

24  addressed by a licensed certified mental health

25  providers, and I am not such a person.

45

1   record at 11:12 am.

2       BY MR. GONZALEZ-PAGAN:

3       Q.      Dr. Van Meter, we were about to discuss some

4   more of the specifics of your report.  This is Exhibit 1.

5   In paragraph eight of your report, the second sentence

6   states to the contrary there is no biologic basis for

7   gender identity, and you cite to the DSM-5, is that

8   right?

9       A.      Yes.

10      Q.      How does the DSM-5 support your statement?

11      A.      What was your question again exactly?  I'm

12   sorry.

13      Q.      Sure.  You state there is no biologic basis for

14   gender identity, and you cited to the DSM-5 as support.

15   How does the DSM-5 support your statement?

16      A.      I don't have a DSM-5 open right in front of me,

17   but there is a statement about fluidity and the

18   desistance rates.

19      Q.      The DSM-5 doesn't say that there's no biologic

20   basis for gender identity, is that right?

21      A.      I would have to go through sentence by

22   sentence.  I know DSM-4 specifically said so.  DSM-5 I

23   believe has -- I can't speak on that exactly.

24      Q.      I'm going to show you what's been marked as

25   Exhibit 6.  Can you see my screen?

46

1      A.      Yes, I can.

2      Q.      This is a article that was published in the

3  Journal of Neuroendocrinology, is that right?

4      A.      It looks that way, yes.

5      Q.      The Journal of Neuroendocrinology is a peer-

6  reviewed journal, is that right?

7      A.      I'm not familiar with it.  So, I can't state

8  exactly.

9                      (Plaintiff's Exhibit No. 6 was

10                     marked for identification.)

11  BY MR. GONZALEZ-PAGAN:

12      Q.      You said that you have read a number of the

13  literature in the context of gender identity and gender

14  dysphoria over the last 15 years.  This is an article

15  that you've encountered?

16      A.      No.

17      Q.      The last sentence of the abstract states --

18  well, the title of the article is neurobiology of gender

19  identity and sexual orientation.  Did I read that

20  correctly?

21      A.      Yes, you did.

22      Q.      And the last sentence of the abstract -- let me

23  zoom in a little bit -- states nonetheless despite the

24  many challenges to research in this area existing

25  empirical evidence makes it clear that there is a

47

1    significant biological contribution to the development of

2    an individual's sexual identity and sexual orientation.

3    Did I read that correctly?

4         A.      You did.

5         Q.      Then on page 4 there is a heading gender

6    identity.  Do you see that?

7         A.      Correct.

8         Q.      And the last sentence of the first paragraph

9    after that heading states several extensive reviews by

10   Dick Swaab and coworkers elaborate the current evidence

11   for an array of prenatal factors that influence gender

12   identity including genes and hormones.  Did I read that

13   correctly?

14        A.      You did.

15        Q.      So, you would agree that peer-reviewed

16   scientific literature states that there is empirical

17   evidence that there is a biological basis for a person's

18   gender identity, is that right?

19        A.      It stated so in the sentence.  I have not read

20   this article to go through point by point and look at the

21   references chosen.  So, I cannot comment on the validity

22   of this journal article.

23        Q.      Sure, but the article says that?

24        A.      The article said that.

25        Q.      Let's go to paragraph 10 of your report, the

53

1      A.      Yes.

2      Q.      This was published in the International Journal

3  of Transgender Health, is that right?

4      A.      That's correct.

5                      (Plaintiff's Exhibit No. 7 was

6                      marked for identification.)

7      BY MR. GONZALEZ-PAGAN:

8      Q.      I'm going to go to page S178.  That is the

9  references to the SOC 8.  Do you see that?

10     A.      Yes.

11     Q.      The citation to -- and can you see my cursor?

12     A.      I can.

13     Q.      The citation to Aitken, Steensma, Blanchard, et

14 al, do you see this?

15     A.      I do.

16     Q.      One of the co-authors of that article is

17 Kenneth Zucker, is that right?

18     A.      Yes.

19     Q.      If we go to the next page, actually a couple of

20 pages down, there's lots of citations here.  There we go.

21 Page S191, do you see a citation to Cohen-Kettenis?

22     A.      Yes.

23     Q.      Cohen, Kaijser, Bradley, and Zucker, is that

24 right?            A.      I do.  Yeah.

25     Q.      So, Zucker is a co-author of this article, is

54

1  that right?

2       A.    Yes.

3       Q.    I could go through this 14 more times, but I

4  will represent to you that there are at least 16 articles

5  of which Dr. Zucker was a co-author that were referencing

6  SOC 8?

7       A.    Yes.

8       Q.    Would you agree with me then that the SOC 8

9  cites to Dr. Zucker's work?

10       A.    I'm sorry, do I agree with which?

11       Q.    Would you agree with me then that the SOC 8

12  cites to Dr. Zucker's work?

13       A.    It cites to articles in which he was co-author,

14  yes, it does, but only 16 times as you said.

15       Q.    Do you know if Dr. McHugh has published any

16  original research with regards to the treatment of gender

17  dysphoria?

18       A.    He published essentially a chapter.  It would

19  be a chapter of a textbook in the New Atlantis article

20  back in 2016.  A subsequent article co-authored with Dr.

21  Paul Roos within the year later in the same journal.

22       Q.    The New Atlantis Journal is not a peer-reviewed

23  publication though?

24       A.    Not in the sense that all the references are

25  sent out for review as you discussed.

55

1    Q.    In fact, it's a religiously-affiliated journal?

2    A.    I'm unaware of any religious affiliation to

3  that journal.

4    Q.    But Dr. McHugh has not published any original

5  research, right?  Those are all reviews?

6    A.    It's a review of the literature, the entirety

7  of the literature at the time, and it is an extensive

8  review, more extensive than any of the other treatises

9  that I have been able to find on gender identity disorder

10  or gender dysphoria.

11    Q.    So, going back to my original question, Dr.

12  McHugh has not published any original peer-reviewed

13  research with regards to gender dysphoria?

14    A.    He has not.

15    Q.    Is that right?

16    A.    That is correct.

17    Q.    Do you know if Dr. Zucker applied to be an

18  author of SOC 8?

19    A.    I don't know if he did or not.  He has had a

20  strained relationship with WPATH in recent years.

21    Q.    Do you know if Dr. McHugh applied to be an

22  author of SOC 8?

23    A.    No, you don't apply to be an author.  The

24  authors are members of WPATH who decide on their own to

25  publish their medical guidelines.  So, it's invitation

57

1    it's Exhibit 8.

2          MR. GONZALEZ-PAGAN:  Thank you, Madam Court

3    Reporter.

4          BY MR. GONZALEZ-PAGAN:

5          Q.    Yes, just to correct the record, this is

6    Exhibit 8.  Exhibit 7 is SOC 8.  Maybe I should have

7    ordered that better.  So, let's go to page 111 of this

8    document.  Do you see here where it lists the members of

9    the standards of care revision committee?

10         A.    Yes, I do.

11         Q.    One of the members that wrote the standards of

12    care version 7 is Kenneth Zucker, is that right?

13         A.    That's correct.

14         Q.    And the standards of care version 7 recommended

15    medical treatment for gender dysphoria in the form of

16    puberty blockers, hormone therapy and surgery, is that

17    correct?

18         A.    Yes.

19                        (Plaintiff's Exhibit No. 8 was

20                        marked for identification.)

21         BY MR. GONZALEZ-PAGAN:

22         Q.    On paragraph 13 of your report -- this is again

23    Exhibit 1.  The first sentence reads the vast amount of

24    publications which exist including the DSM-5 and the

25    handbook of human sexuality published by the American

59

1   that you cite?  You reference to a vast amount.

2        A.      The remainder of the references that can

3   pertain to that are the articles on patient desistance

4   which are quoted later in the article, in the report that

5   I prepared.

6        Q.      That's the next sentence, right?

7        A.      One moment.  Let me get back to the document

8   again on my screen.  I'm sorry.  I inadvertently closed

9   my document.

10        Q.      That's the nature of the beast now in the

11   virtual world.

12        A.      We were on paragraph 13, is that correct?

13        Q.      That's correct.

14        A.      One moment.  Let me get back to that.

15        Q.      It's page 6.

16        A.      Those 11 published studies that are listed,

17   yes, that's correct.

18        Q.      The sentence reads there are over 11 published

19   studies which clearly prove that desistance occurs in

20   children who have been allowed to proceed uninterrupted

21   from natural puberty ranging 50 to 98 percent of the

22   time?

23        A.      That's correct.

24        Q.      The studies to which you refer to pertain to

25   subjects diagnosed with gender identity disorder under

60

1  the DSM-4, is that correct?

2       A.      These are actually all related to gender

3  dysphoria so-called as well as gender identity disorder.

4  Those two are essentially the same.  The purpose of

5  changing the wording was to be able to have a diagnostic

6  code that pertained to individuals who had an incongruent

7  gender identity compared to their biologic sex.  Those

8  patients are all the same.  The name just changed because

9  of the wording in DSM-5.

10      Q.      I understand that, but all of those are

11 patients that would have been diagnosed under the DSM-4

12 because the studies occurred before the DSM-5 was

13 published, is that right?

14      A.      Actually one study by Zucker and Zane is

15 published subsequent to that that changed the DSM-5.

16      Q.      That study looked at patients that were

17 diagnosed in the '80s.  It was a long follow-up study for

18 patients diagnosed in the '80s, is that correct?

19      A.      No, that was a current study that was done by

20 Dr. Zane in the more recent years.

21      Q.      It was published in 2021, is that right?

22      A.      That's correct.

23      Q.      Yes, and the Zane study actually looked at

24 patients going back to the '80s who were now adults in

25 2021?

61

1      A.      Yes.

2      Q.      So, as children, they would have been diagnosed

3   under the DSM-4?

4      A.      Yes, because that was the diagnosis code used

5   at the time.

6      Q.      All of those studies pertain to preadolescent

7   children, is that right?

8      A.      On purpose, yes, to be started as

9   preadolescents and then proceeded forward.

10      Q.      This case concerns coverage for medical and

11   surgical treatments for gender dysphoria, is that

12   correct?

13      A.      It is the same population of patients.

14      Q.      I'm sorry.  That wasn't my question.  My

15   question is what do you understand this case to be about?

16      A.      About the treatment of patients who have an

17   incongruent gender identity.

18      Q.      We're talking about medical treatments,

19   correct?

20      A.      Medical treatments.

21      Q.      You indicated that you are familiar with the

22   standards of care 7 and standards of care 8, is that

23   right?

24      A.      Yes.

25      Q.      Are you familiar also with the Endocrine

62

1    Society guidelines?

2        A.    Very familiar.

3        Q.    No medical or surgical treatment is suggested

4    or recommended for pre-pubertal youth, is that right?

5        A.    That's correct.

6        Q.    What is the desistance rate for transgender

7    adolescents?

8        A.    The desistance rate is figured on the patients

9    who lost their incongruence of gender identity by the

10   time they reached young adulthood, at the end of, the

11   complete end of adolescence.

12       Q.    But those studies were looking at preadolescent

13   children and following them forward, is that right?

14       A.    Some of them were preadolescents, and others

15   were in the midst of puberty, and the ones from Europe

16   were actually children who were in puberty, in some cases

17   two years in, and therefore they were followed and found

18   that the desistance was there as well.

19       Q.    But my question is what is the desistance rate

20   for adolescents?

21       A.    I would specifically in those reference have to

22   pull and look at the individual desistance rates

23   described in each of those articles, and I do not have

24   that information right in front of me, but I could

25   provide that for you later if you wish.

65

1    2018 to 2020.  It's hard to find that reference, but it

2    was there for a while, and then there are case reports of

3    the individuals who have de-transitioned if you will once

4    they have made that decision, and there are cases

5    increasing in number that are basically coming to the

6    surface indicating that that's what they went through and

7    that they are de-transitioning because of the desistance

8    of their gender and congruity.

9         Q.    Understood.  My question still remains the

10   same.  Are there any peer-reviewed scientific articles

11   that lay out, look specifically at the desistance rate of

12   adolescents with gender dysphoria?

13        A.    I am unaware of articles specifically with

14   adolescents, but I will be happy to look into that and

15   provide those for you.

16        Q.    Isn't one of those articles the one by

17   Christina Olson that showed a desistance rate of 2.5

18   percent?

19        A.    Dr. Olson's research has come under criticism.

20   I don't know the paper.  I would be happy to review it

21   for you if it can be provided to me to look at how she

22   determined her denominator and numerator.

23        Q.    So, you're not familiar with the Olson study?

24        A.    I have certainly heard of it, but I have not

25   critically reviewed the paper.

66

1      Q.    What is the desistance rate for adults?

2      A.    By the time they're adults I don't think

3  there's any published data.  It is thought that if they

4  persist with their gender incongruence into adulthood

5  that they tend to stay there.  However, there are

6  articles describing the difficulty of collecting data

7  because the de-transitioners basically do not come forth

8  and report themselves.  In reports we find that they are

9  not cared for by the people that transitioned them, and

10 so, there's no data collected anywhere that says one way

11 or the other, but those who are de-transitioning

12 specifically report that they did not return to the

13 places where they were treated because those places did

14 not want to treat them and refused to treat them.  The

15 numbers are not available anywhere.

16      Q.    So, this is based on what then?

17      A.    This is based ...

18      Q.    Your statements are based on what?

19      A.    They are based on reports from de-

20 transitioners.

21      Q.    Has any of this been published scientific

22 literature?

23      A.    No.

24      Q.    You stated that it's known that for most adults

25 by the time they're adults their gender incongruence

72

1    is where those are gleaned from.  Those are called

2    convenience samples.  They represent nowhere close to the

3    population, and the design of the questionnaire is not

4    adequate enough to look at any causality whatsoever.

5        Q.     I understand, Dr. Van Meter.  I have 20 more

6    pages of questions.  So, I think we need to stick to the

7    questions that's asked if you will.  My question is is

8    the safety and efficacy of a treatment in the United

9    States determined by whether a study follows every

10   patient with that condition?

11       A.     Yes is the answer.

12       Q.     So, in order for a treatment in the United

13   States to be effective, we know the outcomes for every

14   patient as part of the study that has that condition in

15   the United States?

16       A.     If they are a part of a study, absolutely yes.

17       Q.     I'm not asking if they're part of a study.  I'm

18   asking you if the entire population?

19       A.     There is no way to do that.  There is no way to

20   get that information.

21       Q.     So, that is a standard that is not possible to

22   meet for the treatment of gender dysphoria either?

23       A.     That is correct.

24       Q.     Paragraph 16 of your report, the second clause

25   of that sentence states wait-and-see has been used by

73

1    others to describe waiting until completion of puberty at

2    the age of consent since by that time the vast majority

3    of patients have desisted.  On what peer-reviewed

4    literature do you rely on for that proposition?

5        A.    The statements of the researchers and the

6    statements in documents describing what gender dysphoria

7    is and what has been used as the design of treatment.

8        Q.    So, which studies are you referring to here?

9        A.    The ones in Europe and Dr. Kenneth Zuckers'

10   particular paper itself.

11       Q.     So, you're referring to Dr. Zucker, right?

12       A.    Correct.

13       Q.    By use via the Center for Addiction and Mental

14   Health, is that right?

15       A.    That's correct.

16       Q.    And you're referring to the European studies.

17   Are you referring to the Dutch studies?

18       A.    Dutch among others, but most of it is from the

19   Dutch protocol study.

20       Q.    Is your statement that no medical treatment is

21   provided in those contexts until after the completion of

22   puberty?

23       A.    Those patients were counseled, and if they did

24   not meet the criteria for the medical treatment, they

25   counted those patients in some of those studies all the

74

1   way, and that's where they said their desistance rates

2   were; and that's what the range was between I think the

3   lowest was 50, and the highest in the Dutch protocol or

4   the Dutch studies was up in the 90 percent range.

5        Q.      In the Dutch protocols they would provide

6   puberty blockers beginning at age 12, isn't that right?

7        A.      They would if it was appropriate.  If they did

8   not, they left those patients out of the medical

9   treatment.  It turns out that -- I won't muddy the waters

10  with that, but yes, they did not empirically treat every

11  patient that came in to be studied.

12       Q.      But they would provide medical care beginning

13  at age 12?

14       A.      As young as age 12 they provided puberty

15  blockers to those who met the criteria of being, you

16  know, completely mentally stable, no undercurrent issues,

17  no coerced parental consent, very specific kinds of

18  criteria that they used.

19       Q.      Dr. Kenneth Zucker at the Center for Addiction

20  and Mental Health under that center's protocols they

21  would provide medical treatment to some adolescents, is

22  that right?

23       A.      No, they did not.

24       Q.      You say that the wait-and-see model has been

25  used by others to describe waiting until completion of

75

1    puberty.  What about after puberty is completed?  What

2    about when somebody is an adult?  Should they not have

3    access to medical care?

4        A.    I stick specifically to the subject of

5    adolescents below the age of consent.  I cannot speak of

6    the appropriateness of medical treatment thereafter.  I

7    have an opinion, but I'm not going to --  I don't cite

8    literature on the subject and don't pretend to be an

9    expert in treating adults.

10       Q.    So, as we stand here today, your opinions are

11   limited to those under 18?

12       A.    Correct.

13       Q.    On the next paragraph going on to the next

14   page, so paragraph 17, the last sentence states her

15   theory that social affirmation in pre-pubertal patients

16   does not lead to medical and surgical interventions

17   during puberty is false.  Did I read that correctly?

18       A.    Yes, you did.

19       Q.    For that proposition you cite to the Endocrine

20   Society guidelines for the endocrine treatment of gender

21   dysphoric and gender incongruent persons.  I'm happy to

22   go to the references to show you?

23       A.    That's correct.

24       Q.    How does the Endocrine Society guidelines

25   support your statement that that is false?

77

1      A.      I do, yeah. yes.

2      Q.      And 31 is Van Meter QL, personal patient

3  interview, is that right?

4      A.      That's correct.

5      Q.      So, your statement there that the pause in US

6  transgender clinic is often for as little as a month is

7  based on a single patient interview?

8      A.      Actually there are two patient interviews from

9  a local clinic here, patients that came to me locally.

10     Q.      So, it is based on two patients' interviews?

11     A.      Yes, two of my 20.

12     Q.      So, based on two patient interviews you then

13  are making a generalized statement about all US trans

14  clinics?

15     A.      I am making a statement of my own personal

16  experience.  I have had antidotal reports from others who

17  have had patients leave both from parents, and I've come

18  to know parents of desisting children who have stated

19  that they were given puberty blockers within a month in

20  the case of Planned Parenthood, the drugs are often

21  given, given antidotally at the first visit.  So, there

22  is no screening of mental health that can be adequately

23  done and resolve deep-seated issues, and patients are

24  treated as soon as a month.  Historically, again

25  antidotally from reports of individuals who have de-

78

1   transitioned, they were offered drugs at three months

2   into their evaluation.

3        Q.     And you cite to no literature then for this

4   proposition?

5        A.     No, there is no study.  Nothing has been

6   published because the data is not able to be found.  It

7   is kept within those transgender clinics.

8        Q.     Go ahead.

9        A.     It's not published data over the vast number of

10  60 plus transgender clinics, and there's no data

11  published at all by Planned Parenthood in terms of the

12  timing of first visit and initiation of any medical

13  treatments.  No one is allowing us to see the data from

14  all of the centers.

15       Q.     Is that normal that all the data of all of the

16  centers ...

17       A.     Yes, that would be ...

18       Q.     Released?

19       A.     When they are doing an ongoing clinical

20  experiment, that data exists and should -- we should have

21  access to it.  It's not published.  We should be able to

22  obtain it, but we cannot get that data.

23       Q.     But my question wasn't we should.  My question

24  is is that normal.  Is it normal for academic health

25  clinics particularly, for example, DSD clinics to release

84

1   discussed, and I have had no luck in that.  I would have

2   been happy to publish my article in pediatrics.  I sent

3   an article to JAMA to be considered and published, and

4   also a letter to the editor of JAMA, and they were

5   refused publication.  So, it's a very stilted kind of

6   acceptance if you will.  My colleagues have had the same

7   thing happen to them.  So, it's very difficult to get

8   things published.  You work critically.  You use the

9   avenues you do have, and that's why two of the things

10  that prior to the author of went in as letters to the

11  editor because that's a way you can get through the bias

12  if you will against what you're trying to publish.  So,

13  publication of things on the concerns about social,

14  medical and surgical affirmation are very often rejected

15  for publication.

16      Q.     Going back to my question though, there's a

17  difference between publishing a piece as a review or an

18  opinion or a case report.  Case reports are very specific

19  types of publications, is that right?

20      A.     That's correct.

21      Q.     So, my question was why didn't you publish case

22  reports about your two patients that you referred to

23  here?

24      A.     Because I have a medical practice.  I am

25  involved in advocacy for these kids.  I have not taken

85

1    the time specifically to do that, and I very frankly have

2    been discouraged from sending things in as case reports

3    or editorials or letters to the editor because of a

4    refusal to publish them.

5        Q.    Have you attempted to publish a case report?

6        A.    I have not sent a letter or a case report in.

7    It's just I am discouraged from putting the effort into

8    doing this when I realize the likely outcome is it will

9    be rejected.

10       Q.    (Inaudible.)

11       A.    That question broke up.  I'm sorry?

12       Q.    (Inaudible) publishing these case reports?

13       A.    Again, the first half of your sentence I could

14   not hear.

15       Q.    Has anybody, any person, actively discouraged

16   you from publishing case reports or articles or letters?

17       A.    No, no one discouraged me actively.

18       Q.    For these two patients what were the ages of

19   the patients?

20       A.    One was 11, and the other was -- these are both

21   females.  The other patient was 11 or 12.

22       Q.    How do these patients identify now?

23       A.    I'm sorry, again, the distortion of your voice

24   unfortunately.

25       Q.    How do these patients identify now?

91

1      Q.      In Sweden within the Karolinska Institute there

2  will be the provision of that care within that specific

3  protocol?

4      A.      Only in that specific protocol which has not

5  yet been developed.

6      Q.      But it's not stopping the care completely?

7      A.      No, it is recommending that it cannot be

8  applied to the general population until the clinical

9  study is complete.  To do a clinical study on this would

10  require that you have a control arm, and this is their

11  intention as well.

12      Q.      I apologize.  I know that we're going to try

13  not to interrupt each other.

14      A.      It will be a very small number of patients in a

15  controlled trial, not to be done outside of that trial.

16      Q.      In Sweden there are six different hospitals

17  that provide care, and the hospital to which the

18  statement that you cite pertains only to one, is that

19  right?

20      A.      I do not know those facts.

21      Q.      In Finland they will still continue providing

22  this care in some circumstances, is that right?

23      A.      They did not forbid that care.

24      Q.      In the United Kingdom they continue to provide

25  this care in some circumstances, is that right?

92

1     A.     I think the most recent directive -- and I

2  don't have a reference for that -- said no, they will not

3  do that at all, that there will be no such care.

4     Q.     I believe the review is still ongoing, isn't

5  that true?

6     A.     The review is ongoing?

7     Q.     They have moved from the Tavistock centralized

8  system of the GIDS to a regionalized model, is that

9  right?

10     A.     That was one of the suggestions in order to be

11  able to get the waiting times cut down because the

12  waiting time for the centralized system was well beyond

13  usefulness, and they wanted to get the access to the

14  counseling, appropriate counseling, to happen in local

15  areas and have those physicians recognizing that that

16  needed to be provided.

17     Q.     So, then you would agree then that it is true

18  that not all of these countries that you've cited have

19  stopped providing this care completely?

20     A.     That would be a correct statement.

21     Q.     Let's turn to paragraph 22.  The second and

22  third sentences of the paragraph read as follows:   This

23  describes using survey data obtained by advertising

24  through advocacy sites such as the Trevor Project or the

25  US transgender survey to anyone with an interest in the

95

1    Q.    But it included people who had the transition?

2    A.    I cannot speak to that specifically.

3    Q.    You refer to people who died as a result of

4    their efforts to transition.  On what sources do you rely

5    on for that statement?

6    A.    Someone who's dead can't respond to -- it's

7    just logic.  A dead person can't respond to a survey.

8    Q.    But are you aware of anybody who has died

9    because of the prevention of medical treatment for gender

10   dysphoria?

11   A.    Surgical in particular, I know of specific

12   cases who had taken their lives.

13   Q.    Taken their lives is different from dying as a

14   result of the care, isn't that right?

15   A.    I would say if the patient went through with

16   care and took their lives, that that's a failure of --

17   that's related to the care.

18   Q.    I understand that you would say or you would

19   find that that may be ineffective, but my question is

20   they didn't die because of the care?

21   A.    I can't speak to that.

22   Q.    Later on you state these databases show

23   potential correlation at best but prove no direct

24   causation.  Did I read that correctly?

25   A.    Yes.

1  proposition that any independent review board would have

2  halted the study?

3       A.     By the design of the independent review boards.

4  Every single study that I have participated in that is

5  with an independent review board.  The independent review

6  board is specifically to be independent of any

7  relationship with the organization or university which it

8  is attached to, and there is a safety committee, and

9  there are stopping criteria.  So, if there is a death of

10  a patient, the study is halted and externally reviewed to

11  see whether or not the death is related to the procedure

12  that is being studied, and that's how IRBs and safety

13  committees are done.  In ethical research those are the

14  protections of patients who are in clinical studies.

15       Q.     I understand that.  It still doesn't answer my

16  question is there any particular parameter, publication,

17  standards for independent review boards that you cite

18  that say that?

19       A.     That's the design.  Every IRB I've ever worked

20  with has those criteria established.  That's the purpose

21  of them.

22       Q.     So, what your statement then that any

23  independent review board would have halted the study is

24  really speculation.  It may be informative speculation,

25  but it is speculation?

1       A.      I cannot account for all the IRBs.  You are

2   correct.

3       Q.      In that paragraph the next sentence you state

4   it is flawed because regret and de-transition is known to

5   occur much later than two years after interventions

6   begin?

7       A.      That's correct.

8       Q.      You say that regret and de-transition are known

9   to occur much later than two years.  When are regret and

10  de-transition known to occur?

11      A.      After ten years of continuous medical and/or

12  surgical treatment.

13      Q.      What literature do you cite for that

14  proposition?

15      A.      That is from the DeHayne article.

16      Q.      I thought you told me that you didn't recall

17  that the DeHayne article spoke about regret or de-

18  transition?

19      A.      In terms of statistical numbers it did not

20  categorize those as I recall, but it mentions that regret

21  occurs after ten years.  It does not give a percentile.

22      Q.      And you didn't cite the DeHayne article in this

23  paragraph, right?

24      A.      I do not believe I relatively put a reference

25  in at that point to the DeHayne article, no, I did not.

Page 103

1    Q.    Let's turn to paragraph 28 of your report.  The
2  second sentence says in my experience patients were
3  convinced they had gender dysphoria because of the online
4  influence to which they were exposed.  To what extent do
5  you refer to?
6    A.    To what extent do I refer to?
7    Q.    To what experience do you refer to?
8    A.    The patients that have been my transgender
9  patients.  Every one of them, the first thing I do in an
10  interview is to find out where they got information, what
11  were their sources, and that is published in articles I
12  did not cite that the websites are where patients learn
13  about information.  They go to their phones and social
14  media and talk to each other.  They admit that freely.
15  They go to see pictures.  These are not things that are
16  daily references in their lives.  Newspapers and library
17  reference books are not where kids go generally for
18  information.  The most information they get is from
19  online sources.  So, to say that that is not true is to
20  just not deal with reality.
21    Q.    Of course, they couldn't look at books if they
22  get removed from the school libraries, right?
23    A.    They can't look at books that do the
24  instructions of where to go, what hormones can be used.
25  I mean the school library may have an article or a book

Page 104

1    talking about the concept of transgender and the support

2    and the benefits.  Those are available in some school

3    libraries.

4        Q.    If they are removed, they have to go online

5    then to try to find that information, right?

6        A.    Most teenagers live online.  So, I think they

7    use those influences certainly to find out something

8    deeper than a book that has cartooned pictures.  They

9    want to see results, and they want -- so, they are

10   definitely influenced by the online presence of

11   information.

12       Q.    To what literature do you cite?  You mentioned

13   that there were some articles that you did not cite.  So,

14   what literature is that?

15       A.    I will be able to provide those to you.  I

16   can't quote them from memory.

17       Q.    But you did not include them in your report

18   then?

19       A.    I did not include them in my report.

20       Q.    These articles to which you referred to, are

21   they be peer-reviewed scientific studies?

22       A.    I cannot specifically cite the article.  So I

23   can't tell you those which were any kind of -- they're

24   published, and I don't know about the peer review.

25       Q.    You later state in that same paragraph social

Page 105

1   media now presents them with a one-size-fits-all solution
2   which offers acceptance and celebrity instantly.  What
3   peer-reviewed literature do you cite for this
4   proposition?
5       A.     There's no literature cited because it is a
6   common theme in all the patients that I see, and when we
7   discuss these among other people who are in the field of
8   gender medicine, they mention it frequently.  So, it's
9   sort of a known background without having to look in peer
10  review to, -- you know, the color green is green.  You
11  don't need a peer-reviewed journal to tell you that.
12  When you hear over and over again the circumstances of
13  the patients, their stories, it is routinely a reason.
14  They want to be accepted, and that gives them acceptance.
15      Q.     Just to clarify here, when you're saying about
16  your patients, you mean the 20 patients you have seen in
17  the last 30 years, right?
18      A.     That's correct.
19      Q.     So, you're making your observations here based
20  on your knowledge from 20 people?
21      A.     And the stories of other people in the field.
22  It is not an uncommon thing to discuss the reason
23  particularly amongst the mental health providers.  They
24  share that information from their own clinical
25  experience.

1   Q.   And, you know, you mentioned acceptance, but
2   you also say celebrity instant.  What do you mean by
3   that?
4   A.   They become to be transgendered is a very shiny
5   object to the patient.  If they have not been accepted
6   but they feel they will be much more accepted and special
7   amongst their peers, then that is the celebrity they're
8   looking for.  They're looking for acceptance for
9   something that makes them happy and different than they
10  are so they can be someone else.  So, that is the
11  celebrity effect among the patients.  They suddenly have
12  friends they never had before.  They were invited to
13  places they had not been invited to before because the
14  concept of being inclusive, being all-inclusive.  Instead
15  of being an outrider that had very few friends, they
16  suddenly find there are bunches of people online that
17  state that they are wonderful, that they are happy, that
18  they've chosen the right thing, and they didn't have that
19  beforehand.  So, that's what I mean by celebrity.
20  Q.   So, Dr. Van Meter, I'm honestly a little bit
21  confused by what you mean by this because I guess it's
22  your statement saying that some people choose to be
23  transgender because it's going to make them popular?
24  A.   It makes them accepted.  Yes, I am saying that.
25  Q.   Do you know the rates of bullying and

1    1        A.     Because it's easy.  Nothing is ever easy.  No,

2    2    I do not want to suggest such.

3    3        Q.     You conclude the paragraph with this statement:

4    4    Before the advent of social media transgender teens tend

5    5    to parental support and counseling which resolved the

6    6    gender identity confusion 60 to 98 percent of the time.

7    7    Did I read that correctly?

8    8        A.     You did.

9    9        Q.     I imagine that you're referring to the 11

10   10   studies that we were talking about earlier, is that

11   11   right?

12   12       A.     Some of the references in there, yes, Kenneth

13   13   Zucker specifically.

14   14       Q.     And we established that none of the studies

15   15   were looking specifically at desistance in adolescence,

16   16   correct?

17   17       A.     Not specifically in adolescence, no.

18   18       Q.     And in particular you cite here to an article

19   19   by Kenneth Zucker titled the developmental

20   20   biopsychosocial model for the treatment of children with

21   21   gender identity disorder, is that right?

22   22       A.     That's correct.

23   23       Q.     I'm going to show you what's been marked as

24   24   Exhibit 9.

25   25            MR. GONZALEZ-PAGAN:  Madam Court Reporter, I

Page 113

1    1        Q.       Have you seen this document before?

2    2        A.       I have not.

3    3        Q.       I will represent to you that it is a statement

4    4    by the American Psychiatric Association dated May 23,

5    5    2008, on the appointment of Kenneth Zucker as the chair

6    6    of the DSM-5 sexual and gender identity disorders

7    7    workgroup?

8    8        A.       Yes.

9    9        Q.       The fifth paragraph, do you see my cursor?

10   10       A.       I do.

11   11                       (Plaintiff's Exhibit No. 10 was

12   12                        marked for identification.)

13   13   BY MR. GONZALEZ-PAGAN:

14   14       Q.       Let me just zoom that in a little.  The fifth

15   15   paragraph states for adolescent patients including those

16   16   who first came to the clinic as young children Dr. Zucker

17   17   follows the standards of care guidelines of the World

18   18   Professional Association for Transgender Health.  The

19   19   treatment options include helping patients make a

20   20   satisfactory transition to the opposite sex, including

21   21   the institution of hormonal treatment to facilitate

22   22   transition.  In some cases treatment may include helping

23   23   an interested adolescent obtain sex reassignment surgery.

24   24   Did I read that correctly?

25   25       A.       You did.

1  DSM-4 was proposed and voted in and up to 2013.  The

2  landscape changed dramatically in terms of incidents and

3  subsequent clinical studies.  So, this is a clarification

4  of those concepts, and I would like to do an AV

5  comparison, so one by one I could say that they are

6  completely different.

7       Q.    At the bottom of the table it says it should be

8  noted that for adolescents and adults the criteria DSM-4

9  TR were written in a relatively vague manner and were not

10 in fully polythetic format.  Did I read that correctly?

11      A.    Yes, you did.

12      Q.    Let's go to the bottom of page 904 going into

13 page 905.  Do you see my cursor, that last paragraph on

14 page 904?

15      A.    I do.

16      Q.    It states it was therefore argued that in DSM-5

17 the currently proposed A1 criterion be a necessary

18 symptom in making the GD diagnosis.  We contend that the

19 presence of this symptom will, if anything, make the

20 diagnosis more restrictive and conservative.  Given the

21 critiques leveled at the DSM-4 criteria it was deemed

22 that reduction of false positives is preferable to false

23 negatives.  Did I read that correctly?

24      A.    You did.

25      Q.    So, you would agree that the changes from the

Page 118

1   1   DSM-4 to the DSM-5 were just not changing the name?

2   2        A.     Having seen those tables, yes, I would agree.

3   3        Q.     Let's go to paragraph 33 of your report.  The

4   4   second sentence starting on page 14 going into page 15 it

5   5   states the overwhelming increase in the number of

6   6   patients presenting to Tavistock is what caused the NHS

7   7   to take a deeper look at what caused the rise, and

8   8   lessening social stigma was clearly shown not to be the

9   9   cause, and then you cite to number 50 in your references,

10  10  is that right?

11  11       A.     I'm sorry.  I am trying to scroll down and get

12  12  where you are.  We're on what page?

13  13       Q.     Of course, yes.  I apologize.  Page 14 going

14  14  into 15.  It's the sentence that starts -- do you see

15  15  that sentence?

16  16       A.     I am looking for it and don't see it in the

17  17  paragraph.  Is this paragraph 31?

18  18       Q.     33, 33.

19  19       A.     33, I'm sorry.  My page numbers are different.

20  20  The overwhelming increase in the number of patients

21  21  presenting to Tavistock, yes.

22  22       Q.     You see that the citation is to number 50 in

23  23  your reference?

24  24       A.     Yes.

25  25       Q.     That's a newspaper article, is that right?

1   cancer is going to die because there is no other option.

2   When there is another option, putting together an arm

3   that includes sterility and sexual dysfunction would not

4   be considered ethical, and therefore when I say no IRB,

5   no functioning IRB that is ethically respected would do

6   such a study.

7        Q.   So, even though you call for the need for

8   random control trials in this context, you think that no

9   respectable IRB  should approve it?

10        A.   Would be likely to approve it.  You know, IRB

11   makes that decision.  I know from my experience in IRBs

12   and the courses that we are assigned to take in order to

13   do clinical research, general clinical criteria for

14   research, GPCs, it states that, you know, you've got to

15   have an IRB to be sure that ethical and safe studies are

16   designed and monitored.  I don't know what they're going

17   to do in Sweden where they say that the only way patients

18   can get treatment is within a protocol.  I don't know

19   what their standards are, but it would be difficult to

20   use an arm in a study that unquestionably takes

21   functioning organs, fully functioning body organs, and

22   removes them and causes sterility by that means and

23   others.  These are not diseased organs to begin with.

24   This is not a physical condition.  I'm sorry.

25        Q.   It is a real condition.  Gender dysphoria is a

1    real condition?

2         A.      It is a real condition.

3         Q.      The study that you cite with regards to

4    effective treatment is the one by Kenneth Zucker

5    published in 2012 having to do with children?

6         A.      Children and adolescents actually so stated.

7         Q.      But that study, that's the same study that said

8    that the treatment paradigm for adolescents was

9    different?

10        A.      I'm sorry, I didn't understand your question.

11        Q.      That study said that the treatment paradigm for

12   adolescents was different than for children?

13        A.      Yes.

14        Q.      In paragraph 38 of your report you conclude the

15   paragraph by stating in reference to the studies cited by

16   Dr. Olson-Kennedy no reputable editor would accept such

17   studies for publication in peer-reviewed journals.  Did I

18   read that correctly?

19        A.      No, heretofore no reputable editor.

20        Q.      But these are peer-reviewed studies that were

21   published in scientific journals?

22        A.      Yes, they were.

23        Q.      So, is it your opinion then that the editors of

24   the Journal of the American Medical Association are just

25   not reputable?

1       A.      They are approving things that heretofore would

2   not have necessarily been reported.

3       Q.      Is that true also for the editors in the

4   Journal of Pediatrics?

5       A.      Yes.

6       Q.      Is that true then for the editors in the

7   International Journal of Pediatric Endocrinology?

8       A.      Yes.

9       Q.      Is that true then for the editors in the

10  Journal of Adolescent Health?

11      A.      Yes.

12      Q.      What about the Journal of Sexual Medicine, the

13  same?

14      A.      Again, I would say that I don't know.  I have

15  seen one article from that journal, and the one article

16  is well referenced front to back.  It is not a mainstream

17  journal per se.

18      Q.      But your opinion is that heretofore there's

19  just no reputable editors in any of the journals?

20      A.      No.

21      Q.      And these studies actually went through two

22  peer reviews, is that right?

23      A.      This study being which?

24      Q.      Well, the studies referenced by Dr. Kennedy,

25  Turbine, et al, 2020, Tourduf, et al., 2022, Aquila, et

1  al., 2020, Standard Mason, et al. 2020, Devry, et al.,

2  2011, Devry, et al., 2014, all of these were studies that

3  went through peer review, is that right?

4       A.   The fact that they're published in those

5  journals would suggest they did.

6       Q.   Let me ask you something.  In your report you

7  make distinction, and I think you did earlier when

8  speaking about the standards of care published by

9  Dolopathy which you call them they're not true standards

10  of care but guidelines, you made that distinction between

11  standards of care and clinical guidelines, is that right?

12       A.   Yes, I did.

13       Q.   We talked earlier that you were deposed in 2019

14  in the Grimm case, is that right?

15       A.   Yes.

16       Q.   In that deposition you testified that one would

17  most likely find accepted standards of care in published

18  textbooks, is that right?

19       A.   That's where they are referenced and archived

20  if you will, yes.

21       Q.   I'm going to show you what's been marked as

22  Exhibit 13.  Can you see the screen?

23       A.   I do.

24       Q.   This is the cover page of Lewis's Child and

25  Adolescent Psychiatry, a comprehensive textbook, 5th

Page 125

1    edition, published in 2018.  Is this the type of textbook

2    to which you refer?

3         A.    That's a textbook that has been published, and

4    I referred to.  I don't know if I've done it this

5    particular deposition, excuse me, but there's the prior

6    edition and this edition.  I am familiar with the

7    contents, not specifics, but I have read both of them.

8                   (Plaintiff's Exhibit No. 13 was

9                   marked for identification.)

10   BY MR. GONZALEZ-PAGAN:

11        Q.    Okay, let's go to the next page.  Obviously,

12   this is an excerpt, not the entire textbook.  Textbooks

13   are pretty big.  The next page which starts on page 632

14   there's a chapter titled chapter 5.14 gender dysphoria

15   and gender incongruence.  Do you see that?

16        A.    I do.

17        Q.    One of the co-authors of this chapter in this

18   medical textbook is Kenneth Zucker, is that right?

19        A.    That is correct.

20        Q.    Let's go to page 640 of the document.  Do you

21   see the heading for treatment of adolescents?

22        A.    Yes.

23        Q.    Let me zoom a little bit more just to make it

24   bigger.  Under that heading the first sentence reads

25   once children have reached puberty when gender identity

1   1    persists in the vast majority of cases and medical

2   2    intervention is often considered.    Did I read that

3   3    correctly?

4   4         A.    You did.

5   5         Q.    Let's go to the next page.   There's a heading

6   6    that reads summary.   Do you see that?

7   7         A.    I do.

8   8         Q.    The last sentence it states for those children

9   9    who continue to have strong cross-sex identification in

10  10   adolescence pubertal blockade and cross-sex hormone

11  11   therapy to align patients' bodies with their identities

12  12   have been shown to improve mental health outcomes.   Did I

13  13   read that correctly?

14  14        A.    You did.

15  15        MR. GONZALEZ-PAGAN:   I think this may be a

16  16   natural stopping point.   Let's just take a five-

17  17   minute break.   Can we go off the record?

18  18        COURT REPORTER:   All right, we are off the

19  19   record at 2:23 pm.

20  20        (Off the record for a short break.)

21  21        (Back on the record.)

22  22        COURT REPORTER:   All right, we are back on the

23  23   record at 2:30.

24  24        BY MR. GONZALEZ-PAGAN:

25  25        Q.    Dr. Van Meter, have you spoken to anybody on

1    Exhibit 14.  Do you see my screen?

2         A.    Yes.

3         Q.    This is a document titled psychotherapy for

4    unwanted homosexual attraction among youth, American

5    College of Pediatricians, January, 2016.  Do you

6    recognize this document?

7         A.    I do.

8                         (Plaintiff's Exhibit No. 14 was

9                         marked for identification.)

10   BY MR. GONZALEZ-PAGAN:

11        Q.    This is one of the position statements of the

12   American College of Pediatricians, is that right?

13        A.    It is an article.  It's not a particular

14   position statement.  It basically is a review of the

15   literature and a presentation on the subject of mental

16   health services provided to patients with unwanted

17   homosexual attraction.

18        Q.    Page 10, do you see that there?

19        A.    Yes.

20        Q.    The second to last paragraph, let me ask you

21   this.  Do you stand by the statements contained within

22   this document published by the American College of

23   Pediatricians?

24        A.    My personal position is that therapy for

25   individuals who have unwanted same-sex attraction should

Page 130

1   1   psychotherapy because even though it hasn't been shown to

2   2   be fully effective 100 percent of the time, it shouldn't

3   3   be banned?

4   4        A.      It should not be banned.

5   5        Q.      The first sentence of the second to last

6   6   paragraph, do you see my cursor?

7   7        A.      Yeah.

8   8        Q.      It reads no therapy, whether medical,

9   9   psychological or surgical is 100 percent effective.  All

10  10  treatments have some degree of failure.  In addition, all

11  11  therapies carry a degree of risk for unwanted side

12  12  effects.  Did I read that correctly?

13  13        A.      You did.

14  14        Q.      And you agree with that statement?

15  15        A.      Yes.

16  16        Q.      I'm going to show you what's been marked as

17  17  Exhibit 15.  Do you see my screen?

18  18        A.      I can.

19  19        Q.      Is that another publication of the American

20  20  College of Pediatricians, is that right?

21  21        A.      Correct.

22  22                    (Plaintiff's Exhibit No. 15 was

23  23                    marked for identification.)

24  24  BY MR. GONZALEZ-PAGAN:

25  25        Q.      It is titled homosexual parenting, a scientific

1   analysis, and it was published in May, 2019, is that

2   right?

3        A.      That's correct.

4        Q.      Do you stand by this document?

5        A.      I agree with the majority of what's said in the

6   article.

7        Q.      Do you agree that studies appear to indicate

8   ...

9        A.      I see the sentence.

10       Q.      Do you agree that research has demonstrated

11   considerable risks to children exposed to the homosexual

12   lifestyle?

13       A.      Yes, I agree with that as an issue.  The extent

14   to which can vary significantly, but the environment in

15   which the children live having the same-sex parenting

16   specifically is what the study showed that there is a

17   risk to the children, not the risk to being exposed to a

18   homosexual lifestyle and the individual and their

19   environment, but specifically to the parenting and

20   chronic residence in a household with same-sex parents.

21       Q.      Thank you.  I'm going to be asking you some

22   questions now.  We're going to completely (inaudible) the

23   report now and talk a little bit about your role in the

24   GAPMS process and your drafting of Attachment E which

25   you've referenced a couple of times in today's

1    1    ADF members as long ago perhaps as six or seven years

2    2    ago.  I have helped in providing input for patients and

3    3    have been asked by them to be an expert witness in cases

4    4    of child custody.

5    5         MR. GONZALEZ-PAGAN:  Let's take if it's all

6    6    right, and I do believe that with the next set of

7    7    questions we should be over.  So, I truly hope that

8    8    we can be out of here probably by 4:30-ish.  Let's

9    9    take a five-minute break and go off the record.

10   10        DR. VAN METER:  That's fine with me.

11   11        COURT REPORTER:  We are off the record at 3:44

12   12   pm.

13   13        (Off the record for a short break.)

14   14        (Back on the record.)

15   15        COURT REPORTER:  We are back on the record at

16   16   3:51 pm.

17   17        BY MR. GONZALEZ-PAGAN:

18   18        Q.    Mr. Van Meter, I'm going to show you what's

19   19   been marked as Exhibit 28.  Well before I do that, we

20   20   left off with you letting me know your communications

21   21   with the Alliance Defending Freedom, is that right?

22   22        A.    Yes.

23   23        Q.    You said that they go back maybe five, six

24   24   years or so?

25   25        A.    Yes.

1    Q.    In 2017 the Alliance Defending Freedom hosted a

2  meeting in Arizona regarding transgender issues.  Were

3  you present at this meeting?

4    A.    I was present at one of their meetings.  I

5  think there was a meeting the year before, that the 2017

6  would have been the second or the first.  I did go to a

7  meeting.  That was the subject, but I believe it was the

8  second such meeting that they had had.

9    Q.    Andre Van Mol was present at that meeting as

10  well, correct?

11    A.    He was.

12    Q.    Paul Hruz was present at that meeting as well,

13  correct?

14    A.    He was.

15    Q.    So was Patrick Lappert?

16    A.    Yes, he was.  That's when he reminded me I knew

17  him from the Navy days.

18    Q.    Patrick Lappert actually has testified that one

19  of the topics discussed at that meeting was the need for

20  expert witnesses to support ADF's litigation efforts.

21  Was that a topic that was discussed?

22    A.    I'm sure it was.  I can't state exactly, but I

23  would have come away with the feeling that they wanted to

24  get to know who we were and get to know about us.

25    Q.    You have not provided expert testimony.  We

1    went through your expert testimony before.  You did not

2    provide any expert testimony regarding transgender issues

3    until 2017, is that right?

4         A.    Let me think back.  I think that's correct.

5         Q.    I'm going to show you now what's been marked as

6    Exhibit 28.  Do you see this email?

7         A.    I do.

8         Q.    It is subject line Medicaid coverage for gender

9    affirming care, privileged and confidential.  Then it has

10   a Bates stamp of Grossman0054, is that right?

11        A.    That's correct.

12        Q.    The first email is dated July 9, 2022.  This is

13   after the hearing, is that right?

14        A.    Yes, it would have been after the hearing.

15        Q.    The last couple of sentences from this email

16   from Miriam Grossman -- well actually before I get to

17   that, you're a recipient of this email, is that right?

18        A.    I'm sorry.  I was what?

19        Q.    You're one of the recipients of this email, is

20   that correct?

21        A.    Yes.

22                        (Plaintiff's Exhibit No. 28 was

23                         marked for identification.)

24   BY MR. GONZALEZ-PAGAN:

25        Q.    In the last few sentences Miriam Grossman

Page 180

1    Van Meter.  It also includes Michelle Cretella.  It also

2    includes Gary McCaleb.  McCaleb is an attorney at ADF, is

3    that right?

4         A.    Yes, he is.

5         Q.    It also includes Michael Laidlaw.  It also

6    includes Paul Hruz.  It also includes Paul McHugh.  It

7    also includes Patrick Lappert and Roger Brooks from the

8    Alliance Defending Freedom, and Matt Sharp from the

9    Alliance Defending Freedom.  Is that right?

10        A.    Yes, it does among others.

11                      (Plaintiff's Exhibit No. 29 was

12                      marked for identification.)

13   BY MR. GONZALEZ-PAGAN:

14        Q.    You received this email?

15        A.    I'm sorry.  Did you ask a question?

16        Q.    You received this email?

17        A.    Yes, I did.

18        Q.    And the subject has to do with the Idaho Vital

19   Statistics Integrity Act, is that right?

20        A.    It does.

21        Q.    And essentially this is an email that was sent

22   after the act was signed into law by the governor, right?

23        A.    I'm reading that there, yes.

24        Q.    So, there's an email chain with you, Dr. Hruz,

25   Dr. McHugh, Dr. Lappert, Dr. Lehmann, Dr. Cretella, all

Page 181

1   of them involved, right, in this advocacy effort, and

2   once they signed the law, you replied on March 30 God is

3   with us, is that right?

4        A.   That's correct.

5        Q.   What did you mean by that?

6        A.   That our faith, in our religious lives we have

7   guidance and moral circumstances that are part of a

8   faith-based individual and that I felt that things went

9   our way.  So, it's a way of stating that based on our

10  faith beliefs that that was the right thing that

11  happened, and, you know, we were looked after, and our

12  prayers were answered if you will.

13       Q.   Is it fair to say that part of your advocacy is

14  motivated in part by your religious beliefs?

15       A.   My whole life is motivated by my religious

16  faith.  My medical practice, my interaction with human

17  beings, it is impossible to separate a concept of a moral

18  compass and a greater power for me to essentially thrive

19  in the image of what I believe is correct on the basis of

20  ethics and morality.

21       Q.   Thank you.  I'm going to show you the next

22  exhibit.  That is Exhibit 30.  This is another email

23  chain, and it's seven pages, the whole chain, but you are

24  among the recipients of part of the chain.  This is dated

25  March 19, 2020.  It has to do with the Idaho Vital

1   Statistics Integrity Act as well, and again among the

2   recipients are yourself, Gary McCaleb, Matt Sharp.

3   Here's your email here.  Paul McHugh, Patrick Lappert,

4   Michael Laidlaw, Paul Hruz and all of you.  So, this is

5   advocacy at the state legislative level about bills

6   affecting the ability to change the sex designation on

7   birth certificates as well as a bill called VCAP.  What

8   is VCAP?

9          A.    It's protecting children, the VCAP acronym.

10  For the moment I'm having trouble remembering it, but

11  essentially it's advocating for protecting children from

12  the harm of social, medical and surgical interventions to

13  affirm an incongruent gender.

14                      (Plaintiff's Exhibit No. 30 was

15                       marked for identification.)

16  BY MR. GONZALEZ-PAGAN:

17         Q.    And so, deeper efforts that have been

18  introduced in various states, is that right?

19         A.    That's correct.

20         Q.    And you have been involved with the advocacy

21  surrounding the bills in various states?

22         A.    Yes.

23         Q.    Does that include with that list that you

24  testified in Alabama at least?  Is that right?

25         A.    That's correct.

1   1   the Eagle Forum, do you know her to be affiliated with

2   2   the Eagle Forum?

3   3        A.    Yes, I believe I actually have her card in a

4   4   pile in my little card catalog if you will.

5   5        Q.    Margaret Clark says that Fred Deutsch -- this

6   6   is the representative in South Dakota.  She says of him

7   7   your courage to confront this growing abomination.  What

8   8   do you understand the growing abomination to be?

9   9        A.    I would be putting words in her mouth to know.

10  10  Clearly it's about the rise in transgender affirmation

11  11  efforts.

12  12        Q.    Do you consider gender affirmation efforts to

13  13  be a growing abomination?

14  14        A.    I am concerned that they are harmful.  I don't

15  15  know that I would choose the word abomination.  I would

16  16  say it is medical abuse.  That is as strong as I would

17  17  put it because of what it does to the human body and how

18  18  it medicalizes a mental health issue and causes morbidity

19  19  for the lifetime of the patient that in many cases cannot

20  20  be undone with medical cross-sex hormones.

21  21        Q.    Let's turn to the next exhibit, Exhibit 31.

22  22  This is another email.  It's a chain.  It's two pages.

23  23  It's a single email actually.  It is dated October 30,

24  24  2019, and it is sent by Vernadette Broyles who is the

25  25  president and general counsel of the Child and Parental

1    Rights Campaign in Georgia.  Do you recognize that?

2         A.    I do.  I recognize who she is, yes.

3         Q.    And you are among the recipients of this email,

4    is that correct?

5         A.    That's correct.

6                    (Plaintiff's Exhibit No. 31 was

7                    marked for identification.)

8    BY MR. GONZALEZ-PAGAN:

9         Q.    It references the Georgia bill, is that right?

10        A.    Yes, it does.

11        Q.    And it says kudos to Quentin who makes a

12   powerful statement in support of this bill right out of

13   the starting gate, is that right?

14        A.    That's what it says.

15        Q.    This is about your advocacy efforts to ban

16   gender affirming medical care in Georgia, is that

17   correct?

18        A.    Yes.

19        Q.    Let's go to the next exhibit.  This is an email

20   chain, three pages, and the top email is from you, and it

21   is dated February 4, 2020.  Do you see that?

22        A.    I do.

23        Q.    You sent this email?

24        A.    I did.

25                   (Plaintiff's Exhibit No. 32 was

Page 188

1          1                 marked for identification.)

2          2       BY MR. GONZALEZ-PAGAN:

3          3          Q.       Your email says I agree that adopting use of

4          4    cis-gender only validates transgender as a healthy

5          5    variance which it is clearly not.   Did I read that

6          6    correctly?

7          7          A.       You did.

8          8          Q.       In your GAPMS report Attachment E you wrote

9          9    gender discordance is not considered a normal

10        10    developmental variation.   Is that right?

11        11          A.       There was a buzz in the middle of your

12        12    sentence.   I want to make sure I hear all of it.

13        13          Q.       In your Attachment E to the GAPMS report that

14        14    you authored you wrote gender discordance is not

15        15    considered a normal developmental variation.   Do you

16        16    recall those words?

17        17          A.       Yes.

18        18          Q.       To what peer-reviewed or scientific literature

19        19    do you cite in support of your statement that being

20        20    transgender is not a healthy variant?

21        21          A.       Because it is preceded by mental health

22        22    morbidity conservatively 70 percent, but in my clinical

23        23    experience 100 percent of the patients that come in.   So,

24        24    it is based on a psychological concept.   It is a

25        25    sociological concept.   It causes morbidity.   It causes

1    1   you is is being transgender in itself an illness?

2    2       A.    I would say it is in the words -- and I trust

3    3   Kenneth Zucker because he is the expert in mental health.

4    4   I can't comment on the mental health issues, but when I

5    5   consult with Kenneth Zucker, he says clearly in his

6    6   personal opinion that to believe you are born in the

7    7   wrong body is a delusion.  So, a delusion is a disorder.

8    8   Regardless of what DSM-5 states, you know, he is an

9    9   expert who has been following this and has been respected

10   10  for numbers of decades.  If you looked at his first

11   11  bibliography, it was stated how many articles and book

12   12  chapters that he has written on the subject, and he

13   13  personally believes that the dysphoria is a sort of a

14   14  state of mind that needs to be fixed, and it needs to be

15   15  fixed by appropriate interventions that help the mental

16   16  health, and in doing so the majority of those kids

17   17  including adolescents when you talk to them in person

18   18  will benefit greatly from mental health evaluation and

19   19  treatment, and if they get to late adolescence, it's more

20   20  difficult if they have not sought, resolved their

21   21  dysphoria for them to resolve it just with counseling,

22   22  that if it persists into adulthood he sees no reason not

23   23  to use the medical and surgical interventions, but he

24   24  says the most important thing is the counseling.

25   25      Q.    Is it your opinion that being transgender is

1    not normal?

2        A.      Yes, I believe that is true.

3        Q.      Is it your opinion that being transgender is

4    not natural?

5        A.      It's not biologically explained.  There is no

6    biologic basis for it, and so, if it's something that is

7    a state of mind in the individual and it causes them to

8    suffer, that's not a normal state.

9        Q.      Is it your opinion that being transgender is

10   wrong?

11       A.      No, I don't judge the patients who are

12   suffering from gender dysphoria.  I think it is best to

13   get as healthy as you possibly can and to do everything

14   you know works to help that patient.  So, I have

15   compassion for these kids.  I know they are all

16   suffering, the ones that come see me.  So, I treat them

17   as clients.  They are essentially the center of my

18   efforts.  I speak to them respectively.  I do everything

19   I can not to be in any way offensive to the patients

20   because my job and my goal is to get them to get out of

21   the emotional distress that they are in, and that is my

22   focus.  So, I don't say it's wrong.  That would be sort

23   of a pejorative term and judgmental, and I don't have --

24   the patients themselves I have compassion for.  It is the

25   people that are pushing the ideology where I speak

1    1    against.

2    2         Q.    Let me ask you this, and I know that you have

3    3    limited your expert opinions to people under 18, right?

4    4    That's correct, right?

5    5         A.    That's correct.

6    6         Q.    You oppose affirmation of a person's gender

7    7    identity who's under 18 under any circumstances, is that

8    8    right?

9    9         A.    Yes, because I don't think they can actually be

10   10   consented.  That's the purpose is that the adolescent has

11   11   very limited capacity for judgment for long-term

12   12   consequences of short-term goals.  So, knowing that I

13   13   want the patient to proceed to an age where they're more

14   14   likely to actually understand exactly what they're

15   15   getting into.  So, that's no five-year-old, seven-year-

16   16   old, 13-year-old, 15-year-old, 19-year-old maybe, but 18

17   17   or younger, someone all the way up to age 30, but I'm

18   18   sticking from under age 18, they cannot wrap their head

19   19   around the consequences of what they are essentially

20   20   assenting to.  So, I don't want them -- I get them to age

21   21   18, and I just pray that they get better.  Whatever they

22   22   are suffering for, that their subsequent therapist will

23   23   be open-minded, take care of the mental morbidity as the

24   24   core of what needs to be done.

25   25        Q.    Let me stick with this, and then I will follow

1    pronouns for somebody say a 15-year-old you focus a lot

2    on the impact on the family, the impact on their

3    community, the impact in their peer group.  What about

4    that person?  What about the impact on them?

5         A.    I'm sorry, you say the impact on the doctors?

6    It sounded like that's what you said.

7         Q.    No, on the adolescent who has the preferred or

8    chosen pronouns that is be inconsistent with that

9    person's assigned sex?

10        A.    It makes them uncomfortable unless you explain

11   it as I have done on the advice of one of the clinical

12   counselors who gave me feedback that excuse me if I

13   forget and accidentally use incorrect pronouns.  I will

14   try altogether not to say anything that uses a pronoun if

15   I can because I have a particular sense that it's not

16   healthy, but you're my client, and you know, you tell me

17   what it is that you will accept.  You know, the child

18   wants something.  If they don't get it, they're unhappy.

19   That's not a justification for actions by parents or

20   their environment.  Wanting something and not getting it

21   makes them very unhappy.

22        Q.    Well you said wanting something now, and

23   earlier in this conversation you mentioned the word

24   choice, and I want to go back to that for a second.  Do

25   you believe that people who are transgender make a choice

Page 198

1   to be transgender?

2          A.      Absolutely.

3          MR. GONZALEZ-PAGAN:  Let's take a two-minute

4   break.  I just want to check that I'm done, and if

5   not, we're done.

6          MR. PRATT:  Sounds good.

7          COURT REPORTER:  We are off the record at 4:40

8   pm.

9          (Off the record for a short break.)

10          (Back on the record.)

11          COURT REPORTER:  We're back on the record at

12   4:42 pm.

13          MR. GONZALEZ-PAGAN:  Mr. Van Meter, thank you

14   for your time today.  I appreciate your availability

15   and you answering my questions.  I'm done with my

16   questions for today.  I appreciate you being

17   available throughout the day.

18          DR. VAN METER:  Thank you.

19          MR. PRATT:  Good afternoon, Dr. Van Meter.

20   Thank you again for being here this afternoon.  We

21   appreciate it.

22          DR. VAN METER:  Thank you very much.

23                    DIRECT EXAMINATION

24   BY MR. PRATT:

25          Q.      I have just some very, very brief questions for