# Exhibit B

```
 1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF ARKANSAS
 2                       CENTRAL DIVISION

 3    DYLAN BRANDT, et al.,

 4                    Plaintiffs,
          v.                           No. 4:21CV00450 JM
 5
                                       November 28, 2022
 6                                     Little Rock, Arkansas
                                       8:57 AM
 7    LESLIE RUTLEDGE, et al.,

 8                    Defendants.

 9           TRANSCRIPT OF BENCH TRIAL - VOLUME 5
          BEFORE THE HONORABLE JAMES M. MOODY, JR.,
10               UNITED STATES DISTRICT JUDGE
                 _____
11
      APPEARANCES:
12
      On Behalf of the Plaintiffs:
13
          MR. CHASE STRANGIO, Attorney at Law
14        MS. LESLIE COOPER, Attorney at Law
          MR. JAMES D. ESSEKS, Attorney at Law
15           American Civil Liberties Union
             125 Broad Street, Suite 1800
16           New York, New York  10004-2400

17        MS. BREEAN WALAS, Attorney at Law
             Walas Law Firm, PLLC
18           Post Office Box 4591
             Bozeman, Montana  59772
19

20        MR. AVIV S. HALPERN, Attorney at Law
          MS. LAURA KABLER OSWELL, Attorney at Law
21           Sullivan & Cromwell, LLP
             1870 Embarcadero Road
22           Palo Alto, California  94303

23

24    Appearances continuing...

25
```

```
 1

 2    APPEARANCES CONTINUED:

 3    On Behalf of the Plaintiffs:

 4        MR. ARUN BODAPATI, Attorney at Law
          MS. LAUREN M. GOLDSMITH, Attorney at Law
 5          Sullivan & Cromwell, LLP
            125 Broad Street, Suite 2424
 6          New York, NY 10004-2498

 7        MR. DANIEL J. RICHARDSON, Attorney at Law
            Sullivan & Cromwell LLP
 8          1700 New York Avenue
            Washington, DC 20006
 9
          MR. GARY L. SULLIVAN, Attorney at Law
10          ACLU of Arkansas
            Legal Division
11          904 West 2nd Street, Suite One
            Little Rock, AR 72201
12
          MS. SHARON ELIZABETH ECHOLS, Attorney at Law
13          Gill Ragon Owen P.A.
            425 West Capitol Avenue
14          Suite 3800
            Little Rock, AR 72201-2413
15
16    On Behalf of the Defendants:

17        MR. DYLAN JACOBS, Attorney at Law
          MR. MICHAEL CANTRELL, Attorney at Law
18        MS. AMANDA LAND, Attorney at Law
          MS. HANNAH TEMPLIN, Attorney at Law
19          Arkansas Attorney General's Office
            323 Center Street, Suite 200
20          Little Rock, Arkansas  72201

21

22

23        Proceedings reported by machine stenography.  Transcript
      prepared utilizing computer-aided transcription.
24

25
```

Karen Dellinger, RDR, CRR, CCR
United States Court Reporter
Karen_Dellinger@ARED.uscourts.gov (501)604-5125

1

2                    **INDEX - VOLUME 5 (11/28/22)**

3  WITNESSES FOR THE DEFENDANTS:   Direct   Cross   Redirect   Recross

4  STEPHEN LEVINE                    781     885      955       959

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Karen Dellinger, RDR, CRR, CCR
United States Court Reporter
Karen_Dellinger@ARED.uscourts.gov (501)604-5125

```
1         (Proceedings continuing in open court at 8:57 AM.)
2              THE COURT:  Are y'all ready?
3              MR. JACOBS:  Your Honor, Defendants are ready to
4    call, I guess, our next witness, not our first witness.  One
5    thing I wanted to check in on.  So Dr. Regnerus is prepared to
6    testify remotely tomorrow, and I wanted to ask at what time the
7    Court could begin tomorrow with the hope that it could begin I
8    guess as early as we can make it happen.  Because Dr. Regnerus
9    is testifying late in the evening from where he's located, so
10   just to avoid him having to run into testifying in the wee
11   hours of the early morning, if we could start as early as we
12   can.  I recognize that --
13             THE COURT:  I expect this will likely make everybody
14   cringe, but courthouse opens at 7:30.
15             MR. JACOBS:  Could we -- I think he'd be available
16   to start at like 8:00.
17             THE COURT:  That's fine.  That would give everybody
18   time to get in the building and get settled and we could make
19   sure stuff is up.
20             MR. JACOBS:  Okay.  That's all the preliminary
21   matters that we have.
22             THE COURT:  So with an asterisk, you've got my
23   entire week.  What are your thoughts on how long you're going
24   to take?
25             MR. JACOBS:  Our witnesses will be done Thursday and
```

1    we'll rest on Thursday.

2             THE COURT:  I've got two sentencings, one at 1:00

3    and one at 2:00 on Wednesday.  Those usually last 30 minutes,

4    so we're probably going to work a little later into lunch on

5    Wednesday.

6             MR. JACOBS:  That won't be a problem, Your Honor.

7             THE COURT:  And then it looks like I've got a lunch

8    hearing on the 1st.  Okay.  That's what is on my schedule other

9    than you guys.  So are we ready to jump back in?

10            MR. JACOBS:  We're ready, Your Honor.  Defendants

11   will call Dr. Stephen Levine.

12            THE COURT:  Sir, if you could come on the far side

13   of that silver rail.  Good morning.

14             STEPHEN LEVINE, DEFENDANTS' WITNESS, DULY SWORN

15                        DIRECT EXAMINATION

16   BY MR. CANTRELL:

17   Q    Good morning, Dr. Levine.

18   A    Good morning.

19   Q    Can you state your name and spell it for the record.

20   A    Stephen, S-t-e-p-h-e-n, Barrett, B-a-r-r-e-t-t, Levine,

21   L-e-v-i-n-e.

22   Q    Thank you.  Dr. Levine, can you tell us what academic and

23   clinical positions that you currently hold?

24   A    I am clinical professor of psychiatry at Case Western

25   Reserve University.  I'm a staff psychiatrist in a group

1   dictating a trans identity.  As many people have come to
2   realize that teenagers and now especially during COVID when
3   teenagers were at home have spent a great deal of time on the
4   internet and we believe that the internet has many
5   opportunities to learn about trans life, and we think this has
6   been an influence on the rising incidence of transgender
7   identities.
8        But I can say that while I could go on and speculate
9   about why there has been this increase, I don't really think
10  that science can tell you why.  We can speculate and various
11  people have various speculations.  Some people think it's a
12  social contagion from the internet, other people think it's a
13  social contagion from friends, close relationships, especially
14  among girls who have a friend who's trans.  Some people think
15  that it's a retreat from adverse life experiences and family
16  disruptions and inability to like both parents or love both
17  parents, but these are all speculations, and I doubt since
18  there are so many people involved with this that we would find
19  one explanation that would explain everything.
20       We need to understand that in mental health work and
21  trying to grasp what happens to people who become who they
22  become and why, that we can't ever find one explanation for
23  things.  Things are multifactorial, so I think this phenomenon
24  must be multifactorial as well, but it is a dramatic worldwide
25  change in how young people are identifying.  And they're not

LEVINE - CROSS

1   A.   Yes.

2   Q.   Have you reviewed any transcripts of the first week

3   of trial?

4   A.   No.

5   Q.   Has anyone spoken to you about the testimony that was

6   given during the first week of trial?

7   A.   No.

8   Q.   You've been a psychiatrist seeing patients, I believe

9   you said, since 1973.  Is that correct?

10  A.   I started my residency three years before and I saw

11  patients then, so officially as credentialed psychiatrist,

12  yes, 1973.

13  Q.   And the overwhelming majority of your patients have

14  been adults.

15  A.   Over the years, yes.

16  Q.   Is that right, that the overwhelming majority have

17  been adults?

18  A.   Yes.

19  Q.   Is that a yes?

20       And you've estimated that you've seen about 50

21  minors, patients under 18, in your nearly 50-year career.

22  Is that correct?

23  A.   Yeah.  In a previous testimony, give can you give me

24  that number?

25  Q.   I can show you.

1          THE COURT:  Let's short cut.  Is that true?

2          THE WITNESS:  It's approximately true.

3          MS. COOPER:  Thank you, Your Honor.

4  BY MS. COOPER:

5  Q.  And you've testified that you've seen about six

6  prepubertal children in your career over 50-plus years.

7  A.  Yes.  That's probably approximately true, personally

8  seen.

9          THE COURT:  What was the last part?  I couldn't

10 hear you?

11         THE WITNESS:  I'm sorry?

12         THE COURT:  I didn't hear the last couple of

13 words.  Did you say something --

14         THE WITNESS:  That I personally have been

15 involved.

16         THE COURT:  Thank you.  You faded off.  I

17 couldn't hear.

18 BY MS. COOPER:

19 Q.  I believe you testified on direct that there are

20 about 70 gender clinics in the United States.  Is that

21 right?

22 A.  Yes.

23 Q.  And you don't know how different practitioners or

24 clinics provide care, correct?

25 A.  There are many, many practitioners.  How would I

LEVINE - CROSS

1    possibly know how they all provide care?  I've been aware

2    of some instances of care, yes.

3    Q.    So there are many practitioners and clinics about

4    which you don't know protocols --

5    A.    Many.

6    Q.    And you don't know how common it is for clinicians to

7    provide hormone therapy to minors without a careful

8    assessment of the child and their comorbidities.  Is that

9    correct?

10   A.    Well, I've been in touch with many parents from all

11   over the country who have indicated that to me.  But in a

12   numerical sense with a denominator, I'm not aware.  I

13   certainly have had many experience where I heard

14   complaints of -- about that.

15   Q.    You don't know if it's a small minority, a majority,

16   or something in between?

17   A.    I don't know that 38 percent do and 42 percent don't

18   or -- I don't have that kind of information.

19   Q.    You wouldn't say whether it's a majority or a

20   minority.

21   A.    Couldn't say.

22   Q.    You don't have any knowledge about how gender

23   affirming medical care is provided to minors in Arkansas.

24   Is that correct?

25   A.    That's correct.

LEVINE - CROSS

1   of rapid onset gender dysphoria versus lifelong gender

2   dysphoria, the parents -- the parents' view is vital, you

3   see.

4        But, you know, today most of the onset of the gender

5   dysphoria presents itself at first in adolescence, not at

6   age four.  In that sense, you and I are talking past each

7   other.

8   Q.   All right.  If we can look at -- just to wrap this

9   question up for clarity, on page 41 -- can you see the

10  screen in front of you --

11  A.   Yes.

12  Q.   -- beginning on line 22.  Question:  Does your -- you

13  mentioned that you meet with the parents too.  Does that

14  contribute to your assessment whether someone meets the

15  criteria for gender dysphoria, what's reported by the

16  parents.

17       Answer:  Of course.

18       That was your testimony?

19  A.   I thought I just explained what I meant by that.

20  Q.   When you diagnosis patients for other conditions like

21  depression or bipolar disorder, do you rely on self-report

22  of patients?

23  A.   And reports from the parents.

24  Q.   Reliance on self-report from the patients and

25  information from parents is not unique to the diagnosis of

LEVINE - CROSS

1   gender dysphoria, is it?

2   A.   That's right.   It's not unique.

3   Q.   Diagnosing patients based on self-report and

4   information from families who know the -- people who know

5   the patient, that's how psychiatry works, isn't it?

6   A.   Ideally.

7   Q.   You were deposed this past March in a case called BPJ

8   in West Virginia.   Do you remember that case involving

9   athletics?

10  A.   Yes.

11  Q.   I'd like to show you a passage from -- well, a

12  passage from your deposition in that case.   Can we look at

13  paragraph 6, please?

14       Do you see that in front of you in paragraph 6?   It

15  says, if you'll read along with me:   In the course of my

16  five decades of practice treating patients -- I'm sorry.

17  This is not your deposition.   Let me back up.   I misspoke.

18       You remember giving a report in the BPJ case.   Is

19  that right?

20  A.   I vaguely remember.

21  Q.   And is this your expert report?

22  A.   I don't know.   You just --

23  Q.   Can we scroll through this front page just to show?

24  A.   It's my signature, yes.

25  Q.   So if we can turn back to paragraph 6.   And I would

LEVINE - CROSS

1    like you to read along with me.  In the course of my five

2    decades of practice treating patients who suffer from

3    gender dysphoria, I have at one time or another

4    recommended or prescribed or supported social transition,

5    cross-sex hormones, and surgery for particular patients,

6    but only after extensive diagnostic and psychotherapeutic

7    work.

8         So you wrote this passage, correct?

9    A.   Yes.

10   Q.   And you have supported patients' social transition.

11   Is that correct?

12   A.   This -- this paragraph or sentence doesn't give an

13   age group.

14   Q.   Understood.  But I'm just asking generally, you have

15   supported --

16   A.   Many four-year-olds.

17   Q.   Yes.  Okay.  You have counseled some parents to

18   support the transgender identification of their child,

19   haven't you?

20   A.   I'm not sure that's true.  Depending on what you mean

21   by child.  Child -- a could be 25.  That is a child of a

22   parent can be 25.

23   Q.   You've counseled some parents to support their minor

24   child's social transition, haven't you?

25   A.   I have on rare occasion, yes.

LEVINE - CROSS

1   Q.   And switching back to adults, you've written letters

2   of authorization for adults seeking gender-affirming

3   surgeries.   Is that correct?

4   A.   I have.

5   Q.   And you've done that as recently as the past two

6   years.

7   A.   I have.

8   Q.   And you've also written letters authorizing hormone

9   therapy for adult patients with gender dysphoria.

10   A.   I have.

11   Q.   And these are letters they can take to the

12   endocrinologist.   Is that right?

13   A.   Yes.

14   Q.   And you have written such letters approving hormone

15   therapy for minors under 18 in a few cases within the past

16   five years, haven't you?

17   A.   I don't think in the past five years.

18   Q.   Okay.   Can we turn to Dr. Levine's deposition, page

19   78?

20       I would like you to read along with me starting on

21   line 3.   So between you and Mrs. Novak, there have been a

22   handful of cases in the past, say, five years where you

23   have approved hormone therapy for minor.   Is that right?

24       These are particularly fraught difficult

25   circumstances, yes.

1    A.    Yes.

2    Q.    Mrs. Novak is someone who works in your medical

3    practice -- or your psychiatry practice?

4    A.    She's a younger colleague of mine.

5    Q.    That was your testimony.

6    A.    I'm sorry?

7    Q.    That was your testimony that I read correctly.

8    A.    Yes.   I'm just not sure today whether it's five years

9    or six years now.   And in generally, there have been a few

10   very fraught cases where we felt that this is a very

11   reasonable thing given the severity, the complexity of the

12   case, and that we would -- we, along with parents, would

13   hold our breath that this would be of help.

14   Q.    And you have cosigned letters for hormone therapy for

15   minors written by Mrs. Novak, again, approving some minors

16   for hormone therapy.   Is that right?

17   A.    Yes, but this has not occurred very recently, Ms.

18   Cooper.

19   Q.    You would not write a letter supporting hormone

20   therapy for a minor if you did not believe the patient had

21   gender dysphoria, correct?

22   A.    Correct.

23   Q.    And you would not write a letter approving a minor

24   for hormone therapy without first determining that they

25   had a longstanding, stable gender identity.   Is that

LEVINE - CROSS

1  much more cautious.  We will give adolescents hormones,

2  but not as quickly as the Standards of Care would like.

3      That was your testimony in Keohane.

4  A.   I have to say yes.

5  Q.   And just to clarify, the Standards of Care you're

6  referring to in the 7th Edition, is that the WPATH's

7  Standards of Care 7th Edition?

8  A.   Yes.

9  Q.   When you were deposed in May of this year in this

10  case, the Brandt case, you testified, did you not, that

11  going forward you have not made a decision to no longer

12  write letters approving hormone therapy for patients under

13  18 years of age.

14  A.   Indulge me a minute.  In the previous thing you put

15  up, my deposition of adolescents was not the definition I

16  gave to the Judge earlier this morning.  It was my

17  definition of an adolescent is somebody 19 years of age.

18  And so if you reread that, it would include 18-year-olds

19  and 19-year-olds.

20      So would you repeat the last question you asked me?

21  Q.   Sure.  When you were deposed this past May in this

22  case in Arkansas, you testified that, going forward, you

23  have not made a decision to categorically not write

24  letters approving hormone therapy for patients under 18,

25  correct?

LEVINE - CROSS

1    A.    I don't remember saying that, but if you have that, I

2    trust you.

3    Q.    Yeah.  I think we want to put that in the record.

4          Can we look at deposition page 227?

5          And if you go to line 3, part way through beginning

6    with the words, "Have you made a decision."  Are you with

7    me?  It's highlight.

8          Have you made a decision to no longer consider

9    hormone therapy for anybody who has not reached their 18th

10   birthday since you provided those letters?

11         Answer:  I've made a decision to be very cautious and

12   to put a period of time in therapy between me and the

13   letter.

14         You go on to say more, which you're welcome to read

15   if you would like, but I want to continue on to another

16   passage that picks up rather than taking the Court's time

17   reading a lot of discussion in between.

18         If we could turn to page 228, line 3.  Let me know if

19   you want to review there.

20             MR. CANTRELL:  Your Honor, I would like to just,

21   if we could, take a look at the intervening testimony,

22   glance at that.

23             MS. COOPER:  Sure.  We can post that.

24   Absolutely.

25             THE COURT:  I thought you were in the

LEVINE - CROSS

1    deposition, Mr. Cantrell, but go ahead.

2    BY MS. COOPER:

3    Q.   Do you have that in front of you now, Doctor?  If you

4    look at line 3 and read along with me.

5         So I'm not sure if that answers my question.  Have

6    you made a decision to no longer provide letters?

7         Answer:  Oh, I'm sorry.  No, I haven't made that

8    decision.

9         Question:  So would it be a case-by-case basis if

10   there were a patient that you felt it was appropriate for

11   you -- appropriate for, you would consider doing it, say,

12   a 17-year-old or a 16-year-old?

13        Mr. Cantrell:  Object to form.

14        Answer:  I don't have a -- yes.  The answer to your

15   question is yes.

16        I'm not going to ask you if that was your testimony

17   again --

18   A.   Thank you.

19   Q.   -- since I see how you love those questions.

20        Now, today you testified that you would not recommend

21   hormone therapy for patients under 18.  Do you mean you

22   would not generally recommend hormone therapy as a general

23   matter?

24   A.   Yes.

25   Q.   So there may be exceptional cases where you would

LEVINE - CROSS

1   still consider it appropriate.

2   A.   Yes.   These are very fraught circumstances.   I think

3   all of us all over the world recognize that we are under

4   very difficult circumstances sometimes.   We don't know

5   what to do and we eventually go along with the patient's

6   sincere desire to try hormones.

7   Q.   Now, you talked on direct about an article you wrote

8   called, *Reconsidering Informed Consent for*

9   *Trans-identified Children, Adolescents, and Young Adults.*

10       And I just want to ask you a couple of questions

11   about that article.

12       In this article, you recommend informed content

13   process that you think providers should undertake before

14   authorizing medical or surgical transition for minors,

15   correct?

16   A.   Yes.

17   Q.   I'd like to pull up a passage from that article to

18   show you.  If we can look at page 2.  And I have some

19   material highlighted.  Actually, I would like you to skip

20   to -- sorry.  I wasn't in front of the mic.  I would like

21   to skip to the second highlighted paragraph.

22   A.   I know what you're you talking about.

23   Q.   We over highlighted.  If you'll read along with me in

24   the second paragraph there.

25       Social transition, hormonal interventions, and

LEVINE - CROSS

1   that is immutable, that it cures suicidal ideation, and

2   that it makes everyone live happily ever after, you see.

3        So in order to understand that last -- the

4   second-last sentence there, it does not preclude

5   transition.  It presumes that the doctor is knowledgeable.

6   And what it I have been saying is that all the doctors are

7   not equally knowledgeable about the state of science.

8   Q.   But you're not saying that no doctors are

9   knowledgeable.

10  A.   Of course I'm not saying that, Ms. Cooper.

11  Q.   In that article that we're looking at here, you don't

12  say that gender-affirming medical care, specifically

13  hormone therapy or blockers or surgeries, should be

14  categorically prohibited for minors, do you?

15  A.   No, I don't.  This is -- that was not the topic of

16  this article.

17  Q.   You testified that you would like to see an

18  international committee -- this was today.  You testified

19  that you'd like to see an international committee

20  developed standards for informed consent to provide

21  gender-affirming medical care to adolescents.  Is that

22  right?

23  A.   Yes.

24  Q.   So, you're not seeking to prohibit care, but to

25  ensure that patients have been thoroughly provided

LEVINE - CROSS

1   information and take the time and patience to understand

2   it before making this monumental decision.

3   A.    Ms. Cooper, when you say "patients," you need to ask

4   -- for me to agree to that, you have to add parents and

5   patients.

6   Q.    Thank you.  Let me ask it differently.

7         So you're not looking to prohibit care, but to ensure

8   that patients, and particularly their parents when they're

9   minors, have thorough information in order to be able to

10  adequately make that decision.  Is that correct?

11  A.    I am not motivated to prohibit care.  I am motivated

12  to clarify the scientific basis upon which the care is

13  provided, and if the basis is inadequate, to let doctors

14  be cautious about this.

15  Q.    And to inform families of this information as well.

16  A.    And to inform -- to use their own ethical unease

17  about the wisdom of this in their informing patients and

18  parents about the state of science here and what is not

19  known, the uncertainties, and the risks of harms.

20  Q.    And your view is that, if families are -- by

21  "families," I'm specifically focusing on parents -- are

22  fully informed about the risks and the state of the

23  science, the decision about whether to pursue hormone

24  therapy for adolescents -- minor adolescents should be

25  made by the parents, patient, and doctors.  Is that

LEVINE - CROSS

1    Q.    I'm sorry.   Yes?

2    A.    Yes.

3    Q.    You believe that for youth who are currently

4    receiving hormone therapy, requiring them to discontinue

5    treatment could create a psychological -- could create

6    psychological and physiological problems, correct?

7    A.    Most certainly, I think it would be a psychological

8    challenge for those folks, whether physiologically or

9    cause a significant problem is not clear because,

10   depending on their age and depending on the original

11   maturation of their ovaries and testes, stopping estrogen

12   or stopping testosterone abruptly may cause brief periods

13   of thermo-regulatory -- what we call hot flashes.

14         But I think if a person's just had hormones, say,

15   starting at age 15 or 16, their gonads had matured enough,

16   that they would begin the secretion of progesterone and

17   estrogen for biologic girls and testosterone for boys.

18   But I think psychologically, it would be a shocking and

19   devastating thing for them.

20         There are lots of negative things that happen to all

21   of us in life that are shocking and devastating, and we

22   learn to cope with it.   And what I said at the deposition

23   is that doctors are compassionate people generally and

24   they would find a way to be of help.   And my concern with

25   the law as ti was originally written is that it seems to

1          (Proceedings continuing at 3:00 p.m.)

2    BY MS. COOPER:

3    Q.    Dr. Levine, you submitted a report in opposition to our

4    plaintiffs' motion for preliminary injunction.  Do you remember

5    doing that in this case?

6    A.    In this case?

7    Q.    In this case, yeah.

8    A.    That's too legalese for me.

9    Q.    Okay.  Let's show you -- if you can put up the report or

10   the rebuttal.

11         If you can look at the document on the screen dated

12   July 9th, '21, or filed.  On the top, it says, "July 9th, '21,

13   declaration of Stephen Levine."  Is this a report that you

14   prepared in this case?

15   A.    That was my original report.

16   Q.    Okay.  If you can look at page -- excuse me -- paragraph

17   35, and read along, the highlighted material.

18         "To my knowledge, there is no credible scientific evidence

19   beyond anecdotal reports that psychotherapy can enable a return

20   to male identification for genetically male boys, adolescents,

21   and men, or return to female identification for genetically

22   female girls, adolescents and women."

23         That's what you said in your report?

24   A.    That's what I did say, yes.

25   Q.    Okay.  Now, you talked on direct about your clinical

1    experience, and you mentioned that most of your patients were

2    adult patients.  It's correct that you've had only two patients

3    who have detransitioned after medically transitioning.  Is that

4    correct?

5    A.    That I'm aware of at the moment, yeah.

6    Q.    Okay.  And in your report in this case, you cited a paper

7    by Exposito-Campos about detransition.  Correct?

8    A.    Yes.

9    Q.    And you noted that the Exposito-Campos review of

10   detransitioning claimed to have identified 16,000 entries in a

11   search of proliferating websites devoted to this topic.  Is that

12   correct?

13   A.    Detransitioning, yes.

14   Q.    And, to be clear, this did not represent 16,000

15   detransitioners.  Right?

16   A.    It's not possible to know what percentage of them are

17   individual people who have detransitioned.

18   Q.    That was a reference of the number of people participating

19   in these online groups.  Is that right?

20   A.    Right.

21   Q.    Uh-huh.  Okay.  Now, you talked some during direct

22   testimony about detransition and studies looking at rates of

23   detransition.  I just had a couple of questions about that.  You

24   mentioned that there was a study that said that there was a rate

25   of about 30 percent of patients detransitioned.

1   A.    Yes.

2   Q.    Right?   How was detransition defined in that study?

3   A.    I think as stopping hormones.

4   Q.    People may stop hormones without going back to reverting to

5   their biological sex.   Correct?

6   A.    Yeah.   The study is about the rate, you see.   It's not

7   about the details, right?

8   Q.    Okay.   And I would like to pull up a passage in your

9   rebuttal report in this case.   Do you have that, paragraph 17?

10  If you can look at page 1, is this your rebuttal?

11       Oh, is this the same document?   I'm sorry.   It is the same

12  document.

13       This is your report you wrote in this case?

14  A.    I trust you.

15  Q.    It has your name on it.   Right?   Did you look at it?   I

16  want to make sure we're on the same page.

17  A.    A rebuttal declaration of Dr. Stephen Levine, M.D.

18  Q.    Let's look at paragraph 17, please.   I would like to have

19  you go down sort of towards the bottom, second-to-last line in

20  that paragraph, beginning with the word "according."   And read

21  along with me.

22       It says, "According to a recent study from a UK adult

23  gender clinic, 6.9 percent of those treated with

24  gender-affirmative interventions detransitioned within 16 months

25  of starting treatment, and 3.4 percent had a pattern of care

1    detransition occurs in various forms to various degrees should

2    not be denied any longer.  The incidence of using this 1 or

3    2 percent of regret for the whole phenomenon of maybe a mistake

4    has been made somewhere along the line no longer is acceptable.

5    What we need to think is that with the rising number of people

6    getting hormones and the rising number of people saying they are

7    transgender and then the rising number of people getting access

8    to hormones, we should expect that some of those people, given

9    the ordinary ambivalence of the human soul, will change their

10   mind as they get older and detransition to various degrees.

11   These studies are just the first early reports.

12   Q.   Understood.  But my question has to do with the 30 percent

13   figure you gave.  These studies don't show that 30 percent of

14   patients who were on treatment detransitioned.  Isn't that

15   right?

16   A.   I think -- yes, that's right.  They are showing that

17   30 percent dropped out of treatment or were lost to the original

18   treatment plan.

19   Q.   So, to be clear, they showed that 6.9 percent, what you

20   described here, 6.9 percent detransitioned, and another

21   3.4 percent had a pattern of care suggestive of detransition.

22   But separately, to get to the remainder, to get to that

23   30 percent are 21.7 percent who are just people who dropped out

24   of the program.  Right?

25   A.   And that's study No. 1.  That's Hall.

1    Q.    Just to clarify, we don't know if 21 percent of those

2    people detransitioned.

3    A.    No.  They may have gotten their care at a different

4    country.

5    Q.    In fact, your own description says some of them reengaged

6    in the clinics in those 21 percent.

7    A.    That was a quote.

8    Q.    That was a quote.  Okay.  Tell me, so there's another study

9    that showed 30 percent detransitioned?  Which one is that?

10   A.    If you look down further to No. 9, reference No. 9 to Boyd,

11   that's a study of older people detransitioning.

12   Q.    Okay.

13   A.    My point, Ms. Cooper, is that people detransition.  And we

14   shouldn't be surprised, and we shouldn't sell the public that

15   once a trans always a trans.

16   Q.    I want to switch gears for now and ask you about a

17   presentation you gave at the American Psychiatric Association

18   this past May.  Correct?

19   A.    Correct.

20   Q.    Yeah.  You presented at an annual conference of the

21   American Psychiatric Association in a symposium on reexamining

22   the best practices for transgender youth.  Is that correct?

23   A.    That is very correct.

24   Q.    And among your co-presenters were Ken Zucker.  Correct?

25   A.    Yes.

Levine - Cross                                     926

1   Q.    And others were Lisa Marchiano and Sasha Ayad?  Correct?

2   A.    Yes.

3              THE COURT:  Ms. Cooper, can you spell that last name?

4              MS. COOPER:  I can.  Ayad is A-y-a-d.

5   BY MS. COOPER:

6   Q.    And all four of you who were on that panel are people who

7   have dissenting views from APA policies on trans healthcare.

8   Correct?

9   A.    That's right.

10  Q.    Okay.  And the APA was aware that the four of you were

11  presenting ideas that were not in keeping with official policies

12  of the APA.  Correct?

13  A.    Yes.  They made an announcement of that before we were

14  allowed to present.  And they sent a special person to moderate

15  it.  They didn't allow me, the chairman, to moderate it, but

16  they didn't tell me they were going to do that.  They just

17  showed up three minutes before the symposium, yes.

18  Q.    And while you were talking, the group in the audience was

19  polite, and no one interrupted.  Is that correct?

20  A.    While I --

21  Q.    While you were presenting on the panel.

22  A.    Yes.  They were very polite until the presentation was --

23  the presentations were finished.

24  Q.    Excuse me?  Until the presentations were --

25  A.    Finished.

1            THE COURT:  Dr. Levine, as a psychiatrist, how did

2   that make you feel?  No.  I'm kidding.

3            THE WITNESS:  I can answer that, Your Honor.

4            THE COURT:  You don't have to answer it.  I'm just

5   trying to shake things up a bit.  Keep going.

6            THE WITNESS:  You succeeded.

7   BY MS. COOPER:

8   Q.   No one interrupted.  Correct?

9   A.   I'm sorry?

10  Q.   No one interrupted the presentations.  Correct?

11  A.   The only interruption in the presentation was when I began

12  to speak to introduce the symposium, this woman appeared and

13  told me to wait a minute, she was going to make the first

14  comment.

15  Q.   But there wasn't a disruption of the content of the

16  presentations?

17  A.   That's right.

18  Q.   We just mentioned Ken Zucker, who was on the panel with

19  you.  Is it correct that he is called -- excuse me -- he is a

20  proponent of what some call watchful waiting for prepubertal

21  children?

22  A.   That's not what he presented about.

23  Q.   But your understanding is he's a proponent.  I'm sorry if

24  that wasn't clear.  Putting aside his presentation at the panel,

25  he is a person who supports watchful waiting for prepubertal

1   for off-label use."

2       That was your testimony.  Correct?

3   A.   Oh, yes, yes.  That was my testimony.

4   Q.   Okay.  Off-label drug use is very common in probably every

5   field of medicine.  Correct?

6   A.   Yes.

7   Q.   Uh-huh.  And the fact that a drug is being used off label

8   does not make the use experimental.  Correct?

9   A.   In some sense it is experimental.  It's not approved.

10  There hasn't been evidence other than in a clinical fashion to

11  do it.  It's not experimental in the same serious way we're

12  talking about using the various drugs for gender dysphoria off

13  label and perhaps experimental.

14  Q.   You would agree, though, that the fact that a drug is being

15  used off label does not alone mean that it's experimental.

16  Correct?

17  A.   I would agree with that.

18  Q.   People in your field know the difference between articles

19  that are peer reviewed in a scientific journal and different

20  kinds of publications.  Right?

21  A.   Yes.

22  Q.   Speaking generally about psychiatric conditions, you would

23  agree that because of the complexity of the human psyche and the

24  difficulty of running controlled experiments in this area,

25  substantial disagreements among professionals about the causes

1    WPATH's principles.

2    Q.   But, again, you don't know how most practitioners around

3    the country, how credentialed they are and how they provide

4    care.

5    A.   Who in the world knows?

6    Q.   But you don't.

7    A.   I don't and you don't.

8    Q.   Okay.  Now, I want to switch gears and talk about some of

9    the European reports that you talked about.  Let's start with

10   Finland.  You talked about a report from Finland.  Do you

11   remember talking about that?  Okay.  And you mentioned that a

12   committee of, I believe you said, blue ribbon experts put

13   together these international reports.  Which were the experts

14   who were the blue ribbon experts who put together the Finnish

15   report?

16   A.   Their names?

17   Q.   Anything about them.

18   A.   I don't know their names.

19   Q.   Do you know anything about them?

20   A.   Well, I know the head of this national program.  I know

21   her, but I don't know her colleagues.

22   Q.   And do you know what organization put that report out?

23   A.   Well, it's called COHERE.  Please don't ask me what the

24   COHERE stands for.

25   Q.   How many experts were on that blue ribbon committee that

```
 1                 THE COURT:  Is that true, Doctor?
 2                 THE WITNESS:  It is true.
 3    BY MS. COOPER:
 4    Q.    Okay.  Now, the French report, the French document that you
 5    talk about, that's not a review of the literature.  Right?
 6    A.    I'm sorry.  Which one?
 7    Q.    The French application.
 8    A.    The French, I don't think -- I don't want to testify it's
 9    based on a review.
10    Q.    So you don't know if that was done by a blue ribbon
11    committee of experts?
12    A.    I don't know who did it, just there was a national body in
13    France.
14    Q.    Okay.  Thank you.  That helped clarify that.  I want to go
15    back to some of these individual reports and just a few
16    questions.  The Finnish report did not recommend banning
17    gender-affirming medical care for minors, did it?
18    A.    I think in special cases they thought it could be
19    continued.
20    Q.    In fact, it allowed puberty blockers on a case-by-case
21    basis after careful consideration.  Isn't that what it says?
22    A.    I think so.
23    Q.    And it says in the Finnish report that hormone therapy
24    could be provided to minors based on a thorough case-by-case
25    consideration if it can be ascertained that the identity as the
```

1   other sex is of a permanent nature and causes severe dysphoria.

2   Is that correct?

3   A.    Yes.

4   Q.    Now --

5   A.    Ms. Cooper, then how could a bunch of doctors know that a

6   nine year-old's gender identity is permanent?  It only could be

7   based on the fact it has existed for three years.

8   Q.    Is anybody providing hormone therapy -- cross-sex hormone

9   therapy to nine year-olds?

10  A.    Yes, yes, yes.

11  Q.    Cross-sex hormone therapy?

12  A.    No, no.

13  Q.    That's what we're talking about.

14  A.    Puberty blocking hormones.

15  Q.    This was about cross-sex hormone therapy.

16  A.    Oh, I'm sorry.

17  Q.    Yeah.

18  A.    Even so, if somebody has consistent cross-gender

19  identification from 12 to 16, there's no guarantee that that

20  person will be cross-gender identified at 25.

21  Q.    But that's what the Finnish report said, what I described.

22  A.    Right.  You see the limitations inherent even in policy.

23  Q.    So, turning to the French report, just to be clear, they

24  did not recommend prohibiting gender-affirming medical care for

25  minors, did they?

1    A.    I don't know.

2    Q.    You don't know?

3    A.    At this moment.

4    Q.    Uh-huh.   So you don't know if in France minors can receive

5    gender-affirming medical care to treat gender dysphoria?

6    A.    I think this was a general recommendation rather than a

7    prohibition.   And the recommendation was psychotherapy and

8    psychiatric evaluation first.

9    Q.    Okay.

10   A.    I think what we have in common here in all of these

11   countries we're talking about is the recommendation, the prudent

12   recommendation that psychiatric evaluation and attention to

13   associate a psychopathology and worry about both detransition

14   and the rapid rise in the number of people calling themselves

15   transgender calls for a different approach, not the preclusion

16   of individual cases getting a particular treatment, but, in

17   general, doctors of our country think psychotherapy first, not

18   hormones first, not transition first.   That's what these things

19   have in common, whether I remember one phrase or another from

20   the report.

21   Q.    And your assumption is in the U.S. doctors are doing

22   medical transition before psychotherapy?

23   A.    Oh, yes.

24   Q.    But you don't actually know how many doctors do that.

25   Right?

1   get these drugs.

2   Q.   And you mentioned a report from Canada.  Hormone therapy

3   and puberty blockers are not prohibited for minors in Canada,

4   are they?

5   A.   No.  This was done for the State of Florida.  It was not

6   done by the Canadian National Service.  But what it did was

7   reiterate the low quality of evidence for puberty blockers being

8   beneficial and for cross-gender hormones being beneficial or

9   them in sequence being beneficial.  Based on international

10  standards, blue ribbon people, sophisticated people, every

11  review says that the scientific objective review of the evidence

12  supporting these treatments is of very low quality.

13  Q.   I'm not asking about the quality of evidence.  I'm asking

14  about the recommendations in the reports.  That's what my

15  questions were focused on.  And going back to the Canadian

16  report, do I understand from what you said earlier that that's a

17  report that was prepared to be used in litigation to support a

18  ban on treatment in Florida?

19  A.   I don't know exactly why it was done.  What I was trying to

20  help you not make a mistake in thinking, that it was part of

21  Canadian national policy.  It was an academic center.  That

22  place does reviews, does all kind of reviews.  And somebody I

23  think from the State of Florida commissioned and paid for the

24  review.  And the review said, and it was objectively done, the

25  same thing that the other reviews have said, low quality and

1    taking that into consideration in comorbidities, but in Europe

2    they are focusing on that.  But when I pointed out that the

3    standards of care here actually require that, you said, well,

4    they don't really follow the standards.

5    A.    Ms. Cooper, what I was trying to say to you, you can read

6    these wonderful words in the standards of care, but it turns out

7    the devil is in the details.  The devil is how it's translated,

8    who is doing the psychiatric assessments, what mindset do they

9    have, what knowledge do they have, and how long do they have to

10   do it.  Every clinic can say we do comprehensive care.  Every

11   clinic will say we do these evaluations.  But from the parents'

12   point of view or the educated parents' point of view, that is

13   not what is happening to their child frequently.

14   Q.    For some families you've talked to.

15   A.    Frequently.

16   Q.    For some families you've talked to.  Correct?

17   A.    I'm sorry?

18   Q.    For some families you've talked to.

19   A.    Almost for all the families I've talked to.

20   Q.    Which is a tiny amount, representing a very tiny amount of

21   the clinics around the country.  Correct?

22   A.    And I don't know what percentage of the clinics, but they

23   are from many states.

24   Q.    I just have a few more questions.  I want to go back to the

25   second study on detransition that you mentioned showing the

1  30 percent detransition rate.

2  A.    The Boyd study?

3  Q.    That was the one by Boyd.  Thank you.  We're going to put

4  that up so we can get clarity on that.  Looking at a study

5  called "Care of Transgender Patients:  A General Practice

6  Quality Improvement Approach" by Isabel Boyd, et al., that's the

7  study you are talking about?

8  A.    That was I think a primary care study.

9  Q.    Okay.  You have the highlighted portion in front of you?

10  A.    Yes.

11  Q.    "3.2.4.  Undesired Treatment Outcomes (stopping hormones,

12  abnormal blood test results, side effects and complications)."

13  It says here, "Nine patients had stopped hormone therapy, one

14  related to practice policy because they had not attended any GIC

15  follow-up (the patient has restarted since the audit).  Thus,

16  eight patients had stopped hormones voluntarily (20 percent

17  stopping rate; six trans men, two trans women).  These patients

18  had been on treatment for a mean of five years (range 17 months

19  to 10 years).  Four trans men had comments in the record that

20  related to a change in gender identity or detransitioning (4 out

21  of 41, 9.8 percent) quote:  Would like to gradually

22  detransition.  No longer wish to live your life as a male.  Has

23  decided to detransition.  Feels comfortable having decided to

24  dress and appear more feminine.  Feels it was a mistake

25  identifying as non-binary now, close quotes.

1          None of these patients had undergone any gender-related

2   surgery.  They had presented at a mean of 18 years of age, taken

3   testosterone for a mean of 18 months and currently presented as

4   female (three) or non-binary (one).  The other four patients who

5   had stopped hormones continued to present as trans (two women,

6   two men):  One, who had experienced orchidectomy, had a record

7   of regret (no hormonal treatment currently, regrets gender

8   reassignment); one had a medical reason noted for stopping,

9   quote, problems with PV bleeding despite androgen; two had no

10  specific reason for stopping in their record, but it was

11  documented that they had stopped."

12         So I see a 20 percent stopping rate, but I don't see a

13  30 percent detransition rate anywhere in there.  Is this the

14  study you are talking about?

15  A.   Yes.  But, you know, I haven't read this study since it

16  came out.  And you've picked out one paragraph.  And perhaps we

17  could sit down and read it together and figure out whether I'm

18  right or wrong.  And if I'm wrong, I'm wrong by 10 percent.  The

19  point is, Ms. Cooper, the detransition for various reasons

20  happens.  If it happens in this clinic, we should assume it

21  happens in Arkansas and in Missouri and everywhere else.  And

22  the idea that people think it's a mistake is one of the things

23  I've tried to talk about this morning.  We can't be sure that a

24  14 or 15 or 17 year-old knows what his or her future is going to

25  be.  And if they cannot be prudent, we have to be prudent.  And

1    if the medical profession isn't prudent about this, isn't

2    careful, isn't aware of the limitations, I guess legislatures

3    make a decision.

4          So I'm just asking the medical profession to be prudent and

5    to know about the evolution of gender identity.  Even after it's

6    been solid during adolescence for three years or four years, it

7    doesn't mean that when you are 23 you don't think differently.

8    We must be prudent, and we must protect people sometimes against

9    things that we have reason to believe that a majority of people

10   may come to regret.  Now, you see the real question here is not

11   the Boyd study.

12   Q.   Well, I do want to stay on the Boyd study for a minute.  I

13   understand your point that detransition happens.  And that is

14   not the question I want to -- I'm not arguing about that.

15   A.   Good.

16   Q.   I'm asking about this 30 percent number that you testified.

17   I understand now you may be not standing by that 30 percent

18   figure?

19   A.   Yeah.  Maybe I'm going back to 20 percent.

20   Q.   Then, even the 20 percent you would agree is not a

21   representation of detransition, but it represents the number of

22   people who stop medical transition for various reasons, some

23   medical reasons and unknown reasons.  Correct?

24   A.   I don't think you are going to make compelling points in my

25   view by picking out one paragraph and not looking at the whole

Levine - Cross                                                    953

1   thing.

2   Q.   You used the number 30 percent, and this appears to be

3   where it came from, so I need to pick it apart.

4   A.   I do not represent myself as infallible.  And my

5   statements, I can't imagine every statement is verifiable that I

6   ever make in my life.  I'm doing the best I can with my memory.

7   Q.   Fair enough.  It's not a memory test.  Looking at it here

8   now, though, you would agree that this study does not even say

9   20 percent detransitioned.  It says 20 percent stopped the

10  medical transition for various reasons.

11  A.   Well, can you tell what the denominator here is?

12  Q.   Well, 20 percent.  Twenty is a percentage.

13  A.   That requires a denominator.  What number of people are we

14  talking about?

15              THE COURT:  Twenty out of a hundred.

16              THE WITNESS:  That's not --

17  BY MS. COOPER:

18  Q.   41 is the N.  If you want to know the number, it's 41 I

19  think it says.  Four out of 41 were the ones who --

20  A.   Is 41 the denominator?

21  Q.   4 out of 41 detransitioned.

22  A.   So nine of 41 people stopped their hormones.  Is that what

23  you are saying?  So we do that math.  9 of 41.

24  Q.   Twenty percent stopped.

25  A.   It's over 20 percent.

Levine - Cross

1   Q.   Stopped hormones?

2   A.   Yeah.

3   Q.   I just want to be clear, though, that doesn't represent

4   detransition.  It represents stopping hormones for a variety of

5   different reasons.

6   A.   And I want to be clear.  I want to be clear that you don't

7   know it doesn't represent detransition.  It means stopping

8   hormones.  Why does a person stop hormones?

9   Q.   Well, it says right here problems with bleeding despite

10  androgen, and two had no specific reasons.  You don't understand

11  people stopping hormones besides detransition?

12  A.   What are you quizzically asking?

13  Q.   Do you think the only reason somebody who is on hormone

14  therapy for gender dysphoria would stop treatment, that the only

15  reason would be because they detransitioned?

16  A.   No.  Some stop because they get hypertension.  Some stop

17  because they get obese.  Some stop because they get blood clots.

18  Some stop because their hemoglobin levels go way up and they are

19  threatened with stroke.

20  Q.   But they may still maintain their trans identity.  Correct?

21  A.   And, of course, if that would happen to a person, that

22  would make them rethink everything.

23  Q.   I think we can put this study aside, and just a couple of

24  questions.  Prior to this case, you had never heard of Mark

25  Regnerus.  Correct?

1    Q.    I understand you are speculating about the connection

2    there.  But the national review board of Sweden did not ban

3    blockers.  Correct?  We talked about that before.

4    A.    If Karolinska blocked blockers and if Karolinska is the

5    primary site for the Swedish people to get gender-affirming

6    care --

7    Q.    Is it your understanding that's the only place you could

8    get gender-affirming medical care if you are a minor in Sweden?

9    A.    I'm not sure.  Sweden is a small country compared to the

10   United States.  Those countries tend to create clinics like the

11   Portman Clinic in the UK that funnel these patients to the

12   centers of excellence, the centers of study.

13   Q.    But you don't know how it's done in Sweden?

14   A.    I don't know for sure how it's done in Sweden.  I do know

15   Sweden, we're very concerned about the suicide rates of their

16   transgender population.  The last report I had, it was

17   3.5 percent higher than the general population.

18   Q.    I lied.  I have a second question, if that's okay, related

19   to the same topic.  I would like to put up another document, the

20   Swedish national report that we have discussed.  This is, for

21   reference, DX17.  This is the Swedish report you were discussing

22   earlier.  Correct?

23   A.    The translation of it?

24   Q.    The English translation.  If we can scroll, if you can look

25   at the first highlighted paragraph with me.  "To minimize the

1    risk that a young person with gender incongruence later will

2    regret a gender-affirming treatment, the NBHW deems that the

3    criteria for offering GnRH analog and gender-affirming hormones

4    should link more closely to those used in the Dutch protocol,

5    where the duration of gender incongruence over time is

6    emphasized.  Accordingly, an early childhood onset of gender

7    incongruence, persistence of gender incongruence until puberty

8    and a marked psychological strain in response to a pubertal

9    development is among the recommended criteria."

10           I'm sorry.  I'm reading the wrong paragraph.

11           Apologies.  I'm going to read the highlighted second

12    paragraph.  "To ensure that new knowledge is gathered, the NBHW

13    further deems that treatment with GnRH analogs and sex hormones

14    for young people should be provided within a research context,

15    which does not necessarily imply the use of randomized

16    controlled trials, RCTs.  As in other healthcare areas where it

17    is difficult to conduct RCTs while retaining sufficient internal

18    validity, it is also important that other prospective study

19    designs are considered for ethical review and that register

20    studies are made possible.  Until a research study is in place,

21    the NBHW deems that treatment with GnRH analogs and sex hormones

22    may be given in exceptional cases, in accordance with the

23    updated recommendations and criteria described in the

24    guidelines."  This is the requirement or provision in the

25    Swedish national report.  Correct?

1    eight o'clock tomorrow.

2            MR. JACOBS:  Yes, Your Honor.

3       (Overnight recess at 4:19 p.m.)

4                    REPORTER'S CERTIFICATE

5       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

6

7    /s/Elaine Hinson, RMR, CRR, CCR      Date:  December 4, 2022.
     United States Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25