# Exhibit C

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

3                      HUNTINGTON DIVISION

4    ----------------------------------------------------------

5    Christopher Fain, individually and on behalf of all

6    others similarly situated, et al.,

7                   Plaintiffs,

8       vs.                    CIVIL ACTION NO. 3:20-cv-00740

9    William Crouch, et al.,

10                  Defendants.

11   ----------------------------------------------------------

12

13

14      REMOTE VIDEOTAPED DEPOSITION OF DR. STEPHEN LEVINE

15

16

17

18   DATE:   April 27, 2022

19   TIME:   8:00 a.m. CST

20   PLACE:  Veritext Virtual Videoconference

21

22

23

24   REPORTED BY: KELLEY E. ZILLES, RPR (Via Videoconference)

25   JOB NUMBER:  5176996

Page 2

1                          APPEARANCES

2

3    On Behalf of the Plaintiffs (Via Videoconference):

4          TARA L. BORELLI, ESQ.

5          Lambda Legal Defense and Education Fund, Inc.

6          158 West Ponce De Leon Ave., Suite 105

7          Decatur, Georgia  30030

8          470.225.5341

9          tborelli@lambdalegal.org

10

11         AVATARA SMITH-CARRINGTON, ESQ.

12         NICHOLAS GUILLORY, ESQ.

13         Lambda Legal Defense and Education Fund, Inc.

14         3500 Oak Lawn Avenue, Suite 500

15         Dallas, Texas  75219

16         214.219.8585

17         asmithcarrington@lambdalegal.org

18         nguillory@lambdalegal.org

19

20         CARL CHARLES, ESQ.

21         Lambda Legal Defense and Education Fund, Inc.

22         158 West Ponce De Leon Avenue, Suite 105

23         Atlanta, Georgia  30030

24         212.809.8585

25         ccharles@lambdalegal.org

Page 3

1          WALT AUVIL, ESQ.

2          The Employment Law Center, PLLC

3          1208 Market Street

4          Parkersburg, West Virginia  26101

5          304.485.3058

6          auvil@theemploymentlawcenter.com

7

8    On Behalf of Defendants William Crouch; Cynthia Beane;

9    and West Virginia Department of Health and Human

10   Resources, Bureau for Medical Services (Via

11   Videoconference):

12          KIMBERLY M. BANDY, ESQ.

13          LOU ANN S. CYRUS, ESQ.

14          CALEB B. DAVID, ESQ.

15          Shuman McCuskey Slicer, PLLC

16          1411 Virginia Street East, Suite 200

17          Charleston, West Virginia  25301

18          304.345.1400

19          kbandy@shumanlaw.com

20          lcyrus@shumanlaw.com

21          cdavid@shumanlaw.com

22

23   ALSO PRESENT:  Kraig Hildahl, Videographer

24                         (Via Videoconference)

25

Page 4

1                        INDEX

2

3

4   WITNESS:  DR. STEPHEN LEVINE                    PAGE

5

6

7

8   EXAMINATION BY MR. CHARLES......................... 10

9   AFTERNOON SESSION................................. 111

10  EXAMINATION BY MR. DAVID.......................... 229

11

12

13

14

15  OBJECTIONS... 14, 71, 73, 85, 86, 91, 92, 93, 94, 119,

16  133, 134, 163, 231, 232, 233, 235, 238, 239, 240

17

18

19

20

21  EXHIBITS MARKED AND REFERRED TO:

22

23  Exhibit 1    Expert Disclosure Report of Dr.

24               Stephen B. Levine, M.D................. 18

25

1    Exhibit 2    Curriculum Vitae........................ 20

2

3    Exhibit 3    BPJ vs. West Virginia State Board of

4                 Education, et al Deposition of

5                 Stephen Levine, Volume I, 3/30/22...... 53

6

7    Exhibit 4    Special Programs....................... 64

8

9    Exhibit 5    Kadel vs. Folwell, et al Deposition of

10                Stephen B. Levine, M.D., 9/10/21....... 76

11

12   Exhibit 6    Case Western Health Care Coverage for

13                Staff and Students..................... 88

14

15   Exhibit 7    Considering Sex as a Biological Variable

16                in Basic and Clinical Studies: An

17                Endocrine Society Scientific Statement.  97

18

19   Exhibit 8    Reflections on the Clinician's Role with

20                Individuals Who Self-identify as

21                Transgender Paper...................... 100

22

23   Exhibit 9    One Year Since Finland Broke with WPATH

24                Standards of Care, 7/2/21.............. 105

25

Page 6

1   Exhibit 10   International Clinical Practice Guidelines

2                for Gender Minority/Trans People:

3                Systematic Review and Quality Assessment

4                Article............................... 113

5

6   Exhibit 11   Dear Colleagues, Clients and Friends,

7                by Marci Bowers, M.D................... 125

8

9   Exhibit 12   Gender Dysphoria and Gender

10               Reassignment Surgery Article........... 131

11

12  Exhibit 13   Canadian Gender Report................. 140

13

14  Exhibit 14   Detransition-Related Needs and Support: A

15               Cross-Sectional Online Survey Article.. 155

16

17  Exhibit 15   Individuals Treated for Gender Dysphoria

18               with Medical and/or Surgical Transition

19               Who Subsequently Detransitioned: A

20               Survey of 100 Detransitioners.......... 161

21

22  Exhibit 16   Endocrine Treatment of

23               Gender-Dysphoric/Gender-Incongruent

24               Persons: An Endocrine Society Clinical

25               Practice Guideline.................... 163

 1   Exhibit 17   Pediatric Obesity—Assessment, Treatment,

 2                and Prevention: An Endocrine Society

 3                Clinical Practice Guideline........... 177

 4

 5   Exhibit 18   26 Swedish Review Unavailable......... 189

 6

 7   Exhibit 19   Finnish Article...................... 189

 8

 9   Exhibit 20   Gender-Affirming Hormone in Children

10                and Adolescents Blog Screen Shot....... 193

11

12   Exhibit 21   Gender-Affirming Hormone in Children

13                and Adolescents Article, 2/25/19....... 194

14

15   Exhibit 22   Fain vs. Crouch, et al Deposition

16                Transcript of Cynthia Beane, 3/29/22... 217

17

18   Exhibit 23   Transgender and Gender Diverse Children

19                and Adolescents: Fact-Checking of AAP

20                Policy................................ 221

21

22   Exhibit 24   A Follow-Up Study of Boys with Gender

23                Identity Disorder Article.............. 224

24

25

1   Exhibit 25    Gender Dysphoria in Childhood Article.. 227

2

3

4   (Original exhibits attached to original transcript.

5   Copies attached to transcript copies.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   of your career, right?

2       A.  Yes.

3       Q.  Okay.  You listed 23 separate pharmaceutical

4   company grants to study various pro-sexual medications,

5   right?

6       A.  Yes.

7       Q.  Were any of these 23 grants related to the

8   treatment of gender dysphoria in transgender people?

9       A.  No.

10      Q.  And were any of the grants related to the

11  treatment, any kind of treatment of prepubertal children

12  with gender dysphoria?

13      A.  No.

14      Q.  Or adolescents with gender dysphoria?

15      A.  No.

16      Q.  You also list in that same section in your

17  report, Dr. Levine, that you received a U.S. National

18  Institute of Health grant for the study of sexual

19  consequences of systemic lupus erythematosus and that

20  you were a co-principle investigator.  Does that ring a

21  bell, is that accurate?

22      A.  It is accurate.

23      Q.  Okay.  And did this grant have to do with the

24  study of anything related to gender dysphoria?

25      A.  No.

Page 28

1      A.   Only to the extent that the grant helped us to

2   set up the Center For Marital & Sexual Health.  The

3   Center For Marital & Sexual Health had a program called

4   the Case Western Reserve Gender Identity Clinic, and so

5   this was, this was not a grant for research, this was a

6   grant for the establishment, the administrative

7   establishment of our center that dealt with many sexual,

8   all sexual things including trans phenomenon.  We didn't

9   in those days call it so much trans phenomenon, but we

10  called it gender identity problems.

11     Q.   Right.  So one of the grants was used to start

12  the Center for Marital & Sexual Health, but those five

13  separate grants were not for the study or, or direct

14  treatment under the Sihler Mental Health Foundation?

15     A.   That's correct.

16     Q.   Okay.  But the Center For Marital & Sexual

17  Health, as a clinician there you saw a wide range of

18  patients there, right?

19     A.   Yes.

20     Q.   With a variety of problems related to sexuality

21  or sexual well-being?

22     A.   Yes.

23     Q.   Okay.  And did you treat any children with

24  gender dysphoria at the Center For Marital & Sexual

25  Health?

1      A.   If I can clarify your question, by you do you

2    mean me personally or do you mean under me as the

3    supervisor of people who did that?

4      Q.   Let's start with you personally.

5      A.   Yes, I have only on a rare occasion personally

6    treated or directly or indirectly treated a child.  My

7    center, however, over the years has, has seen children

8    and, and I've been involved in the, the treatment as a

9    supervisor of those children.

10     Q.   Okay.  So you've reviewed their cases by way of

11   your supervision of clinicians at the center, but not

12   individually?

13     A.   That's right.

14     Q.   Okay.  And is that the same for any adolescents

15   with gender dysphoria who were seen at the center?  In

16   the early years I'm talking about now, not in recent

17   times.

18     A.   Well, in the early years I occasionally saw

19   personally an older teenager, older adolescent, but in

20   the early years you must understand most of the patients

21   were adults.

22     Q.   Okay.  So to your knowledge, Dr. Levine, have

23   you received any grants to study the treatment -- I'm

24   sorry, excuse me.  Have you received any grants to study

25   treatment for adults with gender dysphoria?

Page 51

1   April 27, 2022.  We're going back on the record at

2   10:36 a.m.

3   BY MR. CHARLES:

4       Q.   Okay.  Dr. Levine, talking about your writing

5   credentials, you've testified previously that you were

6   involved in drafting portions of the WPATH standards of

7   care Version 5, right?

8       A.   Yes, I was the chairman of that group.

9       Q.   And besides that, have you developed -- let me

10  back up.  Have you helped to develop treatment

11  guidelines for the treatment of children or adolescents

12  with gender identity issues?

13      A.   If you mean have I been part of a national or

14  international group that tried to, to publish, that

15  published guidelines about the treatment of these

16  individuals, the answer is no.  But in my November of

17  2021 article I gave, I offered my opinions about what

18  the evaluation of adolescents and children ought to

19  consist of.  In that sense I'm hoping that would

20  influence the guidelines of those committees who might

21  function in the future.

22      Q.   I see.  When we spoke in September of 2021 for

23  the Kadel vs. Folwell deposition, you said that you were

24  working with SEGM to develop some treatment guidelines.

25  What, what happened to those?

1      Q.   Yes, Exhibit 01.

2      A.   Would you give me the pages again.

3      Q.   Sure, Page 2, Paragraph 3, so that will be the

4   top of Page 2, the paragraph does begin on Page 1.

5      A.   Yeah.

6      Q.   Okay.  So in that paragraph your report states

7   that, "During this era an occasional child was seen."

8   By this era do you mean from around 1974 to 1993?

9      A.   Yes.

10     Q.   Okay.  And by occasional do you mean infrequent?

11     A.   Infrequent is a good word.

12     Q.   So is it fair to say during that period your

13  clinic did not see many children with gender dysphoria?

14     A.   It's fair to say that.

15     Q.   And in your deposition on March 30th you

16  estimated that over the course of your career you've

17  probably only seen regularly six prepubertal children,

18  right?

19     A.   It's an estimate, yes.

20     Q.   And around 50 adolescents, give or take?

21     A.   Give or take an unknown number, yeah, ten, 12,

22  five.

23     Q.   Sorry, so you --

24     A.   I've had extensive experience talking to

25  adolescents over the course of my career, adolescents

1      A.   Page 51.

2      Q.   Okay.  Can you please scroll to Page 55.

3      A.   I'm there.

4      Q.   Okay.  So at line 13 on Page 55, "Question,

5   okay, and I'm sorry, just by recent, when was the last

6   time you wrote a letter of authorization for a gender

7   affirming surgery for an adult?  Answer, probably

8   12 months ago."  So have you written a letter of

9   authorization for a gender affirming surgery in the last

10  seven months, Dr. Levine?

11     A.   I think the last letter -- you, I need to, I

12  need to help you qualify your question.  I have in the

13  last seven months given my, my approval to several

14  letters for bilateral mastectomies for members in Mass

15  at Framingham, the correctional institution in

16  Massachusetts.  I don't know if that would number two or

17  three, but since September the 10th I believe at least

18  two and possibly three letters.  I haven't personally

19  written the letter, but I am the consultant to a group

20  of team that approves such surgeries, and so the answer

21  to the question is yes.

22     Q.   Okay.  Thank you.  And to your recollection,

23  any, any such letter outside the, outside of that

24  context?

25     A.   Since September the 10th?

1     Q.  That's correct, yes.

2     A.  Yes, I think the answer is that, no, but I

3  believe at our center someone else has written one

4  letter for bilateral mastectomies.

5     Q.  Okay.  Thank you.  Dr. Levine, are you familiar

6  with the, the exclusion for gender affirming surgical

7  care in the West Virginia Medicaid Program that's at

8  issue in this case?

9          MR. DAVID:  Objection to form.

10    Q.  You can answer.

11    A.  I'm vaguely familiar that surgical care is

12  excluded currently, but endocrine care is not excluded.

13    Q.  Have you reviewed any documents that, that show

14  that exclusion or was that information just communicated

15  to you by counsel?

16    A.  Verbally communicated.

17    Q.  Okay.  And so you're aware that there are

18  categorical exclusions, which means that the exclusions

19  prohibit surgical care related to the treatment of

20  gender dysphoria regardless of a West Virginia Medicaid

21  member's need for it or appropriateness for such

22  intervention?

23          MR. DAVID:  Objection to form.

24    Q.  Let me simplify my question.

25    A.  Thank you.

Page 86

1     Q.  The categorical, the exclusion does not

2   investigate or contemplate whether someone receiving

3   West Virginia Medicaid needs or is an appropriate

4   candidate for such intervention, it just prohibits it,

5   period?

6            MR. DAVID:  Objection to form.

7     A.  The categorical exclusion would include surgery

8   for teenagers and surgery for adults, so it would cover

9   removing the breasts or removing the scrotum of a

10   15-year-old who feels like --

11     Q.  Not my question, Dr. Levine.  Let me, let me

12   rephrase again.  The, the West Virginia Medicaid Program

13   and the exclusion it maintains, which excludes surgical

14   care for members for whom it is appropriate, it, it just

15   excludes it, you're, you're aware it just excludes it,

16   there's no, there's no conditional considerations or any

17   investigation done into the member's health at all, it

18   just, there's no coverage for that care, you understand

19   that?

20     A.  I, I --

21            MR. DAVID:  Objection to form.

22     A.  I think that's what categorical means, so I

23   think the answer is I understand that at the moment,

24   yes.

25     Q.  Okay.  But you don't view your testimony here in

1    your expert report as being in support of that exclusion

2    or whether it should exist, right?

3        A.  Yeah, it's my understanding that, that the

4    lawyers who hired me wanted me to testify to the state

5    of science in this field, and, and so I have not been

6    involved with the legal questions, per se, or giving an

7    opinion about those matters.  As I sort of indicated to

8    you before, I don't really feel that the, my expertise

9    extends to how the insurance industry works and how

10   governments and legislatives works and so forth.  So I,

11   I think the answer to the question is that I'm not

12   considering myself to be expert on the question that

13   you're asking me.

14       Q.  Right.  So you're, you, you are an expert about

15   what your testimony is about though, right, and you're

16   saying your testimony is not about whether or not that

17   exclusion should exist?

18       A.  Yes, I'm not offering an opinion about pro or

19   con about that question.

20       Q.  I see.  Because you're, you're, as you say,

21   you're not a politician or a law maker?

22       A.  Or an insurance expert.

23       Q.  Right.  Or a public health expert, right?

24       A.  Well, I'm a little more ambivalent about public

25   health matters, yeah.  I'm not as, I'm not, I really

Page 88

1    think that public health is the issue here and so I, I

2    don't want to say I'm not an expert.  I'm not an expert

3    in public health, but I do have opinions about the

4    long-term public health of people who are prematurely

5    having their bodies changed because I do think this has

6    public health implications for the future of each of

7    these, these adolescence children and young adults.

8         Q.   Understood.

9         A.   And adults as well.

10        Q.   And you, generally speaking, don't advocate to

11   deny all forms of medical intervention to people with

12   gender dysphoria though, right?

13        A.   That's right.

14        Q.   Okay.  I'm going to introduce another exhibit,

15   Dr. Levine, give me just a moment.

16              (Exhibit 6 marked for identification.)

17        Q.   Okay.  It should be now or shortly visible, you

18   might need to refresh.

19        A.   I now have Exhibit 6 here.

20        Q.   Okay.

21              MR. CHARLES:  So I'm showing Dr. Levine

22   what has been marked as SL06.

23        Q.   Dr. Levine, this is a short document, please

24   just take a minute and scroll through it.

25        A.   Okay, I, I've scrolled.

Page 106

1          (A break was taken at 11:33 a.m.)

2          VIDEO TECHNICIAN:  We're going back on the

3    record at 12:34 p.m.

4          MR. CHARLES:  Okay.  So I'm showing Dr.

5    Levine what has been marked as SL09, an article from

6    Society for Evidence Based Gender Medicine entitled,

7    "One year since Finland broke with WPATH standards of

8    care."

9    BY MR. CHARLES:

10        Q.  Dr. Levine, do you see the date of publication

11   in the left corner of that first page?

12        A.  July 2nd.

13        Q.  And, and the year is 2021, right?

14        A.  Yes.

15        Q.  So looking at the first paragraph there, I'm

16   just going to read that, "A year ago the Finnish Health

17   Authority (PALKO/COHERE) deviated from WPATH standards

18   of care 7 by issuing new guidelines that state that

19   psychotherapy rather than puberty blockers and cross sex

20   hormones should be a first line treatment for gender

21   dysphoric youth.  This change occurred following a

22   systematic evidence review which found a body of

23   evidence for pediatric transition inconclusive."

24          And then the next paragraph, the first sentence,

25   "Although pediatric medical transition is still allowed

1   in Finland, the guidelines urge caution given the

2   unclear nature of the benefits and the interventions,

3   largely reserving puberty blockers and cross sex

4   hormones for minors with early onset gender dysphoria

5   and no co-occurring mental health conditions."  Did I

6   read that correctly?

7        A.   Yes, you did.

8        Q.   Okay.  So as this article states, medical

9   interventions are still available in Finland for youth

10  experiencing gender dysphoria, right?

11       A.   On a case-by-case basis I think.

12       Q.   And --

13       A.   I should say on a case-by-case basis and two

14  research centers as opposed to in any practitioner's

15  office throughout the country.

16       Q.   Right.  But it's, it's not been completely

17  prohibited is what I'm asking?

18       A.   Oh, it's been, it's been, the brakes have been

19  put on.

20       Q.   But it's not been completely prohibited is what

21  I'm asking?

22       A.   That's what you and I have agreed on, yes.

23       Q.   So it's not been completely prohibited, right?

24       A.   Right.

25       Q.   So then in the third paragraph beginning with,

1   "The qualifying criteria for gender reassignment of

2   youth articulated in the 2020 Finnish treatment

3   guidelines are consistent with the original Dutch

4   protocol, but represent a significant tightening of the

5   more recent practices promoted by WPATH."  So the

6   article describes it as a tightening of the standards

7   which WPATH allows for, right?

8       A.  Yes.

9       Q.  So you, you've talked about in your report an

10   idea of rapid affirmation treatment where you allege

11   that diagnoses of gender dysphoria are being made in an

12   hour and then, and then prescriptions provided for

13   medical interventions, right?

14       A.  Yes.

15       Q.  Do you have, or I should say, your evidence for

16   that is anecdotal in nature, right?

17       A.  My evidence for that is what has been told to me

18   by parents, what has been told to me by patients and

19   what this, what the third paragraph of this document

20   says.

21       Q.  Right.  So --

22       A.  So I don't really think the answer is simply

23   anecdotal, it's based upon a considerable consistent

24   range of, of experiences, both of my personal

25   experiences, of my patient's personal experiences, and

1    paragraph -- actually, hang on a second.  Dr. Levine,

2    let's go ahead and go to Page 26 of your report,

3    Exhibit 1.

4         A.   Okay.  Let me, I have to scroll back.  Did you

5    say page or Paragraph 26?

6         Q.   That would be Page 26.

7         A.   Okay, I'm on Page 26.

8         Q.   Okay.  Okay.  So, Dr. Levine, you've testified

9    previously that you generally provide care along some of

10   the same guidelines as WPATH, right?

11        A.   In a general way, sure.

12        Q.   And the difference from your view is that you

13   require psychotherapy for some not necessarily

14   predetermined length of time for patients that you see

15   before you will authorize any kind of like medical

16   intervention, right?

17        A.   I don't want to answer that question right or

18   wrong because embedded in the question is the word

19   psychotherapy and I don't know what you understand by

20   psychotherapy, I mean, you're a lawyer and I'm a

21   practitioner of psychotherapy.  And I think when a

22   lawyer uses psychotherapy it is a certain concept about

23   I'm trying to achieve a certain aim, you see.  And in

24   the context of the question that you've asked, you could

25   substitute an extended period of time with the patient

1  working with patients.

2      Q.  Okay.  So back to my question.  On some, on some

3  level that that is, that universe of care that you are

4  providing, which again, I think I'm still going to call

5  it psychotherapy, but I understand your explanation that

6  it is, that encompasses a lot that you do in your, in

7  your clinical practice, but again, the difference for

8  you between the Levine way, if we can shorthand, and

9  WPATH is that you cultivate, you engage in that process

10  as a requirement before you will authorize any kind of

11  medical intervention for a patient for the treatment of

12  gender dysphoria?

13      A.  That's true.

14      Q.  Okay.  Thank you.  But even still as a part of

15  your practice as we discussed earlier, you still

16  occasionally write letters of authorization for medical

17  interventions, like endocrine treatments or surgical

18  interventions?

19      A.  Yes.

20      Q.  Okay.  Okay.  Let's go back to your report,

21  please, to Page 35.

22      A.  I am there.

23      Q.  Okay.  And looking at Paragraph 70, let's start

24  with Paragraph 70.  I take that back, let's go with

25  Paragraph 71 at the bottom of the page, "In recent years

Page 140

1   WPATH has fully adopted some mix of the medical and

2   rights paradigm discussed above.  It has downgraded the

3   role of counseling or psychotherapy as a requirement for

4   these life-changing processes.  WPATH no longer

5   considers pre-operative psychotherapy to be a

6   requirement.  It is important to WPATH if the person has

7   gender dysphoria, the pathway to the true, the

8   development of this state is not.  Cited Levine,

9   Reflections, at 240.  Two separate evaluations, one from

10  Canada and one from the UK reviewed WPATH's guidelines

11  and found them untrustworthy."

12          So for that footnote 113 you've cited the Dahlen

13  study which we talked about and then there's also a

14  citation here that says, "See also," and then there's a,

15  a Web address, do you see that, the very last line?

16      A.  Yeah, yeah, right.

17      Q.  It says, "Gender report, CA"?

18      A.  Yeah.

19              (Exhibit 13 marked for identification.)

20      Q.  Okay.  There should be another exhibit there for

21  you, Exhibit 13.  Just let me know when you can see

22  that.

23      A.  Okay.  Okay.

24      Q.  Okay.

25      A.  Yeah, okay.

1    Q.  Have you, have you seen this article before

2    either on the Internet or printed out perhaps?

3    A.  The reason I cited it is that I had read it

4    before.

5    Q.  Okay.  And this is not a peer reviewed journal,

6    is it?

7    A.  This is a journalist, but if you look very

8    carefully at the, its length and its content, it's very

9    impressive.

10    Q.  Okay.  Is this the review from Canada that you

11    were talking about in that sentence --

12    A.  Yes, yes, it is.

13    Q.  Okay.  But it's, it's not a systematic review

14    like the one from the UK?

15    A.  It's not systematic in that it wasn't done by a

16    community of scientists, a committee of scientists.

17    Q.  Okay.  And the --

18    A.  It is systematic and it is a review, but it's

19    one person's review.

20    Q.  Right.  So it's more, we were discussing the

21    difference between systematic reviews earlier today,

22    it's a, it's, it's not a scientific committee that's

23    done in a, in a formal way that we were discussing, it's

24    more akin to that latter one person reviewing things

25    kind of --

Page 142

1    A.  It's an investigative report by a journalist.

2    Q.  Right.  And you see in the first page, Dr.

3 Levine, it says, "The following investigative report was

4 developed by @LisaMacRichards (a pseudonym)"?

5    A.  Yeah, okay, right.

6    Q.  Okay.

7    A.  I see I'm wrong, she wasn't the journalist.

8    Q.  So we, you don't know who this author is, right?

9    A.  Well, her real identity?

10    Q.  Correct, yeah.

11    A.  No, I don't know who Lisa Mac Richards really

12 is.

13    Q.  Okay.  So it's hard to know if she's an actual

14 person?

15    A.  If she's an actual person, is that what you

16 said?

17    Q.  What I mean to say is, because she's using a

18 pseudonym, you can't confirm her identity is what she

19 represents it is, right?

20    A.  Well, she says it's a pseudonym, so I presume

21 the rest of the paragraph is correct, that she works at

22 a Canadian hospital and holds a master's of science

23 degree and, yeah.

24    Q.  But what I mean is there's no way to confirm

25 that because we don't know what her name is?

1      A.  It could be written by a man, I don't know, it

2  could be written by a committee, I have no idea.

3      Q.  Okay.  Okay.  So going back to what we were

4  talking about just a few minutes ago, Dr. Levine, about

5  your approach versus WPATH.  You, you've said before,

6  not, not necessarily today, but you've testified in

7  other depositions that your approach has the limitation

8  that there's not any scientific evidence or long-term

9  studies to support it, right?

10     A.  I think in particular what I said is that, that

11 the status of the outcome, the outcome status and the

12 methodologic status of psychotherapy as a first line

13 approach to the trans adolescent has, does not have a

14 firm evidence base just as trans affirmative care does

15 not have a firm evidence base.

16         So oftentimes that's, that's, I get a question

17 just like you ask, you just posed sort of implying that

18 there's no evidence that my, my recommendations have a

19 scientific proven basis to it.  And that is correct,

20 except that all other psychiatric difficulties are

21 treated with, in our society both European and American

22 and Asian societies by a psychotherapeutic extended

23 evaluation and treatment approach before, with or

24 without psychiatric medications, you see.

25         And so we are trying to make a, you, some people

1  centers have cropped up that are providing affirming

2  care in one hour, again, we talked about the 35 parents

3  you had talked to, you've mentioned a couple of patients

4  you've talked to, but you don't have, or I should say

5  what evidence can you provide me today that is, is

6  scientific peer reviewed published data showing that

7  this is actually what's happening in these clinics?

8      A.  Well, if I look at Exhibit 6.  Do you know what

9  the, the first name for this center was and the name of

10  so many of the 50 or so centers are?  And it has the

11  term gender affirming care, the clinic, you see.  If you

12  look at all of the materials in Exhibit 6, it's about

13  support and affirmation, it's not about investigation,

14  it's not about psychotherapy.  And, and you see, gender

15  affirming care has been taken over, it's been taking

16  over the world's sensibilities without any scientific,

17  first demonstrating its efficacy with scientifically

18  respectable methods.

19      Q.  I understand that, Dr. Levine, but that's not my

20  question.  My question is, what evidence can you point

21  to that these kinds of interactions are happening in

22  clinics?  Is your basis that the, are you basing that on

23  the way these centers are named?

24      A.  I'm basing it on what they're named and I'm

25  looking at the document that you are, are talking about.

Page 147

1    friendly especially designed specialty clinic.  Those

2    clinics exist to take care of trans people, to give them

3    hormones and to get them surgery, that exists.

4        Q.  But what you're describing --

5        A.  It exists to do psychotherapy.

6        Q.  Okay.  And what you described, Dr. Levine, is

7    the basis for your, for this opinion, right?

8        A.  The basis for my opinion is my collective

9    experience of dealing, watching, participating in the

10   evolution of the study of transsexual care over, over

11   since 1974.

12       Q.  Okay.  So your report states that you were

13   involved with WPATH before it was called WPATH, when it

14   was called the Harry Benjamin --

15       A.  Can I help you?

16       Q.  Yes.  Harry Benjamin?

17       A.  International Gender Dysphoria Association.

18       Q.  Thank you.  And you were involved around 1999

19   when the 6th version of the standards of care was

20   released, right, we talked about that?

21       A.  Yes.

22       Q.  Okay.  And it's, it's true that you helped to

23   draft portions of that version, right?

24       A.  Actually, my report misstates me as the

25   co-chair.  If I remember correctly, I was the chairman.

Page 148

1      Q.   The chairman of that committee, okay.   Thank

2   you.

3      A.   And most, with very little exception I had a

4   significant editorial role in creating every sentence in

5   that 21-page document.

6      Q.   Okay.   And you've testified in other depositions

7   that even though the, there have been changes made to

8   the standards of care in subsequent versions, you still

9   continue to see your work reflected in those versions,

10   right?

11      A.   Yes, my language.

12      Q.   Yes, mm-hmm.

13      A.   Yeah, my language, right.   In fact, the next

14   version which came out I think three years later or two

15   years later I think was pretty much word for word except

16   for a requirement for one letter for endocrine treatment

17   rather than two, which is what my committee of eight

18   people recommended.

19      Q.   Okay.   And you've testified before that even

20   Version 7, which is, you know, one more, obviously one

21   more removed from Version 6, that that, as you read it

22   much of the language you had actually still, it was

23   still reflecting your language in that version even,

24   even though it's a much longer document?

25      A.   Well, yeah, I think the introduction section

1    about what guidelines were and, and the problems of

2    cross culture, cross country rules affecting the laws

3    are different and the, that we wanted this to be a

4    information guide for, for patients and parents and

5    wives and husbands and so forth.

6          I think, you know, once, once we got, I mean, I

7    don't have it in front of me and I'm not sure I could

8    recognize every sentence I wrote anyway, but, but they

9    did, they did continue to use some of my sentences, some

10   of my concepts.  It was my concept that there is a

11   difference between readiness criteria and eligibility

12   criteria, that was one of my contributions

13       Q.  Thank you.  And, and I think also you testified

14   in the Soneeya trial that you had asked to be involved

15   in helping to write standards of care 8 but were told

16   that you, in order to do so you had to be a WPATH

17   member, right?

18       A.  Yes.

19       Q.  And looking back at your report -- actually,

20   give me just a minute here.  Actually, Dr. Levine,

21   let's --

22               MR. CHARLES:  Sorry, Kelley and Kraig, can

23   we go off the record real quick.

24               VIDEO TECHNICIAN:  We're going off the

25   record at 2:26 p.m.

Page 151

1    be trans boys or trans males.

2         The historic pattern throughout most of the

3    world was 3.5 to 4 biologic males who wanted to be women

4    to biologic females who wanted to be men dominated

5    dramatically for decades in the '70s and the '80s and

6    the '90s and the early 2000s.  But since 2005 there's

7    been a growing incidence of request for services and

8    particularly request for services from girls assigned at

9    birth who wanted to be males.

10        Some of us have come to in recent years call

11   this delayed or pubertal or rapid onset of gender

12   dysphoria, meaning it's a pubertal phenomenon because

13   there was no evidence prior to that except in the

14   retrospective subjective histories given by these kids

15   that they had any indication, parents and themselves,

16   had no behavioral indications that they were trans

17   identified or even sort of leaning in that direction.

18        Q.  I understand that, Dr. Levine, and I'm not

19   talking necessarily about the, the increase in

20   referrals, I'm talking about this phenomenon that you

21   referenced called rapid onset gender dysphoria.  So not

22   just adolescent onset gender dysphoria, which I

23   understand you're saying has somewhat increased since

24   2005, but rapid onset gender dysphoria.  And I'm

25   specifically asking what peer reviewed studies, what

1   papers and what research would you refer me to or is

2   referenced in your report as evidence that this

3   hypothesis actually exists or that there's any

4   scientific study to support it?

5       A.  No. 1, this is not a hypothesis, this is a

6   demonstrated fact.

7       Q.  Okay.  Based on what, Dr. Levine, that's what

8   I'm asking, what are the peer reviewed studies?

9       A.  If you look up the presentations of Kenneth

10  Zucker, if you look at papers, I can't give you the

11  authors at the moment from Europe, this has been

12  documented by DiAngelo I believe in Australia, by

13  Clayton in Australia.

14      It seems to me there is no disagreements about

15  this except I've heard the cynical response that what

16  rapid onset gender dysphoria really means is that the

17  parents have suddenly discovered that their kids have

18  been transgender, meaning to deny the parental reports

19  that the children were not cross gender identified prior

20  to that, even though the kids say, well, I was never

21  comfortable with being a boy or a girl.

22      Q.  Okay.  So you, for this contention in your

23  report you cite one thing and that is Midgen A.

24  Hutchinson and her study is entitled, "In support of

25  research into rapid onset gender dysphoria."  So that

Page 153

1   was published in 2020 and I don't, I'm not seeing here

2   any of the other --

3        A.   One, one of the reasons you're not seeing it is

4   that I assume that everyone understands that this is

5   true.

6        Q.   Well, Dr. Levine, this is an expert report and

7   you have to include all of your expert opinions, and

8   you're also required under Rule 26 to disclose all of

9   the data and research that you considered for those

10  opinions.  That's the purpose of our deposition today is

11  for me to understand and to have you put on the record

12  what you relied on to establish your opinions, so that's

13  what I'm trying to get at.  And, and I understand what

14  you're saying that from your vantage point as a

15  clinician outside of the legal sphere that there are

16  things you think are givens, but we can't operate like

17  that unfortunately.  So I need to, I need to understand,

18  and all I see here is the Midgen A. Hutchinson study

19  that's asking for support of, that's offering that she

20  wants to support research into this phenomenon, not that

21  the phenomenon has been evidenced to exist.  Does that

22  make sense?

23       A.   Yes.  May I comment on that?

24       Q.   On Hutchinson, yeah.  Let me pull it up

25  actually.

1   makes reference to it as well.  This is not to be

2   denied.

3          So if you're questioning whether, whether this

4   is really true, I think you're just simply wrong, but

5   you're not, you may not be questioning that.  I'm wrong

6   and I didn't document adequately that sentence and I

7   apologize, I stand corrected.

8   Q.  Okay.  So let's turn in your report, Dr. Levine,

9   here to the following sentence which says, "There is

10  also no chapter on detransition despite the evidence

11  that a growing number of young people regret transition

12  and wish to reverse it," do you see that, are you still

13  on Page 38 there?

14  A.  I do.

15  Q.  Okay.  So for this sentence here you have

16  provided a couple of citations.  The first is an article

17  by Vanderbussche I believe, if I'm pronouncing it

18  correctly, and then a second article by Littman.  So

19  let's, let's take each of those in turn.  And I'll just

20  introduce the Vanderbussche exhibit, give me just a

21  moment.

22              (Exhibit 14 marked for identification.)

23  A.  Is it up now?

24  Q.  Let me know when you can see it.

25  A.  This will be 14?

Page 156

1      Q.   Yes, correct.

2      A.   Okay.  All right, I see it.

3           MR. CHARLES:  So this is, for the record

4   I'm showing Dr. Levine what has been marked as

5   Vanderbussche article entitled, "Detransition related

6   needs and support:  A cross-sectional online survey, by

7   Elie" -- oh, excuse me, it's Elie Vandenbussche, not

8   Vanderbussche.

9      Q.   And, and you've seen this article before, Dr.

10  Levine?

11     A.   Yes.

12     Q.   Okay.  Scroll please to the, the first page of

13  text.  Let me know if you can see that or if you need a

14  minute to zoom in.

15     A.   You mean, "Introduction"?

16     Q.   Yes, it has, it's the page that has introduction

17  on it, yes.

18     A.   Okay.

19     Q.   So from the abstract, the first sentence, the

20  abstract is in a, set off in a blue box there at the

21  top?

22     A.   Yes, yes.

23     Q.   It says, "The aim of this study is to analyze

24  the specific needs of detransitioners from online

25  detrans communities and discover to what extent they are

1    being met.  For this purpose a cross-sectional online

2    survey was conducted and gathered a sample of 237 male

3    and female detransitioners.  The results showed

4    important psychological means in relation to gender

5    dysphoria, co-morbid conditions, feelings of regret and

6    internalized homophobic and sexist prejudices.  It also

7    found that many detransitioners need medical support

8    notably in relation to stopping/changing hormone

9    therapy, surgery/treatment complications and reversal

10   interventions."  So the aim of this study as outlined

11   here in the abstract is to analyze the specific needs of

12   detransitioners, right?

13        A.  Yes.

14        Q.  Okay.  Not to demonstrate that there is a

15   growing number of young people who regret transition or

16   wish to reverse it, right?

17        A.  It's true.  But you see, you're, you're taking

18   the reference out of that sentence and missing the first

19   phrase of that sentence.  This sentence that you're

20   drawing attention to is that WPATH's standards of care

21   draft did not have any section on the phenomenon of

22   detransition.

23        Detransition exists and detransition is a

24   reflection of those adolescents or people, or adults who

25   have at one time in their lives thought that they needed

Page 158

```
 1    this care and then after they lived following the care
 2    they decided that their problems have not been solved
 3    and they decided to return to the gender expression --
 4         Q.  I understand that, Dr. Levine, and I'm not
 5    actually contesting the assertion in your, in your
 6    report that detransition exists at all.
 7         A.  All right.
 8         Q.  What I'm asking about is your assertion in the
 9    latter half of that sentence that says that there is a
10    growing number of young people who regret transition and
11    wish to reverse it.  Again, I'm just trying to
12    understand what you're saying here and on what basis you
13    are making those assertions.
14              So I'm not asserting whether or not
15    detransitioning exists, my question is, this study did
16    not look at how many detransitioners are there now as
17    opposed to any other time in history, it was not a
18    qualitative or quantitative analysis.  It was a study
19    according to the abstract here, and I'm just asking you
20    to confirm that, about the specific needs of
21    detransitioners, both psychological, medical, other
22    kinds of support, right?  So that's what I'm saying is
23    this study is not, the aim is not to quantify the number
24    of, whether the number of detransitioners is growing or
25    shrinking or staying the same, right?
```

1     A.   Yes, I can answer to your question, correct.

2     Q.   Okay.

3     A.   But it doesn't mean that -- I think you're

4  missing the point.  And, and by, by having me say yes,

5  that it doesn't quantify the incidents of detransition,

6  it's missing the point.

7     Q.   I understand that, Dr. Levine.  But if your

8  point was, if your point in your report was detransition

9  is a thing and here are the psychological supports that

10  these people need, that's what you should have written,

11  but that's not what you wrote.  You wrote that a growing

12  number of young people regret transition and wish to

13  reverse it.

14          So my question to you about the article you rely

15  on for that contention is, this article doesn't say

16  that, this article is not a study of the growing numbers

17  or small or diminishing numbers or staying the same

18  numbers of people who detransitioned.  That's what I'm

19  asking you to confirm.

20     A.   What I am confirming is that this particular

21  paper talks about 237 people who have detransitioned and

22  that WPATH has no serious discussion of detransition,

23  there's no chapter on this, on this phenomenon which is

24  extremely relevant to the care of transgender people,

25  especially transgender young people.

1     The reason I cited this is 237, and the reason,

2     the next thing, Littman is another additional 100

3     people.  And if you, if you read closely some of the

4     references in this particular article, there is

5     Exposito-Campos' article talking about subreddit and the

6     number of people who were discussing detransition.

7         So what I'm saying if WPATH is responsible for,

8     for providing a scientific basis for affirmative care,

9     they must talk about the error rate as represented by

10    detransitioned people.  And four years ago we had no

11    idea about the, the rate of detransitioned people and

12    today we have two studies that have been published from

13    the UK that begin to give us a rate of detransition.

14        And so to me you are making the wrong point and

15    that I have not been in error.  You just have

16    misunderstood the difference of why I cited these

17    particular papers.  These particular papers just

18    demonstrate that detransition is a real problem and, and

19    it is a moral and ethical and scientific problem.  And

20    that WPATH if it's going to deal with the science of

21    transition, it has to deal with the error rates and what

22    happens to people who detransition, you see.  And so I

23    don't, I don't have nothing more to say about that, I

24    just think your point is quite irrelevant.

25        Q.  Okay.  Well, I'm going to continue to ask you

1   about evidence that you cite in your report that you use

2   as support for assertions you're making, so I'm just

3   going to flag that for you now.  And again, this --

4   let's actually, let me, let me just ask one more time.

5   This study does not speak to the numbers of people who

6   have detransitioned now as opposed to any other time in

7   history, right?

8       A.  As far as I remember this paper, the answer to

9   your question is right.

10      Q.  Sorry, the answer to my question is -- okay,

11  right, okay.  So let's actually now that you mention it,

12  let me just pull up really quickly the Littman study

13  that you mentioned.

14              (Exhibit 15 marked for identification.)

15      Q.  This will be Exhibit 15.

16      A.  Okay.

17      Q.  Okay.

18              MR. CHARLES:  So for the record, I'm

19  showing Dr. Levine what has been marked as SL15,

20  "Individuals treated for gender dysphoria with medical

21  and/or surgical transition who subsequently

22  detransitioned, a survey of 100 detransitioners by Lisa

23  Littman, received," well, published online 19 October

24  '21.

25      Q.  Okay.  So looking at the abstract again, the

1    first sentence, "The study's purpose was to describe a

2    population of individuals who experienced gender

3    dysphoria, chose to undergo medical and/or surgical

4    transition, and then detransitioned by discontinuing

5    medications, having surgery to reverse the effects of

6    transition, or both.  Recruitment" -- oh, wait, let me

7    stop there, just a second.  And then the last sentence

8    of the abstract -- oh, wait, hang on.  So then actually

9    if you'll look please to page -- okay, go to two pages

10   down, Dr. Levine, it's going to be numbered Page 3355 in

11   the upper right-hand corner.

12        A.   Okay, I'm on the page.

13        Q.   Okay.   In the left-hand corner the paragraph

14   starts on that page with, "Individuals," but I'm going

15   to start reading from the second to last sentence.  It

16   begins, "This study does not describe the population of

17   individuals who undergo medical or surgical transition

18   without issue, nor is it designed to assess the

19   prevalence of detransition as an outcome of transition.

20   Instead, the goal was to identify detransition reasons

21   and narratives in order to inform clinical care and

22   future research."

23             So again, my question here, Dr. Levine, is this

24   study by design and by the admission of Lisa Littman is

25   not about assessing the prevalence of detransition or

Page 163

```
 1   whether or not the numbers of detransitioners are
 2   growing, right?
 3              MR. DAVID:  Objection to form.
 4        A.  You know, I, I don't know if I should just
 5   repeat what I said before.  Detransition is a
 6   phenomenon, science is only now beginning to get, we
 7   have two studies that were published within the last I
 8   think four months or five months.
 9        Q.  Okay.  So, Dr. Levine, are you refusing to
10   answer my question because --
11        A.  Not at all, I'm answering your question, I'm
12   answering.
13        Q.  No, you're not.
14        A.  Well, then ask me the question again.  I'm
15   sorry, I apologize.  You want to confine me to an answer
16   and so, so set me up for the answer you want, please.
17        Q.  Okay.  What I'm asking is, this sentence by the
18   admission of the author was not designed to assess the
19   prevalence of detransition?
20        A.  That's true.
21        Q.  Okay.  Instead the purpose of this study was to
22   identify detransition reasons and narratives in order to
23   inform clinical care and future research, right?
24        A.  Correct.
25        Q.  Okay.  Thank you.  Okay.  Let's, I'm going to
```

1      A.  This is --

2      Q.  Well, let me just ask you, Dr. Levine, you don't

3   speak Finnish, do you?

4      A.  I'm an American, which means I have one

5   language.

6      Q.  Okay.  Okay.

7      A.  I only speak English.

8      Q.  Okay.  Are you saying you have read a

9   translation of this document at some point?

10     A.  Yes.

11     Q.  And do you know if it was an official

12  translation, a certified official translation?

13     A.  I don't know if it was a certified one.  I think

14  I, I accessed it through SEGM.

15     Q.  Okay.  All right.  Let's go, let's go back to

16  your report, Exhibit 1.

17     A.  God, I'm having the same damn problem again.

18  All right.  Exhibit 1, I'm going to get there.  All

19  right, here I am.

20     Q.  Okay.  And you, you said earlier that the UK was

21  also changing some of their guidelines with regard to

22  medical interventions for the treatment of gender

23  dysphoria, right?

24     A.  Yes.

25     Q.  Give me just a second here.  But the UK has also

1    not completely banned all medical interventions, right,

2    they're just adjusting them?

3        A.   That's correct, you're correct.

4        Q.   And then are you aware of the Cass review?

5        A.   Yes.

6        Q.   That the UK is doing?

7        A.   Yes.

8        Q.   Okay.  And, and as a part of that review you're

9    aware that the, that the national, what do they call it,

10   the National Health Service acknowledges that some

11   children do experience gender dysphoria and will need

12   clinical support and interventions?

13       A.   Yes.

14       Q.   Okay.

15       A.   That's the clinical perception around many

16   people, yeah.

17       Q.   Okay.  All right.  Let's take a look, hopefully

18   you still have it up, Page 51 of your report,

19   Paragraph 103.

20       A.   Getting there.  Okay, I'm here.

21       Q.   Okay.  So in Paragraph 103 you're talking about

22   a review by Professor, excuse me, Professor Carl

23   Heneghan, the editor of the British Medical Journal.

24   And the citation provided to that review is at the end

25   of the paragraph, do you see that, footnote 165?

1            (Exhibit 23 marked for identification.)

2       Q.   Okay.   Dr. Levine, you talk in your report,

3   let's see here, it's going to be Page 42 of your report

4   about, "That many professionals are unfamiliar with

5   these 11 research studies indicating a high natural

6   resolution rate of gender dysphoria," I think that's

7   supposed to say gender dysphoria in children, but it

8   just says, "gender dysphoria children by late

9   adolescence," do you see that?

10      A.   I don't see it, but I don't think I want to go

11  to the report.

12      Q.   Okay.

13      A.   It just takes time.

14      Q.   Okay.   That's fine.   I'll just represent to you

15  that's where I'm reading that from.   And your citation

16  is to this study here, or this article rather by James

17  M. Cantor.

18           MR. CHARLES:   And for the record, I'm

19  showing Dr. Levine what has been marked as SL23,

20  "Transgender and gender diverse children and

21  adolescents:   Fact checking of AAP policy."

22      Q.   And the 11 studies you mentioned, Dr. Levine,

23  are included by Mr. -- I'm sorry, I don't know if it's

24  Dr. Cantor, is it Dr. Cantor, do you know?

25      A.   Yeah, I definitely know, it's Dr. Cantor.

Page 222

1      Q.   Okay.   Thank you.   The 11 studies are referenced

2   by Dr. Cantor in this article in an appendix, but let me

3   point you to the sentence where he says that.   So

4   it's --

5      A.   I have the appendix in front of me.

6      Q.   Okay, perfect.   Let's just look at that.   Okay.

7   So looking at that list of studies, the, the, how do I

8   say this, the, the oldest study is listed first, so

9   that's a study by P.S. Lebovitz published in 1972, do

10   you see that?

11      A.   Yes.

12      Q.   Okay.   And then the second study by B. Zuger?

13      A.   Yes.

14      Q.   Published in 1978.   A study by J. Money and A.

15   Russo published in 1979?

16      A.   I see all those.

17      Q.   Okay.   I just, I'm just confirming the dates of

18   publication.   So C.W. Davenport was published in 1986;

19   R. Green was published in 1987; it looks like R.J.

20   Kosky was published in 1987; Cohen-Kettenis and M.

21   Wallien was published in 2008; Drummond, et al. was

22   published in 2008; Singh, unpublished doctoral

23   dissertation was published in 2012; and lastly the

24   Steensma, et al. was published in 2013, right?

25      A.   That's, although you didn't ask, I should tell

1   you that the Singh, et al. article, this 2012, has been

2   published now that it's, there's more years, it was

3   published in Frontiers of Psychiatry in April 2021.

4        Q.  Okay.

5        A.  And so, you know, that's --

6        Q.  I'll, I'll, thank you for that, I'll turn to

7   that in a minute.  So I just want to confirm, these

8   studies were all published, with the exception of

9   Steensma, they were all published before 2013, right?

10       A.  Yes, these were follow-up studies, these are

11  long-term follow-up studies.

12       Q.  And the datasets, none of the data that was

13  collected in any of these studies was collected after

14  2013, right?

15       A.  Even after the DSM-V criteria.

16       Q.  None of them, none of the data was collected

17  after 2013, right?

18       A.  None of the original.

19       Q.  Which, which data of any of these studies was

20  collected after 2013?

21       A.  Oh, I see what you mean.

22       Q.  Yeah.

23       A.  I see.  All right.

24       Q.  I, I agree with you they are follow-up studies,

25  they, they follow youth sometimes as far back as the

Page 224

1   late '60s all the way through as I understand it the

2   latest was corrected in 2011.  So I just, I'm confirming

3   that that's your understanding of the scope of the

4   follow-up studies as well?

5        A.  Yeah, I confirm.

6        Q.  Okay.  And the, let me, the Singh dissertation

7   which was later published in the Frontiers of

8   Psychiatry, that did not include any data that was

9   collected after 2013, right?

10       A.  I don't remember one way or the other.

11       Q.  Okay.  Let's, I'll just, we'll just take a look

12   really quickly.

13                (Exhibit 24 marked for identification.)

14       Q.  Okay.  That should be available to you, Dr.

15   Levine --

16       A.  Okay.

17       Q.  -- as a new exhibit, it will be Exhibit 24.

18       A.  The Singh article.

19       Q.  That's correct, yeah, from Frontiers of

20   Psychiatry.

21       A.  Oh, good.

22       Q.  Okay.  And you can see that now?

23       A.  I do.

24       Q.  Okay.  So then just looking at the first page.

25       A.  The abstract or the instruction?

Page 225

1      Q.   It's, I don't see a label abstract, but I'm

2  assuming that's what it is, just that intro paragraph on

3  the first page.

4      A.   Mm-hmm.

5      Q.   Okay.  So I'm assuming, Dr. Singh, et al. is

6  writing this.  And, let's see, we've got, okay.  So,

7  "This study reports follow-up data on the largest sample

8  to date of boys clinic-referred for gender dysphoria

9  (n=139) with regards to gender identity and sexual

10  orientation.  In childhood, the boys were assessed at a

11  mean age of 7.49 years with a range of 3.33-12.99 at a

12  mean year of 1989 and followed up at a mean age of 20.58

13  years with a range of 13.07-39.15 at a mean year of

14  2002."  Do you see that, have I read that correctly?

15      A.   You did.

16      Q.   Okay.  Let's go to page -- give me just a minute

17  here.

18              MR. CHARLES:  Kraig, let me go off the

19  record real quickly.

20              VIDEO TECHNICIAN:  Okay.  One moment,

21  please.  We're going off the record at 5:04 p.m.

22              (A break was taken at 4:04 p.m.)

23              VIDEO TECHNICIAN:  We're going back on the

24  record at 5:08 p.m.

25  BY MR. CHARLES:

Page 226

1      Q.  Okay.   So, Dr. Levine, back to the Singh

2   article.   And if you would, please, scroll to Page 4,

3   and you're looking for the heading, "Method."

4      A.  I'm there.

5      Q.  Okay.   So there in the first paragraph, "The

6   participants were 139 boys ('birth-assigned males') who

7   in childhood had been referred to and then assessed in

8   the Gender Identity Service, Child, Youth and Family

9   Program at the Centre for Addiction and Mental Health

10   (CAMH) in Toronto, Ontario between 1975 and 2009 (mean

11   year of assessment, 1989) and were adolescents or adults

12   at follow-up (mean year at follow-up, 2002)"

13          Continuing on there to the second paragraph,

14   "Participants entered the follow-up study through two

15   methods of recruitment.   The majority of participants

16   (77%) were recruited for research follow-up.   There were

17   two main waves of participant recruitment through

18   research contact, from 1986 to 1993 (n=32), and then

19   from 2009 to 2011 (n=71)."

20          So just, I just wanted to confirm with you

21   that's the, that's the same dataset that Dr. Singh, then

22   Ph.D. candidate Dr. Singh, presented in the dissertation

23   as well.   So there, there was a, a follow-up collection

24   period from 2009 to 2011, but nothing beyond 2011, is

25   that, that's your understanding there of that, of those

1    sentences?

2        A.   So isn't it -- let's see.   During the period of

3    data collection 32 patients recontacted service for

4    clinical reasons and they were informed about the

5    opportunity to participate in a follow-up site.   Okay.

6    So some were purely research, they agreed to

7    participate, and some asked for various services from

8    CAMH again.

9        Q.   Right.   And that collection in total, both the

10   initial contacts that was either patient initiated or

11   follow-up research requested, that all happened before,

12   collectively before 2013?

13       A.   Yep.

14       Q.   Okay.   And let's take a look at one more article

15   here.

16                 (Exhibit 25 marked for identification.)

17       Q.   This should be available, Dr. Levine, if you

18   refresh your screen.

19       A.   Are we done with the Cantor article?

20       Q.   Oh, yes, you can put that to the side.   Thank

21   you.

22       A.   Okay.   Okay.

23       Q.   And do you see what's been marked as SL25?

24       A.   Yes.

25       Q.   Okay.   And this article is entitled, "Gender

1   dysphoria in childhood, Jiska Ristori and Thomas D.

2   Steensma, published 2015."  Oh, sorry, published, yes,

3   published online January 2016, accepted October 2015.

4   You cite this and the Singh article we just looked at in

5   your report for the, for the proposition that, "The

6   majority of children," and you put in parentheses,

7   "between 61 and 98 percent of them who identifies

8   transgender will reidentify with their sex before

9   reaching maturity absent interventions."  So I just

10  wanted to locate that in context, in the context of your

11  report.  So let's take a look at this article.  Okay.

12  So if you would scroll to page, it's the third page of

13  this article, but it's numbered Page 15.

14      A.  Okay, I'm on Page 15.

15      Q.  Okay.  And you'll see that the, this study is

16  listing the follow-up studies it's referencing in the

17  Table 1 at the bottom right-hand corner, do you see

18  that?

19      A.  Yes.

20      Q.  Okay.  And do you see any overlap between the

21  studies cited in Dr. Cantor's article and this table

22  here in terms of on the left-hand side the, the names of

23  the authors and the year of publication?

24      A.  Well, the Bakwin, was the Bakwin article in

25  Cantor?

1      Q.  Now that you mention it, I don't think it was.

2      A.  Yes.

3      Q.  Okay.

4      A.  And, and what about the Davenport?

5      Q.  Yeah, Davenport was there, that was the

6  follow-up study of ten boys.

7      A.  Yeah, I see.  Of course Green was, yeah, and the

8  girls weren't in there because, yeah, all right.

9      Q.  Okay.  So is, is it your understanding that this

10  study is also looking at that, again that historical

11  dataset that begins back in the late '60s, early '70s

12  and continues through at the latest point 2011, right,

13  for the follow-up?

14      A.  I'm going to trust you on that.

15      Q.  Okay.  Okay.

16              MR. CHARLES:  Kraig, can we go off the

17  record.

18              VIDEO TECHNICIAN:  Yeah, one moment please.

19  We're going off the record at 5:15 p.m.

20              (A break was taken at 4:15 p.m.)

21              VIDEO TECHNICIAN:  We're going back on the

22  record at 5:25 p.m.

23                      EXAMINATION

24  BY MR. DAVID:

25      Q.  Dr. Levine, I'm going to be as brief as I

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.