# Exhibit D

Page 1

1        IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

2

             ~~~~~~~~~~~~~~~~~~~~

3

     MAXWELL KADEL, et al.,

4

5                  Plaintiffs,

6

          vs.           Case No. 1:19-cv-272-LCB-LPA

7

8     DALE FOLWELL, in his official
      capacity as State Treasurer of

9     North Carolina, et al.,

10

                  Defendants.

11

12             ~~~~~~~~~~~~~~~~~~~~

13             Video Deposition of
               STEPHEN B. LEVINE, M.D.

14

15             September 10, 2021
                   9:05 a.m.

16

17               Taken at:
             Veritext Legal Solutions

18            1100 Superior Avenue
                Cleveland, Ohio

19

20             Tracy Morse, RPR

21

22

23

24

25

```
 1      APPEARANCES:
 2           On behalf of the Plaintiff:
 3                Lambda Legal, by
                  CARL S. CHARLES, ESQ.
 4                120 Wall Street, 19th Floor
                  New York, New York  10005-3919
 5                ccharles@lambdalegal.org
 6                TARA BORELLI, ESQ.
                  730 Peachtree Street, N.E.
 7                Suite 640
                  Atlanta, Georgia  30308-1210
 8                tborelli@lambdalegal.org
 9                    and
10                McDermott Will & Emery, by
                  MICHAEL M. WEAVER, ESQ.
11                444 West Lake Street, Suite 4000
                  Chicago, Illinois  60606-0029
12                mweaver@mwe.com
13
           On behalf of the Defendants Dale Folwell,
14         Dee Jones, and the NC State Health Plan
           For Teachers and State Employees:
15
                  Law Office of John Knepper, LLC, by
16                JOHN KNEPPER, ESQ.
                  1720 Carey Avenue, Suite 590
17                Cheyenne, Wyoming  82001
                  john@knepperllc.com
18
19         On behalf of the Defendant State of North
           Carolina Department of Public Safety:
20
                  North Carolina Dpt. Of Justice, by
21                ALAN MCINNES, ESQ.
                  114 W. Edenton Street
22                Raleigh, North Carolina  27603
                  amcinnes@ncdoj.gov
23
                           ~ ~ ~ ~ ~
24      ALSO PRESENT:
25                Joseph Vandetta, Videographer
```

1                    TRANSCRIPT INDEX

2

     APPEARANCES............................    2

3

4     INDEX OF EXHIBITS......................    4

5

     EXAMINATION OF STEPHEN B. LEVINE, M.D.

6     By MR. CHARLES.........................    7

     By MR. KNEPPER........................  227

7     By MR. CHARLES........................  244

8

     REPORTER'S CERTIFICATE................  249

9

10    EXHIBIT CUSTODY

     EXHIBITS RETAINED BY COURT REPORTER, 1-21

11    (No Exhibit 16)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    INDEX OF EXHIBITS
2       NUMBER            DESCRIPTION            MARKED
3       Exhibit 1      4/28/2021 Declaration.... 14
               of Stephen B. Levine,
4              M.D. With Attachment
       Exhibit 2      12/21/2020 Zoom.......... 56
5              Deposition of Stephen
               Levine, M.D.
6       Exhibit 3      Typewritten Three-Page... 62
               Document Entitled,
7              "Special Programs,"
       Exhibit 4      1/1/2019-12/31/2019...... 78
8              North Carolina State
               Health Plan Benefits
9              Booklet, Bates Numbers
               PLAN DEF0001785-0001900
10      Exhibit 5      Lesbian Gay Bisexual..... 89
               Transgender Center
11             Document Entitled,
               "Transgender Resources"
12      Exhibit 6      4/8/19 Soneeya v. Turco..104
               Trial Transcript, Day 1
13      Exhibit 7      "Correction: Parent......116
               Reports of adolescents
14             And young adults
               Perceived to show signs
15             Of a rapid onset of
               Gender dysphoria,"
16             Article
       Exhibit 8      "Transgender Teens: Is...122
17             The Tide Starting To
               Turn?" Article
18      Exhibit 9      "Finland Issues Strict...139
               Guidelines for Treating
19             Gender Dysphoria,"
               Article
20      Exhibit 10     "Recommendation of the...140
               Council for Choices in
21             Health Care in Finland
               (PALKO/COHERE Finland),"
22             Article
       Exhibit 11     "Stod och utredning vid..145
23             konsinkongruens hos barn
               Och ungdomar," Article
24

25

```
 1              INDEX OF EXHIBITS (Continued)
 2      NUMBER              DESCRIPTION          MARKED
 3      Exhibit 12      "Long-Term Follow-Up of..154
                        Transsexual Persons
 4                      Undergoing Sex
                        Reassignment Surgery:
 5                      Cohort Study in Sweden,"
                        Article
 6      Exhibit 13      2017 "On Gender.........156
                        Dysphoria," Booklet
 7                      From Department of
                        Clinical Neuroscience,
 8                      Karolinska Institutet
        Exhibit 14      "Long-Term Follow-Up of..161
 9                      Individuals Undergoing
                        Sex-Reassignment Surgery:
10                      Somatic Morbidity and
                        Cause of Death," Article
11      Exhibit 15      5/15/2017 Telephonic.....170
                        Deposition of Stephen
12                      Levine, M.D.
        Exhibit 17      "A Typology of Gender....196
13                      Detransition and Its
                        Implications for
14                      Healthcare Providers,"
                        Article
15      Exhibit 18      DSM-5: Frequently Asked..202
                        Questions
16      Exhibit 19      "Endocrine Treatment of..213
                        Gender-Dysphoric/Gender
17                      Incongruent Persons:
                        An Endocrine Society
18                      Clinical Practice
                        Guideline," Article
19      Exhibit 20      "Pediatric Obesity.......217
                        Assessment, Treatment,
20                      And Prevention: An
                        Endocrine Society
21                      Clinical Practice
                        Guideline," Article
22      Exhibit 21      "Practice Parameter on...223
                        Gay, Lesbian, or Bisexual
23                      Sexual Orientation,
                        Gender Nonconformity,
24                      and Gender Discordance
                        In Children and
25                      Adolescents," Article
```

Page 23

1          Q.    Okay.  And so then were there any
2     external grants to research and publish about
3     the treatment of children or adolescents --
4          A.    No.
5          Q.    -- with gender dysphoria?
6          Okay.  Is that a, "No," when I included
7     the, "Gender dysphoria," as well?
8          A.    That is a, no.
9          Q.    Okay.  Thank you.  Okay.  So on
10    page 3 of your report -- actually, I'm sorry.
11    It's going to be the bottom of page 4 and to
12    the top of page 5.  Your report lists your
13    experience as an expert witness, which we
14    talked about a little bit earlier.  I just --
15    I'm wondering if you would confirm this is not
16    an exhaustive list of your experience as an
17    expert witness either via deposition or report.
18         A.    I wouldn't want to testify that
19    this is absolutely complete, given the fact
20    that I don't keep a list compiled.  This is
21    kind of compiled retrospectively from memory
22    and documents.  And so this is the best I could
23    have done on April of 2021 --
24         Q.    Understood.  Thank you.  So --
25         A.    -- you might find something else.

```
 1    two, two and a half years ago.
 2          Q.    Oh, okay.  And what kind of
 3    treatment -- I should say, have you referred
 4    any of those adolescent patients for additional
 5    treatment, besides psychotherapy, for the
 6    treatment of gender dysphoria?
 7          A.    Yes.
 8          Q.    And what kinds of treatment have
 9    you referred them for?
10          A.    For endocrine treatment.
11          Q.    Okay.  And approximately what
12    percentage of those adolescent patients have
13    you referred for endocrine treatment?
14          A.    Give me the timeframe of that
15    question, please.
16          Q.    Sure.  So you said a few moments
17    ago, in the last five years, you saw maybe,
18    asterisk, 12 to 15 adolescent individually
19    yourself.  Of those 12 to 15, what would be the
20    approximate percentage you referred for
21    endocrine treatment?
22          A.    I'm hesitating to answer the
23    question, because some of those children have
24    been taking testosterone or estrogen
25    surreptitiously from their parents.  And while
```

Page 55

1    where the number of adults has diminished and
2    the number of adolescents has increased
3    dramatically.
4         Q.    Okay.  Thank you.  So as a part of
5    your private practice, do you write letters of
6    authorization for endocrine treatments?
7         A.    Yes.
8         Q.    And do you write letters of
9    authorization for gender affirming surgeries?
10        A.    I have.  I have not recently,
11   because most of my patients are 13 or 15 or 16,
12   you know.
13        Q.    Okay.  And I'm sorry.  Just by,
14   "Recent," when was the last time you wrote a
15   letter of authorization for a gender affirming
16   surgery for an adult?
17        A.    Probably twelve months ago.
18        Q.    Okay.  And over the course of your
19   career focusing on your treatment of adults
20   experiencing gender identity issues, for what
21   percentage of those patients would you estimate
22   you wrote a letter of authorization for gender
23   affirming surgery for?
24             MR. KNEPPER:  Objection, form.
25        A.    Again, I would like to put an

1    asterisk to whatever I answer this question as.
2    I have not kept track of those figures.  I have
3    written -- I've written or cosigned letters for
4    hormone treatments and for gender confirming
5    surgeries for many people.  There were more
6    people in the '70s and '80s than in recent
7    decades.  In part as a reflection of my own
8    evolution of understanding of these problems
9    and in part it's a reflection of the demography
10   of patients who are coming to see me.  I really
11   would not like to answer that question, only
12   because I don't know if the word, "Fifteen," or
13   the word, "Twenty-five," or the word,
14   "Thirty-five," is more accurate --
15        Q.    Understood.
16        A.    -- but I can tell you, I have
17   written letters, especially in the early years,
18   for the things that you're making reference to.
19                   -  -  -  -  -
20                   (Thereupon, Deposition Exhibit 2,
21                   12/21/2020 Zoom Deposition of
22                   Stephen B. Levine, M.D., was marked
23                   for purposes of identification.)
24                   -  -  -  -  -
25        Q.    Okay.  For the record, I'm showing

Page 67

1    patient be able to afford it?

2              MR. KNEPPER:  Objection, form.

3         A.    May I say, of course?

4         Q.    You may.  You may say anything you

5    would like.

6         A.    Of course.

7         Q.    Thank you.  Well, anything you

8    would like within reason.

9         If you make a letter of authorization for

10   a patient for the treatment of gender dysphoria

11   specifically related to a surgical treatment,

12   do you think it is good that they be able to

13   access that treatment that you've authorized?

14             MR. KNEPPER:  Objection, form.

15        A.    Not to be cagey, I want to talk

16   about one word you just used in that sentence.

17   I need you to understand that historically in

18   our clinic for those 47 years, our clinics

19   for 47 years, we are not in the business and we

20   have never been in the business of recommending

21   surgery or recommending hormones.  We recommend

22   a continued evaluation so that we -- the person

23   can make up their mind how to proceed.

24        It is not our knowledge base to know

25   who's going to do better and who's going to do

Page 68

```
 1    worse and who is not going to have any
 2    difference at all with hormones or with
 3    surgery.  So what we do is we say, we will
 4    write a letter of support for endocrine
 5    treatment or for hormones if this is what you
 6    want.  And we say what our concerns are.  We
 7    tell the endocrinologist and we tell the
 8    surgeon what our concerns are and that we
 9    see -- we have reservations about this, and
10    these are our reservations, but the patient has
11    decided this is what he or she wants to do.
12         And so we write a letter of support, but
13    I don't -- every time you use the word,
14    "Recommendation," there's part of me that wants
15    to say, no, we do not recommend.  We have never
16    recommended.  We have not had the knowledge
17    base.  We have not had the clinical experience
18    and the knowledge base to say, I'm a doctor.  I
19    know this field.  This is what I recommend to
20    make you better.  We do not talk that way.  We
21    do not think that way.  And so I may want to
22    always put an asterisk to any sentence that you
23    use the word, "Recommend."  I need you to
24    understand that that's where I'm coming from.
25              MR. CHARLES:  Thank you,
```

Page 73

1    concept of agency and being a doctor, I think

2    is different than the implication of your

3    question.

4          Q.    Is the worrisomeness for a

5    patient's future health, is that a reason to

6    deny all medical care for gender dysphoria?

7          A.    Absolutely not.

8          Q.    Dr. Levine, I'd like to return back

9    to, I believe it's Exhibit 2, the Claire

10   deposition.  And please, if you would turn to

11   page 156.

12         A.    I'm sorry.  150 what?

13         Q.    Page 156.  And beginning at line 10

14   on page 156, Dr. Levine, I'll read it, if

15   you'll just follow along, please.

16         Question:  "Are you aware that this case

17   concerns an insurance exclusion that is

18   categorical at preventing" --

19         Skipping to line 15.

20         "-- hormones and surgery as a treatment

21   for gender dysphoria?"

22         Answer:  "I am aware that your plaintiffs

23   are suing to get coverage for -- that is not

24   provided by their particular insurance.  I am

25   aware of that."

Page 84

```
 1        demonstrate their efficacy.  This is the
 2        problem.
 3             This is the essence of the problem.  This
 4        is, I think the essence of my testimony with
 5        you today.  It's not whether I personally as a
 6        doctor would like this patient to have
 7        insurance to cover their hormones.  It's about,
 8        is this the right thing to do for this person
 9        and can I help the person see clearly what the
10        dangers are and what the benefits are.  That's
11        the issue for a doctor, for Stephen Levine as a
12        doctor.  I hope that's a cogent answer --
13             Q.    It is --
14             A.    -- to your question.
15             Q.    -- it is cogent.  Thank you.
16             Given all of that, is that -- so you just
17        explained, testified that there are
18        complications, some lack of -- and I'm
19        summarizing here, so I will confirm that this
20        is an accurate summary of what you just shared,
21        but I can't possibly repeat all of that.  Given
22        all of those concerns that you have, is that a
23        reason to deny all medical interventions to
24        people with gender dysphoria?
25                  MR. KNEPPER:  Objection, form.
```

Page 85

```
 1        A.     No, but that's not -- that's a
 2    separate question about insurance.
 3        Q.     Yes, it is a separate question.  So
 4    now I'm asking:  Are those concerns you raised
 5    justifications in your mind for denying medical
 6    interventions to all people with gender
 7    dysphoria?
 8             MR. KNEPPER:  Objection, form.
 9        A.     You know, I'm not advocating
10    denying endocrine treatment or surgical
11    treatment.  I'm just saying that we as a
12    medical profession need to walk the walk that
13    we talk.  We say as a principle of ethics that
14    our interventions should be based upon the best
15    current knowledge, it should be based on
16    science.  It should not be based on politics.
17    It should not be based on fashion.  It should
18    not be based on civil rights considerations.
19    They should be based on the kinds of studies
20    that I just described to you with predetermined
21    outcome majors that are agreed upon --
22        Q.     Sorry?
23        A.     -- period.
24        Q.     I was --
25        A.     I forgot to put the period.
```

Page 86

1           Q.    That's okay.  Did you just say,
2      Dr. Levine, you're not an expert in health
3      insurance?
4           A.    I am not an expert in health
5      insurance.
6           Q.    Okay.  Or what insurance should or
7      should not cover?
8           A.    Yes.
9           Q.    Do you recall what the insurance
10      billing code typically is for psychotherapy for
11      gender dysphoria?  I know it's been a long time
12      since you've accepted commercial insurance, so
13      I'm not sure if the billing codes are the same,
14      but do you recall --
15           A.    The billing code is 90837.
16           Q.    Okay.  Is there a code that you're
17      familiar with that is F64.0?
18           A.    That's not a billing -- that's
19      diagnostic code --
20           Q.    Thank you.
21           A.    -- there's a separate code for
22      diagnosis and a separate code for procedure.
23           Q.    I see.  So F64.0 is a diagnostic
24      code?
25           A.    Yes.

```
 1                    VIDEOGRAPHER: Off the record 11:26.
 2                    (Recess taken.)
 3                    VIDEOGRAPHER: On the record 11:31.
 4        BY MR. CHARLES:
 5             Q.    Okay.  Dr. Levine, in your report,
 6        you stated that you had not met with any of the
 7        plaintiffs in this case, correct?
 8             A.    Yes.
 9             Q.    Okay.  And you have not interviewed
10        any of the plaintiffs in this case, correct?
11             A.    Correct.
12             Q.    And so you are not offering any
13        opinions about the plaintiffs in this case,
14        correct?
15             A.    Correct.
16             Q.    Okay.  And that would include the
17        veracity of their experiences of gender
18        dysphoria, correct?
19             A.    Yes, correct.
20             Q.    And that would not include the
21        accuracy of their gender dysphoria diagnoses,
22        correct?
23             A.    Correct.
24             Q.    Okay.  You're not offering any
25        opinions about their mental health histories?
```

1    methodology and are capable of critically

2    reviewing the literature.  So your statement is

3    true on the most superficial level, but is

4    totally incorrect when it comes to scientific

5    standards of care for issuing guidelines for

6    the medical profession.  So I don't know how to

7    answer the question.  On the surface, the

8    answer is, yes.  And underneath the surface,

9    the answer is, no.

10         Q.    So the International Journal For

11   Transgender Health is still a peer-reviewed

12   source, though, right?

13         A.    It's peer reviewed by people who

14   make their living supporting transgender care.

15         Q.    But it's still peer reviewed,

16   right?

17         A.    It's peer reviewed --

18         Q.    And as for your --

19         A.    -- I think it's peer reviewed.

20         Q.    Okay.  Understood.  And as for your

21   more conservative approach, can you cite to any

22   studies or research that resulted in better

23   outcomes than people who adhere strictly to the

24   WPATH standards of care version 7?

25         A.    No.  This is part of the problem in

1    evaluation leading to a therapeutic process, it
2    seems prudent, given the fact that we are
3    changing people's bodies, especially teenagers'
4    bodies, and they are not of developmental
5    sophistication yet that court systems or at
6    least one court system thinks they're certainly
7    too young to make these life-altering
8    decisions.  So people in SEGM are biased in the
9    direction of being conservative and providing
10   psychotherapeutic evaluations of the child, of
11   the teenager and of their parents, of their
12   family systems to see if we can find a way to
13   help them be informed about what is going --
14   what they think they want to do in their
15   future.
16            Q.   And so when you provide letters of
17   authorization for hormones or for surgery, do
18   you do so in accordance with the WPATH
19   standards of care?
20            A.   Yes.  That is the standard, to
21   provide a letter of recommendation.
22            Q.   Okay.  So turning back to your
23   report, Dr. Levine.  You can go ahead and put
24   away the trial transcript there.
25            A.   I'm sorry.  Did you say, "Turning

Page 116

1      hours and hours of their time getting counseled
2      or participating with the virtual trans
3      community.   That's a hypothesis.
4           Q.    So no scientific citation?
5           A.    When we use the word, "Scientific,"
6      in the best sense, yes, the answer to your
7      question is, no scientific.
8           Q.    Okay.  No studies of citations you
9      can point to today to support that hypothesis?
10          A.    Oh, I think Lisa Littman's studies
11     are in the literature and/or in press that
12     documents this.
13                    -  -  -  -  -
14                (Thereupon, Deposition Exhibit 7,
15                "Correction: Parent reports of
16                adolescents and young adults
17                perceived to show signs of a rapid
18                onset of gender dysphoria," Article,
19                was marked for purposes of
20                identification.)
21                    -  -  -  -  -
22          Q.    Okay.  For the record, please note
23     I'm showing to Dr. Levine what has been marked
24     as Exhibit 7.  "Correction: Parent reports of
25     adolescents and young adults perceived to show

1      signs of a rapid onset of gender dysphoria," by
2      Lisa Littman published March 19, 2019.  Have
3      you seen this material before, Dr. Levine?
4            A.    I've seen of it.  I don't think
5      I've read it.
6            Q.    Okay.  Were you aware that the Lisa
7      Littman article had to be withdrawn, corrected
8      and republished?
9            A.    Yes.
10            Q.    Okay.  And were you aware that the
11      initial article was based on a survey of
12      parents --
13            A.    Yes.
14            Q.    -- of purportedly transgender
15      children and the parents were recorded -- I'm
16      sorry.  Let me start over.  Were you aware that
17      the Littman article was based on a survey of
18      parents who were recruited through some parent
19      groups?
20                  MR. KNEPPER:  Objection, form.
21            A.    I knew it was a survey of parents.
22            Q.    Okay.  And did you know there were
23      no report-outs from the young adults of those
24      parents in the article?
25            A.    It was a report of parents'

                                        Page 122

1       transitioning.  However, it is...important to

2       note that there are other survey items where

3       the parent would have direct access to

4       information about their child and that those

5       answers reflect items that can be directly

6       observed."  Did I read that correctly?

7               A.    Yes, you did.

8               Q.    All right.  Your report also cites

9       as support for the social contagion hypothesis

10      to an article from Medscape.com written by

11      Becky Mccall and Lisa Nainggolan as support for

12      the social contagion theory.  Is that correct?

13      I'm sorry.  It's not going to be on this

14      article, Doctor.

15              A.    I don't know that article.

16              Q.    Okay.

17              A.    You haven't asked me a question

18      about this.  Did I misunderstand something?

19              Q.    No, no.  Sorry.  We're just --

20              A.    You haven't asked my opinions about

21      that, yeah.

22                            -   -   -   -   -

23                      (Thereupon, Deposition Exhibit 8,

24                      "Transgender Teens: Is the Tide

25                      Starting To Turn?" Article, was

Page 123

```
 1              marked for purposes of

 2              identification.)

 3                   -  -  -  -  -

 4      Q.    Yeah.  So, for the record, I'm

 5  showing Dr. Levine what has been marked as

 6  Exhibit 8.  "Transgender Teens:  Is the Tide

 7  Starting To Turn?" by Becky McCall and Lisa

 8  Nainggolan, April 26, 2021.  Dr. Levine, you

 9  said you have not reviewed this article before?

10      A.    Which one are you referring to?

11      Q.    I'm sorry.  That one to your left.

12      A.    This?

13      Q.    Yes.  Take your time.

14      A.    Have I reviewed it, no.  You know,

15  I've seen the picture of Keira Bell.  I've seen

16  news reports of this in the past, but they were

17  just news reports, yeah.

18      Q.    Do you know if either of the

19  authors of this article is a scientist?

20      A.    I have no idea.

21      Q.    Okay.  Or a psychiatrist?

22      A.    (Indicating.)

23      Q.    I'm sorry.  Could you make your

24  responses verbal?  I'm forgetting.

25      A.    I have no idea.
```

1          Q.    Okay.  Thank you.  Have either of
2     them ever treated transgender children or
3     adolescents?
4          A.    I would have no idea.
5          Q.    Okay.  To your knowledge, is the
6     information provided on Medscape.CA subject to
7     peer review?
8          A.    I don't know how Medscape works.
9     I've heard there have been retractions, but I
10     don't know how their peer reviewed is made.
11     Perhaps people write in that, This is
12     ridiculous what you've been teaching or what
13     you've been saying, but whether they're peer
14     reviewed or not, I have no idea.
15          Q.    So you probably -- I'm sorry.  So
16     do you know if this article has been published
17     in a peer-reviewed journal to your knowledge?
18          A.    "Transgender teens:  Is the
19     Tides" -- that article?
20          Q.    Yes.
21          A.    I don't know.  I don't know this
22     article.  I don't know where it's from.
23          Q.    Okay.  So your report includes a
24     quotation from this article.  "The vast
25     majority of youth now presenting with gender

1      multi-continental set of observations from
2      Europe, from Australia, from North America --
3              Q.    Okay.
4              A.    -- it almost doesn't even need
5      citations it's so clinically apparent.
6              Q.    Okay.  But there's no citation in
7      your report?
8              A.    In my report, yes.
9              Q.    Okay.  So on page 18, going back to
10     your report, at the bottom of page 18, you use
11     a term, "Transgender Treatment Industry."  Is
12     this the first time you have used this term?
13             A.    In this report?
14             Q.    No.
15             A.    You mean, did I ever use it in
16     another report?
17             Q.    Yeah, yeah.
18             A.    I'm not sure.  If this is -- if
19     it's not the first, it might be the second.
20             Q.    And where did the term originate?
21             A.    I think it -- the term originated
22     from Dwight Eisenhower at the end of his --
23     when he was leaving the presidency in 1952, he
24     warned the people about the military industrial
25     complex and that there was a very comfortable

```
                                            Page 137
 1              A.    No.   Their gender dysphoria may be
 2       a product, you see, of these other things.  For
 3       example, if you have someone who has been
 4       sexually abused by her stepfather and becomes a
 5       trans person in adolescents, we want to talk
 6       about the sexual abuse and the process between
 7       that person and what fears for the present and
 8       the future that has caused the child.  And
 9       we're not attacking their trans identity.
10       We're trying to help them understand where they
11       came from and what they're coping with and why
12       they're so fearful or so distressed by their
13       body changing.
14              Q.    And their gender dysphoria could be
15       separate and apart from that traumatic
16       experience?
17              A.    Theoretically it could be, yes.
18              Q.    And if it persisted sufficiently
19       enough, you would consider a letter of
20       authorization for --
21              A.    Yes.
22              Q.    -- hormones?
23              A.    Yes.
24              MR. KNEPPER:  Objection, form.
25              Q.    Okay.  If you would, please, turn
```

1          A.     That is correct.  And may I add

2     that it's very, very difficult to understand.

3     The natural question would be, how do you

4     compare the general population with the trans

5     people who did not have surgery with the trans

6     people who did have surgery.

7          Q.     Thank you, Dr. Levine.  That's not

8     my question, though.  I just wanted to confirm

9     that was not the control group.  You mentioned

10    this study later in your report, page 66

11    beginning at paragraph 74.  Do you see that?

12         A.     Um-hum.

13         Q.     Okay.  And basically that -- well,

14    here, let me point you exactly.  The sentence

15    starts with, "Similarly," about halfway down

16    the page, third sentence of that paragraph.

17         A.     Um-hum.

18         Q.     And, as you mentioned, you cite the

19    Dhejne study and I believe -- or I should ask:

20    Is the Denmark study you're referencing the

21    study directly after it --

22         A.     The Simonsen study.

23         Q.     -- the Simonsen study?

24         A.     Yes.

25         Q.     Okay.  So beginning with the Dhejne

1      study, do you think because that study showed
2      that some people committed suicide after gender
3      affirming surgery that no patient should be
4      able to access gender affirming surgery?
5                      MR. KNEPPER:  Objection, form.
6           A.    That would be illogical.
7           Q.    Okay.  Dr. Levine, I understand you
8      said that would be illogical, but just to be
9      clear.  You're not recommending -- sorry.  I'm
10     not using that word.  You're not saying that
11     the fact that some people commit suicide
12     following gender affirming surgery means that
13     there should be a ban on access to that
14     surgery.  Is that right?
15          A.    Not for that reason, no.
16                      MR. KNEPPER:  Objection, form.
17          Q.    Not for that reason.  Okay.  Are
18     you recommending that there would be bans on
19     gender affirming surgery for any reason?
20          A.    I think there are -- you know, I
21     think most prudent people in this field, just
22     to use the example of what you read out loud
23     about the Finland study, a case-by-case basis.
24     That's how doctor need to decide things, but
25     there are many, many reasons to be cautious

Page 154

1    fashion and to be very hesitant about going

2    forward.

3         Q.    But you're not recommending total

4    bans on gender affirming surgery?

5         A.    I'm not recommending total bans.

6    I'm aware of the individual circumstances of

7    individual people's lives and their commitment

8    to transgender living.  And I don't want to be

9    draconian about this.  I want to be

10   compassionate about this.

11        Q.    I understand.  I appreciate that.

12   I just want to make sure I'm understanding you

13   correctly.

14                    -   -   -   -   -

15                   (Thereupon, Deposition Exhibit 12,

16                   "Long-Term Follow-Up of Transsexual

17                   Persons Undergoing Sex Reassignment

18                   Surgery: Cohort Study in Sweden,"

19                   Article, was marked for purposes of

20                   identification.)

21                    -   -   -   -   -

22        Q.    So for the record, I'm presenting

23   to Dr. Levine what has been marked as

24   Exhibit 12.  "Long-Term Follow-Up of

25   Transsexual Persons Undergoing Sex Reassignment

 1          For the 22nd time today, did I read that

 2     correctly?

 3          A.     It's the 23rd time.

 4          Q.     Oh, okay.

 5          A.     Yes.

 6          Q.     I was hoping you weren't counting,

 7     but, okay.  Did you testify earlier today that

 8     the limitation of the Dhejne study is that the

 9     controls were not transgender persons who had

10     not undergone gender affirming surgery?

11          A.     Yes.

12               MR. KNEPPER:  Objection, form.

13          Q.     Okay.  You can set that aside,

14     Dr. Levine.

15                    -   -   -   -   -

16               (Thereupon, Deposition Exhibit 13,

17               2017 "On Gender Dysphoria," Booklet

18               From Department of Clinical

19               Neuroscience, Karolinska Institutet,

20               Stockholm, Sweden, was marked for

21               purposes of identification.)

22                    -   -   -   -   -

23          Q.     For the record, Dr. Levine has an

24     exhibit that has been marked as Exhibit 13.

25     "On Gender Dysphoria," by Cecilia Dhejne from

Page 160

1       ideation in transgender people.

2             A.    Well, you know about the

3       Branstrom-Pachankis study and the criticism of

4       the study --

5             Q.    But I'm not talking about the

6       study.

7             A.    -- and part of the study

8       demonstrated that it increased suicidal

9       ideation and attempts in the first two and a

10      half years after surgery, especially in the

11      first year --

12            Q.    Right.  Is your testimony --

13            A.    -- so I'm not testifying that.  I

14      thought you were asking me about this, which I

15      need to comment on, because this is not an

16      accurate depiction of my statement in the

17      reference.  (Indicating.)

18            Q.    Well, that's not what I'm asking

19      about, Dr. Levine.

20            A.    Well, you're reading this and I'm

21      misquoted here.  So I don't want you to imply

22      that she is accurately representing my views,

23      because I did not say that gender affirming

24      treatment in general should be stopped.  I've

25      never said that.  This is an article about

Page 173

```
1       at different times have reported that in the
2       large majority of patients, absent a
3       substantial intervention such as social
4       transition and/or hormone therapy, gender
5       dysphoria does not," continue, "through
6       puberty."
7              So there are some children who persist in
8       their asserted gender identity through puberty,
9       correct?
10                   MR. KNEPPER:  Objection, form.
11             A.    Correct.
12             Q.    And some who persist in wanting to
13      transition via medical treatments?
14                   MR. KNEPPER:  Objection, form.
15             A.    Yes.  Some of the children have
16      learned about medical treatments somewhere
17      along the line and they feel instantly that
18      this is for them.
19             Q.    And then looking at paragraph 56,
20      which is on page 41, so just the very next page
21      on the bottom, the second sentence in that
22      paragraph.  "I observe an increasingly vocal
23      online community of young women who have
24      reclaimed a female identity after claiming a
25      male...identity at some point during their teen
```

1    years."

2          But there are some patients who assert a

3    male gender identity in their teen years and

4    continue to assert it into adulthood, correct?

5          A.     Yes.

6               MR. KNEPPER:   Objection, form.

7          Q.     Okay.   Can social transition be

8    used to treat gender dysphoria in adults?   Not

9    looking at your report, now, Dr. Levine.

10   Sorry.   Can social transition treat gender

11   dysphoria in adults?

12         A.     Yes.   As a matter of fact, that

13   used to be the recommendation in the '70s

14   and '80s, prior to taking hormones, was to try

15   living, what was sometimes called the real-life

16   experience or the real-life test for one year.

17   And then if when you confront the new issues of

18   confronting you in your new neo gender, if you

19   still want to do that, then we'll come back and

20   we'll think about using hormones to facilitate

21   your transition.   But in the 7th edition of the

22   standards of care that was removed.   There's no

23   real-life experience, real-life test anymore.

24   If persons want it, they should have it.

25   Patient autonomy was valued far greater than

1      transgender people is individual based, right?

2              A.      Well, it's both --

3                      MR. KNEPPER:  Objection, form.

4              A.      -- yes, that's partially true.  And

5      ideally that's true, but it's obviously not

6      entirely true.  It's why we're here, is it's

7      categorically based.

8              Q.      Let me rephrase that.  You design

9      treatment for your patients based on what that

10     patient in front of you, what they need, what

11     they want, what you determine -- sorry.  Not

12     what you determine, but what you might

13     authorize?

14                     MR. KNEPPER:  Objection, form.

15             A.      What the patient and I discern

16     together.

17             Q.      Thank you.  Okay.  Let's jump to,

18     again, still in your report, page 68.

19             A.      We've left 40 and 41?  68.

20             Q.      Okay.  Looking at the bottom of

21     page 68, Dr. Levine, paragraph 78.  It states,

22     "Similarly, the American Psychological

23     Association has stated because approach" --

24             A.      Sorry.

25             Q.      I apologize.

1    Gender Nonconforming People (2015)."

2          So is that lack of consensus that you

3    discuss a justification to categorically ban

4    social transition for children as a treatment

5    for gender dysphoria?

6               MR. KNEPPER:  Objection, form.

7          A.    By, "Children," you mean 6 and 7

8    year olds?

9          Q.    Those for whom medical intervention

10   is not indicated.

11         A.    Is that a reason to ban it?

12         Q.    Correct, social transition.

13              MR. KNEPPER:  Objection, form.

14         A.    The reason to -- so let me qualify

15   that.  There's a, yes, answer, there's a reason

16   to ban it.  And the reason to ban it is both a

17   developmental and an ethical reason.  There

18   have been eleven studies of these cross-gender

19   identity children who are not socially

20   transitioned and the vast majority of them

21   de-transition by the time they're mid

22   adolescents or older adolescents.  They become

23   homosexual individuals usually or bisexual

24   individuals, but they are cis gender.

25              So if we take a 6-year-old child and

Page 186

1    her peers or his peers and I don't think this

2    is a prudent idea.

3         And if you wanted me to suggest a ban on

4    anything, it would be a ban on using puberty

5    blocking hormones, especially when the

6    evaluation of those children are focused on the

7    gender dysphoria of the child and not on the

8    background of the child and not on what's going

9    on.  So I think that's an answer to your

10   question.

11        If we're going to use these drugs, if

12   we're going to use social transformation of

13   children, if we're going to use puberty

14   blocking hormones, it should only be used in a

15   carefully designed protocol.  And follow up has

16   to be guaranteed so in one year and in two

17   years and in three years and before we start

18   giving cross-gender hormones we have data --

19        Q.    Sorry.

20        A.    -- so the answer to your question

21   is, I would consider banning puberty blocking

22   hormones even for children who have been

23   cross-gender identified for four years to give

24   them a chance to desist, which is exactly what

25   the Dutch protocol did, by the way.

Page 187

1          Q.    Sorry.  So you just said you would
2     ban -- you would recommend a ban on --
3          A.    If --
4                MR. KNEPPER:  Objection, form.
5          A.    -- look, I'm a doctor.  I'm not a
6     policy maker --
7          Q.    I understand, yes.
8          A.    -- if you ask me my political
9     opinion about, should we ban this, is that a
10    reasonable thing, I think there's a very strong
11    argument for banning puberty blocking hormones.
12         Q.    Okay.  And, right.  So you're here
13    as an expert offering an expert opinion.  So
14    are you separating that from -- like are you
15    saying your political views that you would
16    advocate for bans or are you saying your expert
17    opinion you're offering in this case is you
18    would recommend ban?
19               MR. KNEPPER:  Objection, form.
20         A.    I would recommend ban.  To what
21    extent it's from my politics or from my being a
22    parent or from my being a doctor, I don't know.
23    I would recommend we not use puberty blocking
24    hormones.
25         Q.    In Claire, in this case that we

Page 191

1           Answer:  "Where we had a healthy mother
2       and father, an intact family who was
3       psychologically informed and who has -- where a
4       child has come out of toddlerhood acting
5       consistently in a gender atypical fashion, and
6       where the parents are not homophobic..."
7           Question:  "The parents are not what kind
8       of people?"
9           Answer:  "Homophobic."
10          For the 27th time, did I read that
11      correctly?  Did I read that correctly?
12          A.    Yes.
13              MR. CHARLES:  Okay.  All right.
14      Let's go ahead and take a break for a few
15      minutes.
16              VIDEOGRAPHER: Off the record 3:20.
17                (Recess taken.)
18              VIDEOGRAPHER: On the record 3:38.
19      BY MR. CHARLES:
20          Q.    So, Dr. Levine, before the break,
21      you were talking about 6 and 7 year olds and
22      you mentioned there were eleven studies.  Can
23      you identify which eleven studies from your
24      report you're referring to?
25          A.    Cantor, the reference Cantor lists

1    the eleven studies and these eleven studies

2    have been done over probably thirty years.

3         Q.    Okay.  So Cantor was one review of

4    eleven studies?

5         A.    Cantor was a review of the eleven

6    studies.  I can't list to you the eleven

7    individual studies.  The latest one is written

8    by Singh, S-i-n-g-h.  It was published in April

9    of 2021, in the Frontiers of Psychiatry.  And

10   that perhaps is the most comprehensive of them.

11   And that's the one that confirms -- that's a

12   study of boys and it confirmed that 12.2, I

13   think percentage of them persisted over a

14   thirteen-year period.

15        Q.    So that was one -- that was the

16   Singh study that came out.  Is that same study

17   mentioned in the Cantor review?

18        A.    (Nodding.)

19        Q.    Okay.  And you said that

20   established that 12.2 percent of prepubertal

21   boys persisted into adolescents?  Okay.

22        A.    Yes.  This harkens back to the

23   ethical issue that I talked about before.  You

24   know, if you know that 88 percent of them are

25   going to persist -- desist, why in the world

Page 196

```
 1      identified 60,000 case reports world wide on
 2      the Internet.  See Exposito-Campos..." --
 3              A.    That is an error, by the way.
 4              Q.    Sorry.  Which part of that is an
 5      error?
 6              A.    That, "60,000," is my error.  It
 7      should say, "16,000."
 8                          -  -  -  -  -
 9                    (Thereupon, Deposition Exhibit 17,
10                    "A Typology of Gender Detransition
11                    and Its Implications for Healthcare
12                    Providers," Article, was marked for
13                    purposes of identification.)
14                          -  -  -  -  -
15              Q.    Okay.  So for the record, I'm
16      showing Dr. Levine what has been marked as
17      Exhibit 17.  "A Typology of Gender Detransition
18      and Its Implications for Healthcare Providers,"
19      Pablo Exposito-Campos, 2021.  Okay.  Have you
20      seen this study before, Dr. Levine?
21              A.    Yes.
22              Q.    Okay.  So on page 1 of this report,
23      about halfway through the very first paragraph
24      in the introduction beginning with, "As a
25      consequence."  Do you see that there?
```

Page 200

1    important to note that this typology does not

2    suggest two clear-cut categories, for a

3    secondary detransition can lead to a primary

4    detransition" -- oh, sorry.  Let me start over.

5    Sorry.

6          Okay.  Let me start from a different

7    place, Dr. Levine.  The second sentence.

8    "In r/detrans" --

9          And there's an HTTP address --

10          A.    Okay.

11          Q.    Okay.  You see that.

12          -- "a subreddit for detransitioners to

13    share their experiences with more than 16,000

14    members, one can find several stories of people

15    who call their transgender status into question

16    after stopping transitioning due to medical

17    complications or feeling dissatisfied with

18    their treatment results"?

19          Do you know what a, "Subreddit," is,

20    Dr. Levine?

21          A.    I believe it's just a division of a

22    larger website where people, you know, with

23    similar interests.

24          Q.    Okay.  Do you understand this

25    sentence to be suggesting that all 16,000 of

1    those members have offered a story of

2    detransition?

3                MR. KNEPPER:  Objection, form.

4         A.    I think -- I think it may be true

5    that either they have offered a personal story

6    or they're fascinated because of their own

7    considerations of that story.  They're thinking

8    about it themselves, which would be in keeping

9    with the idea that even people who have

10   transitioned begin to doubt whether they made a

11   wise decision and they're considering

12   detransition.  I'm not so sure it means that

13   all 16,000.  I would have no way of

14   ascertaining that.  You know, in my worry, I

15   would lean towards most of them are seriously

16   considering or have detransitioned.  And in my

17   skepticism, I would say I'm not sure whether

18   it's 15,000 or 12,000 or 8,000.

19        Q.    But you have no way to confirm

20   that --

21        A.    I have no way.

22        Q.    -- if it's all of them or a few of

23   them or three of them?

24        A.    You're absolutely right.  I have no

25   way of confirming that.

Page 225

```
 1      where hormones are safe and surgery is a good
 2      thing to do.  If a person said that, you know,
 3      skeptically, I think that would disappoint
 4      certain patients, but how it was said and when
 5      it was said in response to what would either
 6      determine whether the person is engaged with
 7      the mental health professional or leaves the
 8      mental health professional.  You know, all
 9      mental health professionals are not created
10      equal.
11           Q.    So it sounds like you're saying it
12      could do harm to that patient?
13                MR. KNEPPER:  Objection, form.
14           A.    No, I'm not saying that.  I'm
15      saying it could be disappointing to that
16      person.  What that person did with the
17      disappointment may prove harmful just because
18      of that person or it may prove in fact
19      beneficial.
20           Q.    Are you satisfied -- let's orient
21      this question around the patients you've seen
22      in the last 12 months.  Are you satisfied that
23      those patients -- actually, sorry.  Let me
24      start over.  Are you satisfied that the
25      patients you have seen historically for whom
```

1       you provide letters of authorization for

2       hormones give sufficiently informed consent?

3                       MR. KNEPPER:  Objection, form.

4               A.      From my point of view, I did what I

5       could to reach the standard of having the

6       person internalize and think about, digest,

7       dream about and come back and talk to me about

8       it.  That's all I can do.  I can't guarantee

9       that if I do what I do that it's going to

10      change your mind or help you steer your ship in

11      a slightly different angle --

12              Q.      So --

13              A.      -- so I would not write a letter of

14      recommendation if I didn't feel like I did my

15      part.  And if the person indicated that they

16      couldn't pay attention to me, I wouldn't write

17      the letter.

18                      MR. CHARLES:  Understood.

19              Okay.  John, finished.

20                      MR. KNEPPER:  You're finished?

21                      MR. CHARLES:  I mean, barring --

22                      MR. KNEPPER:  Barring --

23                      MR. CHARLES:  We can't tell the

24      future.

25                      MR. KNEPPER:  I wasn't ready for