IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

     Plaintiffs,

v.                                                    Case No. 4:22-cv-00325-RH-MAF

JASON WEIDA, et al.,

     Defendants.

_____/

## THE STATE'S OMNIBUS RESPONSE TO PLAINTIFFS' MOTIONS TO EXCLUDE EXPERT TESTIMONY (DOCS.119, 127, 128, 133, 136, 138, 139, 141, 142, 143, 144, 145)

Defendants Secretary Weida and the Florida Agency for Health Care Administration (individually, "AHCA," and collectively with Secretary Weida, the "State") respond in opposition to Plaintiffs' nine motions to exclude the State's experts. *See* Doc.119 (Scott); Doc.127 (Lappert); Doc.128 (Biggs); Doc.133 (Laidlaw); Doc.136 (Hruz); Doc. 138 & 139 (Kaliebe); Doc.141 & 145 (Levine); Doc.142 (Zanga); Doc.143 & 144 (Van Meter). For the reasons explained in the attached memorandum, the motions should be denied.

Dated: April 21, 2023                    Respectfully submitted by:

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Gary V. Perko (FBN 855898)
gperko@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938
*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2023, I electronically filed the foregoing with

the Clerk of Court by using CM/ECF, which automatically serves all counsel of record

for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## MEMORANDUM

In Plaintiffs' telling, only they can fully use experts in this case. In their *nine* motions to exclude, Plaintiffs seek to either partially or completely bar testimony from the State's experts. Despite the number, each motion presents the same arguments—claiming that WPATH and the Endocrine Society set the medical consensus on treatments for gender dysphoria, contending that the State's experts get the relevant science "wrong" and read studies "incorrectly," and attacking the experts' religion and character, to provide a few examples. The arguments aren't persuasive, and Plaintiffs' motions should be denied.

## LEGAL STANDARD

For expert testimony to be admissible under Federal Rule of Evidence 702 and *Daubert*, (1) an expert must be qualified to render his or her opinions, (2) the expert's opinions must be based on reliable methodologies, and (3) the expert's opinions should assist the trier of fact. *Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1328 (11th Cir. 2014). This is a flexible inquiry: "[m]any factors will bear on the inquiry, and there is no definitive checklist or test." *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (cleaned up).

## ARGUMENT

Given that each motion to exclude largely contains the same arguments, the State broadly responds to those arguments. Plaintiffs contend (1) that the motions should be decided at this juncture, and (2) that the State's experts' testimony should be partially

or fully excluded (a) because they fall outside the alleged medical mainstream, as set by WPATH, the Endocrine Society, and medical organizations; (b) because the experts don't provide gender-affirming care; (c) because Plaintiffs believe that the experts get the science and read medical studies "wrong"; (d) because opining on international standards of care is irrelevant, and (e) because of the experts' religion and character. The State then individually responds to Plaintiffs' motions.

## I. GENERAL RESPONSES

### A. These Motions Need Not Be Decided Now

Plaintiffs argue that their motions to exclude should be decided before trial. *E.g.*, Doc.144 at 5 (arguing that the motions need to be decided at the outset). But there's no need for this rush to judgment. After all, this case is set to be tried by a bench trial, not a jury trial. "Where a trial judge conducts a bench trial, the judge need not conduct a *Daubert* (or Rule 702) analysis before presentation of the evidence, even though he must determine admissibility at some point." *Travelers Prop. Cas. Co. of Am. v. Barkley*, 2017 WL 4867012, at *2 (S.D. Fla. June 1, 2017) (cleaned up).

With a bench trial, there's less of a risk of the trier of fact being confused or misled by expert testimony. The trial judge, "as a fact finder," "is presumably competent to disregard what he thinks he should not have heard, or to discount it for practical and sensible reasons." *Adams v. Paradise Cruise Line Operator Ltd. Inc.*, 2020 WL 3489366, at *7 (S.D. Fla. June 26, 2020) (cleaned up). As the Eleventh Circuit put it, there's "less

4

need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005).

Thus, this Court can simply "later decide" at trial "to disregard testimony in whole or in part and/or to decide how much weight to give it." *Adams*, 2020 WL 3489366, at *11 (cleaned up). There's no need to do it now.

## B.   The Experts' Testimony Should Not Be Excluded

### i.   WPATH, the Endocrine Society, and Medical Organizations Can't Be Used as a Sword and Shield

Just as the State predicted, Plaintiffs are using WPATH, the Endocrine Society, and medical organizations as a sword and shield. Doc.124 (the State's motion in limine). Plaintiffs broadly state that these organizations set the medical consensus on treatments for gender dysphoria:

> The provisions of gender-confirming care has been accepted and endorsed, *inter alia*, by the: American Medical Association; American Psychiatric Association; American Psychological Association; Endocrine Society; Pediatric Endocrine Society; [and] . . . WPATH.

Doc.136 at 24-25 (cleaned up). In particular, Plaintiffs hang their hat on WPATH's standards of care. According to Plaintiffs, the standards are the "widely accepted and authoritative protocol for the treatment of gender dysphoria." Doc.145 at 15. Saying otherwise, according to Plaintiffs, is "demonstrably false" and "misleading." *Id.*

Naturally, the State's experts disagree with WPATH and other organizations' standards of care, guidelines, and policy positions. Seizing on this disagreement, Plaintiffs argue that the experts' opinions are therefore not "accepted in the scientific

and medical community" and should be excluded. Doc.119 at 17-18; Doc.127 at 13-17; Doc.128 at 32; Doc.133 at 18-19; Doc.136 at 24-26; Doc.139 at 30-31; Doc.142 at 17-19; Doc.144 at 24-25; Doc.145 at 13-17.

Plaintiffs go further still. They claim that the State's experts can't criticize these organizations' standards, guidelines, and policy positions. In responding to one expert's critiques of WPATH, Plaintiffs stated that the expert couldn't opine on WPATH because he doesn't have "personal knowledge regarding the internal conversations at WPATH, has not participated in WPATH conferences," and is "not a member of WPATH." Doc.136 at 14-15; *see, e.g.*, Doc.133 at 31-32.

Plaintiffs' arguments aren't persuasive. Plaintiffs and these organizations have resisted the State's efforts to obtain that very discovery—how the organizations created their standards, guidelines, and policy positions, and whether the organizations can speak for the medical community on this issue. Doc.124 (providing a detailed account). Plaintiffs' counsel even instructed their expert Dr. Edmiston to not answer questions relating to his drafting of a WPATH standards-of-care chapter, which served as a basis of his expert report. *Id.* at 14-16. And now Plaintiffs thus unfairly use that lack of discovery against the State.

Plaintiffs' sword-and-shield tactics are improper. They shouldn't be used to exclude State expert testimony.

### ii.   Plaintiffs Can't Fault the Experts for Declining to Provide Gender-Affirming Care

Plaintiffs argue that only medical professionals who have provided gender-affirming care can opine on whether gender-affirming care is experimental. Consider Plaintiffs' assessment of one State expert:

> [The expert] has no training and absolutely no experience providing treatment for gender dysphoria. He has never prescribed puberty blocking medications to treat gender dysphoria, nor to treat any condition. He has never prescribed hormones to treat gender dysphoria. Over the course of his career, [the expert] saw a grant total of two or three transgender patients more than a decade ago. He did not provide any treatment for their gender dysphoria, instead referring them to mental health professionals.

Doc.142 at 8-9 (cleaned up); *see also* Doc.127 at 7 n.3; Doc.128 at 14-15; Doc.133 at 32-33; Doc.136 at 3, 6; Doc.139 at 3-4, 9-11; Doc.144 at 3, 9.

This is a remarkable argument. It's also a self-serving one: Plaintiffs take the position that only their experts can opine on gender-affirming care's propriety. But that argument can't be right. That's like saying that only those who have "st[oo]d up to the bullets" can serve on a police-reform commission. Erwin Chemerinsky, *Presumed Guilty: How the Supreme Court Empowered the Police and Subvert Civil Rights* 28 (2020) (stating that a police chief informed Prof. Chemerinsky that "'[y]ou can't criticize this department until you stand up to the bullets'"). Or that only vegans can discuss whether a vegan diet is healthy. The standards presuppose a desired outcome.

Plaintiffs adopt qualification standards that only their experts can meet. Throughout their motions, Plaintiffs require each State expert to be "familiar with the scientific literature on gender dysphoria." Doc.142 at 9. Yet when a State expert meets this requirement, it's then not good enough. Doc.144 at 10 (faulting an expert for basing opinions on others' scholarship). Instead, the expert must also be a clinician. Doc.128 at 14. But this standard, too, will then not be good enough: the expert must have provided gender-affirming care. Doc.142 at 8-9. For the State, Dr. Levine meets these criteria, but Plaintiffs still seek to exclude part of his testimony. Doc.145.

What's more, Plaintiffs fault Dr. Scott, the State's expert neurologist, for not being a medical professional. Doc.119 at 2 ("she has never treated patients with gender dysphoria (at any age)," "she is not a medical provider of any kind"). Yet for Dr. Edmiston, Plaintiffs' expert neurologist, these qualifications no longer matter. Doc.120-36 (9:8-19).

All told, State expert testimony shouldn't be excluded on this basis.

### iii.   Plaintiffs Can't Argue that the State Experts Get the Relevant Science "Wrong"

According to Plaintiffs, the State's experts read studies "incorrectly" and reach conclusions that are "wrong." To provide examples, in Plaintiffs telling:

- An expert "repeatedly opines that medical treatment should not be provided to adolescents because they will ultimately desist. This is false." Doc.144 at 18 (cleaned up).
- An expert's "opinions that gender dysphoria may resolve on its through [sic] his mischaracterizing description of 'watchful

waiting' are based on a severely flawed reading of the literature." Doc.127 at 18 (cleaned up).

- An expert "cites" a study "for the proposition that the study showed that gender-affirming care was not effective. This characterization flatly contradicts the study's own conclusion that 'surgery and hormonal therapy alleviates gender dysphoria.'" Doc.133 at 15 (cleaned up).

- An expert "maligns studies based on the 2015 US Transgender Survey because it was not a randomized control study but used convenience sampling. While there are inherent limitations to convenience sampling, it is an important methodology to capture information about large cohorts." Doc.133 at 16 (cleaned up).

- An expert "misconstrues the effect of puberty-delaying treatments on fertility." Doc.133 at 21.

- An expert "opines that the literature around gender-affirming care is in a state insufficient to enable sound conclusions about the efficacy of affirming treatments. Not true." Doc.136 at 18-19 (cleaned up).

- An expert "falsely presented 'reparative therapy' as if it was an accepted modality of treatment. Nothing could be further from the truth, however." Doc.136 at 20-21.

*See also* Doc.119 at 12, 17; Doc.127 at 18-20; Doc.128 at 28-29; Doc.133 at 15-18; Doc.136 at 12-13, 18-23; Doc.139 at 22-25; Doc.145 at 16-19, 21-29. In essence, Plaintiffs seek to exclude the State's experts because the experts reach conclusions Plaintiffs don't agree with.

This argument, however, is inappropriate in a motion to exclude. These arguments, if anything, go to the weight and credibility of an expert's testimony, not to whether expert testimony should be excluded. Motions to exclude aren't "intended to supplant the adversary system." *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999). Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking" contested "but admissible evidence." *Id.* (cleaned up).

Therefore, these arguments shouldn't be used to exclude State expert testimony.

### iv.   Expert Discussion of the International Consensus Is Relevant and Helpful

Plaintiffs claim that expert discussion on the international consensus on treatments for gender dysphoria is misleading and irrelevant. *E.g.*, Doc.136 at 12-13; Doc.139 at 33-34. Not so. At this point, it's axiomatic that the central issue in this case is whether, based on current medical opinion, the State reasonably determined that the at-issue excluded treatments are experimental. *Rush* doesn't limit medical opinion to the United States's shores. How other countries address this subject is relevant to *Rush* and therefore this case.

The State's experts can opine on this consensus. After all, as clinicians and academics, the State's experts must keep up with current medical literature and standards. That includes keeping abreast of international developments. It's well-established that the State experts are aware of these international standards. And the experts should therefore be able to speak to them. If Plaintiffs disagree with how the experts characterize an international standard, Plaintiffs can cross-examine the experts on that issue.

### v.   Plaintiffs Improperly Attack the Experts' Religion and Character

It's one thing to go after an expert's opinions. It's another thing to go after an expert's religion and character. In each of Plaintiffs' nine motions, Plaintiffs subject the State's experts to bitter attacks on their religion and character.

In one motion, Plaintiffs argue that an expert's report contained "quantum leaps of logic," Doc.128 at 29; "pretzel logic tethered to [] false statement[s]," *id*.; "wildly irrational and irresponsible" and "reckless" statements *id*. at 22, 29; "smoke and mirrors," *id*. at 23; "fear tactics and unsupported innuendo," *id*.; opinions "unmoored to reality," *id*. at 29; and "simply junk science," *id*. Not only that, Plaintiffs stated that his report contains "rank speculation, untested theories, unsubstantiated anecdotes, assumptions that are obsolete, flawed, unethical, and unsettled science." *Id*. at 25; *see also id*. at 22 ("The implication to this Court that we should ignore vulnerable individuals with suicidal ideation because an unqualified sociologist believes that they don't *really* want to hurt themselves is as ridiculous as it is irresponsible." (emphasis in the original)).

That expert wasn't alone. Plaintiffs go after other experts with similar arguments. Plaintiffs state that certain experts are associated with alleged hate groups, Doc.127 at 23, Doc.136 at 9 n.4; Doc.144 at 11 n.4; are "fringe," Doc.127 n. 7 n.3; "manufactured" and "improper mouthpiece[s]," Doc.144 at 11, Doc.128 at 7 (cleaned up); transphobic, Doc.119 at 13 n.1; and "extrem[ists]," Doc.142 at 19-21. Plaintiffs also refer to the experts' "'so-called review of the literature,'" Doc.119 at 7; "'analysis,'" *id*. at 14;

"'experience,'" Doc.145 at 15; "musings," Doc.136 at 14, Doc.139 at 34; "unsupported

musings," Doc.133 at 35; "general grievances," Doc.142 at 2; and "proselytiz[ations],"

Doc.127 at 7.

Not only that, Plaintiffs also go after the experts' religions, even though

"evidence of a witness's religious beliefs or opinions is not admissible to attack or

support the witness's credibility." Fed. R. Evid. 610. Consider the following:

- An expert's "moral and religious views have influenced his purported expert opinions—indeed, they seem to be the motivating factor—that is something the Court must be aware of and should consider as it assesses the reliability of his testimony." Doc.136 at 28-31.
- An expert's  "testimony appears to be motivated by his personal and religious views regarding transgender people." Doc.144 at 26-28.
- An expert's "opinions are so tainted by his strong personal" and religious "views against gender-affirming care as to render those opinions unreliable." Doc.127 at 21-24.
- "There is ample evidence that" an expert's "testimony about both the AAP and the appropriateness of gender-affirming care is so permeated and tainted by his personal bias and religious views as to render it unreliable." Doc.142 at 19.

Plaintiffs seem to backtrack some of these positions, *e.g.*, Doc.127 at 21-22, but such

positions are precluded by the rules of evidence.

The State understands that this case and these issues bring about strong

emotions. But out-of-bounds attacks on experts in publicly docketed legal papers isn't

a productive means of prosecuting this case. If anything, it chills professional opinions

and encourages professionals to not become experts—especially when powerful

interest groups and organizations advocate different opinions.

"[M]eanness, sharp practice, and unnecessarily aggressive behavior" are uncalled for in this case. Forward, *Code of Pretrial and Trial Conduct*, Am. Coll. of Trial Lawyers (2009); Doc.67 ¶ 20 (scheduling order, encouraging the parties to read the code). They shouldn't be used as a means to disqualify expert witnesses, either.

## II.   SPECIFIC RESPONSES

In addition to the arguments expressed above, the State provides specific responses to each motion.

### A.   Dr. Scott

Plaintiffs seek to exclude Dr. Scott's testimony in its entirety. Doc.119. They argue that she's not qualified to be an expert, her methodologies are unreliable, and that she will not assist the trier of fact. Plaintiffs are wrong for several reasons.

*First*, Dr. Scott would assist this Court in this case. For better or worse, in cases involving treatments for gender dysphoria, there are two starkly different expert camps of thought. Dr. Scott doesn't fall into either of these camps.

She's new to this kind of litigation in the United States, and in her expert report, she even admits that in certain situations for certain adults, she believes that gender-affirming care might be appropriate. Doc.120-18 ¶ 7. She provides a neutral perspective on the risks of puberty blockers on minors. That is a valuable perspective when dealing with a hotly contested issue.

*Second*, Dr. Scott is qualified to provide her expert opinion. She's a neuroscientist who's opining on neuroscience. She bases her expert opinion on her "training and experience as a neuroscientist" and her "reading and" "assessment of the relevant neuroscientific literature on brain development." Doc.120-18 ¶ 4. This isn't a situation where a mechanic is opining on social science. *See generally Lebron v. Sec'y of the Fla. Dep't of Children & Families*, 772 F.3d 1352, 1369 (11th Cir. 2014).

*Finally*, Plaintiffs contend that Dr. Scott "does not know what the effects of puberty delaying medication are on the brain, and she does not know whether teenagers can fully grasp its implications." Doc.119 at 9. Unless Plaintiffs fundamentally misunderstood Dr. Scott's report, that's exactly what she concludes: due to the dearth of studies on hormone therapies on minors, and given the brain changes during youth, the science isn't there to support this kind of treatment. Doc.120-18. Available studies suggest, as Dr. Scott opines, that such treatments could lead to negative consequences, such as lower IQ scores, lower heart rates, greater emotional reactivity, higher anxiety, greater avoidance behavior, and more risk-taking behavior. Doc.120-18 ¶ 15.

As for her opinions about adolescent risk behavior, Plaintiffs refer to her statements as "hypothetical and unmoored from facts or data." Doc.119 at 9. Plaintiffs neglect to mention that the Supreme Court agrees with Dr. Scott. *See Roper v. Simmons*, 543 U.S. 551, 569 (2005) (discussing that the available science suggests that adolescents tend to engage in reckless behavior). Dr. Scott even mentions this salient point in her report, but Plaintiffs fail to mention it. Doc.120-18 ¶ 8.

14

In short, Dr. Scott is a qualified expert who can assist this Court in assessing the potential impacts of puberty blockers on the adolescent brain.

**B.      Dr. Lappert**

Plaintiffs ask this Court to limit Dr. Lappert's opinions and testimony to the field of plastic surgery and surgical care generally. Doc.127 at 25. Frankly, that's what the State would mostly ask him. Dr. Lappert is a surgeon, and the State would mostly ask him about his experience as a surgeon, about the risks—potentially irreversible risks— of surgery, and about the international standards of care on this issue.

**C.      Dr. Biggs**

Plaintiffs seek to exclude Dr. Biggs's testimony in its entirety. Doc.128. It's ironic that Plaintiffs seek to exclude a sociologist, even though WPATH identifies sociology as a relevant profession for WPATH membership. Despite the out-of-bounds attacks on Dr. Biggs, the State has made the independent decision not to call him as an expert in this case. Therefore, Plaintiffs' motion to exclude is moot.

**D.      Dr. Laidlaw & Dr. Hruz**

Plaintiffs seek to limit Dr. Laidlaw's and Dr. Hruz's testimony to "the risks associated with puberty suppressing medication and hormone therapy." Doc.133 at 4; Doc.136 at 3-4. That's far too narrow.

Dr. Laidlaw and Dr. Hruz are also well-versed in discussing treatments for gender dysphoria, particularly endocrinological treatments, critiquing WPATH, and opining on the international consensus on these treatments.

15

Dr. Laidlaw is the only State expert who evaluated Plaintiffs' health records. Such review was helpful to this Court during the preliminary-injunction stage of litigation. Doc.49 at 27-30 (Dr. Laidlaw's assessment of the individual Plaintiffs, in the State's response in opposition to the preliminary-injunction motion). It would also be helpful at trial. Plaintiffs argue that Dr. Laidlaw isn't qualified to discuss Plaintiffs' mental-health comorbidities, Doc.133 at 9, but this gets things wrong. As a practicing endocrinologist, Dr. Laidlaw must consider matters beyond hormone-producing bodies; mental health is something that he must also consider. That's true when treating someone with an adrenal issue. It's also true when treating someone with gender dysphoria.

Most of Plaintiffs' arguments against Dr. Hruz are addressed above: they criticize Dr. Hruz's discussion of the international responses to gender-dysphoria treatments, his critique of WPATH, and his discussion about the lack of a medical consensus on the at-issue treatments. Doc.136. Plaintiffs attack other topics of Dr. Hruz's testimony, such as desistance, which they claim are irrelevant, even though they provide necessary background and otherwise go to whether the at-issue treatments are experimental. And as with other experts, Plaintiffs contend that Dr. Hruz's opinions as "wrong" or "misleading," even though these matters are appropriate subjects for cross-examination, not motions to exclude.

16

### E.    Dr. Kaliebe

Plaintiffs seek to exclude Dr. Kaliebe's testimony in full. Doc.139 at 35; *see also id.* (arguing in the alternative that Dr. Kaliebe's testimony should be limited to "the diagnosis of gender dysphoria in children and adolescents"). But that's not warranted. He's a child and adolescent psychiatrist who can discuss whether there's a professional medical consensus in the field regarding the treatments for gender dysphoria. Plaintiffs trot out the arguments outlined in Section I, but as shown above, such arguments don't move the needle.

### F.    Dr. Levine

Plaintiffs seek to limit Dr. Levine's testimony to "at a minimum" his identifications of risks associated with prescribing mediation and surgery to adolescents and criticizing the quality of research on treatments for gender dysphoria. Doc.145 at 32. Again, that's far too narrow.

To get to that position, Plaintiffs make the interesting argument that Dr. Levine's testimony should be excluded because it helps *them*, *id.* at 8-14, as well as the arguments expressed above: that Dr. Levine is wrong in arguing that WPATH's standards of care isn't the authoritative protocol on treatments for gender dysphoria, *id.* at 15-17; that his opinions on the international consensus are irrelevant and misleading, *id.* at 17-19; and that he gets the science "wrong," *id.* at 19-31. For the reasons set forth above, that's not persuasive.

Dr. Levine's testimony would assist this Court. He's a psychiatrist from Case Western Reserve University and was an early proponent of gender-affirming care. Doc.120-12 ¶¶ 1, 5. In fact, he's provided gender-affirming care, and he was a leader of WPATH's predecessor organization, the Harry Benjamin International Gender Dysphoria Association. *Id.* More than any expert in this case, on both sides, Dr. Levine can speak to the history of gender-affirming care in this country, as well as internationally.

### G.   Dr. Zanga

Should the State call Dr. Zanga as an expert at trial, the State would only ask Dr. Zanga to opine on the American Academy of Pediatrics. This Court may recall that the AAP was one of the organizations, like WPATH and the Endocrine Society, that resisted the State's discovery efforts. Doc.124. What's more, the State produced evidence (also from Dr. Zanga, earlier in this case) that the AAP likely suppressed member-led resolutions critical of the AAP's support of gender-affirming care. Doc.49-5 at 21-28. Whether Dr. Zanga's testimony is categorized as expert or lay testimony, Doc.142 at 13, he can speak to his membership in the organization and can speak to the critical resolutions.

### H.   Dr. Van Meter

Plaintiffs seek to exclude Dr. Van Meter's testimony and do so through the arguments expressed in Section I. Doc.144. For the reasons expressed above, Plaintiffs'

motion should be denied, though the State has placed Dr. Van Meter on its may-call witness list.

## CONCLUSION

For the reasons set forth above, this Court should grant the State's motion.

Dated: April 21, 2023                Respectfully submitted by:

<u>/s/ Mohammad O. Jazil</u>
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Gary V. Perko (FBN 855898)
gperko@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301
(850) 270-5938
*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

I certify under Local Rule 7.1(F) that this response contains 3,845 words, and I certify that this response complies with the requirements in Local Rule 5.1(C).

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2023, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil