THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

   *Plaintiffs*,

v.

JASON WEIDA, et al.,

   *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' OMNIBUS MOTION IN LIMINE

Plaintiffs AUGUST DEKKER; BRIT ROTHSTEIN; SUSAN DOE, a minor, by and through her parents JANE and JOHN DOE; and K.F., a minor, by and through his parent and next friend JADE LADUE (collectively, "Plaintiffs"), submit this opposition to the Defendant's, Secretary Weida and the Florida Agency for Healthcare Administration (collectively, "Defendants" or "AHCA"), Omnibus Motion *in Limine* [Dkt. 124] (the "Motion").

For the for the reasons outlined below, Plaintiffs respectfully request the Motion be denied.

## **INTRODUCTION**

Defendants' Motion, in a sweeping fashion, seeks to "(1) exclude from trial all mention of World Professional Association for Transgender Health ("WPATH"), the Endocrine Society ("ES"), and Plaintiffs' preferred medical organizations, and the organizations' standards of care, guidelines, and policy positions on treatments for gender dysphoria; (2) exclude the testimony of Plaintiffs' expert Dr. Edmiston because Plaintiffs prevented him from answering deposition questions related to his rebuttal expert report; and (3) exclude Plaintiffs' experts' opinions that are based on the based on the organizations' standards of care, guidelines, and policy positions on treatments for gender dysphoria." Mot., at 1. Apart from being a vague and unduly prejudiced request against Plaintiffs, it is improper and unenforceable.

The primary issue before this Court is "whether, based on current medical knowledge, the state's determination that these treatments are experimental is reasonable." ECF 64 at 4. "Current medical evidence" includes the current and widely accepted standards of care, clinical guidelines, and policy statements issued by professional medical associations regarding the treatment of gender dysphoria. It is therefore evidence that should be considered at trial and upon which experts may rely. Just because Defendants did not consider this evidence in promulgating the Challenged Exclusion or do not like that it contradicts their GAPMS Report

does not establish good grounds for this Court to exclude. To the contrary, under Florida law, "[t]o determine whether [a] health service is consistent with generally accepted medical standards, the Agency *shall consider* … *Evidence-based clinical practice guidelines*." Fla. Admin. Code 59G-1.035(4)(a).

Defendants base their motion on their purported inability to obtain information relating to the inner workings of the Third-Party Medical Organizations. Not only are such inner workings irrelevant, however, but it is also false that Defendants were precluded from obtaining relevant and lawfully discoverable information from these third parties. For one, Defendants received documentary evidence from each of these Third-Party Medical Organizations in response to their subpoenas seeking the production of documents. For another, Defendants' inability to obtain *some* of this information resulted from other courts' actions that either limited or stopped the discovery that Defendants sought from these non-parties because it was either overly burdensome or based on First Amendment concerns raised by the Third-Party Medical Organizations.

The fact that Defendants were precluded *by lawful court orders* from obtaining irrelevant information or information to which it had no right to obtain is not a sufficient reason for the exclusion of the current and widely accepted standards of care, clinical guidelines, and policy statements issued by professional medical associations regarding the treatment of gender dysphoria. Parties to

3

litigation are precluded from obtaining certain discovery all the time because it is too broad, unnecessary, too burdensome, or, as alleged by the Third-Party Medical Organizations, infringes of others' First Amendment rights. *See*, *e.g.*, ECF 105 (Order on the Motion to Quash the Grossman Subpoena, which limited the discovery Plaintiffs could obtain from one AHCA's consultants and the inner workings of groups with which AHCA's consultants work); ECF 118 (Order Allowing Mr. Weida's Deposition, but setting limits on such deposition).[1] The fact that Defendants were unable to obtain *some* of the discovery they wanted through arguably harassing fishing expeditions into the inner workings of third-party organizations they actively and ideologically oppose is not a reason to preclude Plaintiffs from presenting their case.   This is particularly so when information Defendants seek to preclude is information that they, by operation of law, *must* consider in determining whether a health service is experimental or

---

[1] The lack of seriousness of Defendants' Motion is demonstrated by the fact that Defendants themselves have continually resisted discovery into their own inner workings and the inner workings of those with whom they worked with, including their consultants, the Executive Office of the Governor, and Florida Department of Health.   At one point or another, Defendants have raised the apex doctrine, attorney-client privilege, work product doctrine, and common defense privileges to obstruct Plaintiffs' ability to discover the full truth of the machinations that lead to the Challenged Exclusion.   Should that preclude any discussion of the GAPMS Memo or testimony from AHCA?   That would be absurd, as is Defendants' request that this Court "exclude from trial all mention of [World Professional Association for Transgender Health ("WPATH")], [Endocrine Society ("ES")], and Plaintiffs' preferred medical organizations, and the organizations' standards of care, guidelines, and policy positions on treatments for gender dysphoria." ECF 64 at 4.

investigational, and is widely relied upon by experts in the relevant fields of medicine.

Simply put, Defendants' Omnibus Motion *in Limine* has no merit and in fact is illustrative of their failure to undergo a lawful and reasonable process before arriving at their desired result:   the unlawful and discriminatory Challenged Exclusion.  Defendants' Motion should be denied, in full.

## **ARGUMENT**

### I.     **The Internal Workings of WPATH, the Endocrine Society, and other Third-Party Medical Organizations are Irrelevant to this Case.**

In the first instance, AHCA seeks to exclude "all mention of [WPATH], [Endocrine Society] and Plaintiffs' preferred medical organizations, and the organizations' standards of care guidelines, and policy position on treatment for gender dysphoria." Mot., 1. AHCA claims that the evidence should be excluded because they were prevented from obtaining certain information from these third parties and therefore this Court should make the severe decision to exclude "any mention" of the organizations.  But Defendants were not prevented from obtaining any relevant, let alone essential, information.

The Court has identified the "controlling" issue in this case as being "whether, based on current medical knowledge, the state's determination that these treatments are experimental is reasonable." Dkt. 64, 4.  This is a question that will

be answered by the parties' experts.[2] Moreover, each of the guidelines already provides, on its face, a description of its methodology and cites the studies on which it relies. Inquiry beyond the four corners of the guidelines into the internal deliberations of the Third-Party Medical Organizations are of no concern to resolving the issue of whether these services are experimental or investigational and AHCA's efforts to tie the two issues together should be dismissed out of hand.

> ### A. Defendants Have Not Demonstrated The Information They Requested From Third-Party Medical Organizations Is Relevant or Necessary for this Case.

Defendants served nearly limitless third-party subpoenas for documents and depositions of over twenty Third Party Medical Organizations, all of whom are non-parties to this litigation. Mot., 7-8. The subpoenas sought information about how the organizations established and developed their standards of care, guidelines, and policy positions. *Id.* They also sought substantial proprietary internal information about the standards of care, guidelines and policy statements—including communications evidencing who created them, supported them, opposed them, and why. Mot., 10. The Third-Party Medical Organizations moved to quash the subpoenas, arguing that the information sought by Defendants

---

[2] As discussed throughout, state Medicaid regulations require Defendants to consider, in determining whether a particular medical service is experimental, "evidence-based clinical practice guidelines," but this inquiry merely asks what clinical guidelines exist and does not require investigation into how they were developed. Fla. Admin. Code R. 59G-1.035(4)(a).

was  (1) irrelevant, (2) unduly burdensome, and (3) infringed on their free speech and associational rights under the First Amendment. *E.g., In re Subpoenas Served on Am. Acad. Of Pediatrics*, 1:23-mc-00004-CJN (D.D.C. 2023) (herein "D.C. Dkt.") D.C. Dkt. 27. The U.S. District Court for the District of Columbia substantially narrow the scope of the requests but still allowed Defendants to go fishing (D.C. Dkt. 18) a decision which the Third-Party Medical Organizations appealed, moving for a stay that the U.S. Court of Appeals for D.C. Circuit granted.

As a threshold issue, Defendants have not demonstrated that the information they seek is relevant, let alone essential, to their defense of Plaintiffs' claims or that it has any grounds to conduct an overly broad fishing expedition that would violate Third-Party Medical Organizations' constitutional rights. To justify their intrusive and improper requests into the decision-making function of the Third-Party Medical Organizations, AHCA cites to Plaintiffs' experts testimony that they routinely treat patients in accordance with these guidelines. Mot., at 6. Defendants also reference the cross-examination of Dr. Laidlaw at the hearing on Plaintiffs' Motion for Preliminary Injunction to suggest that because some position statements were used to discredit Dr. Laidlaw's qualifications and properly represent him as an outlier in the field of medicine, the information bears on the issues presented.  Mot., 6-7. AHCA is wrong.

The question is not whether the standards of care, guidelines, and policy positions on treatments for gender dysphoria are relevant, but whether the inner workings of the Third-Party Medical Organizations' inner workings are relevant. And even if they were, Defendants' inability to obtain *all* of the information they desired, as opposed to *some* of the information which they did obtain, is if no consequence.

The WPATH Standards of Care and the Endocrine Society's Clinical Practice Guidelines are evidence-based recommendations, which cite to and rely upon a deluge of scientific studies and literature.  *See* ECF 144-21 (WPATH's Standards of Care, Version 8); ECF 120-20 (Endocrine Society's Clinical Practice Guidelines).  They exist. And no amount of wishing otherwise by Defendants will erase that undeniable fact.

To the extent that AHCA decided to wholly ignore the clinical guidelines for the treatment of gender dysphoria during the GAPMS process notwithstanding that the mandate the consider them during the GAPMS process, their witnesses and experts can so testify. To the extent that Defendants take issue with the science supporting the standards of care and clinical guidelines, they can cross-examine Plaintiffs' expert witnesses or present their own affirmative testimony about the scientific literature. These perspectives do not put at issue the internal deliberations, procedures, or communications about the standards of care,

guidelines, and policy statements. *See In re Schaefer*, 331 F.R.D. 603, 612 (W.D. Pa. 2019) (quashing subpoena seeking the deposition of the lead author of a publicly available report on transgender persons in the military, because the respondent had access to the report and "the same studies and data that [the petitioner] did in formulating her opinions and conclusions in the [] Report[,]" which "foreclose[d] any argument that the [respondent] ha[d] a 'substantial need' (or anything close to it) for [the petitioner's] testimony"); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 249 F.R.D. 8, 12–13 (D. Mass. 2008) (finding that a non-party publisher of medical journal was entitled to protective order to avoid disclosing peer review comments and communications with authors of articles; although materials sought were relevant to litigation, the probative value of documents was limited, since peer reviewers' and authors' confidential comments were not at issue in the case).

This analysis, nor the inevitable outcome of Defendants' improper motion here, does not change because AHCA "asserts that WPATH and ES don't speak for the medical community, and that other organizations, like the [American Academy of Pediatrics], might not actually speak for its membership on gender-affirming care." Mot., 16. It is incontrovertible that within any organization there are members who do not agree with the organization's position on any given issue. *E.g.*, ECF 81-4 (Email from then-AHCA employee Jeffrey English stating with

regards to the GAPMS Report, "All I can say about that report, as I have read it, is that it does not present an honest and accurate assessment of the current evidence and practice guidelines as I understand them to be in the existing literature.").  It is undeniable that these organizations have adopted clinical guidelines or position statements that *represent the organization's position*.  How an organization arrives at its position does not negate the fact that it is the organization's position.  Moreover, Defendants cannot cite and have provided no example of any *major medical organization* that adopts guidelines or position statements by having its *entire* membership vote on it.

Here, Plaintiffs' experts have and will testify that these standards of care, clinical practice guidelines, and policy statements reflect the wide acceptance of professionals who, unlike all of Defendants' experts save one, treat transgender patients and the clinical practice guidelines make recommendations consistent with the scientific literature.  Plaintiffs' experts will also explain, based on the scientific evidence, why the standards and guidelines are sound and why they rely on them.  Of course, Defendants can ask and have asked the expert witnesses about the scientific evidence and how the clinical guidelines are supported by it.

WPATH, the Endocrine Society, and the other Third-Party Medical Organizations are simply not witnesses in this case. The fact that qualified health professionals in the field rely on their standards of care, clinical guidelines, and policy statements does not transform these entities into witnesses, nor does it transform their internal communications into relevant or admissible evidence . Nor would it be proper or relevant how these organizations establish their standards, guidelines, and policies. By analogy, it would be no more proper for a party to seek to depose the American Institute of Certified Public Accountants (AICPA) in an accounting dispute or the American Institute of Architects (AIA) in a construction related dispute.  What *is* relevant is the testimony of the parties' expert witnesses and how they arrived at their opinions.  Thus, to the extent Defendants question Plaintiffs' experts' qualifications, reliability, or helpfulness (which they do not), , Defendants are free to cross-examine Plaintiffs' experts.

Despite the irrelevant nature  of the information Defendants sought, they claim the lawful court orders limiting or staying their intrusive subpoenas justify the exclusion of *any mention* of more than a dozen well-recognized and respected medical associations while at the same time allowing Defendants and their expert witnesses to question and attempt to undermine their:

> American Academy of Pediatrics, American Academy of Child & Adolescent Psychiatry, American Academy of Family Physicians, American Academy of Nursing, American College of Obstetricians and Gynecologists, American College of Physicians, American

> Medical Association, American Pediatric Society, American Psychiatric Association, Association of American Medical Colleges, National Association of Pediatric Nurse Practitioners, North Central Florida Council of Child & Adolescent Psychiatry, Societies for Pediatric Urology, Society for Adolescent Health and Medicine, Society for Pediatric Research, and Society of Pediatric Nurses.

Mot., 7; *Id.* at 8 n. 1.

But again, it is AHCA's own regulations which require Defendants to consider "evidence-based clinical practice guidelines" and makes reference to the views of "the relevant medical community or practitioner specialty associations." Fla. Admin. Code 59G-1.035(4)(a), (b).  The regulation at issue makes no mention of the *inner workings* of these organizations, nor does require such an inquiry to determine if a health service is experimental or investigational.  Indeed, AHCA cites no example where such an inquiry was performed or sought as part of the GAPMS process.  It thus boggles the mind that Defendants seek to exclude any mention of "the relevant medical community or practitioner specialty associations" and the views and "evidence-based clinical practice guidelines" of these organizations, when ***AHCA's own regulations require a different result.***

In support of its unmoored and incredible request, AHCA cites to two cases (*Kosilek* and *Gibson*) for the proposition that a small minority of courts did not follow WPATH's recommendations.  But not only is this disingenuous, but, at most, it goes to weight.  It is not a reason to exclude any mention of the Third-Party Medical Organizations or their clinical guidelines and position statements.

Defendants disingenuously leave out that most federal courts consider the clinical practice guidelines and the positions statements adopted by the Third-Party Medical Organizations, including WPATH and the Endocrine Society, to be widely accepted and represent the consensus within the medical community. These include, among others:

- The Fourth Circuit, *see Williams v. Kincaid*, 45 F.4th 759, 768 n.3 (4th Cir. 2022); *Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps.*, 12 F.4th 422, 427 (4th Cir. 2021), as amended (Dec. 2, 2021), *cert. denied*, 142 S. Ct. 861 (2022); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 595 (4th Cir. 2020), as amended (Aug. 28, 2020); *De'lonta v. Johnson*, 708 F.3d 520, 522-23 (4th Cir. 2013);

- The Seventh Circuit, *see Fields v. Smith*, 653 F.3d 550, 553 (7th Cir. 2011); *see also Fields v. Smith*, 712 F.Supp.2d 830, 843 (E.D. Wis. 2010), supplemented (July 9, 2010), *aff'd*, 653 F.3d 550;

- The Eighth Circuit, *see Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 671 (8th Cir. 2022);

- The Ninth Circuit, *see Edmo v. Corizon, Inc.*, 935 F.3d 757, 769, 771 (9th Cir. 2019);

- The U.S. District Court for the Middle District of Alabama, *see Eknes-Tucker v. Marshall*, 603 F.Supp.3d 1131, 1139 (M.D. Ala. 2022);

- The U.S. District Court for the Eastern District of Arkansas, *see Brandt v. Rutledge*, 551 F.Supp.3d 882, 890 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661;

- The U.S. District Court for the Middle District of North Carolina, *see Kadel v. Folwell*, No. 1:19CV272, 2022 WL 3226731, at *32 (M.D.N.C. Aug. 10, 2022); and

- The U.S. District Court for the Western District of Wisconsin, *see Campbell v. Kallas*, No. 16-CV-261-JDP, 2020 WL 7230235, at *4 (W.D. Wis. Dec. 8, 2020); and *Flack v. Wisconsin Dep't of Health Servs.*, 395 F.Supp.3d 1001, 1018 (W.D. Wis. 2019).

In sum, Defendants' unprecedent request should be denied because the wide-ranging information pertaining to the Third-Party Medical Organizations' inner workings that Defendants sought and which they were only *partially* unable to obtain is irrelevant to this case.   However, the information that they seek to exclude, which is undeniable, ***must be considered under AHCA's own regulations***.   Finally, to the extent the information Defendants sought to obtain from third parties and were unable to obtain is relevant (and it is not), such information or lack thereof goes to the weight of the evidence and testimony Defendants seek to exclude, not to its admissibility.

**B. The Requested Information Does Not Bear on the GAPMS Factors.**

As noted above, to determine if a service meets Florida's Generally Accepted Professional Medical Standards (GAPMS), AHCA is required to consider several factors, including the existence of "evidence-based clinical practice guidelines" and the views of "the relevant medical community or practitioner specialty associations."    Fla. Admin. Code 59G-1.035(4)(a), (b). Defendants cannot cite to, because no such requirement exists, that AHCA look at the internal communications and processes in determining how a particular guideline was established. Thus, previous GAPMS reports do not even comment on the organization that developed the guidelines, much less delve into the inner workings of those organizations or their processes for developing the guidelines. *See, e.g.*, Exhibit "A" (Def-000286954), Exhibit "B" (Def_000286961), Exhibit "C" (Def_000286947), Exhibit "D" (Def_000286931). Similarly, AHCA is required to rely on the "[r]ecommendations or assessments by clinical experts on the subject or field." Fla. Admin. Code 59G-1.035(4)(f). The discovery AHCA sought from the Third-Party Medical Organizations has no bearing on the medical necessity of these treatments or their scientific merits.

Defendants' position is particularly disingenuous because each of these organizations (i.e., WPATH and the Endocrine Society) cite to every study and piece of evidence on which they rely, and outlines the methodology used to

develop their recommendations.  *See* ECF 144-21 (WPATH's *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8); 120-20 ( Endocrine Society's *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*).

Looking into the internal processes of the creation of the guidelines is not a factor for AHCA to consider in arriving at its decision because it is irrelevant to making a scientific determination.  Rather, it has available the same data and information utilized by these organizations; if Defendants' experts review and analyze those same studies and have different opinions, they are free to bring that to this Court's attention. But they are not free, and indeed are well outside of the proper bounds of third-party discovery or the GAMPS process requirements to seek the inner workings of  established professional medical associations in an effort to intimidate or silence them to serve Defendants' aims in this litigation.

Notably, there is *no evidence* AHCA reviewed or otherwise requested this information from WPATH, the Endocrine Society, or any of the organizations during the GAPMS process.  If it was not relevant then, why is it relevant now? AHCA made its (erroneous) decision that gender-affirming medical care is "experimental" and purportedly has the evidence to support it.

Defendants are entitled to demonstrate the basis for promulgating the Challenged Exclusion and attempt to convince this Court that it was based on legitimate analysis. Defendants, however, are not entitled to exclude otherwise relevant evidence and testimony that undoubtedly goes to the heart of what AHCA is required to consider by claiming they were prevented from probing into the inner workings of non-party medical organizations, which AHCA's regulations do not require and they have never done.

That Plaintiffs rely on the internationally recognized WPATH's Standards of Care and the Endocrine Society's Clinical Practice Guidelines does not open the door to explore and turn over every rock of the inner workings and decision-making processes of these organizations. Nor is a lack of insight into the inner workings decision-making processes of these organizations a basis to not consider their widely recognized recommendations, positions, and statements, which AHCA's own regulations require. Indeed, these organizations are not parties to this case and Defendants have never sought to make them so.

### C. Plaintiffs have not withheld any evidence.

While it is, according to court order, not the non-parties' obligation to provide Defendants with the irrelevant information sought, it is undoubtedly not Plaintiffs' obligation to provide it either. The Third-Party Medical Organizations, which are not under Plaintiffs' agency or control, properly objected to the requests

propounded on them by Defendants.  Plaintiffs do not speak for the Third-Party Medical Organizations nor could they have provided the information Defendants sought.  In any event, Defendants never served Plaintiffs with discovery requests seeking this information.

Defendants' contention that it has been "thwarted … by Plaintiffs from obtaining this discovery" (Mot., 4.) is entirely without merit.  It was the U.S. District Court for the District of Columbia and the U.S. Court of Appeals for the D.C. Circuit, at the request of the Third-Party Medical Organizations, who limited or barred Defendants from *partially* obtaining the information they sought.

Defendants now toss a Hail Mary by arguing that Plaintiffs stopped them from obtaining the information by objecting to their improper questioning of an expert witness to discuss information he was not at liberty to discuss.  But notably, as further explained below, Defendants cannot and do not point to any substantive questions which Dr. Edmiston refused to answer.

The only example they point to is that Dr. Edmiston responded "Yeah, that would – that would – discussing that would be in violation of the confidentiality agreement," when he was asked "did you contribute in authoring any other chapters in WPATH?"  Mot., at 16.  But a single question to a single expert, without any follow up, is not a basis to "exclude from trial all mention of World Professional Association for Transgender Health ("WPATH"), the Endocrine

Society ("ES"), and Plaintiffs' preferred medical organizations, and the organizations' standards of care, guidelines, and policy positions on treatments for gender dysphoria," or to "exclude Plaintiffs' experts' opinions that are based on the based on the organizations' standards of care, guidelines, and policy positions on treatments for gender dysphoria." Mot., at 1.  Not only is it irrelevant, but, as explained below, Dr. Edmiston had previously testified that "[m]any different people were involved in" SOC8 and that "the document was written collaboratively." Mot., at 15.

## II.  There Is No Basis to Exclude Dr. Edmiston as He Did Not Rely on WPATH's Standards of Care or Endocrine Society's Guidelines in Rendering His Opinions and Did Not Withhold Any Relevant Information.

In reading AHCA's Motion, the reader is left with the impression that Dr. Edmiston was prevented from answering questions relevant to his opinions. But a close examination of the facts reveals something strikingly different.  AHCA's arguments are misguided for two reasons. *First,* Dr. Edmiston's opinions are not based on the WPATH Standards of Care or on the Endocrine Society's Clinical Practice Guidelines, to say nothing of the policy position statements of other medical professional organizations. *Second,* the questioning of Dr. Edmiston was a thinly veiled attempt to circumvent the D.C. Circuit's stay. Dr. Edmiston responded to all but *a single question* in his deposition, because that question

(which was outside the scope of his testimony and opinions) was in direct violation of the stay order.

### A. Dr. Edmiston Rebuttal Opinions Do Not Rely on WPATH's Standards of Care or the Endocrine Society's Guidelines.

Dr. Edmiston is a neuroscientist and is proffered by Plaintiffs as a limited rebuttal witness to opinions raised by Defendants designated expert Professor Scott.  Even a cursory review of Professor Scott's report shows her testimony is wholly unrelated to WPATH, the Endocrine Society, and any of the other Third-Party Medical Organizations to which Defendants' Motion relates. *See generally* Exhibit "E" (Scott Report).[3] Professor Scott's report includes *no mention* of WPATH or of the Endocrine Society either.   The same holds true for Dr. Edmiston.  Dr. Edmiston's opinions and testimony are primarily based on his own research and academic experience and the peer-reviewed literature relating to neuropsychological assessment and brain development.   Throughout his opinions, he makes mention of the SOC8 *only once* (and completely unrelated to either the information upon which the instant motion is based, i.e., inner workings of

---

[3] Plaintiffs moved to exclude the expert report, opinions, and testimony of Professor Scott in its entirety. *See* ECF 119. As outlined in the motion, Professor Scott is not a qualified expert on gender dysphoria or its treatment, and her opinions and testimony are neither relevant nor reliable under Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. A copy of Professor Scott's Expert Report is attached as Exhibit "E" ("Scott Report").

WPATH and other Third-Party Medical Organizations), (*see* Exhibit "F" (Edmiston Report), at ¶ 20), and makes no mention of the Endocrine Society's Guidelines or position statements from Medical Organizations.[4]  This makes sense as his testimony limited to rebutting Professor Scott's opinions outlined in her report (which makes no mention of the organizations).  Accordingly, and naturally, the lack of WPATH and Endocrine Society related discovery could not and did not affect Defendants' ability to conduct a proper deposition of Dr. Edmiston.

In fact, Dr. Edmiston confirmed as much at deposition.  However, AHCA grossly mischaracterizes Dr. Edmiston's deposition testimony. A review of the deposition transcript makes clear that Dr. Edmiston did not rely on the WPATH's Standards of Care or Endocrine Society's Clinical Practice Guidelines to form the opinions contained in his exert report.[5]

---

[4] A copy of Corrected Expert Rebuttal Report of E. Kale Edmiston, Ph.D. is attached as Exhibit "F" ("Edmiston Report"); a copy of his deposition transcript is attached as Exhibit "G" ("Edmiston Dep.").  Citation to Edmiston's Report will be referenced as "Edmiston Report" followed by the page number. Citation to his deposition will be referenced as "Edmiston Dep." followed by the page(s) and line(s).

[5] Other than mentioning his experience as a contributing author of WPATH SOC 8 and emphasizing its recommendation of an "individualized approach to joint decision-making regarding healthcare[,]" Dr. Edmiston does not rely on WPATH's Standards of Care or any of the Third-Party Medical Organizations' positions. As noted above, a review of Dr. Edmiston's report reveals only a singular passing mention of the SOC8 (Exhibit "F" (Edmiston Report), at ¶ 20) and the bibliography attached to his report does not cite WPATH's Standards of Care or the Endocrine Society's Guidelines.

**Q: Did you rely on the WPATH Standards of Care 8 in making
conclusions in your expert report?**

A. I relied on my expertise on the topic. …

**Q. Is it your opinion that WPATH sets professional standards of
care for treatments for gender dysphoria? …**

A. They are one organization. There are other medical organizations
that also have standards of care. …

**Q. Did you review any Endocrine Society documents in making
this expert report?**

A. No.

*See* Exhibit "G" (Edmiston Dep.), at 16:21-17:14. If the deposition was not

"illuminating," it is due to the lack of appropriate and relevant questioning, not to

Dr. Edmiston's answers.  Indeed, AHCA's counsel deposed Dr. Edmiston for less

than two hours. Further, in response to the following exchange **"Q: Did you rely on**

**the WPATH Standards of Care 8 in making conclusions in your expert report?  A.**

**I relied on my expertise on the topic. …"** (Exhibit "G" (Edmiston Dep.), at 16:21-

16:24), there was not a single follow up question as to what specific expertise that

referenced or what—if anything it had to do with WPATH.

It seems likely that Defendants did not ask the question because the answer

is was an obvious "nothing."  In reviewing the bibliography of Dr. Edmiston's

report for the sources he relies upon for his specific opinions, there is no mention

of WPATH's Standards of Care or the Endocrine Society's Guidelines.  And the

only mention within Dr. Edmiston's opinions of WPATH's Standards is a single passing sentence that is completely unrelated to the questions he was asked at his deposition and unrelated to the information of which Defendants complain in their motion.

Indeed, the sought-after discovery is wholly irrelevant and unrelated to Dr. Edmiston's opinions and testimony. Thus, Dr. Edmiston's co-authorship of a WPATH Standards of Care Version 8, Chapter 5, the Assessment of Adults, (Edmiston Dep., at 32:2-32:9), is immaterial to his rebuttal opinions presented in this case.[6] Instead of Defendant's line of questioning focusing on the content of Dr. Edmiston's expert report, as discussed below, Defendant opted to spend their time questioning him on issues of the internal processes of WPATH and Endocrine Society in a clear attempt to circumvent the D.C. Circuit's stay order prohibiting AHCA from seeking *further* discovery into the inner working of the Third-Party Medical Organizations.

---

[6] The Assessment chapter discusses how to diagnose gender dysphoria in adults and has nothing to do with the opinions Dr. Edmiston's proffers in this case, where Dr. Scott's and his testimony related to the effects of brain development in *adolescents*. Nevertheless, AHCA deposed Dr. Edmiston extensively on this Chapter and he answered every single one of those question. *See* Edmiston Dep., at 22:13-45:2.

There simply is no basis to exclude Dr. Edmiston's opinions in their entirety or even in part.

### B. Defendants Improperly Attempted to Circumvent the Stay Order By Its Questioning of Dr. Edmiston.

The D.C. Circuit stayed the D.C. district court's order allowing *further* limited discovery into the  Third-Party Medical Organizations' inner workings. No. 23-7025 (D.C. Cir. Mar. 8, 2023).  Despite this, AHCA attempted to circumvent the stay order by asking Dr. Edmiston about topics unrelated to his expert report or expert opinions, and that they were prohibited from further seeking discovery on by the stay. That is, AHCA asked Dr. Edmiston about the specific internal processes to the drafting process of the WPATH Standards of Care, Version 8. There is nothing improper about this Court ensuring Defendants comply with a duly issued and binding order from a court with jurisdiction over the matter.

Defendants' strategic attempt to circumvent the stay order through the deposition of Dr. Edmiston should not be permitted. Plaintiffs' counsel was acting within the rules when they objected to questioning, to the extent that the answers would violate the stay granted by the D.C. Circuit or violate a confidentiality agreement entered into by Dr. Edmiston, and in any event, but for one question, Dr. Edmiston *answered every question asked of him*.

During a deposition, "[a] person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." *See* FED. R. CIV. P. 30(c)(2). As a matter of "comity and respect for the effect of preexisting judicial orders," *Donovan v. Lewnowski*, 221 F.R.D. 587, 588 (S.D. Fla. 2004), there is no dispute that the existing order continues to have full force and effect on the parties subject to it, including Defendants. Defendants' attempt to circumvent the lawful stay order through the deposition of Dr. Edmiston goes directly against principles of comity and courtesy. To the extent that Defendants want to obtain the information it seeks, that request should be addressed to the D.C. Circuit, which issued the stay.[7] In their motion, Defendants acknowledge that they were "*again* prevented from probing into how WPATH creates its standards of care." Mot., at 22. Defendants *admit* they intentionally sought a line of questioning that was specifically limited by the D.C. Circuit's Order staying the third-party subpoena. No matter how frustrating to their purposes outside the scope of this dispute,

---

[7] As an aside and to highlight the principles of comity and respect for the effect of preexisting judicial orders, courts also respect protective orders entered by other courts. *See*, e.g., *Santiago v. Honeywell Int'l, Inc*., 16-CIV-25359, 2017 WL 3610599, at *2 (S.D. Fla. Apr. 6, 2017) (discussing that courts faced with deciding discovery motions that involve requests to modify or terminate a protective order previously issued by another court, frequently feel constrained by principles of comity and courtesy, and citing cases in support).

Defendants simply cannot circumvent the stay order by using Plaintiffs' expert Dr. Edmiston as a vehicle for that prohibited discovery, particularly when the information does not relate to Dr. Edmiston's proffered expert opinions.

Despite any objections premised on protection by the stay order and the existence of a confidentiality agreement, Dr. Edmiston answered every question related to WPATH and the Endocrine Society but for *one*:

> **Q**: … And, again, you authored this document, or at least this chapter in the Standards of care 8?
>
> **Plaintiffs' Counsel:**
>
> **A**: I –
>
> **Plaintiffs' Counsel**: Objection to form; scope and the other restrictions that we 've talked about before relating to your confidentiality agreement and the stay order in place.
>
> **A**: Yes, I was a co-author of SOC8.
>
> **Q**: And this chapter?
>
> **A**: Yes.
>
> **Q**:  Any other chapters, Doctor?
>
> **Plaintiffs' Counsel**: Objection. Form; scope; and same objections relating to the confidentiality agreement and the violation of -- and any – and not to violate the stay in place.
>
> **A**: I would, again, refer you to the WPATH website which outlines the process by which this document was drafted. It was written via consensus and was drafted collaboratively.
>
> **Q**: Okay. So I don't think you answered my question. Did you- -again noting the objections, did you contribute in authoring any other chapters in WPATH?

> **Plaintiffs' Counsel**: I'm going to object to form; scope. Again, do not violate your confidentiality agreement or the stay that's in place.
>
> **A**: Yeah, that would – that would – discussing that would be in violation of the confidentiality agreement.
>
> **Q**: All right. I'll move on.

*See* Edmiston Dep., at 23:1-45:2. While Dr. Edmiston cited his confidentiality agreement, this is also precisely the information prohibited by the existing stay order, i.e., the internal workings of WPATH and how the consensus driven, collaborative guidelines were established.[8]

The exchanges in the transcript clearly evidence the fact that Dr. Edmiston answers all but *one* question related to WPATH. Defendants' position that the answers elicited by the line of questioning were "hardly illuminating" is not a valid reason to exclude Dr. Edmiston's testimony, in part or in total, particularly when none of the questions relate to Dr. Edmiston's opinions in this matter. Plaintiffs' counsel did not instruct Dr. Edmiston not to answer any questions and did not prevent Defendants' counsel from asking follow-up questions. Indeed, after not answering only one question—based on the confidentiality agreement—AHCA's counsel immediately stopped pursuing the line of questioning under his own volition and moved on to a different subject.

---

[8] Defendants argue Plaintiffs' Counsel should have sought a protective order. But there is already such as order in place from the D.C. Circuit. As a result, no additional protective order was necessary.

Defendants also conveniently omit important portions of the deposition transcript which highlight Plaintiffs' counsel's deference in allowing Defendant to question Dr. Edmiston about WPATH. Specifically, when asked if it was "plaintiffs' position that [Defendant's counsel] cannot ask any WPATH-specific questions to [Dr. Edmiston], (Exhibit "G" (Edmiston Dep.), at 19:10-19:12), Plaintiff's counsel made it abundantly clear that they were "not suggesting that [Defendant's counsel] can't ask WPATH questions." Exhibit "G" (Edmiston Dep.), at 19:13-19:24. Moreover, Plaintiffs' counsel did not make any "blanket prohibition or objection," but instead, objected on a "question by question" basis with the goal being not to "reveal confidential information or information that would otherwise be barred by the current stay and order." Exhibit "G" (Edmiston Dep.), at 20:18-21:10. Again, Dr. Edmiston answered every question but *one*.

More importantly, Defendants make no showing as to why any of this undermines Dr. Edmiston's qualifications, or the helpfulness and reliability of his testimony, which are the factors to be considered under *Daubert*.  *See United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

### III. There is No Prejudice to AHCA Not Obtaining Records Resulting from Their Overbroad and Irrelevant Requests.

Denying the Motion will not unfairly prejudice Defendants. Defendants cannot claim unfair prejudice when any prejudice faced is a direct result of their inaction in obtaining the requested information either during the GAPMS process

or because a court found the third-party discovery to be unjustified as unduly burdensome or unconstitutional. If Defendants now want to "'test the conclusions in the [WPATH's Standard of Care], it can, of course, retain its own experts to utilize their own knowledge, skill, experience, training, or education to analyze the data and sources that [WPATH] did, and then affirm or critique the Report." *In re Schaefer*, 331 F.R.D. 603, 613 (W.D. Pa. 2019) (citation omitted).  Accordingly, there is no prejudice, and the Motion should be denied.

## IV.  There is No Basis to Exclude Any Expert Testimony on "*Daubert* concerns."

AHCA also seems to suggest that Plaintiffs' experts should wholesale be excluded because of "*Daubert* concerns" because they did not get the information they requested before now.  Mot., at 22-23.  But that is not the standard for the exclusion of an expert witness or their testimony. Nor has AHCA put forth any evidence from which this Court should exclude any of the expert witnesses on such grounds.

In determining the admissibility of expert testimony under Federal Rule of Evidence 702, district courts consider whether "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to

understand the evidence or to determine a fact in issue." *Frazier*, 387 F.3d at 1260 (cleaned up).

Defendants do not challenge the qualifications of any of Plaintiffs' experts nor do they challenge the helpfulness of their testimony.  At most, Defendants indirectly challenge the reliability of Plaintiffs' experts' opinions and testimony by making the unremarkable point that information that Courts can rely on to test an expert's theory include "consider[ing] whether the scientific community agrees with the theory or technique" and "published sources" that are "generally accepted by the medical community in defining the applicable standard of care." *United States v. Azmat*, 805 F.3 1018, 1042 (11th Cir. 2015); Mot., at 23. Bizarrely, Defendants go on to say that *this* is what they requested from these organizations. *Id.* ("Of course, that's the information that the State has sought and doesn't have.").  Not so.

For one, whether a particular medical organization agrees with an expert's theory is a binary question:  yes or no.  The problem for Defendants is that every major medical organization agrees with Plaintiffs' experts on this issue, and they would like to erase that reality from existence for their convenience.  For another, Defendants have had unfettered access to the published sources at issue, whether those are the WPATH Standards of Care, the Endocrine Society's Clinical Practice Guidelines, or the positions statements of other medical organizations, or the

underlying studies cited within each of those documents.   The information Defendants sought and which they do not have is therefore unrelated and not part of any inquiry under Federal Rules of Evidence or *Daubert* pertaining to the admissibility of expert testimony.  .

The question at hand is simple and straightforward.  Plaintiffs' experts have relied, in part, on WPATH's Standards of Care, the Endocrine Society's Clinical Practice Guidelines, and the positions and views of other medical organizations to formulate their opinions.  They are entitled to do so because they are relying on or referencing "materials other experts in the particular field would reasonably rely on … in forming an opinion on the subject."  Fed. R. Evid. 703.  That is what the Rules of Evidence envision, permit, and endorse as the basis for an expert's opinion.  Defendants do not grapple with this, at all.  Nowhere in their motion do Defendants reference, let alone allude to Rule 703.

In fact, Defendants themselves has previously relied on these clinical practice guidelines.  A 2016 GAPMS determination by Defendants concluding that they could not "categorically exclude" coverage of puberty-delaying medications to treat an adolescent's gender dysphoria explicitly cited and relied upon the Endocrine Society's Clinical Practice Guidelines and a consensus statement by the American Academy of Pediatrics regarding the use of puberty-delaying medications.   *See* ECF 81-5 at 6; *see also* Exhibit "H" (Def_000366785)

(considering the Endocrine Society's guidelines in developing internal criteria for the coverage of puberty suppressing medications).

What is more, one of the Defendants' own purported experts, Dr. Levine, adheres to the WPATH Standards of Care in his own practice. *See Kadel*, 2022 WL 3226731, at *15 ("In his own practice, Levine adheres to the WPATH Standards of Care and personally provides letters of authorization for medical and surgical treatments for his gender dysphoric patients after advising them on the risks associated with those treatments.").[9] Defendants cannot ask to exclude any mention of WPATH's standards of care, the Endocrine Society's Clinical Practice Guidelines, and policy position statements of the Third-Party Medical Organizations while simultaneously relying on them themselves and relying on purported experts who adhere to and observe those same materials and concepts.

It also simply cannot be that an expert witness relying on or otherwise referencing materials "other experts in the particular field would reasonably rely on … in forming an opinion on the subject," necessitates unfettered and limitless access to every aspect of an organization's operations in order for the expert to

---

[9] Plaintiffs also moved to exclude the expert report, opinions, and testimony of Dr. Levine because his opinions are either unhelpful or unreliable under Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and its progeny. *See* ECF 141.

formulate and provide a reliable opinion.   Nothing in the Federal Rules of Evidence nor *Daubert* dictate such a result.

Given the number of experts and attendant reports offered by Defendants, the Court will hear substantial opinions and analyses on the core question in this case. There is no prejudice to Defendants in Plaintiffs and their experts referencing medical organizations and the organizations' standards of care, guidelines, and policy positions on treatments for gender dysphoria.   On the other hand, there is substantial prejudice to Plaintiffs in not being able to mention or refer to the "evidence-based clinical practice guidelines" and views of "the relevant medical community or practitioner specialty associations" that AHCA's own regulations require be considered.   Fla. Admin. Code 59G-1.035(4)(a), (b).

What is more, Defendants can question (and have questioned) Plaintiffs' experts on the mountain of scientific studies cited by each of these documents and that support the provision of gender-affirming medical care.   And while a district court can consider whether the scientific community agrees with a theory or technique (Mot. at 23), Defendants cannot cite a single example where this has justified a free-wheeling and boundless inquiry into a third party's decision-making for arriving at that conclusion, particularly, when the third party is not a party to the litigation nor serves as an expert in the case. This is routine.   Experts routinely rely on peer-reviewed studies and publications (like the WPATH

Standards of Care and Endocrine Society Guidelines are).  That a party is unable to obtain non-public proprietary information underlying said peer-reviewed publication is not a basis to exclude the expert's opinion.  And again, Defendants have not pointed to a single example where this has occurred.

In any event, and importantly, the Plaintiffs' expert witnesses do not rely on the WPATH and the Endocrine Society guidelines in a vacuum. Not only are these guidelines reasonably that are reasonably relied upon by other experts in the field that are providing this care to people with gender dysphoria, but Plaintiffs' experts cite to and rely to their extensive clinical and research experience, as well as a plethora scientific studies.

That AHCA was unable to fully look under the hood of WPATH's Standards of Care, the Endocrine Society's Clinical Practice Guidelines, and the position statements of other medical organizations is not a reason to exclude qualified, relevant, and reliable testimony.

## V.    The Court Should Not Exclude Expert Testimony Under Rule 403.

Exclusion under Rule 403 is only appropriate if the probable value of otherwise admissible expert testimony is ***substantially outweighed*** by its potential to confuse or mislead the jury, or if the testimony is cumulative or needlessly time consuming.  *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 579 (N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183 (11th Cir. 2010).  But

"Rule 403 has a limited role, if any, in a bench trial." *Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F.Supp.3d 1180, 1216 (E.D. Wash. 2015); *see also E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir.1994) (citing *Gulf States Utils. Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir.1981)); *Brister v. Universal Sodexho*, No. CIV.A. 05-4034, 2006 WL 5156736, at *1 (E.D. La. Sept. 12, 2006) ("Because this will be a bench trial, the dangers listed in Rule 403 are significantly reduced and do not substantially outweigh Mr. Barbe's potential value as a witness.").

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' Omnibus Motion in *Limine* in its entirety.

Respectfully submitted this 21 day of April, 2023.

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

By: */s/ Jennifer Altman*
**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsburylaw.com
shani.rivaux@pillsburylaw.com

**William C. Miller***
**Gary J. Shaw***
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Joe Little***
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle***
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee***
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan*** 120 Wall Street, 19th Floor New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles***
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506) 3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

* *Admitted pro hac vice.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of April, 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

*/s/ Shani Rivaux*
Attorney for Plaintiffs

## CERTIFICATE OF WORD COUNT

As required by Local Rule 7.1(F), I certify that this Opposition contains 7,776 words.

*/s/ Shani Rivaux*
Attorney for Plaintiffs