August Dekker

*vs.*

Jason Weida

CONFIDENTIAL - ATTORNEY'S EYES ONLY

Deposition of:

E. Kale Edmiston, Ph.D

March 23, 2023

Vol 1



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION
CASE NO. 4:22-CV-00325-RH-MAF

AUGUST DEKKER, et al.,

     Plaintiffs,

v.

JASON WEIDA, et al.,

     Defendants.

_____/


VIDEO-RECORDED DEPOSITION OF E. KALE EDMISTON, Ph.D.



Thursday, March 23, 2023
10:07 a.m. – 11:43 a.m.



VIA ZOOM








Stenographically Reported By:
Barbie Gallo, RMR-CRR
www.lexitaslegal.com
888-811-3408

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 2

1     APPEARANCES:

2     On behalf of the Plaintiffs:
          PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
3         600 Brickell Avenue
          Suite 3100
4         Miami, Florida 33131
          (786) 913-4900
5         BY:  SHANI RIVAUX, ESQUIRE
          shani.rivaux@pillsbury.com
6
      AND
7
          PILLSBURY, WINTHROP, SHAW, PITTMAN, LLP
8         1200 17th Street N.W.
          Washington, D.C. 20036
9         (202) 663-8000
          BY:  GARY J. SHAW, ESQUIRE
10        gary.shaw@pillsburylaw.com

11
      On behalf of the Defendants:
12        HOLTZMAN VOGEL
          119 South Monroe Street
13        Suite 500
          Tallahassee, Florida 32301
14        (850) 270-5938
          BY:  MICHAEL BEATO, ESQUIRE
15        mbeato@holtzmanvogel.com

16    AND

17        LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.
          120 Wall Street
18        19th Floor
          New York, NY 10005
19        (212) 809-8585
          BY:  OMAR GONZALEZ-PAGAN, ESQUIRE
20        ogonzalez-pagan@lambdalegal.org

21
      ALSO PRESENT:
22        Zack Bennington, paralegal
          Randy Wright, videographer
23

24

25

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 3

1                    INDEX OF PROCEEDINGS
      WITNESS:                                      PAGE
2
                 E X A M I N A T I O N S
3
      WITNESS                                       PAGE
4     E. KALE EDMISTON, Ph.D.
       DIRECT EXAMINATION                             6
5       BY MR. BEATO
      CERTIFICATE OF OATH                            67
6     CERTIFICATE OF REPORTER                        68
      READ & SIGN LETTER TO WITNESS                  69
7     ERRATA SHEET                                   70

8

                    E X H I B I T S
9
      NUMBER              DESCRIPTION              PAGE
10    Exhibit 1      CORRECTED EXPERT REBUTTAL       11
                     REPORT OF E. KALE EDMISTON,
11                   PH.D.
      Exhibit 2      WPATH SOC (6 PAGES)             23
12                   "ESTABLISHING THE SOC 8
                     REVISION COMMITTEE AND MEET
13                   THE CHAIRS AND LEAD EVIDENCE
                     TEAM."
14                   DEKKERFL_WPATH_000381 –
                     DEKKERFL_WPATH_000386
15    Exhibit 3      SOC8 CONTRIBUTORS (29 PAGES)    24
      Exhibit 4      WPATH SOC8 (260 PAGES)          30
16                   DEKKERFL_WPATH_000001 –
                     DEKKERFL_WPATH_000260
17

18

19

20

21

22

23

24

25

E. Kale Edmiston, Ph.D          CONFIDENTIAL
March 23, 2023

Page 4

1    Thereupon,

2    the following proceedings began at 10:07 a.m.:

3                      *   *   *

4            THE VIDEOGRAPHER:  We are now on the record.

5    The time is 10:07 a.m.  This is the

6    video-recorded deposition of Dr. Kale Edmiston

7    in the matter of August Dekker et al. versus

8    Jason Weida, et al.

9            This deposition is being held remotely via

10   Zoom meetings on March 23rd, 2023.  The

11   videographer is Randy Wright, and the

12   stenographer is Barbie Gallo, both in

13   association with Lexitas.

14           Will counsel please announce their

15   appearance for the record.

16           MR. BEATO:  Good morning.  This is

17   Michael Beato on behalf of the defense.

18           MS. RIVAUX:  Good morning.  This is

19   Shani Rivaux with Pillsbury, Winthrop, Shaw,

20   Pittman on behalf of the plaintiffs, and with me

21   is Gary Shaw.

22           MR. GONZALEZ:  This is Omar Gonzalez on

23   behalf of the plaintiffs.  I'm with Lamda Legal.

24           THE VIDEOGRAPHER:  Will the court reporter

25   please swear in the witness.

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 5

 1              THE STENOGRAPHER:  Do we need an appearance

 2         from Mr. Bennington?

 3              If you would, Doctor --

 4              MR. BENNINGTON:  I'm --

 5              THE STENOGRAPHER:  I'm sorry.

 6              MR. BENNINGTON:  That's okay.

 7              Good morning.  I'm a paralegal appearing

 8         here from Holtzman Vogel.

 9              THE STENOGRAPHER:  Dr. Edmiston, do you

10         consent to my administering the oath to you

11         remotely this morning since we are not all in

12         person?

13              THE WITNESS:  Yes.

14              THE STENOGRAPHER:  If you would raise your

15         right hand, I'll swear you in.  Do you swear the

16         testimony you're about to give in this matter

17         will be the truth, the whole truth and nothing

18         but the truth so help you God.

19              THE WITNESS:  Yes.

20              THE STENOGRAPHER:  Thank you.

21    THEREUPON,

22                   E. KALE EDMISTON, Ph.D.,

23    Being by me first duly sworn to tell the whole truth,

24    as hereinafter certified, testified as follows:

25

E. Kale Edmiston, Ph.D                 CONFIDENTIAL
March 23, 2023

Page 6

1                           DIRECT EXAMINATION

2     BY MR. BEATO:

3          Q.    All right.  Perfect.

4                Good morning, Doctor.  Again, my name is

5     Michael Beato, and I represent the defendants in this

6     case.  Before we begin, let me ask you, have you ever

7     been deposed before?

8          A.    No.

9          Q.    Okay.  So let me go over some ground rules.

10    So, number one, for the benefit of the court reporter

11    when answering a question, please verbally state "yes"

12    or "no" if the question so desires instead of nodding

13    "yes" or "no."

14         A.    (Nodding head).

15         Q.    Also, a deposition is not an endurance

16    contest.  If you need a break at any time, please let

17    me know, and I think we can accommodate that.

18               Moreover, for the benefit of the court

19    reporter, we can endeavor to limit crosstalk, so I will

20    not speak when you're speaking and vice versa.  And if

21    you don't understand any of my questions, please let me

22    know.  I'm more than happy to clarify or restate the

23    question.

24               With that said, let me ask you some

25    preliminary questions.  Are there any notes or

E. Kale Edmiston, Ph.D                 CONFIDENTIAL
March 23, 2023

1    documents in front of you right now?

2         A.    I have my -- my report in front of me right

3    now.

4         Q.    Perfect.  Any other documents?

5         A.    I have a tablet, but I can put it away.

6         Q.    I'm just curious.

7               Have you talked to anyone about this

8    deposition?

9               MS. RIVAUX:  I'm going to object to form.

10              Go ahead, you can answer.

11        A.    I -- my -- my partner is aware that I'm

12   doing it.

13   BY MR. BEATO:

14        Q.    Okay.  What is your current occupation?

15        A.    I am an associate professor.

16        Q.    At what university?

17        A.    UMass Chan School of Medicine.

18        Q.    When did you start this job?

19        A.    September.

20        Q.    And you are a professor of what area?

21        A.    Psychiatry.

22        Q.    What does your job entail?

23        A.    My job entails conducting research and

24   mentoring students.

25        Q.    What specific research?

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 8

1      A.    I conduct research in anxiety and
2    depression.
3      Q.    Where do you currently live?
4      A.    I live in Worcester, Massachusetts.
5      Q.    And could you describe to me your
6    educational background.
7      A.    Yeah, I completed a bachelor's degree at
8    Hampshire College, and from there I worked at a
9    neuroscience or psychiatry lab at the Yale School of
10   Medicine.
11         Then I went on to earn a Ph.D. in
12   neuroscience from Vanderbilt University.  And then
13   after that, I did two post docs, one at China Medical
14   University and the other at university of Pittsburgh.
15     Q.    Thank you, Doctor.
16         And this is a standard deposition question.
17   Are you taking any medications that would affect your
18   memory today?
19     A.    No.
20     Q.    Perfect.  So for the purposes of this
21   deposition I'm going to define the firm
22   "gender-affirming care" as puberty blockers, cross-sex
23   hormones, surgeries and treatments to alter primary or
24   secondary sex characteristics for gender dysphoria.
25   Does that work for you, Doctor?

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 9

1      A.    I think those are all very different things,

2    so I would actually appreciate specificity.

3      Q.    Okay.  Fair enough.  But in terms of the

4    blanket term, it's our understanding that it would

5    incorporate those four different treatments.  When

6    greater specificity is warranted, I can clarify.

7      A.    Okay.

8      Q.    Are you a psychiatrist?

9      A.    No.

10     Q.    Are you a neurologist?

11     A.    No.

12     Q.    Are you an endocrinologist?

13     A.    No.

14     Q.    Are you a surgeon?

15     A.    No.

16     Q.    In your medical opinion, what is your

17   definition of gender dysphoria?

18     A.    Well, I don't have a medical opinion because

19   I'm trained as a scientist, not a medical provider.

20     Q.    All right.  So what is your going definition

21   of gender dysphoria?

22     A.    I would probably -- probably lean on the

23   language that's used in the DSM-5.

24     Q.    And what is your definition of gender

25   identity?

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 10

1        A.    A sense of one's self as being a particular

2    gender.

3        Q.    Can one change one's gender identity

4    throughout one's life?

5              MS. RIVAUX:  Objection.  Form.

6    BY MR. BEATO:

7        Q.    You can answer.

8        A.    I don't really feel that it's my place to

9    determine that for another person.

10        Q.    Fair enough.

11              So based on your previous answers you

12    haven't diagnosed anyone with gender dysphoria?

13        A.    No.

14        Q.    Never prescribed puberty blockers for an

15    individual with gender dysphoria?

16        A.    No.  I have a Ph.D., not an M.D.

17        Q.    So cross-sex hormone surgeries, haven't

18    prescribed or performed that for an individual with

19    gender dysphoria?

20        A.    No.

21              MS. RIVAUX:  Objection.  Form.

22    BY MR. BEATO:

23        Q.    So now I'm going to pull up a document.

24    Hopefully this works.  I am not good with technology,

25    so please bear with me, Doctor.

E. Kale Edmiston, Ph.D          CONFIDENTIAL
March 23, 2023

Page 11

1           Tell me if you see this document.

2      A.   Yes.

3      Q.   Okay.  Perfect.  What is this document?

4      A.   That is my rebuttal report.

5           MR. BEATO:  So, court reporter, I'm going to

6        mark this as Exhibit 1.

7      (Defendants' Exhibit Number 1 for i.d.)

8  BY MR. BEATO:

9      Q.   So, Doctor, does this document fairly and

10  accurately state your expert opinions in this case?

11     A.   Yes.

12     Q.   Are all of the studies and evidence you

13  relied on contained in the bibliography in this report?

14     A.   Yes.

15     Q.   So I'm scrolling down on page 1.  The title

16  says "corrected."  Why is this a corrected copy?

17          MS. RIVAUX:  Objection.  You can answer.

18     A.   Can you sort of -- can you restate that?

19  BY MR. BEATO:

20     Q.   Oh, sure.  What does the title of this

21  document say?

22     A.   Corrected Expert Rebuttal Report of

23  E. Kale Edmiston, Ph.D.

24     Q.   Thank you, Doctor.  And why does it say

25  "corrected"?

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 12

1       A.    Because it was corrected.

2       Q.    Did you submit an earlier version of an

3    expert rebuttal report in this case?

4       A.    Yes.

5       Q.    What is the difference between Exhibit 1,

6    the corrected one, and the previous one?

7       A.    The previous one cited a Soleman 2013 study

8    where I should have cited a Soleman 2016 study, and

9    there are two instances where that's the case.

10      Q.    Thank you, Doctor.

11            Could you just quickly specify, do you

12   recall which paragraphs?

13      A.    Paragraphs 26 and 29.

14      Q.    Okay.  Excellent memory, by the way.  It's

15   impressive.

16            So here's another question.  Have you

17   conducted any empirical research on gender dysphoria?

18      A.    Can you define what you mean by "empirical"?

19      Q.    What does empirical research mean to you?

20      A.    All -- if you mean by empirical, original

21   research with data than I've collected, I have.  But I

22   have not -- my publications have been reviews of the

23   extant literature.

24      Q.    So to clarify, you have original research

25   with data; is that correct?

E. Kale Edmiston, Ph.D          CONFIDENTIAL
March 23, 2023

Page 13

 1      A.    I'm sorry?

 2      Q.    I apologize, Doctor.  So am I correct so for

 3    empirical research on gender dysphoria you have

 4    original research with data?

 5            MS. RIVAUX:  Objection.  Form.

 6            You can answer.

 7      A.    I have done studies related to gender

 8    dysphoria, but those studies haven't been published to

 9    date.

10    BY MR. BEATO:

11      Q.    So could you -- oh, I apologize, Doctor.

12      A.    I've also -- but I have published studies

13    that have reviewed the literature on specific topics

14    related to gender dysphoria.

15      Q.    Thank you for the clarification.  Could you

16    describe those for us?

17            MS. RIVAUX:  Objection.  Form.

18            You can answer.

19      A.    Yeah.  What do you mean by "describe"?

20    BY MR. BEATO:

21      Q.    Can you explain what you are studying in

22    those studies you referenced?

23      A.    So there is review study that I published

24    some years ago that reviews the primary care literature

25    among transgender people.  There is a review paper that

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 14

1   is currently in press that reviews the neuro -- the

2   sort of biological basis for a trans identity.  And

3   then I have another paper that has been submitted

4   related to adolescent decision making and brain

5   development as it pertains to gender dysphoria.

6       Q.    Thank you.  Are those documents mentioned in

7   your bibliography?

8       A.    They are.  There's also another paper that

9   I'm revising that's in the bibliography as well that is

10  about development and mental health in trans

11  adolescents.

12      Q.    In your opinion, what makes a treatment

13  experimental?

14            MS. RIVAUX:  Objection.  Form.

15      A.    I would say that that designation is outside

16  of -- that's not my responsibility to determine, but I

17  would say that -- I'll leave it at that.

18  BY MR. BEATO:

19      Q.    Okay.  And you collect research, Professor?

20      A.    Yes.

21      Q.    And you deal with -- do you deal with

22  studies that are high quality and low quality?

23      A.    Yes.

24            MS. RIVAUX:  Objection.  Form.

25

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 15

1    BY MR. BEATO:

2        Q.    So what is -- so what makes evidence low

3    quality?

4        A.    There are a lot of different reasons why a

5    study might be low quality.  However, all studies have

6    limitations, and so as a scientist my job is to review

7    all of the literature and look at it as a whole because

8    any one study will necessarily have limitations, so you

9    can't look at any one study to sort of draw a

10   definitive conclusion.

11       Q.    So in your answer, Doctor, you mentioned

12   limitations.  What are the limitations that you're

13   thinking of?

14       A.    I mean, I think any study can have

15   limitations, and there are so many different sorts of

16   limitations.  It can be related to study design or

17   available data.  No one study can do everything, so,

18   you know, resources are always finite.

19       Q.    Understood.  Could you think of any other

20   limitations besides those two?

21       A.    It -- there are -- I mean, there are

22   numerous possible limitations.  That's sort of the

23   nature of science, so I couldn't possibly begin to list

24   every limitation or every possible limitation of a

25   scientific study.

E. Kale Edmiston, Ph.D                 CONFIDENTIAL
March 23, 2023

Page 16

1       Q.    Okay.  And, Doctor, how did you learn about

2    this case?

3       A.    I was aware of the law from the news, and I

4    assumed that there would be a challenge to it.  And

5    then I was approached by Lambda Legal, and that's how I

6    learned about this specific case.

7       Q.    And in preparing your expert rebuttal

8    report, what defendants' reports did you read?

9       A.    I read Dr. Scott's and Biggs', Dr. Levine's,

10   several others.  I don't recall all of them at this

11   time.

12      Q.    So I'm going down on Exhibit 1 to page 3,

13   paragraph 7 which I'm highlighting.  Doctor, could you

14   read the highlighting.  Don't read the highlight, but

15   can you see the highlighting?  It doesn't make the text

16   darker?

17      A.    Yes.

18      Q.    Perfect.

19            Is that an accurate statement, Doctor?

20      A.    Yes.

21      Q.    Did you rely on the WPATH Standards of Care

22   8 in making conclusions in your expert report?

23            MS. RIVAUX:  Objection.  Form.

24      A.    I relied on my expertise on the topic.

25

E. Kale Edmiston, Ph.D               CONFIDENTIAL
March 23, 2023

Page 17

1    BY MR. BEATO:

2        Q.    Is it your opinion that WPATH sets the

3    professional standards of care for treatments for

4    gender dysphoria?

5            MS. RIVAUX:  Objection.  Form.

6            You can answer.

7        A.    They are one organization.  There are other

8    medical organizations that also have standards of care.

9    BY MR. BEATO:

10       Q.    And what are those medical organizations?

11       A.    Well, the Endocrine Society comes to mind.

12       Q.    Did you review any Endocrine Society

13   documents in making this expert report?

14       A.    No.

15       Q.    In paragraph 7, it states that you were a

16   chapter author for the Assessment chapter; is that

17   correct?

18       A.    Yes.

19       Q.    Does the Assessment chapter involve

20   treatments for adults?

21           MS. RIVAUX:  Objection.  Form.

22       A.    The Assessment chapter outlines the

23   assessment process for adults.

24   BY MR. BEATO:

25       Q.    Does your expert report concern treatment

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 18

 1    for adults?

 2        A.    No.

 3              MS. RIVAUX:  Objection.  Form.

 4    BY MR. BEATO:

 5        Q.    Do your conclusions reached in the

 6    Assessment chapter fairly and accurately describe your

 7    opinions and conclusions about gender-affirming care?

 8              MS. RIVAUX:  Objection.  Form.

 9        A.    The Assessment chapter is a consensus

10    document of many experts.

11    BY MR. BEATO:

12        Q.    Is that a "yes"?

13              MS. RIVAUX:  Objection.  Form.

14        A.    I -- you know, my -- I stand by the

15    standards of care as the gold standard for treatment

16    guidelines.

17    BY MR. BEATO:

18        Q.    Why do you say that?

19              MS. RIVAUX:  Objection.  Form.

20              You can answer.

21        A.    Yeah, because it -- because of the process

22    through which it was created.

23    BY MR. BEATO:

24        Q.    And what was the process in which it was

25    created?

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

                                                    Page 19
 1              MS. RIVAUX:  Objection.  Form.

 2              I'm also going to object to the extent that

 3         it would address any issues that are covered by

 4         the stay that you -- in this case that you do

 5         not go into any of that.

 6              So I'm assuming, Michael, that you're not

 7         asking anything that's privileged information as

 8         it relates to that.

 9              MR. BEATO:  So let me ask you -- let me ask

10         you, Shani, is it plaintiffs' position that I

11         cannot ask any WPATH-specific question to the

12         doctor?

13              MS. RIVAUX:  No, I'm not suggesting you

14         can't ask WPATH questions, but just you can't go

15         into the issues that are currently addressed in

16         the order that stays the discovery relating to

17         internal processes of WPATH.  So as long as it's

18         not going into that, it's fine just depending on

19         the question, but I guess that's the concern

20         that I have is just not to violate that court

21         order or to violate any nondisclosure agreement.

22         You can ask anything that's about public

23         information but nothing internal or private to

24         WPATH that would violate that court order or

25         require Dr. Edmiston to violate his

E. Kale Edmiston, Ph.D          CONFIDENTIAL
March 23, 2023

Page 20

 1          confidentiality agreement.

 2              MR. BEATO:  So, for example, asking about

 3          how the doctor went about and revised the

 4          assessment chapter to Standard of Care 8 I

 5          cannot, according to plaintiffs, I cannot ask

 6          questions relating to that?

 7              MS. RIVAUX:  Ask -- say that again.  I'm not

 8          sure I understood.

 9              MR. BEATO:  Sure.  I'll break it down.  So

10          in paragraph 7 the doctor states that the doctor

11          was an author for the Assessment chapter for

12          Standards of Care 8.  And in revising the

13          standards of care, specifically the Assessment

14          chapter, I cannot ask any questions as to what

15          was the consensus; how did you come up with

16          revisions; what was the process like, I

17          cannot --

18              MS. RIVAUX:  I -- so I think it's going to

19          be tough to -- I'm not giving you any blanket

20          prohibition or objection, so it may be easier

21          just to go question by question.

22              But I think to the extent it doesn't reveal

23          information that seeks confidential information,

24          then that's fine.  So I think the limitation and

25          the instruction is just not to reveal

Page 21

1          confidential information.

2                  MR. BEATO:  Okay.  I'm a little --

3                  MS. RIVAUX:  If you want to ask -- ask the

4          question, and then we can, you know -- to the

5          extent it doesn't seek information, my

6          instruction is going to be to the extent it

7          doesn't reveal confidential information or

8          information that would otherwise be barred by

9          the current stay and order, then Dr. -- then

10          Dr. Edmiston can certainly answer the question.

11                  MR. BEATO:  Sure.  And I'm happy to seek

12          additional court guidance on this particular

13          issue too.

14                  MS. RIVAUX:  I'm sorry?

15                  MR. BEATO:  I'm happy to seek additional

16          court guidance on this issue too because we

17          believe it goes to credibility.

18                  MS. RIVAUX:  Right.  Well, I think here

19          really the issue is he's here to take about his

20          expert report, not WPATH.  And if there's

21          specific questions that you want to ask about

22          it, you know, we could go about it individually.

23          But, as I mentioned, there's a stay in place as

24          it relates to specific areas relating to WPATH

25          that you're aware of, and, you know, there's a

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

                                                            Page 22
 1            confidentiality agreement.  So to the extent
 2            that it doesn't violate those, you can ask the
 3            questions.  And if we need to seek additional
 4            guidance from the court, we certainly can do
 5            that.
 6                 MR. BEATO:  Okay.  How about -- okay.  How
 7            about this?  I ask my questions.  You can
 8            instruct the witness not to answer any questions
 9            you believe he should not answer.
10                 MS. RIVAUX:  Okay.
11                 MR. BEATO:  Okay.  Perfect.
12       BY MR. BEATO:
13            Q.   So, Doctor, how does the -- well, let me
14       take a step back before I take a step forward.
15                 Does WPATH standards of care have a process
16       in which those standards of care are revised?
17                 MS. RIVAUX:  Objection.  Form.
18                 You can answer.
19            A.   What do you mean by "revised"?
20       BY MR. BEATO:
21            Q.   So in terms of making a new version.
22            A.   Oh.  So the shift -- the drafting of
23       version 8?
24            Q.   Precisely.  Perfectly.
25            A.   All right.  Yes.

E. Kale Edmiston, Ph.D                 CONFIDENTIAL
March 23, 2023

Page 23

1        Q.     What is that process?

2               MS. RIVAUX:  Objection.  Form.

3               You can answer to the extent it doesn't

4          violate your confidentiality agreement or the

5          stay entered by the Appellate Court relating to

6          the subpoenas to WPATH.

7        A.     I would refer you to the WPATH SOC8 website

8     which outlines that process.

9        (Defendant's Exhibit Number 2 for i.d.)

10    BY MR. BEATO:

11       Q.     So I'm going to pull up another document.

12    I'm mark this as Exhibit 2.  So I will scroll down.

13    It's six pages.  And I will ask if this document looks

14    familiar to you.

15       A.     No, I have not seen it before.

16       Q.     Could you read the title for me?

17       A.     "Establishing the SOC8 Revision Committee

18    and Meet the Chairs and Lead Evidence Team."

19       Q.     And I can represent that this was on the

20    website.

21              So I'm going to page 3.  Doctor, were you a

22    chapter lead when the Assessment chapter was being

23    revised or reviewed?

24              MS. RIVAUX:  Objection.  Form.

25       A.     I was a chapter co-author.

Page 24

```
 1    BY MR. BEATO:

 2        Q.    What's the difference between the two?

 3        A.    A chapter lead, I don't believe I can answer

 4    a specific question about roles.

 5        Q.    Okay.  Based on what counsel said?

 6        A.    Yes.

 7        Q.    Who was the chapter lead during the revision

 8    process for the Assessment chapter?

 9        A.    Christina.  I'm sure she's listed on the

10    website.

11        (Defendant's Exhibit Number 3 for i.d.)

12    BY MR. BEATO:

13        Q.    I'm going to pull up another document.  This

14    is Exhibit 3.  It's a little bit longer than the other

15    one, but I'm going to scroll down.  I will also

16    represent that this is from the WPATH website.

17              Does this document look familiar to you,

18    Doctor?

19        A.    No.

20        Q.    So I'm scrolling down to page 12, and I'll

21    represent that there are individuals under the

22    Assessment Of Adults With Gender Diversity/Dysphoria.

23              Doctor, do these individuals look familiar

24    to you?

25        A.    Yes.
```

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 25

1             MS. RIVAUX:  Objection.  Form.

2   BY MR. BEATO:

3        Q.    How do you know these individuals?

4             MS. RIVAUX:  Objection.  Form.

5             You can answer.

6        A.    I worked with them to write the chapter.

7   BY MR. BEATO:

8        Q.    Are there any individuals who worked with

9   you who are not listed here?

10            MS. RIVAUX:  Objection.  Form.  And

11         objection to the extent you can't answer without

12         violating a confidentiality agreement or any

13         stay in this case.

14       A.    The authors list for SOC8 is very long.

15   Many different people were involved in it, and the

16   document was written collaboratively.

17   BY MR. BEATO:

18       Q.    And earlier in the deposition you said that

19   the standards of care is a consensus document.  What

20   does that mean?

21       A.    I would refer you to the process, the

22   consensus process that is outlined on the website.

23       Q.    Can you describe the process just generally?

24       A.    There --

25            MS. RIVAUX:  I'm going to object, again,

E. Kale Edmiston, Ph.D          CONFIDENTIAL
March 23, 2023

Page 26

 1          only to the extent that you can answer the

 2          question -- I mean to the extent the question is

 3          asking generalities and not asking specifics

 4          into the process or things that would be

 5          violated, then that's fine, you can answer.

 6    BY MR. BEATO:

 7          Q.    Let me clarify.  Generally speaking.

 8          A.    Yes, there was a lit review that was

 9    conducted externally, and then there were grievance

10    statements, and then the authors all had to build a

11    consensus around the statements.

12          Q.    Understood.

13                Doctor, are you a member of WPATH?

14          A.    I was.  I believe my membership -- I might

15    be overdue on my dues, but, yes, I was at one time.

16          Q.    When did you start being a member of WPATH?

17          A.    I don't recall at this time exactly.

18          Q.    Ballpark range?

19          A.    Probably around probably 2017, I would

20    guess.

21          Q.    And so this is another general question.

22    Looking at Exhibit Number 3 for the individuals listed

23    here -- and, again, you recall working with these

24    individuals?

25          A.    Yes.

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 27

1      Q.    Are any of them endocrinologists, to your

2   memory?

3           MS. RIVAUX:  Objection.  Form.

4      A.    No.

5   BY MR. BEATO:

6      Q.    Are any of them surgeons?

7           MS. RIVAUX:  Objection.  Form.

8      A.    There are endocrinologists and surgeons

9   involved in SOC8 for the hormone and surgery chapters

10  of SOC8.

11  BY MR. BEATO:

12     Q.    And how would you describe each of these

13  individual's areas of expertise?

14          MS. RIVAUX:  Objection.  Form.

15     A.    I think that the document describes their

16  areas of expertise.

17  BY MR. BEATO:

18     Q.    Fair enough.  So I'm going back to Exhibit

19  Number 2, and I'm scrolling down to page 4, chapter

20  stakeholder members.  Again, this is on the public

21  website.  Does WPATH when it's revising its standards

22  of care, to your knowledge, employ the help of

23  nonmedical professionals in that process?

24          MS. RIVAUX:  Objection.  I'm going to give

25          the same instruction.  And also just to the

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 28

```
 1            extent that Dr. Edmiston is also not here,

 2            doesn't speak on behalf of WPATH.  But to the

 3            extent that Dr. Edmiston has personal knowledge

 4            that doesn't violate any confidentiality

 5            agreement or the order, then you may answer.

 6       A.    Can you define "medical professional"?

 7  BY MR. BEATO:

 8       Q.    Sure.  So, for example, an M.D., an

 9  endocrinologist, psychiatrist, someone who's gone to

10  medical school.

11       A.    There are certainly people involved in

12  drafting the standards of care who have expertise who

13  did not go to medical school because obviously there

14  are lots of different manners to become educated and

15  gain expertise on this topic.

16       Q.    And this topic is?

17       A.    Transgender healthcare.

18       Q.    And you mentioned or counsel mentioned a

19  confidentiality agreement.

20       A.    Yes.

21       Q.    As a member of WPATH you signed a

22  confidentiality agreement?

23       A.    No, as a --

24            MS. RIVAUX:  Objection.  Form.

25            Sorry.
```

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 29

1    BY MR. BEATO:

2         Q.    I'm sorry.

3               MS. RIVAUX:  I'm raising an objection only

4          to the extent you're not going to violate any

5          agreement.

6    BY MR. BEATO:

7         Q.    No, do not violate anything.  I'm just

8    asking what's with the confidentiality?

9         A.    The chapter authors all signed it.

10        Q.    I see.

11        A.    We were asked to.  I don't know what anyone

12   else did.

13        Q.    Understood.  So WPATH asked you to sign that

14   confidentiality agreement?

15              MS. RIVAUX:  Objection to form.

16        A.    I signed a confidentiality statement.

17   BY MR. BEATO:

18        Q.    Understood.  And, again, Doctor, we're just

19   building the record.  I don't want you to violate

20   anything or make you feel uncomfortable in answering

21   any questions.

22              So let me scroll up on Exhibit 2.  I know,

23   Doctor, you said you weren't a chapter lead.  But

24   looking at the criteria for chapter leads, WPATH full

25   member in good standing.  What do you think that means?

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 30

```
 1                  MS. RIVAUX:  Objection.  Form.
 2        A.    I assume it means that you're a member of
 3   WPATH.
 4   BY MR. BEATO:
 5        Q.    A well-recognized advocate for WPATH and the
 6   standards of care?
 7                  MS. RIVAUX:  Objection.  Form.
 8        A.    I'm not sure what you're asking me.  Are you
 9   asking me what a -- like what the word "recognized"
10   means?  I'm not sure what you're asking.
11   BY MR. BEATO:
12        Q.    Sure, what does recognize mean in this
13   context, in your opinion?
14                  MS. RIVAUX:  Objection to form.
15        A.    That -- that you are known to people in this
16   area.
17   BY MR. BEATO:
18        Q.    Understood.
19              So, Doctor, we're going to move away from
20   the process questions.
21              So now let me see if I can move this.
22        (Defendant's Exhibit Number 4 for i.d.)
23   BY MR. BEATO:
24        Q.    I'm now going to introduce this as
25   Exhibit 4.  Doctor, does this look familiar?
```

Page 31

```
 1        A.    Yes.
 2        Q.    What is this document?
 3        A.    This is the Standards of Care 8.
 4        Q.    Excellent.
 5              So -- well, let me ask you this.
 6              Do you think WPATH is an advocacy
 7   organization?
 8              MS. RIVAUX:  Objection.  Form.
 9        A.    No.
10   BY MR. BEATO:
11        Q.    Why?
12              MS. RIVAUX:  Objection, form.
13              You can answer.
14        A.    The purpose of WPATH is to gather the
15   scientific evidence and expertise of scientists and
16   clinicians to -- to develop the standards of care and
17   to disseminate research.
18   BY MR. BEATO:
19        Q.    And what kind of evidence does WPATH
20   collect?
21              MS. RIVAUX:  Objection.  Form.
22        A.    So, again, I would refer you to the website
23   which outlines the process for drafting the standards
24   of care.
25
```

Page 32

```
 1   BY MR. BEATO:

 2       Q.    And in terms of the chapter that you

 3   assisted with authoring, which chapter is that?

 4             MS. RIVAUX:  Objection.  Form.

 5       A.    I am co-author of the Assessment of Adults

 6   chapter.

 7   BY MR. BEATO:

 8       Q.    And that is Chapter 5?

 9       A.    Yes.

10       Q.    I am now going on Exhibit 4 to page 33.  I'm

11   scrolling to the -- now I'm on page 34.  I'm scrolling

12   to the bottom of page 34.  Doctor, I just have a few

13   questions.

14             If you look at 5.4, it says, "We suggest..."

15   and 5.5, "We recommend..."

16       A.    Um-hum.

17       Q.    Is there a difference between "suggest" and

18   "recommend" here?

19       A.    Yes.

20       Q.    What is that difference?

21       A.    They are different words.

22       Q.    Okay.  Do they convey anything differently?

23   So there is -- strike that.

24             So they're used synonymously?

25       A.    No.
```

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 33

1      Q.     So what are their differences?

2      A.     The WPATH document has graded evidence, so

3   the language there is specific to the strength of

4   evidence.

5      Q.     And what kind of evidence grading systems

6   does WPATH use?

7      A.     I'm sorry.  Can you repeat the question?

8      Q.     Sure.  So what kind of evidence grading

9   system does WPATH use?

10            So, for example, I believe the Endocrine

11  Society uses the GRADE system.

12     A.     I would refer you to the website for that

13  information.

14     Q.     Understood.  So now I'm going to go back to

15  page 33, Doctor.  One moment, Doctor.

16            33, I'm highlighting a section.  It begins,

17  "For TGD..." and goes all the way to "... required."

18            So, Doctor, I highlighted this sentence.

19  Just so the record is clear, what does TGD mean in this

20  chapter?

21     A.     I would suggest that you scroll up to the

22  top.  It will be defined there.

23     Q.     Right up here (indicating)?

24     A.     Yes.

25     Q.     Transgender and gender diverse?

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 34

1        A.    Yes.

2        Q.    **So in this highlighted section can you**

3   **elaborate on that sentence?**

4              MS. RIVAUX:  Objection.  Form.

5        A.    No.

6   BY MR. BEATO:

7        Q.    **It says what it says?**

8        A.    If you have a specific question, I'm happy

9   to, you know -- if you have a specific question.  But

10  I -- I don't know what you -- you'll have to ask me a

11  specific question.

12  BY MR. BEATO:

13       Q.    **Sure.  So when it says "...less common**

14  **treatments..." what does less common treatments mean?**

15             MS. RIVAUX:  Objection.  Form.  You can

16       answer.

17       A.    I think if an adult was to ask for an

18  intervention that was nonstandard.

19  BY MR. BEATO:

20       Q.    **As an example, what would that be?**

21       A.    I wouldn't really want to speculate.

22       Q.    **Can you provide an example, though?**

23             MS. RIVAUX:  I'm going to object on the

24       grounds of scope, but you can go ahead and

25       answer.

Page 35

```
1        A.    Yeah, I mean, it's a -- it is a bit outside

2   of the scope of, you know, my rebuttal.  Sometimes

3   people ask for -- they might ask for a surgical

4   intervention that's nonstandard for as an example.

5   BY MR. BEATO:

6        Q.    And limited research evidence, what does

7   that mean?

8              MS. RIVAUX:  Objection.  I'm going to object

9        on both form and scope here, but you can answer.

10       A.    I mean, somebody -- it's -- there's always a

11  possibility that someone might request an intervention

12  that hasn't been researched before or has been

13  researched very little.

14  BY MR. BEATO:

15       Q.    Can you provide an example, Doctor?

16             MS. RIVAUX:  Objection.  Form and scope.

17             You can answer.

18       A.    I think the same -- the same answer.  So if

19  someone were to ask -- if an adult were to ask for a

20  nonstandard surgical intervention, for example.

21  BY MR. BEATO:

22       Q.    Scrolling to page 34, I'm highlighting

23  another sentence beginning with, "The statements

24  below..." and ending with "...consensus of professional

25  best practice."
```

E. Kale Edmiston, Ph.D                  CONFIDENTIAL
March 23, 2023

Page 36

 1                    Doctor, what does the phrase "consensus of

 2       best" -- strike that -- "consensus of professional best

 3       practice" mean?

 4                    MS. RIVAUX:  Objection.  Form and scope.

 5                    You can answer.

 6       A.    Yeah, I mean, again, I would refer you to

 7       the WPATH website where they outline a lot of sort of

 8       the process and the specific terminology that they use

 9       in this document.

10       BY MR. BEATO:

11       Q.    With that in mind, could you today provide

12       me with what your opinion as an author of this section,

13       what consensus of professional best practice means?

14                    MS. RIVAUX:  Objection to both form and

15          scope.

16                    You can answer.

17       A.    The consensus of ex -- people with expertise

18       on the topic.

19       BY MR. BEATO:

20       Q.    And how would you define expertise on the

21       topic?

22                    MS. RIVAUX:  Objection.  Form and scope.

23                    But you can answer.

24       A.    I would, again, refer you to the WPATH

25       website where they talk about the -- they outline the

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 37

1    sort of selection process for authors and how they

2    determine expertise.

3    BY MR. BEATO:

4        Q.    Okay.  So I'm going back to Exhibit -- bear

5    with me.  This is now Exhibit 3.  Again, we're still on

6    page 12 and 13.  Do all of these individuals support

7    gender-affirming care?

8            MS. RIVAUX:  Objection.  Form; scope.

9            And to the extent it doesn't violate your

10            confidentiality agreement or the stay, you can

11            answer and if you know.

12        A.    These individuals support the care that

13    is -- has an evidence -- that -- you know, your

14    question is very broad because gender-affirming care is

15    very broad.

16    BY MR. BEATO:

17        Q.    It is.

18        A.    And the SOC8 guidelines recommend an

19    individualized approach to care.  So I think everyone

20    involved in -- for those individuals they support

21    quality healthcare.

22        Q.    Going back to Exhibit 4, this sentence,

23    Doctor, "The empirical evidence base for the,"

24    scrolling to page 35 -- "assessment of TGD adults is

25    limited."

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 38

1          My question is, in the sentence, what does
2     "empirical evidence base" mean?
3          MS. RIVAUX:  Objection.  Form and scope.
4       You can answer.
5     A.    So I would have to re-read the chapter in
6     context.  I do not want to define what a specific word
7     means in a specific sentence without reading the
8     context in which it occurs.
9     BY MR. BEATO:
10     Q.    Fair enough.  And would that same answer be
11    true for "limited" in this sentence?
12     A.    Yes.
13          MS. RIVAUX:  Objection.  Form; scope.
14    BY MR. BEATO:
15     Q.    Doctor, I apologize.  I did not hear an
16    answer.
17     A.    Oh.  Yes.
18     Q.    Let's go to the next page.  This sentence,
19    Doctor, "Some TGD individuals will have the capacity to
20    grant consent immediately during the assessment."
21          What does that mean?
22          MS. RIVAUX:  Objection.  Form and scope.
23     A.    This is about the assessment of adults and
24    is about the assessment process being individualized.
25

E. Kale Edmiston, Ph.D              CONFIDENTIAL
March 23, 2023

Page 39

1    BY MR. BEATO:

2        Q.    So in an individualized scenario, can an

3    individual be given puberty blockers for gender

4    dysphoria after one medical treatment?

5              MS. RIVAUX:  Objection.  Form.

6        A.    I would ask you to restate the question with

7    a little bit more specificity.

8    BY MR. BEATO:

9        Q.    Fair question, Doctor.  Fair question.

10             Let me -- let me go back to these questions.

11             Scrolling down to the next page, statement

12   5.3A, Doctor, what does this sentence mean?

13             MS. RIVAUX:  Objection.  Form and scope.

14       A.    So this is a sentence from the adult chapter

15   that says "To access GAMSTs, a TGD person's gender

16   incongruence must be marked and sustained."

17             So that means that part of the assessment

18   process is to determine sort of the duration of the

19   feelings of gender incongruence and the degree to which

20   they are distracting or upsetting or troubling.

21   BY MR. BEATO:

22       Q.    Scrolling a little bit further down, while

23   marked and sustained gender incongruence is present,

24   going all the way down to access gender-affirming care,

25   Doctor, what does that sentence mean?

E. Kale Edmiston, Ph.D          CONFIDENTIAL
March 23, 2023

Page 40

1           MS. RIVAUX:  I'm going to object to form and

2       scope.

3       A.    That if a person -- it just means that --

4   it's not -- there's not some threshold of suffering

5   that someone -- you know, that someone needs to suffer

6   a certain amount before they're allowed to access

7   healthcare.

8   BY MR. BEATO:

9       Q.    Okay.  Moving to page --

10          Well, actually, Doctor, we've been going for

11  about an hour.  Would you like a five-minute break?

12      A.    No, I'm okay.

13      Q.    Okay.  Okay.  And, once again, if you'd like

14  a break at any time, please let me know.  More than

15  happy to accommodate.

16      A.    Sure.

17      Q.    So this is on Page 38 highlighting the

18  sentence -- oops, no -- I -- I apologize.

19          Page 39, "in rare cases..." Doctor, in this

20  sentence what does "rare cases" mean?

21          MS. RIVAUX:  Objection.  Form and scope.

22      A.    So in rare cases would mean a nontypical

23  instance.

24  BY MR. BEATO:

25      Q.    And in the context of this sentence what

Page 41

1    would that nontypical instance be?

2                    MS. RIVAUX:  Objection.  Form and scope.

3         A.    So I would have to review the Hembree

4    citation there.  I mean, one example could be if

5    someone had an estrogen receptor positive cancer.

6    BY MR. BEATO:

7         Q.    And generally speaking, Doctor, when you

8    were authoring this section, did you read all of these

9    cases that are mentioned in this chapter?

10                   MS. RIVAUX:  Objection.  Form; scope.

11                   And to the extent it doesn't violate any of

12             the stay order that we discussed or the

13             confidentiality order, you may answer.

14        A.    I have reviewed much of this literature.  If

15   you have a specific question about a specific paper,

16   then I would request that you give me a break to review

17   the specific paper.

18   BY MR. BEATO:

19        Q.    Understood.  And perfectly reasonable.  I

20   just had a broad general question.

21                   And within the literature that you have

22   reviewed when authoring this chapter, do you know if

23   any of those studies were low evidence?

24                   MS. RIVAUX:  Objection.  Form; scope.

25                   You can answer.

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 42

1        A.    I think that you would have to describe what
2    you mean by "low evidence."  I recall you asked me that
3    question before, and I answered that all studies have
4    limitations, and that's why we look at the literature
5    as a whole to draw conclusions.
6            I'm sure you're aware, there's quite a bit
7    of evidence cited in SOC8.  I'm not sure off the top of
8    my head how many citations there are, but it's quite a
9    few.
10   BY MR. BEATO:
11       **Q.    So earlier in the deposition I think you**
12   **provided examples of low-quality evidence or**
13   **limitations.  Do you recall saying study design could**
14   **lead to evidence being low quality?**
15           MS. RIVAUX:  Objection.  Form.
16       A.    I believe I said that that is an example of
17   a limitation.  I didn't -- I do not think I said that
18   it was an example of low quality.
19   BY MR. BEATO:
20       **Q.    Okay.  And -- okay.  And as of right now,**
21   **you do not recall if any of those citations mentioned**
22   **in Chapter 5 have low-quality evidence?**
23           MS. RIVAUX:  Objection.  Form; scope.
24       A.    I -- I take -- I sort of -- I challenge the
25   premise of the idea of low quality.  I am instead

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 43

1    talking about the limitations that occur with any

2    scientific study, which is why we do lots of different

3    studies to draw conclusions.

4            So I sort of -- or not sort of.  I object to

5    the premise of the question.

6    BY MR. BEATO:

7        Q.    So still on page 39, sentence, "Because of

8    the possible harm..." all the way down to "...is

9    important," Doctor, what does this sentence mean?

10           MS. RIVAUX:  Objection.  Form and scope.

11       A.    Again, I would ask that if you want me to

12   discuss specific sentences from a very large document

13   that I would be given time to review the document in

14   its entirety to ensure that I am fully representing the

15   context of any particular sentence.

16   BY MR. BEATO:

17       Q.    Fair enough.  And, again, you authored this

18   document, or at least this chapter in the Standards of

19   Care 8?

20           MS. RIVAUX:

21       A.    I --

22           MS. RIVAUX:  Objection to form; scope and

23          the other restrictions that we've talked about

24          before relating to your confidentiality

25          agreement and the stay order in place.

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

                                                      Page 44
 1        A.    Yes, I was a co-author of SOC8.

 2   BY MR. BEATO:

 3        Q.    And this chapter?

 4        A.    Yes.

 5        Q.    Any other chapters, Doctor?

 6              MS. RIVAUX:  Objection.  Form; scope; and

 7         same objections relating to the confidentiality

 8         agreement and the violation of -- and any -- and

 9         not to violate the stay in place.

10        A.    I would, again, refer you to the WPATH

11   website which outlines the process by which this

12   document was drafted.  It was written via consensus and

13   was drafted collaboratively.

14   BY MR. BEATO:

15        Q.    Okay.  So I don't think you answered my

16   question.  Did you -- again, noting the objections, did

17   you contribute in authoring any other chapters in

18   WPATH?

19              MS. RIVAUX:  I'm going to object to form;

20         scope.

21              Again, do not violate your confidentiality

22         agreement or the stay that's in place.

23        A.    Yeah, that would -- that would -- discussing

24   that would be in violation of the confidentiality

25   agreement.

E. Kale Edmiston, Ph.D          CONFIDENTIAL
March 23, 2023

Page 45

 1    BY MR. BEATO:

 2        Q.    All right.  I'll move on.

 3              Doctor, to the best of your knowledge in

 4    Chapter 5, does Chapter 5 discuss any negative health

 5    risks of gender-affirming care?

 6              MS. RIVAUX:  Objection.  Form; scope.

 7              You can answer.

 8        A.    The Assessment chapter discusses the types

 9    of assessments that are necessary to determine

10    eligibility and readiness for gender-affirming care.

11    BY MR. BEATO:

12        Q.    Does it also talk about risks involved?

13              MS. RIVAUX:  Objection.  Form and scope.

14              You can answer.

15        A.    I would ask what you mean by "talk about."

16    It outlines what assessments need to be or should be

17    done to determine the readiness for care.

18    BY MR. BEATO:

19        Q.    And if I understand this correctly, part of

20    the assessments involve evaluating benefits and risks?

21              MS. RIVAUX:  Objection.  Form and scope.

22         You can answer.

23        A.    Broadly, yes.

24    BY MR. BEATO:

25        Q.    And in evaluating the risks, does that

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 46

1    also -- in evaluating -- sorry.

2             In evaluating risks, do you also have to

3    weigh irreversible potential medical consequences?

4             MS. RIVAUX:  Objection.  Form; scope.

5             You can answer.

6    A.    This is very standard healthcare.  All

7    healthcare interventions have outcomes associated with

8    them, and this is no different from any other type of

9    health intervention.

10   BY MR. BEATO:

11   Q.    So, Doctor, I would like to take a

12   five-minute break if you don't mind.

13   A.    Sure.

14            MR. BEATO:  Would you mind if we reconvene,

15        just because I like base-five numbers, how about

16        11:15?

17            THE WITNESS:  Sounds good.

18            MR. BEATO:  Thank you very much.

19            THE VIDEOGRAPHER:  Stand by.  We're going

20        off video record.  The time is 11:08 a.m.

21   (A recess was taken from 11:08 a.m. to 11:16 a.m.)

22            THE VIDEOGRAPHER:  We are back on the video

23        record.  The time is 11:16 a.m.

24   BY MR. BEATO:

25   Q.    All right.  So, Doctor, let me ask you this.

E. Kale Edmiston, Ph.D          CONFIDENTIAL
March 23, 2023

Page 47

1   And let me pull up Exhibit 1, the expert rebuttal

2   report.  Did you base any of your expert opinions on

3   the WPATH Standards of Care Version 8?

4              MS. RIVAUX:  Objection.  Form.  You can

5        answer.

6              MR. BEATO:  Counsel, can I have the basis

7        for the objection?

8              MS. RIVAUX:  It was confusing the way you

9        worded the question.

10             MR. BEATO:  Okay.  I could rephrase.

11  BY MR. BEATO:

12       Q.    Doctor, did you use WPATH's Standard of Care

13  Version 8 recommendations as a basis for your expert

14  report opinions?

15       A.    I suppose I would ask what you mean by

16  "use."  I have expertise and I reviewed the relevant

17  literature.

18       Q.    So I'm scrolling down to page 4, paragraph

19  13.  I highlight, "My opinions are based..." and I go

20  down to "...including my work as a contributing author

21  of WPATH Standards of Care 8."

22             Doctor, is paragraph 13 a fair and accurate

23  representation of your opinion?

24       A.    Yes.

25       Q.    Is the confidentiality from WPATH, is that

Page 48

```
 1    preventing you from answering some of the WPATH

 2    questions in this case?

 3            MS. RIVAUX:  Objection.  Form; scope; and,

 4        again, the same objections relating to the

 5        confidentiality agreement and the stay order.

 6    A.    I'm adhering to the confidentiality

 7    agreement that I signed.

 8    BY MR. BEATO:

 9    Q.    Understood.

10            And, Doctor, again, in your expert report do

11    you opine on adult treatment?

12    A.    In the rebuttal.

13    Q.    Right.  Apologies.  I can be clear.  Let me

14    rephrase.

15            Doctor, in your expert rebuttal report, do

16    you discuss adult treatment?

17    A.    It -- the primary point or one of the

18    primary points of my report was related to adolescent

19    brain development.

20    Q.    Understood.  So where specifically do you

21    mention adults in your expert rebuttal report?

22    A.    I would have to review, but I believe by and

23    large the report is regarding adolescents because that

24    is what is pertinent.

25    Q.    And if you need time to review this report,
```

Page 49

1    let me know.  So, again, your report concerns

2    adolescent treatment; is that correct?

3        A.   Yes.

4        Q.   Now, Doctor, regarding adolescent treatment

5    and gender-affirming care, is there a lot of literature

6    out there on the treatment?

7             MS. RIVAUX:  Objection.  Form.

8             MR. BEATO:  Basis for objection?

9             MS. RIVAUX:  It's a really broad, ambiguous

10       question.  There's a lot of literature out

11       there.  It's just, you know, just a broad,

12       ambiguous question.

13   BY MR. BEATO:

14       Q.   Okay.  Let me rephrase.

15            Doctor, is there a good, a great deal of

16   evidence on the effects of gender-affirming care on

17   adolescents?

18            MS. RIVAUX:  Objection.  Form.

19            MR. BEATO:  Basis, Counsel.

20            MS. RIVAUX:  Same thing.  I think it's

21       ambiguous to say whether there's a great deal.

22       I think it's ambiguous.  But he may answer.

23   BY MR. BEATO:

24       Q.   I will scroll down to, we're still on

25   Exhibit 1, page 21.

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 50

1          Doctor, could you read this sentence for me?

2     A.    "In contrast, there is a great deal of

3 evidence supporting the mental health benefits of GnRHa

4 treatment for transgender adolescents."

5     Q.    Doctor, is "great deal," is that vague?

6          MS. RIVAUX:  Objection.  Form.

7          MR. BEATO:  Basis?

8          MS. RIVAUX:  What's the relevance?

9          MR. BEATO:  The doctor wrote it.

10          MS. RIVAUX:  Okay.  So you can ask him about

11      what he means by it.

12 BY MR. BEATO:

13     Q.    What do you mean by "a great deal"?

14     A.    So in this instance I'm looking at the

15 literature, the decades of use of GnRHa treatment and

16 the expertise of, my own expertise, the expertise of my

17 colleagues.  There's a great deal -- again, there's a

18 great deal of evidence to support this, right.  So I'm

19 thinking broadly about evidence from clinical

20 experience of my colleagues as well as the research

21 literature.

22     Q.    Okay.  When you say "research literature,"

23 what do you mean?

24     A.    Publications like peer-reviewed

25 publications.

E. Kale Edmiston, Ph.D          CONFIDENTIAL
March 23, 2023

Page 51

1      Q.    Can you provide me examples of those?

2      A.    I would refer to you my bibliography.  I

3  think there's quite a few citations.

4      Q.    Can you name one off the top of your head?

5      A.    There's a de Vries paper.

6      Q.    And, again, Doctor, if I'm reading this

7  correctly, "In contrast, there's a great deal of

8  evidence supporting the mental health benefits of GnRHa

9  treatment for transgender adolescents."

10          Again, that's accurate?

11     A.    Yeah, so the sentence that that is -- so the

12  sentence begins with the phrase, "In contrast."  The

13  sentence prior to it says, "There is little to support

14  the defendants' designated experts' speculation about

15  the negative effects of GnRHa treatment on the brain."

16  So I stand by the sentence as written.

17     Q.    Understood.  I will scroll up to page 16,

18  paragraph 31.  I highlighted the first sentence.

19  Doctor, could you please read that sentence?

20     A.    Yes, "There is a small body of literature on

21  the effects of gender-affirming hormone care on the

22  brain in transgender adolescents."

23          So am I correct in assuming that you're

24  trying to suggest that these two sentences are in

25  conflict with each other?

Page 52

1        Q.    No.

2        A.    Oh, okay.  Great.

3        Q.    Let's go to paragraph 5.  I'm sorry.  I

4    misspoke.  Page 5.  Bear with me, Doctor.  Sorry.  So

5    in chapter -- strike that.  Sorry.

6              In paragraph 16, I believe you're responding

7    to one of Dr. Scott's statements; is that correct?

8        A.    Yes.

9        Q.    I'm highlighting one sentence, I believe

10   it's the second sentence, "That is, literature

11   indicates that there are highly specific circumstances

12   in which adolescents are more likely to engage in risky

13   or impulsive behavior."

14             Doctor, my question is, did you provide a

15   citation for that assertion?

16       A.    I do later on.

17       Q.    Where is that?

18       A.    I believe it's -- yeah, paragraph 18.

19       Q.    And all those cases stand for that

20   proposition?

21       A.    So those are references that describe the

22   context -- the contextual nature of decision making and

23   adolescents.

24       Q.    And I'm scrolling back to page 5.  Bear with

25   me.  The sentence, "However, none of these examples are

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 53

1     relevant to the issue at hand: Protracted medical

2     decision making made in the context of adult guidance

3     and consultation with a medical professional."

4             Doctor, my question is, what does protracted

5     mean here?

6        A.    Drawn out.

7        Q.    So in this context, what period of time are

8     we talking about?

9        A.    I'm sorry.  They're doing some work outside

10    of my office and it's a little loud.  Can you repeat

11    the question?

12       Q.    No problem whatsoever.  No problem.  And,

13    again, if there's like a -- something going on in the

14    background, more than happy to do that.

15            So in the final sentence of paragraph 16,

16    "However, none of these treatments are relevant to the

17    issue at hand: Protracted medical decision making made

18    in the context of adult guidance and consultation with

19    a medical professional," what does "protracted" mean?

20    Like what kind of -- here's the question.  What kind of

21    period of time are we looking at?

22       A.    So it could be -- you know, I think that it

23    varies, which is why SOC8 recommends an individualized

24    approach.  It could be eight months or even years for

25    some people.

Page 54

1        Q.     Okay.  Do you have a citation or a study or

2    some basis for that proposition?

3        A.     I believe in the next paragraph I cite the,

4    I think it's a Bauer study.  Yeah, the Bauer 2022 study

5    which outlines the time between an adolescent realizing

6    that they're trans and then them coming out to a

7    healthcare provider.

8        Q.     All right.  So the this sentence -- okay.

9    Understood.  So that citation for that's -- okay.

10    Thank you, Doctor.  That's all I wanted.

11        A.     Um-hum.

12        Q.     Give me one second.

13            Let's go to Paragraph 25.  I think this is

14    on page 10, still on Exhibit 1.  I'm highlighting the

15    second sentence in Paragraph 25, "Case studies are the

16    lowest quality of evidence."  Could you elaborate on

17    that, Doctor?

18        A.     Yeah, a case study is a study of a single

19    individual, so they are generally not regarded as the

20    type of evidence that we would want to use to make --

21    to inform, you know, standards of care policy, you

22    know, the -- because it's just regarding a single

23    person, so generally, you know, we don't think of those

24    as being generalizable.

25        Q.     Understood.  And what limitations come with

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 55

1    case studies?

2        A.    Well, it's a study of a single person, so we

3    don't know if we can extrapolate the findings to the

4    broader population.

5        Q.    Are there any other limitations inherent

6    with case studies, or it's just the focus of an

7    individual on one person, to your knowledge?

8        A.    I would say that's probably the primary

9    limitation of a case study is just the, you know,

10   questionable generalized ability of them.

11       Q.    Understood.

12             In your knowledge, do you know if WPATH

13   references any case studies in its standards of care?

14       A.    I don't know off the top of my head, but I

15   do know that WPATH cites a large body of literature

16   that includes empirical studies, longitudinal studies,

17   cross-sectional studies, cohort studies, unlike

18   Dr. Levine who did not cite any valid literature.

19       Q.    And in terms of the literature, does it

20   pertain to adolescent treatments with gender dysphoria?

21             MS. RIVAUX:  Objection.  Form.

22             MR. BEATO:  Basis?

23             MS. RIVAUX:  I didn't understand the

24        question.

25             MR. BEATO:  Sure, I'll back up.  I can take

E. Kale Edmiston, Ph.D                  CONFIDENTIAL
March 23, 2023

Page 56

1            a step back before taking a step forward.

2       BY MR. BEATO:

3            Q.    So, Doctor, you said that in the standards

4       of care, in WPATH there's a lot of longitudinal

5       peer-reviewed literature, correct?

6            A.    I said that there is a variety of different

7       types of evidence that are informing recommendations as

8       a whole, so that could include longitudinal cohort,

9       cross-sectional.

10           Q.    Could that also include case studies?

11           A.    It may, yes.

12           Q.    And in terms of the longitudinal cohort

13      literature that you mentioned, does that literature

14      reference or relate to adolescent treatment concerning

15      gender-affirming care?

16           A.    There have been longitudinal adolescent

17      studies.  If you're asking me to speak to a specific

18      one, I would want to take a break and review it.

19           Q.    Understood.  Without speaking in depth about

20      it, could you identify them for me off the top of your

21      head, or are they mentioned in your bibliography?

22           A.    They are mentioned in my bibliography.

23           Q.    To your mind, does your bibliography

24      reference all of those longitudinal cohort adolescent

25      related studies that you're thinking of right now?

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 57

1          A.    I cite the -- so I did a targeted literature

2     review, and I cite the studies that I was -- that I

3     identified that looked at mental health outcomes in

4     transgender youth.  I would hesitate to claim that I

5     have cited every longitudinal study of transgender

6     youth, but I did do a thorough literature review.

7          Q.    Fair enough.  Fair enough.  Are there any

8     additional reports that should be in your bibliography?

9          A.    Not that I'm aware of.

10         Q.    Let me go to paragraph 27 highlighting the

11    first sentence, "Both Dr. Levine and Dr. Laidlaw state

12    that the effects of GnRHa treatment on the brain are

13    both 'unknown' and 'likely negative.'"

14                Does WPATH comment on the effects of GnRH --

15    I'm going to get it wrong, Doctor.  I apologize.

16                Does WPATH opine on the effects of GnRHa

17    treatment on the brain?

18         A.    Not that I recall, but I would want to

19    review the entire document before making a definitive

20    statement.

21         Q.    Is there a great deal of evidence on the

22    subject?

23         A.    There is --

24                MS. RIVAUX:  Objection.

25                THE WITNESS:  Sorry.

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 58

1              MS. RIVAUX:  You can answer.

2              MR. BEATO:  And what's the basis for the

3         objection?

4              MS. RIVAUX:  I'm not sure when you're saying

5         "there's a great deal of evidence on the

6         subject" what the subject in particular you were

7         referring to.

8              MR. BEATO:  The effects of GnRHa treatment

9         on the brain.

10             MS. RIVAUX:  Do you want to rephrase -- the

11        way -- to me, the way it came out was a

12        little -- is a little bit ambiguous.  If you

13        want to rephrase it that way, that's fine.

14             MR. BEATO:  No problem whatsoever.  I'm just

15        asking for the basis of the objection so I can

16        ask a better question.

17             MS. RIVAUX:  Yeah, that's fine.

18             MR. BEATO:  Perfect.

19   BY MR. BEATO:

20        Q.   So, Doctor, is there a great deal of

21   evidence on the effects of GnRHa treatment on the

22   brain?

23        A.   There is -- there is evidence.  There are

24   studies that look at GnRHa treatment on the brain.

25        Q.   How many studies are you thinking of right

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 59

 1    now?

 2         A.    In humans -- well, also, I guess it would

 3    depend.  If you mean in humans, in transgender

 4    adolescents, I believe there's three neuroimaging

 5    studies.  There are also animal studies as well.

 6         Q.    With, for example, I think, sheep?

 7         A.    Yes, there are some studies of sheep.

 8         Q.    Sheep and mice?

 9         A.    And a primate study also.

10         Q.    And for those -- if I remember this --

11    please correct me if I'm wrong.  For those three human

12    studies, what were the results of those studies?

13         A.    I outlined those in the report.  Those

14    studies used different imaging modalities.  They found

15    differences in brain structure function that were

16    associated with sex assigned at birth; others that were

17    associated with gender identity.

18              But when they ran correlations to determine

19    associations between GnRHa treatment and brain

20    structure function, they did not find any -- there were

21    no significant findings.

22         Q.    Okay.  So no significant findings of

23    benefits in the treatments?

24         A.    No significant findings of any association.

25         Q.    Understood.  And for the animal studies, the

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 60

1    sheep, mice and primates, what were the results of

2    those studies?

3         A.    Well, as I outlined in my rebuttal as well

4    as the paper, the review paper that I wrote that I

5    cited, the problem with a lot of the animal literature

6    is that they don't use the correct reference group for

7    comparing.  So a lot of those studies report

8    differences with GnRH treatment, but really their

9    difference is between natal sex, so we would expect a

10   medication that delays puberty to have sex-specific

11   effects.  That is the desired outcome of the treatment.

12        Q.    And I have no additional questions regarding

13   the report.  I do have additional follow-up questions,

14   though.

15              Earlier in the deposition you stated that

16   you were aware of the law in place in Florida.

17        A.    (Nodding head).

18        Q.    By the way, it's not a law; it's a

19   regulation, but understood, understood.

20        A.    All right.

21        Q.    How did you hear about it, the at-issue

22   regulation?

23        A.    I don't recall.

24        Q.    Understood.  If you could think back, was it

25   social media, the news or you don't remember?

Page 61

1       A.    I don't remember.  I don't recall at this

2    time.

3       Q.    And for your expert report, did you review

4    the at-issue regulations?

5       A.    I reviewed, as I believe is stated at the

6    beginning of the report, I reviewed the Florida

7    Medicaid opinion.

8       Q.    The so-called GAPMS report?

9       A.    Yes.

10       Q.    But not the at-issue regulation?

11       A.    No, I did not review the text of it.

12       Q.    But you were aware of the at-issue

13    regulation through something?

14       A.    (Nodding head).

15       Q.    Okay.  What is your opinion on the GAPMS

16    report?

17            MS. RIVAUX:  Objection.  Scope.

18       A.    I would ask that you just be a little bit

19    more specific.

20    BY MR. BEATO:

21       Q.    Sure.  So in writing this expert report, you

22    reviewed the GAPMS report with the accompanying

23    attachments, correct?

24       A.    Um-hum, yes.

25       Q.    As a professor, as a scientist, what are

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 62

1      your opinions of the GAPMS report?

2                MS. RIVAUX:  Objection.  Scope.

3                You can answer.

4         A.    I was surprised that it didn't seem to cite

5      a lot of relevant literature.

6      BY MR. BEATO:

7         Q.    What literature would you have cited?

8         A.    All the literature that I cited in my

9      rebuttal.

10        Q.    And in hearing about the at-issue

11     regulation, how do you feel about the regulation?

12                MS. RIVAUX:  Objection.

13     BY MR. BEATO:

14        Q.    What is your opinion as to the regulation?

15                MS. RIVAUX:  Objection.  Scope.

16        A.    I believe that healthcare decisions should

17     be made between patients and providers and their

18     families and based on expert medical evidence and

19     standards of care.

20                MR. BEATO:  Doctor, I have no further

21        questions.

22                Counsel can ask some follow-up questions.

23                MS. RIVAUX:  I don't have any follow-up

24        questions.

25                MR. BEATO:  All right.  Doctor, you're done.

E. Kale Edmiston, Ph.D               CONFIDENTIAL
March 23, 2023

Page 63

1          THE WITNESS:  All right.  Thank you.

2          MR. BEATO:  Thank you, Doctor.  I know

3      you're probably busy.  And thank you for making

4      yourself available and taking time to answer

5      these questions.  It's really appreciated.

6          MS. RIVAUX:  Do you want to give him the

7      instruction about reading or waiving?

8          MR. BEATO:  Could you do that, Counsel?

9          MS. RIVAUX:  Sure.  So, Dr. Edmiston, you

10     have the right to read your report and make any

11     changes to the extent that there were any errors

12     in the transcription or you can waive that.

13     Otherwise, you'd get a copy.  If you choose to

14     read it, you'll have 30 days when you get it to

15     review it to make any changes.  There will be a

16     form in which you can make any correction.  And

17     then that gets sent back and a corrected copy

18     will get circulated to everybody.

19         THE WITNESS:  Yeah, I'd like to read it.

20         MS. RIVAUX:  Okay.

21         MR. BEATO:  And, Doctor, just to be super

22     cautious because I know you have a

23     confidentiality agreement, I don't want to

24     violate that at all.  If you said something

25     inadvertently that, you know, maybe you probably

E. Kale Edmiston, Ph.D          CONFIDENTIAL
March 23, 2023

Page 64

```
1          shouldn't have said, should this deposition be
2          under seal?  We can send the court reporter the
3          protective order.  I just want to make sure.
4              MS. RIVAUX:  Yeah, you know what?  Why don't
5          we do it that way, and then if there's any
6          reason to unseal it or to seal any specific
7          portion, we can go ahead and do that.  And then
8          we can -- you know, if there's anything -- so
9          until Dr. Edmiston has an opportunity to review
10         it, and then we can mark things confidential as
11         appropriate later on.  I appreciate that.  Thank
12         you.
13             MR. BEATO:  No problem.  Doctor, I
14         understand.  You're put in a tough position,
15         right.  You have -- you got something signed.  I
16         respect that.  I wasn't trying to make you feel
17         uncomfortable or get around that, so I just want
18         to make sure everything is good.
19             I will ask, though, for an expedited
20         transcript.
21             And, Doctor, I want to make sure you have
22         sufficient time to review it, but at the same
23         time we want to get this finalized as soon as
24         possible.
25             THE WITNESS:  I appreciate that.
```

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023

Page 65

1              MR. BEATO:  So, Zack, are you on there?  We

2         can send over the court reporter the protective

3         order.

4              THE STENOGRAPHER:  I just want to remind you

5         we're still on video record.

6              MR. BEATO:  That's fine.  This can all be on

7         the record.  That's fine.

8              Okay.  I think we're -- I think we're good.

9         Thank you for your time, Doctor.

10             THE WITNESS:  You're welcome.

11             THE VIDEOGRAPHER:  This is the videographer.

12        Would anyone like to order a copy of the video?

13             MR. BEATO:  A copy of the video, I don't

14        need a copy of the video.

15             THE VIDEOGRAPHER:  And Ms. Rivaux?

16             MS. RIVAUX:  I don't -- I don't think we

17        need a copy of the video at this time.  But for

18        the transcript, we'd like it at the same time,

19        please.

20             MR. BEATO:  Yes, expedited.

21             THE VIDEOGRAPHER:  Is there a date for that?

22        Just as soon as possible or --

23             MS. RIVAUX:  As soon as possible.

24             THE VIDEOGRAPHER:  Okay.

25             MR. BEATO:  Thank you very much.

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 66

 1              THE VIDEOGRAPHER:  And then I'll go ahead

 2           and take us off the video record.  We're going

 3           off the record in the video deposition of

 4           Dr. Kale Edmiston.  We're going off the record

 5           on March 23rd, 2023 at 11:43 a.m.

 6        (Thereupon, the proceedings concluded at

 7         11:43 a.m.)

 8        (The witness did not waive signature.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 67

CERTIFICATE OF OATH

THE STATE OF FLORIDA            )

COUNTY OF PALM BEACH COUNTY   )


    I, the undersigned authority, certify that

E. KALE EDMISTON, Ph.D. remotely appeared before me and

was duly sworn on the 23rd day of March 2023.

Signed this 23rd day of March 2023.




_____
BARBIE GALLO, RMR-CRR
Notary Public - State of Florida
My Commission No. GG939757
My Commission Expires: December 15, 2023

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 68

CERTIFICATE OF REPORTER


THE STATE OF FLORIDA )

COUNTY OF PALM BEACH )


    I, Barbie Gallo, RMR-CRR, Registered Merit
Reporter-Certified Realtime Reporter, certify that I
was authorized to and did stenographically report the
deposition of E. KALE EDMISTON, Ph.D., pages 1 through
69; that a review of the transcript was requested; and
that the transcript is a true and complete record of my
stenographic notes.

    I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorney or counsel connected with the action, nor am I
financially interested in the action.


       DATED this 23rd day of March 2023.



_____
Barbie Gallo, RMR-CRR

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 69

Thursday, March 23rd, 2022

E. Kale Edmiston, Ph.D. c/o Shani Rivaux
Pillsbury, Winthrop, Shaw, Pittman, LLP
600 Brickell Avenue
Suite 3100
Miami, Florida 33131
(786) 913-4900
shani.rivaux@pillsbury.com

IN RE:  DEKKER vs WEIDA
CASE NO.:  CASE NO. 4:22-CV-00325-RH-MAF

Please take notice that on the 23rd day of March 2023,
you gave your deposition in the above cause.  At that
time you did not waive your signature.

The above-addressed attorney has ordered a copy of this
transcript and will make arrangements with you to read
their copy.  Please execute the Errata Sheet, which can
be found at the back of the transcript, and have it
returned to us for distribution to all parties.

If you do not read and sign the deposition within 30
days, the original, which has already been forwarded to
the ordering attorney, may be filed with the Clerk of
the Court.

If you wish to waive your signature now, please sign
your name in the blank at the bottom of this letter and
return it to the address listed below.

Very truly yours,



Barbie Gallo, RMR-CRR
Phipps Reporting, Inc.
1551 Forum Place, Suite 200-E
West Palm Beach, Florida 33401

I do hereby waive my signature.


_____
E. KALE EDMISTON, Ph.D.

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023

Page 70

                        ERRATA SHEET
        DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE
                    IN RE: DEKKER vs WEIDA
            CASE NO.:   CASE NO. 4:22-CV-00325-RH-MAF
                WITNESS:  E. KALE EDMISTON, PH.D.
                    TAKEN:  03/23/2023


    PAGE     LINE       CHANGE           REASON FOR CHANGE

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____

    _____


        Under penalties of perjury, I declare that I have
    read the foregoing document and that the facts stated
    in it are true.


    _____        _____
    Date                        E. KALE EDMISTON, Ph.D.

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023                                                    1

———————
**1**
———————

**1**
  3:10 11:6,7,
  15 12:5 16:12
  47:1 49:25
  54:14
**10**
  54:14
**10:07**
  4:2,5
**11**
  3:10
**11:08**
  46:20,21
**11:15**
  46:16
**11:16**
  46:21,23
**11:43**
  66:5,7
**12**
  24:20 37:6
**13**
  37:6 47:19,22
**16**
  51:17 52:6
  53:15
**18**
  52:18

———————
**2**
———————

**2**
  3:11 23:9,12
  27:19 29:22
**2013**
  12:7

**2016**
  12:8
**2017**
  26:19
**2022**
  54:4
**2023**
  4:10 66:5
**21**
  49:25
**23**
  3:11
**23rd**
  4:10 66:5
**24**
  3:15
**25**
  54:13,15
**26**
  12:13
**260**
  3:15
**27**
  57:10
**29**
  3:15 12:13

———————
**3**
———————

**3**
  3:15 16:12
  23:21 24:11,
  14 26:22 37:5
**30**
  3:15 63:14
**31**
  51:18
**33**

32:10 33:15,
16
**34**
  32:11,12
  35:22
**35**
  37:24
**38**
  40:17
**39**
  40:19 43:7

———————
**4**
———————

**4**
  3:15 27:19
  30:22,25
  32:10 37:22
  47:18

———————
**5**
———————

**5**
  32:8 42:22
  45:4 52:3,4,
  24
**5.3A**
  39:12
**5.4**
  32:14
**5.5**
  32:15

———————
**6**
———————

**6**
  3:4,11
**67**
  3:5
**68**

3:6
**69**
  3:6

———————
**7**
———————

**7**
  16:13 17:15
  20:10
**70**
  3:7

———————
**8**
———————

**8**
  3:12 16:22
  20:4,12 22:23
  31:3 43:19
  47:3,13,21

———————
**A**
———————

**a.m.**
  4:2,5 46:20,
  21,23 66:5,7
**ability**
  55:10
**access**
  39:15,24 40:6
**accommodate**
  6:17 40:15
**accompanying**
  61:22
**accurate**
  16:19 47:22
  51:10
**accurately**
  11:10 18:6
**additional**
  21:12,15 22:3

57:8 60:12,13

**address**
19:3

**addressed**
19:15

**adhering**
48:6

**administering**
5:10

**adolescent**
14:4 48:18
49:2,4 54:5
55:20 56:14,
16,24

**adolescents**
14:11 48:23
49:17 50:4
51:9,22
52:12,23 59:4

**adult**
34:17 35:19
39:14 48:11,
16 53:2,18

**adults**
17:20,23 18:1
24:22 32:5
37:24 38:23
48:21

**advocacy**
31:6

**advocate**
30:5

**affect**
8:17

**agreement**
19:21 20:1
22:1 23:4
25:12 28:5,
19,22 29:5,14

37:10 43:25
44:8,22,25
48:5,7 63:23

**ahead**
7:10 34:24
64:7 66:1

**allowed**
40:6

**alter**
8:23

**ambiguous**
49:9,12,21,22
58:12

**amount**
40:6

**animal**
59:5,25 60:5

**announce**
4:14

**answering**
6:11 29:20
48:1

**answers**
10:11

**anxiety**
8:1

**Apologies**
48:13

**apologize**
13:2,11 38:15
40:18 57:15

**appearance**
4:15 5:1

**appearing**
5:7

**Appellate**
23:5

**appreciated**
63:5

**approach**
37:19 53:24

**approached**
16:5

**area**
7:20 30:16

**areas**
21:24 27:13,
16

**assertion**
52:15

**assessment**
17:16,19,22,
23 18:6,9
20:4,11,13
23:22 24:8,22
32:5 37:24
38:20,23,24
39:17 45:8

**assessments**
45:9,16,20

**assigned**
59:16

**assisted**
32:3

**associate**
7:15

**association**
4:13 59:24

**associations**
59:19

**assume**
30:2

**assumed**
16:4

**assuming**

19:6 51:23

**at-issue**
60:21 61:4,
10,12 62:10

**attachments**
61:23

**August**
4:7

**author**
17:16 20:11
36:12 47:20

**authored**
43:17

**authoring**
32:3 41:8,22
44:17

**authors**
25:14 26:10
29:9 37:1

**aware**
7:11 16:3
21:25 42:6
57:9 60:16
61:12

---

**B**

**bachelor's**
8:7

**back**
22:14 27:18
33:14 37:4,22
39:10 46:22
52:24 55:25
56:1 60:24
63:17

**background**
8:6 53:14

**Ballpark**

26:18

**Barbie**
4:12

**barred**
21:8

**base**
37:23 38:2
47:2

**base-five**
46:15

**based**
10:11 24:5
47:19 62:18

**basis**
14:2 47:6,13
49:8,19 50:7
54:2 55:22
58:2,15

**Bauer**
54:4

**bear**
10:25 37:4
52:4,24

**Beato**
3:5 4:16,17
6:2,5 7:13
10:6,22 11:5,
8,19 13:10,20
14:18 15:1
17:1,9,24
18:4,11,17,23
19:9 20:2,9
21:2,11,15
22:6,11,12,20
23:10 24:1,12
25:2,7,17
26:6 27:5,11,
17 28:7 29:1,
6,17 30:4,11,
17,23 31:10,

18 32:1,7
34:6,12,19
35:5,14,21
36:10,19
37:3,16 38:9,
14 39:1,8,21
40:8,24 41:6,
18 42:10,19
43:6,16 44:2,
14 45:1,11,
18,24 46:10,
14,18,24
47:6,10,11
48:8 49:8,13,
19,23 50:7,9,
12 55:22,25
56:2 58:2,8,
14,18,19
61:20 62:6,
13,20,25
63:2,8,21
64:13 65:1,6,
13,20,25

**began**
4:2

**begin**
6:6 15:23

**beginning**
35:23 61:6

**begins**
33:16 51:12

**behalf**
4:17,20,23
28:2

**behavior**
52:13

**benefit**
6:10,18

**benefits**
45:20 50:3

51:8 59:23

**Bennington**
5:2,4,6

**bibliography**
11:13 14:7,9
51:2 56:21,
22,23 57:8

**Biggs'**
16:9

**biological**
14:2

**birth**
59:16

**bit**
24:14 35:1
39:7,22 42:6
58:12 61:18

**blanket**
9:4 20:19

**blockers**
8:22 10:14
39:3

**body**
51:20 55:15

**bottom**
32:12

**brain**
14:4 48:19
51:15,22
57:12,17
58:9,22,24
59:15,19

**break**
6:16 20:9
40:11,14
41:16 46:12
56:18

**broad**
37:14,15

41:20 49:9,11

**broader**
55:4

**broadly**
45:23 50:19

**build**
26:10

**building**
29:19

**busy**
63:3

---

**C**

**cancer**
41:5

**capacity**
38:19

**care**
8:22 13:24
16:21 17:3,8
18:7,15 20:4,
12,13 22:15,
16 25:19
27:22 28:12
30:6 31:3,16,
24 37:7,12,
14,19 39:24
43:19 45:5,
10,17 47:3,
12,21 49:5,16
51:21 54:21
55:13 56:4,15
62:19

**case**
6:6 11:10
12:3,9 16:2,6
19:4 25:13
48:2 54:15,18
55:1,6,9,13

E. Kale Edmiston, Ph.D                  CONFIDENTIAL
March 23, 2023                                                          4

56:10

**cases**
40:19,20,22
41:9 52:19

**cautious**
63:22

**CERTIFICATE**
3:5,6

**certified**
5:24

**Chairs**
3:13 23:18

**challenge**
16:4 42:24

**Chan**
7:17

**change**
10:3

**chapter**
17:16,19,22
18:6,9 20:4,
11,14 23:22,
25 24:3,7,8
25:6 27:19
29:9,23,24
32:2,3,6,8
33:20 38:5
39:14 41:9,22
42:22 43:18
44:3 45:4,8
52:5

**chapters**
27:9 44:5,17

**characteristics**
8:24

**China**
8:13

**choose**
63:13

**Christina**
24:9

**circulated**
63:18

**circumstances**
52:11

**citation**
41:4 52:15
54:1,9

**citations**
42:8,21 51:3

**cite**
54:3 55:18
57:1,2 62:4

**cited**
12:7,8 42:7
57:5 60:5
62:7,8

**cites**
55:15

**claim**
57:4

**clarification**
13:15

**clarify**
6:22 9:6
12:24 26:7

**clear**
33:19 48:13

**clinical**
50:19

**clinicians**
31:16

**co-author**
23:25 32:5
44:1

**cohort**
55:17 56:8,

12,24

**collaboratively**
25:16 44:13

**colleagues**
50:17,20

**collect**
14:19 31:20

**collected**
12:21

**College**
8:8

**comment**
57:14

**Committee**
3:12 23:17

**common**
34:13,14

**comparing**
60:7

**completed**
8:7

**concern**
17:25 19:19

**concerns**
49:1

**concluded**
66:6

**conclusion**
15:10

**conclusions**
16:22 18:5,7
42:5 43:3

**conduct**
8:1

**conducted**
12:17 26:9

**conducting**

7:23

**confidential**
20:23 21:1,7
64:10

**confidentiality**
20:1 22:1
23:4 25:12
28:4,19,22
29:8,14,16
37:10 41:13
43:24 44:7,
21,24 47:25
48:5,6 63:23

**conflict**
51:25

**confusing**
47:8

**consensus**
18:9 20:15
25:19,22
26:11 35:24
36:1,2,13,17
44:12

**consent**
5:10 38:20

**consequences**
46:3

**consultation**
53:3,18

**contained**
11:13

**contest**
6:16

**context**
30:13 38:6,8
40:25 43:15
52:22 53:2,7,
18

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023                                                          5

contextual
  52:22

contrast
  50:2 51:7,12

contribute
  44:17

contributing
  47:20

CONTRIBUTORS
  3:15

convey
  32:22

copy
  11:16 63:13,
  17 65:12,13,
  14,17

correct
  12:25 13:2
  17:17 49:2
  51:23 52:7
  56:5 59:11
  60:6 61:23

corrected
  3:10 11:16,
  22,25 12:1,6
  63:17

correction
  63:16

correctly
  45:19 51:7

correlations
  59:18

counsel
  4:14 24:5
  28:18 47:6
  49:19 62:22
  63:8

court
  4:24 6:10,18

11:5 19:20,24
21:12,16 22:4
23:5 64:2
65:2

covered
  19:3

created
  18:22,25

credibility
  21:17

criteria
  29:24

cross-sectional
  55:17 56:9

cross-sex
  8:22 10:17

crosstalk
  6:19

curious
  7:6

current
  7:14 21:9

—————————

          D

darker
  16:16

data
  12:21,25 13:4
  15:17

date
  13:9 65:21

days
  63:14

de
  51:5

deal
  14:21 49:15,
  21 50:2,5,13,

17,18 51:7
57:21 58:5,20

decades
  50:15

decision
  14:4 52:22
  53:2,17

decisions
  62:16

defendant's
  23:9 24:11
  30:22

defendants
  6:5

defendants'
  11:7 16:8
  51:14

defense
  4:17

define
  8:21 12:18
  28:6 36:20
  38:6

defined
  33:22

definition
  9:17,20,24

definitive
  15:10 57:19

degree
  8:7 39:19

Dekker
  4:7

DEKKERFL_WPATH_
000001
  3:16

DEKKERFL_WPATH_
000260

3:16

DEKKERFL_WPATH_
000381
  3:14

DEKKERFL_WPATH_
000386
  3:14

delays
  60:10

depend
  59:3

depending
  19:18

deposed
  6:7

deposition
  4:6,9 6:15
  7:8 8:16,21
  25:18 42:11
  60:15 64:1
  66:3

depression
  8:2

depth
  56:19

describe
  8:5 13:16,19
  18:6 25:23
  27:12 42:1
  52:21

describes
  27:15

DESCRIPTION
  3:9

design
  15:16 42:13

designated
  51:14

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023                                                            6

designation
   14:15

desired
   60:11

desires
   6:12

determine
   10:9 14:16
   37:2 39:18
   45:9,17 59:18

develop
   31:16

development
   14:5,10 48:19

diagnosed
   10:12

difference
   12:5 24:2
   32:17,20 60:9

differences
   33:1 59:15
   60:8

differently
   32:22

DIRECT
   3:4 6:1

discovery
   19:16

discuss
   43:12 45:4
   48:16

discussed
   41:12

discusses
   45:8

discussing
   44:23

disseminate
   31:17

distracting
   39:20

diverse
   33:25

Diversity/
dysphoria
   24:22

docs
   8:13

doctor
   5:3 6:4 8:15,
   25 10:25
   11:9,24 12:10
   13:2,11 15:11
   16:1,13,19
   19:12 20:3,10
   22:13 23:21
   24:18,23
   26:13 29:18,
   23 30:19,25
   32:12 33:15,
   18 35:15 36:1
   37:23 38:15,
   19 39:9,12,25
   40:10,19 41:7
   43:9 44:5
   45:3 46:11,25
   47:12,22
   48:10,15
   49:4,15 50:1,
   5,9 51:6,19
   52:4,14 53:4
   54:10,17 56:3
   57:15 58:20
   62:20,25
   63:2,21
   64:13,21 65:9

document

10:23 11:1,3,
9,21 18:10
23:11,13
24:13,17
25:16,19
27:15 31:2
33:2 36:9
43:12,13,18
44:12 57:19

documents
   7:1,4 14:6
   17:13

drafted
   44:12,13

drafting
   22:22 28:12
   31:23

draw
   15:9 42:5
   43:3

Drawn
   53:6

DSM-5
   9:23

dues
   26:15

duly
   5:23

duration
   39:18

dysphoria
   8:24 9:17,21
   10:12,15,19
   12:17 13:3,8,
   14 14:5 17:4
   39:4 55:20

_____
         E
_____

earlier
   12:2 25:18
   42:11 60:15

earn
   8:11

easier
   20:20

Edmiston
   3:4,10 4:6
   5:9,22 11:23
   19:25 21:10
   28:1,3 63:9
   64:9 66:4

educated
   28:14

educational
   8:6

effects
   49:16 51:15,
   21 57:12,14,
   16 58:8,21
   60:11

elaborate
   34:3 54:16

eligibility
   45:10

empirical
   12:17,18,19,
   20 13:3 37:23
   38:2 55:16

employ
   27:22

endeavor
   6:19

ending
   35:24

Endocrine
  17:11,12
  33:10
endocrinologist
  9:12 28:9
endocrinologist
s
  27:1,8
endurance
  6:15
engage
  52:12
ensure
  43:14
entail
  7:22
entails
  7:23
entered
  23:5
entire
  57:19
entirety
  43:14
ERRATA
  3:7
errors
  63:11
Establishing
  3:12 23:17
estrogen
  41:5
et al
  4:7,8
evaluating
  45:20,25
  46:1,2

evidence
  3:13 11:12
  15:2 23:18
  31:15,19
  33:2,4,5,8
  35:6 37:13,23
  38:2 41:23
  42:2,7,12,14,
  22 49:16
  50:3,18,19
  51:8 54:16,20
  56:7 57:21
  58:5,21,23
  62:18
EXAMINATION
  3:4 6:1
examples
  42:12 51:1
  52:25
Excellent
  12:14 31:4
Exhibit
  3:10,11,15
  11:6,7 12:5
  16:12 23:9,12
  24:11,14
  26:22 27:18
  29:22 30:22,
  25 32:10
  37:4,5,22
  47:1 49:25
  54:14
expect
  60:9
expedited
  64:19 65:20
experience
  50:20
experimental
  14:13

expert
  3:10 11:10,22
  12:3 16:7,22
  17:13,25
  21:20 47:1,2,
  13 48:10,15,
  21 61:3,21
  62:18
expertise
  16:24 27:13,
  16 28:12,15
  31:15 36:17,
  20 37:2 47:16
  50:16
experts
  18:10
experts'
  51:14
explain
  13:21
extant
  12:23
extent
  19:2 20:22
  21:5,6 22:1
  23:3 25:11
  26:1,2 28:1,3
  29:4 37:9
  41:11 63:11
externally
  26:9
extrapolate
  55:3

_____

F

fair
  9:3 10:10
  27:18 38:10
  39:9 43:17

47:22 57:7
fairly
  11:9 18:6
familiar
  23:14 24:17,
  23 30:25
families
  62:18
feel
  10:8 29:20
  62:11 64:16
feelings
  39:19
final
  53:15
finalized
  64:23
find
  59:20
findings
  55:3 59:21,
  22,24
fine
  19:18 20:24
  26:5 58:13,17
  65:6,7
finite
  15:18
firm
  8:21
five-minute
  40:11 46:12
Florida
  60:16 61:6
focus
  55:6
follow-up
  60:13 62:22,

23

**form**
7:9 10:5,21
13:5,17
14:14,24
16:23 17:5,21
18:3,8,13,19
19:1 22:17
23:2,24 25:1,
4,10 27:3,7,
14 28:24
29:15 30:1,7,
14 31:8,12,21
32:4 34:4,15
35:9,16 36:4,
14,22 37:8
38:3,13,22
39:5,13 40:1,
21 41:2,10,24
42:15,23
43:10,22
44:6,19 45:6,
13,21 46:4
47:4 48:3
49:7,18 50:6
55:21 63:16

**forward**
22:14 56:1

**found**
59:14

**front**
7:1,2

**full**
29:24

**fully**
43:14

**function**
59:15,20

———————————

G

**gain**
28:15

**Gallo**
4:12

**GAMSTS**
39:15

**GAPMS**
61:8,15,22
62:1

**Gary**
4:21

**gather**
31:14

**gender**
8:24 9:17,21,
24 10:2,3,12,
15,19 12:17
13:3,7,14
14:5 17:4
24:22 33:25
39:3,15,19,23
55:20 59:17

**gender-affirming**
8:22 18:7
37:7,14 39:24
45:5,10 49:5,
16 51:21
56:15

**general**
26:21 41:20

**generalities**
26:3

**generalizable**
54:24

**generalized**
55:10

**generally**
25:23 26:7
41:7 54:19,23

**give**
5:16 27:24
41:16 54:12
63:6

**giving**
20:19

**Gnrh**
57:14 60:8

**Gnrha**
50:3,15 51:8,
15 57:12,16
58:8,21,24
59:19

**God**
5:18

**gold**
18:15

**Gonzalez**
4:22

**good**
4:16,18 5:7
6:4 10:24
29:25 46:17
49:15 64:18
65:8

**GRADE**
33:11

**graded**
33:2

**grading**
33:5,8

**grant**
38:20

**great**
49:15,21
50:2,5,13,17,

18 51:7 52:2
57:21 58:5,20

**greater**
9:6

**grievance**
26:9

**ground**
6:9

**grounds**
34:24

**group**
60:6

**guess**
19:19 26:20
59:2

**guidance**
21:12,16 22:4
53:2,18

**guidelines**
18:16 37:18

———————————

H

**Hampshire**
8:8

**hand**
5:15 53:1,17

**happy**
6:22 21:11,15
34:8 40:15
53:14

**harm**
43:8

**head**
6:14 42:8
51:4 55:14
56:21 60:17
61:14

health
  14:10  45:4
  46:9  50:3
  51:8  57:3
healthcare
  28:17  37:21
  40:7  46:6,7
  54:7  62:16
hear
  38:15  60:21
hearing
  62:10
held
  4:9
Hembree
  41:3
hereinafter
  5:24
hesitate
  57:4
high
  14:22
highlight
  16:14  47:19
highlighted
  33:18  34:2
  51:18
highlighting
  16:13,14,15
  33:16  35:22
  40:17  52:9
  54:14  57:10
highly
  52:11
Holtzman
  5:8
hormone
  10:17  27:9

51:21
hormones
  8:23
hour
  40:11
human
  59:11
humans
  59:2,3

_____

I

i.d.
  11:7  23:9
  24:11  30:22
idea
  42:25
identified
  57:3
identify
  56:20
identity
  9:25  10:3
  14:2  59:17
imaging
  59:14
immediately
  38:20
important
  43:9
impressive
  12:15
impulsive
  52:13
inadvertently
  63:25
include
  56:8,10

includes
  55:16
including
  47:20
incongruence
  39:16,19,23
incorporate
  9:5
INDEX
  3:1
indicating
  33:23
individual
  10:15,18  39:3
  54:19  55:7
individual's
  27:13
individualized
  37:19  38:24
  39:2  53:23
individually
  21:22
individuals
  24:21,23
  25:3,8  26:22,
  24  37:6,12,20
  38:19
inform
  54:21
information
  19:7,23  20:23
  21:1,5,7,8
  33:13
informing
  56:7
inherent
  55:5
instance

40:23  41:1
  50:14
instances
  12:9
instruct
  22:8
instruction
  20:25  21:6
  27:25  63:7
internal
  19:17,23
intervention
  34:18  35:4,
  11,20  46:9
interventions
  46:7
introduce
  30:24
involve
  17:19  45:20
involved
  25:15  27:9
  28:11  37:20
  45:12
irreversible
  46:3
issue
  21:13,16,19
  53:1,17
issues
  19:3,15

_____

J

Jason
  4:8
job
  7:18,22,23
  15:6

**K**

**Kale**
3:4,10 4:6
5:22 11:23
66:4

**kind**
31:19 33:5,8
53:20

**knowledge**
27:22 28:3
45:3 55:7,12

**L**

**lab**
8:9

**Laidlaw**
57:11

**Lambda**
16:5

**Lamda**
4:23

**language**
9:23 33:3

**large**
43:12 48:23
55:15

**law**
16:3 60:16,18

**lead**
3:13 23:18,22
24:3,7 29:23
42:14

**leads**
29:24

**lean**
9:22

**learn**
16:1

**learned**
16:6

**leave**
14:17

**Legal**
4:23 16:5

**LETTER**
3:6

**Levine**
55:18 57:11

**Levine's**
16:9

**Lexitas**
4:13

**life**
10:4

**limit**
6:19

**limitation**
15:24 20:24
42:17 55:9

**limitations**
15:6,8,12,15,
16,20,22
42:4,13 43:1
54:25 55:5

**limited**
35:6 37:25
38:11

**list**
15:23 25:14

**listed**
24:9 25:9
26:22

**lit**
26:8

**literature**
12:23 13:13,
24 15:7
41:14,21 42:4
47:17 49:5,10
50:15,21,22
51:20 52:10
55:15,18,19
56:5,13 57:1,
6 60:5 62:5,
7,8

**live**
8:3,4

**long**
19:17 25:14

**longer**
24:14

**longitudinal**
55:16 56:4,8,
12,16,24 57:5

**looked**
57:3

**lot**
15:4 36:7
49:5,10 56:4
60:5,7 62:5

**lots**
28:14 43:2

**loud**
53:10

**low**
14:22 15:2,5
41:23 42:2,
14,18,25

**low-quality**
42:12,22

**lowest**
54:16

**M**

**M.D.**
10:16 28:8

**made**
53:2,17 62:17

**make**
16:15 29:20
54:20 63:10,
15,16 64:3,
16,18,21

**makes**
14:12 15:2

**making**
14:4 16:22
17:13 22:21
52:22 53:2,17
57:19 63:3

**manners**
28:14

**March**
4:10 66:5

**mark**
11:6 23:12
64:10

**marked**
39:16,23

**Massachusetts**
8:4

**matter**
4:7 5:16

**means**
29:25 30:2,10
36:13 38:7
39:17 40:3
50:11

**media**
60:25

E. Kale Edmiston, Ph.D        CONFIDENTIAL
March 23, 2023                                               11

**Medicaid**
  61:7

**medical**
  8:13 9:16,18,
  19 17:8,10
  28:6,10,13
  39:4 46:3
  53:1,3,17,19
  62:18

**medication**
  60:10

**medications**
  8:17

**Medicine**
  7:17 8:10

**Meet**
  3:12 23:18

**meetings**
  4:10

**member**
  26:13,16
  28:21 29:25
  30:2

**members**
  27:20

**membership**
  26:14

**memory**
  8:18 12:14
  27:2

**mental**
  14:10 50:3
  51:8 57:3

**mention**
  48:21

**mentioned**
  14:6 15:11
  21:23 28:18
  41:9 42:21

  56:13,21,22

**mentoring**
  7:24

**mice**
  59:8 60:1

**Michael**
  4:17 6:5 19:6

**mind**
  17:11 36:11
  46:12,14
  56:23

**misspoke**
  52:4

**modalities**
  59:14

**moment**
  33:15

**months**
  53:24

**morning**
  4:16,18 5:7,
  11 6:4

**move**
  30:19,21 45:2

**Moving**
  40:9

---

**N**

**natal**
  60:9

**nature**
  15:23 52:22

**necessarily**
  15:8

**negative**
  45:4 51:15

**negative.'**

  57:13

**neuro**
  14:1

**neuroimaging**
  59:4

**neurologist**
  9:10

**neuroscience**
  8:9,12

**news**
  16:3 60:25

**nodding**
  6:12,14 60:17
  61:14

**nondisclosure**
  19:21

**nonmedical**
  27:23

**nonstandard**
  34:18 35:4,20

**nontypical**
  40:22 41:1

**notes**
  6:25

**noting**
  44:16

**number**
  3:9 6:10 11:7
  23:9 24:11
  26:22 27:19
  30:22

**numbers**
  46:15

**numerous**
  15:22

---

**O**

**oath**
  3:5 5:10

**object**
  7:9 19:2
  25:25 34:23
  35:8 40:1
  43:4 44:19

**objection**
  10:5,21 11:17
  13:5,17
  14:14,24
  16:23 17:5,21
  18:3,8,13,19
  19:1 20:20
  22:17 23:2,24
  25:1,4,10,11
  27:3,7,14,24
  28:24 29:3,15
  30:1,7,14
  31:8,12,21
  32:4 34:4,15
  35:8,16 36:4,
  14,22 37:8
  38:3,13,22
  39:5,13 40:21
  41:2,10,24
  42:15,23
  43:10,22 44:6
  45:6,13,21
  46:4 47:4,7
  48:3 49:7,8,
  18 50:6 55:21
  57:24 58:3,15
  61:17 62:2,
  12,15

**objections**
  44:7,16 48:4

**occupation**

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023                                                              12

7:14

**occur**
43:1

**occurs**
38:8

**office**
53:10

**Omar**
4:22

**one's**
10:1,3,4

**oops**
40:18

**opine**
48:11 57:16

**opinion**
9:16,18 14:12
17:2 30:13
36:12 47:23
61:7,15 62:14

**opinions**
11:10 18:7
47:2,14,19
62:1

**opportunity**
64:9

**order**
19:16,21,24
21:9 28:5
41:12,13
43:25 48:5
64:3 65:3,12

**organization**
17:7 31:7

**organizations**
17:8,10

**original**
12:20,24 13:4

**outcome**
60:11

**outcomes**
46:7 57:3

**outline**
36:7,25

**outlined**
25:22 59:13
60:3

**outlines**
17:22 23:8
31:23 44:11
45:16 54:5

**overdue**
26:15

---

**P**

---

**pages**
3:11,15 23:13

**paper**
13:25 14:3,8
41:15,17 51:5
60:4

**paragraph**
16:13 17:15
20:10 47:18,
22 51:18
52:3,6,18
53:15 54:3,
13,15 57:10

**paragraphs**
12:12,13

**paralegal**
5:7

**part**
39:17 45:19

**partner**
7:11

**patients**
62:17

**peer-reviewed**
50:24 56:5

**people**
13:25 25:15
28:11 30:15
35:3 36:17
53:25

**Perfect**
6:3 7:4 8:20
11:3 16:18
22:11 58:18

**perfectly**
22:24 41:19

**performed**
10:18

**period**
53:7,21

**person**
5:12 10:9
40:3 54:23
55:2,7

**person's**
39:15

**personal**
28:3

**pertain**
55:20

**pertains**
14:5

**pertinent**
48:24

**Ph.d.**
3:4,11 5:22
8:11 10:16
11:23

**phrase**

36:1 51:12

**Pillsbury**
4:19

**Pittman**
4:20

**Pittsburgh**
8:14

**place**
10:8 21:23
43:25 44:9,22
60:16

**plaintiffs**
4:20,23 20:5

**plaintiffs'**
19:10

**point**
48:17

**points**
48:18

**policy**
54:21

**population**
55:4

**portion**
64:7

**position**
19:10 64:14

**positive**
41:5

**possibility**
35:11

**possibly**
15:23

**post**
8:13

**potential**
46:3

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023                                                        13

practice
  35:25 36:3,13

Precisely
  22:24

preliminary
  6:25

premise
  42:25 43:5

preparing
  16:7

prescribed
  10:14,18

present
  39:23

press
  14:1

preventing
  48:1

previous
  10:11 12:6,7

primary
  8:23 13:24
  48:17,18 55:8

primate
  59:9

primates
  60:1

prior
  51:13

private
  19:23

privileged
  19:7

problem
  53:12 58:14
  60:5 64:13

proceedings
  3:1 4:2 66:6

process
  17:23 18:21,
  24 20:16
  22:15 23:1,8
  24:8 25:21,
  22,23 26:4
  27:23 30:20
  31:23 36:8
  37:1 38:24
  39:18 44:11

processes
  19:17

professional
  17:3 28:6
  35:24 36:2,13
  53:3,19

professionals
  27:23

professor
  7:15,20 14:19
  61:25

prohibition
  20:20

proposition
  52:20 54:2

protective
  64:3 65:2

protracted
  53:1,4,17,19

provide
  34:22 35:15
  36:11 51:1
  52:14

provided
  42:12

provider
  9:19 54:7

providers
  62:17

psychiatrist
  9:8 28:9

psychiatry
  7:21 8:9

puberty
  8:22 10:14
  39:3 60:10

public
  19:22 27:20

publications
  12:22 50:24,
  25

published
  13:8,12,23

pull
  10:23 23:11
  24:13 47:1

purpose
  31:14

purposes
  8:20

put
  7:5 64:14

————————————

Q

quality
  14:22 15:3,5
  37:21 42:14,
  18,25 54:16

question
  6:11,12,23
  8:16 12:16
  19:11,19
  20:21 21:4,10
  24:4 26:2,21
  33:7 34:8,9,
  11 37:14 38:1
  39:6,9 41:15,
  20 42:3 43:5

44:16 47:9
  49:10,12
  52:14 53:4,
  11,20 55:24
  58:16

questionable
  55:10

questions
  6:21,25 19:14
  20:6,14 21:21
  22:3,7,8
  29:21 30:20
  32:13 39:10
  48:2 60:12,13
  62:21,22,24
  63:5

quickly
  12:11

————————————

R

raise
  5:14

raising
  29:3

ran
  59:18

Randy
  4:11

range
  26:18

rare
  40:19,20,22

re-read
  38:5

reached
  18:5

read
  3:6 16:8,9,14

E. Kale Edmiston, Ph.D                CONFIDENTIAL
March 23, 2023                                                    14

23:16 41:8
50:1 51:19
63:10,14,19

**readiness**
45:10,17

**reading**
38:7 51:6
63:7

**realizing**
54:5

**reason**
64:6

**reasonable**
41:19

**reasons**
15:4

**rebuttal**
3:10 11:4,22
12:3 16:7
35:2 47:1
48:12,15,21
60:3 62:9

**recall**
12:12 16:10
26:17,23
42:2,13,21
57:18 60:23
61:1

**receptor**
41:5

**recess**
46:21

**recognize**
30:12

**recognized**
30:9

**recommend**
32:15,18
37:18

**recommendations**
47:13 56:7

**recommends**
53:23

**reconvene**
46:14

**record**
4:4,15 29:19
33:19 46:20,
23 65:5,7
66:2,3,4

**refer**
23:7 25:21
31:22 33:12
36:6,24 44:10
51:2

**reference**
56:14,24 60:6

**referenced**
13:22

**references**
52:21 55:13

**referring**
58:7

**regarded**
54:19

**regulation**
60:19,22
61:10,13
62:11,14

**regulations**
61:4

**relate**
56:14

**related**
13:7,14 14:4
15:16 48:18
56:25

**relates**
19:8 21:24

**relating**
19:16 20:6
21:24 23:5
43:24 44:7
48:4

**relevance**
50:8

**relevant**
47:16 53:1,16
62:5

**relied**
11:13 16:24

**rely**
16:21

**remember**
59:10 60:25
61:1

**remind**
65:4

**remotely**
4:9 5:11

**repeat**
33:7 53:10

**rephrase**
47:10 48:14
49:14 58:10,
13

**report**
3:10 7:2
11:4,13,22
12:3 16:8,22
17:13,25
21:20 47:2,14
48:10,15,18,
21,23,25 49:1
59:13 60:7,13
61:3,6,8,16,

21,22 62:1
63:10

**reporter**
3:6 4:24
6:10,19 11:5
64:2 65:2

**reports**
16:8 57:8

**represent**
6:5 23:19
24:16,21

**representation**
47:23

**representing**
43:14

**request**
35:11 41:16

**require**
19:25

**required**
33:17

**research**
7:23,25 8:1
12:17,19,21,
24 13:3,4
14:19 31:17
35:6 50:20,22

**researched**
35:12,13

**resources**
15:18

**respect**
64:16

**responding**
52:6

**responsibility**
14:16

**restate**

6:22 11:18
39:6

**restrictions**
  43:23

**results**
  59:12 60:1

**reveal**
  20:22,25 21:7

**review**
  13:23,25 15:6
  17:12 26:8
  41:3,16 43:13
  48:22,25
  56:18 57:2,6,
  19 60:4 61:3,
  11 63:15
  64:9,22

**reviewed**
  13:13 23:23
  41:14,22
  47:16 61:5,6,
  22

**reviews**
  12:22 13:24
  14:1

**revised**
  20:3 22:16,19
  23:23

**revising**
  14:9 20:12
  27:21

**revision**
  3:12 23:17
  24:7

**revisions**
  20:16

**risks**
  45:5,12,20,25
  46:2

**risky**
  52:12

**Rivaux**
  4:18,19 7:9
  10:5,21 11:17
  13:5,17
  14:14,24
  16:23 17:5,21
  18:3,8,13,19
  19:1,13 20:7,
  18 21:3,14,18
  22:10,17
  23:2,24 25:1,
  4,10,25 27:3,
  7,14,24 28:24
  29:3,15 30:1,
  7,14 31:8,12,
  21 32:4 34:4,
  15,23 35:8,16
  36:4,14,22
  37:8 38:3,13,
  22 39:5,13
  40:1,21 41:2,
  10,24 42:15,
  23 43:10,20,
  22 44:6,19
  45:6,13,21
  46:4 47:4,8
  48:3 49:7,9,
  18,20 50:6,8,
  10 55:21,23
  57:24 58:1,4,
  10,17 61:17
  62:2,12,15,23
  63:6,9,20
  64:4 65:15,
  16,23

**roles**
  24:4

**rules**
  6:9

―――――――――
**S**
―――――――――

**scenario**
  39:2

**school**
  7:17 8:9
  28:10,13

**science**
  15:23

**scientific**
  15:25 31:15
  43:2

**scientist**
  9:19 15:6
  61:25

**scientists**
  31:15

**scope**
  34:24 35:2,9,
  16 36:4,15,22
  37:8 38:3,13,
  22 39:13
  40:2,21 41:2,
  10,24 42:23
  43:10,22
  44:6,20 45:6,
  13,21 46:4
  48:3 61:17
  62:2,15

**Scott's**
  16:9 52:7

**scroll**
  23:12 24:15
  29:22 33:21
  49:24 51:17

**scrolling**
  11:15 24:20
  27:19 32:11
  35:22 37:24

39:11,22
47:18 52:24

**seal**
  64:2,6

**secondary**
  8:24

**section**
  33:16 34:2
  36:12 41:8

**seek**
  21:5,11,15
  22:3

**seeks**
  20:23

**selection**
  37:1

**send**
  64:2 65:2

**sense**
  10:1

**sentence**
  33:18 34:3
  35:23 37:22
  38:1,7,11,18
  39:12,14,25
  40:18,20,25
  43:7,9,15
  50:1 51:11,
  12,13,16,18,
  19 52:9,10,25
  53:15 54:8,15
  57:11

**sentences**
  43:12 51:24

**September**
  7:19

**sets**
  17:2

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023                                                          16

sex
  8:24 59:16
  60:9
sex-specific
  60:10
Shani
  4:19 19:10
Shaw
  4:19,21
sheep
  59:6,7,8 60:1
SHEET
  3:7
shift
  22:22
sign
  3:6 29:13
signature
  66:8
signed
  28:21 29:9,16
  48:7 64:15
significant
  59:21,22,24
single
  54:18,22 55:2
small
  51:20
so-called
  61:8
SOC
  3:11,12
SOC8
  3:15 23:7,17
  25:14 27:9,10
  37:18 42:7
  44:1 53:23

social
  60:25
Society
  17:11,12
  33:11
Soleman
  12:7,8
sort
  11:18 14:2
  15:9,22 36:7
  37:1 39:18
  42:24 43:4
sorts
  15:15
Sounds
  46:17
speak
  6:20 28:2
  56:17
speaking
  6:20 26:7
  41:7 56:19
specific
  7:25 13:13
  16:6 21:21,24
  24:4 33:3
  34:8,9,11
  36:8 38:6,7
  41:15,17
  43:12 52:11
  56:17 61:19
  64:6
specifically
  20:13 48:20
specificity
  9:2,6 39:7
specifics
  26:3

speculate
  34:21
speculation
  51:14
stakeholder
  27:20
stand
  18:14 46:19
  51:16 52:19
standard
  8:16 18:15
  20:4 46:6
  47:12
standards
  16:21 17:3,8
  18:15 20:12,
  13 22:15,16
  25:19 27:21
  28:12 30:6
  31:3,16,23
  43:18 47:3,21
  54:21 55:13
  56:3 62:19
standing
  29:25
start
  7:18 26:16
state
  6:11 11:10
  57:11
stated
  60:15 61:5
statement
  16:19 29:16
  39:11 57:20
statements
  26:10,11
  35:23 52:7

states
  17:15 20:10
stay
  19:4 21:9,23
  23:5 25:13
  37:10 41:12
  43:25 44:9,22
  48:5
stays
  19:16
stenographer
  4:12 5:1,5,9,
  14,20 65:4
step
  22:14 56:1
strength
  33:3
strike
  32:23 36:2
  52:5
structure
  59:15,20
students
  7:24
studies
  11:12 13:7,8,
  12,22 14:22
  15:5 41:23
  42:3 43:3
  54:15 55:1,6,
  13,16,17
  56:10,17,25
  57:2 58:24,25
  59:5,7,12,14,
  25 60:2,7
study
  12:7,8 13:23
  15:5,8,9,14,
  16,17,25

42:13 43:2
54:1,4,18
55:2,9 57:5
59:9

**studying**
13:21

**subject**
57:22 58:6

**submit**
12:2

**submitted**
14:3

**subpoenas**
23:6

**suffer**
40:5

**suffering**
40:4

**sufficient**
64:22

**suggest**
32:14,17
33:21 51:24

**suggesting**
19:13

**super**
63:21

**support**
37:6,12,20
50:18 51:13

**supporting**
50:3 51:8

**suppose**
47:15

**surgeon**
9:14

**surgeons**
27:6,8

**surgeries**
8:23 10:17

**surgery**
27:9

**surgical**
35:3,20

**surprised**
62:4

**sustained**
39:16,23

**swear**
4:25 5:15

**sworn**
5:23

**synonymously**
32:24

**system**
33:9,11

**systems**
33:5

---

**T**

**tablet**
7:5

**taking**
8:17 56:1
63:4

**talk**
36:25 45:12,
15

**talked**
7:7 43:23

**talking**
43:1 53:8

**targeted**
57:1

**Team**

3:13 23:18

**technology**
10:24

**term**
9:4

**terminology**
36:8

**terms**
9:3 22:21
32:2 55:19
56:12

**testified**
5:24

**testimony**
5:16

**text**
16:15 61:11

**TGD**
33:17,19
37:24 38:19
39:15

**thing**
49:20

**things**
9:1 26:4
64:10

**thinking**
15:13 50:19
56:25 58:25

**threshold**
40:4

**time**
4:5 6:16
16:11 26:15,
17 40:14
43:13 46:20,
23 48:25
53:7,21 54:5
61:2 63:4

64:22,23
65:9,17,18

**title**
11:15,20
23:16

**today**
8:18 36:11

**top**
33:22 42:7
51:4 55:14
56:20

**topic**
16:24 28:15,
16 36:18,21

**topics**
13:13

**tough**
20:19 64:14

**trained**
9:19

**trans**
14:2,10 54:6

**transcript**
64:20 65:18

**transcription**
63:12

**transgender**
13:25 28:17
33:25 50:4
51:9,22 57:4,
5 59:3

**treatment**
14:12 17:25
18:15 39:4
48:11,16
49:2,4,6
50:4,15 51:9,
15 56:14
57:12,17

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023                                                          18

58:8,21,24
59:19 60:8,11

**treatments**
8:23 9:5
17:3,20 34:14
53:16 55:20
59:23

**troubling**
39:20

**true**
38:11

**truth**
5:17,18,23

**type**
46:8 54:20

**types**
45:8 56:7

---

              **U**

**Um-hum**
32:16 54:11
61:24

**UMASS**
7:17

**uncomfortable**
29:20 64:17

**understand**
6:21 45:19
55:23 64:14

**understanding**
9:4

**understood**
15:19 20:8
26:12 29:13,
18 30:18
33:14 41:19
48:9,20 51:17
54:9,25 55:11

56:19 59:25
60:19,24

**university**
7:16 8:12,14

**unknown**
57:13

**unlike**
55:17

**unseal**
64:6

**upsetting**
39:20

---

              **V**

**vague**
50:5

**valid**
55:18

**Vanderbilt**
8:12

**varies**
53:23

**variety**
56:6

**verbally**
6:11

**versa**
6:20

**version**
12:2 22:21,23
47:3,13

**versus**
4:7

**vice**
6:20

**video**
46:20,22

65:5,12,13,
14,17 66:2,3

**video-recorded**
4:6

**violate**
19:20,21,24,
25 22:2 23:4
28:4 29:4,7,
19 37:9 41:11
44:9,21 63:24

**violated**
26:5

**violating**
25:12

**violation**
44:8,24

**Vogel**
5:8

**Vries**
51:5

---

              **W**

**waive**
63:12 66:8

**waiving**
63:7

**wanted**
54:10

**warranted**
9:6

**website**
23:7,20
24:10,16
25:22 27:21
31:22 33:12
36:7,25 44:11

**Weida**
4:8

**weigh**
46:3

**well-recognized**
30:5

**whatsoever**
53:12 58:14

**Winthrop**
4:19

**Worcester**
8:4

**word**
30:9 38:6

**worded**
47:9

**words**
32:21

**work**
8:25 47:20
53:9

**worked**
8:8 25:6,8

**working**
26:23

**works**
10:24

**WPATH**
3:11,15 16:21
17:2 19:14,
17,24 21:20,
24 22:15
23:6,7 24:16
26:13,16
27:21 28:2,21
29:13,24
30:3,5 31:6,
14,19 33:2,6,
9 36:7,24
44:10,18
47:3,21,25

E. Kale Edmiston, Ph.D                    CONFIDENTIAL
March 23, 2023                                                    19

```
    48:1 55:12,15
    56:4 57:14,16
WPATH's
    47:12

WPATH-SPECIFIC
    19:11

Wright
    4:11

write
    25:6

writing
    61:21

written
    25:16 44:12
    51:16

wrong
    57:15 59:11

wrote
    50:9 60:4

            ———————
                  Y
            ———————

Yale
    8:9

years
    13:24 53:24

youth
    57:4,6

            ———————
                  Z
            ———————

Zack
    65:1

Zoom
    4:10
```