## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

AUGUST DEKKER, et al.,

*Plaintiffs*,

v.

JASON WEIDA, et al.,

*Defendants*.

Case No. 4:22-cv-00325-RH-MAF

## EXPERT REBUTTAL REPORT OF DAN H. KARASIC, M.D.

I, Dan H. Karasic, M.D., hereby state as follows:

1.     I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

2.     I am over the age of 18.

3.     I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

4.     I previously submitted an expert witness report in this case ("Karasic Report"). I submit this report to respond to points raised in the reports of Defendants' designated experts: Michael Biggs, Ph.D.; G. Kevin Donovan, M.D.; Paul W. Hruz, M.D.; Kristopher Kaliebe, M.D.; Michael K. Laidlaw, M.D.; Patrick Lappert, M.D.; Stephen B. Levine, M.D.; Sophie Scott, Ph.D.; and Joseph Zanga, M.D.

1

Pl. Trial Ex. 011

PLAINTIFFS002293

5.     My background, qualifications, and compensation for my services in this case, and the bases for my opinions in this case are described in my original report.

6.     In preparing this report, I was provided with and reviewed the reports from defendants' designated experts described above and the accompanying exhibits, as well as the expert reports of Dr. Armand Antommaria, Dr. Kellan Baker, Dr. Johanna Olson-Kennedy, Dr. Loren Schechter, and Dr. Daniel Shumer, submitted by plaintiffs.

7.     In preparing this rebuttal report, I have relied on my training and years of research and clinical experience, as set out in my curriculum vitae (attached as **Exhibit A** to my original report) and on the materials listed therein; the materials listed in the bibliography attached as **Exhibit B** to my original report; and the additional materials listed in the supplemental bibliography attached as **Exhibit C** to this rebuttal report.  The sources cited in each of these are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject, which include authoritative, scientific peer-reviewed publications.

8.     I also reviewed medical records pertaining to the plaintiffs, as provided by counsel.

2

PLAINTIFFS002294

9.     I reserve the right to revise and supplement the opinions expressed in this report or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.  I may also further supplement these opinions in response to information produced by Defendants in discovery and in response to additional information from Defendants' designated experts.

## EXPERT OPINIONS

10.     The critiques below apply to more than one expert. The experts for the defense are outside the mainstream of transgender health. Instead, they are better known for their political efforts to deny care to transgender people, rather than for providing care for or clinical research regarding transgender people. Their views are outside the mainstream of experts in transgender health and mainstream medical organizations.

### A. Dr. Levine's Report

11.     Stephen Levine, MD, was an editor of Standards of Care 5 ("SOC 5") of the Harry Benjamin Gender Dysphoria Association (the precursor to WPATH), which were released in 1998. After widespread criticism of the SOC 5, it was replaced by the SOC 6 in just three years. By contrast, the SOC 6 (published in 2001)

3

PLAINTIFFS002295

and SOC 7 (published in 2012) were each in use for approximately 10 years. Dr. Levine was critical of the changes in transgender care in 1998, and has been a critic of modern transgender care since. His involvement in transgender health in recent years has centered on the denial of care to transgender people through his role providing testimony with respect to prison systems.

12.     Dr. Levine quotes the Endocrine Society repeatedly in his discussion of "biological sex." (Levine Report, para. 19-27). However, he omits that the Endocrine Society states, "the terms biological sex and biological male and female are imprecise and should be avoided." (Hembree, et al. 2017).

13.     Dr. Levine states, "Contrary to assertions and hopes that medicine and society can fulfill the aspiration of the trans individual to become 'a complete man' or 'a complete woman,' this is not biologically attainable," because will nevertheless be unable to reproduce (Levine Report, para. 27). For one, transgender individuals may find other ways to build families, as do other individuals who need medical assistance with reproduction or choose to adopt. Reproductive capacity is not what makes a person a man or a woman, and we do not describe others as less of a man or woman for needing assistance with family building or choosing not to raise children. For another, the goal of health practitioners in this field is not to facilitate "trans individual to become 'a complete man' or 'a complete woman'," the goal of

4

PLAINTIFFS002296

practitioners in this field is to treat the clinically significant distress of Gender Dysphoria and to improve the quality of life of those living with gender dysphoria.

14.     In paragraph 29 of his report, Dr. Levine uses his prior writing as the reference for the assertion that "There are at least five distinct pathways to gender dysphoria…." What he describes is that the patient with Gender Dysphoria may present to clinicians at different times of life, not that these are "five distinct pathways to gender dysphoria," or even that there are "distinct pathways."

15.     Dr. Levine discusses pre-pubertal desistance and social transition. Dr. Levine's criticism is based on studies relying on the now obsolete and overly broad categorizations contained in the DSM III-R and DSM IV for "Gender Identity Disorder in Children." None of the studies cited by Dr. Levine use the current DSM-5 gender dysphoria diagnosis. As noted above, a child could meet criteria for the DSM III-R or DSM-IV diagnosis of gender identity disorder without identifying as transgender because the diagnostic criteria did not require identification with a gender other than the one assigned to the person at birth. This problem with the diagnosis was remedied with the new DSM-5 diagnosis of "Gender Dysphoria in Children," which requires a child to have "a strong desire to be of the other gender or an insistence that one is the other gender (or some alternative gender different from one's assigned gender)." It is therefore not surprising that children discussed

5

PLAINTIFFS002297

in the studies cited by Dr. Levine did not identify as transgender at follow-up as these children did not necessarily identify as transgender to begin with.

16.     Moreover, the cohorts from UCLA and Toronto in those studies were all or largely *prepubertal* boys who engaged in feminine behavior, leading their parents in the 1960's, 1970's and 1980's to bring them to clinical attention before they came out as gay or bisexual. The one large modern American study of pre-pubertal children who were using a pronoun other than one that aligned with their sex assigned at birth, found that only 2.5% of them later identified as cisgender (Olson, et al., 2022). Clearly these are different populations of gender diverse children with different trajectories. There is no evidence that a psychotherapeutic intervention changes gender identity.

17.     Dr. Levine states "engaging in social transition starts a juvenile on a "conveyor belt" path that almost inevitably leads to the administration of puberty blockers, which in turn almost inevitably leads to the administration of cross-sex hormones." (Levine Report, at ¶130). A recently published study, which Dr. Levine fails to cite, has found this not to be true. The study authors found that gender identification did not meaningfully differ before and after social transition. (Rae, et al., 2019).

6

PLAINTIFFS002298

18.     What is more, this case involves is about the coverage of medical care, and no medical care is provided to youth before the onset of puberty.  Indeed, there is broad consensus that once youth reach the earliest stages of puberty (i.e., Tanner 2) and identify as transgender, desistance is rare. The notion of desistance therefore is not generally applied to transgender people once they reach the Tanner 2 stage of puberty. Even the researchers who published the dataset about desistance that Dr. Levine cites are clear that once a child reaches puberty, it is not medically appropriate to withhold affirming treatment.

19.     Moreover, social transition is not a medical intervention, involving instead hair length, clothes, and in some cases using another name and pronouns. And while there may be differing views on social transition before puberty, even the practitioner cited by Dr. Levine, Dr. Anderson (Levine Report, at ¶¶ 74, 83), is a strong supporter of medical interventions after onset of puberty, when indicated, and has referred our mutual patients for such care.

20.     There are also many possible reasons for the increase in the number of transgender youth counted in surveys and the change in the ratio of those assigned female at birth to those assigned male at birth, to which Dr. Levine alludes to. Transmasculine youth (assigned female at birth) have long received care where it was available and were a majority of my patients at Dimensions Clinic for trans

7

PLAINTIFFS002299

youth, which provided services without regard to insurance status, since my work began there in 2003. Insurance coverage for transgender care and the availability of clinics for trans youth nationwide were uncommon until a decade later in much of the United States. When the old Gender Identity Disorder diagnosis was an exclusion for reimbursement, the diagnosis was rarely submitted to insurance. Therefore, when measured by clinic enrollment or by insurance reimbursement by diagnosis, the numbers of trans youth counted was low until about 10 years ago, when insurance reimbursement allowed for the counting by diagnosis.

21.     Population-based surveys only started counting transgender identity with Conron, 2012, based on data from BRFSS health surveys from 2007-2009. The share of the population identifying as transgender on the BRFSS has not changed dramatically since then, with similar numbers of each gender, though the number of estimated transgender youth increased with use of another survey, the YRBS, which surveyed large urban school districts. (Herman, et al., 2022).

22.     Compared with those counted on surveys as having a transgender identity, much smaller numbers get a Gender Dysphoria diagnosis or receive gender-affirming medical care.

23.     These statistics show that only a minority of those identifying as transgender get clinical care to get a Gender Dysphoria diagnosis, and only a small

8

PLAINTIFFS002300

share of these receive gender affirming medical or surgical treatment. These numbers reflect the careful process of assessment and medical care provision. There must be at least a 6-month duration of symptoms that are strong enough to cause clinically significant distress or social or occupational impairment to receive the Gender Dysphoria diagnosis. To receive gender-affirming care, the patient, their parents, and their medical and mental health care team must agree that this is the best course for treating gender dysphoria. There is no other treatment of Gender Dysphoria with any evidence of efficacy for these patients, as Dr. Levine admits.

24. Dr. Levine discusses providing psychotherapy for co-occurring mental health conditions, but states, "To my knowledge, there is no evidence beyond anecdotal reports that psychotherapy can enable a return to male identification for genetically male boys, adolescence, and men, or return to female identification for genetically female girls, adolescents, and women."

25. Dr. Levine further states, "I don't know what proportion of practitioners are using which model," before stating that practitioners are practicing in ways that "disregard principles of child development and family development." WPATH SOC 8 requires that practitioners have knowledge of child development and family development and approach the child in a way that "does not favor any identity." (Coleman, et al., 2022).

9

PLAINTIFFS002301

26.     In paragraph 72 of his report, Dr. Levine states that "In 2010 the WPATH Board of Directors issued a statement advocating that incongruence between sex and felt gender identity should cease to be identified in the DSM as a pathology. This position was debated but not adopted by the (much larger) American Psychiatric Association." This is patently false.   In fact, I was a member of WPATH's committee advising the American Psychiatric Association on diagnostic revision for DSM-5 (after editing a book on the subject). WPATH stated that transgender identity should not be pathology but that the diagnosis should focus on the distress of gender dysphoria and be named Gender Dysphoria. The American Psychiatric Association  agreed with WPATH and replaced the Gender Identity Disorder diagnosis with Gender Dysphoria.   Indeed, the American Psychiatric Association's own "Guide for Working With Transgender and Gender Nonconforming Patients" states that "[w]ith the publication of DSM–5 in 2013, 'gender identity disorder' was eliminated and replaced with 'gender dysphoria.' This change further focused the diagnosis on the gender identity-related distress that some transgender people experience (and for which they may seek psychiatric, medical, and surgical treatments) rather than on transgender individuals or identities themselves." (Yarbrough, et al., 2017).  It goes on to state that "[t]he presence of gender variance is not the pathology but dysphoria is from the distress caused by the

10

PLAINTIFFS002302

body and mind not aligning and/or societal marginalization of gender-variant people." *Id.*

27.     Dr. Levine states without basis that WPATH members and mental health professionals working with transgender people are not qualified to do so. I have been practicing in this field for over 30 years and have provided training and instruction to thousands of healthcare providers across the United States, including in Florida as well as psychiatrists and other mental health providers at UCSF and elsewhere.   It has not been my experience that practitioners in this field are unqualified.   To the contrary, they are highly specialized professionals living up to their calling of providing the best care possible for their patients.

28.     Regarding Dr. Levine and others use of Dhejne et al., 2011 for the proposition that gender-affirming is not effective (*e.g.*, Levine Report, at ¶150), Dr. Dhejne has specifically cited Dr. Levine as someone who misinterprets her study. "The findings have been used to argue that gender-affirming treatment should be stopped since it could be dangerous (Levine, 2016) … Despite the paper clearly stating that the study was not designed to evaluate whether or not gender-affirming is beneficial, it has been interpreted as such." (Dhejne, 2017).

29.     Mainstream medicine, transgender health advocates, and Dr. Levine all agree on the centrality of informed consent in the provision of healthcare. Dr.

11

PLAINTIFFS002303

Levine's version of informed consent includes his confirmation bias on the futility of care for transgender people. Informed consent should encapsulate the risks and benefits of the given treatment as best known through the perspective of scientific evidence and modern health practice.

30.     There are limits on the capacity of children to consent, which is why parents consent for healthcare, including for transgender youth.

**B. Dr. Kaliebe's Report**

31.     Dr. Kaliebe states there is "no consensus in the field regarding the treatment of gender dysphoria." (Kaliebe Report, at ¶4(b)).  In fact, there is an international consensus of leaders in providing and researching care for transgender people, which is published as the WPATH Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. The use of the WPATH Standards of Care is supported and/or adopted by, among others, the American Psychiatric Association, the American Psychological Association, the American Medical Association, the American Academy of Pediatrics, by the Federal Bureau of Prisons, and by many insurance companies, and health systems, as well as by Maximus, which administers independent medical reviews for insurance appeals in many states as well as federal appeals.  The fact that there some dissenting views, which no matter how loud constitute a minority within the medical and scientific

12

PLAINTIFFS002304

community, does not mean that there is no broad consensus among the larger medical and scientific community about the propriety, safety, and effectiveness of gender-affirming medical care for the treatment of gender dysphoria.

32.     Dr. Kaliebe asserts that gender dysphoria "has been rare until the last two decades." (Kaliebe Report, at ¶4(a)).  This observation by Dr. Kaliebe illustrates his lack of experience and involvement in this field.  Gender-affirming care dates back decades and the WPATH Standards of Care have been in existence since 1979. In fact, there is documentation of transgender youth and adults taking hormones for over 70 years. The UCLA Gender Identity Research Clinic met regularly starting in the early 1960's. During my psychiatry residency training at UCLA from 1987-1991, I was trained in transgender care by two experts who had worked with gender diverse and transgender youth and adults for decades—Drs. Robert Stoller and Richard Green. My training included watching films of transgender people being interviewed by Dr. Stoller in the 1950's and 1960's. Gender dysphoria was studied at gender centers in many United States academic centers in the 1960's and 1970's, before the 1981 federal decision at the start of the Reagan administration to ban federal support for such care, a decision that was only reversed in 2014 (Fritz and Mulkey, 2021). After the 1970's, American research efforts largely ended as funding was cut off, and research into treatment of gender dysphoria and outcomes of care

13

PLAINTIFFS002305

mostly took place in other countries that continued to fund gender-affirming care, such as the Netherlands, Belgium, and Sweden.

33.     Care in the United States during these years largely was provided either in private offices or in public health clinics, without resources for research.

34.     Despite the long cutoff of funding and consequent hiatus of research programs in the United States, there is some data from that earlier era of transgender care. A 40 year follow up of patients who received gender-affirming surgery at University of Virginia before its program was shut down was published recently, showing continuing positive effects and no regrets from gender affirming surgery among 15 participants that could be found 40 years later. (Park, et al., 2022).

35.     With resumption of funding, robust research programs are ongoing in the United States, with longitudinal studies of pre-pubertal gender diverse youth by Kristina Olson, PhD and her colleagues at Princeton and University of Washington that have shown low rates of pre-pubertal desistance (Olson, et al., 2022), and a longitudinal multicenter NIH-funded study that has recently published improvement with gender affirming hormones in youth (Chen, et al., 2023).

36.     Dr. Kaliebe states that none of his patients expressed gender dysphoria from 2005-2016. Meanwhile in San Francisco, from 2003-2020, I had a psychiatric clinic that only saw youth experiencing gender dysphoria. Does that mean that

14

PLAINTIFFS002306

transgender youth didn't exist in Florida and that all transgender youth were in San Francisco during those years? Of course not. An individual psychiatrist's practice does not reflect the broader population. Perhaps patients were not being asked about gender dysphoria or didn't feel comfortable disclosing gender dysphoria during these years, and particularly with Dr. Kaliebe. Transgender people don't disappear or don't exist simply because they don't receive care from a particular provider. And based on my work with practitioners in Florida and elsewhere, I know there were transgender patients in Florida who worked with other providers.

37.     Take just two of my experiences related to transgender youth in Florida in the 2000s and 2010s:

     a. Around the year 2000 I received a call from a man in Florida who said he had a transgender child for whom he was seeking care. He stated he was unable to find care in Florida. He stated he had the means to go anywhere to find a knowledgeable provider to work with his child. I referred him to a child and adolescent psychiatrist with expertise working with transgender youth in Atlanta.

     b. In 2012, I attended the first UCSF Child and Adolescent Gender Clinic. There was a meeting with a family that had just moved from Florida to San Francisco because they were unable to find adequate healthcare and

15

PLAINTIFFS002307

an accepting school environment in Florida for their transgender adolescent.

38.     Even if transgender youth were invisible to Dr. Kaliebe during that time, they existed and needed care.

39.     Many parents who seek psychiatric care with me for their adolescents have stated that it was, in part, because their prior psychiatrist or mental health provider lacked knowledge to provide competent care. Not infrequently, the youth have told me that they had never discussed their gender dysphoria with prior mental health professionals because they didn't think they would be understood or they didn't feel safe doing so.

40.     Dr. Kaliebe references a study by Kaltiala et al. in 2020 to state that "The Finnish experience shows that 'treating' the gender dysphoria with affirmative medications and surgeries does not resolve the patients' mental disorders." (Kaliebe Report, at ¶ 151).  In fact, in the Kaltiala et al. study, of the 52 youth studied, 54% needed treatment for depression before initiation of gender-affirming hormones, versus 15% needing treatment for depression after initiation of gender-affirming hormones. In the study, 48% of the trans youth needed treatment for anxiety before starting hormones, versus 15% after starting hormones. And 35% of the trans youth

16

PLAINTIFFS002308

needed treatment for suicidality/self-harm before starting hormones, versus 4% after initiation of gender affirming hormones (Kaltiala, et al., 2020).

## C. *Dr. Lappert's Report*

41.     Dr. Lappert, who is a retired surgeon with no experience in transgender health care and who is not trained in nor a provider of mental health care, opines that because "WPATH v.8 speak[s] of the need to have these psychological disturbances 'well-controlled' prior to surgery," it must mean "self-harming or suicidal thoughts must be well controlled before one can proceed with surgery" and that therefore "the main reason for the consenting the [sic] child for surgery has been successfully treated medically, and the patient no longer requires the surgery." (Lappert Report, at ¶71).  Not only is this wrong, but it also gets it backwards.  First of all, surgery is not recommended for any child.  Surgery is appropriate when medically indicated for adults and some older adolescents (typically for chest masculinization surgery). Second, SOC 8 does not say that mental health symptoms must be resolved before gender affirming care, rather that these must be assessed and risks/benefits weighed. Indeed, to make a Gender Dysphoria diagnosis prior to providing gender-affirming care, there must be clinically significant distress or social/occupational impairment lasting at least 6 months.

PLAINTIFFS002309

42.    With regards eligibility for surgery, SOC 8 also recommends for adults that "[m]ental health and physical conditions that could negatively impact the outcome of gender-affirming surgical intervention have been assessed, with risks and benefits have been discussed," and for adolescents that "Mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed; sufficiently so that gender-affirming medical treatment can be provided optimally." (Coleman, et al., 2022). But that refers to *other* conditions that *may interfere* with diagnosis, capacity to understand the risks and benefits, or the medical treatments. It takes intentional misrepresentation and leaps of logic to argue that SOC 8 recommends that the condition for which the surgery may be medically indicated must be resolved in order to obtain the surgery.

43.    Dr. Lappert asserts that "[t]he fact that gender affirmation physicians and surgeons cite the DSM as a source document for diagnostic criteria is further proof that the condition exists in the subjective life of the patient." (Lappert Report, at ¶ 75). But just because a diagnosis is in the DSM doesn't mean it is "subjective" only. A mental health professional makes a diagnosis. Psychiatrists and psychologists have many years of training to make diagnoses, which are made primarily by the clinical interview with the patient. This process is similar to that of

18

PLAINTIFFS002310

diagnosing other DSM diagnoses, to determine treatment for other disorders. The process of taking a history of symptoms from a patient is not only used to determine most psychiatric treatment, but also many medical and pediatric treatments. It is surprising to hear any medical professional dismiss the importance of taking a good history from a patient. Even medical disorders that rely on blood tests and imaging for a definitive diagnosis rely first on taking a history to know which tests to order. And treatment of many DSM diagnoses is considered medically necessary and covered by Medicaid.

44.     Dr. Lappert states that selection for surgery "begins in psychology continues with psychological support, and concludes with certification by psychological services that the patient is ready for surgical modification." (Lappert Report, at ¶ 76).  Again, this is false.  In fact, the patient is receiving in most cases ongoing medical care, with history taking and physical exam by both the primary care provider or endocrinologist, as well as the surgeon. An outcome measure used in gender affirming surgery and other surgeries is quality of life. As with other surgeries, medical providers are involved before surgery, in the perioperative period, and in aftercare. (Karasic and Fraser, 2018).

45.     Lappert mistakenly cites the Dhejne et al. study published in 2011 to say "that long term longitudinal population studies show that there is a dramatic rise

PLAINTIFFS002311

in post-surgical in post-surgical problems such as depression, hospitalization, substance abuse, and suicide beginning around year 7 post surgery." (Lappert Report, at ¶ 86). But the Dhejne et al. study explicitly states that the study cannot be used to make any conclusions about the outcome of surgery. (Dhejne, et al., 2011). And since 2011, Dr. Dhejne has repeatedly stated that interpretations like the above are incorrect. Dr. Dhejne compared morbidity and mortality statistics from a national database of transgender people with those in the general Swedish population, and only made comparisons between these groups, not before and after surgery, or transgender people with surgery and without surgery, or "year 7" with prior years. (e.g., Dhejne, 2017).

46.     Dr. Lappert opines at length about the "experimental nature" of gender-affirming care, in particularly surgery. However, as explained in my original report and in the reports of Plaintiffs' other experts, there is ample documentation of the safety and efficacy of gender-affirming care, going back decades, which includes a 40 year follow of patients who received gender-affirming care showing continuing benefit. (*See* Karasic Report, at ¶¶ 55-59).

47.     Dr. Lappert makes reference to "watchful waiting" as a model of care. (Lappert Report, at ¶ 94). Note that the debate over desistance in pre-pubertal children and of watchful waiting versus affirming approaches is for the period of life

PLAINTIFFS002312

before medical and surgical interventions are warranted. "Watchful waiting" was coined by the same Dutch researchers who pioneered the use of puberty blockers once the same children reached puberty, and found that puberty blockers, hormones, and later surgery successfully treated gender dysphoria in the same youth once they were of developmental stage for puberty blockers. (Ehrensaft, 2017). The result was that mental health outcomes significantly improved in the youth who received transition care in the study. (de Vries, et al., 2014). Other studies have also shown improvement in mental health measures in trans youth with gender-affirming medical treatment. (*e.g.*, van der Miesen, et al., 2020; Kuper, et al., 2020). It is important to emphasize that in the Dutch research, the youth who were going to desist from the gender identity disorder diagnosis were not treated with medications and surgery, and desistance occurred before puberty. The youth whose gender dysphoria persisted to puberty, and who were therefore treated, did not have a reversion to the gender identity congruent with sex assigned at birth, nor did any research participants who transitioned experience regret at doing so. Furthermore, "watchful waiting" is not a psychotherapeutic approach. In fact, no psychotherapeutic intervention has been demonstrated effective to change gender identity, and mainstream health organization call conversion therapy unethical. (*See* Karasic Report, at ¶¶ 23, 30, 37).

PLAINTIFFS002313

48.    Dr. Lappert claims a "5000% increase" in the "diagnosis of transgender" in the past decade. Transgender is an identity, and only started being asked in the general population in studies published in the last 11 years. There is a great difference between the percentages of people responding to a question of identity with the number of people receiving a diagnosis or care for Gender Dysphoria— less than 1 in 1000 people are diagnosed with Gender Dysphoria.

### D. Dr. Hruz's Report

49.    Dr. Hruz is not a psychiatrist or psychologist and his use of the DSM in his ordinary work as a pediatrician is therefore limited.

50.    Dr. Hruz says that "[t]he reliability and validity of various usages of the term 'gender' is controversial and not accepted by the relevant scientific community." (Hruz Report, at ¶ 19). The term "gender identity" is credited to Dr. Robert Stoller, a professor of psychiatry at UCLA. Dr. Stoller started the Gender Identity Research Clinic in 1963. The use of the term has been well established in the intervening years since 1963. It is used in research and medicine, and by every major medical organization in the United States.

51.    Dr. Hruz opines that "[t]here are no long-term, peer-reviewed published, reliable and valid research studies documenting the reliability and validity of assessing gender identity by relying solely upon the expressed desires of a

PLAINTIFFS002314

patient." (Hruz Report, at ¶ 127). There are multiple fallacies contained within Dr. Hruz's statement. First, the validity and reliability of each diagnosis in DSM-5 were field tested prior to inclusion.

52.    Dr. Hruz opines that providers are "not permitted to openly ask questions, properly investigate alternative diagnoses, or explore alternative hypotheses for the symptoms of gender dysphoric patients" and "are instead compelled (sometimes under fear of employment termination or legal attacks) to adopt a patient's self-diagnosis and only support 'affirming' medical interventions." (Hruz Report, at ¶ 90). Dr. Hruz provides no support for this opinion other than citing to two documents that speak to how the discredited and unethical practice of "conversion" or "reparative" therapy is harmful and ineffective. What is more, this opinion is directly contrary to WPATH's SOC 8 which for adults sets forth as a criteria for treatment that "other possible causes of apparent gender incongruence have been identified and excluded" and for adolescents sets forth as criteria that a "comprehensive biopsychosocial assessment including relevant mental health and medical professionals" and that "[m]ental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed; sufficiently so that gender-affirming medical treatment can be provided optimally." (Coleman, et al., 2022).

23

PLAINTIFFS002315

53.     What is more, Gender Dysphoria is not a "self-diagnosis"; the Gender Dysphoria diagnosis is made by mental health professionals and SOC 8 sets forth the criteria necessary to be qualified to make and for making that diagnosis.  The diagnosis of Gender Dysphoria under the DSM-5 is made the same way as other DSM diagnoses, through an interview in which the health professional determines if DSM-5 diagnostic criteria are met. Mental health professionals are well-trained to conduct such interviews. The validity and reliability of DSM-5 diagnoses were assessed and determined in the process of creating the DSM-5. Clinicians do not simply defer to the reported experiences of the patient, but instead rely on the application of professional experience and expertise to assess whether the patient meets the relevant diagnostic criteria.

### E. Dr. Zanga's Report

54.     Dr. Zanga appears to have no experience in transgender health or working with patients with gender dysphoria, let alone in the assessment, diagnosis, and treatment of this condition.

55.     Dr. Zanga states that "the brains of children are incapable of making long term, life changing decisions until their early to mid-20s." (Zanga Report, at ¶ 18(c)).  However, this case concerns coverage of medical care as treatment for gender dysphoria.  People at the age of 18 are legally adults, and are presumed to be

24

PLAINTIFFS002316

able to consent for all other medical care.  Before the age of 18, parents consent for health care. The parents of adolescent youth are older than their mid-20's, and therefore, even by Zanga's standard are capable to giving consent. WPATH SOC 8 does recommend healthcare professionals working with transgender youth assess the ability of minors to assent to the healthcare for which their parents consent. (Coleman, et al., 2022).

56.     Dr. Zanga states that it is "puzzling" that we provide medically necessary care to a transgender adolescent "when a youth, incapable of making such a decision, requests to transition to the opposite sex" and notes "[t]his is especially concerning when good studies have shown that the desire to do this disappears in most (80-90%) after passing through puberty or by late adolescence." (Zanga Report, at ¶ 18(f)).  To be clear, gender-affirming care is not provided simply because someone requests it, it is recommended and provided by health professionals when such care is medically indicated. Moreover, though numbers vary by study, desistance is a pre-pubertal phenomenon.  Older longitudinal studies included gender nonconforming children who were not transgender due to the broad criteria for the since-abandoned "gender identity disorder in children" diagnosis, and the one large modern American longitudinal study showed very low desistance rates. (Karasic Report, at ¶¶ 87-88, *citing* DeVries, et al., 2011; van der Loos, et al., 2022).

EXPERT REBUTTAL REPORT OF DR. DAN H. KARASIC
Case No. 4:22-cv-00325-RH-MAF

PLAINTIFFS002317

Moreover, because no medical treatment, let alone irreversible medical and surgical interventions, is used prior to puberty, the persistence and desistance statistics of pre-pubertal children do not inform the decision whether or not to initiate these treatments.

### F. Dr. Donovan's Report

57.    In his report, in reference to me, Dr. Donovan states "pathways upon which he has set patients for 'gender affirming care' should have included protocols for the 'detransitioning.'" (Donovan Report, at ¶ 27).

58.    Dr. Donovan appears to not have read WPATH SOC 8, which explicitly "recommend[s] health care professionals assessing adults who wish to detransition and seek gender-related hormone intervention, surgical intervention, or both, utilize a comprehensive multidisciplinary assessment that will include additional viewpoints from experienced health care professional in transgender health and that considers, together with the individual, the role of social transition as part of the assessment process" and explicitly discusses detransition. (Coleman, et al., 2022).

59.    In addition to WPATH SOC 8, WPATH has provided education on working with detransitioners, including a session I helped organized at USPATH in 2017 and trainings by WPATH's Global Education Initiative.  As clinicians, we did not anticipate drafting protocols for forced detransition because the state of Florida

PLAINTIFFS002318

has stopped paying for care. However, WPATH SOC 8 warns against the involuntary cessation of hormones, e.g., in hospitals and other institutional settings. (Coleman, et al 2022).

### G. Dr. Scott's Report

60.     Dr. Sophie Scott, who has no experience in transgender health care, discusses whether adolescents, based on their brain development, can consent to gender affirming care. But Dr. Scott ignores that in Florida, it is the parents of the adolescent who consent for gender-affirming care, and the parents' brains are presumable fully mature to make this decision.

61.     **The following section of this rebuttal report (Section H – Dr. Laidlaw's Report) is designated as CONFIDENTIAL pursuant to the Protective Order in this matter (ECF No. 77).**

27

PLAINTIFFS002319

CONFIDENTIAL

### H. Dr. Laidlaw's Report

62.    Dr. Laidlaw is an adult endocrinologist, which no experience or specialized training as a mental health provider, no apparent experience experiences working with pediatric patients, and no apparent experience providing or researching medical treatment for gender dysphoria.  Notwithstanding his lack of experience and that he has not met any of the plaintiffs, Dr. Laidlaw opines at length about the course of treatment for the plaintiffs, including their mental health.

*Dr. Laidliaw's misrepresentations as to KF*

63.    Dr. Laidlaw writes that KF did not see a qualified mental health professional before treatment for Gender Dysphoria. In fact, the endocrinology clinical notes state that the "initial GEMS-Y visit" was by a psychologist, Dr. Williams.  In addition, a GI note from 4/27/20, when the patient was 10 years old, stated that KF has been seeing a psychotherapist "Jessica" for "a few months now" and was in ongoing treatment with a psychiatrist, who was prescribing buspirone for anxiety.

64.    The website of the Gender Multispecialty Service (GeMS) at Boston Children's Hospital states, "We take a team approach to gender-affirmative care, partnering with experts from many different specialties…." (GeMs website).  GeMS structured its program after the pioneering Dutch clinic, with a strong mental health

PLAINTIFFS002320

assessment component, as well as endocrinology (Edwards-Leeper & Spack, 2012). Dr. Laidlaw suggests that KF's providers did not have the proper qualifications to provide care, but in fact, they are considered experts in care by this pioneering Harvard-affiliated clinic. Dr. Laidlaw takes issue with the fact that some of KF's care was provided by a nurse practitioner, but she was providing care as part of a team led by a Harvard pediatric endocrinologist. There is documentation that the risks and benefits of pubertal suppression were discussed with KF's parents when consent from them was obtained.

65.    Dr. Laidlaw states of KF's subsequent provider, Kevin Ray Lewis, DNP, "…there is no evidence that Kevin Ray Lewis holds a doctoral degree of any kind." In fact, the Johns Hopkins All Children's website states that Dr. Lewis holds a Doctorate in Nursing Practice, from West Virginia University. Dr. Lewis provides care in pediatric endocrinology for transgender youth as well as children with diabetes. (Johns Hopkins website).

66.    Dr. Laidlaw states, "As to informed consent for puberty blockers, there is no evidence from the medical records indicating signed documentation or a discussion regarding benefits, adverse effects or alternatives…" In fact, on an endocrinology visit of 6/22/18, there was substantial discussion with KF and his mother of the risks and benefits of puberty blockers, including a discussion of the

29

PLAINTIFFS002321

effects of blocking puberty, as well as potential risks with bone density and fertility, and the need for hormonal studies, metabolic studies, DEXA scans and bone age studies. On 6/26/20, there is documentation that informed consent was obtained for puberty blockers from KF's parents, with a detailed description of the treatment offered and of possible side effects of treatment, including possible risks to bone health and fertility. Signatures were not obtained at the June 2020 due to COVID protocols at the time, necessitating a remote visit. Risks and benefits were again discussed by Michael Kurtz, MD, a pediatric urologist, before insertion of Supprelin. Dr. Kurtz states that KF is aware of "all options," and there is documentation of a fertility discussion.

67.     Dr. Laidlaw states that if KF takes "testosterone, the is a high probability that KF with have permanent abnormal sexual function." If fact, many trans men and trans women have good sexual functioning after transitioning. (Garcia, et al., 2014; Jerome, et al., 2022).

68.     Dr. Laidlaw suggests without foundation that KF's co-occurring ADHD and anxiety are caused or worsened by social transition, puberty blockers, and hormones, and that testosterone "would be dangerous to start in this patient." (Laidlaw Report, at ¶ 249).  There is substantial evidence, discussed in my original report, that many youth benefit from gender-affirming care (Karasic Report, at ¶¶

30

PLAINTIFFS002322

54-56), and no evidence that KF's co-occurring psychiatric conditions were caused by or exacerbated by transition or gender-affirming care.

*Dr. Laidlaiw's misrepresentations as to Brit Rothstein (BR)*

69.  Dr. Laidlaw states that BR is on "high dose testosterone," but notes show a dose of 100mg/month, a low dose as demonstrated by a testosterone level of 233 ng/dL, which is at the low end of the testosterone range for those assigned male at birth.

70.  Dr. Laidlaw misleadingly cites a review of psychiatric side effects of anabolic steroid abuse in cisgender men (Hall, et al., 2005) to make the claim  that testosterone use is dangerous to mental health. In Pope et al. 2000, which was one study cited in the Hall, 2005 paper, even 600mg/week of testosterone usually didn't cause psychiatric symptoms. This dose is over 20 times BR's dose of 100mg/month. (Pope, et al., 2000).

71.  When used at proper doses in transgender males, testosterone is safe and well-tolerated, usually without clinically significant mental health complications. A prospective study showed improved psychological functioning on multiple domains on initiation of testosterone in transgender males. (Keo-Meier, et al., 2015).

PLAINTIFFS002323

*Dr. Laidlaiw's misrepresentations as to Susan Doe (SD)*

72.    Dr. Laidlaw mistakenly suggests that the psychiatric history that SD has ADHD and experiences anxiety at times somehow disqualifies her from receiving gender-affirming care. Co-occurring mental health conditions are to be addressed but, in most cases, do not disqualify a patient from care. (Coleman, et al., 2022). I provide care for many transgender youth with co-occurring mental health conditions who benefit from gender-affirming care as well as treatment of ADHD, anxiety, and other mental health conditions.

*Dr. Laidlaiw's misrepresentations as to August Dekker (AD)*

73.    Dr. Laidlaw discusses at length the licensure status of Abbie Aldridge, LMHC, but also states that AD had a letter written by AD's psychiatrist, Troy Paulus, MD.  WPATH and most insurance only require one letter for chest surgery, yet AD had two.

74.    Dr. Laidlaw states: "Dr. Paulus follows the advice of advocacy group WPATH. '[AD] has met the WPATH SOC v7 criteria for double mastectomy surgery. This procedure has been deemed medically necessary by WPATH.'" The reason this statement is used in the letter is not because Dr. Paulus is following the advice of an advocacy group. Medical necessity of care must use "accepted standards of medicine." Insurance companies require the wording used by Dr.

32

CONFIDENTIAL

Paulus, because insurance companies use meeting WPATH Standards of Care criteria for the specific intervention as documentation of the generally accepted standards of medicine.

75.     Dr. Laidlaw states that AD is receiving "high-dose" testosterone, when AD is receiving testosterone cypionate 0.5mg/week.   Again, Dr. Laidlaw misleadingly cites a Hall, 2005 review of studies of cisgender body builders takes several times that dose, and having elevated rates of mood symptoms as a result. There is no evidence that trans men taking dosages of testosterone to achieve testosterone levels that are within the normal range for men are comparable to those who abuse very high dosages of steroids, and there no reason except to mislead to repeatedly use of this reference to wrongfully suggest that the much lower dosages of testosterone used by trans men are dangerous.

PLAINTIFFS002325

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of March 2023.

_____
Dan H. Karasic, M.D.

34

PLAINTIFFS002326

# Exhibit C

## *Supplemental Bibliography*

PLAINTIFFS002327

## SUPPLEMENTAL BIBLIOGRAPHY

American Psychiatric Association. (2013). Diagnostic and Statistical Manual of Mental Disorders (5th ed.). Arlington, VA: American Psychiatric Publishing.

Boston Children's Hospital. "Gender Multispecialty Service (GeMS)." Available at https://www.childrenshospital.org/programs/gender-multispecialty-service (last visited March 9, 2023).

Chen D, Berona J, Chan YM, Ehrensaft D, Garofalo R, Hidalgo MA, Rosenthal SM, Tishelman AC, Olson-Kennedy J. (2023). Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. *New England Journal of Med.* 2023 Jan 19;388(3):240-250.

Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., de Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A., Leibowitz, S. F., Meyer-Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., Nieder, T. O., … Arcelus, J. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International journal of transgender health*, *23*(Suppl 1), S1–S259.

Conron, K. J., Scott, G., Stowell, G. S., & Landers, S. J. (2012). Transgender health in Massachusetts: results from a household probability sample of adults. *American journal of public health*, *102*(1), 118–122.

de Vries, A. L. C., McGuire, J. K., Steensma, T. D., Wagenaar, E. C. F., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2014). Young Adult Psychological Outcome After Puberty Suppression and Gender Reassignment. *Pediatrics*, *134*(4), 696-704.

de Vries, A. L., Steensma, T. D., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *The journal of sexual medicine*, *8*(8), 2276–2283.

Dhejne, C. H. (2017).  Science AMA Series: I'm Cecilia Dhejne a fellow of the European Committee of Sexual Medicine, from the Karolinska University Hospital in Sweden. I'm here to talk about transgender health, suicide rates, and my often misinterpreted study. Ask me anything! *Winnower* 10:e150124.46274.

1

PLAINTIFFS002328

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. *PloS one*, *6*(2), e16885.

Edwards-Leeper, L., & Spack, N. P. (2012). Psychological evaluation and medical treatment of transgender youth in an interdisciplinary "Gender Management Service" (GeMS) in a major pediatric center. *Journal of homosexuality*, *59*(3), 321–336.

Ehrensaft D. (2017). Gender nonconforming youth: current perspectives. *Adolescent Health, Medicine and Therapeutics*, *8*, 57–67.

Garcia, M. M., Christopher, N. A., De Luca, F., Spilotros, M., & Ralph, D. J. (2014). Overall satisfaction, sexual function, and the durability of neophallus dimensions following staged female to male genital gender confirming surgery: the Institute of Urology, London U.K. experience. *Translational andrology and urology*, *3*(2), 156–162.

Hall, R. C., Hall, R. C., & Chapman, M. J. (2005). Psychiatric complications of anabolic steroid abuse. *Psychosomatics*, *46*(4), 285–290.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., Rosenthal, S. M., Safer, J. D., Tangpricha, V., & T'Sjoen, G. G. (2017). Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline. *The Journal of clinical endocrinology and metabolism*, *102*(11), 3869–3903.

Herman, J.L., Flores, A.R., O'Neill, K.K. (2022). How Many Adults and Youth Identify as Transgender in the United States? The Williams Institute, UCLA School of Law.

Jerome, R. R., Randhawa, M. K., Kowalczyk, J., Sinclair, A., & Monga, I. (2022). Sexual Satisfaction After Gender Affirmation Surgery in Transgender Individuals. *Cureus*, *14*(7), e27365.

Johns Hopkins All Children's Hospital. "Kevin Lewis, DNP." Available at https://www.hopkinsallchildrens.org/Find-A-Doctor/Practitioner-Details/Kevin--Ray--Lewis (last visited March 9, 2023).

PLAINTIFFS002329

Kaltiala, R, Heino, E., Työläjärvi, & Suomalainen, L. (2020). Adolescent development and psychosocial functioning after starting cross-sex hormones for gender dysphoria. *Nordic Journal of Psychiatry*, 74, 213–219.

Karasic, D. H., & Fraser, L. (2018). Multidisciplinary Care and the Standards of Care for Transgender and Gender Nonconforming Individuals. *Clinics in plastic surgery*, *45*(3), 295–299.

Keo-Meier, C. L., Herman, L. I., Reisner, S. L., Pardo, S. T., Sharp, C., & Babcock, J. C. (2015). Testosterone treatment and MMPI-2 improvement in transgender men: a prospective controlled study. *Journal of consulting and clinical psychology*, *83*(1), 143–156.

Kuper, L.E., Stewart, S., Preston, S., Lau, M., & Lopez, X. (2020). Body Dissatisfaction and Mental Health Outcomes of Youth on Gender-Affirming Hormone Therapy. *Pediatrics*. 145. e20193006.

Olson, K. R., Durwood, L., Horton, R., Gallagher, N. M., & Devor, A. (2022). Gender Identity 5 Years After Social Transition. *Pediatrics*, *150*(2), e2021056082.

Park, R. H., Liu, Y. T., Samuel, A., Gurganus, M., Gampper, T. J., Corbett, S. T., Shahane, A., & Stranix, J. T. (2022). Long-term Outcomes After Gender-Affirming Surgery: 40-Year Follow-up Study. *Annals of plastic surgery*, *89*(4), 431–436.

Pope, H. G., Jr, Kouri, E. M., & Hudson, J. I. (2000). Effects of supraphysiologic doses of testosterone on mood and aggression in normal men: a randomized controlled trial. *Archives of general psychiatry*, *57*(2), 133–156.

van der Loos, M. A. T. C., Hannema, S. E., Klink, D. T., den Heijer, M., & Wiepjes, C. M. (2022). Continuation of gender-affirming hormones in transgender people starting puberty suppression in adolescence: a cohort study in the Netherlands. *The Lancet. Child & adolescent health*, *6*(12), 869–875.

van der Miesen, A. I. R., Steensma, T. D., de Vries, A. L. C., Bos, H., & Popma, A. (2020). Psychological Functioning in Transgender Adolescents Before and After Gender-Affirmative Care Compared With Cisgender General Population Peers. *Journal of Adolescent Health*, 66(6), 699-704.

Yarbrough, E., Kidd, J., Parekh, R., American Psychiatric Association. (2017). "Gender Dysphoria Diagnosis" in <u>A Guide for Working With Transgender and Gender Nonconforming Patients</u>. Available at

3

https://www.psychiatry.org/psychiatrists/cultural-competency/transgender-and-gender-nonconforming-patients/gender-dysphoria-diagnosis.

PLAINTIFFS002331