**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division**

AUGUST DEKKER, et al.,

      *Plaintiffs*,

v.

JASON WEIDA, et al.,

      *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

## EXPERT REBUTTAL REPORT OF
## JOHANNA OLSON-KENNEDY, M.D., M.S.

I, Johanna Olson-Kennedy, M.D., M.S., hereby state as follows:

1.     I have been retained by counsel for Plaintiffs as an expert in connection with the above-captioned litigation.

2.     I am over the age of 18.

3.     I have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

4.     I previously submitted an expert witness report in this case ("Olson-Kennedy Report"). I submit this report to respond to points raised in the reports of Defendants' designated experts: Michael K. Laidlaw, M.D., Paul W. Hruz, M.D., and Michael Biggs, Ph.D., as well as those by Stephen B. Levine, M.D.,

1

Pl. Trial Ex. 012

PLAINTIFFS002332

Kristopher Kaliebe, M.D., Patrick Lappert, M.D., Joseph Zanga, M.D., Sophie Scott, Ph.D., and G. Kevin Donovan, M.D.

5.     My background, qualifications, and compensation for my services in this case, and the bases for my opinions in this case are described in my original report.

6.     In preparing this report, I was provided with and reviewed the reports from defendants' designated experts described above and the accompanying exhibits, as well as the expert reports of Dr. Armand Antommaria, Dr. Kellan Baker, Dr. Dan Karasic, Dr. Loren Schechter, and Dr. Daniel Shumer, submitted by plaintiffs.

7.     In preparing this rebuttal report, I have relied on my training and years of research and clinical experience, as set out in my curriculum vitae (attached as **Exhibit A** to my original report) and on the materials listed therein; the materials listed in the bibliography attached as **Exhibit B** to my original report; and the additional materials listed in the supplemental bibliography attached as **Exhibit C** to this rebuttal report.  The sources cited in each of these are the same types of materials that experts in my field of study regularly rely upon when forming opinions on the subject, which include authoritative, scientific peer-reviewed publications.

2

PLAINTIFFS002333

8.      I reserve the right to revise and supplement the opinions expressed in this report or the bases for them if any new information becomes available in the future, including as a result of new scientific research or publications or in response to statements and issues that may arise in my area of expertise.  I may also further supplement these opinions in response to information produced by Defendants in discovery and in response to additional information from Defendants' designated experts.

## EXPERT OPINIONS

9.      Defendants' designated experts show a lack of familiarity and understanding regarding the existing research about gender identity and gender dysphoria, as well as the clinical experience surrounding the treatment of gender dysphoria, particularly regarding transgender youth.

10.      This lack of familiarity and understanding makes sense. Dr. Laidlaw, Dr. Hruz, Dr. Kaliebe, Dr. Lappert, Dr. Donovan, and Dr. Scott have no experience working with transgender patients suffering from gender dysphoria or conducting original research regarding the safety and efficacy of gender-affirming care. Dr. Biggs has no experience whatsoever treating patients, as he is a sociologist, not a health care provider.  Finally, Dr. Levine has very limited

EXPERT REBUTTAL REPORT OF DR. JOHANNA OLSON-KENNEDY, M.D., M.S.
Case No. 4:22-cv-00325-RH-MAF

PLAINTIFFS002334

experience working with transgender youth and has not been a member of WPATH for decades.

11.     These doctors have critiqued and opposed the provision of gender-affirming care as treatment for gender dysphoria for years, and in the case of Dr. Levine, decades. Yet, in all of these years, they have not undertaken the research they call for to answer the questions they raise.  Rather, it seems their primary goal is opposing gender-affirming care for transgender people, instead of finding answers to questions and providing the best care for transgender people suffering from gender dysphoria.

12.     Below I outline more specific critiques regarding the reports of Dr. Laidlaw, Dr. Hruz, and Dr. Biggs.  Some of the specific critiques apply in equal measure to more than one expert report, however.

### *Dr. Laidlaw's Report*

13.     Dr. Laidlaw has no peer-reviewed original publications regarding transgender individuals, either adults or youth. While he is an adult endocrinologist, he does not have any cited experience in the clinical care of children, adolescents, or adults with gender dysphoria.

14.     One of Dr. Laidlaw's major critiques of gender-affirming care  is that "[t]here are no laboratory, imaging, or other objective tests to diagnose a true

4

PLAINTIFFS002335

transgender child," (Laidlaw Report, at ¶24), as if this was a reason to deny coverage and access to medically necessary gender-affirming medical care as treatment for gender dysphoria.  While it is true that there is no objective test to determine someone's gender identity yet, this does not mean there are no biological markers to prove someone has gender dysphoria.  It also ignores that the lack of such "objective tests" is not uncommon for other medical conditions. Take chronic fatigue syndrome, for example. The CDC says this about chronic fatigue syndrome: "Myalgic encephalomyelitis/chronic fatigue syndrome (ME/CFS) is a serious, long-term illness that affects many body systems ... Researchers have not yet found what causes ME/CFS, and there are no specific laboratory tests to diagnose ME/CFS directly. Therefore, doctors need to consider the diagnosis of ME/CFS based on in-depth evaluation of a person's symptoms and medical history." (CDC, 2021).

15.    In paragraph 26 of his report, Dr. Laidlaw further opines that "gender dysphoria is a purely psychological phenomenon and not an endocrine condition."  Dr. Laidlaw provides no support for his assertion that gender dysphoria is a purely psychological condition.  Indeed, there is no existing data to demonstrate that gender dysphoria is a psychological phenomenon. Human developmental trajectories that are not yet fully understood are often considered

5

psycho pathological, such as left handedness and homosexuality. Gender incongruence is such a developmental trajectory, likely related to the morphology and connectivity of the brain structures. Like many developmental trajectories, it is rare. Same sex attraction is also the non-dominant trajectory of romantic/sexual development and was similarly considered psychopathologic. Same sex attraction was viewed as such secondary to existing theories at the time that some posited, like Dr. Laidlaw does in his report, that "some internal defect or external pathogenic agent causes homosexuality and that such events can occur pre- or postnatally (i.e., intrauterine hormonal exposure, excessive mothering, inadequate or hostile fathering, sexual abuse, etc.)" (Drescher, 2015). But just as "homosexuality" was first pathologized and then depathologized within the DSM, ultimately being removed altogether, gender incongruence has been depathologized within the DSM, moving from "gender identity disorder" to "gender dysphoria." This change within the DSM-5 came about because "[t]he presence of *gender variance is not the pathology* but dysphoria is from the distress caused by the body and mind not aligning and/or societal marginalization of gender-variant people" (Yarbrough, et al., 2017).

16.    In paragraph 35 of his report, Dr. Laidlaw takes issue with my discussion of desistance studies by stating that I "confused prepubertal (a medical

PLAINTIFFS002337

term) with preadolescence (a psychological designation)" and emphasizing that the studies "include children in the age range of 8-12 years old many of whom were going through puberty based on their age."  But while the upper range of *some* of these studies might have included a few youth in Tanner stage 2 (i.e., children at the onset of puberty) or greater, the average age of the participants places them in a prepubertal age range and a review of the ages of the participants shows that most were in indeed pre-pubertal. What is more, consistently in these studies, the investigators specifically point out that older youth to which Dr. Laidlaw refers were more likely to continue experiencing gender incongruence. The question confronted in the GAPMS Memo and this case pertains to medical intervention, which is not even considered in pre-pubertal children. As Dr. Laidlaw himself asserts, Tanner stages are not reported in any of these early studies and it is therefore inappropriate for him to extrapolate data from studies looking at desistance rates of *primarily* pre-pubertal *gender diverse* children (not necessarily transgender children), as informing anything about the trajectory or likelihood of desistance among transgender adolescents who are peri-pubertal or pubertal. The studies simply cannot support that proposition.

17.    In paragraph 92 of his report, Dr. Laidlaw purports to opine about infertility as a result of the use of GnRH analogs.  However, it is well established

7

PLAINTIFFS002338

that GnRH analogs do not cause infertility. In a manuscript published in 2019 entitled "Use of Gonadotropin-Releasing Hormone Analogs in Children: Update by an International Consortium" the following statement regarding infertility and the use of GnRH analogs is asserted: "There is no substantiated evidence that GnRHa treatment for CPP impairs reproductive function or reduces fertility. In most girls, gonadal function is restored promptly after cessation of therapy, with subsequent menarche and regular ovulatory menstrual cycles" (Bangalore, et al., 2019). It is true that individuals who do not go through endogenous puberty as a result of using GNRH analogs directly followed by GAH will likely experience impacts on future fertility. It is for this reason that the SOC cautions clinicians to counsel patients and families about fertility when they use these medications so that they can make informed choices about future fertility and reproduction, which may include creating a window between GnRHa use and GAH in order to collect and preserve gametes. Indeed, there have been transgender patients who have discontinued GNRH analogs or GnRHa/GAH in order to progress through puberty and undergo fertility preservation. These individuals resumed menstruation and/or underwent fertility induction for harvesting of mature eggs. (Martin, et al., 2021; Rothenberg, et al., 2019).

EXPERT REBUTTAL REPORT OF DR. JOHANNA OLSON-KENNEDY, M.D., M.S.
Case No. 4:22-cv-00325-RH-MAF

PLAINTIFFS002339

18.     Similarly, in paragraph 94 of his report, Dr. Laidlaw opines about sterility, particularly with regards to the minor plaintiffs (whom he appears to have neither met nor examined).  However, Dr. Laidlaw disregards the despair that many transgender youth have about experiencing or anticipating going through endogenous puberty.  It is a common perspective from those who do not work with youth experiencing gender dysphoria. The question posited to such youth is not "what do you think about not having biological children in your future" but rather "do you want to undergo the changes of puberty that are not aligned with your gender."  The advantage of GnRH analogs is that they act as a bridge, so that cognition can develop but spare the development of misaligned secondary sex characteristics that will result in a patient being perceived as the wrong gender.

19.     In paragraph 97, Dr. Laidlaw goes on to assert that "[t]here is the additional possibility that cytotoxic effects of high dose opposite sex hormones will damage the immature gonads leading to permanent sterility."  However, Dr. Laidlaw provides no support for this assertion.  In fact, as someone familiar with this care would know, viable follicles and sperm have been obtained from individuals who discontinue GnRH analogs and/or GAH for the purpose of fertility preservation.

EXPERT REBUTTAL REPORT OF DR. JOHANNA OLSON-KENNEDY, M.D., M.S.
Case No. 4:22-cv-00325-RH-MAF

PLAINTIFFS002340

20.    In paragraphs 98 and 99 of his report, Dr. Laidlaw opines about sexual dysfunction as a result of the use of GnRH analogs.  There is no evidence, however, to suggest that sexual dysfunction will occur.  To the contrary, there is both existing evidence and clinical evidence that orgasm does occur both in prepubertal youth, as well as transgender youth who have utilized GnRH analogs to treat gender dysphoria. (Finkelstein, et al., 1996; Leung and Robson, 1993; Fleischer and Morrison, 1990).[1] Leaning on one reality TV show to make a broad assertion about all transgender youth is what people do when they do not have clinical experience or research to substantiate their perspective.

21.    In paragraphs 101 through 106 of his report, Dr. Laidlaw discusses the use of DEXA scans to evaluate changes in bone density.  What Dr. Laidlaw does not explain is that DEXA scans compare bone density of **individuals of the same age**. It is expected that the bone density of someone who had their puberty delayed would demonstrate a lower bone density than their peers who had not had puberty delayed.  However, as explained in paragraph 105 of my original report, following cessation of therapy with puberty-delaying medications, bone

---

[1] While these articles don't specifically state that the children had orgasms, the movements and physical responses described in them indicate as such.

10

PLAINTIFFS002341

mineral accrual appears to be within the normal range compared with population norms.  Dr. Laidlaw fails to disclose or respond to such studies.

22.    In paragraph 109, Dr. Laidlaw then states that "Amenorrhea is detrimental to bone health."  But, while taking GnRH analogs, the body is not producing sex steroids.  If someone discontinues GnRH analogs, their body will resume endogenous puberty (after some delay).  If that individual has ovaries, they will begin to secrete estrogen, which stimulates and supports bone density. If that individual adds testosterone to their hormone regimen to undergo masculinization, the testosterone will support accrual and maintenance of bone density.  Dr. Laidlaw is conflating amenorrheic women, who have little or no sex steroids, to transmasculine individuals, who are taking testosterone that supports bone density.

23.    In paragraph 110, Dr. Laidlaw opines about "unknown, but likely negative consequences to blocking normal puberty with respect to brain development."  Dr. Laidlaw's assertion has at least two foundational problems. First, what is known about is the negative impact of untreated gender dysphoria on cognition, which Dr. Laidlaw ignores, and which at best can be persistently distressing and at worst, life threatening.  Second, Dr. Laidlaw ignores that suppression in transgender youth does not delay puberty beyond the typical

11

PLAINTIFFS002342

range.  As explained in my original report, pubertal development has a very wide variation among individuals.  Puberty in individuals assigned male at birth typically begins anywhere from age nine to age fourteen, and sometimes does not complete until a person's early twenties. For those individuals assigned female at birth, typically ranges from age eight to age seventeen (Wyshak and Frisch, 1982).  Protocols used for transgender youth would tend to put them in the latter third of typical puberty but nothing outside of the typical range (Hembree, et al., 2017).  As such there is no reason to assume, and no data to support, Dr. Laidlaw's assumption that slightly delaying puberty will have negative short- or long-term consequences.

24.    In paragraph 111 of his report, Dr. Laidlaw again misrepresents the desistance literature to state that "a very high proportion of minors diagnosed with gender dysphoria will eventually desist or come to accept their physical sex."  This is an inaccurate statement.  Dr. Laidlaw is lumping together pre-pubertal children and adolescents.  In the same paragraph, Dr. Laidlaw further argues that "Puberty blockers have been shown to dramatically alter natural desistance."  However, this is an assumed causality with no support in the literature.  Youth who are more gender dysphoric in childhood are more likely to persist with gender incongruence. They are also more likely to seek out a

12

PLAINTIFFS002343

mechanism to avoid the development of secondary sex characteristics that are not aligned with their gender.  It is thus unsurprising that the youth whose gender dysphoria persisted until the onset of puberty and who presented for medical care were indeed the youth who are transgender.  As stated in my original report, studies show that if gender dysphoria is present in adolescence, it usually persists. *See* Olson-Kennedy Report, at ¶¶52-57.

25.     Dr. Laidlaw's claim that "puberty blockers, rather than being a 'pause' to consider aspects of mental health, are instead a pathway towards future sterilizing surgeries" (Laidlaw Report, at ¶ 112) is a wholly unsubstantiated claim.  Again, youth with significant gender dysphoria pursue blockers because of that distress, they do not experience continued incongruence because of the intervention.  Dr. Laidlaw's argument is akin to saying something like "youth who are treated with combined oral contraceptive pills for endometriosis in adolescence are more likely to undergo laparoscopic treatment for endometriosis because of the earlier OCP treatment." Youth who are prescribed GnRH analogs for gender incongruence have gender incongruence, and if it continues, they are likely to go on gender-affirming hormone therapy ("GAH").  Dr. Laidlaw and others who assert that GnRH analogs are a gateway drug to GAH and surgery

13

PLAINTIFFS002344

make an unsubstantiated and false claim that gender incongruence dissipates in the majority of those who initiate care in adolescence.

26.     In paragraph 113 of his report, Dr. Laidlaw states that "[t]he third stage of gender affirmative therapy involves using hormones of the opposite sex (also called cross sex hormones) at high doses to attempt to create secondary sex characteristics in the person's body."  The staging suggested by Dr. Laidlaw assumes a linear progression through various available interventions. This perspective is indicative of someone unfamiliar with the care, which is individualized.  Some youth who go on blockers do not continue GAH.  Many youth who utilize GAH do not pursue surgery.  Some youth stop GAH after they achieve their embodiment goals.  Additionally, high doses of hormones are not utilized.  Treatment for gender dysphoria involves getting someone's hormones to the same level as their cisgender counterparts of the same gender.

27.     In paragraph 115, Dr. Laidlaw opines that "[t]he use of high dose testosterone in females is experimental."  The implication here is that testosterone use in transgender males is new. The use of testosterone in transmasculine individuals has been happening for close to 100 years.  Also, as discussed above, the treatment doses are not "high dose."

14

PLAINTIFFS002345

28.    In paragraph 116, Dr. Laidlaw states that "[t]here have been reports of misuse by men taking higher doses of legally obtained testosterone than prescribed and continuing testosterone despite adverse events or against medical advice."  Dr. Laidlaw cites to no evidence for this statement, and I am not aware of a single case report of a transgender man abusing testosterone. This is a phenomenon widely understood among cisgender men using higher doses of testosterone for sports and aesthetic enhancement.  To equate these two things is improper, and is characteristic of someone who does not take care of transgender people.  In any event, even Dr. Laidlaw's assertion notes that this occurs "against medical advice" so it is difficult to see how this unfounded assertion supports the denial of coverage of medical treatment prescribed and provided by medical professionals.

29.    In paragraph 118 of his report, Dr. Laidlaw opines "that testosterone applied to the adolescent will cause premature closure of the growth plates, stopping further gains in height in the growing individual, and ultimately making the person shorter than they otherwise would have been."  Professionals using GAH in youth with gender dysphoria understand the mechanism of epiphyseal plate fusion. Testosterone dosing is ramped up in a manner equivalent to that of

15

PLAINTIFFS002346

testosterone administration in youth with hypogonadal hypogonadism in order to mimic a cisgender male pubertal process.

30.      Dr. Laidlaw goes on to opine in paragraph 119 of his report that "[l]ong-term clinical safety trials have not been conducted to assess the cardiovascular outcomes of testosterone replacement therapy in men." This is untrue, as there have been studies examining the metabolic effect of testosterone in transgender men, including a review by Aranda et al. in 2021 titled "Cardiovascular Risk Associated With Gender Affirming Hormone Therapy in Transgender Population." This review and other studies have demonstrated that transgender men using testosterone have a similar risk of myocardial infarction to that of cisgender males, and higher than cisgender females.

31.      In paragraph 120 of his report, Dr. Laidlaw cites a drug label insert for the proposition that "[t]here have been postmarketing reports of venous thromboembolic events [blood clots], including deep vein thrombosis (DVT) [blood clot of the extremity such as the lef] and pulmonary embolism (PE) [blood clot of the lung which may be deadly], in patients using testosterone products, such as testosterone cypionate." However, in a meta-analysis of studies examining the relationship between testosterone and venous thromboembolism (VTE), the authors concluded: "Results: Six RCTs ($n = 2236$) and 5 observational

16

PLAINTIFFS002347

studies (n = 1,249,640) were included. Five RCTs were performed in men with documented hypogonadism. The observational studies included: 2 case-control studies, 2 retrospective cohorts, and 1 retrospective cohort with a nested case-control study. There was no evidence of a statistically significant association between VTE and testosterone (OR 1.41, 95%CI 0.96-2.07). Heterogeneity was high (I-squared = 84.4%). The association remained nonsignificant when the analysis was stratified by study design: RCTs (2.05, 95% CI 0.78-5.39); cohort (1.06, 95% CI 0.85-1.33); and case-control (1.34, 95% CI 0.78-2.28). The overall risk of bias was moderate." (Houghton, et al., 2018).

32.    In paragraph 122, Dr. Laidlaw states that "Prolonged use of high doses of androgens ... has been associated with development of hepatic adenomas [benign tumors], hepatocellular carcinoma [cancer], and peliosis hepatis [generation of blood-filled cavities in the liver that may rupture] —all potentially life-threatening complications."  However, the types of liver damage discussed by Dr. Laidlaw have not been reported in transgender men taking testosterone in the literature, nor in clinical professional spaces. Again, the levels of serum testosterone in transmasculine individuals mimics that of cisgender men.

33.    In paragraph 138, Dr. Laidlaw appeals to common sense for the proposition "that changes of voice and hair growth could be psychologically

17

PLAINTIFFS002348

troubling should a patient decide to detranstition and attempt to reintegrate into society as female." However, Dr. Laidlaw ignores that someone who identifies as male would desire a lower voice and male pattern facial and body hair. The proportion of people who "detransition," which is very rare, is degrees of multitude lower than those who do not. There is no space in medicine where we prioritize a false positive by discontinuing care for all of the true positives.

34.     Dr. Laidlaw states in paragraph 139 of his report that "[p]otential cancer risks from high dose testosterone include ovarian and breast cancer." However, there is no data substantiating increased ovarian or breast cancer in transgender men taking testosterone and, again, the levels of serum testosterone in transmasculine individuals mimics that of cisgender men.

35.     In paragraph 140 of his report, Dr. Laidlaw cites a paper by Hall et al. in 2005 to argue that 23% of subjects with "medium steroid use (between 300 and 1000 mg/week of any AAS) and high use (more than 1000 mg/week of any AAS)" "met the DSM-III-R criteria for a major mood syndrome (mania, hypomania, and major depression) and that 3.4% — 12% developed psychotic symptoms." However, dosage of 300 to 1000 mg/week is markedly higher than the doses prescribed for transgender men and transmasculine adolescents. The

18

PLAINTIFFS002349

dosing for the purposes of masculinization are usually between 20 and 100 mg/week. Thus, the Hall paper is irrelevant to the risk to this population.

36.     In paragraph 149 of his report, Dr. Laidlaw asserts that "[t]he use of estrogen to treat pediatric age males is experimental." The implication here is that the use of estrogen in young transgender females is new and untested. Not only has this care been shown to be safe and effective in numerous studies, but Harry Benjamin's first patient in 1948 was a 14 y/o transgender girl, for whom he prescribed estrogen. Additionally, female adolescent transgender patients have been treated with estrogen for decades in this country and abroad.

37.     In paragraph 154 of his report, Dr. Laidlaw seems to imply that the growth of breast tissue in transgender females is akin to gynecomastia, but breast development is a positive side effect of estrogen and indeed a desired effect for transgender women. It is not gynecomastia as Dr. Laidlaw suggests. Likewise in paragraph 155 of his report, Dr. Laidlaw states that other changes "such as softening of the skin and changes in fat deposition and muscle development" may occur as a result of feminizing GAH, but again those are also desirable effects of estrogen in transgender women.

38.     In paragraph 156 of his report, Dr. Laidlaw states "[t]here is strong evidence that estrogen therapy for trans women increases their risk for venous

19

PLAINTIFFS002350

thromboembolism over 5 fold."  But Dr. Laidlaw reveals his lack of familiarity

with gender-affirming medical care by failing to explain that this risk is related

to the use of ethinyl estradiol, a synthetic estrogen, and that when this risk was

identified, practice changed to utilize only bioidentical estrogen (17 β estradiol),

reducing the risk.

39.     In paragraph 157 of his report, Dr. Laidlaw speaks of the risk of

breast cancer in transgender women after GAH, but as stated previously, it is not

surprising that establishing a hormone milieu similar to that of a cisgender female

would also increase risk related to that of a cisgender male.  Moreover, in the

study Dr. Laidlaw references, the risk was actually lower in transgender women

than cisgender women. Moreover, the risk factor profile associated with hormone

use is discussed during the consent process.

40.     In paragraphs 180 and 181 of his report Dr. Laidlaw discusses his

concerns about informed consent in this context.  However, Dr. Laidlaw ignores

that there is a relatively large body of evidence indicating that adolescents do

have the capacity to make informed decisions in the context of medical care and

provide assent, particularly at age 14 and above.  Moreover, part of providing

consent is knowledge of existing studies, and knowledge of what is not

understood or poorly understood. This is discussed with patients and their

20

PLAINTIFFS002351

parents/guardians.  Moreover, parents/guardians routinely consent to treatments

in other areas of medicine that result in irreversible changes (including infertility)

for their minor children, including chemotherapy and other cancer-related

treatments like surgery and radiation.

41.     In paragraph 191 of his report, Dr. Laidlaw argues that retrospective

review of all of the Endocrine Society's guidelines by ECRI *implies* that the

Endocrine Society Guidelines relating to gender dysphoria that "not all

recommendations were 'based on verifiable systematic evidence review with

explicit descriptions of search strategy, study selection, and evidence

summaries.'"  Dr. Laidlaw does not specify which recommendations within the

Endocrine Society Guidelines do not meet this standard but also that the

Endocrine Society has authored 29 clinical practice guidelines, including

guidelines for cardiovascular endocrinology, Diabetes Mellitus and Glucose

metabolism, Endocrine cancer and neoplasia, Female Reproductive

Endocrinology, Male Reproductive Endocrinology, Neuroendocrinology

Conditions, Obesity Management, and Pediatric Endocrinology with

subcategories for each of these.  Given that only the guidelines relating to

osteoporosis met the standard Dr. Laidlaw articulates, one must wonder whether

each of these 27 other guidelines (some of which Dr. Laidlaw and Dr. Hruz, as

21

endocrinologists, presumably rely on) would also be considered unreliable by Dr. Laidlaw.

42.     In paragraph 191 of his report, Dr. Laidlaw takes issue with the overlap in authorship between the WPATH SOC and the Endocrine Society Guidelines.  But expertise within a field does not represent a conflict of interest. This is akin to suggesting that a co-author of guidelines published by the American Heart Association should not be able to co-author any recommendations from the American College of Cardiology. The people that are co-authors of the WPATH SOC and the Endocrine Society Guidelines are tasked with this responsibility by the organizations because they have expertise and experience in the field of transgender health care, unlike Defendants' designated experts.

43.     In paragraph 200 of his report, Dr. Laidlaw takes issue with my example of the off-label use of antibiotics or anti-histamines being indicative of the routineness with which medications are used off-label, particularly for the pediatric population.   Specifically, Dr. Laidlaw states that "[t]he health consequences are categorically different and the lifelong potential for permanent injury are extremely high in GAT."  Of course, those are not the only examples. Vincristine and procarbazine, medications commonly used off-label for cancer

PLAINTIFFS002353

treatment, are two other examples.  These medications are not FDA-approved for use in breast cancer but are commonly used off-label for this purpose.  Both medications have the potential to cause the development of other cancers, which could be life-altering, but this does not make their off-label use experimental or unsafe.

44.    In paragraph 202 of his report, Dr. Laidlaw misrepresents and misuses the data from Djhene et al.'s study. The study found that suicide rates are higher among transgender people than the population as a whole. In her study, Dhejne did not compare treated vs. untreated transgender women. These data speak to the comparison of transgender people compared to the general population.  The study itself warns against drawing any conclusions regarding the effectiveness of surgery as a treatment for gender dysphoria.  To be clear, Dhejne's study states: "For the purpose of evaluating whether sex reassignment is an effective treatment for gender dysphoria, it is reasonable to compare reported gender dysphoria pre and post treatment. Such studies have been conducted either prospectively or retrospectively, and suggest that sex reassignment of transsexual persons improves quality of life and gender dysphoria."

EXPERT REBUTTAL REPORT OF DR. JOHANNA OLSON-KENNEDY, M.D., M.S.
Case No. 4:22-cv-00325-RH-MAF

PLAINTIFFS002354

45.     Dr. Laidlaw criticizes my study pertaining to chest surgery in transgender adolescents as "flawed and unethical."  Laidlaw Report, at ¶ 214. It was neither. While it is true that at the time of the study the Chest Dysphoria Scale was not yet formally validated, the individual elements of the scale are taken directly from ten years of experience caring for transmasculine young people seeking chest surgery. Additionally, the scale has now been demonstrated to correlate with depression and anxiety.

46.     In a different study utilizing the scale we developed, entitled "Association of Chest Dysphoria with Anxiety and Depression in Transmasculine and Non-binary Adolescents Seeking Gender Affirming Care," the authors wrote: "One hundred fifty-six patients met inclusion criteria. Mean age was 15.3 years (standard deviation [SD] = 1.7). Most patients identified as transmasculine (n = 132); 18 identified as nonbinary and 6 as questioning. Mean (SD) YI-4 symptom severity scores were 10.67 (6.64) for anxiety and 11.99 (7.83) for depression. Mean (SD) Chest Dysphoria Measure composite score was 30.15 (9.95); range 2-49."  (Sood, et al., 2021). The study concluded that "Chest dysphoria was positively correlated with anxiety (r = .146; p = .002) and depression (r = .207; p < .001). In multivariate linear regression models, chest dysphoria showed a significant, positive association with anxiety and depression,

24

PLAINTIFFS002355

after accounting for gender dysphoria, degree of appearance congruence, and social transition status." *Id.*

47.     In addition, within this same cohort, Ascha et al. demonstrated similar findings in their study entitled "Top Surgery and Chest Dysphoria Among Transmasculine and Non-Binary Adolescents and Young Adults." This study demonstrated an improvement in chest dysphoria, transgender congruence and body esteem after surgery.  (Ascha, et al., 2022).

48.     Finally, there is no need for validation of the question "Do you regret having chest surgery?"   In my study, only one participant responded "sometimes."

49.     In paragraph 215 of his report, Dr. Laidlaw criticizes a study by Mehringer et al. in 2021.  But the Mehringer et al. study was a qualitative study asking respondents specifically about chest distress.  Attributing chest dysphoria to a side effect of testosterone is outlandish, particularly given that the adverse responses Dr. Laidlaw is referring to are related to "high doses" of testosterone, which as discussed before is not what is used in GAH care.

50.     In paragraph 219 of his report, Dr. Laidlaw makes the unfounded accusation that both my study and the Mehringer study "appear[] to have been designed, at least in part, to justify insurance companies paying for mastectomy

25

procedure for minors with GD, even though they have provided no long-term statistical evidence of benefit." This is false. Our study was undertaken to better understand the impact of chest surgery in transgender adolescents, as well as to document regret (if any). Additionally, we undertook the study to determine if the impact was different depending on the age of the individual undergoing surgery (it was not). Finally, we wanted to determine if time on testosterone was a useful benchmark and requirement for chest surgery. Clinically we understood that chest distress actually increases with time on testosterone, so it was important to test and see if this actually was the case (it was). There is no existing data that even suggests that chest masculinizing surgery is problematic for people. To suggest that this procedure is dubious is flatly unsubstantiated.

51.    In paragraph 221 of his report, Dr. Laidlaw opines that "evidence of benefit is lacking and the risks and harms due to GAT are very high." To be sure, Dr. Laidlaw may believe that the body of evidence demonstrating the benefit of gender affirming treatment is inadequate, but that does not make it true and only represents his personal opinion. As discussed in my original report, there are many studies demonstrating the safety and efficacy of gender affirming hormones, as well as GnRH analogs, to treat gender dysphoria. *See* Olson-Kennedy Report, at ¶¶24-41.  The same is true with regards to surgery.  *See*

PLAINTIFFS002357

Olson-Kennedy Report, at ¶¶42-46.   By contrast, it is clear that there is no evidence that such interventions are harmful, and Dr. Laidlaw cites to none.

52.     In paragraph 223 of his report, Dr. Laidlaw alludes to and references to the case of *Bell v. Tavistock* in the United Kingdom.   I do not disagree that gender-affirming care, like all of medicine, should be done with great care.   What the final decision in *Bell v. Tavistock* made clear, however, is that the decision making in this context should lie with the patient, family and prescribing doctor.

### *Dr. Hruz's Report*

53.     Similar, to Dr. Laidlaw, Dr. Hruz has no peer-reviewed publications regarding transgender individuals, either adults or youth. While he appears to have experience in the care of intersex patients, he does not have any cited experience in the clinical care of children, adolescents or adults with gender dysphoria.

54.     In paragraph 19 of his report, Dr. Hruz speaks of "gender" as "a term that had traditionally been reserved for grammatical purposes" and that it "exist[s] only in reference to subjective personal perceptions and feelings and societal expectations, not biology."   But as early as 1910, Magnus Hirschfeld described gender as the sexual organs, the other physical characteristics, sex drive, and emotional characteristics. "Gender" is thus a concept that incorporates

PLAINTIFFS002358

chromosomes, sexual organs and respective gametes (sex) as well as identity such as male or female. More importantly, the arguments made by Dr. Hruz about language do not negate the necessity for medication intervention as treatment for gender dysphoria.

55.     In paragraph 20 of his report, Dr. Hruz states that "[t]he term 'gender identity' is controversial" and that "[t]here is no current worldwide definition of 'gender identity' accepted by the relevant clinical communities." This is false. It is remarkable that Dr. Hruz consistently positions the advancement of our understanding about gender and gender dysphoria as controversial, untested and unethical when he has little to no experience clinically with treating transgender youth or even communicating with transgender youth. The term gender identity was originally coined in 1964 by American psychiatrist Robert J. Stoller, a noted psychoanalyst who studied sexual orientation, gender identity, and differences in sexual development. Gender identity is defined as a personal conception of oneself as male or female (or rarely, both or neither). The concept of gender identity is contemporaneously understood both colloquially and within the domain of science and medicine to denote someone's gender. It is a concept well-understood and accepted in medicine and science. Indeed, gender identity

EXPERT REBUTTAL REPORT OF DR. JOHANNA OLSON-KENNEDY, M.D., M.S.
Case No. 4:22-cv-00325-RH-MAF

PLAINTIFFS002359

information is commonly collected and reported on within the context of scientific research (Clayton, et al., 2016).

56.     In paragraphs 57 and 58 of his report, Dr. Hruz inaccurately suggests that diagnosis of gender dysphoria is done solely through a patient's self-report. His critique demonstrates a fundamental misunderstanding of how gender affirming care is provided. While we have continued to attain a greater understanding about the etiology of gender incongruence, patients do not "self-diagnose." However, it is not unusual or extraordinary in medicine for a provider to consider patients' reports of their symptoms as part of the medical assessment. Much like the diagnosis of many clinical conditions, providers rely on self-report to ascertain accurate diagnoses. Again, consider the diagnosis of chronic fatigue. The diagnostic criteria for this diagnosis include the following: fatigue so severe that it interferes with the ability to engage in pre-illness activities; of new or definite onset (not lifelong); not substantially alleviated by rest; worsened by physical, mental or emotional exertion. Like gender dysphoria, these diagnostic criteria are a subjective telling of an individual's personal experience. It is incumbent upon providers of gender affirming care to acquire skills that help them ascertain many details about their patient's gender experience including but

29

PLAINTIFFS002360

not limited to the history, developmental trajectory and expectations regarding treatment options.

57.    Moreover, the provision of gender-affirming care for adolescents primarily occurs in multi-disciplinary settings, and indeed, the Standards of Care recommend such an approach (Chen, et al., 2016; Coleman, et al., 2022). The multiple health providers involved, from various fields, are well trained to conduct clinical interviews and to assess a patient's report to determine whether they meet the diagnostic criteria for gender dysphoria.

58.    In paragraph 60 of his report, Dr. Hruz discusses so-called "reparative therapy" as a modality of treatment.  However, as discussed in my original report, "reparative therapy is both ineffective and harmful for transgender and gender diverse youth." *See* Olson-Kennedy Report, at ¶¶ 14-15. Indeed, there are no studies that I know of in which reparative therapy has successfully changed someone's gender identity in adolescence. To posit this mechanism as a successful mechanism to manage gender dysphoria is unsubstantiated and shows a clear lack of understanding of the literature and clinical experience in this field.

59.    In paragraphs 61 to 64 of his report, Dr. Hruz discusses and misrepresents the "watchful waiting" model of treatment.  I describe this model

PLAINTIFFS002361

of treatment in paragraph 17 of my original report.  However, it is important to note that even under the "watchful waiting" model, gender-affirming medical care is recommended and appropriate for adolescents with gender dysphoria. That is so because studies show that if gender dysphoria is present in adolescence, it usually persists (de Vries, et al., 2011).

60.    In paragraph 63 of his report, Dr. Hruz makes the unfounded assertion that "very few gender dysphoric children still want to transition by the time they reach adulthood."  Dr. Hruz not only seems to misapprehend the literature pertaining to desistance but he fails to distinguish between gender diverse children and transgender children, adolescents, and adults.  I discuss the desistance literature and the misrepresentations and misunderstanding of it more fully in paragraphs 52-57 of my original report.  However, it is worth adding that the studies upon which Dr. Hruz relies are of predominately *pre-pubertal* youth, based on ages of the children studied. While it is possible that some of the children were in early puberty, none of these studies report Tanner staging. Additionally, in a personal communication to me, one of the authors of the Wallien study reported that some of those youth categorized as desisters returned to the center for care related to phenotypic transition after the study had concluded. Finally, in the Wallien study specifically, all of the participants who

31

PLAINTIFFS002362

were not available were categorized as desisters. This data was deconstructed in the manuscript: A critical commentary on follow-up studies and "desistance" theories about transgender and gender-nonconforming children (Temple, et al., 2018).

61. Dr. Hruz's suggestion in paragraph 64 that psychological treatment alone is effective in treating gender dysphoria is not true. Moreover, the studies he cites for this proposition employed modalities of treatment that have been widely critiqued as unethical. For example, Dr. Zucker (in Canada) would instruct the parents of gender non-conforming children to ignore or even punish their children for exhibiting or showing interest in games, toys or clothing outside of gender stereotypical behaviors.

62. In paragraph 65 of his report, Dr. Hruz misrepresents the "gender affirming" care model by stating that it "encourages children to embrace transgender identity with social transitioning followed by puberty blockage and hormonal therapy (cross-sex hormones), and potential surgical interventions." As explained in my original report, the gender affirmative model is defined as a method of therapeutic care that includes allowing children to express their gender identity without fear of shame or coercion to change it, and providing support for them to evolve into their authentic gender selves regardless of age. Support is not

32

PLAINTIFFS002363

characterized by "encouraging" children or youth to be transgender or not. In any event, there is little relevance to Dr. Hruz's statement as no prepubertal children are provided with medical care, and the Challenged Exclusion and this case concern Medicaid coverage of gender-affirming medical care, which is not provided to any patient until *after* the onset of puberty.

63.     Dr. Hruz goes on to argue in the following paragraph that "underlying biology is not changed by altering bodily features to appear as the opposite sex." Hruz Report, at ¶ 66. This perspective assumes that individuals undergoing phenotypic gender transition do not know this, and that the singular goal of all humans is reproduction. Transgender individuals, including adolescents, understand they will not be able to produce gametes in alignment with their gender. While this may be challenging for some individuals, most people will choose to be perceived and walk in the world as themselves over gamete production associated with their own genetic material.

64.     In paragraph 69, Dr. Hruz states that gender dysphoria is "unique" because it would be "the only psychiatric condition to be treated by surgery." To be clear, not every transgender individual needs or requires gender-affirming surgery, and surgery is very rare for transgender adolescents, usually limited to chest surgery for older transgender adolescent males. Moreover, Dr. Hruz

PLAINTIFFS002364

appears to be operating under the assumption that gender dysphoria is a purely psychiatric illness. But gender incongruence is a developmental trajectory, likely related to the morphology and connectivity of the brain structures. Like many developmental trajectories, it is rare. So while the distress that results from such incongruence is part of the diagnostic criteria, and suffering is a psychological state, the condition is not purely psychological, as Dr. Hruz assumes. That said, Dr. Hruz ignores that there are indeed some surgeries that are performed to address psychological disorders, such as anterior cingulotomy, subcaudate tractotomy, limbic leucotomy, and anterior capsulotomy. And if surgeries are able to bring someone's physical body into better alignment with their gender and alleviate some of their distress so that their functioning improves (which decades of research and clinical experience shows that gender affirming surgery does), it is irrelevant if it is the first time or not that surgery is being utilized to address a psychiatric condition, as Dr. Hruz assumes gender dysphoria to be.

65. In paragraph 71 of his report, while discussing puberty-delaying medications, Dr. Hruz seems to argue that providing puberty-delaying medications interferes with an adolescent's ability to develop "a gender identity corresponding to his or her biological sex." Ignoring for purposes of this paragraph the assumptions built into the use of the term "biological sex" here,

34

PLAINTIFFS002365

Dr. Hruz seems to exhibit a willful ignorance of the devastation that may be caused to transgender adolescents by undergoing an unaligned puberty.

66.     The concept of passing within the transgender community refers to the ability to walk in the world and be perceived as their gender, just as it would be for a cisgender person (those who's sex designated at birth is aligned with their gender). While passing is critiqued within the community, it remains a common goal of many transgender individuals who are undergoing medical interventions. In an article entitled "Your Picture Looks the Same as My Picture": An Examination of Passing in Transgender Communities" written by Alecia Anderson et al., the authors posit that passing for transgender individuals serves two primary purposes. The first is to escape violence and discrimination based on transphobia. The second is for affirmation of gender. While not all transgender individuals identify passing as important; for some, passing can be lifesaving. Transgender people are identifiable as transgender when they look, dress and behave outside of our rigid societal expectations about how men and women should do these things.

67.     Physiologic changes that result from puberty for those designated male at birth include deepening of the voice, development of male pattern facial and body hair, laryngeal prominence (Adam's apple), larger hands and feet and

35

others. While gender affirming hormones can promote breast development, soften skin, redistribute body fat and slow down body and facial hair growth, they have no impact on voice, laryngeal prominence, stature, size of hands and feet or skeleton. For those designated female at birth, shorter stature, higher voice pitch, menstruation, predominance of hip and thigh development and breast development all provide clues for someone to be perceived as female. While hormones may lower the voice and stop menstruation, there are some body features that simply cannot be altered. The use of puberty-delaying medications in early puberty followed by gender affirming hormones not only helps eliminate much of the incongruence that leads to the distress that characterizes gender dysphoria, but it also radically increases the possibility of "passing" because the development of secondary sex characteristics is avoided.   The introduction of puberty-delaying medications is perhaps the most significant event in the landscape of transgender medicine since the synthesizing of exogenous hormones. This intervention spares transgender individuals from the changes of endogenous puberty that lead to significant downstream issues.

68.    Dr. Hruz's assumption that "normal pubertal development will influence the gender identity of the child by reducing the prospects for developing a gender identity corresponding to his or her biological sex" has no basis in fact.

PLAINTIFFS002367

Indeed, he cites to no authority for it.  But for the sake of argument, if such assumption were true, there would be no individuals who ever transition after puberty, which is actually when the majority of transgender individuals transition. Everyone who has, in adulthood, sought or required medical treatment to bring about physical changes that would bring their body into more alignment with their gender experienced their "natural" puberty, and yet, their gender identity was not aligned with their sex assigned at birth.

69.     With regards to paragraph 75 of Dr. Hruz's report, youth experiencing gender dysphoria related to going through an unaligned puberty have many challenges, including emergence or worsening of anxiety, depression, social isolation and suicidality. These symptoms impact cognitive development and should not be dismissed for a theoretical possibility. Puberty-delaying medications can alleviate the distress related to the development of permanent secondary sex characteristics that will eventually result in someone being perceived as the incorrect gender, and in the worst cases, victimized by violence and sometimes homicide.

70.     In paragraph 77 of his report, Dr. Hruz asks, "what psychological consequences there might be for children with gender dysphoria whose puberty has been suppressed and who later come to identify as their biological sex." I do

PLAINTIFFS002368

not disagree that investigating all outcomes is paramount.  However, the fact that a very small percentage of youth who experience gender dysphoria in adolescence later identify with their birth assigned sex (indeed, it is a very small percentage of an already very small minority), it does not follow that the rest should be denied care that has been shown to be safe and effective to treat to gender dysphoria.

71.    Dr. Hruz says that scientific studies in support of treatments for gender dysphoria are of low quality. The care of transgender individuals has a long history, and cannot be equated to the sorts of things that Dr. Hruz likens it to, however, including eugenics, the Tuskegee experiments, or the relatively short phase of unlocking "repressed memories." *See* Hruz Report, at ¶109.  As I explain in my original report, the care of transgender individuals has a long history and, as with *all medical care*, there is a range of quality in the existing data regarding the treatment of gender dysphoria.  *See* Olson-Kennedy Report, at ¶¶ 70-72.  But not only are there dozens of interdisciplinary gender clinics associated with research institutions and teaching hospitals that have been providing gender affirming care for transgender youth and adults across the United States for years, but, in 2017, Dr. Hruz's own Washington University in St. Louis opened a

PLAINTIFFS002369

Transgender Center that provides gender affirming care for children, adolescents, and adults.

72.     As Dr. Hruz notes (Hruz Report, at ¶111), one of the intrinsic elements of rating the quality of evidence is the study design. And while randomized controlled studies are considered the highest quality in the grading of evidence, as I explain on my original report (Olson-Kennedy Report, at ¶¶74-75), it is well-established that utilizing an untreated control group is unethical in this context, where gender-affirming medical interventions have been used for decades, resulting in a vast amount of clinical knowledge about their efficacy. That said, we have a large de facto group of untreated individuals with gender dysphoria who experience significant psychiatric symptoms because of widespread barriers to access to care.

73.     In the end, the safety and efficacy in medicine is not and cannot be measured by any single study.  Indeed, *every study has limitations.* **To determine whether a treatment is safe and effective, and whether it is experimental or investigational, we look at the whole body of research and clinical experience.** By this measure, gender-affirming medical care as treatment for gender dysphoria has been shown to be safe, effective, and is not experimental or investigational.

PLAINTIFFS002370

74.    As discussed in my original report, there is a multitude studies demonstrating the safety and efficacy of gender affirming hormones, as well as of GnRH analogs, to treat gender dysphoria.  *See* Olson-Kennedy Report, at ¶¶24-41.  The same is true with regards to surgery.  *See* Olson-Kennedy Report, at ¶¶42-46.

75.    In paragraphs 47 and 82 of his report, Dr. Hruz makes reference to the concept of sexually dimorphic epigenetics in discussing how people with different genetic makeup may respond to hormone therapy.  However, none of the articles Dr. Hruz cites in paragraph 47 mention or discuss the influence of sex steroids on the sex differential expression.  Nor does Dr. Hruz offer an example or authority for his supposition that "if one gives testosterone to a male, the physiologic effects of that treatment, even in the measurement at which genes are turned on and turned off, will be different than if one gives testosterone to a female."  But simply because there are sexually dimorphic genes does not mean that there are negative consequences to having one's hormone milieu adjusted.

76.    In addition, in paragraph 86 of his report, Dr. Hruz says he is not aware of any reports that show that adolescents treated with puberty-delaying medications followed with GAH was able to preserve their fertility.  I am surprised, however, that Dr. Hruz fails to discuss a case report originating from

40

PLAINTIFFS002371

his own hospital and division.  Indeed, providers from Washington University in Saint Louis/St. Louis Children's Hospital published a case report in 2021 of a successful case of ovarian hyperstimulation and oocyte cryopreservation in a transgender male adolescent after suppression with a gonadotropin-releasing hormone (GnRH) agonist (Martin, et al., 2021).  Given that this case report originates from Dr. Hruz's own institution, one can assume that he is familiar with it and would have expected him to discuss it.

77.    In paragraph 90 of his report, Dr. Hruz argues, without any support, that providers are "compelled (sometimes under fear of employment termination or legal attacks) to adopt a patient's self-diagnosis and only support 'affirming' medical interventions" and are therefore "being pressured and/or compelled to commit the scientific and medical malpractice of confirmation bias."  This is false.  Providers are not pressured or compelled to commit confirmation bias nor are they required to provide gender-affirming medical services at all if they have reservations or concerns about the care based on their clinical judgment. However, this statement by Dr. Hruz highlights an overarching theme with the GAPMS Memo and the reports by Defendants' designated experts, that being the overlooking of the experience of the providers of gender-affirming care. Professionals who are doing this work are utilizing their own clinical experience

41

PLAINTIFFS002372

and judgment, as well as utilizing existing data, to help make recommendations for patients and their families.   However, this is completely ignored by Defendants and their experts.

78.     Without any citation or support, Dr. Hruz opines in paragraph 91 of his report that "existing guidelines base recommendations for 'affirming' medical interventions on uncorroborated patient self-reports, assessed by mental health professionals with no methodology for discerning true from false patient reports, with no ability to decipher accurate from contaminated 'memories,' with no alternative treatments offered, and no alternative explanations (e.g., social contagion) explored."  Not only is Dr. Hruz's offensive opinion unfounded, but it is also false.   There is so much clarity in the WPATH SOC 8 about the qualifications of providers making a diagnosis of gender incongruence/gender dysphoria. The recommendations from WPATH regarding the qualifications of healthcare providers assessing adolescents are as follows:

**Statements of Recommendations**

6.1-     We recommend health care professionals working with gender diverse adolescents:

      6.1.a-     Are licensed by their statutory body and hold a postgraduate degree or its equivalent in a clinical field relevant to this role granted by a nationally accredited statutory institution.

42

PLAINTIFFS002373

6.1.b-    Receive theoretical and evidenced-based training and develop expertise in general child, adolescent, and family mental health across the developmental spectrum.

6.1.c-    Receive training and have expertise in gender identity development, gender diversity in children and adolescents, have the ability to assess capacity to assent/consent, and possess general knowledge of gender diversity across the life span.

6.1.d-    Receive training and develop expertise in autism spectrum disorders and other neurodevelopmental presentations or collaborate with a developmental disability expert when working with autistic/neurodivergent gender diverse adolescents.

6.1.e-    Continue engaging in professional development in all areas relevant to gender diverse children, adolescents, and families.

6.2-    We recommend health care professionals working with gender diverse adolescents facilitate the exploration and expression of gender openly and respectfully so that no one particular identity is favored.

6.3-    We recommend health care professionals working with gender diverse adolescents undertake a comprehensive biopsychosocial assessment of adolescents who present with gender identity-related concerns and seek medical/surgical transition-related care, and that this be accomplished in a collaborative and supportive manner.

43

PLAINTIFFS002374

6.4-     We recommend health care professionals work with families, schools, and other relevant settings to promote acceptance of gender diverse expressions of behavior and identities of the adolescent.

6.5-     We recommend against offering reparative and conversion therapy aimed at trying to change a person's gender and lived gender expression to become more congruent with the sex assigned at birth.

6.6-     We suggest health care professionals provide transgender and gender diverse adolescents with health education on chest binding and genital tucking, including a review of the benefits and risks.

6.7-     We recommend providers consider prescribing menstrual suppression agents for adolescents experiencing gender incongruence who may not desire testosterone therapy, who desire but have not yet begun testosterone therapy, or in conjunction with testosterone therapy for breakthrough bleeding.

6.8-     We recommend health care professionals maintain an ongoing relationship with the gender diverse and transgender adolescent and any relevant caregivers to support the adolescent in their decision-making throughout the duration of puberty suppression treatment, hormonal treatment, and gender- related surgery until the transition is made to adult care.

6.9-     We recommend health care professionals involve relevant disciplines, including mental health and medical professionals, to reach a decision about whether puberty suppression, hormone initiation, or gender-related surgery for gender

44

PLAINTIFFS002375

diverse and transgender adolescents are appropriate and remain indicated throughout the course of treatment until the transition is made to adult care.

6.10-    We recommend health care professionals working with transgender and gender diverse adolescents requesting gender-affirming medical or surgical treatments inform them, prior to initiating treatment, of the reproductive effects including the potential loss of fertility and available options to preserve fertility within the context of the youth's stage of pubertal development.

6.11-    We recommend when gender-affirming medical or surgical treatments are indicated for adolescents, health care professionals working with transgender and gender diverse adolescents involve parent(s)/guardian(s) in the assessment and treatment process, unless their involvement is determined to be harmful to the adolescent or not feasible.

The following recommendations are made regarding the requirements for gender-affirming medical and surgical treatment (All of them must be met):

6.12-    We recommend health care professionals assessing transgender and gender diverse adolescents only recommend gender-affirming medical or surgical treatments requested by the patient when:

6.12.a-   The adolescent meets the diagnostic criteria of gender incongruence as per the ICD-11 in situations where a diagnosis is necessary to access health care. In countries that have not implemented the latest ICD, other taxonomies may be used although efforts should be undertaken to utilize the latest ICD as soon as practicable.

45

PLAINTIFFS002376

6.12.b-  The experience of gender diversity/incongruence is marked and sustained over time.

6.12.c-  The adolescent demonstrates the emotional and cognitive maturity required to provide informed consent/assent for the treatment.

6.12.d-  The adolescent's mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender-affirming medical treatments have been addressed.

6.12.e-  The adolescent has been informed of the reproductive effects, including the potential loss of fertility and the available options to preserve fertility, and these have been discussed in the context of the adolescent's stage of pubertal development.

6.12.f-  The adolescent has reached Tanner stage 2 of puberty for pubertal suppression to be initiated.

6.12.g-  The adolescent had at least 12 months of gender-affirming hormone therapy or longer, if required, to achieve the desired surgical result for gender-affirming procedures, including breast augmentation, orchiectomy, vaginoplasty, hysterectomy, phalloplasty, metoidioplasty, and facial surgery as part of gender-affirming treatment unless hormone therapy is either not desired or is medically contraindicated.

Dr. Hruz goes on to conclude his critique by stating that "[t]here is no biological test to verify the diagnosis," as if this was a reason not to cover this medically

46

PLAINTIFFS002377

necessary care.  This is misguided for the same reasons articulated above with regards to Dr. Laidlaw.

79.     Finally, like Dr. Laidlaw, Dr. Hruz takes issue with the overlap in authorship between the WPATH SOC and the Endocrine Society Guidelines.  But as noted above, expertise within a field does not represent a conflict of interest.

### *Dr. Biggs's Report*

80.     Dr. Biggs is a sociologist with absolutely no experience with the provision gender-affirming care.  While he appears to have published some letters to the editor, he has not conducted any original research relating to gender dysphoria nor published any peer-reviewed studies.  Rather Dr. Biggs appears to be an individual with no expertise, training, or experience in this field who has made it his mission to stop transgender people from being able to access gender-affirming medical care.  Nonetheless, below I respond to some of the most problematic aspects of Dr. Biggs's "expert" report.

81.     In paragraph 7 of his report, Dr. Biggs states that "puberty suppression for gender dysphoria entails stopping normal puberty in order to prepare the child for taking hormones of the opposite sex."  This is not the reason for GnRHa use in this context.  The use of GnRHa is to pause puberty for a variety of reasons, including time for gender consolidation which may or may not be

47

PLAINTIFFS002378

followed by gender affirming hormone treatment, and in order to avoid having the dysphoric adolescent from having to undergo a puberty incongruent with their gender, which may lead to substantial distress and additional negative effects.

82.     In paragraph 12 of his report, Dr. Biggs asserts, in reference to our multi-site study, that "practitioners of gender medicine are curiously reluctant to publish the outcomes of puberty suppression for psychological functioning and gender dysphoria—even though those outcomes were the primary justification for the treatment."  This is patently false. We are not at all reluctant to publish outcome data, analysis of data takes time and expertise. Our grant funding was cut by 40% which left us with very limited biostatistical support. This is why the publishing of data in our study has been slow.  In fact, we just published a study documenting the positive effects of GAH in adolescents and noted within that paper what we are in the process of analyzing the data pertaining to the use of GnRHa (Chen, et al., 2023).

83.     In paragraph 14, Dr. Biggs asserts that "Children on the autistic spectrum are more likely to face difficulties fitting in with their same-sex peers, which makes a transgender identity obviously appealing as both an explanation and a solution."  Dr. Biggs cites to no authority in support of his statement.  This unsubstantiated claim is wild at best, and significantly damaging at worst. It is

48

PLAINTIFFS002379

equally likely that lack of societal pressure leaves individuals more room to express a gender not aligned with sex assigned at birth. The fact that there is a considerable overlap of autism spectrum disorder and gender dysphoria does not mean that assuming a transgender identity is a work around for difficulty fitting in with peers.

84.     In paragraph 16 of his report, Dr. Biggs expounds about the distinction between suicidal ideation and suicide attempts.  This distinction is known to all in adolescent work. Regardless of how the adolescent intends the suicidal thoughts to land (cry for help or intent to die) it is paramount to respond to this distress. I am not certain why Dr. Biggs is working so hard to convince the world that transgender youth are not really suicidal, while simultaneously criticizing the two suicide deaths in our own study as astronomical.  Of course, suicidal ideation by an adolescent should be of concern to any provider and a clear sign of the intense distress experienced by the adolescent.

85.     In paragraph 19 of his report, Dr. Biggs asserts that "[t]he elevated suicide rate of children who identify as transgender could be explained by some combination of gender dysphoria, accompanying psychological conditions, and ensuing social disadvantages such as bullying."  Unfortunately, it seems Dr. Biggs has no comprehension of the level of transphobia that exists in our society

PLAINTIFFS002380

and the impact it has on transgender people, nor of the interconnectedness between lack of access of gender-affirming care and some of these other stressors (see discussion about passing above).

86.    There is absolutely *zero* data to support Dr. Biggs's claim that "the elevated suicide rate for transgender youth compared to their peers reflects the higher incidence of ASC [(autism spectrum conditions)]."   (Biggs Report, at ¶19).  I am aware of no data linking the numbers of reported suicides being related to ASD.

87.    In paragraph 20 of his report, Dr. Biggs opines that "[b]ecause the risk of suicide increases greatly from prepubescence to late adolescence, halting normal cognitive and emotional development with GnRHa could reduce the risk of suicide by preventing the child from maturing."  This ignores that most young people who present for GnRHa as treatment for gender dysphoria have relatively good mental health at baseline and by definition, have supportive parents or guardians.  The suicide rate in youth on GnRH analogs is very low, but this is likely related to the fact that they are supported and are not anticipating progressing through the wrong puberty.  To assert that this is related to pausing someone's endogenous puberty and therefore their cognitive age does not match

50

PLAINTIFFS002381

their chronologic age is the way someone might interpret this if they had no experience in the field, like Dr. Biggs.

88.    In paragraph 23 of his report, Dr. Biggs discusses some "drugs used in Britain." But this is indicative of Dr. Biggs's lack of familiarity with this care, particularly in the United States. In fact, the medications to which he refers are not used in the United States, so this information is entirely irrelevant here.

89.    In paragraph 26 of his report, Dr. Biggs asserts that "children given GnRHa already have unusually low bone density, perhaps due to the high prevalence of eating disorders." He cites no authority or source for this assertion and I struggle to see why he is making this connection between GnRHa and eating disorders, when there is no evidence or research linking the two.

90.    In paragraph 27 of his report, Dr. Biggs cites a newspaper article as anecdotal evidence that transgender adolescent "who started GnRHa at age 12 then experienced four broken bones by the age of 16." For one, Dr. Biggs misgenders the young person in question. The young person described in this media article is referred to as male, and clearly is not identifying as his sex assigned at birth (female). And the young person bemoans not having a flat chest and low voice. For another, the media article described here does not share many important details about this young person's medical history. For example, what

51

PLAINTIFFS002382

was his bone density?  Were his fractures traumatic?  If one is to make a claim attributing broken bones to GnRH analogs, these data points are critical.  Also interestingly, this young person suffered from not undergoing male puberty along with his peers.  This is one of the primary reasons why we consider using gender-affirming hormones in patients who are in the adolescent age range.

91.     In paragraph 28 of his report, Dr. Biggs makes reference to a statement by Dr. Marci Bowers.  Dr. Bowers addressed this statement by her at WPATH's 2022 Conference.  She acknowledged in a surgical workshop about vaginoplasties in girls who had received blockers that "I went back and counted. It was actually about half who had not achieved orgasm."  The issues surrounding self-pleasure in girls who received puberty blockers in early in puberty are more complex than the idea put forth here by Dr. Biggs.  I am wondering if he himself has ever had a conversation with a patient who had blockers in early puberty?  I have had many such conversations. In fact, many of my patients have negative thoughts and feelings about experiencing sexual pleasure with the genitals they are born with.  This is related to several factors.  First, most transgender girls have been misgendered their whole lives because of their genitals.  This has a proclivity to create an adversarial relationship with their genitals.  Second, there are many transgender girls who feel like masturbation would make them "less of

52

PLAINTIFFS002383

a girl." Some are simply reviled by their genitals. Some girls have heard incorrect information: that masturbation and ejaculation raise testosterone levels. It is incumbent upon professionals doing this work to be able to have sensitive conversations with patients about these issues. Dr. Biggs leans on two references here, the assertion of Dr. Bowers (which she significantly amended) and one article about one patient. His information simply is not representative of the literature or experience of clinicians who provide this care.

92.     Finally, in paragraph 30 of his report, Dr. Biggs asserts that "[t]he suspicion is that puberty suppression reinforces gender dysphoria."  Again, Dr. Biggs overlooks the fact that gender affirming hormones are a natural progression of care for adolescents with gender dysphoria. To suggest that GnRHa's are a "gateway drug" is completely unsubstantiated.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of March 2023.

Johanna Olson-Kennedy, M.D., M.S.


53

PLAINTIFFS002384

# Exhibit C

## *Supplemental Bibliography*

PLAINTIFFS002385

# SUPPLEMENTAL BIBLIOGRAPHY

Aranda, G., Halperin, I., Gomez-Gil, E., Hanzu, F. A., Seguí, N., Guillamon, A., & Mora, M. (2021). Cardiovascular Risk Associated With Gender Affirming Hormone Therapy in Transgender Population. *Frontiers in endocrinology*, *12*, 718200.

Anderson, A.D., Irwin, J.A., Brown, A.M., & Grala, C. L. (2020). "Your Picture Looks the Same as My Picture": An Examination of Passing in Transgender Communities. *Gender Issues* 37, 44–60.

Ascha, M., Sasson, D. C., Sood, R., Cornelius, J. W., Schauer, J. M., Runge, A., Muldoon, A. L., Gangopadhyay, N., Simons, L., Chen, D., Corcoran, J. F., & Jordan, S. W. (2022). Top Surgery and Chest Dysphoria Among Transmasculine and Nonbinary Adolescents and Young Adults. *JAMA pediatrics*, *176*(11), 1115–1122.

Bangalore Krishna, K., Fuqua, J. S., Rogol, A. D., Klein, K. O., Popovic, J., Houk, C. P., Charmandari, E., Lee, P. A., Freire, A. V., Ropelato, M. G., Yazid Jalaludin, M., Mbogo, J., Kanaka-Gantenbein, C., Luo, X., Eugster, E. A., Klein, K. O., Vogiatzi, M. G., Reifschneider, K., Bamba, V., Garcia Rudaz, C., … Medina Bravo, P. G. (2019). Use of Gonadotropin-Releasing Hormone Analogs in Children: Update by an International Consortium. *Hormone research in paediatrics*, *91*(6), 357–372.

Centers for Disease Control and Prevention. What is ME/CFS? (last reviewed January 27, 2021). Available at https://www.cdc.gov/me-cfs/about/.

Chen D, Berona J, Chan YM, Ehrensaft D, Garofalo R, Hidalgo MA, Rosenthal SM, Tishelman AC, Olson-Kennedy J. (2023). Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. *New England Journal of Med.* 2023 Jan 19;388(3):240-250.

Chen, D., Hidalgo, M. A., Leibowitz, S., Leininger, J., Simons, L., Finlayson, C., & Garofalo, R. (2016). Multidisciplinary Care for Gender-Diverse Youth: A Narrative Review and Unique Model of Gender-Affirming Care. *Transgender health*, *1*(1), 117–123.

Clayton, J. A., & Tannenbaum, C. (2016). Reporting Sex, Gender, or Both in Clinical Research?. *JAMA*, *316*(18), 1863–1864.

1

PLAINTIFFS002386

Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., de Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A., Leibowitz, S. F., Meyer-Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., Nieder, T. O., … Arcelus, J. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. *International journal of transgender health*, *23*(Suppl 1), S1–S259.

de Vries, A. L., Steensma, T. D., Doreleijers, T. A., & Cohen-Kettenis, P. T. (2011). Puberty suppression in adolescents with gender identity disorder: a prospective follow-up study. *The journal of sexual medicine*, *8*(8), 2276–2283.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L., Långström, N., & Landén, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. *PloS one*, *6*(2), e16885.

Drescher J. (2015). Out of DSM: Depathologizing Homosexuality. *Behavioral sciences (Basel, Switzerland)*, *5*(4), 565–575.

Finkelstein, E., Amichai, B., Jaworowski, S., & Mukamel, M. (1996). Masturbation in prepubescent children: a case report and review of the literature. *Child: care, health and development*, *22*(5), 323–326.

Fleisher, D. R., & Morrison, A. (1990). Masturbation mimicking abdominal pain or seizures in young girls. *The Journal of pediatrics*, *116*(5), 810–814.

Hall, R. C., Hall, R. C., & Chapman, M. J. (2005). Psychiatric complications of anabolic steroid abuse. *Psychosomatics*, *46*(4), 285–290.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H., Rosenthal, S. M., Safer, J. D., Tangpricha, V., & T'Sjoen, G. G. (2017). Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline. *The Journal of clinical endocrinology and metabolism*, *102*(11), 3869–3903.

Houghton, D. E., Alsawas, M., Barrioneuvo, P., Tello, M., Farah, W., Beuschel, B., Prokop, L. J., Layton, J. B., Murad, M. H., & Moll, S. (2018). Testosterone therapy and venous thromboembolism: A systematic review and meta-analysis. *Thrombosis research*, *172*, 94–103.

2

PLAINTIFFS002387

Leung, A. K., & Robson, W. L. (1993). Childhood masturbation. *Clinical pediatrics*, *32*(4), 238–241.

Martin, C. E., Lewis, C., & Omurtag, K. (2021). Successful oocyte cryopreservation using letrozole as an adjunct to stimulation in a transgender adolescent after GnRH agonist suppression. *Fertility and sterility*, *116*(2), 522–527.

Rothenberg, S. S., Witchel, S. F., & Menke, M. N. (2019). Oocyte Cryopreservation in a Transgender Male Adolescent. *The New England Journal of Medicine*, *380*(9), 886–887.

Sood, R., Chen, D., Muldoon, A. L., Chen, L., Kwasny, M. J., Simons, L. K., Gangopadhyay, N., Corcoran, J. F., & Jordan, S. W. (2021). Association of Chest Dysphoria With Anxiety and Depression in Transmasculine and Nonbinary Adolescents Seeking Gender-Affirming Care. *The Journal of adolescent health: official publication of the Society for Adolescent Medicine*, *68*(6), 1135–1141.

Temple Newhook, J., Pyne, J., Winters, K., Feder, S., Holmes, C., Tosh, J., Sinnott, M.L., Jamieson, A. & Pickett, S. (2018). A critical commentary on follow-up studies and "desistance" theories about transgender and gender-nonconforming children, *International Journal of Transgenderism*, 19:2, 212-224.

Wallien, M. S., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child and Adolescent Psychiatry*, *47*(12), 1413–1423.

Wyshak, G., & Frisch, R. E. (1982). Evidence for a secular trend in age of menarche. *The New England journal of medicine*, *306*(17), 1033–1035.

Yarbrough, E., Kidd, J., Parekh, R., American Psychiatric Association. (2017). "Gender Dysphoria Diagnosis" in A Guide for Working With Transgender and Gender Nonconforming Patients. Available at https://www.psychiatry.org/psychiatrists/cultural-competency/transgender-and-gender-nonconforming-patients/gender-dysphoria-diagnosis.

PLAINTIFFS002388