IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

AUGUST DEKKER, et al.,

    *Plaintiffs*,

v.

JASON WEIDA, et al.,

    *Defendants.*

Case No. 4:22-cv-00325-RH-MAF

# EXPERT REBUTTAL REPORT BY LOREN S. SCHECHTER, M.D.

## Preliminary Statement

1. I have been retained by counsel for the Plaintiffs as an expert in the above-captioned lawsuit. I previously submitted an expert witness report ("Schechter Rep.") in connection with this case.

2. I submit this rebuttal report to respond to points raised in the reports of two of Defendants' retained experts, Patrick W. Lappert, M.D. and Michael K. Laidlaw, M.D.

3. My background, qualifications, and compensation for my services in this case are described in my original report. In my original report, I

Pl. Trial Ex. 013

PLAINTIFFS002389

inadvertently omitted that I also provided expert testimony in *C.P. v. Blue Cross Blue Shield*, W.D. Wash (deposition) within the last four years.

4. In preparing this rebuttal report, I reviewed the Expert Report of Patrick W. Lappert, M.D., with attachments, and the Expert Report of Michael K. Laidlaw, M.D., with attachments.

5. My opinions contained in this rebuttal report are based on: my professional experience, as set forth in my curriculum vitae (attached as Exhibit A to my original report); the materials included in the reference list attached as Exhibit B to my original report and the case-specific materials included in paragraph 18 of my original report; and the additional research and materials cited in the footnotes of this report and included in the supplemental reference list attached as Exhibit C.

6. Both Drs. Lappert and Laidlaw do not accept that gender dysphoria is a valid medical diagnosis. *See* Schechter Rep. ¶ 20. Because they do not accept gender dysphoria as a diagnosis, it is no surprise that Drs. Lappert and Laidlaw disagree that surgery is an appropriate reconstructive treatment. But their views on the appropriateness of surgery and other medical interventions to treat gender dysphoria fall far outside of the medical mainstream and are not supported by evidence.

PLAINTIFFS002390

## Dr. Lappert

**American Plastic Surgery Society Levels of Evidence**

7. Dr. Lappert discusses the American Society of Plastic Surgeons Levels of Evidence, as well as the peer review process, extensively. *See* Lappert Rep. ¶¶ 24-28, 56-57. He suggests that with only Level IV and V peer-reviewed studies supporting gender affirming surgical procedures, these surgeries are not established as safe, effective, or accepted. *See* Lappert Rep. ¶¶ 55-67. This discussion has a number of flaws. First, Dr. Lappert ignores the Level III literature on gender affirming surgical care.[1]

8. Second, as I described in my prior report, there are practical and ethical limitations on conducting studies in clinical medicine, especially in surgery. It is difficult, if not impossible, to conduct Level I or II studies in this context. *See* Schechter Rep. ¶¶ 52-53. But Dr. Lappert is wrong to contend that studies with lower levels of evidence are not useful to inform clinical decision making. In fact, Dr. Lappert has recognized the value of such studies. In 1998, he published a single case report (Level V) detailing the endoscopic repair of a

---

[1] *See, e.g.,* Ascha, M. et al. (2022). Top Surgery and Chest Dysphoria Among Transmasculine and Nonbinary Adolescents and Young Adults. JAMA Pediatrics, 176(11): 1115-1122, doi:10.1001/jamapediatrics.2022.3424; Massie, J.P. et al. (2018). Predictors of Patient Satisfaction and Postoperative Complications in Penile Inversion Vaginoplasty. Plastic and Reconstructive Surgery, 141(6): 991e-921e, doi: 10.1097/PRS.0000000000004427.

PLAINTIFFS002391

frontal sinus fracture.[2] He stated: "This case demonstrates the safety, efficacy, and economy of the endoscopic technique in properly selected cases."[3]

9. Dr. Lappert focuses on the evolution of treatment for gastric ulcers to support his claims that using Level IV and V evidence to support surgical treatment "can result in grave missteps." Lappert Rep. ¶ 29. But as Dr. Lappert notes, once Level I and II studies demonstrated that gastric ulcers could be treated with medications, the standard of care changed. This is common in medicine. As the research and clinical evidence evolves, treatment evolves in turn.[4] For example, we previously counseled patients that the only way to lose weight was through dietary changes. Now, we use surgical interventions, such as bariatric surgery, to treat obesity in certain situations.

10. Third, and relatedly, Dr. Lappert ignores that the quality of the evidence supporting gender affirming surgeries is similar to that supporting many common plastic surgeries, as I previously discussed. *See* Schechter Rep. ¶ 54. Outside the field of plastic surgery, many common and generally accepted

---

[2] Lappert, P.W. & Lee, J.W. (1996). Treatment of an Isolated Outer Table Frontal Sinus Fracture Using Endoscopic Reduction and Fixation. Plastic and Reconstructive Surgery, 102(5): 1642-5.
[3] *Id.* at 1644.
[4] *See, e.g.,* Sugrue, C.M. et al. (2019). Levels of Evidence in Plastic and Reconstructive Surgery Research: Have We Improved Over the Past 10 Years? Plastic and Reconstructive Surgery Global Open, 7(9): e2408, doi: 10.1097/GOX.0000000000002408.

PLAINTIFFS002392

medical treatments are not supported by higher level studies. One recent article concluded that "only a minority of outcomes for health care interventions are supported by high-quality evidence."[5]

11.  While Dr. Lappert criticizes studies on gender confirming surgery based on their duration, see Lappert Rep. ¶¶ 101, 58 (claiming that a follow-up period of 4 to 7 years is insufficient), a three-year follow-up period is used and is sufficient to understand most acute surgical complications, and a five-year follow-up period is often used in studies of cancer treatments. And, as I previously described, the 2011 study by Dhejne et al., which Dr. Lappert holds up as a model long-term study, see Lappert Rep. ¶ 103, does not show that gender confirming surgeries are not effective. See Schechter Rep. ¶ 74. In fact, the authors of the article start from the premise that gender affirming surgery "has been practised for more than half a century and is the internationally recognized treatment to ease gender dysphoria."[6]

---

[5] Howick, J. et al., (2020). The quality of evidence for medical interventions does not improve or worsen: a metaepidemiological study of Cochrane reviews. J. Clin. Epidemiology, 126: 154-159, doi: 10.1016/j.jclinepi.2020.08.005.

[6] Dhejne, C. et al. (2011). Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden; PLOS One, 6(2): e16885, doi: 10.1371/journal.pone.0016885 (noting that the design of the existing studies is reasonable given the nature of the surgery and that the studies suggest that surgery does improve quality of life and gender dysphoria).

PLAINTIFFS002393

**Reconstructive Surgeries**

12. Dr. Lappert goes to great pains to try to explain why gender affirming surgery is cosmetic, as opposed to reconstructive. However, none of his arguments is persuasive.

13. First, he contends that gender affirming surgery is cosmetic because it does not restore form or function that has been lost. *See* Lappert Rep. ¶ 44-45, 49-50. But, as I previously described, that distinction between reconstructive and cosmetic surgery simply does not hold up. *See* Schechter Rep. ¶¶ 35, 72.

14. Second, he wrongly suggests that gender confirming surgeries are cosmetic "because the patient is physically healthy before the surgery." Lappert Rep. ¶ 107. Of course, patients who have a genetic predisposition to cancer often undergo risk-reduction mastectomies and/or salpingo-oophorectomies even though the relevant tissue is "healthy." In addition, healthy individuals undergo surgery to donate a kidney or a portion of their liver to a person in need of a transplant. And again, Dr. Lappert misunderstands the condition of gender dysphoria. As I previously explained, it is the underlying diagnosis that distinguishes a reconstructive procedure from a cosmetic one. Schechter Rep. ¶¶ 31-32. Gender affirming surgery is considered medically necessary, reconstructive surgery when performed in accordance with the WPATH

PLAINTIFFS002394

Standards of Care because it is clinically indicated to treat the underlying diagnosis of gender dysphoria. While patients with gender dysphoria may be healthy in other respects, they have a real medical diagnosis for which surgery is indicated. This is no different from someone who is healthy but for their condition of appendicitis. The fact that they have no other ailments does not mean that an appendectomy is contraindicated. When a surgeon sees a patient for a particular condition, it is common for the surgeon to report that the patient "is otherwise healthy."

15.  Third, Dr. Lappert incorrectly contends that gender affirming surgery must be cosmetic because studies of the treatment use "quality of life" as a measure of success. Lappert Rep. ¶¶ 48, 58. He ignores that studies of gender affirming surgery look at other outcomes as well.[7] And, studies of procedures that Dr. Lappert would classify as reconstructive or medically necessary regularly use quality of life as a measure of success.[8]

---

[7] *See, e.g.*, Ascha, M. et al., *supra* note 1; Lane, M. et al. (2023). Gender Affirming Mastectomy Improves Quality of Life in Transmasculine Patients. Annals of Surgery, 277(3): e725-e729, doi:10.1097/SLA.0000000000005158.

[8] *See, e.g.*, Fortunato, L. et al. (2021). Regret and Quality of Life After Mastectomy With or Without Reconstruction. Clinical Breast Cancer, 21(3): 162-169, doi: 10.1016/j.clbc.2019.11.005. ("Quality of life (QoL) issues are particularly relevant, currently, because breast cancer is a curable disease in most cases, and a long-term survival can be anticipated for the majority of the affected women."); Santosa, K.B. et al. (2018). Long-term Patient-Reported Outcomes in Postmastectomy Breast Reconstruction. JAMA Surgery, 153(10): 891-899, doi: 10.1001/jamasurge.2018.1677; Stavrou, D. et al. (2014). Health

PLAINTIFFS002395

16. Ultimately, Dr. Lappert classifies gender affirming procedures as cosmetic because he does not believe that gender dysphoria is a valid diagnosis for which surgery could ever be necessary, pointing to the lack of "objective" tests for the condition. Lappert Rep. ¶¶ 32, 53-55, 76, 107; *see also id.* ¶ 82 (stating that the condition of a cancer patient "is far more grievous" than the condition of a person with gender dysphoria). That belief conflicts with the consensus of the medical community. Schechter Rep. ¶¶ 24-27, 70. Moreover, despite Dr. Lappert's assertion that a "claim of consensus insists on an absence of important controversy surrounding the use of social, medical, and surgical gender affirmation, particularly with regard to the young," Lappert Rep. ¶ 33, he has not shown the existence of any such important controversy. The fact that a handful of doctors are opposed to providing any medical treatment for the condition does not mean that the treatment is not generally accepted. Rather, as I previously explained, the broader medical community has recognized that gender confirming surgeries are standard, appropriate, and often necessary treatments for adults and adolescents with gender dysphoria. *See* Schechter Rep. ¶ 27.

---

related quality of life in burn patients – a review of the literature. Burns, 40(5): 788-796, doi: 10.1016/j.burns.2013.11.014.

8

**Informed Consent and Mental Health**

17. It is not uncommon for patients needing surgery for a wide variety of conditions to have been diagnosed with mental health conditions; this includes transgender patients. Dr. Lappert claims that patients with mental health conditions that can "provoke the patient to acts of self-harm, or to suicidal ideation" cannot consent to surgery of any kind. Lappert Rep. ¶¶ 68-69. But patients with mental health conditions that can lead to self-harm or suicidal ideation regularly and appropriately consent (and assent, as described below) to surgical care. Generally, these conditions do not prevent patients from understanding the procedure, the risks and complications of the procedure, and the benefits that they can reasonably expect to achieve from surgery. Rather, in some cases, surgeons and their colleagues will work with patients in a capacity referred to as "prehabilitation" to address mental health conditions and psychosocial considerations that could impact surgical results.[9] The WPATH Standards of Care are consistent with that approach. *See* Schechter Rep. ¶¶ 61-62.

---

[9] *See* Durrand, J. et al. (2019). Prehabilitation. Clin. Med., 19(6): 458-64, doi: 10.7861/clinmed.2019-0257.

PLAINTIFFS002397

18.   What is more, Dr. Lappert is wrong to suggest that if a patient is not engaging in self-harm or does not have suicidal ideation, then gender affirming surgery is not indicated or necessary. *See* Lappert Rep. ¶ 71. Surgery is indicated to alleviate gender dysphoria. The primary indication for gender affirming surgery is not a treatment for depression or anxiety, although these conditions may also improve following surgery. *See* Schechter Rep. ¶¶ 31-32. Certainly, if gender dysphoria is not adequately treated, it can lead to self-harm, suicide attempts, and suicide. However, it does not follow that providers withhold effective treatment for gender dysphoria until patients are experiencing these severe harms.

19.   Dr. Lappert also misunderstands the informed consent process for minors, claiming they "by definition are not competent to consent." Lappert Rep. ¶ 70. When individuals under age 18 seek any surgery, including gender affirming surgery, it is their parent or guardian that must provide informed consent. Of course, the adolescent must also assent to gender confirming surgery. *See* Schechter Rep. ¶ 61.

20.   In addition, Dr. Lappert misconstrues the process for determining if surgery is necessary for a particular patient, incorrectly suggesting that surgery is provided to young people on-demand. Lappert Rep. ¶ 76. To the contrary, the

PLAINTIFFS002398

Standards of Care recommend that health practitioners "undertake a comprehensive biopsychosocial assessment of adolescents who present with gender identity-related concerns and seek medical/surgical transition-related care."[10] In addition, the Standards of Care emphasize the importance of taking a multidisciplinary approach when determining if surgery is necessary for adolescents.[11]

21.   Finally, Dr. Lappert ignores that once a diagnosis is established, treatment then depends on a discussion with the patient. For example, while Dr. Lappert references complex oropharyngeal reconstruction, *see* Lappert Rep. ¶ 78, he fails to acknowledge that there are other methods for treating and/or reconstructing this complex defect, as there are other techniques for reconstructing genitalia to treat gender dysphoria. Thus, while Dr. Lappert may be describing his preferred approach to patient care, that approach does not reflect the clinical reality of medicine in 2023.

---

[10] Coleman, E. et al. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. Int'l J. of Transgender Health, 23: S1-S259, S50 doi: 10.1080/26895269.2022.2100644.

[11] *Id.* at S56-57, S133.

11

### Dr. Laidlaw

22. Dr. Laidlaw is not a surgeon. Not only does he not perform gender affirming surgery, but he does not even refer transgender patients for gender affirming surgery. *See* Laidlaw Rep. ¶ 310. His report reveals his lack of expertise in this area of medicine.

23. Dr. Laidlaw makes several inaccurate or incomplete statements about "what any surgery can and cannot accomplish." Laidlaw Rep. ¶ 162. Dr. Laidlaw claims that "[i]n its basic form, surgery is subtractive." Laidlaw Rep. ¶ 163. Of course, that statement ignores the entire discipline of reconstructive surgery. *See* Schechter Rep. ¶¶ 35, 72.

24. While Dr. Laidlaw goes on to recognize the existence of reconstructive surgery, explaining that sometimes "a diseased tissue or organ is removed so that a foreign replacement part may be substituted for an unhealthy organ or tissue," Laidlaw Rep. ¶ 164, that statement is likewise far too simplistic. He ignores that surgeons often perform risk-reduction mastectomies and/or salpingo-oophorectomies in patients who do not have cancer, but have a genetic predisposition to cancer. In addition, some reconstructive surgeries do not involve the removal of tissue or an organ. For example, surgeons perform procedures to reconstruct structures that have been absent since birth.

PLAINTIFFS002400

25. Finally, Dr. Laidlaw claims that "surgery cannot de novo create new organs." Laidlaw Rep. ¶ 165. Here, Dr. Laidlaw ignores that surgeons regularly perform organ transplants, effectively giving the recipient a new organ, and that certain artificial organs, including artificial hearts and ventricular assist devices, have been used for decades.

26. His more specific claims about mastectomy and genital surgeries suffer from similar flaws. Dr. Laidlaw highlights the potential complications of mastectomy, vaginoplasty, and phalloplasty. Laidlaw Rep. ¶ 167, 171, 175. First, he fails to acknowledge that the risks he describes are equally present when the procedures are performed to treat conditions other than gender dysphoria. As I explained in my prior report, surgeons regularly perform mastectomies and genital reconstructive surgeries to treat a range of conditions. *See* Schechter Rep. ¶¶ 37-38. Second, some of what he describes as "complications" are not in fact seen as complications by surgery patients. For example, he emphasizes that mastectomy "results in a permanent loss of the ability to breastfeed." Laidlaw Rep. ¶¶ 167-168. While that is true, not every person with breasts can or wants to have a child, much less to breastfeed a child. Like Dr. Lappert, Dr. Laidlaw appears to have little regard for a patient's values, preferences, choices, and autonomy. *See* Schechter Rep. ¶ 71.

PLAINTIFFS002401

## Conclusion

27. In sum, not all people with gender dysphoria need, want or are candidates for surgery. However, in appropriately-identified and prepared people, surgery is safe, effective, and medically necessary. *See* Schechter Rep. ¶ 81-82. As with all areas of medicine and surgery, clinicians and researchers continue to refine surgery, including techniques, timing, patient selection, and outcome measures. Such discussions are reasonable. However, a categorical exclusion of coverage for gender affirming surgery is clearly not supported by the evidence, professional medical consensus, or my professional experience.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 9th day of March, 2023.

Loren S. Schechter, M.D.

PLAINTIFFS002402

# Exhibit C

*Supplemental References*

PLAINTIFFS002403

# Supplemental References

1. Ascha, M. et al. (2022). Top Surgery and Chest Dysphoria Among Transmasculine and Nonbinary Adolescents and Young Adults. JAMA Pediatrics, 176(11): 1115-1122, doi:10.1001/jamapediatrics.2022.3424.

2. Coleman, E. et al. (2022). Standards of Care for the Health of Transgender and Gender Diverse People, Version 8. Int'l J. of Transgender Health, 23: S1-S259, S50 doi: 10.1080/26895269.2022.2100644.

3. Dhejne, C. et al. (2011). Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden; PLOS One, 6(2): e16885, doi: 10.1371/journal.pone.0016885.

4. Durrand, J. et al. (2019). Prehabilitation. Clin. Med., 19(6): 458-64, doi: 10.7861/clinmed.2019-0257.

5. Fortunato, L. et al. (2021). Regret and Quality of Life After Mastectomy With or Without Reconstruction. Clinical Breast Cancer, 21(3): 162-169, doi: 10.1016/j.clbc.2019.11.005.

6. Howick, J. et al., (2020). The quality of evidence for medical interventions does not improve or worsen: a metaepidemiological study of Cochrane reviews. J. Clin. Epidemiology, 126: 154-159, doi: 10.1016/j.jclinepi.2020.08.005.

7. Lane, M. et al. (2023). Gender Affirming Mastectomy Improves Quality of Life in Transmasculine Patients. Annals of Surgery, 277(3): e725-e729, doi:10.1097/SLA.0000000000005158.

8. Lappert, P.W. & Lee, J.W. (1996). Treatment of an Isolated Outer Table Frontal Sinus Fracture Using Endoscopic Reduction and Fixation. Plastic and Reconstructive Surgery, 102(5): 1642-5.

PLAINTIFFS002404

9. Massie, J.P. et al. (2018). Predictors of Patient Satisfaction and Postoperative Complications in Penile Inversion Vaginoplasty. Plastic and Reconstructive Surgery, 141(6): 991e-921e, doi: 10.1097/PRS.0000000000004427.

10. Santosa, K.B. et al. (2018). Long-term Patient-Reported Outcomes in Postmastectomy Breast Reconstruction. JAMA Surgery, 153(10): 891-899, doi: 10.1001/jamasurge.2018.1677

11. Stavrou, D. et al. (2014). Health related quality of life in burn patients – a review of the literature. Burns, 40(5): 788-796, doi: 10.1016/j.burns.2013.11.014.

12. Sugrue, C.M. et al. (2019). Levels of Evidence in Plastic and Reconstructive Surgery Research: Have We Improved Over the Past 10 Years? Plastic and Reconstructive Surgery Global Open, 7(9): e2408, doi: 10.1097/GOX.0000000000002408.

PLAINTIFFS002405