## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

AUGUST DEKKER, et al.,

*Plaintiffs*,

v.                                                    Case No. 4:22-cv-00325-RH-MAF

JASON WEIDA, et al.,

*Defendants*.

## EXPERT REBUTTAL DECLARATION OF
## ARMAND H. MATHENY ANTOMMARIA, MD, PhD

I, ARMAND H. MATHENY ANTOMMARIA, MD, PhD, have been retained by counsel for the plaintiffs in connection with the above-captioned litigation.

1.      I have actual knowledge of the matters stated in this rebuttal report and declaration and have collected and cited relevant literature concerning the issues that arise in this litigation in the body of this report. I herein refer to my initial expert report and declaration in this matter as "Antommaria Report."

2.      If called to testify in this matter, I would do so truthfully and based on my expert opinions.

3.      I reviewed the reports of the defendants' experts Michael Biggs, PhD, G. Kevin Donovan, MD, MA, Paul W. Hruz, MD, PhD, Kristopher Kaliebe, MD, Michael K. Laidlaw, MD, Patrick W. Lappert, MD, Stephen B. Levine, MD, Sophie

1

Pl. Trial Ex. 014

PLAINTIFFS002406

Scott, PhD, and Joseph Zanga, MD (referred to herein by the author's last name and "Report").

4.      I respond in this report to some of those reports' the central points. I do not specifically address each study or article cited in putative support of the points. I instead explain the overall problems with the author's arguments and conclusions, and, in response, provide information showing why such conclusions are in error. I reserve the right to supplement my opinions, if necessary, as this matter proceeds.

5.      In preparing this report, I reviewed again the text of General Medicaid Policy Rule 59G-1.050 at issue in this matter, as well as "Florida Medicaid: Generally Accepted Professional Medical Standards Determination on the Treatment of Gender Dysphoria" and all related attachments. I also relied on my education and training, my research experience, and my knowledge of the literature in the pertinent fields.

6.      The materials I have relied on in preparing this rebuttal report are the kinds of materials that experts in my fields of study and practice regularly rely on when forming opinions on these subjects. I may wish to supplement these opinions or the bases for them because of new research or publications or in response to statements and issues that may arise in my areas of expertise.

PLAINTIFFS002407

## INDIVIDUALS WHO PROVIDE GENDER-AFFIRMING MEDICAL CARE DO NOT HAVE INHERENT CONFLICTS OF INTEREST

7.     Defendants' experts characterize Plaintiffs' experts and those who provide gender-affirming medical care as biased. They attempt to position themselves and those who never have or never will provide gender-affirming medical care as unbiased observers whose opinions are deserving of more credibility. Donovan Report p. 4; Kaliebe Report p. 66-67; Lappert Report p. 8.

8.     Dr. Donovan, for example, states, "it is difficult for one whose professional reputation and financial compensation has depended heavily on a single diagnosis to maintain sufficient distance to render a completely unbiased opinion about it." Donovan Report p. 4.

9.     Medical professionals performing research, developing clinical practice guidelines, or providing expert testimony within their clinical specialty is not unique to gender-affirming medical care. This assertion also ignores the various mechanisms within the medical profession to manage potential sources of bias.

10.     Cardiologists (doctors who evaluate and treat patients for heart and blood vessel conditions) perform cardiology research and write cardiology clinical practice guidelines and oncologists (doctors who evaluate and treat patients for cancer) do the same in oncology. It is not clear who else the defendants' experts think would conduct the research or develop the clinical practice guidelines if not the professionals routinely evaluating and treating the relevant patient groups.

PLAINTIFFS002408

11.     Medicine has multiple mechanisms to address potential bias and conflicts of interest. National Institutes of Health grant applications undergo peer review by scientific review groups and advisory councils or boards.[1]  Medical and scientific journals require authors to disclose potential conflicts of interest and submit manuscripts to peer review.[2]  Professional medical organizations also require those developing clinical practice guidelines and policy statements to disclose potential conflicts of interest and have processes for managing potential conflicts.[3] In these ways potential biases are constrained.

12.     Dr. Donovan characterizes himself as an unbiased observer stating, "none of my opinions are biased by my professional income being generated by these activities nor by my professional reputation relying primarily on these diagnoses."  Donovan Report p. 4. Dr. Donovan, however, is not performing this work *pro bono* and is instead being compensated for his work at a rate of $350 per hour. Donovan Report p. 4.

---

[1] NIH. Grants & funding: Peer Review. October 24, 2021. Accessed February 28, 2023. Available at https://grants.nih.gov/grants/peer-review.htm.

[2] See, for example, AAP Publications: Pediatrics: Author Instructions: Publication Ethics. March 11, 2022. Accessed February 28, 2023. Available at https://publications.aap.org/pediatrics/pages/author-instructions?autologincheck=redirected#publication_ethics.

[3] See, for example, American Academy of Pediatrics. Evidence-Based Clinical Practice Guidelines: Development and Implementation Manual. November 10, 2019. Accessed February 28, 2023. Available at https://downloads.aap.org/DOCCSA/CPGManual20190628.pdf.

PLAINTIFFS002409

## GENDER DYSPHORIA IS A RELIABLE MEDICAL DIAGNOSIS

13.    The defendants' experts assert that gender-dysphoria is an unreliable diagnosis because it is solely based on individuals' self-reported symptoms[4] and cannot be confirmed by a diagnostic test.[5]

14.    Dr. Hruz, for example, states "The clinical assessment methodology in sex discordant gender medicine is currently limited to self-reported information from patients without objective scientific markers or medical tests." Hruz Report, p. 31.

15.    As stated in my initial report, there are other common medical diagnoses, such as migraine headache, which rely on individuals' self-report of their symptoms and do not have confirmatory laboratory or radiographic tests. Antommaria Report p. 26-27. Dr. Laidlaw asserts that this comparison is "faulty" but he either misunderstands or misrepresents it. Laidlaw Report p. 66.

16.    For, example, Dr. Laidlaw states that, "migraine headaches are a neurological condition with a potential vascular component and not a condition of the mind, nor found as a psychological diagnosis in the DSM-5." Laidlaw Report p. 66. This is exactly the point. Many psychiatric diagnoses, such as major depressive disorder and anxiety disorder, rely on individuals' self-reports of their symptoms

---

[4] Hruz Report p. 31-33, 45-46, 52, 96; Kaliebe Report p. 64; Laidlaw Report p. 13; Lappert Report p. 16, 17, 26, 33, 46, 65; Levine Report p. 51.
[5] Donovan Report p. 6; Hruz Report p. 31, 52, 96; Laidlaw Report p. 8, 13; Lappert Report p. 16, 17, 26, 33, 46, 65; Levine Report p. 9; Scott Report p. 3.

PLAINTIFFS002410

and do not have confirmatory laboratory or radiographic tests. This is not only true of psychiatric conditions but also of some "medical" conditions like migraine headache. Presumably Dr. Laidlaw does not question the reliability of the diagnosis of migraine headache. That migraine headache has a potential vascular component is irrelevant. Regional cerebral blood flow imaging is not a diagnostic test for migraine.[6] His further claims about treatment of migraine and gender dysphoria are also irrelevant to this point about the credibility of the diagnosis.

17.    Defendants' experts also falsely assert that health care providers rely on individuals with gender dysphoria's "self-diagnosis" for diagnosing patients.[7] Again, as stated in my report, this claim is false. Antommaria Report p. 27.

18.    Individuals may suspect that they have gender dysphoria based on their symptoms, e.g., a strong desire to be rid of their facial hair because of a marked incongruence with their experienced female gender, in the same way that individuals may suspect that they have pneumonia based on their symptoms, e.g., fever, cough, and shortness of breath. Health care providers, however, evaluate patients and formulate their own diagnoses before beginning treatment. A health care provider would, to extend the analogy, take a history and perform a physical examination to

---

[6] Steiner TJ, Jensen R, Katsarava Z, et al. Aids to management of headache disorders in primary care, 2nd edition. *J Headache Pain*. 2019;20(1):57; Headache Classification Committee of the International Headache Society (IHS). The international classification of headache disorders, 3rd edition. *Cephalalgia*. 2018;38(1):1-211.
[7] Donovan Report Exhibit A p. 5; Hruz Report p. 51; Kaliebe Report p. 54, 64; Lappert Report p. 7, 33, 43, 45, 64.

PLAINTIFFS002411

determine whether a patient has pneumonia before prescribing antibiotics. The diagnostic criteria, clinical evaluation, and, if appropriate, subsequent treatment of gender dysphoria, are described in clinical practice guidelines.[8]

19.     In contrast to the defendants' experts' claim that gender dysphoria is a subjective diagnosis, they assert that identifying an individuals' sex is an objective determination. Dr. Laidlaw, for example, states, "Biological sex is the objective physical condition having organs and body parts which correspond to a binary sex." Laidlaw Report at p. 13.

20.     Dr. Laidlaw's assertion of the objectivity of sex is undermined by Dr. Hruz who states, "Current practice is to defer sex assignment until the etiology of the disorder is determined and, if possible, a reliable prediction can be made on likely biologic and psychologic outcomes. When this cannot be done with confidence, a presumptive sex assignment is made. Factors used in making such decisions include karyotype (46XX, 46XY, or other), phenotypic appearance of the external genitalia, and parental desires." Hruz Report p. 11. If identifying an individual's sex was objective, psychologic outcomes and parental desires would be irrelevant. Note also that Dr. Hruz uses the term "assignment," which affirms the accepted understanding that physicians indeed "assign" sex to newborns.

---

[8] Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/ gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.

PLAINTIFFS002412

## GENDER-AFFIRMING MEDICAL CARE IS NOT EXPERIMENTAL

21.     Defendants' experts incorrectly characterize gender-affirming medical care as "experimental."[9]  Their reports do not generally define experimental, but, to the extent that they do, their definitions are inaccurate.

22.      Dr. Donovan, for example, states, "In any medical condition where the cause is unknown, the treatments still uncertain, and the adverse effects of the interventions not fully elucidated, a proposed course of therapy would have to be seen as experimental." Donovan Report p. 7.

23.     There are many medical conditions whose cause is not known but that nonetheless have well established treatments. Kawasaki disease, for example, is an acute febrile illness in children which causes inflammation of the blood vessels and, in some cases, ballooning of the blood vessels that supply the heart.

24.     The American Heart Association's (AHA's) clinical practice guideline for the diagnosis, treatment, and long-term management of this condition states, "Kawasaki disease (KD) is an acute, self-limited febrile illness of unknown cause that predominantly affects children <5 years of age" and that "[d]espite 4 decades of investigation, the cause of KD remains unknown." The AHA nonetheless recommends individuals with Kawasaki disease be treated with intravenous

---

[9] Donovan Report Exhibit A p. 1, 4; Hruz Report p. 56-57, 69, 98-100; Kaliebe Report p. 63; Laidlaw Report p. 22, 25, 39, 81-82; Lappert Report p. 10, 41; Levine Report p. 11, 65, 81; Zanga Report p. 9-10.

PLAINTIFFS002413

immunoglobulin (Class 1; Level of Evidence A).[10]   The American College of Cardiology Foundation and the AHA use different categories for the quality of evidence and the strength of recommendations[11] from the Grading of Recommendations Assessment, Development and Evaluation (GRADE) system described in my report. Antommaria Report p. 7-11. This treatment recommendation can, nonetheless, be interpreted as a strong recommendation based on high quality evidence.

25.     The adverse effects of a treatment not being fully elucidated also does not make the treatment experimental.

26.     Defendants' experts appear to accept that approval by the United States (US) Food and Drug Administration (FDA) is a sufficient criterion for a medication to not be experimental based on their discussion of off-label treatment analyzed below. But the FDA requires post-marketing surveillance of medications' adverse effects because the clinical trials on which the approvals are based cannot identity

---

[10] McCrindle BW, Rowley AH, Newburger JW, et al. Diagnosis, treatment, and long-term management of Kawasaki disease: A scientific statement for health professionals from the American Heart Association. *Circulation*. 2017;135(17): e927-e999. The quotations appear on pages e928 and e931 respectively.

[11] American College of Cardiology Foundation, American Heart Association. Methodology manual and policies from the ACCF/AHA Task Force on practice guidelines. June 2010. Accessed March 5, 2023. Available at https://www.acc.org/-/media/Non-Clinical/Files-PDFs-Excel-MS-Word-etc/Guidelines/About-Guidelines-and-Clinical-Documents/Methodology/2014/Methodology-Practice-Guidelines.pdf?la=en&hash=157B7835091CF7856B26528717BE14B33BE8226F.

PLAINTIFFS002414

all possible side effects.[12]  Defendants' experts appear to expect a level of certainty that is not always available in medicine, nor that even the FDA expects.

27.     Defendants' expert reports also repeatedly note that puberty blockers, testosterone, and estrogen are prescribed off-label in their use to treat gender dysphoria as supposed further evidence that the treatment is experimental. Biggs Report p. 4; Donovan Report Exhibit A p. 4; Laidlaw Report p. 25, 29, 52, 59, 66, 81-82, 107.

28.     Dr. Donovan's report, for example, states, "After close scrutiny, it can only be seen as off label experimentation, despite the fact that informed consent practices do not conform to this reality." Donovan Report Exhibit A p. 4.

29.     My report, however, demonstrates that a medication being used off-label does not mean it is either unsafe or ineffective. Antommaria Report p. 18-21.

30.     A treatment not having been evaluated using a particular study design is also not an indication that the treatment is experimental, contrary to what Dr. Laidlaw states in his report. He claims, "[T]he use of [gonadotrophin releasing hormone (GnRH)] anolgue [sic] medication for this purpose in adolescents is experimental as there have been no randomized controlled trials for this specific use case."  Laidlaw Report p. 25. Randomized controlled trials are not a necessary

---

[12] U.S. Food & Drug Administration. Postmarketing Surveillance Programs. April 2, 2020. Accessed February 26, 2023. Available at https://www.fda.gov/drugs/surveillance/postmarketing-surveillance-programs.

PLAINTIFFS002415

criterion for a medication to not be deemed experimental. GnRH analogues were approved by the FDA for treatment of central precocious puberty without randomized controlled trials.[13]

31.     In general, defendants' experts' primary contention appears to be that there is inadequate evidence of gender-affirming medical care's safety and efficacy or, in other words, this care is unproven. My report demonstrates that there is sufficient evidence to recommend this medical care and that the evidence for this care is the same quality as used to make recommendations in other areas of medicine. Antommaria Report p. 7-13.

32.     Several of the defendants' experts emphasize the lack of randomized trials, Biggs Report p. 5; Hruz Report p. 65, 69, 90; Laidlaw Report p. 25, 108, without addressing the methodological and ethical issues with such trials in gender-affirming medical care. Antommaria Report p. 13-15.

33.     Dr. Hruz, for example, states "Such studies can be ethically designed and executed with provisions for other dignity affirming measures to all treatment groups." Hruz Report p. 156. Dr. Hruz does not, however, provide any additional explanation to substantiate this claim. His citation, Sugarman J., Ethics in the design and conduct of clinical trials. *Epidemiol Rev*. 2002;24(1):54-58, does not justify it.

---

[13] HIGHLIGHTS OF PRESCRIBING INFORMATION. May 2017. Accessed February 26, 2023. Available at
https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/020263s042lbl.pdf.

11

PLAINTIFFS002416

Dr. Sugarman's article is a general outline of ethical issues in designing and conducting clinical research and does not address the specific ethical issues in clinical research on gender-affirming medical care.

34.     Some of the expert witnesses go even further to suggest that some individuals with gender dysphoria have been experimented on without their, or their parents' or legal guardian's consent.

35.     Dr. Levine asserts that two individuals were correct to feel that they were treated like guinea pigs and Dr. Hruz compares gender-affirming medical care to the "infamous Tuskegee studies" and the "Nazi and Imperial Japanese wartime experiments." Levine Report p. 71; Hruz Report p. 62.

36.     Such accusations are unfounded and irresponsible. Neither report provides evidence that individuals with gender dysphoria were treated without adequate informed consent.

### PARENTS AND GUARDIANS CAN AND DO PROVIDE INFORMED CONSENT FOR GENDER-AFFIRMING MEDICAL CARE

37.     Several of the defendants' experts emphasize minors' inability to provide informed consent for gender-affirming medical care.[14]

38.     Dr. Hruz, for example, asserts, "For adolescent children seeking medical gender affirmation medical [sic], well established limitations in decision

---

[14] Donovan Report Exhibit A p. 2; Hruz Report p. 58-59; Kaliebe Report p. 5-6; Laidlaw Report p. 59-60, 72, 79, 108-109; Lappert Report p. 44; Scott Report p. 11.

12

PLAINTIFFS002417

making ability raise serious concerns about their ability to consent to hormonals [sic] and surgical interventions." Hruz Report p. 58.

39.    These claims ignore the fact that it is parents or legal guardians and not minors who provide informed consent for gender-affirming medical care. (The exception is adolescents who have been legally emancipated, but in this case their decision-making capacity has been verified.)

40.    Dr. Laidlaw goes on to assert, "With respect to [gender affirmative therapy], in my opinion, it is not possible for the parent or guardian to make a true informed consent decision for the child because of the poor quality of the evidence of benefit, the known risks or harm, and the many unknown longterm [sic] risks of harm which could only truly be known after years and decades of gender affirmative therapy." [15]  Laidlaw Report p. 59-60, see also p. 109.

41.    To the contrary, parents and legal guardians are frequently asked to consent to interventions in which there is uncertainty about the nature or the frequency of the risks. There is, for example, substantial uncertainty in medical decisions in neonatology, especially for infants born between 22 and 25 weeks

---

[15] Cf, Laidlaw Report p. 79 where he lists criteria for applying gender affirmative therapy to patients that suggest adult patients and parents and guardians can provide informed consent.

PLAINTIFFS002418

estimated gestational age.[16]   Clinicians or investigators disclose this uncertainty, and parents or legal guardians weigh it in their decision making.

42.   One component of informed consent is the disclosure of the potential benefits, risks, and alternatives to the proposed treatment.

43.   The defendants' experts at times mischaracterize the potential benefits of gender-affirming medical care. Dr. Laidlaw, for example, bizarrely asserts that the Endocrine Society and World Professional Association for Transgender Health (WPATH) mislead patients and their families into believing that gender-affirming medical care will change transgender women's testicles into ovaries, permit them to develop uteruses, and allow them to conceive and carry a pregnancy to term. He provides no citation or evidence to support this assertion. Laidlaw Report p. 98.

44.   The defendants' experts also, at times, overstate the potential risks of gender affirming medical care. Levine Report p. 60, 89. Cf., Hruz Report p. 48. For example, while gender-affirming medical care entails a risk of infertility, gender-affirming hormone treatment does not universally result in sterility. There are transgender men who became pregnant while on or after discontinuing testosterone therapy.[17]   Transgender men and women are also capable of producing eggs and

---

[16] Crilly CJ, Haneuse S, Litt JS. Predicting the outcomes of preterm neonates beyond the neonatal intensive care unit: What are we missing? *Pediatr Res*. 2021;89(3):426-445.
[17] Light AD, Obedin-Maliver J, Sevelius JM, Kerns JL. Transgender men who experienced pregnancy after female-to-male gender transitioning. *Obstet Gynecol*. 2014;124(6):1120-1127.

14

PLAINTIFFS002419

sperm respectively after the discontinuation of gender-affirming hormone treatment.[18]

45.   Several of the defendants' experts propose mental health interventions alone as the alternative to gender-affirming medical care. Hruz Report p. 36-37; Kaliebe Report p. 57-61; Lappert Report p. 44. While some experts overstate the evidence base of this proposed alternative, others acknowledge its limitations. Dr. Levine, for example, states, "To my knowledge, there is no evidence beyond anecdotal reports that psychotherapy can enable a return to male identification for genetically male boys, adolescents, and men, or return to female identification for genetically female girls, adolescents, and women." Levine Report p. 26-27.

46.   Defendants' experts assert that parents, guardians, and/or adolescent patients are provided inadequate information to make informed decisions, Donovan Report Exhibit A p. 3-4; Hruz Report p. 56-57, 59-62, or are coerced into decisions that are not voluntary. Hruz Report p. 60; Levine Report p. 76. They do not, however, provide empirical data to support these claims.

47.   Dr. Hruz, for example, contends "Parents are often told by gender affirmation activists or providers that the failure to allow a gender dysphoric child

---

[18] Leung A, Sakkas D, Pang S, Thornton K, Resetkova N. Assisted reproductive technology outcomes in female-to-male transgender patients compared with cisgender patients: A new frontier in reproductive medicine. *Fertil Steril*. 2019;112(5):858-865; de Nie I, van Mello NM, Vlahakis E, et al. Successful restoration of spermatogenesis following gender-affirming hormone therapy in transgender women. *Cell Rep Med*. 2023;4(1):100858.

PLAINTIFFS002420

to medically transition will result in suicide. These 'threats' ignore data that challenge this biased assumption." Hruz Report p. 60. Dr. Hruz does not, however, provide any empirical data regarding the frequency with which parents are told this or the effect this reported claim has on their ability to weigh the potential benefits and risks of treatment. The article that he cites,  D'Angelo R, Syrulnik E, Ayad S, Marchiano L, Kenny DT, Clarke P. One size does not fit all: In support of psychotherapy for gender dysphoria. *Arch Sex Behav*. 2021;50(1):7-16, also lacks such information.

### WPATH, THE ENDOCRINE SOCIETY, AND THE AMERICAN ACADEMY OF PEDIATRICS (AAP) ARE MEDICAL PROFESSIONAL ORGANIZATIONS THAT DEVELOP CLINICAL PRACTICE GUIDELINES AND POLICY STATEMENTS USING ESTABLISHED METHODS

48.     Defendants' expert reports make many misleading or inaccurate claims about medical professional organizations and the development of clinical practice guidelines and policy statements.

49.     Dr. Levine, for example, argues that WPATH "can no longer be considered a purely professional organization" because it permits "trans individuals who are not licensed professionals" to attend its biennial meetings. Levine Report p. 37.

16

50.     In fact, to be a full member of WPATH, with full voting rights, individuals must have relevant professional qualifications.[19]

51.     An active member of the Endocrine Society must be "a physician or scientist whose training and interests promote the knowledge of hormones and other regulatory substances."[20]   Voting rights are limited to active, emeritus, and retired members and doctoral-level trainees.

52.     The AAP similarly restricts voting to fellows, specialty fellows, post residency training members that are board certified, candidate members, and senior members.[21]

53.     Others of defendants' experts characterize WPATH as an advocacy organization. Hruz Report p. 55; Kaliebe Report p. 3; Levine Report p. 35-36. This is an inappropriately narrow characterization of the association. WPATH describes its mission as follows: "To promote evidence-based care, education, research, public policy, and respect in transgender health."[22]

---

[19] The World Professional Association for Transgender Health, Inc. A Nonprofit Educational Organization: Bylaws. Accessed February 26, 2023. Available at https://www.wpath.org/media/cms/Documents/About/Bylaws%20APPROVED%20by%20Members%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.pdf.

[20] Endocrine Society. Bylaws. May 2019. Accessed March 5, 2023. Available at https://www.endocrine.org/-/media/endocrine/files/about/bylaws.pdf.

[21] American Academy of Pediatrics. Constitution and Bylaws. Accessed February 27, 2023. Available at https://downloads.aap.org/AAP/PDF/Const-and-Bylaws-2020.pdf.

[22] WPATH: World Professional Association for Transgender Health. Mission and Vision. Accessed February 26, 2023. Available at https://www.wpath.org/about/mission-and-vision.

PLAINTIFFS002422

54.     It is common for medical professional organizations to have advocacy as a component of their mission as the welfare of the patients that the members of the association treat is contingent on the laws and regulations governing that medical care.

55.     The Endocrine Society's bylaws emphasize the promotion of research and study in the science of endocrinology and the diffusion of information.[23]  Its website also describes its advocacy efforts, stating, "We identify issues that will impact the profession of endocrinology and patients with endocrine conditions and pursue opportunities to impact relevant policy through our relationships with policymakers and by engaging you, their constituents."[24]

56.     The AAP articulates 13 scientific, social, and educational objectives including "function as an effective advocate for all children and youth in all matters pertaining to health and health care."[25]

57.     Some of the defendants' experts contend that small numbers of "activists" have been able to commandeer medical professional organizations' decision-making processes to advance a specific agenda. Kaliebe Report p. 3, 31, 32, 66; Lappert Report p. 46

---

[23] Endocrine Society. Bylaws. May 2019. Accessed March 5, 2023. Available at https://www.endocrine.org/-/media/endocrine/files/about/bylaws.pdf.
[24] Endocrine Society. Shaping public policy. September 6, 2022. Accessed March 5, 2023. Available at https://www.endocrine.org/our-community/shaping-healthcare-and-research-policy.
[25] American Academy of Pediatrics. Constitution and Bylaws. Accessed February 27, 2023. Available at https://downloads.aap.org/AAP/PDF/Const-and-Bylaws-2020.pdf.

PLAINTIFFS002423

58.     Dr. Kaliebe, for example, asserts that, "Small numbers of advocate physicians within medical organizations have been able to leverage moralized claims and low-quality evidence in order to promote affirmative care for gender dysphoria." Kaliebe Report p. 3.

59.     However, this is not true. In my report I describe the rigorous and transparent methods the Endocrine Society and WPATH use to develop their clinical practice guidelines. Antommaria Report p. 7-8, 15-16. Given guidelines are developed by a well-defined, reproducible, and transparent methods, it is not clear why they should be subject to the vote of medical professional organization's entire membership. Hruz Report p. 54; Lappert Report p. 46. Dr. Hruz confusingly both criticizes medical professional organizations for not submitting guidelines to their entire membership for approval and for engaging in "consensus-seeking methodologies by vote." Hruz Report p. 54, 99.

60.     Defendants' experts also provide no evidence to support their assertion that membership in one medical professional organization constitutes a conflict of interest for their work in another medical professional organization. Hruz Report p. 54; Laidlaw Report p. 61, 63. Medical professionals are commonly members of multiple medical professional organizations which does not present an intrinsic conflict of interest of which I am aware. Dr. Donovan's curriculum vitae, for example, lists membership in 13 professional societies and concurrent membership

19

on the AAP Committee on Bioethics, the North American Society for Pediatric Gastroenterology, Hepatology, and Nutrition Ethics Committee, and the Oklahoma State Medical Association Bioethics Committee. Donovan Report Exhibit B p. 5-7.

61.     Defendants' experts also draw attention to legal disclaimers in clinical practice guidelines. Laidlaw Report p. 61; Lappert Report p. 19, 21-22; Levine Report p. 44. Such disclaimers do not in fact undermine the credibility of the guidelines. They simply indicate that health care providers need to consider the characteristics of each individual patient and that such characteristics may justify deviating from the guideline's recommendations.

62.     Here I will focus on the AAP's process for developing policy statements. Another of the defendant's expert's description of this process makes clear the erroneous nature of Dr. Kaliebe's claims. Zanga Report p. 4-5.

63.     AAP policy statements are developed by its committees, sections, councils, and task forces. Committee members and chairpersons are not self-selected but are appointed by the Board of Directors. Board members are elected from specific geographic regions or nationally except for the Chief Executive Officer/Executive Vice President who is appointed by the Board. Entities proposing to develop or revise policy statements must submit an intent form which includes a preliminary literature search and a draft outline. Permission to develop potential policy statements must be given by the Board's Policy Committee and the Intent

PLAINTIFFS002425

Review Committee. Authors of policy statements are required to disclose potential conflicts of interest. Draft policy statements are reviewed by internal (e.g., other committees, sections, and councils) and external reviewers (e.g., other medical professional associations). After revisions are made, senior staff and the entire Board of Directors review proposed policy statements and final approval must be given by the Board's Executive Committee.[26]

64.   The requirement that the elected Board approve policy statements prevents the process from being commandeered by a small group of individuals. Given the Board is elected by the members to represent them, it is unclear, and no evidence is provided, as to why defendant's expert suggested policy statements would need to be approved by a vote of the entire membership. Zanga Report, p. 5.

65.   In addition to these robust methods to develop policy statements, the AAP has mechanisms for members of national leaderships entities to express disagreement with positions taken by the Board of Directors or its Executive Committee, and to facilitate communication from the membership to the Board of Directors.

---

[26] American Academy of Pediatrics. AAP Board of Directors policy and procedures manual. 2021. Accessed February 27, 2023. Available at https://collaborate.aap.org/Lead/Documents/PolicyManual-2021-06.pdf#search=AAP%20Board%20of%20Directors%20policy%20and%20procedures%20manual. Copy available from author.

PLAINTIFFS002426

66.     Individual members of the AAP, chapters, committees, councils, sections, and districts may submit resolutions to the Academy's Annual Leadership Forum. Resolutions are reviewed by the Chapter Forum Management Committee, the Senior Leadership Team, and the Manager of Chapter Programs who may request changes to improve clarity or meet formatting requirements. If the resolution is accepted, it is referred to the staff liaisons of entities within the Academy to provide background information. Members are permitted to review and comment on resolutions prior to the Forum. Resolutions likely to pass through the Forum are placed on a Consent Calendar and the others are assigned to Reference Committees that hold hearings on the resolutions. Resolutions from individual members that are not endorsed by a chapter, committee, council, section, or district requires a second by a Forum representative to be considered. The Forum may adopt, adopt as amended, defeat, refer, postpone, or table resolutions. The Senior Leadership Team and Board of Directors review all adopted resolutions and refer them to appropriate entities for their response.[27]

67.     The fact that the resolutions to which Dr. Zanga refers were not adopted by the Forum does not mean that they were treated undemocratically, or outside of the Academy's standard procedures. Zanga Report p. 6.

---

[27] American Academy of Pediatrics. Guidelines for Submitting Resolutions. October 30, 2020. Accessed February 27, 2023.  Available at https://aapca2.org/wp-content/uploads/2021/02/Guidelines-for-Submitting-Resolutions-_2021.pdf.

PLAINTIFFS002427

68.     Dr. Kaliebe's report also contends that academic journals affiliated with medical professional organizations stifle debate. Kaliebe Report p. 3, 33-36. On the contrary, the AAP's journals have editorial independence from the Academy and regularly publish articles which question the Academy's clinical practice guidelines and policy statements.

69.     The AAP, for example, produced a revised, clinical practice guideline for the diagnosis and management of the initial urinary tract infections (UTIs) in febrile infants and children 2 to 24 months of age that was published in September 2011.[28] The guideline recommended febrile infants with UTIs should undergo renal and bladder ultrasonography but not voiding cystourethrograms (VCUGs) unless the ultrasound revealed findings consistent with high-grade vesicular ureteral reflux or obstructive uropathy. *Pediatrics* published an accompanying commentary to the guideline in which the author made alternative recommendations that the author believed were supported by the available evidence.[29]   In April 2012, the journal published another commentary, this time by the Executive Committee of the Section

---

[28] Subcommittee on Urinary Tract Infection, Steering Committee on Quality Improvement and Management, Roberts KB. Urinary tract infection: Clinical practice guideline for the diagnosis and management of the initial UTI in febrile infants and children 2 to 24 months. *Pediatrics*. 2011;128(3):595-610.
[29] Newman TB. The new American Academy of Pediatrics urinary tract infection guideline. *Pediatrics*. 2011;128(3):572-5.

23

PLAINTIFFS002428

on Urology, critical of the recommendation against performing VCUGs and a response by several authors of the guideline.[30]

70.     With respect to gender-affirming medical care, *Pediatrics* has published comments on its website and Letters to the Editor in the journal critical of articles on gender-affirming medical care. The journal solicits reader comments and posts selected comments on its website following editorial review. Comments may also be published in *Pediatrics* as Letters to the Editor.[31]

71.     An example of such criticism is the response to the article by Turban et al. in which the authors argued that the sex assigned at birth ratio of transgender and gender diverse adolescents in the US does not favor individuals assigned female at birth based on their analysis of the Youth Risk Behavior Survey.[32]   The journal posted 4 critical comments on its website, including one by Lisa Littman,[33] and

---

[30] Wan J, Skoog SJ, Hulbert WC, et al. Section on Urology response to new guidelines for the diagnosis and management of UTI. *Pediatrics*. 2012;129(4):e1051-1053 and Roberts KB, Finnell SM, Downs SM. Response to the AAP Section on Urology concerns about the AAP urinary tract infection guideline. *Pediatrics*. 2012;129(4):e1054-1056. See also American Academy of Pediatrics. Committee on Bioethics. Children as hematopoietic stem cell donors. *Pediatrics*. 2010;125(2):392-404; Pentz RD, Alderfer MA, Pelletier W, et al. Unmet needs of siblings of pediatric stem cell transplant recipients. *Pediatrics*. 2014;133(5):e1156-1162; and Ross LF, Antommaria AH. The need to promote all pediatric stem cell donors' understanding and interests. *Pediatrics*. 2014;133(5):e1356-1357.
[31] AAP Publications: Pediatrics. Author Instructions: Reader Comments. March 11, 2022. Accessed February 28, 2023.  Available at https://publications.aap.org/pediatrics/pages/author-instructions#reader_comments.
[32] Turban JL, Dolotina B, King D, Keuroghlian AS. Sex assigned at birth ratio among transgender and gender diverse adolescents in the United States. *Pediatrics*. 2022;150(3):e2022056567.
[33] AAP Publications: Pediatrics. Sex assigned at birth ratio among transgender and gender diverse adolescents in the United States. Accessed February 28, 2023.  Available at

PLAINTIFFS002429

subsequently published 1 of the comments as a Letter to the Editor. The Letter writers state that they "identified critical theoretical and methodological concerns specific to [the study's] conceptualization of social contagion and its data analysis."[34] A reply by Turban et al. includes additional analyses of the data in response to the commenters' criticisms.[35] *Pediatrics'* posting and publication of these criticisms belies Kaliebe's claims. Kaliebe Report p. 3, 33-36.

### DOCUMENTS FROM OTHER COUNTRIES DO NOT SUPPORT BANS ON GENDER-AFFIRMING MEDICAL CARE

72.    Defendants' experts reference documents from several other countries on the treatment of gender dysphoria, predominantly from Finland, Sweden, and the United Kingdom (UK), although they also mention documents from France, Australia, and New Zealand.[36]

73.    Before addressing the substance of these claims, several preliminary points should be made. Defendants' experts do not provide a comprehensive review of international practices, rather they selectively cite documents that they believe

---

https://publications.aap.org/pediatrics/article/150/3/e2022056567/188709/Sex-Assigned-at-Birth-Ratio-Among-Transgender-and?autologincheck=redirected.

[34] Lett E, Everhart A, Streed C, Restar A. Science and public health as a tool for social justice requires methodological rigor. *Pediatrics*. 2022;150(6):e2022059680.

[35] Turban JL, Dolotina B, King D, Keuroghlian AS. Author response to: Science and public health as a tool for social justice requires methodological rigor. *Pediatrics*. 2022;150(6):e2022059680.  See also Correction to Branstrom and Pachankis. *Am J Psychiatry*. 2020;177(8):734 that is discussed by Laidlaw Report p. 68.

[36] Donovan Report p. 6-7, Exhibit A p. 1, 3; Hruz Report p. 91-96; Kaliebe Report p. 18-24; Laidlaw Report p. 75; Lappert Report p. 2, 63; Levine Report 42-43; Zanga Report p. 11.

PLAINTIFFS002430

support their position. Hruz, for example, cites a document reportedly from the Astrid Lindgren Children's Hospital[37] without acknowledging that the 5 other children's hospitals in Sweden that provide gender-affirming medical care did not concurrently modify their practices.[38]  Hruz Report p. 92.

74.    Language differences also make it difficult to assess fully some of the material that the defendants' experts cite to as support for their claims. For example, the Swedish National Board of Health and Welfare's (NBHW's) guideline for the care of children and adolescents with gender dysphoria is not available in an official English translation; only a 6-page summary is available in an official English translation.[39]

75.    With respect to the content of these documents, none is a clinical practice guideline which rates the quality of the evidence and the strength of the recommendations. Some of the documents are systematic reviews of the literature

---

[37] It should also be noted that to support his assertion, Dr. Hruz cites a webpage of the "Society for Evidence Based Gender Medicine." Hruz Report p. 92.  This webpage contains links to PDFs of documents that the webpage states were obtained from the Karolinska Hospital and links to the Society's unofficial translations of the documents.  The webpage does not contain links to the documents on the Karolinska Hospital's own website or information regarding who performed the translation and their credentials.  Society for Evidence Based Gender Medicine.  Sweden's Karolinska ends all use of puberty blockers and cross-sex hormones on minors outside of clinical studies. February 2022.  Accessed March 5, 2023.  Available at https://segm.org/Sweden_ends_use_of_Dutch_protocol.

[38] Mission Investigate/SVT. Transbarnen. 2021. Accessed March 10, 2023. Available at https://b2b.svt.se/svt-sales/programme-sales/trans-children.html.

[39] The National Board of Health and Welfare. Care of children and adolescents with gender dysphoria: Summary. 2022. Accessed February 27, 2023.  Available at https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-3-7799.pdf.

PLAINTIFFS002431

that rate the quality of the evidence but do not make recommendations.[40]   Direct inferences cannot be drawn from the quality of the evidence to the strength of recommendations; low quality evidence may be a sufficient basis for strong recommendations. Antommaria Report p. 10-11. The French document referenced is in fact only a press release.[41]

76.     Several of defendants' experts mischaracterize the conclusions of these documents. Kaliebe, for example, states "Sweden, England and Finland have all reviewed the evidence and pressed pause." Kaliebe Report p. 65. Similarly, Dr. Lappert asserts "The world literature demonstrates emphatically that early medical and surgical transitioning is in fact so controversial that medical leadership in multiple countries has put a stop to it." Lappert Report p. 64. None of the documents to which defendants' experts refer recommends banning gender-medical care and none, to the best of my knowledge, addresses insurance coverage.

---

[40] National Institute for Health and Care Excellence (NICE). Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria. October 2020. Accessed February 27, 2023. Available at https://cass.independent-review.uk/nice-evidence-reviews/; National Institute for Health and Care Excellence (NICE). Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria. October 2020. Accessed February 27, 2023. Available at https://cass.independent-review.uk/nice-evidence-reviews/.
[41] Académie Nationale de Médecine. Medicine and gender transidentity in children and adolescents. February 25, 2022. Accessed February 27, 2023. Available at https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/?lang=en.

PLAINTIFFS002432

77.     Finland, Sweden, and the UK are all moving to providing care through regional multidisciplinary clinics, the type of care commonly provided in the US.[42] In Finland, for example, gender-affirming medical care is provided by Helsinki University Central Hospital and Tampere University Hospital. Puberty blockers and gender-affirming hormone treatment are provided to minors with persistent gender dysphoria on a case-by-case basis.[43]

78.     Sweden is restructuring care for gender dysphoria into 3 national specialized medical care units. While the Swedish recommendations state puberty blockers and gender-affirming hormone treatment "should be offered only in exceptional cases," they later state "an early (childhood) onset of gender incongruence, persistence of gender incongruence until puberty and a marked psychological strain in response to pubertal development is among the recommended criteria."[44]

---

[42] Hsieh S, Leininger J. Resource list: Clinical care programs for gender-nonconforming children and adolescents. *Pediatr Ann*. 2014;43(6):238-244.

[43] Council for Choices in Health Care in Finland. Medical treatment methods for dysphoria associated with variations in gender identity in minors – recommendation. June 16, 2020. Accessed February 27, 2023.  Available at https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474.

[44] The National Board of Health and Welfare. Care of children and adolescents with gender dysphoria: Summary. 2022. Accessed February 27, 2023.  Available at https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-3-7799.pdf.

PLAINTIFFS002433

79.     The UK is moving from a single specialist provider model to regional centers. The Cass Review does not provide definitive advice on the use of puberty blockers or gender-affirming hormone treatment in its interim report.[45]

80.     The documents all emphasize the importance of data collection. The Cass Review recommends, for example, "Existing and future services should have standardised data collection in order to audit standards and inform understanding of the epidemiology, assessment and treatment of this group of children and young people."[46]

81.     The Swedish NBHW, however, states, "To ensure that new knowledge is gathered, the NBHW further deems that treatment with GnRH-analogues and sex hormones for young people should be provided within a research context, which does not necessarily imply the use of randomized controlled trials (RCTs). As in other healthcare areas where it is difficult to conduct RCTs while retaining sufficient internal validity, it is also important that other prospective study designs are considered for ethical review and that register studies are made possible."[47]

---

[45] The Cass Review. Independent review of gender identity services for children and young people: Interim report at p. 22. February 2022. Accessed February 27, 2023. Available at https://cass.independent-review.uk/publications/interim-report/.

[46] The Cass Review. Independent review of gender identity services for children and young people: Interim report. February 2022. p. 22.  Accessed February 27, 2023. Available at https://cass.independent-review.uk/publications/interim-report/.

[47] The National Board of Health and Welfare. Care of children and adolescents with gender dysphoria: Summary at p. 4. 2022. Accessed February 27, 2023.  Available at https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-3-7799.pdf.

PLAINTIFFS002434

82.   This is inconsistent with the defendants' experts' emphasis on the use of randomized controlled trials discussed above.

## GENDER DYSPHORIA AND GENDER-AFFIRMING MEDICAL CARE ARE NOT PROPERLY ANALOGIZED TO ANOREXIA NERVOSA, BODY INTEGRITY IDENTITY DISORDER, OR LOBOTOMIES

83.   The treatment of gender dysphoria can be clearly differentiated from the treatment of anorexia nervosa and body integrity identity disorder. Cf., Donovan Report Exhibit A p. 7; Kaliebe Report p. 54; Zanga Report p. 8. Clinical studies have shown that gender-affirming medical care improves the clinical outcomes of individuals with gender dysphoria. This is not the case with endorsing individuals with anorexia nervosa's fear of gaining weight or becoming fat.  Anorexia nervosa is treated with family-based therapy and weight restoration.[48]

84.    Body integrity identity disorder is not a diagnosis contained in the American Psychiatric Association's *Diagnostic and Statistical Manual*.[49]  Evidence regarding the effects of amputation is limited to case reports[50] and cross-sectional studies[51] as opposed to observational studies as in gender-affirming medical care.

---

[48] Society for Adolescent Health and Medicine. Medical management of restrictive eating disorders in adolescents and young adults. *J Adolesc Health*. 2022;71(5):648-654 and Bou Khalil R, Richa S. Apotemnophilia or body integrity identity disorder: A case report review. *Int J Low Extreme Wounds*. 2012;11(4):313-319.

[49] American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders*. 5th ed, Text Revision. American Psychiatric Publishing; 2022.

[50] Bou Khalil R, Richa S. Apotemnophilia or body integrity identity disorder: A case report review. *Int J Low Extrem Wounds*. Dec 2012;11(4):313-319.

[51] First MB. Desire for amputation of a limb: Paraphilia, psychosis, or a new type of identity disorder. *Psychol Med*. 2005;35(6):919-928.

PLAINTIFFS002435

85.     The fact that some medical treatments, such as lobotomy, can be shown retrospectively to have been unsafe or ineffective or better alternatives were developed does not permit one to know prospectively when this will be the case.[52] Cf., Donovan Report p. 9-10; Kaliebe Report p. 63.

## RECONSTRUCTIVE AND AESTHETIC SURGERY

86.     Dr. Lappert's putative distinction between reconstructive and aesthetic surgery does not provide a sound basis to support providing coverage for gynecomastia and breast reduction surgery and excluding coverage for gender-affirming surgeries.

87.     Dr. Lappert defines reconstructive surgery as "the restoration of form and function for a person who has suffered a loss through genetic, in utero developmental accident, trauma, infection, or surgery for infectious events or cancer." Lappert Report p. 24-25. He contends that reconstructive breast reduction surgery is differentiated from cosmetic breast reduction surgery based on the weight of the breast tissue removed and that this criterion is based on the highest levels of

---

[52] In this regard, Dr. Lappert misrepresents the history of the treatment of peptic ulcer disease and Profs. Seselja and Strasser's article. Lappert Report p. 15, 57.  Profs. Seselja and Strasser argue that there were two rival hypotheses of the cause of peptic ulcer disease—that it was caused by gastric acid and that it was caused by bacteria.  The bacterial hypothesis was perceived to be refuted by a large study which failed to demonstrate bacteria in the stomach using a particular stain until later investigators identified bacteria using a different staining technique. The authors argue that there were sound reasons not to abandon the bacterial hypothesis at the time the earlier study was published.  Seselja D, Strasser C. Heuristic reevaluation of the bacterial hypothesis of peptic ulcer disease in the 1950s. *Acta Biotheor*. 2014;62(4):429-454.

PLAINTIFFS002436

scientific support. Lappert Report p. 31-33. He characterizes aesthetic surgery as beginning in the subjective life of the patient and research on aesthetic surgery as relying on purely subjective evaluations. Lappert Report p. 25, 47.

88.     Clinical practice guidelines published by professional medical organizations characterize both gynecomastia and breast reduction surgery as aesthetic surgery according to Dr. Lappert's definitions. The European Academy of Andrology has published a clinical practice guideline for the evaluation and management of gynecomastia (GM) using the GRADE system, the same system used by the Endocrine Society in its guidelines, including its guideline for the endocrine treatment of gender-dysphoric/gender-incongruent persons.

89.     The Academy's recommendation regarding surgical management, "We suggest surgical treatment only for patients with long-lasting GM, which does not regress spontaneously or following medical therapy" is a weak recommendation based on low quality evidence.[53]

90.     The guideline's remarks regarding surgery state the following:

Persistent GM may have significant psychosocial and psychological consequences. Available literature suggests the association of GM with depression, anxiety, low self-esteem and body image concerns, issues that may lead patients to maladaptive coping mechanisms such as wrapping of the chest, walking with slumped shoulders and arms crossed, and eventually restriction of physical and social activities (Ordaz & Thompson, 2015). It should be noted though that most of the relevant data refer to adolescents, with

---

[53] Kanakis GA, Nordkap L, Bang AK, et al. EAA clinical practice guidelines-gynecomastia evaluation and management. *Andrology*. 2019;7(6):779.

PLAINTIFFS002437

other populations being less represented (Kinsella et al., 2012). In such cases of GM where the disease causes considerable cosmetic and psychological distress, surgical treatment is justified (Mathur & Braunstein, 1997; Kasielska & Antoszewski, 2011; Rew et al., 2015). Older studies suggest better psychological post-operative adjustment when surgery is combined with psychotherapy (Schonfeld, 1962); however, recent data are missing.

91.     The analysis focuses exclusively on individuals' subjective experiences consistent with Dr. Lappert's characterization of aesthetic surgery.

92.     The American Society of Plastic Surgeons has published a revised clinical practice guideline on reduction mammaplasty which also uses the GRADE approach.[54] It makes a strong recommendation that "post menarche female patients presenting with breast hypertrophy should be offered reduction mammaplasty surgery as first-line therapy over nonoperative therapy based solely on the presence

---

[54] I will note that the guideline includes a disclaimer that states in part:

> However, this guideline should not be construed as a rule, nor should it be deemed inclusive of all proper methods of care or exclusive of other methods of care reasonably directed at obtaining the appropriate results. It is anticipated that it will be necessary to approach some patients' needs in different ways. The ultimate judgment regarding the care of a particular patient must be made by the physician in light of all the circumstances presented by the patient, the available diagnostic and treatment options, and available resources.
>
> This guideline is not intended to define or serve as a standard of medical care. Standards of medical care are determined on the basis of all the facts or circumstances involved in an individual case and are subject to change as scientific knowledge and technology advance. The recommendations in this guideline reflect the state of current knowledge at the time of publication. Given the inevitable changes in the state of scientific information and technology, this guideline will be considered relevant for a period of 5 years after publication, in accordance with the inclusion criteria of the ECRI Guidelines Trust (939e).

The guideline nonetheless goes on to state, "Reduction Mammaplasty surgery is considered standard of care for symptomatic breast hypertrophy (396e)." Perdikis G, Dillingham C, Boukovalas S, et al. American Society of Plastic Surgeons evidence-based clinical practice guideline revision: Reduction mammaplasty. *Plast Reconstr Surg.* 2022;149(3):392e-409e.

33

PLAINTIFFS002438

of multiple symptoms rather than resection weight" based on high quality evidence.[55]

93.     In its discussion of the rationale for this recommendation, the guideline states, "The evidence demonstrates that resection weight does not accurately predict patient-oriented outcomes such as alleviation of pain and related symptoms, and should not be the primary determinant of medical necessity" citing 11 references.[56] By multiple symptoms, it means two or more of the following symptoms: upper back pain, rashes, bra strap grooves, neck pain, shoulder pain, numbness, and arm pain. In its discussion of the outcomes of surgery, the guidelines mention reduction in depression and anxiety and increases in quality of life.

94.     Again, based on Dr. Lappert's own definitions, reduction mammaplasty would be considered an aesthetic surgery. He therefore does not provide a sound basis for providing coverage of gynecomastia and breast reduction surgery but not coverage of gender-affirming surgery.

---

[55] Perdikis G, Dillingham C, Boukovalas S, et al. American Society of Plastic Surgeons evidence-based clinical practice guideline revision: Reduction mammaplasty. *Plast Reconstr Surg*. 2022;149(3):395e.
[56] Perdikis G, Dillingham C, Boukovalas S, et al. American Society of Plastic Surgeons evidence-based clinical practice guideline revision: Reduction mammaplasty. *Plast Reconstr Surg*. 2022;149(3):396e.

PLAINTIFFS002439

I declare under penalty of perjury under the laws of the United States of America
that this foregoing is true and correct. Executed on this 10th day of March 2023.

ARMAND H. MATHENY ANTOMMARIA, MD, PhD

35

PLAINTIFFS002440

# Exhibit A

PLAINTIFFS002441

# BIBLIOGRAPHY

AAP Publications: Pediatrics: Author Instructions: Publication Ethics. March 11, 2022. Accessed February 28, 2023. Available at https://publications.aap.org/pediatrics/pages/author-instructions?autologincheck=redirected#publication_ethics.

AAP Publications: Pediatrics. Author Instructions: Reader Comments. March 11, 2022. Accessed February 28, 2023.  Available at https://publications.aap.org/pediatrics/pages/author-instructions#reader_comments.

AAP Publications: Pediatrics. Sex assigned at birth ratio among transgender and gender diverse adolescents in the United States. Accessed February 28, 2023.  Available at https://publications.aap.org/pediatrics/article/150/3/e2022056567/188709/Sex-Assigned-at-Birth-Ratio-Among-Transgender-and?autologincheck=redirected.

Académie Nationale de Médecine. Medicine and gender transidentity in children and adolescents. February 25, 2022. Accessed February 27, 2023. Available at https://www.academie-medecine.fr/la-medecine-face-a-la-transidentite-de-genre-chez-les-enfants-et-les-adolescents/?lang=en.

American Academy of Pediatrics. AAP Board of Directors policy and procedures manual. 2021. Accessed February 27, 2023. Available at https://collaborate.aap.org/Lead/Documents/PolicyManual-2021-06.pdf#search=AAP%20Board%20of%20Directors%20policy%20and%20procedures%20manual. Copy available from author.

American Academy of Pediatrics. Constitution and Bylaws. Accessed February 27, 2023. Available at https://downloads.aap.org/AAP/PDF/Const-and-Bylaws-2020.pdf.

American Academy of Pediatrics. Evidence-Based Clinical Practice Guidelines: Development and Implementation Manual. November 10, 2019. Accessed February 28, 2023. Available at https://downloads.aap.org/DOCCSA/CPGManual20190628.pdf.

American Academy of Pediatrics. Guidelines for Submitting Resolutions. October 30, 2020. October 30, 2020.  Accessed February 27, 2023.  https://aapca2.org/wp-content/uploads/2021/02/Guidelines-for-Submitting-Resolutions-_2021.pdf.

American Academy of Pediatrics. Committee on Bioethics. Children as hematopoietic stem cell donors. *Pediatrics*. 2010;125(2):392-404.

American College of Cardiology Foundation, American Heart Association. Methodology manual and policies from the ACCF/AHA Task Force on practice guidelines. June 2010. Accessed March 5, 2023. Available at https://www.acc.org/-/media/Non-Clinical/Files-PDFs-Excel-MS-Word-etc/Guidelines/About-Guidelines-and-Clinical-Documents/Methodology/2014/Methodology-Practice-Guidelines.pdf?la=en&hash=157B7835091CF7856B26528717BE14B33BE8226F.

PLAINTIFFS002442

American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders*. 5th ed, Text Revision. American Psychiatric Publishing; 2022.

Bou Khalil R, Richa S. Apotemnophilia or body integrity identity disorder: A case report review. *Int J Low Extreme Wounds*. 2012;11(4):313-319.

Correction to Branstrom and Pachankis. *Am J Psychiatry*. 2020;177(8):734.

Council for Choices in Health Care in Finland. Medical treatment methods for dysphoria associated with variations in gender identity in minors – recommendation. June 16, 2020. Accessed February 27, 2023. Available at https://palveluvalikoima.fi/documents/1237350/22895008/Summary_minors_en+(1).pdf/fa2054c5-8c35-8492-59d6-b3de1c00de49/Summary_minors_en+(1).pdf?t=1631773838474.

Crilly CJ, Haneuse S, Litt JS. Predicting the outcomes of preterm neonates beyond the neonatal intensive care unit: What are we missing? *Pediatr Res*. 2021;89(3):426-445.

D'Angelo R, Syrulnik E, Ayad S, Marchiano L, Kenny DT, Clarke P. One size does not fit all: In support of psychotherapy for gender dysphoria. *Arch Sex Behav*. 2021;50(1):7-16.

de Nie I, van Mello NM, Vlahakis E, et al. Successful restoration of spermatogenesis following gender-affirming hormone therapy in transgender women. *Cell Rep Med*. 2023;4(1):100858.

Endocrine Society. Bylaws. May 2019. Accessed March 5, 2023. Available at https://www.endocrine.org/-/media/endocrine/files/about/bylaws.pdf.

Endocrine Society. Shaping public policy. September 6, 2022. Accessed March 5, 2023. Available at https://www.endocrine.org/our-community/shaping-healthcare-and-research-policy.

First MB. Desire for amputation of a limb: Paraphilia, psychosis, or a new type of identity disorder. *Psychol Med*. 2005;35(6):919-928.

Headache Classification Committee of the International Headache Society (IHS). The international classification of headache disorders, 3rd edition. *Cephalalgia*. 2018;38(1):1-211.

Hembree WC, Cohen-Kettenis PT, Gooren L, et al. Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *J Clin Endocrinol Metab*. 2017;102(11):3869-3903.

HIGHLIGHTS OF PRESCRIBING INFORMATION. May 2017. Accessed February 26, 2023. Available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/020263s042lbl.pdf.

Hsieh S, Leininger J. Resource list: Clinical care programs for gender-nonconforming children and adolescents. *Pediatr Ann*. 2014;43(6):238-244.

Kanakis GA, Nordkap L, Bang AK, et al. EAA clinical practice guidelines-gynecomastia evaluation and management. *Andrology*. 2019;7(6):778-793.

PLAINTIFFS002443

Lett E, Everhart A, Streed C, Restar A. Science and public health as a tool for social justice requires methodological rigor. *Pediatrics*. 2022;150(6):e2022059680.

Leung A, Sakkas D, Pang S, Thornton K, Resetkova N. Assisted reproductive technology outcomes in female-to-male transgender patients compared with cisgender patients: A new frontier in reproductive medicine. *Fertil Steril*. 2019;112(5):858-865.

Light AD, Obedin-Maliver J, Sevelius JM, Kerns JL. Transgender men who experienced pregnancy after female-to-male gender transitioning. *Obstet Gynecol*. 2014;124(6):1120-1127.

McCrindle BW, Rowley AH, Newburger JW, et al. Diagnosis, treatment, and long-term management of Kawasaki disease: A scientific statement for health professionals from the American Heart Association. *Circulation*. 2017;135(17): e927-e999.

Mission Investigate/SVT. Transbarnen. 2021. Accessed March 10, 2023. Available at https://b2b.svt.se/svt-sales/programme-sales/trans-children.html.

National Institute for Health and Care Excellence (NICE). Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria. October 2020. Accessed February 27, 2023. Available at https://cass.independent-review.uk/nice-evidence-reviews/.

National Institute for Health and Care Excellence (NICE). Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria. October 2020. Accessed February 27, 2023. Available at https://cass.independent-review.uk/nice-evidence-reviews/.

Newman TB. The new American Academy of Pediatrics urinary tract infection guideline. *Pediatrics*. 2011;128(3):572-575.

NIH. Grants & funding: Peer Review. October 24, 2021. Accessed February 28, 2023. Available at https://grants.nih.gov/grants/peer-review.htm.

Pentz RD, Alderfer MA, Pelletier W, et al. Unmet needs of siblings of pediatric stem cell transplant recipients. *Pediatrics*. 2014;133(5):e1156-1162.

Perdikis G, Dillingham C, Boukovalas S, et al. American Society of Plastic Surgeons evidence-based clinical practice guideline revision: Reduction mammaplasty. *Plast Reconstr Surg*. 2022;149(3):392e-409e.

Roberts KB, Finnell SM, Downs SM. Response to the AAP Section on Urology concerns about the AAP urinary tract infection guideline. *Pediatrics*. 2012;129(4):e1054-1056.

Ross LF, Antommaria AH. The need to promote all pediatric stem cell donors' understanding and interests. *Pediatrics*. 2014;133(5):e1356-1257.

Seselja D, Strasser C. Heuristic reevaluation of the bacterial hypothesis of peptic ulcer disease in the 1950s. *Acta Biotheor*. 2014;62(4):429-454.

3

PLAINTIFFS002444

Society for Adolescent Health and Medicine. Medical management of restrictive eating disorders in adolescents and young adults. *J Adolesc Health*. 2022;71(5):648-654.

Society for Evidence Based Gender Medicine.  Sweden's Karolinska ends all use of puberty blockers and cross-sex hormones on minors outside of clinical studies. February 2022.  Accessed March 5, 2023.  Available at https://segm.org/Sweden_ends_use_of_Dutch_protocol.

Steiner TJ, Jensen R, Katsarava Z, et al. Aids to management of headache disorders in primary care, 2nd edition. *J Headache Pain*. 2019;20(1):57.

Subcommittee on Urinary Tract Infection, Steering Committee on Quality Improvement and Management, Roberts KB. Urinary tract infection: Clinical practice guideline for the diagnosis and management of the initial UTI in febrile infants and children 2 to 24 months. *Pediatrics*. 2011;128(3):595-610.

Sugarman J., Ethics in the design and conduct of clinical trials. *Epidemiol Rev*. 2002;24(1):54-58.

The Cass Review. Independent review of gender identity services for children and young people: Interim report. February 2022. Accessed February 27, 2023. Available at https://cass.independent-review.uk/publications/interim-report/.

The National Board of Health and Welfare. Care of children and adolescents with gender dysphoria: Summary. 2022. Accessed February 27, 2023.  Available at https://www.socialstyrelsen.se/globalassets/sharepoint-dokument/artikelkatalog/kunskapsstod/2022-3-7799.pdf.

The World Professional Association for Transgender Health, Inc. A Nonprofit Educational Organization: Bylaws. Accessed February 26, 2023. Available at https://www.wpath.org/media/cms/Documents/About/Bylaws%20APPROVED%20by%20Members%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.pdf.

Turban JL, Dolotina B, King D, Keuroghlian AS. Author response to: Science and public health as a tool for social justice requires methodological rigor. *Pediatrics*. 2022;150(6):e2022059680.

Turban JL, Dolotina B, King D, Keuroghlian AS. Sex assigned at birth ratio among transgender and gender diverse adolescents in the United States. *Pediatrics*. 2022;150(3):e2022056567.

U.S. Food & Drug Administration. Postmarketing Surveillance Programs. April 2, 2020. Accessed February 26, 2023. Available at https://www.fda.gov/drugs/surveillance/postmarketing-surveillance-programs.

Wan J, Skoog SJ, Hulbert WC, et al. Section on Urology response to new guidelines for the diagnosis and management of UTI. *Pediatrics*. 2012;129(4):e1051-1053.

WPATH: World Professional Association for Transgender Health. Mission and Vision. Accessed February 26, 2023. Available at https://www.wpath.org/about/mission-and-vision.

PLAINTIFFS002445