Advertisement

Pl. Trial Ex. 041

ACP Journals

Annals of Internal Medicine®

Position Papers  |  21 July 2015

# Lesbian, Gay, Bisexual, and Transgender Health Disparities: Executive Summary of a Policy Position Paper From the American College of Physicians

FREE

Hilary Daniel, BS and  Renee Butkus, BA, …    View all authors +

Author, Article, and Disclosure Information

https://doi.org/10.7326/M14-2482

## Abstract

In this position paper, the American College of Physicians examines the health disparities experienced by the lesbian, gay, bisexual, and transgender (LGBT) community and makes a series of recommendations to achieve equity for LGBT individuals in the health care system. These recommendations include enhancing physician understanding of how provide culturally and clinically competent care for LGBT individuals, addressing environmental and social factors that can affect their mental and physical well-being, and supporting further research into understanding their unique health needs.

PDF

Help

The lesbian, gay, bisexual, and transgender (LGBT) community is diverse, comprising persons from various races, ethnicities, and socioeconomic

PLAINTIFFS001236

backgrounds; however, LGBT persons face a common set of challenges within the health care system. These challenges range from access to health care coverage and culturally competent care to state and federal policies that reinforce social stigma, marginalization, or discrimination. Recent years have brought about reliable data collection, research, and a greater understanding of the health care needs of the LGBT community and the challenges they face in accessing care. Although great strides have been taken in reducing health disparities in the LGBT community, much more needs to be done to achieve equity for LGBT persons in the health care system.

Although members of the LGBT community face similar health concerns as the general population, certain disparities are reported at a higher rate among LGBT persons than the heterosexual population (1). These disparities experienced by LGBT persons may be compounded if they are also part of a racial or ethnic minority (1). Of note, LGBT persons are more likely to identify themselves as being in poor health than heterosexual individuals, and different segments of the LGBT population have individual health risks and needs. For example, gay and bisexual men are at increased risk for certain sexually transmitted infections and account for more than half of all persons living with HIV or AIDS in the United States (1); lesbian women are less likely to have mammography or Papanicolaou test screening for cancer (2); lesbian and bisexual women are more likely to be overweight or obese (3); and lesbian, gay, and bisexual persons are more likely to become disabled at a younger age than heterosexual individuals (4).

Various state or federal laws may affect the quality of life of LGBT persons and can affect their physical and mental health. Same-sex marriage bans may cause psychological distress (5), prohibitive hospital visitation policies may prevent a same-sex parent from seeing a minor while the child is ill or participating in medical decision making for the child, and exclusions on transgender health care in private and public health plans may cause a transgender patient to seek treatment options through illegal channels (6). These laws and policies, along with others that reinforce marginalization, discrimination, social stigma, or rejection of LGBT persons by their families or communities or that simply keep LGBT persons from accessing health care, have been associated with increased rates of anxiety, suicide, and substance or alcohol abuse (7).

Addressing these disparities will require changes in the way LGBT persons and their families are regarded in society and by the health care system. Policies that are discriminatory toward the LGBT community, or are no longer supported by empirical research, continue to reinforce the environmental and social factors that can affect the mental and physical well-being of LGBT persons. The American College of Physicians (ACP) long-standing commitment to improving the health of all Americans and opposes any form of discrimination in the delivery of health care services. ACP is dedicated to eliminating disparities in the quality of or access to health care and is committed to working toward fully understanding the unique needs of the LGBT community and eliminating health disparities for LGBT persons.

PLAINTIFFS001238

This Executive Summary provides a synopsis of the full position paper, which is available in Appendix.

## Methods

The ACP Health and Public Policy Committee, which is charged with addressing issues affecting the health care of the U.S. public and the practice of internal medicine and its subspecialties, developed these recommendations. The committee reviewed numerous studies, reports, and surveys on LGBT health care and related health policy. The committee also reviewed information on how state and federal policies may affect the physical and mental health of the LGBT population. Draft recommendations were reviewed by the ACP Board of Regents, Board of Governors, Council of Early Career Physicians, Council of Resident/Fellow Members, Council of Student Members, and Council of Subspecialty Societies. The position paper and recommendations were reviewed by the ACP Board of Regents and approved on 27 April 2015.

## ACP Position Statements and Recommendations

PDF

Help

The following statements represent the official policy positions and recommendations of the ACP. The rationale for each is provided in the full position paper (Appendix).

A glossary of LGBT terminology used throughout this paper can be found at https://lgbt.ucsf.edu/glossary-terms.

PLAINTIFFS001239

1. The American College of Physicians recommends that gender identity, independent and fundamentally different from sexual orientation, be included as part of nondiscrimination and antiharassment policies. The College encourages medical schools, hospitals, physicians' offices, and other medical facilities to adopt gender identity as part of their nondiscrimination and antiharassment policies.

2. The American College of Physicians recommends that public and private health benefit plans include comprehensive transgender health care services and provide all covered services to transgender persons as they would all other beneficiaries.

3. The definition of "family" should be inclusive of those who maintain an ongoing emotional relationship with a person, regardless of their legal or biological relationship.

4. The American College of Physicians encourages all hospitals and medical facilities to allow all patients to determine who may visit and who may act on their behalf during their stay, regardless of their sexual orientation, gender identity, or marital status, and ensure visitation policies are consisten the Centers for Medicare & Medicaid Services Conditions of Participation and The Joint Commission standards for Medicare-funded hospitals and critical-access hospitals.

5. The American College of Physicians supports civil marriage rights for same-sex couples. The denial of such rights can have a negative impact on

PLAINTIFFS001240

*the physical and mental health of these persons and contribute to ongoing stigma and discrimination for LGBT persons and their families.*

*6. The American College of Physicians supports data collection and research into understanding the demographics of the LGBT population, potential causes of LGBT health disparities, and best practices in reducing these disparities.*

*7. Medical schools, residency programs, and continuing medical education programs should incorporate LGBT health issues into their curricula. The College supports programs that would help recruit LGBT persons into the practice of medicine and programs that offer support to LGBT medical students, residents, and practicing physicians.*

*8. The College opposes the use of "conversion," "reorientation," or "reparative' therapy for the treatment of LGBT persons.*

*9. The American College of Physicians supports continued reviews of blood donation deferral policies for men who have sex with men. The College supports evidence-based deferral policies that take into account a comprehensive assessment of the risk level of all individuals seeking to donate, which may result in varying deferral periods or a lengthened or permanent deferral on blood donation.*

## Conclusion

The ACP recognizes that reducing health disparities in the LGBT population will take concerted efforts not only by those in the medical community but

PLAINTIFFS001241

also from society as a whole. Training future physicians to be culturally and clinically competent in LGBT health care, working with practicing physicians to increase their understanding of the LGBT population and their health needs, advocating for practical health policies supported by empirical research, and working to eliminate laws that discriminate against the LGBT community and their families are all important steps to reducing and ultimately eliminating the health disparities experienced by the LGBT community.

## Appendix: Lesbian, Gay, Bisexual, and Transgender Health Disparities: A Policy Position Paper From The American College of Physicians

### Understanding the LGBT Community

The LGBT community is a highly diverse and multifaceted group of persons encompassing all cultures, ethnicities, and walks of life. Under the LGBT umbrella, each individual group faces unique cultural and health-related needs but shares common challenges, such as social stigma, discrimination, and disparities in health care, that unite them.

Research into LGBT health has been expanding as the community has become more visible and outspoken about engaging the health care system in developing a knowledge base on the distinctive challenges and health disparities they face. However, gaps in the medical community's understanding of the overall makeup of the LGBT community and the environmental and social factors that may influence the needs of those

PLAINTIFFS001242

persons present an obstacle to addressing challenges in a meaningful way. In 2011, the Institute of Medicine issued a report outlining a research agenda targeting several areas that could affect how the health care system approaches LGBT health, including demographics, social influences, disparities and inequalities, intervention that includes increasing access to care and addressing physical or mental conditions, and transgender-specific needs. The report also recommended the inclusion of the LGBT community in national health surveys and emphasized a need for scientific rigor and a respectful environment when gathering data (8).

One important obstacle to identifying health issues within the LGBT population is a lack of reliable data and the exclusion of sexual and gender minorities' identification on federal health surveys. Recent efforts have been made to gather population data on persons who identify as lesbian, gay, bisexual, or transgender and those who identify as being in a same-sex marriage or partnership. For the first time in 2010, the U.S. Census Bureau did not change the data reporting the number of same-sex couples that identified as being married. Before that, the 2000 U.S. Census changed the relationship status of same-sex partners identifying as being the spouse of the head of household to an "unmarried partner" because there were no states in which same-sex marriage was legal. In the 1990 U.S. Census, if a same-sex couple identified themselves as married, the sex of 1 of the respondents was automatically changed to the opposite sex and the couple was enumerated as an opposite-sex married couple (9). The Patient Protection and Affordable Care Act allows the Department of Health and Human Services (HHS) to collect "additional demographic data to further

PLAINTIFFS001243

improve our understanding of health disparities," and in 2013, the National Health Interview Survey—an annual study of health care access, use, and behaviors—included sexual orientation as part of its data collection system (10). Recent estimates put the number of persons who identify as lesbian, gay, bisexual, or transgender at more than 9 million or approximately 3.4% of the U.S. population, which some analysts believe may be an underestimate (1). Individuals who may have same-sex attractions or experiences but do not self-identify as LGBT may still fall into the category of sexual minorities and face health disparities associated with LGBT persons.

## Access to Care in the LGBT Population

The LGBT community has often been overlooked when discussing health care disparities and continues to face barriers to equitable care. Barriers to care are multidimensional and include stigma and discrimination, poverty, lack of education, racial or ethnic minority status, and other psychological health determinants (11). Studies show that persons who identify as LGBT have greater economic disadvantages and are more vulnerable to poverty than those who do not. Using available information from national sur the Williams Institute reports higher overall poverty rates for persons identifying under the LGBT umbrella than heterosexual persons and higher rates of poverty in same-sex couples than heterosexual couples (7.6% vs. 5.7%) (12).

Research shows that LGBT adults and their children are more likely to be uninsured by public or private insurance and that they and their family

PLAINTIFFS001244

members continue to face difficulties in gaining access to care and face a higher risk for health disparities than the general population (2). Most Americans gain health insurance coverage through their employer; data are limited but suggest LGBT persons face higher unemployment rates than non-LGBT persons. A 2009 survey in California found a 14% unemployment rate among LGBT adult workers compared with 10% among non-LGBT adults (13).

The Affordable Care Act sought to increase access to care for low-income Americans by expanding Medicaid programs to all persons at or below 133% of the federal poverty level, providing financial subsidies to help those making between 100% and 400% of the federal poverty level purchase insurance on the federal and state marketplace exchanges, and including nondiscrimination protections in health plans sold on the exchanges. Although estimates suggested that the number of uninsured LGBT persons would be reduced as a result of Medicaid expansion, only about half of states have chosen to expand their Medicaid programs, which greatly diminishes its effect. This increases the number of LGBT persons who may fall into what has been dubbed the "coverage gap," in which persons may earn too much to qualify for their state's Medicaid program but too little to qualify for subsidies (14).

Transgender individuals face additional challenges in gaining access to care. Not only are they more likely to be uninsured than the general population, they are more likely to be uninsured than lesbian, gay, or bisexual persons (1). They also face high out-of-pocket costs for transgender-specific medical

PLAINTIFFS001245

care if they lack insurance or their insurance coverage does not cover transgender health care. According to the American Congress of Obstetricians and Gynecologists, transgender youth who receive inadequate treatment are at an increased risk for engaging in self-mutilation or using illicit venues to obtain certain treatments; research shows more than 50% of persons who identify as transgender have obtained injected hormones through illegal means or outside of the traditional medical setting (6).

## Mental and Physical Health Disparities

Existing research into the health of the LGBT population has found some health disparities that disproportionately affect the LGBT population. In 2000, the first federally funded research study on the health of LGBT persons assessed 5 major areas of concern for lesbian, gay, and bisexual persons (the report noted that transgender health concerns warranted an independent evaluation): cancer, family planning, HIV and AIDS, immunization and infectious diseases, and mental health (15). Research has shown that lesbian women are less likely to get preventive cancer screenings; lesbian and bisexual women are more likely to be overweight or obese (16); gay men at higher risk for HIV and other sexually transmitted infections; and LGBT populations have the highest rates of tobacco, alcohol, and other drug use (17). Lesbian, gay, and bisexual persons are approximately 2.5 times more likely to have a mental health disorder than heterosexual men and women (18).

PLAINTIFFS001246

Transgender persons are also at a higher lifetime risk for suicide attempt and show higher incidence of social stressors, such as violence, discrimination, or childhood abuse, than nontransgender persons (19). A 2011 survey of transgender or gender-nonconforming persons found that 41% reported having attempted suicide, with the highest rates among those who faced job loss, harassment, poverty, and physical or sexual assault (20).

**Positions**

*1. The American College of Physicians recommends that gender identity, independent and fundamentally different from sexual orientation, be included as part of nondiscrimination and antiharassment policies. The College encourages medical schools, hospitals, physicians' offices, and other medical facilities to adopt gender identity as part of their nondiscrimination and antiharassment policies.*

Nondiscrimination policies are in place to prevent employment discrimination or harassment based on race, color, national or ethnic origin, age, religion, sex, disability, genetics, or other characteristics protected under federal, state, or local law (21). However, state law varies considerably on the inclusion of sexual orientation and gender identity in nondiscrimination policies and some policies based on sexual orientation alone may not include gender identity. Eighteen states have employment nondiscrimination or equal employment opportunity statutes that cover both gender identity and sexual orientation, and an additional 3 states have nondiscrimination statutes that cover sexual orientation only (22). The

PLAINTIFFS001247

Human Rights Campaign, an LGBT rights organization, estimated that as a result of these assorted laws, 3 of 5 U.S. citizens live in an area that does not provide protection for gender identity or sexual orientation (23).

Sexual orientation and gender identity are inherently different and should be considered as such when assessing whether nondiscrimination or harassment policies provide protection to all members of the LGBT community. According to the Institute of Medicine, "sexual orientation" refers to a person's enduring pattern of or disposition to have sexual or romantic desires for, and relationships with, persons of the same sex or both sexes (8). "Gender identity" refers to a person's basic sense of being a man or boy, a woman or girl, or another gender. Gender identity may or may not correspond to a person's anatomical sex assigned at birth. The term "transgender" is now widely used to refer to a diverse group of persons who depart significantly from traditional gender norms (24). Persons who have a "marked difference" between their anatomical sex at birth and their expressed or experienced gender may be diagnosed with gender dysphoria, which is a diagnosis under the American Psychiatric Association *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* (25).

Evidence shows that individuals with gender identity variants face increased discrimination, threats of violence, and stigma. The National Gay and Lesbian Task Force and the National Center for Transgender Equality conducted a national survey of transgender and gender-nonidentifying persons and found high rates of harassment (78%), physical assault (35%), and sexual violence (12%) (20). More than 90% of survey participants

reported harassment or discrimination in the workplace, and they experience double the rate of unemployment than the general population (20). Therefore, LGBT persons are more likely to lose their job or not be hired (26).

Employers have the option to include gender identity as part of their company's nondiscrimination or antiharassment policies even if their state does not, and many companies have chosen to include comprehensive protections policies. To reduce the potential for discrimination, harassment, and physical and emotional harm toward persons who are not covered by current protections, the medical community should include both sexual orientation and gender identity as part of any comprehensive nondiscrimination or antiharassment policy.

*2. The American College of Physicians recommends that public and private health benefit plans include comprehensive transgender health care services and provide all covered services to transgender persons as they would all other beneficiaries.*

The LGBT community is at increased risk for physical and emotional h resulting from discrimination or harassment, and transgender persons may face greater inequalities in the health care system than the general population. Of note, 19% of transgender persons lack any type of health insurance (20). A handful of states have laws about insurance coverage for transgender health care, such as hormone replacement therapy or sexual reassignment surgery, which may be considered medically necessary as part of the patient's care. Eight states and the District of Columbia have

PLAINTIFFS001249

prohibitions on insurance exclusion of treatments for sex reassignment surgery (27).

The World Professional Association for Transgender Health has developed health care standards for transgender persons who have been diagnosed with gender dysphoria. The standards emphasize treatments that will achieve "lasting personal comfort with their gendered selves, in order to maximize their overall health, psychological well-being, and self-fulfillment" and may or may not include modification to a person's gender expression or how this individual appears or presents physically to others (28). Research shows that when transgender persons receive individual, medically appropriate care, they have improved mental health, reduction in suicide rates, and lower health care costs overall because of fewer mental health–related and substance abuse–related costs (29). However, not all health plans cover all services associated with transgender health or consider such services medically necessary; some plans may issue blanket exclusions on transgender health care, not cover certain services for a transgender person as they would for nontransgender persons, or only cover the cost of gender reassignment surgery if certain conditions are met. For example, an insurance company may cover posthysterectomy estrogenic hormone replacement therapy for biological women but will not cover a similar type of hormone therapy for a postoperative male-to-female transgender patient. Many professional medical organizations, including the American Medical Association, American Psychological Association, American Psychiatric Association, American Congress of Obstetricians and Gynecologists, and

PLAINTIFFS001250

American Academy of Family Physicians, consider gender transition–related medical services medically necessary (30).

The decision to institute a hormone therapy regimen or pursue sexual reassignment surgery for transgender individuals is not taken lightly. Transgender patients and their health care team, which may include primary care physicians, endocrinologists, mental health professionals, and others, are in the best position to determine the most appropriate care plan unique to the patient's needs. Throughout the course of treatment, patients and their physicians or health care team should discuss available options and the evidence base for those treatments in which such evidence exists. It is especially important that transgender patients whose health care team has determined that treatment should include cross-sex hormone therapy or sexual reassignment surgery and postoperative hormone therapy be well-informed about the potential health risks associated with the long-term use of some hormonal replacement therapies before treatment.

Without insurance coverage, the cost of treatment for persons with gender dysphoria may be prohibitively expensive. The most extensive and exp                  sexual reassignment surgeries may cost tens of thousands of dollars; t does not include associated costs, such as counseling, hormone replacement therapy, copays, or aftercare. The high costs of treatment can result in persons who cannot access the type of care they need, which can increase their levels of stress and discomfort and lead to more serious health conditions. In 2014, the HHS lifted the blanket ban on Medicare coverage for gender reassignment surgery (31) and the federal government announced it

PLAINTIFFS001251

would no longer prohibit health plans offered on the Federal Employees Health Benefits Program from offering gender reassignment as part of the plan (27). Transgender health advocates are hopeful this will result in wider coverage for transgender care in private health plans.

The cost of including transgender health care in employee health benefits plans is minimal and is unlikely to raise costs significantly, if at all. A survey of employers offering transition-related health care in their health benefit plans found that two thirds of employers that provided information on actual costs of employee utilization of transition-related coverage reported 0 costs (32). This is the result of a very small portion of the population identifying as transgender and a smaller portion of that group having the most expensive type of gender reassignment surgery as part of their treatment. An analysis of the utilization of transgender health services over 6 years after transgender discrimination was prohibited in one California health plan found a utilization rate of 0.062 per 1000 covered persons (33). The inclusion of transgender-related health care services within a health plan may also result in an overall reduction of health care costs over time because patients are less likely to engage in self-destructive behaviors, such alcohol or substance abuse.

*3. The definition of "family" should be inclusive of those who maintain an ongoing emotional relationship with a person, regardless of their legal or biological relationship.*

The term "family" as it is seen in society is changing and no longer means married heterosexual parents with children. An analysis shows only 22% of

PLAINTIFFS001252

families fall into this category (34). Stepparents, single parents, grandparents, same-sex couples, or foster or adoptive parents all make up the changing face of U.S. families. Across the country, LGBT persons are raising children, and demographic data shows that 110 000 same-sex couples are raising as many as 170 000 biological, adopted, or foster children and 37% of LGBT adults have had a child (35). This modern concept of family is no longer dependent on parental status and does not only include adult heads of household with minor children. Same-sex couples and different-sex couples who do not have children may nevertheless have persons in their lives that they consider family.

Despite research that shows a growing trend toward acceptance of LGBT individuals and families (36), there is no widely used standard definition of family inclusive of the diverse nature of the family structure and definitions vary widely: They can differ from state to state, within the Internal Revenue Service for tax purposes, by employers to determine eligibility for health plans, and by hospitals for the purposes of visitation or medical decision making. If LGBT spouses or partners are not legally considered a family member, they are at risk for reduced access to health care and restrict on caregiving and decision making; further, they are at increased risk for health disparities, and their children may not be eligible for health coverage (34). Therefore, LGBT persons and families may already be at a financial disadvantage, with single LGBT parents 3 times more likely to live near the poverty line than their non-LGBT counterparts and LGBT families twice as likely to live near the poverty threshold (35). These financial disadvantages can translate into lack of access to medical care and poorer health outcomes

PLAINTIFFS001253

similar to those experienced by non-LGBT persons and their families who are uninsured or underinsured, in addition to the health disparities that are already reported among the LGBT community.

The Human Rights Campaign's definition of family for health care organizations, developed with multistakeholder input, is inclusive of same- and different-sex married couples and families and is an example of a broad, comprehensive definition of family that includes a person's biological, legal, and chosen family:

> Family means any person(s) who plays a significant role in an individual's life. This may include a person(s) not legally related to the individual. Members of "family" include spouses, domestic partners, and both different-sex and same-sex significant others. "Family" includes a minor patient's parents, regardless of the gender of either parent. (37)

A definition of family inclusive of all types of families, including the LGBT population, is not only fundamental to reducing the disparities and inequalities that exist within the health care system, but also important for the equal treatment of LGBT patients and their visitors in the hospital setting. Countless accounts show loved ones being denied the right to visit; assist in the medical decision-making process for their partner, minor, or child; or be updated on the condition of a patient because hospital visitation policy broadly prohibits those who are not recognized family members from access to the patient. These policies are discriminatory against LGBT patients, their visitors, and the millions of others who are considered family,

such as friends, neighbors, or nonrelative caregivers who can offer support to the patient.

*4. The American College of Physicians encourages all hospitals and medical facilities to allow all patients to determine who may visit and who may to act on their behalf during their stay, regardless of their sexual orientation, gender identity, or marital status, and ensure visitation policies are consistent with the Centers for Medicare & Medicaid Services Conditions of Participation and The Joint Commission standards for Medicare-funded hospitals and critical-access hospitals.*

When persons or their loved ones need emergency care or extended inpatient stays in the hospital, they do not often immediately think about access to visitors or hospital visitation policies, the ability to assist in medical decision making, or their legal rights as patients or visitors. Hospital visitation policies are not always clear or consistent about who can visit or make medical decisions for a patient if they become incapacitated or cannot do so themselves. The absence or limited access of loved ones can cause uncertainty and anxiety for the patient. In contrast, the involvement of family and outside support systems can improve health outcomes, such management of chronic illness and continuity of care (38).

A highly publicized incident of LGBT families facing discrimination and being denied hospital visitation occurred in Florida in 2007. A woman on vacation with her family had an aneurysm and was taken to the hospital. Her same-sex partner and their children were denied the right to see her or receive updates on her condition, and she eventually slipped into a coma

PLAINTIFFS001255

and died (39). In response to this incident, President Obama issued a presidential memorandum recommending that the HHS review and update hospital visitation policies for hospitals participating in Medicare or Medicaid and critical-access hospitals to prohibit discrimination based on such factors as sexual orientation or gender identity (40).

Throughout the rulemaking process, the HHS revised the Medicare Conditions of Participation to require that all hospitals explain to all patients their right to choose who may visit during an inpatient stay, including same-sex spouses, domestic partners, and other visitors, and the patients' right to choose a person to act on their behalf. The Joint Commission, the nation's largest organization for hospital accreditation, also updated its standards to include equal visitation for LGBT patients and visitors (41). As a result of these updated policies, most hospitals and long-term care facilities are required to allow equal visitation for LGBT persons and their families.

The presidential memorandum also recommended that the HHS instruct hospitals to disclose to their patients that patients have a right to designate a representative to make medical decisions on their behalf if they canno[t] make those decisions themselves. The revised Conditions of Participa[tion] emphasized that hospitals "should give deference to patients' wishes about their representatives, whether expressed in writing, orally, or through other evidence, unless prohibited by state law" (42). With piecemeal regulations and policies governing the legal rights of LGBT persons and their families, some same-sex spouses or domestic partners choose to prepare advance directives, such as durable powers of attorney and health care proxies, in an

PLAINTIFFS001256

effort to ensure their access to family members and their ability to exert their right to medical decision making if necessary.

*5. The American College of Physicians supports civil marriage rights for same-sex couples. The denial of such rights can have a negative impact on the physical and mental health of these persons and contribute to ongoing stigma and discrimination for LGBT persons and their families.*

The health and financial benefits of marriage for different-sex couples are widely reported, and contemporary research supports similar benefits in same-sex marriage. On the other hand, denial of marriage rights for LGBT persons may lead to mental and physical health problems. Health benefits associated with same-sex marriage result from improved psychological health and a reinforced social environment with community support (43). Research suggests that being in a legally recognized same-sex marriage diminishes mental health differentials between LGBT and heterosexual persons (5). A comparison study on the utilization of public health services by gay and bisexual men before and after Massachusetts legalized same-sex marriage found a reduction in the number of visits for health problem mental health services. The study noted a 13% reduction in visits over after the legalization of same-sex marriage (44).

In contrast, denial of such rights can result in ongoing physical and psychological health issues. Thus, LGBT persons encountering negative societal attitudes and discrimination often internalize stressors and have poor health unseen to those around them; further, these stressors can lead to self-destructive behaviors (43). A study of LGBT individuals living in states

PLAINTIFFS001257

with a same-sex marriage ban found increases in general anxiety, mood disorders, and alcohol abuse (45). The denial of marriage rights to LGBT persons has also been found to reinforce stigmas of the LGBT population that may undermine health and social factors, which can affect young adults (46). The American Medical Association's broad policy supporting civil rights for LGBT persons acknowledges that denial of civil marriage rights can be harmful to LGBT persons and their families and contribute to ongoing health disparities (47).

Since 2003, the overall support for marriage equality has increased. The shift in attitudes toward acceptance of same-sex marriage has broad positive implications for the future of U.S. civil marriage rights. A 2013 survey by the Pew Research Center revealed that nearly half of U.S. adults expressed support for same-sex marriage. Of note, millennials (those born after 1980) showed the highest rate of support for same-sex marriage rights at 70%. Not only has overall opinion changed, but individually, 1 in 7 respondents reported they had changed their minds from opposing to supporting same-sex marriage. The Pew survey found that 32% of respondents changed their mind because they knew someone who identified as lesbian or gay (36

The legal landscape is also shifting in favor of inclusive civil marriage rights for same-sex couples. The American Bar Association has adopted a resolution recognizing "that lesbian, gay, bisexual and transgender (LGBT) persons have a human right to be free from discrimination, threats and violence based on their LGBT status and condemns all laws, regulations and rules or practices that discriminate on the basis that an individual is [an]

PLAINTIFFS001258

LGBT person" (48). In June 2013, the U.S. Supreme Court struck down a provision of the Defense of Marriage Act that defined marriage as a "union between a man and a woman." The decision allowed legally married same-sex couples to have the same federal benefits offered to heterosexual couples (49). Currently more than half of the states and the District of Columbia allow same-sex marriage, and several states have rulings in favor of same-sex marriage that are stayed pending legal appeals (50). In April 2015, the Supreme Court heard oral arguments in a case involving same-sex marriage bans in Michigan, Ohio, Kentucky, and Tennessee; this will ultimately determine the constitutionality of same-sex marriage bans, including whether states would be required to recognize same-sex marriages performed legally out of state (51).

*6. The American College of Physicians supports data collection and research into understanding the demographics of the LGBT population, potential causes of LGBT health disparities, and best practices in reducing these disparities.*

Previous efforts to understand the LGBT population by including sexu orientation or gender identity in health surveys and data collection ar good first step, but there is a long way to go to understand the unique health needs of all members of the LGBT community. Understanding the demographics of the persons who make up this community is a key first step to understanding how environmental and social determinants may contribute to the health disparities they face. Overwhelming evidence shows that racial and ethnic minorities experience greater health disparities than

PLAINTIFFS001259

the general population. In 2010, ACP published an updated position paper on racial and ethnic disparities in health care, which identified various statistics on health disparities in racial and ethnic minority groups, such as higher levels of uninsured Hispanics than white persons (34% vs. 13%) and lower rates of medication adherence in minority Medicare beneficiaries diagnosed with dementia (52). Persons who are part of both the LGBT community and a racial or ethnic minority group may face the highest levels of disparities. For example, data show that 30% of African American adults who identify as lesbian, gay, or bisexual are likely to delay getting a prescription compared with 19% of African American heterosexual adults (26).

Transgender persons may also face certain increased risk factors that can affect their health that are not included when discussing the LGBT population as a whole, which creates research gaps with the LGBT community. A survey study of transgender persons shows elevated reports of harassment, physical assault, and sexual violence (20). In addition, transgender persons are more likely to face discrimination in education, employment, housing, and public accommodations than other sexual, racial, or ethnic minority groups. The lack of and unfamiliarity with research focused on the physical health issues of transgender persons, such as hormone replacement therapy and cancer risk, limit the understanding or development of best practices that could reduce the disparities felt by this population. The dearth of such research is detrimental to physicians' understanding of issues unique to transgender patients and reduces their ability to care for these patients.

PLAINTIFFS001260

Data that have been gathered in the relatively short time since the inclusion of sexual orientation, gender identity, and same-sex marital status have revealed information that can be used to create tailored plans to decrease health disparities in in the LGBT community. For example, in 2009 the California Health Interview Survey collected information on certain health indicators and included sexual orientation along with racial and minority status. The survey found a higher rate of uninsured lesbian, gay, or bisexual Latino adults in the state than their African American counterparts (36% vs. 14%) (20).

In addition to obtaining information from population surveys, including gender identity and sexual orientation as a component of a patient's medical record (paper or electronic) may help a physician to better understand an LGBT patient's needs and provide more comprehensive care. This can be particularly useful in the care of transgender persons, whose gender identity and gender expression may differ from their sex assigned at birth and are not in line with the standard sex template on many forms. Including this information—especially in electronic health records that can standardize information, such as anatomy present and the preferred name/pronoun can create a more comfortable experience for the patient and keep the physician up to date on the patient's transition history, if applicable (53). If a physician uses paper medical records, the patient's chart should be flagged using an indicator, such as a sticker, to alert staff to use the preferred name and pronoun of the patient (54).

PLAINTIFFS001261

*7. Medical schools, residency programs, and continuing medical education programs should incorporate LGBT health issues into their curricula. The College supports programs that would help recruit LGBT persons into the practice of medicine and programs that offer support to LGBT medical students, residents, and practicing physicians.*

Establishing understanding, trust, and communication between a physician and a patient is key to an ongoing and beneficial physician–patient relationship. However, reported instances of physician bias or denial of care to LGBT patients may influence patients to withhold information on their sexual orientation, gender identity, or medical conditions that could help the physician have a better understanding of the potential health needs of their patients. Physicians can play an integral role in helping an LGBT patient navigate through the medical system by providing respectful, culturally, and clinically competent care that underscores the overall health of the patient. In an article published in *The New England Journal of Medicine,* Makadon noted how physicians can create a welcoming and inclusive environment to LGBT patients:

> [G]uidelines for clinical practice can be very simple: ask the appropriate questions and be open and nonjudgmental about the answers. Few patients expect their providers to be experts on all aspects of gay and lesbian life. But it is important that providers inquire about life situations, be concerned about family and other important relationships, understand support systems, and make appropriate referrals for counseling and support when necessary. (55)

PLAINTIFFS001262

Providing clinically and culturally competent care for transgender persons in the primary care setting may present a challenge to physicians who are not knowledgeable about transgender health. Transgender persons have reported encounters with physicians who are unaware of how to approach treatment of a transgender person, and half of transgender patients reported having to "teach" their physician about transgender health (20). The National Transgender Survey found that 19% of participants had been denied medical care because of their transgender status (20). Resources for physicians on how to approach the treatment of transgender patients should emphasize respecting the patient's gender identity while providing prevention, treatment, and screening to the anatomy that is present (56).

To better understand the unique health needs of the LGBT community, physicians and medical professionals must develop a knowledge base in cultural and clinical competency and understand the factors that affect LGBT health; this should begin in the medical school setting and continue during practice. Assessment of LGBT-related content at medical schools found a median of 5 hours spent on LGBT-related issues over the course of the curriculum (57). Exposure to members of the LGBT population in medical school has been shown to increase the likelihood that a physician will take a more comprehensive patient history, have a better understanding of LGBT health issues, and have a more positive attitude toward LGBT patients (58). Studies show that undergraduate students pursuing a career in medicine are receptive to incorporating LGBT-related issues into their education and agree that it applies to their future work (59). The College recognizes the importance of incorporating LGBT health into the medical

school curriculum and publishes a comprehensive medical textbook on LGBT health, *The Fenway Guide to Lesbian, Gay, Bisexual, and Transgender Health, 2nd Edition* (60).

In November 2014, the Association of American Medical Colleges Advisory Committee on Sexual Orientation, Gender Identity, and Sex Development released a comprehensive report recommending strategies on how to implement changes in academic medical institutions to better address the needs of LGBT patients; further, the committee identified challenges and barriers to carrying out these changes. The report recognizes 3 methods of integrating LGBT health into the medical school curricula: full curriculum revision, the addition of a required class, or LGBT health study as a part of elective materials. The report also identifies barriers to curricular changes, including but not limited to a lack of material that has been shown to be effective, reluctance of faculty and staff to teach the new material, and a shortage of institutional time that would permit teachers to participate in continuing education on the topic (61).

For some LGBT persons interested in pursuing careers in medicine, there continues to be an underlying concern that their sexual orientation or gender identity may affect their selection into a medical school or residency program and acceptance by their peers. In 2012, Dr. Mark Schuster published his personal story about being gay in medicine starting in the 1980s when he entered medical school, through residency, and into practice. In his article, he spoke of a former attending physician he worked under who acted as an advisor and had indicated he would offer him a

PLAINTIFFS001264

recommendation for residency, only to find this physician later renege on that offer after Dr. Schuster shared that he was gay (62). Little research has been done on the recruitment of LGBT physicians into the practice of medicine or how disclosing sexual orientation may affect training. One survey measuring the perceptions and attitudes toward sexual orientation during training found that 30% of respondents did not reveal their sexual orientation when applying for residency positions for fear of rejection (63).

Academic medical institutions can make efforts to create a welcoming and inclusive environment for students and faculty. The University of California, San Francisco, LGBT Resource Center developed a checklist for medical schools to assess LGBT curriculum, admissions, and the working environment within their institution. The checklist includes inclusive application procedures, measurement of retention of LGBT students, and efforts and resources dedicated to student well-being (64). In a 2013 white paper, the Gay and Lesbian Medical Association made several recommendations to support an LGBT-inclusive climate at health professional schools in such areas as institutional equality, transgender services and support, diversity initiatives, admissions, staff and faculty recruitment and retention, staff and faculty training, and other areas that underscore simple yet thoughtful ways to create an accepting environment for LGBT students, faculty, and employees (65). Tools such as these can assist in recruiting and retaining LGBT physicians.

*8. The College opposes the use of "conversion," "reorientation," or "reparative" therapy for the treatment of LGBT persons.*

Since 1973, the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* has not considered homosexuality an illness (66). All major medical and mental health organizations do not consider homosexuality as an illness but as a variation of human sexuality, and they denounce the practice of reparative therapy for treatment of LGBT persons (67). The core basis for "conversion," "reorientation," or "reparative" therapy, which is generally defined as therapy aiming at changing the sexual orientation of lesbian women and gay men, is mostly based on religious or moral objections to homosexuality or the belief that a homosexual person can be "cured" of their presumed illness.

In 2007, the American Psychological Association conducted a literature review of 83 studies on the efficacy of efforts to change sexual orientation. It found serious flaws in the research methods of most of the studies and identified only 1 study that met research standards for establishing safety or efficacy of conversion therapy and also compared persons who received a treatment with those who did not. In that study, intervention had no effect on the rates of same-sex behavior, so it is widely believed that there is no scientific evidence to support the use of reparative therapy ( 68). The I American Health Organization, the regional office for the Americas of the larger World Health Organization, also supports the position that there is no medical basis for reparative therapy and that the practice may pose a threat to the overall health and well-being of an individual (69). Dr. Robert Spitzer, the author of a 2003 research study often cited by supporters of the reparative therapy movement to purport that persons may choose to change their sexual orientation, has denounced the research as flawed and

apologized to the LGBT community in a letter for misinterpretations or misrepresentations that arose from the study (70).

Available research does not support the use of reparative therapy as an effective method in the treatment of LGBT persons. Evidence shows that the practice may actually cause emotional or physical harm to LGBT individuals, particularly adolescents or young persons. Research done at San Francisco State University on the effect of familial attitudes and acceptance found that LGBT youth who were rejected by their families because of their identity were more likely than their LGBT peers who were not rejected or only mildly rejected by their families to attempt suicide, report high levels of depression, use illegal drugs, or be at risk for HIV and sexually transmitted illnesses (71). The American Psychological Association literature review found that reparative therapy is associated with the loss of sexual feeling, depression, anxiety, and suicidality (68).

States have delved into the debate over the use of reparative therapy for minor children given the potential for harm. California; New Jersey; and Washington, DC, have enacted laws banning the practice. Several other legislatures, such as those in Washington state, Massachusetts, New York, and Oregon, have introduced or passed legislation through one chamber but failed to pass the bill into law (72). The New Jersey law was challenged on the grounds that the ban limited the free speech of mental health professionals, but the law was upheld by the Third U.S. Circuit Court of Appeals (73). In May 2015, the U.S. Supreme Court declined to hear a challenge to the law (74).

PLAINTIFFS001267

*9. The American College of Physicians supports continued reviews of blood donation deferral policies for men who have sex with men. The College supports evidence-based deferral policies that take into account a comprehensive assessment of the risk level of all individuals seeking to donate, which may result in varying deferral periods or a lengthened or permanent deferral on blood donation.*

Persons who are considered at increased or possible risk for certain infectious diseases, such as intravenous drug users, recipients of animal organs or tissues, and those who have traveled or lived abroad in certain countries, are prohibited by the U.S Food and Drug Administration from donating blood (75). Since the early 1980s, the policy has also included men who have sex with men (MSM) since 1977. This lifetime deferral of blood donation for MSM was instituted during a time when the incidence of HIV and AIDS increased to epidemic levels in the United States, and the disease and how it was transmitted were largely misunderstood by the scientific community. In the following years, concerted efforts by the medical community, patient advocates, and government officials and agencies resulted in advancements in blood screening technology and treatment the virus. However, during that time of uncertainty, policies were implemented to balance the risk for contaminating the blood supply with what was known about the transmissibility of the disease.

Several medical organizations support deferral policy reform based on available scientific evidence and testing capabilities. The American Medical Association policy on blood donor criteria supports, "the use of rational,

scientifically based blood and tissue donation deferral periods that are fairly and consistently applied to donors according to their level of risk" (76). The American Association of Blood Banks, America's Blood Centers, and the American Red Cross have long advocated for a modification to deferral criteria to be "made comparable with criteria for other groups at increased risk for sexual transmission of transfusion-transmitted infections" and recommend a 12-month deferral for men who have had sex with another man since 1977, which is in line with deferral criteria for others who have exhibited high-risk behavior (77). The eligibility standards and policies on the donation of tissues or tissue products (5-year deferral since last sexual contact) (78) and vascular organs (risk assessed individually, disclosed to transplant team, and consent required) (79) by MSM also reflect a measured assessment of disease transmission risk to donor recipients.

Many countries, including the United Kingdom, Canada, Finland, Australia, and New Zealand, have successfully instituted deferral periods ranging from 12 months to 5 years in lieu of a lifetime ban on blood donation by MSM without measurable increased risk to the blood supply. A study of the risk of blood donations from MSM after the implementation of shorter deferral periods in England and Wales 12 months after their last sexual encounter found only a marginal increase in the risk for transfusion-transmitted HIV (80). Australia changed the deferral policy for MSM from 5 years to 12 months over 1996 to 2000. A study that compared the prevalence of HIV among blood donors from the 5-year deferral period compared with the 12-month deferral period found no evidence that the 12-month period increased risk for HIV in recipients (81).

PLAINTIFFS001269

In late 2014, the HHS Advisory Committee on Blood and Tissue Safety and Availability voted in favor of recommending a 1-year deferral policy for MSM and increased surveillance of the blood supply. The U.S Food and Drug Administration announced it would be updating its policy on blood donation from MSM after considering recommendations made by the HHS, reviews of available scientific evidence, and recommendations from its own Blood Products Advisory Committee. The policy about indefinite deferral on blood donation from MSM is being updated to a 1-year deferral period from the last sexual contact, and the U.S. Food and Drug Administration will issue draft guidance on the policy change in 2015. In addition, the agency announced it has already taken steps to implement a national blood surveillance system to monitor what, if any, effects the new policy has on the nation's blood supply (82). Lifting the lifetime ban on blood donation by MSM is an important first step toward creating equity among those wishing to donate blood. The U.S Food and Drug Administration should continue to monitor the effects of a 1-year deferral and update its policy as information and data are gathered through surveillance to make further strides toward policies that assess donor eligibility on the basis of scientific data and individual risk fact〔 such as the length of time since a high-risk behavior has occurred, typ sex that occurred, number of partners during a period of time, or a combination of factors (83).

PDF

Help

## Comments

**6 Comments**

SIGN IN TO SUBMIT A COMMENT

PLAINTIFFS001270

Rex Moss, MD  •  Dallas, Texas  •  27 May 2015

## Comment

To the Editor: "ACP Takes a Stand against Health Disparities Affecting LGBT Individuals New policy paper aims to ensure high-quality health care for all" This is very disappointing. I love the Annals and very much enjoyed and learned a great deal at several ACP conferences. But I left the AMA as it stood up for abortion rights and I resign from ACP, now as you stand up for a number of foolish policies, more oriented to political ideology than medical care or logic. Your new policy states: For instance, health data related to marital status show a benefit for married heterosexual couples, but the committee found that the fact that LGBT partners and families live without the same protections and recognition appears to increase their risk for depression and other poor health outcomes. Does it really follow that societys protections and encouragement of heterosexual marriage has the power to prevent depression and poor health outcomes? Is it possible that heterosexual marriage is our natural state and that our minds and bodies work best when used in the appropriate way? ACP's Health and Public Policy Committee recommends: Including comprehensive transgender heath care services in public and private health benefit plans. You recommend public and private insurance pay for sexual reassignment surgery. Is there data of benefit? Perhaps a reduction in mortality, disability or morbidity? Do those who have sexual reassignment surgery live longer or commit suicide less often? Why should anyone outside the person determined to change their body pay for it? Expanding the definition of "family" to include all who maintain an emotional connection to the patient, regardless of legal or biological relationship. Do you have data that children raised in families other than with their biological parents do better or as well? In absence of data, would it not be logical to encourage keeping biological parents together or at least permit states to make the judgment for themselves how to regulate/ encourage marriage? (as opposed to having courts take over as the "determiners of all things not established by study or fact") Opposing the use of "conversion," "reorientation" or "reparative" therapies in the treatment of LGBT individuals. Do you have data that such therapies are harmful? If a deeply disturbed person is confused about his/ her sexual identity and wants to focus attention on the opposite sex and seeks counseling to do so, is that wrong or harmful? LGBT individuals have a high incidence of depression and suicide. Do you wish to oppose possible the may help if you have no alternative therapy that will help? Political trends come and go. Slavery, racial marriage, cocaine, smoking, breast self-exam, and epinephrine have been normal, encouraged, discouraged and tossed away. Allowing a popular political idea to lead to policy changes not supported by data, that costs a great deal of money and is very disruptive to a current healthy institution: heterosexual marriage is a poor plan. ACP think before you act. When you act wrongly think again and change. Good-bye, Rex Moss MD

Hilary Daniel, BS, Renee Butkus, BA  •  American College of Physicians  •  11 September 2015

## Response to Comments Made by Drs. Lacy and Ng

The two comments submitted by Drs. Lacy and Ng speak to the diversity of ACP's 143,000 internal medicine physicians and student members. ACP advocates on a wide variety of topics and the College

PLAINTIFFS001271

recognizes that not all ACP members will agree with our positions. The need to address the unique needs of the LGBT persons and their families is a based on ACP's long standing commitment to advocate for those being negatively affected by health care disparities. Ignoring or glossing over some topics that affect health because they are controversial would be inconsistent with ACP's mission "To enhance the quality and effectiveness of health care by fostering excellence and professionalism in the practice of medicine" including "to advocate responsible positions on individual health and on public policy relating to health care for the benefit of the public, our patients, the medical profession, and our members."

We appreciate Dr. Ng's support for our paper. As the paper was being developed, policies concerning same sex marriage, blood donation by men who have sex with men, and coverage for transgender health care services were undergoing change. The College recognizes the need for continued review of issues relating to LGBT health.

Dr. Lacy takes issue with our call for a more inclusive definition of family. As our paper points out, it's estimated that only 22% of U.S. families consist of married heterosexual parents with their own biological children. A modern definition of family that is inclusive of all types of families, including the LGBT population, is fundamental to reducing the disparities and inequalities that exist within the health care system and to equal treatment of LGBT patients and their visitors in the hospital setting. Our opposition to "therapy" to change the sexual orientation of an individual is based on the science that shows that sexual and gender orientation are not disability or disorder in need of treatment or cure, and that such "therapies" may be harmful to patients receiving them.

Hilary Daniel, BS
Renee Butkus, BA

1. Movement Advancement Project, Family Equality Council, Center for American Progress. All children matter: how legal and social inequalities hurt LGBT families: condensed version. Denver: Movement Advancement Project; 2011. Accessed at www.lgbtmap.org/file/all-children-matter-condensed-report.pdf on 11 February 2015

2. American Psychological Association Task Force. Report of the American Psychological Association Task Force on appropriate therapeutic responses to sexual orientation. Washington, DC: American Psychological Association; 2009. Accessed atwww.apa.org/pi/lgbt/resources/therapeutic-response.pdf on 11 February 2015.

Paul J Hudson, MD, MPH, FACP  •  SIM  •  22 June 2015

**The policy on LGBT reaches beyond evidence**

Dear friends at ACP,

PLAINTIFFS001272

I too am disappointed at the lack of evidence for this very broad set of policy changes, which not only goes beyond the evidence but becomes an agent for changing institutions that have stood the test of millenia. For example, defining a family as something other than biological is a step in the wrong direction. The evidence shows that children need a father and they need a mother; this has something to do with biology, and cannot be socially constructed.

Please reconsider your over-reach and return to medical evidence.

Thank you,

Paul Hudson, MD, FACP, MPH

---

Mark D Lacy   •   Lubbock, Tx   •   3 June 2015

## Access for All but losing our way in the Process

To advocate for the elimination of health care disparities among Lesbian, Gay, Bisexual, and Transgender (LGBT) persons is a worthy objective not just for these populations but all patients facing obstacles to quality care. Sadly, the American College of Physicians Position Paper published May 12, 2015 addressing LGBT Health Disparities goes beyond advocating health care access by promoting a damaging sociopolitical ideology. The Paper re-defines the meaning of family, marriage, and calls for denying LGBT persons choices in behavioral health services.

While alleging the Position Paper was the product following review of "numerous studies, reports, and surveys on LGBT health care and related health policy" many cited references are based on research neither well executed nor widely corroborated. Further, it appears the reviewers fail to account for sound, copious evidence contradicting the cited sources.

To redefine family as "those who maintain an ongoing emotional relationship with a person, regardless of their legal or biological relationship" is to deny the reality of paternity and maternity, both integr most wholesome child-rearing environments. Dads contribute to the growth and development children much differently than moms do. Asserting family as whatever one wants it to be is to succumb to the solipsistic notion that the self is the final arbiter of reality, to substitute the real and immutable childhood need for mothers and fathers with the sexual-romantic mutable desires of adults. Will the next Position Paper call for endorsing the aims of the North American Man Boy Love Association or Peter Singer's call for granting civil rights to primates? Marriage is, and for millennia has been, rooted in the male-female complementarity that makes sexual reproduction possible and child-rearing wholistic. What is at play in this Statement are very imprudent mental maneuvres, "The moment you step into the world of facts, you step into a world of limits. You can free things from alien or accidental laws, but not from the laws of their own nature. You may, if you like, free a tiger from his bars, but not free him from his stripes. Do not free a camel from his hump; you may be freeing him from being a camel!". In "re-inventing" family and the meaning of marriage is to engage in the same sort of casuistry.

PLAINTIFFS001273

With regard to the American Psychological Association (APA) being invoked as the authority to repudiate psychotherapy for unwanted sexual behaviours recall the APA Task Force unequivocally posits "Same-sex sexual attractions, behavior, and orientations per se are normal and positive variants of human sexuality." If that is the a priori assertion, can objective assessment of "sexual orientation change efforts" (SOCE) be realistically expected? Probably not. To satisfactorily debunk SOCE entails more than citing the APA. In the meantime, persons who opt for SOCE should be given the prerogative in the same way, for example, the transgender person is offered high- dose estrogens in spite of the increased risk of thrombosis.

The LGBT Position Papers unfortunately makes the Annals a mouthpiece for the post-modern notion that we can write our own narrative and call it true, regardless of the facts. Once the Annals becomes a purveyor of ideology and asserts a world view which doesn't comport with facts, it is no longer a reliable source of guidance for physicians.

Mark D Lacy, MD, MA, FACP

---

Henry Ng, MD, MPH, FAAP, FACP • MetroHealth Medical Center, Case Western Reserve University School of Medicine • 2 June 2015

## In support of the American College of Physician's Policy Position Paper on Lesbian, Gay, Bisexual and Transgender Health Disparities

As an internist-pediatrician who has worked in LGBT health care for the last decade, I am invigorated that the American College of Physicians (ACP), one of my professional homes, has developed a set of LGBT health focused policy statements. From my perspective as an LGBT health advocate and clinical director of a hospital-based LGBT health service line, these policy statements were sorely needed to assist internists around the US and internationally to improve the health experiences and outcomes, and ultimately eliminate health disparities of LGBT patients. I am proud to see the American College of Physicians join a growing group of professional organizations with LGBT-inclusive policies or mis statements including the American Academy of Family Physicians, the American Medical Assoc American Academy of Pediatrics, the American Academy of Physician Assistants, the American Academy of Nursing , the American College of Obstetrics and Gynecology, the American Psychological Association, the American Psychiatric Association, GLMA: Health Professionals Advancing LGBT Equality and others.

The nine policy statements developed by Daniel et al which compose the ACP's policy position paper are both bold and broad in their recommendations. Many of the recommendations are timely and remind internists to keep in-step with guidelines set forth by accrediting bodies such as the Joint Commission and the Centers for Medicare & Medicaid Services. This is especially important as more and more LGBT Americans enroll in health insurance through the Affordable Care Act and begin to routinely access the US health care system. However, the ACP's policy statements will only be as useful as they are complete and current and must be considered a living document with the capacity to grow and change based on

PLAINTIFFS001274

the best available data and knowledge regarding LGBT health. I encourage the members of the ACP Health and Public Policy Committee to revisit the policy statement on regular intervals for updates to fill the many gaps in our knowledge about LGBT health.

Future revisions of the policy statement should pay careful attention to details not necessarily called out in the current policy's executive summary. For example, policy statement 2 calls for the ACP to "recommend that all public and private health benefit plans include comprehensive transgender care services and provide all covered services to transgender persons as they would all other beneficiaries."1 The authors continue to describe the impact of arbitrary or blanket exclusions for transgender health services in their example of hysterectomy coverage for a cisgender patient, but exclusion for a transgender patient. Yet in the policy statement, the ACP falls short of stating that such hormonal and/or surgical care is medically necessary. Moreover, the term "comprehensive" is an unclear term in this context. For optimal health outcomes, comprehensive care would need to be inclusive of all medically necessary care including primary care, mental health care, transgender hormonal care, transgender-related and non-transgender-related surgical care, and HIV care.

The policy authors write in policy statement 6 that the ACP supports data collection and research into the understanding the demographics of the LGBT population, potential causes of LGBT health disparities, and best practices in reducing these disparities. This statement particularly important as there exist few nationally representative datasets describing LGBT population health. In fact, Healthy People 2020 still prioritizes collecting data on LGB and Transgender populations in their four objectives.2 To date, only the 2013 National Health Interview Survey has collected nationally representative data on lesbian, gay and bisexual people.3 Federal nationally representative surveys continue to exclude transgender respondents by not collecting gender identity/expression as part of the respondents' demographic variables. Unfortunately, the majority of electronic health records also fail to provide fields for collection of sexual orientation and gender identity (SOGI) data. Cahill et al found that integrating SOGI data collection into the meaningful use requirements was both acceptable to diverse samples of patients, including heterosexuals, and feasible.4 The ACP should consider supporting inclusion of SOGI data collection in Meaningful Use as another strategy to improve LGBT health data collection.

PDF

Help

Daniel et al write in position statement 7 that "Medical Schools, residency programs, and continue medical education programs should incorporate LGBT health issues into their curriculum. The College supports programs that would help recruit LGBT persons into the practice of medicine and programs that offer support to other LGBT medical students, residents, and practicing physicians."1 Creating the next generation of culturally and clinically competent health professionals and internists is central to improving LGBT health. Nationally, few health organizations and hospitals have actively implemented comprehensive programs to create LGBT affirming environments, educate health professionals and staff on LGBT health, or create sustainable supportive infrastructure. There continues to be a great need for LGBT safe space programs, LGBT 101 cultural competency education, and inclusion of LGBT topics in academic discourse and mentorship. Homophobia, transphobia, few visible LGBT health professional

PLAINTIFFS001275

mentors and lack of institutional support for LGBT health scholarship serve as barriers to growing a cadre of academic internists adequately prepared to care for LGBT populations.5 The College can continue to champion LGBT health by supporting inclusion of LGBT health content in internal medicine certification examination questions, internal medicine in-training examination questions and promotion of additional LGBT health education resources like Fenway Guide to Lesbian, Gay, Bisexual, and Transgender Health.6

Finally, the ACP should consider adding an additional statement which addresses and acknowledges the intersectionality of our patients' identities as noted by IOM report.7 Sexual orientation and gender identity/expression do not exist within a vacuum and are part of the multidimensionality of our identities as people.

References:

1. Daniel H, Butkus R; Health and Public Policy Committee of the American College of Physicians. Lesbian, Gay, Bisexual, and Transgender Health Disparities: Executive Summary of a Policy Position Paper From the American College of Physicians. Ann Intern Med. 2015 May 12. doi: 10.7326/M14-2482. [Epub ahead of print] PMID:25961598

2. Healthy People 2020 LGBT Health Objectives. http://www.healthypeople.gov/2020/topics-objectives/topic/lesbian-gay-bisexual-and-transgender-health/objectives. Accessed 5/29/15

3. Ward BW, Dahlhamer JM, Galinsky AM, Joestl SS. Sexual orientation and health among U.S. adults: National Health Interview Survey, 2013. National health statistics reports; no 77. Hyattsville, MD: National Center for Health Statistics. 2014.

4. Cahill S, Singal R, Grasso C, King D, Mayer K, Baker K, Makadon H.
Do ask, do tell: high levels of acceptability by patients of routine collection of sexual orientation and gender identity data in four diverse American community health centers.
PLoS One. 2014 Sep 8;9(9):e107104. doi: 10.1371/journal.pone.0107104. eCollection 2014. PMID: 25198577

5. Sánchez, N; Rankin, S; Callahan, E; Ng, H.; Holaday, L; McIntosh, K; Poll-Hunter, N; John Paul Sánchez, JP LGBT Health Professional Perspectives on Academic Careers – Facilitators and Challenges. LGBT Health Forthcoming. 2015.

6. Makadon H., Mayer K.,Potter, J., Goldhammer, H. (Eds.). (2015). Fenway Guide to Lesbian, Gay. B and Transgender Health. 2nd edition. American College of Physicians.

7. IOM (Institute of Medicine). 2011.The Health of Lesbian, Gay, Bisexual and Transgender People: Build a Foundation for Better Understanding. Washington, DC: The National Academies Press.

**Disclosures:** I am the President of GLMA: Health Professionals Advancing LGBT Equality

Hilary Daniel   •   American College of Physicians   •   13 May 2015

## FDA Releases Draft Guidance on Blood Donation by MSM

On Tuesday May 12, 2015 the Food and Drug Administration released the document "Revised Recommendations for Reducing the Risk of Human Immunodeficiency Virus Transmission by Blood and Blood Products: Draft Guidance for Industry." The proposed recommendations would replace the lifetime deferral period on blood donation by men who have sex with men (MSM) with a 12-month deferral period from most recent sexual contact. The FDA is accepting public comment on the guidance for 60 days.

&#8249; **PREVIOUS ARTICLE**     **NEXT ARTICLE** &#8250;

PDF

Help

PLAINTIFFS001277