# Indications and Usage Section of Labeling for Human Prescription Drug and Biological Products — Content and Format

# Guidance for Industry

## *DRAFT GUIDANCE*

**This guidance document is being distributed for comment purposes only.**

Comments and suggestions regarding this draft document should be submitted within 60 days of publication in the *Federal Register* of the notice announcing the availability of the draft guidance. Submit electronic comments to https://www.regulations.gov. Submit written comments to the Dockets Management Staff (HFA-305), Food and Drug Administration, 5630 Fishers Lane, Rm. 1061, Rockville, MD 20852. All comments should be identified with the docket number listed in the notice of availability that publishes in the *Federal Register*.

For questions regarding this draft document, contact (CDER) Iris Masucci at 301-796-2500 or (CBER) the Office of Communication, Outreach and Development at 800-835-4709 or 240-402-8010.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**July 2018**
**Labeling**

*10844dft.doc*
*07/03/18*

Pl. Trial Ex. 066

PLAINTIFFS003931

# Indications and Usage Section of Labeling for Human Prescription Drug and Biological Products — Content and Format

# Guidance for Industry

*Additional copies are available from:*

Office of Communications, Division of Drug Information
Center for Drug Evaluation and Research
Food and Drug Administration
10001 New Hampshire Ave., Hillandale Bldg., 4th Floor
Silver Spring, MD 20993-0002
Phone: 855-543-3784 or 301-796-3400; Fax: 301-431-6353
Email: druginfo@fda.hhs.gov
http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm

*and/or*

Office of Communication, Outreach and Development
Center for Biologics Evaluation and Research
Food and Drug Administration
10903 New Hampshire Ave., Bldg. 71, Room 3128
Silver Spring, MD 20993-0002
Phone: 800-835-4709 or 240-402-8010
Email: ocod@fda.hhs.gov
http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/default.htm

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**July 2018**
**Labeling**

PLAINTIFFS003932

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................... 1

II.  GENERAL PRINCIPLES ....................................................................................... 2

   A.   Scope of the Indication(s) ................................................................................. 3

     *1. Scope of an Indication Relative to the Population Studied* ................................... 3
     *2. Age Groups in Indications* ..................................................................................... 4

   B.   Distribution of Information Among Labeling Sections ................................... 6

   C.   Updating the INDICATIONS AND USAGE Section ...................................... 6

III. CONTENT AND FORMAT OF THE INDICATIONS AND USAGE SECTION ..... 6

   A.   Indication .......................................................................................................... 7

     *1. The Disease, Condition, or Manifestation Being Treated, Prevented, Mitigated, Cured, or Diagnosed* ................................................................................................................. 8
     *2. Other Information Necessary To Describe the Approved Indication* ................... 8

   B.   Limitations of Use ........................................................................................... 10

     *1. Situations in Which Limitations of Use Would Be Appropriate* .......................... 11
     *2. Situations in Which Limitations of Use Generally Would **Not** Be Appropriate* ........... 13

   C.   Other Considerations for Writing the INDICATIONS AND USAGE Section ................. 14

     *1. Identification of Outcomes, Endpoints, and Benefit(s) the Drug Conveys* .................. 14
     *2. Accelerated Approval* ........................................................................................... 15
     *3. Required or Recommended Language* ................................................................... 15
     *4. Preferred Wording and Wording Generally To Avoid* ......................................... 16

   D.   Formatting the INDICATIONS AND USAGE Section ................................. 16

     *1. Format for Multiple Indications* ........................................................................... 16
     *2. Format for Limitations of Use* .............................................................................. 17

PLAINTIFFS003933

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

# Indications and Usage Section of Labeling for Human Prescription Drug and Biological Products – Content and Format Guidance for Industry[1]

> This draft guidance, when finalized, will represent the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA staff responsible for this guidance as listed on the title page.

## I.     INTRODUCTION

This guidance is intended to assist applicants in drafting the INDICATIONS AND USAGE section of labeling as described in the regulations for the content and format of labeling for human prescription drug and biological products[2] (21 CFR 201.57(c)(2)).[3]

Recommendations include the following:

- General principles to consider when drafting the INDICATIONS AND USAGE section of the labeling

- What information to include in the INDICATIONS AND USAGE section

- When to include additional descriptors or qualifiers as part of the indication in the INDICATIONS AND USAGE section

- When to include limitations of use in the INDICATIONS AND USAGE section

---

[1] This guidance has been prepared by the Office of Medical Policy in the Center for Drug Evaluation and Research (CDER) in cooperation with the Center for Biologics Evaluation and Research (CBER) at the Food and Drug Administration.

[2] This guidance applies to drugs, including biological drug products. For the purposes of this guidance, *drug product* or *drug* will be used to refer to human prescription drug and biological products that are regulated as drugs, except when there is a difference in the regulation. In such cases, *biological products* will be used. This guidance does not apply to those biological products that are also devices.

[3] See the final rule "Requirements on Content and Format of Labeling for Human Prescription Drug and Biological Products" (71 FR 3922, January 24, 2006) and additional labeling guidances at https://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/LawsActsandRules/ucm084159.htm. We update guidances periodically. To make sure you have the most recent version of a guidance, check the FDA guidance web page at https://www.fda.gov/RegulatoryInformation/Guidances/default.htm.

PLAINTIFFS003934

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

32  • How to write, organize, and format the information within the INDICATIONS AND
33    USAGE section
34

35  The purpose of this guidance is to help ensure that the INDICATIONS AND USAGE section is
36  clear, concise, useful, and informative and, to the extent possible, consistent within and across
37  drug and therapeutic classes. Applicants should follow the recommendations in this guidance
38  when developing the INDICATIONS AND USAGE section for a new drug and when revising
39  this section for a currently approved drug, including when seeking approval of a new indication.
40

41  In general, FDA's guidance documents do not establish legally enforceable responsibilities.
42  Instead, guidances describe the Agency's current thinking on a topic and should be viewed only
43  as recommendations, unless specific regulatory or statutory requirements are cited. The use of
44  the word *should* in Agency guidances means that something is suggested or recommended, but
45  not required.
46
47

48  **II.    GENERAL PRINCIPLES**
49

50  The primary role of the INDICATIONS AND USAGE section of labeling is to enable health
51  care practitioners to readily identify appropriate therapies for patients by clearly communicating
52  the drug's approved indication(s). Among other information, the INDICATIONS AND USAGE
53  section states the disease or condition, or manifestation or symptoms thereof, for which the drug
54  is approved, as well as whether the drug is indicated for the treatment, prevention, mitigation,
55  cure, or diagnosis of that disease or condition, including relief of symptoms (21 CFR
56  201.57(c)(2)). Other sections of labeling (e.g., DOSAGE AND ADMINISTRATION,
57  CONTRAINDICATIONS, WARNINGS AND PRECAUTIONS, USE IN SPECIFIC
58  POPULATIONS), as applicable, also provide essential details that enable safe and effective use
59  of a drug, and labeling should be considered in its entirety for individual prescribing decisions.
60

61  To comply with the general labeling requirements in 21 CFR 201.56 and 201.57, the
62  INDICATIONS AND USAGE section must:
63

64  • Reflect the scientific evidence accurately
65

66  • Be concisely written to include the information necessary to clearly convey the use(s) for
67    which the drug has been shown to be safe and effective
68

69  • Use terminology that is clinically relevant and scientifically valid and understandable to
70    health care practitioners
71

72  Additionally, indications that are straightforward, clear, concise, and consistently written will
73  facilitate the indexing of indications in electronic drug databases. This may, in turn, assist health
74  care practitioners in searching indications in electronic medical information systems, thereby
75  providing easier access to the information in FDA-approved labeling needed for clinical decision
76  making.
77

2

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

78    **A.    Scope of the Indication(s)**

80    Governing regulations articulate parameters for the evidentiary standard necessary for an
81    indication to be listed in the INDICATIONS AND USAGE section of labeling.  For drug
82    products other than biological products, absent an applicable waiver, "all indications listed in the
83    INDICATIONS AND USAGE section must be supported by substantial evidence of
84    effectiveness based on adequate and well-controlled studies" as defined in 21 CFR 314.126(b)
85    (§ 201.57(c)(2)(iv)).[4]  For biological products, indications "must be supported by substantial
86    evidence of effectiveness" (§ 201.57(c)(2)(v)).  Any statements in this section of the labeling
87    comparing the safety or effectiveness of drug or biological products with other agents for the
88    same indications must be similarly supported – that is, for drugs, they must be supported by
89    substantial evidence of effectiveness based on adequate and well-controlled studies and, for
90    biological products, they must be supported by substantial evidence of effectiveness
91    (§ 201.57(c)(2)(iii)).

93    Pursuant to the governing regulations, "[i]ndications or uses must not be implied or suggested in
94    other sections of the labeling if not included" in the INDICATIONS AND USAGE section
95    (§ 201.57(c)(2)(iv) and (v)).  However, FDA may require a specific warning relating to an
96    unapproved use in the WARNINGS AND PRECAUTIONS section of the labeling if the drug is
97    commonly prescribed for a disease or condition and if such usage is associated with a clinically
98    significant risk or hazard (§ 201.57(c)(6)(i)).[5]

100    *1.    Scope of an Indication Relative to the Population Studied*

102    The INDICATIONS AND USAGE section should clearly communicate the scope of the
103    approved indication, including the population to which the determination of safety and
104    effectiveness is applicable.  The indicated population may mirror the studied population, for
105    example, in terms of patient demographics or severity of disease or condition, but can sometimes
106    differ.  In some cases, FDA's expert reviewers may fairly and responsibly conclude, based on
107    their scientific training and experience, that the available evidence supports approval of an
108    indication that is broader or narrower in scope than the precise population studied.[6]  Applicants
109    should discuss the scope of a proposed indication with the applicable review division.[7]

111    Indications may be written to include certain patient populations that may have been absent or
112    specifically excluded from the clinical studies that supported approval (e.g., geriatric patients,

---

[4] The Director of CDER may, on the Director's own initiative or on the petition of an interested person, waive in whole or in part any of the criteria in 21 CFR 314.126(b) with respect to a specific clinical investigation, either prior to the investigation or in the evaluation of a completed study.  A waiver petition must explain why the study, as conducted, will still yield substantial evidence of effectiveness (see 21 CFR 314.126(c)).  Additionally, an applicant may submit a request to the Director of CDER or the Director of CBER asking for a waiver of any requirement under 21 CFR 201.56, 201.57 or 201.80 (see 21 CFR 201.58).

[5] See the guidance for industry *Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products — Content and Format*.

[6] See generally 21 U.S.C 355(d).

[7] See 21 CFR 312.41.

3

PLAINTIFFS003936

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

113  pregnant women, patients taking certain concomitant drugs, patients with a different severity or
114  stage of a disease).  An indication for a broader population than the patient population studied in
115  controlled trials may be appropriate after careful consideration of the generalizability of the
116  evidence, consistencies in the disease process across different groups, and the drug's overall
117  benefits and risks.
118
119  For example, if a study evaluating a drug in adults enrolled patients of a certain age range and
120  excluded patients taking certain concomitant drugs, and available evidence does not suggest the
121  drug would be unsafe or ineffective in adult patients outside that age range or in those taking the
122  other drugs, the indication should be worded to reflect the broader age group (i.e., "in adults")
123  rather than the exact ages studied.  In addition, unless available evidence suggests otherwise, the
124  indication should not exclude use in patients taking the concomitant drugs.  Recommendations
125  regarding age groups outside of an adult population are discussed in section II.A.2.
126
127  Similarly, if a drug were studied only in patients with a moderate form or stage of a disease and
128  there is reason to believe, based on the generalizability of the data, consistencies in the disease
129  process, and the drug's benefits and risks, that the drug would be both safe and effective in a
130  broader group with the condition, an indication covering the broader population may be
131  appropriate.  In some cases, an indication covering the overall disease population can be
132  considered.  Specifics regarding the patient population studied should be described in the
133  CLINICAL STUDIES section of the labeling.
134
135  Conversely, an indication may be approved for a population narrower than that which was
136  studied.  For example, a study may enroll and randomize patients, but then stratify participants
137  by the presence or absence of a specific genomic marker.  If the study demonstrated benefit only
138  in patients who had tested positive for the marker, FDA's expert reviewers may fairly and
139  responsibly conclude, based on their scientific training and experience, that the available
140  evidence supports approval of an indication in a population that is narrower in scope than the
141  population that was studied.[8]
142
143  There may also be circumstances in which the indication should reflect the precise population
144  studied.  For example, some study designs such as prognostic enrichment strategies (e.g.,
145  enrolling only people with a prior myocardial infarction in a study examining the effects of an
146  antiplatelet drug) and most predictive enrichment strategies (e.g., enrolling only people with a
147  specific genomic marker) may identify the population in which the benefits outweigh the risks or
148  the only population in which effectiveness is reasonably likely.[9]  In such cases, the indication
149  should reflect only the population studied, unless and until evidence becomes available to
150  support a determination that broader safety and effectiveness can be expected.
151
152      *2.*    *Age Groups in Indications*
153

---

[8] See generally 21 USC 355(d).

[9] See the draft guidance for industry *Enrichment Strategies for Clinical Trials to Support Approval of Human Drugs and Biological Products*.  When final, this guidance will represent FDA's current thinking on this topic.

4

PLAINTIFFS003937

154  Approval of a drug in pediatric patients[10] is generally based on sufficient data from studies in the
155  following populations:

156
157  • A pediatric population only
158
159  • Both adult and pediatric populations
160
161  • Adults, with supporting data in a pediatric population (e.g., safety,
162  pharmacokinetic data) that allow extrapolation of effectiveness to a pediatric
163  population[11]
164
165  • One pediatric population that allows extrapolation of effectiveness to another
166  pediatric population[12]
167
168  In certain circumstances (see section II.A.1), it may be appropriate to consider an indication for
169  an adult population in an age group broader than the population that was studied.  However, this
170  approach is generally not appropriate across pediatric populations or between adult and pediatric
171  populations because of the statutory requirements related to pediatric assessments[13] and the
172  unique clinical considerations for pediatric patients.  For example, pediatric patients may
173  metabolize drugs differently from adults (in an age-related manner), are susceptible to different
174  safety risks, and often require different dosing regimens even after correction for weight.

175
176  For these reasons, age groups should be included in indications.  As such, an indication should
177  state that a drug is approved, for example, "in adults," "in pediatric patients X years of age and
178  older," or "in adults and pediatric patients X years of age and older."

179
180  Applicants should discuss the scope of and age groups for a proposed indication with the
181  applicable review division.[14]

---

[10] The labeling regulations define *pediatric patients* as those ranging in age from birth through 16 years (21 CFR 201.57(c)(9)(iv)).

[11] Although it may be appropriate to extrapolate effectiveness, it is generally not appropriate to extrapolate safety with respect to pediatric populations.

[12] See section 505B(a)(2)(B) of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and 21 CFR 201.57(c)(9)(iv).  See also the draft guidance for industry and review staff *Pediatric Information Incorporated Into Human Prescription Drug and Biological Products Labeling*.  When final, this guidance will represent FDA's current thinking on this topic.

[13] The Pediatric Research Equity Act (Public Law 108-155) generally requires certain applications for, among other things, a new indication to contain a pediatric assessment unless the applicant has obtained a waiver or deferral. Pediatric assessments "shall contain data, gathered using appropriate formulations for each age group for which the assessment is required that are adequate (i) to assess the safety and effectiveness of the drug or the biological product for the claimed indications in all relevant pediatric subpopulations; and (ii) to support dosing and administration for each pediatric subpopulation for which the drug or the biological product is safe and effective" (section 505(B)(a) of the FD&C Act).

[14] See 21 CFR 312.41.

5

PLAINTIFFS003938

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

182
183   **B.   Distribution of Information Among Labeling Sections**
184
185   Generally, the section of the full prescribing information to which particular drug information is
186   most relevant will contain the most detailed discussion of such information.  Other sections
187   should discuss only those aspects of the information that are pertinent to those other sections'
188   scopes and purposes.  There may be instances when it is necessary to include information in the
189   INDICATIONS AND USAGE section that is discussed in greater detail elsewhere in the
190   labeling.  For example, the INDICATIONS AND USAGE section may include a limitation of
191   use that has a cross-reference to a more detailed discussion of the information supporting the
192   limitation in the WARNINGS AND PRECAUTIONS section (see section III.B).  Because
193   detailed information about topics such as clinical studies and risks related to limitations of use
194   will generally be found elsewhere in the labeling, the information in the INDICATIONS AND
195   USAGE section should be concise.
196
197   **C.   Updating the INDICATIONS AND USAGE Section**
198
199   The INDICATIONS AND USAGE section "must be updated when new information becomes
200   available that causes the labeling to be inaccurate, false, or misleading" (§ 201.56(a)(2)).[15]  In
201   addition, it is appropriate in certain circumstances for application holders to update this section
202   to reflect current practices for writing indications for a particular group of drugs (for example,
203   when more information becomes available about the drug, drug class, or specific disease or when
204   the endpoints become better established).  Application holders should review the INDICATIONS
205   AND USAGE section regularly to ensure that it reflects current science and, to the extent
206   possible, maintains consistency within a pharmacologic or therapeutic class.[16]
207
208
209   **III.   CONTENT AND FORMAT OF THE INDICATIONS AND USAGE SECTION**
210
211   The INDICATIONS AND USAGE section includes the indication and, as appropriate, any
212   identified limitations of use.[17]  The INDICATIONS AND USAGE section "must state that the
213   drug is indicated for the treatment, prevention, mitigation, cure, or diagnosis of a recognized
214   disease or condition, or of a manifestation of a recognized disease or condition, or for the relief
215   of symptoms associated with a recognized disease or condition" (§ 201.57(c)(2)).  When drafting
216   the INDICATIONS AND USAGE section, applicants should consider what information is
217   needed to clearly convey the approved indication and whether other information in addition to
218   the identification of the disease or condition is warranted.
219
220   For many drugs, the indication will be sufficiently conveyed by stating the disease or condition
221   being treated, prevented, mitigated, cured, or diagnosed, and the approved age group(s) (see
222   section II.A.).  For example, indications may be straightforward for many conditions (e.g.,

---

[15] Application holders update their labeling using the procedures in 21 CFR 314.70 or 601.12, as applicable.

[16] See generally 21 CFR 201.56(a).

[17] See 21 CFR 201.57(c)(2).

PLAINTIFFS003939

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

223  symptomatic conditions such as pain, allergic rhinitis). In such circumstances, endpoints and
224  descriptions of benefit should be summarized in the CLINICAL STUDIES section of labeling
225  and should not be included in the indication.
226
227  On the other hand, other scenarios may warrant the inclusion of more information in the
228  indication. Such scenarios could include cases in which a drug may target different aspects of a
229  disease (e.g., in multiple sclerosis) or cases where endpoints are not well-standardized (e.g., in
230  heart failure); in these scenarios, the specific benefits of the drug should be stated. For example,
231  for a drug indicated for the treatment of insomnia, the indication should state whether the drug
232  affects sleep onset, sleep maintenance, or both, in order to facilitate appropriate prescribing for
233  an individual patient. Similarly, for many outcome studies, when there is an overall effect on a
234  composite endpoint, the indication should identify the components of the composite (e.g.,
235  cardiovascular death, myocardial infarction, and stroke). In such cases, it would be critical to
236  clearly state in the indication what benefit the drug has been shown to convey (see
237  section III.C.1).
238
239  Details of studies that describe the basis for approval (e.g., "Effectiveness was demonstrated in
240  two 12-week trials in patients with $FEV_1$ less than 60% of predicted.") should not be included in
241  the INDICATIONS AND USAGE section. This section is not intended to be a description of the
242  data supporting the determination of effectiveness, and the inclusion of such statements here
243  could have the unintended consequence of inappropriately limiting use of the drug in practice
244  (e.g., inadvertently suggesting short-term use of a drug indicated for a chronic condition).
245  Likewise, discussions of disease definitions (e.g., diagnostic criteria for major depressive
246  disorder) should not be included. These types of details should be discussed in the CLINICAL
247  STUDIES section of labeling (see section III.C.1).
248
249  Specific components of and other considerations for the INDICATIONS AND USAGE section
250  are discussed in detail in sections A through D below.
251
252  **A.    Indication**
253
254  The indication should begin "DRUG-X is indicated" and must include the following elements
255  required under 21 CFR 201.57(c)(2)(i):
256
257  - The disease, condition, or manifestation of the disease or condition (e.g., symptom(s))
258    being treated, prevented, mitigated, cured, or diagnosed
259
260  - When applicable, other information necessary to describe the approved indication (e.g.,
261    descriptors of the population to be treated, adjunctive or concomitant therapy, or
262    specific tests needed for patient selection)
263
264  The following subsections provide details on each element of an indication listed above, along
265  with illustrative examples demonstrating how to draft these elements so they are clear, concise,
266  and easily identifiable and searchable.
267

PLAINTIFFS003940

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

268     *1.    The Disease, Condition, or Manifestation Being Treated, Prevented, Mitigated,*
269              *Cured, or Diagnosed*
270

271 The INDICATIONS AND USAGE section must state that the drug "is indicated for the
272 treatment, prevention, mitigation, cure, or diagnosis of a recognized disease or condition, or of a
273 manifestation of a recognized disease or condition, or for relief of symptoms associated with a
274 recognized disease or condition" (§ 201.57(c)(2)).  The disease, condition, or manifestation
275 should be included in the indication using high-level terms that are clinically relevant and
276 scientifically valid (e.g., asthma, diabetes mellitus, pain).  Although FDA does not endorse any
277 particular resource for terms used to describe diseases, conditions, or symptoms, all terminology
278 should be well understood and easily recognizable by health care practitioners.
279

280     *2.    Other Information Necessary To Describe the Approved Indication*
281

282 In addition to identifying the disease, condition, or symptom for which the drug is approved,
283 there may be additional critical aspects of an indication that are important to include.  Examples
284 of such situations are described in items a through c below.
285

286          a.  Selected patient subgroups or disease subpopulations for whom the drug is
287              approved
288

289 In some cases, additional descriptors or qualifiers are critical to include as part of the indication
290 to clearly identify the patient population for whom the drug is approved.  In addition to including
291 the approved age group(s) (see section II.A.2), other circumstances in which such additional
292 information would be important include, but are not limited to, indicating a drug for patients
293 previously treated with other therapies (e.g., hormone-refractory prostate cancer), patients with a
294 certain classification of a disease (e.g., World Health Organization Group I pulmonary arterial
295 hypertension), or patients with other important identifying variables (e.g., immunocompetent
296 patients).  For example, if a drug is for use only in patients with a history of coronary disease
297 events (i.e., as secondary prevention), the indication should clearly convey the patient population
298 for which the drug is approved.
299

300 If evidence is available to support the safety and effectiveness of the drug only in selected
301 subgroups of the larger population with the target disease or condition, "this section must
302 include…a succinct description of the limitations of usefulness" (§ 201.57(c)(2)(i)(B)).  Thus,
303 the indication should include information on the subgroup(s) for whom the drug is approved.
304 For example:
305

306          •  DRUG-X is indicated for the treatment of adult and pediatric patients 12
307             years of age and older with moderate to severe plaque psoriasis who are
308             candidates for phototherapy or systemic therapy.
309

310 If a drug should be reserved for use in specific situations (e.g., cases refractory to other drugs)
311 because of safety concerns, "this section must include…a statement of the information"
312 pertaining to such situations (§ 201.57(c)(2)(i)(E)).  For example:
313

8

PLAINTIFFS003941

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

314        •   DRUG-X is indicated for the treatment of moderate to severe active
315             rheumatoid arthritis in adult patients who have had an inadequate response
316             to TNF antagonist therapy.
317

318 For drugs approved for use only after other drug therapies have failed (e.g., an indication for
319 second-line use), consideration should be given as to whether it is necessary to specify the name
320 of the drug(s) or drug class(es) the patients are to have initially received or instead to word the
321 indication more broadly (e.g., for use in previously treated patients).
322

323       b.   Adjunctive or concomitant therapy or therapeutic modalities to use before
324            initiating drug therapy, such as diet or exercise or another drug
325

326 If the drug is approved for use only in conjunction with a primary mode of therapy (e.g., diet,
327 surgery, behavior changes, or another drug), "[t]his section must include…a statement that the
328 drug is indicated as an adjunct to that mode of therapy" (§ 201.57(c)(2)(i)(A)).  For example:
329

330        •   DRUG-X is indicated in adults for the treatment of high-grade malignant
331             glioma as an adjunct to surgery and radiation.
332

333 For drugs approved for use as adjunctive therapy, consideration should be given as to whether it
334 is necessary to specify the name of the drug(s) or drug class(es) the patients are to receive
335 concomitantly or instead to word the indication more broadly (e.g., as adjunctive therapy or as
336 part of a combination regimen).
337

338       c.   Specific tests needed to select patients in whom to use the drug
339

340 If specific tests are necessary for selection or monitoring of patients who need the drug, "[t]his
341 section must include…the identity of such tests" (§ 201.57(c)(2)(i)(C)).[18]  For example:
342

343        •   DRUG-X is indicated for the treatment of adult patients with metastatic
344             non-small cell lung cancer whose tumors are anaplastic lymphoma kinase
345             (ALK)-positive as detected by an FDA-approved test.
346

347 In general, information on tests used for monitoring appears in other labeling sections (e.g.,
348 DOSAGE AND ADMINISTRATION or WARNINGS AND PRECAUTIONS).[19]
349

---

[18] When appropriate, the labeling should identify the type of FDA-approved or cleared in vitro companion diagnostic device with which the product is approved, rather than a particular manufacturer's device.  See the guidance for industry and FDA staff *In Vitro Companion Diagnostic Devices*.

[19] See the following two guidances for industry: (1) *Dosage and Administration Section of Labeling for Human Prescription Drug and Biological Products — Content and Format* and (2) *Warnings and Precautions, Contraindications, and Boxed Warning Sections of Labeling for Human Prescription Drug and Biological Products — Content and Format*.

PLAINTIFFS003942

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

350   **B.    Limitations of Use**
351
352   *Limitations of use* are presented separately from the indication within the INDICATIONS AND
353   USAGE section (see section III.D.2).  A limitation of use is included when there is reasonable
354   concern or uncertainty among FDA's expert reviewers, who are qualified by scientific training
355   and experience, about a drug's risk-benefit profile.  Limitations of use should be distinguished
356   from contraindications.  A contraindication "must describe any situations in which the drug
357   should not be used because the risk of use (e.g., certain potentially fatal adverse reactions)
358   clearly outweighs any possible therapeutic benefit" (§ 201.57(c)(5)).  However, there are cases in
359   which the evidence falls short of requiring a contraindication, but suggests that use of the drug
360   may be inadvisable.  There are also cases in which there is sufficient uncertainty about the drug's
361   benefits in certain clinical situations to suggest that the drug should generally not be used in
362   those settings.  In these cases, a limitation of use may be appropriate.  To avoid redundancy
363   within the labeling, contraindications should not be restated as limitations of use in the
364   INDICATIONS AND USAGE section.
365
366   Limitations of use should be included in the INDICATIONS AND USAGE section only when
367   the awareness of such information is important for practitioners to ensure the safe and effective
368   use of the drug.  In most cases, limitations of use will identify a particular patient population in
369   which a drug should generally not be used.  If evidence is available to support the safety and
370   effectiveness of the drug only in selected subgroups of the larger population, the INDICATIONS
371   AND USAGE section "must include…a succinct description of the limitations of usefulness of
372   the drug and any uncertainty about anticipated clinical benefits, with reference to the 'Clinical
373   Studies' section for a discussion of the available evidence" (§ 201.57(c)(2)(i)(B)).  Such
374   information would be appropriate to include as a separate limitation of use — rather than
375   narrowing the language of the indication itself — when needed to inform practitioners that there
376   is a reasonable concern or uncertainty about the drug's safety or effectiveness outside the
377   specific population for which the drug is approved.
378
379   In contrast, information that essentially narrows or further defines a drug's approved indication
380   and is used to direct appropriate therapy (e.g., identifying particular subsets of the population for
381   whom the drug is approved, drugs to be used only after other drug therapies have failed, or
382   specific tests needed to identify patients to be treated) should be incorporated directly into the
383   indication whenever possible (see section III.A.2).  This information should not be presented as a
384   separate limitation of use.  Whereas a limitation of use most often will be included to identify a
385   patient population in which the drug should generally *not* be used (i.e., discouraging its use),
386   information that specifies the patient population in which the drug *should* be used (i.e.,
387   encouraging its use) should, wherever possible, be incorporated in the indication itself.  For
388   example, if a drug should be used only after failure of or as an adjunct to another drug or
389   treatment modality, the indication should include this information rather than having it presented
390   separately as a limitation of use.
391
392   Although there are invariably areas of uncertainty about a drug's effectiveness, not all drugs will
393   include limitations of use in the INDICATIONS AND USAGE section.  Information considered
394   for a limitation of use should be evaluated to decide if it may be better suited to another section
395   of the labeling (e.g., WARNINGS AND PRECAUTIONS, USE IN SPECIFIC POPULATIONS,

PLAINTIFFS003943

396   CLINICAL STUDIES).  For example, although there may be circumstances in which a
397   limitation of use will be further described in (and cross-referenced to) a subsection in the
398   WARNINGS AND PRECAUTIONS section, most warnings and precautions will typically not
399   be repeated as limitations of use.  Only information that provides a clearer understanding of the
400   scope of the approved indication to facilitate safe and effective prescribing decisions should be
401   included as a limitation of use.  Moreover, an absence of data in a particular population subset
402   should generally not appear as a limitation of use unless there is reasonable concern about the
403   drug's safety or effectiveness in that group.
404
405   *1.     Situations in Which Limitations of Use Would Be Appropriate*
406
407   The following are examples of situations in which it may be appropriate to include a separate
408   limitation of use within the INDICATIONS AND USAGE section:
409
410          a.  Drugs for which there is reasonable concern or uncertainty about effectiveness
411              or safety in a certain clinical situation
412
413   As recommended in section II.A.2, the approved age group(s) should be included in an
414   indication.  If there is a concern or uncertainty about safety or effectiveness in a population
415   outside the approved age group (e.g., younger patients), a limitation of use should be included
416   about that population.  The inclusion of a limitation of use will differentiate between (1) a
417   circumstance in which use of the drug in a certain population outside of the approved population
418   raises a reasonable concern or uncertainty about safety or effectiveness and (2) a circumstance in
419   which an indication is simply directed to a certain group (e.g., patients within a particular age
420   range).  The concern that warranted the limitation of use should typically be described elsewhere
421   in labeling (e.g., WARNINGS AND PRECAUTIONS and USE IN SPECIFIC POPULATIONS
422   sections), with a cross-reference in the limitation of use to the section of labeling where this
423   detailed information can be found.  For example:
424
425          •  DRUG-X is indicated for the treatment of hypertension in adults and
426             pediatric patients 1 year of age and older.
427
428             Limitations of Use
429             In patients younger than one year of age, DRUG-X can adversely affect
430             kidney development *[see Warnings and Precautions (5.X) and Use in*
431             *Specific Populations (8.4)]*
432
433   The governing regulation states that "[i]f there is a common belief that a drug may be effective
434   for a certain use or if there is a common use of the drug for a condition, but the preponderance of
435   evidence related to the use or condition shows that the drug is ineffective or that the therapeutic
436   benefits do not generally outweigh its risks, FDA may require that [the INDICATIONS AND
437   USAGE] section state that there is a lack of evidence that the drug is effective or safe for that use
438   or condition" (§ 201.57(c)(2)(ii)).  A limitation of use may be of particular importance in these
439   circumstances if proven alternative therapies exist for the condition in question.  For example:
440

11

PLAINTIFFS003944

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

441       •   DRUG-X is indicated in adults for the acute treatment of migraine
442            headache with or without aura.
443
444            Limitations of Use
445            Multiple clinical trials failed to establish the effectiveness of DRUG-X for
446            the prophylaxis of migraine headaches *[see Clinical Studies (14.X)]*.
447
448      b.   Drugs approved without evidence of benefits known to occur with other drugs
449         in the same class
450
451 If a drug is approved without having demonstrated a particular benefit that has been
452 demonstrated with other drugs in the same pharmacologic or therapeutic class, it may be
453 important to convey the differences among products under a "Limitations of Use" heading in the
454 INDICATIONS AND USAGE section. For example, the INDICATIONS AND USAGE section
455 for a new HMG-CoA reductase inhibitor that is approved based on its serum lipid-lowering
456 effects (without evidence of a beneficial effect on cardiovascular morbidity and mortality) would
457 typically be presented as follows:
458
459       •   DRUG-X is indicated as an adjunctive therapy to diet to reduce elevated
460            total cholesterol, LDL cholesterol, apolipoprotein B, and triglycerides and
461            to increase HDL cholesterol in adult patients with primary hyperlipidemia
462            or mixed lipidemia.
463
464            Limitations of Use
465            The effect of DRUG-X on cardiovascular morbidity and mortality has not
466            been determined.
467
468      c.   Drugs with dose, duration, or long-term use considerations
469
470 If information on limitations of use or uncertainty about anticipated benefits is relevant to the
471 recommended dosing intervals, to appropriate treatment duration when treatment should be
472 limited, or to any dosage modification, the INDICATIONS AND USAGE section "must
473 include…a concise description of the information, with a reference to the more detailed
474 information in the 'Dosage and Administration' section" (§ 201.57(c)(2)(i)(D)). Under these
475 circumstances, information about important dose or duration considerations, such as how long a
476 drug can safely be used or uncertainty about the risks and benefits of treatment beyond a certain
477 period (e.g., long-term cumulative toxicity), should be included as a limitation of use. For
478 example:
479
480       •   DRUG-X is indicated for the management of elevated plasma uric acid
481            levels in adult patients with tumor lysis syndrome.
482

PLAINTIFFS003945

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

483
484          Limitations of Use
485          The activity of DRUG-X may be neutralized by the development of anti-
486          drug antibodies if more than a single course of treatment is administered
487          *[see Dosage and Administration (2.X) and Warnings and Precautions*
488          *(5.X)]*.
489
490   It is generally not necessary to limit duration of use in the INDICATIONS AND USAGE section
491   unless such a limited duration is essential to ensure the safe and effective use of the drug.  If
492   clinical trials evaluated the effectiveness of a drug for a chronic condition only in short-term
493   trials of sufficient duration to support such an approval (e.g., drugs for major depressive disorder
494   or hypertension), but the drug is indicated for long-term use due to the chronic nature of the
495   condition and because there is no known or anticipated safety or efficacy concern from continued
496   use, a description of the duration of use from the clinical trials or information about the lack of
497   longer term data generally should not be included in the INDICATIONS AND USAGE section.
498   Information on the length of the clinical trials should instead be discussed in detail in the
499   CLINICAL STUDIES section of the labeling.
500
501   If there are specific conditions that should be met before the drug is used on a long-term basis
502   (e.g., demonstration of responsiveness to the drug after short-term use in an individual patient),
503   the INDICATIONS AND USAGE section "must include…a statement of the conditions; or if
504   the indications for long term use are different from those for short term use, a statement of the
505   specific indications for each use" (§ 201.57(c)(2)(i)(F)).  For drugs with these characteristics, a
506   limitation of use may be used to address such issues.  For example:
507
508          •   DRUG-X is indicated for the treatment of severe spasticity in adult
509              patients with spinal cord injury, brain injury, or multiple sclerosis.
510
511          Limitations of Use
512          Prior to implantation of a device for chronic intrathecal infusion of
513          DRUG-X, confirm a positive clinical response to DRUG-X in a screening
514          phase *[see Dosage and Administration (2.X)]*.
515
516      2.   *Situations in Which Limitations of Use Generally Would **Not** Be Appropriate*
517
518   Limitations of use generally would ***not*** be appropriate in the following situations:
519
520          a.   To restate information already included in the indication
521
522   For example, if an indication is clearly worded as being approved for use in combination with
523   another drug, there is no need for a limitation of use stating that the subject drug should be used
524   only in combination and not as monotherapy.
525

13

PLAINTIFFS003946

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

526        b.  To address the absence of data in populations in which the drug was not
527           studied
528
529  For example, if an oncology drug was studied in and is indicated for use in patients with a cancer
530  of a specific mutation, there should not be a limitation of use about the absence of data in
531  patients with typical (wild-type) forms, unless there is reasonable concern about the drug's safety
532  or effectiveness in such patients.  Likewise, if a drug is approved to reduce the risk of rejection in
533  patients receiving a heart transplant, there should not be a limitation of use about the lack of data
534  on use in lung transplants.  Similarly, if a vaccine is approved for use in children 12 months
535  through 12 years of age, there should not be a limitation of use about the absence of data in other
536  age groups.
537
538      **C.     Other Considerations for Writing the INDICATIONS AND USAGE Section**
539
540      *1.     Identification of Outcomes, Endpoints, and Benefit(s) the Drug Conveys*
541
542  The approved indication will generally convey the benefit of the treatment (i.e., the disease,
543  condition, manifestation, or symptoms of the disease or condition being treated, prevented,
544  mitigated, cured, or diagnosed), and it is usually not necessary to fully describe the specific way
545  benefit was measured in clinical trials (i.e., identifying outcomes or endpoints) when the
546  treatment affects a broad range of manifestations of the disease (e.g., an indication for the
547  symptoms of allergic rhinitis).  In some cases, however, a broad disease indication may not be
548  appropriate because, for example, the drug may affect only certain signs, symptoms, or
549  manifestations of the disease (see section III).  An indication identifying an outcome or endpoint
550  may be considered, for example, when the drug's effect on the overall disease is not well
551  understood, when different drugs have different effects on various manifestations of the diseases,
552  when clinical trials evaluated only one or some of the manifestations of the disease, or when the
553  endpoints are different from typical effectiveness measures.  For example:
554
555      •   DRUG-X is indicated to improve walking in adult patients with multiple sclerosis.
556
557  For certain other conditions, the drug's indication may be to reduce the risk of significant
558  morbidity and mortality, which describes the demonstrated benefit more accurately than would a
559  more broadly written indication indicating the product simply as a treatment for the condition
560  itself.  In such cases, the specific endpoint(s) for which the drug has demonstrated benefits
561  should be incorporated into the indication.  For example:
562
563      •   DRUG-X is indicated to reduce the risk of nonfatal myocardial infarction, fatal
564        and nonfatal stroke, and revascularization procedures in adult patients with
565        clinically evident coronary heart disease.
566
567  The CLINICAL STUDIES section of labeling "must discuss those studies that facilitate an
568  understanding of how to use the drug safely and effectively" (§ 201.57(c)(15)).  The information
569  presented in that section ordinarily includes, among other things, a description of the study
570  population, endpoints, and results.  For example, if an indication were written for an overall
571  effect on a composite endpoint, the details on the endpoints studied and results (e.g., which

14

PLAINTIFFS003947

572  component of a composite endpoint drove the overall combined finding) would be discussed in
573  detail in the CLINICAL STUDIES section.  Additionally, if only one component of a composite
574  primary endpoint was affected and indicating the drug for the composite would misrepresent the
575  true result, an indication for the single component can be considered, with the explanation of
576  study results summarized in the CLINICAL STUDIES section.
577
578      2.    *Accelerated Approval*
579
580  If a drug is approved for an indication based on an effect on a surrogate endpoint or an
581  intermediate clinical endpoint under section 506(c) of the Federal Food, Drug, and Cosmetic Act
582  (FD&C Act) (21 U.S.C. 356(c)) and 21 CFR 314.510 or 601.41 (i.e., accelerated approval), the
583  INDICATIONS AND USAGE section "must include…a succinct description of the limitations
584  of usefulness of the drug and any uncertainty about anticipated clinical benefits, with a reference
585  to the Clinical Studies section for a discussion of the available evidence"
586  (§ 201.57(c)(2)(i)(B)).[20]
587
588      3.    *Required or Recommended Language*
589
590  Under governing statutory and regulatory provisions, certain products have required or
591  recommended language for the INDICATIONS AND USAGE section.  For example:
592
593      •  Labeling for systemic antibacterial drug products must include a specific
594         statement in the INDICATIONS AND USAGE section about strategies for
595         reducing the development of drug-resistant bacteria and maintaining the
596         effectiveness of the subject drug and other antibacterial drugs (21
597         CFR 201.24(b)).
598
599      •  Section 505(u)(2)(B) of the FD&C Act (21 U.S.C. 355(u)(2)(B)) requires that
600         labeling for certain products containing a single enantiomer of a previously
601         approved racemic drug include a statement that the non-racemic product is not
602         approved, and has not been shown to be safe and effective, for any condition of
603         use of the previously approved racemic drug.  For such products approved under
604         505(u), this information should be presented as a limitation of use.
605
606      •  Other FDA guidances (e.g., clinical/medical guidances) recommend specific
607         wording for the INDICATIONS AND USAGE section for certain indications.[21]
608

---

[20] See the draft guidance for industry *Labeling for Human Prescription Drug and Biological Products Approved Under the Accelerated Approval Regulatory Pathway*.  When final, this guidance will represent FDA's current thinking on this topic.

[21] Additional labeling guidances are available on the FDA Drugs guidance web page at
http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/default.htm.

PLAINTIFFS003948

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

609    4.    *Preferred Wording and Wording Generally To Avoid*[22]
610
611  Consistent with this guidance and the regulatory framework, as a general matter, care should be
612  taken when considering use of the following terms and phrases:
613
614         a.  "Reduce the risk" versus "prevent"
615
616  If the indication for a drug is to reduce the risk of the occurrence of a particular clinical outcome,
617  phrases such as "reduce the risk of" or "reduce the incidence of" should be considered rather
618  than using "prevent" in the indication. The use of a term such as *prevent* may imply a guarantee
619  of success that is not supported by the data. However, for certain indications, the use of terms
620  such as *prevent* (e.g., for preventive vaccines) or *prophylaxis* (e.g., drugs for post-exposure
621  prophylaxis) in the indication may be appropriate because, in a given context, these terms are
622  well established and understood by the clinical community.
623
624         b.  "Only"
625
626  The INDICATIONS AND USAGE section should be worded clearly to convey the approved use
627  of the drug, making inclusion of the word "only" unnecessary (i.e., the indication generally
628  should ***not*** state "DRUG-X is indicated only for…").
629
630         c.  "Also indicated"
631
632  When a new indication is added to the INDICATIONS AND USAGE section, the phrase "is also
633  indicated" generally should ***not*** be used because it may imply that the new indication is less
634  important than the existing indication(s).
635
636         d.  Product identification in the indication
637
638  The indication should include the proprietary name (or trade name). If the product does not have
639  a proprietary or trade name, the indication should include the nonproprietary name (i.e.,
640  established name for a drug product or proper name for a biological product).
641
642  To avoid unnecessary clutter and to enhance clarity, other information (such as the non-
643  proprietary name, dosage form, route of administration) generally should not be included in the
644  indication. The established pharmacologic class appears with the indication only in Highlights
645  (§ 201.57(a)(6)).
646
647  **D.    Formatting the INDICATIONS AND USAGE Section**
648
649    1.    *Format for Multiple Indications*
650
651  When a drug is approved for more than one indication, the format of the INDICATIONS AND
652  USAGE section should be carefully considered. For some drugs, it may be preferable to assign a
653  subsection to each indication (e.g., 1.1 Disease-A, 1.2 Disease-B), but for others, it may be

---

[22] See generally 21 CFR 201.56.

16

PLAINTIFFS003949

*Contains Nonbinding Recommendations*

*Draft — Not for Implementation*

654  preferable to present distinct indications using only bullets (e.g., "DRUG-X is indicated for:"
655  followed by a bulleted list) immediately under the main section heading or within a subsection.
656
657       *2.      Format for Limitations of Use*
658
659  Limitations of use are presented separately from the indication within the INDICATIONS AND
660  USAGE section, under the heading *Limitations of Use* and not usually under a separate
661  numbered subsection.  If, however, a drug has multiple indications and the limitations of use
662  apply to all of them, it may be preferable to use a separate numbered subsection for *Limitations*
663  *of Use* within the section.  The INDICATIONS AND USAGE section should be formatted to
664  clearly show if the limitations apply to all or to only some of the indications.
665
666
667

PLAINTIFFS003950