Stephen Levine
December 21, 2020

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO. 4:20-cv-00020-MW/MAF

JAMI CLAIRE, KATHRYN LANE and
AHMIR MURPHY,

    Plaintiffs,
vs.

FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES, et al,

    Defendants.
_____

ZOOMED DEPOSITION OF STEPHEN B. LEVINE, M.D.

Monday, December 21, 2020

9:30 a.m. - 2:51 p.m.

Via Zoom

Tallahassee, Florida  32308

STENOGRAPHICALLY REPORTED BY:

SANDRA L. NARGIZ
RPR, CM, CRR, CRC, FPR, CCR-GA

Job No. 166551

Pl. Trial Ex. 085

PLAINTIFFS003214

Stephen Levine
December 21, 2020

Page 2

1    APPEARANCES: (All appearing via Zoom.)

2              ON BEHALF OF THE PLAINTIFFS:

3              SOUTHERN LEGAL COUNSEL, INC.
               1229 NW 12th Avenue
4              Gainesville, FL  32601
               352.271.8347
5              BY: JODI SIEGEL, ESQUIRE
               jodi.siegel@southernlegal.org
6              SIMONE MICHELLE CHRISS, ESQUIRE
               simone.chriss@southernlegal.org
7

8              LEGAL SERVICES OF GREATER MIAMI
               4343 West Flagler Street, #100
9              Miami, FL  33134
               305.438.3809
10             BY:  JOCELYN JAUREGUI ARMAND, ESQUIRE
               jjauregui@legalservicesmiami.org
11             PAMELA FLORES, ESQUIRE
               pflores@legalservicesmiami.org
12
               ACLU OF FLORIDA
13             4343 W Flagler Street, #400
               Miami, FL 33134
14             786.363.2700
               BY: DANIEL TILLEY, ESQUIRE
15             dtilley@aclufl.org

16             ON BEHALF OF THE DEFENDANT DMS/SECRETARY
               SATTER:
17
               HENRY BUCHANAN HUDSON SUBER & CARTER
18             P.O. BOX 14079
               Tallahassee, FL  32317
19             850.222.2920
               BY: MIRIAM COLES, ESQUIRE
20             mcoles@henryblaw.com

21
               ALSO PRESENT:
22
               Samantha Howell
23

24

25

PLAINTIFFS003215

Stephen Levine
December 21, 2020

Page 3

1                    I N D E X

2   WITNESS                                          PAGE
    STEPHEN B. LEVINE, M.D.                             5
3
        Direct Examination by Mr. Tilley                5
4       Cross Examination by Ms. Coles                171

5

6

7

8   (STENOGRAPHER'S NOTE:  Exhibits were received
    premarked electronically; only Exhibits 1, 2, 3, 7,
9   10, 11 and 13 were referred to in deposition.)

10

11                   INDEX OF EXHIBITS

12
    NO.     DESCRIPTION                                ID
13
    1    Levine expert report                          70
14  2    Psychotherapeutic Approaches to Sexual       109
         Problems: An Essential Guide for Mental
15       Health Professionals
    3    Dhejne study                                 165
16  7    Standards of Care, V7                         48
    10   Kosilek report                                83
17  11   Soneeya 2011 report                           94
    13   Soneeya case trial transcript                167
18

19

20

21

22
    CERTIFICATE OF OATH                              181
23  CERTIFICATE OF REPORTER                          182
    READ AND SIGN LETTER                             183
24  ERRATA SHEET                                     184

25

PLAINTIFFS003216

Stephen Levine
December 21, 2020

Page 29

```
 1   right?
 2        A    No, that is.  I think -- we'll quibble
 3   over the word only.  If you use the word
 4   predominantly, I would say they are predominantly
 5   taking care of.  They are a specialty clinic for the
 6   transgender.
 7        Q    So predominantly treating transgender
 8   people, but not 100 percent?
 9        A    That's my guess.
10        Q    Okay.  What sorts of treatments do you
11   provide for your patients with gender dysphoria?
12        A    Psychiatric evaluation of the patient and
13   the family, the parents and the other siblings;
14   psychotherapy to further the process of
15   understanding this whole phenomenon; recommendations
16   for hormones and occasionally recommendations for --
17   depending on the biologic sex of the patient, for
18   genital or breast surgery.
19        Q    How many patients have you recommended
20   hormone therapy for?
21        A    You mean over 47 years?
22        Q    Let's start with the 47 years, yeah.
23        A    I don't know.  Can I give you a gross
24   estimate?
25        Q    Sure.
```

PLAINTIFFS003217

Stephen Levine
December 21, 2020

Page 37

```
 1   to be directed to the surgeon.
 2        Q    Okay.  If a surgeon told you I require a
 3   letter for this facial feminization surgery, are
 4   there circumstances under which you could see
 5   yourself providing a letter, not of recommendation
 6   but of authorization, for a person to receive this
 7   surgery from the surgeon?
 8        A    I could see myself under certain
 9   circumstances, if I understood the patient's motives
10   and had a lot of time to discover and discuss this,
11   the history and alternative approaches and wondering
12   about the psychology of wanting this, I could see
13   theoretically.
14             That's what I do, you know, as a
15   psychiatrist; I am trying to investigate the meaning
16   of the wish and the solution that the patient is
17   hoping for, the problem the patient is hoping this
18   would be a solution for.
19             And so I want to be able to consider this
20   and have a respectful, mutual, slow dialogue that is
21   slow, meaning multiple sessions, to consider the
22   nuances of this because, you know, all of us have a
23   self-concept of how handsome we are or pretty we
24   are, and most everyone wants to get a little more
25   handsome and a little more pretty and we are -- we
```

PLAINTIFFS003218

Case 4:22-cv-00325-RH-MAF   Document 177-5   Filed 04/27/23   Page 6 of 11
Case 4:20-cv-00020-MW-MAF   Document 118-20   Filed 02/04/21   Page 47 of 184

Stephen Levine
December 21, 2020

Page 47

1   Q   Okay.
2   A   I believe that if a surgeon is going to do
3   this, he ought to know what I think -- what I know
4   about the person's history and the person's
5   intellectual capacities and the prices they paid for
6   their gender dysphoria already.
7           For example, the loss of a family and no
8   relations to children, or the inability to have a
9   relationship, an intimate relationship with other
10  people.  I believe the surgeon needs to have an
11  understanding of the person.
12          I don't have an understanding whatsoever
13  of the techniques of surgery.  You see?  I am just a
14  psychiatrist.  And the psychiatrist -- and the
15  surgeon has very little understanding of how a
16  person got to be in his office.  And I believe that
17  the letters of recommendation should capture the
18  humanness of this person and the desperation of this
19  person and the justification that the person uses
20  and the hopes they have for this surgery.  But
21  that's Levine, you know.
22  Q   I want to show you the WPATH Centers of
23  Care section that discusses letters.  This is
24  Exhibit 7 which we are going to put on the screen.
25

Stephen Levine
December 21, 2020

```
                                                        Page 48
 1                (Exhibit 7 was marked for identification.)
 2     BY MR. TILLEY:
 3          Q    Let's go to page 27.  It looks like the
 4     document page 27, it's .pdf page 33, Bates stamp
 5     PL 0450524.
 6                You see, Dr. Levine --
 7                MS. COLES:  Can you read that, Dr. Levine?
 8          It looks a little small on my computer.
 9                THE WITNESS:  I can read it.  It says
10          referral for surgery.
11                MS. COLES:  Okay.  Just making sure.
12     BY MR. TILLEY:
13          Q    At the bottom, I am going to start there
14     and then we'll go on to the following page.  At the
15     bottom it says, The recommended content of the
16     referral letters for surgery is as follows:  1, the
17     client's general identifying characteristics -- now
18     we are continuing on to the next page -- number 2,
19     results of the client's psychosocial assessment,
20     including any diagnoses.
21                And then it goes on to 3, 4, 5, and 6.
22                Dr. Levine, can you just review those if
23     you can read it and then let me know if you agree
24     with those statements.
25                (Short pause.)
```

Stephen Levine
December 21, 2020

Page 49

1    A    I don't disagree with the statements, but
2    each of those statements, of course, need to be
3    operationalized by the letter writer.  For example,
4    the first one, identifying characteristics,
5    oftentimes identifying characteristics would be like
6    this is a 63-year-old Caucasian veterinarian.  But
7    there are many other identifying characteristics
8    that might be included.
9         So you can interpret these things with
10   terse statements or elaborate statements.  I favor
11   elaborate statements.  For example, I would like to
12   say a divorced father of four, or a roller derby
13   official.  I would like to identify him as much as a
14   person as possible.  But in the history of medicine,
15   race, age, and nourishment passes for identifying
16   information.
17        So the results of the psychosocial
18   assessment, including any diagnosis.  Psychosocial
19   assessment would be the processes in his life
20   history, including any current or past diagnoses,
21   you see.  So substance abuse might be a very
22   important part of number 2.; and the duration.  So
23   if I am writing a letter, if I am one of two people
24   who have been hired to write a letter for genital
25   surgery, and I might have had three visits with the

Stephen Levine
December 21, 2020

Page 103

1  not inquiring about your medical history and your
2  psychiatric history.  But it may be psychologically
3  beneficial to you and an M.D. may recommend that you
4  do that.  And that recommendation would be based on
5  his or her knowledge that you are likely to suffer
6  from seasonal affective disorder, and the treatment
7  is bright lights and sunshine.  And sunshine would
8  be far superior because of its luminescence, the
9  number of lumens exposed, than bright lights.
10 BY MR. TILLEY:
11     Q     Let's go back just briefly to WPATH.  And
12 I know you mentioned you have a more conservative
13 approach.  So let me ask you this.
14           Is it fair to say that if you personally
15 believed that you would authorize hormones or
16 surgery for someone with gender dysphoria, someone
17 following the WPATH Standards of Care would also
18 believe that?
19     A     Yes.
20     Q     Okay.  Let's talk about insurance for a
21 little bit.  If you recommended that -- if you
22 authorized some form of treatment for gender
23 dysphoria, whether it be hormones or some form of
24 surgery, would you expect that that treatment would
25 be covered by your patient's insurance?

PLAINTIFFS003222

Stephen Levine
December 21, 2020

Page 156

1  You see?
2           So I am saying, please, let me talk to you
3  about human beings here and how important having
4  ongoing lifelong relations with one's children are
5  and being a grandfather or grandmother, and being
6  connected to a family of origin.  I am not talking
7  about categorical bans.  I am talking about being
8  smart.
9  BY MR. TILLEY:
10      Q   Are you aware that this case concerns an
11  insurance exclusion that is categorical at
12  preventing --
13          MS. COLES:  Form.
14  BY MR. TILLEY:
15      Q   -- hormones and surgery as a treatment for
16  gender dysphoria?
17          MS. COLES:  Form.
18      A   I am aware that your plaintiffs are suing
19  to get coverage for -- that is not provided by their
20  particular insurance.  I am aware of that.
21  BY MR. TILLEY:
22      Q   Do you think that exclusion is
23  appropriate?
24          MS. COLES:  Form.
25      A   I've already answered that question, I

PLAINTIFFS003223

Stephen Levine
December 21, 2020

Page 157

1  believe.
2  BY MR. TILLEY:
3      Q    What is the answer?
4      A    That it's a political decision that varies
5  from state to state, and it belongs to the process
6  of political science and the courts and not doctors.
7      Q    And if you yourself were treating them and
8  determined that they understood the risks and you
9  thought the treatment would be psychologically
10 beneficial and provided letters of authorization to
11 them, you would want that treatment to be covered by
12 insurance; is that correct?
13           MS. COLES:  Form.
14     A    I am an agent of the patient, I want
15 what's best for the patient, and especially if the
16 patient couldn't otherwise afford it, I would wish
17 for my patient to have it, yes.
18 BY MR. TILLEY:
19     Q    I know you said you are not about
20 categorical bans, but let me ask you about minors
21 again.
22           Would you support a categorical ban on
23 access to puberty blockers to treat gender
24 dysphoria?
25           MS. COLES:  Form.

PLAINTIFFS003224