Page 1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2
                ~~~~~~~~~~~~~~~~~~~~
3
     MAXWELL KADEL, et al.,
4
5               Plaintiffs,
6
        vs.            Case No. 1:19-cv-272-LCB-LPA
7
8    DALE FOLWELL, in his official
     capacity as State Treasurer of
9    North Carolina, et al.,
10
                Defendants.
11
12              ~~~~~~~~~~~~~~~~~~~~
13           Video Deposition of
             STEPHEN B. LEVINE, M.D.
14
15           September 10, 2021
                9:05 a.m.
16
17              Taken at:
          Veritext Legal Solutions
18           1100 Superior Avenue
              Cleveland, Ohio
19
20           Tracy Morse, RPR
21
22
23
24
25



Pl. Trial Ex. 087

PLAINTIFFS003280

```
                                             Page 2
 1      APPEARANCES:
 2           On behalf of the Plaintiff:
 3                Lambda Legal, by
                  CARL S. CHARLES, ESQ.
 4                120 Wall Street, 19th Floor
                  New York, New York  10005-3919
 5                ccharles@lambdalegal.org
 6                TARA BORELLI, ESQ.
                  730 Peachtree Street, N.E.
 7                Suite 640
                  Atlanta, Georgia  30308-1210
 8                tborelli@lambdalegal.org
 9                    and
10                McDermott Will & Emery, by
                  MICHAEL M. WEAVER, ESQ.
11                444 West Lake Street, Suite 4000
                  Chicago, Illinois  60606-0029
12                mweaver@mwe.com
13
             On behalf of the Defendants Dale Folwell,
14           Dee Jones, and the NC State Health Plan
             For Teachers and State Employees:
15
                  Law Office of John Knepper, LLC, by
16                JOHN KNEPPER, ESQ.
                  1720 Carey Avenue, Suite 590
17                Cheyenne, Wyoming  82001
                  john@knepperllc.com
18
19           On behalf of the Defendant State of North
             Carolina Department of Public Safety:
20
                  North Carolina Dpt. Of Justice, by
21                ALAN MCINNES, ESQ.
                  114 W. Edenton Street
22                Raleigh, North Carolina  27603
                  amcinnes@ncdoj.gov
23
                     ~ ~ ~ ~ ~
24      ALSO PRESENT:
25                Joseph Vandetta, Videographer
```

PLAINTIFFS003281

Page 3

1                     TRANSCRIPT INDEX

2

       APPEARANCES............................   2

3

4      INDEX OF EXHIBITS......................   4

5

       EXAMINATION OF STEPHEN B. LEVINE, M.D.

6      By MR. CHARLES........................   7
       By MR. KNEPPER........................ 227

7      By MR. CHARLES........................ 244

8

       REPORTER'S CERTIFICATE................ 249

9

10     EXHIBIT CUSTODY

       EXHIBITS RETAINED BY COURT REPORTER, 1-21

11     (No Exhibit 16)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PLAINTIFFS003282

Page 4

1                       INDEX OF EXHIBITS
2       NUMBER          DESCRIPTION              MARKED
3       Exhibit 1       4/28/2021 Declaration.... 14
                        of Stephen B. Levine,
4                       M.D. With Attachment
        Exhibit 2       12/21/2020 Zoom.......... 56
5                       Deposition of Stephen
                        Levine, M.D.
6       Exhibit 3       Typewritten Three-Page... 62
                        Document Entitled,
7                       "Special Programs,"
        Exhibit 4       1/1/2019-12/31/2019...... 78
8                       North Carolina State
                        Health Plan Benefits
9                       Booklet, Bates Numbers
                        PLAN DEF0001785-0001900
10      Exhibit 5       Lesbian Gay Bisexual..... 89
                        Transgender Center
11                      Document Entitled,
                        "Transgender Resources"
12      Exhibit 6       4/8/19 Soneeya v. Turco..104
                        Trial Transcript, Day 1
13      Exhibit 7       "Correction: Parent......116
                        Reports of adolescents
14                      And young adults
                        Perceived to show signs
15                      Of a rapid onset of
                        Gender dysphoria,"
16                      Article
        Exhibit 8       "Transgender Teens: Is...122
17                      The Tide Starting To
                        Turn?" Article
18      Exhibit 9       "Finland Issues Strict...139
                        Guidelines for Treating
19                      Gender Dysphoria,"
                        Article
20      Exhibit 10      "Recommendation of the...140
                        Council for Choices in
21                      Health Care in Finland
                        (PALKO/COHERE Finland),"
22                      Article
        Exhibit 11      "Stod och utredning vid..145
23                      konsinkongruens hos barn
                        Och ungdomar," Article
24
25

PLAINTIFFS003283

```
 1              INDEX OF EXHIBITS (Continued)
 2      NUMBER              DESCRIPTION          MARKED
 3      Exhibit 12          "Long-Term Follow-Up of..154
                            Transsexual Persons
 4                          Undergoing Sex
                            Reassignment Surgery:
 5                          Cohort Study in Sweden,"
                            Article
 6      Exhibit 13          2017 "On Gender.........156
                            Dysphoria," Booklet
 7                          From Department of
                            Clinical Neuroscience,
 8                          Karolinska Institutet
        Exhibit 14          "Long-Term Follow-Up of..161
 9                          Individuals Undergoing
                            Sex-Reassignment Surgery:
10                          Somatic Morbidity and
                            Cause of Death," Article
11      Exhibit 15          5/15/2017 Telephonic.....170
                            Deposition of Stephen
12                          Levine, M.D.
        Exhibit 17          "A Typology of Gender....196
13                          Detransition and Its
                            Implications for
14                          Healthcare Providers,"
                            Article
15      Exhibit 18          DSM-5: Frequently Asked..202
                            Questions
16      Exhibit 19          "Endocrine Treatment of..213
                            Gender-Dysphoric/Gender
17                          Incongruent Persons:
                            An Endocrine Society
18                          Clinical Practice
                            Guideline," Article
19      Exhibit 20          "Pediatric Obesity.......217
                            Assessment, Treatment,
20                          And Prevention: An
                            Endocrine Society
21                          Clinical Practice
                            Guideline," Article
22      Exhibit 21          "Practice Parameter on...223
                            Gay, Lesbian, or Bisexual
23                          Sexual Orientation,
                            Gender Nonconformity,
24                          and Gender Discordance
                            In Children and
25                          Adolescents," Article
```

PLAINTIFFS003284

Page 23

1          Q.    Okay.  And so then were there any
2     external grants to research and publish about
3     the treatment of children or adolescents --
4          A.    No.
5          Q.    -- with gender dysphoria?
6          Okay.  Is that a, "No," when I included
7     the, "Gender dysphoria," as well?
8          A.    That is a, no.
9          Q.    Okay.  Thank you.  Okay.  So on
10    page 3 of your report -- actually, I'm sorry.
11    It's going to be the bottom of page 4 and to
12    the top of page 5.  Your report lists your
13    experience as an expert witness, which we
14    talked about a little bit earlier.  I just --
15    I'm wondering if you would confirm this is not
16    an exhaustive list of your experience as an
17    expert witness either via deposition or report.
18         A.    I wouldn't want to testify that
19    this is absolutely complete, given the fact
20    that I don't keep a list compiled.  This is
21    kind of compiled retrospectively from memory
22    and documents.  And so this is the best I could
23    have done on April of 2021 --
24         Q.    Understood.  Thank you.  So --
25         A.    -- you might find something else.

PLAINTIFFS003285

1    two, two and a half years ago.

2         Q.    Oh, okay.  And what kind of

3    treatment -- I should say, have you referred

4    any of those adolescent patients for additional

5    treatment, besides psychotherapy, for the

6    treatment of gender dysphoria?

7         A.    Yes.

8         Q.    And what kinds of treatment have

9    you referred them for?

10        A.    For endocrine treatment.

11        Q.    Okay.  And approximately what

12   percentage of those adolescent patients have

13   you referred for endocrine treatment?

14        A.    Give me the timeframe of that

15   question, please.

16        Q.    Sure.  So you said a few moments

17   ago, in the last five years, you saw maybe,

18   asterisk, 12 to 15 adolescent individually

19   yourself.  Of those 12 to 15, what would be the

20   approximate percentage you referred for

21   endocrine treatment?

22        A.    I'm hesitating to answer the

23   question, because some of those children have

24   been taking testosterone or estrogen

25   surreptitiously from their parents.  And while

PLAINTIFFS003286

Page 55

1      where the number of adults has diminished and

2      the number of adolescents has increased

3      dramatically.

4            Q.    Okay.  Thank you.  So as a part of

5      your private practice, do you write letters of

6      authorization for endocrine treatments?

7            A.    Yes.

8            Q.    And do you write letters of

9      authorization for gender affirming surgeries?

10           A.    I have.  I have not recently,

11     because most of my patients are 13 or 15 or 16,

12     you know.

13           Q.    Okay.  And I'm sorry.  Just by,

14     "Recent," when was the last time you wrote a

15     letter of authorization for a gender affirming

16     surgery for an adult?

17           A.    Probably twelve months ago.

18           Q.    Okay.  And over the course of your

19     career focusing on your treatment of adults

20     experiencing gender identity issues, for what

21     percentage of those patients would you estimate

22     you wrote a letter of authorization for gender

23     affirming surgery for?

24                 MR. KNEPPER:  Objection, form.

25           A.    Again, I would like to put an

PLAINTIFFS003287

1    asterisk to whatever I answer this question as.

2    I have not kept track of those figures.  I have

3    written -- I've written or cosigned letters for

4    hormone treatments and for gender confirming

5    surgeries for many people.  There were more

6    people in the '70s and '80s than in recent

7    decades.  In part as a reflection of my own

8    evolution of understanding of these problems

9    and in part it's a reflection of the demography

10   of patients who are coming to see me.  I really

11   would not like to answer that question, only

12   because I don't know if the word, "Fifteen," or

13   the word, "Twenty-five," or the word,

14   "Thirty-five," is more accurate --

15           Q.    Understood.

16           A.    -- but I can tell you, I have

17   written letters, especially in the early years,

18   for the things that you're making reference to.

19                   -  -  -  -  -

20                (Thereupon, Deposition Exhibit 2,

21                12/21/2020 Zoom Deposition of

22                Stephen B. Levine, M.D., was marked

23                for purposes of identification.)

24                   -  -  -  -  -

25           Q.    Okay.  For the record, I'm showing

PLAINTIFFS003288

Page 67

1   patient be able to afford it?

2          MR. KNEPPER:  Objection, form.

3      A.    May I say, of course?

4      Q.    You may.  You may say anything you

5   would like.

6      A.    Of course.

7      Q.    Thank you.  Well, anything you

8   would like within reason.

9          If you make a letter of authorization for

10  a patient for the treatment of gender dysphoria

11  specifically related to a surgical treatment,

12  do you think it is good that they be able to

13  access that treatment that you've authorized?

14          MR. KNEPPER:  Objection, form.

15     A.    Not to be cagey, I want to talk

16  about one word you just used in that sentence.

17  I need you to understand that historically in

18  our clinic for those 47 years, our clinics

19  for 47 years, we are not in the business and we

20  have never been in the business of recommending

21  surgery or recommending hormones.  We recommend

22  a continued evaluation so that we -- the person

23  can make up their mind how to proceed.

24          It is not our knowledge base to know

25  who's going to do better and who's going to do

PLAINTIFFS003289

Page 68

1    worse and who is not going to have any

2    difference at all with hormones or with

3    surgery.  So what we do is we say, we will

4    write a letter of support for endocrine

5    treatment or for hormones if this is what you

6    want.  And we say what our concerns are.  We

7    tell the endocrinologist and we tell the

8    surgeon what our concerns are and that we

9    see -- we have reservations about this, and

10   these are our reservations, but the patient has

11   decided this is what he or she wants to do.

12        And so we write a letter of support, but

13   I don't -- every time you use the word,

14   "Recommendation," there's part of me that wants

15   to say, no, we do not recommend.  We have never

16   recommended.  We have not had the knowledge

17   base.  We have not had the clinical experience

18   and the knowledge base to say, I'm a doctor.  I

19   know this field.  This is what I recommend to

20   make you better.  We do not talk that way.  We

21   do not think that way.  And so I may want to

22   always put an asterisk to any sentence that you

23   use the word, "Recommend."  I need you to

24   understand that that's where I'm coming from.

25             MR. CHARLES:  Thank you,

PLAINTIFFS003290

1    concept of agency and being a doctor, I think

2    is different than the implication of your

3    question.

4         Q.    Is the worrisomeness for a

5    patient's future health, is that a reason to

6    deny all medical care for gender dysphoria?

7         A.    Absolutely not.

8         Q.    Dr. Levine, I'd like to return back

9    to, I believe it's Exhibit 2, the Claire

10   deposition.  And please, if you would turn to

11   page 156.

12        A.    I'm sorry.  150 what?

13        Q.    Page 156.  And beginning at line 10

14   on page 156, Dr. Levine, I'll read it, if

15   you'll just follow along, please.

16        Question:  "Are you aware that this case

17   concerns an insurance exclusion that is

18   categorical at preventing" --

19        Skipping to line 15.

20        "-- hormones and surgery as a treatment

21   for gender dysphoria?"

22        Answer:  "I am aware that your plaintiffs

23   are suing to get coverage for -- that is not

24   provided by their particular insurance.  I am

25   aware of that."

PLAINTIFFS003291

Page 84

1    demonstrate their efficacy.  This is the

2    problem.

3         This is the essence of the problem.  This

4    is, I think the essence of my testimony with

5    you today.  It's not whether I personally as a

6    doctor would like this patient to have

7    insurance to cover their hormones.  It's about,

8    is this the right thing to do for this person

9    and can I help the person see clearly what the

10   dangers are and what the benefits are.  That's

11   the issue for a doctor, for Stephen Levine as a

12   doctor.  I hope that's a cogent answer --

13        Q.    It is --

14        A.    -- to your question.

15        Q.    -- it is cogent.  Thank you.

16        Given all of that, is that -- so you just

17   explained, testified that there are

18   complications, some lack of -- and I'm

19   summarizing here, so I will confirm that this

20   is an accurate summary of what you just shared,

21   but I can't possibly repeat all of that.  Given

22   all of those concerns that you have, is that a

23   reason to deny all medical interventions to

24   people with gender dysphoria?

25             MR. KNEPPER:  Objection, form.

Page 85

1          A.     No, but that's not -- that's a

2      separate question about insurance.

3          Q.     Yes, it is a separate question.  So

4      now I'm asking:  Are those concerns you raised

5      justifications in your mind for denying medical

6      interventions to all people with gender

7      dysphoria?

8                MR. KNEPPER:  Objection, form.

9          A.     You know, I'm not advocating

10     denying endocrine treatment or surgical

11     treatment.  I'm just saying that we as a

12     medical profession need to walk the walk that

13     we talk.  We say as a principle of ethics that

14     our interventions should be based upon the best

15     current knowledge, it should be based on

16     science.  It should not be based on politics.

17     It should not be based on fashion.  It should

18     not be based on civil rights considerations.

19     They should be based on the kinds of studies

20     that I just described to you with predetermined

21     outcome majors that are agreed upon --

22         Q.     Sorry?

23         A.     -- period.

24         Q.     I was --

25         A.     I forgot to put the period.

PLAINTIFFS003293

Page 86

1          Q.    That's okay.  Did you just say,
2     Dr. Levine, you're not an expert in health
3     insurance?
4          A.    I am not an expert in health
5     insurance.
6          Q.    Okay.  Or what insurance should or
7     should not cover?
8          A.    Yes.
9          Q.    Do you recall what the insurance
10    billing code typically is for psychotherapy for
11    gender dysphoria?  I know it's been a long time
12    since you've accepted commercial insurance, so
13    I'm not sure if the billing codes are the same,
14    but do you recall --
15         A.    The billing code is 90837.
16         Q.    Okay.  Is there a code that you're
17    familiar with that is F64.0?
18         A.    That's not a billing -- that's
19    diagnostic code --
20         Q.    Thank you.
21         A.    -- there's a separate code for
22    diagnosis and a separate code for procedure.
23         Q.    I see.  So F64.0 is a diagnostic
24    code?
25         A.    Yes.

PLAINTIFFS003294

Page 91

1           VIDEOGRAPHER: Off the record 11:26.

2                (Recess taken.)

3           VIDEOGRAPHER: On the record 11:31.

4     BY MR. CHARLES:

5           Q.    Okay.  Dr. Levine, in your report,

6     you stated that you had not met with any of the

7     plaintiffs in this case, correct?

8           A.    Yes.

9           Q.    Okay.  And you have not interviewed

10    any of the plaintiffs in this case, correct?

11          A.    Correct.

12          Q.    And so you are not offering any

13    opinions about the plaintiffs in this case,

14    correct?

15          A.    Correct.

16          Q.    Okay.  And that would include the

17    veracity of their experiences of gender

18    dysphoria, correct?

19          A.    Yes, correct.

20          Q.    And that would not include the

21    accuracy of their gender dysphoria diagnoses,

22    correct?

23          A.    Correct.

24          Q.    Okay.  You're not offering any

25    opinions about their mental health histories?

PLAINTIFFS003295

1    methodology and are capable of critically

2    reviewing the literature.  So your statement is

3    true on the most superficial level, but is

4    totally incorrect when it comes to scientific

5    standards of care for issuing guidelines for

6    the medical profession.  So I don't know how to

7    answer the question.  On the surface, the

8    answer is, yes.  And underneath the surface,

9    the answer is, no.

10        Q.   So the International Journal For

11   Transgender Health is still a peer-reviewed

12   source, though, right?

13        A.   It's peer reviewed by people who

14   make their living supporting transgender care.

15        Q.   But it's still peer reviewed,

16   right?

17        A.   It's peer reviewed --

18        Q.   And as for your --

19        A.   -- I think it's peer reviewed.

20        Q.   Okay.  Understood.  And as for your

21   more conservative approach, can you cite to any

22   studies or research that resulted in better

23   outcomes than people who adhere strictly to the

24   WPATH standards of care version 7?

25        A.   No.  This is part of the problem in

PLAINTIFFS003296

1    evaluation leading to a therapeutic process, it

2    seems prudent, given the fact that we are

3    changing people's bodies, especially teenagers'

4    bodies, and they are not of developmental

5    sophistication yet that court systems or at

6    least one court system thinks they're certainly

7    too young to make these life-altering

8    decisions.  So people in SEGM are biased in the

9    direction of being conservative and providing

10    psychotherapeutic evaluations of the child, of

11    the teenager and of their parents, of their

12    family systems to see if we can find a way to

13    help them be informed about what is going --

14    what they think they want to do in their

15    future.

16         Q.    And so when you provide letters of

17    authorization for hormones or for surgery, do

18    you do so in accordance with the WPATH

19    standards of care?

20         A.    Yes.  That is the standard, to

21    provide a letter of recommendation.

22         Q.    Okay.  So turning back to your

23    report, Dr. Levine.  You can go ahead and put

24    away the trial transcript there.

25         A.    I'm sorry.  Did you say, "Turning

PLAINTIFFS003297

Page 116

1      hours and hours of their time getting counseled

2      or participating with the virtual trans

3      community.  That's a hypothesis.

4           Q.    So no scientific citation?

5           A.    When we use the word, "Scientific,"

6      in the best sense, yes, the answer to your

7      question is, no scientific.

8           Q.    Okay.  No studies of citations you

9      can point to today to support that hypothesis?

10          A.    Oh, I think Lisa Littman's studies

11     are in the literature and/or in press that

12     documents this.

13                      -  -  -  -  -

14                  (Thereupon, Deposition Exhibit 7,

15                  "Correction: Parent reports of

16                  adolescents and young adults

17                  perceived to show signs of a rapid

18                  onset of gender dysphoria," Article,

19                  was marked for purposes of

20                  identification.)

21                      -  -  -  -  -

22          Q.    Okay.  For the record, please note

23     I'm showing to Dr. Levine what has been marked

24     as Exhibit 7.  "Correction: Parent reports of

25     adolescents and young adults perceived to show

PLAINTIFFS003298

Page 117

1      signs of a rapid onset of gender dysphoria," by

2      Lisa Littman published March 19, 2019.  Have

3      you seen this material before, Dr. Levine?

4           A.    I've seen of it.  I don't think

5      I've read it.

6           Q.    Okay.  Were you aware that the Lisa

7      Littman article had to be withdrawn, corrected

8      and republished?

9           A.    Yes.

10          Q.    Okay.  And were you aware that the

11     initial article was based on a survey of

12     parents --

13          A.    Yes.

14          Q.    -- of purportedly transgender

15     children and the parents were recorded -- I'm

16     sorry.  Let me start over.  Were you aware that

17     the Littman article was based on a survey of

18     parents who were recruited through some parent

19     groups?

20               MR. KNEPPER:  Objection, form.

21          A.    I knew it was a survey of parents.

22          Q.    Okay.  And did you know there were

23     no report-outs from the young adults of those

24     parents in the article?

25          A.    It was a report of parents'

PLAINTIFFS003299

Page 122

1     transitioning.  However, it is...important to

2     note that there are other survey items where

3     the parent would have direct access to

4     information about their child and that those

5     answers reflect items that can be directly

6     observed."  Did I read that correctly?

7            A.    Yes, you did.

8            Q.    All right.  Your report also cites

9     as support for the social contagion hypothesis

10    to an article from Medscape.com written by

11    Becky Mccall and Lisa Nainggolan as support for

12    the social contagion theory.  Is that correct?

13    I'm sorry.  It's not going to be on this

14    article, Doctor.

15           A.    I don't know that article.

16           Q.    Okay.

17           A.    You haven't asked me a question

18    about this.  Did I misunderstand something?

19           Q.    No, no.  Sorry.  We're just --

20           A.    You haven't asked my opinions about

21    that, yeah.

22                       -   -   -   -   -

23                 (Thereupon, Deposition Exhibit 8,

24                 "Transgender Teens: Is the Tide

25                 Starting To Turn?" Article, was

PLAINTIFFS003300

Page 123

1          marked for purposes of

2          identification.)

3              -   -   -   -   -

4       Q.    Yeah.  So, for the record, I'm

5   showing Dr. Levine what has been marked as

6   Exhibit 8.  "Transgender Teens:  Is the Tide

7   Starting To Turn?" by Becky McCall and Lisa

8   Nainggolan, April 26, 2021.  Dr. Levine, you

9   said you have not reviewed this article before?

10      A.    Which one are you referring to?

11      Q.    I'm sorry.  That one to your left.

12      A.    This?

13      Q.    Yes.  Take your time.

14      A.    Have I reviewed it, no.  You know,

15  I've seen the picture of Keira Bell.  I've seen

16  news reports of this in the past, but they were

17  just news reports, yeah.

18      Q.    Do you know if either of the

19  authors of this article is a scientist?

20      A.    I have no idea.

21      Q.    Okay.  Or a psychiatrist?

22      A.    (Indicating.)

23      Q.    I'm sorry.  Could you make your

24  responses verbal?  I'm forgetting.

25      A.    I have no idea.

PLAINTIFFS003301

Page 124

1          Q.     Okay.  Thank you.  Have either of

2     them ever treated transgender children or

3     adolescents?

4          A.     I would have no idea.

5          Q.     Okay.  To your knowledge, is the

6     information provided on Medscape.CA subject to

7     peer review?

8          A.     I don't know how Medscape works.

9     I've heard there have been retractions, but I

10    don't know how their peer reviewed is made.

11    Perhaps people write in that, This is

12    ridiculous what you've been teaching or what

13    you've been saying, but whether they're peer

14    reviewed or not, I have no idea.

15         Q.     So you probably -- I'm sorry.  So

16    do you know if this article has been published

17    in a peer-reviewed journal to your knowledge?

18         A.     "Transgender teens:  Is the

19    Tides" -- that article?

20         Q.     Yes.

21         A.     I don't know.  I don't know this

22    article.  I don't know where it's from.

23         Q.     Okay.  So your report includes a

24    quotation from this article.  "The vast

25    majority of youth now presenting with gender

PLAINTIFFS003302

Page 128

1      multi-continental set of observations from
2      Europe, from Australia, from North America --
3          Q.   Okay.
4          A.   -- it almost doesn't even need
5      citations it's so clinically apparent.
6          Q.   Okay.  But there's no citation in
7      your report?
8          A.   In my report, yes.
9          Q.   Okay.  So on page 18, going back to
10     your report, at the bottom of page 18, you use
11     a term, "Transgender Treatment Industry."  Is
12     this the first time you have used this term?
13         A.   In this report?
14         Q.   No.
15         A.   You mean, did I ever use it in
16     another report?
17         Q.   Yeah, yeah.
18         A.   I'm not sure.  If this is -- if
19     it's not the first, it might be the second.
20         Q.   And where did the term originate?
21         A.   I think it -- the term originated
22     from Dwight Eisenhower at the end of his --
23     when he was leaving the presidency in 1952, he
24     warned the people about the military industrial
25     complex and that there was a very comfortable

PLAINTIFFS003303

Page 137

1      A.    No.   Their gender dysphoria may be
2     a product, you see, of these other things.   For
3     example, if you have someone who has been
4     sexually abused by her stepfather and becomes a
5     trans person in adolescents, we want to talk
6     about the sexual abuse and the process between
7     that person and what fears for the present and
8     the future that has caused the child.   And
9     we're not attacking their trans identity.
10    We're trying to help them understand where they
11    came from and what they're coping with and why
12    they're so fearful or so distressed by their
13    body changing.
14      Q.    And their gender dysphoria could be
15    separate and apart from that traumatic
16    experience?
17      A.    Theoretically it could be, yes.
18      Q.    And if it persisted sufficiently
19    enough, you would consider a letter of
20    authorization for --
21      A.    Yes.
22      Q.    -- hormones?
23      A.    Yes.
24            MR. KNEPPER:  Objection, form.
25      Q.    Okay.  If you would, please, turn

PLAINTIFFS003304

Page 151

1          A.     That is correct.  And may I add

2     that it's very, very difficult to understand.

3     The natural question would be, how do you

4     compare the general population with the trans

5     people who did not have surgery with the trans

6     people who did have surgery.

7          Q.     Thank you, Dr. Levine.  That's not

8     my question, though.  I just wanted to confirm

9     that was not the control group.  You mentioned

10    this study later in your report, page 66

11    beginning at paragraph 74.  Do you see that?

12         A.     Um-hum.

13         Q.     Okay.  And basically that -- well,

14    here, let me point you exactly.  The sentence

15    starts with, "Similarly," about halfway down

16    the page, third sentence of that paragraph.

17         A.     Um-hum.

18         Q.     And, as you mentioned, you cite the

19    Dhejne study and I believe -- or I should ask:

20    Is the Denmark study you're referencing the

21    study directly after it --

22         A.     The Simonsen study.

23         Q.     -- the Simonsen study?

24         A.     Yes.

25         Q.     Okay.  So beginning with the Dhejne

PLAINTIFFS003305

Page 152

1      study, do you think because that study showed

2      that some people committed suicide after gender

3      affirming surgery that no patient should be

4      able to access gender affirming surgery?

5               MR. KNEPPER:  Objection, form.

6          A.     That would be illogical.

7          Q.     Okay.  Dr. Levine, I understand you

8      said that would be illogical, but just to be

9      clear.  You're not recommending -- sorry.  I'm

10     not using that word.  You're not saying that

11     the fact that some people commit suicide

12     following gender affirming surgery means that

13     there should be a ban on access to that

14     surgery.  Is that right?

15         A.     Not for that reason, no.

16              MR. KNEPPER:  Objection, form.

17         Q.     Not for that reason.  Okay.  Are

18     you recommending that there would be bans on

19     gender affirming surgery for any reason?

20         A.     I think there are -- you know, I

21     think most prudent people in this field, just

22     to use the example of what you read out loud

23     about the Finland study, a case-by-case basis.

24     That's how doctor need to decide things, but

25     there are many, many reasons to be cautious

PLAINTIFFS003306

Page 154

1      fashion and to be very hesitant about going

2      forward.

3            Q.    But you're not recommending total

4      bans on gender affirming surgery?

5            A.    I'm not recommending total bans.

6      I'm aware of the individual circumstances of

7      individual people's lives and their commitment

8      to transgender living.  And I don't want to be

9      draconian about this.  I want to be

10     compassionate about this.

11           Q.    I understand.  I appreciate that.

12     I just want to make sure I'm understanding you

13     correctly.

14                       -  -  -  -  -

15                 (Thereupon, Deposition Exhibit 12,

16                 "Long-Term Follow-Up of Transsexual

17                 Persons Undergoing Sex Reassignment

18                 Surgery: Cohort Study in Sweden,"

19                 Article, was marked for purposes of

20                 identification.)

21                       -  -  -  -  -

22           Q.    So for the record, I'm presenting

23     to Dr. Levine what has been marked as

24     Exhibit 12.  "Long-Term Follow-Up of

25     Transsexual Persons Undergoing Sex Reassignment

PLAINTIFFS003307

Page 156

1          For the 22nd time today, did I read that

2     correctly?

3          A.    It's the 23rd time.

4          Q.    Oh, okay.

5          A.    Yes.

6          Q.    I was hoping you weren't counting,

7     but, okay.  Did you testify earlier today that

8     the limitation of the Dhejne study is that the

9     controls were not transgender persons who had

10    not undergone gender affirming surgery?

11         A.    Yes.

12               MR. KNEPPER:  Objection, form.

13         Q.    Okay.  You can set that aside,

14    Dr. Levine.

15                    -   -   -   -   -

16               (Thereupon, Deposition Exhibit 13,

17               2017 "On Gender Dysphoria," Booklet

18               From Department of Clinical

19               Neuroscience, Karolinska Institutet,

20               Stockholm, Sweden, was marked for

21               purposes of identification.)

22                    -   -   -   -   -

23         Q.    For the record, Dr. Levine has an

24    exhibit that has been marked as Exhibit 13.

25    "On Gender Dysphoria," by Cecilia Dhejne from

PLAINTIFFS003308

Page 160

1      ideation in transgender people.

2            A.    Well, you know about the

3      Branstrom-Pachankis study and the criticism of

4      the study --

5            Q.    But I'm not talking about the

6      study.

7            A.    -- and part of the study

8      demonstrated that it increased suicidal

9      ideation and attempts in the first two and a

10     half years after surgery, especially in the

11     first year --

12           Q.    Right.  Is your testimony --

13           A.    -- so I'm not testifying that.  I

14     thought you were asking me about this, which I

15     need to comment on, because this is not an

16     accurate depiction of my statement in the

17     reference.  (Indicating.)

18           Q.    Well, that's not what I'm asking

19     about, Dr. Levine.

20           A.    Well, you're reading this and I'm

21     misquoted here.  So I don't want you to imply

22     that she is accurately representing my views,

23     because I did not say that gender affirming

24     treatment in general should be stopped.  I've

25     never said that.  This is an article about

PLAINTIFFS003309

Page 173

```
1      at different times have reported that in the
2      large majority of patients, absent a
3      substantial intervention such as social
4      transition and/or hormone therapy, gender
5      dysphoria does not," continue, "through
6      puberty."
7            So there are some children who persist in
8      their asserted gender identity through puberty,
9      correct?
10               MR. KNEPPER:  Objection, form.
11           A.    Correct.
12           Q.    And some who persist in wanting to
13     transition via medical treatments?
14               MR. KNEPPER:  Objection, form.
15           A.    Yes.  Some of the children have
16     learned about medical treatments somewhere
17     along the line and they feel instantly that
18     this is for them.
19           Q.    And then looking at paragraph 56,
20     which is on page 41, so just the very next page
21     on the bottom, the second sentence in that
22     paragraph.  "I observe an increasingly vocal
23     online community of young women who have
24     reclaimed a female identity after claiming a
25     male...identity at some point during their teen
```

PLAINTIFFS003310

Page 174

1    years."

2         But there are some patients who assert a

3    male gender identity in their teen years and

4    continue to assert it into adulthood, correct?

5         A.    Yes.

6              MR. KNEPPER:  Objection, form.

7         Q.    Okay.  Can social transition be

8    used to treat gender dysphoria in adults?  Not

9    looking at your report, now, Dr. Levine.

10   Sorry.  Can social transition treat gender

11   dysphoria in adults?

12        A.    Yes.  As a matter of fact, that

13   used to be the recommendation in the '70s

14   and '80s, prior to taking hormones, was to try

15   living, what was sometimes called the real-life

16   experience or the real-life test for one year.

17   And then if when you confront the new issues of

18   confronting you in your new neo gender, if you

19   still want to do that, then we'll come back and

20   we'll think about using hormones to facilitate

21   your transition.  But in the 7th edition of the

22   standards of care that was removed.  There's no

23   real-life experience, real-life test anymore.

24   If persons want it, they should have it.

25   Patient autonomy was valued far greater than

PLAINTIFFS003311

Page 176

1    transgender people is individual based, right?

2        A.    Well, it's both --

3            MR. KNEPPER:  Objection, form.

4        A.    -- yes, that's partially true.  And

5    ideally that's true, but it's obviously not

6    entirely true.  It's why we're here, is it's

7    categorically based.

8        Q.    Let me rephrase that.  You design

9    treatment for your patients based on what that

10   patient in front of you, what they need, what

11   they want, what you determine -- sorry.  Not

12   what you determine, but what you might

13   authorize?

14           MR. KNEPPER:  Objection, form.

15       A.    What the patient and I discern

16   together.

17       Q.    Thank you.  Okay.  Let's jump to,

18   again, still in your report, page 68.

19       A.    We've left 40 and 41?  68.

20       Q.    Okay.  Looking at the bottom of

21   page 68, Dr. Levine, paragraph 78.  It states,

22   "Similarly, the American Psychological

23   Association has stated because approach" --

24       A.    Sorry.

25       Q.    I apologize.

PLAINTIFFS003312

1    Gender Nonconforming People (2015)."

2           So is that lack of consensus that you

3    discuss a justification to categorically ban

4    social transition for children as a treatment

5    for gender dysphoria?

6                MR. KNEPPER:  Objection, form.

7           A.    By, "Children," you mean 6 and 7

8    year olds?

9           Q.    Those for whom medical intervention

10   is not indicated.

11          A.    Is that a reason to ban it?

12          Q.    Correct, social transition.

13               MR. KNEPPER:  Objection, form.

14          A.    The reason to -- so let me qualify

15   that.  There's a, yes, answer, there's a reason

16   to ban it.  And the reason to ban it is both a

17   developmental and an ethical reason.  There

18   have been eleven studies of these cross-gender

19   identity children who are not socially

20   transitioned and the vast majority of them

21   de-transition by the time they're mid

22   adolescents or older adolescents.  They become

23   homosexual individuals usually or bisexual

24   individuals, but they are cis gender.

25               So if we take a 6-year-old child and

PLAINTIFFS003313

Page 186

1        her peers or his peers and I don't think this
2        is a prudent idea.
3            And if you wanted me to suggest a ban on
4        anything, it would be a ban on using puberty
5        blocking hormones, especially when the
6        evaluation of those children are focused on the
7        gender dysphoria of the child and not on the
8        background of the child and not on what's going
9        on.  So I think that's an answer to your
10       question.
11           If we're going to use these drugs, if
12       we're going to use social transformation of
13       children, if we're going to use puberty
14       blocking hormones, it should only be used in a
15       carefully designed protocol.  And follow up has
16       to be guaranteed so in one year and in two
17       years and in three years and before we start
18       giving cross-gender hormones we have data --
19           Q.    Sorry.
20           A.    -- so the answer to your question
21       is, I would consider banning puberty blocking
22       hormones even for children who have been
23       cross-gender identified for four years to give
24       them a chance to desist, which is exactly what
25       the Dutch protocol did, by the way.

PLAINTIFFS003314

Page 187

1          Q.    Sorry.  So you just said you would
2     ban -- you would recommend a ban on --
3          A.    If --
4                MR. KNEPPER:  Objection, form.
5          A.    -- look, I'm a doctor.  I'm not a
6     policy maker --
7          Q.    I understand, yes.
8          A.    -- if you ask me my political
9     opinion about, should we ban this, is that a
10    reasonable thing, I think there's a very strong
11    argument for banning puberty blocking hormones.
12         Q.    Okay.  And, right.  So you're here
13    as an expert offering an expert opinion.  So
14    are you separating that from -- like are you
15    saying your political views that you would
16    advocate for bans or are you saying your expert
17    opinion you're offering in this case is you
18    would recommend ban?
19                MR. KNEPPER:  Objection, form.
20         A.    I would recommend ban.  To what
21    extent it's from my politics or from my being a
22    parent or from my being a doctor, I don't know.
23    I would recommend we not use puberty blocking
24    hormones.
25         Q.    In Claire, in this case that we

PLAINTIFFS003315

Page 191

1           Answer:  "Where we had a healthy mother
2       and father, an intact family who was
3       psychologically informed and who has -- where a
4       child has come out of toddlerhood acting
5       consistently in a gender atypical fashion, and
6       where the parents are not homophobic..."
7           Question:  "The parents are not what kind
8       of people?"
9           Answer:  "Homophobic."
10          For the 27th time, did I read that
11      correctly?  Did I read that correctly?
12          A.   Yes.
13              MR. CHARLES:  Okay.  All right.
14      Let's go ahead and take a break for a few
15      minutes.
16                  VIDEOGRAPHER: Off the record 3:20.
17                  (Recess taken.)
18                  VIDEOGRAPHER: On the record 3:38.
19      BY MR. CHARLES:
20          Q.   So, Dr. Levine, before the break,
21      you were talking about 6 and 7 year olds and
22      you mentioned there were eleven studies.  Can
23      you identify which eleven studies from your
24      report you're referring to?
25              A.   Cantor, the reference Cantor lists

PLAINTIFFS003316

Page 192

1      the eleven studies and these eleven studies

2      have been done over probably thirty years.

3            Q.    Okay.  So Cantor was one review of

4      eleven studies?

5            A.    Cantor was a review of the eleven

6      studies.  I can't list to you the eleven

7      individual studies.  The latest one is written

8      by Singh, S-i-n-g-h.  It was published in April

9      of 2021, in the Frontiers of Psychiatry.  And

10     that perhaps is the most comprehensive of them.

11     And that's the one that confirms -- that's a

12     study of boys and it confirmed that 12.2, I

13     think percentage of them persisted over a

14     thirteen-year period.

15           Q.    So that was one -- that was the

16     Singh study that came out.  Is that same study

17     mentioned in the Cantor review?

18           A.    (Nodding.)

19           Q.    Okay.  And you said that

20     established that 12.2 percent of prepubertal

21     boys persisted into adolescents?  Okay.

22           A.    Yes.  This harkens back to the

23     ethical issue that I talked about before.  You

24     know, if you know that 88 percent of them are

25     going to persist -- desist, why in the world

PLAINTIFFS003317

Page 196

1    identified 60,000 case reports world wide on

2    the Internet.  See Exposito-Campos..." --

3          A.    That is an error, by the way.

4          Q.    Sorry.  Which part of that is an

5    error?

6          A.    That, "60,000," is my error.  It

7    should say, "16,000."

8                     -  -  -  -  -

9                (Thereupon, Deposition Exhibit 17,

10               "A Typology of Gender Detransition

11               and Its Implications for Healthcare

12               Providers," Article, was marked for

13               purposes of identification.)

14                   -  -  -  -  -

15         Q.    Okay.  So for the record, I'm

16   showing Dr. Levine what has been marked as

17   Exhibit 17.  "A Typology of Gender Detransition

18   and Its Implications for Healthcare Providers,"

19   Pablo Exposito-Campos, 2021.  Okay.  Have you

20   seen this study before, Dr. Levine?

21         A.    Yes.

22         Q.    Okay.  So on page 1 of this report,

23   about halfway through the very first paragraph

24   in the introduction beginning with, "As a

25   consequence."  Do you see that there?

PLAINTIFFS003318

Page 200

1    important to note that this typology does not

2    suggest two clear-cut categories, for a

3    secondary detransition can lead to a primary

4    detransition" -- oh, sorry.  Let me start over.

5    Sorry.

6         Okay.  Let me start from a different

7    place, Dr. Levine.  The second sentence.

8    "In r/detrans" --

9         And there's an HTTP address --

10        A.    Okay.

11        Q.    Okay.  You see that.

12        -- "a subreddit for detransitioners to

13   share their experiences with more than 16,000

14   members, one can find several stories of people

15   who call their transgender status into question

16   after stopping transitioning due to medical

17   complications or feeling dissatisfied with

18   their treatment results"?

19        Do you know what a, "Subreddit," is,

20   Dr. Levine?

21        A.    I believe it's just a division of a

22   larger website where people, you know, with

23   similar interests.

24        Q.    Okay.  Do you understand this

25   sentence to be suggesting that all 16,000 of

PLAINTIFFS003319

Page 201

1     those members have offered a story of

2     detransition?

3                    MR. KNEPPER:  Objection, form.

4          A.    I think -- I think it may be true

5     that either they have offered a personal story

6     or they're fascinated because of their own

7     considerations of that story.  They're thinking

8     about it themselves, which would be in keeping

9     with the idea that even people who have

10    transitioned begin to doubt whether they made a

11    wise decision and they're considering

12    detransition.  I'm not so sure it means that

13    all 16,000.  I would have no way of

14    ascertaining that.  You know, in my worry, I

15    would lean towards most of them are seriously

16    considering or have detransitioned.  And in my

17    skepticism, I would say I'm not sure whether

18    it's 15,000 or 12,000 or 8,000.

19         Q.    But you have no way to confirm

20    that --

21         A.    I have no way.

22         Q.    -- if it's all of them or a few of

23    them or three of them?

24         A.    You're absolutely right.  I have no

25    way of confirming that.

PLAINTIFFS003320

Page 225

1    where hormones are safe and surgery is a good

2    thing to do.  If a person said that, you know,

3    skeptically, I think that would disappoint

4    certain patients, but how it was said and when

5    it was said in response to what would either

6    determine whether the person is engaged with

7    the mental health professional or leaves the

8    mental health professional.  You know, all

9    mental health professionals are not created

10   equal.

11        Q.   So it sounds like you're saying it

12   could do harm to that patient?

13             MR. KNEPPER:  Objection, form.

14        A.   No, I'm not saying that.  I'm

15   saying it could be disappointing to that

16   person.  What that person did with the

17   disappointment may prove harmful just because

18   of that person or it may prove in fact

19   beneficial.

20        Q.   Are you satisfied -- let's orient

21   this question around the patients you've seen

22   in the last 12 months.  Are you satisfied that

23   those patients -- actually, sorry.  Let me

24   start over.  Are you satisfied that the

25   patients you have seen historically for whom

PLAINTIFFS003321

Page 226

1    you provide letters of authorization for

2    hormones give sufficiently informed consent?

3                MR. KNEPPER:  Objection, form.

4         A.    From my point of view, I did what I

5    could to reach the standard of having the

6    person internalize and think about, digest,

7    dream about and come back and talk to me about

8    it.  That's all I can do.  I can't guarantee

9    that if I do what I do that it's going to

10   change your mind or help you steer your ship in

11   a slightly different angle --

12        Q.    So --

13        A.    -- so I would not write a letter of

14   recommendation if I didn't feel like I did my

15   part.  And if the person indicated that they

16   couldn't pay attention to me, I wouldn't write

17   the letter.

18                MR. CHARLES:  Understood.

19        Okay.  John, finished.

20                MR. KNEPPER:  You're finished?

21                MR. CHARLES:  I mean, barring --

22                MR. KNEPPER:  Barring --

23                MR. CHARLES:  We can't tell the

24   future.

25                MR. KNEPPER:  I wasn't ready for

PLAINTIFFS003322