Page 1

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF FLORIDA

DREW ADAMS, a minor,       )
                           )
        Plaintiff,         )
                           )
   vs.                     ) Civil Action
                           ) No. 3:17-cv-00739-TJC-JBT
THE SCHOOL BOARD OF ST.    )
JOHNS COUNTY, FLORIDA,     )
                           )
        Defendant.         )


TELEPHONIC DEPOSITION OF KIM G. HUTTON
Taken on behalf of Defendant
December 5, 2017
(Starting time of the deposition: 3:00 p.m.)

Pl. Trial Ex. 088

```
                                                          Page 2
                  I N D E X   O F   E X A M I N A T I O N


                                                          Page
   Questions by Mr. Harmon ..........................    5
   Questions by Mr. Gonzalez-Pagan ..................   49


              (No exhibits were marked.)
```

```
                                                            Page 3
 1              UNITED STATES DISTRICT COURT
                         FOR THE
 2              MIDDLE DISTRICT OF FLORIDA
 3
    DREW ADAMS, a minor,      )
 4                            )
              Plaintiff,      )
 5                            )
       vs.                    )Civil Action
 6                            )No.3:17-cv-00739-TJC-JBT
    THE SCHOOL BOARD OF ST.   )
 7  JOHNS COUNTY, FLORIDA,    )
                              )
 8            Defendants.     )
 9
10          TELEPHONIC DEPOSITION OF WITNESS, KIM G.
11  HUTTON, produced, sworn, and examined on the 5th day
12  of December, 2017, between the hours of nine o'clock
13  in the forenoon and six o'clock in the evening of that
14  day, at the offices of Veritext Legal Solutions, 515
15  Olive Street, Suite 300, St. Louis, Missouri before
16  BRENDA ORSBORN, a Certified Court Reporter within and
17  for the State of Missouri, in a certain cause now
18  pending in the United States District Court for the
19  Middle District of Florida, wherein Drew Adams, a
20  minor, is the Plaintiff and The School Board of St.
21  Johns County, Florida is the Defendant.
22
23
24
25
```

```
                                                          Page 4
 1              A P P E A R A N C E S
 2         For the Plaintiff:
 3         Mr. Omar Gonzalez-Pagan
           Lambda Legal
 4         120 Wall Street
           New York, New York 10005
 5         (212) 809-8585
           ogonzalez-pagan@lambdalegal.org
 6
 7
 8         For the Defendant:
 9         Mr. Terry Harmon (via phone)
           Sniffen & Spellman, P.A.
10         123 North Monroe Street
           Tallahassee, Florida 32301
11         (850) 205-1996
           tharmon@sniffenlaw.com
12
13
14         The Court Reporter:
15         Ms. Brenda Orsborn, RPR/CSR/CCR
           Missouri CCR No. 914
16         Illinois CSR No. 084-003460
           Veritext Legal Solutions
17         515 Olive Street, Suite 300
           St. Louis, Missouri 63101
18         (888) 391-3376
19
20
21
22
23
24
25
```

Page 21

1  center in St. Louis.
2          And that's how that happened.  Dr. Hruz
3  e-mailed me -- it's either the same day or the next
4  day, and invited me to lunch.
5      Q.   Where did you go -- did you end up going to
6  lunch?
7      A.   We did.
8      Q.   Where did you go?
9      A.   At the Wild Flower in the Central West End.
10     Q.   And what -- you said it was in 2013?
11     A.   Yes.
12     Q.   Do you recall what month?
13     A.   October.
14     Q.   Okay.  Was anybody else at the lunch?
15     A.   No.
16     Q.   Do you recall approximately how long the
17 lunch was?
18     A.   Maybe 45 minutes.
19     Q.   Was your conversation recorded?
20     A.   No.
21     Q.   I guess, to your knowledge, you may not
22 know, right?
23     A.   To my knowledge.  I did not record it.
24     Q.   Okay.  What -- what did you -- when you were
25 going to have that lunch with Dr. Hruz, what was the

Case 4:22-cv-00325-RH-MAF   Document 136-12   Filed 04/07/23   Page 6 of 15

Page 22

1   purpose of it, in your mind?
2        A.   Well, the e-mail that he sent me stated that
3   he wanted to meet to -- I think he kind of positioned
4   it as wanting to learn more about this experience, and
5   he shared that he -- he was well aware that Dr. Abby
6   Hollander was working with me, or that I had
7   approached her about starting a pediatric gender
8   center inside the hospital, and that he was having
9   great difficulty being open to that concept based on
10  his morals.
11             He said that he did not -- part of the note
12  I remember said something about he did not agree with
13  the -- the recommended standards of care, or something
14  like that, for our children, that he didn't believe
15  that it was appropriate medically or spirit -- or that
16  it -- or that it wouldn't meet their spiritual needs,
17  or something like that.
18             And so I realized -- I realized -- I felt
19  like it was going to be not a great meeting, but I was
20  still willing to meet with him because I felt that
21  maybe, you know, the parent perspective could be
22  helpful to him.
23       Q.   Now, was that document, was that in an
24  e-mail that he conveyed that information to you?
25       A.   Yes.

```
                                                      Page 23
 1        Q.   Do you still have that e-mail?
 2        A.   I do.
 3        Q.   Okay.  Have you shown that e-mail to counsel
 4   in the room?
 5        A.   I did.
 6        Q.   Do you have it with you now?
 7        A.   I don't.
 8        Q.   Okay.  To the best of your knowledge, can
 9   you tell me everything, aside from what you've already
10   told me, that that e-mail says in it?
11        A.   Those -- those were the sticking points for
12   me, because I found it very odd that he would be
13   talking about faith or morals or spiritual needs in
14   the context of this conversation.  It was not -- I
15   talk to many medical professionals in my work with
16   TransParent, and it's the first time that somebody was
17   so overtly upfront that it was problematic due to
18   their faith on some -- at least on some level.  So I
19   can't remember it.  It wasn't -- it was longer --
20   the -- the note was longer than that, but those were
21   the points that have stuck out with me.
22        Q.   Okay.  Other than that e-mail, do you have
23   any other document that reflects communication you
24   have had with Dr. Hruz?
25        A.   There's -- I mean, after he e-mailed me, I
```

Page 24

1  e-mailed him and told him that I, you know, was very
2  excited to meet with him, although I was -- you know,
3  I think I expressed some disappointment because
4  Dr. Spack had shared that he was, you know, I guess
5  against a pediatric gender center at St. Louis
6  Children's Hospital and -- but that, you know, I
7  was -- I would be very happy to have the conversation
8  or something like that.  And then he e-mailed me back
9  and said, "Thank you for responding so quickly," and
10 he would have his secretary reach out to me to set a
11 date and time.
12      Q.   Okay.  So this meeting that you were going
13 to have with him that ended up being a lunch, was any
14 part of that meeting in the context of receiving
15 medical care, opinions or services?
16      A.   No.
17      Q.   Okay.  Were you going to learn anything from
18 Dr. Hruz you would personally use with you or your
19 family members when it comes to treatment for any type
20 of disorders?
21      A.   No.
22      Q.   Was it just to learn about Dr. Hruz's
23 position on the pediatric gender center at the
24 Washington University?
25      A.   Well, he called the meeting, so I -- I --

Page 25

1   again, I really wanted to go, because I understood
2   that he had a lot of influence on whether or not the
3   center moved forward.  And I had been talking with
4   other doctors and people on their DSD team at
5   St. Louis Children's Hospital about moving this
6   forward, but it really had stalled.
7           And so I -- I just felt like being the head
8   of Endocrine, that he would have a lot of influence
9   over that decision.  And so for me, that is why I
10  wanted to go and meet with him, to see if I could say
11  anything that would might make -- that might make him
12  more interested in doing something like that.
13      Q.   So would you characterize this as a business
14  meeting?
15      A.   Not really.  I'm -- not really.  I guess --
16  I guess --
17      Q.   Were you hoping to come away from that
18  meeting with some type of support from Dr. Hruz for
19  the establishment of the pediatric gender center?
20      A.   I guess I just felt like all of the
21  treatment for our kids was going through a person that
22  reported to Dr. Hruz.  And so I guess I felt like he
23  may not have enough information to support it or not
24  support it.  He wasn't seeing any of our kids.
25  There -- there were only a handful of our kids at the

Page 26

1   time.
2         You know, this is four years ago before
3   everything really opened up in St. Louis as far as
4   treatment and care for kids.  But I just understood
5   that he -- and especially since he had already said in
6   his e-mail that he didn't support the center, I guess
7   I was hopeful that the parent perspective might be
8   helpful.
9       Q.   Okay.  Now, did I understand you to say that
10  you were aware that Dr. Hruz was providing treatment
11  to your -- when you say "our kids," are you referring
12  to TransParent --
13      A.   Yes.
14      Q.   -- members' kids?
15      A.   Yes.
16      Q.   Okay.  So to your knowledge, as of 2013, to
17  your knowledge, was Dr. Hruz treating transgender
18  children?
19      A.   He was not, that I -- to my knowledge.
20      Q.   Okay.  So in terms of that -- that lunch
21  meeting, can you tell me everything you can remember
22  from the meeting?
23      A.   Yes.
24           MR. GONZALEZ-PAGAN:  Form.
25      Q.   (By Mr. Harmon) Well, let me ask it a

Page 27

1  different way.  Can you tell me, to the best of your
2  recollection, everything Dr. Hruz said to you during
3  the lunch meeting?
4           MR. GONZALEZ-PAGAN:  Form.  You can answer.
5           THE WITNESS:  Oh.
6      Q.   (By Mr. Harmon) Yeah, you can answer.
7      A.   Yeah.  So after, you know, introducing
8  ourselves I started off with trying to tell him a
9  little bit about my family and our experience, but
10 I -- I really didn't get very far.  He interrupted me
11 fairly quickly, probably within a minute or so, two
12 minutes tops, and said that he had reviewed my
13 brochure from TransParent and that he knew that my aim
14 was to normalize the transgender experience, but that
15 it would never be a normal experience.  It was not a
16 normal experience, and it would never be normal.
17          We went on to talk more about, you know,
18 his -- he -- he actually started talking about Pope
19 John Paul II's writings on gender and -- and how they
20 explain God's plan for gender, and that I should
21 consider reading them.  And he said, you know, this
22 idea that -- the idea of doing surgeries on
23 transgender people is -- is wrong, that, you know, we
24 should not be, you know, changing bodies.
25          And I said -- I -- I argued with him on that

Page 28

1   point that, you know, there are men that have man
2   boobs, and I said they have theirs surgically removed
3   or altered.  And I said wouldn't that be the same
4   thing, and -- and why is that okay, but not removing
5   the breast for a transgender boy, and he said,
6   "Because male breasts aren't used for anything, but
7   female breasts lactate and provide nourishment to
8   babies.  So, therefore, it would be -- it would go
9   against, you know, God's plan to remove breasts from
10  women."  Something -- something very close that.
11           He said several times during this
12  conversation, as I tried to tell him, you know, how
13  hard it was for my child living a transgender life,
14  you know, but that -- but what a great -- what a great
15  son I've had since I allowed him to transition, how
16  happy he was.  And he said that, you know, what a -- I
17  kept saying, "What a normal life -- like if you met my
18  son, you would never know.  He's a very normal little
19  boy."
20           And he kept saying, he kept insisting that
21  my child was not normal and would never be normal.
22  And he said that to me at least three or four times
23  during our conversation.
24           He said -- and -- and at the same time he
25  just kept saying, "If only you would read Pope John

Page 29

1  Paul II's writings.  If only you would read them, you
2  would understand everything."  And I said, "Well, you
3  know, the Bible tells a story about, you know, man
4  was -- woman was created from the rib of man," and I
5  said, "You know, maybe this all started with Adam and
6  Eve because God took a rib from a woman -- or from a
7  man and put it into women, and maybe he crossed that
8  DNA, you know, at the very beginning, and maybe that's
9  why we have transgender people."
10         He said -- he got very irritated with me,
11  and he said, "Not all the stories in the Bible are
12  true."
13         And I said, "Well, then how do you decide
14  which ones you're going to believe and which ones
15  you're not?  How do you determine that, like, which
16  ones you follow and which ones you don't follow?"
17         And he -- he reverted right back to -- he
18  goes, "You just need to read Pope John Paul II's
19  writings on gender.  It will -- it will explain it all
20  to you."
21         And I said, "Do you realize that kids like
22  mine are at a 41 percent risk of suicide if they don't
23  have acceptance and -- and care from their parents
24  and -- and if they don't get their medical needs met?"
25         And he said, "Some children are born in this

Page 30

1   world to suffer and die." And he said, "Do you think
2   I don't ask myself all the time why some people get
3   cancer?" He goes, "I -- I ask myself that all the
4   time."
5           And I said, "Well, people with cancer, at
6   least we try to help them. At least we give them
7   care." And I think the conversation ended shortly
8   after that, and he stood up, and he said, "I -- I have
9   to tell you there will never be a pediatric gender
10  center at St. Louis Children's Hospital. I won't
11  allow it." And I --
12      Q.  Did he say why?
13      A.  Pardon me?
14      Q.  Did he say why he would not allow it?
15      A.  Well, based on every -- no, he did not say
16  why. That's how he ended the conversation, but my
17  interpretation would have been based on everything
18  we -- he had just shared with me that he was in
19  disagreement from -- based on his faith.
20      Q.  Did he ever say that he would not allow a
21  gender center because of his faith?
22      A.  He did not.
23      Q.  Okay. That was your interpretation of --
24      A.  Yes.
25      Q.  -- what the conversation was?

Case 4:22-cv-00325-RH-MAF   Document 177-8   Filed 04/27/23   Page 15 of 15
Case 4:22-cv-00325-RH-MAF   Document 136-12   Filed 04/07/23   Page 15 of 15

```
                                                    Page 37
 1        A.    I am.
 2        Q.    How are you aware of what his position is
 3   now?
 4        A.    I saw a -- some papers that he's publishing,
 5   and I understand that he is involved in other cases
 6   involving students, so Internet searches.
 7        Q.    Did your conversation with Dr. Hruz anger
 8   you?
 9        A.    My conversation?
10        Q.    Yes.
11        A.    It -- it perplexed me.  I found --
12        Q.    Why did it perplex you?
13        A.    Again, because it was so religious-based.
14   I -- I was very taken off guard by the religious tone
15   of the conversation, because I -- I figured it would
16   at least be based on science.  He would have some
17   science behind his feelings over children like mine,
18   but that is not what I heard in our conversation at
19   all.
20        Q.    So your conversation with Dr. Hruz, is it
21   fair to say that it was based on religion and moral
22   viewpoints as opposed to science?
23        A.    Yes.
24              MR. GONZALEZ-PAGAN:  Form.
25        Q.    (By Mr. Harmon) What was the answer?
```

Veritext Legal Solutions
800-726-7007                                    305-376-8800

PLAINTIFFS003167