Page 1

1                    UNITED STATES DISTRICT COURT
                              FOR THE
2                    MIDDLE DISTRICT OF FLORIDA
3
   DREW ADAMS, a minor,      )
4                            )
            Plaintiff,       )
5                            )
      vs.                    )Civil Action
6                            )No.3:17-cv-00739-TJC-JBT
   THE SCHOOL BOARD OF ST.   )
7  JOHNS COUNTY, FLORIDA,    )
                             )
8           Defendant.       )
9
10
11
12        VIDEOTAPED DEPOSITION OF PAUL W. HRUZ, M.D., Ph.D
13              Taken on behalf of Plaintiff
14                   November 20, 2017
15       (Starting time of the deposition:  8:58 a.m.)
16
17
18
19
20
21
22
23
24
25

Pl. Trial Ex. 090

PLAINTIFFS002980

Page 2

1          I N D E X   O F   E X A M I N A T I O N

2

3                                                  Page

4    Questions by Mr. Gonzalez-Pagan ................  7

5    Questions by Mr. Kostelnik ...................... 286

6    Further Questions by Mr. Gonzalez-Pagan ......... 292

7

8    INDEX  OF  EXHIBITS

9    EXHIBIT      DESCRIPTION                      PAGE

10   For the Plaintiff:

11   Exhibit 1    Subpoena                          11

     Exhibit 2    Expert Declaration                29

12   Exhibit 3    Growing Pains Article             29

     Exhibit 4    Letter                            68

13   Exhibit 5    Article                          163

     Exhibit 6    Article                          231

14   Exhibit 7    Article                          246

     Exhibit 8    Article                          249

15

16           (The original exhibits were retained by the

     court reporter, to be attached to Mr. Gonzalez-Pagan's

17   transcript.)

18

19

20

21

22

23

24

25

PLAINTIFFS002981

Page 3

1                    UNITED STATES DISTRICT COURT
                              FOR THE
2                   MIDDLE DISTRICT OF FLORIDA
3

DREW ADAMS, a minor,      )
4                               )
             Plaintiff,   )
5                               )
       vs.                )Civil Action
6                         )No.3:17-cv-00739-TJC-JBT
THE SCHOOL BOARD OF ST. )
7  JOHNS COUNTY, FLORIDA,  )
                          )
8            Defendants.   )
9

10            VIDEOTAPED DEPOSITION OF WITNESS, PAUL W.
11  HRUZ, M.D., Ph.D., produced, sworn, and examined on
12  the 20th day of November, 2017, between the hours of
13  nine o'clock in the forenoon and six o'clock in the
14  evening of that day, at the offices of Veritext Legal
15  Solutions, 515 Olive Street, Suite 300, St. Louis,
16  Missouri before BRENDA ORSBORN, a Certified Court
17  Reporter within and for the State of Missouri, in a
18  certain cause now pending in the United States
19  District Court for the Middle District of Florida,
20  wherein Drew Adams, a minor, is the Plaintiff and The
21  School Board of St. Johns County, Florida is the
22  Defendant.
23

24

25

PLAINTIFFS002982

Page 4

1                    A P P E A R A N C E S
2          For the Plaintiff:
3          Mr. Omar Gonzalez-Pagan
           Lambda Legal
4          120 Wall Street
           New York, New York 10005
5          (212) 809-8585
           ogonzalez-pagan@lambdalegal.org
6          and
           Ms. Shani Rivaux
7          Pillsbury Winthrop Shaw Pittman LLP
           600 Brickell Avenue, Suite 3100
8          Miami, Florida 33131
           (786) 913-4882
9          shani.rivaux@pillsburylaw.com
10
11         For the Defendant:
12         Mr. Kevin Kostelnik
           Mr. Terry Harmon (via phone)
13         Sniffen & Spellman, P.A.
           123 North Monroe Street
14         Tallahassee, Florida 32301
           (850) 205-1996
15         kkostelnik@sniffenlaw.com
16
17         The Court Reporter:
18         Ms. Brenda Orsborn, RPR/CSR/CCR
           Missouri CCR No. 914
19         Illinois CSR No. 084-003460
           Veritext Legal Solutions
20         515 Olive Street, Suite 300
           St. Louis, Missouri 63101
21         (888) 391-3376
22
23         The Videographer:  Ms. Kimberlee Lauer
24
25

PLAINTIFFS002983

Page 5

1          IT IS HEREBY STIPULATED AND AGREED, by and

2     between counsel for Plaintiffs and counsel for

3     Defendants that the VIDEOTAPED DEPOSITION OF PAUL W.

4     HRUZ, M.D., Ph.D., may be taken in shorthand by Brenda

5     Orsborn, a Certified Court Reporter, and afterwards

6     transcribed into typewriting; and the signature of the

7     witness is expressly not waived.

8                   *   *   *   *   *

9          VIDEOGRAPHER:  Good morning.  We're going on

10    the record at 8:58 a.m. on Monday, November 20th,

11    2017.  Please note that the microphones are sensitive

12    and may pick up whispering and private conversations

13    and cellular interference.  Please turn off all cell

14    phones or place them away from the microphones as they

15    can interfere with the deposition audio.  Audio and

16    video recording will continue to take place unless all

17    parties agree to go off the record.

18             This is Media Unit No. 1 of the video

19    recorded deposition of Dr. Paul Hruz, taken by counsel

20    for the Plaintiffs in the matter of Drew Adams versus

21    the School Board of St. Johns County, Florida, filed

22    in the United States District Court for the Middle

23    District of Florida.  This deposition is being held at

24    Veritext Legal Solutions, located at 515 Olive Street

25    in St. Louis, Missouri.

PLAINTIFFS002984

Page 6

1          My name is Kimberlee Lauer from Veritext,

2    and I'm the videographer.  Our court reporter is

3    Brenda Orsborn, also from Veritext.  I am not

4    authorized to administer an oath.  I am not related to

5    any party in this action.  Nor am I financially

6    interested in the outcome.

7          Counsel and all present in the room and

8    everyone attending remotely will now please state your

9    appearances and affiliations for the record, and if

10   there are any objections to proceeding, please state

11   them at the time of your appearance beginning, please,

12   with the noticing attorney.

13         MR. GONZALEZ-PAGAN:  Thank you.  Omar

14   Gonzalez-Pagan of Lambda Legal for the Plaintiff.

15         MS. RIVAUX:  Good morning.  Shani Rivaux

16   with Pillsbury Winthrop Shaw Pittman, on behalf of the

17   Plaintiff.

18         MR. KOSTELNIK:  Good morning, Kevin

19   Kostelnik of Sniffen & Spellman on behalf of the

20   Defendant.

21         THE WITNESS:  Paul Hruz --

22         MR. HARMON:  And this is Terry Harmon on the

23   phone, as well, for the Defendant.

24         THE WITNESS:  And Paul Hruz, pediatric

25   endocrinologist, witness for the defense.

PLAINTIFFS002985

Page 7

1                            DR. PAUL HRUZ,

2     of lawful age, being produced, sworn and examined on

3     behalf of the Plaintiff, deposes and says:

4                            EXAMINATION

5     QUESTIONS BY MR. GONZALEZ-PAGAN:

6          Q.   All right.  Dr. Hruz, thank you for being

7     here today.  I know you're a busy man.  As you're

8     aware, I represent Drew Adams, the Plaintiff in this

9     litigation, and I'll be asking some questions about

10    your opinions in this case today.  I just want to go

11    over some ground rules just to get started.  First, do

12    you understand that you're under oath today?

13         A.   Yes, I do.

14         Q.   And that -- that this requires to testify

15    truthfully?

16         A.   Yes, I do.

17         Q.   We cannot be speaking at the same time.  It

18    will be annoying to the court reporter.  It will make

19    it difficult for you to hear me, me to hear you.  So

20    please let me finish a question before you start

21    answering it, and I'll strive to do the same as well,

22    and let you finish answering before I go into another

23    question.  Is that agreed?

24         A.   Very good.  Yes.

25         Q.   If you don't understand something I ask,

PLAINTIFFS002986

Case 3:17-cv-00739-TJC-JBT   Document 128-3   Filed 12/06/17   Page 9 of 58 PageID 4040

```
                                          Page 17

 1    identity, a gender identity, that does not correspond

 2    with their sex.

 3         Q.   Okay.  So now understanding that term, I ask

 4    you, would you agree with me that there are

 5    transgender people?

 6         A.   I would agree that there are individuals

 7    that have a gender identity that does not match their

 8    sex.

 9         Q.   Okay.  Have you met with Drew Adams?

10         A.   I have not.

11         Q.   Did you request to meet with Drew Adams?

12         A.   I did not.

13         Q.   Did anyone tell you you could not meet with

14    Drew Adams?

15         A.   No.

16         Q.   Have you evaluated Drew Adams?

17         A.   Clarify what you mean by "evaluate."

18         Q.   As a doctor, you conduct evaluations of your

19    patients.

20         A.   So I have not participated in the medical

21    care of Drew Adams.

22         Q.   Okay.  So you have not treated Drew Adams

23    either?

24         A.   That is correct.

25         Q.   And you haven't examined him, medically
```

PLAINTIFFS002987

```
                                               Page 18
 1    examined Drew Adams either?
 2         A.    I have never met him.
 3         Q.    Did you ask for an independent medical
 4    examination?
 5         A.    I did not.
 6         Q.    Have you ever met with either of Drew Adams'
 7    parents?
 8         A.    I have not.
 9         Q.    Have you spoken with any of Drew Adams'
10    treating physicians?
11         A.    I'm -- I'm just trying to see if -- if the
12    ones that were listed, if I've ever met them at a
13    meeting.  I've never spoke with them directly related
14    to this case, no.
15         Q.    So if you've spoken to any of the doctors,
16    okay, you have never spoken with them about Drew
17    Adams?
18              MR. KOSTELNIK:  Form.
19         A.    That is correct.
20         Q.    (By Mr. Gonzalez-Pagan) Did anyone advise
21    you that you could not speak to Drew Adams' treating
22    physicians?
23         A.    No.
24         Q.    Do you believe that speaking with Drew
25    Adams' treating physicians would have enabled you to
```

PLAINTIFFS002988

Page 22

1   physiological definition.

2        A.   He is post-pubertal, and that's how I

3   define --

4        Q.   So you consider him an adult?

5        A.   No, I do not.

6        Q.   So what -- what -- what would you consider

7   Drew Adams, then?

8        A.   I would consider him a post-pubertal female

9   who identifies as a -- a male.

10       Q.   Is it safe to say you consider him a

11  post-pubertal teenager?

12       A.   Yes.

13       Q.   You said from a legal standpoint.  From a

14  legal standpoint, is Drew Adams an adolescent?

15       A.   He has not reached the age of 18.

16       Q.   And you -- just to clarify, you just stated

17  that Drew is post-pubescent, correct?

18            MR. KOSTELNIK:  Form.

19       A.   Post-pubertal.

20       Q.   (By Mr. Gonzalez-Pagan) Let me just rephrase

21  that, because that was a form objection.  Is Drew

22  Adams post-pubertal?

23       A.   Drew Adams is post-pubertal.

24       Q.   Would you agree that Drew Adams is

25  transgender?

PLAINTIFFS002989

Page 23

1       A.   I -- as I said earlier, he is a biological

2    female that identifies as a male.  By that definition,

3    he would qualified as a transgender individual.

4       Q.   Is Drew a transgender boy?

5       A.   Again, you have to be very careful when you

6    make the designation.  The -- the terminology that is

7    often used right now would classify him as a

8    transgendered male.

9       Q.   If Drew told you he was a boy, would you

10   accept that?

11            MR. KOSTELNIK:  Form.

12       A.   It would depend on what he was asking in

13   terms of that, if he was asking about his gender

14   identity or his biology.  If he was asking about

15   whether he was biologically male or female, I would

16   say that he's biologically female.

17       Q.   (By Mr. Gonzalez-Pagan) And if he told you

18   that his gender identity was male?

19       A.   I would take him at his word.

20       Q.   If Drew told you he uses male pronouns,

21   would you use male pronouns?

22       A.   My practice is to use as much respect as I

23   can and within the confines of scientific and

24   biological reality, I would not have [sic] not an

25   objection to be able to identify him as he wished.

PLAINTIFFS002990

Page 24

1      Q.   So is that a "yes" or a "no"?

2      A.   That is a -- to make sure I understand the

3   question again, please address it again.

4      Q.   If Drew asked you to use male pronouns,

5   would you use male pronouns?

6      A.   Yes.

7      Q.   In your practice -- and I take it you've

8   been practicing for several years, so in your

9   practice, how many transgender patients have you

10  treated in the past five years?

11     A.   As stated explicitly in my declaration, I

12  intentionally do not treat transgender patients.

13     Q.   At all?

14     A.   That is correct.

15     Q.   In any -- for any treatment?

16     A.   Oh, the ones that I'm aware of, I have not

17  encountered any patients that have presented to me as

18  transgendered for any other conditions.  I have

19  certainly encountered many patients where that was

20  something under consideration or something that I

21  suspected, but nobody has ever mentioned directly to

22  me that they were transgendered.

23     Q.   Okay.  So to your knowledge, you have not

24  treated any person that you knew was transgender?

25          MR. KOSTELNIK:  Form.

PLAINTIFFS002991

Page 25

1        A.   Well, again, if you would -- yeah, that is
2   true for -- for the -- the patient -- somebody like
3   Drew Adams that was biologically normal.  I have
4   certainly cared for hundreds of patients that have
5   disorders of sexual development.  Many practitioners
6   will include those in that designation.  I believe
7   that they are a completely different patient
8   population than Drew Adams.
9        Q.   (By Mr. Gonzalez-Pagan) What is gender
10  dysphoria?
11       A.   Gender dysphoria is the discomfort that one
12  experiences related to gender identity that does not
13  conform with one's biological sex.
14       Q.   Is that the definition in the DSM?
15       A.   Yes.
16       Q.   It uses the word "discomfort"?
17       A.   I'd have to go look back at the exact
18  wording of that.  It's the difficulty that they
19  experience, psychological difficulty with that, yes.
20       Q.   Okay.  And based on your testimony, would
21  you agree that you have not treated any transgender
22  patients for gender dysphoria?
23       A.   Yes, I would agree.
24       Q.   Would you agree that Drew's treating
25  physicians have diagnosed him with gender dysphoria?

PLAINTIFFS002992

Page 26

1      A.    I would agree, yes.

2      Q.    Would you agree that Drew Adams suffers from

3  gender dysphoria?

4      A.    Based on the information presented to me, I

5  would accept that.  I have nothing to dispute that.

6      Q.    What do you understand gender-affirming

7  treatment to mean?

8            MR. KOSTELNIK:  Form.

9      A.    So gender-affirming treatment?

10     Q.    (By Mr. Gonzalez-Pagan) Yes.

11     A.    That is the treatment paradigm that rather

12  than challenging the discrepancy between biological

13  sex and gender identity, it is affirmed and validated

14  in the individual, his -- encouraged in that

15  transgendered identity.

16     Q.    So I just want to clarify a little bit,

17  because you used different words there for what's

18  being -- you said not challenge, correct?

19     A.    That is correct.

20     Q.    You said that it's accepted, that they

21  accept the gender identity of the --

22     A.    And -- and I would say even encourage.

23     Q.    So that's where I was going.

24     A.    Yes.

25     Q.    So you think not challenging is the same as

PLAINTIFFS002993

Page 40

1    the person putting forward this clinic and trying to

2    understand what care that was being proposed to be

3    provided in the setting of that context in my role as

4    the director of our -- or the chief of our division of

5    endocrinology.

6         Q.    Just to be clear, though, you have never sat

7    in a meeting between a provider and a patient

8    discussing their treatment options for gender

9    dysphoria?

10        A.    That is correct, I've never been in the room

11   with a patient while that care is being discussed.

12        Q.    All right.  Would you agree that Drew Adams'

13   doctors have concluded that gender-affirming treatment

14   is appropriate treatment for him?

15        A.    That is what they concluded, yes.

16        Q.    Would you agree that Drew Adams' doctors

17   have concluded that the gender-affirming treatment has

18   been helpful to Drew?

19        A.    I believe that that's what they claim, yes.

20        Q.    Do you agree that Drew Adams' gender-

21   affirming treatment has been beneficial for him?

22        A.    It depends on what you mean by beneficial.

23   I think that it is far too early to know what the

24   long-term outcome -- outcomes are going to be from

25   what is being provided for Drew Adams.

PLAINTIFFS002994

Page 41

1      Q.   As we stand here today, has the

2   gender-affirming treatment been beneficial to Drew

3   with regards to his gender dysphoria?

4           MR. KOSTELNIK:  Object to form.

5      A.   So similar to the literature that has

6   already been published in this area, Drew, by the

7   reports that I've read, is experiencing a -- a

8   lessening of the dysphoria in relation to the gender

9   discordance, and I would say that based on the

10  information that I saw, the answer is yes.

11     Q.   (By Mr. Gonzalez-Pagan) As we stand here

12  today, do you agree that Drew Adams' gender-affirming

13  treatment has improved his quality of life?

14     A.   So again, I can't say with certainty what

15  actually has improved his quality of life.  I can say,

16  based on the record, that he is better adjusted than

17  previously.

18     Q.   Dr. Hruz, you're an endocrinologist,

19  correct?

20     A.   That is correct.

21     Q.   You're not a psychiatrist, correct?

22     A.   That is correct.

23     Q.   You're not a psychologist?

24     A.   That is correct.

25     Q.   Are you a licensed mental healthcare

PLAINTIFFS002995

Page 42

1    provider of any kind?

2         A.    I am not.

3         Q.    Can you diagnose gender dysphoria?

4         A.    I can -- I can diagnose gender dysphoria to

5    the extent that my colleagues, as pediatric

6    endocrinologists, follow the DSM-5 and look at the

7    criteria and put the check boxes there.  That is the

8    extent of what my colleagues, as pediatric

9    endocrinologists, do, and I'm just as capable of doing

10   that as they are.

11        Q.    As an endocrinologist, do you routinely

12   diagnose conditions in the DSM-5?

13        A.    I -- I do not -- well, let me -- I'm

14   trying -- the reason I'm waiting is I'm trying to

15   think as I put in my ICD9 codes in my visits, I do

16   believe that I've actually added them, but I do not

17   consider myself as a psychiatrist to making those

18   diagnoses, no.

19        Q.    Do you have any basis to know whether Drew

20   Adams has suffered distress as a result of being

21   denied access to the restroom consistent with his

22   gender identity?

23        A.    I can only evaluate what is contained within

24   his patient chart and the literature -- or the

25   information that was provided to me.

PLAINTIFFS002996

Page 45

1    exact basis of that cannot be determined with -- in

2    the context of what the medical record shows.

3        Q.   Again, having reviewed the medical records,

4    is there anything in the medical records that leads

5    you to believe that Drew Adams' anxiety cannot be

6    attributed in part to his being denied access to the

7    restroom consistent with his gender identity?

8            MR. KOSTELNIK:  Form.

9        A.   There are certainly entries in the medical

10   record that indicate that his treating providers

11   believed that that was a contributing factor.  Whether

12   that was or was not true, I don't have a basis to

13   judge.

14       Q.   (By Mr. Gonzalez-Pagan) Okay.  Do you agree

15   that Drew Adams feels stigmatized as a result of being

16   denied access to the restroom consistent with his

17   gender identity?

18           MR. KOSTELNIK:  Form.

19       A.   My understanding from what I've read is that

20   he does make that claim.

21       Q.   (By Mr. Gonzalez-Pagan) Do you agree that

22   Drew Adams' gender dysphoria is exacerbated as a

23   result of his being denied access to the restroom

24   consistent with his gender identity?

25       A.   I can state that that claim has been made,

PLAINTIFFS002997

Page 46

1   not -- not proven.

2        Q.   Do you have any basis to dispute the claim?

3        A.   No.

4        Q.   Having never met, evaluated, examined or

5   treated Drew Adams, can you offer an opinion regarding

6   Drew Adams specifically?

7             MR. KOSTELNIK:   Form.

8        A.   My opinions in this case are based upon a

9   review of the medical literature and in the condition

10  itself, and that is what I am offering to the court in

11  my serving as an expert witness.

12       Q.   (By Mr. Gonzalez-Pagan) Okay.  Can you point

13  me to where you have specific opinions with regards to

14  Drew Adams in your report?

15       A.   I specifically cover the medical

16  information.  I do have a paragraph in there where

17  I -- I go through the details of what the allegations

18  are, and --

19       Q.   Is that Paragraph 12?

20       A.   I -- yes, that is correct.

21       Q.   Is that a description of the case details?

22       A.   That is correct.

23       Q.   Is there any opinion specific as to Drew

24  Adams in Paragraph 12?

25       A.   No.

PLAINTIFFS002998

Page 47

1      Q.   Is there any opinion specific as to Drew

2   Adams anywhere else in the report?

3      A.   No.  My opinions are based on -- near the

4   end of my declaration, I specifically state the

5   concerns in a -- in a general sense of all patients

6   that are -- are faced with this particular condition.

7   And I think that that certainly is pertinent to Drew

8   Adams in addition to the many other individuals that

9   are suffering from this condition.

10      Q.   Okay.  But none of those opinions are

11   specific to Drew Adams?

12      A.   They are applicable to all individuals that

13   present as Drew Adams does.

14           MR. GONZALEZ-PAGAN:  Move to strike as

15   nonresponsive.

16      Q.   (By Mr. Gonzalez-Pagan) Are they specific to

17   Drew Adams?

18      A.   They include Drew Adams.  They are not

19   limited to Drew Adams.

20      Q.   Would you agree that those opinions are

21   general in nature and not specific to Drew Adams?

22      A.   Yes.

23      Q.   Having never met, evaluated, examined or

24   treated Drew Adams, can you make an assessment as to

25   whether Drew Adams suffers from gender dysphoria?

PLAINTIFFS002999

Page 58

1    clinical guidelines?

2        A.    I would let them know that the clinic was

3    available, and I would let the people in that clinic,

4    if they chose to attend that clinic, present all of

5    the information for the basis for their treatment

6    approach.

7        Q.    So you wouldn't inform the patient that the

8    treatment is in accordance with the clinical

9    guidelines?

10       A.    I'm envisioning the hypothetical situation

11   that you're talking about, and the extent of my normal

12   clinic visit and how much time I have to present all

13   of the -- the important aspects of clinical care, and

14   I'm envisioning that there would be a limit of the --

15   the length of that conversation if I was going to

16   adequately address all of the other relevant issues

17   that I was caring that patient for [sic].

18       Q.    Would you suggest that the patient seek

19   conversion therapy?

20       A.    No.

21       Q.    Is the treatment at the transgender center

22   consistent with the position and recommendations of

23   the American Medical Association?

24       A.    I -- as I understand it, yes.

25       Q.    Is the treatment at the transgender center

PLAINTIFFS003000

Case 3:17-cv-00739-TJC-JBT   Document 128-3   Filed 12/06/17   Page 23 of 53 PageID 4054

Page 59

1  consistent with the position and recommendations of

2  the American Academy of Pediatricians?

3       A.   The AAP, yes.

4       Q.   Is the treatment at the transgender center

5  consistent with the position and recommendations of

6  the American Psychiatric Association?

7       A.   I don't follow those as closely, but I would

8  assume yes.

9       Q.   Is the treatment at the transgender center

10  consistent with the position and clinical guidelines

11  of the American Psychological Association?

12       A.   The same as the last answer.  To my

13  knowledge, I don't know them specifically, but I would

14  say yes.

15       Q.   Okay.  Let's go a little bit for some of

16  your memberships.  You're a member of the American

17  Medical Association, right?

18       A.   No.

19       Q.   Were you a member of the American Medical

20  Association?

21       A.   I was in the past, yes.

22       Q.   Are you a member of the American Academy of

23  Pediatricians?

24       A.   Yes.

25       Q.   Is your position in your report and as you

PLAINTIFFS003001

Page 60

1     sit -- sit here today consistent with the position of

2     the American Academy of Pediatricians?

3         A.   It is not consistent with the -- the opinion

4     that is presented by the AAP.  Again, I will note that

5     is not a -- a position that has been voted upon by the

6     entire membership of the AAP.

7         Q.   Are the -- all the positions adopted by the

8     AAP voted upon by the membership?

9         A.   No.  In fact, they're usually voted on by a

10    very small select committee, a -- a very minority of

11    the entire academy.

12        Q.   So the position of the AAP on this subject

13    has been adopted via its regular procedures?

14        A.   Yes.  Which -- which I would add do not

15    involve membership of the entire academy.

16        Q.   Are you a member of the Endocrine Society?

17        A.   Yes, I am.

18        Q.   Are your positions here today and in your

19    report consistent with the clinical guidelines of the

20    Endocrine Society?

21        A.   They are at odds with the recommendations

22    that are put forward, the guidelines that are put

23    forward for the treatment of gender dysphoria.

24        Q.   You're a member of the Pediatric Endocrine

25    Society, correct?

PLAINTIFFS003002

Page 61

1          A.    Yes, I am.

2          Q.    Are your positions here today and the

3     positions in your report consistent with the positions

4     adopted by the Pediatric Endocrine Society?

5          A.    They are not, and I've actually written to

6     the PES on more than one occasion with my opinions and

7     invited them to dialogue about the -- the scientific

8     evidence that I have in dispute from -- that are

9     included per the recommendations.

10         Q.    And we've requested those comments, right?

11         A.    Yes.  And everything I have on file, I gave

12    you everything I have.  I don't have records of

13    anything that I did not send you.

14         Q.    You have published a body of literature in

15    your career, correct?  Right?

16         A.    That is correct.

17         Q.    How many peer-reviewed articles have you

18    written and published regarding gender identity?

19         A.    I have not published peer-reviewed articles

20    on gender identity.

21         Q.    How many peer-reviewed articles have you

22    written and published regarding transgender people?

23         A.    I have not written peer -- peer-reviewed

24    papers on that topic.

25         Q.    How many peer-reviewed articles have you

PLAINTIFFS003003

Page 62

1   written and published regarding the treatment of

2   transgender children and adolescents?

3        A.   Again, as peer-reviewed, I have not written

4   any.

5        Q.   How many peer-reviewed articles have you

6   written and published regarding the treatment of

7   gender dysphoria?

8        A.   I have not written any.

9        Q.   How many peer-reviewed articles have you

10   written and published regarding the use of restrooms

11   by transgender students?

12        A.   I have not written any.

13        Q.   How many studies have you conducted

14   regarding gender identity?

15        A.   Conducted, I have not conducted any, but I

16   am in the process right now of responding to a

17   research funding announcement by the NIH to be able to

18   engage in that research.

19        Q.   But just to be clear, you haven't conducted

20   any as we stand here today?

21        A.   That is correct.

22        Q.   And you -- have you submitted that proposal

23   to the NIH?

24        A.   I -- I have not.

25        Q.   How many studies have you conducted

Page 63

1    regarding transgender people?

2        A.   I have not.

3        Q.   How many studies have you conducted

4    regarding the treatment of transgender children and

5    adolescents?

6        A.   I have not.

7        Q.   How many studies have you conducted

8    regarding the treatment for gender dysphoria?

9        A.   I have not.

10       Q.   How many studies have you conducted

11   regarding the use of restrooms by transgender

12   students?

13       A.   I have not.

14       Q.   So you have no experience treating gender

15   dysphoria, right?

16       A.   Treating gender dysphoria?

17       Q.   Yes.

18       A.   I have not -- as I said earlier, I have not

19   treated patients with gender dysphoria.

20       Q.   And you have no experience conducting

21   studies regarding transgender youth and adolescents,

22   correct?

23       A.   Conducting studies, I have not, as I said,

24   have not participated in any studies to date.

25       Q.   And you have no experience conducting

PLAINTIFFS003005

Page 64

1    studies regarding gender dysphoria?

2         A.    I have not conduct -- as I said, I have not

3    conducted any studies on gender dysphoria.

4         Q.    Nor have you published any literature

5    regard -- regard -- peer-reviewed literature regarding

6    gender dysphoria?

7         A.    Peer-reviewed, no.

8         Q.    So having no experience treating transgender

9    patients for gender dysphoria, no experience

10   conducting studies regarding transgender people, and

11   no experience publishing peer-reviewed literature

12   regarding transgender people, you consider -- do you

13   consider yourself an expert on transgender issues?

14             MR. KOSTELNIK:  Object to form.

15        A.    I am a physician/scientist who has

16   extensively read the literature for the merits, as I

17   do in any other condition, and I believe I have

18   expertise related to my role as a physician and a

19   scientist and a pediatric endocrinologist to

20   adequately assess the quality and quantity of the

21   literature that's present on this area.

22        Q.    (By Mr. Gonzalez-Pagan) And having no

23   experience treating gender dysphoria, no experience

24   conducting studies -- scratch that.

25             Let's talk a little bit about your article,

PLAINTIFFS003006

Page 83

1   with that, so --

2         Q.    Is "Growing Pains" your only article on

3   transgender people and gender dysphoria?

4         A.    Yes.

5         Q.    Are you familiar with the St. John Paul II

6   Bioethics Center?

7         A.    Absolutely.

8         Q.    Is this St. John Paul II Bioethics Center a

9   religiously affiliated institution?

10        A.    Yes, it is.

11        Q.    Is it part of the Holy Apostles College and

12  Seminary?

13        A.    Yes, it is.

14        Q.    Did you speak at the St. John Paul II

15  Bioethics Center just three days ago, on Friday,

16  November 17th?

17        A.    I did, yes.

18        Q.    During your speech last Friday, did you --

19  you said, "The identity of the individual is

20  interactively linked to the body and the soul of the

21  person."  Is that right?

22              MR. KOSTELNIK:  Form.

23        A.    Repeat that again, just so I make sure you

24  said that accurately.

25        Q.    (By Mr. Gonzalez-Pagan) During your speech

PLAINTIFFS003007

Page 84

1    last Friday, you said, "The identity of the individual

2    is interactively linked to the body and soul of a

3    person."  Is that correct?

4            MR. KOSTELNIK:  Form.

5        A.    That is correct.

6        Q.    (By Mr. Gonzalez-Pagan) During your speech

7    last Friday, you said about being transgender, that,

8    in fact, it probably goes back to some of the early

9    heresies in the church; is that correct?

10       A.    The introduction that I was providing to

11   that audience was trying to put the context of the

12   discussion in the proper framework, and I specifically

13   made the statement that I am not a philosopher, that

14   I'm going to be talking about issues of science and

15   medicine.  And it was an introduction to that talk

16   to -- for that audience.

17       Q.    Okay.  Do you know who Caitlyn Jenner is?

18       A.    Yes, I do.

19       Q.    Caitlyn Jenner is a transgender woman,

20   correct?

21           MR. KOSTELNIK:  Form.

22       A.    Caitlyn Jenner, formerly known as Bruce

23   Jenner, is somebody that has been widely advertised

24   in -- in the media related to the gender transition

25   that -- that Caitlyn underwent.

PLAINTIFFS003008

Page 85

1       Q.   (By Mr. Gonzalez-Pagan) Is Caitlyn Jenner

2   transgender?

3       A.   By definition, yes.

4       Q.   In referring to a picture of Caitlyn Jenner,

5   did you not say these pictures are often disturbing?

6       A.   I did.  And that was the slide --

7   specifically was the statement, not Caitlyn Jenner,

8   but there were two other pictures presented in that

9   talk of children saying I hate my body.  That was what

10  I was referring to.

11      Q.   Just to be clear, when it comes to the

12  treatment of transgender people and gender dysphoria,

13  your only publication is in a religiously-affiliated

14  journal and you've spoken to -- about the topic to

15  religiously-affiliated institutions?

16           MR. KOSTELNIK:  Form.

17      A.   I have offered to speak at all institutions

18  that have invited me.  And to date, yes, that was --

19  that was the institute that -- that invited me to

20  speak last Friday.

21      Q.   (By Mr. Gonzalez-Pagan) When did you first

22  become interested in the matter of transgender people

23  and the treatment of -- for gender dysphoria?

24      A.   It was about five to six years ago, as chief

25  of our Division of Endocrinology, when the question

PLAINTIFFS003009

Case 3:17-cv-00739-TJC-JBT   Document 128-3   Filed 12/06/17   Page 32 of 53 PageID 4063

Page 87

1   claims that were made by Drew Adams were

2   scientifically justified and accurate.

3        Q.   And just to be clear, you're not a

4   psychiatrist?

5        A.   That is correct.

6        Q.   And you're not a psychologist?

7        A.   That is correct.

8        Q.   And you're not a mental healthcare provider

9   of any kind?

10        A.   That is correct.

11        Q.   Have you ever been a school administrator

12   for a public school?

13        A.   I have not.

14        Q.   Have you ever been a teacher for a public

15   school?

16        A.   Not for a public school, unless you consider

17   my role as an educator at the university of -- or

18   Washington University a teacher.

19        Q.   Let me clarify.  Have you ever been a

20   teacher for K to 12 education?

21        A.   No.

22        Q.   Have you spoken with school administrators

23   with regards to the access to restrooms for

24   transgender students?

25        A.   No.

PLAINTIFFS003010

Page 90

1     Q.   Just to clarify, did you submit an expert

2   report or a rebuttal report?

3     A.   An -- an expert opinion report.  And I also

4   submitted -- you requested information from prior

5   litigation, and that included a rebuttal report.

6     Q.   Okay.  So you know the difference between a

7   rebuttal report and an expert report?

8     A.   Yes, I do.

9     Q.   Okay.  And the -- it is your understanding

10   that the report that you submitted in this case is an

11   expert report, not a rebuttal report?

12     A.   That's my understanding.  Again, I would

13   rely on the legal counsel to -- to clarify if I'm in

14   error there.

15     Q.   What did you do to write your report?

16     A.   Start back from five to six years ago when I

17   started investigating the scientific information.

18   I -- I -- I've gathered the information for the last

19   five to six years, and initially I was not doing that

20   for the purpose of writing an expert declaration.  In

21   fact, at the beginning I had no clue that I would ever

22   be serving in this capacity.

23          But I drew upon that information that I

24   obtained in the reading of the literature over the

25   past five to six years, my conversations with parents

PLAINTIFFS003011

Page 92

1          A.    I provided everything that I have access to
2     right now that I can recall.  I'm only stating that
3     there are likely other papers that I do not have
4     access to, because I did not keep track of it at the
5     time that I read them or looked at them.
6          Q.    Okay.  Have you spoken with Dr. Allan
7     Josephson?
8          A.    Yes, I have.
9          Q.    When?
10         A.    On multiple occasions.
11         Q.    Can you please describe?
12         A.    I met Dr. Josephson within the last year
13    as -- it was probably in the spring at some point in
14    time, the first time that I actually met him.  We've
15    had a number of conversations over this past year,
16    specifically related to his expertise as -- as a
17    psychiatrist and mine as an endocrinologist.  I have
18    drawn upon him for questions related to psychiatric
19    issues that -- that I did not have expertise in, to
20    gather his opinion.
21         Q.    In what capacity did you first
22    counter-interact with Dr. Josephson?
23         A.    It was at a conference that was put together
24    to bring experts from various disciplines to this
25    question of -- of gender dysphoria.

PLAINTIFFS003012

Page 93

1       Q.    Who put that conference together?

2       A.    The Alliance Defending Freedom.

3       Q.    The Alliance Defending Freedom is a

4    religiously-affiliated institution, isn't it?

5       A.    If you say so.  I don't pay attention to

6    what their religious affiliation is.

7       Q.    When was this conference?

8       A.    It was in the -- I don't know the exact

9    date, but it was in the spring.

10      Q.    Where was this conference?

11      A.    It was in Phoenix.

12      Q.    Aside from you and Dr. Josephson, do you

13   recall any other experts, physicians or clinicians

14   that attended this conference?

15      A.    Yes, there were -- there was several other

16   psychiatrists and psychologists.  I don't remember

17   their specific names, unfortunately.  There were

18   people that are in the social sciences.  There was one

19   other endocrinologist.  I'm trying to remember who

20   else was there.  There were several lawyers from the

21   ADA.

22      Q.    Do you have any documents pertaining to this

23   conference?

24      A.    Not that I saved, no.

25      Q.    Just to clarify, is there anything you

PLAINTIFFS003013

                                                    Page 102

1    university, they offer gender-affirming treatment for

2    gender dysphoric youth?

3         A.   Yes, they do.

4         Q.   Do they offer reparative treatment as a

5    treatment for gender dysphoria at Boston Children's

6    Hospital?

7              MR. KOSTELNIK:  Form.

8         A.   The word reparative therapy covers a lot of

9    connotation by different people but to my

10   understanding, they do not make any specific effort in

11   counseling to lead to the realignment of gender with

12   sex, if that's what you mean by conversion therapy.

13        Q.   Before you started researching the issues of

14   dysphoria around five years ago, had you met with

15   Dr. Spack then?

16             MR. KOSTELNIK:  Form.

17        A.   Prior to five years ago, I do not recall a

18   specific encounter yet.  I'm sure we interacted at

19   some point at one of the international meetings.

20        Q.   (By Mr. Gonzalez-Pagan) In Paragraph 7, you

21   state that you have met with parents of children with

22   gender dysphoria; is that correct?

23        A.   That is correct.

24        Q.   In what capacity have you met with the

25   parents of transgender children?

PLAINTIFFS003014

Page 103

1      A.   Again, this was at the very early time frame

2   when I was trying to investigate the claims for the

3   treatment and care, and I wanted to get as

4   comprehensive of a viewpoint as I could.  The first

5   encounter I had was with a mother of an organization

6   called Trans Parent Child, and I sat down for lunch

7   with her for an extended period of time, more to

8   listen to the experience that she had in countering a

9   transgender child that she had.

10      Q.   With how many parents of transgender

11   children have you met?

12      A.   Met or spoken on the phone?  I think lately

13   many of them have been over the telephone.  I would

14   say it's less than a dozen, but it's quite a few, and

15   it's actually increased certainly since the

16   publication of the "New Atlantis" article.

17      Q.   So in the last five years, you've spoken to

18   less than a dozen parents of transgender children?

19      A.   Yes.

20      Q.   When you first met with the parent of the --

21   associated with the organization Trans Parent, was

22   this before you dealt -- scratch that.

23           MR. GONZALEZ-PAGAN:  You're going to object

24   anyway.

25      Q.   (By Mr. Gonzalez-Pagan) When you met with

PLAINTIFFS003015

Page 104

1   the parent associated with the association Trans

2   Parent, had you already delved into the literature

3   regarding gender dysphoria?

4        A.   I was starting the process.  It was very

5   early on, so I don't recall the exact timing.  I had

6   read some papers, but I was still in the very early

7   investigative phase.

8        Q.   You said you have been contacted by parents

9   since the publishing of your article "Growing Pains."

10  Is that correct?

11       A.   That is correct.

12       Q.   How many have contacted you since the

13  publishing of the article "Growing Pains"?

14       A.   I'm not keeping track of that.

15       Q.   Less than 35?

16       A.   It may be more than five.  Probably less

17  than a dozen.

18       Q.   What did you discuss with the parents of the

19  transgender children that have contacted you since the

20  publishing of your article "Growing Pains"?

21       A.   I specifically discussed the context of my

22  "New Atlantis" article in my role as a physician,

23  which I always take as being a teacher.  I try to

24  educate them on my understanding of the condition and

25  the treatment paradigm that was being offered to their

PLAINTIFFS003016

Case 3:17-cv-00739-TJC-JBT   Document 128-3   Filed 12/06/17   Page 39 of 53 PageID 4070

Page 126

1    access the bathrooms as the cause of Drew's distress

2    is not supported.

3         Q.    But you're not a mental health provider,

4    right?

5         A.    That is correct.

6         Q.    And you've never met with Drew, right?

7         A.    That is correct.

8         Q.    Let's go back to the meetings with parents

9    that you had when you were first delving into this

10   topic?

11        A.    Very good.

12        Q.    You discussed that you met with a parent

13   associated with an organization called Trans Parent;

14   is that correct?

15        A.    That is correct.

16        Q.    What did you learn from that meeting?

17        A.    I learned quite few things.  The most

18   important thing that I learned, and that was what I

19   was actually seeking in the interaction, was to really

20   understand the suffering that was going on in this

21   family.  I wanted to understand the dynamics of what

22   was going on in the family, the approach that the

23   parents had in dealing with the presentation of their

24   child, what they had attempted to do to address this

25   particular issue, and at that point in time, I was

PLAINTIFFS003017

Page 127

1   approaching this in a purely investigative manner.  I

2   did more listening than anything else, asking

3   questions about their lived experience.

4        Q.   What did the parent tell you?

5        A.   Well, that was many years ago, but I will

6   try to summarize my recollection of that conversation.

7   This was with the mother.  And she shared that this

8   child, who was a prepubertal in early grade school,

9   told her, when the mother was talking -- they were

10  combing hair or something of that nature -- that she

11  would -- he, at that time, was a girl, so she was

12  referring to him as a girl, and that the parents'

13  reaction initially was shock, fear, trying to

14  understand what was going on, trying to be able at

15  that time -- this was early on in this resurgence --

16  or emergence, I should say of this discussion that's

17  going on socially, so there wasn't, at that time, a

18  lot of resources being published on the Internet.

19          So she shared her attempt to look at what

20  experience people have had with this particular

21  condition.  And I saw at that time, certainly a parent

22  that was desiring to do the best for their child, but

23  having questions that were not answered, and at that

24  time, with the information I had, I was certainly not

25  able to provide any answers.  And, in fact, at this

PLAINTIFFS003018

Page 128

1    point in time, I don't think I would have been able to

2    specifically answer the questions that she had as far

3    as long-term outcomes, because we don't have that

4    information.  It was a very respectful conversation.

5    It was very helpful.  I think that it was mutually

6    beneficial, but, again, the purpose was for me to

7    understand this particular family and their experience

8    with transgender identity.

9         Q.   What is the organization Trans Parent?

10        A.   All I know is it's a -- it's supposed to be

11   a support group, and I think that the parents

12   themselves, the woman I talked to at that time was

13   trying to get out information so other people

14   understood what they were experiencing.

15        Q.   In that meeting with the parents of a

16   transgender -- let me scratch that.

17             The next set of the questions I'm just going

18   to be focusing on that one parent.

19        A.   Okay.

20        Q.   In that meeting with the parent of the

21   transgender child, did you ever tell the parent that

22   their child was not normal and would never be normal?

23        A.   I did not, because I was still investigating

24   and trying to understand what was going on.

25        Q.   In that meeting with the parent of that

PLAINTIFFS003019

Page 129

1    transgender child, did you ever tell that parent that

2    their transgender son was a girl and would never be a

3    boy?

4         A.   I never said that, no.

5         Q.   In that meeting with the parent of that

6    transgender child, have you ever told -- scratch that.

7              In that meeting with the parent of a

8    transgender child, did you ever tell the parent that

9    surgeries attempting to change sex was wrong and went

10   against God's plan for humanity?

11        A.   No, not that I recall.  That was many years

12   ago, but I don't remember that, no.

13        Q.   In that meeting with the parents of the

14   transgender child, did you not urge them to read Pope

15   John Paul II's writing on gender to fully understand

16   God's plan regarding gender?

17        A.   Thank you for reminding me.  That was a long

18   time ago, so this is bringing back some information.

19   I believe that -- this was a personal conversation.

20   This was a one-on-one conversation, and I think at the

21   time that we began talking about that, she started

22   relating her personal faith training, and I never back

23   away from those conversations when people are asking

24   me those questions, and I think that that's what led

25   to that particular conversation.

PLAINTIFFS003020

Page 189

1    in individuals.  That was the intent of that

2    statement, and I believe it is the useful statement

3    for that purpose.

4         Q.   I get that, so I'm not -- and I'm not trying

5    to be like moving to strike here all the time, and I'm

6    not trying to, but the question is, do you think that

7    the limitation that those studies don't distinguish

8    between post-pubescent and pre-pubescent youth is

9    important?

10        A.   I think that it is certainly something that

11   needs to be considered, yes.

12        Q.   Okay.  Do you think you should have

13   disclosed that to the court?

14             MR. KOSTELNIK:  Object to form.

15        A.   For the purposes of putting my declaration

16   together, I believe that I adequately summarized my

17   understanding of the situation related to Drew Adams'

18   case.

19        Q.   (By Mr. Gonzalez-Pagan) Drew Adams, by your

20   own testimony, is a post-pubescent teenager?

21        A.   That is correct.

22        Q.   Don't you think that that limitation should

23   have been disclosed to the court?

24             MR. KOSTELNIK:  Object to form.

25        A.   Drew Adams was also a late onset gender

PLAINTIFFS003021

Case 3:17-cv-00739-TJC-JBT   Document 128-3   Filed 12/06/17   Page 44 of 53 PageID 4075

Page 190

1    dysphoric individual, and that is a population that

2    was not covered in these studies, and there is no

3    evidence as to what the outcome is in those

4    individuals.

5         Q.   (By Mr. Gonzalez-Pagan) Okay.  So in any

6    event, the studies, then, that you cite are

7    inapplicable to Drew Adams?

8              MR. KOSTELNIK:  Form.

9         A.   I believe that they are applicable to him in

10   the context of what is known, and I will assert

11   there's so much that is unknown about this condition,

12   I think it is relevant based on the quality of

13   evidence that is and needs to be considered by the

14   court.

15        Q.   Are there any other limitations to the

16   studies to which you cite in Paragraph 28?

17        A.   There are many limitations to the studies.

18   Most of the earlier studies had very small sample

19   lines.  There is -- again, since they were done over

20   an extended period of time, the cultural milieu has

21   changed, and so I think that there are many, many

22   limitations of the studies, and that certainly needs

23   to be considered.  The fact is that they've all shown

24   consistently the same result despite the fact that

25   they were done in different patient populations during

PLAINTIFFS003022

Page 232

1    marked as Exhibit C -- 6.  Can you please mark -- go

2    to the Page 2205.  It's the last page.

3        A.   Yeah, okay.  Okay.

4        Q.   Could you please read for me the

5    conclusions -- well, actually, let's go back.  Do you

6    recognize this document?

7        A.   Yes, I do.

8        Q.   What is it?

9        A.   It -- well, it's a treatment -- an update on

10   the treatment and outcomes of precocious puberty.

11       Q.   Okay.  Is this a peer-reviewed journal

12   article?

13       A.   It looks like it's a -- a statement.  I'm

14   not sure exactly.  It's a JC&M, so it probably went

15   through some -- a peer-reviewed process, yes.

16       Q.   Okay.  Let's go to the conclusions, please.

17       A.   Okay.

18       Q.   Could you please read the conclusions for

19   me?

20       A.   "Precocious puberty is a common problem seen

21   in pediatric endocrinology practice.  Identification

22   of the child with pathological pubertal development

23   allows for accurate diagnosis and application of

24   current treatment strategies.  Recent improvements in

25   therapeutic agents allow for a complete suppression of

PLAINTIFFS003023

Page 233

1   CPP with less discomfort to the patient and

2   improvement of height outcomes, particularly those

3   less than six years old."

4           "Our major gaps in understanding lie in the

5   area of long-term outcomes, including endocrine and

6   metabolic effects of precocious puberty.  The most

7   striking deficit is the lack of long-term data on the

8   psychological and behavioral effects of precocious

9   puberty and the effects of GNRHA treatment.  We can

10  anticipate additional information on these aspects in

11  the years to come."

12      Q.   Is it safe to say that this article

13  concludes that there's a lack of long-term data on the

14  effects of the treatment of precocious puberty with

15  puberty blockers?

16      A.   That is correct.

17      Q.   Yet you said that you provide puberty

18  blockers as a treatment for precocious puberty?

19      A.   That is correct.

20      Q.   How does that square with your concern of

21  providing gender-affirming treatment due to the lack

22  of long-term data?

23           MR. KOSTELNIK:  Form.

24      A.   So any decision that a practitioner makes is

25  made on a risk/benefit analysis, and the risk/benefit

PLAINTIFFS003024

Page 237

1          Q.   Are you aware that the AMA, quote, "opposes

2     the use of reparative or conversion therapy for sexual

3     orientation or gender identity"?

4               MR. KOSTELNIK:   Form.

5          A.   I'm aware of the WPATH saying that, and I --

6     I believe it may also be in the AMA statement as well.

7          Q.   (By Mr. Gonzalez-Pagan) Are you aware that

8     the American Academy of Pediatricians has stated that,

9     quote, "In no situation is a referral for conversion

10    or reparative therapy indicated"?

11         A.   I'm aware of that statement, yes.

12         Q.   Are you aware that a publication by the

13    American Psychological Association and the U.S.

14    Department of Health and Human Services states that

15    interventions -- quote, "Interventions aimed at a

16    fixed outcome, such as gender conformity or

17    heterosexual orientation, including those aimed at

18    changing gender identity, gender expression and sexual

19    orientation are coercive, can be harmful and should

20    not be part of the behavior health treatment"?

21              MR. KOSTELNIK:   Form.

22         A.   I am aware of that statement, but there is

23    no scientific evidence to support that statement.

24         Q.   (By Mr. Gonzalez-Pagan) On what basis do you

25    disagree with that statement?

PLAINTIFFS003025

Page 254

1      A.   I never said that I was advocating for one

2   position to the other.  I merely said that there's no

3   science to back up the assertion that this is -- needs

4   to be mandated.

5      Q.   So do you believe that Drew Adams should not

6   be allowed to use the boys' restroom?

7           MR. KOSTELNIK:  Object to form.

8      A.   I have never made a school policy.  I'm not

9   a witness making any opinions about what the school

10  policy is.  I'm merely stating what the science is

11  behind the treatment paradigm that is currently being

12  advocated.

13     Q.   (By Mr. Gonzalez-Pagan) So you do not have

14  any opinion as to whether the current policy should or

15  should not be implemented at St. John's County School

16  District?

17     A.   That would require me to have experience as

18  a school administrator or making school policies,

19  which I do not have that experience.

20     Q.   So again, can you say whether the current

21  policy of the School Board of St. John's County should

22  or should not be implemented?

23          MR. KOSTELNIK:  Form.

24     A.   Again, I said I don't have the

25  qualifications as far as making school policy to make

PLAINTIFFS003026

Page 277

1    outcome as far as persistence or desistence.

2         Q.   When did you first speak to Dr. Josephson

3    about this case?

4         A.   Oh, I believe it was within the last month.

5         Q.   Did you speak to Dr. Josephson before or

6    after you were retained as an expert in this case?

7         A.   After.

8         Q.   Just cleaning up a little bit.  Going back

9    to 2012 and 2013 again, you testified that you spoke

10   to Dr. Norman Spack around 2012 and 2013?

11        A.   Yes.

12        Q.   Can you please describe that conversation

13   for us?

14        A.   Dr. Spack had come to Washington University

15   and presented his treatment approach in the context of

16   all the discussion that was going on at that time as

17   to whether we should initiate the transgender

18   treatment program.  In addition to the talk and the

19   question session after that, we had a panel or

20   actually a round table discussion with a number of the

21   different providers, not only within the Endocrine

22   Division, but also with a representative from

23   adolescent medicine, our psychologist, a number of

24   different individuals.  This was at the time when the

25   Endocrine Society acknowledged that this care was

PLAINTIFFS003027

Page 278

1    controversial, that it was unsettled as far as the

2    science was concerned, and there was lots of

3    discussion going on not only at my university, but at

4    the national level.

5                The discussion at that time revolved around

6    all of -- much of the data that I had not fully read.

7    I read some of the papers, but I certainly hadn't read

8    all of them, and there were differing opinions

9    expressed at that point in time.  The individuals that

10   have gone on to direct that clinic and -- were

11   certainly taking one approach, in my opinion, even at

12   that time, made comments that -- of where my questions

13   were related to that condition.

14               And I distinctly remember, and this actually

15   led into the "New Atlantis" article at the very end,

16   Dr. Spack recognized that I was unconvinced by the

17   level of scientific evidence supporting this care, and

18   I distinctly remember him saying, "Well, if you can't

19   accept cross-hormone treatment, at least do puberty

20   suppression because it's safe and reversible."  And

21   that's almost a verbatim quote, and I've heard this by

22   many other individuals as well.  And that prompted me

23   to investigate the claims about whether that truly was

24   safe and reversible, and that led to the "New

25   Atlantis" publication.

PLAINTIFFS003028

Page 279

1      Q.    What were the opinions expressed by

2   Dr. Spack besides saying that puberty blockers were

3   safe and reversible?

4      A.    He essentially made the argument based upon

5   the Dutch experience that this was necessary to

6   prevent individuals from committing suicide, that this

7   was a life-saving intervention, and he took quite

8   great pride in being able to participate at that stage

9   of his career in that intervention.  As far as the

10  data presented at that time that this was a long-term

11  solution, was not offered by Dr. Spack, and certainly

12  the concerns related to the medical risks, and I

13  believe at that point in time we were talking a little

14  bit about philosophical discussions as well, as far as

15  what it means to be a man and what it means to be a

16  women.  It was a very respectful conversation, but at

17  the level of scientific evidence to support what he

18  was recommending, I found it completely lacking.

19     Q.    What do you mean by philosophical

20  conversations about what it means to be a man and what

21  it means to be a woman?

22     A.    I mean exactly what it says.  I don't

23  remember the details of the conversation.

24           (Phone ringing. Whereupon an off-the-record

25  discussion was held.)

PLAINTIFFS003029

Page 280

1      Q.    (By Mr. Gonzalez-Pagan) Do you need me to

2   restate the question?

3      A.    Please.

4      Q.    What do you mean by the philosophical

5   conversations about what it means to be a man and what

6   it means to be a woman?

7      A.    I would say it includes the discussion of --

8   from a biological standpoint about what it means to be

9   a women.  At that point in time there was lots of

10   discussion about the terms "sex gender," "gender

11   identity" and "sexual orientation" that was included

12   in that discussion.  There was, I believe at that

13   point in time, a lot of conflicting assertions that

14   were being made by different people about whether sex

15   and gender were the same or different, and the

16   arguments were being made pro and con.  More specific

17   details, I don't recall.

18      Q.    And you stated that there was controversy

19   about the provision of care for gender dysphoria at

20   the time in the Endocrine Society?

21      A.    That is correct.  My first recollection was

22   at one of the national Pediatric Endocrine Society

23   meetings when this new paradigm was introduced.  And

24   as I recall, there was a very strong reaction by a

25   number of members of the audience related to what was

Page 295

1  amount of experience that somebody who is a

2  clinical -- a full-time clinician versus -- now, I --

3  I know from my own experience many people that are

4  listed on those clinical studies were not the ones

5  that designed the trial.  They're not the ones

6  analyzing the data.  Their role usually in those

7  studies, as clinical faculty, are usually in filling

8  out and the protocols that are present for those.  And

9  now the specifics of the trial that she's involved

10 with, I would have to look in more detail to assess

11 that in -- in greater detail.

12      Q.   Okay.  Do you know what her role is?

13      A.   You'll have to tell me what the study is

14 and -- and give me more information to be able to do

15 that.

16      Q.   Did you review Dr. Ehrensaft's expert --

17 expert report in this case?

18      A.   I did.

19      Q.   Have you published any peer-reviewed

20 literature regarding gender dysphoria or transgender

21 youth?

22      A.   These are questions that I've already

23 answered, and the answer is no.

24      Q.   Okay.  Are you aware that Dr. Ehrensaft has

25 published a number of peer-reviewed articles regarding

PLAINTIFFS003031