Page 1

1              IN THE UNITED STATES DISTRICT COURT FOR

2              THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4         MAXWELL KADEL, et al.                    )

5                                                  )

6             Plaintiffs                           )

7                                                  ) Cause No.

8         vs.                                      ) 1:19-cv-00272-

9                                                  ) LCB-LPA

10        DALE FOLWELL, et al.                      )

11                                                  )

12            Defendants                           )

13

14            VIDEO ZOOM DEPOSITION OF DR. PAUL W. HRUZ

15               Taken on behalf of the Plaintiffs

16                     September 29, 2021

17

18                   Sheryl A. Pautler, RPR,

19               MO-CCR 871, IL-CSR 084-004585

20

21        (The proceedings began at 9:31 a.m. Eastern.)

22

23

24

25

PLAINTIFFS003042

Page 2

```
1    QUESTIONS BY:                              PAGE
2    Mr. Gonzalez-Pagan                           8
3    Mr. Knepper                                269
4    Mr. Gonzalez-Pagan                         295
5
6                     INDEX OF EXHIBITS
7    NO.                                    PAGE MKD.
8    Exhibit 1   (Expert report.)               11
9    Exhibit 2   (November 26, 2017,
                  transcript.)                   13
10
     Exhibit 3   (July 16, 2018, transcript.)   15
11
     Exhibit 4   (Publication of the National
12                Catholic Bioethics Center.)    51
13   Exhibit 5   (Endocrine Society guidelines.) 86
14   Exhibit 6   (Press release.)                95
15   Exhibit 7   (Thomas Insel statement.)      115
16   Exhibit 8   (Article on adolescent
                  health medicine and
17                therapeutics.)                122
18   Exhibit 9   (Adolescent Health, Medicine
                  Therapeutics article.)        123
19
     Exhibit 10  (APA Official Actions.)        167
20
     Exhibit 11  (Resolution by the American
21                Psychological Association.)   168
22   Exhibit 12  (Understanding the Well
                  Being of LGBTQI Plus
23                Population.)                   170
24   Exhibit 13  (Medical Treatment Methods
                  for Dysphoria Related to
25                Gender Variance in Minors.)   196
```

Case 1:19-cv-00272-LCB-LPA   Document 205-2   Filed 02/02/22   Page 3 of 112

PLAINTIFFS003043

INDEX OF EXHIBITS CONTINUED


| NO. | | PAGE MKD. |
|---|---|---|
| Exhibit 14 | (November 18, 1994, Food and Drug Administration notice.) | 212 |
| Exhibit 15 | (Understanding and Approved Use of Approved Drugs Off-Label.) | 214 |
| Exhibit 16 | (Off-Label, Investigational Use of Marketed Drugs, Biologics and Medical Devices.) | 215 |
| Exhibit 17 | (Off-Label Use of Drugs in Children.) | 217 |
| Exhibit 18 | (2019 Journal of the Endocrine Society article.) | 230 |
| Exhibit 19 | (Declaration of Norm Spack in the Adams case.) | 248 |
| Exhibit 20 | (The use of Cross-Sex Steroids in the Treatment of Gender Dysphoria article.) | 255 |
| Exhibit 21 | (Doe v. Boyertown Area School District amicus brief.) | 266 |
| Exhibit 22 | (Hisle-Gorman article.) | 270 |
| Exhibit 23 | (2019 Goddings article) | 288 |


(Exhibits attached to transcritp.)

Page 4

1          IN THE UNITED STATES DISTRICT COURT FOR
            THE MIDDLE DISTRICT OF NORTH CAROLINA

2

      MAXWELL KADEL, et al.                    )

3                                              )

         Plaintiffs                            )

4                                              ) Cause No.

      vs.                                      ) 1:19-cv-00272-

5                                              ) LCB-LPA

      DALE FOLWELL, et al.                      )

6                                              )

         Defendants                            )

7

8              VIDEO ZOOM DEPOSITION OF WITNESS, DR. PAUL

9         W. HRUZ, produced, sworn, and examined on the

10        29th day of September, 2021, between the hours

11        of nine o'clock in the forenoon and eight

12        o'clock in the afternoon of that day, via

13        Veritext Zoom, before SHERYL A. PAUTLER, RPR,

14        Certified Shorthand Reporter within and for the

15        State of Illinois and Certified Court Reporter

16        within and for the State of Missouri, in a

17        certain cause now pending before the United

18        States District Court for the Middle District

19        of North Carolina, wherein MAXWELL KADEL, et

20        al. are the Plaintiffs, and DALE FOLWELL, et

21        al. are the Defendants.

22

23

24

25

Page 5

```
1               A P P E A R A N C E S
2          For the Plaintiffs via Zoom:
3               Mr. Omar Gonzalez-Pagan
                Ms. Tara Borelli
4               Lambda Legal Defense and
                Education Fund, Inc.
5               120 Wall Street, 19th Floor
                New York, New York  10005
6               212-809-0055
                Ogonzalez-pagan@lambdalegal.orb
7
8          For the Defendants Dale Folwell, Dee Jones
           and North Carolina State Health Plan for
9          Teachers and State Employees via Zoom:
10              Mr. John G. Knepper
                Law Office of John G. Knepper
11              1720 Carey Avenue, Suite 590
                Cheyenne, Wyoming  82002
12              307-632-2842
                John@knepperllc.com
13
14         For the Defendant State of North Carolina
           Department of Public Safety via Zoom:
15
                Mr. Alan D. McInnes
16              N.C. Department of Justice
                114 West Edenton Street
17              Raleigh, North Carolina  27603
                919-716-6529
18              Amcinnes@ncdoj.com
19
           The Court Reporter:
20
                Ms. Sheryl Pautler
21              Veritext Legal Solutions
                701 Market Street, Suite 310
22              St. Louis, Missouri  63101
                314-241-6750
23
24
25
```

PLAINTIFFS003046

Page 31

1          Q.    Okay.   What is a wet lab?

2          A.    A wet lab is really designating somebody

3     that does hands-on research usually with either

4     in-vitro or in-vivo studies, as opposed to a dry lab

5     which mostly does literature searches or computer

6     programming or things that do not involve

7     experimentation with -- the reason the term comes,

8     from wet reagents like buffers and solutions and

9     bodily fluids.

10         Q.    Is your research primarily conducted in a

11    wet lab?

12         A.    My -- until recently the vast majority of

13    my research has been conducted in a wet lab.  I have

14    participated on a few occasions in clinical trials

15    and have served as an adviser and consultant for

16    colleagues in those types of studies.

17         Q.    On how many occasions have you

18    participated in clinical trials?

19         A.    I never direct -- well, there was one

20    trial at Washington University where I was more

21    directly involved.  But all of -- as far as

22    principal investigator, all of my NIH funded

23    research and service as a principal investigator has

24    been done with my basic science research.

25         Q.    Would you agree that clinical trials is

Page 32

1    not your area of expertise?

2              MR. KNEPPER:  Objection, form.

3         A.   I would not agree with that statement.  I

4    would say that I -- in the course of the last decade

5    that -- as I've been required to investigate the

6    literature surrounding this particular issue of

7    treatment of gender dysphoria, I have developed

8    considerable expertise in clinical trials.  And I

9    also have previously served on institutional review

10   boards.  I did that while I was a medical student,

11   where I reviewed the ethics of clinical trials

12   and -- and in other ways as well.  So I would say

13   that covers my -- is included in my expertise as a

14   physician scientist.

15        Q.   (By Mr. Gonzalez-Pagan)  Earlier you stated

16   that the testimony you provided in the Bruce

17   deposition was truthful; is that right?

18        A.   To the best of my knowledge.

19        Q.   In the Bruce deposition, you were asked:

20   So clinical trials is in your area of expertise?

21              And you answered:  That is correct.

22              MR. KNEPPER:  Objection, form.

23        A.   Can you please read that statement again?

24   And it might even be helpful if we went to the area

25   of that deposition so I can see the entire context.

Page 33

1    But for now maybe you can just reread that just so I

2    understand what that statement said.

3         Q.   (By Mr. Gonzalez-Pagan)  Well, let's -- my

4    computer is not going to survive today.  I

5    apologize.  It's on Page 39 of Exhibit 3.

6         A.   Is there an easy way to navigate directly

7    to a page without just scrolling down?

8         Q.   Unfortunately I don't believe so.  It's

9    limitation of the medium.  I apologize for that.

10             MR. KNEPPER:  I will confirm that.  Yeah.

11        I haven't found one either.

12        A.   Okay.  So which line are you -- I'm on

13   Page 39 right now.

14        Q.   (By Mr. Gonzalez-Pagan)  All right.  So on

15   line -- beginning on Line 23.

16        A.   Okay.

17        Q.   It says, Question:  I see.  So clinical

18   trials isn't your area of expertise?

19                  Answer:  That is correct.

20                  Did I read that correctly?

21        A.   Well, if you read the preceding lines, it

22   immediately followed a question about my direct

23   participation in clinical trials where I clearly

24   stated that there was only one clinical trial.  That

25   was the one I just mentioned to you at Washington

PLAINTIFFS003049

Page 34

1    University.  And similar to what I had in this

2    deposition, my role in that project was relatively

3    minor.

4                    So in that sense, that does not mean

5    that I do not have knowledge and experience in the

6    context of clinical trials.  It only means I have

7    not directly participated in those clinical trials.

8    Context is important.

9         Q.    What is primary research?

10        A.    I'm sorry.  Primary research?

11        Q.    Yeah.

12        A.    Oh, so you're -- you're talking about the

13   difference between conducting experimental --

14   directly conducting experiments versus systematic

15   reviews and literature reviews of that nature.  Is

16   that the distinction you're trying to get at?

17        Q.    Is that what you understand the

18   distinction between primary and secondary research

19   to be?

20                MR. KNEPPER:  Objection, form.

21        A.    That would be one definition that I would

22   agree with, yes.

23        Q.    (By Mr. Gonzalez-Pagan)  Okay.  Would it be

24   okay if I were to adopt that definition, that

25   primary research refers to conducting experiments --

Page 35

1    experiments, etc. and not literature review or
2    metanalysis of existing data?
3         A.   For the purposes of this deposition, yes,
4    that is fine.
5         Q.   With that understanding, have you
6    conducted any primary research relating to gender
7    dysphoria?
8              MR. KNEPPER:  Objection, form.
9         A.   So if you're asking whether I have
10   directly participated in clinical trials on gender
11   dysphoria, the answer is no.
12        Q.   (By Mr. Gonzalez-Pagan)  Have you
13   participated in cross-sectional studies related to
14   gender dysphoria?
15        A.   Again, I have not -- cross-sectional
16   studies, you're meaning retrospective reviews?
17        Q.   It could be longitudinal observational.
18   It could be cohort studies.  I guess my question
19   is -- let me back up.  Have you conducted any direct
20   research relating to gender dysphoria that is not
21   based on a literature review?
22             MR. KNEPPER:  Objection, form.
23        A.   It would depend on what your definition of
24   conduct.  I have not physically myself done those
25   chart reviews or participated in the clinical

PLAINTIFFS003051

Page 36

1    setting.  My experience to what you had described as
2    primary research is limited to my role as associate
3    or assistant fellowship program director in
4    supervising my fellows, two of whom are doing what
5    we would -- what you would define as primary
6    research.

7                     I'm not the primary investigator, but
8    I do have a role in directing my fellows in doing
9    that research to make sure it's of the highest
10   quality and standards that we expect of all of our
11   fellows.

12        Q.   (By Mr. Gonzalez-Pagan)   When did you
13   resume supervision of the fellowship program?

14        A.    The official designation has happened
15   since the time I filed my initial curriculum vitae.
16   However, I have continually throughout my career
17   been involved in the fellowship program.

18                     One of the reasons I was reappointed
19   as the assistant program director was that it was
20   recognized that the area of scholarly research
21   needed somebody with my background to be able to
22   help the fellows to be able to select projects,
23   select mentors and conduct research in the most
24   rigorous manner.  And that was a shortcoming that
25   had developed since I had formally stepped away from

Page 42

1    A.   Okay.

2    Q.   Well, actually, let me -- let me check.

3  We've been going about an hour.  Would you like to

4  take a break right now or I can do this line of

5  questioning?  And we can --

6    A.   I'm actually doing quite well.  I'd be

7  fine to keep pressing on.

8         MR. GONZALEZ-PAGAN:  Sheryl, is that okay?

9         THE COURT REPORTER:  That's fine.

10   Q.   (By Mr. Gonzalez-Pagan)  Okay.  So if we go

11  to the list of publications in your CV.  Are you

12  with me?

13   A.   I am.

14   Q.   In the category of journal articles,

15  No. 48 is titled Deficiencies in Scientific Evidence

16  for Medical Management of Gender Dysphoria.  Did I

17  read that correctly?

18   A.   Yes.  And I do see it here.

19   Q.   Is that one of your publications relating

20  to gender dysphoria?

21   A.   Yes, it is.  And it's probably one of the

22  most highly cited of the papers that I provided.

23   Q.   Sure.  Is that a publication based on any

24  primary research that you conducted?

25         MR. KNEPPER:  Objection, form.

Page 43

1           A.   As which have defined it, no.  It's a
2      review of the literature and critical appraisal of
3      the evidence.
4           Q.   (By Mr. Gonzalez-Pagan)  And that
5      publication is -- that -- sorry.  That -- that
6      article was published in the Linacre Quarterly; is
7      that right?
8           A.   That is correct.
9           Q.   Is the Linacre Quarterly a scientific
10     publication?
11          A.   It is an ethics journal.  In fact, it's
12     the longest standing continuously published ethics
13     journal in the United States.
14          Q.   Who publishes the Linacre Quarterly?
15          A.   The NCBC.
16          Q.   What does the NCBC stand for?
17          A.   The National Catholic Bioethics Center.
18          Q.   Turn to 50.  Is this one of the other
19     publications you have relating to gender dysphoria?
20          A.   It's a letter to the editor.
21          Q.   So it's not -- this is not a publication
22     based on any primary research or scientific study
23     you have conducted?
24          MR. KNEPPER:  Objection, form.
25          A.   As we have defined primary research, it is

PLAINTIFFS003054

Page 44

1    merely a presentation of -- of concerns about the
2    literature that has already been published.
3         Q.   (By Mr. Gonzalez-Pagan)  And as I
4    understand this letter to the editor is a commentary
5    on another publication, on another article; is that
6    right?
7              MR. KNEPPER:  Objection, form.
8         A.   It includes more information than just the
9    article itself.  But, yes.
10        Q.   (By Mr. Gonzalez-Pagan)  And just pure
11   curiosity, I don't know the answer to this, but are
12   letters to the editor peer reviewed?
13        A.   This particular one was.  I recall when we
14   were submitting this, that we were asked to make
15   changes.  And I interpret that as being peer
16   reviewed.
17        Q.   Well, I just want to clarify.  There's
18   peer review and then there's editorial review; is
19   that right?
20             MR. KNEPPER:  Objection, form.
21        A.   There are numbers of different types of
22   review; that's correct.
23        Q.   (By Mr. Gonzalez-Pagan)  Okay.  As I
24   understand peer review to mean, it is a process of
25   objecting and circulating an author's work to the

Page 45

1      scrutiny of others who are experts in the same

2      field; is that right?

3                   MR. KNEPPER:  Objection.

4           A.    That's how it's generally defined yes.

5           Q.    Are you saying that the letter to the

6      editor was circulated to experts in the field before

7      it was published?

8           A.    I don't know the details of how the letter

9      was handled.  I only can say that when we submitted

10     it, we were asked to make revisions.  It was

11     reviewed by individuals with understanding of the

12     area that was covered.  I don't know any more

13     details.  And that's the way generally peer review

14     occurs.  One is not usually told who actually

15     reviews the submission.

16          Q.    The next publication, it's -- it's No. 2

17     under book chapter.  It's titled Medical Approaches

18     to Alleviating Gender Dysphoria.  And it's a chapter

19     in the book Transgender Issues in Catholic

20     Healthcare; is that right?

21          A.    That is correct.

22          Q.    Who publishes the book, Transgender Issues

23     in Catholic Healthcare?

24          A.    That was also the NCBC.

25          Q.    Is the book a peer-reviewed publication?

Page 46

1          A.    No.

2          Q.    Going to the next page, there's a list of

3    invited publications; is that right?

4          A.    Yes.

5          Q.    No. 6 is your article titled Growing

6    Pains, Problems With Pubertal Supression in Treating

7    Gender Dysphoria.

8                     Did I read that correctly?

9          A.    Yes, you did read it correctly.

10         Q.    Is this a peer-reviewed publication?

11         A.    It is not peer reviewed.  It was

12   editorially reviewed.

13         Q.    The growing pains article was published in

14   the New Atlantis; is that right?

15         A.    That is correct.

16         Q.    Is the New Atlantis a scientific journal?

17         A.    It is not considered a scientific journal

18   in the definition that we normally designate it.  It

19   was -- it's a journal that provides more broad

20   readership to be able to distill topics of relevance

21   at an understandable level to the lay public.

22         Q.    At the time of the publication of the

23   article, who published the New Atlantis?

24         A.    Well, the New Atlantis.

25         Q.    Was the new Atlantis a publication of the

Page 47

1    ethics and public policy center?

2            MR. KNEPPER:  Objection, form.

3        A.   I believe that may be true.  I didn't pay

4    much attention to that.

5        Q.   (By Mr. Gonzalez-Pagan)  Let's turn to

6    Exhibit No. 3, Page 44 -- sorry -- Page 46.

7        A.   I went too far.

8        Q.   You know what, it could probably be me.

9    It's a few later.  It's Page 49.  I do apologize.

10   Page 49.

11       A.   I'm still scrolling, so.  Okay.  I'm

12   there.

13       Q.   Okay.  Beginning on Line 13, it reads;

14   Question:  Okay.  And the New Atlantis was founded

15   by the Ethics and Public Policy Center; is that

16   right?

17               Answer:  I believe that that is

18   correct.

19               Question:  Okay.  And that's a center

20   dedicated to applying the Judeo-Christian moral

21   tradition to critical issues of public policy; is

22   that your understanding?

23               Answer:  I believe that question came

24   up at the last deposition.  And I believe that

25   that's an accurate statement.

Page 48

1                    Did I read that correctly?

2          A.   You did read it correctly, yes.

3          Q.   And you stand by that testimony?

4          A.   Yes.  I have no reason -- it's not

5    something that I consider all that important.  And I

6    don't usually retain that.  I've got so many other

7    pieces of information for me to retain.  But, yes.

8          Q.   Going back to your CV, under invited

9    publications.

10         A.   I'm there.

11         Q.   Okay.  The next publication is an article

12   titled The Use of Cross-Sex Steroids in Treating

13   Gender Dysphoria; is that right?

14         A.   That is correct.

15         Q.   It was published in the National Catholic

16   Bioethics Quarterly; is that right?

17         A.   That is correct.

18         Q.   Is this article, The Use of Cross-Sex

19   Steroids, a peer-reviewed publication?

20         A.   No, it is not.

21         Q.   Is the National Catholic Bioethics

22   Quarterly a peer-reviewed journal?

23         A.   No.

24         Q.   Is the National Catholic Bioethics

25   Quarterly a scientific journal?

Page 49

1          A.    No.  It is an ethics journal.
2          Q.    All right.  And the next publication, 8,
3     under publications in your CV is Experimental
4     Approaches to Alleviating Gender Dysphoria in
5     Children; is that right?
6          A.    Yes.
7          Q.    And this is another one of your
8     publications that relates to gender dysphoria?
9          A.    Yes.
10         Q.    Is this a peer-reviewed article?
11         A.    It is published in the same journal as
12    No. 7.  And it is not a peer-reviewed journal.
13         Q.    Okay.  Do you have any other publications
14    besides the ones that we just went through that
15    relate to gender dysphoria?
16              MR. KNEPPER:  Objection, form.
17         A.    So there are -- I have no publications
18    that have been added since the time I submitted this
19    CV and it reflects my publications to date.
20         Q.    (By Mr. Gonzalez-Pagan)  Do you have any
21    other publications besides the ones that we've
22    discussed today relating to transgender people?
23         A.    Not that I recall.
24              MR. GONZALEZ-PAGAN:  All right.  I
25         actually do need to break.  So if we can go off

Page 55

1    scientific understanding of this condition.  To my
2    understanding, the transition from this definition
3    as gender identity disorder to gender dysphoria was
4    not based upon new scientific information.
5              It was more of a desire to alleviate
6    the discomfort that one has in that label.  So how
7    we classify that really rests on the premises that
8    one has about the underlying etiology.  And I think
9    that there are -- are more than one valid hypothesis
10   or I should say premises that can be put forward,
11   not necessarily all of equal weight.
12        Q.  (By Mr. Gonzalez-Pagan)  Okay.  But what is
13   your understanding of the condition of gender
14   incongruent?
15             MR. KNEPPER:  Objection, form, scope.
16        A.   It's a very broad question.  Could you
17   narrow it down a little bit?
18             MR. GONZALEZ-PAGAN:  John, what's the
19        objection of the scope?  I thought Dr. Hruz is
20        here to testify about gender-affirming
21        treatment for the condition of gender dysphoria
22        and gender incongruent.
23             MR. KNEPPER:  Hold on, Omar.  You're free
24        to ask the questions.  I think the question I'm
25        trying to understand is:  Are you trying to ask

Page 56

1          him to testify about -- as a psychiatrist or a

2          psychologist?  And it's not clear to me, you

3          know, what the definition of gender

4          incongruence -- are you -- it's not clear to me

5          when you use that term, are you trying to say

6          it's the ICD-11 definition or are you using

7          something else?

8              I'm happy -- happy to let you continue to

9          pursue this.  I'm just as interested as you

10         are.  But I want to make sure that as you go

11         through this, we don't end up -- we don't end

12         up down a path where you're trying to say, now,

13         ah-ha, he's coming here pretending to be a

14         psychologist which is outside the scope of what

15         he said he's going to testify to.

16             MR. GONZALEZ-PAGAN:  Well, I mean, we have

17         a 90-page report that I'm happy to go through.

18             MR. KNEPPER:  Please do.

19         Q.  (By Mr. Gonzalez-Pagan)  Dr. Hruz, in your

20     report, you state a number of opinions about the

21     validity of the diagnosis of gender dysphoria

22     contained within the DSM; is that right?

23             MR. KNEPPER:  Objection, form.

24         A.    I would be much more comfortable looking

25     at the specific areas that you're referring to.

PLAINTIFFS003062

Page 57

1    Because I present many things in my report as

2    hypotheses.  And without making definitive

3    statements.  So it would be most helpful if we can

4    look at specific areas that you're referring to.

5         Q.  (By Mr. Gonzalez-Pagan)  Okay.  So I guess

6    what I'm curious about is, do you have a particular

7    as a physician scientist, do you have a particular

8    belief as to whether gender dysphoria is a disorder?

9         A.   I have multiple scientific premises that I

10   have and continue to consider.  Again not of equal

11   weight or validity.  One of those premises is that

12   this condition arises from a disconnect between

13   neuronal biology and the bodily from -- sex --

14   bodily form of the body.

15                  Another scientific premise is that

16   this condition is due to the number of

17   environmental, social, hormonal and neuronal

18   components.  So how we understand this condition is

19   markedly influenced by the premise that we come to

20   address the hypotheses that we're going to need to

21   consider to develop clinical trials to establish

22   safety and efficacy of treatment that provides the

23   greatest benefit to the affected patients.

24        Q.   Would you agree there are transgender

25   people in this world?

PLAINTIFFS003063

Page 58

1        A.   Again, we have to be very careful about

2    the terminology that we're using, to acknowledge

3    that the condition of sex discordant gender

4    identity, and there are individuals that -- that

5    express an identity that is not in agreement with

6    their biology is a true statement.  That's

7    undeniable that these -- there are individuals that

8    have this experience of discordance between their

9    gender identity and their sex.

10       Q.   Do you believe that the experience of

11   discordance between their identity and what you term

12   their biology, is a disorder?

13            MR. KNEPPER:  Objection, form.

14       A.   So, again, it depends on what premise

15   you're operating under.  As far as whether this is a

16   normal experience of -- of a human condition or

17   whether it falls outside of -- of the norm for us as

18   sexed beings.  And, again, as a physician scientist

19   I'm obligated to be able to consider all

20   possibilities to be able to do the proper science to

21   get at the ultimate question here as to what we can

22   do to alleviate the suffering.

23       Q.   (By Mr. Gonzalez-Pagan)  Dr. Hruz, I guess

24   I'm a little confused as to what it is that is your

25   opinion here.  Can you briefly summarize for me what

Page 61

1    more cautious approach by the recognition that the

2    studies that have been done up to this point in time

3    do not give us an answer as to whether this is the

4    best or the only course of intervention to alleviate

5    that suffering.  Is that -- is that what you're

6    looking for?

7         Q.   Thank you.  I appreciate that.  In your --

8    as part of your opinions, do you provide -- let me

9    back up.

10                  Do you express an opinion as to which

11   modality of care should be provided to people

12   diagnosed with gender dysphoria?

13        A.   I believe that it's an ongoing scientific

14   question about what the most efficacious approach is

15   to provide the greatest benefit with the least

16   amount of risk.  And that is why I'm participating

17   as an expert witness in this case, to bring to light

18   for the benefit of the court that this is something

19   that needs to be very much investigated to be able

20   to get an answer to that question.

21        Q.   Do you express an opinion as to which

22   modality of care should be provided to people

23   experiencing gender dysphoria?

24             MR. KNEPPER:  Objection, form.

25        A.   I would say because it's an unsettled

Page 62

1    scientific question, that I don't have a firm

2    opinion as to which is the best approach.  Yet as

3    time has gone on, more and more information is being

4    generated that calls into question the

5    affirmation-only approach.

6        Q.  (By Mr. Gonzalez-Pagan)  And I don't

7    want -- what I'm trying to do is get clarity here.

8    So would it be fair to say that you do not provide

9    an opinion as to which modality of care should be

10   provided for people experiencing gender dysphoria?

11           MR. KNEPPER:  Objection, form.

12       A.   My opinion is that based upon the lack of

13   evidence for the gender -- gender-affirmation

14   approach, that if we are going to provide

15   interventions for this population that it is best

16   done under a carefully controlled clinical

17   experimental setting.

18       Q.  (By Mr. Gonzalez-Pagan)  You express that

19   there are ongoing questions as to the efficacy of

20   the gender-affirmation approach; is that right?

21       A.   That is correct.

22       Q.   Again for clarity's sake, are you --

23   you're not expressing an opinion with -- with

24   medical certainty as to whether the

25   gender-affirmation approach is effective or not; is

PLAINTIFFS003066

Page 73

1    anxiety?

2         A.   I would say that the answer is yes.

3         Q.   So for people who experience gender

4    dysphoria and do not have any other co-morbidity,

5    what would you do to address their gender dysphoria

6    while the clinical trials are being conducted?

7              MR. KNEPPER:  Objection, form.

8         A.   That's a broad question.  And it depends

9    upon the individual characteristics of the patient,

10   including their age and including all of the other

11   factors that are associated with that gender

12   dysphoria.  Was it a child who is prepubertal?  Is

13   it a child who is an adolescent?  Is it an adult?

14   Is it a child or an adult that, you know, all of the

15   social situations or circumstances that they're

16   involved in?

17              Again, without having a formal

18   diagnosis of depression or anxiety or these other

19   co-morbidities, all of that is going to impact how

20   one approaches that particular patient.

21        Q.   (By Mr. Gonzalez-Pagan)  I guess here we're

22   talking about this case, you said it's a provision

23   of coverage for treatment for gender dysphoria; is

24   that right?

25        A.   That is the nature of this case, correct.

PLAINTIFFS003067

Page 85

1    had a new chairman that came on board from the one

2    that recruited me to that position.  We disagreed in

3    more than one area.

4              There was also my research program

5    had been rapidly expanding and was getting into the

6    area of drug development.  I would say that the role

7    of chief of any division is a thankless job.  It

8    requires a tremendous amount of time and effort.

9    And so, you know, the decision to -- to step down

10   from that position was actually very advantageous to

11   my further career development.  But, you know, it

12   was one of the -- the gender center was one among

13   many disagreements that I had at that time.

14        Q.   Does the Washington University Transgender

15   Center offer pediatric and adolescent

16   gender-affirming care?

17        A.   Yes.  In the definition that we're talking

18   about here meaning the GnRH agonist or puberty

19   blockers, cross-sex hormones.

20        Q.   Does the Wash --

21        A.   In addition to --

22        Q.   Does the Washington University Transgender

23   Center offer hormone therapy as treatment for gender

24   dysphoria in adults?

25        A.   Does the pediatric center -- your question

Page 86

1   is does the pediatric center provide care for

2   adults?

3         Q.   Well, my -- the transgender center offers

4   both care to pediatric and adult patients; is that

5   right?

6         A.   So in general, the care that's delivered

7   at St. Louis Children's Hospital spans birth to the

8   low -- early 20s.  There are individuals that are

9   adults that are cared for by the adult endocrine

10  division.  And there's a separate team of doctors

11  that participate in that care.

12        Q.   Are you a member of the Endocrine Society?

13        A.   Yes.

14        Q.   The Endocrine Society publishes clinical

15  practice guidelines regarding the treatment of

16  gender dysphoria; is that right?

17        A.   That's correct.  Their initial document

18  came out in 2009 with lead author Hembree and then

19  they had a revision that was done in 2017.

20        Q.   Showing you what's been marked as

21  Exhibit 5.

22                    (Whereupon Exhibit 5 was

23                     introduced for identification.)

24        A.   Okay.  I see it.

25        Q.   (By Mr. Gonzalez-Pagan)  Do you recognize

Page 88

1            THE COURT REPORTER:   Thank you.

2            MR. GONZALEZ-PAGAN:   Borrowing a word from

3       you, John.

4       Q.   (By Mr. Gonzalez-Pagan)   What is WPATH?

5       A.   It's an organization known as the World

6   Association of Professional Transgender Health.   It

7   is -- again, this is the organization that came out

8   with their version seven of the guidelines quite a

9   long time ago to provide their perspective on what

10  should be done for people that experience sex

11  discordant gender identity.

12      Q.   Does the Washington University Transgender

13  Center follow the WPATH guidelines?

14      A.   Again, I will say that I'm not directly

15  involved in the gender center.   My understanding

16  based on conversations with the director of that

17  center, he claims that they do.

18      Q.   Do you, yourself, provide treatment for

19  gender dysphoria?

20      A.   I will state that I'm a pediatric

21  endocrinologist charged with treating hormonal

22  diseases.   And because I have not seen the evidence

23  that supports the proper risk/benefit to that

24  intervention, I do not provide that care, as I don't

25  in any other area where I have not determined

PLAINTIFFS003070

Page 89

1    appropriate benefit versus risk.

2         Q.   Have you ever diagnosed a person with

3    gender dysphoria?

4              MR. KNEPPER:  Objection, form.

5         A.   I'm a pediatric endocrinologist and my

6    charge is to treat hormone related diseases.  And

7    therefore, I've not been called upon to make that

8    diagnosis.

9         Q.   (By Mr. Gonzalez-Pagan)  Would you agree

10   you do not have any clinical experience providing

11   care for people for gender dysphoria?

12        A.   I would not agree with that.

13        Q.   Do you provide treatment for people?

14        A.   I provide -- I provide treatment for

15   hormone-related conditions that includes people with

16   gender dysphoria.

17        Q.   But specifically in treating gender

18   dysphoria, do you have any clinical experience with

19   regards to the treatment of that condition?

20        A.   Since I'm a pediatric endocrinologist, my

21   experience is limited to the treating of

22   hormone-related diseases.

23        Q.   Is that a no?

24        A.   I have not treated with hormones for the

25   purpose of alleviating gender dysphoria.  I have

PLAINTIFFS003071

Page 90

1    however treated patients that have experienced side
2    effects related to that hormonal treatment including
3    obesity, diabetes, dyslipidemia.  So in that respect
4    I have treated them, but not to address dysphoria.
5    But, rather, the complications that have occurred in
6    association with that treatment.
7         Q.    Clarify, you said association, yes?
8         A.    That's correct.
9         Q.    Do you have proof -- do you have proof
10   that it was caused by the treatment for gender
11   dysphoria?
12        A.    If I thought I had enough evidence to say
13   cause, I would have said caused.  I said
14   association.
15        Q.    Thank you.  You've given a number --
16   Strike that.
17              Have you given presentations
18   regarding gender dysphoria?
19        A.    Yes.
20        Q.    Have any of these presentations been at
21   medical conference -- conferences or settings?
22        A.    Yes.  I've -- well, I've delivered many
23   lectures to major academic centers during medical
24   grand rounds.  And I'm happy to detail those for
25   you.  It includes University of Tennessee, Texas

Page 91

1    Tech, Notre Dame, the University of Montevideo.  And

2    there are probably others.  I can't remember.  So --

3    and so as being a grand rounds presentation in major

4    medical centers, yes.

5         Q.   Aside from grand rounds, have you provided

6    any presentations regarding gender dysphoria at any

7    medical conferences or sites?

8         A.   Well, I would consider grand rounds a

9    conference.

10        Q.   Grand rounds is when there's an invited

11   lecturer at a particular hospital and everybody is

12   invited to attend; is that right?

13        A.   So you're asking about national meetings,

14   like the Endocrine Society meetings or such?

15        Q.   Well, let me just clarify what grand

16   rounds are for the record.  So what are grand

17   rounds?

18        A.   Grand rounds are usually a recurring

19   series of talks given by experts in various fields

20   to the relevant scientific community about topics of

21   interest to those physicians.  And generally, it

22   involves the presentation of high quality scientific

23   evidence for the conditions that those physicians in

24   the audience would encounter.

25        Q.   Okay.  So you have not conducted any

Page 92

1    studies for any gender dysphoria, right?

2         A.    I believe we answered that question

3    earlier when we went through my CV.

4         Q.    Well, I'm just wondering what your

5    presentation of the grand rounds are since you have

6    not conducted any such study?

7         A.    It was providing the same types of

8    evidence that I presented in my expert declaration

9    about the scientific studies that have been done or

10   need to be done in this field.  Presenting the

11   various hypotheses for etiology and potential

12   treatment.  The various side effects that are known

13   or potentially could occur.  So it includes all

14   of -- or very similar information regarding the

15   scientific studies that I presented in my expert

16   declaration.

17        Q.    And now, to continue aside from grand

18   rounds, have you provided any presentations

19   regarding gender dysphoria in any other medical

20   conferences or settings?

21        A.    I would have to -- I'd have to think

22   through my list.  It's actually most of the major

23   presentations that I've made are listed within my

24   CV.  So I'd have to look back as to what I listed

25   there.  But if you're asking about the Endocrine

Page 93

1    Society or the pediatric Endocrine Society or those

2    types of organizations, I have not presented at

3    those conferences.

4         Q.    Are you familiar with the gender and sex

5    conference?

6         A.    Yes.  And are you referring to the one in

7    Madrid.

8         Q.    That was going to be my question.  Did you

9    participate in the gender and sex conference in

10   Madrid in 2018?

11        A.    I don't recall the exact date.  But if it

12   was 2018, yes, I did present there.

13        Q.    Did you know that the conference was

14   billed as, quote:  A rebellion against the gender

15   ideology and its freedom destroying damaging law,

16   closed quote?

17        A.    I -- I don't recall that language being

18   presented to me when I agreed to present at that

19   conference.

20        Q.    Did you know that the conference was

21   focused on opposing what it termed "gender

22   ideology"?

23        A.    You know, again, I was asked -- and this

24   is true for -- if you're going to go through the

25   list of all of the places that I've spoken at.  When

Page 94

1    I've been invited to present at any of these

2    conferences, my desire is to provide the most

3    accurate and up-to-date scientific information

4    related to the condition of gender dysphoria.

5              I am willing to present to any

6    audience that is willing to hear that information.

7    I don't make judgment about what the motives are of

8    the individuals organizing the conference.  But

9    merely serve with my area of expertise and my

10   knowledge to be able to further that discussion in a

11   productive manner.  And that applies to that sex and

12   gender conference in Madrid.

13        Q.    Who organized the gender and sex

14   conference in Madrid?

15        A.    I do not recall the entity.  I'm sure

16   you'll tell me.  But again that wasn't who invited

17   me was not as important as whether I was going to be

18   given the opportunity to present the information

19   objectively on this particular condition within my

20   area of expertise.

21            MR. GONZALEZ-PAGAN:  Oh, shoot.  John, I

22        just published an exhibit without a label.  Do

23        you have any objection to me calling it

24        Exhibit 6?

25            MR. KNEPPER:  Having done that very same

Page 95

1          thing, Omar, let me take a look at it.  But,

2          no, I -- I cannot imagine I will have an

3          objection.  Actually it labeled it as Exhibit 6

4          automatically, but there's no stamp.

5               MR. GONZALEZ-PAGAN:  There's no stamp,

6          yes.

7               MR. KNEPPER:  Sheryl, you'll have to put

8          the stamp on it.  But I'm completely okay with

9          calling that Exhibit 6.

10              MR. GONZALEZ-PAGAN:  Thank you.

11                   (Whereupon Exhibit 6 was

12                   introduced for identification.)

13         Q.  (By Mr. Gonzalez-Pagan)  Dr. Hruz, I'm

14    showing you what's been marked as Exhibit 6.

15         A.  I can see it.

16         Q.  And I apologize for the formatting.  Some

17    pages don't print as well as others.  This appears

18    to be a press release following the conclusion of

19    the gender and sex conference which you were talking

20    about; is that right?

21         A.  I've never seen this document before.

22         Q.  Okay.  If you go to the second page.

23         A.  Okay.  I think I'm there.

24         Q.  It talks about the gender and sex -- in

25    the paragraph beginning eight speakers, sort of --

Page 96

1          A.    Okay.  I'm there.  I've got it now.

2          Q.    Okay.  It speaks of the gender and sex

3     conference as being organized by HazteOir.org and

4     its international platform, CitizenGo; is that

5     right?

6          A.    That's what it says here, yes.

7          Q.    And does that -- is that in keeping with

8     your recollection about who organized the gender and

9     sex conference?

10         A.    Yes.  I seem to recall now that you've

11    jogged my memory.  That is correct.

12         Q.    Okay.  And then on the third page in the

13    middle, there's a paragraph beginning:  The rest of

14    the panel experts and lecturers was made up by

15    Professor Glenn Stanton; Dr. Paul Hruz; the

16    sociologist, Gabriella Kuby; and the former

17    transsexual, Walt Heyer.

18                    Did I read that correctly?

19         A.    I see the paragraph that starts Stanton

20    assured that and, in quotes, the gender theory is

21    unscientific, is that what you're --

22         Q.    Just above.

23         A.    Oh.

24         Q.    I skipped the links in reading those.

25         A.    Ah, okay.  I see that, yes.

Page 97

1          Q.    Okay.  So it is your recollection then
2     that you presented at this conference; is that
3     right?
4          A.    Oh, yes.  I do recall the conference.  I
5     just didn't until you reminded me.  I didn't know
6     who organized it.
7          Q.    You used the term "gender ideology" in
8     your report; is that right?
9          A.    I have used that term in the course of my
10    investigation of this condition, yes.
11         Q.    What is gender ideology?
12         A.    I would define ideology is including
13    statements that are made on a non -- a
14    non-scientific basis with premises and goals that
15    are outside of science.
16         Q.    Do you consider any healthcare
17    professional that subscribes to the gender-affirming
18    treatment model to be a gender ideolog?
19         A.    I think you're conflating different terms.
20    You mentioned gender-affirming medical care and
21    ideology; those are two separate --
22         Q.    Well, that's my question.  My question is,
23    does somebody that provides or advocates for
24    gender-affirming treatment, is that person a person
25    who subscribes to the gender ideology?

Page 110

1      turn to, to be able to define, you know, the

2      condition and the treatment approach.  And I --

3           Q.   Isn't that true for many psychiatric

4      conditions?

5           A.   Absolutely.  I would -- absolutely.  It is

6      not unique to the area of gender dysphoria.  In

7      fact, in talking, you know, to those that are

8      engaged more in the field of psychiatry, they will

9      acknowledge that the rudimentary nature of the

10     discipline in comparison to the rest of the

11     medical -- medical enterprise, it is a very known

12     and serious shortcoming.  And there is a desire

13     certainly to -- to fill in those gaps.

14                    And there's actually hope that as

15     time moves forward with the advance in tools that

16     one has, to study neurobiology and address some of

17     these questions.  But there will be an opportunity

18     to provide clearer answers that are more evidenced

19     based.

20          Q.   Sure.  But, I mean, isn't that the nature

21     of science and medicine; we don't know everything,

22     period?

23          A.   We know far less of the psychiatric

24     conditions that are listed in -- or many of the

25     psychiatric conditions -- I wouldn't say all -- that

PLAINTIFFS003080

Page 112

1          Q.   But your practice is in the field of

2     endocrinology, not psychiatry; is that right?

3          A.   I think we've touched upon this earlier,

4     but I'm happy to expound upon that.  Is --

5          Q.   Well, it's a yes or no.

6          A.   I'm a physician scientist.  So I'm very

7     qualified to talk about deficiencies in scientific

8     evidence that are present in this particular area.

9          Q.   So you're not a psychiatrist?

10         A.   I covered that earlier.  That I'm a

11     pediatric endocrinologist.  Yes, that's correct.

12         Q.   Are you aware that the revision of the DSM

13     involves the establishment of a scientific review

14     committee that evaluated and provided guidance on

15     the strength of evidence of any proposed changes?

16         A.   You know, that is how they describe the

17     process.  I again have asked for the evidence,

18     scientific evidence for the change between gender

19     identity disorder and gender dysphoria and then even

20     the move to shift toward the ICD code of gender

21     incongruence, that is based upon a scientific

22     evidence, rather than something other than that.

23         Q.   You also make reference in your report

24     with statements by Thomas Insel, the then director

25     of the National Institute of Mental Health, that it

PLAINTIFFS003081

Page 115

1   field forward.  So I think that's entirely
2   consistent with my interpretation of the whole
3   question.
4       Q.   Were you aware that two weeks after the
5   statement that you reference from Dr. Insel,
6   Dr. Insel issued a joint statement with the American
7   Psychiatric Association stating that, quote:  The
8   American Psychiatric Association Diagnostic and
9   Statistical Manual of Mental Disorders, along with
10  the International Classification of Diseases
11  represents the best information currently available
12  for clinical diagnosis of mental disorders.
13              Were you aware of that statement?
14      A.   Yes.  And that is completely in agreement
15  with my opinion that I put forward here as well.
16              (Whereupon Exhibit 7 was
17               introduced for identification.)
18      Q.   (By Mr. Gonzalez-Pagan)  Showing you what's
19  been marked as Exhibit 7.
20      A.   I have it.
21      Q.   Okay.  This is a statement issued by
22  Thomas Insel, the then director of the National
23  Institute of Mental Health, and Jeffrey Lieberman,
24  the then president elect of the American Psychiatric
25  Association; is that right?

Page 116

1        A.   Yes.  I believe -- well, I don't know for
2     sure, but I agree.

3        Q.   Okay.  Right below DSM-5 and RDoC, colon,
4     shared interests, it states:  The authors of this
5     statement.

6             Do you see that?

7        A.   I see the two authors, Thomas Insel and
8     Jeffrey Lieberman, correct.

9        Q.   All right.  Going to the second paragraph,
10    it reads:  Today the American Psychiatric
11    Association Diagnostic and Statistical Manual of
12    Mental Disorders, along with the International
13    Classification of Diseases represents the best
14    information currently available for clinical
15    diagnosis of mental disorders.  Patients, families
16    and insurers can be confident that effective
17    treatments are available, and that the DSM is the
18    key resource for delivering the best available care.
19    The National Institute of Mental Health has not
20    changed its position on DSM-5.  As the National
21    Institute of Mental Health research domain criteria
22    project website states, the diagnostic categories
23    represent that in the DSM-IV and the International
24    Classification of Diseases 10, the main contemporary
25    consensus standard for how mental disorders are

Page 117

1    diagnosed and treated.

2              Did I read that correctly?

3       A.    You read it correctly.  Yet what follows

4    in the next paragraph is more pertinent to the

5    statement that I made in the declaration

6    acknowledging the fact that the DSM is not

7    sufficient for researchers and the statement was

8    related to the basis for research funding.  So, you

9    know, taken in context, this document is completely

10   in line with the statement that I made about the

11   limitations of the DSM.

12      Q.    But the DS -- the DSM -- this is a case

13   about the treatment of gender dysphoria; is that

14   right?

15            MR. KNEPPER:  Objection form.

16      A.    So as we've been talking about all

17   morning, okay, the ability to have effective

18   treatments is based upon quality research.  And if

19   the DSM is not sufficient for researchers to be able

20   to conduct their scientific study, because of how

21   the DSM generates their diagnostic codes, I think

22   that that understanding is completely relevant to

23   why one needs to be aware of that.

24      Q.    (By Mr. Gonzalez-Pagan)  All right.  Going

25   to what is the fifth paragraph, the second to last

PLAINTIFFS003084

Page 118

1    sentence.  It states:  As research findings begin to

2    emerge from the RDoC effort, this finding may be

3    incorporated into future DSM revisions and clinical

4    practice guidelines.  But this is a long-term

5    undertaking.  It will take years to fulfill the

6    promise that this research effort represents for

7    transforming the diagnosis and treatment of mental

8    disorders.

9                     Did I read that correctly?

10        A.    You did read it correctly.

11        Q.    Is there a reason why you did not include

12   this follow-up statement from Dr. Insel regarding

13   the DSM views and reliability in your report?

14        A.    You know, I could have put the entire

15   document that you have here into the report.  The

16   point being made, I think, is one that I fully agree

17   with.  I think that as we be able to -- are able to

18   incorporate science into the DSM, it is going to

19   increase in its validity and its usefulness.  But in

20   its current state there is acknowledged in this

21   statement itself by the fact that this research is

22   needed.  It acknowledges the deficiencies that

23   currently exist.  So there's a whole host of other

24   things that I could have included in my declaration.

25   The point that was intended, I think, was

Page 119

1    sufficiently made and supported even by this

2    document that you put forward as a new exhibit.

3        Q.   Sure.  But in clinical qualification to

4    your statement is that that doesn't exist yet, and

5    that the DSM is the best current available tool that

6    we have according to this statement?

7            MR. KNEPPER:  Objection, form.

8        A.   The point I made is that there are

9    deficiencies in how it was -- or limitations how the

10   DSM has been put together.  And that is relevant to

11   the understanding of how we put forward hypotheses

12   for efficacious treatments.  And so I would say

13   that, you know, that's -- the state of knowledge in

14   this area is -- is what is of concern and how we are

15   using the DSM beyond its capabilities without

16   knowledge of molecular or physiologic mechanisms for

17   most of the psychiatric diseases is a major

18   limitation which is acknowledged by the authors of

19   this document.  That is what I believe is important

20   for the court to recognize and to understand as we

21   move forward in this conversation.

22       Q.   (By Mr. Gonzalez-Pagan)  In your report you

23   speak of three modalities of treatment for gender

24   dysphoria; is that right?

25       A.   I would say three different categories

Page 120

1    based upon different underlying scientific premises.

2    I think the reality of interventions are much

3    broader than that and not as easily demarcated into

4    three categories.  But indeed, I do present those in

5    my declaration.

6         Q.   And these modalities, are they reparative

7    therapy, watchful waiting and the affirming

8    approach?

9         A.   That is how I presented it, correct.  And,

10   again, if it would be helpful, if we're going to

11   talk about it, if we can direct ourselves to that

12   part of my declaration.

13        Q.   We'll get there.  Are you familiar with

14   Ken Zucker's work?

15        A.   Yes, I am.

16        Q.   In fact, you repeatedly cite Dr. Zucker

17   throughout your report; is that right?

18        A.   Yes, I do, among other people, yes.

19        Q.   What do you understand to be the model of

20   care that Dr. Zucker employed?

21        A.   Broadly speaking prior to his clinic being

22   shut down was to approach care in a way to

23   understand the underlying basis for the sex

24   discordant gender identity in that era was referred

25   to as gender identity disorder.

PLAINTIFFS003087

Page 121

1               And to -- one of the approaches that

2     he used was to help facilitate an individual to

3     realign their gender identity with their sex.  And

4     if that was not possible, would then advocate for

5     moving forward with affirmative approaches.

6          Q.   So under Dr. Zucker's model, affirming

7     care would be provided if there was persistence of

8     cross-gender identification into adolescence and

9     adulthood?

10         A.   Based upon the information that Dr. Zucker

11    had at the time that he was engaged in that care,

12    that was how he proceeded, yes.  He was not privy to

13    the information that has come forward in the last

14    several years about outcomes with that affirmative

15    approach.

16         Q.   What is the watchful waiting model?

17         A.   Again, all of these approaches are based

18    upon different scientific premises and it is based

19    upon the experience that the majority of prepubertal

20    children that experience sex discordant gender

21    identity, if merely left alone, will have

22    spontaneous realignment of their gender identity

23    with their sex.

24               And it is again, whether it's

25    intended or not, perceived as to be a desirable

Page 122

1    outcome.  And that those individuals that have that

2    experience will not be exposed to gender-affirming

3    medical interventions with all the associated risks

4    and questionable benefits that we -- that I

5    mentioned already.  And I certainly can share more

6    information if you would like.

7        Q.   Let me introduce you to what's been marked

8    as Exhibit 8.

9                    (Whereupon Exhibit 8 was

10                   introduced for identification.)

11       Q.   (By Mr. Gonzalez-Pagan)  Do you have access

12   to the exhibit?

13       A.   Yeah.  I'm seeing it now, correct.

14       Q.   This is a publication on -- it's an

15   article on adolescent health medicine and

16   therapeutics; is that right?

17       A.   I'm seeing that here.  Is this a

18   peer-reviewed journal -- a peer-reviewed article,

19   just so I know?

20       Q.   I'll answer that question for you then.

21   The answer is yes, but it's the next exhibit.

22       A.   Okay.  I'm sorry.  Did you have a question

23   for me?

24       Q.   Not yet.

25       A.   Okay.

Page 123

1           Q.   I will represent to you that this is a

2      peer-reviewed journal, but -- and I'll come back

3      to -- to another exhibit to discuss that with you.

4      But turning --

5           A.   The reason I ask that was because it's a

6      review article.  And even in peer-reviewed journals,

7      not all reviewed articles are reviewed with the same

8      rigor.  So that's -- but thank you.

9           Q.   Let's exit out of that exhibit.  And if my

10     computer will cooperate.

11                          (Whereupon Exhibit 9 was

12                          introduced for identification.)

13          Q.   (By Mr. Gonzalez-Pagan)  All right.  I'm

14     introducing what's been marked as Exhibit 9.

15          A.   I have the document, just so you know.

16          Q.   Great.  Do you see where it describes the

17     journal as an international peer-reviewed, open

18     access journal focusing on health, pathology and

19     treatment issues specific to the adolescent age

20     group?

21          A.   That's true.  Just below the ISSN number.

22          Q.   Correct.

23          A.   Yes, I see that.

24          Q.   Okay.  So you would agree that it is a

25     peer-reviewed journal?

Page 124

1        A.    Yes.  They're claiming it is.  I would
2    have no reason to doubt that.
3        Q.    Okay.  So going back to Exhibit 8.  If you
4    can turn to Page 61 of the document.
5        A.    Okay.  Are you referring to the
6    highlighted area?
7        Q.    Well, we're going to go to the bottom of
8    the right-hand -- right-hand column.
9        A.    Okay.
10       Q.    Under the watchful waiting model.
11             MR. KNEPPER:  And, Omar, let's identify on
12             the record the highlighting is not in the
13             underlying document, but it's been added.
14             MR. GONZALEZ-PAGAN:  For the record, the
15             highlighting in the exhibit has been added by
16             me.  Otherwise the document is unaltered.
17       Q.    (By Mr. Gonzalez-Pagan)  The highlighted
18    portion states -- reads:  In contrast to live in
19    your own skin approach, a young child's
20    demonstration of gender nonconformity, be it gender
21    identity, expressions or both, is not to be
22    manipulated in any way, but observed over time.  If
23    a child's cross-gender identification and
24    affirmations are persistent over time, interventions
25    are made available for a child to consolidate a

PLAINTIFFS003091

Page 125

1    transgender identity, once it is assessed, through

2    therapeutic intervention and psychometric assessment

3    as in the best interest of the child.  These

4    interventions include social transition (the shift

5    from one gender to another, including possible name

6    change, gender marker change and gender pronoun

7    changes), puberty blockers and, later, hormone and

8    possible gender-affirming surgeries.

9              Did I read that correctly?

10        A.   Yes.

11        Q.   So under the watchful waiting model,

12   gender-affirming care is provided for adolescents

13   and adults if they persist in the cross-gender

14   identification; is that right?

15             MR. KNEPPER:  Objection to form.

16        A.   That's correct according to this use of

17   the model, yes.

18        Q.   (By Mr. Gonzalez-Pagan)  Well, the watchful

19   waiting model was developed by -- it's the Dutch

20   model.  It was developed in the Amsterdam Center of

21   Expertise on Gender Dysphoria; is that right?

22        A.   That's my understanding.

23        Q.   Under the gender-affirmative model,

24   medical and -- no medical and surgical interventions

25   are initiated until after the onset of puberty; is

Page 126

1    that right?

2         A.   If you're talking about there's no reason

3    to block puberty that hasn't started yet or to

4    intervene with cross-sex hormones until that age;

5    that is correct.

6         Q.   Did you disclose to the -- in your report

7    that under Dr. Zucker's model, under the watchful

8    waiting model, and under the gender-affirmative

9    model, gender-affirming medical treatment is

10   indicated if cross-gender identification persists

11   into adolescence and adulthood?

12        A.   I would challenge you on the assertion

13   that it's indicated.  I would say that the model

14   itself bases itself on the next step of

15   intervention.  Whether there's a prudent approach is

16   really what is of concern with the literature that

17   we have available.  So the models itself indeed --

18   and they actually differ in not only in the timing

19   of when one engages.

20              The affirmative model actually begins

21   earlier with social affirmation, not just medical

22   intervention.  And there's different scientific

23   premises that are underlying -- underlie these two

24   different approaches.

25        Q.   But under each of the models of the three

PLAINTIFFS003093

Page 127

1    models that we've discussed, medical and surgical

2    care is provided as a mode of treatment?

3              MR. KNEPPER:  Objection, form.

4        A.    Under the model.  So let me be clear.

5    Okay.  So the reason for the watch and wait approach

6    is to know that in prepubertal children that present

7    with gender dysphoria, that the vast majority of

8    them will have that spontaneous realignment, other

9    gender identity with their sex, by varying estimates

10   ranging from 50 to 98 percent.  I think 88 --

11   85 percent is a good average based upon the

12   published literature.

13                   That means that this would apply to

14   15 -- at most 15 percent, maybe even less, that

15   would have persistence.  It also makes the

16   assumption -- and this is certainly one that one

17   considers with the current social environment as to

18   whether the influence of the social affirmation

19   component, you know, is -- is provided.

20                   So the underlying premises are

21   different in the two models.  One has a premise that

22   there are a number of factors that led to the gender

23   dysphoria.  And the vast majority of individuals,

24   that they may differ from one patient to another.

25   There is no biological test that one can do to

PLAINTIFFS003094

Page 128

1    determine which of these individuals are going to

2    have persistence or have that spontaneous

3    realignment.  And the safest course of action is to

4    do nothing until things are sorted out.

5             The gender-affirmative model makes a

6    scientific premise that when one experiences sex

7    discordant gender identity, it reflects something

8    that is innate and immutable.  And, therefore, a

9    prudent approach would be to immediately engage in

10   social affirmation followed by these hormonal

11   interventions.  I hope that I've stated that clearly

12   enough for you and for the court.

13        Q.  (By Mr. Gonzalez-Pagan)  Sure.  But

14   ultimately as to the question for transgender people

15   who persist in their cross-gender identification by

16   definition into adolescence and adulthood, medical

17   care and surgical care if indicated under any of the

18   three models, that being Zucker's model, the

19   watchful waiting model or the gender-affirming

20   model?

21        A.   I don't know that I would distinguish what

22   we were talking about earlier with the Zucker model

23   being -- I think you're doing that more as the

24   reparative therapy.

25             And this is based upon again the

Page 129

1   issue at hand of the emerging scientific evidence

2   that leads one to question whether this provides a

3   long-term solution to the problem of dysphoria.

4   And, again, I will state again that there are many

5   concerns about the presumption in proceeding with

6   affirmative care that can be challenged by the

7   outcomes that one is observing about how well these

8   individuals are doing after receiving the

9   gender-affirmative care.

10          So this is -- these are statements in

11   this particular paper by Dr. Ehrensaft that is based

12   upon the presumption that those are -- who receive

13   the affirmative approach are going to be completely

14   cured of their difficulties that they experience.

15   And my point is that when you say indicated, it

16   fails to recognize the -- the challenges that are

17   emerging for that outcome.

18      Q.   Sure.  But my last question wasn't whether

19   it was indicated.  My last question is whether under

20   each of the three models -- and let me clarify

21   something.  You discuss a reparative therapy model

22   in your report; is that right?

23      A.   Yes.  Can we again go to that part just so

24   you can direct me just so we can be looking exactly

25   at what I wrote.

Page 130

1           Q.   Sure.  It's Page 49 going into Page 50.

2           A.   Thank you very much.  Okay.  Very good.

3           Q.   My point is --

4           A.   I do remember what I wrote.  I just want

5       to make sure we're talking about the same thing.

6           Q.   My point is that -- that I'm trying to

7       distinguish actually there are four models, if you

8       will.  The Ken Zucker model is distinguished from

9       reparative therapy in that -- in a significant way.

10                   And let's go to Page 61 of Exhibit 8,

11      the highlighted portion above the watchful waiting

12      model.  It states:  If by the arrival of puberty a

13      child is still exhibiting cross-gender

14      identification and expressing a cross-gender

15      identity, that child should be supported in

16      transitioning to the affirmed gender including

17      receiving puberty blockers and hormones once it is

18      assessed from clinical interviews and psychometric

19      testing that the affirmed gender identity is

20      authentic.

21                   Did I read that correctly?

22          A.   Yes.

23          Q.   Okay.  So my question was whether you

24      disclose in your report that under the watchful

25      waiting model and/or Ken Zucker's approach,

Page 131

1    gender-affirming medical care is provided after the

2    onset of puberty?

3         A.    I'm trying to -- let's go back again to my

4    report and the context of the discussion that I'm

5    putting forward.  You said that was -- we were on

6    page -- page or bullet point No. 59, I think you

7    said.

8         Q.    Page 49, going into 50.

9         A.    49.  Okay.  That's where I -- that's where

10   I lost you.  I was on 59.  Sorry.  So I would also

11   add that the presentation of three broad

12   categories -- and you've mentioned a variation of

13   one of those categories saying there are four

14   approaches.  I would -- I would posit it that

15   there's a number of other hypotheses that have been

16   put forward about treatment approaches that --

17        Q.    Did you disclose any of those other

18   approaches in your report beyond the three that you

19   listed in this paragraph?

20        A.    Let me explain what I mean by that.  Okay?

21   As I repeatedly said in my declaration that there

22   are multiple hypoth -- alternative hypotheses that

23   can be put forward about the most prudent approach

24   to care.  These broad categories provide the

25   foundation for understanding the design and

1    implementation of these various applications of

2    these broad categories.

3              The point of dividing it up into

4    three categories is to really -- and I think that

5    that is still valid -- that the starting underlying

6    scientific hypotheses or the scientific premise, I

7    should say, varies in these three different

8    approaches.  How that scientific premise is

9    translated into hypotheses that lead to care

10   approaches is -- is at issue here.  And that I think

11   is the important point that I wanted to illustrate

12   for the court.  And make it very clear that what is

13   put forward by the plaintiff experts, and they said

14   this repeatedly, is that the affirmation-only

15   approach is the only accepted intervention in the

16   care of gender dysphoria youth.  And in this paper

17   here and in my declaration, you know, challenge that

18   as far as the most prudent approach.  And that's the

19   point of why it was included in a benefit for the

20   court.

21             The affirmation approach is not the

22   sole approach.  And there are alternative approaches

23   that haven't been adequately investigated and that

24   need to be investigated.  And this is an area of

25   unsettled controversial treatment that is going on

Page 133

1    currently.

2         Q.   Sure.  But ultimately there's a

3    distinction that they are different, right?  Under

4    all three of these models, gender medical care and

5    surgical care is provided after the onset of

6    puberty?

7              MR. KNEPPER:  Objection, form.

8         A.   I would say that is an important

9    distinction because if the underlying --

10        Q.   (By Mr. Gonzalez-Pagan)  The modalities of

11   treatment, are they different?

12        A.   If the outcome of the affirmation approach

13   is proven to be not effective it would change the

14   way that one applies that model to the effected

15   patients.

16        Q.   But on the altering model, you're

17   providing medical care after the onset of puberty.

18   So the real difference has to do with prepubertal

19   children and how they're treated; is that right?

20        A.   Well, let's talk a little bit about the

21   emerging demographic of what we are experiencing

22   right now.  Many of the people --

23        Q.   But that's not my question, though.

24   Like --

25        A.   Okay.  I don't think it applies

Page 134

1    exclusively to the prepub -- medical care -- I would

2    say the hormonal interventions apply only to people

3    that have progressed at least to stage two puberty.

4    Social affirmation applies across the board and

5    would be relevant whether one presented during

6    adolescence or in childhood.

7         Q.   But social affirmation is not a medical or

8    surgical treatment.

9         A.   Many would argue that.  And I would say in

10   a technical sense, that is true.  However, there are

11   many concerns that are evidenced in the literature,

12   that that influences the trajectory of the children

13   as to whether they go on to medical care.  So many

14   can and have argued that it is the first step that

15   is leading them on to the subsequent hormonal

16   interventions.  So I think it is relevant.

17        Q.   In Paragraph 50 in discussing -- in

18   describing the watchful waiting approach, you note

19   that this approach may include the use of

20   scientifically validated treatment, e.g., CBT, for

21   the patient's anxiety, depression, social skill

22   deficits or other issues.

23                  But you do not note that

24   gender-affirming medical care and surgical care are

25   provided under this approach.  I'm just wondering

PLAINTIFFS003101

Page 135

1    why you did not provide that context in your report?

2         A.    Because that's under the premise that the

3    affirmative approach actually provides benefit, and

4    throughout my declaration I have raised multiple

5    concerns with existing published data that lead to a

6    presumptive or tentative conclusion that at best we

7    should have more caution to that approach.

8         Q.    So at best your description of the

9    watchful waiting approach in this paragraph is

10   incomplete?

11             MR. KNEPPER:  Objection.

12        A.    Let's read through and we can even read it

13   into the record if you'd like, the way that I

14   present that.  Because that's where I think it's

15   important to look at this in context.

16        Q.    (By Mr. Gonzalez-Pagan)  Actually let's

17   just -- let's just go to Paragraph 53 of your

18   declaration.  It states:  Another controversy --

19        A.    Hold on.  I'm not there yet.

20        Q.    Okay.  I'll wait for you.

21        A.    It's a long paragraph.

22        Q.    Well, I'm right at the beginning of

23   Paragraph 53.

24        A.    It starts with "assistance"?

25        Q.    Paragraph 53.

Page 136

1          A.    Paragraph 53 talking about another

2     controversy, the watchful waiting treatment; is that

3     what you're talking about?

4          Q.    Sure.

5          A.    Okay.

6          Q.    I'll just read the heading:  Another

7     Controversy, the watchful waiting treatment modality

8     involves no medical treatment and is currently the

9     best specifically -- sorry -- is currently the best

10    scientifically supported intervention for young

11    children reporting gender dysphoria.

12                    But the watchful waiting model does

13    involve medical treatment; isn't that right?

14         A.    Perhaps to clarify that statement when I

15    say young children when we're referring to

16    prepubertal children, that is true, and it is

17    actually included in the Endocrine Society

18    guidelines.  As far as the concerns about

19    intervening and the caution that should be expressed

20    precisely because of the high rates of desistence.

21                    So that statement, again, when we're

22    talking about social affirmation and your contention

23    as I'm hearing it as you're stating it is social

24    affirmation is not technically a medical

25    intervention.  And I think we've already discussed

Page 137

1   that.  That it is relevant as far as the first step

2   in influencing the trajectory of these individuals.

3        Q.   This case --

4        A.   And there's also --

5        Q.   So this case involves gender-affirming

6   care, right?

7             MR. KNEPPER:  Object to form.

8             MR. GONZALEZ-PAGAN:  I apologize, Sheryl.

9        A.   So -- so -- okay.  Let's -- let's also

10  move on.  So if -- if you then look at the first

11  stage of medical intervention which involves the

12  administration of an GnRH agonist or also known as a

13  puberty blocker, significant concerns that that

14  normal trajectory where you see the majority 50 to

15  98, I would say 85 percent have the desistence.

16  That demographic or that statistic changes

17  drastically in those individuals that have received

18  that first step of pubertal blockade and that

19  actually most of the studies that have been

20  published thus far says the vast majority of -- it's

21  not 100 percent.  It's very close to that -- will go

22  on cross-sex hormones.  So again that is not -- that

23  is more the affirmative model.

24             The watch and wait model would posit

25  that as a child begins into their puberty, that

PLAINTIFFS003104

Page 138

1    acknowledging that the bodily changes that occur may

2    heighten the level of dysphoria that they

3    experience.  But as they go through that

4    developmental process, that experience of puberty is

5    actually critically important in the overall

6    integration of one's identity with their sex.  And

7    that would be consistent with the watch and wait

8    model.  So that again, as being presented in this

9    one review article by Dr. Ehrensaft -- much more I

10   could say about that -- I think there's much more to

11   be said about the way that these models are being

12   presented.

13        Q.    The study that you -- the study to which

14   you refer regarding persistent cross-gender

15   identification following the provision of GnRH

16   analogue, is that the de Vries study?

17        A.    That's the one that shows a hundred

18   percent persistence or a hundred percent moving that

19   across sex hormones.  There's been subsequent ones

20   where it's not been a hundred percent, but it's been

21   the 90 percent range.

22        Q.    You say that those studies pertain to the

23   application of the gender-affirmation model, but the

24   de Vries study is actually speaking to the watchful

25   waiting model.  It is the Dutch model.

Page 139

1        A.    We need to say a lot more about that if we

2    want to flesh that out for you.  I don't know that

3    you've adequately characterized the Dutch model.

4    And I will add that the Dutch model was presented a

5    decade ago with a different patient population that

6    is currently presenting at the gender clinics across

7    the world.  And even --

8        Q.    But that's a different point than -- than

9    the one that we're talking about, right?  You

10   indicated that the affirmation model -- studies show

11   that the affirmation model leads into persistence,

12   but you're relying on a study based on the Dutch

13   model.

14       A.    Well, I would qualify that statement.  I

15   didn't say that it leads to that model, because the

16   way the study was conducted, you know, causal effect

17   cannot be inferred.  Okay?  So I would moderate

18   that.  But I would say it's certainly of concern

19   that that number is drastically different than the

20   prior studies that have shown that rate of

21   spontaneously -- spontaneous realignment with gender

22   identity with sex.

23       Q.    But those are different populations,

24   right?  I mean, we're talking about prepubertal and

25   pubertal youth versus prepubertal youth?

Page 140

```
 1          A.   Not necessary -- so, again, you know, it
 2     would be much more helpful to talk about specific
 3     studies.  In the de Vries study, the whole basis of
 4     giving pubertal blockers applied only to pubertal
 5     patients.
 6          Q.   That's by definition any person who's
 7     receiving puberty blockers.
 8          A.   No necessarily.
 9          Q.   It has to happen at the onset of puberty.
10          A.   Well, yes, onset of puberty, that would be
11     the only indication for giving it in the area of
12     pediatrics.
13               MR. GONZALEZ-PAGAN:  All right.  How about
14          we break now for lunch?
15               MR. KNEPPER:  Dr. Hruz?
16               MR. GONZALEZ-PAGAN:  Well, I'm -- I'm
17          hungry, so.
18               MR. KNEPPER:  I know.  This works with
19          your diet?
20               THE WITNESS:  Yeah.  I think as we go
21          through this, I'm going to be happy just
22          plowing through.  So it's going to have to come
23          from your end if you want to take a break.
24               MR. GONZALEZ-PAGAN:  Well, it's coming
25          from my end.  Because I -- I'm running on a
```

PLAINTIFFS003107

Page 143

1      have to demonstrate a concept of what we call

2      non-inferiority.  So if that's the natural outcome,

3      so if there's a realignment with gender identity

4      with sex and that obviates the need for them to go

5      on to receive hormonal treatment of any sort at all,

6      that would be a desired outcome.

7                    The challenge is that in those

8      individuals, there is no reliable diagnostic test to

9      predict which of those children are in the category

10     of 85 percent, like we go to this realignment versus

11     the subset that's going to persist in that sex

12     discordant gender identity.

13                    So that's the challenge.  So I would

14     say I wouldn't be so firm to make an absolute

15     determination of the best course of action, but I

16     wouldn't say that any alternate approach would have

17     to prove that non-inferiority outcome.

18          Q.   (By Mr. Gonzalez-Pagan)  Okay.  And the

19     desistence study speaks to prepubertal youth who

20     were diagnosed with gender identity disorder under

21     the DSM-III or the DSM-IV; is that right?

22          A.   So this is -- I'm very much aware of that

23     critique, and the way that people have attempted to

24     dismiss that desistence literature based upon that

25     difference of gender identity disorder versus gender

PLAINTIFFS003108

Page 144

1    dysphoria.  It's very interesting that if you look

2    in detail for example at that same paper the number

3    of people based upon the criteria --

4         Q.   I'm sorry, Doctor.  I apologize for

5    interrupting.  But I guess -- I'm happy to go into a

6    conversation about this.  But I guess I have a

7    predicate question, which is I want to establish

8    whether it's true or not that the desistence studies

9    are based on prepubertal children diagnosed with

10   gender identity disorder as opposed to gender

11   dysphoria under the DSM-5?

12        A.   Well, older studies would certainly

13   necessitate that they use the diagnostic criteria

14   that was available at the time the study was

15   conducted.  And some of them -- and most of those

16   studies were the era prior to the revision of the

17   DSM-5 giving the gender dysphoria diagnosis.

18        Q.   Are you aware of any studies looking into

19   the desistence in prepubertal youth using the DSM-5

20   criteria?

21        A.   You know, that is an outstanding question

22   and I'm very happy to share with you the problems

23   with that question.  In the fact that because of

24   what has happened in the approach to the care of

25   these individuals, the opportunity because of the

Page 145

1     widespread adoption of the affirmation only approach
2     and the early adoption of social affirmation makes
3     it very challenging to be able to even put forward
4     as a hypothesis a study that would be able to
5     operate under the current diagnosis of gender
6     dysphoria.

7               And I think that's very problematic
8     as we seek to understand the natural history of this
9     disease, and we seek to find ways to alleviate the
10    suffering that will be sustained long-term in these
11    individuals.  I think it's the fact that the
12    discussion is not allowed to occur and the studies
13    have not been proposed and conducted.  And even if
14    they were, there would be challenges in the current
15    environment of really encouraging that social
16    affirmation approach.

17              So the answer to the question is that
18    there are many problems that currently exist as to
19    why those studies have not been reported and would
20    be very difficult to perform at this point in time,
21    yet would be essential to providing the best care
22    for these individuals.

23          Q.   Okay.  But you do not know of any studies
24    documenting an 85 percent desistance rate for kids
25    diagnosed -- prepubertal kids diagnosed with gender

Page 146

1    dysphoria mode in the DSM-5?

2         A.   I'm not aware the question has actually

3    been investigated by a scientific trial.  Not that

4    there's data that says it doesn't exist, but that it

5    has not been investigated.  The only data that's

6    available right now are people that have received

7    that social affirmation which clearly shows that

8    that demographic has changed.  And, you know, if you

9    ask this as a hypothesis --

10        Q.   I appreciate that, Dr. Hruz.  We'll get to

11   the demographic changes later on.  But I want to

12   stay focused.  So going back, the studies have to

13   do -- the studies in desistance that you reference

14   have to do with prepubertal children; is that right?

15        A.   The ones that were done previously that

16   I'm referring to dealt with prepubertal children.

17   Now, there's another component of this, that of --

18   you divided this between prepubertal and adults.

19   And it's very necessary if we're going to adequately

20   address this question to consider what happens

21   during the period of puberty.

22        Q.   Okay.  Are there studies that document

23   desistence during the period of puberty?

24        A.   There are case reports.  There are not --

25   and there's a growing -- this gets at the --

Page 147

1          Q.    In your report you state that case reports
2     are not valid scientific evidence.

3          A.    They are useful for hypothesis generation.
4     They're not useful for making definitive causal
5     conclusions.  That is correct.

6          Q.    So are there any studies showing high
7     desistence among adolescence diagnoses with gender
8     identity disorder?

9          A.    There are not.  And the reason for that,
10    again, is because in many of the studies where one
11    looks at this, there's a very, very high dropout
12    rate in many of the subjects where one can't
13    conclude at all what the outcomes were.  Based upon
14    the available evidence, more by case reports of
15    growing number of people experiencing this
16    desistence, that did occur when it's experienced
17    post pubertally would lead one to raise hypotheses
18    to be investigated in a rigorous scientific manner
19    to address that question.

20         Q.    You believe that all medical treatment
21    needs to be subjected to randomized clinical trial?

22         A.    It depends on -- so every medical decision
23    that is made is based upon consideration of the
24    overall risk and the overall benefit.  And I think
25    that the greater the risk, the greater the scrutiny

Page 154

1    are certainly --

2         Q.   But that's just a hypothesis; is that

3    right?

4         A.   You know, all along here, I've been

5    tell -- I've been stating, and I hope very clearly,

6    that much of my opinion is based upon hypotheses and

7    alternative hypotheses, because there is no

8    definitive answer to this question.  But the

9    prevailing current hypothesis that's not presented

10   as a hypothesis, it's presented as an established

11   fact, is that gender-affirming interventions are the

12   solution to gender dysphoria.  And that is what I

13   challenge.  And that is what, I think, is very

14   important for this court to understand, is that the

15   scientific evidence does not support that as being a

16   cure for all of the difficulties that these

17   individuals are experiencing.

18        Q.   Going back to the desistence studies.

19   What is the error rate for the desistence studies

20   that you rely on?

21        A.   So the error rate is -- there's a number

22   of factors.  I'm glad that you brought this up as

23   far as, you know, how we think about the reliability

24   of studies.  So this is a problem throughout the

25   literature.  And I've addressed this in my

Page 164

1          Q.   (By Mr. Gonzalez-Pagan)   Are you aware

2     that the American Psychiatric Association opposes

3     reparative therapy efforts regarding gender

4     identity?

5          A.   Now we're into a new line of questioning

6     about medical societies.  But I'm aware of -- of the

7     general recommendations for affirmation only.  That

8     is entirely consistent with what has been put

9     forward by WPATH, American Psychological

10    Association.  There's a little bit more caveat in

11    the Endocrine Society guidelines.  I think they're a

12    little bit more cautious in the prepubertal

13    children, at least in the 2009 document cautioned

14    against social affirmation in recognition of the

15    same desistence literature that I'm referring to.

16    Again, not just my opinion.  This is the

17    professional societies in the 2009 guidelines

18    acknowledged those studies of being relevant to that

19    consideration of treatment.

20         Q.   Sorry.  I just don't want us to go down a

21    different path.  I'm not talking about the general

22    position statement about gender-affirming care.  I

23    am talking about the physician statements regarding

24    conversion therapy.  Are you aware that the American

25    Psychiatric Association opposes conversion therapy

Page 165

1    eff -- conversion therapy efforts?

2         A.   The reason I answered in the way I did to

3    your previous question was not to evade the

4    question.  It was merely to -- you began with a

5    professional association.  And so it's necessary to

6    acknowledge what the basis of those statements are.

7    The APA recommends the affirmative approach to care.

8         Q.   Okay.  But that's not my question.  That

9    is a different position statement.  And I'm glad --

10   yeah, the APA does do that.  But does the American

11   Psychiatric Association also have a position

12   statement regarding conversion therapy?

13        A.   Okay.  Thank you.  Because you used the

14   word "conversion therapy" for the first time.  I

15   think it's very important for us to acknowledge when

16   we're talking about reparative therapy and what

17   people talk about as far as conversion therapy.

18   That's actually a pejorative term that actually is

19   trying to equate these efforts to realign gender

20   identify with sex to a completely different

21   condition related to same sex attraction with

22   methods that virtually everyone would recognize as

23   being unethical.

24                  And so I think it's an injustice

25   to -- and the statements are often made in the

PLAINTIFFS003115

Page 166

1    literature published talking about conversion

2    therapy.

3         Q.   All right.  One second.  Let's just go --

4    let's just go to Page 49 of your report,

5    Paragraph 52.

6         A.   Sorry.  Paragraph 52?

7         Q.   Yeah.  So very last sentence going into

8    the next page of your report states:  The first

9    approach often referred to as conversion or

10   reparative -- reparative therapy --

11        A.   Correct.

12        Q.   -- is directed to or actively supporting

13   and encouraging children to identify with their

14   biological sex.

15             Did I read that correctly?

16        A.   I could add often incorrectly referred to

17   as conversion therapy.  I think that's probably

18   something I could have added to my declaration to

19   indicate that.  I think it's incorrect and an

20   injustice to use that term to describe the approach

21   to -- to addressing gender dysphoria.

22        Q.   Are you aware that the American -- you

23   know what, let's -- I apologize.  I forgot the stamp

24   again.  It is marked Exhibit 10.  Do you see that?

25                    (Whereupon Exhibit 10 was

Page 167

1                          introduced for identification.)

2          A.    Correct.  I see this.

3          Q.    (By Mr. Gonzalez-Pagan)  Okay.  Under the

4     position heading at the bottom of the page, in

5     Paragraph 2, it states:  APA recommends that ethical

6     practitioners respect the identity for those with

7     gender diverse expression.

8                          Did I read that correctly?

9          A.    I'm in the wrong paragraph.  You said the

10    second paragraph?

11         Q.    Under -- under the heading position at the

12    bottom of the page?

13              MR. KNEPPER:  Omar, I think you made -- I

14         think you swapped gender and diverse.  But it's

15         just -- in other words, I think you read gender

16         diverse expression and it's diverse gender

17         expression.

18         Q.    (By Mr. Gonzalez-Pagan)  Sure.  Let me

19    just read that again.  Are you there?

20         A.    I'm here.  Okay.  I'm sorry.  I was

21    reading the introductory paragraph.  Sorry.

22         Q.    Okay.  It states, Paragraph 2, quote:  APA

23    recommends that ethical practitioners respect the

24    identity for those with diverse gender expressions.

25                          Did I read that correctly?

Page 168

1          A.    Yes.

2          Q.    Then just below that on Paragraph 3 on the

3     next page, it states, quote:  APA encourages

4     psycho -- psychotherapies which affirm individual's

5     sexual orientations and gender identities.

6                    Did I read that correctly?

7          A.    Yes.

8                        (Whereupon Exhibit 11 was

9                        introduced for identification.)

10         Q.    (By Mr. Knepper)  Showing you what's been

11    marked as Exhibit 11.

12         A.    I see it.

13         Q.    Okay.  This is a resolution by the

14    American Psychological Association on gender

15    identity change efforts.  Is that right?

16         A.    That's the title of this document,

17    correct.

18         Q.    It's dated February 2021; is that correct?

19         A.    That's correct.

20         Q.    Go to the second page, third to last

21    paragraph on the right-hand side column.  And it's

22    use of GICE as an acronym for gender identity change

23    effort; is that right?

24         A.    I see that, yes.

25         Q.    It reads:  Whereas, GICE has not been

Page 169

1       shown to alleviate or resolve gender dysphoria

2       (Bradley and Zucker, 1997; Cohen-Kettenis & Kuiper,

3       1984; Gelder and Marks, 1969; Greenson, 1964; Pauly,

4       1965; and SAMHSA, 2015).

5                       Did I read that right?

6            A.   You did.

7            Q.   If you go to Page 3, the last two

8       paragraphs, on the right-hand side column, it

9       states:  Be it therefore resolved, that consistent

10      with the APA definition of evidenced-based practice

11      (APA 2005), the APA affirms that scientific evidence

12      and clinical experience indicates that GICE put

13      individuals at significant risk of harm.

14                      Be it further resolved that the APA

15      opposes GICE because such efforts put individuals at

16      significant risk of harm and encourages individuals,

17      families, health professionals, organizations to

18      avoid GICE.

19                      Did I read that correctly?

20           A.   You did.

21           Q.   Okay.  So the American Psychiatric

22      Association and the American Psychological

23      Association both oppose reparative therapy as a form

24      of treatment; is that right?

25           A.   Gender identity change efforts as stated

Page 170

1    in the document, which again is different than what

2    people generally equate with conversion therapy, in

3    quotes.

4         Q.   And the American Psychiatric Association

5    and the American Psychological Association consider

6    gender identity change efforts to be unethical and

7    harmful; is that right?

8         A.   That's what's stated in these documents.

9         Q.   All right.  I will apologize in advance,

10   that exhibit is large and will make navigating it a

11   little difficult.  Hopefully it will take a little

12   bit longer to upload.

13                       (Whereupon Exhibit 12 was

14                       introduced for identification.)

15        Q.   (By Mr. Gonzalez-Pagan)  Showing you

16   what's been marked as Exhibit 12.  It's a document

17   entitled Understanding the Well Being of LGBTQI Plus

18   Population.  Is that right?

19        A.   That's the title in the document that I'm

20   looking at, yes.

21        Q.   It appears to have been published in 2010;

22   is that right?

23        A.   It says 2020.

24        Q.   Sorry.  2020.

25        A.   Okay.

Page 176

1    correctly.  And that many of the studies that are
2    referenced here have major methodologic weaknesses
3    and the strength of the statement based upon that
4    evidence in light of the emerging evidence that is
5    coming forward, for example, in the other studies
6    that we've discussed already today --
7         Q.   Well, let's --
8         A.   -- this conclusion can be scrutinized.
9         Q.   Let's move to the next page.  The
10   highlighted statement reads:  The available evidence
11   suggests that sexual orientation and gender identity
12   conversion efforts were ineffective and dangerously
13   detrimental to the health of SGD population,
14   especially for minors who are unable to give
15   informed consent.
16               Did I read that correctly?
17        A.   I'll say again, you read it correctly.
18   And the meaning of that statement and context of the
19   whole paper is something that we can discuss later.
20        Q.   Would you agree that it is the position of
21   the National Academies of Sciences, Engineering and
22   Medicine that conversion therapy is harmful?
23               MR. KNEPPER:  Objection, form.
24        A.   I don't know whether the small panel of
25   people that were included in generating this

Page 177

1    consensus statement represents the entire views of
2    the entire membership of that society.  I know from
3    my own experience that for the other societies that
4    I'm involved with these types of consensus
5    statements are not brought to the entire membership
6    of the organization.  I can only conclude that the
7    members that were present on this panel made those
8    conclusions.  I would not go as far as to say that
9    it was supported by every member or even majority or
10   even substantial number of the rest of that group.
11        Q.   (By Mr. Gonzalez-Pagan)  If you go to the
12   fourth page of the PDF.
13        A.   Back up to the top now?  Okay.
14        Q.   On the last sentence, the second clause,
15   it states:  It represents the position of the
16   National Academies on the statement of facts; is
17   that right?
18        A.   That is what is stated here, and that is
19   also stated by other organizations that have put
20   forward similar statements.  The same concern
21   applies, that just because they put it forward, it
22   does not mean that -- that the entire membership has
23   been able to weigh into this question or those that
24   wish to do so.
25        Q.   Was the review that you referenced in

Page 183

1          A.    You know, again I don't have the answer.
2     I don't know.

3          Q.    Okay.  Are you aware that in the United
4     Kingdom, medical and surgical care is provided for
5     transgender adolescents post puberty and for
6     transgender adults?

7               MR. KNEPPER:  Objection to form.

8          A.    I guess I didn't understand the question
9     there.

10         Q.    (By Mr. Gonzalez-Pagan)  Sure.

11                    (Simultaneous speakers.)

12         Q.    (By Mr. Gonzalez-Pagan)  You talk about --
13    you talk about the reviews in the United Kingdom, in
14    Finland and in Sweden.  So I'm curious, are you
15    aware -- are you aware whether in the national
16    health system in the United Kingdom, they provide
17    coverage and treatment for gender dysphoria in post
18    prepubertal adolescents and adults?

19         A.    So I think it's reflected in the recent
20    Tavistock versus Bell decision.  It is recognized
21    that this is an area of controversy and that is an
22    unsettled question about --

23         Q.    Well, the Tavistock decision has to do
24    with minors.  I'm talking about adults and cross-sex
25    hormones and surgery.  Are you aware whether in the

Page 184

1     United Kingdom they provide coverage and treatment

2     of cross-sex hormones and surgery as a modality of

3     treatment for gender dysphoria?

4          A.   Yes, I do.

5          Q.   Okay.  Same question with regards to

6     Sweden?

7          A.   Sweden -- again, I'm a pediatric

8     endocrinologist.  And I think that the caution that

9     is put forward in relegating this care to the

10    setting of -- of an experimental setting is where

11    it's been pulled back with concerns based upon

12    the --

13         Q.   The restrictions to which you speak all

14    relate to the provision of puberty blockers; is that

15    right?

16         A.   No.  I think it's more extensive than

17    that.  But it -- it acknowledges that based upon the

18    literature that there's not very stong evidence and

19    then instructs that this care be delivered with the

20    safeguards exactly as I'm saying, you know, it

21    should be done here in the United States.

22    Recognizing that this is --

23         Q.   That's in the context of minors, though;

24    is that right?

25              MR. KNEPPER:  Objection, form.

Page 185

```
 1        A.    Again, that's what I've addressed in my
 2    declaration.  And that is my --
 3        Q.    (By Mr. Gonzalez-Pagan)  But with regards
 4    to transgender adults in Sweden, does the
 5    nationalized healthcare system in Sweden provide
 6    coverage and treatment for gender dysphoria in the
 7    form of hormones and surgical care?
 8        A.    You know, I would say this is outside the
 9    scope if we're getting into a discussion about
10    insurance coverage.  My expertise is in looking at
11    the scientific data about the affirmation and
12    other --
13        Q.    Well, you rely on the national reviews of
14    Sweden, Finland, and the United Kingdom.  So --
15        A.    Correct.
16        Q.    -- I'm wondering if you rely on the
17    national reviews, I think it's pertinent and
18    relevant whether you disclose in your report that
19    these countries provide for the treatment and
20    coverage of this care?
21            MR. KNEPPER:  Objection, form, scope.
22        A.    As a pediatric endocrinologist and
23    physician scientist, my service to this court is not
24    to opine upon -- I know it's a big part about this
25    case about insurance coverage.  My role in this
```

PLAINTIFFS003125

Page 189

1    gender-affirming treatment for adults?

2         A.   Again, I would have to say for me to

3    comment specifically about that, we would need to

4    have the document in front of me to be able to look

5    through all of the papers.  It was a very extensive

6    study.  And there are a number of papers there.

7                    And so I would have to look through

8    the papers to specifically look at the inclusion

9    criteria, whether it was exclusively in kids or

10   included adults and, again, how he defined, you

11   know, adulthood, whether it's post prepubertal, post

12   18, early 20s.  You know, many people have different

13   definitions of that.  And so --

14        Q.   All right.  Same line of questioning with

15   regards to Finland.  Did you disclose that Finland

16   provides through its national -- nationalized health

17   care system gender-affirming treatment for gender

18   dysphoria for adults?

19             MR. KNEPPER:  Objection, form, scope.

20        A.   I'm going to state again that for me to

21   opine on that, I would need to look at, in those

22   studies, what the inclusion -- inclusion criteria

23   and whether it extended into adulthood.

24        Q.   (By Mr. Gonzalez-Pagan)  My -- my -- my

25   question is not pertinent to the report.  It's not a

Page 190

1          question of whether they reviewed it.  It's a

2          question whether that care is provided in Finland.

3                    MR. KNEPPER:  Objection, form.

4              A.    I will say again that this is a question

5          related to insurance coverage.  And I'm a pediatric

6          endocrinologist, physician scientist opining on

7          issues of science, not on medical coverage.

8              Q.    (By Mr. Gonzalez-Pagan)  One moment,

9          please.  Let's take a -- well, actually no.  We'll

10         come back.  In your report you disclose the Bell v.

11         Tavistock position; is that right?

12             A.    That's correct.

13             Q.    That was a decision from December 2020 in

14         the United Kingdom?

15             A.    Correct.  And it was before the appeals

16         court decision came out recently.

17             Q.    And you submitted an expert report in

18         Tavistock; is that right?

19             A.    In that Bell versus Tavistock case, I did.

20             Q.    Are you aware that the Bell v. Tavistock

21         case dealt solely with the ability of a minor to

22         provide informed consent on their own?

23                    MR. KNEPPER:  Objection to form.

24             A.    So the decision was based on that.  But

25         that was not what I was opined [sic] to comment on.

PLAINTIFFS003127

Page 205

1    there's no indication here that this was a

2    peer-reviewed document.  It wasn't published in a

3    journal in the typical way that we do it.  So it's a

4    Council for Choices -- recommendations of the

5    Council for Choices in Healthcare in Finland.  So

6    this is -- the council itself came to this

7    conclusion to answer your question.

8         Q.   Let's go back to Exhibit 12.

9         A.   I'm there.

10        Q.   All right.  We're going to go to

11   Page 12-10.  It is Page 311 of the PDF.

12        A.   I wish there was a way you could just type

13   in the number and get to it.

14        Q.   Don't we all.

15        A.   Okay.  This is with the section that's

16   titled Guidelines and Policies Related to

17   Gender-Affirmation?

18        Q.   That's right.

19        A.   Very good.

20        Q.   The highlighted statement states:

21   Clinicians who provide gender-affirming psychosocial

22   and medical services in the United States are

23   informed by expert evidence-based guidelines.  In

24   2012, the World Professional Association for

25   Transgender Health, WPATH, published Version 7 of

Page 206

1     the Standards of Care for the Health of Transgender,

2     Transsexual, and Gender-Nonconforming People, which

3     have been continuously maintained since 1979, and

4     revisions for Version 8 are currently underway

5     (Coleman, et al., 2012).  Two newer guidelines have

6     also published -- have also been published by the

7     Endocrine Society (Hembree, et al., 2017), and the

8     Center of Excellence for Transgender Health (UCSF

9     Transgender Care, 2016).  Each set of guidelines is

10    informed by the best available data and is intended

11    to be flexible and holistic in application to

12    individual people.  All of the guidelines recommend

13    psychosocial support in tandem with physical

14    interventions and suggest timing interventions to

15    optimize an individual's ability to give informed

16    consent.  Mental and physical health problems need

17    not be resolved before a person can begin a process

18    of medical gender-affirmation, but they should be

19    managed sufficiently such that they do not interfere

20    with treatment.

21              Did I read that correctly?

22        A.   You indeed read that correctly.

23        Q.   Okay.  This is a consensus study report by

24    the National Academies of Sciences, Engineering and

25    Medicine of the United States; is that right?

PLAINTIFFS003129

Page 208

1          record.  This is Media Unit No. 5.  The time is

2          4:05 Eastern time.

3               Q.  (By Mr. Gonzalez-Pagan)  Dr. Hruz, one of

4     the critiques in your report is that puberty

5     blockers have not been approved by the FDA as a

6     treatment for gender dysphoria; is that right?

7               A.   That is correct.  Although it's important

8     to understand why that is a relevant piece of

9     information.

10               Q.   Well, let's go to page 50 of your report.

11               A.   I'm there.

12               Q.   Okay.  On the -- there's a number of

13     statements that you bold and italicize, but on the

14     third -- the sentence involving the third bold and

15     italics.

16               A.   Okay.

17               Q.   It's like in the middle of the page.  It

18     states:  The off-label prescription of this drug is

19     legal but unethical outside the setting of a

20     carefully controlled and supervised clinical trial.

21                         Did I read that correctly?

22               A.   You did.

23               Q.   And why is that?

24               A.   So, again, this relates to the statements

25     that are made that these drugs are known to be safe

Page 209

1     in this patient population.  And we really don't

2     have the scientific evidence to make that statement.

3     Because it's unknown what the -- some of the effects

4     are known, but many of the effects are unknown, to

5     be able to expose people to this intervention, not

6     only to expose them to that, but to make the

7     statement that it is known to be safe with that

8     absence of evidence, it really finds itself outside

9     of what I'd consider ethical.

10         Q.   Just for clarify, what do you understand

11    "off-label" use to mean?

12         A.   Oh, it's actually very common in the area

13    of pediatrics.  It's to prescribe a medication for

14    something that it has not been FDA approved.  So it

15    could be for another -- a drug that's approved for

16    one purpose and using it for another purpose.  Most

17    often that's how it's used.

18         Q.   Have you personally ever prescribed any

19    drugs on an off-label basis?

20         A.   Very frequently do.

21         Q.   Do you do so even in the absence of

22    randomized clinical control trials?

23         A.   Usually when I prescribe them off-label,

24    there are randomized controlled trials in different

25    populations that I turn to.  I look at the relative

Page 210

1    risk and -- but I don't make the statement that we

2    know with definity [sic] about the safety of a

3    medication in a way that we don't have that

4    information.

5         Q.   And you said usually.  So there are times

6    when you prescribe off-label drugs even in the

7    absence of clinical controlled randomized trials?

8              MR. KNEPPER:  Objection, form.

9         A.   Usually when I'm prescribing it, what we

10   would consider off-label most often, it is for a

11   condition that is not markedly different for the use

12   that it is being given only that it had been

13   approved most often for adults rather than children.

14        Q.   (By Mr. Gonzalez-Pagan)  And clinical

15   control trials are actually relatively rare in the

16   pediatric population?

17        A.   No.  I would say that -- I mean, that's

18   the standard that's accepted especially for

19   medication use.  The reason why they're not done in

20   pediatrics is that usually there's a substantial

21   cost associated with that.  People are looking at

22   market share and, you know, how much it's going to

23   cost to be able to study that drug in that patient

24   population.  Yet it's already been studied in a

25   randomized control trial in a similar population

Page 211

1     without the same caveats that we consider when we

2     look at this question of pubertal blockade.

3            Q.    What is the FDA?

4            A.    The Food and Drug Administration.

5            Q.    Does the FDA regulate prescription drugs?

6            A.    Yes.

7            Q.    What is the FDA's decision with regards to

8     a prescription of off-label use of drugs?

9                  MR. KNEPPER:  Objection, form, scope.

10           A.    You know, I don't know that they have a

11    statement that there is an ethical responsibility

12    that all physicians who are prescribing off-label.

13    It also applies both to the prescribing physician

14    and it also applies to the pharmaceutical company

15    that's making the medication.

16                       If it's off-label, they cannot market

17    it to a group of people that it wasn't approved for.

18    Physicians that prescribe off-label medications

19    accept the responsibility, you know, for the risks

20    and benefits.  And they're obligated to inform their

21    patients of the evidence that they have, where it

22    comes from, and the basis for recommending that

23    medication.

24                       That's true for all medications, but

25    certainly when you're using it off-label, you know,

PLAINTIFFS003133

Page 212

1    it involves consideration of the indication, how

2    applicable the randomized control studies that have

3    been done to approve the drug are applicable to the

4    population that you're going to use it for.

5                          (Whereupon Exhibit 14 was

6                          introduced for identification.)

7         Q.   (By Mr. Gonzalez-Pagan)   Showing you what's

8    been marked as Exhibit 14.   Do you have that in

9    front of you?

10        A.   I do.

11        Q.   This appears to be a notice by the Food

12   and Drug Administration in the Federal Register

13   dated November 18, 1994, pertaining to a citizen

14   petition regarding the Food and Drug

15   Administration's policy on promotion of unapproved

16   uses of approved drugs and devices, request for

17   comments.

18        A.   I see that.

19        Q.   Did I -- did I describe the document

20   correctly?

21        A.   I've not read the entire document.   But

22   that section that you read was read correctly.

23        Q.   Okay.   Going on to the second page.   It's

24   a highlighted portion.   I will represent any

25   highlights in the document were done by me.   And

Page 213

1     there are no other alterations to the document.

2                    The highlighted portion reads:  Over

3     a decade ago, the FDA Drug Bulletin informed the

4     medical community that once a drug product has been

5     approved for marketing, a physician may prescribe it

6     for uses or in treatment regimens of patient

7     populations that are not included in approved

8     labeling.

9                    The publication further stated

10    unapproved, or more precisely unlabeled uses may be

11    appropriate and rational in certain circumstances

12    and may, in fact, reflect approaches to the drug

13    therapy that have been extensively reported in

14    medical literature.  Valid new uses of drugs already

15    on the market are often first discovered through

16    serendipitous observations and therapeutic

17    innovations, subsequently confirmed by well-planned

18    and executed clinical investigations.

19                    Did I read that correctly?

20        A.    You did, indeed.

21        Q.    Your report doesn't acknowledge that the

22    long-standing position of the FDA has -- with

23    regards to off-label use of drugs?

24            MR. KNEPPER:  Objection, form.

25        A.    I would say that this paragraph that you

Page 214

1    read does not directly apply for the reason for my

2    consideration of this use of GnRH agonist in

3    pubertal adolescence for gender dysphoria is the

4    same.  And it's important to note in this paragraph,

5    it says the word "may."  It doesn't guarantee that

6    it is.  And it reflects the nature of the

7    application that one is providing.

8                        (Whereupon Exhibit 15 was

9                        introduced for identification.)

10        Q.   (By Mr. Gonzalez-Pagan)  Introducing what

11   has been marked as Exhibit 15.  Noted below, the

12   creator of the document is a printout of a web page

13   from the Food and Drug Administration's website.  It

14   is titled Understanding and Approved Use of Approved

15   Drugs Off-Label.

16                   Did I read the title of this web page

17   correctly?

18        A.   Yes, you did.

19        Q.   Okay.  Moving on to the second page,

20   there's a highlighted portion.  I will stipulate for

21   the record that any highlights in this document were

22   inserted by me and that there are no other

23   alterations to the document.

24                   The highlighted portion of the

25   document states:  From the FDA perspective, once the

Page 215

1    FDA approves a drug, healthcare providers generally

2    may prescribe the drug for an unapproved use when

3    they judge that it is medically appropriate for

4    their patient?

5                    Did I read that correctly?

6        A.    You indeed read it correctly.

7        Q.    Before opining as to whether the use of

8    off-label puberty blockers should be considered

9    unethical, did you review the positions of the FDA

10   with regards to off-label use?

11       A.    Again, I'm very, very familiar with that.

12   Maybe perhaps not these specific documents, but I --

13   this is entirely consistent with my understanding of

14   the off-label use of drugs.

15                    (Whereupon Exhibit 16 was

16                    introduced for identification.)

17       Q.    (By Mr. Gonzalez-Pagan)   Showing you what's

18   been marked as Exhibit 16.   I'll represent this is a

19   guidance for institutional review board for clinical

20   investigators published by the Food and Drug

21   Administration dated January 1998.   It is titled

22   Off-Label, an Investigational Use of Marketed Drugs,

23   Biologics and Medical Devices.

24                    Did I represent the document

25   correctly?

PLAINTIFFS003137

Page 216

1          A.   You correctly read the title of this
2      document.

3          Q.   There is a highlighted portion in the
4      first page of the exhibit.  I'll represent that all
5      the highlights were added by me to that exhibit.
6      And there are no other alterations to the document.

7                   The highlighted statement reads:  If
8      physicians use a product for an indication not in
9      the approved labeling, they have the responsibility
10     to be well-informed about the product, to base its
11     use on firm scientific rationale and on sound
12     medical evidence, and to maintain records of the
13     product's use and effects.  Use of the marketed
14     product in this manner when the intent is the
15     practice of medicine does not require the submission
16     of an Investigational New Drug Application,
17     Investigational Device Exception or review by an
18     Institutional Review Board.

19                   Did I read that correctly?

20         A.   You read that section correctly.

21         Q.   Do you acknowledge this guidance of the
22     FDA in your report?

23         A.   You mean the statement that I made about
24     the ethics of prescribing the medication and the
25     need does not require that, but it does not mean

Page 217

1     that it's not the approach that should be done.  So

2     that one -- for example, it's not malpractice and

3     one's not going to lose their license by prescribing

4     a medication off-label in this manner.

5                    However, when we look at the use of

6     this -- the GnRH agonist with a reference that I

7     made to the FDA off-label use involves product use

8     that is not the same as what it is used in the

9     treatment of prepubertal children and the risks

10    require -- and because of the risks of the

11    intervention and the lack of knowledge, it's very

12    different than many of the other times that I myself

13    have used off-labeled use of medications.

14                    So the statement itself is accurate.

15    It is consistent with my understanding of the FDA

16    guidelines for that.  And I think my statement in my

17    declaration fully reflects the reason why it is of

18    ethical concern in this case.

19                    (Whereupon Exhibit 17 was

20                    introduced for identification.)

21        Q.   (By Mr. Gonzalez-Pagan)  Showing you what's

22    been marked as Exhibit 17.  Are you familiar with

23    the American Academy of Pediatrics?

24        A.   I was a member of the American Academy of

25    Pediatrics for over 20 years.

Page 218

1      Q.   This is a policy statement by that

2   organization titled Off-Label Use of Drugs in

3   Children; is that right?

4      A.   That is the title of the statement, yes.

5      Q.   I'll represent that there are highlights

6   within this document.  Those highlights have been

7   added by me.  And there are no other alterations in

8   the document.

9              On the abstract in the highlighted

10  portion, it states:  However, off-label drug use

11  remains an important public health issue for

12  infants, children and adolescents, because an

13  overwhelming number of drugs still have no

14  information in the labeling for use in pediatrics.

15  The purpose of off-label use is to benefit the

16  individual patient.  Practitioners use their

17  professional judgment to determine these uses.  As

18  such, the term "off-label" does not imply an

19  improper, illegal, contraindicated or

20  investigational use.  Therapeutic decision-making

21  must always rely on best available evidence, the

22  importance of the benefit for the individual

23  patient.

24              Did I read that correctly?

25      A.   You read it correctly.  And I would

Page 219

 1    comment that the very last sentence is at the heart

 2    of my concern about how it's -- GnRH agonists are

 3    being used in the setting of gender dysphoria.

 4         Q.   So is your critique that the use of GnRH

 5    analogues [sic] for the treatment of gender

 6    dysphoria is unethical because it's not the best

 7    available evidence in your opinion?

 8         A.   There are many layers to the question.  I

 9    would say that many of the people that are

10    prescribing these drugs are not even aware of the

11    emerging evidence that is coming forward about lack

12    of efficacy and the risks of these medications.

13    They're relying on their decision based upon

14    statements made by many of the organizations that

15    you mentioned earlier that -- that are not

16    considering the relative risk-benefit analysis.  And

17    so a provider, unless they've had the opportunity

18    like myself and others who have been familiar with

19    the literature, are going to be misled with the

20    assumption that this is the available evidence,

21    supports its use.

22         Q.   Well --

23         A.   Many of the people that are prescribing

24    these medications have not read those papers, not

25    considered those papers, not considered the poor

Page 241

1          Q.   (By Mr. Gonzalez-Pagan)   Dr. Hruz, how did

2     you first come to be an expert in transgender

3     litigation?

4          A.   Well, I think it was a recognition of my

5     knowledge of the -- of the subject area and -- that

6     I had in a number of different settings including

7     the grand rounds talks that I said previously and

8     some of the things that I've been discussing for the

9     last -- since almost ten years now.

10         Q.   Do you know what the Alliance Defending

11    Freedom is?

12         A.   Yes.

13         Q.   Have you met with staff from the Alliance

14    Defending Freedom in order to discuss how to serve

15    as an expert in cases involving transgender issues?

16         A.   My involvement was mostly to tap into my

17    knowledge and expertise in this area, to inform that

18    organization of some of the relevant issues.  I've

19    never been coached on how to be an expert witness,

20    nor have I necessarily been encouraged in any way.

21    These requests have generally come from the

22    litigating lawyers, how they received my name or to

23    what extent and in what ways they became familiar

24    with my knowledge and expertise in this area is not

25    known to me.

Page 242

1               Just like the other groups that I've

2      spoken to, I've been more than willing to be -- to

3      share the knowledge that I've accumulated over this

4      last decade in this area.

5          Q.   Did you attend a meeting at the Alliance

6      Defending Freedom offices in Arizona in 2017?

7          A.   I don't recall the exact date, but I did

8      travel to Arizona to meet with other individuals

9      that also had unique areas of expertise in the area,

10     yes.

11         Q.   Just to clarify, was that one or two

12     meetings?

13         A.   I think I've had two separate meetings.

14     The first was much shorter.  And the second one was

15     much more of presentations with actual data.

16         Q.   What was discussed in that first meeting?

17         A.   Again, it was many years ago.  But my

18     recollection was just to understand what was going

19     on.  It was -- it was the same types of questions

20     about the care that is being proposed and offered.

21     But it was much less defined, I think, at that point

22     in time.  It was more of an informal type of

23     meeting.

24         Q.   Who was in attendance at that first

25     meeting?

Page 243

1           A.    I suspected you were going to ask me.

2     And, you know, honestly I don't remember the exact

3     composition of the people that were there.  If you

4     happen to know, I can acknowledge or deny whether

5     they were there or not.  But I've met literally

6     hundreds of people over the last ten years in

7     various settings.  I do know that at that first

8     meeting, Allan Josephson was there.  And I believe

9     that Mark Ramirez was there as well.

10          Q.    Was Jeff Shafer there?

11          A.    Yes.  He actually at that time was working

12    for ADF.

13          Q.    Was Gary McCaleb there?

14          A.    Yes.  And he was one of the first contacts

15    I had from that group.

16          Q.    When they invited you to this meeting,

17    what was the invitation, what did they tell you it

18    was going to be about?

19          A.    They had desired to convene a group of

20    people that had knowledge in this area and to be

21    able to discuss that, is my recollection at that

22    point in time.

23          Q.    Was Ryan Anderson there?

24          A.    He was at one of the meetings, the two

25    meetings, I'm not sure which -- which one.

Page 244

1          Q.    About how many people were in that first
2     meeting?
3          A.    Probably about eight to ten if you include
4     Jeff Shafer and Gary McCaleb.  You know, no more
5     than a dozen, probably less than that.
6          Q.    And the second meeting, you indicated that
7     it involved some presentations; is that right?
8          A.    That's correct.
9          Q.    Was it also in Arizona?
10         A.    Yes.
11         Q.    Who was present at the second meeting?
12         A.    Similar to the first meeting.  And, again,
13    I may get mixed up, the first and second meetings.
14    There were different people that were present.  I
15    know that Walt Heyer was at one of the meetings.
16    Oxy Horvath was at one of the meetings as well.
17    You'd have to give me the other names if there was
18    any.  I'm drawing a blank.  It was a while ago.
19         Q.    Was Mark Regnerus at the second meeting?
20              THE COURT REPORTER:  I'm sorry.  What was
21         that name?
22         A.    He was only at --
23              MR. GONZALEZ-PAGAN:  Mark Regnerus,
24         R-E-G-N-E-R-U-S.
25         A.    I believe he was at one of the meetings.

PLAINTIFFS003145

Page 245

1      I'm not sure which one.

2          Q.   (By Mr. Gonzalez-Pagan)  Was Patrick

3      Lappert at one of these meetings?

4          A.   He would have been likely at the second

5      meeting.

6          Q.   Was Paul McHugh at any of those meetings?

7          A.   No.

8          Q.   Was Michelle Cortella at any of these

9      meetings?

10         A.   I've encountered Michelle at a number of

11     different settings.  I'm trying to think back.  I

12     honestly -- I just can't remember.  She may have

13     been at one of them.

14         Q.   Was Quinton Van Meter at any of these

15     meetings?

16         A.   I have met with him.  I'm just trying to

17     think of what the circumstances and when he was

18     there.  Again, you know, I've met so many people

19     over many different years in many different venues.

20     It's challenging for me to remember who was in what

21     meeting.

22         Q.   Did the ADF lawyers discuss the need to

23     develop expert witnesses for litigation?

24         A.   Again since it was several years ago, I'm

25     trying to remember the exact content.  I think the

Page 246

1    main focus was -- was understanding what was going

2    on to be able to understand from multiple different

3    perspectives.  One of the most helpful outcomes for

4    myself was the opportunity to talk to the

5    transitioners.  These are adults that have had the

6    experience of going through the affirmation approach

7    only to discover eight to ten years after that, that

8    it did not solve their problems.

9                    It was similar to my efforts to

10   connect with parents and -- that were experiencing

11   this with their children as part of my understanding

12   of the unique circumstances facing these

13   individuals.  That's what I walked away with more

14   than anything else.  Whether there was discussions

15   about, you know, whether there were -- were

16   litigation going on is -- I just don't recall.

17        Q.   Were you aware that the Alliance Defending

18   Freedom is a religious organization?

19        A.   I think that's -- if you travel to their

20   headquarters, that's hard to miss.

21        Q.   Let's go back to your report, Exhibit 1.

22   On the third page, Paragraph 7.

23        A.   We're on my expert report.  Okay.

24        Q.   Page 3, Paragraph 7.

25        A.   Thank you.  I'm going to go to my clean

PLAINTIFFS003147

Page 247

1    copy that I have printed out.  Okay.

2         Q.   Okay.  It is mentioned that you also

3    spoken with parents of children experiencing gender

4    dysphoria and earlier you mentioned that you had

5    spoken with Eli Coleman; is that right?

6         A.   That is correct.

7         Q.   And Eli Coleman is one the authors of the

8    WPATH standards of the care; is that correct?

9         A.   He's one of the lead authors, correct.

10        Q.   In Paragraph 7 you state that you have met

11   individually and consulted with several pediatric

12   endocrinologists including Dr. Norman Spack, who had

13   developed and led transgender programs in the United

14   States; is that right?

15        A.   That is correct.

16        Q.   Who's Norman Spack?

17        A.   Norman Spack was from Harvard.  He was

18   actually probably the first person to introduce the

19   Dutch model of care to the United States.  In the

20   latter years of his career, he became a very

21   outspoken advocate for that approach.  In fact,

22   Dr. Spack was invited to Washington University very

23   early on when the question was being proposed to

24   start the gender center at Washington University.

25        Q.   And you discussed the treatment of gender

Page 248

1    dysphoria and transgender people with Dr. Spack?

2         A.    That's correct.

3                         (Whereupon Exhibit 19 was

4                         introduced for identification.)

5         Q.   (By Mr. Gonzalez-Pagan)  Showing you what's

6    been marked as Exhibit 19.

7         A.    So this is the declaration for Norm Spack

8    for the Drew Adams case, correct?

9         Q.    That's correct, yes.  Have you seen this

10   document before?

11        A.    I've heard of it.  I believe I saw that

12   during the -- my involvement in the Adams case.

13        Q.    He mentions that on or about October 19,

14   2014 -- sorry.  On Paragraph 8 of the declaration on

15   Page 2, he mentions that on or about October 9,

16   2014, he gave a presentation at St. Louis Children's

17   Hospital regarding the foundation of GeMS, the

18   workings of a gender management program at a

19   pediatric hospital, and in medical treatment and

20   care of gender and nonconforming and transgender

21   children and adolescents; is that right?

22        A.    Other than the word "gender" is

23   misspelled, yes.

24        Q.    It goes on to say on Paragraph 9 on the

25   next page that following the presentation, he met

Page 249

1    privately with medical staff including

2    endocrinologists at St. Louis Children's Hospital to

3    answer their questions and share his knowledge and

4    experience.

5              He then goes on to say that he also

6    in that context met privately with you at St. Louis

7    Children's Hospital when you approached him after

8    the presentation.

9              Do you recall that?

10   A.   I recall the meeting both with the

11   faculty -- I don't specifically remember the private

12   meeting afterwards.  I do remember we had kind of a

13   round table.  We actually sat around a circle with

14   other colleagues of mine and addressed questions.

15   But I -- it certainly would be in agreement with

16   where I was at that point in time in an

17   understanding for the proposal for care involving

18   affirmation.

19   Q.   He goes on say that during his meeting

20   with you, you directly expressed that you had,

21   quote, a significant problem with the entire issue,

22   closed quote, and, quote, whole idea of transgender,

23   closed quote.  He then states that you followed up

24   these comments by stating, quote, for me it is a

25   matter of my faith, closed quote.

Page 250

1            Do you recall making these statements

2     to Dr. Spack?

3          A.   I do not.

4          Q.   Do you deny making these statements to

5     Dr. Spack?

6          A.   I do not recall making those statements.

7     And it really seems to be -- I'm not sure of the

8     context of the conversation, where that came from.

9     This was a time shortly after our institution was

10    considering the adoption of the affirmative care

11    model for starting their gender center.  And very

12    clearly at that point in time, I was very early in

13    investigating the literature and I remember talking

14    with my colleagues at that very same time about the

15    questions that I had about the science, about some

16    of the statements that were being made.

17            One of the questions that came up

18    related to some of the assertions about more in the

19    area of anthropology as far as a human being and

20    whether it was possible for one to change one's sex.

21    I recall that at that point in time, you know, the

22    people were just starting to make the comments like

23    in one of the other cases where Dr. Atkins would

24    make the statements gender is sex.  And I certainly

25    challenged those assertions at that time.

Page 251

1                 So this is a period of discovery for
2      me.  And for me to make a definitive statement like
3      that is not really even logical from where I was at
4      that point in time.
5           Q.   Are you familiar with the St. John Paul,
6      II, Bioethics Center?
7           A.   Yes.
8           Q.   Is St. John Paul, II, Bioethics Center a
9      religiously affiliated institution?
10          A.   I believe it is, yes.
11          Q.   Did you speak at the St. John Paul, II,
12     Bioethics Center in November of 2017?
13          A.   I'm not sure of the exact date.  But I did
14     deliver a talk to that group.
15          Q.   During that talk, did you not state about
16     being transgender that, quote, in fact, probably
17     goes back to some of the early heresies in the
18     church, closed quote?
19               MR. KNEPPER:  Objection, form, scope.
20          A.   You know, I'd have to see the context of
21     when that statement was made and how it was being
22     portrayed to that audience, whether it was in
23     response to a question with context that is not
24     included in your question.
25                    Again, as you mentioned, this was a