

Deposition of:
## Patrick Lappert, M.D.

*September 30, 2021*

In the Matter of:

## Kadel, et al vs. Folwell

Veritext Legal Solutions
800-734-5292 | calendar-dmv@veritext.com |

Pl. Trial Ex. 095

PLAINTIFFS001582

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3

4

5

6

7      CIVIL ACTION NO.:  1:19-cv-272-LCB-LPA

8

9      MAXWELL KADEL, et al.

10              Plaintiffs

11

12      v.

13

14      DALE FOLWELL, et al.

15              Defendants

16

17

18        REMOTE VIDEOTAPED VIDEOCONFERENCE

19              DEPOSITION TESTIMONY OF:

20              PATRICK LAPPERT, M.D.

21              September 30, 2021

22

23

PLAINTIFFS001583

Page 2

1                A P P E A R A N C E S

2

3        FOR THE PLAINTIFFS (via remote

4        videoconference):

5

6        Dmitriy Tishyevich, Esq.

7        MCDERMOTT, WILL & EMERY

8        One Vanderbilt Avenue

9        New York, New York  10017

10       dtishyevich@mwe.com

11

12       Tara L. Borelli, Esq.

13       LAMBDA LEGAL DEFENSE AND EDUCATION FUND

14       158 West Ponce de Leon Avenue, Suite 105

15       Decatur, Georgia  30030

16       tborelli@lambdalegal.com

17

18       Omar Gonzalez-Pagan, Esq.

19       LAMBDA LEGAL DEFENSE AND EDUCATION FUND

20       120 Wall Street, 19th Floor

21       New York, New York  1005

22       ogonzalez-pagan@lambdalegal.com

23

PLAINTIFFS001584

Page 3

1      FOR THE DEFENDANTS (via remote

2      videoconference):

3

4      John G. Knepper, Esq.

5      LAW OFFICE OF JOHN G. KNEPPER LLC

6      1720 Carey Avenue, Suite 590

7      Cheyenne, Wyoming  82001

8      john@knepperllc.com

9

10     Kevin G. Williams, Esq.

11     BELL, DAVIS & PITT

12     100 North Cherry Street, Suite 600

13     Winston-Salem, North Carolina  27101

14     kwilliams@belldavispitt.com

15

16

17     ALSO PRESENT (via remote

18     videoconference):

19

20     Andrew Baker, Videographer

21

22

23

PLAINTIFFS001585

Page 4

1                    I N D E X

2

3     EXAMINATION BY:                    PAGE

4     Mr. Tishyevich                      11

5     Mr. Knepper                        472

6     REEXAMINATION BY:

7     Mr. Tishyevich                     489

8

9

10                  E X H I B I T S

11

12    FOR THE PLAINTIFFS:               MARKED

13    Exhibit 1   Lappert Expert Report      12

14    Exhibit 2   ABPlasticSurgery.org       27

15    Exhibit 3   Brandt - Lappert Declaration   34

16    Exhibit 4   Brandt - Supplemental Order,   37

17                08/02/2021

18    Exhibit 5   Utah Legislature - Answers    55

19                for Joint Interim Committee

20    Exhibit 6   "Alabama bill that would     62

21                criminalize treatment for

22                transgender minors headed to

23                full Alabama Senate,"

PLAINTIFFS001586

Page 5

1              rocketcitynow.com

2       Exhibit 7   ASPS - "State Focus on      108

3                   Gender Affirmation

4                   Intensifies"

5       Exhibit 8   ASPS - 2021 State Policy     116

6                   Priorities

7       Exhibit 9   Lappert Resumé               127

8       Exhibit 10  Code of Ethics of the        171

9                   American Society of Plastic

10                  Surgeons

11      Exhibit 11  Federal Register, Vol, 59,   223

12                  No. 22 - November 18, 1994

13      Exhibit 12  FDA, Understanding           230

14                  Unapproved Use of Approved

15                  Drugs "Off Label"

16      Exhibit 13  FDA, "Off-Label" and         232

17                  Investigational Use of

18                  Marketed Drugs, Biologics,

19                  and Medical Devices

20      Exhibit 14  American Academy of          239

21                  Pediatrics Policy Statement,

22                  Off-Label Use of Drugs in

23                  Children

PLAINTIFFS001587

Page 6

| 1 | Exhibit 15 | Yackey, Off-label Medication | 256 |
| 2 | | Prescribing Patterns in | |
| 3 | | Pediatrics: An Update | |
| 4 | Exhibit 16 | FDA Botox Cosmetic | 263 |
| 5 | | 2017-10-02 Approval Letter | |
| 6 | Exhibit 17 | Sugrue 2019, Levels of | 299 |
| 7 | | Evidence in Plastic and | |
| 8 | | Reconstructive Surgery | |
| 9 | | Research: Have We Improved | |
| 10 | | Over the Past 10 Years? | |
| 11 | Exhbiit 18 | Reversal Surgery in | 326 |
| 12 | | Regretful Male-to-Female | |
| 13 | | Transsexuals After Sex | |
| 14 | | Reassignment Surgery | |
| 15 | | (Djordjevic) | |
| 16 | Exhibit 19 | (Exhibit number not used) | --- |
| 17 | Exhibit 20 | Wiepjes 2018, The Amsterdam | 339 |
| 18 | | Cohort of Gender Dysphoria | |
| 19 | | Study (1972-2015) | |
| 20 | Exhibit 21 | Wilson 2017, Regret In | 355 |
| 21 | | Surgical Decision Making: A | |
| 22 | | Systematic Review of Patient | |
| 23 | | and Physician Perspectives | |

PLAINTIFFS001588

Page 7

1        Exhibit 22  Exposito-Campos, A Typology   361

2                    of Gender Detransition and

3                    Its Implications for

4                    Healthcare Providers

5        Exhibit 23  BCBS NC - Corporate Medical   375

6                    Policy, update July 2021

7        Exhibit 24  Dhejne, Long-Term Follow-Up   388

8                    of Transsexual Persons

9                    Undergoing Sex Reassignment

10                   Surgery: Cohort Study in

11                   Sweden

12       Exhibit 25  Finnish Guidelines 2020       394

13                    Minors, Unofficial

14                   Translation

15       Exhibit 26  WPATH Standards of Care,       396

16                   Version 7

17       Exhibit 27  Carmichael, Short-term        411

18                   outcomes of pubertal

19                   suppression in a selected

20                   cohort of 12 to 15 year old

21                   young people with persistent

22                   gender dysphoria in the UK

23       Exhibit 28  2020 Cochrane Database of     414

PLAINTIFFS001589

Page 8

1            Systematic Reviews

2      Exhibit 29   Tradition 70/30 PPO Plan        419

3                   Benefits Booklet, 2017

4      Exhibit 30   Aetna, Gender Affirming          427

5                   Surgery Policy

6      Exhibit 31   Cigna Medical Coverage           430

7                   Policy, Treatment of Gender

8                   Dysphoria

9      Exhibit 32   United Healthcare Medical        434

10                  Policy, Gender Dysphoria

11                  Treatment

12     Exhibit 33   Lappert Denver Conference        451

13                  Presentation

14     Exhibit 34   Plastic surgeon: Sex-change      463

15                  operation 'utterly

16                  unacceptable' and a form of

17                  'child abuse',

18                  LifeSiteNews.com

19

20          (Exhibits attached to transcript.)

21

22

23

PLAINTIFFS001590

Page 9

```
 1                I, Lane C. Butler, a Court

 2        Reporter and Notary Public, State of

 3        Alabama at Large, acting as Notary,

 4        certify that on this date, pursuant to

 5        the Federal Rules of Civil Procedure,

 6        there came before me via remote

 7        videoconference from Decatur, Alabama,

 8        commencing at approximately 8:30 a.m.

 9        Central, on the 30th day of September,

10        2021, PATRICK LAPPER, M.D., witness in

11        the above cause, for oral examination,

12        whereupon the following proceedings were

13        had:

14

15             THE VIDEOGRAPHER:  Good morning.

16        We are going on the record at 8:31 a.m.,

17        Thursday, September 30th, 2021.  This is

18        Media Unit 1 of the videorecorded

19        deposition of Dr. Patrick Lappert as

20        taken by counsel for plaintiff in the

21        matter of Kadel, et al. v. Folwell, et

22        al., filed in the United States District

23        Court for the Middle District of North
```

Page 10

1    Carolina, Civil Action No.

2    1:19-cv-272-LCB-LPA.

3         This deposition is being

4    recorded remote via Zoom located in

5    Decatur, Alabama.  My name is Andrew

6    Baker from the firm Veritext Legal

7    Solutions.  I am the videographer.  The

8    court reporter is Lane Butler, also from

9    Veritext Legal Solutions.

10        Will counsel now state their

11   appearance and affiliations for the

12   record.  The court reporter will swear in

13   the witness.  Thank you.  We may proceed.

14        MR. TISHYEVICH:  This is Dmitriy

15   Tishyevich from McDermott, Will & Emery,

16   LLP, for plaintiffs.

17        MR. KNEPPER:  My name is John

18   Knepper.  I represent three of the

19   defendants in this matter: the North

20   Carolina State Health Plan for Teachers

21   and State Employees; Dale Folwell, the

22   treasurer for the State of North

23   Carolina; and Dee Jones, the executive

PLAINTIFFS001592

1    administrator of the North Carolina State

2    Health Plan.  I'll be defending Dr.

3    Lappert's deposition.

4

5              PATRICK LAPPERT, M.D.,

6         having first been duly sworn,

7      was examined and testified as follows:

8

9    EXAMINATION BY MR. TISHYEVICH:

10       Q.   Good morning, Doctor.

11       A.   Good morning, sir.

12       Q.   State your full name for the

13   record.

14       A.   Patrick Walter Lappert.

15       Q.   Any reason you're not able to

16   give complete and truthful testimony

17   today?

18       A.   There is no reason.

19       Q.   You've been retained as an

20   expert by defendants in this case;

21   correct?

22       A.   I have.

23       Q.   You've prepared an expert

PLAINTIFFS001593

Page 12

1      report; right?

2          A.   I have.

3          Q.   So, I've premarked Exhibit 1.

4      Open that, and let me know when you have

5      it.

6      (Exhibit 1 was marked for identification

7      and is attached.)

8          A.   Okay.  I have it.

9          Q.   This report contains all the

10     opinions that you intend to offer in this

11     case; correct?

12         A.   It does.

13         Q.   All right.  Without telling me

14     any conversations that you had with

15     counsel, what did you do to prepare for

16     your deposition today?

17         A.   Well, I reviewed the -- the

18     documents.  I guess it's called the

19     complaint.  I reviewed the patient

20     records.  And then, I reviewed the

21     literature, pertinent journal articles,

22     publications, and had conversations with

23     -- with counsel, Mr. Kadel [sic], and his

PLAINTIFFS001594

Page 13

1        staff at various times.

2            Q.    When you say "patient records,"

3        are you talking about the medical records

4        for the individual plaintiffs?

5            A.    Yes.  The ones that were -- that

6        were given to me to review.

7            Q.    And when you say "the

8        literature," are you referring to some of

9        the studies that you cite in your report?

10           A.    Yes.

11           Q.    Have you reviewed any studies --

12       strike that.

13               In preparing for your deposition

14       today, have you reviewed additional

15       studies that are not cited in your

16       report?

17           A.    No.  The report contains all of

18       the studies that I -- that I reviewed

19       that I consider pertinent.  I glossed

20       some but didn't see them as germane.  So

21       all the ones that were -- that were

22       germane to my opinion are -- are in the

23       -- in the document.

PLAINTIFFS001595

```
 1        Q.   Understood.  And you mentioned
 2     that you met with or spoke with Mr.
 3     Knepper in preparing for today?
 4        A.   I have.
 5        Q.   Okay.  Again, without disclosing
 6     any substance of the conversation, how
 7     many times did you speak or meet with
 8     him?
 9        A.   Three or four times, I think.
10        Q.   And when did those conversations
11     take place?
12        A.   Well, as recently as yesterday
13     evening and I think a couple of meetings
14     back in May, I think it was.  I'd have to
15     look at my calendar, but.
16        Q.   Last evening, you spoke --
17     strike that.
18             You know that Dr. Hruz was
19     deposed yesterday; right?
20        A.   I'd heard, yes.
21        Q.   And so before yesterday, when
22     was the last time that you spoke with Mr.
23     Knepper to prepare for your deposition?
```

PLAINTIFFS001596

Page 15

```
 1        A.    I want to say it's a couple of
 2    weeks ago.  I'm not exactly sure.
 3        Q.    How long was the conversation
 4    with Mr. Knepper last night?
 5        A.    A little less than an hour.
 6        Q.    Did he provide you with copies
 7    of any of the exhibits that were used at
 8    Dr. Hruz's deposition?
 9        A.    No, he did not.
10        Q.    Did he provide you with any --
11    any portions of that deposition
12    transcript?
13        A.    No.
14        Q.    And then going in reverse
15    chronological order, you mentioned you
16    may have spoken a couple of weeks ago?
17        A.    I think.  I don't know exactly
18    -- I don't know exactly when that was,
19    Mr. Tishyevich.  I want to say three
20    weeks ago perhaps.  I'm not exactly sure.
21        Q.    Do you recall roughly how long
22    that conversation was?
23        A.    About the same duration.  I
```

PLAINTIFFS001597

Page 16

1    think it was perhaps an hour, perhaps an

2    hour.

3        Q.   Okay.  All right.  You -- in the

4    course of -- strike that.

5            In the course of working on this

6    case, have you ever communicated with Dr.

7    Hruz?

8        A.   Not directly.  I've spoken with

9    Dr. Hruz, but in the matter at hand, I

10   have not spoken with him about it.

11           MR. TISHYEVICH:  For the court

12   reporter, that's H-R-U-Z.  And I'll try

13   and spell things as we go to make it a

14   little easier.

15       Q.   How about Dr. McHugh?

16   M-C-H-U-G-H.  Have you spoken with him in

17   the course of working on this case?

18       A.   I've never spoken directly to

19   him, no.

20       Q.   How about Dr. Levine?

21   L-E-V-I-N-E.

22       A.   I have not spoken with Dr.

23   Levine.

PLAINTIFFS001598

1    Q.   But you have met Dr. Hruz before

2    working on this case; right?

3    A.   Yes.

4    Q.   And is the same true for Dr.

5    Levine?

6    A.   I've never met Dr. Levine.

7    Q.   All right.  About how many hours

8    do you estimate you've spent working on

9    your expert report?

10    A.   Somewhere around maybe 60 hours.

11    I could -- I could look for that number,

12    but I'm going to estimate it at about 60

13    hours, something like that.

14    Q.   You're aware that the individual

15    plaintiffs in this case have been

16    deposed; right?

17    A.   Yes, I've heard.

18    Q.   Were you provided with

19    deposition transcripts or any portion of

20    their testimony?

21    A.   I have -- I have not seen those,

22    no.

23    Q.   Okay.  You're aware that other

PLAINTIFFS001599

Page 18

```
 1     experts in this case have also already
 2     been deposed?
 3        A.   Yes.
 4        Q.   Have you been provided with
 5     deposition transcripts or any portion of
 6     their deposition testimony?
 7        A.   I -- I saw a transcript of Dr.
 8     McHugh's.
 9        Q.   Was that the only tran- --
10     strike that.
11             Was Dr. McHugh's transcript the
12     only expert deposition transcript you've
13     seen?
14        A.   It's the only one I've read.  I
15     -- I think that -- yeah, I think it's the
16     only one I read.  Yes, sir.
17        Q.   Okay.  All right.  So throughout
18     your report, you use this term --
19        A.   Could I amend that last answer?
20        Q.   Of course.
21        A.   I -- I did read portions of Dr.
22     Brown's transcript, actually, some days
23     back.  My -- my apologies.
```

PLAINTIFFS001600

Page 19

1        Q.    No.   And I should say that.   If
2    at any point in time in your deposition
3    you want to go back and amend your
4    answer, that is totally fine.
5        A.    Thank you.
6        Q.    Okay.  So in your report, you
7    use this term "transgender treatment
8    industry."   Right?
9        A.    Yes.
10       Q.    And you and Dr. Levine and Dr.
11   McHugh all use this term in your reports.
12   Were you aware of that?
13       A.    Oh, I was aware that the -- no,
14   I wasn't aware that they were using it,
15   actually.
16       Q.    Is it coincidental that the
17   three of you are using this term?
18       A.    I -- I think it's sort of
19   becoming a common term lately.  I don't
20   know where it came from.  I was trying to
21   think about that.  I don't know who
22   originated it, but I've -- I don't know
23   even if it was me that originated it,

PLAINTIFFS001601

Page 20

1        actually, since I've been speaking about

2        this subject for some time now.  But it

3        seemed like an apt term, so it doesn't

4        surprise me that others are using it.

5            Q.   You don't know who came up with

6        that term?

7            A.   I don't.

8            Q.   It's possible that it was you?

9            A.   It wouldn't surprise me.

10           Q.   And you mentioned that it's

11       becoming more commonly used.  Is that

12       right?

13           A.   It seems to be.  I don't know.

14       I don't know how common it is, but it's

15       kind of a small circle of people talking

16       about these things.

17           Q.   Are you aware of a single

18       peer-reviewed scientific article that has

19       used the term "transgender treatment

20       industry"?

21           A.   I am not.

22           Q.   Do you know what PubMed is?

23       P-U-B-M-E-D.

PLAINTIFFS001602

Page 21

1        A.    Yes.

2        Q.    It's a search engine maintained

3     by the National Institute of Health;

4     right?

5        A.    Yes.   That's my understanding.

6        Q.    It's a search engine for

7     scientific articles, basically; right?

8        A.    Yes.

9        Q.    So I'll represent to you that I

10    ran a search in PubMed for the phrase

11    transgender treatment industry, in

12    quotation marks, and came back with zero

13    results for that phrase.

14            MR. KNEPPER:  Objection to form.

15       Q.    Do you find that surprising?

16       A.    No.

17       Q.    Okay.  What does that lack of

18    results tell you about whether this term

19    is a commonly used term in this field?

20            MR. KNEPPER:  Objection to form.

21       A.    I wouldn't expect it to be a

22    commonly used term, and it doesn't

23    surprise me that you didn't find it.

PLAINTIFFS001603

1          Q.     Yeah.   "Transgender treatment

2     industry" is not a commonly used term in

3     the field of treatment and diagnosis of

4     gender dysphoria; right?

5               MR.  KNEPPER:   Objection to form.

6          A.    I would agree.

7          Q.    Yeah.   It's a term that, as far

8     as I can tell, is fairly idiosyncratic to

9     the opinions that you and the other

10    defendant experts are using in this case.

11    Does that sound right?

12              MR.  KNEPPER:   Objection to form.

13         A.    That sounds right to me, yeah.

14         Q.    Okay.   Lock at page 1 of your

15    expert report, Exhibit 1.

16         A.    All right.

17         Q.    I see it says, "Declaration of

18    Patrick Lappert, MD."   You see that?

19         A.    Yes.

20         Q.    Under that, it says, "Board

21    Certified in Surgery and Plastic

22    Surgery."   Do you see that?

23         A.    I do.

PLAINTIFFS001604

Page 23

1       Q.   Let's talk about your

2    certifications.  Let's start with plastic

3    surgery.  You originally received your

4    board certification in plastic surgery in

5    1997; correct?

6       A.   That's correct.

7       Q.   Then you got recertified in

8    2008; correct?

9       A.   That's correct.

10      Q.   That board certificate was only

11   valid for ten years; correct?

12      A.   Correct.

13      Q.   And your plastic board -- strike

14   that.

15           And your plastic surgery board

16   certificate expired at the end of 2018;

17   correct?

18      A.   Correct.

19      Q.   Well, why did you decide not to

20   renew your board certificate past 2018?

21      A.   Well, I'm a -- I'm a solo

22   practitioner, and the main reason for

23   maintaining that expensive certificate

PLAINTIFFS001605

Page 24

```
 1      was that many hospitals required it in
 2      order to have privileges.  Several years
 3      ago, a lot of hospitals started dropping
 4      that requirement, so it didn't make sense
 5      for a surgeon who is within three years
 6      of retirement to expend all that money
 7      and time to maintain a certification that
 8      was no longer necessary for me in terms
 9      of maintaining my practice.
10          Q.   Do you currently have admitting
11      privileges at any hospital?
12          A.   No.
13          Q.   When was the last time you had
14      admitting privileges in any hospital?
15          A.   A year ago.
16          Q.   What hospital was that?
17          A.   Crestwood Hospital, Huntsville,
18      Alabama.
19          Q.   So within the last year at
20      least, I take it you haven't performed
21      any surgeries at a hospital.  Right?
22          A.   That's correct.  A -- a year
23      ago, I retired from active surgical
```

PLAINTIFFS001606

Page 25

1    practice.

2        Q.    Were you doing surgeries in 2019

3    after your plastic -- plastic surgery

4    board certificate expired?

5        A.    Yes.

6        Q.    When -- just can we pin this

7    down more?  What -- what month do you

8    think you stopped performing surgeries?

9        A.    Let's see.  This is November of

10   2021, so it would have been August of

11   2020.

12       Q.    All right.  You are not

13   currently board-certified in plastic

14   surgery; correct?

15       A.    Correct.

16       Q.    And you have not been

17   board-certified in plastic surgery since

18   2018; correct?

19       A.    Correct.

20       Q.    For over two and a half years at

21   this point; right?

22       A.    Correct.

23       Q.    So this page 1 of your report

PLAINTIFFS001607

1    says that you're board-certified in

2    plastic surgery.  Do you think it's

3    appropriate for you to make that

4    representation even though you don't have

5    an active certification?

6           MR. KNEPPER:  Objection, form.

7       A.   Well, appropriate in terms of --

8    I don't understand the question.

9       Q.   Let me be more specific.

10      A.   Okay.

11      Q.   Do you know what the Amer- --

12   I'll go back.

13           You know what the American Board

14   of Plastic Surgery is; right?

15      A.   Certainly.

16      Q.   Do you know what the American

17   Board of Plastic Surgery has to say about

18   doctors who represent that they're

19   board-certified when they don't have an

20   active certification?

21           MR. KNEPPER:  Objection, form.

22      A.   They discourage it.  I -- I

23   suspect that the -- the document -- well,

PLAINTIFFS001608

Page 27

```
 1       I didn't prepare that -- that particular
 2       part of the document, although I signed
 3       it, certainly.  But I see your point,
 4       yes.
 5          Q.   Okay.  I'm going to introduce
 6       another exhibit.  You'll see it in a
 7       minute.  Let me know when you have it,
 8       Doctor.
 9       (Exhibit 2 was marked for identification
10       and is attached.)
11          A.   I have it.
12          Q.   This is a printout from the -- a
13       web page from the American Board of
14       Plastic Surgery.  Go to page 2.
15          A.   All right.  I'm there.
16          Q.   Middle of the page, it says in
17       bold letters, "Guidelines for Stating
18       Certification Status."  Do you see that?
19          A.   I do.
20          Q.   Look at the third paragraph.
21          A.   All right.
22          Q.   It says, "ABPS does not mandate
23       the specifics of how diplomates state
```

PLAINTIFFS001609

Page 28

```
 1       their certification, except to assert

 2       that diplomates should not state or imply

 3       that they are certified if their

 4       certification has expired."

 5               Do you see that?

 6       A.    I do.

 7       Q.    All right.  You understand that

 8       under this guidance from the ABPS, you

 9       are not supposed to be representing that

10       you are board-certified in plastic

11       surgery because you do not have a current

12       certification; correct?

13               MR. KNEPPER:  Objection, form.

14       A.    Yes, I understand it.

15       Q.    Let's look at what else it says.

16       Towards the bottom of page 2, it says,

17       "We ask that you follow these guidelines

18       throughout your career to accurately

19       state your ABPS certification."  Do you

20       see that?

21       A.    I do.

22       Q.    The first bullet says,

23       "Diplomates of ABPS must accurately state
```

PLAINTIFFS001610

Page 29

1     their certification status at all times."

2     Do you see that?

3          A.   I do.

4          Q.   And you understand what this

5     means; right?

6          A.   I do.

7               MR. KNEPPER:  Objection, form.

8          Q.   Page 3, next bullet says,

9     "Diplomates with expired time-limited

10    certification or those whose

11    certification is revoked may not claim

12    Board certification by ABPS and must

13    revise all descriptions of their

14    qualifications accordingly."  Right?

15               MR. KNEPPER:  Objection to form.

16          A.   Yes.  Yes, I see that.

17          Q.   And you understand what that

18    means; right?

19               MR. KNEPPER:  Objection to form.

20          A.   I do.

21          Q.   Your expert report is not in

22    compliance with this guidance from the

23    ABPS; correct?

PLAINTIFFS001611

Page 30

```
 1              MR. KNEPPER:  Objection, form.
 2         A.    The -- the one line there under
 3    my name is not in compliance.  That's
 4    correct.
 5         Q.   And the same is true of your CV;
 6    right?
 7         A.    Well, the CV states that I have
 8    been board-certified by the American
 9    Board of Surgery and have been
10    board-certified by the ABPS in 1997 and
11    2008, yes.  Have been.
12         Q.   And look back at this page 3
13    from the ABPS.  It says, "When a
14    physician misrepresents certification
15    status, ABPS may notify local
16    credentialing bodies, licensing bodies,
17    law enforcement agencies and others."  Do
18    you see that?
19         A.   I do.
20         Q.   All right.  And you understand
21    what this means; right?
22              MR. KNEPPER:  Objection to form.
23         A.   Yes.
```

PLAINTIFFS001612

Page 31

1          Q.    Okay.   Are you going to update

2      your expert report so that it comports

3      with this guidance from the ABPS?

4                MR. KNEPPER:   Objection to form.

5          A.    Certainly.

6          Q.    Okay.  So that's plastic

7      surgery.  Let's talk about your board

8      certification in surgery next.  So, go

9      back to your expert report, page 1.

10         A.    Okay.

11         Q.    You received your board

12     certification in surgery in 1992;

13     correct?

14         A.    Was it '92 or '91?  '92, yes,

15     sir.

16         Q.    And that certification expired

17     in 2002; right?

18         A.    Yes.

19         Q.    And you had not renewed that

20     after 2002; right?

21         A.    Correct.

22         Q.    You're not currently

23     board-certified in surgery; correct?

PLAINTIFFS001613

Page 32

```
 1        A.    Correct.

 2        Q.    You have not been

 3     board-certified in surgery since 2002;

 4     correct?

 5        A.    Since 2002, yes, sir.

 6        Q.    That's over nineteen years;

 7     right?

 8              So, I showed you this guidance

 9     from the American Board of Plastic

10     Surgery.  How about the American Board of

11     Surgery?  What do you think they have to

12     say about doctors who make these kind of

13     representations?

14              MR. KNEPPER:  Objection, form.

15        A.    I'm sure it's probably the same.

16        Q.    Yeah.  Would it surprise you

17     that the American Board of Surgery does

18     not allow doctors to represent that they

19     are board-certified in surgery unless

20     they have a current board certificate?

21              MR. KNEPPER:  Objection, form.

22        A.    It would not surprise me, no.

23        Q.    All right.  You are currently
```

PLAINTIFFS001614

Page 33

1      serving as an expert in another case,

2      Brandt v. Rutledge.   B-R-A-N-D-T.

3      Correct?

4          A.   Yes.

5          Q.   That's a case pending in federal

6      court in Arkansas; right?

7          A.   Correct.

8          Q.   In that case, you were retained

9      by the defendants, by the State of

10     Arkansas; right?

11         A.   Yes.

12         Q.   Dr. Hruz, who is one of the

13     defendants -- strike that.  Dr. Hruz, who

14     is one of the experts in this case, is

15     also serving as an expert for defendants

16     in that Brandt case; right?

17         A.   That's my understanding, yes.

18         Q.   And the same is true for Dr.

19     Levine; right?

20         A.   I didn't know about Dr. Levine,

21     but.

22         Q.   And you submitted an expert

23     declaration in that Brandt case in July

PLAINTIFFS001615

Page 34

1      of this year; correct?

2          A.    I believe that was when I

3      submitted it, yes.

4          Q.    All right.  Let's look at it.

5      And let me know when you get the exhibit,

6      Doctor.

7      (Exhibit 3 was marked for identification

8      and is attached.)

9          A.    Here it is.  Let's see.  All

10     right.

11         Q.    All right.  Page 1 says,

12     "Declaration of Dr. Patrick Lappert."

13     That's you; right?

14         A.    Yes.

15         Q.    Fair to say that there is at

16     least some overlap between the opinions

17     that you're offering in this case and the

18     opinions that you're offering in that

19     Brandt case; right?

20             MR. KNEPPER:  Form.

21         A.    Well, given that the subject

22     matter is the same, I would expect some

23     overlap, yes, sir.

PLAINTIFFS001616

Page 35

1      Q.   Go to page 5 of that
2    declaration.
3      A.   All right.  I'm there.
4      Q.   You say under Section II,
5    "'Gender affirming' treatments are
6    experimental."  Right?
7      A.   Yes.
8      Q.   It's basically the same opinion
9    that you offered in this case; right?
10     A.   Yes, sir.
11     Q.   Go to page 29 of your
12   declaration.  See there's a paragraph 63?
13     A.   Yes, sir.
14     Q.   And toward the end of that
15   paragraph, you talk about the national
16   reviews in England, Sweden, and Finland
17   and other reviews like Cochrane, Griffin,
18   and Carmichael.  You see that?
19     A.   Yes, sir.
20     Q.   You relied -- you relied on all
21   those studies for your opinions in this
22   case as well; right?
23     A.   I did.

PLAINTIFFS001617

Page 36

```
 1        Q.   Okay.  Go to page 38 of your
 2      declaration.  Do you see that it's the
 3      section titled "Concluding Opinions" and
 4      it goes through the next --
 5        A.   Yes, sir.
 6        Q.   -- few pages?
 7             We don't need to go through
 8      these individually, but you agree there's
 9      a lot of overlap between the opinions
10      you're offering in that Brandt case and
11      the opinions you're offering in this
12      case; right?
13             MR. KNEPPER:  Objection to form.
14        A.   Yes.
15        Q.   The Brandt case involves a
16      challenge to an Arkansas law which bans
17      doctors from providing various types of
18      gender-affirming treatments to
19      adolescents; correct?
20        A.   Yes.
21        Q.   Including puberty blockers and
22      cross-sex hormones and gender-affirming
23      surgery; correct?
```

PLAINTIFFS001618

Page 37

1          A.    Yes.

2                MR. KNEPPER:   Objection.

3          Q.    Have you kept up with what's

4     going on in that case in Arkansas?

5                MR. KNEPPER:   Objection, form.

6          A.    I haven't heard anything perhaps

7     in the last several weeks.

8          Q.    Well, are you aware that in July

9     of this year, the judge in that case held

10    that the State is prohibited from

11    enforcing the ban while the case is being

12    decided?

13         A.    I've heard that.

14         Q.    All right.  And as part of that

15    order, the judge made some factual

16    findings.  Are you aware of that?

17         A.    I'm not -- haven't read the

18    details.

19         Q.    All right.  Let me show you.

20         A.    Okay.

21         Q.    Let me introduce one more

22    exhibit.

23         (Exhibit 4 was marked for identification

PLAINTIFFS001619

Page 38

1      and is attached.)

2           A.   I have it now.

3           Q.   Okay.  So, this is a

4      supplemental order from Judge Moody in

5      Arkansas dated August 2nd, 2021.  Do you

6      see that?

7           A.   I see that, yes.

8           Q.   This first paragraph says,

9      "After further consideration, the Court

10     supplements the ruling made at the

11     conclusion of the July 21, 2021 hearing

12     to include the following findings."  Do

13     you see that?

14          A.   I do.

15          Q.   By the way, did you testify live

16     at that July 2021 hearing?

17          A.   No.

18          Q.   Do you know if any of the other

19     experts testified live at that hearing?

20          A.   I don't know.

21          Q.   Go to page 7.

22          A.   All right.

23          Q.   All right.  Look at the last

PLAINTIFFS001620

Page 39

1    paragraph.

2        A.    Okay.

3        Q.    The second sentence in that last

4    paragraph says, "Gender-affirming

5    treatment is supported by medical

6    evidence that has been subject to

7    rigorous study."  Right?  Do you see

8    that?

9        A.    That's what it says, yes, sir.

10        Q.    And that finding by the Court in

11    Arkansas is contrary to the opinions that

12    you offered in that case; right?

13        A.    Apparently so, yes.

14        Q.    And it's also contrary to the

15    opinions that Dr. Hruz and Dr. Levine

16    offered in that case; right?

17        A.    Yes.

18            MR. KNEPPER:  Objection to form.

19        A.    It appears to be, yes.

20        Q.    And it's also contrary to the

21    opinions that you and Dr. Hruz and Dr.

22    Levine are offering in this case; right?

23        A.    Yes.

PLAINTIFFS001621

Page 40

1        Q.   Look at the next sentence.  It

2     says, "Every major expert medical

3     association recognizes that

4     gender-affirming care for transgender

5     minors may be medically appropriate and

6     necessary to improve the physical and

7     mental health of transgender people."

8            That's what it says; right?

9        A.   That's what it says, yes, sir.

10       Q.   That's also contrary to the

11    opinions that you and Dr. Hruz and Dr.

12    Levine are offering in both these cases;

13    right?

14       A.   Yes, it certainly is.

15       Q.   In fact, according to this

16    order, every major expert medical

17    association disagrees with you because

18    they've all taken a position that this

19    treatment is in fact medically necessary;

20    right?

21            MR. KNEPPER:  Objection to form.

22       A.   Apparently so, yes.

23       Q.   All right.  Look at page 6.

PLAINTIFFS001622

Page 41

```
 1      Look at the last paragraph.  You see it
 2      says that -- the third sentence says,
 3      "The consensus recommendation of medical
 4      organizations is that the only effective
 5      treatment for individuals at risk of or
 6      suffering from gender dysphoria is to
 7      provide gender-affirming care."  Do you
 8      see that?
 9         A.   I do.
10         Q.   You see there's a Footnote 3?
11         A.   Let me get my glasses on here.
12      Footnote 3.  I don't see Footnote 3.
13      Let's see.
14         Q.   The bottom of page 6.
15         A.   I see it now, yes.
16         Q.   Footnote 3 has a long list of
17      medical organizations that all have taken
18      the position that gender-affirming care
19      is medically appropriate for individuals
20      with gender dysphoria; right?
21              MR. KNEPPER:  Objection to form.
22         A.   Yeah, the consensus
23      recommendations.  Those are consensus
```

PLAINTIFFS001623

Page 42

1       recommendations.  And yes, I was aware

2       that those were the positions taken by

3       those organizations even before the

4       judge's opinion.

5           Q.    Yeah.  By my count, Footnote 3

6       lists 18 different professional medical

7       organizations, and as I read this

8       footnote, every single one of them takes

9       the view that's contrary to the opinions

10      that you and Dr. Hruz and Dr. Levine are

11      offering; right?

12              MR. KNEPPER:  Objection to form.

13          A.    Yes.  There's a consensus of

14      consensus on this, exactly, yes, sir.

15          Q.    And you're not aware of a single

16      professional medical organization that

17      submitted anything in this Brandt case

18      and said that they agree with the

19      opinions that you and Dr. Hruz and

20      Dr. Levine are offering; right?

21          A.    Well, I'm aware of at least one

22      professional organization that -- that

23      disagrees with that, yeah, the

PLAINTIFFS001624

Page 43

```
 1      pediatric -- American Pediatric --
 2      American Association of Pediatricians.
 3          Q.   Do you know if they submitted
 4      anything to the Court in this Brandt case
 5      to that effect?
 6          A.   I'm not aware.  I don't know.
 7          Q.   Okay.  Look back to your report,
 8      Exhibit 1.
 9          A.   Okay.
10          Q.   And go to page 5.
11          A.   Okay.
12          Q.   See there's paragraph 11?
13          A.   Yes.
14          Q.   And you say that "Affirmation
15      Treatments are Currently Experimental."
16      And then you say, "are not generally
17      accepted by the relevant scientific
18      community."  Right?
19          A.   Yes, I say that, absolutely.
20          Q.   Well, apparently, there's at
21      least eighteen different professional
22      medical organizations that all say that
23      you and Dr. Hruz and Dr. Levine are wrong
```

PLAINTIFFS001625

Page 44

1      and that these gender-affirming

2      treatments are, in fact, medically

3      appropriate; right?

4           A.   Well, I --

5                MR. KNEPPER:   Object.

6           A.   I would say that part of the

7      difficulty here is a misunderstanding

8      about how those consensus opinions are

9      arrived at.  They're not arrived at

10     scientifically.  So minus a scientific

11     opinion, those are -- those are consensus

12     opinions.

13                For example, in plastic surgery,

14     there was a controversy some years ago

15     about the use of fat grafting in breast

16     reconstruction, and there was a concern

17     about whether it would promote malignant

18     degeneration.  The American Society of

19     Plastic and Reconstructive Surgeons came

20     out with a consensus statement

21     essentially recommending against, if not

22     outright forbidding, the use of fat

23     grafting in breast reconstruction or

PLAINTIFFS001626

Page 45

 1         cosmetic surgery.  But I was never

 2         polled.  I was a member of the American

 3         Society of Plastic Surgery, but I was

 4         never polled.

 5                  These consensus statements do

 6         not poll the scientific or professional

 7         community.  They're the work product of

 8         a -- of small committees where they

 9         perhaps will review scientific literature

10         and come to an opinion within that

11         relatively small group.

12                  So I think the misunderstanding

13         is that because, for example, the

14         American Medical Association or the

15         American Pediatric Society has a

16         statement making this claim, it's not, by

17         definition, supported by the membership

18         of that -- that society.  It is the work

19         product of a committee, and it's -- and

20         it doesn't -- it doesn't lay out the

21         scientific basis for those opinions for

22         the membership to review, as was the case

23         in -- and it turns out that seven, eight

PLAINTIFFS001627

Page 46

1       years later, the American Society of

2       Plastic and Reconstructive Surgery

3       rescinded their prohibition when the

4       membership basically chimed in and said

5       this is incorrect and this is our

6       evidence, here's the science.  And the

7       American Society rescinded that consensus

8       statement that they had made ten years

9       earlier.

10              So I imagine that similar things

11      are going on here.  Committees generates

12      consensus statements.  The consensus

13      statements are published.  And one gets

14      the impression that the entire membership

15      supports the statement when that in fact

16      is not the case.  And when these

17      consensus statements are published, they

18      don't publish the supporting scientific

19      literature.  They merely make the

20      statement.  So I think this is the case

21      here as well.

22          Q.   You are not a member of the,

23      let's say, American Medical Association;

PLAINTIFFS001628

Page 47

1    right?

2        A.    Not -- not any longer, no.

3        Q.    And your -- I hear you

4    speculating that there's a committee that

5    came to this decision at the AMA; right?

6            MR. KNEPPER:  Objection, form.

7        A.    Well, if the AMA functions like

8    the American Society of Plastic Surgery

9    or other -- other professional bodies

10   like that, professional organizations

11   like that, I would expect that's how they

12   make their consensus statements, yes.

13       Q.    You personally do not know how

14   the AMA came to issue this consensus

15   statement, do you?

16           MR. KNEPPER:  Objection.

17       A.    I have no personal knowledge,

18   no.

19       Q.    You have no personal knowledge

20   what scientific literature they reviewed

21   in coming up with that consensus

22   statement, do you?

23       A.    That's the difficulty.  Yes,

PLAINTIFFS001629

Page 48

```
 1      sir.
 2          Q.    Yeah.
 3          A.    Correct.
 4          Q.    You have no idea, in short, how
 5      the AMA came to reach this consensus
 6      statement; right?
 7              MR. KNEPPER:  Objection to form.
 8          A.    I have no personal knowledge of
 9      it, no.
10          Q.    How about the American Pediatric
11      Society?  You're not a member of that;
12      right?
13          A.    No.
14          Q.    You have no idea how the
15      American Pediatric Society came to
16      support this consensus statement; right?
17          A.    Well, in that case, I do have
18      friends who are members of the American
19      Pediatric Society, I think it is.  And
20      they, in conversation, have told me that
21      this is how the process works.  I don't
22      have personal -- personal knowledge of
23      it, no.
```

PLAINTIFFS001630

Page 49

```
 1        Q.    Are those friends on the
 2     committee at the APA that decided to
 3     adopt this consensus statement?
 4        A.    Not to my knowledge.
 5        Q.    So they also -- strike that.
 6              How about the American
 7     Psychiatric Association?  You're not a
 8     member of that --
 9        A.    No.
10        Q.    -- right?
11        A.    No.
12        Q.    You have no idea on what basis
13     they decided to support this consen- --
14     what you call consensus -- consensus
15     statement about the necessity of
16     treatment for gender dysphoria, do you?
17        A.    No.
18        Q.    So, Doctor, I hear you
19     criticizing these organizations, but you
20     do not have firsthand knowledge of how
21     any of those organizations came to reach
22     these positions, do you?
23              MR. KNEPPER:  Objection to form.
```

PLAINTIFFS001631

Page 50

1          A.    No.

2          Q.    And you do not know what

3    scientific literature they relied on, do

4    you?

5          A.    No.

6                MR. KNEPPER:   Objection to form.

7          A.    Other than to say that I'm

8    familiar with the current literature, and

9    I -- and whenever these -- these

10   consensus statements are supported with

11   references to the scientific literature,

12   that literature I have reviewed.  That

13   was part of the process of generating my

14   expert testimony.

15         Q.    I thought I just heard you say

16   that these position statements are not

17   typically supported by "Here's the study

18   we relied on."  Isn't that what you said?

19         A.    Well, no.  In the -- in the

20   actual document that they publish, they

21   make -- they make reference to things

22   like that.

23               What I meant to say, I suppose,

PLAINTIFFS001632

Page 51

```
 1        is that -- that I've reviewed the current
 2        literature, particularly in the last
 3        three to five years, that's germane to
 4        the subject of gender affirmation in
 5        pediatric patients and adolescents, and
 6        I -- and I find that the science is weak,
 7        so --
 8            Q.   But because you have no
 9        firsthand knowledge of how any of these
10        associations came out with these position
11        statements, you do not know to what
12        extent it may have taken that literature
13        into account before adopting these
14        position statements; right?
15            MR. KNEPPER:   Objection.
16            A.   I can only say that if they gave
17        full force to the scientific literature
18        that is used to support their position, I
19        find the scientific literature weak,
20        yeah.
21            Q.   This Brandt case involves a
22        state law that prohibits doctors in
23        Arkansas from providing gender-affirming
```

PLAINTIFFS001633

Page 52

```
 1        medical treatment to anyone under
 2        eighteen; correct?
 3            A.    Yes.
 4            Q.    You yourself support these kind
 5        of state law bans; right?
 6                  MR. KNEPPER:  Objection, form,
 7        scope.
 8            A.    I do support a control over
 9        these kinds of therapies, yes, I do.
10            Q.    Well, not -- not just control,
11        because Arkansas says it will criminally
12        prosecute doctors that do it; right?
13            A.    Right.
14                  MR. KNEPPER:  Objection to form,
15        scope.
16            Q.    And you think that's a good
17        idea; right?
18            A.    I do.
19                  MR. KNEPPER:  Objection to form,
20        scope.
21            Q.    You think that other states
22        outside of Arkansas should be passing
23        similar bans; right?
```

PLAINTIFFS001634

Page 53

1            MR. KNEPPER:  Objection, form,

2      scope.

3        A.    Actually, what I would prefer to

4      see is the -- is the professional

5      societies recommend against these sorts

6      of things, yes.  That would be my

7      preference.  I would rather that the

8      State did not step in and manage the care

9      of people who are suffering.  I'd rather

10      the State stayed out of it.  But short of

11      that, I suppose that's the -- the

12      fallback position is to recourse through

13      the law.

14            It would seem to me that

15      professional organizations should be

16      managing these issues, and practitioners

17      ultimately should be responsible, as was

18      found in the -- in the -- the case in

19      Great Britain at the Tavistock Portman

20      Institute when the Court came back and

21      reviewed the find -- the ruling there and

22      declared that primacy should be given to

23      the decision-making of doctors rather

PLAINTIFFS001635

Page 54

1    than the Courts stepping in as -- as

2    managers of medical care.

3              And I feel the same way.  I

4    don't think that the State should have to

5    do this.  But -- given that -- given that

6    things are moving at the pace they are.

7        Q.   Are you aware that state

8    legislators in Utah have proposed a

9    similar ban as Arkansas for

10   gender-affirming medical treatment for

11   minors?

12       A.   Yes.

13            MR. KNEPPER:  Objection to form,

14   scope.

15       Q.   You had involvement with those

16   legislative efforts in Utah, didn't you?

17       A.   I think I made some

18   recommendations to them.  Yes, I did.

19       Q.   Yeah.  Because now I hear you

20   saying you prefer the professional

21   organizations handle it.  But the fact is

22   you have actively lobbied to get these

23   kind of bans passed in other states,

PLAINTIFFS001636

Page 55

1      haven't you?

2          A.   Yes, I have.

3               MR. KNEPPER:  Objection to form,

4      scope.

5          A.   Yes, I have.

6          Q.   I'm going to introduce another

7      exhibit.  Let me know when you have it,

8      Doctor.

9      (Exhibit 5 was marked for identification

10     and is attached.)

11         A.   I have it.

12         Q.   Exhibit 5 is a document titled:

13     "Transgender 'Transition' Procedures

14     Performed on Minors.  Answers to

15     Questions and Information for Joint

16     Interim Committee," dated June 10th,

17     2021.  Do you see that?

18         A.   I do.

19         Q.   It says, "Submitted by Rep Rex

20     P. Shipp," S-H-I-P-P.  Do you know who

21     that is?

22         A.   I don't know him personally, but

23     I -- I see he's a representative from

PLAINTIFFS001637

Page 56

```
 1      Utah apparently.
 2          Q.   Have you ever communicated with
 3      Mr. Shipp and his staff?
 4          A.   I may have and don't recall.
 5          Q.   Why do you say you may have?
 6          A.   I have a lot of correspondence
 7      with people who ask a lot of questions
 8      who are involved in this -- in this
 9      issue, and I don't have a great memory
10      for names sometimes.  But I know I was in
11      communication at some level with people
12      in Utah, but I don't recall exactly the
13      nature of that conversation, or that
14      interchange.
15          Q.   Go to page 16.
16          A.   Sixteen?
17          Q.   One six.
18          A.   One six.  Okay.
19          Q.   Toward the bottom of the page,
20      it says, "We express appreciation to
21      these noted professionals who contributed
22      to this report."  Do you see that?
23          A.   I do.
```

PLAINTIFFS001638

Page 57

1          Q.   Go to page 17.

2          A.   Okay.

3          Q.   The bottom of the page says,

4     "Patrick Lappert, M.D."

5          A.   Yes.

6          Q.   That's you; right?

7          A.   Yes.

8          Q.   So at some point earlier this

9     year, you were providing information to

10    the Utah State Legislature to support the

11    potential enactment of a ban on

12    gender-affirming healthcare for minors;

13    right?

14             MR. KNEPPER:  Objection, form.

15         A.   Yes.

16         Q.   Look at the fourth name from the

17    bottom on page 17.

18         A.   Fourth name -- I'm sorry?

19         Q.   Fourth name from the bottom.

20         A.   Paul Hruz.  Yes.

21         Q.   That's the same Dr. Hruz who's

22    an expert in this case; right?

23         A.   Yes.

PLAINTIFFS001639

Page 58

1      Q.   Go to page 18.  The second name
2   from the top is Stephen B. Levine M.D.;
3   right?
4      A.   Yes.
5      Q.   Same Dr. Levine who is an expert
6   in this case; right?
7      A.   Yes.  I think so, yes.
8      Q.   And the next name is Paul
9   McHugh, M.D.; right?
10      A.   Yes.
11      Q.   The same Dr. McHugh who is an
12   expert in this case; right?
13      A.   Yes.
14      Q.   All four of you were providing
15   information to the Utah State Legislature
16   to support this potential ban; right?
17           MR. KNEPPER:  Objection to form.
18      A.   Yes.
19      Q.   How did you get involved with
20   providing this information to the Utah
21   State Legislature?
22      A.   I don't recall.  My -- my
23   suspicion is I may have been contacted by

PLAINTIFFS001640

Page 59

1    e-mail or some other such thing.  In

2    fact, I'm fairly confident it was an

3    e-mail request for assistance, probably.

4        Q.   Do you remember who the e-mail

5    was from?

6        A.   I do not.

7        Q.   Do you remember who at the Utah

8    State Legislature or anyone affiliated

9    with them you were communicating with in

10   this respect?

11       A.   I don't remember, no.

12       Q.   All right.  Let's see what you

13   were telling the state legislature in

14   this report.  Go to page 5.  See there's

15   a section near the top titled "Sex

16   reassignment surgeries"?

17       A.   Yes.

18       Q.   There's some language in quotes

19   -- in quotes and italicized.  Do you see

20   that?

21       A.   I do.

22       Q.   And the first portion of the

23   paragraph says: '"Sex reassignment

PLAINTIFFS001641

Page 60

1       surgery' is a massive misrepresentation

2       of what these operations actually do.

3       You can't change a person's sex.  All

4       that is happening is that the patient is

5       undergoing an intentional mutilation in

6       order to create a counterfeit appearance

7       of the other sex."

8               Do you see that?

9          A.   I do.

10         Q.   And underneath, it says,

11      "Patrick Lappert, M.D."  Right?

12         A.   Yes.

13         Q.   These are your words, Dr.

14      Lappert; right?

15         A.   Yes.

16         Q.   You consider gender reassignment

17      surgery to be an intentional mutilation;

18      right?

19         A.   I do.  Absolutely.

20              MR. KNEPPER:  Form.

21         Q.   And calling gender reassignment

22      surgery, quote, intentional mutilation,

23      is that commonly accepted terminology in

PLAINTIFFS001642

Page 61

1        this field, Doctor?

2             A.    I expect not.

3             Q.    And then you say that when a

4        patient undergoes gender reassignment

5        surgery, all that is happening is, quote,

6        a counterfeit appearance of the other

7        sex; right?

8             A.    Yes.

9             Q.    This phrase, "counterfeit

10       appearance," do you think that's an

11       appropriate term for a doctor to use?

12            A.    Absolutely.

13            Q.    And you stand by these words;

14       right?

15            A.    I do.

16            Q.    All right.  So, we've talked

17       about Arkansas, we've talked about Utah.

18       Now, I know there is currently a number

19       of other states that are considering

20       passing similar bans.  Outside of Utah,

21       have you done any work whatsoever in

22       connection with these potential bans in

23       other states?

PLAINTIFFS001643

Page 62

1          MR. KNEPPER:  Objection, form,
2      scope.
3          A.   I have.
4          Q.   Which states?
5          A.   Alabama, Texas.
6          Q.   What else?
7          A.   Texas.  I don't know if there
8      were any in the Northwest or not.  I
9      think that's all of them.  I may be
10     wrong, but I think that's all.  Alabama
11     and Texas I would just add to your list.
12         Q.   Okay.
13         A.   There may been something in
14     Arizona.  I'm not certain about Arizona
15     as well, but --
16         Q.   Now let me introduce another
17     exhibit.  Okay.  Let me know when you get
18     this one.
19     (Exhibit 6 was marked for identification
20     and is attached.)
21         A.   I've got it.
22         Q.   All right.  This article is
23     titled, "Alabama bill that would

PLAINTIFFS001644

Page 63

1    criminalize treatment for transgender

2    minors headed to full Alabama Senate."

3    You see that?

4        A.   I do.

5        Q.   Alabama, your home state, was

6    considering a ban very similar to

7    Arkansas just this year; correct?

8        A.   Actually over the last couple of

9    years.

10        Q.   Okay.  The first paragraph says,

11    "The Alabama Senate Health Committee on

12    Wednesday approved a bill that would

13    outlaw puberty-blocking medications and

14    gender-affirming care for minors,

15    giving" -- "giving it a favorable report

16    in an 11-2 vote."  You see that?

17        A.   I do.

18        Q.   Then it says, "An Alabama House

19    committee heard testimony in a public

20    hearing on a companion bill, but the

21    committee did not vote on the" -- "on the

22    measure."  You see that?

23        A.   I do.

PLAINTIFFS001645

Page 64

```
 1        Q.    You testified in support of this
 2    bill; right?
 3        A.    Yes, sir.
 4        Q.    Go to page 2.
 5        A.    Okay.
 6        Q.    Look at the second paragraph
 7    from the bottom.
 8        A.    Second from the bottom.  Yes.
 9        Q.    It says, "Dr. Patrick Lappert, a
10    Decatur plastic surgeon, spoke in favor
11    of the bill."
12              That's you; right?
13        A.    That's right.
14        Q.    Go to page 3.
15        A.    Okay.
16        Q.    And look at the third paragraph.
17    It says that you've "spoken against the
18    use of medicine and surgery for
19    transgender people as a Catholic deacon
20    in his local diocese."  See that?
21        A.    Yes.
22        Q.    You don't deny that you've
23    spoken against the use of medical and
```

Page 65

1      surgical treatment for transgender people

2      in your position as a Catholic deacon;

3      right?

4          A.    That's correct, I do not.

5          Q.    All right.  Focus on the last

6      sentence of this third paragraph.  It

7      says that when a committee member

8      questioned your medical expertise on this

9      issue, you said that you would not treat

10     a person for gender dysphoria and would

11     instead refer them to a qualified mental

12     health professional.  You see that?

13         A.    Yes.

14         Q.    At this hearing, someone on the

15     committee was questioning your medical

16     expertise to offer these opinions; right?

17              MR. KNEPPER:  Objection, form.

18         A.    I don't remember that detail,

19     but I think so, yeah.  I think the

20     objection they raised was that I don't do

21     these treatments, how could I know.

22         Q.    You're not a psychiatrist;

23     right?

PLAINTIFFS001647

Page 66

1        A.    No.

2        Q.    You do not have specialized

3     training or expertise in diagnosing

4     mental health conditions; right?

5        A.    I have limited -- limited

6     training.  Yes.

7        Q.    And when you say "limited

8     training," what does that mean?

9        A.    Well, in the training of plastic

10    surgeons, we are -- we are required --

11    because we offer aesthetic surgery, we

12    get some training in issues,

13    psychological/psychiatric issues relating

14    to people who will seek to modify their

15    bodies in order to achieve a sense of

16    peace or a sense of improvement in their

17    lives.  And it's imperative that a

18    plastic surgeon be able to recognize

19    persons who are suffering from

20    psychiatric problems because plastic

21    surgery -- to offer them plastic surgery

22    to modify their bodies is in the category

23    of malpractice, not to mention that very

PLAINTIFFS001648

Page 67

```
 1      often, dissatisfied patients will -- will

 2      make life very difficult for the

 3      practitioner, if not threaten them with

 4      physical harm.

 5              I would refer you to an article

 6      by -- although we haven't offered it up,

 7      -- a friend of mine, Dr. Mark Gorney, who

 8      was one of the -- one of the grand old

 9      men of plastic surgery, started the

10      Physicians Company to manage physician

11      liability and risk and had -- he

12      discovered that there's an

13      overrepresentation of -- of violence

14      against physicians by aesthetic patients

15      committing violence against plastic

16      surgeons.  That's just one of the

17      motivators.

18              But nonetheless, the issue of

19      body dysmorphic disorder is part of our

20      training, persons who are seeking a

21      remedy to their interior woundedness or

22      their psychological disturbances by

23      changing their outward opinion.  And body
```

PLAINTIFFS001649

Page 68

```
 1        dysmorphic disorder is a

 2        well-characterized psychiatric diagnosis

 3        that impinges greatly upon plastic

 4        surgery precisely because aesthetic

 5        surgery -- even in its name, you can tell

 6        that aesthetic surgery is surgery aimed

 7        at the aesthetic, the feelings, esthesia,

 8        the feelings that a patient has about

 9        themselves, about their life.  So it's

10        incumbent upon plastic surgeons to know

11        about these things, and so we get trained

12        in those matters.

13               So again, I have very limited

14        psychiatric/psychological knowledge, but

15        I do know that that subset of patients

16        should be referred for psychological help

17        rather than offered surgery.  Not to

18        mention the fact that such patients can't

19        even give informed consent because of

20        their psychological disturbances.

21           Q.   All right.  You're talking about

22        patients who have body dysmorphic

23        disorder; right?
```

PLAINTIFFS001650

Page 69

1          A.    That's right.

2          Q.    When did you last receive

3     training in how to diagnose someone with

4     body dysmorphic disorder?

5          A.    I guess it's ongoing training

6     when one's in the -- in the practice of

7     plastic surgery.  But I had originally in

8     my residency and then on an ongoing basis

9     I think at conferences through the years.

10          Formal training in it, I -- I

11     don't recall beyond my residency.  All I

12     do is try to keep abreast of the

13     literature.

14          Q.    Yeah.  So, let's take that in

15     steps.  Outside of -- when was your

16     residency in plastic surgery, Doctor?

17          A.    '92 to '94.

18          Q.    Right.  Past '94, you have not

19     received formal training in how to

20     diagnose someone with body dysmorphic

21     disorder; right?

22          A.    There may have been some CME

23     credits at a conference in there

PLAINTIFFS001651

Page 70

1      somewhere or remote learning.  I don't
2      recall.
3          Q.   But sitting here, you can't
4      recall any of those specifically; right?
5          A.   I cannot, no.
6          Q.   What are the diagnostic criteria
7      for body dysmorphic disorder?
8          A.   Well --
9          Q.   Do you know that sitting here
10     today?
11         A.   Yes.  So, a person with body
12     dysmorphic disorder, the diagnostic
13     criteria is the -- is the patient who
14     presents with evidence of a psychological
15     disturbance.  In review of their history
16     and physical examination, you may see
17     evidence of a history of substance abuse,
18     maybe evidence of some self-harm,
19     evidence of social isolation in their
20     intake forms, that sort of thing.  That
21     would raise the concern.
22              The second would be the person
23     who attaches tremendous potential benefit

PLAINTIFFS001652

Page 71

```
 1       of, psychologically, the -- the quality
 2       of the -- sort of a transformative power
 3       of cosmetic surgery.
 4               And then the third criteria
 5       would be that they -- they see something
 6       that you don't see.  They see a defect
 7       that you don't see.  And that's probably
 8       the key diagnostic criteria.  For
 9       example, a man who presents seeking a
10       modification to his nose who has evidence
11       of living a life of social isolation who
12       is adamant that by changing his -- the
13       appearance of his nose, he will -- he
14       will have a much better life.  And
15       hearing that, of course, the alarm bells
16       go off and then examining the patient and
17       seeing that there's no objectively
18       definable deformity, only a normal
19       variation that one would expect to see on
20       a man's face.
21               Those are all red flags.  And --
22       and based upon that, it is -- it
23       is definitely the -- has been
```

PLAINTIFFS001653

Page 72

1        historically the recommendation of the

2        likes of Dr. Mark Gorney and other

3        leaders in the American Society of

4        Plastic Surgery to not offer surgery, but

5        rather to offer referral for

6        psychiatric/psychological support and

7        evaluation.

8            Q.    These diag- -- these diagnostic

9        criteria that you mentioned, where do

10       they come from?

11           A.    They -- I think you can find

12       much of that in the DSM book, if -- if --

13       if that's the route you want to go.  You

14       find it in the literature.  There are --

15       there are references in the scientific

16       literature about it dating back to I

17       think the 1920s.  I included some of

18       those, I think, in my discussion, if not

19       on this one, in the Arkansas case.

20               But -- but there have been

21       papers published through the years that

22       describe the condition and make

23       recommendations about care, and again,

PLAINTIFFS001654

Page 73

1          going all the way back even to textbooks

2          in plastic surgery and -- and of course,

3          the residency training that speaks about

4          that as well.

5              Q.   So for diagnosing someone with

6          body dysmorphic disorder, you would rely

7          on the DSM-5; right?

8              A.   I wouldn't rely on it, no.  No.

9          I would rely on my -- my clinical

10         experience more than anything else there.

11             Q.   Well, you just rattled off three

12         or four guidelines that I think I heard

13         you say come from the DSM-5; right?

14              MR. KNEPPER:  Objection, form.

15             A.   Well, they're -- they don't come

16         from the DSM-5 but are described in the

17         DSM-5, yeah.

18             Q.   So when I asked you --

19             A.   And 4 -- actually, DSM-4 has a

20         clearer description, I think, than DSM-5.

21             Q.   So when I asked you what

22         criteria you would use to diagnose

23         someone with body dysmorphic disorder,

PLAINTIFFS001655

Page 74

```
 1      the source you went to was the DSM;
 2      right?
 3          A.   No.   The source I went to was my
 4      training and the -- and the papers that
 5      relate to it.   I think it's just been
 6      subsequently characterized in the DSM.
 7      And it's a ready -- it's a volume that's
 8      readily accessible to people.   The
 9      language is readily accessible, so people
10      who are seeking information about that,
11      they can go there for it or they can go
12      to the articles, if they like.   Yes.
13          Q.   Outside of whatever training you
14      had on diagnosing someone with body
15      dysmorphic disorder, you do not have
16      specialist training or expertise in
17      diagnosing other mental health
18      conditions; fair?
19              MR. KNEPPER:   Objection, form.
20          A.   Let's see.   Well, there's -- I
21      guess there are subcategories of -- of
22      body dysmorphic disorder, like
23      recognizing the anorexic patient, of
```

PLAINTIFFS001656

Page 75

1      course, who presents for body

2      modification.   That -- that's a fairly

3      readily and obvious one.

4                 But no, I'm not a -- I'm not

5      formally trained in psychiatry or

6      psychology.

7         Q.    You do not have -- you do not

8      hold yourself out as an expert in

9      diagnosing mental health conditions

10     outside, potentially, of body dysmorphic

11     disorder; right?

12        A.    Correct.

13        Q.    You do not have specialist

14     training or expertise in treating mental

15     health conditions; right?

16        A.    No.

17        Q.    You would refer that person to a

18     qualified mental health professional;

19     right?

20        A.    I would.   I would.

21        Q.    Because you yourself are not a

22     qualified mental health professional;

23     correct?

PLAINTIFFS001657

1        A.    Correct.

2        Q.    All right.  You've also

3    published an op-ed in May of this year

4    supporting this Alabama ban; correct?

5        A.    Yes.

6        Q.    And you said that Alabama

7    legislators should enact this ban because

8    they have a duty to protect the

9    vulnerable population of gender-confused

10    children.  Does that sound familiar?

11        A.    Yes.

12        Q.    So again, earlier you said you

13    had a preference for professional

14    societies dealing with this, but you're

15    out there publishing op-eds calling on

16    state legislatures to pass these bans;

17    right?

18            MR. KNEPPER:  Objection, form.

19        A.    Right.  Yes, sir.

20        Q.    All right.  How about Texas?

21    Tell me what work you've done supporting

22    this kind of a ban in Texas?

23        A.    It's been similar.  I've been in

PLAINTIFFS001658

Page 77

1     communication with -- I can't remember if

2     they're on the legislative side or on the

3     justice side.  I don't remember exactly

4     where they fit into the -- the government

5     of Texas, but I've corresponded with them

6     and offered them information and advice.

7         Q.   Was it similar information to

8     what we've seen in that Utah packet?

9         A.   I'm sorry, sir?

10        Q.   Was it information similar to

11    what we've seen in that Utah legislation

12    packet?

13            MR. KNEPPER:   Objection, form.

14        A.   Right.  The substance -- the

15    substance of the issue at hand is the

16    same wherever you find it.  It's this

17    contest between those who -- who promote

18    gender-affirming care versus those who

19    promote, in the case of children, for

20    example, watchful waiting and

21    psychological support and cognitive

22    behavioral therapy and those things, yes.

23    It's the same battle wherever you find it

PLAINTIFFS001659

Page 78

1        because it's the same problem, the same

2        science, the same language.  All of it's

3        the same.

4            Q.   So earlier, we saw that in

5        addition to you, Dr. Hruz and Dr. Levine

6        and Dr. McHugh were also involved with

7        those Utah legislative efforts; right?

8                MR. KNEPPER:  Objection, form.

9            A.   I -- I don't know their

10       involvement in -- in Texas.  I'm -- I'm

11       not aware.

12           Q.   Yeah.  Do you know whether any

13       of them have been involved with any of

14       these efforts in any other state?

15           A.   I don't.  I don't know.

16           Q.   Okay.  Fair to say that you have

17       some strong personal opinions on whether

18       doctors should be providing

19       gender-affirming treatment to minors?

20               MR. KNEPPER:  Objection to form.

21           A.   Very fair to -- very fair to

22       say, yes.

23               MR. TISHYEVICH:  Let's go off

PLAINTIFFS001660

Page 79

1          the record.

2                    THE VIDEOGRAPHER:  This is the

3          end of Media Unit 1.  We are off the

4          record at 9:33 a.m.

5                         (Break taken.)

6                    THE VIDEOGRAPHER:  This is the

7          beginning of Media Unit No. 4.  We are on

8          the record at 9:44 a.m.

9             Q.   (By Mr. Tishyevich) Doctor,

10         you're familiar with an organization

11         called Alliance Defending Freedom, ADF;

12         right?

13            A.   Yes.

14            Q.   How are you familiar with the

15         ADF?

16            A.   I was invited down there for a

17         conference on the subject of transgender.

18         I was an invited presenter, I should say.

19         They asked me to come and speak from a

20         plastic surgeon's perspective on how I

21         view the current state of transgender

22         medicine and surgery.

23            Q.   Those were -- those were the

PLAINTIFFS001661

Page 80

```
 1      meetings in Arizona?  Is that right?
 2              MR. KNEPPER:  Objection.
 3          A.   Yes.
 4          Q.   Who invited you?
 5          A.   I don't remember who the
 6      particular name was.  I -- I don't recall
 7      who the -- the particular person, the one
 8      that sent me the invitation.
 9          Q.   Was it --
10          A.   It may have been -- it may have
11      been Gary McCaleb, I want to say.  I'm
12      not positive about that, though.
13          Q.   You -- you anticipated my
14      question.
15          A.   Okay.
16          Q.   To your knowledge, what's the
17      view that the FDA takes on providing
18      healthcare treatment to patients with
19      gender dysphoria?
20          A.   The position of the FDA?
21          Q.   The ADF.
22          A.   Oh, the ADF.  They -- let's see.
23      So, the sense I get is that the ADF takes
```

PLAINTIFFS001662

Page 81

1      a -- the opinion that the present state

2      of transgender medicine and surgery is

3      not in the interest of the patients or

4      the families.

5          Q.   The ADF has moral objections to

6      doctors performing this kind of surgery

7      and treatment; right?

8              MR. KNEPPER:  Objection, form,

9      scope.

10         A.   I would -- I would characterize

11     the ADF's position as more than just a

12     moral objection.  It's both moral and

13     objective scientific objections.

14             So the -- the -- the sense I got

15     from that conference was that most of the

16     invited speakers came to speak about --

17     for example, Dr. Hruz was there, and he

18     spoke about endocrinology and the

19     endocrinol- -- endocrinologic basis for

20     sex/gender.  And he spoke about the

21     effects of -- the endocrinological

22     effects, the objective changes that are

23     caused by, for example, puberty-blocking

PLAINTIFFS001663

Page 82

1      cross-sex hormones.

2            I was -- there was also another

3      speaker there, I think, on the subject

4      of -- from the family medicine

5      perspective, the overall effects on the

6      health of the child, developmental

7      issues.  There was a presenter on the

8      objective psychological issues.

9            And then, I presented on the

10     realities of the surgery.  They wanted me

11     to speak about the technical details of

12     transgender surgery, kind of the

13     evolution of the process of transitioning

14     surgery, and the -- and to give them a

15     summary of the state of the science on

16     it.

17            So I would characterize the ADF

18     as interested in both the moral -- the

19     moral issues and the objective, and they

20     impinge upon one another.  Clearly, to do

21     something that is not in the -- in the

22     objective benefit of the patient is a

23     moral problem.

PLAINTIFFS001664

Page 83

1            Did I answer your question?

2       Q.    That's helpful, yeah.

3            The ADF is not a professional

4     scientific organization; right?

5       A.    Not to my knowledge, no.

6            MR. KNEPPER:  Objection to form,

7     scope.

8       Q.    They're a legal organization;

9     right?

10      A.    Yes.  That's my understanding.

11      Q.    ADF is engaged with bringing

12    lawsuits that do things like challenge

13    schools' rights to -- to have transgender

14    persons on their teams; right?

15            MR. KNEPPER:  Objection, form,

16    scope.

17      A.    I don't know the scope, the full

18    scope of their efforts, but yeah, they're

19    one of I guess several legal

20    organizations that are -- that are

21    approaching these matters, as are you,

22    for example.

23      Q.    All right.  Let's talk about

PLAINTIFFS001665

Page 84

1          these meetings in more detail.  So, how

2          many -- strike that.

3                  You've been to two meetings

4          organized by ADF?

5              A.    That's my recoll- -- yeah, two

6          meetings.  I think that's right.

7              Q.    All right.  Let's start with the

8          first one.  This was in 2017?

9              A.    That sounds about right, yeah.

10             Q.    What --

11             A.    I think it was 2017, yeah.

12             Q.    What month roughly?

13             A.    I don't remember now.

14             Q.    Do you know how they came to

15         invite you to that first meeting?

16             A.    I do not.

17             Q.    Before that meeting, you had not

18         published anything about gender

19         dysphoria, had you?

20             A.    No.

21             Q.    Before that meeting, you had not

22         published anything about the risks of use

23         of hormone blockers in minors; right?

PLAINTIFFS001666

Page 85

1        A.   No.  I've given -- I gave some

2    -- some -- I think they may have heard of

3    me not through publications, but through

4    public speaking.

5        Q.   How long have you been doing

6    public speaking on the issues related to

7    gender dysphoria?

8        A.   Since 2014.

9        Q.   Let's start with the first

10   meeting.  So, Dr. Hruz was also present

11   at that meeting?

12       A.   Yes.

13       Q.   Was Dr. Levine present at that

14   meeting?

15       A.   I don't think I've ever met Dr.

16   Levine, so I don't -- he couldn't have

17   been there because I would have

18   remembered meeting him, and I don't

19   remember ever having met him.

20       Q.   How about Dr. McHugh?

21       A.   No.  I would have remembered

22   him.  He's a very famous person.

23       Q.   How many people were present at

PLAINTIFFS001667

Page 86

1       this first meeting?

2           A.    Perhaps ten.  I'm not certain.

3           Q.    Outside of you and Dr. Hruz, who

4       else do you remember being at that first

5       meeting?

6           A.    I remember meeting a Dr. Andre

7       Van Mol.  I believe he was at that

8       meeting.  There was a pediatric

9       endocrinologist there by the name of

10      Quentin Van Meter.  I think he was there.

11              There was a -- there was an

12      expert in scientific data and scientific

13      data analysis, medical record data

14      analysis from UC-San Francisco.  I don't

15      believe he was a physician.  I think he

16      was a -- had a doctorate in science.  And

17      he was a -- he was actually a

18      detransitioner.  So he was giving not

19      only his knowledge of the medical

20      literature, he was just an incredible

21      resource and reference for medical

22      literature.  You could just about ask him

23      anything.  But he was also there, I

PLAINTIFFS001668

Page 87

1      think, to speak from a personal

2      perspective as well, being a

3      detransitioner.

4            There was another detransitioner

5      there who I don't remember their name,

6      but they were there to speak.  I think

7      they were also an educator as well.  I'm

8      not positive about that.

9            So it's kind of vague for me,

10     but I -- but definitely Paul Hruz stands

11     out because we had a very good

12     conversation there.

13        Q.   What was the format?  Were there

14     presentations, a round table discussion?

15     How did the conversations go?

16        A.   There was some introductory

17     remarks, and then -- and then each --

18     each sort of specialist gave a

19     presentation.  I think I gave an

20     hour-long presentation.  And there were

21     others like mine on those other subjects

22     we talked about.

23        Q.   Did you use slides as part of

PLAINTIFFS001669

Page 88

1     that presentation?

2          A.    I usually do, yes, although I

3     don't know what I've done with that slide

4     deck.  I don't keep them very long.  They

5     sort of morph all the time.

6          Q.    Do you think you might have an

7     electronic copy of that slide deck

8     somewhere?

9          A.    I don't.

10         Q.    At a very high level, what was

11    the -- what were you trying to convey

12    through your presentation to that group?

13    Let me ask it a different way.  Were --

14    was your presentation broadly similar to

15    the opinions that you're offering in this

16    case and in the Brandt case?

17              MR. KNEPPER:  Objection, form.

18         A.    Well, by the -- by "broadly

19    similar," do you mean the subject matter

20    or the nature of my opinion or the

21    evidence used to support my opinion?

22         Q.    All right.  Give me a high-level

23    summary of what your presentation was at

PLAINTIFFS001670

Page 89

1      that first meeting.

2          A.    It was a --

3              MR. KNEPPER:  Objection, form,

4      scope.

5          A.    -- a summary, a summary of the

6      present state of transgender medicine and

7      surgery, a review of the scientific

8      literature used to support the treatments

9      that are being offered, a review of the

10     long-term outcomes of treatment that are

11     being offered, with particular attention

12     to the European literature, which is more

13     reliable.  I sort of -- I compared the

14     American literature to the European

15     literature because that's one of the

16     great problems we're having in this

17     issue.  And it was already evident in

18     2017 that there was a great disparity

19     between the American literature and the

20     European literature in terms of the

21     quality of the scientific evidence that's

22     being used to support the interventions.

23              So that was -- really at the

PLAINTIFFS001671

1       heart of the presentation was what's the

2       state of the science and where is the

3       reliable science coming from and what is

4       it -- what is it showing us, so.  But

5       they also -- the audience wanted to have

6       an understanding of what these plastic

7       surgery interventions were.  So there was

8       an extensive discussion of the

9       particulars of the surgeries, the details

10      about the surgeries, the typical outcomes

11      of the surgeries, so.

12           Q.   I want to -- strike that.

13                One of the topics of discussion

14      at that meeting was about the need to

15      have expert witnesses for litigation;

16      right?

17                MR. KNEPPER:  Objection, form,

18      scope.

19           A.   I remember -- I remember a

20      fairly long discussion about the poverty

21      of people who are willing to testify

22      because of the risk that they take in

23      testifying.  That was a -- that was a

PLAINTIFFS001672

Page 91

1    fairly long discussion.  And the

2    difficulty that that -- that people have

3    in finding expert witnesses because of

4    the risks they place themselves in, in

5    testifying.

6        Q.   And people at that meeting were

7    asked whether they would be willing to

8    participate as expert witnesses; right?

9        A.   Yes.

10       Q.   Before that meeting, you had

11   never testified as an expert witness?

12       A.   Before this moment, I never

13   testified as an expert witness.

14       Q.   Who made the introductory

15   remarks at the beginning of this meeting?

16            MR. KNEPPER:  Objection, form,

17   scope.

18       A.   I'm trying to remember.  It was

19   a -- it was an attorney whose first name

20   is Jeff, and I'm trying to remember what

21   his last name was.  But he seemed to be

22   the -- the -- kind of the emcee, if you

23   will.  Yeah, Jeff.  I'll see if, in the

PLAINTIFFS001673

Page 92

```
 1        course of our conversation today, the
 2        name will pop in.  This is the difficulty
 3        I have with remembering names.  They'll
 4        just pop in at a moment's notice.
 5             But it was -- yeah, it was an
 6        attorney who gave the overall scope of
 7        why -- why we were there, to discuss this
 8        issue, to see what -- what the -- what
 9        the science is showing to see where --
10        what the -- the moral aspects of good
11        science versus bad science and issues
12        like that, yeah.
13        Q.   Aside from you and Dr. Hruz, do
14        you recall anyone else expressing an
15        interest at that conference about serving
16        as an expert witness?
17             MR. KNEPPER:  Objection, form,
18        scope.
19        A.   You mean someone expressing just
20        generally about having expert witnesses?
21        Q.   No.  Other participants saying,
22        "I might consider being an expert witness
23        in one of these cases."
```

PLAINTIFFS001674

Page 93

1          A.    I don't recall.  I don't, no.

2          Q.    Okay.  All right.  So then there

3      was a second meeting also in Arizona;

4      right?

5          A.    Right.

6          Q.    And that was also in 2017?

7          A.    I don't remember the date of

8      that as well -- either, no.

9          Q.    What was the purpose of that

10     second meeting?

11         A.    I think it was similar, although

12     it may have been a little bit more

13     refined.  There was not as much

14     discussion of the really foundational

15     science as more a review, I think, of --

16     you know, I -- I guess it was similar in

17     terms of format.  I think there were more

18     -- more people there who were speaking

19     from personal experience.

20              So I think the most important

21     thing I recall from that meeting was that

22     -- that there was a mother -- actually, a

23     couple of family members of persons who

PLAINTIFFS001675

Page 94

1    experienced cross-sex self-identification

2    who have gone through various -- various

3    phases of transitioning.  And they were

4    giving sort of a personal experience,

5    trying to describe to us what they went

6    through as a family, what they went

7    through with their children.  And that's

8    what -- so that was the difference

9    between the first and the second meeting.

10   I think it was more of a personal thing.

11   It had the science as well, but I think

12   it had more of a personal side to it as

13   well.

14       Q.   How many people do you think

15   attended -- attended that second meeting?

16       A.   I'm trying to think how full the

17   room was.  I think it was probably

18   comparable maybe, a dozen perhaps.  I'm

19   not sure.

20       Q.   Who do you remember being there

21   by name?

22       A.   I think that may have been when

23   I met Dr. Cretella.  I can't remember if

PLAINTIFFS001676

1       I met her at the first meeting or the

2       second meeting.

3               Oh, also at that second meeting,

4       there was a plastic surgeon.  I can't

5       remember his last name.  I was -- I

6       remember being very encouraged to meet

7       another plastic surgeon who saw this as

8       an issue.  And I do remember that he had

9       been the chairman -- this speaks to the

10      issue of fear about testifying.  He had

11      been the chairman of a major plastic

12      surgery department in a large Midwest

13      university, had built that program for

14      many years, had run one of the most

15      successful residency training programs.

16      And he had been fired because he had

17      objections to the transgender services

18      that the hospital administration -- or

19      the university administration wanted to

20      introduce.  And I thought it was a very

21      heartbreaking story to see that a man had

22      lost his entire career over his

23      professional opinion.  I don't remember

PLAINTIFFS001677

Page 96

1      his last name, but I do know that I met

2      him at that second meeting.

3         Q.   Do you remember his first name?

4         A.   I don't.

5         Q.   Do you remember which center he

6      was affiliated with?

7         A.   I believe he was from the Ohio

8      State University.  But I haven't seen or

9      heard from him since.  He has just

10     disappeared.  I tried to reach out to

11     him, I recall, because, again, there's

12     not a lot of plastic surgeons who are

13     willing to speak on this matter.  And --

14     but I haven't heard from him since.

15        Q.   Did participants at the second

16     meeting make presenta- -- make

17     presentations as well?

18             MR. KNEPPER:  Objection, form,

19     scope.

20        A.   I -- I don't -- yeah, I think it

21     was more limited presentations, briefer,

22     sort of reviews sort of thing.  But it

23     wasn't -- it didn't have the formality of

PLAINTIFFS001678

Page 97

1          the first meeting, as I recall.  Again,

2          it's -- it's a little bit murky four

3          years on.

4              Q.   Yeah.  I'm just asking for your

5          best recollection.  That's fine.

6              A.   Sure.  Okay.

7              Q.   Do you remember giving a

8          presentation at that second meeting?

9              A.   I believe I did.

10             Q.   How long do you think that

11         meeting lasted, roughly?

12                  MR. KNEPPER:  Objection, form,

13         scope.

14             A.   Well, I remember it -- we went

15         through a full morning, a light lunch,

16         and perhaps into the very early

17         afternoon.

18             Q.   And you mentioned that there was

19         some personal testimony from parents,

20         families.  What portion of the meeting

21         was that, roughly?

22             A.   What -- what portion?

23                  MR. KNEPPER:  Objection, form,

PLAINTIFFS001679

Page 98

1      scope.

2           Q.    What portion, yes.

3           A.    I would be guessing that perhaps

4      a third of the meeting was -- was that.

5           Q.    Okay.  After these meetings in

6      2017, have you continued to stay in touch

7      with the ADF?

8                 MR. KNEPPER:  Objection, form,

9      scope.

10          A.    I think perhaps, you know, one

11     or two e-mail exchanges, but nothing --

12     nothing substantive.  I haven't really

13     heard anything from them.  I think I got

14     a -- no.  Well, I can't -- I can't recall

15     anything other than maybe a thank-you

16     e-mail or hope you're doing well kind of

17     thing, but nothing substantive, no.

18          Q.    How did you come to get involved

19     with being an expert in this case?

20          A.    I was contacted by Mr. Knepper.

21          Q.    Okay.

22          A.    Actually, I was contacted by his

23     staff.  He didn't call me himself, but

PLAINTIFFS001680

Page 99

```
 1     his -- someone on his staff called me and
 2     asked --
 3         Q.   I understand.
 4         A.   -- if I would be available.
 5     Yeah.
 6         Q.   How did you come to get involved
 7     with the Brandt case in Arkansas?
 8              MR. KNEPPER:  Objection, form,
 9     scope.
10         A.   I think it may have been
11     similar.  I don't recall the particulars,
12     but I -- someone on -- on the legal
13     counsel side contacted me.  I don't
14     remember who it was.
15         Q.   Okay.  Let me shift gears a bit.
16     You know what the American Society of
17     Plastic Surgeons is; right?
18         A.   Of course.
19         Q.   Are you a current member?
20         A.   No.  I -- I let my membership
21     lapse years ago, yeah.
22         Q.   When --
23         A.   About two years ago, I would
```

PLAINTIFFS001681

Page 100

1      say.  Maybe two years ago, yeah.
2          Q.   Why did you decide to let your
3      membership lapse?
4          A.   Well, in order to be a member of
5      the American Society of Plastic Surgeons,
6      you have to be board-certified.  And so
7      since I declined continuing board
8      certification for the reasons I explained
9      to you, then my membership -- you know,
10     over time, when my subscriptions and
11     membership fees lapsed, so did my
12     membership.  And I think that would have
13     been in 2019.
14         Q.   I understand.
15         A.   Yeah.
16         Q.   Is it -- is an active board
17     certification in plastic surgery a
18     prerequisite to being in the American
19     Society of Plastic Surgeons?
20         A.   I seem to remember that when I
21     -- back in the '90s after my residency,
22     there's a -- there's a membership for --
23     for board-eligible.  It's not the full

PLAINTIFFS001682

Page 101

```
 1      membership, but then when you get

 2      board-certified, then you get full

 3      membership and the rights to use the logo

 4      and all that sort of stuff, so.  Yeah, as

 5      I recall.  It's been a long time since I

 6      read the bylaws.  That would have been

 7      back in '95, I think, that I read those

 8      things.

 9          Q.  Yeah.  When did you first join

10      the ASPS?

11          A.  I think I joined as a student

12      member when I was in my residency.  I

13      want to say it was probably like '92 or

14      '93, somewhere in there.

15          Q.  So you were in the ASPS roughly

16      '92 --

17          A.  I think, yeah.

18          Q.  -- to 2017?

19          A.  I think, yeah.  As I recall --

20      again, it's a little bit murky, but as I

21      recall, there's sort of a provisional

22      membership for residents in training.

23      You sort of get a discounted rate on all
```

PLAINTIFFS001683

Page 102

1     of the expensive things, and the -- and

2     access to the White Journal, as it's

3     called.  And then -- and then I -- as I

4     recall, you don't get the full membership

5     until you've been board-certified, which

6     happened for me, as you know, in '97.

7         Q.   Okay.  But you were part of the

8     ASPS for a long time; right?

9         A.   Yes.  Going to meetings.

10        Q.   You consider the ASPS to be a

11    reputable organization; right?

12             MR. KNEPPER:  Objection, form.

13        A.   Yeah.  Well, for the most part,

14    yeah.  Certainly, the members, virtually

15    most of the members I've ever known are

16    reputable.  And there are some things

17    that the ASPS has done through the years

18    that -- that I've had difficulty with

19    and -- but they're certainly the

20    organization in American plastic surgery.

21        Q.   Yeah.  I think one statistic I

22    heard is 93 or so percent of all plastic

23    surgeons are part of the ASPS.

PLAINTIFFS001684

Page 103

1          A.    Yeah.

2          Q.    Right?

3          A.    That -- that number wouldn't

4     surprise -- I would have thought even

5     higher, actually, but yeah.

6          Q.    Do you think the ASPS would

7     encourage its members to perform

8     surgeries that are not medically

9     necessary?

10          MR. KNEPPER:  Objection, form.

11          A.    Well, the -- as a -- as an

12     organization, they don't encourage

13     particular surgeries, but they may

14     support them with their scientific

15     presentations, their conferences, and

16     that sort of thing.

17          For example, three or four years

18     ago, I went to a meeting of the

19     California Society of Plastic Surgery,

20     which is -- I think it has sort of a

21     subsidiary relationship with the ASPS.

22     And at that conference, among other

23     things -- I went there because that's one

PLAINTIFFS001685

Page 104

1    of the -- the areas of the country where

2    I trained and I had hoped to see some

3    friends there.  But -- but for example,

4    in that conference I went to a lot of

5    great presentations, but the last day was

6    devoted almost entirely to transgender

7    surgery.

8            And so if you're asking me do I

9    -- how do I feel about that, well, I have

10   great difficulty with a professional

11   organization that would support or

12   promote those sorts of interventions

13   knowing what I know about the scientific

14   underpinnings of those medical and

15   surgical procedures.  And I had many

16   conversations at that conference on the

17   subject with persons who were providing

18   the services, and I didn't find their

19   answers particularly satisfactory.  So

20   that would be an example.

21           I can't give you carte blanche

22   that everything that the Society says and

23   does is to my liking.  I would say

PLAINTIFFS001686

1       probably most of what they say and do is

2       very much to my liking.  But on this

3       matter, I have -- I have a great

4       difficulty.  And it's one of the reasons

5       that I -- I -- yeah.

6            Q.   It's one of -- one of the

7       reasons that you what?

8            A.   That I -- that I don't have a

9       lot of heartache about stepping away from

10      the ASPS.

11           Q.   Do you think the AS- -- ASPS

12      advocates in favor of surgical procedures

13      that are not medically necessary?

14           A.   I think that would be probably

15      an overreaching statement.  I wouldn't

16      say that.  I would say that perhaps

17      they're mute on some of the -- some of

18      the procedures that their members

19      perform, and they certainly have their

20      eyes and ears open for new things.  And

21      so when members come forward to make

22      presentations about particular new

23      therapies and new approaches, as they

PLAINTIFFS001687

1    should, the ASPS is open to those things.

2    So for many years, transgender surgery

3    has been in that category.

4            I remember when I was a -- even

5    when I was a general surgeon and I was

6    looking for residency programs to train

7    in, I was considering UVA.  And I saw

8    that -- that Milton Edgerton, one of the

9    great names in plastic surgery was at UVA

10   doing transgender surgery, both at UVA

11   and at Johns Hopkins.  And I remember

12   thinking, well, I'm -- I really need --

13   it struck me as an unusual operation, and

14   I -- I started doing some research into

15   it.

16           And I remember starting to think

17   about the issue of transgender surgery

18   back in the -- what would have been 1991,

19   1990, 1991.  And -- and through the

20   years, the ASPS has made room for that

21   intervention, those therapies, in their

22   conferences, in their dialogues, in their

23   publications.  And I've reviewed all that

PLAINTIFFS001688

Page 107

```
 1      stuff as it has come along.  And I think
 2      now being twenty, nearly thirty years on
 3      since I first started looking at it and
 4      they're still just sort of at that stage
 5      of -- of putting it out there, although
 6      now they're offering more extensive
 7      training conferences on how to do those
 8      procedures, and they're now encouraging
 9      that it be included in residency
10      programs, and so -- yeah.
11          Q.   Do you know what position the
12      ASPS takes on whether gender-affirming
13      surgery is medically necessary?
14          A.   I think that position has
15      changed, and now they're -- they're
16      speaking positively about it.
17          Q.   Yeah.  Your own professional
18      organization, or at least your former
19      organization, takes the position that
20      gender-affirming surgery is medically
21      necessary; right?
22              MR. KNEPPER:  Objection, form.
23          A.   Yeah.  As I -- as I said before,
```

PLAINTIFFS001689

Page 108

1       this is one of the reasons why I don't

2       have a lot of heartache about having

3       withdrawn my membership.  Yeah.

4           Q.   Now let me introduce another

5       exhibit.  Let me know when you have it,

6       Doctor.

7       (Exhibit 7 was marked for identification

8       and is attached.)

9           A.   Okay.  Okay.  I've got it.

10          Q.   The top of the page says,

11      "American Society of Plastic Surgeons."

12      Right?

13          A.   Yes.

14          Q.   You see this document is dated

15      February 25, 2021; right?

16          A.   Yes.

17          Q.   This is after all the studies

18      that you cite in your report; right?

19          A.   Where does that say that?  I'm

20      sorry, you're at a particular paragraph?

21          Q.   No.  The date of this --

22          A.   Oh, I see.  Oh, the date is

23      after this --

PLAINTIFFS001690

Page 109

1        Q.    Yeah.

2        A.    Yes.  Well, February 25th, yes,

3    2021.

4        Q.    Yeah.  This is -- this is dated

5    after all of the studies that you cite in

6    your report; correct?

7        A.    I don't -- yeah, I don't

8    remember off the top of my head any

9    studies that were dated after.  There may

10   have been an April study in there, but

11   okay.

12       Q.    The first sentence says, "Policy

13   around transgender care has recently

14   gained considerable attention amid a

15   growing trend of legislation carrying

16   serious professional, financial or

17   criminal penalties for the provision of

18   gender affirmation care."  You see that?

19       A.    I do.

20       Q.    Now, this reference to a growing

21   trend of legislation, that's talking

22   about legislation like the Arkansas ban

23   and the Utah ban and the Alabama ban that

PLAINTIFFS001691

Page 110

1        we talked about earlier; right?

2            A.    Right.

3                  MR. KNEPPER:   Objection, form.

4            Q.    Go to page 2.   Look at the

5        second paragraph.   It says that "Less

6        than three months into 2021, 11 pieces of

7        legislation attempting to criminalize

8        gender affirmation therapies have been

9        introduced in 10 states."  See that?

10           A.    I do.

11           Q.    And then there's a list of

12       states; right?

13           A.    Yes.

14           Q.    So we talked about Utah and

15       Alabama and Texas before.   Looking at

16       this list, does that refresh your

17       recollection whether you've worked on

18       these kind of legislative efforts in any

19       other states?

20           A.    I think -- I think, yeah, my

21       answer has not changed.   I think I've

22       only been involved in Alabama, Texas, and

23       Utah.   I don't remember anything from

PLAINTIFFS001692

Page 111

```
 1      Oklahoma, New Hampshire, Montana, or
 2      Missouri or Mississippi.  I don't recall
 3      any other states in that list, no.
 4          Q.   Okay.  All right.  Now let's
 5      look at what position the ASPS takes on
 6      whether gender-affirming treatment is
 7      medically necessary.  Go to page 3.  The
 8      first sentence says, "ASPS firmly
 9      believes that plastic surgery services
10      can help gender dysphoria patients align
11      their bodies with whom they know
12      themselves to be and improve their
13      overall mental health and well-being."
14      Do you see that?
15          A.   I do.
16          Q.   The ASPS, your own professional
17      organization, does not agree with your
18      opinions that gender-affirming surgery is
19      medically inappropriate; right?
20               MR. KNEPPER:  Objection, form.
21          A.   Let me just read that.  Give me
22      just a moment to look at that.  Okay.
23               Yeah.  This is a very --
```

PLAINTIFFS001693

Page 112

1  language used by the other professional

2  organizations, and essentially, the

3  language takes the position that surgical

4  intervention for a subjective problem is

5  medically indicated.  And that's the

6  difficulty that I'm having here, is that

7  in this document the ASPS does not --

8  does not provide medical scientific

9  support.  They essentially admit that the

10  surgery is for help with a psychological

11  problem of perception on the part of the

12  patient.  So essentially what -- what the

13  ASPS firmly believes in is the use of

14  surgery to manage a psychological

15  problem.  And -- and this is -- this is

16  consonant with the -- with the -- the

17  consensus opinions that were offered by

18  the other professional organizations that

19  you listed earlier.

20      Q.   The AS- -- ASPS does not agree

21  with your opinions that gender-affirming

22  surgery is experimental; correct?

23           MR. KNEPPER:  Objection, form.

PLAINTIFFS001694

Page 113

```
 1        A.   They don't -- let's see, do they
 2    say anything about experimental in here?
 3    No, they don't.  So yeah, I would agree.
 4        Q.   Do you agree?  Yeah.
 5        A.   I would agree, yeah, sure.
 6        Q.   Look at the last sentence.  It
 7    says, "ASPS will continue its efforts to
 8    advocate across state legislatures for
 9    full access to medically necessary
10    transition care."  Do you see that?
11        A.   Yeah.  I don't find that
12    statement at all surprising.  No.
13        Q.   Yeah.
14        A.   I do see that, yeah.  Not
15    surprising.  This is legislative --
16        Q.   The ASPS --
17        A.   -- legislative advocacy by the
18    ASPS.
19        Q.   The ASPS considers transition
20    care to be medically necessary; right?
21            MR. KNEPPER:  Objection, form.
22        A.   Again, that returns -- returns
23    to that -- that inherent and
```

PLAINTIFFS001695

Page 114

1        contradictory statement of medical

2        necessity for a subjective condition.

3        And the statement is consistent with what

4        -- yeah.  Exactly, yeah.

5            Q.   It's fair to say that the

6        opinions that you and Dr. Hruz and Dr.

7        Levine are offering in this case are very

8        different than the position that the ASPS

9        has adopted on whether gender-affirming

10       surgery is medically necessary; right?

11               MR. KNEPPER:  Objection, form.

12           A.   Absolutely correct.

13           Q.   In fact, let me show you how

14       strongly the ASPS feels about this issue.

15       Let me introduce another exhibit.  Okay.

16       Let me know when you -- when you receive

17       it.

18               MR. KNEPPER:  Dmitriy, I -- I

19       will tell you, it seems to be moving more

20       slowly than normal.  I don't know if

21       you're seeing the same thing on your end.

22               MR. TISHYEVICH:  I am.

23           A.   So yeah, I have this document.

PLAINTIFFS001696

Page 115

```
 1      Again from the ASPS?  Is that the one?
 2      February 25th?
 3          Q.   No.  It should be -- it's a
 4      one-page document.  I think it just says
 5      ASPS in your folder.
 6          A.   Exhibit 7?
 7              MR. TISHYEVICH:  Let me -- let's
 8      go off the record for a minute.
 9              MR. KNEPPER:  Sure.
10              THE VIDEOGRAPHER:  We are off
11      the record at 10:19 a.m.
12                  (Break taken.)
13              THE VIDEOGRAPHER:  We are back
14      on the record at 10:21 a.m.
15          Q.   (By Mr. Tishyevich) All right.
16      Doctor, before the break, we were talking
17      about the ASPS and the position they take
18      on the medical necessity of
19      gender-affirming surgery.  You recall
20      that?
21          A.   Yes.
22          Q.   All right.  This is a document
23      from the ASPS titled "2021 State Policy
```

PLAINTIFFS001697

Page 116

1    Priorities."  Do you see that?

2    (Exhibit 8 was marked for identification

3    and is attached.)

4        A.    Yes.

5        Q.    Last sentence of the first

6    paragraph says, "To ensure that our

7    health care system is effective and

8    efficient, ASPS will focus its state

9    advocacy efforts on," and then there's a

10   list.  Do you see that?

11       A.    Yes.

12       Q.    And there's three sections:

13   "Core Priorities," "High Priorities," and

14   "Other Priorities."  You see that?

15       A.    Yes.

16       Q.    Go to the "High Priorities"

17   section.

18       A.    Okay.

19       Q.    The last bullet says, "Opposing

20   attempts to criminalize gender

21   confirmation."  Do you see that?

22       A.    I do.

23       Q.    And you understand what this

PLAINTIFFS001698

Page 117

1      bullet means; right?

2          A.    I do.

3               MR. KNEPPER:  Objection to form.

4          Q.    One of the ASPS's high

5      priorities for this year is to oppose

6      legislation like the Arkansas ban and the

7      Utah ban and the Alabama ban that you are

8      supporting; right?

9          A.    Apparently so, yes.

10              MR. KNEPPER:  Objection, form,

11     scope.

12         Q.    The sense that I got from

13     reading your report, Doctor, is that it's

14     supposedly generally accepted that

15     gender-affirming surgical treatment is

16     experimental and should not be performed

17     on anyone; right?  That's what you think?

18              MR. KNEPPER:  Objection, scope,

19     form.

20         A.    Right.  My opinion -- my opinion

21     in that matter is based on the -- on the

22     world literature rather than advocacy

23     statements by a professional

PLAINTIFFS001699

Page 118

1    organization.  That's right.

2       Q.   You are suggesting, in fact,

3    that doctors who do these surgeries

4    should be investigated for unethical

5    behavior and potential misconduct; right?

6            MR. KNEPPER:  Objection, form.

7       A.   I -- yes, I do.

8       Q.   And you do not think it's

9    relevant to mention that your own

10   professional society takes a view that is

11   contrary to the opinions that you're

12   offering in this case; right?

13      A.   I'm not sure I understood your

14   question, sir.

15      Q.   Yeah.  When you talk about how

16   these doctors should be investigated for

17   misconduct, you don't think it's relevant

18   that your own professional society takes

19   a completely contrary view?

20           MR. KNEPPER:  Objection, form.

21      A.   Well, I think I would -- I would

22   characterize my concern and -- and

23   possibly recommendation of investigation,

PLAINTIFFS001700

Page 119

```
 1        I was discussing, I think, consent
 2        procedures and getting informed consent.
 3        I don't think -- yeah, so -- so I think
 4        the object- -- the concerns I raised had
 5        to do with the off-label use of drugs in
 6        irreversible treatments, the -- the
 7        problem of obtaining consent from
 8        emotionally compromised people who are
 9        threatening suicide.  Those were the
10        issues that I raised in terms of, you
11        know, investigation kind of things, or
12        examination would be a better term,
13        examination of -- of how a
14        physician/surgeon conducts their
15        practice, so.
16            Q.   Go -- go back to your report.
17            A.   Okay.
18            Q.   Go to page 15.  You with me?
19            A.   Yes, sir.
20            Q.   Look at the second sentence in
21        the bottom paragraph.  You say, "Basing
22        life changing surgeries that damage and
23        destroy the natural functions of
```

PLAINTIFFS001701

Page 120

```
 1        perfectly healthy organs on nothing more

 2        than the unverified self-reports

 3        (conversations) of often disturbed

 4        patients as part of untested, unproven,

 5        experimental 'treatments' that are

 6        'supported' by a methodo-" --

 7        "methodologically defective research base

 8        when competent reviews have called such

 9        research 'low quality' evidence and noted

10        the 'lack of any randomized clinical

11        trials' -- should be properly

12        investigated as unethical, misconduct and

13        an abuse of a vulnerable patient

14        population."

15             Right?  That's your opinion?

16        A.    Yes, sir.  And I stand by that.

17        Q.    You know that today there's

18        thousands of plastic surgeons that are

19        performing these surgeries; right?

20             MR. KNEPPER:  Objection, form,

21        scope.

22        A.    I don't know the number of

23        plastic surgeons who do these surgeries.
```

PLAINTIFFS001702

Page 121

1          Q.    Hundreds?
2          A.    I'm -- I'm sure the number is
3     large.  I don't know what the number is.
4     Yes.
5          Q.    And you think all of those
6     doctors are out there committing
7     misconduct?  Is that really what you
8     think?
9          A.    Well, I think that -- that their
10    knowledge might affect their
11    decision-making.  So if somebody is going
12    through a residency training program that
13    -- that is teaching these things and they
14    grow up in that world -- let me give you
15    an example.
16               When I was a surgeon in training
17    in general surgery, the -- the most
18    coveted surgical experience would be, as
19    a chief resident, to do ulcer surgery.
20    At the time, we thought that ulcers were
21    caused by neurologic problems affecting
22    the stomach.  And so some of the most
23    complex abdominal surgeries were ulcer

PLAINTIFFS001703

Page 122

```
 1        surgeries, and some of the greatest names
 2        in general surgery were given to those
 3        operations.  Subsequent to my residency
 4        training, perhaps five years later, it
 5        was found to be a medical condition
 6        treatable with antibiotics and antacids.
 7        Nobody does ulcer surgery any longer.
 8             I would put -- I would put
 9        transgender surgery in the same category.
10        Well-meaning persons who are interested
11        in the care of people who are suffering,
12        in this case, transgender persons who are
13        suffering, well-meaning physicians and
14        surgeons are offering them the best care
15        that they've learned in their training.
16        But I -- I would expect that when the
17        science shows that to be not the case,
18        that those same doctors will abandon it.
19        And I think we're at the same stage now.
20        We're at an inflection point in plastic
21        surgery where in the last three years
22        things have changed radically.
23             If you had asked that question
```

PLAINTIFFS001704

Page 123

```
 1      five, seven years ago, it would have been
 2      up for grabs.  But things have changed
 3      radically with the flood of credible
 4      scientific evidence pouring in from
 5      Europe to now -- if -- if five years from
 6      now, having seen that information,
 7      surgeons persist in doing transgender
 8      surgery, then I would -- then I would
 9      have real issues with that, as I would
10      with a -- with a general surgeon offering
11      a Billroth II ulcer operation today when
12      you could give the patient erythromycin
13      and some -- and some Zantac.  You see
14      where I'm going.
15              So we're at a -- we're at a
16      tipping point in the world of plastic
17      surgery right now, and the last three
18      years have changed everything, because
19      the very, very well-supported -- see, the
20      problem is quality of evidence.  Plastic
21      surgeons in America are operating with
22      scientific evidence that even the
23      American Society of Plastic Surgery
```

PLAINTIFFS001705

Page 124

1    characterizes as level 5 evidence,

2    basically, the -- the professional

3    opinions based on personal experience.

4    This is entry-level science for a

5    particular therapy or a particular

6    intervention.

7              To raise to level 4, you would

8    have to have the same collected cases

9    with -- with before and after tests of

10   the patient.  We haven't gotten to that

11   level yet.  There are no long-term

12   longitudinal studies in the American

13   literature.  It's all in the European

14   literature, and the bulk of it in the

15   last three years.

16             So the question is a difficult

17   one to answer.  As simply as saying that

18   all of these people are immoral, I'm not

19   saying that at all.  I'm saying that

20   they're doing the best that they know how

21   according to the training that they've

22   received for people that they very much

23   care for and are hoping to do good by.

PLAINTIFFS001706

Page 125

```
 1      But the -- but the world is changing

 2      rapidly now, and we've reached a stage

 3      now where it's such a controversy that

 4      this is -- this is -- this is why I've

 5      become so publicly vocal about it,

 6      because the controversy is now raging.

 7      It's no longer:  "Maybe so.  Milton

 8      Edgerton, interesting guy.  You know, the

 9      surgery at UVA, the surgery at Johns

10      Hopkins, let's get a look at that kind of

11      thing."  We've gone beyond that now, and

12      just in the last three years.

13              So I -- the people who do these

14      surgeries are not right out of residency

15      training.  These are people who have --

16      you know, who have been in the -- in the

17      business for a number of years now, and

18      they're relying on what they learned and

19      doing the best that they can.  But as I

20      say, the science is changing everything,

21      so.

22              MR. TISHYEVICH:  With respect,

23      I'm going to strike that answer as not
```

PLAINTIFFS001707

Page 126

1      responsive.

2          Q.   Here's the -- here's --

3               MR. KNEPPER:  No.

4          Q.   -- the question that I'd like

5      you to answer.

6               MR. KNEPPER:  Go ahead.

7          Q.   Here's the question that I'd

8      like you to answer.  Is it your expert

9      opinion that the surgeons that are today

10     performing gender-affirming surgical

11     procedures are committing or potentially

12     committing misconduct, yes or no?

13              MR. KNEPPER:  Objection, form,

14     scope, asked and answered.  Dmitriy, you

15     asked him.  He gave you a --

16              MR. TISHYEVICH:  I don't need

17     the speaking objections.  I do not need

18     the speaking objections.

19         Q.   Answer my question, Doctor.

20              MR. KNEPPER:  He gave you a

21     thoughtful answer.

22         A.   Okay.  If you could ask me the

23     question again, I want to be sure that

PLAINTIFFS001708

Page 127

1    I -- I answer it as succinctly as I can.

2        Q.   Is it your expert opinion that

3    the surgeons that are performing

4    gender-affirming surgical procedures

5    today are potentially committing

6    professional misconduct, yes or no?

7            MR. KNEPPER:  Objection, form.

8        A.   I would -- I would say, only to

9    the extent that they're familiar with the

10   more recent literature would make them

11   sort of culpable, if you will.  Not --

12   not being aware of that literature, I

13   would not accuse them of such a thing.

14       Q.   All right.  Let me introduce

15   another exhibit.  Let me know when you

16   get this one, Doctor, Exhibit 9.

17   (Exhibit 9 was marked for identification

18   and is attached.)

19       A.   All right.  The first page of

20   my -- well, that's the CV, I guess.  My

21   CV, yes.

22       Q.   This is a copy of your CV;

23   right?

PLAINTIFFS001709

Page 128

1        A.    Yeah.  Yes.

2        Q.    You prepared this?

3        A.    Well, it was prepared for me by

4    -- I gave -- I gave the factual input for

5    it, but I didn't prepare it myself, let's

6    say.

7        Q.    Top of the page says, "Board

8    Certified in Surgery and Plastic Surgery"

9    again; right?

10       A.    Right.  Same mistake, yeah.

11       Q.    We agree that's not consistent

12   with guidance from the American Board of

13   Surgery, American Plastic Board of

14   Surgery; correct?

15            MR. KNEPPER:  Objection, form.

16       A.    Yes.

17       Q.    Go to page 3, the bottom of the

18   page.  It says, "Publications - Peer

19   Reviewed Medical Journals."  You see

20   that?

21       A.    I do.

22       Q.    And then through page 4, it

23   lists six publications; right?

PLAINTIFFS001710

Page 129

1          A.    Right.

2          Q.    In your professional career,

3     you've published six articles in

4     peer-reviewed medical journals; right?

5          A.    Right.

6          Q.    First one was in 1997; right?

7          A.    '87.  Yes.

8          Q.    Most recent one was in 1998;

9     correct?

10         A.    Correct.

11         Q.    That's 23 years ago; right?

12         A.    Right.

13         Q.    You have not published any

14    original research in peer-reviewed

15    literature within the last 23 years;

16    correct?

17         A.    Correct.

18         Q.    All right.  Let's go through

19    these in reverse order.  All right.  Most

20    recent one from '98 is titled "Treatment

21    of an isolated outer table frontal sinus

22    fracture using endoscopic reduction and

23    fixation."  Right?

PLAINTIFFS001711

Page 130

1          A.    Yes.

2          Q.    That publication doesn't relate

3     to gender-affirming surgery or to gender

4     dysphoria; correct?

5          A.    Tangentially, it would relate to

6     it.  And I would say this about it.  It

7     was one of the first, if not the first,

8     paper demonstrating the use of endoscopic

9     technique to operate on facial bones of

10    the forehead and the use of internal

11    fixation devices for modification or

12    repair of the forehead.  Those are the

13    same techniques that are now used by

14    transgender surgeons who are offering top

15    surgery.  For example, for feminization

16    of a masculine brow ridge, they use

17    endoscopic technique, which is described

18    in this paper that came out 23 years ago

19    and was written by myself and another

20    Navy surgeon.

21         Q.    Understood.

22         A.    Yeah.

23         Q.    The -- the patient in this

PLAINTIFFS001712

1   publication was not treated for face --

2   for gender dysphoria obviously; right?

3       A.   No.  She was a sweet pizza maker

4   who had slipped in the kitchen and struck

5   her head on a stainless steel table and

6   had a -- had a displaced fracture of her

7   forehead.  But no, she was -- not to my

8   knowledge.  I don't know if she was or

9   not, but to my knowledge, she was not.

10      Q.   Next one going backwards is from

11  1996, and it's titled, "Scarless Fetal

12  Skin Repair: 'Unborn Patients' and 'Fetal

13  Material.'"  Do you see that?

14      A.   I do.

15      Q.   All right.  That doesn't relate

16  to gender-affirming surgery or to gender

17  dysphoria, I take it?

18      A.   It -- it actually refers to all

19  forms of surgery and particularly,

20  ethical decision-making.  So I would say

21  that it's -- it's a -- it's a fairly

22  broad paper that talks about how we treat

23  other human persons.  So transgender

PLAINTIFFS001713

Page 132

1    surgery is all about how we treat other

2    human persons.  That's what that paper is

3    about and how -- how some surgeons are

4    likely -- or possibly physicians and

5    surgeons could characterize someone as

6    less than human, which is a -- which is a

7    danger that transgender persons

8    experience when they're seeking care.

9    And so I would say that in a very

10   tangential way, it does.  It does impinge

11   upon the field of transgender medicine

12   precisely for the reason that transgender

13   persons suffer oftentimes from being

14   treated as -- as someone who is less than

15   human.

16        Q.   Aside from that very tangential

17   angle, this paper does not specifically

18   relate to gender-affirming surgery or

19   gender dysphoria; correct?

20        A.   No, it does not.

21        Q.   And the next one before that is

22   in 1995.  Do you see that?

23        A.   I do.

PLAINTIFFS001714

Page 133

```
 1       Q.   You're listed as the third
 2     author in this one; right?
 3       A.   Yes, sir.
 4       Q.   Because you're not the lead
 5     author; right?
 6       A.   No.  The attending surgeon is
 7     always the lead author, and I was a
 8     resident.  I was a resident at that time,
 9     yeah.
10       Q.   Understood.  This one's titled
11     "Delayed development of an ectopic
12     frontal sinus muccele after pediatric
13     cranial trauma."
14       A.   Mucocele, yes.  Mucocele.
15       Q.   Thank you.  This publication
16     doesn't relate to gender-affirming
17     surgery or gender dysphoria; correct?
18       A.   Not directly, no.
19       Q.   Okay.  Next one before that is
20     titled "Patch Esophagoplasty"?
21       A.   Very good.
22       Q.   And that's repair or
23     reconstruction of the esophagus; right?
```

PLAINTIFFS001715

Page 134

1        A.    Yes.

2        Q.    Does this relate to

3    gender-affirming surgery or gender

4    dysphoria?

5        A.    No.

6        Q.    Next one before that is titled

7    "Modified Skin Incisions for Mastectomy:

8    The Need for Plastic Surgical Input in

9    Preoperative Planning."  Do you see that?

10       A.    I do.

11       Q.    And finally, your oldest

12   publication is from 1987, titled

13   "Peritoneal Fluid in Human Acute

14   Pancreatitis."  Do you see that?

15       A.    Yes.

16       Q.    Does that relate to

17   gender-affirming surgery or gender

18   dysphoria?

19       A.    It does not.  By the way,

20   that -- that second to the last article,

21   your pattern of questions, I wondered if

22   you overlooked asking the same question

23   on that paper.

PLAINTIFFS001716

Page 135

1      Q.   No.  I want to ask you more

2      specific questions about that one, so

3      we'll spend --

4      A.   Oh, okay.

5      Q.   -- more time on that one.

6      A.   Good.  Good.  Very good.  All

7      right.

8      Q.   Don't worry.

9      A.   Yeah.  "Peritoneal Fluid in

10     Acute Pancreatitis" was a research paper,

11     animal model, and review of the

12     literature.  Yeah.

13     Q.   Okay.  You agree there's a

14     difference between a scientific article

15     that reports original research versus a

16     letter to the editor that's published in

17     a scientific journal?

18          MR. KNEPPER:  Objection, form.

19     A.   Yes.

20     Q.   Some of your publications listed

21     here are just letters to editors; right?

22     A.   Yes.

23     Q.   Why is it that your CV doesn't

PLAINTIFFS001717

Page 136

```
 1      identify those as letters as opposed to
 2      original research?
 3         A.   I didn't -- that didn't occur to
 4      me to do that.  Do we generally list them
 5      separately?  I don't know.  I just put
 6      all my publications there.
 7         Q.   So we can look at them, but for
 8      example, the scarless fetal skin repair,
 9      that's a letter to the editor; right?
10         A.   Right.
11         Q.   And so is the 1993 publication
12      on patch esophagoplasty; right?
13         A.   Right.
14         Q.   So out of the six publications
15      that you list in your CV, at least two of
16      them are letters to editors rather than
17      original research; fair?
18              MR. KNEPPER:  Objection, form.
19         A.   Right.  Yes.
20         Q.   Okay.  Let's talk about your
21      experience treating transgender patients.
22      You retired from the military in 2002;
23      correct?
```

PLAINTIFFS001718

1      A.   Correct.

2      Q.   In 2002, the U.S. military

3   certainly was not providing any

4   gender-affirming treatment to anyone in

5   the military; right?

6      A.   That's correct.

7      Q.   Or to veterans; right?

8      A.   Correct.

9      Q.   In fact, at that time, there was

10  a policy not to provide gender-affirming

11  treatment to active military or to

12  veterans; correct?

13         MR. KNEPPER:  Objection, form,

14  scope.

15     A.   Correct.

16     Q.   So during your career in the

17  military, you did not provide any

18  gender-affirming treatment to any

19  patients; correct?

20     A.   Correct.

21     Q.   All right.  Let's focus on your

22  practice after you left the military in

23  2002.  You currently run the Lappert Skin

PLAINTIFFS001719

Page 138

1     Care clinic; right?

2          A.    That's correct.

3          Q.    How long have you operated that

4     clinic?

5          A.    One year.

6          Q.    Did you operate any clinics

7     before opening this one?

8          A.    Yes.

9          Q.    What was that one?

10         A.    That was my plastic surgery

11    office called Lappert Plastic Surgery in

12    Madison, Alabama.  And before that, it

13    was under the same name but located in

14    Decatur, Alabama.  And before that, it

15    was in Scottsbluff, Nebraska, same name.

16         Q.    How long did you run the Lappert

17    Plastic Surgery clinic?

18         A.    The Madison office was for 15

19    years.  I'm sorry.  The Madison office

20    was for ten years.  My -- my mistake.

21    Ten years at the Madison office, five

22    years at the Decatur office, and three

23    years at the Scottsbluff office.

PLAINTIFFS001720

Page 139

```
 1        Q.   So, let me just make sure I have
 2     my timing here.  So you've had the
 3     Lappert Skin Care clinic for a year,
 4     since 2020?
 5        A.   Right.
 6        Q.   And then the Lappert Plastic
 7     Surgery ten years in Madison, so roughly
 8     2010 to 2020?
 9        A.   That's right.
10        Q.   And then five years before that
11     in Decatur, 2005 --
12        A.   Right.
13        Q.   -- to 2010, roughly?
14        A.   Right.
15        Q.   And then --
16        A.   Scottsbluff was from 2002
17     through two -- through 2005.  That was
18     where I went when I retired out of the
19     Navy.
20        Q.   Your -- your skin clinic
21     currently does treatments like Botox,
22     light therapy, laser hair removal; right?
23        A.   Right.  Laser tattoo removal,
```

PLAINTIFFS001721

Page 140

1    injectables, just skin consultations for
2    skin problems like rosacea, acne, that
3    sort of thing.  That's right.
4        Q.   Were you performing similar
5    treatments at the Lappert Plastic Surgery
6    clinic?
7        A.   Yes.  All I've done is I've just
8    suspend -- I just retired from active
9    surgical practice.  I had an operatory in
10   my office in Madison as well as in
11   Decatur previously, so I would do both
12   hospital-based surgeries as well as
13   clinic-based, office-based procedures.
14       Q.   So for example, light therapy
15   services, you've offered that for
16   ten-plus years, I take it?
17       A.   I believe we got that instrument
18   in 2006.
19       Q.   How about Botox?  Have you been
20   offering that for more than ten years?
21       A.   Yes.
22       Q.   Have you done forehead
23   injections for more than ten years?

PLAINTIFFS001722

Page 141

1    A.    With Botox?

2    Q.    Yes.

3    A.    Yes.

4    Q.    How about crow's feet?  Is that

5    the right term?

6    A.    Yes.

7    Q.    More than -- more than ten

8    years?

9    A.    Yes.

10   Q.    When was the last time you've

11   performed a surgical procedure?

12   A.    Well, as I said, I retired from

13   surgery in August of 2020, so it was -- I

14   think I was doing some last procedures in

15   that same month, perhaps July, somewhere

16   in there.

17   Q.    And in 2020, roughly how many

18   surgical procedures do you think you've

19   performed?

20   A.    From January to July?

21   Q.    Yes.

22   A.    Let's see.  Seven months.

23   Perhaps -- I don't know.  Maybe eighty,

PLAINTIFFS001723

Page 142

1    something 80 to 100, I'm guessing.  I

2    don't know.

3        Q.   And give me examples of common

4    surgeries you would have performed in

5    2020.

6        A.   Well, among the most common ones

7    that we did in the -- in the office were

8    autologous fat grafting for recon- -- for

9    rejuvenation of the face, autologous fat

10   grafting for breast augmentation,

11   ultrasound -- I'm sorry -- laser

12   lipoplasty for body contouring, and then

13   many in-office surgical procedures for

14   skin cancer and skin cancer

15   reconstruction, particularly of the face

16   and the extremities.

17            And then on the hospital side, I

18   would be guessing how many, but it was

19   common for me to do breast reductions and

20   abdominoplasties, little local flap

21   reconstructions in the hospital for

22   younger patients who needed anesthesia,

23   reconstruction -- little reconstructive

PLAINTIFFS001724

Page 143

1      flaps for trauma or for cancer.

2              I had a working relationship

3      with a dermatologist who did a lot of

4      what's called Mohs surgery for removal of

5      cancers.  He would send me his patients

6      if they -- if they were cancers that

7      involved the face.  I would do those

8      reconstructive surgeries.

9              Yeah, that was probably -- I was

10     definitely throttling back in my last

11     year.  I didn't take on a lot of complex

12     cases, so.

13        Q.   Okay.

14        A.   Because I needed -- you need

15     follow-up, and so limited.

16        Q.   I understand.  Let's go back to

17     your report.  Go to page 4.

18        A.   Okay.

19        Q.   Okay.  Five lines down, you see

20     the sentence starting with, "In my

21     private practice"?

22        A.   Yes.

23        Q.   Okay.  Let's break this down.

Page 144

1      So you reference treated skin

2      pathologies.  What skin pathologies are

3      you referring to here?

4          A.   Skin can- -- well, surgically or

5      medically, we're talking two different

6      categories, but.  So I'm consulted on --

7      on a lot of nonsurgical skin pathologies.

8      But as far as surgical skin pathologies,

9      that would include various forms of

10     malignancy and then benign growths and

11     things that are either aesthetically or

12     -- aesthetically problematic or

13     suspicious in appearance, so both proven

14     cancers and things that are suspicious of

15     cancers.  So those would be the skin

16     conditions.  The medical --

17         Q.   Yeah.  Well --

18         A.   -- skin conditions -- I'm sorry?

19         Q.   Yeah.  That's all right.  I'm

20     asking more specifically.

21         A.   Okay.

22         Q.   Because here, you write, "I've

23     had occasion to treat many

PLAINTIFFS001726

Page 145

1      self-identified transgender patients for

2      skin pathologies related to their use of

3      high dose sex steroids."

4          A.    Yeah.

5          Q.    So focusing specifically on that

6      patient population.

7          A.    Okay.

8          Q.    So, what skin pathologies are

9      you referring to here with respect to

10     transgender patients?

11         A.    Well, I've had a few patients

12     who've come in evidencing, you know,

13     acneiform conditions of the facial skin.

14     And so helping people manage acne is a

15     common thing that I do, and a variety of

16     interventions including, you know, the

17     light therapy, but more -- more properly,

18     the use of medications and -- and

19     sometimes laser therapy to manage

20     scarring.   But in those particular cases

21     of the trans-identified people, it's

22     mostly just ordinary management of acne.

23     And it's usually the same patients who

PLAINTIFFS001727

Page 146

1      come to see me about facial hair removal

2      with laser.  I have a couple of patients

3      in that category, people who are

4      transitioning and who are seeking laser

5      removal of hair from their faces.

6          Q.   And you said this is a few

7      patients.  How many transgender patients

8      would you estimate you've treated for

9      skin pathologies related to steroids?

10         A.   Related to -- to sex steroids?

11         Q.   Yes.

12         A.   Oh, I don't know.  Probably less

13     than half a dozen.

14         Q.   Okay.  The acne you're referring

15     to, it's essentially a side effect from

16     the steroids; right?

17         A.   It's a common side effect of --

18     of -- yeah.  Particularly androgen is the

19     most common.

20         Q.   So this -- and so you're

21     treating patients with gender dysphoria

22     after they have already decided to follow

23     a certain course of treatment and started

PLAINTIFFS001728

Page 147

1      taking sex steroids; right?

2          A.    Right.  Yeah.

3          Q.    Okay.  And then you say you've

4      done laser therapies for management of

5      facial hair of also the transgender

6      population?

7          A.    That's right.

8          Q.    Right?

9          A.    That's right.

10         Q.    And is that also in about half a

11     dozen patients?  Or what's you're

12     estimate?

13         A.    Yeah.  It's not a huge number.

14         Q.    Okay.  And finally, you say

15     you've done breast reversal surgeries for

16     detransitioning patients.  On how many

17     patients have you performed -- strike

18     that.

19              On how many detransitioning

20     patients have you performed the surgery?

21         A.    Two.

22         Q.    Two.  All right.  It's not a

23     commonly performed procedure for you;

PLAINTIFFS001729

Page 148

1    fair?

2            MR. KNEPPER:  Objection, form.

3        A.   Yeah, no.  They -- they started

4    coming to me in that last year of

5    practice, so.  Yeah, that -- it's not

6    a -- yeah, it's not a -- it was never a

7    common procedure for me.  I did a lot of,

8    you know, implant removals and stuff

9    through my years.  It's the same

10   operation.  And I've done a lot of

11   gynecomastectomy surgeries.  That's also

12   the same operation.  But in terms of as

13   it's applied to a trans- -- a

14   transitioned person who wants to revert

15   back to male presentation, very limited

16   experience.  But even though it's the

17   same operation, I have only done it for

18   two people.

19       Q.   And you said both of those

20   patients were in 2020?

21       A.   I believe so, yeah.  One of them

22   may have been in 2019.  I'm not positive

23   about that.

PLAINTIFFS001730

Page 149

```
 1        Q.   Before 2019 or 2020, you had
 2    never had a detransitioning patient come
 3    to you to obtain breast reversal surgery;
 4    fair?
 5        A.   I think that's correct, yeah.
 6    I'm just trying to think if there was
 7    any, but I can't -- I can't recall any
 8    other.
 9        Q.   Okay.  Are you aware that modern
10    gender affirmation programs typically
11    have a multidisciplinary team of
12    healthcare providers?
13        A.   Yes.
14             MR. KNEPPER:  Objection, form.
15        Q.   And they usually involve mental
16    health specialists; right?
17        A.   Yes.
18             MR. KNEPPER:  Objection, form.
19        Q.   Endocrinologists?
20        A.   Yes, that's my understanding.
21        Q.   And oftentimes plastic surgeons
22    if the patient wants to go that route;
23    right?
```

PLAINTIFFS001731

Page 150

```
 1        A.    Right.   That's -- that's my
 2     understanding, yes.
 3        Q.    You personally have never been
 4     part of this kind of a multidisciplinary
 5     team for any patient with gender
 6     dysphoria; correct?
 7        A.    No.   I have always -- I have
 8     always turned away personal -- for per-
 9     -- well, my understanding of those
10     procedures has caused me to reject
11     offering them to my patients because I
12     don't see them as beneficial.   So
13     clearly, I wouldn't want to participate
14     in a multidisciplinary team that's
15     offering therapies that I consider to be
16     incorrect treatments for a condition that
17     deserves our care, so.
18        Q.    All right.
19        A.    If you want, I can give you a
20     shorter answer.   No.
21        Q.    Yeah, let's -- you personally
22     have never treated a single patient for
23     gender dysphoria; correct?
```

PLAINTIFFS001732

1      A.   I have never treated a patient
2   with gender dysphoria surgically.
3      Q.   Okay.
4      A.   Other than the detransitioner.
5   I -- I suspect they were still suffering
6   from dysphoria even though they were
7   detransitioning, but I didn't treat them
8   with surgery to -- per se for that
9   condition the way the transgender teams
10   do.  Yeah.
11      Q.   When you were providing laser
12   hair removal to trans women, is that
13   providing gender-affirming care?
14          MR. KNEPPER:  Objection, form.
15      A.   I don't get into the affirmation
16   side of the treatment.  I'm simply
17   providing a service to -- to people who
18   -- who I want to have as friends.
19   Believe it or not, it's true.  I -- I
20   don't turn anyone away whose -- whose
21   request is -- is within the scope of what
22   I consider moral practice of medicine and
23   surgery, so.

Page 152

```
 1        Q.   So earlier, I asked you, you
 2     personally have never treated a single
 3     patient for gender dysphoria, and I think
 4     you said not surgically.  Let me ask more
 5     broadly.  Not limited to surgery, you
 6     have never treated a single patient for
 7     their gender dysphoria symptoms; correct?
 8        A.   Well, I guess if -- if you were
 9     to look at laser facial hair removal and
10     consider that in the -- in the spectrum
11     of care, certainly that's -- that's --
12     that's clinic care that's probably
13     improving the emotional life of the
14     patient because they're seeking to
15     present as women.  So in that sense, I
16     have, yeah.
17        Q.   Nothing outside of laser hair
18     removal?
19        A.   No.
20        Q.   You personally have never --
21        A.   Well, and -- and acne.  Because
22     clearly, that's a problem.  But in terms
23     of their -- the trajectory of their
```

PLAINTIFFS001734

Page 153

1    transition, acne doesn't enter into it.

2    But certainly laser hair removal, yeah.

3        Q.   You personally have never sat in

4    any meetings between a provider and a

5    patient where the doctor was trying to

6    diagnose whether the patient has gender

7    dysphoria; correct?

8        A.   Correct.

9        Q.   You have never sat in any

10   meetings between a provider and a patient

11   discussing their potential treatment

12   options for gender dysphoria; correct?

13       A.   No.

14       Q.   All right.  You're not an

15   endocrinologist; right?

16       A.   Correct.

17       Q.   You're not a psychiatrist;

18   right?

19       A.   Correct.

20       Q.   You're not a licensed mental

21   healthcare provider of any kind; right?

22       A.   Correct.

23       Q.   In your professional day-to-day

PLAINTIFFS001735

Page 154

```
 1       practice, you do not diagnose mental
 2       health conditions of any kind; right?
 3               MR. KNEPPER:  Objection, form.
 4          A.   With the exception of what we
 5       discussed earlier about body dysmorphic
 6       disorder and gender -- gender identity as
 7       a subcategory of body dysmorphic
 8       disorder, no, I would say I don't.
 9          Q.   Okay.  If some patient thinks
10       that they may have depression or anxiety,
11       you would expect that patient to go to a
12       mental health professional, not to you;
13       right?
14          A.   That's my expectation.  But
15       again, many depressed people come to
16       plastic surgeons seeking a remedy for
17       their depression thinking that their
18       appearance is the cause of their
19       depression.  And it's my duty as a
20       plastic surgeon to recognize those
21       patients and -- and send them to the
22       psychologist, psychiatrist, rather than
23       offering them surgical care, yeah, so.
```

PLAINTIFFS001736

Page 155

1          Q.   Yeah.  I'm asking a slightly
2      different question.
3          A.   Okay.
4          Q.   If a -- if a patient, for some
5      reason, came to you and asked you to
6      diagnose them with depression or anxiety,
7      I assume you would refer them to a train
8      -- trained mental health professional;
9      right?
10          A.   Yes.
11          Q.   Because doctors should not be
12      diagnosing patients with mental health
13      conditions if they do not have training
14      in how to diagnose mental health
15      conditions; right?
16              MR. KNEPPER:  Objection, form.
17          A.   Well, I wouldn't say that,
18      because for example, as a -- as a -- as a
19      surgeon, as a plastic surgeon, we do have
20      to make diagnoses outside of our
21      specialty in order to get people to the
22      right specialist.  So to an extent, you
23      have to make that diagnosis.

PLAINTIFFS001737

```
 1              So for example, as a resident in
 2      training, I diagnosed an endocrinological
 3      disease and probably saved a woman's life
 4      because she was in a psych ward, and --
 5      and -- and the doctors had a question
 6      about her -- a lump in her neck.  She had
 7      been on the psych ward for weeks, and I
 8      diagnosed a hyperfunctioning thyroid
 9      nodule.  I didn't confirm that diagnosis.
10      I sent her to an endocrinologist.  But I
11      made the initial diagnosis of
12      hyperfunctioning thyroid nodule, and --
13      and ultimately, I did her thyroidectomy.
14      But that's an example.
15              You have to understand pathology
16      outside your specialty because you don't
17      know why the patient is going to present
18      to you, and you have to be ready to start
19      the process that gets them to the
20      specialist, so you have to have a working
21      knowledge of the problems.
22      Q.   Yeah, that's exactly the point.
23      Even for that one example, you still send
```

PLAINTIFFS001738

Page 157

```
 1      this patient to a trained endocrinologist
 2      to confirm the diagnosis; right?
 3         A.   Right.  And then they sent them
 4      back to me to give them definitive care.
 5         Q.   Yeah.  And that's what you would
 6      do for any patient that presents to you
 7      with a mental health condition; right?
 8      You would train -- you would send them to
 9      someone who is -- who is trained in how
10      to diagnose mental health conditions;
11      right?
12              MR. KNEPPER:  Objection, form.
13         A.   Yes.
14         Q.   You're not trained in providing
15      psychotherapy counseling; right?
16         A.   Right.
17         Q.   You've never provided
18      counseling, psychotherapy counseling to
19      children or adolescents with gender
20      dysphoria; right?
21         A.   Right.
22         Q.   You've never provided
23      psychotherapy counseling to adults who
```

PLAINTIFFS001739

Page 158

1    have gender dysphoria; right?

2        A.    Right.

3        Q.    You do not have the professional

4    training to provide psychotherapy

5    counseling to adults who have gender

6    dysphoria; right?

7            MR. KNEPPER:  Objection, form.

8        A.    Correct.

9        Q.    Or to children or adolescents

10   with gender dysphoria; right?

11           MR. KNEPPER:  Objection, form.

12       A.    Correct.

13       Q.    Go to page -- back to your --

14   strike that.

15           Back to your report on page 4,

16   in this paragraph 9, about six lines

17   down, you say, "I have consulted with

18   families with children who are

19   experiencing gender discordance."  Do you

20   see that?

21       A.    Yes.

22       Q.    Describe these consultations for

23   me at a high level.

PLAINTIFFS001740

Page 159

```
1          A.   Basically, it was families that
2       wanted to understand what -- the nature
3       of plastic surgery sort of in the future
4       for their children.  These were -- these
5       were personal encounters rather than in
6       the office, but fairly lengthy at times,
7       talking to families about -- they wanted
8       to understand what was being offered to
9       their children.  They wanted to
10      understand the nature of -- or what the
11      future would look like for their
12      children.  They wanted to get some idea
13      of -- basically, they wanted to hear sort
14      of a fuller explanation of the -- of the
15      medical and surgical side of things.  So
16      I wasn't giving them psychiatric
17      counseling, but basically offering them
18      my experience as a plastic surgeon,
19      wanting to know what the surgery's about,
20      what the -- the hormone therapy that
21      precedes the surgery's about, that sort
22      of thing.
23          Q.   How many of these consultations
```

PLAINTIFFS001741

```
 1     have you done, would you estimate?
 2         A.    Perhaps five or six, maybe more.
 3     Maybe -- yeah, five or six would be a
 4     fair number, I think.
 5         Q.    Over what years?
 6         A.    Perhaps the last three.
 7         Q.    Do you know how these parents
 8     know to reach out to you for these
 9     consultations?
10         A.    It's -- I think maybe some of
11     them were -- having heard about my public
12     presentations at various venues.  People
13     hear about this plastic surgeon in
14     Decatur who's raising objections, I
15     guess.  I don't know the particular
16     details about how a particular patient
17     might have come to me.  I just -- I just
18     always make myself available when people
19     are anxious for their children and
20     they're looking for an understanding of
21     what transgender is about.
22         Q.    What's the typical advice that
23     you give to parents of children or
```

PLAINTIFFS001742

Page 161

1      adolescents who are considering starting

2      puberty blockers?

3          A.   Well, my advice on that score is

4      based on the -- on the world literature,

5      that the desistance rate for their child,

6      if they don't give them puberty blockers,

7      the likelihood is that by the time they

8      reach mid-adolescence, they have an 80

9      percent likelihood of desisting in their

10     cross-sex self-identification.  And if

11     you follow them into young adulthood,

12     that percentage will be in the 90s.

13          But essentially, I recommend

14     that they slow everything down, and I

15     recommend against the use of puberty

16     blockade because it's experimental and

17     because the likelihood is very high -- in

18     fact, if I had any medical procedure that

19     gave me 90-plus percent success rate, I

20     would consider that a great victory.

21     So -- so that's -- that's what I speak to

22     them about.

23          That -- that desistance data is

PLAINTIFFS001743

Page 162

```
 1      a very important thing for parents to
 2      understand.  And very often, the patient
 3      -- the parents are experiencing
 4      tremendous pressure from the people
 5      they've seen in consultation, a
 6      tremendous pressure.  And usually, the
 7      parents are very distressed about what
 8      they're hearing, particularly the -- the
 9      fear of suicide and self-harm.
10          Q.   Yeah.
11          A.   So --
12          Q.   You encourage -- yeah, no, I got
13      it.  You encourage patients of children
14      who -- or adolescents who experience
15      gender dysphoria not to start them on
16      puberty-blocking drugs; fair?
17              MR. KNEPPER:  Objection, form.
18          A.   Yeah, I discourage the use of
19      puberty blockade for anything other than
20      precocious puberty or other
21      endocrinopathies.
22          Q.   And you also discourage them
23      from pursuing surgical procedures for
```

PLAINTIFFS001744

Page 163

1      gender dysphoria; correct?

2              MR. KNEPPER:  Objection, form.

3          A.   Correct.

4          Q.   When you do these consultations,

5      do you talk just to the parents or to the

6      children as well?

7          A.   Both, yeah.  I like to meet the

8      children and -- and -- and get to know

9      them, yeah.

10         Q.   And do you convey the same

11     message to the children?  Don't start

12     puberty blockers; don't start -- don't do

13     any surgical procedures?

14             MR. KNEPPER:  Objection.

15         A.   I -- I generally don't -- I'm

16     sorry.  I generally don't speak about the

17     details of therapy to children.  I speak

18     to their parents.

19         Q.   How many children do you think

20     you have consulted with specifically?

21         A.   On this -- on this issue?

22         Q.   Yes.

23         A.   As I say, maybe six.  I often --

PLAINTIFFS001745

Page 164

```
1       well, yeah, I would say six is a good
2       number.
3           Q.   Do you know how many of them
4       went on to start hormone-blocking
5       therapy, if any?
6           A.   I don't.  I don't know the
7       answer to that question.  Yeah, I don't.
8           Q.   Do you know how many of them, if
9       any, went on to start cross-sex hormone
10      therapy?
11          A.   I don't know the answer to that
12      question, no.
13          Q.   You don't know how many of them
14      went on to do any kind of surgical
15      gender-affirming procedures?
16          A.   No.
17          Q.   You haven't done any follow-up
18      with any of these families that you've
19      consulted?
20          A.   As I say, this was an informal
21      thing, so.  Yeah.  So no, I -- I haven't
22      followed up long-term.  This has -- as I
23      say, this has happened over the last
```

PLAINTIFFS001746

Page 165

```
 1      perhaps three years.  And so the general
 2      course of events there is -- is typically
 3      longer than that, so.  But I have not
 4      seen -- well, I have seen one -- one
 5      child twice, actually, with the parents.
 6      And actually -- okay.  So -- so perhaps
 7      she would be an exception.
 8              She was sort of headed in the
 9      direction of seeking puberty blockade.
10      And then in our meetings, she has sort of
11      given that up.  She was under a lot of
12      pressure at school, you know, being
13      pressured by boys because she was
14      starting to develop secondary sex
15      characteristics, and she developed a
16      tremendous anxiety about it.  And someone
17      had told her that -- that if she went
18      through transition care, that that would
19      be avoided.  And I had a conversation
20      with her parents, I had a conversation
21      with her, and essentially just encouraged
22      her to slow down and sort of examine her
23      other options.  And I think within about
```

PLAINTIFFS001747

Page 166

1      seven months, she came back to me, and

2      she's not even thinking along those lines

3      any longer.  In fact, now she's talking

4      about what high school she wants to go

5      to, so.

6          Q.   Okay.  So this is one child who

7      was considering, or whose parents were

8      considering starting puberty-blocking,

9      but after consultation with you, decided

10     not to; right?

11         A.   I think that she -- yeah.

12              MR. KNEPPER:  Objection to form.

13              MR. TISHYEVICH:  Okay.  All

14     right off the record.

15              THE VIDEOGRAPHER:  This is the

16     end of Media Unit No. 2.  We are off the

17     record at 11:06 a.m.

18                   (Break taken.)

19              THE VIDEOGRAPHER:  This is the

20     beginning of Media Unit No. 3.  We are on

21     the record at 11:16 a.m.

22         Q.   (By Mr. Tishyevich) Doctor, you

23     know what facial feminization surgery is;

PLAINTIFFS001748

Page 167

1    right?

2        A.   Yes, I do.

3        Q.   You have never performed facial

4    feminization surgery for any transgender

5    patient; correct?

6        A.   Correct.

7        Q.   You know what facial

8    masculinization surgery is?

9        A.   Yes.

10       Q.   You have never performed that

11   for any transgender patient; correct?

12       A.   Correct.

13       Q.   Do you know what transfeminine

14   top surgery is?

15       A.   Yes.

16       Q.   You have never performed that on

17   a transgender patient?

18       A.   No.

19       Q.   How about a chest reconstruction

20   surgery?  Have you performed that on a

21   transgender patient?

22       A.   No.

23       Q.   You have never performed a

PLAINTIFFS001749

Page 168

1      vaginoplasty for a transgender patient?

2           A.    No.

3           Q.    You have never performed a

4      metoidioplasty for any transgender

5      patient?

6           A.    No.

7           Q.    You've never performed what's

8      colloquially known as bottom surgery for

9      any transgender patient; correct?

10          A.    Correct.

11          Q.    Fair to say you've never

12     performed any kind of gender-affirming

13     surgery in transgender patients; right?

14          A.    Correct.

15          Q.    And fair to say you don't have

16     recent and substantive experience in

17     performing gender-affirming -- -affirming

18     surgery for transgender patients;

19     correct?

20               MR. KNEPPER:   Form.

21          A.    I have -- I have substantive

22     experience with all the actual -- the

23     nature of the particular operations but

PLAINTIFFS001750

Page 169

1    never performed for transgender patients

2    to transition them, no.  But the

3    operations themselves as used in

4    reconstruction, I have considerable

5    experience with.

6        Q.   We talked earlier about the

7    American Society of Plastic Surgeons.

8    You recall that?

9        A.   I do.

10       Q.   You know that the ASPS has a

11   code of ethics?

12       A.   Yes.

13       Q.   And you know that members are

14   required to comply with the code of

15   ethics; right?

16       A.   Yes.

17       Q.   And I know you're not a member

18   now, but you were a member of the ASPS

19   for a considerable amount of time; right?

20       A.   Yes.

21       Q.   And I assume during that time,

22   you followed the ASPS code of ethics;

23   right?

PLAINTIFFS001751

Page 170

```
1        A.   To my knowledge, I never
2    violated it.  Yes.
3        Q.   When was the last time you
4    reviewed it?
5        A.   I'm sorry, did I lose the sound
6    here?
7        Q.   When was the last time you
8    reviewed the ASPS code of ethics?
9        A.   Oh, gosh.  Years ago.  Years
10   ago.
11       Q.   Let me introduce an exhibit.
12            Let me ask you this first.  Are
13   you aware that the ASPS code of ethics
14   had some specific rules for members who
15   provide expert testimony?
16       A.   Yes.
17       Q.   Okay.  You didn't review those
18   provisions before you formed your expert
19   opinions in this case?
20       A.   No.
21       Q.   Sitting here today, do you know
22   if your opinions in this case are in
23   compliance with what the ASPS code of
```

PLAINTIFFS001752

Page 171

```
 1      ethics says about members who provide
 2      expert testimony?
 3          A.   I'm not aware that I've violated
 4      them in any way, yeah.
 5          Q.   Let me introduce an exhibit.
 6      Okay.  Let me know when you have it.
 7      (Exhibit 10 was marked for identification
 8      and is attached.)
 9          A.   Okay.
10          Q.   It's still opening on my end.
11               Okay.  So, Exhibit 10 is the
12      Code of Ethics of the American Society of
13      Plastic Surgeons.  You see that?
14          A.   I do.
15          Q.   The bottom left corner says,
16      "Updated September 25, 2017."  See that?
17          A.   I do.
18          Q.   That's when you were still an
19      active member of the ASPS; right?
20          A.   Yeah, that's right.
21          Q.   Go to page 4.
22          A.   I think I'm on page 4 here.
23      They're not numbered.  Oh, here we are,
```

PLAINTIFFS001753

Page 172

1      yes.

2          Q.    Or I'm sorry, page 6.

3          A.    Page 6.

4          Q.    Section IV.

5          A.    Section IV, yes.

6          Q.    Section IV is "Expert

7      Testimony"; right?

8          A.    Yes.

9          Q.    I want to focus you on the last

10     two sentences of this first paragraph.

11     It says, "Members whose testimony,

12     including testimony as to credentials or

13     qualifications, is false, deceptive, or

14     misleading may be subject to disciplinary

15     action, including expulsion."  You see

16     that?

17         A.    Yes.

18         Q.    The next sentence says, "Further

19     to help limit false, deceptive and/or

20     mislead" -- "misleading testimony,

21     Members serving as expert witnesses

22     must," and then there's a list of

23     requirements.  You see that?

PLAINTIFFS001754

Page 173

1          A.    I do.

2          Q.    Okay.  So "must" means this is a

3     mandatory rule, not an optional

4     suggestion; right?

5                MR. KNEPPER:  Objection, form.

6          A.    I expect that's what it means,

7     yes.

8          Q.    All right.  Let's look at these

9     rules.  Number 1 says that members

10    serving as expert witnesses must "Have

11    recent and substantive experience (as

12    defined in the Glossary of the Code) in

13    the area in which they testify,

14    including, without limitation, experience

15    in the relevant subspecialty or the

16    particular procedure performed on the

17    plaintiff."

18                Do you see that?

19         A.    I do.

20         Q.    All right.  Without looking at

21    the glossary, do you know, sitting here

22    today, how the glossary defines "recent

23    and substantive experience"?

PLAINTIFFS001755

Page 174

```
1        A.    I don't.

2        Q.    Okay.  Why don't we look at that

3     definition together.  Go to page 8.

4        A.    Okay.

5        Q.    See there's subsection F?

6        A.    Yes.

7        Q.    All right.  Read that definition

8     to yourself, and tell me when you're

9     done.

10        A.    Okay.

11           (Witness reviews document.)

12        A.    Okay.

13        Q.    To be able to provide expert

14     testimony -- well, strike that.

15           Let me focus you on the very

16     last part of this definition.  Okay.  To

17     be able to provide expert testimony about

18     a particular surgical procedure, the ASPS

19     Code of Ethics requires a surgeon to have

20     performed a specific procedure in

21     question within three years of being

22     retained as an expert witness; correct?

23        A.    That's what it says, yes, sir.
```

PLAINTIFFS001756

Page 175

```
 1              MR. KNEPPER:  Objection, form.
 2         Q.   All right.  Now, as we've just
 3      discussed, you personally have not
 4      performed any kind of facial
 5      masculinization surgery in the last three
 6      years; correct?
 7              MR. KNEPPER:  Objection, form.
 8         A.   Correct.
 9         Q.   Any kind of facial feminization
10      surgery; right?
11         A.   Correct.
12              MR. KNEPPER:  Objection, form.
13         Q.   Vaginoplasty; right?
14              MR. KNEPPER:  Objection, form.
15         A.   Correct.
16         Q.   Metoidioplasty; right?
17              MR. KNEPPER:  Objection to form.
18         A.   Correct.
19         Q.   You personally have not
20      performed any kind of gender-affirming
21      surgical procedure on a transgender
22      patient in the last three years; correct?
23              MR. KNEPPER:  Objection, form.
```

PLAINTIFFS001757

Page 176

1        A.    I have never performed such

2    procedures.

3        Q.    All right.  Well, given that you

4    have not ever personally performed any

5    kind of surgical procedures in the last

6    three years, I take it you're not

7    offering expert opinions on any of these

8    surgeries because doing so would be

9    inconsistent with the ASPS code of

10    ethics; right?

11            MR. KNEPPER:  Objection, form.

12        A.    Well, so the ethics that informs

13    my opinion here is I don't derive from

14    the ASPS, nor am I subject to their --

15    their -- what's the word I'm looking

16    for -- their sanctions, I guess, would be

17    the correct word.  The expert opinion I

18    offer here is not on -- on complications

19    of an operation that might enter into a

20    litigation.  In terms of the -- you know,

21    I guess the -- the question at hand here

22    is transition surgery, the bigger

23    picture.  I certainly make record of --

PLAINTIFFS001758

Page 177

1       of the known complications as available

2       in the literature.  And in my testimony,

3       I did a literature review on the

4       complications of particular surgeries.

5               But I don't do these operations

6       for a reason, and the reason I don't do

7       these operations is ethical based on my

8       knowledge of the science.  I don't derive

9       my ethical decision-making from the ASPS,

10      and this is one of the reasons why,

11      again, I have no heartburn about having

12      withdrawn my membership.  I have great

13      issue with -- with the idea that a

14      professional organization would encourage

15      or sanction these operations given the

16      world literature.

17          Q.   Your opinion -- your -- strike

18      that.

19               Your expert report does offer

20      some opinion, or purports to offer some

21      opinions about surgical risks of some of

22      these gender-affirming surgical

23      procedures, does it not?

PLAINTIFFS001759

Page 178

1          A.    Yes.   Based on my -- my

2     experience in microvascular surgery, on

3     flap reconstruction of the perineum, for

4     example, flap reconstruction of the chest

5     or the -- or the genital area in

6     treatment for traumatic injuries and

7     things.   So the operations themselves,

8     I'm quite familiar with.   I'm quite

9     familiar with the complications that are

10    peculiar to free flap or local flap

11    reconstructions.

12              But as far as doing those

13    operations for gender transitioning, I --

14    I don't do those operations.   But the

15    complications are the same: flap loss,

16    flap necrosis, urinary fistulas.   All of

17    those things I have -- I have experience

18    with in managing trauma, in managing

19    cancer, in managing infectious

20    destruction of the genital area.   But

21    I've never done the operation for

22    transgender per se, correct.

23          Q.    And because you've never done

PLAINTIFFS001760

Page 179

```
 1      any of those procedures on transgender
 2      patients, can we agree that offering
 3      those opinions is inconsistent with the
 4      ASPS Code of Ethics?
 5              MR. KNEPPER:  Objection, form.
 6         A.   I would not agree with that.
 7         Q.   Does it bother you that you
 8      might be in violation of the Code of
 9      Ethics by offering these opinions?
10              MR. KNEPPER:  Objection.
11         A.   No.  Not in the least.
12         Q.   Do you think that a judge might
13      be troubled by the fact that your
14      professional organization, former
15      professional organization, says you
16      shouldn't be allowed -- you shouldn't be
17      offering these kind of opinions?
18              MR. KNEPPER:  Objection, form.
19         A.   Yeah, I find -- I find the --
20      the whole situation troubling, and I
21      would hope that the judge would be
22      troubled by it, yes.
23         Q.   Okay.  Yeah, no, I mean, I'm
```

PLAINTIFFS001761

Page 180

1    asking a much more specific question.

2    The judge is going to be asked to find

3    whether your testimony is reliable.  Do

4    you think the judge might have some

5    concerns if she -- if they were to

6    conclude that the testimony you're

7    offering in this case is not allowed

8    under the code of ethics of the ASPS?

9         MR. KNEPPER:  Objection, form.

10        A.   I -- I -- I haven't thought

11   about it.

12        Q.   And you haven't thought about it

13   because before today, you didn't know

14   whether or not your testimony complies

15   with the ASPS Code of Ethics; right?

16        MR. KNEPPER:  Objection, form.

17        A.   I was not -- I was not concerned

18   with the ASPS Code of Ethics, for reasons

19   we've discussed earlier.

20        Q.   Did you know that -- did you

21   know that the ASPS Code of Ethics

22   prohibits members from offering expert

23   testimony on topics in which they do not

PLAINTIFFS001762

Page 181

1    have recent and substantive experience?

2              MR. KNEPPER:  Objection, form.

3         A.   Could you -- can you -- I want

4    to make sure I answer your question and

5    not something else.  Could you offer me

6    that question again, please?

7         Q.   Before I showed you this code of

8    ethics at your deposition today, were you

9    aware that the ASPS Code of Ethics

10   prohibits members from offering expert

11   opinions on topics on which they do not

12   have recent and substantive experience?

13             MR. KNEPPER:  Objection, form.

14        A.   Actually, I dreaded that such a

15   -- such a fact would come to light.  I

16   have not read the -- the ethics code in

17   recent years, as I said earlier.  But

18   I -- I have dreaded this evolution in the

19   ethics of my former professional society,

20   that they would consider transgender

21   surgery the way they do.

22             I -- other -- aside from that, I

23   was not concerned that I might be

PLAINTIFFS001763

Page 182

```
1       violating the ethics of the society
2       because in all my previous life, I have
3       never violated the ethics of the society.
4       And I don't -- at present, I don't
5       consider my testimony to be a violation
6       of this policy that we've read together.
7           Q.   I understand.  All right.  Let's
8       switch gears.  You know what the WPATH
9       is?  The World Professional Association
10      for Transgender Health?
11          A.   Yes.
12               MR. TISHYEVICH:  And for the
13      court reporter, it's W-P-A-T-H, all
14      capital.
15          Q.   All right.  You know that the
16      WPATH publishes standards of care for the
17      health of transgender people; right?
18          A.   They have a publication that
19      they call the standards of care, yes.
20          Q.   And are you aware that they've
21      been publishing those standards since
22      1979?
23          A.   Yes.
```

PLAINTIFFS001764

Page 183

```
1        Q.   The latest publicly available

2    standard of care is Version 7; correct?

3        A.   Correct.

4        Q.   And that was published in 2012;

5    right?

6        A.   That's right.

7        Q.   All right.  Before you wrote

8    your report, did you sit down and review

9    the Standards of Care, Version 7 that

10   you're criticizing?

11       A.   Yes, I did.

12       Q.   All right.  You yourself are not

13   part of the WPATH; correct?

14       A.   No, I am not.

15       Q.   You've never been part of the

16   WPATH; right?

17       A.   I would never be part of the

18   WPATH.

19       Q.   You've never advised the WPATH

20   in any capacity; right?

21       A.   They've never asked my opinion.

22   No.

23       Q.   You've never advised the WPATH
```

PLAINTIFFS001765

Page 184

1      in any capacity; correct?

2           A.   I have not.

3           Q.   You personally have not been

4      involved with the development of WPATH's

5      Standards of Care, Version 7; correct?

6           A.   Correct.

7           Q.   You don't know what year the

8      WPATH started working on Version 7;

9      right?

10          A.   My understanding was it was in

11     2007, but I could be wrong.  I think it

12     was 2007.  I think it was a five-year

13     process, but I could be wrong on that.

14          Q.   You don't know for sure?

15          A.   I don't know for sure.

16          Q.   You don't know how many

17     different work groups at the WPATH were

18     involved with working on Version 7;

19     correct?

20               MR. KNEPPER:  Objection, form.

21          A.   In reading the -- the

22     introduction to the document, the number

23     nine pops into my mind, but I can't swear

PLAINTIFFS001766

Page 185

1    to that.

2        Q.   Okay.  You don't know what kind

3    of scientific literature the WPATH

4    conducted as part of drafting Version 7;

5    right?

6        A.   As far as naming the particular

7    papers that they may have reviewed, I

8    can't do that for you because those

9    are -- that happens in closed committee.

10   I -- all I can say to you is my -- based

11   upon my reading of the product and the

12   verbiage that it's used, my suspicion is

13   that it's pretty heavily weighted towards

14   the American literature and -- and does

15   not bring in particular document -- well,

16   being that it was published in 2012, the

17   big inflection point in 2011 probably

18   wasn't available to the committee when

19   they were writing that document.

20            So given that the document is

21   already out of date and it's -- and the

22   subsequent WPATH 8, no one knows when

23   it's going to come out, yeah, it's --

PLAINTIFFS001767

Page 186

1       it's almost -- it's almost irrelevant

2       because of the change in the literature

3       that happened since it was published, so.

4       In particular, the 2011 article by

5       Dhejne, Cecilia Dhejne, and -- and others

6       that kind of changed the view of the

7       scientific evidence.

8              So yeah, it's an out-of-date

9       document by the standards of what are

10      called standards of care.  It's not a

11      standards of care document.  It's a --

12      it's a treatment guideline document is

13      really what it is, and it's a poorly

14      supported treatment guideline at that,

15      so -- gosh, I wandered off.

16             Did I -- did I answer your

17      question?

18        Q.   Yeah, you anticipated my

19      objection.

20             MR. TISHYEVICH:  Which, again,

21      I'll move to strike most of that as

22      nonresponsive.

23        Q.   Because here's my question.  You

PLAINTIFFS001768

Page 187

```
1       don't personally know what kind of

2       scientific literature the WPATH conducted

3       as part of drafting Version 7; correct?

4              MR. KNEPPER:  Objection, form.

5          A.   No.  Again, a closed session, so

6       I don't know what documents they used.

7          Q.   You don't know what kind of

8       outside experts the WPATH may have

9       consulted in drafting Version 7; right?

10         A.   No.

11         Q.   You don't know what kind of peer

12      review the WPATH may have conducted as

13      part of developing Version 7; right?

14             MR. KNEPPER:  Objection, form.

15         A.   No.

16         Q.   You don't know what kind of

17      public comments the WPATH may have

18      solicited as part of developing Version

19      7.

20             MR. KNEPPER:  Objection, form.

21         Q.   Right?

22         A.   No.

23         Q.   You don't know how many
```

PLAINTIFFS001769

Page 188

```
1        different drafts the Version 7 went
2        through before it was finalized; right?
3            A.    No.
4            Q.    You don't know how many
5        different meetings or conferences the
6        WPATH had to discuss the development of
7        Version 7; right?
8            A.    Correct.
9            Q.    You have no idea what may have
10       gone on during those meetings or
11       conferences; correct?
12               MR. KNEPPER:  Objection, form.
13           A.    No.  I was not a part of the
14       conferences that produced the product.
15           Q.    Yeah, you are not an expert in
16       how Version 7 of the WPATH was developed;
17       right?
18           A.    Correct.
19           Q.    And we can go through all these
20       questions again individually for Version
21       8, but maybe we can shortcut this.
22           A.    Well, no one knows what's in
23       Version 8 except the people who are in
```

PLAINTIFFS001770

Page 189

1      the committee.  It's a -- it's a

2      privileged document.  There's no one in

3      plastic surgery who knows it apart from

4      the people who serve as members of the

5      WPATH, so that would be the case.

6          Q.    Okay.

7          A.    It's a -- it -- yeah.

8          Q.    So just so we have it on the

9      record, you don't hold yourself out as an

10     expert on how Version 8 of the WPATH

11     Standards of Care are currently being

12     developed; fair?

13         A.    Fair.

14         Q.    Okay.  We talked earlier about

15     the DSM; right?

16         A.    Yes.

17         Q.    In your day-to-day practice, you

18     don't use the DSM-5; correct?

19         A.    No.

20         Q.    But you do know the DSM-5 is

21     widely used by psychiatrists; correct?

22         A.    Yes.

23         Q.    The DSM-5 was published in 2013;

PLAINTIFFS001771

Page 190

1      correct?

2          A.   I don't know the publication

3      date, but it sounds about right.

4          Q.   Do you know that it was

5      developed by the American Psychiatric

6      Association?

7          A.   Yes.

8          Q.   You're not a member of the APA;

9      right?

10         A.   Correct.

11         Q.   You personally have not been

12     involved with the development of DSM-5;

13     right?

14         A.   No.

15         Q.   You don't know how many

16     different working groups were involved

17     with developing the DSM-5; right?

18             MR. KNEPPER:  Objection, form.

19         A.   Correct.

20         Q.   You don't know how many

21     different members those working groups

22     had; right?

23             MR. KNEPPER:  Objection, form.

PLAINTIFFS001772

Page 191

1          A.   No.

2          Q.   Or how they were selected;

3     right?

4               MR. KNEPPER:  Objection, form.

5          A.   Correct.

6          Q.   You don't know how many

7     different authors contributed to the

8     development of DSM-5; correct?

9          A.   Correct.

10              MR. KNEPPER:  Objection, form.

11         Q.   You don't know what kind of

12    scientific literature review was done by

13    different work groups as part of

14    developing the DSM-5; correct?

15              MR. KNEPPER:  Objection, form.

16         A.   Correct.

17         Q.   You don't know what kind of

18    public comments the APA may have

19    solicited in developing the DSM-5;

20    correct?

21              MR. KNEPPER:  Objection, form.

22         A.   Correct.

23         Q.   You don't know how many

PLAINTIFFS001773

Page 192

```
 1        different drafts the DSM-5 went through
 2        before it was finalized; correct?
 3               MR. KNEPPER:  Objection, form.
 4          A.   Correct.
 5          Q.   You don't know how many
 6        different meetings or conferences or
 7        telephonic conferences the working groups
 8        had to discuss the development of the
 9        DSM-5; right?
10               MR. KNEPPER:  Objection, form.
11          A.   Right.
12          Q.   You have no idea what was
13        discussed during any of those meetings;
14        right?
15          A.   Right.
16          Q.   Let me ask you specifically
17        about the Sexual and Gender Identity
18        Disorders Work Group.  First of all,
19        before today, did you know that the APA
20        had a Sexual and Gender Identity
21        Disorders Work Group as part of the
22        development of the DSM-5?
23               MR. KNEPPER:  Objection, form.
```

PLAINTIFFS001774

Page 193

1          A.   Yes.

2          Q.   Do you know how many members

3     were in that work group?

4          A.   No.

5          Q.   You don't know --

6               MR. KNEPPER:  Objection.

7          Q.   -- how those members were

8     selected; right?

9               MR. KNEPPER:  Objection to form.

10         A.   Correct.

11         Q.   You don't know their expertise;

12    right?

13         A.   Correct.

14         Q.   You do not have expert firsthand

15    knowledge of how the DSM-5 was developed;

16    fair?

17              MR. KNEPPER:  Objection, form.

18         A.   Fair.

19         Q.   Are you aware that the DSM-4

20    used the term "gender identity disorder"

21    instead of "gender dysphoria"?

22         A.   Yes.

23         Q.   Do you know the reason for that

PLAINTIFFS001775

Page 194

1      change?

2          A.    From DSM-4 to DSM-5?

3          Q.    Yes.

4          A.    Yes.

5          Q.    What's the reason?

6          A.    In reading the literature and

7      reading the reports of perhaps people who

8      served on the committee, because I don't

9      know how else you would be privy to this

10     information, there was a desire on the

11     part of the APA to de-pathologize the

12     condition, and they wanted to use

13     terminology that didn't sound like

14     medical diagnoses.  It was the opinion of

15     the members of that committee that --

16     that transgenderism is only a diagnostic

17     issue from the standpoint of the

18     discomfort or the sorrow that the patient

19     feels rather than any underlying

20     pathology.  So the -- the desire was to

21     move those -- the diagnosis to change the

22     language of diagnosis to de-pathologize

23     it.  But the problem that the committee

PLAINTIFFS001776

Page 195

```
1      faces is that having done that, there's

2      no mechanism for providing the services

3      that they felt that the patients needed,

4      so there had to be a diagnose -- a

5      diagnostic code in order to get

6      thirty-part -- third-party payers to pay.

7      So it's a de-pathologize but maintain a

8      diagnostic -- diagnostic code.  That's my

9      understanding of it.

10               Again, I wasn't there.  But

11     again, reading the writings of people who

12     could only have gleaned it from having

13     been present because it's closed session,

14     that's my understanding.

15       Q.   Understood.  All right.  Do you

16     know what the Endo- -- Endocrine Society

17     guidelines for treatment of

18     gender-dysphoric or gender-incongruent

19     persons are?

20       A.   Do I know what they are?

21       Q.   Yeah.

22       A.   Yes.

23       Q.   Do you know when they were
```

PLAINTIFFS001777

Page 196

1       initially published?

2           A.    No.

3           Q.    Do you know when they were last

4       revised?

5           A.    I think it was just a couple of

6       years ago, but I don't know the exact

7       date.

8           Q.    If I tell you it's 2017, does

9       that sound right?

10          A.    That wouldn't -- it wouldn't

11      surprise me if that were true.  I -- just

12      within the last couple of years.  I think

13      theirs are current, and the expectation

14      is that these standards of care or

15      treatment guidelines will have a

16      five-year revision.  So given that

17      they're current, they couldn't be any

18      older than, say, 2017.  So I suspect that

19      -- yeah.

20          Q.    All right.  Did you review the

21      latest available version of those

22      Endocrine Society guidelines before

23      forming your opinions in this case?

PLAINTIFFS001778

Page 197

1          A.    Yes.   I have read them, yes.

2          Q.    Okay.   You yourself are not part

3     of the Endocrine Society; right?

4          A.    Correct.

5          Q.    Have never been part of that

6     society; right?

7          A.    Correct.

8          Q.    You've never advised the

9     Endocrine Society in any capacity;

10    correct?

11         A.    Correct.

12         Q.    You personally were not involved

13    with the development of these original

14    guidelines; correct?

15         A.    That's correct.

16         Q.    Not personally involved with the

17    development of the updated guidelines in

18    2017; right?

19         A.    Correct.

20         Q.    Do you know how many people at

21    the Endocrine Society were involved with

22    those 2017 updates?

23         A.    I do not know that number.

PLAINTIFFS001779

Page 198

1      Q.   And you don't know how they were
2    selected to work on the 2017 updates;
3    correct?
4      A.   Correct.
5      Q.   You personally don't know what
6    kind of scientific literature review the
7    Endocrine Society conducted in developing
8    those updates; correct?
9          MR. KNEPPER:  Objection to form.
10     A.   Correct.
11     Q.   You don't know what kind of
12   outside experts they may have used;
13   right?
14     A.   What kind of outside experts?  I
15   would imagine they were all
16   endocrinologists.  Or are you asking did
17   they have plastic surgeon input or --
18     Q.   Do you know specifically whether
19   the Endocrine Society used any outside
20   experts in updating the -- in
21   implementing the 2017 updates?
22     A.   Well --
23          MR. KNEPPER:  Objection, form.

PLAINTIFFS001780

Page 199

1        A.   I can only infer that they

2    would, because such -- such statements,

3    in order to be valid, demand review by

4    outside parties to -- to obviate

5    conflicts of interest, whether financial

6    or professional.  Those are all issues

7    when generating standards of care, so of

8    necessity, they would have had to have

9    had outside experts to come in, yes.

10       Q.   Okay.  Do you know what kind of

11   public comments the Endocrine Society may

12   have solicited as part of developing the

13   2017 updates?

14       A.   I don't.

15            MR. KNEPPER:  Objection to form.

16       Q.   You don't know how many

17   different drafts there were of those 2017

18   updates before they were finalized;

19   right?

20       A.   No.

21            MR. KNEPPER:  Objection to form.

22       A.   No, I don't.

23       Q.   Again, you haven't been to any

PLAINTIFFS001781

Page 200

1      meetings or conferences or telephonic

2      conferences where those 2017 updates were

3      discussed, where the development of those

4      2017 updates was discussed; correct?

5              MR. KNEPPER:  Objection to form.

6          A.   Correct.

7          Q.   You don't know what went on

8      during those meetings or conferences;

9      right?

10             MR. KNEPPER:  Objection, form.

11         A.   I do not.

12         Q.   You -- you're not an expert in

13     how the Endocrine Society developed the

14     original 2009 guidelines for treating

15     gender dysphoria; correct?

16             MR. KNEPPER:  Objection to form.

17         A.   That's not -- that's not my area

18     of expertise.  That's correct.

19         Q.   Right.  And you're also not an

20     expert in how the Endocrine Society then

21     developed the 2017 updates back to those

22     guidelines; correct?

23         A.   Correct.

PLAINTIFFS001782

1      Q.   Okay.  All right.  Now let's

2    talk about puberty-blocking agents.  What

3    puberty blocker drugs are you aware of by

4    name?

5      A.   Well, Lupron is probably the

6    most widely used one.  They're -- they're

7    all gonadotropin-releasing hormone

8    agonists.  They come by a variety of

9    trade names.  But gonadotropin-releasing

10   hormone is the genetic -- I'm sorry, the

11   generic name for the drug that may appear

12   under a variety of, you know, proprietary

13   names, Lupron being the most commonly

14   used.

15     Q.   You've never prescribed Lupron;

16   right?

17     A.   No, I have never.  No.

18     Q.   You have never prescribed any

19   puberty-blocking drugs of any kind;

20   right?

21     A.   No.  That's not my area of

22   expertise.

23     Q.   Right.  Have you ever looked at

PLAINTIFFS001783

Page 202

1      the package -- strike that.

2              You know what a package insert

3      is; right?

4         A.   Yes.

5         Q.   Have you ever looked at a

6      package insert for Lupron?

7         A.   Some time ago, but yes, I have.

8         Q.   Okay.  How recently do you

9      think?

10        A.   Gosh, it's probably more than

11     four or five years ago.  I think probably

12     when I first started go -- you know,

13     looking into this more carefully back in

14     2014.  It was probably that long ago.

15        Q.   Do you know what Vantas is?

16     V-A-N-T-A-S.

17        A.   Oh, I've read that somewhere

18     before.  Let's see.  Is it -- it's the

19     adverse events reporting -- is that what

20     I -- I don't --

21        Q.   It's a type of drug.

22        A.   Oh.

23        Q.   So no, that doesn't sound

PLAINTIFFS001784

Page 203

```
1      familiar?
2           A.    It does not sound familiar, no.
3           Q.    How about Triptodur?
4      T-R-I-P-T-O-D-U-R.
5           A.    That sounds like a trade name
6      I'm not familiar with.
7           Q.    Okay.  Fensolvil?
8      F-E-N-S-O-L-V-I-L.
9           A.    That sounds like a trade name
10     I'm not familiar with.
11          Q.    Trelstar?  T-R-E-L-S-T-A-R.
12          A.    Same.
13          Q.    All right.  You're not an expert
14     in the different types of prescription
15     drugs that are used as puberty-blocking
16     agents; fair?
17          A.    I do not consider myself an
18     expert in that area, no.  I rely on
19     experts.
20          Q.    All right.  You know that
21     puberty blockers are typically prescribed
22     by endocrinologists; right?
23          A.    Yes.  Pediatricians and
```

PLAINTIFFS001785

Page 204

1    endocrinologists, yes.

2        Q.    Right.  You have no specialized

3    training or expertise in endocrinology;

4    correct?

5        A.    Correct.

6        Q.    You don't hold yourself out as

7    an expert in endocrinology; correct?

8        A.    No, I do not.

9        Q.    You're not planning on offering

10   any expert opinions in endocrinology in

11   this case because that's outside your

12   scope of expertise; right?

13       A.    Yes.

14           MR. KNEPPER:  Objection to form.

15       Q.    All right.  Earlier, you said

16   you have never prescribed

17   puberty-blocking agents to anyone, so I

18   take it you have no experience, no

19   firsthand experience with advising your

20   patients about potential risks and

21   benefits of puberty blockers; right?

22           MR. KNEPPER:  Objection, form.

23       A.    Well, I have talked to patients

PLAINTIFFS001786

Page 205

```
 1        -- well, families, really, about the
 2        risks of puberty blockers in -- in early
 3        puberty and into adolescence.  I have
 4        because I've reviewed the literature and
 5        I've spoken with experts in the area.
 6        And so, is that the question --
 7            Q.    Yeah.
 8            A.    -- you're asking, have I spoken
 9        to anybody?  Yeah, I have.  I -- I have,
10        again, knowing that -- for example, that
11        the drug Lupron, as an example, is -- is
12        -- is not cleared by the FDA for
13        application.  It's an off-label use when
14        using it in the diagnosed condition of
15        gender dysphoria.  So I know that it's an
16        off-label application of the drug, and I
17        know what the effects of the drug are.
18        But nobody knows what the effects of the
19        drug are on otherwise normal children,
20        and that's pretty much all I'd relate to
21        the families on the -- on that subject.
22                I don't offer myself as an
23        endocrinologist, but I offer myself as a
```

PLAINTIFFS001787

Page 206

1          concerned physician who has spoken with

2          the specialists and read the package

3          insert.  Yes.

4              Q.    You think off-label use is

5          improper; right?  That's the sense I got

6          from reading your report.

7                  MR. KNEPPER:  Objection, form.

8              A.    Off-label use in certain

9          situations.  So I use -- I use -- I have

10         applied drugs' off-label use many times.

11         But what the -- what the practitioner has

12         to do is weigh the risk/benefit equation

13         there and what is the expected goal and

14         what are the likely risks.

15                 For example, I used Botox long

16         ago in the treatment of -- of

17         hyperhidrosis before the company that

18         produces it got FDA clearance to use it

19         that way.  The risk, very, very low risk;

20         the potential benefit, very, very high.

21         But in this case, we're talking about

22         very significant risks for an unproven

23         benefit.  So that's an example of how you

PLAINTIFFS001788

Page 207

1      have to weigh off-label use.

2              And the FDA understands that,

3      and they don't go after off-label use

4      unless there's significant risk.  And

5      even then, they might not yet spring into

6      action.  It's a pretty slow-moving

7      organization.

8         Q.   All right.  We'll come back to

9      that.

10        A.   Okay.

11        Q.   You never sat in on any

12     appointment where an endocrinologist

13     prescribed a puberty-blocking drug to a

14     patient; correct?

15        A.   I have never.

16             MR. KNEPPER:  Objection, form.

17        Q.   You personally don't know what

18     endocrinologists typically tell their

19     patients about risks and benefits of

20     puberty blockers; right?

21             MR. KNEPPER:  Objection, form.

22        A.   Only what I have read in the

23     record.  For example, the plaintiffs'

PLAINTIFFS001789

1    records, I -- I -- I believe I have read

2    that -- that kind of consultation, yeah.

3    But I -- but I wasn't present in the

4    room, if that's what your question is.

5         Q.   Yeah.  You don't know what was

6    actually communicated to the patient;

7    correct?

8         A.   Only what was entered in the

9    record, yeah, the medical record.

10        Q.   And just as a more -- outside of

11   these plaintiffs, as a more general

12   matter, you don't personally know what

13   endocrinologists tell their patients

14   about potential risks and benefits of

15   puberty blockers because you're not

16   present on those prescribing decisions;

17   right?

18             MR. KNEPPER:  Objection, form.

19        A.   Well, if -- I assume that they

20   follow the same sort of process that

21   every other medical professional does

22   when getting consent for -- for therapies

23   of various kinds.  And so to offer

PLAINTIFFS001790

Page 209

```
 1      informed consent to a -- in this case,

 2      perhaps a family, parents, that informed

 3      consent would have to include -- in order

 4      to be valid, it would have to include the

 5      potential risks that are enumerated in

 6      the package insert.  And then they would

 7      also, in certain cases, have to enumerate

 8      risks that may not be in the package

 9      insert but may be expected given the --

10      the particular case of their child or the

11      particular patient.

12              So we all have to follow that

13      same general standard, and so to that

14      extent, I have some knowledge of what

15      they would be saying.  But the particular

16      words or the particular things they may

17      have emphasized, I have no -- no personal

18      knowledge of.

19      Q.   Your general expectation is that

20      before a doctor prescribes the drugs,

21      they will at least inform the patients of

22      the risks as specifically enumerated in

23      the drug labeling; right?
```

PLAINTIFFS001791

Page 210

1          A.    Among other things, yes.

2          Q.    And the doctor may also go

3     beyond the labeling and advise them of

4     potential risks even though they're not

5     specifically disclosed in the drug

6     labeling; right?

7          A.    Yes.  Because there -- there are

8     circumstances wherein the underlying

9     conditions of the patient may -- may

10    cause particular risks in particular

11    areas, so that's right.

12              So there's the general

13    precautions that are included in the

14    package insert, but they usually tend to

15    be exhaustive.  They -- they list in the

16    package inserts even remote

17    possibilities, so.  But most physicians

18    can't drill down into those details with

19    a patient.  You don't want to overwhelm

20    the patient and their family with those

21    minute details.  You want to talk about

22    the major risks and then the risks that

23    are peculiar to the patient because of

PLAINTIFFS001792

Page 211

1          their underlying condition.  And that's
2          generally what everybody does.
3              Q.   Yeah.
4              A.   Although, again, I'm not present
5          in every office on every occasion, but
6          that's generally how we're trained to
7          conduct a consent.
8              Q.   Do you know -- are you aware
9          that patients who are prescribed
10         puberty-blocking agents are typically
11         monitored through blood tests and lab
12         work?
13             MR. KNEPPER:  Objection, form.
14             A.   It -- I don't -- I'm not
15         familiar in all cases to what extent
16         they're monitored.  My hope is that
17         they're being monitored.  I would expect
18         that they're being monitored.
19             Q.   Yeah.  And you don't have
20         experience with monitoring patients who
21         undergoing treatment with puberty
22         blockers; right?
23             A.   No.

PLAINTIFFS001793

Page 212

1          Q.   And you don't have experience
2      with reviewing blood work, labs, what's
3      normal, what's not, anything in that
4      field; right?
5              MR. KNEPPER:  Objection to form.
6          A.   Oh, no, I am familiar with
7      reviewing labs and interpreting
8      laboratory data --
9          Q.   Sorry.
10         A.   -- as it pertains -- yeah.
11         Q.   Sorry.  Let me make -- make my
12     question more specific.  I'm still
13     talking about patients who are treated
14     with puberty-blocking agents.
15         A.   Okay.
16         Q.   For those patients in
17     particular, you don't have experience
18     with reviewing their blood work, labs to
19     see -- to check their hormone levels and
20     see if any adjustments are needed; right?
21             MR. KNEPPER:  Objection, form.
22         A.   No.  I have some familiarity
23     with the interpretation of hormone levels

PLAINTIFFS001794

1    in endocrinology.  As a -- as a general

2    surgeon and a critical care doctor, these

3    issues were very important to me for a

4    number of years.  So I'm familiar with

5    that, although I haven't monitored

6    patients receiving puberty blockers or

7    cross-sex hormones per se.  So generally,

8    I am familiar with -- with that and the

9    ramifications of endocrinopathies, again,

10   because I had considerable experience

11   with management of critical care patients

12   and -- yeah.

13       Q.   Yeah.  My question is more

14   specific.

15       A.   Okay.

16       Q.   You personally have not

17   monitored blood work from patients who

18   are undergoing puberty-blocking agents;

19   right?

20       A.   Correct.

21       Q.   Okay.  And you mentioned

22   cross-sex hormones.  You know what those

23   are; right?

PLAINTIFFS001795

Page 214

1        A.    Yes.

2        Q.    For transgender women, estrogen

3    is a hormone that's typically prescribed;

4    right?

5        A.    Yes.

6        Q.    For transgender men,

7    testosterone is the hormone that's

8    typically prescribed; right?

9        A.    Right.

10        Q.    You've never prescribed

11    cross-sex hormones for treatment of

12    gender dysphoria to anyone; correct?

13        A.    Correct.

14        Q.    You have no firsthand experience

15    with advising your patients about

16    potential risks and benefits of cross-sex

17    hormones when used for treatment of

18    gender dysphoria; correct?

19        A.    Correct.

20        Q.    You personally don't know what

21    doctors who do prescribe estrogen or

22    testosterone to their patients for gender

23    dysphoria tell those patients about the

PLAINTIFFS001796

Page 215

```
 1      risks and benefits of that treatment;
 2      correct?
 3              MR. KNEPPER:  Objection, form.
 4         A.   I would answer that question as
 5      we did earlier, that my expectation would
 6      be that they would cover the -- the risks
 7      and benefits of that -- of that
 8      particular therapy and that the
 9      exploration of potential risks would
10      include the major points that are
11      contained in the package insert and
12      whatever particular risks that the
13      patient may have because of their
14      underlying conditions, medical conditions
15      that may impinge upon them.  That would
16      be my expectation.
17         Q.   Okay.  So for testosterone and
18      estrogen when used to treat gender
19      dysphoria, you would generally expect
20      doctors to at least give the warning
21      about -- that's in the labeling and
22      potentially give additional warnings
23      outside of that as well; fair?
```

PLAINTIFFS001797

Page 216

1          MR. KNEPPER:  Objection to form.

2     A.    That would be my -- that would

3     be my expectation.

4     Q.    All right.  We started talking

5     about off-label use, so let's circle back

6     to that.  So in your report, you

7     criticize Dr. Brown and Dr. Schechter for

8     not disclosing that the FDA has not

9     approved these hormones for treatment of

10    gender dysphoria.  Do you recall that?

11    A.    Yes.  My testimony, yes, I do

12    recall that.

13    Q.    All right.  Off-label use is

14    when a doctor prescribes a drug outside

15    of its FDA-approved indication; correct?

16    A.    Correct.

17    Q.    And we touched earlier on

18    whether it's proper or improper to

19    prescribe drugs on an off-label basis.

20    There are circumstances where it is

21    appropriate to prescribe a drug on an

22    off-label basis; correct?

23    A.    Yes.

PLAINTIFFS001798

Page 217

```
 1        Q.    It's a case-by-case decision;
 2    right?
 3             MR. KNEPPER:  Objection, form.
 4        A.    Yes.
 5        Q.    It's a case-by-case decision
 6    that's made between the doctor and their
 7    patient; right?
 8             MR. KNEPPER:  Objection, form.
 9        A.    Right.
10        Q.    You're not expressing the
11    opinion that doctors should not be
12    prescribing drugs on an off-label basis
13    ever; right?
14        A.    I'm expressing the opinion that
15    -- that drugs that have massive potential
16    side effects should not be off-label
17    prescribed unless those risks warrant --
18    I mean, those risks are warranted given
19    the underlying condition of the patient
20    and that the patient is being treated as
21    a -- as a -- as a trial or an
22    experimental patient with ethics
23    monitoring and all the rest of it that
```

PLAINTIFFS001799

Page 218

1      attends.

2              The reason why off-label use is

3      problematic is because it doesn't have a

4      body of proven scientific evidence that

5      the FDA has made use of in order to -- to

6      warrant the use of the drug.  So if

7      you're going to go off label, again, the

8      risks have to be low.  If the condition

9      you're treating makes -- makes the risks

10     high, then that's where you have to get

11     into ethics panels and experimental

12     trials and things like that.  I think

13     that's at the heart of this issue.

14              We're dealing with a condition

15     where the application of these drugs is

16     not proven and the risks are very high,

17     and that's where my concern lay.

18     Q.    Do you think that off-label use

19     of prescription drugs is, by definition,

20     investigational?

21     A.    To the extent that very often

22     the -- the use of -- the off-label use of

23     drugs begins on the basis of anecdotal

PLAINTIFFS001800

Page 219

```
 1        reports.  So anecdotal reports, again,

 2        are categorized as level 5 evidence.  And

 3        -- and so when those reports are

 4        published and -- and the risks are seen

 5        as low, then other physicians may begin

 6        the off-label use of those drugs.

 7               But generally, one wants to

 8        progress to a more definitive scientific

 9        evidence, like level 4 evidence where

10        there's a pre-application test, the use

11        of the drug, and a post-application test,

12        or level 3 where you're looking at

13        longitudinal data to confirm not only the

14        safety but the efficacy of the

15        application of the drug.

16               In the case of the use of

17        puberty blockade and cross-sex hormones,

18        it doesn't exist beyond level 5 evidence

19        even though the treatment has now been

20        going on off-label for more than a

21        decade, if not approaching twenty years.

22        Q.    All right.  You mentioned

23        doctors are prescribing on an off-label
```

PLAINTIFFS001801

Page 220

```
 1      basis after there's case reports.  It
 2      does happen that doctors prescribe drugs
 3      on an off-label basis based on nothing
 4      more than case reports; right?
 5          A.   That's how it always begins,
 6      yeah.
 7          Q.   Yeah.  The FDA doesn't say
 8      that's not permissible, do they?
 9          A.   No, they don't.
10          Q.   Okay.
11          A.   I don't know.  I don't know what
12      the FDA -- if there's a published policy
13      about that.  I would suspect not, given
14      the history in my lifetime of people
15      off-label using, for example, asthma
16      medications for the treatment of breast
17      implant encapsulation, that kind of
18      stuff.  That's an example of a very
19      benign drug being used off-label to treat
20      a surgical condition of breast implant
21      encapsulation.  So that's my personal
22      experience.  I suspect there isn't an FDA
23      policy that utterly prohibits it.  I
```

PLAINTIFFS001802

Page 221

1      would agree, yeah.

2          Q.   Okay.  The FDA is the federal

3      agency that regulates prescription drugs;

4      correct?

5          A.   Food and drugs, yes.

6          Q.   And they decide whether a

7      particular drug can be marketed for a

8      particular indication; correct?

9          A.   Right.

10              MR. KNEPPER:  Form.

11         Q.   And one of the areas of

12     oversight the FDA has is the safety of

13     prescription drugs; right?

14         A.   Right.

15         Q.   Before forming your opinions in

16     this case, did you investigate what

17     position the FDA takes on off-label use

18     of drugs?

19         A.   No, I did not.

20         Q.   Sitting here today, do you know

21     what that position is?

22         A.   I do not, no.

23         Q.   Do you know whether the expert

PLAINTIFFS001803

Page 222

```
1       opinions you're expressing about

2       off-label use of drugs are consistent or

3       inconsistent with what the -- what the

4       FDA has said about off-label use?

5               MR. KNEPPER:  Objection, form.

6          A.   I remember when the controversy

7       about the use of Singulair in breast

8       implant capsules came up.  That was

9       discussed at an ASPS meeting and then

10      some articles that came out.  And I think

11      I recall from those -- either the

12      conference or the article that the FDA

13      takes a permissive attitude where risk is

14      low.

15         Q.   You think the FDA only allows

16      off-label use of prescription drugs when

17      the risk is low?

18         A.   I don't know that for a fact.

19         Q.   All right.

20         A.   I would -- I would hope.  I

21      would hope low risk/high benefit.  So --

22      so again, it's an equation, it's not just

23      a one-sided thing.  So it isn't just the
```

PLAINTIFFS001804

Page 223

```
1      risk but also the potential benefits.

2      And the potential benefits have to be

3      very high.  The higher the risk is, the

4      higher the benefit has to be.  And that's

5      kind of a general principle of the

6      medical care.  You know, before all else,

7      do no harm.  That's what informs all

8      medical care, and I would hope that's

9      what informs the FDA policy, whatever

10     that may be.

11          Q.   Okay.  Well, let's look at the

12     policy.

13          A.   Okay.

14          Q.   I'm going to introduce another

15     exhibit.  Okay.  This is going to be

16     Exhibit 11.  Let me know when you have

17     it.

18     (Exhibit 11 was marked for identification

19     and is attached.)

20          A.   Okay.

21          Q.   Have you ever seen this document

22     before?

23          A.   I have not.
```

PLAINTIFFS001805

Page 224

1        Q.   Do you know what the Federal

2    Register is?

3        A.   It's a -- it's a federal list of

4    regulations pertaining to things like

5    this.

6        Q.   Yeah.  It's the

7    official publication --

8        A.   Federal code.

9        Q.   -- of federal rules, proposed

10   rules, and notices for federal agencies;

11   right?

12       A.   Yeah.  Right.

13       Q.   I see this is dated at the top

14   November 18, 1994.  See that?

15       A.   Yes.

16       Q.   Page 1, middle column, see it

17   says, "Agency: Food and Drug

18   Administration, HHS"?

19       A.   Let's see.  "Agency: Food and

20   Drug Administration, HHS."  Yes.

21       Q.   It says, "Action."  It says,

22   "Notice; request for comments."  Do you

23   see that?

PLAINTIFFS001806

Page 225

```
 1          A.    Yes.

 2          Q.    All right.  Go to page 2.

 3          A.    Okay.

 4          Q.    In the column all the way to the

 5     right, you see there's a section II, and

 6     it's titled, "FDA Policy on Promotion of

 7     Unapproved Uses."  Do you see that?

 8          A.    I do.

 9          Q.    All right.  The first paragraph

10     says, "Over a decade ago, the FDA Drug

11     Bulletin informed the medical community

12     that 'once a [drug] product had been

13     approved for marketing, a physician may

14     prescribe it for uses or in treatment

15     regimens of patient populations that are

16     not included in approved labeling.'"  Do

17     you see that?

18          A.    I do.

19          Q.    What do you understand that to

20     mean?

21          A.    That --

22                MR. KNEPPER:  Objection.

23          A.    I apply that to mean that --
```

PLAINTIFFS001807

Page 226

1    that the -- that the FDA does not -- does

2    not intend to weigh in on off-label use,

3    you know, without restriction, I guess.

4    The sense I get of it is that they're --

5    they're declining to prohibit the

6    off-label use in -- in other patients at

7    this time, I would -- I would guess.  I

8    suppose that if they started to see

9    complications, they might weigh in.  This

10   has been the history, for example, with

11   nausea medicines and things like that

12   that created problems after use.

13       Q.   At that time at least, the FDA

14   was telling the medical community that

15   doctors may prescribe drugs for uses

16   outside of FDA-approved indications;

17   correct?

18       A.   Yes.  I would say that --

19            MR. KNEPPER:  Objection, form.

20       A.   -- in 1994, the FDA declined to

21   -- to -- I don't know what they've done

22   subsequently.  I -- but -- but in 1994,

23   they -- they -- off-label use was not

PLAINTIFFS001808

Page 227

1      prohibited.

2          Q.   Well, actually --

3          A.   They finally --

4          Q.   Sorry, finish.

5          A.   No, go ahead.

6          Q.   Well, you see this actually

7      says, "The publication further stated,"

8      and then there's a quote.  And after the

9      quote, there's a Footnote 4.

10              Before we get to that, do you

11     see it says -- it cites to the FDA Drug

12     Bulletin from 1982.

13         A.   Right.

14         Q.   Right?

15         A.   Right.

16         Q.   So that original guidance came

17     from a 1982 FDA position; right?

18         A.   Right.

19              MR. KNEPPER:  Objection, form.

20         Q.   And you say that you read this

21     and you don't think that the FDA has

22     taken a position, but let's see what else

23     that quote says.  You see the quoted

PLAINTIFFS001809

Page 228

```
 1      language starting with "The publication
 2      further stated"?  Do you see that?
 3          A.   That starts with the word
 4      "unapproved"?
 5          Q.   Yeah.  It says, "'unapproved'
 6      or, more precisely, 'unlabeled' uses may
 7      be appropriate and rational in certain
 8      circumstances, and may, in fact reflect
 9      approaches to drug therapy that have been
10      extensively reported in medical
11      literature."  Do you see that?
12          A.   I do.
13          Q.   You understand what that means;
14      right?
15              MR. KNEPPER:  Objection to form.
16          A.   Yes.  Yes.
17          Q.   Off-label use -- strike that.
18              The FDA has recognized as early
19      as 1982 that off-label use may be based
20      on medical literature, not published
21      indications; right?
22          A.   Right.
23          Q.   And then it says, "Valid new
```

PLAINTIFFS001810

Page 229

1      uses for drugs already on the market are

2      often first discovered through

3      serendipitous observations and

4      therapeutic innovations, subsequently

5      confirmed by well-planned and executed

6      clinical investigations."  Right?

7          A.    Yeah.  That's -- that's kind of

8      a -- just a restating of what I related

9      to you about, for example, the use of

10     Botox and hyperhidrosis, as I have done.

11     Yeah, I would totally agree with that.

12         Q.    And then it says, "The agency

13     and its representatives have restated

14     this policy on numerous occasions."  Do

15     you see that?

16         A.    I do.

17         Q.    Do you understand that for

18     decades, for three decades at least, the

19     FDA has taken the position that

20     physicians are allowed to prescribe drugs

21     on an off-label basis?

22              MR. KNEPPER:  Objection, form.

23         A.    Yes.

PLAINTIFFS001811

Page 230

```
 1        Q.    Your report doesn't acknowledge
 2     this longstanding position from the FDA,
 3     does it?
 4        A.    My report does not -- no, it
 5     does not.
 6        Q.    And I mean, I know I just heard
 7     you say, well, maybe this is from the
 8     '80s.  Let me show you what the FDA says
 9     today.
10        A.    Okay.
11        Q.    I'm going to introduce another
12     exhibit.  This is Exhibit 12.  Let me
13     know when you get it.
14     (Exhibit 12 was marked for identification
15     and is attached.)
16        A.    Okay. All right.  I've got it.
17        Q.    All right.  You see that this is
18     a printout from fda.gov, the official
19     website of the FDA; right?
20        A.    Right.
21        Q.    The title is "Understanding
22     Unapproved Use of Approved Drugs 'Off
23     Label.'"  Right?
```

PLAINTIFFS001812

Page 231

```
 1        A.    Right.

 2        Q.    Go to page 2.

 3        A.    Okay.

 4        Q.    Toward the bottom, it says in

 5     bold, "Why might an approved drug be used

 6     for an unapproved use?"  Do you see that?

 7        A.    I do.

 8        Q.    Then it says, "From the FDA

 9     perspective, once the FDA approves a

10     drug, healthcare providers generally may

11     prescribe the drug for an unapproved use

12     when they judge that it is medically

13     appropriate for their patient."  Do you

14     see that?

15        A.    I do.

16        Q.    And then skipping one sentence,

17     it says, "One reason is that there"

18     may -- "might not be an approved drug to

19     treat your disease or medical condition."

20     Right?

21        A.    Right.

22        Q.    So the FDA -- the position that

23     the FDA takes is off-label use may be
```

PLAINTIFFS001813

Page 232

1      medically appropriate for patients;
2      right?
3          A.    Right.
4          Q.    That's a position they've taken
5      for thirty years plus; right?
6          A.    Right.
7                MR. KNEPPER:  Objection, form.
8          Q.    All right.  And we talked
9      earlier about, you know, is off-label use
10     experimental or investigational.  Before
11     forming those opinions, did you look to
12     see what the FDA says on that point?
13         A.    How the FDA classifies
14     experimental or investigational?
15         Q.    Do you know what position the
16     FDA takes on whether off-label use is
17     considered investigational?
18         A.    I don't know what their official
19     position is, no.
20         Q.    All right.  Let's look at that.
21     All right.  This is going to be Exhibit
22     13.  Let me know when you have it.
23     (Exhibit 13 was marked for identification

PLAINTIFFS001814

Page 233

1      and is attached.)

2          A.    I have it.

3          Q.    This is a guidance document from

4      the FDA from 1998.  Generally, are you

5      aware that the FDA issues guidance

6      documents?

7          A.    Generally, yes, I am aware.

8          Q.    Have you ever seen an FDA

9      guidance document before today?

10         A.    I've heard them referred to, but

11     I've never read one, no.

12         Q.    Okay.  All right.  Well, this

13     one's titled "'Off-Label' and

14     Investigational Use of Marketed Drugs,

15     Biologics, and Medical Devices."  You see

16     that?

17         A.    I do.

18         Q.    Okay.  All right.  The first

19     paragraph, second sentence says, "If

20     physicians use a product for an

21     indication not in the approved labeling,

22     they have the responsibility to be well

23     informed about the product, to base its

PLAINTIFFS001815

1    use on firm scientific rationale and on

2    sound medical evidence, and to maintain

3    records of the product's use and

4    effects."  You see that?

5         A.   I do.

6         Q.   All right.  The next sentence

7    says, "Use of a marketed product in this

8    manner when the intent is the 'practice

9    of medicine' does not require the

10   submission of an Investigational New Drug

11   Application, Investigational Device

12   Exemption or review by an Institutional

13   Review Board."  Do you see that?

14        A.   I do.

15        Q.   I understand that what this is

16   saying, according to the FDA, when a

17   doctor prescribes a drug on an off-label

18   basis, that is not necessarily an

19   investigational use of that drug; right?

20             MR. KNEPPER:  Objection, form.

21        A.   I would disagree, because as it

22   says there, when they're -- when they're

23   prescribing in that manner, they have a

PLAINTIFFS001816

Page 235

1       responsibility not only to be informed

2       about the product but to do the

3       recordkeeping of its effects, which is

4       really the initial phase of

5       investigation.  So in a sense, they are

6       -- they are part of the investigative

7       process now because a new application of

8       the medication has been proposed, and

9       safety and efficacy have -- have to be

10      documented in some measure.

11               So the FDA is giving you room to

12      broaden the application of the drug, but

13      they're also placing upon you the burden

14      of documenting so that its effects and

15      benefits can be characterized because

16      that's being -- obviously, it's being

17      investigated.  That's the point of their

18      wanting the recordkeeping, so --

19          Q.   Do you know what the

20      Institutional Review Board is?

21          A.   Yes.

22          Q.   Clinical trials have to be

23      cleared by IR- -- IRBs; right?

PLAINTIFFS001817

Page 236

1        A.    Right.

2        Q.    And this says you don't actually

3    have to apply for approval by an IRB when

4    you're prescribing a drug on an off-label

5    basis; right?

6            MR. KNEPPER:   Objection, form.

7        A.    It says that it's not of

8    necessity, so they're not making a

9    blanket requirement.   I would imagine

10   that that might be modified in particular

11   cases.

12       Q.    Yeah.   Because this is saying

13   that when you're prescribing a drug on an

14   off-label basis, that doesn't mean you're

15   starting up a clinical trial; right?

16       A.    It doesn't necessarily mean

17   you're starting a clinical trial, that's

18   right.   It doesn't exclude the necessity

19   for a clinical trial.   It just says

20   you're not necessarily starting a

21   clinical trial.

22       Q.    Yeah.   And when this says --

23   when it says doctors should maintain

PLAINTIFFS001818

Page 237

1        records of the product's use and effects,

2        it's not telling them that they're

3        enrolling their patients in a clinical

4        trial by starting -- by prescribing a

5        drug on an off-label basis; right?

6              MR. KNEPPER:  Objection, form.

7         A.    Right.  But what it -- what it

8        probably is inferring is that if they

9        start seeing complications, then the

10       further application of the drug in that

11       circumstance might be required -- might

12       require an IRB.  So yeah.  So it's --

13       what they're saying is it doesn't require

14       an IRB of necessity.  It does require

15       recordkeeping.  And I would expect that

16       if they were to see complications,

17       problems, lack of efficacy, that -- and

18       the desire for its continued use might

19       require an IRB.  In fact, I would -- I

20       would hope it would require an IRB.

21       Yeah.

22        Q.    Yeah.  A clinical trial down the

23       line is a "this might be nice to have,"

PLAINTIFFS001819

Page 238

```
 1      but it's not a requirement for a doctor
 2      to prescribe a drug on an off-label use
 3      basis.  That's what this says; right?
 4              MR. KNEPPER:  Objection, form.
 5          A.   That's what that says, yeah.
 6          Q.   Yeah.  You don't cite this
 7      guidance in your report obviously; right?
 8          A.   I don't think it's --
 9              MR. KNEPPER:  Objection, form.
10          A.   I don't think it's germane to my
11      report.  No.
12          Q.   All right.  You've also offered
13      opinions on whether it's proper to
14      prescribe drugs on an off-label basis to
15      children and adolescents; right?
16          A.   I've only offered it in the case
17      of this particular therapy.  I haven't
18      offered it generally, only in the case of
19      puberty blockade and cross-sex hormones
20      for the purposes of transitioning a child
21      to the appearance of the other sex.
22      That's all I've offered it as an opinion.
23          Q.   All right.  Do you know what the
```

PLAINTIFFS001820

```
                                             Page 239
 1      American Pediatrics Association is?
 2         A.    Yes.
 3         Q.    Before forming your opinions,
 4      did you look to see what the APA says
 5      about off-label use of drugs in children
 6      and adolescents?
 7         A.    No.
 8         Q.    Sitting here today, you don't
 9      know the APA's position on this -- on
10      this topic; correct?
11              MR. KNEPPER:  Objection, form.
12         A.    Correct.
13         Q.    Let's look at that next.  Okay.
14      This is going to be Exhibit 14, and let
15      me know when you have it.
16      (Exhibit 14 was marked for identification
17      and is attached.)
18         A.    Okay.  I have it.
19         Q.    You understand this is a policy
20      statement from the APA?
21         A.    I'm reading it now.  I see that
22      it is a policy statement from the
23      American Academy of Pediatrics.
```

PLAINTIFFS001821

Page 240

1      Q.   It's a policy statement

2    entitled, "Off-Label Use of Drugs in

3    Children."  Right?

4      A.   Yes.  Yes.

5      Q.   Look at the introduction section

6    toward the bottom of the page.

7      A.   Okay.

8      Q.   It says that, "The purpose of

9    this statement is to further define and

10   discuss the status of off-label use of

11   medic- -- medications in children."  And

12   then it talks about a publication of a

13   2002 statement.  You see that?

14     A.   Yes.

15     Q.   All right.  So the FDA -- APA

16   has taken a position on off-label use of

17   drugs in children since at least 2002;

18   right?

19          MR. KNEPPER:  Objection, form.

20     A.   I'm reading it now.  It appears

21   to be that, yeah.

22     Q.   All right.  Look at the abstract

23   towards the top.

PLAINTIFFS001822

Page 241

```
 1        A.    Okay.
 2        Q.    Second sentence says, "However,
 3     off-label drug use remains an important
 4     public health issue for infants,"
 5     childrens, and" -- "children, and
 6     adolescents, because an overwhelming
 7     number of drugs still have no information
 8     in the labeling for use in pediatrics."
 9     Do you see that?
10        A.    I do.
11        Q.    Okay.  And then it says, "The
12     purpose of off-label use is to benefit
13     the individual patient."  Right?
14        A.    Yes.
15        Q.    And then it says, "Practitioners
16     use their professional judgment to
17     determine these uses."  Correct?
18        A.    Yes.
19        Q.    And then it says, "As such, the
20     term 'off-label' does not imply an
21     improper, illegal, contraindicated, or
22     investigational use."  Right?
23        A.    That's what it says there, yes.
```

PLAINTIFFS001823

Page 242

1          Q.    Yeah.   The APA also takes the
2     position that off-label use does not
3     imply investigational use; correct?
4               MR. KNEPPER:   Objection to form.
5          A.    It does not de facto imply
6     off-label use, that's right, yeah.   It
7     does not imply, right.
8          Q.   And it does not imply that
9     off-label use is de facto improper or
10    illegal or contraindicated; right?
11         A.    Right.
12              MR. KNEPPER:   Objection, form.
13         Q.    All right.   Go to page 2.
14         A.    Okay.
15         Q.    Look at the left column, the
16    very bottom paragraph.
17         A.    Okay.
18         Q.    It says:   "The absence of
19    labeling for a specific age group or for
20    a specific disorder does not necessarily
21    mean that the drug's use is improper for
22    that age or disorder.   Rather, it only
23    means that the evidence required by law

PLAINTIFFS001824

Page 243

1      to allow inclusion in the label has not

2      been approved by the FDA.  Additionally,

3      in no way does a lack of labeling signify

4      that therapy is unsupported by clinical

5      experience or data in children."

6              Do you see that?

7          A.   I do.

8          Q.   This is the APA recognizing that

9      even in the absence of FDA approval for a

10     particular indication, that use may still

11     be supported by clinical experience and

12     data; right?

13             MR. KNEPPER:  Objection, form.

14         A.   Yeah.  I would -- I would say

15     also that the APA recognizes that -- that

16     there's a poverty of evidence.  The

17     poverty of evidence is one of the

18     characteristics of off-label use.  And

19     that's -- that's what the nature of my

20     expert opinion was about, that the

21     poverty of evidence is what makes the

22     off-label use an issue, and in this case,

23     poverty of evidence for off-label use in

PLAINTIFFS001825

Page 244

```
 1       a situation where the harms -- potential

 2       harms are great.  That's what the concern

 3       was, not -- obviously, I use -- I've

 4       off-label used drugs in my own practice,

 5       as I said before.

 6               I don't have an objection

 7       without qualification that -- that the

 8       off-label use of drugs is somehow a

 9       crime.  I'm saying that in this

10       particular instance of this particular

11       application, that the off-label use tells

12       us that there's a poverty of scientific

13       evidence to support its application that

14       way.  Clearly, there's anecdotal reports;

15       otherwise, doctors wouldn't be using it.

16       But there's a poverty of evidence, and

17       what we're dealing with here is not a

18       potential trivial complication but

19       potentially permanently life-altering

20       complications.

21               That was the issue that I was

22       addressing in my concern about the

23       off-label use, that there's a standard
```

PLAINTIFFS001826

Page 245

```
1      of -- of caution that's required when you

2      go off-label.  And that caution isn't

3      being demonstrated by the -- for the

4      persons who are prescribing or applying

5      these drugs in this way.  That was my

6      concern.

7          Q.   All right.  You think that

8      before these drugs are to be prescribed,

9      they should first be supported by results

10     from clinical trials; right?

11             MR. KNEPPER:  Objection, form.

12         A.   That's the beginning.

13         Q.   That's the beginning.

14         A.   Yeah.

15         Q.   The absolute minimum to

16     prescribe these drugs; right?

17             MR. KNEPPER:  Objection, form.

18         A.   Well, no.  No, I -- I didn't say

19     that.  As I said, it begins with

20     anecdotal evidence, not clinical trials.

21     So somebody somewhere sees an effect.  As

22     it said in that FDA document, it's

23     oftentimes serendipitous.  A clinician
```

PLAINTIFFS001827

Page 246

```
 1        will see an effect, and then -- and then
 2        they'll, based on that, they'll hopefully
 3        check out the potential risks to the
 4        patient and then begin that off-label
 5        use.
 6                  So it begins actually with
 7        anecdotal reports, maybe case
 8        collections, maybe a number of providers'
 9        case collections, maybe it's a -- it's
10        a -- it's an institutional experience.
11        But that leads to clinical trials and the
12        IRB and all the rest of it.  So that's
13        just the beginning of it.
14            Q.   It may be appropriate for a
15        doctor to prescribe a drug on an
16        off-label basis without having the
17        results from a clinical trial; correct?
18            A.   Yeah, I would -- I would hope
19        that after thirty years of doing this,
20        that we would beyond -- be beyond
21        institutional or personal experience,
22        that those trials would have already been
23        done.  This isn't -- we're not just at
```

PLAINTIFFS001828

Page 247

1        the beginning of puberty blockade and

2        cross-sex hormones.  We're well into this

3        now, to the point where the European

4        literature is now vehemently rejecting

5        that.

6                That's -- these things have

7        changed.  In the last three years, it's

8        all changed.  With respect to this

9        off-label application of puberty blockade

10       and cross-sex hormones, it's changed

11       utterly.  So these general statements

12       about off-label use are important to

13       understand, certainly, when you see a

14       serendipitous result and you consider

15       applying the drug.  But we are so far

16       beyond that at this point in the history

17       of transgender therapy, this is where

18       we're concerned.  We're concerned with

19       the continued off-label use, the

20       continued absence of clinical trials.  We

21       should have been beyond that years ago.

22       And this is what the European literature

23       is now showing us, that the application

PLAINTIFFS001829

Page 248

```
 1      of those drugs by -- which is approved by
 2      the APA, is now being rejected by the
 3      medical services in Great Britain, in
 4      Sweden, in Finland, in Holland.  And this
 5      is where we as American providers have to
 6      get.
 7          Q.   All right.  We'll -- we'll
 8      definitely come back to those --
 9          A.   Okay.
10          Q.   -- studies.  I promise.
11          A.   Okay.
12          Q.   Let's finish this document
13      first, though.  All right.  Go to page 3.
14      All right.
15          A.   Okay.
16          Q.   Look at the left column.
17          A.   Okay.
18          Q.   It says:  "Therapeutic
19      decision-making should always be guided
20      by the best available evidence and the
21      importance of the benefit for the
22      individual patient.  Practitioners are in
23      agreement regarding the importance of
```

PLAINTIFFS001830

Page 249

1       practicing evidence-based medicine.

2       However, for the pediatric population,

3       gold standard clinical trials are often

4       not available, so practitioners must rely

5       on either less definitive information,

6       such as expert opinion for the age group

7       that they are treating, or use evidence

8       from a different population to guide

9       practice."

10              You see that?

11         A.   I do.  And I would agree with

12      that, that particularly in pediatric

13      patients, the clinical trial approach

14      oftentimes is -- is not available because

15      of the nature of the condition and so on.

16      But in the -- in this case, there's a --

17      it's not an all or none, it's got to be

18      clinical trials or -- or nothing.

19              There's longitudinal

20      population-based studies, long-term

21      results seen in a population that has

22      matured through this therapy, and looking

23      at, you know, cohort studies

PLAINTIFFS001831

Page 250

1          longitudinally, cohort study, which is --

2          which is an alternative when -- when the

3          clinical trial is not available to you

4          for ethical reasons.  Like you wouldn't

5          do sham surgery on somebody.  That would

6          be ethically untenable.  But you can look

7          at population-based studies where you

8          have a cohort to compare.  And that's --

9          that's where we should be.  That's where

10         the European literature is now.

11              So I would agree with that

12         statement that -- that the APA is making

13         there, but I would qualify it by saying

14         that there's an alternative available

15         that brings you to a higher level of

16         evidence that may in fact bring it to

17         on-label use if they were to bother to do

18         it.

19         Q.   The APA recognizes that for the

20         pediatric population in particular,

21         results from clinical trials are often

22         not available; right?

23         A.   Right.

PLAINTIFFS001832

Page 251

1       Q.   And the answer in those

2    situations is not to stop prescribing

3    these drugs altogether; right?

4            MR. KNEPPER:  Objection, form.

5       A.   Yeah.  The "altogether" would be

6    the qualifier there because there are

7    some circumstances where it would be -- I

8    mean, it wouldn't be good to stop its

9    prescription, but there would be others

10   that you would have to examine more

11   carefully because of the risk issue.

12      Q.   Yeah.  Instead, what the APA

13   says is that when clinical trial results

14   are not available, doctors have to rely

15   on less definitive -- definitive

16   information; right?

17      A.   That's what -- that's all you

18   have.  That's right.

19      Q.   Yeah.  The APA says it may be

20   appropriate for doctors to prescribe

21   drugs to pediatric patients on an

22   off-label basis even when that use is not

23   supported by randomized clinical trials;

PLAINTIFFS001833

Page 252

1          correct?

2               A.    Right.

3               Q.    Because the reality is that for

4          a lot of conditions, in the pediatric

5          population, there are no randomized

6          clinical trial results available; right?

7                    MR. KNEPPER:  Objection, form.

8               A.    Again, so you're holding out

9          randomized clinical trial, or they're

10         holding out randomized clinical trial as

11         the only alternative to the lowest form

12         of evidence.  And I -- I agree that

13         randomized clinical trial are not always

14         available, and we have to have recourse

15         to perhaps lesser but nonetheless more

16         convincing forms of evidence to fall back

17         on rather than falling back to the lowest

18         form of evidence as is the case today

19         with the application of these drugs.

20              Q.    All right.  Look at the last

21         paragraph in the left column of this

22         page.

23              A.    Okay.

PLAINTIFFS001834

Page 253

```
 1        Q.    It says:  "In most situations,
 2     off-label use of medications is neither
 3     experimentation nor research.  The
 4     administration of an approved drug for a
 5     use that is not approved by the FDA is
 6     not considered research and does not
 7     warrant special consent or review if it
 8     is deemed to be in the individual
 9     patient's best interest."  Do you see
10     that?
11        A.    I do.
12        Q.    If the physician deems an
13     off-label use to be in the individual
14     patient's best interest, that's not
15     experimental use, according to the APA;
16     right?
17             MR. KNEPPER:  Object to the
18     form.
19        A.    Well, according to the --
20     according to the APA, in most situations.
21        Q.    Yeah.
22        A.    So in that statement, it
23     acknowledges that there are some
```

PLAINTIFFS001835

Page 254

1      situations where that would be

2      considered.  That's the implication in

3      that statement.  So "most" is the

4      qualifier, implying that there are

5      situations where it would be considered

6      experimental.

7           Q.   Okay.

8           A.   And that's what we propose in

9      our expert testimony, is that this is one

10     of those situations.  This is

11     experimental use.

12               MR. TISHYEVICH:  Now let's go

13     off the record.

14               THE VIDEOGRAPHER:  This is the

15     end of Media Unit No. 3.  We are off the

16     record at 12:30 p.m.

17                    (Break taken.)

18               THE VIDEOGRAPHER:  This is the

19     start of Media Unit No. 4.  We are on the

20     record at 1:21 p.m.

21          Q.   (By Mr. Tishyevich) All right,

22     Doctor.  You know you're still under

23     oath; right?

PLAINTIFFS001836

1      A.   Yes.

2      Q.   Before lunch, we were talking

3   about off-label use of prescription

4   drugs.  Do you know how common or

5   uncommon off-label use of prescription

6   drugs is in the overall population?

7      A.   I'm not familiar with that

8   number, no.

9      Q.   All right.  You don't know if

10  it's 5 percent or 10 percent or 50

11  percent of all drugs are prescribed off

12  label; right?

13     A.   I have no idea.

14     Q.   How about pediatrics

15  specifically?  Do you know how common or

16  uncommon off-label use is in the

17  pediatric population?

18     A.   I do not.

19     Q.   Let me introduce an exhibit.

20          MR. KNEPPER:  One second.

21          Dr. Lappert?

22          THE WITNESS:  Yes.

23          MR. KNEPPER:  Your camera has

PLAINTIFFS001837

Page 256

1      moved accidentally, yeah.

2            THE WITNESS:  It just allows me

3      to look at the bottom of the other screen

4      here so I can look at the exhibits.

5            MR. KNEPPER:  Okay.  I think

6      just for the video recording, we want to

7      make sure that the camera stays on your

8      face.

9            THE WITNESS:  I'll go like this,

10     then.

11           MR. KNEPPER:  Perfect.

12        Q.   (By Mr. Tishyevich) So this is

13     going to be Exhibit 15.  Let me know when

14     you have it.

15     (Exhibit 15 was marked for identification

16     and is attached.)

17        A.   All right.  I have it.

18        Q.   All right.  This is a study from

19     2019 by Dr. Yackey, Y-A-C-K-E-Y, titled

20     "Off-label Medication Prescribing

21     Patterns in Pediatrics: An Update."  Do

22     you see that?

23        A.   I do.

PLAINTIFFS001838

Page 257

1          Q.    All right.  And the objective is
2      "To describe the frequency of off-label
3      drug use in 2014 as defined by the
4      FDA-approved age ranges in patients 18 or
5      under 18 years of age."  Do you see that?
6          A.    I do.
7          Q.    All right.  Look at "Methods."
8      Do you see that section?
9          A.    I do.
10          Q.    It says, "This is a
11      retrospective cohort study of an
12      administrative database containing
13      inpatient resource use data from January
14      1, 2014, to December 31, 2014."  And do
15      you see that?
16          A.    I do.
17          Q.    Look at the "Results" section.
18          A.    Okay.
19          Q.    The first sentence says, "At
20      least 1 drug was prescribed off-label in
21      779,270 of 2,773,770 (28.1%) patient
22      visits during the study period."  Do you
23      see that?

PLAINTIFFS001839

Page 258

1          A.    I do.

2          Q.    And skipping a sentence, then it

3     says:  "Off-label usage of certain

4     medications differed between care

5     settings.  Rates of off-label medication

6     use were higher in observational (45.5%),

7     inpatient (53.9%), and ambulatory (54.2%)

8     settings."  Do you see that?

9          A.    I do.

10         Q.    All right.  The study concluded

11    after reviewing 2.7 patient visits that

12    overall, 28.1 percent of patients were

13    prescribed an off-label -- prescribed a

14    drug on an off-label basis; right?

15         A.    Right.

16         Q.    And depending on the setting,

17    off-label prescriptions in the pediatrics

18    context can be as high as 45 to 54

19    percent; right?

20         A.    That's what the study shows.

21         Q.    All right.  The reality is that

22    prescribing drugs to children and

23    adolescents on an off-label basis is a

PLAINTIFFS001840

Page 259

```
 1      fairly common practice; right?

 2              MR. KNEPPER:  Objection to form.

 3          A.   It appears to be, yes.

 4          Q.   You did not know this before you

 5      formed your expert opinions?

 6          A.   I knew that it was more common

 7      in children than in adults, and I knew

 8      that it was, you know, fairly common,

 9      having -- having prescribed off-label

10      myself to children, that it's -- it's

11      probably fairly common.  I didn't know

12      the exact numbers, though, until now.

13          Q.   Okay.

14          A.   Again, my -- my expert opinion

15      about this is not about does it happen.

16      It's about the particular case of the

17      transgendered person receiving an

18      off-label use of a -- of a fairly

19      problematic drug in light of the recently

20      changing evidence about its efficacy.  So

21      the issue of off-label use that I

22      presented was not about are drugs

23      prescribed off-label.  The issue was
```

PLAINTIFFS001841

Page 260

```
 1      these particular drugs in these

 2      particular patients off-label in light of

 3      the recent change in the world literature

 4      about the risk/benefits of doing those

 5      things.  And the evidence now is that

 6      that whole position about puberty

 7      blockade and cross-sex hormones, it's

 8      falling apart in the last three years,

 9      and there's a -- there's a growing wave

10      of evidence that says do not do this.

11      And in fact, that's where the Court

12      stepped in in Great Britain, and it's

13      where the Karolinska Institute stepped

14      in.

15           It's not that it's off-label

16      use.  It's that it's particularly

17      problematic in the case of these drugs in

18      these suffering patients.  That's what my

19      expert opinion was about.  It was not

20      about drug policy.  It was about these

21      patients, these problems, these drugs.

22      And the fact is that when you off-label

23      use, the responsibility falls much more
```

PLAINTIFFS001842

Page 261

1      heavily on the provider.  When the FDA

2      approves it, the responsibility falls to

3      the shoulders of the approving authority.

4      But if you're going off-label, it's on

5      you as the provider to be certain that

6      you're doing good to the patient.  And up

7      until the last three years, the evidence

8      wasn't there.  Now it's there.  The

9      continued use of the drugs in this way

10     has become very problematic, and that's

11     -- that's what my expert opinion was

12     about, not about drug policy, but about

13     these drugs, these patients.

14         Q.   Doctor, there's actually no

15     question pending, so I'm going to ask

16     that you stick with listening to my

17     questions and then answering them instead

18     of making speeches.  Okay?

19             All right.  You -- we talked

20     earlier about the Botox injections that

21     you've done; right?

22         A.   Yes.

23         Q.   You told me you've been doing

PLAINTIFFS001843

Page 262

```
1     Botox injections in the forehead for over
2     ten years; right?
3          A.   Correct.
4          Q.   You've told me that you've been
5     doing Botox injections for crow's feet
6     for over ten years; right?
7          A.   Yes.
8          Q.   Do you know when the FDA first
9     approved Botox for the use of treating
10    forehead wrinkles?
11         A.   Let's see.  I recall that it was
12    when I was the chief of plastics at
13    Portsmouth, Virginia, because we had been
14    using it for dystonias and things like
15    that in children.  And it got approved
16    for cosmetic use I'm going to say before
17    we moved to the new hospital, so it had
18    to have been around ninety- -- I want to
19    say '97, somewhere in there.  I'm just
20    ballparking it here.
21         Q.   So when you were using Botox to
22    do forehead injections, you think that
23    was an on-label FDA approved use for the
```

PLAINTIFFS001844

Page 263

1    last ten years; right?

2        A.   Yeah.   When used in the

3    corrugator and procerus muscles, that's

4    the on-label use for cosmetic botulinum

5    toxin.

6        Q.   Let me introduce another

7    exhibit.  All right.  This is going to be

8    Exhibit 16, and let me know when you have

9    it.

10   (Exhibit 16 was marked for identification

11   and is attached.)

12       A.   All right.  I have it.

13       Q.   Top right corner, you see it

14   says, "Food and Drug Administration"?

15       A.   Yes.

16       Q.   Below that, do you see it says,

17   "Supplement Approval"?

18       A.   Yes.

19       Q.   You know what this is?

20       A.   It looks to be a -- a letter

21   from the FDA to the Allergan corporation,

22   to a particular Ph.D. there who is the

23   director of regulatory affairs.  And it's

PLAINTIFFS001845

Page 264

```
 1      a supplemental -- I guess it's an

 2      amendment.  I haven't read it.  Can I

 3      have a moment to read it?

 4          Q.   I'll -- I'll point you to it.

 5      Don't worry.

 6          A.   All right.

 7          Q.   Allergan is a manufacturer of

 8      Botox; right?

 9          A.   Allergan, yes, uh-huh.

10          Q.   Go to page 3.

11          A.   Okay.

12          Q.   And you see there's a signature

13      line, and under that, it says,

14      "10/02/2017"?

15          A.   Correct.

16          Q.   You understand this was issued

17      on October 2, 2017; right?

18          A.   That's -- that's what the

19      document appears to show, yeah.

20          Q.   Go back to the first page.

21          A.   Okay.

22          Q.   First paragraph says, "Dear Dr.

23      Richmond:  Please refer to your
```

PLAINTIFFS001846

Page 265

1      Supplemental Biologics License

2      Application, dated and received December

3      2, 2016."  Do you see that?

4          A.   I do.

5          Q.   The next paragraph says, "This

6      Prior Approval supplemental biologics

7      application proposes an additional

8      indication for the temporary improvement

9      in the appearance of moderate to severe

10     forehead lines associated with frontalis

11     muscle activity."

12         A.   Right.

13         Q.   Do you see that?

14         A.   I do.

15         Q.   All right.  Then the next

16     section says, "Approval & Labeling."

17     Right?

18         A.   Yes.

19         Q.   It says, "We have completed our

20     review of this supplemental application,

21     as amended.  It is approved, effective on

22     the date of this letter, for use as

23     recommended in the enclosed, agreed-upon

PLAINTIFFS001847

Page 266

1      labeling text."  Do you see that?

2          A.   I do.

3          Q.   All right.  You understand that

4      Botox was not an FDA-approved treatment

5      for improvement in moderate to severe

6      forehead lines until October 3, 2017 --

7              MR. KNEPPER:  Objection --

8          Q.   -- right?

9              MR. KNEPPER:  -- to form.

10         A.   The sense I get of your question

11     is that you -- you're conflating the

12     injection of corrugator and procerus

13     muscles with the injection of the

14     frontalis muscles.  I consider all those

15     muscle groups to be forehead muscles

16     because they all animate the brow.  The

17     approval of Botox for the corrugator and

18     frontalis -- I mean, corrugator and

19     procerus muscle that goes way back is, I

20     thought, what you were -- you were asking

21     me about with ten years application to

22     the forehead.  So yeah.  So I consider

23     the -- the corrugator and procerus

PLAINTIFFS001848

Page 267

1      muscles (indicating) forehead muscles.

2      Maybe others would call them glabellar,

3      but glabellar is the lesser-included

4      category.  So yeah.

5              So I was aware of the broadened

6      application, and I was aware that for

7      most of the time it's been on the market,

8      it has been limited, the approval been

9      limited to the corrugator and procerus.

10     And the frontalis marginal radicularis

11     was considered off-label use, as was its

12     use in hyperhidrosis, like we talked

13     about earlier.  Yeah.

14        Q.   You have prescribed Botox

15     cosmetic -- or strike that.

16              You have used Botox for

17     treatment of moderate to severe forehead

18     lines associated with frontalis muscle

19     activity before October 3, 2017; correct?

20        A.   Yes.

21              MR. KNEPPER:  Objection to form.

22        A.   Absolutely.

23        Q.   It's an off-label use; right?

PLAINTIFFS001849

Page 268

```
1        A.   As we've talked about before,
2    yes, I've -- I've used it off-label.
3        Q.   And do you know when Botox
4    received this indication for treatment of
5    crow lines?
6        A.   I'm sorry.  Of?
7        Q.   Treatment of crow lines.
8        A.   Crow lines?
9        Q.   Yes.
10       A.   Oh, crow's feet (indicating).
11       Q.   Sorry, crow's feet.
12       A.   Yeah.  Yeah.  I don't know -- I
13   don't know the exact date of that.  I
14   just know that it's been broadened.
15       Q.   All right.  Before -- strike
16   that.
17            Before you first started using
18   Botox on an off-label basis, did you do a
19   literature search to see if there was a
20   randomized, double-blinded controlled
21   trial to demonstrate that this forehead
22   use was safe and effective?
23       A.   No.
```

PLAINTIFFS001850

Page 269

1          MR. KNEPPER:  Objection, form.

2      Q.   So you were using it without

3    having any idea if there was randomized

4    controlled clinical trials to demonstrate

5    the safety and effectiveness of that use;

6    correct?

7          MR. KNEPPER:  Objection, form.

8      A.   So the question is, was I using

9    it in other than the on-label purposes

10    before the approval was handed down by --

11    to the -- by the FDA?

12      Q.   No.  I already heard the answer

13    to that question.

14      A.   Oh, okay.

15      Q.   I'm asking you a different

16    question.

17      A.   Okay.

18      Q.   At the time you were using

19    Botox on --

20      A.   Oh.

21      Q.   -- an off-label basis --

22      A.   Right.

23      Q.   -- you were doing that without

PLAINTIFFS001851

Page 270

1      having results from a randomized

2      controlled trial to demonstrate that this

3      off-label use was safe and effective;

4      correct?

5          A.   Correct.  Correct.

6               MR. KNEPPER:  Objection, form.

7          Q.   The same is true for respective

8      cohort studies; right?

9          A.   Correct.

10         Q.   The same is true for case

11     control studies; right?

12              MR. KNEPPER:  Objection, form.

13         A.   Right.  And that's an example of

14     what we were talking about earlier where

15     a low-risk application begins with

16     anecdotal experience, shared anecdotal

17     experience, and -- and the literature

18     that comes later leading to the

19     controlled trial that the Allergan

20     company may have done and it's then

21     subsequently approved by the FDA.  That's

22     right.  So this would fit into that

23     category.

PLAINTIFFS001852

Page 271

1          Q.    All right.  Let's talk more

2     about randomized controlled trials

3     outside of Botox.  If I call them RCTs

4     for short, you'll know what I'm referring

5     to; right?

6          A.    Yes.

7          Q.    An RCT typically involves two

8     groups, an experiment group and a control

9     group; right?

10         A.    Yes.

11         Q.    RCTs are typically

12    double-blinded; right?

13         A.    Well, in most cases.  But when

14    you're talking about things where there's

15    going to be an outward change in the

16    patient, it's -- it's difficult to blind

17    such studies.  You're essentially just --

18    for example, you couldn't have a

19    double-blinded study of a surgical

20    procedure, or you couldn't have a

21    double-blinded study of a -- of a medical

22    intervention where there's outward change

23    to the patient that would be evident to

PLAINTIFFS001853

Page 272

1      both the experimenter and the subject.

2      So yeah.

3          Q.   Yeah.  So -- yeah, we'll get to

4      that in a minute.  Let me ask just some

5      more general questions first.

6          A.   Okay.

7          Q.   Because I want to figure out

8      your experience with RCTs.  You

9      personally have never been the lead

10     investigator for an RCT; correct?

11         A.   That's correct.

12         Q.   You personally -- strike that.

13              Have you ever been involved with

14     an RCT?

15         A.   Yes.  When I was a resident at

16     the University of California-San

17     Francisco working on the neurosurgical

18     trauma unit, we were doing a randomized

19     controlled trial of the medical

20     management of elevated intracranial

21     pressure, and I was -- because I was part

22     of the team, I was responsible for

23     gathering data in the critical care unit

PLAINTIFFS001854

Page 273

```
 1      and -- and working with the investigators
 2      ensuring the integrity of the data.  So I
 3      was not the lead investigator, obviously.
 4      I was just one of the participants as one
 5      of the treating physicians.
 6          Q.   The only time you worked on a
 7      randomized controlled trial was during
 8      your surgery res- -- general surgery
 9      residency; correct?
10              MR. KNEPPER:  Objection, form.
11          A.   I'm trying to think if there
12      were other instances here.  At UC-Davis
13      -- I'm trying to think.  Give me just a
14      moment.  I just want to --
15          Q.   Sure.
16          A.   -- make sure I'm not missing any
17      more.  I think that's the only one where
18      it was a randomized blinded study.
19      That's right, yeah.
20          Q.   And that residency was '87
21      through '91?
22          A.   That's right.
23          Q.   Okay.  You've never published
```

PLAINTIFFS001855

Page 274

1      any articles in peer-reviewed journals

2      about RCTs; correct?

3          A.    That's correct.

4          Q.    You've personally never designed

5      an RCT; correct?

6          A.    That's correct.

7          Q.    You don't hold yourself out as

8      an expert in RCT design; right?

9              MR. KNEPPER:   Objection, form.

10         A.    Well, I would qualify that

11     answer by saying that part of my training

12     involves me being able to understand and

13     review published literature on the

14     subject even though I'm not the

15     investigator because of my training as a

16     plastic and reconstructive surgeon, as a

17     general surgeon.  As just a physician in

18     general, we're trained on how to

19     interpret the validity or the veracity of

20     the medical literature, including how to

21     interpret the randomized controlled trial

22     and -- and understand its validity, which

23     is -- what I'm testifying about is not my

PLAINTIFFS001856

Page 275

```
1      personal experience.  It's my opinion of

2      the validity of the scientific data.  So

3      I -- so it's not that I -- that I can't

4      express an opinion on it.  It's just that

5      I haven't personally conducted one, but I

6      have been trained on how to interpret

7      them.

8          Q.   I understand that distinction

9      you're making.

10         A.   Thank you.

11         Q.   But when it comes to designing

12     RCT, you're not an expert in that aspect

13     of RCT?

14             MR. KNEPPER:  Objection, form.

15         A.   Well, again, part of the

16     evaluation of a randomized controlled

17     trial is to evaluate how the study was

18     designed.  That's one of the criteria

19     used for understanding the validity of a

20     published document like a RCT.  So you

21     always look at -- that's why it's such an

22     essential part of a -- of a RCT

23     publication is you look at the materials
```

PLAINTIFFS001857

Page 276

1          and methods and you look at the study

2          design, and that's where, really, your

3          analysis begins if you're trying to

4          interpret the data.  Did they design the

5          study properly?  Does it have the power

6          of discrimination of what they claim that

7          it has?  And then you look at the actual

8          results, and it's on -- it's on your

9          shoulders as the -- as the professional,

10         whether you're a -- you know, a

11         researcher or somebody who's seeking to

12         apply it in his practice, you're

13         responsible for interpreting the data

14         quite apart from their interpretation of

15         it.

16                  So an example of that would be

17         the Branström study, where they --

18         they -- they generated a good -- a

19         reasonable study design, but they

20         misinterpreted the data, and that's what

21         caused the retraction of the Branström

22         study, is that all the other people who

23         were not RCT investigators, but they were

PLAINTIFFS001858

Page 277

1    all physicians, endocrinologists,

2    pediatricians, they looked at the data

3    and said, "You've misinterpreted the

4    study."

5          And that's really what we're

6    talking about here.  There are those who

7    perform the study, and then there's us

8    who have to live with it, and we have to

9    be able to understand what they're --

10   what they're purporting to.  So we have

11   to interpret the data even before reading

12   their conclusions.

13      Q.   Do you know what the CONSORT

14   criteria are?  C-O-N-S-O-R-T.

15      A.   I've read it sometime before.  I

16   can't -- I can't -- I can't quote it for

17   you, but it's -- it's germane to the

18   study design process?  I'm not sure.

19      Q.   Okay.  Can you describe for me

20   what the CONSORT criteria are in general

21   terms?

22      A.   I cannot.

23      Q.   All right.  How about cohort

PLAINTIFFS001859

Page 278

```
1      studies?  You've personally never
2      designed a cohort study; correct?
3          A.   No, I have not.
4          Q.   You've personally never been an
5      investigator in a cohort study; correct?
6          A.   Well, so -- so, that experience
7      at -- at UC-San Francisco was a -- well,
8      so are you asking -- by cohort study, are
9      you talking about like a retrospective
10     study of a -- of a population cohort?  Is
11     that what you're asking me about?
12         Q.   Prospective or retrospective,
13     either -- either/or.
14         A.   I haven't designed any of those
15     studies, no.
16         Q.   Okay.  And outside the one
17     experience in your residency, have you
18     ever been involved with any prospective
19     or retrospective cohort study?
20         A.   No.
21         Q.   And how about case-control
22     studies?  Have you ever personally
23     designed a case-control study?
```

PLAINTIFFS001860

Page 279

```
 1         A.    No, I have not.
 2         Q.    Have you ever been an
 3     investigator in a case-control study?
 4         A.    I'm just trying to think if the
 5     -- if the head trauma investigation would
 6     fit the category of a case control.  It
 7     was a randomized study.  It had its own
 8     internal controls.  So I guess I've
 9     assisted in that investigation, but only
10     as a -- as a provider and a -- and a data
11     gatherer.
12         Q.    Outside of that one experience,
13     you have not been involved with any
14     prospective or retrospective cohort
15     study; right?
16         A.    No.
17         Q.    Or a case-control study?  Excuse
18     me.
19               Okay.  Let's go back to your
20     report, Exhibit 1, and go to page 13.
21         A.    Okay.  Okay.
22         Q.    You see there's a header that
23     says in capital letters, "Anecdotal
```

PLAINTIFFS001861

Page 280

1      Patient Stories Are Not Data."  Do you
2      see that?
3          A.   I do.
4          Q.   And you write, "Drs Schechter
5      and Brown also failed to disclose and
6      properly discuss that Anecdotal Data
7      unverified patient reports without
8      control groups, randomized trials, or
9      other scientific protections for the
10     integrity of the medical system -- are
11     not reliable science."  Do you see that?
12         A.   I do.
13         Q.   And then you reference personal
14     patient stories, and you say, "This is
15     unreliable Anecdotal Data and it is not
16     credible, scientific information."  Do
17     you see that.
18         A.   I do.
19         Q.   All right.  You think that case
20     reports are anecdotal evidence; right?
21         A.   Yeah, they're --
22              MR. KNEPPER:  Objection.
23              THE WITNESS:  I'm sorry?

PLAINTIFFS001862

Page 281

```
 1            MR. KNEPPER:  Objection, form.
 2            Go ahead.
 3            THE WITNESS:  I'm sorry.
 4       A.   Yeah.  And so anecdotal data is
 5       personal experience of a -- of a
 6       practitioner, for example.  So -- so a
 7       surgeon reporting on five cases that he
 8       did would be considered anecdotal
 9       reporting, or case reports and things
10       like that, yeah.  That's anecdotal,
11       personal experience, a personal exper- --
12       Q.   And you think --
13       A.   I'm sorry?
14       Q.   Go ahead.  Sorry.
15       A.   Personal experience as distinct
16       from more stringent scientific evidence
17       like a longitudinal study or a cohort
18       study or something like that.  Or even --
19       even personal experience with pre- and
20       posttreatment testing rises to a higher
21       level than anecdotal.  So you can base --
22       you can base scientific evidence on that
23       next level, which would be anecdotal
```

PLAINTIFFS001863

1      experience elevated to the next level by

2      pretreatment and posttreatment testing.

3      This is -- this is from the guidance that

4      the American Society of Plastic Surgery

5      puts out.

6              So depending on the -- depending

7      on the type of study, if it's a -- if

8      it's a therapeutic study or a diagnostic

9      study or a prognostic study, depending on

10     what you're looking at, if -- if you --

11     if you take it to that next level with

12     pre- and posttreatment testing with a

13     validated scientific instrument, you

14     know, a validated study even of

15     subjective reporting from the

16     psychiatric/psychological side of things,

17     that has more validity than the anecdotal

18     reports of a practitioner or even an

19     institution.

20       Q.   Do you think that a case report

21     that doesn't have this before and after

22     comparator that you describe is

23     essentially worthless from the --

PLAINTIFFS001864

Page 283

1          A.    No.

2          Q.    -- scientific perspective?

3          A.    No, no.  Not worthless.  Not

4     worthless, but it's what's considered in

5     the -- in the -- in plastic surgery

6     circles, certainly, it's considered the

7     lowest form of evidence.  So for a number

8     of years now, the American Society of

9     Plastic Surgery has insisted that

10    publications -- if you're going to

11    publish a case series, for example, that

12    they have to be a sequential -- you can't

13    pick the cases you're reporting on.  It

14    has to be a sequential series of

15    patients, and you have to declare in the

16    publication, in your -- in your article,

17    the level of evidence that you're

18    presenting.

19          So if -- if it's merely a --

20    case reports, that would be level 5

21    evidence.  If you added to that a review

22    of the literature with a -- you know, a

23    definitive review of the literature

PLAINTIFFS001865

Page 284

```
 1        looking at the -- at where the weight of
 2        evidence lies, then you raise it to the
 3        next level.  But we're -- we're now
 4        required when we're publishing in -- in
 5        the ASPS journal, for example, to state
 6        in the -- in the document level of
 7        evidence.  So a case report is not zero
 8        scientific evidence.  It's level 5
 9        evidence.  It's the lowest form of -- of
10        evidence is what it is.
11           Q.   You personally would not rely on
12        a level 5 case report to decide if a
13        surgical technique is effective?
14           A.   It would be the beginning of my
15        interest in a particular technique.  As a
16        surgeon, we tend to be very conservative,
17        and we call upon our personal experience
18        very much and certainly upon our
19        training.  So if somebody proposes
20        something radically new and all they have
21        to support it is level 5 evidence,
22        generally -- there's a saying that I
23        learned in training is never be the first
```

PLAINTIFFS001866

Page 285

1      or -- first one to do a procedure or the

2      last one to do a procedure.

3              And so, yeah, you know, surgeons

4      tend to not jump in early on -- on

5      low-quality evidence.  We tend to be

6      conservative about it.  And I would

7      number myself among them.

8      Q.   All right.  Let me ask the flip

9      side.

10     A.   Okay.

11     Q.   Do you think it's necessary for

12     a surgical procedure to be supported by

13     results from a level 5 RCT before it can

14     be considered effective?

15     A.   No.

16             MR. KNEPPER:  Objection to form.

17     A.   That would -- that would be one

18     of those circumstances where what is the

19     risk to the patient and -- and what's the

20     potential benefit to the patient.

21     That's -- that's what kind of would drive

22     my decision to act on a level 5 case

23     report, offering something like that to

PLAINTIFFS001867

Page 286

1    one of my patients.

2        Q.   Do you think that a surgical

3    procedure has to be supported by a level

4    2 controlled study before that surgical

5    procedure can be considered

6    nonexperimental?

7        A.   Not necessarily.  It would

8    depend on what is -- what is -- what is

9    at risk here.  Certainly, we're much more

10   willing to -- to proceed with -- with

11   techniques and procedures that aren't

12   hugely supported if there's great risk to

13   the patient of not doing anything.  So

14   level of risk and what is at stake kind

15   of drives that and -- and yeah.

16        Did I answer that question?  Is

17   that what you were asking?

18       Q.   Yeah.  It's basically a

19   case-by-case decision; right?

20       MR. KNEPPER:  Objection, form.

21       A.   Well, I wouldn't say case by

22   case.  I would say, you know, you're

23   relying on -- on -- on a lifetime of

PLAINTIFFS001868

1    experience possibly, and you're relying

2    also on -- on conversations with your

3    peers, your colleagues, what is their

4    experience in the area and how much of a

5    risk are you going to subject to the

6    patient -- subject the patient to in

7    order to achieve a result.  The greater

8    the risk, the greater the expectation of

9    a defined scientifically supported

10   outcome.

11          So in the case -- in the issue

12   at hand here, great risk of doing, for

13   example, a transition surgery, because

14   you're talking about permanent

15   sterilization, irreversible

16   sterilization, or the removal of the

17   breasts, permanent and irreversible loss

18   of the breasts, that's a huge stake, a

19   huge risk to the patient that the -- the

20   expected outcomes have to be consummately

21   much larger in order to justify something

22   like that if you don't have scientific

23   support.  If you're at low levels of

PLAINTIFFS001869

Page 288

1    scientific evidence, then clearly, you

2    have an obligation to the patient not to

3    -- not to try something risky if you

4    don't have extensive and very valid

5    scientific -- and that's where we are

6    now.  We're at very low-level evidence

7    for these things.  That's kind of why

8    we're here today.

9        Q.   I guess I'm asking a more

10   specific question.  You're not taking the

11   position that in order to be considered

12   nonexperimental, a particular surgical

13   procedure has to be supported by at least

14   level 1 or level 2 evidence; right?

15           MR. KNEPPER:  Objection, form.

16       A.   Oh, okay.  So you're asking me

17   the definition of experimental.  Is

18   that -- do I understand you correctly?

19       Q.   Sure.

20       A.   Yes.  Am I saying that something

21   is nonexperimental once it reaches level

22   2 evidence or higher and not before?

23       Q.   Correct.

PLAINTIFFS001870

Page 289

1          A.    I'm not saying that, no.

2          Q.    Okay.  How about level 3?  Are

3     you taking the position -- strike that.

4              Are you expressing the opinion

5     that a surgical procedure can only be

6     considered not experimental if it reaches

7     evidence level 3?

8          A.    Well, it's getting closer.  So

9     when you're -- when you're at level 3,

10     you're talking about a retrospective

11     study with a cohort.  And if we were

12     talking about some simple technique of

13     reconstructing, say, a wound on the face

14     for cancer therapy, then I certainly

15     wouldn't wait to try a new technique.  If

16     it promised to get a better result, I

17     wouldn't wait until I got to level 3

18     evidence.

19              But if you're talking about a

20     very drastic operation where I'm

21     amputating healthy parts, then yeah, I'm

22     going to want to go at least to level 3

23     before I consider that, because again,

PLAINTIFFS001871

Page 290

1    you're talk about tremendous risk to the

2    patient, permanently life-altering

3    changes.  You better have very strong

4    evidence that you're doing the patient

5    good because you're doing the patient a

6    great harm by, you know, removing their,

7    genitals, permanently sterilizing them,

8    removing their breasts.  So again, it's

9    -- it's not a case by case, but let's --

10   let's say broad categories of -- of

11   techniques or surgery.

12          If you're talking about

13   something small like reconstructing a

14   facial defect, then yeah, you don't need

15   to get to level 3.  But if you're talking

16   about something large and permanently

17   life-altering, then at least level 3.

18      Q.   All right.  We talked earlier a

19   while ago about some of the surgical

20   procedure you performed, and I think one

21   of the things you mentioned was breast

22   reductions.

23      A.   Yes.

PLAINTIFFS001872

Page 291

1          Q.    Right?

2          A.    Yes.

3          Q.    You've done those; right?

4          A.    I have done so many of those.

5          Q.    All right.  You've done breast

6      reduction surgery without having the

7      results from a randomized controlled

8      clinical trial; right?

9          A.    I believe the -- the bulk of the

10     evidence in the therapeutic benefit of

11     breast reduction is primarily given to us

12     by a long-term longitudinal cohort study

13     that we actually get from the insurance

14     industry.  Because when you do breast

15     reduction surgery, one of the key issues

16     in a breast reduction is, is it going to

17     be efficacious in curing an orthopedic

18     problem.  So if you're talking about

19     breast reduction surgery as a quote,

20     unquote reconstructive procedure, then

21     really, it's being applied to an

22     orthopedic condition.

23             And the insurance companies have

PLAINTIFFS001873

Page 292

1      a wealth of evidence about, for example,

2      the weight of the specimen that has to be

3      submitted in order to have a hope of

4      relieving the orthopedic complaint of

5      neck, back, and shoulder pain.

6             So -- and vir- -- and I can tell

7      you categorically, because I'm very

8      fastidious about this, that all of the

9      breast reduction operations that I've

10     ever done for the orthopedic condition of

11     neck, back, and shoulder pain have met

12     the criteria based upon this long-term

13     longitudinal cohort study that the

14     insurance companies have been running

15     since back in the '80s at least.

16        Q.   All right.  Doctor, again, I

17     need you to listen to my questions.   I

18     didn't ask about cohort studies.  I asked

19     about randomized clinical trial.

20        A.   Oh.

21        Q.   You have done -- you have done

22     breast reductions without having results

23     from a randomized controlled clinical

PLAINTIFFS001874

Page 293

1      trial?

2          A.   Oh, forgive me.  I -- I

3      misunderstood the question, then.  No.

4      The -- I have not, no.  The industry --

5      the plastic surgery community does not

6      rely on a randomized trial for the -- the

7      operation to be merited.  That's correct.

8          Q.   Right.  Nobody in this industry

9      waits for results from a randomized

10     controlled trial before determining that

11     a particular surgical procedure is

12     nonexperimental; right?

13              MR. KNEPPER:  Objection, form.

14         A.   Well, this gets back to what we

15     were talking about before, what the --

16     what the level of evidence is, what's at

17     risk, and what are the potential

18     benefits.  So in the case of breast

19     reduction surgery, yes, we have not

20     relied on randomized controlled trials

21     because there was such an abundance of

22     level 3 evidence to justify the

23     procedure.  And so -- and level 3

PLAINTIFFS001875

Page 294

1      evidence is sufficient to answer the

2      question, is this experimental or not?

3      This procedure doesn't rise to the level

4      of level 2 or level 1 in order to be

5      justified.  I believe there have been --

6      well, no, I can't say categorically, so I

7      won't.

8              So yeah, to answer your

9      question, breast reduction does not rely

10     on randomized trials.  It relies on level

11     3 evidence.

12         Q.   All right.  Let's take it out of

13     the realm of breast reduction in

14     particular.

15         A.   Okay.

16         Q.   It is not uncommon for plastic

17     surgeons to perform procedures that are

18     not supported by results from an RCT;

19     correct?

20             MR. KNEPPER:  Objection, form.

21         A.   As a general principle, plastic

22     surgeons are perhaps more innovative than

23     other surgeons, so we're inclined to try

PLAINTIFFS001876

Page 295

```
 1        new techniques.  And then, of course, you
 2        have to exercise some significant
 3        prudential judgment about what risk are
 4        you placing the patient in before you get
 5        experimental with them.  Yeah.  So yes,
 6        we -- we do that all -- we're innovators,
 7        as -- as a general principle.
 8            Q.   And as a general principle,
 9        plastic surgeons will often commonly
10        perform procedures that are not supported
11        by level 2 evidence; correct?
12                MR. KNEPPER:  Objection, form.
13            A.   Yes.
14            Q.   And as innovators, plastic
15        surgeons will often perform surgical
16        procedures that are not level 3 evidence;
17        right?
18                MR. KNEPPER:  Objection, form.
19            A.   Yeah.  They -- if you're talking
20        about small like technical improvements
21        in -- in low-risk procedures, then yeah,
22        we -- we do that very commonly.
23            Q.   Okay.  You know what the
```

PLAINTIFFS001877

Page 296

1      Plastics and Reconstructive Surgery

2      journal is; right?

3         A.    Yes.

4         Q.    It's the official publication of

5      the ASPS; correct?

6         A.    Correct.

7         Q.    It's a peer-reviewed medical

8      journal; right?

9         A.    Correct.

10         Q.    It's published monthly; right?

11         A.    And plus supplements as well and

12      online.  Yes, sir.

13         Q.    One purpose of that journal is

14      to educate members about new surgical

15      techniques; right?

16         A.    Yes.

17         Q.    Would you agree that the journal

18      is the premier peer-reviewed source for

19      current information on reconstructive and

20      cosmetic surgery?

21         A.    I would.

22         Q.    All right.  Are you -- I know

23      that you're no longer a member.  Are you

PLAINTIFFS001878

Page 297

1      still subscribing to the journal?

2          A.   No, I'm not.  It's a -- it's for

3      members that you get the journal, so

4      yeah.  That's what my subscription relied

5      on, so -- all those years.

6          Q.   I understand.  So not -- you

7      haven't had access to it since 2018?

8          A.   Well, I -- no, I go online, and

9      I'll pay for access to particular

10     articles.  So yeah.  So it's not that

11     I've lost contact with it, it's just that

12     I do literature searches, and if an ASPS

13     citation comes up, I'll pay to look at

14     it.

15         Q.   I understand.  Sitting here

16     today, what percent of publications in

17     that journal do you think consist of

18     results from RCTs?

19             MR. KNEPPER:  Objection, scope,

20     form.

21         A.   Yeah, I'm -- I'm not sure I

22     could hazard a guess even.

23         Q.   Ballpark, do you think it's 10

PLAINTIFFS001879

Page 298

```
 1      percent?  50 percent?
 2          A.   Of their published articles that
 3      are randomized controlled trials?
 4          Q.   Yes.
 5              MR. KNEPPER:  Objection to form,
 6      scope.
 7          A.   Gosh, I'm going to guess it's
 8      probably somewhere -- probably less than
 9      10 percent.
10          Q.   How about cohort studies?  If
11      you had to estimate, what percentage of
12      publications in that journal do you think
13      consist of results from cohort studies?
14              MR. KNEPPER:  Objection, form.
15          A.   Again, just ballparking here
16      after, you know, 35 years of reading that
17      article -- that journal for 35 years, I
18      would say that -- I don't -- I may be
19      guessing, but 15 percent maybe are -- are
20      cohorts that are usually single-center
21      studies.  There's a lot of those in
22      the -- in the White Journal.  There'll be
23      a single-center cohort study of -- of
```

PLAINTIFFS001880

Page 299

```
 1      some operation or technique, and they'll
 2      usually report it as three or four
 3      surgeons at a single center reporting a
 4      -- a longitudinal cohort of, say, breast
 5      cancer reconstructions with implants
 6      versus breast reconstruction with
 7      autologous flaps and comparing
 8      satisfaction surveys and things like
 9      that.  So I'm going to ballpark it at 15
10      percent, but I don't know.  I don't know
11      for a fact.
12          Q.   Let me introduce an exhibit.  So
13      this will be Exhibit 17, and let me know
14      when you get it.
15      (Exhibit 17 was marked for identification
16      and is attached.)
17          A.   Okay.  All right.  I have it.
18          Q.   All right.  This is a study from
19      2019 by Sugrue, S-U-G-R-U-E, titled
20      "Levels of Evidence in Plastic and
21      Reconstructive Surgery Research."  See
22      that?
23          A.   I do.
```

PLAINTIFFS001881

Page 300

1          Q.    All right.  See there's a

2     "Summary" box on the first page?

3          A.    Yes.

4          Q.    The third sentence says, "The

5     aim of this study is to determine if the

6     quality of evidence in plastic surgery

7     research has improved over the past 10

8     years.  Systematic review of research

9     published in Plastics and Reconstructive

10     Surgery journal over the years, 10-year

11     period (2008, 2013, 2018), was

12     performed."  Do you see that?

13          A.    I do.

14          Q.    Now, you understand what this

15     study was trying to accomplish; right?

16          A.    Yeah.  They were measuring the

17     level of success that the American

18     Society of Plastic Surgery was having

19     after having applied those criteria we

20     talked about earlier, the -- this

21     requirement of reporting levels of

22     evidence, seeking the clarity on levels

23     of evidence.  And so I expect -- I

PLAINTIFFS001882

Page 301

1      haven't read this -- this article before,

2      but I guess that's what they're looking

3      at, is how successful have we been as a

4      professional society in publishing --

5          Q.    Yeah.

6          A.    -- these things.

7          Q.    And this references the levels

8      of evidence, LOE, metric; right?

9          A.    Yes.

10         Q.    And that's the same metric that

11     you referenced earlier, levels 1 through

12     5; right?

13         A.    Right.  Well, the levels 1

14     through 5 that I referenced includes

15     the -- sort of the subcategorizing,

16     depending on if it's a therapeutic trial

17     or a -- or a trial of risk or things like

18     that.  So the -- the document that the

19     ASPS published some years ago includes

20     risk studies and diagnostic studies, but

21     they're all ranked 1 through 5.  That's

22     right.

23         Q.    And you see a couple of

PLAINTIFFS001883

Page 302

```
1        sentences down, it says 884 studies were
2        included in the final analysis.  You see
3        that?
4            A.    Yes, I do.
5            Q.    Okay.  Go to page 2.
6            A.    Okay.
7            Q.    You see there's a Table 1?
8            A.    Yes, I do.
9            Q.    Table 1 is "Percentage of Each
10       Level of Evidence Published per Year."
11       Do you see that?
12           A.    I do.
13           Q.    And there's columns for 2008,
14       2013, and 2018; right?
15           A.    Yes.
16           Q.    All right.  Let's start with
17       level 1, and that's randomized control
18       trials or metaanalyses of those trials;
19       right?
20           A.    Right.
21           Q.    In 2018, only 2.1 percent of all
22       publications in the journal were level 1
23       evidence; right?
```

Page 303

1        A.    That's right.

2        Q.    And in 2008 and 2013, those

3    percentages were 0.3 and 1.7 percent

4    respectively; correct?

5        A.    Correct.

6        Q.    Not very common for the journal

7    to report on results of RCTs, according

8    to this summary; right?

9             MR. KNEPPER:   Objection, form.

10       A.    Yeah.  And it even goes along

11   with what -- my ballpark earlier, so I'm

12   surprised -- yes, it was less than 10

13   percent were -- were level 1 evidence and

14   somewhere around -- yeah, so those

15   numbers are consistent.  But yeah.

16            And the other thing to note

17   about it is that they appear to have been

18   successful in choosing what they publish

19   to support higher levels of evidence.  So

20   I guess they're to be commended for

21   having done this, yeah.

22       Q.    Okay.  All right.  Then level 2

23   are -- level 2 evidence includes

PLAINTIFFS001885

Page 304

1      prospective cohort or comparative

2      studies; right?

3          A.    Yes.

4          Q.    With controls; right?

5          A.    Yeah.   There's a level of

6      randomization that -- that's there as

7      well --

8          Q.    Okay.

9          A.    -- in those prospective studies.

10     That's right.

11         Q.    And for that level 2 evidence,

12     only 13.6 percent of all publications in

13     the journal in 2018 consisted of that

14     evidence; right?

15         A.    Yes.   That's what it says there,

16     yes.

17         Q.    All right.   Level of evidence 4

18     is case series with a pre- or posttest or

19     only posttest; right?

20         A.    Right.

21         Q.    And in 2018, those amounted to

22     41.7 percent of all publications; right?

23         A.    Right.   It looks as though more

PLAINTIFFS001886

Page 305

1          of those level 4 have been shifted up

2          into level 3, given that the level 5 has

3          declined.  So it looks like they're

4          pushing more of the level 4 up into level

5          5.  Yeah.

6              Q.   Yeah.  Much of the research on

7          which your field relies doesn't consist

8          of results from RCTs or controlled cohort

9          studies; right?

10             A.   Well, I wouldn't --

11                 MR. KNEPPER:  Objection, form.

12             A.   I wouldn't say that based on

13         this.  I would say that much of the

14         published research in this journal is of

15         that -- of what you described, relying on

16         RCTs and so on.

17                 This is a -- this is not a

18         document about what the profession is

19         doing.  This is a document about what

20         this journal is publishing.  And what

21         they're publishing is more papers of

22         higher value, for which they're to be

23         commended.  So this says nothing about

PLAINTIFFS001887

Page 306

1    what people are investigating.  This says
2    about -- this says something about what
3    this journal is publishing.
4         Q.   Well, this is the journal for
5    the ASPS; right?
6         A.   Right.  With limited space for
7    publication.  So they're being,
8    apparently, more selective about what
9    they'll publish, that it's not just that
10   well, this is the chief of plastic
11   surgery at NYU, so we're going to publish
12   his paper.  It's the chief of plastic
13   surgery has a level 2 case.  Let's --
14   let's present -- let's publish that one.
15   I think that's what this is telling us,
16   that they're being more fastidious about
17   what they publish, whereas before, they
18   might have been more -- well, less
19   selective, let's say.
20        Q.   Have you ever been involved with
21   selecting articles to be published in
22   this journal?
23        A.   I've never been involved in --

PLAINTIFFS001888

Page 307

```
 1      in journal publication staff or -- no, I
 2      have not.
 3          Q.   You don't know the process by
 4      which they select what article to
 5      publish; right?
 6               MR. KNEPPER:  Objection, form.
 7          A.   I have some idea, but I'm --
 8      it's not my -- my area of professional
 9      expertise.
10          Q.   Yeah.
11          A.   I merely read the journal, and
12      have for approaching forty years now.
13          Q.   Look at Table 2.
14          A.   Okay.
15          Q.   And look at the column under
16      2018.
17          A.   Yes.
18          Q.   The first two rows, "Systematic
19      review/meta analysis" and "Randomized
20      control trials," account for 3.2 plus 3.8
21      percent of all publications of the
22      journal in 2018.  Correct?
23          A.   Right.
```

PLAINTIFFS001889

Page 308

1              MR. KNEPPER:  Objection.

2         Q.   Case series account for 26.3

3     percent; right?

4         A.   Right.

5         Q.   Okay.  Go to page 3 of this

6     exhibit.

7         A.   Okay.  I'm there.

8         Q.   All right.  First full

9     paragraph, first sentence says, "Case

10    series are the backbone of surgical

11    research."  Do you see that?

12        A.   I do.

13        Q.   You don't disagree that case

14    series can be helpful scientific

15    evidence; right?

16        A.   No.  As I -- as I testified

17    before, this is the beginning of

18    research.  It always begins with perhaps

19    a serendipitous discovery, then to case

20    reports, then to case series, single --

21    single-provider case series or multiple

22    providers in a -- in a -- an institution.

23    But that's the beginning of surgical

PLAINTIFFS001890

Page 309

```
 1      research, yeah.  That's how it always
 2      begins.
 3          Q.   Well, it's a beginning, but
 4      sometimes it's also the end; right?
 5      Because look at the third sentence.  It
 6      says:  "The absence of a control group
 7      justifiably ranks this design at the
 8      lower end of the evidence pyramid.
 9      Despite this, case series are vital.
10      They may be the only feasible and ethical
11      study methodology obtainable, as seen
12      with craniofacial surgery."  You see
13      that?
14          A.   Yeah.  And to that -- to that
15      particular point, so I've got extensive
16      experience with craniofacial surgery, and
17      -- and it's -- this is one of those
18      procedures where the outward change to
19      the child can't be blinded.  You cannot
20      blind the investigator because,
21      obviously, he's doing the surgery, and
22      you can't blind the patient or the family
23      to it because the results are quite
```

PLAINTIFFS001891

Page 310

```
 1      obvious.  And that's what they're saying
 2      here.  And obviously, they're not saying
 3      that it's never useful or is never
 4      necessary.  They're saying that in many
 5      cases, you don't need to rise to that
 6      level because you have evident benefit to
 7      the patient and the risk is not only
 8      manageable but -- but sufficiently low to
 9      warrant the application of a particular
10      technique.
11              So that was certainly the case,
12      for example, when we introduced external
13      fixation devices for advancement of the
14      mid face in certain congenital
15      deformities.  Nobody had done a
16      randomized trial because you can't.
17      You've got this hardware sitting on the
18      patient's face.  So -- but yet, the --
19      the luminaries in craniofacial surgery
20      were able to demonstrate through a case
21      series that this was a valid technique,
22      and then the rest of us adopted it.  So
23      that's an example of how plastic surgery
```

PLAINTIFFS001892

Page 311

1      works.

2              Now, if the patient was at risk

3      of death because this technique was being

4      applied or if the patient was at risk of

5      permanent life-altering changes that

6      couldn't be reversed, then yeah, you

7      would have to proceed with much greater

8      caution, and you may be looking at

9      finding some way, longitudinal

10     study-wise, to -- to quantify the benefit

11     of using your technique over using

12     established techniques.

13        Q.   There are some areas in plastic

14     surgery and reconstructive surgery where

15     case series are basically as good as it

16     gets in terms of scientific evidence;

17     right?

18              MR. KNEPPER:   Objection, form.

19        A.   Yeah.   I suppose in the newer --

20     at the newer end of techniques, that's

21     all you got for now until the technique

22     has been applied over a sufficiently long

23     time that you can look at a retrospective

PLAINTIFFS001893

Page 312

1    cohort.

2            So for example, in the case of

3    gender transitioning surgery, the -- the

4    -- the surgeons have been at it now for

5    several decades.  And we should be

6    already at the level of level 3 evidence,

7    but -- but we're not.

8        Q.   Well, you --

9        A.   So I wouldn't put that in the

10   category of -- you're talking there about

11   a high-risk procedure that has a long

12   track record that can be examined.  And

13   -- and clearly, the examination of that

14   technique in the last three years, give

15   or take, has -- has shown us that that

16   this is in the category of those

17   operations that demand higher levels of

18   evidence than a case series, whether it's

19   single provider, single institution, or

20   even single nation.  You've got to --

21   you've got to look at the data now and --

22   and prove that you are doing something

23   good for the patient.

PLAINTIFFS001894

Page 313

```
 1              And quite frankly, it hasn't
 2       been proven in the -- in the American
 3       literature.  Certainly, WPATH hasn't
 4       proven that.  But in the European
 5       literature, they're looking at it and
 6       saying, gosh, you know, the -- the
 7       Swedish study shows us that if you only
 8       follow patients for five years at the
 9       most, you're not even going to see the
10       long-term effect of what you did to them.
11       And if you look at them eight years and
12       beyond, you'll see that you haven't
13       solved the suicidality, the self-harm,
14       the incarceration, psychiatric diagnosis
15       admissions, and things like that.
16              So -- so yeah, as far as what
17       we're talking about today, yeah, there's
18       a whole spectrum of what's acceptable
19       levels of evidence for a particular
20       procedure.  The higher the risk, the
21       higher the level of evidence is demanded.
22       And sometimes you have to wait to get to
23       that level of evidence if you're dealing
```

PLAINTIFFS001895

Page 314

```
 1      with something potentially
 2      life-threatening.
 3              Like certainly, the providers
 4      were fully justified in considering this
 5      because of the high suicide rate of
 6      transgender patients.  Case series,
 7      totally valid reason given that the life
 8      of the patient is at risk here, totally
 9      valid to go with a case series as the
10      evidence by which you're consenting the
11      patient to surgery.  But we're now beyond
12      that.  We're now beyond that.  We're at
13      -- we're now -- the ethics demands that
14      we look at higher levels of evidence
15      because of the long-term risk to the
16      patient and the fact that the long-term
17      evidence doesn't support the indication
18      for surgery, which is lower suicide rate,
19      lower self-harm, lower drug abuse.
20      That's really what we're talking about
21      here.
22          Q.   I have some other questions.
23      You agree that -- strike that.
```

PLAINTIFFS001896

Page 315

1            Do you agree that it is not

2       possible to perform RCTs for some

3       surgical procedure because you can't

4       blind the patient or the investigator to

5       what the procedure is?

6            A.   Absolutely agree, yeah.

7            Q.   So, let's take phalloplasty;

8       right?

9            A.   Okay.  Yeah.

10           Q.   When a surgeon performs a

11      phalloplasty on a patient, both the

12      surgeon and the patient are going to know

13      that the procedure was done; right?

14           A.   Yes.

15           Q.   It's not possible to have a RCT

16      for phalloplasty because you can't blind

17      the participant or the investigator;

18      right?

19           A.   Yeah.  That's typical of most

20      surgical interventions.  The only

21      exception to that would be intraabdominal

22      or intrathoracic surgeries or even

23      intracranial surgeries.  And -- and

PLAINTIFFS001897

Page 316

1      that's considered sham surgery, which is

2      considered malpractice and ethical

3      violation of professional standards.  So

4      you can pretty much rule out most all

5      surgical procedures from the randomized

6      control trial category.  Correct.

7          Q.   And we agree that the same would

8      apply to metoidioplasty, for example;

9      right?

10         A.   Yes.

11         Q.   To all types of, again,

12     colloquially known as bottom surgery;

13     right?

14         A.   Correct.

15         Q.   All right.  Let's take

16     puberty-blocking hormones.

17         A.   Okay.

18         Q.   When patients with gender

19     dysphoria treatment start

20     puberty-blocking hormones, they're not

21     going to undergo puberty, basically;

22     right?

23         A.   Well, that's the intended use,

PLAINTIFFS001898

Case 4:22-cv-00325-RH-MAF   Document 177-15   Filed 04/27/23   Page 318 of 576

Page 317

1       that's correct.

2          Q.   So there's going to be

3       observable physical effects of the

4       hormones that will be apparent to the

5       patient; right?

6          A.   Yes.   Within a year, that child

7       is going to look much smaller than his

8       peers.   He's going to be developmentally

9       delayed psychologically,

10      neurophysiologically.   His -- his

11      movements are not going to be as -- his

12      coordination is going to be less matured.

13      His higher executive functions will be

14      impaired.   So it will be very obvious

15      that this child is now different from his

16      peers.   So I would agree with you; you

17      couldn't find a way to blind such a study

18      because the evidence of effect is so

19      obvious within the first year that

20      everyone would know that they're taking

21      the -- the puberty-blocking

22      gonadotropin-releasing hormone agonist.

23         Q.    We agree that -- we agree that

PLAINTIFFS001899

Page 318

1        it's not possible to do an RCT for
2        puberty-blocking hormones because of
3        these apparent physical effects; right?
4                MR. KNEPPER:  Objection, form.
5            A.   I -- I would agree, yes.
6            Q.   Okay.  Let's take cross-sex
7        hormones.
8            A.   And the -- the last question you
9        asked me, did you qualify that as you
10       couldn't do a double-blinded study using
11       puberty-blocking drugs in self-identified
12       transgender children?
13           Q.   Yes.
14           A.   Yeah.  Because if you're
15       applying the drug to other conditions
16       like precocious puberty, it -- it may be
17       possible.  It may be possible to -- I
18       don't know.  I'd have to think about that
19       but -- okay.  Sorry.
20           Q.   Let's take cross-sex hormones.
21           A.   Okay.
22           Q.   When somebody -- someone is
23       treated with estrogen or testosterone for

PLAINTIFFS001900

Page 319

1          gender dysphoria, there are also going to

2          be physical effects from those

3          treatments; correct?

4              A.   Yes.  Given that sex hormones

5          have such a profound effect on every body

6          system, then it's going to be impossible

7          to conceal the fact that the person is on

8          sex hormones because every -- every

9          function of the body is affected by sex

10         hormone levels, particularly at the age

11         of early adolescence.

12             Q.   And given these visible physical

13         effects, it's not possible to design a

14         double-blind RCT for cross-sex hormones

15         for gender dysphoria; correct?

16             A.   It would probably be an invalid

17         study, yes.

18             Q.   All right.  Let's go back to

19         your -- actually, you know what?  I'm

20         going to move to a different area.  It's

21         been about an hour.  Let's take a quick

22         break.

23                  MR. TISHYEVICH:  Off the record.

PLAINTIFFS001901

Page 320

```
 1              THE VIDEOGRAPHER:  This is the
 2      end of Media Unit No. 4.  We are off the
 3      record at 2:16 p.m.
 4                   (Break taken.)
 5              THE VIDEOGRAPHER:  This is the
 6      beginning of Media Unit No. 5.  We are on
 7      the record at 2:24 p.m.
 8          Q.   (By Mr. Tishyevich) Let's go
 9      back to your report, Exhibit 1.
10          A.   Okay.
11          Q.   Go to page 21.
12          A.   Twenty-one.  Okay.
13          Q.   And you see there's a paragraph
14      starting with, "Failure to discuss the
15      failure to conduct"?
16          A.   Yes.
17          Q.   Okay.  So in the second line,
18      you reference the "unknown number and
19      percentage of patients who drop out of
20      transitioning or reverse the process
21      parentheses (Detransitioners)."
22          A.   Right.
23          Q.   You see that?
```

PLAINTIFFS001902

Page 321

1      A.    I do.

2      Q.    All right.  You agree that the

3    number and percentage of patients with

4    gender dysphoria who drop out of

5    transitioning or who reverse the process

6    is currently unknown; right?

7      A.    Well, it depends on if you're

8    asking that question about the general

9    population or in a particular study.  So

10   in particular studies, that number is

11   known, but in the general population,

12   it's an unknown.

13     Q.    Yeah.

14     A.    And the reason -- the reason

15   it's unknown in the general population is

16   because the people doing the research

17   aren't following those patients.  That's

18   why we don't know.

19     Q.    In the overall population, the

20   number and percentage of patients who

21   drop out of transitioning or reverse the

22   process is unknown; agree?

23     A.    Yeah.  I would agree that's

PLAINTIFFS001903

Page 322

1    unknown, yeah.

2        Q.   All right.  Given that,

3    obviously, you're not offering any expert

4    opinions on what that number or

5    percentage is in the general population;

6    right?

7        A.   Yeah, I don't -- I don't think

8    it's possible for anyone to break out the

9    difference, for example, between somebody

10   who isn't followed up because they've

11   detransitioned or somebody who isn't

12   followed up because they've taken their

13   own life.  We have no way of knowing

14   because nobody's following up.

15       Q.   All right.  Look toward the

16   bottom of this page 21.  You cite a case

17   series from I believe it's Djordjevic,

18   D-J-O-R-D-J-E-V-I-C.  Do you see that?

19       A.   I do.

20       Q.   And you say, "More dramatically,

21   a surgical group prominently active in

22   the SRS field has published a report on a

23   series of seven male-to-female patients

PLAINTIFFS001904

Page 323

```
 1      requesting surgery to transform their

 2      surgically constructed female genitalia

 3      back to their original male form."

 4      Right?

 5          A.   I see that, yes.

 6          Q.   Okay.  Now, this article was not

 7      an RCT, obviously; right?

 8          A.   Right, right.

 9          Q.   It was not a cohort study;

10      right?

11          A.   No.  This would be a case -- a

12      case series.

13          Q.   Yeah.  The lowest level of

14      evidence; right?

15          A.   No.  Actually, the lowest level

16      of evidence would be sort of single

17      patient -- well, it's sort of somewhere

18      between 4 and 5, I suppose.  I'd have to

19      look at the article again to see what the

20      -- what the denominator is, but --

21          Q.   Yeah.  Well, generally, you

22      think that anecdotal patient stories like

23      these are not reliable scientific
```

PLAINTIFFS001905

Page 324

1    information; right?

2              MR. KNEPPER:  Objection, form.

3         A.    No.  They're the first clue to a

4    problem or the first clue to a solution.

5    That's exactly right.  So that -- that

6    sort of points to the controversial

7    nature of these therapies, is that -- is

8    that we don't have the answer.  We can't

9    explain why these detransitioners weren't

10   predicted preoperatively because we don't

11   have a test instrument to figure that

12   out.

13             So when you see a series like

14   this -- this is what we talked about

15   earlier, about the -- the history of

16   progression of levels of evidence.  You

17   start out with reports like this.  This

18   leads to further research.  And I'm just

19   trying to remember, when I read the

20   article, where that study was done.  I

21   don't have it in front -- I'm just trying

22   to remember what -- what country that was

23   done in.

PLAINTIFFS001906

Page 325

1        Q.    Yeah.  I'll -- I'll show it to

2    you.

3        A.    Okay.

4        Q.    Hold on.  Let me introduce it.

5        A.    Thank you.

6        Q.    You did read these -- this

7    article in full before you cited it;

8    right?

9        A.    Yeah.  That -- it was -- it was

10   probably about seven months ago, but yes,

11   I did.

12       Q.    Sure.

13            THE COURT REPORTER:  I didn't

14   hear anything.  So it's just --

15            THE WITNESS:  Okay.

16            THE COURT REPORTER:  We're

17   losing it in Zoom.  Thank you.

18            THE WITNESS:  Forgive me.  I'm

19   sorry.

20            THE COURT REPORTER:  No, that's

21   okay.  It's awkward.

22       Q.    (By Mr. Tishyevich) Okay.  This

23   is going to be Exhibit 18, and let me

PLAINTIFFS001907

Page 326

1       know when you have it.

2       (Exhibit 18 was marked for identification

3       and is attached.)

4            A.    Okay.  Okay.  Yeah, there it is.

5       Yes.  Yeah, right.  Okay.  It's coming

6       back to me now.  And this was published

7       out of the -- Amsterdam.  That's right.

8       Okay.  All right.  Yeah.

9            Q.    All right.  Let me ask you --

10      strike that.

11               Bottom of the page, there's a

12      section titled "Introduction."  You see

13      that?

14           A.    The bottom of the first page?

15           Q.    Yes.

16           A.    Yes, I see that.

17           Q.    Look at -- look to the column on

18      the right.

19           A.    Okay.

20           Q.    The last sentence says, "In

21      general, most researchers have reported

22      their patients are extremely satisfied

23      overall with their surgical outcomes,

PLAINTIFFS001908

```
 1     with a low rate of complications."  You
 2     see that?
 3          (Witness reviews document.)
 4       A.   Right.  I see -- I do see that,
 5     yes.
 6       Q.   Then it cites three footnotes, 5
 7     through 7; right?
 8       A.   Right.
 9       Q.   You don't acknowledge this
10     portion of the article in your report;
11     right?
12       A.   Well, it is in the discussion, I
13     think.  Well, actually, probably maybe in
14     the summary of the -- of the medical
15     evidence.  The -- I would put this in the
16     category of subjective reporting and
17     short -- subjective reporting and short
18     follow-up.  Right.  That's what --
19       Q.   Well, you --
20       A.   I'm sorry.  Go ahead.
21       Q.   No, no, go ahead.
22       A.   So I think the reason I included
23     this was to show that there are -- you
```

PLAINTIFFS001909

Page 328

1    know, that there's a growing pool of

2    patients who are returning for reversal

3    surgery.  I don't think I discussed in

4    this part of my report -- yeah.  I'm just

5    talking about increasingly visible

6    community and patient -- increasing

7    number of patients requesting reversal

8    surgery.  And as an example of that,

9    again, going to a single-center case

10   collection as an example, early evidence,

11   we're starting to see this now as numbers

12   of patients who have surgically

13   transitioned increases, the numbers of

14   patients who regret is going to increase,

15   particularly in light of what these

16   authors speak about here.

17          Let me see if I -- yeah.  So in

18   the second sentence of the abstract in

19   the introduction, it says, "However,

20   misdiagnosed patients sometimes regret

21   their decisions."  And one of the reasons

22   for including this article is the fact

23   that misdiagnosis is not measured.  The

PLAINTIFFS001910

1    world literature doesn't present error

2    rates.  This would be what I would

3    consider an error rate, that an erroneous

4    diagnosis was acted upon surgically,

5    leading to this complication of regret

6    and a -- and a desire for reversal.

7    Yeah.

8        Q.   Your expert testimony is that

9    there's no data available on the

10   percentage of people who have received

11   treatment for gender dysphoria who

12   experience regret?

13       A.   Yeah.  It's very, very low --

14   low-level evidence right now.  It's

15   basically we're in the -- we're in the

16   case collection study, whereas actually

17   in the -- well, that's not regret.  But

18   -- but perhaps in the category of

19   misdiagnosis would be the -- the reports

20   out of Sweden, certainly the -- yeah, so

21   beginning with the Swede -- Swedish

22   studies by Cecilia Dhejne and others that

23   shows us a lack of efficacy.  Whether or

PLAINTIFFS001911

Page 330

1      not the patient presented for reversal is

2      definitely an unknown number, definitely.

3          Q.   All right.  That study doesn't

4      quantify anything about patient regret;

5      right?

6          A.   The Swedish study does not.  It

7      quantifies lack of -- of effect from the

8      surgical interventions.  Lack of benefit,

9      I should say.

10         Q.   Go to page -- PDF page 7 of this

11     document and look at the Conclusions --

12         A.   Okay.

13         Q.   -- section.

14         A.   All right.  Let's see that page.

15     Conclusions.  Okay.  I'm there.

16         Q.   The first sentence says, "The

17     vast majority of properly diagnosed

18     transsexual patients are satisfied with

19     their decision to undergo SRS, with only

20     a few coming to regret it."  Right?

21         A.   Right.  So this -- the other

22     reason why this study is useful to our

23     conversation is that this is the same

PLAINTIFFS001912

Page 331

1          language and the same metrics that's used

2          to describe the success of cosmetic

3          surgery.  They don't include in here,

4          apart from the regret number that they're

5          actually publishing here -- not number

6          but the examples, I should say.  They

7          don't include in their -- in their

8          conclusions any statement about objective

9          quantifiable benefit from the surgery.

10         They talk about subjective reporting.

11                 So this is an example of a -- of

12         a peer-reviewed journal article that

13         measures the efficacy of this surgery

14         based solely upon a satisfaction survey

15         of patients who have returned for

16         follow-up, so this would be an example of

17         that.  Yes, sir.

18         Q.   Do you know what metric was used

19         to measure satisfaction or

20         nonsatisfaction in these studies?

21         A.   I'd have to reread the -- the

22         methods and materials here, but I

23         would -- I would guess it was one of the

PLAINTIFFS001913

Page 332

1      approved instruments for measuring

2      satisfaction.  There are a variety of

3      test instruments used for -- in

4      satisfaction surveys, particularly in the

5      world of plastic surgery.

6            Let's see.  They used the --

7      these are the kind of things I don't keep

8      in my long-term memory here for a

9      particular article.  Okay.

10          (Witness reviews document.)

11      A.   Okay.  There's the outcomes

12   measures.  Forgive me for eating up your

13   time.

14      Q.   Let me -- let help you, Doctor.

15   Go to page --

16      A.   Okay.  There it is.

17      Q.   -- PDF page 5.

18      A.   Yeah.  Fif- -- yeah.

19      Q.   Yeah.

20      A.   Fifteen, right.

21      Q.   Question on the page --

22      A.   So there's a -- there's a test

23   instrument there.  Right.

PLAINTIFFS001914

Page 333

1          Q.    Yeah.   There's a test instrument

2      that measures things like erectile

3      function, sexual desire, orgasmic

4      function, intercourse satisfaction, and

5      overall satisfaction; right?

6          A.    Right.

7          Q.    They don't just ask the patient,

8      "Hey, are you happy with the surgery?"

9      There's five criteria that are applied;

10     right?

11         A.    Right.

12         Q.    This is an approved instrument

13     for measuring this type of satisfaction

14     for surgery; right?

15              MR. KNEPPER:   Objection, form.

16         A.    This is -- this is -- yeah, it's

17     definitely a valuable instrument for

18     measuring things, but none of them are

19     the -- are the indication for surgery,

20     which is things like reduced suicidality,

21     reduced self-harm, reduced alcohol use,

22     all of those other things which are --

23     which are the reason, the indication for

PLAINTIFFS001915

Page 334

1       the operation.  So you generally try to

2       match the surgical procedure with the

3       indication for the surgery.

4               They're measuring things that

5       weren't involved in the indications for

6       surgery.  They didn't get, you know,

7       reconstructive surgical approval so that

8       they could achieve erections, for

9       example.  This was approved because of

10      the risk of self-harm, suicide, those

11      sorts of things.  Yeah.  But none of

12      those are measured.  They -- it is -- it

13      is they do have objective measures, and

14      this is one of the -- one of the values

15      of this study.  But I don't think they

16      report the complication rate in this

17      study, as I recall.

18      Q.    This -- this study specifically

19      did not purport to seek out anything

20      about suicidality or mortality or other

21      adverse outcomes of that nature; right?

22      A.    Let's see.  I'm trying to

23      remember in their introduction.

PLAINTIFFS001916

1          (Witness reviews document.)

2       A.   Yeah.  I think their indications

3    used language that was more consistent

4    with -- with aesthetic, aesthetic surgery

5    rather than the reconstructive language.

6    So yeah.

7          (Witness reviews document.)

8       A.   Yeah.  So --

9       Q.   Yeah.  Here's --

10       A.   Yeah, I would --

11       Q.   Here's what I find interesting,

12    Doctor.

13       A.   Okay.

14       Q.   Your report cites this one case

15    series of seven patients to make the

16    point that there's this regret occurring

17    without even mentioning that there's

18    multiple case series that say the vast

19    majority of these patients end up being

20    satisfied with this type of surgery?

21       A.   No.  I don't think --

22       Q.   You don't think that's

23    appropriate to mention?

PLAINTIFFS001917

1      A.   No.  I -- actually, what I

2    present these examples to show, that --

3    that the literature in support of these

4    surgeries is characterized by very short

5    follow-up and subjective reporting.  So

6    this is an example of some objective

7    reporting, mostly subjective reporting.

8    And most of the articles, for example,

9    that you just asked me about involve

10    subjective reporting and short follow-up.

11    That's right, yeah.

12      Q.   All right.

13      A.   And in this case, you also --

14    I'm -- I'm pleased that they reported

15    that one, two, three, four, five, six,

16    seven -- so nearly half of their patients

17    had a surgical complication of a urethral

18    fistula, and if you have a urethral

19    fistula and you have a malleable

20    prosthesis, probably they went on to

21    remove the prosthesis as well.  But

22    that's -- I mean, I -- props for this --

23    this team that they reported their

PLAINTIFFS001918

Page 337

1    complications.

2        Q.   Where -- what page is the

3    complications portion you're looking at?

4        A.   That's on -- just before you get

5    -- the last page before the -- the same

6    page as the conclusions.  There's a table

7    at the top, and they have the seven

8    patients, and you can see -- what's also

9    interesting here, too, is -- is that if

10   you look at the period after sex

11   reassignment surgery, that the -- that

12   the dissatisfaction level really kicks in

13   when you're beyond eight years.

14   Actually, if you look at even six years

15   beyond.

16           Initially, there's no patients

17   reporting dissatisfaction at anything

18   less than five years, and so this is

19   actually further evidence of the -- of

20   the inadequacy of the -- the papers that

21   are in the literature right now which

22   have follow-ups that are typically two to

23   three years.  So none of these patients

PLAINTIFFS001919

Page 338

1       would have been seen, with most of the

2       literature that supports these

3       techniques, as a way to, you know, avoid

4       -- avoid dissatisfaction or -- or

5       suicidality or drug use or anything else

6       like that.  So that's an interesting -- I

7       hadn't noticed that before, but yeah.

8            Q.   Yeah.  Are you reading Table 1

9       to say that these complications like

10      urethral fistula and stricture were from

11      the original surgery?

12           A.   Well, I'm -- I'm merely --

13           Q.   Or is it from the reversal

14      surgery that was being done later?

15           A.   So they're talking here about

16      flaps.  They're talking about

17      complications from the -- the -- the

18      surgeries.  Yeah.  So this --

19           Q.   Yeah.  This is --

20           A.   They're speaking about urethral

21      fistulas and strictures are the main

22      problem after total phalloplasty.  So

23      that's the construct of the counterfeit

PLAINTIFFS001920

Page 339

1      phallus because of insufficient vascular

2      supply.  I also discuss that in my

3      complications section.  These are

4      characteristic complications of these

5      free flaps, radial forearm free flaps,

6      and you see those complications here.

7      And you even see them later in -- in the

8      case, so.  Some of them are step

9      procedures.  In fact, all of them are.

10          Q.  All right.  Let me -- let me

11     show you another study.

12          A.  Okay.

13          Q.  Let me reintroduce this with an

14     exhibit -- exhibit stamp.  Give me a

15     second.  All right.  I'm reintroducing

16     this as Exhibit 20.  Let me know when you

17     have it.

18     (Exhibit 20 was marked for identification

19     and is attached.)

20          A.  I just got Exhibit 19.  Is there

21     another?  There's a 20 to follow?

22          Q.  It -- it should load

23     momentarily.  Yeah.

PLAINTIFFS001921

Page 340

1          A.   Oh, I'm sorry.

2               MR. KNEPPER:  Are 19 and 20 the

3     same, just one's missing the little

4     stamp?

5               MR. TISHYEVICH:  Correct.

6               THE WITNESS:  Okay.  I'll just

7     go to 20, then, when it comes in.

8          Q.   Okay.  This is a study titled

9     "The Amsterdam Cohort of Gender Dysphoria

10    Study (1972-2015): Trends in Prevalence,

11    Treatment, and Regrets."  Do you see

12    that?

13         A.   I do.

14         Q.   And then it's by an author,

15    let's say Wiepjes, W-I-E-P-J-E-S.

16         A.   Yeah.

17         Q.   Right?

18         A.   I agree.

19         Q.   Have you seen this study before?

20         A.   I'm trying to gloss it to see if

21    I've read this before.  I -- I may have.

22    Give me just a moment, if that's okay.

23         Q.   Sure.

PLAINTIFFS001922

1          (Witness reviews document.)

2     A.   Yeah, this looks familiar.

3     Q.   I don't think I saw this in your

4     report, but tell me if you remember

5     otherwise.

6          (Witness reviews document.)

7     A.   Yeah, no.  I remember this being

8     evidence of the growing population of

9     self-reported transgender patients,

10    and it's a retro- --

11    Q.   Okay.  Let me --

12    A.   -- retrospective trial.  Yeah.

13    Q.   Yeah.  Let's go through this.

14    A.   Retrospective study, I should

15    say.

16    Q.   All right.  You see the

17    "Abstract" section on the first page?

18    A.   I do.

19    Q.   See the "Results" section?

20    A.   I do.

21    Q.   It says, "6,793 people (4,432

22    birth-assigned male, 2,361 birth-assigned

23    female) visited our gender identity

PLAINTIFFS001923

Page 342

1       clinic from 1972 through 2015."  See

2       that?

3            A.   I do.

4            Q.   All right.  So you understand

5       that as part of this study, the authors

6       reviewed medical records of 6,793 people

7       who visited this gender identity clinic

8       from 1972 to 2015; right?

9            A.   I do.

10           Q.   All right.  And you see the

11      "Strengths and Limitations" section?

12           A.   Yes, I do.

13           Q.   And you understand that this

14      Dutch gender identity clinic treats more

15      than 95 percent of the transgender

16      population in the Netherlands; right?

17           A.   Right.

18           Q.   Pretty comprehensive study;

19      right?

20                MR. KNEPPER:  Objection, form.

21           A.   As of 2015, yes.  So it's a

22      7-year-old study, and it's -- it's

23      certainly large in numbers, that's for

PLAINTIFFS001924

Page 343

1      sure.  So it's a retrospective chart

2      review of patients visiting the -- the

3      center in the Netherlands, and it's -- it

4      concludes in 2015.

5          Q.   This is certainly a better study

6      than that seven series case report that

7      you cited in your report; right?

8          A.   It's a different type of study.

9      Yes, it is.  Right.

10         Q.   Yeah.  This study reports on

11     6,793 people, whereas the case series on

12     which you rely has seven what you call

13     anecdotes; right?

14         A.   I wouldn't say I relied on that

15     study.  I merely presented it as an

16     example of -- of reporting on transgender

17     regret.  I didn't present it as a study

18     that I relied all my opinions on.

19     Certainly, there's other study types and

20     other studies in the literature that --

21     that one might rely more heavily on.

22         Q.   Well, let the --

23         A.   A retro- -- a retrospective

PLAINTIFFS001925

Page 344

1       chart review, for example, might be more

2       useful.

3           Q.   Yeah.

4           A.   But not -- not definitive.   And

5       again, we've got to examine the fact that

6       we're looking at old data here.

7           Q.   Well, let's see what this

8       30-year retrospective review found.   Look

9       at the "Results" section.

10          A.   Scroll down.   Okay.

11          Q.   Look at the last two sentences.

12      "The percentage of people who underwent

13      gonadectomy within 5 years after starting

14      HT remained stable over time" --

15          A.   Right.

16          Q.   -- "(74.7% of transwomen and

17      83.8% of transmen).   Only 0.6% of

18      transwomen and 0.3% percent of transmen

19      who underwent gonadectomy were identified

20      as experiencing regret."   Do you see

21      that?

22          A.   I do.   And that has caused me to

23      want to look back and see -- okay.   So

PLAINTIFFS001926

Page 345

1     they started with the 6,800, roughly, and

2     they report on 6,000 -- 7,000 almost.

3     Okay.  And clinic.  Okay.  And increase.

4              So I'm just trying to see if

5     they reported the average follow-up.

6     They're reporting when they underwent

7     gonadectomy after starting hormone

8     therapy, but they don't report the length

9     of follow-up, which is one of the key

10    reporting points there, because regret,

11    as we talked about earlier, is a -- tends

12    to be a function of time postsurgically.

13    So, let's just scroll down because it's

14    been a long time since I looked at this

15    article.  Transwomen, transmen total

16    underwent gonadectomy.

17             Yeah.  As I recall, they don't

18    report average follow-up time.  Every

19    five-year cohort.  So they're looking --

20    they -- they did look at when they

21    entered the system.  Prevalence and

22    treatment.  Confidence interval.

23             Yeah, as I -- yes.  So I think

PLAINTIFFS001927

1    that's -- this is coming back to me now.

2    I think they didn't report the average

3    follow-up or the -- let's see if I'm

4    missing something here.  Age for each

5    year, so they did break them out in age

6    that they -- they entered the -- the

7    process, the years during which they

8    entered the process, age groups.  And

9    yeah, I think that's -- that was one of

10   the -- one of the issues.

11           And this is -- consonant with --

12   with a lot of the literature, is they

13   don't report the follow-up interval.  And

14   that's what the Swedish study is showing

15   us, that if -- if you don't have a handle

16   on the length of follow-up after sex

17   reassignment surgery, then you don't have

18   a -- you don't have any way to fully

19   understand the issue of lack of efficacy

20   or regret.

21           If you're asking the questions

22   is the surgery effective in correcting

23   the most calamitous problems that a

PLAINTIFFS001928

Page 347

```
1        transgender person has, which is
2        suicidality, self-harm, and all those
3        things that we talked about earlier, then
4        you have to look at the interval
5        postsurgery in order to have a full
6        understanding of the efficacy of the
7        procedure.  And as I recall now, looking
8        it over again, this study does not report
9        on the follow-up period.  The median age
10       at first visit was younger, 25.  Yeah.
11       So they talk about age.  They talk about
12       the years in which they were cared for,
13       but they don't talk about the length of
14       the follow-up interval, so.
15            Q.   All right.  Let me move on --
16            A.   Okay.
17            Q.   -- to save time.
18            A.   All right.
19            Q.   Go to page 4 and where it says
20       "Regret."
21            A.   Okay.
22            Q.   You with me?
23            A.   I am.
```

PLAINTIFFS001929

1      Q.    Third sentence says -- fourth

2      sentence says, "Reasons for regret were

3      divided into social regret, true regret,

4      or feeling non-binary."  You see that?

5      A.    I do.

6      Q.    And social regret -- strike

7      that.

8              It says, "Transwomen who were

9      classified as having social regret still

10     identified as women, but reported reasons

11     such as 'ignored by surroundings' or 'the

12     loss of relatives is a large sacrifice'

13     for returning to the male role."  Do you

14     see that?

15     A.    I do.

16     Q.    All right.  So some of the

17     persons who are being counted as

18     experiencing regret in the study did not

19     experience regret in the sense of they're

20     realizing they're not transgender; right?

21     A.    Realizing they're not

22     transgender?  I'm -- I'm trying to

23     understand your question here.  So you're

PLAINTIFFS001930

Page 349

1      -- you're pointing me to the -- social

2      regret, true regret, feeling non-binary

3      is what's stated here.

4              "Transwomen who were classified

5      as having social regret still identified

6      as women, but reported reasons such as

7      'ignored by surroundings' or 'the loss of

8      relatives is a large sacrifice' for

9      returning to the male role."

10             Okay.  Yeah.  So -- so it's --

11     it's reporting without quantifying the

12     reasons for regret and the -- basically

13     all of them, subjective reporting again,

14     so -- okay.

15       Q.   Well -- well, let's go to page

16     6.

17       A.   That's the next page, isn't it?

18     Am I on the right page?

19       Q.   On page 6, it has a large

20     vertical table on the left side.

21       A.   Okay.  There we are.

22       Q.   And you may want to rotate it so

23     that you can see that table 6.

PLAINTIFFS001931

Page 350

1      A.    When I got -- let's see.

2    There's a way to do that, isn't there?

3           THE COURT REPORTER:  Yeah.  If

4    you put your cursor over the document, a

5    black rectangle will come up at the

6    bottom.

7           THE WITNESS:  I see it now.

8    Yes.

9           THE COURT REPORTER:  There you

10   go.

11          THE WITNESS:  All right.  There

12   we are.

13     Q.    Table 4 is titled

14   "Characteristics of people with regret."

15     A.    Okay.

16     Q.    According to this table, out of

17   6,793 patients who received treatment, 14

18   of them reported regret of any type;

19   right?

20     A.    Okay.

21     Q.    And all the way on the right,

22   you see there's a "Reason for regret"

23   column; right?

PLAINTIFFS001932

Page 351

1          A.    Right.

2          Q.    And you're welcome to count it,

3     but by my count, only 7 of those 14

4     reported, quote, unquote, true regret;

5     right?

6          A.    Yeah.  And what's interesting

7     about that is that those are the same

8     criteria that were used to seek

9     transgender surgery to solve their

10    interior problems.  So many patients will

11    present for care because they feel

12    socially isolated and because they have,

13    you know, issues of -- well, for example,

14    being non-binary and so on, those --

15    those -- like social acceptance and

16    feeling non-binary is among the

17    indications for the procedure.  So it's

18    interesting to note also that time after

19    surgery, the regretters seem to favor --

20    postsurgical, you start to see them,

21    what, maybe 50 to 90 months out and a lot

22    of them, years -- ten years out.  Yeah.

23    So that -- that speaks to what we talked

PLAINTIFFS001933

Page 352

1   about earlier, that you see these regrets

2   and these problems beyond five years.

3       Q.   All right.  Whatever criticism

4   you have of the methodology, what the

5   study reports is -- are rates of regret

6   that are below 1 percent; right?

7           MR. KNEPPER:  Objection, form.

8       A.   Yeah.  Again, so as we talked

9   about earlier, that's the problem with

10  this study, is that -- is that the -- the

11  denominator is a much larger number than

12  these 14 patients, and they don't address

13  the length of follow-up out of which they

14  extracted these 14 patients.  So it makes

15  it difficult to interpret the study, and

16  the claim that it's a small number is

17  hard to support by their own evidence

18  because they didn't follow them long

19  enough.  As their own data shows, you got

20  to follow them longer to see the regret

21  in most patients.  And they don't tell us

22  what that number is.

23      Q.   Are you aware that there are

PLAINTIFFS001934

Page 353

1        studies on patient regret outside of the

2        treatment for gender dysphoria?

3            A.   Am I aware of -- of transgender

4        transition regret outside of --

5            Q.   No.  I'm going to ask -- I'm

6        going to ask this again.

7            A.   I'm sorry.

8            Q.   Are you aware there are studies

9        on rates of patient regret outside of

10       surgical treatment for gender dysphoria?

11           A.   Yes.  Absolutely, yeah.  So --

12           Q.   Okay.

13           A.   One of the -- one of the most

14       important --

15           Q.   Okay.  Let me ask -- yeah,

16       Doctor, let's -- this is going to be a

17       long day.  Just listen to my questions.

18               Did you do a literature search

19       to find out what the average rates of

20       patient regret are for other surgical

21       procedures compared to surgical treatment

22       for gender dysphoria?

23           A.   I did not.

PLAINTIFFS001935

Page 354

```
 1        Q.   Do you know if those rates are
 2    higher, lower, or about the same as the
 3    rates of regret for surgical treatment
 4    for gender dysphoria?
 5        A.   I would say there's no way of
 6    knowing because we don't have the -- the
 7    rate of regret in transgender regretters.
 8    We don't have that number, so there's no
 9    way to compare or to know which is the
10    higher number.
11        Q.   Okay.
12        A.   Like we talked about earlier, we
13    don't have this number.
14        Q.   Well, this one study I just
15    showed you showed a finding of 0.3
16    percent to 0.6 percent; right?
17        A.   Right.  And I -- and as I said,
18    this is -- this is -- it's difficult to
19    use this to compare to other regret cases
20    because of the poor quality of this
21    study.  So I can't use this to compare it
22    to the other studies on regret because
23    this is not -- not useful to that end.  I
```

PLAINTIFFS001936

1          mean, it's useful in seeing that 14 -- 14

2          regretters had these complications, 14

3          regretters had these -- these

4          explanations for their regret.

5                    And so it's kind of like a case

6          collection, and retrospective reviews of

7          -- of patient records are helpful in

8          getting a sense of the size of the

9          problem.  Certainly, this study shows us

10         that there's an increasing patient pool

11         of people who self-identify as

12         transgender.  So in that regard, this

13         publication is very useful.  But in terms

14         of comparing the regret rate based on

15         this paper, I'd say this paper is

16         useless.

17             Q.   Okay.  Open Exhibit 21.

18         (Exhibit 21 was marked for identification

19         and is attached.)

20             A.   Okay.

21             Q.   Let me know when you have it.

22             A.   Okay.

23             Q.   All right.  This is a

PLAINTIFFS001937

Page 356

1     publication from 2017 by Wilson,

2     W-I-L-S-O-N, titled "Regret in Surgical

3     Decision Making: a Systematic Review of

4     Patient and Physician Perspectives."  See

5     that?

6          A.   I do.

7          Q.   All right.  Look at the

8     abstract.  You with me?

9          A.   I'm -- I'm looking -- I'm just

10    reading it now.

11         Q.   The third sentence says, "We

12    performed a systematic review of the

13    literature focused on patient and

14    physician regret in the surgical

15    setting."  See that?

16         A.   I do.

17         Q.   Now look at "Results."  See

18    that?

19         A.   I'm there now, yes.

20         Q.   It says, "Of 889 studies

21    identified, 73 patient studies and 6

22    physician studies met inclusion

23    criteria."  Do you see that?

PLAINTIFFS001938

Page 357

```
 1        A.   I'm reading it now, yes.
 2        Q.   I understand this is a
 3    systematic review of 73 patient studies
 4    and 6 physician studies on regret and
 5    surgical decision-making; right?
 6        A.   That's what it says here, yes.
 7        Q.   Then the third sentence of
 8    "Results" says, "Interestingly
 9    self-reported patient regret was
10    relatively uncommon with an average
11    prevalence across studies of 14.4%."
12    Right?
13        A.   Right.
14        Q.   And then "Conclusion" says,
15    "Self-reported decisional regret was
16    present in about 1 in 7 surgical
17    patients."  You see that?
18        A.   I do.
19        Q.   All right.  So according to this
20    systematic review, one out of seven
21    surgical patients, on average, report
22    having decisional regret; correct?
23             MR. KNEPPER:  Objection, form.
```

Page 358

1          A.    Right.  So actually, I would go
2      a little deeper than that.  The first
3      thing to note about this study -- and
4      again, this is my first reading of it, so
5      I'm on the fly here.
6                The first thing to note about it
7      is that they looked at nearly 900
8      studies, of which only 73 qualified as
9      having sufficient validity to include in
10     their study.  So this -- this speaks to a
11     problem in the literature.  I'd have to
12     read lower to see what particular -- if
13     they even examined what kind of surgeries
14     were performed, because regret can happen
15     for a number of reasons, including
16     postsurgical complications and so on,
17     types of surgery.
18         Q.    We don't need --
19         A.    Yeah.
20         Q.    We don't need to dig into this
21     too deeply.  But, I mean, you don't
22     dispute that regret is not uncommon for
23     patients who have any kind of surgical

PLAINTIFFS001940

Page 359

1      procedure; right?

2             MR. KNEPPER:  Objection to form.

3         A.    No.  You know, there's --

4      there's -- it's such a life-changing

5      event that the potential for regret is

6      very high, so that's why you have to be

7      careful in consenting the patient.

8         Q.    Okay.  Let me -- let's go back

9      to your report.

10        A.    Okay.

11        Q.    Because I hear you criticizing

12     all this evidence, and I want to see the

13     stuff that you're relying on.  Go to page

14     22.

15        A.    All right.

16        Q.    All right.  About halfway down

17     this paragraph, you say, "As reported by

18     one author in 2021, 60,000 testimonies of

19     personal de-transition can be found on

20     the Internet."

21        A.    Yeah, that's a typo.  That's a

22     typo.  That should have been 16, not 60.

23        Q.    Okay.  Well, I think it's more

PLAINTIFFS001941

Page 360

1      than that.

2          A.   Okay.

3          Q.   So we'll look at this in a

4      second.

5          A.   Sure, sure.

6          Q.   And you cited this article from

7      Pablo Exposito-Campos.

8          A.   Yes.

9          Q.   E-X-P-O-S-I-T-O, dash,

10     C-A-M-P-O-S.  Right?  That's what you

11     rely on; right?

12         A.   Not relying.  I'm basically just

13     putting that out there as an example of a

14     growing number of patients regretting

15     transitioning, yeah.

16         Q.   Well, no.  What you say in your

17     report is that according to this

18     publication, you can find 60,000 -- or

19     let's call it 16,000 testimonies of

20     personal de-transition on the Internet;

21     right?  That's the point you're making?

22         A.   Sixteen thousand, right.  Yeah.

23         Q.   Let's look at what that article

PLAINTIFFS001942

Page 361

1      actually says.

2          A.    Okay.

3          Q.    Okay.  This is going to be

4      Exhibit 22.  And let me know when you get

5      it.

6          A.    Doesn't seem to be coming

7      through.

8          Q.    Yeah, it may be stuck on my end.

9      Okay.  Just went through, so you should

10     see it shortly.

11     (Exhibit 22 was marked for identification

12     and is attached.)

13         A.    There it is.  Okay.  Right.

14         Q.    All right.  This is the article

15     that you're citing in your report; right?

16         A.    Uh-huh.

17         Q.    All right.  So before we get

18     there, you know that what this author was

19     talking about was a Reddit website;

20     right?

21         A.    Yeah.  That was -- that was

22     their data source, yeah.  Right.

23         Q.    Reddit is not a peer-reviewed

PLAINTIFFS001943

Page 362

```
 1     publication, obviously; right?
 2         A.   Clearly.
 3              MR. KNEPPER:  Objection.
 4         A.   Yeah.
 5         Q.   Right?
 6         A.   Yes.  It's not a peer-reviewed.
 7         Q.   It's a social website that
 8     anyone can access; right?
 9         A.   Right.  Correct.
10         Q.   Anyone can post -- can register
11     an account on Reddit and post whatever
12     they want; right?
13         A.   Right.
14         Q.   A post on Reddit is not
15     something that you would consider
16     reliable scientific evidence, I assume;
17     right?
18         A.   Yeah, no.
19              MR. KNEPPER:  Objection, form.
20         A.   I would -- I would put that as
21     self-reporting anecdotal-level evidence,
22     that's right.  So it's -- it's not
23     definitive, but it's suggestive of an
```

PLAINTIFFS001944

Page 363

1    area in need of examination.  And that's
2    the reason I include it here, is not as
3    definitive evidence of a particular level
4    of problem but the -- the presence of a
5    problem that needs to be addressed.  So
6    the substance of my testimony there where
7    I call this study up is to show that
8    there's a growing body of patients, as we
9    talked about earlier, a growing body of
10   patients who regret their transition and
11   are seeking reversal.  So that's what
12   this is about.
13           It's not a quantification of the
14   phenomenon.  It's not a level 3 evidence
15   of the phenomenon.  It's a level 5,
16   self-reported, anecdotal stuff that --
17   that is basically just calling us to look
18   more carefully at what promises to be a
19   controversial area of medical care.  So
20   this is just part -- part of the
21   controversy is what we're looking at
22   here.  We're not looking at a definitive
23   scientific document, so.

PLAINTIFFS001945

Page 364

1        Q.   It's not even level 5 because at

2     least a case report that's published in a

3     peer-reviewed journal has someone looking

4     at that case report to figure out if it's

5     a real thing; right?

6        A.   Right.

7             MR. KNEPPER:  Objection, form.

8        A.   What we have here is a clinical

9     psychologist who's looking at something

10    going on online, and the clinical

11    psychologist is -- is reporting this,

12    that's right.

13       Q.   Go to page 4 of this article.

14       A.   One, two, three, four.  Okay.

15       Q.   See there's a second paragraph

16    under "Further clarifications"?

17       A.   Yes, I do.

18       Q.   All right.  And it references

19    this Reddit/detrans subreddit; right?

20       A.   Right.

21       Q.   And it says it's "a subreddit

22    for detransitioners to share their

23    experiences with more than 16,000

PLAINTIFFS001946

Page 365

1       members."

2           A.    That's correct.

3           Q.    Right?

4           A.    Uh-huh.

5           Q.    Then it says, "one can find

6       several stories of people who call their

7       transgender status into question."  You

8       see that?

9           A.    Right.

10          Q.    All right.  This author is not

11      saying that there's 16,000 separate

12      testimonies of people tran- --

13      detransitioning on that subreddit; right?

14          A.    I think the author is saying

15      that there's a pool of 16,000 people

16      among whom are evidence of regret or

17      cessation of transition.  That's what --

18      I think that's what the author's saying.

19          Q.    Well, let's be more specific,

20      because what he actually says is "one can

21      find several stories."  Right?

22          A.    Right.

23          Q.    There's a very big difference

PLAINTIFFS001947

Page 366

1       between, quote, several stories and

2       16,000 stories of detransitioning; right?

3           A.   I think what the author is

4       saying is that -- that there are -- let's

5       see.  Subreddit -- detran- --

6       experiences -- more than 16- -- one can

7       find several stories of a particular kind

8       of transgender -- persons who call their

9       transgender status into question after

10      stopping transition.

11              So the several stories have to

12      do with people who call their transgender

13      status into question.  Not people who

14      regret the surgery, but these are people

15      who regret the diagnosis.  So he's

16      talking about several stories of

17      regretters of the diagnosis.  It doesn't

18      speak about regretters of the transition.

19      He doesn't address that in that.

20          Q.   All right.  A bunch of posts on

21      a social website is not scientifically

22      reliable evidence to show the number of

23      different people who actually

PLAINTIFFS001948

Page 367

1      detransition; right, Doctor?

2              MR. KNEPPER:   Form.

3          A.   Yeah.  As we said before, we

4      have no way of -- at present, of knowing

5      the number of people.

6          Q.   Okay.  Go back to your report.

7          A.   Okay.

8          Q.   Go to page 40.

9          A.   All right.  Okay.

10         Q.   All right.  Your first paragraph

11     at the top of this page says, "A

12     currently unknown percent-" --

13     "percentage and number of patients

14     reporting gender dysphoria are being

15     manipulated by a -- peer group, social

16     media, YouTube role modeling, and/or

17     parental -- social contagion and social

18     pressure processes."  Right?

19         A.   That's right.

20         Q.   I take it you're not aware of

21     any peer-reviewed studies that quantifies

22     the number of people with gender

23     dysphoria that are being, quote, unquote,

PLAINTIFFS001949

Page 368

1    manipulated by social contagion or social

2    pressure; right?

3        A.    Again, as I said before, we

4    don't know the numbers because that's not

5    -- it's not adequately reported in the

6    literature.  But what we do know is that

7    the social -- Lisa Littman's article, for

8    example, in 2017 shows us that there's a

9    significant factor in this new

10   demographic of self-reported transgender

11   patients, the new demographic being

12   adolescent to young adult females without

13   prior history of gender dysphoria or

14   gender discordance suddenly reporting

15   transgender self-identification.

16           And -- and what it shows us,

17   what Lisa -- Lisa Littman's publication

18   from Brown University shows us is that

19   underlying these outbreaks is peer group

20   networks of people online, peer groups

21   online, social media, a modeled speech, a

22   rehearsed speech, and -- and these --

23   these sudden outbreaks of -- of

PLAINTIFFS001950

Page 369

1        self-identified transgender patients.

2                So we know it's there, but we

3        can't quantify it yet.  It's just it's --

4        but it's -- we have at present no other

5        explanation for why the demographic of

6        self-reported transgender patients has

7        suddenly shifted from virtually all young

8        boys to 50 to 60 percent of the new cases

9        being adolescent to young adult females.

10       And that's -- that's what we're -- what

11       we're talking about here.  This just

12       speaks to the controversial nature of

13       this -- medical and surgical

14       interventions is that we don't even

15       understand the origin of that phenomenon.

16       And -- and what that Littman article

17       shows us is precisely these things:  that

18       there's an element of social contagion,

19       that there's peer pressure, there's

20       rehearsed speech, online networks that

21       cause these outbreaks of these new kind

22       of patients, adolescent young adult

23       females who previously had no

PLAINTIFFS001951

Page 370

```
 1      self-reporting of trans- -- cross-sex
 2      self-identification.
 3              MR. TISHYEVICH:  This is not
 4      responsive to my question, and I move to
 5      strike it.
 6         Q.   Here's my question, Doctor.  You
 7      are not aware of any peer-reviewed study
 8      that quantifies the number of people with
 9      gender dysphoria who are being
10      manipulated by social contagion or social
11      pressure; correct?
12         A.   No.  We're at the -- we're at
13      the level of level 4/5 evidence now.
14      Lisa Littman's article is a level 5,
15      possibly 4.  A level 5.  So --
16         Q.   It's not a -- you're also not
17      aware of any peer-reviewed study that
18      quantifies the percentage of people with
19      gender dysphoria who are being
20      manipulated by social contagion or social
21      pressure; correct?
22         A.   No.  That's part of the -- part
23      of the problem with the literature.
```

PLAINTIFFS001952

Page 371

1      Exactly right.

2          Q.   Yeah.

3          A.   Exactly right.

4          Q.   Given this lack of reliable

5      studies, do you agree that this

6      phenomenon of social contagion is

7      currently hypothetical?

8              MR. KNEPPER:  Objection, form.

9          A.   I would not agree with that.

10     It's not hypothetical.

11         Q.   Do you -- did you read the

12     response from Lisa -- from Littman to the

13     criticisms to that article?

14         A.   I did.  And -- and I also noted

15     that the -- the -- the organization under

16     which she published that article put

17     considerable pressure on her.  But she

18     can't retract her data.  She can retract

19     her conclusions, but she can't retract

20     her data, and she can't retract the

21     findings in the paper itself that show

22     the rehearsed speech, that show the

23     networks that are involved, that showed

PLAINTIFFS001953

Page 372

```
 1       the -- the character of the -- the
 2       rehearsed speech, like, you know, if
 3       you're talking to the psychologist, tell
 4       them you've been thinking about suicide;
 5       if you're talking to the endocrinologist,
 6       tell them you feel better now that you're
 7       started on T, that sort of stuff.  So --
 8       so it's not hypothetical, it's actual.
 9               The -- the size of the
10       phenomenon can only be compared to the
11       change in the demographic.  Why are 60
12       percent of patients fitting into that
13       category suddenly, whereas before, only
14       20 percent of patients were females?
15       Q.   Do you remember --
16       A.   That's what --
17       Q.   Okay.  Do you remember the part
18       of the correction from Ms. Littman where
19       she said that this is a
20       hypothesis-generating article?
21       A.    Hypothesis as to -- as to
22       mechanism of -- of action, and some of
23       the hypotheses are what's listed there:
```

PLAINTIFFS001954

Page 373

1     social network peer -- media -- I'm

2     sorry -- peer pressure, social media,

3     role modeling, social contagion.  So she

4     admits that is a -- it is not understood.

5     She admits that those phenomena are

6     there, but it -- at present, we're

7     hypothesizing about the actual cause.

8     And this speaks again to the

9     controversial nature of even the

10    diagnosis, much less the treatment.

11         Q.   Go back to your report.

12         A.   Okay.

13         Q.   Page 40.

14         A.   I'm there.

15         Q.   Toward the bottom, you say, in

16    capital letters, "Not Generally

17    Accepted."  You see that?

18         A.   I do.

19         Q.   And you say, "Affirmation

20    medical treatments -- hormones and

21    surgery -- for gender dysphoria and

22    transitioning have not been accepted by

23    the relevant scientific communities."  Do

PLAINTIFFS001955

Page 374

1     you see that?

2          A.    I do.

3          Q.    It's your expert opinion that

4     it's generally accepted that puberty

5     blockers are not medically necessary;

6     right?

7          A.    No.

8                MR. KNEPPER:  Objection, form.

9          A.    I would say puberty blockers in

10    the setting of a self-identified

11    transgender is not medically necessary,

12    but puberty blockers are often medically

13    necessary, just not in that particular

14    patient population.

15         Q.    Is it also your expert opinion

16    that it's generally accepted that hormone

17    treatment for gender dysphoria is not

18    medically necessary?

19         A.    Well, the scientific evidence

20    now shows that it is -- is not useful.

21    That's what I said --

22         Q.    Answer my question.  Is it your

23    expert opinion that it's generally

PLAINTIFFS001956

Page 375

1    accepted that hormone treatment for

2    gender dysphoria is not medically

3    necessary?

4        A.   Yes.

5        Q.   Is it also your expert opinion

6    that it's generally accepted that

7    gender-affirming surgery for gender

8    dysphoria is not medically necessary?

9        A.   Yes.  I would say so, yeah.  I

10   can't put a number on it, but yeah.

11       Q.   All right.  Let me -- let me

12   show you another document.  Okay.  Let me

13   introduce this.  Okay.  This is going to

14   be Exhibit 23.  And let me know when you

15   get it.

16   (Exhibit 23 was marked for identification

17   and is attached.)

18       A.   Okay.  All right.  I'm there.

19       Q.   Okay.  Top of the page says,

20   "BlueCross BlueShield of North Carolina."

21   Right?

22       A.   Correct.

23       Q.   You know what Blue Cross and

PLAINTIFFS001957

Page 376

```
 1      Blue Shield is; right?
 2         A.    Right.
 3         Q.    It's a healthcare insurer;
 4      right?
 5         A.    Yes.
 6         Q.    Are you aware that Blue Cross
 7      Blue Shield is the largest private
 8      insurer in the state of North Carolina?
 9         A.    I am now.
10               MR. KNEPPER:  Objection, form.
11         Q.    All right.  This document is
12      titled "Corporate Medical Policy,"
13      "Gender Affirmation Surgery and Hormone
14      Therapy."  Right?
15         A.    Right.
16         Q.    Do you know what this is?
17         A.    Do I know what what is?
18         Q.    Do you know what this document
19      is?
20         A.    It appears to be an insurance
21      company document concerning the coverage
22      of certain services.  I would have to
23      read it to know what it is specifically,
```

PLAINTIFFS001958

Page 377

1      but I think it's probably a policy

2      statement about what is covered and what

3      is not covered and what the diagnostic

4      criteria are.

5          Q.    Yeah.

6          A.    What the policy of the company

7      is.  Yeah.  So, shall I read it or?

8          Q.    I'll walk you through it.

9          A.    Okay.

10         Q.    You see it says "Last Review"

11     near the top?

12         A.    Right.

13         Q.    It's 3/2021.  That's March 2021;

14     right?

15         A.    Yes.

16         Q.    All right.  You understand this

17     policy was a -- strike that.

18              In your report, you cite a

19     number of articles that you say Dr. Brown

20     and Dr. Schechter overlooked, like a

21     bunch of 2020 articles; right?

22         A.    Right.

23         Q.    You understand this was

PLAINTIFFS001959

Page 378

1     published -- updated after all those

2     studies that you cited were published;

3     right?

4          A.   It appears to be.

5          Q.   Okay.  Go to page 7.  You see it

6     says "Scientific Background and Reference

7     Sources"?

8          A.   Right.

9          Q.   You understand this section of

10    the policy provides some of the

11    scientific background on which the policy

12    is based; right?

13         A.   I see that, yes.

14         Q.   And if you go to page -- the

15    next page, page 8, you see there's a

16    bunch of references to Specialty Matched

17    Consultant Advisory Panel; right?

18         A.   I see that, yeah.

19         Q.   And there's some references to

20    sen- -- Senior Medical Director reviews;

21    right?

22         A.   I see that, yeah, from 2016.

23         Q.   Yeah.  Well, if you keep

PLAINTIFFS001960

Page 379

1      looking, there's a bunch from 2020;

2      right?

3          A.   I see medical director review in

4      2020.  Yes, I do.  I see that.

5          Q.   And then including a medical

6      director review in March 2021; right?

7          A.   I see it.  That's probably what

8      generated this document.  Am I right?

9          Q.   Yeah.  Good guess.  Now,

10     obviously --

11         A.   That's why they pay me the big

12     bucks.  Sorry.

13         Q.   Obviously, you had no

14     involvement with the development of this

15     policy from BlueCross BlueShield of North

16     Carolina; right?

17         A.   Correct.

18         Q.   You have no idea how BlueCross

19     BlueShield of North Carolina came to

20     decide what gender affirmation surgeries

21     or hormone therapy they're going to cover

22     or not; right?

23         A.   Wrong.  I -- I have now some

PLAINTIFFS001961

Page 380

1    idea of what they used because you've

2    listed -- or they've listed the

3    scientific background and reference

4    sources for coming to their company

5    policy.  And what I would point you to is

6    the fact that every one of the documents,

7    the scientific documents that support

8    their decision-making, I think the most

9    recent one is 2014.  You've got some that

10   go back to the year 2000.  So you've got

11   21-year-old DSM-4 characterizations.

12   You've got 2001 Harry Benjamin Gender

13   Dysphoria Association publications.  The

14   most recent thing is a -- is a -- well,

15   that's actually an advisory panel.  So

16   the most recent medical article is the

17   Cohen-Kettenis Hembree article from 2016.

18   So what's used to support a March 2021

19   document is essentially six-year-old

20   information.  And as we talked about

21   earlier, it hasn't -- it's changed a lot.

22   It's changed a lot since then.

23              The fact that Blue Cross Blue

PLAINTIFFS001962

Page 381

1       Shield is slow off the mark would be

2       troublesome to the shareholders, I

3       suppose.  But as far as what I'm here to

4       talk about, the scientific basis for

5       this, the scientific basis is old data.

6            Q.   Doctor, you don't know whether

7       this is an exhaustive list of every

8       scientific resource that Blue Cross Blue

9       Shield considered in making the March

10      2021 update; right?  You have no idea?

11           MR. KNEPPER:  Objection, form.

12           A.   I can only go by what they've

13      disclosed.

14           Q.   Right.

15           A.   And what they've disclosed --

16      which I would assume they would be

17      leading with their best information

18      rather than their worst -- I would call

19      that -- the scientific support of low

20      quality because of the -- the

21      better-quality data that's now available

22      in the last three years.

23           Q.    You don't know personally

PLAINTIFFS001963

Page 382

1        whether Blue Cross Blue Shield considered

2        any of the articles that you've cited

3        when they're making this policy change in

4        2021; right?  You don't know that?

5            A.    I have no way of knowing how --

6            Q.    Yeah.

7            A.    -- that committee worked.  I

8        only -- I only assume that they would

9        have put out their best scientific

10       support rather than their weakest.

11           Q.    Yeah.  Bottom of this page, by

12       the way, see there's a section that says,

13       "Policy Implementation/Update

14       Information"?

15           A.    Yes, I see that.

16           Q.    And it says, "7/19/11" --

17           A.    Yeah.

18           Q.    -- "New policy developed."

19       Right?

20           A.    Right.

21           Q.    You understand that Blue Cross

22       Blue Shield has had some form of this

23       policy for gender affirmation surgery

PLAINTIFFS001964

Page 383

1       since July 2011?

2               MR. KNEPPER:  Objection, form.

3          A.   I can see that they have had a

4       policy, according to their own reporting,

5       since July of 2011.

6          Q.   All right.  So, let's look at

7       what Blue Cross Blue -- Blue Cross Blue

8       Shield thinks about whether these

9       procedures are medically necessary.  Go

10      to page 5.

11         A.   Let's see.  So we're at page 8.

12      We're going up to page 5?  Okay.  Okay.

13         Q.   Give me a second.  Actually, let

14      me start you on page 1.  You see there's

15      a description of -- let me know when you

16      get there.

17         A.   I'm there.

18         Q.   Okay.  Now, the beginning says,

19      "Gender Dysphoria is the formal diagnosis

20      used by professionals to describe persons

21      who experience significant gender

22      dysphoria (discontent with their

23      biological sex and/or birth gender)."

PLAINTIFFS001965

Page 384

1       Right?

2           A.   Yes, I see that.

3           Q.   All right.  You understand what

4       this policy is addressing; right?

5           A.   Yeah.  It's addressing a

6       psychiatric classification, not medically

7       classified as a medical illness.  So

8       they're -- yeah.

9           Q.   Okay.  Go to page 2.

10          A.   Can you give me just a moment to

11      reread that sentence for just a second.

12              (Witness reviews document.)

13          A.   Okay.  Yeah.  So that's

14      boilerplate.  I'm sorry.  Sorry for

15      slowing you down here.

16          Q.   That's fine.  Go to page 2.

17          A.   Okay.

18          Q.   Top of the page says, "Policy."

19      Right?

20          A.   Correct.

21          Q.   And it says, "Services for

22      gender affirmation surgery and hormone

23      therapy may be considered medically

PLAINTIFFS001966

Page 385

1      necessary when the criteria below are
2      met."  You see that?
3          A.    Right.  So that's -- that's
4      language that insurance companies use.
5      If you're not in the category of medical
6      necessity, there's no insurance coverage.
7      So whether or not one could classify it
8      as a medical diagnosis is not at issue.
9      What's at issue is, is the insurance
10     company going to cover this -- this
11     benefit.
12         Q.    Yeah.  Because insurers
13     typically are not in the business of
14     covering services that are not medically
15     necessary; right?
16         A.    No.  I wouldn't --
17               MR. KNEPPER:  Objection, form.
18         A.    -- characterize it that way.
19               THE WITNESS:  I'm sorry.
20         A.    I wouldn't characterize it that
21     way.  Insurance companies are in the
22     business of -- certainly, they're in the
23     business of -- of paying for covered

PLAINTIFFS001967

Page 386

```
 1      benefits.  But that's the problem with
 2      the insurance industry, is their primary
 3      fiduciary duty is to their investors.
 4      And so the question of coverage has more
 5      to do with are we going to make an
 6      insurance policy that earns us money or
 7      are we going to be paying for something
 8      and not seeing the money.  Okay?  Does
 9      that make sense?
10          Q.   Doctor, you --
11          A.   I think that's what -- that's
12      what this language here is talking about
13      is -- is medical necessity is the
14      language that's used when an insurance
15      company will cover.  They will not cover
16      cosmetic surgery, but they're -- they're
17      proposing to cover transgender surgery
18      beginning by attempting to define it as a
19      medical diagnosis.  That's what's at
20      stake here is.
21          Q.   No.  What -- what this policy
22      says is that when certain criteria are
23      met --
```

PLAINTIFFS001968

1          A.    Right.

2          Q.    -- gender affirmation surgery

3     and hormone therapy may be considered

4     medically necessary; right?  That's what

5     it says in black and white.

6               MR. KNEPPER:  Objection, form.

7          A.    Yeah, again, so medically

8     necessary from the standpoint of an

9     insurance company is if you meet these

10    criteria, we'll pay for it; if you don't

11    meet these criteria, we won't pay for it.

12    That's -- that's --

13         Q.    Right.  And the difference is

14    whether the surgery is considered to be

15    medically necessary or not; right?

16              MR. KNEPPER:  Objection, form.

17         A.    Well, again, so medically

18    necessary in this case is has the

19    insurance company decided that they're

20    going to cover this benefit.  It says

21    nothing about the scientific support for

22    the efficacy of the procedure.  They

23    haven't said anything in that about it.

PLAINTIFFS001969

Page 388

1      They've just called it medically

2      necessary.

3          Q.   All right.  Let's -- let's go

4      off the record.

5          A.   Okay.

6               THE VIDEOGRAPHER:  This is the

7      end of Media Unit No. 5.  We are off the

8      record at 3:25 p.m.

9                    (Break taken.)

10               THE VIDEOGRAPHER:  This is the

11      beginning of Media Unit No. 6.  We are on

12      the record at 3:36 p.m.

13          Q.   (By Mr. Tishyevich) All right.

14      I'm going to introduce another exhibit,

15      Doctor.

16          A.   Okay.

17          Q.   It's being slow on my end.  Bear

18      with me.  Okay.  This will be Exhibit 24.

19      Let me know when you have it.

20      (Exhibit 24 was marked for identification

21      and is attached.)

22          A.   I will.  Okay.  I've got it.

23          Q.   Okay.  You've seen this study

PLAINTIFFS001970

Page 389

1       before; right?

2            A.   Yes, I have.

3            Q.   How do you pronounce the lead

4       author's name?

5            A.   That's the subject of great

6       debate, but I think it's Dhejne or -- I

7       think it's Dhejne, Cecilia Dhejne, but

8       I -- I -- I'm not -- I'm not a

9       Swissophone.

10           Q.   I'll use Dhejne as well.

11           A.   Okay.

12               MR. TISHYEVICH:  And for the

13       court reporter, it's D-H-E-J-N-E.

14           Q.   Okay.  This is a study from

15       2011; right?

16           A.   Yes.

17           Q.   And you cited this study in

18       several places in your report --

19           A.   I do.

20           Q.   -- right?

21               And one of the points for which

22       you cite this study is to say that

23       Swedish patients who underwent

PLAINTIFFS001971

Page 390

1      gender-affirming surgery had a 19.1 times

2      greater suicide rate than the control

3      group; right?

4          A.   Yeah.  The hazard ratio for --

5      well, for all reassigned persons is 19.1,

6      and they further break out the -- that

7      into subgroups of female-to-male and

8      male-to-female.

9          Q.   Yeah.  And you understand how

10     the control group in this study was

11     defined; right?

12         A.   Yes.

13         Q.   The control group did not

14     consist of patients with gender dysphoria

15     who did not undergo gender-affirming

16     surgery; correct?

17         A.   Correct.

18         Q.   The control group consisted of

19     patients without gender dysphoria; right?

20         A.   Yeah.  That's kind of the point

21     of the -- of the research, yes.  That's

22     right.

23         Q.   Yeah.  What this Dhejne study

PLAINTIFFS001972

Page 391

1      compared was the suicide rate for

2      patients who underwent gender-affirming

3      surgery against the general Swedish

4      population; right?

5          A.    Right.

6          Q.    And you know there's many

7      studies that find that patients with

8      gender dysphoria, as a population, have a

9      higher risk of suicide compared to the

10     general population; right?

11         A.    Very much accepted fact, yes.

12         Q.    Yeah.  All right.  We'll go to

13     page 7.

14         A.    Let's see here.

15         Q.    You see there's a "Strengths and

16     limitations of the study" section?

17         A.    Two, three, four, five, six,

18     seven.  Yes, I'm there.

19         Q.    All right.  Look at the third

20     full paragraph in that column.

21         A.    Okay.

22         Q.    All right.  Second sentence

23     says:  "The caveat with this design is

PLAINTIFFS001973

Page 392

1          that transsexual persons before sex
2          reassignment might differ from healthy
3          controls (although this bias can be
4          statistically corrected for by adjusting
5          for baseline differences).  It is
6          therefore important to note that the
7          current study is only informative with
8          respect to transsexual persons health
9          after sex reassignment; no inferences can
10         be drawn as to the effectiveness of sex
11         reassignment as a treatment for
12         transsexualism."
13                You see that?
14            A.    Right.  Yeah.
15            Q.    Then it says:  "In other words,
16         the results should not be interpreted
17         such as sex reassignment per se increases
18         morbidity and mortality.  Things might
19         have been even worse without sex
20         reassignment."  Correct?
21            A.    Yeah.  It's -- the -- let's see.
22         The -- yeah, so -- and I don't think I
23         ever make the claim that the surgery

PLAINTIFFS001974

Page 393

1   increases the risk of morbidity and

2   mortality.  Yeah, I -- I would agree with

3   that.

4       Q.   Yeah, no --

5       A.   But I would -- I would also

6   wonder on what basis they -- there's

7   nothing to support that it might have

8   been worse either.  It's for the same

9   reason.

10      Q.   Yeah.  This study does not

11  support the conclusion that sex

12  reassignment surgery by itself increases

13  risk of suicide; correct?

14      A.    That's what they -- they say,

15  yes.

16      Q.   And they also say that this

17  study does not support the conclusion

18  that surgical procedure for gender

19  dysphoria by themselves increase risk of

20  morbidities other than suicide; right?

21      A.   Right.

22      Q.   Okay.  All right.  Let me -- you

23  mentioned that -- in your report the 2020

PLAINTIFFS001975

Page 394

1      Finland guidelines.  You recall that?
2         A.    I do.
3         Q.    Let me ask you a couple of
4      questions on those.
5         A.    Okay.
6         Q.    So I'll introduce another
7      exhibit.  This will be Exhibit 25, and
8      let me know when you get it.
9      (Exhibit 25 was marked for identification
10     and is attached.)
11        A.    Okay.
12        Q.    Let me ask you before we get
13     into this, look at page 46 of your
14     report.
15        A.    Okay.
16        Q.    Near the top, there's a "2020 -
17     Finland" reference.  You see that?
18        A.    I see that, yeah.
19        Q.    You say, "This new Finnish
20     guidance prioritizes psychological
21     therapy over treatment with hormones or
22     surgery and suggests different care plans
23     for early-onset vs late-onset childhood

PLAINTIFFS001976

Page 395

1      gender dysphoria."  You see that?

2          A.   I do.

3          Q.   And then you say in the last

4      sentence, "The Finland National

5      Guidelines appear quite contrary to the

6      opinions of Drs Brown and Schechter and

7      WPATH."  Do you see that?

8          A.   I do.

9          Q.   Is it your opinion that the

10     WPATH guidelines recommend that children

11     who experience gender dysphoria should

12     transition to a different gender role?

13              MR. KNEPPER:  Objection, form.

14         A.   No.  I would say that the WPATH

15     guidelines essentially leaves us with

16     affirmation care only, that it does -- it

17     does, you know, recom- -- recommend all

18     of the psychological support but all of

19     it in support of transition.  I would say

20     that.  Yeah.

21         Q.   Yeah.  The WPATH guidelines do

22     not recommend that children with gender

23     dysphoria automatically be put on puberty

PLAINTIFFS001977

Page 396

1      blockers; right?

2          A.   They don't make that

3      recommendation, no.  They don't state

4      that recommendation, no.

5          Q.   Yeah.  Let's look at what they

6      actually say.

7          A.   Okay.

8          Q.   I'm going to introduce one more

9      exhibit.

10         A.   So we're going to leave the

11     Finland article for now and go to --

12         Q.   Yeah.  We'll come back to it.  I

13     want to show you the WPATH --

14         A.   Okay.

15         Q.   -- Standards of Care Version 7

16     first.

17         A.   Uh-huh.

18         Q.   All right.  This will be Exhibit

19     26.  Let me know when you have it.

20     (Exhibit 26 was marked for identification

21     and is attached.)

22         A.   Okay.

23         Q.   This is a larger file, so this

PLAINTIFFS001978

Page 397

1      may take an extra minute or so.

2           A.   Okay.  I've got it.

3           Q.   Okay.  These are the WPATH

4      Standards of Care Version 7; right?

5           A.   Yes.

6           Q.   Turn to page 23.

7           A.   Okay.

8           Q.   All right.  There's a section

9      titled "Social Transition in Early

10     Childhood."  You see that?

11          A.   I must be on the wrong page.

12     Did you say page 23?

13          Q.   It's PDF page 23, which is going

14     to be page 17 in the standards.

15          A.   Oh, I'm sorry.  Okay.  Let's go

16     back, then.  Page 17.  Okay.  I'm there.

17     Right.  "Social Transition in Early

18     Childhood."

19          Q.   All right.  It says:  "Some

20     children state that they want to make a

21     social transition to a different gender

22     role long before puberty.  For some

23     children, this may reflect an expression

PLAINTIFFS001979

Page 398

1       of their gender identity.  For others,

2       this could be motivated by other forces."

3               You see that?

4           A.   I do.

5           Q.   And then a couple of sentences

6       down, it says:  "This is a controversial

7       issue, and divergent views are held by

8       health professionals.  The current

9       evidence base is insufficient to predict

10      the long-term outcomes of completing a

11      gender role transition during early

12      childhood."  You see that?

13          A.   I do.

14          Q.   All right.  The WPATH Standards

15      of Care Version 7 is not making any

16      clinical recommendations encouraging

17      children in early childhood to go through

18      gender transition roles; correct?

19          A.   Yeah, I would -- yes.  I would

20      add to that that they're also not

21      offering any clinical guidance on how to

22      distinguish who might or who might not be

23      suitable for transition.  Right.

PLAINTIFFS001980

Page 399

1          Q.   Do you know whether that's

2     explored somewhere else in this Standards

3     of Care Version 7?

4          A.   Yeah.  I think it's discussed.

5          Q.   Okay.

6          A.   But -- but it's -- but I --

7     yeah.  So what's -- what's important, I

8     think, in what you cite here is that the

9     current evidence base is insufficient to

10    predict the long-term outcome.  Yes.

11         Q.   Okay.  Go to the next page.

12         A.   Okay.

13         Q.   Page 18, PDF page 24.

14         A.   Okay.

15         Q.   There's a section titled

16    "Physical Interventions for Adolescents."

17         A.   Right.

18         Q.   Right?

19         A.   Yes.

20         Q.   You understand that adolescents

21    are different than children; right?

22              MR. KNEPPER:  Objection, form.

23         A.   Well, yeah.  So, adolescents are

PLAINTIFFS001981

```
 1        treated in pediatric clinics, but they're

 2        different from prepubertal children, yes.

 3            Q.   Yeah.  This section does not

 4        provide any clinical recommendations for

 5        hormone therapy in prepubescent children;

 6        right?

 7            A.   Let's see.  I've just got to

 8        refresh my memory here on the verbiage.

 9               (Witness reviews document.)

10            A.   Yeah.  So it -- it addresses the

11        important issue of gender fluidity in

12        adolescents, potential for shift to

13        conformity and -- that may not persist.

14        Yeah.  Right.

15            Q.   Okay.  And this section also

16        does not provide any clin- -- clinical

17        recommendations for surgical intervention

18        in prepubescent children; right?

19            A.   This section doesn't address

20        prepubescent children.  It addresses

21        adolescents.

22            Q.   Yeah, exactly.  And you don't

23        know of any other section in these
```

PLAINTIFFS001982

Page 401

1     Standards of Care Version 7 that provide

2     those guidelines for prepubescent

3     children; right?

4         A.   No.

5         Q.   Okay.  Go to the next page, PDF

6     page 25, page 19 in the document.

7         A.   Okay.

8         Q.   And you see there's a section

9     that says, "Criteria for

10    Puberty-Suppressing Hormones"?

11        A.   Yes.

12        Q.   It says, "In order for

13    adolescents to receive

14    puberty-suppressing hormones, the

15    following minimum criteria must be met."

16    You see that?

17        A.   Yes.

18        Q.   And then there's four items;

19    right?

20        A.   Yes.

21        Q.   Number 4 says, "The adolescent

22    has given informed consent and,

23    particularly when the adolescent has not

PLAINTIFFS001983

Page 402

```
 1        reached the age of medical consent, the
 2        parents or other caretakers or guardians
 3        have consented to the treatment and are
 4        involved in supporting the adolescents
 5        throughout the treatment process."
 6             You see that?
 7        A.   Yeah.   That -- in fact, that was
 8        one of the most troubling things I read
 9        when I reviewed this whole document from
10        the WPATH guidelines, is that -- yeah,
11        that using those words in the same
12        sentence, an adolescent giving informed
13        consent, is a -- is a non sequitur
14        because I -- I don't think -- in all my
15        years of practice as a surgeon, which
16        amounts to greater than 35, the idea of
17        obtaining consent from an adolescent was
18        never accepted by the surgical community
19        or the medical community, to my
20        understanding.
21        Q.   Well, this also talks about
22        getting informed consent from the parents
23        or other caretakers or guardians; right?
```

PLAINTIFFS001984

Page 403

```
 1        A.   Yeah.  So in their role
 2    supporting the adolescent's decision.  It
 3    doesn't say -- yeah.  So the parents or
 4    other caregivers have consented in
 5    support.  Right.
 6        Q.   Yeah.  What the guidelines
 7    contemplate is that it's not just the
 8    adolescent that's going to give an
 9    informed consent, it's also the parents
10    or other caretakers or guardians; right?
11        A.   Yeah.  But again, that's the
12    problem I have with it, because that's --
13    the introductory sentence has -- has no
14    meaning -- or the introductory part of
15    the one sentence has no meaning.  If the
16    beginning point of the process is
17    adolescent consent, that's -- that's not
18    an ethical thing to do because --
19        Q.   Yeah.
20        A.    -- because an adolescent can't
21    grasp -- they don't have enough executive
22    function or development, particularly if
23    they have been through a period of
```

PLAINTIFFS001985

Page 404

```
 1        puberty suppression before they begin the
 2        period of cross-sex hormones, that it's
 3        -- it's already quite evident that these
 4        patients, these children do not have
 5        enough -- and it's just known in society
 6        at large that adolescent children don't
 7        have the capacity for long-term reckoning
 8        of things like risk and outcomes and
 9        neither do they have the executive
10        capacity in their brains to make an
11        informed consent decision.  So that part
12        of it is meaningless to me.  Yeah.
13            Q.   Yeah.  But you understand
14        there's two components to this
15        requirement; one is informed consent by
16        the adolescent, and two is informed
17        consent by parents or other caretakers or
18        guardians.  Right?
19            A.   Yes.
20            Q.   Okay.
21            A.   That's what it says.
22            Q.   All right.  Let's now go back to
23        the Finland guidelines.  It's Exhibit 25.
```

PLAINTIFFS001986

Page 405

1      A.    Okay.

2      Q.    And go to PDF page 9 which has

3   Section 8, "Summary" -- "Summary of the

4   Recommendations."  Let me know when you

5   get there.

6      A.    Okay.

7      Q.    All right.  This page provides

8   recommendations for treatment of minors

9   with gender dysphoria in Finland; right?

10      A.    Yes.

11      Q.    All right.  Look at number 2 at

12   the bottom.

13      A.    At the bottom.  Okay.  Okay.

14      Q.    All right.  So it starts with,

15   "If a child is diagnosed prior to the

16   onset of puberty with a persistent

17   experience of identifying as the other

18   sex and shows symptoms of gender-related

19   anxiety, which increases in severity in

20   puberty."  You see that?

21      A.    Yes, I do.

22      Q.    All right.  And then next

23   sentence says, "Based on these

PLAINTIFFS001987

Page 406

1    assessments, puberty suppression

2    treatment may be initiated on a

3    case-by-case basis after careful

4    consideration and appropriate diagnostic

5    examinations if the medical indications

6    for the treatment are present and there

7    are no contraindications."

8            Do you see that?

9        A.   I do.

10       Q.   All right.  You understand that

11   these Finland guidelines do not

12   categorically prohibit the use of

13   puberty-blocking agents in minors;

14   correct?

15           MR. KNEPPER:  Objection, form.

16       A.   Right.  They don't

17   categorically, but what they do is they

18   express uncertainty about the data that

19   -- that's been used to support the use of

20   those drugs in children.

21       Q.   Yeah.  But -- but despite that

22   data, what the guidelines recognize is

23   that puberty-blocking treatment may still

PLAINTIFFS001988

Page 407

1      be initiated for some minor patients in

2      certain circumstances.

3           A.    Right.

4           Q.    Right?

5           A.    Agree.

6                 MR. KNEPPER:  Objection, form.

7           Q.    All right.  Let's go back to

8      your report.  Go to page 46.

9           A.    I'm there.

10          Q.    So in your discussion of these

11     Finland guidelines, you cite something

12     called -- it's a website,

13     genderreport.ca.

14          A.    Correct.

15          Q.    Do you see that?

16          A.    I do.

17          Q.    And I saw at least two other

18     references to this source in your report.

19     All right.  This is -- genderreport is

20     not a peer-reviewed publication, Doctor;

21     right?

22          A.    No.  It's a data collection

23     site.  Yeah.

PLAINTIFFS001989

Page 408

1      Q.    It's a data collection site?

2      A.    I think that's what the -- so,

3    let me just review what I wrote here.

4          (Witness reviews document.)

5      A.    All right.  Okay.  Yeah.  Okay.

6    Yeah, no.  I agree they're not

7    peer-reviewed to my knowledge, no.

8      Q.    It's a blog; right?

9      A.    Right.  It's on -- it's online,

10    exactly.

11      Q.    Blogs are not generally

12    considered reliable scientific evidence,

13    I take it.  Right?

14          MR. KNEPPER:  Objection, form.

15      A.    No, they're not.

16      Q.    Okay.  Do you know who started

17    this genderreport blog?

18      A.    I do not.

19      Q.    Do you know this person was a

20    doctor?

21      A.    I don't know the person, no.

22      Q.    You don't know they're a

23    scientist?

PLAINTIFFS001990

Page 409

1          A.   I'm sorry?

2          Q.   You don't know whether they're a

3     scientist; right?

4          A.   I don't know.

5          Q.   Did you know that this blog was

6     started by a parent who was upset that

7     her daughter was told in school that

8     girls are not real and who filed a

9     lawsuit about it?

10              MR. KNEPPER:  Objection, form.

11         A.   I did not know those details,

12    no.

13         Q.   Assuming that's true, do you

14    think this is an unbiased, objective

15    resource?

16              MR. KNEPPER:  Objection to form.

17         A.   I -- I don't know.  I don't know

18    the answer to that question.

19         Q.   Do other experts in your field

20    rely on blogs like this one to support

21    their opinions?

22              MR. KNEPPER:  Objection, form.

23         A.   And I don't, and neither did I

PLAINTIFFS001991

Page 410

```
1      rely on this as sole support for my

2      opinion.  This -- again, this is just

3      evidence of -- of controversy that exists

4      out in the literature, or that exists out

5      in the -- in the greater world, I should

6      say, in this case because this is not

7      medical literature, but in the wider

8      world.

9         Q.   Well, as I read this, your page

10     46, you're -- you're citing this gender

11     report for your analysis of the 2020

12     Finland guidelines.

13            MR. KNEPPER:  Objection, form.

14        Q.   Right?

15        A.   I think I'm using the Finland

16     guidelines as a standalone and just

17     referencing this gender report as

18     evidence of events in Finland rather than

19     scientific support for the conclusions of

20     the Finland review.

21        Q.   Okay.  Another article you cite

22     is the Carmichael 2021 study.

23        A.   Right.
```

PLAINTIFFS001992

Page 411

1          Q.   Let's look at that one.  I'll

2     introduce it as Exhibit 27.  Let me know

3     when you have that.

4     (Exhibit 27 was marked for identification

5     and is attached.)

6          A.   Okay.  Okay.  I have it.

7          Q.   Okay.  This is titled,

8     "Short-Term outcomes of pubertal

9     suppression in a selected cohort of 12 to

10    15 year old young people with persistent

11    gender dysphoria in the UK."

12         A.   Right.

13         Q.   Right?

14         A.   Yeah.

15         Q.   All right.  Look at the -- on

16    page 1, you see there's an abstract?

17         A.   Yes.

18         Q.   Under "Methods," it says, "We

19    undertook an uncontrolled prospective

20    observational study."  Right?  Do you see

21    that?

22         A.   Right.

23         Q.   All right.  This is not a

PLAINTIFFS001993

Page 412

1    randomly controlled clinical trial;

2    right?

3         A.    Right.

4         Q.    Not a cohort study --

5         A.    Right.

6         Q.    -- right?

7         A.    Right.

8         Q.    There's no control group; right?

9         A.    Correct.

10        Q.    You don't mention any of that in

11   your report even though you spend a lot

12   of time discussing the limitations of

13   other studies.  Why is that?

14             MR. KNEPPER:  Objection, form.

15        A.    I -- we include this to one to

16   show the raging controversy in the world

17   of transgender medicine, and this is an

18   example of that, the -- the evidence of

19   uncertain result or no result, no change

20   from baseline effect.

21             Let's see.  Let me just review

22   because I've reviewed so many of these

23   articles lately.

PLAINTIFFS001994

Page 413

1          (Witness reviews document.)

2      A.   Right.  Yeah.  So -- yeah.  So

3      that's right.  So they were unable to

4      quantify benefit or harm from puberty

5      suppression.

6      Q.   Go to page 21.  See there's a

7      "Strength and Limitations" section?

8      A.   I see it.  Yes, I do.

9      Q.   The second sentence says:  "The

10     study size and uncontrolled design were

11     key limitations.  The small sample size

12     limited our ability to identify small

13     changes in outcomes.  This was an

14     uncontrolled observational study and thus

15     cannot infer causality."  See that?

16     A.   I do.

17     Q.   Again, you don't acknowledge any

18     of these limitations in your report;

19     right?

20          MR. KNEPPER:  Objection, form.

21     A.   Right.  I believe I made

22     reference to this in terms of it's

23     evidence of -- of controversy in the

PLAINTIFFS001995

Page 414

```
 1        literature, that they could not see a
 2        benefit from it.  So again, at lower
 3        levels of evidence, evidence of benefit
 4        would suggest further study.  This shows
 5        that further study is needed because, at
 6        the observational level, you don't see
 7        effect.
 8            Q.   All right.  Another study -- not
 9        a study, a review that you cite is this
10        Cochrane 2020 --
11            A.   Yes.
12            Q.   -- review; right?
13            A.   Right.
14                 MR. TISHYEVICH:  And for the
15        court reporter, that's C-O-C-H-R-A-N-E.
16            Q.   I'm going to introduce that one
17        next.
18            A.   Okay.
19            Q.   All right.  I'm introducing this
20        as Exhibit 28, and let me know when you
21        get it.
22        (Exhibit 28 was marked for identification
23        and is attached.)
```

PLAINTIFFS001996

Page 415

1          A.    I will.  Okay.

2          Q.    Okay.  This is from the Cochrane

3      Library.  This is the review that you

4      cite in your report; right?

5          A.    Right.

6          Q.    Go to page 2.

7          A.    Okay.

8          Q.    All right.  You see there's the

9      section titled, "Authors' Conclusions"?

10         A.    Okay.  Yes, I do.

11         Q.    All right.  Toward the end, do

12     you see it says, "We will include

13     non-controlled cohort studies in the next

14     iteration of this review, as our review

15     has shown that such studies provide the

16     highest quality evidence currently

17     available in the field."  You see that?

18         A.    Yes, I do.

19         Q.    All right.  So the Cochrane

20     review is not saying they're just going

21     to ignore all those studies going

22     forward; right?

23         A.    Right.

PLAINTIFFS001997

Page 416

```
1              MR. KNEPPER:  Objection, form.
2         Q.    They rec- -- they recognize that
3     those noncontrolled studies currently
4     represent the best available evidence;
5     right?
6              MR. KNEPPER:  Objection, form.
7         A.    Well, yeah.  Before they say
8     best available evidence, they speak about
9     the level of the evidence now.  And
10    what's -- what's interesting about this
11    Cochrane review, because it's a worldwide
12    review of the literature on the subject
13    of cross-sex hormones and hormone
14    blockade in transwomen, is that they
15    found over a thousand references, and by
16    the time they got through qualifying
17    those references for suitability, they
18    got down to thirteen studies.  And when
19    they fully screened the text, they got
20    down to a single study.  And that's --
21    that's kind of characteristic of -- of
22    the data used to support hormonal
23    transitioning.
```

PLAINTIFFS001998

Page 417

```
 1              And so yeah, they -- they have
 2     to -- they have to backpedal in order to
 3     get any data because what they have in
 4     hand now is -- is not supportive of -- of
 5     the use of cross-sex hormones in
 6     transwomen, so.
 7        Q.   All right.  Let me introduce
 8     another exhibit.
 9              MR. TISHYEVICH:  Can we go off
10     the record?
11              THE VIDEOGRAPHER:  We are off
12     the record at 4:07 p.m.
13                 (Break taken.)
14              THE VIDEOGRAPHER:  We are back
15     on the record at 4:20 p.m.
16        Q.   (By Mr. Tishyevich) All right.
17     Doctor, let me ask you about what
18     experience you have with the individual
19     plaintiffs in this case specifically.
20              You personally did not meet with
21     any of the plaintiffs in this case;
22     correct?
23        A.   No.  I did a review of their
```

PLAINTIFFS001999

Page 418

1    charts and nothing more.  Yeah.

2        Q.   All right.  You've personally

3    never spoken with any of the plaintiffs;

4    correct?

5        A.   I have not.

6        Q.   You obviously were not present

7    in any meetings that any of these

8    plaintiffs may have had with their mental

9    health professionals; right?

10       A.   I was not.

11       Q.   And you don't know specifically

12   what was said or not said during those

13   meetings; correct?

14       A.   The only information I have

15   about those meetings was what's entered

16   in the medical record that was given to

17   me to review.

18       Q.   Yeah.  You were also not present

19   in any meetings any of the plaintiffs may

20   have had with their endocrinologists;

21   right?

22       A.   Correct.

23       Q.   And outside of reading medical

PLAINTIFFS002000

Page 419

1      records, you don't know what was said or

2      not said during those meetings; correct?

3          A.   Correct.

4          Q.   And finally, for plaintiffs who

5      had undergone surgical procedures, you

6      were also not present in any meetings

7      between these plaintiffs and their

8      surgeons; correct?

9          A.   Correct.

10         Q.   And outside of medical records,

11     again, you don't know what was said or

12     not said during those meetings; correct?

13         A.   Correct.

14         Q.   Okay.  You should see a new

15     exhibit pop up, Exhibit 29.

16         A.   Okay.

17     (Exhibit 29 was marked for identification

18     and is attached.)

19         Q.   And if you can go to PDF page

20     54.

21         A.   PDF page 54.  Okay.

22         Q.   First of all, you understand

23     what this document is; right?

PLAINTIFFS002001

Page 420

```
 1        A.   I didn't get to see the header
 2    on it.  I haven't seen this before, I
 3    don't think.
 4        Q.   Oh, feel free -- yeah, feel free
 5    to go back to the first page if you want
 6    to.
 7        A.   Okay.
 8           (Witness reviews document.)
 9        Q.   All right.  This is the --
10        A.   Okay.  Okay.  So it's --
11        Q.   Yeah.
12        A.   -- a benefits booklet for the
13    State health plan.  Is that right?
14        Q.   For North Carolina, right.
15        A.   Yes.  The teachers union --
16    teachers and employ- -- and State
17    employees, right.  Okay.
18        Q.   You know what a benefit plan is;
19    right?
20        A.   Yes, uh-huh.
21        Q.   At a high level, it sets out
22    what the insurer is going to cover or not
23    cover; right?
```

PLAINTIFFS002002

Page 421

1          A.    Correct.

2          Q.    Among other things.  Okay.  And

3     earlier, we talked about medical

4     necessity.  You recall that?

5          A.    Yes.

6          Q.    All right.  Go to -- now go back

7     to PDF page 54 of this plan.

8          A.    Okay.  I'm there.

9          Q.    You see at the top, it says,

10     "What is not Covered?"  And it's a list

11     of items?

12          A.    Am I on the right page?  I'm

13     on -- on PDF page 54?

14          Q.    Yeah.

15          A.    That's the -- the -- oh, I'm

16     sorry.

17          Q.    Plan page 46, so that's --

18          A.    Plan page 46.  Let me back up

19     real quickly here.  Sorry.  Okay.  I'm

20     there.

21          Q.    At the top or near the top, it

22     says, "What is not Covered?"  You see

23     that?

PLAINTIFFS002003

Page 422

1          A.    I do.

2          Q.    There's a list of items

3     alphabetically.  See that?

4          A.    Yes.

5          Q.    And under M, it says, "Services

6     or supplies deemed not medically

7     necessary."  "Medically necessary" is in

8     bold; right?

9          A.    Right.

10         Q.    All right.  Let's look at that

11    definition.  Go to PDF page 89, which is

12    page 81 of the plan.

13         A.    Okay.

14         Q.    All right.  At the bottom, you

15    see there's a definition of "Medically

16    Necessary (or Medical Necessity"; right?

17         A.    Yes.

18         Q.    And it says, "those covered

19    services or supplies that are: a)

20    Provided for the diagnosis, treatment,

21    cure, or relief of a health condition,

22    illness, injury, or disease; and, except

23    for clinical trials as described under

PLAINTIFFS002004

Page 423

1      this health benefit plan, not for

2      experimental, investigational, or

3      cosmetic purposes."  Right?

4          A.    Okay.

5          Q.    I understand that as part of

6      determining what the benefit plan is

7      going to consider medically necessary,

8      whether or not the treatment is

9      experimental is one of the factors;

10     right?

11         A.    As would be defined -- so all of

12     the definitions here are determined by

13     the insurance provider.  So they've

14     defined these listed necessities as

15     covered under their plan, yes.

16         Q.    Yeah.  So under this definition,

17     if a treatment is experimental, it is

18     likely not going to be covered under the

19     plan; right?

20         A.    Right.  According to their

21     definition, it doesn't appear they would

22     cover experimental surgery or cosmetic

23     surgery.

PLAINTIFFS002005

Page 424

```
 1        Q.    Conversely, if a treatment is
 2    not experimental, it may be covered by
 3    the plan in some circumstances; right?
 4        A.    It would seem --
 5             MR. KNEPPER:  Objection, form.
 6        Q.    Yeah.  And I showed you earlier
 7    a policy from BlueCross BlueShield of
 8    North Carolina from March 2021 that says
 9    that gender-affirming hormone and
10    surgical treatment is considered
11    medically necessary; right?
12             MR. KNEPPER:  Objection, form.
13        A.    Yeah, no.  As we talked about
14    before, these are definitions formulated
15    by the insurance company to define
16    coverage, not medical definitions in
17    terms of medical care.  This is strictly
18    coverage by insurance.  Yeah.
19        Q.    Well, one of the factors that
20    goes into that consideration is whether
21    or not that treatment in question is
22    experimental; right?
23             MR. KNEPPER:  Objection, form.
```

PLAINTIFFS002006

Page 425

1       A.   Right.  The plan excludes

2    experimental or investigational or

3    cosmetic procedures.

4       Q.   Okay.  All right.  We're talking

5    about BlueCross BlueShield of North

6    Carolina.  Let me ask you about another

7    insurer, Aetna, A-E-T-N-A.  You've heard

8    of Aetna; right?

9       A.   Yes.

10       Q.   Are you aware that Aetna is one

11    of the five largest health insurance --

12    insurers in the U.S.?

13       A.   It would not surprise me to

14    learn that.

15            MR. KNEPPER:  Form.

16       Q.   Do you have any idea whether

17    Aetna considers gender-affirming surgery

18    and hormone therapy to be medically

19    necessary?

20            MR. KNEPPER:  Objection, form,

21    scope.

22       Q.   Would it surprise you if Aetna

23    --

PLAINTIFFS002007

Page 426

```
 1              THE COURT REPORTER:  I'm sorry.
 2       I didn't hear the answer over the
 3       objection.
 4              THE WITNESS:  I haven't answered
 5       yet.
 6              THE COURT REPORTER:  Okay.
 7              THE WITNESS:  Sorry.
 8         A.   So as to the size of Aetna or
 9       the -- that they cover --
10         Q.   Yeah, let me just ask -- I'll
11       ask the question again.
12         A.   Okay.
13         Q.   Do you have any idea whether
14       Aetna considers gender-affirming surgery
15       and hormone therapy to be medically
16       necessary?
17              MR. KNEPPER:  Objection, form,
18       scope.
19         A.   I don't.
20         Q.   Well, let me show you.  I'm
21       going to introduce another exhibit.
22       Okay.  This is going to be Exhibit 30.
23       Let me know when you have it.
```

PLAINTIFFS002008

Page 427

1      (Exhibit 30 was marked for identification

2      and is attached.)

3          A.    Okay.  All right.  I have it.

4          Q.    All right.  This is a policy

5      from Aetna titled "Gender Affirming

6      Surgery."  You see that?

7          A.    I do.

8          Q.    You see there's a "Policy

9      History" on the right?

10         A.    Yes.

11         Q.    Under "Last Review," it says

12     January 12th, 2021; right?

13         A.    Yes.

14         Q.    So you understand this was

15     revised within this year; right?

16         A.    Yes.

17         Q.    And under Policy, it says,

18     "Aetna considers gender affirming surgery

19     medically necessary when all of the

20     following criteria are met."  Right?

21         A.    Right.

22             MR. KNEPPER:  Form.

23         Q.    All right.  So according to this

PLAINTIFFS002009

Page 428

```
 1      policy, in Aetna's view, gender-affirming
 2      surgery is medically necessary, therefore
 3      nonexperimental; right?
 4              MR. KNEPPER:  Objection, form.
 5          A.   Yeah, Aetna's definition of what
 6      is medically necessary appears to allow
 7      for gender-affirming surgery.
 8          Q.   Okay.  Go to page 3.
 9          A.   Okay.
10          Q.   Look at the bottom of the page.
11          A.   Okay.
12          Q.   The second to the last paragraph
13      says, "Aetna considers
14      gonadotropin-releasing hormone medically
15      necessary to suppress puberty in trans
16      identified adolescents if they meet World
17      Professional Association for Transgender
18      Health (WPATH) criteria."  Do you see
19      that?
20          A.   I do.
21          Q.   Okay.  According to Aetna,
22      puberty-blocking hormones are medically
23      necessary to suppress puberty in
```

PLAINTIFFS002010

Page 429

```
 1      trans-identified adolescents if they meet
 2      the WPATH criteria; right?
 3              MR. KNEPPER:  Objection, form.
 4         A.   That -- that's what it states
 5      there, yes.
 6         Q.   By the way, look at the next
 7      paragraph.  See it says, "Aetna considers
 8      reversal of gender affirming surgery for
 9      gender dysphoria not medically
10      necessary."
11              MR. KNEPPER:  Objection.
12         Q.   Do you see that?
13         A.   I do.
14         Q.   Okay.  We talked about Blue
15      Cross Blue Shield, talked about Aetna.
16      Do you know what Cigna is?
17         A.   Yeah.  It's one of the largest
18      health insurance providers.
19         Q.   Do you know what position Cigna
20      takes on whether gender dysphoria
21      treatment is medically necessary?
22              MR. KNEPPER:  Objection, form,
23      scope.
```

PLAINTIFFS002011

1     A.   I have not read their policies.

2     Q.   You don't know; right?

3     A.   Correct.

4     Q.   Let me show you that policy.

5     A.   Okay.

6     Q.   All right.  This is going to be

7     Exhibit 31.  Let me know when you have

8     it.

9     (Exhibit 31 was marked for identification

10    and is attached.)

11    A.   Okay.  Okay.  I have it.

12    Q.   All right.  This is a Cigna

13    medical coverage policy titled "Treatment

14    of Gender Dysphoria."  Do you see that?

15    A.   Yes, I do.

16    Q.   On the right top, it says

17    "Effective Date," May 18th, 2021; right?

18    A.   Yes.

19    Q.   Also recently updated; right?

20    A.   Yes.

21    Q.   Go to page 2.  Under "Coverage

22    Policy," look at the third paragraph in

23    bold.  It says, "Medically necessary

Page 431

1       treatment for an individual with gender

2       dysphoria may include any of the

3       following services, when services are

4       available in the benefit plan."  Do you

5       see that?

6           A.   I do.

7           Q.   All right.  And then there's

8       five different bullets of different

9       categories of services; right?

10          A.   One, two, three, four, five.

11      Yes.

12          Q.   Number two is "Hormonal therapy,

13      including but not limited to androgens,

14      anti-androgens, Gn-" -- "GnRH analogues,

15      estrogens, and progestins."  Right?

16          A.   Yes.

17          Q.   That's a medically necessary

18      benefit in Cigna's view; right?

19               MR. KNEPPER:  Objection, form.

20          A.   It is a -- medically necessary

21      as defined by a insurance company for

22      purposes of a policy.

23          Q.   Yeah.

PLAINTIFFS002013

Page 432

1          A.    Yes.

2          Q.    And the last bullet point says,

3     "Gender reassignment and related surgery

4     (see below)."  Do you see that?

5          A.    I do.

6          Q.    According to this policy, in

7     Cigna's view, gender reassignment and

8     related surgery is a medically necessary

9     service; right?

10          MR. KNEPPER:  Objection, form.

11          A.    Again, so -- so the insurance

12     company makes a distinction between

13     medically necessary, meaning things that

14     they will cover, versus not medically

15     necessary, meaning things they won't

16     cover.  It's not based on an actual

17     medical diagnosis but a -- a managerial

18     diagnosis, because if it's not medically

19     necessary, it's not covered by insurance.

20     So if they choose to cover it, they will

21     call that medically necessary.  And

22     that's what they're detailing here, what

23     they will cover and what they won't

PLAINTIFFS002014

Page 433

```
 1      cover.
 2          Q.   Okay.
 3          A.   And they call what they will
 4      cover medically necessary.
 5          Q.   Let me show you one last policy.
 6      Do you know -- strike that.
 7               You know what UnitedHealthcare
 8      is; right?
 9          A.   Yes, I do.
10          Q.   It's another health insurer;
11      right?
12          A.   Yes.
13          Q.   They're the largest health
14      insurer in the country; right?
15          A.   I don't know that for a fact.
16      I'll assume if you're telling me so.
17          Q.   All right.  Well, do you have
18      any idea whether United considers
19      gender-affirming surgery and hormone
20      treatment to be medically necessary for
21      gender dysphoria?
22          A.   I have a dawning suspicion that
23      they do.
```

PLAINTIFFS002015

Page 434

1      Q.   Yeah.  I think you can probably

2    tell where this is heading at this point;

3    right?

4      A.   Sure.  The insurance industry

5    likes these services.

6      Q.   Let me introduce this next

7    exhibit.  This is going to be Exhibit 32.

8    All right at the top it says, "United

9    Healthcare."  You see that?

10   (Exhibit 32 was marked for identification

11   and is attached.)

12     A.   I don't have it yet.

13     Q.   Oh, I apologize.

14     A.   That's okay.

15     Q.   Let me know when.

16     A.   Okay.  Yes.

17     Q.   All right.  Top right says

18    "United Healthcare" -- "Healthcare

19    Commercial Medical Policy."  Right?

20     A.   Yes.

21     Q.   Under that, it says, "Gender

22    Dysphoria Treatment."  Right?

23     A.   Yes.

PLAINTIFFS002016

Page 435

1      Q.   See there's an effective date of
2    April 1, 2021; right?
3      A.   Yes.
4      Q.   Also fairly recently updated;
5    right?
6      A.   Yes.
7      Q.   Okay.  And then you see there's
8    a bunch of bullet points setting forth
9    criteria for the services on page 1;
10   right?
11     A.   Yeah.  Yes.
12     Q.   Then go to page 2.
13     A.   Okay.
14     Q.   And the first full paragraph
15   says, "When the above criteria are met,
16   the following surgical procedures to
17   treat Gender Dysphoria are medically
18   necessary and covered as a proven
19   benefit."  Do you see that?
20     A.   I do.
21     Q.   Okay.  So United also covers --
22   also considers this treatment to be
23   medically necessary; right?

PLAINTIFFS002017

Page 436

```
 1            MR. KNEPPER:  Objection to form.
 2       A.   Yeah, again, so the interesting
 3       thing about this that I'm just reading --
 4       because, again, this is the first time
 5       I've seen this -- is that the same policy
 6       declares that the policy does not apply
 7       to individuals with objectively ambiguous
 8       genitalia or disorders of sexual
 9       development.  So that's an example of the
10       insurance company choosing what to call
11       medically necessary based upon an
12       insurance definition rather than a
13       medical definition.  Because under, you
14       know, plastic surgical/general medical
15       wisdom, ambiguous genitalia and disorders
16       of sexual development are objective
17       medical surgical -- well, medical
18       conditions, at least, that would be
19       covered -- would be considered medically
20       necessary to treat, you know, because
21       disorders of sexual development can
22       include emergencies like adrenal
23       hyperplasia.  So that's a -- you've given
```

PLAINTIFFS002018

Page 437

```
1        an example of how insurance companies

2        make their own definitions for the sake

3        of distinguishing what they will cover

4        and what they will not cover.

5             Q.   Go to page 9.

6             A.   Okay.

7             Q.   You see there's a section toward

8        the bottom that says, "Benefit

9        Considerations"?

10            A.   Yes.

11            Q.   Third paragraph says, "Unless

12       otherwise specified, if a plan covers

13       treatment for Gender Dysphoria, coverage

14       includes psychotherapy, cross-sex hormone

15       therapy, puberty suppressing medications

16       and laboratory testing to monitor the

17       safety of hormone therapy."  Do you see

18       that?

19            A.   I do.

20            Q.   You understand that United

21       considers not just surgery but all these

22       other services, including cross-sex

23       hormone therapy and puberty suppressing
```

PLAINTIFFS002019

Page 438

1      medications, to be medic- -- medically

2      necessary for the treatment of gender

3      dysphoria; right?

4              MR. KNEPPER:  Objection, form,

5      scope.

6         A.   Yeah, again, the same -- same

7      issues of definition.  So they -- they

8      can define it any way they choose for the

9      sake of the business of insuring people,

10     yeah.  So they -- they definitely have

11     defined all of the services associated

12     with gender dysphoria as covered

13     benefits.

14        Q.   And not just as covered

15     benefits, as medically necessary; right?

16        A.   Again --

17             MR. KNEPPER:  Objection, form

18     and scope.

19        A.   Again, they use -- the use of

20     the word "medically necessary" is defined

21     by the insurance company to distinguish

22     covered benefits from not covered

23     benefits, and it's not based in medical

PLAINTIFFS002020

Page 439

1      evidence of efficacy or anything else.

2      It's just an internal definition for the

3      sake of their business model.

4          Q.   You think that insurers do not

5      look at scientific literature in deciding

6      whether or not to cover something?

7              MR. KNEPPER:  Objection, form.

8          Q.   Is that really what you think?

9          A.   Your -- your first example that

10     we've gone through is a -- is an example

11     of the level of literature they've been

12     using, and that example showed that the

13     most recent paper that they used to

14     support it was 2016.  So in my mind, it's

15     in doubt.  I don't know for a fact what

16     this particular policy used as

17     references.  All I have is what you've

18     shown me on that particular policy.  And

19     the evidence there was they're not

20     current in the -- in the literature.  But

21     they're still doing good business,

22     apparently, because they continue even

23     after reviewing.

PLAINTIFFS002021

Page 440

```
 1        Q.   Okay.  Go to page 10.
 2        A.   Okay.  All right.
 3        Q.   See there's a section at the
 4     bottom that says, "Clinical Evidence"?
 5        A.   Yes.
 6        Q.   Do you know what that means?
 7        A.   Yes, I do.
 8        Q.   You see then the first thing
 9     that's said -- cited is a study from 2019
10     and the second thing is a study from
11     2019, the third thing is a study from
12     2019.  You see that?
13        A.   I do.
14             MR. KNEPPER:  Objection, form.
15        Q.   Do you under- -- do you
16     understand what this section represents?
17             MR. KNEPPER:  Objection, form.
18        A.   Permit me to just look at the
19     particular names and the particular cited
20     articles, if I could.
21          (Witness reviews document.)
22        A.   Sorry.  I just wanted to see if
23     there were any -- and then they go to --
```

PLAINTIFFS002022

Page 441

```
 1      okay.  Okay.  Could I ask you to ask your
 2      question again?  I'm sorry to have to do
 3      that.  I just wanted to see what you were
 4      referring to.
 5          Q.   Yeah.  You understand that this
 6      "Clinical Evidence" section provides an
 7      overview of some of the scientific
 8      evidence on which United based its
 9      policy; right?
10              MR. KNEPPER:  Objection, form.
11          A.   Yes.  They -- they have listed
12      some of the scientific evidence available
13      in the literature.
14          Q.   Including studies as recently as
15      2019 --
16          A.   Yes.
17          Q.   -- right?
18          A.   Right.
19          Q.   And because you weren't involved
20      with writing this policy or updating for
21      United, you don't know what else they may
22      have considered outside of this policy;
23      right?
```

PLAINTIFFS002023

Page 442

```
1         A.    I have no way of knowing what
2     they would have considered.  That's
3     right.
4         Q.    Okay.  All right.  Let's shift
5     gears a little bit.  You've heard the
6     term "Christian anthropology."  Right?
7         A.    Yes, I have.
8         Q.    You've used that term yourself;
9     right?
10        A.    Yes, I have.
11        Q.    The view that Christian
12    anthropology takes is that the -- a
13    person's sex assigned at birth is
14    intrinsic and unchangeable; correct?
15        A.    No.
16              MR. KNEPPER:  Objection, form,
17    scope.
18        A.    I would not say that.
19        Q.    What would you -- how would you
20    describe it?
21        A.    Well, your use of the term "sex
22    assigned at birth" is not -- is not
23    contained within Christian anthropology.
```

PLAINTIFFS002024

Page 443

1          Q.   Let me try this --

2          A.   By the -- by the way, I don't --

3     I don't use definitions in Christian

4     anthropology to confect my expert

5     opinion.  My opinion is based in the

6     scientific literature, my review of that

7     literature, and my 30-plus years'

8     experience as a reconstructive surgeon.

9          Q.   I understand.  The view that

10    Christian -- to use your words, the view

11    that Christian anthropology takes is that

12    a person's biologic sex is intrinsic and

13    unchangeable; right?

14         A.   Yes.

15              MR. KNEPPER:  Objection, form,

16    scope.

17         Q.   You think that people with

18    gender dysphoria should be welcomed, but

19    they should be told that they're

20    biological sex cannot be changed; right?

21              MR. KNEPPER:  Objection, form,

22    scope.

23         A.   Yeah.  So, persons who

PLAINTIFFS002025

Page 444

1        self-identify as transgender are to be

2        welcomed and are to be cared for because

3        they suffer greatly, and they -- they

4        deserve, in justice -- they deserve, out

5        of justice, I should say, our -- our care

6        and support.  But that care and support

7        must always be rooted in the truth of the

8        nature of the human person, the nature of

9        the biology that informs our

10       understanding of that, because that has

11       to drive our medical and surgical

12       decision-making.

13              So that's why my -- my expert

14       opinion is based in the objective

15       scientific evidence.  I don't make

16       reference to my -- any faith statements

17       when I'm -- when I'm developing my expert

18       opinion on transgender medicine and

19       surgery.

20          Q.   In your expert report, you refer

21       to plaintiff Julie -- Dr. Julie McKeown;

22       right?

23          A.   Could you walk me to where I

PLAINTIFFS002026

Page 445

1      speak about her?

2          Q.   Yeah.  Go to -- go to page 54 of

3      your report.

4          A.   Fifty-four.  Thank you.

5               MR. TISHYEVICH:  And the

6      spelling is M-C-K-E-O-W-N.

7          A.   Fifty-four.  Okay.  I'm there.

8          Q.   Give me a second.  Yeah.  This

9      is -- this is you discussing one of the

10     plaintiffs; right?

11         A.   Yes.  Yes.  I'm on page 53, 54.

12         Q.   Yeah.  And the second full

13     paragraph on page 54, you refer to Dr.

14     McKeown as a he; right?

15             (Witness reviews document.)

16         A.   Am I looking at the right -- oh,

17     yes.  Okay.  I'm sorry.  Right at the

18     very beginning.  Yes.

19         Q.   Page 48 of your report, this is

20     you discussing minor plaintiff CB; right?

21         A.   Right.

22         Q.   And you refer to minor plaintiff

23     as a she; right?

PLAINTIFFS002027

Page 446

1          A.    Correct.

2          Q.    Go to page 51.

3          A.    Fifty-one?

4          Q.    Five one.

5          A.    Okay.  All right.

6          Q.    This is you talking about

7     plaintiff Connor Thonen-Fleck; right?

8          A.    Let me go to the preceding page

9     because I've got to see where the names

10     -- oh, I only used the initials.  Yes.

11     CT-F, yes.

12          Q.    It's T-H-O-N-E-N, dash,

13     F-L-E-C-K.  And you refer to him as a

14     she; right?

15          A.    Yes.

16          Q.    Now, you personally do not

17     believe that a person's sex assigned at

18     birth can ever be changed?

19          MR. KNEPPER:  Objection.

20          Q.    Sorry, let me -- let me use your

21     terms.  You personally do not believe

22     that a person's biological sex can ever

23     be changed; right?

PLAINTIFFS002028

Page 447

1          MR. KNEPPER:  Objection, form.

2      A.    A person's biological sex can

3   never be changed, yes.

4      Q.    Do you know what the term

5   "misgendering" is?

6      A.    It's a -- it's a political term,

7   yes.  It's a political, cultural term, I

8   should say.  Political, cultural term.

9      Q.    Misgendering means referring to

10   a person in a way that doesn't align with

11   their gender; right?

12          MR. KNEPPER:  Objection, form.

13      A.    In -- within their hearing, I

14   could see a problem with that.  But from

15   the standpoint of offering medical

16   evidence, I'm obliged to honor objective

17   biological realities when I speak about

18   an examination of their medical record.

19          There's so many things at stake

20   relating to the sex of the patient that

21   impinge upon the effects of drugs, the

22   effects of time, the effects of hormones

23   that I -- I cannot incorrectly report the

PLAINTIFFS002029

Page 448

```
 1      sex of the patient when I'm talking about

 2      objective medical care.

 3           Now, speaking with the patients

 4      themselves, I wouldn't do that.  As we

 5      talked about earlier, I have a number of

 6      transgender patients, and I don't

 7      misgender them.  We're talking here about

 8      something that's not within their hearing

 9      or I assume they -- I assume that they

10      wouldn't be reading this.  We're speaking

11      as a professional to a professional

12      review of this stuff, among other

13      experts.  So I think it's essential that

14      we stick to the biological reality that

15      -- that biological sex is immutable.

16      Q.   In your expert report, you are

17      misgendering several of the individual

18      plaintiffs in this case; correct?

19           MR. KNEPPER:  Objection, form.

20      A.   I would say incorrect, because

21      misgendering is something that's done to

22      the person themselves or is something

23      that they're going to read or hear or
```

Page 449

1      see.  And that's an abuse of the person's

2      right to their name, and I don't do that

3      to people.  I don't misgender people.

4          Q.   Well, in this report at least,

5      you are referring to several of these

6      plaintiffs, including a minor, in a way

7      that does not align with their gender;

8      right?

9          A.   I would be --

10             MR. KNEPPER:  Objection, form.

11         A.   Again, I would be concerned to

12     not do that if it was going to be

13     something they were going to read or

14     hear.  But this expert testimony, in my

15     understanding, is for the Court and for

16     the other experts to review, in which

17     case, I insist upon the -- the prevailing

18     necessity of sticking to objective truths

19     when talking about medical opinions,

20     scientific opinions.

21             Again, I -- I'm not in the habit

22     of -- of offending people or using names

23     that they haven't chosen, because, again,

PLAINTIFFS002031

Page 450

1         I treat transgender patients and I don't

2         subject them to that kind of abuse.  But

3         when reviewing medical and biological

4         realities like this, I have to insist

5         upon it because medical care is not

6         served by incorrectly naming biological

7         realities and confusing people.  I can

8         give you an example if you like.

9             Q.    That's all right.

10            A.    Of a --

11            Q.    That's all right.

12            A.    Okay.

13            Q.    You've used the phrase before,

14        "You can't heal an interior wound with

15        external surgery."  Right?

16            A.    Yes, I have.

17            Q.    Do you remember giving a

18        presentation at the Gospel of Life

19        conference in Denver in 2018?

20            A.    Yes.

21            Q.    And that presentation was titled

22        "Transgender Surgery & Christian

23        Anthropology."  Right?

PLAINTIFFS002032

Page 451

```
 1        A.   Yes.
 2        Q.   All right.  Let me introduce an
 3   exhibit.  This will be Exhibit 33.  Let
 4   me know when you have it.
 5   (Exhibit 33 was marked for identification
 6   and is attached.)
 7        A.   Okay.  Yes, I have it.
 8        Q.   Go to page 2.
 9        A.   Okay.
10        Q.   These are slides you prepared;
11   right?
12        A.   Yes.
13        Q.   On the bottom left corner,
14   there's a red logo for Courage
15   International.  You see that?
16        A.   I do.
17        Q.   Why did you include that logo in
18   this presentation?
19             MR. KNEPPER:  Objection, form,
20   scope.
21        A.   This was a presentation for the
22   Archdiocese of Denver, the Catholic
23   Archdiocese of Denver, and it was to an
```

PLAINTIFFS002033

Page 452

```
 1        audience of pastors, teachers, school
 2        administrators, and so on.  And I was
 3        there representing my position in the
 4        Catholic apostolate of courage, and so
 5        making a presentation to a church group,
 6        I wanted them to understand the resource
 7        so that they could investigate it
 8        themselves if they wanted to.  So I put
 9        that up there for their benefit.
10           Q.   Well, some of the topics you
11        covered also included your views on what
12        the scientific evidence on these issues
13        is; right?
14           A.   Yeah.   The -- the talk is a
15        combination of both the scientific
16        evidence and the historic Catholic
17        teachings on the nature of the human
18        person.
19           Q.   For example, go to page -- go to
20        page 87, for example.
21           A.   Okay.  Let me hustle down there.
22        Boy, no wonder people get bored when I
23        give this talk.  It's so long; right?
```

PLAINTIFFS002034

Page 453

```
 1       Let's see.  87.  Here we are.  Is that --
 2       let's see.  This is -- I want to make
 3       sure I'm on the same page as you are.
 4       It's of the --
 5           Q.   It's titled "The Swedish
 6       Study" --
 7           A.   Yes.
 8           Q.   -- at the top.
 9           A.   Yes, yes.
10           Q.   And go to the next page.
11           A.   Okay.  Yeah.
12           Q.   You cite from the abstract on
13       that study; right?
14           A.   Yes.  Well, I -- I'm not citing
15       it.  I'm showing them what this study
16       looks like if they search for it online.
17           Q.   So part of the talk was your
18       recitation of what you think the
19       scientific evidence on these issues
20       shows; right?
21               MR. KNEPPER:  Objection, form,
22       scope.
23           A.   Yeah, I was asked to talk on
```

PLAINTIFFS002035

Page 454

```
1      this -- on -- on both subjects, as I said

2      earlier, both the -- the teaching in

3      human anthropology as well as the

4      scientific evidence that's used to

5      support these services of transgender

6      medicine and surgery.  That's right.

7         Q.   Courage International is an

8      organization that offers support for

9      persons who experience same-sex

10     attraction; right?

11        A.   Yes.

12             MR. KNEPPER:  Objection, form,

13     scope.

14        Q.   Courage International says that

15     people should not act on same sex

16     attraction and should strive for chastity

17     instead; right?

18             MR. KNEPPER:  Objection, form,

19     scope.

20        A.   Actually, it's broader than

21     that.  So, Courage addresses chastity as

22     something that's required of everyone.

23     But it -- it particularly addresses the
```

PLAINTIFFS002036

Page 455

1       struggles that persons who experience

2       same-sex attraction experience in trying

3       to maintain the same chastity that all of

4       us are called to.  So it's not an

5       exceptional case; it's a particular

6       apostolate to a particular group of

7       people.

8           Q.   There's a chapter of Courage

9       International in Birmingham, Alabama;

10      right?

11          A.   That's correct.

12               MR. KNEPPER:  Objection, form,

13      scope.

14          Q.   And their website lists you as

15      the main contact for that chapter; right?

16          A.   I'm not only the contact, I'm

17      the chaplain for that chapter.

18          Q.   Okay.  Go to page 3 of this

19      presentation.

20          A.   Okay.

21          Q.   Let me know when you get there.

22          A.   Okay.  Two, three.  Yes.  The

23      Challenge?

PLAINTIFFS002037

Page 456

1        Q.    It's titled "The Challenge"?

2        A.    Yeah.

3        Q.    The first bullet says, "'Male

4     and female He created them.'"  Right?

5        A.    Right.

6        Q.    That's a quote from Genesis;

7     right?

8        A.    Correct.

9        Q.    The capitalized "He" refers to

10     God; right?

11        A.    Yes.

12        Q.    And this bullet reflects the

13     church's position that God has created

14     each individual as either a man or a

15     woman; right?

16        A.    Well, actually, so this -- these

17     slides serve as jumping-off points for a

18     discussion that I have at each slide.  In

19     this case, the point of the discussion

20     was to disabuse the audience of the idea

21     that they can rely on scripture when

22     addressing this problem because the

23     majority of the people that are seeking

PLAINTIFFS002038

Page 457

```
 1        to serve do not speak in Biblical
 2        language.  So the point of this slide is
 3        to -- is to encourage them to understand
 4        that they have to learn a new language in
 5        order to be able to speak effectively to
 6        people suffering from gender discordance
 7        and to speak to their families on this
 8        same issue.  That's what this slide is
 9        about.  It's not a -- it's not a
10        declaration about what God has said.
11        It's a -- it's an explanation of the
12        problem they're going to have if they're
13        going to seek to serve people who
14        experience same-sex -- I'm sorry, who
15        experience cross-sex identification.
16           Q.   All right.  You say, "'Male and
17        female He created them' has been replaced
18        by a confusion of exceptional cases."
19        Right?
20           A.   Yes.
21           Q.   And by the phrase "confusion of
22        exceptional cases," one of the things
23        you're referring to are patients with
```

PLAINTIFFS002039

1     gender dysphoria; right?

2              MR. KNEPPER:  Objection, form,

3       scope.

4         A.    Right.  I'm referring to the --

5       the recently growing list of exceptional

6       cases that is enumerated in the -- the

7       acronyms of -- of this topic, LGBTQ add a

8       plus and so on, which can be very

9       confusing to people who are trying to

10      help.  And so I'm acknowledging that the

11      -- the likelihood that they may be

12      confused by those terms, and I'm also

13      acknowledging the sources of those

14      confusing terms.  And the point of the

15      slide, again, is to help them understand

16      there's a language they need to learn and

17      to not be daunted by the confusion that

18      they may experience when they first look

19      into this topic.  Yeah.  That's what this

20      is.

21        Q.    Go to slide 11.  It's titled

22      "Human Nature."

23        A.    So slide 11, Human Nature, yes.

PLAINTIFFS002040

Page 459

1      Okay.

2          Q.   So the first two bullets say,

3      "Why must we consider first the nature of

4      the human person?"  Then it says,

5      "Defines the 'end' of medical and

6      surgical care."

7          A.   Yes.

8          Q.   What does it mean that it

9      "defines the 'end' of medical and

10     surgical care"?

11              MR. KNEPPER:  Objection, form,

12     scope.

13         A.   Okay.  So that's a -- that's a

14     term that dates back to Aristotelian

15     philosophy.  And what it has to do is

16     what is the purpose or what is the

17     ultimate arc of a particular thing.  So

18     the "end" meaning what are you seeking to

19     accomplish, what is the final goal of

20     that -- of that medical or surgical

21     treatment.

22              So -- and the examples I use are

23     you have to have an understanding, for

PLAINTIFFS002041

Page 460

1    example, of normal blood pressure in

2    order to know when to treat it and why

3    normalizing blood pressure is important.

4    Or we have to know that, you know, the

5    human person has two legs, and if he has

6    a poverty of legs, he has a poverty of

7    human flourishing.  And so in the one

8    case, I might be treating with blood

9    pressure medicine, and in the other case,

10   I might be fitting him for a prosthesis.

11   But the point is we have an objective

12   understanding of the nature of the human

13   person, which defines the goals of

14   treatment, whether you're talking about

15   orthopedics or transgender medicine.

16       Q.   Yeah.  You think this concept

17   also applies to the concept of treatment

18   for gender dysphoria; right?

19       A.   It does.  Yes, it does.

20            MR. KNEPPER:  Objection, form,

21   scope.

22       Q.   All right.  Go to slide 23.

23       A.   Okay.  Okay.

PLAINTIFFS002042

Page 461

1          Q.    The top left says, "Shaping the
2     Conversation, & Grooming a Generation."
3          A.    Right.
4          Q.    You see that?
5          A.    Right.
6          Q.    What do you mean by "grooming a
7     generation"?
8          A.    Grooming is a -- is a process by
9     which ideas are introduced that make
10     subsequent actions possible, so that's
11     what -- that's what grooming is, yeah.
12          Q.    Grooming is sometimes used to
13     refer to preparing to -- strike that.
14                Grooming is sometimes used as
15     preparing children for sexual abuse.
16     Isn't that true?
17          A.    That's one of the --
18                MR. KNEPPER:  Objection, form,
19     scope.
20          A.    That's one of the uses of
21     grooming, yeah, but it's not exclusive
22     use of grooming.  Yeah.  And I discuss
23     this in this -- in this slide.  Yes, I

PLAINTIFFS002043

Page 462

1    do.

2        Q.   And you think that discussing

3    gender identity issues with children

4    means sexualizing them; right?

5        A.   Yes, I do.  Absolutely, I do.

6            MR. KNEPPER:  Objection, form,

7    scope.

8        Q.   And you think that discussing

9    gender identity issues with children

10   means grooming them for potential later

11   sexual abuse; right?

12           MR. KNEPPER:  Objection, form,

13   scope.

14       A.   No.  No.  What we're talking

15   about here is grooming them for -- for

16   future -- what's the word I would want to

17   choose carefully?  It's preparing them

18   for these interventions is what it does.

19   It lays the groundwork for it by

20   sexualizing their thoughts in a way

21   that's -- is not consonant with their

22   best interest.  That's what this slide is

23   about, so --

PLAINTIFFS002044

Page 463

```
1         Q.   Let me introduce another

2    exhibit.

3         A.   Okay.

4         Q.   This will be Exhibit 34.

5    (Exhibit 34 was marked for identification

6    and is attached.)

7         A.   Could I back up to that last

8    one?  Would that be all right?

9         Q.   Sure.

10        A.   Before we -- before we press on.

11   One of the things I'm just recalling, the

12   -- the -- the urgency of having that

13   particular slide there is that when

14   people take care of transgender persons,

15   children in particular, we always -- but

16   including adults.  But -- but children

17   and adults, one always has to be on the

18   lookout for signs of sexual abuse because

19   it's a very -- it's a very commonly

20   reported comorbidity in persons who

21   experience these self-identifications.

22   It's not uncommon to discover that

23   they've suffered some form of abuse that
```

PLAINTIFFS002045

Page 464

1      may be sexual but not necessarily sexual.

2      And so this is -- one of the things I

3      talk about in that slide is -- is for the

4      people who are care providers,

5      counselors, school administrators, to be

6      alert to that possibility.

7                So I'm sorry, we were going to

8      move on to the next one.

9           Q.   Do you have the next exhibit?

10          A.   And that is Exhibit 34?

11          Q.   Yeah.

12          A.   Okay.

13          Q.   All right.  This is a printout

14     from LifeSite, and the title is "Plastic

15     surgeon: Sex-change operation 'utterly

16     unacceptable' and a form of 'child

17     abuse.'"  Right?

18          A.   Yes.

19          Q.   And it says, "Dr. Patrick

20     Lappert, a Catholic deacon in Alabama,

21     says changing a person's sex is a lie and

22     also a moral violation for a physician."

23     Right?

PLAINTIFFS002046

Page 465

1        A.    Yes.

2        Q.    And you hold those views --

3        A.    I do.

4        Q.    -- correct?

5        A.    I do.

6              MR. KNEPPER:  Objection, form,

7        scope.

8        Q.    Go to page 2.

9        A.    Okay.

10       Q.    This was published in September

11       2019; right?

12       A.    Yes.

13       Q.    This is reporting on you

14       appearing on a broadcast of something

15       called the "Relevant Radio's Trending

16       With Timmerie."

17       A.    Yes.

18       Q.    Right?

19       A.    Yes.

20       Q.    You made that appearance; right?

21       A.    On the radio, yes.

22       Q.    Okay.  Look -- look to the fifth

23       paragraph on page 2.

PLAINTIFFS002047

Page 466

1     A.   Okay.

2     Q.   It says, "He called it 'utterly

3    unacceptable' on moral grounds for a

4    plastic surgeon, because it disregards

5    the surgeon's call to balance respect for

6    both form and function of the body in his

7    or her work."

8     A.   Right.

9     Q.   Right?

10     A.   Yes, sir.

11     Q.   You don't deny saying that;

12    right?

13     A.   Right.  You should understand,

14    though, that the use of the term "moral

15    grounds" here is strictly from the

16    standpoint of my training as a plastic

17    surgeon.  I'm not using this as a

18    platform for a religious discussion.

19    Speaking -- I'm speaking about form and

20    function, which are both very crucial to

21    an understanding of what plastic surgery

22    means.

23          And again, that speaks to the

PLAINTIFFS002048

Page 467

```
1       end of plastic surgery, which is -- when
2       you're speaking about reconstructive
3       surgery, it's the restoration of form and
4       function.  And these operations lack
5       moral basis precisely because they
6       destroy essential human functions for the
7       sake of achieving a cosmetic result,
8       which is morally unacceptable.  And I say
9       that without reference to any religious
10      teaching.  This is strictly my training
11      as a plastic surgeon, morally
12      unacceptable.  And from the first moments
13      of my training as a reconstructive
14      surgeon, that was drilled into me, that
15      if you're planning a reconstructive
16      operation and it involves the movement of
17      tissue on the patient's body, you never
18      do something that's going to compromise
19      or destroy an essential human function.
20              You may challenge that function
21      a little bit, as you do, for example, in
22      a radial forearm flap, the same flap
23      that's used to recon- -- to construct a
```

PLAINTIFFS002049

Page 468

```
 1      phalloplasty.  I've used that flap many
 2      times to reconstruct head and neck cancer
 3      defects, the same neurotized vascular
 4      flap.  And I would never dream of using
 5      that flap, for example, if I was going to
 6      compromise hand function.  So it obliges
 7      me to be careful, to make sure that when
 8      I raise the flap, I don't harm the blood
 9      supply to the hand.  That's an example of
10      that.
11              In the example of transgender
12      surgery, by definition, you're destroying
13      fertility for life, which is an immoral
14      act in the eyes of plastic surgery as I
15      learned it through 30-plus years of
16      training.
17          Q.   I understand.  Let me just ask
18      you about the next two paragraphs --
19          A.   Okay.
20          Q.   -- of this article.
21          A.   Okay.
22          Q.   Then it says:  "Regarding
23      children, Lappert said, sexualizing them
```

PLAINTIFFS002050

Page 469

```
 1      at a young age with these ideas is
 2      grooming them for later abuse.  'It's
 3      atrocious,' he said.  'And no one even
 4      knows how that's going to play out.
 5      There's no body of scientific evidence to
 6      even support the safety of doing that to
 7      children.  But it's being done.'"  Right?
 8           MR. KNEPPER:  Objection, form,
 9      scope.
10        A.   Okay.  So, let's go through
11      that.  So in this case -- we talked about
12      multiple uses of the word "grooming."  In
13      this case, the abuse that they're -- it's
14      grooming them for is the abuse we just
15      finished discussing, what I consider to
16      be the abuse of transgender medicine and
17      surgery and what it does to the life of
18      that child.  So that's the abuse I'm
19      referring to here.  I'm not speaking
20      about this in terms of sexual abuse, I'm
21      speaking about in terms of
22      medical/surgical abuse of a child.  So if
23      you get a child -- if you sexualize a
```

PLAINTIFFS002051

Page 470

1       child's thinking and encourage them to

2       believe, for example, if -- if -- if I --

3       and I don't want to take up your

4       remaining time, but we can go into it in

5       more detail if you wish.  But the point

6       I'm making here is this is grooming them

7       for medical and surgical abuse.

8           Q.   Okay.

9                MR. TISHYEVICH:  We can go off

10      the record.

11               THE VIDEOGRAPHER:  This is the

12      end of Media Unit 6.  We are off the

13      record at 5:07 p.m.

14                     (Break taken.)

15               THE VIDEOGRAPHER:  This is the

16      beginning of Media Unit No. 7.  We are on

17      the record at 5:14 p.m.

18          Q.   (By Mr. Tishyevich) Doctor,

19      that's all the questions I have for you

20      today.  Thanks for your time.

21          A.   Thank you.  This was my first

22      ever deposition, and you were very kind

23      to me.  Thank you for that.

Page 471

```
 1        Q.    Okay.
 2              MR. TISHYEVICH:  All right.
 3      Mr. Knepper?
 4              MR. KNEPPER:  Yeah, I'm ready to
 5      go.  I'm sorry.  I actually had you
 6      turned down, because when I put you on
 7      mute, I could still hear Lane and Andrew.
 8      I thought I saw their lips moving.
 9              THE COURT REPORTER:  Yeah, he
10      said he was finished asking questions.
11              MR. KNEPPER:  Oh, I'm sorry.  I
12      didn't hear that.  I'm sorry, Dmitriy.  I
13      apologize.  I had -- you know, Lane
14      and -- and Andrew were talking to one
15      another, and so I was -- I had to turn
16      down my speaker.
17              So I guess why don't we -- why
18      don't we take a -- I've got 4:15.  Why
19      don't we take a 15-minute break, and then
20      I'll see if I have anything on redirect,
21      and we'll come back at I guess it would
22      be 6:30 your time, Dmitriy?
23              MR. TISHYEVICH:  Yeah.
```

PLAINTIFFS002053

Page 472

1           MR. KNEPPER:  Okay.

2           MR. TISHYEVICH:  Sounds good.

3           THE VIDEOGRAPHER:  We are off

4      the record at 5:15.

5                (Break taken.)

6           THE VIDEOGRAPHER:  We are back

7      on the record at 5:29 p.m.

8

9      EXAMINATION BY MR. KNEPPER:

10          Q.   Dr. Lappert, I wanted to ask you

11     a couple of questions about your CV and

12     your biography.

13          A.   Okay.

14          Q.   On your biography, you identify

15     yourself as the Specialty Leader for

16     Plastic and Reconstructive Surgery, the

17     Office of the Surgeon General - United

18     States Navy, from 1997 to 2002.  Could

19     you describe what that position involved?

20          A.   Yeah.  So I advised the Surgeon

21     General, first of all, with regard to the

22     selection of physicians for advanced

23     training in plastic surgery.  I also

PLAINTIFFS002054

Page 473

1      advised the Office of the Surgeon General

2      on policy matters pertaining to the

3      movement of patients and the availability

4      of services in the various treatment

5      facilities.  I also advised him on policy

6      relating to coverage of particular

7      medical problems versus sending them out

8      into the community for care or declining

9      care.

10              So part of it was resource

11     management, part of it was personnel

12     management, and part of it was financial

13     management.  And all the time, it

14     required to review the state of the

15     literature regarding reconstructive

16     surgery for combat-injured and as well as

17     medically retired personnel and other

18     retired people.

19         Q.   And I -- I note that also in

20     your resumé is that from 1996 to 2002,

21     you were the Chairman of the Department

22     of Plastic and Reconstructive Surgery at

23     Naval Hospital Portsmouth.  Could you

PLAINTIFFS002055

Page 474

1      describe that -- that facility and its

2      role within the United States military?

3           A.   Okay.  Well, that -- as

4      department head, I was -- I had a five --

5      five staff plastic surgeons working for

6      me.  I had I think seventeen hospital

7      corpsmen working for me.  And we provided

8      services, reconstructive surgical

9      services on a referral basis from --

10     essentially from the eastern

11     Mediterranean all the way to Appalachia

12     and from North Carolina -- I'm sorry,

13     from -- from Maryland all the way down to

14     Florida.  So all persons requiring

15     reconstructive surgery, including

16     combat-injured or other, would be

17     referred to us, people with congenital

18     deformities, peop- -- you know, pediatric

19     patients and -- and adults.  And this was

20     in a -- in the facility which at the time

21     was the largest medical treatment

22     facility in -- I think in the world,

23     certainly in -- in the American purview.

PLAINTIFFS002056

Page 475

1            I also -- I also established and
2      ran congenital craniofacial deformity
3      treatment.  We ran a limb salvage
4      treatment that involved a great deal of
5      microvascular reconstructive surgery for
6      wounds, cancer, that sort of thing.  We
7      also established the -- the wound care
8      center for that facility, and that --
9      again, we served that large catchment
10     area with advanced wound care services.
11        Q.   Dr. Lappert, you served as a --
12     as a plastic and reconstructive surgeon
13     for the United States Navy.  Is that
14     correct?
15        A.   Correct.
16        Q.   And you also served as a plastic
17     and reconstructive surgeon in private
18     practice.  Is that correct?
19        A.   Correct.
20        Q.   Could you describe the -- or
21     contrast or describe the similarities and
22     differences in those two practices.
23        A.   Certainly.  Well, so both

PLAINTIFFS002057

Page 476

```
 1        practices involved both reconstructive
 2        surgery and aesthetic cosmetic surgery.
 3        But the difference is that in the
 4        military, because of the nature of the
 5        requirements, the experience level grows
 6        much more rapidly in the military than it
 7        does in the civilian world.  So within
 8        the first couple of years of my practice
 9        as a reconstructive surgeon in the Navy,
10        I was doing the most advanced
11        reconstructive procedures, such as the
12        mi- -- the neurotized microvascular flap
13        operations that are often used, for
14        example, in the phalloplasties of
15        transgender surgery, or the perineal
16        vaginal reconstruction for cancer, same
17        operations that are used in the
18        vaginoplasty for transgender
19        self-identified persons.  So a very
20        advanced complexity.
21                In fact, when I sat for my
22        boards, my oral boards, we had to present
23        ten selected cases that the board
```

PLAINTIFFS002058

Page 477

```
 1        selected, and both of my examiners were
 2        startled at the level of complexity for a
 3        second-year person out of training, doing
 4        craniofacial surgery, free flap
 5        operations, massive limb salvage surgery.
 6        So that's the distinct difference, what
 7        you get in civilian versus what you get
 8        in the military.  But both of them
 9        involved reconstructive as well as
10        aesthetic cosmetic surgery.
11            Q.   Sure.  Now earlier, you were
12        asked about whether you had performed
13        certain procedures in the context of
14        transgender surgery.  Is that correct?
15            A.   Yes, sir.
16            Q.   And your answer was that you had
17        not.  Is that correct?
18            A.   That's correct.
19            Q.   Have you done those procedures
20        in the context of your practice of
21        plastic surgery?
22            A.   I have.
23            Q.   Could you describe that --
```

PLAINTIFFS002059

Page 478

1       those -- those circumstances.

2           A.    Well, as an example, a -- a very

3       memorable case, a patient with what's

4       called Fournier's gangrene, where

5       essentially, they had a massive

6       uncontrollable infection of the perineum

7       that destroyed the scrotum, destroyed

8       major portions of the penis, required

9       what amounts to a reconstructive

10      phalloplasty/scrotoplasty to reconstitute

11      them after a long period of wound care.

12      But the -- the operations to reconstruct

13      the urethra is the same operation that's

14      used to construct the urethra in a

15      phalloplasty or construct the urethra in

16      a metoidioplasty, same operations

17      involving local flaps, mucosal grafts,

18      tubularized flap operations.  All of

19      those are the same.  Just the indication

20      for the surgery is reconstructive rather

21      than the surgeries for transgender.

22              Same thing with the

23      vaginoplasty.  Again, often --

PLAINTIFFS002060

Page 479

```
 1        oftentimes, reconstruction for radiation
 2        injuries secondary to management of
 3        vagineal -- vaginal perineal malignancies
 4        that require removal of large areas of
 5        soft tissue, again reconstruction of the
 6        -- the perineum, the external genitalia,
 7        the vaginal introitus, the vaginal canal,
 8        same operations using flaps, grafts to
 9        reconstruct as are used in the
10        transgender surgery world.
11            Q.   So, do you feel that your
12        professional experience and
13        qualifications allow you to comment on
14        the -- the medical operations involved in
15        surgery for a transgender individual?
16            A.   Yes.  I'm -- I'm very familiar
17        with all of those operations.
18            Q.   And -- and you've performed
19        those operations?
20            A.   Yes, I have.
21            Q.   Okay.  Just not in the context
22        of gender transition?
23            A.   That's correct.
```

PLAINTIFFS002061

Page 480

1      Q.   Okay.  There was a -- there was

2      a brief question, and -- and we didn't

3      get back to it, about one of the articles

4      on your CV on breast reconstruction.  Is

5      that -- is that correct?

6      A.   Right.  Yeah, that's one of my

7      listed articles.  That's right.

8      Q.   Great.  Did you want to -- did

9      you want to say more about that article?

10     A.   Yeah.  So, that's -- was really

11     my entrance into the breast

12     reconstruction world.  That actually

13     started when I was still a general

14     surgeon and I was collaborating with a

15     plastic surgeon, and we examined the

16     surgical planning for mastectomy in the

17     setting of breast cancer or other causes

18     and -- and the surgeon's role in

19     designing those operations to get the

20     best possible outcome.  And it was

21     actually a seminal article, up until

22     recently was the most quoted article in

23     the literature on breast reconstruction.

PLAINTIFFS002062

Page 481

1    And that was actually the first article

2    that spoke about conservation surgery in

3    surgical planning for the treatment of

4    breast malignancies or other breast

5    problems.

6        Q.   Dr. Lappert, you were asked

7    questions about the policy or position

8    statements of several professional

9    organizations.  Do you recall those

10   questions?

11       A.   I do.

12       Q.   Did those exhibits or any of the

13   questions change your opinion that

14   affirmative hormonal treatment and

15   surgery remains unproven and

16   experimental?

17       A.   It has not changed my opinion.

18       Q.   You were asked questions about

19   the evidence supporting the provision of

20   hormonal therapy and surgical

21   interventions for the treatment of gender

22   dysphoria.  Is that correct?

23       A.   Yes.

PLAINTIFFS002063

Page 482

1      Q.    Were any of the questions or any
2    of the studies that were presented to
3    you, did they change your opinion that
4    the existing medical evidence supporting
5    those interventions is of very low
6    quality and has methodological defects?
7      A.    That did not change my opinion
8    about those, no.
9      Q.    And just to clarify, what is
10   your opinion about the -- about the
11   current state of the evidence supporting
12   hormonal therapy for treatment of gender
13   dysphoria?
14     A.    My opinion is that all of these
15   published studies that are used to
16   support or to justify the use of puberty
17   blockade, cross-sex hormones, or
18   transgender -- gender-affirming surgery
19   are of the lowest quality scientific
20   evidence and are not sufficient to
21   support care and interventions that have
22   such far-reaching and lifelong effects on
23   the patient.

PLAINTIFFS002064

Page 483

1          Q.   Are your opinions on that -- on

2      that issue in this case based on anything

3      other than your review of the scientific

4      and medical literature and your training

5      as a -- as a physician?

6          A.   No, they're not.

7          Q.   Dr. Lappert, you were asked

8      about off-label use of Botox for certain

9      muscle -- muscle groups.  Is that

10      correct?

11          A.   Yes, I was.

12          Q.   And you -- and you described --

13      and you stated that you've actually used

14      Botox off label for treatment of those

15      muscle groups before that was approved by

16      the FDA.  Is that correct?

17          A.   That's correct.

18          Q.   But you have also said that you

19      believe that it is significant and -- and

20      relevant to this case that the use of

21      hormone and puberty blockers for

22      treatment of gender dysphoria is

23      off-label.  Is that correct?

PLAINTIFFS002065

Page 484

1        A.    Yes.

2        Q.    Could you disting- --

3    distinguish between why you hold the view

4    that off-label uses of some

5    pharmaceuticals is acceptable by a -- by

6    a physician and when you consider that to

7    be unacceptable by a physician?

8        A.    Right.  So, the off-label use of

9    medications when there's a low risk to

10   the patient or that the -- the possible

11   adverse effect may be brief and that a

12   favorable result is likely where risk is

13   low, then that's justifiable to go off

14   label with medications.  But when you're

15   -- when you're talking about significant

16   risk to the patient and irreversible

17   changes, that the off-label use places a

18   tremendous burden on the practitioner to

19   -- to have scientific evidence to support

20   his decision to do that.  And to not have

21   sufficient evidence when doing that is a

22   -- is a -- is a great difficulty in terms

23   of consent and in terms of just general

PLAINTIFFS002066

Page 485

1      medical/surgical decision-making.

2              So the distinction is the

3      risk/benefit equation.  How much risk are

4      you placing the patient under, is it

5      irreversible, and is the benefit so great

6      that it's worth taking the risk.

7          Q.   Sure.  Just to follow up, and

8      these are going to be my final questions,

9      is it your view that there are no -- and

10     does it continue to be your view that

11     there are no -- currently no competent --

12     competently conducted long-term,

13     peer-reviewed, reliable, and valid

14     research studies documenting the number

15     or percentage of patients who receive

16     gender-affirming medical interventions

17     who are helped by such procedures?

18         A.   It's still my position that --

19     that the medical literature does not

20     support those interventions of medical

21     and surgical treatment for

22     self-identified transgender persons.

23         Q.   Is it still your view that there

PLAINTIFFS002067

Page 486

1    are no published, reliable, and valid

2    research studies that document a valid or

3    reliable biological, medical, surgical,

4    radiological, psychological, or other

5    objective assessment of a -- of a

6    patient's gender identity or gender

7    dysphoria?

8        A.   Yes.  It's still my position

9    that there are no tests that will confirm

10   or refute the diagnosis of transgender, a

11   diagnosis made by the patient.  There's

12   no way to test for that.

13       Q.   All right.  Is it still your

14   view, after the evidence and the

15   questions that you've been presented,

16   that an unknown percentage of patients

17   who present with gender dysphoria also

18   suffer from mental illnesses that

19   complicate and may distort their

20   judgments and perceptions of gender

21   identity?

22       A.   Yes.  The -- the world

23   literature demonstrates a consistent and

PLAINTIFFS002068

Page 487

1    significant level of comorbidities,

2    including severe anxiety, major

3    depression, self-harm.  The patient is

4    very likely to be on the autism spectrum.

5    Suicidal ideation.  And -- and the world

6    literature supports that.  So -- and

7    those are -- those are serious issues,

8    not only in terms of decision-making, but

9    even on the question of consent and

10   competence for consent.

11       Q.   Just one -- one more thing I

12   wanted to follow up with.  Your testimony

13   -- we didn't cover this, but I want to

14   make sure that it's still your view that

15   medical treatments may differ

16   significantly by sex according to your

17   chromosomal assessment but not based on

18   your gender identity and that

19   misinforming physicians of a patient's

20   biological sex could have deleterious

21   effects on treatment for medical

22   conditions?

23       A.   Yes, that's correct.  And when

PLAINTIFFS002069

Page 488

```
1      we discuss the issue of misgendering,

2      that's what we were talking about.  We

3      were talking about placing the patient at

4      risk.  If you're having a -- a discussion

5      or conversation about medical

6      decision-making, you have to distinguish

7      between biological male and female

8      because you run -- there -- there are

9      illnesses that predominate in females

10     that don't exist in males; there are

11     conditions that affect males that do not

12     affect females, and you have to know that

13     if you're going to offer care.  But

14     again, that hasn't been changed by -- by

15     what I've seen or heard here today.

16     That's still -- is still the case.

17        Q.   Okay.  And it's still your view

18     that the use of hormones and surgery to

19     treat gender dysphoria is not supported

20     by the relevant scientific communities as

21     discerned by your literature review and

22     your training as a physician in

23     reconstructive and plastic surgery?
```

PLAINTIFFS002070

Page 489

1        A.   Yes.

2             MR. KNEPPER:  Those are my

3     questions.  I don't think I have anything

4     else.  Did you have follow-ups you

5     wanted, Dmitriy?

6             MR. TISHYEVICH:  Very, very

7     briefly.

8             MR. KNEPPER:  Okay.

9

10    EXAMINATION BY MR. TISHYEVICH:

11        Q.   Doctor, you were just asked

12    about your views on why it's okay to use

13    Botox off-label but you have a different

14    view of puberty blockers.  Do you recall

15    that?

16        A.   I do.

17        Q.   And one of your considerations

18    is the risk/benefit profile of Botox;

19    right?

20        A.   Right.

21        Q.   Do you know what a black box

22    warning is, Doctor?

23        A.   Yes.

PLAINTIFFS002071

Page 490

1          Q.    It's the strongest warning that
2     the FDA can require; right?
3          A.    That's -- that's right.
4          Q.    And that warning is typically
5     only used if studies indicate that the
6     drug carries a significant risk of
7     serious or even life-threatening adverse
8     effects; right?
9          A.    Yes.
10          Q.    Do you know that Botox has a
11     black box warning?
12          A.    Yes, I do.
13          Q.    It's for distant spread of toxin
14     effect; right?
15          A.    Yes.
16          Q.    And the use of Botox has -- has
17     resulted in reports of life-threatening
18     injuries and death; right?
19          A.    I'm even familiar with the case
20     reports that reported that.  Yes, sir.
21          Q.    Okay.  That's all I've got for
22     you.
23               MR. KNEPPER:  Okay.  Thank you,

PLAINTIFFS002072

Page 491

1       Dr. Lappert.

2               THE WITNESS:   Thank you.

3               MR. KNEPPER:   We're finished

4       with your testimony.

5               Thank you, Dimitry.   Thank you,

6       Lane.   Thank you, Andrew.

7               We can go off the record.

8               THE VIDEOGRAPHER:   This is the

9       end of Media Unit No. 7.   We are off the

10      record at 5:47 p.m. Thursday, September

11      30th, 2021, and this concludes today's

12      testimony given by Dr. Patrick Lappert.

13

14               END OF DEPOSITION

15                (5:47 p.m.)

16

17

18

19

20

21

22

23

PLAINTIFFS002073

```
                                        Page 492

1                 C E R T I F I C A T E

2       STATE OF ALABAMA     )

3       COUNTY OF JEFFERSON )

4                 I hereby certify that the above

5       and foregoing proceeding was taken down

6       by me by stenographic means, and that the

7       content herein was produced in transcript

8       form by computer aid under my

9       supervision, and that the foregoing

10      represents, to the best of my ability, a

11      true and correct transcript of the

12      proceedings occurring on said date at

13      said time.

14                 I further certify that I am

15      neither of counsel nor of kin to the

16      parties to the action; nor am I in

17      anywise interested in the result of said

18      case.

19                 /s/ Lane C. Butler

20                 LANE C. BUTLER, RPR, CRR, CCR

21                 CCR# 418 -- Expires 9/30/22

22                 Commissioner, State of Alabama

23                 My Commission Expires:  2/11/25
```

PLAINTIFFS002074

Page 493

1    John G. Knepper, Esquire

2    john@knepperllc.com

3                         October 13, 2021

4    RE:    Kadel, Et Al v. Folwell

5         9/30/2021, Patrick Lappert, M.D. (#4814384)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of transcript.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

PLAINTIFFS002075

```
                                                    Page 494

1    Kadel, Et Al v. Folwell

2    Patrick Lappert, M.D. (#4814384)

3                E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____  _____

24   Patrick Lappert, M.D.                      Date

25
```

PLAINTIFFS002076

Page 495

1    Kadel, Et Al v. Folwell

2    Patrick Lappert, M.D. (#4814384)

3                 ACKNOWLEDGEMENT OF DEPONENT

4        I, Patrick Lappert, M.D., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Patrick Lappert, M.D.                    Date

13   *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25

PLAINTIFFS002077

**&**

**&** 2:7 3:11 10:15
265:16 450:22
461:2

**0**

**0.3** 303:3 344:18
354:15
**0.6** 344:17 354:16
**08/02/2021** 4:17

**1**

**1** 4:13 9:18 12:3,6
22:14,15 25:23
31:9 34:11 43:8
79:3 173:9 224:16
257:14,20 279:20
288:14 294:4
301:11,13,21
302:7,9,17,22
303:13 320:9
338:8 352:6
357:16 383:14
411:16 435:2,9
**1.7** 303:3
**10** 5:8 6:10 110:9
171:7,11 255:10
297:23 298:9
300:7,10 303:12
440:1
**10/02/2017** 264:14
**100** 3:12 142:1
**10017** 2:9
**1005** 2:21
**105** 2:14
**108** 5:2
**10:19** 115:11
**10:21** 115:14
**10th** 55:16
**11** 4:4 5:11 43:12
110:6 223:16,18
458:21,23

**11-2** 63:16
**116** 5:5
**11:06** 166:17
**11:16** 166:21
**12** 4:13 5:13 7:20
230:12,14 411:9
**120** 2:20
**127** 5:7
**12:30** 254:16
**12th** 427:12
**13** 5:16 232:22,23
279:20 493:3
**13.6** 304:12
**14** 5:20 239:14,16
350:17 351:3
352:12,14 355:1,1
355:2
**14.4** 357:11
**15** 6:1 7:20 119:18
138:18 256:13,15
298:19 299:9
411:10 471:19
**158** 2:14
**16** 6:4 56:15 263:8
263:10 359:22
366:6
**16,000** 360:19
364:23 365:11,15
366:2
**17** 6:6 57:1,17
299:13,15 397:14
397:16
**171** 5:8
**1720** 3:6
**18** 5:12 6:11 42:6
58:1 224:14 257:4
257:5 325:23
326:2 399:13
**18th** 430:17
**19** 6:16 339:20
340:2 401:6

**19.1** 390:1,5
**1920s** 72:17
**1972** 342:1,8
**1972-2015** 6:19
340:10
**1979** 182:22
**1982** 227:12,17
228:19
**1987** 134:12
**1990** 106:19
**1991** 106:18,19
**1992** 31:12
**1993** 136:11
**1994** 5:12 224:14
226:20,22
**1995** 132:22
**1996** 131:11
473:20
**1997** 23:5 30:10
129:6 472:18
**1998** 129:8 233:4
**19th** 2:20
**1:19** 1:7 10:2
**1:21** 254:20

**2**

**2** 4:14 27:9,14
28:16 64:4 110:4
166:16 225:2
231:2 242:13
264:17 265:3
286:4 288:14,22
294:4 295:11
302:5 303:22,23
304:11 306:13
307:13 384:9,16
405:11 415:6
430:21 435:12
451:8 465:8,23
**2,361** 341:22
**2,773,770** 257:21

**2.1** 302:21
**2.7** 258:11
**2/11/25** 492:23
**20** 6:17 339:16,18
339:21 340:2,7
372:14 495:15
**2000** 380:10
**2001** 380:12
**2002** 31:17,20 32:3
32:5 136:22 137:2
137:23 139:16
240:13,17 472:18
473:20
**2005** 139:11,17
**2006** 140:18
**2007** 184:11,12
**2008** 23:8 30:11
300:11 302:13
303:2
**2009** 200:14
**2010** 139:8,13
**2011** 185:17 186:4
383:1,5 389:15
**2012** 183:4 185:16
**2013** 189:23
300:11 302:14
303:2
**2014** 85:8 202:14
257:3,14,14 380:9
**2015** 342:1,8,21
343:4
**2016** 265:3 378:22
380:17 439:14
**2017** 6:20 8:3 84:8
84:11 89:18 93:6
98:6 101:18
171:16 196:8,18
197:18,22 198:2
198:21 199:13,17
200:2,4,21 264:17
266:6 267:19

PLAINTIFFS002078

**[2017 - 5]**

356:1 368:8
**2017-10-02** 6:5
**2018** 6:17 23:16,20
25:18 297:7
300:11 302:14,21
304:13,21 307:16
307:22 450:19
**2019** 6:6 25:2
100:13 148:22
149:1 256:19
299:19 440:9,11
440:12 441:15
465:11
**2020** 7:12,23 25:11
139:4,8 141:13,17
142:5 148:20
149:1 377:21
379:1,4 393:23
394:16 410:11
414:10
**2021** 1:21 5:5 7:6
9:10,17 25:10
38:5,11,16 55:17
108:15 109:3
110:6 115:23
359:18 377:13
379:6 380:18
381:10 382:4
410:22 424:8
427:12 430:17
435:2 491:11
493:3
**21** 6:20 38:11
320:11 322:16
355:17,18 380:11
413:6
**22** 5:12 7:1 359:14
361:4,11
**223** 5:11
**23** 7:5 129:11,15
130:18 375:14,16

397:6,12,13
460:22
**230** 5:13
**232** 5:16
**239** 5:20
**24** 7:7 388:18,20
399:13
**25** 7:12 108:15
171:16 347:10
394:7,9 401:6
404:23
**256** 6:1
**25th** 109:2 115:2
**26** 7:15 396:19,20
**26.3** 308:2
**263** 6:4
**27** 4:14 7:17 411:2
411:4
**27101** 3:13
**272** 1:7 10:2
**28** 7:23 414:20,22
**28.1** 257:21 258:12
**29** 8:2 35:11
419:15,17
**299** 6:6
**2:16** 320:3
**2:24** 320:7
**2nd** 38:5

**3**

**3** 4:15 29:8 30:12
34:7 41:10,12,12
41:16 42:5 64:14
111:7 128:17
166:20 219:12
248:13 254:15
264:10 266:6
267:19 289:2,7,9
289:17,22 290:15
290:17 293:22,23
294:11 295:16
305:2 308:5 312:6

363:14 428:8
455:18
**3.2** 307:20
**3.8** 307:20
**3/2021** 377:13
**30** 1:21 8:4 344:8
426:22 427:1
443:7 468:15
493:17
**30030** 2:15
**30th** 9:9,17 491:11
**31** 8:6 257:14
430:7,9
**32** 8:9 434:7,10
**326** 6:11
**33** 8:12 451:3,5
**339** 6:17
**34** 4:15 8:14 463:4
463:5 464:10
**35** 298:16,17
402:16
**355** 6:20
**361** 7:1
**37** 4:16
**375** 7:5
**38** 36:1
**388** 7:7
**394** 7:12
**396** 7:15
**3:25** 388:8
**3:36** 388:12

**4**

**4** 4:16 37:23 73:19
73:19 79:7 124:7
128:22 143:17
158:15 171:21,22
193:19 194:2
219:9 227:9
254:19 304:17
305:1,4 320:2
323:18 347:19

350:13 364:13
370:15 380:11
401:21
**4,432** 341:21
**4/5** 370:13
**40** 367:8 373:13
**41.7** 304:22
**411** 7:17
**414** 7:23
**418** 492:21
**419** 8:2
**427** 8:4
**430** 8:6
**434** 8:9
**45** 258:18
**45.5** 258:6
**451** 8:12
**46** 394:13 407:8
410:10 421:17,18
**463** 8:14
**472** 4:5
**48** 445:19
**4814384** 493:5
494:2 495:2
**489** 4:7
**4:07** 417:12
**4:15** 471:18
**4:20** 417:15

**5**

**5** 4:18 35:1 43:10
55:9,12 59:14
73:7,13,16,17,20
124:1 189:18,20
189:23 190:12,17
191:8,14,19 192:1
192:9,22 193:15
194:2 219:2,18
255:10 283:20
284:8,12,21
285:13,22 301:12
301:14,21 305:2,5

PLAINTIFFS002079

[5 - account]                                                                          Page 3

| | 7 | 9 | |
|---|---|---|---|
| 320:6 323:18 | | | **absence** 242:18 |
| 327:6 332:17 | **7** 5:2 7:16 38:21 | **9** 5:7 127:16,17 | 243:9 247:20 |
| 344:13 363:15 | 108:7 115:6 183:2 | 158:16 405:2 | 309:6 |
| 364:1 370:14,15 | 183:9 184:5,8,18 | 437:5 | **absolute** 245:15 |
| 383:10,12 388:7 | 185:4 187:3,9,13 | **9/30/2021** 493:5 | **absolutely** 43:19 |
| **50** 255:10 298:1 | 187:19 188:1,7,16 | **9/30/22** 492:21 | 60:19 61:12 |
| 351:21 369:8 | 327:7 330:10 | **90** 161:19 351:21 | 114:12 267:22 |
| **51** 446:2 | 342:22 351:3 | **900** 358:7 | 315:6 353:11 |
| **53** 445:11 | 357:16 378:5 | **90s** 100:21 161:12 | 462:5 |
| **53.9** 258:7 | 391:13 396:15 | **91** 31:14 273:21 | **abstract** 240:22 |
| **54** 258:18 419:20 | 397:4 398:15 | **92** 31:14,14 69:17 | 328:18 341:17 |
| 419:21 421:7,13 | 399:3 401:1 | 101:13,16 | 356:8 411:16 |
| 445:2,11,13 | 470:16 491:9 | **93** 101:14 102:22 | 453:12 |
| **54.2** 258:7 | **7,000** 345:2 | **94** 69:17,18 | **abundance** 293:21 |
| **55** 4:18 | **7/19/11** 382:16 | **95** 101:7 342:15 | **abuse** 8:17 70:17 |
| **59** 5:11 | **70/30** 8:2 | **97** 102:6 262:19 | 120:13 314:19 |
| **590** 3:6 | **73** 356:21 357:3 | **98** 129:20 | 449:1 450:2 |
| **5:07** 470:13 | 358:8 | **9:33** 79:4 | 461:15 462:11 |
| **5:14** 470:17 | **74.7** 344:16 | **9:44** 79:8 | 463:18,23 464:17 |
| **5:15** 472:4 | **779,270** 257:21 | | 469:2,13,14,16,18 |
| **5:29** 472:7 | | **a** | 469:20,22 470:7 |
| **5:47** 491:10,15 | **8** | **a.m.** 9:8,16 79:4,8 | **academy** 5:20 |
| | **8** 5:5 116:2 174:3 | 115:11,14 166:17 | 239:23 |
| **6** | 185:22 188:21,23 | 166:21 | **acceptable** 313:18 |
| **6** 4:20 40:23 41:14 | 189:10 378:15 | **abandon** 122:18 | 484:5 |
| 62:19 172:2,3 | 383:11 405:3 | **abdominal** 121:23 | **acceptance** 351:15 |
| 349:16,19,23 | **80** 142:1 161:8 | **abdominoplasties** | **accepted** 43:17 |
| 356:21 357:4 | **80s** 230:8 292:15 | 142:20 | 60:23 117:14 |
| 388:11 470:12 | **81** 422:12 | **ability** 413:12 | 373:17,22 374:4 |
| **6,000** 345:2 | **82001** 3:7 | 492:10 | 374:16 375:1,6 |
| **6,793** 341:21 342:6 | **83.8** 344:17 | **able** 11:15 66:18 | 391:11 402:18 |
| 343:11 350:17 | **87** 129:7 273:20 | 174:13,17 274:12 | **access** 102:2 113:9 |
| **6,800** 345:1 | 452:20 453:1 | 277:9 310:20 | 297:7,9 362:8 |
| **60** 17:10,12 359:22 | **884** 302:1 | 457:5 | **accessible** 74:8,9 |
| 369:8 372:11 | **889** 356:20 | **abplasticsurgery...** | **accidentally** 256:1 |
| **60,000** 359:18 | **89** 422:11 | 4:14 | **accomplish** 300:15 |
| 360:18 | **8:30** 9:8 | **abps** 27:22 28:8,19 | 459:19 |
| **600** 3:12 | **8:31** 9:16 | 28:23 29:12,23 | **account** 51:13 |
| **62** 4:20 | | 30:10,13,15 31:3 | 307:20 308:2 |
| **63** 35:12 | | **abreast** 69:12 | 362:11 |
| **6:30** 471:22 | | | |

PLAINTIFFS002080

accuracy 493:9
accurately 28:18
  28:23
accuse 127:13
achieve 66:15
  287:7 334:8
achieving 467:7
acknowledge
  230:1 327:9
  413:17
acknowledgement
  495:3
acknowledges
  253:23
acknowledging
  458:10,13
acknowledgment
  493:12
acne 140:2 145:14
  145:22 146:14
  152:21 153:1
acneiform 145:13
acronyms 458:7
act 285:22 454:15
  468:14
acted 329:4
acting 9:3
action 1:7 10:1
  172:15 207:6
  224:21 372:22
  492:16
actions 461:10
active 24:23 26:5
  26:20 100:16
  137:11 140:8
  171:19 322:21
actively 54:22
activity 265:11
  267:19
actual 50:20
  168:22 276:7

372:8 373:7
  432:16
acute 134:13
  135:10
adamant 71:12
add 62:11 398:20
  458:7
added 283:21
addition 78:5
additional 13:14
  215:22 265:7
additionally 243:2
additions 495:6
address 352:12
  366:19 400:19
addressed 363:5
addresses 400:10
  400:20 454:21,23
addressing 244:22
  384:4,5 456:22
adequately 368:5
adf 79:11,15 80:21
  80:22,23 81:5
  82:17 83:3,11
  84:4 98:7
adf's 81:11
adjusting 392:4
adjustments
  212:20
administration
  95:18,19 224:18
  224:20 253:4
  263:14
administrative
  257:12
administrator
  11:1
administrators
  452:2 464:5
admissions 313:15

admit 112:9
admits 373:4,5
admitting 24:10
  24:14
adolescence 161:8
  205:3 319:11
adolescent 368:12
  369:9,22 401:21
  401:23 402:12,17
  403:8,17,20 404:6
  404:16
adolescent's 403:2
adolescents 36:19
  51:5 157:19 158:9
  161:1 162:14
  238:15 239:6
  241:6 258:23
  399:16,20,23
  400:12,21 401:13
  402:4 428:16
  429:1
adopt 49:3
adopted 114:9
  310:22
adopting 51:13
adrenal 436:22
adult 368:12 369:9
  369:22
adulthood 161:11
adults 157:23
  158:5 259:7
  463:16,17 474:19
advanced 472:22
  475:10 476:10,20
advancement
  310:13
adverse 202:19
  334:21 484:11
  490:7
advice 77:6 160:22
  161:3

advise 210:3
advised 183:19,23
  197:8 472:20
  473:1,5
advising 204:19
  214:15
advisory 378:17
  380:15
advocacy 113:17
  116:9 117:22
advocate 113:8
advocates 105:12
aesthetic 66:11
  67:14 68:4,6,7
  335:4,4 476:2
  477:10
aesthetically
  144:11,12
aetna 8:4 425:7,8
  425:10,17,22
  426:8,14 427:5,18
  428:13,21 429:7
  429:15
aetna's 428:1,5
affairs 263:23
affect 121:10
  488:11,12
affiliated 59:8
  96:6
affiliations 10:11
affirmation 5:3
  43:14 51:4 109:18
  110:8 149:10
  151:15 373:19
  376:13 379:20
  382:23 384:22
  387:2 395:16
affirmative 481:14
affirming 8:4 35:5
  36:18,22 39:4
  40:4 41:7,18 44:1

PLAINTIFFS002081

51:23 54:10 57:12
63:14 77:18 78:19
107:12,20 111:6
111:18 112:21
114:9 115:19
117:15 126:10
127:4 130:3
131:16 132:18
133:16 134:3,17
137:4,10,18
151:13 164:15
168:12,17,17
175:20 177:22
375:7 390:1,15
391:2 424:9
425:17 426:14
427:5,18 428:1,7
429:8 433:19
482:18 485:16
**afternoon** 97:17
**age** 242:19,22
249:6 257:4,5
319:10 346:4,5,8
347:9,11 402:1
469:1
**agencies** 30:17
224:10
**agency** 221:3
224:17,19 229:12
**agents** 201:2
203:16 204:17
211:10 212:14
213:18 406:13
**ago** 15:2,16,20
24:3,15,23 44:14
99:21,23 100:1
103:18 123:1
129:11 130:18
170:9,10 196:6
202:7,11,14
206:16 225:10

247:21 290:19
301:19 325:10
**agonist** 317:22
**agonists** 201:8
**agree** 22:6 36:8
42:18 111:17
112:20 113:3,4,5
128:11 135:13
179:2,6 221:1
229:11 249:11
250:11 252:12
296:17 314:23
315:1,6 316:7
317:16,23,23
318:5 321:2,22,23
340:18 371:5,9
393:2 407:5 408:6
**agreed** 265:23
**agreement** 248:23
**ahead** 126:6 227:5
281:2,14 327:20
327:21
**aid** 492:8
**aim** 300:5
**aimed** 68:6
**al** 1:9,14 9:21,22
493:4 494:1 495:1
**alabama** 4:20,23
9:3,7 10:5 24:18
62:5,10,23 63:2,5
63:11,18 76:4,6
109:23 110:15,22
117:7 138:12,14
455:9 464:20
492:2,22
**alarm** 71:15
**alcohol** 333:21
**alert** 464:6
**align** 111:10
447:10 449:7

**allergan** 263:21
264:7,9 270:19
**alliance** 79:11
**allotted** 493:20
**allow** 32:18 243:1
428:6 479:13
**allowed** 179:16
180:7 229:20
**allows** 222:15
256:2
**alphabetically**
422:3
**altering** 244:19
290:2,17 311:5
**alternative** 250:2
250:14 252:11
**altogether** 251:3,5
**ama** 47:5,7,14
48:5
**ambiguous** 436:7
436:15
**ambulatory** 258:7
**amend** 18:19 19:3
**amended** 265:21
**amendment** 264:2
**amer** 26:11
**america** 123:21
**american** 5:9,20
26:13,16 27:13
30:8 32:9,10,17
43:1,2 44:18 45:2
45:14,15 46:1,7,23
47:8 48:10,15,18
49:6 72:3 89:14
89:19 99:16 100:5
100:18 102:20
108:11 123:23
124:12 128:12,13
169:7 171:12
185:14 190:5
239:1,23 248:5

282:4 283:8
300:17 313:2
474:23
**amid** 109:14
**amount** 169:19
**amounted** 304:21
**amounts** 402:16
478:9
**amputating**
289:21
**amsterdam** 6:17
326:7 340:9
**analogues** 431:14
**analysis** 86:13,14
276:3 302:2
307:19 410:11
**andre** 86:6
**andrew** 3:20 10:5
471:7,14 491:6
**androgen** 146:18
**androgens** 431:13
431:14
**anecdotal** 218:23
219:1 244:14
245:20 246:7
270:16,16 279:23
280:6,15,20 281:4
281:8,10,21,23
282:17 323:22
362:21 363:16
**anecdotes** 343:13
**anesthesia** 142:22
**angle** 132:17
**animal** 135:11
**animate** 266:16
**anorexic** 74:23
**answer** 18:19 19:4
83:1 110:21
124:17 125:23
126:5,8,19,21
127:1 150:20

PLAINTIFFS002082

164:7,11 181:4
186:16 215:4
251:1 269:12
274:11 286:16
294:1,8 324:8
374:22 409:18
426:2 477:16
**answered** 126:14
426:4
**answering** 261:17
**answers** 4:18
55:14 104:19
**antacids** 122:6
**anthropology**
442:6,12,23 443:4
443:11 450:23
454:3
**anti** 431:14
**antibiotics** 122:6
**anticipated** 80:13
186:18
**anxiety** 154:10
155:6 165:16
405:19 487:2
**anxious** 160:19
**anybody** 205:9
**anywise** 492:17
**apa** 49:2 190:8
191:18 192:19
194:11 239:4,20
240:15 242:1
243:8,15 248:2
250:12,19 251:12
251:19 253:15,20
**apa's** 239:9
**apart** 189:3 260:8
276:14 331:4
**apologies** 18:23
**apologize** 434:13
471:13

**apostolate** 452:4
455:6
**appalachia** 474:11
**apparent** 317:4
318:3
**apparently** 39:13
40:22 43:20 56:1
117:9 306:8
439:22
**appear** 201:11
303:17 395:5
423:21
**appearance** 10:11
60:6 61:6,10
71:13 144:13
154:18 238:21
265:9 465:20
**appearing** 465:14
**appears** 39:19
240:20 259:3
264:19 376:20
378:4 428:6
**appended** 495:7
**applicable** 493:8
**application** 205:13
205:16 218:15
219:10,11,15
234:11 235:7,12
237:10 244:11,13
247:9,23 252:19
265:2,7,20 266:21
267:6 270:15
310:9
**applied** 148:13
206:10 291:21
300:19 311:4,22
333:9
**applies** 460:17
**apply** 225:23
236:3 276:12
316:8 436:6

**applying** 245:4
247:15 318:15
**appointment**
207:12
**appreciation**
56:20
**approach** 249:13
**approaches**
105:23 228:9
**approaching**
83:21 219:21
307:12
**appropriate** 26:3
26:7 40:5 41:19
44:3 61:11 216:21
228:7 231:13
232:1 246:14
251:20 335:23
406:4
**approval** 6:5
236:3 243:9
263:17 265:6,16
266:17 267:8
269:10 334:7
**approved** 5:14
63:12 216:9,15
225:13,16 226:16
230:22 231:5,18
233:21 243:2
248:1 253:4,5
257:4 262:9,15,23
265:21 266:4
270:21 332:1
333:12 334:9
483:15
**approves** 231:9
261:2
**approving** 261:3
**approximately** 9:8
**april** 109:10 435:2

**apt** 20:3
**arc** 459:17
**archdiocese**
451:22,23
**area** 173:13 178:5
178:20 200:17
201:21 203:18
205:5 287:4 307:8
319:20 363:1,19
475:10
**areas** 104:1
210:11 221:11
311:13 479:4
**aristotelian**
459:14
**arizona** 62:14,14
80:1 93:3
**arkansas** 33:6,10
36:16 37:4 38:5
39:11 51:23 52:11
52:22 54:9 61:17
63:7 72:19 99:7
109:22 117:6
**arrived** 44:9,9
**article** 20:18 62:22
67:5 134:20
135:14 186:4
222:12 283:16
298:17 301:1
307:4 323:6,19
324:20 325:7
327:10 328:22
331:12 332:9
345:15 360:6,23
361:14 364:13
368:7 369:16
370:14 371:13,16
372:20 380:16,17
396:11 410:21
468:20 480:9,21
480:22 481:1

PLAINTIFFS002083

**articles** 12:21 21:7
74:12 129:3
222:10 274:1
297:10 298:2
306:21 336:8
377:19,21 382:2
412:23 440:20
480:3,7
**aside** 92:13 132:16
181:22
**asked** 73:18,21
79:19 91:7 99:2
122:23 126:14,15
152:1 155:5 180:2
183:21 292:18
318:9 336:9
453:23 477:12
481:6,18 483:7
489:11
**asking** 97:4 104:8
134:22 144:20
155:1 180:1
198:16 205:8
266:20 269:15
278:8,11 286:17
288:9,16 321:8
346:21 471:10
**aspect** 275:12
**aspects** 92:10
**asps** 5:2,5 101:10
101:15 102:8,10
102:17,23 103:6
103:21 105:10,11
106:1,20 107:12
111:5,8,16 112:7
112:13,20 113:7
113:16,18,19
114:8,14 115:1,5
115:17,23 116:8
169:10,18,22
170:8,13,23

171:19 174:18
176:9,14 177:9
179:4 180:8,15,18
180:21 181:9
222:9 284:5 296:5
297:12 301:19
306:5
**asps's** 117:4
**assert** 28:1
**assessment** 486:5
487:17
**assessments** 406:1
**assigned** 341:22
341:22 442:13,22
446:17
**assistance** 59:3
**assisted** 279:9
**associated** 265:10
267:18 438:11
**association** 40:3
40:17 43:2 45:14
46:23 49:7 182:9
190:6 239:1
380:13 428:17
**associations** 51:10
**assume** 155:7
169:21 208:19
362:16 381:16
382:8 433:16
448:9,9
**assuming** 409:13
**asthma** 220:15
**atrocious** 469:3
**attached** 8:20 12:7
27:10 34:8 38:1
55:10 62:20 108:8
116:3 127:18
171:8 223:19
230:15 233:1
239:17 256:16
263:11 299:16

326:3 339:19
355:19 361:12
375:17 388:21
394:10 396:21
411:5 414:23
419:18 427:2
430:10 434:11
451:6 463:6
493:11
**attaches** 70:23
**attempting** 110:7
386:18
**attempts** 116:20
**attended** 94:15,15
**attending** 133:6
**attends** 218:1
**attention** 89:11
109:14
**attitude** 222:13
**attorney** 91:19
92:6 493:13
**attraction** 454:10
454:16 455:2
**audience** 90:5
452:1 456:20
**augmentation**
142:10
**august** 25:10 38:5
141:13
**author** 133:2,5,7
340:14 359:18
361:18 365:10,14
366:3
**author's** 365:18
389:4
**authority** 261:3
**authors** 191:7
328:16 342:5
415:9
**autism** 487:4

**autologous** 142:8
142:9 299:7
**automatically**
395:23
**availability** 473:3
**available** 99:4
160:18 177:1
183:1 185:18
196:21 248:20
249:4,14 250:3,14
250:22 251:14
252:6,14 329:9
381:21 415:17
416:4,8 431:4
441:12 493:6
**avenue** 2:8,14 3:6
**average** 345:5,18
346:2 353:19
357:10,21
**avoid** 338:3,4
**avoided** 165:19
**aware** 17:14,23
19:12,13,14 20:17
37:8,16 42:1,15,21
43:6 54:7 78:11
127:12 149:9
170:13 171:3
181:9 182:20
193:19 201:3
211:8 233:5,7
267:5,6 352:23
353:3,8 367:20
370:7,17 376:6
425:10
**awkward** 325:21

**b**

**b** 4:10 20:23 33:2
58:2
**back** 14:14 18:23
19:3 21:12 26:12
30:12 31:9 43:7

PLAINTIFFS002084

53:20 72:16 73:1
100:21 101:7
106:18 115:13
119:16 143:10,16
148:15 157:4
158:13,15 166:1
200:21 202:13
207:8 216:5 248:8
252:16,17 264:20
266:19 279:19
292:5,11,15
293:14 319:18
320:9 323:3 326:6
344:23 346:1
359:8 367:6
373:11 380:10
396:12 397:16
404:22 407:7
417:14 420:5
421:6,18 459:14
463:7 471:21
472:6 480:3
**backbone** 308:10
**background** 378:6
378:11 380:3
**backpedal** 417:2
**backwards** 131:10
**bad** 92:11
**baker** 3:20 10:6
**balance** 466:5
**ballpark** 297:23
299:9 303:11
**ballparking**
262:20 298:15
**ban** 37:11 54:9
57:11 58:16 63:6
76:4,7,22 109:22
109:23,23 117:6,7
117:7
**bans** 36:16 52:5,23
54:23 61:20,22

76:16
**base** 120:7 233:23
281:21,22 398:9
399:9
**based** 71:22
117:21 124:3
140:12,13,13
161:4 177:7 178:1
185:10 220:3
228:19 246:2
249:1,20 250:7
292:12 305:12
331:14 355:14
378:12 405:23
432:16 436:11
438:23 441:8
443:5 444:14
483:2 487:17
**baseline** 392:5
412:20
**basically** 21:7 35:8
46:4 124:2 159:1
159:13,17 286:18
311:15 316:21
329:15 349:12
360:12 363:17
**basing** 119:21
**basis** 45:21 49:12
69:8 81:19 216:19
216:22 217:12
218:23 220:1,3
229:21 234:18
236:5,14 237:5
238:3,14 246:16
251:22 258:14,23
268:18 269:21
381:4,5 393:6
406:3 467:5 474:9
**battle** 77:23
**bcbs** 7:5

**bear** 388:17
**becoming** 19:19
20:11
**beginning** 79:7
91:15 166:20
245:12,13 246:13
247:1 284:14
308:17,23 309:3
320:6 329:21
383:18 386:18
388:11 403:16
445:18 470:16
**begins** 218:23
220:5 245:19
246:6 270:15
276:3 308:18
309:2
**behavior** 118:5
**behavioral** 77:22
**believe** 34:2 86:7
86:15 96:7 97:9
140:17 148:21
151:19 208:1
291:9 294:5
322:17 413:21
446:17,21 470:2
483:19
**believes** 111:9
112:13
**bell** 3:11
**belldavispitt.com**
3:14
**bells** 71:15
**beneficial** 150:12
**benefit** 70:23
82:22 206:12,20
206:23 222:21
223:4 241:12
248:21 285:20
291:10 310:6
311:10 330:8

331:9 385:11
387:20 413:4
414:2,3 420:18
423:1,6 431:4,18
435:19 437:8
452:9 485:3,5
489:18
**benefits** 8:3
204:21 207:19
208:14 214:16
215:1,7 223:1,2
235:15 260:4
293:18 386:1
420:14 438:13,15
438:22,23
**benign** 144:10
220:19
**benjamin** 380:12
**best** 97:5 122:14
124:20 125:19
248:20 253:9,14
381:17 382:9
416:4,8 462:22
480:20 492:10
**better** 71:14
119:12 289:16
290:3 343:5 372:6
381:21
**beyond** 69:11
125:11 210:3
219:18 246:20,20
247:16,21 313:12
314:11,12 337:13
337:15 352:2
**bias** 392:3
**biblical** 457:1
**big** 185:17 365:23
379:11
**bigger** 176:22
**bill** 4:20 62:23
63:12,20 64:2,11

PLAINTIFFS002085

**billroth** 123:11
**binary** 348:4
  349:2 351:14,16
**biography** 472:12
  472:14
**biologic** 443:12
**biological** 383:23
  443:20 446:22
  447:2,17 448:14
  448:15 450:3,6
  486:3 487:20
  488:7
**biologics** 5:18
  233:15 265:1,6
**biology** 444:9
**birmingham**
  455:9
**birth** 341:22,22
  383:23 442:13,22
  446:18
**bit** 93:12 97:2
  99:15 101:20
  442:5 467:21
**black** 350:5 387:5
  489:21 490:11
**blanche** 104:21
**blanket** 236:9
**blind** 271:16
  309:20,22 315:4
  315:16 317:17
  319:14
**blinded** 268:20
  271:12,19,21
  273:18 309:19
  318:10
**blockade** 161:16
  162:19 165:9
  219:17 238:19
  247:1,9 260:7
  416:14 482:17

**blocker** 201:3
**blockers** 36:21
  84:23 161:2,6
  163:12 203:21
  204:21 205:2
  207:20 208:15
  211:22 213:6
  374:5,9,12 396:1
  483:21 489:14
**blocking** 63:13
  81:23 162:16
  164:4 166:8 201:2
  201:19 203:15
  204:17 207:13
  211:10 212:14
  213:18 316:16,20
  317:21 318:2,11
  406:13,23 428:22
**blog** 408:8,17
  409:5
**blogs** 408:11
  409:20
**blood** 211:11
  212:2,18 213:17
  460:1,3,8 468:8
**blue** 375:23 376:1
  376:6,7 380:23,23
  381:8,8 382:1,1,21
  382:22 383:7,7,7,7
  429:14,15
**bluecross** 375:20
  379:15,18 424:7
  425:5
**blueshield** 375:20
  379:15,19 424:7
  425:5
**board** 22:20 23:4
  23:10,13,15,20
  25:4,13,17 26:1,13
  26:17,19 27:13
  28:10 29:12 30:8

  30:9,10 31:7,11,23
  32:3,9,10,17,19,20
  100:6,7,16,23
  101:2 102:5 128:7
  128:12,13 234:13
  235:20 476:23
**boards** 476:22,22
**bodies** 30:16,16
  47:9 66:15,22
  111:11
**body** 67:19,23
  68:22 69:4,20
  70:7,11 73:6,23
  74:14,22 75:1,10
  142:12 154:5,7
  218:4 319:5,9
  363:8,9 466:6
  467:17 469:5
**boilerplate** 384:14
**bold** 27:17 231:5
  422:8 430:23
**bones** 130:9
**book** 72:12
**booklet** 8:3 420:12
**bored** 452:22
**borelli** 2:12
**bother** 179:7
  250:17
**botox** 6:4 139:21
  140:19 141:1
  206:15 229:10
  261:20 262:1,5,9
  262:21 264:8
  266:4,17 267:14
  267:16 268:3,18
  269:19 271:3
  483:8,14 489:13
  489:18 490:10,16
**bottom** 28:16
  41:14 56:19 57:3
  57:17,19 64:7,8

  119:21 128:17
  168:8 171:15
  231:4 240:6
  242:16 256:3
  316:12 322:16
  326:11,14 350:6
  373:15 382:11
  405:12,13 422:14
  428:10 437:8
  440:4 451:13
**botulinum** 263:4
**box** 300:2 489:21
  490:11
**boy** 452:22
**boys** 165:13 369:8
**brains** 404:10
**brandt** 4:15,16
  33:2,16,23 34:19
  36:10,15 42:17
  43:4 51:21 88:16
  99:7
**branström** 276:17
  276:21
**break** 79:5 115:12
  115:16 143:23
  166:18 254:17
  319:22 320:4
  322:8 346:5 388:9
  390:6 417:13
  470:14 471:19
  472:5
**breast** 44:15,23
  142:10,19 147:15
  149:3 220:16,20
  222:7 290:21
  291:5,11,14,16,19
  292:9,22 293:18
  294:9,13 299:4,6
  480:4,11,17,23
  481:4,4

PLAINTIFFS002086

**breasts** 287:17,18
290:8
**brief** 480:2 484:11
**briefer** 96:21
**briefly** 489:7
**bring** 185:15
250:16
**bringing** 83:11
**brings** 250:15
**britain** 53:19
248:3 260:12
**broad** 131:22
290:10
**broadcast** 465:14
**broaden** 235:12
**broadened** 267:5
268:14
**broader** 454:20
**broadly** 88:14,18
152:5
**brow** 130:16
266:16
**brown** 216:7
280:5 368:18
377:19 395:6
**brown's** 18:22
**bucks** 379:12
**built** 95:13
**bulk** 124:14 291:9
**bullet** 28:22 29:8
116:19 117:1
432:2 435:8 456:3
456:12
**bulletin** 225:11
227:12
**bullets** 431:8
459:2
**bunch** 366:20
377:21 378:16
379:1 435:8

**burden** 235:13
484:18
**business** 125:17
385:13,22,23
438:9 439:3,21
**butler** 9:1 10:8
492:19,20
**bylaws** 101:6

**c**

**c** 2:1 9:1 16:16
256:19 277:14
322:18 360:10
414:15,15 445:6
446:13 492:1,1,19
492:20
**calamitous** 346:23
**calendar** 14:15
**california** 103:19
272:16
**call** 49:14 98:23
182:19 267:2
271:3 284:17
343:12 360:19
363:7 365:6 366:8
366:12 381:18
432:21 433:3
436:10 466:5
**called** 12:18 79:11
99:1 102:3 120:8
138:11 143:4
186:10 388:1
407:12 455:4
465:15 466:2
478:4
**calling** 60:21
76:15 363:17
**camera** 255:23
256:7
**campos** 7:1 360:7
**canal** 479:7

**cancer** 142:14,14
143:1 178:19
289:14 299:5
468:2 475:6
476:16 480:17
**cancers** 143:5,6
144:14,15
**capacity** 183:20
184:1 197:9 404:7
404:10
**capital** 182:14
279:23 373:16
**capitalized** 456:9
**capsules** 222:8
**care** 7:15 40:4
41:7,18 53:8 54:2
63:14 72:23 77:18
109:13,18 113:10
113:20 116:7
122:11,14 124:23
132:8 138:1 139:3
150:17 151:13
152:11,12 154:23
157:4 165:18
182:16,19 183:2,9
184:5 186:10,11
189:11 196:14
199:7 213:2,11
223:6,8 258:4
272:23 351:11
363:19 394:22
395:16 396:15
397:4 398:15
399:3 401:1
424:17 444:5,6
448:2 450:5 459:6
459:10 463:14
464:4 473:8,9
475:7,10 478:11
482:21 488:13

**cared** 347:12
444:2
**career** 28:18 95:22
129:2 137:16
**careful** 359:7
406:3 468:7
**carefully** 202:13
251:11 363:18
462:17
**caregivers** 403:4
**caretakers** 402:2
402:23 403:10
404:17
**carey** 3:6
**carmichael** 7:17
35:18 410:22
**carolina** 1:2 3:13
10:1,20,23 11:1
375:20 376:8
379:16,19 420:14
424:8 425:6
474:12
**carries** 490:6
**carrying** 109:15
**carte** 104:21
**case** 11:20 12:11
16:6,17 17:2,15
18:1 22:10 33:1,5
33:8,14,16,23
34:17,19 35:9,22
36:10,12,15 37:4,9
37:11 39:12,16,22
42:17 43:4 45:22
46:16,20 48:17
51:21 53:18 57:22
58:6,12 72:19
77:19 88:16,16
98:19 99:7 114:7
118:12 122:12,17
170:19,22 180:7
189:5 196:23

PLAINTIFFS002087

204:11 206:21
209:1,10 217:1,1,5
217:5 219:16
220:1,4 221:16
238:16,18 243:22
246:7,9 249:16
252:18 259:16
260:17 270:10
278:21,23 279:3,6
279:17 280:19
281:9 282:20
283:11,20 284:7
284:12 285:22
286:19,19,21,22
287:11 290:9,9
293:18 304:18
306:13 308:2,9,13
308:19,20,21
309:9 310:11,20
311:15 312:2,18
314:6,9 322:16
323:11,12 328:9
329:16 335:14,18
336:13 339:8
343:6,11 355:5
364:2,4 387:18
406:3,3 410:6
417:19,21 448:18
449:17 455:5
456:19 460:8,9
469:11,13 478:3
483:2,20 488:16
490:19 492:18
**cases**  40:12 92:23
124:8 143:12
145:20 209:7
211:15 236:11
271:13 281:7
283:13 310:5
354:19 369:8
457:18,22 458:6

476:23
**catchment**  475:9
**categorically**
292:7 294:6
406:12,17
**categories**  144:6
290:10 431:9
**categorized**  219:2
**category**  66:22
106:3 122:9 146:3
267:4 270:23
279:6 312:10,16
316:6 327:16
329:18 372:13
385:5
**catholic**  64:19
65:2 451:22 452:4
452:16 464:20
**causality**  413:15
**cause**  9:11 154:18
210:10 369:21
373:7
**caused**  81:23
121:21 150:10
276:21 344:22
**causes**  480:17
**caution**  245:1,2
311:8
**caveat**  391:23
**cb**  445:20
**ccr**  492:20,21
**cecilia**  186:5
329:22 389:7
**center**  96:5 298:20
298:23 299:3
328:9 343:3 475:8
**central**  9:9
**certain**  62:14 86:2
146:23 206:8
209:7 228:7 258:3
261:5 310:14

376:22 386:22
407:2 477:13
483:8
**certainly**  26:15
27:3 31:5 40:14
102:14,19 105:19
137:3 152:11
153:2 176:23
247:13 283:6
284:18 286:9
289:14 310:11
313:3 314:3
329:20 342:23
343:5,19 355:9
385:22 474:23
475:23
**certificate**  23:10
23:16,20,23 25:4
32:20
**certification**  23:4
24:7 26:5,20
27:18 28:1,4,12,19
29:1,10,11,12
30:14 31:8,12,16
100:8,17
**certifications**  23:2
**certified**  22:21
25:13,17 26:1,19
28:3,10 30:8,10
31:23 32:3,19
100:6 101:2 102:5
128:8
**certify**  9:4 492:4
492:14
**cessation**  365:17
**chairman**  95:9,11
473:21
**challenge**  36:16
83:12 455:23
456:1 467:20

**change**  8:14 60:3
186:2 194:1,21
260:3 271:15,22
309:18 372:11
382:3 412:19
464:15 481:13
482:3,7 494:4,7,10
494:13,16,19
**changed**  107:15
110:21 122:22
123:2,18 186:6
247:7,8,10 380:21
380:22 443:20
446:18,23 447:3
481:17 488:14
**changes**  81:22
290:3 311:5
413:13 484:17
493:10 495:6
**changing**  67:23
71:12 119:22
125:1,20 259:20
359:4 464:21
**chaplain**  455:17
**chapter**  455:8,15
455:17
**character**  372:1
**characteristic**
339:4 416:21
**characteristics**
165:15 243:18
350:14
**characterizations**
380:11
**characterize**  81:10
82:17 118:22
132:5 385:18,20
**characterized**
68:2 74:6 235:15
336:4

PLAINTIFFS002088

**characterizes**
124:1
**chart** 343:1 344:1
**charts** 418:1
**chastity** 454:16,21
455:3
**check** 212:19
246:3
**cherry** 3:12
**chest** 167:19 178:4
**cheyenne** 3:7
**chief** 121:19
262:12 306:10,12
**child** 8:17 82:6
161:5 165:5 166:6
209:10 238:20
309:19 317:6,15
405:15 464:16
469:18,22,23
**child's** 470:1
**childhood** 394:23
397:10,18 398:12
398:17
**children** 5:23
76:10 77:19 94:7
157:19 158:9,18
159:4,9,12 160:19
160:23 162:13
163:6,8,11,17,19
205:19 238:15
239:5 240:3,11,17
241:5 243:5
258:22 259:7,10
262:15 318:12
395:10,22 397:20
397:23 398:17
399:21 400:2,5,18
400:20 401:3
404:4,6 406:20
461:15 462:3,9
463:15,16 468:23

469:7
**childrens** 241:5
**chimed** 46:4
**choose** 432:20
438:8 462:17
**choosing** 303:18
436:10
**chosen** 449:23
**christian** 442:6,11
442:23 443:3,10
443:11 450:22
**chromosomal**
487:17
**chronological**
15:15
**church** 452:5
**church's** 456:13
**cigna** 8:6 429:16
429:19 430:12
**cigna's** 431:18
432:7
**circle** 20:15 216:5
**circles** 283:6
**circumstance**
237:11
**circumstances**
210:8 216:20
228:8 251:7
285:18 407:2
424:3 478:1
**citation** 297:13
**cite** 13:9 108:18
109:5 238:6
322:16 377:18
389:22 399:8
407:11 410:21
414:9 415:4
**cited** 13:15 325:7
343:7 360:6 378:2
382:2 389:17

440:9,19
**cites** 227:11 327:6
335:14
**citing** 361:15
410:10 453:14
**civil** 1:7 9:5 10:1
**civilian** 476:7
477:7
**claim** 29:11 45:16
276:6 352:16
392:23
**clarifications**
364:16
**clarify** 482:9
**clarity** 300:22
**classification**
384:6
**classified** 348:9
349:4 384:7
**classifies** 232:13
**classify** 385:7
**clearance** 206:18
**cleared** 205:12
235:23
**clearer** 73:20
**clearly** 82:20
150:13 152:22
244:14 288:1
312:13 362:2
**clin** 400:16
**clinic** 138:1,4,17
139:3,20 140:6,13
152:12 342:1,7,14
345:3
**clinical** 73:9
120:10 229:6
235:22 236:15,17
236:19,21 237:3
237:22 243:4,11
245:10,20 246:11
246:17 247:20

249:3,13,18 250:3
250:21 251:13,23
252:6,9,10,13
269:4 291:8
292:19,23 364:8
364:10 398:16,21
400:4,16 412:1
422:23 440:4
441:6
**clinician** 245:23
**clinics** 138:6 400:1
**closed** 185:9 187:5
195:13
**closer** 289:8
**clue** 324:3,4
**cme** 69:22
**cochrane** 7:23
35:17 414:10
415:2,19 416:11
**code** 5:8 169:11,14
169:22 170:8,13
170:23 171:12
173:12 174:19
176:9 179:4,8
180:8,15,18,21
181:7,9,16 195:5,8
224:8
**cognitive** 77:21
**cohen** 380:17
**cohort** 6:18 7:10
7:20 249:23 250:1
250:8 257:11
270:8 277:23
278:2,5,8,10,19
279:14 281:17
289:11 291:12
292:13,18 298:10
298:13,23 299:4
304:1 305:8 312:1
323:9 340:9
345:19 411:9

PLAINTIFFS002089

412:4 415:13
cohorts 298:20
coincidental 19:16
collaborating
480:14
colleagues 287:3
collected 124:8
collection 328:10
329:16 355:6
407:22 408:1
collections 246:8,9
colloquially 168:8
316:12
column 224:16
225:4 242:15
248:16 252:21
307:15 326:17
350:23 391:20
columns 302:13
combat 473:16
474:16
combination
452:15
come 45:10 72:10
73:13,15 79:19
98:18 99:6 105:21
107:1 145:12
146:1 149:2
154:15 160:17
181:15 185:23
199:9 201:8 207:8
248:8 350:5
396:12 471:21
comes 270:18
275:11 297:13
340:7
coming 47:21 90:3
148:4 326:5
330:20 346:1
361:6 380:4

commencing 9:8
commended
303:20 305:23
comment 479:13
comments 187:17
191:18 199:11
224:22
commercial
434:19
commission
492:23
commissioner
492:22
committee 4:19
45:19 47:4 49:2
55:16 63:11,19,21
65:7,15 185:9,18
189:1 194:8,15,23
382:7
committees 45:8
46:11
committing 67:15
121:6 126:11,12
127:5
common 19:19
20:14 142:3,6,19
145:15 146:17,19
148:7 255:4,15
259:1,6,8,11 303:6
commonly 20:11
21:19,22 22:2
60:23 147:23
201:13 295:9,22
463:19
communicated
16:6 56:2 208:6
communicating
59:9
communication
56:11 77:1

communities
373:23 488:20
community 43:18
45:7 225:11
226:14 293:5
328:6 402:18,19
473:8
comorbidities
487:1
comorbidity
463:20
companies 291:23
292:14 385:4,21
437:1
companion 63:20
company 67:10
206:17 270:20
376:21 377:6
380:4 385:10
386:15 387:9,19
424:15 431:21
432:12 436:10
438:21
comparable 94:18
comparative
304:1
comparator
282:22
compare 250:8
354:9,19,21
compared 89:13
353:21 372:10
391:1,9
comparing 299:7
355:14
competence
487:10
competent 120:8
485:11
competently
485:12

complaint 12:19
292:4
complete 11:16
495:8
completed 265:19
493:17
completely 118:19
completing 398:10
complex 121:23
143:11
complexity 476:20
477:2
compliance 29:22
30:3 170:23
complicate 486:19
complication
244:18 329:5
334:16 336:17
complications
176:18 177:1,4
178:9,15 226:9
237:9,16 244:20
327:1 337:1,3
338:9,17 339:3,4,6
355:2 358:16
complies 180:14
comply 169:14
components
404:14
comports 31:2
comprehensive
342:18
compromise
467:18 468:6
compromised
119:8
computer 492:8
conceal 319:7
concept 460:16,17
concern 44:16
70:21 118:22

PLAINTIFFS002090

218:17 244:2,22
245:6
**concerned** 180:17
181:23 206:1
247:18,18 449:11
**concerning** 376:21
**concerns** 119:4
180:5
**conclude** 180:6
**concluded** 258:10
**concludes** 343:4
491:11
**concluding** 36:3
**conclusion** 38:11
357:14 393:11,17
**conclusions**
277:12 330:11,15
331:8 337:6
371:19 410:19
415:9
**condition** 72:22
114:2 122:5
150:16 151:9
157:7 194:12
205:14 211:1
217:19 218:8,14
220:20 231:19
249:15 291:22
292:10 422:21
**conditions** 66:4
74:18 75:9,15
144:16,18 145:13
154:2 155:13,15
157:10 210:9
215:14,14 252:4
318:15 436:18
487:22 488:11
**conduct** 211:7
320:15
**conducted** 185:4
187:2,12 198:7

275:5 485:12
**conducts** 119:14
**confect** 443:4
**conference** 8:12
69:23 79:17 81:15
92:15 103:22
104:4,16 222:12
450:19
**conferences** 69:9
103:15 106:22
107:7 188:5,11,14
192:6,7 200:1,2,8
**confidence** 345:22
**confident** 59:2
**confirm** 156:9
157:2 219:13
486:9
**confirmation**
116:21
**confirmed** 229:5
**conflating** 266:11
**conflicts** 199:5
**conformity** 400:13
**confused** 76:9
458:12
**confusing** 450:7
458:9,14
**confusion** 457:18
457:21 458:17
**congenital** 310:14
474:17 475:2
**connection** 61:22
**connor** 446:7
**consen** 49:13
**consensus** 41:3,22
41:23 42:13,14
44:8,11,20 45:5
46:7,12,12,17
47:12,14,21 48:5
48:16 49:3,14,14
50:10 112:17

**consent** 68:19
119:1,2,7 208:22
209:1,3 211:7
253:7 401:22
402:1,13,17,22
403:9,17 404:11
404:15,17 484:23
487:9,10
**consented** 402:3
403:4
**consenting** 314:10
359:7
**conservation**
481:2
**conservative**
284:16 285:6
**consider** 13:19
60:16 92:22
102:10 150:15
151:22 152:10
161:20 181:20
182:5 203:17
247:14 266:14,22
289:23 329:3
362:15 423:7
459:3 469:15
484:6
**considerable**
109:14 169:4,19
213:10 371:17
**consideration** 38:9
406:4 424:20
**considerations**
437:9 489:17
**considered** 232:17
253:6 254:2,5
267:11 281:8
283:4,6 285:14
286:5 288:11
289:6 316:1,2
381:9 382:1

384:23 387:3,14
408:12 424:10
436:19 441:22
442:2
**considering** 61:19
63:6 106:7 161:1
166:7,8 314:4
**considers** 113:19
425:17 426:14
427:18 428:13
429:7 433:18
435:22 437:21
**consist** 297:17
298:13 305:7
390:14
**consisted** 304:13
390:18
**consistent** 114:3
128:11 222:2
303:15 335:3
486:23
**consonant** 112:16
346:11 462:21
**consort** 277:13,20
**construct** 338:23
467:23 478:14,15
**constructed** 323:2
**consultant** 378:17
**consultation** 162:5
166:9 208:2
**consultations**
140:1 158:22
159:23 160:9
163:4
**consulted** 144:6
158:17 163:20
164:19 187:9
**consummately**
287:20
**contact** 297:11
455:15,16

PLAINTIFFS002091

contacted 58:23
98:20,22 99:13
contagion 367:17
368:1 369:18
370:10,20 371:6
373:3
contained 215:11
442:23
containing 257:12
contains 12:9
13:17
contemplate 403:7
content 492:7
contest 77:17
context 258:18
477:13,20 479:21
continue 113:7
439:22 485:10
continued 98:6
237:18 247:19,20
261:9
continuing 100:7
contouring 142:12
contradictory
114:1
contraindicated
241:21 242:10
contraindications
406:7
contrary 39:11,14
39:20 40:10 42:9
118:11,19 395:5
contrast 475:21
contributed 56:21
191:7
control 52:8,10
270:11 271:8
278:21,23 279:3,6
279:17 280:8
302:17 307:20
309:6 316:6 390:2

390:10,13,18
412:8
controlled 268:20
269:4 270:2,19
271:2 272:19
273:7 274:21
275:16 286:4
291:7 292:23
293:10,20 298:3
305:8 412:1
415:13
controls 279:8
304:4 392:3
controversial
324:6 363:19
369:12 373:9
398:6
controversy 44:14
125:3,6 222:6
363:21 410:3
412:16 413:23
conversation 14:6
15:3,22 48:20
56:13 87:12 92:1
165:19,20 330:23
461:2 488:5
conversations
12:14,22 14:10
87:15 104:16
120:3 287:2
conversely 424:1
convey 88:11
163:10
convincing 252:16
coordination
317:12
copies 15:6 493:14
copy 88:7 127:22
core 116:13
corner 171:15
263:13 451:13

corporate 7:5
376:12
corporation
263:21
corpsmen 474:7
correct 11:21
12:11 23:5,6,8,9
23:11,12,17,18
24:22 25:14,15,18
25:19,22 28:12
29:23 30:4 31:13
31:21,23 32:1,4
33:3,7 34:1 36:19
36:23 48:3 52:2
63:7 65:4 75:12
75:23 76:1,4
109:6 112:22
114:12 128:14
129:9,10,16,17
130:4 132:19
133:17 136:23
137:1,6,8,12,15,19
137:20 138:2
149:5 150:6,23
152:7 153:7,8,12
153:16,19,22
158:8,12 163:1,3
167:5,6,11,12
168:9,10,14,19
174:22 175:6,8,11
175:15,18,22
176:17 178:22
183:2,3,13 184:1,5
184:6,19 187:3
188:8,11,18
189:18,21 190:1
190:10,19 191:5,8
191:9,14,16,20,22
192:2,4 193:10,13
197:4,7,10,11,14
197:15,19 198:3,4

198:8,10 200:4,6
200:15,18,22,23
204:4,5,7 207:14
208:7 213:20
214:12,13,18,19
215:2 216:15,16
216:22 221:4,8
226:17 239:10,12
241:17 242:3
246:17 252:1
262:3 264:15
267:19 269:6
270:4,5,5,9 272:10
272:11 273:9
274:2,3,5,6 278:2
278:5 288:23
293:7 294:19
295:11 296:5,6,9
303:4,5 307:22
316:6,14 317:1
319:3,15 340:5
357:22 362:9
365:2 370:11,21
375:22 379:17
384:20 390:16,17
392:20 393:13
398:18 406:14
407:14 412:9
417:22 418:4,13
418:22 419:2,3,8,9
419:12,13 421:1
430:3 442:14
446:1 448:18
455:11 456:8
465:4 475:14,15
475:18,19 477:14
477:17,18 479:23
480:5 481:22
483:10,16,17,23
487:23 492:11
495:8

PLAINTIFFS002092

corrected   392:4
correcting   346:22
correction   372:18
corrections   495:6
correctly   288:18
corresponded
    77:5
correspondence
    56:6
corrugator   263:3
    266:12,17,18,23
    267:9
cosmetic   6:4 45:1
    71:3 262:16 263:4
    267:15 296:20
    331:2 386:16
    423:3,22 425:3
    467:7 476:2
    477:10
counsel   9:20 10:10
    12:15,23 99:13
    492:15 493:14
counseling   157:15
    157:18,18,23
    158:5 159:17
counselors   464:5
count   42:5 351:2,3
counted   348:17
counterfeit   60:6
    61:6,9 338:23
country   104:1
    324:22 433:14
county   492:3
couple   14:13 15:1
    15:16 63:8 93:23
    146:2 196:5,12
    301:23 394:3
    398:5 472:11
    476:8
courage   451:14
    452:4 454:7,14,21

455:8
course   16:4,5,17
    18:20 71:15 73:2
    75:1 92:1 99:18
    146:23 165:2
    295:1
court   1:1 9:1,23
    10:8,12 16:11
    33:6 38:9 39:10
    43:4 53:20 182:13
    260:11 325:13,16
    325:20 350:3,9
    389:13 414:15
    426:1,6 449:15
    471:9
courts   54:1
cover   215:6
    379:21 385:10
    386:15,15,17
    387:20 420:22,23
    423:22 426:9
    432:14,16,20,23
    433:1,4 437:3,4
    439:6 487:13
coverage   8:6
    376:21 385:6
    386:4 424:16,18
    430:13,21 437:13
    473:6
covered   377:2,3
    385:23 421:10,22
    422:18 423:15,18
    424:2 432:19
    435:18 436:19
    438:12,14,22,22
    452:11
covering   385:14
covers   435:21
    437:12
coveted   121:18

cranial   133:13
craniofacial
    309:12,16 310:19
    475:2 477:4
create   60:6
created   226:12
    456:4,13 457:17
credentialing
    30:16
credentials   172:12
credible   123:3
    280:16
credits   69:23
crestwood   24:17
cretella   94:23
crime   244:9
criminal   109:17
criminalize   4:21
    63:1 110:7 116:20
criminally   52:11
criteria   70:6,13
    71:4,8 72:9 73:22
    275:18 277:14,20
    292:12 300:19
    333:9 351:8
    356:23 377:4
    385:1 386:22
    387:10,11 401:9
    401:15 427:20
    428:18 429:2
    435:9,15
critical   213:2,11
    272:23
criticism   352:3
criticisms   371:13
criticize   216:7
criticizing   49:19
    183:10 359:11
cross   36:22 82:1
    94:1 161:10 164:9
    213:7,22 214:11

214:16 219:17
    238:19 247:2,10
    260:7 318:6,20
    319:14 370:1
    375:23 376:6
    380:23 381:8
    382:1,21 383:7,7
    404:2 416:13
    417:5 429:15
    437:14,22 457:15
    482:17
crow   268:5,7,8
crow's   141:4
    262:5 268:10,11
crr   492:20
crucial   466:20
cs   493:15
ct   446:11
culpable   127:11
cultural   447:7,8
cure   422:21
curing   291:17
current   28:11
    32:20 50:8 51:1
    79:21 99:19
    196:13,17 296:19
    392:7 398:8 399:9
    439:20 482:11
currently   24:10
    25:13 31:22 32:23
    43:15 61:18
    137:23 139:21
    189:11 321:6
    367:12 371:7
    415:16 416:3
    485:11
cursor   350:4
cv   1:7 10:2 30:5,7
    127:20,21,22
    135:23 136:15
    472:11 480:4

PLAINTIFFS002093

**[d - demand]** Page 17

| | | | |
|---|---|---|---|
| **d** | **dawning** 433:22 | 217:1,5 248:19 | **defense** 2:13,19 |
| **d** 4:1 20:23 33:2 | **day** 9:9 104:5 | 285:22 286:19 | **definable** 71:18 |
| 203:4 322:18,18 | 153:23,23 189:17 | 330:19 356:3 | **define** 240:9 |
| 389:13 | 189:17 353:17 | 357:5 380:8 403:2 | 386:18 424:15 |
| **dale** 1:14 10:21 | 495:15 | 404:11 444:12 | 438:8 |
| **damage** 119:22 | **days** 18:22 493:17 | 484:20 485:1 | **defined** 173:12 |
| **danger** 132:7 | **de** 2:14 194:11,22 | 487:8 488:6 | 257:3 287:9 |
| **dash** 360:9 446:12 | 195:7 242:5,9 | **decisional** 357:15 | 390:11 423:11,14 |
| **data** 86:12,13,13 | 359:19 360:20 | 357:22 | 431:21 438:11,20 |
| 161:23 212:8 | **deacon** 64:19 65:2 | **decisions** 208:16 | **defines** 173:22 |
| 219:13 243:5,12 | 464:20 | 328:21 | 459:5,9 460:13 |
| 257:13 272:23 | **deal** 475:4 | **deck** 88:4,7 | **definitely** 71:23 |
| 273:2 275:2 276:4 | **dealing** 76:14 | **declaration** 4:15 | 87:10 143:10 |
| 276:13,20 277:2 | 218:14 244:17 | 22:17 33:23 34:12 | 248:8 330:2,2 |
| 277:11 279:10 | 313:23 | 35:2,12 36:2 | 333:17 438:10 |
| 280:1,6,15 281:4 | **dear** 264:22 | 457:10 | **definition** 45:17 |
| 312:21 329:9 | **death** 311:3 | **declare** 283:15 | 174:3,7,16 218:19 |
| 344:6 352:19 | 490:18 | 495:4 | 288:17 422:11,15 |
| 361:22 371:18,20 | **debate** 389:6 | **declared** 53:22 | 423:16,21 428:5 |
| 381:5,21 406:18 | **decade** 219:21 | **declares** 436:6 | 436:12,13 438:7 |
| 406:22 407:22 | 225:10 | **declined** 100:7 | 439:2 468:12 |
| 408:1 416:22 | **decades** 229:18,18 | 226:20 305:3 | **definitions** 423:12 |
| 417:3 | 312:5 | **declining** 226:5 | 424:14,16 437:2 |
| **database** 7:23 | **decatur** 2:15 9:7 | 473:8 | 443:3 |
| 257:12 | 10:5 64:10 138:14 | **dee** 10:23 | **definitive** 157:4 |
| **date** 9:4 93:7 | 138:22 139:11 | **deemed** 253:8 | 219:8 249:5 |
| 108:21,22 185:21 | 140:11 160:14 | 422:6 495:6 | 251:15,15 283:23 |
| 186:8 190:3 196:7 | **december** 257:14 | **deems** 253:12 | 344:4 362:23 |
| 265:22 268:13 | 265:2 | **deeper** 358:2 | 363:3,22 |
| 430:17 435:1 | **deceptive** 172:13 | **deeply** 358:21 | **deformities** |
| 492:12 494:24 | 172:19 | **defect** 71:6 290:14 | 310:15 474:18 |
| 495:12 | **decide** 23:19 100:2 | **defective** 120:7 | **deformity** 71:18 |
| **dated** 38:5 55:16 | 221:6 284:12 | **defects** 468:3 | 475:2 |
| 108:14 109:4,9 | 379:20 | 482:6 | **degeneration** |
| 224:13 265:2 | **decided** 37:12 | **defendant** 22:10 | 44:18 |
| **dates** 459:14 | 49:2,13 146:22 | **defendants** 1:15 | **delayed** 133:11 |
| **dating** 72:16 | 166:9 387:19 | 3:1 10:19 11:20 | 317:9 |
| **daughter** 409:7 | **deciding** 439:5 | 33:9,13,15 | **deleterious** 487:20 |
| **daunted** 458:17 | **decision** 6:21 47:5 | **defending** 11:2 | **demand** 199:3 |
| **davis** 3:11 273:12 | 53:23 121:11 | 79:11 | 312:17 |
| | 131:20 177:9 | | |

PLAINTIFFS002094

demanded   313:21
demands   314:13
demographic
    368:10,11 369:5
    372:11
demonstrate
    268:21 269:4
    270:2 310:20
demonstrated
    245:3
demonstrates
    486:23
demonstrating
    130:8
denominator
    323:20 352:11
denver   8:12
    450:19 451:22,23
deny   64:22 466:11
department   95:12
    473:21 474:4
depend   286:8
depending   258:16
    282:6,6,9 301:16
depends   321:7
deponent   493:13
    495:3
deposed   14:19
    17:16 18:2
deposing   493:13
deposition   1:19
    9:19 10:3 11:3
    12:16 13:13 14:23
    15:8,11 17:19
    18:5,6,12 19:2
    181:8 470:22
    491:14
depressed   154:15
depression   154:10
    154:17,19 155:6
    487:3

derive   176:13
    177:8
dermatologist
    143:3
describe   72:22
    94:5 158:22 257:2
    277:19 282:22
    331:2 383:20
    442:20 472:19
    474:1 475:20,21
    477:23
described   73:16
    130:17 305:15
    422:23 483:12
description   73:20
    383:15
descriptions   29:13
deserve   444:4,4
deserves   150:17
design   274:8 276:2
    276:4,19 277:18
    309:7 319:13
    391:23 413:10
designed   274:4
    275:18 278:2,14
    278:23
designing   275:11
    480:19
desire   194:10,20
    237:18 329:6
    333:3
desistance   161:5
    161:23
desisting   161:9
despite   309:9
    406:21
destroy   119:23
    467:6,19
destroyed   478:7,7
destroying   468:12

destruction
    178:20
detail   65:18 84:1
    470:5
detailing   432:22
details   37:18
    82:11 90:9 160:16
    163:17 210:18,21
    409:11
determine   241:17
    300:5
determined
    423:12
determining
    293:10 423:6
detran   366:5
detrans   364:19
detransition   7:2
    367:1
detransitioned
    322:11
detransitioner
    86:18 87:3,4
    151:4
detransitioners
    320:21 324:9
    364:22
detransitioning
    147:16,19 149:2
    151:7 365:13
    366:2
develop   165:14
developed   165:15
    188:16 189:12
    190:5 193:15
    200:13,21 382:18
developing   187:13
    187:18 190:17
    191:14,19 198:7
    199:12 444:17

development
    133:11 184:4
    188:6 190:12
    191:8 192:8,22
    197:13,17 200:3
    379:14 403:22
    436:9,16,21
developmental
    82:6
developmentally
    317:8
device   234:11
devices   5:19
    130:11 233:15
    310:13
devoted   104:6
dhejne   7:7 186:5,5
    329:22 389:6,7,7
    389:10 390:23
diag   72:8
diagnose   69:3,20
    73:22 153:6 154:1
    155:6,14 157:10
    195:4
diagnosed   156:2,8
    205:14 330:17
    405:15
diagnoses   155:20
    194:14
diagnosing   66:3
    73:5 74:14,17
    75:9 155:12
diagnosis   22:3
    68:2 155:23 156:9
    156:11 157:2
    194:21,22 313:14
    329:4 366:15,17
    373:10 383:19
    385:8 386:19
    422:20 432:17,18
    486:10,11

PLAINTIFFS002095

**diagnostic** 70:6,12
71:8 72:8 194:16
195:5,8,8 282:8
301:20 377:3
406:4
**dialogues** 106:22
**differ** 392:2
487:15
**differed** 258:4
**difference** 94:8
135:14 322:9
365:23 387:13
476:3 477:6
**differences** 392:5
475:22
**different** 42:6
43:21 88:13 114:8
144:5 155:2
184:17 188:1,5
190:16,21 191:7
191:13 192:1,6
199:17 203:14
249:8 269:15
317:15 319:20
343:6 366:23
394:22 395:12
397:21 399:21
400:2 431:8,8
489:13
**difficult** 67:2
124:16 271:16
352:15 354:18
**difficulty** 44:7
47:23 91:2 92:2
102:18 104:10
105:4 112:6
484:22
**dig** 358:20
**dimitry** 491:5
**diocese** 64:20

**diplomates** 27:23
28:2,23 29:9
**direction** 165:9
**directly** 16:8,18
133:18
**director** 263:23
378:20 379:3,6
**disabuse** 456:20
**disagree** 234:21
308:13
**disagrees** 40:17
42:23
**disappeared** 96:10
**discerned** 488:21
**disciplinary**
172:14
**disclose** 280:5
**disclosed** 210:5
381:13,15
**disclosing** 14:5
216:8
**discomfort** 194:18
**discontent** 383:22
**discordance**
158:19 368:14
457:6
**discounted** 101:23
**discourage** 26:22
162:18,22
**discover** 463:22
**discovered** 67:12
229:2
**discovery** 308:19
**discrimination**
276:6
**discuss** 92:7 188:6
192:8 240:10
280:6 320:14
339:2 461:22
488:1

**discussed** 154:5
175:3 180:19
192:13 200:3,4
222:9 328:3 399:4
**discussing** 119:1
153:11 412:12
445:9,20 462:2,8
469:15
**discussion** 72:18
87:14 90:8,13,20
91:1 93:14 327:12
407:10 456:18,19
466:18 488:4
**disease** 156:3
231:19 422:22
**disorder** 67:19
68:1,23 69:4,21
70:7,12 73:6,23
74:15,22 75:11
154:6,8 193:20
242:20,22
**disorders** 192:18
192:21 436:8,15
436:21
**disparity** 89:18
**displaced** 131:6
**dispute** 358:22
**disregards** 466:4
**dissatisfaction**
337:12,17 338:4
**dissatisfied** 67:1
**distant** 490:13
**distinct** 281:15
477:6
**distinction** 275:8
432:12 485:2
**disting** 484:2
**distinguish** 398:22
438:21 484:3
488:6

**distinguishing**
437:3
**distort** 486:19
**distressed** 162:7
**district** 1:1,2 9:22
9:23
**disturbance** 70:15
**disturbances**
67:22 68:20
**disturbed** 120:3
**divergent** 398:7
**divided** 348:3
**djordjevic** 6:15
322:17
**dmitriy** 2:6 10:14
114:18 126:14
471:12,22 489:5
**doctor** 11:10 27:8
34:6 49:18 55:8
61:1,11 69:16
79:9 108:6 115:16
117:13 126:19
127:16 153:5
166:22 209:20
210:2 213:2
216:14 217:6
234:17 238:1
246:15 254:22
261:14 292:16
332:14 335:12
353:16 367:1
370:6 381:6
386:10 388:15
407:20 408:20
417:17 470:18
489:11,22
**doctorate** 86:16
**doctors** 26:18
32:12,18 36:17
51:22 52:12 53:23
78:18 81:6 118:3

PLAINTIFFS002096

118:16 121:6
122:18 155:11
156:5 214:21
215:20 217:11
219:23 220:2
226:15 236:23
244:15 251:14,20
**document**   13:23
26:23 27:2 50:20
55:12 108:14
112:7 114:23
115:4,22 174:11
184:22 185:15,19
185:20 186:9,11
186:12 189:2
223:21 233:3,9
245:22 248:12
264:19 275:20
284:6 301:18
305:18,19 327:3
330:11 332:10
335:1,7 341:1,6
350:4 363:23
375:12 376:11,18
376:21 379:8
380:19 384:12
400:9 401:6 402:9
408:4 413:1
419:23 420:8
440:21 445:15
486:2
**documented**
235:10
**documenting**
235:14 485:14
**documents**   12:18
187:6 233:6 380:6
380:7
**doing**   25:2 85:5
98:16 106:10,14
123:7 124:20

125:19 141:14
176:8 178:12
246:19 260:4
261:6,23 262:5
269:23 272:18
286:13 287:12
290:4,5 305:19
309:21 312:22
321:16 439:21
469:6 476:10
477:3 484:21
**dose**   145:3
**double**   268:20
271:12,19,21
318:10 319:14
**doubt**   439:15
**dozen**   94:18
146:13 147:11
**dr**   9:19 11:2 14:18
15:8 16:6,9,15,20
16:22 17:1,4,6
18:7,11,21 19:10
19:10 33:12,13,18
33:20 34:12 39:15
39:15,21,21 40:11
40:11 42:10,10,19
42:20 43:23,23
57:21 58:5,11
60:13 64:9 67:7
72:2 78:5,5,6
81:17 85:10,13,15
85:20 86:3,6
92:13 94:23 114:6
114:6 216:7,7
255:21 256:19
264:22 377:19,20
444:21 445:13
464:19 472:10
475:11 481:6
483:7 491:1,12

**drafting**   185:4
187:3,9
**drafts**   188:1 192:1
199:17
**dramatically**
322:20
**drastic**   289:20
**drawn**   392:10
**dreaded**   181:14,18
**dream**   468:4
**drill**   210:18
**drilled**   467:14
**drive**   285:21
444:11
**drives**   286:15
**drop**   320:19 321:4
321:21
**dropping**   24:3
**drs**   280:4 395:6
**drug**   201:11
202:21 205:11,16
205:17,19 207:13
209:23 210:5
216:14,21 218:6
219:11,15 220:19
221:7 224:17,20
225:10,12 227:11
228:9 231:5,10,11
231:18 234:10,17
234:19 235:12
236:4,13 237:5,10
238:2 241:3
246:15 247:15
253:4 257:3,20
258:14 259:19
260:20 261:12
263:14 314:19
318:15 338:5
490:6
**drug's**   242:21

**drugs**   5:15,18,22
119:5 162:16
201:3,19 203:15
206:10 209:20
216:19 217:12,15
218:15,19,23
219:6 220:2 221:3
221:5,13,18 222:2
222:16 226:15
229:1,20 230:22
233:14 238:14
239:5 240:2,17
241:7 244:4,8
245:5,8,16 248:1
251:3,21 252:19
255:4,6,11 258:22
259:22 260:1,17
260:21 261:9,13
318:11 406:20
447:21
**dsm**   72:12 73:7,13
73:16,17,19,20
74:1,6 189:15,18
189:20,23 190:12
190:17 191:8,14
191:19 192:1,9,22
193:15,19 194:2,2
380:11
**dtishyevich**   2:10
**duly**   11:6
**duration**   15:23
**dutch**   342:14
**duty**   76:8 154:19
386:3
**dysmorphic**   67:19
68:1,22 69:4,20
70:7,12 73:6,23
74:15,22 75:10
154:5,7
**dysphoria**   6:18
7:22 8:8,10 22:4

PLAINTIFFS002097

41:6,20 49:16
65:10 80:19 84:19
85:7 111:10 130:4
131:2,17 132:19
133:17 134:4,18
146:21 150:6,23
151:2,6 152:3,7
153:7,12 157:20
158:1,6,10 162:15
163:1 193:21
200:15 205:15
214:12,18,23
215:19 216:10
316:19 319:1,15
321:4 329:11
340:9 353:2,10,22
354:4 367:14,23
368:13 370:9,19
373:21 374:17
375:2,8 380:13
383:19,22 390:14
390:19 391:8
393:19 395:1,11
395:23 405:9
411:11 429:9,20
430:14 431:2
433:21 434:22
435:17 437:13
438:3,12 443:18
458:1 460:18
481:22 482:13
483:22 486:7,17
488:19
**dysphoric** 195:18
**dystonias** 262:14

**e**

**e** 2:1,1 4:1,10
16:21,21 20:23
59:1,3,4 98:11,16
203:8,11 256:19
299:19 322:18

340:15,15 360:9
389:13,13 414:15
425:7 445:6
446:12,13 492:1,1
494:3,3,3
**earlier** 46:9 57:8
76:12 78:4 110:1
112:19 152:1
154:5 169:6
180:19 181:17
189:14 204:15
215:5 216:17
232:9 261:20
267:13 270:14
290:18 300:20
301:11 303:11
324:15 345:11
347:3 352:1,9
354:12 363:9
380:21 421:3
424:6 448:5 454:2
477:11
**early** 97:16 205:2
228:18 285:4
319:11 328:10
394:23 397:9,17
398:11,17
**earns** 386:6
**ears** 105:20
**easier** 16:14
**eastern** 474:10
**eating** 332:12
**ectopic** 133:11
**ed** 76:3
**edgerton** 106:8
125:8
**editor** 135:16
136:9
**editors** 135:21
136:16

**eds** 76:15
**educate** 296:14
**education** 2:13,19
**educator** 87:7
**effect** 43:5 146:15
146:17 245:21
246:1 313:10
317:18 319:5
330:7 412:20
414:7 484:11
490:14
**effective** 41:4
116:7 265:21
268:22 270:3
284:13 285:14
346:22 430:17
435:1
**effectively** 457:5
**effectiveness**
269:5 392:10
**effects** 81:21,22
82:5 205:17,18
217:16 234:4
235:3,14 237:1
317:3 318:3 319:2
319:13 447:21,22
447:22 482:22
487:21 490:8
**efficacious** 291:17
**efficacy** 219:14
235:9 237:17
259:20 329:23
331:13 346:19
347:6 387:22
439:1
**efficient** 116:8
**efforts** 54:16 78:7
78:14 83:18
110:18 113:7
116:9

**eds** 76:15
**eight** 45:23 313:11
337:13
**eighteen** 43:21
52:2
**eighty** 141:23
**either** 93:8 144:11
222:11 249:5
278:13,13 393:8
456:14
**electronic** 88:7
**element** 369:18
**elevated** 272:20
282:1
**eligible** 100:23
**emcee** 91:22
**emergencies**
436:22
**emery** 2:7 10:15
**emotional** 152:13
**emotionally** 119:8
**emphasized**
209:17
**employ** 420:16
**employees** 10:21
420:17
**enact** 76:7
**enactment** 57:11
**encapsulation**
220:17,21
**enclosed** 265:23
**encounters** 159:5
**encourage** 103:7
103:12 162:12,13
177:14 457:3
470:1
**encouraged** 95:6
165:21
**encouraging** 107:8
398:16
**endo** 195:16

PLAINTIFFS002098

endocrine 195:16
196:22 197:3,9,21
198:7,19 199:11
200:13,20
endocrinol 81:19
endocrinologic
81:19
endocrinological
81:21 156:2
endocrinologist
86:9 153:15
156:10 157:1
205:23 207:12
372:5
endocrinologists
149:19 198:16
203:22 204:1
207:18 208:13
277:1 418:20
endocrinology
81:18 204:3,7,10
213:1
endocrinopathies
162:21 213:9
endoscopic 129:22
130:8,17
enforcement
30:17
enforcing 37:11
engaged 83:11
engine 21:2,6
england 35:16
enrolling 237:3
ensure 116:6
ensuring 273:2
enter 153:1 176:19
entered 208:8
345:21 346:6,8
418:15
entire 46:14 95:22

entirely 104:6
entitled 240:2
entrance 480:11
entry 124:4
enumerate 209:7
enumerated 209:5
209:22 458:6
equation 206:12
222:22 485:3
erectile 333:2
erections 334:8
errata 493:11,13
493:17
erratas 493:15
erroneous 329:3
error 329:1,3
erythromycin
123:12
esophagoplasty
133:20 136:12
esophagus 133:23
esq 2:6,12,18 3:4
3:10
esquire 493:1
essential 275:22
448:13 467:6,19
essentially 44:21
112:2,9,12 146:15
161:13 165:21
271:17 282:23
380:19 395:15
474:10 478:5
established 311:12
475:1,7
esthesia 68:7
estimate 17:8,12
146:8 147:12
160:1 298:11
estrogen 214:2,21
215:18 318:23

estrogens 431:15
et 1:9,14 9:21,21
493:4 494:1 495:1
ethical 131:20
177:7,9 250:4
309:10 316:2
403:18
ethically 250:6
ethics 5:8 169:11
169:15,22 170:8
170:13 171:1,12
174:19 176:10,12
179:4,9 180:8,15
180:18,21 181:8,9
181:16,19 182:1,3
217:22 218:11
314:13
europe 123:5
european 89:12,14
89:20 124:13
247:3,22 250:10
313:4
evaluate 275:17
evaluation 72:7
275:16
evening 14:13,16
event 359:5
events 165:2
202:19 410:18
everybody 211:2
evidence 6:7 39:6
46:6 70:14,17,18
70:19 71:10 88:21
89:21 120:9 123:4
123:20,22 124:1
186:7 218:4 219:2
219:9,9,18 234:2
242:23 243:16,17
243:21,23 244:13
244:16 245:20
248:20 249:1,7

250:16 252:12,16
252:18 259:20
260:5,10 261:7
280:20 281:16,22
283:7,17,21 284:2
284:7,8,9,10,21
285:5 288:1,6,14
288:22 289:7,18
290:4 291:10
292:1 293:16,22
294:1,11 295:11
295:16 299:20
300:6,22,23 301:8
302:10,23 303:13
303:19,23 304:11
304:14,17 308:15
309:8 311:16
312:6,18 313:19
313:21,23 314:10
314:14,17 317:18
323:14,16 324:16
327:15 328:10
329:14 337:19
341:8 352:17
359:12 362:16,21
363:3,14 365:16
366:22 370:13
374:19 398:9
399:9 408:12
410:3,18 412:18
413:23 414:3,3
415:16 416:4,8,9
439:1,19 440:4
441:6,8,12 444:15
447:16 452:12,16
453:19 454:4
469:5 481:19
482:4,11,20
484:19,21 486:14
evidencing 145:12

PLAINTIFFS002099

evident 89:17
271:23 310:6
404:3
evolution 82:13
181:18
exact 196:6 259:12
268:13
exactly 15:2,17,18
15:20 42:14 56:12
77:3 114:4 156:22
324:5 371:1,3
400:22 408:10
examination 4:3
9:11 11:9 70:16
119:12,13 312:13
363:1 447:18
472:9 489:10
examinations
406:5
examine 165:22
251:10 344:5
examined 11:7
312:12 358:13
480:15
examiners 477:1
examining 71:16
example 44:13
45:13 71:9 77:20
81:17,23 83:22
103:17 104:3,20
121:15 130:15
136:8 140:14
155:18 156:1,14
156:23 178:4
205:10,11 206:15
206:23 207:23
220:15,18 226:10
229:9 270:13
271:18 276:16
281:6 283:11
284:5 287:13

292:1 310:12,23
312:2 316:8 322:9
328:8,10 331:11
331:16 334:9
336:6,8 343:16
344:1 351:13
360:13 368:8
412:18 436:9
437:1 439:9,10,12
450:8 452:19,20
460:1 467:21
468:5,9,11 470:2
476:14 478:2
examples 142:3
331:6 336:2
459:22
exception 154:4
165:7 315:21
exceptional 455:5
457:18,22 458:5
exchanges 98:11
exclude 236:18
excludes 425:1
exclusive 461:21
excuse 279:17
executed 229:5
executive 10:23
317:13 403:21
404:9
exemption 234:12
exercise 295:2
exhaustive 210:15
381:7
exhbiit 6:11
exhibit 4:13,14,15
4:16,18,20 5:2,5,7
5:8,11,13,16,20
6:1,4,6,16,16,17
6:20 7:1,5,7,12,15
7:17,23 8:2,4,6,9
8:12,14 12:3,6

22:15 27:6,9 34:5
34:7 37:22,23
43:8 55:7,9,12
62:17,19 108:5,7
114:15 115:6
116:2 127:15,16
127:17 170:11
171:5,7,11 223:15
223:16,18 230:12
230:12,14 232:21
232:23 239:14,16
255:19 256:13,15
263:7,8,10 279:20
299:12,13,15
308:6 320:9
325:23 326:2
339:14,14,16,18
339:20 355:17,18
361:4,11 375:14
375:16 388:14,18
388:20 394:7,7,9
396:9,18,20
404:23 411:2,4
414:20,22 417:8
419:15,15,17
426:21,22 427:1
430:7,9 434:7,7,10
451:3,3,5 463:2,4
463:5 464:9,10
exhibits 8:20 15:7
256:4 481:12
exist 219:18
488:10
existing 482:4
exists 410:3,4
expect 21:21 34:22
47:11 61:2 71:19
122:16 154:11
173:6 211:17
215:19 237:15
300:23

expectation
154:14 196:13
209:19 215:5,16
216:3 287:8
expected 206:13
209:9 287:20
expend 24:6
expensive 23:23
102:1
exper 281:11
experience 73:10
93:19 94:4 121:18
124:3 132:8
136:21 148:16
159:18 162:14
168:16,22 169:5
173:11,14,23
178:2,17 181:1,12
204:18,19 211:20
212:1,17 213:10
214:14 220:22
243:5,11 246:10
246:21 270:16,17
272:8 275:1 278:6
278:17 279:12
281:5,11,15,19
282:1 284:17
287:1,4 309:16
329:12 348:19
383:21 395:11
405:17 417:18
443:8 454:9 455:1
455:2 457:14,15
458:18 463:21
476:5 479:12
experienced 94:1
experiences
364:23 366:6
experiencing
158:19 162:3
344:20 348:18

PLAINTIFFS002100

experiment 271:8
experimental 35:6
  43:15 112:22
  113:2 117:16
  120:5 161:16
  217:22 218:11
  232:10,14 253:15
  254:6,11 288:17
  289:6 294:2 295:5
  423:2,9,17,22
  424:2,22 425:2
  481:16
experimentation
  253:3
experimenter
  272:1
expert 4:13 11:20
  11:23 17:9 18:12
  22:15 29:21 31:2
  31:9 33:1,15,22
  40:2,16 50:14
  57:22 58:5,12
  75:8 86:12 90:15
  91:3,8,11,13 92:16
  92:20,22 98:19
  126:8 127:2
  170:15,18 171:2
  172:6,21 173:10
  174:13,17,22
  176:7,17 177:19
  180:22 181:10
  188:15 189:10
  193:14 200:12,20
  203:13,18 204:7
  204:10 221:23
  243:20 249:6
  254:9 259:5,14
  260:19 261:11
  274:8 275:12
  322:3 329:8 374:3
  374:15,23 375:5

443:4 444:13,17
444:20 448:16
449:14
expertise 65:8,16
  66:3 74:16 75:14
  193:11 200:18
  201:22 204:3,12
  307:9
experts 18:1 22:10
  33:14 38:19 187:8
  198:12,14,20
  199:9 203:19
  205:5 409:19
  448:13 449:16
expired 23:16 25:4
  28:4 29:9 31:16
expires 492:21,23
explain 324:9
explained 100:8
explanation
  159:14 369:5
  457:11
explanations
  355:4
exploration 215:9
explored 399:2
exposito 7:1 360:7
express 56:20
  275:4 406:18
expressing 92:14
  92:19 217:10,14
  222:1 289:4
expression 397:23
expulsion 172:15
extensive 90:8
  107:6 288:4
  309:15
extensively 228:10
extent 51:12 127:9
  155:22 209:14
  211:15 218:21

external 310:12
  450:15 479:6
extra 397:1
extracted 352:14
extremely 326:22
extremities 142:16
eyes 105:20
  468:14

**f**

f 174:5 203:8
  446:11,13 492:1
face 71:20 131:1
  142:9,15 143:7
  256:8 289:13
  310:14,18
faces 146:5 195:1
facial 130:9
  145:13 146:1
  147:5 152:9
  166:23 167:3,7
  175:4,9 290:14
facilities 473:5
facility 474:1,20
  474:22 475:8
fact 40:15,19 44:2
  46:15 54:21 59:2
  68:18 114:13
  118:2 137:9
  161:18 166:3
  179:13 181:15
  222:18 228:8
  237:19 250:16
  260:11,22 299:11
  314:16 319:7
  328:22 339:9
  344:5 380:6,23
  391:11 402:7
  433:15 439:15
  476:21
facto 242:5,9

factor 368:9
factors 423:9
  424:19
factual 37:15
  128:4
failed 280:5
fails 493:19
failure 320:14,15
fair 34:15 74:18
  78:16,21,21 114:5
  136:17 148:1
  149:4 160:4
  162:16 168:11,15
  189:12,13 193:16
  193:18 203:16
  215:23
fairly 22:8 59:2
  75:2 90:20 91:1
  131:21 159:6
  259:1,8,11,18
  435:4
faith 444:16
fall 252:16
fallback 53:12
falling 252:17
  260:8
falls 260:23 261:2
false 172:13,19
familiar 50:8
  76:10 79:10,14
  127:9 178:8,9
  203:1,2,6,10
  211:15 212:6
  213:4,8 255:7
  341:2 479:16
  490:19
familiarity 212:22
families 81:4
  97:20 158:18
  159:1,7 164:18
  205:1,21 457:7

PLAINTIFFS002101

**family** 82:4 93:23
94:6 209:2 210:20
309:22
**famous** 85:22
**far** 22:7 144:8
178:12 185:6
247:15 313:16
381:3 482:22
**fastidious** 292:8
306:16
**fat** 44:15,22 142:8
142:9
**favor** 64:10
105:12 351:19
**favorable** 63:15
484:12
**fda** 5:13,16 6:4
80:17,20 205:12
206:18 207:2
216:8,15 218:5
220:7,12,22 221:2
221:12,17 222:4
222:12,15 223:9
225:6,10 226:1,13
226:16,20 227:11
227:17,21 228:18
229:19 230:2,8,19
231:8,9,22,23
232:12,13,16
233:4,5,8 234:16
235:11 240:15
243:2,9 245:22
253:5 257:4 261:1
262:8,23 263:21
266:4 269:11
270:21 483:16
490:2
**fda.gov** 230:18
**fear** 95:10 162:9
**feasible** 309:10

**february** 108:15
109:2 115:2
**federal** 5:11 9:5
33:5 221:2 224:1
224:3,8,9,10
**feel** 54:3 104:9
351:11 372:6
420:4,4 479:11
**feeling** 348:4
349:2 351:16
**feelings** 68:7,8
**feels** 114:14
194:19
**fees** 100:11
**feet** 141:4 262:5
268:10,11
**felt** 195:3
**female** 6:12
322:23 323:2
341:23 390:7,8
456:4 457:17
488:7
**females** 368:12
369:9,23 372:14
488:9,12
**feminization**
130:15 166:23
167:4 175:9
**fensolvil** 203:7
**fertility** 468:13
**fetal** 131:11,12
136:8
**fiduciary** 386:3
**field** 21:19 22:3
61:1 132:11 212:4
305:7 322:22
409:19 415:17
**fif** 332:18
**fifteen** 332:20
**fifth** 465:22

**fifty** 445:4,7 446:3
**figure** 272:7
324:11 364:4
**file** 396:23
**filed** 9:22 409:8
**final** 302:2 459:19
485:8
**finalized** 188:2
192:2 199:18
**finally** 134:11
147:14 227:3
419:4
**financial** 109:16
199:5 473:12
**find** 21:15,23 51:6
51:19 53:21 72:11
72:14 77:16,23
104:18 113:11
179:19,19 180:2
317:17 335:11
353:19 360:18
365:5,21 366:7
391:7
**finding** 39:10 91:3
311:9 354:15
**findings** 37:16
38:12 371:21
**fine** 19:4 97:5
384:16
**finish** 227:4
248:12
**finished** 469:15
471:10 491:3
**finland** 35:16
248:4 394:1,17
395:4 396:11
404:23 405:9
406:11 407:11
410:12,15,18,20
**finnish** 7:12
394:19

**fired** 95:16
**firm** 10:6 234:1
**firmly** 111:8
112:13
**first** 11:6 28:22
38:8 59:22 63:10
84:8,15 85:9 86:1
86:4 89:1 91:19
94:9 95:1 96:3
97:1 101:9 107:3
109:12 111:8
116:5 127:19
129:6 130:7,7
170:12 172:10
192:18 202:12
225:9 229:2
233:18 245:9
248:13 257:19
262:8 264:20,22
268:17 272:5
284:23 285:1
300:2 307:18
308:8,9 317:19
324:3,4 326:14
330:16 341:17
347:10 358:2,4,6
367:10 396:16
419:22 420:5
435:14 436:4
439:9 440:8 456:3
458:18 459:2,3
467:12 470:21
472:21 476:8
481:1
**firsthand** 49:20
51:9 193:14
204:19 214:14
**fistula** 336:18,19
338:10
**fistulas** 178:16
338:21

PLAINTIFFS002102

**fit** 77:4 270:22
279:6
**fitting** 372:12
460:10
**five** 51:3 122:4
123:1,5 138:21
139:10 143:19
160:2,3 184:12
196:16 202:11
281:7 313:8 333:9
336:15 337:18
345:19 352:2
391:17 425:11
431:8,10 446:4
474:4,5
**fixation** 129:23
130:11 310:13
**flags** 71:21
**flap** 142:20 178:3
178:4,10,10,15,16
467:22,22 468:1,4
468:5,8 476:12
477:4 478:18
**flaps** 143:1 299:7
338:16 339:5,5
478:17 479:8
**fleck** 446:7
**flip** 285:8
**flood** 123:3
**floor** 2:20
**florida** 474:14
**flourishing** 460:7
**fluid** 134:13 135:9
**fluidity** 400:11
**fly** 358:5
**focus** 5:2 65:5
116:8 137:21
172:9 174:15
**focused** 356:13
**focusing** 145:5

**folder** 115:5
**follow** 7:7 28:17
143:15 146:22
161:11 164:17
208:20 209:12
313:8 327:18
331:16 336:5,10
337:22 339:21
345:5,9,18 346:3
346:13,16 347:9
347:14 352:13,18
352:20 485:7
487:12 489:4
**followed** 164:22
169:22 322:10,12
**following** 9:12
38:12 321:17
322:14 401:15
427:20 431:3
435:16
**follows** 11:7
**folwell** 1:14 9:21
10:21 493:4 494:1
495:1
**food** 221:5 224:17
224:19 263:14
**footnote** 41:10,12
41:12,16 42:5,8
227:9
**footnotes** 327:6
**forbidding** 44:22
**force** 51:17
**forces** 398:2
**forearm** 339:5
467:22
**foregoing** 492:5,9
495:5
**forehead** 130:10
130:12 131:7
140:22 262:1,10
262:22 265:10

266:6,15,22 267:1
267:17 268:21
**forgive** 293:2
325:18 332:12
**form** 8:16 21:14
21:20 22:5,12
26:6,21 28:13
29:7,15,19 30:1,22
31:4 32:14,21
34:20 36:13 37:5
39:18 40:21 41:21
42:12 47:6 48:7
49:23 50:6 52:6
52:14,19 53:1
54:13 55:3 57:14
58:17 60:20 62:1
65:17 73:14 74:19
76:18 77:13 78:8
78:20 81:8 83:6
83:15 88:17 89:3
90:17 91:16 92:17
96:18 97:12,23
98:8 99:8 102:12
103:10 107:22
110:3 111:20
112:23 113:21
114:11 117:3,10
117:19 118:6,20
120:20 126:13
127:7 128:15
135:18 136:18
137:13 148:2
149:14,18 151:14
154:3 155:16
157:12 158:7,11
162:17 163:2
166:12 168:20
173:5 175:1,7,12
175:14,17,23
176:11 179:5,18
180:9,16 181:2,13

184:20 187:4,14
187:20 188:12
190:18,23 191:4
191:10,15,21
192:3,10,23 193:9
193:17 198:9,23
199:15,21 200:5
200:10,16 204:14
204:22 206:7
207:16,21 208:18
211:13 212:5,21
215:3 216:1 217:3
217:8 221:10
222:5 226:19
227:19 228:15
229:22 232:7
234:20 236:6
237:6 238:4,9
239:11 240:19
242:4,12 243:13
245:11,17 251:4
252:7,11,18
253:18 259:2
266:9 267:21
269:1,7 270:6,12
273:10 274:9
275:14 281:1
283:7 284:9
285:16 286:20
288:15 293:13
294:20 295:12,18
297:20 298:5,14
303:9 305:11
307:6 311:18
318:4 323:3 324:2
333:15 342:20
352:7 357:23
359:2 362:19
364:7 367:2 371:8
374:8 376:10
381:11 382:22

PLAINTIFFS002103

383:2 385:17
387:6,16 395:13
399:22 406:15
407:6 408:14
409:10,16,22
410:13 412:14
413:20 416:1,6
424:5,12,23
425:15,20 426:17
427:22 428:4
429:3,22 431:19
432:10 436:1
438:4,17 439:7
440:14,17 441:10
442:16 443:15,21
447:1,12 448:19
449:10 451:19
453:21 454:12,18
455:12 458:2
459:11 460:20
461:18 462:6,12
463:23 464:16
465:6 466:6,19
467:3 469:8 492:8
**formal** 69:10,19
383:19
**formality** 96:23
**formally** 75:5
**format** 87:13
93:17
**formed** 170:18
259:5
**former** 107:18
179:14 181:19
**forming** 196:23
221:15 232:11
239:3
**forms** 70:20
131:19 144:9
252:16

**formulated** 424:14
**forth** 435:8
**forty** 307:12
**forward** 105:21
415:22
**found** 53:18 122:5
344:8 359:19
416:15
**foundational**
93:14
**four** 14:9 58:14
73:12 97:2 103:17
202:11 299:2
336:15 364:14
391:17 401:18
431:10 445:4,7
**fournier's** 478:4
**fourth** 57:16,18,19
348:1
**fracture** 129:22
131:6
**francisco** 86:14
272:17 278:7
**frankly** 313:1
**free** 178:10 339:5
339:5 420:4,4
477:4
**freedom** 79:11
**frequency** 257:2
**friend** 67:7
**friends** 48:18 49:1
104:3 151:18
**front** 324:21
**frontal** 129:21
133:12
**frontalis** 265:10
266:14,18 267:10
267:18
**full** 4:23 11:12
51:17 63:2 83:17
94:16 97:15

100:23 101:2
102:4 113:9 308:8
325:7 347:5
391:20 435:14
445:12
**fuller** 159:14
**fully** 314:4 346:18
416:19
**function** 319:9
333:3,4 345:12
403:22 466:6,20
467:4,19,20 468:6
**functions** 47:7
119:23 317:13
467:6
**fund** 2:13,19
**further** 38:9
172:18 227:7
228:2 237:10
240:9 324:18
337:19 364:16
390:6 414:4,5
492:14
**future** 159:3,11
462:16

**g**

**g** 3:4,5,10 16:16
299:19 493:1
**gained** 109:14
**gangrene** 478:4
**gary** 80:11
**gatherer** 279:11
**gathering** 272:23
**gears** 99:15 182:8
442:5
**gender** 5:3 6:18
7:2,22 8:4,7,10
22:4 35:5 36:18
36:22 39:4 40:4
41:6,7,18,20 44:1
49:16 51:4,23

54:10 57:12 60:16
60:21 61:4 63:14
65:10 76:9 77:18
78:19 80:19 81:20
84:18 85:7 107:12
107:20 109:18
110:8 111:6,10,18
112:21 114:9
115:19 116:20
117:15 126:10
127:4 130:3,3
131:2,16,16
132:18,19 133:16
133:17 134:3,3,17
134:17 137:4,10
137:18 146:21
149:10 150:5,23
151:2,13 152:3,7
153:6,12 154:6,6
157:19 158:1,5,10
158:19 162:15
163:1 164:15
168:12,17 175:20
177:22 178:13
192:17,20 193:20
193:21 195:18,18
200:15 205:15
214:12,18,22
215:18 216:10
312:3 316:18
319:1,15 321:4
329:11 340:9
341:23 342:7,14
353:2,10,22 354:4
367:14,22 368:13
368:14 370:9,19
373:21 374:17
375:2,7,7 376:13
379:20 380:12
382:23 383:19,21
383:23 384:22

PLAINTIFFS002104

387:2 390:1,14,15
390:19 391:2,8
393:18 395:1,11
395:12,22 397:21
398:1,11,18
400:11 405:9,18
410:10,17 411:11
424:9 425:17
426:14 427:5,18
428:1,7 429:8,9,20
430:14 431:1
432:3,7 433:19,21
434:21 435:17
437:13 438:2,12
443:18 447:11
449:7 457:6 458:1
460:18 462:3,9
479:22 481:21
482:12,18 483:22
485:16 486:6,6,17
486:20 487:18
488:19
**genderreport**
407:19 408:17
**genderreport.ca.**
407:17
**general** 106:5
121:17 122:2
123:10 165:1
208:11 209:13,19
210:12 213:1
223:5 247:11
272:5 273:8
274:17,18 277:20
294:21 295:7,8
321:8,11,15 322:5
326:21 391:3,10
436:14 472:17,21
473:1 480:13
484:23

**generally** 43:16
92:20 117:14
136:4 163:15,16
211:2,6 213:7
215:19 219:7
231:10 233:4,7
238:18 284:22
323:21 334:1
373:16 374:4,16
374:23 375:6
408:11
**generated** 276:18
379:8
**generates** 46:11
**generating** 50:13
199:7 372:20
**generation** 461:2
461:7
**generic** 201:11
**genesis** 456:6
**genetic** 201:10
**genital** 178:5,20
**genitalia** 323:2
436:8,15 479:6
**genitals** 290:7
**georgia** 2:15
**germane** 13:20,22
51:3 238:10
277:17
**getting** 119:2
208:22 289:8
355:8 402:22
**girls** 409:8
**give** 11:16 68:19
82:14 88:22
104:21 111:21
121:14 123:12
142:3 150:19
157:4 160:23
161:6 215:20,22
273:13 312:14

339:14 340:22
383:13 384:10
403:8 445:8 450:8
452:23
**given** 13:6 34:21
53:22 54:5,5 85:1
122:2 165:11
176:3 177:15
185:20 196:16
209:9 217:18
220:13 291:11
305:2 314:7 319:4
319:12 322:2
371:4 401:22
418:16 436:23
491:12 495:9
**giving** 63:15,15
86:18 94:4 97:7
159:16 235:11
402:12 450:17
**glabellar** 267:2,3
**glasses** 41:11
**gleaned** 195:12
**gloss** 340:20
**glossary** 173:12,21
173:22
**glossed** 13:19
**gn** 431:14
**gnrh** 431:14
**go** 16:13 19:3
26:12 27:14 31:8
35:1,11 36:1,7
38:21 43:10 56:15
57:1 58:1 59:14
64:4,14 71:16
72:13 74:11,11
78:23 87:15 110:4
111:7 115:8
116:16 119:16,16
119:18 126:6
128:17 129:18

143:16,17 149:22
154:11 158:13
166:4 171:21
174:3 188:19
202:12 207:3
210:2 218:7 225:2
227:5 231:2
242:13 245:2
248:13 254:12
256:9 264:10,20
279:19,20 281:2
281:14 289:22
297:8 302:5 308:5
314:9 319:18
320:8,11 327:20
327:21 330:10
332:15 340:7
341:13 347:19
349:15 350:10
358:1 359:8,13
364:13 367:6,8
373:11 378:5,14
380:10 381:12
383:9 384:9,16
388:3 391:12
396:11 397:15
398:17 399:11
401:5 404:22
405:2 407:7,8
413:6 415:6 417:9
419:19 420:5
421:6,6 422:11
428:8 430:21
435:12 437:5
440:1,23 445:2,2
446:2,8 451:8
452:19,19 453:10
455:18 458:21
460:22 465:8
469:10 470:4,9
471:5 484:13

PLAINTIFFS002105

491:7
**goal** 206:13
  459:19
**goals** 460:13
**god** 456:10,13
  457:10
**goes** 36:4 266:19
  303:10 424:20
**going** 9:16 15:14
  17:12 27:5 31:1
  37:4 46:11 55:6
  73:1 102:9 121:11
  123:14 125:23
  131:10 156:17
  180:2 185:23
  218:7 219:20
  223:14,15 230:11
  232:21 239:14
  256:13 261:4,15
  262:16 263:7
  271:15 283:10
  287:5 289:22
  291:16 298:7
  299:9 306:11
  313:9 315:12
  316:21 317:2,7,8
  317:11,12 319:1,6
  319:20 325:23
  328:9,14 353:5,6
  353:16 361:3
  364:10 375:13
  379:21 383:12
  385:10 386:5,7
  387:20 388:14
  396:8,10 397:13
  403:8 414:16
  415:20,21 420:22
  423:7,18 426:21
  426:22 430:6
  434:7 448:23
  449:12,13 457:12

457:13 464:7
  467:18 468:5
  469:4 485:8
  488:13
**gold** 249:3
**gonadectomy**
  344:13,19 345:7
  345:16
**gonadotropin**
  201:7,9 317:22
  428:14
**gonzalez** 2:18
**good** 9:15 11:10
  11:11 52:16 87:11
  92:10 124:23
  133:21 135:6,6,8
  164:1 251:8 261:6
  276:18 290:5
  311:15 312:23
  379:9 439:21
  472:2
**gorney** 67:7 72:2
**gosh** 170:9 186:15
  202:10 298:7
  313:6
**gospel** 450:18
**gotten** 124:10
**government** 77:4
**grabs** 123:2
**grafting** 44:15,23
  142:8,10
**grafts** 478:17
  479:8
**grand** 67:8
**grasp** 403:21
**great** 53:19 56:9
  89:16,18 104:5,10
  105:3 106:9
  161:20 177:12
  244:2 248:3
  260:12 286:12

287:12 290:6
  389:5 475:4 480:8
  484:22 485:5
**greater** 287:7,8
  311:7 390:2
  402:16 410:5
**greatest** 122:1
**greatly** 68:3 444:3
**griffin** 35:17
**grooming** 461:2,6
  461:8,11,12,14,21
  461:22 462:10,15
  469:2,12,14 470:6
**grounds** 466:3,15
**groundwork**
  462:19
**group** 45:11 88:12
  192:18,21 193:3
  242:19 249:6
  271:8,9 309:6
  322:21 367:15
  368:19 390:3,10
  390:13,18 412:8
  452:5 455:6
**groups** 184:17
  190:16,21 191:13
  192:7 266:15
  271:8 280:8 346:8
  368:20 483:9,15
**grow** 121:14
**growing** 109:15,20
  260:9 328:1 341:8
  360:14 363:8,9
  458:5
**grows** 476:5
**growths** 144:10
**guardians** 402:2
  402:23 403:10
  404:18
**guess** 12:18 69:5
  74:21 83:19 93:16

127:20 152:8
  160:15 176:16,21
  226:3,7 264:1
  279:8 288:9
  297:22 298:7
  301:2 303:20
  331:23 379:9
  471:17,21
**guessing** 98:3
  142:1,18 298:19
**guidance** 28:8
  29:22 31:3 32:8
  128:12 227:16
  233:3,5,9 238:7
  282:3 394:20
  398:21
**guide** 249:8
**guided** 248:19
**guideline** 186:12
  186:14
**guidelines** 7:12
  27:17 28:17 73:12
  195:17 196:15,22
  197:14,17 200:14
  200:22 394:1
  395:5,10,15,21
  401:2 402:10
  403:6 404:23
  406:11,22 407:11
  410:12,16
**guy** 125:8
**gynecomastecto...**
  148:11

| **h** |
| --- |

**h** 4:10 16:12,16,16
  55:20 182:13
  389:13 414:15
  446:12 494:3
**habit** 449:21
**hair** 139:22 146:1
  146:5 147:5

PLAINTIFFS002106

151:12 152:9,17
153:2
**half** 25:20 146:13
147:10 336:16
**halfway** 359:16
**hampshire** 111:1
**hand** 16:9 77:15
176:21 287:12
417:4 468:6,9
**handed** 269:10
**handle** 54:21
346:15
**happen** 220:2
259:15 358:14
**happened** 102:6
164:23 186:3
**happening** 60:4
61:5
**happens** 185:9
**happy** 333:8
**hard** 352:17
**hardware** 310:17
**harm** 67:4 70:18
162:9 223:7 290:6
313:13 314:19
333:21 334:10
347:2 413:4 468:8
487:3
**harms** 244:1,2
**harry** 380:12
**hazard** 297:22
390:4
**head** 109:8 131:5
279:5 468:2 474:4
**headed** 4:22 63:2
165:8
**header** 279:22
420:1
**heading** 434:2
**heal** 450:14

**health** 10:20 11:2
21:3 40:7 63:11
65:12 66:4 74:17
75:9,15,18,22 82:6
111:13 116:7
149:16 154:2,12
155:8,12,14 157:7
157:10 182:10,17
241:4 392:8 398:8
418:9 420:13
422:21 423:1
425:11 428:18
429:18 433:10,13
**healthcare** 7:4 8:9
57:12 80:18
149:12 153:21
231:10 376:3
434:9,18,18
**healthy** 120:1
289:21 392:2
**hear** 47:3 49:18
54:19 159:13
160:13 325:14
359:11 426:2
448:23 449:14
471:7,12
**heard** 14:20 17:17
37:6,13 50:15
63:19 73:12 85:2
96:9,14 98:13
102:22 160:11
230:6 233:10
269:12 425:7
442:5 488:15
**hearing** 38:11,16
38:19 63:20 65:14
71:15 162:8
447:13 448:8
**heart** 90:1 218:13
**heartache** 105:9
108:2

**heartbreaking**
95:21
**heartburn** 177:11
**heavily** 185:13
261:1 343:21
**held** 37:9 398:7
**help** 68:16 111:10
112:10 172:19
332:14 458:10,15
**helped** 485:17
**helpful** 83:2
308:14 355:7
**helping** 145:14
**hembree** 380:17
**hereto** 495:7
**hey** 333:8
**hhs** 224:18,20
**high** 88:10,22
116:13,16 117:4
145:3 158:23
161:17 166:4
206:20 218:10,16
222:21 223:3
258:18 312:11
314:5 359:6
420:21
**higher** 103:5
223:3,4 250:15
258:6 281:20
288:22 303:19
305:22 312:17
313:20,21 314:14
317:13 354:2,10
391:9
**highest** 415:16
**historic** 452:16
**historically** 72:1
**history** 70:15,17
220:14 226:10
247:16 324:15
368:13 427:9

**hold** 75:8 189:9
204:6 274:7 325:4
465:2 484:3
**holding** 252:8,10
**holland** 248:4
**home** 63:5
**honor** 447:16
**hope** 98:16 179:21
211:16 222:20,21
223:8 237:20
246:18 292:3
**hoped** 104:2
**hopefully** 246:2
**hoping** 124:23
**hopkins** 106:11
125:10
**hormonal** 416:22
431:12 481:14,20
482:12
**hormone** 84:23
159:20 164:4,9
201:7,10 212:19
212:23 214:3,7
317:22 319:10
345:7 374:16
375:1 376:13
379:21 384:22
387:3 400:5
416:13 424:9
425:18 426:15
428:14 433:19
437:14,17,23
483:21
**hormoncs** 36:22
82:1 213:7,22
214:11,17 216:9
219:17 238:19
247:2,10 260:7
316:16,20 317:4
318:2,7,20 319:4,8
319:14 373:20

PLAINTIFFS002107

394:21 401:10,14
404:2 416:13
417:5 428:22
447:22 482:17
488:18
**hospital**  24:11,14
24:16,17,21 95:18
140:12 142:17,21
262:17 473:23
474:6
**hospitals**  24:1,3
**hour**  15:5 16:1,2
87:20 319:21
**hours**  17:7,10,13
**house**  63:18
**hruz**  14:18 16:7,9
17:1 33:12,13
39:15,21 40:11
42:10,19 43:23
57:20,21 78:5
81:17 85:10 86:3
87:10 92:13 114:6
**hruz's**  15:8
**ht**  344:14
**huge**  147:13
287:18,19
**hugely**  286:12
**huh**  264:9 361:16
365:4 396:17
420:20
**human**  131:23
132:2,6,15 134:13
444:8 452:17
454:3 458:22,23
459:4 460:5,7,12
467:6,19
**hundreds**  121:1
**huntsville**  24:17
**hustle**  452:21
**hyperfunctioning**
156:8,12

**hyperhidrosis**
206:17 229:10
267:12
**hyperplasia**
436:23
**hypotheses**  372:23
**hypothesis**  372:20
372:21
**hypothesizing**
373:7
**hypothetical**
371:7,10 372:8

**i**

**idea**  48:4,14 49:12
52:17 159:12
177:13 188:9
192:12 255:13
269:3 307:7
379:18 380:1
381:10 402:16
425:16 426:13
433:18 456:20
**ideas**  461:9 469:1
**ideation**  487:5
**identification**  12:6
27:9 34:7 37:23
55:9 62:19 94:1
108:7 116:2
127:17 161:10
171:7 223:18
230:14 232:23
239:16 256:15
263:10 299:15
326:2 339:18
355:18 361:11
368:15 370:2
375:16 388:20
394:9 396:20
411:4 414:22
419:17 427:1
430:9 434:10

451:5 457:15
463:5
**identifications**
463:21
**identified**  145:1
145:21 318:11
344:19 348:10
349:5 356:21
369:1 374:10
428:16 429:1
476:19 485:22
**identify**  136:1
355:11 413:12
444:1 472:14
**identifying**  405:17
**identity**  154:6
192:17,20 193:20
341:23 342:7,14
398:1 462:3,9
486:6,21 487:18
**idiosyncratic**  22:8
**ignore**  415:21
**ignored**  348:11
349:7
**ii**  35:4 123:11
225:5
**illegal**  241:21
242:10
**illness**  384:7
422:22
**illnesses**  486:18
488:9
**imagine**  46:10
198:15 236:9
**immoral**  124:18
468:13
**immutable**  448:15
**impaired**  317:14
**imperative**  66:17
**impinge**  82:20
132:10 215:15

447:21
**impinges**  68:3
**implant**  148:8
220:17,20 222:8
**implants**  299:5
**implementation**
382:13
**implementing**
198:21
**implication**  254:2
**implications**  7:3
**imply**  28:2 241:20
242:3,5,7,8
**implying**  254:4
**importance**
248:21,23
**important**  93:20
162:1 213:3 241:3
247:12 353:14
392:6 399:7
400:11 460:3
**impossible**  319:6
**impression**  46:14
**improper**  206:5
216:18 241:21
242:9,21
**improve**  40:6
111:12
**improved**  6:9
300:7
**improvement**
66:16 265:8 266:5
**improvements**
295:20
**improving**  152:13
**inadequacy**
337:20
**inappropriate**
111:19
**incarceration**
313:14

PLAINTIFFS002108

incisions 134:7
inclined 294:23
include 38:12
  144:9 209:3,4
  215:10 331:3,7
  358:9 363:2
  412:15 415:12
  431:2 436:22
  451:17
included 72:17
  107:9 210:13
  225:16 267:3
  302:2 327:22
  452:11
includes 301:14,19
  303:23 437:14
including 36:21
  145:16 172:12,15
  173:14 274:20
  328:22 358:15
  379:5 431:13
  437:22 441:14
  449:6 463:16
  474:15 487:2
inclusion 243:1
  356:22
incongruent
  195:18
inconsistent 176:9
  179:3 222:3
incorrect 46:5
  150:16 448:20
incorrectly 447:23
  450:6
increase 328:14
  345:3 393:19
increases 328:13
  392:17 393:1,12
  405:19
increasing 328:6
  355:10

increasingly 328:5
incredible 86:20
incumbent 68:10
indicate 490:5
indicated 112:5
indicating 267:1
  268:10
indication 216:15
  221:8 233:21
  243:10 265:8
  268:4 314:17
  333:19,23 334:3
  478:19
indications 226:16
  228:21 334:5
  335:2 351:17
  406:5
individual 13:4
  17:14 241:13
  248:22 253:8,13
  417:18 431:1
  448:17 456:14
  479:15
individually 36:8
  188:20
individuals 41:5
  41:19 436:7
industry 19:8
  20:20 21:11 22:2
  291:14 293:4,8
  386:2 434:4
infants 241:4
infection 478:6
infectious 178:19
infer 199:1 413:15
inferences 392:9
inferring 237:8
inflection 122:20
  185:17
inform 209:21

informal 164:20
information 55:15
  57:9 58:15,20
  74:10 77:6,7,10
  123:6 194:10
  241:7 249:5
  251:16 280:16
  296:19 324:1
  380:20 381:17
  382:14 418:14
informative 392:7
informed 68:19
  119:2 209:1,2
  225:11 233:23
  235:1 401:22
  402:12,22 403:9
  404:11,15,16
informs 176:12
  223:7,9 444:9
inherent 113:23
initial 156:11
  235:4
initially 196:1
  337:16
initials 446:10
initiated 406:2
  407:1
injectables 140:1
injection 266:12
  266:13
injections 140:23
  261:20 262:1,5,22
injured 473:16
  474:16
injuries 178:6
  479:2 490:18
injury 422:22
innovations 229:4
innovative 294:22
innovators 295:6
  295:14

inpatient 257:13
  258:7
input 128:4 134:8
  198:17
insert 202:2,6
  206:3 209:6,9
  210:14 215:11
inserts 210:16
insist 449:17 450:4
insisted 283:9
instance 244:10
instances 273:12
institute 21:3
  53:20 260:13
institution 282:19
  308:22 312:19
institutional
  234:12 235:20
  246:10,21
instrument 140:17
  282:13 324:11
  332:23 333:1,12
  333:17
instruments 332:1
  332:3
insufficient 339:1
  398:9 399:9
insurance 291:13
  291:23 292:14
  376:20 385:4,6,9
  385:21 386:2,6,14
  387:9,19 423:13
  424:15,18 425:11
  429:18 431:21
  432:11,19 434:4
  436:10,12 437:1
  438:21
insurer 376:3,8
  420:22 425:7
  433:10,14

PLAINTIFFS002109

**insurers** 385:12
425:12 439:4
**insuring** 438:9
**intake** 70:20
**integrity** 273:2
280:10
**intend** 12:10 226:2
**intended** 316:23
**intensifies** 5:4
**intent** 234:8
**intentional** 60:5
60:17,22
**interchange** 56:14
**intercourse** 333:4
**interest** 81:3 92:15
199:5 253:9,14
284:15 462:22
**interested** 82:18
122:10 492:17
**interesting** 125:8
335:11 337:9
338:6 351:6,18
416:10 436:2
**interestingly**
357:8
**interim** 4:19 55:16
**interior** 67:21
351:10 450:14
**internal** 130:10
279:8 439:2
**international**
451:15 454:7,14
455:9
**internet** 359:20
360:20
**interpret** 274:19
274:21 275:6
276:4 277:11
352:15
**interpretation**
212:23 276:14

**interpreted**
392:16
**interpreting** 212:7
276:13
**interval** 345:22
346:13 347:4,14
**intervention**
106:21 112:4
124:6 271:22
400:17
**interventions**
89:22 90:7 104:12
145:16 315:20
330:8 369:14
399:16 462:18
481:21 482:5,21
485:16,20
**intraabdominal**
315:21
**intracranial**
272:20 315:23
**intrathoracic**
315:22
**intrinsic** 442:14
443:12
**introduce** 27:5
37:21 55:6 62:12
95:20 108:4
114:15 127:14
170:11 171:5
223:14 230:11
255:19 263:6
299:12 325:4
375:13 388:14
394:6 396:8 411:2
414:16 417:7
426:21 434:6
451:2 463:1
**introduced** 110:9
310:12 461:9

**introducing**
414:19
**introduction**
184:22 240:5
326:12 328:19
334:23
**introductory**
87:16 91:14
403:13,14
**introitus** 479:7
**invalid** 319:16
**investigate** 221:16
452:7
**investigated** 118:4
118:16 120:12
235:17
**investigating**
306:1
**investigation**
118:23 119:11
235:5 279:5,9
**investigational**
5:17 218:20
232:10,14,17
233:14 234:10,11
234:19 241:22
242:3 423:2 425:2
**investigations**
229:6
**investigative**
235:6
**investigator**
272:10 273:3
274:15 278:5
279:3 309:20
315:4,17
**investigators**
273:1 276:23
**investors** 386:3
**invitation** 80:8

**invite** 84:15
**invited** 79:16,18
80:4 81:16
**involve** 149:15
336:9
**involved** 56:8
58:19 78:6,13
98:18 99:6 110:22
143:7 184:4,18
190:12,16 197:12
197:16,21 272:13
278:18 279:13
306:20,23 334:5
371:23 402:4
441:19 472:19
475:4 476:1 477:9
479:14
**involvement** 54:15
78:10 379:14
**involves** 36:15
51:21 271:7
274:12 467:16
**involving** 478:17
**ir** 235:23
**irb** 236:3 237:12
237:14,19,20
246:12
**irbs** 235:23
**irrelevant** 186:1
**irreversible** 119:6
287:15,17 484:16
485:5
**isolated** 129:21
351:12
**isolation** 70:19
71:11
**issue** 47:14 56:9
65:9 67:18 77:15
89:17 92:8 95:8
95:10 106:17
114:14 163:21

PLAINTIFFS002110

177:13 194:17
218:13 241:4
243:22 244:21
251:11 259:21,23
287:11 346:19
385:8,9 398:7
400:11 457:8
483:2 488:1
**issued** 264:16
**issues** 53:16 66:12
66:13 82:7,8,19
85:6 92:11 119:10
123:9 199:6 213:3
233:5 291:15
346:10 351:13
438:7 452:12
453:19 462:3,9
487:7
**italicized** 59:19
**items** 401:18
421:11 422:2
**iteration** 415:14
**iv** 172:4,5,6

**j**

**j** 322:18,18 340:15
389:13
**january** 141:20
257:13 427:12
**jeff** 91:20,23
**jefferson** 492:3
**john** 3:4,5,8 10:17
493:1,2
**johns** 106:11
125:9
**join** 101:9
**joined** 101:11
**joint** 4:19 55:15
**jones** 10:23
**journal** 12:21
102:2 135:17
284:5 296:2,8,13

296:17 297:1,3,17
298:12,17,22
300:10 302:22
303:6 304:13
305:14,20 306:3,4
306:22 307:1,11
307:22 331:12
364:3
**journals** 128:19
129:4 274:1
**judge** 37:9,15 38:4
179:12,21 180:2,4
231:12
**judge's** 42:4
**judgment** 241:16
295:3
**judgments** 486:20
**julie** 444:21,21
**july** 7:6 33:23 37:8
38:11,16 141:15
141:20 383:1,5
**jump** 285:4
**jumping** 456:17
**june** 55:16
**justice** 77:3 444:4
444:5
**justifiable** 484:13
**justifiably** 309:7
**justified** 294:5
314:4
**justify** 287:21
293:22 482:16

**k**

**k** 256:19 445:6
446:13
**kadel** 1:9 9:21
12:23 493:4 494:1
495:1
**karolinska** 260:13
**keep** 69:12 88:4
332:7 378:23

**kept** 37:3
**kettenis** 380:17
**kevin** 3:10
**key** 71:8 291:15
345:9 413:11
**kicks** 337:12
**kin** 492:15
**kind** 20:15 32:12
52:4 54:23 76:22
81:6 82:12 87:9
91:22 98:16
110:18 119:11
125:10 150:4
153:21 154:2
164:14 168:12
175:4,9,20 176:5
179:17 185:2
186:6 187:1,7,11
187:16 191:11,17
198:6,11,14
199:10 201:19
208:2 220:17
223:5 229:7
285:21 286:14
288:7 332:7 355:5
358:13,23 366:7
369:21 390:20
416:21 450:2
470:22
**kinds** 52:9 208:23
**kitchen** 131:4
**knepper** 3:4,5 4:5
10:17,18 14:3,23
15:4 21:14,20
22:5,12 26:6,21
28:13 29:7,15,19
30:1,22 31:4
32:14,21 34:20
36:13 37:2,5
39:18 40:21 41:21
42:12 44:5 47:6

47:16 48:7 49:23
50:6 51:15 52:6
52:14,19 53:1
54:13 55:3 57:14
58:17 60:20 62:1
65:17 73:14 74:19
76:18 77:13 78:8
78:20 80:2 81:8
83:6,15 88:17
89:3 90:17 91:16
92:17 96:18 97:12
97:23 98:8,20
99:8 102:12
103:10 107:22
110:3 111:20
112:23 113:21
114:11,18 115:9
117:3,10,18 118:6
118:20 120:20
126:3,6,13,20
127:7 128:15
135:18 136:18
137:13 148:2
149:14,18 151:14
154:3 155:16
157:12 158:7,11
162:17 163:2,14
166:12 168:20
173:5 175:1,7,12
175:14,17,23
176:11 179:5,10
179:18 180:9,16
181:2,13 184:20
187:4,14,20
188:12 190:18,23
191:4,10,15,21
192:3,10,23 193:6
193:9,17 198:9,23
199:15,21 200:5
200:10,16 204:14
204:22 206:7

PLAINTIFFS002111

| | | | |
|---|---|---|---|
| 207:16,21 208:18 | 425:15,20 426:17 | 136:5 141:23 | 277:13 282:14 |
| 211:13 212:5,21 | 427:22 428:4 | 142:2 145:12,16 | 283:22 285:3 |
| 215:3 216:1 217:3 | 429:3,11,22 | 146:12 148:8 | 286:22 290:6 |
| 217:8 221:10 | 431:19 432:10 | 156:17 159:19 | 295:23 296:22 |
| 222:5 225:22 | 436:1 438:4,17 | 160:7,8,15 163:8 | 298:16 299:10,10 |
| 226:19 227:19 | 439:7 440:14,17 | 164:3,6,8,11,13 | 299:13 307:3 |
| 228:15 229:22 | 441:10 442:16 | 165:12 166:23 | 313:6 315:12 |
| 232:7 234:20 | 443:15,21 446:19 | 167:7,13 169:10 | 317:20 318:18 |
| 236:6 237:6 238:4 | 447:1,12 448:19 | 169:13,17 170:21 | 319:19 321:18 |
| 238:9 239:11 | 449:10 451:19 | 171:6 173:21 | 326:1 328:1 |
| 240:19 242:4,12 | 453:21 454:12,18 | 176:20 180:13,20 | 331:18 334:6 |
| 243:13 245:11,17 | 455:12 458:2 | 180:21 182:8,15 | 338:3 339:16 |
| 251:4 252:7 | 459:11 460:20 | 184:7,14,15,16 | 351:13 354:1,9 |
| 253:17 255:20,23 | 461:18 462:6,12 | 185:2 187:1,6,7,11 | 355:21 359:3 |
| 256:5,11 259:2 | 465:6 469:8 471:3 | 187:16,23 188:4 | 361:4,18 368:4,6 |
| 266:7,9 267:21 | 471:4,11 472:1,9 | 189:20 190:2,4,15 | 369:2 372:2 |
| 269:1,7 270:6,12 | 489:2,8 490:23 | 190:20 191:6,11 | 375:14,23 376:16 |
| 273:10 274:9 | 491:3 493:1 | 191:17,23 192:5 | 376:17,18,23 |
| 275:14 280:22 | **knepperllc.com** | 192:19 193:2,5,11 | 381:6,23 382:4 |
| 281:1 285:16 | 3:8 493:2 | 193:23 194:9 | 383:15 388:19 |
| 286:20 288:15 | **knew** 259:6,7 | 195:16,20,23 | 391:6 394:8 |
| 293:13 294:20 | **know** 12:4 14:18 | 196:3,6 197:20,23 | 395:17 396:19 |
| 295:12,18 297:19 | 15:17,18 19:20,21 | 198:1,5,11,18 | 399:1 400:23 |
| 298:5,14 303:9 | 19:22 20:5,13,14 | 199:10,16 200:7 | 405:4 408:16,19 |
| 305:11 307:6 | 20:22 26:11,13,16 | 201:12 202:2,12 | 408:21,22 409:2,4 |
| 308:1 311:18 | 27:7 33:20 34:5 | 202:15 203:20 | 409:5,11,17,17 |
| 318:4 324:2 | 38:18,20 43:3,6 | 205:15,17 207:17 | 411:2 414:20 |
| 333:15 340:2 | 47:13 50:2 51:11 | 208:5,12 211:8 | 418:11 419:1,11 |
| 342:20 352:7 | 55:7,20,22 56:10 | 213:22 214:20 | 420:18 426:23 |
| 357:23 359:2 | 61:18 62:7,17 | 220:11,11 221:20 | 429:16,19 430:2,7 |
| 362:3,19 364:7 | 65:21 68:10,15 | 221:23 222:18 | 433:6,7,15 434:15 |
| 367:2 371:8 374:8 | 70:9 78:9,12,15 | 223:6,16 224:1 | 436:14,20 439:15 |
| 376:10 381:11 | 83:17 84:14 88:3 | 226:3,21 230:6,13 | 440:6 441:21 |
| 383:2 385:17 | 93:16 96:1 98:10 | 232:9,15,18,22 | 447:4 451:4 |
| 387:6,16 395:13 | 99:16 100:9 102:6 | 235:19 238:23 | 455:21 460:2,4,4 |
| 399:22 406:15 | 104:13 107:11 | 239:9,15 249:23 | 471:13 474:18 |
| 407:6 408:14 | 108:5 111:11 | 254:22 255:4,9,15 | 488:12 489:21 |
| 409:10,16,22 | 114:16,20 119:11 | 256:13 259:4,8,11 | 490:10 |
| 410:13 412:14 | 120:17,22 121:3 | 262:8 263:8,19 | **knowing** 104:13 |
| 413:20 416:1,6 | 124:20 125:8,16 | 268:3,12,13,14 | 205:10 322:13 |
| 424:5,12,23 | 127:15 131:8 | 271:4 276:10 | 354:6 367:4 382:5 |

PLAINTIFFS002112

442:1

**knowledge** 47:17
47:19 48:8,22
49:4,20 51:9
68:14 80:16 83:5
86:19 121:10
131:8,9 156:21
170:1 177:8
193:15 209:14,18
408:7

**known** 102:15
168:8 177:1
316:12 321:11
404:5

**knows** 185:22
188:22 189:3
205:18 469:4

**kwilliams** 3:14

**l**

**l** 2:12 16:21 203:8
203:8,11 356:2
446:13

**lab** 211:11

**label** 5:15,16,22
6:1 119:5 205:13
205:16 206:4,8,10
207:1,3 216:5,13
216:19,22 217:12
217:16 218:2,7,18
218:22 219:6,20
219:23 220:3,15
220:19 221:17
222:2,4,16 226:2,6
226:23 228:17,19
229:21 230:23
231:23 232:9,16
233:13 234:17
236:4,14 237:5
238:2,14 239:5
240:2,10,16 241:3
241:12,20 242:2,6

242:9 243:1,18,22
243:23 244:4,8,11
244:23 245:2
246:4,16 247:9,12
247:19 250:17
251:22 253:2,13
255:3,5,12,16
256:20 257:2,20
258:3,5,13,14,17
258:23 259:9,18
259:21,23 260:2
260:15,22 261:4
262:23 263:4
267:11,23 268:2
268:18 269:9,21
270:3 483:8,14,23
484:4,8,14,17
489:13

**labeling** 209:23
210:3,6 215:21
225:16 233:21
241:8 242:19
243:3 265:16
266:1

**laboratory** 212:8
437:16

**labs** 212:2,7,18

**lack** 21:17 120:10
237:17 243:3
329:23 330:7,8
346:19 371:4
467:4

**lambda** 2:13,19

**lambdalegal.com**
2:16,22

**lane** 9:1 10:8
471:7,13 491:6
492:19,20

**language** 59:18
74:9 78:2 112:1,3
194:22 228:1

331:1 335:3,5
385:4 386:12,14
457:2,4 458:16

**lapper** 9:10

**lappert** 1:20 4:13
4:15 5:7 8:12 9:19
11:5,14 22:18
34:12 57:4 60:11
60:14 64:9 137:23
138:11,16 139:3,6
140:5 255:21
464:20 468:23
472:10 475:11
481:6 483:7 491:1
491:12 493:5
494:2,24 495:2,4
495:12

**lappert's** 11:3

**lapse** 99:21 100:3

**lapsed** 100:11

**large** 9:3 95:12
121:3 290:16
342:23 348:12
349:8,19 404:6
475:9 479:4

**larger** 287:21
352:11 396:23

**largest** 376:7
425:11 429:17
433:13 474:21

**laser** 139:22,23
142:11 145:19
146:2,4 147:4
151:11 152:9,17
153:2

**lasted** 97:11

**late** 394:23

**lately** 19:19
412:23

**latest** 183:1
196:21

**law** 3:5 30:17
36:16 51:22 52:5
53:13 242:23

**lawsuit** 409:9

**lawsuits** 83:12

**lay** 45:20 218:17

**lays** 462:19

**lcb** 1:7 10:2

**lead** 133:4,7 272:9
273:3 389:3

**leader** 472:15

**leaders** 72:3

**leading** 270:18
329:5 381:17

**leads** 246:11
324:18

**learn** 425:14 457:4
458:16

**learned** 122:15
125:18 284:23
468:15

**learning** 70:1

**leave** 396:10

**leaves** 395:15

**left** 137:22 171:15
242:15 248:16
252:21 349:20
451:13 461:1

**legal** 2:13,19 10:6
10:9 83:8,19
99:12 493:23

**legislation** 77:11
109:15,21,22
110:7 117:6

**legislative** 54:16
77:2 78:7 110:18
113:15,17

**legislators** 54:8
76:7

**legislature** 4:18
57:10 58:15,21

PLAINTIFFS002113

59:8,13

**legislatures** 76:16
113:8

**legs** 460:5,6

**length** 345:8
346:16 347:13
352:13

**lengthy** 159:6

**leon** 2:14

**lesser** 252:15
267:3

**letter** 6:5 135:16
136:9 263:20
265:22

**letters** 27:17
135:21 136:1,16
279:23 373:16

**level** 56:11 88:10
88:22 124:1,4,7,11
158:23 219:2,9,12
219:18 250:15
281:21,23 282:1
282:11 283:17,20
284:3,6,8,12,21
285:13,22 286:3
286:14 288:6,14
288:14,21 289:2,7
289:9,17,22
290:15,17 293:16
293:22,23 294:3,4
294:4,10 295:11
295:16 300:17
302:10,17,22
303:13,22,23
304:5,11,17 305:1
305:2,2,4,4 306:13
310:6 312:6,6
313:21,23 323:13
323:15 329:14
337:12 362:21
363:3,14,15 364:1

370:13,13,14,15
414:6 416:9
420:21 439:11
476:5 477:2 487:1

**levels** 6:6 212:19
212:23 287:23
299:20 300:21,22
301:7,11,13
303:19 312:17
313:19 314:14
319:10 324:16
414:3

**levine** 16:20,23
17:5,6 19:10
33:19,20 39:15,22
40:12 42:10,20
43:23 58:2,5 78:5
85:13,16 114:7

**lgbtq** 458:7

**liability** 67:11

**library** 415:3

**license** 265:1

**licensed** 153:20

**licensing** 30:16

**lie** 464:21

**lies** 284:2

**life** 67:2 68:9
71:11,14 119:22
152:13 156:3
182:2 244:19
290:2,17 311:5
314:2,7 322:13
359:4 450:18
468:13 469:17
490:7,17

**lifelong** 482:22

**lifesite** 464:14

**lifesitenews.com**
8:18

**lifetime** 220:14
286:23

**light** 97:15 139:22
140:14 145:17
181:15 259:19
260:2 328:15

**likelihood** 161:7,9
161:17 458:11

**likes** 72:2 434:5

**liking** 104:23
105:2

**limb** 475:3 477:5

**limit** 172:19

**limitation** 173:14

**limitations** 342:11
391:16 412:12
413:7,11,18

**limited** 29:9 66:5,5
66:7 68:13 96:21
143:15 148:15
152:5 267:8,9
306:6 413:12
431:13

**line** 30:2 237:23
264:13 320:17
494:4,7,10,13,16
494:19

**lines** 143:19
158:16 166:2
265:10 266:6
267:18 268:5,7,8

**lipoplasty** 142:12

**lips** 471:8

**lisa** 368:7,17,17
370:14 371:12

**list** 41:16 62:11
110:11,16 111:3
116:10 136:4,15
172:22 210:15
224:3 381:7
421:10 422:2
458:5

**listed** 112:19
133:1 135:20
372:23 380:2,2
423:14 441:11
480:7

**listen** 292:17
353:17

**listening** 261:16

**lists** 42:6 128:23
455:14

**literature** 12:21
13:8 45:9 46:19
47:20 50:3,8,11,12
51:2,12,17,19
69:13 72:14,16
86:20,22 89:8,12
89:14,15,19,20
117:22 124:13,14
127:10,12 129:15
135:12 161:4
177:2,3,16 185:3
185:14 186:2
187:2 191:12
194:6 198:6 205:4
228:11,20 247:4
247:22 250:10
260:3 268:19
270:17 274:13,20
283:22,23 297:12
313:3,5 329:1
336:3 337:21
338:2 343:20
346:12 353:18
356:13 358:11
368:6 370:23
410:4,7 414:1
416:12 439:5,11
439:20 441:13
443:6,7 473:15
480:23 483:4
485:19 486:23

PLAINTIFFS002114

487:6 488:21
**litigation**  90:15
176:20
**little**  15:5 16:14
93:12 97:2 101:20
142:20,23 340:3
358:2 442:5
467:21
**littman**  369:16
371:12 372:18
**littman's**  368:7,17
370:14
**live**  38:15,19 277:8
**lives**  66:17
**living**  71:11
**llc**  3:5
**llp**  10:16
**load**  339:22
**lobbied**  54:22
**local**  30:15 64:20
142:20 178:10
478:17
**located**  10:4
138:13
**loe**  301:8
**logo**  101:3 451:14
451:17
**long**  7:7 15:3,21
41:16 85:5 87:20
88:4 89:10 90:20
91:1 97:10 101:5
102:8 124:11
138:3,16 164:22
202:14 206:15
249:20 291:12
292:12 311:22
312:11 313:10
314:15,16 332:8
345:14 352:18
353:17 397:22
398:10 399:10

404:7 452:23
478:11 485:12
**longer**  24:8 47:2
122:7 125:7 165:3
166:3 296:23
352:20
**longitudinal**
124:12 219:13
249:19 281:17
291:12 292:13
299:4 311:9
**longitudinally**
250:1
**longstanding**
230:2
**look**  14:15 17:11
22:14 27:20 28:15
30:12 34:4 38:23
40:1,23 41:1 43:7
57:16 64:6,16
110:4 111:5,22
113:6 119:20
125:10 136:7
152:9 159:11
173:8 174:2
223:11 232:11,20
239:4,13 240:5,22
242:15 248:16
250:6 252:20
256:3,4 257:7,17
275:21,23 276:1,7
297:13 307:13,15
309:5 311:23
312:21 313:11
314:14 317:7
322:15 323:19
326:17,17 330:11
337:10,14 344:8
344:11,23 345:20
347:4 356:7,17
360:3,23 363:17

383:6 391:19
394:13 396:5
405:11 411:1,15
422:10 428:10
429:6 430:22
439:5 440:18
458:18 465:22,22
**looked**  201:23
202:5 277:2
345:14 358:7
**looking**  106:6
107:3 110:15
160:20 173:20
176:15 202:13
219:12 249:22
282:10 284:1
301:2 311:8 313:5
337:3 344:6
345:19 347:7
356:9 363:21,22
364:3,9 379:1
445:16
**lookout**  463:18
**looks**  263:20
304:23 305:3
341:2 453:16
**lose**  170:5
**losing**  325:17
**loss**  178:15 287:17
348:12 349:7
**lost**  95:22 297:11
**lot**  24:3 36:9 56:6
56:7 96:12 104:4
105:9 108:2 143:3
143:11 144:7
148:7,10 165:11
252:4 298:21
346:12 351:21
380:21,22 412:11
**low**  120:9 206:19
218:8 219:5

222:14,17,21
270:15 285:5
287:23 288:6
295:21 310:8
327:1 329:13,14
381:19 482:5
484:9,13
**lower**  309:8
314:18,19,19
354:2 358:12
414:2
**lowest**  252:11,17
283:7 284:9
323:13,15 482:19
**lpa**  1:7 10:2
**luminaries**  310:19
**lump**  156:6
**lunch**  97:15 255:2
**lupron**  201:5,13
201:15 202:6
205:11

___

**m**

**m**  16:16 20:23
360:10 422:5
445:6
**m.d.**  1:20 9:10
11:5 57:4 58:2,9
60:11 493:5 494:2
494:24 495:2,4,12
**madison**  138:12
138:18,19,21
139:7 140:10
**mail**  59:1,3,4
98:11,16
**main**  23:22 338:21
455:15
**maintain**  24:7
195:7 234:2
236:23 455:3
**maintained**  21:2

PLAINTIFFS002115

**maintaining** 23:23
24:9
**major** 40:2,16
95:11 210:22
215:10 478:8
487:2
**majority** 330:17
335:19 456:23
**maker** 131:3
**making** 6:21 45:16
53:23 121:11
131:20 177:9
236:8 248:19
250:12 261:18
275:9 356:3 357:5
360:21 380:8
381:9 382:3
398:15 444:12
452:5 470:6 485:1
487:8 488:6
**male** 6:12 148:15
322:23 323:3
341:22 348:13
349:9 390:7,8
456:3 457:16
488:7
**males** 488:10,11
**malignancies**
479:3 481:4
**malignancy**
144:10
**malignant** 44:17
**malleable** 336:19
**malpractice** 66:23
316:2
**man** 71:9 95:21
456:14
**man's** 71:20
**manage** 53:8
67:10 112:14
145:14,19

**manageable** 310:8
**management**
145:22 147:4
213:11 272:20
473:11,12,13
479:2
**managerial**
432:17
**managers** 54:2
**managing** 53:16
178:18,18,19
**mandate** 27:22
**mandatory** 173:3
**manipulated**
367:15 368:1
370:10,20
**manner** 234:8,23
**manufacturer**
264:7
**march** 377:13
379:6 380:18
381:9 424:8
**marginal** 267:10
**mark** 67:7 72:2
381:1
**marked** 4:12 12:6
27:9 34:7 37:23
55:9 62:19 108:7
116:2 127:17
171:7 223:18
230:14 232:23
239:16 256:15
263:10 299:15
326:2 339:18
355:18 361:11
375:16 388:20
394:9 396:20
411:4 414:22
419:17 427:1
430:9 434:10
451:5 463:5

**market** 229:1
267:7
**marketed** 5:18
221:7 233:14
234:7
**marketing** 225:13
**marks** 21:12
**maryland** 474:13
**masculine** 130:16
**masculinization**
167:8 175:5
**massive** 60:1
217:15 477:5
478:5
**mastectomy** 134:7
480:16
**match** 334:2
**matched** 378:16
**material** 131:13
**materials** 275:23
331:22
**matter** 9:21 10:19
16:9 34:22 88:19
96:13 105:3
117:21 208:12
**matters** 68:12
83:21 473:2
**matured** 249:22
317:12
**maxwell** 1:9
**mccaleb** 80:11
**mcdermott** 2:7
10:15
**mchugh** 16:15
19:11 58:9,11
78:6 85:20
**mchugh's** 18:8,11
**mckeown** 444:21
445:14
**md** 22:18

**mean** 66:8 88:19
92:19 179:23
217:18 225:20,23
230:6 236:14,16
242:21 251:8
266:18 336:22
355:1 358:21
459:8 461:6
**meaning** 122:10
122:13 403:14,15
432:13,15 459:18
**meaningless**
404:12
**means** 29:5,18
30:21 117:1 173:2
173:6 228:13
242:23 440:6
447:9 462:4,10
466:22 492:6
**meant** 50:23
**measure** 63:22
235:10 331:19
**measured** 328:23
334:12
**measures** 331:13
332:12 333:2
334:13
**measuring** 300:16
332:1 333:13,18
334:4
**mechanism** 195:2
372:22
**media** 9:18 79:3,7
166:16,20 254:15
254:19 320:2,6
367:16 368:21
373:1,2 388:7,11
470:12,16 491:9
**median** 347:9
**medic** 240:11
438:1

PLAINTIFFS002116

**medical** 5:19 7:5
8:6,9 13:3 39:5
40:2,16 41:3,17
42:6,16 43:22
45:14 46:23 52:1
54:2,10 64:23
65:8,15 86:13,19
86:21 104:14
112:8 114:1
115:18 122:5
128:19 129:4
144:16 159:15
161:18 194:14
208:9,21 215:14
223:6,8 225:11
226:14 228:10,20
231:19 233:15
234:2 248:3
271:21 272:19
274:20 280:10
296:7 327:14
342:6 363:19
369:13 373:20
376:12 378:20
379:3,5 380:16
384:7 385:5,8
386:13,19 402:1
402:19 406:5
410:7 418:16,23
419:10 421:3
422:16 424:16,17
430:13 432:17
434:19 436:13,14
436:17,17 438:23
444:11 447:15,18
448:2 449:19
450:3,5 459:5,9,20
469:22 470:7
473:7 474:21
479:14 482:4
483:4 485:1,16,19

485:20 486:3
487:15,21 488:5
**medically** 40:5,19
41:19 44:2 103:8
105:13 107:13,20
111:7,19 112:5
113:9,20 114:10
144:5 231:12
232:1 374:5,11,12
374:18 375:2,8
383:9 384:6,23
385:14 387:4,7,15
387:17 388:1
422:6,7,15 423:7
424:11 425:18
426:15 427:19
428:2,6,14,22
429:9,21 430:23
431:17,20 432:8
432:13,14,18,21
433:4,20 435:17
435:23 436:11,19
438:1,15,20
473:17
**medication** 6:1
235:8 256:20
258:5
**medications** 63:13
145:18 220:16
240:11 253:2
258:4 437:15
438:1 484:9,14
**medicine** 64:18
79:22 81:2 82:4
89:6 132:11
151:22 234:9
249:1 412:17
444:18 454:6
460:9,15 469:16
**medicines** 226:11

**mediterranean**
474:11
**meet** 14:7 95:6
163:7 387:9,11
417:20 428:16
429:1
**meeting** 84:15,17
84:21 85:10,11,14
85:18 86:1,5,6,8
89:1 90:14 91:6
91:10,15 93:3,10
93:21 94:9,15
95:1,2,3 96:2,16
97:1,8,11,20 98:4
103:18 222:9
**meetings** 14:13
80:1 84:1,3,6 98:5
102:9 153:4,10
165:10 188:5,10
192:6,13 200:1,8
418:7,13,15,19
419:2,6,12
**member** 45:2
46:22 48:11 49:8
65:7 99:19 100:4
101:12 169:17,18
171:19 190:8
296:23
**members** 48:18
93:23 102:14,15
103:7 105:18,21
169:13 170:14
171:1 172:11,21
173:9 180:22
181:10 189:4
190:21 193:2,7
194:15 296:14
297:3 365:1
**membership**
45:17,22 46:4,14
99:20 100:3,9,11

100:12,22 101:1,3
101:22 102:4
108:3 177:12
**memorable** 478:3
**memory** 56:9
332:8 400:8
**men** 67:9 214:6
**mental** 40:7 65:11
66:4 74:17 75:9
75:14,18,22
111:13 149:15
153:20 154:1,12
155:8,12,14 157:7
157:10 418:8
486:18
**mention** 66:23
68:18 118:9
335:23 412:10
**mentioned** 14:1
15:15 20:10 72:9
97:18 213:21
219:22 290:21
393:23
**mentioning**
335:17
**merely** 46:19
283:19 307:11
338:12 343:15
**merited** 293:7
**message** 163:11
**met** 14:2 17:1,6
85:15,19 94:23
95:1 96:1 292:11
356:22 385:2
386:23 401:15
427:20 435:15
**meta** 307:19
**metaanalyses**
302:18
**meter** 86:10

PLAINTIFFS002117

**methodo**  120:6
**methodological**
   482:6
**methodologically**
   120:7
**methodology**
   309:11 352:4
**methods**  257:7
   276:1 331:22
   411:18
**metoidioplasty**
   168:4 175:16
   316:8 478:16
**metric**  301:8,10
   331:18
**metrics**  331:1
**mi**  476:12
**microvascular**
   178:2 475:5
   476:12
**mid**  161:8 310:14
**middle**  1:2 9:23
   27:16 224:16
**midwest**  95:12
**military**  136:22
   137:2,5,11,17,22
   474:2 476:4,6
   477:8
**milton**  106:8
   125:7
**mind**  184:23
   439:14
**mine**  67:7 87:21
**minimum**  245:15
   401:15
**minor**  407:1
   445:20,22 449:6
**minors**  4:22 7:13
   40:5 54:11 55:14
   57:12 63:2,14
   78:19 84:23 405:8

406:13
**minus**  44:10
**minute**  27:7 115:8
   210:21 272:4
   397:1 471:19
**misconduct**  118:5
   118:17 120:12
   121:7 126:12
   127:6
**misdiagnosed**
   328:20
**misdiagnosis**
   328:23 329:19
**misgender**  448:7
   449:3
**misgendering**
   447:5,9 448:17,21
   488:1
**misinforming**
   487:19
**misinterpreted**
   276:20 277:3
**mislead**  172:20
**misleading**  172:14
   172:20
**misrepresentation**
   60:1
**misrepresents**
   30:14
**missing**  273:16
   340:3 346:4
**mississippi**  111:2
**missouri**  111:2
**mistake**  128:10
   138:20
**misunderstanding**
   44:7 45:12
**misunderstood**
   293:3
**model**  135:11
   439:3

**modeled**  368:21
**modeling**  367:16
   373:3
**moderate**  265:9
   266:5 267:17
**modern**  149:9
**modification**
   71:10 75:2 130:11
**modified**  134:7
   236:10
**modify**  66:14,22
**mohs**  143:4
**mol**  86:7
**moment**  91:12
   111:22 264:3
   273:14 340:22
   384:10
**moment's**  92:4
**momentarily**
   339:23
**moments**  467:12
**money**  24:6 386:6
   386:8
**monitor**  437:16
**monitored**  211:11
   211:16,17,18
   213:5,17
**monitoring**  211:20
   217:23
**montana**  111:1
**month**  25:7 84:12
   141:15
**monthly**  296:10
**months**  110:6
   141:22 166:1
   325:10 351:21
**moody**  38:4
**moral**  81:5,12,12
   82:18,19,23 92:10
   151:22 464:22
   466:3,14 467:5

**morally**  467:8,11
**morbidities**
   393:20
**morbidity**  392:18
   393:1
**morning**  9:15
   11:10,11 97:15
**morph**  88:5
**mortality**  334:20
   392:18 393:2
**mother**  93:22
**motivated**  398:2
**motivators**  67:17
**move**  186:21
   194:21 319:20
   347:15 370:4
   464:8
**moved**  256:1
   262:17
**movement**  467:16
   473:3
**movements**
   317:11
**moving**  54:6
   114:19 207:6
   471:8
**mucocele**  133:12
   133:14,14
**mucosal**  478:17
**multidisciplinary**
   149:11 150:4,14
**multiple**  308:21
   335:18 469:12
**murky**  97:2
   101:20
**muscle**  265:11
   266:15,19 267:18
   483:9,9,15
**muscles**  263:3
   266:13,14,15
   267:1,1

PLAINTIFFS002118

**mute** 105:17 471:7
**mutilation** 60:5,17
  60:22
**mwe.com** 2:10

**n**

**n** 2:1 4:1 16:21
  33:2 202:16 203:8
  277:14 356:2
  389:13 414:15
  425:7 445:6
  446:12,12
**name** 10:5,17
  11:12 30:3 57:16
  57:18,19 58:1,8
  68:5 80:6 86:9
  87:5 91:19,21
  92:2 94:21 95:5
  96:1,3 138:13,15
  201:4,11 203:5,9
  389:4 449:2
**names** 56:10 92:3
  106:9 122:1 201:9
  201:13 440:19
  446:9 449:22
**naming** 185:6
  450:6
**nation** 312:20
**national** 21:3
  35:15 395:4
**natural** 119:23
**nature** 56:13
  88:20 159:2,10
  168:23 243:19
  249:15 324:7
  334:21 369:12
  373:9 444:8,8
  452:17 458:22,23
  459:3 460:12
  476:4
**nausea** 226:11

**naval** 473:23
**navy** 130:20
  139:19 472:18
  475:13 476:9
**nc** 7:5
**near** 59:15 377:11
  394:16 421:21
**nearly** 107:2
  336:16 358:7
**nebraska** 138:15
**necessarily** 234:18
  236:16,20 242:20
  286:7 464:1
**necessary** 24:8
  40:6,19 103:9
  105:13 107:13,21
  111:7 113:9,20
  114:10 285:11
  310:4 374:5,11,13
  374:18 375:3,8
  383:9 385:1,15
  387:4,8,15,18
  388:2 422:7,7,16
  423:7 424:11
  425:19 426:16
  427:19 428:2,6,15
  428:23 429:10,21
  430:23 431:17,20
  432:8,13,15,19,21
  433:4,20 435:18
  435:23 436:11,20
  438:2,15,20 495:6
**necessities** 423:14
**necessity** 49:15
  114:2 115:18
  199:8 236:8,18
  237:14 385:6
  386:13 421:4
  422:16 449:18
**neck** 156:6 292:5
  292:11 468:2

**necrosis** 178:16
**need** 36:7 90:14
  106:12 126:16,17
  134:8 143:14
  290:14 292:17
  310:5 358:18,20
  363:1 458:16
**needed** 142:22
  143:14 195:3
  212:20 414:5
**needs** 363:5
**neither** 253:2
  404:9 409:23
  492:15
**netherlands**
  342:16 343:3
**network** 373:1
**networks** 368:20
  369:20 371:23
**neurologic** 121:21
**neurophysiologi...**
  317:10
**neurosurgical**
  272:17
**neurotized** 468:3
  476:12
**never** 16:18 17:6
  45:1,4 91:11,12
  148:6 149:2 150:3
  150:22 151:1
  152:2,6,20 153:3,9
  157:17,22 167:3
  167:10,16,23
  168:3,7,11 169:1
  170:1 176:1
  178:21,23 182:3
  183:15,17,19,21
  183:23 197:5,8
  201:15,17,18
  204:16 207:11,15
  214:10 233:11

272:9 273:23
  274:4 278:1,4
  284:23 306:23
  310:3,3 402:18
  418:3 447:3
  467:17 468:4
**new** 2:9,9,21,21
  105:20,22,23
  111:1 228:23
  234:10 235:7
  262:17 284:20
  289:15 295:1
  296:14 368:9,11
  369:8,21 382:18
  394:19 419:14
  457:4
**newer** 311:19,20
**nice** 237:23
**night** 15:4
**nine** 184:23
**nineteen** 32:6
**ninety** 262:18
**nobody's** 322:14
**nodule** 156:9,12
**non** 348:4 349:2
  351:14,16 402:13
  415:13
**noncontrolled**
  416:3
**nonexperimental**
  286:6 288:12,21
  293:12 428:3
**nonresponsive**
  186:22
**nonsatisfaction**
  331:20
**nonsurgical** 144:7
**normal** 71:18
  114:20 205:19
  212:3 460:1

PLAINTIFFS002119

**normalizing** 460:3
**north** 1:2 3:12,13
  9:23 10:19,22
  11:1 375:20 376:8
  379:15,19 420:14
  424:8 425:5
  474:12
**northwest** 62:8
**nose** 71:10,13
**notary** 9:2,3
  495:13,19
**note** 303:16
  351:18 358:3,6
  392:6 473:19
  493:10
**noted** 56:21 120:9
  371:14 495:7
**notice** 92:4 224:22
**noticed** 338:7
**notices** 224:10
**notify** 30:15
**november** 5:12
  25:9 224:14
**number** 6:16
  17:11 61:18 103:3
  120:22 121:2,3
  125:17 147:13
  160:4 164:2 173:9
  184:22 197:23
  213:4 241:7 246:8
  255:8 283:7 285:7
  320:18 321:3,10
  321:20 322:4
  328:7 330:2 331:4
  331:5 352:11,16
  352:22 354:8,10
  354:13 358:15
  360:14 366:22
  367:5,13,22 370:8
  375:10 377:19
  401:21 405:11

431:12 448:5
485:14
**numbered** 171:23
**numbers** 259:12
  303:15 328:11,13
  342:23 368:4
**numerous** 229:14
**nyu** 306:11

**o**

**o** 203:4,8 277:14
  277:14 322:18
  356:2 360:9,9,10
  414:15 445:6
  446:12
**oath** 254:23
**object** 44:5 119:4
  253:17
**objection** 21:14,20
  22:5,12 26:6,21
  28:13 29:7,15,19
  30:1,22 31:4
  32:14,21 36:13
  37:2,5 39:18
  40:21 41:21 42:12
  47:6,16 48:7
  49:23 50:6 51:15
  52:6,14,19 53:1
  54:13 55:3 57:14
  58:17 62:1 65:17
  65:20 73:14 74:19
  76:18 77:13 78:8
  78:20 80:2 81:8
  81:12 83:6,15
  88:17 89:3 90:17
  91:16 92:17 96:18
  97:12,23 98:8
  99:8 102:12
  103:10 107:22
  110:3 111:20
  112:23 113:21
  114:11 117:3,10

117:18 118:6,20
120:20 126:13
127:7 128:15
135:18 136:18
137:13 148:2
149:14,18 151:14
154:3 155:16
157:12 158:7,11
162:17 163:2,14
166:12 173:5
175:1,7,12,14,17
175:23 176:11
179:5,10,18 180:9
180:16 181:2,13
184:20 186:19
187:4,14,20
188:12 190:18,23
191:4,10,15,21
192:3,10,23 193:6
193:9,17 198:9,23
199:15,21 200:5
200:10,16 204:14
204:22 206:7
207:16,21 208:18
211:13 212:5,21
215:3 216:1 217:3
217:8 222:5
225:22 226:19
227:19 228:15
229:22 232:7
234:20 236:6
237:6 238:4,9
239:11 240:19
242:4,12 243:13
244:6 245:11,17
251:4 252:7 259:2
266:7 267:21
269:1,7 270:6,12
273:10 274:9
275:14 280:22
281:1 285:16

286:20 288:15
293:13 294:20
295:12,18 297:19
298:5,14 303:9
305:11 307:6
308:1 311:18
318:4 324:2
333:15 342:20
352:7 357:23
359:2 362:3,19
364:7 371:8 374:8
376:10 381:11
383:2 385:17
387:6,16 395:13
399:22 406:15
407:6 408:14
409:10,16,22
410:13 412:14
413:20 416:1,6
424:5,12,23
425:20 426:3,17
428:4 429:3,11,22
431:19 432:10
436:1 438:4,17
439:7 440:14,17
441:10 442:16
443:15,21 446:19
447:1,12 448:19
449:10 451:19
453:21 454:12,18
455:12 458:2
459:11 460:20
461:18 462:6,12
465:6 469:8
**objections** 81:5,13
  95:17 126:17,18
  160:14
**objective** 81:13,22
  82:8,19,22 257:1
  331:8 334:13
  336:6 409:14

PLAINTIFFS002120

| | | | |
|---|---|---|---|
| 436:16 444:14 | 181:5 205:22,23 | 288:16 292:20 | 239:13,18 240:7 |
| 447:16 448:2 | 208:23 488:13 | 293:2 340:1 | 241:1,11 242:14 |
| 449:18 460:11 | **offered**   35:9 39:12 | 397:15 420:4 | 242:17 248:9,11 |
| 486:5 | 39:16 67:6 68:17 | 421:15 434:13 | 248:15,17 252:23 |
| **objectively**   71:17 | 77:6 89:9,11 | 445:16 446:10 | 254:7 256:5 |
| 436:7 | 112:17 140:15 | 471:11 | 257:18 259:13 |
| **obligation**   288:2 | 159:8 238:12,16 | **ohio**   96:7 | 261:18 264:11,21 |
| **obliged**   447:16 | 238:18,22 | **okay**   12:8 14:5 | 269:14,17 272:6 |
| **obliges**   468:6 | **offering**   34:17,18 | 16:3 17:23 18:17 | 273:23 277:19 |
| **observable**   317:3 | 36:10,11 39:22 | 19:6 21:17 22:14 | 278:16 279:19,21 |
| **observational** | 40:12 42:11,20 | 26:10 27:5 31:1,6 | 279:21 285:10 |
| 258:6 411:20 | 88:15 107:6 114:7 | 31:10 36:1 37:20 | 288:16 289:2 |
| 413:14 414:6 | 118:12 122:14 | 38:3 39:2 43:7,9 | 294:15 295:23 |
| **observations** | 123:10 130:14 | 43:11 56:18 57:2 | 299:17 302:5,6 |
| 229:3 | 140:20 150:11,15 | 62:12,17 63:10 | 303:22 304:8 |
| **obtain**   149:3 | 154:23 159:17 | 64:5,15 78:16 | 307:14 308:5,7 |
| **obtainable**   309:11 | 176:7 179:2,9,17 | 80:15 93:2 97:6 | 315:9 316:17 |
| **obtaining**   119:7 | 180:7,22 181:10 | 98:5,21 99:15 | 318:6,19,21 |
| 402:17 | 204:9 285:23 | 102:7 108:9,9 | 320:10,12,17 |
| **obviate**   199:4 | 322:3 398:21 | 109:11 111:4,22 | 323:6 325:3,15,21 |
| **obvious**   75:3 | 447:15 | 114:15 116:18 | 325:22 326:4,4,5,8 |
| 310:1 317:14,19 | **offers**   454:8 | 119:17 126:22 | 326:19 330:12,15 |
| **obviously**   131:2 | **office**   3:5 138:11 | 133:19 135:4,13 | 332:9,11,16 |
| 235:16 238:7 | 138:18,19,21,22 | 136:20 143:13,18 | 335:13 339:12 |
| 244:3 273:3 | 138:23 140:10,13 | 143:19,23 144:21 | 340:6,8,22 341:11 |
| 309:21 310:2 | 142:7,13 159:6 | 145:7 146:14 | 344:10,23 345:3,3 |
| 322:3 323:7 362:1 | 211:5 472:17 | 147:3,14 149:9 | 347:16,21 349:10 |
| 379:10,13 418:6 | 473:1 | 151:3 154:9 155:3 | 349:14,21 350:15 |
| **occasion**   144:23 | **official**   224:7 | 165:6 166:6,13 | 350:20 353:12,15 |
| 211:5 | 230:18 232:18 | 170:17 171:6,9,11 | 354:11 355:17,20 |
| **occasions**   229:14 | 296:4 | 173:2 174:2,4,10 | 355:22 359:8,10 |
| **occur**   136:3 | **oftentimes**   132:13 | 174:12,16 179:23 | 359:23 360:2 |
| **occurring**   335:16 | 149:21 245:23 | 185:2 189:6,14 | 361:2,3,9,13 |
| 492:12 | 249:14 479:1 | 197:2 199:10 | 364:14 367:6,7,9 |
| **october**   264:17 | **ogonzalez**   2:22 | 201:1 202:8 203:7 | 372:17 373:12 |
| 266:6 267:19 | **oh**   19:13 80:22 | 207:10 212:15 | 375:12,13,18,19 |
| 493:3 | 95:3 108:22,22 | 213:15,21 215:17 | 377:9 378:5 |
| **offending**   449:22 | 135:4 146:12 | 220:10 221:2 | 383:12,12,18 |
| **offer**   12:10 65:16 | 170:9 171:23 | 223:11,13,15,20 | 384:9,13,17 386:8 |
| 66:11,21 72:4,5 | 202:17,22 212:6 | 225:3 230:10,16 | 388:5,16,18,22,23 |
| 176:18 177:19,20 | 268:10 269:14,20 | 231:3 233:12,18 | 389:11,14 391:21 |

PLAINTIFFS002121

393:22 394:5,11
394:15 396:7,14
396:22 397:2,3,7
397:15,16 399:5
399:11,12,14
400:15 401:5,7
404:20 405:1,6,13
405:13 408:5,5,16
410:21 411:6,6,7
414:18 415:1,2,7
415:10 419:14,16
419:21 420:7,10
420:10,17 421:2,8
421:19 422:13
423:4 425:4 426:6
426:12,22 427:3
428:8,9,11,21
429:14 430:5,11
430:11 433:2
434:14,16 435:7
435:13,21 437:6
440:1,2 441:1,1
442:4 445:7,17
446:5 450:12
451:7,9 452:21
453:11 455:18,20
455:22 459:1,13
460:23,23 463:3
464:12 465:9,22
466:1 468:19,21
469:10 470:8
471:1 472:1,13
474:3 479:21
480:1 488:17
489:8,12 490:21
490:23
**oklahoma**   111:1
**old**   7:20 67:8
342:22 344:6
380:11,19 381:5
411:10

**older**   196:18
**oldest**   134:11
**omar**   2:18
**once**   225:12 231:9
288:21
**one's**   69:6 133:10
233:13 340:3
**ones**   13:5,21 142:6
**ongoing**   69:5,8
**online**   296:12
297:8 364:10
368:20,21 369:20
408:9 453:16
**onset**   394:23,23
405:16
**op**   76:3,15
**open**   12:4 105:20
106:1 355:17
**opening**   138:7
171:10
**operate**   130:9
138:6
**operated**   138:3
**operating**   123:21
**operation**   8:15
106:13 123:11
148:10,12,17
176:19 178:21
289:20 293:7
299:1 334:1
464:15 467:16
478:13
**operations**   60:2
122:3 168:23
169:3 177:5,7,15
178:7,13,14 292:9
312:17 467:4
476:13,17 477:5
478:12,16,18
479:8,14,17,19
480:19

**operatory**   140:9
**opinion**   13:22 35:8
42:4 44:11 45:10
67:23 81:1 88:20
88:21 95:23
117:20,20 120:15
126:9 127:2
176:13,17 177:17
177:20 183:21
194:14 217:11,14
238:22 243:20
249:6 259:14
260:19 261:11
275:1,4 289:4
374:3,15,23 375:5
395:9 410:2 443:5
443:5 444:14,18
481:13,17 482:3,7
482:10,14
**opinions**   12:10
22:9 34:16,18
35:21 36:3,9,11
39:11,15,21 40:11
42:9,19 44:8,12
45:21 65:16 78:17
88:15 111:18
112:17,21 114:6
118:11 124:3
170:19,22 176:7
177:21 179:3,9,17
181:11 196:23
204:10 221:15
222:1 232:11
238:13 239:3
259:5 322:4
343:18 395:6
409:21 449:19,20
483:1
**oppose**   117:5
**opposed**   136:1

**opposing**   116:19
**optional**   173:3
**options**   153:12
165:23
**oral**   9:11 476:22
**order**   4:16 15:15
24:2 37:15 38:4
40:16 60:6 66:15
100:4 129:19
155:21 195:5
199:3 209:3 218:5
287:7,21 288:11
292:3 294:4 347:5
401:12 417:2
457:5 460:2
**ordinary**   145:22
**organization**
42:16,22 79:10
83:4,8 102:11,20
103:12 104:11
107:18,19 111:17
118:1 177:14
179:14,15 207:7
371:15 454:8
**organizations**   41:4
41:17 42:3,7
43:22 47:10 49:19
49:21 53:15 54:21
83:20 112:2,18
481:9
**organized**   84:4
**organs**   120:1
**orgasmic**   333:3
**origin**   369:15
**original**   129:14
135:15 136:2,17
197:13 200:14
227:16 323:3
338:11
**originally**   23:3
69:7

PLAINTIFFS002122

**originated** 19:22
19:23
**orthopedic** 291:17
291:22 292:4,10
**orthopedics**
460:15
**outbreaks** 368:19
368:23 369:21
**outcome** 287:10
399:10 480:20
**outcomes** 7:18
89:10 90:10
287:20 326:23
332:11 334:21
398:10 404:8
411:8 413:13
**outer** 129:21
**outlaw** 63:13
**outright** 44:22
**outside** 52:22
61:20 69:15 74:13
75:10 86:3 152:17
155:20 156:16
187:8 198:12,14
198:19 199:4,9
204:11 208:10
215:23 216:14
226:16 271:3
278:16 279:12
353:1,4,9 418:23
419:10 441:22
**outward** 67:23
271:15,22 309:18
**overall** 82:5 92:6
111:13 255:6
258:12 321:19
326:23 333:5
**overlap** 34:16,23
36:9
**overlooked** 134:22
377:20

**overreaching**
105:15
**overrepresentation**
67:13
**oversight** 221:12
**overview** 441:7
**overwhelm** 210:19
**overwhelming**
241:6

## p

**p** 2:1,1 20:23
55:20,20,20
182:13 203:4
340:15 360:9,10
**p.m.** 254:16,20
320:3,7 388:8,12
417:12,15 470:13
470:17 472:7
491:10,15
**pablo** 360:7
**pace** 54:6
**package** 202:1,2,6
206:2 209:6,8
210:14,16 215:11
**packet** 77:8,12
**pagan** 2:18,22
**page** 4:3 22:14
25:23 27:13,14,16
28:16 29:8 30:12
31:9 34:11 35:1
35:11 36:1 38:21
40:23 41:14 43:10
56:15,19 57:1,3,17
58:1 59:14 64:4
64:14 108:10
110:4 111:7 115:4
119:18 127:19
128:7,17,18,22
143:17 158:13,15
171:21,22 172:2,3
174:3 224:16

225:2 231:2 240:6
242:13 248:13
252:22 264:10,20
279:20 300:2
302:5 308:5
320:11 322:16
326:11,14 330:10
330:10,14 332:15
332:17,21 337:2,5
337:6 341:17
347:19 349:15,17
349:18,19 359:13
364:13 367:8,11
373:13 375:19
378:5,14,15,15
382:11 383:10,11
383:12,14 384:9
384:16,18 391:13
394:13 397:6,11
397:12,13,14,16
399:11,13,13
401:5,6,6 405:2,7
407:8 410:9
411:16 413:6
415:6 419:19,21
420:5 421:7,12,13
421:17,18 422:11
422:12 428:8,10
430:21 435:9,12
437:5 440:1 445:2
445:11,13,19
446:2,8 451:8
452:19,20 453:3
453:10 455:18
465:8,23 494:4,7
494:10,13,16,19
**pages** 36:6
**pain** 292:5,11
**pancreatitis**
134:14 135:10

**panel** 378:17
380:15
**panels** 218:11
**paper** 130:8,18
131:22 132:2,17
134:23 135:10
306:12 355:15,15
371:21 439:13
**papers** 72:21 74:4
185:7 305:21
337:20
**paragraph** 27:20
35:12,15 38:8
39:1,4 41:1 43:12
59:23 63:10 64:6
64:16 65:6 108:20
110:5 116:6
119:21 158:16
172:10 225:9
233:19 242:16
252:21 264:22
265:5 308:9
320:13 359:17
364:15 367:10
391:20 428:12
429:7 430:22
435:14 437:11
445:13 465:23
**paragraphs**
468:18
**parent** 409:6
**parental** 367:17
**parentheses**
320:21
**parents** 97:19
160:7,23 162:1,3,7
163:5,18 165:5,20
166:7 209:2 402:2
402:22 403:3,9
404:17

PLAINTIFFS002123

**part** 27:2 37:14
44:6 50:13 67:19
87:23 102:7,13,23
112:11 120:4
150:4 174:16
183:13,15,17
185:4 187:3,13,18
188:13 191:13
192:21 194:11
195:6 197:2,5
199:12 235:6
272:21 274:11
275:15,22 328:4
342:5 363:20,20
370:22,22 372:17
403:14 404:11
423:5 453:17
473:10,11,12
**participant** 315:17
**participants** 92:21
96:15 273:4
**participate** 91:8
150:13
**particular** 27:1
80:6,7 89:11
103:13 105:22
108:20 124:5,5
145:20 160:15,16
168:23 173:16
174:18 177:4
185:6,15 186:4
209:10,11,15,16
210:10,10 212:17
215:8,12 221:7,8
236:10 238:17
243:10 244:10,10
250:20 259:16
260:1,2 263:22
284:15 288:12
293:11 294:14
297:9 309:15

310:9 313:19
321:9,10 332:9
358:12 363:3
366:7 374:13
439:16,18 440:19
440:19 455:5,6
459:17 463:13,15
473:6
**particularly** 51:2
104:19 131:19
142:15 146:18
162:8 249:12
260:16 319:10
328:15 332:4
401:23 403:22
454:23
**particulars** 90:9
99:11
**parties** 199:4
492:16
**parts** 289:21
**party** 195:6
**pass** 76:16
**passed** 54:23
**passing** 52:22
61:20
**pastors** 452:1
**patch** 133:20
136:12
**pathologies** 144:2
144:2,7,8 145:2,8
146:9
**pathologize**
194:11,22 195:7
**pathology** 156:15
194:20
**patient** 6:22 12:19
13:2 60:4 61:4
68:8 70:13 71:16
74:23 82:22
112:12 120:13

123:12 124:10
130:23 145:6
149:2,22 150:5,22
151:1 152:3,6,14
153:5,6,10 154:9
154:11 155:4
156:17 157:1,6
160:16 162:2
167:5,11,17,21
168:1,5,9 175:22
194:18 207:14
208:6 209:11
210:9,19,20,23
215:13 217:7,19
217:20,22 225:15
231:13 241:13
246:4 248:22
257:21 258:11
261:6 271:16,23
280:1,7,14 285:19
285:20 286:13
287:6,6,19 288:2
290:2,4,5 295:4
309:22 310:7
311:2,4 312:23
314:8,11,16 315:4
315:11,12 317:5
323:17,22 328:6
330:1,4 333:7
353:1,9,20 355:7
355:10 356:4,13
356:21 357:3,9
359:7 374:14
447:20 448:1
478:3 482:23
484:10,16 485:4
486:11 487:3
488:3
**patient's** 253:9,14
310:18 467:17
486:6 487:19

**patients** 51:5 67:1
67:14 68:15,18,22
80:18 81:3 111:10
120:4 131:12
136:21 137:19
142:22 143:5
145:1,10,11,23
146:2,7,7,21
147:11,16,17,20
148:20 150:11
154:21 155:12
162:13 168:13,18
169:1 179:2 195:3
204:20,23 207:19
208:13 209:21
211:9,20 212:13
212:16 213:6,11
213:17 214:15,22
214:23 226:6
232:1 237:3
249:13 251:21
257:4 258:12
260:2,18,21
261:13 283:15
286:1 313:8 314:6
316:18 320:19
321:3,17,20
322:23 326:22
328:2,7,12,14,20
330:18 331:15
335:15,19 336:16
337:8,16,23 341:9
343:2 350:17
351:10 352:12,14
352:21 357:17,21
358:23 360:14
363:8,10 367:13
368:11 369:1,6,22
372:12,14 389:23
390:14,19 391:2,7
404:4 407:1 448:3

PLAINTIFFS002124

448:6 450:1
457:23 473:3
474:19 485:15
486:16
**patrick** 1:20 9:10
9:19 11:5,14
22:18 34:12 57:4
60:11 64:9 464:19
491:12 493:5
494:2,24 495:2,4
495:12
**pattern** 134:21
**patterns** 6:2
256:21
**paul** 57:20 58:8
87:10
**pay** 195:6 297:9
297:13 379:11
387:10,11
**payers** 195:6
**paying** 385:23
386:7
**pdf** 330:10 332:17
397:13 399:13
401:5 405:2
419:19,21 421:7
421:13 422:11
**peace** 66:16
**peculiar** 178:10
210:23
**pediatric** 43:1,1
45:15 48:10,15,19
51:5 86:8 133:12
249:2,12 250:20
251:21 252:4
255:17 400:1
474:18
**pediatricians** 43:2
203:23 277:2
**pediatrics** 5:21 6:3
239:1,23 241:8

255:14 256:21
258:17
**peer** 20:18 128:18
129:4,14 187:11
274:1 296:7,18
331:12 361:23
362:6 364:3
367:15,21 368:19
368:20 369:19
370:7,17 373:1,2
407:20 408:7
485:13
**peers** 287:3 317:8
317:16
**penalties** 109:17
**pending** 33:5
261:15
**penis** 478:8
**peop** 474:18
**people** 7:21 20:15
40:7 53:9 56:7,11
64:19 65:1 66:14
74:8,9 85:23
90:21 91:2,6
93:18 94:14 119:8
122:11 124:18,22
125:13,15 145:14
145:21 146:3
148:18 151:17
154:15 155:21
160:12,18 162:4
182:17 188:23
189:4 194:7
195:11 197:20
220:14 276:22
306:1 321:16
329:10 341:21
342:6 343:11
344:12 350:14
355:11 365:6,12
365:15 366:12,13

366:14,23 367:5
367:22 368:20
370:8,18 411:10
438:9 443:17
449:3,3,22 450:7
452:22 454:15
455:7 456:23
457:6,13 458:9
463:14 464:4
473:18 474:17
**percent** 102:22
161:9,19 255:10
255:10,11 258:12
258:19 297:16
298:1,1,9,19
299:10 302:21
303:3,13 304:12
304:22 307:21
308:3 342:15
344:18 352:6
354:16,16 367:12
369:8 372:12,14
**percentage** 161:12
298:11 302:9
320:19 321:3,20
322:5 329:10
344:12 367:15
370:18 485:15
486:16
**percentages** 303:3
**perception** 112:11
**perceptions**
486:20
**perfect** 256:11
**perfectly** 120:1
**perform** 103:7
105:19 277:7
294:17 295:10,15
315:2
**performed** 24:20
55:14 117:16

141:11,19 142:4
147:17,20,23
167:3,10,16,20,23
168:3,7,12 169:1
173:16 174:20
175:4,20 176:1,4
290:20 300:12
356:12 358:14
477:12 479:18
**performing** 25:8
81:6 120:19
126:10 127:3
140:4 168:17
**performs** 315:10
**perineal** 476:15
479:3
**perineum** 178:3
478:6 479:6
**period** 257:22
300:11 337:10
347:9 403:23
404:2 478:11
**peritoneal** 134:13
135:9
**permanent** 287:14
287:17 311:5
**permanently**
244:19 290:2,7,16
**permissible** 220:8
**permissive** 222:13
**permit** 440:18
**persist** 123:7
400:13
**persistent** 7:21
405:16 411:10
**person** 65:10
70:11,22 75:17
80:7 85:22 148:14
259:17 319:7
347:1 408:19,21
444:8 447:10

PLAINTIFFS002125

448:22 452:18
459:4 460:5,13
477:3
**person's** 60:3
442:13 443:12
446:17,22 447:2
449:1 464:21
**personal** 47:17,19
48:8,22,22 78:17
87:1 93:19 94:4
94:10,12 97:19
124:3 150:8 159:5
209:17 220:21
246:21 275:1
280:13 281:5,11
281:11,15,19
284:17 359:19
360:20
**personally** 47:13
55:22 150:3,21
152:2,20 153:3
175:3,19 176:4
184:3 187:1
190:11 197:12,16
198:5 207:17
208:12 213:16
214:20 272:9,12
274:4 275:5 278:1
278:4,22 284:11
381:23 417:20
418:2 446:16,21
**personnel** 473:11
473:17
**persons** 7:8 66:19
67:20 83:14 93:23
104:17 122:10,12
131:23 132:2,7,13
195:19 245:4
348:17 366:8
383:20 390:5
392:1,8 443:23

454:9 455:1
463:14,20 474:14
476:19 485:22
**perspective** 79:20
82:5 87:2 231:9
283:2
**perspectives** 6:23
356:4
**pertaining** 224:4
473:2
**pertains** 212:10
**pertinent** 12:21
13:19
**ph.d.** 263:22
**phalloplasties**
476:14
**phalloplasty** 315:7
315:11,16 338:22
468:1 478:10,15
**phallus** 339:1
**pharmaceuticals**
484:5
**phase** 235:4
**phases** 94:3
**phenomena** 373:5
**phenomenon**
363:14,15 369:15
371:6 372:10
**philosophy** 459:15
**phrase** 21:10,13
61:9 450:13
457:21
**physical** 40:6 67:4
70:16 317:3 318:3
319:2,12 399:16
**physician** 6:23
30:14 67:10 86:15
119:14 206:1
225:13 253:12
274:17 356:4,14
356:22 357:4

464:22 483:5
484:6,7 488:22
**physicians** 67:10
67:14 122:13
132:4 210:17
219:5 229:20
233:20 273:5
277:1 472:22
487:19
**pick** 283:13
**picture** 176:23
**pieces** 110:6
**pin** 25:6
**pitt** 3:11
**pizza** 131:3
**place** 14:11 91:4
**places** 389:18
484:17
**placing** 235:13
295:4 485:4 488:3
**plaintiff** 9:20
173:17 444:21
445:20,22 446:7
**plaintiffs** 1:10 2:3
4:12 10:16 13:4
17:15 207:23
208:11 417:19,21
418:3,8,19 419:4,7
445:10 448:18
449:6
**plan** 8:2 10:20
11:2 420:13,18
421:7,17,18
422:12 423:1,6,15
423:19 424:3
425:1 431:4
437:12
**planned** 229:5
**planning** 134:9
204:9 467:15
480:16 481:3

**plans** 394:22
**plastic** 5:9 6:7
8:14 22:21 23:2,4
23:13,15 25:3,3,13
25:17 26:2,14,17
27:14 28:10 31:6
32:9 44:13,19
45:3 46:2 47:8
64:10 66:9,18,20
66:21 67:9,15
68:3,10 69:7,16
72:4 73:2 79:20
90:6 95:4,7,11
96:12 99:17 100:5
100:17,19 102:20
102:22 103:19
106:9 108:11
111:9 120:18,23
122:20 123:16,20
123:23 128:8,13
134:8 138:10,11
138:17 139:6
140:5 149:21
154:16,20 155:19
159:3,18 160:13
169:7 171:13
189:3 198:17
274:16 282:4
283:5,9 293:5
294:16,21 295:9
295:14 299:20
300:6,18 306:10
306:12 310:23
311:13 332:5
436:14 464:14
466:4,16,21 467:1
467:11 468:14
472:16,23 473:22
474:5 475:12,16
477:21 480:15
488:23

PLAINTIFFS002126

plastics 262:12
296:1 300:9
platform 466:18
play 469:4
please 181:6
264:23
pleased 336:14
plus 140:16
161:19 232:5
296:11 307:20
443:7 458:8
468:15
point 19:2 25:21
27:3 57:8 122:20
123:16 156:22
185:17 232:12
235:17 247:3,16
264:4 309:15
335:16 360:21
380:5 390:20
403:16 432:2
434:2 456:19
457:2 458:14
460:11 470:5
pointing 349:1
points 215:10
324:6 345:10
389:21 435:8
456:17
policies 430:1
policy 5:5,21 7:6
8:5,7,10 109:12
115:23 137:10
182:6 220:12,23
223:9,12 225:6
229:14 239:19,22
240:1 260:20
261:12 376:12
377:1,6,17 378:10
378:11 379:15
380:5 382:3,13,18

382:23 383:4
384:4,18 386:6,21
424:7 427:4,8,17
428:1 430:4,13,22
431:22 432:6
433:5 434:19
436:5,6 439:16,18
441:9,20,22 473:2
473:5 481:7
political 447:6,7,8
poll 45:6
polled 45:2,4
ponce 2:14
pool 328:1 355:10
365:15
poor 354:20
poorly 186:13
pop 92:2,4 419:15
pops 184:23
population 76:9
120:14 145:6
147:6 249:2,8,20
249:21 250:7,20
252:5 255:6,17
278:10 321:9,11
321:15,19 322:5
341:8 342:16
374:14 391:4,8,10
populations
225:15
portion 17:19 18:5
59:22 97:20,22
98:2 327:10 337:3
portions 15:11
18:21 478:8
portman 53:19
portsmouth
262:13 473:23
position 40:18
41:18 50:16 51:10
51:14,18 53:12

65:2 80:20 81:11
107:11,14,19
111:5 112:3 114:8
115:17 221:17,21
227:17,22 229:19
230:2 231:22
232:4,15,19 239:9
240:16 242:2
260:6 288:11
289:3 429:19
452:3 456:13
472:19 481:7
485:18 486:8
positions 42:2
49:22
positive 80:12
87:8 148:22
positively 107:16
possibilities
210:17
possibility 464:6
possible 20:8
315:2,15 318:1,17
318:17 319:13
322:8 461:10
480:20 484:10
possibly 118:23
132:4 287:1
370:15
post 219:11
362:10,11,14
posts 366:20
postsurgery 347:5
postsurgical
351:20 358:16
postsurgically
345:12
posttest 304:18,19
posttreatment
281:20 282:2,12

potential 57:17
58:16 61:22 70:23
118:5 153:11
204:20 206:20
208:14 209:5
210:4 214:16
215:9 217:15
223:1,2 244:1,18
246:3 285:20
293:17 359:5
400:12 462:10
potentially 75:10
126:11 127:5
215:22 244:19
314:1
pouring 123:4
poverty 90:20
243:16,17,21,23
244:12,16 460:6,6
power 71:2 276:5
ppo 8:2
practice 24:9 25:1
69:6 119:15
137:22 140:9
143:21 148:5
151:22 154:1
189:17 234:8
244:4 249:9 259:1
276:12 402:15
475:18 476:8
477:20
practices 475:22
476:1
practicing 249:1
practitioner 23:22
67:3 206:11 281:6
282:18 484:18
practitioners
53:16 241:15
248:22 249:4

PLAINTIFFS002127

**pre** 219:10 281:19
282:12 304:18
**precautions**
210:13
**precedes** 159:21
**preceding** 446:8
**precisely** 68:4
132:12 228:6
369:17 467:5
**precocious** 162:20
318:16
**predict** 398:9
399:10
**predicted** 324:10
**predominate**
488:9
**prefer** 53:3 54:20
**preference** 53:7
76:13
**premarked** 12:3
**premier** 296:18
**preoperative**
134:9
**preoperatively**
324:10
**prepare** 12:15
14:23 27:1 128:5
**prepared** 11:23
128:2,3 451:10
**preparing** 13:13
14:3 461:13,15
462:17
**prepubertal** 400:2
**prepubescent**
400:5,18,20 401:2
**prerequisite**
100:18
**prescribe** 214:21
216:19,21 220:2
225:14 226:15
229:20 231:11

238:2,14 245:16
246:15 251:20
**prescribed** 201:15
201:18 203:21
204:16 207:13
211:9 214:3,8,10
217:17 245:8
255:11 257:20
258:13,13 259:9
259:23 267:14
**prescribes** 209:20
216:14 234:17
**prescribing** 6:2
208:16 217:12
219:23 234:23
236:4,13 237:4
245:4 251:2
256:20 258:22
**prescription**
203:14 218:19
221:3,13 222:16
251:9 255:3,5
**prescriptions**
258:17
**presence** 363:4
**present** 3:17 81:1
85:10,13,23 89:6
152:15 156:17
182:4 195:13
208:3,16 211:4
306:14 329:1
336:2 343:17
351:11 357:16
367:4 369:4 373:6
406:6 418:6,18
419:6 476:22
486:17
**presenta** 96:16
**presentation** 8:13
87:19,20 88:1,12
88:14,23 90:1

97:8 148:15
450:18,21 451:18
451:21 452:5
455:19
**presentations**
87:14 96:17,21
103:15 104:5
105:22 160:12
**presented** 82:9
259:22 330:1
343:15 482:2
486:15
**presenter** 79:18
82:7
**presenting** 283:18
**presents** 70:14
71:9 75:1 157:6
**press** 463:10
**pressure** 162:4,6
165:12 272:21
367:18 368:2
369:19 370:11,21
371:17 373:2
460:1,3,9
**pressured** 165:13
**pretreatment**
282:2
**pretty** 185:13
205:20 207:6
316:4 342:18
**prevailing** 449:17
**prevalence** 340:10
345:21 357:11
**previous** 182:2
**previously** 140:11
369:23
**primacy** 53:22
**primarily** 291:11
**primary** 386:2
**principle** 223:5
294:21 295:7,8

**printout** 27:12
230:18 464:13
**prior** 265:6 368:13
405:15
**priorities** 5:6
116:1,13,13,14,16
117:5
**prioritizes** 394:20
**private** 143:21
376:7 475:17
**privileged** 189:2
**privileges** 24:2,11
24:14
**privy** 194:9
**probably** 32:15
59:3 71:7 94:17
101:13 105:1,14
143:9 146:12
152:12 156:3
185:17 201:5
202:10,11,14
237:8 259:11
298:8,8 319:16
325:10 327:13
336:20 377:1
379:7 434:1
**problem** 78:1
82:23 112:4,11,15
119:7 123:20
152:22 194:23
291:18 324:4
338:22 352:9
355:9 358:11
363:4,5 370:23
386:1 403:12
447:14 456:22
457:12
**problematic**
144:12 218:3
259:19 260:17
261:10

PLAINTIFFS002128

**problems** 66:20
89:16 121:21
140:2 156:21
226:12 237:17
260:21 346:23
351:10 352:2
473:7 481:5
**procedure** 9:5
141:11 147:23
148:7 161:18
173:16 174:18,20
175:21 271:20
285:1,2,12 286:3,5
288:13 289:5
290:20 291:20
293:11,23 294:3
312:11 313:20
315:3,5,13 334:2
347:7 351:17
359:1 387:22
393:18
**procedures** 55:13
104:15 105:12,18
107:8 119:2
126:11 127:4
140:13 141:14,18
142:13 150:10
162:23 163:13
164:15 176:2,5
177:23 179:1
286:11 294:17
295:10,16,21
309:18 316:5
339:9 353:21
383:9 419:5 425:3
435:16 476:11
477:13,19 485:17
**proceed** 10:13
286:10 311:7
**proceeding** 492:5

**proceedings** 9:12
492:12
**procerus** 263:3
266:12,19,23
267:9
**process** 48:21
50:13 82:13
156:19 184:13
208:20 235:7
277:18 307:3
320:20 321:5,22
346:7,8 402:5
403:16 461:8
**processes** 367:18
**produced** 188:14
492:7
**produces** 206:18
**product** 45:7,19
185:11 188:14
225:12 233:20,23
234:7 235:2
**product's** 234:3
237:1
**profession** 305:18
**professional** 42:6
42:16,22 43:21
45:6 47:9,10 53:4
53:15 54:20 65:12
75:18,22 76:13
83:3 95:23 104:10
107:17 109:16
111:16 112:1,18
117:23 118:10,18
124:2 127:6 129:2
153:23 154:12
155:8 158:3
177:14 179:14,15
181:19 182:9
199:6 208:21
241:16 276:9
301:4 307:8 316:3

428:17 448:11,11
479:12 481:8
**professionals**
56:21 383:20
398:8 418:9
**profile** 489:18
**profound** 319:5
**progestins** 431:15
**prognostic** 282:9
**program** 95:13
121:12
**programs** 95:15
106:6 107:10
149:10
**progress** 219:8
**progression**
324:16
**prohibit** 226:5
406:12
**prohibited** 37:10
227:1
**prohibition** 46:3
**prohibits** 51:22
180:22 181:10
220:23
**prominently**
322:21
**promise** 248:10
**promised** 289:16
**promises** 363:18
**promote** 44:17
77:17,19 104:12
**promotion** 225:6
**pronounce** 389:3
**proper** 216:18
238:13
**properly** 120:11
145:17 276:5
280:6 330:17
**propose** 254:8

**proposed** 54:8
224:9 235:8
**proposes** 265:7
284:19
**proposing** 386:17
**proprietary**
201:12
**props** 336:22
**prosecute** 52:12
**prospective**
278:12,18 279:14
304:1,9 411:19
**prosthesis** 336:20
336:21 460:10
**protect** 76:8
**protections** 280:9
**prove** 312:22
**proven** 144:13
218:4,16 313:2,4
435:18
**provide** 15:6,10
41:7 112:8 137:10
137:17 158:4
170:15 171:1
174:13,17 400:4
400:16 401:1
415:15
**provided** 17:18
18:4 157:17,22
422:20 474:7
**provider** 153:4,10
153:21 261:1,5
279:10 308:21
312:19 423:13
**providers** 7:4
149:12 231:10
246:8 248:5
308:22 314:3
429:18 464:4
**provides** 378:10
405:7 441:6

PLAINTIFFS002129

providing 36:17
51:23 57:9 58:14
58:20 78:18 80:17
104:17 137:3
151:11,13,17
157:14 195:2
provision 109:17
481:19
provisional 101:21
provisions 170:18
prudential 295:3
psych 156:4,7
psychiatric 49:7
66:13,20 68:2,14
72:6 159:16 190:5
282:16 313:14
384:6
psychiatrist 65:22
153:17 154:22
psychiatrists
189:21
psychiatry 75:5
psychological
66:13 67:22 68:14
68:16,20 70:14
72:6 77:21 82:8
112:10,14 282:16
394:20 395:18
486:4
psychologically
71:1 317:9
psychologist
154:22 364:9,11
372:3
psychology 75:6
psychotherapy
157:15,18,23
158:4 437:14
pubertal 7:18
411:8

puberty 36:21
63:13 81:23 161:2
161:6,15 162:16
162:19,20 163:12
165:9 166:8 201:2
201:3,19 203:15
203:21 204:17,21
205:2,3 207:13,20
208:15 211:10,21
212:14 213:6,18
219:17 238:19
247:1,9 260:6
316:16,20,21
317:21 318:2,11
318:16 374:4,9,12
395:23 397:22
401:10,14 404:1
405:16,20 406:1
406:13,23 413:4
428:15,22,23
437:15,23 482:16
483:21 489:14
public 9:2 63:19
85:4,6 160:11
187:17 191:18
199:11 241:4
495:19
publication 130:2
131:1 133:15
134:12 136:11
182:18 190:2
224:7 227:7 228:1
240:12 275:23
283:16 296:4
306:7 307:1
355:13 356:1
360:18 362:1
368:17 407:20
publications 12:22
85:3 106:23
128:18,23 135:20

136:6,14 283:10
297:16 298:12
302:22 304:12,22
307:21 380:13
publicly 125:5
183:1
publish 46:18
50:20 283:11
303:18 306:9,11
306:14,17 307:5
published 46:13
46:17 72:21 76:3
84:18,22 129:3,13
135:16 183:4
185:16 186:3
189:23 196:1
219:4 220:12
228:20 273:23
274:13 275:20
296:10 298:2
300:9 301:19
302:10 305:14
306:21 322:22
326:6 364:2
371:16 378:1,2
465:10 482:15
486:1
publishes 182:16
publishing 76:15
182:21 284:4
301:4 305:20,21
306:3 331:5
pubmed 20:22
21:10
purport 334:19
purporting 277:10
purports 177:20
purpose 93:9
240:8 241:12
296:13 459:16

purposes 238:20
269:9 423:3
431:22
pursuant 9:4
pursuing 162:23
purview 474:23
pushing 305:4
put 122:8,8 136:5
312:9 327:15
350:4 362:20
371:16 375:10
382:9 395:23
452:8 471:6
puts 282:5
putting 107:5
360:13
pyramid 309:8

**q**

qualification
244:7
qualifications
29:14 172:13
479:13
qualified 65:11
75:18,22 358:8
qualifier 251:6
254:4
qualify 250:13
274:10 318:9
qualifying 416:16
quality 71:1 89:21
120:9 123:20
285:5 300:6
354:20 381:20,21
415:16 482:6,19
quantifiable 331:9
quantification
363:13
quantifies 330:7
367:21 370:8,18

PLAINTIFFS002130

**quantify** 311:10
330:4 369:3 413:4
**quantifying**
349:11
**quentin** 86:10
**question** 26:8
80:14 83:1 118:14
122:23 124:16
126:4,7,19,23
134:22 155:2
156:5 164:7,12
174:21 176:21
180:1 181:4,6
186:17,23 205:6
208:4 212:12
213:13 215:4
261:15 266:10
269:8,13,16
286:16 288:10
293:3 294:2,9
318:8 321:8
332:21 348:23
365:7 366:9,13
370:4,6 374:22
386:4 409:18
424:21 426:11
441:2 480:2 487:9
**questioned** 65:8
**questioning** 65:15
**questions** 55:15
56:7 134:21 135:2
188:20 261:17
272:5 292:17
314:22 346:21
353:17 394:4
470:19 471:10
472:11 481:7,10
481:13,18 482:1
485:8 486:15
489:3

**quick** 319:21
**quickly** 421:19
**quite** 178:8,8
276:14 309:23
313:1 395:5 404:3
**quotation** 21:12
**quote** 60:22 61:5
227:8,9,23 277:16
291:19 351:4
366:1 367:23
456:6
**quoted** 227:23
480:22
**quotes** 59:18,19

**r**

**r** 2:1 16:12 33:2
203:4,4,11,11
277:14 299:19
322:18 414:15
492:1 494:3,3
**radial** 339:5
467:22
**radiation** 479:1
**radically** 122:22
123:3 284:20
**radicularis** 267:10
**radio** 465:21
**radio's** 465:15
**radiological** 486:4
**raging** 125:6
412:16
**raise** 70:21 124:7
284:2 468:8
**raised** 65:20 119:4
119:10
**raising** 160:14
**ramifications**
213:9
**ran** 21:10 475:2,3
**randomization**
304:6

**randomized**
120:10 251:23
252:5,9,10,13
268:20 269:3
270:1 271:2
272:18 273:7,18
274:21 275:16
279:7 280:8 291:7
292:19,23 293:6,9
293:20 294:10
298:3 302:17
307:19 310:16
316:5
**randomly** 412:1
**ranges** 257:4
**ranked** 301:21
**ranks** 309:7
**rapidly** 125:2
476:6
**rate** 101:23 161:5
161:19 314:5,18
327:1 329:3
334:16 354:7
355:14 390:2
391:1
**rates** 258:5 329:2
352:5 353:9,19
354:1,3
**ratio** 390:4
**rational** 228:7
**rationale** 234:1
**rattled** 73:11
**rct** 271:7 272:10
272:14 274:5,8
275:12,13,20,22
276:23 285:13
294:18 315:15
318:1 319:14
323:7
**rcts** 271:3,11
272:8 274:2

297:18 303:7
305:8,16 315:2
**reach** 48:5 49:21
96:10 160:8 161:8
**reached** 125:2
402:1
**reaches** 288:21
289:6
**reaching** 482:22
**read** 18:14,16,21
37:17 42:7 101:6
101:7 111:21
174:7 181:16
182:6 197:1
202:17 206:2
207:22 208:1
227:20 233:11
264:2,3 277:15
301:1 307:11
324:19 325:6
340:21 358:12
371:11 376:23
377:7 402:8 410:9
430:1 448:23
449:13 493:9
495:5
**readily** 74:8,9
75:3
**reading** 117:13
184:21 185:11
194:6,7 195:11
206:6 239:21
240:20 277:11
298:16 338:8
356:10 357:1
358:4 418:23
436:3 448:10
**ready** 74:7 156:18
471:4
**real** 123:9 364:5
409:8 421:19

PLAINTIFFS002131

**realities** 82:10
447:17 450:4,7
**reality** 252:3
258:21 448:14
**realizing** 348:20
348:21
**really** 89:23 93:14
98:12 106:12
121:7 186:13
205:1 235:4 276:2
277:5 291:21
314:20 337:12
439:8 480:10
**realm** 294:13
**reason** 11:15,18
23:22 132:12
155:5 177:6,6
193:23 194:5
218:2 231:17
314:7 321:14,14
327:22 330:22
333:23 350:22
363:2 393:9
493:11 494:6,9,12
494:15,18,21
**reasonable** 276:19
**reasons** 100:8
105:4,7 108:1
177:10 180:18
250:4 328:21
348:2,10 349:6,12
358:15
**reassigned** 390:5
**reassignment** 6:14
7:9 59:16,23
60:16,21 61:4
337:11 346:17
392:2,9,11,17,20
393:12 432:3,7
**rec** 416:2

**recall** 15:21 56:4
56:12 58:22 69:11
70:2,4 80:6 92:14
93:1,21 96:11
97:1 98:14 99:11
101:5,19,21 102:4
111:2 115:19
149:7 169:8
216:10,12 222:11
262:11 334:17
345:17 347:7
394:1 421:4 481:9
489:14
**recalling** 463:11
**receipt** 493:18
**receive** 69:2
114:16 401:13
485:15
**received** 23:3
31:11 69:19
124:22 265:2
268:4 329:10
350:17
**receiving** 213:6
259:17
**recertified** 23:7
**recitation** 453:18
**reckoning** 404:7
**recognize** 66:18
154:20 406:22
416:2
**recognized** 228:18
**recognizes** 40:3
243:15 250:19
**recognizing** 74:23
243:8
**recoll** 84:5
**recollection** 97:5
110:17
**recom** 395:17

**recommend** 53:5
161:13,15 395:10
395:17,22
**recommendation**
41:3 72:1 118:23
396:3,4
**recommendations**
41:23 42:1 54:18
72:23 398:16
400:4,17 405:4,8
**recommended**
265:23
**recommending**
44:21
**recon** 142:8
467:23
**reconstitute**
478:10
**reconstruct** 468:2
478:12 479:9
**reconstructing**
289:13 290:13
**reconstruction**
44:16,23 133:23
142:15,23 167:19
169:4 178:3,4
299:6 476:16
479:1,5 480:4,12
480:23
**reconstructions**
142:21 178:11
299:5
**reconstructive** 6:8
44:19 46:2 142:23
143:8 274:16
291:20 296:1,19
299:21 300:9
311:14 334:7
335:5 443:8 467:2
467:13,15 472:16
473:15,22 474:8

474:15 475:5,12
475:17 476:1,9,11
477:9 478:9,20
488:23
**record** 9:16 10:12
11:13 79:1,4,8
86:13 115:8,11,14
166:14,17,21
176:23 189:9
207:23 208:9,9
254:13,16,20
312:12 319:23
320:3,7 388:4,8,12
417:10,12,15
418:16 447:18
470:10,13,17
472:4,7 491:7,10
**recorded** 10:4
**recording** 256:6
**recordkeeping**
235:3,18 237:15
**records** 12:20 13:2
13:3 208:1 234:3
237:1 342:6 355:7
419:1,10
**recourse** 53:12
252:14
**rectangle** 350:5
**red** 71:21 451:14
**reddit** 361:19,23
362:11,14 364:19
**redirect** 471:20
**reduced** 333:20,21
333:21
**reduction** 129:22
291:6,11,15,16,19
292:9 293:19
294:9,13
**reductions** 142:19
290:22 292:22

PLAINTIFFS002132

**reexamination** 4:6
**refer** 65:11 67:5
  75:17 155:7
  264:23 444:20
  445:13,22 446:13
  461:13
**reference** 50:21
  86:21 109:20
  144:1 280:13
  320:18 378:6
  380:3 394:17
  413:22 444:16
  467:9
**referenced** 301:11
  301:14 493:6
**references** 50:11
  72:15 301:7
  364:18 378:16,19
  407:18 416:15,17
  439:17
**referencing**
  410:17
**referral** 72:5
  474:9
**referred** 68:16
  233:10 474:17
**referring** 13:8
  144:3 145:9
  146:14 271:4
  441:4 447:9 449:5
  457:23 458:4
  469:19
**refers** 131:18
  456:9
**refined** 93:13
**reflect** 228:8
  397:23
**reflects** 456:12
**refresh** 110:16
  400:8

**refute** 486:10
**regard** 355:12
  472:21
**regarding** 248:23
  468:22 473:15
**regimens** 225:15
**register** 5:11
  224:2 362:10
**regret** 6:20 328:14
  328:20 329:5,12
  329:17 330:4,20
  331:4 335:16
  343:17 344:20
  345:10 346:20
  347:20 348:2,3,3,6
  348:9,18,19 349:2
  349:2,5,12 350:14
  350:18,22 351:4
  352:5,20 353:1,4,9
  353:20 354:3,7,19
  354:22 355:4,14
  356:2,14 357:4,9
  357:15,22 358:14
  358:22 359:5
  363:10 365:16
  366:14,15
**regretful** 6:12
**regrets** 340:11
  352:1
**regretters** 351:19
  354:7 355:2,3
  366:17,18
**regretting** 360:14
**regulates** 221:3
**regulations** 224:4
**regulatory** 263:23
**rehearsed** 368:22
  369:20 371:22
  372:2
**reintroduce**
  339:13

**reintroducing**
  339:15
**reject** 150:10
**rejected** 248:2
**rejecting** 247:4
**rejuvenation**
  142:9
**relate** 74:5 130:2,5
  131:15 132:18
  133:16 134:2,16
  205:20
**related** 85:6 145:2
  146:9,10 229:8
  405:18 432:3,8
**relating** 66:13
  447:20 473:6
**relationship**
  103:21 143:2
**relatively** 45:11
  357:10
**relatives** 348:12
  349:8
**releasing** 201:7,9
  317:22 428:14
**relevant** 43:17
  118:9,17 173:15
  373:23 465:15
  483:20 488:20
**reliable** 89:13 90:3
  180:3 280:11
  323:23 362:16
  366:22 371:4
  408:12 485:13
  486:1,3
**relied** 35:20,20
  50:3,18 293:20
  297:4 343:14,18
**relief** 422:21
**relies** 294:10
  305:7

**relieving** 292:4
**religious** 466:18
  467:9
**rely** 73:6,8,9
  203:18 249:4
  251:14 284:11
  293:6 294:9
  343:12,21 360:11
  409:20 410:1
  456:21
**relying** 125:18
  286:23 287:1
  305:15 359:13
  360:12
**remained** 344:14
**remaining** 470:4
**remains** 241:3
  481:15
**remarks** 87:17
  91:15
**remedy** 67:21
  154:16
**remember** 59:4,7
  59:11 65:18 77:1
  77:3 80:5 84:13
  85:19 86:4,6 87:5
  90:19,19 91:18,20
  93:7 94:20,23
  95:5,6,8,23 96:3,5
  97:7,14 99:14
  100:20 106:4,11
  106:16 109:8
  110:23 222:6
  324:19,22 334:23
  341:4,7 372:15,17
  450:17
**remembered**
  85:18,21
**remembering** 92:3
**remote** 1:18 2:3
  3:1,17 9:6 10:4

PLAINTIFFS002133

70:1 210:16
**removal** 139:22,23
  143:4 146:1,5
  151:12 152:9,18
  153:2 287:16
  479:4
**removals** 148:8
**remove** 336:21
**removing** 290:6,8
**renew** 23:20
**renewed** 31:19
**rep** 55:19
**repair** 130:12
  131:12 133:22
  136:8
**replaced** 457:17
**report** 4:13 12:1,9
  13:9,16,17 17:9
  18:18 19:6 22:15
  25:23 29:21 31:2
  31:9 43:7 56:22
  59:14 63:15
  108:18 109:6
  117:13 119:16
  143:17 158:15
  177:19 183:8
  206:6 216:6 230:1
  230:4 238:7,11
  279:20 282:20
  284:7,12 285:23
  299:2 303:7 320:9
  322:22 327:10
  328:4 334:16
  335:14 341:4
  343:6,7 345:2,8,18
  346:2,13 347:8
  357:21 359:9
  360:17 361:15
  364:2,4 367:6
  373:11 377:18
  389:18 393:23

394:14 407:8,18
  410:11,17 412:11
  413:18 415:4
  444:20 445:3,19
  447:23 448:16
  449:4
**reported** 228:10
  326:21 336:14,23
  341:9 345:5
  348:10 349:6
  350:18 351:4
  357:9,15 359:17
  363:16 368:5,10
  369:6 463:20
  490:20
**reporter** 9:2 10:8
  10:12 16:12
  182:13 325:13,16
  325:20 350:3,9
  389:13 414:15
  426:1,6 471:9
**reporting** 202:19
  281:7,9 282:15
  283:13 299:3
  300:21 327:16,17
  331:10 336:5,7,7
  336:10 337:17
  343:16 345:6,10
  349:11,13 362:21
  364:11 367:14
  368:14 370:1
  383:4 465:13
**reports** 19:11
  120:2 135:15
  194:7 219:1,1,3
  220:1,4 244:14
  246:7 280:7,20
  281:9 282:18
  283:20 308:20
  324:17 329:19
  343:10 352:5

490:17,20
**represent** 10:18
  21:9 26:18 32:18
  416:4
**representation**
  26:4
**representations**
  32:13
**representative**
  55:23
**representatives**
  229:13
**representing** 28:9
  452:3
**represents** 440:16
  492:10
**reputable** 102:11
  102:16
**request** 59:3
  151:21 224:22
**requesting** 323:1
  328:7
**require** 234:9
  237:12,13,14,19
  237:20 479:4
  490:2
**required** 24:1
  66:10 169:14
  237:11 242:23
  245:1 284:4
  454:22 473:14
  478:8 495:13
**requirement** 24:4
  236:9 238:1
  300:21 404:15
**requirements**
  172:23 476:5
**requires** 174:19
**requiring** 474:14
**reread** 331:21
  384:11

**res** 273:8
**rescinded** 46:3,7
**research** 6:9
  106:14 120:7,9
  129:14 135:10,15
  136:2,17 253:3,6
  299:21 300:7,8
  305:6,14 308:11
  308:18 309:1
  321:16 324:18
  390:21 485:14
  486:2
**researcher** 276:11
**researchers**
  326:21
**residency** 69:8,11
  69:16 73:3 95:15
  100:21 101:12
  106:6 107:9
  121:12 122:3
  125:14 273:9,20
  278:17
**resident** 121:19
  133:8,8 156:1
  272:15
**residents** 101:22
**resource** 86:21
  257:13 381:8
  409:15 452:6
  473:10
**respect** 59:10
  125:22 145:9
  247:8 392:8 466:5
**respective** 270:7
**respectively** 303:4
**response** 371:12
**responsibility**
  233:22 235:1
  260:23 261:2
**responsible** 53:17
  272:22 276:13

PLAINTIFFS002134

**responsive** 126:1
370:4
**rest** 217:23 246:12
310:22
**restated** 229:13
**restating** 229:8
**restoration** 467:3
**restriction** 226:3
**result** 247:14
287:7 289:16
412:19,19 467:7
484:12 492:17
**resulted** 490:17
**results** 21:13,18
245:9 246:17
249:21 250:21
251:13 252:6
257:17 270:1
276:8 285:13
291:7 292:22
293:9 294:18
297:18 298:13
303:7 305:8
309:23 341:19
344:9 356:17
357:8 392:16
**resumé** 5:7 473:20
**retained** 11:19
33:8 174:22
**retired** 24:23
136:22 139:18
140:8 141:12
473:17,18
**retirement** 24:6
**retract** 371:18,18
371:19,20
**retraction** 276:21
**retro** 341:10
343:23
**retrospective**
257:11 278:9,12

278:19 279:14
289:10 311:23
341:12,14 343:1
343:23 344:8
355:6
**return** 493:13,17
**returned** 331:15
**returning** 328:2
348:13 349:9
**returns** 113:22,22
**reversal** 6:11
147:15 149:3
328:2,7 329:6
330:1 338:13
363:11 429:8
**reverse** 15:14
129:19 320:20
321:5,21
**reversed** 311:6
**revert** 148:14
**review** 6:22 13:6
45:9,22 70:15
89:7,9 93:15
135:11 170:17
177:3 183:8
187:12 191:12
196:20 198:6
199:3 234:12,13
235:20 253:7
265:20 274:13
283:21,23 300:8
307:19 343:2
344:1,8 356:3,12
357:3,20 377:10
379:3,6 408:3
410:20 412:21
414:9,12 415:3,14
415:14,20 416:11
416:12 417:23
418:17 427:11
443:6 448:12

449:16 473:14
483:3 488:21
493:7
**reviewed** 12:17,19
12:20 13:11,14,18
20:18 47:20 50:12
51:1 53:21 106:23
128:19 129:4,14
170:4,8 185:7
205:4 274:1 296:7
296:18 331:12
342:6 361:23
362:6 364:3
367:21 370:7,17
402:9 407:20
408:7 412:22
485:13
**reviewing** 212:2,7
212:18 258:11
439:23 450:3
**reviews** 8:1 35:16
35:17 96:22 120:8
174:11 327:3
332:10 335:1,7
341:1,6 355:6
378:20 384:12
400:9 408:4 413:1
420:8 440:21
445:15
**revise** 29:13
**revised** 196:4
427:15
**revision** 196:16
**revoked** 29:11
**rex** 55:19
**richmond** 264:23
**ridge** 130:16
**right** 12:1,13
14:19 16:3 17:2,7
17:16 18:17 19:8
20:12 21:4,7 22:4

22:11,13,16 24:21
25:12,21 26:14
27:15,21 28:7
29:5,14,18 30:6,20
30:21 31:17,20
32:7,23 33:6,10,16
33:19 34:4,10,11
34:13,19 35:3,6,9
35:22 36:12 37:14
37:19 38:22,23
39:7,12,16,22 40:8
40:13,20,23 41:20
42:11,20 43:18
44:3 47:1,5 48:6
48:12,16 49:10
51:14 52:5,12,13
52:17,23 57:6,13
57:22 58:3,6,9,12
58:16 59:12 60:11
60:14,18 61:7,14
61:16 62:22 64:2
64:12,13 65:3,5,16
65:23 66:4 68:21
68:23 69:1,18,21
70:4 73:7,13 74:2
75:11,15,19 76:2
76:17,19,20 77:14
78:7 79:12 80:1
81:7 83:4,9,14,23
84:6,7,9,23 88:22
90:16 91:8 93:2,4
93:5 99:17 102:8
102:11 103:2
107:21 108:12,15
108:18 110:1,2,12
111:4,19 113:20
114:10 115:15,22
117:1,8,17,20
118:1,5,12 120:15
120:19 123:17
125:14 127:14,19

PLAINTIFFS002135

127:23 128:9,10
128:23 129:1,4,5,6
129:11,12,18,19
129:23 131:2,15
133:2,5,23 135:7
135:21 136:9,10
136:12,13,19
137:5,7,21 138:1
139:5,9,12,14,22
139:23 140:3
141:5 144:19
146:16 147:1,2,7,8
147:9,22 149:16
149:23 150:1,18
153:14,15,18,21
154:2,13 155:9,15
155:22 157:2,3,7
157:11,15,16,20
157:21 158:1,2,6
158:10 166:10,14
167:1 168:13
169:15,19,23
171:19,20 172:7
173:4,8,20 174:7
175:2,10,13,16
176:3,10 180:15
182:7,15,17 183:5
183:6,7,12,16,20
184:9 185:5 187:9
187:13,21 188:2,7
188:17 189:15
190:3,9,13,17,22
191:3 192:9,11,14
192:15 193:8,12
195:15 196:9,20
197:3,6,18 198:13
199:19 200:9,19
201:1,16,20,23
202:3 203:13,20
203:22 204:2,12
204:15,21 206:5

207:8,20 208:17
209:23 210:6,11
211:22 212:4,20
213:19,23 214:4,8
214:9 216:4,13
217:2,7,9,13
219:22 220:4
221:9,13,14
222:19 224:11,12
225:2,5,9 227:13
227:14,15,17,18
228:14,21,22
229:6 230:16,17
230:19,20,23
231:1,20,21 232:2
232:3,5,6,8,20,21
233:12,18 234:6
234:19 235:23
236:1,5,15,18
237:5,7 238:3,7,12
238:15,23 240:3
240:15,18,22
241:13,22 242:6,7
242:10,11,13
243:12 245:7,10
245:16 248:7,13
248:14 250:22,23
251:3,16,18 252:2
252:6,20 253:16
254:21,23 255:9
255:12 256:17,18
257:1,7 258:10,14
258:15,19,21
259:1 261:19,21
262:2,6 263:1,7,12
263:13 264:6,8,17
265:12,15,17
266:3,8 267:23
268:15 269:22
270:8,11,13,22
271:1,5,9,12

273:19,22 274:8
277:23 279:15
280:19,20 285:8
286:19 288:14
290:18 291:1,3,5,8
292:16 293:8,12
294:12 295:17
296:2,8,10,15,22
299:17,18 300:1
300:15 301:8,12
301:13,22 302:14
302:16,19,20,23
303:1,8,22 304:2,4
304:10,14,17,19
304:20,22,23
305:9 306:5,6
307:5,23 308:3,4,8
308:15 309:4
311:17 315:8,13
315:18 316:9,13
316:15,22 317:5
318:3 319:18
320:22 321:2,6
322:2,6,15 323:4,7
323:8,8,10,14
324:1,5 325:8
326:5,7,8,9,18
327:4,7,8,11,18
329:14 330:3,5,14
330:20,21 332:20
332:23 333:5,6,10
333:11,14 334:21
336:11,12 337:21
339:10,15 340:17
341:16 342:4,8,10
342:16,17,19
343:7,9,13 344:15
347:15,18 348:16
348:20 349:18
350:11,19,21,23
351:1,5 352:3,6

354:16,17 355:23
356:7 357:5,12,13
357:19 358:1
359:1,15,16
360:10,11,21,22
361:13,14,15,17
361:20,22 362:1,5
362:8,9,12,13,17
362:22 364:5,6,12
364:18,19,20
365:3,9,10,13,21
365:22 366:2,20
367:1,9,10,18,19
368:2 371:1,3
374:6 375:11,18
375:21 376:1,2,4
376:11,14,15
377:12,14,16,21
377:22 378:3,8,12
378:17,21 379:2,6
379:8,16,22
381:10,14 382:4
382:19,20 383:6
384:1,3,4,19 385:3
385:15 387:1,4,13
387:15 388:3,13
389:1,15,20 390:3
390:11,19,22
391:4,5,10,12,19
391:22 392:14
393:20,21,22
396:1,18 397:4,8
397:17,19 398:14
398:23 399:17,18
399:21 400:6,14
400:18 401:3,19
402:23 403:5,10
404:18,22 405:7,9
405:11,14,22
406:10,16 407:3,4
407:7,19,21 408:5

PLAINTIFFS002136

408:8,9,13 409:3
410:14,23 411:12
411:13,15,20,22
411:23 412:2,3,5,6
412:7,8 413:2,3,19
413:21 414:8,12
414:13,19 415:4,5
415:8,11,19,22,23
416:5 417:7,16
418:2,9,21 419:23
420:9,13,14,17,19
420:23 421:6,12
422:8,9,10,14,16
423:3,10,19,20
424:3,11,22 425:1
425:4,8 427:3,4,9
427:12,15,20,21
427:23 428:3
429:2 430:2,6,12
430:16,17,19
431:7,9,15,18
432:9 433:8,11,14
433:17 434:3,8,17
434:17,19,22
435:2,5,10,23
438:3,15 440:2
441:9,17,18,23
442:3,4,6,9 443:13
443:20 444:22
445:10,14,16,17
445:20,21,23
446:5,7,14,23
447:11 449:2,8
450:9,11,15,23
451:2,11 452:13
452:23 453:13,20
454:6,10,17
455:10,15 456:4,5
456:7,10,15
457:16,19 458:1,4
460:18,22 461:3,5

462:4,11 463:8
464:13,17,23
465:11,18,20
466:8,9,12,13
469:7 471:2 480:6
480:7 484:8
486:13 489:19,20
490:2,3,8,14,18
**rights** 83:13 101:3
**rigorous** 39:7
**rise** 294:3 310:5
**rises** 281:20
**risk** 41:5 67:11
90:22 206:12,19
206:19 207:4
222:13,17,21
223:1,3 251:11
260:4 270:15
285:19 286:9,12
286:14 287:5,8,12
287:19 290:1
293:17 295:3,21
301:17,20 310:7
311:2,4 312:11
313:20 314:8,15
334:10 391:9
393:1,13,19 404:8
484:9,12,16 485:3
485:3,6 488:4
489:18 490:6
**risks** 84:22 91:4
177:21 204:20
205:2 206:14,22
207:19 208:14
209:5,8,22 210:4
210:10,22,22
214:16 215:1,6,9
215:12 217:17,18
218:8,9,16 219:4
246:3

**risky** 288:3
**rocketcitynow.c...**
5:1
**role** 348:13 349:9
367:16 373:3
395:12 397:22
398:11 403:1
474:2 480:18
**roles** 398:18
**room** 94:17
106:20 208:4
235:11
**rooted** 444:7
**rosacea** 140:2
**rotate** 349:22
**roughly** 15:21
84:12 97:11,21
101:15 139:7,13
141:17 345:1
**round** 87:14
**route** 72:13
149:22
**rows** 307:18
**rpr** 492:20
**rule** 173:3 316:4
**rules** 9:5 170:14
173:9 224:9,10
**ruling** 38:10 53:21
**run** 95:14 137:23
138:16 488:8
**running** 292:14
**rutledge** 33:2

**s**

**s** 2:1 4:10 55:20
202:16 203:8,11
277:14 299:19
340:15 356:2
360:9,10 492:19
494:3
**sacrifice** 348:12
349:8

**safe** 268:22 270:3
**safety** 219:14
221:12 235:9
269:5 437:17
469:6
**sake** 437:2 438:9
439:3 467:7
**salem** 3:13
**salvage** 475:3
477:5
**sample** 413:11
**san** 86:14 272:16
278:7
**sanction** 177:15
**sanctions** 176:16
**sat** 153:3,9 207:11
476:21
**satisfaction** 299:8
331:14,19 332:2,4
333:4,5,13
**satisfactory**
104:19
**satisfied** 326:22
330:18 335:20
**save** 347:17
**saved** 156:3
**saw** 18:7 78:4 95:7
106:7 341:3
407:17 471:8
**saying** 54:20 92:21
124:17,19,19
209:15 234:16
236:12 237:13
244:9 250:13
274:11 284:22
288:20 289:1
310:1,2,4 313:6
365:11,14,18
366:4 415:20
466:11

PLAINTIFFS002137

| | | | |
|---|---|---|---|
| **says** 22:17,20 26:1 | 375:19 377:10 | 81:13 83:4 86:12 | 151:21 204:12 |
| 27:16,22 28:15,16 | 378:6 382:12,16 | 86:12 89:7,21 | 297:19 298:6 |
| 28:22 29:8 30:13 | 383:18 384:18,21 | 103:14 104:13 | 425:21 426:18 |
| 34:11 38:8 39:4,9 | 386:22 387:5,20 | 112:8 123:4,22 | 429:23 438:5,18 |
| 40:2,8,9 41:2,2 | 391:23 392:15 | 135:14,17 185:3 | 442:17 443:16,22 |
| 52:11 55:19 56:20 | 397:19 398:6 | 186:7 187:2 | 451:20 453:22 |
| 57:3 59:23 60:10 | 401:9,12,21 | 191:12 198:6 | 454:13,19 455:13 |
| 63:10,18 64:9,17 | 404:21 405:23 | 218:4 219:8 234:1 | 458:3 459:12 |
| 65:7 104:22 | 411:18 413:9 | 244:12 275:2 | 460:21 461:19 |
| 108:10 109:12 | 415:12 421:9,22 | 280:9,16 281:16 | 462:7,13 465:7 |
| 110:5 111:8 113:7 | 422:5,18 424:8 | 281:22 282:13 | 469:9 |
| 115:4 116:6,19 | 427:11,17 428:13 | 283:2 284:8 | **score** 161:3 |
| 128:7,18 171:1,15 | 429:7 430:16,23 | 287:22 288:1,5 | **scottsbluff** 138:15 |
| 172:11,18 173:9 | 432:2 434:8,17,21 | 308:14 311:16 | 138:23 139:16 |
| 174:23 179:15 | 435:15 437:8,11 | 323:23 362:16 | **screen** 256:3 |
| 224:17,21,21 | 440:4 454:14 | 363:23 373:23 | **screened** 416:19 |
| 225:10 227:7,11 | 456:3 459:4 461:1 | 374:19 378:6,11 | **scripture** 456:21 |
| 227:23 228:5,23 | 464:19,21 466:2 | 380:3,7 381:4,5,8 | **scroll** 344:10 |
| 229:12 230:8 | 468:22 | 381:19 382:9 | 345:13 |
| 231:4,8,17 232:12 | **scarless** 131:11 | 387:21 408:12 | **scrotoplasty** |
| 233:19 234:7,22 | 136:8 | 410:19 439:5 | 478:10 |
| 236:2,7,19,22,23 | **scarring** 145:20 | 441:7,12 443:6 | **scrotum** 478:7 |
| 238:3,5 239:4 | **schechter** 216:7 | 444:15 449:20 | **se** 151:8 178:22 |
| 240:8 241:2,11,15 | 280:4 377:20 | 452:12,15 453:19 | 213:7 392:17 |
| 241:19,23 242:18 | 395:6 | 454:4 469:5 | **search** 21:2,6,10 |
| 248:18 251:13,19 | **school** 165:12 | 482:19 483:3 | 268:19 353:18 |
| 253:1 257:10,19 | 166:4 409:7 452:1 | 484:19 488:20 | 453:16 |
| 258:3 260:10 | 464:5 | **scientifically** | **searches** 297:12 |
| 263:14,16 264:13 | **schools** 83:13 | 44:10 287:9 | **second** 39:3 58:1 |
| 264:22 265:5,16 | **science** 46:6 51:6 | 366:21 | 64:6,8 70:22 93:3 |
| 265:19 279:23 | 78:2 82:15 86:16 | **scientist** 408:23 | 93:10 94:9,15 |
| 300:4 302:1 | 90:2,3 92:9,11,11 | 409:3 | 95:2,3 96:2,15 |
| 304:15 305:23 | 93:15 94:11 | **scope** 52:7,15,20 | 97:8 110:5 119:20 |
| 306:1,2 308:9 | 122:17 124:4 | 53:2 54:14 55:4 | 134:20 233:19 |
| 309:6 326:20 | 125:20 177:8 | 62:2 81:9 83:7,16 | 241:2 255:20 |
| 328:19 330:16 | 280:11 | 83:17,18 89:4 | 320:17 328:18 |
| 341:21 347:19 | **scientific** 20:18 | 90:18 91:17 92:6 | 339:15 360:4 |
| 348:1,2,8 356:11 | 21:7 43:17 44:10 | 92:18 96:19 97:13 | 364:15 383:13 |
| 356:20 357:6,8,14 | 45:6,9,21 46:18 | 98:1,9 99:9 | 384:11 391:22 |
| 361:1 364:21 | 47:20 50:3,11 | 117:11,18 120:21 | 413:9 428:12 |
| 365:5,20 367:11 | 51:17,19 72:15 | 126:14 137:14 | 440:10 445:8,12 |

PLAINTIFFS002138

477:3
**secondary** 165:14
479:2
**section** 35:4 36:3
59:15 116:17
172:4,5,6 225:5
240:5 257:8,17
265:16 326:12
330:13 339:3
341:17,19 342:11
344:9 378:9
382:12 391:16
397:8 399:15
400:3,15,19,23
401:8 405:3 413:7
415:9 437:7 440:3
440:16 441:6
**sections** 116:12
**see** 13:20 22:17,18
22:22 25:9 27:3,6
27:18 28:5,20
29:2,16 30:18
34:9 35:12,18
36:2 38:6,7,13
39:7 41:1,8,10,12
41:13,15 43:12
53:4 55:17,23
56:22 59:12,14,19
60:8 63:3,16,22
64:20 65:12 70:16
71:5,6,6,7,19
74:20 80:22 91:23
92:8,9 95:21
104:2 108:14,22
109:18 110:9
111:14 113:1,10
113:14 116:1,10
116:14,21 123:13
123:19 128:19
131:13 132:22
134:9,14 141:22

143:19 146:1
150:12 158:20
171:13,16 172:15
172:23 173:18
174:5 202:18
212:19,20 224:13
224:14,16,19,23
225:5,7,17 226:8
227:6,11,22,23
228:2,11 229:15
230:17 231:6,14
232:12 233:15
234:4,13 237:16
239:4,21 240:13
241:9 243:6 246:1
247:13 249:10
253:9 256:22
257:5,8,15,23
258:8 262:11
263:13,16 264:12
265:3,13 266:1
268:19 279:22
280:2,11,17
299:21 300:1,12
301:23 302:2,7,11
308:11 309:12
313:9,12 320:13
320:23 322:18
323:5,19 324:13
326:12,16 327:2,4
327:4 328:11,17
330:14 332:6
334:22 337:8
339:6,7 340:11,20
341:16,19 342:1
342:10 344:7,20
344:23 345:4
346:3 348:4,14
349:23 350:1,7,22
351:20 352:1,20
356:4,15,17,23

357:17 358:12
359:12 361:10
364:15 365:8
366:5 373:17
374:1 377:10
378:5,13,15,18,22
379:3,4,7 382:12
382:15 383:3,11
383:14 384:2
385:2 391:14,15
392:13,21 394:17
394:18 395:1,7
397:10 398:3,12
400:7 401:8,16
402:6 405:20
406:8 407:15
411:16,20 412:21
413:6,8,15 414:1,6
415:8,12,17
419:14 420:1
421:9,22 422:3,15
427:6,8 428:18
429:7,12 430:14
431:5 432:4,4
434:9 435:1,7,19
437:7,17 440:3,8
440:12,22 441:3
446:9 447:14
449:1 451:15
453:1,2 461:4
471:20
**seeing** 71:17
114:21 237:9
355:1 386:8
**seek** 66:14 334:19
351:8 457:13
**seeking** 67:20 71:9
74:10 132:8 146:4
152:14 154:16
165:9 276:11
300:22 363:11

456:23 459:18
**seen** 17:21 18:13
77:8,11 96:8
123:6 162:5 165:4
165:4 219:4
223:21 233:8
249:21 309:11
338:1 340:19
388:23 420:2
436:5 488:15
**sees** 245:21
**select** 307:4
**selected** 7:19
191:2 193:8 198:2
411:9 476:23
477:1
**selecting** 306:21
**selection** 472:22
**selective** 306:8,19
**self** 70:18 94:1
120:2 145:1
161:10 162:9
313:13 314:19
318:11 333:21
334:10 341:9
347:2 355:11
357:9,15 362:21
363:16 368:10,15
369:1,6 370:1,2
374:10 444:1
463:21 476:19
485:22 487:3
**seminal** 480:21
**scn** 378:20
**senate** 4:23 63:2
63:11
**send** 143:5 154:21
156:23 157:8
**sending** 473:7
**senior** 378:20

PLAINTIFFS002139

**sense**  24:4 66:15
66:16 80:23 81:14
117:12 152:15
206:5 226:4 235:5
266:10 348:19
355:8 386:9
**sent**  80:8 156:10
157:3 493:14
**sentence**  39:3 40:1
41:2 65:6 109:12
111:8 113:6 116:5
119:20 143:20
172:18 231:16
233:19 234:6
241:2 257:19
258:2 300:4 308:9
309:5 326:20
328:18 330:16
348:1,2 356:11
357:7 384:11
391:22 395:4
402:12 403:13,15
405:23 413:9
**sentences**  172:10
302:1 344:11
398:5
**separate**  365:11
**separately**  136:5
**september**  1:21
9:9,17 171:16
465:10 491:10
**sequential**  283:12
283:14
**sequitur**  402:13
**serendipitous**
229:3 245:23
247:14 308:19
**series**  283:11,14
304:18 308:2,10
308:14,20,21
309:9 310:21

311:15 312:18
314:6,9 322:17,23
323:12 324:13
335:15,18 343:6
343:11
**serious**  109:16
487:7 490:7
**serve**  189:4 456:17
457:1,13
**served**  194:8
450:6 475:9,11,16
**service**  151:17
432:9
**services**  95:17
104:18 111:9
140:15 195:2
248:3 376:22
384:21 385:14
422:5,19 431:3,3,9
434:5 435:9
437:22 438:11
454:5 473:4 474:8
474:9 475:10
**serving**  33:1,15
92:15 172:21
173:10
**session**  187:5
195:13
**sets**  420:21
**setting**  258:16
356:15 374:10
435:8 480:17
**settings**  258:5,8
**seven**  45:23 123:1
141:22 166:1
322:23 325:10
335:15 336:16
337:7 343:6,12
357:20 391:18
**seventeen**  474:6

**severe**  265:9 266:5
267:17 487:2
**severity**  405:19
**sex**  6:13 7:9 8:14
36:22 59:15,23
60:3,7 61:7 81:20
82:1 94:1 145:3
146:10 147:1
161:10 164:9
165:14 213:7,22
214:11,16 219:17
238:19,21 247:2
247:10 260:7
318:6,20 319:4,8,9
319:14 337:10
346:16 370:1
383:23 392:1,9,10
392:17,19 393:11
404:2 405:18
416:13 417:5
437:14,22 442:13
442:21 443:12,20
446:17,22 447:2
447:20 448:1,15
454:9,15 455:2
457:14,15 464:15
464:21 482:17
487:16,20
**sexual**  192:17,20
333:3 436:8,16,21
461:15 462:11
463:18 464:1,1
469:20
**sexualize**  469:23
**sexualizing**  462:4
462:20 468:23
**sham**  250:5 316:1
**shaping**  461:1
**share**  364:22
**shared**  270:16

**shareholders**
381:2
**sheet**  493:11
**shield**  376:1,7
381:1,9 382:1,22
383:8 429:15
**shift**  99:15 400:12
442:4
**shifted**  305:1
369:7
**shipp**  55:20 56:3
**short**  7:17 48:4
53:10 271:4
327:17,17 336:4
336:10 411:8
**shortcut**  188:21
**shorter**  150:20
**shortly**  361:10
**shoulder**  292:5,11
**shoulders**  261:3
276:9
**show**  37:19 114:13
230:8 264:19
325:1 327:23
336:2 339:11
363:7 366:22
371:21,22 375:12
396:13 412:16
426:20 430:4
433:5
**showed**  32:8 181:7
354:15,15 371:23
424:6 439:12
**showing**  90:4 92:9
247:23 346:14
453:15
**shown**  312:15
415:15 439:18
**shows**  122:17
258:20 313:7
329:23 352:19

PLAINTIFFS002140

355:9 368:8,16,18
369:17 374:20
405:18 414:4
453:20
**sic** 12:23
**side** 77:2,3 94:12
99:13 142:17
146:15,17 151:16
159:15 217:16
282:16 285:9
349:20
**sided** 222:23
**sign** 493:12
**signature** 264:12
**signed** 27:2 493:20
**significant** 206:22
207:4 295:2 368:9
383:21 483:19
484:15 487:1
490:6
**significantly**
487:16
**signify** 243:3
**signs** 463:18
**similar** 46:10
52:23 54:9 61:20
63:6 76:23 77:7
77:10 88:14,19
93:11,16 99:11
140:4
**similarities** 475:21
**simple** 289:12
**simply** 124:17
151:16
**single** 20:17 42:8
42:15 150:22
152:2,6 298:20,23
299:3 308:20,21
312:19,19,20
323:16 328:9
416:20

**singulair** 222:7
**sinus** 129:21
133:12
**sir** 11:11 18:16
31:15 32:5 34:23
35:10,13,19 36:5
39:9 40:9 42:14
48:1 64:3 76:19
77:9 118:14
119:19 120:16
133:3 174:23
296:12 331:17
466:10 477:15
490:20
**sit** 183:8
**site** 407:23 408:1
**sitting** 70:3,9
170:21 173:21
221:20 239:8
297:15 310:17
**situation** 179:20
244:1
**situations** 206:9
251:2 253:1,20
254:1,5,10
**six** 56:17,18
128:23 129:3
136:14 158:16
160:2,3 163:23
164:1 336:15
337:14 380:19
391:17
**sixteen** 56:16
360:22
**size** 355:8 372:9
413:10,11 426:8
**skin** 131:12 134:7
136:8 137:23
139:3,20 140:1,2
142:14,14 144:1,2
144:4,7,8,5,18

145:2,8,13 146:9
**skipping** 231:16
258:2
**slide** 88:3,7 456:18
457:2,8 458:15,21
458:23 460:22
461:23 462:22
463:13 464:3
**slides** 87:23
451:10 456:17
**slightly** 155:1
**slipped** 131:4
**slow** 161:14
165:22 207:6
381:1 388:17
**slowing** 384:15
**slowly** 114:20
**small** 20:15 45:8
45:11 290:13
295:20 352:16
413:11,12
**smaller** 317:7
**social** 70:19 71:11
348:3,6,9 349:1,5
351:15 362:7
366:21 367:15,17
367:17 368:1,1,7
368:21 369:18
370:10,10,20,20
371:6 373:1,2,3
397:9,17,21
**socially** 351:12
**societies** 53:5
76:14
**society** 5:9 44:18
45:3,15,18 46:1,7
47:8 48:11,15,19
72:3 99:16 100:5
100:19 103:19
104:22 108:11
118:10,18 123:23

169:7 171:12
181:19 182:1,3
195:16 196:22
197:3,6,9,21 198:7
198:19 199:11
200:13,20 282:4
283:8 300:18
301:4 404:5
**soft** 479:5
**sole** 410:1
**solely** 331:14
**solicited** 187:18
191:19 199:12
**solo** 23:21
**solution** 324:4
**solutions** 10:7,9
493:23
**solve** 351:9
**solved** 313:13
**somebody** 121:11
245:21 250:5
276:11 284:19
318:22 322:9,11
**sorrow** 194:18
**sorry** 57:18 77:9
108:20 138:19
142:11 144:18
163:16 170:5
172:2 201:10
212:9,11 227:4
268:6,11 280:23
281:3,13,14
318:19 325:19
327:20 340:1
353:7 373:2
379:12 384:14,14
385:19 397:15
409:1 421:16,19
426:1,7 440:22
441:2 445:17
446:20 457:14

PLAINTIFFS002141

464:7 471:5,11,12
474:12
**sort** 19:18 70:20
71:2 87:18 88:5
89:13 94:4 96:22
96:22 101:4,21,23
103:16,20 107:4
127:11 140:3
159:3,13,21 165:8
165:10,22 208:20
301:15 323:16,17
324:6 372:7 475:6
**sorts** 53:5 104:12
334:11
**sound** 22:11 76:10
170:5 194:13
196:9 202:23
203:2 234:2
**sounds** 22:13 84:9
190:3 203:5,9
472:2
**source** 74:1,3
296:18 361:22
407:18
**sources** 378:7
380:4 458:13
**space** 306:6
**speak** 14:7 79:19
81:16 82:11 87:1
87:6 96:13 161:21
163:16,17 328:16
366:18 416:8
445:1 447:17
457:1,5,7
**speaker** 82:3
471:16
**speakers** 81:16
**speaking** 20:1
85:4,6 93:18
107:16 126:17,18
338:20 448:3,10

466:19,19 467:2
469:19,21
**speaks** 73:3 95:9
351:23 358:10
369:12 373:8
466:23
**special** 253:7
**specialist** 74:16
75:13 87:18
155:22 156:20
**specialists** 149:16
206:2
**specialized** 66:2
204:2
**specialty** 155:21
156:16 378:16
472:15
**specific** 26:9 135:2
170:14 174:20
180:1 212:12
213:14 242:19,20
288:10 365:19
**specifically** 70:4
132:17 144:20
145:5 163:20
192:16 198:18
209:22 210:5
255:15 334:18
376:23 417:19
418:11
**specifics** 27:23
**specified** 437:12
**specimen** 292:2
**spectrum** 152:10
313:18 487:4
**speculating** 47:4
**speech** 368:21,22
369:20 371:22
372:2
**speeches** 261:18

**spell** 16:13
**spelling** 445:6
**spend** 135:3
412:11
**spent** 17:8
**spoke** 14:2,16,22
64:10 81:18,20
481:2
**spoken** 15:16 16:8
16:10,16,18,22
64:17,23 205:5,8
206:1 418:3
**spread** 490:13
**spring** 207:5
**srs** 322:22 330:19
**stable** 344:14
**staff** 13:1 56:3
98:23 99:1 307:1
474:5
**stage** 107:4 122:19
125:2
**stainless** 131:5
**stake** 286:14
287:18 386:20
447:19
**stamp** 339:14
340:4
**stand** 61:13
120:16
**standalone** 410:16
**standard** 183:2
209:13 244:23
249:3
**standards** 7:15
182:16,19,21
183:9 184:5 186:9
186:10,11 189:11
196:14 199:7
316:3 396:15
397:4,14 398:14
399:2 401:1

**standpoint** 194:17
387:8 447:15
466:16
**stands** 87:10
**start** 23:2 84:7
85:9 156:18
162:15 163:11,12
164:4,9 237:9
254:19 302:16
316:19 324:17
351:20 383:14
**started** 24:3 67:9
106:14 107:3
146:23 148:3
184:8 202:12
216:4 226:8
268:17 345:1
372:7 408:16
409:6 480:13
**starting** 106:16
143:20 161:1
165:14 166:8
228:1 236:15,17
236:20 237:4
320:14 328:11
344:13 345:7
**startled** 477:2
**starts** 228:3
405:14
**state** 5:2,5 9:2
10:10,20,21,22
11:1,12 27:23
28:2,19,23 33:9
37:10 51:22 52:5
53:8,10 54:4,7
57:10 58:15,21
59:8,13 63:5
76:16 78:14 79:21
81:1 82:15 89:6
90:2 96:8 113:8
115:23 116:8

PLAINTIFFS002142

284:5 376:8 396:3
397:20 420:13,16
473:14 482:11
492:2,22
**stated** 227:7 228:2
349:3 483:13
**statement** 5:21
44:20 45:16 46:8
46:15,20 47:15,22
48:6,16 49:3,15
105:15 113:12
114:1,3 239:20,22
240:1,9,13 250:12
253:22 254:3
331:8 377:2
**statements** 45:5
46:12,13,17 47:12
50:10,16 51:11,14
117:23 199:2
247:11 444:16
481:8
**states** 1:1 9:22
30:7 52:21 54:23
61:19,23 62:4
110:9,12,19 111:3
429:4 472:18
474:2 475:13
**stating** 27:17
**statistic** 102:21
**statistically** 392:4
**status** 27:18 29:1
30:15 240:10
365:7 366:9,13
**stay** 98:6
**stayed** 53:10
**stays** 256:7
**steel** 131:5
**stenographic**
492:6
**step** 53:8 339:8

**stephen** 58:2
**stepped** 260:12,13
**stepping** 54:1
105:9
**steps** 69:15
**sterilization**
287:15,16
**sterilizing** 290:7
**steroids** 145:3
146:9,10,16 147:1
**stick** 261:16
448:14
**sticking** 449:18
**stomach** 121:22
**stop** 251:2,8
**stopped** 25:8
**stopping** 366:10
**stories** 280:1,14
323:22 365:6,21
366:1,2,7,11,16
**story** 95:21
**street** 2:20 3:12
**strength** 413:7
**strengths** 342:11
391:15
**strictly** 424:17
466:15 467:10
**stricture** 338:10
**strictures** 338:21
**strike** 13:12 14:17
16:4 18:10 23:13
33:13 49:5 84:2
90:12 125:23
147:17 158:14
174:14 177:17
186:21 202:1
228:17 267:15
268:15 272:12
289:3 314:23
326:10 348:6
370:5 377:17

433:6 461:13
**stringent** 281:16
**strive** 454:16
**strong** 78:17 290:3
**strongest** 490:1
**strongly** 114:14
**struck** 106:13
131:4
**struggles** 455:1
**stuck** 361:8
**student** 101:11
**studies** 13:9,11,15
13:18 35:21
108:17 109:5,9
124:12 248:10
249:20,23 250:7
270:8,11 271:17
278:1,15,22
292:18 298:10,13
298:21 301:20,20
302:1 304:2,9
305:9 321:10
329:22 331:20
343:20 353:1,8
354:22 356:20,21
356:22 357:3,4,11
358:8 367:21
371:5 378:2 391:7
412:13 415:13,15
415:21 416:3,18
441:14 482:2,15
485:14 486:2
490:5
**study** 6:19 7:10
39:7 50:17 109:10
250:1 256:18
257:11,22 258:10
258:20 271:19,21
273:18 275:17
276:1,5,17,19,22
277:4,7,18 278:2,5

278:8,10,19,23
279:3,7,15,17
281:17,18 282:7,8
282:9,9,14 286:4
289:11 291:12
292:13 298:23
299:18 300:5,15
309:11 311:10
313:7 317:17
318:10 319:17
321:9 323:9
324:20 329:16
330:3,6,22 334:15
334:17,18 339:11
340:8,10,19
341:14 342:5,18
342:22 343:5,8,10
343:15,17,19
346:14 347:8
348:18 352:5,10
352:15 354:14,21
355:9 358:3,10
363:7 370:7,17
388:23 389:14,17
389:22 390:10,23
391:16 392:7
393:10,17 410:22
411:20 412:4
413:10,14 414:4,5
414:8,9 416:20
440:9,10,11 453:6
453:13,15
**stuff** 101:4 107:1
148:8 220:18
359:13 363:16
372:7 448:12
**subcategories**
74:21
**subcategorizing**
301:15

PLAINTIFFS002143

| | | | |
|---|---|---|---|
| subcategory 154:7 | substantive 98:12 | suitable 398:23 | 245:9 251:23 |
| subgroups 390:7 | 98:17 168:16,21 | suite 2:14 3:6,12 | 285:12 286:3,12 |
| subject 20:2 34:21 | 173:11,23 181:1 | summary 82:15 | 287:9 288:13 |
| 39:6 51:4 79:17 | 181:12 | 88:23 89:5,5 | 294:18 295:10 |
| 82:3 88:19 104:17 | success 161:19 | 300:2 303:8 | 488:19 |
| 172:14 176:14 | 300:17 331:2 | 327:14 405:3,3 | supporting 46:18 |
| 205:21 272:1 | successful 95:15 | supervision 492:9 | 76:4,21 117:8 |
| 274:14 287:5,6 | 301:3 303:18 | supplement | 402:4 403:2 |
| 389:5 416:12 | succinctly 127:1 | 263:17 | 481:19 482:4,11 |
| 450:2 | sudden 368:23 | supplemental 4:16 | supportive 417:4 |
| subjective 112:4 | suddenly 368:14 | 38:4 264:1 265:1 | supports 46:15 |
| 114:2 282:15 | 369:7 372:13 | 265:6,20 | 338:2 487:6 |
| 327:16,17 331:10 | suffer 132:13 | supplements | suppose 50:23 |
| 336:5,7,10 349:13 | 444:3 486:18 | 38:10 296:11 | 53:11 226:8 |
| subjects 87:21 | suffered 463:23 | supplies 422:6,19 | 311:19 323:18 |
| 454:1 | suffering 41:6 | supply 339:2 | 381:3 |
| submission 234:10 | 53:9 66:19 122:11 | 468:9 | supposed 28:9 |
| submitted 33:22 | 122:13 151:5 | support 48:16 | supposedly 117:14 |
| 34:3 42:17 43:3 | 260:18 457:6 | 49:13 51:18 52:4 | suppress 428:15 |
| 55:19 292:3 | sufficient 294:1 | 52:8 57:10 58:16 | 428:23 |
| subreddit 364:19 | 358:9 482:20 | 64:1 72:6 77:21 | suppressing |
| 364:21 365:13 | 484:21 | 88:21 89:8,22 | 401:10,14 437:15 |
| 366:5 | sufficiently 310:8 | 103:14 104:11 | 437:23 |
| subscribed 495:14 | 311:22 | 112:9 244:13 | suppression 7:19 |
| subscribing 297:1 | suggest 414:4 | 284:21 287:23 | 404:1 406:1 411:9 |
| subscription 297:4 | suggesting 118:2 | 303:19 314:17 | 413:5 |
| subscriptions | suggestion 173:4 | 336:3 352:17 | sure 15:2,20 32:15 |
| 100:10 | suggestive 362:23 | 380:7,18 381:19 | 94:19 97:6 113:5 |
| subsection 174:5 | suggests 394:22 | 382:10 387:21 | 115:9 118:13 |
| subsequent 122:3 | sugrue 6:6 299:19 | 393:7,11,17 | 121:2 126:23 |
| 185:22 461:10 | suicidal 487:5 | 395:18,19 403:5 | 139:1 181:4 |
| subsequently 74:6 | suicidality 313:13 | 406:19 409:20 | 184:14,15 256:7 |
| 226:22 229:4 | 333:20 334:20 | 410:1,19 416:22 | 273:15,16 277:18 |
| 270:21 | 338:5 347:2 | 439:14 444:6,6 | 288:19 297:21 |
| subset 68:15 | suicide 119:9 | 454:5,8 469:6 | 325:12 340:23 |
| subsidiary 103:21 | 162:9 314:5,18 | 482:16,21 484:19 | 343:1 360:5,5 |
| subspecialty | 334:10 372:4 | 485:20 | 434:4 453:3 463:9 |
| 173:15 | 390:2 391:1,9 | supported 39:5 | 468:7 477:11 |
| substance 14:6 | 393:13,20 | 45:17 50:10,17 | 485:7 487:14 |
| 70:17 77:14,15 | suitability 416:17 | 120:6 123:19 | surgeon 8:14 24:5 |
| 363:6 | | 186:14 243:11 | 64:10 66:18 95:4 |

PLAINTIFFS002144

| | | | |
|---|---|---|---|
| 95:7 106:5 119:14 | 358:13 379:20 | 189:3 250:5 273:8 | **surgery's** 159:19 |
| 121:16 123:10 | 478:21 | 273:8 282:4 283:5 | 159:21 |
| 130:20 133:6 | **surgery** 6:8,11,14 | 283:9 287:13 | **surgical** 6:21 |
| 154:20 155:19,19 | 7:10 8:5 22:21,22 | 290:11 291:6,15 | 24:23 65:1 104:15 |
| 159:18 160:13 | 23:3,4,15 25:3,14 | 291:19 293:5,19 | 105:12 112:3 |
| 174:19 198:17 | 25:17 26:2,14,17 | 296:1,20 299:21 | 117:15 121:18 |
| 213:2 274:16,17 | 27:14 28:11 30:9 | 300:6,10,18 | 126:10 127:4 |
| 281:7 284:16 | 31:7,8,12,23 32:3 | 306:11,13 309:12 | 134:8 140:9 |
| 315:10,12 402:15 | 32:10,11,17,19 | 309:16,21 310:19 | 141:11,18 142:13 |
| 443:8 464:15 | 36:23 44:13 45:1 | 310:23 311:14,14 | 144:8 154:23 |
| 466:4,17 467:11 | 45:3 46:2 47:8 | 312:3 314:11,18 | 159:15 162:23 |
| 467:14 472:17,20 | 60:1,17,22 61:5 | 316:1,12 323:1 | 163:13 164:14 |
| 473:1 475:12,17 | 64:18 66:11,21,21 | 328:3,8 331:3,9,13 | 174:18 175:21 |
| 476:9 480:14,15 | 67:9 68:4,5,6,6,17 | 332:5 333:8,14,19 | 176:5 177:21,22 |
| **surgeon's** 79:20 | 69:7,16 71:3 72:4 | 334:3,6 335:4,20 | 220:20 271:19 |
| 466:5 480:18 | 72:4 73:2 79:22 | 337:11 338:11,14 | 284:13 285:12 |
| **surgeons** 5:10 | 81:2,6 82:10,12,14 | 346:17,22 351:9 | 286:2,4 288:12 |
| 44:19 66:10 67:16 | 89:7 90:7 95:12 | 351:19 358:17 | 289:5 290:19 |
| 68:10 96:12 99:17 | 100:17 102:20 | 366:14 373:21 | 293:11 295:15 |
| 100:5,19 102:23 | 103:19 104:7 | 375:7 376:13 | 296:14 308:10,23 |
| 108:11 120:18,23 | 106:2,9,10,17 | 382:23 384:22 | 315:3,20 316:5 |
| 122:14 123:7,21 | 107:13,20 111:9 | 386:16,17 387:2 | 322:21 326:23 |
| 126:9 127:3 | 111:18 112:10,14 | 387:14 390:1,16 | 330:8 334:2,7 |
| 130:14 132:3,5 | 112:22 114:10 | 391:3 392:23 | 336:17 353:10,20 |
| 149:21 154:16 | 115:19 121:17,19 | 393:12 394:22 | 353:21 354:3 |
| 169:7 171:13 | 122:2,7,9,21 123:8 | 423:22,23 425:17 | 356:2,14 357:5,16 |
| 285:3 294:17,22 | 123:17,23 125:9,9 | 426:14 427:6,18 | 357:21 358:23 |
| 294:23 295:9,15 | 128:8,8,13,14 | 428:2,7 429:8 | 369:13 393:18 |
| 299:3 312:4 419:8 | 130:3,15 131:16 | 432:3,8 433:19 | 400:17 402:18 |
| 474:5 | 131:19 132:1,18 | 437:21 444:19 | 419:5 424:10 |
| **surgeries** 24:21 | 133:17 134:3,17 | 450:15,22 454:6 | 435:16 436:14,17 |
| 25:2,8 59:16 90:9 | 138:10,11,17 | 466:21 467:1,3 | 444:11 459:6,10 |
| 90:10,11 103:8,13 | 139:7 140:5 | 468:12,14 469:17 | 459:20 469:22 |
| 118:3 119:22 | 141:13 143:4 | 472:16,23 473:16 | 470:7 474:8 |
| 120:19,23 121:23 | 147:20 149:3 | 473:22 474:15 | 480:16 481:3,20 |
| 122:1 125:14 | 151:8,23 152:5 | 475:5 476:2,2,15 | 485:1,21 486:3 |
| 140:12 142:4 | 159:3 166:23 | 477:4,5,10,14,21 | **surgically** 144:4 |
| 143:8 147:15 | 167:4,8,14,20 | 478:20 479:10,15 | 151:2 152:4 323:2 |
| 148:11 176:8 | 168:8,13,18 175:5 | 481:2,15 482:18 | 328:12 329:4 |
| 177:4 315:22,23 | 175:10 176:22 | 488:18,23 | **surprise** 20:4,9 |
| 336:4 338:18 | 178:2 181:21 | | 21:23 32:16,22 |

PLAINTIFFS002145

103:4 196:11
425:13,22
**surprised** 303:12
**surprising** 21:15
113:12,15
**surroundings**
348:11 349:7
**survey** 331:14
**surveys** 299:8
332:4
**suspect** 26:23
151:5 196:18
220:13,22
**suspend** 140:8
**suspicion** 58:23
185:12 433:22
**suspicious** 144:13
144:14
**swear** 10:12
184:23
**swede** 329:21
**sweden** 7:11 35:16
248:4 329:20
**swedish** 313:7
329:21 330:6
346:14 389:23
391:3 453:5
**sweet** 131:3
**swissophone**
389:9
**switch** 182:8
**sworn** 11:6 495:14
**symptoms** 152:7
405:18
**system** 116:7
280:10 319:6
345:21
**systematic** 6:22
8:1 300:8 307:18
356:3,12 357:3,20

**t**

**t** 4:10 33:2 182:13
202:16 203:4,4,11
203:11 277:14
360:9 372:7 425:7
446:12 492:1,1
494:3,3
**table** 87:14 129:21
131:5 302:7,9
307:13 337:6
338:8 349:20,23
350:13,16
**take** 14:11 24:20
69:14 90:22
115:17 131:17
140:16 143:11
176:6 204:18
282:11 294:12
312:15 315:7
316:15 318:6,20
319:21 367:20
397:1 408:13
463:14 470:3
471:18,19
**taken** 9:20 40:18
41:17 42:2 51:12
79:5 115:12
166:18 227:22
229:19 232:4
240:16 254:17
320:4 322:12
388:9 417:13
470:14 472:5
492:5
**takes** 42:8 80:17
80:23 107:12,19
111:5 112:3
118:10,18 221:17
222:13 231:23
232:16 242:1
429:20 442:12

443:11
**talk** 23:1 31:7
35:15 83:23
118:15 136:20
163:5 201:2
210:21 271:1
290:1 331:10
347:11,11,13
381:4 452:14,23
453:17,23 464:3
**talked** 61:16,17
87:22 110:1,14
169:6 189:14
204:23 232:8
261:19 267:12
268:1 290:18
300:20 324:14
345:11 347:3
351:23 352:8
354:12 363:9
380:20 421:3
424:13 429:14,15
448:5 469:11
**talking** 13:3 20:15
68:21 109:21
115:16 144:5
159:7 166:3
206:21 212:13
216:4 255:2
270:14 271:14
277:6 278:9
287:14 289:10,12
289:19 290:12,15
291:18 293:15
295:19 312:10
313:17 314:20
328:5 338:15,16
361:19 366:16
369:11 372:3,5
386:12 425:4
446:6 448:1,7

449:19 460:14
462:14 471:14
484:15 488:2,3
**talks** 131:22
240:12 402:21
**tangential** 132:10
132:16
**tangentially** 130:5
**tara** 2:12
**tattoo** 139:23
**tavistock** 53:19
**tborelli** 2:16
**teachers** 10:20
420:15,16 452:1
**teaching** 121:13
454:2 467:10
**teachings** 452:17
**team** 149:11 150:5
150:14 272:22
336:23
**teams** 83:14 151:9
**technical** 82:11
295:20
**technique** 130:9
130:17 284:13,15
289:12,15 299:1
310:10,21 311:3
311:11,21 312:14
**techniques** 130:13
286:11 290:11
295:1 296:15
311:12,20 338:3
**telephonic** 192:7
200:1
**tell** 21:18 22:8
68:5 76:21 114:19
174:8 196:8
207:18 208:13
214:23 292:6
341:4 352:21
372:3,6 434:2

PLAINTIFFS002146

**telling** 12:13 59:13
226:14 237:2
306:15 433:16
**tells** 244:11
**temporary** 265:8
**ten** 23:11 46:8
86:2 138:20,21
139:7 140:16,20
140:23 141:7
262:2,6 263:1
266:21 351:22
476:23
**tend** 210:14
284:16 285:4,5
**tends** 345:11
**term** 7:7,17 18:18
19:7,11,17,19 20:3
20:6,19 21:18,19
21:22 22:2,7
61:11 89:10
119:12 124:11
141:5 164:22
193:20 241:20
249:20 291:12
292:12 313:10
314:15,16 332:8
398:10 399:10
404:7 411:8 442:6
442:8,21 447:4,6,7
447:8 459:14
466:14 485:12
**terminology** 60:23
194:13
**terms** 24:8 26:7
89:20 93:17
119:10 148:12
152:22 176:20
277:21 311:16
355:13 413:22
424:17 446:21
458:12,14 469:20

469:21 484:22,23
487:8
**test** 219:10,11
324:11 332:3,22
333:1 486:12
**testified** 11:7
38:19 64:1 91:11
91:13 308:16
**testify** 38:15 90:21
173:13
**testifying** 90:23
91:5 95:10 274:23
**testimonies** 359:18
360:19 365:12
**testimony** 1:19
11:16 17:20 18:6
50:14 63:19 97:19
170:15 171:2
172:7,11,12,20
174:14,17 177:2
180:3,6,14,23
182:5 216:11
254:9 329:8 363:6
449:14 487:12
491:4,12 493:9
495:8
**testing** 281:20
282:2,12 437:16
**testosterone** 214:7
214:22 215:17
318:23
**tests** 124:9 211:11
486:9
**texas** 62:5,7,11
76:20,22 77:5
78:10 110:15,22
**text** 266:1 416:19
**textbooks** 73:1
**thank** 10:13 19:5
98:15 133:15
275:10 325:5,17

445:4 470:21,23
490:23 491:2,5,5,6
**thanks** 470:20
**theirs** 196:13
**therapeutic** 229:4
248:18 282:8
291:10 301:16
**therapies** 52:9
105:23 106:21
110:8 147:4
150:15 208:22
324:7
**therapy** 77:22
124:5 139:22
140:14 145:17,19
159:20 163:17
164:5,10 215:8
228:9 238:17
243:4 247:17
249:22 289:14
345:8 376:14
379:21 384:23
387:3 394:21
400:5 425:18
426:15 431:12
437:15,17,23
481:20 482:12
**thing** 59:1 70:20
93:21 94:10 96:22
98:17 103:16
114:21 125:11
127:13 140:3
145:15 159:22
162:1 164:21
222:23 303:16
358:3,6 364:5
380:14 403:18
436:3 440:8,10,11
459:17 475:6
478:22 487:11

**things** 16:13 20:16
46:10 50:21 53:6
54:6 68:11 77:22
83:12 101:8 102:1
102:16 103:23
105:20 106:1
119:11 121:13
122:22 123:2
144:11,14 159:15
178:7,17 209:16
210:1 218:12
224:4 226:11
247:6 260:5
262:14 271:14
281:9 282:16
288:7 290:21
299:8 301:6,17
313:15 332:7
333:2,18,20,22
334:4,11 347:3
369:17 392:18
402:8 404:8 421:2
432:13,15 447:19
457:22 463:11
464:2
**think** 14:9,13,14
15:17 16:1 18:15
18:15 19:18,21
25:8 26:2 32:11
45:12 46:20 48:19
52:16,21 54:4,17
58:7 61:10 62:9
62:10 65:19,19
69:9 72:11,17,18
73:12,20 74:5
82:3 84:6,11 85:2
85:15 86:10,15
87:1,6,19 88:6
93:11,15,17,20
94:10,11,14,16,17
94:22 96:20 97:10

PLAINTIFFS002147

**[think - told]** Page 71

98:10,13 99:10
100:12 101:7,11
101:17,19 102:21
103:6,20 105:11
105:14 106:16
107:1,14 110:20
110:20,21 115:4
117:17 118:8,17
118:21 119:1,3,3
121:5,8,9 122:19
141:14,18 149:5,6
152:3 160:4,10
163:19 165:23
166:11 171:22
179:12 180:4
184:11,12 196:5
196:12 202:9,11
206:4 218:12,18
222:10,15 227:21
238:8,10 245:7
256:5 262:22
273:11,13,17
279:4 280:19
281:12 282:20
285:11 286:2
290:20 297:17,23
298:12 306:15
318:18 322:7
323:22 327:13,22
328:3 334:15
335:2,21,22 341:3
345:23 346:2,9
359:23 365:14,18
366:3 377:1 380:8
386:11 389:6,7
392:22 399:4,8
402:14 408:2
409:14 410:15
420:3 434:1 439:4
439:8 443:17
448:13 453:18

460:16 462:2,8
474:6,22 489:3
**thinking** 106:12
154:17 166:2
372:4 470:1
**thinks** 154:9 383:8
**third** 27:20 41:2
64:16 65:6 71:4
98:4 133:1 195:6
300:4 309:5 348:1
356:11 357:7
391:19 430:22
437:11 440:11
**thirteen** 416:18
**thirty** 107:2 195:6
232:5 246:19
**thonen** 446:7
**thought** 50:15
95:20 103:4
121:20 180:10,12
266:20 471:8
**thoughtful** 126:21
**thoughts** 462:20
**thousand** 360:22
416:15
**thousands** 120:18
**threaten** 67:3
**threatening** 119:9
314:2 490:7,17
**three** 10:18 14:9
15:19 19:17 24:5
51:3 73:11 103:17
110:6 116:12
122:21 123:17
124:15 125:12
138:22 160:6
165:1 174:21
175:5,22 176:6
229:18 247:7
260:8 261:7 299:2
312:14 327:6

336:15 337:23
364:14 381:22
391:17 431:10
455:22
**throttling** 143:10
**thursday** 9:17
491:10
**thyroid** 156:8,12
**thyroidectomy**
156:13
**time** 14:22 19:2
20:2 24:7,13 29:9
88:5 100:10 101:5
102:8 121:20
133:8 135:5 137:9
141:10 161:7
169:19,21 170:3,7
202:7 226:7,13
267:7 269:18
273:6 311:23
332:13 344:14
345:12,14,18
347:17 351:18
412:12 416:16
436:4 447:22
470:4,20 471:22
473:13 474:20
492:13 493:19
**timeframe** 493:8
**times** 13:1 14:7,9
29:1 159:6 206:10
390:1 468:2
**timing** 139:2
**timmcric** 465:16
**tipping** 123:16
**tishyevich** 2:6 4:4
4:7 10:14,15 11:9
15:19 16:11 78:23
79:9 114:22 115:7
115:15 125:22
126:16 166:13,22

182:12 186:20
254:12,21 256:12
319:23 320:8
325:22 340:5
370:3 388:13
389:12 414:14
417:9,16 445:5
470:9,18 471:2,23
472:2 489:6,10
**tissue** 467:17
479:5
**title** 230:21 464:14
**titled** 36:3 55:12
59:15 62:23
115:23 129:20
131:11 133:10,20
134:6,12 225:6
233:13 256:19
299:19 326:12
340:8 350:13
356:2 376:12
397:9 399:15
411:7 415:9 427:5
430:13 450:21
453:5 456:1
458:21
**today** 11:17 12:16
13:14 14:3 70:10
92:1 120:17
123:11 126:9
127:5 170:21
173:22 180:13
181:8 192:19
221:20 230:9
233:9 239:8
252:18 288:8
297:16 313:17
470:20 488:15
**today's** 491:11
**told** 48:20 165:17
261:23 262:4

PLAINTIFFS002148

409:7 443:19
**top** 58:2 59:15
 108:10 109:8
 128:7 130:14
 167:14 224:13
 240:23 263:13
 337:7 367:11
 375:19 377:11
 384:18 394:16
 421:9,21,21
 430:16 434:8,17
 453:8 461:1
**topic** 239:10 458:7
 458:19
**topics** 90:13
 180:23 181:11
 452:10
**total** 338:22
 345:15
**totally** 19:4 229:11
 314:7,8
**touch** 98:6
**touched** 216:17
**toxin** 263:5 490:13
**track** 312:12
**trade** 201:9 203:5
 203:9
**tradition** 8:2
**train** 106:6 155:7
 157:8
**trained** 68:11 75:5
 104:2 155:8 157:1
 157:9,14 211:6
 274:18 275:6
**training** 66:3,6,8,9
 66:12 67:20 69:3
 69:5,10,19 73:3
 74:4,13,16 75:14
 95:15 101:22
 107:7 121:12,16
 122:4,15 124:21

125:15 155:13
156:2 158:4 204:3
274:11,15 284:19
284:23 466:16
467:10,13 468:16
472:23 477:3
483:4 488:22
**trajectory** 152:23
**tran** 18:9 365:12
**trans** 145:21
 148:13 151:12
 370:1 428:15
 429:1
**transcript** 8:20
 15:12 18:7,11,12
 18:22 492:7,11
 493:6,18,20 495:5
 495:8
**transcripts** 17:19
 18:5
**transfeminine**
 167:13
**transform** 323:1
**transformative**
 71:2
**transgender** 4:22
 19:7 20:19 21:11
 22:1 40:4,7 55:13
 63:1 64:19 65:1
 79:17,21 81:2
 82:12 83:13 89:6
 95:17 104:6 106:2
 106:10,17 109:13
 122:9,12 123:7
 130:14 131:23
 132:7,11,12
 136:21 145:1,10
 146:7 147:5 151:9
 160:21 167:4,11
 167:17,21 168:1,4
 168:9,13,18 169:1

175:21 178:22
179:1 181:20
182:10,17 214:2,6
247:17 314:6
318:12 341:9
342:15 343:16
347:1 348:20,22
351:9 353:3 354:7
355:12 365:7
366:8,9,12 368:10
368:15 369:1,6
374:11 386:17
412:17 428:17
444:1,18 448:6
450:1,22 454:5
460:15 463:14
468:11 469:16
476:15,18 477:14
478:21 479:10,15
482:18 485:22
486:10
**transgendered**
 259:17
**transgenderism**
 194:16
**transition** 55:13
 113:10,19 153:1
 165:18 169:2
 176:22 287:13
 353:4 359:19
 360:20 363:10
 365:17 366:10,18
 395:12,19 397:9
 397:17,21 398:11
 398:18,23 479:22
**transitioned**
 148:14 328:13
**transitioning**
 82:13 94:3 146:4
 178:13 238:20
 312:3 320:20

321:5,21 360:15
373:22 416:23
**translation** 7:14
**transmen** 344:17
 344:18 345:15
**transsexual** 7:8
 330:18 392:1,8
**transsexualism**
 392:12
**transsexuals** 6:13
**transwomen**
 344:16,18 345:15
 348:8 349:4
 416:14 417:6
**trauma** 133:13
 143:1 178:18
 272:18 279:5
**traumatic** 178:6
**treasurer** 10:22
**treat** 65:9 131:22
 132:1 144:23
 151:7 215:18
 220:19 231:19
 435:17 436:20
 450:1 460:2
 488:19
**treatable** 122:6
**treated** 131:1
 132:14 144:1
 146:8 150:22
 151:1 152:2,6
 212:13 217:20
 318:23 400:1
**treating** 75:14
 136:21 146:21
 200:14 218:9
 249:7 262:9 273:5
 460:8
**treatment** 4:21 8:7
 8:11 19:7 20:19
 21:11 22:1,3 39:5

PLAINTIFFS002149

40:19 41:5 49:16
52:1 54:10 63:1
65:1 78:19 80:18
81:7 89:10 111:6
117:15 129:20
137:4,11,18
146:23 151:16
153:11 178:6
186:12,14 195:17
196:15 206:16
211:21 214:11,17
215:1 216:9
219:19 220:16
225:14 266:4
267:17 268:4,7
316:19 329:11
340:11 345:22
350:17 353:2,10
353:21 354:3
373:10 374:17
375:1 392:11
394:21 402:3,5
405:8 406:2,6,23
422:20 423:8,17
424:1,10,21
429:21 430:13
431:1 433:20
434:22 435:22
437:13 438:2
459:21 460:14,17
473:4 474:21
475:3,4 481:3,14
481:21 482:12
483:14,22 485:21
487:21
**treatments**  35:5
36:18 43:15 44:2
65:21 89:8 119:6
120:5 139:21
140:5 150:16
319:3 373:20

487:15
**treats**  342:14
**trelstar**  203:11
**tremendous**  70:23
162:4,6 165:16
290:1 484:18
**trend**  109:15,21
**trending**  465:15
**trends**  340:10
**trial**  217:21
236:15,17,19,21
237:4,22 246:17
249:13 250:3
251:13 252:6,9,10
252:13 268:21
270:2,19 272:19
273:7 274:21
275:17 291:8
292:19 293:1,6,10
301:16,17 310:16
316:6 341:12
412:1
**trials**  120:11
218:12 235:22
245:10,20 246:11
246:22 247:20
249:3,18 250:21
251:23 269:4
271:2 280:8
293:20 294:10
298:3 302:18,18
307:20 422:23
**tried**  96:10
**triptodur**  203:3
**trivial**  244:18
**troubled**  179:13
179:22
**troublesome**  381:2
**troubling**  179:20
402:8

**true**  17:4 30:5
33:18 151:19
196:11 270:7,10
348:3 349:2 351:4
409:13 461:16
492:11 495:8
**truth**  444:7
**truthful**  11:16
**truths**  449:18
**try**  16:12 69:12
288:3 289:15
294:23 334:1
443:1
**trying**  19:20 88:11
91:18,20 94:5,16
149:6 153:5
273:11,13 276:3
279:4 300:15
324:19,21 334:22
340:20 345:4
348:22 455:2
458:9
**tubularized**
478:18
**turn**  151:20 397:6
471:15
**turned**  150:8
471:6
**turns**  45:23
**twenty**  107:2
219:21 320:12
**twice**  165:5
**two**  25:20 84:3,5
98:11 99:23 100:1
136:15 139:17
144:5 147:21,22
148:18 172:10
271:7 307:18
336:15 337:22
344:11 364:14
391:17 404:14,16

407:17 431:10,12
455:22 459:2
460:5 468:18
475:22
**type**  202:21 282:7
333:13 335:20
343:8 350:18
**types**  36:17 203:14
316:11 343:19
358:17
**typical**  90:10
160:22 315:19
**typically**  50:17
149:10 165:2
203:21 207:18
211:10 214:3,8
271:7,11 337:22
385:13 490:4
**typo**  359:21,22
**typology**  7:1

| **u** |
| --- |

**u**  16:12,16 20:23
203:4 299:19,19
**u.s.**  137:2 425:12
**uc**  86:14 273:12
278:7
**uh**  264:9 361:16
365:4 396:17
420:20
**uk**  7:22 411:11
**ulcer**  121:19,23
122:7 123:11
**ulcers**  121:20
**ultimate**  459:17
**ultimately**  53:17
156:13
**ultrasound**  142:11
**unable**  413:3
**unacceptable**  8:16
464:16 466:3
467:8,12 484:7

PLAINTIFFS002150

**unapproved**   5:14
  225:7 228:4,5
  230:22 231:6,11
**unbiased**   409:14
**unborn**   131:12
**uncertain**   412:19
**uncertainty**
  406:18
**unchangeable**
  442:14 443:13
**uncommon**   255:5
  255:16 294:16
  357:10 358:22
  463:22
**uncontrollable**
  478:6
**uncontrolled**
  411:19 413:10,14
**undergo**   316:21
  330:19 390:15
**undergoes**   61:4
**undergoing**   7:9
  60:5 211:21
  213:18
**undergone**   419:5
**underlying**   194:19
  210:8 211:1
  215:14 217:19
  368:19
**underneath**   60:10
**underpinnings**
  104:14
**understand**   26:8
  28:7,14 29:4,17
  30:20 99:3 100:14
  116:23 143:16
  156:15 159:2,8,10
  162:2 182:7
  225:19 228:13
  229:17 234:15
  239:19 247:13

264:16 266:3
274:12,22 275:8
277:9 288:18
297:6,15 300:14
342:4,13 346:19
348:23 357:2
369:15 377:16,23
378:9 382:21
384:3 390:9
399:20 404:13
406:10 419:22
423:5 427:14
437:20 440:16
441:5 443:9 452:6
457:3 458:15
466:13 468:17
**understanding**
  5:13 21:5 33:17
  83:10 90:6 149:20
  150:2,9 160:20
  184:10 195:9,14
  230:21 275:19
  347:6 402:20
  444:10 449:15
  459:23 460:12
  466:21
**understands**   207:2
**understood**   14:1
  118:13 130:21
  133:10 195:15
  373:4
**undertook**   411:19
**underwent**   344:12
  344:19 345:6,16
  389:23 391:2
**unethical**   118:4
  120:12
**union**   420:15
**unit**   9:18 79:3,7
  166:16,20 254:15
  254:19 272:18,23

320:2,6 388:7,11
470:12,16 491:9
**united**   1:1 8:9 9:22
  433:18 434:8,18
  435:21 437:20
  441:8,21 472:17
  474:2 475:13
**unitedhealthcare**
  433:7
**university**   95:13
  95:19 96:8 272:16
  368:18
**unknown**   320:18
  321:6,12,15,22
  322:1 330:2
  367:12 486:16
**unlabeled**   228:6
**unofficial**   7:13
**unproven**   120:4
  206:22 481:15
**unquote**   291:20
  351:4 367:23
**unreliable**   280:15
**unsupported**
  243:4
**untenable**   250:6
**untested**   120:4
**unusual**   106:13
**unverified**   120:2
  280:7
**update**   6:3 7:6
  31:1 256:21
  381:10 382:13
**updatcd**   171:16
  197:17 378:1
  430:19 435:4
**updates**   197:22
  198:2,8,21 199:13
  199:18 200:2,4,21
**updating**   198:20
  441:20

**ups**   337:22 489:4
**upset**   409:6
**urethra**   478:13,14
  478:15
**urethral**   336:17
  336:18 338:10,20
**urgency**   463:12
**urinary**   178:16
**usage**   258:3
**use**   5:14,17,22
  18:18 19:7,11
  44:15,22 61:11
  64:18,23 73:22
  84:22 87:23 101:3
  112:13 119:5
  130:8,10,16 145:2
  145:18 161:15
  162:18 189:18
  194:12 205:13
  206:4,8,9,9,10,18
  207:1,3 216:5,13
  218:2,5,6,18,22,22
  219:6,10,16
  221:17 222:2,4,7
  222:16 226:2,6,12
  226:23 228:17,19
  229:9 230:22
  231:6,11,23 232:9
  232:16 233:14,20
  234:1,3,7,19 237:1
  237:18 238:2
  239:5 240:2,10,16
  241:3,8,12,16,22
  242:2,3,6,9,21
  243:10,18,22,23
  244:3,8,11,23
  246:5 247:12,19
  249:7 250:17
  251:22 253:2,5,13
  253:15 254:11
  255:3,5,16 257:3

PLAINTIFFS002151

257:13 258:6
259:18,21 260:16
260:23 261:9
262:9,16,23 263:4
265:22 267:11,12
267:23 268:22
269:5 270:3
316:23 333:21
338:5 354:19,21
385:4 389:10
406:12,19 417:5
438:19,19 442:21
443:3,10 446:20
459:22 461:22
466:14 482:16
483:8,20 484:8,17
488:18 489:12
490:16
**useful**  310:3
330:22 344:2
354:23 355:1,13
374:20
**useless**  355:16
**uses**  225:7,14
226:15 228:6
229:1 241:17
461:20 469:12
484:4
**usually**  88:2
145:23 149:15
162:6 210:14
298:20 299:2
**utah**  4:18 54:8,16
56:1,12 57:10
58:15,20 59:7
61:17,20 77:8,11
78:7 109:23
110:14,23 117:7
**utterly**  8:15
220:23 247:11
464:15 466:2

**uva**  106:7,9,10
125:9

**v**

**v**  1:12 9:21 16:21
33:2 202:16 203:8
322:18 493:4
494:1 495:1
**vaginal**  476:16
479:3,7,7
**vagineal**  479:3
**vaginoplasty**
168:1 175:13
476:18 478:23
**vague**  87:9
**valid**  23:11 199:3
209:4 228:23
288:4 310:21
314:7,9 485:13
486:1,2
**validated**  282:13
282:14
**validity**  274:19,22
275:2,19 282:17
358:9
**valuable**  333:17
**value**  305:22
**values**  334:14
**van**  86:7,10
**vanderbilt**  2:8
**vantas**  202:15
**variation**  71:19
**variety**  145:15
201:8,12 332:2
**various**  13:1 36:17
94:2,2 144:9
160:12 208:23
473:4
**vascular**  339:1
468:3
**vast**  330:17 335:18

**vehemently**  247:4
**venues**  160:12
**veracity**  274:19
**verbiage**  185:12
400:8
**verify**  493:9
**veritext**  10:6,9
493:14,23
**veritext.com**
493:15
**version**  7:16 183:2
183:9 184:5,8,18
185:4 187:3,9,13
187:18 188:1,7,16
188:20,23 189:10
196:21 396:15
397:4 398:15
399:3 401:1
**versus**  77:18 92:11
135:15 299:6
432:14 473:7
477:7
**vertical**  349:20
**veterans**  137:7,12
**victory**  161:20
**video**  256:6
**videoconference**
1:18 2:4 3:2,18
9:7
**videographer**  3:20
9:15 10:7 79:2,6
115:10,13 166:15
166:19 254:14,18
320:1,5 388:6,10
417:11,14 470:11
470:15 472:3,6
491:8
**videorecorded**
9:18
**videotaped**  1:18

**view**  42:9 79:21
80:17 118:10,19
186:6 428:1
431:18 432:7
442:11 443:9,10
484:3 485:9,10,23
486:14 487:14
488:17 489:14
**views**  398:7
452:11 465:2
489:12
**violated**  170:2
171:3 182:3
**violating**  182:1
**violation**  179:8
182:5 316:3
464:22
**violence**  67:13,15
**vir**  292:6
**virginia**  262:13
**virtually**  102:14
369:7
**visible**  319:12
328:5
**visit**  347:10
**visited**  341:23
342:7
**visiting**  343:2
**visits**  257:22
258:11
**vital**  309:9
**vocal**  125:5
**vol**  5:11
**volume**  74:7
**vote**  63:16,21
**vs**  394:23
**vulnerable**  76:9
120:13

PLAINTIFFS002152

**w**

**w**  182:13 340:15
356:2 445:6
**wait**  289:15,17
313:22
**waiting**  77:20
**waits**  293:9
**walk**  377:8 444:23
**wall**  2:20
**walter**  11:14
**wandered**  186:15
**want**  15:1,19 19:3
72:13 80:11 90:12
101:13 126:23
135:1 150:13,19
151:18 172:9
181:3 210:19,21
256:6 262:18
272:7 273:14
289:22 344:23
349:22 359:12
362:12 396:13
397:20 420:5
453:2 462:16
470:3 480:8,9
487:13
**wanted**  82:10 90:5
95:19 159:2,7,9,12
159:13 194:12
440:22 441:3
452:6,8 472:10
487:12 489:5
**wanting**  159:19
235:18
**wants**  148:14
149:22 166:4
219:7
**ward**  156:4,7
**warning**  215:20
489:22 490:1,4,11

**warnings**  215:22
**warrant**  217:17
218:6 253:7 310:9
**warranted**  217:18
**watchful**  77:20
**wave**  260:9
**way**  38:15 54:3
73:1 88:13 132:10
134:19 151:9
171:4 181:21
206:19 225:4
243:3 244:14
245:5 261:9
266:19 311:9
317:17 322:13
338:3 346:18
350:2,21 354:5,9
367:4 382:5,12
385:18,21 429:6
438:8 442:1 443:2
447:10 449:6
462:20 474:11,13
486:12
**we've**  61:16,17
77:8,11 125:2,11
175:2 180:19
182:6 268:1 344:5
439:10
**weak**  51:6,19
**weakest**  382:10
**wealth**  292:1
**web**  27:13
**website**  230:19
361:19 362:7
366:21 407:12
455:14
**wednesday**  63:12
**weeks**  15:2,16,20
37:7 156:7
**weigh**  206:12
207:1 226:2,9

**weight**  284:1
292:2
**weighted**  185:13
**welcome**  351:2
**welcomed**  443:18
444:2
**went**  74:1,3 94:5,6
97:14 103:18,23
104:4 139:18
164:4,9,14 165:17
188:1 192:1 200:7
336:20 361:9
**west**  2:14
**whatsoever**  61:21
**white**  102:2
298:22 387:5
**who've**  145:12
**widely**  189:21
201:6
**wider**  410:7
**wiepjes**  6:17
340:15
**williams**  3:10
**willing**  90:21 91:7
96:13 286:10
**wilson**  6:20 356:1
**winston**  3:13
**wisdom**  436:15
**wise**  311:10
**wish**  470:5
**withdrawn**  108:3
177:12
**witness**  9:10 10:13
91:11,13 92:16,22
174:11,22 255:22
256:2,9 280:23
281:3 325:15,18
327:3 332:10
335:1,7 340:6
341:1,6 350:7,11
384:12 385:19

400:9 408:4 413:1
420:8 426:4,7
440:21 445:15
491:2 493:8,10,12
493:19
**witnesses**  90:15
91:3,8 92:20
172:21 173:10
**woman**  456:15
**woman's**  156:3
**women**  151:12
152:15 214:2
348:10 349:6
**wonder**  393:6
452:22
**wondered**  134:21
**word**  176:15,17
228:3 438:20
462:16 469:12
**words**  60:13 61:13
209:16 392:15
402:11 443:10
**work**  45:7,18
61:21 76:21
184:17 191:13
192:18,21 193:3
198:2 211:12
212:2,18 213:17
466:7
**worked**  110:17
273:6 382:7
**working**  16:5,17
17:2,8 143:2
156:20 184:8,18
190:16,21 192:7
272:17 273:1
474:5,7
**works**  48:21 311:1
**world**  117:22
121:14 123:16
125:1 161:4

PLAINTIFFS002153

| | | | |
|---|---|---|---|
| 177:16 182:9 | 397:11 | 186:8,18 188:15 | 344:3 345:17,23 |
| 260:3 329:1 332:5 | **wrote** 183:7 408:3 | 189:7 195:21 | 346:9 347:10 |
| 410:5,8 412:16 | **wyoming** 3:7 | 196:19 205:7,9 | 349:10 350:3 |
| 428:16 474:22 | **x** | 208:2,5,9 211:3,19 | 351:6,22 352:8 |
| 476:7 479:10 | **x** 4:1,10 360:9 | 212:10 213:12,13 | 353:11,15 358:19 |
| 480:12 486:22 | | 220:6,7 221:1 | 359:21 360:15,22 |
| 487:5 | **y** | 224:6,12 228:5 | 361:8,21,22 362:4 |
| **worldwide** 416:11 | **y** 256:19,19 | 229:7,11 236:12 | 362:18 367:3 |
| **worry** 135:8 264:5 | **yackey** 6:1 256:19 | 236:22 237:12,21 | 371:2 375:9,10 |
| **worse** 392:19 | **yeah** 18:15 22:1,7 | 237:22 238:5,6 | 377:5,7 378:18,22 |
| 393:8 | 22:13 32:16 41:22 | 240:21 242:1,6 | 378:23 379:9 |
| **worst** 381:18 | 42:5,23 48:2 | 243:14 245:14 | 382:6,11,17 384:5 |
| **worth** 485:6 | 51:20 54:19 65:19 | 246:18 251:5,12 | 384:8,13 385:12 |
| **worthless** 282:23 | 69:14 73:17 78:12 | 251:19 253:21 | 387:7 390:4,9,20 |
| 283:3,4 | 83:2,18 84:5,9,11 | 256:1 263:2 | 390:23 391:12 |
| **wound** 289:13 | 91:23 92:5,12 | 264:19 266:22 | 392:14,21,22 |
| 450:14 475:7,10 | 96:20 97:4 99:5 | 267:4,13 268:12 | 393:2,4,10 394:18 |
| 478:11 | 99:21 100:1,15 | 268:12 272:2,3,3 | 395:20,21 396:5 |
| **woundedness** | 101:4,9,17,19 | 273:19 280:21 | 396:12 398:19 |
| 67:21 | 102:13,14,21 | 281:4,10 285:3 | 399:4,7,23 400:3 |
| **wounds** 475:6 | 103:1,5 105:5 | 286:15,18 289:21 | 400:10,14,22 |
| **wpath** 7:15 182:8 | 107:10,17,23 | 290:14 294:8 | 402:7,10 403:1,3,6 |
| 182:16 183:13,16 | 108:3 109:1,4,7 | 295:5,19,21 297:4 | 403:11,19 404:12 |
| 183:18,19,23 | 110:20 111:23 | 297:10,21 300:16 | 404:13 406:21 |
| 184:8,17 185:3,22 | 113:3,4,5,11,13,14 | 301:5 303:10,14 | 407:23 408:5,6 |
| 187:2,8,12,17 | 114:4,4,23 118:15 | 303:15,21 304:5 | 411:14 413:2,2 |
| 188:6,16 189:5,10 | 119:3 128:1,10 | 305:5,6 307:10 | 416:7 417:1 418:1 |
| 313:3 395:7,10,14 | 130:22 133:9 | 309:1,14 311:6,19 | 418:18 420:4,11 |
| 395:21 396:13 | 135:9,12 143:9 | 313:16,17 315:6,9 | 421:14 423:16 |
| 397:3 398:14 | 144:17,19 145:4 | 315:19 318:14 | 424:6,13,18 |
| 402:10 428:18 | 146:18 147:2,13 | 321:13,23 322:1,7 | 426:10 428:5 |
| 429:2 | 148:3,5,6,21 149:5 | 323:13,21 325:1,9 | 429:17 431:23 |
| **wpath's** 184:4 | 150:21 151:10 | 326:4,5,8 328:4,17 | 434:1 435:11 |
| **wrinkles** 262:10 | 152:16 153:2 | 329:7,13,20 | 436:2 438:6,10 |
| **write** 144:22 280:4 | 154:23 155:1 | 332:18,18,19 | 441:5 443:23 |
| **writing** 185:19 | 156:22 157:5 | 333:1,16 334:11 | 445:2,8,12 452:14 |
| 441:20 | 160:3 162:10,12 | 335:2,6,8,9,10 | 453:11,23 456:2 |
| **writings** 195:11 | 162:18 163:7,9 | 336:11 338:7,8,18 | 458:19 460:16 |
| **written** 130:19 | 164:1,7,21 166:11 | 338:19 339:23 | 461:11,21,22 |
| **wrong** 43:23 62:10 | 171:4,20 179:19 | 340:16 341:2,7,12 | 464:11 471:4,9,23 |
| 184:11,13 379:23 | 179:23 185:23 | 341:13 343:10 | 472:20 480:6,10 |

PLAINTIFFS002154

**year**   7:20 24:15,19
   24:22 34:1 37:9
   57:9 63:7 76:3
   117:5 138:5 139:3
   143:11 148:4
   184:7,12 196:16
   300:10 302:10
   317:6,19 342:22
   344:8 345:19
   346:5 380:10,11
   380:19 411:10
   427:15 477:3
**years**   6:10 23:11
   24:2,5 25:20 32:6
   44:14 46:1,8 51:3
   63:9 69:9 72:21
   95:14 97:3 99:21
   99:23 100:1
   102:17 103:17
   106:2,20 107:2
   122:4,21 123:1,5
   123:18 124:15
   125:12,17 129:11
   129:15 130:18
   138:19,20,21,22
   138:23 139:7,10
   140:16,20,23
   141:8 148:9 160:5
   165:1 170:9,9
   174:21 175:6,22
   176:6 181:17
   196:6,12 202:11
   213:4 219:21
   232:5 246:19
   247:7,21 257:5
   260:8 261:7 262:2
   262:6 263:1
   266:21 283:8
   297:5 298:16,17
   300:8,10 301:19
   307:12 312:14

   313:8,11 337:13
   337:14,18,23
   344:13 346:7
   347:12 351:22,22
   352:2 381:22
   402:15 443:7
   468:15 476:8
**yesterday**   14:12
   14:19,21
**york**   2:9,9,21,21
**young**   7:21 161:11
   368:12 369:7,9,22
   411:10 469:1
**younger**   142:22
   347:10
**youtube**   367:16

**z**

**z**   16:12
**zantac**   123:13
**zero**   21:12 284:7
**zoom**   10:4 325:17

PLAINTIFFS002155

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

PLAINTIFFS002156

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

PLAINTIFFS002157