Michael Laidlaw                                    September 2, 2022

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF F WASHINGTON

AT TACOMA

_____

C.P., by and through his parents,  )

Patricia Pritchard and Nolle        )

Pritchard and PATRICIA PRITCHARD,   )

      Plaintiffs,              )

  vs.                               ) No. 3:20-cv-06145-RJB

BLUE CROSS BLUE SHIELD OF           )

ILLINOIS,                           )

      Defendant.               )

_____

ZOOM VIDEO DEPOSITION UPON ORAL EXAMINATION

OF

MICHAEL LAIDLAW

_____

9:00 a.m.

September 2, 2022

REPORTED BY:  Pat Lessard, CCR #2104

Pl. Trial Ex. 096

PLAINTIFFS003168

Michael Laidlaw                                    September 2, 2022

```
                                                           Page 2
 1              A P P E A R A N C E S

 2     FOR THE PLAINTIFFS:

 3              MS. ELEANOR HAMBURGER

 4              Sirianni, Youtz, Spoonemore & Hamburger

 5              3101 Western Avenue, Suite 350

 6              Seattle, Washington 98121

 7              206.223.0303

 8              ele@sylaw.com

 9              MR. OMAR GONZALEZ-PAGAN, pro hac vice

10              Lamda Legal Defense and Education Fund

11              120 Wall Street, 19th Floor

12              New York, NY 1005

13              212.809.9585

14              ogonzalez-pagan@lambdalegal.org

15

16     FOR THE DEFENDANT:

17              MS. GWENDOLYN PAYTON

18              Kilpatrick Townsend

19              1420 Fifth Avenue, Ste. 3700

20              Seattle, WA 98101

21              206.467.9600

22              gpayton@kilpatricktownsend.com

23

24     ALSO PRESENT:

25              MR. PATRICK NORTON, Videographer
```

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com            206.622.6661          800.657.1110

PLAINTIFFS003169

Michael Laidlaw                                    September 2, 2022

Page 3

1                E X H I B I T   I N D E X

2    No.                 DESCRIPTION                    PAGE

3    Exhibit 1   Declaration of Michael Laidlaw.         9

4    Exhibit 2   Michael Laidlaw CV.                    11

5    Exhibit 3   Notice of Deposition of Michael K.     19

6                Laidlaw, M.D.

7    Exhibit 4   Our Mission - Public Discourse.        38

8    Exhibit 5   Subpoena to Produce Documents.         62

9    Exhibit 6   Understanding the Well-Being of       104

10               LGBTQI Populations (2020)

11   Exhibit 7   Formal comment on:  Parent reports    122

12               of adolescents and young adults...

13   Exhibit 8   Gender nonconforming youth:           128

14               current perspectives.

15   Exhibit 9   Position Statement on Conversion      139

16               Therapy and LGBTQ Patients.

17   Exhibit 10  Resolution by the American            140

18               Psychological Association.

19   Exhibit 11  Treatment of Central Precocious       148

20               Puberty.

21   Exhibit 12  Notice in Federal Register.           161

22   Exhibit 13  Understanding Unapproved Use of       162

23               Approved Drugs "Off Label."

24   Exhibit 15  Removing Financial Barriers to        171

25               Care for Transgender Patients.

PLAINTIFFS003170

Michael Laidlaw                                    September 2, 2022

```
                                                        Page 4
 1                    E X H I B I T   I N D E X

 2    No.                   DESCRIPTION                  PAGE

 3    Exhibit 16  Health insurance coverage for          172

 4                gender-affirming care of

 5                transgender patients.

 6    Exhibit 17  Hormonal Therapy and sex               179

 7                reassignment: a systematic review

 8                and meta-analysis of quality of

 9                life and psychosocial outcomes.

10    Exhibit 18  American Psychiatric Association        191

11                Ethics Committee Opinion.

12    Exhibit 19  Neurobiology of gender identity          93

13                and sexual orientation.

14                    E X A M I N A T I O N

15    ATTORNEY                                           PAGE

16    BY MR. GONZALEZ-PAGAN:                                6

17    BY MR. GONZALEZ-PAGAN:                              115

18

19

20

21

22

23

24

25
```

PLAINTIFFS003171

# PAGE

# BREAK

PLAINTIFFS003172

Michael Laidlaw                                    September 2, 2022

Page 29

 1    on existing publications and preexisting data.
 2           I think that's the distinction that you were
 3    drawing in your answer as well, is that correct?
 4        A.   Yes.
 5        Q.   So would you be comfortable with that
 6    understanding, that shared understanding of -- do you
 7    know what I mean by primary research?
 8        A.   Yes, I understand your meaning.
 9        Q.   Have you performed any primary research?
10        A.   Yes.
11        Q.   On what?  On what matters?
12        A.   There were two studies.  One was a magnesium
13    study that had to -- we're looking for an association
14    of low magnesium leading to osteoporosis.
15           And the other study was regarding thyroid
16    cancer where we were looking at thyroid globulin tumor
17    markers and how they correlated with ultrasound
18    findings of the neck.
19        Q.   And when did you perform this research?
20        A.   This was during my -- it may have begun
21    during my -- I think it began during my residency and
22    then I continued into fellowship.
23        Q.   Have you performed any primary research
24    regarding gender dysphoria?
25        A.   No.

PLAINTIFFS003173

Michael Laidlaw                                    September 2, 2022

```
                                                         Page 30
 1        Q.   Have you performed any primary research

 2   relating to transgender people?

 3        A.   No.

 4        Q.   Have you performed any primary research

 5   relating to gender identity?

 6        A.   No.

 7        Q.   Do you have any peer-reviewed publications?

 8        A.   Yes.

 9        Q.   Do you have a copy of your CV with you?

10        A.   No.

11        Q.   I will show you what's been marked as

12   Exhibit 2.

13        A.   Okay.

14        Q.   And this is a copy of your CV, right?

15             Well, it's not showing yet.  This is a copy

16   of your CV, right?

17        A.   Yes.  It's the one we looked at earlier.

18        Q.   And you have here a section titled

19   "Research, Publications, and Expert Witness Work," is

20   that right?

21        A.   Yes.

22        Q.   And we can scroll through it but just go

23   area by area.

24             Can you tell me which the -- within the

25   screen showing right now which of these publications
```

Michael Laidlaw                                    September 2, 2022

Page 31

 1    listed here are peer-reviewed?

 2            MS. PAYTON:  Object to the form of the

 3    question.  And the blue print on the question on the

 4    screen here, I'm not sure that's easy to follow.

 5            But go ahead and answer.

 6            THE WITNESS:  Understood.

 7       Q.  (By Mr. Gonzalez-Pagan)  Dr. Laidlaw, you

 8    have marked in your CV some of these as expert

 9    witness --

10       A.  Yes.

11       Q.  -- brief of Amicus Curiae, Expert Witness,

12    et cetera, is that correct?

13       A.  Yes.

14       Q.  Okay.  So there's a publication listed for

15    2021 --

16       A.  Uh-huh.

17       Q.  -- it's a Letter to the Editor --

18       A.  Uh-huh.

19       Q.  -- titled "Erythrocytosis in a Large Cohort

20    of Trans Men Using Testosterone:  A Long-Term

21    Follow-Up Study on Prevalence, Determinants and

22    Exposure Years," is that right?

23       A.  Yes.

24       Q.  It's a Letter to the Editor pertaining to

25    that separate article, is that correct?

PLAINTIFFS003175

Michael Laidlaw                                    September 2, 2022

Page 32

1      A.    That's right.

2      Q.    And is a Letter to the Editor a peer

3    reviewed publication?

4      A.    I don't know.  It has to be accepted before

5    they publish it, so I don't know what process they go

6    through.  It may be or it may not be.

7      Q.    There's another listing or a publication in

8    2020 titled "Correction Transgender Surgery Provides

9    No Mental Health Benefit," is that right?

10     A.    Yes.

11     Q.    And you're a coauthor of this piece, is that

12   right?

13     A.    Yes.

14     Q.    It was published in the Public Discourse, is

15   that correct?

16     A.    That's correct.

17     Q.    Is this a peer-reviewed publication?

18     A.    Not to my knowledge.

19     Q.    There's another publication just below it,

20   in 2020, titled Gender-Affirmation surgery conclusion

21   lacks evidence (letter)."

22           And you're a coauthor of this publication,

23   is that right?

24     A.    That's right.

25     Q.    This was another letter, is that correct?

PLAINTIFFS003176

Michael Laidlaw                                     September 2, 2022

Page 33

1          A.    Yes, it's a Letter to the Editor.

2          Q.    Okay.  Is this peer-reviewed?

3          A.    I don't know.  It has to be accepted for

4   publication, like I said, so I don't know what process

5   they go through.

6          Q.    Below that there's another publication

7   titled "The Pediatric Endocrine Society's Statement on

8   Puberty Blockers isn't just Deceptive.  It's

9   Dangerous."

10               And you're the sole author of this

11  publication, is that right?

12         A.    Yes.

13         Q.    And it was published in Public Discourse, is

14  that correct?

15         A.    That's correct.

16         Q.    And the next page, the next publication

17  listed is "The Right to Best Care for Children does

18  Not Include the Right to Medical Transition," is that

19  right?

20         A.    Yes.

21         Q.    And you're a coauthor of this piece?

22         A.    Yes.

23         Q.    And this is an opinion piece, is that

24  correct?

25               MS. PAYTON:  Object to the form.

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

PLAINTIFFS003177

Michael Laidlaw                                    September 2, 2022

```
                                                          Page 34
 1        A.    My understanding is it's a peer-reviewed
 2   piece, but that's the one I would say has to be
 3   peer-reviewed to be published but I don't know their
 4   process.
 5        Q.    (By Mr. Gonzalez-Pagan)  But is it an
 6   opinion piece or is it a research piece?
 7             MS. PAYTON:  Object to the form.
 8        A.    I mean it's the Journal of Bioethics, so
 9   it's not -- if you're asking is it based on primary
10   research?  Because there's two different things.  You
11   could have a peer-reviewed -- peer review doesn't
12   necessarily mean it's primary research, to my
13   understanding.
14        Q.    No.  Understood.
15             I'm asking the question is the Journal of
16   Bioethics a peer-reviewed publication?
17        A.    That's my understanding, yes.  I mean all
18   the medical journals that you have listed are peer
19   reviewed publications.  The exact process they use, I
20   don't know.
21        Q.    And this piece in 2019 for which you are a
22   coauthor in the American Journal of Bioethics is not a
23   piece of original research, is that correct?
24        A.    When you say that, do you mean did we have
25   patients doing -- collecting data on individual
```

PLAINTIFFS003178

Michael Laidlaw                                    September 2, 2022

Page 35

 1   patients?  Is that what you mean by that?
 2        Q.   Yes.  Do you have an understanding of what
 3   primary research meant?  So I guess I would ask it
 4   that way.
 5             Is this article based on primary research
 6   you conducted?
 7        A.   It's not based on primary research I
 8   conducted.
 9        Q.   Thank you.  There's another publication.
10   It's a Letter to the Editor, "Endocrine Treatment of
11   Gender-Dysphoric/Gender Incongruent Persons: An
12   Endocrine Society Clinical Practice Guideline," is
13   that correct?
14        A.   Correct.
15        Q.   And you're a coauthor of this piece?
16        A.   Yes.
17        Q.   And this is another Letter to the Editor,
18   correct?
19        A.   Yes.
20        Q.   Just below that there's a publication titled
21   "The Gender Identity Phantom," and you are the sole
22   author, is that right?
23        A.   Correct.
24        Q.   And it appears to be published in the
25   gdworkinggroup.org, is that right?

PLAINTIFFS003179

Michael Laidlaw                                      September 2, 2022

Page 36

 1       A.    Yes, I think so.

 2       Q.    What's the gdworkinggroup.org?

 3       A.    They're a collection of different

 4   psychologists, psychiatrists and other mental health

 5   professionals, and there may have been other

 6   physicians, but who were writing pieces with concerns

 7   or criticisms about the care of people with gender

 8   identity conditions.

 9       Q.    Is this a publication posting on a

10   discussion board?

11       A.    Could you repeat that?

12       Q.    Is this a publication posting within a

13   discussion board?

14       A.    No.  Are you asking me like can you just

15   post something as part of a discussion or are you

16   asking can people discuss the topic below your

17   article?  Is that what you're asking?

18       Q.    I'm asking if it's a discussion forum for

19   professionals where you are set up, made a post, or

20   whether it's an article.

21       A.    Oh, it's an article against -- each author

22   can write -- you have to be a member to be an author

23   and you have to be an author to put something up

24   there.

25             So not just any general member of the public

PLAINTIFFS003180

Michael Laidlaw                                    September 2, 2022

                                                            Page 37
 1   could write something, if that clarifies it.
 2        Q.   Okay.  Is this peer-reviewed?
 3        A.   No.
 4        Q.   The next publication is titled  "Gender
 5   Dysphoria and Children: An Endocrinologist's
 6   evaluation of 'I am Jazz,'" and you're the sole
 7   author, is that right?
 8        A.   That's correct.
 9        Q.   And it was published in Public Discourse, is
10   that correct?
11        A.   Yes.
12        Q.   Are there any other publications that you
13   have in relation to gender dysphoria or transgender
14   issues?
15        A.   Not that I can think of.  I did have this --
16   I think I put it somewhere with my subpoena response,
17   but there's gendersanity.org where I explained myself
18   and coauthors explained the most recent Letter to the
19   Editor.
20        Q.   Sorry?  What is that?
21        A.   Gendersanity.org I believe is the name.
22        Q.   And is that a self-published website?
23        A.   Yes.
24        Q.   We've established that three of your
25   publications are for Public Discourse, is that

PLAINTIFFS003181

Michael Laidlaw                                        September 2, 2022

Page 38

 1    correct?

 2            MS. PAYTON:  Object to the form.

 3        A.    Yeah.   Three -- I think it was three, yeah,

 4    three publications for Public Discourse.

 5        Q.    (By Mr. Gonzalez-Pagan)  Who publishes,

 6    Public Discourse?

 7        A.    I believe at the time I submitted my

 8    articles that -- I don't know who the publisher is but

 9    the editor was Ryan Anderson, I believe.

10        Q.    Are you familiar with the Witherspoon

11    Institute?

12        A.    Only that I saw their name associated with

13    Public Discourse.

14        Q.    I'm going to show you what's been marked as

15    Exhibit 4.

16        A.    Okay.

17               (Marked Deposition Exhibit No. 4.)

18        Q.    (By Mr. Gonzalez-Pagan)  Do you see the

19    document in front of you?

20        A.    Yes.

21        Q.    This is the Mission Statement for Public

22    Discourse, is that right?

23        A.    It says "Our Mission," so I suppose it is.

24        Q.    Okay.  And just to clarify, this is a

25    printout on September 2nd, 2022, 8:30 a.m., off the

PLAINTIFFS003182

Michael Laidlaw                                  September 2, 2022

                                                          Page 39

 1   website www.the public discourse.com/our mission, is

 2   that correct?

 3            MS. PAYTON:  Object to the form, foundation.

 4        A.   You are posting -- or I can see on the

 5   screen a mission statement from Public Discourse as of

 6   today.  Today is the first time I've ever seen it.

 7        Q.   (By Mr. Gonzalez-Pagan)  Yes.  On the

 8   screen?

 9        A.   Yeah.

10        Q.   And do you understand Public Discourse to be

11   an online journal?

12        A.   Yes.

13        Q.   And are you aware that their mission is to

14   enhance public understanding of the moral foundations

15   of free society?

16            MS. PAYTON:  Object to the form.

17        A.   You know, I'm looking at it now and I can

18   say you just read what is on there.  But I don't have

19   any affiliation with them in particular.

20            I think, but I don't recall exactly, that

21   anything I publish at the bottom, I think, says

22   something like "This does not necessarily represent

23   the views of the Public Discourse," so --

24        Q.   Is there any reason why you chose to publish

25   in the Public Discourse?

                SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

PLAINTIFFS003183

# PAGE

# BREAK

PLAINTIFFS003184

Michael Laidlaw                                    September 2, 2022

Page 42

```
 1              THE VIDEOGRAPHER:  We're going off the
 2     record at 10:00 a.m.
 3                   (Recess.)
 4              THE VIDEOGRAPHER:  We're back on the record
 5     at 10:07 a.m.
 6         Q.   (By Mr. Gonzalez-Pagan)  We left off
 7     discussing your publications.  Do you recall that,
 8     Dr. Laidlaw?
 9         A.   Yes, I do.
10         Q.   Just to sum up, none of your publications
11     pertaining to gender dysphoria are based on original
12     primary research, is that correct?
13         A.   That's correct.
14         Q.   And with the exception of the piece in the
15     Journal of Bioethics none of your publications
16     pertaining to gender dysphoria are peer-reviewed?
17         A.   Well, a number are published in peer-reduced
18     journals.
19         Q.   Sorry.  The Letters to the Editor, is that
20     right?
21         A.   The Letters to the Editors are in
22     peer-reviewed journals, yes.
23         Q.   We've established that you have a private
24     practice dedicated to endocrinology, is that correct?
25         A.   That's correct.
```

PLAINTIFFS003185

Michael Laidlaw                                September 2, 2022

Page 43

1       Q.   As part of your practice do you treat any

2   pediatric patients?

3       A.   I have some patients who are under the age

4   of 18, so later teens or mid teens.

5       Q.   What percentage of your practice are

6   patients under the age of 18?

7       A.   Probably, like, less than five percent.

8       Q.   Have you ever provided care to a transgender

9   patient?

10      A.   Yes.

11      Q.   Have you provided them with care relating to

12  their gender dysphoria?

13      A.   Only once.

14      Q.   What care did you provide that one patient?

15      A.   The patient needed a refill of estrogen.

16      Q.   Did you provide them with the refill?

17      A.   Yes.

18      Q.   About how many transgender patients have you

19  treated for other conditions besides this one patient

20  for gender dysphoria?

21      A.   So I would say that in my practice I have

22  patients with, I would use a more general term and say

23  "gender incongruence," who I'm seeing for other

24  conditions.

25           For example, they may have a pituitary

PLAINTIFFS003186

# PAGE

# BREAK

PLAINTIFFS003187

Michael Laidlaw                                    September 2, 2022

Page 45

 1        A.   Or there would be one who had -- well, I
 2   would say two because the detransition person I am
 3   treating as a consequence of gender dysphoria.  So I
 4   would say two.
 5        Q.   Okay.  So there's the one person who has
 6   detransitioned and then the one person who you
 7   provided a refill for estrogen, is that correct?
 8        A.   Those are two patients who received hormones
 9   related to a gender incongruence condition.
10        Q.   How old was the patient that detransitioned?
11        A.   In his 20s.  He was diagnosed in his early
12   teens.
13        Q.   Do you know how this patient came about
14   connecting with you?
15        A.   He has had a very difficult time finding an
16   endocrinologist who will treat him.  He had an
17   orchiectomy or testicles removed and vaginal plasty.
18             He had a difficult time finding a physician
19   who would prescribe testosterone so he had made a
20   search and somehow found me.
21        Q.   Have you ever diagnosed any patient with
22   gender dysphoria?
23        A.   Being that it's a psychological diagnosis, I
24   do not make psychological diagnoses, so no.
25        Q.   Have you ever diagnosed a person with gender

PLAINTIFFS003188

Michael Laidlaw                                    September 2, 2022

Page 46

1   identity disorder?

2       A.   The same answer.  A psychological, you know,

3   diagnosis that I do not make.

4       Q.   Just to clarify, for the patient who

5   detransitioned, you're not providing care for

6   treatment of gender dysphoria, is that correct?

7       A.   Well, I guess it depends how you define

8   treatment for gender dysphoria.

9       Q.   Well, what do you understand gender

10  dysphoria to be?

11      A.   Well, this would be a discomfort arising

12  from a person's, you know, true feeling of their

13  gender identity versus their physical body.

14           So I don't think this person has fully

15  resolved that issue within himself, but he feels very

16  poorly not receiving testosterone so I'm treating him.

17  So in a sense I am treating his gender -- I mean he

18  feels better.  He's doing better.

19           So I believe I am treating his gender

20  dysphoria.  That's not my primary purpose but it's a

21  secondary consequence.

22      Q.   Are you working in conjunction with a mental

23  health therapist or mental health provider in

24  providing this care to this individual?

25      A.   He just moved to Southern California and in

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

PLAINTIFFS003189

# PAGE

# BREAK

PLAINTIFFS003190

Michael Laidlaw                                    September 2, 2022

Page 89

1   last two sentences.  It states "WPATH claims to be a

2   scientific organization while explicitly acting as an

3   advocacy group.  These are incompatible goals."

4        A.   Yes.

5        Q.   What is the basis for your opinion that a

6   scientific organization cannot engage in advocacy?

7        A.   I think a scientific organization can -- for

8   example, the American Cancer Society, which we talked

9   about earlier, they can advocate for eliminating

10  cancer or better treatments for cancer.  But they

11  would not -- one would expect them not to exclusively

12  follow one, say, politically based point of view.

13            There could be a variety of points of view

14  within the American Cancer Society, I'm just giving

15  you an example, or Endocrine Society.  Whatever the

16  society is should be open to a variety of points of

17  view.

18            And what I've seen is that the WPATH is not.

19       Q.   You're not a member of WPATH, is that right?

20       A.   That's correct.

21       Q.   Do you know, are you privy to the debates

22  that occur within WPATH?

23       A.   I've seen some online debates.  I've spoken

24  to a psychologist who was a member and quit basically

25  because of this problem.

PLAINTIFFS003191

Michael Laidlaw                                        September 2, 2022

Page 90

 1       Q.   But you're not privy to the actual internal
 2   conversations of WPATH, is that correct?
 3       A.   I've spent time looking at the WPATH
 4   standards of care.
 5       Q.   That wasn't my question, though.  Have you
 6   participated in any WPATH conferences?
 7       A.   I do not participate in WPATH conferences.
 8   I'm not a member.
 9       Q.   Have you participated in internal discussion
10   forums?
11       A.   I do not participate with WPATH.  I'm not a
12   member.
13       Q.   So what is the basis for your opinion that
14   there are no diverse -- no differences of opinion
15   within WPATH?
16       A.   I'm basing it on their standards of care.
17       Q.   The Endocrine Society has a variety of
18   clinical practice guidelines, is that not correct?
19       A.   They do.
20       Q.   Some people disagree with many of those
21   variety of clinical practice guidelines, is that not
22   correct?
23       A.   Are you saying that the members of the
24   Endocrine Society disagree with practice guidelines?
25       Q.   Yes.

PLAINTIFFS003192

# PAGE BREAK

PLAINTIFFS003193

Michael Laidlaw                                    September 2, 2022

```
                                                    Page 92
 1    allowed for a variety of viewpoints in my opinion.
 2         Q.   (By Mr. Gonzalez-Pagan)  And I'm asking
 3    whether you know whether, know from a first hand basis
 4    whether WPATH allows for a variety of opinions?
 5         A.   My impression is that they do not.
 6         Q.   What's the basis for your impression?
 7         A.   Their standards of care and my conversation
 8    with the psychologist that I mentioned.
 9         Q.   So the standards of care itself is proof
10    there's no debate?
11         A.   Right.  Because it doesn't offer any
12    alternatives.
13         Q.   Let's turn to page 31 -- sorry, paragraph 31
14    of your report.
15         A.   Okay.
16         Q.   There you state -- is there an echo?  There
17    you state that the assertion by Dr. Etner that a
18    growing assemblage of research documents that gender
19    identity is immutable and biologically based lacks
20    scientific support and therefore impairs the
21    credibility of Dr. Etner's opinions?
22         A.   Yes.
23         Q.   Okay.  Are you saying that gender identity
24    is not biologically based?
25         A.   I'm saying there's no evidence of it at this
```

PLAINTIFFS003194

# PAGE

# BREAK

PLAINTIFFS003195

Michael Laidlaw                                    September 2, 2022

                                                          Page 103

 1          A.    I'm not sure.  I think some of the earlier

 2    studies were in the United States but I'm not a

 3    hundred percent sure.

 4          Q.    Are you aware that the desistance studies

 5    only involve youth that were diagnosed or were sub

 6    threshold for gender identity disorder rather than

 7    gender dysphoria?

 8          A.    Well, the gender dysphoria diagnosis was

 9    not, you know, hadn't been published at that point,

10    so.

11          Q.    It didn't exist at that time, is that

12    correct?

13          A.    Well, I mean it may have existed but it

14    didn't exist as a term in the DSM.

15          Q.    Sure.  What I'm trying to say, the gender

16    dysphoria diagnosis as contained within the DSM-5 did

17    not exist at the time that these studies were

18    conducted?

19          A.    Yes.

20          Q.    Okay.  And the diagnostic criteria of gender

21    identity disorder contained in the DSM-3 and 4 is

22    different than the diagnostic criteria for gender

23    dysphoria in the DSM-5, is that correct?

24          A.    At that time I believe they had a term

25    gender identity disorder.

PLAINTIFFS003196

Michael Laidlaw                                    September 2, 2022

                                                            Page 104
 1        Q.    Yes.  And I'm asking whether the diagnostic
 2   criteria are different.
 3        A.    There were different diagnostic criteria, to
 4   my knowledge.
 5        Q.    I'm going to show you what's been marked as
 6   Plaintiffs' Exhibit 6.
 7              (Marked Deposition Exhibit No. 6.)
 8        Q.    (By Mr. Gonzalez-Pagan)  I apologize.  This
 9   is actually a pretty enormous PDF.
10              Can you see my screen?
11        A.    Yes.
12              This is a publication titled "Understanding
13   the Well-Being of LGBTQI Populations," from 2020,
14   published by the National Academies of Sciences,
15   Engineering and Medicine.
16              Do you see that?
17        A.    I see it.
18        Q.    Are you familiar with this document?
19        A.    Only briefly looking at it this morning but
20   I had not heard of it before.
21        Q.    Okay.  And in your report you relied on
22   reported reviews from the United kingdom, Sweden and
23   Finland relating to the scientific evidence of the
24   care of gender dysphoria, is that right?
25        A.    Yes.

PLAINTIFFS003197

# PAGE BREAK

PLAINTIFFS003198

Michael Laidlaw                                    September 2, 2022

Page 109

1    looked at primarily up to age twelve population.

2              So I'm asking if you know any desistance

3    rates or studies pertaining to desistance rates, you

4    know, above age twelve?

5         A.   Well, I don't -- well, let's say from the

6    age of 13 to 18 I'm not aware of any study that looks

7    at desistance.

8         Q.   Do you know of any study that looks at

9    desistance above age 18?

10        A.   I don't know if there's any published study.

11   I know there was a professor in the UK who wanted to

12   publish something and he was obstructed from doing

13   that.  I don't remember his name, Caspin, I think.

14             So I'm not aware that there's any out there.

15        Q.   (By Mr. Gonzalez-Pagan)  I'm going to refer

16   you again to Exhibit 6.  This is the National

17   Academies study report.  I'm on page 302 of the

18   document.

19             And it states that while interest in the

20   so-called desistance of transgender identity has been

21   informed by studies suggesting that as high as 80

22   percent of prepubertal youth presenting to pediatric

23   gender clinics ultimately do not identify as

24   transgender, many of the youth included in the studies

25   did not meet full DSM criteria for a gender

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com         206.622.6661         800.657.1110

PLAINTIFFS003199

# PAGE

# BREAK

PLAINTIFFS003200

Michael Laidlaw                                    September 2, 2022

Page 184

 1    on minor C.P."

 2              That's a mode of treatment.  And I'm asking

 3    how is that consistent with your critique on paragraph

 4    180?

 5         A.   Well, my critique was of Dr. Karasic.

 6         Q.   Did that apply to you?

 7         A.   No.

 8         Q.   You're not a mental health provider, right?

 9         A.   I'm sorry?

10         Q.   You're not a mental health provider, right?

11         A.   No.

12         Q.   And you're not a surgeon, right?

13         A.   Correct.

14         Q.   Look at paragraph 195.  You conclude

15    "Therefore, it appears that Dr. Hatfield had begun

16    pubertal suppression at Tanner Stage 1, which was not

17    advised by either the ESG or even the WPATH's SOC."

18              Did I read that correctly?

19         A.   Yes.

20         Q.   That is not something you know, that is

21    speculation based on some gaps you appear to have

22    found in the medical records, is that right?

23         A.   No.  I'm basing my opinion on the medical

24    record.

25         Q.   Okay.  So are you saying that with

PLAINTIFFS003201

# PAGE

# BREAK

PLAINTIFFS003202

Michael Laidlaw                                      September 2, 2022

Page 195

 1    that question, do you consider a person to be

 2    transgendered to be troubling?

 3              MS. PAYTON:  I'll object to the form.

 4         A.   I'm not sure what you mean by that.  Are you

 5    saying medically or are they troubled, you know, at

 6    risk for hormones?  Is that what you're saying?

 7         Q.   (By Mr. Gonzalez-Pagan)  I am making

 8    reference to your own publication.

 9         A.   Well, you'd have to show me exactly what it

10    is.  I'm not sure what you're referencing.

11              MR. Gonzalez-Pagan:  Okay.  Those are all my

12    questions.

13              MS. PAYTON:  No questions.  We'll reserve.

14    No video, please.

15              THE VIDEOGRAPHER:  Did Ele have some

16    questions?

17              MS. HAMBURGER:  No. I have no questions.

18              THE VIDEOGRAPHER:  Okay.  I thought she said

19    hold on a few minutes.

20              This concludes the video-recorded deposition

21    of Dr. Michael Laidlaw.

22              We are off the record at 3:21 p.m.

23                   (Deposition recessed at 3:21 p.m.)

24

25

PLAINTIFFS003203

Michael Laidlaw                                      September 2, 2022

Page 196

```
 1                    S I G N A T U R E

 2                 I declare under penalty of perjury under the

 3   laws of the State of Washington that I have read my within

 4   deposition, and the same is true and accurate, save and

 5   except for changes and/or corrections, if any, as indicated

 6   by me on the CHANGE SHEET flyleaf page hereof.

 7                 Signed in _____, Washington,

 8   this _____ day of _____, 2022.

 9

10

11   ----------------------------

12   MICHAEL LAIDLAW

13   Taken:  September 2, 2022

14

15

16

17

18

19

20

21

22   Re:  C.P. versus Blue Cross Blue Shield
     Cause No.:  3:20-cv-06145-RJB
23   Pat Lessard, CCR 2104

24

25
```

PLAINTIFFS003204

Michael Laidlaw                                    September 2, 2022

Page 197

1              C E R T I F I C A T E

2    STATE OF WASHINGTON   )
                           ) ss.
3    COUNTY OF KING        )

4         I, the undersigned Washington Certified Court

5    Reporter, hereby certify that the foregoing deposition upon

6    oral examination of MICHAEL LAIDLAW was taken

7    stenographically by me on September 2, 2022, and transcribed

8    under my direction;

9         That the witness was duly sworn by me pursuant to

10   RCW 5.28.010 to testify truthfully; that the transcript of

11   the deposition is a full, true, and correct transcript to

12   the best of my ability; that I am neither attorney for nor

13   relative or employee of any of the parties to the action or

14   any attorney or counsel employed by the parties hereto, nor

15   am I financially interested in its outcome.

16        I further certify that in accordance with

17   CR 30(e) the witness was given the opportunity to examine,

18   read and sign the deposition within 30 days upon its

19   completion and submission, unless waiver of

20   signature was indicated in the record.

21        IN WITNESS WHEREOF, I have hereunto set my hand

22   12th day of September, 2022.

23

24                   Pat Lessard,
                     pat@court-reporter.com
25

SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

PLAINTIFFS003205

Michael Laidlaw                                    September 2, 2022

Page 199

1                          CHANGE SHEET

2      PLEASE MAKE ALL CHANGES OR CORRECTIONS ON THIS SHEET,
       SHOWING PAGE, LINE AND REASON.
3      _____

4      PAGE    LINE    CORRECTION AND REASON

5      ____    ____    _____

6      ____    ____    _____

7      ____    ____    _____

8      ____    ____    _____

9      ____    ____    _____

10     ____    ____    _____

11     ____    ____    _____

12     ____    ____    _____

13     ____    ____    _____

14     ____    ____    _____

15     ____    ____    _____

16     ____    ____    _____

17     ____    ____    _____

18     ____    ____    _____

19     ____    ____    _____

20

21     _____

22     MICHAEL LAIDLAW
       Taken: September 2, 2022
23     Re:  C.P. versus Blue Cross Blue Shield
       Cause No.:  3:20-cv-06145-RJB
24     Pat Lessard, CCR 2104.

25

                SEATTLE DEPOSITION REPORTERS, LLC
www.seadep.com          206.622.6661          800.657.1110

PLAINTIFFS003206