

# Planet Depos®
We Make It *Happen*™

# Transcript of Dr. Quentin Van Meter

**Date:** March 18, 2019
**Case:** Grimm -v- Gloucester County School Board

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING | INTERPRETATION | TRIAL SE
Pl. Trial Ex. 097
PLAINTIFFS003323

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

1

1    IN THE UNITED STATES DISTRICT COURT
2        EASTERN DISTRICT OF VIRGINIA
3          NEWPORT NEWS DIVISION
4  -------------------------x
5  GAVIN GRIMM,          :CASE NO. 4:15-cv-54
6        Plaintiff,    :
7    v.              :
8  GLOUCESTER COUNTY SCHOOL  :
9  BOARD,              :
10       Defendant.    :
11
12
13      Deposition of Dr. Quentin Van Meter
14          Atlanta, Georgia
15        Monday, March 18, 2019
16            10:03 a.m.
17
18
19
20  Job No.: 233197
21  Pages 1 - 219
22  Reported by: Robyn Bosworth, RPR, CRR, CRC, CCR

2

1      Deposition of Dr. Quentin Van Meter, held at:
2
3
4  Drew Eckl Farnham
5  303 Peachtree Street, NE
6  Suite 3500
7  Atlanta, Georgia  30308
8  404.885.6367
9
10
11
12
13      Pursuant to Notice, before ROBYN BOSWORTH, RPR,
14  CRR, CCR, CRC, CCR-B-2138.
15
16
17
18
19
20
21
22

3

1            A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFF (Via
3  Videoconference):
4      JOSHUA A. BLOCK, ESQUIRE
5      LESLIE COOPER, ESQUIRE
6      SHAYNA MEDLEY-WARSOFF, ESQUIRE
7      American Civil Liberties Union
8      Foundation
9      125 Broad Street
10     18th Floor
11     New York, New York  10004
12     (212) 549-2627
13  -and-
14     EDEN B. HEILMAN, ESQUIRE
15     JENNIFER SAFSTROM, ESQUIRE
16     NICOLE TORTORIELLO, ESQUIRE
17     American Civil Liberties Union
18     Foundation of Virginia
19     701 East Franklin Street, Suite 1412
20     Richmond, Virginia  23219
21     (804) 644-8022
22

4

1            A P P E A R A N C E
2  ON BEHALF OF THE DEFENDANT:
3      DAVID P. CORRIGAN, ESQUIRE
4      Harman, Claytor, Corrigan & Wellman
5      P.O. Box 70280
6      Richmond, Virginia  23255
7      (804) 747-5200
8
9  A L S O  P R E S E N T:
10     MARCY HAMPTON (via videoconference)
11
12
13
14
15
16
17        C O N T E N T S
18  EXAMINATION OF DR. QUENTIN VAN METER      PAGE
19     By Mr. Block
20
21
22

PLAINTIFFS003324

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

2 (5 to 8)

**5**

```
               E X H I B I T S
            (Attached to Transcript)
DEPOSITION EXHIBIT                          PAGE
Exhibit 1  Gloucester County School Board's
           Rule 26(a)(2) Disclosure           7
Exhibit 2  Declaration of Quentin L. Van
           Meter, MD                          17
Exhibit 4  American College of Pediatricians
           "About Us" from website          146
Exhibit 5  Gender Ideology Harms Children   149
Exhibit 6  On the Promotion of Homosexuality
           in Schools                       167
Exhibit 8  Dr. Quentin Van Meter: How Faulty
           Research in a 1950's Sexual
           Revolutionist Guided the Modern
           Transgender Movement             158
```

**6**

1        P R O C E E D I N G S
2        DR. QUENTIN VAN METER,
3  having been first duly sworn, was examined and
4  testified as follows:
5        EXAMINATION
6  BY MR. BLOCK:
7     Q   Good morning, Dr. Van Meter.  My name is
8  Joshua Block.  I'll be taking your deposition today.
9  I represent the plaintiff, Gavin Grimm, in this
10 lawsuit.
11      Have you ever had your deposition taken
12 before?
13    A   I have.
14    Q   Great.  So you're familiar with the
15 procedure here.  I'll be asking questions, and
16 you'll be providing answers.  There's three ground
17 rules I'd like to go over with you.
18      The first, as you already know, is that we
19 have the court reporter writing down everything that
20 we say, so it's important that we don't talk over
21 each other, so I'd appreciate it if you could wait
22 for me to finish a question before you start

**7**

1  answering, and I will wait for you to finish
2  answering before I ask the next question.  Agreed?
3     A   Agreed.
4     Q   Second, because the court reporter is
5  writing things down, and because the video is a
6  little fuzzy, it's important that you don't respond
7  with visual cues like nodding your head or saying
8  "uh-huh."  All your answers need to be verbal so
9  they can appear on the transcript.  Okay?
10    A   Okay.
11    Q   And third is it's my job to ask questions
12 that you can understand, so if I say anything that
13 is unclear or you would like me to repeat or
14 rephrase the question, please let me know.  And if
15 you do answer my question, I'm going to take that to
16 mean that you understood it.  Okay?
17    A   Okay.
18    Q   Great.  So let's start with the document
19 that's been marked by the court reporter as Exhibit
20 Number 1.
21      (Exhibit 1 was marked for identification
22 and is attached to the transcript.)

**8**

1  BY MR. BLOCK:
2     Q   If you turn to -- a couple pages into the
3  document there's a photocopy with your letterhead on
4  it.  Let me know if you found that page.
5     A   I have it here.
6     Q   Great.  Do you recognize this letter?
7     A   I do.
8     Q   What is it?
9     A   This is a statement of my opinion
10 regarding information that I gleaned from reviewing
11 records on the Gavin Grimm case.
12    Q   Great.  And if you flip to the end of the
13 letter and look at the next page, there's a document
14 that appears to be your CV; is that right?
15    A   That is correct.
16    Q   Okay.  So I'll be asking some questions
17 both about the letter and about your CV here.
18      So let's go back to the beginning of your
19 letter.  If you look at paragraph 9.
20    A   Okay.
21    Q   The second sentence says:  I have
22 testified at Georgia state legislative committee

PLAINTIFFS003325

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

3 (9 to 12)

**9**

1  hearings; is that right?
2  **A    That is correct.**
3  Q    What was the subject of your testimony?
4  **A    This was regarding obesity in children, as**
5  **I recall.**
6  Q    And how many times did you testify at the
7  Georgia state legislative committee hearings?
8  **A    I testified once, I believe.**
9  Q    And in your testimony did you discuss at
10 all any information related to transgender children?
11 **A    I did not.**
12 Q    Can you think of any way that the subject
13 matter of your testimony at the Georgia state
14 legislative committee hearings would have relevance
15 to the issues in this case?
16 **A    No.**
17 Q    Okay.  So going to the next sentence, you
18 say:  In the past six years, I have testified by
19 deposition in Harlen Schneider versus J. Enrique
20 Lujan, MD, in the Circuit Court of the First
21 Judicial Circuit of Okaloosa County, Florida, Civil
22 Division; is that right?

**10**

1  **A    That's correct.**
2  Q    And what was that case about?
3  **A    It was a medical malpractice case.**
4  Q    And what was your testimony about?
5  **A    It was in -- it was for the defense --**
6  **excuse me, for the plaintiff in regard to the**
7  **quality of medical care.  Specific diagnosis, I do**
8  **not remember.**
9  Q    And was this for an endocrine condition?
10 **A    This was for an endocrine condition.**
11 Q    And to the best of your memory, was the
12 diagnosis at all related to either gender or sexual
13 differentiation?
14 **A    It was not.**
15 Q    The rest of that sentence after the
16 semicolon says that you also testified in the case
17 of plaintiff, Kimora Gilmer.  What was that case
18 about?
19 **A    That case was about the death of a young**
20 **child who had acute onset of thyroid illness which**
21 **was not recognized by the medical treating facility**
22 **or the physician, and the patient died as a result.**

**11**

1  Q    What was your testimony?
2  **A    My testimony was as an expert witness**
3  **talking about the standard of care in a primary care**
4  **setting, and the need to have consulted**
5  **endocrinology appropriately, and that was not done.**
6  Q    Now, when you give expert testimony
7  regarding the standard of care, what sources do you
8  look to to determine what the standard of care is?
9  **A    Routinely, they will be referencing**
10 **textbooks.  If there are published standards of care**
11 **outside of a textbook, if it's already outdated or**
12 **has been updated I will refer, after researching the**
13 **literature, to the most recent standards of care.**
14 Q    Are guidelines from the Endocrine Society
15 one of the sources you look to in other areas of
16 endocrine medical practice to determine what the
17 standard of care is?
18 **A    Yes, but I'd like to clarify, there's a**
19 **difference between guidelines and standards of care,**
20 **as I understand it.  Guidelines are suggestions;**
21 **standards of care, in terms of my worldview, are**
22 **what are published and recognized as the -- as the**

**12**

1  **most common and generally accepted ways to treat a**
2  **patient.**
3  Q    So in your opinion the standards of care
4  would be found in this textbook as opposed to
5  guideline recommendations?
6  **A    I am not sure.**
7  Q    But the guidelines from the Endocrine
8  Society are at least one source that you would
9  usually look to to determine the applicable standard
10 of care; is that fair?
11 **A    Not exactly.**
12 Q    Could you explain that further?
13 **A    Guidelines from the Endocrine Society are**
14 **based on opinion of the committee that developed the**
15 **guidelines.  They are not necessarily accepted**
16 **across the board as standards of care.**
17 Q    So where would you find the accepted
18 standards of care in that case?
19 **A    Most likely they would be in published**
20 **textbooks.**
21 Q    In published textbooks?
22 **A    Yes.**

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003326

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

4 (13 to 16)

13

1  Q   So to find the standards of care for
2  treating gender dysphoria, would someone then look
3  to textbooks on treating gender dysphoria?
4  **A   They could.  There are standards of care**
5  **published by the American Psychological Association**
6  **in their handbook published in 2014.  The exact name**
7  **of that textbook, whether it's the Handbook of Human**
8  **Sexuality or -- it's a title very similar to that,**
9  **but it's a published textbook of guidelines.**
10  Q   Okay.  So published textbooks of
11  guidelines from the American Psychological
12  Association would be a source for determining the
13  standards of care for treating gender dysphoria in
14  your opinion?
15  **A   Yes.**
16  Q   Is there anything else that would be a
17  source for determining the standards of care?
18  **A   You could look to articles across the**
19  **world's literature to see the broad spectrum of**
20  **opinion and come up with what would be the best-case**
21  **scenario for the patient.**
22  Q   And in general articles that are peer

14

1  reviewed would be the best source of articles to
2  look at; is that right?
3  **A   Yes.  The whole concept of peer review**
4  **ideally is to have a team of, if you will, referees**
5  **that have a broad background that essentially go**
6  **through and check all the references to make sure**
7  **that they are valid, that the opinions stated from**
8  **the references match the information published in**
9  **the paper.  So that would be -- and by peer review,**
10  **it's somebody in the field of endocrinology, and**
11  **perhaps in a field of subspecialty so that there is**
12  **a very critical assessment of the validity of what's**
13  **being published.**
14  Q   So when you say "look at the broad
15  spectrum of opinion," is there a way to quantify
16  what qualifies as a broad spectrum of opinion?
17      MR. CORRIGAN:  Object to the form of the
18  question.
19      Go ahead.
20  **A   A broad spectrum --**
21 **BY MR. BLOCK:**
22  Q   Sorry.  No, no, I'll clarify.  Is there a

15

1  way to quantify what constitutes a broad spectrum of
2  opinion for purposes of identifying the standard of
3  care?
4      MR. CORRIGAN:  Same objection.
5      Go ahead.
6  **A   Can you restate the question?**
7  **BY MR. BLOCK:**
8  Q   Sure.  You referenced looking at articles
9  to find a broad spectrum of opinion in order to
10  derive a standard of care.  Is there some sort of
11  number of articles that you would look at for that
12  purpose?
13  **A   More than the number of articles, the**
14  **number clearly is important if you were trying to**
15  **look at the balanced approach to review the subject**
16  **at hand, there is sort of a general process when you**
17  **review information and review literature that you**
18  **look at every side of the subject, every published**
19  **paper and the quality of that paper and lay them all**
20  **out in front of you, if you will, and come up with**
21  **what is a balanced approach to developing your**
22  **opinion based on different research, different sides**

16

1  **of an issue, so that you come up with what is best**
2  **for the patient.**
3  Q   So when you have determined your opinion
4  regarding treatment for gender dysphoria, did you
5  look at all sides of the research in forming your
6  opinion, including materials that supported your
7  view and materials that contradicted your view?
8  **A   Yes, I did.**
9  Q   What sources did you look to for finding
10  opinions that were different from your own?
11  **A   I looked at the bibliography for the**
12  **Endocrine Society guidelines, I looked at the**
13  **bibliography for the World Professional Association**
14  **of Transgender Health, I looked in the Handbook**
15  **of -- that I referred to published in 2014 by the**
16  **American Psychological Association, I looked at the**
17  **DSM-V criteria, I looked at articles published in**
18  **the Journal of Endocrinology and Metabolism, the**
19  **Journal of Pediatrics, a number of additional**
20  **journals that I could reference if you need the**
21  **specifics.**
22  Q   And when did you conduct this research?

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003327

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

5 (17 to 20)

17

1    A    I've been doing this probably five or six
2  years in depth.
3    Q    What research have you done since the time
4  that you filed your declaration in the Carcano
5  versus McCorey case?
6    A    I've done a fair amount of additional
7  research because there have been articles published
8  since that time.
9    Q    Let's look at your declaration in Carcano
10  versus McCorey, which is marked as Exhibit 2 by the
11  court reporter.
12        (Exhibit 2 was marked for identification
13  and is attached to the transcript.)
14    A    I have it here.
15  BY MR. BLOCK:
16    Q    Great.  And does this appear to be a copy
17  of the declaration that you wrote for that case?
18    A    It does.
19    Q    Who first contacted you about being an
20  expert in the Carcano case?
21    A    I actually do not remember.
22    Q    Do you remember what organization they

18

1  were from?
2    A    It would be a guess.
3        MR. CORRIGAN:  Don't guess.
4    A    Okay.  I do not recall exactly, so I don't
5  want to misstate.
6  BY MR. BLOCK:
7    Q    Well, can you describe, in the best of
8  your recollection, how you came to be an expert in
9  that case?
10    A    We had published the American College of
11  Pediatricians guidelines for care of transgender
12  patients, and that was used, I think, as a reference
13  point for whoever contacted me to ask me to be -- to
14  provide information for this case.
15    Q    To the best of your knowledge, has the
16  American College of Pediatricians ever been used as
17  a source for determining what the standard of care
18  is in a court proceeding?
19    A    Yes, it has been -- the American College
20  has filed amicus briefs on a number of subjects, and
21  I do not know whether transgender specifically was
22  one of those.  I don't know what level of court it

19

1  has ascended to, but I know it has been used as a
2  document in transgender cases.
3    Q    But my question is not amicus briefs, but
4  if a physician or pediatrician was going about
5  determining the standards of care for a condition,
6  is the American College of Pediatricians publication
7  a source that they would look to?
8    A    Yes, they would review it.
9    Q    Are you aware of any instance in which an
10  expert witness testifying in a case has relied upon
11  them?
12    A    They have mentioned them specifically.  I
13  can't give you a specific case, but I know they have
14  been referenced.
15    Q    So you say you don't recall who contacted
16  you about being an expert in the Carcano case.  Is
17  it your recollection that you were contacted by
18  someone as opposed to you being the person that
19  initiated contact?
20    A    Yes, I was contacted.
21    Q    And if you look at your declaration.  Go
22  back to your declaration in this case.

20

1        MR. CORRIGAN:  So Exhibit 1, not Exhibit
2  2?
3        MR. BLOCK:  Correct.
4  BY MR. BLOCK:
5    Q    So paragraph 10 says:  I provided an
6  expert declaration in the case of Carcano v. McCorey
7  and U.S. v. North Carolina on August 12, 2016; is
8  that right?
9    A    That's correct.
10    Q    And the declaration we just looked at as
11  Exhibit 2 is a copy of that declaration, correct?
12    A    It is.
13    Q    So next sentence says:  I testified in
14  Springfield, Illinois, as a plaintiff's expert
15  witness in the case of Cooley versus Paul.
16        What was that case about?
17    A    That was a case of a child, it had nothing
18  to do with transgender, it was a child who was
19  treated with excessive amounts of steroid over a
20  number of years who suffered severe medical
21  consequences as a result.
22    Q    What was the subject of your testimony?

PLAINTIFFS003328

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

6 (21 to 24)

21

1     A    Subject of the testimony was the standard
2 of care for treatment of children with steroids for
3 whatever reason and the monitoring of the side
4 effects of those drugs.
5     Q    And for all of these -- all of the
6 malpractice cases we've discussed so far, did you
7 ever reference the American College of Pediatricians
8 as a source for determining your standard of care in
9 your testimony?
10     A    I did not because the issues that were
11 raised were not issues where the College had a
12 position statement.
13     Q    Did you reference the Endocrine Society in
14 any of your testimony in those cases?
15     A    Not so much the Endocrine Society, but
16 endocrine -- published endocrine textbooks for
17 children.
18     Q    The next sentence in your declaration
19 says: I testified in court in Hamilton County,
20 Ohio, on February 2018 in regard to Jessica Siefert,
21 a transgender teen that had been removed from the
22 custody of her biological parents.

22

1     Can you tell me about that case?
2     A    I was to provide information to the judge
3 as an expert witness on the subject of transgender
4 medicine presenting the broad spectrum of opinion on
5 the appropriate treatment.
6     Q    And you testified in court to a judge in
7 that case?
8     A    I testified by Skype to a judge.
9     Q    How did you come to be involved in that
10 case?
11     A    The parents' attorney found me because of
12 the position statement of the American College of
13 Pediatricians.
14     Q    And who was the parents' attorney?
15     A    Let me think for one moment if I can
16 remember the name. I can provide it after the fact.
17 I don't want to guess.
18     Q    What was the context in which this
19 teenager had been removed from the custody of her
20 biologic parents?
21     A    The Hamilton County Child Protective
22 Services removed the child from the family at the

23

1 request of the clinic which was treating this young
2 lady because the parents would not give permission
3 for hormonal treatment for their female child. And
4 so the clinic brought charges, and the Hamilton
5 County DFCS assumed custody of the child and kept
6 her in their custody and were requesting that they
7 be able to grant custody to the grandparents, who
8 indicated they would allow hormone treatment to
9 continue.
10     And so the parents were requesting
11 returned custody to them from Hamilton County DFCS,
12 and the judge made the decision, after all the
13 proceedings, to give the child custody to the
14 grandparents.
15     Q    And was that the end of the case?
16     A    As far as I know.
17     Q    Do you know if the judge made any findings
18 of fact regarding your testimony?
19     A    I do not. I do know that she made a
20 specific request that the child be evaluated by
21 mental health practitioners who were completely
22 independent of the children's hospital who were part

24

1 of the mechanism for getting the child taken away
2 from her parents. The judge couldn't believe that
3 the evaluation was not done by an independent
4 practitioner because of the way their practitioners
5 testified about the care of that child.
6     Q    But the independent practitioner that the
7 judge asked to do another evaluation ended up
8 agreeing with the clinic; is that right?
9     A    I do not know. The child was 17 years and
10 10 months of age at the time of the proceedings, and
11 so it's a bit moot. Two months into the proceedings
12 she was age of consent, so she could pretty much do
13 whatever she chose.
14     Q    Do you have a copy of the testimony that
15 you provided in that case?
16     A    I do not.
17     Q    What is -- in your declaration the next
18 sentence says: I testified via Skype in Alberta
19 Province, Canada.
20     What was that case about?
21     A    That case was a suit by parents in the
22 school district in Alberta who had a child, an

PLAINTIFFS003329

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

7 (25 to 28)

25

1 autistic child, who was recruited into an
2 organization at school without the parents'
3 knowledge.
4        The child was approached by a teaching
5 assistant for the class with kids with special needs
6 and autism, and that -- without the parents' notice,
7 the teaching assistant told the girl that, first,
8 she was a lesbian, and then secondarily that she was
9 transgender. The parents were not aware of any of
10 this information, and so their concern was the
11 school did not share information that was important
12 for the parents to know about their child in the
13 school setting, and they thought that that was an
14 inappropriate thing for the school district to take
15 the responsibility without the knowledge of the
16 parents. So that was -- that was the crux of the
17 case.
18    Q   So what was your testimony about?
19    A   My testimony was just to give them some
20 background information about what transgenderism as
21 a concept is, the historical background of how it
22 has come to be as a concept in medicine, and to give

26

1 the broad spectrum of published literature
2 background for that case.
3    Q   And did you testify in court too?
4    A   No, this was just by Skype. This was --
5 actually, this -- I was interviewed -- was not in
6 court. I was interviewed by the plaintiffs'
7 attorneys.
8    Q   Do you know what the --
9    A   I'm sorry.
10   Q   Do you know what the outcome of that case
11 was?
12   A   I want to correct. I was interviewed by
13 the defense attorneys primarily, I'm sorry.
14       I do not know what the outcome is.
15   Q   If we can turn to your CV. Do you have
16 any education or training related to gender
17 dysphoria or gender identity disorder?
18   A   My training at my fellowship at Johns
19 Hopkins was the first introduction to me of what
20 then was called transsexualism, but which is now
21 referred to in current terminology as
22 transgenderism. So that was in 1978 that I was

27

1 introduced to that concept.
2    Q   Have you had any other training?
3    A   No specific training because there is not
4 a -- there is not a curriculum, if you will, to
5 teach transgender medicine that is available.
6    Q   Did you have any clinical training?
7    A   The clinical training was in the
8 fellowship years, and then subsequently meeting with
9 experts in the field, attending a conference of the
10 joint Pediatric Endocrine Society and European
11 Society of Pediatric Endocrinology in New York, but
12 it was not so much a course, it was just a
13 conversation.
14   Q   And would conversations of that sort
15 generally in your field qualify as clinical
16 training?
17   A   No.
18   Q   Okay. So the only training that you had
19 related to transsexualism, gender identity disorder,
20 gender dysphoria, took place during your fellowship
21 at Johns Hopkins; is that right?
22   A   That's correct.

28

1    Q   So during your fellowship, did you
2 actually provide any treatment for people with
3 transsexualism, gender identity disorder or gender
4 dysphoria?
5    A   I did not personally do so, but I was --
6 the attending physicians and -- were providing the
7 care. It was we were used as consultants to
8 evaluate the clinical status of these patients, but
9 we did not specifically write prescriptions for
10 medication, we did not make recommendations for
11 surgery.
12   Q   You did a pediatric -- a fellowship in
13 endocrine pediatrics; is that right?
14   A   That's correct.
15   Q   So what role, if any, did you have in
16 providing recommendations for the treatment of
17 adults with transsexualism, gender identity disorder
18 or gender dysphoria?
19   A   Well, we were sort of observers, if you
20 will, of the clinical circumstances because these
21 were adult patients, and we were pediatric trainees.
22 Johns Hopkins's adult endocrinology division did not

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003330

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

8 (29 to 32)

29

1 take care of these patients.
2     Dr. John Money was the professor on the
3 faculty, and he worked exclusively with the
4 pediatric department, developed his own protocol,
5 and treated adult patients, and we were taught about
6 that, and we were instructed about what was going on
7 with those patients, their clinical status, and
8 their response to therapy.
9     Q   So you were -- in terms of how you were
10 informed about the treatment of those patients and
11 their responses, could you tell me the context in
12 which you were informed of that?
13    A   That we were informed that with clinical
14 conference -- case conferences.
15    Q   About how many of those?
16    A   I recall four specific patients that we
17 learned about in a fair amount of detail at the
18 time. I remember I still have teaching slides from
19 those patients in my teaching slide library. There
20 were, I believe, as many as 12 patients overall in
21 the program during the time that I was there at
22 Johns Hopkins, and those cases were subsequently

30

1 reviewed and reported in the medical literature.
2     Q   And did you provide any input in the
3 treatment of those patients?
4     A   I did not.
5     Q   Did not?
6     A   I did not.
7     Q   You say in your report that during your
8 time at Johns Hopkins you had above-average exposure
9 to children with disorders of sexual
10 differentiation; is that right?
11    A   That's correct.
12    Q   What do you mean by "above-average
13 exposure"?
14    A   Well, the endocrine fellowship training
15 programs are essentially all university based, and
16 because Johns Hopkins was the place where steroid
17 biochemistry and physiology and the physiology of
18 sexual differentiation was primarily outlined, the
19 effect of steroid hormones on the development of the
20 fetus, patients were referred there because the
21 faculty were world renowned. And so comparing that
22 to another center in another city, we tended to get

31

1 more referrals there because of the reputation, if
2 you will, of the clinical faculty.
3     Q   So how many children were you exposed to
4 regarding disorders of sexual differentiation?
5     A   In the two years of my clinical fellowship
6 I would -- and this is an estimate -- would say
7 somewhere between 50 and 75 patients.
8     Q   And did you treat any of those patients?
9     A   Yes, I did.
10    Q   How many of them did you treat?
11    A   I would say almost all those patients that
12 I told you about are patients that I actually
13 treated or was involved in the treatment. There
14 were -- as a fellow you share the treatment
15 experience with other training fellows. Because of
16 the numbers of patients we all got to see most of
17 these very interesting patients.
18    Q   Now, all of these patients were children
19 with DSDs, not transsexualism, gender identity
20 disorder or gender dysphoria; is that right?
21    A   That's correct.
22        MR. CORRIGAN: What's a DSD?

32

1        THE WITNESS: Disorder of sexual
2 differentiation.
3        MR. CORRIGAN: Sorry.
4 BY MR. BLOCK:
5     Q   The fellowship ended in 1980; is that
6 right?
7     A   That is correct.
8     Q   Have you had any training in psychiatry?
9     A   No, I have not, other than its implication
10 and recognition of mental health disorders in the
11 general pediatric population and how mental health
12 issues are related to endocrine diseases, but not
13 specifically in the active treatment with
14 medication.
15    Q   Have you had any training in psychology?
16    A   As part of our pediatric residency
17 program, we were exposed to courses and information
18 on pediatric mental health issues with psychiatry
19 faculty, psychology faculty. In my Navy career of
20 20 years in the hospitals where I was stationed,
21 there were clinical psychologists on the faculty
22 that regularly integrated their work with the

PLAINTIFFS003331

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

9 (33 to 36)

**33**

1 endocrine population of patients, most notably the
2 diabetic patients.
3     Q    But you did not personally receive any
4 training; is that right?
5     A    I received training; I just did not have a
6 certification as a mental healthcare provider.
7     Q    Would you feel qualified to appear as an
8 expert witness regarding psychology or psychiatry
9 for a condition other than gender dysphoria?
10        MR. CORRIGAN:  Object to form.
11        Go ahead.
12    A    No.
13 BY MR. BLOCK:
14    Q    Have you done any scientific research
15 related to transsexualism, gender dysphoria or
16 gender identity disorder?
17    A    I have not.
18    Q    Have you done any scientific research
19 related to transgender people?
20    A    I have not.
21    Q    Have you done any scientific research
22 related to gender identity issues at all?

**34**

1     A    I have not done any research, I have just
2 reviewed the literature.
3     Q    Have you published any articles or books
4 addressing transsexualism, gender identity disorder
5 or gender dysphoria?
6     A    Our letter in regard to the Endocrine
7 Society guidelines was just published in this
8 month's edition of the Journal of Clinical
9 Endocrinology and Metabolism, so that is published
10 in a peer-reviewed journal.  I have submitted for
11 publication an article about the potential pathways
12 of treatment for transgenderism; do not know the
13 status of that publication.
14    Q    Tell me the -- what you're referencing as
15 something published in the Journal of Endocrine and
16 Metabolism, that was a letter to the editor; is that
17 right?
18    A    That's correct.
19    Q    Is it your understanding that letters to
20 the editor are peer reviewed?
21    A    They are.
22    Q    And are letters to the editor based on

**35**

1 independent research?
2     A    Letters to the editor are very
3 specifically required to have a number of
4 references, and they're reviewed before publication.
5     Q    But my question is about research like
6 your independent research.  The letter to the editor
7 wasn't based on that, right?
8     A    No, this was not based on a research
9 study.
10    Q    What is the nature of the peer review for
11 letters to the editor?
12    A    The letters to the editor, as I
13 understand, are reviewed by peers for accuracy,
14 appropriateness of references, and content, and then
15 they are recommended for publication or not.
16    Q    And the second publication you referenced
17 regarding -- was it pathways of treatment for gender
18 dysphoria?
19    A    Yes.
20    Q    What was the name of it?  What was the
21 name of that article again?
22    A    It's a commentary article bringing

**36**

1 transparency to treatment of transgender persons.
2     Q    And where did you submit that article for
3 publication?
4     A    It has just been submitted to a journal
5 that I do not recall the name of, I'm embarrassed to
6 say.  It just was finished last week and sent to the
7 person who was to get it to the publication for
8 review.  There was evidently a possibility of
9 several journals, and if it is not accepted or
10 reviewed appropriately, it will be sent to another
11 journal.
12    Q    Is the journal that you submitted it to a
13 peer-reviewed journal?
14    A    Yes, it is.
15    Q    Is the journal called The New Atlantis?
16    A    No.
17    Q    Is it a journal that specializes in
18 endocrinology?
19    A    I do not believe it is.
20    Q    Is it the Journal -- what's the subject
21 matter of the publications in general?
22    A    I don't want to misspeak, so I might -- I

PLAINTIFFS003332

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

---

37

1 think I have an idea of the name of the journal
2 called Issues in Law and Medicine.
3     Q   Do you know who publishes it?
4     A   I do not.
5     Q   I'm sorry, did you answer?  I couldn't
6 hear.
7     A   I do not know.
8     Q   So other than the letter to the editor, do
9 any of your publications list on your CV address
10 transsexualism, gender dysphoria, gender identity
11 disorder or related issues?
12    A   They do not.
13    Q   Have you given any presentations about
14 gender dysphoria, gender identity disorder or
15 transgender issues?
16    A   I have.
17    Q   How many?
18    A   11 or 12.
19    Q   And are any of those presentations listed
20 on your CV at all?
21    A   I do not believe they are.
22    Q   Why not?

---

38

1     A   I didn't think about putting them on, and
2 most of them are in the past year, and I
3 specifically did not think about putting them on the
4 CV, not for any reason other than I was focusing on
5 publications more than anything else.  There are a
6 list of presentations given on general endocrine
7 subjects in the past.  If you need specifics of
8 those, I can provide that, I just didn't put it on
9 the CV.
10    Q   So where -- in what context did you give
11 these presentations about transgender issues?
12    A   I gave a series of lectures in Australia
13 on behalf of the Australian Family Association, I
14 gave a presentation at the International Federation
15 of Therapeutic Choice, I gave a presentation to the
16 Matthew Bulfin Conference -- joint conference at the
17 American College of Pediatricians, I gave -- and I'm
18 giving another one to this -- the same group this
19 year in early April, and I've given a talk on
20 transgender medicine in the Southern Pediatric
21 Endocrine Society meeting on two occasions.
22    Q   Tell me about this -- the Southern

---

39

1 Pediatric Endocrine Society meeting.  What sort of
2 meeting is that?
3     A   It is -- it's a regional meeting of
4 pediatric endocrinologists which occurs -- has been
5 occurring annually.  We had a year off last year.
6 It involves pediatric endocrinologists in Kentucky,
7 Tennessee, Virginia, South Carolina, North Carolina,
8 Georgia, Florida, Alabama, and Mississippi.
9     So they're inviting -- the invitation is
10 to pediatric endocrinologists in those areas to come
11 together and do a -- either a planning session or
12 case presentations.
13    Q   When did you give your presentation?
14    A   The first presentation was in 2016.  The
15 most recent presentation was last month in Orlando,
16 Florida.
17    Q   Do you have copies of your presentations?
18    A   I do.
19    Q   Is it easy for you to provide copies
20 without that being burdensome?
21    A   They're PowerPoint presentations.  I could
22 present --

---

40

1         THE WITNESS:  I could give them to you.
2         MR. CORRIGAN:  Okay.
3         MR. BLOCK:  We'll follow up with counsel
4 about that.
5 BY MR. BLOCK:
6     Q   So looking at the other organizations, I
7 want to make sure I have the list, so you have --
8 you gave presentations to the Australian Family
9 Association.  Is that a medical organization?
10    A   It is -- no, it's not.
11    Q   And you gave a presentation at the
12 International Association of Therapeutic Choice; is
13 that correct?
14    A   That's correct.
15    Q   What is the International Association of
16 Therapeutic Choice?
17    A   It's a consortium of mental health
18 providers around the world, so it's primarily based
19 on, again, mental health issues.
20    Q   Is it fair to say that it's an
21 organization that supports the option of patients
22 seeking therapies to change their sexual

---

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003333

Case 4:15-cv-00054-AWA-RJK   Document 192-14   Filed 03/26/19   Page 12 of 56 PageID# 2221

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

11 (41 to 44)

41
1 orientation?
2        MR. CORRIGAN: Object to form.
3        Go ahead.
4     A   It's an organization that asks for ability
5 to provide counseling that the patients request.
6 BY MR. BLOCK:
7     Q   To change their sexual orientation?
8     A   That is often an outcome, but it's not the
9 goal.
10     Q   And does the organization also support the
11 ability of patients to seek therapies that change
12 their gender identity?
13     A   Again, it is at the beginning of this
14 subject, so they have no particular guidelines other
15 than those that are recommended by the American
16 Psychological Association, which they use as a
17 reference for standards of care for treatment.
18     Q   What's your understanding of the American
19 Psychological Association's position on therapy to
20 change a person's sexual orientation or gender
21 identity?
22     A   The concept of the idea is that there is

42
1 fluidity in both circumstances, and that's -- that
2 is their statement specifically, that there is
3 fluidity.  It doesn't recommend, as I understand,
4 anything that should or should not be done, other
5 than things that are proven to be harmful.
6     Q   Is there anything that this association
7 focuses on besides sexual orientation or gender
8 identity?
9     A   I do not know.
10     Q   So not that you're aware of?
11     A   Not that I'm aware of.
12     Q   The next organization you referenced
13 sounded like you said Matthew Bulfin.  Am I hearing
14 that correctly?
15     A   It's Matthew B-U-L-F-I-N.
16     Q   And what's that?
17     A   It's a conference that's given every other
18 year, I believe, and it involves issues of bioethics
19 in medicine.
20     Q   Is that conference religiously affiliated?
21     A   No, it is not.
22     Q   What organization is the conference

43
1 affiliated with?
2     A   It's affiliated with the American College
3 of Pediatricians and the American Association of
4 Pro-Life Obstetrics and Gynecology.
5     Q   So are there any other organizations that
6 you gave conference presentations to other than the
7 ones that we've discussed?
8     A   I gave a presentation on the history of
9 transgender medicine to the Teens for Truth
10 conference in I believe it was Houston, Texas, in
11 February of 2017, I believe.  That could be a guess.
12 I don't want to state that on the record.
13     Q   What is Teens for Truth?
14     A   It was a conference for teens to come
15 together and learn about issues of human sexuality.
16     Q   But what specifically were they learning?
17     A   Things -- cases were presented to them by
18 individuals who had experienced certain issues in
19 their lives that they wished to let the teens know
20 that they needed to be open about these issues,
21 discuss them with their parents, discuss them with a
22 therapist, and hopefully resolve their depression

44
1 and anxiety.
2     Q   So is this -- the presenters are people
3 who said that they formerly identified as being gay
4 or transgender, and that they no longer do so?
5     A   There was no case of transgender in that
6 particular conference.  There was a focus on the
7 family and adverse childhood events, so to
8 essentially get the kids to open up about things
9 that had happened in their lives and be able to have
10 a vehicle to bring those things up to their parents
11 or healthcare providers.
12     Q   So the "truth" referenced in Teens for
13 Truth is that someone who struggled with same-sex
14 attraction could have treatment that makes them not
15 be gay; is that right?
16     A   No.
17        MR. CORRIGAN: Object to the form of the
18 question.
19        Go ahead.
20     A   The answer is no.  It was essentially
21 aimed at trying to get kids to open up about the
22 truth of what was going on in their lives that

PLAINTIFFS003334

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

12 (45 to 48)

45

1  brought them to the point of depression or suicide
2  or severe anxiety.
3  BY MR. BLOCK:
4      Q   But all of these children, their -- their
5  depression or other anxiety was related also to
6  same-sex attraction; is that right?
7      A   Not all.
8      Q   Many?
9      A   Some.
10     Q   So the conference had nothing to do with
11 overcoming same-sex attraction?
12     A   That was a subject that was discussed.
13     Q   What other subjects were discussed?
14     A   As I recall, concept of sexual abuse was a
15 major topic, coming out from under the concept of
16 sexual abuse; stories of patients who had
17 experienced rape and how that affected their life,
18 and being able to come out whole on the other side
19 of those kind of issues; children who had grown up
20 in families where there was enormous amount of
21 psychological and behavioral malfunction of parents
22 in raising the child, a lot of it that had to do

46

1  with sexual activity and sexual abuse and trying to
2  bring this to the forefront as a reason to seek
3  therapy and to be healed.  And the healing had to do
4  with resolution of depression and anxiety,
5  specifically.
6      Q   Did it have anything to do with lessening
7  same-sex attraction?
8      A   If that was -- if that was something that
9  happened, it was not -- it was not shunned as an
10 option, but the option was not specifically to focus
11 on that as the only -- only outcome, it was more on
12 trying to get these children to be able to be
13 functional kids in their lives.  If part of the
14 resolution was that they changed their sexual
15 attraction to any degree at all, that was what was
16 viewed as an outcome, but the outcome was primarily
17 to avoid depression and suicide.
18     Q   So what's your understanding of what the
19 name of the organization references with respect to
20 truth?
21     A   The organization, I think, chose the title
22 to be able to allow kids to discuss things with

47

1  their parents, and to discuss things that were very
2  difficult that otherwise would be buried.
3      Q   You're a pediatric endocrinologist,
4  correct?
5      A   That's correct.
6      Q   You have a private practice?
7      A   I do.
8      Q   What's the age range of your patients?
9      A   From birth to completion of their first
10 undergraduate college degree.
11     Q   Have you ever been sued for medical
12 malpractice?
13     A   I have.
14     Q   Have you ever treated or evaluated
15 patients with gender dysphoria, gender identity
16 disorder or gender discordance?
17     A   I have.
18     Q   How many?
19     A   Within the past two years, I have about 12
20 patients, active patients.  I had one patient in
21 1993 when I came to the Atlanta area.  And a family
22 moved from Southern California -- it was a military

48

1  family, and they moved often, and they brought their
2  child in to ask me if I would provide estrogen
3  therapy for that child, who had been evaluated by a
4  psychiatrist in the Los Angeles area, and the
5  parents were advised that upon the next move that
6  that child should be allowed to assume the identity
7  of a female.
8          When the child came to see me, the patient
9  was 13 years old, had a female name and pronouns,
10 and dressed as a female.  The school board of the
11 county asked me to help them develop a policy for
12 that child to be able to -- to have physical
13 education at a time of day when the child could go
14 home from school and not have to worry about sharing
15 locker facilities that did not match the biologic
16 sex.  Fayette County School Board here in the
17 Atlanta area allowed the child access to a unisex
18 bathroom in the school.  So I helped them develop a
19 policy for that child.
20         At that particular time I canvassed all of
21 my mentors across the country to ask them how to
22 handle the estrogen therapy, because there was no

PLAINTIFFS003335

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

13 (49 to 52)

49

1 appropriate FDA indication to treat such a child,
2 and there had been no standards of care set up for
3 that.
4        They advised me that they had no
5 experience in this field subsequent to the closure
6 of the clinic at Johns Hopkins -- no, there were no
7 recommendations professionally by any professional
8 societies in the United States, and so they
9 suggested that I use our practice attorneys to draw
10 up an informed consent for the parents to sign
11 indicating that they were choosing to have their
12 child treated with estrogen at their request, even
13 though we did not know about the potential adverse
14 outcomes that might happen over the long run.
15        I treated that child for six months, and
16 the family then moved out of the geographic region,
17 and I have no idea what happened to that child after
18 that.
19        So that was my very first case of a
20 transgender patient in my clinic, and there was no
21 reference source of standards of care or clinical
22 experience that I could find across the United

50

1 States at the time.
2     Q    This was in 1993, you said?
3     A    Yes.
4     Q    So that was the first transgender patient
5 since your fellowship; is that correct?
6     A    That's correct.
7     Q    So when's the next time you treated a
8 transgender patient?
9     A    Approximately two years ago I began
10 receiving referrals for transgender patients to my
11 private practice office.
12     Q    And so this was after you filed your
13 declaration in Calrezina versus McCorey?
14     A    I might be off on the date.  It might be
15 that as of three years ago I started seeing
16 transgender patients.  It's in the past two years
17 that the numbers have increased.
18     Q    Did these patients all come to you after
19 the American College of Pediatricians had published
20 statements disagreeing with providing hormone
21 therapy to transgender youth?
22     A    They did.

51

1     Q    And so what sort of treatment do these
2 people that come to you ask for?
3     A    They ask for anything from hormone therapy
4 to -- hormone therapy specifically, because that's
5 in the purview of endocrinology.
6     Q    In what context are these patients
7 referred to you?
8     A    It's usually a self-referral.
9     Q    Are they familiar with your position on
10 the American College of Pediatricians?
11     A    None have stated so.
12     Q    So what treatment do you provide these
13 people?
14     A    I evaluate their history, I evaluate their
15 physical condition, their status in puberty, I
16 review the -- in depth the family and social
17 history, and then I request the ability to be able
18 to talk to their counselors who have evaluated them
19 in the first place.  If they have not done so, I
20 refer them to a general counselor in their area to
21 evaluate the undercurrent emotional issues.
22     Q    And then after that, what do you do?  Do

52

1 you provide any treatment to them?
2     A    I do not provide any hormone treatment.
3     Q    So why make them go through this
4 evaluation if you don't provide that treatment?
5     A    Because that treatment is harmful.  It's
6 proven to be harmful.  The vast majority of
7 scientific literature looks at the side effects
8 short-term and long-term, and mostly long-term, and
9 indicates that there is potential damage.
10        So I explain to the parents that I am very
11 much caring and compassionate for this child, and I
12 will do everything I can to help them through and be
13 sure that they have the appropriate evaluation of
14 their mental health issues that are brewing beneath
15 the surface.  And I would say without question every
16 single patient that has come in has significant
17 emotional health history issues.
18     Q    So you're not actually providing any
19 treatment to the patients yourself; is that right?
20     A    I am not providing hormone therapy.  I am
21 providing them information on what hormones do; I
22 explain the physiology of hormones; I explain the

PLAINTIFFS003336

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

14 (53 to 56)

### 53

1  history of treatment and the options that are --
2  that they read about; I discover from them, by
3  interview, what they have learned and what sources
4  they have used to learn that information.
5      Q   So but you don't treat them?
6      MR. CORRIGAN:  Object to form.
7      A   That in my -- I'm not giving them
8  hormones, but I am treating them in the sense of
9  evaluation and continued contact to be sure that
10 their needs are being met in terms of emotional
11 evaluation.
12 BY MR. BLOCK:
13     Q   What continued contact do you have with
14 them?
15     A   I see them every three months.
16     Q   What diagnostic code do you use to bill it
17 to insurance?
18     A   There is -- there is a code for
19 transgenderism.
20     Q   So you use the diagnostic code for
21 treating transgenderism for follow-up appointments
22 with patients after you tell them that you don't

### 54

1  provide hormone therapy?
2      A   Well, I code out the physical exam, the
3  evaluation and the history on the initial exam, and
4  then I code out subsequent counseling appointments
5  where it's essentially a conference appointment.  If
6  it requires an evaluation of their physical
7  condition and their stage of progression in puberty,
8  that is coded as a physical exam.
9      Q   How many counseling appointments do you
10 have with a typical patient?
11     A   Again, these particular patients are seen
12 every three months.
13     Q   But how many times?
14     A   Ongoing as far as possible.
15     Q   I guess I'm confused about what the
16 check-in would be, like, for the second time.
17     A   The check-in is to ask what they
18 understand.  It is a very complex issue to deal
19 with.  Particularly in the younger children, I find
20 that many things that we have -- I have interviewed
21 them and found information about from them as
22 individuals, both in private interview with them,

### 55

1  and also with their parents, is that they, many
2  times because of their age, do not understand a lot
3  of what we talked about and a lot of the information
4  we gathered previously.
5      So it is very important, based on the
6  maturity of the patient and their understanding, to
7  be able to go back and make sure they are on the
8  same page with me in terms of what I know they know,
9  and what I have taught them, and what I have
10 suggested for them, and how their counseling is
11 going.
12     Q   And so you need to have -- so you need to
13 have, like, a third or fourth or a fifth check-in
14 for that purpose?
15     A   I do not want these patients to be lost,
16 okay?  That's the problem.  If they're lost to care,
17 then I have not done my job to my best ability.  So
18 it's like any condition where you are constantly in
19 touch with the patient, such as a patient with
20 obesity.  You keep in touch with them, you bring
21 them back, you see what's going on with all of the
22 issues, school performance, et cetera, et cetera.

### 56

1  It's a complex review of history and any physical
2  changes, and I demonstrate to them the depth to
3  which I am trying to keep them in the fold and make
4  sure that their needs are being met appropriately.
5      Q   By your phrase "keeping them in the fold,"
6  do you mean making sure that they're not receiving
7  gender-affirming hormone therapy?
8      A   I wouldn't be providing that, so if they
9  share that with me, I would assume they're not --
10 that's not something that I can continue or
11 recommend for them, so I would probably part ways at
12 that point in time and say, you know, you have a
13 choice to come here, or you have a choice to go
14 someplace else.  I've done to my best ability all I
15 can to help you.  My door is open, you can call 24/7
16 and request to be in touch with me through my
17 practice, and I will be available to help you with
18 anything that I can.
19     Q   Do you have any qualifications as a mental
20 health counselor?
21     A   I do not.
22     And would you describe your meetings with

PLAINTIFFS003337

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

15 (57 to 60)

57

1 these patients as involving mental health
2 counseling?
3    **A    Not mental health counseling, but**
4 **evaluation of where they stand and how they are**
5 **doing both physically and emotionally because as an**
6 **endocrinologist we deal with depression and anxiety**
7 **in patients very frequently with chronic, nonfatal**
8 **illness.**
9    Q    Do you ever refer the patients to mental
10 health counselors?
11    **A    I do.**
12    Q    Which ones?
13    **A    Ones that are covered by their insurance.**
14    Q    Is there any -- is there any specific
15 counselors that you generally try to refer people
16 to, assuming that they're covered by insurance?
17    **A    I try to hook them up with a personality**
18 **that I believe would be a good fit in terms of the**
19 **child's level of comfort. Most often, adolescent**
20 **males I refer to male counselors, adolescent females**
21 **to female counselors.**
22    Q    And Allan Josephson, is he one of the

58

1 counselors you refer people to?
2    **A    I don't recognize that name.**
3    Q    Do you make sure that the counselor that
4 you're referring people to share your views about
5 the dangers of gender-affirming therapy?
6    **A    Not often. I basically try to find**
7 **somebody who is a general counselor who understands**
8 **anxiety and depression and who will delve into the**
9 **adverse childhood events which lie beneath the**
10 **surface.**
11    Q    Do you have a preference for referring
12 people to counselors who are members of the American
13 College of Pediatricians?
14    **A    They're -- no, I do not because there are**
15 **not very many members of the American College.**
16 **American College members, full members are**
17 **pediatricians, Board-certified pediatricians. There**
18 **are some ancillary associate members in fields of**
19 **surgery and mental health who have aligned**
20 **themselves with the College as being interested in**
21 **helping and aligning themselves with our guidelines,**
22 **but those are people from across -- they're not in**

59

1 **my geographic region.**
2    Q    Do you have a preference for referring
3 people to counselors who are members of the
4 Christian Medical and Dental Association?
5    **A    I do not.**
6    Q    Is that a no? Sorry, I didn't hear.
7    **A    That's a no.**
8    Q    Are you familiar with the Christian
9 Medical and Dental Association?
10    **A    I am.**
11    Q    Are you a member?
12    **A    I am not.**
13    Q    In your practice, your private practice,
14 do you treat children with DSDs?
15    **A    I do.**
16    Q    How many?
17    **A    I have, perhaps, four active patients who**
18 **qualify as having disorder -- no, I have six**
19 **patients who I follow currently.**
20    Q    Over the course of your career, on average
21 how many patients a year would you say you have with
22 DSDs?

60

1    **A    With DSDs? The six patients I mentioned**
2 **are patients that are in the practice that are**
3 **geographically in the Atlanta metro area or within**
4 **the state where we're the closest -- we are a**
5 **conveniently located practice. So the number is**
6 **fairly stable.**
7        **These are really rare kids. Those that**
8 **require any sort of team approach, we are developing**
9 **a DSD multi-specialty clinic at Emory University**
10 **locally where they can get essentially local care**
11 **for any urologic or gynecologic types of surgeries,**
12 **and so it's a newly developing entity we have put**
13 **together in the Atlanta metro area. It is brand**
14 **new.**
15        **Before that the cases were rare enough**
16 **that if -- I would refer back to Johns Hopkins a**
17 **number of the patients over the years I practiced in**
18 **Atlanta who required any surgical intervention.**
19    MR. CORRIGAN: What do you think about a
20 break?
21    MR. BLOCK: We can -- that's okay, we can
22 do that. Five minutes?

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003338

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

16 (61 to 64)

61

1     MR. CORRIGAN: Sure.
2     THE WITNESS: Good.
3     MR. BLOCK: Okay, great.
4     (Recess 11:17-11:28 a.m.)
5  BY MR. BLOCK:
6     Q    So before the break we were talking about
7  your treatment of transgender patients or patients
8  with gender dysphoria, and I just want to make sure
9  I have an understanding of the facts.
10        So from the date of your end of your
11 fellowship, the next time you treated someone with
12 gender dysphoria or gender identity disorder was in
13 1993; is that correct?
14    **A    That is correct.**
15    Q    And then since 1993, you haven't treated
16 any other transgender children until a couple of
17 years ago; is that correct?
18    **A    That is correct.**
19    Q    And by "couple of years," that means two
20 or three years?
21    **A    Yes.**
22    Q    And what is the total number of patients

62

1  with gender dysphoria that you've treated during
2  that time period?
3     **A    12.**
4     Q    12 total.
5         Are all 12 of them -- 12 of them currently
6  active patients?
7     **A    Let me think for a minute. I think one --**
8  **one patient has left the geographic area.**
9     Q    So you're currently seeing 11?
10    **A    I included the -- well, 11 is fine, yes.**
11    Q    Okay. And what is the longest that one of
12 these active patients has been seeing you for?
13    **A    Three years.**
14    Q    And how many appointments would you say
15 you've had with that patient over the course of
16 three years?
17    **A    That one has had six -- six visits.**
18    Q    And does that patient -- does that patient
19 expect to have more visits in the future?
20    **A    The visits tapered off. The patient is**
21 **primarily managed by the mental health provider.**
22    Q    When is the last time you've seen that

63

1  patient?
2     **A    About six months ago.**
3     Q    And how old is the patient?
4     **A    The patient would now be around 15.**
5     Q    And has the patient, to the best of your
6  knowledge, received any gender-affirming therapy?
7     **A    No.**
8     Q    Have any of your patients, to the best of
9  your knowledge, received gender-affirming therapy?
10    **A    I do not know of any who have.**
11    Q    Have any of the patients that you've seen
12 for transgender issues socially transitioned?
13    **A    Some were socially transitioned as they**
14 **presented. One is still socially transitioned. The**
15 **others have essentially stopped the social**
16 **transition.**
17    Q    But they had started the social transition
18 before seeing you, and after they saw you they
19 stopped?
20    **A    That's correct.**
21    Q    And would you say that you encouraged them
22 to stop social transition?

64

1     **A    Their mental health therapist made that --**
2  **helped them guide them toward that advice. I**
3  **specifically -- again, my role is to explain what**
4  **the options are and what I know about complications,**
5  **and I do not -- I do not force the patient to take**
6  **any particular route other than to stick with the**
7  **therapist. I'm very, very insistent on the fact**
8  **that they maintain their contact with the therapist.**
9  **And if the therapist ends up not being a good fit**
10 **not -- for any other reason other than they don't**
11 **get along, I find a new therapist.**
12        **I'm in a role, if you will, of sort of a**
13 **subset of primary care in that -- in the world of**
14 **transgender in that I am taking the responsibility**
15 **of making sure that the therapy is continuing, and**
16 **the patient is not lost to follow-up.**
17    Q    And when the patients come to you in the
18 first instance, how many of these 12 had therapists
19 that had already treated them and recommended that
20 they see an endocrinologist?
21    **A    It's an estimate of about half of them**
22 **already seen by a therapist.**

PLAINTIFFS003339

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

17 (65 to 68)

65

1    Q    And half weren't?
2    A    **And half were not.**
3    Q    So the half that were already seen by the
4    therapist, how many of them did you encourage to
5    find a different therapist?
6    A    **All of them.**
7    Q    All of them?
8    A    **Yes.**
9    Q    And why did you encourage them to have a
10   different therapist?
11   A    **Because it was my sense that the therapist**
12   **that they were seeing was not dealing at all with**
13   **the basic issues that I could glean, was not paying**
14   **attention to the undercurrent depression and**
15   **anxiety.**
16   Q    And you saw yourself as being able to
17   diagnose that more than their therapist that they
18   had before seeing you?
19   A    **The patients gave the history of what they**
20   **were -- what the sessions were about, the parents**
21   **gave the history of their input and what was told to**
22   **them by the therapist, and it did not include any**

66

1    **treatment for depression or anxiety, it did not**
2    **include any evaluation in depth of what the parents**
3    **shared with me.**
4        **So in those cases I felt that it seemed**
5    **that they were being superficial and not actually**
6    **paying attention to the undercurrent mental health**
7    **issues, and so instead of trying to treat those**
8    **mental health issues and evaluate them in depth, I**
9    **referred them to somebody who could do a better job.**
10   Q    And that was your opinion for all of the
11   patients that you saw that had already been seeing a
12   therapist; is that right?
13   A    **That is correct.**
14   Q    So when you encouraged them to see a
15   different therapist, did you -- what was the
16   explanation you gave them for why you were
17   encouraging them to see a different therapist?
18   A    **Because I felt that their emotional health**
19   **history had not been adequately evaluated by**
20   **feedback given to me by either the patient or the**
21   **parents or both.**
22   Q    So the therapists that they were referred

67

1    to, did you have any prior knowledge of those
2    therapists' opinions with respect to treatment for
3    gender dysphoria?
4    A    **In one case I did.**
5    Q    And what was your knowledge of those
6    opinions?
7    A    **This particular individual essentially**
8    **said that they had had a good deal of clinical**
9    **experience, that they would not necessarily have an**
10   **agenda set ahead, but they wanted my -- they wanted**
11   **me to know that they might possibly suggest**
12   **affirmation therapy.**
13   Q    And you referred that patient to that
14   therapist?
15   A    **I did.**
16   Q    What are the age ranges of these patients
17   when they come to you?
18   A    **I have had a patient as young as six, and**
19   **patients as old as 17.**
20   Q    So in what context -- half of the patients
21   had not been seeing a therapist, so how do they come
22   to be in your office in that case?

68

1    A    **The parents either sought out an**
2    **endocrinologist and found me because I was on their**
3    **insurance plan, or they were referred by their**
4    **pediatrician.**
5    Q    Did any -- to the best of your knowledge,
6    any of the patients that came to you know in advance
7    of your opinions with regard to gender-affirming
8    therapy?
9    A    **I do not know.**
10   Q    Do you know if their parents knew?
11   A    **I do not know.**
12   Q    Did any of them come to you with -- did
13   all of them come to you seeking gender-affirming
14   therapy, or did any of them come to you to talk
15   someone out of seeking gender-affirming therapy?
16       MR. CORRIGAN: Object to the form of the
17   question.
18       Go ahead.
19   A    **All of them came to me with concern that**
20   **there were issues of gender incongruence to some**
21   **degree.**
22       **They asked what kinds of services I**

PLAINTIFFS003340

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

18 (69 to 72)

69

1  provide, and I tell them that I provide an in-depth
2  evaluation of their physical condition, and a review
3  in depth of their family and social history with
4  siblings and adults in their lives, and that I am
5  fairly up front as I get to the end of my evaluation
6  to say that I do not provide hormone treatment
7  therapy, but that I do recommend before they go
8  anywhere that they seek out a very thorough,
9  in-depth evaluation of their mental health.
10 BY MR. BLOCK:
11 Q   So to the best of your knowledge, none of
12 the parents of the patients knew in advance that you
13 would not be providing transition-related care?
14 A   I did not know, and I did not ask.
15 Q   So you had said that there was one
16 situation where you knew in advance the therapist's
17 views on gender-affirming care before you made the
18 referral, but for the other 11 therapists that you
19 referred people to, you didn't know their views in
20 advance?
21 A   The one that I referred to was the very
22 first case that I asked among my mental health

70

1  practitioners in the Atlanta area who had referred
2  to me and I had referred to them in my medical
3  history of treating patients in Atlanta, and the one
4  psychiatrist, one child psychiatrist that I had the
5  most referrals from and who I referred to very often
6  suggested that this person was the counselor who had
7  the most clinical experience, and he knew her
8  personally and thought that she unquestionably would
9  review everything with an open mind, and that I
10 should consider talking with her, which I did, and I
11 found out that she -- the insurance that she accepts
12 is very limited, so it ends up not being possible
13 for the parents to get to her very often as a result
14 of that.
15     In the meantime, I began talking to the
16 other providers and asking them if they would help
17 me with evaluations of kids that came to me with
18 transgender issues in regard specifically to going
19 in and looking at the review of adverse childhood
20 events and family dynamics that would set up
21 depression and anxiety that needed to be evaluated,
22 and that's the depth of what I know about.

71

1  Many of these people say they had no
2  specific training in transgender issues, but I said,
3  that's not what I'm asking you to do.  I'm asking
4  you to evaluate the undercurrent pathology,
5  emotional pathology that exists that I sense is
6  going on based on my clinical experience with these
7  patients, clinical literature which says that that's
8  the issue, and that I would like to have them
9  evaluated, and I've not had any pushback with those
10 practitioners.
11 Q   So you've -- with the one exception of
12 this therapist that doesn't take a lot of insurance,
13 the other therapists you've referred people to don't
14 have any experience treating transgender
15 individuals?
16 A   I don't know.  They do have experience in
17 treating mental health in general, and this is a
18 mental health issue.
19 Q   Right.  But for transgender individuals,
20 they don't have any experience specifically with
21 respect to that; is that correct?
22 A   I do not know.

72

1  Q   And when you provide -- when you have a
2  conversation with the therapist that you're
3  referring them to, do you disclose that you do not
4  provide gender-affirming care in your practice?
5  A   I do.
6  Q   So -- and do they -- how do they respond
7  once you disclose that?
8  A   They respond that they're very interested
9  in evaluating the patient, and they will provide
10 that service.
11 Q   Have any therapists declined?
12 A   I had one therapist who said that they
13 were not comfortable with the idea of treating
14 transgender patients; that they would prefer not to.
15 Q   And did you have any prior knowledge
16 whether any of these therapists provided counseling
17 to people struggling with same-sex attraction?
18 A   I do not.
19 Q   Did any of the therapists that you talked
20 to indicate in advance that they agreed with your
21 views with respect to not providing gender-affirming
22 therapy?

PLAINTIFFS003341

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

19 (73 to 76)

73

1    A   They respect the fact that I practice as I
2  do, and they would evaluate the patient, and if they
3  were unsuccessful with their endeavors would be
4  open-minded to recommend, if necessary, other places
5  to go to treat.
6        Q   What do you mean by "unsuccessful with
7  their endeavors"?
8    A   This is a long-term process of evaluation,
9  which is why these cases are all ongoing. This is
10 therapy that takes a long time to work with the
11 families and the patients to understand all the
12 dynamics. This is experience that's been published
13 by -- primarily by Kenneth Zucker in his extensive
14 work with these families.
15       It is not an easy problem to solve. It
16 takes a lot of attention and time. And so if at the
17 end of -- if they're not successful with getting
18 this child to improve their mental health, they're
19 going to try to find somebody else who can do that
20 for them if they're not -- if it's not working for
21 them.
22       Q   So success would be defined as improving

74

1  mental health without having any gender-affirming
2  therapy?
3    A   I think because of the fact they know I do
4  not provide gender-affirming therapy, that they
5  would let me know if the issue was beyond their area
6  of expertise and success, and they would refer to
7  somebody else.
8        Q   So the only therapy that they personally
9  would be able to provide would be to address mental
10 health issues without providing gender-affirming
11 therapy, and if -- but they would not themselves as
12 part of their treatment be providing any
13 gender-affirming therapy, that wasn't an option for
14 what they would personally be providing?
15   A   I don't know what they provide. I just
16 know that I refer to them to evaluate the
17 undercurrent issues, and that's where my focus is.
18 I think that they would rather -- well, I can't
19 speak for what they do.
20       Q   Did you refer these patients just for
21 evaluation?
22   A   Evaluation and treatment.

75

1        Q   So to provide ongoing therapy also?
2    A   Yes.
3        Q   And if the -- and the therapists report
4  back to you on the state of their treatment?
5    A   They do.
6        Q   And for the patients, how many of the
7  patients would you view as having improved
8  psychologically?
9    A   It's a process in the work. I would say
10 two patients of those have resolved their issues
11 successfully and moved on, and the rest are works in
12 progress.
13       Q   So of the 12, two you would say have
14 successfully resolved their issues?
15   A   Yes.
16       Q   And how do you determine that; how do you
17 know that they've successfully resolved their
18 issues?
19   A   Feedback from the therapist, and the
20 patient's own description of how they feel, and the
21 fact that their gender incongruence has resolved.
22       Q   I'm sorry, are you still speaking?

76

1    A   Yes. No, no, I finished. I said that --
2        Q   Okay.
3    A   -- the way I know is input from the
4  therapist, and also input from the patients
5  themselves in terms of what they describe of no
6  longer being -- feeling that they are born into the
7  wrong body.
8        Q   How old were these two patients?
9    A   One was 15, and one was 17.
10       Q   You referenced Kenneth Zucker; is that
11 right?
12   A   Yes.
13       Q   Who is Kenneth Zucker?
14   A   He is a Ph.D. psychologist from Toronto
15 who established a clinic for evaluation of children
16 with transgender issues. He coined the term "gender
17 identity disorder." I believe he's a member of the
18 World Professional Association of Transgender
19 Health. He is widely published, widely respected
20 for his opinions on evaluation and treatment with
21 mental health -- providing mental healthcare.
22       Q   You would view him as an expert in the

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003342

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

20 (77 to 80)

77

1  field; is that right?
2      A   Yes.
3      Q   And you would view his therapy as being in
4  accordance with proper standards of care for
5  treating transgender youth; is that right?
6      A   That is correct.
7      Q   And you said he's a member of WPATH; is
8  that right?
9      A   I believe he is.  I don't know of the
10 status of that membership.  I know he has been in
11 the past.
12     Q   Are you aware of Dr. Zucker's views on the
13 appropriateness of hormone therapy for transgender
14 youth whose dysphoria persists through adolescence?
15     A   I believe he indicates that as an adult
16 that those patients could be considered for therapy.
17 If their lifelong evaluation and therapy did not
18 bring about desistance of their gender incongruence,
19 that hormone therapy could be appropriate.
20     Q   I want to just make sure we're talking
21 about terms like "adults," when we use that term.
22 My -- so my question is people whose gender

78

1  dysphoria persists through adolescence, not
2  necessarily legal age of majority in a given
3  country, is it your understanding -- what's your
4  understanding of his views in providing hormone
5  therapy for people whose dysphoria persists through
6  adolescence?
7      MR. CORRIGAN:  Object to form of the
8  question.
9      Go ahead.
10     A   My understanding is that if with
11 consistent therapy there is persistence of gender
12 incongruence, that those specific patients, and
13 there is a very small percentage of them -- it
14 might be warranted for them to be considered for
15 hormone therapy.
16 BY MR. BLOCK:
17     Q   And do you think someone providing hormone
18 therapy to those patients is engaging in child
19 abuse?
20     A   If they are treating a child, I would say
21 that that is essentially treating the patient and
22 causing harm.  Whether I specifically use the term

79

1  "child abuse," it is known to have inappropriate
2  long-term effects, it is not evaluating -- it's not
3  paying attention to the core issue, it is preventing
4  that child from being able to make it through
5  natural puberty with their natal hormones to allow
6  them to resolve these issues through counseling and
7  personal experience of living in the biologic body
8  unaltered by opposite hormone therapy.
9      So it is -- I would say it is
10 inappropriate to do that.
11     Q   So my question isn't about people who have
12 not yet come through puberty.  My question is about
13 people whose dysphoria persist through puberty.  So,
14 for example, someone who is 16 years old and falls
15 within that small category of people we referred to
16 earlier about for whom Dr. Zucker thinks treatment
17 might be appropriate, do you think it is child abuse
18 to provide that group of teenagers with
19 gender-affirming hormone therapy?
20     A   So adolescence goes actually up through
21 age 21, technically.  It happens that age of
22 majority sort of falls in the last stages of

80

1  adolescence in this country.  I would think that
2  it's inappropriate for a patient to be treated while
3  they are still going through puberty.
4      Puberty goes up in boys -- the final
5  stages of an average travel through puberty for a
6  boy is 18 and for a girl is 16 and a half, so the
7  hormonal changes that are happening in the process
8  of puberty that is physiologic continues to that
9  point.  The development of the brain, however,
10 continues up through age 25.
11     So there are things that are supposed to
12 happen as a result of going through puberty.  If it
13 is altered, if it is stopped in any way, if it is
14 then changed with cross-sex hormones, you are
15 throwing into the human body hormones that are
16 incompatible with the physical biologic body, and
17 you are creating harm.
18     So I would say my purview of patients as
19 far as I can make recommendations is up through the
20 age of consent.  If they come to me after, as one
21 patient has, I still recommend to them that they
22 consider carefully other options and pay attention

PLAINTIFFS003343

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

81

1 to other options instead of doing hormone-affirming
2 and surgical therapy. That's my advice to them at
3 that point in time.
4     Q   Dr. Zucker's published research on rates
5 of persistence and desistance of gender dysphoria
6 among children; is that right?
7     A   Yes, he has.
8     Q   And what's your understanding of what his
9 research shows about the age at which persistence is
10 more likely than desistance?
11     A   A persistence occurs at the end of puberty
12 as they have finished going through puberty.
13 Desistance occurs anywhere along the way.
14     Q   So it's your understanding of Dr. Zucker's
15 research that rates of desistance remain high until
16 boys reach the age of 21 or girls reach the age of
17 16 or 16 and a half?
18     A   No, there is a curve of slower amounts of
19 desistance. The vast majority of patients who are
20 allowed to go through natural puberty desist.
21     Q   Yes, but for people who continue to have
22 gender dysphoria once they start going through

82

1 puberty, are you familiar with the rates of
2 desistance for that group of people?
3     A   That group of people if left alone desist.
4 It's a smaller percentage as they get older and
5 farther along in puberty, but blocking puberty is
6 not an appropriate thing to do because it's not
7 physiologic.
8       So the desistance rates from his published
9 work show that there are -- as you got older and
10 older the desistance rate lessened, but that in the
11 group of all the patients, including those who
12 entered puberty, that desistance was remarkably
13 high.
14       Puberty is a six-and-a-half-year event for
15 a boy and about a five-year event for a girl. Five
16 or six years. And so that is a time spectrum during
17 which if you say if you enter puberty, he's talking
18 about people that have been in puberty, who have
19 been counseled, who have not had affirmation medical
20 therapy, that the majority of those kids desist. A
21 small percentage do not, and his recommendation
22 personally, based on his experience, is those would

83

1 be patients who would be candidates potentially for
2 hormone therapy.
3     Q   And do you know either way about whether
4 he thinks the age where desistance rates are no
5 longer high comes around age 15 or so?
6     A   That -- his opinion has changed as far as
7 I know. His first published studies in his paper in
8 2012 indicated older age. I have not had a direct
9 conversation with him but have had opportunity to
10 know his opinions, and he is waffling a little bit
11 on the upper end of that, saying that there are
12 patients in late adolescence versus young adulthood.
13 It's a matter of semantics more than anything else.
14     Q   So but you disagree with his view that
15 hormone therapy should be considered for transgender
16 youth whose dysphoria persists until late
17 adolescence; is that right?
18     A   Yes, I do. I'm not -- he is not an
19 endocrinologist. I am. I'm aware of the endocrine
20 side effects and the long-term morbidity that's
21 caused by cross-hormone therapy, and I could not
22 recommend it for any adult.

84

1       But I do not practice adult medicine. I'm
2 a pediatrician. I go up through my age range up
3 through age 21 or 22, and in no circumstance would I
4 recommend cross-hormone therapy personally as an
5 endocrinologist. That's my field of expertise.
6     Q   But that's a view that Dr. Zucker does not
7 share?
8     A   I don't know about his background in
9 endocrinology and why he makes that recommendation,
10 but -- and I don't know the exact age. I know it
11 was late adolescence because the desistance rates
12 that he published originally and that also come up
13 from studies in Europe show desistance is very, very
14 high.
15     Q   I just want a yes-or-no question that
16 Dr. Zucker disagrees with you with respect to
17 providing hormone therapy for people whose gender
18 dysphoria persists until late adolescence.
19     MR. CORRIGAN: Object to form.
20     Go ahead.
21     A   I think the term here is -- that we're
22 wrestling with is "late adolescence," what he means

PLAINTIFFS003344

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

22 (85 to 88)

85
1 by late adolescence, and what I mean by late
2 adolescence, and I don't personally know now what he
3 means by late adolescence. I knew what he published
4 before, and I don't know what his opinion is today.
5 BY MR. BLOCK:
6    Q   He thinks hormone therapy could be
7 considered appropriate for some people, and you
8 think hormone therapy is never appropriate for
9 anyone; is that correct?
10   A   Would you restate that question?
11   Q   Yeah. So he thinks that gender-affirming
12 hormone therapy may be medically appropriate for
13 some people, and you think it is never medically
14 appropriate for anyone; is that right?
15   A   That is correct.
16   Q   Do you consider yourself to be an expert
17 in gender dysphoria?
18   A   I am -- I consider myself an expert in the
19 endocrine management of patients with gender
20 dysphoria.
21   Q   When do you think you became an expert?
22   A   With experience of treating patients, with

86
1 experience of background at Johns Hopkins.
2 Essentially -- I consider myself as having more
3 experience than most because of my longevity of
4 clinical experience and training from Johns Hopkins.
5 So it could be argued what is an expert, and I guess
6 you can ask me specifically what you mean.
7    Q   Well, at the time that a patient came to
8 you in 1993 seeking treatment, did you at that time
9 consider yourself to be an expert in treating gender
10 dysphoria?
11   A   I considered myself having as much
12 clinical experience as anybody I knew, and I
13 verified that by talking to people in the field of
14 endocrinology across the United States and found
15 that what I knew they knew, and we forged together
16 forward with a treatment plan.
17   Q   So in 1993, would you have put yourself
18 forward to be an expert witness in a case involving
19 the treatment of transgender individuals?
20       MR. CORRIGAN: Object to the form of the
21 question.
22       Go ahead.

87
1    A   That was not a topic of medical treatment
2 at that time, that was a standard of care. So as
3 much as anybody could be defined as an expert, I
4 would have had as much clinical experience as most
5 people who were defined as experts at the time.
6 BY MR. BLOCK:
7    Q   Wouldn't someone who had actually provided
8 hormone therapy to someone be more qualified as an
9 expert in 1993?
10       MR. CORRIGAN: Object to form.
11       Go ahead.
12   A   There weren't people at that time that
13 were in the mainstream of medicine that we know of,
14 okay? Children were not treated with hormone
15 therapy that anybody in the field of pediatric
16 endocrinology was aware of at the time that I could
17 find in this country.
18 BY MR. BLOCK:
19   Q   But you had not -- at that time you hadn't
20 treated adult transgender people with hormone
21 therapy either; is that right?
22   A   No, I was aware and taught extensively

88
1 about hormone intervention of those adult patients.
2    Q   But you hadn't treated them?
3    A   I did not treat them specifically. I was
4 taught about the treatment, and the case studies
5 were reviewed as they were ongoing.
6    Q   So your view is that once you finished
7 your fellowship in 1980, you had sufficient
8 qualification to be an expert in the treatment of
9 gender dysphoria?
10   A   No.
11   Q   So at what point did you develop
12 sufficient qualification to be an expert in the
13 treatment of gender dysphoria?
14   A   Over the past six to 10 years, since the
15 publication of the guidelines of the Endocrine
16 Society in 2009, specifically, I began the
17 evaluation of the world's literature that I could
18 find and discussions among my endocrine peers to
19 gain as much knowledge as I possibly could, and I
20 was aware of the number of increases in gender
21 transition clinics that were growing and developing
22 in the United States. I was a little bit alarmed

PLAINTIFFS003345

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

23 (89 to 92)

89

1 about the fact that those clinics were established
2 without anybody who had had any training of any kind
3 in a formal curriculum, and I was worried about the
4 quality of medicine.
5       I began looking at the effects of -- I
6 already knew what we were doing in the field of
7 endocrinology trying to prevent the side effects of
8 opposite hormone effects on the human body as the
9 patients developed through adolescence and young
10 adulthood. Those are disease states for which we
11 had standards of care to treat.
12       So as I began seeing that these guidelines
13 were being implemented, I became concerned and
14 learned more and more and more about what was going
15 on and became then as much of an expert by
16 evaluation of literature; discussion amongst my
17 peers. And then I began treating patients -- these
18 patients as they came to my office as of about three
19 years ago.
20       So that is how I would say that I
21 understand the treatment of transgender patients,
22 the adverse effects of hormone therapy, and -- both

90

1 short term and long term, and so that's where I
2 would say that I would ask patients to come to see
3 me for the specific reason because of my expertise,
4 evaluation, and concern for those patients.
5       So the word "expert" is hard to nail down.
6 I would say experienced.
7   Q   Did you say patients came to you for a
8 specific reason; did I hear that right?
9       MR. CORRIGAN: Object to form.
10   A   They come to me because they have an issue
11 of concern about gender incongruence. They know
12 that I'm a endocrinologist, and that's where they're
13 supposed to go to get evaluated to look at their
14 stage of puberty, to find out what resources are
15 available to them.
16 BY MR. BLOCK:
17   Q   So I have the time frame right, the first
18 Endocrine Society guidelines on treating trans kids
19 was published in 2009; is that right?
20   A   That's correct.
21   Q   So you said it was about five or six years
22 after that that you conducted the literature review

91

1 that has made you an expert in this area; is that
2 right?
3   A   No, it was at that time when they were
4 published that I became quite concerned about the
5 recommendations being essentially 180 degrees out of
6 the mainstream of hormone evaluation and hormone
7 treatment effects in children, and so I began in
8 depth at that point in time starting to review the
9 literature and discuss among my peers.
10   Q   Beginning around 2009?
11   A   Yes.
12   Q   If we can turn to your declaration in this
13 case, Exhibit 1, to paragraph 34. If we can look at
14 the second sentence: There has been a flurry of
15 non-peer-reviewed articles in journals and
16 newsletters circulated to general pediatricians that
17 promote the ideology of transgenderism without
18 specific support.
19       What non-peer-reviewed articles are you
20 referring to?
21   A   There are articles in what we call
22 throwaway journals. They're called Pediatric

92

1 Annals, Contemporary Pediatrics, Pediatric News,
2 Endocrinology Today, these are -- Endocrinology
3 Today is aimed at endocrinologists. But these are
4 things that come to physicians' offices free of
5 charge, they're also available online now instead of
6 in the print versions. They are articles written
7 talking about transgender health, talking only
8 affirmation.
9       When they first started being published
10 back in as early as 19 -- excuse me, 2004, there was
11 mention up front in each of these articles about the
12 high desistance rate in children and adolescents,
13 and then, more recently, that has essentially
14 disappeared.
15       But these are articles that when you look
16 at the references, many times they are discussions
17 on Good Morning America, they are references to
18 conferences that WPATH provides teaching sessions or
19 local conferences in geographic regions, they're not
20 in peer-reviewed journals.
21   Q   Is it your position that all of the
22 articles that are supportive of gender-affirming

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003346

Case 4:19-cv-00054-AWA-RJK   Document 132-14   Filed 03/28/19   Page 25 of 56 PageID# 2234

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

24 (93 to 96)

93

1 therapy are published in non-peer-reviewed journals?

2   A   No.

3   Q   So, in fact, many of the articles are

4 published in peer-reviewed journals; is that right?

5   A   No, some are.

6   Q   Are any of these articles cited in your

7 report?

8   A   The ones in peer-reviewed journals?  Yes.

9   Q   Yes.  Which ones?

10   A   Pediatrics, International Journal of

11 Transgenderism, Journal of the American Academy of

12 Child and Adolescent Psychiatry, PLoS One, Child and

13 Adolescent Psychiatry -- excuse me, that's not a

14 journal, that's a textbook.  Those are the ones that

15 I've cited.

16   Q   Which is the one that you said was a

17 textbook?

18   A   It was Zucker's chapter, Child and

19 Adolescent Psychiatry.

20   Q   So is Pediatrics a journal that is viewed

21 as a source of guidance in your field?

22   A   Pediatrics is a peer-reviewed journal,

94

1 yes.

2   Q   Is it viewed as a source of guidance by

3 practitioners in your field for --

4   A   Yes, it is.

5   Q   Yes?

6   A   Yes.

7   Q   Would you consult articles in Pediatrics

8 as part of your review of literature for determining

9 the standard of care?

10   A   Yes, I would.

11   Q   Now, when you previously discussed how you

12 determined standards of care and you talked about

13 conducting a broad survey, how do you decide which

14 of the opinions in that broad survey are going to

15 constitute the standard of care?

16   A   I review the article thoroughly, I look at

17 the design of research if there is research

18 involved.  If it's a summary view I look for what's

19 recommended in terms of breadth of opinion.  There

20 are articles written that are ostensibly to cover

21 the entire field, all aspects of it, all opinions,

22 and come up with a sort of presentation at the end,

95

1 what we call a balanced presentation for the reader

2 then to make an assessment, and perhaps the writer

3 of that particular review article would do the same.

4       I look at things like the Endocrine

5 Society guidelines and the references they use, I

6 look -- and, again, when you go to the specific

7 references, that's a step beyond just reading the

8 article, it's actually looking at what studies are

9 referenced to look those up.

10       It's an arduous task, but on key issues,

11 many times I will request of my local medical

12 librarian copies of those articles so that I can see

13 whether or not what was gleaned from that reference

14 is actually proving the point or not.

15       In some cases I already know the articles,

16 and if I find that they're at odds with what the

17 author cites them to represent, that brings into

18 question the quality of the article.

19       So the design of the research, and then

20 the number of references and where they come from

21 allows me to make a personal opinion on -- and then

22 I discuss that amongst my endocrine -- pediatric

96

1 endocrine peers to find out what they feel and how

2 they approach things, and we go from there.

3   Q   When you were conducting your research

4 regarding treating gender dysphoria, was anyone --

5 were you receiving any payment from any source while

6 conducting that research?

7   A   No.

8   Q   No?

9   A   "No" is the answer, yeah.

10   Q   So tell me if I am mischaracterizing this,

11 but my understanding from your earlier testimony is

12 you had said that standards of care means the most

13 generally accepted way of treating.  Is that

14 something that you believe?

15       MR. CORRIGAN:  Object to form.

16       Go ahead.

17   A   Standards of care are somewhat fluid in

18 that sometimes they are published, sometimes they

19 are not, sometimes they are in development and

20 changed with new developments that come along, so

21 they are essentially a consensus across the board of

22 practitioners.  Often they are guided by a

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003347

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

25 (97 to 100)

97

1 professional organization, hopefully with a balanced
2 approach so that the guidelines that they develop to
3 become or be considered standards of care represents
4 all aspects of the subject thoroughly reviewed and
5 brought to the table for consideration.
6 BY MR. BLOCK:
7     Q    And is it your understanding that
8 standards of care always supported by 30-year
9 long-term research studies?
10    A    They are a combination of longstanding
11 review of literature, clinical research studies in
12 the past, and then new studies that have -- that
13 might be on the forefront of the issue.
14    Q    So are there any standards of care
15 representing the general consensus of practitioners
16 that are not supported by long-term studies?
17    A    Yes, the Endocrine Society guidelines are
18 not supported by any long-term studies of quality.
19    Q    So I'm talking about -- by "Endocrine
20 Society guidelines" are you referring to guidelines
21 regarding treatment of transgender people or in
22 general Endocrine Society guidelines for other

98

1 conditions as well?
2     A    The ones that I pay attention to are those
3 that are published that are germane to children, and
4 it just so happens having spent a lot of time
5 looking specifically at the transgender guidelines I
6 found, with critical review, that there was very
7 little scientific basis for the recommendation.
8         I have not done the same thing in depth
9 with every single one of the Endocrine Society
10 guidelines because many of them deal with patient
11 populations that are adult and disease states that
12 are in adults that do not pertain specifically to
13 children.
14        So in things like treatment of type 1
15 diabetes and those types of things, those
16 guidelines, again, are graded, and they generally
17 are based on good scientific evidence.
18    Q    Sitting here today, you don't -- you don't
19 know whether the quality of research supporting the
20 Endocrine Society guidelines for gender dysphoria is
21 of higher or lower quality than the research of the
22 Endocrine Society guidelines for other conditions?

99

1     A    In the guidelines that I have read, these
2 guidelines have very low scientific evidence
3 compared to the others that I reviewed.
4     Q    Which others have you reviewed?
5     A    Treatment of hypercortisolism, treatment
6 of thyroid disease in the perinatal period.  Those
7 are some that come to the forefront in recent times.
8 Treatment of disorders of sexual differentiation is
9 another one.
10    Q    Treatment disorders of sexual
11 differentiation guidelines are supported by
12 long-term research?
13    A    Yes, they are.
14    Q    And I asked a question asking about
15 standards of care, and you answered talking about
16 the Endocrine Society guidelines, so I want to get
17 an answer to my question about standards of care.
18        So my question is: Is it your
19 understanding that the standard of care with respect
20 to a particular issue is always supported by
21 long-term research?
22        MR. CORRIGAN:  Object to form.

100

1        Go ahead.
2     A    It should be.
3 BY MR. BLOCK:
4     Q    But is it?
5     A    No.
6     Q    Why not?
7     A    I would only be conjecturing as to why
8 not.
9     Q    And yet a particular treatment might
10 represent the consensus of practitioners among a
11 field even if it is not supported by long-term
12 research; is that right?
13    A    It's a consensus of some individuals in
14 the field, not all individuals in the field.
15    Q    But I'm talking about consensus for
16 purposes of standard of care.
17    A    I can't answer that.  The standards of
18 care is a term that gets applied to things that are
19 published.
20        I am not -- my experience with standards
21 of care previously was in dealing with medical
22 malpractice and what the standard of care was in

PLAINTIFFS003348

Case 4:22-cv-00325-RH-MAF   Document 177-17   Filed 04/27/23   Page 27 of 56
Case 4:15-cv-00054-AWA-RJK   Document 192-14   Filed 03/26/19   Page 27 of 56 PageID# 2236

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019                    26 (101 to 104)

101

1  terms of the disease state and the applied treatment
2  and whether or not it met that standard or if it was
3  outside the standard of care, and if it was, were
4  there extenuating circumstances as to why it was.
5         The standards of care from WPATH are
6  published as standards of care by that organization,
7  and they call them standards of care, they don't
8  call them guidelines. It's SOC. And so it's
9  basically use of the language to promote that as a
10 pathway for treatment by that organization.
11    Q    What, in your view, is the accepted
12 standard of care for treating gender dysphoria in
13 adolescence?
14    A    Accepted standards of care that has been
15 proven effective are -- well, my standard of care,
16 which is based on what has been proven to be
17 effective in allowing desistance to occur, is that
18 in-depth counseling be the predominant feature of
19 treatment, and that hormone manipulation is not.
20    Q    I'm not asking about your standard of
21 care, I'm asking for what are the consensus
22 standards of care for treating gender dysphoria in

102

1  adolescence?
2         MR. CORRIGAN: Object to form.
3         Go ahead.
4     A    All I know is my conversations with my
5  endocrine peers is that they are alarmed by what has
6  been reported as a standard of care by WPATH. I
7  would say that the majority of endocrinologists I
8  talk to do not understand the guidelines or why they
9  are recommended. They are labeled as standard of
10 care by an organization that calls them a standard
11 of care, and that's what they are, they are
12 recommendations.
13 BY MR. BLOCK:
14    Q    Is there any written material or sources
15 that you think do represent the consensus standards
16 of care among practitioners for treating gender
17 dysphoria in adolescence?
18    A    No, they are being developed.
19    Q    By whom?
20    A    Endocrinologists and mental healthcare
21 providers.
22    Q    What do you mean by "being developed";

103

1  they're being written down?
2     A    They're being developed, they're being put
3  together. Conversations are happening, groups are
4  getting together who are concerned about WPATH
5  recommendations, about the Endocrine Society
6  recommendations, and they're asking for a dialogue
7  so that everyone can basically come to the table and
8  open up a discussion instead of having it be
9  dictated from one side of the equation.
10    Q    What organization are they having these
11 discussions in?
12    A    It's nothing organized specifically. It's
13 a number of individuals who are concerned across the
14 country who are representatives from their field of
15 interest. We talked about it at length at the
16 Southern Pediatric Endocrine Society at that
17 meeting. Many, many concerned folks. Probably 75
18 percent of the people expressed significant concern
19 about the WPATH guidelines and wondered what should
20 or could be done to essentially come back to the
21 table and redevelop guidelines that took into
22 account the entire complexity of the issue.

104

1     Q    Come back to the table and redevelop
2  guidelines in the Endocrine Society or through a
3  different organization?
4     A    Well, this is the Southern Pediatric
5  Endocrine Society, so that's not -- that's its own
6  loose organization that represents pediatric
7  endocrinologists in the southeastern United States,
8  so cannot speak to the other subgroups.
9         The Pediatric Endocrine Society has a
10 special interest group in transgender health, and it
11 was our hope that at the annual meeting next month
12 in Baltimore that we could come together and have a
13 discussion with individuals in that special interest
14 group about our concerns.
15        It turns out that the special interest
16 group for transgender medicine is not meeting at the
17 Pediatric Endocrine national meeting in Baltimore.
18 There will be a session on disorders of sexual
19 differentiation, which I intend to attend.
20    Q    So as far as you're aware, there are no
21 written drafts of any guidelines from a medical
22 organization that you think represents a consensus

PLAINTIFFS003349

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

105

1 standards of care for treating gender dysphoria in
2 adolescence?
3     A    There are no written guidelines that is a
4 consensus of the broad spectrum of endocrinologists
5 across this country.  There are guidelines written
6 by a special interest group, but not by the majority
7 of endocrinologists across the country.
8     Q    Do you provide treatment for precocious
9 puberty in your practice?
10    A    I do.
11    Q    To delay puberty -- you do.  Sorry.
12        And are there long-term studies on the
13 long-term effects of providing treatment for
14 precocious puberty?
15    A    The treatment for precocious puberty is
16 usually short lived.  It's on an average about a
17 year and a half to two years.  It is rarely longer
18 than that.
19        Because of that, there are studies now of
20 18 years of experience, in particular with Depot
21 Lupron, that look at the effectiveness of treatment,
22 the restarting of puberty naturally, the fertility

106

1 of those individuals who have been treated, any
2 general health issues that happened, and in that
3 young child group -- age group who were not of the
4 age of puberty but are starting puberty, there
5 appears to be benefit socially in terms of,
6 particularly in females, of avoiding menstruation in
7 the very early primary grades, also preserving adult
8 height to some extent.  And those are the two goals
9 for which we use that interruption of therapy.
10        But it is not approved or recommended for
11 long-term use, and it is not approved or recommended
12 for the age of adolescence when calcium bone
13 accretion occurs, and when brain development is very
14 dependent upon the presence of those hormones as the
15 body physiologically goes through puberty.
16    Q    Are there long-term studies on the safety
17 of the treatment, though, the negative health
18 effects?
19    A    There are long-term studies in adults
20 because the GnRH agonists, as they are called,
21 that's gonadotropin-releasing hormone agonists, were
22 used extensively and for longer periods of time in

107

1 adults with hormone-dependent tumors, prostate
2 cancer in males, and estrogen-dependent tumors in
3 females, and there are evidently mental health
4 issues that have surfaced in the long term that are
5 now being recognized and evaluated by the companies
6 that developed those therapies.  We do not have any
7 long-term experience in children because the therapy
8 is not used for long term.
9     Q    Going back to paragraph 35 of your
10 declaration, you say -- sorry, yeah, 35, about seven
11 or eight sentences in, the sentence begins with "The
12 response to these guidelines." It says:  The
13 response to these guidelines was the burgeoning of
14 gender identity clinics in the United States from
15 three to over 45 in a period of seven years.
16        Do you see where I'm reading from?
17    A    I do.
18    Q    So is your opinion that the Endocrine
19 Society guidelines led to more gender identity
20 clinics?
21    A    Yes.
22    Q    So these hospitals with these clinics all

108

1 followed the Endocrine Society guidelines; is that
2 right?
3     A    These clinics decided that they needed to
4 have gender identity clinics to treat patients who
5 would be coming into their practices.  I do not know
6 why each of the individual clinics developed,
7 because I am not a part of those clinics, I don't
8 know what administrative decisions were made.  It is
9 just an interesting phenomenon that once the
10 guidelines were published that there was literally
11 this very rapid increase in the number of centers
12 treating children.
13    Q    And these centers treat the children in
14 accordance with the Endocrine Society guidelines; is
15 that right?
16    A    I do not know each individual center, I
17 just know a few of the centers where I've had a
18 chance to have a dialogue with the clinic directors.
19 And in the case of the clinic in Cincinnati, I was
20 told that 100 percent of patients were affirmed.  I
21 have tried to find out as best I can just by asking
22 people directly the percentage of patients that are

PLAINTIFFS003350

Case 4:22-cv-00325-RH-MAF   Document 177-17   Filed 04/27/23   Page 29 of 56
Case 4:15-cv-00054-AWA-RJK   Document 192-14   Filed 03/28/19   Page 29 of 56 PageID# 2238

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019                                   28 (109 to 112)

109

1 affirmed and those that are sent through counseling,
2 and I am not given a clear answer, but I have the
3 sense that the patients go in the door, and they're
4 affirmed.
5     Q    By "affirmed" you mean provided hormone
6 therapy, cross-sex hormone therapy?
7     A    Initially they are affirmed with
8 counseling to the family to allow the patient to
9 live in the role they wish to assume, trying to get
10 the family to adjust to that and accept that, and
11 then to work with the school systems to be sure that
12 the child is called by the pronouns they wish to be
13 called by, and the name that they wish to be called by,
14 and then when they -- they show the first signs of
15 puberty to have puberty blocked, and then at some
16 point in time after that, now as young as age 13 or
17 14, to receive cross-sex hormones, to have
18 mastectomies if they are a female wishing to trans
19 to a male identity, and then to wait, at least so
20 far in this country, to age 18 before they have any
21 additional surgical procedures done.
22     Q    And these gender identity clinics are all

110

1 over the country; is that right?
2     A    That is correct.
3     Q    How many patients would you estimate
4 they're treating?
5     A    I only have anecdotal evidence that in the
6 state of New York that there is 700 patients per
7 year. I don't know if it's a single clinic or a
8 multiplicity of clinics in a healthcare system.
9         I know that in the local system here in
10 Atlanta, that in 2016 they had 45 patients in that
11 calendar year that were maintained as patients. In
12 2017 that number increased to around 80. The data
13 for 2018 has yet to be published.
14         Those data I happen to know because it's
15 part of the U.S. News and World Report grading
16 system that if you have a transgender clinic that's
17 active, you get higher point scores on your area of
18 excellence in providing children's healthcare. So
19 that I know at least for our local healthcare system
20 is a strong motivation for them to maintain a
21 transgender clinic is because they get recognition
22 nationally as being a center of excellence at a

111

1 higher level the higher the points that they garner.
2     Q    So -- but you know what the numbers are
3 for the upcoming year?
4     A    I do not.
5     Q    You do not.
6         At the Southern Pediatric Endocrine
7 meeting that you were at, were there these gender
8 identity clinics at any of the states where the
9 meeting participants came from?
10     A    Yes.
11     Q    About how many?
12     A    I knew specifically of two in Florida, one
13 in Virginia, I knew of the Emory clinic as well, was
14 not -- there's a clinic -- a gender identity clinic
15 in South Carolina. There were no members from that
16 organization or that state at the meeting, as it
17 turned out. I don't specifically know about
18 Kentucky. Mississippi I'm not aware of. Alabama
19 has a gender identity clinic in Birmingham, although
20 the person that is in charge of that clinic, who I
21 know personally, was not in attendance at the
22 meeting.

112

1     Q    You personally know the person in charge
2 of the clinic in Alabama, is that what you said?
3     A    Yes. I personally know the two in
4 Florida, I do not personally know the person that
5 runs the clinic in Virginia, I do personally know
6 the person that runs the clinic in South Carolina,
7 don't know who runs it in Mississippi, and that's --
8 those are people I know personally.
9     Q    So the people that you know personally who
10 run these clinics, do you think they are
11 practitioners of child abuse?
12     A    I think they are misguided in terms of
13 recommending hormone therapy. The term "child
14 abuse" is a flashy term in my worldview to catch
15 attention. I would say that my concern for these
16 individuals is that there are going to be adverse
17 outcomes in their patient population because of what
18 they recommend and what they -- how they are
19 treating, and I don't think that they are
20 necessarily paying attention to the broader
21 literature, which says that that treatment is
22 harmful more than it is beneficial. They are very

PLAINTIFFS003351

Case 4:22-cv-00325-RH-MAF Document 177-17 Filed 04/27/23 Page 30 of 56
Case 4:15-cv-00054-AWA-RJK Document 192-14 Filed 03/28/19 Page 30 of 56 PageID# 2239

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

29 (113 to 116)

113

1 much drawn to the Endocrine Society guidelines
2 because they are convenient, and they themselves
3 have no personal experience.
4     Q   Do you consider them just in their -- as
5 practitioners to be unqualified as -- in general as
6 pediatric endocrinologists?
7     A   Not at all.
8     Q   You consider them to be conscientious
9 practitioners?
10    A   I do.
11    Q   And you think that they are acting in what
12 they believe is the best interest of their patients?
13    A   I think that they are practicing in what
14 they do believe is the best interest, but I also
15 believe they are not informed.  And when they have a
16 chance -- when I have a chance to talk with many of
17 them, they -- they are kind of taken aback by the
18 fact that there is so much evidence that shows what
19 the Endocrine Society guidelines recommend is
20 contrary to the long-term health of the patient.
21        They had not considered that.  It was not
22 presented to them.  They trusted the Endocrine

114

1 Society to be the voice of reason and assumed that
2 all this information had already been reviewed and
3 came out with a predominantly positive outcome, and
4 they are, a lot of them, quite astonished.
5     Q   Is it your opinion that the Endocrine
6 Society guidelines do not discuss adverse health
7 effects?
8     A   They discuss them in three of the
9 recommendations in the first iteration, and four in
10 the second iteration, the 2017.  They are the only
11 scientifically valid graded recommendations that
12 carry literature with them, and all of them say that
13 there is concern that there are no long-term studies
14 of the long-term effects, that they are aware of, of
15 the hormone -- cross-hormone therapy and puberty
16 blocking, and that there must be studies designed to
17 assess that before they can -- they would assess as
18 being safe and sound.  Despite those statements,
19 they recommend that the treatment be done.
20    Q   If we look at paragraph 45 of your
21 declaration --
22        MR. CORRIGAN:  It ends at 41.

115

1     A   Mine ends at 41.
2 BY MR. BLOCK:
3     Q   That's what I meant, 41.  Apologies.  The
4 second sentence in paragraph 41 says:  Allowing a
5 biologic female to use the male-designated bathroom
6 facility is one of several, quote, gender affirming,
7 unquote, care options, but it is creating harm to at
8 least two parties.  The harm to the gender
9 incongruent person is that it promotes a pathway to
10 inevitable long-term medical and psychological
11 morbidity.
12        And that's what you think, right; that's
13 your view?
14    A   That is my opinion.
15    Q   All right.  So what if the student has
16 already completed puberty, has had surgery, and is
17 taking hormones, is that harm still present?
18    A   The harm has been done.
19    Q   So what additional harm is inflicted by
20 allowing that student to at that point use restrooms
21 consistent with their gender identity?
22    A   Well, you are adding to the long-term

116

1 psychological morbidity of that patient, which is
2 proven to happen in the long-term studies of adults
3 who have lived 20 to 30 years in a transgendered
4 identity situation.  Their mental health issues are
5 still quite high.
6        So if you -- your -- anything you do that
7 keeps the patient away from the therapy that they
8 need -- and all of these patients -- and
9 Dr. Zucker recommends exactly the same, despite
10 whether or not they are given hormone therapy, they
11 are never emotionally well, and they need long-term
12 mental health.
13        So if you add something that is -- we're
14 talking about -- in the case of the school system,
15 we're talking about kids that would not have had
16 surgery yet.  So we're talking about kids that might
17 have had cross-hormone therapy and been socially
18 transitioned.  At that point in time you are adding
19 affirmation that that is a beneficial -- proven
20 beneficial event to allow them to have a presence in
21 the bathroom of the opposite of their biologic sex.
22        And there are no studies that say that

PLAINTIFFS003352

Case 4:22-cv-00325-RH-MAF  Document 177-17  Filed 04/27/23  Page 31 of 56
Case 4:15-cv-00054-AWA-RJK  Document 132-14  Filed 03/26/19  Page 31 of 56 PageID# 2240

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

30 (117 to 120)

117

1 that is true; there are no studies that say that
2 that is not true. There are no studies in
3 existence.
4     Q   So you think -- in terms of adults you
5 think that affirming an adult transgender person's
6 gender identity is harmful to their health?
7     A   I do.
8     Q   Are there any long-term studies on the
9 mental health outcomes of people who identify as
10 being formerly transgender?
11     A   No, they are beginning to develop at this
12 point in time. They have not been available on
13 those who have desisted subsequent to medical and
14 surgical because these patients are just now
15 beginning to come out to the forefront. A, it is
16 the age with which they approach this, they have
17 been transgendered long enough to recognize and to
18 have the strength to return back to their biologic
19 sexual identity and are now beginning to speak out,
20 write, publish, gather like-minded people together
21 so that they can publish their clinical experience.
22       But this is a brand-new group. This is

118

1 where -- this is the end point of people who did --
2 had these things only as adults, not as children,
3 back as far as 30 years ago.
4     Q   So but -- so there are published studies
5 saying that even after receiving treatment, the
6 population of transgender people may have, as a
7 whole, poorer health outcomes than the population of
8 non-transgender people, right? Those are the
9 studies you were referring to previously; is that
10 right?
11     A   That's correct.
12     Q   But there are no studies on assessing what
13 their mental health outcomes would have been without
14 the gender-affirming care, right?
15     A   No.
16     Q   So what you're saying -- "no" means there
17 are no long-term studies, correct?
18     A   There are no long-term reputable studies.
19 There are long-term things that are published, but
20 they are laced with -- as essentially a Cochrane
21 review of those -- all those studies shows that the
22 study design is extremely poor, that it is -- it's a

119

1 preselected population, does not represent 100
2 percent.
3       The only study that's published that has
4 100 percent of participants evaluated at the end is
5 the Swedish study, which is condemned outright
6 because it says what it says. There is incredible
7 amount of increase in mental health morbidity as a
8 result of medical and surgical transitioning. It's
9 the only study that had 100 percent of participants.
10     Q   Sorry. That's your understanding of what
11 the Swedish study says, that as a result of
12 receiving care affirming their identity, the mental
13 outcomes are worse as a result of receiving that
14 treatment?
15     A   It compares it to no one, unfortunately.
16 That's the one downside to that is it did not have a
17 control group of those who did not receive medical
18 and surgical care. It was a review of 100 percent
19 of the patients.
20       So it's called into question without a
21 control group to say that you're comparing itself to
22 itself, but the statistics are there that there's a

120

1 19-fold increase in completed suicides compared to
2 the general Swedish population.
3     Q   So but there are -- so for the type of
4 treatment that you are recommending of just having
5 counseling for underlying health issues, there is no
6 scientifically valid study saying that those health
7 outcomes are better than what the health outcomes
8 would be if the same patient received
9 gender-affirming care?
10     A   That's absolutely correct. We have one
11 study which is all affirmation which is Zucker's,
12 and we have the one study all surgical and medical
13 from Sweden, okay. We know Zucker reported all of
14 his patients, not just some of his patients. Sweden
15 reported all of their patients, not just some. What
16 has not been done is a longitudinal study of
17 side-by-side randomized to an arm of
18 counseling only versus affirmation with counseling,
19 medical treatment, and surgery.
20       No such study exists or has been designed.
21 There needs to be that study, and until that study
22 is completed and the results are evaluated 20 to 30

PLAINTIFFS003353

Case 4:22-cv-00325-RH-MAF Document 177-17 Filed 04/27/23 Page 32 of 56
Case 4:15-cv-00054-AWA-RJK Document 132-14 Filed 03/28/19 Page 32 of 56 PageID# 2241

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

31 (121 to 124)

---

121

1 years post treatment, post beginning of treatment,
2 we will not be able to say without question that one
3 is better than the other in terms of long-term
4 outcome.
5        What we do -- what we do know is that
6 there are so many adverse side effects of the
7 medical and surgical side that creates medical
8 morbidity that would not otherwise exist that the
9 logical assumption is we are creating a disease
10 state by intervening that way, we are creating
11 mentally healthy individuals by doing the
12 affirmation pathway, and what we need to do is have
13 an unbiased study that looks side-by-side, and no
14 study exists.
15    Q    If that study were conducted and the
16 evidence in that study showed that the mental health
17 outcomes for people receiving affirming --
18 gender-affirming care were better, would you then
19 provide gender-affirming hormones in your medical
20 practice?
21    A    I would -- there are two issues here:
22 There's the mental health which is very important,

122

1 and there's the medical health in terms of side
2 effects. So I would have to have -- be shown that
3 the medical side effects and the mental health
4 effects were predominantly beneficial and the
5 downside and adverse effects on both sides were
6 minimal before I would recommend that.
7    Q    So but if the evidence did show that, then
8 you would personally provide gender-affirming
9 hormone therapy?
10    A    I probably wouldn't because I wouldn't be
11 practicing medicine at that time, I probably would
12 not be alive, so it's a theoretical question.
13    Q    Yeah, but so asking a theoretical
14 question, let's say the study came out tomorrow,
15 would you in that situation personally provide
16 gender-affirming hormone therapy, or are there other
17 reasons why you may still not provide it?
18        MR. CORRIGAN: Object to form of the
19 question.
20        Go ahead.
21    A    Yeah, if the medical and mental health
22 issues were better in the affirmed pathway, I

123

1 would -- I would likely change my mind.
2 BY MR. BLOCK:
3    Q    Let's look at the paragraph 41 again.
4 Near to the bottom it says: The second party harmed
5 is the student without gender incongruence who must
6 suffer emotionally while being told they must
7 tolerate the presence of an opposite sex individual
8 in a sexually segregated space and embrace the
9 regulation which gives the gender incongruent person
10 special privileges as if it were based on civil
11 rights founded on immutable biology.
12        Did I read that right?
13    A    Yes.
14        MR. CORRIGAN: Let me -- can I interrupt
15 for a second?
16        MR. BLOCK: Yeah.
17        MR. CORRIGAN: He's not going to offer
18 that opinion. I can tell you that in this case he's
19 not going to offer that opinion. I know it's in his
20 thing, and you can ask him about it, but he's not
21 going to offer that opinion at trial.
22        MR. BLOCK: Okay.

124

1 BY MR. BLOCK:
2    Q    I'd still like to ask you a few questions.
3 So the harm that you're talking about there is not
4 harm limited to the possibility of exposure to
5 nudity; is that right?
6    A    It is primarily harm due to exposure to
7 nudity, and that is just a general survey of asking
8 any adolescent males and females in a social
9 discussion, how would you feel if a naked person of
10 the opposite sex entered your locker room naked and
11 while you were naked? Would that bring you a zone
12 of comfort, would you grade it as neither one way or
13 the other or fantastically wonderful, can't wait
14 until it happens, or I wouldn't want that to happen?
15 And it's pretty much universal, I wouldn't want that
16 to happen.
17        That's just a nonscientific study. There
18 is no -- I am not aware -- I would just assume that
19 the standards that we have set up legally in
20 sexually segregated spaces is there for a reason for
21 privacy. And whoever has done any sociologic
22 studies of that -- we could go back. I am not aware

PLAINTIFFS003354

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

125

1 of those studies.  At this point in time it has been
2 essentially what I would refer to as common sense.
3      Q   So but talking about a restroom in
4 particular, not someone walking in naked into a
5 locker room, talking specifically about a restroom,
6 is it your opinion that there is harm to a
7 non-transgender person in having to tolerate the
8 presence of a transgender person in the restroom
9 even if there is no exposure to nudity?
10      A   I have -- I'm not aware of any study that
11 says that.  Outside of a courtroom if you ask my
12 opinion, exposure to -- if you're in a restroom
13 standing in front of a urinal and you have your
14 pants down around your ankles, and you've inserted a
15 device through which you can direct urine from your
16 vagina into the urinal, I think that would probably
17 cause some people to take notice, but there's no
18 study.  I'm not aware of any study.
19      Q   How about if someone uses a stall?
20      A   What happens in a stall if it's got
21 floor-to-ceiling --
22          MR. CORRIGAN:  Object to form.

126

1          Go ahead.
2      A   If it's in privacy, I can't tell you.
3 BY MR. BLOCK:
4      Q   So in that situation there would be no
5 harm to the non-transgender student?
6          MR. CORRIGAN:  Object to form.
7      A   I cannot say that.
8 BY MR. BLOCK:
9      Q   So you don't know whether it would be
10 harmful?
11      A   I do not know whether it would be harmful.
12      Q   You say special privileges, as if they
13 were based on a civil right founded on immutable
14 biology.  Do you think that civil rights should be
15 based only on immutable biology?
16          MR. CORRIGAN:  Object to form, legal
17 conclusion.
18          Go ahead.
19      A   So I think in terms of things like
20 religious faith, that is something that is not
21 immutable biology, and I think that intolerance of
22 religious faith becomes an issue of the right of

127

1 expression and -- personal right of expression.
2          I don't feel that something that is
3 furthering a detrimental mental health issue is a
4 civil right, especially when it is advertised as if
5 it is immutable biology and it's based on that that
6 we can treat that person as if that were a biologic
7 race or a biologic sex, which it is not.
8 BY MR. BLOCK:
9      Q   Do you have a medical basis for an opinion
10 on what traits should be protected by civil rights
11 laws and which ones shouldn't?
12          MR. CORRIGAN:  Object to the form.  That's
13 why he's not giving the opinion.
14          Go ahead.
15      A   Yeah, I mean, my personal opinion here in
16 this deposition is I would think that race and
17 gender -- and biologic sex are immutable and should
18 be considered to allow people to have specific
19 rights or not be denied rights.
20 BY MR. BLOCK:
21      Q   So if the person using the boys' restroom
22 is a transgender teenage girl who has been having

128

1 affirming hormone therapy since before -- had
2 puberty blockers and affirming therapy and has fully
3 developed breasts, do you think that it is harmful
4 to the non-transgender boy to tolerate the presence
5 of her in the restroom?
6          MR. CORRIGAN:  Object to form.
7          Go ahead.
8      A   I cannot say that that person would be
9 harmed.  It depends on the individual.
10 BY MR. BLOCK:
11      Q   So what about the -- what about the
12 transgender girl who has been receiving affirming
13 hormone therapy, is changing in the school locker
14 room, do you think that's harmful to the
15 non-transgender boys in the locker room with her?
16          MR. CORRIGAN:  Object to form.  We're not
17 here to talk about locker rooms.  He'll answer the
18 question.
19          Go ahead.
20      A   I would personally assume that there would
21 be a level of discomfort of having opposite sex
22 nudity in the same locker room.

PLAINTIFFS003355

Case 4:22-cv-00325-RH-MAF Document 177-17 Filed 04/27/23 Page 34 of 56
Case 4:15-cv-00054-AWA-RJK Document 132-14 Filed 03/28/19 Page 34 of 56 PageID# 2243

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

33 (129 to 132)

129

1 BY MR. BLOCK:

2    Q    But their chromosomal sex is the same, so
3 if the opposite sex nudity is solely as a result of
4 hormone therapy, then is your answer the same?

5        MR. CORRIGAN: Same objection.

6        Go ahead.

7    A    Yes, it would be.

8 BY MR. BLOCK:

9    Q    So what -- so it would be -- it would be
10 better -- just to clarify that question and answer,
11 so it would be uncomfortable for a non-transgender
12 boy to be in a locker room with a transgender girl,
13 meaning someone who is assigned male at birth but
14 has fully developed breasts as a result of hormone
15 therapy?

16    A    That would be --

17        MR. CORRIGAN: Object to form.

18        Go ahead.

19    A    That would be uncomfortable in my opinion.

20 BY MR. BLOCK:

21    Q    And do you have an opinion on whether it
22 would be harmful?

130

1    A    I cannot opine on that. I think there
2 would be uncomfortableness. I don't -- it depends
3 on the individual.

4        I would imagine in the scheme of things
5 for a biologic male who has very large breasts that
6 have been induced by hormone therapy, that that
7 would cause people to notice, comment, to not be
8 comfortable, to try to figure out what's going on,
9 and that they might think that they would -- they
10 definitely would be uncomfortable. I don't know if
11 it causes mental harm. I'm not a mental health
12 practitioner.

13    Q    Do you have a medical opinion on whether
14 that transgender girl with breasts who was assigned
15 male sex at birth should be using the boys' locker
16 room or a separate facility by herself?

17        MR. CORRIGAN: Object to form.

18        Go ahead.

19    A    I think that for the sake of all parties
20 that there needs to be a private space for that
21 person to disrobe where they are comfortable in a
22 private space and other people are comfortable in

131

1 their private space. So a gender-neutral changing
2 space, if you will.

3 BY MR. BLOCK:

4    Q    But the person who has to use that space
5 would be the transgender girl, not the
6 non-transgender boys; is that right?

7    A    It would be available for anybody.

8    Q    And it would be better if she used that
9 separate facility?

10        MR. CORRIGAN: Object to form.

11        Go ahead.

12    A    It would be better if she used that
13 facility because of privacy of other individuals.
14 There are also biologic males who feel very
15 self-conscious about their physical appearance who
16 would like to have a gender-neutral space where they
17 are completely private where they don't have to
18 disrobe in front of anybody of either sex because of
19 how they feel about themselves. Adolescent boys who
20 have a small amount of breast development are very,
21 very sensitive about that and often very
22 embarrassed, and if they were -- if the school would

132

1 provide a neutral space for that person to disrobe,
2 shower, and redress, there would be benefit to both
3 parties.

4 BY MR. BLOCK:

5    Q    How about the presence of a
6 non-transgender boy who is gay in the male locker
7 room --

8        MR. CORRIGAN: Object to form.

9 BY MR. BLOCK:

10    Q    -- would that create harm to other boys
11 who have to tolerate his presence?

12        MR. CORRIGAN: We're far afield from the
13 designation.

14        Go ahead.

15    A    No, I don't see that would. If that gay
16 boy were uncomfortable, I would like to have that
17 gay boy have a place to go where he is comfortable.
18 So if there were a private space for him to disrobe,
19 shower, and dress, that should be made available.

20 BY MR. BLOCK:

21    Q    But if he prefers to shower and disrobe in
22 the same locker room that everyone else showers and

PLAINTIFFS003356

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

133

1 disrobe, you don't have any opinion that he
2 shouldn't be allowed to do that?
3         MR. CORRIGAN: Object to form.
4    **A    There should be no reason why he should**
5 **not be able to. He should be able to use that male**
6 **locker facility.**
7         MR. BLOCK: This is an okay place for me
8 to take a break if it's okay with you. I can also
9 keep going if that's what you prefer.
10        MR. CORRIGAN: I'm always up for a break.
11 Any ideas on how long we'll be doing this?
12        MR. BLOCK: A couple hours.
13        MR. CORRIGAN: Okay. We'll take a break.
14        MR. BLOCK: Sorry, what?
15        MR. CORRIGAN: We'll take a break.
16        MR. BLOCK: Okay. So how about see you at
17 10 minutes?
18        MR. CORRIGAN: Sure. Are you going to
19 have lunch, or what are you going to do about that?
20        MR. BLOCK: We'll have a longer break for
21 lunch then, so come back at 1:30.
22        MR. CORRIGAN: That's fine. That should

134

1 be fine.
2         (Recess 1:02-1:39 p.m.)
3 BY MR. BLOCK:
4    Q    Good afternoon, Dr. Van Meter.
5         You're a fellow with the American College
6 of Pediatricians; is that right?
7    **A    Yes.**
8    Q    And you've been a fellow since 2007,
9 correct?
10   **A    That is correct.**
11   Q    Did you have any role at the American
12 College of Pediatricians before 2007?
13   **A    No.**
14   Q    How did you first come into contact with
15 the American College of Pediatricians?
16   **A    The inaugural president was a personal**
17 **friend of mine. He encouraged me to join the**
18 **organization because it had very specific benefits**
19 **for children's health that were somewhat different**
20 **and more appropriate than the other major pediatric**
21 **professional organization, the American Academy of**
22 **Pediatrics.**

135

1    Q    Did he identify any particular
2 recommendations or positions that were more
3 appropriate than the recommendations of the American
4 Academy of Pediatrics?
5    **A    Well, the American Academy of Pediatrics,**
6 **I was a member during my residency and joined in**
7 **1976, was very active in local chapters, I was a**
8 **chapter chairman for the Uniformed Services West,**
9 **was the legislative committee director for the**
10 **Georgia chapter. I am still a member of the Georgia**
11 **chapter of the AAP because an awful lot of what they**
12 **do has a lot of benefit for children and also looks**
13 **after the ability for pediatricians to be able to**
14 **practice quality medicine.**
15   Q    So what made him think that you had a need
16 for looking at an organization with different policy
17 recommendations?
18   **A    The American College guidelines on a**
19 **number of subjects are essentially based on what is**
20 **purely the published science, and it's devoid of**
21 **political flavor. It basically says we're going to**
22 **be taking care of the needs of children, not the**

136

1 **wants of the adults. The American Academy had been**
2 **leaning toward paying more attention to the wants of**
3 **the adults in a number of areas.**
4     **I put together in 1994-1995, I believe,**
5 **what I sort of thought of as a children's Bill of**
6 **Rights for healthcare for the state of Georgia, and**
7 **we passed it through the House and the Senate**
8 **chambers in the Georgia legislature but not in the**
9 **same year because of the way the legislature ran,**
10 **and we were unable to get both houses to approve of**
11 **it and get it to the Governor's desk for signature.**
12 **We brought that document from Georgia to the**
13 **national AAP, where it was essentially devoured by**
14 **politics and thrown away.**
15     **And that was the beginning of my sense**
16 **that the American Academy of Pediatrics and its very**
17 **small executive group of district chairmen was not**
18 **speaking for pediatricians, and certainly not**
19 **speaking in some very important areas about the**
20 **welfare of kids.**
21     **So Joe Zanga knew that. Joe Zanga was**
22 **actually the president of the American Academy of**

PLAINTIFFS003357

Case 4:22-cv-00325-RH-MAF   Document 177-17   Filed 04/27/23   Page 36 of 56
Case 4:15-cv-00054-AWA-RJK   Document 152-14   Filed 03/26/19   Page 36 of 56 PageID# 2245

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

35 (137 to 140)

137

1 Pediatrics at the time that that resolution came to
2 the floor and was shouted down, and he just was
3 flabbergasted.
4      And I think that he knew how I felt about
5 that, so he asked me if I wanted to consider joining
6 another professional organization that was going to
7 be free from the political needs of the adults in
8 the room and essentially took care of the
9 biologically and scientifically proven needs of
10 children, and that's basically the motto of the
11 American College of Pediatricians is "Best for
12 Children," and that's -- everything we do is through
13 that filter.
14   Q   So after 2007, were there any specific
15 policies of the American Academy of Pediatrics that
16 you disagreed with?
17   A   There were issues of demeaning the value
18 of heterosexual parents adopting children versus
19 same-sex parents adopting children. They came out
20 with a policy statement which was really, really
21 unfortunately very poorly written and very badly
22 documented in the technical support documents which

138

1 favored -- at least favored, if not suggested, that
2 same-sex parenting was probably more beneficial than
3 heterosexual biologic parenting, and certainly more
4 than heterosexual families adopting children. That
5 was -- that was a statement that was very hard to
6 justify because it wasn't based on science.
7      So that was one issue, but that actually
8 happened before I even joined the College. I was
9 still -- I had a bad feeling about the American
10 Academy based on their rejection of our children's
11 Bill of Rights, which had broad political spectrum
12 support from both sides of the political aisle,
13 which was trashed.
14      And I thought knowing how the -- how those
15 things happen, how policies are made and how little
16 of the membership has input -- at no time as a
17 general member was I asked to give any input or
18 review policy statements that were being adopted by
19 the American Academy of Pediatrics.
20      They specifically condemned circumcision,
21 and then they turned around and then reapproved
22 circumcision, then they approved genital mutilation

139

1 of females, and then they quickly withdrew that, and
2 they were just following the political winds.
3 That's not good for any professional organization to
4 do flip-flops and make policy statements that are
5 embarrassing and clearly not based on science.
6      So that's why I finally relinquished my
7 membership in the American Academy. I held on as
8 long as I could to the national organization. The
9 Georgia chapter has its own unique ability to help
10 kids in Georgia deal with Medicaid issues and access
11 to care, things that are near and dear to all of our
12 hearts here as practitioners in the state of
13 Georgia. They're very effective, and they are
14 highly respected in our legislature, so I've
15 maintained my membership with them.
16   Q   So you've been on the board of directors
17 since 2008, right?
18   A   Yes.
19   Q   When did you become vice president?
20   A   Two and a half years ago.
21   Q   And when did you become president?
22   A   It was earlier than anticipated because we

140

1 restructured and developed the position of executive
2 director, and the current president was elevated to
3 that position as a paid employee, and so as vice
4 president, I assumed the presidency on the 1st of
5 July of 2018.
6   Q   When was the American College of
7 Pediatricians formed?
8   A   I believe it was 2002.
9   Q   Why did it form?
10   A   Dr. Zanga was very upset about the issue
11 before the recommendation in regard to the
12 condemning or belittling the benefits of
13 heterosexual parenting, which sociologic research
14 had shown was solid and beneficial to children. The
15 Academy refused to recognize that, and so that was
16 the turning point for, I guess, a nucleus of people
17 who decided that they wanted an organization that
18 actually, again, forgot the needs and political
19 wants of adults and looked after what is best for
20 children.
21   Q   By belittling heterosexual parenting, you
22 mean that the American Academy of Pediatrics said

PLAINTIFFS003358

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

36 (141 to 144)

---

**141**

1 that parenting by same-sex couples is not harmful to
2 children?
3    A  No, that's not -- they said that, but they
4 also essentially inferred that it was possibly
5 better than for heterosexual parenting. That's just
6 stepping across the line without any scientific
7 evidence at all.
8       What it did is it forced individuals to
9 critically go back through, and there was one
10 particular individual who went through every single
11 reference on the technical support paper for that
12 and found it completely full of holes,
13 misrepresenting science.
14      And, again, it was an agenda that seemed
15 to be pushed through by a very small nucleus of
16 individuals, perhaps 35 people at that time were
17 speaking for 60,000 members who were in the American
18 Academy of Pediatrics at the time as members. And I
19 was one at that time, and I never -- I never saw
20 anything published, it wasn't placed in any place
21 for review or discussion, it just happened, and so
22 that's -- that was the turning point.

**142**

1    Q  Did Dr. Zanga believe that same-sex
2 couples should be allowed to legally adopt?
3    A  Yes.
4    Q  He did believe it should be legal?
5    A  Yes.
6    Q  Isn't it true that the American College of
7 Pediatricians filed a legal brief supporting
8 Florida's law prohibiting same-sex couples from
9 adopting?
10    A  The problem is that there is subsequent
11 research that has been out that's -- that shows that
12 there are detrimental effects of that, and that if
13 there is a detrimental effect it should be explained
14 and not accepted as a -- an unharmful beneficial
15 thing when there is actual harm that happens.
16      So if there is a circumstance where there
17 is no other place for a child to go and
18 circumstances are that -- are as such that a
19 same-sex couple can adopt a child, but do not
20 advertise it as equal to or better than a
21 heterosexual couple.
22    Q  Did the American College of Pediatricians

**143**

1 take a position defending a Florida law that
2 prohibited same-sex couples from adopting under any
3 circumstance?
4      MR. CORRIGAN: Let me interject here. Why
5 are we talking about this? How does this have
6 anything whatsoever to do with our case?
7      MR. BLOCK: He's the president of this
8 organization.
9      MR. CORRIGAN: But what does that have to
10 do with anything? I don't see how -- we're here
11 talking about transgender individuals, and we're
12 talking about restroom use, and that's what our case
13 is about, and this talking about whether or not the
14 organization that he's the president of filed a
15 brief in a case dealing with whether same-sex
16 couples can adopt children has nothing to do with
17 that.
18      I think -- I think we're wasting time, I
19 don't think there's anything related to the case, it
20 has nothing to do with anything in his report,
21 there's just no basis for it, Josh. And if you have
22 some basis for it, then please tell me.

**144**

1      MR. BLOCK: He's saying that this
2 organization has standards of care for treating
3 people with gender dysphoria that are better than
4 the American Academy of Pediatrics, they use this as
5 a reputable organization, more reputable than the
6 American Academy of Pediatrics. This is completely
7 fair game.
8      MR. CORRIGAN: But those things have
9 nothing to do with each other.
10      MR. BLOCK: David, if you want to -- this
11 is totally fair game. I'm going to be asking these
12 questions. You can object to their relevance.
13      MR. CORRIGAN: I think this deposition is
14 going off track to talk about things unrelated to
15 this case for a purpose having nothing to do with
16 this case, and I don't want that to happen, I don't
17 think it should happen. I don't think -- this would
18 not be legitimate cross-examination at trial.
19 There's zero chance a judge would say, let's talk
20 about the position of the American College on
21 whether or not same-sex couples can adopt. I just
22 can't imagine that's admissible testimony or ever

---

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003359

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

145

1 could be in this case.
2        MR. BLOCK: It goes to bias, and we're
3 allowed to develop a record on that.
4        MR. CORRIGAN: But what is the bias that
5 it goes to?
6        MR. BLOCK: Well, why don't you wait until
7 we finish asking questions about their positions,
8 and I think it will be shown.
9        MR. CORRIGAN: If you want to get to
10 questions that have anything to do with our case and
11 bias, that's fine. I don't think this bias has
12 anything to do with bias in our case.
13        So -- so let's make sure we're clear
14 because I'm -- at some point I'm going to instruct
15 him not to answer, and we're going to have to take
16 it to the judge, so you may want to be really
17 careful about how long you spend on things having
18 nothing to do with our case because I'm not going to
19 sit here and just have this deposition be about
20 thing that are unrelated to our case. I've been
21 very patient, and now you're crossing over.
22 BY MR. BLOCK:

146

1    Q    So is it true that Joseph Zanga
2 characterized -- is it true that Zanga described the
3 organization as one with the Judeo-Christian
4 traditional values?
5    **A    That might be his opinion. There is**
6 **nothing in its charter that is based on any tenet of**
7 **religious faith. No particular faith is required**
8 **for membership. That is not a question is to**
9 **asked afore of members as they apply. The**
10 **membership criteria is Board-certification in**
11 **pediatrics. It does not require that you be a**
12 **person of faith of any strife or person without any**
13 **particular religious faith, any political strife,**
14 **without any sexual orientation, without -- there is**
15 **no -- that's not part of what makes up the**
16 **organization.**
17    Q    Let's go to Exhibit 4.
18        (Off-the-record discussion.)
19        (Exhibit 4 was marked for identification
20 and is attached to the transcript.)
21 BY MR. BLOCK:
22    Q    Do you have that document in front of you?

147

1    **A    I do.**
2    Q    Do you recognize what this document is?
3    **A    It is, I believe, from the website,**
4 **College website.**
5    Q    It's on the part of the website that says
6 About Us; is that right?
7    **A    That's correct.**
8    Q    Would you turn to -- go down to Core
9 Values of the College. You see that. Yes?
10    **A    Yes.**
11    Q    Number 2 says: Recognizes that good
12 medical science cannot exist in a moral vacuum.
13        What does -- what do you mean by that?
14    **A    It means that ethics play an incredible**
15 **role in the practice of medicine and the application**
16 **of science to medicine.**
17    Q    So when it says that science cannot exist
18 in a moral vacuum, the Academy -- the College's
19 position on care for transgender people based on a
20 moral principle?
21    **A    It's based on a scientific principle.**
22 **It's based on an ethical principle to do no harm,**

148

1 **yes.**
2    Q    So what -- just if you can explain the
3 relationship between science and the moral
4 principles. How -- are there ever situations where
5 the two come into conflict?
6    **A    Well, I think that there is an issue here**
7 **in terms of transgenderism of not paying attention**
8 **or avoiding the reality of solid science to promote**
9 **a social agenda, and that is -- there is harm as a**
10 **result of that, and that's not -- that's**
11 **objectionable in terms of a moral precept.**
12    Q    But what is the moral background that
13 science is located in when you say "can't exist in a
14 moral vacuum"?
15    **A    If you do not pay attention to concepts of**
16 **ethics you will likely do harm to your patients, and**
17 **that's to be avoided.**
18    Q    If you turn the page -- so the bottom of
19 this page says history. If you turn the page it
20 appears under history where it says -- if you look
21 to the third line down, third sentence, it says:
22 The College bases its policies and positions upon

PLAINTIFFS003360

Case 4:22-cv-00325-RH-MAF Document 177-17 Filed 04/27/23 Page 39 of 56
Case 4:15-cv-00054-AWA-RJK Document 132-14 Filed 03/26/19 Page 39 of 56 PageID# 2248

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

38 (149 to 152)

149

1  scientific truths within a framework of ethical
2  absolutes.
3       What ethical absolutes does this refer to?
4       **A   This refers to sort of the Hippocratic**
5       **oath, if you will, again keeping to the basic**
6       **principles we all swear to when we accept our**
7       **medical degree of doing no harm to patients, not**
8       **ending life, the Hippocratic principles, but**
9       **overall, above all do no harm.**
10      Q   Let's look at -- so this'll be -- this is
11 Exhibit 5.
12          (Exhibit 5 was marked for identification
13 and is attached to the transcript.)
14 BY MR. BLOCK:
15      Q   Do you recognize this document?
16      **A   I do.**
17      Q   Sorry, do you have the document in front
18 of you?
19      **A   I do.**
20      Q   Okay.  Do you recognize this document?
21      **A   I do.**
22      Q   Okay.  The title of the document is Gender

150

1  Ideology Harms Children, correct?
2       **A   That is correct.**
3       Q   And if you turn the page, there are --
4  there's three authors it's attributed to, and one of
5  them is you; is that correct?
6       **A   That's correct.**
7       Q   So at the very beginning of the document
8  it says: The American College of Pediatricians
9  urges healthcare professionals, educators, and
10 legislators to reject all policies that condition
11 children to accept as normal a life of chemical and
12 surgical impersonation of the opposite sex.
13          Did I read that right?
14      **A   Yes, you did.**
15      Q   So according to this document, schools
16 shouldn't be sending a message that gender
17 transition is normal, right?
18      **A   That is correct.**
19      Q   And schools should be discouraging
20 students from transitioning genders, correct?
21      **A   To their -- to their detriment to affirm.**
22      Q   So the schools should discourage it?

151

1       **A   It should not -- yeah, they should**
2       **discourage it.**
3       Q   Do you think that a school is acting in
4  the best interest of a child by calling the child by
5  pronouns that are different than the sex assigned to
6  them at first?
7       **A   We don't feel that that is appropriate or**
8       **beneficial to the child.**
9       Q   So you think it's harmful to the child?
10      **A   Yes.**
11      Q   And by agreeing to use the child's --
12 changing a child's new name as consistent with their
13 gender identity, you think that's harmful to the
14 child also, right?
15      **A   Yes.**
16      Q   And go to -- are you aware -- are you
17 aware about what Gloucester County School Board's
18 policies are with respect to what pronouns it uses
19 to refer to transgender children?
20      **A   I was aware in this particular case that**
21      **they allowed this patient to assume a new name and**
22      **new pronouns.**

152

1       Q   And you believe that allowing them to do
2  so was harmful to him, correct?
3       **A   I do.**
4          MR. CORRIGAN:  Just to be clear, he's not
5  being offered for those opinions.  His only opinions
6  where he's being offered for are strictly with
7  respect to restroom use, which is the issue in the
8  case.
9  BY MR. BLOCK:
10      Q   So is there any basis to conclude that
11 using the restroom as opposed to being referred to
12 by particular pronouns is uniquely harmful or -- to
13 a transgender student?
14      **A   It is part of the process of affirming**
15      **something which at the time is just a gender**
16      **confusion, a state of mind, not a biologic reality,**
17      **and anything that promotes that is not of benefit to**
18      **the child.  And --**
19      Q   Turn the page to paragraph 8.  It says:
20 Conditioning children into believing a lifetime of
21 chemical and surgical impersonation of the opposite
22 sex is normal and helpful is child abuse.

PLAINTIFFS003361

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

39 (153 to 156)

---

153

1    Did I read that right?
2    A   You did.
3    Q   So when I referenced the term "child
4  abuse" before you said it was a flashy term.  Am I
5  accurately characterizing your testimony?
6    A   Yes.
7    Q   So why do you use that term here in this
8  paragraph?
9    A   Primarily for emphasis.
10    Q   The next sentence says: Endorsing gender
11  discordance as normal via public education and legal
12  policies will confuse children and parents, leading
13  more children to present to, quote, gender clinics,
14  unquote, where they will be given puberty-blocking
15  drugs.  This, in turn, virtually ensures they will,
16  quote, choose a lifetime of carcinogenic and
17  otherwise toxic cross-sex hormones, and likely
18  consider unnecessary surgical mutilation of their
19  healthy body parts as young adults.
20    Did I read that right?
21    A   You did.
22    Q   So is one of the harms in allowing a

---

154

1  transgender student to change pronouns and names and
2  restroom usage consistent with their identity that
3  it will confuse non-transgender students as well?
4    A   It is confusing to non-transgender
5  students because they do not understand, especially
6  at young ages, what is -- is happening to their
7  classmates, or they are in a state of mind with
8  Erikson's basic premise of being very concrete
9  thinkers, and they think a five-year-old child is
10  essentially, from what I've read, not being an
11  expert in the field of mental health, but what the
12  experts say, a five-year-old believes that if a man
13  leaves a room and comes back in dressed as a woman
14  and wearing women's makeup, to appear to be a woman,
15  that that man has changed into a woman.  That's the
16  level of psychological assessment at that age.
17    By age seven there is an ability for a
18  child to recognize that perhaps that is just a
19  costume and not a real person of the opposite sex.
20    So if you were, at the elementary school
21  age, promoting aggressively that gender is whatever
22  you want it to be, you are basically bringing in an

---

155

1  ideology that is programming the child to be
2  confused and upset.  And there are certainly
3  clinical cases where that's happened, and the
4  parents have brought legal action against school
5  systems.
6    Q   Let's look at the last -- the very end of
7  the statement.  So this is after the clarification
8  at the bottom of the paragraph, the bottom line is
9  the final sentence says:  For this reason, the
10  College maintains it is abusive to promote this
11  ideology, first and foremost for the well-being of
12  the gender dysphoric children themselves, and
13  secondly, for all of their non-gender-discordant
14  peers, many of whom will subsequently question their
15  own gender identity, and face violations of their
16  rights to bodily privacy and safety.
17    Did I read that right?
18    A   You did.
19    Q   What do you mean by it will cause many of
20  their non-gender-discordant peers to question their
21  own gender identity?
22    A   Well, there is a phenomenon with the

---

156

1  advent of social media where the incidence of gender
2  identity issues has exponentially -- has
3  geometrically increased, and the ratio has flipped
4  from two-to-one male to female to two-to-one female
5  to male.  It's a social contagion phenomenon amongst
6  kids who are coming together as groups and deciding
7  that they are transgender and would like to have
8  their surgeries done together and travel to the
9  identity of the opposite sex.
10    These kids are coming out of the woodwork
11  literally in larger and larger numbers as a social
12  contagion phenomenon.  Society itself, it's not that
13  it's just more acceptable.  It exceeds that kind of
14  mathematical computation.  So it is -- it is a
15  contagion that's happened, and it's certainly
16  promoted by Internet.
17    Q   So if the school affirms the gender
18  identity of the transgender student, that
19  transgender student could spark a social contagion
20  that causes other students to say they're
21  transgender too?
22    A   Absolutely.  It has happened, and it's

---

PLAINTIFFS003362

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

40 (157 to 160)

157

1 documented.

2    Q    So by not allowing the transgender student
3 to use the same restrooms as cisgendered students
4 with their gender identity, the school is stopping
5 the spread of social contagion; is that right?

6         MR. CORRIGAN:  Object to the form of the
7 question.  The witness is not being called in this
8 case to discuss these very issues; he's not speaking
9 on behalf of the school board.

10        Go ahead.

11   **A    I have no proof to say that not allowing**
12 **use in a bathroom would make that difference.**
13 **Again, there is no study I'm aware of that says**
14 **using the gender-identified non-biologic sex**
15 **bathroom has any benefit or any detriment to the**
16 **long-term outcome of a patient.  Those studies have**
17 **not been done.**

18 **BY MR. BLOCK:**

19   Q    So my question is that you believe that if
20 a transgender student is affirmed and allowed to use
21 the bathroom consistent with their identity, then
22 that is more likely to cause other students to think

158

1 they might be transgender too?

2         MR. CORRIGAN:  Object to form of the
3 question.

4         Go ahead.

5    **A    It is theoretically quite possible.**

6  **BY MR. BLOCK:**

7    Q    So going to Exhibit -- going to jump ahead
8 here to Exhibit -- I think this is 8.

9         (Exhibit 8 was marked for identification
10 and is attached to the transcript.)

11 BY MR. BLOCK:

12   Q    Do you have that document in front of you?

13   **A    Almost.**

14   Q    Do you have it in front of you now?

15   **A    I do.**

16   Q    The title of this article is, Dr. Quentin
17 Van Meter: How Faulty Research by a 1950's Sexual
18 Revolutionist Guided the Modern Transgender
19 Movement; is that right?

20   **A    Yes.**

21   Q    And do you recall giving an interview to
22 Breitbart for purposes of this article?

159

1    **A    I did.**

2    Q    Did you read this article when it came

3 out?

4    **A    Yeah, I saw it after it came out.**

5    Q    Was there anything in the article that you
6 thought was inaccurate or mischaracterized your
7 views?

8    **A    I had some questions about sort of**
9 **interpretive sentences when I read it.  I would have**
10 **to read it back through completely to go back**
11 **through and pick those out again, but in general the**
12 **flavor and the purpose of the article was to -- was**
13 **to essentially discuss John Money and his influence**
14 **on the sexual health, mental health side of issues**
15 **in this country.**

16   Q    Sorry, if you give me one second.  If you
17 turn to page 4 of 6.

18   **A    I have it.**

19   Q    So the second paragraph there, it says:
20 According to Van Meter, since the transgender
21 movement has developed every patient that come to
22 him claiming to be in the wrong body, quote, have

160

1    come from a totally dysfunctional family, unquote.

2         And just to continue this next paragraph
3 says, quote, there's nothing normal about the
4 environment where these children are brought up,
5 unquote, he said.  Quote, there are emotional
6 traumas left and right.  It's so obvious that what
7 we're doing is painting over the trauma, unquote.

8         Do those quotes accurately reflect what
9 you told the reporter for this article?

10   **A    Yes.**

11   Q    So do you think that if someone is
12 transgender or thinks they're transgender it's the
13 fault of the family?

14        MR. CORRIGAN.  Object to form.

15   **A    If the child is transgender, they have**
16 **chosen this as an answer to relieve them of dealing**
17 **with a stress that is in their environment.**
18 **Sometimes it's the family, sometimes it's the**
19 **extended family or the social environment of the**
20 **child.**

21 **BY MR. BLOCK:**

22   Q    But if someone is transgender, that often

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003363

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

41 (161 to 164)

161

1 indicates that they come from a totally
2 dysfunctional family; is that right?
3     **A   The word "totally" might be a pejorative**
4 **type of word that was used in the interview.  There**
5 **is always trauma, always emotional trauma, and**
6 **always a level of dysfunction in the family.**
7 **Divorce, separation, sexual abuse, death, all those**
8 **things affect the child.**
9     Q   You think that is true for all transgender
10 people?
11     **A   All the transgender patients I have cared**
12 **for.**
13     Q   So all 12 --
14     **A   Yes.**
15     Q   -- of them?
16     **A   Yes.**
17     Q   How about the one in 1993?
18     **A   There was a lot of trauma.  This was a**
19 **military family that moved every six to nine months.**
20 **I did not broach the subject of sexual abuse by any**
21 **member of the family, siblings or adults, but the**
22 **child was severely traumatized by the rapidity and**

162

1 **frequency of moves from community to community.**
2     Q   Last paragraph of this article, which is
3 page 5, it says, quote, this is the recruitment of a
4 cult, unquote, Van Meter said.  Quote, it's so
5 scary, and I'm so overwhelmingly worried about the
6 welfare of the population of people 30 years out,
7 unquote.
8     Is that quote accurate -- an accurate
9 reflection of what you told the reporter?
10     **A   Yes.**
11     Q   So can you explain what you mean by "this
12 is the recruitment of a cult"?
13     **A   This is an ideology which is promoted by**
14 **some to essentially use this as a valid medicalized**
15 **diagnosis to gather children and to treat them, and**
16 **their purpose is to see what happens when the**
17 **treatment is over and make a decision then, just**
18 **like John Money did some 40 years earlier with an**
19 **idea that was not based on any known science that --**
20 **to be beneficial, and then to come out with an**
21 **experimentation at the other end.**
22     **The cult aspect of it is what's happening**

163

1 **on the Internet and the recruitment of patients by**
2 **websites and blogs, and all that's happening as if**
3 **they're pulling in the kids unwittingly, most often**
4 **against their parents' wishes and without their**
5 **parents' knowledge, and then they are sucked into**
6 **the ideology, which is very much like a cult.**
7     Q   You think the American Academy of
8 Pediatrics is recruiting children into a cult?
9     **A   The American Academy of Pediatrics**
10 **produced a statement written by one individual**
11 **promoting this concept, and specifically and most**
12 **dangerously saying that under no circumstance is**
13 **there any need for psychological evaluation.**
14 **That is one individual, the author of that**
15 **paper, and 35 -- as many as 35, perhaps a little**
16 **less, of administrative people rubber stamping this**
17 **as a promotional position of the American Academy of**
18 **Pediatrics.**
19 **It is abysmal, it is embarrassing, it is**
20 **dangerous, and the fact that they say they represent**
21 **and are supported by all now 67,000 members is**
22 **entirely and completely untrue.**

164

1     Q   Do you think the author of that paper is
2 recruiting children into a cult?
3     **A   I don't know the author.  I cannot speak**
4 **to that.  I just know that he wrote a paper and a**
5 **position that's based on really essentially**
6 **fraudulent -- fraudulent information.  He misquotes**
7 **papers.  He ends up saying the papers say one thing**
8 **to support his point, and when you pull the**
9 **reference, you find out that it does not support the**
10 **paper.**
11 **The article was very carefully critiqued**
12 **by an independent psychologist in the field of**
13 **psychology and lesbian gay psychology, and he**
14 **himself is a pro -- a proponent, an advocate for gay**
15 **people, and he tore this apart as absolutely abysmal**
16 **trash.**
17     Q   So you believe that schools can help kids
18 by discouraging students from being transgender; is
19 that right?
20     MR. CORRIGAN:  Object to form of the
21 question.
22     Go ahead.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003364

Case 4:22-cv-00325-RH-MAF Document 177-17 Filed 04/27/23 Page 43 of 56
Case 4:15-cv-00054-AWA-RJK Document 192-14 Filed 03/28/19 Page 43 of 56 PageID# 2252

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

42 (165 to 168)

165

1    A   I believe schools can help kids by making
2  sure that the family is fully aware and that they
3  are aware that there is counseling going on and
4  there's an intervention that the family is involved
5  in, and I think that's as far as schools can go.
6  That's as much as I can say on that subject.
7  BY MR. BLOCK:
8    Q   But they shouldn't be sending a message
9  that being transgender is an equally acceptable
10 lifestyle to have?
11       MR. CORRIGAN:  Object to form, not
12 designated for this purpose.
13       Go ahead.
14   A   Yes, I think that's inappropriate for them
15 to be promoting something which, as Kenneth Zucker
16 said, is not a delusional disorder but is a
17 delusion.
18 BY MR. BLOCK:
19   Q   So would one way to send that message be
20 to stigmatize transgender students, would that be a
21 way of sending that message?
22   A   No.

166

1        MR. CORRIGAN:  Object to form, object to
2  foundation.
3        Go ahead.
4    A   No.
5  BY MR. BLOCK:
6    Q   So what are the ways they can send that
7  message that transgender students have a delusion?
8    A   They could deal with the student
9  themselves and make sure the student is in the care
10 of a mental health provider.
11   Q   I want to turn to -- actually, you said
12 before you're familiar with the Christian Medical
13 and Dental Association; is that right?
14   A   Yes.
15   Q   How are you familiar with them?
16   A   I took -- A, I know they exist.  I'm not a
17 member.  I took a course from them on preparation
18 for speaking to the media.  It's a generic course
19 that teaches you how to be interviewed, how to
20 respond most effectively to questions so that the --
21 your interview can be used more appropriately, to
22 not do run-on sentences, to not mumble, to have the

167

1  camera, and they basically train you on how to do
2  that appropriately and give you a critique of what
3  you've done in front of a camera or in front of a
4  microphone so that you can improve some of your bad
5  habits.
6    Q   Have you read their position statement on
7  transgender identification?
8    A   I have not.
9    Q   I'd like to turn to Exhibit 6.
10       (Exhibit 6 was marked for identification
11 and is attached to the transcript.)
12 BY MR. BLOCK:
13   Q   Do you have that document in front of you?
14   A   I do.
15   Q   Do you have that document in front of you?
16   A   I do.
17   Q   Do you recognize the document?
18   A   I do.
19   Q   It's called, On the Promotion of
20 Homosexuality in Schools; is that right?
21   A   That's correct.
22   Q   If you look in the right-hand column on

168

1  the fourth checkmark down it says:  The homosexual
2  lifestyle carries grave health risks; is that right?
3    A   Yes.
4        MR. CORRIGAN:  Let me interject here.
5  This is something having to do with homosexuality in
6  schools.  To my knowledge our case has nothing to do
7  with homosexuality in schools, okay?  This is about
8  transgender bathroom -- transgender restroom use.  I
9  don't see how this is in any way related, relevant,
10 has any significance whatsoever, so I object to any
11 questions regarding this.
12       MR. BLOCK:  It goes to the credibility of
13 his opinion and whether or not it represents medical
14 mainstream.
15       MR. CORRIGAN:  His opinion is that there's
16 no science to support the notion that using a
17 restroom of any description has any effect on a
18 transgender youth.  I don't see how that opinion is
19 in any way influenced by whether or not this
20 American College has a paper on a promotion of
21 homosexuality in schools.  Just completely
22 unrelated, not admissible, never going to be part of

PLAINTIFFS003365

Case 4:22-cv-00325-RH-MAF  Document 177-17  Filed 04/27/23  Page 44 of 56

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

| 169 | 171 |
|---|---|
| 1 our case. | 1 MR. BLOCK: You can't put forth an expert |
| 2 Go ahead. | 2 and not allow me to build a record exploring bias. |
| 3 MR. BLOCK: You're proffering him as an | 3 MR. CORRIGAN: But again, the bias has to |
| 4 expert on what the mainstream medical view is, and | 4 be somehow related to the case. You can't just talk |
| 5 this goes to his views being outside the mainstream | 5 about what kind of bias he may have that has nothing |
| 6 and being based on ideology and not based on | 6 to do with the case. |
| 7 science. | 7 MR. BLOCK: If you want to take it to the |
| 8 MR. CORRIGAN: I am not offering him as an | 8 judge and explain why I shouldn't be able to ask him |
| 9 expert on what the mainstream view of anything is. | 9 about a document from this organization that is On |
| 10 I'm just telling you that his opinion is, based on | 10 the Promotion of Homosexuality in Schools, you're |
| 11 his review of the literature and et cetera, that | 11 welcome to put that issue before the judge. |
| 12 there is no scientific basis, medical basis, | 12 MR. CORRIGAN: Okay, I will. |
| 13 psychological or other basis for anyone saying that | 13 MR. BLOCK: Excellent. So you're |
| 14 using a particular restroom has any effect on that | 14 instructing him not to answer any questions on, On |
| 15 person one way or the other. | 15 the Promotion of Homosexuality in the Schools? |
| 16 That's what our case is about, and that's | 16 MR. CORRIGAN: I'm instructing you to ask |
| 17 what he's going to testify to. He's not going to | 17 a question that has something to do with our case. |
| 18 talk about any of this, and this has nothing to do | 18 If it's related to this document, I'm not going to |
| 19 with our case. | 19 object to it, but if it has nothing to do with our |
| 20 MR. BLOCK: But we can explore bias, and | 20 case I'm going to continue to object to you asking |
| 21 we can explore the ability to draw valid conclusions | 21 questions about topics unrelated to the issues in |
| 22 from reviews of evidence. | 22 our case. |

| 170 | 172 |
|---|---|
| 1 MR. CORRIGAN: If they have anything to do | 1 MR. BLOCK: You can object all you want. |
| 2 with the case that would be true, but when they have | 2 I'm -- but my question -- I'm going to continue |
| 3 nothing to do with the case, they're just -- it's | 3 asking questions. |
| 4 totally irrelevant, totally tangential, totally | 4 MR. CORRIGAN: Ask your next question. |
| 5 collateral, and has nothing to do with the case. So | 5 BY MR. BLOCK: |
| 6 I just don't see the benefit of talking about these | 6 Q So let's look at the second sentence of |
| 7 types of things. | 7 the bolded at the top, which is a sentence that is |
| 8 MR. BLOCK: Bias is always relevant and | 8 very similar to a view that you express in this |
| 9 not collateral. | 9 case. It says, quote, these organizations recommend |
| 10 MR. CORRIGAN: What's relevant? | 10 promoting homosexuality as a normal, immutable trait |
| 11 MR. BLOCK: Bias. | 11 that should be validated during childhood as early |
| 12 MR. CORRIGAN: What's the bias? Our case | 12 as kindergarten. |
| 13 is about transgender, it's not about homosexual. | 13 So you disagree -- just as you disagree |
| 14 You're confusing two concepts. | 14 with being transgender as being promoted as a |
| 15 MR. BLOCK: That he has opinions about | 15 normal, immutable trait, you also disagree with |
| 16 homosexuality and gender identity that are based not | 16 schools promoting homosexuality as a normal, |
| 17 on science but based on ideology or moral bias. | 17 immutable trait; is that right? |
| 18 MR. CORRIGAN: But homosexual is not part | 18 MR. CORRIGAN: Object to form. |
| 19 of our case, and you're asking questions about | 19 Go ahead. |
| 20 homosexual. I just don't see how it has anything to | **20 A That is correct because there is no** |
| 21 do with -- it's like saying the arm and the pancreas | **21 biologic basis for same-sex attraction. That has** |
| 22 are two parts of the body. | **22 been stated by both sides of political aisle. It is** |

PLAINTIFFS003366

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

44 (173 to 176)

173

1 a fact there is no biology.  It is a combination of
2 things, but it is not biologically based.  And
3 that's -- that's in published science, that's truth,
4 that's not a bias.  It's been evaluated and scoured
5 and looked for by advocates for the gay community,
6 and they specifically state there is no such basis.
7 So, again, that is science, it's not a bias.
8       The College is about what is science, not
9 what is about hopeful things that you would wish
10 would be true, but you have to look at everything
11 that's actually biologically sound and proven, and
12 that's what that sentence is based on.
13 BY MR. BLOCK:
14    Q    And so homosexuality is also not normal,
15 right?
16       MR. CORRIGAN:  Object to form.
17    A    The statement is that promoting it as an
18 immutable biologically based norm is not -- is not
19 based on valid science.
20 BY MR. BLOCK:
21    Q    If we go to the second checkmark on the
22 right-hand column, just as affirming a transgender

174

1 student's identity can be harmful, this checkmark
2 says: Declaring and validating a student's same-sex
3 attraction during the adolescent years is premature
4 and may be harmful.
5       Is that right?
6       MR. CORRIGAN:  Object to form.
7       Go ahead.
8    A    This is based on the handbook of the APA,
9 which says that there is an incredible amount of
10 fluidity in and out of same-sex attraction, and that
11 validation is premature.
12 BY MR. BLOCK:
13    Q    And can be harmful?
14    A    If it's -- if it's premature and ends up
15 causing ill health, it's harmful.
16    Q    And the next checkmark says that -- you
17 testified that many -- that all transgender people
18 have a dysfunctional -- dysfunction in their
19 background.  This checkmark says: Many youths with
20 homosexual attractions have experienced a troubled
21 upbringing, including sexual abuse, and are in need
22 of therapy.

175

1       Is that right?
2       MR. CORRIGAN:  Object to form of the
3 question, object to mischaracterization of prior
4 testimony.
5       Go ahead.
6    A    The answer to that is yes, it's proven
7 based on published science.
8 BY MR. BLOCK:
9    Q    So you agree -- and you agree with that.
10 You agree with what that checkmark says, right?
11       MR. CORRIGAN:  Object to form.
12       Go ahead.
13    A    Yes, I do.
14 BY MR. BLOCK:
15    Q    And so when it says that youths with
16 homosexual attraction, quote, are in need of
17 therapy, what sort of therapy are they in need of?
18    A    They're in need of therapy to evaluate and
19 treat their depression and anxiety.
20    Q    And that their homosexuality is sort of
21 tapering over underlying depression and anxiety
22 resulting from trauma?

176

1    A    No, it coexists and cannot be and should
2 not be validated as being purely due to societal
3 rejection or pressure.
4       That is such an important right of the gay
5 community to be able to be recognized that their own
6 suffering and anxiety and depression should be
7 treated as for exactly what it is and not to be
8 dismissed as unimportant or not even present.
9       It is a huge disservice to the mental
10 health of the gay community that that -- that is
11 glossed over as if those things don't exist when
12 they do.
13       The conservative estimates that I read are
14 that 40 percent of people with a gay lifestyle
15 suffer significant depression and anxiety, and
16 they're not getting the therapy they need.
17       So the advocates for the gay community
18 strongly are coming out to say they need this
19 therapy, they should be encouraged to go for that
20 therapy.  It is not to change anything, it is to
21 make them be functional adults so that you lessen
22 the long-term suicide risk, which is the end of

PLAINTIFFS003367

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

45 (177 to 180)

---

177

1 severe depression in many cases.
2     Q     And how did you acquire this knowledge?
3     A     **Reading standardized publications and**
4 **articles written today and available for anyone to**
5 **read.**
6     Q     And when you treat patients, do you
7 provide any counseling or discouragement from being
8 gay?
9     A     **No.**
10    Q     Do you ever talk to them about health
11 risks associated with the homosexual lifestyle?
12    A     **I generally try to talk to them first**
13 **about risks of sexual activity in general, then**
14 **specifically if there are things that put them at**
15 **specific risk based on their -- about the things**
16 **that they do in terms of sexual activity, I point**
17 **out those things, I talk about STDs, and I talk**
18 **about depression and anxiety.**
19    Q     So before we leave this document, is there
20 anything about this document Exhibit 6, that you
21 disagree with?
22          MR. CORRIGAN:  Object to the form.

---

178

1     A     **The purpose of this document was in**
2 **response to the promotion at the letter of the**
3 **superintendent of the schools that was done through**
4 **the Obama Administration which the College felt was**
5 **a harmful avoidance of the serious and significant**
6 **issues associated with promotion of this as if it**
7 **were -- it had no downsides to it in any aspect.**
8          **So a statement needed to be brought out**
9 **that brought up conversations that talked about**
10 **STDs, that talked about depression and anxiety and**
11 **the adverse outcomes that can happen.  It's not that**
12 **they always do, but it's a risk.  It talks about the**
13 **risks that these kids face, and if you promote**
14 **something that has risks, you need to be up in the**
15 **forefront and mention those risks without glossing**
16 **over them as if they did not exist.**
17          **So that's -- that was the point of the**
18 **paper is to present the risks.  The known,**
19 **scientifically proven risks.**
20 **BY MR. BLOCK:**
21    Q     Do you have any religious beliefs related
22 to being lesbian, gay, bisexual or transgender?

---

179

1     A     I do not.
2     Q     Does the -- do you have any religious
3 beliefs about acting on same-sex attraction?
4          MR. CORRIGAN:  I'm going to object to
5 anything about his religious beliefs or his personal
6 beliefs. I don't see how it has relevance or
7 potential relevance.
8          Go ahead.
9     A     **I do not impose my religious faith on**
10 **anyone.  It is my personal journey.  I use my**
11 **religious faith to balance with science to keep me**
12 **with a compass of doing things that are, again, not**
13 **in a moral vacuum, that have -- again, focus on,**
14 **above all, doing no harm, behaving well, not hurting**
15 **the patient in any possible way that is intentional**
16 **or based on any bias, not based on any harmful --**
17 **harmful ideas I may have about behavior.  So it's --**
18 **that's where my faith comes into my professional**
19 **life.**
20 **BY MR. BLOCK:**
21    Q     The American College of Pediatrician files
22 amicus briefs; is that right?

---

180

1     A     **They do.**
2     Q     And those amicus briefs express the views
3 of the College, right?
4     A     **They do.**
5     Q     I'm sorry, I didn't hear the answer.
6     A     **I do.**
7     Q     So do you play any role in approving the
8 content of amicus briefs?
9     A     **I know of some of them, particularly on**
10 **the transgender issue.  Some of the other briefs I'm**
11 **not an author of, but they were filed.  I'm not**
12 **aware of the absolute design and content, I just**
13 **know that they exist.**
14    Q     But is it fair to attribute statements
15 made in amicus briefs filed on behalf of the
16 American College of Pediatricians to the views of
17 the American College of Pediatricians?
18          MR. CORRIGAN:  Object to form of the
19 question.
20          Go ahead.
21    A     **Yes.**
22 **BY MR. BLOCK:**

---

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003368

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

46 (181 to 184)

181

1   Q    So is it the belief of the American
2   College of Pediatricians that, quote, it's not
3   beyond the scope of a court to acknowledge the moral
4   foundation of God's laws when considering the
5   institution of marriage, unquote?
6        MR. CORRIGAN:  Object to form.
7   **A   That is a philosophical, beneficial**
8   **concept that is -- it's looked at from its**
9   **scientific validity to have a benefit to the patient**
10  **or the family that marriage has a historical**
11  **construct that is based on society and most often**
12  **verified and sanctified by a religious faith germane**
13  **to the population, and that is to the benefit of the**
14  **child to have -- to come from an intact family, and**
15  **that anything that can be done to promote intact**
16  **biologic families is probably the most ideal of**
17  **circumstances.  And if something is less than ideal,**
18  **so be it, but if you're trying to promote what is**
19  **ideal, you label that as ideal.**
20  **BY MR. BLOCK:**
21  Q    Does the moral foundation of God's law
22  have any relevance to the treatment of transgender

182

1   people?
2   **A   No, I'm basing it on -- purely on science.**
3   **I don't -- I think the way it would be looking at a**
4   **theologic concept is it is appropriate to harm**
5   **children, and if that is -- if your faith structure**
6   **or your theology suggests that there is harm to be**
7   **done to a patient and you are doing harm, perhaps**
8   **that's not within the precepts of what your faith**
9   **might guide you to do, so that's how it comes into**
10  **play.**
11       **Like it does -- it's an ethical structure**
12  **to be sure that we are paying attention and**
13  **validating what we do on science and not falling**
14  **into a trap of validating something on popularity or**
15  **social pressure.**
16  Q    Is it true that the American College of
17  Pediatricians told the Alabama Supreme Court it
18  should ignore the opinion of the Supreme Court in
19  Obergefell?
20       THE REPORTER:  Supreme Court in...
21       MR. CORRIGAN:  Obergefell.  Obergefell.
22       MR. BLOCK:  O-B-E-R-G-E-F-E-L-L.

183

1   **A   Yes, they did.**
2   **BY MR. BLOCK:**
3   Q    Do you agree with that?
4   **A   The point was, again, the concept of what**
5   **is best for children in an intact biologic family.**
6   **That does not have any potential for increased**
7   **adverse outcomes for the child.  And so, again, it's**
8   **the foundation of the family in that regard and that**
9   **opinion that the College chose to say what is best**
10  **for children in an ideal circumstance, the ideal was**
11  **that the Obergefell decision should not be -- should**
12  **be ignored at the Alabama court level.**
13  Q    And you think that if a court says that
14  the school board in this case should let transgender
15  students use restrooms in line with their gender
16  identity that the school board should ignore that
17  court decision?
18       MR. CORRIGAN:  Object to form, object to
19  foundation.
20  **A   I would not make that statement.**
21       MR. CORRIGAN:  Witness not being called
22  for that purpose.

184

1        Go ahead.
2   **A   I would not make -- I would not tell the**
3   **school to go against a court decision.**
4   **BY MR. BLOCK:**
5   Q    So if there's a conflict between what the
6   law requires and what your medical views are, you
7   would think that the school board would need to do
8   what the law requires, right?
9        MR. CORRIGAN:  Object to form.
10       Go ahead.
11  **A   The school board should do what the law**
12  **requires, and if they are at odds with that law,**
13  **they should file suit and take it through legal**
14  **proceedings.**
15  **BY MR. BLOCK:**
16  Q    Going back to Exhibit 5 just one more
17  time, that's the On the Promotion of Homosexuality
18  in Schools.  I just need to know is there anything
19  in this statement that you disagree with?  I just
20  want to have that on the record.
21       MR. CORRIGAN:  Object to form, object to
22  foundation.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003369

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

47 (185 to 188)

---

185

1      Go ahead.
2      **A   I'm going to carefully go through each**
3   **point.**
4   **BY MR. BLOCK:**
5      Q   Yes, sir, take a minute.
6      **A   Okay, I concur with all points.**
7      Q   Thank you.
8         I want to take a couple minutes to revisit
9   what we were talking about before about these 12
10  patients that you've been treating over the past two
11  to three years related to gender dysphoria.
12        Is there -- was there any precipitating
13  event that you're aware of that caused people to
14  start coming to you two to three years ago for
15  treatment in connection with gender dysphoria?
16     **A   Nothing that I perceived as a specific**
17  **event.  I thought it reflected just a general**
18  **increase in the number of transgender clinics and**
19  **the online presence of transgender-promoting**
20  **websites and blogs that would be responsible, but**
21  **that is my perception without any basis on**
22  **scientific research.**

186

1      Q   Do you identify yourself within your
2   medical network as an endocrinologist who provides
3   treatment for gender dysphoria?
4      **A   Yes.**
5      Q   And when did you start identifying
6   yourself that way?
7      **A   When I began accepting patients and**
8   **getting feedback from practitioners, when I began**
9   **discussing things amongst my endocrine peers, that's**
10  **when I began to make sure that people knew that I**
11  **was very willing and able to have these patients**
12  **come to my office for evaluation.**
13     Q   And did you start describing yourself as
14  someone who provides treatment for gender dysphoria
15  before or after the first of these 12 patients came
16  to see you?
17     **A   I was -- I was quiet and didn't say much**
18  **because I was gathering information, so it was until**
19  **actually perhaps a year before the first patient**
20  **came in at a time when I had put together enough of**
21  **my own review of the literature to feel very**
22  **strongly that there was a need for this service, and**

187

1   **it happened to coincide with the time that the Emory**
2   **University medical campus opened their transgender**
3   **clinic.**
4      Q   So before -- in the time period before you
5   started identifying yourself as a practitioner who
6   provides treatment for gender dysphoria, the only
7   transgender patient who had come to see you was this
8   one in 1993; is that right?
9      **A   That is correct.**
10     Q   Now, when you describe yourself as a
11  practitioner who provides treatment for gender
12  dysphoria, do you include in that description
13  your -- what your views are with respect to
14  providing gender-affirming hormone therapy?
15     **A   The people that I talk to professionally**
16  **who know me as endocrinology colleagues know how I**
17  **feel because I've spoken in front of them, so I am**
18  **assuming everyone knows how I feel.**
19     Q   Is there, like, insurance networks or your
20  medical groups that you're associated with, is there
21  like a lookup feature where patients can find a
22  doctor in an area that provides treatment for gender

188

1   dysphoria, and certain people's names pop up if they
2   identify as that sort of certain practitioner?
3      **A   I am not aware I am on such a list.**
4      Q   Is it on your website?
5      **A   No, it is not.**
6      Q   So of the 12 patients that come to you,
7   about how many were referred to you by -- referred
8   to you specifically?
9      **A   About half of them are referred, and the**
10  **other half spontaneously found me.**
11     Q   The half who spontaneously found you, to
12  the best of your knowledge, were they aware of your
13  views with respect to gender-affirming therapy?
14     **A   I was aware at least two of those.  One of**
15  **the parents sought me specifically because they had**
16  **seen one of my talks on YouTube.**
17     Q   For the ones that were referred -- for the
18  patients who were referred specifically to you, who
19  made those referrals?
20     **A   Pediatricians.**
21     Q   Pediatricians that you knew?
22     **A   Yes.**

---

PLAINTIFFS003370

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

48 (189 to 192)

189

1  Q  In what capacity did you know them?
2  **A  From prior referrals from endocrine**
3  **patients over the span of the last 28 years. Up to**
4  **28 years.**
5  Q  Did those pediatricians -- do you know
6  whether those pediatricians shared your views with
7  respect to gender-affirming therapy?
8  **A  I do not.**
9  Q  Do you know whether they knew those views
10 at the time they referred the patients specifically
11 to you?
12 **A  I do not.**
13 Q  You said that two of the patients you
14 think have had success in resolving their dysphoria,
15 and 10 are work in progress; is that right?
16 **A  That's correct. One of them moved out of**
17 **the area, and I don't know what has happened in**
18 **follow-up with that patient.**
19 Q  Are there -- are there any patients who
20 saw you for an initial consultation but then decided
21 to seek treatment with someone else instead of
22 continuing to follow up with you?

190

1  **A  I am unaware of any.**
2  Q  And so the 10 that are in -- that are a
3  work in progress -- or are there nine that are a
4  work in progress? I just want to get the number
5  right.
6  **A  That's correct, it's nine.**
7  Q  Nine. The nine that are a work in
8  progress, have they reported any lessening of their
9  symptoms of gender dysphoria?
10 **A  They are working through issues and seem**
11 **to be in better mental health, but some of them are**
12 **still struggling with issues. Some of them are**
13 **young, so some of them are coming back and just we**
14 **are revisiting the same overall view, and they're**
15 **works in progress.**
16 Q  So did I get it right that some have shown
17 improvement with respect to depression and anxiety,
18 but at the same time not showing improvement in
19 resolving their feelings of gender discordance?
20 **A  I'm trying to specifically categorize**
21 **those which are not living affirming the**
22 **gender-incongruent lifestyle, and I think the**

191

1  **majority of them are back to being -- living in**
2  **their biologic body as that gender at least**
3  **outwardly for the school and for purposes of other**
4  **people outside the family. But the family is**
5  **working within the family to work these kids through**
6  **that process and to do healing amongst themselves.**
7  Q  For the follow-up visits after the initial
8  visit with these patients, do you conduct a medical
9  exam on the follow-up visit?
10 **A  I conduct a medical exam if I sense that**
11 **something is going wrong. For instance, several of**
12 **these children are obese and are increasing their**
13 **body weight significantly because every patient that**
14 **comes in is weighed and measured, and I want to**
15 **address that issue because it's a co-morbidity in**
16 **some ways, but it's also innate for them to become**
17 **obese. So I'm aware of, in kids like that, that I**
18 **want to pay attention to those issues.**
19 **If the parents describe something that**
20 **they think is puberty that's happening, I'll do a**
21 **physical exam. So it is very much case by case.**
22 Q  But there's some patients that for the

192

1  follow-up visits you don't conduct a medical
2  examination, correct?
3  **A  If it's -- particularly since the visits**
4  **are designed to try to be three months apart and**
5  **nothing physically is changing, I would sort of**
6  **mandatorily do a full physical exam at least once a**
7  **year.**
8  Q  So what happens at a visit like that where
9  there's no medical examination, it's a check-up
10 after three months?
11 **A  First it's an interview with everybody in**
12 **the room, and then it is permission to have the**
13 **child and either parent. If the parents are not --**
14 **are not functional together, I will interview the**
15 **parents individually, I will then sort of**
16 **reinterview them together to discuss the things that**
17 **I have permission to talk about between the two of**
18 **them that might be constructive of things that I**
19 **might learn about that situation, and then I ask**
20 **permission to interview the child individually**
21 **without the parents in the room.**
22 Q  And what do you bill that as to insurance?

PLAINTIFFS003371

Case 4:22-cv-00325-RH-MAF Document 177-17 Filed 04/27/23 Page 50 of 56
Case 4:15-cv-00054-AWA-RJK Document 152-14 Filed 03/26/19 Page 50 of 56 PageID# 2259

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

49 (193 to 196)

193

1     A    That's as a counseling visit as a parent
2 conference.  It usually is about a 30-minute visit.
3 Sometimes it's longer if things are sort of opening
4 up and there are re-questions and re-education, or
5 in the case of a split family if it's the first time
6 I've been able to actually interview or take -- get
7 information from a parent who had previously been
8 absent it takes longer, so it's all based on time.
9 But it's done as a parent conference visit.
10    Q    Do you have a license to provide
11 counseling?
12    A    I have a license to provide evaluation of
13 children's health.
14    Q    After the initial evaluation when you're
15 providing continued visits, is it -- would
16 counseling be a fair description of what occurs in
17 those visits?
18    A    No, it's basically information gathering.
19    Q    And what do you do with the information
20 that you gather?
21    A    I record it in the record.  If there is
22 education to be done in terms of questions and

194

1 answers about the medical side, those are explained,
2 reexplained.
3         Often because of the nature of the visits
4 there's a lot of emotional tension, and there's not
5 necessarily a lot of constructive listening, so I go
6 back over again and be sure that everyone
7 understands the medical aspects of what's going on
8 and what they might have read on the Internet, what
9 they might have new concerns about, and I address
10 those things, but I do not do counseling for
11 depression and anxiety.
12    Q    You said you spoke about
13 transgender-related issues to the International
14 Association of Therapeutic Choice; is that right?
15    A    That's correct.
16    Q    How did you come to become familiar with
17 the International Association of Therapeutic Choice?
18    A    I was approached by their director and
19 asked if I would be willing to come and talk on the
20 history of transgender health in the United States.
21        MR. BLOCK:  If you'll just give me a
22 minute.  We can go off the record for a second.

195

1         (Recess 2:59-3:02 p.m.)
2 BY MR. BLOCK:
3    Q    So when you said before that you at some
4 point made it be known that you were interested in
5 seeing patients that were seeking care for gender
6 dysphoria, how did you communicate that to others?
7    A    By word of mouth at regional meetings
8 mostly.
9    Q    Regional meetings of endocrinologists?
10    A    Yes.
11    Q    Do any patients get referred to you
12 through the American College of Pediatricians?
13    A    I -- I actually don't believe I've had a
14 patient come specifically referred from the College.
15 We do have a referral base for pediatricians who are
16 members so that if a family calls and said, is there
17 a pediatrician in my area who's a member of the
18 College, we can tell them who is in their geographic
19 region and hook the two of them up.  So that is --
20 I'm not aware of actually having a family come to me
21 referred by the College.
22    Q    Are you aware of having a family come to

196

1 you being referred by a pediatrician who's a member
2 of the College?
3    A    Yes, because there are members in Georgia,
4 and I would -- I would guess that, yes, that has
5 happened, but I can't -- I don't have a
6 documentation of an individual's name.
7    Q    So during the first visit when someone
8 comes to you for treatment for gender dysphoria, do
9 you conduct an examination to determine how far
10 along in puberty the patient is?
11    A    Absolutely, yes.
12    Q    And so what's the purpose of doing that if
13 you're going to not provide hormone therapy
14 regardless of what stage of puberty the individual
15 is in?
16    A    Well, staging of puberty is in the DNA of
17 being an endocrinologist so that at any visit that
18 we do, whether they have a diagnosis of type 1
19 diabetes or hypothyroidism or vitamin D deficiency,
20 rickets, staging them in puberty is exceedingly
21 important because it's part of what affects their
22 growth.

PLAINTIFFS003372

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

197

1       Human growth, statural, and weight gain
2   are related and timed with puberty and are affected
3   by puberty, and so it is essentially, as I said, in
4   our DNA as endocrinologists to be sure we have
5   staged puberty no matter the age of the patient.
6       We do not assume that just because the
7   concept of a pubertal-related symptom is not brought
8   up that we should not verify that the patient is
9   indeed not pubertal or is pubertal and is in what
10  stage of puberty and how they are growing and how
11  they have grown before if we can gather the data and
12  watch them grow as they move forward.
13      Q   So you do this initial evaluation, you
14  have a discussion where you warn the patients about
15  harms associated with gender-affirming therapy, you
16  encourage them to see a counselor, and then what's
17  the explanation you give for why they should come
18  back for a check-up in three months?
19          MR. CORRIGAN:  Object to form.
20          Go ahead.
21      A   My story to them is that I am there to
22  care for them, and that I will dedicate my time and

198

1   effort to absolutely everything that is beneficial
2   to them, and that I know this is a confusing,
3   painful experience for them, and that it is my job
4   to monitor how they are doing and how we are moving
5   in the direction that is to their greatest benefit,
6   and so that's why they come back.
7       And I say it's easy to get lost in the
8   woodwork, and if I don't -- it's the same thing I do
9   with my diabetic patients who don't come back for
10  follow-up, we contact them and make sure that they
11  do come back because we know there is a necessity
12  for them to be followed to be sure all is going as
13  beneficially as it possibly can be, so that's the
14  same principle.
15  BY MR. BLOCK:
16      Q   But why followed by you instead of by the
17  psychologist or psychiatrist that you're referring
18  them to?
19      A   The psychiatry part is one part of the
20  equation. The questions about what to do in terms
21  of endocrinologic intervention are always hovering
22  around the edge, and the psychologist is very

199

1   definitely interested in anchoring them back to me
2   to discuss anything that -- any questions the
3   parents may have.  Particularly with the advent of
4   Internet access, the parents read over and over
5   again about new ideas, new concepts.  They need
6   somebody to anchor to that talks about hormones and
7   the effects of hormones, and that's why they come
8   back.
9       Q   So even after the first visit, a parent
10  might come back to you with repeated questions about
11  hormones possibly being a good course of treatment,
12  and you have to explain to the parent repeatedly why
13  they're not; is that right?
14      A   In part, but it's also because most of
15  these families are split families, and one parent
16  will see doubt in the mind of the parent who is the
17  one who's been bringing them in, and the parent
18  needs to come back and be reassured, or the other
19  parent wants to come and hear what I have to say,
20  and we have not talked before.
21      So this is such a -- this is not something
22  where you have a sit down, one discussion, send them

200

1   to the counselor and you're done.  This is a
2   multifaceted approach for a very complex
3   psychological issue that involves a lot of pain and
4   agony, and the patient -- here is the poor patient
5   in the middle trying to figure out what to do, what
6   the answer is.
7       And if they know that somebody is
8   dedicated to them from the medical side as well as
9   from the counseling side, it is our hope that that
10  gives them some place to hang on to and a sense that
11  somebody really does care, even if they don't
12  necessarily agree with the patient, that they want
13  them to be -- to understand how dedicated we are to
14  their welfare and how compassionate we really are.
15      It's very difficult to talk to a very
16  sullen 14- or 15-year-old who sees you for the first
17  time and convince them that you're on their team,
18  and so it takes time.
19      Q   But from the very first meeting, though,
20  you make clear to the parents that under no
21  circumstances will you be recommending
22  gender-affirming hormones, right?

PLAINTIFFS003373

201
1   A   That's correct.
2   Q   And are there any other conditions that
3  you treat in which you have the series of follow-up
4  conferences without providing medical treatment as
5  part of it?
6   A   It's not often, but diabetes would be one
7  of them. There is so much overlay of issues with
8  compliance and whatnot that don't have to do with
9  physical wellness at the moment that require visits
10 to come back and predominantly talk about behavioral
11 responses and things that are germane to our
12 clinical experience in the field of diabetes, so
13 those kids, we'll bring them back.
14      Normally they're every three months, but
15 it is not uncommon in the adolescent years for us to
16 see them back a month after they've been seen before
17 to give them a pep talk, try to give them the
18 responsibility for managing their diabetes, set them
19 up for success with telephone contact and office
20 website secure communications so that we can try to
21 invest this child back in their diabetes care.
22      There are often points in time where the

202
1  mental health issues are so overwhelming that we
2  literally jettison to primarily back to an
3  aggressive mental health intervention scheme and let
4  the diabetes kind of go for a while because it's
5  impossible for those kids to get their blood sugars
6  in control or even care about managing their
7  diabetes when they're overwhelmed with depression,
8  so that's another circumstance where often the visit
9  will be predominantly information gathering, team
10 building, putting together things like that.
11   Q   And you said before that one of the
12 reasons why you decided you wanted to start making
13 it known that you would provide -- that you would
14 see patients seeking care for gender dysphoria was
15 because you thought there was a need for it; is that
16 right?
17   A   That is correct.
18   Q   To the best of your knowledge, is there
19 any other pediatric endocrinologist that you're
20 aware of that provides the same course of office
21 visits that you do to patients who have come to you
22 seeking care for gender dysphoria?

203
1   A   It's very limited because the guidelines
2  have been so pervasive, and what happens is that --
3  and this was an admission by a number of the
4  pediatricians in our regional meeting last month in
5  Orlando is they say, I don't take care of these
6  patients, I send them to the centers. So that's --
7  they kind of punt. And they are -- they were
8  relieved.
9      My presentation of a case study of one
10 particular patient just all of a sudden brought into
11 their minds, and they shared this with me, thank
12 goodness. Thank goodness. How do we do this? How
13 do we do this? What have you got written? Can you
14 come talk to us in Birmingham? Can you give us a
15 presentation for pediatricians where we can -- we
16 can get the people in the community to understand
17 that there are other avenues than the transgender
18 clinics as they now exist?
19   Q   But in terms -- but as far as you're
20 aware, are there any other endocrinologists that you
21 are aware of who provide the same course of
22 treatment for gender dysphoria that you provide?

204
1   A   Yes. Yes.
2   Q   Who?
3   A   There's a pediatric endocrinologist, Paul
4  Hruz, in St. Louis, I believe Robert Hoffman in
5  Indianapolis. There's just a few of us because
6  we're just -- we're just starting to put together
7  communications that are effective among our
8  endocrine communities.
9      We can't -- you know, I can't get invited
10 to national endocrine meetings because they won't
11 have me. I've tried the American Association of
12 Clinical Endocrinologists on two occasions over the
13 past three years to do a balance -- what I call a
14 balanced-dialogue type of a presentation, and I
15 specifically have been told no, that that's not
16 going to happen, and it could not happen, so...
17      And at those very same meetings they had
18 transgender clinic directors do a presentation,
19 which is basically telling everybody, this is what
20 you do, this is how you do it, this is the only way
21 that's effective, send your patients to us, and
22 that's -- that's what happened.

PLAINTIFFS003374

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

52 (205 to 208)

205

1    So it's hard to get -- it's hard to get
2 colleagues unless you literally spend the time of
3 contacting them individually and saying, let us tell
4 you our experience.
5    I share my -- the paper that I've
6 submitted for publication with other
7 endocrinologists to let them know. When I presented
8 in Orlando, the positive feedback from the community
9 was about three out of four people coming to me
10 afterwards saying, please tell us more, please tell
11 us more, so that's it.
12    It's a slow -- this movement is just
13 beginning to get an anchor because of the validity
14 in science that we've been able to prove.
15 Q   What's your understanding about why these
16 organizations refuse to let you provide a
17 presentation on the course of treatment you provide?
18 A   I have -- sheer conjecture. I have not
19 been able to talk to the meeting directors directly.
20 I have communicated one way with them most recently
21 both by e-mail and telephone message, and that
22 individual for the meeting of the American

206

1 Association of Clinical Endocrinologists in Los
2 Angeles, I believe it's next week, that person chose
3 not to communicate back with me.
4 Q   In your declaration if you go to paragraph
5 29 of it, going back to Exhibit 1. Are you at that
6 page now?
7 A   I am.
8 Q   Great. The paragraph 29 says: Up until
9 recent -- up until the recent revision of DSM-IV
10 criteria, the American Psychological Association
11 held that gender identity disorder (GID) was the
12 mental disorder described as a discordance between
13 the natal sex and gender identity of the patient.
14    Is that right?
15 A   That's true except there is a
16 misstatement. It's the American Psychiatric
17 Association, and I apologize for that inaccuracy.
18 They both have the same initials, APA, but it is the
19 American Psychiatric Association that generates the
20 DSM criteria.
21 Q   And do you have any opinion on whether it
22 was appropriate for the APA to no longer describe

207

1 gender dysphoria as a mental disorder?
2    A   I'm not a mental health practitioner. I
3 really find it difficult to sometimes use the
4 correct words without offending people who are
5 licensed and trained in mental health issues.
6    I learned actually from Dr. Zucker that
7 the word "disorder" is very specifically chosen and
8 cherished in the mental health community for very
9 specific purposes. Prior to that conversation with
10 him I would -- was thinking that anybody who had
11 transgender or gender incongruence had the disorder,
12 and that, I learned, is not the case. It is sort of
13 living a delusion, but not living with a delusional
14 disorder. So I find that the removal of the "gender
15 identity disorder" is a disservice to the patients.
16    So did Dr. Zucker, from indirect
17 conversation as I learned in between my statement to
18 the Carcano case and this that when the APA group,
19 again, it doesn't represent all psychiatrists, but
20 it's the group that develops the criteria, and they
21 are -- they're parsed into interest groups, they
22 pushed very strongly to eliminate any pathologic

208

1 reference to gender identity issues.
2    And Dr. Zucker argued -- and, again, this
3 is not from a conversation with him, but through
4 second parties who talked to him about this
5 personally, he argued that if you remove it, the
6 suffering is going to be legendary as it is, and
7 it's going to be ignored and will not be allowed to
8 be treated by third -- and covered as a service by
9 third parties who cover healthcare costs, insurance
10 mainly, and that medications then wouldn't be
11 covered.
12    And it was a disservice to the patients to
13 eliminate the disorder, but if they were going to
14 pressure to do that, would they please replace it
15 with "gender dysphoria" so that there was a medical
16 condition that would allow that patient to seek and
17 be treated and have that as covered services by
18 government entities and private insurance.
19 Q   So did I hear you right that one of
20 Dr. Zucker's reasons was to ensure that medicines
21 would be covered?
22    A   That treatment of any kind would be

PLAINTIFFS003375

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

53 (209 to 212)

209

1  covered.

2  Q   But including hormone therapy, correct?

3  **A   I assume that, yes, but, again, I didn't**

4  **write that policy, and I didn't talk to him directly**

5  **to know.**

6  Q   Have you ever talked to Dr. Zucker

7  directly?

8  **A   No, I have not.**

9  Q   So do you have any views on the APA's

10 decision to remove homosexuality as a mental

11 disorder?

12      MR. CORRIGAN:  Now we're getting far

13 afield again --

14 **A   I do not.**

15      MR. CORRIGAN:  -- with the conversation

16 about homosexuality.  We're not here to talk about

17 homosexuality.  Has nothing to do with our case.

18 Go ahead.

19 **A   I do not have any issues with the removal.**

20 **My issue is that the mental health issues are being**

21 **overlooked, and that's a disservice to people who**

22 **are gay and lesbian, and that we should do**

210

1  **everything we can to help these individuals and**

2  **advocate for them to recognize things that need**

3  **treatment instead of pretending that they are not**

4  **there, and therefore worsening the quality of their**

5  **life overall.**

6  **BY MR. BLOCK:**

7  Q   Going back briefly to the formation of

8  American College of Pediatricians, is it accurate to

9  say that the catalyzing event for forming the

10 American College of Pediatricians was the AAP's

11 position on children raised by same-sex parents?

12 **A   As I understand it historically, it was.**

13 Q   One more minute.  I may come back and

14 finish.

15      (Brief recess.)

16 BY MR. BLOCK:

17 Q   One more line of questions.  In terms of

18 the issues in this case with Mr. Grimm, do you think

19 that by preventing Mr. Grimm from being allowed to

20 use the boys' restroom, that that was actually

21 something that was to his medical and mental benefit

22 to prevent him from using the restroom?

211

1  **A   In the sense that it was an affirmation, I**

2  **personally believe that affirmation is harmful,**

3  **so -- that I would say that was a harmful concept to**

4  **let him use the bathroom of the sex he wished he**

5  **were.**

6  Q   So when the board decided to stop letting

7  him use the bathroom, you think that -- the bathroom

8  consistent with his gender identity, you think that

9  was to his benefit?

10 **A   Yes.**

11 Q   Is that right?

12 **A   Yes.**

13 Q   Okay.  And is that because you think by

14 not affirming him, by not letting him use the

15 restroom, the school was making it any less likely

16 that he would continue to be transgender?

17      MR. CORRIGAN:  Object to form of the

18 question.

19 **A   Can you restate the question again?**

20 **BY MR. BLOCK:**

21 Q   Sure.  Is it your opinion that by not

22 allowing Mr. Grimm to use the boys' restroom, that

212

1  the school was making it less likely that he would

2  continue to identify as being transgender?

3  **A   That would be a -- an opinion of mine**

4  **personally based on the fact that anything that**

5  **pushes affirmation ends up pushing the patient**

6  **farther along on a spectrum which will inevitably**

7  **involve cross-sex hormones and eventually surgical**

8  **mutilation.**

9  Q   But -- so in Mr. Grimm's case, since he

10 has already had cross-sex hormones and already had

11 surgical chest surgery, and -- is it still your view

12 that preventing him from using the boys' restroom

13 would make it less likely that he would continue to

14 identify as being transgender?

15      MR. CORRIGAN:  Object to form of the

16 question, beyond the scope.

17 Go ahead.

18 **A   So the concept is that, as Dr. Zucker has**

19 **pointed out in his opinions as well, is that**

20 **anything that you do that affirms the patient,**

21 **because there is no -- there's no avenue that is**

22 **successful up to that point in time in bringing the**

PLAINTIFFS003376

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

213

1 patient to desistance, that you're essentially
2 pushing for ongoing mental health issues that need
3 to be continually addressed.
4         And I would say that anything that does
5 harm to that child -- the continuation of cross-sex
6 hormones, the acute effects are masculinization of
7 the body, the long-term effects for Mr. Grimm are
8 going to be increased risk for medical conditions
9 that he would not otherwise have as a result of that
10 continued treatment.
11        So anything that pushes him to continue
12 the hormone therapy, feeling that it is the only
13 avenue or the only beneficial avenue, is to his
14 harm. And therefore I would say if the school chose
15 to not affirm him with a bathroom, that gives him a
16 concept that perhaps there is not benefit in that,
17 there's no proven benefit, no proven harm as an
18 isolated event, but if it's part of the big picture
19 of affirmation, that the Gloucester County School
20 System should have no part of it.
21 BY MR. BLOCK:
22     Q   But focused specifically on someone who is

214

1 17 or 18 -- which Dr. Zucker does not think that
2 hormones should be precluded for someone who is 17
3 and 18, correct?
4       MR. CORRIGAN: Object to form.
5       Go ahead.
6     A   Dr. Zucker is not an endocrinologist. I'm
7 an endocrinologist. I know about the harmful
8 effects of hormones, and I disagree with that, that
9 opinion of his, if that's what he agrees at this
10 point in time.
11        Dr. Zucker's opinion on the persistence of
12 the -- of gender dysphoria has to do with children
13 who have started from young childhood and progressed
14 up through adolescence and, despite constant and
15 significant intervention, do not desist. He was not
16 in general talking about kids who in their mid teens
17 make a decision that they are now transgender and
18 are essentially wishing to be the opposite sex. So
19 it's comparing apples to oranges here.
20 BY MR. BLOCK:
21     Q   So assuming that we're dealing with
22 someone who has consistently from an early age

215

1 identified with the opposite sex and has -- and
2 other therapies have proven not to be successful,
3 they are a junior or senior in high school, does
4 Dr. Zucker's views provide any support for
5 continuing to exclude that individual from using the
6 boys' restroom, that transgender boy?
7       MR. CORRIGAN: Object to the form of the
8 question.
9       Go ahead.
10     A   I would say at any point during -- I
11 disagree with Dr. Zucker. If that's -- if that is
12 truly his opinion that the only route left is
13 affirmation, and nothing else should be done to deal
14 with that patient, then you let them go, I would
15 personally disagree based on the long-term effects
16 of affirmation and long-term hormones because
17 without persistence of the incongruity as a concept,
18 that patient is going to have to require the hormone
19 therapy that's eventually going to be causing them a
20 significant medical morbidity.
21 BY MR. BLOCK:
22     Q   What if a patient has -- is 18 and has had

216

1 genital surgery so that they no longer have -- it's
2 a transgender woman and no longer has their male
3 gonads and needs hormones, in that case would you
4 still oppose gender-affirming hormone therapy for
5 that individual?
6     A   I recommend that that patient go back on
7 the physiologic levels of their natal sex hormones
8 at that age to maintain their body's health without
9 harm.
10     Q   And that would also be your view if the
11 patient were 40 instead of 18, right?
12     A   Yes. Yes.
13     Q   And you think that when it comes to the
14 issues of providing hormones, you are in a better
15 position to make judgments about the benefits and
16 risks than Dr. Zucker is because you are a trained
17 endocrinologist, and he's not; is that right?
18     A   That is correct.
19     Q   And so would the converse be true, that a
20 trained psychologist is in a better position to make
21 decisions about what psychological care a
22 transgender individual needs than an endocrinologist

PLAINTIFFS003377

Transcript of Dr. Quentin Van Meter
Conducted on March 18, 2019

55 (217 to 220)

217

1  is?
2  **A   Yes.**
3          MR. BLOCK:  Okay.  That's all the
4  questions I have.
5          MR. CORRIGAN:  He'll read.
6          (Off the record at 3:31 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

219

1                  CERTIFICATE
2          I, Robyn Bosworth, RPR, CRR, CRC,
3  CCR-B-2138, do hereby certify that the witness was
4  first duly sworn by me pursuant to stipulation of
5  counsel and that I was authorized to and did report
6  said proceedings.
7          I further certify that the foregoing
8  transcript is a true and correct record of the
9  proceedings; that said proceedings were taken by me
10 stenographically and thereafter reduced to
11 typewriting under my supervision; that review was
12 not waived; and that I am neither attorney nor
13 counsel for, nor related to or employed by, any of
14 the parties to the action in which this deposition
15 was taken; and that I have no interest, financial or
16 otherwise, in this case.
17         IN WITNESS WHEREOF, I have hereunto set my
18 hand this 22nd day of March, 2019.
19
20
21         _Robyn Bosworth_____
22         ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138

218

1          ACKNOWLEDGEMENT OF DEPONENT
2      I, DR. QUENTIN VAN METER, do hereby acknowledge
3  that I have read and examined the foregoing
4  testimony, and the same is a true, correct and
5  complete transcription of the testimony given by me,
6  and any corrections appear on the attached errata
7  sheet signed by me.
8
9  _____     _____
10  (DATE)                (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

PLAINTIFFS003378