

U.S. COMMISSION ON CIVIL RIGHTS

# WORKING FOR INCLUSION

TIME FOR CONGRESS TO ENACT FEDERAL LEGISLATION TO ADDRESS WORKPLACE
DISCRIMINATION AGAINST LESBIAN, GAY, BISEXUAL, AND TRANSGENDER AMERICANS

BRIEFING
R E P O R T

NOVEMBER 2017

U.S. COMMISSION ON CIVIL RIGHTS

Washington, DC 20425
Official Business
Penalty for Private Use $300

Visit us on the Web: www.usccr.gov

Pl. Trial Ex. 131

PLAINTIFFS004475

**U.S. COMMISSION ON CIVIL RIGHTS**

The U.S. Commission on Civil Rights is an independent, bipartisan agency established by Congress in 1957. It is directed to:

- Investigate complaints alleging that citizens are being deprived of their right to vote by reason of their race, color, religion, sex, age, disability, or national origin, or by reason of fraudulent practices.

- Study and collect information relating to discrimination or a denial of equal protection of the laws under the Constitution because of race, color, religion, sex, age, disability, or national origin, or in the administration of justice.

- Appraise federal laws and policies with respect to discrimination or denial of equal protection of the laws because of race, color, religion, sex, age, disability, or national origin, or in the administration of justice.

- Serve as a national clearinghouse for information in respect to discrimination or denial of equal protection of the laws because of race, color, religion, sex, age, disability, or national origin.

- Submit reports, findings, and recommendations to the President and Congress.

- Issue public service announcements to discourage discrimination or denial of equal protection of the laws.

**MEMBERS OF THE COMMISSION**

Catherine E. Lhamon, *Chairperson*
Patricia Timmons-Goodson, *Vice Chairperson*
Debo P. Adegbile
Gail L. Heriot
Peter N. Kirsanow
David Kladney
Karen Narasaki
Michael Yaki

Mauro Morales, *Staff Director*

**U.S. Commission on Civil Rights**
1331 Pennsylvania Avenue, NW
Washington, DC 20425
(202) 376-8128 voice
TTY Relay: 711

www.usccr.gov

PLAINTIFFS004476

# Working for Inclusion: Time for Congress to Enact Federal Legislation to Address Workplace Discrimination Against Lesbian, Gay, Bisexual, and Transgender Americans

Briefing Before
The United States Commission on Civil Rights
Held in Washington, DC

Briefing Report

PLAINTIFFS004477

[*This page intentionally left blank*]

PLAINTIFFS004478



## UNITED STATES COMMISSION ON CIVIL RIGHTS

**1331 PENNSYLVANIA AVE., NW • SUITE 1150 • WASHINGTON, DC 20425**
**WWW.USCCR.GOV**

## Letter of Transmittal

President Donald J. Trump
Vice President Mike Pence
Speaker of the House Paul Ryan
Senate Majority Leader Mitch McConnell

On behalf of the United States Commission on Civil Rights ("the Commission"), I am pleased to transmit our briefing report, *Working for Inclusion: Time for Congress to Enact Federal Legislation to Address Workplace Discrimination Against Lesbian, Gay, Bisexual, and Transgender Americans*. The report is also available in full on the Commission's website at www.usccr.gov.

The report examines the main social and economic arguments made for and against enacting federal legislation to provide federal nondiscrimination workplace protections for lesbian, gay, bisexual, and transgender (LGBT) employees.

The majority of the Commission voted for key findings including that LGBT workers have faced a long, serious, and pervasive history of official and unofficial employment discrimination by federal, state, and local governments and private employers. Such discrimination persists and has wide-ranging, damaging implications for the quality of life for many LGBT Americans, their children and families, and communities. An inconsistent and irreconcilable patchwork of state laws against LGBT workplace discrimination and federal court decisions interpreting existing federal law render LGBT employees insufficiently protected from workplace discrimination.

Our primary recommendation is directed to Congress: In order to effectively and consistently protect LGBT employees from workplace discrimination, Congress should immediately enact a federal law explicitly banning discrimination in the workplace based on sexual orientation and gender identity. We also make particular recommendations that federal agencies should issue and —where relevant—reaffirm specific guidance for federal and private employers outlining protections for LGBT individuals in the workforce, including specifically enumerating

PLAINTIFFS004479

protections for transgender persons; federal agencies should also collect workplace discrimination data about LGBT employees.

We at the Commission are pleased to share our views, informed by careful research and investigation, to help ensure that all Americans enjoy civil rights protections to which we are entitled.

For the Commission,

Catherine E. Lhamon

Chair

PLAINTIFFS004480

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................................ i

EXECUTIVE SUMMARY .......................................................................................................1

Chapter 1:    Introduction to LGBT Employment in America........................................................7

  Number of Lesbian, Gay, Bisexual, and Transgender Employees ..............................................7

  Extent of Discrimination Against LGBT Employees .................................................................11

      Economic Impacts from Workplace Discrimination ............................................................14

      Intensified Discrimination against Transgender Individuals.................................................17

  Existing State Laws for LGBT Employees...............................................................................21

  Failed Efforts to Enact Federal Legislation ............................................................................23

Chapter 2:    Existing Federal Non-Discrimination Law..............................................................28

  Title VII of the Civil Rights Act and LGBT Employees ............................................................28

  "Because of Sex" Court and Administrative Decisions.............................................................29

      Title VII and Sexual Orientation .........................................................................................29

      Title VII and Gender Identity .............................................................................................32

      Non-Discrimination and Religious Beliefs............................................................................35

  Additional Legal Protections for LGBT Employees in the Federal Workplace.........................35

      Presidential Executive Orders............................................................................................36

      Transgender Guidance for Federal Agencies .......................................................................38

      Federal Agencies' Employment Policies Inclusive of Gender Identity and Sexual Orientation
      .........................................................................................................................................39

  Private Workplace Protections for LGBT Employees...............................................................41

CHAPTER 3:    Viewpoints in Favor and Against Federal Legislation .....................................44

  Ensuring Equal Rights and the Normative Argument ...............................................................45

  What Does Existing Federal Law (Title VII) Mean for Additional Federal
      Legislation?......................................................................................................................52

      *Bona Fide* Occupational Qualification Exception.................................................................53

      Religious Liberty and Free Exercise Concerns ....................................................................54

  Constitutionality of Federal Legislation ....................................................................................56

  Are Existing Public Sector Protections Enough?.......................................................................58

Working for Inclusion: Time for Congress to Enact Federal Legislation

Are Private Sector Policies Enough? ............................................................................................60

How Would Federal Legislation Impact the Economy?.............................................................61

    Economic Support of Federal Legislation ..............................................................................61

    Economic Opposition to Federal Legislation .......................................................................64

New Developments in Federal Legislation..................................................................................66

Chapter 4: Findings and Recommendations ...............................................................................70

    Findings and Recommendations ............................................................................................71

        Findings ............................................................................................................................71

        Recommendations............................................................................................................73

Commissioners' Statements, Rebuttals, and Surrebuttals..........................................................75

Statement of Chair Catherine E. Lhamon, in which Vice-Chair Patricia Timmons-
Goodson concurs....................................................................................................................75

Statement of Commissioner David Kladney.................................................................................79

Statement of Commissioner Karen K. Narasaki, in which Vice-Chair Patricia
Timmons-Goodson concurs ..................................................................................................81

Statement of Commissioner Michael Yaki .................................................................................85

Dissenting Statement of Commissioner Gail Heriot.................................................................105

Rebuttal of Commissioner Peter Kirsanow...............................................................................135

Surrebuttal of Commissioner David Kladney..........................................................................145

# EXECUTIVE SUMMARY

American employees spend a large part of our awake hours at work. At the same time, the majority of lesbian, gay, bisexual, and transgender (LGBT)[1] workers live in states that do not offer explicit LGBT-specific nondiscrimination protections in employment. The briefing testimony and written materials submitted to the Commission, along with extensive social science research and surveys, reflect the reality that many LGBT Americans are forced to deal with prejudice and discrimination every day in the workplace. Over the past several decades, there has been increasing national support for extending equal protections to LGBT individuals. According to a 2013 poll released by Project Right Side and Americans for Workplace Opportunity, a majority of people (88 percent), regardless of political affiliation, agreed that LGBT individuals should be judged based on their performance in the workplace.[2] Congress has not enacted federal antidiscrimination workplace protections for LGBT employees. This report highlights the main social and economic arguments made by proponents and opponents for enacting federal legislation and makes findings and recommendations regarding civil rights status for LGBT employees.

Over the past forty years, Congress has introduced multiple iterations of legislation that would prohibit workplace discrimination against LGBT Americans, but has not passed such legislation. On March 16, 2015, the Commission held a briefing to examine workplace discrimination against LGBT Americans.[3] The purpose of the briefing was to gather information about existing state, local, and federal laws and policies, and the impacts of discrimination on LGBT employees. The Commission also sought to hear from multiple perspectives in support of and against enacting federal legislation to address workplace discrimination against LGBT employees.[4]

---

[1] This report uses the acronym of LGBT to include individuals who are lesbian, gay, bisexual, or transgender. At times, this report refers to "LGB" to refer only to those individuals because, for example, the particular study being discussed may have been limited to that sub-group.

[2] Alex Lundry, "ENDA National Poll Results," (TargetPoint Consulting, September 16, 2013), http://images.politico.com/global/2013/09/29/enda_poll_2013-09-08_natl_memo.html, p. 1; *see also* http://images.politico.com/global/2013/09/29/enda_poll_2013-09-08_50_states.html.

[3] U.S. Commission on Civil Rights, *Briefing: Examining Workplace Discrimination Against LGBT Americans,* (Washington, DC, March 16, 2015), http://www.usccr.gov/calendar/trnscrpt/Discrimination_LGBT_03-16-2015.pdf (*hereinafter cited* as Briefing Transcript).

[4] During the briefing, the Commission heard from three panels of experts. These experts discussed 1) the federal government's compliance with laws, regulations, and presidential Executive Orders that prohibit discrimination against LGBT Americans; 2) the impacts for LGBT employees who reside in states that do not have specific state nondiscrimination protections; and 3) policy issues, including whether Congress should pass federal legislation and the appropriate language for such federal legislation. *Ibid.*

PLAINTIFFS004483

Proponents in favor of a national law that specifically forbids discriminating against employees based on their sexual orientation[5] or gender identity[6] contend that federal legislation is necessary to provide LGBT workers equal rights and equal dignity in the workplace similar to other workers. Proponents of federal legislation further argue that although the federal government, states, corporations, and businesses are increasingly creating and enforcing LGBT-inclusive policies, this progress is at best sporadic and uneven. As these policies are enacted separately and independently, the lack of national legal protections leaves many to hide who they are for fear of discrimination—including termination—in the workplace. They also assert that while the nation has experienced some great strides in LGBT equality over the past several years, widespread discrimination and animus towards LGBT communities is still prevalent. Additionally, researchers have found that LGBT individuals who live in jurisdictions without worker protections also experience poverty at higher rates than heterosexuals in those jurisdictions. At the same time, lesbians and gay men living in jurisdictions that do offer employment protections were less likely to be impoverished compared to heterosexuals.[7] These findings suggest anti-discrimination protections and a social climate of acceptance may mitigate disparities.

Proponents further note that existing state and federal laws leave many LGBT employees unprotected from workplace discrimination.[8] Recently, the Equal Employment Opportunity Commission (EEOC) interpreted existing federal law prohibiting sex discrimination (Title VII of the Civil Rights Act) to include claims of discrimination based on sexual orientation and gender identity.[9] The U.S. Court of Appeals for the Seventh Circuit is currently the sole Circuit to hold that sexual orientation falls within the existing language of Title VII.[10] Yet, other Circuit Courts

---

[5] Sexual orientation may be defined as "one's emotional or physical attraction to the same and/or opposite sex." Office of Personnel Management, U.S. Equal Employment Opportunity Commission, U.S. Office of Special Counsel, and Merit Systems Protection Board, *Addressing Sexual Orientation and Gender Identity Discrimination in Federal Civilian Employment: A Guide to Employment Rights, Protections, and Responsibilities*, rev. June 2015, http://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reference-materials/addressing-sexual-orientation-and-gender-identity-discrimination-in-federal-civilian-employment.pdf, p. 2.

[6] Gender identity may be defined as "one's inner sense of one's own gender, which may or may not match the sex assigned at birth. Different people choose to express their gender identity differently. For some, gender may be expressed through, for example, dress, grooming, mannerisms, speech patterns, and social interactions. Gender expression usually ranges between masculine and feminine, and some transgender people express their gender consistent with how they identify internally, rather than in accordance with the sex they were assigned at birth." *Ibid.*

[7] M.V. Lee Badgett, Laura E. Durso, and Alyssa Schneebaum, "New Patterns of Poverty in the Lesbian, Gay, and Bisexual Community," Williams Institute, June 2013, https://williamsinstitute.law.ucla.edu/wp-content/uploads/LGB-Poverty-Update-Jun-2013.pdf, pp. 2–3, 4, 8–9.

[8] Sarah Warbelow and Breanna Diaz, "2016 State Equality Index," Human Rights Campaign Foundation, 2016, http://assets.hrc.org//files/assets/resources/SEI-2016-Report-FINAL.pdf?_ga=2.163800255.1465071743.1510103868-576800549.1507751318, p. 14.

[9] *See, Baldwin v. Foxx,* EEOC Doc No. 0120133080, 2015 WL 4397641 (EEOC Jul. 16, 2015) (discussing Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*).

[10] *Hively v. Ivy Tech Comty. Coll. of Ind.*, 853 F.3d 339, 350-51 (7th Cir. 2017). At the time of publication, this question was also pending before the U.S. Court of Appeals for the Second Circuit. See discussion *infra* in Chapter 2.

PLAINTIFFS004484

have held that Title VII does not include such protections.[11] In practice, this means that employees may or may not have access to a federal forum to hear their allegations of discrimination based on sexual orientation and gender identity. Additionally, twenty-eight states do not have state law protections prohibiting workplace discrimination based on sexual orientation, and thirty states do not have state law protections for being transgender or gender-nonconforming.[12] Proponents of federal legislation argue:

> Today, it's possible for a lesbian couple to get legally married on Saturday and then be fired on Monday for putting a wedding picture on their desk.[13]

> [D]iscrimination has no place in our nation and yet right now in 2015 in many states, like Florida, a person can be fired simply for being lesbian, gay, bisexual or transgender. As a result, millions of LGBT Americans go to work every day fearing that without any warning they could lose their jobs not because of their work performance but simply because of who they are or who they love . . . . Passing ENDA[14] would eliminate the patchwork of differing state and often absurd state legislation and provide consistent workplace protections across the country.[15]

Opponents to enactment of a specific federal non-discrimination law question whether the Constitution allows Congress to legislate non-discriminatory workplace protections for LGBT workers and argue that these protections, if any, should be governed by localities and businesses. They argue that federal legislation protecting sexual orientation and gender identity would infringe upon business owners' First Amendment rights and not permit them to run organizations that are consistent with their values.[16] Further, they argue that while all individuals should be respected, federal antidiscrimination legislation is bad policy because it is inconsistent with free-market principles protecting the freedom of contract and against overregulation by the government.[17] Ryan Anderson of the Heritage Foundation argues that a "fundamental principle" guiding American labor law is the "doctrine of 'at will' employment" that permits employers to dismiss employees

---

[11] *See infra* note 134 (collecting cases).

[12] Movement Advancement Project, "Non-Discrimination Laws", http://www.lgbtmap.org/equality-maps/non_discrimination_laws/ (data current as of 10/19/17).

[13] Selisse Berry, Founder and CEO at Out and Equal Workplace Advocates, testimony, Briefing Transcript, pp. 158–59.

[14] As discussed in more detail later in this chapter, the Employment Non-Discrimination Act (ENDA) was the federal nondiscrimination legislation pending at the time of the Commission's briefing in 2015.

[15] Gina Duncan, Transgender Inclusion Director at Equality Florida, testimony, Briefing Transcript, pp. 213–14.

[16] For example, *see* Family Research Council, "The Employment Non-Discrimination Act (ENDA): A Threat to Free Markets and Freedom of Conscience and Religion," October 2013, http://downloads.frc.org/EF/EF13J68.pdf.

[17] For example, *see* Ryan Anderson, "Sexual Orientation and Gender Identity (SOGI) Laws Threaten Freedom," Heritage Foundation, November 2015, http://www.heritage.org/civil-society/report/sexual-orientation-and-gender-identity-sogi-laws-threaten-freedom, p. 2.

PLAINTIFFS004485

at any time.[18] He argues that antidiscrimination laws would threaten this principle and negatively affect the business community. Hans Bader of the Competitive Enterprise Institute claims that "[s]ince American business seldom discriminates based on sexual orientation, the potential benefits of ENDA [the Employment Non-Discrimination Act] are limited, at best. But ENDA would impose real and substantial costs on business, and it could trigger conflicts with free speech and religious freedom."[19] Bader contends that the principles of free-market competition will offer enough protections to LGBT employees, since many private companies have already prohibited discrimination on the basis of sexual orientation, and to appear anti-gay may be perceived as bad for business.[20] Finally, opponents also raise concerns about the potential for increased legal costs and workplace disruptions that they believe such federal legislation would cause.[21]

After examining the current state of LGBT workplace protections, the Commission highlights the following findings and recommendations, discussed in full in Chapter 4:

Highlighted findings:

- Historians, researchers, and courts have extensively documented that lesbian, gay, bisexual, and transgender (LGBT) workers have faced a long, serious, and pervasive history of official and unofficial employment discrimination by both federal, state, and local governments and private employers.
- Federal data sources do not effectively capture rates of LGBT employment or rates of LGBT employment discrimination.
- An inconsistent and irreconcilable patchwork of state laws against anti-LGBT workplace discrimination and federal court decisions interpreting existing federal law render LGBT employees insufficiently protected from workplace discrimination.

Highlighted recommendations:

- In order to effectively and consistently protect LGBT employees from workplace discrimination, Congress should immediately enact a federal law explicitly banning discrimination in the workplace based on sexual orientation and gender identity.
- In addition to Congressional action, federal agencies including the Departments of Justice and Labor, the Equal Employment Opportunity Commission, and the Office of Personnel Management should issue and—where relevant—reaffirm specific guidance for federal

---

[18] *Ibid.* at 6.

[19] Hans Bader, "Employment Non-Discrimination Act Makes as Little Sense as Chemotherapy for a Cold," *OpenMarket Blog*, Competitive Enterprise Institute, June 2012, https://cei.org/blog/employment-non-discrimination-act-makes-little-sense-chemotherapy-cold.

[20] *Ibid.*

[21] For example, *see* Ryan Anderson, William E. Simon Fellow at the Heritage Foundation, testimony, Briefing Transcript, p. 276 ("[Nondiscrimination federal legislation] will expose employers to unimaginable liability").

PLAINTIFFS004486

and private employers outlining protections for LGBT individuals in the workforce, including specifically enumerating protections for transgender persons.

- Workplace discrimination data should be collected through the inclusion of sexual orientation and gender identity questions in population-based surveys of the workforce such as the Census, American Community Survey, and surveys fielded by the Bureau of Labor Statistics and other agencies.

PLAINTIFFS004487

6    Working for Inclusion: Time for Congress to Enact Federal Legislation

[*This page intentionally left blank*]

PLAINTIFFS004488

Case 4:22-cv-00325-RH-MAF   Document 178-11   Filed 04/27/23   Page 15 of 154

# CHAPTER 1:   INTRODUCTION   TO   LGBT   EMPLOYMENT   IN AMERICA

This introductory chapter: 1) seeks to quantify the number of LGBT employees in the United States, 2) discusses the extent and impact of workplace discrimination against LGBT employees, 3) lists the existing state laws addressing LGBT employees, and 4) discusses the prior efforts to enact federal legislation.

## Number of Lesbian, Gay, Bisexual, and Transgender Employees

The exact number of individuals who self-identify as LGBT is not known. Historically, many national surveys have not included questions exploring sexual orientation or gender identity.[22] In fact, early estimates of LGBT couples were made by examining U.S. Census responses identifying households with cohabitating unmarried couples of the same sex.[23] Most recently, the U.S. Census Bureau sent a draft of the 2020 Census and American Community Survey collection report to Congress in March 2017.[24] It appeared that the Census Bureau was going to collect LGBT demographic information, but later that same day, the Census Bureau stated that it mistakenly included those categories for collection.[25] Advocates have argued that alongside adding LGBT questions to the Census, the American Community Survey and surveys fielded by the Bureau of Labor Statistics should include questions on sexual orientation and gender identity.[26]

A 2013 survey conducted by the Centers for Disease Control and Prevention's National Center for Health Statistics found that 3.4 percent of Americans identify themselves as gay or lesbian (1.6 percent), bisexual (0.7 percent) or other (1.1 percent).[27] More recently, a 2017 Gallup survey found

---

[22] Berry testimony, Briefing Transcript, p. 176 ("[W]e're not being counted. We're not being asked to self-identify who we are within companies or within workplaces at all.").

[23] Jaime Grant, "How Big is the LGBT Community? Why Can't I Find This Number?", National Gay and Lesbian Task Force, 2010, http://www.thetaskforce.org/static_html/downloads/release_materials/tf_lgbt_community.pdf, p. 3.

[24] U.S. Census Bureau, "Subjects Planned for the 2020 Census and American Community Survey," March 2017, https://www2.census.gov/library/publications/decennial/2020/operations/planned-subjects-2020-acs.pdf.

[25] Hansi Lo Wang, "U.S. Census to Leave Sexual Orientation, Gender Identity Questions Off New Surveys," *NPR*, March 29, 2017, https://www.npr.org/sections/thetwo-way/2017/03/29/521921287/u-s-census-to-leave-sexual-orientation-gender-identity-questions-off-new-surveys70329. The Administration for Community Living of the U.S. Department of Health and Human Services also proposed to delete a question on sexual orientation from the National Survey of Older Americans Act Participants, but decided to retain the question after many groups and individuals objected to the change. Revision of Currently Approved Collection for National Survey of Older Americans Act Participants (NSOAAP), 82 Fed. Reg. 28491 (Jun. 22, 2017).

[26] Statement of Stacey Long Simmons, Director of Public Policy & Government Affairs at National LGBTQ Task Force, U.S. Commission on Civil Rights, *Briefing: Examining Workplace Discrimination Against LGBT Americans,* (Washington, DC, March 16, 2015) at 5 (*hereinafter cited* as Simmons Statement).

[27] Brian W. Ward, James M. Dahlhamer, Adena M. Galinsky, Sarah J. Joestl, "Sexual Orientation and Health Among U.S. Adults: National Health Interview Survey, 2013," National Center for Health Statistics, 2014, https://www.cdc.gov/nchs/data/nhsr/nhsr077.pdf, p. 1. The National Health Interview Survey of 34,557 adults aged

PLAINTIFFS004489

that the portion of American adults who identified as LGBT increased from 3.5 percent in 2012 to 4.1 percent in 2016.[28] According to Gallup, these figures are from "the largest representative sample of LGBT Americans collected in the U.S."[29] This means there are an estimated 10 million adults who now identify as LGBT in the U.S., which is approximately 1.75 million more individuals than in 2012. This increase is largely due to millennials (defined as those born between 1980 and 1998) being more than twice as likely as previous generations to self-identify as LGBT.[30]

Population estimates of LGBT communities may be non-inclusive due to several factors, because of the multiple dimensions of sexuality.[31] First, self-identification is only one aspect of measuring sexual orientation and gender identity. For example, research shows that when surveys are inclusive of the complex dynamics of identity, behavior, attraction, and relationships, these surveys yield very different (and often larger) population estimates compared to those that only utilize self-identification measures.[32] Other studies suggest that sexual orientation and gender identity are on a continuum (*i.e.*, not static) for some individuals, therefore, they do not self-identify with categories that traditionally appear on surveys.[33] Thus, depending on which definition(s) and measure(s) a researcher chooses, estimates may vary. These disparate results can also be due to "how comfortable and confident survey respondents feel about the confidentiality and privacy of data collected."[34]

Based on these estimates (and considering the likelihood of underreporting, as mentioned above), it is fair to say that LGBT Americans comprise a significant portion of private and public sector employees.[35] In addition to the difficulties described above, the exact number of LGBT employees

---

18–64 added questions on sexual orientation in 2013 to create an "ongoing collection of information on sexual orientation" to enable a "more consistent, long-term monitoring" of the goal of "improving the health, safety, and well-being of LGB persons." The "other" category represents the "something else" response, "don't know" response, or respondent refused to answer. *Ibid.* at 2.

[28] Gary J. Gates, "In US, More Adults Identifying as LGBT," Gallup, January 11, 2017, http://www.gallup.com/poll/201731/lgbt-identification-rises.aspx.

[29] *Ibid.* Results are based on telephone interviews with a random sample of 1,626,773 U.S. adults, 18 and older, living in all 50 states and D.C., collected from June 1, 2012 through December 30, 2016.

[30] *Ibid.*

[31] Grant, *supra* note 23, at 4-5.

[32] Identity, behavior, attraction, and relationships all capture related dimensions of sexual orientation and gender identity, but none of these measures completely address the concepts. *See* Gary Gates, "How many people are lesbian, gay, bisexual, and transgender?", Williams Institute, April 2011, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Gates-How-Many-People-LGBT-Apr-2011.pdf, p. 2.

[33] *Ibid.* Judith Bradford and Jocelyn C. White, "Lesbian Health Research," in *Women and Health* (San Diego, Calif.: Academic Press, 2000), 64–78. Edward O. Laumann, John H. Gagnon, Robert T. Michael, Stuart Michaels, *The Social Organization of Sexuality: Sexual Practices in the United States* (Chicago, Ill: University of Chicago Press, 1994). Laura Dean, Ilan H. Meyer, Kevin Robinson, Randall L. Sell, Robert Sember, Vincent M.B. Silenzio, Deborah J. Bowen, et al., "Lesbian, Gay, Bisexual, and Transgender Health: Findings and Concerns," *Journal of the Gay and Lesbian Medical Association*, 4:3 (2000), p. 101, https://doi.org/10.1023/A:1009573800168.

[34] Gates, *supra* note 28.

[35] Crosby Burns, Kate Childs Graham, and Sam Menefee-Libey, "Gay and Transgender Discrimination in the Public Sector: Why It's a Problem for State and Local Governments, Employees and Taxpayers," Center for American

PLAINTIFFS004490

is also not fully known due to fear of coming out at work which could subject individuals to harassment or discrimination by colleagues or their employer. According to a survey from the Pew Research Center, "only one-third of employed LGBT adults say all or most of the people they closely work with are aware of their sexual orientation or gender identity."[36] Further, over a third of respondents say no one at work knows their sexual orientation or gender identity.[37] Only approximately 5.8 percent of self-identified bisexual survey respondents were generally open about their sexual orientation to their coworkers.[38] A 2014 report authored by the Human Rights Campaign found that most (53 percent) of LGBT employees are open about their sexuality with only a few people or are entirely "closeted" at work.[39]

Nevertheless, the best available data suggests a general range of 5.4 million to 8.2 million for estimating employees who self-identify as LGBT. The National LGBTQ Taskforce estimates there are 5.4 million LGBT workers in the United States.[40] For the upper-range, the 2015 Williams Institute report[41] estimates that up to 9.5 million adults self-identify as LGBT[42] and the 2017 Gallup poll estimates 10 million adults, or 4.1 percent of U.S. adults.[43] This puts the LGBT workforce at approximately over eight million LGBT employees. As of September 2009, state and local governments employed approximately 19.7 million workers.[44] This estimate includes about 5.2 million state employees and 14.5 million local government employees.[45] The Williams Institute

Progress, September 2012, https://cdn.americanprogress.org/wp-content/uploads/2012/08/LGBTPublicSectorReport1.pdf, p. 6.

[36] Pew Research Center, "A Survey of LGBT Americans: Attitudes, Experiences and Values in Changing Times," June 13, 2013, http://assets.pewresearch.org/wp-content/uploads/sites/3/2013/06/SDT_LGBT-Americans_06-2013.pdf, p. 59.

[37] Brad Sears & Christy Mallory, The Williams Institute, Documented Evidence of Employment Discrimination & Its Effects on LGBT People (2011), *available at* https://williamsinstitute.law.ucla.edu/wp-content/uploads/Sears-Mallory-Discrimination-July-20111.pdf; Gary J. Gates, "Sexual Minorities in the 2008 General Social Survey: Coming Out and Demographic Characteristics," October 2010.

[38] *Ibid.*

[39] Deena Fidas and Liz Cooper, "The Cost of the Closet and the Rewards of Inclusion: Why the Workplace Environment for LGBT People Matters to Employers," Human Rights Campaign Foundation, May 2014, http://assets.hrc.org//files/assets/resources/Cost_of_the_Closet_May2014.pdf?_ga=1.25864509.1225877603.1490017176, p. 9.

[40] Stacey Long Simmons, Director of Public Policy and Government Affairs for the National LGBTQ Task Force, testimony, Briefing Transcript, p. 80. *See also* Simmons Statement, *supra* note 26, at 2.

[41] The Williams Institute is a nationally recognized think tank housed at the UCLA School of Law that specializes in research on sexual orientation and gender identity law, and public policy. It was founded in 2001 and is a respected, independent research institute that is often cited and influential in policy change, media, and nonprofit advocacy work regarding LGBTQ communities.

[42] Lauren Jow, "9.5M LGBT Adults Nationwide Would Be Protected under New Comprehensive Non-Discrimination Bill," Williams Institute, July 2015, *available at* https://williamsinstitute.law.ucla.edu/press/press-releases/9-5m-lgbt-adults-nationwide-would-be-protected-under-new-comprehensive-non-discrimination-bill/, Gary J. Gates, "LGBT Demographics: Comparisons among population-based surveys," Williams Institute, 2014, http://williamsinstitute.law.ucla.edu/wp-content/uploads/lgbt-demogs-sep-2014.pdf, p. 1.

[43] Gates, *supra* note 28.

[44] Burns, *supra* note 35, at 6.

[45] *Ibid.*

PLAINTIFFS004491

estimates that as of 2009 slightly more than 4 percent of municipal employees (585,000) and slightly more than 8 percent of state employees (418,000) are LGBT.[46] In addition, as shown in Table 1 below, data from the U.S. Bureau of Labor Statistics and the Williams Institute reflect that approximately 7 million private-sector employees—roughly 85 percent of the total LGBT workforce—are LGBT.

| Table 1 | Number of Gay and Transgender Employees by Sector | | |
| --- | --- | --- | --- |
| | **Number of LGBT Employees (Est.)** | **Total Number of Employees** | **Percent out of total LGBT Workforce (Est.)** |
| **Local** | 585,000 | 14,516,000 | 7.13 |
| **State** | 418,000 | 5,155,000 | 5.09 |
| **Federal** | 200,000 | 2,829,000 | 2.44 |
| **Total Public** | 1,203,000 | 22,500,000 | 14.67 |
| **Total Private** | 7,000,000 | 107,234,000 | 85.33 |
| **Total Public and Private** | 8,203,000 | 129,734,000 | 100 |

Source: Crosby Burns, Kate Childs Graham, and Sam Menefee-Libey, "Gay and Transgender Discrimination in the Public Sector: Why It's a Problem for State and Local Governments, Employees and Taxpayers," Center for American Progress, September 2012, https://cdn.americanprogress.org/wp-content/uploads/2012/08/LGBTPublicSectorReport1.pdf, p. 6 (noting that the source of its data is the Williams Institute and U.S. Bureau of Labor Statistics), *accessed at* https://www.americanprogress.org/wp-content/uploads/2012/08/LGBTPublicSectorReport1.pdf, USCCR staff provided calculations for third (totals) column.

In 2012, the Office of Personnel Management (OPM) began asking federal employees to self-identify whether they are LGBT on its annual survey of federal workers.[47] As of 2015, OPM estimates that 3 percent of the federal civilian workforce is LGBT.[48] With regard to military service, the University of Southern California estimates that nearly 71,000 LGBT service members were serving in the military, or 2.8 percent of the total work force of the United States military as of 2016.[49] The Williams Institute estimates that nearly 150,000 transgender military personnel have served or are currently serving in the military.[50]

---

[46] Brad Sears, Nan D. Hunter, Christy Mallory, "Documenting Discrimination on the Basis of Sexual Orientation and Gender Identity in State Employment," Williams Institute, September 2009, https://williamsinstitute.law.ucla.edu/wp-content/uploads/1_LGBTWorkforce1.pdf, p. 1.

[47] U.S. Office of Personnel Management, "2012 Federal Employee Viewpoint Survey Results: Employees Influencing Change," 2012, https://www.fedview.opm.gov/2012files/2012_Government_Management_Report.pdf, p. 21.

[48] U.S. Office of Personnel Management, "Federal Employee Viewpoint Survey Results: Employees Influencing Change," 2015, https://www.fedview.opm.gov/2015FILES/2015_FEVS_Gwide_Final_Report.PDF, p. 38.

[49] Jeremy T. Goldbach and Carl Andrew Castro, "Lesbian, Gay, Bisexual, and Transgender (LGBT) Service Members: Life After Don't Ask, Don't Tell," *Current Psychiatry Reports*, 18:56 (2016), p. 1, http://cir.usc.edu/wp-content/uploads/2016/04/GoldbachCastro-LGBT-Military.pdf.

[50] Gary J. Gates and Jody L. Herman, "Transgender Military Service in the United States," Williams Institute, May 2014, http://williamsinstitute.law.ucla.edu/wp-content/uploads/Transgender-Military-Service-May-2014.pdf, p. 1. *See also* Agnes Gereben Schaefer, Radha Iyengar, Srikanth Kadiyala, Jennifer Kavanagh, Charles C. Engel, Kayla

PLAINTIFFS004492

## Extent of Discrimination Against LGBT Employees

Studies have found that discrimination in the workplace has a negative effect on LGBT employees.[51] LGBT individuals often face lower wages, increased difficulty in finding jobs, promotion denials, and/or job terminations due to their sexual orientation or gender identity. Studies have found that anywhere from 21 to 47 percent of LGBT adults faced employment discrimination because they were gay or transgender.[52] A summary of numerous studies of LGBT employee survey respondents showed that ten to 28 percent reported receiving negative performance evaluations or were passed over for promotion because they were gay or transgender, and seven to 41 percent experienced verbal and/or physical abuse in the workplace.[53] More staggering is that 90 percent of transgender employees report experiencing some form of harassment or mistreatment on the job.[54] For instance, 23 percent of employed transgender workers reported mistreatment such as "being forced to use a restroom that did not match their gender

---

M. Williams and Amii M. Kress, "Assessing the Implications of Allowing Transgender Personnel to Serve Openly," RAND Corporation, 2016, https://www.rand.org/pubs/research_reports/RR1530.html (finding that somewhere between 1,320 and 6,630 transgender individuals then served in the military and a more precise estimate was not possible given current data limitations).

[51] *See e.g.,* Deborah Vagins, "Working in the Shadows: Ending Employment Discrimination for LGBT Americans," American Civil Liberties Union, September 2007, https://www.aclu.org/files/pdfs/lgbt/enda_20070917.pdf; Sears, *supra* note 37; Jennifer C. Pizer, Brad Sears, Christy Mallory, and Nan D. Hunter, *Evidence of Persistent and Pervasive Workplace Discrimination Against LGBT People: The Need for Federal Legislation Prohibiting Discrimination and Providing for Equal Employment Benefits*, 45 Loy. L.A. L. Rev. 715 (2012), *available at* http://williamsinstitute.law.ucla.edu/wp-content/uploads/Pizer-Mallory-Sears-Hunter-ENDA-LLR-2012.pdf.

[52] Movement Advancement Project, Center for American Progress, and Human Rights Campaign, "A Broken Bargain: Discrimination, Fewer Benefits and More Taxes for LGBT Workers," June 2013, http://www.lgbtmap.org/file/a-broken-bargain-full-report.pdf, p. 27 (estimating that 38% of LGBT employees who were "out at work" had experienced discrimination or harassment); Preston Mitchum, "Workplace Discrimination Series: Brooke Waits," Center for American Progress, Aug. 5, 2013, *available at* http://www.americanprogress.org/issues/lgbt/news/2013/08/05/71447/workplace-discrimination-series-brooke-waits/; Burns, *supra* note 35, at pp. 7–8 (collecting data from four different surveys that reflected that, at the low end, 13 percent of gay public-sector workers "reported being denied a promotion or receiving a negative job evaluation" to, at the high end, 47% of respondents in on a survey on transgender Americans reported experiencing "some sort of adverse job outcome"). Michigan Department of Civil Rights, *Report on LGBT Inclusion Under Michigan Law, With Recommendations for Action,* 43–44, (Jan. 28, 2013,) *available at* https://www.michigan.gov/documents/mdcr/MDCR_Report_on_LGBT_Inclusion_409727_7.pdf; Hon. Jared Polis, U.S. Representative of Second District of Colorado, testimony, Briefing Transcript, p. 257 (stating that "[f]orty-two percent of LGBT Americans have experienced mistreatment of harassment on their job just due to their sexual orientation").

[53] M.V. Lee Badgett, Holning Lau, Brad Sears, Deborah Ho, "Bias in the Workplace: Consistent Evidence of Sexual Orientation and Gender Identity Discrimination," Williams Institute, 2007, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Badgett-Sears-Lau-Ho-Bias-in-the-Workplace-Jun-2007.pdf, p. 2.

[54] U.S. Department of Labor, "DOL Policies on Gender Identity: Rights and Responsibilities," July 2013, https://www.dol.gov/oasam/programs/crc/20130712GenderIdentity.htm (citing Jaime M. Grant, Lisa A. Mottet, and Justin Tanis, "Injustice at Every Turn: A Report of the National Transgender Discrimination Survey," National Center for Transgender Equality and National Gay and Lesbian Task Force, 2011, http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf, p. 3).

PLAINTIFFS004493

identity, being told to present in the wrong gender in order to keep their job, or having a boss or coworker share private information about their transgender status without their permission."[55]

Discrimination against LGBT employees can begin with the job application process. Researchers found discrimination against LGBT employee applicants, for example, in a study when researchers sent two sets of matched resumes to major employers, where one resume suggested the applicant was gay (*e.g.*, by disclosing leadership experience at an LGBT student organization), employers were far less likely to positively receive "gay" applicants than "straight" ones. Results revealed that those with indications of being LGBT received approximately 30 percent fewer callbacks.[56]

Discrimination against LGBT employees affects all occupations. LGBT individuals across the country and in a variety of professions report being discriminatorily terminated from their jobs. As with all discrimination claims, there may be conflicting narratives between employee and employer. Pointing to either administrative (*i.e.*, EEOC) or court rulings to determine rates of discrimination is also difficult: the EEOC only recently ruled that people claiming discrimination on the basis of sexual orientation or gender identity have the right to sue under Title VII. As discussed in more detail below, only one Circuit has held that sexual orientation claims may be brought under Title VII, and the Circuit courts are divided on whether claims of gender identity fall under Title VII.

At the same time, there is evidence that discrimination is occurring. Every year (since January 2013 when the EEOC began collecting data), there has been a steady increase in the number of merit resolutions rulings and reasonable cause claims reported to the EEOC for LGBT plaintiffs (see Table 2). While the EEOC does not publish their decisions, these numbers suggest that these cases had favorable outcomes to LGBT plaintiffs alleging discrimination or the EEOC determined that there was reasonable cause to believe discrimination occurred based upon investigation.

Results from the 2008 General Social Survey (GSS)[57] found that 42 percent of LGB employees experienced at least one form of employment discrimination at some point in their lives.[58] Moreover, the survey found 25 percent of LGB-identified respondents employed by federal, state, or local governments reported having experienced workplace discrimination due to their sexual orientation in the prior five years.[59]

---

[55] Sandy E. James, Jody L. Herman, Susan Rankin, Mara Keisling, Lisa Mottet, and Ma'ayan Anafi, "The Report of the 2015 U.S. Transgender Survey," National Center for Transgender Equality, December 2016, http://www.transequality.org/sites/default/files/docs/usts/USTS%20Full%20Report%20-%20FINAL%201.6.17.pdf, p. 10–11.

[56] Emma Mishel, Discrimination against Queer Women in the U.S. Workforce: A Résumé Audit Study, *Socius*, p. 6, (2016), http://journals.sagepub.com/doi/pdf/10.1177/2378023115621316.

[57] The GSS is conducted by the National Opinion Research Center at the University of Chicago, and has been a reliable source for monitoring social and demographic changes in the United States since 1972.

[58] Pizer, *supra* note 51, at 722-23.

[59] *Ibid.* at 723.

PLAINTIFFS004494

| Table 2    LGBT-Based Sex Discrimination Charges | FY 2013* | FY 2014 | FY 2015 | FY 2016 |
|---|---|---|---|---|
| **Receipts** | 808 | 1,100 | 1,412 | 1,768 |
| **Resolutions** | 337 | 846 | 1,135 | 1,649 |
| **Resolutions By Type** | | | | |
| **Settlements** | 31 | 71 | 96 | 118 |
| | 9.2% | 8.4% | 8.5% | 7.2% |
| **Withdrawals w/Benefits** | 17 | 46 | 57 | 74 |
| | 5.0% | 5.4% | 5.0% | 4.5% |
| **Administrative Closures** | 69 | 164 | 203 | 282 |
| | 20.5% | 19.4% | 17.9% | 17.1% |
| **No Reasonable Cause** | 216 | 544 | 737 | 1,114 |
| | 64.1% | 64.3% | 64.9% | 67.6% |
| **Reasonable Cause** | 4 | 21 | 42 | 61 |
| | 1.2% | 2.5% | 3.7% | 3.7% |
|    **Successful Conciliations** | 1 | 13 | 13 | 26 |
| | 0.3% | 1.5% | 1.1% | 1.6% |
|    **Unsuccessful Conciliations** | 3 | 8 | 29 | 35 |
| | 0.9% | 0.9% | 2.6% | 2.1% |
| **Merit Resolutions** | 52 | 138 | 195 | 253 |
| | 15.4% | 16.3% | 17.2% | 15.3% |
| **Monetary Benefits (Millions)** | **$0.9** | **$2.2** | **$3.3** | **$4.4** |

*The data for FY 2013 is for the last three quarters only. EEOC began tracking information on charges filed alleging discrimination related to gender identity and/or sexual orientation for charges received on or after January 1, 2013. Note: Charges may have multiple allegations under multiple statutes, so totals will not tally with breakdowns of specific bases or issues and are subject to updates. Monetary benefits include amounts which have been recovered exclusively or partially on non-LGBT claims included in the charge.

Source: Jeanne Goldberg (Senior Attorney Advisor, Office of the Legal Counsel, EEOC), in discussion with USCCR staff, April 17, 2017.

According to the Williams Institute, in 2008 approximately 38 percent of LGB people who were open about their sexual orientation in the workplace have experienced discrimination or harassment in the workplace.[60] Seven percent of LGB Americans report losing jobs because of their sexual orientation.[61] According to the National Center for Transgender Equality and the National Gay and Lesbian Task Force, for transgender employees the statistics are significantly higher, with 90 percent reporting experiencing harassment, mistreatment, or discrimination at

---

[60] *Ibid.*
[61] *Ibid.*

PLAINTIFFS004495

work, or taking actions to avoid it (*e.g.*, hiding their identity), due to their gender identity.[62] In addition, 2013 data from the Pew Research Center indicates that 21 percent of LGBT Americans feel that an employer has treated them unfairly due to their sexual orientation or gender identity.[63]

Employment discrimination also significantly affects LGBT youth and their long-term career opportunities. Bill Bettencourt from the Center for the Study of Social Policy explained that "[t]he lack of sufficient supportive career options for LGBT young people unfortunately leads to a path that impacts our criminal system and society as a whole."[64] According to a 2011-2012 Williams Institute survey, approximately 40 percent of homeless youth are LGBT.[65] Respondents most frequently cited family rejection of their sexual orientation or gender identity as a factor leading to their homelessness,[66] and 32 percent indicated abuse from their families as a reason cited for leaving.[67] Bettencourt argued that "[n]o matter what kinds of system improvements we put in place to support these young people in achieving some independence and becoming responsible citizens, without workplace supports we are doomed to fail them. Even when they can get jobs, if they cannot be themselves in the workplace, too often their productivity is impacted, as well as their ability to keep a job."[68]

## ECONOMIC IMPACTS FROM WORKPLACE DISCRIMINATION

Workplace discrimination against LGBT communities can cause job instability and high turnover, resulting in greater unemployment and poverty rates as well as substantial wage gaps between LGBT and heterosexual workers. On average gay men earn from ten to 32 percent less than similarly qualified heterosexual males.[69] Older gay and lesbian adults experience higher poverty rates than their heterosexual counterparts.[70] In the 2015 U.S. Transgender Survey released by the

---

[62] Grant, *supra* note 54, at 51.

[63] Pew Research Center, *supra* note 36, at 1. Pew Research Center surveyed "a nationally representative sample of 1,197 self-identified lesbian, gay, bisexual, and transgender adults 18 years of age or older. The sample comprised 398 gay men, 277 lesbians, 479 bisexuals, and 43 transgender adults." *Ibid.* at 3.

[64] Public Comment of Bill Bettencourt, Senior Associate, Center for the Study of Social Policy, U.S. Commission on Civil Rights, *Briefing: Examining Workplace Discrimination Against LGBT Americans* (Washington, DC, March 16, 2015) (submitted March 11, 2015).

[65] Laura E. Durso and Gary J. Gates, "Serving Our Youth: Findings from a National Survey of Services Providers Working with Lesbian, Gay, Bisexual, and Transgender Youth Who Are Homeless or At Risk of Becoming Homeless," Palette Fund, True Colors Fund, and Williams Institute, July 2012, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Durso-Gates-LGBT-Homeless-Youth-Survey-July-2012.pdf, p. 3.

[66] *Ibid.* at 4 (finding that 46% of respondents cited this factor, the highest of any factor cited by the youth).

[67] *Ibid.*

[68] Bettencourt Comment, *supra* note 64.

[69] Lee Badgett, *supra* note 53, at 1.

[70] Movement Advancement Project Services & Advocacy for Gay, Lesbian, Bisexual & Transgender Elders, and Center for American Progress, "LGBT Older Adults: Falling Through the Safety Net," September 2010, https://cdn.americanprogress.org/wp-content/uploads/issues/2010/09/pdf/lgbt_safetynet.pdf, p. 1. Randy Albelda, M.V. Lee Badgett, Alyssa Schneebaum, Gary J. Gates, "Poverty in the Lesbian, Gay, and Bisexual Community,"

National Center for Transgender Equality, transgender individuals were three times as likely to be unemployed and more than twice as likely to live in poverty compared to general rates in the U.S.[71] Nearly 30 percent of respondents in the survey reported being homeless.[72] The National Commission on Employment Policies estimated that discrimination against LGBT employees can be quantified as causing a $47 million loss in annual profits, attributable to training expenditures and unemployment benefits. Others have estimated that hostile work environments cost companies $1.4 billion in lost output per year due to a decline in productivity.[73]

Financially, discrimination also creates a large burden on national economic growth. Discrimination can lead to increased turnover for a business. For instance, approximately 53 percent of LGBT employees are "closeted."[74] Closeted LGBT employees "who felt isolated at work" are 73 percent more likely than their heterosexual counterparts to leave a position within three years.[75] Due to direct and indirect costs (*e.g.*, exit interviews, severance pay, temporary staffing, loss of productivity, training new employees) replacing employees can be quite costly.[76] Replacing employees due to discrimination can cost anywhere from $5,000 to $10,000 for an hourly worker, and between $75,000 to $211,000 for an executive who makes $100,000 a year.[77] Another analysis found the annual cost of employee turnover due to various forms of workplace discrimination could cost U.S. employers upwards of $64 billion annually.[78] There are also legal costs associated with discrimination for all businesses. Employers who find themselves tied up in discrimination lawsuits can experience significant financial costs. In 2010, the Annual Workplace Class Action Litigation Report found that the cost of the top-ten private plaintiff employment discrimination lawsuits totaled $346.4 million, which increased from $84.4 million just a year

Williams Institute, March 2009, *available at*: http://escholarship.org/uc/item/2509p8r5; Crosby Burns and Jeff Krehely, "Gay and Transgender People Face High Rates of Workplace Discrimination and Harassment: Data Demonstrate Need for Federal Law," Center for American Progress, May 2011, *available at* https://cdn.americanprogress.org/wp-content/uploads/issues/2011/06/pdf/workplace_discrimination.pdf.

[71] James, *supra* note 55, at 3.

[72] *Ibid.*

[73] Kenneth A. Kovach and Peter E. Millspaugh, *Employment Non Discrimination Act: On the Cutting Edge of Public Policy*, 39 Bus. Horizon 65, 70 (1996). *See also* Jeremy S. Barber, Comment, Re-Orienting Sexual Harassment: Why Federal Legislation is Needed to Cure Same-Sex Sexual Harassment Law, 52 AM. U. L. REV. 493, 531 & n. 238 (2002).

[74] Fidas, *supra* note 39, at 2. HRC Staff, "HRC Study Shows Majority of LGBT Workers Closeted at the Workplace," Human Rights Campaign, HRC Blog, May 7, 2014, *available at* http://www.hrc.org/blog/entry/hrc-study-shows-majority-of-lgbt-workers-closeted-on-the-job.

[75] Pizer, *supra* note 51, at 14.

[76] Heather Boushey and Sarah Jane Glynn, "There Are Significant Business Costs to Replacing Employees," Center for American Progress, November 2012, https://cdn.americanprogress.org/wp-content/uploads/2012/11/16084443/CostofTurnover0815.pdf, p. 5.

[77] Gail Robinson and Kathleen Dechant, "Building a business case for diversity," *The Academy of Management Executive*, 11.3: 21, August 1997, http://cursos.itam.mx/sastre/casos%20y%20ejercicios/diversidadrobinsonydechant97.pdf, p. 23.

[78] The Level Playing Field Institute, "The Corporate Leavers Survey," January 2007. http://www.workforcediversitynetwork.com/docs/corporate-leavers-survey.pdf, p. 4.

PLAINTIFFS004497

Working for Inclusion: Time for Congress to Enact Federal Legislation

before.[79] In 2013, the cost of the top-ten private plaintiff employment discrimination lawsuits totaled \$638 million.[80]

Studies have found that policies protecting against discrimination on the basis of sexual orientation and/or gender identity have a positive impact on businesses in terms of employee morale, the work environment, and profits. Utilizing data from the Organization for Economic Co-operation and Development (OECD), Out Now Global estimates that—as a nation—the U.S. could save \$8.93 billion if LGBT workers felt comfortable being out at work.[81] They argue these savings would be the result of LGBT workers being able to be out to all of their colleagues without fear of harassment or discrimination. Further, the report estimates that businesses would have a direct benefit as well. Out Now Global found that for businesses with 10,000 employees their savings could be between \$127 thousand and \$944 thousand; for businesses with 50,000 employees, their savings estimated between \$633 thousand and \$4.7 million; businesses with 100,000 employees, \$1.3 million and \$9.4 million; and for those with 250,000 employees, \$3.2 million and \$23.6 million in savings.[82]

Businesses have also cited that having a diverse staff positively affects office operations. Such benefits include: recruitment and retention, ideas and innovation, customer service, productivity, customer base, and employee relations and morale.[83] Additionally, nondiscrimination policies have positive effects on LGBT workers, including high job satisfaction, high commitment to the company, high life satisfaction, high psychological adjustment, and less conflict between work

---

[79] Seyfarth Shaw LLP, "Annual Workplace Class Action Litigation Report," January 2011, http://www.seyfarth.com/dir_docs/publications/2016WCARfinal.pdf.

[80] Chris DiMarco, "Top 10 most expensive discrimination settlements of 2013," *Corporate Counsel*, July 8, 2014, http://www.insidecounsel.com/2014/07/08/top-10-most-expensive-discrimination-settlements-o.

[81] Ian Johnson and Darren Cooper, "LGBT Diversity: Show Me The Business Case," Out Now, February 2015, http://www.outnowconsulting.com/media/13505/Report-SMTBC-Feb15-V17sm.pdf, p. 47 (data source: Out Now Global LGBT 2020 Study). This calculation uses the midpoint between the Center for American Progress' estimate of 16.1% of annual salary to replace low-skilled employees and Oxford Economics' estimate of 120% of annual salary to replace average to high-skilled employees. Boushey, *supra* note 76, at p. 2; Oxford Economics, "The Cost of Brain Drain: Understanding the financial impact of staff turnover," February 2014, http://www.oxfordeconomics.com/my-oxford/projects/264283. The calculation is for moving the "out to none" population to being "out to all" for the national full time workforce, with 38% of U.S. respondents stating they are currently "out to all," assuming that the LGBT community comprises 6% of the adult population. Lukenbill, G, "Untold millions: Positioning your business for the gay and lesbian consumer revolution" Harper Collins: New York; U.S. Census Bureau, "Annual estimates of the population by five-year age groups and sex for the United States," May 2007.

[82] The achievable savings for companies of the sizes indicated where the lower amount is if all workers are defined as low-skilled (Boushey, *supra* note 76, at 2), and the upper level in the calculation is the average figure found in 2014 as the costs to replace staff (Oxford Economics, *supra* note 81).

[83] Brad Sears and Christy Mallory, "Economic Motives for Adopting LGBT-Related Workplace Policies," Williams Institute, October 2011, http://williamsinstitute.law.ucla.edu/wp-content/uploads/Mallory-Sears-Corp-Statements-Oct2011.pdf, p. 2–3.

PLAINTIFFS004498

and home.[84] A 2014 Human Rights Campaign report found that one in four LGBT employees reported staying at a job specifically because of its inclusive environment.[85]

Implementing these policies affects employee morale and satisfaction, thereby affecting productivity. Of the top 50 Fortune 500 companies that implemented nondiscrimination policies, a majority of those companies stated that these policies increased overall profitability.[86] When polled, a majority of small business owners believe laws that prohibit discrimination against LGBT employees can improve their bottom line.[87] Further, more than two-thirds of small business owners believe there should be a federal law prohibiting employment discrimination against LGBT individuals.[88]

## INTENSIFIED DISCRIMINATION AGAINST TRANSGENDER INDIVIDUALS

Due to the lack of cultural awareness on transgender issues and stigma, many transgender workers face particular difficulty obtaining jobs, retaining jobs, and receiving promotions. Mara Keisling, Executive Director of the National Center for Transgender Equality, offered testimony to the Commission explaining some of the hardships that the transgender community faces:

> [W]hat I think is important for everybody to understand -- that right now in 2015, more than at any time in my 15-year career -- in this moment, transgender people are traumatized. They are traumatized economically, they are traumatized culturally and they are very much traumatized physically. . . . We are really a resilient and determined people. You have to be when you are as marginalized as transgender people are, and . . . our testimony shows how transgender people are under siege and traumatized economically with an unemployment rate twice the national average or four times [more] likely than non-trans people to live on less than $10,000 a year.[89]

The Commission also received testimony that showed how these difficulties are "exacerbated for transgender people who are also members of other vulnerable communities, such as being a person

---

[84] Kristin Griffith and Michelle Hebl, "The Disclosure Dilemma for Gay Men and Lesbians: 'Coming Out' at Work," *Journal of Applied Psychology*, 87(6):1191–99 (2002), pp. 1195–96.

[85] Fidas, *supra* note 39, at 23.

[86] U.S. Congress, Joint Economic Committee Democratic Staff, "Economic Consequences of Discrimination Based on Sexual Orientation and Gender Identity", November 2013, p. 2.

[87] Small Business Majority, "Opinion Poll: Small Businesses Support Workplace Nondiscrimination Policies," June 4, 2013, https://www.smallbusinessmajority.org/sites/default/files/research-reports/060413-workplace-nondiscrimination-poll-report.pdf, p. 4.

[88] *Ibid.*

[89] Mara Keisling, Executive Director of the National Center for Transgender Equality, testimony, Briefing Transcript, pp. 215–16.

PLAINTIFFS004499

of color; undocumented; living with HIV/AIDS; or a senior or youth."[90] A survey by the National Center for Transgender Equality and the National Gay and Lesbian Task Force found that 44 percent of transgender employees were passed over for a job, 23 percent were denied a promotion, and 26 percent were fired due to their gender identity.[91] Respondents, who reported having lost a job due to bias, further reported being currently unemployed at much higher percentages than the general population (26 to seven percent respectively).[92] This finding suggests that transgender individuals struggle to regain employment after they have been discriminatorily terminated.

Transgender individuals are unemployed at three times the rate of the general population,[93] and transgender people of color are jobless at up to four times the rate of the general population, according to the National Transgender Discrimination Survey.[94] The same survey found that employment discrimination negatively affects transgender workers in many ways. These issues include hiring, retention, promotion, and suffering from underemployment. Further, many transgender workers report experiencing hostile work environments where they are often mistreated, harassed, physically or sexually assaulted, forced to present as a gender they do not identify with, asked inappropriate questions, and deliberately taunted by the use of incorrect pronouns by their coworkers.[95] Due to the increased stigma of being transgender and these barriers listed above, unemployment is particularly detrimental to transgender individuals. Further, many transgender individuals consider themselves underemployed because they are overqualified for their position. For example, transgender people report often taking such jobs because of difficulties of being hired. According to a 2011 report, transgender respondents who were unemployed have nearly double the rate of engaging in survival sex work, four times the rate of homelessness, and 85 percent more incarceration compared to those who were employed.[96] In addition, they are disproportionately more likely to be HIV positive, smoke, use drugs or drink heavily, and have multiple suicide attempts.[97]

---

[90] Statement of Ilona Turner, Legal Director at Transgender Law Center, U.S. Commission on Civil Rights, *Briefing: Examining Workplace Discrimination Against LGBT Americans,* (Washington, DC, March 16, 2015) at 2 (*hereinafter cited* as Turner Statement).

[91] Grant, *supra* note 54, at 53.

[92] *Ibid.*

[93] James, *supra* note 55, at 140.

[94] Grant, *supra* note 54, at 55.

[95] *Ibid.* at 56-62. *See, e.g., Bost v. Sam's East, Inc.*, E.E.O.C. Charge Number 430-2014-01900, Determination (Aug. 4, 2017), *available at* http://transgenderlegal.org/media/uploads/doc_729.pdf. In this case, the EEOC issued a determination that a transgender employee of Sam's Club "was subjected to a hostile work environment because of her sex," after the evidence demonstrated that the employee "was harassed in that [employer] officials repeatedly referred to [the employee] by using masculine pronouns when speaking with her or providing her written correspondence. Despite [the employee's] complaints to have this behavior stopped, the derogatory masculine references continued."

[96] Grant, *supra* note 54, at 65.

[97] *Ibid.*

Data released in 2016 from the largest national survey of transgender Americans by the National Center for Transgender Equality show:[98]

1.  In the past year, 30 percent of respondents who had a job claimed they were fired, denied a promotion, or experienced other forms of mistreatment (*e.g.*, verbal harassment, physical or sexual assault at work) due to their gender identity; 13 percent of respondents claimed a lost job.
2.  In the past year, 15 percent of respondents were verbally harassed, physically attacked, and/or sexually assaulted while at work.
3.  77 percent of respondents who had a job in the past year hid their gender identity, delayed their transition, or quit their job, due to fear of negative repercussions.
4.  Due to perceived bias in employment, 20 percent of those surveyed felt forced to have to work in the "underground economy" (*e.g.*, sex work or dealing drugs).

Kylar Broadus, a transgender man and the Senior Public Policy Counsel with the National LGBTQ Task Force, presented some of these findings along with his personal experiences of discrimination before the United States Senate in 2012 and again at the March 2015 briefing of the U.S. Commission on Civil Rights. After announcing his transition to coworkers, Broadus reported that he was harassed daily, forbidden from talking to certain individuals, and heavily monitored by his supervisor, despite the fact that his work performance had not suffered. Six months later, Broadus lost his job. He was unemployed for a year before finding another job and suffered post-traumatic stress disorder because of the negative treatment at work.[99] Fifteen years later, he stated that he is still dealing with the financial repercussions due to extended underemployment and has not been able to pay off his student loans.[100]

As a part of the National LGBTQ Task Force, he seeks to ensure that there are clear directives to employers regarding protections for LGBT Americans. In his own words:

> [W]hile we worked hard, all of us, to provide protections there are not enough protections and they're slim, particularly for transgender individuals, and [] there are unclear directives. And as we've seen with past laws enacted in the United States, when there are unclear directives to employers then the laws that are there become very murky . . . We

---

[98] James, *supra* note 55, at 10-11.

[99] Statement of Kylar W. Broadus, Senior Public Policy Counsel of the Transgender Civil Rights Project at the National LGBTQ Task Force, U.S. Commission on Civil Rights, *Briefing: Examining Workplace Discrimination Against LGBT Americans,* (Washington, DC, March 16, 2015) at 4-5 (*hereinafter cited* as Broadus Statement).

[100] *Ibid.*

PLAINTIFFS004501

need clear expressed federal protections for transgender Americans. After all, we are people and we are human beings and we deserve the right to make a living.[101]

Broadus' experiences are not unique; many transgender individuals have reported enduring similar mistreatment in the workplace (Figure 1). Further, they report feeling forced to take jobs for which they are overqualified and to make significantly less money compared to cisgender[102] individuals. Figure 2 shows the large disparity in the percentage of transgender individuals with household incomes less than $10,000 compared to the general population.

**Figure 1.    Transgender Workers—Mistreatment and Workplace Discrimination**



Source: Jaime M. Grant, Lisa A. Mottet, and Justin Tanis, "Injustice at Every Turn: A Report of the National Transgender Discrimination Survey," National Center for Transgender Equality and National Gay and Lesbian Task Force, 2011, http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf, p. 56.

---

[101] Kylar W. Broadus, Senior Public Policy Counsel of the Transgender Civil Rights Project at the National LGBTQ Task Force, testimony, Briefing Transcript, pp. 225–26.

[102] Cisgender is a term referring to individuals whose gender identity is congruent with the sex they were assigned at birth.

PLAINTIFFS004502

**FIGURE 2.    Percent of People with Household Incomes under $10,000**



Source: Jaime M. Grant, Lisa A. Mottet, and Justin Tanis, "Injustice at Every Turn: A Report of
the National Transgender Discrimination Survey," National Center for Transgender Equality and
National Gay and Lesbian Task Force, 2011,
http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf, p. 51.

Recently, additional issues transgender individuals face in the workplace have become more
prominent in national media. These news accounts cover efforts from transgender individuals to
be treated fairly and have their gender identities recognized, which includes the use of their correct
names and pronouns as well as being allowed to adhere to the appropriate dress code.[103] OPM
encourages federal agencies to eliminate "gender-specific dress and appearance rules" to ensure
that all employees are comfortable.[104] Additionally, many advocates are fighting for employer-
provided healthcare benefits to include sex reassignment surgery, counseling, and hormone
therapy.[105]

## Existing State Laws for LGBT Employees

Most states use Title VII of the Civil Rights Act of 1964 as the model for state anti-discrimination
laws. Accordingly, most states have enacted legislation to prohibit discrimination on the basis of

---

[103] Ellen Chang, "Transgender Employees Seeking Greater Workplace Protection," *The Street,* July 27, 2017,
https://www.thestreet.com/story/13157435/1/transgender-employees-seeking-greater-workplace-protection.html.
[104] U.S. Office of Personnel Management, "Guidance Regarding the Employment of Transgender Individuals in the
Federal Workplace Diversity and Inclusion," Diversity & Inclusion: Reference Materials,
https://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reference-materials/gender-identity-guidance/.
[105] R. Nick Gorton, "Transgender Health Benefits: Collateral Damage in the Resolution of the National Health Care
Financing Dilemma," *Sexuality Research and Social Policy*, December 2007, Vol 4(4): 81-91, *available at*
http://www.deanspade.net/wp-content/uploads/2010/08/gorton.pdf; Human Rights Campaign Foundation,
"Corporate Equality Index 2017: Rating Workplaces on Lesbian, Gay, Bisexual and Transgender Equality,"
http://assets.hrc.org//files/assets/resources/CEI-2017-FinalReport.pdf?_ga=1.92925597.1225877603.1490017176,
pp. 24–27; Jennifer Wong, *Recasting Transgender-Inclusive Healthcare Coverage: A Comparative Institutional
Approach to Transgender Healthcare Rights*, 31 Law & Ineq. 471 (2013), *available at*:
http://scholarship.law.umn.edu/lawineq/vol31/iss2/6.

PLAINTIFFS004503

race, sex, and religion along with other protections provided by federal law. Some states have adopted protections against discrimination based on sexual orientation and/or gender identity, but a sizable minority of states have not extended any anti-discrimination protections to LGBT individuals. Where they exist, these state protections may be in the form of a state statute, a state executive order, an administrative order, or state policy for state employees. Such legislation or orders vary between states. Local jurisdictions (such as cities or counties) may also have passed ordinances. Twenty states plus the District of Columbia have state laws that offer employment protections for all LGBT employees.[106] An additional two states have laws prohibiting sexual orientation discrimination, but exclude transgender protections.[107] Eight states have an executive order, administrative order, or a state policy that protects only LGBT state employees. An additional three states offer LGB protections to state employees, but do not address transgender employees. And 17 states offer no protections on the basis of sexual orientation or gender identity, but cities and local municipalities may offer their own protections (see Table 3).[108]

| Table 3    Employment Protection Laws by State | | | | | |
|---|---|---|---|---|---|
| **Sexual Orientation & Gender Identity Statute (LGBT)*** | **Sexual Orientation Only (LGB)**** | **Executive Order for State Employees** | **Administrative Order for State Employees** | **Government Policy for State employees** | **No LGBT protections** |
| California | New Hampshire | Arizona (LGB) | Alaska (LGB) | Indiana (LGBT) | Alabama |
| Colorado | Wisconsin | N.C. (LGBT)*** | | | Arkansas |
| Connecticut | | Kentucky (LGBT) | | | Florida |
| Delaware | | Michigan (LGBT) | | | Georgia |
| District of Columbia | | Missouri (LGB) | | | Louisiana |
| Hawaii | | Montana (LGBT) | | | Idaho |
| Illinois | | Ohio (LGBT) | | | Mississippi |
| Iowa | | Pennsylvania (LGBT) | | | Nebraska |
| Maine | | Virginia (LGBT) | | | Kansas |
| Maryland | | | | | North Dakota |
| Massachusetts | | | | | Oklahoma |

---

[106] Movement Advancement Project, "Non-Discrimination Laws: Employment," data current as of October 19, 2017, http://www.lgbtmap.org/equality-maps/non_discrimination_laws; Human Rights Campaign, "State Maps of Laws & Policies: Employment," updated April 25, 2017, http://www.hrc.org/state-maps/employment.
[107] *Ibid.*
[108] Movement Advancement Project, "Non-Discrimination Laws: Employment," data current as of October 19, 2017, http://www.lgbtmap.org/equality-maps/non_discrimination_laws.

PLAINTIFFS004504

| Minnesota | | | | | South Carolina |
|---|---|---|---|---|---|
| Nevada | | | | | South Dakota |
| New Jersey | | | | | Tennessee |
| New Mexico | | | | | Texas |
| New York | | | | | West Virginia |
| Oregon | | | | | Wyoming |
| Rhode Island | | | | | |
| Utah | | | | | |
| Vermont | | | | | |
| Washington | | | | | |

Source: Movement Advancement Project, "Non-Discrimination Laws: Employment," data current as of October 19, 2017, http://www.lgbtmap.org/equality-maps/non_discrimination_laws; Human Rights Campaign, "State Maps of Laws & Policies: Employment," updated April 25, 2017, http://www.hrc.org/state-maps/employment. Table created by USCCR staff.

\* "LGBT" indicates that the state offers both sexual orientation and gender identity protections.

\*\* "LGB" indicates that the state offers only sexual orientation protections. \*\*\*N.C.'s Ex. Or. does not protect transgender bathroom acessibility.

## Failed Efforts to Enact Federal Legislation

Since 1974, seven separate pieces of legislation to prohibit LGBT employment discrimination on the basis of actual or perceived sexual orientation or gender identity have been introduced in Congress. Table 4 below summarizes introduced LGBT workplace protection legislation from 1974 through 2017 (see Appendix A for full explanation and language of the various legislation). The first two iterations of this federal legislation—frequently dubbed the Employment Non-Discrimination Act (ENDA) or the Equality Act—prohibited employment discrimination on the basis of sexual orientation alone.[109] In 2009, gender identity protections were added and if enacted, the legislation would offer protections for all LGBT individuals.[110] These proposed bills sought to provide employment protections to LGBT workers as well as to offer a legal avenue for employees to file formal complaints alleging sexual orientation and gender identity discrimination in the workplace.[111] Closely modeled after existing civil rights legislation such as Title VII of the Civil Rights Act and the Americans with Disabilities Act, the various incarnations of these bills sought to enhance protections beyond those provided by local policies and state laws.[112]

---

[109] Equality Act, H.R. 14752, 93rd Cong. (1974), *available at* https://www.congress.gov/bill/93rd-congress/house-bill/14752; Employment Non-Discrimination Act of 1994, H.R. 4636, 103rd Cong. (1994), *available at* https://www.congress.gov/bill/103rd-congress/house-bill/4636.

[110] Employment Non-Discrimination Act of 2009, H.R. 3017, 111th Cong. (2009), *available at* https://www.congress.gov/bill/111th-congress/house-bill/3017.

[111] *Id.*

[112] Seth Althauser and Sarah Greenberg, "FAQ: Employment Non-Discrimination Act: What You Need to Know," Center for American Progress, July 2011, https://www.americanprogress.org/issues/lgbt/news/2011/07/19/9988/faq-the-employment-non-discrimination-act/#r1.

PLAINTIFFS004505

No version has ever successfully passed both the House and the Senate (see Table 4).[113] The failure of these bills can be attributed to opponents against enacting new federal legislation, and after the Supreme Court's *Hobby Lobby* decision, some prominent LGBT activist organizations opposed the breadth of the exemptions afforded to religious groups.[114] For instance, some opponents to enacting federal legislation prohibiting employment discrimination argue that the expansion of these laws would constitute another example of government overreach against private businesses.[115] In his testimony to the Commission, Roger Clegg of the Center for Equal Opportunity stated his opposition to ENDA on the premise that:

> [p]eople should be able to use their private property the way that they want to use their private property—and that employers should be able to make personnel decisions without interference from the government . . . . And there should be a presumption against the government, at any level, stepping in and saying . . . we know better than you whom you should hire and whom you should promote. And there should be an especially strong presumption against the federal government passing a law that second guesses employers in this regard.[116]

Others argue that passing federal legislation prohibiting sexual orientation and gender identity discrimination creates a new protected class on the basis of someone's choice. For instance, at the 2009 House Education and Labor Committee Hearing, Rep. John Kline of Minnesota argued that it would create "an entirely new protected class that is vaguely defined and often subjective . . . . Attempting to legislate individual perceptions is truly uncharted territory and it does not take a legal scholar to recognize that such vaguely defined protections will lead to an explosion in litigation and inconsistent judicial decisions."[117]

In response to the 2015 version of the bill, some LGBT groups such as the National LGBTQ Task Force withdrew support because they felt that the religious exemptions were too broad. Other

---

[113] Jerome Hunt, "History of the Employment Non-Discrimination Act: It's Past Time to Pass This Law," Center for American Progress, July 2011, *available at* https://www.americanprogress.org/issues/lgbt/news/2011/07/19/10006/a-history-of-the-employment-non-discrimination-act/.

[114] Ed O'Keefe, "Gay Rights groups withdraw support of ENDA after Hobby Lobby decision," *The Washington Post*, July 8, 2014, https://www.washingtonpost.com/news/post-politics/wp/2014/07/08/gay-rights-group-withdrawing-support-of-enda-after-hobby-lobby-decision/?utm_term=.004df929e6bf.; Tierney Sneed, "Why LGBT Groups Turned on ENDA," *U.S. News*, July 9, 2014, https://www.usnews.com/news/articles/2014/07/09/why-lgbt-groups-turned-on-enda?int=news-rec.

[115] Walter Olson, "Against ENDA," *Cato At Liberty Blog*, November 1, 2013, https://www.cato.org/blog/against-enda.

[116] Roger Clegg, President and General Counsel at the Center for Equal Opportunity, Briefing Transcript, pp. 107-08.

[117] For example, *see* H.R. 3017, Employment Non-Discrimination Act of 2009, Hearing Before the House Comm. on Ed. and Labor, 111th Congress (2009), *transcript available at* https://www.gpo.gov/fdsys/pkg/CHRG-111hhrg52242/pdf/CHRG-111hhrg52242.pdf.

PLAINTIFFS004506

groups such as the American Civil Liberties Union (ACLU), Lambda Legal, the National Center for Lesbian Rights, and the Transgender Law Center all raised similar concerns and wanted the bill to offer the same amount of protections given to other minority groups (*e.g.*, minority races, religions).[118] Ian Thompson, a legislative representative at the ACLU, stated that "[i]n none of those other categories is there this kind of broad, sweeping religious exemption that gives a stamp of legitimacy to discrimination, and we feel adamantly that there should not be for this type of discrimination against LGBT people."[119]

| Table 4    Summary of Introduced LGBT Employment Non-Discrimination Legislation⁺ | | | | | |
|---|---|---|---|---|---|
| | | Protected Classes | | Protected Venues | |
| | Congressional Actions | LGB | Gender Identity* | Workplace | Other |
| **1974 Equality Act** | Not voted out of committee Reintroduced 1975–1991 | Sex, Marital status, Sexual orientation | No | Yes, including: Employers, Employment agencies, Labor unions, Joint labor-management committees Exempt: < 15 employees | Public accommodations, Public facilities, Federally assisted programs |
| **1994 ENDA** | Not voted out of committee. Reintroduced in 1996, then failed Senate 49–50. Not voted upon in House Same version reintroduced 1997-2004 Not introduced in 2005-2006 | Yes | No | As above. Exempt: Faith-based organizations Armed forces | |
| **2007 ENDA** | Passed House 235–184 Not introduced in Senate | Yes | Yes, but removed from voted-upon House bill | As above | No preferential treatment, No quotas |
| **2009 ENDA** | Not voted out of committee | Yes | Yes | As above | |

---

[118] Sneed, *supra* note 114.
[119] *Ibid.*

PLAINTIFFS004507

| Table 4 | Summary of Introduced LGBT Employment Non-Discrimination Legislation[a] | | | | |
|---|---|---|---|---|---|
| | | **Protected Classes** | | **Protected Venues** | |
| | **Congressional Actions** | **LGB** | **Gender Identity\*** | **Workplace** | **Other** |
| **2013 ENDA** | Passed Senate 64–32  Not voted upon in House | Yes | Yes | As above. | |
| **2015 Equality Act** | Introduced 7/23/15 | Yes | Yes | As above. Religious exemption changes to incorporate existing Title VII exemption. | Public accommodatio ns, federally funded programs, housing, federal jury service, credit |
| **2017 Equality Act** | Reintroduced 5/2/17 | Yes | Yes | As above. | As above. |

[a] LGB = lesbian, gay, bisexual. ENDA = Employment Non-Discrimination Act. \*Gender Identity = Transgender, Gender Non-conforming or pertaining to anyone who does not adhere to the gender binary. Source: U.S. Commission on Civil Rights staff

In May 2017, 241 Democratic members of Congress reintroduced the Equality Act in both the Senate and House.[120] If this bill passes, it would include broad societal protections on the basis of sex (including pregnancy and childbirth), sexual orientation, and gender identity in employment, housing, public accommodations, federal jury service, and public education.[121] One of the co-sponsors of the bill, Rep. David Cicilline of Rhode Island, stated: "The Equality Act represents a simple idea that everyone, including members of the LGBT community, is entitled to equal treatment under the law, and the right to live free of discrimination."[122] Unlike other iterations of this bill, this version does not have religious exemptions. The bill states that the Religious Freedom Restoration Act (RFRA) cannot be used to block protections against discrimination. The bill states: "The Religious Freedom Restoration Act of 1993 (42 U.S.C. 2000bb et seq.) shall not provide a claim concerning, or a defense to a claim under, a covered title, or provide a basis for challenging the application or enforcement of a covered title."[123] A more detailed discussion on the advantages and disadvantages of federal legislation can be found in Chapter 3.

---

[120] Equality Act, H.R. 2282, 115th Cong. (2017), *available at* https://www.congress.gov/bill/115th-congress/house-bill/2282; Equality Act, S. 1006, 115th Cong. (2017), *available at* https://www.congress.gov/bill/115th-congress/senate-bill/1006.

[121] *Id.*

[122] Jeff Taylor, "241 members of Congress just announced their support for full LGBT equality," *LGBTQ Nation*, May 2, 2017, https://www.lgbtqnation.com/2017/05/democrats-take-stand-lgbtq-rights-reintroducing-equality-act/.

[123] Equality Act, H.R. 2282, 115th Cong. (2017), *available at* https://www.congress.gov/bill/115th-congress/house-bill/2282; Equality Act, S. 1006, 115th Cong. (2017), *available at* https://www.congress.gov/bill/115th-congress/senate-bill/1006.

PLAINTIFFS004508

[*This page intentionally left blank*]

PLAINTIFFS004509

## CHAPTER 2:    EXISTING FEDERAL NON-DISCRIMINATION LAW

### Title VII of the Civil Rights Act and LGBT Employees

Title VII of the Civil Rights Act of 1964 states: "It shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[124] As discussed below, the question for LGBT employees is whether discrimination based on sexual orientation or gender identity falls within Title VII's prohibition against discriminating on the basis of "sex."

The EEOC's "congressionally mandated role is to enforce Title VII of the Civil Rights Act of 1964, as well as the other federal employment non-discrimination laws."[125] Employees who believe that they have been discriminated against can file claims for discrimination with the EEOC. The EEOC has authority to issue administrative decisions and resolve charges of discrimination. While the EEOC receives all claims, the Department of Justice (DOJ) enforces Title VII in cases involving state or local government employees.[126] In January 2013, the EEOC began tracking information on filed claims alleging discrimination on the basis of sexual orientation or gender identity.[127] The data for claims (or charges) based on LGBT discrimination filed with the EEOC FY 2013-2016 can be found above in Chapter 1.

Title VII contains a religious exemption that recognizes the right of religious organizations to preferentially hire individuals of a particular religion.[128] The Supreme Court recognized in *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos*

---

[124] 42 U.S.C. § 2000e-2(a). Of note, Title VII's protections do not apply to all employers. Congress exempted employers with 15 or fewer employees, 42 U.S.C. § 2000e(a), and certain religious employers from Title VII. 42 U.S.C. § 2000e-1(a).
[125] Jeanne Goldberg, Senior Attorney Advisor, Office of Legal Counsel at EEOC, testimony, Briefing Transcript, p. 10.
[126] U.S. Department of Justice, Laws Enforced by the Employment Litigation Section, https://www.justice.gov/crt/laws-enforced-employment-litigation-section (last updated Oct. 25, 2017).
[127] Mary Beth Maxwell, Principal Deputy Assistant Secretary for Policy at the Department of Labor, testimony, Briefing Transcript, p. 30.
[128] Title VII states its provisions do not apply to "a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with carrying on of the corporation, association, educational institution, or society of its activities." 42 U.S.C § 2000e-1(a). Under the statute, religion is defined to include "all aspects of religious observance and practice, as well as belief." 42 U.S.C § 2000e(j). The EEOC defines religious practices "to include moral or ethical beliefs as to what is right and wrong which are sincerely held with the strength of traditional religious views." 29 C.F.R. § 1605.1.

PLAINTIFFS004510

that the scope of this exemption is not limited to jobs that might be considered primarily religious, but includes "all activities of religious employers."[129]

In *Hosanna-Tabor v. E.E.O.C.*, the Supreme Court also recognized that the "ministerial exception" to antidiscrimination laws is required by the Religious Clauses of the First Amendment.[130] The Supreme Court ruled that having to "accept or retain an unwanted minister, or punishing a church for failing to do so," would infringe on the Free Exercise Clause, which "protects a religious group's right to shape its own faith and mission through its appointments," and the Establishment Clause, "which prohibits government involvement in such ecclesiastical decisions."[131] Determining whether the ministerial exception applies in a particular case requires a fact-specific analysis, but *Hosanna-Tabor* makes clear that it is not limited to only those who meet the popular conception of clergy.[132]

## "Because of Sex" Court and Administrative Decisions

### TITLE VII AND SEXUAL ORIENTATION

In April 2017, the Seventh Circuit held that claims of discrimination based on sexual orientation could be brought under the existing language of Title VII.[133] Until then, all federal circuit courts of appeals that had considered the question had uniformly rejected claims that workplace actions based upon sexual orientation constitute discrimination under Title VII.[134] In May 2017, in *Zarda*

---

[129] 483 U.S. 327, 339 (1987).

[130] *Hosanna-Tabor Evangelical Lutheran Church and School v. E.E.O.C.*, 565 U.S. 171, 188 (2012).

[131] *Id.* at 188-89.

[132] *See id.* at 192-95. For more discussion about the religious exemptions, please see the Commission's report on the subject. U.S. Commission on Civil Rights, "Peaceful Coexistence: Reconciling Nondiscrimination Principles with Civil Liberties," September 2016, http://www.usccr.gov/pubs/Peaceful-Coexistence-09-07-16.PDF. In October 2017, Attorney General Jeff Sessions issued guidance "interpreting religious liberty protections in federal law," pursuant to President Trump's Executive Order No. 13798 (May 4, 2017). Attorney General, Memorandum for All Executive Departments and Agencies re Federal Law Protections for Religious Liberty, Oct. 6, 2017, *available at* https://www.justice.gov/opa/press-release/file/1001891/download.

[133] *Hively,* 853 F.3d at 350-51 (holding that "the logic of the Supreme Court's decisions, as well as the common-sense reality that it is actually impossible to discriminate on the basis of sexual orientation without discriminating on the basis of sex" meant that discrimination on the basis of sexual orientation is actionable under Title VII.). The employer in the *Hively* case has not asked the Supreme Court to review the Seventh Circuit's decision, and the time for seeking a petition of *certiorari* has passed.

[134] *See, e.g., Christiansen v. Omnicom Group, Inc.*, 852 F.3d 195, 199 (2d Cir. 2017) (declining to revisit past circuit precedent that holds sexual orientation discrimination does not fall under Title VII); *Evans v. Georgia Regional Hospital*, 850 F.3d 1248, 1255 (11th Cir. 2017) ("[T]here is no sexual orientation action under Title VII."); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 764 (6th Cir. 2006) ("[R]ecognition of Vickers' claim would have the effect of *de facto* amending Title VII to encompass sexual orientation as a prohibited basis for discrimination."); *Medina v. Income Support Div., New Mexico,* 413 F.3d 1131, 1135 (10th Cir. 2005) ("Title VII"s protections . . . do not extend to harassment due to a person's sexuality."); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257, 261 (3d Cir. 2001) (affirming decision of district court granting summary judgment to defendant where plaintiff claimed he was harassed on the basis of his sexual orientation); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999) ("Title VII does not proscribe harassment simply because of sexual orientation."); *Hopkins v. Balt. Gas &*

*v. Altitude Express*, the U.S. Court of Appeals for the Second Circuit voted to review *en banc* whether Title VII protects against discrimination on the basis of sexual orientation.[135] Even where courts rejected sexual orientation claims, in some courts, allegations based on gender non-conformity were deemed actionable.[136] Those courts that have held that discrimination based on gender non-conformity is actionable have generally relied on the rationale that discrimination based on "sex stereotyping" is actionable, as the Supreme Court found in *Price Waterhouse v. Hopkins*. In *Price Waterhouse v. Hopkins*, the Supreme Court held that sex discrimination includes employment decisions based upon a woman's failure to conform to "sex stereotypes."[137] Hopkins was a female senior manager whose firm denied her partnership because the partners believed she did not act sufficiently feminine. The firm advised Hopkins she would have a better chance at being elected partner if she would, among other things, "take a course at charm school," "walk more femininely," "talk more femininely," and "wear makeup."[138]

In an earlier decision, the Supreme Court held that "[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes."[139] The Supreme Court therefore reasoned that "[a]n employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind."[140] "[W]e are beyond the day," concluded the Court, "when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their group."[141] In 1998, the Supreme Court also held that Title VII sexual harassment of an employee by a person of the same sex is actionable, regardless of the victim's or harasser's sex.[142]

---

*Elec. Co.*, 77 F.3d 745, 751 (4th Cir. 1996) ("Title VII does not prohibit conduct based on the employee's sexual orientation[.]"); *Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989) ("Title VII does not prohibit discrimination against homosexuals."); *DeSantis v. Pacific Tel. & Tel Co., Inc.*, 608 F.2d 327, 329-30 (9th Cir. 1979) (Title VII does not prohibit discrimination based upon homosexuality), *overruled on other grounds by Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 875 (9th Cir. 2001); *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979) ("Discharge for homosexuality is not prohibited by Title VII[.]").

[135] *Zarda et al. v. Altitude Express et al.*, Case No. 15-3775, Dkt. 271 (2nd Cir. May 25, 2017).

[136] *See, e.g., Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000), discussed *infra*.

[137] 490 U.S. 228, 251 (1989).

[138] *Id.* at 235 (internal quotation marks omitted).

[139] *Id.* at 251 (*quoting Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 707 n. 13 (1978)) (further citations omitted).

[140] *Id.* at 251.

[141] *Id.*

[142] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79-80 (1998). The plaintiff in *Oncale* worked on an oil platform crew, and was forcibly subjected to sex-related humiliating actions by co-workers in the presence of the rest of the crew. The Court focused on "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* at 80 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)). Justice Scalia, writing for the Court, recognized this ruling expanded the textual meaning of "sex" beyond what the sponsors of the law may have intended:

In practice, some courts have found that the distinctions among sex stereotyping, sexual orientation, gender non-conformity, same-sex harassment, and gender identity are confusing, difficult to apply, and depending on the facts, not necessarily distinct.[143] "The challenge facing the lower courts since *Price Waterhouse* is finding a way to protect against the entire spectrum of gender stereotyping while not protecting against the stereotype that people should be attracted only to those of the opposite gender."[144] The Seventh Circuit recently described the efforts of courts to sort through the distinction between sexual orientation discrimination versus gender non-conformity discrimination as follows:

> [C]ourts have gone about this task in different ways—either by disallowing any claims where sexual orientation and gender non-conformity are intertwined, (and, for some courts, by not allowing claims from lesbian, gay, or bisexual employees at all), or by trying to tease apart the two claims and focusing only on the gender stereotype allegations. In both methods, the opinions tend to turn circles around themselves because, in fact, it is exceptionally difficult to distinguish between these two types of claims.[145]

In 2015, the Equal Employment Opportunity Commission concluded that a person's claim alleging sexual orientation discrimination falls within Title VII on the basis of alleged sex discrimination.[146] The practical impact of the EEOC's ruling is that all employees covered by EEOC jurisdiction may now file administrative claims under Title VII before the agency alleging discrimination based on sexual orientation. The EEOC's decision is not binding on courts, however courts may, and often do, defer to the EEOC. In its decision, the EEOC identified the following three legal bases for recognizing sexual orientation discrimination under Title VII:

- First, the EEOC concluded that "sexual orientation is inherently a 'sex-based consideration,' and an allegation of discrimination based on sexual orientation is necessarily an allegation of sex discrimination under Title VII."[147] The very concept of sexual orientation is based upon a person's sexual attractions, and cannot be defined or

---

> As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII. But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.

*Id.* at 79.

[143] *See, e.g., Videckis et al. v. Pepperdine University*, Case No. 2:15-CV-00298, Dkt. 41 (C.D. Cal. Dec. 15, 2015), *available at* http://documents.latimes.com/judge-pregerson-ruling-sexual-orientation-discrimination/.

[144] Brian Soucek, Perceived Homosexuals: Looking Gay Enough for Title VII, 63 Am. U. L. Rev. 715, 726 (2014).

[145] *Hively v. Ivy Tech Cmty. Coll.,* 830 F.3d 698, 705 (7th Cir. 2016), *overruled by Hively*, 853 F.3d at 350-51.

[146] *Baldwin v. Foxx,* EEOC Doc No. 0120133080, 2015 WL 4397641 (EEOC Jul. 16, 2015).

[147] 2015 WL 4397641 at *5 (quoting *Price Waterhouse*, 490 U.S. at 242).

PLAINTIFFS004513

understood without reference to "sex." Therefore, sexual orientation is "inseparable from and inescapably linked to sex."[148]

- Second, the EEOC determined that sexual orientation discrimination is associational discrimination on the basis of sex. "For example, a gay man who alleges that his employer took an adverse employment action against him because he associated with or dated men states a claim for sex discrimination under Title VII; the fact that the employee is a man instead of a woman motivated the employer's discrimination against him."[149] In other words, "an employee alleging discrimination on the basis of sexual orientation is alleging that his or her employer took his or her sex into account by treating him or her differently for *associating* with a person of the same sex."[150] The EEOC compared such discrimination to associational race discrimination courts have long recognized.[151]

- Third, the EEOC clarified that there is little to no distinction between sexual orientation discrimination and gender stereotype discrimination (which is actionable under *Price Waterhouse*). According to the EEOC, gender stereotypes involve more than assumptions about over-masculine or feminine behavior: "Sexual orientation discrimination and harassment '[are] often, if not always, motivated by a desire to enforce heterosexually defined gender norms.'"[152]

## TITLE VII AND GENDER IDENTITY

Courts' view of claims based on sex stereotyping and gender identity have changed over time, with some courts allowing these claims to proceed under Title VII and some finding that Title VII does not cover these claims. For its part, the EEOC held in 2012 that claims based on gender identity may be brought under Title VII's prohibition against discrimination "because of sex."[153] In 2017, Attorney General Jeff Sessions withdrew guidance issued by Attorney General Eric Holder in 2014 and stated that going forward the Department of Justice would take the position that Title VII "encompasses discrimination between men and women but does not encompass discrimination based on gender identity *per se*, including transgender status."[154]

In the late 1970s and early 1980s, the first circuit courts to consider Title VII claims brought by plaintiffs seeking protection from discrimination based on their gender identities adopted the

---

[148] *Id.*

[149] *Id.* at *6.

[150] *Id.* (emphasis in original).

[151] *Id.* (citing *Floyd v. Amite Cnty. School Dist.*, 581 F.3d 244, 249 (5th Cir. 2009); *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)).

[152] *Id.* at *8 (quoting *Centola v. Potter*, 183 *F. Supp.* 2d 403, 410 (D. Mass. 2002)) (alteration in original).

[153] *Macy v. Holder*, EEOC Doc No. 0120120821, 2012 WL 1435995 (EEOC Apr. 20, 2012).

[154] Attorney General, Memorandum re Revised Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964, Oct. 4, 2017.

PLAINTIFFS004514

Case 4:22-cv-00325-RH-MAF   Document 178-11   Filed 04/27/23   Page 41 of 154

Existing Federal Non-Discrimination Law    33

position that the plain meaning of the term "sex" did not extend to discrimination based on "transsexualism."[155] In *Holloway*, an employee of Arthur Andersen who was assigned male at birth brought suit under Title VII, alleging her employer discharged her after she began her transition from living as a man to living as a woman.[156] The Ninth Circuit held that "[a] transsexual individual's decision to undergo sex change surgery does not bring that individual, nor transsexuals as a class, within the scope of Title VII."[157]

Similarly, in the *Sommers* case—where a transgender woman was discharged because she "misrepresented herself as an anatomical female when she applied for the job"[158]—the Eighth Circuit viewed "the major thrust of the 'sex' amendment was towards providing equal opportunities for women."[159] The Eighth Circuit court held, "[b]ecause Congress has not shown an intention to protect transsexuals, we hold that discrimination based on one's transsexualism does not fall within the protective purview of the Act."[160] Thus, the focus of these early cases was on what Congress intended the scope of the term "sex" to encompass.

As discussed above, in 1989, in *Price Waterhouse*, the Supreme Court held that sex discrimination includes employment decisions based upon a woman's failure to conform to "sex stereotypes."[161] Of importance here, in *Price Waterhouse*, the Supreme Court used the terms "sex" and "gender" interchangeably.[162] With regard to congressional intent, the Supreme Court stated that "Congress' intent to forbid employers to take *gender* into account in making employment decisions *appears on the face of the statute*."[163]

After *Price Waterhouse*, courts began analyzing gender identity discrimination claims under Title VII in two ways. The first approach recognizes open identification as a member of the opposite sex as a deviation from preconceived gender norms. This category is an extension of the *Price Waterhouse* framework whereby it is unlawful to discriminate against an individual for failing to conform to sex stereotypes. An example of cases falling into the first category is the Ninth Circuit's decision in *Schwenk v. Hartford.*[164] The Ninth Circuit relied on the "logic and language of *Price*

---

[155] *See Holloway v. Arthur Andersen & Co.*, 566 *F.2d* 659, 663 (9th Cir. 1977); *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982).
[156] *Holloway*, 566 F.2d at 661.
[157] *Id.* at 664.
[158] *Sommers*, 667 F.2d at 748.
[159] *Id.* at 750 (citations omitted).
[160] *Id.*
[161] *Price Waterhouse*, 490 U.S. at 248-51.
[162] In concluding an employer cannot discharge an employee for deviations from "sex stereotypes," the Supreme Court held "an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of *gender*." *Id. at* 250 (emphasis added). Likewise, the Supreme Court viewed the words "because of . . . *sex*" to mean "*gender* must be irrelevant to employment decisions." *Id.* at 240 (emphasis added).
[163] *Id.* at 239 (emphasis added).
[164] 204 F.3d at 1187.

PLAINTIFFS004515

*Waterhouse*" to conclude that openly expressing one's identity as a member of the opposite sex is therefore no different from the failure to conform with sex stereotypes in *Price Waterhouse*.[165]

Under the second approach, courts have continued to analyze cases using the pre-*Price Waterhouse* view of differentiating between "sex" and "gender," and associating transgender status with one or the other. The cases interpreting "sex" to include "gender identity" hold transgender status is protected, whereas the cases interpreting "sex" to mean biological sex hold it is not. The Tenth Circuit followed this approach in *Etsitty v. Utah Transit Auth.*:

> [T]here is nothing in the record to support the conclusion that the plain meaning of "sex" encompasses anything more than male and female. In light of the traditional binary conception of sex, transsexuals may not claim protection under Title VII from discrimination based solely on their status as a transsexual.[166]

The court did suggest, without deciding, that an actionable claim may arise based on discrimination against a transgender individual for failing to conform to the gender stereotypes of his or her biological sex.[167] More recently courts have, even while differentiating between "sex" and "gender," held the analysis employed by *Etsitty* to be too narrow.[168]

Currently, six federal circuit courts of appeals have adjudicated the merits of a Title VII claim asserted by transgender individuals. The Sixth, Ninth, and Eleventh Circuits all hold Title VII prohibits discrimination against a transgender employee on the basis of the reasoning announced in *Price Waterhouse*.[169] In contrast, the Seventh, Eighth, and Tenth Circuits have held there is no Title VII protection for transgender individuals.[170]

---

[165] *Id.* at 1201-02. *See also Smith v. City of Salem*, 378 F.3d 566, 574 (6th Cir. 2004); *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011) ("'The very acts that define transgender people as transgender are those that contradict stereotypes of gender-appropriate appearance and behavior.' There is thus a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms.") (quoting Ilona M. Turner, *Sex Stereotyping Per Se: Transgender Employees and Title VII*, 95 Cal. L. Rev. 561, 563 (2007)) (alteration and internal citations omitted).

[166] 502 F.3d 1215, 1222 (10th Cir. 2007).

[167] *Id.* at 1224.

[168] For example, the court in *Fabian v. Hosp. of Cent. Conn.* reasoned the definition of "sex" extends beyond the biological distinctions between male and female, but also to the social and cultural manifestations associated with a particular biological sex. 172 F.Supp.3d 509, 526 (D. Conn. 2016). An unlawful adverse employment action is also made "because of . . . sex" when motivated by a recent gender reassignment surgery. *Schroer v. Billington*, 577 F.Supp.2d 293, 308 (D.D.C. 2008) ("[T]he Library's refusal to hire Schroer after being advised that she planned to change her anatomical sex by undergoing sex reassignment surgery was *literally* discrimination 'because of . . . sex.'") (emphasis in original).

[169] *See Smith*, 378 F.3d at 574; *Schwenk*, 204 F.3d at 1201-02; *Glenn*, 663 F.3d at 1316.

[170] *See Ulane v. Eastern Airlines, Inc.*, 742 F.2d 1081, 1084 (7th Cir. 1984); *Sommers*, 667 F.2d at 750; *Etsitty*, 502 F.3d at 1222. Both the *Ulane* and *Sommers* decisions, however, were decided pre-*Price Waterhouse*, and the continued force of those opinions is therefore uncertain.

PLAINTIFFS004516

**NON-DISCRIMINATION AND RELIGIOUS BELIEFS**

The right to be free of discrimination at work may conflict with other protected rights of co-employees and/or employers. For example, in *Cruzan v. Special Sch. Dist. No. 1*, a female employee alleged the employer's policy allowing a transgender woman to use the women's restroom created a hostile work environment and discriminated against her on the basis of religion.[171] The court upheld the lower court's grant of summary judgment to the employer because the evidence was not sufficient to show a hostile work environment and because the employee did not notify the employer of her religious objections.[172]

More recently, a district court in the Eastern District of Michigan granted summary judgment to a funeral home that terminated a transgender woman who was willing to comply with the female, but not the male, dress code. The court held enforcement of Title VII in these circumstances was not allowed because under the Religious Freedom Restoration Act, it imposed a substantial burden on the owner's sincerely held religious belief that a person's sex is a "God-given gift" and people should not deny or attempt to change their sex.[173]

## Additional Legal Protections for LGBT Employees in the Federal Workplace

Multiple federal departments have responsibilities for ensuring non-discrimination against LGBT employees working within the federal government. For instance, the Department of Labor has made efforts to protect LGBT employees from discrimination and remove barriers for the LGBT workforce through policy, education, and training.[174] To this end, the Office of Diversity and Inclusion within OPM has issued publications regarding the treatment of LGBT employees in the federal workplace. Additionally, same-sex marriage benefits in federal employment are addressed in agency-specific EEO policies following the *U.S. v. Windsor* and *Obergefell v. Hodges* decisions to ensure equal benefits for same-sex married couples. For instance, the Department of Labor changed its policies to ensure implementation and compliance where necessary.[175]

---

[171] 294 F.3d 981, 982-83 (8th Cir. 2002).

[172] *Id.* at 984.

[173] *EEOC v. R.G. & G.R. Harris Funeral Homes*, 201 F.Supp.3d 837, 856 (E. D. Mich. 2016), *appeal docketed*, No. 16-2424 (6th Cir. Oct. 13, 2016). For more discussion about the Religious Freedom Restoration Act, please see the Commission's report. Peaceful Coexistence, *supra* note 132.

[174] Maxwell testimony, Briefing Transcript at 22–23.

[175] *Ibid.* at 21-23.

PLAINTIFFS004517

## PRESIDENTIAL EXECUTIVE ORDERS

Since the late 1960s, Presidents have issued Executive Orders to address workplace discrimination within the executive branch and/or by federal contractors and subcontractors. Presidents use executive orders "to achieve policy goals, set uniform standards for managing the executive branch, or outline a policy view intended to influence the behavior of private citizens."[176] Executive orders provide a uniform policy for the federal government, but generally are not enforceable in courts.

In 1969, President Nixon issued Executive Order 11,478, which required all executive department and agencies to adopt an affirmative program to prohibit employment discrimination.[177] In 1998, President Clinton amended Nixon's Executive Order to include "sexual orientation."[178] On the same day, President Clinton issued a caveat noting that the amended Executive Order "does not and cannot create any new enforcement rights (such as the ability to proceed before the Equal Employment Opportunity Commission)."[179] The Clinton Executive Order did play a significant role toward employment equality within federal agencies.[180] For example, it directed agencies to revise their policies to ensure that employment decisions for federal civilian employees are not made on the basis of sexual orientation.

In 2014, President Obama issued Executive Order 13,672, reaffirming non-discrimination against employees in all aspects of federal employment, including upgrades, demotions, promotions, transfers, recruitment, recruitment advertising, layoff, termination, pay and other forms of compensation, and selection for various types of training. [181] This Executive Order added "gender identity" to the list of categories already protected from employment discrimination and thus

---

[176] Vivian S. Chu and Todd Garvey, "Executive Orders: Issuance, Modification and Revocation," Congressional Research Service, April 16, 2014 at Summary, *available at* http://fas.org/sgp/crs/misc/RS20846.pdf.

[177] Exec. Order No. 11,478, Equal Employment Opportunity in the Federal Government, 3 C.F.R. § 803 (Aug. 8, 1969) (stating "[i]t is the policy of the Government of the United States to provide equal opportunity in Federal employment for all persons, to prohibit discrimination in employment because of race, color, religion, sex, national origin, handicap, or age, and to promote the full realization of equal employment opportunity through a continuing affirmative program in each executive department and agency.").

[178] Exec. Order No. 13,087, Further Amendment to Executive Order 11478, Equal Employment Opportunity in the Federal Government, 3 C.F.R. § 30097.

[179] William J. Clinton, *Statement on Signing an EO on Equal Employment Opportunity in the Federal Government*, May 28, 1998, Gerhard Peters and John T. Woolley, eds., American Presidency Project, *available at* http://www.presidency.ucsb.edu/ws/?pid=56040.

[180] U.S. Equal Employment Opportunity Commission (EEOC), *Discrimination Based on Sexual Orientation, Status as a Parent, Marital Status and Political Affiliation,* (Fact Sheet, Dec. 29, 2009), *available at* http://www.eeoc.gov/federal/upload/otherprotections.pdf.

[181] E.O. 13,672, July 21, 2014, Further Amendment to Executive Order 11,478, Equal Employment Opportunity in the Federal Government, and Executive Order 11,246, Equal Employment Opportunity, July 21, 2014, *available at* https://obamawhitehouse.archives.gov/the-press-office/2014/07/21/executive-order-further-amendments-executive-order-11478-equal-employmen. *See also* Remarks by the President at Signing of Executive Order on LGBT Workplace Discrimination, July 21, 2014, *available at* https://obamawhitehouse.archives.gov/the-press-office/2014/07/21/remarks-president-signing-executive-order-lgbt-workplace-discrimination.

PLAINTIFFS004518

clarified that protections extend protection to transgender individuals.[182] In support of the Executive Order, the White House issued a statement saying that prohibiting LGBT employment discrimination is not only critical to promoting equality, but also plays an important role in supporting businesses and strengthening the economy.[183]

Additionally, the Obama Executive Order prohibits federal contractors from engaging in discrimination on the bases of both gender identity and sexual orientation.[184] The Department of Labor enforces this provision, and in 2014, the Office of Federal Contract Compliance Programs issued a regulation governing non-discrimination by federal contractors and subcontractors.[185] To satisfy their obligations under the final rule, federal contractors or federally assisted contractors must: 1) include an updated equal opportunity clause in new or modified subcontracts and purchase orders, 2) ensure that applicants and employees are not discriminated against by reason of their sexual orientation and gender identity, 3) update the equal opportunity language in job solicitations, and 4) post updated notices.[186] Only federal contracts entered into after April 8, 2015, are impacted by the Final Rule.[187]

The development of the Obama Executive Order was criticized by several religious organizations, which fought for inclusion of a religious exemption.[188] While the Obama Executive Order did not specifically grant exemptions to religious contractors, it did not amend President Bush's Executive Order 13,279, which protects the right of faith-based social service programs receiving federal funding to limit "employment of individuals [to] a particular religion."[189]

Further, opponents of extending federal legislation were supportive of President Trump's Executive Order that revoked President Obama's Executive Order 13,673, also known as the Fair Pay and Safe Workplaces order, which required federal contracting agencies to consider violations of federal and state labor laws when considering contract rewards.[190] In 2016, the Department of Labor regulations implementing Executive Order 13,673 required companies seeking federal contracts to report workplace law violations, including Title VII violations, which the Department

---

[182] *Id.*
[183] White House, Office of the Press Secretary, FACT SHEET: Taking Action to Support LGBT Workplace Equality Is Good for Business.
[184] *Id.*
[185] DOL, Office of Federal Contract Compliance Programs, Implementation of Executive Order 13672 Prohibiting Discrimination by Contractors and Subcontractors (Washington DC: GPO, 2014), 79 Fed. Reg. 72985 (Dec. 9, 2014).
[186] 41 C.F.R. Parts 60-1, 60-2, 60-4, and 6-50.
[187] *Id.*
[188] Julie Hirschfeld Davis and Erik Eckholm, "Faith Groups Seek Exclusion from Bias Rule," *New York Times,* July 8, 2014, http://www.nytimes.com/2014/07/09/us/faith-groups-seek-exclusion-from-bias-rule.html?_r=0.
[189] E.O. 13,672 *supra* note 181; E.O. 13,279, Equal Protection of the Laws for Faith-Based and Community Organizations, 3 C.F.R. §§ 77141–77144 (Dec. 12, 2002).
[190] Exec. Order No. 13,673, 79 Fed. Reg. 45309 (Jul. 31, 2014).

PLAINTIFFS004519

had previously interpreted as banning discrimination based on sexual orientation and gender identity.[191] Camilla Taylor, Senior Counsel for Lambda Legal, argued that while President Trump did not specifically overturn the order that protected LGBT employees who work for federal contractors, he made the policy increasingly difficult to enforce.[192]

## TRANSGENDER GUIDANCE FOR FEDERAL AGENCIES

In March 2015, OPM issued "Guidance Regarding the Employment of Transgender Individuals in the Federal Workplace," which defines terms and addresses questions agencies may have related to the employment of transgender individuals within the Federal workforce:

> The guidance outlines a series of core concepts including gender identity, transgender, and transition and defines common terms related to the transition process. The guidance also provides information on issues such as employee confidentiality and privacy, dress and appearance, sanitary and related facilities, recordkeeping, and insurance benefits.[193]

OFCCP has also issued guidance stating that the current laws banning discrimination on the basis of sex should include transgender workers.[194] At the Commission's briefing, Mary Beth Maxwell, Principal Deputy Assistant Secretary for Policy at the DOL, stated that former Secretary Thomas Perez directed DOL to update enforcement protocols and antidiscrimination guidance to clarify that "we provide the full protection of the federal nondiscrimination laws that we enforce to transgender individuals."[195]

---

[191] Guidance for Executive Order 13673, "Fair Pay and Safe Workplaces," 81 Fed. Reg. 58653 (Aug. 25, 2016), *available at* https://www.federalregister.gov/documents/2016/08/25/2016-19678/guidance-for-executive-order-13673-fair-pay-and-safe-workplaces.

[192] Mary Emily O'Hara, "LGBTQ Advocates Say Trump's New Executive Order Makes Them Vulnerable to Discrimination," *NBC News*, Mar. 29, 2017, https://www.nbcnews.com/news/us-news/lgbtq-advocates-say-trump-s-news-executive-order-makes-them-n740301.

[193] Statement, U.S. Office of Personnel Management at 1, March 25, 2015 (*hereinafter* OPM Statement); U.S. Office of Personnel Management, Diversity & Inclusion Reference Materials: Guidance Regarding the Employment of Transgender Individuals in the Federal Government, http://www.opm.gov/policy-data-oversight/diversity-and-inclusion/reference-materials/gender-identity-guidance/.

[194] U.S. Department of Labor, DOL Policies on Gender Identity: Rights and Responsibilities, http://www.dol.gov/oasam/programs/crc/20130712GenderIdentity.pdf.

[195] Adam Edelman, "Labor Department to update discrimination protection guidance for federal transgender workers," *New York Daily News*, July 1, 2014, http://www.nydailynews.com/news/politics/labor-department-update-anti-discrimination-protection-guidance-federal-transgender-workers-article-1.1851248; *see also* Maxwell testimony, Briefing Transcript at 23.

PLAINTIFFS004520

## FEDERAL AGENCIES' EMPLOYMENT POLICIES INCLUSIVE OF GENDER IDENTITY AND SEXUAL ORIENTATION

Federal agencies' Equal Employment Opportunity (EEO) policies and No Fear Act statements generally list prohibitions of discrimination based on race, color, sex, religion, national origin, age, disability, marital status, or political affiliation. Many federal agencies now also specifically include gender identity or sexual orientation.

Of the ten federal agencies with the largest numbers of employees, all have gender identity and/or sexual orientation language within their EEO policies. OPM guidance encourages federal agencies to update their EEO statements and policies to include prohibitions against discrimination based on sexual orientation and gender identity.[196]

Table 5 depicts information regarding EEO and No Fear Act policies of the ten largest federal agencies by number of employees. The Notification and Federal Antidiscrimination and Retaliation Act of 2002 (No Fear Act) was implemented in October 2003. The EEOC states that the Act "imposes additional duties upon Federal agency employers intended to reinvigorate their longstanding obligation to provide a work environment free of discrimination and retaliation."[197]

| Table 5   EEO/No Fear Language   Ten Largest Federal Departments by Number of Employees | | | |
|---|---|---|---|
| **Department** | **EEO Policy/No Fear Act Contains Gender Identity or Sexual Orientation Language** | **Language Listed in Policy** | **Additional Findings** |
| **Justice** | Yes, Both[198] | Discrimination on the basis of sex, gender identity, sexual orientation | N/A |
| **Agriculture** | Yes, Both[199] | Discrimination on the basis of sex, gender identity, sexual orientation | Policy states that not all prohibited bases will apply to all programs and/or employment activities |

---

[196] Office of Personnel Management, *supra* note 5.

[197] U.S. Equal Employment Opportunity Commission, "No FEAR Act," https://www.eeoc.gov/eeoc/statistics/nofear/qanda.cfm.

[198] U.S. Department of Justice, "U.S. Department of Justice Equal Employment Opportunity Policy," https://www.justice.gov/jmd/file/790081/download, *available from* https://www.justice.gov/jmd/policy (last updated Oct. 31, 2015).

[199] U.S. Department of Agriculture, "Non Discrimination Statement," https://www.usda.gov/non-discrimination-statement (last visited Nov. 12, 2017).

PLAINTIFFS004521

| Table 5 | EEO/No Fear Language—Ten Largest Federal Departments by Number of Employees | | |
|---|---|---|---|
| Department | EEO Policy/No Fear Act Contains Gender Identity or Sexual Orientation Language | Language Listed in Policy | Additional Findings |
| Veterans Affairs | Yes, Both[200] | Discrimination on the basis of sex, gender identity, sexual orientation, transgender status | N/A |
| Homeland Security | Yes, Both[201] | Discrimination on the basis of sex, sexual orientation and gender identity | N/A |
| Treasury | Yes, Both[202] | Discrimination on the basis of sex (including gender identity, sexual orientation, and pregnancy) | |
| Health & Human Services | Yes, Both[203] | Discrimination on the basis of sex, gender identity, sexual orientation | N/A |
| Interior | Yes, Both[204] | Discrimination on the basis of sex, gender, sexual orientation, gender identity | |
| Transportation | Yes, Both[205] | Discrimination on the basis of sex, sexual orientation, gender identity and transgender | N/A |

---

[200] U.S. Department of Veterans Affairs, "EEO, Diversity and Inclusion, No FEAR, and Whistleblower Rights and Protection Policy Statement," Jul. 5, 2017, https://www.diversity.va.gov/policy/statement.aspx.

[201] U.S. Department of Homeland Security, "Revised DHS Anti-Discrimination Policy Statement," Jun. 12, 2014, https://www.dhs.gov/sites/default/files/publications/DHS%20Anti-Discrimination%20Policy%20Statement%20-%206.12.14_1.pdf.

[202] U.S. Department of the Treasury, "EEO and Civil Rights Policies," May 31, 2017, https://www.treasury.gov/about/organizational-structure/offices/Mgt/Documents/FY%202017.EEO%20Policy%20FY2017%20Draft%203.30.17.pdf.

[203] U.S. Department of Health and Human Services, "Department of Health and Human Services Equal Employment Opportunity Policy," Apr. 29, 2016, https://www.hhs.gov/about/agencies/asa/eeo/policy/index.html.

[204] U.S. Department of the Interior, "Employment Complaints and Adjudication Division," https://www.doi.gov/pmb/eeo/Complaints-Processing.

[205] U.S. Department of Transportation, "DOT Discrimination Policy—Complaint Process," Oct. 4, 2016, https://www.transportation.gov/civil-rights/complaint-resolution/equal-employment-opportunity-complaint-process.

PLAINTIFFS004522

| Table 5     EEO/No Fear Language—Ten Largest Federal Departments by Number of Employees | | | |
|---|---|---|---|
| Department | **EEO Policy/No Fear Act Contains Gender Identity or Sexual Orientation Language** | **Language Listed in Policy** | **Additional Findings** |
| Labor | Yes, Both[206] | Discrimination on the basis of sex (including gender identity) and sexual orientation. | |
| Defense | Yes, Both[207] | Discrimination on the basis of sex, sexual orientation and gender identity | N/A |

Source: Compiled by U.S. Commission on Civil Rights staff.

## Private Workplace Protections for LGBT Employees

Many private companies have adopted and implemented workplace policies or practices that prohibit discrimination on the basis of sexual orientation and/or gender identity.[208] According to written testimony by The Leadership Conference on Civil and Human Rights to the Senate, by 2012, 86 percent of Fortune 500 companies prohibited sexual orientation discrimination and more than 50 percent also prohibited discrimination based on gender identity.[209]

For the past fifteen years, the Human Rights Campaign has released a list that ranks the Fortune 500, Fortune 1000, and the top 200 revenue-grossing law firms on the basis of the "best places to work for LGBT equality."[210] The ranking is based on what they call the "corporate equality index" (CEI) that utilizes several criteria.[211] First, businesses are rated if they have equal employment opportunity policies that include: sexual orientation and gender identity for all operations (domestic and global), and contractor/vendor standards that include sexual orientation and gender identity. The second set of criteria is based on employment benefits that are equivalent to spousal and partner benefits such as equivalent medical benefits (*e.g.*, dental, vision, legal dependent

---

[206] U.S. Department of Labor, "U.S. Department of Labor Policy on Equal Employment Opportunity," Feb. 24, 2015, https://www.dol.gov/oasam/programs/crc/crc-internal/2015EEOPolicy.pdf.

[207] U.S. Department of Defense, "Directive 1020.02E: Diversity Management and Equal Opportunity in the DoD," Nov. 29, 2016, http://www.esd.whs.mil/Portals/54/Documents/DD/issuances/dodd/102002e_dodd_2015.pdf.

[208] Human Rights Campaign Foundation, *supra* note 105, at 2.

[209] Senate Hearing 112-915, "Equality at Work: The Employment Non-Discrimination Act," Hearing of the Committee on Health, Education, Labor, and Pensions, June 2012, *available at* https://www.gpo.gov/fdsys/pkg/CHRG-112shrg92383/html/CHRG-112shrg92383.htm.

[210] Human Rights Campaign Foundation, *supra* note 105, at 10. Commission staff is unaware of other reports that are as comprehensive and robust as the HRC's CEI reports regarding the inclusive private employers' policies, practices, and benefits for LGBT employees in the United States. Started in 2002, these reports are nationally recognized benchmarks for businesses to gauge their level of LGBT workplace inclusion against competitors.

[211] *Ibid.* at 16-18. A tool established by the Human Rights Campaign that rates U.S. businesses on their treatment of gay, lesbian, bisexual, and transgender employees, consumers, and investors.

coverage, COBRA) and other "soft" benefits (*e.g.*, bereavement leave, employer-provided supplemental life insurance for partner, adoption assistance, qualified joint and survivor annuity for partners).

Regarding transgender protections specifically, the Human Rights Campaign rates corporations on the basis of providing transgender employees equal health coverage. This includes use of insurance contracts and/or policy documentation that are based on the World Professional Association for Transgender Health Standards of Care, use of documentation that clearly communicates inclusive insurance options, and whether such coverage is readily available to employees. They state that benefits should include services related to gender transition (*e.g.*, medically necessary services related to sex affirmation/reassignment such as short-term medical leave, pharmaceutical coverage, coverage for medical visits, coverage for reconstructive surgical procedures related to sex reassignment, and coverage for routine non-transition services).[212]

According to the Human Rights Campaign 2017 CEI report, as of 2016, 92 percent of Fortune 500 companies included sexual orientation and 82 percent included gender identity in their non-discrimination policies.[213] Half of these Fortune 500 companies offer transgender-inclusive health care benefits, including surgical procedures. For the 2017 CEI report, the 327 Fortune 500 companies that submitted surveys had an average score of 91 out of a possible 100. However, when analyzing the scores of all Fortune 500 companies, it found substantially lower scores. The average score for all Fortune 500 companies (reporting and non-reporting) was 66; and those companies that did not respond to the survey had an average score of 14 (see Table 6).[214]

| Table 6   Equality at Fortune-Ranked Companies | | | |
|---|---|---|---|
| | **All Fortune 500** | **Fortune 500 Participants** | **Fortune 500 Non-Responders** |
| **Sexual Orientation in U.S. Non-Discrimination Policy** | 92% | 99% | 75% |
| **Gender Identity in U.S. Non-Discrimination Policy** | 82% | 98% | 49% |
| **Domestic Partner Benefits** | 61% | 81% | 19% |
| **Transgender-Inclusive Benefits** | 50% | 74% | 0% |
| **Organizational LGBT Competency** | 57% | 83% | 0% |
| **Public Commitment to the LGBT Community** | 47% | 69% | 0% |

---

[212] *Ibid.* at 14.
[213] *Ibid.* This report discusses the 2017 CEI report. The Human Rights Campaign recently published the 2018 CEI report, which is available at https://www.hrc.org/campaigns/corporate-equality-index.
[214] *Ibid.* at 7.

PLAINTIFFS004524

Source: Human Rights Campaign Foundation, Corporate Equality Index 2017, http://assets.hrc.org//files/assets/resources/CEI-2017-FinalReport.pdf?_ga=1.92925597.1225877603.1490017176

Some question whether the high percentages of the United States' largest companies having antidiscrimination policies evidences nondiscrimination and equality. For instance, there is only one openly gay chief executive officer (CEO) of a Fortune 500 company, which is Apple's Tim Cook.[215] Todd Sears, a former financial advisor at Merrill Lynch who now runs Out on the Street, an organization that helps companies recruit and retain LGBT employees, argues that, "when people see that 90 percent of companies have nondiscrimination policies in place, that's great. But to me, a better indicator, is, how many senior leaders are there who are gay and who are out? If LGBT people look around and they don't see other LGBT people who are out, if they don't hear inclusive messages, they're not going to feel valued."[216]

---

[215] Benjamin Snyder, "Apple's CEO becomes the Fortune 500's only openly gay CEO. Here are 11 other workplace stats," *Fortune*, Oct. 30, 2014, http://fortune.com/2014/10/30/apples-ceo-becomes-the-fortune-500s-only-openly-gay-ceo-here-are-11-more-workplace-stats/.

[216] Hunter Stuart, "U.S. Companies Less LGBT-Friendly Than They'd Like You To Believe," *The Huffington Post*, Jun. 27, 2014, http://www.huffingtonpost.com/2014/06/27/lgbt-employees-equality-discrimination-protection-at-work_n_5526746.html.

PLAINTIFFS004525

44    Working for Inclusion: Time for Congress to Enact Federal Legislation

[*This page intentionally left blank*]

PLAINTIFFS004526

## CHAPTER 3:   VIEWPOINTS IN FAVOR AND AGAINST FEDERAL LEGISLATION

### Ensuring Equal Rights and the Normative Argument

Advocates who favor federal legislation protecting employees against discrimination based on sexual orientation and gender identity assert that passing comprehensive protections for LGBT Americans that include anti-discrimination employment provisions is essential to ensure equal rights for all citizens.[217] Selisse Berry from Out and Equal Workplace Advocates, a panelist at our briefing, noted that "we live in an interesting time. LGBT people can be married in 37 states and we can still be fired in 29 states simply because of who we love and who we are."[218] At the time of the briefing, in March 2015, same-sex marriage was a state-by-state determination. Since that time, the Supreme Court has determined that states must license marriage between two people of the same sex and recognize same-sex marriages performed in other states.[219] Kate Kendell, the Executive Director for the National Center for Lesbian Rights, stated that "[b]oth methodological and anecdotal information enforces that LGBT, particularly transgender employees, even in this moment of great acceleration of LGBT rights, [still] suffer in the employment realm."[220]

The debate concerning extending specific anti-discrimination protections to LGBT Americans often draws comparisons to enacting the Civil Rights Act and issues of racial discrimination in the United States. Opponents of enacting federal legislation argue that discrimination against LGBT communities is not analogous to discrimination based on race or sex. For instance, the Family Research Council argues that unlike race and sex which are considered "inborn, involuntary and immutable" sexual orientation and gender identity are not.[221] Further, these opponents argue, unlike historical discrimination against an individual's race or sex, the LGBT community cannot make similar discrimination claims. Peter Sprigg of the Family Research Council argues that

> [t]he bad name given to the word 'discrimination' relates primarily to our country's shameful history of racial discrimination, including over two centuries of slavery and

---

[217] For example, *see* Senate Hearing 112-915, "Equality at Work: The Employment Non-Discrimination Act," Hearing of the Committee on Health, Education, Labor, and Pensions, June 2012, *available at* https://www.gpo.gov/fdsys/pkg/CHRG-112shrg92383/html/CHRG-112shrg92383.html; Human Rights Campaign, "Federal Legislation," http://www.hrc.org/resources/federal-legislation; Neera Tanden and Ted Strickland, "We Need A Federal LGBT Non-Discrimination Act," *Newsweek*, Dec. 10, 2014, http://www.newsweek.com/we-need-federal-lgbt-non-discrimination-act-290907; Shalyn Caulley, *The Next Frontier to LGBT Equality: Securing Workplace-Discrimination Protections*, 2017 U. Ill. L. Rev. 909 (2017); Sarah Warbelow, Legal Director for Human Rights Campaign, testimony, Briefing Transcript at 75.

[218] Berry testimony, Briefing Transcript at 158.

[219] *Obergefell v. Hodges*, 576 U.S. __, 135 S. Ct. 2584 (2015).

[220] Kate Kendell, Executive Director of the National Center for Lesbian Rights, testimony, Briefing Transcript at 70.

[221] Family Research Council, *supra* note 16.

PLAINTIFFS004527

another century of segregation. Homosexuals can claim no comparable disadvantage. Until less than a century ago, women were not even granted the most fundamental right of voting. Again, homosexuals have no comparable claim. Protecting against religious discrimination advances the cause of religious liberty which was enshrined in our nation's Constitution at the Founding. No comparable guarantee of sexual liberty is found in the Constitution.[222]

Thus, they argue that members of LGBT communities do not need federal legislation to prohibit workplace discrimination. During his testimony before the Commission, Ryan Anderson of the Heritage Foundation argued that "[t]he Civil Rights Act of 1964 barring discrimination on the basis of race was a proper response. America has no similar history of society-wide legal prohibition on employment based on sexual orientation or gender identity."[223]

Proponents argue discrimination against LGBT communities is similar to historical discrimination based on race and sex. Many studies support the claim of historic and continuing employment discrimination against employees on the basis of sexual orientation and gender identity. Historians, researchers, and the courts have all recognized that LGBT workers have faced a long, serious, and pervasive history of employment discrimination.[224] Scholars have argued that not only did LGBT individuals face societal stigma, but also faced various forms of institutional discrimination including being barred from federal or state government employment.[225] Gary Gates, the Research Director at UCLA Law School's Williams Institute, found that judicial opinions from appellate courts in seven states—California, Connecticut, Iowa, Maryland, Montana, Oregon, and Washington, including six of those states' highest courts—have all agreed that LGBT individuals have faced a long history of discrimination, regardless of how the court ultimately ruled on whether sexual orientation is a suspect classification.[226] For example, Maryland's highest court in 2007 recognized that "[h]omosexual persons have been the object of societal prejudice by private actors as well as by the judicial and legislative branches of federal and state governments."[227] Additionally the court found that "homosexual persons, at least in terms of contemporary history, have been a

---

[222] S. M., "Indiscriminate," *The Economist*, *Democracy in America blog*, Jul. 12, 2013, http://www.economist.com/blogs/democracyinamerica/2013/07/gay-rights-workplace (quoting Peter Sprigg, "Homosexuality is Not a Civil Right," Family Research Council, 2007).

[223] Anderson testimony, Briefing Transcript at 280-281.

[224] Sears, *supra* note 46; *Conaway v. Deane*, 932 A.2d 571, 609 (Md. 2007). Christine Michelle Duffy and Denise Visconti, eds., *Gender Identity and Sexual Orientation Discrimination in the Workplace: A Practical Guide*, Bloomberg BNA, October 2014; Pizer, *supra* note 51.

[225] Stephanie Rotondo, eds., "Employment Discrimination against LGBT Persons," 16 Geo. J. Gender & L. 103 (2015); Alison Lorenzo, "Constitutional Law—Equal Rights Amendment, Equal Protections, and Due Process—The Right of Same-Sex Marriage is Not Fundamental, Prohibiting Same-Sex Marriage Does Not Constitute Gender-Based Discrimination, and Restrictions on the Right of Marriage are Rationally Related to the State's Interest in Regulation of Marriage," 39 Rutgers L.J. 1003, nn. 122–124 (2008).

[226] Sears, *supra* note 46, at Chapter 6, https://williamsinstitute.law.ucla.edu/wp-content/uploads/6_FindingsCourtsScholars.pdf.

[227] *Conaway*, 932 A.2d at 609.

PLAINTIFFS004528

disfavored group in both public and private spheres of our society."[228] In 2004, a concurring opinion filed by a justice of the Supreme Court of Montana described how LGBT people have been marginalized by their "government and institutions," and cited a number of cases documenting discrimination by state and local governments to demonstrate how "gays and lesbians historically have been the focus of discriminatory treatment in the workplace."[229]

The Supreme Court and federal courts have also recognized that LGBT employees have historically faced issues of workplace discrimination. For instance, the Ninth Circuit held that "[d]iscrimination against homosexuals has been pervasive in both the public and private sectors. Legislative bodies have excluded homosexuals from certain jobs and schools, housing, churches, and have prevented homosexual marriage."[230] The court concluded that "the discrimination faced by homosexuals in our society is plainly no less pernicious or intense than the discrimination faced by other groups already treated as suspect classes, such as aliens or people of a particular national origin."[231]

The Sixth Circuit in 1995 concluded "[h]omosexuals have suffered a history of pervasive irrational and invidious discrimination in government and private employment, in political organization and in all facets of society in general, based on their sexual orientation."[232] Additionally, that same year, a District of Columbia Court of Appeals judge cited examples of such discrimination in a dissent, including that: "[b]eing identified with homosexuality has been the basis of refusals to hire, the ruin of careers, undesirable military discharges, denials of occupational licenses, denials of the right to adopt, to the custody of children and visitation rights, denials of national security clearances and denials of the right to enter the country."[233]

Further, according to Congressional testimony by M.V. Lee Badgett, economist and research director of the Williams Institute and director of the Center for Public Policy and Administration, following over a decade of research and twelve studies, gay male workers were paid significantly less on average than their heterosexual male counterparts.[234] Data on the earnings for lesbians tend to be more inconsistent. Several studies show that lesbian or bisexual women do not earn less than

[228] *Id.* at 610.

[229] *Snetsinger v. Mont. Univ. Sys.*, 104 P.3d 445, 455 (Mont. 2004) (Nelson, J., specially concurring).

[230] *Watkins v. U.S. Army*, 875 F.2d 699, 724 (9th Cir. 1989), *cert. denied*, 498 U.S. 957 (1990).

[231] *Id.*

[232] *Equal. Found. of Greater Cincinnati v. City of Cincinnati*, 54 F.3d 261, 264 n.1 (6th Cir. 1995) (quoting trial court findings), *cert. granted, judgment vacated,* 518 U.S. 1001 (1996).

[233] *Dean v. D.C.*, 653 A.2d 307, 334 (D.C. 1995) (quoting Elvia Arriola, Sexual Identity and the Constitution: Homosexual Persons as a Discrete and Insular Minority, 10 Women's Rts. L. Rep. 143, 157 (1988)).

[234] Testimony on H.R. 2015, The Employment Non-Discrimination Act of 2007: Hearing on H.R. 2015 Before the House Committee on Education & Labor and the House Subcommittee on Health, Employment, Labor & Pensions, 110th Cong. 4 (2007) (statement of M.V. Lee Badgett), *available at*: http://williamsinstitute.law.ucla.edu/wp-content/uploads/Badgett-HR2015-testimony-Sept-2007.pdf.

PLAINTIFFS004529

heterosexual women.[235] Badgett et al., argue that this does not imply the absence of employment discrimination. They argue that these findings suggest that since lesbians may not be constrained by the same gender expectations that result from being in relationships with men, they may make different decisions than heterosexual women (*e.g.*, choosing to delay or not have children, invest more into training, go into male-dominated professions) which may hide effects of discrimination.[236] Regardless, lesbian, bisexual, and heterosexual women all earn less than either gay or heterosexual men.[237] Moreover, when transgender individuals are surveyed separately the disparities are even more apparent. In six surveys conducted between 1996 and 2006, 20 percent to 57 percent of transgender respondents reported having experienced employment discrimination during some point in their life. At the time of the report, no detailed wage and income studies have been conducted regarding the transgender community, but convenience samples of the transgender population find that six percent to 60 percent of respondents report being unemployed, and 22 percent to 64 percent earn less than $25,000 per year.[238]

Another argument for extending LGBT protections is grounded in the principle of equal access to public markets and equal dignity of persons. Some researchers argue that as a society we have implemented legal safeguards intended to ensure equal access to necessities (*e.g.*, food, shelter, work) through federal and state statutes and common law principles.[239] This demonstrates that, as a society, we acknowledge the necessity for all citizens to have access to public accommodations, housing, and employment regardless of arbitrary characteristics like race, religion, nationality, disability, sex, and—with increasing consistency—sexual orientation and gender identity. Thus, the argument is that discrimination against LGBT persons is a clear violation of the normative principle of equal access and ultimately is dangerous and dehumanizing.

Conversely, Richard Epstein, Professor of Law at New York University School of Law and Senior Fellow at The Hoover Institution, argues that workplace antidiscrimination legislation would interfere with business owners' freedom of contract.[240] Epstein argues that in a free market society,

---

[235] Arabshebani, G. Reza, Alan Marin and Jonathan Wadsworth. 2007. "Variations in Gay Pay in the USA and the UK," in M. V. Lee Badgett and Jefferson Frank, eds. "Sexual Orientation Discrimination: An International Perspective." London: Routledge; Badgett, M. V. Lee. 1995. "The Wage Effects of Sexual Orientation Discrimination." Industrial and Labor Relations Review 48(4): 726-739; Black, Dan A., Hoda R. Makar, Seth G. Sanders, and Lowell J. Taylor. 2003. "The Effects of Sexual Orientation on Earnings." Industrial and Labor Relations Review 56(3): 449-469.

[236] Lee Badgett, *supra* note 53.

[237] M.V. Lee Badgett and Alyssa Schneebaum, "The Impact of Wage Equality on Sexual Orientation Poverty Gaps," Williams Institute, June 2015, https://williamsinstitute.law.ucla.edu/wp-content/uploads/Impact-of-Wage-Equality-on-Sexual-Orientation-Poverty-Gaps-June-2015.pdf.

[238] *Ibid.*

[239] Isaac Saidel-Goley, "The Right Side of History: Prohibiting Sexual Orientation Discrimination in Public Accommodations, Housing, and Employment," 31 Wisc. J. of L., Gender & Soc'y 2 (2017).

[240] Richard Epstein, "Freedom of Association and Antidiscrimination Law: An Imperfect Reconciliation," *Liberty Law Forum*, Jan. 2, 2016, http://www.libertylawsite.org/liberty-forum/freedom-of-association-and-antidiscrimination-law-an-imperfect-reconciliation/.

PLAINTIFFS004530

the markets will correct the injustices of discrimination and discriminatory practices by punishing those who discriminate (*e.g.*, loss of profits, loss of qualified workforce), and thus result in economic equality for all.[241] In addition, he argues that antidiscrimination legislation is too costly, burdensome, and inefficient for the federal government to legislate over business practices.[242] In a somewhat similar vein, Andrew Koppelman, Professor of Law and Political Science at Northwestern University, argues that "[t]he general principle governing transactions between private parties should be freedom of association, for reasons of both liberty and efficiency. Any departure from that rule, such as a prohibition of discrimination, has the burden of proof."[243] However, Koppelman argues that Epstein does not consider the pervasive nature of discrimination and prejudice in our culture.[244] While some groups may be subject to historic and current pervasive discrimination, Epstein argues that economic equality cannot be achieved because those who choose not to prohibit discrimination still comprise the majority share of the market as a whole. Koppelman argues that when discriminators dominate the market, which at the present time it is for LGBT employees, then legal intervention is arguably justified.[245] He posits that not only can antidiscrimination laws help mitigate a society's pattern of stigma and marginalization that marks some members in society as inferior to others; but also, since "[h]abits of discrimination are hard to break, and legal intervention can help to break them."[246]

Further, the principle of the equal dignity of persons incorporates the "fundamental assumption that human beings are to be treated with dignity and respect"[247] and the equally fundamental assumption that all humans are to be treated with "equal dignity in the eyes of the law."[248] This principle is perhaps one of the most basic and foundational tenets of a free and democratic society, and a cornerstone of American society.[249] One viewpoint holds that "we can all accept that invidious sex discrimination violates equal dignity, and it is logically impossible to accept that notion without also accepting that sexual orientation [and gender identity] discrimination violates equal dignity."[250] Likewise, as stated by panelist Kylar Broadus, "[t]he bottom line is that it boils

---

[241] *Ibid.* at 207.

[242] *Ibid.*

[243] Andrew Koppelman, "Richard Epstein's Imperfect Understanding of Antidiscrimination Law," *Liberty Law Forum*, Jan. 12, 2016, *available at* http://www.libertylawsite.org/liberty-forum/richard-epsteins-imperfect-understanding-of-antidiscrimination-law/.

[244] *Ibid.* at 208.

[245] *Ibid.*

[246] *Ibid.*

[247] Joseph William Singer, *Normative Methods for Lawyers*, 56 UCLA L. Rev. 899, 959 (2009).

[248] *Obergefell*, 135 S. Ct. at 2608.

[249] *Id.*

[250] Saidel-Goley, *supra* note 239, at 126.

PLAINTIFFS004531

Working for Inclusion: Time for Congress to Enact Federal Legislation

down to we're all human beings on this planet and that in the United States you have to have a job to survive and that protections are needed."[251]

Employment discrimination can have long-lasting material effects, especially if it hinders individuals from securing steady employment. Those who suffer from chronic and cyclical under- and unemployment are more likely to be impoverished and often have secondary effects (*e.g.*, long-term earnings losses, declines in psychological and physical well-being, social withdrawal, family disruption) that can create additional difficulties for individuals and their families.[252] According to a 2015 study, Badgett and Schneebaum found that non-married gay and bisexual men earn less than non-married heterosexual men.[253] Looking at the poverty rates among same-sex and opposite-sex couples, same-sex white male couples tend to fare better (3.3 percent),[254] but the researchers found that lesbian couples have higher rates of poverty (7.9 percent) than heterosexual couples (5.8 percent). Critically, breaking these numbers down by race exposes even deeper inequities. Researchers found that African American lesbian couples have a poverty rate of 24.7 percent and gay African American couples have a rate of 14.5 percent, making them 3.1 and 1.8 times more likely to be in poverty compared to heterosexual African American couples (eight percent), respectively.[255]

Researchers have shown that state-employment protections for LGBT workers correlate with reduced poverty rates for those workers. In 2013, researchers found that in states where employment protections exist for LGBT workers, the poverty rate for both married opposite-sex couples and same-sex (both female and male) couples decreased.[256] In contrast, in states without protections, male same-sex couples tend to have slightly lower rates than opposite-sex couples, however, female same-sex couples are nine percent more likely to be in poverty than married opposite-sex couples.[257] Throughout the report, researchers found that employment discrimination protections seem to have a positive effect on all workers, but especially LGBT workers. For instance, poverty rates for both heterosexual and LGBT workers were shown to be lower in states with employment discrimination protections as opposed to states without protections, where

---

[251] Broadus testimony, Briefing Transcript at 224-25.

[252] Jennie Brand, "The Far-Reaching Impact of Job Loss and Unemployment," *Annual Review of Sociology*, Vol 41, 359-375; Lindsey Hanson and Timothy Essenburg, eds., "The New Faces of American Poverty: A Reference Guide to the Great Recession," ABC-CLIO, 2014.

[253] Lee Badgett, *supra* note 237.

[254] This is largely due to their demographic makeup because white men are still on average the highest earners in the U.S.

[255] Lee Badgett, *supra* note 237.

[256] Lee Badgett, *supra* note 7.

[257] *Ibid.*

PLAINTIFFS004532

LGBT poverty is significantly higher than the poverty rate of heterosexual citizens.[258] Kate Kendell, Executive Director of the National Center for Lesbian Rights, noted

> many of the calls that we get are from individuals in these 29 States where there are no protections. If they live in a State where there are protections, it's an easy answer for them. We encourage them to file a complaint. We refer them to attorneys that do LGBT employment discrimination cases. There is recourse they can take. And then our resource is really just to hook them up with the knowledge base and with someone who can be their advocate. Most of what we—the calls that we get are in States where there is no protection. And it's only been recently in light of the EEOC's Macy ruling that we've seen an expansion of Title VII perhaps being available as a vehicle. Many, many times the most difficult answer that we give to people when they call saying that they've suffered some adverse employment action is, I'm sorry, there is nothing we can do. There is no protection in your State.[259]

Some opponents argue that discrimination against LGBT Americans has declined to the point that federal legislation has become unnecessary.[260] However, Coffman et al., argue that the magnitude of antigay sentiment is substantially underestimated.[261] They found that many individuals when asked sensitive questions are less likely to answer honestly, especially if the opinion is considered socially undesirable. When Coffman et al., utilized a "veiled" methodology[262] they found that antigay sentiments were reported at much higher rates. Specifically regarding the workplace, they found that respondents were 67 percent more likely to disapprove of an openly gay manager and 71 percent more likely to say it should be legal to discriminate in hiring on the basis of sexual orientation. In FY 2015, the EEOC received 1,412 claims alleging sex discrimination based on sexual orientation and/or gender identity/transgender status.[263] This represented an overall increase of approximately 28 percent of the total LGBT charges filed in 2014 (1,100).

Gina Duncan, the Transgender Inclusion Director of Equality Florida, the state's largest LGBT advocacy organization, touted the work of her organization in increasing legislative employment

---

[258] *Ibid.*

[259] Kendell testimony, Briefing Transcript at 95–96.

[260] For example, *see* Anderson testimony, Briefing Transcript at 281 (arguing that "American businesses seldom discriminat[e] based on sexual orientation") (quoting Hans Bader of the Competitive Enterprise Institute).

[261] Katherine Coffman, Lucas Coffman, Keith Marzilla Ericson, "The Size of the LGBT Population and the Magnitude of Anti-gay sentiment are Substantially Underestimated," *National Bureau of Economic Research*, (2013), *available at* http://www.nber.org/papers/w19508.pdf.

[262] The researchers refer to their methodology as "veiled" to mean that they utilized a method to reduce social desirability bias by being able to obscure a participant's identity from being matched to their answers. They utilized the item count technique that has been proven effective by Miller, JD, "A new survey technique for studying deviant behavior," PhD Diss. G Wash U, 1984.

[263] U.S. Equal Employment Opportunity Commission, "What You Should Know About EEOC and the Enforcement Protections for LGBT Workers," *available at* https://www.eeoc.gov/eeoc/newsroom/wysk/enforcement_protections_lgbt_workers.cfm.

protections,[264] but at the Commission's briefing, she expressed concerns regarding the continued opposition she faced:

> The gender identity and expression piece of most legislation passed and pending has come under the most scrutiny and opposition and, frankly, the understanding of the transgender community is minimal among our elected officials, locally and at the statewide level. In lobbying in Tallahassee for legislation, I am often told I'm the first transgender person a lawmaker has ever met and I say, that you know of. The issue of public accommodations, *i.e.*, public bathrooms, as they relate to transgender citizens is always the baseless point of opposition that we must overcome to pass fully inclusive laws in Florida and in states across the country.[265]

Members of Congress have also made equal rights arguments in favor of passing a non-discrimination federal statute to extend workplace protections to all members of LGBT communities. For example, Rep. Alan Lowenthal sees the Equality Act as providing the same protections that all persons have under the 1964 Civil Rights Act, related to race. He stated that passing the Act would give

> the lesbian, gay, and trans community the same civil rights status as those other groups that had been denied equal access and equal opportunity under the law. I think it's the most comprehensive and sweeping way to ensure equal opportunities and equal protection under the law for all people. I think it's the right thing to do, because if you don't do it under the Equality Act, you're going to have to do [it] piece by piece, through piecemeal legislation. That's what's happened up until now.[266]

## What Does Existing Federal Law (Title VII) Mean for Additional Federal Legislation?

Some proponents of workplace protection legislation argue that the primary need for federal legislation stems from the need to halt inconsistent and irreconcilable decisions which exist under the growing patchwork of employment discrimination decisions across the nation. As discussed in detail above, "courts have not taken a uniform position by any means with respect to the interpretations of Title VII discrimination."[267] The court decisions, in particular, are often

---

[264] Ms. Duncan stated that Equality Florida has worked to pass fully inclusive human rights ordinances across the state and that as of the time of the briefing, over 55% of the population of Florida is now protected against discrimination in employment, housing, and public accommodations. Duncan testimony, Briefing Transcript at 209.
[265] *Ibid.* at 209-210.
[266] John Riley, "Exclusive: Rep. Alan Lowenthal on why Congress must pass the Equality Act," *Metro Weekly*, Mar. 23, 2017. http://www.metroweekly.com/2017/03/congressman-alan-lowenthal-on-why-congress-must-pass-the-equality-act/. *See also* U.S. Congress, *supra* note 86 (stating that "Workplace discrimination on the basis of sexual orientation and gender identity remains a problem in the American workplace and carries significant economic consequences.").
[267] Goldberg testimony, Briefing Transcript at 32.

PLAINTIFFS004534

confusing and contradictory regarding whether discrimination based on sexual orientation or gender identity can be alleged under Title VII, as reported to the Commission:

1.  Jeanne Goldberg, Senior Attorney Advisor in the Office of the Legal Counsel of the EEOC, stated that court decisions are "not consistent," especially "on the sexual orientation issue." She went on to state that what federal legislation "would add as a general proposition is explicit protections and would therefore provide clarity and consistency across the country for our stakeholders, both employees and employers." She concluded that "at this point in time," such clarity does not exist.[268]

2.  Kate Kendell, Director of the National Center for Lesbian Rights, put it more starkly: "Most of . . . the calls that we get are in States where there is no protection . . . Many, many times the most difficult answer that we give to people when they call saying that they've suffered some adverse employment action is, I'm sorry, there is nothing we can do. There is no protection in your State."[269]

Debates have also arisen as to what extent federal legislation protecting against discrimination based on sexual orientation and gender identity should replicate existing federal legislation terms —specifically whether the *bona fide* occupational qualification exception or the religious exemption found in Title VII should be included. Discussion in this area also concerns whether such federal legislation is constitutional, with proponents relying on the court decisions holding that the Civil Rights Act was constitutional, and opponents arguing that the histories and policies surrounding protections of race are different than for protections based on a person being LGBT. These points of view are discussed further herein.

## *BONA FIDE* OCCUPATIONAL QUALIFICATION EXCEPTION

Title VII of the Civil Rights Act allows for employment decisions to be made on the basis of sex, religion, or national origin (but not race or color) if sex, religion, or national origin is a *bona fide* occupational qualification reasonably necessary for the operation of the business.[270] This is a "narrow" exception that allows an employer to "discriminate on the basis of 'religion, sex, or national origin in those certain instances where religion, sex, or national origin is . . . reasonably necessary to the normal operation of that particular business or enterprise.'"[271] The employer bears

---

[268] *Ibid.* at 33-34.

[269] Kendell testimony, Briefing Transcript at 96.

[270] 42 U.S.C. § 2000e-2(e)(1).

[271] *Automobile Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 200–01, 111 S. Ct. 1196 (1991) (*"Johnson Controls"*) (quoting 42 U.S.C. § 2000e–2(e)(1)). In *Johnson Controls,* a female plant worker in a battery manufacturing plant sued her employer because of a company policy that prohibited all women from working near lead—which entailed a health risk of harm to any fetus carried by a female employee—unless the employee documented her infertility. The Supreme Court held that even "the professed moral and ethical concerns about the welfare of the next generation do not suffice to establish a BFOQ of female sterility. Decisions about the welfare of

PLAINTIFFS004535

the burden of establishing the affirmative defense that a particular qualification falls within the exception.[272] The 2017 version of the Equality Act (and ENDA) did not include such an exception to discriminate on the basis of sexual orientation, and modifies the BFOQ exception as to sex to state that "individuals are recognized as qualified in accordance with their gender identity."[273] While some have argued that any federal legislation should include this exception,[274] a representative of the EEOC indicated that employers have not raised the issue in the cases she is aware of.[275] In Goldberg's testimony to the Commission, she stated that employers generally do not raise BFOQ exceptions as an excuse.[276] Thus, with the infrequency of this qualification, it makes it unlikely to be relevant regarding this specific issue. Others have argued that sexual orientation and gender identity more closely align with race, and thus, there are no *bona fide* reasons to discriminate.[277] Some would support only an extremely narrow exception similar to the BFOQ exception for discrimination based on gender.[278] Of note, courts have held that a customer preference invokes the exception only when it is based on the company's inability to perform the primary function or service it offers.[279]

## **RELIGIOUS LIBERTY AND FREE EXERCISE CONCERNS**

Title VII of the Civil Rights Act allows a religious employer to discriminate on the basis of religion when it hires an employee.[280] For example, a Christian organization may require its employees to

---

future children must be left to the parents who conceive, bear, support, and raise them rather than to the employers who hire those parents." *Id.* at 206. It further stated "our cases have stressed that discrimination on the basis of sex because of safety concerns is allowed only in narrow circumstances." *Id.* at 202.

[272] *See Dothard v. Rawlinson*, 433 U.S. 321 (1977), in which a prison rejected the application of female correctional counselor (prison guard) because she failed to meet the minimum 120-pound weight requirement of an Alabama statute. In deciding for the employee, the Court determined that the employer failed to rebut the *prima facie* case of discrimination on the basis that the height and weight requirements are job-related in that they have a relationship to the strength essential to efficient job performance as a correctional counselor, produced no evidence correlating such requirements with the requisite amount of strength thought essential to good job performance and, in fact, had not offered evidence of any kind in specific justification of the statutory standards.

[273] https://www.congress.gov/bill/115th-congress/house-bill/2282/text.

[274] Clegg testimony, Briefing Transcript at 148.

[275] Goldberg testimony, Briefing Transcript at 50.

[276] *Ibid.*

[277] Kylie Byron, "Natural Law and *Bona Fide* Discrimination: The Evolving Understanding of Sex, Gender, and Transgender Identity in Employment," 6 Wash. U. Jur. Rev. 343 (2014), *available at*: http://openscholarship.wustl.edu/law_jurisprudence/vol6/iss2/4; Laura Underkuffler, "Odious Discrimination and the Religious Exemption Question," 32 Cardozo L. Rev. 2069 (2011), *available at*: http://cardozolawreview.com/content/32-5/Underkuffler.32-5.pdf.

[278] Sarah Warbelow, Briefing Transcript at 154.

[279] *See Diaz v. Pan-Am*, 442 F.2d 385 (5th Cir. 1971) ("Similarly, we do not feel that the fact that Pan Am's passengers prefer female stewardesses should alter our judgment [that the *bona fide* occupational exception applies]. On this subject, EEOC guidelines state that a BFOQ ought not be based on 'the refusal to hire an individual because of the preferences of co-workers, the employer, clients or customers.'").

[280] Title VII of the Civil Rights Act of 1964 (Pub. L. 88-352).

PLAINTIFFS004536

be Christians.[281] The previously introduced version of ENDA (2013) included a religious exemption based upon the Title VII religious exemption.[282] The inclusion of this provision was criticized by some as not sufficiently protective of religious liberty. According to Ryan Anderson of the Heritage Foundation, "[w]hile ENDA provides some religious liberty protections, they are inadequate and vaguely defined . . . The religious liberty language in ENDA has been subject to repeated litigation with conflicting rulings by different courts as to which religious institutions are considered religious enough . . . the bill would not protect those who wish to run their businesses and other organizations in keeping with their moral or religious values."[283]

There are also multiple, conflicting viewpoints within the LGBT community on whether any religious exemption should be included. Many, but not all, LGBT advocacy groups withdrew their support for the religious exemption in ENDA after the Supreme Court's decision in *Hobby Lobby*.[284] The heart of these advocacy groups' concerns is that:

ENDA's discriminatory provision, unprecedented in federal laws prohibiting employment discrimination, could provide religiously affiliated organizations—including hospitals, nursing homes and universities—a blank check to engage in workplace discrimination against LGBT people. The provision essentially says that anti-LGBT discrimination is different—more acceptable and legitimate—than discrimination against individuals based on their race or sex. If ENDA were to pass and be signed into law with this provision, the most important federal law for the LGBT community in American history would leave too many jobs, and too many LGBT workers, without protection. Moreover, it actually might lessen non-discrimination protections now provided for LGBT people by Title VII of CRA and very likely would generate confusion rather than clarity in federal law. Finally, such a discrimination provision in federal law likely would invite states and municipalities to follow the unequal federal lead. All of this is unacceptable.

---

[281] 42 U.S.C. § 2000e-1. *See also Amos*, 483 U.S. at 327 (holding that a gym operated by the Mormon Church could legally require their staff to be Mormons in good standing).

[282] 42 U.S.C. § 2000e -1; Employment Non-Discrimination Act of 2013, S. 815, 113th Cong. (2013) (as passed by Senate November 7, 2013).

[283] Anderson testimony, Briefing Transcript at 281-82.

[284] *See, e.g.*, David Badash, "After Hobby Lobby, Seven Top LGBT and Civil Rights Orgs Drop Support for ENDA," New Civil Rights Movement, July 8, 2014, *available at*
http://www.thenewcivilrightsmovement.com/breaking_after_hobby_lobby_six_top_lgbt_and_civil_rights_orgs_dro
p_support_for_enda; "ACLU Withdraws Support for ENDA," American Civil Liberties Union, July 8, 2014,
*available at* https://www.aclu.org/lgbt-rights/aclu-withdraws-support-enda; and Chris Johnson, "Nadler
'Concerned,' Wants to Narrow ENDA's Religious Exemption," Washington Blade, July 8, 2014, *available at*
http://www.washingtonblade.com/2014/07/08/rep-nadler-says-enda-religious-exemption-overbroad/. David Badash,
"HRC Charts Lone Course, Reiterates Support for ENDA Despite Religious Exemptions," New Civil Rights
Movement, July 8, 2014, *available at*
http://www.thenewcivilrightsmovement.com/hrc_standing_alone_reiterates_support_for_enda_despite_religious_ex
emptions.

PLAINTIFFS004537

The Supreme Court's decision in Hobby Lobby has made it all the more important that we not accept this inappropriate provision. Because opponents of LGBT equality are already misreading that decision as having broadly endorsed rights to discriminate against others, we cannot accept a bill that sanctions discrimination and declares that discrimination against LGBT people is more acceptable than other kinds of discrimination.[285]

Finally, some would use the exact same language as found in Title VII and have argued that the existing Title VII case law properly defines the line for which religious organizations should be able to use such an exception. As Alan Brownstein, law professor at University of California, Davis, testified before the Commission:

I've written that there's a parallel between religion and sexual orientation both because there's a conduct dimension to both religion and sexual orientation, because both are relational and involve obligations based on relationships, because the protection of both religious liberty and the rights of the LGBT community are usually challenged by the same kind of slippery slope arguments that have been used to defeat both. So, I think there's some basis for saying not that discrimination against LGBT people is somehow sui generis and unique, and we need a separate regime of exemptions for the LGBT community. But I think one could argue that there's an analogy and a parallel between religion and sexual orientation so that the same religious exemptions that would apply with regard to discrimination on the basis of religion in hiring ought also to apply with regard to discrimination on the basis of sexual orientation.[286]

## Constitutionality of Federal Legislation

Although not a focus of the Commission's investigation, opponents of legislation affording workplace nondiscrimination protections to LGBT Americans question the constitutionality of such a law.[287] In particular, they object to use of the Commerce Clause and Section 5 of the Fourteenth Amendment as the constitutional basis.[288] Article 1, Section 8, clause 3 of the U.S.

---

[285] "Joint Statement on Withdrawal of Support for ENDA and Call for Equal Workplace Protections for LGBT People," American Civil Liberties Union, Gay & Lesbian Advocates and Defenders, Lambda Legal, National Center for Lesbian Rights, and Transgender Law Center, July 8, 2014, *available at* https://www.aclu.org/sites/default/files/assets/joint_statement_on_enda.pdf.

[286] Alan Brownstein, Law Professor at University of California, Davis, Briefing Transcript, pp. 284-85.

[287] Clegg testimony, Briefing Transcript at 101-104.

[288] Section 5 of the 14th Amendment provides Congress "power to enforce, by appropriate legislation, the provisions of this [amendment]" which, in Section 1, provides that, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Section 5 of the 14th Amendment provides Congress the power to enforce, by appropriate legislation, the substantive provisions of the Amendment. U.S. CONST., amend. XIV, sec. 5.

PLAINTIFFS004538

Constitution describes the enumerated power of Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."[289] In *U.S. v. Lopez*,[290] the U.S. Supreme Court articulated that one test for determining whether an activity is within Congress' power to regulate under the Commerce Clause is "whether it substantially affects interstate commerce." Organizations and individuals who oppose this legislation believe that "Congress is going to have a hard time meeting those standards."[291] The Supreme Court also opined that "the power of Congress to promote interstate commerce also includes the power to regulate the local incidents thereof, including local activities in both the States of origin or destination, which might have a substantial and harmful effect upon that commerce."[292]

Proponents of anti-discrimination workplace protections for LGBT Americans counter that the interconnectedness of our national economy strengthens the argument that LGBT workplace protections affect interstate commerce:

> More so than ever, our economy is interconnected. We no longer live in a world in which goods and services are produced in one particular area; they stay in that area. Mom and pop shops are virtually a thing of the past when you're talking about production that is solely within a given area.[293]

Similarly, as discussed throughout this report, LGBT employees work throughout the United States and are employed by corporations that conduct business across state lines. For example, Northrop Grumman employs LGBT workers and "is located in all 50 states."[294] Such factual evidence seems to support the use of the Commerce Clause as the basis for federal anti-discrimination legislation.

In sum, as stated by briefing panelist Brownstein, "we fought that battle [about interstate commerce and nondiscrimination laws] and we've concluded as a society that the rights of employees, and the rights of people who seek public accommodations outweigh the rights of employers."[295]

---

[289] U.S. CONST., art. I § 8, cl. 3.

[290] 514 U.S. 549 (1995).

[291] Clegg testimony, Briefing Transcript at 101 ("Now, it was certainly arguable in 1964 that the widespread and systemic discrimination against blacks in large parts of the country had a substantial effect on interstate commerce. But can it be credibly argued that, in 2015, discrimination against homosexuals has a "substantial" effect on interstate commerce? I don't think so.").

[292] *Heart of Atlanta Motel, Inc. v. U.S.*, 379 U.S. 241, 258 (1964).

[293] Warbelow testimony, Briefing Transcript at 99.

[294] Sylvester Mendoza, Global Director of Global Inclusion and Strategic Alliance at Northrop Grumman, testimony, Briefing Transcript, p. 172.

[295] Brownstein testimony, Briefing Transcript at 295.

## Are Existing Public Sector Protections Enough?

While there have been formal restrictions and barriers in the private sector against LGBT employees, there also has been a long history of LGBT workers being barred from employment in the federal government.[296] The Merit Systems Protections Board cited a 2012 OPM survey that "found that lesbian, gay, bisexual, and transgender federal employee perceptions of the workplace were generally less positive than other employees."[297] When surveying federal LGBT employees, scholars Lewis and Pitts found that many LGBT workers do not believe they are given the same treatment as their heterosexual colleagues. They gave more negative responses to every question about their jobs, organizations, leaders, and co-workers.

> LGBT employees are 1 to 3 percentage points less likely than heterosexuals to think their performance appraisals are fair and to be satisfied with their pay; 3 to 6 points less likely to be satisfied with their advancement opportunities or to feel that merit drives rewards in their agencies; 4 to 6 points less likely to think highly of their immediate supervisors, agency leadership, or organizations; and 4 to 8 points less likely to be satisfied with their agencies' treatment of diversity, [prohibited personnel practices] and employee empowerment. They are also 3 to 8 percentage points more likely to say that they are planning to look for a new job outside their agency. Given the low percentages reporting dissatisfaction, LGBTs are one quarter more likely than heterosexuals to express dissatisfaction on most measures.[298]

Additionally, outside of reporting EEOC claims, the federal government does not appear to collect data regarding whether the efforts to ensure federal anti-discrimination policies are fully implemented. Advocates argue that it would be helpful if "every federal agency [were] charged with collecting information on sexual orientation and gender identity in all of their surveys."[299] According to the National LGBTQ Task Force, collecting additional data on sexual orientation and gender among LGBT federal employees, federal contractors, and federally assisted contractors could be "spearheaded by a presidential Executive Order calling for agencies to determine best methods for integrating these demographic questions into their data collection instruments" and to examine the "levels of filing" of complaints and what is happening in federal enforcement and oversight.[300] It is worth noting that adding demographic measures may not be a wanted change for all LGBT people in fear of privacy concerns. Due to the societal stigma of embodying an LGBT

---

[296] Sears, *supra* note 224.

[297] Merit Systems Protection Board, *Sexual Orientation in the Federal Workplace, Policy and Perspective*, (May 2014) (discussing and citing the Office of Personal Management's 2012 Employee Viewpoint Survey at iii).

[298] Gregory B. Lewis and David W. Pitts, "LGBT–Heterosexual Differences in Perceptions of Fair Treatment in the Federal Service," *American Review of Public Administration*, 1-19 (2015), p. 15.

[299] Simmons testimony, Briefing Transcript at 82-83.

[300] *Ibid.* at 93.

PLAINTIFFS004540

identity and the fear of prejudice, some LGBT individuals may not want to disclose their sexual orientation or gender identity in surveys.

Outside of federal employment, an estimated one million LGBT employees work in the public sector for state and local governments.[301] Of these employees, only 45 percent of American workers live in a jurisdiction prohibiting sexual orientation discrimination in employment, and only 34 percent of workers live in a jurisdiction prohibiting gender identity discrimination.[302] These workers may face a patchwork of employment protections, depending on what state or local jurisdiction they work for. For instance, Lisa Howe, Executive Director of the Nashville LGBT Chamber of Commerce, explained at the briefing how state-by-state protections do not offer adequate protections for all LGBT workers. She reported that in Tennessee there are "very few protections . . . for contractors or anything like that. So in Nashville the metro government did pass a policy to extend sexual orientation, gender identity onto the employment—the discrimination policies for their contractors and the state overturned it and said that local governments do not have that authority."[303]

Even though some states have policies for state and local LGBT employees, researchers have found that discrimination is still pervasive and occurs nearly as frequently as discrimination in the private sector.[304] Looking at public sector complaints in 123 jurisdictions, Mallory and Sears found that the rate of discrimination complaints filed by LGB state and local employees was slightly lower than, but similar to, that of filings by LGB employees in the private sector.[305] They found that the frequency is similar with state and local government employment, but state filings are slightly lower (2.8 complaints for state government and 3.2 complaints for local government for every 10,000 LGB employees). Mallory and Sears found the rate of sexual orientation and gender identity complaints occurred at a similar rate as discrimination claims based on race and sex.[306] They further discussed that the actual rate of discrimination against LGBT employees may be drastically underreported for several reasons. First, some state and local agencies lack the resources and staff necessary to effectively enforce nondiscrimination laws. Panelist Roger Clegg brought up this point in his testimony, stating that having to resort to litigation and regulation is "very

---

[301] Chris Mallory and Brad Sears. "Discrimination Against State and Local Government LGBT Employees." *LGBTQ Policy Journal*, Volume 4, (2012).

[302] Lee Badgett et al., "Executive Order to Prevent Discrimination Against LGBT Workers," Center for American Progress and Williams Inst., 4 (Feb. 2013),
https://www.americanprogress.org/issues/lgbt/reports/2013/02/19/53931/an-executive-order-to-prevent-discrimination-against-lgbt-workers/.

[303] Howe testimony, Briefing Transcript at 173.

[304] Lee Badgett, *supra* note 53.

[305] Mallory and Sears, *supra* note 301. Three per every 10,000 LGB public sector employee compared to 4.1 per every 10,000 LGB private sector employee.

[306] *Ibid.* at 46-47 (four per every 10,000 LGB employee, 3.9 per every 10,000 racial minority employee, 5.2 per every 10,000 female employee).

PLAINTIFFS004541

expensive and distortive media."[307] This argument may be likely to have bipartisan support for those in favor and those who oppose federal legislation. Second, LGBT people may be hesitant to file complaints because of a perception of judicial unresponsiveness. Third, LGBT people may choose not to file complaints in order to avoid further "outing" themselves and thus risk suffering further negative consequences in the workplace.

## Are Private Sector Policies Enough?

Opponents of federal legislation assert that "while racial integration might not have been forthcoming apart from the Civil Rights Act, in the case of sexual orientation, voluntary actions and market forces have emerged that undermine the clamor for federal action."[308] Proponents of federal legislation disagree, arguing that although the federal government, corporations, and businesses are increasingly creating and enforcing LGBT-inclusive policies, LGBT workers still lack an array of national legal protections, leaving many to hide who they are for fear of discrimination in the workplace. These proponents note that private sector policies are necessary, but not sufficient to create a national climate of inclusion. Proponents for federal legislation argue that voluntary measures implemented by some major corporations are not enough, since the effects of workplace discrimination against members of the LGBT community remain very serious. For individuals, workplace discrimination can drastically increase psychological stress and other mental health problems. A fifth of LGBT respondents to the Human Rights Campaign Foundation's 2014 survey reported feeling exhausted from expending time and energy hiding their identities and a third felt distracted from their duties at work due to negative workplace environments.[309] As the Director of Human Rights Campaign's Workplace Equality Program has stated "[t]he inclusive policies coming from the boardroom have not fully made it into the everyday culture of the American workplace."[310]

Further, business policies are not enforceable in courts, and businesses may decide not to follow their own policies. The Director of the Public Policy at the National LGBTQ Task Force shared the story of an insurance company receptionist, who was terminated the same day an agency executive saw him kiss his partner in the work parking lot.[311] The employer had a general company policy of non-discrimination; yet according to testimony before the Commission, the employee perceived that he had no recourse to challenge the termination decision. This case occurred in 2002, therefore it was before the EEOC's decision to extend workplace protections based on sexual

[307] Clegg testimony, Briefing Transcript at 108.
[308] Anderson testimony, Briefing Transcript at 281.
[309] Fidas, *supra* note 39, at 3.
[310] "HRC Study Shows Majority of LGBT Workers Closeted on the Job," News release, HRC, May 7, 2014.
[311] Simmons Statement at 7.

PLAINTIFFS004542

orientation. Panelist Long-Simmons used this example to highlight the importance of enacting federal legislation to protect LGBT workers since businesses merely having a stated policy may not offer these employees full protections.

Lastly, even though the EEOC has held that claims of discrimination based on sexual orientation and gender identity can be brought under Title VII, for employees to "truly benefit from these legal protections, explicit statutes must be enacted to make sure that the law is clear to everyone, including employers, workers, and courts."[312] "Courts are not strictly bound to follow the [EEOC's] interpretation of the law."[313] Given the current inconsistent Circuit court decisions, should a private employer in some jurisdictions not agree with the EEOC's decision, it could refuse to abide by it, which may result in a court overturning the EEOC's decision.[314]

## How Would Federal Legislation Impact the Economy?

### ECONOMIC SUPPORT OF FEDERAL LEGISLATION

There is substantial support for federal legislation in the business community. As Mary Beth Maxwell, the former Principal Deputy Assistant Secretary for Policy at the Department of Labor put it, "Equality in the workplace is not only the right thing to do; it turns out to be good business."[315] Sylvester Mendoza, Director of Global Inclusion and Strategic Alliances at Northrop Grumman, stated that discrimination "has no place in the workplace, and we believe in doing everything possible to eliminate discrimination against any employee, including members of the LGBT community."[316] Northrop Grumman's zero tolerance policy offers protections to their employees from "discrimination based on sex, gender, gender identity, expression, and sexual orientation."[317] They feel that diversity and inclusion are strengths necessary to a global corporation. By providing an inclusive working environment, Northrop Grumman believes that employees "bring their whole authentic selves to work every day, contributing diverse ideas, perspectives, and talents to solve our customers' toughest challenges."[318] While this policy is an example of a positive and inclusive step towards workplace equality for LGBT employees, this policy only protects Northrop's workers from discrimination. Thus, this example illustrates how

---

[312] Mendoza testimony, Briefing Transcript at 193; Ilona Turner, Legal Director at the Transgender Law Center, testimony, Briefing Transcript, p. 204.

[313] Turner testimony, Briefing Transcript at 207. As discussed in more detail above, only one circuit court has followed EEOC's lead and held that Title VII permits sexual orientation lawsuits.

[314] *See ibid.* at 207-08.

[315] Maxwell testimony, Briefing Transcript at 21.

[316] Mendoza testimony, Briefing Transcript at 166.

[317] *Ibid.* at 167.

[318] *Ibid.*

the need to eliminate patchwork protections for LGBT employees is imperative so all employees can have the reassurance of being protected from discrimination.

There are many companies like Northrop Grumman who believe that discrimination against LGBT employees and applicants leads to less qualified staff.[319] Discrimination lowers motivation to invest in future education. Not only does this affect individuals, it also lowers a company's overall skilled staff and the entire U.S. labor force. Furthermore, this leads to a decrease in productivity and, therefore, a decrease in profit and economic growth. LGBT and heterosexual employees alike who work for businesses that discriminate show high rates of absenteeism and are generally less committed to their respective businesses.[320] Accordingly, many businesses support federal legislation:

1. 63 percent of small businesses support legislation to legally protect LGBT employees regardless of employer's religious beliefs.[321]
2. Almost six in ten small-business owners also believe that employment nondiscrimination laws improve or would improve their businesses' bottom lines by allowing access to the most talented individuals, regardless of sexual orientation or gender identity.[322]

Employment protection policies often cost companies little to nothing to implement or maintain antidiscrimination policies. Eighty-six percent of small businesses that do not already have such an antidiscrimination policy state that these policies cost them "nothing or next to nothing," while only two percent of small businesses with such policies say there is a "small but significant" cost associated with antidiscrimination policies. None of the businesses surveyed reported a substantial cost. [323]

Furthermore, findings suggest there are economic benefits in extending LGBT employees' equal benefits and adding protective inclusion and diversity policies. As discussed previously, employees perceive these policies as positive, thus contribute positively to business profits. Moreover, with the increasing numbers of same-sex households, the buying power of LGBT consumers is also growing. Studies suggest there has been a 20 percent increase in LGBT market growth from 2006 to 2012, which equates to approximately $790 billion.[324] Further, surveys suggest that consumers (both LGBT and allies) see acceptance and tolerance positively, thereby

---

[319] Mendoza testimony, Briefing Transcript at 166-67. Human Rights Campaign Foundation, *supra* note 105.
[320] Out & Equal, Harris Interactive, and Witeck Combs Communications, "Out & Equal Workplace Culture Report," 2008.
[321] Small Business Majority, *supra* note 87.
[322] *Ibid.*; Movement Advancement Project, *supra* note 52.
[323] Small Business Majority, *supra* note 87.
[324] Witeck-Combs Communications, "America's LGBT 2012 Buying Power Projected at $790 Billion," 2012.

PLAINTIFFS004544

increasing customer flow and money earned for the economy.[325] A majority of heterosexual and LGBT consumers state that friendliness and support of equal rights for the LGBT community influence the decision to purchase products or services from a business. In a national survey in 2011, 87 percent of LGBT individuals and 75 percent of heterosexuals say they consider choosing a brand known to provide equal benefits to employees regardless of sexual orientation or gender identity.[326] In the same survey, researchers found that brand loyalty is important to LGBT consumers. They found that 71 percent LGBT adults said that they are likely to remain loyal if the business is believed to be "very friendly" and "supportive" of the LGBT community, regardless if the less-friendly company is cheaper and/or more conveniently located.[327]

Conversely, the potential for boycotts of a company's products or services has impacted many businesses' view of supporting LGBT rights. For decades, most companies rarely targeted or advertised to the LGBT community, choosing instead to stay away from partisan issues to avoid taking a position that might isolate a segment of their customer base.[328] Today though, customers increasingly see their dollars as an extension of their power in the voting booth.[329] Social media campaigns have bolstered boycotts, which have allowed people around the country to organize protests and boycott products.[330] As the Chief Executive of the Center for Talent Innovation has noted "[t]here's enormous value in figuring out how to be seen and to act as a LGBT-friendly company."[331] However, even with the positive voluntary measures that companies have implemented to end discrimination against LGBT employees, as stated previously, many people are not covered and discrimination remains a significant problem for these communities.

---

[325] Ogilvy, "LGBT-Inclusive Advertising Is Driving Business Yet Consumers Demand Authenticity According to Ogilvy Survey," June 28, 2017, https://www.prnewswire.com/news-releases/lgbt-inclusive-advertising-is-driving-business-yet-consumers-demand-authenticity-according-to-ogilvy-survey-300481056.html, Harris Interactive, "LGBT Adults Strongly Prefer Brands That Support Causes Important to Them and That Also Offer Equal Workplace Benefits," *PR Newswire*, Jul. 18, 2011, http://www.prnewswire.com/news-releases/lgbt-adults-strongly-prefer-brands-that-support-causes-important-to-them-and-that-also-offer-equal-workplace-benefits-125742178.html.
[326] Harris Interactive, *supra* note 325.
[327] *Ibid.*
[328] Katherine Sender, *Business, Not Politics: The Making of the Gay Market*, Columbia University Press, February 2005; Samantha Felix, "15 Ads That Changed the Way We Think About Gays and Lesbians," *Business Insider*, Oct. 13, 2012, http://www.businessinsider.com/15-ads-that-changed-the-way-we-think-about-gays-and-lesbians-2012-10?op=1.
[329] Amanda Hoover, "Major Companies Back Transgender Teen in Supreme Court Case: A New Trend?", *Christian Science Monitor*, Mar. 2, 2017, https://www.csmonitor.com/USA/2017/0302/Major-companies-back-transgender-teen-in-Supreme-Court-case-a-new-trend.
[330] Americus Reed and Judith Samuelson, "When Do Consumer Boycotts Work?", *New York Times, Opinion Pages, Room for Debate,* Feb. 7, 2017, https://www.nytimes.com/roomfordebate/2017/02/07/when-do-consumer-boycotts-work.
[331] Hoover, *supra* note 329.

PLAINTIFFS004545

## ECONOMIC OPPOSITION TO FEDERAL LEGISLATION

Opponents of the Employment Non-Discrimination Act and the Equality Act argue that anti-discrimination laws against LGBT people will prove economically disadvantageous to businesses and the economy.[332] Some believe that anti-discrimination laws will be counterproductive and result in less frequent hiring of LGBT employees because of the risk of costly lawsuits. Their concern is that employers will hire a non-LGBT person over an LGBT person because the former does not present the risk of later lawsuits claiming discrimination.[333] Additionally, opponents argue that employers may not want to lay off employees who are protected by the Employment Non-Discrimination Act, even if the layoff is for legitimate reasons, because the employee could sue for wrongful termination. Because of this, opponents argue businesses will be stuck with "unproductive or superfluous workers," which will cause further economic stress.[334] Opponents believe this reluctance to fire people would also result in hiring fewer LGBT individuals because employers feel such employees cannot be fired. The end result of federal legislation on hiring and firing employees, according to those opposed to federal legislation, will be less job creation in the market as a whole.[335]

Opponents of federal legislation are concerned that there may be additional litigation due to what they perceive as the subjective nature of sexual orientation and gender identity, which is more difficult for an employer to identify than sex or race. According to some opponents, this means that an LGBT employee who is fired could, theoretically, bring more lawsuits against a former employer, which could harm all businesses, including those that already have antidiscrimination policies in place.[336] One author asserts that, even if the employer were to win a wrongful termination suit, the business would still have to pay at least $250,000 in attorney fees. Additional costs, though minimal, could also come from training seminars on a new federal law and the cost of following strict guidelines.[337]

---

[332] For example, *see* Ryan Anderson, "ENDA Threatens Fundamental Civil Liberties," Heritage Foundation, November 2013, http://www.heritage.org/civil-society/report/enda-threatens-fundamental-civil-liberties; Heritage Action For America, "'No' On the Employment Non-Discrimination Act (ENDA), November 2013, *available at* http://heritageaction.com/key-votes/employment-non-discrimination-act-enda/. The U.S. Chamber of Commerce did not take a position either for or against the Employment Non-Discrimination Act when it was debated in 2013. Chris Johnson, "U.S. Chamber of Commerce stays neutral on ENDA," *Washington Blade*, Sept. 18, 2013, http://www.washingtonblade.com/2013/09/18/chamber-stays-neutral-enda/.

[333] Courtney Michaluk and Daniel Burnett, "Gayconomics 101: Why the Latest LGBT Rights Legislation Could Be the 'ENDA' the Road for Some Job Seekers," *Huffington Post*, Nov. 25, 2013, http://www.huffingtonpost.com/courtney-michaluk/enda_b_4326767.html.

[334] Anderson, *supra* note 332.

[335] *Ibid.*

[336] For example, *see* Hans Bader, "Employment Non-Discrimination Act Makes as Little Sense as Chemotherapy for a Cold," Competitive Enterprise Institute, June 13, 2012, https://cei.org/blog/employment-non-discrimination-act-makes-little-sense-chemotherapy-cold.

[337] Michaluk, *supra* note 333; Small Business Majority, *supra* note 87.

At the Commission's briefing, panelists noted that in states that have enacted LGBT anti-discrimination protections, there has not been a flood of litigation in response. Kate Kendell stated:

> We have a number of states that have passed laws that prohibit discrimination based on gender identity . . . And there hasn't been some—there hasn't been a huge flood of litigation, nor has there been inane interpretations. What these laws do, is they set a tone for how we think people should be treated on the job. And by existing, they stop the very discrimination that they're meant to redress. And then in extreme cases, people then are free and have the ability to bring cases. The ability to answer the question, what kind of country do we want to live in? With the statute that says, we want to live in a country where people, all sorts of people, including people based on sexual orientation or gender live free, honored for who they are and able to do their jobs to the highest of their ability. And their ability is what matters, not who they are. That seems to me to be a good thing for this country to do.[338]

Of note, the number of EEOC claims alleging sexual orientation and/or gender identity discrimination counters against the narrative of additional lawsuits. The EEOC reports that it "receives close to 95,000 charges a year on all of the statutes we enforce . . . in those three quarters of fiscal year 2013 and looking at a snapshot of 2014, we are talking about a fraction, really small fraction—talking about 800 charges altogether raising these issues, and, obviously, a number of them may not be meritorious."[339] After the EEOC held that sexual orientation and gender identity fall within Title VII, the number of charges filed alleging discrimination on these bases did rise to 1,768 for FY 2016, which is approximately 1.8 percent of all charges filed with the EEOC.

Another concern about the effect of federal legislation and additional federal regulation on business hiring and firing could negatively impact the free market system.[340] The "at-will" employment concept in which businesses fire and rehire at any time follows this economy philosophy. They argue that businesses hire the most qualified regardless of sexual orientation or gender identity because it is in their best interest to do so.[341] This belief holds that "the free market is already correcting what bureaucratic red tape cannot fix."[342]

---

[338] Kendell testimony, Briefing Transcript at 115.

[339] *Ibid.* at 55-56.

[340] Statement of Roger Clegg, President and General Counsel at Center for Equal Opportunity, U.S. Commission on Civil Rights, *Briefing: Examining Workplace Discrimination Against LGBT Americans,* (Washington, DC, March 16, 2015) at 4; *see also* Clegg testimony, Briefing Transcript at 277 (raising concerns about "government interference in the marketplace.").

[341] Clegg testimony, Briefing Transcript at 67. ("If discrimination on the basis of sexual orientation is always irrational, then employers that engage in such discrimination will be at economic disadvantage, and the market will punish them.").

[342] Michaluk, *supra* note 333.

PLAINTIFFS004547

## New Developments in Federal Legislation

In May 2017, the Equality Act was reintroduced in Congress.[343] This newest version extends protections for LGBT individuals not only in the workplace, but also in public accommodations, housing, federally funded programs, jury service, and credit. This is significant and worth noting in this report since the right of transgender persons to access the bathroom that correctly aligns with their gender identity has gained national attention. Kylar Broadus, Senior Public Policy Counsel of the Transgender Civil Rights Project, at the briefing explained the frustrating dilemma in simply trying to access a bathroom. He told the Commission: "I didn't go to the bathroom for years [in public facilities] because I would be accosted by police at every place and thrown out of the women's room."[344] While a full discussion of these issues is beyond the scope of this report, we acknowledge them for contextual reasons.

Specifically regarding the workplace, transgender rights advocates argue that employers should allow transgender workers to use the restroom that conforms to their gender identity and/or allow them access to private, single user facilities.[345] And the American public seems to also agree. A 2016 survey found broad, bi-partisan support for LGBT nondiscrimination laws, with 72 percent of Americans saying they favor laws that would protect LGBT individuals from discrimination in jobs, public accommodations, and housing.[346] Further, a majority (53 percent) of Americans oppose laws that require transgender persons to use the bathroom that corresponds to their assigned sex at birth rather than their gender identity.[347] A lack of a clear policy surrounding the use of restrooms for transgender employees (and citizens more broadly) creates an uncomfortable and sometimes hostile atmosphere for transgender people. Mara Keisling from the National Center for Transgender Equality, stated the explicit connection between bathroom rights and workplace protections. In her testimony she stated: "If you're allowed to have a job and you can't be fired but they don't have to let you use a bathroom at work, you can't work."[348]

Access to restrooms for transgender people is also a health issue relevant to both employees and businesses. The Department of Labor's (DOL) Occupational Safety and Health Administration (OSHA) released guidelines in 2015 for employers to ensure all employees have access to facilities they need. The report states: "all employees, including transgender employees, should have access to restrooms that correspond to their gender identity." The department argues that lack of access

---

[343] https://www.congress.gov/bill/115th-congress/house-bill/2282/text.

[344] Broadus testimony, Briefing Transcript at 224.

[345] Chang, *supra* note 103.

[346] Robert P. Jones, Betsy Cooper, Daniel Cox, and Rachel Lienesch, "Majority of Americans Oppose Laws Requiring Transgender Individuals to Use Bathrooms Corresponding to Sex at Birth Rather than Gender Identity." *PRRI*. 2016, *available at* http://www.prri.org/research/poll-lgbt-transgender-bathroom-bill-presidential-election/.

[347] *Ibid.*

[348] Keisling testimony, Briefing Transcript at 219.

to proper and hygienic restrooms can cause health problems or risks to physical safety for affected individuals.[349] For instance, the National Center for Transgender Equality found that in the past year, 8 percent of respondents reported having a urinary tract infection, kidney infection, or another kidney-related problem as a result of avoiding restrooms.[350] Further, the DOL's Office of Federal Contract Compliance Program (OFCCP) released a fact sheet stating that gender identity is protected under their policy prohibiting sex discrimination. Its new rule requires "contractors to allow workers to use bathrooms, changing rooms, showers, and similar facilities consistent with the gender with which the workers identify."[351] These policies by the Department of Labor reflect some of the ongoing policy struggles in this realm—for both state and local laws—that inhibit an individual's access to a bathroom that corresponds with the individual's gender identity (e.g., Texas and North Carolina).[352] However, some private companies have instituted their own policies regarding their public and employee bathrooms (*e.g.*, Target and Starbucks)[353] to compensate for the lack of federal protections.

Over the past several years, the business community has become more vocal about social issues, both for and against LGBT rights. Corporations have taken positions on state religious freedom restoration laws, which allow businesses to discriminate against customers on the basis of religion that many see as anti-gay. For example, corporations like Hobby Lobby and Chick-Fil-A have both come under fire by advocates for touting anti-LGBT rhetoric and adopting non-inclusive policies.[354] Conversely, many corporations have publicly declared support for extending employment protections for LGBT workers and customers. Todd Sears, founder and principal of Out Leadership, argues that these actions from the business community are "the new normal . . . [and] it's not just that companies are speaking out, there's actually a price to not speaking out." [355] For instance, after then-North Carolina Governor Pat McCrory passed the HB 2 bill that blocked local governments from passing anti-discrimination laws protecting LGBT people, repealed existing municipal housing and employment protections for LGBT people, and forced transgender

---

[349] U.S. Department of Labor, Occupational Safety and Health Administration, *A Guide to Restroom Access for Transgender Workers*, 2015, *available at* http://www.dol.gov/asp/policy-development/TransgenderBathroomAccessBestPractices.pdf.

[350] James, *supra* note 55.

[351] U.S. Department of Labor, Office of Federal Contract Compliance Programs, *OFCCP's Sex Discrimination Final Rule*, 2016, *available at*
https://www.dol.gov/ofccp/SexDiscrimination/SexDiscrimFinalRuleFactSheet_JRFQA508c.pdf.

[352] http://www.legis.state.tx.us/tlodocs/85R/billtext/pdf/SB00006I.pdf; M.S.R., "Texas Republicans revive their 'bathroom bill,'" *The Economist*, Jul. 27, 2017,
https://www.economist.com/blogs/democracyinamerica/2017/07/toilet-talk. See below for an in-depth discussion of the North Carolina legislation.

[353] Hadley Malcolm, "How other stores are handling transgender bathroom policies," *USA TODAY*, Apr. 27, 2016, https://www.usatoday.com/story/money/2016/04/27/retailers-transgender-bathroom-policy-lgbt/83560714/.

[354] The Advocate, "Chick-Fil-A," http://www.advocate.com/chick-fil (last visited Nov. 12, 2017); Emma Margolin, "How Hobby Lobby will reverberate throughout the LGBT community," *MSNBC*, Jul. 10, 2014,
http://www.msnbc.com/msnbc/hobby-lobby-reverberate-throughout-lgbt-community.

[355] Hoover, *supra* note 329.

PLAINTIFFS004549

people to utilize public bathrooms based on the sex on their birth certificates rather than their gender identities, many companies refused to continue doing business in the state. When businesses and corporate investors oppose legislation, such as when the National Basketball Association pulled its 2017 All-Star Game out of North Carolina in opposition to HB 2, they are likely to influence local and state policy going forward. For example, when the Georgia state legislature attempted to pass their own religious freedom bill, Governor Nathan Deal vetoed it, stating that it would hurt Georgia business growth.[356] According to the *Associated Press*, the "bathroom bill" has cost North Carolina an estimated $3.76 billion in lost business revenue.[357] Due to the political, economic, and social backlash from HB2, now-Governor Roy Cooper promised during his 2017 gubernatorial campaign that he was going to repeal the bill. However, he did not issue a full repeal. Rather in March 2017 he offered a "compromise" in the form of House Bill 142.[358] This new bill forbids "state agencies, boards, offices, departments, institutions," and "branches of government," including public universities, from regulating "access to multiple occupancy restrooms, showers, or changing facilities."[359] HB 142 further restricts local governments, school boards, and public universities from passing their own LGBT-inclusive policies and bans any city in North Carolina from "regulating private employment practices or regulating public accommodations" until December 1, 2020.[360] This new bill has assuaged some of the concerns from HB 2, for instance the NCAA has decided to return to North Carolina despite the continued discriminatory impacts of this new bill. The NCAA governors argue that HB142 brings North Carolina laws in step with the majority of the other states.[361] However, LGBT advocates argue that the bill "literally does not do one thing to protect the LGBT community and locks in HB2's most basic and offensive provision."[362]

On May 30, 2017 the Seventh Circuit Court of Appeals ruled in favor of a transgender plaintiff regarding bathroom access.[363] The court ruled that restricting the transgender student from using

---

[356] Sandhya Somashekhar, "Georgia governor to veto religious freedom bill criticized as anti-gay," *Washington Post*, Mar. 28, 2016, https://www.washingtonpost.com/news/post-nation/wp/2016/03/28/georgia-governor-to-veto-religious-freedom-bill-criticized-as-anti-gay/?utm_term=.a7a46bc15b99.

[357] Emery Dalesio and Jonathan Drew, "Price tag of North Carolina's LGBT law: $3.76B" *Associated Press*, Mar. 27, 2017, https://www.apnews.com/fa4528580f3e4a01bb68bcb272f1f0f8.

[358] Eliot McLaughlin, "North Carolina's HB142: Repeal? Compromise? What does it all mean?", *CNN*, Mar. 30, 2017, http://www.cnn.com/2017/03/30/us/north-carolina-hb2-repeal-hb142-explainer/; Mark Joseph Stern, "The HB2 "Repeal" Bill Is an Unmitigated Disaster for LGBTQ Rights and North Carolina" *Slate*, Mar. 30, 2017, http://www.slate.com/blogs/outward/2017/03/30/hb2_repeal_bill_is_a_disaster_for_north_carolina_and_lgbtq_rights.html.

[359] General Assembly of North Carolina, Session Law 2017-4, House Bill 142.

[360] *Id*.

[361] Camila Domonoske, "NCAA Returning to North Carolina After Partial Repeal of 'Bathroom Bill'", *National Public Radio*, Apr. 4, 2017, http://www.npr.org/sections/thetwo-way/2017/04/04/522579434/ncaa-returning-to-north-carolina-after-partial-repeal-of-bathroom-bill.

[362] The Observer Editorial Board, "HB2 repeal: Cooper turns back on LGBT community" *The Charlotte Observer*, Mar. 30, 2017, http://www.charlotteobserver.com/opinion/editorials/article141667999.html.

[363] *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d. 1034 (7th Cir. 2017).

PLAINTIFFS004550

the bathroom that corresponded to his gender identity was a form of sex discrimination, which is protected under Title IX.[364] While this case was specifically regarding a Wisconsin high school student, the court's decision has sweeping implications for how Title IX will be interpreted in the future, and potentially for the 14th Amendment.[365] Where courts interpret bans against sex discrimination to prohibit discrimination against transgender individuals, their reasoning offers analogies in other contexts in which bans against sex discrimination apply (*e.g.*, workplace, housing, public accommodations).

---

[364] Education Amendments of 1972, Pub. L. 92-318, codified at 20 U.S.C. § 1681 et seq.

[365] In February 2017, the Departments of Education and Justice rescinded earlier guidance, dated May 13, 2016, from the Departments of Education and Justice stating that Title IX's prohibition of discrimination on the basis of sex required access to sex-segregated facilities based on an individual's gender identity. Civil Rights Division of the U.S. Department of Justice and Office for Civil Rights of the U.S. Department of Education, Dear Colleague letter, Feb. 22, 2017, *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.docx.

PLAINTIFFS004551

70    Working for Inclusion: Time for Congress to Enact Federal Legislation

[*This page intentionally left blank*]

PLAINTIFFS004552

# CHAPTER 4: FINDINGS AND RECOMMENDATIONS

The Commission makes the following findings and recommendations:

## Findings and Recommendations

### FINDINGS

1. **Overview**

    a) Historians, researchers, and courts have extensively documented that lesbian, gay, bisexual, and transgender (LGBT) workers have faced a long, serious, and pervasive history of official and unofficial employment discrimination by both federal, state, and local governments and private employers.

    b) Anti-LGBT employment discrimination persists and has wide-ranging, damaging implications for the quality of life for many LGBT Americans, their children and families, and communities.

    c) In the absence of explicit federal statutory nondiscrimination protections, LGBT workers face serious barriers to both gaining and keeping jobs and promotions. Workplace discrimination against LGBT communities can cause job instability and high turnover, resulting in greater unemployment and poverty rates as well as substantial wage gaps between LGBT workers and workers outside the LGBT community. Studies have shown that state anti-discrimination laws appear to help reduce these wage gaps.

    d) Federal data sources do not effectively capture rates of LGBT employment or rates of LGBT employment discrimination.

2. **Anti-Discrimination Laws**

    a) An inconsistent and irreconcilable patchwork of state laws against anti-LGBT workplace discrimination and federal court decisions interpreting existing federal law render LGBT employees insufficiently protected from workplace discrimination.

    b) Currently, only 20 states and the District of Columbia prohibit employment discrimination on the basis of sexual orientation and gender identity.

    c) Seventeen states offer no employment protections on the basis of sexual orientation or gender identity, but cities and local municipalities may offer their own protections.

    d) Twenty states and the District of Columbia currently have laws that explicitly prohibit employment discrimination based upon gender identity or expression, and two other states have laws prohibiting sexual orientation discrimination, but exclude transgender protections.

PLAINTIFFS004553

e) Some federal courts have concluded that the existing federal statutory protection against discrimination based on sex, under Title VII of the Civil Rights Act of 1964, includes within its protection discrimination based on sexual orientation and gender identity. Other federal courts have disagreed. These inconsistent interpretations result in different protections available to individuals based on their jurisdiction, and it is not clear when the Supreme Court will resolve the dispute.

f) Public opinion supports Congress enacting a non-discrimination bill to protect against workplace discrimination against LGBT people.

g) In the past Administration, federal agencies including the EEOC and Departments of Justice and Labor interpreted existing federal law to protect LGBT persons against employment discrimination. Under the current administration the Department of Justice has changed its position, while other agencies, including the EEOC, have not yet taken different positions on the issue.

h) In July 2017, the Department of Justice filed an amicus brief arguing that the prohibition against discrimination based on sex found in Title VII of the Civil Rights Act does not include claims based on sexual orientation. In October 2017, Attorney General Jeff Sessions withdrew guidance issued by Attorney General Eric Holder in 2014 and stated that going forward the Department of Justice would take the position that Title VII's prohibition on sex discrimination does not include discrimination based on gender identity. In addition, the current Administration has interpreted related federal civil rights laws, such as Title IX, in ways that depart from an interpretation that nondiscrimination protection on the basis of sex necessarily includes protection on the basis of sexual orientation and/or gender identity.

i) As evidenced by the Department of Justice's change in position with respect to the interpretation of "sex" in Title VII, federal agency policies and positions can be changed depending on the Administration and do not provide the same weight of protection as federal legislation.

j) The lack of binding and enumerated federal employment protections for LGBT workers remains a central vulnerability for LGBT people.

k) It has not been difficult for some private companies to adopt and implement workplace policies or practices that prohibit discrimination on the basis of sexual orientation and/or gender identity. As of 2016, 92 percent of Fortune 500 companies included sexual orientation and 82 percent included gender identity in their equal employment opportunity policies. Businesses that support these policies note such practices are beneficial to their businesses by attracting the most qualified workforce and increasing productivity.

l) There has not been a flood of litigation in response to the passage of LGBT workplace anti-discrimination laws in the states that have adopted them. To the extent litigation does occur, evidentiary requirements limit baseless claims.

PLAINTIFFS004554

## RECOMMENDATIONS

a)  In order to effectively and consistently protect LGBT employees from workplace discrimination, Congress should immediately enact a federal law explicitly banning discrimination in the workplace based on sexual orientation and gender identity.

b)  In addition to Congressional action, federal agencies including the Departments of Justice and Labor, the Equal Employment Opportunity Commission, and the Office of Personnel Management should issue and—where relevant—reaffirm specific guidance for federal and private employers outlining protections for LGBT individuals in the workforce, including specifically enumerating protections for transgender persons.

c)  Congress should authorize the necessary appropriations to ensure that all current and future non-discrimination protections are fully enforced by agencies including, but not limited to, the Departments of Justice and Labor and the Equal Employment Opportunity Commission.

d)  The Commission strongly supports religious freedom and nondiscrimination on the basis of religion. Title VII offers a workable model for protecting religious freedom in the context of federal statutory nondiscrimination protections in the workplace. In *Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment Opportunity Commission the Supreme Court* also unanimously endorsed the common law ministerial exemption, which recognizes the right of religious groups to select their own ministers and clergy. No further expansion of exceptions to nondiscrimination protections in the workplace are necessary or warranted to balance the rights to freedom of religion and to nondiscrimination on the bases either of religion or LGBT status.

e)  Workplace discrimination data should be collected through the inclusion of sexual orientation and gender identity questions in population-based surveys of the workforce such as the Census, American Community Survey, and surveys fielded by the Bureau of Labor Statistics and other agencies.

PLAINTIFFS004555

74   Working for Inclusion: Time for Congress to Enact Federal Legislation

[*This page intentionally left blank*]

PLAINTIFFS004556

# COMMISSIONERS' STATEMENTS, REBUTTALS, AND SURREBUTTALS

## Statement of Chair Catherine E. Lhamon, in which Vice-Chair Patricia Timmons-Goodson concurs

Firing a person because of who the person is, rather than for nonperformance of job requirements, offends the concept of equity and ought to be unequivocally unlawful. For lesbian, gay, bisexual, and transgender (LGBT) Americans in too many parts of this country right now, it is not.

Our report notes that public opinion, untethered to political affiliation, supports fair workplace treatment for LGBT individuals.[1] While I appreciate the popular support for equity, in fact our national ideals have always sounded in equity and our federal civil rights laws have, for the past six decades, otherwise strongly protected equity. Failure to include formal federal civil rights protection for LGBT persons, regarding employment among other aspects of life, marks a distinct and unjustifiable outlying gap in the fabric of our laws.

In fact, its absence has led to tortured discussions in federal cases,[2] analyzing whether and how much sex discrimination protection applies to sexual orientation and gender identity. Together with diametrically opposing views on these questions expressed and enforced in the Trump and Obama Administrations, they underscore the need for Congress to act unequivocally to protect all workers from employment discrimination based on who they are.[3]

Congress does not fail to act on a blank slate: it has and has had concrete information about the harms LGBT Americans experience in workplace harassment and discrimination as well as about the degree of uncertainty about federal civil rights coverage applicable to LGBT employees. Over

---

[1] U.S. Commission on Civil Rights, Working for Inclusion: Time for Congress to Enact Federal Legislation to Address Workplace Discrimination Against Lesbian, Gay, Bisexual, and Transgender Americans, 2017 [*hereinafter* Report] at p. 1.

[2] *See, e.g., Evans v. Georgia Reg'l Hosp.*, 850 F.3d 1248, 1266–67 (11th Cir. 2017) (Rosenbaum, J., concurring and dissenting) (arguing that the decision attempted to create "an artificial line between discrimination because an employee has not behaved in a way that the employer thinks a person of that gender should, on the one hand, and discrimination because an employee is not the way that the employer thinks a person of that gender should be, on the other. . . [which] makes no sense from a practical, textual, or doctrinal point of view."); *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d 1151, 1159 (C.D. Cal. 2015) (collecting cases and concluding that "the line between sex discrimination and sexual orientation discrimination is 'difficult to draw' because that line does not exist, save as a lingering and faulty judicial construct").

[3] At the time of this writing, the United States Supreme Court has pending a petition seeking its review of the question whether Title VII sex discrimination protection covers sexual orientation. *Evans v. Georgia Reg'l Hosp.*, No. 17-370, Petition for Writ of Certiorari (U.S. Sept. 7, 2017). A Supreme Court answer to that question could—or could not—render federal legislation partially duplicative, depending both on whether the Court takes the case and on what it rules if it does. The petitioners have not asked the Court to take up the question of whether Title VII sex discrimination protection covers gender identity, and so there will be a gap of protection regardless of how the Supreme Court acts in this particular case. Because we cannot know in advance whether the Court will review the question or how it will rule, Congress should act now to ensure workplace protection for LGBT Americans.

PLAINTIFFS004557

the four decades during which Congress has considered but not enacted specific workplace protective laws covering LGBT Americans, it has considered workplace vulnerability of LGBT employees as well as the reality that states and cities have specifically enacted laws excluding LGBT persons from coverage. In 1996, when the Supreme Court ruled one such law from Colorado unconstitutional, it concluded that the law, "in making a general announcement that gays and lesbians shall not have any particular protections from the law, inflicts on them immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it."[4] Whereas Congress has not announced that LGBT Americans may not be protected in law, its inaction—in the face of evidence that some courts view existing federal law as inapplicable to these employees—nonetheless leaves these persons notably vulnerable.[5]

Before that Colorado case reached the U.S. Supreme Court, Burke Marshall—who wrote the 1964 Civil Rights Act that included Title VII, was Assistant Attorney General for Civil Rights in the Kennedy Administration, and taught me constitutional law the year of this testimony—testified as an expert in the case in trial court.[6] Marshall testified that "civil rights protections bring those discriminated against 'safely into the mainstream of American society' and enable them 'to participate fully in the life of the United States, including its economic life.'"[7] He further testified that "the purpose of anti-discrimination laws is to upset a social norm of discrimination and 'to create a society that respects and complies by the value of equality . . . which is made a constitutional norm by the . . . 14th amendment and is part of the American tradition of fairness.'"[8] I know, because when I was a third-year law student writing a paper about Title VII coverage of transgender employees, we discussed the questions, that Burke Marshall believed without question that the law he wrote—Title VII—protected transgender persons and lesbian, gay, and bisexual persons, from discrimination. And I know still, all these years later, that LGBT Americans, like all Americans, deserve the legal protection that, in Burke Marshall's expert terms, "respects and complies by the value of equality" in the "American tradition of fairness."[9]

---

[4] *Romer v. Evans*, 517 U.S. 620, 635 (1996).

[5] Cementing this point, in 2003, the Court ruled that criminalization of intimate acts between same-sex couples was tantamount to "an invitation to subject homosexual persons to discrimination both in the public and in the private spheres." *Lawrence v. Texas*, 539 U.S. 558, 575 (2003). In 2013, it declared the Defense of Marriage Act unconstitutional as it "impose[d] a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages." *United States v. Windsor*, 570 U.S. __, __, 133 S. Ct. 2675, 2693 (2013). In 2015, the Court recognized that "the right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty." *Obergefell v. Hodges*, 576 U.S. __, __, 135 S. Ct. 2584, 2604 (2015).

[6] *Evans v. Romer*, No. CIV. A. 92 CV 7223, 1993 WL 518586, at *11 (Colo. Dist. Ct. Dec. 14, 1993), aff'd, 882 P.2d 1335 (Colo. 1994), aff'd, 517 U.S. 620 (1996) (*hereinafter Evans II*).

[7] Suzanne B. Goldberg, *Gay Rights Through the Looking Glass: Politics, Morality, and the Trial of Colorado's Amendment 2*, 21 Fordham Urb. L. J. 1057, 1069 (1994) (quoting deposition transcript of Professor Burke Marshall, *Evans II*, at 13), *available at* http://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=2581&context=ulj.

[8] *Id.* at 1069-70 (*quoting* deposition transcript of Professor Burke Marshall, *Evans III*, at 24-26).

[9] *Id.*

PLAINTIFFS004558

I urge Congress to act to put an end to decades of questions about whether some among us may—finally, today—be equal to all among us.

Resistance to formal federal protection from discrimination for LGBT employees often purports to rely on a putative conflict between religious freedom and nondiscrimination. My own experience of faith, in addition to my love of our Constitution, animates my every action—and I am offended by the notion that our existing constitutional and federal statutory protections for religious freedom prevent like protection for nondiscrimination for lesbian, gay, bisexual, and transgender Americans. I saw the fallacy of that putative conflict play out painfully some thirteen years ago, when I represented students in a south Los Angeles high school whose teachers and administrators discriminated against them because they were gay and lesbian students. Their school staff defended standing by while, among other actions, a student physically attacked another student in class, because the teacher believed the attacked student needed to be taught to be more "manly"; telling a deeply religious Catholic student she would go to hell because she dated another girl; and outing two boys to their parents in the course of disciplining the boys because the boys had been caught kissing in a school building where opposite sex couples were also kissing at the same time but were not disciplined for their behavior. These school staff reported that their religious faith dictated their actions to harm these students, because the students were gay or lesbian. A teacher's decision to tell a devout Catholic girl she would go to hell for dating another girl lowlights the error in the assumption that LGBT persons are not simultaneously persons of faith—and underscores the distinct (and in our system of laws profoundly unconstitutional) harm that privileging one understanding of faith over another can visit on people. The teachers and administrators at that school were and are free to disapprove of same sex relationships, and even of the status of being LGBT, on religious or other bases; they were and are not, however, free to act on that disapproval in ways that harmed the students as people or as learners. Likewise in an employment context, our laws should protect LGBT employees from discrimination while also protecting all of our religious freedom.

Congress and our courts have, many times in our history, reconciled religious objections to civil rights protections without denigrating the rights of Americans to be who they are. In one stark example, the United States Supreme Court quoted the federal trial court judge who sanctioned criminalization of interracial marriage justifying his decision because "'Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents. . . The fact that he separated the races shows that he did not intend for the races to mix.'"[10] Despite the invocation of a religious basis for upholding a racially discriminatory law, the Court ruled Virginia's laws against interracial marriage unconstitutional because "classifications so directly

---

[10] *Loving v. Virginia*, 388 U.S. 1, 3 (1967) (quoting *Loving v. Virginia* (Circuit Court of Caroline County, Virginia, 1959)).

subversive of the principle of equality at the heart of the Fourteenth Amendment . . . deprive all the State's citizens of liberty without due process of law."[11] Just as religious objection to interracial marriage or interracial association has not and as a matter of course should not have prevented federal nondiscrimination protection on the basis of race, so religious objection, where it exists, is no impediment to federal nondiscrimination protection for LGBT Americans.

The possibility that questions could arise regarding how to reconcile sincerely held religious views with nondiscrimination protections for LGBT persons does not lead logically to a conclusion that LGBT persons should lack legal protection. We already have strong religious freedom protections both in the Constitution and in federal law. The First Amendment protects against discrimination on the basis of religion, and particular additional protections are included in the Religious Freedom Restoration Act[12] as well as exemptions detailed in our longstanding federal civil rights laws.[13] What we do not have now in federal law is explicit protection for LGBT persons; that gap should be filled while simultaneously ensuring respect for faith in all its forms as well as sexual orientation and gender identity in all of theirs.

It is the Commission's core function to advise Congress, the President, and the American public about federal civil rights policy. I wholeheartedly support the Commission's recommendations including that Congress enact federal legislation as soon as possible to correct the harms we have already borne witness to, guard against future such harms, and fulfill the "American tradition of fairness."[14]

---

[11] *Id.* at 12; *see also Bob Jones Univ. v. United States*, 461 U.S. 574, 603 (1983) (holding that religious objection does not justify race discrimination with respect to interracial marriage or association).
[12] Religious Freedom Restoration Act of 1993, PL 103–141, November 16, 1993, 107 Stat 1488, codified at 42 U.S.C. § 2000bb et seq.
[13] *See e.g.,* 42 U.S.C. § 2000e-2(2) (regarding Title VII's religious exemption) and 20 U.S.C. § 1681(a)(3) (regarding Title IX's religious exemption).
[14] Goldberg, *supra* note 7, at 1070.

PLAINTIFFS004560

## Statement of Commissioner David Kladney

This report raises an inevitable question: why would an employer seek to fire, harass, or otherwise reduce the productivity of a successful employee merely because of that person's sexual orientation or gender identity? It makes no sense. Business leaders in many industries continually band together to say LGBT employment discrimination is bad for business. It is better to accept that every person has their own idea of how to express gender and form (or not form) a family.

Business plans for inclusion are encouraging. A representative of Northup Grumman described the way they not only accept LGBT people, but embrace them in office culture.[1] This is exactly what companies should be doing, for their own competitive advantage and because it is right. As business representatives testified they value every employee and cannot afford to turn away well-qualified people who can help them succeed.[2] Many companies make clear they welcome and value LGBT employees.

As business is growing more accepting by the day, why are employment discrimination protections necessary? As this report explains, with all the progress made in this area, employment discrimination still occurs for no valid reason. It is prevalent. As I see it, even if discrimination were rare, we should still have a federal law prohibiting it because it is wrong each and every time it happens.

Business initiative is not enough. The speed at which LGBT rights have advanced belies the progress still needed. Hundreds of companies have come out in support of a law requiring them to do what they have done voluntarily: create a work environment where people can succeed without discrimination.[3] Equal protection requires that LGBT citizens are not left to the whim of their employers. Most of these employers are corporations, large and small, who take advantage of the legal protections and shields the government affords them. As such, they should be required to not discriminate against any qualified United States citizen in employment. To do so is not consistent with the American values.

Relying on companies to do the right thing voluntarily also presumes the progress only moves one direction. It assumes that there can be no backlash to the advancements LGBT people have

---

[1] Testimony of Sylvester Mendoza, Briefing Transcript, p. 166–170, *available at*
http://www.usccr.gov/calendar/trnscrpt/Discrimination_LGBT_03-16-2015.pdf (stating, "Our LGBT community is mission critical to our advancement, innovation and to being a responsible global corporate citizen and global security company.")

[2] *See* Briefing Transcript, p. 166-202 (testimony on economic impacts of non-discrimination protections).

[3] *See, e.g.*, Charles E. Ramirez, *More than 100 companies join Equality Act coalition*, The Detroit News, September 25, 2017, http://www.detroitnews.com/story/news/local/detroit-city/2017/09/25/more-than-100-companies-join-equality-act-coalition/699224001/; Human Rights Campaign, *Business Coalition for Workplace Fairness, Members*, https://www.hrc.org/resources/business-coalition-for-workplace-fairness-members.

PLAINTIFFS004561

achieved. This is not the case. As we see with President Trump's unilateral ban of transgender people from serving in the military, decision makers can act in a willy-nilly fashion without any regard to the best interests of the objective—success of the mission.[4] The varying interpretations of Title VII depending on which presidential administration is interpreting it demonstrate the shifting sands beneath what should be bedrock principles of non-discrimination.[5]

The bottom line is this: people should have the right to work to support themselves and succeed for their families and our country. When people have requisite skills, they should not have to fear that their right to work is contingent on their ability to successfully hide a fundamental aspect of themselves. The purges of people from the federal government because of sexual orientation are not so far in the past.[6] Transgender people in particular still lack basic acknowledgment by the federal government that they deserve protections from discrimination.[7] People in the LGBT community are our friends and members of our families. They are in every community in the world. In this country, where we value equality and fairness, they should be able to live and work freely.

---

[4] Reporting indicated the Joint Chiefs of Staff were not consulted prior to the policy change, and as of this writing the Department of Defense has delayed implementation of the ban for troops currently serving, citing the need for more study. *See* Barbara Starr, Zachary Cohen and Jim Sciutto, US Joint Chiefs blindsided by Trump's transgender ban, CNN, July 27, 2017, http://www.cnn.com/2017/07/27/politics/trump-military-transgender-ban-joint-chiefs/index.html; Dan Lamothe, Transgender ban frozen as Mattis moves forward with new review of options, Washington Post, August 29, 2017, https://www.washingtonpost.com/news/checkpoint/wp/2017/08/29/pentagon-chief-mattis-freezes-trumps-ban-on-transgender-troops-calls-for-more-study.

Numerous retired generals have stated they believe the ban, if implemented, would degrade military readiness. The Palm Center, Fifty-Six Retired Generals and Admirals Warn That President Trump's Anti-Transgender Tweets, If Implemented, Would Degrade Military Readiness, August 1, 2017, http://www.palmcenter.org/fifty-six-retired-generals-admirals-warn-president-trumps-anti-transgender-tweets-implemented-degrade-military-readiness.

[5] *See* Attorney General Jeff Sessions, Memorandum re Revised Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964, Oct. 4, 2017, *available at* https://www.documentcloud.org/documents/4067437-Sessions-memo-reversing-gender-identity-civil.html

[6] *See, e.g.*, Judith Adkins, Congressional Investigations and the Lavender Scare, National Archives, Prologue Magazine, Summer 2016, https://www.archives.gov/publications/prologue/2016/summer/lavender.html.

[7] *See* Revised Treatment of Transgender Employment Discrimination Claims, *supra* note 5.

PLAINTIFFS004562

## Statement of Commissioner Karen K. Narasaki, in which Vice-Chair Patricia Timmons-Goodson concurs

Fundamental to the founding of our nation is the principle that every person has a universal and inalienable right to "life, liberty, and the pursuit of happiness."[1] In *Obergefell v Hodges*, Justice Kennedy explained that liberty includes the right of individuals "to define and express their identity."[2] Sexual orientation and gender identity are characteristics that are fundamental and essential to one's identity.[3] To deny a person equal protection under the law due to these characteristics—whether in the workplace or elsewhere—violates not only one of our country's most sacred tenets, but the basic dignity and humanity that all people inherently deserve.

Freedom from discrimination based on sexual orientation or gender identity also naturally incorporates many other rights recognized under the Constitution, including the right to privacy[4] and freedom of expression and association. Moreover, international human rights laws complement and reinforce our nation's laws by recognizing that "all human beings are born free and equal in dignity and rights" and therefore LGBT people are entitled to the numerous protections afforded by human rights laws, including the right to be free from discrimination.[5]

Some opponents to legislation protecting LGBT workers and their families from discrimination mistakenly contend sexual orientation and gender identity are unlike other protected categories such as race and sex, which in their view are protected because they are considered immutable.[6]

---

[1] The Declaration of Independence para.2 (U.S. 1776); U.S. Const. amend XIV (no State shall "deprive any person of life, liberty, or property, without due process of law").

[2] *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593 (2015); *Lawrence v. Texas*, 539 U.S. 558, 562 (2003) (private sexual conduct included in right to liberty under Due Process Clause) ("Liberty presumes an autonomy of self that includes freedom of thought, belief, expression, and certain intimate conduct.").

[3] *See* Brief for American Psychological Ass'n *et al.* as Amici Curiae in Support of Petitioners 10, *Obergefell*, 135 S. Ct. 2584 (No. 14-556), 2015 WL 1004713 ("[S]exual orientation is integrally linked to the intimate personal relationships that human beings form with others to meet their deeply felt needs for love, attachment, and intimacy. It defines the universe of persons with whom one is likely to find the satisfying and fulfilling relationships that, for many individuals, comprise an essential component of personal identity.").

[4] *Lawrence*, 539 U.S. 558.

[5] *See* UN Office for the High Commissioner for Human Rights, Discriminatory Laws and Practices and Acts of Violence Against Individuals Based on Their Sexual Orientation and Gender Identity 4 (2011), http://www2.ohchr.org/english/bodies/hrcouncil/docs/19session/A.HRC.19.41_English.pdf ("The application of international human rights law is guided by the principles of universality and non-discrimination enshrined in Article 1 of the Universal Declaration of Human Rights, which states that "all human beings are born free and equal in dignity and rights." All people, including lesbian, gay, bisexual and transgender (LGBT) persons, are entitled to enjoy the protections provided for by international human rights law, including in respect of rights to life, security of person and privacy, the right to be free from torture, arbitrary arrest and detention, the right to be free from discrimination and the right to freedom of expression, association and peaceful assembly.").

[6] *See* Report at 45 (citing Family Research Council, "The Employment Non-Discrimination Act (ENDA): A Threat to Free Markets and Freedom of Conscience and Religion," Issue Brief, October 2013, *available at* http://downloads.frc.org/EF/EF13J68.pdf ("[The Civil Rights Act of 1964 bars discrimination based on "race, color, national origin, sex, and religion." The first four of these are included largely because they are inborn, involuntary

PLAINTIFFS004563

Whether a person's sexual orientation or gender identity is changeable is not the appropriate inquiry. Rather, as Ninth Circuit Court Judge Norris describes it, it is whether such "traits [] are so central to a person's identity that it would be abhorrent for government to penalize a person for refusing to change them, regardless of how easy that change might be physically."[7] Religion, for example, is not immutable in the classic sense but is central to the identity of many people,[8] which is why the First Amendment protects the right to practice religion[9] and why we have laws prohibiting employment discrimination based on religion.

Our understanding of sexual orientation and gender identity continues to evolve. Because of that, significant progress for LGBT equality has been made in recent decades, but as our report reveals much work remains.[10] As Senior Judge Davis concluded when he sided with transgender youth Gavin Grimm's efforts to use the bathroom that corresponds with his gender identity, it is now up to the resolve of our leaders and our nation to stand for equality and human dignity:

> [S]ome entities will not protect the rights of others unless compelled to do so. Today, hatred, intolerance, and discrimination persist—and are sometimes even

---

and immutable. (Religion, while voluntary, is explicitly protected by the First Amendment to the U.S. Constitution.)."). However, Columbia University sociologist Shamus Khan argues sexual identity, like race, is a social construction. Shamus Khan, Not Born This Way, Aeon (July 23, 2015), https://aeon.co/essays/why-should-gay-rights-depend-on-being-born-this-way ("True, many gay and lesbian people will note that they 'always felt different' or that they knew about their homosexuality for as long as they've been aware of themselves as sexual beings. Is this not evidence of a powerful biological drive? Not necessarily, because it is also consistent with the idea of sexuality as co-determined by biology and environment. Race is a social construct, and its experience is felt from the moment we begin our lives."); *see also G.G. v. Gloucester County Sch. Bd.,* 853 F.3d 729, 730 (4th Cir. 2017) (Davis, J., concurring) ("[Gavin Grimm's] plight has shown us the inequities that arise when the government organizes society by outdated constructs like biological sex and gender.")

[7] *Watkins v. U.S. Army*, 875 F.2d 699, 726 (9th Cir. 1988) (Norris, J., concurring). Or as the district court in *Obergefell* stated, "To the extent that "immutability" is relevant to the inquiry of whether to apply heightened scrutiny, the question is not whether a characteristic is strictly unchangeable, but whether the characteristic is a core trait or condition that one cannot or should not be required to abandon." *Obergefell v. Wymyslo*, 962 *F. Supp.* 2d 968, 990 (S.D. Ohio 2013), *rev'd sub nom. DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014), *rev'd sub nom. Obergefell*, 135 *S. Ct.* 2584; Report at 49 (discussing dignity); *see also* Jessica A. Clarke, *Against Immutability*, 125 Yale L.J. 2, 6 n.7 (2015) (citing numerous comments in support of "new" immutability based on human dignity and moving away from traditional equal protection jurisprudence).

[8] Steward Harrison Oppong, *Religion and Identity*, Am. Int'l J. Contemporary Research, July 2013, at 10, http://www.aijcrnet.com/journals/Vol_3_No_6_June_2013/2.pdf (exploring link between religion and identity).

[9] Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1491-92 ("Religion is understood to be a product of individual choice, and protected as such."). In fact, the first "free exercise" clause on the continent was passed by Maryland in 1649 and guaranteed that "no[] person . . . professing to believe in Jesus Christ, shall . . . be compelled to the belief[] or exercise of any other Religion against his or her consent." *Id.* at 1425. Scholars have also argued religion should be treated as immutable because of "fundamental interests in not changing them." *See* Clarke, *supra* note 7, at 24 n. 111 (citing Douglas Laycock, *Taking Constitutions Seriously: A Theory of Judicial Review*, 59 Tex. L. Rev. 343, 383 (1981)); Testimony of Mara Kiesling at 251-52 ("[W]e believe that people should be able to select their religion. In fact, that's the beauty of religion. You have to really come to it. You really have to make the decision. It is not born to you. You may be born into a religion. But we still want to protect people's religions. We still want to respect people. We still want them to be able to have jobs, and it does not matter that . . . you're not born with your religion. But you know what? You just are born with your gender identity and you are born with your sexual orientation and saying not doesn't make it not.").

[10] *See e.g.* Testimony of Mara Kiesling at 108-09.

promoted—but by challenging unjust policies rooted in invidious discrimination,
. . . one day, equality will prevail, and [ ] the core dignity of every one of our
brothers and sisters is respected by lawmakers and others who wield power over
their lives.[11]

---

[11] *Gloucester County Sch. Bd.,* 853 F.3d 729, 731 (4th Cir. 2017).

PLAINTIFFS004565

84  Working for Inclusion: Time for Congress to Enact Federal Legislation

[*This page intentionally left blank*]

PLAINTIFFS004566

## Statement of Commissioner Michael Yaki

The concept of what constitutes "rights" has been fluid throughout time. At the time of the Founders, the notion of liberty was viewed through a lens of a land-owning white male. Freedom of speech, of religion, the freedom to assemble and speak were all, to be true, radical notions in the day. There was, in fact much debate whether these "rights" should be enshrined at all—these rights being the first ten amendments to the Constitution. Some argued government had no right to put these into the Constitution. Others, perhaps more presciently, were concerned that listing enumerated rights meant *expressio unius est exclusio alterius*—the mention of one thing amounts to the exclusion of others, and thus, nothing else could be considered now or in the future.

As we know now, a Constitution that once counted black Americans as three-fifths the worth a white American for the purposes of apportionment has been changed, through the adoption of the Thirteenth and Fourteenth Amendments, to mean something entirely different. While the Equal Protection Clause of the Fourteenth Amendment does not enumerate to whom those protections extend, jurisprudence over a century has sought to define it to mean the "suspect classes" of race, religion, and national origin. Thus, even now, *expressio unius est exclusio alterius* continues to vex constitutional scholars, Supreme Court justices, and policymakers in terms of who is entitled to equal protection.

For members of the lesbian, gay, bisexual and transgender community, the struggle to receive recognition, to be given the same rights and treatment as other Americans, has been difficult. As an elected official, I voted for the first domestic partnership registry in America, and was proud to officiate at the first ceremonies in San Francisco City Hall. From those first domestic partnerships to the U.S. Supreme Court's recognition of the right to marry[1] less than twenty years later, the strides made by the LGBT community have been significant. The fundamental right to marry, however, has not been met by equal strides in other areas of civil rights—to the point of this report, in the area of employment discrimination. Yet even today, they fight to not be excluded from the broad protections afforded other oppressed groups under the Constitution and our laws.

## I.    A Seminal Report at a Critical Time

As a prefatory comment, the Commission has been in existence for sixty years. This year, its' sixtieth, marks the first instance in which the Commission has undertaken and published an investigation focused solely upon the civil rights burdens suffered by lesbian, gay, bisexual, and transgender ("LGBT") people.[2] I thank my esteemed colleague, the Honorable Roberta

---

[1] *Obergefell v. Hodges*, 576 US ___ (2015).

[2] In its 2011 statutory enforcement report, the Commission addressed problems faced by LGBT youth alongside an examination of youth targeted due to sex, race and national origin, disability, and religion. *See* U.S. Commission on


Achtenberg, for bringing this inquiry before the Commission. The Commission's briefing was powerful.[3] Our report[4] is very thoroughly researched and written. It is comprehensive and explains the often-painful, real-life implications of federal, state, and private sector employment discrimination against LGBT people in great detail. The findings and recommendations are clear, succinct, well-grounded, and powerful. This project deservedly takes its place among our finest work.[5]

Our nation's LGBT population has a vulnerability unique among all those whom the Commission is mandated to protect: it is the only class under our jurisdiction which lacks the shelter of at least one powerful, civilian, federal statutory protection. The right to marry does not have transitive properties, at least in terms of the qualities that, to date, the Courts have looked at for protection under the Civil Rights Act of 1964. Yet, it is undisputed that LGBT Americans have faced and still face invidious discrimination at the hands of the government and private sectors. Therefore, the Commission has a special duty to be mindful of civil rights deprivations faced by LGBT Americans, to investigate and publicize those abridgements, and to recommend loudly and clearly to the Congress and the President actions which the federal government must take to remediate and prevent such abuses. With regard to our LGBT community, the Commission has a special obligation to fulfill its role as the conscience of the nation, and sound alarms as current and future developments may dictate.

The Commission's far-reaching report comes at a critical juncture of the incremental march toward full legal equality and social inclusion for LGBT people in this country. The obstacles have been many, as homophobia and transphobia have long permeated the American worldview. Until 1973, the American Psychiatric Association classified a homosexual orientation as a mental disorder[6]—and it considered a transgender identity in the same category until 2012.[7] States had the ability to—and did—criminalize intimate same-sex conduct between consenting adults and imprison "offenders" until the U.S. Supreme Court put an end to so-called "sodomy laws" a mere fourteen

---

Civil Rights, "Peer to Peer Violence + Bullying: Examining the Federal Response," September 2011, *available at* http://usccr.gov/pubs/2011statutory.pdf.

[3] In particular, thanks are due to panelists Mara Keisling, Kylar Broadus, Gina Duncan, and Ilona Turner for their briefing statements regarding transgender issues.

[4] U.S. Commission on Civil Rights, "Working for Inclusion: Time for Congress To Enact Federal Legislation to Address Workplace Discrimination Against Lesbian, Gay, Bisexual, and Transgender Americans," September 2017, *available at* http://www.usccr.gov/pubs/LGBT_Employment_Discrimination2017.pdf ("USCCR Report").

[5] Thanks are due to all staff members, past and present, who worked diligently on this investigation and report.

[6] *See, e.g.,* Jack Drescher, "Out of DSM: Depathologizing Homosexuality," *Behavioral Sciences*, December 4, 2015, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4695779/pdf/behavsci-05-00565.pdf; *and* Carla Moleiro and Nuno Pinto, "Sexual Orientation and Gender Identity: Review of Concepts, Controversies and Their Relation to Psychopathology Classification Systems," Frontiers in Psychology, U.S. National Library of Medicine, National Institutes of Health, October 2015, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4589638/.

[7] Moleiro and Pinto, n. 6 *supra.*

PLAINTIFFS004568

years ago in 2003.[8] The challenges remain intense, as many powerful fundamentalist Christian and other conservative groups vociferously oppose legal and social equality for LGBT people.

It is in this context, therefore, that sexual orientation was hardly mentioned, let alone even considered for inclusion, when courts began naming those characteristics that required greater scrutiny as they began to interpret the breadth of the Equal Protection Clause. And by omission— by *exclusion alterius*—the issue of sexual orientation remained in the closet of jurisprudence for much of the 20th century.

Since the final quarter of the 20th century, many sectors of American society have been moving, inch by inch, toward the end of marginalization and demonization of LGBT people in society.[9] We can only hope that these changes in social attitudes will erode the pervasive discrimination which LGBT people face in the employment sector. And where changes in social attitude move deliberately, the swifter enactment of laws to protect LGBT people, as this report recommends, becomes more important.

## II.    The Federal Government's (Forgotten?) History of Perpetuating Employment Discrimination Against LGBT People: 1940s through the 1970s

From the 1940s into the 1970s, the federal government was no mere bystander in the societal discrimination against the LGBT community. To the contrary, it was an overt proponent of employment discrimination against LGBT people. Many "homosexuals and other sex perverts" lost their federal jobs during the "Lavender Scare" that began in the Truman Administration.[10] This purge was fueled when:

---

[8] *Lawrence v. Texas*, 539 U.S. 558 (2003). *See also* William N. Eskridge, Jr., Dishonorable Passions: Sodomy Laws in America 1861-2003, Viking, 2008.

[9] *See, e.g.,* GALLUP News, "Gay and Lesbian Rights," 2017, *available at* http://news.gallup.com/poll/1651/gay-lesbian-rights.aspx; Pew Research Center, Religion and Public Life, "Changing Attitudes on Gay Marriage," June 26, 2017, *available at* http://www.pewforum.org/fact-sheet/changing-attitudes-on-gay-marriage/; and Andrew R. Flores, "National Trends in Public Opinion on LGBT Rights in the United States," The Williams Institute, November 2014, *available at* https://williamsinstitute.law.ucla.edu/wp-content/uploads/POP-natl-trends-nov-2014.pdf.

For information on "acceptance" of homosexuality across the globe, with better statistics coming in general from more affluent and less religious nations, *see, e.g.*, Pew Research Center, Global Attitudes and Trends, "The Global Divide on Homosexuality," June 4, 2013, *available at* http://www.pewglobal.org/2013/06/04/the-global-divide-on-homosexuality/. Of note is this Commissioner's objection to the notion of the terminology and concept of "acceptance" of homosexuality or any status on the LGBTQ (lesbian, gay, bisexual, transgender, and queer) spectrum, while recognizing its widespread use in social discourse and academic parlance. These human conditions simply exist. "Accepting" them is not the core issue, as people do not have the right to "accept" people—or not— based upon race, color, sex, national origin, age, disability status, gender identity, sexual orientation, or any other inherent characteristic. People simply are who they are. Merely recognizing their existence and valuing the equality of all individuals, regardless of sexual orientation or gender identity, is at the center of a compassionate value system.

[10] *See, e.g.,* David K. Johnson, The Lavender Scare: The Cold War Persecution of Gays and Lesbians in the Federal Government, The University of Chicago Press, 2004; U.S. Merit Systems Protection Board, "Sexual Orientation and the Federal Workplace: Policy and Perception: A Report to the President and Congress of the United States," May

PLAINTIFFS004569

the U.S. Senate created a subcommittee, chaired by North Carolina Senator Clyde Hoey, to evaluate the threat homosexuals presented to public civil service and national security. [fn. 10: *See generally* JOHNSON, *supra* note 1, at 101-18 (providing a thorough account of the subcommittee's investigation, the evidence it ignored, and its report).] In December 1950, the Hoey Subcommittee issued its report, entitled *Employment of Homosexuals and Other Sex Perverts in Government*, unanimously concluding that those who engage in acts of homosexuality and other perverted sex activities are unsuitable for employment in the Federal Government. In the committee's view, homosexuals and other sex perverts should be barred from civil service positions, those who were already employed should be fired, and the government should expend resources to aggressively ferret them out. [fn. 11: S. COMM. ON EXPENDITURES IN THE EXEC. DEP'T, SUBCOMM. ON INVESTIGATIONS, 81ST CONG. 2ND SESS., EMPLOYMENT OF HOMOSEXUALS AND OTHER SEX PERVERTS IN GOVERNMENT 4527-4528 (Cong. Rec. Vol. 96 1950). The report stated "It is the opinion of this subcommittee that those who engage in acts of homosexuality and other perverted sex activities are unsuitable for employment in the Federal Government. This conclusion is based upon the fact that persons who indulge in such degraded activity are committing not only illegal and immoral acts, but they also constitute security risks in positions of public trust."][11]

In 1953, President Eisenhower issued Executive Order 10450, "Security Requirements for Government Employment," which effectively prohibited the United States government from retaining or employing in the first instance anyone who engaged in "sexual perversion."[12] Thousands of LGBT federal employees were fired simply due to their sexual orientation, and thousands of applicants were denied jobs.[13] "Although we will never know the exact number of individuals who were denied employment or who had their employment terminated based on their

---

2014, *available at*

https://www.mspb.gov/mspbsearch/viewdocs.aspx?docnumber=1026379&version=1030388&application=ACROB AT; and Brad Sears, Nan D. Hunter, Christy Mallory, "Documenting Discrimination on the Basis of Sexual Orientation and Gender Identity in State Employment," The Williams Institute, September 2009, *available at* https://williamsinstitute.law.ucla.edu/research/discrimination/documenting-discrimination-on-the-basis-of-sexual-orientation-and-gender-identity-in-state-employment/.

[11] Sears, Hunter, and Mallory, "Documenting Discrimination on the Basis of Sexual Orientation and Gender Identity in State Employment," p. 5–4, n. 7 *supra*, *available at* https://williamsinstitute.law.ucla.edu/wp-content/uploads/5_History.pdf.

[12] Executive Order 10450, "Security Requirements for Government Employment," Sec. 8(a)(1)(iii), 3 CFR, 1949–1953 Comp., p. 396, April 27, 1953, *available at* https://www.archives.gov/federal-register/codification/executive-order/10450.html.

Ironically, President Eisenhower advocated for the creation of this United States Commission on Civil Rights as part of the Civil Rights Act of 1957 (Pub.L. 85-315, 71 Stat. 634). The juxtaposition of these two actions of his demonstrates just how far removed from the civil rights domain any consideration of LGBT rights remained.

[13] *See, e.g.,* Capehart, Jonathan, "Frank Kameny: American Hero," The Washington Post, October 21, 2011, *available at* https://www.washingtonpost.com/blogs/post-partisan/post/frank-kameny-american-hero/2011/03/04/gIQAH2DRfL_blog.html; and Sears, Hunter, and Mallory, n. 8 *supra*.

PLAINTIFFS004570

actual or assumed sexual orientation, one estimate places this number between 7,000 and 10,000 in the 1950s alone."[14] State and local employment purges were common as well.[15]

The ban remained in full effect for twenty years. In 1973, the U.S. District Court for the District of Columbia ruled, upon motion from two gay men denied continued federal employment, that "the [Civil Service] Commission *is* prohibited from excluding plaintiffs from federal employment unless *particular* circumstances are enumerated which may justify dismissal on charges relating to homosexual conduct."[16]

However,

> [i]t was not until July 1975 that the CSC announced a new approach to determining the suitability of homosexual applicants for Federal employment. The CSC stated that the new guidelines were a significant change from past policies and were a result of court decisions requiring that persons not be disqualified from Federal employment based solely on homosexual conduct. The new guidelines applied the same standards to evaluating sexual conduct, whether heterosexual or homosexual. Although applicants could no longer "be found unsuitable based on unsubstantiated conclusions concerning possible embarrassment for the Federal service, a person may be dismissed or found unsuitable where the evidence exists that sexual conduct affects job fitness." [orig. fn. 86: "Homosexual Hiring is Revised by U.S.," The New York Times, July 4, 1975, p. 45.]

> This change in policy was not absolute, however—the CIA and FBI were exempted from its requirements.[17]

LGBT people's access to security clearances may have been negatively impacted by vague, hold-ever rules until as late as 1991[18] or even 1995.[19] No President put forth any openly LGBT candidate for a position requiring Senate confirmation until President Bill Clinton nominated our recent Commissioner Roberta Achtenberg for Assistant Secretary of Fair Housing and Equal Opportunity at Housing and Urban Development in 1993, who prevailed after a deeply homophobic effort to deny her confirmation.[20] We did not have an openly LGBT U.S. Ambassador until James Hormel

---

[14] U.S. Merit Systems Protection Board, p. i, n. 10 *supra.*

[15] Sears, Hunter, and Mallory, pp. 5—18, n. 11 *supra.*

[16] *Baker v. Hampton,* U.S. District Court for the District of Columbia, No. 2525-71, decided December 21, 1973, 1973 WL 274 (not reported in F.Supp.).

[17] U.S. Merit Systems Protection Board, p. 18, n. 10 *supra.*

[18] *See, e.g.,* U.S. General Accounting Office, "GAO Report: Security Clearances: Consideration of Sexual Orientation in the Clearance Process," March 1995, p. 2, *available at* http://www.gao.gov/assets/230/220962.pdf.

[19] Executive Order 12968, "Access to Classified Information," Sec. 3.1, August 2, 1995, 60 CFR 40245, August 7, 1995, *available at* https://fas.org/sgp/clinton/eo12968.html. *See also* Todd S. Purdum, "Clinton Ends Ban on Security Clearance for Gay Workers," The New York Times, August 5, 1995, *available at* http://www.nytimes.com/1995/08/05/us/clinton-ends-ban-on-security-clearance-for-gay-workers.html.

[20] "Nomination: Roberta Achtenberg, of California, to be an Assistant Secretary of Housing and Urban Development, . . . 05/24/1993: Confirmed by the Senate," Action PN154—103rd Congress (1993-1994), *available*

PLAINTIFFS004571

was put in place by virtue of President Clinton's recess appointment in 1999,[21] an appointment held up by a vicious and bigoted smear campaign launched by extremist groups. Until the 2011 implementation of the Don't Ask, Don't Tell Repeal Act of 2010, lesbians, gay men, and bisexuals could not serve openly in our military.[22] The U.S. Supreme Court finally capped decades of social and political debate, legislation, and litigation by recognizing that the fundamental right to marriage extends to same-sex couples as recently as 2015.[23]

## III.   Selected Historical Efforts by LGBT Americans to Foster Inclusivity

The recent progress, of course, has been no accident. It is fueled by the decades of momentum created by brave LGBT Americans who risked prosecution, careers, and families to come together, to stand up publicly against condemnation and criminalization, and to demand their rights to full equality.

Activist Harry Hay and others co-founded the Mattachine Society in 1951 for purposes of furthering societal equality and also personal growth. The Mattachine Society . . . began sponsoring discussion groups in 1951, providing lesbians and gay men an opportunity to share openly, often for the first time, their feelings and experiences. The meetings were frequently emotional and cathartic.[24]

---

*at* https://www.congress.gov/nomination/103rd-congress/154. An elected member of the San Francisco Board of Supervisors from 1990 to 1993, Assistant Secretary Achtenberg was the highest-ranking openly LGBT official in the Clinton administration. *See also* Michael Ross, "Gay Activist OKd for Fair Housing Post: Government: Roberta Achtenberg of San Francisco is the First Openly Declared Lesbian to Serve in High Federal Office, Senate Approval on 58-31 Vote Follows Impassioned Debate on Gay Rights," The Los Angeles Times, *available at* http://articles.latimes.com/1993-05-25/news/mn-39579_1_gay-rights. President Barack Obama appointed Assistant Secretary Achtenberg to the U.S. Commission on Civil Rights in January 2011, a seat she held until her term expired in December 2016. *See, e.g.,* Nick Wing, "Obama Announces Three High-Profile LGBT Appointments," The Huffington Post, January 28, 2011, *available at* https://www.huffingtonpost.com/2011/01/28/obama-announces-lgbt-appointments_n_814852.html.

[21] *See, e.g.,* Claude Summers, "Obama's 6 Gay U.S. Ambassadors are Leading the Global Fight for LGBT Rights," The New Civil Rights Movement, August 21, 2016, *available at* http://www.thenewcivilrightsmovement.com/claude_summers/america_s_openly_gay_ambassadors. *See also* Colby Itkowitz, "The Six Openly Gay U.S. Ambassadors Were in One Room Together," The Washington Post, March 25, 2015, *available at* https://www.washingtonpost.com/blogs/in-the-loop/wp/2015/03/25/the-six-openly-gay-u-s-ambassadors-were-together-in-one-room/.

[22] H.R. 2965, S. 4023 (2011); *see also* Elisabeth Bumiller, "Obama Ends 'Don't Ask, Don't Tell' Policy," The New York Times, July 22, 2011, *available at* http://www.nytimes.com/2011/07/23/us/23military.html.

It was 2016 before we had our first openly LGBT Service Secretary, Eric Fanning, Secretary of the Army. *See, e.g.,* Aaron Mehta and Joe Gould, "Senate Confirms Eric Fanning, First Openly Gay Service Secretary," Defense News, May 17, 2016, *available at* https://www.defensenews.com/interviews/2016/05/17/senate-confirms-eric-fanning-first-openly-gay-service-secretary/.

[23] *Obergefell v. Hodges*, n. 1 *supra.*

[24] Craig Kacaorowski, "Mattachine Society," glbtq, Inc., 2004, *available at* http://www.glbtqarchive.com/ssh/mattachine_society_S.pdf. A friend and fellow activist of Mr. Hay's, Phyllis Lyon, said, "He was marvelous. "He was one of the first to remind us we need to stop, to consolidate our efforts," said Lyon, who with her partner Del Martin, founded the nation's first lesbian rights organization, the Daughters of Bilitis in 1955. "He was really the originator of the concept of gays, lesbians, bisexuals and transgender people as a minority to be reckoned with."

PLAINTIFFS004572

The Mattachine Society's visionary Statement of Purpose, which set forth the road map on which the movement for full LGBT inclusion and equality yet travels, states

It is the purpose of this organization to act by any lawful means:

(a) To secure for homosexuals the right to life, liberty, and the pursuit of happiness, as proclaimed for all men by the Declaration of Independence; and to secure for homosexuals the basic rights and liberties established by the word and the spirit of the Constitution of the United States;

(b) To equalize the status and position of the homosexual with those of the heterosexual by achieving equality under law, equality of opportunity, equality in the society of his fellow men, and be eliminating adverse prejudice, both private and official;

(c) To secure for the homosexual the right, as a human being, to develop and achieve his full potential and dignity, and the right, as a citizen, to make his maximum contribution to the society in which he lives.[25]

This succinct credo has shaped, both by design and by virtue of common sense, the LGBT civil rights movement.

Life-long couple Phyllis Lyon and Del Martin co-founded the Daughters of Bilitis in 1955 for women. They offered private and public meetings regarding homosexuality.[26] Their iconic newsletter, "The Ladder," reached isolated women and offered hope and empowerment for many years.[27] Del Martin and Phyllis Lyon were the first couple married when San Francisco, CA offered same-sex marriage certificates in 2004, and again in 2008 when the state of California recognized marriage equality. Unfortunately, Del Martin did not live to see marriage equality become the law of the land.[28]

---

Christopher Heredia, "Henry 'Harry' Hay—Gay Rights Pioneer / He Started Mattachine Society," (obituary), San Francisco Chronicle Gate, October 25, 2002, *available at* http://www.sfgate.com/bayarea/article/Henry-Harry-Hay-gay-rights-pioneer-He-2779360.php.

[25] Mattachine Society of Washington, "Mattachine Society of Washington Statement of Purpose," undated, digitized archival copy, accessed September 15, 2017, *available at* https://rainbowhistory.omeka.net/items/show/4937957.

[26] Teresa Theophano, "Daughters of Bilitis," glbtq, Inc., 2004, *available at* http://www.glbtqarchive.com/ssh/daughters_bilitis_S.pdf.

William Grimes, "Del Martin, Lesbian Activist, Dies at 87," The New York Times, August 27, 2008, *available at* http://www.nytimes.com/2008/08/28/us/28martin.html.

[27] Stuart Hinds, "The Ladder: the Voice of A Lesbian Generation," The Phoenix Newsletter, Winter 2014, *available at* https://library2.umkc.edu/spec-col/glama/pdfs/history/phoenix-2014-01-winter.pdf. *See also* Diana Lee Johnson, "A Narrative Life Story of Activist Phyllis Lyon and Her Reflections on a Life with Del Martin," Masters Thesis, Grand Valley State University, (2012), *available at* http://scholarworks.gvsu.edu/cgi/viewcontent.cgi?article=1021&context=theses.

[28] William Grimes, "Del Martin, Lesbian Activist, Dies at 87," The New York Times, August 27, 2008, *available at* http://www.nytimes.com/2008/08/28/us/28martin.html.

PLAINTIFFS004573

The Daughters of Bilitis also rallied the community against abusive police raids on neighborhood LGBT bars.[29] Transgender people, including Marsha P. Johnson and Sylvia Rivera, took their place alongside lesbians and gay men in the public fight for equality at the Stonewall Riots in New York City which ushered in a new era in the march for LGBT equality.[30]

When the Stonewall Riots began in Greenwich Village on June 28, 1969, neighborhood bars where LGBT people gathered across the country were no strangers to police raids. These raids were carried out to, often under the pretext of stopping illegal liquor and cigarette sales, to harass, intimidate and subjugate the LGBT community because they had to create their own public places in which to congregate.[31] When police conducted a raid at the Stonewall Inn on that fateful night,

> [a] crowd had gathered outside the tavern by the time the police were ready to load up their wagons with contraband alcohol, Stonewall employees, and unhappy bar goers. When the cops started to manhandle their unruly prisoners, the onlookers became enraged, throwing coins, stones, and bottles at the officers. The police, a few prisoners, and a writer from the Village Voice who had noticed the fracas from his nearby office, were forced to retreat into the bar, which the mob then tried to set on fire. The cops were eventually rescued with the intervention of the fire department and the riot squad, which dispersed the crowd. But low-level protests lasted for four more days, flaring up for a final time on Wednesday, when the Voice published an inflammatory account of the uprising. Why did the gays of Christopher Street suddenly fight back after decades of persecution? Witness Morty Manford likened the melee to "a slight lancing of the festering wound of anger at this kind of unfair harassment and prejudice." He said, "We had just been kicked and punched around symbolically by the police. They weren't doing this at heterosexual bars. And it's not my fault that the local bar is run by organized crime and is taking payoffs and doesn't have a liquor license."[32]

---

[29] *See, e.g.,* Zoe Sonnenberg, "Daughters of Bilitis: Historical Essay," FoundSF, 2015, *available at* http://www.foundsf.org/index.php?title=Daughters_of_Bilitis.

[30] *See, e.g.,* Jamilah King, "Meet the Trans Women of Color Who Helped Put Stonewall on the Map," Mic, June 25, 2015, *available at* https://mic.com/articles/121256/meet-marsha-p-johnson-and-sylvia-rivera-transgender-stonewall-veterans#.3RBDc3H9O.

[31] *See, e.g.,* June Thomas, "The Gay Bar: Why the Gay Rights Movement Was Born in One," Slate, June 2011, *available at http://www.slate.com/articles/life/the_gay_bar/2011/06/the_gay_bar_4.html*.

[32] *Id.*

There were at least two known instances prior to the Stonewall Riots when gay patrons of gathering places resisted arrest.

In May 1959, a skirmish broke out around Cooper's Doughnuts, a shabby all-night Los Angeles coffee shop frequented by hustlers and their customers, when gays threw coffee cups and paper plates at police officers rather than submit to arbitrary arrests. This "was perhaps the first homosexual uprising in the world," according to Gay L.A. . . . Similarly, in the summer of 1966, transvestite patrons of Compton's Cafeteria in San Francisco's Tenderloin district fought with cops who were trying to detain them. Again, the incident failed to generate attention. *Id.*

PLAINTIFFS004574

Perhaps buoyed by the energy of post-Stonewall community activism—and understanding that changing the laws that oppressed them could only be done through the political process—LGBT people began to openly enter the world of elected public service in the mid-1970s. In 1974, 21-year old Kathy Kozachenko become the nation's first openly LGBT elected official when she won a seat on the Ann Arbor, MI City Council.[33]

Harvey Milk, a child of Lithuanian Jewish immigrants,[34] a Navy veteran,[35] and the "Mayor of Castro Street,"[36] became California's first openly LGBT public official upon his election to the San Francisco Board of Supervisors in 1977.[37] He was quickly able to garner more than enough votes needed to pass a landmark gay rights ordinance, with ten out of the eleven Supervisors voting in support.[38] His brief eleven months in office came to a tragic end as former Supervisor Dan White—the only Supervisor who voted against the gay rights ordinance—gunned him down, along with Mayor George Moscone, in San Francisco City Hall on November 27, 1978.[39]

---

[33] Steve Friess, "The First Openly Gay Person to Win an Election in America Was Not Harvey Milk," Bloomberg Politics, December 11, 2015, *available at* https://www.bloomberg.com/news/features/2015-12-11/the-first-openly-gay-person-to-win-an-election-in-america-was-not-harvey-milk.

[33] Rebecca Spence, "Harvey Milk, in Life and on Film, Typified the Proud Jew as Outsider," Forward, December 2008, *available at* http://forward.com/news/14715/harvey-milk-in-life-and-on-film-typified-the-pro-02973/.

[34] Sam LeGrone, "Navy to Name Ship After Gay Rights Activist Harvey Milk," U.S. Naval Institute News, July 28, 2016, *available at* https://news.usni.org/2016/07/28/navy-name-ship-gay-rights-activist-harvey-milk.

The United States Navy announced plans to name a ship after Harvey Milk on July 14, 2016.

*Id.*

[36] *See, e.g.,* Randy Shilts, The Mayor of Castro Street: The Life and Times of Harvey Milk, Stonewall Editions, 1988.

[37] *See, e.g.,* Darby West, "Harvey Milk, the First Openly Gay Elected Official in California: Not Your Typical Candidate," FoundSF, accessed September 15, 2017, *available at*

http://www.foundsf.org/index.php?title=Harvey_Milk,_the_First_Openly_Gay_Elected_Official_in_California:_Not_Your_Typical_Candidate.

[38] *See, e.g.,* Natalie Jones, "The Life of Harvey Milk," American Civil Liberties Union, accessed September 15, 2017, available at https://www.aclu.org/files/pdfs/lgbt/schoolsandyouth/ramona_milk_presentation.pdf.

[39] Tim O'Rourke, "Chronicle Covers: The Assassinations of Moscone and Milk," November 2016, *available at* http://www.sfchronicle.com/news/article/Chronicle-Covers-The-assassinations-of-Moscone-10629367.php.

Sen. Dianne Feinstein, then the president of the Board of Supervisors who would become mayor upon Moscone's death, was in City Hall when the killings occurred and found Milk's body. "I put my finger to see if there was any pulse, and it went in a bullet hole in his chest," Feinstein told The Chronicle's Carl Nolte in 2003. "I think of it as if it were yesterday. I remember Harvey's body, his blood on me. I see it all." Both Moscone and Milk died instantly. *Id.*

Before his brutal end at age forty-eight, Supervisor Milk was aware of death threats. He hoped, unfortunately prophetically, that "[i]f a bullet should enter my brain, let that bullet shatter every closet door."

Jamie McGonnigal, "In Memoriam: 'If a bullet should enter my brain, let that bullet shatter every closet door,'" LGBTQ Nation, November 2011, *available at* https://www.lgbtqnation.com/2011/11/if-a-bullet-should-enter-my-brain-let-that-bullet-shatter-every-closet-door/.

Given the seminal nature of his San Francisco gay rights ordinance banning discrimination in public accommodations, housing, and employment, and the impact of the "White Night Riots"—which erupted in San Francisco on Mary 21, 1979, the night that his killer was given a light sentence for manslaughter—it is safe to say that Dan White's bullets helped to shatter closet doors for generations yet to come.

*See, e.g.,* Martin Stezano, "What Were the White Night Riots?," History, June 2017, *available at* http://www.history.com/news/ask-history/what-were-the-white-night-riots.

PLAINTIFFS004575

Milk's assassination galvanized a generation of LGBT leadership that continue to this day. In 1987, Barney Frank (D-MA) became the first sitting Member of Congress to publicly identify as LGBT.[40] Rep. Frank served in Congress from 1981 to 2013, and "was the primary sponsor of 31 bills that were enacted," including the 2010 Dodd-Frank Act which precipitated an overhaul of the American finance industry.[41] A powerful and outspoken leader, Rep. Frank was Chair of the House Financial Services Committee.[42] In 2012, Rep. Frank became the first sitting Member of Congress to marry a same-sex spouse.[43]

Today, a record six openly LGBT members serve in the U.S. House of Representatives: Reps. David Cicilline (D-RI), Sean Patrick Maloney (D-NY), Mark Pocan (D-WI), Jared Polis (D-CO), Kyrsten Sinema (D-AZ), and Mark Takano (D-CA).[44] November 2012 saw the election of the country's first openly LGBT Senator, the former Representative Tammy Baldwin (D-WI).[45] At the state level, Oregon elected our country's first openly LGBT Governor, Kate Brown, in 2016.[46] That these public officials display integrity and commitment to serving all constituents during this difficult era in progressive politics is more than laudable.

## IV.   The White House Fuels A Rising Tide of Inequality

Despite this Report's recommendations, and despite the progress made by the LGBT community, it is clear that in today's climate, no gains are safe. No one who values LGBT equality can rest easily, despite decades' worth of advancements. In stark contrast to the time of the Commission's 2015 briefing on these issues, the American political landscape is at an inflection point that can

---

[40] Barney Frank, "My Life as a Gay Congressman," Politico Magazine, March 2015, *available at* http://www.politico.com/magazine/story/2015/03/barney-frank-life-as-gay-congressman-116027?o=0. *See also* Stuart Weisberg, Barney Frank: The Story of America's Only Left-Handed, Gay, Jewish Congressman, Sheridan Books, 2009.

[41] "Rep. Barney Frank," govtrack, accessed September 15, 2017, *available at* https://www.govtrack.us/congress/members/barney_frank/400140.

[42] *See, e.g.,* CNBC News Releases, "House Financial-Services Committee Chairman, Rep. Barney Frank (D) Massachusetts on 'Kudlow & Company' with Larry Kudlow (Transcript Included)," September 10, 2010, *available at* https://www.cnbc.com/id/20720084.

[43] Justin Sink, "Barney Frank to Marry Longtime Partner," The Hill, January 2012, *available at* http://thehill.com/blogs/blog-briefing-room/news/206799-report-barney-frank-to-marry; *and* Amanda Cedrone, "Barney Frank Marries Longtime Partner Jim Ready," The Boston Globe, July 8, 2012, *available at* https://www.bostonglobe.com/metro/2012/07/08/frank/J1ebJWjTAq2MgRUt2opQSM/story.html.

[44] Congressional Equality Caucus, "About the Caucus," accessed September 15, 2017, *available at* https://lgbt-polis.house.gov/about. (Note: This leadership list refers to members of the 114th Congress, but all members remain in office during the 115th Congress. In addition to its six openly LGBT Co-Chairs, the Caucus benefits from the membership of many other Representatives as well.)

[45] Emanuella Grinberg, "Wisconsin's Tammy Baldwin is First Openly Gay Person Elected to Senate," CNN, November 7, 2012, *available at* http://www.cnn.com/2012/11/07/politics/wisconsin-tammy-baldwin-senate/index.html.

[46] Camila Domonoske, "For First Time, Openly LGBT Governor Elected: Oregon's Kate Brown," National Public Radio, November 9, 2016, *available at* http://www.npr.org/sections/thetwo-way/2016/11/09/501338927/for-first-time-openly-lgbt-governor-elected-oregons-kate-brown.

PLAINTIFFS004576

move our nation forward, or send it backwards in a reactionary reflex to a time prior to the creation of the Commission. Recent progress is being actively and speedily undone.

Actions taken by President Trump and his administration, some of which are highlighted below, underscore the importance and timeliness of the Commission's report, including its Findings and Recommendations. Executive Branch documents on which the proverbial—or literal—ink is barely dry increase the urgency of the Commission's recommendations and decrease the likelihood that they will be honored in the near term. It is vitally important that Congress enact the Commission's recommendation to explicitly ban discrimination in the workplace based on sexual orientation and gender identity."[47] As this Administration revels in the cultural wars that it has created, Congress must act to even out an incomplete and contradictory patchwork of state and local laws, and to acknowledge that nothing akin to the federal government's reprehensible "Lavender Scare"[48] could be repeated.

During the 2016 Presidential campaign, then-candidate Trump worked hard to project the image of a devoted supporter of LGBT people.[49] However, the early record of his administration is replete with actions demonstrating that he is anything but interested in protecting LGBT Americans. This President is quickly building a legacy of transphobic and homophobic public policies.[50] Whether

---

[47] USCCR Report, p. 73, n. 4 *supra.*

[48] *See, e.g.,* Johnson, The Lavender Scare: The Cold War Persecution of Gays and Lesbians in the Federal Government; U.S. Merit Systems Protection Board May 2014 report; and Sears, Hunter, and Mallory, Williams Institute report, n. 10 *supra.*

[49] During the campaign, then-candidate Trump made the following statements:

"'People are people to me, and everyone should be protected,' he told The Washington Post in a May 2016 interview." Anne Gearan, "White House Spokeswoman Says Trump and Alabama's Roy Moore 'Don't Agree' on Gay Rights," The Washington Post, September 28, 2017, *available at* https://www.washingtonpost.com/news/post-politics/wp/2017/09/28/white-house-spokeswoman-says-trump-and-alabamas-roy-moore-dont-agree-on-gay-rights/
"Ask yourself who is really the friend of women and the L.G.B.T. community, Donald Trump with actions or Hillary Clinton with her words?", he said. "I will tell you who the better friend is, and someday I believe that will be proven out, big-league." Haberman, Maggie, "Furious Gay Rights Advocates See Trump's 'True Colors,'" The New York Times, July 26, 2017, *available at* https://www.nytimes.com/2017/07/26/us/politics/furious-gay-rights-advocates-see-trumps-true-colors.html. "I will do everything in my power to protect our L.G.T.B.Q. citizens from the violence and oppression of a hateful foreign ideology." *Id.*

Commentators note that

Trump is only a few months into his presidency, and we've already seen a quiet but steady chipping away of protections for LGBT Americans. This president may have said he would be great for the LGBT community, but actions speak louder than words. And it's clear his veneer of inclusion can't hide the intent of his administration to make the lives of LGBT people, young and old, more difficult.

Lanae Erickson Hatalsky and Nathan Kasai, "Trump's Quiet War Against LGBT Americans," Newsweek, April 24, 2017, *available at* https://www.usnews.com/opinion/civil-wars/articles/2017-04-24/donald-trumps-guerrilla-war-against-against-lgbt-americans. *See also* Emanuella Grinberg, "The First 100 Days in LGBT Rights," CNN, April 28, 2017., *available at* http://www.cnn.com/2017/04/28/politics/first-100-days-lgbt-rights-trnd/index.html.

Depending upon the actions of the judicial nominees whom he may be successful in placing on the federal bench, including, of course, the U.S. Supreme Court, this legacy will likely live long past 2020 or 2024. *See, e.g.,* Mark Joseph Stern, "Obergefell is Already Under Attack," *Slate,* September 20, 2017, *available at* http://www.slate.com/articles/news_and_politics/jurisprudence/2017/09/trump_is_laying_the_groundwork_to_overt urn_marriage_equality.html.

PLAINTIFFS004577

or not a specific action which negatively impacts upon LGBT people directly affects workplace discrimination is not germane to this overarching inquiry; all pieces of this puzzle are interconnected, and the removal of one threatens the stability of all.

If Trump meant any word of his pre-election pronouncements, then he should waste little time in using one of his many Executive Orders to implement our specific recommendation that "federal agencies including the Departments of Justice and Labor, the Equal Employment Opportunity Commission, and the Office of Personnel Management should issue and—where relevant— reaffirm specific guidance for federal and private employers outlining protections for LGBT individuals in the workforce, including specifically enumerating protections for transgender persons."[51] Yet it is evident that the difference between candidate Trump and President Trump on the issue of LGBT rights and protections is stark. Already, some federal agencies have already taken actions which contravene the Commission's specific call for protection, changing the terms of engagement and likely rendering the enforcement issues moot.

It is particularly sad and disturbing that the new Administration's first public anti-LGBT action was aimed at children and youth. In February 2017, Attorney General Jeff Sessions and Education Secretary Betsy DeVos, at the direction of the President, rolled back protections of Title IX of the Civil Rights Act of 1964 which the Obama Administration had interpreted as allowing transgender youth to use the school bathrooms that aligned with their gender identities.[52] For an Administration which has trumpeted, through its First Lady, an anti-bullying manifesto, this action seems particularly cruel and hypocritical.

Also sadly, but predictably, the President struck a blow against LGBT workplace protections in March 2017 (and as discussed in the report) when he made it easier for federal contractors to discriminate against LGBT employees or prospective workers. Executive Order 13673 required federal contractors to demonstrate compliance with the antidiscrimination requirements of Executive Order 13672 and other Executive Orders and federal laws.

---

[51] USCCR Report, p. 73, n. 4 *supra.*

Further, recognizing that a right without a remedy is not a right at all, the Commission recommends that "Congress should authorize the necessary appropriations to ensure that all current and future non-discrimination protections are fully enforced by agencies including, but not limited to, the Departments of Justice and Labor and the Equal Employment Opportunity Commission."

*Id.* at p. 73.

[52] "'As President Trump has clearly stated, he believes policy regarding transgender bathrooms should be decided at the state level," the White House said in a statement . . . .'" Erin Dooley, Geneva Sands, Justin Fishel, Katherine Faulders, and Veronica Stracqualursi, "Trump Reverses Transgender Bathroom Guidance," ABC News, February 22, 2017, *available at* http://abcnews.go.com/Politics/trump-administration-issue-guidance-transgender-bathrooms/story?id=45663275. *See also* Jeremy W. Peters, Jo Becker, and Julie Hischfeld Davis, "Trump Rescinds Rules on Bathrooms for Transgender Students," The New York Times, February 22, 2017, *available at* https://www.nytimes.com/2017/02/22/us/politics/devos-sessions-transgender-students-rights.html.

PLAINTIFFS004578

The U.S. military has historically been a battleground for recognition of LGBT rights. From the first tentative steps of "don't ask, don't tell" of the Clinton Administration to the full integration of LGBT servicepersons during the Obama administration, the rights of LGBT to serve our country has been, unfortunately, a continuing flashpoint of controversy. Yet, until recently, the issue had been swiftly and surely receding. However, the President broadcasted a series of morning tweets on July 26, 2017,[53] apparently issued to the surprise of military leadership—despite the fact that he claimed consultation with them[54]—announcing that transgender people would no longer be allowed to serve in the U.S. military. He cited the "tremendous medical costs" associated with their care and the "disruption" they create as justification.[55] The President's reasoning for reversing existing policy is specious at best and transphobic at worst.

The two leading studies on the question of the military's medical costs associated with transgender service members to be anything but "tremendous." A better word, in the context of the military's astronomical budget, might be "miniscule." The RAND Corporation estimates the annual costs to be in the range of $2.4 to $8 million dollars.[56] The New England Journal of Medicine estimates $5.6 million annually.[57]

These numbers are the size of a speck of dust in the military's annual budget of $496 billion. They still pale in comparison to the military's reported annual expenditure of $64.4 million for Viagra and Cialis.[58] "Tremendous?" No. Taking this to scale, the annual costs projected for transgender

---

[53] "After consultation with my Generals and military experts, please be advised that the United States Government will not accept or allow . . . ." Trump, Donald J. (@realDonaldTrump), Tweet, July 26, 2017, *available at* https://twitter.com/realDonaldTrump/status/890193981585444864.

" . . . Transgender individuals to serve in any capacity in the U.S. Military. Our military must be focused on decisive and overwhelming . . . ." Trump, Donald J. (@realDonaldTrump), Tweet, July 26, 2017, *available at* https://twitter.com/realDonaldTrump/status/890196164313833472.

" . . . victory and cannot be burdened with the tremendous medical costs and disruption that transgender [people] in the military would entail. Thank you[.]" Trump, Donald J. (@realDonaldTrump), Tweet, July 26, 2017, *available at* https://twitter.com/realDonaldTrump/status/890197095151546369.

[54] Scott Maucione, "Congress Wants Answers on Who Advised Trump on Transgender Military Ban," Federal News Radio, October 10, 2017, *available at* https://federalnewsradio.com/defense-main/2017/10/congress-wants-answers-on-who-advised-trump-on-transgender-military-ban/. *See also* Nick Visser, "Letter From 1114 House Democrats Challenges Trump's Decision to Ban Transgender Troops," The Huffington Post, October 11, 2017, *available at* https://www.huffingtonpost.com/entry/trump-transgender-troop-ban_us_59dd9756e4b04fc4e1e9cfa9.

[55] Trump, n. 53 *supra. See also* Julie Hirschfeld Davis and Helene Cooper, "Trump Says Transgender People Will Not be Allowed in the Military," The New York Times, July 26, 2017, *available at* https://www.nytimes.com/2017/07/26/us/politics/trump-transgender-military.html.

[56] Agnes Gereben Schaefer, Radha Iyengar, Srikanth Kadiyala, Jennifer Kavanagh, Charles C. Engel, Kayla M. Williams, and Amii M. Kress, "Assessing the Implications of Allowing Transgender Personnel to Serve Openly," RAND Corporation, 2016, p. 33, 37, *available at* https://www.rand.org/content/dam/rand/pubs/research_reports/RR1500/RR1530/RAND_RR1530.pdf.

[57] Aaron Belkin, "Caring for Our Transgender Troops—the Negligible Cost of Transition-Related Care," The New England Journal of Medicine, September 17, 2015, p. 1089, 1090, *available at* http://www.nejm.org/doi/pdf/10.1056/NEJMp1509230.

[58] Paul Szoldra and Skye Gould, "The Pentagon Spends 5 Times More on Viagra Than Transgender Services," Business Insider, July 26, 2017, *available at* http://www.businessinsider.com/pentagon-transgender-medical-comparison-2017-7.

PLAINTIFFS004579

service members is akin to a federal budget rounding error. Further, discharging transgender service members is estimated to cost $960 million—more than the equivalent of over a decade's worth of their medical care.[59] In other words, notwithstanding whether there can even be an economic justification for the transgression of civil rights, the lie behind the President's statements is laid bare by even the most cursory of analysis.

The President cited the "disruption" which, by their very presence in the military, he apparently believes that transgender people create. Again, evidence that transgender people create disruption in the military is lacking. To the contrary, based on analysis of other nations which permit military service by transgender people, the RAND Corporation found that disruption was not inherent and that straightforward policy changes could minimize any impact upon unit cohesion.[60] At least eighteen of our sister nations across the globe allow transgender service members to serve openly.[61]

On the same day on which the President tweeted that transgender service members would be removed, his Department of Justice inserted itself into federal litigation involving civilian workplace protections for LGBT people. The Department, as an uninvited participant, is using the private litigation between a fired gay worker and his former employee as a forum in which to argue that Title IX of the Civil Rights Act of 1964 does not protect LGBT people from employment discrimination. This is starkly and sadly in opposition to a 2015 decision by the Equal Employment Opportunity Commission.[62]

The Commission has recommended that "[w]orkplace discrimination data should be collected through the inclusion of sexual orientation and gender identity questions in population-based surveys of the workforce such as the Census, American Community Survey, and surveys fielded by the Bureau of Labor Statistics and other agencies."[63] This worthy recommendation is likely to be ignored as well. The Census Bureau has already removed planned questions involving gender

---

[59] The Palm Center reports that "[t]he upshot of our analysis is that implementing President Trump's transgender service ban would cost $75,000 per person in order to accrue an annual savings of $656 per person. For the military as a whole, fully implementing President Trump's ban would cost $960 million in pursuit of saving $8.4 million per year." Aaron Belkin, Frank J. Barrett, Mark J. Eitelberg, and Marc J. Ventresca, "Discharging Transgender Troops Would Cost $960 Million," Palm Center, August 2017, p. 1, *available* at http://www.palmcenter.org/wp-content/uploads/2017/08/cost-of-firing-trans-troops-3.pdf.

[60] Schaefer, et al., n. 56 *supra.*

[61] Paul LeBlanc, "The Countries That Allow Transgender Troops to Serve in Their Armed Forces," CNN, July 27, 2017, *available at* http://www.cnn.com/2017/07/27/us/world-transgender-ban-facts/index.html.

[62] Alan Feuer, "Justice Department Says Rights Law Doesn't Protect Gays," The New York Times, July 27, 2017, *available at* https://www.nytimes.com/2017/07/27/nyregion/justice-department-gays-workplace.html.

[63] USCCR Report, p. 73, n. 4 *supra.*

PLAINTIFFS004580

identity and sexual orientation from the 2020 Census.[64] Further, federal survey questions regarding use of services by homeless and elderly LGBT people are on the chopping block. Sadly,

> [c]ombined with the withdrawal of another planned survey evaluating the effectiveness of a homelessness project for lesbian, gay, bisexual and transgender youth, the moves have alarmed watchdogs who worry they may point to a manipulation of government data collection to serve the ideology of a government they view as hostile to their causes.[65]

Even as the approved text of the Commission's report was being prepared for release, the President and his administration took additional actions against LGBT people's right to employment protection.

First, on October 4, 2017, the Department of Justice dismantled a powerful tool for the protection of transgender people in the workplace. It rescinded the Obama-era interpretation of the Civil Rights Act of 1964 Title VII as providing protection for transgender workers.[66] This Administration believes that Title VII "only prohibits discrimination on the basis of a worker's biological sex, and not their gender identity."[67]

Second, on October 6, 2017, the Administration took aim at employment protections for all LGBT people under the guise of "religious liberty." The Commission addressed this critical and highly-charged issue:

> Title VII offers a workable model for protecting religious freedom in the context of federal statutory nondiscrimination protections in the workplace. In *Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment Opportunity Commission* the Supreme Court also unanimously endorsed the common law ministerial exemption, which recognizes the right of religious groups to select their own ministers and clergy. No further expansion of exceptions to nondiscrimination protections in the workplace are necessary or warranted to balance the rights to

---

[64] Stephen Dinan, "President Trump Cancels Sexual Orientation Questions on 2020 Census," The Washington Times, March 28, 2017, *availalable at* http://www.washingtontimes.com/news/2017/mar/28/trump-cancels-census-sexual-orientation-questions-/.

[65] Matt Sedensky, "Federal Surveys Trim LGBT Questions, Alarming Advocates," US News, March 20, 2017, *available at* "https://www.usnews.com/news/us/articles/2017-03-20/federal-surveys-trim-lgbt-questions-alarming-advocates.

[66] Laura Jarrett, "Sessions Says Civil Rights Law Doesn't Protect Transgender Workers," CNN, October 5, 2017, *available at* http://www.cnn.com/2017/10/05/politics/jeff-sessions-transgender-title-vii/index.html. (Note: The Department of Justice memo is embedded in this article.)

[67] Daniel Wiessner and Sarah N. Lynch, "U.S. Anti-Bias Law Does Not Protect Transgender Workers: Justice Dept.," Reuters, October 5, 2017, *available at* http://www.reuters.com/article/us-usa-lgbt/u-s-anti-bias-law-does-not-protect-transgender-workers-justice-dept-idUSKBN1CA1Z9?il=0.

PLAINTIFFS004581

> freedom of religion and to nondiscrimination on the bases either of religion or
> LGBT status.[68]

To the contrary, however, the Department of Justice published guidance directing the "interpreting religious liberty protections in federal law" in accordance with the President's May 2016 Executive Order 13798.[69] After setting forth the precept that stating that "individuals and organizations do not give up their religious-liberty [sic] protections by . . . seeking to earn or earning a living; [or] by employing others to do the same"[70] this guidance implicitly allows religious businesses—which openly agitated for this interpretation—to decline to hire LGBT people if the religion holds anti-LGBT beliefs.

Even more alarmingly, the guidance implicitly seeks to expand dramatically the reach of the Religious Freedom Restoration Act ("RFRA"), which, on its face, protects only the First Amendment Free Exercise rights of a "person."[71] The U.S. Supreme Court expanded that reach, holding in *Burwell v. Hobby Lobby*[72] that the federal RFRA prevents the government from dictating the religiously-motivated behavior of "a closely held, for-profit corporation."[73] The guidance rides the *Hobby Lobby* toboggan as it boldly careens down a slippery slope, declaring—in the apparent absence of statutory or judicial authority—"RFRA protects the exercise of religion by individuals and by *corporations, companies, associations, firms, partnerships, societies, and joint stock companies.*"[74] It is unclear whether the Attorney General's twisted interpretation has, in fact, any legal authority. But many will take the guidance at face value.

## V.   Conclusion

As this statement was being written, the President became the first sitting President to address [an] anti-LGBTQ event.[75] He boasted about his new "religious freedom" guidance (as discussed above)

---

[68] Commission Report, p. 73, n. 4 *supra.*

[69] Executive Order 13798, "Promoting Free Speech and Religious Liberty," May 4, 2017, 82 CFR 21675, *available at* https://www.federalregister.gov/documents/2017/05/09/2017-09574/promoting-free-speech-and-religious-liberty.

[70] U.S. Department of Justice, "Memorandum for All Executive Departments and Agencies: Federal Law Protections for Religious Liberty," Paragraph 4, p. 2, October 6, 2017, *available at* https://www.justice.gov/opa/press-release/file/1001891/download. *See also* David Crary and Ricardo Alonso-Zaldivar, "Trump's One-Two Punch Hits Birth Control, LGBT Rights," Chicago Tribune October 7, 2017, *available at* http://www.chicagotribune.com/business/sns-bc-us--trump-religious-rules-20171006-story.html#article.

[71] The Religious Freedom Restoration Act, 42 U.S.C. sec. 2000bb—2000bb4, Pub.L. No. 103-141, 107 Stat. 1488, Sec. 3(a) November 16, 1993.

[72] *Burwell v. Hobby Lobby*, 573 U.S. ____, 2014.

[73] U.S. Department of Justice Memorandum, Paragraph 11, p. 4, n. 70 *supra.*

[74] *Id.*, italics added. *See also* Julie Moreau, "Justice Department 'Religious Liberty' Guidance: A 'License to Discriminate'?," NBC News, October 9, 2017, *available at* https://www.nbcnews.com/feature/nbc-out/justice-dept-religious-liberty-guidance-license-discriminate-n808836.

[75] Paige Lavender, "Trump Becomes First Sitting President to Address Anti-LGBTQ Event," The Huffington Post, October 13, 2017, *available at* https://www.huffingtonpost.com/entry/donald-trump-values-voter-summit_us_59e0b596e4b03a7be57fe666?ncid=inblnkushpmg00000009.

PLAINTIFFS004582

to the annual "Values Voter Summit" [76]organized by Family Research Council.[77] He spoke in full view of an audience that had been given pamphlets containing excerpts from "The Health Hazards of Homosexuality" and advertising the website www.HealthHazardsOfHomosexuality.info.[78] The pamphlet included statements that claimed that same-sex marriage "made sodomy a right" and that homosexuality was a mental disorder.[79] In the context of an event hosted by an organization that considers anyone in the LGTB community to be "unnatural"[80] and that the Bible punishes homosexuality[81] is it any wonder that many LGTB Americans would be alarmed when he said that his Administration was "returning moral clarity to our view of the world" and "stopping cold the attacks on Judeo-Christian values."[82]

So this President, who campaigned as a self-professed "friend . . . of the L.G.B.T. community,"[83] who compared himself to Secretary Hillary Clinton by averring, "I will tell you who the better friend is, and someday I believe that will be proven out, big-league,"[84] spoke proudly to an organization labelled an anti-LGBT hate group by the Southern Poverty Law Center.[85] It is in this context that the actions of the Administration become clear.

---

[76] *Id.*

[77] The Southern Poverty Law center states that "[t]he FRC often makes false claims about the LGBT community based on discredited research and junk science. The intention is to denigrate LGBT people as the organization battles against same-sex marriage, hate crime laws, anti-bullying programs and the repeal of the military's "Don't Ask, Don't Tell" policy." Southern Poverty Law Center, *available at* https://www.splcenter.org/fighting-hate/extremist-files/group/family-research-council

[78] Aris Foley, "Anti_LGBT Pamphlets Handed Out at Values Voter Summit Trump Spoke At," AOL News, October 13, 2017, *available at* https://www.aol.com/article/news/2017/10/13/anti-lgbt-pamphlets-handed-out-at-values-voter-summit-trump-spoke-at-hate-groups/23242678/. "The Health Hazards of Homosexuality" is written by Mass Resistance, which the Southern Poverty Law Center recognizes as a hate group. *See, e.g.,* Southern Poverty Law Center, "Texas Chapter of Anti-LGBT Hate Group Mass Resistance Launches, Helmed by Robert Oscar Lopez," March 29, 2017, *available at* https://www.splcenter.org/hatewatch/2017/03/29/texas-chapter-anti-lgbt-hate-group-mass-resistance-launches-helmed-robert-oscar-lópez.

[79] https://www.nbcnews.com/feature/nbc-out/hazards-homosexuality-flier-distributed-values-voter-summit-n810471.

[80] From the Family Research Council website: "Family Research Council believes that homosexual conduct is harmful to the persons who engage in it and to society at large, and can never be affirmed. It is by definition unnatural, and as such is associated with negative physical and psychological health effects." *Available at* http://www.frc.org/homosexuality.

[81] The Family Research Council has a publication entitled "The Bible's Teachings on Marriage and Family" which states that "[i]n recent years, homosexual advocates have argued that the Bible, rightly interpreted, does not forbid homosexual relationships, only perverse expressions of such. For example, they have argued that God's judgment on Sodom on Gomorrah (Genesis 18:17-19:29) was merely for these cities' inhospitality, not for the sin of homosexuality. However, while Sodom and Gomorrah did in fact show a lack of hospitality, *it is hardly conceivable that God would punish these cities by utter annihilation for this comparatively minor offense*. Also, the Epistle of Jude clearly states that the people of Sodom and Gomorrah "indulged in sexual immorality and pursued unnatural desire" (*i.e.* homosexuality; Jude 7; cf. Romans 1:26-27), emphasis added, *available at* http://www.frc.org/brochure/the-bibles-teaching-on-marriage-and-family.

[82] Lavender, n. 54 *supra;* and Dan Merica, "Trump: We Are Stopping Cold the Attacks on Judeo-Christian Values," CNN, October 13, 2017, *available at* http://www.cnn.com/2017/10/13/politics/trump-values-voters-summit/index.html.

[83] Haberman, n. 49 *supra.*

[84] *Id.*

[85] Southern Poverty Law Center, "Hate Groups," accessed September 15, 2017, *available at* https://www.splcenter.org/hate-map.

PLAINTIFFS004583

This incident underscores the fact that the Commission's report, especially when read in the context of all anti-LGBT actions by the current President and his Administration, is a call to action. The progress has been halted, the roll-backs are in motion, the need for immediate action is real. LGBT people, their allies (long including this Commissioner), and all who care about social justice and true equality for all must exercise vigilance in tracking new developments and participate in all non-violent and legal forms of activism to oppose setbacks. Without the pre-existing benefit of deeply-embedded federal and judicial protections, LGBT people are a fair target for discrimination by the government and private actors alike. It is apparently open season.

Despite the assurances from the candidate in 2016, the President and his Administration have taken actions in 2017 in contravention to the Commission's recommendations before the Commission could even get its report out the door or before this Commissioner could hit save on the final version of this Statement. For many in the LGTB community, it is dismaying that the President and this Administration have taken actions that appear to be committed to targeting LGBT people for the denial of hard-won basic rights and protections as minority members of our society. This behavior is decidedly un-American. It is vicious, spiteful, exclusionary, and—at its most basic— needless. The LGBT civil rights quest has never been about the dreaded boogeyman of "special rights." It is a search for mere equality, not supremacy. It is the oft-repeated story of disqualifying the qualified because of fear, jealous, and hatred.

The breadth and pace of this Administration's actions underscore the need for all fair-minded Americans to practice vigilance and activism. Part of that activism must be work to try to prevent future dangers. Just how far will this President and his Administration go in trying to force LGBT people back into the proverbial closet and reduce their abilities to participate fully and openly in American life—to interfere with their pursuit of happiness? The federal actions since Inauguration Day, and the specter of what may yet be in the offing, especially in appointments to the judiciary, only emphasize the need for federal legislation barring employment discrimination which the Commission recommends. Most telling, a chilling harbinger of what is yet to come, is the President's open embrace of the possible election of a United States Senator[86] with a long history of virulently homophobic beliefs.[87]

---

[86] The President has articulated enthusiastic support for Roy Moore. "'Spoke to Roy Moore of Alabama last night for the first time. Sounds like a really great guy who ran a fantastic race. He will help to #MAGA!' the president tweeted, referring to his own "Make America Great Again" campaign slogan."
Julia Manchester, "Trump: Roy Moore 'Sounds Like a Really Great Guy,'" The Hill, September 27, 2017, *available at* http://thehill.com/homenews/administration/352616-trump-speaks-to-roy-moore-after-primary-victory-tweets-support.

[87] Roy Moore has likened homosexuality to bestiality. *See, e.g.,* Eugene Scott, "How Roy Moore's Rhetoric on Gays, Muslims Harks Back to Alabama's Past," The Washington Post, September 27, 2017, *available at* https://www.washingtonpost.com/news/the-fix/wp/2017/09/27/roy-moores-values-could-take-alabama-back-to-a-place-many-of-its-residents-have-tried-to-get-past/?utm_term=.3e245740a6f9.

PLAINTIFFS004584

It is more apparent than it has been in decades that LGBT people require even farther-reaching, more comprehensive, federal legal protections than just in the workplace. Such safeguards in the arenas of employment, public accommodation, housing, credit, and federally funded programs are feasible via amendments to the Civil Rights Act of 1964, the Fair Housing Act, and other federal laws. Such amendments would place sexual orientation and gender identity under the Acts' umbrellas as protected classes. The bipartisan Equality Act of 2017 seeks to do just that.[88] This is not fringe legislation; there are 197 co-sponsors in the House[89] and 45 co-sponsors in the Senate.[90] The Commission's next step in executing its duty to safeguard the civil rights of LGBT people should be to explore the broader issues which underlie the Equality Act and the remedies which it offers.

If there is any lesson from the recent events in Charlottesville, it is that the ugliness of racism, bigotry, homophobia, and transphobia still resides within a deep dark crevasse of the American soul. It is the duty of leaders in our government, especially the President, to denounce and deny these groups and individuals in the strongest possible terms. It is the duty of leaders in our government, especially the President, to take strong action to dismantle and disarm the leaders and the organizations that give bigotry, hatred, homophobia, and transphobia a voice. And it is the duty of our leaders in government, especially the President, to show that our government will enact laws to protect people from bigotry, hatred, homophobia, and transphobia.

This Commission has a duty to be the federal government's watchdog on civil rights, a mandate placed on it 60 years ago, a charge that requires us to give voice to the oppressed. It has been the Commission's voice that has spoken loudest when the civil rights laws of this country were required to be extended to other groups not named in the testimony surrounding the Civil Rights Act of 1964, as we did for women, as we did for the disabled, and as we do today for the LGBT community. It is a terrible day when the Oval Office chooses not just to ignore what we say on behalf of the American people, but to deliberately, and callously, act in opposition to the extension of these those hard-won civil rights to a group that is deserving and in need of their protection.

---

While Chief Justice of Alabama, Moore opined that "[h]omosexual conduct by its very nature is immoral, and its consequences are inherently destructive to the natural order of society." In *re D.H. v. H.H.*, Supreme Court of Alabama, Docket No. 1002045, decided February 15, 2002, *available at* http://caselaw.findlaw.com/al-supreme-court/1303306.html.

[88] H.R. 2282: Equality Act, 115th Congress, 1st Session, introduced May 2, 2017, *available at* https://www.gpo.gov/fdsys/pkg/BILLS-115hr2282ih/pdf/BILLS-115hr2282ih.pdf. *See also* S. 1006: Equality Act, 115th Congress (2015-2017), introduced May 2, 2017, *available at* https://www.congress.gov/115/bills/s1006/BILLS-115s1006is.pdf.

[89] "All Information (Except Text) for H.R.2282—Equality Act," Congress.gov, accessed September 15, 2017, *available at* https://www.congress.gov/bill/115th-congress/house-bill/2282/all-info.

[90] "S.106—Equality Act," Congress.gov, accessed September 15, 2017, *available at* https://www.congress.gov/bill/115th-congress/senate-bill/1006/cosponsors .

PLAINTIFFS004585

 Working for Inclusion: Time for Congress to Enact Federal Legislation

[This page intentionally left blank]

PLAINTIFFS004586

## Dissenting Statement of Commissioner Gail Heriot

I have sympathy for some of the goals of the basic legislative proposal discussed in this Report. In a different world, I might have been able to support at least a more modest version of it. I continue to support Title VII of the Civil Rights Act of 1964's provisions prohibiting discrimination in employment on the basis of race, color, religion, sex and national origin. But, alas, given the ways in which that legislation has been misapplied over the years, I worry about the wisdom of expanding it further unless the expansion comes packaged with general Title VII reform.

For example, under current interpretations of Title VII, employers must endeavor to prevent their employees from engaging in the sexual harassment of their colleagues. That is a worthwhile goal. But the concept of sexual harassment has been given such a broad and vague construction that its effect has been to force employers to squelch not just sexual harassment, but free expression at the workplace.[1] By extending the reach of anti-discrimination laws to sexual orientation and gender identity, the proposed legislation would only compound this problem.

Quite apart from my concerns over the proposed legislation, I have concerns over this report's usefulness as a guide to Congress.[2] The data are not always presented fairly and in context. For example, by focusing on employee *perceptions* of discrimination, it almost certainly overstates the

---

[1] A good example of this is the recent firing of Google software engineer James Damore, which I discuss infra at Part IB(2).

[2] The report is unsatisfying in part because of an unbalanced record. Given that I had no fixed view on this particular issue—that is, I am not categorically against all anti-discrimination laws of this kind— I was looking forward to a balanced panel that could help me clarify my thinking. A balanced briefing on this topic should have had about the same number of witnesses who are generally for, as well as generally against, federal prohibitions on sexual orientation and gender identity discrimination in employment. Yet this briefing had 15 panelists generally in favor of such prohibitions and two generally against them. The Commission secured one of the two witnesses against—Ryan Anderson—at the very last minute, only after Commissioner Kirsanow and I complained vociferously about panel imbalance.

Although I was told that staff made a good-faith effort to secure a balanced panel and that the panel was imbalanced only because too many opponents declined to testify, that appears to be untrue. At a Commission business meeting on February 20, 2015, about three weeks before the briefing, the then-head of the Commission's Office for Civil Rights Research and Evaluation ("OCRE") happily said that she had already confirmed 13 witnesses and was looking to fill only two more slots.

*See* United States Commission on Civil Rights, Transcript of Business Meeting, February 20, 2015, 19-21, *available at* http://www.usccr.gov/calendar/trnscrpt/UNEDITEDCommissionMeetingTranscript_02-20-15.pdf.

After that meeting, OCRE agreed to provide us with a list of witnesses who had already been invited.

That list showed that only two critics of sexual orientation discrimination laws had been invited as of then. OCRE then tried to argue that the briefing was balanced because some potential panelists from the Human Rights Campaign and the Center for American Progress criticized the proposed federal Employment Non-Discrimination Act for not going far enough. These organizations are nonetheless strong supporters of ENDA's core prohibition on sexual orientation discrimination; the Human Rights Campaign at the time had a large banner on its website that said "Pass ENDA Now," and the proposed witness Gene Robinson of the Center for American Progress has gone so far as to assert that Christian opposition to ENDA would embarrass Jesus. *See* http://www.huffingtonpost.com/bishop-gene-robinson/enda-vote-jesus_b_4234440.html.

The notion that these panelists were interchangeable with conservatives and libertarians or made the panels more balanced was risible. I am forced to conclude that there never was a plan in place for a balanced briefing.

PLAINTIFFS004587

extent of discrimination based on sexual orientation. It states, for example, that "[s]tudies have found that anywhere from 21[3] to 47[4] percent of LGBT adults faced employment discrimination because they were gay or transgender." Rep. at 10. But the cited studies were all based on the *perceptions* of job applicants/employees (and the latter figure was for transgender/gender-nonconforming persons only). When one looks at the Equal Employment Opportunity Commission's statistics on the matter, one learns that "charges" of discrimination are not the same as actual discrimination. The vast majority of charges filed by job applicants/employees with the EEOC are found to be without merit. For Fiscal Year 2016, the EEOC found *"No Reasonable Cause" for 67.6% of all LGBT-based charges.* It found *"Reasonable Cause" for only a tiny number—3.7% of LGBT-based charges.* An additional 17.1% of charges were not pursued by the charging party.[5]

To be sure, this problem is not unique to LGBT-based charges of discrimination. EEOC data for Fiscal Year 2016 are similar for race-based charges (No Reasonable Cause 73.7%, Reasonable Cause 2.1%), religion-based charges (No Reasonable Cause 70.7%, Reasonable Cause 3.2%), and sex-based charges (No Reasonable Cause 64.2%, Reasonable Cause 3.2%).[6] Dealing with non-meritorious charges is part of the price we pay for our protections against employment discrimination, and it is a price we should be willing to pay in a well-functioning system that seeks to root out non-meritorious claims quickly and efficiently.[7] But in deciding whether to extend Title

---

[3] The 21 percent figure appears to be taken from a Pew Research Survey: http://www.pewresearch.org/fact-tank/2013/11/04/as-congress-considers-action-again-21-of-lgbt-adults-say-they-faced-workplace-discrimination/. The actual question was whether the respondent had been "treated unfairly by an employer because of their sexual orientation or gender identity (5% say this happened within the past year and 16% report that this happened but not within the past year)." Note that some of what respondents consider unfair treatment may not violate employment discrimination laws.

[4] *See* Jaime M. Grant, Lisa A. Mottet & Justin Tanis, Injustice at Every Turn: A Report of the National Transgender Discrimination Survey 51 (2011)("Forty-seven percent (47%) said they had experienced an adverse job outcome, such as being fired, not hired or denied a promotion because of being transgender/gender non-conforming"), *available at* http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf. For a criticism of the methodology in this survey, see *infra* at 107.

[5] The rest of the cases were as follows: In 7.2%, some sort of settlement was arrived at without a finding of reasonable cause on the part of the EEOC. An additional 4.5% were classified as "withdrawals with benefits" in the sense that, while no official findings were ever arrived at, the employer gave the employee at least something in return for the withdrawal. Rep. at 13.

[6] Race-Based Charges, https://www.eeoc.gov/eeoc/statistics/enforcement/race.cfm; Religion-Based Charges, https://www.eeoc.gov/eeoc/statistics/enforcement/religion.cfm; Sex-Based Charges, https://www.eeoc.gov/eeoc/statistics/enforcement/sex.cfm.

[7] Note that as discrimination becomes more rare, the ratio of non-meritorious cases to meritorious cases likely gets higher. Since our system of rooting out non-meritorious cases leaves something to be desired, the downside of having a law against discrimination becomes more prominent. Commissioner Kladney argues that "even if discrimination were rare, we should still have a federal law prohibiting it because it is wrong each and every time it happens." Kladney Statement at 79. I wonder if he really means that. There are all sorts of ways in which an employer can act arbitrarily. Suppose, for example, I refuse to hire Commissioner Kladney because his given name is "David" and my ex-husband's name is David. Or I refuse to hire him because he rooted for the Indians instead of my beloved Cubs in the 2016 World Series . . . or because his wristwatch keeps better time than mine. All are bad reasons to deny someone a job. But the obvious solution for each would be for him to go onto the next opportunity. Since my hypothetical reasons for declining to hire him are so idiosyncratic, he is unlikely to be worse off. Just as there are a lot of fish in the sea, there are a lot of employers out there. If discrimination on the basis of sexual

PLAINTIFFS004588

VII's coverage, it is important that we understand that perceptions of discriminations on the part of job applicants/employees are just that—perceptions. To get a real estimate of the size of the problem of discrimination, one must try to dig deeper.

The misidentified statistics concerning "perceptions" of discrimination are not the only example. Parts of the Report positively bristle with statistics about various aspects of life in the LGBT community. But rather than take those statistics at face value, I would urge the reader to drill down to the material in the footnotes and to approach that material with a critical eye. Gathering statistics on the LGBT community requires researchers to find a broad, representative sample. That isn't as easy as it sounds, particularly for the transgender subset of the population, given its extremely small size. Some of the surveys cited in the report try to get around the difficulty by using problematic methodologies.

One survey cited in this report—*The National Transgender Discrimination Survey*—"decided to pay stipends to workers in homeless shelters, legal aid clinics, mobile health clinics and other service settings to host 'survey parties' to encourage respondents whose economic vulnerability, housing insecurity, or literacy level might pose particular barriers to participation."[8] While I respect the researchers' efforts to try to find hard-to-reach persons, it should not have been surprising that looking in these places tended to uncover lots of respondents with low incomes, spotty employment histories, and other personal difficulties. Would a different approach have yielded a brighter picture of what it is like to be transgender? That question cannot be answered with certainty, though it seems likely. But the Report makes no effort to grapple with these

---

orientation were rare to the point of being idiosyncratic, it's hard to see how Kladney could support its being outlawed, unless he would favor laws that employers can't make stupid decisions.

Commissioner Kladney makes another point in his Statement that deserves comment: He writes that most employers "are corporations, large and small, who take advantage of the legal protections and shields the government affords them" and that "[a]s such, they should be required to not discriminate against any qualified United States citizen in employment. To do so is not consistent with . . . American values." *Id.* This is another one that I have a hard time believing an easy-going guy like Commissioner Kladney really means. I can't imagine anything more inconsistent with American values than to demand that every employer who uses the corporate form (*i.e.* practically all private employers) act consistently with American values. A tolerant, plural society does not impose the values of the majority on everyone. That's what liberalism is supposed to be about (and what I thought it was about back in the days when I was a liberal).

[8] Approximately 500 out of a total of about 7,500 responses came from such efforts. The rest came through an online survey, which was evidently brought to the attention of potential respondents "through direct contacts with more than 800 transgender-led or transgender-serving community based organizations in the U.S." and "through 150 active online community listserves." See Jaime M. Grant, Lisa A. Mottet, & Justin Tanis, Injustice at Every Turn: A Report of the National Transgender Discrimination Survey at 12 (2011), *available at* http://www.thetaskforce.org/static_html/downloads/reports/reports/ntds_full.pdf. This methodology, of course, has its own problems.

The Report cites this survey for a variety of purposes. For example, it cites the survey in stating that "90 percent of transgender employees report experiencing some form of harassment or mistreatment on the job"—a figure it terms "staggering." Report at 11, n.54.

PLAINTIFFS004589

methodological issues, instead accepting at face value these surveys' assertions about the problems faced by transgender persons.[9]

A second example is the U.S. Transgender Survey, which is the largest survey of transgender persons taken to date, conducted in 2015.[10] The researchers responsible for it relied heavily on transgender advocacy organizations to disseminate the survey. That, of course, can lead to problems. We have no way of knowing whether transgender persons who have suffered from discrimination are more likely to respond to such surveys than those who have had no problems. But intuitively it certainly seems likely. The study's authors therefore cautioned readers:

> Although the intention was to recruit a sample that was as representative as possible of transgender people in the U.S., it is important to note that respondents in this study were not randomly sampled and the actual population characteristics of transgender people in the U.S. are not known. Therefore, it is not appropriate to generalize the findings in this study to all transgender people.[11]

This warning about the survey's limitations didn't make it into this Report. For this and other reasons, some of which I will have the opportunity to detail below, many of the factual assertions in this Report need to be taken with a grain of salt.

**I. THE CASE FOR ANTI-DISCRIMINATION LEGISLATION FOR SEXUAL ORIENTATION IS SOMEWHAT WEAKER THAN THAT FOR RACE, COLOR, RELIGION, SEX AND NATIONAL ORIGIN IN 1964 AND HAS BEEN MADE WEAKER STILL BY SUBSEQUENT EVENTS. THE CASE FOR ANTI-DISCRIMINATION LEGISLATION FOR GENDER IDENTITY HAS BEEN RENDERED EVEN WEAKER ON ACCOUNT OF OVER-BROAD DRAFTING.**

---

[9] The methodological problem with the use of the General Social Survey ("GSS") in this Report is less dramatic, but nonetheless serious. The GSS surveys a large random sample of the country, and its findings concerning the views of Americans in general can usually be considered methodologically sound. But the Williams Institute chose to rely on its data to look at the employment experiences of sexual minorities in particular. Unfortunately, the number of GSS respondents who qualify as members of sexual minorities is tiny—57 self-identified as lesbian, gay or bisexual. In addition, 23 did not identify as lesbian, gay or bisexual, but nonetheless disclosed that they had had same-sex sexual partners. This is out of a total of 3,559 respondents. Even if one can assume that 3,359 respondents can be broadly representative of the American population as a whole, it is not at all clear that 80 can represent lesbian, gay and bisexual Americans.

[10] Rep. at n. 96 and 98.

[11] Sandy E. James, Jody L. Herman, Susan Rankin, Mara Keisling, Lisa Mottet & Ma'ayan Anafi, The Report of the 2015 U.S. Transgender Survey, National Center for Transgender Equality at 26 (2016) *available at* https://www.transequality.org/sites/default/files/docs/usts/USTS%20Full%20Report%20-%20FINAL%201.6.17.pdf. This Report cited the 2015 U.S. Transgender Survey for the proposition that "Transgender individuals are three times as likely to be unemployed and are more than twice as likely to live in poverty compared to the rate in the U.S." Rep. at 15, n.71.

PLAINTIFFS004590

## A. A Presumption in Favor of Freedom of Association Should Always Be Applied When Anti-Discrimination Legislation Is Proposed; While that Presumption Can Be (and Has Been) Overcome in the Right Cases, It Takes A Convincing Argument to Do So.

The report quotes Professor Andrew Koppelman for this: "The general principle governing transactions between private parties should be freedom of association, for reasons of both liberty and efficiency. Any departure from that rule, such as a prohibition of discrimination, has the burden of proof."[12]

Koppelman is no conservative. But nearly all conservatives as well as most moderates and liberals would likely agree: If one is going to depart from the ordinary rule that in a free society private parties get to decide for themselves how to order their activities, including how to hire employees for their businesses,[13] one must have a good reason.[14]

---

[12] Report at 49, *quoting* Andrew Koppelman, "Richard Epstein's Imperfect Understanding of Antidiscrimination Law, Library of Law and Liberty," January 2016, *available at* http://www.libertylawsite.org/liberty-forum/richard-epsteins-imperfect-understanding-of-antidiscrimination-law/.

[13] Interestingly, despite widespread agreement that race and sex discrimination are wrong, no one argues that prospective employees (as opposed to employers) should be prohibited from considering the race or sex of a prospective employer in deciding whether to apply for or accept an offer of employment.

[14] One person who seems not to agree is Commissioner Narasaki. Her statement seems to be premised on the notion that the freedom at stake in this area of the law is "freedom *from* discrimination" rather than freedom *of* association. Narasaki Statement at 81. As much as I respect Commissioner Narasaki, our views on the meaning of the word "freedom" and hence on the principles she identifies as fundamental to the founding of our nation could not be more different. Sometimes it is appropriate for the federal or state governments to coerce cooperation from private individuals (*i.e.* limit their freedom of association). But it is important not to lose sight of the fact that we are engaging in coercion, and dressing up coercion as providing "freedom *from*" this or that for others promotes unclear thinking. A free society must be ever vigilant before it encroaches on the freedom of private individuals (including employers) to choose the persons with whom they are willing to associate. As Koppelman put it, the "burden of proof" must always be on the advocates of departures from the basic rule of freedom of association.

As an American, I enjoy the Constitutional right to the free exercise of my religion. But I have no Constitutional right to require particular churches to accept me as one of their own. I have a right of free speech, but that does not include the power to coerce private individuals into buying my book.

Commissioner Narasaki uses *Obergefell v. Hodges*, 576 U.S. ___ (1976), as the starting point for her argument in favor of the proposed Employment Non-Discrimination Act. Since discrimination against same-sex marriage was prohibited in that case, it should be prohibited in employment as well—or so her argument goes. But *Obergefell* was not about the coercion of private individuals. It establishes a right of same-sex couples to marry, but it does not establish a right for individuals to marry someone who doesn't wish to marry them for reasons deemed arbitrary by the state.

For a law coercing individuals to marry someone they don't wish to marry, even if the reason given is arbitrary and capricious, would (I hope) take one heck of a reason. Coercing private employers to hire someone they don't wish to hire, even if their reason is rock stupid, presumably requires a lesser showing of necessity, but the presumption is still against it. In 1964, in passing Title VII to the Civil Rights Act, Congress decided that the problem of race, sex, religion, and national origin discrimination was so serious that the usual presumption in favor of freedom of association was overcome. But note that Congress did not decide that all wrongheaded decisions not to hire should be outlawed. It is still perfectly legal for an employer to be stupid. An employer can choose not to hire a job applicant because the applicant's hairstyle is too old-fashioned, the applicant used to date the employer's weird Cousin Cedric, the applicant is a Republican, the applicant is active in the Sierra Club, or the applicant is a devoted Star Trek fan.

How strong the presumption in favor of freedom of association should be is a question upon which reasonable minds will disagree. I'm not always sure myself. Reasonable individuals are on both sides of the question of whether

The reason for departing from that rule cannot be just that private parties are making bad decisions not to associate (or not to hire). If individuals are free only to make "good" decisions (*i.e.* decisions approved by the government), then they are not free at all. Nor can the reason be that by declining to associate with someone, private individuals have somehow "harmed" that person. While no one is free to physically attack another or to take, destroy, or otherwise injure another's property, declining to confer a benefit on someone (including the benefit of one's association) cannot be equated with imposing a harm. If it could be, the concept of freedom of association would evaporate. Something more is needed to overcome the presumption of freedom.[15]

So under what circumstances is the presumption in favor of free association overcome? A traditional example might be the common law rule that common carriers and public utilities must provide service to all who could pay. These entities were considered special because they tended toward monopoly. If a natural gas utility refuses service to anyone for a reason other than failure to pay, that individual has no practical alternative. If he relies on the free market to provide him with natural gas, he will be waiting a long time, since the town where he resides will likely have only one natural gas provider.

Anti-discrimination laws are a more recent addition to the list of exceptions. Because Title VII applied broadly to the conduct of private employers, it was by far the most controversial part of the Civil Rights Act of 1964. But there was nevertheless a strong argument for Congressional action—especially in the case of discrimination against African Americans. In the view of members of Congress, irrational race discrimination had become so pervasive, it could only be corrected through national legislation: Sometimes extraordinary steps are necessary.

It wasn't just that *some* employers in the South were discriminating on the basis of race: Essentially, all employers of any size were. The complex web of Jim Crow laws made it difficult for Southern employers to employ African-American workers on an equal basis even if they wanted to. If employers had to provide separate bathrooms, shower facilities and even pay

---

sexual orientation should join race, color, religion, sex and national origin as prohibited classifications for Title VII purposes. My only point is that we ought to be able to agree that the presumption should always be in favor of freedom of association (and hence of employer choice) and not coercion. The proponents of legislation thus have the burden of persuading us why sexual orientation should be made part of Title VII, rather than opponents of the legislation having the burden to prove it why it should not. This is why I object to Commissioner Narasaki's quotation at the end of her Statement, which attempts to associate opposition to coercive laws—even well-intentioned coercive laws—with "hatred" and "intolerance." There is massively less hatred in the world than social justice warriors who toss the word "hatred" around carelessly think. As for "intolerance," it is a much more complicated phenomenon than they seem to understand. It is not always the ones the crowd is accusing of intolerance who are the most intolerant.

[15] As Koppelman recognizes, it is not just the value of freedom that drives the presumption in favor of freedom of association. What he calls "efficiency," too, is at stake. It is sometimes tempting for governments to believe that they can make better decisions on behalf of individuals. But it often doesn't turn out the way they thought it would. Sometimes the individuals know more about their particular situation than the government does. What may look to outsiders like invidious discrimination may turn out to be something else entirely.

PLAINTIFFS004592

windows for each race, it is not remarkable that many employers didn't hire African Americans at all or did so only on a limited basis. [16]

That was the intent of those laws—to ensure that whites were hired first into the best jobs. This is what happens when an entire segment of the population is effectively disfranchised. Those who can vote pass laws designed to benefit themselves; those who cannot will be on the losing end of the deal. Discrimination was so pervasive that help wanted ads in newspapers customarily were divided into "Help Wanted—White" and "Help Wanted—Colored." This wasn't subtle stuff.

And it wasn't just employers. Formally or informally, unions were frequently whites only, not just in the South, but also in the North. And employers were obliged to play by union rules. This angle of the discrimination problem was compounded by the Davis-Bacon Act, Pub. L. 71-798,40 Stat. 1494, 40 U.S.C. §§ 3141-48, which requires the federal contractors on public works projects to pay the "prevailing wage" in a given locality. Prevailing wage in practice meant (and continues to mean) union-scale wage. Since union members would ordinarily be more experienced than non-union members, if one had to pay union-scale wages, one might as well hire union members. When these unions were whites only, the system worked to the detriment of African-American workers.[17]

In the view of many members of Congress at the time, the case for protection against sex discrimination may have been somewhat weaker, but it was nevertheless strong. Like race discrimination, sex discrimination was so pervasive it was the norm for help wanted advertisements to separate "Help Wanted—Male" from "Help Wanted—Female."

---

[16] This point tracks an observation made by C. Vann Woodward in The Strange Career of Jim Crow (1955)—the book Martin Luther King called "the bible" of the civil rights movement. Many people argued at the time that Southern culture had always and would always favor racial separation. It didn't matter whether the law required segregation or not; it would have happened without the law.

Woodward disputed this. He showed there was lots of early opposition to Jim Crow laws and without the power of the State to *require* segregation, it would likely not have become as ingrained in Southern culture as it did. To use Woodward's vocabulary, folkways did not dictate stateways. Instead, stateways—that is state laws—profoundly shaped Southern folkways—that is Southern culture. And as long as those laws remained unaltered, southern culture would be frozen in place. The Civil Rights Act of 1964, including Title VII, was a way of uprooting them. While it would be difficult to say that it was the perfect solution to the country's complex race problems, it did manage to accomplish the task of displacing those laws.

[17] Note that to supporters of the Davis-Bacon Act, this was a feature, not a bug. Rep. Robert Bacon, who represented a Long Island House District and for whom the law was named, was motivated in large part by race. In 1927, a contractor from Alabama won a bid to build a Veteran's Bureau in Long Island and brought an African American construction crew with him up from Alabama. Bacon was appalled and began his push to outlaw such competition. *See* David Bernstein, Roots of the Underclass: The Decline of Laissez-Faire Jurisprudence and the Rise of Racist Labor Legislation, 43 Am. U. L. Rev. 85, 115 (1993).

He was not alone. In supporting the proposed legislation, Rep. John J. Cochran of Missouri stated in connection with the proposal that he had "received numerous complaints in recent months about southern contractors employing low-paid colored mechanics getting work and bringing the employees from the South." Hearings on H.R. 7995 and H.R. 9232 Before the House Committee on Labor, 71t Cong. 2d Sess. 17 (26-27). Rep. Clayton Allgood agreed, complaining of "cheap colored labor" that "is in competition with white labor throughout the country." 74 Cong. Rec. 6513 (1931).

PLAINTIFFS004593

Working for Inclusion: Time for Congress to Enact Federal Legislation

Some of this tendency was frozen in place by the law. Progressive Era state legislation often purported to make distinctions between men and women in order to protect the health of the supposedly weaker sex, but at least some of the motivation behind such laws was the desire to exclude women from the most desirable jobs. And while the hey-day of such laws was the early part of the 20th century (at a time when many women could not vote), many remained in place at the time Title VII was passed.[18]

In *Muller v. Oregon*, 208 U.S. 412 (1908), the Supreme Court had unanimously upheld the constitutionality of an Oregon statute restricting women from working for more than 10 hours a day. Justice Josiah Brewer's opinion for the Court stated:

> That woman's physical structure and the performance of maternal functions place her at a disadvantage in the struggle for subsistence is obvious. This is especially true when the burdens of motherhood are upon her. Even when they are not, by abundant testimony of the medical fraternity continuance for a long time on her feet at work, repeating this from day to day, tends to injurious effects upon the body, and as healthy mothers are essential to vigorous offspring, the physical well-being of woman becomes an object of public interest and care in order to preserve the strength and vigor of the race.

208 U.S. at 412.

As such laws multiplied during the Progressive Era and beyond, some feminists, like Suzanne LaFollette, voiced their objections:

> [I]f discriminative laws and customs are to continue to restrict the opportunities of women and hamper them in their undertakings, it makes little difference for whose benefit those laws and customs are supposed to operate, whether for the benefit of men, of the home, of the race, or of women themselves; their effect on the mind of woman and her opportunities will be the same. While society discriminates against her sex, for whatever reason, she can not be free as an individual.
>
> . . . Laws which fix fewer hours of work for women than for men may result . . . in the substitution of men—or children—for women in factories where but few have been employed. Laws prohibiting night-work may reduce the chances of women to get much-needed employment, and may sometimes shut them out of work which would offer higher returns on their labor than anything they might get to do during the day . . .

---

[18] The EEOC took the position that Title VII overruled all discriminatory statutes of this kind unless sex is a *bona fide* occupational qualification. But it took some work to uproot them. In *Megelkoch v. Industrial Welfare Commission*, 442 *F.2d* 1119 (9th Cir. 1971), a woman employee had to challenge California's maximum hour statute for women when her employer refused to promote her on the ground that she couldn't work the same hours as her male colleagues. She won. In *Weeks v. Southern Bell*, 408 *F.2d* 228 (5th Cir. 1969), the court held that a Georgia law imposing weightlifting limits of 30 pounds on women was void under Title VII. *Rosenfeld v. Southern Pacific Co.*, 293 *F. Supp.* 1219, 1223 (C.D. Cal. 1968), aff'd 444 *F.2d* 1219 (9th Cir. 1971), was similar.

PLAINTIFFS004594

Suzanne LaFollette, Concerning Women 19-20 (1926).

Sexual orientation provides an interesting comparison to race and sex. There is no doubt that racial minorities, sexual-orientation minorities, and women (as well as others) have suffered significant discrimination in employment. But there are interesting differences too, and these differences sometimes cut in different directions. For example, members of sexual orientation minorities have traditionally mitigated the effects of discrimination by declining to disclose their membership in a minority to their employer. For most women and members of racial minorities, that was never an option. On the other hand, the stigma associated with membership in a sexual orientation minority has in some ways been greater than the stigma associated with being female or with being a member of a racial minority.

Another interesting contrast: Unlike women and racial minorities, sexual orientation minorities have never been disfranchised on the ground of their sexual orientation. On the other hand, sexual orientation minorities tend to be very small and except in a small number of localities their voting power has been small.

This may be the most significant contrast: Few actual state laws have discriminated on the basis of sexual orientation in employment. Those that have existed have disappeared. This is in contrast to the situation with regard to race and even sex in 1964 when Title VII was promulgated. This is not to say that no government policies ever existed that hampered LGBT individuals from getting desired employment. As the Report indicates, for a time, the federal government took the position that the social stigma suffered by LGBT individuals made them vulnerable to blackmail and hence security risks. Rep. at 61. LGBT individuals applying for some federal jobs therefore had to hide their sexual orientation. If they were hired, their troubles were not over. If their sexual orientation became known, they would be fired.[19] To be fair, however, one must point out that this policy was abandoned decades ago.[20]

---

[19] For a more detailed discussion of the federal policy, see Yaki Statement at 87-96. At this point in time it is unclear how many LGBT individuals were discouraged from applying for, were screened out from, or were fired from a federal job on account of their sexual orientation. But my own mother, who was working for the Department of Defense in the 1950s, remembers a colleague of hers being unceremoniously removed from his job when his sexual orientation was apparently discovered for the first time. She is 92 years old today and has not forgotten the unfairness of it.

[20] The relationship of military servicemen or servicewomen to the federal government is not one of employment. The various legislative proposals discussed in this Report therefore do not apply. But it should be pointed out that it was not until the 1990s that the policy of "Don't Ask, Don't Tell" was implemented, thus allowing closeted gays, lesbians and bisexuals to join the military. Department of Defense Directive 1304.26 (December 21, 1993). It was not until 2011 that openly gay, lesbian and bisexual individuals were permitted to join the military. See Pub. L. 111-321, 124 Stat. 3515, 10 U.S.C. § 654 (2010)(policy went into effect September 20, 2011).

Policies that gave better benefits to married rather than unmarried discriminate on the basis of marital status, not sexual orientation. Most of those who end up with the short end of the stick are not LGBT. But nevertheless at a time that same-sex marriage was unrecognized in most states, LGBT individuals were disproportionately affected. Since *Obergefell v. Hodges*, 576 U.S. ___ (2015), however, all states have recognized same-sex marriage.

PLAINTIFFS004595

The bottom line, as far as I can see, is that the case for an anti-discrimination law for sexual orientation is weaker than the case for race or sex.[21] But, given the history of stigma associated with LGBT status, it is not insubstantial. That makes it a tough decision. What makes it somewhat easier to decide is the fact that Title VII has been misapplied so much over the years, it may be unwise to expand it before reforms are put into place.[22] Will it be possible to draft legislation that will make some version of the proposed Employment Non-Discrimination Act a good idea? I think so. Indeed, it is clear that some members of Congress have been working on the problem. But, in my view, we are not there yet.

On the other hand, the case for "gender identity" coverage is weak—not on the ground that transgender persons have not been historically discriminated against (they have been), but on the ground that the treatment of gender identity in the legislative proposals in this area to date have been overbroad to the point of incoherence.

---

[21] Some have argued that only immutable characteristics should form the basis of anti-discrimination laws. In response those who support the proposed legislation have argued that sexual orientation *is* an immutable characteristic. I have no need to resolve that dispute, since I do not believe that only immutable characteristics should form the basis of anti-discrimination laws (although immutability might well be a factor to consider in determining whether the argument for banning discrimination on that basis is strong enough to overcome the presumption against coercing private parties to associate). From the beginning, Title VII contained a provision banning discrimination based on religion, and yet religion is not an immutable characteristic. Religion and sexual orientation also have something in common in the sense that some employers may have religious or moral objections to working with persons of religious persuasions or sexual orientations they consider to be sinful or otherwise problematic. That raises important and interesting questions that need careful consideration. Rather than attempt to address them here, I refer the reader to my Commission Statement in Peaceful Co-Existence: Reconciling Nondiscrimination Principles with Civil Liberties at (September 2016)(Statement of Gail Heriot), *available at* http://www.usccr.gov/pubs/Peaceful-Coexistence-09-07-16.PDF. The Statement is also *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2897849.

Commissioner Narasaki makes a different argument—that a characteristic's immutability should not drive whether anti-discrimination laws are appropriate for it (I agree with this part), but that whether the characteristic is "central to a person's identity" should. Narasaki Statement at 81-2. But that dog won't hunt. That notion that "characteristics that are fundamental and essential to one's identity," *id.* at 1, should be made the subject of anti-discrimination laws, without any further justification, runs into the problem of human complexity.

Some people consider their race fundamental to their identities; others regard their race as literally skin deep. Indeed, up until fairly recently, it was the fashion among right-thinking liberals to believe exactly that—that race was unimportant. A few days ago I overheard a young man say to an elderly woman that he had no idea about the origins of his surname and didn't know his ethnicity. On the other hand, I've known individuals who regard their astrological sign, their musical ability, their sense of humor, their extremist political ideology, their artistic ability, their entrepreneurial spirit, their Myers-Briggs personality type, and their facility with the written word to be central to their identities. One could always argue with them about what is fundamental to *their* identities. But usually, if persons say that something is fundamental to their identity, it's best to just accept that it is.

Do individuals regard sexual orientation as central to their identity? The answer is almost certainly that some do and some don't. In some surveys, some individuals acknowledge frequent consensual same-sex activity, but nonetheless do not identify themselves as lesbian, gay or bisexual.

[22] I have expressed no opinion on the extent to which Title VII, through the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), already offers protection to those who have been discriminated against on the basis of sexual orientation or gender identity. This issue became more of a front-burner issue for the Commission after this Report was approved. At the point of this writing, the Commission is preparing to address the Department of Justice's conclusion that Title VII does not cover sexual orientation and gender identity. Since I have not yet had time to consider the Commission's proposed amendments, I have not addressed them in this Statement.

PLAINTIFFS004596

Prior to 2007, the various versions of the proposed Employment Non-Discrimination Act applied only to sexual orientation and not to gender identity. Since then, however, a number of versions have been introduced that do cover gender identity. Typical of these proposed Employment Non-Discrimination Act of 2013 (S. 815),[23] which defines "gender identity" thusly:

> (7) GENDER IDENTITY.—The term "gender identity" means the gender-related identity, appearance, or mannerisms or other gender-related characteristics of an individual, with or without regard to the individual's designated sex at birth.

The proposed Act goes on to declare it to be "an unlawful employment practice for an employer" "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual . . . because of such individual's actual or perceived . . . gender identity."

That won't work. Race, sex, and sexual orientation (at least where sexual orientation is defined narrowly)[24] are statuses that for the most part are unrelated to how one does a particular job. Gender identity, however, at least as it is defined here, is not a single thing, but a whole range of things. Any "gender-related" "mannerisms" or "characteristics" constitute "gender identity."

The problem is that huge numbers of mannerisms and characteristics are gender-related, and some of them are commonly job-related. In general, we regard aggressiveness to be more characteristic of males than females. That was the whole point of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). The plaintiff in that case alleged that she was not promoted because she was thought to have an aggressive and hence "unladylike" personality, but that she would have been promoted if she had been a male with the same kind of personality. The Court agreed that if she would have been promoted if she had been male, she was discriminated against on the basis of sex within the meaning of Title VII.

By making gender-related characteristics (rather than sex itself) the subject of anti-discrimination laws, the proposed law would radically change the law. Right now it is a violation to fail to promote a woman with an aggressive personality if a man with the same personality would have been promoted. Under the proposed law, it would be a violation to fail to promote someone with a passive personality, if someone with an aggressive personality would have gotten the job.

But there are lots of jobs for which an aggressive personality is a legitimate job qualification, just as there are lots of jobs where a more passive, but nurturing, personality is the right fit. If the federal government prohibits employers from making hiring decisions on the basis of "gender-related characteristics," it will be prohibiting a lot of rational behavior.

---

[23] https://www.congress.gov/bill/113th-congress/senate-bill/815/text.

[24] In the proposed Employment Non-Discrimination Act of 2013 (S. 815), "sexual orientation" was defined this way: "(10) SEXUAL ORIENTATION.—The term "sexual orientation" means homosexuality, heterosexuality, or bisexuality." It does not include such things as pedophilia, necrophilia, or sexual sadism.

I rather suspect this is not what the drafters of the proposed Employment Non-Discrimination Act had in mind. But it is what they wrote. Its supporters may not have thought this out very well. One version actually passed the Senate in 2013. What were they thinking?

**B.    *Expansions of Title VII and Why They Have Made It Risky to Add Sexual Orientation to the Already-Existing List of Race, Color, Religion, Sex and National Origin.***

### (1)    Preferential Treatment

If there is one thing you can depend on it's that the 88th Congress banned both discrimination against women and minorities and discrimination in favor of them. It's not just that the text of Title VII makes this clear (though it does):

> It shall be an unlawful employment practice for an employer—to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).

Title VII easily could have been drafted to ban "discrimination against women" or "discrimination against racial minorities." But if it had been, it almost certainly wouldn't have passed. Instead the text proudly declares that discrimination on the basis of race, color, religion, sex, or national origin is prohibited.

If the text hadn't been crystal clear, then the legislative history would have easily clarified matters. For example, when H.R. 7152 reached the floor of the House of Representatives, the very first speech in support of it was delivered by the bill's chief sponsor, Committee on the Judiciary Chairman Emanuel Celler. Part of his speech responded to arguments against the bill, one of which was that it would lead to discrimination against whites. He responded that these arguments were "entirely wrong" and stated:

> Even [a] court could not order that any preference be given to any particular race, religion or other group, but would be limited to ordering an end of discrimination. The statement that a Federal inspector could order the employment only of members of a specific racial or religious group is therefore patently erroneous.
>
> . . . The Bill would do no more than prevent . . . employers from discriminating against *or in favor* of workers because of their race, religion, or national origin.

110 Cong. Rec. 1518 (emphasis added).

PLAINTIFFS004598

Celler's sentiments were echoed repeatedly in the Senate. In their well-known interpretative memorandum on Title VII, Senators Joseph Clark and Clifford Case, bipartisan floor managers for the bill, wrote:

> Title VII would have no effect on established seniority rights. Its effect is prospective, and not retrospective. Thus, for example, if a business has been discriminating in the past and, as a result, has an all-white working force, when the title comes into effect, the employer's obligation would be simply to fill future vacancies on a nondiscriminatory basis. He would not be obliged—*or indeed permitted*—to fire whites in order to hire Negroes, or to prefer Negroes for future vacancies, or, once Negroes are hired, to give them special seniority rights at the expense of the white workers hired earlier.

110 Cong. Rec. at 7213 (emphasis added).

This is why the 5-4 decision in *United Steelworkers v. Weber*, 443 U.S. 193 (1979), was shocking to many. In *Weber*, the Court decided that, despite all this, it was permissible for Kaiser Aluminum and Chemical Corp. and the United Steelworkers to enter into a collective bargaining agreement that permitted whites to enter into their training program *only* on a one-to-one basis with African Americans (regardless of the applicants' comparative credentials and despite the fact that white applicants were more numerous).

The majority decision in Weber triggered one of the most devastating dissents in Supreme Court history:

> [B]y a tour de force reminiscent not of jurists such as Hale, Holmes and Hughes, but of escape artists such as Houdini, the Court eludes clear statutory language, "uncontradicted" legislative history and uniform precedent in concluding that employers are, after all, permitted to consider race in making employment decisions.

*United Steelworkers v. Weber*, 443 U.S. 193, 219, 222 (1979)(Rehnquist, J., dissenting).

Justice Rehnquist's take-no-prisoners prose showed step by step how Title VII could not fairly be construed to allow racial preferences of any kind, including those practiced by Kaiser and the United Steelworkers. *See also* Bernard D. Meltzer, *The* Weber *Case: The Judicial Abrogation of the Antidiscrimination Standard in Employment*, 47 U. Chi. L. Rev. 423 (1980).

What does *Weber* have to do with the legislative proposals that would prohibit discrimination on the basis of sexual orientation? Perhaps a lot. Americans have learned that when they pass laws that forbid discrimination, what they sometimes get are laws that give preferential treatment to the group that is perceived by those in power as the underdog. For those who oppose preferential treatment, that obviously seems bad. For those who support it, it may seem good. But that may be only at a superficial level. When executive agencies and courts interpret laws to go far beyond

what was originally intended by a statute, no one should be surprised that moderate legislators become gun shy. Further legislative action becomes more difficult.[25]

At least one version of the legislative proposal appears to specifically eschew the use of affirmative action preferential treatment. But after *Weber*, such efforts would need to be ironclad. This one doesn't seem to be.

The proposed Employment Non-Discrimination Act of 2013 (S. 815) states:

> (f) NO PREFERENTIAL TREATMENT OR QUOTAS.—Nothing in this Act shall be construed or interpreted to require or permit . . .
>
> (1) any covered entity to grant preferential treatment to any individual or to any group because of the actual or perceived sexual orientation or gender identity of such individual or group on account of an imbalance which may exist with respect to the total number or percentage of persons of any actual or perceived sexual orientation or gender identity employed by any employer, referred or classified for employment by any employment agency or labor organization, admitted to membership or classified by any labor organization, or admitted to, or employed in, any apprenticeship or other training program, in comparison with the total number of percentage of persons of such actual or perceived sexual orientation or gender identity in any community, State, section, or other area, or in the available work force in any community, State, section, or other area; or
>
> (2) the adoption of implementation by a covered entity of a quota on the basis of actual or perceived sexual orientation or gender identity.

But note that this prohibits preferential treatment only in the context of efforts to match the proportions of those hired or promoted to the proportions found in some outside "community, State, section or other area." Aggressive lawyers might claim that preferential treatment designed to reap the unspecified benefits of diversity rather than to mimic the demographics of any particular "community, State, section or other area" are permissible.

On a blank slate, I would regard this as a weak argument. But in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), a Title VI case, Justice Powell drew exactly this distinction. In his controlling opinion, he rejected the idea that the University of California could grant preferential treatment on the basis of race to medical school applicants in order to better match the student body to the racial composition of California. But he upheld the authority of the

---

[25] *See* Daniel B. Rodriguez & Barry R. Weingast, The Positive Political Theory of Legislative History: New Perspectives on the 1964 Civil Rights Act and Its Interpretation, 151 U. Penn. L. Rev. 1417, 1535 (2003) (arguing that, after the judicial expansions of Title VII, some Members of Congress "were likely nervous about agreeing [with Members who supported those expansions] on legislative bargains, which, when they came before the courts, would be rewritten").

PLAINTIFFS004600

University of California to grant preferential treatment on the basis of race in order to reap the pedagogical benefits of diversity.

Justice Rehnquist was right. For the majority in *Weber* to come out as they did required the skills of escape artists like Houdini. Given *Bakke*, however, getting around the proposed Employment Non-Discrimination Act of 2013's ban on preferential treatment or quotas would not be nearly as difficult.

### (2)   Harassment

It is difficult to defend *Weber* as a matter of statutory interpretation no matter what one thinks of it as a matter of policy. The interpretation was just plain wrong, and painfully so. It would not be fair to put *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986), in the same category. For reasons I hope to write about elsewhere, I believe the basic thrust of *Meritor Saving Bank* decision—that at least in some circumstances sexual harassment can be actionable under Title VII—is surely defensible.

The origins of the problems with current doctrine on sexual harassment are more subtle. Five years after *Meritor Savings Bank*, when the ill-conceived Civil Rights Act of 1991 made ordinary monetary damages available under Title VII, sexual harassment lawsuits became much more common, and employers became more fearful of them.

Their fear was mainly of "hostile environment" cases.[26] Employers could be liable for the *cumulative* effect of a series of many rude remarks, slights, and inconveniences, each of which might have come from a different employee (or even a customer). The only way to be sure of not being sued was (and is) to prevent as many as possible of them.

If an employee is upset at the photo of her colleague's bikini-clad wife on his desk, it is in the employer's interest to make him get rid of it.[27] If another employee doesn't like to be told by her

---

[26] The "quid pro quo" kind of sexual harassment case was easier for employers to deal with. These are the cases in which an employee is told that she (or he) must engage in sexual relations if she (or he) wishes to be hired, get a promotion, or avoid dismissal. So long as the employee can demonstrate that a similarly-situated employee of the opposite sex would not have had to submit to this, one can see why such a deal amounts to discrimination on the basis of sex. Note that the shoe can be on the other foot here as well. An employee whose sexual favors are not desired may also have a Title VII complaint, because he (or she) was not given a similar opportunity to be hired, promoted, or avoid dismissal.

To deal with the "quid pro quo" cases, employers need to make it crystal clear to their supervisory personnel that such deals will not be tolerated. As a secondary precaution, they need to make sure that employees know the rules and have someone other than their supervisor to report to if their supervisor breaks those rules.

[27] Bonnie Miller Rubin & Judy Peres, Workplace on Edge Over Harassment, Chicago Tribune (April 3, 1998)("In 1993, a University of Nebraska graduate student was forced to remove a photo of his bikini-clad wife from his desk when two fellow students complained that it offended their sensibilities").

Working for Inclusion: Time for Congress to Enact Federal Legislation

boss that her hair looks nice today, the employer has every incentive to order him to stop.[28] And if a copy of Goya's Naked Maja hanging in the building upsets an employee, the employer's instinct is unlikely to leave it there for others to enjoy. Rather, the picture is likely to be taken down.[29] If the other employees start to complain, the safe solution is to tell them to shut up and arrange for them to take a course in sexual harassment once a year.

"'We advise employers not to focus on the legal definition of harassment, but to have zero tolerance for any behavior extraneous to the workplace. There shouldn't be any touching or sexual joking. Period,'" an employment lawyer told the *Chicago Tribune* in 1998.[30]

When these kinds of actions started to become commonplace, many Americans—indeed a majority—began to wonder if we weren't going down the wrong road. In a 1997 CNN poll, 57% of men and 52% of women agreed that "we have gone too far in making common interactions between employees into cases of sexual harassment."

Since then, the pressure to avoid saying anything that might be construed as offensive has only increased. Sometimes it had served to suppress serious discussions.[31] A recent example is the firing of software engineer James Damore at Google.

Damore wrote what was intended to be an internal discussion memorandum entitled "Google's Ideological Echo Chamber." Contrary to what some media outlets claimed, it was not an anti-diversity or misogynistic screed. In fact, it went out of its way to suggest helpful ways to make employment at Google more attractive to women.

But it dared to question whether women's underrepresentation in software engineering and in leadership positions at Google is wholly due to bias against them. It argued—alluding to a large body of scientific evidence—that fewer women than men may aspire to be software engineers. Damore was careful to acknowledge that there is plenty of variation among men and among women, but as a group, women tend to be more interested in people-oriented jobs. And while Damore's statement says nothing about particular women or particular men, especially those who already work at Google, it happens to be a true statement at the general level. It's certainly worth talking about whether that might account for some of the under-representation of women at Google.[32]

---

[28] *See Ellison v. Brady*, 924 *F.2d* 872 (9th Cir. 1991)("Well-intentioned compliments by co-workers or supervisors can form the basis of a sexual harassment cause of action . . . .").

[29] Nat Hentoff, Sexual Harassment by Francisco Goya, Washington Post (December 27, 1991).

[30] Bonnie Miller Rubin & Judy Peres, Workplace on Edge Over Harassment, Chicago Tribune (April 3, 1998).

[31] *See* David Bernstein, You Can't Say That!: The Growing Threat to Civil Liberties from Antidiscrimination Laws (2004).

[32] *See, e.g.*, Peter Singer, Why Google Was Wrong: Did James Damore Really Deserve to be Fired for What He Wrote? N.Y. Daily News (August 10, 2017).

But instead the author of the memo was fired. And one of the arguments made for his firing was that his memo violates Title VII: He is creating a hostile atmosphere for women, some observers argued; if he isn't fired, Google may be sued. *See e.g.*, Dan Eaton, Here's Why Google Had the Right to Fire that Employee over his Diversity Memo, cnbc.com (August 8, 2017)("Google Vice President of Diversity, Inclusion & Governance Danielle Brown is correct that an employee has no right to engage in workplace discourse that offends anti-discrimination laws; employees may not engage in unlawful harassment under the guise of protected concerted activity or political grievances."), *available at* https://www.cnbc.com/2017/08/08/heres-why-google-had-the-right-to-fire-that-employee-over-his-diversity-memo-commentary.html.

Some people at Google might have wanted Damore fired even if they had believed Google didn't need to worry about Title VII liability. But the culture—an intolerance of serious discussions about issues relating to sex—has been created in part because cautious people err on the side avoiding litigation. All too often that means appeasing extremists.

Google, of course, is a private entity and is not required to honor Damore's First Amendment rights. But Congress is. Insofar as Title VII liability was what drove Google's decision, Title VII (as interpreted) itself is unconstitutional.

Expanding Title VII's reach to other areas, whether it's to sexual orientation, gender identity or something else, can only compound the problem. Future discussions like that Damore tried to initiate would be squelched.

Consider the following situation: Even ten years ago, if someone had argued that New York City would pass a law requiring landlords to address tenants by the pronouns of the tenant's choice (rather than the pronouns of the landlord's choice or the pronouns that correspond to the tenant's actual anatomical sex), they would have been laughed at. But that has become a reality.[33] Would expanding Title VII cause such a rule to be applied to the workplace around the country? It isn't clear to me why it wouldn't.

---

[33] New York City Commission on Human Rights Legal Enforcement Guidance on Discrimination on the Basis of Gender Identity or Expression: Local Law No. 3 (2002); N.Y.C. Admin. Code § 8-102(23). Eugene Volokh, You Can Be Fined for Not Calling People "Ze" or "Hir," if That's the Pronoun that They Demand You Use, The Volokh Conspiracy, May 17, 2016, *available at* https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/05/17/you-can-be-fined-for-not-calling-people-ze-or-hir-if-thats-the-pronoun-they-demand-that-you-use/; Richard Thomson, Transgender Individuals and Free Speech in New York City, The Federalist Society Blog, May 16, 2016, *available at* https://www.fed-soc.org/blog/detail/?dbid=459. See also Naveed Ahsan, The Silencing of Jordan Peterson, Fair Observer (August 30, 2017)(discussing the practices of the Ontario Human Rights Commission under which "it is now punishable if individuals refuse to use non-gender pronouns such as 'ze' or 'zir' to refer to transgender people"), *available at* https://www.fairobserver.com/region/north_america/jordan-peterson-canada-transgender-rights-debate-news-51321/; Lindsey Bever, Students Were Told to Select Gender Pronouns; One Chose "Your Majesty" to Protest "Absurdity," Washington Post (October 7, 2016).

PLAINTIFFS004603

Unlike the problem of preferential treatment, the problem of harassment overreach is not treated at all in any version of the legislative proposals considered in this Report.

### (3)   Disparate Impact

This is another one where the Supreme Court has misapplied Title VII, transforming it from a statute that requires equal treatment into one that presumptively requires equal results. See *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). The various iterations of the proposed Employment Non-Discrimination Act have attempted to deal with this problem.[34] But for reasons I will discuss more fully below, at least the version that passed the Senate in 2013 ultimately failed in its attempt to do so. In addition, the proposed Equality Act does allow for disparate impact claims.

To explain how all this fits together, one must start at the beginning:

While the passage of Title VII was important and historic, it was not intended to assert federal control over every aspect of the workplace. Its carefully limited purpose was to prohibit employment discrimination based on race, color, religion, sex and national origin. As Representative William M. McCulloch et al. put it:

> [M]anagement prerogatives and union freedoms are to be left undisturbed to the greatest extent possible. Internal affairs of employers and labor organizations must not be interfered with except to the limited extent that correction is required in discrimination practices.[35]

At the time, this was likely seen as an obvious, but important, point. Free enterprise had always been the engine that drove the nation's prosperity. For that and other reasons, the best way for the federal government to promote the general welfare, including the welfare of women and minorities, had usually been to allow peaceable and honest individuals the freedom to run their own business affairs. When exceptions become necessary (as they did in 1964), they were understood by most as precisely that—exceptions. They were not intended to swallow the rule.

Congressional leaders assured their colleagues that Title VII would not interfere with employer discretion to set job qualifications—so long as race, color, religion, sex and national origin were not among them. Senators Clifford Case (R-N.J.) and Joseph Clark (D-Pa.), the bill's co-managers on the Senate floor, emphasized this in an interpretative memorandum:

> There is no requirement in Title VII that employers abandon *bona fide* qualification tests where, because of differences in background and education, members of some

---

[34] The proposed Employment Non-Discrimination Act of 2013 (S. 815), *available at* https://www.congress.gov/bill/113th-congress/senate-bill/815/text. It states: "(g) NO DISPARATE IMPACT CLAIMS.—Only disparate treatment claims may be brought under this Act." For reasons why this language fails to cover disparate impact claims brought under the "gender identity" provisions of the proposal, see infra at 127.

[35] Statement of William M. McCulloch, et al., H.R. Rep. No. 914, 88th Cong., 2d Sess. (1964). McCulloch was the House Judiciary Committee's ranking member and was considered by many to have been indispensable in passing the Act.

PLAINTIFFS004604

> groups are able to perform better on these tests than members of other groups. An
> employer may set his qualifications as high as he likes, he may test to determine
> which applicants have these qualifications, and he may hire, assign, and promote
> on the basis of test performance.

Case & Clark Memorandum, 110 Cong. Rec. 7213.

Note that Case and Clark used the term "*bona fide* qualification tests," meaning qualification tests adopted in good faith, and not "necessary" or "scientifically valid" qualification tests. To Case and Clark the issue was whether the employer chose a particular job qualification *because* he believed it would bring him better employees or *because* he believed it would help him exclude applicants based on their race, color, religion, sex or national origin. *See also* Case & Clark Memorandum, 110 Cong. Rec. 7247 (Title VII "expressly protects the employer's right to insist that any prospective applicant, Negro or white, must meet the applicable job qualifications. Indeed, the very purpose of Title VII is to promote hiring on the basis of job qualifications, rather than on the basis of race or color.").

Congress's intention to outlaw only discriminatory treatment and not disparate impact is made clear from Title VII's central prohibition, which bans discrimination against any individual "because of such individual's race, color religion, sex, or national origin." As Richard K. Berg, one of the government lawyers who worked on Title VII's passage, wrote, to "discriminate" against an individual "because of" his "race, color, religion, sex, or national origin" always requires some level of intentionally, whether the intention is conscious or unconscious.[36]

But just in case Section 703 were to be misinterpreted, the bill was amended in the Senate at the insistence of Republican Leader Everett Dirksen—without whose support the bill likely never would have gotten past the Southern filibuster. Dirksen insisted on adding the word "intentionally" to Section 706(g), which deals with judicial power to enforce the prohibitions of Section 703. As modified, Section 706(g)(1) read:

> (1) If the court finds that the respondent has intentionally engaged in or is
> intentionally engaging in an unlawful employment practice charged in the
> complaint, the court may enjoin the respondent from engaging in such unlawful
> employment practice, and order such affirmative action as may be appropriate,
> which may include, but is not limited to, reinstatement or hiring of employees, with
> or without back pay . . . , or any other equitable relief as the court deems appropriate.
> . . .

42 U.S.C. sec. 2000e-5(g)(1).

---

[36] *See* Richard K. Berg, Equal Employment Opportunity Under the Civil Rights Act of 1964, 31 Brook. L. Rev. 62, 71 (1964) ("Discrimination is by its nature intentional. It involves both an action and a reason for the action. To discriminate 'unintentionally' on grounds of race . . . appears a contradiction in terms").

PLAINTIFFS004605

In explaining why the term "intentionally" was added here, Senator Hubert Humphrey said, "Section 706(g) is amended to require a showing of intentional violation of the title in order to obtain relief. . . . The expressed requirement of intent is designed to make it wholly clear that inadvertent or accidental discrimination will not violate the title or result in entry of court orders." 110 Cong. Rec. 12,723-28 (1964).[37]

In addition, by denying the newly-created EEOC both substantive rulemaking authority and to issue cease and desist orders, Title VII's Congressional supporters attempted to ensure Title VII's reach could not be expanded. The power to issue regulations might be interpreted to authorize limited prophylactic measures, and Congress evidently wished to make it clear that Title VII was already as broad as they intended it to be. The EEOC was to be a mediating agency *only*.

But EEOC officials soon began issuing guidances as an alternative to substantive regulations. Alfred W. Blumrosen, BLACK EMPLOYMENT AND THE LAW 52 (1971). Given most employers' eagerness to stay on the right side of the law, these guidances can be as effective (or even more effective) as regulations at influencing employer practices. An advantage from the EEOC's perspective is that they are not subject to notice and comment requirements and thus tend to receive less public scrutiny or government oversight. They are also difficult to challenge in court.[38] They are, of course, supposed to be interpretations of the Act and not extensions of it. But in practice the EEOC went much further.

Blumrosen, the EEOC's first "Chief of Conciliations" and disparate impact liability's primary architect, was unabashed in describing the extent to which the EEOC was (and in his view should be) aggressive in its interpretation of Title VII:

> Creative administration converted a powerless agency operating under an apparently weak statute into a major force for the elimination of employment discrimination. . . . [Legal education] rarely deals with the affirmative aspects of administration. Rather, the law schools provide elaborate intellectual equipment to *restrict* the efforts of administrators. Constitutional law and administrative law are still largely concerned with what government may not do, rather than with how it should decide what it may do. Students impatient with the negativism of present legal education would be better equipped as lawyers if they would focus sharply on the question of "how we can best fulfill the purposes which brought our agency into being" rather than on the question of "whether the courts will sustain this course of action."

---

[37] Dirksen's amendment and Humphrey's explanation are not in perfect harmony, since the amendment applied only to judicial remedies, while Humphrey's explanation applies generally. Dirksen might possibly have intended to foreclose courts from intervening even in the case of unconscious disparate treatment and to leave such cases entirely to the EEOC's mediation efforts. An employer who engaged in unconscious discrimination would essentially be allowed "one free bite." If the employer continued its practices after EEOC mediation efforts, it would be difficult for the employer to maintain that its actions were unconscious.

[38] The fact that Title VII makes EEOC investigations and mediations confidential, 42 U.S.C. 2000e-8(e), adds to the degree to which EEOC policymaking has tended to escape both public scrutiny and government oversight.

PLAINTIFFS004606

*Id.* at 53 (emphasis in original).

Blumrosen was part of the generation of civil rights policymakers profoundly influenced by the turbulence of the late 1960s—something that is easy to forget today. He urgently pushed the EEOC to interpret Title VII with an eye toward effectuating what he perceived as a higher purpose—increasing African-American employment as quickly as possible—rather than with an eye towards what the courts would be likely to uphold as consistent with Congressional intent as well as the statute's text. In particular, he pushed a "disparate impact" approach to Title VII. Under it, employer intent didn't matter. If, given the job qualification required by an employer, proportionately fewer African Americans than whites qualify, the employer is in violation of Title VII unless it can demonstrate that it essentially had no choice.

Historian Hugh Davis Graham wrote concerning this period in the EEOC's history:

> "The EEOC legal staff was aware from the beginning that a normal, traditional, and literal interpretation of Title VII could blunt their efforts [based on disparate impact theory] against employers who used either professionally developed tests or *bona fide* seniority systems. The EEOC's own official history of these early years records with unusual candor the commission's fundamental disagreement with its founding charter, especially Title VII's literal requirement that the discrimination be intentional."

Hugh Davis Graham, THE CIVIL RIGHTS ERA: ORIGINS AND DEVELOPMENT OF NATIONAL POLICY at 248-49 (1990).

In *Griggs v. Duke Power Co.*, the Supreme Court deferred to the EEOC's disparate impact approach to Title VII liability. It held, therefore, that under Title VII, "practices, procedures, or tests neutral on their face, *and even neutral in terms of intent*, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Id.* (emphasis supplied). "The touchstone is business necessity," it stated. "If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.* at 431.[39]

As explained above, this was certainly a misinterpretation of Title VII. *See* Hugh Davis Graham, THE CIVIL RIGHTS ERA: ORIGINS AND DEVELOPMENT OF NATIONAL POLICY at 387 (1990)("Burger's interpretation in 1971 of the legislative intent of Congress in the Civil Rights Act would have been greeted with disbelief in 1964"); Daniel Rodriguez & Barry R. Weingast, *The Positive Political Theory of Legislative History: New Perspectives on the 1964 Civil Rights Act and Its Interpretation*, 151 U. Penn L. Rev. 1417 (2003) (also arguing that the 88th Congress would have been astonished at the result in *Griggs*).

---

[39] The facts of Griggs may well have involved intentional discrimination. But if so, it should have been incumbent upon the plaintiffs to prove their case on that theory.

PLAINTIFFS004607

After *Griggs*, Title VII was interpreted to demand two things: (1) Employers must provide equality of opportunity to all persons regardless of race, color, sex, religion or national origin (the traditional interpretation of Title VII); and (2) In deciding upon job qualifications, employers must provide at least equal results for women and minorities unless they can prove they are driven by business necessity to do otherwise (the disparate impact interpretation). For decades, few remarked on it, but these dual requirements were at war with each other from the beginning. Equality of treatment and equality of results are very different.[40]

*One problem with disparate impact theory is that all job qualifications have a disparate impact.* It is no exaggeration to state that there is always some protected group that will do comparatively poorly with any particular job qualification. As a group, men are stronger than women, while women are generally more capable of fine handiwork. Chinese Americans and Korean Americans score higher on standardized math tests and other measures of mathematical ability than most other ethnic groups. Subcontinental Indian Americans are disproportionately more likely to have experience in motel management than Norwegian Americans, who more likely have experience growing durum wheat. African Americans are over-represented in many professional athletics as well as in many areas of the entertainment industry. Unitarians are more likely to have college degrees than Baptists. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977 (1988)(recognizing that disparate impact liability applies to subjective as well as objective job qualifications).

Some of the disparities are surprising. Cambodian Americans are disproportionately likely to own or work for doughnut shops and hence are more likely to have experience in that industry when it is called for by an employer. *See* Seth Mydans, *Long Beach Journal: From Cambodia to Doughnut Shops*, N.Y. Times, May 26, 1995. The reasons behind other disparities may be more obvious: Non-Muslims are more likely than Muslims to have an interest in wine and hence develop qualifications necessary to get a job in the winemaking industry, because Muslims tend to be non-drinkers.

---

[40] The problem was compounded by establishing a stringent standard of proof for "business necessity" that few employers can dream of achieving in *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975). The employer there had hired an expert industrial psychologist to conduct a validation study to justify its use of standardized tests to hire and promote its employees. But the Court found the expert's report was not sufficiently scientifically rigorous. Among other things, the job qualifications had not been validated at the micro-level, i.e. for each of an employer's job categories. But it is nearly impossible for any but the largest employers to generate enough data for statistically significant validation studies. Under *Albemarle*, unless a bank could scientifically prove that high-school graduates make better tellers than high-school dropouts, it could not require a high-school diploma for tellers, since proportionally more whites than African Americans possess such a diploma. Indeed, its proof would have to apply specifically to its own tellers, including its minority tellers, not just to tellers in general. It was Justice Blackmun in his concurrence who tentatively sounded the alarm: "I fear that a too-rigid application of the EEOC Guidelines will leave the employer little choice, save an impossibly expensive and complex validation study, but to engage in a subjective quota system of employment selection." 422 U.S. at 449 (Blackmun, J., concurring in the judgment). While *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989), appeared to overrule *Albemarle*, the Civil Rights Act of 1991 restored the law to its pre-*Wards Cove* condition.

PLAINTIFFS004608

The result is that the labor market is anything but free and flexible. At any moment, the EEOC—an agency Congress designed to have very limited power—can declare an employer's long-standing job requirements to be a violation of Title VII.[41]

The upshot of this is that hiring and firing practices must be shrouded in secrecy. Employers seldom advertise clear job qualifications for fear they will attract a lawsuit. Performance tests, indeed any kind of innovative hiring practices, are invitations to a lawsuit. Wise employers try to be on good terms with the EEOC, knowing that when everything is potentially illegal, the name of the game is to avoid antagonizing the regulator.

Passing any version of the employment discrimination legislative proposal discussed in this Report can only make the problem worse. Even the proposed Employment Non-Discrimination Act of 2013, which specifically eschews the application of disparate impact liability, has the problem. By defining "gender identity" as "the gender-related identity, appearance, or mannerisms or other gender-related characteristics of an individual, with or without regard to the individual's designated sex at birth," the proposal embeds disparate impact into the proposal's core prohibition.

There is no way to define "gender-related" mannerisms and characteristics except by disparate impact. Not all women wear make-up or skirts, but those characteristics are more commonly associated with women than with men. Not all men sing baritone, have short hair, enjoy watching sports on television, own guns, or wear boxer shorts, but these are all characteristics that are to a greater or lesser extent more common among men than among women.

If a statute prohibits employers from discriminating on the basis of characteristics that have a disparate effect on men and women, there is no need for a separate ability to bring lawsuits based on a disparate impact theory.

## II. DATA ARE NOT ALWAYS ACCURATELY AND FAIRLY PRESENTED IN THIS REPORT

There is a lot that is wrong with this Report simply from the standpoint of accurately and fairly reporting the facts. Consider, for example, the very first sentence of the very first section: "American employees spend the majority of our awake hours at work." That isn't true.[42] Assuming

---

[41] Note that disparate impact liability applies to promotions and terminations too. *See George v. Farmers Electric Cooperative, Inc.*, 715 *F.2d* 175 (5th Cir. 1983); *Wilmore v. Wilmington*, 699 *F.2d* 667 (3d Cir. 1983).

[42] Bureau of Labor Statistics, Department of Labor, American Time Use Survey—2016 Results (June 27, 2017), *available at* https://www.bls.gov/news.release/pdf/atus.pdf. The data in that report don't make it easy to calculate exactly how much time American employees spend at work. But it is possible to see or to calculate from Table 4 that full-time workers were 77% of all American workers. They worked just a hair over 5 days a week and an average of 8.15 hours per day on the days they worked (for a total of approximately 40.75 hours). Part-time workers were 33% of the workforce. On average they worked slightly less than 4 days per week and averaged 5.34 hours on the days that they worked.

PLAINTIFFS004609

that the typical American employee sleeps 8 hours a day, that leaves 112 waking hours per week. Assuming a 5-day, approximately 40-hour work week, that is less than half, even before one figures in holidays and vacations. Once one figures in part-time work, the sentence isn't close to true. The point is trivial . . . but it doesn't fill one with a lot of confidence to start the Report that way. [43]

Other errors are somewhat less trivial. Accurately reporting the results of the 2013 survey conducted by the Centers for Disease Control and Prevention's National Center for Health Statistics somehow got botched. The report states that "3.4 percent of Americans identify themselves as gay or lesbian (1.6%), bisexual (0.7%) or 'something else' (1.1%)." The correct figures are that 2.5% percent of Americans identify themselves gay or lesbian (1.6%), bisexual (0.7%) or "something else" (0.2%).[44] Two additional categories were "I don't know" (0.4%) and refused to provide an answer (0.6%).

There are likely more such errors. But I have time to describe only one significant area. Perhaps the most troubling aspect of the report's use of data what looks a bit like a purposeful effort to hide the ball concerning income disparities. In the portion of the report entitled "Economic Impacts from Workplace Discrimination," the report recites, "On average gay men earn from 10 to 32 percent less than similarly qualified heterosexual males."[45] Rep. at 14.[46] By itself, that figure may

[43] After I handed in my Statement (and apparently as a result of my criticism), this problem was corrected (along with several other corrections). It is extremely unusual to make anything other than formatting changes to reports that have already voted on by the Commission, since corrected reports need to be resubmitted to the Commission.

[44] The material in the text is as of the date the Commission approved the report. After the due date of the Commission's statements, but before the deadline for rebuttal material, I learned that the staff planned to alter the passage to read, "A 2013 survey conducted by the Center for Disease Control and Prevention's National Center for Health Statistics found that 3.4 percent of Americans identify themselves as gay or lesbian (1.6 percent), bisexual (0.7 percent) or 'other' (1.1 percent)." This is still wrong. Individuals who refuse to answer the question (0.6 percent) or who have reported that they don't know (0.4 percent) did not "identify" themselves as "other." Even those who identify themselves as "something else" may simply mean that they are celibate. Beyond all this, the staff should never make substantive changes to a report after it has been adopted by the Commission without a Commission vote to accept those changes.

[45] When the Report says these studies compare gay men to "similarly qualified heterosexual males" it means that they controlled for things like whether the individuals covered in the study had a high school diploma, some college, a college degree or advanced degree and whether they reside in a metropolitan area. The studies also attempt roughly to control for broad job categories. Only then do the numbers begin to suggest that gay men might be "underpaid" relative to heterosexual men.

But the qualifications controlled for are far too rough to be fair. Not all college degrees are equal. An electrical engineering or computer science degree will ordinarily result in a much higher starting salary than a degree in psychology or communications.

Similarly, the efforts to control for job category are rudimentary. For example, one article divided up individuals into "executive," "specialist," "low-skilled workers," and "everyone else." Nathan Berg & Donald Lien, Measuring the Effect of Sexual Orientation on Income: Evidence of Discrimination?, 20 Contemp. Econ. Pol'y 394 (2002)(Berg & Lien also controlled for race, experience, experience squared, union membership, region of the country, urban status and educational attainment). *See also* John M. Blandford, The Nexus of Sexual Orientation and Gender in the Determination of Earnings, 56 Indus. & Lab. Rel. Rev. 622, 638-39 (2003)(making the point that controls for job category are rudimentary in these studies).

[46] Curiously, the Report does not cite the actual studies it (indirectly) is referring to. Rather, it cites an article that attempts to summarize those studies. Rep. at 14, n.70 (citing M.V. Lee Badgett, Holming Lau, Brad Sears, Deborah

PLAINTIFFS004610

seem to some to indicate discrimination. But a closer examination shows that things are much more complicated.[47]

The Report's sin is one of omission. First of all, it fails to make clear that comparisons between lesbians and heterosexual women run strongly in the opposite direction: ***On average, lesbians substantially out-earn heterosexual women.*** Instead, the Report states only that several studies "*show that lesbian or bisexual women **do not earn less** than heterosexual women*." Rep. at 50 (boldface added).

For example, in *The Nexus of Sexual Orientation and Gender in the Determination of Earnings*, among full-time workers, the median income for Lesbian/Bisexual women was almost 18% more than that for married or unmarried women.[48] Similarly, *An Investigation into Sexual Orientation Discrimination as an Explanation for Wage Differences* found "women living with partners of the same sex tend to have higher earnings than otherwise similar women."[49] *The Earnings Effects of Sexual Orientation* came to a similar conclusion—that lesbian/bisexual orientation is associated with about a 20% wage premium.[50] There is no shortage of such studies.[51] In *Measuring the Effect*

---

Ho, Bias in the Workplace: Consistent Evidence of Sexual Orientation and Gender Identity Discrimination, Williams Institute (June 2007), *available at* https://williamsinstitute.law.ucla.edu/research/discrimination/bias-in-the-workplace-consistent-evidence-of-sexual-orientation-and-gender-identity-discrimination/.

[47] Gay men are more likely to have college and advanced degrees than heterosexual men. In addition, gay men are more likely to live in metropolitan areas, where wage scales are higher (and living expenses are also higher). *See, e.g.,* Christopher Carpenter, Samuel Eppink, Does it Get Better? Recent Estimates of Sexual Orientation and Earnings in the United States, *available at* http://onlinelibrary.wiley.com/doi/10.1002/soej.12233/full. The studies referred to by the Report attempt to control for these factors. Some early surveys found that gay men out-earn heterosexual men when such factors are not controlled for. *See, e.g.,* Steve Teichner, Results of Polls, San Francisco Examiner A-19 (June 6, 1989).

[48] John M. Blandford, The Nexus of Sexual Orientation and Gender in the Determination of Earnings, 56 Indus. & Lab. Rel. Rev. 622, 633 (2003). Comparisons are between full-time workers.

[49] Suzanne Heller Clain & Karen Leppel, An Investigation into Sexual Orientation Discrimination as an Explanation for Wage Differences, 33 Applied Econ. 37 (2001). Heller & Leppel noted that Badgett came to the opposite conclusion in 1995 (*i.e.* that lesbian and bisexual women earned less than heterosexual women). They state, however, that Badgett's "finding was not consistently statistically significant across specifications" and that "Badgett's sample included only 34 (4.9%) lesbian or bisexual women, . . . so insignificant results are not surprising." *Id.* at 37. *See* M.V. Lee Badgett, The Wage Effects of Sexual Orientation Discrimination, 48 Indus. & Lab. Rel. Rev. 726 (1995).

[50] Dan A. Black, Hoda R. Makar, Seth G. Sanders & Lowell J. Taylor, The Earnings Effects of Sexual Orientation, 56 Indus. & Lab. Rev. 449, 463 (2003)("Lesbian/bisexual orientation appears to raise earnings of women by about 20%, a result that is both economically and statistically significant"). Comparisons are between full-time workers. "While gays and lesbians had levels of education similar to those of their heterosexual counterparts, they were half as likely to be married, they were more likely to live in the West and Northeast, and they were more likely to live in large cities. Following Badgett, we use regression analysis to control for these background differences." *Id.* at 452.

[51] *See* Christopher S. Carpenter, Self-Reported Sexual Orientation and Earnings: Evidence from California, 58 Indus. & Lab. Rel. Rev. 258, 263 (2005)("[L]esbian full-time workers report higher average earnings last month ($3,816) than do female unmarried bisexuals ($3,247), married bisexuals ($3,329), unmarried heterosexuals ($3070), or married heterosexuals ($3,631)"). This California-based study had interesting results for men too: Gay men earned more than heterosexual men. The authors wrote: "Among full-time working men, married straight men report the highest average earnings last month, $5,207, followed by gay men ($4,504), bisexual married men ($4,076), unmarried straight men ($3,518), and unmarried bisexual men ($3,382)." *Id.* at 263. But if one combines the heterosexual married men (n=8,810) and heterosexual unmarried men (n=7,158) categories, one gets an average

PLAINTIFFS004611

*of Sexual Orientation on Income: Evidence of Discrimination?*, the authors found that lesbians, on average, earn more than 30% more than heterosexual women.[52]

Why is that important? The data on lesbian earnings put the data on gay men's earnings in an entirely different light. The Report asks us to take a leap of logic. It tries to suggest that if, once certain basic credentials are controlled for, heterosexual men earn more than gay men, then it must be because of discrimination against gay men. But if lesbians substantially out-earn heterosexual women after such rudimentary controls are put into place, ***there needs to be an explanation for why. If we are to assume adjusted wage disparities prove gay men are being discriminated against, employers discriminate against gay men, then why don't we assume that employers are discriminating in favor of lesbians?*** The most logical explanation for all this is that the initial premise is wrong and that there is a lot more going on with these numbers than discrimination. Indeed, discrimination may not be playing any role at all.

The Report paraphrases Badgett et al. for its attempt at an explanation for why lesbians, in the Report's language "do not earn less than heterosexual women":

> Badgett et al., argue that this does not imply the absence of employment discrimination. They argue that these findings suggest that since lesbians may not be constrained by the same gender expectations that result from being in relationships with men, they may make different decisions than heterosexual women (*e.g.* choosing to delay or not have children, invest more into training, go into male-dominated professions) which may hide effects of discrimination.

Report at 48.

Well, yes, of course. But the Report doesn't seem to realize it has given away the store. Just as lesbians may make different career choices, so might gay men. They may choose a career in nursing instead of a career in mechanical engineering. They may choose not to work overtime in order to earn the money necessary to put a down payment on a five-bedroom house that will fit the children. They may choose to engage in a high-risk entrepreneurial activity—like opening a new restaurant—because they don't expect to be having to support a family in the near future. Just as the fact that lesbians earn more than heterosexual women doesn't eliminate the possibility that they have been discriminated against, the fact the gay men earn less (at least after rudimentary

---

income for heterosexual men of $4,450, which is less than the income for gay men (although greater than the income for the two bisexual categories).

[52] Nathan Berg & Donald Lien, Measuring the Effect of Sexual Orientation on Income: Evidence of Discrimination?, 20 Contemp. Econ. Pol'y 394 (2002). *See also* Christopher S. Carpenter & Samuel T. Eppink, Does It Get Better?: Recent Estimates of Sexual Orientation and Earnings in the United States, 84 Southern Econ. J. 426, 426 (2017)(calling the finding that self-identified lesbians earn significantly more than comparable heterosexual women "well-documented" and reproducing that finding yet again).

PLAINTIFFS004612

controls are used) doesn't prove they have been discriminated against. There can be lots of other explanations.

If we want to understand the situation, we need to be looking at the different jobs that gay and heterosexual men are undertaking. There is certainly evidence gay men are disproportionately attracted to certain jobs. "Numerous scholars have noted the disproportionately high number of gay and lesbian workers in certain occupations" and that "common to both gay men and lesbians is a propensity to concentrate in occupations that provide task independence or require social perceptiveness, or both."[53]

We also need to be looking at differences in college major choice. It is not easy to come up with solid empirical data on the differences in college major choices between gay and heterosexual men. But there is lots of data about the differences in college major choices between women and men. For example, according to the American Enterprise Institute, electrical engineering majors (82% of whom are male) can expect to earn an average of $70,000 in their first 5 years of work. By contrast, psychology majors (only 23.3% of whom are male) can expect only $42,000.[54] Given these differences, it would be surprising if gay and heterosexual men made precisely the same college major choices.[55]

In addition, we need to know which households are rearing children. Who has primary responsibility for providing monetary support for children and who doesn't? Who has primary responsibility for providing direct supervision for children?

The kind of information necessary to undertake such a study is hard to come by. But that is why President Eisenhower and the 85th Congress established the Commission in the first place—in order to conduct research on civil rights issues that otherwise might not get undertaken. Instead of conducting that research, the Commission chose to simply present other people's research on income disparities without proper context.

Here is what John Blandford had to say on the subject in *The Nexus of Sexual Orientation and Gender in the Determination of Earnings* (a study that found both that gay/bisexual men are paid

---

[53] Andras Tilcsik, Michel Anteby, and Carly R. Knight, "Concealable Stigma and Occupational Segregation: Toward a Theory of Gay and Lesbian Occupations, 60 Administrative Science Quarterly 446 (2015), *available at* http://www.michelanteby.net/files/manteby/files/concealable_stigma.pdf. Although Tilcsik et al. argue that bias against gays does influence these preferences—*e.g.* people who are concerned about being discriminated against are more likely to prefer occupations where they are often able to work independently—the mechanism described in their study is more complex than simple "discrimination drives gays out of certain jobs."

[54] Mark J. Perry, Highest-Paying College Majors, Gender Composition of Students Earning Degrees in those Fields and the Gender Pay Gap, American Enterprise Institute (October 19, 2016), *available at* http://www.aei.org/publication/highest-paying-college-majors-gender-composition-of-students-earning-degrees-in-those-fields-and-the-gender-pay-gap/.

[55] I am not aware of any claims that major choices of gay and heterosexual males are identical. But most of the discussions of the issue involve at least in part informal observations. *See* Manil Suri, Why Is Science So Straight?, N.Y. Times (September 4, 2015).

PLAINTIFFS004613

less than heterosexual men and that lesbian/bisexual women are paid more than heterosexual women):

> The evidence described in this study strains the credibility of the argument that measured wage differentials between heterosexual workers and gay, lesbian, and bisexual workers are owing solely to workplace attitudes about homosexuality. Defending that explanation would require explaining how workplace attitudes could penalize non-heterosexual male workers while simultaneously awarding lesbian and bisexual female workers with a substantial premium. Certainly, workplace attitudes toward sexual orientation may have a gender component; that is, bias against homosexuality and bisexuality may be more strongly expressed against persons of one gender than of another. Nonetheless, it seems unlikely that the wage effects would differ in sign rather than merely in magnitude.
>
> A more probable explanation for the disparate earnings effects of sexual orientation across genders may be found in treating workplace bias as but one orientation-related factor influencing earnings outcomes. Workplace bias that might negatively affect the wages of lesbian and bisexual women appears to be offset by other labor market factors. Most influential among these factors are subtle occupational clustering effects not adequately captured by the two-digit controls in this study or by the one-digit controls employed elsewhere (Badgett 1995). Case-level analysis of occupational patterns associated with sexual orientation points to trends that are both highly nuanced and gender-specific, suggesting that parameter estimates may over-estimate the direct effect of orientation on earnings. Lesbian and bisexual women are revealed to be unusually successful in gaining employment in largely male-dominated—and typically better-remunerated—occupational categories. For gay and bisexual men, in contrast, over-representation in female-identified occupations likely further depresses returns to human capital attributes relative to other male workers.[56]

There are further anomalies in the literature that should give pause those who would rush to judgment about the prevalence of discrimination. For example, among heterosexual males, married men, cohabiting men, and single men have been repeatedly shown to earn very different wages, with married men far outdistancing cohabiting men who in turn do better than single men.[57] And this is true even when age (or years of work experience) and other factors are controlled for. Yet few argue that the differences are caused by discrimination.

---

[56] John M. Blandford, The Nexus of Sexual Orientation and Gender in the Determination of Earnings, 56 Indus. & Lab. Rel. Rev. 622, 638-39 (2003).

[57] *See, e.g.*, Sylvia A. Allegretto & Michelle M. Arthur, An Empirical Analysis of Homosexual/Heterosexual Male Earnings Differentials: Unmarried and Unequal?, 54 Indus. & Lab. Rel. Rev. 631 (2001)(finding that gay men in unmarried partnered relationships earn on average 15.6% less than otherwise similar married heterosexual men, but the come in only 2.4% lower than otherwise similar unmarried partnered heterosexual men); Donna K. Ginther & Madeline Zavodny, Is the Male Marriage Premium Due to Selection?: The Effect of Shotgun Weddings on the Return to Marriage, 14 J. Population Econ. 313 (2001); Sander Korenman & David Neumark, Does Marriage Really Make Men More Productive?, 26 J. Human Res. 282 (1991).

PLAINTIFFS004614

The premium for married men over single or co-habiting men is comparable to the gap between gay and heterosexual men. Yet no one has ever suggested that the reason is that employers are discriminating against co-habiting men or single men. The actual reasons are likely more complex. Among them we might find the following: (1) High-income men have an easier time finding women willing to marry them; (2) The same attributes that are conducive to success in creating and maintaining stable relationships at home are also conducive to success in one's professional life and; (3) Men who have or plan to have children are more likely to seek out higher paying jobs and work long hours to support them rather than seek out the jobs they find most interesting or spend their extra time at leisure activities.

Finally, it is important to point out that the most recent empirical studies on income disparities between gay and heterosexual men have been turning out very different from the studies cited in the article that the Report cites for its conclusion that "on average gay men earn from 10 to 32 percent less than similarly qualified heterosexual males." Indeed, the most recent empirical study of which I am aware—*Does It Get Better?: Recent Estimates of Sexual Orientation and Earnings in the United States*—comes to precisely the opposite conclusion: ***Gay men employed full time on average earn almost 10% more than comparable heterosexual men***. [58]

The findings of that study—conducted by Christopher Carpenter and Samuel T. Eppink—are broadly consistent with some other recent research. For example, in *The Disappearing Gay Income Penalty*, Geoffrey Clarke and Purvi Sevak examined data from the National Health and Nutrition Examination Surveys (NHANES) from 1988 to 2007. [59] They found that while men who reported same-sex sexual activity had lower household income than otherwise similar heterosexual men during the earlier part of the time frame they examined, by the end of that time frame the situation was reversed with the average gay man's earnings topping those of similar heterosexual men. Similarly, Marieka Klawitter's meta-analysis of all published studies on sexual orientation and earnings indicated that both the lesbian premium and gay male penalty were decreasing over time. [60]

One possible explanation for the disappearing wage penalty for gay men is that the stigma associated with being gay. As Carpenter & Eppink put it:

---

[58] This finding was significant at 5%. Christopher S. Carpenter & Samuel T. Eppink, Does It Get Better?: Recent Estimates of Sexual Orientation and Earnings in the United States, 84 Southern Econ. J. 426, 432, tbl. 2 (2017). The authors were working with a database in which individuals had self-identified as either gay, bisexual, other sexual orientation, do not know sexual orientation, or heterosexual, had refused the sexual orientation question, or the sexual orientation information was missing from the data. They controlled for the month of the year in which the answers were given. They also controlled for age and its square, race, Hispanic ethnicity, level of educational attainment, relationship status, young children in the household, older children in the household, region of the country, number of years on the job and its square, firm size, and sector of employment. They also used 26 industry dummies and 26 occupation dummies.

[59] Geoffrey Clarke & Purvi Sevak, The Disappearing Gay Income Penalty, 121 Econ. Letters 542 (2013).

[60] Marieka Klawitter, Meta-Analysis of the Effects of Sexual Orientation on Earnings, 54 Indus. Rel.: J Econ. & Soc'y 4 (2015)(analyzing all such studies up until 2012).

PLAINTIFFS004615

> Improved attitudes toward the lesbian, gay, bisexual, and transgender (LGBT) communities have been some of the most striking and rapid social changes in the United States in the past several decades. These improved attitudes are perhaps most evident in the well-documented shift in public attitudes regarding same-sex marriage: The proportion of adults in the United States who favored same-sex marriage increased from 35 to 55% from 2001 to 2016, the year after the U.S. Supreme Court granted nationwide legal access to same-sex marriage in *Obergefell v. Hodges* in 2015. And historical data from the General Social Survey suggest that these shifts in attitudes began in the early 1990s: while in 1991 fully 72% of adults considered homosexual behavior "always wrong," the associated share reporting this view in 2010 fell to 44%. The share of adults saying homosexual behavior was "not wrong at all" increased over this same period from 14 to 41%.[61]

Ultimately, however, Carpenter & Eppink express doubt that changing attitudes is what is behind their result. They point out that changing attitudes might be expected to decrease the "penalty" for gay men's earnings, but it is not clear why it would produce a premium or why gay men would continue to have lower employment rates than heterosexual men. In addition, changing attitudes would be expected to help lesbians too (by increasing the premium they have over heterosexual women). Yet the findings in the article are instead that the premium has continued at pretty much the same level.[62]

---

[61] Carpenter & Eppink at 426.
[62] Carpenter & Eppink at 436.

# Rebuttal of Commissioner Peter Kirsanow

Commissioner Yaki writes: "Our nation's LGBT population has a vulnerability unique among all those *whom the Commission is mandated to protect*: it is the only class *under our jurisdiction* which lacks the shelter of at least one powerful, civilian, federal statutory protection."[1]

This is wrong. LGBT matters as such are not within the Commission's jurisdiction, which is one reason the Commission had not examined this issue before. The Commission's authorizing statute provides, "The Commission shall investigate allegations in writing under oath or affirmation relating to deprivations—because of color, race, religion, sex, age, disability, or national origin; or as a result of any pattern or practice of fraud; of the right of citizens of the United States to vote and have votes counted".[2] Sexual orientation or gender identity are nowhere mentioned. I understand that my colleagues think this is an important issue that needs to be addressed.[3] Fair enough. But it is not within our jurisdiction.[4]

## Constitutional and Secular Concerns Regarding ENDA

It is indisputable that some individuals hold positions regarding LGBT issues out of pure animus. It is also indisputable that there is no system equivalent to Jim Crow that is designed to prevent LGBT people from participating in society. The Commission majority's findings testify to this fact:

> It has not been difficult for some private companies to adopt and implement workplace policies or practices that prohibit discrimination on the basis of sexual orientation and/or gender identity. As of 2016, 92 percent of Fortune 500 companies included sexual orientation and 82 percent included gender identity in their equal employment opportunity policies. Businesses that support these policies note such practices are beneficial to their businesses by attracting the most qualified workforce and increasing productivity.[5]

Had such an overwhelming majority of companies voluntarily adopted similar policies regarding race in 1964, passage of Title VII of the 1964 Civil Rights Act would have been far less

---

[1] Statement of Commissioner Yaki at 90.

[2] 42 U.S.C. § 1975a.

[3] Statement of Commissioner Karen Narasaki at851 ("international human rights laws complement and reinforce our nation's laws by recognizing that 'all human beings are born free and equal in dignity and rights' and therefore LGBT people are entitled to the numerous protections afforded by human rights laws, including the right to be free from discrimination."). It doesn't really matter what international human rights laws say. We are the *Civil* Rights Commission, not the *Human* Rights Commission, and our jurisdiction extends only to the *civilly*-recognized rights listed in our originating statute.

[4] Before Commissioner Yaki cites *Pricewaterhouse* and "sexual orientation discrimination as sex-stereotyping discrimination" to me, *see* discussion of *Pricewaterhouse*, *infra* at 141-43.

[5] Commission Findings at 76; *see also* Statement of Commissioner David Kladney at 83-84.

PLAINTIFFS004617

consequential. Indeed, if EEO policies had so abounded in the early Sixties, passage of Title VII may not have been a legislative imperative. As Roger Clegg from the Center for Equal Opportunity stated in his testimony, it actually is unclear whether Congress has the constitutional authority to prohibit discrimination on the basis of sexual orientation or gender identity. But then, constitutionality seems an increasingly trivial impediment to government action. Congress had the authority to enact the 1964 Civil Rights Act because discrimination against African-Americans was pervasive and, in significant parts of the country, inescapable.[6] LGBT discrimination is not comparable to the pervasive racial discrimination that prompted and gave constitutional authority to passage of the 1964 Civil Rights Act.

My colleagues appear to hold that Title VII ought to evolve into a "general civility code," which the Supreme Court sought to avoid in its decision in *Oncale v. Sundowner*.[7] The Supreme Court cautioned in *Oncale* that any sex-discrimination claims brought under Title VII must be *because of* sex, and that "We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."[8] The report approvingly cites an EEOC decision that a transgender individual was discriminated against on the basis of her sex because coworkers continued to address her using masculine pronouns.[9] The problem with determining that this is discrimination on the basis of sex is the person's sex is *literally* male. It may be a breach of decorum, sensibility, civility, and good manners to refer to the person using masculine pronouns, but it is not *sex* discrimination.

The EEOC and some courts have claimed that discrimination against transgender individuals is sex discrimination prohibited by the "sex stereotyping" interpretation of Title VII, because "A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes."[10] If a person is protected by the sex stereotyping theory, it is because he or she supposedly is not conforming to gender stereotypes. For example, a man wearing makeup and a dress or a woman taking testosterone to grow a beard do not conform to gender stereotypes. But a woman would not be transgressing gender stereotypes by wearing a dress, and a man would not be transgressing gender stereotypes by growing a beard.[11] So it cannot perforce

---

[6] Written Statement of Roger Clegg at 2-3.

[7] *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998).

[8] *Id.* at 80. This is also strong evidence that my colleagues are wrong in interpreting our jurisdiction over sex discrimination as encompassing discrimination on the basis of sexual orientation and gender identity.

[9] *Bost v. Sam's East, Inc.*, Charge No. 430-2014-01900 (E.E.O.C. 2017), at http://transgenderlegal.org/media/uploads/doc_729.pdf.

[10] *Macy v. Holder*, 2012 WL 1435995 (E.E.O.C. 2012), at 9, *quoting Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011).

[11] *See E.E.O.C. v. R.G. & G.R. Funeral Homes, Inc.*, 201 F.Supp.3d 837, 840 (E.D.Mich. 2016).

    (a)   The EEOC claims the Funeral Home fired Stephens for failing to conform to the masculine gender stereotypes expected as to work clothing and that Stephens has a Title

PLAINTIFFS004618

be discrimination on the basis of sex to refer to a transgender person by the name or pronouns of his or her birth sex, when the only reason this person purportedly is protected by Title VII is because the person is not conforming to gender stereotypes.[12] We are in a wilderness of mirrors.

All of this reveals that it would be helpful for the Supreme Court to revisit *Pricewaterhouse v. Hopkins*, and possibly *Oncale v. Sundowner*. In recent years, *Pricewaterhouse* has been used by the EEOC and some courts to attempt to transform sexual orientation and gender identity into protected classes.[13] Abuses of authority by federal agencies are by this time unremarkable, as is judicial activism. The fact that some courts are now discovering that transgenderism is encompassed within Title VII and Title IX[14] should alert everyone that they are legislating from the bench.[15]

---

> VII right *not to be subject to gender stereotypes* in the workplace. Yet the EEOC has not challenged the Funeral Home's sex-specific dress code, that requires female employees to wear a skirt-suit and requires males to wear a pants-suit with a neck tie. Rather, the EEOC takes the position that Stephens has a Title VII right to "dress as a woman" (*i.e.*, dress in a stereotypical feminine manner) while working at the Funeral Home, in order to express Stephens's gender identity. If the compelling interest is truly in eliminating gender stereotypes, the Court fails to see why the EEOC couldn't propose a gender-neutral dress code as a reasonable accommodation that would be a *less restrictive* means of furthering that goal under the facts presented here. But the EEOC has not even discussed such an option, maintaining that Stephens must be allowed to wear a skirt-suit in order to *express* Stephens's gender identity. If the compelling governmental interest is truly in *removing or eliminating* gender stereotypes in the workplace in terms of clothing (*i.e.*, making gender "irrelevant"), the EEOC's chosen manner of enforcement in this action does not accomplish that goal.

[12] As the Eastern District of Michigan has noted, this is because "As a practical matter, the EEOC . . . has been proceeding as if gender identity or transgender status is a protected class under Title VII," when this is most assuredly not the case. *E.E.O.C. v. R.G. & G.R. Funeral Homes, Inc.*, 201 F.Supp.3d 837, 860 (E.D. Mich. 2016).
[13] *Fabian v. Hospital of Central Conn.*, 172 F.Supp.3d 509, 522-23 (D.Conn. 2016)("The acknowledgement in *Price Waterhouse* that discrimination by means of gender stereotyping is discrimination 'because of sex' under Title VII eventually led to a significant shift in the direction of decisions examining alleged discrimination on the basis of transgender identity.").
[14] *Johnston v. Univ. of Pittsburgh of Com. System of Higher Educ.*, 97 F.Supp.3d 657, 674 (W.D.Penn. 2015)("nearly every federal court that has considered the question in the Title VII context has found that transgendered individuals are not a protected class under Title VII.").
[15] Former Judge Richard Posner at least had the honesty to admit that this is what judges are doing when they transform sexual orientation and gender identity into protected characteristics. *Hively v. Ivy Tech Com. Coll. of Ind.*, 853 F.3d 339, 357 (7th Cir. 2017)(Posner, J., concurring).

> (b) The majority opinion states that Congress in 1964 "may not have realized or understood the full scope of the words it chose." This could be understood to imply that the statute forbade discrimination against homosexuals but the framers and ratifiers of the statute were not smart enough to realize that. I would prefer to say that theirs was the then-current understanding of the key word—sex. "Sex" in 1964 meant gender, not sexual orientation. What the framers and ratifiers understandably didn't understand was how attitudes toward homosexuals would change in the following half century. They shouldn't be blamed for that failure of foresight. *We* understand the words of Title VII differently not because we're smarter than the statute's framers and ratifiers but because we live in a different era, a different culture. Congress in the 1960s did not foresee the sexual

PLAINTIFFS004619

If my colleagues are correct that these policies are both easy to implement and beneficial to the bottom line, most companies will adopt these policies in short order. Many have.

But they should not be compelled into doing so by judges contorting the plain text of the law to include classifications not set forth by Congress, and by federal agencies that rewrite laws through regulations and subregulatory guidance.[16]

## LGBT As A Defined Class

My colleagues and the report repeatedly refer to "LGBT" as a class. In the report and often in public discourse, there is no differentiation between the four groups. Perhaps there is no rational basis for differentiation. But the report seems to make a presumption, unsupported by any empirical analysis whatsoever, that employment and workplace considerations applicable to lesbians are identical to those applicable to gays are identical to those applicable to bisexuals are identical to those applicable to transsexuals. Yet if Congress were to pass ENDA-like legislation, there is a reasonable likelihood the four different groups would not be treated as one indistinguishable mass.

## Religious Liberty Concerns Regarding ENDA

There are many people who bear no ill-will toward LGBT persons as persons, but who also, for religious reasons, and in good faith, disagree with the choice to engage in a same-sex relationship or to present as a sex other than their birth sex.[17] Religious liberty will be diminished and

---

revolution of the 2000s. What our court announced in *Doe v. City of Belleville*, 119 F.3d 563, 572 (7th Cir. 1997), is what Congress had declared in 1964: "the traditional notion of 'sex.' "

(c) I would prefer to see us acknowledge openly that today we, who are judges rather than members of Congress, are imposing on a half-century-old statute a meaning of "sex discrimination" that the Congress that enacted it would not have accepted. This is something courts do fairly frequently to avoid statutory obsolescence and concomitantly to avoid placing the entire burden of updating old statutes on the legislative branch. *We should not leave the impression that we are merely the obedient servants of the 88th Congress (1963–1965), carrying out their wishes. We are not.* We are taking advantage of what the last half century has taught. [emphasis added]

[16] Commissioner Heriot has written persuasively that Title IX's prohibition on sex discrimination does not encompass gender identity. It is even less likely that Title VII includes a prohibition on gender identity discrimination. The Americans with Disabilities Act explicitly excludes transgenderism from its coverage. *See Johnson v. Fresh Mark*, 337 F.Supp.2d 996, 1001 (N.D. Ohio 2003), *quoting* 42 U.S.C. § 12211(b)(1).
[17] Russell Moore, "What the Transgender Debate Means for the Church," RussellMoore.com, Feb. 23, 2017 (Dr. Moore is the President of the Southern Baptist Convention's Ethics & Religious Liberty Commission), http://www.russellmoore.com/2017/02/23/transgender-debate-means-church/; "USCCB Committee Chairmen Applaud the Repeal of 'Dear Colleague Letter on Transgender Students," U.S. Conference of Catholic Bishops, Feb. 24, 2017 ("Pope Francis has taught that 'biological sex and the socio-cultural role of sex (gender) can be distinguished but not separated' (Amoris Laetitia, no. 56)"), http://www.usccb.org/news/2017/17-045.cfm; *E.E.O.C. v. R.G. & G.R. Funeral Homes, Inc.*, 201 F.Supp.3d 837, 848 (E.D.Mich. 2016)("It is also undisputed that Rost sincerely believes that the "Bible teaches that a person's sex (whether male or female) is an immutable God-given gift and that it is wrong for a person to deny his or her God-given sex." . . . Rost believes that he "would be violating

PLAINTIFFS004620

vulnerable if Congress enacts ENDA or similar legislation. The Commission says in its recommendations:

> The Commission strongly supports religious freedom and nondiscrimination on the basis of religion. Title VII offers a workable model for protecting religious freedom in the context of federal statutory nondiscrimination protections in the workplace. In *Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment Opportunity Commission* the Supreme Court also unanimously endorsed the common law ministerial exemption, which recognizes the right of religious groups to select their own ministers and clergy. No further expansion of exceptions to nondiscrimination protections in the workplace are necessary or warranted to balance the rights to freedom of religion and to nondiscrimination on the bases either of religion or LGBT status.

My colleagues' individual statements suggest that "strongly supports" may be overstating the matter a bit. The Chair refers to concerns over conflicts between religious liberty and nondiscrimination as "the fallacy of that putative conflict"—before stating:

> A teacher's decision to tell a devout Catholic girl she would go to hell for dating another girl lowlights the error in the assumption that LGBT persons are not simultaneously persons of faith—and underscores the distinct (and in our system of laws profoundly unconstitutional) harm that privileging one understanding of faith over another can visit on people. The teachers and administrators at that school were and are free to disapprove of same sex relationships, and even of the status of being LGBT, on religious or other bases; they were and are not, however, free to act on that disapproval in ways that harmed the students as people or as learners. Likewise in an employment context, our laws should protect LGBT employees from discrimination while also protecting all of our religious freedom.[18]

The school to which Chair Lhamon refers is a public school.[19] I see nothing in her statement, however, that suggests that she would see the matter differently if it were at a private religious school. In his statement, Commissioner Yaki attacks recent guidance from the Attorney General, describing it as "rid[ing] the Hobby Lobby toboggan as it boldly careens down a slippery slope declaring—in the apparent absence of statutory or judicial authority—'RFRA protects the exercise of religion by individuals and by corporations, companies, associations, firms, partnerships, societies, and joint stock companies.'"[20]

---

God's commands" if he were to permit one of the Funeral Home's male funeral directors to wear the skirt-suit uniform for female directors while at work because Rost "would be directly involved in supporting the idea that sex is a changeable social construct rather than an immutable God-given gift.").

[18] Statement of Chair Catherine Lhamon at 81.

[19] ACLU of Southern California Stands Up for Gay and Lesbian High School Students Harassed by School Officials on Basis of Sexual Orientation, ACLU of Southern California, Oct. 28, 2004,
https://www.aclusocal.org/en/news/aclu-southern-california-stands-gay-and-lesbian-high-school-students-harassed-school-officials.

[20] Statement of Commissioner Yaki at 104 (quoting U.S. Department of Justice Memorandum at 4).

Commissioner Yaki contends that the Attorney General's interpretation is not based in statutory or judicial authority. Apparently it escaped Commissioner Yaki's notice that Justice Alito's analysis in *Hobby Lobby **begins*** with settling RFRA's definition of a "person":

> RFRA applies to "a person's" exercise of religion, 42 U.S.C. §§ 2000bb-1(a), (b), and RFRA itself does not define the term "person." We therefore look to the Dictionary Act, which we must consult "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise." 1 U.S.C. § 1.

> Under the Dictionary Act, "the wor[d] 'person' . . . Include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals. *Ibid; see FCC v. AT & T Inc.*, 131 S.Ct. 1177, 1182-1183(2011)('We have no doubt that 'person,' in a legal setting, often refers to artificial entities. The Dictionary Act makes that clear"). Thus, unless there is something about the RFRA context that "indicates otherwise," the Dictionary Act provides a quick, clear, and affirmative answer to the question whether the companies involved in these cases may be heard.

> We see nothing in RFRA that suggests a congressional intent to depart from the Dictionary Act definition, and HHS makes little effort to argue otherwise. We have entertained RFRA and free-exercise claims brought by nonprofit corporations, *see Gonzales v. O Centro Espírita Beneficente Uniao do Vegetal,* 546 U.S. 418 (2006) (RFRA); *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC,* 132 S.Ct. 694 (2012) (Free Exercise); *Church of the Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520 (1993) (Free Exercise), and HHS concedes that a nonprofit corporation can be a "person" within the meaning of RFRA. *See* Brief for HHS in No. 13–354, at 17; Reply Brief in No. 13–354, at 7–8.

> This concession effectively dispatches any argument that the term "person" as used in RFRA does not reach the closely held corporations involved in these cases. No known understanding of the term "person" includes *some* but not all corporations. The term "person" sometimes encompasses artificial persons (as the Dictionary Act instructs), and it sometimes is limited to natural persons. But no conceivable definition of the term includes natural persons and nonprofit corporations, but not for-profit corporations.[20] *Cf. Clark v. Martinez,* 543 U.S. 371, 378, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) ("To give th[e] same words a different meaning for each category would be to invent a statute rather than interpret one"). [citations omitted]

In other words, the Attorney General's definition of a "person" has *both* statutory and judicial support. It is taken verbatim from the Dictionary Act, which the Supreme Court stated in Hobby Lobby provided the correct definition of "person" in RFRA.

If this is what the Commission majority thinks when it is in strong support of religious freedom, I hate to think what it thinks in its less sanguine moments. Title VII provides:

> Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, for

PLAINTIFFS004622

an employment agency to classify, or refer for employment any individual, for a labor organization to classify its membership or to classify or refer for employment any individual, or for an employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining programs to admit or employ any individual in any such program, on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a *bona fide* occupational qualification reasonably necessary to the normal operation of that particular business or enterprise, and (2) it shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.[21]

Title VII's protections for religious liberty require a painstaking case-by-case examination of the circumstances surrounding each claim.[22] Although the exact contours of Title VII's religious employer exemption are disputed, in some circumstances it is interpreted to apply only to cases of discrimination on the basis of religion, not discrimination on the basis of another protected characteristic that is motivated by a religious belief.[23] Under this narrow construction, a Catholic school could fire a teacher who left the Catholic faith, but could not fire a teacher who entered into a civil same-sex marriage if that teacher continued to maintain that she was a member of the Catholic faith. This appears to be what is contemplated by Professor Alan Brownstein, who explained in his written statement, "[T]he Title VII amendment permitting religious discrimination in hiring cannot justify discrimination on the basis of other characteristics prohibited by Title VII, such as race or gender. . . . Pursuant to this understanding, religious organizations operated by faiths whose beliefs condemn homosexual conduct could not discriminate against gay or lesbian job applicants on the ground that the very conduct of such individuals which identified them as members of a protected class violated the dictates of the employer's faith."[24]

---

[21] 42 U.S.C. § 2000e-2(e).

[22] *Spencer v. World Vision, Inc.*, 633 F.3d 723, 729 (9th Cir. 2011)("In sum, when confronted with a section 2000e-1 case, *Townley* and *Kamehameha* require us to analyze, on a case-by-case basis, whether the 'general picture' of an organization is 'primarily religious,' taking into account '[a]ll significant religious and secular characteristics.'"); *E.E.O.C. v. Kamehameha Schools/Bishop Estate*, 990 *F.2d* 458, at n. 7 (9th Cir. 1993)("In view of the narrow reach of the § 2000e-1 exemption, it is not surprising that we have found no case holding the exemption to be applicable where the institution was not wholly or partially owned by a church.").

[23] *Herx v. Diocese of Fort Wayne-South Bend, Inc.*, 772 F.3d 1085, 1087 (7th Cir. 2014).

[24] Written Statement of Alan Brownstein at 3. It should be noted that the discrimination at issue is on the basis of behavior or conduct, not identity, status, or immutable characteristics.

There are no major faiths in the United States that include racial superiority as one of their tenets. There are likely some branches of major faiths that hold views regarding gender roles that are at odds with popular opinion.[25] The vast majority of Christians have no objections to married women working outside the home. Whether or not that would have occurred without federal interference is a fair question, and whether forcing churches to change their views regarding the roles of men and women is an appropriate exercise of governmental power is another.

This is the problem with only providing Title VII's religious exemption in an ENDA-like bill, even for religious employers. If the principal of a Catholic school fired a black Catholic school teacher because of her race, the principal's actions would not be in accord with the teaching of the Catholic Church. If the principal fired a teacher who entered into a same-sex marriage, even though the teacher claimed to be Catholic and knew that the Catholic Church teaches that same-sex marriage is not marriage at all, the principal would not be defying Catholic teaching. And the ability to fire teachers and other employees in these situations is important, because actions speak louder than words.[26] A divorced woman who remarries without receiving an annulment undercuts the Church's teaching that marriage is permanent.[27] An individual who is in a civil same-sex marriage undermines the Church's teaching regarding both the indispensability of a sacramental marriage and the necessity that the spouses be male and female. For the government to come into either case and insist that the school continue to employ the teacher because the teacher identifies as Catholic is an intrusion upon church discipline and an enervation of the faith. Perhaps, to avoid this, the Church can issue a formal excommunication to the employee, although even that is arguably not a declaration that the individual is not Catholic, but rather that he is a Catholic in bad standing. But perhaps the Church hopes to bring the individual to repent of his or her sins, and thus hesitates to impose the ultimate penalty. But the Church still cannot employ this person, because to do so appears to condone his or her *behavior* and thus cause scandal.[28] These are not questions into

---

[25] Popular opinion does not always proceed in the direction one would think or prefer, however. W. Bradford Wilcox and Samuel Sturgeon, "Why would millennial men prefer stay-at-home wives? Race and feminism.", Wash. Post, Apr. 5, 2017 ("the overall trend in the GSS and another survey, Monitoring the Future, is consistent with the idea that a growing minority of younger millennials hold a more traditional view on this male breadwinner-female homemaker item.").

[26] *See Herx v. Diocese of Ft.Wayne-South Bend Inc.*, 48 F.Supp.1168, 1177 (N.D. Ind. 2014).

> (d) Mrs. Herx contends that the Diocese's admission that it didn't renew her contract because she underwent in vitro fertilization treatments creates a triable fact issue as to sex discrimination because the only people who could be terminated for that reason are pregnant women and women trying to become pregnant. . . .According to Mrs. Herx, forbidding non-ministerial employees from undergoing in vitro fertilization discriminates against women because men don't (and can't) undergo the procedure.

[27] *See Little v. Wuerl*, 929 *F.2d* 944 (3rd Cir. 1991).

[28] The term "scandal" has a particular theological meaning within the Catholic Church. *See* CATECHISM OF THE CATHOLIC CHURCH, 2284, 2286, *available at* http://www.vatican.va/archive/ENG0015/_P80.HTM.

> (e) Scandal is an attitude or behavior which leads another to do evil. The person who gives scandal becomes his neighbor's tempter. He damages virtue and integrity; he may even

PLAINTIFFS004624

which the government may intrude, because the government is essentially substituting its own judgment regarding theology and morality for that of the Church. The government is arrogating to itself the authority to decide who is a Catholic in good standing, or a Southern Baptist, or a Jew.[29] This is similar to the New York legislature enacting a statute that transferred the administration of churches from the Russian Orthodox Church to an American metropolitan district.[30] The government is weighing in on an ecclesiastical dispute because it is politically aligned with one branch of the dispute.[31] That is impermissible.[32]

If the contraception mandate included in HHS's ACA-implementing regulations taught us anything, it demonstrated that efforts to make religious organizations and institutions violate their consciences quickly descend into hair-splitting examinations of exactly who is paying for what and where to draw the lines of complicity in what a religion considers sinful behavior.

We live in a time when the country is sharply divided along almost every line imaginable—politics, race, income, sex, religion, and anything that distinguishes one human being from another. It appears there may be no way to bridge many of these divides, because the differences of opinion go the heart of what one holds most dear. My colleagues' solution is for traditionalists to capitulate to secular imperatives, even giving up the modest First Amendment right to be politically incorrect or impolite by referring to someone by the pronouns associated with his birth sex rather than his preferred gender identity.[33] My solution is more modest: follow the Constitution.

---

draw his brother into spiritual death. Scandal is a grave offense if by deed or omission another is deliberately led into a grave offense. . . .

(f)   Scandal can be provoked by laws or institutions, by fashion or opinion.

[29] *Little* at 948.

(g)   The *Maguire* case demonstrates the even graver dangers courts face when asked to rule on religious discrimination that does not follow clear denominational lines. In that sex discrimination case, a Catholic university claimed that it had refused to hire plaintiff as a theology professor because she held views on abortion that disqualified her from being a Catholic. The court properly decided that any scrutiny of that claim would violate both the free exercise and establishment clauses.

[30] *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in North America*, 344 U.S. 94, 97-99 (1952).
[31] *Id.* at 109-110.
[32] *Id.* at 114-115 (quoting *Watson v. Jones*, 13 Wall 728-79 (1871)).

(h)   The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed.

[33] *Bost v. Sam's East, Inc.*, Charge No. 430-2014-01900 (E.E.O.C. 2017), at http://transgenderlegal.org/media/uploads/doc_729.pdf.

PLAINTIFFS004625

144   Working for Inclusion: Time for Congress to Enact Federal Legislation

[*This page intentionally left blank*]

PLAINTIFFS004626

## Surrebuttal of Commissioner David Kladney

Commissioners Kirsanow and Heriot object to the idea that LGBT people deserve federal employment protections against employers targeting them for their orientation or gender identity. They claim such protections would be too burdensome for employers and are not needed because discrimination on the basis of sexual orientation or gender identity is not a pervasive problem. Commissioner Heriot has taken my words, that "discrimination [against LGBT persons] is wrong each and every time it happens" to mean I would support laws against any employment decision which is morally wrong but, in her words "idiosyncratic." Commissioner Kirsanow has taken my praise of the business community for voluntarily adopting LGBT protections to argue that no legal protections are needed. Finally, Commissioner Heriot has taken my note that businesses derive many benefits from government (for example, through using the corporate form) and it is therefore proper to hold them to account with nondiscrimination requirements to mean I would think it proper to impose my understanding of American values on every company.

I write simply to state that these arguments are quite obviously not the case. I see discrimination against LGBT persons as a pervasive, destructive problem. I do believe it is wrong in each instance, but we are far from a day when it could be said to be idiosyncratic. I find it impossible that a fair observer of our society could come to the conclusion that LGBT persons are not systematically disadvantaged in ways heterosexual people are not. The report speaks for itself in cataloguing the existing literature on employment discrimination, but should these existing statistics not be sufficient for Commissioners Heriot and Kirsanow, I suggest they indicate their strong support for the Commission's recommendation: "Workplace discrimination data should be collected through the inclusion of sexual orientation and gender identity questions in population-based surveys of the workforce such as the Census, American Community Survey, and surveys fielded by the Bureau of Labor Statistics and other agencies."

In a thought experiment to a world where discrimination against LGBT people were vanishingly rare, Commissioner Heriot proposes that firing someone for their LGBT status would be no more offensive on a societal level than firing someone for an arbitrary reason such as the person's first name or sports team affiliation. That is not our world. In our world, LGBT people face negative employment consequences for their status, as do people of color and people of other protected statuses. In fact, employers use "idiosyncratic" reasons as pretext to hide their discrimination. Such discrimination abrogates our belief in a meritocracy. The only true open question is whether as a society we find it tolerable for LGBT people to suffer because others disapprove of them. I believe it is consistent with American values to protect people on this basis, and while I do not believe every business should be required to adopt my understanding of American values in every respect, I do believe it behooves this country to acknowledge the history of discrimination against LGBT people along with the current realities of employment discrimination and adopt employment protections. Voluntary adoption of employment protections by many companies is insufficient for

PLAINTIFFS004627

the simple reason that these policies are unenforceable, and thus offer cold comfort to those who face discrimination.

Commissioner Kirsanow uses the bulk of his rebuttal to argue for the incompatibility of LBGT employment protections with religious liberty. I disagree with Commissioner Kirsanow on this point, but write simply to say, counter to his assertions, the Commission does strongly support religious freedom and nondiscrimination on the basis of religion. Nothing in this report states otherwise, and the Commission's history demonstrates support for the tenets of religious freedom and nondiscrimination. Disagreement as to the contours of religious protections in particular instances does not indicate an abandonment of Constitutional and statutory religious protections.

PLAINTIFFS004628