DRUG UTILIZATION REVIEW BOARD

Agency for Health Care Administration

Tampa Marriott Westshore

Saturday, September 26, 2015

8:08 a.m - 10:55 a.m.


REPORTED BY:    JACQUELINE L. REICHERT
                Integra Reporting Group
                Court Reporter
                Notary Public
                Commission No. EE 160968
                Expires 3/27/16

Def_000322520

PRESENT:

**BOARD MEMBERS:**

       Anna Hayden (Chair)
       Jeffrey Martorana (Vice-Chair)
       Allen Moses
       Diane Fagan
       Vanessa Goodnow (Absent)
       Kevin Olson
       Alfred Romay
       Luis Saez
       Amy Zitiello

**AHCA STAFF:**

       Shevaun Harris, Medicaid Policy Bureau Chief
       Beverly H. Smith, Esquire, Medicaid Counsel
       Vern Hamilton, AHCA Liaison
       Arlene Elliott, RPh, Operations Administrator
       (Absent)
       Sara Craig, PharmD
       Susan Williams, PharmD

**MAGELLAN MEDICAID ADMINISTRATION**

       Elboni Moore, PharmD
       Rebecca Borgert, PharmD

Def_000322521

I N D E X

|                                              | Page |
|----------------------------------------------|------|
| Opening Remarks                              | 6    |
| Voting for Chair and Vice-Chair              | 8    |
| Approval of DUR Minutes from June 27, 2015   | 9    |
| Review of P&T Minutes from June 26, 2015     | 11   |
| Quarterly DUR Activity Reports               | 12   |
| Open Discussion                              | 142  |
| Public Comment                               | 145  |
| Next Meeting Date                            | 154  |
| Reporter Certification                       | 155  |

Def_000322522

```
 1                 P R O C E E D I N G S
 2          THE CHAIRPERSON:  Good morning.  Welcome
 3      to the Drug Utilization Review Board, the
 4      time now is 8:08 on September 26th.  It's
 5      Saturday.  We have a lot of new members here
 6      this morning and for roll call what I'd like
 7      to do is go around the room and have everyone
 8      introduce themselves.  And we'll start with
 9      Moses.
10          DR. ALLEN:  Sure.  Moses Allen.  I'm
11      currently pharmacy director -- currently
12      pharmacy director at Prestige Health Choice
13      in Tampa, Florida.
14          MS. FAGAN:  Good morning.  I am Diane
15      Fagan.  I work with WellCare here in Tampa
16      and I live in Sarasota and I'm happy to be
17      here.  Thank you.
18          MR. HAMILTON:  Please use your
19      microphones, our meetings are recorded.
20      Still not working?  Still have no
21      microphones?  Sorry about that.  Speak up as
22      best you can.  No, they're not working.
23          DR. MARTORANA:  I'm Dr. Jeff Martorana.
24      I'm a family physician.  I'm chief medical
25      officer at Sunshine Health Office in Sunrise,
```

1    Florida.

2         DR. OLSON:  Kevin Olson.  I work at All

3    Children's John Hopkins.  I'm manager of our

4    home care and retail pharmacy divisions.

5         DR. ROMAY:  Good morning.  Alfred Romay,

6    I'm the director of pharmacy over at Molina

7    Healthcare of Florida.

8         DR. SAEZ:  Hi.  My name Dr. Luis Saez and

9    I work with BHC at Fort Lauderdale, Florida,

10   with HIV.

11        DR. ZITIELLO:  I'm Amy Zitiello.  I am a

12   medical director with Amerigroup and a

13   pediatrician.

14        DR. HAYDEN:  My name is Anna Hayden.  I'm

15   a family physician out of Broward Health.

16   I'm also a clinical professor for Nova

17   Southeastern College of Osteopathic Medicine,

18   and I'm also certified in HIV medicine as

19   well.

20        MS. SMITH:  I'm Beverly Smith.  I'm the

21   assistant general counsel for the Agency of

22   Health Care Administration and serving as

23   Medicaid counsel.

24        MS. HARRIS:  Good morning.  I'm Shevaun

25   Harris.  I'm with the Bureau Chief over

Def_000322524

1     Medicaid Policy with the Agency for Health
2     Care Administration.
3          DR. CRAIG:  Good morning.  I'm Sara
4     Craig, senior pharmacist with pharmacy policy
5     with the Agency for Health Care
6     Administration.
7          MS. WILLIAMS:  Good morning.  I'm Susan
8     Williams.  I'm also with the Agency for
9     Health Care Administration and I'm a senior
10    pharmacist.
11         MR. HAMILTON:  Good morning everyone.
12    I'm Vern Hamilton with the Agency.  I'm the
13    pharmacy policy liaison.
14         DR. BORGERT:  Good morning everyone.  My
15    name is Becky Borgert, I'm a pharmacist with
16    Magellan Healthcare.
17         DR. MOORE:  Good morning.  I'm Elboni
18    Moore, I'm the clinical account manager with
19    Magellan.
20         THE CHAIRPERSON:  Ms. Harris, would you
21    like to do the opening remarks?
22         MS. HARRIS:  Yes.  Thank you.  Good
23    morning, everyone.  I'll be very brief this
24    morning.  I just want to welcome all of our
25    new DUR Board members.  On behalf of the

1      Agency we are very thankful and appreciative

2      of your willingness to serve in this

3      capacity.  And returning members, thank you

4      for those who are willing to continue to

5      serve on the board, Dr. Hayden and others

6      here.  I'm sorry, I'm having a hard time

7      reading.

8           Just one quick update.  If you are one of

9      the individuals who participate in our

10     Pharmaceutical Therapeutics Committee

11     meeting, we are in the process of trying to

12     appoint new members to that particular

13     committee.  And so I believe the appointments

14     have been made and will be going out -- or

15     have already gone out I think yesterday.

16          And so we had to postpone the meeting

17     that was scheduled for yesterday.  We will be

18     getting the meeting rescheduled in the next

19     few weeks.  So please pay attention to our

20     pharma notices and our healthcare alerts that

21     we post on our website.  We will get more

22     information out as soon as possible on when

23     that meeting will be rescheduled.

24          That's it for me, unless anyone has

25     questions?  Okay.  Thank you.

 1          MS. HAYDEN:  Thank you very much.  I
 2     think my mic is working now.
 3          Next on our agenda item is the voting for
 4     chair and vice-chair.  We had -- Dr. Burno
 5     was our previous vice chair and he had
 6     retired out and he's now considered a
 7     full-time snowbird, and I just wanted to
 8     recognize him for his years of service on
 9     this committee.
10          So as for chair, I'd love to serve as
11     chair again.  I have no disclosures to report
12     here.  There's no conflict of interest on my
13     behalf.  So I'd be happy to serve as chair.
14     I guess we have to vote on that.  And vice
15     chair, we need a volunteer.  In case I'm not
16     here to chair, we have to have, you know,
17     someone running the meeting.
18          DR. OLSON:  I --
19          THE CHAIRPERSON:  Thank you for
20     volunteering, Dr. Olson.
21          DR. OLSON:  Even though she's not here I
22     was going to volunteer Vanessa as vice
23     chairman, but...  Even though she's not here.
24          THE CHAIRPERSON:  Well --
25          DR. MARTORANA:  I'll be happy to serve as

1      vice chair.

2         DR. ALLEN:  So I guess to make it

3      official, I guess I will make -- I nominate

4      Dr. Hayden as the official chair of the DUR

5      Committee and Dr. M as the vice chair?

6         THE CHAIRPERSON:  Doctor who?

7         DR. ALLEN:  I'm sorry.  Dr. Martorana.

8      He also goes by Dr. M.

9         THE CHAIRPERSON:  So we'll take a vote on

10     the -- and we need a second.

11        DR. ZITIELLO:  Second.

12        THE CHAIRPERSON:  So all those in favor

13     signify by saying "aye."

14        THE BOARD:  Aye.

15        THE CHAIRPERSON:  Very good.  So I'll be

16     happy to serve again.

17        And as for the vice chair we have

18     Dr. Jeffrey.  Do we have a second?

19        DR. ALLEN:  I'll second.

20        THE CHAIRPERSON:  All those in favor

21     signify by saying "aye."

22        THE BOARD:  Aye.

23        THE CHAIRPERSON:   Very good.

24     Congratulations.  Very nice.

25        Next on our agenda is the approval of the

Def_000322528

1          Drug Utilization Review Minutes from the June
2          27th meeting.  Has everyone had the
3          opportunity to review that?  Do we have a
4          motion for approval?
5               DR. ALLEN:  I have a question regarding
6          the minutes.
7               THE CHAIRPERSON:  Yes, sir.
8               DR. ALLEN:  On page 2, I believe
9          paragraph 5, there was a question from --
10         well, you, Dr. Hayden, regarding the
11         comprehensive annual review.  And I think
12         Arlene Elliott was checking into it, I guess
13         the report was supposed to be posted online,
14         and I guess she wasn't sure.  And I think it
15         would be valuable for the committee members,
16         particularly since a couple of us are new.
17              THE CHAIRPERSON:  Yeah.  There's an
18         annual report that goes out yearly, it's a --
19         it's a comprehensive report that used to go
20         out.  I haven't seen it in a while and so I
21         asked about it at the last meeting.
22         Ms. Harris.
23              MS. HARRIS:  So I am fairly confident
24         that the one for this year was listed into
25         the legislature.  We'll go back and make sure

Def_000322529

1      it is posted on our website.  And what we can
2      do is send the report out to all of the board
3      members after this meeting.
4          THE CHAIRPERSON:  I think it was posted
5      online somewhere and I haven't been able to
6      -- it was posted years ago.  It was a public
7      record, so I guess I didn't see it.
8          MS. HARRIS:  We can send it out.
9          THE CHAIRPERSON:  Thank you.  Any other
10     comments on the minutes?
11         Do I have a motion -- I'll make a motion
12     to approve the previous minutes.  Do I have a
13     second?
14         DR. ALLEN:  Second.
15         THE CHAIRPERSON:  All those in the favor
16     signify by saying "aye."
17         THE BOARD:  Aye.
18         THE CHAIRPERSON:  Any further discussion,
19     anything?  I guess we have approval though.
20     Thank you.
21         Next on our agenda is just informational
22     from the last P&T minutes from June 26th,
23     there's no action on that.  And any comments
24     or any discussion on the previous P&T
25     minutes?

 1          We used -- Elboni will be our liaison

 2      from P&T and DUR.  They make recommendations

 3      and we go back and forth and creating some

 4      pathway of a conduit and some -- making the

 5      recommendations when they make their review

 6      as well.  So Elboni will be serving as our

 7      liaison.  Our previous liaison was

 8      Dr. Natasha Robinson, and I believe she was

 9      reappointed to P&T as well.  So thank you,

10      Elboni.

11          Next we have the quarterly DUR with

12      Rebecca and she will be presenting on that.

13      We have the overhead projector and also paper

14      copies.

15          DR. BORGERT:  Good morning, everyone.  As

16      I said, my name is Becky Borgert.  I'm a

17      pharmacist with Magellan RX.  And just to --

18      I know a lot of people are new today.  I'm

19      just going to kind of give a little

20      background on how we normally do this just so

21      you kind of have an idea.  I know that there

22      was a call, and Elboni was on the call on

23      Tuesday, so forgive me if I repeat some of

24      this.

25          But typically a few weeks before the

Def_000322531

1        meeting a quarterly report will come out, so
2        it's a Word document.  And it is basically
3        the basis for what will be presented, you
4        know, as a presentation at this meeting.
5        Sometimes, you know, there's obviously space
6        for a little more background information to
7        go in that report.  It's a Word document as
8        opposed to a PowerPoint slide presentation.
9            Sometimes not all the data has been
10       analyzed and is available at the time the
11       report deadline is due, so sometimes it will
12       say, you know, more data will be needed, or
13       more information will be presented at the
14       meeting.
15           If there's any proposed -- this is
16       important.  If there's any proposed banner
17       messages that we're going to vote on for
18       approval, those will be in the quarterly
19       report so we don't just type a bunch of words
20       on a slide up here for you to read.  So those
21       will be important to look over, because we'll
22       refer to those and then vote on those perhaps
23       at the meeting, depending on how the
24       discussion goes.
25           So that's kind of how the quarterly

1     report kind of fits in with what we do here

2     today.  And then the other thing I wanted to

3     do is kind of give you an overview of how we

4     typically formatted this.

5          So we'll start with follow-up and

6     updates.  And what this is, just basically

7     any topics that we have new information about

8     that we've presented on in the past.  So, for

9     example, you'll hear me refer to something

10    that we call opposed implementation analysis,

11    because what we try to do is we try to

12    measure any intervention that we do as a

13    result of this committee.

14         So it's not perfect because, you know,

15    it's not always apples to apples because, you

16    know, the Medicaid population is not static,

17    so you're not always looking at the same

18    patients before and after, but we try to do

19    the best we can.

20         So if we have an intervention, be it --

21    you know, say we initiated an automated prior

22    authorization, or we put in some quantity

23    limits, or we've made some other

24    recommendations.  We try to look at, you

25    know, what that data looked like before the

Def_000322533

1        edit was deployed and then pick a similar

2        time frame -- similar length of time after

3        the edit was deployed and look at the data at

4        that point and try to draw some comparisons.

5             Like I said, it's not perfect.  It's

6        probably not statistically -- you know, it

7        wouldn't pass the statistical mustard

8        necessarily, but we look at claims,

9        recipients, and total pay.  Just to kind of

10       get a ballpark idea of -- you know, a way of

11       trying to measure the impact of what we do.

12       So that's typically what we do in follow-up

13       and updates.

14            And after that we'll go into new

15       business.  And then new business typically

16       contains two parts.  The first thing we do is

17       talk about upcoming P&T classes.  And as

18       Dr. Hayden just said, Elboni has volunteered

19       to serve as the P&T/DUR board liaison.

20       Because in our vision, at least, ideally the

21       DUR Board would work in tandem with the P&T

22       Committee.

23            And typically, although the P&T Committee

24       can sort of get into the nitty-gritty of

25       criteria, technically typically they don't.

Def_000322534

1              So that's more of the role of this board is,
2        you know, looking at utilization and looking
3        at how the drugs are being used, not just if
4        they're preferred or not preferred.
5              So we would like for this board to be
6        able to think about those types of issues and
7        provide feedback to the P&T Committee.  In
8        order to be able to do that in a timely
9        manner, because we meet the day after P&T, we
10        always have to be looking ahead at what P&T
11        classes are coming up for review.
12              So that's another thing that you'll find
13        in your quarterly report is that I gave you a
14        full list of January 2016 and March 2016 the
15        classes that are scheduled to be reviewed at
16        the P&T Committee.  Because basically it's a
17        a set schedule and we review the same classes
18        at each -- whatever the designated quarter
19        is.
20              So sometimes we'll look at, you know,
21        upcoming -- the very next upcoming, so in
22        this case we might look at -- in here we're
23        going to look at through January P&T classes
24        that are coming up.  And if there's something
25        simple that we see that you might want to

1          recommend to the DUR Board, that's easy.

2              Or in some cases there might be something

3          where you'd say, you know, "I'd like for you

4          to go back and pull some utilization data or

5          look at something," in which case that would

6          probably have to be -- that's why we look at

7          say two meetings ahead.

8              Because if that were the case, that you

9          wanted to pull something for something that's

10         going to be looked at and the P&T is going to

11         be reviewing in March, that would give us an

12         opportunity to pull the data in this quarter,

13         come back to the DUR Board with that

14         information in January, have a discussion

15         about it, and then have a recommendation

16         ready to go for the March P&T committee

17         meeting.  So that's kind of how the whole

18         P&T/DUR Board working in tandem goes

19         generally speaking.

20             The other part of new business is our

21         quarterly topics.  Typically we have three to

22         four of these a quarter.  It can vary, but

23         typically we'll try to select three to four

24         topics to look at for the next quarter.

25             And finally, the last thing we do is we

1        look at proposed topics for the next quarter.

2        And as I said, in the MCO meeting yesterday,

3        which I know some of you were attending, we

4        love for the DUR Board members to come to us

5        with ideas, things that they see in their

6        practice.  You know, mostly ideas that you

7        have from your own practice, your place where

8        you work.

9             But Magellan usually comes with a few

10       things too, just in case, you know, we don't

11       have any other recommendations, we'll throw

12       some ideas out there for discussion to see if

13       that's something the board would like to look

14       at.  So I just wanted to -- before I just

15       dive right in -- since it's the first meeting

16       for a lot of you, I just wanted to give you

17       that review of that format of how this

18       meeting usually flows.

19            Are there any questions about that?

20       Okay.

21            As I was mentioning about post

22       implementation analysis here's a good example

23       in our first follow-up.  So in May of this

24       past year we implemented an edit that this

25       board discussed and that was to implement

1    maximum daily dose limits on atypical

2    antipsychotics for adult patients over the

3    age of 18.  Prior to this edit, we did have

4    an edit in place for children with maximum

5    daily dose of antipsychotics, but we did not

6    have anything in place for adults.

7         So in May of this year we implemented

8    that edit.  So to try to look at a comparison

9    we looked at January -- a three-month period

10   from January to March of this past year.  And

11   you will see there in the left -- I don't

12   have a pointer -- but in the far left column

13   on both of the tables, did the dose that

14   was -- the claim that was submitted, did it

15   exceed the maximum daily doses?  Yes it did,

16   or no it didn't.  Understand the tables?

17        So obviously the vast majority did not

18   exceed the maximum daily dose when the claim

19   was originally submitted.

20        And then how many -- on the other hand,

21   how many of those did exceed the maximum

22   daily dose?  And so you can see there that

23   prior to the edit -- and in the post edit

24   period was immediately following when the

25   edit was implemented for a three-month time

1    period.

2        Prior to that about 5 percent of the

3    claims exceeded the maximum daily dose,

4    afterwards about 2 1/2 percent of the claims

5    exceeded the dose.  It affected about 9

6    percent of the recipients versus 5 percent of

7    the recipients.

8        And, you know, obviously you can see the

9    totals there -- if you look at the totals at

10   the bottom, you know, we had 7,821 recipients

11   that received atypical antipsychotics.  And I

12   should say that this is just fee-for-service,

13   by the way.  7,821 recipients in the pre-edit

14   analysis and 7,409 in the post-edit analysis.

15   So there's about a 5 percent difference there

16   between number of recipients.

17       So again, you know, you have to keep in

18   mind that this is not a perfect statistical

19   comparison.  So the number of recipients was

20   slightly less.  But I do think that probably

21   the dollar impact is somewhat significant in

22   that about 10 percent of the overall claims

23   in fee-for-service were exceeding that

24   maximum dose prior to this edit, and it's

25   down to about 4 1/2 percent after.

1          Dr. Hayden?

2          THE CHAIRPERSON:  The 2.5 percent that

3    exceed the dose, was there a prior auth that

4    was done by the psychiatrist, or how did they

5    justify exceeding the maximum daily dose?

6          DR. BORGERT:  Yes.  At this point now

7    that it stops for prior auth and it has to be

8    submitted for a prior authorization.

9          THE CHAIRPERSON:  And the reason -- the

10   common reason was -- was it -- what was

11   the --

12         DR. BORGERT:  I'd have to check with our

13   call center.

14         THE CHAIRPERSON:  I'd just be interested.

15         DR. BORGERT:  Yeah.  I can take that back

16   and ask our call center and look into the

17   specifics of the prior authorizations.

18         DR. ALLEN:  One other question, so just

19   out of curiosity were any of these claims

20   grandfathered?  I just --

21         DR. BORGERT:  No.  We do not grandfather.

22         DR. ALLEN:  So it's just the hard stop

23   line you're looking at.

24         THE CHAIRPERSON:  And they took into

25   account the injectables as well or is it just

Def_000322540

1          the orals?  I'm just curious.

2              DR. BORGERT:  I'll have to go back and

3          look at the data we pulled.  It was all.

4              THE CHAIRPERSON:  It was all of them.

5          Thank you.

6              DR. ALLEN:  So, Dr. Hayden, just an

7          assumption here.  I think probably the

8          majority of these yeses probably is what

9          leads you to the members being grandfathered,

10         they were probably already established on the

11         atypical and maybe if they had it available

12         for six months.  It's just an assumption

13         obviously --

14             DR. Borgert:  Yeah.  I'll take that back

15         to our call center and ask them for the

16         specifics on those.

17             THE CHAIRPERSON:  I mean, is it drug-to-

18         drug interaction with the levels of the

19         medication were decreased?  You know, that's

20         the only other thing I'm thinking of.  Well,

21         that's good.  That's good data in terms of,

22         you know, rendering safe patient care.

23             DR. BORGERT:  Right.

24             THE CHAIRPERSON:  So I think it's really

25         going in a positive direction.

1           DR. BORGERT:  And so that's what I mean

2      about, you know, trying to do some

3      measurement, you know, of what we've done to

4      get some idea.

5           And so here's another example of that

6      exact same kind of thing in terms of a post

7      implementation analysis.  The dark blue

8      columns there are the pre-period to the edit.

9      And then the light blue columns are the

10     post-period of data.  So let me tell you a

11     little bit about this.

12          So prior to the edit that -- the edits

13     that went into place, our quantity limits on

14     insulin vials were 10 vials per month, and in

15     January of this past year we did lower that

16     to a maximum quantity of allowing 7 vials of

17     insulin per month.  And in March -- excuse

18     me, April of this past year, we decreased the

19     quantity limit on our insulin pens down to

20     two boxes -- a maximum of two boxes, so 10

21     pens per month.

22          And so in looking at that impact, you can

23     see that really there was no impact

24     whatsoever on the vials, it actually went up

25     a slight amount.  However, we did see, you

Def_000322542

1          know, about a 13 percent decrease in our
2          quantities dispensed with pens.  And by
3          quantities dispensed, that means the number
4          of mls of insulin is what that quantity is.
5          So if you're looking for units, you're going
6          to have to multiply that by 100.
7               So the point was since -- I know there's
8          a lot of representation now in the DUR Board
9          from the MCOs.  There was a discussion
10         yesterday I think in that MCO meeting that
11         4 1/2 vials of insulin a month is a lot of
12         insulin a month for a patient to be using.
13              Now, obviously, you know, insulin is not
14         a set dose, it's a sliding scale, it's all
15         over the board.  So there's no, you know,
16         this is the standard dose of insulin kind of
17         thing.
18              And the question arose, you know, could
19         this be an anomaly to fee-for-service
20         population as opposed to maybe the recipients
21         are in an MCO population.  Really we can't
22         tell, we don't know.  It is possible that the
23         patients that are in fee service are
24         "sicker."  It's hard to know.
25              But, you know, I'll just throw that out

Def_000322543

```
 1          there because it was brought up at the
 2          meeting if people are interested.  I think,
 3          you know, the MCOs feel like that limit of 7
 4          vials per month is still pretty high.  We
 5          feel like if we lower the limit -- one of the
 6          recommendations from the MCOs was to limit
 7          the vials to 2 to 4 vials a month.  But if we
 8          did that, we'd impact more than half of the
 9          patients based on this data, right?  So that
10          doesn't seem like a prudent thing to do.
11               I'll just throw that out there, not
12          necessarily if the board has any comment
13          about whether or not we would want to look at
14          the MCO data as it relates to see if it's any
15          different than the fee-for-service data.
16               THE CHAIRPERSON:  Yeah.  When I looked at
17          this data, I looked at in terms of I know
18          that under Medicaid they can pick up their
19          prescriptions every 25 days.
20               DR. BORGERT:  I think it's 27.
21               THE CHAIRPERSON:  Is it 27 now or is it
22          25?
23               DR. MOORE:  The edit actually stops at
24          the 27th.
25               THE CHAIRPERSON:  So every 27 days.  So
```

Def_000322544

1       it would be interesting to see when they next

2       picked up their prescription, was it access

3       just to walking to their pharmacy or getting

4       a ride to their pharmacy they were picking it

5       up in 40 days.  And so I'm not sure if that

6       data stratifies when their next pickup is.

7       Because they could be stretching it out until

8       they just run out and then they get their --

9          DR. ROMAY:  I just wanted to say in terms

10      of we can look up the refill to see how long

11      it's really taking them to get through that

12      supply.  Because it strikes me odd that

13      there's recipients out there using 7 vials of

14      insulin, I find that hard to believe.  I know

15      there's a lot of demand for insulin,

16      depending.  But we need to do a better job

17      educating those members in, you know, dietary

18      and trying to scale them back.  I know if

19      they need insulin, that's one thing; but if

20      we're just kind of like, you know,

21      stockpiling at home just because they have to

22      fill it every so often, that's what -- I

23      mean, we can do a comparison data so see, you

24      know, how long it's really taking them to get

25      to the pharmacy.

Def_000322545

```
 1              THE CHAIRPERSON:  The pickup dates.  I'm
 2         not sure we can.
 3              DR. BORGERT:  Yeah.  I would imagine we
 4         can look at that in terms of length of time
 5         between fills, we can probably look at that
 6         information.
 7              THE CHAIRPERSON:  And I'm not sure if we
 8         can differentiate a type 1 from a type 2, you
 9         know, some of these aren't pumped.  If they
10         pick up the vials and they -- yeah.  So I'm
11         not sure what the --
12              DR. MOORE:  The only way we can possibly
13         do that is maybe tie the diagnosis codes in
14         with those listed that we've identified.
15              THE CHAIRPERSON:  Right.
16              DR. MOORE:  We probably can pull in that
17         data.
18              THE CHAIRPERSON:  You know, the dilemma
19         that we face here is not to restrict
20         anybody's coverage, but yet provide safe --
21         you know, making sure that the half-life
22         dose, you know, those meds at home are still
23         viable.  You know, it's always a concern.
24              DR. OLSON:  And I don't know if you can
25         look into whether it's lost or damaged,
```

Def_000322546

    1          because you run into that a lot as well with
    2          broken vials.  So that would be good to be
    3          looking into that too.
    4              DR. BORGERT:  Right.  I'm trying to think
    5          of how we could capture that.
    6              DR. OLSON:  There's an override code,
    7          right, for a lost or not --
    8              DR. BORGERT:  Or even if they're getting
    9          it as an early refill?
   10              DR. MOORE:  Early refills are only
   11          approved for dosage changes in general.
   12          Yeah, they don't really do early refills for
   13          lost or stolen or vacation supplies.
   14              THE CHAIRPERSON:  And maybe look at the
   15          data on the patients that are using closer to
   16          the 7 vials or exceeding a higher dosage.
   17          Perhaps maybe looking at that population and
   18          seeing what's going on there.  And seeing --
   19          you know, look at better management of
   20          diabetes and those care coordinators or if
   21          something else is going on there or other
   22          options.
   23              DR. BORGERT:  Yeah, we can bring back
   24          some general information about who those
   25          recipients are; you know, age, diagnoses.

```
 1        Some general types of -- maybe types of
 2        diagnoses, we can try to pull out some
 3        specific information about those.
 4            THE CHAIRPERSON:  I guess on the patients
 5        that are using more than 100 units per day,
 6        is that a fair -- I mean, that's kind of high
 7        still, but again -- I think --
 8            Any comments, any opinions?
 9            DR. MARTORANA:  You can also just look --
10        just look at how many individuals say at 5,
11        what percentage are more than 5.  And the
12        average, it's kind of diluted but you can
13        have some very high utilizers with the
14        overall is 3.  So if you just look at the
15        pure percentage that over 5 maybe it gives us
16        an idea of what the 5 are off or 5 are above
17        or something like that.
18            THE CHAIRPERSON:  I guess we'd have to
19        look at how many units per day.  Because if
20        they use the 5, but they pick it up at 35
21        days and not the 27 days.  So I guess it
22        would be -- I'm sure if we can -- if you can
23        look at how many units per day total the high
24        users instead of the vials pick up, because
25        they could be picking up every 40 days
```

Def_000322548

 1       instead of every 27 days.
 2            DR. BORGERT:  We can use either mls or
 3       units.  I mean, we can get that.
 4            THE CHAIRPERSON:  It's interesting.
 5            DR. BORGERT:  So what I heard was, we're
 6       going to take it back and try to drill down a
 7       little bit more looking at time between fills
 8       to see -- we're going try to get out some
 9       specific information on patients who are
10       using more than 100 units per day and we're
11       going to look at specifically patients that
12       are getting 5 or more vials a month, what
13       percentage of the overall utilized population
14       does that represent.
15            I laugh because this is the thrid or the
16       fourth meeting that we've had this -- it's a
17       good topic, a really good topic, but we've
18       struggled to get to the finish -- bring this
19       one across the finish line.
20            So what we initially -- and this --
21       actually this recommendation actually came
22       out of P&T.  P&T asked the DUR Board to look
23       at this.  They asked the DUR Board
24       specifically to look at codeine utilization
25       under the age of 12.

1          So when we looked at our data what we
2     found is that we did have some utilization.
3     We had about 675 recipients and about 740
4     claims in patients less than -- under the age
5     12 or under who are receiving codeine.
6          Now I will say that none of these claims
7     were for a single agent codeine, they were
8     all or, you know, codeine acetaminophen or
9     codeine guaifenesin.
10         And the reason -- the backup behind why
11    the P&T Committee brought forth this topic
12    was in 2013 the FDA added a contraindication
13    and black box warning for the use of codeine
14    in patients under the age of 12.
15    Specifically those patients who were status
16    post tonsillectomy and/or adenoidectomy.
17         But the issue here is that a small
18    percentage of the population, probably less
19    than 10 percent overall but higher in some
20    ethnic groups, are ultra-rapid metabolizers
21    of codeine.  And to go back to the
22    pharmacology, codeine is a pro drug.  So it
23    actually has to be converted in the body to
24    morphine and that's where the analgesic
25    properties come from.

Def_000322550

 1          So I think it's 592(D)(6), but don't

 2     quote me on that.  If you are an ultra-rapid

 3     metabolizer, you're going to convert codeine

 4     to morphine more rapidly and, therefore,

 5     could be at a higher risk.  And of course the

 6     converse is true as well; some patients get

 7     very, very ill because of the analgesic from

 8     codeine because they don't convert the

 9     codeine -- if you're a poor metabolizer, you

10     don't convert it to morphine or hardly at

11     all.

12          And then we look -- thought about the

13     other things the codeine is used for

14     pediatric patients; cough, general pain

15     management.  The American Academy of

16     Pediatrics and the American College of Chest

17     Physicians recommend against the use of

18     codeine in pediatrics for cough.  And we have

19     a pediatrician on the board.  That's awesome.

20     And it's also not recommended for pain

21     management for anyone by the World Health

22     Organization, analgesics stepladder.

23          So on page 9 of the quarterly report that

24     you received there is a proposed banner

25     message.  And we did look at this banner

Def_000322551

```
 1          message the last time and I'll bring you up
 2          to speed on that in a minute.  But just a
 3          couple of highlights from that banner message
 4          is that codeine -- the DUR board lowered the
 5          age from 12 to 6, they felt like it was more
 6          appropriate to limit -- to require prior
 7          authorization only in those children under
 8          the age of 6 rather than using the age of 12
 9          as a cutoff.
10              There's a link in the banner message to
11          the FDA announcement for February of 2103.
12          The banner message contains an alternate drug
13          and dosing regimens that are reported in the
14          literature for the use of children both
15          post-tonsillectomy as well as bone fractures.
16          And most of those supported the use of
17          Ibuprofen and/or acetaminophen.
18              A link to the abstracts of those studies
19          are in there.  And then also on the banner
20          message there is an equal analgesic opioid
21          dosing conversion for children less than 50
22          kilos.
23              The thing that kind of stopped us last
24          time was this alternate -- alternatives for
25          pain management in these patients.  And there
```

1     was a discussion on the board that they were

2     concerned that if the alternatives were OTC,

3     that that might pose a problem in terms of

4     the children ultimately receiving those

5     medications.

6         Would the caregivers, you know, go to the

7     pharmacy, pay out-of-pocket for an OTC med,

8     make sure that the child received the

9     medication.  There was some speculation that

10    that might not happen.

11        So the board wanted to make sure that

12    there was a prescription alternative that the

13    caregiver could fill at the pharmacy and have

14    it be reimbursed by Florida Medicaid and to

15    make sure that the patient would receive the

16    pain medication.

17        And so we took it back and did some

18    research on it, and we do have Ibuprofen

19    suspension 100 milligrams per 5 ml as an Rx

20    product that is available on the PDL, so they

21    will have -- Medicaid recipients will have

22    access to that prescription product, that

23    will be reimbursed under their Medicaid

24    benefits.

25        I think that was the sticking point last

1      time, and now that we've got that cleared up

2      -- actually I think we even voted on the

3      banner message last time.  I don't remember.

4      But it's probably just for -- say we should

5      probably revisit the banner message.

6         THE CHAIRPERSON:  After further review of

7      this banner message -- I always want access

8      to patient care and I'm making sure they have

9      adequate analgesic postop.  Ibuprofen is

10     good, but again the risk of bleeding, that's

11     commonly known even in using an anti -- of

12     that particular nature.

13        DR. BORGERT:  I will say that the ENT

14     Society actually came out and made a

15     statement that Ibuprofen is safe for use

16     post-tonsillectomy, they've looked at that,

17     the risk of bleeding, and they feel that it's

18     safe.  The ENT -- I can find that.

19        THE CHAIRPERSON:  That's fine.  But the

20     banner message, just look at it on -- looking

21     at it as an antagonist, because codeine as an

22     oral starting dose.  Now we're putting this

23     banner message out and here it says,

24     "recommended starting doses of opioids in

25     children weighing less than 50 kilograms,"

1     and yet codeine is listed on there.

2         DR. BORGERT:  Well, yeah.

3         THE CHAIRPERSON:  I mean, should we

4     delegate that line as a --

5         DR. MOORE:  Yeah.

6         THE CHAIRPERSON:  -- consideration?

7         DR. MOORE:  Yeah, I think the intent when

8     it was put in there was as a comparison.  You

9     know, if you would have prescribed codeine at

10    this, but I can see what you're saying.

11        DR. OLSON:  I agree with Dr. Hayden.  Why

12    don't we just take it out of the chart and

13    put it as a reference as a baseline as it

14    exists but not in the chart for dosage.

15        DR. BORGERT:  Okay.

16        DR. OLSON:  The other question too is, so

17    we're pushing -- you know, oxycodone is

18    covered by Rx and that's fine.  Why are we

19    not allowing acetaminophen be covered by Rx?

20    Because I mean, we alternate.

21        The other problem with some of the other

22    combinations is the frequency of the opioid

23    and getting large acetaminophen, so we

24    recommend alternating, but most families

25    don't buy the acetaminophen.  So I recommend

1          we put acetaminophen on as available by Rx.

2              THE CHAIRPERSON:  For those children

3          under 6 years of age.  I think that was

4          our --

5              DR. OLSON:  We brought that out.

6              THE CHAIRPERSON:  We brought that out at

7          the last meeting to have that.  Do we have

8          other generics like loratadine on our

9          formulary that's generic?  Ibuprofen is

10         generic and over-the-counter as well, it's a

11         liquid suspension.  And I also made that

12         recommendation that Dr. Olson is making about

13         the acetaminophen.

14             DR. OLSON:  It comes down to, you know,

15         unfortunately the ibuprofen liquid, a lot of

16         children don't like it.  So acetaminophen is

17         more palatable and you have the melt-away

18         tablet and things like that.  You have other

19         options with acetaminophen.  It's much

20         better.

21             THE CHAIRPERSON:  And the other concern I

22         think I mentioned maybe two meetings ago

23         regarding this banner message is putting this

24         information out here and you're going from a

25         schedule -- I think it's Schedule 4 drug or

Def_000322556

```
1       Schedule 3 drug, these morphines and
2       oxycodones are Schedule 2, so you kind of say
3       "Well, let's do this."
4           That was my other concern as a
5       recommendation. To put that ibuprofen or
6       acetaminophen bolder or this is your option,
7       you know, making it really easy for the
8       prescriber to the see what their available
9       options are.
10          DR. BORGERT:  Yeah.  I can't make the
11      decision about acetaminophen, that has to be
12      an Agency decision, so...
13          THE CHAIRPERSON:  Acetaminophen is
14      currently available on the preferred drug
15      list, under arthritis dosage, I believe.  So
16      I'm sure why it would be -- you know, as a
17      time limit postop, if it was for the six and
18      under, it wasn't a long period of time.  So
19      as an available option If we're going to do
20      this banner message to promote patient
21      safety.
22          DR. BORGERT:  I will take that back to
23      the Agency.  And --
24          THE CHAIRPERSON:  And perhaps look at a
25      fiscal analysis of it as well, maybe.  If
```

1          that was the concern or --

2               DR. BORGERT:  I don't think it's fiscal.

3          I don't think that's the issue, but I

4          certainly will take that back to the Agency

5          about the acetaminophen.

6               THE CHAIRPERSON:  Yeah.  I don't think

7          parents will buy the over-the-counter, even

8          if they had those benefits with the added

9          enhanced.  They won't even buy the Refresh

10         eyedrops, I mean, for dry eyes.  It's just

11         costs.

12              DR. BORGERT:  Our next follow-up item has

13         to do with methadone.  And just some

14         background that we discussed last time.

15         Methadone is -- and specifically we were

16         looking here at drug interactions with

17         methadone.  And we parsed out these -- just

18         looking at the severe and major methadone

19         drug interaction.

20              So we know that methadone has been

21         associated with prolonged Q-T intervals and

22         Torsades de Pointes.  Methadone is

23         metabolized by several of the CYP pathways.

24         And concurrent use of drugs that block these

25         pathways may increase methadone plasma

 1          levels.  It's also extensively protein bound,

 2          so that's another route of possible drug

 3          interaction.

 4              And then, you know, another possible

 5          problem with drug interaction is that if you

 6          use multiple drugs that can prolong the Q-T

 7          interval, increase the risk there.  And so

 8          consensus guidelines recommend the use of

 9          baseline ECGs to measure the Q-T intervals,

10          as well as clinicians being aware of

11          interactions between methadone and other

12          drugs that might prolong the Q-T interval or

13          slow the elimination of morphine -- or,

14          excuse me, methadone.

15              So we looked at our data to see, you

16          know, what we had going on in terms of these

17          specific -- these very specific drug

18          interactions, severe or major drug

19          interactions with methadone.  And we did have

20          some claims there, as you can see, that got

21          this message.

22              Now, what happens at this point in time

23          with these drug interactions is what we call

24          post and pay.  So in other words, the message

25          is sent back to the pharmacy, an alert on the

Def_000322559

1    drug interaction -- and probably a lot of the

2    pharmacy software has a drug interaction

3    alert as well.  But we do not stop the claim

4    from paying based on that drug interaction,

5    we still allow the claim to pay.

6        There were a few of them that were

7    reversed.  We have no idea why they were

8    reversed.  Some of it might be because of

9    this reason or not, we don't really know.

10   And so what the DUR Board had discussed was

11   putting in a hard stop when -- anytime this

12   type of drug, as severe or major drug

13   interaction with methadone, was flagged at

14   the pharmacy level.  That would require the

15   pharmacist to basically investigate the

16   situation.

17       The pharmacy can then be able to enter

18   some DUR service codes to allow the claim to

19   pay if it were appropriate.  But it would

20   stop it to a point where some intervention

21   needs to be taken.

22       However, in the interim, we met at the

23   end of June and had this big discussion.  And

24   then I sent this letter out in pdf format

25   with the packet.  There was a letter to the

1       CMS acting administrator on July 20th, that

2       was signed by eight U.S. Senators.  And the

3       gist of it was that they were very concerned

4       that methadone was a preferred drug in many

5       state Medicaid programs.

6            So some of those comments that they made

7       is that they were deeply concerned about the

8       inappropriate use and abuse of opioid

9       prescription painkillers that has led to

10      unprecedented numbers of overdose deaths

11      across the United States.  They estimated

12      that 30 percent of opioid-related

13      prescription drug overdoes deaths involve

14      methadone.  That most state Medicaid programs

15      have designated methadone as a preferred drug

16      for managing pain.  And they feel that these

17      state Medicaid policies may be inadvertently

18      contributing to opioid overdose deaths.  And

19      they want to clean up the issue guidance to

20      state Medicaid directors recommending the

21      removal of methadone for pain from preferred

22      drug lists.

23           So they pretty much just said "hum."  So

24      the plan was that the P&T Committee was going

25      to discuss this yesterday and the

 1      recommendation was going to be, I think --

 2      well, the P&T Committee -- okay.

 3          Since the P&T Committee did not meet

 4      yesterday, the P&T Committee did not discuss

 5      this issue.  However, we didn't at the time

 6      that the P&T Committee was not going to meet.

 7      So we didn't proceed forward with this drug

 8      interaction edit, because we felt like that

 9      if something is going to change, then we --

10      you know, we don't need to do all that work.

11          So I think at this point what I would say

12      about this is that it's pending.  You know, I

13      think it's pending the outcome of when the

14      P&T Committee meets next.  And we don't even

15      know when the P&T Committee is going to meet

16      next.  So that's kind of the status at this

17      point, just to bring you up to date that it's

18      pending.

19          Anybody have any comments --

20          THE CHAIRPERSON:  Well, the whole aspect

21      of controlled substances is the Board of

22      Pharmacy is going to be meeting again next

23      month regarding their rule on controlled

24      substance dispensing.  I don't know if you

25      all are aware of that.  But the Board of

1          Osteo, Board of Medicine, FMA, all the state
2          boards, CVS, Walgreens have been looking
3          at -- you know, we talked about the paper
4          that came out of the National Association of
5          the Board of Pharmacy paper and all the
6          states gave their recommendation.
7              So they're going to re -- updating their
8          dispensing rules to reflect the consensus
9          state guidelines in terms of the TMP and
10         these red flags that are raised.  And here's
11         a perfect red flag in terms of safety for
12         patient care.  So that's another issue.
13             So anything that impacts patient care is
14         to be reviewed.  And I'm not sure -- this is
15         the preferred drug list?  The -- I'm just
16         getting an update, they are looking at
17         their -- updating their 64 -- I forget which
18         one it is.  They're somewhere in the process
19         right now.
20             They have a committee that was meeting
21         looking at the dispensing practices in terms
22         of having the pharmacist asking the PDMP and
23         making sure -- because sometimes the
24         prescribers are not looking at it or writing
25         a script because the server is down, the

1          password is reset, whatever.  So many

2          obstacles on behalf of patient practices --

3          private practices.  So I'm just getting an

4          update on that they're looking at that.

5               DR. SAEZ:  I have a question.  You know,

6          I have -- you know, in the community I know

7          that -- I'm not a psychiatrist, but I think

8          methadone is also used for --

9               THE CHAIRPERSON:  Detox.

10              DR. SAEZ:  -- detox.  So are we going to

11         be able to differentiate these, you know,

12         from pain?  Because remember, methadone is

13         also used for drug detox.  So I mean, if you

14         cut it from the preferred drug, all this --

15         we have a big drug issue in our community.

16              DR. BORGERT:  Right.  Actually that is

17         not covered through the fee-for-service

18         Medicaid benefit for methadone use for drug

19         detox, only for -- right.  It's kind of a

20         separate issue.  The 40 milligram dispersible

21         tablet is not covered, because that's the one

22         they use for detox.  So that's a separate

23         issue.

24              DR. SAEZ:  What I see in the community is

25         sometimes they just continue giving the

```
1        patient, not for the pain, but they just
2        maintain them on a dose of methadone.  I'm
3        not sure if -- I think.  You know, like --
4             DR. BORGERT:  I mean, I think that -- I
5        mean, what you're saying is you're kind of
6        using it as medications just for treatment
7        like similar to suboxone or something like
8        that.
9             DR. SAEZ:  Yes.  That's what we see a lot
10       in the community.  And maybe they get away by
11       saying that it's pain, but what we really see
12       -- I don't know the standard of care.  Again,
13       I'm not a psychiatrist or, you know, a drug
14       addiction doctor, but I see it used in this
15       manner.
16            DR. BORGERT:  Right.  I think that's a
17       valid point and I will say that I read
18       recently that CMS is going to lessen the
19       restrictions on suboxone prescribing.
20       Because I think it's currently now there's a
21       limit on the number of patients they need, a
22       certified suboxone prescriber can prescribe
23       and they are going to do away with that.
24       Because they want to encourage medication-
25       assisted treatment, and obviously I don't
```

1          think they want to encourage methadone in
2          that role.  So I think that we probably are
3          going to see an increase in suboxone in that
4          situation as opposed to the methadone.
5              THE CHAIRPERSON:  I also wanted to
6          comment in November the CDC is coming out
7          with their revised guidelines or updated or
8          new guidelines on chronic pain, and that will
9          be coming out.  There is a paper right now on
10         there but it's not posted, I don't think, on
11         the CDC website for chronic pain management.
12             Yes.
13             DR. MARTORANA:  Question.  Is it within
14         the purview of this committee to make a
15         recommendation to the P&T such like for
16         removal of methadone?
17             THE CHAIRPERSON:  Yes.  You know, we have
18         done it before.  We did it with Soma years
19         ago as well.  And we also can put -- you
20         know, the other recommendation we had done in
21         the past, let's say for muscle relaxers, we
22         put in like a time limit like for acute pain
23         it's like 21 days or some -- or a certain
24         number of refills per a calendar year.  So
25         we've looked at that as well.

Def_000322566

```
 1           Moses?
 2           DR. ALLEN:  And just to piggyback on both
 3      points.  You know, certainly this is
 4      concerning the safety impact, but as a
 5      committee do we have -- will we be able to I
 6      guess have access to the impact that this
 7      would have if it were removed from the PDL?
 8           So obviously it's currently a PDL
 9      medication and I would imagine, you know,
10      there's a number of people that are on it.
11      But, you know, have we had the ability to,
12      you know, analyze those numbers, perhaps we
13      could make the recommendation of removal or
14      perhaps even put steps in place to just
15      hypothetically try morphine or whatever first
16      prior to going to the methadone, just to make
17      it more difficult per se to get that
18      medication.
19           MS. MOORE:  Yes.  This committee does
20      have that -- it's in the purview of the
21      committee to make that recommendation.  What
22      I will say is we do a pre-implementation
23      impact analysis when I code the changes from
24      the P&T Committee.  However, we'll probably
25      meet as a committee prior to this board
```

1          meeting again, so it would be kind of tough

2          to get you guys that information.  We can

3          bring that information back once the P&T

4          Committee votes.

5              Because we don't know which way the

6          committee will go at that time.  So if that

7          drug does move to the non-preferred status,

8          we will have that information that we can

9          provide to you at that time.  And if you all

10         would like to -- at that time -- so it would

11         be January at that point -- to discuss

12         criteria, we can certainly discuss criteria

13         for approval here and implement it after the

14         January meeting.

15             So at this point I think that this edit

16         is pretty much on hold until the P&T

17         Committee reviews it.

18             DR. BORGERT:  Okay.  The next item for

19         follow-up is regarding topical testosterone

20         products.  Just quickly some background.  We

21         know that Androgen prescriptions among men 48

22         years of age or older have increased

23         threefold, and this is from 2001 to 2011.

24         Now, this is not specifically to Medicaid,

25         this is referring to in general.

Def_000322568

1          There are four formulations of
2     testosterone available; injectable, oral,
3     transdermal, and topical gel.  And of those
4     four formulations the topical gel is the one
5     that's really seen the most increase in
6     utilization, it's increased more than
7     fivefold.  Again, not specific to Medicaid,
8     just in the general population.
9          Another factor that caused us to want to
10     look at this was the FDA in May, when they
11     did labeling changes regarding possible
12     increased risk of heart attack and strokes,
13     there was a randomized trial in testosterone
14     gels in older men that was halted due to
15     these ongoing concerns about cardiovascular
16     safety.  And the FDA further made a statement
17     that the benefit and safety of these
18     medications have not been established solely
19     for the treatment of low testosterone levels
20     due to aging.
21          So what we did topical testosterone is on
22     the preferred drug list for Florida Medicaid.
23     We looked at our utilization.  We did have --
24     during the one quarter -- the first quarter
25     of this year 167 claims, 81 recipients, about

Def_000322569

1    $82,000.

2        We tried to look a little bit about who

3    these patients were.  And some things that

4    were a bit concerning were that, you know, we

5    had a couple patients who had a diagnosis of

6    prostate cancer or related to prostate cancer

7    and theoretically testosterone should be

8    contraindicated in anybody with that type of

9    medical history.

10        And so what we did in the interim was to

11    go back and explore what would be some

12    reasonable diagnoses that we might be able to

13    put in place to implement an AutoPA.  So it

14    is a preferred drug, so we're going -- it

15    will continue to be a preferred drug as

16    approved by the P&T Committee.  But for

17    preferred drugs it is acceptable for us to

18    put a diagnosis look back on those to --

19    because that's in line with the FDA labeling

20    of this drug.

21        And so these are the proposed ICD 9 --

22    and I know ICD 10 is literally around the

23    corner -- but these are the proposed ICD 9

24    codes that the -- have thought to put in

25    place where the system would just from back

1     automatically, look for this diagnosis in the

2     patient's history, and if it found this

3     diagnosis, then it would pay.  And these are

4     pretty raw.  I mean, really pretty broad, you

5     know, testicular dysfunction.  Testicular

6     dysfunction, really not otherwise classified,

7     you know, pretty broad.

8          DR. ALLEN:  Quick question.  So No. 1, I

9     really like this recommendation.  But

10    secondly, if this AutoPA were implemented, is

11    there a look back, are all your edits hard

12    stops from that point in time?

13         DR. BORGERT:  I'm sorry, could you repeat

14    the question?

15         THE CHAIRPERSON:  What's the look-back

16    time, I think.

17         DR. BORGERT:  Oh, what's the duration

18    time that we look back for diagnoses?

19         DR. MOORE:  Generally it's two years.

20         DR. ALLEN:  So --

21         THE CHAIRPERSON:  What's the look back --

22    go head, I'm sorry, Moses.

23         DR. ALLEN:  So just for clarity.  So in

24    the event, you know, that I was a patient

25    that didn't have one of the three diagnoses

Def_000322571

1          that you're looking for, and I had previously

2          been on Androgel, when this AutoPA is put in

3          place, it's going to reject it.

4               DR. BORGERT:  That's correct.

5               DR. ROMAY:  Have we researched the -- or

6          perhaps we can -- or in addition maybe in

7          place some AutoPA or actually PA the drug to

8          request a baseline testosterone level?  Have

9          we looked at that?  Because a lot of times --

10              DR. BORGERT:  It's a preferred drug,

11         so...

12              THE CHAIRPERSON:  Or verfication of

13         diagnosis I think he's asking for.

14              Also, are there other -- I believe there

15         are other ICD 9 codes or a pituitary

16         hypofunction.  I mean, isn't there some other

17         additional codes that should be on that list?

18              DR. ROMAY:  Yes.

19              THE CHAIRPERSON:  Do you have any other

20         codes that were under any other -- besides

21         pituitary hypofunction?  I think there's  --

22         any other suggestions in terms of other

23         diseases that need testosterone?  Because

24         once these ICD 9 codes are used and if you

25         don't have the other code are more broader.

Def_000322572

1           DR. ALLEN:  Right.  So just out of
2      curiosity, were these compendium?  Were these
3      four under compendium or I guess the PDI?
4           DR. MOORE:  The Agency asks for
5      suggestions from the plans to submit some ICD
6      9 codes that we would code for an AutoPA, and
7      these are the ones that they had received
8      feedback from the plan.  And so we verified
9      the ICD submitted it and that's where were
10      this list came from.
11           THE CHAIRPERSON:  Dr. Zitiello made a
12      recommendation of adding --
13           DR. ZITIELLO:  In the pediatric
14      population we see it for Klinefelter Syndrome
15      and I don't think a pediatrician in general
16      would use ICD 9 codes.
17           DR. BORGERT:  Right.  And that's
18      certainly on the list of medications.
19           THE CHAIRPERSON:  Dr. Luis?
20           DR. SAEZ:  You know, my population
21      there's again a lot of transgender, so I
22      guess gender as far as a new diagnosis are
23      used by the psychiatric.  I don't remember
24      the diagnosis, but there may be a female that
25      wants to transition into a male, you know.

1 So they may be using the injectable form of

2 testosterone.  So it's a valid ICD 9 code

3 nowadays.  It's gender coding or something.

4  THE CHAIRPERSON:  Any other ICD 9 codes

5 or suggestions from the board members?

6 Moses?

7  DR. ALLEN:  I'm sorry.  I'm asking a ton

8 of questions at the first meeting.  I guess

9 as a general rule of thumb, would this to be

10 our advantage to have the ICD 9 codes mirror

11 the PDI or compendium?  I mean, just the

12 reason I ask so -- I mean, I'm referring

13 basically for suggestions right now, but

14 without micromanaged or clinical

15 pharmacology, I can't quote it right now, but

16 I think we're at a disadvantage.

17  DR. MOORE:  I actually have a

18 pharmacology degree.

19  THE CHAIRPERSON:  Go ahead.  What does it

20 say?

21  DR. MOORE:  So for an indication --

22 they're really excited next door.  So the

23 only indications are delayed puberty,

24 hypogonadism, and palliative treatment of

25 breast cancer.  There are a number of

1      off-label indications, but those are -- and I

2      just looked up Androgel.

3          THE CHAIRPERSON:  Okay.  So I guess it

4      will go through with those prior and then

5      some other ones you just mentioned and then

6      if they want to do a prior auth, they would

7      have to submit their --

8          DR. MOORE:  Right.  It would be a manual

9      PA at that point.

10          The CHAIRPERSON:  So if the item -- and

11      you may want to -- if an item is a

12      non-preferred item, a patient can still have

13      access to the medication, they would -- a

14      prescriber would have to submit a prior

15      authorization justifying medical use of any

16      drug.

17          DR. MOORE:  Right, right.

18          THE CHAIRPERSON:  Just so you all know

19      that.

20          DR. SAEZ:  The other question is that

21      there's a real controversy about how long

22      should a person stay on this?  You know,

23      there's really no full guidelines as to how

24      long.  I know it's a preferred drug, but

25      sometimes, for example, in the HIV

```
 1          population, like they don't know what came
 2          first, either testosterone that was caused by
 3          the HME or the medications.
 4               So sometimes what we do is we start the
 5          patient, we get them off for a year and then
 6          we do a trial where we see if they can be
 7          without it, and then we check the
 8          testosterone.  Some, too, are able to be
 9          without it.  So, you know, I don't know how
10          long somebody should be on testosterone.  I
11          don't know if there's any indication.  I know
12          it's a preferred drug, but shouldn't there be
13          some type of PA, maybe it's like a preferred
14          for a year and then like -- I don't know.
15               THE CHAIRPERSON:  Time limits you're
16          talking about?
17               DR. SAEZ:  Yes.  I think --
18               THE CHAIRMAN:  I don't think that's in
19          the packaging insert.  We've done that --
20          we've done time limits for oncology agents.
21          For example, Tamoxifen has a 5-year time
22          limit.
23               DR. OLSON:  The prescription is only
24          valid for a year so you would at least renew
25          with the PA annually, but -- you know.  I
```

Def_000322576

1       don't know.

2            DR. SAEZ:  But right now she says there's

3       no PA because it's a preferred drug, so you

4       just go through.  So the question is like

5       should we have some preferred.  Should we

6       have some type of PA?  Because, you know, how

7       long does somebody need to be on

8       testosterone?  Because the question is it's

9       very hard to write right now with all these

10      heart attacks and -- if we're talking about

11      the safety of the patient, you know.  Like

12      there's studies that are coming out that --

13      you know, to answer these questions.

14            I mean, should there be -- I think

15      everybody should be happy with the

16      testosterone and everything, but I think we

17      should also question ourselves because

18      there's really no standard of care as to how

19      long somebody should be on it.  Some people

20      would need to be on it forever, but there's

21      no --

22            DR. BORGERT:  Yeah.  I'm just thinking

23      about prorating it.  I think we might have it

24      -- we thought about doing a duration of

25      therapy and I think we might have to tie that

1        to a specific ICD 9 code.  For instance, you
2        know, men who've had testicular cancer, who
3        had a radiation or something like that, they
4        -- my understanding is they're on lifelong,
5        lifelong testosterone.
6             THE CHAIRPERSON:  And also pituitary
7        hypofunction --
8             DR. BORGERT:  Right.  So there are some
9        occasions that lifelong therapy is clearly
10       medically indicated.  So we might need -- if
11       we looked at duration of therapy, we might
12       have to narrow that down in terms of
13       diagnoses codes.  We might just --
14            DR. ROMAY:  I think to go back up to what
15       we were mentioning before about the
16       testosterone levels, I think we need to do a
17       better job of getting that baseline level of
18       testosterone.  And then under renewal of that
19       PA, they can submit, you know, the members --
20       you know, "they're therapeutic now, we're
21       going to keep watching them, you know, we'll
22       monitor them, you know, we're reassessing
23       their condition to see if there's any cardiac
24       complication or anything like that."  And
25       then moving forward and then they continue,

1          then we just monitor them on a yearly basis

2          to make sure that they're on target.

3               THE CHAIRPERSON:  Yeah.  Then it voids

4          the no-show part until the prescriber

5          re-evaluates.

6               MS. MOORE:  And my suggestion is because

7          of the nature of the recommendation through

8          the P&T.  So because this is a preferred

9          drug, we have limitation as to what we can do

10         with this drug at this time.  However, since

11         we review P&T classes yearly, I think if we

12         review those drugs through here before it

13         goes to P&T, I think that's a great

14         recommendation to take when that drug is up

15         from review.

16              So since we get out ahead of the P&T

17         classes, we're able to take everything that

18         you all said here, which are valid and well

19         points that we should take back to the P&T

20         Committee.  But it has to be before those

21         classes are reviewed so that when provider

22         synergies goes out to reach out to those

23         manufacturers, they can layout our criteria

24         that we want.

25              THE CHAIRPERSON:  So you'll table that --

1       this item for -- because it's not in the
2       January.  I'm looking at the January.  Well,
3       it says January intergenic agents.
4            DR. MOORE.  Yes.
5            THE CHAIRPERSON:  So for January you'll
6       have to put it on their agenda.
7            DR. MOORE:  Right.  So I think at this
8       time it's a great time to discuss this,
9       because before we meet again those
10      discussions will happen with provider
11      synergies and the Agency.  So if we could
12      summarize our talking points that we would
13      like to propose for the next --
14           THE CHAIRPERSON:  Dr. Luis made a motion
15      for -- go ahead, make your motion.
16           DR. SAEZ:  The motion to discuss the
17      restrictions for --
18           DR. MOORE:  Yes.  So we should define
19      those restrictions today.
20           THE CHAIRPERSON:  So --
21           MS. BORGERT:  Let me ask you a question,
22      Dr. Luis.  In your HIV population, the
23      formulation that you're using in these
24      patients, is it injectable or is it topical?
25           DR. SAEZ:  We use both, but for some

1       reason or another, you know, or male
2       population they like injectable form.  So I
3       have notice --
4            DR. BORGERT:  Let me do this.  We might
5       be able to differentiate it a little out and
6       look at it that way.  I don't know.
7            THE CHAIRPERSON:  I think the cost of the
8       injection is less than the topicals.
9            DR. SAEZ:  It is.   Men tend to like the
10      injection more because they feel like
11      Superman, because they get the injection and
12      they get like a big surge and then -- and I
13      do notice that especially on my men patients,
14      some of it I think is a little bit of abuse.
15      You know, like -- so I don't know how -- I
16      think getting the testosterone level and
17      doing a trial without it to see, you know, I
18      think it would be the one of the restrictions
19      that I would put on it.
20           And getting a PSA every so often, because
21      we do know that even though testosterone
22      doesn't cause cancer -- you know, if a
23      person, you know, is likely to get cancer, is
24      just going to make it faster.  So a
25      testosterone PSA would be some of the things

Def_000322581

1        that I would check.

2              DR. BORGERT:  And when we looked at it,

3        only 13 patients had a PSA or were ordered a

4        PSA.

5              DR. ALLEN:  So I have a question.  I just

6        want to make sure what we said -- we're on

7        the right track here because it almost seems

8        like we're veering off in two different

9        directions.  I think the original

10       recommendation was for the AutoPA -- and

11       please, I don't want to overstep my bounds

12       here -- but maybe it's prudent for us to take

13       a look at -- well, are we going to see if

14       we're going to accept that recommendation and

15       then take a look at the separate

16       recommendation of the limit on the amount of

17       time if we're in agreement?

18             DR. MOORE:  I think, yes, the AutoPA was

19       because it's in the preferred status and we

20       can only look at certain items if it is in

21       the preferred status, which, you know, the

22       diagnosis is fine.  If, you know, the

23       inclining limits that are dictated in the

24       prescribing information, we can implement

25       those.  Those are things that, you know, the

Def_000322582

1          P&T Committee can look at the prescribing
2          information.
3               But I think that the committee is trying
4          to go a step further.  And it seems to me
5          that the recommendation might be to make this
6          drug non-preferred to stop it so we could
7          look at these lab values, take a PSA -- you
8          know, monitor the PSA levels as well, and
9          duration of therapy was something else that
10         came up.
11              So if it's stopped as a non-preferred
12         drug, that would allow us to do a better
13         review of the appropriateness of this -- for
14         those patients.  So we could always look for
15         the diagnosis when it stops as a
16         non-preferred drug.
17              So to me it seems like our recommendation
18         to P&T for January is to make these -- this
19         product non-preferred and we're trying to
20         draft some type of criteria here as to when
21         it can be approved.
22              DR. ALLEN:  That's what I'm saying on my
23         part, yeah.
24              DR. OLSON:  Can you bring back the
25         diagnosis code data without that stop.  Can

1      you get access to that information?  Because

2      my question to you, is how much -- what

3      percent of these fall under the other

4      category?

5           You know, if it's 50 percent, those are

6      probably people that are kind of like -- I

7      agree with you that even the ones that should

8      be getting a baseline diagnosis and might be

9      abused, that might be -- if that's 50 percent

10     that's a category we might want to drill

11     down, and say yes, you need a testosterone

12     level.  Yes, you need this or that.

13          DR. MOORE:  It's really hard when it's

14     non-preferred to tie the diagnosis to the

15     actual recipient because they may fall in

16     like in another -- like another category.

17     But because it's -- it's not stopping for any

18     reason at all, it's preferred.  So they don't

19     have to have a diagnosis.  So they don't even

20     have a diagnosis listed there in the first

21     place.  So it's kind of hard to tie that,

22     make a correlation, a one-to-one, they're

23     getting this drug because they have this

24     indication, when it's non-preferred.

25          DR. BORGERT:  I will say that when the

1       raw data was pulled -- yeah, when the raw

2       data was pulled to these 81 recipients, 167

3       claims.  The statistician when she pulls it,

4       she usually gives me the raw data and just

5       looking at it, just very unscientifically,

6       the most common diagnosis was testing

7       pituitary hypofunction.

8           THE CHAIRPERSON:  So we have a motion on

9       the floor.  Luis, do you want to clearly

10      state your motion again?

11          DR. SAEZ:  The motion is to make

12      testosterone products non-preferable and

13      bring out a criteria for the P&T to review.

14          THE CHAIRPERSON:  Do we have a second for

15      the motion?

16          DR. ROMAY:  Second.

17          THE CHAIRPERSON:  Any further discussion?

18          DR. MARTORANA:  The only would be to

19      bring in the ICD 10 codes for us to review.

20      Because I think that's going to allow us to

21      more accurately and succinctly narrow that

22      because they're going to be much more

23      descriptive and much more specific than the

24      general ICD 9s.

25          THE CHAIRPERSON:  Moses?

Def_000322585

1           DR. ALLEN:  No.  No questions.

2           THE CHAIRPERSON:  The other item I think

3      was to -- along with the ICD 9 code -- ICD 10

4      codes to review, the time limit was also, the

5      one year, with lab values or the baseline PSA

6      is to adhere to testosterone levels.  And

7      also adding transgender coding for the ICD 10

8      on there.

9           DR. SAEZ:  And the other thing I see is

10     like the amount people use.  Do you have a

11     limit on the amount?  Because sometimes some

12     people, they go crazy, they want more and

13     more.  So is like there a limit on the amount

14     too, like how much --

15          THE CHAIRPERSON:  It should be based on

16     the levels of testosterone so that they're

17     therapeutic and so everybody is

18     individualized, I thought.

19          DR. SAEZ:  Like just for the injection we

20     try to keep it mostly I think 1 1/2 ccs per

21     month -- a month at the most, you know, so...

22     With the gel it's different because it's just

23     like a set parameter I think 2.5 or 5.  But

24     with the testosterone sometimes they overdo

25     it and they go 2 ccs.  That is too much.

```
 1          THE CHAIRPERSON:  I think there should be

 2      a reassessment of the testosterone after your

 3      injection.  I think that's what the --

 4          DR. ROMAY:  Yeah.  I think it has to do a

 5      lot also based on weight also.  I mean, if

 6      you have big body area and especially when

 7      you're applying the gel or the patch, you

 8      know, you need adequate blood level, so it's

 9      also really tied to the blood level of

10      testosterone.

11          THE CHAIRPERSON:  They recommend a lab

12      value after injection to asses them, a

13      fasting level, I believe.

14          DR. ROMAY:  It has to be drawn usually in

15      the morning, like an 8 a.m. draw.  So we have

16      to look at that as well.  We have to make

17      sure that the blood level drawing time is

18      within, you know, standards.

19          THE CHAIRPERSON:  And don't think we can

20      set a limit on the dosing unless you have the

21      lab values.  Yeah, you need to know that

22      they're therapeutic.

23          DR. SAEZ:  I think the reason the package

24      insert is like a limit of how much.  So we

25      have to be careful because then there's some
```

```
1          safety data that if you give too much, you

2          may cause increased anxiety or other stuff

3          that may be also -- I think there is a limit

4          on how much you can give in order to be safe.

5          So I think there should be --

6               DR. MOORE:  It depends on the medication.

7               THE CHAIRPERSON:  So you have a vote on

8          that.  We all voted or a final vote.  All

9          those in favor signify by saying "aye."

10              THE BOARD:  Aye.

11              THE CHAIRPERSON:  We have unanimous

12         approval on that.

13              DR. MOORE:  Just so I'm clear as to doing

14         this.  This is tabled until P&T votes on it

15         in January.  Our recommendation is to make

16         that product non-preferred, so I'll take that

17         back to them when I get back home.  And the

18         criteria for this is based on testosterone

19         labs, we want that.  Do we talk about

20         duration of therapy?  One year?

21              THE CHAIRPERSON:  It would have to be a

22         one year.

23              DR. MOORE:  Right.  PA's are generally a

24         year, prescriptions are.  PSA values, how

25         often do we want those measured?  Just
```

Def_000322588

1           baseline and then subsequently every year

2           or --

3               DR. ROMAY:  Every six to one year

4           depending on how often they're followed up.

5           But I mean it's definitely warranted that

6           they at least get a baseline and then that

7           way we can monitor.

8               THE CHAIRPERSON:  I think most plans

9           cover it once a year.

10              DR. MOORE:  Then we'll do once a year for

11          that as well.

12              THE CHAIRPERSON:  It has to be up to 365

13          days though.

14              DR. MOORE:  Right.  And then we're going

15          to code, the ICD 10s.  And the ICD 10s we are

16          going to code are the prescribing information

17          ICD 10 along with the --

18              THE CHAIRPERSON:  Klinefelter, pituitary

19          hypofunction, and transgenders.

20              DR. MOORE:  Got it.  Thank you.  We'll

21          get back to you for those ICD 10s.

22              DR. BORGERT:  The next topic we're going

23          to revisit is Synagis.  Dr. Hayden, I just

24          want to tell you that I did talk to

25          Dr. Winterstein from the University of

Def_000322589

1          Florida College of Pharmacy and who has done,

2          you know, a lot of research and publications

3          in this area.  She wasn't able to make it to

4          this meeting but she has committed to come to

5          our January meeting and kind of give us an

6          update on her research, which is what you had

7          asked about regarding this topic.

8               THE CHAIRPERSON:  So this is a hot topic

9          we've been discussing for the last three

10         years at our table.  Three years, right, at

11         least.  And then when we went into the

12         decision making as an advisory group here,

13         our decisions were based on science with

14         Dr. Winterstein and her group with all the

15         research and most recently -- if you want to

16         give the background to our new members so

17         that they're up to par.

18              DR. BORGERT:  Yes.  That's what I have on

19         the slide.

20              So in August of last year the American

21         Academy of Pediatrics did update their

22         guidance which they use very -- I don't know

23         if it's on a regular basis.  But they have

24         certainly updated it multiple times.

25              And with when August 2014 update they

Def_000322590

1            suggested a maximum of five total monthly

2            doses in qualifying recipients.  Prior to

3            that it had been seven.  The maximum

4            recommended doses had been seven.

5                 Now, just for background for those of you

6            that don't necessarily do pediatrics, there

7            is a geographic variability in RSV seasons.

8            In most of the continental United States it's

9            considered to be November to April.  However,

10           Florida is kind of an anomaly in that they

11           have variations within the different regions

12           of the state.  And just FYI, this is the map

13           of the different regions as it's classified

14           for Synagis utilization.  So we have

15           northwest, north, central, southeast, and

16           southeast, that's how it's broken down.

17                But, however, despite this -- and this is

18           a direct quote there on the slide from the

19           American Academy of Pediatrics, "Despite the

20           varying onset and offset dates of the RSV

21           season in different regions of Florida, a

22           maximum of five monthly doses of palivizumab

23           should be adequate for qualifying individuals

24           for most RSV seasons in Florida."

25                So what we were proposing at that time

1       was to decrease the limits for the 2015-2016

2       RSV seasons done to a maximum of five doses

3       to be in line with American Academy of

4       Pediatrics recommendation.

5           So the data we looked at the last meeting

6       was what happened in the 2014-2015 RSV

7       season, which would have been July of 2014

8       through April of 2015, how many of our

9       patients could we see that received more than

10      five doses.  And there was only about 25

11      percent of the recipients who did receive the

12      maximum allowed at that time, which was seven

13      doses.

14          And we broke it down by region and there

15      was no difference amongst the different

16      regions in terms of number of patients who

17      received the seven doses.  It was about 25 or

18      30 percent across the board regardless of the

19      region.  So that kind of brings you up to

20      speed to where we left off with this topic at

21      the last meeting.

22          So at the last meeting -- well, I guess I

23      should say one less important thing.  And

24      that was the committee did vote, ultimately

25      after quite a bit of discussion, to decrease

1      the maximum number of doses to five with the

2      caveat that if a practitioner felt that a

3      child needed the extra two doses, that they

4      would be able to use the prior authorization

5      process to obtain those extra two doses.

6           So I believe Dr. Olson was the one who

7      brought up, you know, we're not really

8      capturing inpatient utilization of Synagis

9      and how does that change the picture or does

10      that change the picture.  So we did attempt

11      to go back and capture our inpatient dosages

12      of Synagis.  However, looking at -- we were

13      able to find some, but we really were not

14      confident that we had a complete data set.

15      Just based on coding and billing formats, we

16      just didn't really feel like, you know, we

17      got everything.

18           So we didn't want to present that as -- I

19      mean, we included that data where we had it,

20      but we just didn't really feel like it was a

21      complete data set.  But what we did do --

22      because we want to try to tie that to things

23      that did have an RSV-related hospital

24      admission.

25           So we looked at -- and we were able to

1          pretty clearly get that information.  So we
2          looked at Synagis recipients and these
3          Synagis recipients either in the 2013-2014
4          RSV season or the 2014-2015 RSV season who
5          had a RSV hospitalization in the 2014-2015
6          RSV Season.  So do you follow me?
7               So they were hospitalized -- okay, so all
8          these patients fit two criteria.  They had a
9          hospitalization for RSV that was the
10         admitting diagnosis, the primary diagnoses or
11         the secondary diagnosis.  Somewhere between
12         July of 2014 and April of 2015.  Okay?  But
13         we needed to look at kids who got Synagis in
14         the season before that, right?  You know, in
15         order to -- right.  You understand?  Do you
16         follow me?
17              So then we look for back if you received
18         Synagis in the two prior seasons and if you
19         had a hospitalization in this past season.
20         So everybody clear on the patient population?
21         I will say, you know, again, you know, this
22         is not -- you know, I'm not --
23              DR. OLSON:  And can you define got
24         Synagis?  Did they complete the course or did
25         they get a dose two, three, four --

Def_000322594

```
 1          DR. BORGERT:  That's where I'm going with
 2     that.  Thank you.  Thank you for that
 3     beautiful segue.  I will say that, you know,
 4     limitations that are very obvious to this is
 5     don't have -- we don't know -- we don't know
 6     the indication percentages.  We don't know
 7     what their gestational age was, we don't know
 8     if they had a diagnosis of chronic lung
 9     disease.  We don't know that information.
10     And as I already said, we certainly believe
11     that we had incomplete capture of inpatient
12     doses of palivizumab.
13          With all those limitations in place
14     let's look at what this population looked
15     like.  So not surprisingly most of the
16     RSV-related hospitalization admissions were
17     in the first year of life, which is what we
18     would expect to see.  So that is what we
19     expected.
20          So this is being addressed -- this is
21     your question, Dr. Olson.  How many of these
22     patients who had an RSV admission and
23     received Synagis, how many of them got, you
24     know, appropriate Synagis utilization?  And
25     by "appropriate" I mean they started within a
```

Def_000322595

1        month or two of birth, assuming they were

2        born in RSV season, and they received monthly

3        doses.  Or even maybe, you know, maybe they

4        even skipped one month, but it was pretty

5        close to textbook the way they were supposed

6        to received Synagis.

7            About 50 percent of those patients who

8        had the RSV admission did what were

9        identified as having appropriate Synagis

10       utilization based on their date of birth and

11       the dates of service that we had for Synagis.

12           So that's the dark blue piece of the pie

13       there.

14           DR. OLSON:  I don't mean to interrupt.

15       So where did you cut that?  Is it they got

16       four doses, they got three?  Where did you

17       cut that off because you have some of them at

18       50 percent.

19           DR. BORGERT:  Well, I allowed them to

20       have all the way up to seven, but I stopped

21       at their hospitalization.  So I'm talking

22       about they received it within a month or two

23       of being born and received it every month

24       prior to their hospitalization.

25           DR. OLSON:  Okay.  I'm still not

1         following you, because it's like -- I mean, I
2         get what you're saying of how they get it.
3         But did they get at least the five doses or
4         like you said they might have skipped a
5         month.  So do you have the data for how many
6         doses the babies received total?
7              DR. BORGERT:  Yes.
8              DR. OLSON:  Because if you're just
9         looking --really you're supposed to complete
10        the whole series.  That's the most effective
11        way is to do the whole series.
12             DR. BORGERT:  Yes, I do have the data.  I
13        don't have a graph on the data,
14        unfortunately; but I do have that data, yes.
15             Just, you know, off the cuff I would say
16        that the majority did not receive, you know,
17        the seven doses prior to their
18        hospitalization.
19             DR. OLSON:  I bring that up because I
20        think that -- I keep bringing up the hospital
21        component because I think that's what's key
22        here, is the dollars we're spending for
23        patients to get doses.  Some are getting it
24        in the hospital, they're discharged, and the
25        pediatricians do not follow up and complete

Def_000322597

1          the series; some are getting hit and miss.
2          So we're spending money on a drug that I
3          think in reality very few patients are
4          getting the whole series of the drug.  So
5          that's another thing I think we really have
6          to consider.
7               DR. BORGERT:  And I will go back and pull
8          out those numbers.  But like I said, just
9          from my spending a couple of days with this
10         data looking at it, most patients did not
11         receive the seven doses.
12              But by "appropriate," I mean that prior
13         to their hospitalization they were started in
14         a timely manner and they pretty much received
15         it on time, regardless of the number of doses
16         they received prior to that hospitalization.
17              And then the purple piece of the pie
18         there, the 20 percent, those were children
19         who either had their doses delayed
20         significantly.  So, you know, maybe they were
21         more born and then, you know, not -- nine
22         months later they got their first dose of
23         Synagis or something.  Or they skipped
24         multiple months in between there.  That's
25         mostly who those 20 percent of the patients

Def_000322598

1      are.

2          And then what really intrigued me, was

3      the 30 percent of the patients who only

4      received Synagis after they had a RSV-related

5      hospitalization.  And pardon me while I read

6      to you, but what the American Academy of

7      Pediatrics has to say about that in their

8      statement is that "if any instance or young

9      child receiving monthly palivizumab

10     prophylaxis experiences a breakthrough RSV

11     hospitalization, monthly prophylaxis should

12     be discontinued because of the extremely low

13     likelihood of a second RSV hospitalization in

14     the same season."  And they quote the number

15     as less than 0.5 percent.

16         So 30 percent of the children that had an

17     RSV hospitalization only received Synagis

18     after that RSV hospitalization.  And to take

19     that one step further of all the dose -- when

20     you're looking at this population, they had

21     an RSV admission, they had gotten Synagis in

22     one of the two previous seasons, a full 63

23     percent of those doses were only given after

24     the RSV admission.  Only 37 percent were

25     given prior to.

1          So when you think about what we're

2     spending on this drug, as you said, this is

3     -- we're 63 percent of the utilization in

4     these RSV-hospitalized children was

5     probably -- I mean, according to the American

6     Academy of Pediatrics it's completely

7     worthless.

8          And do you know what happens is, you

9     know -- I don't know.  I mean, I'm not sure

10    what happens.  But I guess the plan is we

11    don't have -- you know, we don't get that

12    inpatient -- you know, "oh, they were

13    hospitalized," so it's not like we get some

14    feed where we know that.  It's only in

15    retrospect when we look back at the data that

16    we see this.

17         So I don't know.  I don't really have a

18    proposed solution, but I think it's very --

19    when we're looking at, you know, wise

20    utilization of dollars this -- at least

21    according to the guidelines, we're not doing

22    a very good job.

23         THE CHAIRPERSON:  It's interesting to

24    note that recommendation from the American

25    Academy of Pediatrics was not recommended

     1          post hospitalization for RSV.

     2               DR. BORGERT:  That's correct.

     3               THE CHAIRPERSON:  And it's very quite

     4          different than the pneumonia admissions for

     5          the adults that we give our influenza and

     6          pneumococcal vaccination during any admission

     7          for any lung condition, pneumonia, or COPD

     8          exacerbation, or asthma exacerbation, so

     9          that's the standard.  And it's interesting to

    10          note that new information.

    11               So I'm not sure if there's anything that

    12          we can do as making a recommendation --

    13               DR. MARTORANA:  Could we put it under

    14          prior auth for Synagis?  If there is a

    15          question on there, if there is a culture

    16          positive admission for RSV, then that

    17          would --

    18               THE CHAIRPERSON:  Well, a claim -- but

    19          again, if we don't get that data --

    20               DR. MARTORANA:  That's what I'm saying,

    21          claims lag, but the individual or the

    22          physician requesting if they can -- if they

    23          attest that there is a culture positive

    24          admission, they might know that.  Maybe you

    25          might not catch them all, but you might catch

1          some to say not to go ahead and offer it.

2              THE CHAIRPERSON:  Dr. Olson.

3              DR. OLSON:  Is that part of the PA, is

4          that not on there as an indication to non --

5          I thought it was.

6              THE CHAIRPERSON:  I don't think it was.

7              DR. OLSON:  No?

8              THE CHAIRPERSON:  No, it's not.

9              DR. OLSON:  Because we added all the

10         other criteria.

11             THE CHAIRPERSON:  Right, we did.  But I

12         think that we had discussed this like a few

13         years ago, three years ago.  I don't think we

14         get that data RSV admission.  I mean, it's

15         never in their discharge diagnosis.  I'm not

16         sure -- it's not, right?

17             DR. OLSON:  No.  It's not on there, no.

18             THE CHAIRPERSON:  And is it a culture

19         that's transpositive admission or is it a

20         viral -- Amy?

21             DR. ZITIELLO:  It's usually a rapid --

22         you can do cultures for it, but they usually

23         only do the rapid test.

24             DR. OLSON:  The thing here, too, is, if

25         you look at -- I mean, the criteria is pretty

1        clear.  I don't know if this is appropriate
2        that this Board to take this approach.  But
3        we keep looking at -- you know, there is an
4        indication for it.
5            The other thing I think we're missing is
6        the avenue to give it is not clear and it's
7        not -- it's expensive.  Most pediatricians do
8        not want to take on the expense of that drug.
9        So I think that's another -- I think we
10       should look at it is where it's appropriate,
11       how do we make that process simpler for the
12       patients to get the medications.
13           Again, I'm not trying to say we're not
14       going to use the drug, but use it
15       appropriately, and to open up the guidelines.
16       You know, Medicaid is -- I don't want to say
17       it, but even contact specific specialty
18       pharmacies.  But it's that kind of
19       methodology where you set up a system where
20       you get it to the pediatrician's offices on
21       behalf of the patient, they can still give it
22       and bill for it.  But it's just I think
23       carrying the expense of the drug, a lot of
24       them shy away from doing this.  I think
25       that's part of the reason compliance isn't

1      there.
2          THE CHAIRPERSON:  Isn't there a care
3      coordination program that -- like a home --
4      I'm not sure if that's done, but like a care
5      coordination through a disease management or
6      at least a premature pulmonary patient, or
7      general abnormality?  Is a therapy initiative
8      at a bigger level?  Do they have those kind
9      of programs?  I know we do it for mental
10     health.  Because stocking it in the office I
11     guess it's cost prohibitive?
12         DR. MARTORANA:  Yeah.  And I know some
13     practices -- because you need 1 1/2 vials,
14     basically the other half vial is wasted
15     unless you go ahead and schedule all of your
16     Synagis kids in for a day, then you can go
17     ahead, split vials.  Because once it's
18     reconstituted it has I think a four-hour or
19     six-hour shelf life that you need to go ahead
20     and administer.  So that is one way that some
21     large systems have looked to is go ahead and
22     schedule those individuals in a certain date
23     so that you can go ahead and use the multi-
24     split vial.
25         THE CHAIRPERSON:  The other -- what we've

1          done in our practice for another vaccine,

2          adult shingles vaccine.  It's very cost

3          prohibitive to stock it internally.  So what

4          I do is I script it out.  Unfortunately, this

5          vaccine is not given to a pharmacist to

6          administer at the pharmacy level at this

7          point.  That would be a legislative change I

8          believe.  But that's another consideration of

9          doing it at the pharmacy level within -- or a

10         walk-in facility or at a pharmacy -- I guess

11         it would have to be legislative change for

12         the pharmacist to admin -- or the nurse at

13         the -- Dr. Olson.

14              DR. BORGERT:  How does home care play a

15         role in these kids -- to get these kids the

16         Synagis?

17              DR. OLSON:  And, again, I'm talking about

18         making the drug available.  I think home care

19         can play a big part.  I think it's a great

20         opportunity.  The argument there is that

21         it's -- you know, the reimbursement for a

22         nurse to go into a home and administer is not

23         there.  But my argument against that is the

24         cost of a nurse is much less than the cost of

25         giving a dose or missing a dose or giving it

Def_000322605

1        in a hospital.  That's where I'm going with

2        this, is how do you either give it in the

3        home, you know, or you at least get it to the

4        pediatrician's office where they can give it.

5        Those I think are two great avenues to

6        accomplish this.

7            THE CHAIRPERSON:  Or the other option is

8        to prescription vial -- you know, but if you

9        give your pediatrician a pulmonary -- a

10       pediatric pulmonary and then give it at the

11       pharmacy.  But again that's another --

12           DR. OLSON:  Well, we can administer in

13       pediatrics in the state of Florida, we do it

14       all the time.

15           THE CHAIRPERSON:  At this point they

16       would give it like they would give the

17       pneumococcal vaccine or other vaccines.  I

18       mean, they've added several vaccines this

19       year.

20           DR. OLSON:  I think it's an -- and this

21       is kind of off topic, but it's a debate

22       between pharmacy and probably the

23       pediatrician world; because, again, it's a

24       source of revenue for them so it would be

25       getting them to allow that.  That's another

Def_000322606

1       avenue that I'd like to approach too.  But

2       again, I just think, you know, we don't

3       usually look at that as far as --

4            DR. BORGERT:  Right.  Yeah.

5            DR. OLSON:  -- some type of care

6       management for that.

7            DR. BORGERT:  Yeah.  That's certainly

8       outside the Magellan purview.  Outside the

9       Agency, and I think it's probably outside the

10      pharmacy policy which is where all our other

11      representatives are here today.  Maybe

12      pharmacy equality or maybe some other avenue

13      with the Agency.  I don't know.  I'll toss

14      that over to you guys.

15          DR. OLSON:  I think that we keep bringing

16      that up.  For three years now we keep

17      discussing the issue of utilization.  We've

18      whittled it down to five doses which is

19      great, but there's still a huge count of what

20      we're missing and how we can bring the data

21      back.  And until we get compliance and come

22      up with a process to do this appropriately,

23      we'll just keep going back and forth.

24          THE CHAIRPERSON:  Jeffrey, you're

25      excused.  Thank you for coming today.  Thank

 1     you.

 2         MS. BORGERT:  I think maybe what we'll do

 3     is just quickly run through the Hep C data

 4     and then maybe take a break.

 5         THE CHAIRPERSON:  We'll take a break for

 6     a few minutes.  We'll take a break now, a

 7     bathroom break for 10 minutes.  And we'll

 8     come back at 9:45.  Thank you.

 9         MR. HAMILTON:  I'm sorry, folks.  There's

10     a motivational speaker next door, if you

11     hadn't already guessed.  There's nothing I

12     can do about it.  I've tried to calm them

13     down, but it's hotel's perogative to put

14     groups where they want to.

15         (WHEREUPON, the exhibit was marked.)

16         THE CHAIRPERSON:  Good morning, everyone.

17     It's 9:45, I would like to continue with

18     meeting.  Rebecca.

19         DR. BORGERT:  For the last, I don't know,

20     probably year and a half now this committee

21     has just briefly -- for a while we've had

22     lots of discussions about hepatitis C.  For

23     the last few meetings we basically just kind

24     of kept abreast of the utilization data --

25     the committee had asked to be kind of kept

1      abreast of the utilization data.  And in your
2      quarterly report I did put some information
3      about there were two new drugs approved in
4      the past quarter, Technivie and Daklinza.
5           And I'll refer you to your quarterly
6      report for more information about the
7      specifics of those drugs.
8           But just in looking at our overall
9      utilization in the fee-for-service population
10     from January of this year up until September
11     1st of this year this is what the numbers
12     look like.  I will note that Viekira Pak was
13     voted the preferred at the March 2015 P&T
14     Committee meeting and all of the 20
15     recipients have been approved by CRS since
16     that time.
17          And then this is just kind of some
18     information about the prior authorization
19     request and the outcomes that we have
20     regarding the hep C drugs.
21          So now I will move on to new business.
22     And as I said earlier, usually the first
23     session of the new business has to do with
24     upcoming P&T classes.
25          As I stated earlier I put in your

```
 1          quarterly report all of the classes that will
 2          be reviewed in January and March.  One of the
 3          classes that will be reviewed in January is
 4          the COPD agents, and I have it there for you
 5          on the screen the utilization data in the
 6          previous quarter for these medications.
 7              And so just kind of looking at this and
 8          thinking about, you know, management,
 9          utilizing it -- utilization management, is
10          there anything, you know, that we might be
11          able to do.  And we don't currently have
12          quantity limits on Spiriva and the hand
13          inhaler is one that's on the PDL and it is a
14          once-a-day drug, so perhaps implementing some
15          quantity limits of 30 capsules for 30 days
16          might be appropriate for the Spiriva
17          medication.
18              Any comments or thoughts about that?
19              THE CHAIRPERSON:  I thought that's how it
20          was dispensed.
21              DR. BORGERT:  Yes, but we have people who
22          are getting more.
23              THE CHAIRPERSON:  But that's not in the
24          FDA packaging, is it?
25              DR. BORGERT:  Right.
```

Def_000322610

```
 1              THE CHAIRPERSON:  So is there a medical
 2      justification for that or is there a
 3      reasoning behind that or is there a travel
 4      supply?  I mean, I can't --
 5          DR. BORGERT:  Well, that can always be
 6      done through the PA.
 7              THE CHAIRPERSON:  What?
 8          DR. BORGERT:  If it were a travel supply
 9      we could do that through the PA's office.
10              THE CHAIRPERSON:  Oh.  I thought it just
11      comes in --
12          DR. BORGERT:  It does, but...
13              THE CHAIRPERSON:  Have we looked at those
14      claims or did you want to look at those
15      claims?
16          DR. BORGERT:  You mean in terms of people
17      who are getting more than 30?
18              THE CHAIRPERSON:  I'm just asking.  I
19      mean, is there a lot.  It says here --
20          DR. BORGERT:  No.  Those are just -- that
21      does not mean that those were recipients who
22      got more than 30.  This is overall
23      utilization of that drug.  It's not specific
24      to people who receive more than the quantity.
25              THE CHAIRPERSON:  Well, we don't know the
```

Def_000322611

1       impact.  If we can put a recommendation out

2       there, is there a potential impact or are

3       there a lot of patients that are getting more

4       than 30 capsules a month?

5           DR. BORGERT:  I don't know the answer to

6       that.  I could speculate, but it would be

7       honestly just speculation.  I don't know the

8       answer.  So I can go back and pull that data.

9           Any other questions or comments?

10          Before I go to the next slide I'll point

11      out to you on the third row on the table

12      Daliresp or roflumilast is also in this PDF

13      category.  We had 176 claims for 71

14      recipients for $46,000 in the previous

15      quarter.

16          Daliresp, for those of you who are not

17      familiar with it, it is phosphodiesterase-4

18      inhibitor.  It has a very, very specific

19      indication that was given to it by the FDA

20      based on what they were able to show in the

21      studies.  And that is to reduce COPD

22      exacerbations in patients with severe to very

23      severe COPD associated with bronchitis and a

24      history of exacerbations.  And so these would

25      be GOLD Class C or D patients with a high

1       risk of exacerbations.

2            So basically the FDA gave them that very

3       specific wording of labeling because that's

4       what they were able to show with this drug

5       when they did the studies.  It is not a

6       bronchodilator and according to the 2015 GOLD

7       guidelines -- the Global Initiative for

8       chronic obstructive lung disease is the GOLD

9       standard for those of you who aren't

10      familiar.  According to the 2015 GOLD

11      guidelines roflumilast should always be used

12      in combination with a long-acting

13      bronchodilator.

14           So we have talked about this and one

15      possible recommendation might be -- this is a

16      preferred drug.  If you go back to the table

17      on the last column there's PDL status, so it

18      is a preferred drug.  And normally, as we've

19      discussed early at this meeting today, we can

20      do an AutoPA for diagnosis, so that wouldn't

21      be a problem in terms of doing an AutoPA for

22      COPD diagnosis.

23           But we might also even want to consider

24      looking for a history of long activated beta-

25      agonist in the claims history since that's --

Def_000322613

1          according to the guidelines that's how this
2          drug is supposed to be used.
3               Now, I will say, you know, that may cause
4          some issues, but we feel like it's a
5          reasonable recommendation to do that anyway.
6               THE CHAIRPERSON:  Well, my recommendation
7          is not only for beta-agonist, some patients
8          could be intolerant of the beta-agonist and
9          then we use the anticholinergic like
10         Ipratropium as GOLD guidelines as first line.
11              Some patients cannot -- especially in the
12         elderly they cannot even use an inhaler
13         because of the coordinated efforts and they
14         can't get a breath in.  So those severe
15         patients are doing quite well with an oral
16         agent.  This is one of the only oral agents
17         we have on the market.  But doing a prior
18         look back on the ICD 9 codes, that's fine.
19         But not only a beta-agonist but also the
20         anticholinergic.
21              DR. BORGERT:  Would you -- do you think
22         short-acting anticholinergics or just
23         long-acting?  So in other words --
24              THE CHAIRPERSON:  Both.  I think the
25         guidelines have long-acting steroid and --

1    depending on the level of COPD and then I

2    think anticholinergics are the first line.

3         DR. BORGERT:  When I looked specifically

4    for this drug they recommended a long-acting

5    beta-agonist.  So I understand what you're

6    saying that not all patients can tolerate it.

7         THE CHAIRPERSON:  Yeah, not all patients

8    can tolerate it.

9         DR. BORGERT:  So if the Board is okay

10   with that recommendation, then that would be

11   something that we bring back to P&T in

12   January when P&T meets to review those drugs.

13   Okay?  All right.  That all is going to be a

14   recommendation that we are going take to P&T.

15   So the --

16        THE CHAIRPERSON:  Do we need to vote on

17   that or --

18        DR. MOORE:  I believe so.  I think this

19   is an edit that we're trying to implement and

20   so we need to get a unanimous decision then.

21        THE CHAIRPERSON:  So I'll make the

22   recommendation that we make a diagnosis look

23   back along with the guidelines, because the

24   GOLD guidelines recommend it for age 3 or 4

25   and just in concordance we'll get a

1          recommendation on the guidelines to make sure

2          that we have either a long-acting

3          bronchodilator, beta-agonist, or an

4          anticholinergic on board.  Do we have a

5          second?

6               DR. ROMAY:  Second.

7               THE CHAIRPERSON:  Any further discussion?

8          All those in favor signify by saying "aye."

9               THE BOARD:  Aye.

10               THE CHAIRPERSON:  Unanimous.

11               DR. OLSON:  Are you looking for a motion

12          to -- for Spiriva?

13               DR. BORGERT:  Possibly.  But since

14          Dr. Hayden wanted to look specifically at how

15          many patients we're going to impact, I

16          thought maybe we ought to table that and we

17          can look at that in terms of how many

18          patients have been impacted.  Thank you,

19          though.

20               THE CHAIRPERSON:  Next.

21               DR. BORGERT:  Yes.  So just quickly

22          looking at some -- of one of the classes that

23          will be reviewed in March, the topical acne

24          agents are up for review in March.  And I

25          have the utilization for the past -- for the

1          second quarter of this year.

2              And really when you look at these things

3          most of the them have FDA approval of age

4          greater than or up to 12.  However, we don't

5          have any age limits on them in our formulary

6          on the PDL, in our summary of limitations.

7          So one thing we might be able to do is to put

8          an age limit on there and possibly explore

9          quantity limits, although we're sort of

10         talking about that in a more general sense at

11         this point, as opposed to specific quantity

12         limits for specific occasions.

13             So I think maybe the most appropriate

14         thing at this time would be to consider

15         putting that age limit of 12 or older on

16         these products.

17             THE CHAIRPERSON:  12 or older and no --

18         that's it?

19             DR. BORGERT:  Yes.  At this time I think

20         the most appropriate thing would be to just

21         do age limits.

22             DR. ALLEN:  I would like to make the

23         recommendation to accept that.

24             THE CHAIRPERSON:  I'm sorry, can you

25         speak into the microphone?

1          DR. ALLEN:  I would like to make the
2     recommendations -- Rebecca's recommendation
3     to limit the use of age limit.
4          THE CHAIRPERSON:  12 and older.  Do we
5     have a second?
6          DR. ROMAY:  Second.
7          THE CHAIRPERSON:  Any further discussion?
8     Do you think we use acne agents perhaps at 9
9     years?  Do we ever -- you don't see it?
10          DR. ZITIELLO:  Not that often.
11          THE CHAIRPERSON:  So it won't impact our
12     pediatric population.  All those agree
13     signify by saying "aye."
14          THE BOARD:  Aye.
15          DR. SAEZ:  I had a question on these
16     agents.  They're kind of expensive, you know,
17     it's like very different.  Are we using the
18     cheapest, you know, version of a -- I mean, I
19     think I don't think it's a disease, but I see
20     that like we have -- it's very expensive, you
21     know.
22          DR. BORGERT:  All of them that I have
23     listed on this slide are preferred.  So you
24     can you get them -- all Medicaid recipients
25     can get them at this time.

1          DR. MOORE:  But I will add this is not

2     net-net.  So this is -- meaning this isn't

3     the actual cost that is actually paid.  This

4     is the cost at the pharmacy counter.  So then

5     you have, you know, federal rebates and

6     supplemental rebates that are also realized

7     and that is not the price here.

8          MS. ZITIELLO:  I wanted to ask a

9     question.  Why is Retin-A preferred over

10    Hepnol?  For years and years and years we

11    have prescribed Hepnol for our pediatric

12    patients and all of a sudden Retin-A was

13    switched over to the PDL.  I mean, we do tons

14    of denials on that.  And, again, I know it's

15    not a critical issue, but, you know, we're

16    supposed to be -- the business is supposed to

17    be helping these providers out and that

18    change really made a lot of people angry.

19         DR. MOORE:  It was a decision through the

20    P&T committee.  They weigh in clinical as

21    well as financial side of the table to make a

22    decision.  You know, first what's safe for

23    the patient, but also what's a benefit to the

24    state, and so at that time that's why the

25    recommendation was made.

```
 1          DR. OLSON:  Can I ask a question?  I know
 2     this came up before and I don't know the
 3     answer.  But, again, we're making decisions
 4     based on paid claims, but we're not making
 5     decisions on drugs spent, right?  Are we
 6     privileged to that information on what the --
 7     we're not?  Okay.
 8          DR. BORGERT:  They discuss that in the
 9     closed session of P&T committee, but since
10     this is an open meeting, I don't think
11     that's -- yeah.  All right.
12          We have reached the quarterly activities
13     for this quarter.  So the first quarterly
14     activity that we wanted to take a look at was
15     morphine equivalent daily doses.  And one of
16     the big reasons we wanted to look at this was
17     basically CMS is really stressing the use of
18     morphine equivalent daily doses.  And they
19     have made a statement that they believe
20     morphine equivalent daily doses would be a
21     useful tool for RetroDUR.  They actually came
22     out and said we think RetroDUR boards should
23     be looking at morphine daily doses, to look
24     at their opioid utilization.  So to the best
25     of my knowledge we have not done that in this
```

1    board, so we wanted to start taking a look at

2    that.

3         Just a little background.  Obviously we

4    all know prescription opioid abuse is a huge

5    problem.  Medicaid participants are twice as

6    likely to be prescribed opioids as privately

7    insured patients.  And Medicaid enrollees

8    account for 45 percent of overdose deaths and

9    are six times at the risk of dying from an

10   overdose.

11        Calculating the morphine equivalent daily

12   doses is basically just one tool that we

13   might use to help us in looking at our opioid

14   utilization.  There are numerous morphine

15   equivalent daily dose calculators that are

16   available online.  And in terms of what

17   threshold to look at as a high dose is

18   controversial, but usually some people will

19   say somewhere between 100 to 120 milligrams

20   of morphine a day would be the number that

21   you would look at.

22        So just to bring everybody up to speed on

23   what our current edits are with regard to

24   controlled substances.  We currently allow a

25   patient a maximum of four controlled

Def_000322621

1    substances -- that's just not opioids, that's

2    any controlled substance.  Four controlled

3    substance prescriptions per month.  There is

4    an exception for patients with cancer or

5    sickle cell disease where they are allowed

6    six controlled substance prescriptions per

7    month.

8        This board in the past year looked at

9    opioid polypharmacy in Medicaid recipients,

10   and as a result of that work we are in the

11   process of coding edits that would deny

12   overlapping long-acting opioids.  So you

13   wouldn't be able to get MS Contin and

14   Oxycontin both basically is the edit that's

15   currently being deployed.

16       So tracking the number of recipients who

17   exceed this threshold of morphine equivalent

18   daily dose can be used by us as a tool

19   overall at looking at our opioid utilization.

20   So it's timely in that we have not yet

21   implemented in this overlapping long-acting

22   opioid edit.  So that might be something that

23   we can use as a tool after that edit to look

24   at it as one of the ways that we look at the

25   data.

1          So just briefly approximate morphine
2     equivalent daily dose and these can be
3     somewhat -- depending on which calculator you
4     use it can be slightly different -- but we're
5     talking about patients who are getting 100
6     milligrams of hydrocodone in 24 hours or 27
7     milligrams of hydromorphone -- these are all
8     oral except for the transdermal fentanyl.  27
9     grams of oral hydromorphone, 15 milligrams of
10    oral methadone in 24 hours, 67 milligrams of
11    oral oxycodone in 24 hours, or 50 micrograms
12    per hour of a duragesic patch.
13         And so when we looked at how many
14    patients we had in a quarter that were
15    exceeding those limits that I just described,
16    you can see there the number.  So we have
17    about 13 percent of our total patients --
18    about 12 percent of our total recipients and
19    13 percent of our total claims.  So not a
20    large number, which is good.  But we -- the
21    idea here I think is just that we keep
22    looking at that and just sort of try to
23    decide is this something that we see
24    increasing, decreasing, staying the same,
25    that sort of thing.

 1          And how do the changes that occur impact

 2     that?  For instance, if methadone changes

 3     status as we've discuss in this committee,

 4     you know, does that change anything?  Do we

 5     see suddenly, you know, people using a lot

 6     more morphine or oxycodone.  And then in

 7     terms of any edits that we implement.  Like I

 8     said, the long-acting opioid polypharmacy.

 9          So I think right now we're just kind of

10     at a point where we're using this as a

11     baseline.  And we'll monitor this going

12     forward to see how changes in opioids; either

13     policy changes, or PDL changes, edits that

14     this board thinks about doing, how this might

15     impact with morphine equivalent daily dose.

16          THE CHAIRPERSON:  Rebecca, that's good

17     data.  The 17 percent of 3,650 claims.  I'd

18     like to know if on those claims, was it one

19     prescriber, or was it two prescribers, or

20     three prescribers that that individual is

21     receiving?

22          DR. BORGERT:  I have the raw data so we

23     can go back and pull those patients who fell

24     into this chart and see how many prescribers

25     accounted for that.

Def_000322624

1          THE CHAIRPERSON:  I know you can't look

2     at ER or true care specialists.  Yeah, that's

3     the hardest part to extrapolate this data.

4     But it's interesting to see that, you know,

5     the proposed pharmacy rules going into

6     changes.  Maybe we'll see further changes

7     down the road.

8          Any other comments, Board Members?

9          DR. ALLEN:  Just a quick comment here.

10    And, once again, Rebecca, I think this is

11    good data.  But I guess is there any

12    consideration for us to make a recommendation

13    to P&T to maybe add an abuse-deterrent

14    product.  Just my reason for bringing that up

15    is because it seems like we may be going down

16    the road that we went with methadone.  And I

17    can't remember the actual legislation that's

18    out, but apparently -- I'll paraphrase.

19    Essentially if a provider wants to write for

20    an abuse-deterrent product, and, you know

21    what the generic equivalent is on the PDL, it

22    is my understanding that we can't deny a PDL

23    product if they truly do want that abuse-

24    deterrent product.

25          So I mean at the end of the day I think

Def_000322625

1        our aim here is to prevent abuse in some safe

2        form or fashion.  So I just wanted to ask if

3        that was anything you wanted to consider?

4             MS. HARRIS:  Elboni, before you respond

5        to that, I think some of us had a hard time

6        hearing you, Moses.  So would you mind

7        repeating exactly what your recommendation

8        is?

9             DR. ALLEN:  Sure.  I'll trade you

10       microphones here.  In summary my

11       recommendation was to ask the Board to

12       consider an abuse-deterrent product for

13       opioid addiction.  I mean, in summary -- I

14       mean, we're looking at the MEDs but, you

15       know, the whole focus of this is to reduce

16       opioid abuse.  And with P&T having a high

17       likelihood of perhaps removing methadone, it

18       just may be an opportunity here to place an

19       opioid-deterrent product, you know, on the

20       PDL.

21            And I was just referring to the

22       legislation.  I can't recall the actual

23       house, you know, representative saying -- who

24       actually said it now.  But essentially the

25       gist of the bill is to say, hey, look, if a

Def_000322626

1          provider wants to write for an opioid-
2          deterrent product, we can't deny it;
3          therefore, an equivalent generic if that's
4          what they really want.  I mean, they --
5          they're evaluating the patient.
6              THE CHAIRPERSON:  Is Naloxone on our
7          formulary?  I'm just asking.
8              MS. HARRIS:  No, it's not.
9              THE CHAIRPERSON:  There's some
10         legislation on that also for --
11             DR. BORGERT:  I don't know, Moses, about
12         that.  But that might be something I think
13         that we could take a look at in terms of the
14         overall formulary and the PDL.  What we have
15         on the PDL, what's an abuse-deterrent, what's
16         not an abuse-deterrent.  And that just might
17         be a good topic even like a good quarterly
18         topic at some point is to look at the abuse-
19         deterrent products versus non and kind of
20         where we sit with all of that.
21             MS. HARRIS:  This is Shevaun Harris.  I
22         can tell you that we are looking at the
23         abuse-deterrents within the Agency.  It's not
24         on the PDL.  I believe there's a question of
25         whether or not it's medically necessary.  And

Def_000322627

1        just because a prescriber chooses to do so,

2        it is not prohibited by law from doing it.

3        It doesn't necessarily mean that we have to

4        actually pay for it as a PDL unless the P&T

5        committee recommended and the Agency approved

6        it.  I think you're welcome to put it forward

7        and we can look at that.  But I can tell you

8        we are looking at it as an Agency.

9            DR. BORGERT:  Thank you, Shevaun.

10           DR. OLSON:  This is combination products

11       all of them?

12           DR. BORGERT:  Yeah.  This is long-acting

13       and short-acting.

14           DR. OLSON:  So did we also look at -- in

15       relation to that too, the acetaminophen doses

16       that are being taken with those.  Because

17       obviously that's a possibility --

18           DR. BORGERT:  The hydrocodone is probably

19       an issue.  Yeah, maybe not so much with the

20       other ones but with the hydrocodone, yeah.

21           DR. OLSON:  Oxycodone.

22           DR. BORGERT:  That's true, percocet.

23       Okay.  Yeah, I'll take that back and I'll

24       look at it.

25           DR. ROMAY:  I don't know if the Agency

Def_000322628

1          has adopted this.  I know we mentioned before
2          where a combination would be long-acting and
3          the combinations that we're capturing the
4          acetaminophen dosage of 4 grams per day, that
5          will also -- you know, that would be an
6          aggregate to patient therapy and will be --
7               DR. MOORE:  We just implemented an edit
8          that caps off the max daily dose of
9          acetaminophen.  I think we did it in August,
10         that you can't have more than 4 grams, and it
11         did include combination products.
12              DR. BORGERT:  And just FYI, too, for
13         those of you who have been on the committee,
14         you've heard me say this before, but I'll say
15         it for the benefit of the new folks.
16         Obviously when we look at diagnoses, you
17         know, we can't say that, you know, this
18         diagnosis and this claim go together, because
19         there's no way to tie a prescription to a
20         specific.  All we can look at is of these
21         claim recipients, what diagnoses did they
22         have on file.
23              So when you look at that list of
24         diagnoses that were on file for those
25         recipients who were exceeding 100 milligrams

1            of morphine equivalent daily dose, this is in
2            numerical order of the possible diagnoses,
3            meaning opioids.  So you can see that a lot
4            of it is chronic pain rather than maybe
5            say -- you know, there's obviously some
6            malignancies, things on there, and that sort
7            of thing.  But a lot of it looks to be
8            chronic pain.
9                One of the topics -- the next topic that
10           was suggested for this quarter was to look at
11           overall anticoagulant utilization in a
12           fee-for-service population.  So we looked at
13           Warfarin, then novel oral anticoagulants, and
14           low-molecular-weight heparins, all of which
15           are represented on the PDL.
16               And what we found in overall
17           anticoagulant utilization is about half of
18           our claims are for Warfarin, but less than
19           half of the recipients are getting Warfarin,
20           and then -- so, you know, half of our claims
21           are for Warfarin and then the others are
22           split pretty evenly between the novel oral
23           anticoagulants and low-molecular-weight
24           heparins made up the other percentage of
25           that.  So that's kind of what the overall

1     utilization looks like.

2         And as we look at the data a little bit

3     more carefully, we decided to look

4     specifically at the novel oral anticoagulants

5     agents.  So just to refresh everybody's mind,

6     we're talking about -- I'm going to use trade

7     names here, they're easier to say -- Pradaxa,

8     Eliquis, Savaysa, and Xarelto.  There's four

9     on the market now, so those are the four

10    drugs we're talking about here.

11        And there are indications not every drug

12    has exactly the same indications, but over --

13    from a broad scope there are indications are

14    for nonvalvular afib, if somebody has an

15    artificial, they're not recommended and they

16    should use Warfarin.  But nonvalvular afib,

17    orthopedic surgery prophylaxis, treatment of

18    DVT and PE.  And you see there which ones are

19    approved for that.  And then the last

20    approval category -- or indication category

21    is to reduce the risk of recurrent DVT or PE

22    after initial therapy.

23        So what's interesting is that two of

24    these are kind of long-term therapy and two

25    of them are somewhat short-term therapy.  So

Def_000322631

1          certainly the orthopedic surgery prophylaxis
2          is really short-term therapy.  For knees it's
3          recommended -- knee replacement it's
4          recommended for 12 days, and for hip
5          replacement it's recommended for 35 days.  So
6          that's relatively a short utilization.
7               Certainly afib is a chronic indication
8          for these medications for most patients.
9          Treatment of DVT or PE is, you know, supposed
10         to be a minimum of three months.  And then
11         reducing the risk of recurrent DVT or PE
12         again can sort of be open-ended in terms of
13         how long therapy is it supposed to last with
14         those.
15              So what we did is we looked at how many
16         patients were on these drugs for less than
17         or equal to or more than 30 days.  And I
18         thought it was a bit surprising that over
19         half of the utilization these patients were
20         on therapy for less than 30 days.
21              Now, this was only a quarter that we
22         looked at of utilization; so, you know, it
23         was only a 90-day possible window, but 56
24         percent of the patients who got a claim for
25         this drug in that 90-day window had 30 days

1          or less of therapy.  Which I thought was

2          surprising given the fact that only one of

3          those indications is for short-term therapy

4          with this drug -- with these types of

5          medications.

6              THE CHAIRPERSON:  The data, Rebecca,

7          maybe fracture with immobility that was

8          missing on there too.  So maybe that can

9          account for the short-term duration.  A

10         recent fracture with immobility, you know,

11         pending surgery or pending --

12             DR. BORGERT:  Okay.

13             THE CHAIRPERSON:  So that was missing on

14         that format.

15             DR. BORGERT:  Maybe I can look at that

16         other ortho surgery.  Okay.

17             THE CHAIRPERSON:  They have casts on or

18         something and just waiting.

19             DR. BORGERT:  Right, right, right.  When

20         I looked at that 44 percent who did receive

21         more than 30 days, only 27 percent of that

22         population had a diagnosis with afib.  So,

23         you know, I don't know, I think maybe what

24         this warrants is looking a little more

25         closely at these four drugs.  I believe they

Def_000322633

1       all four are PDL, and looking maybe at a

2       broader length of time and just trying to

3       see, you know, are patients who are supposed

4       to be taking these drugs on a chronic basis,

5       not taking these drugs on a chronic basis I

6       think is the question.

7          I think they're being utilized because

8       they are easier to manage than Warfarin, but

9       if the patients aren't taking them, and you

10      can't measure their PT and know that they're

11      not taking them, maybe in some ways it's not

12      a good thing, you know.  There's no way, "Oh,

13      yeah, I'm taking it," you know.  But the

14      claims data doesn't seem to bear that out

15      that the adherence is there.

16         And I think maybe that my thought as I

17      looked at this data was maybe we need to go

18      back and look a little more closely at those

19      four drugs in particular and with an emphasis

20      on therapy and trying to figure out, you

21      know, what's going on with that population.

22         Comments?  Questions?  I will do that and

23      I will follow up on that data.

24         The next topic that was proposed for this

25      quarter was to look at maximum daily dose of

Def_000322634

1      antidepressants in recipients six years of

2      age and older.  And the reason we chose that

3      is we already had maximum daily dose limits

4      in place for children under the age of six,

5      but we didn't have anything for the rest of

6      our population.

7           So, again, similar to what we looked at

8      in antipsychotics, did they or did they not

9      exceed the maximum daily dose?  Obviously the

10     majority of them did not exceed the maximum

11     daily dose, but we did have 1,740 claims for

12     1189 recipients where they did exceed the

13     labeled maximum recommended dose for the

14     antidepressants.

15          And this just kind of more minutia when I

16     looked at the data which I thought was

17     interesting, you know, which ones were

18     culprits in terms if they were typically

19     prescribed or typically received more than

20     their recommended daily dose, and it was 34

21     percent of Trazadone prescriptions exceeded

22     the FDA recommended max dose; 15 percent

23     Venlafaxine prescriptions; 13 percent of

24     Escitalopram prescriptions.

25          What I thought was really good was that

Def_000322635

1          the really probably dangerous drugs over

2          here, the Imipramine, Nortriptyline and

3          Amitriptyline, very, very few of those which

4          I think is really good information and

5          helpful to know that -- you know, that one,

6          you  know, potentially could cause great

7          patient harm, they're not exceeding the max

8          daily dose.  So that was I think a good

9          thing.

10              But I think we would like to explore

11         going forward with putting maximum daily

12         doses on the rest of the population over the

13         age of six if the board is in agreement with

14         that.

15              THE CHAIRPERSON:  Do we have to make a

16         motion -- make a motion to look at following

17         FDA package inserts on antidepressants for

18         maximum daily dosage.  Do we have a second?

19              DR. ROMAY:  Second.

20              DR. ALLEN:  Third.

21              THE CHAIRPERSON:  Any discussion?

22              All those in favor signify by saying

23         "aye."

24              THE BOARD:  Aye.

25              THE CHAIRPERSON:  There's a question for

1       Elboni and Rebecca.  Would this go through a

2       process like we do for pediatrics where a

3       psychiatrist reviews any prior auths or they

4       exceed or they can justify, you know a

5       higher dose?

6       DR. MOORE:  Yes, yes.

7       THE CHAIRPERSON:  So the prescriber can

8       still have access or patients can still have

9       -- and there's a drug-to-drug interaction

10      where another drug may decrease some drug

11      level due to pharmacokinetics; or, you know,

12      prescribers still can, you know, get a prior

13      auth for access to the patient?  You ask the

14      psychiatrist to sign off on more?

15      MS. MOORE:  Well, we partner with them

16      for children less than six.  But for children

17      up to age 17, the clinical pharmacist in the

18      call center would handle those requests.  But

19      USF is always available for us to consult

20      with them if we need them.

21      THE CHAIRPERSON:  So if there's any

22      concern on the pharmacist who is signing the

23      authorization, you can at least get another

24      consult.  Everyone wants to know the process.

25      The next part is best practices, correct?

1          We have in Florida -- and you may want to --

2          we have a best practices that was put out a

3          few years ago.  Maybe we should do a -- bring

4          everyone else up to par here on the

5          recommendations we've looked at over the last

6          five years or more.

7               DR. MOORE:  Can we do that next time?

8               THE CHAIRPERSON:  Yes.  The historical

9          things so that, you know, in Florida we do

10         have best practices for psychotropics with

11         children and now we're probably going --

12         heading towards that direction as well.

13              DR. MOORE:  They have a website that, you

14         know, speaks about the best practices, but we

15         can certainly include some of that

16         information in our presentation for January.

17         And bring to you guys some of the edits that

18         we've done in relation to those best

19         practices over the years.  We'll be happy to

20         do that.

21              DR. BORGERT:  And I think there's

22         websites like Medicaidmentalhealth.org,

23         things like that.  It's pretty easy to find.

24         USF administration.

25              MS. WILLIAMS:  And if you look on the

1        prior authorization forms, the website is

2        also located on there and you can see all of

3        our best practices, just go to one of our

4        antidepressant or antipsychotic forms and

5        click on it.

6              DR. BORGERT:   Thank you, Susan.

7              So we have reached the point of the

8        meeting where we talk about possible

9        activities for next quarter.   Now, obviously

10       a lot of what we talked about today, there's

11       some follow-up that needs to come back to

12       this committee and that will all be done.

13       And frankly, that's why follow-up usually

14       takes longer than the usual quarterly

15       activities.   But all of that has been taken

16       down and follow-up will be brought back on

17       those questions for the January meeting.

18             But we also want to select some new fresh

19       topics for the next quarter.   Again, just to

20       throw things out there but we really want to

21       encourage the board to submit their

22       suggestions.

23             One of the things that  a lot of state

24       DUR boards do is whenever the FDA administers

25       a new safety alert or anything like that, you

Def_000322639

 1          know, and obviously it's subjective in terms
 2          of how severe it is or how prevalent it is.
 3          But that's a very common function of DUR
 4          boards in other state Medicaid is to
 5          basically look at those providers who have
 6          recipients who are receiving that drug and
 7          then basically just notify them of this FDA
 8          safety alert.  It's almost just more of a,
 9          "Hey, I don't know if you saw this, but
10          you're prescribing this, so we want to make
11          you aware of that."
12              So, you know, one of those types of
13          things that came out recently was about the
14          joint pain with DPP-4 inhibitors.  We have
15          three DPP-4 inhibitors on the PDL.  And the
16          way I understand the FDAs thinking is that
17          the joint pain can be severe and disabling
18          and even require hospitalization for some
19          patients, but was reversible within a month
20          of stopping the drug and a lot of patients
21          had -- when they were rechallenged, the joint
22          pain -- the severe disabling joint pain
23          returned.
24              So that's one thought for a possible DUR
25          activity.  I don't know if we want to talk

Def_000322640

1        about those individually.  Let me just say
2        quickly about the other three.
3        Metoclopramide maximum dosing and
4        particularly in maybe people under the age 18
5        and the risk of tardive dyskinesia with --
6        related to duration of dose with
7        metoclopramide.  Antidepressants polypharmacy
8        particularly using TCA metoclopramide.  And
9        then drug interactions antipsychotics and
10       phenothiazine between.
11           So those last three there were
12       recommendations that were brought to the
13       Agency so those -- so we put those on the
14       list of possible activities for the next
15       quarter.
16           THE CHAIRPERSON:  So with the
17       metoclopramide maximum dose there's -- I
18       thought we did a banner message a while ago.
19           DR. BORGERT:  Not since my tenure, but...
20           THE CHAIRPERSON:  Do we need a banner
21       message for that one or many -- we can always
22       update that.
23           DR. BORGERT:  So we can look at that
24       topic and see what we find.  And then, yeah,
25       we can decide at that point once we see

1        what's been going on in combination with that
2        what we want to do, whether we want to do a
3        banner message or whether we want to do an
4        edit, or what we want to do.  Okay.
5              DR. MOORE:  One thing I do want to add
6        is -- these are just suggestions that
7        Magellan's seen.  But if you all have
8        anything that you would like to see for us to
9        look at, we'd be happy to entertain those as
10       well.
11             DR. ALLEN:  It's a great point.  I guess
12       for the new members on the Board is it I
13       guess possible -- and maybe it doesn't have
14       to be done now -- but just educate us on the
15       process.  I mean, is there a quota -- I mean
16       is there a minimum amount of suggestions that
17       you can maybe submit; you know, we submit a
18       few, what are the deadlines, things of that
19       nature?
20             DR. MOORE:  It's not really a submission
21       process, we just bring them up at this
22       meeting.  We generally try to take about two
23       to three into the next quarter to work on.
24       That's the work that, you know, Becky and I
25       work on to present to you all in January,

Def_000322642

1          along with the follow-up items that have come
2          about throughout the meeting.
3               So if you just would just jot them down
4          and bring them to this meeting and suggest
5          them to your colleagues here, you all vote on
6          which ones you want, and we get to work on
7          them.
8               DR. BORGERT:  It's kind of an informal
9          process, you know, just kind of throw it out
10         there.
11              THE CHAIRPERSON:  One of the things we
12         had looked in the past was looking at the top
13         expenditures and -- top 10 expenditures and
14         the top 10 usage in our state and looking at
15         that.  And looking at ways of, you know, like
16         we did the oncology drugs and we did the
17         antipsychotic drugs.
18              DR. MOORE:  Would it be helpful if we
19         compiled a list of previous topics that we've
20         looked at so that you all would know?
21              DR. OLSON:  Right.
22              DR. MOORE:  So you're not suggesting the
23         same things that we've looked at.  We've
24         looked at a number of topics and some -- we
25         began in 2008.  So we'll be happy to compile

```
 1      a list.
 2          THE CHAIRPERSON:  I'd like to see the top
 3      10 again.
 4          DR. OLSON:  Yes.  Can we get that list of
 5      top 10 in spending utilization?  You don't
 6      have to give us a huge list, but if you can
 7      just narrow it down is all.
 8          DR. MOORE:  Right.  So you'd like to by
 9      expenditure or claims or both?
10          DR. OLSON:  Both.
11          THE CHAIRPERSON:  Yeah, both would be
12      good informational.  Then we looked at HIV
13      meds in terms of safety and in terms of edits
14      that we've done -- you know, we've done over
15      the years.  Like, for example, DDI with AZT
16      bag combo.  So we've implemented that in
17      terms of safety for our patients.  And as new
18      drugs come out make sure, you know, like the
19      newer agents, you know, make sure that we
20      talk -- if somebody's writing let's say for
21      Prezcobix and you can show that Norbury is no
22      longer on board.
23          DR. MOORE:  We would do like therapeutic
24      duplication on combination products, so
25      patients can't take triple antibiotics.
```

Def_000322644

```
 1              THE CHAIRPERSON:  Exactly.  These are the
 2        DHSS guidelines, yeah.  So make sure those
 3        are still -- so maybe look -- that's a top 10
 4        item in our state.
 5              DR. MOORE:  Oh, yes, it is.
 6              THE CHAIRPERSON:  It's not?
 7              DR. MOORE:  Oh, yes, it is.
 8              THE CHAIRPERSON:  So let's look at that.
 9        I think that would be a good topic.
10              DR. SAEZ:  I think that you should do the
11        drugs utilization reviews that we talked
12        about Daraprim yesterday and this would be
13        good to see.  Because then I talked to my
14        pharmacist yesterday, and it turned out that
15        the three new claims, they happened right
16        after they increased the price.  So I mean, I
17        don't know if it was a coincidence.  And I
18        spoke to the CMO for the other plan and they
19        also did the same.  So it would be
20        interesting to see what happens during these
21        three months if there's an increase in
22        utilization now and if there is fraud or
23        something.  Because I mean I'm assuming --
24              THE CHAIRPERSON:  On which drug?
25              DR. SAEZ:  Daraprim because it went from
```

1          $13 to $700, something that was generic
2          before.  So it just happened last week.  So
3          this would be a good utilization review to
4          see.  And how do we handle if something like
5          that happens again?  Because I mean, it's
6          like as Magellan, the PDL has some type of --
7          you know, where they can bring like the price
8          down from the manufacturer.
9          DR. BORGERT:  In this case it hit the
10         national media so we all knew about it.  But,
11         you know, in Magellan internally we have a
12         way where we can -- in the past the problem
13         has usually been generics that have just
14         skyrocketed out of nowhere.  So we do have a
15         pulse on that, we look at that weekly, you
16         know, in terms of what the percentage change
17         is in pricing.  But this one caught us
18         completely off guard because it was a brand
19         name drug, you know.
20         DR. SAEZ:  And I guess the other drug
21         that we can talk about next time is what's
22         going to happen with utilization with the new
23         drug Daklinza because it's a very tricky
24         drug, it's like genotype 3.  But you have to
25         use all these other drugs in combination and

Def_000322646

```
 1          sometimes the cost can be very expensive.  So
 2          I think it would be a good drug to look at to
 3          see for utilization.  And I'm assuming that
 4          because this is the hepatitis C drug, you
 5          still have the same things, grade -- level,
 6          grade 3 or 4 to treat, right?
 7               MS. WILLIAMS:  Right.
 8               DR. MOORE:  Well, one thing that we do
 9          each quarter is we bring back after the
10          utilization so Daklinza would fall in that.
11               DR. ZITIELLO:  I'm a little concerned
12          about underutilization of some of the asthma
13          medication.  I get a lot of requests for
14          Budesonide and most pediatricians would write
15          for generic upfront, but can only approve the
16          Pulmicort in that population.
17               Doctors just don't seem to be aware that
18          that's, you know, something they can replace.
19          And I'm afraid that the members, you know, or
20          the patients at the point of pharmacy just
21          say, "Oh, well, not covered."  And then those
22          kids go on without their controller
23          medication and end up in the hospital because
24          they weren't controlled.  Not in their
25          benefit and I just for the life of me don't
```

1      understand why the generics aren't on the

2      PDL?  Obviously I said that before.

3         DR. MOORE:  The same issues that we spoke

4      of before, you know, is the clinical benefit

5      versus the financial implication.  What's

6      available and the Agency and the provider

7      synergies makes the decision on which agent

8      to go with and those type of decisions are

9      made.

10         DR. BORGERT:  But I think this is good

11      feedback in that, you know, I don't know off

12      the top my head when those agents are

13      reviewed, but because the Board talks about

14      this, then we can provide that feedback to

15      provider synergies during the contract

16      negotiations and that can be a consideration

17      as well for the P&T committee.  Which until

18      you spoke up and said that, you know, maybe

19      we -- everybody wasn't aware that that's an

20      issue of what adherence and compliance

21      states.

22         DR. ZITIELLO:  A general generic issue is

23      huge.  And cost and benefit state aside,

24      these patients aren't getting the treatment

25      they need.  Potentially it could be very bad,

Def_000322648

1          so...

2               DR. MOORE:  I just wonder if it's a

3          communication issue at the different plan

4          levels, you know, providing that information

5          out to the pharmacies, out to the providers,

6          that, you know, these are preferred agents.

7          If you get a script for, you know,

8          Budesonide, Pulmicort is the PDL agent, so

9          dispense that.

10              So I think it's just communication,

11         training.  You know, helping providers go out

12         to the websites, see what's preferred before

13         you write that prescription and maybe write

14         that actual agent down so that the pharmacy

15         isn't confused or having to try to figure

16         that out while the patient is sitting at the

17         counter.

18              DR. ROMAY:  I think at the plan level we

19         do it very rapidly, and unfortunately we rely

20         on that pharmacist or pharmacy to call out to

21         us.  A lot of times that doesn't happen so

22         there's a real problem with -- at the retail

23         level that that pharmacy is not taking the

24         time out to --

25              DR. MOORE:  I get it.

1          DR. ROMAY:  So that member, as she said,

2     is walking away.  And not only related to

3     that one, but it's also related to all the

4     ones that are in that category.  Like, you

5     know, Abilify, for example.  We've had

6     members who have been not being able to get

7     their antipsychotics, and what happens they

8     end up decompensated in the hospital with

9     psych admission and that -- you know.

10         So I get your point.  It's communication

11    but, you know, there's so much control that

12    you have with that retail pharmacy reaching

13    out and doing their due diligence and make

14    sure that that member gets what they need in

15    a timely manner.

16         THE CHAIRPERSON:  On the other end as a

17    prescriber I have to keep up with about 50

18    different plans and their formularies.  And I

19    am like -- January is all the big change --

20    January is a big month in formularies for

21    preferred drugs list changes, so...  And

22    there's a lot of changes.  And you get

23    notifications from the different plan

24    carriers, you know, Medicare or it doesn't

25    matter which payer source it is.

Def_000322650

1          And, you know, this is the new preferred

2     drug and then I have to implement a change

3     and notify the patient of the changes and of

4     the therapeutic equivalent now.

5          But as a prescriber with all these

6     different plans, it is overwhelming,

7     especially when they prefer -- you know, the

8     plans have a different formulary than what

9     the state has or what Medicare -- what

10    particular Medicare.  So I'm just

11    overwhelmed.

12         And at one time I was downloading all the

13    -- on my desktop all these different plans

14    and just -- but it's very overwhelming as a

15    prescriber.

16         DR. MOORE:  Luckily we have the PDL right

17    now.

18         THE CHAIRPERSON:  I'm sorry?

19         DR. MOORE:  Luckily we have the PDL right

20    now.

21         THE CHAIRPERSON:  No.  But, you know,

22    there's so many different ones.  I mean you

23    have no idea.

24         DR. MOORE:  Right, right.

25         THE CHAIRPERSON:  That Broward Health has

 1      or Jackson or any institution has their own
 2      plan.  Everybody has their own -- and just
 3      keeping up with all the -- it's very
 4      difficult.  Especially January when they
 5      implement the change.
 6           DR. SAEZ:  Is there a way -- maybe an
 7      easy way when the patient and the mother
 8      takes the prescription to the pharmacy
 9      they automatically -- it just reverts to
10      whatever is their preferred agent.  So that
11      way -- I mean, I don't know if that's a
12      possibility to do that?
13           Because like she said, you know, imagine,
14      you know, like seeing 25 patients per day and
15      then trying to go on the PDL, you know, as a
16      provider you cannot -- unfortunately you kind
17      of have to spoon feed and make the process
18      easy enough where like -- and so the only way
19      I can see is that they take it to --
20      sometimes when I was in clinical practice I
21      would put in the prescription "or whatever
22      preferred," you know to make sure that would
23      be a way, because after a while --
24           THE CHAIRPERSON:  We have alerts --
25      actually there is a -- I signed up as a

Def_000322652

1     provider under Medicaid.  There are -- when

2     the updates are sent out, there's a link

3     for the -- but you have to sign up though.

4     So I did sign up and you click on the link,

5     but those are -- they change like every

6     quarter I believe under Medicaid.

7          DR. ROMAY:  After P&T meetings.

8          THE CHAIRPERSON:  I'm sorry?

9          DR. ROMAY:  After P&T meetings it's

10    quarterly.

11         THE CHAIRPERSON:  Yeah.  That's what I

12    said, but you have to keep and click on the

13    whole list and the whole list is extensive,

14    you know.

15         DR. MOORE:  One other option -- and it's

16    to program a message that says, you know,

17    Pulmicort is the preferred agent if they're

18    billing for the non-preferred product.

19    That's one other way --

20         DR. ROMAY:  I just think like we just

21    talked about that yesterday that maybe like a

22    second message maybe you can get exposure.  I

23    mean, maybe to the retail pharmacy when

24    they're --

25         DR. MOORE:  And maybe they're not

1      accessing it.  That's a training issue again.

2      Go and see if there's anything else, you

3      know, what other messages are behind it.

4          DR. OLSON:  The PAs come and go.  Again,

5      the plan of a pharmacy is too late, because

6      you could be a day or two -- I mean, we need

7      to look at ways that the physicians can be

8      better informed so the prescriptions are

9      written per -- I mean, when you get the

10     pharmacy and now you can't use this.  If the

11     doctor doesn't want to switch, and now you

12     got to go through a PA.  I mean, there's a

13     lot of these situations where you get a day

14     to a week in delay in starting therapy or

15     continuing therapy because of that.

16         THE CHAIRPERSON:  Usually under Medicare,

17     or the plan with Medicare it gives you 30

18     days before they implement their formulary

19     change.  I get a letter for like maybe

20     December or January, the letter comes to me

21     and it says "this item is no longer on your

22     preferred" -- or "your patient's preferred

23     drug list."

24         Sometimes, I would say 50 percent of the

25     time, I'll get the preferred drug list

Def_000322654

1          therapeutic exchange item.  So I can at least

2          make a change so I know what's on formulary.

3          50 percent of the time there is no

4          therapeutic equivalent or option on the

5          letter.  And so I don't know what's on there.

6          I mean, especially if it's an angiotensin

7          receptor blocker.

8               Here Medi -- you know, signing up for the

9          new updates is good.  I am not sure -- and

10         maybe at the point of sale the pharmacist can

11         give it to the patient.  The patient can at

12         least have something available in their hand

13         to bring back to our nurses in our office to

14         inform me at that point that that would get

15         rejected at the point of sale is a

16         communication.

17              I don't think sending out a letter to

18         these providers is overwhelming.  I don't

19         know how else to communicate broadly except

20         for the prescriber would have to sign up.

21              The other option may be during

22         credentialing, when we credential under

23         Medicaid.  This is how we try do it at the

24         other states.  Maybe at the time of

25         credentialing, click on the website that you

Def_000322655

1           sign up where we credential under Medicaid,

2           maybe a link for the preferred drug list to

3           make us aware that there is information there

4           maybe.

5                MS. HARRIS:  I'm sorry.  Respectfully, I

6           think we're of kind -- we're a little off

7           topic here.  I'm not sure how a lot of this

8           relates to the purpose of the function of the

9           Board.  So would you mind if we --

10               THE CHAIRPERSON:  Go back on top?

11               MS. HARRIS:  Yeah.

12               MR. HAMILTON:  Don't forget about our

13          changes summary that comes out also quarterly

14          that's on the website.

15               THE CHAIRPERSON:  But to make sure

16          subscribers click on that or are aware of

17          that, how do we bring that out to our

18          Medicaid community?  That's what I'm trying

19          to -- all of the actions that our P&T do, how

20          do we -- besides having -- that's my concern,

21          anyway.

22               DR. OLSON:  Going back to the asthma, are

23          we able to get -- I know we have a hard time

24          with the medical claims, but are we able to

25          get emergency rooms admissions for Medicaid

Def_000322656

1      or no?

2          DR. BORGERT:  If they're admitted --

3      well, if they have an ER visit.

4          DR. OLSON:  ER visit.

5          DR. BORGERT:  We know they have an ER

6      visit and we know they were admitted and what

7      those diagnoses type of admissions are, but

8      I don't know.

9          DR. OLSON:  That would be interesting to

10     tie into too.  If we're looking at that,

11     that's another thing you want to avoid too.

12         Another drug that is kind of on the radar

13     and I don't know what the spend is but we

14     want to watch is for CF, Kalydeco.  And I

15     don't know if that's one we just want to kind

16     of put on the radar watch and maybe get some

17     data for the next meeting, preliminary data.

18         DR. BORGERT:  Probably or can be --

19         THE CHAIRPERSON:  Any other suggestions?

20         So you want to review that again?

21         DR. BORGERT:  Yes, please.  Just to make

22     sure I've got this.  So we talked about doing

23     Metoclopramide and duration and dose-risk of

24     tardive dyskinesia.  We talked about bringing

25     back out top 10 by spend in claims.  We would

Def_000322657

1          look at Daraprim utilization over the next

2          quarter.  We will include Daklinza in the hep

3          C review in the next quarter.

4               And then this whole subject of asthma

5          utilization and the Pulmicort needs to be

6          Budesonide.  I kind of was thinking about

7          what you're saying, Dr. Olson, is like, you

8          know, if they didn't fill -- I think where

9          you're going with that is if they didn't fill

10         the script, did they end up having an ER

11         visit or an admission for acute exacerbation

12         or something like that.  But what we won't

13         know is if they didn't fill, we don't know if

14         there was a script.  Do you know what I'm

15         saying?  That's where there's a link -- a

16         missing link there is, we don't know were

17         they supposed to have gotten it.  All we know

18         is -- does anybody have any thoughts on how

19         to get around that?

20              THE CHAIRPERSON:  Of the HIV drugs also.

21              DR. SAEZ:  Just do a general, you know,

22         to see what's the utilization of these drug

23         agents.

24              DR. BORGERT:  Yeah.  We can certainly

25         pull a general utilization of Pulmicort and

Def_000322658

1          we can look for ER visits and try to tie that
2          to the kinds of claims.  You know, just look
3          at that.
4               DR. OLSON:  You can probably look at
5          rejected claims as being what the --
6               DR. BORGERT:  Yeah.  Well, I think -- I
7          mean, do you want me to pull --
8               DR. MOORE:  Specifically Pulmicort or
9          would you like at all like ICS or asthma
10         medications just in general?
11              DR. OLSON:  Asthma.
12              DR. MOORE:  Just in general?
13              DR. OLSON:  Yeah.
14              THE CHAIRPERSON:  That's a lot.
15              DR. BORGERT:  That's plenty.
16              DR. ALLEN:  I just want to see if I can
17         add one more to the Christmas list.  I just
18         wanted to see if there was any material
19         impact on the PCSK 9s.  I think these agents
20         came on the market in the June, July time
21         frame and there's widespread speculation
22         that, you know, the economic impact was going
23         to be huge.  But, you know, just from an
24         individual plan standpoint we haven't seen
25         that take off.  I just want to see if maybe

Def_000322659

1        you know --

2             DR. BORGERT:  Sure.  That's a good

3        suggestion.  On the utilization we can bring

4        you back information on that if we did or

5        didn't.

6             DR. ROMAY:  I have another one.  I don't

7        know if we can add it, but in terms of the

8        IVIGs the current criteria that we have is

9        not really specific to any one product, it's

10       very broad based on communication and, you

11       know, weights and all that stuff.  Can we get

12       a little bit more guidance as to the specific

13       products that we might want to, you know, use

14       over others -- preferred ones over others

15       or --

16            THE CHAIRPERSON:  Which drug?

17            DR. ROMAY:  The IVIGs, Intravenous

18       immunoglobulin, the gamunex --

19            THE CHAIRPERSON:  Is that outpatient or

20       inpatient?

21            DR. ROMAY:  Usually -- well, depending.

22       Now they have some that are actually given --

23       you know, self-administered, some of them

24       have to be done at a infusion center.

25            THE CHAIRPERSON:  Can you capture

Def_000322660

1      infusion center data?

2         DR. BORGERT:  I don't know.

3         DR. MOORE:  I'm not sure on that one.

4         DR. ROMAY:  That would on their medical

5      claims.

6         DR. MOORE:  It's not on the P&T, so we

7      can -- I don't know if the Agency -- we'll

8      take that suggestion back.  I'll have to

9      consult with the Agency on that one.

10         DR. ROMAY:  Okay.

11         THE CHAIRPERSON:  Another -- so we're

12      done with the suggestions.

13         DR. BORGERT:  It's feast or famine in

14      this committee.

15         THE CHAIRPERSON:  A copy guide to the

16      Sunshine Laws will be sent out to all our

17      board members here for follow-up.

18         Next on our agenda item is open

19      discussion.  Any --

20         DR. ALLEN:  I have a -- sorry.  I don't

21      want to go over my quota.

22         THE CHAIRPERSON:  That's okay.

23         DR. ALLEN:  I just wanted to as far as,

24      you know, the possibility of the date and the

25      time of this meeting.  When -- and it's just

1       been my own personal experience, I attend

2       P&Ts on a Friday from 1:00 to 5:00 and, you

3       know, the attendance is pretty large in

4       comparison to this meeting.  I just wanted to

5       support a possibility to see if maybe a

6       Thursday or I don't know maybe Friday morning

7       would be a possibility for a change in the

8       date?

9            THE CHAIRPERSON:  Well, historically, you

10      know, that involves taking personal leave and

11      vacation hours for some individuals that

12      volunteer their time.  I don't have a lot of

13      vacation days.  I come home on weekends

14      because I'm not working.

15           MS. HARRIS:  If I may, I think that

16      that's something that on behalf of the Agency

17      we'd like to take that suggestion back and

18      think a little bit about.  We coordinate the

19      travel for all of the DUR members and we just

20      think that -- we try to accommodate the DUR

21      Board meeting to be after the P&T since it is

22      late in the afternoon on a Friday, we just

23      need look at all of that logistically.

24           So the board is more than welcome to take

25      that up as a motion and vote, but

1        respectfully we would like to go back as an

2        Agency and talk about it.

3              DR. ALLEN:  That's fair.

4              THE CHAIRPERSON:  The other issue, Moses,

5        as far as the time is 8:00 versus 9:00 versus

6        any other time, we've looked at that over the

7        years and most people would come in the night

8        before; and then travel plans, we've had

9        Board members that would leave and they've

10       had to catch a plane to Pensacola or

11       Jacksonville at certain times.  I catch a

12       plane to Fort Lauderdale.  Just timing it

13       with airlines, so most people come in the

14       night before and then travel out on a noon or

15       at an approximate time to catch their flight.

16          We're always open for suggestions if

17       anyone has, you know, suggestions.  But when

18       you make your recommend -- when you think

19       about it, you know, you think about hardship

20       for work hours and taking off vacation hours,

21       so -- you know.  But I don't get

22       administrative time or -- and then travel,

23       for people that come from all areas in our

24       state, not just from -- to Tampa Bay area;

25       you know, some people come from Jacksonville,

 1              Pensacola, I'm not sure all the regions we
 2              are all from but we have to consider that at
 3              the same time.
 4                   DR. ALLEN:  That's fair.
 5                   MS. HARRIS:  I think what we'll try to do
 6              is maybe look at the logistics and come back
 7              with some recommendations and the Board can
 8              look at them, and you can agree, disagree,
 9              come up with your own.
10                   THE CHAIRPERSON:  Thank you.
11                   Next on our agenda are public comments
12              from our audience.  Yes, come on up to the
13              podium and introduce yourself and --
14                   MR. COLLINS:  I expect the same round of
15              applause they're getting in the other room.
16              I just have to set this up and running here.
17              It's up and running, I just have to get this
18              -- one second.
19                   My name is Scott Collins.  I'm with VCG
20              and Associates, it's now a Division of the
21              Quintiles Company.  And we represent a lot of
22              different companies, so we're more or less a
23              consulting firm.  I'm here today speaking on
24              behalf of one of the clients I represent for
25              the state of Florida, and it's Pierre Fabre.

1    They're out of France, and they have a
2    product called Hemangioma for infantile
3    proliferating hemangioma.  I'm trying to --
4    it's called Hemangeol, it's for infantile
5    hemangioma.
6        Infantile hemagioma is -- I will refer to
7    it as IH from this point forward -- is the
8    most common tumor in infancy affecting
9    approximately 4.5 percent of all infants born
10   in the U.S.  Female sex, low birth weight,
11   prematurity, fair skin, multiple gestation,
12   advanced paternal age, and placenta previa
13   are common risk factors associated with IH
14   development.
15       In the majority of the cases, about 88
16   percent, no treatment is required as the
17   tumors spontaneously involutes over the time.
18   In 12 percent of them, about 20,000 cases a
19   year, IH can be potentially debilitating and
20   associated with serious conditions like life-
21   threatening airway obstruction, congestive
22   heart failure, functional impairment such as
23   vision, hearing, feeding, hypothyroidism,
24   ulcerations with bleeding and pain, risk of
25   permanent disfigurement.  Thus these IHs can

1          have long lasting detrimental impact and also

2          have impact on social, psychological, and

3          emotional well-being in a patient for him

4          and/or her and their immediate family.

5               For these severe forms of IH, systemic

6          therapy is essential to initiate the

7          involution process.  Before 2008 these small

8          babies were treated with corticosteroids,

9          interferons, and other products associated

10         with that which had some benefit but were

11         also very serious side effects sometimes

12         irreversible.

13              In 2008 propranolol was serendipitously

14         discovered to induce rapid involution of the

15         proliferating IH.  Leaute Labreze reported

16         the case of a four-month-old infant born with

17         a nasal capillary hemangioma unresponsive to

18         corticosteroid treatment who developed

19         induced obstructive hypertrophic

20         cardiomyopathy and was subsequently treated

21         with propranolol.

22              Visible changes in the lesion from

23         intense red to purple and palpable softening

24         were observed within one day of initiation of

25         propranolol.  There was continued improvement

Def_000322666

1         after the drug was tapered off.

2              Since its discovery propranolol's

3         efficacy has been documented and numerous

4         cases reported in case series and has led up

5         to anti to first-line therapy for complicated

6         IH.

7              As most of the published data suggests

8         that IH require treatment of uniquely

9         amenable to a non-surgical systemic therapy,

10        Pierre Fabre Pharmaceuticals, Incorporated

11        developed a specific oral solution of

12        propranolol hydrochloride, Hemangeol, and

13        obtained FDA approval for its use and

14        treatment of the proliferating IH requiring

15        systemic therapy.

16             Hemangeol was developed in compliance

17        with existing guidelines for pediatric drugs

18        ensuring safety, ease, and acceptability of

19        use.  It comes in the most appropriate

20        formulation for younger pediatric patients.

21             On behalf of Pierre Fabre we sincerely

22        thank the Florida P&T and DUR Board for

23        making Hemangeol available for the babies

24        from 5 weeks to 5 months old that need it

25        through the traditional prior authorization

Def_000322667

 1      process.

 2          However, because of potential delays of

 3      the PA process and since early detection and

 4      rapid treatment of IH using Hemangeol is so

 5      critical to the success rate and could

 6      potentially be cost-effective for insurers,

 7      while minimizing the impact on patients,

 8      respectfully ask the Florida Medicaid DUR to

 9      consider replacing the traditional PA process

10      with a simple age edit AutoPA.

11          An age edit AutoPA would accomplish the

12      same goal for Florida Medicaid providing

13      Hemangeol to the appropriate patients;

14      however, would potentially remove the

15      approximately $25 to $30 PA cost, eliminating

16      any possible delays in getting Hemangeol to

17      the patients that needed it.

18          The following points highlight the

19      reasons why we believe this is the best

20      decision for the state of Florida and for the

21      patients who are diagnosed with IH.

22      Hemangeolis the only FDA approved treatment

23      for IH and there is no other therapeutic

24      equivalent generic available.

25          Hemangeol is the only drug that has been

Def_000322668

1          evaluated by randomized placebo controlled

2          double blind clinical trial in order to

3          assess the ability to reduce or eliminate IH.

4                Studies reveal that 60 percent of

5          enrolled infants treated with Hemangeol for a

6          period of six months saw a complete or a

7          nearly complete resolution of the targeted

8          IH.  This is in stark contrast to the placebo

9          control which resulted in only 4 percent of

10         patients seeing a complete or nearly complete

11         resolution of IH.

12               Less than 2 percent of the infants who

13         are enrolled in the clinical trial stopped

14         treatment due to adverse experiences.  There

15         were no new side effects associated with

16         Hemangeol treatment.  Only the ones commonly

17         associated with propranolol were observed;

18         which is bronchitis, diarrhea, sleep

19         disorders, and peripheral coldness.

20               Prudence must be taken when developing a

21         drug for pediatric use since its population

22         can be particularly sensitive.  With this in

23         mind Pierre Fabre formulated Hemangeol to be

24         as safe and effective as possible with

25         infants with IH.

1           In order to accomplish this Hemangeol was

2      formulated with the following attributes;

3      there's only one -- only available in one

4      concentration to prevent the possibility of

5      misdosing, and that's at 4.28 milligrams

6      propranolol hydrochloride or a USDA

7      equivalent of 3.75 milligrams of propranolol.

8           Every Hemangeol prescription comes with a

9      specifically designed oral dosage syringe and

10      syringe adaptor which is preinstalled in the

11      bottle, together these accessories ensure the

12      accurate dosing of Hemangeol and preventative

13      spillage respectively.

14           Hemangeol is sugar free, alcohol free,

15      pharament free, and does not contain the

16      artificial sweetener Sorbitol or Xylos.

17      These excipients were not used due to their

18      potential harmful impact on development and

19      the lack of established sets data.

20           Hemangeol comes in a strawberry flavored

21      -- strawberry-vanilla flavor which we found

22      variable tolerated by the infants.  This

23      flavor combination lead to a consistent

24      accurate dose when administered to patients.

25      It's dispensed with an FDA approved

1       medication guide and instructions for use.

2       These documents ensure that caregivers are

3       aware of the potential serious side effects

4       associated with Hemangeol use and now to

5       minimize such risks.

6           Hemangeol is available from a specialty

7       pharmacy that ships directly to the patient.

8       In addition, the specialty pharmacy has a

9       dedicated information center that provides

10      24-hour support.

11          And in conclusion the American Academy of

12      Pediatrics has recently advocated for

13      appropriate benefits coverage and payment for

14      children with infantile hemangiomas and

15      vascular malformations.  For the AAP early

16      treatment of vascular anomalies like IH

17      should be considered medically necessary for

18      benefit plan coverage and payment due to the

19      high risk of serious medical and

20      psychological issues.

21          Therefore, the AAP has called upon public

22      and private payers, including health plans to

23      provide competence of benefit coverage and

24      appropriate patient for evaluation of

25      treatment of these conditions.

1          In the long run it will be more cost-

2     effective for care to cover early

3     intervention and treatment of these

4     disorders.  Children who are not treated

5     properly at the earliest possible stage may

6     not only require more reconstructive

7     procedures down the road, but often requires

8     psychological counseling to address living

9     with these debilitating and disfiguring

10    lesions.

11         Thank you very much.

12         THE CHAIRPERSON:  Thank you, Scott.  You

13    mentioned something about a cost for a prior

14    auth?

15         MR. COLLINS:  Yeah. I think here in the

16    state of Florida this was -- this was written

17    in a general kind of a PA situation.  And our

18    understanding, just from my general knowledge

19    is that PAs can cost about 25 or $30 apiece.

20         THE CHAIRPERSON:  To whom?

21         MR. COLLINS:  To the state for doing --

22         DR. MOORE:  Not from Magellan.

23         THE CHAIRPERSON:  I didn't think so.

24    Just to clarify that.  There's no cost.

25         MR. COLLINS:  So I think here we're just

Def_000322672

1          looking at maybe a more simple way of

2          physicians being able to write this and the

3          AutoPA was a possible suggestion.

4               THE CHAIRPERSON:  Thank you, Scott.

5               Any other public comments?  Very good.

6               Our next meeting, Vern, you want to give

7          us an update?

8               MR. HAMILTON:  Ladies and gentlemen,

9          we're about 90 percent sure that we will be

10         back here at this hotel on January 16th.  I

11         say that because I don't really have any

12         contract in place yet, but we are working

13         that out.  And just please keep attuned to

14         our website for any updates, but we're still

15         focused on January 16th at this hotel.

16              THE CHAIRPERSON:  That's Martin Luther

17         King weekend.

18              MR. HAMILTON:  That is correct.

19              THE CHAIRPERSON:  Just letting you all

20         know.  So I would like to call for

21         adjournment of the meeting.  Thank you,

22         everyone, for coming and safe travels back

23         home.

24              (Proceedings concluded at 10:50 a.m.)

25

Def_000322673

1                          CERTIFICATE OF REPORTER

2

3

4       STATE OF FLORIDA              :

5       COUNTY OF HILLSBOROUGH        :

6

7

8
             I, Jacqueline L. Reichert, Court Reporter,
9       Notary Public in and for the State of Florida

10           DO HEREBY CERTIFY that I was present at the
        foregoing proceedings at the time and place set forth
11      in the caption thereof; that I was authorized to and
        did stenographically report the foregoing
12      proceedings; and that the foregoing pages constitute
        a true and complete computer-aided transcript of my
13      original stenographic notes to the best of my
        knowledge, skill and ability.
14
             IN WITNESS WHEREOF, I have hereunto set my hand
15      at Tampa, Hillsborough County, Florida this 12th day
        of October 2015.
16

17

18

19

20
                        _____
21                      JACQUELINE L. REICHERT
                        Notary Public, State of Florida
22                      Commission No. EE 160968
                        Expires 3/27/2016
23

24

25

Def_000322674