1

DRUG UTILIZATION REVIEW BOARD

Agency for Health Care Administration

Tampa Marriott Westshore

Saturday, January 16, 2016

8 a.m - 10:55 a.m.


REPORTED BY:    JACQUELINE L. REICHERT
                Integra Reporting Group
                Court Reporter
                Notary Public
                Commission No. EE 160968
                Expires 3/27/16

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

Def_000331626

PRESENT:

BOARD MEMBERS:

       Anna Hayden (Chair)
       Jeffrey Martorana (Vice-Chair)
       Allen Moses
       Diane Fagan
       Vanessa Goodnow (Absent)
       Larry Field (Absent)
       Kevin Olson
       Alfred Romay
       Luis Saez
       Amy Zitiello

AHCA STAFF:

       Beverly H. Smith, Esquire, Medicaid Counsel
       Vern Hamilton, AHCA Liaison
       Arlene Elliott, RPh, Operations Administrator
       Susan Williams, PharmD

MAGELLAN MEDICAID ADMINISTRATION

       Rebecca Borgert, PharmD

Def_000331627

3

I N D E X

|                                              | Page |
| -------------------------------------------- | ---- |
| Opening Remarks                              | 6    |
| Approval of DUR Minutes from September 26, 2015 | 6 |
| Review of P&T Minutes from November 9, 2015  | 7    |
| Quarterly DUR Activity Reports               | 11   |
| Open Discussion                              | 103  |
| Public Comment                               | 121  |
| Next Meeting Date                            | 121  |
| Reporter Certification                       | 125  |

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

Def_000331628

4

1                    P R O C E E D I N G S

2          THE CHAIRPERSON:  Good morning.  I call

3     this meeting to order.  I'd like to welcome

4     everyone for taking the opportunity to come

5     here this morning and provide services for

6     the State of Florida.

7          Vern, do you want us to do role call,

8     just go around the room and -- we'll just go

9     around the room and start off with Dr. Moses

10    there, Allen.  And then, you know, just a

11    word or two about your practice and what you

12    do full time.

13          DR. ALLEN:  Sure.  Good morning everyone.

14    Moses Allen.  Currently I'm Director of

15    Specialty Distribution with Lemire Health,

16    previously with Prestige Health Choice as

17    Director of Pharmacy.

18          DR. FAGAN:  Good morning.  I am Diane

19    Fagan.  I'm Director of Pharmacy with

20    WellCare.

21          DR. OLSON:  Kevin Olson, Manager in the

22    Pharmacy at All Children's.

23          DR. SAENZ:  Good morning.  I'm Luis

24    Saenz, I'm Director from PHC.

25          DR. ROMAY:  Good morning.  Alfred Romay,

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

Def_000331629

```
1      Director of Pharmacy over at Molina
2      Healthcare Florida.
3           DR. ZITTELLO:  I am Amy Zittello, Medical
4      Director for Amerigroup.
5           DR. MARTORANA:  Dr. Jeff Mortorana, Chief
6      Medical Officer Sunshine Health.
7           THE CHAIRPERSON:  My name is Anna Hayden.
8      I'm your Chair of this Board -- of the Drug
9      Utilization Review Board.  I'm a family
10     practice physician.  I work in Downtown Fort
11     Lauderdale for Broward Health.
12          MS. SMITH:  I'm Beverly Smith.  I'm the
13     Medicaid Counsel for the DUR Board.
14          MS. ELLIOTT:  Arlene Elliott, Pharmacy
15     Policy Administrator at AHCA.
16          DR. WILLIAMS:  Susan Williams.  I'm a
17     Senior Pharmacist with AHCA.
18          MR. HAMILTON:  And I'm Vern Hamilton, the
19     Agency liaison for these meetings.
20          DR. BORGERT:  And I'm Becky Borgert.  I'm
21     a Pharmacist with Magellan Healthcare.
22          THE CHAIRPERSON:  And we have two members
23     that are excused due to travel issues.
24     Dr. Vanessa Goodnow could not be here due to
25     a grounding of her plane in Fort Lauderdale
```

Def_000331630

1        due to bad weather.  And Dr. Field could not

2        be here this morning, he's also excused due

3        to issues as well.

4            Next on our agenda we have opening

5        remarks from Arlene Elliott, she our AHCA

6        Administrator.

7            MS. ELLIOTT:  Good morning.  Welcome

8        everybody.  Thank you for being here early on

9        this beautiful morning.  I failed to mention

10       yesterday, so you guys can spread the word,

11       the Agency has not made a decision yet

12       whether the plans need to follow or not the

13       PDL.  So at this point currently all the

14       plans should be following the Agency's PDL,

15       the decision has not been made to change that

16       or continue it.  Thank you.

17           THE CHAIRPERSON:  Thank you very much.

18           Next on our agenda is the review of the

19       Drug Utilization Review minute from our

20       September 26th, 2015 meeting.  I make a

21       motion to approve.  Do we have a second?

22           DR. ZITTELLO:  Second.

23           THE CHAIRPERSON:  Any discussion?

24           MR. HAMILTON:  Well, Dr. Hayden, I

25       corrected the spelling of your name I believe

1      on page 3.

2           THE CHAIRPERSON:  That's the editorial.

3           MR. HAMILTON:  Thank you for pointing

4      that out.  And if there are any other

5      corrections, let me know.

6           THE CHAIRPERSON:  Very good.  Thank you.

7      Any other discussion?  So for the final

8      count, all those in favor of approving the

9      Drug Utilization Review minutes with the

10     minor editorial comment, signify by saying

11     "aye"?

12          THE BOARD:  Aye.

13          THE CHAIRPERSON:  We have unanimous

14     approval of the minutes.  Thank you.

15          Next on our agenda we have information

16     from the review of the P&T minutes from the

17     November 9th, that is informational.  And

18     Rebecca will be giving us a short report of

19     yesterday's P&T as a conduit of --

20          DR. BORGERT:  Sure.  So the P&T Committee

21     did meet yesterday.  I'm going to refer in

22     the DUR presentation so this is here now.

23     Now, we know that P&T normally meets the day

24     before DUR and they did yesterday.  But if

25     you'll recall back in the fall, they had to

Def_000331632

1     postpone the meeting, so P&T actually met in
2     November.  So there's one thing that came out
3     of that November meeting that they requested
4     that the DUR Board look into, and that was
5     dosing of Celebrex.  So we're going to talk
6     about that today.  I have that in the
7     quarterly topics because it was requested at
8     the November P&T Meeting.  So it's just a
9     little strange because of the timing of the
10    last meeting.
11         She the P&T Committee did meet yesterday
12    and they reviewed several classes, just
13    things that might have an impact on the DUR
14    Board that I'll mention.
15         They did review Androgenic Agents, and as
16    you know we're going to talk about
17    testosterone today.  And they basically
18    endorsed the DUR Board putting a ClinicalPA
19    on the class and the DUR Board determining
20    the criteria.  So the P&T Committee did
21    endorse the DUR doing that and we'll finalize
22    that today.
23         They added Entresto which is a new --
24    sacubitril/valsartan, a new -- it's in the
25    ACE inhibitor class, although not technically

Def_000331633

```
1       an ACE -- you know, it's one of the entities
2       that's an ACE inhibitor.  Let's see, what
3       else.  For inhaled antibiotics, both Tobi and
4       Kitabis Pak are now -- will now be preferred.
5            All of the -- again, we're going to
6       talking about the novel Oral Anticoagulants
7       today.  And they -- the P&T Board voted to
8       keep all four of the currently available
9       commercial products on the PDL.
10           One thing that was referred to DUR was
11      Xopenex because they reviewed the Beta
12      Agonist Bronchodilators.  And one member of
13      the P&T Committee felt like the utilization
14      was really higher then you would expect it to
15      be, and asked us -- and referred that to the
16      DUR Board.  So that just happened yesterday,
17      so we'll look at that in April when we meet
18      again.
19           Let's see.  You know, we talked in the
20      past we looked at our P&T class, we had
21      talked about Daliresp, and they basically
22      were in favor of having the DUR put some
23      criteria around that to try to tighten
24      utilization.
25           I don't think there's anything else that
```

Def_000331634

 1       had -- we're going to talk today about the

 2       PCSK-9 inhibitors because you guys asked

 3       about that of the last meeting.  Those were

 4       actually single product reviews yesterday,

 5       and they're both non-preferred at this time.

 6       We're talking about alirocumab which is

 7       Praluent, and evolocumab which is Repatha.

 8           And I think that was pretty much the

 9       highlights of things that might have to do

10       with the DUR Board from P&T yesterday.

11           THE CHAIRPERSON:  Thank you very much.

12           And then other item that was on our

13       agenda originally was Dr. Winterstein's

14       presentation, but that's been postponed until

15       more data is available on the Synagis vaccine

16       and impact on our Floridians with access to

17       that medication.  So the data is not

18       available so she's been postponed until

19       either April or September meeting just as a

20       follow up --

21           DR. BORGERT:  We'll probably wait at

22       least until the end of this RSV season so we

23       have at least one full year of RSV data, so

24       that won't be until the end of April, right.

25           THE CHAIRPERSON:  And then that data may

Def_000331635

```
 1     not be available probably until our September
 2     meeting.  And the main impact was reducing
 3     from 7 to 5 vaccines to see if there was any
 4     impact at all, those were questions we had.
 5     So she's been postponed.  Very good.
 6         Next, Ms. Rebecca again on quarterly DUR
 7     activity reports.
 8         DR. BORGERT:  All right.  So as must of
 9     you are familiar now that you've been to at
10     least one meeting.  We typically start this
11     meeting with -- sorry.  We normally start
12     this meeting with follow-up or updates.  So
13     during this section we talk about anything
14     that had previously come to the Board where
15     maybe there were additional questions by the
16     Board about the data that was presented, so
17     we try and follow-up with those questions.
18         The other thing that's presented in this
19     section of the presentation is any post
20     intervention analysis.  So any time we do an
21     intervention or an edit, we try to measure
22     the impact of that.  And so typically we're
23     looking at a three-month period of time and
24     so we always bring that back to the DUR Board
25     in terms of looking at the impact of any
```

Def_000331636

1        interventions that the Board has recommended.

2        So that's what's going to be in this section.

3            And this first topic is one of those

4        things.  It's a follow-up on an intervention.

5        So we wanted to look at limit the duration of

6        therapy of skeletal muscle relaxants.  We

7        felt like patients were getting on skeletal

8        muscle relaxants and sort of being on them

9        indefinitely, when most of really the

10        indications are for short term

11        musculoskeletal type of conditions.

12            So what we did is we put a limit on it

13        where patients were allowed to have six

14        consecutive claims for -- six claims for a

15        30-day supply, and after that time then it

16        would stop requiring a prior authorization.

17            Now, we did exempt any patients with

18        chronic -- some diagnoses and it was

19        diagnosed.  So basically they were chronic

20        spacticity-type conditions for baclofen and

21        tizanidine, because those patients, it would

22        be appropriate for them to be on long term

23        skeletal muscle relaxant therapy.

24            So the edit was deployed in March.  So

25        since the way this edit worked was it allowed

Def_000331637

```
 1        six months worth of therapy, we wouldn't
 2        start having impacted claims until September.
 3        Does that make sense?  The edit went in in
 4        March, but we wouldn't have had had impacted
 5        claims until September because they were
 6        allowed six months before the edit would go
 7        into place.
 8             So when we looked at the post edit, we
 9        looked from September 25th, which would have
10        been six months post implementation, through
11        December 15th which was the day we did the
12        analysis, so that was all the data that we
13        had.
14             And as you can see it was a pretty
15        substantial decrease.  We had 41 percent
16        decrease in claims, 30 percent decrease in
17        recipients, and an overall 43 percent
18        decrease in the number of dosage units that
19        were dispensed, and a 37 percent decrease in
20        the amount paid.
21             Now, I will have to add a caveat here.
22        And that's I don't know the answer to this
23        either, but, you know, back in the day when
24        everybody was Fee-for-service and it was much
25        a more stable population, I think maybe it
```

Def_000331638

```
 1     was more apples to apples.  I think now maybe
 2     when we look at these numbers, I don't know,
 3     nobody knows really, on how much of an apples
 4     to apples comparison it is, because Fee-for-
 5     services are a more fluctuating population
 6     than it used to be in the past.  So all we
 7     can do is take a snapshot, you know, before
 8     and after.  And from what it looks like, it
 9     looks like certainly there was some effect of
10     that edit.
11          So any questions?
12          THE CHAIRPERSON:  Was there any other
13     prior authorizations requested on any of
14     the --
15          DR. BORGERT:  I don't know.
16          THE CHAIRPERSON:  Maybe we should look at
17     that.
18          DR. BORGERT:  I'll look.
19          THE CHAIRPERSON:  I know that's a good
20     point you're making about the fluctuations of
21     the recipients.
22          DR. BORGERT:  Right.
23          THE CHAIRPERSON:  And the other one is,
24     you know, the impact you can look up prior
25     auths if it was a medical necessity or if
```

Def_000331639

1        there was a --

2                DR. BORGERT:  Right, right.

3                DR. MARTORANA:  And is there any ballpark

4        figures as far as the number of members in

5        the Fee-for-service world that this would

6        indicate?

7                DR. BORGERT:  Arlene, do you know the

8        number?

9                MS. ELLIOTT:  Yeah.  It's approximately

10       400,000.

11               DR. MARTORANA:  Okay.

12               DR. BORGERT:  And I mean the whole number

13       is not so much this fluctuating as the

14       individual recipient is fluctuating is what I

15       mean when I say that.

16               THE CHAIRPERSON:  Oh, I got it.

17               DR. BORGERT:  Yeah.  Because you might

18       come in Fee-for-service and then go out to an

19       MCO.  So, you know, not so much the aggregate

20       number as individuals.

21           This is a follow-up item from a topic

22       that we discussed in the past.  This is just

23       a short recap.  Prior to this edit we had an

24       overall limit of 100 mls of insulin per

25       30-day limit, and last year the DUR Board

Def_000331640

1     decreased that to a limit of seven vials of

2     insulin and two boxes of insulin pens.  Some

3     people felt at that time that that was still

4     a very high limit.  However, when we looked

5     at the data, it looked like the majority of

6     patients that was kind of where the cutoff

7     fell for the majority of patients so that's

8     why those numbers were picked.

9          So not surprisingly, I don't think, when

10    he look -- this is the slide that looked at

11    last time -- the new dosing limits didn't

12    really have much of an impact on the

13    quantities that were being dispensed.  Pens

14    went down a little bit because we didn't have

15    any real limit on pens before, so that did

16    decrease about 13 percent.

17         Vials basically stayed the same, which

18    again, is pretty much what we expected

19    because we knew kind of that's where the

20    cutoff was for what was being utilized.

21         So the Board had asked -- you know, we

22    had some discussion last time as you recall

23    about the fact that that seems like an awful

24    lot of insulin for people to be using.  And

25    was it just an anomaly of the fact that that

Def_000331641

1    amount was being dispensed and called it a

2    30-day supply and it really wasn't a 30-day

3    supply.  And so the Board wanted to look into

4    that a little bit closer.

5         So what we did in -- and this was -- you

6    know, with the DUR Board slides, kind of

7    that's a high blood.  Somebody that was

8    getting more than 100 -- greater than or

9    equal to 100 units per day of insulin or five

10   or more vials per claim.

11        So of that same data set that we looked

12   at originally from April to June, we looked

13   -- and this was just strictly based on what

14   was submitted on the claim in terms of

15   quantity dispensed and day supply.

16        So if you just take that at face value,

17   if you just take what's submitted on the

18   claim as quantity dispensed and days

19   supplied, then almost half the patients were

20   exceeding 100 units of insulin per day, which

21   seems like a lot.  I think that's what the

22   point the Board was trying to make.

23        I will note because one of the other

24   questions was about the type of diabetes

25   these patients might have.  And of those high

Def_000331642

1    utilizers almost 70 percent did have a

2    diagnosis of Type 1 diabetes on file -- so at

3    that was good -- whereas, only 28 percent had

4    Type 2 diabetes.  And 4 percent we could find

5    neither of the diagnosis on file.  Maybe some

6    of those were gestational, I don't know, but

7    4 percent we couldn't find a diagnosis, so...

8         So in order to try to gain a better

9    understanding of these high utilizers, we

10   took those same recipients but we expanded

11   the time range out to nine months so that we

12   could look at subsequent fills.

13        So we had that the same utilizers, those

14   ones that were identified in the past slide,

15   and we looked at a nine-month period of time.

16   And we tried to calculate a true day's supply

17   based on time, actual time to the next time

18   they filled the insulin prescription.

19        Now, several of the utilizers only had

20   one claim in that nine-month period of time,

21   actually 38 percent.  I know.  So I think

22   that might speak to, again, the coming in and

23   out of Fee-for-service.  Like, you know,

24   maybe they were Fee-for-service for a very

25   short time, got one fill, and then moved on

Def_000331643

1     to an MCO or something like that.  I have a

2     feeling that's probably the explanation for

3     that.  I don't know why there was --

4          So we, in terms of this analysis, we

5     discarded those 38 because there would be no

6     way to look at when their next fill was.  In

7     Fee-for-service we didn't have that

8     information.

9          So of the remaining 1475 high blood

10    recipients, when we looked at actual days

11    elapsed between fills, the true average day

12    supply was 36 days.  So it was about a week

13    longer than a true 30-day supply.  I was kind

14    of surprised it wasn't even more than, but

15    that's what the number was.

16         It was when we looked at -- you know,

17    there's always going to be a last claim, so

18    we only could carry the data out so far.  But

19    in that nine-month period of time looking at

20    the fills that they received in the

21    quantities that they were dispensed, the

22    average day supply was 36.3.

23         However, when we did that same type of

24    thing, the number of patients who were

25    receiving more than 100 units a day dropped

Def_000331644

```
1        down all the way from 2,367 to only 270

2        recipients.  So that seems a lot more likely,

3        that there were 270 recipients who were truly

4        getting 100 units if insulin or more a day.

5             So that's the information back to the

6        Board.  You know, I think Magellan and the

7        State are, you know, still trying to get our

8        mind around what's the best way to handle

9        insulin utilization because it's really hard

10       to know what an average dose is.  And then

11       we've also got the complicating factor of,

12       you know, vials obviously can't be broken,

13       they're dispensed as one size.  Pens are

14       usually -- the boxes are usually not broken,

15       they're usually dispensed as an entire box.

16       So somewhat of the -- you know, just the

17       nature of the product, I think, makes it

18       harder as well to, you know, really tighten

19       down that quantity dispensed in day's supply.

20            So does anybody have any question

21       questions or comments about that?  That was

22       just the follow-up information from the

23       questions we discussed last time.

24            Okay.  This is a post impact analysis.

25       If you'll recall we looked at putting in a PA
```

```
 1       on long-acting stimulants in children that
 2       were under six years of age.  And we did this
 3       because none of the long-acting stimulants
 4       are currently FDA approved in this age group.
 5       And prior to the edit we had no age limits on
 6       this group of medications.  And this list of
 7       medications that were involved in the edit
 8       are on this screen.
 9            And, again, it seems like this impact did
10       have a very large impact.  So we looked at
11       three months pre-edit and three months
12       post-edit.  The edit was implemented on July
13       1st of 2015.  There was an 80 percent
14       decrease in claims, and 78 percent decrease
15       in the recipients, and then 80 percent
16       overall in total spend on long-acting
17       stimulants in that population.  So that was
18       an effective edit.  I thought that was -- and
19       maybe you were the first one to bring up that
20       idea, so that was a good thing.  And the PA
21       for that is, of course, on the AHCA website.
22       Questions?  All right.
23            As I mentioned yesterday -- as mentioned
24       earlier, excuse me, the P&T Committee
25       yesterday did enforce putting a ClinicalPA on
```

Def_000331646

1           this class and going with the DUR Board

2           recommendations.  The only update -- this was

3           a slide that we went through that last time

4           in terms of background.  The only update to

5           this slide would be the hours we met in

6           September, the American Association of

7           Clinical Endocrinologists issued a position

8           statement that was actually somewhat contrary

9           to the FDA warning about cardiovascular

10          safety.

11               And what the American Association of

12          Clinical Endocrinologists said was there is

13          no compelling evidence that testosterone

14          therapy either increases or decreases

15          cardiovascular risk.  And they encourage

16          large scale clinical trials to assess that.

17          So there's been a little bit of push back in

18          terms of the FDA warnings on cardiovascular

19          use.

20               Again, we saw this last time and we had

21          some concerns about the fact that we had some

22          patients who had some diagnosis of prostate

23          cancer, very few had orders for PSAs, and

24          that, you know, there probably needed to be

25          tighter utilization around this class.

Def_000331647

1           So this is just a summary of what was

2       discussed last time.  The ClinicalPA will

3       require a baseline serum testosterone level,

4       require a diagnosis verification, and we will

5       require baseline PSAs.  So that's what we

6       will be doing and implementing in the next

7       quarter for the top testosterone products as

8       endorsed by the P&T Committee.

9           THE CHAIRPERSON:  There's another online

10      packet here for the ICD-10 codes.  I'm not

11      sure if F64 encompasses all the transgender

12      codes as well -- you're seeing that as

13      well -- is it something else to consider

14      adding as a different ICD-10 code.

15          MS. ELLIOTT:  If I may comment on that?

16          THE CHAIRPERSON:  Yes.

17          MS. ELLIOTT:  Yes.  The Agency is going

18      to discuss that internally and then we'll

19      bring it to the Committee or to the members

20      to the meeting -- next meeting.  Because we

21      don't have -- Medicaid doesn't pay for gender

22      identity disorders, so this is a discussion

23      that will be discussed internally and then

24      we'll figure it out and bring it to the Board

25      next time.

Def_000331648

```
 1              THE CHAIRPERSON:  Thank you.

 2              DR. BORGERT:  Okay.  Just a follow-up

 3     about Synagis.  You probably hope this is the

 4     last time we'll talk about this for a while.

 5     Dr. Olson, I believe had -- he had expressed

 6     some concern that he felt like patients were

 7     not receiving their full schedule of Synagis

 8     doses.  And so he asked for how many doses

 9     were these patients were receiving.  So

10     that's what this graph is trying to indicate.

11              So there were 445 recipients but we could

12     only identify one Synagis claim.  Out to 278

13     recipients that we could identify that got

14     seven Synagis claims.  The only caveat here

15     is, like I said at the last meeting, we don't

16     really feel like -- and this includes both

17     Fee-for-service and encounter data, and we

18     didn't feel like we probably were able to

19     capture all of the medical claims.

20              So all of the hospital -- you know, the

21     hospital administered doses, just really hard

22     for us the way that billing is to capture

23     that.  I mean, If it's a claim at point of

24     sale, super easy, we have that, that's all

25     solid data.
```

Def_000331649

1          But, you know, with a drug like this,

2      it's administered sometimes in the inpatient

3      setting, we're not 100 percent certain that

4      we, you know, documented all the doses that

5      were received on the inpatient side.

6          But I think the point is that you're

7      right that, you know, it does look like that

8      probably the majority of the patients fall

9      between two and five doses, which is -- you

10     know, five doses is now the current

11     recommendation.

12         But certainly there is a significant

13     population who looks like they've received

14     only one or two doses and then don't go on to

15     receive the following doses.  Unless these

16     were doses that they received late.  You

17     know, that one dose that we had is the dose

18     that they received late after they've been

19     hospitalized for many months or something and

20     gotten it in-house.  Kind of hard to know,

21     but that's what the data looked like.

22         Another follow-up in -- and we saw this

23     last time -- is talking about the use of

24     morphine equivalent daily doses as a quality

25     indicator tool.  This is something that is

Def_000331650

```
1        really a lot in the quality literature now
2        about use this measure as a way of managing
3        opioid strategies.
4             So we saw this last time.  We looked at
5        how many of our recipients were exceeding 100
6        milligrams of morphine daily dose.  And the
7        question that was asked about that data was
8        how many prescribers were associated with
9        those opioid claims.
10            And so the pie chart here represents,
11       thankfully, the vast majority 1,007 of the
12       recipients only had one prescriber that was
13       responsible for all of their opioid claims
14       that put them into that greater than 100
15       milligrams of morphine equivalent daily doses
16       per day.  So that was good.
17            You know, the 30 patients who had four --
18       no, wait.  Yeah.  There were 30 patients at
19       four prescribers.  And I don't think there
20       were any that had five.  That six -- seven
21       patients had six prescribers and one patient
22       had nine prescribers.  So, you know, this
23       again would be an additional way that we
24       would look at this.
25            And, you know, certainly the recipients
```

1   who had only one prescriber would much less

2   of a concern than patients who had three or

3   more -- or four or more basically

4   prescribers.  And that might be a way that we

5   identify recipients where we want to look

6   into that utilization.  And, you know, maybe

7   even contact prescribers and say, you know,

8   "Are you aware that, you know, these claims

9   are -- there additional claims for your

10  patient from different prescribers for these

11  drugs?"

12          THE CHAIRPERSON:  As a follow-up to that,

13  when the Board of Pharmacy updated their

14  Pharmacy Rules, 64B16, regarding dispensing

15  of controlled substances, that was in just

16  last month.  So those poly prescribers or the

17  pharmacist, before they issue that

18  prescription, has to check that red flag at

19  the point of sale because the pharmacist now

20  has the ability to go to the PTMP.  They have

21  to take two extra hours of continuing medical

22  education of controlled substance

23  prescribing.  They have to consult with the

24  patient and collaborate with the prescribers

25  writing the order.  Those are recent updates.

Def_000331652

```
 1              So I think that number -- prescriber
 2      counts when you get into that high multiple
 3      prescribers for those patients, especially
 4      four and three, that's still 109 and 30 --
 5              DR. BORGERT:  Right.
 6              THE CHAIRPERSON:  -- almost 150 patients,
 7      they'll have to answer to that.
 8              DR. BORGERT:  Right.
 9              THE CHAIRPERSON:  So I think we'll see
10      less of those numbers in terms of safety for
11      our Floridians.
12              DR. BORGERT:  Right.  I mean, that's the
13      ultimate solution is to have it stopped right
14      there, and have the prescriber contacted at
15      that point to be informed that, you know,
16      there are other prescribers for those
17      patients.
18              DR. ALLEN:  I have a question as well.
19      Is there any correlation to the Lock-In
20      Program with this state?  I guess just a high
21      level thought, the patient who has nine
22      prescribers or even six prescribers, I'm
23      assuming those prescribers are probably
24      prescribing different opioids.  So if yes,
25      are they being controlled in the Lock-In
```

Def_000331653

```
 1      Program?
 2           DR. BORGERT:  Arlene, I don't know if you
 3      want to address this or not, but currently
 4      the Lock-In Program did Sunset --
 5           DR. ALLEN:  Oh, Fee-for-service.  Okay.
 6           DR. BORGERT:  -- I don't know -- a year
 7      or so ago.  So there is currently absolutely
 8      no active Lock-In Program.  But I think the
 9      Agency is looking into --
10           MS. ELLIOTT:  Well, it's Sunset for
11      Fee-for-service patients.  The plans -- the
12      criteria are our guidance.  So, yes, they
13      would follow them.  And we're still reviewing
14      and updating the criteria for the Lock-In
15      Program for the plans.  We have put in so
16      many edits for Fee-for-service, that nobody
17      felt -- it wasn't appropriate, or because all
18      the edits that we put in quantity limits, age
19      limits, a maximum of four or three.  So
20      that -- when we looked at the patients, there
21      were no patients that we would be able to log
22      in.  So that was a good thing.
23           THE CHAIRPERSON:  What about looking
24      at -- we're looking at morphine equivalent
25      doses, but looking at doses for our
```

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

Def_000331654

```
 1        intermediate- or shorter-acting controlled
 2        substances in terms of maximum daily dosages
 3        on the package insert and how many patients
 4        are exceeding that?  If they're outside of
 5        that recommended package insert, could we put
 6        an edit at that also?
 7            DR. BORGERT:  I don't know with opioids
 8        if they actually have a maximum recommend
 9        dose on --
10            THE CHAIRPERSON:  It's two tablets every
11        four to six hours.
12            DR. BORGERT:  Oh, because of the
13        acetaminophen limit.  Is that the product
14        you're talking about or are you talking about
15        just --
16            THE CHAIRPERSON:  Just put the package
17        insert -- I see the date on some of them.
18        I'm looking at the shorter- or intermediate-
19        acting as a possible mechanism of providing
20        for patient care of those patients that are
21        -- or prescribers that are exceeding the
22        maximum daily dosage as in the package
23        insert.
24            DR. BORGERT:  I will look into that.
25            THE CHAIRPERSON:  So that would be like
```

Def_000331655

```
 1        hydrocodone with the Tylenol.

 2             DR. BORGERT:  Right.  Certainly the

 3        products that have acetaminophen.

 4             THE CHAIRPERSON:  Like oxycodones with

 5        Tylenol.

 6             DR. BORGERT:  Right, right.  And that's

 7        the next piece of this down here in the

 8        bottom, which I don't if you can read or not.

 9        But that question came up last time as well

10        about the amount of acetaminophen these

11        patients would be receiving.

12             So of those recipients that we

13        identified, 1500 of them that were receiving

14        more than 100 milligrams of morphine

15        equivalent daily dose, 42 of them did exceed

16        the 4 grams of acetaminophen a day.

17             If you'll recall this time frame that we

18        looked at was April 1st to June 30th.  And an

19        edit did go in on Fee-for-service on November

20        16th that would stop any -- that does an

21        acetaminophen accumulation.  So hopefully

22        those 42 patients would get caught with that

23        edit that was deployed in November.

24             THE CHAIRPERSON:  Didn't we -- I think we

25        talked about this before, Rebecca, as far as
```

Def_000331656

```
 1        the dose of the acetaminophen has been

 2        modified to 3 grams, I believe?

 3            DR. BORGERT:  You know, we talked about

 4        that and then we went back and looked at it

 5        and I think across the board it's still 4

 6        grams.  I mean, certainly at-risk patients,

 7        you know, liver disease or some things like

 8        that, it has been reduced to 3.  But the last

 9        time --

10            THE CHAIRPERSON:  I was thinking more of

11        the older adults.

12            DR. BORGERT:  Maybe there's an age with

13        the 3 grams?

14            THE CHAIRPERSON:  Yes, there is.

15            DR. BORGERT:  Maybe the 3 grams is

16        age-related, that could be.  Because when we

17        looked at it, it was still, you know, 4

18        grams.  But we can go back and look at that.

19            THE CHAIRPERSON:  And is it possible to

20        do an edit on that as well?  Can we can look

21        at that?

22            DR. BORGERT:  We can certainly look that,

23        uh-huh.  We'll look at age as it relates to

24        acetaminophen dose.

25            THE CHAIRPERSON:  I think it's -- I'm not
```

Def_000331657

1      sure if it's 65 and how many Medicaid

2      recipients are duly enrolled and are

3      receiving that.

4           DR. BORGERT:  Right.

5           THE CHAIRPERSON:  I'm not sure if it's

6      65.

7           DR. BORGERT:  Okay.  Well, we can look it

8      up, that's fine.  No, big deal.

9           THE CHAIRPERSON:  I know we sent out

10     banner messages on that as well in the past.

11          DR. BORGERT:  Okay.  That was probably

12     before my time.

13          Out last follow-up item for today, as I

14     mentioned, the P&T Committee did look at this

15     class of drugs, and we had looked at this

16     last time.  We were looking at adherence with

17     therapy.  And this is just -- we saw this

18     last time.  This is just quick reminder of

19     the indications and the recommended duration

20     of therapy.

21          When we looked at, you know, what types

22     of diagnosis these patients were -- we

23     carried it out for a six-month period of time

24     and tried to look at diagnosis.

25     Unfortunately, most of them we couldn't

Def_000331658

34

```
 1      identify a diagnose -- they didn't have any

 2      of those diagnoses on file.  So I don't know

 3      if that really tells us anything.

 4          But, you know, one thing we did kind of

 5      focus in on was the afibulizers.  Now, it's a

 6      relatively small percentage of the utilizers

 7      because, you know, that age demographic tends

 8      to be, you know, less representative in

 9      Medicaid because of Medicare.

10          However, when we looked at a six-month

11      period of time a lot of patients really were

12      not receiving therapy on a continuous basis.

13      And there's been some stuff in the literature

14      about, you know, real world adherence data to

15      these drugs.

16          And, you know, unlike warfarin, which --

17      I mean, these drugs haven't had any

18      advantages over warfarin, but the flip side

19      is, you know, they're not coming in for PT

20      monitoring.  So there's no way that sort of

21      it's being monitored.  And some people

22      speculate because there's that less

23      interaction between healthcare provider and

24      patient with the monitoring of the warfarin,

25      that adherence is actually lower with these
```

Def_000331659

1      medications than with warfarin because of the

2      follow-up involved.

3           So, you know, one of the things that we

4      thought we might do is just pull out those

5      recipients who had gaps in their care.  So,

6      you know, maybe they get a fill and then they

7      don't fill it again for three months and then

8      they fill it.

9           It's a small number of patients, so we

10     could probably just letter those providers

11     that were involved with those patients in

12     terms of saying, "Hey, we've identified that,

13     you know, over a period of time your patient,

14     you know, only had, you know, adequate

15     anticoagulation based on their claim's data

16     for, you know, a third of that period of

17     time," or something like that.  So just kind

18     of a heads-up to those prescribers about

19     adherence with these medications, because

20     obviously patients need to be anticoagulated.

21     And adherence seems to be an issue that is

22     coming to light with these -- with this class

23     of medications.

24          THE CHAIRPERSON:  You know, I think

25     perhaps if the diagnosis was paroxysmal

Def_000331660

```
 1       atrial fib and they didn't have a test for

 2       the novel anticoagulant with warfarin, some

 3       of them are just offered Aspirin.  So I'm not

 4       sure.

 5            DR. BORGERT:  Right.  But these are

 6       patients who have had a fill for one of these

 7       drugs.  So the concept is they filled it and

 8       then they didn't fill it, didn't fill it,

 9       didn't fill it.  And then they fill it again.

10       You know, so it's just very sporadic in terms

11       of -- that's what I mean about the gap in

12       care in terms of, you know, it looks like

13       they were supposed to be taking it all the

14       time, but based on the amount of times

15       they're filling it, it doesn't look like they

16       are really adequately taking the medication.

17            THE CHAIRPERSON:  And these are

18       continuous with the recipients?

19            DR. BORGERT:  Uh-huh.

20            THE CHAIRPERSON:  Okay.

21            DR. BORGERT:  So what we'll do is we'll

22       try to pull out those individual recipients

23       and bring that back next time just with a

24       letter so that you guys can see it.

25            And then just to follow-up -- to finish
```

Def_000331661

37

1       up this section.  This is a standing agenda

2       item regarding Hepatitis C and our

3       utilization.  So as you can see there we have

4       about equal number of recipients for Viekira

5       Pak, which is preferred, and Harvoni.  And

6       that might be a reflection of the fact that

7       Viekira only became preferred at the March

8       2015 meeting.  And certainly the Viekira Pak

9       numbers have gone up since that time.

10          The P&T Committee did make Daklinza and

11      Technivie preferred yesterday as well as

12      Viekira Pak.  And this is the prior

13      authorization information.  And you can kind

14      of just see there the number approved, the

15      number denied, and the total numbers of

16      requests that we received for the Hepatitis C

17      therapies.

18          DR. ALLEN:  A quick question for you.

19          DR. BORGERT:  Yes.

20          DR. ALLEN:  Is there any indication since

21      the implementation of -- well, I guess that's

22      making Viekira Pak preferred is the -- are

23      the other agents -- are their uses trending

24      downward or is the uses still similar?

25          DR. BORGERT:  I think just relatively

Def_000331662

1        speaking, yes.  Because certainly the amount

2        of Viekira Pak that we're dispense -- that

3        we're approving has gone way up compared to

4        what it was before March.  We still see a lot

5        of requests for Harvoni and we still get --

6        you know, we still really -- because Viekira

7        Pak is a preferred agent we really try to --

8        and Elboni and I -- Elboni obviously is not

9        here today.  But she and I were talking about

10       his, and, you know, I think we're going to go

11       ahead and pull all of those PAs on Harvoni

12       that have occurred since March and just look

13       at them.  And just, you know, kind of see

14       what is going on with why are we still

15       approving Harvoni in patients -- you know,

16       there are some valid reasons sometimes.

17            DR. ALLEN:  Sure.

18            DR. BORGERT:  But we want to just kind of

19       really dig a little bit deeper into that,

20       just because of the sensitivity of this class

21       and that sort of thing, and make sure that

22       it's being approved appropriately.

23            DR. MARTORANA:  I had a question.  Are

24       you seeing an uptake in requests for those

25       individuals that don't have stage 3 or higher

                    INTEGRA REPORTING GROUP, LLC
                     Tampa, FL  (813) 868-5130

Def_000331663

39

```
 1    disease?
 2         DR. BORGERT:  Yes.  The state of Florida
 3    we maintained it at stage -- no, we have some
 4    that are F2.  Which ones are F2 now?  Are
 5    there any of them that are F2?  I don't know.
 6    Susan will look for us.
 7         But I will tell you that some Magellan
 8    states went down to F2 across the board.  But
 9    Florida by and large stayed at F3.
10         DR. ALLEN:  Yeah, F3 and F4.
11         THE CHAIRPERSON:  Wasn't there a letter
12    from CMS that we received?
13         DR. BORGERT:  Yes, we did.  And I had a
14    link to that in your quarterly report.  CMS
15    did send out a letter encouraging Medicaid
16    programs to broaden their approval criteria
17    while at the same time sort of try to lean on
18    manufactures to do their part to work with
19    Medicaid to make this a more affordable
20    therapy.
21         MS. ELLIOTT:  Right.  And if I could
22    comment on that.  The letter from CMS was
23    guidance, and an e-mail was sent to all the
24    states.  And we received -- you know, it's a
25    group -- the DEHP Group -- I don't know if
```

40

```
 1        you're familiar with it.  Pharmacy directors

 2        or pharmacy representatives for each state.

 3        And most of the states are just taking it as

 4        that.  They're saying, "It's a guidance,

 5        we're not going to change anything at this

 6        time."

 7             THE CHAIRPERSON:  Thank you.

 8             DR. SAENZ:  I have a question on Daklinza

 9        for the -- you know.  How cost effective is

10        it?  I know that it's approved -- it has a

11        better chance for stage 3, but you still need

12        to use sofosbuvir.

13             DR. BORGERT:  Right.

14             DR. SAENZ:  And it only works if they

15        don't have cirrhosis.  So if you have

16        cirrhosis, then you have to add Ribavirin.

17             DR. BORGERT:  Right.

18             DR. SAENZ:  So cost effective, instead of

19        using Harvoni, how -- you know, I understand

20        that for a grade 3 they have no cirrhosis --

21             DR. BORGERT:  Is Harvoni approved for

22        Genotype 3?  I think it's 1, 4, 6 -- 1, 4, 5,

23        6.

24             DR. SAENZ:  They still use it.  Well,

25        they use it for 24 weeks, you know, for like
```

Def_000331665

1      Genotype 3 it has less percentage of cure.

2      But once it gets to cirrhosis, like they

3      don't do as well with Daklinza.  You know,

4      it's like -- so in terms of cost Daklinza and

5      Harvoni with stage 3 with cirrhosis, I don't

6      know, the price.

7           DR. BORGERT:  The Agency has made a

8      decision more to go -- to base their approval

9      guidelines more on FDA approved indications

10     as opposed to the ASLD guidelines.  So I'm --

11     can somebody look for me -- because I don't

12     want to pull off the slides -- is Harvoni

13     approved in Genotype 3?

14          DR. SAENZ:  Yes.  It's 24 weeks, if I

15     recall.

16          DR. BORGERT:  All right.  I will --

17          DR. SAENZ:  I'm just looking in the

18     cirrhosis stage.

19          DR. BORGERT:  Right.  I know.  So you're

20     taking about Genotype 3 patients --

21          DR. SAENZ:   Yeah.  Because those with

22     cirrhosis don't seem to do as well.

23          DR. BORGERT:  Right.

24          DR. SAENZ:  So it's about the same

25     percentage as Harvoni.  And I don't know how

Def_000331666

1     much they cost because you have to have

2     Daklinza, sofosbuvir, plus Ribavirin.

3           DR. BORGERT:  Right, right, right.

4           DR. SAENZ:  So the three.  And I think

5     you still need to do it for 24 weeks.

6           DR. BORGERT:  Right.  So I guess the

7     question would be --

8           DR. SAENZ:  Like for cirrhosis maybe most

9     cost effective maybe to use Harvoni --

10          DR. BORGERT:  Right.

11          DR. SAENZ:  If they have cirrhosis

12    because there may be the same chance.

13          DR. BORGERT:  Right.  I mean, obviously

14    we only had one approval and three denials

15    for Daklinza.  Obviously this was approved

16    later in year and this is year to date data.

17    But, yeah, we can look at that in terms of,

18    you know, cirrhotic versus non-cirrhotic, and

19    what's the optimal regimen.

20          DR. SAENZ:  And the other question I have

21    is like now we're going to get some of --

22    very unlikely, but there's like very likely

23    that people are going to get reinfected.  You

24    know, so if I look at the FDA guidelines, I

25    think they never said this is used for

Def_000331667

```
 1    infection.  So how do we handle -- I guess,
 2    in a case by case basis.  How do we handle an
 3    appeal like that?  How do we handle a patient
 4    that -- very few, but it's a little money.
 5         DR. BORGERT:  Currently I believe the
 6    State still has the once in a lifetime --
 7         DR. ALLEN:  Yeah.  Criteria is once in a
 8    lifetime.
 9         DR. BORGERT:  -- on the therapy.  I don't
10    know that that will always remain there, but
11    at this time that's still the situation.  I
12    have not heard of any request that we've had
13    for retreatment but -- we've had some
14    requests for retreatment for patients who
15    haven't achieved an SVR, but not patients who
16    achieved an SVR and then were reinfected.  I
17    haven't heard of that situation coming up
18    yet.  But you're right, it will eventually
19    come up.
20         DR. SAENZ:  It will come.  But the data
21    is showing that it's less likely for there's
22    that -- they say it's as high as 1 to 10
23    percent that they may -- very unlikely, but
24    it may happen.
25         DR. ALLEN:  One additional question.  I
```

Def_000331668

44

1        also notice that there were some Peg-Intron

2        and Ribavirin claims.

3             DR. BORGERT:  Right.

4             DR. ALLEN:  And I guess my question is, I

5        guess now with the new generation Hep C

6        agents, I really couldn't imagine a provider

7        utilizing those agents.  Are those old claims

8        prior to the PA going into place or --

9             DR. BORGERT:  Yeah.  The date range was

10       year to date for 2015.

11            DR. ALLEN:  So those will just adjudicate

12       it down.

13            DR. BORGERT:  Yeah.  I mean, the

14       Ribavirin we'll probably continue to see

15       because we use that still in combination --

16            DR. ALLEN:  Sure.

17            DR. BORGERT:  -- with several other

18       recommended regimens.  Ribavirin is still

19       recommended.  But the Peg-Intron I think will

20       fall away to almost nothing.

21            DR. ALLEN:  Okay.

22            DR. BORGERT:  All right.  Well, we are on

23       to our new business section.  And sometimes

24       we take a break here, but it's only 8:45, so

25       do you want plow on?  Do you want to go on?

Def_000331669

```
 1          THE CHAIRPERSON:  You want to take a
 2    break -- a 10-minute break and then we'll
 3    reconvene?
 4          DR. BORGERT:  It's up to you guys.
 5          THE CHAIRPERSON:  Yeah, we'll take a
 6    break.  10 minutes and then we'll start again
 7    at 9:00 -- or 8:50 -- 8:55.
 8          (WHEREUPON, a brief recess was taken.)
 9          THE CHAIRPERSON:  Good morning, everyone.
10    I'd like to reconvene the Drug Utilization
11    Review Broad.  It's 8:56.  And Ms. Rebecca
12    again.
13          DR. BORGERT:  Okay.  Just a couple things
14    that we followed up on in the break that
15    wanted to clarify for the minutes.  We do
16    actually -- Dr. Allen, pointed out that on
17    the summary of limitations we do have
18    quantity limits on products like hydrocodone
19    A pap, we have a tablet per day limit on
20    those things already.  So those are on the
21    summary of limitations.  So we had talked
22    about that.
23          THE CHAIRPERSON:  So how many are the
24    tablet limits?
25          DR. BORGERT:  Does Dr. Allen or Susan do
```

Def_000331670

1        you have them pulled up?

2            DR. ALLEN:  Sure.  I have them up.

3            THE CHAIRPERSON:  I didn't think we had

4        that.  I thought we had the maximum number of

5        scripts per month, but I don't remember

6        tablet --

7            DR. BORGERT:  It might be a fairly new

8        edit in that I think the MCOs encourage that

9        when they, you know, sort of think it's going

10       to --

11           DR. ROMAY:  Yeah.  I think we suggested

12       that we have a cumulative edit that takes all

13       -- if a person is on several formations with

14       the Tylenol, it will look cumulative and then

15       after that it will reject it.

16           DR. BORGERT:  Right.  And that's the edit

17       that went in in November though that I was

18       referring to.  But I think also in addition

19       to that there are individual product tablet

20       limits and that's what Susan is going to look

21       it up right now and is going to tell us.

22           DR. WILLIAMS:  For instance, Vicodin we

23       have eight tablets per day for the 5/300.

24       For the 7.5 we have six tablets.  For Vicodin

25       HP we have six a day.  So we have them on

Def_000331671

```
 1        various products on our summary of

 2        limitations and you can find them on our

 3        website.

 4             THE CHAIRPERSON:  So for the Vicodin 5 we

 5        have the 5/300 you have eight per day?  Is

 6        that what you said?

 7             DR. WILLIAMS:  It was eight per day, yes.

 8             THE CHAIRPERSON:  And the one for the

 9        5/325 also I believe?

10             DR. WILLIAMS:  For which one?

11             THE CHAIRPERSON:  The hydrocodone again.

12             DR. WILLIAMS:  The hydrocodone 7.5?

13             THE CHAIRPERSON: 7.5.

14             DR. WILLIAMS:  Six per day.  And the 10

15        milligram is six per day also.  Was there

16        another one you were interested in that I can

17        see if we have it?

18             THE CHAIRPERSON:  No. I didn't realize we

19        had those edits in place already.  Thank you.

20             DR. ALLEN:  Right.  And it's also the

21        same for Percocet as well.  It's also the

22        same for Percocet as well, they have limits

23        on them as well, yeah.

24             THE CHAIRPERSON:  Aspirin-related

25        products?
```

Def_000331672

```
 1            DR. ALLEN:  Yes.
 2            THE CHAIRPERSON:  Any other limits we
 3       have?  Do we have any on --
 4            DR. BORGERT:  On like single opioid
 5       agents?  Is that what you mean?
 6            THE CHAIRPERSON:  Uh-huh.  For the
 7       short-acting or intermediate-acting.
 8            DR. BORGERT:  Oxycodone would be the most
 9       likely one.
10            DR. WILLIAMS:  Which one?
11            DR. BORGERT:  Just single agent
12       oxycodone.
13            THE CHAIRPERSON:  And tramadol.
14            DR. WILLIAMS:  Yeah, we have it on
15       tramadol.
16            DR. BORGERT:  We definitely have it on
17       tramadol.
18            THE CHAIRPERSON:  How many per day on the
19       tramadol to 400 milligrams per day?
20            DR. WILLIAMS:  On the oxy IR we have 12
21       tablets per day.
22            THE CHAIRPERSON:  Is that per package
23       insert or is that for all doses or for --
24            DR. WILLIAMS:  That is for 5 milligram
25       it's 12 tablet per day.  For the 7.5
```

Def_000331673

1          milligrams it's eight tablets per day.  For

2          the 10, 15, and 30 milligrams it's six

3          tablets per day.  And for the 20 milligrams

4          it's nine tablets per day.

5               THE CHAIRPERSON:  Thank you.

6               DR. WILLIAMS:  And then the tramadol.

7               DR. ALLEN:  One per day.

8               DR. WILLIAMS:  One per day.  I'm sorry.

9               THE CHAIRPERSON:  How many again?

10               DR. WILLIAMS:  One per day for the

11          tramadol.  That's the extended release.

12               THE CHAIRPERSON:  Oh, extended.  But the

13          short-acting?

14               DR. WILLIAMS:  Eight per day.

15               THE CHAIRPERSON:  And the 50 milligram

16          dosage?

17               DR. WILLIAMS:  That is eight per day.

18               THE CHAIRPERSON:  And these edits went

19          into place --

20               DR. BORGERT:  I can't tell you exactly

21          when the individual product limits went into

22          the place.  They've sort have been put in

23          over time.  Some of them I think have been in

24          for quite a long time.  The one that was the

25          most recent is the one that Dr. Romay was

Def_000331674

```
 1      talking about with the cumulative across

 2      different product lines.  If you were

 3      getting, you know, prn hydrocodone; prn

 4      oxycodone, you know, Percocet, Vicodin,

 5      cumulative.

 6           THE CHAIRPERSON:  So if the recipient had

 7      to exceed this dose there would be a prior

 8      authorization?

 9           DR. WILLIAMS:  Right.

10           DR. ALLEN:  Correct.

11           THE CHAIRPERSON:  And have we looked at

12      data on this?  Because we looked at morphine

13      total.  Have we looked at --

14           DR. WILLIAMS:  The short-acting?

15           THE CHAIRPERSON:  Yeah.

16           DR. WILLIAMS:  No, I don't think we've

17      ever done that.

18           THE CHAIRPERSON:  We haven't had an issue

19      with that.

20           DR. BORGERT:  Not that I'm aware, yeah.

21      I think we kind of -- you know, I think

22      that's what the quantity limits do for us is

23      kind of try to keep that under control.

24           THE CHAIRPERSON:  Okay.  Very good.

25      Thank you so much.
```

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

Def_000331675

51

```
1            DR. WILLIAMS:  No problem.

2            DR. BORGERT:  And just for the minutes

3      also just to note that Harvoni is not

4      approved for Genotype 3 for -- FDA.  It is

5      recommended in the AASLD guidelines but it's

6      not FDA approved for Genotype 3 for Harvoni.

7            THE CHAIRPERSON:  Thank you, Rebecca, so

8      much.

9            DR. BORGERT:  All right.  Moving on to

10     new business.  The first thing we usually do

11     in new business is we look at upcoming P&T

12     classes.  And just see if there's anything

13     that the DUR wants to have input with regard

14     to that.

15           A class that's coming up in June for

16     review is Mucolytics. There's really only

17     two drugs in that class, acetylcysteine both

18     as the 10 percent and 20 percent, and then

19     Pulmozyme.  And as you can see there, there's

20     a huge cost factor associated with Pulmozyme.

21     And, of course, it is only approved for --

22     the FDA indication is for Cystic Fibrosis, it

23     is non-approved for other types of general

24     Mucolytic therapy.

25           And so one thing that we might
```

Def_000331676

1    potentially recommend to the P&T Committee

2    was to create a very easy AutoPA that would

3    look back for a diagnosis of Cystic Fibrosis

4    to ensure that it was being limited to

5    patients with Cystic Fibrosis.

6         THE CHAIRPERSON:  Do you want us to vote

7    on that?

8         DR. BORGERT:  Yes.

9         THE CHAIRPERSON:  So the motion would be

10   to have --

11        DR. OLSON:  Motion.

12        THE CHAIRPERSON:  The motion is for easy

13   PA for Cystic Fibrosis look back for a time

14   period of --

15        DR. BORGERT:  Well, I mean, typically

16   with our diagnosis look back, I typically --

17   think we actually typically look back two

18   years.

19        THE CHAIRPERSON:  24 months?  Do we have

20   a second.

21        DR. ROMAY:  Yeah, second.

22        THE CHAIRPERSON:  Any discussion.  All

23   those in favor signify by saying "aye"?

24        THE BOARD:  Aye.

25        THE CHAIRPERSON:  That's a unanimous

Def_000331677

1    approval.

2         DR. BORGERT:  That we can -- what's the

3    word I want to say?  Told to the P&T

4    Committee.  I forgot what I wanted to say.

5         Another class that will be reviewed in

6    June are the Oral Glucocorticoids.  And,

7    again, here I think the thing that kind of

8    jumps out at you a little bit is the

9    Budesonide EC in 3 milligram capsules.  So

10   look a little bit more closely, we broke down

11   the utilization.

12        And just as a background, the indication

13   for that product is mild to moderate Crohn's

14   Disease.  And the way it's dosed it is a 3

15   milligram capsule.  And the way it's dosed is

16   patients take 9 milligrams once daily for up

17   to eight weeks.  And then they can repeat

18   that eight-week course if they have recurring

19   episodes for active disease.  And so that's

20   the active disease dosing regimen.

21        And then maintenance of clinical

22   remission.  So, you know, with steroids or

23   however they've achieved remission, for

24   maintenance of clinical remission the dosing

25   is 6 milligrams once daily for up to three

Def_000331678

54

 1     months.

 2          And the important part here is that

 3     continued treatment with Budesonide EC

 4     tablets for more than three months has not

 5     been shown to provide a substantial clinical

 6     benefit.  There was actually a trial that

 7     looked at this in patients who were on -- who

 8     continued on therapy did not receive any

 9     additional clinical benefit.  So that's where

10     that recommendation comes from.

11          So we pulled the data and there were 46

12     recipients of this product from September

13     through November of this past year.  And

14     so -- obviously that's only three months, so

15     we expanded it to a six-month time frame to

16     look at those 46 recipients claims.  And

17     there were on only six of those patients who

18     did receive more than three consecutive

19     months of therapy.

20          So it doesn't seem to be a huge problem.

21     But we thought, you know, maybe one thing we

22     would do is -- since it's just six patients,

23     is maybe letter those prescribers regarding,

24     you know, these guidelines and the study that

25     supports that data and that sort of thing.

Def_000331679

1          So that's what we looked at with

2     Budesonide EC.  Because, you know, initially

3     we talked about maybe doing a length of

4     therapy edit of three months.  But when we

5     looked at, you know, what was actually going

6     on, at least in Fee-for-service, it was a

7     very small number of recipients who were

8     being prescribed outside of what's

9     recommended.  So probably not worth, you

10    know, creating a whole edit just for the

11    small number of patients.

12         THE CHAIRPERSON:  So you want to vote on

13    the letter or --

14         DR. BORGERT:  Sure.  I mean, actually we

15    can write the letter and bring that back for

16    the next time so you don't have to vote on

17    it, because you'll be voting on the letter at

18    the next meeting.

19         THE CHAIRPERSON:  Is there an age cutoff

20    for this?  I'm not quite familiar with it

21    because I don't use it for -- so a letter is

22    fine.

23         DR. BORGERT:  Okay.  Like I said, when we

24    initially started going down this path, we

25    were thinking we would do an edit, but we

Def_000331680

     1      just saw that it was so few.  Now, if the

     2      MCOs are seeing something different in their

     3      data set, then, you know, we might reconsider

     4      it, but that is what we saw in Fee-for-

     5      service.

     6          DR. MARTORANA:  And I guess going back to

     7      my original question is, what are the numbers

     8      that we're dealing with as the

     9      Fee-for-service numbers continue to come

    10      down, this is not really indicative of what

    11      we're seeing out there --

    12          DR. BORGERT:  Right.

    13          DR. MARTORANA:  -- in the market place

    14      because there's, you know, another million

    15      and a half --

    16          DR. BORGERT:  Right.

    17          DR. MARTORANA:  -- recipients out of the

    18      managed care arena.  So we maybe have to look

    19      at is there something that we're going to

    20      have to do to bridge, or when we're bringing

    21      these classes to maybe have a template to

    22      have the MCOs bring some of their

    23      utilization --

    24          DR. BORGERT:  That would really -- yeah,

    25      that would be --

Def_000331681

```
 1            DR. MARTORANA:  -- of those products so
 2       that we get a better picture --
 3            DR. BORGERT:  Right, right.  I mean, we
 4       have --
 5            DR. MARTORANA:  -- of what's happening
 6       across the state.
 7            DR. BORGERT: -- encounter data, but --
 8            DR. MARTORANA:  It's tough to sort that
 9       out.
10            DR. BORGERT:  Right.  Exactly.  Yeah.  I
11       mean, that's another thing we can do -- not
12       to give you all homework, but, you know, if
13       you guys wan to go back to your plans and
14       those of you that are affiliated with MCOs
15       and look at your utilization and then you can
16       bring that feedback back to the next meeting.
17       And then we can certainly say if you guys are
18       seeing that it is a problem, we could
19       reconsider an edit.
20            MS. ELLIOTT:  Just to piggyback on that,
21       for the next P&T Meeting we have been
22       requested to run data from the plans to --
23       for the next recommendations from now on is
24       to include utilization from the plan.  So we
25       have our data analytics group already warned
```

Def_000331682

1     that we're going to give them the Agency

2     numbers and that we're going to include that

3     utilization from the plans for the next

4     future meetings.

5          DR. MARTORANA:  Yeah.  I think if we just

6     -- both for P&T and DUR if we just have --

7     you know, if the request, then obviously with

8     three months is probably ample time for the

9     plans.

10          I mean, I don't think I'm speaking out of

11     turn, but anyone can throw something at me if

12     they think otherwise, that we very happily

13     would -- you know.  So we just need to go

14     ahead and get that published.  Say, "Okay,

15     this is what we're looking for."  And then

16     everyone can kind of bring it in that same

17     format so that we can compare apples to

18     apples.

19          DR. BORGERT:  Right.  Exactly.  I mean, I

20     think this is all new territory for all of

21     us.  So we're trying to figure out what works

22     best.

23          For the quarterly activities for this

24     quarter.  The first one was looking at

25     metoclpramide dosing.  And specifically

Def_000331683

1    focusing on the risk of Tardive Dyskinesia.

2    Metoclopramide does have a black box warning

3    that it can cause Tardive Dyskinesia.  The

4    risk of developing Tardive Dyskinesia

5    increase with the duration of therapy and the

6    total cumulative dose.

7        And specifically in the black box warning

8    they say that treatment with metoclopramide

9    for longer than 12 weeks should be avoided

10   in all but rare cases where therapeutic

11   benefit is thought to outweigh the risk of

12   developing Tardive Dyskinesia.

13       So since this is associated with both

14   high dose and duration therapy, we decided to

15   look at both dose and duration of therapy.

16   And it appears that we're not having a big

17   problem with patients receiving high doses.

18   Only 16 adult recipients and two pediatric

19   recipients who exceeded the recommended

20   dose -- or we did have 255 recipients who got

21   more than 12 weeks of therapy.

22       So, you know, we went from July -- so

23   July, August, September, October.  So we

24   looked at four months worth of -- and there

25   were -- 255 in that four months who got more

Def_000331684

1     than 12 weeks of therapy.  So it was a pretty

2     substantial number.

3          So I think maybe the recommendation here

4     would be to implement, you know, a 12-week or

5     84-day continuous supply maximum duration of

6     therapy and then require a prior auth once

7     they exceed that just for safety purposes

8     based on the black box warning.

9          DR. ZITTELLO:  Did you look at diagnosis

10    at all?

11         DR. BORGERT:  We did not.  We did not.

12    Are you thinking about like --

13         THE CHAIRPERSON:  Gastroparesis.

14         DR. ZITTELLO:  Exactly.

15         THE CHAIRPERSON:  Because sometimes we

16    may have to.  So I would exclude --

17    consider --

18         DR. BORGERT:  You want to go back and

19    look at it and exclude the gastroparesis?

20         THE CHAIRPERSON:  Yeah.  I think so.

21         DR. BORGERT:  Okay.

22         THE CHAIRPERSON:  You know, I think --

23         DR. BORGERT:  Because those patients are

24    on continuous never ending therapy.

25         THE CHAIRPERSON:  At the lowest possible

Def_000331685

1      dose --

2            DR. BORGERT:  Right.

3            THE CHAIRPERSON:  -- while monitoring.  I

4      think we sent out a banner message a while

5      back.

6            DR. BORGERT:  Again, it must have been

7      before my time.

8            THE CHAIRPERSON:  Yes, we did.  Because

9      it was a concern then.

10            DR. BORGERT:  Okay.  I will go back and I

11      will exclude those patients and then I will

12      bring that information back.

13            THE CHAIRPERSON:  And then we'll look at

14      creating an edit then?

15            DR. BORGERT:  Yeah.  Right.

16            THE CHAIRPERSON:  Because I think it is a

17      good idea, definitely.  Do you want to vote

18      on that also or --

19            DR. BORGERT:  I mean, since we're going

20      to have to follow-up next time, I don't think

21      we really need to take a vote right now

22      because we're going to bring it back up next

23      time.

24            THE CHAIRPERSON:  Very good.

25            DR. BORGERT:  The next thing that the

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

Def_000331686

```
 1       Board expressed an interest in -- and I think
 2       this was good that the Board brought this to
 3       our attention -- was about the brand
 4       preferred.  And specifically we decided to
 5       look at Pulmicort Respules.
 6            And so just for background so that we're
 7       all understanding about the generic drug life
 8       cycle.  In certain cases -- and it depends
 9       what the FDA awards.  But they can award a
10       generic manufacture a 180-day exclusivity for
11       their generic product.  It's basically there
12       to incentivize generic companies to challenge
13       weak patents or whatever and to reward them
14       for doing so.
15            So sometimes when a generic comes on the
16       market there's only one.  And when it comes
17       on the market, it's typically -- that first
18       generic is typically priced at about 90
19       percent of brand.  Basically pretty -- I
20       think legally it can't be more than 90
21       percent, so it is 90 percent.  All right.  So
22       it's at 90 percent of the brand name.
23            And so if they have -- especially if they
24       have that 180 days exclusivity, it's at least
25       six months before more players come into the
```

Def_000331687

1          market.  And in those situations it generally

2          takes about a year for the price of the

3          generic to drop.  So that's the market forces

4          that are in play there.

5               And with Medicaid, based on the federal

6          rebate and supplemental rebate, oftentimes

7          the brand product is still net-net cheaper to

8          the State then the generic product.  Based on

9          the rebate contracts.  Federal and

10         supplemental rebates that the State is

11         collecting back, because, again, those

12         generics are priced almost as much as the

13         brand name and the rebates aren't in place.

14              So that's what creates this dynamic of

15         why the State brand prefer things at a

16         certain time.  So the Committee was concerned

17         that patients -- you know, (a) that lots of

18         calls were coming back into the

19         practitioners, so it was, you know, a

20         workload issue in terms of the pharmacist

21         having to call the prescribers.  And

22         ultimately the concern was that patients

23         weren't just getting their meds.  Because it

24         would reach out to the pharmacy and they

25         would just leave.

Def_000331688

1              So for this particular product multiple

2      generics only become available about mid-2015

3      and there are currently three generic

4      manufacturers of Pulmicort or generic

5      budesonide inhalation on the market.  And

6      currently the net-net cost still is lower for

7      the branded Pulmicort Respules than for the

8      generic.

9              The class review of this class is due in

10     the March P&T meeting, so it's possible that

11     it will switch at that time.  It might switch

12     from brand preferred to generic at that time.

13     But I can't see in the future, so I don't

14     know if that will happen or not.

15             Arlene, do you have a comment?

16             MS. ELLIOTT:  Just to clarify.  The

17     meeting is in April.  It's April 1st.

18             DR. BORGERT:  I'm sorry, I keep saying

19     that.  She tells me, "Don't say March.  Don't

20     say March."

21             MS. ELLIOTT:  P&T is April 1st and DUR is

22     April 2nd.  But just to clarify one point is

23     we -- or Magellan -- Celemonzel (phonetic)

24     rebate factor, which used to be provider

25     Synergis, you're familiar with that name

Def_000331689

65

1        better.  They give us an update every month

2        when it's time to switch.

3            So, for example, if Pulmicort was to be

4        the generic cheaper in June, we would be able

5        to switch it before, you know, the next P&T

6        or whatever.  So every month they give us a

7        list of it's time to switch or not.

8            THE CHAIRPERSON:  It happened also for

9        nimodipine and valsartan a while back.  And

10       the claims were being denied at the pharmacy

11       because it went brand one month and it went

12       generic.  Same situation again.  So I think

13       -- I'm not sure if it's the providers that

14       need the letter.  I think it's the

15       pharmacists, because they'll enter the data

16       there and it stops it at the point of sale.

17           DR. BORGERT:  Right.  And so we looked at

18       it and you guys were right.  We looked at

19       there were -- we looked at denied nebulizer

20       suspension for inhalation claims.  We had

21       2,000 claims in a three-month period for 1700

22       recipients, and only 841 of those

23       subsequently had a paid claim for Pulmicort

24       Respules within a seven-day period.  So we

25       think some more of them might have gotten it

Def_000331690

    1          farther on down the road.  But we wanted to
    2          look at, you know, a time in a period of
    3          time.  So we looked at seven days.
    4               And that played, you know, half or less
    5          received the Pulmicort suspended.  So I think
    6          that's true that what is happening is that
    7          claims are being denied at the pharmacy and
    8          then the patients just aren't receiving the
    9          drug.
   10               So based on this data -- and I don't want
   11          to get into the nuts and bolts of coding
   12          because that's not the role of this
   13          Committee.  But we have some limitations
   14          because of other legislatively required
   15          messaging that has to go back to the
   16          pharmacies.  We had some limitations because
   17          I mean the thing -- the easy solution would
   18          be to say to the pharmacy dispense -- you
   19          know, reprocess or dispense brand name
   20          Pulmicort.  Because if the pharmacy saw that
   21          message, then that would be fine.
   22               We've had some challenges with that just
   23          based on other requirements that we have.
   24          But we did sit down and put our heads
   25          together and we think we've come up with a

Def_000331691

1        solution.  I won't get into the nitty-gritty

2        of the solution by using a State class code.

3        But we're going to try to implement a

4        solution for this that we think will work,

5        that we think will get the message to

6        pharmacies at that exact time so that they

7        will know what they need to do.

8             And so what we'll do is we'll work on

9        implementing that solution and then we'll go

10       back -- you know, if Pulmicort Respules have

11       become preferred by that time, then we'll

12       pick a different, you know, brand preferred,

13       and we'll go back and we'll measure -- try to

14       measure if this new solution that we're still

15       in the works, still being vetted, will solve

16       this problem basically.

17            THE CHAIRPERSON:  Logistically is it

18       possible -- I'm not quite sure about the

19       logistics behind this -- but for the

20       electronic prescribing system for people that

21       are using electronic health records, will

22       that alert the prescriber at that point also?

23       Can that also be done, or is that beyond

24       the --

25            DR. BORGERT:  Yeah.  The solution --

Def_000331692

```
 1            THE CHAIRPERSON:  -- capability?  I know
 2       you have preferred drugs.  Sometimes in my
 3       prescribing it says "preferred."  I'm not
 4       sure if it's up to date, but it will give me
 5       my preferred on the patient's profile based
 6       on their plan.
 7            DR. OLSON:  How is this handled in Prev
 8       -- the same issue was Prevacid a few years
 9       ago, how did we handle that?  I mean, that
10       didn't seem to be an issue at that time of
11       the denied claims.  Brand Prevacid was --
12            MS. ELLIOTT:  Was it preferred?
13            DR. OLSON:  -- rebated, so -- yeah,
14       preferred.
15            MS. ELLIOTT:  What we did -- and I don't
16       know if this will answer your question
17       because I don't know if this is what really
18       resolved it.  But we did have both, brand and
19       generic, paid for like maybe two, three
20       months, either one.  But an alert was sent
21       like four months in advance to allow
22       pharmacists to get used to buying the generic
23       so -- and then they could use their brand
24       that was in stock.
25            So that was -- because we had
```

Def_000331693

1      30-something thousand patients on prevacid.

2      I don't know if this is as many patients.

3      But that was a big one.  And that we never

4      had -- because we overlapped the coding, you

5      know, the reimbursement, that was not an

6      issue after they switched.  So it was a well

7      thought process because it was so big.

8          DR. BORGERT:  We also do big letter

9      campaigns for every single drug that we do

10     this for.  I'm not sure -- you know, we might

11     be on information overload it we tried to.

12     But, like I said, we do -- we have a solution

13     that we think is going to work and we're in

14     the process of sort of working through that

15     process.

16         And then we will go back and if at that

17     branded Pulmicort Respules are still

18     preferred, we will do a post impact analysis

19     once we get that solution implemented and

20     we'll see if we've improved this number here.

21         DR. ZITTELLO:  I appreciate you coming

22     back to the Committee with that information.

23         DR. BORGERT:  Sure.

24         DR. ZITTELLO:  And hopefully it help a

25     lot of kids in the state of Florida.

Def_000331694

70

```
 1            DR. BORGERT:  Right.

 2            DR. SAENZ:  I have a question and I

 3       talked to Kevin about it.  You know there is

 4       going to be a new class of drugs called

 5       Biosimilars.

 6            DR. BORGERT:  Right.

 7            DR. SAENZ:  So how is the Agency going to

 8       handle -- I guess based on the price, you

 9       know, because it's going to be an in between

10       price, between the brand and the generics.

11       Generics are now becoming expensive, they're

12       not as cheap anymore.

13            DR. BORGERT:  Yeah.  We could spend hours

14       talking about drug pricing issues.  But there

15       actually is already one Biosimilar on the

16       market, Zarxio, the generic filgrastim,

17       Biosimilar filgrastim.  And that actually was

18       looked at by P&T yesterday because the Colony

19       Stimulating Factors were one of the classes

20       that were looked at yesterday.

21            DR. SAENZ:  And what happened?

22            DR. BORGERT:  And based on pricing,

23       Neupogen is still the more favorable for the

24       State.  So I think we're going to handle it

25       just like any other generics on this market
```

Def_000331695

```
 1        because Zarxio was talked about at P&T
 2        yesterday.
 3            MS. ELLIOTT:  But to clarify on that,
 4        Zarxio as of now the ACA, you know, the
 5        Affordable Care Act, we are not -- the
 6        pharmacists are not allowed to substitute.
 7            So if you get a prescription for
 8        Neupogen, you have to dispense Neupogen.  If
 9        you get one for Zarxio, you have to -- so
10        they are all -- even the Zarxio is still more
11        expensive, they're all PA.  So they'll have
12        ClinicalPA.
13            So if we get a prescription for Zarxio,
14        we would have to -- the reviewers would have
15        to look at the criteria and approve it or
16        not, depending, you know, if they meet
17        criteria.  But they could not tell them, "No,
18        dispense Neupogen."  At this point they
19        cannot do that.
20            DR. BORGERT:  Yeah.  And just to expand a
21        little bit more one that, not to get too far
22        off on a tangent.  It kind of depends on the
23        way the FDA approves it.  If they approve
24        that they are interchangeable -- because they
25        have the option to approve Biosimilars as
```

Def_000331696

1        interchangeable, Zarxio is not approved as

2        interchangeable.  I think not because it's

3        not interchangeable, but just because they

4        weren't ready to go there yet, and they're

5        still, you know, working through all their

6        process.

7            But, you know, how the FDA designates it,

8        if they designate it as interchangeable or

9        not.  And all of the individual states are

10       looking at this legislatively as

11       substitution.  You know, what could be

12       substituted and what can't.

13           So, yeah, we're still kind of in the

14       process of figuring all that out.  But that's

15       what happened with Zarxio yesterday.

16           MS. ELLIOTT:  And one more thing, if I

17       may add for Dr. Hayden's comment about the

18       electronic prescribing.  That's a different

19       vendor, that's not the Agency, but they have

20       our PDL, so -- you know.  And the other PDLs

21       also from the other plans.

22           THE CHAIRPERSON:  It gets updated elec -

23           MS. ELLIOTT:  Yes.  When we update the

24       PDL, the electronic vendor will update it.

25           THE CHAIRPERSON:  I see it come up.


                  INTEGRA REPORTING GROUP, LLC
                   Tampa, FL  (813) 868-5130

Def_000331697

1          MS. ELLIOTT:  Yes.

2          THE CHAIRPERSON:  Sometimes I see

3     patients every 90 days and then the

4     prescription is already written.  So then the

5     concern is bridging that change in the PDL to

6     the patient's timing of the prescription.

7          DR. SAENZ:  It's basically your vendor

8     for the EMR also.  So like if it's cloud-

9     based, it would do it.  But if it's like an

10    EMR that's not cloud-based, sometimes there

11    might be a delay of a week, a month.  It

12    depends when they update that.  It's not

13    automatically, sometimes there's a delay.

14    And it has nothing to do with them, it's just

15    the vendor that your company is using for the

16    EMR.

17         THE CHAIRPERSON:  That would be

18    interesting.  Thank you.  Thank you.

19         DR. BORGERT:  So we'll continue to keep

20    you guys abreast of what's going on with

21    this.

22         As I mentioned at the top of the meeting,

23    the P&T Committee that met in November

24    specifically asked the DUR Board to look at

25    maximum daily dose limits of Celebrex based

Def_000331698

1          on the available efficacy and safety data.

2               And their concern was that the current

3          quantity limit that we had on Celebrex was

4          two capsules per day.  And Celebrex is

5          available at 50, 100, 200, and 400.  So since

6          there was a two capsule per day limit, that

7          would in essence allow people to get 800

8          milligrams of Celebrex a day.  So that was

9          the concern.

10              So we went back and looked at it.  And

11         those are the currently approved FDA

12         indications for celecoxib; osteoarthritis,

13         rheumatoid arthritis, JRA, and spondylitis,

14         acute pain, and primary dysmenorrhea.

15              I think what has happened here is that

16         the current approved FDA dosing ranges from

17         100 milligrams per day up to 200 milligrams a

18         day.  So the current approved indications

19         their recommended dose is anywhere from 100

20         milligrams a day to 400 milligrams a day.

21              And the history of that in December of

22         1999 it was actually approved as adjuvant

23         treatment of familial adenomatous polyposis,

24         FAP, at a dose of 200 milligrams BID or 400

25         milligrams BID.

Def_000331699

```
 1              And then, 12 years later, the FDA
 2         actually came back and rescinded the approval
 3         of celecoxib for FAP based on two long term
 4         safety studies which revealed an increased
 5         incidents of cardiovascular events in
 6         patients on long-term celecoxib as compared
 7         to placebo.
 8              So at that time the FDA determined that
 9         the risks outweighed the benefits for
10         patients with FAP.
11              And there is no currently FDA approved
12         indication for celecoxib at 800 milligrams a
13         day.  So we would recommend implementing the
14         400 milligram per day maximum daily dose.
15              And P&T just didn't have time to dig into
16         all these details.  You know, that's why they
17         refer this type of thing to the DUR Board so
18         we can look at it more closely and say,
19         "Well, you know, why is this?"  So that's
20         why.
21              It seems a little bit straightforward
22         but, you know, that's why P&T referred it to
23         us because they were like, "Well, we think
24         that, you know, the risks are higher with
25         higher doses and we're allowing patients to
```

Def_000331700

```
 1      get 800 milligrams a day, so let's refer that
 2      to DUR and see what they want to do with it."
 3           THE CHAIRPERSON:  So there are three
 4      exceptions there.  So the impact would be --
 5           DR. BORGERT:  I'm sorry?
 6           THE CHAIRPERSON:  On the data that's
 7      presented in our -- I have three.
 8           DR. BORGERT:  Okay.  I didn't even
 9      realize I had put that in the quarterly
10      report.  So there weren't -- the bottom line
11      is there weren't many patients who were
12      receiving that, so thankfully, but there were
13      a few.  So probably the thing to do at this
14      point, since there are no FDA approved
15      indications for 800 milligrams a day, is to
16      put a limit -- change that two capsule per
17      day limit to a 400 milligram per day limit.
18           THE CHAIRPERSON:  So do you want to put
19      an edit in place?
20           DR. BORGERT:  Yeah.  Change the edit from
21      two capsules per day of any dose of celecoxib
22      to a maximum of 400 milligrams of celecoxib.
23           THE CHAIRPERSON:  So we'll make a motion
24      for that?
25           DR. BORGERT:  Correct.
```

Def_000331701

```
 1           DR. MARTORANA:  So moved.

 2           THE CHAIRPERSON:  Second.

 3           DR. ZITTELLO:  Second.

 4           DR. SAENZ:  Second.

 5           THE CHAIRPERSON:  Any other -- the other

 6      interesting thing is for these drugs are, you

 7      know, the guidelines and the FDA indications

 8      and dosing changes, we probably should look

 9      at all that in our --

10           DR. BORGERT:  Yeah.  There's a lot of

11      that stuff that comes through.  We get

12      like --

13           THE CHAIRPERSON:  There's a lot.

14           DR. BORGERT:  At Magellan we do a weekly

15      summary of basically all those type of FDA

16      updates and that sort of thing.  But I can --

17      so I get that report every week so I can look

18      at that more closely and see if there are

19      things that probably should come to DUR.  I

20      haven't really looked at that report with the

21      thought of DUR in mind, so I can try to do

22      that.

23           THE CHAIRPERSON:  And also other drugs on

24      our preferred drug list if there are

25      high outside of those limits.  I'm not sure
```

Def_000331702

1          if we can look at that and bring it back.  I

2          mean, just for safety, I mean that is the

3          purpose of this Committee.

4                    DR. BORGERT:  Right.

5                    THE CHAIRPERSON:  And when drugs are

6          added to our PDL if there are limits on

7          dosage, I'm not sure if there's an edit.  I

8          mean, do you look at that in terms of --

9                    DR. BORGERT:  Yeah.  It's probably sort

10         of on a case by case basis.  You know, like

11         when new drugs are added.  When we're going

12         about programing to be preferred, you know.

13                    THE CHAIRPERSON:  When we looked at HIV

14         drugs I mean in terms of contraindications

15         with certain things, I mean, we had those

16         edits in place.  But as new agents come out

17         and drug to drug interactions.

18                    DR. BORGERT:  Right, right.

19                    THE CHAIRPERSON:  Okay.  So that's

20         unanimous.

21                    DR. BORGERT:  The next few items that

22         we're going to look at are really just

23         more -- as opposed to analysis, are just more

24         data that the Committee requested at the last

25         meeting to be brought.

Def_000331703

      1            So one of the things that the Committee
      2       asked -- or the DUR Board asked about was
      3       Daraprim utilization.  And I think we're all
      4       familiar with the story, but just as a recap,
      5       on August 11th of this past year the
      6       manufacturer of -- the only manufacturer of
      7       Daraprim increased the price of 25 milligram
      8       tablet from $13.55 a tablet to $750 a tablet.
      9       That's based on wholesale acquisition.  So
     10       that happened in August.
     11            On October 8th, so you know, pretty much
     12       as fast as we can move as a governmental
     13       agency, we did implement a ClinicalPA program
     14       for Daraprim, instead of -- because before
     15       you could get it, anybody could get it.
     16            And can see there the dramatic increase
     17       in spend that happened with Daraprim.  We
     18       went from spending $21,548 for 15 recipients
     19       to less than half of the same number of
     20       recipients cost us $335,574.
     21            And, you know, there was some pressure on
     22       the manufacturer at the beginning, and they
     23       had stated that they were going to
     24       re-evaluate the price.  They have since
     25       stated they are not going to change the

Def_000331704

80

```
1        price.  So $750 a tablet is here to stay.
2             There are some -- I will tell you that
3        some PBMs, some large PBMs in the country are
4        looking at compounding pharmacies who are
5        compounding this in combination with
6        Leucovorin.  And some of the PBMs in the
7        country are going that route in getting the
8        compounding product from a pharmacy I think
9        in California who is offering it as opposed
10       to, you know, going with this scenario.
11            DR. ALLEN:  Question.
12            DR. BORGERT:  Yes.
13            DR. ALLEN:  So this story, to your point,
14       was sensationalized.  I mean, I think
15       everyone knew about it.  But is there any way
16       that the Committee can be notified in the
17       event that there's subtle price increases?
18       So every manufacturer is probably going to
19       increase their drug, you know, to some
20       extent, you know, at the end of the year.
21            But for things that are anomalies, for
22       example, doxycycline on the generic side,
23       that was one.  You know, I don't know.  If we
24       just pick a number and just say, "Hey, if a
25       drug increased by 50 percent," or something
```

Def_000331705

1        of that nature, can we just be notified so we

2        could, you know, keep an eye with it?

3            DR. BORGERT:  The thing about that and --

4        yes.  The answer is yes.  But we actually at

5        Magellan -- since this kind of has starting

6        to be -- we have a process where we actually

7        get a weekly report of generic price

8        increases that have increased more than --

9        there's a cutoff.  I think it's 10 percent or

10       something.

11           But what typically happens is there's

12       multiple NDCs for generics, and only some of

13       the manufacturers have increased their price

14       dramatically.  But there are still other NDCs

15       on the market that haven't increased so

16       dramatically.  And so we look at what percent

17       of our utilization was the product that --

18       product increase and spend a lot or the

19       others to know whether or not we need to take

20       some action.

21           So I think the thing that made this

22       situation so unique was there was only one

23       manufacturer.  But I agree that we can --

24       because we are already doing it.  We're

25       already monitor -- Magellan's already

Def_000331706

```
 1      monitoring that in terms of across the board
 2      if there is very few manufacturers or if all
 3      the manufacturers of a product or both, let's
 4      say.  Most manufacturers have had a similar
 5      increase, then that would be something that
 6      we could bring.  Would that be okay?
 7           DR. ALLEN:  Yeah.  I think that would be
 8      great.
 9           DR. BORGERT:  Because I think there a lot
10      that do have these dramatic price increases,
11      but in most cases what we're finding is that
12      there are other manufacturers, other NDCs
13      that are available that haven't increased
14      their price.  So as an aggregate the price of
15      that drug hasn't bumped up so much.
16           Dr. Olson, were you going to say
17      something?  Okay.  So I will -- I took down
18      that 50 percent and I will make a note about
19      that and we'll bring that back if we find
20      that.  Okay.
21           The Committee also asked us to look at
22      top therapeutic classes by claims count and
23      by total spend.  And so, again, this is
24      Fee-for-service.  I think it's probably --
25      the numbers are probably different, but I
```

Def_000331707

1       think overall similar in terms of placement

2       with claims count; anticonvulsants,

3       antipsychotics, narcotic analgesics, SSRIs,

4       beta-androgenics, NSAIDs, Penicillins, anti-

5       anxiety, and second generation

6       antihistamines.

7            So the Committee hasn't done a lot with

8       anticonvulsants, but certainly we've done a

9       lot with antipsychotics, and certainly we've

10      done a lot with narcotic analgesics.  But in

11      terms of number -- just sheer number of

12      claims, this is what the top ten basically

13      looks like.

14           THE CHAIRPERSON:  Do we have any edits in

15      place for maximum daily dosage of

16      anticonvulsants?  Have we looked at that

17      data --

18           DR. BORGERT:  Susan -- I don't know.

19           THE CHAIRPERSON:  -- for package inserts,

20      can we do that?

21           DR. BORGERT:  Not off the top of my head

22      if we have a limitation on anticonvulsants.

23      I don't know.  Let's pick one.

24           DR. WILLIAMS:  Yes, we do.

25           THE CHAIRPERSON:  Can you talk into the

Def_000331708

1       mic?

2               DR. ALLEN:  Yeah.  We have one Lamictal.

3       I don't know if it's across the board.  But

4       there's a few on fee.

5               DR. BORGERT:  We can look at that.  I

6       mean, we can look at PDL preferred

7       anticonvulsants and we can look at all of

8       them and see --

9               THE CHAIRPERSON:  Maximum daily dosage.

10              DR. BORGERT:  -- how many of them have

11      maximum daily dosages on them.  We can do

12      that, yeah.

13              DR. ZITTELLO:  I'd also be curious to the

14      diagnoses here.

15              THE CHAIRPERSON:  Yeah.  Because we use

16      it for neuropathic pain.

17              DR. BORGERT:  Right.  Progesic is used

18      for, you know, all different kind of

19      psychiatric.

20              THE CHAIRPERSON:  Migraines.  We use it a

21      lot of them.

22              DR. BORGERT:  So it is hard to them pin

23      down how many of them have --

24              DR. ZITTELLO:  And they might be on it

25      for long term and it might not make any

Def_000331709

1      difference and things like that.

2          DR. BORGERT:  So maybe look at how many

3      of them we can actually find a diagnosis of

4      epilepsy on file for, or just look at what

5      the diagnosis is.

6          THE CHAIRPERSON:  I'm not even sure if it

7      would make -- I mean, just look at what --

8      those are important things.  I mean, we use

9      anticonvulsants.  But I think it's -- I mean,

10     in terms of protecting the safety making sure

11     that the maximum daily dose doesn't exceed

12     the number that it's indicated for, package

13     inserting.  I think that would be -- because

14     we have so many uses of anticonvulsants.

15         So bring back the data on the multiple

16     uses is one thing, but I think it's the

17     safety issue and poly -- I don't know if we

18     can do polypharmacy or a drug -- you know,

19     the paid for interactions, that's rejected at

20     the point of sale.  We had an edit in there

21     at one point on that.

22         Any other ideas?

23         DR. ROMAY:  Currently anticonvulsants are

24     on AutoPA, correct, so it looks back for a

25     diagnosis?

Def_000331710

1            DR. BORGERT:  That's correct.  For the

2      branded products.  The generics I think they

3      go through --

4            THE CHAIRPERSON:  They're preferred.

5            DR. BORGERT:  Yeah, they're preferred and

6      they go through the AutoPA.

7            DR. ROMAY:  Because I mean I'm concerned

8      like topiramate, for example, that's being

9      used for obesity, for weight loss.  So that

10     would be something to look at to see if those

11     people are truly have the right diagnosis

12     because we don't cover it.

13           THE CHAIRPERSON:  Which drug was used --

14           DR. ROMAY:  Topiramate, Topamax.  Yeah,

15     it's also in combination with another -- with

16     phentermine as well.  So, I mean, when it

17     comes in like that, I mean obviously it

18     doesn't get paid, but...

19           DR. BORGERT:  I'm aware of that.  So is

20     there an edit on the combination of

21     topiramate and phentermine?

22           DR. ROMAY:  I'm not sure about that.

23           MS. ELLIOTT:  Well, if the indication is

24     weight-loss, it's not --

25           DR. BORGERT:  Well, I don't think it's an

Def_000331711

1        FDA approved indication.  But I don't think

2        we're looking for the -- I'm not aware if we

3        looked at the combo, but...

4            THE CHAIRPERSON:  I don't think it's

5        mentioned on our preferred drug list.

6            DR. BORGERT:  No, it's not.  No, no, no.

7            THE CHAIRPERSON:  But if they filled a

8        claim, you could look at that.  But it

9        wouldn't have been filled --

10           DR. BORGERT:  We wouldn't have.

11           THE CHAIRPERSON:  -- so how can you do

12       it?

13           DR. BORGERT:  Yeah.

14           THE CHAIRPERSON:  And then looking at the

15       SSRIs, do we have maximum daily doses for

16       adults as well?  You knows we have --

17           DR. BORGERT:  Yes.  Yes, we did maximum

18       daily doses of antidepressants for adults I

19       think within the past calendar year we might

20       have done that.

21           THE CHAIRPERSON:  I think it was

22       children.

23           DR. BORGERT:  We've had children for a

24       long time.  But we did adults just this past

25       year, uh-huh.

Def_000331712

1        THE CHAIRPERSON:  All right.

2        DR. BORGERT:  And then the other way to

3    look at the data is by total paid out.  The

4    antihemophiliac factors are not going to be

5    an issue for the MCOs because those are

6    carved out to Fee-for-service.  But, again,

7    you can see it kind of mirrors the number of

8    claims in terms of anticonvulsants,

9    antipsychotics.  Insulins, which we're

10   actively working on.  Orally inhaled

11   glucocorticoids.  Attention deficit disorder

12   drugs, which we we've worked a lot on in this

13   Committee and has some new edits in place on

14   those.

15       THE CHAIRPERSON:  We don't use them.

16   It's not approved for adults over -- Medicaid

17   doesn't cover it for adults over 18?

18       DR. BORGERT:  No.  We do.  We do.  We

19   just have -- but we did put in those maximum

20   daily dose limits on the adults for the ADHD

21   drugs.  But we do cover it.

22       THE CHAIRPERSON:  And then the last one

23   is antineoplastic systemic enzyme inhibitors.

24       DR. BORGERT:  I think that's like Gleevec

25   type of thing in that -- for CNL.

Def_000331713

1          THE CHAIRPERSON:  We had an edit or a

2     safety --

3          DR. BORGERT:  Yeah.  We have it across

4     the board on all oral oncology -- anytime you

5     have a new oral oncology agent that comes on

6     -- I mean, they're not preferred, but we

7     still put quantity limits on them based on

8     the fact --

9          THE CHAIRPERSON:  Yes.

10          DR. BORGERT:  -- it's right when they hit

11     the market.

12          THE CHAIRPERSON:  Yeah, we did last year

13     and it worked out fine.

14          DR. BORGERT:  Yes.  And we continually

15     update that.  We had like seven new oral

16     oncology drugs in 2015, and we added all

17     those to that edit.

18          THE CHAIRPERSON:  And I don't see in

19     terms of the HIV drugs in here.

20          DR. BORGERT:  Yeah.  Interestingly or

21     not.  I guess it's the era of generics.  I

22     don't know.  More of the HIV drugs are

23     available generically.  So from a total cost

24     standpoint, they're not --

25          DR. ROMAY:  I'm curious to know about the

Def_000331714

1  human growth factor, the human growth

2  hormones, did that make the list, because

3  that was -- I think that was -- last time it

4  was up for review.

5    DR. BORGERT:  It was up for review

6  yesterday.  No.  When I'll pulled the data,

7  it didn't show up.  But I'll go back and look

8  at where it falls.

9    DR. ROMAY:  But I think that would

10  probably make the list because that's

11  their -- it's up for utilization.

12    THE CHAIRPERSON:  Yeah.  That had a prior

13  auth on that.

14    DR. ROMAY:  Well, it has an AutoPA on it

15  just to check the diagnosis, but...

16    THE CHAIRPERSON:  Right.

17    MS. ELLIOTT:  Which --

18    DR. BORGERT:  I'll pull it and I'll find

19  out where it falls in the scheme.

20    MS. ELLIOTT:  Yeah.  Just to follow-up in

21  P&T on the human growth hormone, it was voted

22  to keep Genotropin and Saizen as preferred,

23  but it's going to be a ClinicalPA for all.

24    DR. ROMAY:  Okay.

25    MS. ELLIOTT:  And -- are you going to

Def_000331715

```
 1     bring that up?
 2          DR. BORGERT:  Yeah.  You're right.  I
 3     skipped that.  I somehow missed that on P&T
 4     review.  They did -- P&T did request that DUR
 5     look specifically at idiopathic short stature
 6     syndrome.  And it's really -- it's kind of
 7     going to be difficult because one of the
 8     preferred products has an FDA approved
 9     indication for that.  And we're pretty much
10     mandated to cover FDA approved indications,
11     so if that's going to be a preferred product.
12          And the point that was made at P&T is
13     well there are other drugs that are preferred
14     and had an FDA approved indication that --
15     so, for instance, they mentioned, you know,
16     like the PAH drugs, but we don't cover them
17     for erectile disfunction.
18          So they were looking at -- you know, the
19     question to the DUR -- that they wanted to
20     bring to the DUR Board was, you know, is that
21     -- is idiopathic short stature, does it fall
22     sort of into that box?  And, you know, it's
23     sort of an Agency decision as well.
24          But, you know, I don't know, it's gray.
25     I'm not even sure how we'll tackle it, but
```

Def_000331716

```
1        I'm certainly open to thoughts and ideas of
2        the DUR Board surrounding that issue.
3            DR. ROMAY:  I mean, I think personally --
4        not personally.  I think from a standpoint
5        of, you know, making sure that that person
6        has proper -- you know, initial work up for a
7        growth hormone to see to make sure that they
8        really do meet -- because a lot of little
9        patients we have a short stature obviously
10       fail their stimulation test.
11           I mean, they way are over the 10 mark.
12       So we need to look to see to make sure that
13       they didn't get an adequate follow up.
14       Because I know for a fact a lot of members
15       are just seeking these drugs for -- you know,
16       because they want to be at a particular
17       parental or maternal height.  And obviously
18       if that's not there genetically, really it's
19       hard to kind of base the need for that member
20       to use that drug.
21           So we just want to make sure that those
22       people are adequately being -- they truly
23       need the drug and they have -- and the
24       idiopathic short stature that's something, as
25       you say, is very gray.  Because, you know,
```

```
 1        you don't want to not give them therapy, but
 2        you also want to make sure what truly is
 3        happening.  Is the IDF level, you know,
 4        really low?  Is it really showing that
 5        they're are at -- you know, division at IDF.
 6            DR. BORGERT:  So what you're saying is
 7        that perhaps with putting a ClinicalPA on the
 8        class and really looking -- you know, having,
 9        you know, a pharmacist review those tests and
10        that sort of thing that maybe will sort of
11        take care of the problem.  At least somewhat
12        address the issue.
13            DR. MARTORANA:  Right.  Because we review
14        a lot -- to Dr. Romay's comment that you get
15        these requests and they come in.  And
16        genetically, you know, mom's 4'11", dad's
17        5'1", and their mid parental height is
18        5-foot, and they're on track to be 5'2", and
19        all of a sudden you're getting a request for
20        the growth hormone.  You know, what are you
21        trying to do?  You know, it's obvious that
22        the kid is genetically predisposed and
23        unfortunately he's got short parents.
24            DR. ROMAY:  And a lot of times they're
25        growth velocity is going to be right there.
```

Def_000331718

```
 1        It's, you know, on track to get them where

 2        they're going to be.  So even looking at

 3        their growth velocity and looking at their

 4        bone age to see to make sure that they really

 5        truly two standard deviations below the norm.

 6            DR. BORGERT:  Well,  I think then it

 7        sounds to me like maybe what we should do

 8        here at the DUR Board is, we will bring back

 9        to you all the ClinicalPA data -- the

10        specifics of the ClinicalPA that get

11        designed.  And then we will do a pre and

12        post.  And we'll look at the diagnosis mix,

13        and we'll also just look at overall

14        utilization and we'll kind of see what impact

15        that had on it.  So I think that's probably

16        the way the DUR Board should go at this

17        point.

18            MS. ELLIOTT:  Yes.  And this has been a

19        topic on every single meeting that we've had

20        with the plans, is the tightening of the

21        criteria for the human growth hormones,

22        specifically ISS.  So we -- I told them

23        yesterday that we're going to bring it to the

24        Board, we're going to look at parameters so

25        it's not going to be open access like it is
```

Def_000331719

1     right now, or at least that's the goal.

2          DR. BORGERT:  So we should have those

3     parameters developed by the April meeting of

4     the DUR Board and we'll bring that back for

5     the DUR Board to review and comment on.

6          THE CHAIRPERSON:  Good.

7          DR. BORGERT:  Any other comments about

8     the topic of classes?

9          THE CHAIRPERSON:  I think we streamlined

10     everything.

11          DR. BORGERT:  We're going to revisit

12     growth hormone.  Okay.

13          Another question that was asked the last

14     time was about the PCSK-9 inhibitors,

15     Praluent and Repatha.  So my hyperlink is not

16     working.  You know why?  Because I'm not on

17     the Internet.

18          THE CHAIRPERSON:  The package insert has

19     parameters in place for most of these drugs.

20          DR. BORGERT:  Right, right.  So in -- to

21     cut to the chase, we really have had very

22     little uptake with these medications I think

23     is really what the Committee was interested

24     in asking.

25          We've had zero inquiries regarding

Def_000331720

```
 1       Praluent.  And we have had, you know, a total
 2       of seven inquiries regarding Repatha.  None
 3       of which -- none were approve and two were
 4       denied.  So I don't know if the MCOs are
 5       seeing some of sort of the same thing, but
 6       that's what we're seeing in Fee-for-service
 7       is little uptake.
 8            DR. ROMAY:  I just want to go back.  I
 9       don't know if we can go back, but looking to
10       the oral oncology I mentioned that these are
11       up and coming -- the updates?
12            DR. BORGERT:  Correct.
13            DR. ROMAY:  Are you looking to update
14       also continuation of therapy criteria?
15       Because there are, you know, some parameters
16       that we do feel that the members should be
17       hitting to make sure that the drug is really
18       actually working, that there's no progression
19       of disease.  So looking at markers -- not
20       really markers, but looking at, you know PD-1
21       analysis for different types of drugs,
22       especially for the Opdivo and things like
23       that.  I know Opdivo is a medical benefit,
24       but there's other drugs out there as well
25       that have -- you know, looking at those
```

Def_000331721

1          particular parameters to make sure that those

2          drugs are actually really working?

3              DR. BORGERT:  I'm trying to think of an

4          example, because actually I'm board certified

5          in oncology, so that's kind of my wheelhouse.

6          I'm trying to think of an example of --

7              DR. ROMAY:  Like for instance it's the --

8          like the Revlimids and things like that that

9          you're looking for particular, you know,

10         molecular remission.

11             DR. BORGERT:  Right, right, right.  Yeah.

12         I think we do have that for the most part in

13         our continuation of therapy criteria.  Again,

14         like I said, we do get a list of all FDA

15         changes every week.  So if there is some

16         change in, you know, the recommendation, we

17         will -- we do update criteria and address

18         that.

19             I have to go back and look at it across

20         the board.  But off the top of my head I

21         can't really think -- I mean, a lot of the

22         drugs are -- you know, you look at the

23         biomarker up front before you put them on.

24         You know, whatever, there's several of them.

25         You know, whether it's a EGFR or -- all the

Def_000331722

1        TPIs basically that you look for that.

2              And, you know, now there's several new --

3        like if you failed Revlimid and now there's

4        two other alternatives.  So, you know,

5        looking for that factor up front.  But in

6        terms of continuation of therapy --

7              DR. ROMAY:  So it we would be running

8        kind of restaging to make sure that there's a

9        continuous progression up towards becoming,

10       you know, in remission or destroying some

11       kind of -- because we don't want to -- these

12       drugs are very expensive to be put on.  And

13       at lot of times if there's resistance,

14       members don't respond and they have to

15       changed to another agent.

16             So where do you kind of make sure that

17       the patient is really truly on continuation?

18       Because the least we want to do is not

19       approve it, obviously we want to make sure

20       that that person gets clinically -- you know,

21       clinically stable.

22             THE CHAIRPERSON:  So the prior

23       authorization, is that done annually with the

24       submission of data by the oncologist or --

25             DR. BORGERT:  Typically the length of

1           approval varies between three and six months

2           for oral oncology agents and then they have

3           to resubmit for a --

4                DR. ROMAY:  And that's how we do it.  We

5           do it on a three to six month basis just to

6           make sure that there is that response.

7                DR. BORGERT:  Right.

8                DR. ROMAY:  But where there's really no

9           continuation of therapy criteria to go by and

10          we're just looking on submission, there's

11          really -- some of them do, but not all of

12          them do.

13               DR. BORGERT:  Right, right.  You know, I

14          think maybe the other maybe catch 22 you

15          could run into there is, patients who are

16          terminal or, you know, have an incurable

17          disease a lot of times they will continue on

18          therapy just until they have clinical

19          progression.

20               You know, they're not scanning these

21          patients all the time, they're not doing all

22          that sort of stuff because -- I mean, what's

23          the point, really.  There's nothing more to

24          offer them and they have an incurable

25          disease, so they're basically just going to

Def_000331724

1    continue on the drug until, you know, it's

2    obvious that they have clinical symptoms of

3    progression, so...  I don't know.

4        But I can go back and look at that and

5    see if there's anything that we need to

6    tighten up there.  And maybe we can talk up

7    on some other specific examples --

8        DR. ROMAY:  Sure.

9        DR. BORGERT:  -- that we can take a look

10   at.

11       DR. ROMAY:  Sure.

12       THE CHAIRPERSON:  Very good.  And as far

13   as the question for -- on this request for

14   the PCSK-9 inhibitors, we don't have a prior

15   auth -- I mean, it says here "prior auth

16   request."  I mean --

17       DR. BORGERT:  We have prior auth criteria

18   established.  And I'm sorry, I forgot to get

19   online so that my hyperlinks would work.  I

20   had a hyperlink to the ACHA website, but I

21   forgot that I needed to get online to access

22   that.  So I'm sorry about that.

23       DR. MARTORANA:  That is probably one we

24   want to bring in.  I mean, there's care

25   numbers on requests, denials, and approvals

Def_000331725

1       and we are starting to see some pressure from

2       that.

3           DR. BORGERT:  And, you know, basically

4       the same type of thing with CF therapies

5       which the Committee asked about, both which

6       is Kalydeco and Orkambi.  And, again, my

7       hyperlinks, I'm sorry.  I was going to show

8       you the specific criteria.

9           But for those of you who aren't familiar

10      with these medications, these are CF patients

11      who have a specific mutation that has to be

12      identified in order to qualify to receive

13      these therapies.  Like I know with Orkambi

14      it's the 508 -- they have to have homozygous

15      F508 for a patient or something like that.

16          So they have very specific criteria in

17      terms of which CF patients and the mutations

18      that they have that would respond to these

19      drugs.  So that's the basis of the criteria

20      is making sure that these --

21          THE CHAIRPERSON:  Or, yeah, the failure

22      at regular statins with the combination.

23          DR. BORGERT:  For the PCSK-9s, right,

24      that's part of the FDA labeling is that they

25      have -- they're on maximally tolerated statin

Def_000331726

1    therapy.

2         THE CHAIRPERSON:  Along with bococizumab

3    as well.

4         DR. BORGERT:  I think bococizumab is in

5    our criteria for --

6         THE CHAIRPERSON:  And that's on our

7    preferred drug list as well?

8         DR. BORGERT:  Yes, yes.

9         DR. CHAIRPERSON:  So that would satisfy

10   that.

11        DR. BORGERT:  With the CF meds, we are

12   having more uptake with those.  We have

13   approved five Orkambi requests and six

14   Kalydeco requests in calendar year 2015, and

15   that's just what we saw in Fee-for-service.

16   So, again, that might be something that the

17   MCOs want look at their utilization and see

18   if it mirrors what we're seeing in -- we did

19   not deny any requests for those two drugs.

20   So it seems like when they're requesting it,

21   it's appropriate.  You know, they're

22   requesting it for the appropriate patients.

23        We have had some discussions with outside

24   groups regarding a few nuances to the

25   criteria that we're evaluating changing, but

Def_000331727

1       for right now we haven't denied anybody based

2       on our current criteria.  So it would be hard

3       to make the argument that our criteria are

4       too restrictive.

5           DR. ROMAY:  Can I just go back to -- I

6       know you mentioned at the beginning of our

7       meeting today that Tobi was now -- it's now

8       PDL, so there's no criteria to follow in

9       terms of having a sputum culture or anything

10      of that nature?

11          DR. BORGERT:  We do have, don't we?

12          MS. ELLIOTT:  AutoPA.

13          DR. BORGERT:  Oh, AutoPA.  It's going to

14      be AutoPA.

15          DR. ROMAY:  It's going to AutoPA.  So

16      it's not going to require any.

17          DR. BORGERT:  Right.  All right.  That's

18      all of the information that was requested for

19      this quarter.

20          So just moving on to proposed topics for

21      next quarter.  I'll talk about what I've

22      heard and then we'll open it up for the

23      Committee members to make suggestions.

24          What I heard last time was talking about,

25      you know, looking into some of the asthma

Def_000331728

1          quality measures.  Having this Board look

2          into some of the asthma quality measure.  You

3          know, kind of a springboard conversation from

4          the Pulmicort conversation.

5               And so looking a little bit into what

6          those quality measures are, percent days

7          covered for inhaled corticosteroids in

8          patients with a diagnosis with persistent

9          asthma.  Percent based covered for long-

10         acting beta agonists in patients with a

11         diagnosis of persistent asthma.  Those were

12         two quality measures that are recommended for

13         asthma.  Another -- and then those obviously

14         are evaluating adherence.

15              And then an asthma -- something called an

16         asthma medication ratio, is the recommended

17         asthma quality measure.  And that is the

18         percentage of patients with persistent asthma

19         who had a ratio of controller meds to total

20         asthma meds of greater than 0.5 or greater.

21              So, you know, basically that these

22         patients aren't just being treated with

23         short-acting beta agonists symptomatically.

24         That they're on underlying therapy, you know,

25         corticosteroids, first line, to manage it if

1          they have a diagnosis of persistent asthma.

2               And one of the nice things about the

3          ICD-10s it does break out asthma by mild,

4          moderate, and severe, persistent -- and it

5          specifically talks about persistent asthma.

6          So we can hone in on those patients that have

7          persistent asthma as opposed to exercise

8          induced asthma or things like that.  So I

9          think we can identify that population and

10         look at one or all of those quality measures

11         surrounding asthma if anybody is interested

12         in doing that.

13              THE CHAIRPERSON:  Well, the other thing

14         when you look at this data sometimes the

15         leukotriene inhibitors are also used to

16         measure inhaled corticosteroids.  So I think

17         I would add that drug in there because a lot

18         of -- some patients can't coordinate and some

19         of them are intolerant due to thrush or side

20         effects, you know.

21              DR. BORGERT:  Right, right.

22              THE CHAIRPERSON:  Some of the things that

23         we see --

24              DR. BORGERT:  Right.

25              THE CHAIRPERSON:  -- that may or may not

Def_000331730

1     be on there.

2          DR. BORGERT:  And since we're going to

3     narrow it down to the persistent asthma

4     population, I think we can do that.  I mean,

5     in the past we've struggled a little bit with

6     that because so many people are on it for

7     seasonal rhinitis or that sort of thing with

8     Singular.  But we're going to just

9     specifically look at the persistent asthma

10    patients.  So, yeah, we'll look at the

11    leukotriene anti-agonists.

12         DR. ZITTELLO:  Based on the quality

13    measures it's a controller medication it's

14    considered so we do need to look at that.

15         DR. BORGERT:  Okay.

16         DR. OLSON:  And I think we asked last

17    time, can we tie this into ER visits or

18    hospital admission data?

19         DR. BORGERT:  I will do my best.

20         THE CHAIRPERSON:  Admissions or visits

21    period?  Because I think there's more visits.

22         DR. OLSON:  Well, I think tied into ER --

23    yeah, well --

24         THE CHAIRPERSON:  ER visits.

25         DR. OLSON:  Yeah.

Def_000331731

```
 1          DR. BORGERT:  Well, with hospital
 2     admissions we do have the ability usually to
 3     get an admitting diagnosis.  So, you know, we
 4     can look at hospital admissions specifically
 5     with an admitting diagnosis of asthma
 6     exacerbation or whatever the terminology is.
 7     So we can do that.
 8          DR. OLSON:  That would be great, yeah.
 9          DR. BORGERT:  We can do that.
10          THE CHAIRPERSON:  Any other proposed
11     topic?  We have anticonvulsants, we talked
12     about that.
13          DR. BORGERT:  Right, right.
14          DR. ROMAY:  I wanted to bring also, I
15     know we've talked about this a lot in the
16     past, the antipsychotics.  We continuously
17     see a huge epidemic of multi-pharmacy on
18     those agents.  We see people on three
19     atypicals, which is very frightening to see
20     that going on.
21          And it's really -- it's a hard sell when
22     you reach out to that physician and try to,
23     you know, kind of understand what the therapy
24     is.  And it's just very hard to, you know,
25     break down that door and try to get them back
```

Def_000331732

1        down to at least a single agent.

2               So there's a lot of mishandling of those.

3        So I just want to see if maybe we can hone in

4        on that a little bit more details on that.

5               THE CHAIRPERSON:  I thought we had an

6        edit in place for that already.

7               DR. BORGERT:  We do.  I'm trying remember

8        what the antipsychotic polypharmacy edit is.

9               DR. ROMAY:  Yeah, it is.  But I just

10        continue to see requests come through for

11        that, for PA.  And so --

12               DR. BORGERT:  Yeah.  Susan, I think

13        that's -- I agree, I think that's the issue.

14        I think the edit hasn't actually been -- it's

15        Fee-for-service, yet it hasn't actually been

16        programmed or implemented now.  MCOs were --

17               DR. ROMAY:  We have.  We have in our

18        local plan and we started seeing a huge

19        influx, you know, of those members on two or

20        more.

21               DR. BORGERT:  So how does your edit work?

22        Doe sit stop -- you know --

23               DR. ROMAY:  It will message out.  You

24        know, but still we're seeing these physicians

25        adamant about having them on three.  So it's

Def_000331733

     1     hard to kind of -- from an educational
     2     standpoint to get them to --
     3          THE CHAIRPERSON:  And what's the
     4     justification on the prior auth?  What are
     5     they writing on there?
     6          DR. ROMAY:  They're member is stable and
     7     they understand that the member been there --
     8     you know, haven't been to the hospital,
     9     there's no decompensation.  So it's kind of
    10     hard.  But I think it's very dangerous to
    11     have a member on three of those.
    12          THE CHAIRPERSON:  Are they maxed out
    13     doses?
    14          DR. ROMAY:  Yeah, pretty much.  I mean,
    15     we have a psychiatrist that we run them by,
    16     but still it's just very hard to kind of
    17     address that behavior.
    18          DR. BORGERT:  You know, in the pediatric
    19     population obviously we have USF on board
    20     that helps us with that, but with the adult
    21     population we don't have that luxury.
    22          DR. ROMAY:  Yeah.  Inappropriate use too
    23     they use the Seroquel Extended -- Immediate
    24     Release for sleep which really doesn't have
    25     that indication.  So that's another one they

Def_000331734

1      add in there as kind of an adjunct to --

2            THE CHAIRPERSON:  We had looked at that a

3      few years back.

4            DR. BORGERT:  Okay.  Any other

5      suggestions.  Dr. Allen?

6            DR. ALLEN:  Sure.  I just wanted to say

7      thank you this morning for running a very

8      thorough and efficient meeting here.  I think

9      we're getting out on record time.

10           I just wanted to ask if we could take a

11     look at Prevacid Solu Tab?  After I'm looking

12     at the data, the Q3 data.  I noticed that

13     the -- certainly from an economic

14     perspective, the cost of Prevacid Solu Tab

15     actually, you know, is more than Prevacid, or

16     omeprazole, pantoprazole combined.  And I

17     think we're at about 2500 claims for Q3.

18           And I guess my question would be, are

19     there that -- certainly with this Medicaid

20     population there's going to be a lot of kids.

21     But are there that many patients that

22     actually need the solu tab?  So for

23     Zollinger-Ellison Syndrome, I mean, right,

24     there is a -- I don't think there's a closed

25     window on it.  But the FDA indicates and

Def_000331735

```
 1      generally supports 8 to 12 weeks and then it
 2      can be stopped.
 3           So I mean, after a review of the data
 4      perhaps there's an opportunity to implement
 5      an edit to stop it.
 6           DR. BORGERT:  We can look at the age
 7      group.  We have an age limit, I think.  But
 8      we can look at age group.  And also if we
 9      kind find out if the have a G-tube or
10      something like that.  Because I think in that
11      population that drug gets used in that
12      population too.  But we can try to look into
13      that and just look at what the utilization
14      picture looks like.
15           DR. ALLEN:  And second in here is
16      Bromfed DM.  It certainly it doesn't have the
17      same economic impact of Prevacid Solu Tabs,
18      but I noticed that there's -- obviously
19      there's a generic for the Bromfed DM cough
20      syrup, and we had about -- close to about 200
21      claims in Q3 for the brand.  So I can't
22      imagine why 200 people would have to use the
23      brand, but I might be missing something.
24           MS. ELLIOTT:  I'm sorry, Moses, what was
25      the drug?
```

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

1           DR. ALLEN:  Bromfed DM, B-r-o-m-f-e-d.

2           DR. BORGERT:  That wasn't one of the ones

3      they had the recall on recently, was it?

4           DR. ALLEN:  It might be.

5           DR. BORGERT:  There was a recall on cough

6      syrups, so...

7           DR. ROMAY:  Was it probably Cardec DM?

8           DR. BORGERT:  I'm sorry?

9           DR. ROMAY:  Maybe the Cardec DM?

10          DR. BORGERT:  It was on the

11     manufacturers.  I think it had to do with the

12     unit dose cups not being accurate so that's

13     they were worried about that.

14          DR. ALLEN:  Because the Q3 compares as to

15     generic from a utilization standpoint is at

16     29.28, and the brand is at 1.87 or something.

17     So it's not going to break the bank or

18     anything, but just something to keep an eye

19     on.

20          And, lastly, from me I promise.

21          DR. BORGERT:  That's fine.  It's good to

22     have input.

23          DR. ALLEN:  Just from a OTC standpoint,

24     so just right practically all over the

25     non-sedating antihistamines are now on the

Def_000331737

```
 1        PDL, the desloratadine, the loratadine,

 2        et cetera.  And I was just asking, is that

 3        the same approach with the Board or should

 4        the Board consider it the same approach with

 5        PPIs, of course Nexium and Prevacid and

 6        whatever else is over-the-counter now?  And I

 7        just want know if there was ever an

 8        opportunity to do an economical comparison to

 9        see if it may be beneficial to have those

10        products on the OTC?

11            DR. BORGERT:  You know, I think we can

12        take that back to provider Synergis and ask

13        them that question and bring you back what we

14        find out.

15            THE CHAIRPERSON:  That's a recent update

16        to the formulary because that wasn't on there

17        a while ago.  It was taken off and back on in

18        terms of the Prevacid.

19            DR. OLSON:  You know, tying into that, I

20        know last meeting talked about even the

21        acetaminophen over-the-counter and those

22        products as well.  Did we ever -- did that

23        go anywhere?

24            DR. BORGERT:  Remind me.

25            DR. OLSON:  We talked about the Medicaid
```

Def_000331738

```
 1      approving pain for acetaminophen, or pain for

 2      ibuprofen.

 3           DR. BORGERT:  Oh, yes.  I'm glad you

 4      brought that up.  Yes, thank you.  Yes, we

 5      did do that.  For children under six.  There

 6      are now acetaminophen products available on

 7      the PDL for children under six, specifically

 8      for -- to address the codeine issue.  The

 9      removal of codeine approval in children under

10      the age of six, there's now acetaminophen

11      available and ibuprofen as well.

12           DR. OLSON:  Still with a prescription

13      under six they can get it?

14           DR. BORGERT:  Yes, yes, yes.

15           DR. OLSON:  Was that --

16           THE CHAIRPERSON:  Do you remember when

17      that went in, Arlene?

18           DR. OLSON:  -- communicated out?

19           THE CHAIRPERSON:  I got the letter a

20      month ago, right.

21           DR. BORGERT:  Yeah.

22           DR. OLSON:  Did you?

23           DR. BORGERT:  Yeah.

24           DR. OLSON:  The providers got a letter on

25      that one?
```

Def_000331739

```
1            DR. BORGERT:  Yeah.  Well, it surrounded
2       the whole coding thing and in there it
3       mentioned the fact that -- it was actually a
4       banner message.  It was a banner message, not
5       a provider letter.  I misspoke.
6            But if you go and look up on the banner
7       messages, you'll see it.  And as part of that
8       whole coding thing they have availability of
9       acetaminophen for children under the age of
10      six.
11           Just to follow-up on that, I don't know
12      if anybody saw that the FDA Pulmonary
13      Advisory Committee recently refuted it.  And
14      I think where it's going is, I think they're
15      going to restrict it in anybody under 18, but
16      we'll see.  I mean, they really -- they
17      recommended really, really narrow.  So I
18      guess we're a little bit ahead of the curve
19      in terms of --
20           THE CHAIRPERSON:  I actually looked at --
21      when you put it in the -- I actually looked
22      it up and I'm like "what?"
23           DR. BORGERT:  Yeah.  So --
24           THE CHAIRPERSON:  Very good.  Any other
25      input or any other --
```

Def_000331740

```
 1            DR. ROMAY:  I wanted to just mention
 2       opioid antagonist the naloxones and that type
 3       of drugs.  I just wanted to know if there's
 4       -- I know we want to, you know, have
 5       access -- our members have access to that
 6       drug, but right now currently it has a
 7       ClinicalPA but it doesn't really -- the
 8       criteria doesn't really allude to any kind of
 9       like what's required from the prescriber in
10       terms of how the drug screen should be
11       reported.
12            Right now a lot of times we have
13       self-reporting from the doctors, and it's
14       really kind of hard sometimes to really
15       truly, you know, interpret whether it's
16       really coming from the doctor's office or
17       it's just -- because it's kind of like,
18       "yes," "no," you know, the check off here or
19       the check off there.  And we find out over
20       the course of time that sometimes those
21       patients come back positive for, you know,
22       either ecstasy or heroin.
23            So it kind of leads me to believe that a
24       lot of times I don't know how true those
25       results are coming from the physician.  So I
```

Def_000331741

1        don't know if we can mandate some kind of

2        like -- it's okay to do a random drug screen,

3        obviously, if they come in and you want to do

4        a random drug screen in the office.  But

5        really they should be utilizing an outside

6        lab to actually really do the analysis.

7            DR. BORGERT:  And you want to see the

8        drug screen as part of their continuation for

9        therapy.

10           DR. ROMAY:  Exactly.  Right.  Versus it

11       just being a checkmark on bupropion or -- you

12       know.  Because a lot of times we get requests

13       back that the members even negative to

14       bupropion.  So what are they doing?  Are they

15       selling it -- you know, that's a red flag for

16       us.  I mean, obviously those get denied, but

17       truly to get an accurate result from a lab

18       versus just a regular "yes/no" checkmark grid

19       would be maybe something that we may want to

20       consider just to substantiate the

21       justification for the PA.

22           MS. ELLIOTT:  So you're saying follow the

23       condition with -- the checkmark with

24       documentation?

25           DR. ROMAY:  Right.  Or actually have the

Def_000331742

1    actual lab either from LabCorp or from --

2    showing the actual drug screen showing that

3    they're negative for all these things.

4        DR. WILLIAMS:  With them Fee-for-service

5    they already look at those labs.

6        DR. ROMAY:  Yeah, but I don't know for --

7    I don't know for -- when we see RPAs we get a

8    lot of physicians just sending in that little

9    grid that just says -- they check off "yes"

10    on or "no" positive or negative.  But it's

11    not truly an actual lab analysis report

12    coming back from either LabCorp or, you know,

13    from Quest.

14        DR. WILLIAMS:  That's a requirement with

15    them Fee-for-service.  If they don't have

16    that lab attached, they'll ask for it.

17    They'll send it back and say send us the

18    labs.

19        DR. ROMAY:  Right.  But I don't think

20    it's defined on the actual forms that we have

21    now that it actually has to truly be from a

22    lab.

23        DR. BORGERT:  Okay.  I will -- Susan,

24    I'll delve into exactly the procedure for

25    Fee-for-service and maybe look into updating

Def_000331743

1      that PA form to reflect that requirement.

2            DR. ROMAY:  Great.  Thank you.

3            DR. MARTORANA:  But that could just be a

4      qualitative -- quantitative lab result.

5            DR. BORGERT:  Right.

6            DR. WILLIAMS:  On the PA form under the

7      requirements it says that they have to send

8      in the random drug screens.  It's listed.

9            DR. ROMAY:  As well?

10           DR. WILLIAMS:  Yeah.  It's under the

11     prescriber's signature.

12           DR. ROMAY:  Right.  But we get those

13     random drug screens but we actually don't get

14     the -- they should be supplementing with an

15     actual -- they should be sending out the drug

16     screen out.

17           DR. WILLIAMS:  So you want to request --

18           DR. ROMAY:  I just want to --

19           DR. WILLIAMS:  -- the labs, not --

20           DR. ROMAY:  Right.  Just to make sure

21     that it's, you know, an adequate result

22     versus an in office.

23           MS. ELLIOTT:  Do you have a

24     recommendation of how often you would like to

25     see the random test?

Def_000331744

1          DR. ROMAY:  I would -- I mean, random I

2     guess is something as it is random.  So I

3     don't know if you want to do it -- I think it

4     depends on how that member has been in the

5     past.  If they have a history or relapse, I

6     would do it more often, and so maybe every

7     three months.  I don't know.

8          DR. BORGERT:  We can look into that.  Any

9     other requests, suggestions?  I think it's a

10    good idea like you guys were talking about

11    where possible to follow up with, you know,

12    how much the MCO data looks like the

13    Fee-for-service data and that's something

14    that we can consider here.

15         DR. MARTORANA:  Just I guess the last

16    time, the anticonvulsants we'll be bringing

17    that back when we have the individual

18    products, so are at least the top 5 or 10 in

19    that class?

20         DR. BORGERT:  Okay.  We can do that.

21         DR. ROMAY:  Just to add, in terms of like

22    I know we mentioned having the MCOs bring

23    back utilization data.  Are we going to get

24    like some kind of follow-up e-mail stating

25    what exactly is required of us so we can

1       bring it to the next meeting?

2             MS. ELLIOTT:  No.  We're going to run

3       that utilization.  If we get in a bind, then

4       we'll contact you.

5             DR. ROMAY:  Okay got you.  Thank you.

6             THE CHAIRPERSON:  Okay.  Does that close

7       that topic?  Any other suggestions?  Very

8       good.

9             Then next on our agenda is -- we had open

10      discussion.

11            And next would be public comment.  Do we

12      have anyone from the audience that wishes to

13      comment?  No.  Very well.

14            Vern our next meeting?

15            MR. HAMILTON:  Wow.  You all have really

16      moved fast this morning.  It's hard for me to

17      keep up.  I'm still asleep.  You will note --

18      and I have already sent to all of you -- the

19      schedule for the remainder of the year.  But

20      I think I put on the list that -- to be

21      announced on the location you will notice

22      that we are moving these meetings to the

23      Tampa Hilton over on Lois Avenue, and that's

24      where we will be meeting for the April, June,

25      and September, I have contracts in place for

Def_000331746

1      the Hilton.  And we're looking forward to

2      that.  They have been very accommodating to

3      our meetings.  And I think the facilities

4      will be very nice there.  If you're not

5      familiar with that location, it's not

6      terribly far from here.

7           THE CHAIRPERSON:  Just for the record,

8      the June meeting date is --

9           MR. HAMILTON:  The weekend of -- is it

10     June 17th and 18th?  I believe that's

11     correct.  The 17th is a Friday for P&T and

12     the 18th is a Saturday for DUR.

13          THE CHAIRPERSON:  And September's meeting

14     date?

15          MR. HAMILTON:  The last weekend of that

16     month.  Is that the 25th and 26th?  No?

17          MS. SMITH:  It's the 23rd and 24th.

18          MR. HAMILTON:  23rd and 24th.

19          MS. SMITH:  The last day of the month is

20     Friday the 30th.

21          MR. HAMILTON:  So September 24th is a

22     Saturday.

23          MS. SMITH:  Yes.

24          MR. HAMILTON:  But I sent all that to you

25     in the e-mail previously.

Def_000331747

1          THE CHAIRPERSON:  Very good.

2          MR. HAMILTON:  Because you all are such

3     busy professionals, and we have not done it

4     this way in the past, I'm going to be working

5     to try to secure for a whole calendar year at

6     a time.  We've not done that traditionally

7     here before, but it's getting more and more

8     difficult to secure a location and the dates

9     that we need for these meetings here in

10     Tampa.  And it helps you, I believe, in

11     planning your calendar for these meetings.

12     So hopefully by around late August, early

13     September I will try to secure the dates for

14     2017.

15          THE CHAIRPERSON:  Very good.  Thank you.

16          MR. HAMILTON:  Any questions?  I think

17     you noticed I passed out a new travel form.

18     Christine Freeman is no longer in our unit

19     and is not processing those, so we're moving

20     to a new form that the bureau prefers.  And

21     it's just a guideline for sending those.

22     You'll still use me to send those in and I

23     will give them to another person now who will

24     be processing them.  I'm sorry I don't

25     process your travel.  But any questions that

```
 1      come up, please send me an e-mail and I will
 2      follow up.  I don't follow them unless I hear
 3      from you.
 4          So I'm sorry about that, but I will be as
 5      communicative as possible in the processing
 6      of those.
 7          THE CHAIRPERSON:  Thank you, Vern.  Thank
 8      you, Rebecca.  And thank you everyone for
 9      serving and taking the time out of you busy
10      Saturdays.  I'd like to make a motion to
11      adjourn.
12          DR. ALLEN:  Second.
13          DR. MARTORANA:  Second.
14          THE CHAIRPERSON:  Very good.  Thank you.
15          (WHEREUPON, the DUR Board Meeting
16      adjourned at 10:55 a.m.)
17
18
19
20
21
22
23
24
25
```

Def_000331749

```
1                       CERTIFICATE OF REPORTER

2

3

4    STATE OF FLORIDA           :

5    COUNTY OF HILLSBOROUGH      :

6

7

8         I, Jacqueline L. Reichert, Court Reporter,
9    Notary Public in and for the State of Florida

10        DO HEREBY CERTIFY that I was present at the
     foregoing proceedings at the time and place set forth
11   in the caption thereof; that I was authorized to and
     did stenographically report the foregoing
12   proceedings; and that the foregoing pages constitute
     a true and complete computer-aided transcript of my
13   original stenographic notes to the best of my
     knowledge, skill and ability.
14
          IN WITNESS WHEREOF, I have hereunto set my hand
15   at Tampa, Hillsborough County, Florida this 26th day
     of January 2016.
16

17

18

19

20                    _____
21                    JACQUELINE L. REICHERT
                      Notary Public, State of Florida
22                    Commission No. EE 160968
                      Expires 3/27/2016
23

24
```

Def_000331750