DRUG UTILIZATION REVIEW BOARD


Agency For Health Care Administration

Tampa Marriott Westshore

Thursday, March 23, 2017

2:08 - 4:18 p.m.


REPORTED BY:

JUANITA ANNETTE BUTLER
INTEGRA REPORTING GROUP, LLC
Stenographic Court Reporter
Notary Public, State of Florida


INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

Def_000434874

APPEARANCES:

BOARD MEMBERS:

    Moses Allen, Pharm. D. (Vice-Chair)(Acting Chair)
    Larry Field, D.O.
    Vanessa Goodnow, Pharm D.
    Anna Hayden, D.O.
    Kevin Olson, Pharm.D.
    Alfred Romay, Pharm.D.
    Luis Saenz, D.O.
    Amy Zitiello, D.O.

AHCA STAFF:

    Shevaun Harris, Assistant Deputy Secretary
      Medicaid Policy & Quality
    Kevin Dewar, Esquire, Assistant General Counsel
    Vern Hamilton, AHCA Liaison
    Arlene Elliott, R.Ph.,
      Medicaid Pharmacy Policy Administrator
    Sara Craig, Pharm.D., Senior Pharmacist

MAGELLAN MEDICAID ADMINISTRATION:

    Elboni Moore, Pharm.D.
    Selika Sampson, Pharm.D.
    Stephanie McGriff, Pharm.D.

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

Def_000434875

I N D E X

| | PAGE |
|---|---|
| Greetings and Introductions | 4 |
| Opening Remarks | 4 |
| Approval of DUR Minutes from January 12, 2017 | 8 |
| Review of P&T Minutes | 8 |
| Quarterly DUR Activity Reports | 9 |
| Public Comment | 67 |
| Adjournment | 110 |
| Reporter's Certification | 111 |

INTEGRA REPORTING GROUP, LLC
Tampa, FL   (813) 868-5130

Def_000434876

4

```
 1                P R O C E E D I N G S
 2          THE CHAIRPERSON:  The time is now 2:02 and
 3     we'll be starting our First Quarter AHCA DUR
 4     Meeting.  For those of you who are AHCA DUR
 5     geeks, this is actually the first quarter
 6     meeting, even though it's the second meeting of
 7     the year, because the fourth quarter meeting
 8     was held in January.
 9          All right.  Before we get started, we're
10     going to have opening remarks from our deputy
11     secretary, Shevaun Harris.
12          MS. HARRIS:  Good afternoon, board members
13     and audience members.  Thank you for taking
14     time out of your busy schedules to participate
15     in this board meeting to assist the agency.
16          I have just two updates for you.  We are
17     in the process of working on the re-procurement
18     of our statewide Medicaid Managed Care program.
19     For those of you who follow what's going on in
20     managed care, I wanted to let you know about
21     that.  We plan to issue our solicitation over
22     the summer, so keep an eye out for that.
23          The agency has put out an invitation for
24     any interested parties to let us know of their
25     interest and we received quite a bit of
```

Def_000434877

5

```
1        feedback.  And if you're interested in the
2        results of that, it's posted on our website.
3        We can get that out to the board members if
4        they're not quite sure where the link is on our
5        website or what page it's posted on on our
6        website.
7             The other thing, I think probably Arlene
8        gave you updates at the last meeting.  But if
9        you're not aware, we have solidified our
10       leadership team at the agency.  Our secretary,
11       Justin Senior, was appointed by the governor.
12       He moved out of an interim role in January, I
13       believe.  And Beth Kidder, my supervisor, was
14       named Medicaid director for the state of
15       Florida.  And I was recently promoted to
16       assistant deputy secretary for Medicaid Policy
17       & Quality.
18            So my position as bureau chief over
19       Medicaid Policy is vacant.  I'm working to fill
20       that position and hope to still participate in
21       these meetings as frequently as possible, but
22       you probably won't see me as much as you have
23       in the past.
24            We are in the middle of a legislative
25       session.  I will note that, too.  The agency is
```

Def_000434878

1       tracking quite a bit of activity that's

2       happening.  We've had several bills filed that,

3       if enacted, would impact our Medicaid Managed

4       Care program.  Some activity around pharmacies

5       and how our health plans contract with

6       pharmacies as well.  So the agency is just

7       really tracking, at this point, how those bills

8       are working their way through the committee

9       process.  And when we meet in June, we will be

10      able to give you an update of any bills that

11      passed that have any major impacts on the

12      Medicaid program, in particular, our prescribed

13      drugs benefit.

14          Any questions for me?

15          Thanks.

16          THE CHAIRPERSON:  Outstanding.  And

17      congratulations on the promotion.  I think at

18      this time, since we know who you are, I'd like

19      to go ahead and have introductions for the

20      remainder of the committee, starting with

21      Stephanie.

22          DR. MCGRIFF:  Good afternoon, everyone.

23      I'm Stephanie McGriff.  And I'm clinical

24      account manager for Magellan Health Services.

25          DR. SAMPSON:  Good evening.  I'm Selika

Def_000434879

1       Sampson, and I serve as the DUR pharmacist for

2       Magellan Healthcare.

3            DR. MOORE:  Good afternoon.  I'm Elboni

4       Moore.  I'm with Magellan and I'm the pharmacy

5       account executive.

6            MS. ELLIOTT:  Arlene Elliott with AHCA

7       Pharmacy Policy.

8            DR. CRAIG:  Good evening -- or good

9       afternoon.  I'm Sara Craig and I'm a senior

10      pharmacist with the Agency of Healthcare

11      Administration.

12           MR. HAMILTON:  I'm Vern Hamilton with the

13      agency.  I serve as the liaison for these

14      meetings.

15           MR. DEWAR:  Kevin Dewar, Medicaid counsel,

16      Agency for Healthcare Administration.

17           THE CHAIRPERSON:  Moses Allen, director of

18      pharmacy, Magellan Complete Care.

19           DR. FIELD:  Larry Field, practicing

20      physician.

21           DR. GOODNOW:  Vanessa Goodnow, director of

22      pharmacy services at Jackson Memorial Hospital

23      in Miami, Florida.

24           DR. HAYDEN:  My name is Anna Hayden.  I'm

25      a family practitioner in Ft. Lauderdale,

Def_000434880

1      Florida.

2           DR. OLSON:  Kevin Olson, pharmacist out of

3      Tampa, Florida.

4           DR. ROMAY:  Alfred Romay, director of

5      pharmacy, Molina Healthcare of Florida.

6           DR. SAENZ:  Luis Saenz, medical director

7      of Molina.

8           DR. ZITIELLO:  Amy Zitiello, pediatrician

9      and medical director of Avalon Healthcare

10     Solutions.

11          THE CHAIRPERSON:  Great.  Okay.  We're

12     going to go ahead and jump right into the

13     agenda.  As always, our stenographer does a

14     great job of preparing the minutes.  At this

15     point, I'd like to ask the committee to review,

16     and if it meets your approval, I'll need the

17     motion to approve.

18          DR. HAYDEN:  Motion to approve.

19          DR. FIELD:  Second.

20          THE CHAIRPERSON:  It's been properly moved

21     and seconded.  All those in favor, please say

22     aye.

23          THE COMMITTEE:  Aye.

24          THE CHAIRPERSON:  All right.  Moving on.

25          Review of the P&T minutes, as we know,

Def_000434881

1       this item is for information only, so we don't

2       need an actual vote.  So at this time, I just

3       wanted to ask if there are any questions or

4       concerns with those minutes.

5           Great.  Hearing none.  We're going to go

6       ahead and move on to the Quarterly DUR Activity

7       Reports.  And at this point, we'll hand it over

8       to Selika and Elboni.

9           DR. SAMPSON:  Good afternoon.  Without any

10      further delay, we're going to move right into

11      our review for this quarter.

12          Quick overview.  Today we are going to

13      follow up on our previous DUR items.  In

14      addition, to discuss the first quarter DUR

15      activities and also decide on second quarter,

16      2017, DUR activities.

17          The first topic is Growth Hormone.  This

18      was a top therapeutic class review, previously

19      reviewed at the January 2016 DUR meeting.  The

20      data at that time was fourth quarter 2015 data.

21      And what we had to do here was follow up on

22      that report due to the auto PA logic being --

23      the auto PA logic for preferred growth hormone

24      products diagnosis verification was removed

25      from the fee-for-service side, March 2014, 2016

Def_000434882

1   and the post-implementation data was shared at

2   the June 2016 meeting.

3       The post-implementation data, once that

4   was removed, you have the clinical PAs that

5   were reviewed for April 1st, 2016 through June

6   30, 2016, and, at that time, it revealed a fill

7   of $3 million total amount paid over 817 claims

8   for 354 users.  So there you can see the

9   decrease.

10       And on the MCO side, due to implementation

11   for the MCOs, when that happened for them,

12   their numbers remained steady.  They got more

13   recipients during this time as well.

14       Our next topic, Vesicare, Toviaz, minimum

15   age limit of 18 years old.  The purpose of this

16   review was to address the misuse of long-acting

17   agents in the pediatric population.  The added

18   details are as follows:  Vesicare and Toviaz

19   are not indicated in children.  Recipients must

20   be at least 18 years or older for either of

21   those two products, and claims for Vesicare and

22   Toviaz are directed to the preferred

23   alternatives for children.

24       The fee-for-service and MCO utilization

25   has significantly decreased 64 percent and 84

Def_000434883

1     percent, respectively, 78 percent decrease

2     collectively.

3          The prior authorization intervention for

4     pediatric recipients under the age of 18 years

5     is working.  There were 54 claims at roughly

6     $15,000 and also 58 claims for $16,000 on the

7     MCO side.

8          Now, we'll take a look at the breakout for

9     Toviaz.  The pre-edit for children under 18

10    years of age for fee-for-service, it was a

11    small population, but, again, the reason why

12    the edit was done was because it's not

13    indicated for children under 18.

14         And so, you can see there, again, that the

15    intervention is working.  Utilization has

16    decreased overall.  Relatively 60 percent for

17    the fee-for-service and 76 percent for the MCO.

18         And when we take a look at Vesicare, that

19    agent, again, you have a smaller population.

20    Fee-for-service, overall utilization decreased

21    relatively about 66 percent and MCO relatively

22    about 83 percent.

23         Now, during the January 2017 P&T meeting,

24    the PT committee recommended for the DUR board

25    to review vasopressin receptor antagonists.  At

Def_000434884

1     that time, they asked for DUR to review it due

2     to current utilization.  And so, we took a

3     deeper look into this particular class.

4          Vasopressin receptor antagonists are used

5     to treat hypovolemic and euvolemic

6     hyponatremia.  So overall, it helps recipients

7     with diseased states, such as hyponatremia as

8     well as hypovolemia.

9          The population reviewed was a small

10    population on the fee-for-service side.  There

11    was only one prior authorization done during

12    the review period, January 2016 through June

13    of -- I'm sorry, that should have been

14    December.  It was a whole year.  There was only

15    one PA on the fee-for-service side.  And on the

16    MCO side, for that entire, the claims total

17    $239,861.

18         Currently, Florida Medicaid does have

19    criteria for the oral product that is

20    available.

21         Vaprisol is the other agent in this class

22    that is available and it does not currently

23    have criteria.  The P&T committee, at that

24    time, wanted the DUR board to review the class

25    in its totality.  So currently you have one

Def_000434885

1       agent which is available and there is clinical

2       criteria available.  And then you have another

3       agent in which we do not have any criteria at

4       this time.

5            Our next topic that we're following up on,

6       the opiate dependents treatments, agonists and

7       antagonists.  During the P&T committee for

8       January 2017, the committee desired for the DUR

9       board to determine how fee-for-service and MCO

10      recipients were utilizing the medication

11      Subutex, buprenorphine, the single agent

12      medication.  Did the recipients have a

13      pregnancy diagnosis in addition to their need

14      for the medication?  The indication for

15      buprenorphine with naloxone, the combination

16      product, SUBOXONE, versus the single agent

17      product, Subutex, preferred for maintenance

18      therapy in medication assistance treatment

19      patients.

20           The World Health Organization recommends

21      buprenorphine mono therapy without naloxone for

22      women who must receive an opioid agonist during

23      pregnancy or while nursing.

24           So this came back to the DUR board due to

25      the high utilization of the single agents

Def_000434886

1        medication and they wanted to know, Well, do

2        these recipients have a diagnosis of pregnancy,

3        which would mean they should more likely get

4        this particular medication versus the

5        combination product?  The utilization revealed

6        only 14 percent of the fee-for-service claims

7        have a diagnosis for pregnancy or nursing.  And

8        only 23 percent of the recipients reviewed --

9        of the MCO recipients have a diagnosis for

10       pregnancy or nursing.

11            Now, we might add that each claim does not

12       come with a diagnosis attached to it.  So we

13       have to do a two-year look-back from the study

14       period.  Both fee-for-service and MCO data was

15       reviewed for October 1st through December 31st

16       of 2016 within those respective populations.

17            THE CHAIRPERSON:  I have a question.

18            So this is good information.  Obviously,

19       looking at this from a resolution standpoint,

20       would it be possible to take a look at a gender

21       edit for this?  I think I would be curious to

22       know if some of the non-pregnant members that

23       received the Subutex, if they were men.  If

24       that were women -- at least the scenario that I

25       picture in my mind is, a member comes on

Def_000434887

1    board -- let's just say it's January and the
2    member is pregnant January.  I think if I
3    recall, it's a six-month approval that you
4    generally give this agent.
5         DR. SAMPSON:  Roughly.  It varied.
6         THE CHAIRPERSON:  So the PA comes in for
7    review again at Month 6.  Then you approve it
8    for another six months and they could, in
9    theory, fall into this non-pregnancy category,
10   which -- I mean, it is what it is.  If they're
11   a woman.  But if they're a man, they shouldn't
12   be on it at all.  I mean, I can't think of a
13   reason why a male would need to be on the
14   Subutex.
15        DR. SAMPSON:  Right.  Other than them
16   stating they have some type of reaction --
17        THE CHAIRPERSON:  To Latoxin, right.
18        DR. SAMPSON:  Right.  And so, when we --
19        DR. HAYDEN:  Selika?
20        DR. SAMPSON:  Yes.
21        DR. HAYDEN:  Isn't that another indication
22   for induction, so that could --
23        DR. SAMPSON:  Right.  That could be it
24   too.  Correct.  They have both of those there.
25   And what I was going to say is Florida Medicaid

Def_000434888

```
 1        fee-for-service side, they do look at all
 2        aspects of that for the indication.  And if it
 3        is a female, then she must also have any proof
 4        there, if she falls out of the other category,
 5        that she is either pregnant or nursing.
 6            THE CHAIRPERSON:  So just to make sure
 7        that I'm clear:  On the actual PA, we're fine
 8        with this one, or are we taking
 9        recommendations?
10            DR. SAMPSON:  At this point, when you look
11        at the data, the fee-for-service side actually
12        had lower utilization in that population.
13        Whereby, the Subutex category, if the recipient
14        was pregnant and/or nursing, the utilization
15        there for total paid was only 765 for
16        fee-for-service recipients.  And that category
17        had relatively -- the recipient numbers were
18        low there.  Whereby, when you look at it from
19        the MCO side, their total utilization there was
20        54,000.  And they had more recipients, whereby
21        it was mixed, male and female.
22            So the recommendation was to go back and
23        look at the prior authorization process because
24        both medications do require a prior
25        authorization.  And there's lower utilization
```

Def_000434889

```
 1       on the fee-for-service side.  So it would be

 2       back in the hands of the MCOs.

 3            The next topic was the Narcan naloxone

 4       product.  Again, another P&T activity.  During

 5       the January 2017 meeting, the P&T committee

 6       asked for the DUR board to establish quantity

 7       limits and criteria for Narcan nasal spray.

 8       The indication for Narcan nasal spray.  It is

 9       an emergency treatment of known or suspected

10       opiate overdose as manifested by, of course,

11       respiratory and/or central nervous system

12       depression.  The current quantity limit set is

13       one pack, two nasal sprays every 365 days.

14       That was established as the quantity limit.

15       Subsequent treatment would require a prior

16       authorization at this time.

17            We did take a look, in terms of

18       utilization, during a year period and there was

19       little to no utilization on both

20       fee-for-service and MCO sides.  So, as it

21       stands, the quantity limit that's currently set

22       is one pack, two nasal sprays, every 365 for

23       Florida Medicaid recipients.

24            Our last follow-up prior to going into

25       quarterly activity information is the gender
```

Def_000434890

18

```
 1        dysphoria.  This was a third quarter add-on

 2        agenda item that the state presented.

 3            And, at this time, I will turn it over to

 4        Ms. Elliott.

 5            MS. ELLIOTT:  So in the last meeting, we

 6        distributed the criteria and we were going to

 7        bring it back to this meeting to see if the DUR

 8        members had any recommendations.  Remember that

 9        is a special service criteria.  It's not a

10        regular criteria.  This is separate than the

11        other criteria that have FDA limitations.  So

12        this was, like we call it, a special service.

13            So I'm going to open it for discussion, if

14        I may.

15            DR. HAYDEN:  I have a question on the

16        logistics behind it.

17            So it's not a covered Florida Medicaid

18        item.  It goes under special services.  Where

19        does it come out of the, I guess, budgetary --

20        it's a separate item.  And is it in our purview

21        for Florida Medicaid to look at -- is it in our

22        scope to look at this information because it's

23        not a Florida Medicaid item?

24            MS. HARRIS:  So there are federal

25        regulations that require the agency and all
```

Def_000434891

1    State Medicaid programs to cover services that
2    are medically necessary for recipients under
3    the age of 21.  I generically call them
4    "children" even though the 18-to-20 population
5    are adults.
6        This is through the early and periodic
7    screening diagnosis and treatment regulations
8    that the federal government has established.
9    We call it EPSDT.  You might have heard us use
10   that terminology before.
11       DR. HAYDEN:  Right.
12       MS. HARRIS:  Even if something is not
13   covered under Florida Medicaid, we have to have
14   a process in place to review and determine if
15   the request is medically necessary if it's not
16   listed on our fee schedule or on our PDL.  For
17   most of our drugs, if it's not on our PDL -- or
18   for almost all drugs, if it's not on the PDL,
19   we have prior auth criterion in place.  And we
20   look at whether or not the FDA has authorized
21   it or it's authorized through one of the
22   compendia.
23       When we brought this to the DUR board, it
24   was because these drugs were being used
25   off-label.  We had requests for an off-label

Def_000434892

20

1          use of the drug, not supported by the FDA, not

2          authorized through the compendia.

3               So we needed to make sure the agency, in

4          its plans, had criteria that they could use

5          when such requests come in to ensure we were

6          reviewing it under the EPSDT guidelines.

7               So it's not about what budget line it

8          falls into or not.  It's really about making

9          sure we have solid criteria, so that we can

10          remain in compliance with the federal regs that

11          state that states need to have processes in

12          place for these outlier types of requests and

13          it doesn't happen that often with drugs.

14          Actually, in my years with Medicaid, this is

15          the first time.

16               DR. HAYDEN:  What are the medications?  I

17          guess I'm not quite familiar with the -- I

18          mean, I've heard of it.  I've seen the name

19          across -- from years of working, but, I

20          guess -- and I understand we look at it, but is

21          it in the -- logistically, is it in our scope?

22               MS. HARRIS:  Yes, it is.

23               DR. ZITIELLO:  We would just hope that

24          health plans and other people making the

25          decisions will have some sort of consistency in

Def_000434893

1       their decision making.  Because, truly, under

2       the age of 21, you should not render a decision

3       for not being a benefit.  It really needs to be

4       a medical necessity decision.  So it's just --

5       it's the consistency factor, I think, you're

6       looking for.

7              MS. HARRIS:  You said it well.  Thank you.

8              THE CHAIRPERSON:  There wasn't any

9       criteria previously, that this is being

10      introduced to take care of scenarios where --

11      essentially for the transgender situation and

12      maybe they may need hormone therapy.

13             And, essentially, you're looking for the

14      committee to take a vote, really, on this

15      initial criteria to address these issues.

16             DR. SAMPSON:  Yes.  So we brought it two

17      quarters ago.  If I'm not mistaken, the

18      committee voted on the criteria that was

19      established by the agency, but the committee

20      had a request to have the agency bring the

21      criteria back for re-review.  I don't believe

22      we've had any requests to actually use it, but

23      still we're honoring that request.

24             DR. HAYDEN:  So on the criteria itself, I

25      looked at the information that was before us,

Def_000434894

```
 1      special services criteria.  The only question I
 2      had was this language about a mental health
 3      provider.  And I wasn't quite sure what that
 4      meant.  If it was a licensed clinical social
 5      worker or a psychologist?
 6          Because actually the prescription will be
 7      coming from the endocrinologist from what I
 8      understand, not the mental health provider.
 9      Psychologists don't prescribe.  Social workers
10      doesn't prescribe.
11          MS. HARRIS:  Yes, because a part of the
12      prior auth process, the plan for the agency
13      would look to see that the individual or child
14      has an established relationship with a mental
15      health counselor, licensed clinician.  It can
16      be a LCSW or a licensed psychologist.  Because,
17      particularly with this diagnosis and condition,
18      there are a number of comorbid mental health
19      issues present, and we want to make sure that
20      those are being treated.
21          DR. HAYDEN:  I got that, yeah.  But the
22      guest of the prior auth is special services.
23      It doesn't clearly delineate who is -- it
24      doesn't say the endocrinologist is prescribing,
25      I guess.
```

Def_000434895

```
 1          MS. HARRIS:  So are you requesting that we
 2     add who is the prescriber?
 3          DR. HAYDEN:  Just a clarification.  I
 4     understand there's a clinical team, that the
 5     patient is in care, and I understand that.  But
 6     putting a mental health -- just putting those
 7     words in there gives them -- you know.  Are we
 8     giving them prescribing authority here?
 9          I mean, it's kind of confusing when I read
10     the document.  That's what I'm saying.
11          MS. HARRIS:  Okay.
12          DR. HAYDEN:  So it's just a further
13     clarification.  Because it's the
14     endocrinologist who is ultimately responsible
15     for the -- with the team approach, of course.
16          Those are the comments.  Thank you.
17          MS. HARRIS:  Thank you, Dr. Hayden.
18          DR. SAENZ:  But you still need that
19     psychologist or mental health standard because
20     part of the guidelines that were established
21     for gender dysphoria by this association, which
22     is, like, WPATH, they state that before the
23     trans -- because some of these kids may later
24     want to become full -- you know, do the gender
25     reassignment, so they still need to have this
```

Def_000434896

24

```
 1     before they get to that point.  So it should be
 2     the same hormones.  There's some counseling
 3     that needs to be involved.  So I think --
 4          DR. HAYDEN.  That is fine.  It's just that
 5     I was a little bit confused.  I wasn't sure if
 6     the psychiatrist was writing the prescription
 7     or was the endo, when I read the document and I
 8     just wanted further clarity on that.  That was
 9     it.
10          DR. ZITIELLO:  Could we say something like
11     "the appropriate prescribing provider as part
12     of the disciplinary team treating the patient,"
13     and that would cover any appropriate provider?
14          MS. HARRIS:  Yes.
15          DR. HAYDEN:  Do we make a motion for
16     approval then with the edits?  I make a motion
17     to approve the language with the language that
18     Amy -- Dr. Zitiello --
19          THE CHAIRPERSON:  Okay.  Great.  We have a
20     motion on the floor from Dr. Hayden.  Can I get
21     a second?
22          DR. ROMAY:  Second.
23          THE CHAIRPERSON:  A motion has been made
24     and properly seconded.  All those in favor say
25     aye.
```

Def_000434897

1          THE COMMITTEE:  Aye.

2          THE CHAIRPERSON:  Motion passes.

3          DR. MOORE:  I'd like to go back to the

4    vasopressin receptor antagonist, if we can.

5    There was some actionable items that the P&T

6    actually requested.  And so I think we kind of

7    missed that as we were going through the

8    review.  So I'll have Selika flip back to

9    SAMSCA.

10          There are two products in this class that

11    the P&T committee reviewed back in January, and

12    they asked for the DUR board to create some

13    criteria around these products.  And when we

14    did further review, we realized that we had

15    criteria for the oral product, but not the IV

16    Vaprisol.

17          So it would mostly kind of be a class

18    criteria at this point because there's more

19    than one agent, and that's the IV product, but

20    it's supposed to be given in the hospital.

21    It's for a hospitalized patient.

22          So I think that if you-all want to move

23    that over to, like, medical services, so it can

24    be managed on that side of the business, I

25    think that's the most logical approach.  But I

Def_000434898

1        needed to be sure that you-all were aware of

2        that and so you-all can vote for that to occur.

3            DR. ROMAY:  I think the current criteria

4        for the SAMSCA, we would just want to maybe go

5        back and look at it, see if it needs revisions.

6            DR. MOORE:  Yes.

7            DR. ROMAY:  I mean, not that I'm looking

8        to add more criteria points to it, but it's a

9        two-question criteria, so I think we might have

10       to look back to see if there's other

11       indications or anything --

12           DR. MOORE:  Absolutely.  We can do that

13       now, or do you want to take that back and then

14       review it and then let us know at the next

15       meeting or -- it's up to you-all.  What do you

16       want to do?  Your pleasure.

17           DR. FIELD:  Is it also open for any

18       physician around or specifically for a

19       nephrologist?

20           DR. MOORE:  It's open for any at this

21       time.  The SAMSCA?

22           DR. FIELD:  Yeah.

23           DR. MOORE:  Any.

24           DR. SAMPSON:  This is the current criteria

25       for the SAMSCA oral tablet, to the left, your

Def_000434899

1    left.  The recipient must be 18 years of age or

2    older.  They must have a confirmed diagnosis of

3    hyponatremia, the serum sodium level should be

4    below 125 milliequivalents per liter, or the

5    serum sodium level must be greater than or

6    equal to 125 with symptoms and resisted

7    correction with fluid restriction noted in the

8    clinical notes.  That is the current criteria.

9         DR. FIELD:  Do we have data on what

10   physicians, meaning class of physicians -- who

11   is actually writing that?  Is it nephrologists

12   already, or is it --

13        DR. SAMPSON:  We do have that data.  I can

14   provide that for you.  At this moment, I

15   wouldn't want to readily say who they are, but

16   we do have that data, yes.

17        DR. FIELD:  I'd like to see it.

18        DR. GOODNOW:  Those lab values are just

19   single numbers?  Do they require two

20   consecutive -- I think when we were talking

21   about more detailed, what we might want to

22   elaborate on is -- and we can definitely share

23   some criteria from different facilities, but

24   they may require, maybe, like, two consecutive

25   or that number being the last number that the

Def_000434900

1      patient had, as opposed to ever having a number

2      at that level.

3           So I do think some enhancement would be

4      very effective.

5           DR. ROMAY:  I agree with Dr. Goodnow.  And

6      that's what I was referring to.  Like, for the

7      second bullet point -- I mean, what's

8      "resistive correction"?  How much time frame

9      does the member have to have that low sodium

10     before it's considered, you know, chronic,

11     where intervention is needed versus just other

12     things to correct it?

13          DR. GOODNOW:  I think that this might be a

14     greater example of where the two teams can work

15     together because if the patient is initiated on

16     the inpatient side to make that process for the

17     patient a little bit more smooth.  So there

18     might be a way for the medical side and the

19     pharmacy side to work together so that the

20     patient doesn't go without during that

21     transition period, that it's a little smoother

22     for all parties involved.

23          DR. FIELD:  Do you also have the average

24     time period the patients are given the

25     medication?  Are they on it for a week?  Are

Def_000434901

29

```
 1      they on it for 30 days?  Are they on it for six
 2      months?
 3           DR. SAMPSON:  It's a short prior
 4      authorization approval for the course of
 5      therapy written.  So it's not an extended
 6      period.
 7           DR. ROMAY:  Yeah, the current criteria,
 8      it's 30 --
 9           DR. SAMPSON:  Up to --
10           DR. ROMAY:  Date of service, per
11      prescription, up to 30 days.  But there are
12      people who are on it longer.
13           DR. SAMPSON:  And they have to do another
14      prior authorization to reevaluate.
15           DR. GOODNOW:  And I think there's also
16      patients that sort of hang out with a lab --
17      like, they're just chronically at certain
18      levels and it's not affecting them.  I think
19      that the specification is a good request
20      because you don't want to hit one lab value and
21      then do the prior auth based on one level.
22           THE CHAIRPERSON:  So I think I'm going to
23      try and summarize here.  I think there's still
24      two items we have to address.
25           I think the first was Dr. Moore is asking,
```

Def_000434902

```
 1        essentially, for a vote on the Vaprisol, if we
 2        want to keep it under the pharmacy benefit or
 3        move it under the medical benefit due to the
 4        use in the hospital.
 5            So I'll ask the committee to take action
 6        on that item, if someone wants to make a
 7        motion.
 8            DR. OLSON:  Motion to move it to the
 9        medical side.
10            DR. ZITIELLO:  Second.
11            THE CHAIRPERSON:  So the motion has been
12        properly moved and second to move Vaprisol from
13        the pharmacy benefit over to the medical
14        benefit.  All those in favor of that motion
15        please say aye.
16            THE COMMITTEE:  Aye.
17            THE CHAIRPERSON:  The motion has properly
18        passed.
19            I think the next item here was
20        essentially, at least from my interpretation,
21        is to take the SAMSCA criteria back for review.
22        There, obviously, were a number of suggestions,
23        to take a look at the provider type, the time
24        frame on the sodium.  So maybe this is just me
25        being ignorant to the fact, but what I
```

```
1     understood the next step in the process would

2     be is for the committee to take those

3     recommendations back and present it at the next

4     committee meeting.

5         DR. MOORE:  So we'll certainly look up the

6     provider types for the PAs that we've received

7     from the fee-for-service side because that's

8     all that we have exposure to.  And then, the

9     date for the lab value is certainly a valid

10    concern.  And if you-all want to clearly state

11    what you would like the criteria to be and take

12    a vote upon it, we'll take it back to the

13    agency for final approval and then institute

14    it.

15        DR. ROMAY:  I think that's what we want.

16    We want to be able to have input into what the

17    criteria would look like, and then we can bring

18    it back to the agency for approval.

19        THE CHAIRPERSON:  So essentially what

20    we're saying is, we're going to take the SAMSCA

21    criteria back for review, and we'll bring our

22    suggestions back next quarter?

23        DR. ROMAY:  Correct.

24        THE CHAIRPERSON:  Okay.

25        DR. MOORE:  Okay.
```

32

```
 1              THE CHAIRPERSON:  So we don't need to vote
 2        on that?
 3              DR. MOORE:  At this time, no.  So thank
 4        you for that on Vaprisol.
 5              MS. ELLIOTT:  I want to clarify something.
 6        We will address the criteria on our side, bring
 7        it back next time and you vote on it?
 8              DR. ROMAY:  Well, we are, but we probably
 9        want to --
10              MS. ELLIOTT:  Table the whole thing?
11              DR. ROMAY:  Yeah.  We'll bring our
12        recommendations the next time, then we can vote
13        on it.
14              DR. GOODNOW:  Is it more efficient if
15        we -- can we provide, like, recommendations in
16        advance of the meeting or, like, we can maybe
17        work on a draft during the time period until
18        the next meeting and then vote it final at the
19        meeting?
20              DR. MOORE:  Yes.  It can be filtered
21        through Vern.
22              MS. ELLIOTT:  What we'll do is we will
23        email you the criteria that we have right now
24        so you can see exactly what we have.  It's
25        easier to do it that way.
```

Def_000434905

1            THE CHAIRPERSON:  Just one point of

2       clarity for Dr. Phil's request.  He actually

3       was requesting the provider type first.

4            DR. MOORE:  Yes.  We'll certainly bring

5       that back for the next meeting.  Absolutely.

6            DR. FIELD:  Well, before we give you

7       recommendations because that, perhaps, would

8       filter into a recommendation.

9            DR. MOORE:  Okay.  So we'll submit it and

10      Vern will pass it along to you.  Is that good?

11           THE CHAIRPERSON:  Okay.  So I think that

12      closes the discussion on those agents.  I think

13      we can move to quarterly activities.

14           DR. MOORE:  Yes.  I have something to say

15      before we move right into the quarterly

16      activity.

17           In the past, we had looked for some

18      congruency between the DUR and the P&T

19      committees.  Probably like a few years ago, we

20      started looking at how we can best utilize the

21      two committees together.  I think that we've

22      come leaps and bounds from where we were.

23      you-all are talking to each other very well

24      now.  But in the past, there was zero

25      communication between the two committees.

Def_000434906

1          Where we started was the P&T classes.  So
2     in the past, many drugs were open.  It was
3     almost like open access for most of the
4     classes.  And so, we said, Well, maybe we can
5     start streamlining these classes with the
6     recommendation from the DUR committee to the
7     P&T committee to kind of tighten some of these
8     classes up.
9          Each class is reviewed every year.  So
10    year after year, we're looking at the same
11    classes over and over.  And we've gotten to a
12    point where our sister team that runs the P&T
13    committee, they've done a really good job along
14    with the agency in tightening down the
15    availability of so mean products being
16    available on a PDL that we've come to a point
17    where it's probably time to just move on from
18    that approach.  That was a starting point to
19    begin conversations between the two committees.
20         While we're happy to continue to look at
21    specific classes that you-all would like to
22    look at, we're happy to do that.  But, in the
23    past, we would bring the top five classes that
24    we noticed that maybe there was some area where
25    we could tighten up the criteria or maybe the

Def_000434907

35

```
 1      preferred drug list.

 2           But like I said, the drug list is pretty

 3      well maintained at this point.  And we'd be

 4      happy to entertain specific classes if you

 5      would like to look at them.

 6           So what we're going to move into is

 7      something that we did used to do in the past,

 8      reporting the top 10 therapeutic classes from

 9      the MCO space and fee-for-service space --

10      because those are the classes where we spend

11      most of our money -- and take a look to see if

12      there are any edits or suggestions that you-all

13      would like to do within those specific classes.

14           So that's what Selika has next on the

15      docket for you to look at and I just wanted to

16      explain why those P&T classes were listed in

17      your report, but they're not in this

18      presentation.

19           So any questions on that?

20           All right.  Thank you.

21           DR. SAMPSON:  Fee-for-service top

22      therapeutic classes by total paid.  The

23      reporting period was for January 1, 2017

24      through March 1, 2017.  So here you'll find the

25      top 10.
```

Def_000434908

1           You have your agents to treat hemophilia.

2      They came in about 16 million.

3      Antiretrovirals, 6 million.  Anticonvulsants,

4      5.9 million.  Antineoplastic, 3.9 million.

5      Human Growth Hormone, 3.3 million.  Insulin

6      agents, 3 million.  Antipsychotic agents,

7      3 million.  Rheumatoid agents, 2.5. Cystic

8      Fibrosis, 2.4 million.  And Pulmozyme agents,

9      1.9 million.

10          So this is where they fall at this time.

11          THE CHAIRPERSON:  Does the

12     antiretrovirals, does that include the Hep C

13     and HIV -- AIDS together?

14          DR. SAMPSON:  That number does not.

15          THE CHAIRPERSON:  So would it just be

16     Hep C for that -- that's represented in that

17     antiretroviral class?

18          DR. SAMPSON:  One moment.

19          Yes.  The hepatitis -- I'm sorry, I

20     apologize.  It does include the hepatitis

21     agents, the Hep C agents.

22          DR. GOODNOW:  It might be nice to have the

23     number of patients and the number of scripts

24     filled so that can give us an idea of how long

25     a patient is staying in that category because I

Def_000434909

1          think that might answer some questions.

2              DR. SAMPSON:  Okay.  Thank you.  And I can

3          pull that data for you.

4              DR. GOODNOW:  For this side?

5              DR. SAMPSON:  Right.  Because the other

6          side is just the same, whereby when we pulled

7          the data, we pulled the therapeutic class in

8          addition to the total amount paid.

9              So, yes, I will pull that up for you in a

10         minute.

11             THE CHAIRPERSON:  Just one more question,

12         I guess, just for clarity.

13             DR. SAMPSON:  Sure.

14             THE CHAIRPERSON:  So on this slide it has

15         antiretrovirals, which I guess I have to assume

16         that would be HIV.  But then, on the fourth

17         column, it has HCV antiretrovirals, which --

18             DR. SAMPSON:  That one is broken up for

19         the MCOs.

20             THE CHAIRPERSON:  Gotcha.

21             DR. SAMPSON:  Two separate ones.

22             THE CHAIRPERSON:  Okay.

23             DR. SAMPSON:  That one is spelled out.

24             And we were discussing that sidebar.  Yes,

25         it's two separate numbers.

Def_000434910

1          DR. GOODNOW:  And the Anticonvulsants

2     Miscellaneous, is that just called

3     "anticonvulsants" or is it a specific -- are

4     other anticonvulsants not included?

5          DR. SAMPSON:  That number includes all.

6     Hold on one second -- and this, it is grouped

7     with all of them.  And what was your specific

8     question that you want to know so I can pull it

9     for you?

10          DR. GOODNOW:  I was just making sure that

11     the category was all anticonvulsants and not

12     just miscellaneous anticonvulsants.

13          DR. SAMPSON:  No, all.

14          DR. GOODNOW:  All?  Okay.

15          DR. SAMPSON:  And wrapping up the

16     interventions that are coming out this quarter

17     by the end of first quarter going into second

18     quarter and the third quarter, previous topics

19     that have been discussed with the DUR board:

20     Overlapping use of benzodiazepines and opiates.

21     Soft messaging to the pharmacies at the point

22     of sale.  That was previously voted on by the

23     DUR board.  This intervention would require the

24     pharmacist to enter a code as of August 31,

25     2016.  Of course, you know, the FDA issued a

Def_000434911

1      black box warning on opiate products and

2      benzodiazepine products discouraging use

3      together.

4           The September 2016 DUR board review, the

5      first quarter '16 data:  At that time, 23,000

6      fee-for-service and MCO recipients had at least

7      one overlapping claim for both products.  And

8      the end resolve was the soft messaging.  So

9      that particular intervention will deploy third

10     quarter 2017; it's projected to go into

11     production.

12          The second intervention is the Zolpidem

13     intervention.  It was discussed at the June

14     2016 and September 2016 DUR activity.  Based on

15     FDA Safety Communication published in 2013, the

16     labeled dosing for Zolpidem products now states

17     that the recommended initial dose of

18     immediate-release Zolpidem product is

19     5 milligrams for women, while the recommended

20     initial dose for extended release is 6.25

21     milligrams for women.

22          At the September meeting, the DUR board

23     voted to implement a step therapy edit.  In

24     this particular step therapy edit, it will

25     actually go across the board.  There was much

Def_000434912

1          discussion about that -- for male and female

2          recipients, whereby, before they can get higher

3          dosing, they must step through the lower

4          therapy or at least a 24-day supply must be

5          utilized before the recipient can have the

6          higher agent.  And that edit is set to deploy

7          third quarter '17.

8               The next edit intervention that's coming

9          up is the maximum daily dose of antidepressants

10         for recipients greater than or equal to six

11         years of age.  The DUR board approved

12         recommended maximum daily doses of

13         antidepressants in recipients age 6 or older.

14         That edit is set to deploy by second quarter

15         '17.

16              The tumor necrosis factor edit was

17         discussed at the September DUR meeting.  This

18         particular edit, it will prevent the use of

19         more than one TNF inhibitor and/or the use of

20         any other biologic agent that is not classified

21         as a TNF inhibitor.  It is set to deploy third

22         quarter '17.

23              Last but certainly not least, the IR

24         Before ER opiate step therapy edit.  There's

25         been much discussion on this particular topic

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

Def_000434913

41

 1      since the September DUR meeting.  The IR Before

 2      ER intervention will deploy late March.  That's

 3      the end of first quarter '17.

 4          The IR Before ER edit has been merged into

 5      one intervention that also encompasses

 6      abuse-deterrent criteria, the

 7      narcotic automated prior authorization.  The

 8      edit addresses the CDC's recommendation for

 9      recipients to receive an immediate-release

10      product before an extended-release product.

11      The abuse -- and this is all inside of your

12      written packet.  If you refer to pages 18

13      through 19, and it will take you through the

14      steps for that automation.

15          While you're looking through that or

16      thinking about that IR Before ER edit, in

17      addition to that, we included the FDA-approved

18      abuse-deterrent products and some of their

19      release dates.  Some of them are out there --

20      expected to be out there, but currently there

21      aren't any NDCs for them, so the products are

22      not available, but they're expected to be

23      available in the near future.

24          We also included the abuse-deterrent

25      formulations that are non-FDA approved just for

Def_000434914

42

```
 1        a point of information.  They have claims for

 2        having abuse deterrents, but they do not meet

 3        the FDA standard for having all of the desired

 4        properties needed.

 5            DR. MOORE:  I wanted to know if you-all

 6        had a chance to look at the abuse-deterrent

 7        edit?  The narcotic edit is what we're

 8        affectionately calling it.  But if you have any

 9        questions about it, I'm happy to answer any

10        questions that you may have.  We can step

11        through it if you would like to, specifically,

12        because I know the plans will need to

13        understand the edit.  So it's completely up to

14        you how you want to proceed.

15            DR. ROMAY:  Did we ever revisit, instead

16        of doing an automated PA setup, doing more of a

17        criteria?

18            DR. MOORE:  For the abuse deterrent?

19            DR. ROMAY:  Yeah, instead of doing an

20        automated.  I know a lot of the MCO plans don't

21        have those capabilities of adding multiple

22        steps to have a PA logic work.  So did we ever

23        look and see if, maybe, we can just convert it

24        into a criteria to make it easier to navigate

25        through it?
```

Def_000434915

1            DR. MOORE:  Right.  I think the agency is

2       okay with a manual-based PA, if you do not have

3       the capability to automate.

4            DR. ROMAY:  Yeah, that's one of our

5       challenges that we run into when we're

6       programming these things with our PBMs.  It's a

7       lot of factors and there's system limitations.

8            So I don't know if the group feels the

9       same, but I think it would work better if

10      there's a document.

11           DR. MOORE:  The criteria or the steps to

12      the automation will be provided in your weekly

13      file.  And so if your PBM is unable to automate

14      it, they can just follow the steps of the

15      automation as a paper-based or manual-based PA.

16           DR. ROMAY:  Okay.

17           DR. MOORE:  If they want to use our

18      criteria.

19           DR. ROMAY:  So are you saying --

20           DR. MOORE:  They don't have to use this --

21           DR. ROMAY:  Well, are you saying that the

22      agency is willing to just move towards, like, a

23      just regular criteria base versus this?  It's

24      just a suggestion.

25           MS. ELLIOTT:  Well, the initiative was to

Def_000434916

44

```
 1      do an auto PA to facilitate -- I mean, it
 2      prevents doctors having to send manual PAs
 3      every time.  So we're fine if your plan can do
 4      the auto PA.  You just use the same exact --
 5           DR. ROMAY:  Okay.  So we can create our
 6      own criteria based on this and --
 7           MS. ELLIOTT:  Right.
 8           DR. ROMAY:  Okay.
 9           MS. ELLIOTT:  As long as it follows
10      ours --
11           DR. ROMAY:  Fine.  Yeah.
12           MS. ELLIOTT:  -- and it's not more --
13           DR. ROMAY:  Absolutely.  Yeah.
14      Definitely.
15           THE CHAIRPERSON:  Could I make a comment?
16           I remember this topic from the last
17      meeting and, I guess, I have two concerns.
18      Let's just say, for example, Dr. Field writes a
19      prescription for morphine, right?  He comes in.
20      And even if he wants the morphine, it's going
21      to reject him.  He has to go to mData, right?
22      That's pretty much -- right?  And I get the
23      rebates and everything.
24           But let's say, for example, he can't use
25      the mData because, I don't know, he gets highs
```

Def_000434917

1          or whatever.  So now, I guess, based on the

2          wording of the criteria, and since there's no

3          other abuse-deterrent products, really, I

4          guess, from my perspective, his only recourse

5          is to go back to a non-abuse-deterrent agent,

6          right?

7              I mean, if he -- I guess, based on the way

8          the criteria is right now, if Dr. Field writes

9          for another agent, he's going to be redirected

10         to a beta, which he failed.  So I don't know if

11         there is another avenue to get to another

12         abuse-deterrent agent.

13             I don't want my personal feelings about

14         abuse-deterrent products to dictate what the

15         group does.  I personally don't agree with

16         them.  But, you know, since it's on the PDL, I

17         get it; we have to do it.  But I just think the

18         way that the criteria is set up right now, it

19         makes it very difficult for a provider who

20         actually wants their patient to be on an

21         abuse-deterrent agent.  They essentially just

22         have one choice.

23             DR. MOORE:  And we did talk about this at

24         the last meeting.  I think it was No. 5 on our

25         quarterly activities to do and it did not make

Def_000434918

    1        the cut for this meeting.

    2             But Selika and I actually talked about

    3        this extensively this week.  I think your

    4        concern was, well, what else are these patients

    5        taking?  Because you have a valid concern that

    6        if you cannot take Embeda, then what?  We were

    7        going to pull the claims for patients who may

    8        have had Embeda in their past and may not be on

    9        it today, just to see what they are taking.

   10        And that was No. 1 for our quarterly topics for

   11        next quarter.  So you did make the cut for this

   12        coming quarter.

   13             THE CHAIRPERSON:  Moving on up.

   14             DR. MOORE:  Yes.  And, absolutely, we'll

   15        address the criteria concerns at that time,

   16        what's next.  And I think that's probably where

   17        we were headed with that conversation at the

   18        last meeting, so yes.

   19             THE CHAIRPERSON:  Thank you, Dr. Moore.

   20             DR. SAMPSON:  And this graph chart should

   21        look very familiar as we continue our

   22        discussion about morphine milligram

   23        equivalents, meaning continued since September

   24        and January and now.  This chart was shared

   25        previously, whereby it is second quarter '16

                    INTEGRA REPORTING GROUP, LLC
                      Tampa, FL  (813) 868-5130

Def_000434919

```
1          data for Florida Medicaid recipients and --
2          approved fee-for-service and MCO recipients.
3               The data at that point revealed 10,383
4          fee-for-service and MCO recipients combined
5          that were receiving a cumulative 90 morphine
6          milligram equivalents per day or greater.  This
7          data did exclude recipients that had a
8          diagnosis of cancer or sickle cell or were in
9          hospice care.  At that time, the DUR board
10         voted to establish a maximum daily dose based
11         on the CDC guidelines but, at the same time,
12         they wanted to get a deeper dive into that
13         10,383 number and that's what we did.
14              So this is how the information comes back
15         for those recipients in both categories.  When
16         you look at the cumulative number, the
17         biostatistician was able to pull the data and
18         give to us where the recipients were.
19              So starting from the top, you see you have
20         a few recipients in that number that were
21         receiving a greater than or equal to 500 MMEs
22         within the review period and so on and so
23         forth.  And then the majority of the population
24         was falling somewhere at that 150 number.  So
25         greater than or equal to 150 but less than 200
```

Def_000434920

1     MMEs per day.  You were looking at about 1,600

2     recipients on both sides.

3          The most common diagnoses associated with

4     this number -- again, we cannot match claims to

5     diagnoses, but we can go back and look at a

6     two-year review period and use our knowledge

7     there to see what the ailment may have

8     been.  The top five diagnoses during that

9     period all were related to pain in some way,

10    some fashion.  Joint, limb pain, abdominal

11    pain, chest pain, back pain, other long-term

12    pain was associated with all of those claims

13    that you see there over a two-year period.

14         So, where does that leave us?  What we

15    know for sure, we know that higher dosages

16    yield higher risk.  So patients who receive

17    higher dosages of opiates have a higher risk of

18    overdose and death.  We also know that dosages

19    above 50 MME per day increase the risk for

20    overdose by at least two times.  This is data

21    that we know for sure.

22         So where do we go from here?  The

23    September 2016 DUR board voted to establish

24    that maximum daily dose guideline based on the

25    CDC's recommendation.  An intervention edit

Def_000434921

49

```
 1     released over time to reach the 90 MMEs per day
 2     is what we see currently trending across the
 3     country.  So no one is being cut off or
 4     anything of that nature.  But it's making the
 5     providers aware of what the daily amount will
 6     be and then slowly releasing those edits over
 7     time.
 8          MR. OLSON:  Do you have number of claims
 9     for MME less than 90?
10          DR. SAMPSON:  Yes, because those were the
11     numbers that we previously discussed.  I'm
12     happy to pull that up for you.  If we go back
13     to -- this slide?  This is answering your
14     question?
15          MR. OLSON:  Yeah, okay.
16          DR. SAMPSON:  Okay.  So what we have here,
17     right, that number for the 50 MMEs -- greater
18     than 50, that was a total on both sides,
19     72,000.  And then if you look at the greater
20     than or equal to 50, but less than 90, 17,000.
21          DR. GOODNOW:  And these are not unique
22     recipients?  So they are not doubled up if they
23     were fee-for-service and --
24          DR. SAMPSON:  Okay, the statistician did
25     address that.  No, she can't confirm that
```

Def_000434922

1       because sometime the patients do move.

2            Good question.

3            DR. FIELD:  Do we have an idea whether

4       those were coming out of certified pain clinics

5       or whether they were done by, again -- since

6       that dosage is quite high and normally you

7       would expect somebody who specializes in pain

8       to be writing that kind of stuff?

9            DR. SAMPSON:  Right.  We would have to go

10      back in and look specifically at those numbers.

11      But for the majority of the part, the

12      physicians were all categories, all types.  But

13      if you want to look at the ones that are

14      greater than or equal to 90 in terms of the

15      providers?

16           DR. FIELD:  Yeah, the 10,000 that may

17      be --

18           DR. GOODNOW:  And then given the top 10

19      providers of that 10,000, just to see if

20      there's a trend for higher utilization, if

21      there's a higher frequency provider in that

22      higher -- the only thing is they're oncology

23      now --

24           DR. FIELD:  Oncology was included,

25      correct?  Cancer was excluded?

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

Def_000434923

51

1              DR. MOORE:  Yes.

2              DR. FIELD:  So essentially we're talking

3        about chronic nonmalignant pain?

4              DR. MOORE:  Yes.

5              DR. FIELD:  So we already know what

6        physicians in the state have to be matched up

7        and declare that you're going to prescribe like

8        that.  I don't know how many of us have that

9        next to our license.  But in that dosage, you

10       would expect somebody to have a specialty.  If

11       it wasn't coming out of somebody with a

12       specialty, that would be kind of surprising.

13             DR. SAMPSON:  Yes, it would.

14             It was a cumulative edit, so we did it

15       over time whereby each claim, we would go in

16       and then add what would be their day because

17       they were able to fill on the 1st, and then

18       they were able to fill again on the 28th, and

19       then they were able to fill again, maybe on the

20       20th.  So we kept track of that and that's how

21       the cumulative count went.

22             DR. MOORE:  From a data perspective, we do

23       not get a provider's specialty on the claim, so

24       it's essentially impossible for us to determine

25       the specialty of the physician.

Def_000434924

```
 1            Now, for the SAMSCA -- because that's
 2       similar, what you want -- you want us to do is
 3       to look up to see if it's a nephrologist.
 4       Because it's a paper-based PA, chances are I
 5       will be able to tell if this a primary or some
 6       type of specialty clinic, so that's why I know
 7       we can probably do that.  But from products
 8       that do not require a PA or PDO and claims just
 9       pay, we won't be able to determine provider
10       type because we don't get a provider's
11       specialty.
12            DR. FIELD:  I think we had this
13       conversation before, but it goes back to an
14       NPI, and the NPI has a toxomity related to it.
15       There are ways, but it doesn't mean that we
16       have the automated system to do it.
17            DR. MOORE:  Well, we don't -- we don't
18       gather that information from our vendor.  I'm
19       sorry.
20            THE CHAIRPERSON:  So I just want to do a
21       quick temperature check.  The time is 3:05.  It
22       looks like we have two topics left, HIV and
23       Transderm Scop.  So I want to ask if anyone
24       needed a quick break here, bladder relief, or
25       do you want to push through?
```

53

```
1              THE COMMITTEE:  Push through.
2              THE CHAIRPERSON:  I agree.
3              DR. SAMPSON:  HIV polypharmacy.
4              DR. MOORE:  I want to restate the
5      actionable items so that we're clear on what
6      the request is because the homework from the
7      last meeting was to bring back a stratification
8      of the doses that were above 90 so that
9      Magellan has a corporate solution that does
10     evaluate any claims that had an MME of 90 and
11     above.  And we talked about perhaps setting
12     that threshold a little higher, and so that's
13     why we brought back the stratification.  But I
14     believe there's additional items that have come
15     forth now.
16             DR. SAMPSON:  The physician was one that
17     we were unable to do.
18             DR. MOORE:  And is that the only thing?
19             DR. ROMAY: So as I understand the
20     threshold on the MME, is the approach going to
21     be that we're going to do, like, a banner
22     message sort of thing to start it out to
23     educate the providers and then we're going
24     implement the hard edit?
25             DR. MOORE:  Sure.  We can certainly take
```

Def_000434926

54

1          that approach -- basic approach and first the

2          educational campaign about what we're going to

3          do and then move into -- honestly, because the

4          coding takes a little while to get into place.

5          So yes, I believe that's it.

6                DR. ROMAY:  So I guess we'll bring this

7          back -- we'll table this back for the next

8          go-round.

9                DR. MOORE:  Yes.

10               DR. SAMPSON:  The P&T committee requested

11         for the DUR board to look into HIV polypharmacy

12         from a stance of, they wanted to evaluate

13         recipients who are receiving multiple

14         single-agent antiretroviral therapy medication

15         versus some of the newer combination products

16         where applicable.

17               So you have two additional -- here, we

18         just created a cheat sheet that's already

19         available -- readily available on the

20         aidsinfo.org website.  And so, here, at your

21         desk, you have the FDA-approved HIV

22         medications.  And you have the class.

23         Everything from the NRTs, NNRTs, PIs, so on and

24         so forth.

25               And then, on the back of the document

Def_000434927

1      there, you also have the combination products

2      that are available, their generic name, the

3      brand name and what the combination is

4      comprised of.

5          In this particular look, as we already

6      know, the gold standard for most patients, they

7      may have two or more HIV medicines from one or

8      more drug classes.

9          So what was done?  The pharmacy claims

10     were reviewed from October 1st to December

11     31st, 2016.  Who was included?  Recipients who

12     received five or more HIV agents as single

13     agents and/or via a combination therapy.

14         We'll go deeper into how that breaks out,

15     how the data was pulled.  What we have?  We had

16     recipients on the fee-for-service side, as well

17     as the MCO side.  Some of recipients received

18     all single agents, so that means they didn't

19     have any combination therapy, whatsoever.  And

20     you see the low numbers there for

21     fee-for-service and MCO during that time

22     period.

23         Then you have a population that may have

24     had a two-agent combination, either with a

25     two-agent combination medication and then so on

Def_000434928

1     and so forth, whereby if the recipient had four

2     agents, they could have had four by two

3     combination, or a three combination plus one.

4     That's how the statistician was able to pull

5     the data back based on the drug class.  And so

6     it will make more sense when you take a look at

7     the sample.

8          To your left you have all single-agent

9     regimens.  That was for the time period

10    reviewed:  October, November, December.  And

11    then, the way the data came back for October,

12    November, December, you have a recipient there

13    that had the four or more agents, but that four

14    or more was comprised of therapy whereby it was

15    a two-combination drug and then two additional

16    or where you have one that is a four

17    combination drug and then one additional.

18         So overall, when we took even a deeper

19    dive into it, it could have been the course of

20    therapy -- the start of therapy for these

21    particular recipients, so we did not put up any

22    latent red flags that there was an issue or

23    problem.

24         Transderm Scop.  This came up as a

25    quarterly activity that the DUR board wanted to

Def_000434929

1  look into.  The first quarter data for 2017 was

2  reviewed.  The data review was October 1st

3  through December 31st.  There was a diagnosis

4  check for the past two years for the

5  FDA-approved indication for the Transderm Scop

6  patches.

7      As you know, it is indicated for nausea

8  and vomiting associated with motion sickness

9  and postoperative nausea and  vomiting.  Each

10  patch delivers 1 milligram of scopolamine over

11  a three-day period.  Only one patch should be

12  worn at any particular time.  One package

13  equals four patches.  Florida Medicaid will

14  reimburse for 10 patches every rolling 327

15  days.

16      Based on the claims, we took a look at the

17  diagnosis for a two-year period.  And what we

18  discovered was that there were at least 80

19  percent of the fee-for-service recipients and

20  27 percent of the MCO recipients, they did not

21  have a valid diagnosis for Transderm Scop

22  during that period.  Again, we cannot match

23  claims to diagnoses, but we can look back at a

24  two-year period and figure, did they have the

25  diagnosis during that said time.

Def_000434930

```
 1          DR. ZITIELLO:  Was there a look at age
 2     there since it's not approved for under 18?
 3          DR. SAMPSON:  For under 18?  Yes.  We do
 4     have the ages.  It wasn't pulled within this
 5     particular data, but we do have their age
 6     available.
 7          DR. ZITIELLO:  I think the concern was
 8     some use in nursing homes, some use like that.
 9     It's not my area, but is that correct?
10          MS. ELLIOTT:  We brought up the drooling
11     condition for nursing homes.
12          DR. MOORE:  Right.
13          DR. SAMPSON:  But when you take a look at
14     did they have the FDA-approved diagnoses, no,
15     the majority of the recipients did not.  So the
16     decision would be for you to discuss
17     considering how you would like to proceed with
18     the medication as currently preferred
19     medication, but should a diagnosis check be
20     added to the processing of the claim at the
21     point of sale.
22          MR. OLSON:  Do you have the information
23     for what the diagnoses were?  Because that
24     would help determine --
25          DR. SAMPSON:  Oh, well, again, we can't
```

Def_000434931

1        match the diagnoses to the claim.  We can take

2        a look at all that they had and it was a gamut

3        of everything that the recipients may have had.

4        But to try to narrow it down in terms of they

5        definitely had said diagnoses, off-label use --

6            DR. MOORE:  So what we did was, the

7        utilization came back.  And then we also had

8        the biostatistician pull any type of diagnosis

9        that they had on file at the time of the date

10       of service.

11           So there isn't a one-to-one comparison.

12       We have to use deductive reasoning.  So if

13       there was a diagnosis of nausea and vomiting

14       at the time of date of service, we said, Okay,

15       check, you met the criteria because we don't

16       require a diagnosis at this time.

17           So maybe that's the next step, is attach

18       the FDA-approved diagnoses to this product so

19       patients that are getting the product on that

20       date of service actually have a diagnosis -- an

21       approved diagnosis on file.

22           DR. ROMAY:  I think we cite a diagnosis as

23       other agents that the member would probably

24       benefit from using prior to Transderm Scop.  I

25       mean, they're having nausea and vomiting, any

Def_000434932

1    of the antiemetics that are currently on

2    market -- you know, decadrone, things like

3    that, or promethazine, things like that -- I

4    think we need to kind of look at those to see

5    if it's really, truly the only agent that's

6    going to be suitable to control those symptoms.

7         So maybe a PA with criteria outlining some

8    diagnoses that are preapproved, maybe an age

9    and maybe something along the lines of

10   preferred agents that should be used prior

11   to -- depending on the diagnosis.

12        DR. MOORE:  So then the next step would

13   be -- this would be a recommendation to P&T.

14   Because it is a preferred product, so it has to

15   go through that process first.  But it's good.

16   Like I said, we've come leaps and bounds.

17   We're making recommendations to the P&T

18   committee, saying, we reviewed this class.

19   It's a class coming up, I think, relatively

20   soon, and the recommendation is to move it to a

21   non-preferred status with this criteria.  So

22   that's the process.

23        If that's the route we want to go, we can

24   certainly discuss that right now.  I have to

25   check the cycle.  I think it might be up for

Def_000434933

```
 1        review in June, so we would need to discuss it.

 2            DR. GOODNOW:  The other potential is if

 3        they're also on another concomitant antiemetic.

 4        Sometimes they use, like, a multimodal

 5        approach.  So that might meet criteria if

 6        they're already on an antiemetic and they need

 7        a stronger agent.  I don't see it a lot, but

 8        theoretically perhaps some of the claim is just

 9        the multimodal approach to get them on multiple

10        products.

11            DR. ROMAY:  I think the majority of the

12        use that is currently seen with that product is

13        for vertigo.  People taking a cruise or taking

14        a long trip and doesn't want to be taking oral

15        tablets.  It's just a convenience factor a lot

16        of times, so that's where I usually see it

17        most.  I mean, there may be some scenarios

18        where either medically fragile kids who are

19        either on benz or something that their

20        secretions aren't controlled and they need to

21        suppress it with more aggressive therapy.

22            DR. MOORE:  So do you-all want to decide

23        on the level of intervention you want to do?

24        Do you want to do it as a diagnosis, attach a

25        diagnosis -- because it is referred right
```

Def_000434934

62

```
1       now -- so attach a diagnosis, or do you want to
2       take a more stringent approach and say, Hey, we
3       want make a recommendation to a non-preferred
4       status and then establish some type of
5       criteria?
6            DR. SAENZ:  What is the utilization?
7       There's a cost.  How much is it really, like,
8       driving the cost?
9            DR. ROMAY:  We had that last time.
10           DR. SAENZ:  We had that last time?
11           DR. ROMAY:  Yeah.
12           DR. SAENZ:  I forgot how much it was then.
13      I guess it must have been a lot of --
14           DR. ROMAY:  Yeah, there was a lot of funds
15      associated with that drug.  I remember.
16           DR. MOORE:  Right.  It's in the report,
17      the report that you got.
18           DR. SAENZ:  Okay.  It looks like it was a
19      lot of utilization.  Otherwise, we wouldn't
20      be --
21           DR. MOORE:  Right.  Yeah.  It was a P&T
22      class that we brought forth at the last
23      meeting.
24           DR. SAENZ:  I agree with his comments.
25           DR. ROMAY:  So I motion to move that
```

Def_000434935

     1          forward to the P&T for non-PDL with criteria.

     2              DR. HAYDEN:  There was a lot of patients

     3          on this, but was the fiscal impact great to the

     4          Florida Medicaid program as well, or is it just

     5          the number of patients on it?

     6              DR. MOORE:  I'm going to see if I can

     7          resurrect that file that we talked about at the

     8          last meeting so we can give you a point of

     9          reference.

    10              THE CHAIRPERSON:  So at this point, we

    11          have a motion on the floor.  We are going to

    12          table the motion until we get the information

    13          from Dr. Moore, and then, perhaps, a second of

    14          that motion, we'll deal with it and close out

    15          that issue.

    16              DR. ZITIELLO:  Can we also look at dual

    17          therapy with the antiemetics to Dr. Goodnow's

    18          point?  Because I would hate to hold up therapy

    19          for somebody who is getting multimodal

    20          approach.

    21              THE CHAIRPERSON:  So I think just from

    22          Robert's Rules of Order, can I ask you to

    23          rescind your motion since we have some

    24          unreadiness here?  Can you remove your motion

    25          from the floor because we have some

Def_000434936

1     unreadiness?

2          DR. ROMAY:  Sure.  I remove my motion.

3          THE CHAIRPERSON:  So you are looking up

4     information for Dr. Goodnow.

5          DR. MOORE:  Yeah, I just sent it to

6     Salika.

7          DR. ROMAY:  Wouldn't there be a DUR reject

8     that's triggered if those two antiemetics are

9     going to be delivered at the same time?

10         DR. MOORE:  It would trigger.  However, it

11    will pay if it's the same physician and same

12    pharmacy.  So if there's a different physician

13    or a different pharmacy, it will deny.  But the

14    pharmacy can override it with those service

15    intervention codes, prescriber consulted MO,

16    whatever those codes are.

17         DR. ROMAY:  Well, I think we captured that

18    intention if we do what we were going to do

19    initially.

20         DR. MOORE.  It would only stop if the

21    doctor or pharmacy are different.  Otherwise,

22    the claim would continue to process.

23         DR. ROMAY:  I just don't see that scenario

24    coming up very often.  It's very, very, very

25    infrequently where the member requires two

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

1    antiemetics to control their condition.  I

2    mean, I just don't see that.  At least in my

3    clinical practice, I haven't encountered that.

4        DR. MOORE:  Okay.  So "N" means

5    fee-for-service.  "Y" means encounter, so

6    plans.  The data was from September 1st of '16

7    through November 30th of '16.

8        DR. SAMPSON:  Fee-for-service and MCO.

9        DR. MOORE:  Yeah.  The other carrier

10    amount, that's how much the plan paid.

11        DR. ROMAY:  September?  November?

12        DR. MOORE:  September.  So all of

13    September, all of October and all of November.

14        Accounting for that, was the motion for

15    moving Transderm Scop to the non-preferred

16    status along with criteria creation, was that

17    passed?

18        THE CHAIRPERSON:  No.  We rescinded the

19    motion.  I think we had some unreadiness.  We

20    had some questions on the floor.  We have the

21    data here.  I think we need to make an informed

22    decision.

23        Do you want to restate your motion?

24        DR. ROMAY:  I would restate it, yes.  So

25    move forward to suggestion of moving it to

Def_000434938

     1        non-PDL with a criteria creation to supplement

     2        the edit.

     3             THE CHAIRPERSON:  All right.  We have a

     4        motion on the floor.

     5             DR. FIELD:  Second.

     6             THE CHAIRPERSON:  Second by Dr. Field.

     7        Ready for the question.  All those in favor say

     8        aye.

     9             THE COMMITTEE:  Aye.

    10             THE CHAIRPERSON:  Motion passes.

    11             DR. MOORE:  Thank you.

    12             Would you like to discuss the criteria?

    13        Some items that you'd like to see in the

    14        criteria?

    15             DR. ZITIELLO:  Diagnosis.

    16             DR. MOORE:  First and foremost.

    17             All right.  So I heard diagnosis.  I think

    18        I heard age somewhere.

    19             DR. ZITIELLO:  Yes, age.

    20             DR. ROMAY:  Formulate alternatives.

    21             DR. MOORE:  Okay.

    22             DR. ROMAY:  I think we can use the same

    23        concept as we did with the previous agent that

    24        we were reviewing that we were going to --

    25             THE CHAIRPERSON:  SAMSCA.

Def_000434939

1          DR. MOORE:  SAMSCA?

2          DR. ROMAY:  The SAMSCA.

3          DR. MOORE:  Okay.

4          DR. ROMAY:  So we can kind of look -- I

5     guess we can all get together and submit our

6     recommendations.

7          DR. MOORE:  Sure.  Okay.

8          We'll review those at the next meeting.

9     And I can certainly make the recommendation to

10    our sister team that runs the P&T committee to

11    move Transderm Scop to the non-preferred

12    status.  I can go ahead and make that

13    recommendation.

14          Thank you.

15          THE CHAIRPERSON:  Okay.  I think that

16    concludes our Quarterly DUR Activity Reports.

17    If I'm not mistaken, we're going have an

18    audible here to the agenda.  We have open

19    discussion next.  But it's my understanding

20    that we have some individuals in our audience

21    that would like to -- some public comments.

22          I think we're going to just go ahead move

23    right through it.

24          MS. ELLIOTT:  Oh, I thought it was the

25    report that we were going to -- okay.

Def_000434940

```
 1            MS. HARRIS:  Just roll on.
 2            THE CHAIRPERSON:  The big boss has spoken.
 3       We open the floor for public comment.  Does
 4       anyone want to step forward here for any items
 5       of discussion?
 6            I think in the Moses imaginary rule book
 7       here, after 30 seconds, we close the floor.
 8            MS. FUHR:  Hello, everyone.  We were given
 9       the opportunity to come here and speak.  My
10       name is Debbie Fuhr.  I'm with Biogen.  I'm the
11       account manager that covers Florida.
12            I'd like to just give a very high overview
13       on the new product that we just launched for
14       spinal muscular atrophy.  It's called SPINRAZA
15       or nusinersen.  I'd like to get into just a
16       little bit of the dosing, the lab tests that
17       are required, the distribution model, and then
18       I'd like to bring up Biogen's rare disease
19       reimbursement manager to come up and discuss a
20       little bit about coding, site of care issues
21       and that type of thing.  We were told that we
22       could have five minute, so we're going to fly
23       through.
24            SPINRAZA (nusinersen) is a survival motor
25       neuron 2, which is an SMN2.  It's directed
```

Def_000434941

1        antisense oligonucleotide and the first and

2        only FDA-approved therapy indicated for the

3        treatment of SMA in pediatric and adult

4        patients.

5            The efficacy and safety of SPINRAZA was

6        demonstrated in a double-blind double-sham,

7        which went as a placebo.  When it's an

8        intrathecal injection, they would, for the

9        sham-controlled, actually puncture the skin, so

10       it's the placebo equivalent for an intrathecal

11       injection, in controlled clinical trials for

12       patients with infantile onset of SMA.  And it

13       was also supported by open-label clinical

14       trials in presymptomatic and symptomatic

15       patients.

16           Of the 82 patients that were eligible for

17       this interim analysis, there was statistical

18       significant differences in the percentages of

19       patients that were able to achieve motor

20       milestones and response where patients would

21       normally not.  So that includes kick, head

22       control, rolling, sitting up, standing,

23       walking; 40 percent for the SPINRAZA-treated

24       patient versus zero in the sham-controlled.

25           And then, in addition, a greater percent

Def_000434942

```
 1        of the patients that were treated with SPINRAZA
 2        actually survived where untreated patients
 3        would not be expected to.
 4             In the open-label uncontrolled trials, let
 5        me tell you that the FDA stopped our trials.
 6        They deemed that it would unethical to keep the
 7        patients that were on placebo because of the
 8        results that they showed.  So then we have
 9        ongoing clinical trials go on.
10             Patients who were likely to develop SMA
11        Type 1, 2 or 3, achieved milestones, such as
12        the ability to walk or stand unassisted when
13        they would otherwise not be expected to do so.
14        Again, maintain motor milestones at the ages
15        when they would not be expected to do so and
16        survive to ages where they would not be
17        expected to do so.
18             I'll quickly go through the dosing again.
19        SPINRAZA is administered intrathecally by or
20        under the direction of a healthcare
21        professional experienced in performing lumbar
22        punctures.
23             It comes in a 12 milligram vial and it is
24        not weight based.  So a newborn infant would
25        get the same dose as child that would be 15.
```

Def_000434943

```
1        The dosing includes four loading doses:  Day

2        zero, 14 days after that, so Day 14, Day 28.

3        The final loading dose would be around Day 58.

4        And then, thereafter, as a maintenance dose, it

5        is once every four months.

6            The testing that needs to be done at

7        baseline and prior to each dose would be a

8        platelet count, a prothrombin time and

9        quantitative spot urine protein test.

10           The distribution model, as with rare

11       diseases, it's very common to have a limited

12       distribution model.  Accredo is the resource

13       therapy, along with CuraScript, so that's the

14       SP.  And the reason they do that is to keep the

15       handling, the storage, the distribution, and

16       the transportation all very contained so it can

17       be tracked.

18           At this time, I'd like to bring up Brenda

19       for the other two minutes and let her tell you

20       a little bit about the reimbursement and

21       coding.

22           MS. WEAVER:  Hi.  My name is Brenda

23       Weaver.  I'm a rare disease reimbursement

24       manager.

25           My qualifications include -- I'm a
```

Def_000434944

72

1    clinical nurse.  Practiced in ped ICU.  I

2    worked for Blue Cross Blue Shield in medical

3    policy in Minnesota for eight years.  And then

4    I'm also a certified holder for physicians as

5    well as for outpatient settings.

6         So some of the things that we are hearing

7    from sites, at least on SPINRAZA, are they're

8    very, very concerned.  In the rare disease

9    space, the products are very expensive.  This

10   is no exception to that rule.  And these

11   patients, they tend to congregate in MDA

12   centers.  So there's only so many MDA centers

13   around the country.  And so these institutions

14   have actually quite large populations.

15        So when you have a drug in this expensive

16   of a bracket, they simply can't afford to buy

17   and bill the product.  They just don't have the

18   budget in their pharmacy whether it's -- well,

19   these are mostly hospitals.  A physician clinic

20   certainly can't afford to buy and bill the

21   product.  So this is becoming kind of an issue

22   with payors, especially in the Medicaid space,

23   because Medicaid typically uses buy and bill as

24   a methodology.

25        So I want to just see if we can open a

Def_000434945

     1          dialogue about whether or not this product
     2          could be allowed under the specialty pharmacy
     3          benefit as well or the pharmacy benefit versus
     4          medical.  Accredo can dispense under the
     5          medical, but what we're finding out is a
     6          barrier is they need to have a letter of
     7          agreement in place with the payor.  And
     8          typically inside the payor, those letters of
     9          agreement are single case agreements or
    10          contracting.  That's going to go to a separate
    11          area in the payor, at least it did for us, a
    12          silo department.
    13              They are non-clinical in nature and so
    14          they really don't understand the urgency behind
    15          getting these contracts done quickly.  And they
    16          typically don't communicate with the medical
    17          side either.  So that's kind of an issue that
    18          we're having.
    19              I also can help you, if you need -- we can
    20          talk about this offline at some point.  But we
    21          wrote our own edits.  I wrote edits for our
    22          claim system at Blue Cross.  And I've had some
    23          Medicaid plans that have said to me, we're a
    24          little bit concerned about using the SPB
    25          benefit or the pharmacy benefit because we

Def_000434946

 1      don't want to get the pharmacy claim
 2      adjudicated and then also have a medical claim
 3      externally billed to us, which that could
 4      happen in a mistake.
 5          And so, we problem-solved and we talked
 6      about some ways to do reverse claim steps in
 7      the medical system -- in the medical payment
 8      system so that you can catch those claims.  And
 9      I can take that offline, if you have questions
10      like that.
11          Any questions that I can address?
12          MS. ELLIOTT:  I just have a comment.  This
13      is a public information.  I don't know if the
14      members know how much the drug cost or are they
15      interested?
16          DR. ZITIELLO:  I'm interested.
17          MS. WEAVER:  The price of SPINRAZA at the
18      WAC price is $125,000 per vial.  In the first
19      year, treatment for a treatment-naive patient,
20      that is going to be six doses in that first 12
21      months, $750,000 as a first-year treatment.
22      Thereafter, SPINRAZA is dosed at every four
23      months, three times a year, so that's $375,000.
24          Biogen participates in one discount
25      program that would be the Medicaid rebate

Def_000434947

1      program.  So that's another thing to consider

2      if you think about moving this over to your

3      pharmacy benefit manager.  If you produce this

4      as a pharmacy benefit, Medicaid is going to get

5      that rebate.  It's very easy to adjudicate and

6      control rebates on the pharmacy side versus on

7      the medical side when have you the institution

8      buying and billing.

9          I'm not saying that the best thing would

10     necessarily be to block this drug to just a

11     pharmacy benefit because, of course, when we

12     did our research on this population, what we

13     found, when the population is identified, they

14     typically have a commercial insurer.  Mom and

15     dad might both be working.

16         But then, when this diagnosis hits,

17     usually at least one parent ends up having to

18     stop working to take care of the needs of the

19     child.  So what happens, in about six months

20     time, these patients go onto a Medicaid --

21     either Medicaid as a primary payor or Medicaid

22     as a secondary payor.

23         If you would block this only to a pharmacy

24     benefit, then what could happen then is, if you

25     have an instance where you have a commercial

Def_000434948

1    payor as primary, Medicaid is the secondary, we

2    would still want a buy-and-bill channel or at

3    least a medical benefit channel.  Because

4    Accredo could provide the drug under the

5    medical benefit as well.  And then Medicaid

6    would just have to pick up as a secondary

7    payor, if that makes sense.

8         THE CHAIRPERSON:  I have two questions.

9    Thanks for great information.

10        Could you restate what the incidence is of

11   this order?  Forgive me if you stated that

12   before.

13        MS. WEAVER:  I did not.  The incidence is

14   approximately 3- to 400 life births per year in

15   the United States.  That doesn't mean that

16   we -- I don't know exactly what the true

17   population is, living population today.

18   There's estimates between 8 and 10,000, I

19   think, as far as live patients with SMA either

20   Types 1, 2, 3 or 4.

21        DR. ZITIELLO:  And there's very vast

22   differences between the types in spinal

23   muscular atrophy.  The one that I was brought

24   up in pediatrics understanding was type 1,

25   where I think dispensing would have some

Def_000434949

1    efficacy.

2         A little more concerned about the types 2

3    and 3 and this being implemented so soon after

4    it's approved.  There's also -- and I know this

5    very well --

6         THE CHAIRPERSON:  Would there be any

7    dosing variations?

8         DR. ZITIELLO:  Well, the studies that I

9    have read, the dosing was very different for

10   the types 2 and 3.  There wasn't a real control

11   on that.  So that's why I'm concerned.

12        MS. FUHR:  It's the same dosing.

13        And for the later onset for the SMA types

14   2 or 3, any functioning that they currently

15   have, you would want to preserve.  So if the

16   older child has the ability to move the

17   electric wheelchair, obviously, you would want

18   to save that for mobility.

19        And I do have some literature I can leave.

20   We just didn't know what the setup was here and

21   what we could do.  So I have some information

22   for you.

23        MS. WEAVER:  Type 3 is very variable as

24   far as how it presents later in life.  It can

25   be very mild weakness also.  When we're talking

Def_000434950

1      wheelchairs, those would be more severe cases.

2      The American College of Obstetrics & Gynecology

3      just this month determined that all women who

4      are pregnant and are wanting preconceptual care

5      get SMA carrier so there's probably going to be

6      recommendation of more of this disease coming

7      out.  So that's another way I see utilization

8      will increase.

9         DR. ZITIELLO:  Have you guys had an

10     opportunity to comb through your claims data,

11     by any chance, just to identify what you think

12     your patient population is for your plan?

13        MS. WEAVER:  We're the process of doing

14     that.

15        DR. ZITIELLO:  Okay.  Sidebar.  If you'd

16     like, I can help identify and narrow down those

17     diagnosis codes.

18        MS. WEAVER:  We'll take that under

19     advisement.

20        DR. HAYDEN:  I just have a question.

21     Logistically, if it goes to a pharmacy benefit

22     and it's intrathecal infusion, do the parents

23     pick it up at the pharmacy or what is the

24     process?

25        MS. WEAVER:  Good question.  That's an

Def_000434951

1        excellent question.

2              This product requires cold chain for chain

3        of custody.  So in the case of specialty

4        pharmacy procurement, Accredo Specialty

5        Pharmacy would ship from their pharmacy to the

6        hospital pharmacy.  This drug can't go in the

7        hands of a family.

8              DR. HAYDEN:  Or the infusion center.

9              MS. WEAVER:  Right.  It eventually gets to

10       the infusion center.  But typically how it

11       works, it just goes into the inpatient

12       pharmacy.  The inpatient pharmacy does all

13       their required storage and inventory and all

14       that.

15             And then, at the time of the injection,

16       then they hand it over, like, hand-walk it over

17       to the suite where the injection is being done.

18             And to the physician over here, to the

19       point of the variability, there's also a great

20       degree of variability just from an injection

21       standpoint.  You have some patients that are

22       extremely stable.  They still have good

23       respiratory support.  They're okay to be put in

24       the position for a lumbar puncture.

25             Then you have, on the end of the scale,

Def_000434952

1        somebody that might already have scoliosis,

2        growing rods, things like that, and they might

3        actually need interventional radiology.

4             I've had a very few patients injected in

5        the clinic setting because they were stable and

6        safe.  But the large majority of these are

7        requiring actual hospital outpatient services

8        for the injection.

9             And that's sort of what's coming back from

10       some of the payors, with the hospital

11       outpatient dates of service they've told me --

12       at least their CFOs have told me that their

13       payment methodologies for buy and bill tend to

14       be on a bundled rate, which is problematic if

15       we don't have a carve-out or some way to carve

16       out the price for the product if they have to

17       buy and bill.

18            So there's two reasons, really, why

19       they're really not able to buy and bill.

20       Reimbursement, that's one of them.  But then

21       also just the strain to the budget, the impact

22       to their overall pharmacy budget.

23            THE CHAIRPERSON:  Very good.  Thank you.

24            MS. HARRIS:  I just wanted to make sure

25       the board members are aware that we are

Def_000434953

```
 1      bringing forward the clinical criteria that
 2      would be utilized by the agency.  And the
 3      health plan, if they so choose, they cannot be
 4      more restrictive than the criteria that the
 5      agency adopted.  And so, if you had any
 6      additional questions for the speaker, as you
 7      contemplate the criteria that you have before
 8      you, I just wanted to make sure you are aware
 9      of that.  The drugs that we're speaking of are
10      not on our PDL and will be subject to prior
11      auth.
12          THE CHAIRPERSON:  Any additional public
13      comments?
14          MS. HANSON:  Hi.  Jill Hanson.  I just
15      wanted to add a couple of comments.
16          First, just the importance of --
17          MS. ELLIOTT:  Is it for the same drug?
18          MS. HANSON:  My first comment is.
19          MS. ELLIOTT:  Oh, okay.
20          MS. HANSON:  I just wanted to first
21      comment on SPINRAZA and just add one point for
22      our health plan.  We are in close communication
23      for the LOAs SCA process for clinical and
24      non-clinical.  So I just wanted to mention that
25      as far as covering it under medical.  Some
```

Def_000434954

          1          plans are in very close communication with that

          2          process.

          3              There's definitely a need for consistent

          4          criteria for not just this drug but other

          5          high-cost drugs that's on list, one, and the

          6          speed of getting those criteria out is

          7          important to us.  So thank you for looking at

          8          this.  We definitely appreciate the -- I guess,

          9          expediting it potentially.

         10              My last comment, I just wanted to go back

         11          to the opiate dependence discussion and the

         12          buprenorphine.  Since plans cannot be more

         13          restrictive than the criteria, I had hoped that

         14          the committee would look at the reapproval

         15          criteria for straight buprenorphine and revisit

         16          that because of the concern for overuse and

         17          misuse.

         18              So that would be my suggestion, is to

         19          revisit that reapproval criteria.

         20              Thank you.

         21              MS. ELLIOTT:  Before the next speaker

         22          comes up, I just want to make a comment.

         23              I know you-all received the draft criteria

         24          for the two products that we're talking about.

         25          I just wanted to let you know that your chair,

Def_000434955

1  Dr. Martarana, he had submitted some edits or

2  recommendations for SPINRAZA.  And I just

3  wanted to let you know that I'll pass it

4  around.  Because it was so late, I didn't have

5  time to send it.

6    Thank you.

7    MR. FERNANDEZ:  I want to thank the

8  committee for giving me a few minutes to speak

9  about another drug.  I didn't know that

10  SPINRAZA was on the agenda and I would ask to

11  say a few words about it.

12    My name is Ray Fernandez.  I'm a pediatric

13  neurologist in Tampa.  I've been in private

14  practice since forever -- since 1976, 40, 41

15  years.  As mentioned, in private practice.  I'm

16  not an expert.

17    MS. HARRIS:  Excuse me.  Can I interrupt

18  you really quickly?  So for those in the

19  audience, before you videotape or record this

20  session, you must ask the permission of members

21  of the audience.  We already have a court

22  reporter.  And once that transcription is

23  finalized, it will become a public record and

24  you can request that from the agency.  But if

25  you are going to videotape, you need to request

Def_000434956

1        permission from everyone in the audience.

2            THE CHAIRPERSON:  And can I add one

3        additional comment?

4            For most of the legacy DUR attendees, it's

5        pretty atypical to have this many public

6        comments as opposed to our sister committee.

7        The P&T committee generally grants a two-minute

8        time approval.  So I do not want this to come

9        across as a surprise to anyone, but I am

10       keeping time here -- just for organizational

11       purposes up here.

12           So if I cut you off, the intent is not to

13       be rude but just to keep time.

14           MR. FERNANDEZ:  How much time?

15           THE CHAIRPERSON:  Four minutes and 40

16       seconds left.

17           MR. FERNANDEZ:  I just want you to know,

18       I've been in private practice in Tampa since

19       1976.  I had the good fortune of having the

20       Muscular Dystrophy Association contact me 35

21       years ago.  They asked me to establish a clinic

22       in Tampa for children with muscle disease.  I

23       said, sure.  It was easy then because we did

24       not know a whole lot about it.

25           What has happened over the past 35 years

Def_000434957

```
 1        is I have gained a whole lot of experience.  I
 2        don't consider myself to be an expert, but
 3        experience is a very good teacher.
 4            I've seen diseases over time from spinal
 5        muscular atrophy and Duchenne muscular
 6        dystrophy.  Genetic advances began sometime in
 7        the '80s and they have skyrocketed since then.
 8        By mid 1980s to late 1980s, we were able to
 9        establish a diagnosis very specifically by DNA
10        or gene analysis.
11            And then to subcategorize diseases, again,
12        based on genetic analysis very specifically.
13            Spinal muscular atrophy, people have
14        mentioned types 1 through type 4.  The
15        incidence of a disease, the frequency of a
16        disease, is very tricky.  When Biogen, I
17        believe, began clinical trials for type 1 SMA,
18        we had two babies born with it within a month:
19        one in Tampa, one in St. Petersburg.  Both were
20        referred into the drug trials.  I wasn't privy
21        to what was happening so I do not know the
22        outcome of these two early treated babies.
23            But I can tell you the treatment of the
24        babies with type 1 with SPINRAZA, also called
25        nusinersen, has made a huge difference.  I
```

Def_000434958

86

1          mean, these babies died by age two years.

2               It was a diagnosis that you could spot

3          when you walked in the room.  It was a baby

4          that was hardly moving, struggling to breathe,

5          at the age of a month or earlier.  It

6          progressed rapidly.  Death within about two

7          years.  But I think treatment with SPINRAZA has

8          made a huge difference.

9               The type 2 form is milder, but it's not

10          really mild if you see it.  The type 3 form was

11          commented on.  I have two children with type 2

12          spinal muscular atrophy.  One just stopped

13          walking at the age of 10 years.  We're

14          struggling now with whether we should fuse her

15          spine now because she needs it.  Her scoliosis

16          is progressing rapidly.  Or whether we should

17          start treating her with nusinersen by spinal

18          tap.  Intrathecal is given by spinal tap.  I

19          have agreed to be the spinal tapper.

20               We have one child approved and we hope to

21          be starting soon at St. Joseph's Hospital, the

22          Day Hospital, the outpatient center.

23               The treatment of the type 1 babies has

24          made a big difference.  They're achieving

25          milestones that they never would have achieved

Def_000434959

1        untreated.  There's no doubt it.

2              They're living beyond the age of two

3        years.  They're crawling, pulling up, standing

4        with assistance, taking steps with assistance.

5        That never happened.

6              So I would compel and urge you to consider

7        this drug very closely.  It's expensive, yes,

8        but it makes -- it seems to make a big

9        difference in the outcome, both in terms of

10       quality of life and life span.

11             Do I go on to the next or does anybody

12       have any questions?

13             THE CHAIRPERSON:  You have one more

14       minute, 60 seconds.

15             MR. FERNANDEZ:  All right.

16             Well, as a treating doctor, I write

17       prescriptions.  And with these drugs, often

18       there's denial and I follow it with a letter of

19       appeal.  Another denial.  Another letter of

20       appeal.  And slowly, but surely, we are getting

21       patients approved.

22             Again, the first one, the first approval

23       for SPINRAZA, I was informed of while I was in

24       Washington this past weekend at a

25       muscle disease meeting.  And this is a topic of

Def_000434960

```
 1        our discussion in Washington.  It came up, the
 2        logistics and the difficulties involved with
 3        how to administer the drug, et cetera, and the
 4        cost of the drug.  That's not part of my job
 5        description, but I recognize it is expensive
 6        and it creates a problem.
 7             So, hopefully, we'll be able to move on
 8        with this because there are a number of
 9        patients -- these diseases -- I don't know what
10        the numbers mean to you, 1 in 5,000 or 1 in
11        10,000, but we see them and they're not that --
12             THE CHAIRPERSON:  Sir.
13             MR. FERNANDEZ:  -- they're not uncommon.
14             THE CHAIRPERSON:  Thank you very much.
15             MR. FERNANDEZ:  Should I continue?
16             THE CHAIRPERSON:  Does anyone have any
17        questions.
18             DR. ZITIELLO:  Any experience with SMA3 in
19        treatment?
20             MR. FERNANDEZ:  None have been treated
21        that I know of.  I'm not sure what's happening
22        with the drug trials.
23             I have two patients with type 3 SMA that
24        we're planning to treat.  The indication for
25        treatment is all four forms.
```

Def_000434961

```
 1              I understand from my adult colleagues
 2      that -- they call me when an adult calls them
 3      and asks them if the adult should be treated.
 4      I don't think we know.  I'm not sure what the
 5      experiences are.  I think most of the
 6      experience in clinical trials has been with the
 7      type 1 form.
 8              But I think it is our intent to treat all
 9      patients with spinal muscular atrophy, no
10      matter the type.  And there will be exceptions.
11      I think that we try to be reasonable about
12      this.  There's some patients in whom there will
13      not be reasonable expectation of improvement.
14      I don't think that any of us would push for
15      treatment in that particular circumstance.
16      These would be very far advanced people, very
17      weak, virtually unable to do anything
18      independently.
19              THE CHAIRPERSON:  Very good.  Thank you.
20              MR. FERNANDEZ:  I was asked to say a few
21      words about another drug.  Do I get another
22      five minutes for a second drug?
23              THE CHAIRPERSON:  Unfortunately, no.
24              PUBLIC SPEAKER:  So my name is Pratik
25      Parikh.  I'm the senior medical science liaison
```

Def_000434962

1        with Sarepta Therapeutics.  Duchenne muscular

2        dystrophy is a progressive neuromuscular

3        disease and Sarepta got accelerated at the

4        approval on September 19, 2016 for Exondys 51.

5             I will actually, if it's okay with the

6        committee, yield my time back to Dr. Fernandez,

7        my five minutes, so he can speak on Duchenne.

8        And if you have any questions, please feel free

9        to ask me afterwards or during your discussion.

10       If that's okay?

11            THE CHAIRPERSON:  That is fine.  We're at

12       four minutes before yield.

13            MR. FERNANDEZ:  All right.  It's the same

14       drug.  I want to talk a little bit about

15       another disease to talk about is Duchenne

16       muscular dystrophy.  Relatively common.  I

17       think I see new patients with Duchenne muscular

18       dystrophy every year.

19            We just moved our clinic to Shriners

20       Hospital.  We have a multidisciplinary clinic

21       where I am the director, and I have been for

22       about 35 years.  We have cardiologists,

23       pulmonologists, physical therapists, everybody

24       that we need to take care of these kids.

25            Duchenne muscular dsytrophy was brought

Def_000434963

```
1        to attention every year by Jerry Lewis.  It's

2        probably, along with spinal muscular atrophy,

3        it's about the most severe muscle disease

4        you'll see.

5             The Duchenne form is the severe form.

6        It's an x-linked disease carried by mothers,

7        passed on to their boys.

8             There's a milder form called Becker that

9        differs genetically in terms of mutation and

10       the type of mutation.  What we can do now with

11       eteplirsen, which is Exondys 51, is more or

12       less genetically, anyway, convert the severe

13       Duchenne form to the milder Becker form.

14            And if there are questions about it, I

15       will be glad to try to answer them.  But,

16       basically, that's what we do in terms of

17       alteration of the mutation within the gene.

18            This drug is administered intravenously,

19       so that's, somewhat, less complicated.  It's

20       administered weekly.  The indications for

21       treatment are very specific.  Treatment will

22       only be prescribed for boys that have a

23       specific mutation that is amenable to exon 51

24       skipping.  And that is accomplished by

25       eteplirsen or Exondys 51.
```

Def_000434964

1        That encompasses about 10 to 13 percent of

2    boys with Duchenne -- 10 to 13 percent of the

3    total of all boys with Duchenne muscular

4    dystrophy.  Only that relatively small fraction

5    will be eligible for treatment.

6        The same problem arises as it does with

7    spinal muscular atrophy.  We have degeneration

8    of older people that have never been treated.

9    We feel if they qualify for treatment, based on

10    their mutation type, that they should be

11    treated.  And these are older -- these are

12    teenagers and young adults and, yes, some of

13    them have severe weakness.  Most of them are

14    wheelchair-confined.  They have not been able

15    to walk since the age of about 10 or 12 years.

16    We do not feel that should exclude them from

17    treatment.  And, again, we will be reasonable.

18    We do have some treatment criteria or treatment

19    indications that I'll send to the committee in

20    written form.

21        And we also have come up with some

22    exclusion criteria, so that not everyone who

23    has a mutation that is amenable to exon 51

24    skipping will be recommended for treatment,

25    depending on the degree of function of their

Def_000434965

```
 1        upper extremities mainly and depending on their

 2        ventilatory capacity.  And those criteria have

 3        been drawn up.  I have them.  I'll get them to

 4        you in writing at the appropriate time.

 5            We're starting to treat some boys with

 6        Duchenne muscular dystrophy.  Two young adults

 7        have been approved for treatment.

 8            We were planning to give the first few

 9        doses in the outpatient setting of the

10        hospital.  That became complicated.  I made

11        some phone calls around the country.  Talked to

12        real experts and they said, Why don't you just

13        start treatment at home?  That's being done.

14            I met the first boy we treated in Tampa.

15        I made a home visit.  The IV nurse was there.

16        And the boy received his first dose without any

17        untoward effect.  In fact, it's really quite

18        safe.

19            We know that boys that are treated are

20        able to produce a protein that is called

21        dystrophin, which they otherwise cannot make

22        because of their Duchenne mutation.  With

23        treatment, these boys are able to make

24        some dystrophin and it's incorporated within

25        their muscle fibers.
```

Def_000434966

94

```
 1            THE CHAIRPERSON:  Thank you for
 2       information.  Unfortunately, your time is up.
 3            I think I can pretty much speak on behalf
 4       of the board.  I do not want to speak on behalf
 5       of the agency.  But what I will say is this:
 6       Thank you for bringing that.  I think it was
 7       very informative.  I think the agency has shown
 8       their attentiveness to this matter by already
 9       beginning construction of PA criteria.
10       Certainly, the plans will lean on it heavily.
11       I'm sure we'll have more development on this
12       issue to come.
13            MR. FERNANDEZ:  If there are questions, I
14       can be available at any time by telephone or
15       whatever else it takes to move this along.
16            THE CHAIRPERSON:  Perfect.  Thank you.
17            MS. DUSSAULT:  Hi.  Good afternoon.  My
18       name Ginger Dussault.  I'm a mother of a boy
19       with Duchenne muscular dystrophy.  I'd also
20       like to speak to Exondys.
21            Duchenne is a rare progressive where boys
22       lose their muscle function due to a missing
23       protein call dystrophin.  He is 21 years old.
24       My son Dalton is patient of Sunshine
25       Healthcare.  He was diagnosed at the age of 17
```

Def_000434967

```
 1          months, meaning that he was born with a
 2          mutation on the dystrophin gene that keeps his
 3          body from producing the dystrophin and his
 4          muscles functioning properly.  Dalton is here
 5          with his dog, Chulip (ph.), that helps him in
 6          his day-to-day life.
 7               As you know, the FDA recently approved
 8          this drug, Exondys, and it treats Dalton's
 9          specific mutation; 48 through 50 are his
10          missing exons.  It skips 51 and puts together
11          47 and 52, and lets him express and make
12          dystrophin.
13               Dalton is very lucky to have this specific
14          treatable mutation.  Like Dr. Fernandez just
15          mentioned, only 13 percent of the entire
16          Duchenne population is amenable to the skipping
17          of exon 51 and eligible for this treatment.
18               Based off of my son's genetic report and
19          Dr. Fernandez' years of experience in treating
20          patients, such as my son, he has recommended my
21          son for treatment.  You've heard his testimony.
22               Since the FDA approval was granted four
23          months ago, we've seen three separate denials
24          in tireless efforts by myself, my doctor and
25          this clinic.  Sunshine Healthcare just finally
```

Def_000434968

```
 1    approved Dalton, his prior authorization, for

 2    last Thursday.  Even though they only gave us a

 3    a three-month supply of that drug to start,

 4    Dalton will receive his first infusion next

 5    week.  This is huge for our family.

 6         I understand the purpose of today's

 7    meeting is to review the evidence surrounding

 8    Exondys 51 and to begin drafting a policy for

 9    the use and reimbursement of Exondys in

10    Duchenne patients amenable.

11         Thank you for taking the time to hear from

12    families and patients and for taking our

13    perspectives into consideration.  Given that

14    Duchenne is such a rare and complex disease and

15    that there has never been before an

16    FDA-approved treatment for this disease, I urge

17    you to also listen to the small number of

18    medical experts who have dedicated their lives

19    to treating children and young men with

20    Duchenne.  Dr. Fernandez is one.  Dr. Byrne of

21    the University of Florida Medical Center,

22    Dr. Giordano, at Numerous Hospital, Dr. Finkel,

23    and Dr. King, who is at Gainesville Medical

24    Center are some of the Duchenne experts located

25    in Florida who have provided written testimony
```

Def_000434969

1       and are willing to provide guidance and

2       recommendations to Florida's policy for

3       Exondys 51.

4            While I encourage you to take time to hear

5       from all of these experts and make thoughtful

6       policy decisions based off their guidance,

7       please do not take too much more time.  The

8       Duchenne community and the state of Florida

9       cannot afford to wait any longer to access this

10      drug.

11           During this period of information and

12      evidence gathering, I also urge you to review a

13      recent Medicaid policy that was established in

14      California in collaboration with their Duchenne

15      expert for Exondys-51-amenable residents who

16      are on California state's Medicaid.  Medi-Cal

17      created this policy after robust engagement and

18      communication with experts and patients and

19      provided Medi-Cal with a better understanding

20      of the natural history and -- anyway, the

21      natural history of how it happens in Duchenne,

22      the mechanism of action in exon 51 and how this

23      therapy could affect patients in all stages of

24      the disease progression.

25           Another example is that the Pennsylvania

Def_000434970

1        Medicaid agency engaged the clinical experts to

2        draft their state policy as well.  Washington

3        state and Louisiana have also done the same.

4              Typically, plans which have consulted with

5        experts have resulted in policies reflective of

6        FDA-approved and approving drugs for patients

7        that will likely show a benefit.

8              I also want to remind you that your

9        decisions today will affect whether or not

10       Dalton is reauthorized by Sunshine Health Care

11       to continue with treatment beyond the current

12       three-month approval that we've been granted.

13             Dr. Fernandez, Dalton and I are all well

14       aware that your decision here, today, on policy

15       will have a direct impact on whether or not he

16       gets to continue the drug past three

17       months.  The longer Dalton and other young men

18       with Duchenne wait for Exondys 51, the more

19       muscle function they lose.  Their losses are

20       irreversible.  Once lost, the patients never

21       gain skills that they once had, like, walking.

22       Dalton lost his ability at age 10.  He's now

23       21.

24             THE CHAIRPERSON:  I'm sorry, I have to cut

25       you off.  Thank you so much for your time.

Def_000434971

1           PUBLIC SPEAKER:  I won't take up a lot of
2      your time.  I'm piggy-backing upon
3      Dr. Fernandez and Ginger with Dalton.
4           My name is Joe Wilshire.  I'm active duty
5      military.  I'm a single father.  My son was
6      diagnosed with Duchenne muscular dystrophy at
7      the age of 7.  He is currently on Exondys 51,
8      eteplirsen.  He's been in the trial for --
9      today was his 107th dose.
10          My son is 13 now.  He's still able to get
11     up from his chair and walk to the bathroom on
12     his own.  That's not typical.  You can ask the
13     lady right here how important that is.  Just
14     little things.  He's able to open a bottle of
15     water on his own, which is not typical.
16          These boys need this drug to maintain what
17     they have.  And in some instances, he may gain
18     things.  My son has fallen and hurt himself
19     really bad and has recovered.  That's not
20     typical for Duchenne.
21          He's never going to run a marathon.  He's
22     never going to do any of those things.  He's
23     not going to be your typical kid, playing
24     football or anything like that.  But he can
25     take care of himself at his house now.

Def_000434972

1            The drug is expensive.  I don't know the

2       dollar amounts.  That's all you-all's type

3       thing.  I'm more of a witness on what the drug

4       does.  I have nothing scripted for you.  I can

5       just go by my experience.  I can talk to you

6       guys after if that's what is needed as well.

7            It affects everybody differently.   All

8       drugs -- aspirins work for some people and

9       don't work for others and what not, so there's

10      going to be the variety of difference in it.

11      But, I think, regardless of whether they're in

12      a chair already permanently or not, it

13      shouldn't exclude these boys from a chance.

14           My son's pulmonary functions have

15      improved.  Not typical.  Cardiology functions,

16      his heart, maintained.  Not typical, not for

17      his age.

18           So I don't waste any more of your time,

19      please, really, really consider what these

20      people are talking about.  These are boys who

21      deserve a chance and a dollar amount shouldn't

22      affect that chance.  If you guys have children,

23      your children have a chance.

24           So that's what I've got to say.

25           THE CHAIRPERSON:  Thank you.  Thank you

Def_000434973

1       for your comments and your time.

2            Any additional public comments?

3            Hearing none.  We're going to transition

4       back to Open Discussion topics for next

5       quarter.

6            I'm sorry.  Arlene?

7            MS. ELLIOTT:  Yes.  I just want, for the

8       record, for everybody to know that the draft

9       criteria that the members have received was a

10      compilation of other state's Medicaid

11      commercial plans.  We received the one from

12      California Medicaid yesterday, so the committee

13      members haven't seen it yet.

14           So I don't know how you want to proceed,

15      do an interim meeting or via email.  But I have

16      also Dr. Martarana's recommendations with your

17      letter there.

18           THE CHAIRPERSON:  I would make a motion to

19      have an interim meeting.

20           DR. ZITIELLO:  Second.

21           THE CHAIRPERSON:  Okay.  We'll move to our

22      Open Discussion topics now.

23            Any topics?

24           MS. HARRIS:  Mr. Vice Chair, you have to

25      have a vote on your motion.

Def_000434974

1          MS. HARRIS:  I'm sorry.  You're right.

2          I will rescind my motion.  I don't think I

3     can -- yeah, I'm going to rescind my motion.

4     Basically someone else has to make it.

5          DR. ZITIELLO:  I move to have an interim

6     discussion on these policies.

7          DR. ROMAY:  Second.

8          THE CHAIRPERSON:  All right.  The motion

9     has been moved and properly second.  All those

10    in favor, please say aye.

11         THE COMMITTEE:  Aye.

12         THE CHAIRPERSON:  Now, we are at the Open

13    Discussion.

14         DR. HAYDEN:  So at the last P&T, I saw

15    that one of the GLP-1 agents was removed from

16    the Preferred Drug List.  The Bydureon, I

17    believe.  It said, long acting.

18         MS. ELLIOTT:  I'm sorry, I was --

19         DR. HAYDEN:  At the last P&T, the

20    formulary update revealed a Bydureon GLP-1

21    agent was removed from the Preferred Drug List.

22         MS. ELLIOTT:  Was it both formulations?  I

23    can't remember.

24         DR. HAYDEN:  And so we have no GLP-1

25    agents available currently on the Preferred

Def_000434975

1      Drug List.  So I have to do prior

2      authorizations for all my patients.  It's time

3      consuming, but I'm doing them.

4            MS. ELLIOTT:  Was it the pen versus the

5      vial by any chance?  Let me look it up.

6            DR. HAYDEN:  Yeah, because right now, I

7      think it was the pen.  I think that was what

8      was available before.  And then it went to

9      non-preferred.  And so now, I'm completing

10     prior auths.

11           DR. ROMAY:  I believe the vial is

12     preferred and the pen is non-preferred.  It's

13     the vials.  It the formulation.

14           MS. ELLIOTT:  Yeah, the P&T -- it was a

15     financial decision by P&T.

16           DR. HAYDEN:  So the vials are on there.

17     So if she has the connect, she can inject.

18           The patients have to mix it themselves

19     now?  Because I didn't see that on the

20     formulary.  I just saw --

21           DR. ROMAY:  Yeah, the 2 milligram vial is

22     the one that's on the formulary.  It's the

23     vial, which is the same thing.  It's just a

24     different formulation.  It's just the

25     formulation.

                    INTEGRA REPORTING GROUP, LLC
                     Tampa, FL  (813) 868-5130

```
1              DR. GOODNOW:  We already mentioned it but
2         I think the classes are very helpful, very
3         interesting to take a look at.  And I think
4         looking at the number of patients and the
5         number of scripts in addition -- will help us
6         make some recommendations for that class.
7              THE CHAIRPERSON:  I actually -- I'm sorry.
8         Did you have any recommendations, Luis?
9              DR. SAENZ:  No.
10             THE CHAIRPERSON:  Alfred?
11             DR. ROMAY:  I'd like to bring
12        back Hepatitis C in terms of retreatment.  And
13        also, the current change in the criteria is to
14        the black box warning on the reactivation of
15        Hep B.  I think the criteria -- and I think I
16        reached out initially to make some
17        recommendations on adding things to that
18        criteria, but I think we need to bring that
19        criteria back to the board and relook at it to
20        see -- because there's a lot of things that
21        need clarification in terms of products
22        and certain retreatment and certain other
23        scenarios that are not really evident on the
24        criteria or spelled out.
25             THE CHAIRPERSON:  Dr. Hayden?
```

Def_000434977

1          DR. HAYDEN:  I'm looking at the formulary

2     guide.

3          THE CHAIRPERSON:  Elboni, are we at our

4     quota for --

5          DR. MOORE:  I am the quota keeper.

6          So I've been taking my notes.  I have the

7     Embeda utilization.  What are patients taking

8     now?  How do they get to the other agents?  And

9     criteria development for that.  That's

10    something that Magellen would handle as a

11    quarterly topic.

12         And there's follow-up on the SAMSCA

13    utilization to see what types of providers have

14    been requesting these products.

15         There's homework for the committee to

16    reviews vasopressin receptor antagonist

17    criteria, specifically, Vaprisol and also

18    Transderm Scop criteria.

19         And then, another follow-up item for

20    Magellan regarding the top 10 classes are to

21    bring in the recipients, the claims, the dollar

22    amount, possibly the PDL status, which I think

23    that would be helpful for you guys to see that

24    for some of those products.

25         And also, Dr. Romay's Hep C development,

Def_000434978

1      specifically around retreatment.  He wants to

2      look back at the criteria to see if there's a

3      need to enhance the criteria.  So that is not

4      necessarily a quarterly topic.  That's just

5      follow-up.  So you still have two more.

6          THE CHAIRPERSON:  I just want to introduce

7      one other thing.  I think this was tabled from

8      the last meeting, particularly since you

9      weren't able to list the top 10 therapeutic

10     classes.

11         I'm looking at antipsychotics and the

12     fee-for-service as the top -- it's the second

13     most expensive nonclass -- I suspect a large

14     percentage of that are LAIs, so Abilify and

15     Respidol and all of those are generic now.

16         I guess the question that I would like to

17     propose to the state is, you know we're

18     spending money on LAIs.  I can tell you, in our

19     plan, even though it requires a prior

20     authorization, our approval rates are close to

21     96 -- 97 percent.

22         But I guess what I'm looking to know is,

23     since we're paying for these agents, they are

24     approximately $15- to $1800 per injection.  Are

25     the patients being compliant?  How many of

```
 1        those patients or still compliant on a dose

 2        post six months or something?

 3             Because if we're essentially making the

 4        investment to make sure that they're compliant

 5        for that first 30 days, but they're not coming

 6        back in, it kind of defeats the purpose and

 7        perhaps plans may want to take a different

 8        approach, put them in case management, et

 9        cetera, et cetera.

10             DR. MOORE:  Okay.

11             DR. ROMAY:  Two more.  I know we have room

12        for two more.

13             THE CHAIRPERSON:  We just have room for

14        one more.

15             DR. ROMAY:  Well, I can mention it and we

16        can always, I guess, talk about it.

17             One item is, I know I previous -- a

18        couple, couple, couple meetings before -- we

19        had discussed, before Humera went preferred and

20        Embril went non-preferred, we had talked about

21        having -- I don't know if this -- I know we

22        created auto PA criteria but I think we had

23        once talked about creating specifically a

24        criteria for rheumatoid arthritis diagnoses.

25        And I think, right now, it's just the PA -- the
```

Def_000434980

1      auto PA is just strictly if you have these

2      diagnoses, it pays.  But I think we had talked

3      about the need for making sure that those

4      members are adhering to just the gold

5      standards, which are the DMARDS, you know,

6      things like that.

7          I don't know if that was something that we

8      just phased out because we moved to a different

9      approach.

10         DR. MOORE.  It boiled down to the specific

11     contracting language and I can't get into that.

12         DR. ROMAY:  Okay.

13         DR. MOORE:  That was negotiated upon, so

14     we had to move away from that approach and go

15     with the method that we went with.

16         DR. ROMAY:  Okay.

17         And then my second one was surrounding the

18     bupropion products.  So on the criteria, I

19     think -- I don't know if I remember seeing this

20     on here, but I think it was just updated where

21     they added some film was where the preferred

22     product was redirected to.

23         So I was wondering what led to that?  It

24     was just, you know, the pricing, or is it just

25     a brand preferred.  Because the bupropion

Def_000434981

1     tablets are available in a generic form.

2         MS. ELLIOTT:  Right.  It was a financial

3     decision.

4         DR. ROMAY:  Okay.  I just wanted to check.

5     That's what I thought it was, but I wanted to

6     verify that it was okay on that.

7         MS. ELLIOTT:  But it's preferred with a

8     clinical PA, just for the record.

9         DR. ROMAY:  Right.  Right.  Right.  Right.

10     Right.  Because I know before, that wasn't on

11     there.  So I know it was just recently done.

12         Okay.  Thank you.

13         THE CHAIRPERSON:  Okay.  I think that

14     pretty much wraps up the open discussion.

15     Before we adjourn here, a couple of thank yous.

16         No. 1, thank you to the attendees for

17     coming.  Obviously, you could be somewhere

18     else.

19         I want to thank those who came up for the

20     public comments.  I think those were very

21     educational and certainly powerful.

22         I would like to thank AHCA, obviously, for

23     assembling these meetings.

24         And thank the committee.  As you know, our

25     chair is unable to make it today, so we thank

Def_000434982

1     you for having confidence in me to

2     honerate (sic) this meeting.

3          With that being said, I need a motion to

4     adjourn.

5          DR. HAYDEN:  Motion to adjourn.

6          DR. ZITIELLO:  Second.

7          THE CHAIRPERSON:  Was that a third by

8     Alfred?

9          Meeting adjourned.  Thank you.

10         (Thereupon, the proceedings were

11         adjourned at 4:18 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Def_000434983

```
 1                    CERTIFICATE OF REPORTER

 2    STATE OF FLORIDA

 3    COUNTY OF HILLSBOROUGH

 4

 5        I, JUANITA BUTLER, Court Reporter, certify that

 6    I was authorized to and did stenographically report

 7    the foregoing proceeding; and that the transcript is

 8    a true record of said proceeding.

 9

10        I FURTHER CERTIFY that I am not a relative,

11    employee, attorney, or counsel of any of the

12    parties, nor am I a relative or employee of the

13    parties' attorneys or counsel connected with the

14    action, nor am I financially interested in the

15    action.

16

17                    Dated this 17th day of March, 2017.

18

19

20

21

22                    _____
                      JUANITA ANNETTE BUTLER
23                    Stenographic Court Reporter
                      INTEGRA REPORTING GROUP, LLC.
24                    Notary Public, State of Florida
                      Commission No. FF 944824
25                    Expires: December 21, 2019
```

INTEGRA REPORTING GROUP, LLC
Tampa, FL  (813) 868-5130

Def_000434984