Page 1

1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF FLORIDA

2

3                   CASE NO.  4:22-cv-00325-RH-MAF

4

5    AUGUST DEKKER, et al.,

6         Plaintiffs,

7    vs.

8    SIMONE MARSTILLER, et al.,

9         Defendants

10   _____/

11

12   DEPOSITION OF:        JEFFREY ENGLISH

13   AT THE INSTANCE OF:   THE PLAINTIFF

14   DATE:                 JANUARY 23, 2023

15   TIME:                 COMMENCED: 10:00 A.M.

16   LOCATION:             AGENCY FOR HEALTH CARE
                           ADMINISTRATION

17                         2727 MAHAN DRIVE
                           TALLAHASSEE, FLORIDA 32308

18

     REPORTED BY:          DANA W. REEVES

19                         Court Reporter and
                           Notary Public in and for

20                         State of Florida at Large

21

22

23

24

25

```
 1
 2    APPEARANCES:
 3
 4            REPRESENTING THE PLAINTIFF:
 5            KATY DeBRIERE, ESQ.
              Florida Health Justice Project
 6            3900 Richmond Street
              Jacksonville, Florida 32205
 7
 8            SIMONE CHRISS, ESQ.
              CHELSEA DUNN, ESQ.
 9            Southern Legal Counsel, Inc.
              1229 NW 12th Avenue
10            Gainesville, Florida 32601
11
12            REPRESENTING THE DEFENDANT:
13            GARY V. PERKO, ESQ.
              Holtzman, Vogel, Barantorchinsky & Josefiak
14            119 S. Monroe Street, Suite 500
              Tallahassee, Florida 32301
15
16            ANDREW SHEERAN, ESQ.
              Florida Agency for Health Care
17            Administration
              2727 Mahan Drive
18            Tallahassee, Florida 32308
19
20            ALSO APPEARING, VIA TELEPHONE:
21            SHANI RIVAUX, ESQ.
              JENNIFER ALTMAN, ESQ.
22            Pillsbury, Winthrop, Shaw, Pittman, LLP
              600 Brickell Avenue, Suite 3100
23            Miami, Florida 33131
24
25
```

1   Appearances Cont.:
2           ABIGAIL COURSOLLE, ESQ.
            National Health Law Program
3           3701 Wilshire Boulevard, Suite 315
            Los Angeles, California 90010
4
5           GARY SHAW, ESQ.
            Pillsbury, Winthrop, Shaw, Pittman, LLP.
6           1200 17th Street N.W.
            Washington, D.C. 20036
7
8           OMAR GONZALEZ-PAGAN, ESQ.
            Lambda Legal Defense and Education
9           Fund, Inc.
            120 Wall Street, 19th Floor
10          New York, NY 10005
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
1                    INDEX TO WITNESS
2
3   JEFFREY ENGLISH                                 PAGE
4   Examination by Ms. DeBriere                       6
5   Examination by Mr. Perko                        166
6   Further Examination by Ms. DeBriere             172
7
8              PLAINTIFF'S INDEX TO EXHIBITS
9
10   NO.            DESCRIPTION                   MARKED
11   Exhibit 1   Notice of Deposition                 7
     Exhibit 2   GAPMS Rule                          19
12   Exhibit 3   GAPMS Decision Tree Checklist       24
     Exhibit 4   AHCA Request Form                   48
13   Exhibit 5   June 27, 2022 email                105
     Exhibit 6   59G-1.010 Definitions              117
14   Exhibit 7   Breast pump GAPMS determination    128
                 report
15   Exhibit 8   Fractional exhaled nitric oxide    132
                 measurement GAPMS
16               determination report
     Exhibit 9   Specially modified low-protein     134
17               foods GAPMS determination
                 report
18   Exhibit 10  Puberty Supression Therapy GAPMS   140
                 determination report
19   Exhibit 11  Hormone supression therapy in      144
                 children GAPMS determination
20               report
     Exhibit 12  Cross-sex hormone therapy GAPMS    145
21               determination report
     Exhibit 13  Cross-sex hormone therapy GAPMS    147
22               determination report
     Exhibit 14  Florida Medicaid GAPMS June 2022   154
23   Exhibit 15  2020-2021 Performance Plan for     177
                 Jeffrey English
24
25
```

Page 5

```
1
2                 DEFENDANT'S INDEX TO EXHIBITS
3
4     NO.              DESCRIPTION                    MARKED
5     Exhibit D1   Computer-assisted musculoskeletal     166
                   surgical navigational orthopedic
6                  GAPMS
7     Exhibit D2   Blue Cross Blue Shield of             167
                   Rhode Island document
8
9
10
11    *Uh-uh is a negative response
      *Uh-huh is a positive response
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 37

```
 1   that is on our fee schedule and it is --
 2        Q    Can I stop you there?  When you say multiple
 3   things checked off, do you mean yes or no?
 4        A    Yes -- well, let me double-check that.  Yeah.
 5   You know, if something gets checked off as a yes, you
 6   know, especially overwhelmingly so, then that would be
 7   something that we would, you know, give a really serious
 8   consideration of coverage for.  And if we looked at it,
 9   and it was, you know, potentially experimental
10   investigational, and then that's the GAPMS.  And if
11   it's, you know, yes, we should cover this, what -- you
12   know, why don't we have this on our fee schedule kind of
13   thing, then that would be a decision point.
14        Q    Okay.  Does a yes answer to any of these
15   questions imply that a service is not experimental?
16             MR. PERKO: I'm going to object to form.  You
17        can answer.
18             THE WITNESS: Do answer or --
19             MR. PERKO: Do answer.
20             THE WITNESS: Okay.  Well, through this form,
21        we would discover that it's -- you know, if it's
22        something that's already on the fee schedule that
23        we already covered, then that would -- that would
24        end the process immediately and we would just
25        notify the provider, hey, we already pay for this
```

1        and move on to the next thing.

2    BY MS. DeBRIERE::

3        Q    So if it was on AHCA's fee schedule --

4        A    Then it's not and then someone -- I guess the

5    presumption is that someone or someone somewhere along

6    the way determined that AHCA would cover it, and that it

7    was not a -- you know, it was not experimental

8    investigational.

9        Q    I'm sorry, Mr. English.  Hold on one second.

10   Just a real basic question.  I see here an email

11   address, healthserviceresearch@AHCA.myflorida.com inbox?

12       A    Yes.  That's a -- that's a -- the requesters

13   will send in -- that's the email address to inquire

14   about making a GAPMS request or a coverage request.

15       Q    Who can submit a GAPMS request via the email?

16       A    Anybody, I believe.

17       Q    Okay.  Other than the three entities you

18   listed that typically trigger a traditional GAPMS --

19       A    I would think of it other than the weird one

20   with Beth and the bionic pancreas, most of the other

21   requests would come in through health service research,

22   you know, the provider or the manufacturer.  And from

23   time to time, you would get a phone call, usually from a

24   salesperson and they'd want to set up a meeting.  And

25   they -- you know, they have sort of regional travel

Page 39

```
1    schedules, they want to hit you up on their way through.
2    But health service research is sort of, I guess, the
3    basic -- getting the process started way of contacting
4    us.
5        Q    To your knowledge, have you ever had a request
6    to initiate come from another state agency?
7        A    I do not -- I'll just point out, again, I
8    inherited a queue and I don't necessarily know where all
9    the projects that I inherited originated.
10       Q    So, to your knowledge --
11       A    No.
12       Q    And to your knowledge, has a request ever come
13   from a member of the public?
14       A    I'm unclear how you define that.
15       Q    Fair.
16       A    I mean, technically, isn't everyone a member
17   of the public?
18       Q    Yes.  Absolutely.  Have you ever had a request
19   come in from a Medicaid recipient, to your knowledge?
20       A    I can't say for certain.  It sounds familiar,
21   but I can't say for certain.  And what I might actually
22   be remembering is a provider requesting on behalf of
23   Medicaid patient.
24       Q    Okay.  How about request from a political
25   figure?
```

1    A    No.  That's bill analysis.  That's a -- that's

2    a different -- that's a different task.

3    Q    Okay.  To your knowledge, have you ever not

4    used the decision tree for a traditional GAPMS request?

5    A    When I first started, you know, but I only

6    have -- it might have been one or two.  There was a

7    stretch where I was working with what was already in the

8    queue, and so I don't know that this had been performed

9    for those.  I think some of them because I think

10   Chris -- Christina, like, in order to sort of workshop

11   this, we went through and we're like, well, this one

12   would, you know, and this one, but it was pretty much

13   like the newer requests going forward, and then Nick was

14   assigned with backtracking with this, and I don't know

15   if he got every single one in the queue or not, so

16   that's theoretical there are GAPMS that -- for which

17   this was not performed.

18   Q    After the checklist was developed and it was

19   consistently -- after December of 2020 --

20   A    Yes.

21   Q    -- when traditional GAPMS request was received

22   by AHCA, did you ever not use the checklist?

23   A    It was part of the -- it was part of the

24   standard process.  I can't say for sure that, you know,

25   when we were working from home -- I think I had meetings

Page 41

1    with supervisors for them, but I don't know for certain

2    that every single request that came in went through that

3    or not.  I can't say.

4         Q    You said it was the standard process?

5         A    It is.

6         Q    Okay.  Is GAPMS ever initiated with respect to

7    services that AHCA is covering -- already covering?

8         A    In my experience, no, that would -- that would

9    be determined through the checklist and that would be

10   deemed not a GAPMS.

11        Q    Kind of the same question asked a little

12   differently.  Is it ever initiated to assess existing

13   coverage of Medicaid services?

14        A    Not in my experience.

15        Q    I asked some of these.  I don't want to ask

16   them again, so I'm going to blow through them real

17   quick.

18             MR. PERKO: Would now be time for a break?

19             MS. DeBRIERE: Yeah, let's do it.

20             (Brief recess.)

21   BY MS. DeBRIERE::

22        Q    So did you speak to anybody during the break

23   about the deposition?

24        A    I did not.

25        Q    Okay.  And I just want to go back quickly to

1    what I believe we marked as Exhibit 2.  Is that -- no,

2    Exhibit 3, excuse me, which is the GAPMS decision tree

3    checklist.  I needed to ask one more question about

4    that.  If something was -- so when you receive the

5    request, and you're going through the checklist, if

6    something was on Medicaid's fee schedule, and therefore

7    covered by Florida Medicaid, would you initiate the

8    GAPMS process?

9         A    No.

10        Q    What types of Medicaid services are assessed

11   using the GAPMS process?

12        A    Treatments, I guess, for lack of a better way

13   for shorthand.  Typically, it's -- can I answer the

14   question by giving you an example of GAPMS?

15        Q    Absolutely.  You can answer the question

16   however you would like to?

17        A    There's, you know, specially modified

18   low-protein foods for inborn errors of metabolism.

19   There's negative-pressure wound therapy, which is a

20   medical device for wound healing.  There's low-intensity

21   pulsed ultrasound, which is a medical device for healing

22   fractures.  There's a procedure with sort of a

23   proprietary technology called transcervical fibroid

24   ablation that's kind of a cross between a procedure and

25   the type of bead that's used in the procedure that

1      Q    Who's involved in the -- who was involved in

2   the GAPMS process when you were doing it?

3      A    Primarily myself.  There was, from time to

4   time if we got it -- you know, if I got along in the

5   process and was determining that, you know, this had a

6   potential, that it would be recommending coverage --

7   because everything has to be budget-neutral, we would --

8   I would reach out to Medicaid, the fiscal folks, and

9   they would put together a fiscal analysis of what the

10  cost would be, or any potential cost savings.  So from

11  time to time, not every GAPMS, if I didn't reach out to

12  them, if it was something that it was clear that we

13  weren't going to cover, because the time wasn't -- it's

14  pointless to take up their time.  My supervisor -- I had

15  weekly regular weekly meetings with my immediate

16  supervisor, you know, to go over what was in the queue,

17  what was I working on, what was the status.

18          I frequently had scheduled meetings with the

19  Bureau Chief, but those didn't often come off, but it

20  was understood that, you know, typically, along, you

21  know, the course of time, you know, they would get, you

22  know, an update on what was going on, and if it was one

23  where, you know, I had written it, my supervisor had

24  signed off on it, and then the next step was, you know,

25  to get the bureau chief to sign off on it in order for

1  it to go to the Medicaid director.  And then Nick --

2  Nick was doing the checklist.  But I mean, it was -- it

3  was kind of a joke with my, you know, with my

4  co-workers, I was kind of like the one-end game.

5      Q    Okay.  Okay.  So can you describe that line of

6  approval.  So it started with you.

7      A    It started with me.  I would write a report.

8  I would submit it to either, at the time Christina, or

9  Jesse, whoever was my immediate supervisor.  They would

10 review it, they may or may not have some edits to send

11 back, and then it would -- once they had, you know,

12 signed off on it and said, you know, this can advance to

13 the bureau chief, and then, you know, the bureau chief

14 would sign off on it, yay or nay, and then the next step

15 is to go to the Medicaid director.

16      Q    Okay.  And who currently is the Medicaid

17 director?

18      A    Tom Wallace.

19      Q    And who's the bureau chief for Medicaid

20 policy?

21      A    Ann Dalton.

22      Q    And I know you just said this, and I

23 apologize, but the final decision maker then in the

24 GAPMS process is the Medicaid director.  Is that

25 correct?

1      A     Yes.  I mean, it typically requires his or her

2   signature.

3      Q     Is that different from being a decision maker?

4      A     A decision point?  Yes.

5      Q     No, a decision maker.  Sorry.

6      A     That's linguistics, sort of.  I mean, it -- I

7   can't reach out to the requester and say yay or nay

8   until Tom has signed or, you know, whoever -- Beth has

9   signed off on the report.

10     Q     Does the Medicaid director review the report

11  and reach an independent conclusion?

12           MR. PERKO: Object to form.  You can answer.

13           THE WITNESS: I don't know.

14  BY MS. DeBRIERE::

15     Q     In the GAPMS process you just described from

16  you to your supervisor, to the bureau chief, to the

17  Medicaid director, does AHCA ever rely on individuals

18  outside the agency in the process?

19     A     Not in my experience, no.

20     Q     How many GAPMS reports are issued per year?

21     A     That's kind of a loaded question.

22     Q     I don't mean it to be.

23     A     Okay.  In my -- you know, if I can round up

24  three years of doing GAPMS reports, there were a couple

25  of expedited GAPMS that kind of made it all the way

Page 116

1   medical necessity?

2        A    I've read it before.

3        Q    I have a copy of it. Do you want to see it?

4        A    Sure.

5             MS. DeBRIERE: Sorry.  It's on page seven,

6        Gary.  And what the witness is reviewing -- I think

7        I needed more coffee at lunch -- what the witness

8        is reviewing is 59G-1.010, and it's the definition

9        of medically necessary medical necessity at 2.83 in

10       the policy.

11            THE WITNESS: Yes.

12            (Whereupon, Exhibit No. 6 was marked for

13       identification.)

14  BY MS. DeBRIERE::

15       Q    Do you know what AHCA uses this definition

16  for?

17       A    I mean, I've had -- it's been in literature or

18  in, you know, in reference to the GAPMS process. Beyond

19  that, I don't know how its utilized.

20       Q    How does it relate to the GAPMS process?

21       A    As I understand it, if a GAPMS is approved, as

22  you know, something that Medicaid is going to cover,

23  then it's considered under the blanket definition of

24  that term or phrasing.  It's been deemed medically

25  necessary, I guess.

Page 117

1      Q     If what?

2      A     If it's passed GAPMS.

3      Q     If AHCA determines the service is experimental

4  and will not be covered by Medicaid, would there be any

5  reason to determine whether the service is medically

6  necessary under any other portion of the medical

7  necessity definition?

8      A     That question might come up around the EPSDT

9  consideration, but otherwise, I don't know.

10     Q     You don't know or --

11     A     I can't -- I don't believe so, you know.

12     Q     When the agency decides to exclude a Medicaid

13  service as experimental, does AHCA communicate that

14  information to the public?

15     A     Not in my experience.  I've only ever

16  communicated to -- well, I mean, there have been --

17  there have been requests that have come in that didn't

18  reach the level of a GAPMS, because they didn't even get

19  to that point.  It was like, no, we don't cover that,

20  because it's so obvious that we don't cover that. So we

21  would explain to them, you know, these are the things

22  when -- we explain the process to them, and these are

23  things -- but, you know, that's kind of the gist of it.

24     Q     So, in your experience, after determining that

25  a service would be excluded as experimental, does AHCA

Page 118

1    notify the general public?

2         A    No, we would notify the requester and then

3    move on to the next project.

4         Q    Would AHCA typically publish that decision on

5    a website?

6         A    Not that I'm aware of, no.

7         Q    Would they provide the general public with the

8    expert reports they relied on during the GAPMS process?

9         A    Not that I'm aware of, no.

10        Q    Does AHCA typically draft a press release

11   about the conclusion that's reached in GAPMS?

12        A    Not in my experience, no.

13        Q    Is the Governor of Florida typically involved

14   in the dissemination of a GAPMS conclusion?

15        A    Not that I'm aware of, no.

16        Q    Any other political figures, are they

17   typically involved?

18        A    Not that I'm aware of, no.

19        Q    Other state agency heads?

20        A    No.

21        Q    Does AHCA publish the exclusion of a service

22   being experimental in a coverage policy or coverage and

23   limitation handbook?

24        A    If they do, I'm not aware of it.

25        Q    If through the GAPMS process a service is

1   were with her. We shelved it until we got the results.

2   So that -- it's this big study about pregnant women and

3   asthma because the preliminary results were very

4   favorable, and it would have been sort of the -- it

5   would have been a very narrow coverage determination, a

6   very narrow call, but if I remember correctly, the

7   results of that study did not pan out.

8       Q    Okay. Looking at this particular GAPMS --

9       A    No.  It was managing asthma in pregnancy.

10  Sorry.  Not FMAP.

11      Q    Yeah, especially when you're on state plan,

12  right.

13      A    Yeah.

14      Q    Let's move to one I know you're familiar with,

15  specially-modified low-protein foods.  We'll mark as

16  Exhibit 8 -- 9.

17           (Whereupon, Exhibit No. 9 was marked for

18  identification.)

19           THE WITNESS: See, this one predates me.

20  BY MS. DeBRIERE::

21      Q    So what happened there?

22      A    Things didn't move forward.  So it was

23  basically starting over and starting from scratch. And

24  so the report that I wrote for -- especially I wrote

25  multiple versions of that report -- looks very different

Page 134

1   from that one.

2        Q    Do you remember what organizations on which

3   you relied to write this report?

4             MR. PERKO: He said he didn't write this

5        report, counsel.

6             MS. DeBRIERE: I'm sorry.  You're right. I

7        strike the question.

8   BY MS. DeBRIERE::

9        Q    Do you remember on what organizations you

10  relied to write your report on specially-modified

11  low-protein foods?

12       A    I know I consulted organizations concerned

13  with inborn errors of metabolism. And the two, we were

14  directing it specifically to one called phenylketonuria,

15  but there's another one called -- something to the

16  effect of maple syrup disease, so it was organizations

17  that were focused on those two conditions primarily.

18       Q    Do you remember what organizations those were?

19       A    Off the top of my head, I do not.

20       Q    Were you looking -- were you assessing it as

21  to children or as to adults?

22       A    The way, after discussion with my supervisors,

23  the way we were going about it was the argument sort of

24  dictated that we -- that condition requires children to

25  stay on a very strict low-protein diet. It's a lifelong

1   diet.  It's a diet for life. And so what we were able to

2   determine in the research was that, which makes sense,

3   children, you know, when you're a kid, your parent

4   controls your diet, and so you eat what they gave you

5   and parents could keep the children on the diet, but

6   when they started to reach their teenage years, they

7   wanted more autonomy. Nobody wanted to go with their

8   friends to Burger King, while they just sat and had a

9   shake, you know, low-protein, a special shake. And that

10  the research indicated that when children -- in the time

11  of life when people either continue to adhere to the

12  diet or drop off was in their teenage years. So we were

13  targeting under age 21, and with the goal of trying to

14  keep them diet-adherent so that they could progress on

15  to adulthood with good habits and protect their health.

16       Q    Do you remember if one of the organizations

17  you looked at was the American Academy of Pediatrics, or

18  relied on?

19       A    Almost certainly.

20       Q    Why are you -- why are you almost certainly?

21       A    They're kind of a name brand organization.

22       Q    Is it one that you find trustworthy in terms

23  of their opinion?

24       A    I have.

25       Q    Can you look at this document and tell me if

1  this is -- the reason I ask is that -- skip to the front

2  page, to page three.  Do you know if it's complete?  If

3  you see there's a page number at the corner there.

4      A    Yeah. Yeah, there's -- there should be a page.

5  Yeah, there's a page there.

6      Q    You don't think it's a typo?

7      A    No, it's -- because on the second page, it

8  picks up with, like, mid-paragraph.

9      Q    Okay. Thank you for that.  Were you involved

10 in anything related to the GAPMS for scleral contact

11 lenses?

12     A    I was not.

13     Q    So just going over the GAPMS process

14 generally, in summary, to determine whether a service is

15 experimental under GAPMS, you look at professional

16 literature. And then the most persuasive professional

17 literature is going to be, that's peer review?

18     A    Ideally, sure.

19     Q    You look at whether other state Medicaid

20 programs cover?

21     A    Yes.

22     Q    And you look whether health insurance in the

23 private market covers?

24     A    Yes.

25     Q    And if the majority of states cover, that's

1  going to be in the favor of finding it not experimental?

2      A    It's hard -- it would be -- make it harder for

3  us to justify that it's experimental.

4      Q    And you look at whether Medicare covers?

5      A    Yes.

6      Q    And, again, whether Medicaid covers favors a

7  finding of not being experimental?

8      A    Yes.

9           MR. PERKO: Object to form.

10 BY MS. DeBRIERE::

11     Q    And you look at whether evidence-based

12 clinical practice guidelines exist?

13     A    Yes.

14     Q    And you look at whether the service is

15 accepted by relevant professional medical organizations?

16     A    Yes.

17     Q    How do you -- would the American Medical

18 Association be considered an organization on which AHCA

19 would rely for GAPMS?

20          MR. PERKO: Object to form.

21          THE WITNESS: Yes.

22 BY MS. DeBRIERE::

23     Q    How about the American Psychological

24 Association?

25          MR. PERKO: Same objection.

1             THE WITNESS: Yes.

2    BY MS. DeBRIERE::

3        Q    The American Academy of Child and Adolescent

4    Psychiatry?

5             MR. PERKO: Same objection.

6             THE WITNESS: I am not familiar with that

7        organization.

8    BY MS. DeBRIERE::

9        Q    The American College of Obstetricians and

10   Gynecologists?

11            MR. PERKO: Same objection.

12            THE WITNESS: Yes.

13   BY MS. DeBRIERE::

14       Q    In the past GAPMS, organizations on which

15   you've relied include the American Academy of

16   Pediatrics?

17       A    Yes.

18       Q    You undertake a cost analysis for potential

19   cost-saving to Florida Medicaid when you're doing GAPMS?

20       A    Yeah.  I mean, if it's not budget-neutral,

21   it's almost certainly not going to be covered.

22       Q    You do not typically enlist outside medical

23   experts during the GAPMS process?

24       A    I have not.

25       Q    You do not pay outside individuals?

1      A      I don't.

2      Q      You don't ask outside individuals to write a

3  report?

4      A      No.

5             MR. PERKO: Asked and answered, counsel.

6  BY MS. DeBRIERE::

7      Q      You do not typically codify your conclusions

8  reached during the GAPMS process into rule?

9      A      I don't believe so.

10     Q      You do not typically develop a website and

11  slogan to advertise a GAPMS conclusion?

12     A      I have not.

13     Q      Generally, other agency heads or political

14  figures not involved in the initiation -- are not

15  involved in the initiation of the GAPMS process?

16     A      Not in my experience.

17     Q      In disseminating its conclusion?

18     A      No.

19             (Whereupon, Exhibit No. 10 was marked for

20  identification.)

21  BY MS. DeBRIERE::

22     Q      Let's go to Exhibit 10, is the 2016 GAPMS

23  memo, and this is going to be DEF_000288776 to DEF_00028

24  8785.  Are you familiar with this document, Mr. English?

25     A      I am not.

1    imagine this is a very large agency. Have you been

2    involved in any conversation around AHCA's coverage of

3    cross-sex hormone therapy?

4         A    I am not.

5         Q    Okay.  Do you have any idea as to why, even

6    though you were the GAPMS guy during these dates, that

7    you would not be involved in these decisions?

8              MR. PERKO: Object to form.

9              THE WITNESS: I do.  What I was explained by

10             Jesse, my supervisor, his version of how -- and I

11             don't know if the same person that wrote the gender

12             dysphoria GAPMS wrote this -- Jesse's explanation

13             for how that author was chosen, he said that it was

14             a meeting between he and Jason and Ann, and Jason

15             had come and asked who they might recommend to

16             write the report, and when my name was brought up,

17             Jesse said no, that he -- I guess he didn't want me

18             working on that. And Ann offered up the actual

19             author, eventual author, and Jesse concurred.

20   BY MS. DeBRIERE::

21        Q    How do you know that this meeting happened?

22        A    He told me.

23        Q    Jesse told you?

24        A    Uh-huh.

25        Q    Why did Jesse say no?  Did he say to you?

1      A     Yes.  He -- I believe his perception of it was

2    that it was -- he said that he didn't want me involved

3    with it.  He didn't want to be supervising the person

4    who was, and he didn't think that it was something that

5    I would have been willing to do.

6      Q     Was he right?

7      A     Yes.

8      Q     Why?

9      A     Because my perception was that that particular

10   GAPMS was a conclusion in search of an argument.

11     Q     Did Jesse agree with you?

12     A     You'd have to ask him.

13     Q     Why don't you think Jesse wanted to supervise

14   the project?

15     A     We're all sitting here right now.

16     Q     Fair.

17     A     And on top of that, I mean, he was pretty new

18   in his position, too.  He had been promoted after

19   Christina left.

20     Q     How long had he been in that position?

21     A     Not super, super long. I mean, God, I think

22   Christina was -- actually, I don't know.  She left --

23   one of the December's during the pandemic, but I don't

24   remember.  She went out on maternity leave and never

25   came back, and then he ended up filling her position.

Page 150

```
 1    Could have been 2021, or it could have been 2022. I
 2    don't honestly recall.
 3        Q    Who was the author of the report you're
 4    referring to?
 5        A    Matt Brackett.
 6        Q    Do you know why Mr. Brackett was chosen?
 7             MR. PERKO: Object to form.
 8             THE WITNESS: Jesse told me that he -- he told
 9        Jason that Matt would do any assignment that he was
10        given.
11    BY MS. DeBRIERE::
12        Q    Had Mr. Brackett ever done a GAPMS memo
13    before?
14        A    He had.  He was -- he wrote GAPMS prior to my
15    arrival.
16        Q    Why didn't they keep Mr. Brackett in that
17    position?  Why did they hire someone new?
18             MR. PERKO: Object to form.
19             THE WITNESS: When I arrived, Matt was over
20        the -- I believe he was over durable medical
21        equipment.  And I think, just based on
22        conversations he and I had had, there's a kind of a
23        bit of frustration built into the GAPMS position
24        because it's not a priority, you know, outside of a
25        pandemic, even it's just not a priority.  And so he
```

1       was -- you know, he would tell me, you know, look,

2       I didn't get a lot, you know, through either --

3       it's kind of a thankless job, but it's important,

4       you know, that kind of thing. So it -- I think he

5       wanted to go do -- he's been here -- you know, I

6       don't know how much longer though, at least a

7       little bit, or maybe more than that longer than me,

8       and I think he just wanted to go do something else.

9  BY MS. DeBRIERE::

10      Q    Okay.  Why do you think it mattered to Mr.

11 Boucher that you not be a part of the gender dysphoria

12 GAPMS?

13           MR. PERKO: Object to form.

14           THE WITNESS: My belief is that he didn't

15      see -- he didn't believe that it would be something

16      that I would -- I would be willing to do and he, I

17      believe, was possibly trying to save himself, a

18      hassle as well.

19 BY MS. DeBRIERE::

20      Q    Let's turn back to the email between you and

21 Mr. Cogle, which is Exhibit 5.  On the second page, you

22 have a paragraph that starts, if you will, excuse me, I

23 feel obligated to include this information.

24      A    Yes.

25      Q    Are you familiar with what you wrote there?

Page 152

1      A     I am.

2      Q     Would you say that's a reason why you didn't

3   want to be involved in the gender dysphoria GAPMS

4   process?

5      A     Yes and no, indifferent all at the same time.

6   I mean, part of why this paragraph was written was out

7   of frustration. Again, I was -- you know, my

8   co-worker's, it was the -- you know, we joked I was the

9   GAPMS guy.  That report came out. I read the report.  It

10  was not something I felt like I would have produced and

11  because there were a lot of people around inside the

12  agency and my personal life that thought that I wrote

13  the report, because it said, GAPMS, you know.  So I had

14  grown tired of -- you know, and at the same time, it's

15  like, you know, my friends are seeing reports about it

16  on television and things like that, or in the newspaper

17  or whatever, it was a news story, a prominent news story

18  with, you know, debate and politics and all these

19  things, and I was a bit frustrated that that was

20  occurring.  And combined with the fact that Dr. Cogle

21  was someone I respect, and I kind of in response to the

22  emotion I'd received in his initial email, I wanted to

23  assure him that that wasn't me.

24     Q     I just want to make the record clear by

25  entering in Exhibit 14.  And this exhibit is entitled

1   Florida Medicaid generally accepted professional medical

2   standards determination on the treatment of gender

3   dysphoria.  It's dated June 2022.

4          (Whereupon, Exhibit No. 14 was marked for

5   identification.)

6   BY MS. DeBRIERE::

7       Q    Is the report we've been talking about that

8   Mr. Brackett authored?

9       A    Yes.

10      Q    And this is the report that Jesse said you

11  would not author, is that correct?

12      A    Correct.

13      Q    And it's the report that you did not want to

14  author?

15      A    Correct. I mean, keep in mind, I found out

16  about it after the project already started. And then I

17  went and asked Jesse about it.  I was like, you know,

18  and I wasn't like, you know, who's doing the GAPMS.  I

19  was just like, hey, what's going on, you know.  And he

20  explained, you know, how Matt was chosen and why I was

21  not, and I was thankful for that and went from there.

22      Q    And you said in your response to my questions

23  about your email to Dr. Cogle that this report did not

24  reflect the level of work that you would do, is that

25  correct?

Page 154

1      A    Well, that's a -- that's a loaded question. I

2  mean, it's a 45-page report, which is very different

3  from the -- what I was dealing with, which was the push

4  for the trend for tighter cleaner, smaller reports that

5  took less time to read.  What was the --

6      Q    Yeah.  Why isn't this GAPMS report on gender

7  dysphoria reflective of your work?

8      A    It veers a bit from process.

9      Q    In what ways?

10      A    Well, in terms of the quality of the studies

11  included, the dismissal, the professional organizations

12  and experts that we had frequently cited before, the

13  length of the report, where it originated from.

14      Q    Where did it originate from?

15      A    I would say the executive.  Came from they

16  said, you know, Secretary Marstiller, she's part of the

17  executive.

18      Q    Anybody else in the executive?

19      A    Oh, sure.  Governor.  Yeah.

20      Q    I cut you off.

21           MR. PERKO: I meant to object to form on that

22      last question.

23  BY MS. DeBRIERE::

24      Q    You said it dismissed the opinions of

25  professional organizations, where it was initiated was

1  off, the length of the report was off.  Anything else?

2      A    Keep in mind that the people who prepared the

3  report, or Matt and a guy Ni -- I don't remember Ni's

4  last name -- they were not discreet about what they were

5  working on or why, and it seemed to be impacting morale

6  a little bit among some co-workers, and it was kind of

7  an immature sort of approach or attitude or something to

8  it that was off-putting a bit, I suppose, for folks.

9      Q    Are folks in the agency generally aware of

10  things that GAPMS is working on?

11      A    Frankly, most people don't really care or pay

12  attention.  You know, everyone has -- just the way

13  everything's set up here, you, you know, everyone has

14  their own little corner of the piece of the puzzle of

15  Medicaid, and it's a big learning curve for everything,

16  and so you want to focus on your little piece of the

17  puzzle and try and grow your puzzle into, you know,

18  understanding how it fits into the main thing.  Certain

19  topics sometimes, I had to do one on transanal

20  irrigation, and I caught a lot of grief from some of my

21  co-workers on that one, you know, silly stuff, you know,

22  office banter, that kind of thing, but that one was --

23  it was just kind of altogether a different thing.

24      Q    You described it as immature.

25      A    Well, certain behavior was.

1      Q    What?

2      A    There was a -- I don't remember the person's

3  name. I was told that they were a trans person.  I knew

4  him as this guy who had an office nearby Matt and I, and

5  it was after the report had come out, I believe, and

6  they were, like, kind of whooping it up, yelling back

7  and forth across the hallway, because about -- like the

8  number of views it was getting on Twitter and things

9  like that. And so that employee had to get up and go

10  over and tell them, you know, look, it's -- you know,

11  congratulations on your report, but I feel like you're

12  being somewhat insensitive. And, you know, that was

13  awkward.

14      Q    Yeah.  You mentioned that Mr. Brackett was not

15  in -- Mr. Chen -- Dr. Chen?

16      A    He's -- I think he's pharmacist, yeah.

17      Q    Mr. Brackett and Mr. Chen were not discreet

18  about it, what they were working on.  How did they

19  characterize what they were working on?

20      A    Just what the topic was.  It was actually --

21  Ni's the one that told me that -- he's who told me that

22  it was -- I was wholly unaware of the assignment, and

23  Ni's the one that told me about the assignment.

24      Q    Is this the first time you've ever been --

25  since being the GAPMS guy, was the first time you'd ever

Page 157

1    been excluded from the GAPMS process?

2        A    Well, I mean, this other one here predates the

3    publication of that one, but --

4        Q    And that --

5        A    -- in April, and this one probably began in

6    April or March or something like that.  So, yeah,

7    whichever.  The chicken or the egg, whichever one came

8    first. I was unaware of both of those.

9        Q    The title that you were just referencing that

10   is Exhibit 13, I think?  Is that right?

11       A    Yes.

12       Q    And do you think that report was a precursor

13   to the Exhibit 14?

14            MR. PERKO: Object to form.

15            THE WITNESS: I wouldn't know.

16   BY MS. DeBRIERE::

17       Q    How many Medicaid services does this GAPMS

18   memo Exhibit 14 analyze, do you know?

19       A    Maybe three.

20       Q    Is that typical?

21       A    No. Well -- I mean, no, I've looked at GAPMS

22   where it was two devices, two different devices at the

23   same time, but never like two different treatments, same

24   time.

25       Q    Do you know why AHCA used that approach here?

Page 158

1      A    I do not.

2      Q    Would you recommend that approach in a GAPMS

3  process?

4      A    I can't outright say I would or would not.  It

5  would depend on the circumstance and how closely related

6  I perceive the procedures or services to be.

7      Q    Do you know if this is supposed to apply to

8  children or adults or both?

9      A    My understanding is both, or to children

10  and -- most of the discussion has been around children.

11  Children.

12      Q    So you don't -- having reviewed this, you

13  can't say?

14      A    I don't recall. I mean, I read it back in,

15  like, June.

16      Q    Okay?

17          MR. PERKO: About ready for a break, counsel?

18          MS. DeBRIERE: Mr. English, do you think you

19      can do like 10 more minutes?

20          THE WITNESS: I can do whatever's good for the

21      order.

22          MS. DeBRIERE: Is that okay, Gary?

23          MR. PERKO: Yeah.

24  BY MS. DeBRIERE::

25      Q    Do you know if AHCA enlisted outside medical

1    experts to do a literature review for this report?

2         A    That's my understanding.

3         Q    Is that typical for GAPMS?

4         A    Not in my experience.

5         Q    Do you know if they paid these professionals

6    to do the report?

7         A    My understanding is they did.

8         Q    Is that typical?

9         A    Not in my experience.

10        Q    Do you know why AHCA used that approach here?

11        A    I do not.

12        Q    Have you ever -- I'm sorry.  Did they attach

13   the expert reports to the final GAPMS report?  Did AHCA

14   attach the expert reports to the final GAPMS report?

15        A    I don't know if I saw, like, a copy with

16   attachments or if it's -- I don't recall if it was

17   referenced or included in their report like -- but I

18   remember seeing those when I was looking at it, you

19   know?

20        Q    Is that typical?

21        A    Well, no, I mean, I've never had outside

22   reports to attach to it, were included with the GAPMS.

23        Q    When you mentioned that -- one issue you took

24   with the report is they dismissed professional

25   organizations' opinions.  Would those professional

1    organizations include the Endocrine Society's position?

2              MR. PERKO: Object to form.

3    BY MS. DeBRIERE::

4         Q    If you don't remember, that's okay.

5         A    I know who the Endocrine -- who they are.  I

6    would be hard-pressed to envision a scenario where I

7    would second-guess them -- and without, you know,

8    really, really good cause.

9         Q    What about the American Academy of Pediatrics?

10             MR. PERKO: Object to form.

11             THE WITNESS: No.

12   BY MS. DeBRIERE::

13        Q    No, you --

14        A    I would be deferential to their

15   recommendations.

16        Q    Are you aware of the coverage of the treatment

17   for gender dysphoria under other Medicaid programs?

18        A    I want to say that things could have changed

19   because I haven't really looked at some of that stuff

20   since last year.

21        Q    Why were you looking at it last year?

22        A    When I --

23        Q    Go ahead.

24        A    If I recall, it's somewhere between maybe 30

25   and 40 states or something that provide coverage for it.

1        Q    When you undertake GAPMS, how would that

2    factor into your ultimate conclusion?

3        A    If it were 30 states, that would -- it could

4    be a factor.  If it were 40 states or more, it would

5    be -- it'd be harder to dismiss.  It's something that my

6    supervisor would have been making an inquiry about if I

7    were recommending against coverage.

8        Q    Because that many states covering indicates

9    that it's not experimental?

10            MR. PERKO: Form.

11            THE WITNESS: It indicates that there is

12        existing widespread coverage for it.

13   BY MS. DeBRIERE::

14        Q    How does that factor into whether the service

15   is experimental?

16            MR. PERKO: Form.

17            THE WITNESS: It makes an argument for coverage

18        for something easier to make, assuming that they

19        meet the threshold on all the other categories, you

20        know, then that's, you know --

21   BY MS. DeBRIERE::

22        Q    Do you know if they did a decision tree

23   checklist for the services listed in the June 2022 memo?

24        A    I do not.

25        Q    Do you know if AHCA undertook an Analysis

Page 162

1    of -- to determine how excluding coverage of treatment

2    for gender dysphoria would affect the Florida Medicaid

3    budget?

4         A    I do not.

5         Q    Does anything else stand out to you about this

6    memo that we haven't discussed?

7              MR. PERKO: Object to form.

8              THE WITNESS: It's frankly unlike anything I've

9         experienced in the process, but I mean, just the

10        sort of -- you know, we're all sitting here, the

11        publicity about it, everything that sort of comes

12        with it.  It's unusual, in my limited time here.

13   BY MS. DeBRIERE::

14        Q    Do you agree with the conclusion?

15             MR. PERKO: Object to form.

16             THE WITNESS: I think it's two different

17        issues.

18   BY MS. DeBRIERE::

19        Q    Yeah.

20        A    I'm not sure that it matters what I believe

21   about the question of whether or not Florida Medicaid

22   should pay for transgender services. I view it as a

23   process issue, and I believe that everyone should have

24   the same -- the same opportunity for review and a

25   consistent process.

1      Q     Was this consistent with the other

2   opportunities people have had for review of a Medicaid

3   service?

4      A     I do not -- I do not believe it was.

5      Q     Do you know how AHCA implemented the

6   conclusions found in this memo?

7      A     I do not.  I know they had to write a rule,

8   and I know they had a hearing. That's all I know.

9      Q     Have they talked to you about implementation

10   regarding state amendment at all?

11      A     They have not.

12      Q     Throughout this deposition, I got the sense

13   that you were really good at your job, as the GAPMS guy.

14      A     It's not for me to say.  I feel like I put

15   forth some effort.

16      Q     Yeah, and you got a certificate for doing one

17   in eight hours.

18      A     Just a couple of friends, but I think my

19   performance is reflected in my performance reviews.

20      Q     Yeah.  And why do you think they moved you

21   from GAPMS to the state plan?

22      A     I asked to be moved.

23      Q     Okay.  Why did you ask to be moved?

24      A     Because I felt like the GAPMS process had lost

25   some integrity and I didn't want to be associated with

Page 164

1    it. I didn't want the blowback from the requesters out

2    there who were going to wonder why their report

3    wasn't -- I mean, every month it got harder and harder

4    and harder to justify those reports not moving.  And I

5    was just, you know, kind of burned out.  If you're in a

6    position where you're working on something and they tell

7    you, you know, slow down and stop, you know, then let's

8    go learn something else.  And, honestly, I thought

9    leaving would protect me from some of this.

10       Q    You had mentioned that they had to adopt a

11   rule to implement this decision.  Is that typical of a

12   conclusion reached through the GAPMS process?

13       A    Not that I'm aware of.

14       Q    The same question with having a hearing.  Is

15   that something typically related to a conclusion in the

16   GAPMS process?

17       A    Not that I'm aware of.

18       Q    Has it ever been done, that you're aware of,

19   for any GAPMS conclusions?

20       A    I was never asked to attend a rule hearing or

21   anything related to any of the GAPMS I worked on.  So,

22   not that I'm aware of.

23            MS. DeBRIERE: Are you okay with taking like a

24       10 minute break?

25            THE WITNESS: Sure.