IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, *et al.*,

          *Plaintiffs*,

         v.

JASON WEIDA, *et al.*,

          *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

While Defendants correctly acknowledge that a primary question in this case is whether, "based on current medical opinion," Florida's Exclusion and "determination" that medical treatments for gender dysphoria are "experimental is reasonable," *Rush v. Parham*, 625 F.2d 1150, 1157 n.13 (5th Cir. 1980), Defendants' Motion is otherwise a masterclass in misinformation and disinformation.

In addition to misstating facts, Defendants ignore that single most material fact in this case—whether medical treatment for gender dysphoria is experimental— is genuinely disputed, particularly given the overwhelming record evidence that such medical treatment is *not* experimental or investigational, but rather *necessary*, *safe*, and *effective*.  This alone warrants denying Defendants' Motion, as "[t]he party

seeking summary judgment bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Take Defendants' opening paragraph. Defendants reference a handful of countries that have purportedly restricted the provision of gender-affirming care in a manner that is both misleading and false.[1]  Defendants "ignore European countries where access to trans care has recently expanded (Spain, Portugal, and France)." (Opp. Ex. A.)[2]  Indeed, "in France, the use of hormone blockers or hormones of the opposite sex is possible with parental authorization at any age," and surgical treatment for gender dysphoria is likewise available, including "mastectomy, which is authorized … from the age of 14."[3]  New Zealand also has not restricted the provision of gender-affirming medical care.  (Opp. Ex. B; Opp. Ex. C.)

Defendants argue that because some outlier doctors go against the grain, the Exclusion and their determination is "reasonable" under *Rush*.  Not so.  Under *Rush*, "whether the state's determination 'is' reasonable, [is] controlled … by 'current

---

[1] How countries with nationalized health care systems provide medical care has little bearing here.

[2] Exhibits referred to as "Ex.#" refer to Plaintiffs' trial exhibits filed at ECF 175-184.  Exhibits referred to as "Opp. Ex. [letter]" are exhibits attached to this memorandum.

[3]        https://www.academie-medecine.fr/wp-content/uploads/2022/03/22.2.25-Communique-PCRA-19-Gender-identity-ENG.pdf.

medical opinion.'"  Doc.64 (quoting *Rush*, 625 F.2d at 1157 n.13).  "Defendants attempt to create scientific controversy in [an otherwise] uniform agreement through experts who mix their scientific analysis with hypothetical speculation and political hyperbole."  *Kadel v. Folwell*, 2022 WL 3226731, at *32 (M.D.N.C. 2022).  But "Defendants' belief that gender affirming care is ineffective and unnecessary is simply not supported by the record." *Id.*

Here, Plaintiffs have presented copious evidence demonstrating that gender-affirming care is *not* experimental or investigational, but *necessary*, *safe*, and *effective* medical care that has been provided and studied *for decades*.  Each of Plaintiffs' experts completely undermine the State's position, and at minimum, create a genuine issue of material fact.  And unlike Defendants' experts (with one exception), Plaintiffs' experts *all* have experience treating or studying gender dysphoria, and its medical treatment.  Their testimony shows that gender-affirming care is safe, effective, and widely accepted.  Defendants ignore this evidence.[4]

Defendants also fail to contend with the plethora of case law showing that exclusions of medical treatments for gender dysphoria from coverage are unlawful

---

[4] Defendants reference an expert report from Dr. Brignardello-Petersen, one of AHCA's consultants on the GAPMS Report. Defendants never disclosed Dr. Brignardello-Petersen as an expert in this case and refused to accept service of Plaintiffs' subpoena for her as she is based in Canada. To the extent Defendants seek to introduce Dr. Brignardello-Petersen's report in support of the GAPMS Report or to reference it as expert opinion, Plaintiffs move to strike such references.

and violate the Medicaid Act's comparability and EPDST requirements, Section 1557 of the ACA, and the Fourteenth Amendment's Equal Protection Clause.

Because there are material facts genuinely in dispute and a barrage of case law supports Plaintiffs' claims, the Court should deny Defendants' Motion.

## II.   STATEMENT OF THE CASE AND FACTS

Correcting every misstatement in Defendants' statement of the case and facts would exceed permitted word limits, so Plaintiffs refer the Court to their Trial Brief and present the following facts.

### A. Gender Dysphoria

Gender dysphoria is a serious medical condition, experienced only by transgender people, characterized by the significant distress caused by the incongruence between their sex assigned at birth and their gender identity. (Ex.8, at 10 ¶7; Ex.10, ¶20; Ex.7, ¶24.)  Without appropriate treatment, gender dysphoria can cause debilitating anxiety, severe depression, self-harm, and even suicidality. (Ex.7, ¶¶26, 36, 68; Ex.9, ¶41; Ex.10, ¶21.)

### B. Treatment for Gender Dysphoria

Gender dysphoria is treatable, and interventions are supported by well-established evidence-based guidelines, for which decades of research and clinical practice provide support. (Ex.9, ¶ 41; Ex.5, ¶ 17; Ex.8, at 12-13 ¶¶ 10-12; Ex.10, ¶¶24-26; Ex.7, ¶¶27-28, 33, 56-59; Ex.142.)

Treatment seeks to eliminate the distress of gender dysphoria by aligning an individual's body and presentation with their internal sense of self. (Ex.7, ¶36; Ex.10, ¶22.) The medical community does not consider these treatments to be experimental or investigational. (Ex.5, ¶¶32-33; Ex.14, ¶¶21-36; Ex.17, ¶23; Ex.8, ¶73; Ex.10, ¶¶ 44-46; Ex.9, ¶89.).

1) <u>The treatment protocols for gender dysphoria</u>

Gender-affirming medical care dates back almost a century. (Ex.5, ¶32, Ex.10, ¶46.) The first gender-confirming surgeries were performed in the 1920s. (Ex.143, at 48-49.) Hormone treatment for gender dysphoria began after estrogen and testosterone became commercially available in the 1930s. (Ex.5, ¶32; Ex.11, ¶32; Ex.2, ¶ 27; Ex.143, at 49.)  Puberty-delaying medications have been used to treat gender dysphoria since the late 1990s. (Ex.5, ¶32; Ex.8, ¶24; Ex.142, at 364.)

WPATH first established standards of care for the treatment of gender dysphoria in 1979, which have been continuously maintained and are now in their eighth version ("WPATH SOC8") (Ex.7, ¶27; Ex.8, at 12 ¶10; Ex.9, ¶48; Ex.10, ¶ 24; Ex.17, ¶55; Ex.142, at 361; *see also* Ex.34.)  The WPATH SOC8 are based on the best available evidence and professional consensus. (Ex.5, ¶29; Ex.7, ¶28; Ex.8, at 12 ¶10; Ex.9, ¶48; Ex.10, ¶¶ 8, 24; Ex.17, ¶56; Ex.142, at 361; *see also* Ex.34, at S8, S247-S251.)

The Endocrine Society's Clinical Practice Guidelines are largely consistent with the WPATH SOC8 and were developed using rigorous scientific methods. (Ex.5, ¶¶17-18; Ex.7, ¶¶31-33; Ex.8, at 13 ¶12; Ex.9, ¶53; Ex.10, ¶26; Ex.17, ¶¶57-58; Ex.142, at 361; *see also* Ex.123; Doc.193-24.)

The WPATH SOC8 and the Endocrine Society Guidelines provide for medical interventions that are individualized based on patient needs and may include puberty-delaying medications, hormone therapy, or surgeries. (Ex.8, at 12 ¶10; Ex.7, ¶40; Ex.9, ¶57; Ex.10, ¶ 25; *see generally* Ex.34; Ex.123; Doc.193-24.) Treatment protocols differ for adolescents (minors who have started puberty) and adults. (Ex.17, ¶59; *see also* Ex.34, at S32, S48, S111, S129; Ex.123, at 3878, Table 5.) No medical or surgical treatments are provided to any patient until *after the onset of puberty*. (Ex.8, at 17 ¶18; Ex.7, ¶41; Ex.9, ¶44; Ex.17, ¶¶25, 59; *see also* Ex.34, at S69; Ex.123, at 3870.)

America's major medical organizations agree gender-affirming medical care is necessary for people with gender dysphoria. (Ex.5, ¶30; Ex.7, ¶34; Ex.8, at 12 ¶¶10-11, ¶48; Ex.9, ¶¶54-55; Ex.10, ¶27; Ex.17, ¶60; Ex.142, at 361.)

### a) Puberty-delaying medications

For adolescents with gender dysphoria who experience severe distress with the onset of puberty, puberty-delaying medications may be indicated. (Ex.7, ¶42; Ex.8, ¶¶22-23; Ex.9, ¶46; Ex.17, ¶89.) Such interventions afford the adolescent time

to better understand their gender identity while delaying the development of secondary sex characteristics, which can cause severe distress when incompatible with an adolescent's gender identity. (Ex.8, ¶¶23-24; Ex.12, ¶81; Ex.9, ¶66; Ex.17, ¶92.) The treatment is reversible if an adolescent discontinues the treatment, puberty will resume. (Ex.7, ¶42; Ex.8, ¶¶24; Ex.9, ¶65.)

Puberty-delaying medications do not have any long-term implications on fertility or sexual function, and there is no evidence that they impact brain development, emotional regulation, or cognition. (Ex.15, ¶¶21-33; Ex.12, ¶¶17-23; Ex.9, ¶73.) The medical and scientific literature has established that puberty-delaying medications are safe and effective to treat gender dysphoria in adolescents. (Ex.5, ¶32; Ex.9, ¶¶63, 78-82; Ex.8, ¶¶25-29, 99-101; Ex.16, ¶¶51-54; Ex.12, ¶¶73-74; *see also*, *e.g.*, Exs. 141, 163, 165, 167, and 168.)

### b) Hormone therapy

For some adolescents and adults with gender dysphoria, hormone therapy may be medically necessary. (Ex.17, ¶96; Ex.8, ¶32; Ex.7, ¶43, Ex.9, ¶¶46, 72.) Gender-affirming hormone therapy is a partially reversible treatment, meaning some of the hormones' effects are reversible, while others are not. (Ex.7, ¶43; Ex.8, ¶32.) Hormone therapy allows for a physical development more closely aligning with a person's gender identity, helping alleviate gender dysphoria. (Ex.9, ¶¶60, 71.)

The scientific literature shows that hormone treatment is safe and effective to treat gender dysphoria in adolescents and adults. (Ex.9, ¶¶86-88; Ex.8, ¶¶ 34-40; Ex.17, ¶¶101-102; *see also*, *e.g.*, Ex.166; Ex.180; Ex.221; Ex.156; Ex.197; Ex.176; Ex.195; Ex.164; Ex.212.)

### c) Surgery

Gender-confirming surgery may be indicated for some transgender adults and older adolescents to align their primary and secondary sex characteristics with their gender identity. (Ex.8, ¶42; Ex.10, ¶22.) Surgeons regularly perform these procedures to treat conditions other than gender dysphoria. (Ex.10, ¶38.) The scientific literature shows that surgery is a safe and effective treatment for gender dysphoria. (Ex.10, ¶¶40-42, 46; Ex.8, ¶¶44-45; Ex.5, ¶32; *see also*, *e.g.*, Ex.202, Ex.208; Ex.178; Ex.192; Ex.198; Ex.193.)

### 2) The quality of the evidence

The quality of the evidence supporting these gender-affirming medical interventions is comparable to studies supporting other, well-established treatments and procedures.  (Ex.8, ¶¶70-90; Ex.5, ¶¶18-28; Ex.11 ¶¶55, 83; Ex.10, ¶52-54; Ex.17, ¶106.)  Scientific ratings of evidence generally employ stringent standards that are not satisfied for many commonly prescribed treatments. As one recent scientific article concluded, "only a minority of outcomes for health care interventions are supported by high-quality evidence." (Ex.182.) The fact that a

treatment is not supported by "high-quality" evidence does not mean that the treatment is unsupported in the literature and clinical practice, that it is experimental or investigational, or that it is not medically necessary. (Ex.14, ¶75.)  That is because "[t]o determine whether a treatment is safe and effective, and whether it is experimental or investigational, we look at the whole body of research and clinical experience." (Ex.12, ¶73.) "By this measure, gender-affirming medical care as treatment for gender dysphoria has been shown to be safe, effective, and is not experimental or investigational."  (*Id.*)

> 3) <u>Psychotherapy alone is not an effective treatment for gender dysphoria.</u>

There is no established safe and effective alternative to gender-affirming medical care for treating gender dysphoria. (Ex.10, ¶58; Ex.7, ¶37; Ex.11, ¶¶23-24, 47.) Defendants present psychotherapy alone as an alternative but have offered no evidence to support that claim.  (Opp. Ex. D (Weida), 88:18-22.)    None exists. While behavioral health interventions are an important component of gender-affirming care for many, the literature has established for decades that mental health interventions alone are insufficient to treat gender dysphoria.  (Ex.7, ¶37; Ex.11, ¶48; Ex.17, ¶91; Ex.8, ¶112; Ex.10, ¶58; Ex.158, at 13.)

### III.   **ARGUMENT**

### A. **Defendants' determination that gender-affirming medical treatments are experimental is unreasonable, or at least, genuinely disputed.**

This Court, relying on *Rush*, 625 F.2d 1150, articulated as a controlling question in this case "whether, based on current medical knowledge, the state's determination that these treatments are experimental is reasonable."[5] Here, AHCA's determination was not reasonable, or at minimum, there is a genuine issue of material fact on that point.

Defendants' own Medicaid regulations set forth six specific criteria that govern whether a service is consistent with generally accepted professional medical standards, as opposed to experimental or investigational.  Fla. Admin. Code ("FAC") 59G-1.035(4); *see also K.G.*, 864 F.Supp.2d at 1321. These GAPMS factors show that the excluded services are not experimental. AHCA's skewed and incomplete

---

[5] Of note, *Rush* turns on the "reasonable standards" provision of the Medicaid Act, 42 U.S.C. §1396a(a)(17), whereas Plaintiffs claim that the Exclusion violates the EPSDT and comparability provisions. (Doc.1, at ¶¶275-80). Nevertheless, Plaintiffs agree that if the treatments are experimental, the Exclusion does not violate EPSDT requirements. Ex.62; *K.G. ex rel. Garrido v. Dudek*, 864 F.Supp.2d 1314, 1321 (S.D. Fla. 2012), *aff'd in part, rev'd in part sub nom. Garrido v. Dudek*, 731 F.3d 1152 (11th Cir. 2013). Regardless, Plaintiffs contend the Exclusion could violate the Medicaid Act's comparability requirement, Section 1557, and the Equal Protection Clause even if Defendants' conclusion was reasonable. The Court has acknowledged that possibility.  (Doc.64, at 4.)

consideration thereof underscores that its determination was not reasonable.[6] *See K.G.*, 864 F.Supp.3d at 1322.

1) Evidence-based clinical practice guidelines

Two professional medical associations – WPATH and the Endocrine Society – have published clinical practice guidelines recommending gender-affirming care for the treatment of gender dysphoria in persons meeting specific criteria. (Ex. 34; Ex.123; Doc.193-24.)  These guidelines establish the authoritative protocols for health care providers working with transgender patients. (Ex.7, ¶39; Ex.9, ¶¶48-49, 56; Ex.10, ¶24; Ex.324, at 4.)  And no published clinical practice guidelines recommend the use of psychotherapy alone to treat gender dysphoria. (Ex.9, ¶14.)

Defendants' argument that the WPATH and Endocrine Society guidelines are biased and not evidence-based is without merit.  First, it is *de rigeur* for professional medical associations to advocate on behalf of health care providers and patients. (Ex.14, ¶¶54-56.)  That does not undermine—let alone, invalidate—their published clinical practice guidelines. Second, the fact that WPATH members drafted the Standards of Care reflects not bias or a conflict of interest, but that clinicians and researchers with the requisite expertise in transgender medicine drafted them. (Ex.12, ¶42; Ex.5, ¶¶9-11.) Third, the WPATH and Endocrine Society guidelines

---

[6] That AHCA even initiated the GAPMS process for these services reveals that the process was a sham, as it is not used for already-covered services. (Ex.30; Doc.120-6, 93:13-93:21.)

are based on rigorous reviews of the peer-reviewed scientific literature, as well as extensive clinical experience. (Ex.34, at App'x A; Ex.123, at 3872-73; Ex.17, ¶¶55-58; Ex.5, ¶¶18-24, 29; Ex.7, ¶¶28, 33.)

Moreover, the guidelines themselves were peer-reviewed and published in medical journals. "That the research is accepted for publication in a reputable scientific journal after being subjected to the usual rigors of peer review is a significant indication that it is taken seriously by other scientists, i.e., that it meets at least the minimal criteria of good science." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).

Defendants' attempt to discredit these clinical practice guidelines is even more remarkable considering AHCA's prior reliance on these very guidelines during GAPMS processes. For example, the 2016 GAPMS report on puberty suppression therapy included the Endocrine Society guidelines without any suggestion that they were somehow invalid. (Ex. 240.)

    2) <u>Published reports and articles in the authoritative medical and scientific literature</u>

Abundant "peer-reviewed scientific literature generally recognized by the relevant medical community or practitioner specialty associations" examines the use of puberty delaying medications, hormone therapy, and surgery to treat gender dysphoria. FAC 59G-1.035(4)(b).

In drafting the GAPMS Report, AHCA ignored most of the body of peer-reviewed literature on gender-affirming care. (Doc.120-6, at 147:12-147:25; Doc.84-1, ¶4.)  The "assessment" by Dr. Brignardello-Peterson and Dr. Wiercioch included just 27 studies published between 2020 and 2022 (Ex.324, at 10-11.)—hardly a comprehensive review. (Ex.324, at 10-11; Ex.7, ¶¶80-81.)

The GAPMS Report and Defendants' experts attempt to discount the supportive literature they did consider as "low quality." That claim is highly misleading and at minimum surfaces a factual dispute. (Ex.324, at 11-12; Ex.5, ¶¶19-22.) While randomized trials are rated as high-quality evidence and observational studies as low-quality evidence (Ex. 5, ¶20), for ethical and practical reasons, it is not possible to conduct randomized trials involving medical treatments for gender dysphoria. (Ex.8, ¶¶74-85; Ex.10, ¶¶52-53; Ex.5, ¶¶27-28; Ex.9, ¶17; Ex.7, ¶83.) The lack of randomized trials does not render the existing research insufficient to inform clinical decision making. (Ex.324, at 13; Ex.14, ¶30; Ex.10, ¶56; Ex.13, ¶8; Ex.8, ¶¶73, 88-90.)

3)  Effectiveness in improving prognosis or health outcomes

The peer-reviewed literature shows that puberty-delaying medications, hormone therapy, and surgery are: 1) safe and effective for the treatment of gender dysphoria; and 2) when used for that purpose, correlated with additional positive

health outcomes, including improved quality of life, mental health, and psychosocial functioning.  (Section II.B, *supra*.)

### 4)  Utilization trends

The GAPMS Report makes no mention of this factor. There has been a notable increase in the utilization of gender-affirming medical care over the last three decades, and AHCA's own data reflects this increase. (Ex.5, ¶¶39-40; Ex. 317; *see also* Ex.6, at ¶59.) Paradoxically, AHCA appears to view that rise in utilization as a reason to implement the Exclusion. (Ex.335.) But what it shows is that the services are commonly used and not experimental. *See Rush*, 625 F.2d at 1156, n.11 (contrasting service that is "generally accepted by the professional medical community as an effective and proven treatment for the condition for which it is being used" with a one that "is rarely used, novel, or relatively unknown").

### 5)  Other coverage policies

AHCA's coverage exclusion is an outlier among health insurance plans. Most health plans, in Florida and elsewhere, do not have categorical transgender-specific exclusions. (Ex.6, ¶¶40-46; *id.* ¶35 (highlighting that 25 states and D.C. prohibit such exclusions in state-regulated individual and group plans); Ex.5, ¶42.)   In drafting the GAPMS report, AHCA did not even review private insurance policies. (Doc.120-6, at 149:2-152:6.)

Only 9 of the 56 states and territories operating a Medicaid program exclude coverage of gender-affirming medical care. (Ex.6, ¶¶54, 57.) Even among those jurisdictions, Florida's exclusion stands apart for its breadth and scope. (Ex.6, ¶¶ 55-57.) And Florida Medicaid itself covered this care until the Exclusion was adopted. (Doc.120-6, at 66:25-68:17, 74:18-75:9, 84:2-18, 243:7-15; Ex.257; Ex.317.)

While other nations' coverage policies have never factored into the GAPMS process, Defendants argue that their determination regarding puberty-delaying medications, hormone therapy, and surgery reflects an "international consensus" on the issue. (Mot. at 24-25.) That is wrong and misleading. Defendants have not conducted a comprehensive review of other countries' policies regarding gender-affirming care. And Defendants have misrepresented those nations' policies. (Ex.14, ¶¶73-82; Doc.142-11.)

6) Recommendations or assessments by clinical or technical experts on the subject or field

Recognized clinical and technical experts in the field of transgender medicine agree that puberty-delaying medications, hormone therapy, and surgery are safe and effective treatments for gender dysphoria. (Ex.8, ¶121; Ex.9, ¶89; Ex.11, ¶¶53-54, 100; Ex.17, ¶¶23, 133; Ex.10, ¶¶23, 43, 81; Ex.324, at 4-5.) But AHCA did not seek recommendations or assessments from recognized experts; it consulted a handful of vocal opponents of gender-affirming care.

**B. Plaintiffs' Medicaid Act Claims Are Viable.**

   1) <u>The EPSDT and Comparability Provisions of the Medicaid Act Are Enforceable Pursuant to 42 U.S.C. § 1983.</u>

The Court should reject Defendants' argument that Plaintiffs have no private cause of action to enforce their Medicaid Act claims.  For more than 20 years, the Supreme Court has required lower courts to apply a three-prong test to determine whether a statutory provision gives rise to a federal right under 42 U.S.C. § 1983. *See Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002); *Blessing v. Freestone*, 520 U.S. 329 (1997).  Under *Blessing*, courts must evaluate three elements: first, Congress must intend the provision in question to benefit the plaintiff; second, the right contained in the provision must not be so "vague and amorphous" that its enforcement would strain judicial competence; third, the statute must unambiguously impose a binding obligation on the state. 520 U.S. at 340-41 (citations omitted). *Gonzaga* clarified the first prong of the test, instructing that the provision in question must contain unambiguous "right- or duty-creating language," as opposed to language with an aggregate, rather than individual, focus. 536 U.S. at 284 n.3; *see also* 42 U.S.C. §§ 1320a(2), (10) (congressional intent that provisions of the Social Security Act, of which Medicaid is a part, are privately enforceable).[7]

---

[7] Citing *Collins v. City of Harker Heights*, 503 U.S. 115, 119 (1992), Defendants argue that the EPSDT and comparability provisions do not create enforceable rights because § 1983 "does not provide a remedy for abuses that do not violate federal law." (Mot. at 28.) *Collins*, which did not involve a federal law, is inapposite. There,

*Blessing* also instructs plaintiffs to plead their complaints in "manageable analytic bites" and courts to determine whether "each separate claim" satisfies the test. *Blessing*, 520 U.S. at 342; *id*. at 340. Here, Count III of Plaintiffs' complaint alleges that the Exclusion violates the EPSDT provisions, 42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B), 1396d(r)(5), and 1396a(a)(43)(C), and Count IV alleges that the Exclusion violates the comparability requirements, 42 U.S.C. § 1396a(a)(10)(B). (Doc.1, at ¶¶275-80.)

Every federal appellate court to have considered whether the EPSDT provisions are enforceable by Medicaid beneficiaries through section 1983 has concluded that they are. *See S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 602-07 (5th Cir. 2004); *Pediatric Specialty Care, Inc. v. Ark. Dep't of Human Servs.*, 293 F.3d 472, 477-79 (8th Cir. 2002); *Miller v. Whitburn*, 10 F.3d 1315, 1319-20 (7th Cir. 1993); *see also Waskul v. Washtenaw Co. Cmty. Mental Health,* 979 F.3d 426, 445-48 (6th Cir. 2020) (finding § 1396a(a)(10)(A) enforceable in non-EPSDT case); *Bontrager v. Ind. Fam. & Soc. Servs. Admin,* 697 F.3d 604, 606-07 (7th Cir. 2012) (same); *Watson v. Weeks*, 436 F.3d 1152, 1159-62 (9th Cir. 2006) (same).

---

the Supreme Court held that even if the allegations in the complaint were true, there was no constitutional violation. *Id*. at 125-30. Defendants make no such argument, and this Court has found that if Defendants' determination that the excluded treatments are experimental was unreasonable, Defendants have violated the Medicaid Act. (Doc.64, at 3-6.)

Defendants' argument that these courts failed to grasp the nature of a federal right under *Gonzaga* is unfounded.  Take, for example, *S.D. ex rel. Dickson v. Hood*, in which a Medicaid beneficiary sought to enforce the EPSDT provisions. Assessing the first *Blessing*/*Gonzaga* prong, the Fifth Circuit concluded that section 1396a(a)(10)(A)—which requires that the State "must provide for making medical assistance available, including at least the care and services listed in paragraph (1) through (5), (17) and (21) of section 1396d(a) of this title, to all individuals" who meet the eligibility criteria—contains "precisely the sort of 'rights-creating' language identified in *Gonzaga* as critical to demonstrating a congressional intent to establish a new right." *S.D.*, 391 F.3d at 603. The Court also found that the EPSDT provisions do not have an aggregate focus but rather are "'concerned with whether the needs of [particular individuals] have been satisfied.'"  *Id*. at 604 (quoting *Gonzaga*, 536 U.S. at 275). Turning to the second prong, the Court found that enforcement of the EPSDT provisions does not "strain judicial competence; it is the sort of work in which courts engage every day." *S.D.*, 391 F.3d at 605 (quotations omitted).[8] And third, the Court concluded that the provisions impose binding requirements on participating states. *Id*. at 605-06.

---

[8] While Defendants claim otherwise, district courts are clearly capable of determining whether health care services are "necessary" under section 1396d(r)(5). *See, e.g.*, *K.G.*, 981 F.Supp.2d at 1291-92; *C.R. ex rel. Reed v. Noggle*, 559 F.Supp.3d 1323, 1337 (N.D. Ga. 2021).

Similarly, two circuits have concluded that the comparability provision is enforceable through section 1983.[9] *See Waskul*, 979 F.3d at 446-48; *Davis v. Shah*, 821 F.3d 231, 255 n.12 (2d Cir. 2016).[10] In *Waskul*, the Sixth Circuit found that the comparability provision – which requires that "the medical assistance made available to any individual described" must "not be less in amount, duration, or scope than the medical assistance made available to any other such individual," 42 U.S.C. § 1396a(a)(10)(B) – contains "the kind of individually focused terminology that unambiguously confers an individual entitlement under the law." *Id.* at 447 (cleaned up). The Court further determined that the provision is "amenable to judicial remedy," as it "sets forth criteria for determining whether . . . services are equitably provided," and that the provision is "couched in mandatory rather than precatory language." *Id.* at 448 (cleaned up).

These cases establish that the EPSDT and comparability provisions create individual federal rights for Medicaid beneficiaries and are thus "presumptively

---

[9] In *Harris v. James*, 127 F.3d 993 (11th Cir. 1997), the Eleventh Circuit held that a federal regulation itself cannot create an enforceable right under section 1983. *Id.* at 1008. The Court made clear that it was not deciding whether the statutory comparability provision could give rise to a federal right. *Id.* at 1011. Thus, *Harris* has no bearing on the issue before this Court. *See Doe v. Chiles*, 136 F.3d 709, 714-15 (11th Cir. 1998).

[10] Multiple district courts have reached the same conclusion. *See, e.g.*, *Cruz v. Zucker*, 116 F.Supp.3d 332, 345-46 (S.D.N.Y. 2015); *Women's Hosp. Found. v. Townsend*, 2008 WL 2743284 (M.D. La. July 10, 2008); *Michelle P. v. Holsinger*, 356 F.Supp.2d 763, 767-68 (E.D. Ky. 2005).

enforceable by § 1983." *Gonzaga*, 536 U.S. at 284. Defendants cannot make the "difficult showing" that Congress expressly prohibited reliance on section 1983 or that it provided a comprehensive remedial scheme intended to preclude individual suits to rebut this presumption. *Blessing*, 520 U.S. at 346. Congress has not done so. *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 521-22; *see also City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 121-22 (2005).

Finally, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015), does not implicate the enforceability of Medicaid's EPSDT and comparability provisions pursuant to section 1983. *Armstrong* concerned a Medicaid payment provision (not EPSDT or comparability) that health care providers (not Medicaid enrollees) were seeking to enforce under the Supremacy Clause (not section 1983). 575 U.S. at 323-34. Unlike the provisions at issue here, the provision at issue in *Armstrong*, 42 U.S.C. § 1396a(a)(30)(A), had been found unenforceable pursuant to section 1983 by most courts, including this one. *See Fl. Pharmacy Ass'n v. Cook*, 17 F.Supp.2d 1293 (N.D. Fla. 1998). The plurality's reasoning in *Armstrong* did not involve and certainly did not overrule the section 1983 enforcement test. *See*, *e.g.*, *BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815, 820 (7th Cir. 2017); *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 373 (5th Cir. 2018).

2)  <u>The Exclusion Violates the Medicaid Act's EPSDT Requirements.</u>

The EPSDT requirements' fundamental purpose is to ensure that Medicaid recipients under age 21 receive the "health care they need when they need it." *M.H. v. Berry*, 2021 WL 1192938, *6 (N.D. Ga. 2021) (cleaned up). Specifically, they require each state Medicaid program to cover any service allowable under § 1396d(a) if "necessary . . . to correct or ameliorate" health conditions regardless of whether the state covers the service for adults. 42 U.S.C. §§ 1396d(r)(5), 1396a(a)(10)(A), 1396d(a)(4)(B); *see, e.g., Moore ex rel. Moore v.* Reese, 637 F.3d 1220, 1233-34 (11th Cir. 2011); *S.D*, 391 F.3d at 589-93. "The EPSDT obligation is thus extremely broad." *Katie A., ex rel. Ludin v. L.A. County*, 481 F. 3d 1150, 1154 (9th Cir. 2007); *see also Smith v. Benson*, 703 F.Supp.2d 1262, 1269-70 (S.D. Fla. 2018). And "there is a very strong inference to be inclusive rather than exclusive" when determining the meaning of "correct or ameliorate." *Ekloff v. Rodgers*, 443 F.Supp.2d 1173, 1180 (D. Ariz. 2006). Further, states must take the proactive step of ensuring that services determined to be medically necessary for a particular beneficiary are actually arranged for. 42 U.S.C. § 1396a(a)(43)(C); *Katie A.*, 481 F. 3d at 1158-59.

Here, the EPSDT provisions require Defendants to cover the gender-affirming services barred by the Exclusion. Puberty-delaying medications, hormone therapy, and surgery fall within the scope of benefits listed in § 1396d(a). *See* 42 U.S.C. §

1396d(a)(1) (inpatient hospital services), (2)(A) (outpatient hospital services), (5)(A) (physicians' services), (12) (prescribed drugs). And, for many transgender young people, the services are "necessary . . . to correct or ameliorate" their gender dysphoria. *Id*. § 1396d(r)(5).

Broad consensus within the medical community recognizes that these treatments can be medically necessary for transgender adolescents and young adults, based on their individual needs. Prior to implementing the Exclusion, AHCA reached the same conclusion, covering each of these services for a significant number of transgender Medicaid beneficiaries under age 21. (Ex.317.) Indeed, AHCA covered puberty-delaying medications for K.F. and S.D. (Doc.120-6, at 247:9-247:20), and hormone therapy for Mr. Rothstein (*id*. at 246:15-247:6).

3) The Exclusion Violates the Medicaid Act's Comparability Requirement.

The Medicaid Act requires AHCA to ensure that the "medical assistance made available to any [categorically needy] individual . . . shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396a(a)(10)(B); 42 C.F.R. § 440.240. Federal regulations make clear that states "may not arbitrarily deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c).

Courts regularly hold that the comparability requirement "prohibits discrimination among individuals with the same medical needs stemming from different medical conditions." *Davis*, 821 F.3d at 258; *see also White v. Beal*, 555 F.2d 1146, 1148 (3d Cir. 1977); *Cota v. Maxwell-Jolly*, 688 F.Supp.2d 980, 993 (N.D. Cal. 2010).

While AHCA refuses to cover various surgical procedures necessary to treat gender dysphoria, the agency covers the same surgeries when necessary to treat other conditions. (Ex.4 at Definitions ¶ 13; Ex.1, at ¶¶ 8-12.) Multiple federal courts have held that such a policy violates the comparability requirement by discriminating based on diagnosis.[11] *See*, *e.g.*, *Flack v. Wis. Dep't of Health Servs.*, 395 F.Supp.3d 1001, 1019 (W.D. Wis. 2019); *Fain v. Crouch*, 2022 WL 3051015, *13 (S.D. W. Va. 2022).

The same reasoning applies to the categorical exclusion of hormone therapy. AHCA does not cover testosterone or estrogen when necessary to treat gender dysphoria but covers the same prescription drugs when necessary to treat other conditions. (Ex.4, ¶13; Ex.1, ¶8.) While Defendants argue that these uses are not

---

[11] Defendants argue that there is no "equivalence between" a mastectomy performed to treat gender dysphoria and a mastectomy performed to treat breast cancer because in the breast cancer context, "diseased breast tissue is removed from the body." (Mot. at 28.) Defendants do not explain why that distinction is meaningful and ignore that a mastectomy is routinely performed (and covered by AHCA) in patients whose breast tissue is not "diseased." (Ex.10, ¶¶14, 24.)

equivalent for purposes of Medicaid coverage, the prescription drug provision of the Medicaid Act indicates otherwise. The statute requires states to cover all FDA-approved drugs when they are prescribed for a "medically accepted indication," subject to certain limited inapplicable exceptions. [12] 42 U.S.C. §§ 1396r-8(k)(2), 1396r-8(d)(1)(B); Ex.63, at 2; *see also Edmonds v. Levine,* 417 F.Supp.2d 1323, 1338 (S.D. Fla. 2006). A "medically accepted indication" is a use that is FDA-approved or "supported by one or more citations included or approved for inclusion in any of the compendia" listed in the Medicaid Act. 42 U.S.C. § 1396r-8(k)(6); *see also id*. § 1396r-8(g)(1)(B)(i) (listing three compendia, including DRUGDEX). Thus, under the Medicaid Act, a use that is FDA-approved stands on equal footing with a use that is supported by citation in a compendium. *See Edmonds*, 417 F.Supp.2d at 1337 (holding that AHCA cannot "substitute its own judgment for that of Congress" and deny coverage for uses of a prescription drug that are supported by citation in a compendium).

Here, citations in DRUGDEX support the use of various forms of testosterone and estrogen to treat gender dysphoria. Ex.25, at 18-21, 23-26, 29-36; Ex.26at 23-25, 27-28, 34-35. *See Dobson v. Sec'y of Health & Hum. Servs.*, 2022 WL 424813 at *7 (11th Cir. 2022) (interpreting the phrase "supported by one or more citations"

---

[12] Conversely, nothing in the Medicaid Act prohibits states from covering FDA-approved drugs when they are prescribed for a use that is not FDA-approved or supported by citation in a compendium.

in § 1396r-8(k)(6) to mean a citation "tend[s] to show or help[s] prove the efficacy and safety of the prescribed off-label use"). But while that use is on par with any FDA-approved use for purposes of Medicaid coverage, Florida only covers testosterone for FDA-approved indications.  (Ex.27; Ex.25, at 10-11.)  Moreover, as a matter of practice, AHCA covers testosterone cypionate, testosterone enanthate, and estrogen for *absolutely any use* – whether the use is FDA-approved, supported by citation in a compendium, or not – other than to treat gender dysphoria. (Ex.28.)[13] Thus, AHCA is excluding coverage for only one "medically accepted indication" (gender dysphoria) and providing coverage for every other indication, even those that are not medically accepted.

### C. The Exclusion Violates Section 1557 of the ACA.

Section 1557 creates "an affirmative obligation not to discriminate in the provision of health care."  *Schmitt v. Kaiser Found. Health Plan of Wash.*, 965 F.3d 945, 955 (9th Cir. 2020).  Section 1557 requires, in relevant part, that "[a]n individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. 1681 *et seq.*), … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance."  42

---

[13] https://ahca.myflorida.com/content/download/8681/file/PDL.pdf.

U.S.C. § 18116(a).  Title IX prohibits discrimination "on the basis of sex." 20 U.S.C.

§ 1681.

"To state a claim under [Section 1557], a plaintiff is required to show that he

or she (1) was a member of a protected class, (2) qualified for the benefit or program

at issue, (3) suffered an adverse action, and (4) the adverse action gave rise to an

inference of discrimination." *Griffin v. Gen. Elec. Co.*, 752 F.App'x 947, 949 (11th

Cir. 2019).  Plaintiffs address each element in turn.

       1)  <u>The Exclusion discriminates against Plaintiffs based on sex.</u>

The Exclusion discriminates based on sex in three distinct ways.  First, the

Exclusion speaks in explicit gendered terms and *facially discriminates* based on sex.

Second, the Exclusion discriminates based on sex stereotypes relating to a person's

sex assigned at birth.  And third, the Exclusion discriminates based on sex because

it discriminates based on transgender status.

       *a)  The Exclusion facially discriminates based on sex.*

On its face, the Exclusion discriminates based on sex.  The Exclusion

explicitly precludes Medicaid coverage for "services for the treatment of *gender*

dysphoria," including "*[s]ex* reassignment surgeries" and any "procedures that alter

primary or secondary *sexual* characteristics."  FAC 59G-1.050(7).  "A facial inquiry

is what it sounds like: a review of the language of the policy to see whether it is

facially neutral or deals in explicitly racial or gendered terms.'" *Kadel*, 2022 WL

3226731, at *18 (cleaned up).

Here, one cannot "'try writing out instructions' for which treatments are excluded 'without using the word[] … sex (or some synonym).'" *Kadel*, 2022 WL 3226731, at *19 (quoting *Bostock*, 140 S. Ct. at 1746). "It can't be done." *Bostock*, 140 S. Ct. at 1746. It is impossible to determine whether a particular treatment is for "*gender* dysphoria,"[14] leads to ""*[s]ex* reassignment," or "alter[s] primary or secondary *sexual* characteristics"—and thus, whether the Exclusion applies—without comparing the member's sex assigned at birth to how it might be impacted by the treatment. *Kadel*, 2022 WL 3226731, at *19.

A barrage of case law examining similar exclusions supports this conclusion. *See*, *e.g.*, *Fain*, 2022 WL 3051015, at *8; *Fletcher v. Alaska*, 443 F.Supp.3d 1024, 1027, 1030 (D. Alaska 2020); *Flack v. Wisconsin Dep't of Health Servs.*, 395 F.Supp.3d 1001, 1019-22 (W.D. Wis. 2019); *Boyden v. Conlin*, 341 F.Supp.3d 979, 1002-03 (W.D. Wis. 2018).

The Eleventh Circuit's decision in *Adams by & through Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791 (11th Cir. 2022) (en banc), does not affect this straightforward analysis. In *Adams*, the Eleventh Circuit was concerned not with whether the policy at issue discriminated based on sex but "whether discrimination based on biological sex necessarily entails discrimination based on transgender

---

[14] Gender dysphoria necessarily considers an individual's sex assigned at birth.

status." *Id.* at 809.   Indeed, the court found that a "bathroom policy requir[ing] 'biological boys' and 'biological girls'—in reference to their sex determined at birth—to use either bathrooms that correspond to their biological sex or sex-neutral bathrooms," *id.* at 801, facially "classifie[d] on the basis of biological sex." *Id.* at 803.[15]

Because a beneficiary's sex (however, one defines it) plays "an unmistakable and impermissible role in the" decision to deny Medicaid coverage under the Exclusion, the Exclusion facially discriminates based on sex.   *Kadel*, 2022 WL 3226731, at *28.[16]

> b) *The Exclusion discriminates based on sex because it discriminates based on sex stereotypes.*

Excluding coverage for gender-affirming medical care because it "*alter[s]* primary or secondary *sexual* characteristics," FAC 59G-1.050(7), "entrenches" the sex-stereotyped "belief that transgender individuals must preserve the genitalia and other physical attributes of their [sex assigned at birth] sex over not just personal preference, but specific medical and psychological recommendations to the

---

[15] Section 1557 only incorporated the grounds and enforcement mechanisms of Title IX, not any of its exemptions or carve-outs.  *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1, 43 (D.D.C. 2020).

[16] The holding in *Lange v. Houston County, Georgia*, 499 F.Supp.3d 1258, 1275 (M.D. Ga. 2020) ("*Lange I*"), is unavailing.  (Doc.137 at 2-3.)  *Lange I* is particularly unpersuasive for Plaintiffs' statutory claims, where Congress has directly renounced *Geduldig*'s reasoning.

contrary." *Boyden v. Conlin*, 341 F.Supp.3d 979, 997 (W.D. Wis. 2018). This is a "form of sex stereotyping where an individual is required effectively to maintain his or her natal sex characteristics." *Id.*; *see also Flack*, 328 F.Supp.3d at 951. It "is textbook sex discrimination." *Kadel*, 2022 WL 3226731, at *19.

Accordingly, courts throughout the country have found similar discrimination against transgender people to be rooted in impermissible sex stereotyping. *See*, *e.g.*, *Kadel v. Folwell*, 446 F.Supp.3d 1, 14 (M.D.N.C. 2020); *Toomey v. Arizona*, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019).

This principle accords with longstanding Eleventh Circuit precedent that "[a]ll persons, whether transgender or not, are protected from discrimination on the basis of [a sex stereotype]." *Adams,* 57 F.4th at 813 (quoting *Glenn v. Brumby,* 663 F.3d 1312, 1318-19 (11th Cir. 2011)). *Adams* does not change this result. Unlike in *Adams*, the Exclusion hinges on prohibiting coverage for procedures that "*alter* primary or secondary *sexual* characteristics*," FAC 59G-1.050(7), and "services for the treatment of *gender* dysphoria," FAC 59G-1.050(7), which by definition refers to the psychological distress that results from an *incongruence between one's sex assigned at birth and one's gender identity*. (Ex.33).

> c) *The Exclusion discriminates based on sex because it discriminates based on transgender status.*

In *Bostock*, the Supreme Court explained that "it is impossible to discriminate against a person for being … transgender without discriminating against that

individual based on sex." 140 S.Ct. at 1741.  And it is settled law that a policy that discriminates based on conduct or characteristics that either define or are closely correlated with a particular group facially discriminates against that group. *See*, *e.g.*, *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 689 (2010); *Lawrence v. Texas*, 539 U.S. 558, 583 (2003) (O'Connor, J., concurring).

Here, only transgender people have gender dysphoria. *See Fain*, 2022 WL 3051015, at \*6; *see also C.P.*, 2022 WL 17788148, at \*6; *Kadel*, 2022 WL 11166311, at \*4; Section II(A), *supra*.  Thus, the medical care singled out by the Exclusion is medical care that only transgender people need or seek.  *See Fain*, 2022 WL 3051015, at \*8; *Toomey*, 2019 WL 7172144, at \*6; *Flack*, 328 F.Supp.3d at 950.

2) Plaintiffs have suffered an adverse action giving rise to an inference of discrimination.

Plaintiffs suffered an "adverse action" due to the Exclusion.  Because of the Exclusion, Plaintiffs have lost Medicaid coverage for necessary medical treatment recommended by their doctors that would otherwise be covered.   Defendants promulgated the Exclusion with discriminatory intent to achieve a discriminatory effect. The Exclusion bans coverage of medically necessary care for the treatment of gender dysphoria, which only transgender persons need. *See also Kadel*, 2022 WL 3226731, at \*20.

Moreover, where the state "intentionally penalizes a person identified as male

30

at birth for . . . actions that it tolerates in [someone] identified as female at birth"—
here, pursuing medical intervention to affirm a female identity—"sex plays an
unmistakable and impermissible role." *Bostock*, 140 S.Ct. at 1741-42.  Put another
way, whether coverage is prohibited turns explicitly on a person's sex assigned at
birth.

### D. The Exclusion Triggers Heightened Scrutiny Under the Equal Protection Clause and Defendants Have Not Met Their Burden.

None of Defendants' arguments undermine the triable issue that Defendants'
Exclusion violates Equal Protection because it discriminates based on sex and
transgender status.   And because the Exclusion discriminates based on sex and
transgender status, Defendants must show that an "exceedingly persuasive
justification" supports the Exclusion. *United States v. Virginia*, 518 U.S. 515, 531
(1996).

> 1) <u>The Exclusion discriminates based on sex, triggering heightened scrutiny.</u>

As outlined above, the Exclusion (1) *facially discriminates* based on sex; (2)
discriminates based on sex stereotypes relating to a person's sex assigned at birth;
and (3) discriminates based on sex because it discriminates based on transgender
status.

Defendants argue that *Adams* held that "sex-based discrimination is
discrimination based on biological sex" and that the Exclusion "does not make a

distinction based on biological sex."  (Mot. at 32.)  Not so, *see supra*.  But even viewed in that (incorrect) framing, the Exclusion discriminates based on sex because the Exclusion prohibits coverage of procedures that ""*alter* primary or secondary *sexual characteristics*."  FAC 59G-1.050(7).  Such characteristics are biological.

Defendants further argue that rational basis applies because the Exclusion purportedly discriminates not based on sex, but on "medical diagnosis." (Mot. at 32.) But this does not save the Exclusion, either.  Federal courts have rejected identical arguments.  *Kadel*, 446 F.Supp.3d at 18.  Only transgender people need coverage for "services and treatment for *gender dysphoria*" because only transgender people are diagnosed with gender dysphoria.

Defendants also argue that because the Exclusion is applied to both transgender people who were assigned female at birth and those who were assigned male at birth, it does not discriminate "based on sex." (Mot. at 32.)  But that one group of transgender people are not treated worse than another does not change the fact that the Exclusion discriminates based on sex.  "[T]he Equal Protection Clause, extending its guarantee to any person, reveals its concern with rights of individuals, not groups." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 152 (1994) (Kennedy, J., concurring) (cleaned up); *see also Loving v. Virginia*, 388 U.S. 1, 8 (1967).

Finally, Defendants' reliance on *Geduldig v. Aiello*, 417 U.S. 484 (1974), is unavailing.

*First*, the Exclusion explicitly and facially classifies based on sex.  *See Fletcher*, 443 F.Supp.3d at 1027, 1030; *see also Whitaker v. Kenosha Unified Sch. Dist. No.1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017). Every person to whom the Challenged Exclusion applies is therefore discriminated against because of sex.

*Second*, *Geduldig* only held that an exclusion of pregnancy from a disability benefits program with no showing of "pretext" is not *per se* "discrimination against the members of one sex." 417 U.S. at 496 n.20. But "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). Here, the Exclusion categorically excludes gender-affirming care from coverage, "which is only sought by transgender individuals." *Brandt v. Rutledge*, 2021 WL 3292057, at *2 (E.D. Ark. Aug. 2, 2021). That is precisely what *Geduldig* and *Bray* prohibit.

*Third*, the centrality of gender transition to transgender identity distinguishes this case from *Geduldig*.  Unlike the pregnancy exclusion in *Geduldig*, the Exclusion here is based on a characteristic that defines membership in the excluded group. Pregnancy is not the defining characteristic of a woman.  Living in accord with one's gender identity rather than birth-assigned sex is the defining characteristic of a transgender person. *See*, *e.g.*, *Glenn*, 663 F.3d at 1316.

2) <u>The Exclusion discriminates based on transgender status and therefore independently triggers heightened scrutiny.</u>

Defendants misconstrue the reach of the *Adams* case again in their assertion that the court "explained what constitutes unconstitutional discrimination based on transgender status." (Mot. at 32.) But the *Adams* court did no such thing.  True, the *Adams* court expressed in *dicta* "doubt that transgender persons constitute a quasi-suspect class" because "the Supreme Court has rarely deemed a group a quasi-suspect class."  57 F.4th at 803 n.5.  But that does not mean that "[t]ransgender individuals [] aren't entitled to heightened constitutional review per se."  (Mot. at 33.)

Discrimination based on transgender status is separately entitled to, at least, heightened scrutiny because transgender people meet all of the indicia required.  *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020); *see also Karnoski v. Trump*, 926 F.3d 1180, 1200 (9th Cir. 2019). "[T]ransgender people as a class have historically been subject to discrimination or differentiation; … they have a defining characteristic that frequently bears no relation to an ability to perform or contribute to society; … as a class they exhibit immutable or distinguishing characteristics that define them as a discrete group; and … as a class, they are a minority with relatively little political power." *Evancho v. Pine-Richland Sch. Dist.*, 237 F.Supp.3d 267, 288 (W.D. Pa. 2017).

3) <u>There is a genuine dispute of material fact as to whether Defendants engaged in purposeful discrimination.</u>

Defendants must "treat all persons similarly situated alike" or "avoid all classifications that … that reflect a bare desire to harm a politically unpopular group." *Glenn*, 663 F.3d at 1315 (cleaned up).  That said, because the Exclusion is facially discriminatory, a showing of intentional discrimination is unnecessary.  *See Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 177 (3rd Cir. 2005).

Determining discriminatory intent is guided by an eight-factor test. *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373 (11th Cir. 2022) (cleaned up).  Here, these factors are met.

- *The impact of the challenged law*: "[T]he Exclusion impacts only transgender individuals—that provides some circumstantial evidence of intentional discrimination."  *Lange v. Houston Cnty., Georgia*, 608 F.Supp.3d 1340, 1355 (M.D. Ga. 2022) ("*Lange II*").  *See also supra*.

- *The historical background:*  Here, Florida Medicaid covered medical treatment for gender dysphoria, until 2022, when Florida's government adopted a blizzard of anti-LGBTQ laws.  This includes restrictions on the coverage and provision of gender-affirming care, "Don't Say or Trans" laws, banning of books discussing LGBTQ identities, bans on drag performances, and more.  (Opp. Ex. E; Doc.1, ¶¶126(a)-(f).)

35

- *The specific sequence of events leading up to its passage:* Plaintiffs have laid out circumstantial evidence concerning this factor, including the coordination with the Governor's Office, FDOH, and anti-transgender activists.

- *Procedural and substantive departures:* Plaintiffs have documented a litany of procedural and substantive departures, including AHCA's: (1) hiring of outside consultants, which AHCA had never done for a GAPMS (Doc.120-6, at 137:10-12, 139:17-138:3), all of whom opposed gender-affirming care (Ex.324, at 7-9); (2) not enlisting or even considering any consultant supporting the provision of gender-affirming care (Doc.120-6, 135:10-15; Doc.120-9, 112:5-23); (3) employing an unprecedented GAPMS process for a treatment already covered (Doc.120-6, 93:13-21); (4) bypassing the employees typically tasked with conducting GAPMS processes (Doc.120-9, 85:16-19); and (5) closely coordinating with and having the process originate from other agencies like FDOH and the Governor's Office, (Doc.120-6, at 89:18-19, 90:25-91:1, 92:2-4; Opp. Ex. D (Weida), 15:2-18:3; Ex.302).

- *The contemporary statements and actions of key legislators:* Plaintiffs have pointed to some of these demeaning and offensive statements. (Doc.1, ¶126(g).)

- *The foreseeability of the disparate impact and knowledge of that impact:* The impact on transgender Medicaid beneficiaries was both foreseeable and communicated to Defendants during the notice-and-comment process. (Ex. 323, at 6; Ex. 324, at 2; Ex. 325, at 3-4).

- *The availability of less discriminatory alternatives*: "There is no evidence [Defendants] considered less discriminatory alternatives." *Lange II*, 608 F.Supp.3d at 1356.

When it comes to whether Defendants engaged in purposeful discrimination, "the facts are hotly disputed," at least. *Lange II*, 608 F.Supp.3d at 1356.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' Motion.

Respectfully submitted this 28th day of April 2023.

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsburylaw.com
shani.rivaux@pillsburylaw.com

**William C. Miller**\*
**Gary J. Shaw**\*
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Joe Little**\*
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle**\*
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**\*
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

By: */s/ Omar Gonzalez-Pagan*
**Omar Gonzalez-Pagan**\*
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**\*
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

\* *Admitted pro hac vice.*

## CERTIFICATE OF WORD COUNT

As required by Local Rule 7.1(F), I certify that this Motion contains 7,999 words.

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of April 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

*/s/ Omar Gonzalez-Pagan*
Counsel for Plaintiffs