Page 1

```
1              UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF FLORIDA
2
3                    CASE NO.  4:22-cv-00325-RH-MAF
4
5      AUGUST DEKKER, et al.,
6          Plaintiffs,
7      vs.
8      JASON WEIDA, et al.,
9          Defendants
10     _____/
11                          Volume 1, Pgs. 1 - 124
12     VIDEOTAPED DEPOSITION OF: MATTHEW BRACKETT
13     AT THE INSTANCE OF:     THE PLAINTIFFS
14     DATE:                   FEBRUARY 8, 2023
15     TIME:                   COMMENCED: 10:00 A.M.
16     LOCATION:               AGENCY FOR HEALTH CARE
                               ADMINISTRATION
17                             2727 MAHAN DRIVE
                               TALLAHASSEE, FLORIDA 32308
18
       REPORTED BY:            DANA W. REEVES
19                             Court Reporter and
                               Notary Public in and for
20                             State of Florida at Large
21
22
23
24
25
```

```
 1   APPEARANCES:
 2           REPRESENTING THE PLAINTIFF:
 3           KATY DeBRIERE, ESQ.
             Florida Health Justice Project
 4           3900 Richmond Street
             Jacksonville, Florida 32205
 5
             SIMONE CHRISS, ESQ.
 6           CHELSEA DUNN, ESQ.
             Southern Legal Counsel, Inc.
 7           1229 NW 12th Avenue
             Gainesville, Florida 32601
 8
             SHANI RIVAUX, ESQ.
 9           Pillsbury, Winthrop, Shaw, Pittman, LLP
             600 Brickell Avenue, Suite 3100
10           Miami, Florida 33131
11           OMAR GONZALEZ-PAGAN, ESQ.
             Lambda Legal Defense and Education
12           Fund, Inc.
             120 Wall Street, 19th Floor
13           New York, NY 10005
14           CATHERINE MCKEE, ESQ.
             1512 E. Franklin Street, Suite 110
15           Chapel Hill, NC 27514
16
17
             REPRESENTING THE DEFENDANT:
18
             MOHAMMAD O. JAZIL, ESQ.
19           GARY V. PERKO, ESQ.
             Holtzman, Vogel, Barantorchinsky & Josefiak
20           119 S. Monroe Street, Suite 500
             Tallahassee, Florida 32301
21
22
23           ALSO PRESENT:
             RL Minnich, Videographer
24
25
```

1                      INDEX TO WITNESS

2

3    MATTHEW BRACKETT                        PAGE

4    Examination by Ms. DeBriere                 5

5

6                      INDEX TO EXHIBITS

7

8     NO.           DESCRIPTION                MARKED

9     Exhibit 1    Notice of deposition              7
      Exhibit 2    Florida Medicaid policy          16
10    Exhibit 3    Cross-Sex Hormone Therapy GAPMS  21
      Exhibit 4    DEF_000145170                    32
11    Exhibit 5    April 19, 2022 GAPMS             57
      Exhibit 6    June 23, 2017 GAPMS              60
12    Exhibit 7    DEF_000288776                    71
      Exhibit 8    Gender confirmation surgery GAPMS 80
13    Exhibit 9    Native document                  83
      Exhibit 10   Native document                  83
14    Exhibit 11   June 2, 2022 GAPMS               85
      Exhibit 12   After the fact request form under 100
15                 35K

16

17

18

19    *Uh-uh is a negative response
      *Uh-huh is a positive response

20

21

22

23

24

25

```
 1                  D E P O S I T I O N
 2             VIDEOGRAPHER: This is the video-recorded
 3        deposition of corporate representative for Agency
 4        for Healthcare Administration, in the matter of
 5        August Decker, et al. vs. Jason Weida, et al.  Case
 6        No. 4:22-cv-00325, RH-MAF.  This deposition is
 7        being held at 2727 Mahan Drive in Tallahassee,
 8        Florida.  Today's date is February 8th, 2023 and
 9        the time is 10:08 a.m.  The court reporter is Dana
10        Reeves.  My name is RL Minnich.  I'm the
11        videographer.  Would counsel please introduce
12        themselves and the court reporter please swear in
13        the witness?
14             MS. DEBRIERE: Yes, Katy DeBriere and I
15        represent the plaintiffs.
16             MS. CHRISS: Simone Chriss and I also represent
17        the plaintiffs.
18             MS. DUNN: Chelsea Dunn.  I also represent the
19        plaintiffs.
20             MR. JAZIL: Mohammad Jazil for the defense.
21             MS. DEBRIERE: And we have a few people on the
22        Zoom link from the plaintiff's side.  That would be
23        Catherine McKee and Omar Gonzalez-Pagan.
24             MR. PERKO: And Gary Perko on behalf of the
25        defendants on the Zoom link.
```

1          MS. DEBRIERE: And Shani Rivaux has joined us

2      from the plaintiff's side as well.

3          COURT REPORTER: All right, sir, if you would

4      raise your right hand, please.

5   Whereupon,

6                      MATTHEW BRACKETT

7   was called as a witness, having been first duly sworn to

8   speak the truth, the whole truth, and nothing but the

9   truth, was examined and testified as follows:

10          THE WITNESS: I do.

11          COURT REPORTER: Thank you.

12                      EXAMINATION

13   BY MS. DEBRIERE::

14      Q    All right.  So we're just going to mark

15   exhibits as they're discussed, if that's okay with you,

16   Matt.

17      A    That's fine.

18      Q    As we walk through those exhibits, I'm going

19   to read off the Bates numbers on the bottom of each

20   page.  So those are just the -- that line of numbers I'm

21   reading out loud as we discuss exhibits, and that should

22   help you track what page I'm on as we're discussing

23   them.  So we're going to go ahead and mark the notice of

24   deposition as Exhibit 1.  I saw that you brought the

25   copy with you, as well, Mr. Brackett.

1          (Whereupon, Exhibit No. 1 was marked for

2      identification.)

3              MR. JAZIL: Is this the court reporter's copy?

4              MS. CHRISS: The witness' copy that can become

5          the court reporter's copy.

6      BY MS. DEBRIERE::

7          Q     Okay.  So just some preliminary stuff before

8      we go over this notice.  I'm going to be using the

9      acronym GAPMS quite a bit.  That stands for Generally

10     Accepted Professional Medical Standards, and is the

11     acronym that refers to the process described at Florida

12     Administrative Code Rule 59-G-1.035.  When I refer to

13     the GAPMS or GAPMS process, do you understand what I

14     mean?

15         A     Yes.

16         Q     I will also use the term gender dysphoria,

17     which is defined as discomfort or distress that is

18     caused by a discrepancy between a person's gender

19     identity and that person's sex assigned at birth and the

20     associated gender role and/or primary and secondary sex

21     characteristics.  Can we agree that when I say gender

22     dysphoria, that's the definition I'm using?

23         A     Yes.

24         Q     I will also be using a phrase categorical

25     exclusion of treatment for gender dysphoria, which

1   refers to the exclusion in Florida Administrative Code

2   Rule 59-G-1.050(7).  Do you understand that that phrase

3   refers to all the services in that particular portion of

4   the rule when I say categorical exclusion?

5        A    I do.

6        Q    And then I will also be using the term EPSDT

7   services, which stands for Early Periodic -- Early and

8   Periodic Screening Diagnostic and Treatment Services.

9   When I say EPSDT, do you know what I mean?

10       A    Yes.

11       Q    Have you ever been deposed before?

12       A    Yes, I have.

13       Q    Okay.  So if there's at any point that you

14  don't understand my question, what I want you to do is I

15  want you to stop and ask me to rephrase it.  I don't

16  want you to try to attempt to ask -- answer the question

17  if you don't understand it.  Okay?

18       A    Okay.

19       Q    I have a problem sometimes of speaking over

20  someone else, I don't know if you have the same problem,

21  but what we need to try to do is just give each other

22  space to pause in between the questions so we're not

23  speaking over each other.  Okay?

24       A    I'm fine with that.

25       Q    Okay.  Verbal answers.  Sounds like, you know,

1   you speak very clearly, so we shouldn't have a problem,

2   but obviously -- although we do have a videographer

3   here, it's better to speak your answer out loud.

4        A    I do understand.  Articulating hand gestures,

5   the court reporter cannot get those into the

6   transcripts.

7        Q    Exactly.  All right, if you need to take a

8   break for any reason, totally fine, just let me know.  I

9   do ask that you answer my question before we take a

10  break.

11       A    Okay.

12       Q    And then are you on any medications or other

13  substances that could impact your memory today?

14       A    No.

15       Q    And state your name for the record.

16       A    So my full name is John Matthew Brackett.

17       Q    Okay.  And it's your understanding that you're

18  representing the Florida Agency for Health Care

19  Administration in a 30(b)(6) deposition?

20       A    That's correct.

21       Q    Okay.  What topics, looking at the notice,

22  which is Exhibit 1, notice of 30(b)(6) deposition, what

23  topics were you designated for?  Were they all of them

24  here?

25       A    Yes.

1      Q    And you're prepared to testify on behalf of

2  the Agency on each of these topics?

3      A    Yes.

4      Q    Have you seen the 30(b)(6) deposition topics?

5      A    You mean as those listed in the -- yes, I have

6  seen them.

7      Q    And who provided them to you?

8      A    Those were provided to me by our outside

9  counsel.

10     Q    Okay.  And did you consent to acting as the

11 agency representative?

12     A    Yes, I did.

13     Q    What did you do to -- excuse me.  What did you

14 do to prepare for today?

15     A    Mostly just familiarize myself with areas and

16 topics that are on the list that are not familiar to my

17 current job role, and that's pretty much it.  So pretty

18 much standard operating procedures here at the Agency

19 that are -- that might fall under different divisions or

20 different teams, et cetera.  And just kind of, like,

21 reviewed some of our coverage policies, some of our

22 rules and some of our own materials.

23     Q    Okay.  Who did you speak to?

24     A    Principally, consulted with Andrew Sheeran and

25 for any questions that involved managed care, I

1    consulted my supervisor Devona Pickle.

2        Q    Did you gather information from anyone, anyone

3    besides counsel?

4        A    I gathered a little bit of information from

5    Devona Pickle, since one of the questions directly

6    involved her role in the process.

7        Q    Okay.  I saw that you brought a document with

8    you today, it looks like maybe you reviewed that to

9    prepare.  What is that?

10       A    So that is pertinent to the question.  I can

11   provide you the exact one.  Yeah, I think -- yeah,

12   question three.  It was -- since that asked about the

13   process of how we looked at other states' Medicaid

14   programs, which that spreadsheet was -- Devona Pickle

15   administered that role of the GAPMS process.  And since

16   that question was on there, I did ask her to provide me

17   with what she used to -- and the research methods used

18   to go through each state Medicaid program to find out

19   what their coverage criteria is, or if they have a

20   statement prohibiting coverage, or if they just don't

21   have any statement whatsoever.

22            MS. DEBRIERE: Okay.  And, Mo, do you know if

23       that was produced to us in discovery?

24            MR. JAZIL: I don't believe it was.  So we'll

25       make copies and get it to you.

1   BY MS. DEBRIERE::

2       Q    How long did it take you to prepare for the

3   deposition today?

4       A    Well, given that we received these questions

5   about a week ago, I'd probably say I spent probably off

6   and on -- I mean, in between other projects, probably

7   I'd say three, maybe four working days.

8       Q    Okay.  A little bit about you.  Describe your

9   educational background.

10      A    So I received a -- my -- started off, I got my

11  AA at Tallahassee Community College.  I received my

12  Bachelor of Arts in history at Florida University, 2003.

13  I graduated magna cum laude.  Received my Master of Arts

14  in History from Florida University in 2005.  During my

15  time in graduate school, I did spend a few extra years

16  working on a PhD, which I decided not to finish, but

17  during my grad school years, I presented research papers

18  on numerous topics at numerous conferences.  And I also

19  published scholarly articles in the Florida Historical

20  Quarterly and Southern Studies and Interdisciplinary

21  Journal of the South.

22      Q    The conferences, what were those about?

23      A    The conferences ranged.  They could -- they

24  were, I think, either conference on Florida history,

25  conferences on environmental history.  I think there

Page 12

1    were, like, graduate symposiums.  So often they're also,

2    like, regional conferences.  The topics I represented on

3    ranged from anything from environmental history to

4    public health history.

5        Q     And your PhD, what -- what were you attempting

6    to get it in?

7        A     So I was actually looking at getting my PhD in

8    the history of medicine and public health.  And

9    actually, I was -- my dissertation topic was on

10   tuberculosis, on how during the late 19th century, how

11   kind of the infancy of public health agencies and how

12   public health was actually becoming a common concept and

13   how -- and, of course, with the emerging sciences --

14   well, pretty much with the discovery of microbiology and

15   discovery of the tuberculosis bacteria, how all that was

16   coming together to affect changes in the south in public

17   health, and looking at also how, since tuberculosis was

18   very common, on how that shapes southern identity.

19       Q     Okay.  And what's your current position at the

20   Agency for Health Care Administration?

21       A     So my current position is Program Consultant.

22   I work on the Canadian Drug Importation Program

23   primarily.

24            MS. DEBRIERE: And, Court Reporter, just to

25        note, we're going to refer to the Agency for Health

1       Care Administration's throughout as either AHCA or

2       the Agency.

3    BY MS. DEBRIERE::

4       Q    Prior to your role with the Canadian Drug

5    Importation Program -- did I get that right?

6       A    Yeah, close enough.

7       Q    What was your role at the Agency?

8       A    My role at the Agency, I was the Program

9    Administrator over the Specialized Services and

10   Behavioral Health teams.  Of course, we oversaw the

11   development and, of course, updating of policies, such

12   as durable medical equipment, community behavioral

13   health, non-emergency transportation, school-based

14   services, hospice.  There's actually quite a lengthy

15   list.

16      Q    And how long did you do that for?

17      A    I was in that position for three and a half

18   years.

19      Q    Okay.  And prior to that, were you at the

20   Agency?

21      A    Yes, I was.

22      Q    And what was your role then?

23      A    I was a Government Analyst II.  And during

24   that time period, that was from January 2017 to November

25   2017, I was -- my role specifically tasked with

1  completing the Generally Accepted Professional Medical

2  Standards reports.

3      Q    And prior to that time, were you at the

4  Agency?

5      A    Yes.

6      Q    And what did you do then?

7      A    I would -- I worked in the Office of the

8  Deputy Secretary for Health Quality Assurance.

9      Q    So your time in the Bureau of Medicaid policy

10 was from December 2017 to --

11     A    January 2017 to November 2017.  But my job --

12 but becoming a program administrator, I was still in the

13 same bureau.

14     Q    So GAPMS -- working on GAPMS was January 2017

15 to November 2017, and then you shifted to another role

16 in Bureau and Medicaid Policy?

17     A    Yes.

18     Q    And that was in December of 2017 through --

19     A    November 2017 through April of 2021.

20     Q    And so since May of 2021 or April 2021 you've

21 been with the Canadian Drug --

22     A    April 2021.

23     Q    Okay.  Let's look at the Florida definition of

24 medical necessity.  And that is in the Florida Medicaid

25 Definitions Policy, which I'm sure you're intimately

Page 15

```
 1   familiar, at Section 2.83, and it's incorporated by

 2   reference into rule by Florida Administrative Code Rule

 3   59-G-1.010.

 4           MR. JAZIL: Simone, would you happen to have an

 5       extra copy?

 6           MS. CHRISS: Yes.

 7           MR. JAZIL: I'd rather just not lean over his

 8       shoulder.

 9           MS. DEBRIERE: You know what, Mo, you can use

10       mine.  I basically have it committed to memory.

11           MR. JAZIL: Thank you.

12           MS. DEBRIERE: So we'll go ahead and mark this

13       policy as Exhibit 2.

14           (Whereupon, Exhibit No. 2 was marked for

15   identification.)

16   BY MS. DEBRIERE::

17       Q    And, Mr. Brackett, if you want to turn to it,

18   it's 2.83.

19       A    Okay.

20       Q    What's the purpose of the Medical Necessity

21   standard listed here?

22       A    So is -- kind of clarify -- can you clarify

23   what's meant by purpose?

24       Q    What does AHCA use that medical necessity

25   standard for?
```

1      A     So these prongs for medical necessity, as

2  defined, these are our guidelines for determining

3  whether or not Florida Medicaid should cover a service.

4      Q     Okay.  Is it correct to say that the standard

5  is used to determine whether Medicaid service should be

6  prior authorized?

7      A     I don't -- I don't -- I don't think so.

8      Q     Okay.  Tell me why.

9      A     Because for medical necessity, being medically

10  necessary, this is generally -- this is a criteria for

11  whether or not Medicaid should cover a service.  The

12  prior authorization process is just mostly more clinical

13  review to determine whether or not delivery of that

14  service, coverage of that service corresponds to the

15  definition of medical necessity.

16      Q     Okay.  So when you're doing a prior

17  authorization review, you do determine whether or not

18  the service corresponds to the definition of medical

19  necessity?

20      A     So since our subcontractors and our managed

21  care plans do our prior authorizations, they do have to

22  make sure that the -- that with the service they're

23  prior authorizing would, if subjected to the medical

24  necessity guidelines and definition, yeah, they have to

25  make sure it corresponds.

1        Q      Okay.  And that's part of the prior

2    authorization process?

3        A      That's part of the prior authorization

4    process, yes.

5        Q      If a Medicaid service is found to be

6    experimental by AHCA, would AHCA or its contractors,

7    subcontractors like a managed care plan, still review

8    whether the service meets any other portion of AHCA's

9    medical necessity rule?

10       A      No.

11       Q      Okay.  Why not?

12       A      Because it does have to meet the five prongs

13   of medical necessity, and one of those prongs is it has

14   to be in alignment with GAPMS.

15       Q      Okay.  So if it's not in alignment with GAPMS,

16   would you analyze it under any other portion of that

17   definition?

18       A      No, we wouldn't.

19       Q      If a Medicaid service has not been determined

20   experimental, using like GAPMS process, can a Medicaid

21   managed care plan use the portion of the medical

22   necessity standard that reads, be consistent with

23   Generally Accepted Professional Medical Standards?

24       A      Once the Agency deemed that it's not

25   consistent, and often these requests usually come to us

1  from the plans, the plan is not going to cover it.

2      Q     Okay.  Is the plan able to make an independent

3  determination of whether those services are experimental

4  in nature, or must that come from -- decision come from

5  AHCA?

6      A     It does not necessarily have to come from

7  AHCA.  We do grant our managed care plans a great deal

8  of flexibility when it comes down to the services they

9  wish to cover, but sometimes when they get a service

10  that they're not sure about, they do often -- sometimes

11  will ask us to do a GAPMS review of it to determine

12  whether or not that -- if they should cover it.  So

13  sometimes we're kind of more of a reference point, but

14  the plans function pretty independently in these areas.

15      Q     Okay.  So the plan can make an independent

16  determination as to whether or not a service is

17  experimental or investigational?

18      A     No.  Whether or not to cover -- we don't allow

19  them to do -- we don't allow them to do independent

20  GAPMS reviews, if that's what you're asking.

21      Q     What I'm asking is looking at the prong about

22  whether this service is consistent with GAPMS, whether

23  the plan can deny coverage of a service on that basis

24  without AHCA's initial determination?

25      A     No, they need to consult with us before

1  they -- they need to consult with us before they use

2  experimental and investigational as a basis for denial,

3  which they will -- we do get requests from the health

4  plans.

5      Q    Okay.  All right.  So moving on to what's

6  Bates-stamped as defendant DEF_000126105.  This is the

7  GAPMS report on cross-sex hormone therapy, which is

8  dated --

9           MS. CHRISS: May '22.

10 BY MS. DEBRIERE::

11     Q    May 20th, 2022.

12          VIDEOGRAPHER: Counsel, can you put that mic

13     on, please?  They placed it right beside you.

14          MS. DEBRIERE: Yes.  Yes.

15          VIDEOGRAPHER: The one to your right.  Thank

16     you.

17          MS. DEBRIERE: I should have worn my suit

18     jacket tonight.

19          THE WITNESS: It might get hot here shortly, so

20     I may be taking mine off.

21          MS. DEBRIERE: Should I mark this as 3?

22          MS. CHRISS: Yes, the one for him.

23          MS. DEBRIERE: I think we got it split up.  I'm

24     sorry.  Mo, do you want to copy?

25          MR. JAZIL: Sure.  Do you really have all these

```
 1        committed to memory?
 2              MS. DEBRIERE: Well, not this one, no, no, but
 3        somewhat.
 4              MR. JAZIL: Here's the last one, Katy.
 5              MS. DEBRIERE: Thanks.
 6              MR. JAZIL: That's pretty impressive if you do.
 7              MS. DEBRIERE: Well, not these, but definitely,
 8        you know, you practice Medicaid in Florida for
 9        seven years, you know what the medical necessity
10        definition is.
11              (Whereupon, Exhibit No. 3 was marked for
12     identification.)
13              MS. DEBRIERE: All right.  Not a day past seven
14        years, either.
15     BY MS. DEBRIERE::
16        Q    Okay.  So looking at -- do you have a copy,
17     Mr. Brackett?
18        A    Yes.
19        Q    Okay.  Looking at -- if you'll flip to what's
20     marked as DEF_000126112, it's page eight.
21        A    Okay.
22        Q    Starting under coverage policy, there's some
23     discussion about federal regulations, and then moving
24     through to the Florida Medicaid section that ends on the
25     top of page 10, if you could just review that for me.
```

1     A    Okay.

2     Q    So is this an accurate portrayal of the

3  standard to determine Florida Medicaid coverage for

4  prescription drugs?

5     A    Yes, this is.

6     Q    Do all prescription drugs require prior

7  authorization to be reimbursed by Florida Medicaid?

8     A    I can't speak fully to that one.  I don't -- I

9  don't believe so, but often our managed care plans, we

10  grant them a lot more flexibility when it comes down to

11  prior authorizations, so they may require prior

12  authorization for every drug.  But as far as, like,

13  every single drug, as far as the fee for service system

14  goes, I'm not a hundred percent certain, but I believe

15  that we do not require prior authorization for every

16  single drug.

17     Q    Okay.  Do you know if anybody at the Agency

18  would have a hard answer to that question?

19     A    One of our staff pharmacists probably would.

20     Q    So can you briefly describe the process a

21  Medicaid recipient undertakes in seeking prior

22  authorization for a drug?

23     A    Usually, that's taken by the provider usually,

24  or in the case of pharmacy, I'm not sure who would

25  submit the prior authorization.  I don't think that

1    that's -- process is not initiated by the recipient

2    themselves, it's usually initiated by the provider.  Of

3    course, it goes through, like, a one-two level review

4    process.  That first level is usually done by, like, a

5    nurse or an RN.  They just determine whether or not it's

6    medically necessary.  If it is, then that one level

7    stops.  If it's a denial, it has to go -- I think it

8    goes to a second-level review.

9         Q    Okay.  And what is -- what is involved in that

10   review?  What is being reviewed?

11        A    Well, I'm not intimately familiar with it

12   because we used it a long, long time ago, prior to SM's.

13   We did that stuff in-house.  That was before my time

14   with the Agency, but now that's outsourced to EQ Health

15   Solutions in the fee-for-service system.  But they do

16   review the medical records, et cetera, and then, I

17   think, any other materials that are submitted by the

18   doctor, so --

19        Q    Do they compare it to coverage policies or

20   guidelines?

21        A    Well, for children, I don't -- it wouldn't be

22   necessary to because of EPSDT, but for adults, I don't

23   know.  That's information that we would have to ask our

24   vendors.  I assume they would, but that's an assumption.

25        Q    Okay.  Tell me a bit more about what you mean

1  by coverage guidelines when it needs to be reviewed for

2  children because of EPSDT.

3      A    Well, because of EPSDT, in which, since you're

4  familiar with all this, of course, even regardless of

5  what something says on the coverage policies -- because

6  our coverage policies and our fee schedules are very

7  prescriptive, they list out what services can be

8  covered, what services can't be covered.  Our fee

9  schedules, of course, outline the amount of money that

10  we pay for each service and our perimeter service gaps,

11  most importantly, the service gaps.  So for children, if

12  it's deemed medically necessary, and usually it does

13  have to go through the prior authorization process for

14  an EPSDT consideration, if it's determined medically

15  necessary, regardless of whether it's on a fee schedule

16  or not, or in excess of our fee schedule, or if it's not

17  listed in that coverage policies, because of EPSDT

18  requirements from the feds, we do have to cover it.

19      Q    Okay.  Okay.  And how do you define medical

20  necessity for EPSDT?

21      A    It's the same as listed in definitions policy.

22      Q    Okay.  What would be the process for obtaining

23  Medicaid coverage for a drug where prior authorization

24  is not required?

25      A    Well, so the thing about Medicaid coverage for

Page 24

1   drugs is that we do cover all drugs that are FDA

2   approved.  So if -- unless it has a prior authorization

3   requirement and if that FDA approved covered drug can be

4   covered by Medicaid.

5          Q    Okay.  What if it's not FDA approved?

6          A    If it's not FDA approved or if it's -- so are

7   we talking about, like, complete non-FDA approval or are

8   we talking about like our off-label usage?

9          Q    Actually, let's back up.  So if it's FDA

10  approved, does that mean it does not need to go through

11  the prior authorization process for Medicaid to

12  authorize it?

13         A    If it's not FDA approved, we -- I mean, we're

14  not going to cover it if it's not FDA approved.

15         Q    Okay.  If it is FDA approved, does the

16  Medicaid recipients still have to undertake the prior

17  authorization process to --

18         A    If it's FDA approved, and it's a drug that

19  we've required prior authorization, then, yes.

20         Q    Okay.  If it's a drug that does not require

21  prior authorization, what does that process look like

22  for coverage?

23         A    I generally -- I think it just -- the pharmacy

24  fills the prescription, they file a claim, agency pays

25  the claim and the dispensing fee.

Page 25

1       Q     Okay.  So there's no review in medical

2    necessity under that --

3       A     Providing the drug does not -- does not have

4    prior authorization criteria, yes.

5       Q     Okay.  So if it's a drug that does not require

6    authorization, AHCA does not determine if it's being

7    prescribed for a medically necessary use; is that

8    correct?

9       A     Can you repeat that?

10      Q     Yep.  If a drug does not require prior

11   authorization, AHCA does not -- AHCA or its contractors

12   does not undertake a determination as to whether it's

13   being prescribed for a medically necessary use?

14           MR. JAZIL: Object to form.

15           THE WITNESS: We covered -- we cover services

16       that are medically necessary.  So if it's -- that

17       would be in violation of policy if drugs are being

18       covered -- if drugs are being prescribed and

19       covered, when for -- when medical records and the

20       documentation -- when medical necessity is not

21       being met, that is that -- no, we would not cover

22       in those circumstances.

23   BY MS. DEBRIERE::

24      Q     How would you make that determination that you

25   would not cover if you're not doing a prior

1  authorization review?

2      A    So generally when issues like that, when

3  providers are billing Medicaid for services that are not

4  medically necessary, that's usually when our Medicaid --

5  Medicaid program Integrity, they start getting involved

6  in looking at -- looking at such claims.

7      Q    How would that rise to the surface of

8  triggering an investigation with Medicaid Integrity?

9      A    Well, there are lots of tip-offs.  I mean, we

10  do have a -- we do have a fraud hotline.  So somebody

11  could report a provider for fraud.  There -- it could be

12  result from an on-site survey.  Our Bureau of Recipient

13  Provider Assistance does -- they often do Medicaid

14  surveys on providers.  It could also potentially result

15  from a -- one of our health quality assurance surveys,

16  if they're going in and looking at, like, their

17  compliance with licensure rules.  So it really depends

18  on where the fraud's detected.  So there are multiple

19  avenues for reporting Medicaid fraud.

20      Q    Does AHCA have a pharmacy coverage policy for

21  every prescription drug?

22      A    We do have our outpatient prescribed drugs

23  services coverage policy.  And that, of course, is for

24  our covered outpatient drug benefit.

25      Q    Does that policy list every potential

1    prescription drug prescribed under -- prescribed to a

2    Florida Medicaid recipient?

3         A    No.  So -- because Florida Medicaid covers any

4    drug that's FDA approved, when these medical necessity

5    guidelines, that's kind of an encompassing umbrella.

6    And then, of course, we do have the preferred drug list

7    which is assembled by the Pharmaceutical and

8    Therapeutics Committee.  We always just call P&T, so --

9    but because the list is so vast we don't actually

10   reproduce it in any kind of a form.  So the prescribed

11   drug services policy, the way it's worded is supposed to

12   be all-encompassing, but there are exclusions in Section

13   5.2 of non-covered service -- of drugs that we won't

14   cover under certain circumstances.

15        Q    Okay.  So it lists some drugs you won't cover,

16   but it doesn't list all the drugs you will potentially

17   cover?

18        A    Right.  But it's also -- but it's not -- it

19   doesn't specifically state drugs, it's just -- it's more

20   specific to conditions.  Like we don't say we won't

21   cover -- well, let me use it -- Viagra, but we say that

22   we will not cover drugs for ED.

23        Q    Okay.  So there's some general descriptions of

24   what you won't -- will and won't cover?

25        A    Yes.

1     Q    Is there a pharmacy -- is there an AHCA

2 pharmacy coverage policy for estradiol?  And I'm happy

3 to spell it for you if you need it.

4     A    Oh, are we talking about estradiol.

5     Q    Estradiol.  Thank you.

6     A    No, we don't have specific coverage policies

7 for specific drugs.  And by estradiol, I mean, that's

8 an -- that's a kind of name brand estrogen.

9     Q    Okay.  And how about for medroxyprogesterone

10 acetate, or Provera?

11     A    We don't have specific coverage policies for

12 those.

13     Q    Okay.  How about micronized progesterone?

14     A    Those would all be encompassed under the

15 prescribed drug services policy.

16     Q    Okay, but not specifically named?

17     A    We don't specifically name drugs.

18     Q    I'm just going to run down the list.  Spiro --

19 and you're going to correct me when I say it wrong --

20 Spironolactone.

21     A    Spironolactone.  That one, I mean, once again,

22 the previous answer applies.  It's enveloped by our

23 prescribed drug services coverage policy.  We don't

24 have, like, an individual policy addressing that

25 specific drug.

1        Q     Okay.  Finasteride.

2        A     I think that's close enough.  Same as before

3   it's covered -- it's enveloped by the prescribed drug

4   services coverage policy.  We do not have an individual

5   coverage policy for that drug.

6        Q     Dutasteride.

7        A     We do not have an individual coverage policy

8   for that drug, but it is covered.  It is -- it is

9   addressed through the prescribed drug services coverage

10  policy.

11       Q     Okay.  Testosterone.

12       A     The same as before, we don't have an

13  individual coverage policy for it, but it is covered

14  through the prescribed drug services coverage policy.

15       Q     Testosterone enanthate.

16       A     Same as before, as in, we don't have a

17  specific coverage policy, but it is covered through the

18  prescribed drug services coverage policy.

19       Q     Okay.  Two more.  Testosterone undecanoate.

20       A     We do not have an individual coverage policy

21  for that, but it is enveloped by our prescribed drug

22  services policy.

23       Q     Gonadotropin-releasing hormone antagonists.

24       A     Gonadotropin, yeah.  So, yeah, we do not have

25  an individual coverage policy for GnRH.  And that, of

1  course, would be covered through the prescribed drug

2  services coverage policy, is how it would be addressed.

3       Q    Okay.  You do not have a policy, a pharmacy

4  policy for GnRH antagonists?

5       A    Not promulgated into rule.

6       Q    Okay.  Do you have any coverage policies -- I

7  didn't realize that when I asked whether there was a

8  coverage policy that you interpreted that to mean that

9  it had to be promulgated into rule.  Do you have any

10  coverage policies regarding these drugs that are not

11  promulgated into rule?

12       A    As far as the policy goes, we don't really

13  have a policy so for it -- so much.  There was a

14  guideline produced, I think, in 2016 that was given to

15  Magellan for guidance on the prior authorization

16  process, but as far as a policy goes, no, we don't

17  have -- we don't have a specific policy for these drugs.

18       Q    Okay.  So there was some guidance that AHCA

19  provided to Magellan regarding GnRH antagonists.

20            MS. DEBRIERE: Simone, can I have that coverage

21       guidance?

22            MS. CHRISS: This one?

23            MS. DEBRIERE: Yes, please.  Thank you.  We'll

24       mark that as Exhibit 4.  You definitely need a copy

25       of this one.

Page 31

1          (Whereupon, Exhibit No. 4 was marked for

2      identification.)

3              THE WITNESS: I've seen it enough times.

4      BY MS. DEBRIERE::

5          Q    Well, so is that what you're referring to when

6      you said the guidance provided to Magellan?

7          A    Yes.

8          Q    That's all I needed to know.  Okay.  So I'm

9      sure we'll come back to that.  And so you referenced FDA

10     approval in Medicaid coverage earlier.  When making

11     decisions about individual claims for coverage for

12     Medicaid recipients, does AHCA or its contractor

13     determine whether the use the drug is being prescribed

14     for is FDA approved?

15         A    Well, absolutely, yes.  I mean -- I mean, if

16     it doesn't have FDA approval, I mean, it's still -- I

17     mean, it's either not FDA-approved, it's still going

18     through clinical trials.  It's not FDA-approved, then

19     no, it's not eligible for coverage.

20         Q    Okay.  How does AHCA do that on an

21     individualized basis?

22         A    So for an individualized basis, generally this

23     is a prior authorization process, the request is put in.

24     The recipients, or health care plan enrollees, the

25     specific condition is evaluated and determination of

1    medical necessity is made.

2         Q    Okay.  What if the drug does not require prior

3    authorization, then how does AHCA determine whether the

4    use it's being prescribed for is FDA-approved?

5         A    That would normally have to involve a

6    retrospective claims review.

7         Q    Okay.  So at the time it'd be covered, but

8    then AHCA would go back and look to see if it should

9    have been covered?

10        A    That's correct.

11        Q    And how do they do that?

12        A    How do they do that?

13        Q    Yeah.

14        A    I don't know the specifics, generally either

15   MPI or another bureau.  Often people in the field will

16   often look at review claims, and this has happen

17   frequently, that if claims are found to be paid in error

18   or paid for services that were not necessarily -- not

19   medically necessary, but the Agency does have the

20   ability and frequently does gather recoupments on

21   providers.

22        Q    Okay.  MPI stands for --

23        A    Medicaid Program Integrity.

24        Q    So that's like a fraud investigation?

25        A    Yes, there are two fraud investigation teams

1  of the state.  For MPI, they're specifically here for

2  Medicaid.  Every Medicaid program in the country is

3  required to have a program integrity team, but we also

4  have Medicaid Fraud Control Unit over at the Attorney

5  General's Office.

6       Q    Okay.  Just turning back quickly to Exhibit 4,

7  why is this not considered a coverage policy?

8       A    Because coverage policies are generally --

9  well, first of all, it's not promulgated in a rule.  So

10  all of our coverage policies go through the rulemaking

11  process, which is, of course, allows for public input

12  and everything like that.  This is mostly more -- these

13  are guidelines developed in-house and provided to our

14  PBM subcontractor.

15      Q    Okay.  For use in determining whether or not

16  to prescribe GN -- strike that.

17           Are there other coverage guidelines like this

18  not promulgated into rule for other drugs?

19      A    For other -- I am not aware of whether or not

20  we have any other guidelines like this.

21      Q    Okay.  What about for cross-sex hormone

22  therapy?

23      A    There was -- to my knowledge, there was no

24  guidance or for cross-sex hormones.

25      Q    Okay.  So going back to the MPI post-claim

1    reviews, how often does that happen?  Can you quantify?

2         A    I don't have enough numbers of how often it

3    happens, because obviously we have thousands of Medicaid

4    providers.  Then we do hear about cases of recoupment,

5    so I couldn't tell you what the percentage of providers

6    that had to pay back to the Agency money, but I can

7    tell -- I can definitely tell -- like, I know -- well,

8    for instance, I know -- like, I think Miami-Dade or

9    Broward County have -- like, their school district

10   actually they had -- after they had received a Federal

11   Audit from HHS, they ended up having to pay back, I

12   think, a million or so dollars in funds because they

13   were delivering services that weren't properly

14   documented and weren't meeting that medical necessity

15   criteria.  So as far as the larger numbers go, I don't

16   have those.

17        Q    Is there somewhere publicly the public can

18   access that information, or where we can access that

19   information?

20        A    So a public records request can always be put

21   in.  We don't have that information available on our

22   website, but anyone can put in a public records request

23   and find out, like, how often recoupments do occur.

24        Q    Do you know what a drug compendium is?

25        A    Yes.  Yeah, I'm aware of three.

1    Q    Which three are you aware of?

2    A    Drug Index is one.  There are two others whose

3    names do not -- whose names I do not recall immediately

4    offhand.  I believe they are listed.  And, of course,

5    they do usually consist of, like, a very large amount of

6    information on each specific drug, and it talks about,

7    like, appropriate uses and so forth.  So, for each of

8    these compendia -- and I -- they are -- we do utilize

9    them when evaluating whether or not we can use an

10   FDA-approved drug for an off-label purpose.

11   Q    Okay. Do you know if those three compendia are

12   Drug Text Information System, United States

13   Pharmacopoeia Drug Information and American Hospital

14   Formulate -- Formulary Service Drug --

15   A    That sounds correct.

16   Q    And those are the three compendia listed in

17   the Federal Medicaid Act?

18   A    Yes.

19   Q    Okay.  So when I'm using compendium, or

20   compendia for next set of questions, I'm referring only

21   to those three listed in the Federal Medicaid Act.

22   A    Okay, that's fine.

23   Q    For drugs that do not require prior

24   authorization, when making decisions about individual

25   claims for coverage, does AHCA or its contractors

1    determine whether the use that drug is being prescribed

2    for is supported by citation in one of the compendia?

3         A    So is this for drugs that do not require prior

4    authorization, or drugs that do require prior

5    authorization?

6         Q    Do not require.

7         A    We really don't because we don't require prior

8    authorization.  We're not able to check.

9         Q    So that means where AHCA does not require

10   prior authorization for a Medicaid recipient to obtain

11   coverage of a particular drug, it covers the drug

12   without knowing in advance whether the use it's being

13   prescribed for is supported by citation in one of the

14   compendia?

15        A    If we're not requiring prior authorization,

16   there's no way for us to know in advance.

17        Q    Okay.  So I know you mentioned it earlier.

18   I'm just going to reference it on my computer, and that

19   is the prescription drug list.  And the website link --

20   I'll turn it so both you and counsel can see it, without

21   spilling my drinks.  That URL is

22   HTTPS://AHCA.myflorida -- Florida is spelled out --

23   .com//Medicaid/prescribed_drug/pharm -- P-H-A-R-M --

24   _thera -- T-H-E-R-A -- /PDF/PDL.pdf.  So I'm showing you

25   what is AHCA's preferred drug list.  Do you recognize

Page 37

1    it?

2         A     Yes, I recognize that.

3         Q     What is the PDL?

4         A     So the preferred drug list -- so even though

5    we have everything that's FDA-approved, our

6    Pharmaceutical and Therapeutics Committee, they do place

7    drugs on the preferred drug list.  I don't know the --

8    necessarily all the details.  I think often it has to do

9    with the ability for the agency to obtain rebates and so

10   forth, so -- but they do put this together.  It is

11   publicly available on our website.  And, of course, it

12   does -- it does, of course, have age -- it does have

13   age, minimum age, maximum age, clinical care required.

14            I would like to clarify, though.  I know for

15   our -- in our Medicaid Management Information System,

16   which we often dub as FMMIS, we do program for procedure

17   codes and so forth, corresponding diagnosis codes.  So

18   if a claim does not correspond to a diagnosis code,

19   and -- that claim can be denied automatically in the

20   system.

21        Q     Okay.  Okay.

22        A     Which, I'm sorry, I forgot --

23        Q     No, no, no.  It's helpful.  I just want to

24   make a note of it.

25        A     And we do program our system with ICD-10

Page 38

```
 1    codes, so we do have a build in our system for claims to
 2    deny if they don't necessarily correspond to a specific
 3    diagnosis code.
 4        Q    And that's regardless of whether the drug
 5    requires prior authorization?
 6        A    If it's prior authorized, the prior -- there's
 7    a different process for entering claims into the system
 8    that are prior authorized.  So I think if it was prior
 9    authorized, that would override the automatic denials,
10    but I would have to confirm that, but I believe that's
11    how the system does work.
12        Q    So FMMIS can be programmed to deny a certain
13    service if it's associated with a particular diagnostic
14    code, and that's done automatically?
15        A    That's automatic.  Yeah.  Claims can deny
16    automatically in the system, so we do have a fail-safe
17    there.
18        Q    Okay.  And that's even if the drug does not
19    require prior authorization?
20        A    That's correct.
21        Q    Okay.
22        A    So I know it's definitely the case for the
23    procedure codes that I administered when I was over --
24    when I was over specialized services.  I'm going to
25    assume that we have the same in place for NDC's,
```

```
 1   National Drug Codes.

 2       Q    Okay.  Because the services you were

 3   previously working on were not prescription drugs, is

 4   that correct, they were other Medicaid services?

 5       A    No, they were a little of everything.

 6       Q    Do you have a diagnostic code for every drug

 7   in the system?

 8       A    I can't speak to that at the moment.

 9       Q    Okay.  Is there some way we can find that

10   information out?

11       A    Yeah, we can -- we can find that out for you.

12            MS. DEBRIERE: Okay.  Can we flag that as a

13       question, follow-up question?

14   BY MS. DEBRIERE::

15       Q    If a drug is on the PDL, does it mean it's on

16   the fee schedule?

17       A    So we don't -- so with drugs, and this is one

18   of the things with having worked -- working on the

19   Canadian Drug Importation Program is that drug pricing

20   is not a transparent process, so we don't actually list

21   rates, we just list what we cover, or we list what's on

22   the PDL.  We don't actually say what we'll reimburse.

23       Q    Okay, but if it's listed on the PDL, even if

24   the rate's not on the fee schedule, AHCA is going to

25   cover it?
```

1        A     Yeah.

2        Q     Okay.  Does the PDL apply to managed care plan

3   coverage of prescription drugs?

4        A     Yes, that's actually -- well, yes, actually.

5   I think -- I think -- I believe it does.  That we

6   wouldn't -- I would need to verify, but as far as --

7   like, I know that's the way our pharmacy benefit works.

8   So with pharmacy benefit managers, generally the law

9   ensures subcontract, that's the pharmacy benefit

10  managers, who handle both their prior authorization of

11  drugs and also negotiating rebates with manufacturers to

12  help, of course, lower expenses.  And so -- but for

13  Medicaid, the SMC health plans, they have PBM's that

14  they're really only there for the prior authorization

15  process of prescription drugs.  So their PBM's do not

16  negotiate rebates.  All that's done on the Agency side.

17  So the agencies have contracted PBM, which is another

18  branch of Magellan.  They're the ones that negotiate all

19  the rebates.

20       Q     Okay.  Just for clarity of the record, PBM

21  stands for --

22       A     Pharmacy Benefit Manager.

23       Q     Okay.  And then SMC PBM's, they're using the

24  PDL to determine whether or not to authorize coverage

25  for a prescription drug?

1      A    Well, since with Medicaid we'll cover anything

2  that's FDA-approved, they're going to be reviewing

3  primarily medical necessity.

4      Q    Okay.  Are they going to match up the request

5  for drug coverage to the PDL?

6      A    I don't know if they do that or not.

7      Q    Okay.  So you don't know if Medicaid managed

8  care plans rely on the PDL to authorize coverage?

9      A    I don't.  I can't speak to that.

10     Q    All right.  Let's look at a few specific

11 drugs.  Say this one for me again.

12     A    Estradiol.

13     Q    Estradiol.  Thank you.  Okay.  So the PDL

14 indicates that AHCA covers estradiol in each of these

15 formulations, there's many listed here, for at least one

16 indication, but we don't know what the indication is, or

17 at least the PDL doesn't indicate it, correct?

18     A    That's correct.

19     Q    Okay, but AHCA does not cover estradiol to

20 treat gender dysphoria?

21     A    That's correct.

22     Q    For what uses or indications does AHCA

23 authorize coverage for estradiol?

24     A    So for -- well, when estradiol needs to be

25 covered, generally, as I speak very generally, of

1   course, usually it's used for hormonal imbalances, but I

2   mean, but still we go back -- we defer back to the

3   medical necessity guidelines.

4        Q    So what does the no -- let's look at the very

5   first list -- listed formulation of estradiol, which is

6   associated with Climara 0.025-milligrams-per-day patch.

7   And looking over at the clinical PA required, it says

8   no.  What does that mean?

9        A    That means if the provider wants to prescribe

10  it, that, of course, they can prescribe it without

11  having to have a clinical review process.

12       Q    So that means no prior authorization is ever

13  required?

14       A    Not under fee-for-service.  Managed care

15  plans, however, they have the flexibility to make it go

16  through prior authorization.

17       Q    Okay.  So in fee-for-service, estradiol will

18  be covered without AHCA or its contractor first

19  determining for what purpose it's being used?

20       A    Right, not until the claim comes in.

21       Q    Okay.  So that would mean that Medicaid could

22  cover this drug if it were prescribed for

23  non-FDA-approved uses?

24       A    That's, of course, where our claim system

25  comes in.  So our claim -- our claim system was

1    programmed -- and, of course, I'm speaking generally of

2    our CPT codes, et cetera, that if it doesn't -- if the

3    diagnosis code doesn't align with what's in the system,

4    that can come back as a denial.

5         Q    Okay.  So for estradiol, let's use this as an

6    example, but not a hypothetical, in real life.

7         A    Okay.

8         Q    If estradiol is prescribed for treatment of

9    gender dysphoria, is FMMIS programmed to automatically

10   deny that claim?

11        A    I would have to confirm with our -- with our

12   Medicaid fiscal agent operations to make sure -- to know

13   whether or not that the system has been updated for --

14   to deny that.

15        Q    Is it possible to program a system to do that?

16        A    To program it to deny it?

17        Q    Based on -- based on the diagnostic code --

18        A    From my experience, it's pretty -- it's a

19   pretty simple affair to update the system to -- when

20   we -- because we are uploading new and deleting

21   diagnosis codes or uploading new procedure codes, I

22   mean, it's generally a pretty straightforward process.

23        Q    Okay.  Can you provide us a list of those

24   diagnostic codes at some point?

25        A    For estradiol?

```
 1        Q    I think -- well the diagnostic codes would
 2   be -- are you using CPT codes?  What are you using?
 3        A    So we use ICD-10 for --
 4        Q    ICD.  Okay.
 5        A    -- because it's going to be primarily -- those
 6   are going to be like your -- well, those are your
 7   service codes.  Those aren't drug codes.
 8        Q    Okay.  So you use -- for your diagnostic
 9   codes, it's associated with ICD-10?
10        A    That's correct.
11        Q    Okay.  So, looking at testosterone, this
12   indicates that -- we've got to get there first, don't
13   we?  So this indicates that AHCA covers testosterone,
14   and each of these formulations listed on the PDL for at
15   least one indication, although based on the PDL, we
16   don't know which indications for which it covers; is
17   that correct?
18        A    Yeah.  I mean, there's a very large number of
19   FDA-approved clinical indications for testosterone.
20        Q    Okay.  Just for clarity, AHCA will never cover
21   testosterone when used to treat gender dysphoria, is
22   that correct?
23        A    Yes.
24        Q    And it looks like, at least some of these
25   formulations, including, for example, Andrew Durham,
```

1    four milligrams, 24-hour patch, that there is a clinical

2    prior authorization that's required.  Is that correct?

3        A    Yes.  Yeah.  Based on the PDL?  Yes, there

4    would be a PA required.

5        Q    For what uses or indications does AHCA provide

6    prior authorization or approve coverage?

7        A    So that goes back to our definition of medical

8    necessity.

9        Q    Okay.  Would it also be governed by AHCA's

10   drug criteria?  And I'll just -- I'll pull that up.  So

11   when I say AHCA's drug criteria, I'm referring to that

12   criteria listed at https://AHCA --

13   A-H-C-A --.myflorida.com/Medicaid/prescribed_ drug/drug

14   _criteria.shtml.

15           And so would the drug criteria -- I'm looking

16   at the screen.  It says testosterone criteria updated

17   6-16-2022.  Would the indications for which testosterone

18   will be prior authorized -- prior authorized, would it

19   be contained in this criteria?

20       A    It would be contained in that criteria.

21   That's correct.

22       Q    Okay. Is this list exhaustive of all

23   prescription drugs that AHCA will cover?

24       A    I think -- I mean, I haven't seen the entire

25   list, so -- but, I mean, for any drugs that we deem that

Page 46

1   criteria is necessary, I imagine that would be an

2   exhaustive list.

3       Q    Okay.  This applies in fee-for-service,

4   correct?

5       A    Those would apply for fee-for-service, yes.

6       Q    How about for managed care?

7       A    Managed care plans would need to be able to --

8   they would -- they would need to mirror their criteria

9   and align it with the agency's.

10      Q    So it can't -- my understanding is the managed

11  care plan criteria cannot be more restrictive than what

12  AHCA --

13      A    That's correct.  So they can be less

14  restrictive, they can't be more restrictive.

15      Q    Okay.  Would the drug criteria listed here at

16  the link to testosterone provide all the instances in

17  which testosterone would be covered after prior

18  authorization review?

19      A    On the criteria?

20      Q    Uh-huh?

21      A    After --

22      Q    Yes.

23      A    Well, I would -- I'd have to -- I haven't

24  actually had a chance to physically look at the

25  criteria, so -- but I would assume that what we have the

Page 47

1    criteria is accurate, especially given that it was

2    updated in June 2022.

3         Q    Okay.  Turning back to EPSDT briefly.  If the

4    drug was being prescribed to a child under age 21, when

5    AHCA or its contractor was undertaking the prior

6    authorization process, could AHCA or that contract --

7    would AHCA or that contractor deviate from this criteria

8    if the drug was otherwise prescribed for a medically

9    necessary use?

10        A    I have trouble following that question.

11             MR. JAZIL: Object to form.

12   BY MS. DEBRIERE::

13        Q    So where testosterone was prescribed to a

14   child under 21.

15        A    Okay.

16        Q    And EPSDT applies, then could AHCA or its

17   contractor in its prior authorization review deviate

18   from the criteria listed here?  If medically necessary.

19        A    As long as it meets medical necessity

20   criteria, whether or not there's criteria involved and

21   it meets -- if it's for an off-label use and it meets

22   our off-label criteria, I mean, under EPSDT, I mean,

23   yes, Florida Medicaid can cover it, but -- I mean, that

24   would, of course, require significantly in-depth review,

25   et cetera, but, I mean, hypothetically speaking, yes.

Page 48

1      Q    And one of the requirements -- just to circle

2  back -- one of the requirement under that medical

3  necessity review is that the prescribed drug cannot be

4  for an experimental or investigational use, correct?

5      A    That's correct.

6      Q    All right.  Just turning quickly back to FMMIS

7  programming of the ICD-10 codes, what ICD-10 codes are

8  programmed into the system for estradiol?

9      A    What ICD-10 codes?

10     Q    Yes.

11     A    We would have to check the system.  I would --

12  because I know pharmacy codes are set up a little

13  differently than our procedure codes.  So I'm kind of

14  using the procedure code as analogous to the drug codes,

15  but we would need to speak with one of our pharmacists.

16          MS. DEBRIERE: Can we flag that as a follow-up

17      question, too?  I had one more.  So if you -- can

18      we take a break for two minutes?  I just want to

19      confer -- or we can do longer if you need a second

20      to go to the bathroom.

21          THE WITNESS: If you need a break, you can go

22      ahead and take the break.  That's fine.

23          MS. DEBRIERE: Thank you.  Okay.

24          VIDEOGRAPHER: This concludes video one.  The

25      time is 11:05 a.m.

1              (Brief recess.)

2              VIDEOGRAPHER: This is the beginning of video

3         two.  The time is 11:08 a.m.

4    BY MS. DEBRIERE::

5         Q    All right.  So turning back to the preferred

6    drug list, AHCA's preferred drug list, and looking at

7    the formulation of testosterone cypionate -- did I say

8    that correctly?

9         A    I really don't know.

10        Q    The PDL indicates that AHCA covers

11   testosterone cypionate for at least one indication,

12   although it doesn't say what indication, correct?

13        A    Not on the PDL, no.

14        Q    Does it say it anywhere?  Is there anywhere we

15   can find that information?

16        A    Unless there's that criteria, unless we have a

17   criteria listed on the website, generally, no, that's

18   like one of the things -- I mean, we do have our claim

19   system set up, which -- but like all that information

20   is -- I mean, I suppose it could be obtained through

21   public records request.  That's usually the process.

22        Q    Okay.  So AHCA will never cover testosterone

23   cypionate, or any formulation of testosterone for

24   treatment of gender dysphoria, is that correct?

25        A    That's correct.

Page 50

1      Q    So looking at the formulation of testosterone

2  cypionate of testosterone CYP 1000 milligrams per 10

3  milliliters, that indicates there's no clinical prior

4  authorization required, correct?

5      A    That's correct.

6      Q    So that means that AHCA will cover the drug or

7  reimburse for the drug without determining for what use

8  it's being prescribed?

9      A    Well, based on my understanding of how our

10  system works, through my experience is that the claim

11  would deny.

12      Q    Because why?

13      A    Because the diagnosis code that'd be

14  associated with that drug would trigger the system to do

15  a denial.

16      Q    Okay.  So you're looking not at the indication

17  of the -- what indication the drug's being prescribed

18  for, but instead you're looking at the diagnostic code?

19      A    So -- that's correct.  Part of the process

20  requires the procedure code, diagnostic code and place

21  of service.  Of course, those are for our health

22  services, but those three all have to be programmed into

23  the system.  So say you're delivering a -- doing a

24  checkup in a other setting, or you're doing like a

25  setting that's not approved by us, it's not in our

Page 51

1  policy, that claim would deny.

2      Q    Okay.  What if it wasn't for the treatment of

3  gender dysphoria?  What if it was for a diagnostic code

4  that was not programmed to automatically deny?

5      A    If it was for -- so if it was for a diagnosis

6  code that was not programmed to deny?

7      Q    Right.

8      A    If it's programmed in the system -- we

9  don't -- so we program the codes that it will approve.

10  So all the other codes, it's not loaded in the system

11  would automatically deny.  So each -- so there'll be a

12  set of ICD-10 codes that are -- that would link up with

13  a particular service.  As long as the diagnostic code

14  corresponds to that service, the claim will pay.

15      Q    Okay.  So with the formulation of testosterone

16  cypionate that we've been discussing that no clinical

17  prior authorization is required, if the diagnostic code

18  is programmed into the system, then it's going to

19  automatically approve without looking at the indication

20  for which the drug is prescribed?

21      A    Provide that the claim form is -- it's a clean

22  claim and all the pertinent information corresponds with

23  the physician requirements, they will pay.

24      Q    What is involved in a clean claim?

25      A    No errors.

Page 52

1          Q     Errors of what?

2          A     Someone might type in the wrong code by

3     accident.  Maybe they -- human error.

4          Q     Okay.  But you're -- but in that clean claim,

5     there's no requirement to submit the indication for

6     which it's being prescribed or AHCA undertaking a review

7     of that?

8          A     I mean, we do do retrospective review of

9     claims.

10          Q     At the time the coverage is being requested.

11          A     Okay.  Can we go back a little bit?

12          Q     Yeah, yeah.  Yeah.  So looking at this

13     formulation of testosterone cypionate, where no clinical

14     prior authorization is required, when the claim is

15     submitted and -- when the claim is submitted, AHCA is

16     not doing a review of whether the indication it's being

17     prescribed for -- sorry.  Scratch that.

18          Looking at testosterone cypionate, in the

19     formulation that we've been discussing where no clinical

20     prior authorization was required, when the claim is

21     submitted, AHCA -- neither AHCA nor its contractors does

22     a review to determine for what indication the drug is

23     being prescribed for?

24          A     Right, there'd be no manual clinical review

25     process or prior authorization process, if that's what

1    you're asking.

2         Q    And when you said AHCA will only cover drugs

3    that are FDA-approved, does that mean that AHCA never

4    covers off-label use of a drug?

5         A    We do have a -- no, we definitely would

6    never -- we have a procedure for covering FDA-approved

7    drugs for non-approved clinical indications, AKA

8    off-label use.  We do have a procedure for that.  So we

9    wouldn't necessarily -- no, we would never say never.

10   That's --

11        Q    Okay.  I thought you said earlier that AHCA

12   will only cover FDA-approved drugs?

13        A    Right.  But, I mean, like, let's say there's a

14   drug that -- okay.  Let's say it's been manufactured by

15   European pharmaceutical or, you know, it's a

16   pharmaceutical and it hasn't gone through the FDA review

17   process, brand new drug.  It's not FDA-approved.  It's

18   really not even approved -- it's not even approved for

19   sale on the market.  We won't cover those.

20        Q    Okay.  Okay.  But you will cover drugs that

21   are FDA-approved for uses that in and of themselves are

22   not FDA-approved, for off-label uses?

23        A    Yes, we have a procedure for that.

24        Q    Okay.  Do you ever program into the system the

25   use of a drug for a condition for which the drug is not

1    FDA-approved?

2         A     I can't speak to a hundred percent for that,

3    but it seems it'd be counter to the process we have in

4    place for reviewing off-label use for drugs.

5         Q     Okay.  And what is that process?

6         A     So, it's a three-prong process.  Step one is

7    that there has to be a trial period for FDA-approved

8    drugs for that clinical indication to have tried to have

9    been used.  And, of course, if the FDA-approved drugs

10   for that kind of indication are not successful, then

11   the -- then it moves to the second prong, which, you

12   know, that requires like phase-three clinical trials

13   having had to be completed on that drug.  Then the third

14   step is that the peer-review literature and one of the

15   three drug compendia that we mentioned earlier has to

16   pass the list or support it.

17        Q     So you're looking at when determining whether

18   or not you'll authorize coverage for a prescribed drug,

19   you're looking at more than just whether the indication

20   for which it's being prescribed is listed in the

21   compendia?

22        A     Yes, it's a little bit more comprehensive,

23   correct.

24        Q     Yeah.  And so first you look at the individual

25   Medicaid recipient and you determine whether or not they

1    tried other drugs?

2         A    That's correct, yeah.

3         Q    Okay.

4         A    It would be an individualized basis.

5         Q    Okay.  And then the second step was what?

6         A    A phase-three -- the drug had to have

7    completed phase three clinical trials.

8         Q    And then the third step is you look to see if

9    the indication that's being prescribed for is listed in

10   the compendia plus --

11        A    Plus support in the peer-reviewed literature.

12        Q    Okay.  Let's look back at Exhibit 3.

13             MS. DEBRIERE: Simone, do you have that handy?

14        That's the cross-sex hormone therapy GAPMS.

15             MS. CHRISS: You should still have those two

16        versions.

17             MS. DEBRIERE: I might have it.  I have a

18        notice of deposition and I have a cross-sex hormone

19        therapy.  Here it is.

20   BY MS. DEBRIERE::

21        Q    Is there anywhere on this GAPMS that describes

22   the process for the criteria used?

23        A    It's on page nine, if you're referring to the

24   off-label use.

25        Q    Okay.  And that starts with the criteria that

1  utilized under the Florida Medicaid program and

2  authorization for drugs for off-label purposes are as

3  follows?

4       A    Uh-huh.

5       Q    Okay.  And that's what you just described to

6  me?

7       A    Yes.

8       Q    Yeah.  Okay.  All right.  Turning to past

9  GAPMS regarding gender dysphoria.

10      A    Okay.

11      Q    We are aware, plaintiff's counsel is aware of

12  three pre-2022, at least draft GAPMS reports regarding

13  Medicaid coverage of the treatment for gender dysphoria.

14  One we've already marked as Exhibit 3, and that is the

15  May 20th, 2022 version of the GAPMS for cross-sex

16  hormone therapy.  We actually know of two other

17  versions, one dated June 23rd, 2017 and one dated April

18  19th, 2022.  So we're going to mark the June 23rd one as

19  Exhibit 5?

20           MS. DUNN: Yes.

21           (Whereupon, Exhibit No. 5 was marked for

22  identification.)

23           THE WITNESS: Yeah.  I have to apologize for

24      the auto-dating on those documents, so I can

25      probably give you more accurate dates --

1   BY MS. DEBRIERE::

2        Q     Yeah, let's get the documents in front of you,

3   and then that's exactly what we were wondering about.

4   It can get confusing.

5        A     I can give you more --

6        Q     That would be -- that's exactly what we're

7   after.  We appreciate that.

8             MR. JAZIL: They're identical except for the

9        date, right?

10            MS. DEBRIERE: Yes.  Yeah -- well, that's not

11       true.  Yeah --

12            THE WITNESS: Well, I have this one.  I mean,

13       it's fine.  There's one -- there should be one for

14       surgeries.

15            MS. DEBRIERE: No, no.  We're just looking at

16       the versions of cross-sex hormone therapy right

17       now.  We have three different versions, at least,

18       that we've found so far.

19            MR. JAZIL: Thank you.

20   BY MS. DEBRIERE::

21       Q     Okay.  So let's first look at the one with the

22   June 23rd date.

23       A     Okay.

24       Q     June 23rd, 2017.  Who authored the version of

25   this report?

1      A     So listed in our assignment writing and

2    tracking page in SharePoint, the author of this was

3    Sarah Craig.

4      Q     Okay.  And do we have that routing form?

5            MR. JAZIL: You should.

6            THE WITNESS: They should have it.  We -- I did

7      produce it for everybody.

8    BY MS. DEBRIERE::

9      Q     Okay.  And then that was back in 2017 when she

10   authored this?

11     A     She authored it in 2016.  This is actually --

12   so to provide a little context.

13     Q     Please.

14     A     So in 2016, this was before I came to the

15   Bureau of Medicaid Policy, there wasn't -- there wasn't

16   a GAPMS position.  Because they were accumulating a lot

17   of services, a lot of requests for coverage, they

18   created two GAPMS positions in the fall of 2016.  They

19   were filled in January 2017.  So GAPMS reports often

20   went to subject matter experts.  So that's -- so in 2016

21   when this one was completed, the person who completed

22   it, their primary job was not GAPMS.

23     Q     Okay.  What was Sarah Craig a subject matter

24   expert in?

25     A     She was one of our pharmacists.

1    Q    Okay.  And right now, just for clarity of the

2    record, we're looking at June 23rd, 2017.  That's

3    labeled Exhibit 6.

4         (Whereupon, Exhibit No. 6 was marked for

5    identification.)

6    BY MS. DEBRIERE::

7    Q    Who -- so saying that, let's move on to the

8    April 19th, 2022, which is labeled as Exhibit 5, who

9    authored this report -- or made the revisions, I should

10   say, in the April 19th, 2022 version?

11   A    The only person I'm aware of who worked on

12   this one was Sarah Craig.  Since this was done before my

13   entrance into the Bureau, and she's the only author

14   listed in our system.

15   Q    And were any changes made on the April 19th,

16   2022?

17   A    No.  That may have been a day when it was

18   pulled out to be printed.

19   Q    Okay.  Why would it have been pulled out to be

20   printed?

21   A    I think -- because there had been some

22   questions about the history of whether the Agency had

23   previously done any work on this subject.

24   Q    Okay.  And why did those questions arise?

25   A    Those questions had arisen as part of the

1    request process for the GAPMS report we did, and that

2    was approved on June 2nd.

3         Q    And that's related to the treatment of gender

4    dysphoria?

5         A    That's correct.

6         Q    Okay.  Does Sarah Craig still work at the

7    Agency?

8         A    Sarah Craig, I think, left in 2020.

9         Q    Okay.  Do you know where she went?

10        A    I do not.

11        Q    Were there any changes -- looking back at

12   Exhibit 3, which is dated May 20th, 2022, there are some

13   revisions on this one.

14        A    Okay.

15        Q    For example, Beth Kidder is crossed out and

16   Ashley Peterson's name is put in.  And the subject line

17   is crossed out and there's just some edits and comments.

18   And it looks like some text was added, for example, on

19   page three.

20        A    I was not privy to any edits or changes being

21   made after -- I was not privy to any changes being made

22   to that document.

23        Q    Okay.  Well, just to be clear, you're here as

24   the Agency representative and not in your individual

25   capacity, so you should have some knowledge about any

1   revisions to these reports, based on your designation as

2   the Agency representative.  Can you not speak in that

3   capacity to it?

4        A     As far as the work goes during the time period

5   that we were working on the June 2nd GAPMS?

6        Q     Uh-huh.

7        A     That -- the work for the determination of the

8   transgender dysphoria in relation to consistency with

9   GAPMS, that task was specifically designated to myself,

10  and Nai Chen and Devona Pickle in supporting roles.

11       Q     Okay.  Right now, though, I'm just asking

12  about revisions made to the May 20th, 2022 version.  You

13  do not know who made these revisions, is that correct?

14       A     I do not know who made those revisions,

15  because -- as the Agency witness.  Nobody was requiring

16  revisions to that document.

17       Q     But there were revisions made based on what

18  I'm looking at.

19       A     Whoever did so was doing so on their own

20  accord.

21       Q     Okay.  Who had access to this document?

22       A     Well, given that any -- actually, anybody has

23  access to that document because the documents -- it's

24  available on our SharePoint site.  It doesn't require a

25  password.  Anyone in the bureau, anyone who's

1    knowledgeable of our repository could go through and

2    pull up that document.

3         Q    Okay.  Could it have been Ashley Peterson who

4    made the revisions?

5         A    It's possible.  We would have to find out from

6    our IT department.

7         Q    Okay.  I think we do need that information.

8    And then who's GS?  There's some comments on the side

9    there on the front page, Exhibit 3.  It says GS 1.

10        A    Well, GS would be initials.  Would usually

11   like last name first, first name second.  I might --

12   might occur to me later on.  I can't --

13        Q    Would it be Sheena Grantham?

14        A    It's possible.  I don't know.

15        Q    Okay.  Can you track who has access to this

16   document?

17        A    Yeah, our IT department can track whoever had

18   made edits to that.

19        Q    Okay.  Okay.  So we can find out the answer to

20   that question?

21        A    Yes.

22             MS. DEBRIERE: Let's flag that.

23   BY MS. DEBRIERE::

24        Q    Was this report ever finalized?

25        A    To my knowledge, and I did actually do some

1   history -- do historical digging on this one.  Since our

2   pharmacy manager at the time, and I do need to add it

3   because I forgot to add, that I did consult Arlene

4   Elliot, who was the pharmacy manager at the time that

5   this report was initially prepared, I did confer with

6   her to determine whether or not it was finalized.  And

7   what I mean by finalized, it went through the review

8   process and was signed off by the deputy secretary.  She

9   let me know that it had not.

10         Q     Okay.  Do you know why or why not?  Why was it

11  never finalized?

12         A     Well, generally, and this is often the case

13  with GAPMS reports, is that because it's -- well,

14  Medicaid is a -- it's very busy -- we're a very busy

15  division.  We have lots of requests, lots of asks, lots

16  of projects, and often GAPMS reports, usually, for those

17  of us who like to be very detailed and very analytical,

18  we, you know, it's -- it's a craft.  It's almost like

19  each one is like a seminar paper or scholarly article.

20  It takes time to read and review.  And usually it's --

21  and sometimes often, because unless somebody's asking

22  for it, or if it's deemed a low priority, often it

23  just -- it just often waits.  And that may have been

24  why.  That's speculation, though.

25         Q     Okay.

1     A     But it's not surprising that a GAPMS draft is

2  out there and didn't complete the review process.

3  Solely it's because there's just too many other projects

4  going on.

5     Q     And GAPMS is generally low priority?

6     A     It depends.

7     Q     What does it depend on?

8     A     Depends on the situation, because often when

9  the managed care plan requests for the GAPMS, that's

10  usually -- those usually have to be addressed quickly.

11     Q     Okay.  Let's set expedited GAPMS aside.  Just

12  traditional GAPMS, are they generally low priority?

13     A     A traditional GAPMS?  Well, like I said --

14  like I said, it often depends on the context.  It

15  depends on the request.  Sometimes it could be --

16  sometimes it's a stakeholder who made their voice known

17  downtown.  Sometimes -- I mean, it really depends on the

18  context.

19     Q     Okay.  When you're referencing downtown, what

20  do you mean by that?

21     A     The Capitol.

22     Q     Okay.  So sometimes GAPMS will get bumped up

23  if the Capitol is the person who's raising --

24     A     It just depends on the situation/I just don't

25  want to commit to an absolute answer saying that they're

1   all low priority, because not every single circumstance

2   or every single GAPMS means that it will be.

3        Q    Okay, but with the cross-sex hormone therapy

4   GAPMS, you're guessing that one reason why it was never

5   finalized is because it was low priority?

6        A    That's a guess in relation to my experience

7   when I had the role.

8        Q    Okay.  And what was your experience when you

9   had the role?

10       A    When I -- when I had the role, I had it for

11   about 10 months, and I think I drafted ten reports and

12   two of them made through the review process.  Those two

13   I reviewed in January.  They weren't finalized and

14   signed off on until July of that year.  So often, it was

15   more trying to -- you know, reminding supervisors at

16   different levels to review them so they can move

17   forward.  And given how busy everything was, especially

18   with legislative session going on or other special

19   projects taking precedence, often if it could be done --

20   put on hold until the next day or later, it was.

21       Q    Okay.  And so for the two of the ten reports

22   that were finalized, it took seven months for the

23   reports to be finalized, reviewed and finalized?

24       A    Yes.

25       Q    Prior to its adoption, prior to AHCA's

1   adoption of the categorical exclusion of treatment for

2   gender dysphoria, did Florida Medicaid -- were there any

3   instances where Florida Medicaid ever authorized

4   coverage for cross-sex hormone therapy to treat gender

5   dysphoria?

6        A    Were there any circumstances?  The Agency

7   didn't have a policy or criteria regarding cross-sex

8   hormones or, like, hormones for that clinical

9   indication.

10       Q    So that wasn't quite my question.  My question

11  is prior to the adoption of the categorical exclusion of

12  treatment for gender dysphoria, were there any

13  instances, so --

14       A    Under -- so, well --

15       Q    Did Florida Medicaid ever cover treatment of

16  gender -- use of -- did Florida Medicaid ever authorize

17  coverage for cross-sex hormone therapy to treat gender

18  dysphoria?

19       A    So by Florida Medicaid, are you referring to

20  the Agency?

21       Q    AHCA or any of its contractors, Medicaid

22  managed care plans or EQ Health or --

23       A    Under fee-for-service, that was -- no, it was

24  not an approved clinical indication.  Obviously, with

25  managed care plans, since they have the flexibility to

1  cover services that, you know, that are not necessarily

2  clarified in our coverage policies so -- I mean, it's

3  possible that we could have done that, yes.

4      Q    Okay.  So, to be clear, in fee -- under

5  fee-for-service, prior to the adoption of the

6  categorical exclusion for the treatment of gender

7  dysphoria, there was never an instance of Florida

8  Medicaid covering cross-sex hormone therapies to treat

9  gender dysphoria?

10      A    Are you referring to the fee-for-service?

11      Q    Fee-for-service only.

12      A    We don't necessarily have that information

13  available.

14      Q    Why?

15      A    Well, not offhand.

16      Q    Why?

17      A    Well, going -- because we want to go back

18  several years.  We're assessing an extensive data pull.

19      Q    Or even just six months prior to August 21st,

20  2022.

21      A    So I think we did do a data pull for the past

22  year.  And that data pull, of course, show the results

23  of what services we were covering, had the number of

24  recipients with the diagnosis for gender dysphoria, and

25  those who received treatment.  So I'll defer to that

1    data.

2         Q    So we don't have that data in front of us.

3    And, again, you were produced as the 30(b)(6)

4    representative, so what did that data show?

5         A    That data did show that some -- that there

6    were a handful of recipients who were receiving the

7    services.

8         Q    In fee-for-service?

9         A    I think fee-for-service.  I think managed

10   care.

11        Q    Okay.  So there were times, prior to the

12   adoption of the categorical exclusion for the treatment

13   of gender dysphoria, that Florida Medicaid covered

14   cross-sex hormone therapy for treatment of gender

15   dysphoria?

16        A    Cumulatively for the whole program, yes, there

17   were.

18        Q    Okay.  So another previous GAPMS regarding

19   gender dysphoria is the GAPMS entitled puberty

20   suppression therapy, and that begins at DEF_ 000288776.

21   Although, for clarity of the record, I do want to say we

22   received multiple versions of this document, as well.

23             MS. DEBRIERE: Do we have the final one, by any

24        chance?  I'm positive it was my mistake in terms of

25        listing exhibits.

1          MS. DUNN: The one that was signed?

2          MS. DEBRIERE: Yeah.

3          MS. DUNN: That's a whole different -- it has a

4     different name.

5          MS. DEBRIERE: I'm sorry, guys.  That's my

6     fault.  My fault.

7          MR. JAZIL: Counsel, do you want him to clarify

8     that date issue?  I think he mentioned it as you

9     were --

10          MS. DEBRIERE: Oh, yeah, I thought he did.  I'm

11     sorry if -- please, go ahead and clarify the date

12     issue.

13          THE WITNESS: So both of these GAPMS were

14     initiated in 2016.

15  BY MS. DEBRIERE::

16     Q    Okay.  When you say both of these GAPMS,

17  you're referring to --

18     A    Referring to the one on the cross-sex hormone

19  therapy.

20     Q    Okay.

21     A    And the one on the puberty suppression.

22     Q    Okay.  Let's not talk about the puberty

23  suppression one just yet, because I want to get the

24  right exhibit into the record first.

25     A    Okay, but as far as the date goes, these were

1   projects from 2016.

2         Q    Okay.   Okay.

3             MR. JAZIL: Counsel, if you'd like me to just

4       make additional copies of that, I'm sure we can.

5             MS. DEBRIERE: So there are multiple versions

6       that were provided to us of this document.   We are

7       looking for another version that has a signature on

8       it, although I'm sure Mr. Brackett can speak to it

9       being finalized.   But just to make everyone's life

10      easier in the long run, we are going to try to --

11      yeah, this is great.   Okay.

12            Chelsea, should we mark it?

13            MS. DUNN: Yeah.   Do you want that Exhibit 7?

14            MS. DEBRIERE: Are we on 7?   Okay.

15            (Whereupon, Exhibit No. 7 was marked for

16   identification.)

17   BY MS. DEBRIERE::

18         Q    All right.   We have only one copy of this, and

19   it's DEF_000288776, entitled puberty suppression

20   therapy, dated September 14th, 2016.   And the reason we

21   were -- and that's going to be marked as Exhibit 7.   The

22   reason we wanted that one is because if you turn to the

23   back page, it's signed by Mr. Senior.   So we assume then

24   that's the final report?

25         A    This would be the final report if he signed

1    it.

2         Q    Okay.  So it was adopted by the Agency?

3         A    The recommendations in this GAPMS were -- yes,

4    they would be adopted.

5         Q    Who authored this report?

6         A    So in the --in our system, our SharePoint

7    system, that was the individual listed for this report

8    was Monique Johnson.

9         Q    Okay.  And who was Ms. Johnson?  What was her

10   subject matter expertise?

11        A    So she was a program administrator and she

12   oversaw the primary care services team, which is

13   primarily like surgeries, inpatient -- inpatient

14   services, dental services.  Like, I think like surgical

15   procedures, things like that.  Of course, child health

16   checkup procedures.  Generally be like primary care and

17   preventive, anything that would fall into those

18   categories.

19        Q    Why would she then look at puberty suppression

20   therapy?

21        A    So this was, at the time before we had the

22   defined GAPMS individuals, so I can only speculate as to

23   why she was selected.  It may have been she had

24   bandwidth at the time to do it, but since there was no

25   one who actually did GAPMS full time, I don't -- I can't

Page 72

1   speak as to -- because I'm not that familiar with her

2   background, I can't -- and, of course, this was 2016,

3   but more or less, there may have been a number of

4   reasons for why she was selected for this.

5        Q    Okay.  Why wouldn't it have gone to a

6   pharmacist?

7        A    We don't have the -- an answer for that.

8        Q    Was Ms. Johnson a pharmacist or pharmacy tech

9   or had any --

10       A    I think she was an RN.

11       Q    Okay.

12           MR. JAZIL: Counsel, just so the record's

13       clear, this copy of Exhibit 7 has highlights on it.

14       Did you --

15           MS. DEBRIERE: It would have not been -- it

16       would have been highlighted by us.  Is that right?

17       Yeah.  So my apologies.

18           MS. DUNN: It's the only copy we have, but we

19       can potentially print a clean copy.

20           MS. DEBRIERE: And it's Bates-stamped.

21           MR. JAZIL: It's fine.  I just want the record

22       to be clear that it's highlighted and the

23       highlights were added by counsel for plaintiffs,

24       not the witness.

25           MS. DEBRIERE: Yes.  Thank you for that, Mo.

1    BY MS. DEBRIERE::

2         Q     Okay.  So going back to Exhibit 4, pubertal

3    suppression -- yep.  This is the special services

4    criteria.  This was developed only six days after the

5    puberty suppression therapy GAPMS report.  Is that

6    correct?

7         A     You mean the criteria?

8         Q     Yes.  Yes.  Exhibit 4.

9         A     Based -- I'm going to defer to the dates on

10   this, because it predates my time in the Bureau of

11   Medicaid Policy.  So if the dates say 30 days, then that

12   would be --

13        Q     The dates say six days.

14        A     The dates say six days?

15        Q     Yeah.

16        A     I'll defer to that.

17        Q     Okay.  Are these two documents related?

18        A     Can you provide some context on what related

19   means?

20        Q     Is one based off another?

21        A     It seems -- it would appear that following the

22   completion and approval of the GAPMS process, that this

23   document was completed, routed and then approved, based

24   on the time stamps.

25        Q     Okay.  So was the special services criteria at

1   Exhibit 3, was it drafted based on the information

2   contained in the GAPMS report related to puberty

3   suppression therapy?

4             MR. JAZIL: Exhibit 4?

5             MS. DEBRIERE: Did I say 3?  I'm sorry.

6        Exhibit 4.  Thank you, Mo.

7             THE WITNESS: It looks like it's fairly

8        consistent.

9             MS. DEBRIERE: Okay.

10            THE WITNESS: Based on the EPSDT consideration

11       portion.

12  BY MS. DEBRIERE::

13       Q    So based on your understanding of office

14  operations, then it's likely that the special services

15  criteria was drafted in response to the puberty

16  suppression therapy GAPMS?

17       A    Yes.

18       Q    Okay.  And this is the -- this policy, Exhibit

19  4, is the criteria that AHCA used prior to its adoption

20  of the categorical exclusion of treatment for gender

21  dysphoria to determine whether gonadotropin-releasing

22  hormone analog would be prior authorized for pubertal

23  suppression and treating gender dysphoria, correct?

24       A    Yes, correct.

25       Q    Okay.  Between the time this policy was

Page 75

1    adopted, which was October 6th, 2016, and the time AHCA

2    adopted the categorical exclusion of treatment for

3    gender dysphoria in August of 2022, if an individual's

4    condition met the criteria laid out in this policy, then

5    Florida Medicaid would cover the cost of the drug for

6    pubertal suppression and the treatment of gender

7    dysphoria, is that correct?

8         A    Providing that the criteria, and prior to the

9    challenge exclusion, yes.

10        Q    Okay.  Between October 6, 2016, and the time

11   AHCA adopted its categorical exclusion of treatment for

12   gender dysphoria, how many times did AHCA authorize the

13   drug set forth in this policy for the treatment of

14   gender dysphoria?

15        A    We would have to defer at least -- at least

16   prior to the challenge exclusion being implemented, we'd

17   have to defer that data for that time period, but we'd

18   have to go all the way back to 2016 as far as the data

19   goes, at least in fee-for-service, to determine how many

20   recipients actually received the -- actually received

21   authorization for it.

22        Q    Do you have any knowledge of any time period

23   in which fee-for-service covered it, based on the

24   criteria in this policy?

25        A    So this -- so once this policy -- so once this

Page 76

1    criteria was released to Magellan, Magellan was our PBM

2    for fee-for-service.  So they did the prior

3    authorizations for fee-for-service.  So Magellan would

4    review each case individually.

5         Q    Okay.  Do you know how many times Magellan

6    authorized it based on the criteria?

7         A    I do not have those numbers.

8         Q    Okay.  Can we get those numbers?

9         A    We can try to find them.  We can try to get

10   those numbers.  It's a very long time period.

11        Q    But it is your understanding that in certain

12   instances, Magellan did authorize it?

13        A    We would have to -- we would have to look at

14   those numbers.

15        Q    Okay.  Because previously, when we were

16   discussing cross-sex hormone therapy, you did know that

17   in some instances fee-for-service had covered the drug

18   to treat gender dysphoria, but you don't have that same

19   information for pubertal suppression?

20        A    That's speaking more about Medicaid,

21   cumulatively as far as the differences between

22   fee-for-service and managed care encounters, I would

23   have to take a look at the data to get the exact numbers

24   of what was in the fee-for-service system versus the

25   encounters for the managed care were.  But we would --

1    have we would have to go ahead and get this information

2    from Magellan going back to find out exactly how many

3    times that they get pre-authorization requests versus

4    how many approval/how many denials.

5         Q    Okay.  Let's just look quickly at exhibit --

6    it's going to take me a second to find it.

7              MS. DEBRIERE: Simone, is the list of Medicaid

8         recipients and discussion of their

9         authorizations -- yeah.  I don't know.  Yeah,

10        that's it.  Not surgery, though.  There should be a

11        drug one.  Maybe I'm wrong.  They probably didn't

12        include it.

13   BY MS. DEBRIERE::

14        Q    Mr. Brackett, while we're looking for that,

15   let's go back to the notice of deposition.  In the

16   deposition topics, we do list the number of Florida

17   Medicaid recipients who -- participants who have sought

18   any form of care for gender dysphoria from January 1st,

19   2015 until the enactment of the challenged exclusion.

20   And so as we're sitting here today, you're telling me

21   you can't answer whether -- or how many times AHCA or

22   one of its contractors authorized coverage of pubertal

23   suppression therapy for treatment of gender dysphoria,

24   is that correct?

25        A    That's correct, as of now, but we can get that

1  information.

2       Q    And you will provide us that information?

3       A    We will obtain that information.

4       Q    Okay.

5            MS. DEBRIERE: So I think that given that there

6       are a few places where we have follow-up questions

7       I do, at this point, just want to say that once

8       those questions are answered, we're going to

9       reserve some time for this deposition so that we

10      can do follow-up questions based on the information

11      that's provided to us, because right now there's

12      some holes that Mr. Brackett is not able to fill,

13      and once that information is provided to us, of

14      course, we will probably have follow-up questions.

15      So we just need to reserve some time for --

16           MR. JAZIL: Okay.  And just so the record's

17      clear, I think I provided objections to the last

18      set of depo topics.  There may have been an

19      objection to this particular topic, going back to

20      2015, but we'll work with you.  If we can gather

21      the information, we'll provide it.

22           MS. DEBRIERE: Okay.

23  BY MS. DEBRIERE::

24       Q    So looking at the final GAPMS report related

25  to treatment of gender dysphoria, it's entitled gender

1    confirmation surgery.

2              MS. DEBRIERE: Oh, gosh.  Do we have it from

3         the past deposition?  I'm sorry.  We had, like,

4         over 50 exhibits and clearly it's completely my

5         fault not putting them in the list.  We can always

6         pull back around to them and print it out at lunch,

7         too.  There it is.  Okay.  We're going to mark this

8         one as Exhibit 8, and it's entitled GAPMS gender

9         confirmation surgery, dated July 19th, 2017.

10             (Whereupon, Exhibit No. 8 was marked for

11    identification.)

12    BY MS. DEBRIERE::

13        Q    And this one does have markups on it that are

14    not our markups, they're from the Agency.  Who authored

15    this report?

16        A    So this report is authored by Rebecca Buceo.

17        Q    Okay.  When?

18        A    This was authored in the summer of 2017.

19        Q    How do you know who was authored by?

20        A    I was in the bureau at the time and was

21    present when the project was being assigned out.

22        Q    Okay.  Why weren't you assigned the project?

23        A    I was actually being assigned -- I was working

24    on another project related to designated state health

25    programs and getting approval for those through the

1    Centers for Medicaid -- Medicare and Medicaid Services.

2    So I was actually on a kind of a legislative priority

3    project.  And so I was not assigned to this one.

4        Q    It's my understanding that there's only one

5    hard copy of this report, is that correct?

6        A    That's correct.

7        Q    Okay.  Whose office was it found in?

8        A    So, I -- this report, I did -- it was in a

9    binder with -- so this report was found in Rebecca

10   Buceo's old office.  So she had an office in the bureau.

11   I know she maintained her GAPMS materials there.

12       Q    Okay.  And what else was in that binder?

13       A    I think some of the research articles she

14   used.

15       Q    Is that it?

16       A    That was it.

17       Q    Okay.  Is Rebecca Buceo still with AHCA?

18       A    No, she's not.

19       Q    When did she leave?

20       A    I believe she left in 2019.

21       Q    Okay.  And what was her subject matter

22   expertise?

23       A    She had a behavioral health background.  That

24   was her -- that was her subject matter expertise.

25       Q    Did she have any expertise in surgery?

1      A      Not professionally, no.

2      Q      What about not professionally?

3      A      In other words, she's never worked as a

4   surgeon or anything like that.  But, I mean -- but I

5   mean -- or in the formal education in that area.

6      Q      Okay.  But did she have any experience with

7   surgery that would help her inform the drafting of this

8   GAPMS?

9      A      I couldn't speak to that.

10     Q      Did AHCA ever rely on the conclusions in this

11  report?

12     A      So this report did not get past her immediate

13  supervisor, so, no.

14     Q      Okay.  Prior to its adoption of the

15  categorical exclusion of treatment for gender dysphoria,

16  did Florida Medicaid ever cover gender confirmation

17  surgery for the treatment of gender dysphoria?

18     A      Under fee-for-service, to the best of my

19  knowledge, we didn't.  In managed care, there were a few

20  instances where the managed care plan did approve the

21  procedure.

22           MS. DEBRIERE: Okay.  Can we look at those

23       exhibits now?  The -- I forget what they're called.

24       They're a weird name.  ATTB, ATTA.  It's a weird

25       name.  It wouldn't come to me.

1    BY MS. DEBRIERE::

2         Q    Okay.  So I'm handing you -- these were

3    natives, so they were not Bates-stamped, but I'm handing

4    you documents produced to plaintiffs in discovery.  They

5    were also not labeled, and I just want to ask you some

6    questions about what they mean.  We'll mark that as

7    exhibit -- actually, I'll take those copies.  I'm sorry.

8    Well mark this as Exhibit 9 and 10.  And, I'm sorry,

9    because they're natives, they don't have Bates stamps.

10              (Whereupon, Exhibit Nos. 9 - 10 were marked

11   for identification.)

12   BY MS. DEBRIERE::

13        Q    So looking at Exhibit 9 first, which is two

14   pages total, front and back.

15              MS. DEBRIERE: Seems like they -- yeah, it

16         printed out -- I see.  Do I put it together?  What

17         do we do?

18   BY MS. DEBRIERE::

19        Q    Let's look at under service type, outpatient

20   surgery.  Line item status is approve.  Does that mean

21   that Florida Medicaid approved outpatient surgery?

22        A    Yes, that would mean it was approved.

23        Q    Okay.  And the product description was

24   mastectomy with a primary diagnosis code of F649?

25        A    Uh-huh.

1      Q      So that means that the outpatient surgery was

2  approved for a mastectomy for a diagnosis code of F649,

3  is that correct?

4      A      That's correct.

5      Q      Okay. And F649, what is that diagnosis code?

6      A      That's gender dysphoria.

7      Q      Do you know if -- can you tell by this

8  document whether -- it appears that it was approved by

9  children's medical services under product roll-up.

10     A      So based on these two -- so based on these

11 two, I can't tell if the recipient is in managed care or

12 if they're in fee-for-service.  So in Exhibit 10 --

13     Q      Yeah.

14     A      -- this looks like this would be managed care.

15     Q      Okay.  And how do you know that?

16     A      Because it has, like, the member effective

17 category.

18     Q      Okay.  If the title of both of these documents

19 had the term CMS on it, would that mean that it's

20 managed care?

21     A      Children's Medical Services is overseen by

22 Sunshine Health.  So, yes, it's managed care.

23     Q      And looking at Exhibit 10, the Medicaid ID,

24 does that correspond to individual Medicaid recipients?

25     A      Each Medicaid recipient has a unique Medicaid

1    ID assigned to them.  That's correct.

2         Q    Okay.  And these documents are indicating that

3    there were authorizations of surgeries for primary

4    diagnosis codes of F640 and F649, is that correct?

5         A    Yeah, that's correct.

6         Q    Okay.  And F640 is a diagnostic code for what?

7         A    So F64, generally, there is a decimal point

8    after the 4.  So it was F64.  The way ICD-10 codes work,

9    it's kind of like a taxonomy.  So F64, categorically, is

10   gender dysphoria.  So F64.9 would be like a -- like a

11   subcategory of that general diagnosis.

12        Q    So these documents are showing that, at least

13   in managed care, prior to the categorical exclusion --

14   prior to AHCA's adoption of the categorical exclusion

15   for the treatment of gender dysphoria, there were times

16   in which Florida Medicaid covered surgery to treat

17   gender dysphoria; is that correct?

18        A    That would be correct.

19        Q    Okay.  Let's turn to the June 2022 GAPMS.  We

20   have this exhibit.  And Exhibit 11 will be the June 2nd,

21   2022 GAPMS related to the treatment of gender dysphoria.

22             (Whereupon, Exhibit No. 11 was marked for

23   identification.)

24   BY MS. DEBRIERE::

25        Q    I'm going to refer to this throughout as the

```
1    June 2022 GAPMS.
2         A    That's fine.
3         Q    When was the request to initiate this GAPMS
4    made?
5         A    So the formal request was made on April 20th.
6    That was the date of the Secretary's letter.
7         Q    Were there any informal requests prior to that
8    time?
9         A    There were some informal, I guess, indicators
10   of, you know, trying -- when they were trying to
11   determine whether or not we had bandwidth, you know, and
12   so there was some informal indicators that this project
13   would be coming down the pipeline because they were
14   trying to figure out who to do it.  So we were aware of
15   the Secretary's letter it would be coming to us.
16        Q    Okay.  When you say they were trying to figure
17   out.  Who is they?
18        A    Our Agency leadership.
19        Q    And who is that comprised of?
20        A    So that was primarily for the Bureau of
21   Medicaid Policy, Ann Dalton was our bureau -- is still
22   our bureau chief at the time.
23        Q    So Ann Dalton had knowledge of the potential
24   for this project coming down prior to April 20th, 2022;
25   is that correct?
```

1       A    Yes.

2       Q    Okay.  Who else in leadership was aware that

3  this would be coming to AHCA prior to April 20th, 2022?

4       A    At the time, Secretary Weida was serving as

5  Assistant Deputy Secretary.  He did have knowledge.

6       Q    Okay.  Anybody else?

7       A    To my --to my knowledge, those two were the

8  ones with the knowledge of this project.

9       Q    Okay.  When did you have knowledge of the

10  project?

11       A    Just probably a few days before we were given

12  the letter.

13       Q    Okay.  So, like, April 17th?

14       A    Something around there.  Yeah, I don't

15  remember the exact date.

16       Q    Okay.  Who did you gain the knowledge -- who

17  did AHCA leadership gain the knowledge from?

18       A    As far as the project goes, the decision to do

19  a GAPMS to my -- so that was to do a GAPMS report, that

20  was determined by our legal as the best route to

21  evaluate the medical necessity for treatments for gender

22  dysphoria.  It was that -- it was subjected to the GAPMS

23  process.

24       Q    Okay.  And which counsel was that?

25       A    Andrew Sheeran, who's now our General Counsel.

1    Q    Okay.  And who contacted -- was Mr. Sheeran

2   the first point of contact related to what eventually

3   became the June 2022 GAPMS?

4    A    No, I don't think he would have been the first

5   point of contact.

6    Q    Who would have been the first point of

7   contact?

8    A    Generally, our first point of contact would

9   have been our General Counsel at the time.

10    Q    And that was?

11    A    Josephina Tamayo.

12    Q    Okay.  And who contacted Josephina Tamayo

13   about this project?

14    A    So this project, about the GAPMS in

15   particular --

16    Q    No.

17    A    -- or about requesting a Medicaid review?

18    Q    Requesting a Medicaid review.

19    A    So that, of course, that did come down from

20   the Governor's office.

21    Q    Okay.  Who in the Governor's office made the

22   request?

23    A    So that is -- so it was a multi-party meeting.

24   So the three staffers from the Governor's office that

25   were involved were, I think, Katie Strickland, Ryan

1  Newman and Maureen Farino.

2      Q     Okay.  What other agencies were involved?

3      A     As far as the decision for Medicaid's review?

4      Q     No, as far as that initial request coming from

5  the Governor's office.  You said there was a multi-party

6  meeting.

7      A     Well, between AHCA's staff and Governor's

8  office staff.

9      Q     I see.  Okay.  What other AHCA staff were

10  present at that meeting besides Ms. Tamayo?

11      A     I think at that meeting, I think Deputy

12  Secretary Weida may have been present, I think the

13  General Counsel, I think, Andrew Sheeran, may have been

14  present as well.

15      Q     Okay.  Anybody else present at that meeting,

16  besides those people that you just named?

17      A     I can't name them with any specificity.

18      Q     Okay.  Were they from other agencies other

19  than the Governor's office or AHCA?

20      A     So in regards specifically to this project?

21      Q     Are there other projects we should be aware

22  of?

23      A     Well, I -- there were, I think, some people

24  present from the Department of Health.

25      Q     Regarding what project?

1      A      But that was regarding their review of

2   treatments for gender dysphoria.

3      Q      Based on actions related to the Board of

4   Medicine or based on CMS guidance?

5      A      What do you mean -- when you say CMS, are you

6   referring to Children's Medical Services or --

7      Q      No.   Centers for Medicare.   Great question.

8      A      That guidance was actually not by CMS, it was

9   from HHS.

10      Q      Excuse me, HHS.

11      A      It was in regard to that guidance.

12      Q      Okay.   So there was some presence of

13   Department of Health there, as well, but not related to

14   Medicaid?

15      A      Right.

16      Q      Okay.   And what was the date of that initial

17   meeting?

18      A      I don't have -- know the date offhand.   I

19   think it was like early April.

20      Q      Okay.   And at that meeting, it had not yet

21   been determined that AHCA would use the GAPMS process to

22   evaluate whether treatment for gender dysphoria was

23   experimental, is that correct?

24      A      I think that -- yes, I believe that is

25   correct, based on -- based on the information we've

1   gathered, is that the decision is to route it to the

2   GAPMS process was done after that conversation.

3       Q    Okay.  So what was the Governor's office

4   request for the meeting?

5       A    The Governor's office request was to -- in

6   response to the HHS documents, the Department of Justice

7   documents, Department of Education documents regarding

8   gender dysphoria, designing treatments for gender

9   dysphoria, the evidence for gender dysphoria, it was

10  that the Department of Health and AHCA both undertake

11  reviews.

12      Q    Did the Governor's office instruct AHCA to

13  find -- did the Governor's office instruct AHCA to

14  ensure that Florida Medicaid would not cover treatment

15  for gender dysphoria?

16      A    No.

17      Q    Okay.  Did the Governor's office make any

18  specific requests about Florida Medicaid coverage as it

19  related to the treatment of gender dysphoria?

20      A    The Governor's office wanted the Agency to

21  undertake the review.

22      Q    But what type of review did it want the Agency

23  to undertake?

24      A    It wanted to take a look at -- a detailed look

25  at the available medical evidence, or at least the

1    peer-reviewed literature, and to see what it says.

2         Q     Okay.  You referenced earlier the Florida

3    Department of Health's investigation on the HHS fact

4    sheet.  What did that investigation find?

5         A     So the Department of Health's fact sheet, of

6    course, provide some cursory information, like go into

7    some snapshots of some literature out there, you know,

8    stating that the evidence for support -- that was

9    supporting gender dysphoria treatment was too weak for

10   this to be considered a standard treatment for that

11   condition.

12        Q     Okay.  And so at the time of this initial

13   meeting in early April, when there was a discussion of

14   DOH's findings, at that point there was a conclusion

15   that the information or evidence to support treatment of

16   gender dysphoria was weak?

17              MR. JAZIL: Object to form.

18              MS. DEBRIERE: I can strike that.

19   BY MS. DEBRIERE::

20        Q     Why did the Governor's office want AHCA to

21   review Medicaid coverage for treatments of gender

22   dysphoria?

23        A     So in response to these documents, there were

24   questions about whether or not the evidence supported

25   what HHS, DOJ and DOE was -- at least the United States

1    DOJ, United States DOE, the claims they were making.

2    They wanted to do a review to see whether or not this --

3    the evidence that's supporting was -- actually

4    sufficiently supported those claims.

5        Q    Did the Governor have a specific position on

6    whether HHS' findings were accurate, prior to AHCA's

7    review?

8              MR. JAZIL: Object to form.

9              THE WITNESS: No.

10   BY MS. DEBRIERE::

11       Q    Did DOH have a position on whether HHS'

12   findings were accurate prior to AHCA's review?

13             MR. JAZIL: Object to form.

14             THE WITNESS: Can you rephrase that question?

15   BY MS. DEBRIERE::

16       Q    Yeah.  Did DOH -- at that initial meeting,

17   what conclusions had DOH drawn about the HHS report?

18       A    So DOH, they didn't -- they didn't release

19   their opinions until April 20th, the day we got the

20   letter.

21       Q    Okay.  But had they -- at that meeting, had

22   they formulated those opinions?

23       A    To my -- based on the information given to me,

24   they had not yet formulated those.

25       Q    So why did AHCA general counsel decide that

1    the best process to undertake the review was the GAPMS

2    process?

3         A    Because, well, I'm speaking based on our -- on

4    how policy works is that, of course, the medical

5    necessity definition does have a prong saying that the

6    service has to be consistent with generally accepted

7    professional medical standards.  So the best way to do a

8    review to either -- to determine whether or not

9    something is consistent with GAPMS is to do that,

10   undertake that review process, and that really provides

11   the best opportunity to go through the literature on a

12   large scale and to make a conclusion.

13        Q    Okay.  To your knowledge, had there ever been

14   a time previous where a GAPMS was used to determine the

15   experimental nature of services previously covered by

16   Florida Medicaid?

17        A    To my knowledge, there was not.

18        Q    So this is the first time the GAPMS process

19   was used to determine whether services that were already

20   being covered by Florida Medicaid were experimental?

21        A    To my knowledge, yes.

22        Q    The folks at the initial early April meeting,

23   did they reach out to HHS to get the info they relied on

24   before conducting their own review?

25        A    Are you talking about the Florida Department

1    of Health folks?

2         Q    Or the Governor's office, anyone involved in

3    that meeting.

4         A    No, we -- with the releases, the document

5    releases from those -- from those federal agencies was

6    sufficient.

7         Q    So AHCA did not reach out to HHS either?

8         A    No, we had their documents.  We didn't -- we

9    didn't have any need to question them on them.

10         Q    In the letter you're referring to from

11    Secretary Marstiller dated April 20th, 2022, is that

12    correct?

13         A    Uh-huh.

14         Q    That's the letter that directed Tom Wallace,

15    the Director -- I'm sorry --

16         A    State Medicaid Director, Deputy Secretary.

17         Q    Thank you.  That was the letter directing him

18    to undertake GAPMS related to treatment of gender

19    dysphoria, right?

20         A    Yes.

21         Q    Why did Secretary Marstiller's letter say that

22    she was making the request in response to DOH guidance

23    rather than a request from the Governor?

24         A    Because the DOH guidance had just been

25    published.

1    Q    Okay.  But she was asking Mr. Wallace to

2  undertake that GAPMS process because it was a request

3  from the Governor's office, correct?

4    A    A request for the state agencies to look at

5  the existing evidence and making recommendations, that

6  initially came from the Governor's office.  Since I

7  wasn't physically -- since I personally was not present

8  for those meetings, I can't exactly speak to the

9  sequence, but DOH would undertake its review.  And, of

10  course, once they published their guidance, we undertook

11  ours.

12    Q    Okay.  Just to be clear, there's a few times

13  that you said to your knowledge, but, again, you're

14  testifying as an Agency representative?

15    A    Yes.

16    Q    So this is to the knowledge of the Agency,

17  correct?

18    A    To the knowledge of the Agency, yes.

19    Q    When did AHCA begin work on the 2022 GAPMS?

20  What date?

21    A    We started work on April 20th.

22    Q    You didn't do anything prior to that?

23    A    No.  I mean, I may have done, like, an article

24  search, just to see what was out there, but as far as

25  any large-scale work goes, no, we didn't do -- we didn't

1    do anything like that.

2         Q    Okay.  And, again, just to be clear, no one at

3    the Agency, because you're in the capacity as an Agency

4    representative.  So my question is not just about

5    whether you started anything related to the 2022 GAPMS.

6         A    The Agency did not -- did not start work until

7    April 20th.

8         Q    Who worked on the 2022 GAPMS at the Agency?

9         A    You mean the June 2022 GAPMS?

10        Q    Yes.

11        A    So I was primarily the author.  It was myself,

12   Devona Pickle prepared the maps of the United State

13   Medicaid programs.  Nai Chen prepared the maps for the

14   internet -- for the European countries to classify who

15   covered what, but that was it.  It was the three of us.

16        Q    Okay.  And I apologize.  Can you just one more

17   time run through what everybody's roles were?  You were

18   the primary author.  Mr. Chen worked on the maps.

19        A    Worked on the maps for Western Europe.

20        Q    Okay.  And what did Dede Pickle do?

21        A    The maps for the State Medicaid programs.

22        Q    Okay.  And as primary author -- so you wrote

23   everything else except for the maps in the state

24   Medicaid coverage, then?

25        A    That's correct.

Page 97

1          Q       Okay.  And did you have any assistance?

2          A       It's -- GAPMS are a solitary project, any

3     extensive research project is, because once you immerse

4     yourself in the literature, it's very difficult to have

5     assistance because you're trying to get up to -- you

6     have to transplant knowledge from yourself to them.

7     It's actually just easier to do it, to kind of sail the

8     waters on your own.  And this is coming from speaking

9     from experience on, like, a myriad of research projects,

10    from scholarly articles, master's theses for, like,

11    works -- other works for the Agency, previous GAPMS

12    reports.  Once you under -- once you reach a certain

13    understanding of that knowledge, it comes a point where

14    you -- it makes sense -- it's more efficient for you to

15    do it in a solitary fashion.

16         Q       Okay.  So you were the only one involved in

17    outlining and reviewing the literature that became the

18    June 2022 GAPMS?

19         A       Yes.

20         Q       Okay.  Was there anyone else at the Agency --

21    so you didn't work with Mr. Chen on the literature or --

22         A       Nai, he did -- he occasionally he'd find an

23    article and give it to me, but other than give me the

24    occasional article, that was -- that was it.  I went

25    through, reviewed the article, like, broke it down.  As

1   far as any content or analysis, he just gave me copies

2   of articles.

3        Q    Okay.   Okay.   And so no one else at the

4   Agency -- did anybody else at the Agency take on that

5   role to where they were sending you articles or anything

6   related to that?   I guess what I'm trying to determine

7   is whether anyone else assisted you with drafting?

8        A    Nobody assisted me with the drafting.

9        Q    Inside or outside the Agency?

10       A    We did have a few consultations with some of

11  our contracted experts --

12       Q    Were they a verbal consultations?

13       A    They were verbal.

14       Q    Only verbal?

15       A    Yeah, but as far as drafting went, they

16  weren't involved in that process.

17       Q    Okay.   So they didn't write any of the main

18  report?

19       A    They did not write any of the main report.

20       Q    Or outline it or anything?

21       A    No.

22       Q    Okay.   Looking at -- I have another exhibit,

23  the Van Mol ATF.   We're going to mark this as Exhibit --

24  Exhibit 12.   What is wrong with me today?   And it's

25  entitled Agency for Health Care Administration

Page 99

1    after-the-fact request form under 35k.

2            (Whereupon, Exhibit No. 12 was marked for

3    identification.)

4    BY MS. DEBRIERE::

5        Q    So, reason for occurrences, where I'm reading

6    and second sentence to the last, due to the need to

7    start work quickly, all of the purchase order elements

8    were not available until May 6th.  Why was there a need

9    to start work quickly?

10       A    Since this is -- since we did have a request,

11   and since we were writing in response to the Department

12   of Health, which had already had published their

13   findings, the Agency, of course, we considered this a

14   priority project, and this was mostly that's -- that's

15   pretty much, it was a priority project.

16       Q    I'm sorry.  Why was it a priority project?

17       A    It was priority project because in relation

18   to -- in relation to the Department Health guidelines,

19   which had been released, then, of course, because, you

20   know, as the state of Florida wanted to respond to the

21   HHS documents, which had also been released, because we

22   didn't want a significant amount of time, like, five or

23   six or seven months to elapse before the Agency had

24   gotten its response out.

25       Q    Okay.  So you wanted to make sure that there

1  would be a quick response to the HHS guidance?

2      A    Yes.

3      Q    Okay.  When I say a decision tree checklist

4  for GAPMS, do you know what I mean?

5      A    Are you referring to, like, to a checklist?

6      Q    Yes.

7      A    Yes, I do know what you're referring to.

8      Q    Okay.  Did AHCA do a decision tree checklist

9  for this report?

10     A    So that decision tree checklist, that was a --

11  is an internal process, and each person who does GAPMS

12  often kind of brought their own unique perspective or

13  unique approach to them, since these are research

14  projects and there's not really a formula for it, but I

15  believe -- I think Jeffrey English, I think, helped to

16  develop a checklist, which I think he used when making

17  evaluations.  I kind of have my own mental checklist

18  when I did them.  And also, actually, I actually wanted

19  to kind of help refine, to help cut down the number of

20  GAPMS requests we had.  As we started going through

21  requests, we started realizing, well, some of these

22  really aren't GAPMS, these are just coverage

23  determinations.

24     Q    What -- How did you know that?

25     A    Generally -- okay, well, FDA approval for the

Page 101

1    clinical indication.

2         Q    Okay.

3         A    If a national coverage determination's been

4    released by Medicare, things like that.

5         Q    Okay.  What about if it was already listed on

6    AHCA's fee schedule?

7         A    Not necessarily.

8         Q    Why?

9         A    Because -- just because it's listed on AHCA's

10   fee schedule, it does not necessarily mean that it's --

11   wouldn't be experimental or investigational for another

12   clinical indication.

13        Q    So based on the checklist, if it was listed on

14   the fee schedule, that one isn't going to determine

15   whether or not it should go through GAPMS?

16        A    It shouldn't, no.  And that was -- when I --

17   when I did GAPMS, that was not part of my criteria.

18        Q    After the checklist was developed, how many

19   GAPMS did you do?

20        A    The checklist was developed well after I had

21   left that role.

22        Q    Okay.  So -- but we know you did the June 2022

23   GAPMS, so at least one right?

24        A    Uh-huh.

25        Q    Okay.  After the checklist was developed, for

1    any other time that AHCA undertook a GAPMS, was a

2    checklist completed?

3         A    I think there were some completed checklists

4    that I was able to find in our PDM, but that was after

5    the fact.  When I embarked on this one, I was not aware

6    a checklist even existed.  Not that I didn't apply kind

7    of a mental checklist when I was going through it to

8    check to see if there were certain elements in there

9    that would either come to the conclusion that this

10   shouldn't be that way through GAPMS or not.

11        Q    What was your mental checklist?

12        A    FDA approval for a clinical indication, which

13   would mean that there was already substantiating

14   research for it, which had been done by federal agency,

15   which would kind of render GAPMS point moot, or a

16   national coverage determination by Medicare.  And the

17   national coverage determination is pretty much -- it's

18   like a Medicare GAPMS, and it's -- there aren't that

19   many NCD's out there because there's a risk involved in

20   getting an NCD, but if -- but Medicare NCD's are backed

21   by substantial amounts of research.  So if there's an

22   NCD out there supporting a treatment and mandating

23   coverage for a specific service, and all the research

24   they do behind it, it kind of also -- it renders doing

25   the GAPMS moot.

1      Q    Okay.  Any other -- anything else on your

2    checklist?

3      A    No, those were the two items I usually look

4    for.

5      Q    So that's it.  And then if they didn't pass

6    those two tests, they went to a GAPMS?

7      A    Went to a GAPMS.

8      Q    Okay.  So -- I'm sorry.  I just need to find

9    my place in the outline.  When was the checklist

10   developed?  Remind me.  2017?

11     A    No, the checklist would have been developing

12   in 2019.

13     Q    2019.  Okay.  During the 2022 -- the start of

14   the 22 -- 2022 GAPMS, you mentioned that you were having

15   conversations with the Governor -- or there was an

16   initial meeting with the Governor's office when the

17   request was made and DOH was also present?

18     A    Prior to the request being made.

19     Q    After the request was made, was there any

20   communication with the Governor's office?

21     A    No.

22     Q    After the request was made, was there any

23   communication with the Department of Health?

24     A    No.

25     Q    What about HHS?

Page 104

1      A     No.

2      Q     And what about Alliance Defending Freedom?

3      A     No.

4      Q     Liberty Counsel?

5      A     No.

6      Q     Okay.  What consultants were used by AHCA in

7  the development of the GAPMS.

8      A     So during the development, we have a few

9  verbal conversations with Doctors Miriam Grossman and

10 Andre Van Mol.

11     Q     Okay.  And what did those conversations

12 entail?

13     A     Well, Dr. Van Mol, he just offered suggestions

14 for articles and research for us to look at.  He did

15 provide us with a bibliography for our consideration, as

16 far as -- mostly just leads on research to help save

17 time in finding resources.  And Dr. Grossman, of course,

18 she provide us with some history of gender dysphoria

19 treatments, and gave us more reviews of some scientific

20 techniques.

21     Q     How did you get connected with Dr. Van Mol?

22     A     So Dr. Van Mol, like all of our experts, who

23 also provide published reports, so the process for those

24 was that we did get a name at the very outset of the

25 process, which was Michelle Cretella.  And by contacting

1   her, she led us to other providers -- or other

2   practitioners who had expertise in the fields, and

3   that's how AHCA made contact with these individuals.

4        Q    So Michelle was the only person who connected

5   AHCA to the consultants it relied on for the 20 -- June

6   2022 GAPMS?

7        A    Yeah.

8        Q    Okay.  And who Michelle?

9        A    Michelle -- Dr. Michelle Cretella?

10       Q    Uh-huh.

11       A    She's a physician.  I think she has some

12  affiliations with, like, a couple of -- I think American

13  College of Pediatrics, I think.  I'm not sure what her

14  other affiliations are.

15       Q    How did you find her?

16       A    Well, her name was passed on to us from the

17  Department of Health.

18       Q    Okay.  What's her relationship with to the

19  Department of Health?

20       A    I -- the Agency does not know what her

21  relation to the Department of Health is.

22       Q    Okay.  So you just accepted this

23  recommendation by the Department of Health as the person

24  who would connect you to the consultants you would use

25  to develop the 2022 GAPMS?

1     A    Yes.

2     Q    You didn't do any outside research on whether

3 you should seek out other consultants?

4     A    Well, we were vouching for our -- for the

5 consultants.  I mean and so we did want individuals who

6 had expertise in their respective fields of medicine,

7 and who also were going to take an evidence-based

8 approach.

9     Q    Okay.  Who at Department of Health recommended

10 Dr. Cretella?

11     A    Don't -- we don't have the name of the

12 individual.

13     Q    Because it was sent in an anonymous email?

14 Why don't you have the name?

15     A    We can get that information for you.

16     Q    So you don't have the name, but the Agency has

17 the name, correct?

18     A    The Agency might have a name.  We need to

19 confirm that.

20     Q    And who at the Agency was this communication

21 sent to?  I mean, how was it communicated?

22     A    To my knowledge, it was verbal.  It was a

23 verbal exchange.

24     Q    Okay.  So who at AHCA was part of that

25 conversation?

1      A    So I think when it came down to, you know,

2   reaching out to experts and determining who the experts

3   we should use were, I think Andrew Sheeran and Jason

4   Weida were involved.

5      Q    Okay.  So it was either Andrew Sheeran or

6   Jason Weida who received that information from the

7   Department of Health related to Dr. Cretella?

8      A    Yes.

9      Q    Could it have been anybody else at the Agency?

10     A    I don't think so.  I mean --

11     Q    It seems like you have a name in mind.

12     A    Well, I mean, there were other senior leaders.

13  The Secretary may have been given the name, or Chief of

14  Staff may have been given the name, so, but --

15     Q    Who was the chief of staff?

16     A    Cody Farrell.

17     Q    And who was the person who spoke with Dr.

18  Cretella about her recommendations?

19     A    I think -- I think Andrew Sheeran and Jason

20  spoke about that -- spoke to them about the

21  recommendations.

22     Q    And she recommended everyone, is that correct?

23     A    Well, she -- from what I gathered, there was,

24  like, recommendations.  She gave some names.  And not

25  everyone she recommended, of course, we decided to go

1  with.  So there were some that we did turn down.

2      Q    Who did you turn down?

3      A    We can get that -- we can get that -- we can

4  get those names for you.

5      Q    With Dr. Cretella, was there any consideration

6  given to the associations, the medical associations of

7  which she was a member?

8      A    No.

9      Q    Okay.  So you didn't look to see if she was

10  associated with any particular medical association?

11      A    No.

12      Q    You just went off the recommendation of

13  Department of Health?

14      A    Yes.

15      Q    Was Dr. Cretella paid for her assistance

16  with -- to AHCA?

17      A    No.

18      Q    So DOH didn't pay her or anything?

19      A    Well, I don't know at DOH, that's a question

20  for the Department of Health.  AHCA did not -- we did

21  not establish a financial arrangement with her.

22      Q    Okay.  Are you -- are you personally aware of

23  any financial arrangement between Dr. Cretella and

24  Department of Health?

25      A    No.

1     Q    Okay.  I'm sorry.  Who did you turn down?

2     A    We would have to get those for you.

3     Q    Okay.  And so Dr. Grossman and Dr. Van Mol

4  just gave you some article leads, and that's all?

5     A    Gave some article leads, some background

6  information.  Yeah, it was -- I mean, as far as

7  providing us with content to include in the report, they

8  did not.

9     Q    Why not?

10    A    Because it was an independent assessment by

11 the Agency.

12    Q    Okay.  Did -- but they didn't write any of the

13 reports that were in the attachments to the June 2022

14 GAPMS either?

15    A    Right?

16    Q    Why not?

17    A    I think because we had experts.  We already

18 had a psych -- one psychologist who was writing one.  We

19 already had -- we, of course, we had physicians for,

20 like, plastic surgery.  We had a bioethicist, as well.

21 Since those bases were covered, we felt they would best

22 benefit us by helping provide guide -- guidance with

23 research.

24    Q    Were they ever given the option of writing a

25 report for one of the attachments?

1       A       No, we didn't ask them to write a report.

2       Q       Okay.  Did they ask if they could write a

3   report?

4       A       No, they did not.

5       Q       How did you identify Dr. Romina

6   Brignardello-Petersen?

7       A       So through the contacts we were making, her

8   name was passed on to us as someone at McMaster

9   University who had some experience in doing evidence

10  evaluation.

11      Q       Did Dr. Cretella pass on that name?

12      A       As far as the actual contact that gave us that

13  name?

14      Q       Uh-huh.

15      A       Dr. Cretella was kind of the head of the tree

16  of the contacts.  We would have to go back and get that

17  information on who gave us the exact name for Dr.

18  Brignardello-Petersen.

19      Q       Okay.  But Dr. Cretella was the one who -- so

20  what -- if Dr. Cretella didn't recommend Dr.

21  Brignardello-Petersen, who would have?

22      A       We would have to get that information for you.

23      Q       Would it have been another physician?

24      A       Yes, it likely -- yes, it would have probably

25  been another physician.

1        Q    What other physicians provided recommendations

2   for consultants?

3        A    We would have to get that information.

4        Q    What all physicians did you talk to you prior

5   to -- or in the process of drafting the --

6        A    So in the process of drafting the report, we

7   really -- we talked to Doctors Grossman, Van Mol.  There

8   were a couple conference calls with the experts who

9   provided the reports, but those weren't about our

10  report, that was just mostly more -- that was talking to

11  them about them doing their reports.

12       Q    Okay.  So who recommended Dr. Cantor?

13       A    We -- that may have been Dr. Cretella who had

14  recommended him.  We would need to confirm that.

15       Q    Okay.  So, again, just pointing to topic 24 in

16  the notice of deposition, we asked for an Agency

17  representative who was knowledgeable as to --

18            MS. DEBRIERE: No, no.  I just don't know

19       what -- I have no idea where it is.

20  BY MS. DEBRIERE::

21       Q    So looking at topic 24, and we asked very

22  specifically about the identification of Dr.

23  Brignardello-Petersen, Dr. Cantor, Dr. Van Meter, Dr.

24  Lappert, Dr. Donovan, in the inclusion of the written

25  assessment.  So I don't know what to say.  I mean, it

 1    seems like you're not able to answer the question.

 2              MR. JAZIL: So, counsel, the topic says the

 3    process by which AHCA prepared the memo, and I read

 4    that to mean the process by which we identify these

 5    experts.  And so he's detailed the process.  It was

 6    an initial consultation with one physician, and

 7    then it was -- one person recommends another,

 8    recommends another.  And I think he said that a lot

 9    of these were oral.  To the extent that we have any

10    written records of who specifically said, hire Dr.

11    Romina Brignardello-Petersen, we'll supplement the

12    production with that.

13              MS. DEBRIERE: Other than written records, Mo,

14    can you get us -- can you just do an investigation

15    of who spoke with these individuals and collected

16    this?

17              MR. JAZIL: So who -- so I think he's answered

18    that, it was General Counsel's Office, and it's now

19    Secretary Weida, who spoke to these individuals.

20    If the question is who specifically recommended

21    each expert --

22              MS. DEBRIERE: Yes.

23              MR. JAZIL: -- I'll ask.  And if there's a

24    written record, it would have been turned over to

25    you already.  If there's an oral record, beyond

1          what he's talked about, well --

2                MS. DEBRIERE: If someone knows.  Because if

3          someone knows at the Agency --

4                MR. JAZIL: -- you know, Bob talked to Jill,

5          Jill talked to Jane, Jane talked to Jason and said,

6          hey, hire Brignardello-Petersen, I'll get that

7          information for you.

8                MS. DEBRIERE: Thank you.

9    BY MS. DEBRIERE::

10         Q    Whose decision was it to engage with Dr. Van

11   Meter?  I'm sorry.  Who recommended Dr. Van Meter?  I

12   apologize.

13         A    That's information we would have to --

14         Q    So you don't know who recommended any of these

15   individuals other than Dr. Cretella?

16         A    Right.

17         Q    Okay.  When did AHCA first become aware of the

18   HHS fact sheet on gender-affirming care in young people?

19         A    We became aware of it, since we do follow HHS

20   publications, much of our staff in Medicaid, so forth,

21   they are actually on -- they receive automatic updates,

22   so we became aware of them as they came out.

23         Q    What was AHCA's independent reaction to the

24   fact sheet?

25         A    Well, as the Agency initially didn't -- didn't

Page 114

1    have a reaction.  There was -- we didn't -- we don't

2    react publicly to HHS documents.

3        Q    Okay.  So did AHCA -- you stated in your

4    declaration filed with the court on January 23rd -- are

5    you aware of what I'm talking about?  I can get you a

6    copy, if not.

7        A    I should be aware of it.  I've reviewed it.

8        Q    Okay.  That litigation was highly likely

9    because in drafting the GAPMS report, the GAPMS

10   determination might conflict with federal standards.  Do

11   you remember saying that?

12       A    Yeah.  If I -- yeah, I mean, it's written and

13   signed off on, then, yes.

14       Q    Okay.  With what federal standards, did you

15   think it might conflict?

16       A    Well, it might -- it would probably conflict

17   with that guidance that was released from HHS.

18       Q    Any other federal standards?

19       A    No.

20       Q    Why did you think it would conflict with the

21   guidance from HHS?

22       A    Because the guidance from HHS, the conclusions

23   we made -- that we made following an independent

24   assessment, conflicted with the HHS guidance.  The HHS

25   guidance did state that these were, like, medically

1   necessary treatments, that evidence supporting them, so

2   that they would alleviate mental health systems

3   symptoms, et cetera.  Our concluded -- our conclusions

4   and our assessment of literature deemed otherwise, so we

5   knew that there would be a potential conflict.

6       Q    At what point did you realize that there would

7   be a potential conflict?

8       A    When we -- during the drafting process.  So we

9   realized that the evidence was inadequate to support the

10   claims that HHS was making, or that -- that's when we

11   realized that there would be -- there would be a

12   conflict.

13       Q    Okay.  Did you anticipate that the GAPMS

14   report would conclude that the relevant services were

15   experimental?

16       A    When I started working on it, I did not know

17   where the evidence would take me.

18       Q    At what point did you realize that you were

19   going to conclude that the services were experimental?

20       A    As -- the more and more I read the articles

21   that focused on the mental health benefits, the methods

22   and so forth, the more I realized that all those

23   articles left way too many unanswered questions.

24   This -- there was also -- there wasn't any evidence

25   available to answer those outstanding questions.  I

1   realized that I couldn't -- that there was not going to

2   be -- that the conclusion was going to be, no, it was

3   not consistent.

4        Q    Okay.  So your analysis of those services.  So

5   I think one of your concerns related to the treatment of

6   services for gender dysphoria that is now excluded under

7   59-G-1.050(7), was that the services were not supported

8   by randomized controlled trials, is that correct?

9        A    That was one element of many elements.

10       Q    Okay.  Does AHCA ever require that -- does

11  every -- does AHCA require that every treatment or

12  procedure it covers be supported by randomized

13  controlled trials?

14       A    So to contextualize that question, every

15  medical service is unique.  So we don't apply a uniform

16  set of standards to every single medical service,

17  because every single medical service is for a specific

18  condition, every medical service carries its own pros

19  and cons, risks versus benefits.  So we don't

20  necessarily -- we don't have a one-size-fits-all model

21  for evaluating each and every medical service.

22       Q    You mentioned unanswered questions as you were

23  reviewing the literature for treatment of gender

24  dysphoria, or the services you were analyzing.  What

25  were those?

1      A    So those are iterated in the GAPMS report, but

2    generally like -- well, number one, long-term.  And

3    other unanswered questions, like a lot of these studies

4    were based on anonymous surveys.  How are we supposed to

5    know whether or not these responses are credible, if we

6    don't have any longitudinal history of these

7    individuals?  I mean, one of the things that we came up

8    with when we were doing the literature review is the

9    etiology.  There are lots of potential causes and

10   associations with gender dysphoria, not -- not including

11   but not limited to autism, trauma, neglect, abuse,

12   abandonment, things like that.  So because there was so

13   many unanswered questions, I mean, how are we supposed

14   to know whether or not a one-time survey is going to

15   accurately capture all of that, especially if it's

16   done -- being taken by anonymous people, or if the

17   survey -- or for those that weren't anonymous, the

18   sample sizes were very, very small.  So and, of course,

19   you're talking about one- or two-year periods.  These --

20   the changes prompted by these treatments are permanent.

21      Q    Did you adopt any of the conclusions about

22   treatment for gender dysphoria relied upon by the

23   American Academy of Child and Adolescent Psychiatry?

24      A    The American College of -- can you repeat

25   that?

1       Q     American Academy of Child and Adolescent

2   Psychiatry.  I think it's AACAP.

3       A     No, I don't recall we -- us using their

4   recommendations.

5       Q     What about the American Academy of Family

6   Physicians?

7       A     No, we didn't use theirs.

8       Q     What about the American Academy of Pediatrics?

9       A     We did do an evaluation of theirs.

10       Q     Did you rely on them, their conclusions?

11       A     So what do you mean by --

12       Q     Did you -- did you lend credence to their

13   conclusions?

14       A     Yeah, yeah.  It was -- their conclusions

15   required thoughtful analysis and probing of the

16   evidence.  We do take the recommendations of clinical

17   organizations very seriously, but we also do reserve the

18   right to question those recommendations and we did

19   review those and we did analyze them.

20       Q     And after you reviewed and analyzed them, did

21   you adopt them?

22       A     No, we found that they were based on very weak

23   evidence.

24       Q     Okay.  What about the American College of

25   Obstetricians and Gynecologists?

1          A     No.  I mean -- I mean, there -- we didn't --

2    so, aside from AAP, we did notice, like most of the

3    recommendations, guidelines, were very, very similar,

4    very straightforward, and they usually are based on

5    Endocrine Society and WPATH guidelines.

6          Q     And did you adopt the recommendations from the

7    Endocrine Society and the Pediatric Endocrine Society?

8          A     No, we did not.  We did review those in close

9    detail, though, and analyze them.

10         Q     What about -- I'm sorry.  The other WPATH?

11         A     Yes.  So the World Professional Association

12   for Transgender Health, we did closely review their

13   guidelines.  We did -- we did analyze them.  And, of

14   course, we do discuss them in lengthy detail in multiple

15   areas of the GAPMS report.

16         Q     And ultimately you disagreed with their

17   standards?

18         A     Ultimately, yes.

19         Q     What about the American Psychiatric

20   Association?

21         A     I think we actually didn't make reference to

22   them in the GAPMS report.

23         Q     Did you adopt their conclusions related to the

24   treatment of gender dysphoria?

25         A     No, we did not.

Page 120

1       Q      What about the American Psychological
2    Association?
3       A      No, we did not.
4       Q      American Medical Association?
5       A      We did not.
6       Q      When you say we, you mean --
7       A      The Agency.
8            VIDEOGRAPHER: Excuse me, counsel.  Sometime
9    soon, I need to take a short --
10           MS. DEBRIERE: Oh, yes.
11           VIDEOGRAPHER: -- to start the next video.  Do
12   you want to take a break?  We could take a -- do
13   you want to take a 30-minute lunch break or --
14           THE WITNESS: I'm good with that, yeah.
15           VIDEOGRAPHER: Okay.  This concludes video two.
16   The time is 12:42 p.m.
17           (Whereupon, the deposition resumes in Volume
18   2.)
19
20
21
22
23
24
25

1                          CERTIFICATE OF OATH

2

3

4

5    STATE OF FLORIDA  )

6    COUNTY OF LEON    )

7

8

9           I, the undersigned authority, certify that the

10   above-named witness personally appeared before me and

11   was duly sworn.

12

13          WITNESS my hand and official seal this 21st

14   day of February, 2023.

15

16

17

18

19          _____

20          DANA W. REEVES
            NOTARY PUBLIC
21          COMMISSION #GG970595
            EXPIRES MARCH 22, 2024

22

23

24

25

Page 122

1                    CERTIFICATE OF REPORTER

2     STATE OF FLORIDA    )

      COUNTY OF LEON      )

3

4          I, DANA W. REEVES, Professional Court

5     Reporter, certify that the foregoing proceedings were

6     taken before me at the time and place therein

7     designated; that my shorthand notes were thereafter

8     translated under my supervision; and the foregoing

9     pages, numbered 5 through 120, are a true and correct

10    record of the aforesaid proceedings.

11          I further certify that I am not a relative,

12    employee, attorney or counsel of any of the parties, nor

13    am I a relative or employee of any of the parties'

14    attorney or counsel connected with the action, nor am I

15    financially interested in the action.

16          DATED this 21st day of February, 2023.

17

18

19

20    _____._____

21    DANA W. REEVES

      NOTARY PUBLIC

22    COMMISSION #GG970595

      EXPIRES MARCH 22, 2024

23

24

25

Page 123

1    Gary V. Perko, Esq.
     gperko@holtzmanvogel.com

2

3                        February 21, 2023

4

5    RE:    August Dekker, et al. vs. Jason Weida, et al.

6           February 8, 2023/Matthew Brackett/5696545

7

     The above-referenced transcript is available for review.
8    The witness should read the testimony to verify its
     accuracy. If there are any changes, the witness should
9    note those with the reason on the attached Errata Sheet.
     The witness should, please, date and sign the Errata
10   Sheet and email to the deposing attorney as well as to
     Veritext at Transcripts-fl@veritext.com and copies will
11   be emailed to all ordering parties.  It is suggested
     that the completed errata be returned 30 days from
12   receipt of testimony, as considered reasonable under
     Federal rules*, however, there is no Florida statute to
13   this regard.  If the witness fail(s) to do so, the
     transcript may be used as if signed.

14

15   Yours,

16   Veritext Legal Solutions

17   *Federal Civil Procedure Rule 30(e)/Florida Civil
     Procedure Rule 1.310(e).

18

19

20

21

22

23

24

25

Page 124

1   August Dekker, et al. vs. Jason Weida, et al.

2   February 8, 2023/Matthew Brackett

3                  E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it

20  are true.

21

22  _____    _____

23            Matthew Brackett                    DATE

24

25

**[& - 3900]**                                                                          Page 125

| & | 2 | 3 | 4 |
|---|---|---|---|

**&**

**&**  2:19

**0**

**0.025**  42:6
**000126105**  19:6
**000126112**
  20:20
**000145170**  3:10
**000288776**  3:12
  68:20 70:19
**00325**  1:3 4:6

**1**

**1**  1:11,11 3:9
  5:24 6:1 8:22
  62:9
**1.010.**  15:3
**1.035.**  6:12
**1.050**  7:2 116:7
**1.310**  123:17
**10**  3:13 20:25
  37:25 44:3,9
  48:7,7,9 50:2
  51:12 65:11
  82:8,10 83:12
  83:23 84:8
**100**  3:14
**1000**  50:2
**10005**  2:13
**10:00**  1:15
**10:08**  4:9
**11**  3:14 84:20,22
**110**  2:14
**119**  2:20

**11:05**  48:25
**11:08**  49:3
**12**  3:14 98:24
  99:2
**120**  2:12 122:9
**1229**  2:7
**124**  1:11
**12:42**  120:16
**12th**  2:7
**14th**  70:20
**1512**  2:14
**16**  3:9
**17th**  86:13
**19**  3:11
**19th**  2:12 12:10
  56:18 59:8,10
  59:15 79:9
**1st**  77:18

**2**

**2**  3:9,14 15:13
  15:14 120:18
**2.83**  15:1
**2.83.**  15:18
**20**  105:5
**2003**  11:12
**2005**  11:14
**2015**  77:19
  78:20
**2016**  30:14
  58:11,14,18,20
  69:14 70:1,20
  72:2 75:1,10,18
**2017**  3:11 13:24
  13:25 14:10,11
  14:11,14,15,18

14:19 56:17
57:24 58:9,19
59:2 79:9,18
103:10
**2019**  80:20
  103:12,13
**2020**  60:8
**2021**  14:19,20
  14:20,22
**2022**  3:11,14
  19:11 47:2
  56:12,15,18
  59:8,10,16
  60:12 61:12
  67:20 75:3
  84:19,21 85:1
  85:24 86:3 87:3
  94:11 95:19
  96:5,8,9 97:18
  101:22 103:13
  103:14 105:6,25
  109:13
**2023**  1:14 4:8
  121:14 122:16
  123:3,6 124:2
**2024**  121:21
  122:22
**20th**  19:11
  56:15 60:12
  61:12 85:5,24
  86:3 92:19
  94:11 95:21
  96:7
**21**  3:10 47:4,14
  123:3

**21st**  67:19
  121:13 122:16
**22**  19:9 103:14
  121:21 122:22
**23**  3:11
**23rd**  56:17,18
  57:22,24 59:2
  114:4
**24**  45:1 111:15
  111:21
**2727**  1:17 4:7
**27514**  2:15
**29229**  121:18
  122:19
**2nd**  60:2 61:5
  84:20

**3**

**3**  3:10 19:21
  20:11 55:12
  56:14 60:12
  62:9 74:1,5
**30**  8:19,22 9:4
  68:3 73:11
  120:13 123:11
  123:17
**3100**  2:9
**32**  3:10
**32205**  2:4
**32301**  2:20
**32308**  1:17
**32601**  2:7
**33131**  2:10
**35k**  3:15 99:1
**3900**  2:4

**4**

**4** 3:10 30:24 31:1 33:6 73:2,8 74:4,6,19 84:8
**4:22** 1:3 4:6

**5**

**5** 3:4,11 56:19 56:21 59:8 122:9
**5.2** 27:13
**50** 79:4
**500** 2:20
**5696545** 123:6
**57** 3:11
**59** 6:12 7:2 15:3 116:7

**6**

**6** 3:11 8:19,22 9:4 59:3,4 68:3 75:10
**6-16-2022** 45:17
**60** 3:11
**600** 2:9
**6th** 75:1 99:8

**7**

**7** 3:9,12 7:2 70:13,14,15,21 72:13 116:7
**71** 3:12

**8**

**8** 1:14 3:12 79:8 79:10 123:6 124:2

**80** 3:12
**83** 3:13,13
**85** 3:14
**8th** 4:8

**9**

**9** 3:13 82:8,10 82:13

**a**

**a.m.** 1:15 4:9 48:25 49:3
**aa** 11:11
**aacap** 118:2
**aap** 119:2
**abandonment** 117:12
**ability** 32:20 37:9
**able** 18:2 36:8 46:7 78:12 102:4 112:1
**above** 121:10 123:7
**absolute** 64:25
**absolutely** 31:15
**abuse** 117:11
**academy** 117:23 118:1,5,8
**accepted** 6:10 14:1 17:23 93:6 105:22
**access** 34:18,18 61:21,23 62:15

**accident** 52:3
**accord** 61:20
**accumulating** 58:16
**accuracy** 123:8
**accurate** 21:2 47:1 56:25 92:6 92:12
**accurately** 117:15
**acetate** 28:10
**acronym** 6:9,11
**act** 35:17,21
**acting** 9:10
**action** 122:14 122:15
**actions** 89:3
**actual** 110:12
**actually** 12:7,9 12:12 13:14 24:9 27:9 34:10 39:20,22 40:4,4 46:24 56:16 58:11 61:22 62:25 71:25 75:20,20 79:23 80:2 82:7 89:8 92:3 97:7 100:18,18 113:21 119:21
**add** 63:2,3
**added** 60:18 72:23
**additional** 70:4

**addressed** 29:9 30:2 64:10
**addressing** 28:24
**administered** 10:15 38:23
**administration** 1:16 4:4 8:19 12:20 98:25
**administration's** 13:1
**administrative** 6:12 7:1 15:2
**administrator** 13:9 14:12 71:11
**adolescent** 117:23 118:1
**adopt** 117:21 118:21 119:6,23
**adopted** 71:2,4 75:1,2,11
**adoption** 65:25 66:1,11 67:5 68:12 74:19 81:14 84:14
**adults** 22:22
**advance** 36:12 36:16
**affair** 43:19
**affect** 12:16
**affiliations** 105:12,14
**affirming** 113:18

**aforesaid** 122:10
**age** 37:12,13,13 37:13 47:4
**agencies** 12:11 40:17 88:2,18 94:5 95:4
**agency** 1:16 4:3 8:18 9:2,11,18 12:20,25 13:2,7 13:8,20 14:4 17:24 21:17 22:14 24:24 32:19 34:6 37:9 40:16 59:22 60:7,24 61:2,15 66:6,20 71:2 79:14 85:18 90:20,22 95:14 95:16,18 96:3,3 96:6,8 97:11,20 98:4,4,9,25 99:13,23 102:14 105:20 106:16 106:18,20 107:9 109:11 111:16 113:3,25 120:7
**agency's** 46:9
**agent** 43:12
**ago** 11:5 22:12
**agree** 6:21
**ahca** 13:1 15:24 17:6,6 18:5,7 25:6,11,11 26:20 28:1

30:18 31:12,20 32:3,8 35:25 36:9 39:24 41:14,19,22 42:18 44:13,20 45:5,12,23 46:12 47:5,6,7 47:16 49:10,22 50:6 52:6,15,21 52:21 53:2,3,11 66:21 74:19 75:1,11,12 77:21 80:17 81:10 86:3,17 88:9,19 89:21 90:10,12,13 91:20 92:25 94:7 95:19 100:8 102:1 104:6 105:3,5 106:24 108:16 108:20 112:3 113:17 114:3 116:10,11
**ahca's** 17:8 18:24 36:25 45:9,11 49:6 65:25 84:14 88:7 92:6,12 101:6,9 113:23
**ahca.myflorida** 36:22
**ahead** 5:23 15:12 48:22 69:11 77:1

**aka** 53:7
**al** 1:5,8 4:5,5 123:5,5 124:1,1
**align** 43:3 46:9
**alignment** 17:14 17:15
**alleviate** 115:2
**alliance** 104:2
**allow** 18:18,19
**allows** 33:11
**american** 35:13 105:12 117:23 117:24 118:1,5 118:8,24 119:19 120:1,4
**amount** 23:9 35:5 99:22
**amounts** 102:21
**analog** 74:22
**analogous** 48:14
**analysis** 98:1 116:4 118:15
**analyst** 13:23
**analytical** 63:17
**analyze** 17:16 118:19 119:9,13
**analyzed** 118:20
**analyzing** 116:24
**andre** 104:10
**andrew** 9:24 44:25 86:25 88:13 107:3,5 107:19

**ann** 85:21,23
**anonymous** 106:13 117:4,16 117:17
**answer** 7:16 8:3 8:9 21:18 28:22 62:19 64:25 72:7 77:21 112:1 115:25
**answered** 78:8 112:17
**answers** 7:25
**antagonists** 29:23 30:4,19
**anticipate** 115:13
**anybody** 21:17 61:22 86:6 88:15 98:4 107:9
**apologies** 72:17
**apologize** 56:23 96:16 113:12
**appear** 73:21
**appearances** 2:1
**appeared** 121:10
**appears** 83:8
**applies** 28:22 46:3 47:16
**apply** 40:2 46:5 102:6 116:15
**appreciate** 57:7
**approach** 100:13 106:8

**appropriate**
  35:7
**approval**  24:7
  31:10,16 73:22
  77:4 79:25
  100:25 102:12
**approve**  45:6
  51:9,19 81:20
  82:20
**approved**  24:2,3
  24:5,6,10,13,14
  24:15,18 27:4
  31:14,17,18
  32:4 35:10 37:5
  41:2 42:23
  44:19 50:25
  53:3,6,7,12,17
  53:18,18,21,22
  54:1,7,9 60:2
  66:24 73:23
  82:21,22 83:2,8
**april**  3:11 14:19
  14:20,22 56:17
  59:8,10,15 85:5
  85:24 86:3,13
  89:19 91:13
  92:19 93:22
  94:11 95:21
  96:7
**area**  81:5
**areas**  9:15 18:14
  119:15
**arisen**  59:25
**arlene**  63:3

**arrangement**
  108:21,23
**article**  63:19
  95:23 97:23,24
  97:25 109:4,5
**articles**  11:19
  80:13 97:10
  98:2,5 104:14
  115:20,23
**articulating**  8:4
**arts**  11:12,13
**ashley**  60:16
  62:3
**aside**  64:11
  119:2
**asked**  10:12
  30:7 111:16,21
**asking**  18:20,21
  53:1 61:11
  63:21 95:1
**asks**  63:15
**assembled**  27:7
**assessing**  67:18
**assessment**
  109:10 111:25
  114:24 115:4
**assigned**  6:19
  79:21,22,23
  80:3 84:1
**assignment**  58:1
**assistance**  26:13
  97:1,5 108:15
**assistant**  86:5
**assisted**  98:7,8

**associated**  6:20
  38:13 42:6 44:9
  50:14 108:10
**association**
  108:10 119:11
  119:20 120:2,4
**associations**
  108:6,6 117:10
**assume**  22:24
  38:25 46:25
  70:23
**assumption**
  22:24
**assurance**  14:8
  26:15
**atf**  98:23
**atta**  81:24
**attached**  123:9
**attachments**
  109:13,25
**attb**  81:24
**attempt**  7:16
**attempting**  12:5
**attorney**  33:4
  122:12,14
  123:10
**audit**  34:11
**august**  1:5 4:5
  67:19 75:3
  123:5 124:1
**author**  58:2
  59:13 96:11,18
  96:22
**authored**  57:24
  58:10,11 59:9

  71:5 79:14,16
  79:18,19
**authority**  121:9
**authorization**
  16:12,17 17:2,3
  21:7,12,15,22
  21:25 23:13,23
  24:2,11,17,19
  24:21 25:4,6,11
  26:1 30:15
  31:23 32:3
  35:24 36:4,5,8
  36:10,15 38:5
  38:19 40:10,14
  42:12,16 45:2,6
  46:18 47:6,17
  50:4 51:17
  52:14,20,25
  56:2 75:21 77:3
**authorizations**
  16:21 21:11
  76:3 77:9 84:3
**authorize**  24:12
  40:24 41:8,23
  54:18 66:16
  75:12 76:12
**authorized**  16:6
  38:6,8,9 45:18
  45:18 66:3
  74:22 76:6
  77:22
**authorizing**
  16:23
**autism**  117:11

**auto** 56:24
**automatic** 38:9
  38:15 113:21
**automatically**
  37:19 38:14,16
  43:9 51:4,11,19
**available** 34:21
  37:11 61:24
  67:13 90:25
  99:8 115:25
  123:7
**avenue** 2:7,9
**avenues** 26:19
**aware** 33:19
  34:25 35:1
  56:11,11 59:11
  85:14 86:2
  88:21 102:5
  108:22 113:17
  113:19,22 114:5
  114:7

**b**

**b** 8:19,22 9:4
  68:3
**bachelor** 11:12
**back** 24:9 31:9
  32:8 33:6,25
  34:6,11 42:2,2
  43:4 45:7 47:3
  48:2,6 49:5
  52:11 55:12
  58:9 60:11
  67:17 70:23
  73:2 75:18 77:2
  77:15 78:19

  79:6 82:14
  110:16
**backed** 102:20
**background**
  11:9 72:2 80:23
  109:5
**bacteria** 12:15
**bandwidth**
  71:24 85:11
**barantorchinsky**
  2:19
**based** 13:13
  43:17,17 44:15
  45:3 50:9 61:1
  61:17 73:9,20
  73:23 74:1,10
  74:13 75:23
  76:6 78:10
  83:10,10 89:3,4
  89:25,25 92:23
  93:3 101:13
  106:7 117:4
  118:22 119:4
**bases** 109:21
**basically** 15:10
**basis** 18:23 19:2
  31:21,22 55:4
**bates** 5:19 19:6
  72:20 82:3,9
**bathroom** 48:20
**becoming** 12:12
  14:12
**beginning** 49:2
**begins** 68:20

**behalf** 4:24 9:1
**behavioral**
  13:10,12 80:23
**believe** 10:24
  21:9,14 35:4
  38:10 40:5
  80:20 89:24
  100:15
**benefit** 26:24
  40:7,8,9,22
  109:22
**benefits** 115:21
  116:19
**best** 81:18 86:20
  93:1,7,11
  109:21
**beth** 60:15
**better** 8:3
**beyond** 112:25
**bibliography**
  104:15
**billing** 26:3
**binder** 80:9,12
**bioethicist**
  109:20
**birth** 6:19
**bit** 6:9 10:4 11:8
  22:25 52:11
  54:22
**board** 89:3
**bob** 113:4
**bottom** 5:19
**brackett** 1:12
  3:3 5:6,25 8:16
  15:17 20:17

  70:8 77:14
  78:12 123:6
  124:2,23
**branch** 40:18
**brand** 28:8
  53:17
**break** 8:8,10
  48:18,21,22
  120:12,13
**brickell** 2:9
**brief** 49:1
**briefly** 21:20
  47:3
**brignardello**
  110:6,18,21
  111:23 112:11
  113:6
**broke** 97:25
**brought** 5:24
  10:7 100:12
**broward** 34:9
**buceo** 79:16
  80:17
**buceo's** 80:10
**build** 38:1
**bumped** 64:22
**bureau** 14:9,13
  14:16 26:12
  32:15 58:15
  59:13 61:25
  73:10 79:20
  80:10 85:20,21
  85:22
**busy** 63:14,14
  65:17

| c |
| --- |

**c** 45:13
**call** 27:8
**called** 5:7 81:23
**calls** 111:8
**canadian** 12:22
13:4 14:21
39:19
**cantor** 111:12
111:23
**capacity** 60:25
61:3 96:3
**capitol** 64:21,23
**capture** 117:15
**care** 1:16 8:18
9:25 12:20 13:1
16:21 17:7,21
18:7 21:9 31:24
37:13 40:2 41:8
42:14 46:6,7,11
64:9 66:22,25
68:10 71:12,16
76:22,25 77:18
81:19,20 83:11
83:14,20,22
84:13 98:25
113:18
**carries** 116:18
**case** 1:3 4:5
21:24 38:22
63:12 76:4
**cases** 34:4
**categorical** 6:24
7:4 66:1,11 67:6
68:12 74:20

75:2,11 81:15
84:13,14
**categorically**
84:9
**categories** 71:18
**category** 83:17
**catherine** 2:14
4:23
**caused** 6:18
**causes** 117:9
**centers** 80:1
89:7
**century** 12:10
**certain** 21:14
27:14 38:12
76:11 97:12
102:8
**certificate** 121:1
122:1
**certify** 121:9
122:5,11
**cetera** 9:20
22:16 43:2
47:25 115:3
**challenge** 75:9
75:16
**challenged**
77:19
**chance** 46:24
68:24
**change** 124:4,7
124:10,13,16
**changes** 12:16
59:15 60:11,20
60:21 117:20

123:8
**chapel** 2:15
**characteristics**
6:21
**check** 36:8
48:11 102:8
**checklist** 100:3
100:5,8,10,16
100:17 101:13
101:18,20,25
102:2,6,7,11
103:2,9,11
**checklists** 102:3
**checkup** 50:24
71:16
**chelsea** 2:6 4:18
70:12
**chen** 61:10
96:13,18 97:21
**chief** 85:22
107:13,15
**child** 47:4,14
71:15 117:23
118:1
**children** 22:21
23:2,11
**children's** 83:9
83:21 89:6
**chriss** 2:5 4:16
4:16 6:4 15:6
19:9,22 30:22
55:15
**circle** 48:1
**circumstance**
65:1

**circumstances**
25:22 27:14
66:6
**citation** 36:2,13
**civil** 123:17,17
**claim** 24:24,25
33:25 37:18,19
42:20,24,25,25
43:10 49:18
50:10 51:1,14
51:21,22,24
52:4,14,15,20
**claims** 26:6
31:11 32:6,16
32:17 35:25
38:1,7,15 52:9
92:1,4 115:10
**clarified** 67:2
**clarify** 15:22,22
37:14 69:7,11
**clarity** 40:20
44:20 59:1
68:21
**classify** 96:14
**clean** 51:21,24
52:4 72:19
**clear** 60:23 67:4
72:13,22 78:17
95:12 96:2
**clearly** 8:1 79:4
**climara** 42:6
**clinical** 16:12
31:18 37:13
42:7,11 44:19
45:1 50:3 51:16

52:13,19,24
53:7 54:8,12
55:7 66:8,24
101:1,12 102:12
118:16
**close** 13:6 29:2
119:8
**closely** 119:12
**cms** 83:19 89:4
89:5,8
**code** 6:12 7:1
15:2 37:18 38:3
38:14 39:6 43:3
43:17 48:14
50:13,18,20,20
51:3,6,13,17
52:2 82:24 83:2
83:5 84:6
**codes** 37:17,17
38:1,23 39:1
43:2,21,21,24
44:1,2,7,7,9
48:7,7,9,12,13
48:14 51:9,10
51:12 84:4,8
**cody** 107:16
**collected** 112:15
**college** 11:11
105:13 117:24
118:24
**com** 36:23
**come** 17:25 18:4
18:4,6 31:9 43:4
81:25 87:19
102:9

**comes** 18:8
21:10 42:20,25
97:13
**coming** 12:16
85:13,15,24
86:3 88:4 97:8
**commenced**
1:15
**comments** 60:17
62:8
**commission**
121:21 122:22
**commit** 64:25
**committed**
15:10 20:1
**committee** 27:8
37:6
**common** 12:12
12:18
**communicated**
106:21
**communication**
103:20,23
106:20
**community**
11:11 13:12
**compare** 22:19
**compendia** 35:8
35:11,16,20
36:2,14 54:15
54:21 55:10
**compendium**
34:24 35:19
**complete** 24:7
64:2

**completed**
54:13 55:7
58:21,21 73:23
102:2,3 123:11
**completely** 79:4
**completing** 14:1
**completion**
73:22
**compliance**
26:17
**comprehensive**
54:22
**comprised**
85:19
**computer** 36:18
**concept** 12:12
**concerns** 116:5
**conclude** 115:14
115:19
**concluded**
115:3
**concludes** 48:24
120:15
**conclusion**
91:14 93:12
102:9 116:2
**conclusions**
81:10 92:17
114:22 115:3
117:21 118:10
118:13,14
119:23
**condition** 31:25
53:25 75:4
91:11 116:18

**conditions**
27:20
**conducting**
93:24
**confer** 48:19
63:5
**conference**
11:24 111:8
**conferences**
11:18,22,23,25
12:2
**confirm** 38:10
43:11 106:19
111:14
**confirmation**
3:12 79:1,9
81:16
**conflict** 114:10
114:15,16,20
115:5,7,12
**conflicted**
114:24
**confusing** 57:4
**connect** 105:24
**connected**
104:21 105:4
122:14
**cons** 116:19
**consent** 9:10
**consideration**
23:14 74:10
104:15 108:5
**considered** 33:7
91:10 99:13
123:12

consist 35:5
consistency
  61:8
consistent 17:22
  17:25 18:22
  74:8 93:6,9
  116:3
consult 18:25
  19:1 63:3
consultant
  12:21
consultants
  104:6 105:5,24
  106:3,5 111:2
consultation
  112:6
consultations
  98:10,12
consulted 9:24
  10:1
contact 87:2,5,7
  87:8 105:3
  110:12
contacted 87:1
  87:12
contacting
  104:25
contacts 110:7
  110:16
contained 45:19
  45:20 74:2
content 98:1
  109:7
context 58:12
  64:14,18 73:18

contextualize
  116:14
contract 47:6
contracted
  40:17 98:11
contractor
  31:12 42:18
  47:5,7,17
contractors
  17:6 25:11
  35:25 52:21
  66:21 77:22
control 33:4
controlled
  116:8,13
conversation
  90:2 106:25
conversations
  103:15 104:9,11
copies 10:25
  70:4 82:7 98:1
  123:10
copy 5:25 6:3,4
  6:5 15:5 19:24
  20:16 30:24
  70:18 72:13,18
  72:19 80:5
  114:6
corporate 4:3
correct 8:20
  16:4 25:8 28:19
  32:10 35:15
  38:20 39:4
  41:17,18,21
  44:10,17,22

45:2,21 46:4,13
48:4,5 49:12,24
49:25 50:4,5,19
54:23 55:2 60:5
61:13 73:6
74:23,24 75:7
77:24,25 80:5,6
83:3,4 84:1,4,5
84:17,18 85:25
89:23,25 94:12
95:3,17 96:25
106:17 107:22
116:8 122:9
correctly 49:8
correspond
  37:18 38:2
  83:24
corresponding
  37:17
corresponds
  16:14,18,25
  51:14,22
cost 75:5
counsel 2:6 4:11
  9:9 10:3 19:12
  36:20 56:11
  69:7 70:3 72:12
  72:23 86:24,25
  87:9 88:13
  92:25 104:4
  112:2 120:8
  122:12,14
counsel's
  112:18

counter 54:3
countries 96:14
country 33:2
county 34:9
  121:6 122:2
couple 105:12
  111:8
course 12:13
  13:10,11 22:3
  23:4,9 26:23
  27:6 30:1 33:11
  35:4 37:11,12
  40:12 42:1,10
  42:24 43:1
  47:24 50:21
  54:9 67:22
  71:15 72:2
  78:14 87:19
  91:6 93:4 95:10
  99:13,19 104:17
  107:25 109:19
  117:18 119:14
court 1:1,19 4:9
  4:12 5:3,11 6:3
  6:5 8:5 12:24
  114:4 122:4
cover 16:3,11
  18:1,9,12,18
  23:18 24:1,14
  25:15,21,25
  27:14,15,17,21
  27:22,24 39:21
  39:25 41:1,19
  42:22 44:20
  45:23 47:23

49:22 50:6 53:2
53:12,19,20
66:15 67:1 75:5
81:16 90:14
**coverage** 9:21
10:19,20 16:14
18:23 20:22
21:3 22:19 23:1
23:5,6,17,23,25
24:22 26:20,23
28:2,6,11,23
29:4,5,7,9,13,14
29:17,18,20,25
30:2,6,8,10,20
31:10,11,19
33:7,8,10,17
35:25 36:11
40:3,24 41:5,8
41:23 45:6
52:10 54:18
56:13 58:17
66:4,17 67:2
77:22 90:18
91:21 96:24
100:22 101:3
102:16,17,23
**covered** 23:8,8
24:3,4 25:15,18
25:19 26:24
27:13 29:3,8,13
29:17 30:1 32:7
32:9 41:25
42:18 46:17
68:13 75:23
76:17 84:16

93:15,20 96:15
109:21
**covering** 53:6
67:8,23
**covers** 27:3
36:11 41:14
44:13,16 49:10
53:4 116:12
**cpt** 43:2 44:2
**craft** 63:18
**craig** 58:3,23
59:12 60:6,8
**created** 58:18
**credence** 118:12
**credible** 117:5
**cretella** 104:25
105:9 106:10
107:7,18 108:5
108:15,23
110:11,15,19,20
111:13 113:15
**criteria** 10:19
16:10 25:4
34:15 45:10,11
45:12,15,16,19
45:20 46:1,8,11
46:15,19,25
47:1,7,18,20,20
47:22 49:16,17
55:22,25 66:7
73:4,7,25 74:15
74:19 75:4,8,24
76:1,6 101:17
**criteria.shtml.**
45:14

**cross** 3:10 19:7
33:21,24 55:14
55:18 56:15
57:16 65:3 66:4
66:7,17 67:8
68:14 69:18
76:16
**crossed** 60:15
60:17
**cum** 11:13
**cumulatively**
68:16 76:21
**current** 9:17
12:19,21
**cursory** 91:6
**cut** 100:19
**cv** 1:3 4:6
**cyp** 50:2
**cypionate** 49:7
49:11,23 50:2
51:16 52:13,18

**d**

**d** 4:1
**dade** 34:8
**dalton** 85:21,23
**dana** 1:18 4:9
121:20 122:4,21
**data** 67:18,21
67:22 68:1,2,4,5
75:17,18 76:23
**date** 1:14 4:8
57:9,22 69:8,11
69:25 85:6
86:15 89:16,18
95:20 123:9

124:23
**dated** 19:8
56:17,17 60:12
70:20 79:9
94:11 122:16
**dates** 56:25 73:9
73:11,13,14
**dating** 56:24
**day** 20:13 42:6
59:17 65:20
92:19 121:14
122:16
**days** 11:7 73:4
73:11,13,14
86:11 123:11
**deal** 18:7
**debriere** 2:3 3:4
4:14,14,21 5:1
5:13 6:6 10:22
11:1 12:24 13:3
15:9,12,16
19:10,14,17,21
19:23 20:2,5,7
20:13,15 25:23
30:20,23 31:4
39:12,14 47:12
48:16,23 49:4
55:13,17,20
57:1,10,15,20
58:8 59:6 62:22
62:23 68:23
69:2,5,10,15
70:5,14,17
72:15,20,25
73:1 74:5,9,12

77:7,13 78:5,22
78:23 79:2,12
81:22 82:1,12
82:15,18 84:24
91:18,19 92:10
92:15 99:4
111:18,20
112:13,22 113:2
113:8,9 120:10
**december** 14:10
14:18
**decide** 92:25
**decided** 11:16
107:25
**decimal** 84:7
**decision** 18:4
86:18 88:3 90:1
100:3,8,10
113:10
**decisions** 31:11
35:24
**decker** 4:5
**declaration**
114:4
**declare** 124:19
**dede** 96:20
**deem** 45:25
**deemed** 17:24
23:12 63:22
115:4
**def** 3:10,12 19:6
20:20 68:20
70:19
**defendant** 2:17
19:6

**defendants** 1:9
4:25
**defending** 104:2
**defense** 2:11
4:20
**defer** 42:2 67:25
73:9,16 75:15
75:17
**define** 23:19
**defined** 6:17
16:2 71:22
**definitely** 20:7
30:24 34:7
38:22 53:5
**definition** 6:22
14:23 16:15,18
16:24 17:17
20:10 45:7 93:5
**definitions**
14:25 23:21
**dekker** 1:5
123:5 124:1
**deleting** 43:20
**delivering** 34:13
50:23
**delivery** 16:13
**denial** 19:2 22:7
43:4 50:15
**denials** 38:9
77:4
**denied** 37:19
**dental** 71:14
**deny** 18:23 38:2
38:12,15 43:10
43:14,16 50:11

51:1,4,6,11
**department**
62:6,17 88:24
89:13 90:6,7,10
91:3,5 93:25
99:11,18 103:23
105:17,19,21,23
106:9 107:7
108:13,20,24
**depend** 64:7
**depends** 26:17
64:6,8,14,15,17
64:24
**depo** 78:18
**deposed** 7:11
**deposing** 123:10
**deposition** 1:12
3:9 4:3,6 5:24
8:19,22 9:4 11:3
55:18 77:15,16
78:9 79:3
111:16 120:17
**depth** 47:24
**deputy** 14:8
63:8 86:5 88:11
94:16
**describe** 11:8
21:20
**described** 6:11
56:5
**describes** 55:21
**description** 3:8
82:23
**descriptions**
27:23

**designated** 8:23
61:9 79:24
122:7
**designation**
61:1
**designing** 90:8
**detail** 119:9,14
**detailed** 63:17
90:24 112:5
**details** 37:8
**detected** 26:18
**determination**
18:3,16,24
25:12,24 31:25
61:7 102:16,17
114:10
**determination's**
101:3
**determinations**
100:23
**determine** 16:5
16:13,17 18:11
21:3 22:5 25:6
31:13 32:3 36:1
40:24 52:22
54:25 63:6
74:21 75:19
85:11 93:8,14
93:19 98:6
101:14
**determined**
17:19 23:14
86:20 89:21
**determining**
16:2 33:15

42:19 50:7
54:17 107:2
**develop**  100:16
105:25
**developed**  33:13
73:4 101:18,20
101:25 103:10
**developing**
103:11
**development**
13:11 104:7,8
**deviate**  47:7,17
**devona**  10:1,5
10:14 61:10
96:12
**diagnosis**  37:17
37:18 38:3 43:3
43:21 50:13
51:5 67:24
82:24 83:2,5
84:4,11
**diagnostic**  7:8
38:13 39:6
43:17,24 44:1,8
50:18,20 51:3
51:13,17 84:6
**differences**
76:21
**different**  9:13
9:20 38:7 57:17
65:16 69:3,4
**differently**
48:13
**difficult**  97:4

**digging**  63:1
**directed**  94:14
**directing**  94:17
**directly**  10:5
**director**  94:15
94:16
**disagreed**
119:16
**discomfort**  6:17
**discovery**  10:23
12:14,15 82:4
**discrepancy**
6:18
**discuss**  5:21
119:14
**discussed**  5:15
**discussing**  5:22
51:16 52:19
76:16
**discussion**
20:23 77:8
91:13
**dispensing**
24:25
**dissertation**
12:9
**distress**  6:17
**district**  1:1,1
34:9
**division**  63:15
**divisions**  9:19
**doctor**  22:18
**doctors**  104:9
111:7

**document**  3:13
3:13 10:7 60:22
61:16,21,23
62:2,16 68:22
70:6 73:23 83:8
94:4 124:19
**documentation**
25:20
**documented**
34:14
**documents**
56:24 57:2
61:23 73:17
82:4 83:18 84:2
84:12 90:6,7,7
91:23 94:8
99:21 114:2
**doe**  91:25 92:1
**doh**  92:11,16,17
92:18 94:22,24
95:9 103:17
108:18,19
**doh's**  91:14
**doing**  16:16
25:25 50:23,24
52:16 61:19
102:24 110:9
111:11 117:8
**doj**  91:25 92:1
**dollars**  34:12
**donovan**  111:24
**downtown**
64:17,19
**dr**  104:13,17,21
104:22 105:9

106:10 107:7,17
108:5,15,23
109:3,3 110:5
110:11,15,17,19
110:20,20
111:12,13,22,23
111:23,23,24
112:10 113:10
113:11,15
**draft**  56:12 64:1
**drafted**  65:11
74:1,15
**drafting**  81:7
98:7,8,15 111:5
111:6 114:9
115:8
**drawn**  92:17
**drinks**  36:21
**drive**  1:17 4:7
**drug**  12:22 13:4
14:21 21:12,13
21:16,22 23:23
24:3,18,20 25:3
25:5,10 26:21
26:24 27:1,4,6
27:11 28:15,23
28:25 29:3,5,8,9
29:14,18,21
30:1 31:13 32:2
34:24 35:2,6,10
35:12,13,14
36:1,11,11,19
36:23,25 37:4,7
38:4,18 39:1,6
39:15,19,19

40:25 41:5
42:22 44:7
45:10,11,13,13
45:15 46:15
47:4,8 48:3,14
49:6,6 50:6,7,14
51:20 52:22
53:4,14,17,25
53:25 54:13,15
54:18 55:6 75:5
75:13 76:17
77:11
**drug's**  50:17
**drugs**  21:4,6
24:1,1 25:17,18
26:22 27:13,15
27:16,19,22
28:7,17 30:10
30:17 33:18
35:23 36:3,4
37:7 39:3,17
40:3,11,15
41:11 45:23,25
53:2,7,12,20
54:4,8,9 55:1
56:2
**dub**  37:16
**due**  99:6
**duly**  5:7 121:11
**dunn**  2:6 4:18
4:18 56:20 69:1
69:3 70:13
72:18
**durable**  13:12

**durham**  44:25
**dutasteride**
29:6
**dysphoria**  6:16
6:22,25 41:20
43:9 44:21
49:24 51:3 56:9
56:13 60:4 61:8
66:2,5,12,18
67:7,9,24 68:13
68:15,19 74:21
74:23 75:3,7,12
75:14 76:18
77:18,23 78:25
81:15,17 83:6
84:10,15,17,21
86:22 89:2,22
90:8,9,9,15,19
91:9,16,22
94:19 104:18
116:6,24 117:10
117:22 119:24

**e**

**e**  2:14 4:1 36:24
123:17,17 124:3
124:3,3
**earlier**  31:10
36:17 53:11
54:15 91:2
**early**  7:7,7
89:19 91:13
93:22
**easier**  70:10
97:7

**ed**  27:22
**edits**  60:17,20
62:18
**education**  2:11
81:5 90:7
**educational**
11:9
**effective**  83:16
**efficient**  97:14
**eight**  20:20
**either**  11:24
13:1 20:14
31:17 32:14
93:8 94:7 102:9
107:5 109:14
**elapse**  99:23
**element**  116:9
**elements**  99:7
102:8 116:9
**eligible**  31:19
**elliot**  63:4
**email**  106:13
123:10
**emailed**  123:11
**embarked**  102:5
**emergency**
13:13
**emerging**  12:13
**employee**
122:12,13
**enactment**
77:19
**enanthate**  29:15
**encompassed**
28:14

**encompassing**
27:5,12
**encounters**
76:22,25
**ended**  34:11
**endocrine**  119:5
119:7,7
**ends**  20:24
**engage**  113:10
**english**  100:15
**enrollees**  31:24
**ensure**  90:14
**ensures**  40:9
**entail**  104:12
**entering**  38:7
**entire**  45:24
**entitled**  68:19
70:19 78:25
79:8 98:25
**entrance**  59:13
**enveloped**  28:22
29:3,21
**environmental**
11:25 12:3
**epsdt**  7:6,9
22:22 23:2,3,14
23:17,20 47:3
47:16,22 74:10
**eq**  22:14 66:22
**equipment**
13:12
**errata**  123:9,9
123:11
**error**  32:17 52:3

**errors**  51:25
  52:1
**especially**  47:1
  65:17 117:15
**esq**  2:3,5,6,8,11
  2:14,18,19
  123:1
**establish**  108:21
**estradiol**  28:2,4
  28:5,7 41:12,13
  41:14,19,23,24
  42:5,17 43:5,8
  43:25 48:8
**estrogen**  28:8
**et**  1:5,8 4:5,5
  9:20 22:16 43:2
  47:25 115:3
  123:5,5 124:1,1
**etiology**  117:9
**europe**  96:19
**european**  53:15
  96:14
**evaluate**  86:21
  89:22
**evaluated**  31:25
**evaluating**  35:9
  116:21
**evaluation**
  110:10 118:9
**evaluations**
  100:17
**eventually**  87:2
**everybody**  58:7
**everybody's**
  96:17

**everyone's**  70:9
**evidence**  90:9
  90:25 91:8,15
  91:24 92:3 95:5
  106:7 110:9
  115:1,9,17,24
  118:16,23
**exact**  10:11
  76:23 86:15
  110:17
**exactly**  8:7 57:3
  57:6 77:2 95:8
**examination**  3:4
  5:12
**examined**  5:9
**example**  43:6
  44:25 60:15,18
**except**  57:8
  96:23
**excess**  23:16
**exchange**
  106:23
**excluded**  116:6
**exclusion**  6:25
  7:1,4 66:1,11
  67:6 68:12
  74:20 75:2,9,11
  75:16 77:19
  81:15 84:13,14
**exclusions**
  27:12
**excuse**  9:13
  89:10 120:8
**exhaustive**
  45:22 46:2

**exhibit**  3:9,9,10
  3:10,11,11,12
  3:12,13,13,14
  3:14 5:24 6:1
  8:22 15:13,14
  20:11 30:24
  31:1 33:6 55:12
  56:14,19,21
  59:3,4,8 60:12
  62:9 69:24
  70:13,15,21
  72:13 73:2,8
  74:1,4,6,18 77:5
  79:8,10 82:7,8
  82:10,13 83:12
  83:23 84:20,20
  84:22 98:22,23
  98:24 99:2
**exhibits**  3:6
  5:15,18,21
  68:25 79:4
  81:23
**existed**  102:6
**existing**  95:5
**expedited**  64:11
**expenses**  40:12
**experience**
  43:18 50:10
  65:6,8 81:6 97:9
  110:9
**experimental**
  17:6,20 18:3,17
  19:2 48:4 89:23
  93:15,20 101:11
  115:15,19

**expert**  58:24
  112:21
**expertise**  71:10
  80:22,24,25
  105:2 106:6
**experts**  58:20
  98:11 104:22
  107:2,2 109:17
  111:8 112:5
**expires**  121:21
  122:22
**extensive**  67:18
  97:3
**extent**  112:9
**extra**  11:15 15:5

**f**

**f64**  84:7,8,9
**f64.9**  84:10
**f640**  84:4,6
**f649**  82:24 83:2
  83:5 84:4
**fact**  3:14 91:3,5
  99:1 102:5
  113:18,24
**facts**  124:19
**fail**  38:16
  123:13
**fairly**  74:7
**fall**  9:19 58:18
  71:17
**familiar**  9:16
  15:1 22:11 23:4
  72:1
**familiarize**  9:15

**family** 118:5
**far** 21:12,13
  30:12,16 34:15
  40:6 57:18 61:4
  69:25 75:18
  76:21 86:18
  88:3,4 95:24
  98:1,15 104:16
  109:6 110:12
**farino** 88:1
**farrell** 107:16
**fashion** 97:15
**fault** 69:6,6 79:5
**fda** 24:1,3,5,6,7
  24:9,13,14,15
  24:18 27:4 31:9
  31:14,16,17,18
  32:4 35:10 37:5
  41:2 42:23
  44:19 53:3,6,12
  53:16,17,21,22
  54:1,7,9 100:25
  102:12
**february** 1:14
  4:8 121:14
  122:16 123:3,6
  124:2
**federal** 20:23
  34:10 35:17,21
  94:5 102:14
  114:10,14,18
  123:12,17
**feds** 23:18
**fee** 21:13 22:15
  23:6,8,15,16

24:25 39:16,24
  42:14,17 46:3,5
  66:23 67:4,5,10
  67:11 68:8,9
  75:19,23 76:2,3
  76:17,22,24
  81:18 83:12
  101:6,10,14
**felt** 109:21
**field** 32:15
**fields** 105:2
  106:6
**figure** 85:14,16
**file** 24:24
**filed** 114:4
**fill** 78:12
**filled** 58:19
**fills** 24:24
**final** 68:23
  70:24,25 78:24
**finalized** 62:24
  63:6,7,11 65:5
  65:13,22,23,23
  70:9
**financial** 108:21
  108:23
**financially**
  122:15
**finasteride** 29:1
**find** 10:18 34:23
  39:9,11 49:15
  62:5,19 76:9
  77:2,6 90:13
  91:4 97:22
  102:4 103:8

105:15
**finding** 104:17
**findings** 91:14
  92:6,12 99:13
**fine** 5:17 7:24
  8:8 35:22 48:22
  57:13 72:21
  85:2
**finish** 11:16
**first** 5:7 22:4
  33:9 42:5,18
  44:12 54:24
  57:21 62:11,11
  69:24 82:13
  87:2,4,6,8 93:18
  113:17
**fiscal** 43:12
**fits** 116:20
**five** 17:12 99:22
**fl** 123:10
**flag** 39:12 48:16
  62:22
**flexibility** 18:8
  21:10 42:15
  66:25
**flip** 20:19
**floor** 2:12
**florida** 1:1,17
  1:20 2:3,4,7,10
  2:20 3:9 4:8
  6:11 7:1 8:18
  11:12,14,19,24
  14:23,24 15:2
  16:3 20:8,24
  21:3,7 27:2,3

36:22 47:23
  56:1 66:2,3,15
  66:16,19 67:7
  68:13 75:5
  77:16 81:16
  82:21 84:16
  90:14,18 91:2
  93:16,20,25
  99:20 121:5
  122:2 123:12,17
**fmmis** 37:16
  38:12 43:9 48:6
**focused** 115:21
**folks** 93:22 94:1
**follow** 39:13
  48:16 78:6,10
  78:14 113:19
**following** 47:10
  73:21 114:23
**follows** 5:9 56:3
**foregoing** 122:5
  122:8 124:19
**forget** 81:23
**forgot** 37:22
  63:3
**form** 3:14 25:14
  27:10 47:11
  51:21 58:4
  77:18 91:17
  92:8,13 99:1
**formal** 81:5
  85:5
**formula** 100:14
**formulary**
  35:14

| | | | |
|---|---|---|---|
| **formulate** 35:14 | **g** | 105:6,25 109:14 | **general's** 33:5 |
| **formulated** | | 114:9,9 115:13 | **generally** 6:9 |
| 92:22,24 | **g** 6:12 7:2 15:3 | 117:1 119:15,22 | 14:1 16:10 |
| **formulation** | 116:7 | **gaps** 23:10,11 | 17:23 24:23 |
| 42:5 49:7,23 | **gain** 86:16,17 | **gary** 2:19 4:24 | 26:2 31:22 |
| 50:1 51:15 | **gainesville** 2:7 | 123:1 | 32:14 33:8 40:8 |
| 52:13,19 | **gapms** 3:10,11 | **gather** 10:2 | 41:25,25 43:1 |
| **formulations** | 3:11,12,14 6:9 | 32:20 78:20 | 43:22 49:17 |
| 41:15 44:14,25 | 6:13,13 10:15 | **gathered** 10:4 | 63:12 64:5,12 |
| **forth** 35:7 37:10 | 14:14,14 17:14 | 90:1 107:23 | 71:16 84:7 87:8 |
| 37:17 75:13 | 17:15,20 18:11 | **gender** 3:12 | 93:6 100:25 |
| 113:20 115:22 | 18:20,22 19:7 | 6:16,18,20,21 | 117:2 |
| **forward** 65:17 | 55:14,21 56:9 | 6:25 41:20 43:9 | **gestures** 8:4 |
| **found** 17:5 | 56:12,15 58:16 | 44:21 49:24 | **getting** 12:7 |
| 32:17 57:18 | 58:18,19,22 | 51:3 56:9,13 | 26:5 79:25 |
| 80:7,9 118:22 | 60:1 61:5,9 | 60:3 66:2,4,12 | 102:20 |
| **four** 11:7 45:1 | 63:13,16 64:1,5 | 66:16,17 67:6,9 | **gg970595** |
| **franklin** 2:14 | 64:9,11,12,13 | 67:24 68:13,14 | 121:21 122:22 |
| **fraud** 26:10,11 | 64:22 65:2,4 | 68:19 74:20,23 | **give** 7:21 56:25 |
| 26:19 32:24,25 | 68:18,19 69:13 | 75:3,6,12,14 | 57:5 97:23,23 |
| 33:4 | 69:16 71:3,22 | 76:18 77:18,23 | **given** 11:4 30:14 |
| **fraud's** 26:18 | 71:25 73:5,22 | 78:25,25 79:8 | 47:1 61:22 |
| **freedom** 104:2 | 74:2,16 78:24 | 81:15,16,17 | 65:17 78:5 |
| **frequently** | 79:8 80:11 81:8 | 83:6 84:10,15 | 86:11 92:23 |
| 32:17,20 | 84:19,21 85:1,3 | 84:17,21 86:21 | 107:13,14 108:6 |
| **front** 57:2 62:9 | 86:19,19,22 | 89:2,22 90:8,8,9 | 109:24 |
| 68:2 82:14 | 87:3,14 89:21 | 90:15,19 91:9 | **gn** 33:16 |
| **full** 8:16 71:25 | 90:2 93:1,9,14 | 91:16,21 94:18 | **gnrh** 29:25 30:4 |
| **fully** 21:8 | 93:18 94:18 | 104:18 113:18 | 30:19 |
| **function** 18:14 | 95:2,19 96:5,8,9 | 116:6,23 117:10 | **go** 5:23 6:8 |
| **fund** 2:12 | 97:2,11,18 | 117:22 119:24 | 10:18 15:12 |
| **funds** 34:12 | 100:4,11,20,22 | **general** 27:23 | 22:7 23:13 |
| **further** 122:11 | 101:15,17,19,23 | 84:11 86:25 | 24:10 32:8 |
| | 102:1,10,15,18 | 87:9 88:13 | 33:10 34:15 |
| | 102:25 103:6,7 | 92:25 112:18 | 42:2,15 48:20 |
| | 103:14 104:7 | | |

48:21 52:11
62:1 67:17
69:11 75:18
77:1,15 91:6
93:11 101:15
107:25 110:16
**goes** 21:14 22:3
22:8 30:12,16
45:7 61:4 69:25
75:19 86:18
95:25
**going** 5:14,18
5:23 6:8 12:25
18:1 24:14
26:16 28:18,19
31:17 33:25
36:18 38:24
39:24 41:2,4
44:5,6 51:18
56:18 64:4
65:18 67:17
70:10,21 73:2,9
77:2,6 78:8,19
79:7 84:25
98:23 100:20
101:14 102:7
106:7 115:19
116:1,2 117:14
**gonadotropin**
29:23,24 74:21
**gonzalez** 2:11
4:23
**good** 120:14
**gosh** 79:2

**gotten** 99:24
**governed** 45:9
**government**
13:23
**governor** 92:5
94:23 103:15
**governor's**
87:20,21,24
88:5,7,19 90:3,5
90:12,13,17,20
91:20 94:2 95:3
95:6 103:16,20
**gperko** 123:1
**grad** 11:17
**graduate** 11:15
12:1
**graduated**
11:13
**grant** 18:7
21:10
**grantham** 62:13
**great** 18:7 70:11
89:7
**grossman** 104:9
104:17 109:3
111:7
**gs** 62:8,9,10
**guess** 65:6 85:9
98:6
**guessing** 65:4
**guidance** 30:15
30:18,21 31:6
33:24 89:4,8,11
94:22,24 95:10
100:1 109:22

114:17,21,22,24
114:25
**guide** 109:22
**guideline** 30:14
**guidelines** 16:2
16:24 22:20
23:1 27:5 33:13
33:17,20 42:3
99:18 119:3,5
119:13
**guys** 69:5
**gynecologists**
118:25

**h**

**h** 36:23,24
45:13 124:3
**half** 13:17
**hand** 5:4 8:4
121:13
**handful** 68:6
**handing** 82:2,3
**handle** 40:10
**handy** 55:13
**happen** 15:4
32:16 34:1
**happens** 34:3
**happy** 28:2
**hard** 21:18 80:5
**head** 110:15
**health** 1:16 2:3
8:18 12:4,8,11
12:12,17,20,25
13:10,13 14:8
19:3 22:14
26:15 31:24

40:13 50:21
66:22 71:15
79:24 80:23
83:22 88:24
89:13 90:10
94:1 98:25
99:12,18 103:23
105:17,19,21,23
106:9 107:7
108:13,20,24
115:2,21 119:12
**health's** 91:3,5
**healthcare** 4:4
**hear** 34:4
**held** 4:7
**help** 5:22 40:12
81:7 100:19,19
104:16
**helped** 100:15
**helpful** 37:23
**helping** 109:22
**hey** 113:6
**hhs** 34:11 89:9
89:10 90:6 91:3
91:25 92:6,11
92:17 93:23
94:7 99:21
100:1 103:25
113:18,19 114:2
114:17,21,22,24
114:24 115:10
**highlighted**
72:16,22
**highlights** 72:13
72:23

highly 114:8
hill 2:15
hire 112:10
  113:6
historical 11:19
  63:1
history 11:12,14
  11:24,25 12:3,4
  12:8 59:22 63:1
  104:18 117:6
hold 65:20
holes 78:12
holtzman 2:19
holtzmanvoge...
  123:1
hormonal 42:1
hormone 3:10
  19:7 29:23
  33:21 55:14,18
  56:16 57:16
  65:3 66:4,17
  67:8 68:14
  69:18 74:22
  76:16
hormones 33:24
  66:8,8
hospice 13:14
hospital 35:13
hot 19:19
hotline 26:10
hour 45:1
house 22:13
  33:13
https 36:22
  45:12

huh 3:19 46:20
  56:4 61:6 82:25
  94:13 101:24
  105:10 110:14
human 52:3
hundred 21:14
  54:2
hypothetical
  43:6
hypothetically
  47:25

**i**

icd 37:25 44:3,4
  44:9 48:7,7,9
  51:12 84:8
idea 111:19
identical 57:8
identification
  6:2 15:15 20:12
  31:2 56:22 59:5
  70:16 79:11
  82:11 84:23
  99:3 111:22
identify 110:5
  112:4
identity 6:19
  12:18
ii 13:23
imagine 46:1
imbalances 42:1
immediate
  81:12
immediately
  35:3

immerse 97:3
impact 8:13
implemented
  75:16
importantly
  23:11
importation
  12:22 13:5
  39:19
impressive 20:6
inadequate
  115:9
include 77:12
  109:7
including 44:25
  117:10
inclusion
  111:24
incorporated
  15:1
independent
  18:2,15,19
  109:10 113:23
  114:23
independently
  18:14
index 3:1,6 35:2
indicate 41:17
indicates 41:14
  44:12,13 49:10
  50:3
indicating 84:2
indication 41:16
  41:16 44:15
  49:11,12 50:16

50:17 51:19
  52:5,16,22 54:8
  54:10,19 55:9
  66:9,24 101:1
  101:12 102:12
indications
  41:22 44:16,19
  45:5,17 53:7
indicators 85:9
  85:12
individual
  28:24 29:4,7,13
  29:20,25 31:11
  35:24 54:24
  60:24 71:7
  83:24 106:12
individual's
  75:3
individualized
  31:21,22 55:4
individually
  76:4
individuals
  71:22 105:3
  106:5 112:15,19
  113:15 117:7
infancy 12:11
info 93:23
inform 81:7
informal 85:7,9
  85:12
information
  10:2,4 22:23
  34:18,19,21
  35:6,12,13

37:15 39:10
49:15,19 51:22
62:7 67:12 74:1
76:19 77:1 78:1
78:2,3,10,13,21
89:25 91:6,15
92:23 106:15
107:6 109:6
110:17,22 111:3
113:7,13
**initial**  18:24
88:4 89:16
91:12 92:16
93:22 103:16
112:6
**initially**  63:5
95:6 113:25
**initials**  62:10
**initiate**  85:3
**initiated**  22:1,2
69:14
**inpatient**  71:13
71:13
**input**  33:11
**inside**  98:9
**instance**  1:13
34:8 67:7
**instances**  46:16
66:3,13 76:12
76:17 81:20
**instruct**  90:12
90:13
**integrity**  26:5,8
32:23 33:3

**interdisciplina...**
11:20
**interested**
122:15
**internal**  100:11
**internet**  96:14
**interpreted**  30:8
**intimately**  14:25
22:11
**introduce**  4:11
**investigation**
26:8 32:24,25
91:3,4 112:14
**investigational**
18:17 19:2 48:4
101:11
**involve**  32:5
**involved**  9:25
10:6 22:9 26:5
47:20 51:24
87:25 88:2 94:2
97:16 98:16
102:19 107:4
**issue**  69:8,12
**issues**  26:2
**it'd**  32:7 54:3
**item**  82:20
**items**  103:3
**iterated**  117:1

**j**

**jacket**  19:18
**jacksonville**  2:4
**jane**  113:5,5
**january**  13:24
14:11,14 58:19

65:13 77:18
114:4
**jason**  1:8 4:5
107:3,6,19
113:5 123:5
124:1
**jazil**  2:18 4:20
4:20 6:3 10:24
15:4,7,11 19:25
20:4,6 25:14
47:11 57:8,19
58:5 69:7 70:3
72:12,21 74:4
78:16 91:17
92:8,13 112:2
112:17,23 113:4
**jeffrey**  100:15
**jill**  113:4,5
**job**  9:17 14:11
58:22
**john**  8:16
**johnson**  71:8,9
72:8
**joined**  5:1
**josefiak**  2:19
**josephina**  87:11
87:12
**journal**  11:21
**july**  65:14 79:9
**june**  3:11,14
47:2 56:17,18
57:22,24 59:2
60:2 61:5 84:19
84:20 85:1 87:3
96:9 97:18

101:22 105:5
109:13
**justice**  2:3 90:6

**k**

**katie**  87:25
**katy**  2:3 4:14
20:4
**kidder**  60:15
**kind**  9:20 12:11
15:22 18:13
27:5,10 28:8
48:13 54:10
80:2 84:9 97:7
100:12,17,19
102:6,15,24
110:15
**knew**  115:5
**know**  7:9,20,25
8:8 10:22 15:9
20:8,9 21:17
22:23 31:8
32:14 34:7,8,24
35:11 36:16,17
37:7,14 38:22
40:7 41:6,7,16
43:12 44:16
48:12 49:9
53:15 54:12
56:16 60:9
61:13,14 62:14
63:9,10,18
65:15 67:1 76:5
76:16 77:9
79:19 80:11
83:7,15 85:10

85:11 89:18
91:7 99:20
100:4,7,24
101:22 105:20
107:1 108:19
111:18,25 113:4
113:14 115:16
117:5,14
**knowing** 36:12
**knowledge**
33:23 60:25
62:25 75:22
81:19 85:23
86:5,7,8,9,16,17
93:13,17,21
95:13,16,18
97:6,13 106:22
**knowledgeable**
62:1 111:17
**known** 64:16
**knows** 113:2,3

**l**

**label** 24:8 35:10
47:21,22 53:4,8
53:22 54:4
55:24 56:2
**labeled** 59:3,8
82:5
**laid** 75:4
**lambda** 2:11
**lappert** 111:24
**large** 1:20 35:5
44:18 93:12
95:25

**larger** 34:15
**late** 12:10
**laude** 11:13
**law** 40:8
**leaders** 107:12
**leadership**
85:18 86:2,17
**leads** 104:16
109:4,5
**lean** 15:7
**leave** 80:19
**led** 105:1
**left** 60:8 80:20
101:21 115:23
**legal** 2:6,11
86:20 123:16
**legislative** 65:18
80:2
**lend** 118:12
**lengthy** 13:14
119:14
**leon** 121:6 122:2
**letter** 85:6,15
86:12 92:20
94:10,14,17,21
**level** 22:3,4,6,8
**levels** 65:16
**liberty** 104:4
**licensure** 26:17
**life** 43:6 70:9
**likely** 74:14
110:24 114:8
**limited** 117:11
**line** 5:20 60:16
82:20 124:4,7

124:10,13,16
**link** 4:22,25
36:19 46:16
51:12
**list** 9:16 13:15
23:7 26:25 27:6
27:9,16 28:18
36:19,25 37:4,7
39:20,21,21
42:5 43:23
45:22,25 46:2
49:6,6 54:16
77:7,16 79:5
**listed** 9:5 15:21
23:17,21 35:4
35:16,21 39:23
41:15 42:5
44:14 45:12
46:15 47:18
49:17 54:20
55:9 58:1 59:14
71:7 101:5,9,13
**listing** 68:25
**lists** 27:15
**literature** 54:14
55:11 91:1,7
93:11 97:4,17
97:21 115:4
116:23 117:8
**litigation** 114:8
**little** 10:4 11:8
39:5 48:12
52:11 54:22
58:12

**llp** 2:9
**loaded** 51:10
**location** 1:16
**long** 11:2 13:16
22:12,12 47:19
51:13 70:10
76:10 117:2
**longer** 48:19
**longitudinal**
117:6
**look** 14:23
24:21 32:8,16
41:10 42:4
46:24 54:24
55:8,12 57:21
71:19 76:13,23
77:5 81:22
82:19 90:24,24
95:4 103:3
104:14 108:9
**looked** 10:13
**looking** 8:21
12:7,17 18:21
20:16,19 26:6,6
26:16 42:7
44:11 45:15
49:6 50:1,16,18
51:19 52:12,18
54:17,19 57:15
59:2 60:11
61:18 70:7
77:14 78:24
82:13 83:23
98:22 111:21

**looks** 10:8 44:24
60:18 74:7
83:14
**lot** 21:10 58:16
58:17 112:8
117:3
**lots** 26:9 63:15
63:15,15 117:9
**loud** 5:21 8:3
**low** 63:22 64:5
64:12 65:1,5
**lower** 40:12
**lunch** 79:6
120:13

**m**

**m** 36:23
**made** 32:1 59:9
59:15 60:21,21
61:12,13,14,17
62:4,18 64:16
65:12 85:4,5
87:21 103:17,18
103:19,22 105:3
114:23,23
**maf** 1:3 4:6
**magellan** 30:15
30:19 31:6
40:18 76:1,1,3,5
76:12 77:2
**magna** 11:13
**mahan** 1:17 4:7
**main** 98:17,19
**maintained**
80:11

**make** 10:25
16:22,25 18:2
18:15 25:24
37:24 42:15
43:12 70:4,9
90:17 93:12
99:25 119:21
**makes** 97:14
**making** 31:10
35:24 92:1
94:22 95:5
100:16 110:7
115:10
**managed** 9:25
16:20 17:7,21
18:7 21:9 40:2
41:7 42:14 46:6
46:7,10 64:9
66:22,25 68:9
76:22,25 81:19
81:20 83:11,14
83:20,22 84:13
**management**
37:15
**manager** 40:22
63:2,4
**managers** 40:8
40:10
**mandating**
102:22
**manual** 52:24
**manufactured**
53:14
**manufacturers**
40:11

**maps** 96:12,13
96:18,19,21,23
**march** 121:21
122:22
**mark** 5:14,23
15:12 19:21
30:24 56:18
70:12 79:7 82:6
82:8 98:23
**marked** 3:8 6:1
15:14 20:11,20
31:1 56:14,21
59:4 70:15,21
79:10 82:10
84:22 99:2
**market** 53:19
**markups** 79:13
79:14
**marstiller** 94:11
**marstiller's**
94:21
**mastectomy**
82:24 83:2
**master** 11:13
**master's** 97:10
**match** 41:4
**materials** 9:22
22:17 80:11
**matt** 5:16
**matter** 4:4
58:20,23 71:10
80:21,24
**matthew** 1:12
3:3 5:6 8:16
123:6 124:2,23

**maureen** 88:1
**maximum** 37:13
**mckee** 2:14 4:23
**mcmaster** 110:8
**mean** 6:14 7:9
9:5 11:6 22:25
24:10,13 26:9
28:7,21 30:8
31:15,15,16,17
39:15 42:2,8,21
43:22 44:18
45:24,25 47:22
47:22,23,25
49:18,20 52:8
53:3,13 57:12
63:7 64:17,20
67:2 73:7 81:4,5
82:6,20,22
83:19 89:5
95:23 96:9
100:4 101:10
102:13 106:5,21
107:10,12 109:6
111:25 112:4
114:12 117:7,13
118:11 119:1,1
120:6
**means** 36:9 42:9
42:12 50:6 65:2
73:19 83:1
**meant** 15:23
**medicaid** 3:9
10:13,18 14:9
14:16,24 16:3,5
16:11 17:5,19

17:20 20:8,24
21:3,7,21 23:23
23:25 24:4,11
24:16 26:3,4,5,8
26:13,19 27:2,3
31:10,12 32:23
33:2,2,4 34:3
35:17,21 36:10
36:23 37:15
39:4 40:13 41:1
41:7 42:21
43:12 45:13
47:23 54:25
56:1,13 58:15
63:14 66:2,3,15
66:16,19,21
67:8 68:13
73:11 75:5
76:20 77:7,17
80:1,1 81:16
82:21 83:23,24
83:25,25 84:16
85:21 87:17,18
89:14 90:14,18
91:21 93:16,20
94:16 96:13,21
96:24 113:20
**medicaid's** 88:3
**medical** 6:10
13:12 14:1,24
15:20,24 16:1,9
16:15,18,23
17:9,13,21,23
20:9 22:16
23:19 25:1,19

25:20 27:4 32:1
34:14 41:3 42:3
45:7 47:19 48:2
83:9,21 86:21
89:6 90:25 93:4
93:7 108:6,10
116:15,16,17,18
116:21 120:4
**medically** 16:9
22:6 23:12,14
25:7,13,16 26:4
32:19 47:8,18
114:25
**medicare** 80:1
89:7 101:4
102:16,18,20
**medications**
8:12
**medicine** 12:8
89:4 106:6
**medroxyprog...**
28:9
**meet** 17:12
**meeting** 34:14
87:23 88:6,10
88:11,15 89:17
89:20 90:4
91:13 92:16,21
93:22 94:3
103:16
**meetings** 95:8
**meets** 17:8
47:19,21,21
**member** 83:16
108:7

**memo** 112:3
**memory** 8:13
15:10 20:1
**mental** 100:17
102:7,11 115:2
115:21
**mentioned**
36:17 54:15
69:8 103:14
116:22
**met** 25:21 75:4
**meter** 111:23
113:11,11
**methods** 10:17
115:21
**miami** 2:10 34:8
**mic** 19:12
**michelle** 104:25
105:4,8,9,9
**microbiology**
12:14
**micronized**
28:13
**milligrams** 42:6
45:1 50:2
**milliliters** 50:3
**million** 34:12
**mind** 107:11
**mine** 15:10
19:20
**minimum** 37:13
**minnich** 2:23
4:10
**minute** 120:13

**minutes** 48:18
**miriam** 104:9
**mirror** 46:8
**mistake** 68:24
**mo** 10:22 15:9
19:24 72:25
74:6 112:13
**model** 116:20
**mohammad**
2:18 4:20
**mol** 98:23
104:10,13,21,22
109:3 111:7
**moment** 39:8
**money** 23:9
34:6
**monique** 71:8
**monroe** 2:20
**months** 65:11
65:22 67:19
99:23
**moot** 102:15,25
**move** 59:7 65:16
**moves** 54:11
**moving** 19:5
20:23
**mpi** 32:15,22
33:1,25
**multi** 87:23 88:5
**multiple** 26:18
68:22 70:5
119:14
**myflorida.com**
45:13

| | | | |
|---|---|---|---|
| **myriad** 97:9 | 25:16 26:4 | 81:3 | **nw** 2:7 |
| **n** | 32:19 46:1 47:9 | **new** 2:13 43:20 | **ny** 2:13 |
| | 47:18 115:1 | 43:21 53:17 | **o** |
| **n** 4:1 | **necessity** 14:24 | **newman** 88:1 | |
| **nai** 61:10 96:13 | 15:20,24 16:1,9 | **nine** 55:23 | **o** 2:18 4:1,1 |
| 97:22 | 16:15,19,24 | **non** 13:13 24:7 | **oath** 121:1 |
| **name** 4:10 8:15 | 17:9,13,22 20:9 | 27:13 42:23 | **object** 25:14 |
| 8:16 28:8,17 | 23:20 25:2,20 | 53:7 | 47:11 91:17 |
| 60:16 62:11,11 | 27:4 32:1 34:14 | **normally** 32:5 | 92:8,13 |
| 69:4 81:24,25 | 41:3 42:3 45:8 | **northern** 1:1 | **objection** 78:19 |
| 88:17 104:24 | 47:19 48:3 | **nos** 82:10 | **objections** |
| 105:16 106:11 | 86:21 93:5 | **notary** 1:19 | 78:17 |
| 106:14,16,17,18 | **need** 7:21 8:7 | 121:20 122:21 | **obstetricians** |
| 107:11,13,14 | 18:25 19:1 | **note** 12:25 | 118:25 |
| 110:8,11,13,17 | 24:10 28:3 | 37:24 123:9 | **obtain** 36:10 |
| **named** 28:16 | 30:24 40:6 46:7 | **notes** 122:7 | 37:9 78:3 |
| 88:16 121:10 | 46:8 48:15,19 | **notice** 3:9 5:23 | **obtained** 49:20 |
| **names** 35:3,3 | 48:21 62:7 63:2 | 6:8 8:21,22 | **obtaining** 23:22 |
| 107:24 108:4 | 78:15 94:9 99:6 | 55:18 77:15 | **obviously** 8:2 |
| **national** 39:1 | 99:8 103:8 | 111:16 119:2 | 34:3 66:24 |
| 101:3 102:16,17 | 106:18 111:14 | **november** 13:24 | **occasional** |
| **native** 3:13,13 | 120:9 | 14:11,15,19 | 97:24 |
| **natives** 82:3,9 | **needed** 31:8 | **number** 44:18 | **occasionally** |
| **nature** 18:4 | **needs** 23:1 | 67:23 72:3 | 97:22 |
| 93:15 | 41:24 | 77:16 100:19 | **occur** 34:23 |
| **nc** 2:15 | **negative** 3:19 | 117:2 | 62:12 |
| **ncd** 102:20,22 | **neglect** 117:11 | **numbered** | **occurrences** |
| **ncd's** 102:19,20 | **negotiate** 40:16 | 122:9 | 99:5 |
| **ndc's** 38:25 | 40:18 | **numbers** 5:19 | **october** 75:1,10 |
| **necessarily** 18:6 | **negotiating** | 5:20 34:2,15 | **offered** 104:13 |
| 32:18 37:8 38:2 | 40:11 | 76:7,8,10,14,23 | **offhand** 35:4 |
| 53:9 67:1,12 | **neither** 52:21 | **numerous** 11:18 | 67:15 89:18 |
| 101:7,10 116:20 | **never** 44:20 | 11:18 | **office** 14:7 33:5 |
| **necessary** 16:10 | 49:22 53:3,6,9,9 | **nurse** 22:5 | 74:13 80:7,10 |
| 22:6,22 23:12 | 63:11 65:4 67:7 | | 80:10 87:20,21 |
| 23:15 25:7,13 | | | 87:24 88:5,8,19 |

90:3,5,12,13,17
90:20 91:20
94:2 95:3,6
103:16,20
112:18
**official** 121:13
**offs** 26:9
**oh** 28:4 69:10
79:2 120:10
**okay** 5:15 6:7
7:13,17,18,23
7:25 8:11,17,21
9:10,23 10:7,22
11:8 12:19
13:19 14:23
15:19 16:4,8,16
17:1,11,15 18:2
18:15 19:5
20:16,19,21
21:1,17 22:9,25
23:19,19,22
24:5,15,20 25:1
25:5 27:15,23
28:9,13,16 29:1
29:11,19 30:3,6
30:18 31:8,20
32:2,7,22 33:6
33:15,21,25
35:11,19,22
36:17 37:21,21
38:18,21 39:2,9
39:12,23 40:2
40:20,23 41:4,7
41:13,19 42:17
42:21 43:5,7,23

44:4,8,11,20
45:9,22 46:3,15
47:3,15 48:23
49:22 50:16
51:2,15 52:4,11
53:11,14,20,20
53:24 54:5 55:3
55:5,12,25 56:5
56:8,10 57:21
57:23 58:4,9,23
59:1,19,24 60:6
60:9,14,23
61:11,21 62:3,7
62:15,19,19
63:10,25 64:11
64:19,22 65:3,8
65:21 67:4
68:11,18 69:16
69:20,22,25
70:2,2,11,14
71:2,9 72:5,11
73:2,17,25 74:9
74:18,25 75:10
76:5,8,15 77:5
78:4,16,22 79:7
79:17,22 80:7
80:12,17,21
81:6,14,22 82:2
82:23 83:5,15
83:18 84:2,6,19
85:16 86:2,6,9
86:13,16,24
87:1,12,21 88:2
88:9,15,18
89:12,16,20

90:3,17 91:2,12
92:21 93:13
95:1,12 96:2,16
96:20,22 97:1
97:16,20 98:3,3
98:17,22 99:25
100:3,8,25
101:2,5,22,25
103:1,8,13
104:6,11 105:8
105:18,22 106:9
106:24 107:5
108:9,22 109:1
109:3,12 110:2
110:19 111:12
111:15 113:17
114:3,8,14
115:13 116:4,10
118:24 120:15
**old** 80:10
**omar** 2:11 4:23
**once** 17:24
28:21 75:25,25
78:7,13 95:10
97:3,12,12
**ones** 40:18 86:8
**operating** 9:18
**operations**
43:12 74:14
**opinions** 92:19
92:22
**opportunity**
93:11
**option** 109:24

**oral** 112:9,25
**order** 99:7
**ordering** 123:11
**organizations**
118:17
**outline** 23:9
98:20 103:9
**outlining** 97:17
**outpatient**
26:22,24 82:19
82:21 83:1
**outset** 104:24
**outside** 9:8 98:9
106:2
**outsourced**
22:14
**outstanding**
115:25
**override** 38:9
**oversaw** 13:10
71:12
**overseen** 83:21
**own** 9:22 61:19
93:24 97:8
100:12,17
116:18

**p**

**p** 4:1 36:23
**p&t** 27:8
**p.m.** 120:16
**pa** 42:7 45:4
**pagan** 2:11 4:23
**page** 3:3 5:20,22
20:20,25 55:23
58:2 60:19 62:9

**[page - plan]**

70:23 124:4,7
124:10,13,16
**pages** 82:14
122:9
**paid** 32:17,18
108:15
**paper** 63:19
**papers** 11:17
**part** 17:1,3
50:19 59:25
101:17 106:24
**participants**
77:17
**particular** 7:3
36:11 38:13
51:13 78:19
87:15 108:10
**parties** 122:12
122:13 123:11
**party** 87:23
88:5
**pass** 54:16
103:5 110:11
**passed** 105:16
110:8
**password** 61:25
**past** 20:13 56:8
67:21 79:3
81:12
**patch** 42:6 45:1
**pause** 7:22
**pay** 23:10 34:6
34:11 51:14,23
108:18

**pays** 24:24
**pbm** 33:14
40:17,20 76:1
**pbm's** 40:13,15
40:23
**pdf** 36:24
**pdl** 37:3 39:15
39:22,23 40:2
40:24 41:5,8,13
41:17 44:14,15
45:3 49:10,13
**pdl.pdf.** 36:24
**pdm** 102:4
**pediatric** 119:7
**pediatrics**
105:13 118:8
**peer** 54:14
55:11 91:1
**penalties** 124:19
**people** 4:21
32:15 88:16,23
113:18 117:16
**percent** 21:14
54:2
**percentage** 34:5
**perimeter** 23:10
**period** 13:24
54:7 61:4 75:17
75:22 76:10
**periodic** 7:7,8
**periods** 117:19
**perjury** 124:19
**perko** 2:19 4:24
4:24 123:1

**permanent**
117:20
**person** 58:21
59:11 64:23
100:11 105:4,23
107:17 112:7
**person's** 6:18,19
**personally** 95:7
108:22 121:10
**perspective**
100:12
**pertinent** 10:10
51:22
**petersen** 110:6
110:18,21
111:23 112:11
113:6
**peterson** 62:3
**peterson's**
60:16
**pgs** 1:11
**pharm** 36:23
**pharmaceutical**
27:7 37:6 53:15
53:16
**pharmacist** 72:6
72:8
**pharmacists**
21:19 48:15
58:25
**pharmacopoeia**
35:13
**pharmacy** 21:24
24:23 26:20
28:1,2 30:3 40:7

40:8,9,22 48:12
63:2,4 72:8
**phase** 54:12
55:6,7
**phd** 11:16 12:5
12:7
**phrase** 6:24 7:2
**physically** 46:24
95:7
**physician** 51:23
105:11 110:23
110:25 112:6
**physicians**
109:19 111:1,4
118:6
**pickle** 10:1,5,14
61:10 96:12,20
**pillsbury** 2:9
**pipeline** 85:13
**pittman** 2:9
**place** 37:6 38:25
50:20 54:4
103:9 122:6
**placed** 19:13
**places** 78:6
**plaintiff** 2:2
**plaintiff's** 4:22
5:2 56:11
**plaintiffs** 1:6,13
4:15,17,19
72:23 82:4
**plan** 17:7,21
18:1,2,15,23
31:24 40:2
46:11 64:9

81:20

**plans** 16:21 18:1
18:7,14 19:4
21:9 40:13 41:8
42:15 46:7
66:22,25

**plastic** 109:20

**please** 4:11,12
5:4 19:13 30:23
58:13 69:11
123:9

**plus** 55:10,11

**point** 7:13 18:13
43:24 78:7 84:7
87:2,5,6,8 91:14
97:13 102:15
115:6,18

**pointing** 111:15

**policies** 9:21
13:11 22:19
23:5,6,17 28:6
28:11 30:6,10
33:8,10 67:2

**policy** 3:9 14:9
14:16,25 15:13
20:22 23:21
25:17 26:20,23
26:25 27:11
28:2,15,23,24
29:4,5,7,10,13
29:14,17,18,20
29:22,25 30:2,3
30:4,8,12,13,16
30:17 33:7 51:1
58:15 66:7

73:11 74:18,25
75:4,13,24,25
85:21 93:4

**portion** 7:3 17:8
17:16,21 74:11

**portrayal** 21:2

**position** 12:19
12:21 13:17
58:16 92:5,11

**positions** 58:18

**positive** 3:19
68:24

**possible** 43:15
62:5,14 67:3

**post** 33:25

**potential** 26:25
85:23 115:5,7
117:9

**potentially**
26:14 27:16
72:19

**practice** 20:8

**practitioners**
105:2

**pre** 56:12 77:3

**precedence**
65:19

**predates** 73:10

**preferred** 27:6
36:25 37:4,7
49:5,6

**preliminary** 6:7

**prepare** 9:14
10:9 11:2

**prepared** 9:1
63:5 96:12,13
112:3

**prescribe** 33:16
42:9,10

**prescribed** 25:7
25:13,18 26:22
27:1,1,10 28:15
28:23 29:3,9,14
29:18,21 30:1
31:13 32:4 36:1
36:13,23 42:22
43:8 45:13 47:4
47:8,13 48:3
50:8,17 51:20
52:6,17,23
54:18,20 55:9

**prescription**
21:4,6 24:24
26:21 27:1
36:19 39:3 40:3
40:15,25 45:23

**prescriptive**
23:7

**presence** 89:12

**present** 2:23
79:21 88:10,12
88:14,15,24
95:7 103:17

**presented** 11:17

**pretty** 9:17,17
12:14 18:14
20:6 43:18,19
43:22 99:15
102:17

**preventive**
71:17

**previous** 28:22
68:18 93:14
97:11

**previously** 39:3
59:23 76:15
93:15

**pricing** 39:19

**primarily** 12:23
41:3 44:5 71:13
85:20 96:11

**primary** 6:20
58:22 71:12,16
82:24 84:3
96:18,22

**principally** 9:24

**print** 72:19 79:6

**printed** 59:18
59:20 82:16

**prior** 13:4,19
14:3 16:6,12,16
16:21,23 17:1,3
21:6,11,11,15
21:21,25 22:12
23:13,23 24:2
24:11,16,19,21
25:4,10,25
30:15 31:23
32:2 35:23 36:3
36:4,7,10,15
38:5,6,6,8,8,19
40:10,14 42:12
42:16 45:2,6,18
45:18 46:17

47:5,17 50:3
51:17 52:14,20
52:25 65:25,25
66:11 67:5,19
68:11 74:19,22
75:8,16 76:2
81:14 84:13,14
85:7,24 86:3
92:6,12 95:22
103:18 111:4
**priority** 63:22
64:5,12 65:1,5
80:2 99:14,15
99:16,17
**privy** 60:20,21
**probably** 11:5,5
11:6 21:19
56:25 77:11
78:14 86:11
110:24 114:16
**probing** 118:15
**problem** 7:19
7:20 8:1
**procedure**
37:16 38:23
43:21 48:13,14
50:20 53:6,8,23
81:21 116:12
123:17,17
**procedures** 9:18
71:15,16
**proceedings**
122:5,10
**process** 6:11,13
10:6,13,15

16:12 17:2,4,20
21:20 22:1,4
23:13,22 24:11
24:17,21 30:16
31:23 33:11
38:7 39:20
40:15 42:11
43:22 47:6
49:21 50:19
52:25,25 53:17
54:3,5,6 55:22
60:1 63:8 64:2
65:12 73:22
86:23 89:21
90:2 93:1,2,10
93:18 95:2
98:16 100:11
104:23,25 111:5
111:6 112:3,4,5
115:8
**produce** 58:7
**produced** 10:23
30:14 68:3 82:4
**product** 82:23
83:9
**production**
112:12
**professional**
6:10 14:1 17:23
93:7 119:11
122:4
**professionally**
81:1,2
**progesterone**
28:13

**program** 10:18
12:21,22 13:5,8
14:12 26:5
32:23 33:2,3
37:16,25 39:19
43:15,16 51:9
53:24 56:1
68:16 71:11
**programmed**
38:12 43:1,9
48:8 50:22 51:4
51:6,8,18
**programming**
48:7
**programs** 10:14
79:25 96:13,21
**prohibiting**
10:20
**project** 2:3
79:21,22,24
80:3 85:12,24
86:8,10,18
87:13,14 88:20
88:25 97:2,3
99:14,15,16,17
**projects** 11:6
63:16 64:3
65:19 70:1
88:21 97:9
100:14
**prompted**
117:20
**promulgated**
30:5,9,11 33:9
33:18

**prong** 18:21
54:6,11 93:5
**prongs** 16:1
17:12,13
**properly** 34:13
**pros** 116:18
**provera** 28:10
**provide** 10:11
10:16 43:23
45:5 46:16
51:21 58:12
73:18 78:2,21
91:6 104:15,18
104:23 109:22
**provided** 9:7,8
30:19 31:6
33:13 70:6
78:11,13,17
111:1,9
**provider** 21:23
22:2 26:11,13
42:9
**providers** 26:3
26:14 32:21
34:4,5 105:1
**provides** 93:10
**providing** 25:3
75:8 109:7
**psych** 109:18
**psychiatric**
119:19
**psychiatry**
117:23 118:2
**psychological**
120:1

**psychologist** 109:18

**pubertal** 73:2 74:22 75:6 76:19 77:22

**puberty** 68:19 69:21,22 70:19 71:19 73:5 74:2 74:15

**public** 1:19 12:4 12:8,11,12,16 33:11 34:17,20 34:22 49:21 121:20 122:21

**publications** 113:20

**publicly** 34:17 37:11 114:2

**published** 11:19 94:25 95:10 99:12 104:23

**pull** 45:10 62:2 67:18,21,22 79:6

**pulled** 59:18,19

**purchase** 99:7

**purpose** 15:20 15:23 35:10 42:19

**purposes** 56:2

**put** 19:12 31:23 34:20,22 37:10 60:16 65:20 82:16

**putting** 79:5

**q**

**quality** 14:8 26:15

**quantify** 34:1

**quarterly** 11:20

**question** 7:14 7:16 8:9 10:10 10:12,16 21:18 39:13,13 47:10 48:17 62:20 66:10,10 89:7 92:14 94:9 96:4 108:19 112:1,20 116:14 118:18

**questions** 7:22 9:25 10:5 11:4 35:20 59:22,24 59:25 78:6,8,10 78:14 82:6 91:24 115:23,25 116:22 117:3,13

**quick** 100:1

**quickly** 33:6 48:6 64:10 77:5 99:7,9

**quite** 6:9 13:14 66:10

**r**

**r** 36:23,24 124:3 124:3

**raise** 5:4

**raising** 64:23

**randomized** 116:8,12

**ranged** 11:23 12:3

**rate's** 39:24

**rates** 39:21

**rather** 15:7 94:23

**reach** 93:23 94:7 97:12

**reaching** 107:2

**react** 114:2

**reaction** 113:23 114:1

**read** 5:19 63:20 112:3 115:20 123:8 124:19

**reading** 5:21 99:5

**reads** 17:22

**real** 43:6

**realize** 30:7 115:6,18

**realized** 115:9 115:11,22 116:1

**realizing** 100:21

**really** 19:25 26:17 30:12 36:7 40:14 49:9 53:18 64:17 93:10 100:14,22 111:7

**reason** 8:8 65:4 70:20,22 99:5 123:9 124:6,9

124:12,15,18

**reasonable** 123:12

**reasons** 72:4

**rebates** 37:9 40:11,16,19

**rebecca** 79:16 80:9,17

**recall** 35:3 118:3

**receipt** 123:12

**receive** 113:21

**received** 11:4,10 11:11,13 34:10 67:25 68:22 75:20,20 107:6

**receiving** 68:6

**recess** 49:1

**recipient** 21:21 22:1 26:12 27:2 36:10 54:25 83:11,25

**recipients** 24:16 31:12,24 67:24 68:6 75:20 77:8 77:17 83:24

**recognize** 36:25 37:2

**recommend** 110:20

**recommendati...** 105:23 108:12

**recommendati...** 71:3 95:5 107:18,21,24

111:1 118:4,16
118:18 119:3,6
**recommended**
106:9 107:22,25
111:12,14
112:20 113:11
113:14
**recommends**
112:7,8
**record** 8:15
40:20 59:2
68:21 69:24
72:21 112:24,25
122:10
**record's** 72:12
78:16
**recorded** 4:2
**records** 22:16
25:19 34:20,22
49:21 112:10,13
**recoupment**
34:4
**recoupments**
32:20 34:23
**reeves** 1:18 4:10
121:20 122:4,21
**refer** 6:12 12:25
84:25
**reference** 15:2
18:13 36:18
119:21
**referenced** 31:9
91:2 123:7
**referencing**
64:19

**referring** 31:5
35:20 45:11
55:23 66:19
67:10 69:17,18
89:6 94:10
100:5,7
**refers** 6:11 7:1,3
**refine** 100:19
**regard** 89:11
123:13
**regarding** 30:10
30:19 56:9,12
66:7 68:18
88:25 89:1 90:7
**regardless** 23:4
23:15 38:4
**regards** 88:20
**regional** 12:2
**regulations**
20:23
**reimburse**
39:22 50:7
**reimbursed**
21:7
**related** 60:3
73:17,18 74:2
78:24 79:24
84:21 87:2 89:3
89:13 90:19
94:18 96:5 98:6
107:7 116:5
119:23
**relation** 61:8
65:6 99:17,18
105:21

**relationship**
105:18
**relative** 122:11
122:13
**release** 92:18
**released** 76:1
99:19,21 101:4
114:17
**releases** 94:4,5
**releasing** 29:23
74:21
**relevant** 115:14
**relied** 93:23
105:5 117:22
**rely** 41:8 81:10
118:10
**remember**
86:15 114:11
**remind** 103:10
**reminding**
65:15
**render** 102:15
**renders** 102:24
**repeat** 25:9
117:24
**rephrase** 7:15
92:14
**report** 19:7
26:11 57:25
59:9 60:1 62:24
63:5 70:24,25
71:5,7 73:5 74:2
78:24 79:15,16
80:5,8,9 81:11
81:12 86:19

92:17 98:18,19
100:9 109:7,25
110:1,3 111:6
111:10 114:9
115:14 117:1
119:15,22
**reported** 1:18
**reporter** 1:19
4:9,12 5:3,11
8:5 12:24 122:1
122:5
**reporter's** 6:3,5
**reporting** 26:19
**reports** 14:2
56:12 58:19
61:1 63:13,16
65:11,21,23
97:12 104:23
109:13 111:9,11
**repository** 62:1
**represent** 4:15
4:16,18
**representative**
4:3 9:11 60:24
61:2 68:4 95:14
96:4 111:17
**represented**
12:2
**representing**
2:2,17 8:18
**reproduce**
27:10
**request** 3:14
31:23 34:20,22
41:4 49:21 60:1

64:15 85:3,5
87:22 88:4 90:4
90:5 94:22,23
95:2,4 99:1,10
103:17,18,19,22
**requested** 52:10
**requesting**
87:17,18
**requests** 17:25
19:3 58:17
63:15 64:9 77:3
85:7 90:18
100:20,21
**require** 21:6,11
21:15 24:20
25:5,10 32:2
35:23 36:3,4,6,7
36:9 38:19
47:24 61:24
116:10,11
**required** 23:24
24:19 33:3
37:13 42:7,13
45:2,4 50:4
51:17 52:14,20
118:15
**requirement**
24:3 48:2 52:5
**requirements**
23:18 48:1
51:23
**requires** 38:5
50:20 54:12
**requiring** 36:15
61:15

**research** 10:17
11:17 80:13
97:3,9 100:13
102:14,21,23
104:14,16 106:2
109:23
**reserve** 78:9,15
118:17
**resources**
104:17
**respective** 106:6
**respond** 99:20
**response** 3:19
3:19 74:15 90:6
91:23 94:22
99:11,24 100:1
**responses** 117:5
**restrictive** 46:11
46:14,14
**result** 26:12,14
**results** 67:22
**resumes** 120:17
**retrospective**
32:6 52:8
**returned** 123:11
**review** 16:13,17
17:7 18:11
20:25 22:3,8,10
22:16 25:1 26:1
32:6,16 42:11
46:18 47:17,24
48:3 52:6,8,16
52:22,24 53:16
54:14 63:7,20
64:2 65:12,16

76:4 87:17,18
88:3 89:1 90:21
90:22 91:21
92:2,7,12 93:1,8
93:10,24 95:9
117:8 118:19
119:8,12 123:7
**reviewed** 9:21
10:8 22:10 23:1
55:11 65:13,23
91:1 97:25
114:7 118:20
**reviewing** 41:2
54:4 97:17
116:23
**reviews** 18:20
34:1 90:11
104:19
**revisions** 59:9
60:13 61:1,12
61:13,14,16,17
62:4
**rh** 1:3 4:6
**richmond** 2:4
**right** 5:3,4,14
8:7 13:5 19:5,13
19:15 20:13
27:18 41:10
42:20 48:6 49:5
51:7 52:24
53:13 56:8 57:9
57:16 59:1
61:11 69:24
70:18 72:16
78:11 89:15

94:19 101:23
109:15 113:16
118:18
**rise** 26:7
**risk** 102:19
**risks** 116:19
**rivaux** 2:8 5:1
**rl** 2:23 4:10
**rn** 22:5 72:10
**role** 6:20 9:17
10:6,15 13:4,7,8
13:22,25 14:15
65:7,9,10 98:5
101:21
**roles** 61:10
96:17
**roll** 83:9
**romina** 110:5
112:11
**route** 86:20 90:1
**routed** 73:23
**routing** 58:4
**rule** 6:12 7:2,4
15:2,2 17:9 30:5
30:9,11 33:9,18
123:17,17
**rulemaking**
33:10
**rules** 9:22 26:17
123:12
**run** 28:18 70:10
96:17
**ryan** 87:25

**s**

**s** 2:20 4:1
  123:13 124:3
**safe** 38:16
**sail** 97:7
**sale** 53:19
**sample** 117:18
**sarah** 58:3,23
  59:12 60:6,8
**save** 104:16
**saw** 5:24 10:7
**saying** 59:7
  64:25 93:5
  114:11
**says** 23:5 42:7
  45:16 62:9 91:1
  112:2
**scale** 93:12
  95:25
**schedule** 23:15
  23:16 39:16,24
  101:6,10,14
**schedules** 23:6,9
**scholarly** 11:19
  63:19 97:10
**school** 11:15,17
  13:13 34:9
**sciences** 12:13
**scientific** 104:19
**scratch** 52:17
**screen** 45:16
**screening** 7:8
**seal** 121:13
**search** 95:24

**second** 22:8
  48:19 54:11
  55:5 62:11 77:6
  99:6
**secondary** 6:20
**secretary** 14:8
  63:8 86:4,5
  88:12 94:11,16
  94:21 107:13
  112:19
**secretary's** 85:6
  85:15
**section** 15:1
  20:24 27:12
**see** 32:8 36:20
  55:8 82:16 88:9
  91:1 92:2 95:24
  102:8 108:9
**seek** 106:3
**seeking** 21:21
**seems** 54:3
  73:21 82:15
  107:11 112:1
**seen** 9:4,6 31:3
  45:24
**selected** 71:23
  72:4
**seminar** 63:19
**sending** 98:5
**senior** 70:23
  107:12
**sense** 97:14
**sent** 106:13,21
**sentence** 99:6

**september**
  70:20
**sequence** 95:9
**seriously** 118:17
**service** 16:3,5
  16:11,14,14,18
  16:22 17:5,8,19
  18:9,16,22,23
  21:13 22:15
  23:10,10,11
  27:13 35:14
  38:13 42:14,17
  44:7 46:3,5
  50:21 51:13,14
  66:23 67:5,10
  67:11 68:8,9
  75:19,23 76:2,3
  76:17,22,24
  81:18 82:19
  83:12 93:6
  102:23 116:15
  116:16,17,18,21
**services** 7:3,7,8
  13:9,14 18:3,8
  23:7,8 25:15
  26:3,23 27:11
  28:15,23 29:4,9
  29:14,18,22
  30:2 32:18
  34:13 38:24
  39:2,4 50:22
  58:17 67:1,23
  68:7 71:12,14
  71:14 73:3,25
  74:14 80:1 83:9

  83:21 89:6
  93:15,19 115:14
  115:19 116:4,6
  116:7,24
**serving** 86:4
**session** 65:18
**set** 35:20 48:12
  49:19 51:12
  64:11 75:13
  78:18 116:16
**setting** 50:24,25
**seven** 20:9,13
  65:22 99:23
**several** 67:18
**sex** 3:10 6:19,20
  19:7 33:21,24
  55:14,18 56:15
  57:16 65:3 66:4
  66:7,17 67:8
  68:14 69:18
  76:16
**shani** 2:8 5:1
**shapes** 12:18
**sharepoint** 58:2
  61:24 71:6
**shaw** 2:9
**sheena** 62:13
**sheeran** 9:24
  86:25 87:1
  88:13 107:3,5
  107:19
**sheet** 91:4,5
  113:18,24 123:9
  123:10

| | | | |
|---|---|---|---|
| **shifted** 14:15 | **situation** 64:8 | **space** 7:22 | **spent** 11:5 |
| **short** 120:9 | 64:24 | **speak** 5:8 8:1,3 | **spilling** 36:21 |
| **shorthand** | **six** 67:19 73:4 | 9:23 21:8 39:8 | **spiro** 28:18 |
| 122:7 | 73:13,14 99:23 | 41:9,25 48:15 | **spironolactone** |
| **shortly** 19:19 | **size** 116:20 | 54:2 61:2 70:8 | 28:20,21 |
| **shoulder** 15:8 | **sizes** 117:18 | 72:1 81:9 95:8 | **split** 19:23 |
| **show** 67:22 68:4 | **sm's** 22:12 | **speaking** 7:19 | **spoke** 107:17,20 |
| 68:5 | **small** 117:18 | 7:23 43:1 47:25 | 107:20 112:15 |
| **showing** 36:24 | **smc** 40:13,23 | 76:20 93:3 97:8 | 112:19 |
| 84:12 | **snapshots** 91:7 | **special** 65:18 | **spreadsheet** |
| **side** 4:22 5:2 | **society** 119:5,7 | 73:3,25 74:14 | 10:14 |
| 40:16 62:8 | 119:7 | **specialized** 13:9 | **staff** 21:19 88:7 |
| **sign** 123:9 | **solely** 64:3 | 38:24 | 88:8,9 107:14 |
| **signature** 70:7 | **solitary** 97:2,15 | **specific** 27:20 | 107:15 113:20 |
| 121:18 122:19 | **solutions** 22:15 | 28:6,7,11,25 | **staffers** 87:24 |
| **signed** 63:8 | 123:16 | 29:17 30:17 | **stakeholder** |
| 65:14 69:1 | **somebody** 26:10 | 31:25 35:6 38:2 | 64:16 |
| 70:23,25 114:13 | **somebody's** | 41:10 90:18 | **stamped** 19:6 |
| 123:13 | 63:21 | 92:5 102:23 | 72:20 82:3 |
| **significant** | **somewhat** 20:3 | 116:17 | **stamps** 73:24 |
| 99:22 | **soon** 120:9 | **specifically** | 82:9 |
| **significantly** | **sorry** 19:24 | 13:25 27:19 | **standard** 9:18 |
| 47:24 | 37:22 52:17 | 28:16,17 33:1 | 15:21,25 16:4 |
| **similar** 119:3 | 69:5,11 74:5 | 61:9 88:20 | 17:22 21:3 |
| **simone** 2:5 4:16 | 79:3 82:7,8 | 111:22 112:10 | 91:10 |
| 15:4 30:20 | 94:15 99:16 | 112:20 | **standards** 6:10 |
| 55:13 77:7 | 103:8 109:1 | **specificity** 88:17 | 14:2 17:23 93:7 |
| **simple** 43:19 | 113:11 119:10 | **specifics** 32:14 | 114:10,14,18 |
| **single** 21:13,16 | **sought** 77:17 | **speculate** 71:22 | 116:16 119:17 |
| 65:1,2 116:16 | **sounds** 7:25 | **speculation** | **stands** 6:9 7:7 |
| 116:17 | 35:15 | 63:24 | 32:22 40:21 |
| **sir** 5:3 | **south** 11:21 | **spell** 28:3 | **start** 26:5 96:6 |
| **site** 26:12 61:24 | 12:16 | **spelled** 36:22 | 99:7,9 103:13 |
| **sitting** 77:20 | **southern** 2:6 | **spend** 11:15 | 120:11 |
| | 11:20 12:18 | | |

**started** 11:10
  95:21 96:5
  100:20,21
  115:16
**starting** 20:22
**starts** 55:25
**state** 1:20 8:15
  10:18 27:19
  33:1 79:24
  94:16 95:4
  96:12,21,23
  99:20 114:25
  121:5 122:2
**stated** 114:3
  124:19
**statement** 10:20
  10:21
**states** 1:1 10:13
  35:12 91:25
  92:1
**stating** 91:8
**status** 82:20
**statute** 123:12
**step** 54:6,14
  55:5,8
**stop** 7:15
**stops** 22:7
**straightforward**
  43:22 119:4
**street** 2:4,12,14
  2:20
**strickland** 87:25
**strike** 33:16
  91:18

**studies** 11:20
  117:3
**stuff** 6:7 22:13
**subcategory**
  84:11
**subcontract**
  40:9
**subcontractor**
  33:14
**subcontractors**
  16:20 17:7
**subject** 58:20,23
  59:23 60:16
  71:10 80:21,24
**subjected** 16:23
  86:22
**submit** 21:25
  52:5
**submitted** 22:17
  52:15,15,21
**substances** 8:13
**substantial**
  102:21
**substantiating**
  102:13
**successful** 54:10
**sufficient** 94:6
**sufficiently** 92:4
**suggested**
  123:11
**suggestions**
  104:13
**suit** 19:17
**suite** 2:9,14,20

**summer** 79:18
**sunshine** 83:22
**supervision**
  122:8
**supervisor** 10:1
  81:13
**supervisors**
  65:15
**supplement**
  112:11
**support** 54:16
  55:11 91:8,15
  115:9
**supported** 36:2
  36:13 91:24
  92:4 116:7,12
**supporting**
  61:10 91:9 92:3
  102:22 115:1
**suppose** 49:20
**supposed** 27:11
  117:4,13
**suppression**
  68:20 69:21,23
  70:19 71:19
  73:3,5 74:3,16
  74:23 75:6
  76:19 77:23
**sure** 14:25
  16:22,25 18:10
  19:25 21:24
  31:9 43:12 70:4
  70:8 99:25
  105:13

**surface** 26:7
**surgeon** 81:4
**surgeries** 57:14
  71:13 84:3
**surgery** 3:12
  77:10 79:1,9
  80:25 81:7,17
  82:20,21 83:1
  84:16 109:20
**surgical** 71:14
**surprising** 64:1
**survey** 26:12
  117:14,17
**surveys** 26:14
  26:15 117:4
**swear** 4:12
**sworn** 5:7
  121:11
**symposiums**
  12:1
**symptoms** 115:3
**system** 21:13
  22:15 35:12
  37:15,20,25
  38:1,7,11,16
  39:7 42:24,25
  43:3,13,15,19
  48:8,11 49:19
  50:10,14,23
  51:8,10,18
  53:24 59:14
  71:6,7 76:24
**systems** 115:2

**[t - times]**

**t**

**t**  4:1 36:24
24:3,3
**take**  8:7,9 11:2
48:18,22 76:23
77:6 82:7 90:24
98:4 106:7
115:17 118:16
120:9,12,12,13
**taken**  21:23
117:16 122:6
**takes**  63:20
**talk**  69:22 111:4
**talked**  111:7
113:1,4,5,5
**talking**  24:7,8
28:4 93:25
111:10 114:5
117:19
**talks**  35:6
**tallahassee**  1:17
2:20 4:7 11:11
**tamayo**  87:11
87:12 88:10
**task**  61:9
**tasked**  13:25
**taxonomy**  84:9
**team**  33:3 71:12
**teams**  9:20
13:10 32:25
**tech**  72:8
**techniques**
104:20
**tell**  16:8 22:25
34:5,7,7 83:7,11

**telling**  77:20
**ten**  65:11,21
**term**  6:16 7:6
83:19 117:2
**terms**  68:24
**testified**  5:9
**testify**  9:1
**testifying**  95:14
**testimony**  123:8
123:12
**testosterone**
29:11,15,19
44:11,13,19,21
45:16,17 46:16
46:17 47:13
49:7,11,22,23
50:1,2 51:15
52:13,18
**tests**  103:6
**text**  35:12 60:18
**thank**  5:11
15:11 19:15
28:5 30:23
41:13 48:23
57:19 72:25
74:6 94:17
113:8
**thanks**  20:5
**that'd**  50:13
**theirs**  118:7,9
**thera**  36:24
**therapeutics**
27:8 37:6
**therapies**  67:8

**therapy**  3:10
19:7 33:22
55:14,19 56:16
57:16 65:3 66:4
66:17 68:14,20
69:19 70:20
71:20 73:5 74:3
74:16 76:16
77:23
**theses**  97:10
**thing**  23:25
**things**  39:18
49:18 71:15
101:4 117:7,12
**think**  10:11
11:24,25 16:7
19:23 21:25
22:7,17 24:23
29:2 30:14 34:8
34:12 37:8 38:8
40:5,5 44:1
45:24 59:21
60:8 62:7 65:11
67:21 68:9,9
69:8 71:14
72:10 78:5,17
80:13 87:4,25
88:11,11,12,13
88:23 89:19,24
100:15,15,16
102:3 105:11,12
105:13 107:1,3
107:10,19,19
109:17 112:8,17
114:15,20 116:5

118:2 119:21
**third**  54:13 55:8
**thought**  53:11
69:10
**thoughtful**
118:15
**thousands**  34:3
**three**  10:12 11:7
13:17 34:25
35:1,11,16,21
50:22 54:6,12
54:15 55:6,7
56:12 57:17
60:19 87:24
96:15
**time**  1:15 4:9
11:15 13:24
14:3,9 22:12,13
32:7 48:25 49:3
52:10 61:4 63:2
63:4,20 71:21
71:24,25 73:10
73:24 74:25
75:1,10,17,22
76:10 78:9,15
79:20 85:8,22
86:4 87:9 91:12
93:14,18 96:17
99:22 102:1
104:17 117:14
120:16 122:6
**times**  31:3 68:11
75:12 76:5 77:3
77:21 84:15
95:12

| | | | u |
|---|---|---|---|

**tip** 26:9
**title** 83:18
**today** 8:13 9:14
   10:8 11:3 77:20
   98:24
**today's** 4:8
**together** 12:16
   37:10 82:16
**tom** 94:14
**tonight** 19:18
**took** 65:22
**top** 20:25
**topic** 12:9 78:19
   111:15,21 112:2
**topics** 8:21,23
   9:2,4,16 11:18
   12:2 77:16
   78:18
**total** 82:14
**totally** 8:8
**track** 5:22 62:15
   62:17
**tracking** 58:2
**traditional**
   64:12,13
**transcript** 123:7
   123:13
**transcripts** 8:6
   123:10
**transgender**
   61:8 119:12
**translated**
   122:8
**transparent**
   39:20

**transplant** 97:6
**transportation**
   13:13
**trauma** 117:11
**treat** 41:20
   44:21 66:4,17
   67:8 76:18
   84:16
**treating** 74:23
**treatment** 6:25
   7:8 43:8 49:24
   51:2 56:13 60:3
   66:1,12,15 67:6
   67:25 68:12,14
   74:20 75:2,6,11
   75:13 77:23
   78:25 81:15,17
   84:15,21 89:22
   90:14,19 91:9
   91:10,15 94:18
   102:22 116:5,11
   116:23 117:22
   119:24
**treatments**
   86:21 89:2 90:8
   91:21 104:19
   115:1 117:20
**tree** 100:3,8,10
   110:15
**trial** 54:7
**trials** 31:18
   54:12 55:7
   116:8,13
**tried** 54:8 55:1

**trigger** 50:14
**triggering** 26:8
**trouble** 47:10
**true** 57:11 122:9
   124:20
**truth** 5:8,8,9
**try** 7:16,21
   70:10 76:9,9
**trying** 65:15
   85:10,10,14,16
   97:5 98:6
**tuberculosis**
   12:10,15,17
**turn** 15:17
   36:20 70:22
   84:19 108:1,2
   109:1
**turned** 112:24
**turning** 33:6
   47:3 48:6 49:5
   56:8
**two** 22:3 29:19
   32:25 35:2
   48:18 49:3
   55:15 56:16
   58:18 65:12,12
   65:21 73:17
   82:13 83:10,11
   86:7 103:3,6
   117:19 120:15
**type** 52:2 82:19
   90:22

**uh** 3:19,19,19
   46:20 56:4 61:6
   82:25 94:13
   101:24 105:10
   110:14
**ultimately**
   119:16,18
**umbrella** 27:5
**unanswered**
   115:23 116:22
   117:3,13
**undecanoate**
   29:19
**under** 3:14 9:19
   17:16 20:22
   25:2 27:1,14
   28:14 42:14
   47:4,14,22 48:2
   56:1 66:14,23
   67:4 81:18
   82:19 83:9
   97:12 99:1
   116:6 122:8
   123:12 124:19
**undersigned**
   121:9
**understand**
   6:13 7:2,14,17
   8:4
**understanding**
   8:17 46:10 50:9
   74:13 76:11
   80:4 97:13

**undertake**
  24:16 25:12
  90:10,21,23
  93:1,10 94:18
  95:2,9
**undertakes**
  21:21
**undertaking**
  47:5 52:6
**undertook**
  95:10 102:1
**uniform**  116:15
**unique**  83:25
  100:12,13
  116:15
**unit**  33:4
**united**  1:1 35:12
  91:25 92:1
  96:12
**university**  11:12
  11:14 110:9
**update**  43:19
**updated**  43:13
  45:16 47:2
**updates**  113:21
**updating**  13:11
**uploading**  43:20
  43:21
**url**  36:21
**usage**  24:8
**use**  6:16 15:9,24
  17:21 19:1 25:7
  25:13 27:21
  31:13 32:4
  33:15 35:9 36:1

  36:12 43:5 44:3
  44:8 47:9,21
  48:4 50:7 53:4,8
  53:25 54:4
  55:24 66:16
  89:21 105:24
  107:3 118:7
**used**  10:17,17
  16:5 22:12 42:1
  42:19 44:21
  54:9 55:22
  74:19 80:14
  93:14,19 100:16
  104:6 123:13
**uses**  35:7 41:22
  42:23 45:5
  53:21,22
**using**  6:8,22,24
  7:6 17:20 35:19
  40:23 44:2,2
  48:14 118:3
**usually**  17:25
  21:23,23 22:2,4
  23:12 26:4 35:5
  42:1 49:21
  62:10 63:16,20
  64:10,10 103:3
  119:4
**utilize**  35:8
**utilized**  56:1

**v**

**v**  2:19 123:1
**van**  98:23
  104:10,13,21,22
  109:3 111:7,23

  113:10,11
**vast**  27:9
**vendors**  22:24
**verbal**  7:25
  98:12,13,14
  104:9 106:22,23
**verify**  40:6
  123:8
**veritext**  123:10
  123:16
**veritext.com**
  123:10
**version**  56:15
  57:24 59:10
  61:12 70:7
**versions**  55:16
  56:17 57:16,17
  68:22 70:5
**versus**  76:24
  77:3 116:19
**viagra**  27:21
**video**  4:2 48:24
  49:2 120:11,15
**videographer**
  2:23 4:2,11 8:2
  19:12,15 48:24
  49:2 120:8,11
  120:15
**videotaped**  1:12
**violation**  25:17
**vogel**  2:19
**voice**  64:16
**volume**  1:11
  120:17

**vouching**  106:4
**vs**  1:7 4:5 123:5
  124:1

**w**

**w**  1:18 121:20
  122:4,21
**waits**  63:23
**walk**  5:18
**wall**  2:12
**wallace**  94:14
  95:1
**want**  7:14,15,16
  15:17 19:24
  37:23 48:18
  64:25 67:17
  68:21 69:7,23
  70:13 72:21
  78:7 82:5 90:22
  91:20 99:22
  106:5 120:12,13
**wanted**  70:22
  90:20,24 92:2
  99:20,25 100:18
**wants**  42:9
**waters**  97:8
**way**  27:11 36:16
  39:9 40:7 75:18
  84:8 93:7
  102:10 115:23
**we've**  24:19
  44:12 51:16
  52:19 56:14
  57:18 89:25
**weak**  91:9,16
  118:22

**website**   34:22
    36:19 37:11
    49:17
**week**   11:5
**weida**   1:8 4:5
    86:4 88:12
    107:4,6 112:19
    123:5 124:1
**weird**   81:24,24
**went**   58:20 60:9
    63:7 97:24
    98:15 103:6,7
    108:12
**western**   96:19
**whatsoever**
    10:21
**winthrop**   2:9
**wish**   18:9
**witness**   3:1 4:13
    5:7,10 6:4 19:19
    25:15 31:3
    48:21 56:23
    57:12 58:6
    61:15 69:13
    72:24 74:7,10
    92:9,14 120:14
    121:10,13 123:8
    123:8,9,13
**wondering**   57:3
**worded**   27:11
**words**   81:3
**work**   12:22
    38:11 59:23
    60:6 61:4,7
    78:20 84:8

95:19,21,25
96:6 97:21 99:7
99:9
**worked**   14:7
    39:18 59:11
    81:3 96:8,18,19
**working**   11:7,16
    14:14 39:3,18
    61:5 79:23
    115:16
**works**   40:7
    50:10 93:4
    97:11,11
**world**   119:11
**worn**   19:17
**wpath**   119:5,10
**write**   98:17,19
    109:12 110:1,2
**writing**   58:1
    99:11 109:18,24
**written**   111:24
    112:10,13,24
    114:12
**wrong**   28:19
    52:2 77:11
    98:24
**wrote**   96:22

**y**

**yeah**   10:11,11
    13:6 16:24
    29:24,24 32:13
    34:25 38:15
    39:11 40:1
    44:18 45:3
    52:12,12,12

54:24 55:2 56:8
56:23 57:2,10
57:11 62:17
69:2,10 70:11
70:13 72:17
73:15 77:9,9
82:15 83:13
84:5 86:14
92:16 98:15
105:7 109:6
114:12,12
118:14,14
120:14
**year**   65:14
    67:22 117:19
**years**   11:15,17
    13:18 20:9,14
    67:18
**yep**   25:10 73:3
**york**   2:13
**young**   113:18

**z**

**zoom**   4:22,25

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.