Page 125

1              UNITED STATES DISTRICT COURT

               NORTHERN DISTRICT OF FLORIDA

2

3                   CASE NO.  4:22-cv-00325-RH-MAF

4

5     AUGUST DEKKER, et al.,

6          Plaintiffs,

7     vs.

8     JASON WEIDA, et al.,

9          Defendants

10    _____/

11                        Volume 2, Pgs. 125 - 261

12    VIDEOTAPED DEPOSITION OF: MATTHEW BRACKETT

13    AT THE INSTANCE OF:     THE PLAINTIFFS

14    DATE:                   FEBRUARY 8, 2023

15    TIME:                   COMMENCED: 1:30 P.M.

16    LOCATION:               AGENCY FOR HEALTH CARE

                               ADMINISTRATION

17                            2727 MAHAN DRIVE

                               TALLAHASSEE, FLORIDA 32308

18

      REPORTED BY:            DANA W. REEVES

19                            Court Reporter and

                               Notary Public in and for

20                            State of Florida at Large

21

22

23

24

25

```
 1     APPEARANCES:
 2              REPRESENTING THE PLAINTIFF:
 3              KATY DeBRIERE, ESQ.
                Florida Health Justice Project
 4              3900 Richmond Street
                Jacksonville, Florida 32205
 5
                SIMONE CHRISS, ESQ.
 6              CHELSEA DUNN, ESQ.
                Southern Legal Counsel, Inc.
 7              1229 NW 12th Avenue
                Gainesville, Florida 32601
 8
                SHANI RIVAUX, ESQ.
 9              Pillsbury, Winthrop, Shaw, Pittman, LLP
                600 Brickell Avenue, Suite 3100
10              Miami, Florida 33131
11              OMAR GONZALEZ-PAGAN, ESQ.
                Lambda Legal Defense and Education
12              Fund, Inc.
                120 Wall Street, 19th Floor
13              New York, NY 10005
14              CATHERINE MCKEE, ESQ.
                1512 E. Franklin Street, Suite 110
15              Chapel Hill, NC 27514
16
17
                REPRESENTING THE DEFENDANT:
18
                MOHAMMAD O. JAZIL, ESQ.
19              GARY V. PERKO, ESQ.
                Holtzman, Vogel, Barantorchinsky & Josefiak
20              119 S. Monroe Street, Suite 500
                Tallahassee, Florida 32301
21
22
23              ALSO PRESENT:
                RL Minnich, Videographer
24
25
```

Page 127

1                    INDEX TO WITNESS

2

3   MATTHEW BRACKETT                             PAGE

4   Examination by Ms. DeBriere               128

5   Examination by Mr. Jazil                  253

6   Further Examination by Ms. DeBriere       255

7

8                    INDEX TO EXHIBITS

9

10   NO.          DESCRIPTION              MARKED

11   Exhibit 13   Medicaid coverage for children      153
             state list

12   Exhibit 14   Medicaid policy Routing and         163
             Tracking Form

13   Exhibit 15   Molina Health Care Notice of        202
             Adverse Benefits

14   Exhibit 16   August 22, 2022 email               215

     Exhibit 17   August 22, 2022 SMMC policy         215
15            transmittal

     Exhibit 18   Florida Medicaid health care alert  222
16            sign off form

     Exhibit 19   June 3rd, 2022 series of emails     227

17   Exhibit 20   Florida Statute 120.542             234

     Exhibit 21   GAPMS queue                         249

18   Exhibit 22   Health and Human Services document  253

     Exhibit 23   Treatment of gender dysphoria for   253
19            children and adolescents

20

21

22

23    *Uh-uh is a negative response
     *Uh-huh is a positive response

24

25

```
 1                    D E P O S I T I O N
 2    Whereupon,
 3                    MATTHEW BRACKETT
 4    was called as a witness, having been previously duly
 5    sworn to speak the truth, the whole truth, and nothing
 6    but the truth, was examined and testified as follows:
 7              VIDEOGRAPHER: This is beginning of video
 8         three.  The time is 1:30 p.m. We're on the record.
 9                    EXAMINATION
10    BY MS. DEBRIERE::
11         Q    So prior to break, we were talking a little
12    bit about Dr. Van Mol and Dr. Grossman's involvement in
13    the 2022 GAPMS.  How did AHCA identify them to
14    participate in the July 8th rule hearing that was
15    related to?
16         A    So the -- are we talking about the rule
17    hearing?
18         Q    Yes, related to the June 2022 GAPMS.
19         A    So since we had already been working with them
20    in relation to the GAPMS project, because Dr. Grossman
21    is a psychiatrist, and Dr. Van Mol is a family -- family
22    practice practitioner, that's based on their backgrounds
23    and their knowledge of the existing evidence, that was
24    our basis for selecting them to be on the panel for the
25    July 8th hearing.
```

1      Q      And turning back to the individuals who wrote
2   reports for the June 2022 GAPMS, who made the decision
3   to contract with them to prepare those reports?
4      A      So after establishing each one, we wanted
5   to -- their backgrounds and their suitability to provide
6   reports, that decision was made by, I think, now
7   Secretary Weida.
8      Q      And who was involved in determining whether
9   they had the appropriate backgrounds to write the
10  reports?
11     A      So I think those individuals who were working
12  with the experts, I think that was, of course, now
13  Secretary Weida, I think at our time, General Counsel
14  Josephina Tamayo.
15     Q      Okay.  Anybody else?
16     A      I don't --
17     Q      Were you involved?
18     A      I was not.
19     Q      Was Nai Chen involved?
20     A      He was not.
21     Q      Was Dede Pickle involved?
22     A      She was not.
23     Q      Okay.  So now Secretary Weida and Josephina
24  Tamayo were the two people who decided whether the
25  consultants who read the reports were qualified to do

1  so?

2         MR. JAZIL: Object to form.

3         THE WITNESS: So are you asking that whether or

4     not those two only assessed their credentials?

5  BY MS. DEBRIERE::

6         Q    Yes.

7         A    I mean, yeah.  I mean, they assessed their

8  credentials and looked at their background and

9  experience and knowledge.

10        Q    Were those the only two people that assessed

11 their credentials before deciding whether to engage

12 them?

13        A    In regarding the Agency, I mean, the -- Andrew

14 Sheeran may have been involved.  So it's possible a

15 couple others with the principal decision to rely on

16 those experts was theirs.

17        Q    Okay.  And so just to be clear, you were not

18 involved in that decision?

19        A    I was not involved in that decision.

20        Q    And Nai Chen was not involved in that

21 decision?

22        A    That's correct.

23        Q    And Dede Pickle was not involved in that

24 decision?

25        A    Correct.

Page 131

1          Q      When making that decision, did AHCA

2     investigate whether any of the consultants had a stance

3     related to the treatment of gender dysphoria?

4          A      We, of course, were looking for those that

5     had -- were knowledgeable about the existing literature

6     of gender dysphoria, and those who would, for the

7     supplemental reports, would take an evidence-based

8     approach.

9          Q      Did it -- so those were the only two criteria

10    that you used to determine which consultants you would

11    engage with?

12         A      Correct.

13         Q      And so opposition to gender-affirming care was

14    not a factor in who you chose?

15         A      We were specifically looking -- I think we

16    might be talking semantics on what we consider

17    opposition, but we were looking for individuals who were

18    going to make reports and recommendations based on the

19    existing evidence.

20         Q      Okay.  Was whether the vendor had experienced

21    treating -- I'm sorry.  Was whether the consultant had

22    experienced treating gender dysphoria a factor?

23         A      Not so much a factor that would outweigh the

24    knowledge of the existing literature and the evidence,

25    since this was going to be a -- the GAPMS process really

1    takes into account peer-reviewed literature.  It takes

2    into account evidence-based clinical guidelines, et

3    cetera, so those are our primary -- our primary factors

4    in evaluating the experts and their ability to

5    contribute to this report.

6         Q    Would people who actually provide treatment in

7    gender dysphoria be most familiar with peer-reviewed

8    literature as it relates to their practice?

9         A    Well, that is a complicated question.  They

10   don't necessarily have to be.  It's possible to -- I

11   mean, it is possible -- I mean, it is hypothetically

12   speaking, someone could engage in treatment of these

13   individuals and run and follow anecdotes.

14        Q    So it's not important to AHCA that the

15   consultants with whom you engaged had actual experience

16   treating gender dysphoria?

17        A    So based on how the GAPMS rule is written, the

18   needs of the report, we really -- the primary ask was

19   for individuals who were steeped in the evidence.

20        Q    But didn't necessarily have actual real life

21   experience treating gender dysphoria?

22        A    Right, that wasn't a primary consideration.

23        Q    Okay.  For -- was AHCA aware that all the

24   consultants with which you engaged took a stance to

25   oppose mainstream medical organizations' stance on

Page 133

1   gender-affirming care?

2            MR. JAZIL: Object to form.

3            THE WITNESS: So are you talking about in

4        opposition or in contradiction?

5   BY MS. DEBRIERE::

6        Q    Contradiction.

7        A    We -- whether contradiction or alignment

8   really was irrelevant, it really was taking a look and

9   making evidence-based conclusions.

10       Q    Speaking to Dr. Brignardello-Petersen -- I'm

11  sorry.  I'll start here actually.  In deciding on

12  whether to use these consultants, was any input provided

13  from the Alliance Defending Freedom?

14       A    No.

15       Q    What about the Heritage Foundation?

16       A    No.

17       Q    Liberty Council?

18       A    No.

19       Q    Society for Evidence-Based Gender Medicine?

20       A    We may have gotten Romina's name from that

21  organization.

22       Q    Okay.  And what about the Family Christian

23  Coalition?

24       A    No.

25       Q    Did you get anybody else's name from the

1    Society for Evidence-Based Gender Medicine?

2         A    Because the -- because it was verbal

3    conversations, so don't -- don't think so, but the kind

4    of details -- because there's a lot of verbal

5    conversations and no written record, so --

6         Q    Maybe?

7         A    It could be a maybe at best.

8         Q    And did the Family Christian Coalition

9    recommend any of -- or play any role in the

10   recommendation of the consultants --

11        A    No.

12        Q    -- with AHCA engaged?  What about the Florida

13   Citizens Alliance?

14        A    No.

15        Q    The Florida Department of Health?

16        A    Well, the Florida Department of Health passed

17   along to the name of Dr. Michelle Cretella.  So, yes.

18        Q    What about the Governor's office?

19        A    No.

20        Q    The Surgeon General Ladapo?

21        A    Well, he would be acting in his capacity as,

22   of course, the agency head for the Department of Health.

23   So the Department of Health, cumulatively, gave us that

24   name.

25        Q    Did he personally?

1      A      There was a conversation, like, once with our

2    general counsel Tamayo at the time with Dr. Ladapo, but

3    we don't recall whether or not the name was given during

4    that conversation.

5      Q      I think you touched on this a bit earlier, so

6    I apologize for circling back around, but did AHCA

7    consider using any other consultants in the development

8    of the June 2022 GAPMS?

9      A      By any other --

10     Q      Other than those that wrote the reports or

11   Grossman or Dr. Van Mol?

12     A      There were those who were contacted.  Of

13   course, there was -- it was all verbal conversations,

14   but not necessarily -- not necessarily considered to

15   write a report either.

16     Q      And do you remember who you were -- who you

17   contacted?

18     A      Since it was all through verbal conversations,

19   it was eight months ago, it wasn't through written

20   correspondence, the -- we're not really aware of all

21   those details.

22     Q      And who was the one who did the contacting?

23     A      The contacting was done, I think -- I think by

24   Andrew Sheeran.  He's now our General Counsel.  I think

25   Josephina Tamayo -- Tamayo.  Sorry.  I think she also

Page 136

```
 1    was involved in contacting them.
 2           Q    Okay.  And those were all phone calls?
 3           A    These were verbal conversations, yes.
 4           Q    So no communication by email?
 5           A    No.
 6           Q    Did you use the folks who ended up not
 7    offering the reports -- aside from Dr. Van Mol and Dr.
 8    Grossman and the individuals who authored the reports,
 9    did you use the people that you contacted in any other
10    capacity?
11           A    No.
12           Q    And what was the scope of the agreement
13    between AHCA and each consultant?
14           A    So each consultant, of course, they provide us
15    their hourly rate.  We wrote up purchase agreements that
16    those amounts cannot exceed $35,000 because of the
17    nature of the procurement.
18           Q    Can you speak a little bit more to that?  I'm
19    not -- I'm unfamiliar with the way that -- the
20    regulations that govern that.
21           A    So if it were to exceed $35,000, it would have
22    to be a competitive procurement, and that's why -- so
23    the -- so we, of course, we enter in agreements with
24    each of these experts.  The amounts paid to them cannot
25    exceed 35,000.
```

1      Q     Okay.  What was each vendor -- in procurement

2   of consultants, was this the usual procedure?  I'm

3   sorry.  In contracting.

4      A     Yeah, this is the procedure that we can

5   follow.

6      Q     That you can follow, but is it the usual

7   procedure?

8      A     Well, I mean, what is defined by a usual

9   procedure?  I mean --

10      Q     How many times in prior GAPMS have you

11   contracted with a consultant to develop the GAPMS?

12      A     Well, we haven't, but then there are

13   instances -- I know with coverage determinations, et

14   cetera, that sometimes we will actually send stuff for a

15   physician review, like over at EQ Health Solutions.  So

16   it's not unusual for us to ask for medical experts or

17   clinical expertise on a prospectus.

18      Q     Had you ever previously contracted and paid

19   the person for that clinical expertise?

20      A     No, we had not.

21      Q     What was the total budget allocated to the

22   development of the GAPMS?

23      A     You know, 35,000 times seven.  That'd be

24   210 -- 245,000.

25      Q     So each consultant is capped at --

1      A    That was the cap of the budget.

2      Q    And is that 34,999, or 35 straight?

3      A    I'm leaning towards 34,999, so we can subtract

4  $7 from that amount.

5      Q    Okay.  Has each consultant been paid in full

6  for that work?

7      A    Each consultant has been paid in full for the

8  work they completed.

9      Q    Okay.  Some of those consultants now, though,

10  are acting as experts in this case and being reimbursed

11  for that, as well?

12      A    Those would be under separate agreements.

13      Q    Okay.  In the example you just gave about

14  using outside physician consultants for the other GAPMS,

15  did AHCA pay those other consultants?

16      A    For other GAPMS?  Those consultants are

17  usually salaried or have hourly rates from our

18  subcontractors.

19      Q    Okay.  Okay.  But you didn't enter into any

20  kind of vendor agreement with them?

21      A    No, they're already employed by one of our

22  subcontractors.

23      Q    Okay.  Did all of the $35,000 paid to the

24  vendor -- paid to the consultants come directly from

25  AHCA?

Page 139

1        A    Yes.

2        Q    Was AHCA reimbursed by anyone else for those

3   consultant payments?

4        A    No.

5        Q    Other than through its subcontractors, has

6   AHCA ever previously retained outside consultants to

7   undertake a review of the evidence-based clinical

8   practice guidelines for GAPMS?

9        A    Well, previously, we did actually have -- of

10  course, we discontinued it, but we did have PAYS, which

11  was back -- and we had it throughout 2017 -- which was a

12  course and evidence review guide program that I had to

13  subscribed to.  We did have that and often referenced

14  that in the early days, but after the amount of time,

15  and because it was an expensive subscription, we

16  discontinue it.

17       Q    So that was a subscription service.  Do you --

18  can you recall any time that you engaged with an outside

19  consultant, other than those employed by your

20  subcontractors?

21       A    No.

22       Q    What about to undertake a review of

23  professional literature?

24       A    No.

25       Q    To actively participate by making a

1     recommendation or assessment as to the experimental or

2     investigational nature of the service?

3          A     No.

4          Q     Why didn't you use the subcontractors -- AHCA

5     subcontractors, why didn't you rely on their expertise

6     in developing the June 2022 GAPMS?

7          A     Because of this GAPMS and because of the

8     nature of the subject.  We did anticipate litigation

9     after -- once the report was done and once we were

10    working on it.  So because of that anticipation, we

11    needed to have experts that were -- that did have a

12    degree of expertise in this field.  Our subcontractors,

13    their practices are more like general practitioners, or

14    may be specialized in other areas, and they wouldn't be

15    able to adapt quickly enough to the learning curve to

16    provide a valuable assessment.

17         Q     So you were concerned about attacks litigation

18    might have on the integrity of that report itself?

19         A     Can you repeat that?

20         Q     Well, you said that because you anticipated

21    litigation, that's why you engaged with consultants who

22    had expertise, in particular --

23         A     The Agency needed as robust a report as

24    possible.  So because we needed such a robust report,

25    and because of the HHS guidance, the Department of

1   Health, so the fact that there were published documents

2   out there, the Agency did need to come up with a

3   response that we needed to disseminate as robust as

4   possible, and that's why we engaged with the outside

5   experts.

6        Q    Why is gender-affirming care different from

7   any other Medicaid service?

8        A    Well, I'm going to defer to GAPMS process and

9   our GAPMS report.  For -- for the response to that is

10  that gender-affirming care, of course, we are looking

11  at, like, a treatment model that has very weak and

12  low-quality evidence supporting it.  And because we did

13  a review and assessment of the literature, because there

14  are a lot of claims made, especially by HHS, in

15  particular, about its efficacy, because of its nature,

16  because of -- and because of the low-quality evidence,

17  that's how we deemed it.  I mean, it is a different sort

18  of care than we can consider traditional.

19       Q    The GAPMS process is used to determine whether

20  a Medicaid service is experimental, right?

21       A    Yes.

22       Q    So then that question is presented in any

23  Medicaid service you're evaluating under GAPMS?

24       A    That's right.

25       Q    So why is gender-affirming care different?

1        A      I'm going to defer to the conclusions we drew

2    in the GAPMS report.

3        Q      Why did you anticipate litigation before you

4    even reached a decision?

5        A      Well, I think that's because, I mean, this is

6    often a very touchy subject.  It's something that's

7    frequently seen in the mainstream media.  And, of

8    course -- of course, the documents from HHS.  It is a

9    high-profile issue.  It's considered by many to be

10   controversial.  So that should -- that's kind of why we

11   did anticipate potential litigation resulting from

12   whatever determination we made.

13       Q      Why didn't you need gender dysphoria experts

14   from the prior gender dysphoria GAPMS?

15       A      For the prior ones?

16       Q      Uh-huh.

17       A      So for the prior ones, I think at the time --

18   I mean, we have to take it in context at the time, and,

19   of course, these were done piecemeal, these were all

20   separate reports, not one large one.  So in the

21   course -- at the time because this wasn't viewed as far

22   as a potential hot topic, there wasn't the HHS guidance

23   at the time, that's -- I think the best explanation as

24   far as to why we decided not to engage with consultants.

25       Q      HHS releases guidance all the time, though,

1   about coverage?

2        A     Uh-huh.  That's correct.  It does.

3        Q     Did you anticipate litigation for the 2016

4   GAPMS memo on puberty suppression therapy?

5        A     The staff of the Agency who were present for

6   that determination are no longer with the Agency, so we,

7   in our current capacity, can't speak to that.

8        Q     Did you undertake any research to derive an

9   answer for that question?

10       A     No, we didn't.

11       Q     Did you look at any past memos related to

12  whether or not the GAPMS might have litigation

13  initiated?

14       A     It's always a concern with every coverage

15  determination and every GAPMS we do because inevitably,

16  if we do say no to a service, there's going to be

17  disappointed party.  So it is a consideration we always

18  have in place that there might be litigation.

19       Q     Well, then that brings me back to the question

20  as to why gender-affirming -- why this GAPMS is

21  different?

22       A     Well, this brings us back to the present

23  circumstances behind how much attention the subject's

24  been drawing in the media.  The -- and it goes back also

25  to the HHS guidance, which was making claims based on

1    evidence that we determined was insufficient.

2         Q    So I only listen to NPR, I'll be honest.  I

3    don't watch any news.  What media?  Where's this a hot

4    topic in the media?

5         A    Oh, I mean, let's see here.  I mean, we can

6    name a lot of sources.  I also -- I do listen to NPR

7    myself.  So NPR actually does periodically have an

8    article on it.  Then, of course, let's see here, there's

9    quite a few other sources of things listed here.  CNN,

10   MSNBC, ABC, NBC.  Your major outlets.  New York Times.

11   The Guardian.

12        Q    How long has the media coverage been going on

13   for?

14        A    So as far as media coverage goes, well, the

15   media coverage, there's always been smatterings of it

16   here and there, but I think when -- as far as it

17   becoming a consistent theme probably the past year.  But

18   that's not me speaking on behalf of the Agency, that's

19   me speaking from personal observation.

20        Q    Okay.  Fair enough.  Did AHCA share any of the

21   draft consultant reports with external entities?

22        A    We did not.

23        Q    The Governor's office?

24        A    We did not.

25        Q    Department of Health?

1     A    We did not.

2     Q    No one?

3     A    No, they stayed internal.

4     Q    Did AHCA provide any material to the

5     consultants to review in drafting their reports?

6     A    No, we did not.

7     Q    Did AHCA edit the reports of the consultants?

8     A    There was some copy editing for style and

9     grammar.  Other than that, no, we did not make edits to

10    the content.

11    Q    So no substantive edits?

12    A    No substantive edits.

13    Q    And that includes Lappert's report?

14    A    That includes Dr. Lappert's report.

15    Q    And Dr. Donovan's report?

16    A    And that's for Dr. Donovan.

17    Q    And did any of the consultants provide edits

18    to the AHCA GAPMS report?

19    A    So after we finished the draft, we did send

20    drafts to Doctors Grossman and Dr. Van Wol and they

21    provided some feedback, but none of the feedback met --

22    were made -- resulted in drastic changes.  I think -- I

23    think Dr. Van Mol suggested we -- there's one more

24    article we could discuss, and we added some content in

25    there regarding that.  They did help us correct some

1   terminology errors.  There are some -- so there are some

2   technical edits that were made.  But as far as anything

3   substantive, my first draft, I mean, was largely intact

4   by -- from the first draft process to when we had the

5   final draft.

6        Q    Okay.  And you were the only person involved

7   in making the first draft?

8        A    I can articulate a little bit more on how that

9   went.  So while the experts -- while the experts were

10  composing their reports, I was composing mine.  And once

11  we had their reports, then that was -- then we did

12  add -- we added some snippets from their reports in our

13  report to make it more, I guess you could say,

14  cumulative.

15       Q    Okay.  So only after the consultants who wrote

16  a report, those reports were done, then you pulled some

17  of that information into your --

18       A    Correct.  So my section was complete when we

19  started receiving their reports.

20       Q    Okay.  Okay.  What was the date of your first

21  draft?

22       A    I think the date of my first draft -- let's

23  see here -- want to say early to mid May.

24       Q    Okay.  So, like, second week of May-ish?

25       A    Somewhere around there, yeah.

Page 147

1      Q    Going back to the edits that the consultants

2   provided to your report, what terminology had to be

3   corrected?

4      A    What was it?  I mean, it was some medical

5   terminology.  I don't remember the specifics.  I mean,

6   it was very, like, miniscule changes.

7      Q    Where they red lines in, like, a Word

8   document?

9      A    No, the edits were given to me verbally and I

10  made them -- sometimes I made them right there when we

11  were talking to them.

12     Q    Okay.  You stated in your declaration filed

13  with the court on January 25th, 2023, that the only

14  sources you relied on for the June 2022 GAPMS, were

15  those cited in the works cited section of the report; is

16  that a correct statement?

17     A    That's correct.

18     Q    So that means that the only sources that you

19  consulted or considered -- or cited in the June 2022

20  GAPMS report?

21     A    During the -- yeah, during the writing of the

22  GAPMS, those were the sources consulted.

23     Q    Nothing else?

24     A    During the drafting of the report, nothing

25  else.

1      Q    What about after?

2      A    Afterwards, more out of intellectual

3    curiosity, I did want to try to see what else was out

4    there, but that was more for personal intellectual

5    curiosity than it was for professional purposes.

6      Q    Okay.  What were those things that you

7    reviewed?

8      A    Articles by Jack Turban.

9      Q    Can you spell his last name?

10     A    T-U-R-B-A-N.

11     Q    I'm not familiar.

12     A    Well, it's -- he is cited in our report, but

13   he also is -- he's frequently quoted a lot, so I was

14   curious to see what other in print articles he had

15   produced.

16     Q    Quoted in what?

17     A    He's often cited in, like, news stories,

18   media.

19          MS. DEBRIERE: Simone just got a note that

20       folks are having trouble hearing me.

21   BY MS. DEBRIERE::

22     Q    All right.  When you were considering whether

23   the services listed at 59-G-1.050(7) were experimental,

24   did you evaluate whether excluding those services would

25   be budget neutral?

1          A      No, we did not.

2          Q      Did you consider whether private insurance

3     covers the services excluded by 59-G-1.050(7)?

4          A      For this one we didn't, but primarily when we

5     do GAPMS, we really aren't interested in public and

6     private insurers.  We're primarily interested in state

7     Medicaid programs and Medicare since, like, Florida

8     Medicaid, they're public payers.  So primarily, we

9     really want to know what the public payers say.

10    Usually, our lowest priority for GAPMS is to provide

11    analyses of what private payers pay.  And generally,

12    often we need those to supplement if we're unable to get

13    that many policies from Medicaid programs across the

14    nation, but since it's -- for this GAPMS, we actually

15    surveyed all 50 states, then we had adequate information

16    from that.  Most GAPMS reports, usually we get maybe 10

17    or 12 when it comes down to coverage policies, it's --

18    it's pretty much what we can find in a certain amount of

19    time.  But for this one, we've -- since Dede Pickle was

20    working on it independent, she was able to survey all

21    50.

22         Q      And why is it covered under private insurance

23    informative of whether or not a service is experimental?

24         A      Can you repeat that?

25         Q      Uh-huh.  Why don't you rely on -- why don't

1  you consider private insurance coverage to be

2  something -- I'm having trouble formulating what should

3  be a simple question.

4           Why don't you look at private insurance

5  coverage when you're determining whether or not a

6  service is experimental?

7       A    Well, private insurance works differently.  I

8  mean, Florida Medicaid, like Medicare, is a

9  taxpayer-funded health care system.  Private insurers,

10  since they're privately funded, there's a great deal

11  more latitude, what they can cover and what they don't

12  have to cover, and they're more subject to the

13  competition of the market, as opposed to Medicaid

14  programs.  So we -- while we do -- some often will look,

15  but often it's -- we often try to find what private

16  payers pay for following what we get from Medicare and

17  Medicaid.  So, I mean, when it comes down to it, we can,

18  but it's not an absolute requirement, and we really do

19  want to find out what the Medicaid programs are paying

20  for.  That's our first and foremost criteria for looking

21  at the coverage of -- other payers coverage.

22       Q    So it's not apples to apples, because in

23  Medicaid and Medicare, you've got state taxpayer dollars

24  to consider, correct?

25       A    That's correct.

1      Q      Okay.  But when you undertook the June 2022

2   GAPMS, you did not evaluate whether or not excluding

3   those services would be budget neutral?

4      A      No, we didn't for this one, but we -- but

5   that's also not necessarily unique to this, as well.

6      Q      So in other GAPMS, you've not evaluated the

7   budget neutrality of the service, whether or not you're

8   going to cover it?

9      A      That's correct.  In the GAPMS I did in 2017,

10  for, I think, like the nitrous oxide of -- pretty much

11  like an adjuvant to this, kind of jumped-up asthma test,

12  we didn't do a cost budget analysis because, like, we

13  weren't going to cover, it's not going to affect

14  anything.

15     Q      So then you did evaluate whether it was budget

16  neutral.  You won't be covering it, so, therefore, it

17  was neutral?

18     A      Well, we just -- we just don't -- we just

19  don't do one, because, I mean, we're not covering it.

20  So it comes down to if we were going to make a coverage

21  determination, that's when you do a fiscal analysis.  So

22  a coverage determination is definitely turned into a

23  fiscal -- it needs -- it needs a fiscal analysis,

24  because we're -- need to find out whether or not we're

25  going to be able to stay within our budget.

1    Q    I see.  I see.  So in this instance, because

2    we are talking about the only GAPMS that excluded a

3    service previously covered, did you do anything to

4    determine whether or not that would cost or save the

5    state money?

6    A    No.

7    Q    I think you have -- you brought information

8    with you today about this.  How did you collect state

9    Medicaid program coverage data?

10   A    So on that spreadsheet, so Dede Pickle, she

11   went across the -- yeah.  So she --

12        MR. JAZIL: Do you want to mark it as an

13        exhibit?

14        (Whereupon, Exhibit No. 13 was marked for

15   identification.)

16        THE WITNESS: She surveyed 50 states and I

17        think territories -- even up in the territories --

18        and was looking to see what their stances were on

19        gender-affirming care, to see whether or not they

20        had statements saying that they will cover it or

21        policy saying that they wouldn't.  And then

22        there -- those that just didn't have a policy

23        available, or had no policy in place.

24   BY MS. DEBRIERE::

25        Q    So Dede Pickle was the one who put together

1    the spreadsheet?

2         A    Yes.

3         Q    Okay.  And where did she look to find this

4    information in each state?

5         A    Well, she went to their state Medicaid web

6    pages, looked at their -- like, their coverage guides or

7    materials in each state Medicaid -- Medicaid programs.

8    There can likely be idiosyncrasies.  I mean, some

9    have -- some are like ours, have a ton of coverage

10   policies, others are like Texas, Texas has one gigantic

11   coverage policy, which actually does -- despite the fact

12   it's huge, it's actually kind of more efficient.

13   It's -- you can get everything from there.  But

14   that's -- that's what they do in Texas.  Everything's

15   bigger in Texas.  But she went and looked at all of the

16   different state -- various state Medicaid programs and

17   saw what their policies were and saw what was available.

18   And, of course, put the findings in the GAPMS report.

19        Q    Did she only do an online search?

20        A    Yeah, it was only an online search.

21        Q    Did she contact any of the Medicaid programs?

22        A    No.

23        Q    Did she look at any of the policy reporters?

24        A    No, we -- no, we didn't use policy reporter

25   for this GAPMS.

1      Q     So just looking at the state's Medicaid Agency

2  websites?

3      A     For the Medicaid, yes.  But, generally,

4  without having worked in Medicaid, one of our research

5  criteria for across all kinds of reports and projects is

6  that we do want to see what other states do.  And so

7  that gives us a great deal of familiarity of how to

8  navigate other states' programs.  And one of our side

9  projects is the statewide Medicaid managed care program.

10  And, of course, we're always looking to see what other

11  states are doing.  So we get a great deal familiar with

12  how to navigate the web pages of other states.

13      Q     So at least half the states' Medicaid programs

14  explicitly cover pubertal suppression treatment for

15  gender dysphoria, is that correct?

16      A     Based on -- based on the findings of the map.

17  So what -- so I will defer to the findings on the map.

18      Q     Only ten exclude?

19      A     Defer to the findings as stated in the map.

20      Q     Okay.  How about we do this:  Based on the

21  findings in the map, only 10 states explicitly exclude

22  pubertal suppression therapy.  How did you take that

23  into account when you reached the conclusions that you

24  did about the services being experimental, that

25  particular service being experimental?

1      A    As far as that goes, it's informational, but

2   there was -- there was a divide between states that do

3   cover and states that don't.   Primarily when making the

4   determination we focus -- we really focused on the

5   evidence and what the evidence said about treatments for

6   gender dysphoria since the Medicaid program -- since

7   there is -- seems like there's an absence of policies

8   for a lot of states.   There are some states that come

9   out and say yes, and then there are some states that say

10  no.   There is a -- there's a divide and you can even

11  potentially say like there could be a debate between

12  amongst the 50 states plus territories of whether or not

13  coverage is appropriate.

14      Q    But you did say earlier on that you -- whether

15  a service is covered under the other state Medicaid

16  programs is usually a factor that you weigh heavily in

17  determining whether a service is experimental.

18          MR. JAZIL: Object to form.

19          THE WITNESS: So when it comes down to it --

20      it's like, so often, it's not just other Medicaid

21      programs, but also Medicaid programs are similar to

22      Florida.   There are some Medicaid programs -- I'll

23      name two -- New York and California that are --

24      that cover things very, very liberally, as far as

25      services.   Like, these added everything in their

1          fee schedules, where Florida Medicaid -- and

2          Florida Medicaid prides itself on being a very

3          fiscally responsible Medicaid program.  So often we

4          try to see what states that are similar to our

5          Medicaid program, what they do.  But we also do

6          see, we see overwhelming amounts of coverage from

7          states like us and states across the union, then

8          that does factor in our decision, but for in this

9          circumstance, because there is a split, if we were

10         going to have to more -- rely more so on the

11         evidence, than the notion that all these states

12         cover services, there -- it's not -- it's not

13         unanimous at all.

14    BY MS. DEBRIERE::

15         Q     Did you ever contact the states that

16    explicitly exclude and ask them why they explicitly

17    exclude?

18         A     We did not.

19         Q     Did you ever call those states that have no

20    coverage statement one way or another and ask them?

21         A     We didn't reach out to states.  I mean, their

22    policy's online.  I mean, that -- I mean, their

23    published policy is sufficient to give us the responses

24    we need to look at -- to look at it.  Even for other

25    GAPMS, we don't contact other states.

1        Q        Did you analyze how much Florida Medicaid

2    spends on -- spent on treatment for gender dysphoria

3    prior to the categorical exclusion?

4        A        No, we did not.

5        Q        Do you have any plans to reevaluate your

6    findings in the GAPMS report based on the September 2022

7    release of the WPS standards of care version eight?

8        A        So in the immediate term, well, we don't,

9    so -- but, I mean, we can reopen the GAPMS later on,

10   there is -- there is a process for that.  But generally,

11   I mean, these standards of care, I mean, based on the

12   release of one set of new standards of care, I mean, for

13   the time being we don't have any immediate plans, not

14   based on the release of one new update.

15       Q        Okay.  How long did you personally work on

16   that initial draft of the June 2022 GAPMS report?

17       A        Oh, I was working on it pretty much until the

18   day it came out.

19       Q        And you started that second week in May?

20       A        Well, no, that was after I had the very first

21   initial draft done.

22       Q        Okay.  So tell me when you first started

23   working on it.

24       A        April 20th.

25       Q        Okay.  So from April 20th until when it came

1   out.  Published on what -- well, we know that it was

2   first reviewed by your higher-ups on June 1st.  So April

3   20th to June 1st?

4          A     Yeah, that's sufficient.

5          Q     Okay.  And you worked with Nai Chen and Dede

6   Pickle.

7          A     Uh-huh.

8          Q     Did you read all of the articles in the

9   work-cited section?

10         A     I read every single document in that works

11  cited section.

12         Q     88 articles?

13         A     All of them.

14         Q     Okay.  Were you able to read everything,

15  understand it, and draft a report in --

16         A     Yes.

17         Q     How often during that time period did you

18  communicate with the consultants?

19         A     Oh, I think between four and five times.

20         Q     And four or five times over that entire time

21  period?

22         A     Yeah, during those time periods, yes, we

23  have -- periodically have, like, a one-hour discussion

24  with them.

25         Q     So you talked to them about five hours total

Page 159

1    over that time period?

2         A    I think that's a valid estimate, yes.

3         Q    Okay.  Do you think it's more than that, like

4    more like 10 hours?

5         A    No.

6         Q    Okay.  Turning back really quickly to the

7    amount of -- the cost of treatment for gender dysphoria.

8    How much was spent on the coverage of gender dysphoria

9    versus how much was spent -- strike that.

10        Do you know how much, prior to the adoption of

11   the categorical exclusion, how much annually AHCA spent

12   on the coverage of gender dysphoria?

13        A    We did not.

14        Q    Are you able to obtain that information?

15        A    Our data analytics between managed care plans

16   paid per claim, and anything in fee-for-service, our

17   data bureau could probably muster that up.

18        Q    Is there a way that we should ask for that

19   information to make the question clearer?

20        A    You'd want to -- you would -- to put in a

21   request we would need diagnosis code, we'd need NDC, and

22   we would need CPT codes.

23        Q    And what's NDC?

24        A    National Drug Code.

25        Q    Okay.  And then for surgery, what would you

1  need?

2      A    You would need the corresponding CPT code.

3      Q    Okay.  So you need the diagnostic code, the

4  NDC for drug coverage, and the CPT code?

5      A    And the time -- the date ranges.

6      Q    And the date ranges.  Okay.  And then you

7  could tell us how much AHCA -- or the Florida Medicaid

8  program paid in coverage of -- treatment for gender

9  dysphoria over a given period of time.  Okay.  When you

10  were communicating with the consultants about drafting

11  the June 2022 GAPMS report, what kinds of questions did

12  you ask?

13      A    Generally, questions about -- mostly just

14  questions about, like, articles, like studies, making

15  sure we have our bases covered, things like that.  We

16  wanted to make sure we didn't miss anything, or there's

17  anything glaring we -- because it isn't a piece of

18  academic work it is, it is -- mainly it's like a thesis

19  or a dissertation, because we make a case, we have to

20  support that case.  So we want to make sure we have our

21  bases covered.

22      Q    What were the consultants' positions on WPATH?

23      A    Their positions were that -- I think they

24  identified -- all they did was identified it as an

25  advocacy group, like a combination of clinical

1  professionals, plus advocates, community activists can

2  join it.  So that -- it's kind of a hybrid organization,

3  that they explained that to us.  So that was pretty much

4  all the information they gave.

5       Q     And you felt like that was an adequate

6  explanation of what WPATH was?

7       A     Yes.

8       Q     What about the Endocrine Society?  What was

9  their position on?

10      A     Their position was the Endocrine Society. I

11  mean, it is an established clinical organization.  They

12  felt like the other guidelines, they had released

13  guidelines, but the Endocrine Society was transparent in

14  releasing their guidelines.  They did clarify that their

15  recommendations were based on weak or very weak

16  evidence.  They also clarified that their guidelines

17  were not a standard of care, that they were just

18  guidelines.

19      Q     And that's the Endocrine Society.  Who does

20  that -- or your consultancy, who did that?

21      A     The Endocrine Society.  So the Endocrine

22  Society, in the text of their guidelines, they do

23  identify each line of the treatment model, like the

24  puberty suppression, the cross-sex hormones and

25  surgeries.  Primarily the hormones is the Endocrine

1   Society, but they are very clear that it's either low-

2   or very-low-quality evidence that supports it, and they

3   also do put that disclaimer on there, this is not a

4   standard of care.

5        Q    What was your -- what was the consultants'

6   position on the American Psychiatric Association's

7   recommendations for gender-affirming care?

8        A    It didn't come up in the conversations.

9        Q    Okay.  How about the AAP?

10       A    The AAP was that the evidence available to

11  support the AAP's positions wasn't sufficient.

12       Q    Okay.  What about the AMA?

13       A    We didn't talk about the AMA.

14            MS. DEBRIERE: Okay.  So I would like to -- do

15       you have the exhibit of the Medicaid policy routing

16       and tracking form for the June 2002 GAPMS?

17            MR. JAZIL: Can you re-mark on this --

18            MS. DEBRIERE: Yes, please.  I think -- I need

19       a bigger one.

20            (Whereupon, Exhibit No. 14 was marked for

21       identification.)

22            THE WITNESS: Yeah, that new formulation makes

23       it taste just like the real thing.

24            VIDEOGRAPHER: It's pretty good.

25            MR. JAZIL: See, we're finding common ground.

1          THE WITNESS: Wasn't, like, Coca-Cola and all

2      their peace commercials, they were holding hands

3      around the world?  That was from the '70s, I think.

4  BY MS. DEBRIERE::

5          Q     Okay.  So I'm handing you what's been marked

6  as Plaintiff's Exhibit 14.  It's the Medicaid policy

7  Routing and Tracking Form for the June 2022 GAPMS.

8  There's a start date column there.  What's that mean?

9          A     That's a start with the routing process.  So

10  generally, for this, usually -- usually they try to

11  provide like a window.  We always have, like, a window

12  of review.  So for this, we enter the dates in the

13  system.  The GAPMS is routed to first -- well, actually,

14  since my supervisor Dede was out, I was her delegate, so

15  I did sign on her behalf.  Then it went to Ann Dalton

16  who signed.  And, of course, Secretary Weida, of course,

17  signed in his role, and then went to Deputy Secretary

18  Wallace.

19          Q     Okay.  So start date's when the document hits

20  their desk?

21          A     Yes.

22          Q     Okay.  And then end date's when they've

23  reviewed it and passed it on?

24          A     Yes.

25          Q     Okay.  Date received is going to measure the

1    date that it hit their desk, but they didn't necessarily

2    pick it up and start reviewing it?  I'm trying to

3    understand what's the difference between --

4        A    Date received should be when they got it.

5        Q    Okay.  And the start date's when they start

6    reviewing it?  What's the difference there?

7        A    Start date, end date -- yeah, that should be.

8        Q    And the approval column means that the GAPMS

9    was approved by each person that checked the box and

10   initial by it?

11       A    That's correct.

12       Q    Okay.  So the June 2022 GAPMS report, which is

13   46-pages long and contains five separate reports from

14   AHCA consultants, it was reviewed and approved by each

15   person on this list in one day?

16       A    Yes.

17       Q    And all four people on this list reviewed and

18   approved the June 2022 GAPMS report in the span of two

19   days?

20       A    Uh-huh, that's correct.

21       Q    Oh, I see there MB for DVP.

22       A    Yeah.

23       Q    Why choose to adopt the 2022 GAPMS report into

24   rule?

25       A    Because -- so since we had determined it to be

Page 165

1   experimental and investigational, so we decided that we

2   didn't need to make the -- based on the evidence, based

3   on what the GAPMS said, the categorical exclusion

4   promulgating the rule is necessary.

5          Q     Okay.  So you adopted into rule because it was

6   a categorical exclusion?

7          A     It was going to be, yes.

8          Q     When was that decision made?

9          A     The decision that was made -- the decision to

10  make -- to make a new categorical exclusion, of course,

11  that was not going to be made until after we had

12  completed the GAPMS report and signed off on, because

13  obviously, had either the experts had they disagreed

14  with one another, or if I'd come up with a different

15  conclusion, can't make a categorical exclusion unless

16  everyone was in sync.  So it was one of those things

17  where had -- had the expert opinions disagreed with each

18  other, had I come up with a contradictory conclusion,

19  there -- you had -- we had to wait until after the

20  report was done before we'd sign whether or not to

21  proceed with the categorical exclusion.

22         Q     And when was the decision made to adopt it

23  into rule?  Was that at the same time that you decided

24  to make it a categorical exclusion?

25         A     That was made after we had had the report

Page 166

1    signed and done.

2          Q    Okay.  Sorry.  I need to be more specific.

3    What date was that decision made?

4          A    Well, I think it was probably made June 2nd.

5          Q    Okay.  And who made that decision?

6          A    That would have probably have come down from

7    Secretary Marstiller, that would have come down from

8    now-Secretary Weida, and it would have come from our

9    General Counsel, Josephina Tamayo?

10         Q    Why would it have come from those people?

11         A    So -- because, of course, with our General

12   Counsel, with our Secretary, I mean, they do make the

13   decisions for the Agency.  It's not out of the -- I

14   mean, it is typical in their role to make a decision to

15   promulgate something into rule.

16         Q    Would that generally, though, be handled by

17   the Bureau of Medicaid policy?

18         A    Sometimes.  It depends on -- depends on the

19   nature of the rule change.  Depends on where -- where

20   it's originating from.

21         Q    How often has that decision come from the

22   Medicaid Secretary?

23         A    So let's -- so to talk about the rulemaking

24   process a little bit.

25         Q    Yeah.

Page 167

1      A     So rule -- proposes for rule changes come from

2   all different directions and --

3      Q     Let's back up.  Instead of talking generally

4   about rule changes, let's talk about changes to coverage

5   policies.

6      A     Those can be made by our Deputy Secretary.

7   Those can come from the Secretary.  I mean, anyone

8   who --

9      Q     How often does that happen?

10     A     We can't speak to how often it happens.  I

11  mean, it does happen.

12     Q     Had it happened more with the Bureau of

13  Medicaid policy?

14     A     You mean, those in Medicaid policy who

15  initiated these changes?

16     Q     More often than not?

17     A     I actually would probably say not.

18     Q     Oh, okay.  I'm just -- I'm surprised because

19  we learned from Ms. Dalton that the -- both the

20  rulemaking process and the coverage policy units are

21  housed within the Bureau of Medicaid policy.

22     A     Well, that's correct, they are, but often

23  they're responding to directives given to them from

24  either senior leadership or legislative changes.

25     Q     Okay.

```
 1        A    So, yeah, while they are the ones that
 2   implement and write and craft the new policies or update
 3   the policies, they're often not the ones that are
 4   piloting these new policies.
 5        Q    Or initiating the decision as to whether or
 6   not --
 7        A    Precisely.
 8        Q    -- or adopt them into rule?
 9        A    Correct.
10        Q    So you said that it was the decision to adopt
11   into rule was made on June 2nd, is that correct?
12        A    That's correct.
13        Q    Okay.  And the notice of rule development,
14   that was issued on June 3rd, correct?
15        A    Yeah.
16        Q    I swear.
17        A    Yeah, I'm deferring to the record on that.
18        Q    Sure.
19        A    The rulemaking process is highly documents, so
20   I'm going to be deferring to the documentation for the
21   rulemaking process.
22        Q    Okay.  So it took less than 24 hours for AHCA
23   to decide to adopt the conclusion in the 2022 GAPMS
24   report into a rule?  And even less than that, because
25   you made it the same day that the report was released,
```

1    correct?

2        A    Yes.

3        Q    And at that time, you also knew which section

4    of 59-G it was going to go into?

5        A    Yes, we did.

6        Q    And who had to sign off on that decision?

7        A    So all of our -- so whenever we adopt a rule,

8    it does go through a lengthy routing process.  So it

9    does start -- the process starts in the Bureau of

10   Medicaid Policy, starts with the rules -- we have a

11   rules unit.  That gets signed off on, then it goes to

12   the AHCA administrator authorities section, they have to

13   sign off.  Then after that it goes to the Bureau Chief

14   of Medicaid Policy.  Of course, likewise, they have to

15   review and sign off.  Then it goes to the Assistant

16   Deputy Secretary of Policy and Quality.  They have to

17   sign.  Then, of course, the Deputy Secretary for

18   Medicaid has to sign.  General Counsel's Office has to

19   sign.  And then the Secretary is privy to all the

20   changes.  And if Secretary decides like, wait, wait, we

21   can't do this or, no, there's a problem, yeah, that

22   sometimes can result in a frustrating headache, because

23   it takes a lot of work to get something that far.

24       Q    Well, so the decision to adopt a categorical

25   exclusion to rule was made on June 2nd and the Notice of

1   Proposed Rule was made on June 3rd.  So it was routed

2   through that entire process in less than 24 hours?

3        A   Are we talking about the GAPMS or the rule?

4        Q   The rule?

5        A   Yes.  And that -- and that's not unusual

6   sometimes for -- for the process to move very quickly.

7        Q   Okay.  Because you just made it sound like it

8   was a very lengthy process.

9        A   It is with the number of people, but it's --

10   the rule content is very -- it's a very small addition.

11   It's not like a brand new coverage policy, because

12   often -- it depends on the nature of the rules.  Like

13   one addition, that can move fast.  Sometimes with --

14   like, for instance, in my experience as a program

15   administrator, we completely overhauled the community

16   behavioral health policies.  That was five new coverage

17   policies.  So that, of course, is going to require a

18   much lengthier review process rather than a quick

19   amendment to a rule.  So it really depends on the nature

20   of the rule.  If it's a very lengthy coverage policy,

21   yeah, that can take some more time if it's -- but if

22   it's like adding a few bullets or amending a line, that

23   can -- that can move along much faster because the

24   review time's just not -- a lengthy review process is

25   not necessary.

1       Q      Or deciding to eliminate three types of

2    services that were previously covered by Florida

3    Medicaid?

4       A      Correct.  And, of course, but -- and, of

5    course, we have the GAPMS memo to substantiate that.

6       Q      Okay.  Okay.  So speaking to the rule, it bans

7    Medicaid coverage for -- puberty blockers or cross-sex

8    hormone therapy and surgery if done so to treat gender

9    dysphoria, correct?

10      A      That's correct.

11      Q      But not to treat other diagnoses?

12      A      Not to treat other diagnoses.  Only for the

13   diagnosis of gender dysphoria.

14      Q      Okay.  Is this the only time that GAPMS has

15   been used to categorically eliminate coverage of

16   treatment for a particular diagnosis?

17      A      For the one -- I think pretty much since the

18   institution of the GAPMS process, I think this was a

19   first.

20      Q      Once the decision was made to adopt the

21   conclusions of the 2022 GAPMS report into rule, who was

22   in charge of that process?

23      A      So our rule promulgation process, Cole

24   Gerring, he oversees the rule promulgation process for

25   our coverage policies and administrative rules for

1    Medicaid.

2         Q    Does he head the Rules Unit under the Bureau

3    of Medicaid policy?

4         A    Yes, he does.

5         Q    Who drafted the actual language for the rule?

6         A    I believe -- I believe he drafted the

7    language.

8         Q    Did anybody revise it or have any input

9    that --

10        A    There was input.  So I mean, there were some

11   discussions.  I remember we did have a meeting with

12   everyone to -- between, I think, like, Sheena Grantham,

13   myself, I think Dede Pickle, I think Secretary Weida, I

14   think like Sheena Grantham from General Counsel's

15   office, since rules are her area.  I think there were

16   there was a -- there was a discussion on making sure

17   this was the finalized content we wanted.

18        Q    And how long did that discussion take?

19        A    About an hour.

20        Q    Okay.  And what kinds of topics were discussed

21   during that?

22        A    Just determining how granular we should get,

23   mostly.

24        Q    Okay.  Okay.  Was there any conversation about

25   whether adopting this categorical exclusion might

1   violate comparability under the Federal Medicaid Act?

2       A    No.

3       Q    What about EPSDT?

4       A    No, because since we already have the -- we've

5   already had the GAPMS report to substantiate the

6   overriding EPSDT guideline -- guidance and requirements.

7       Q    Because Florida Medicaid does not have to

8   cover a service under EPSDT if it's experimental?

9       A    That's correct.

10      Q    I had another question.  Talking about how

11  granular to get with the language, was there any

12  conversation about what the Federal Medicaid Act

13  requires in terms of prescription drug coverage?

14      A    I don't think so.  Not during that

15  conversation.

16      Q    Any other conversations had about that?

17      A    As far as the federal requirements for

18  prescription drug coverage?  No, I don't think we had

19  any conversations like that.

20      Q    Okay.  Any other conversations about

21  comparability under the Federal Medicaid Act?

22      A    No.

23      Q    So comparability under the Federal Medicaid

24  Act was not taken into consideration when adopting the

25  categorical exclusion?

1      A      No.

2      Q      Who planned the public hearing regarding the

3  proposed language in 59G-1.050(7)?

4      A      So for the public hearing, since we did

5  anticipate a larger than normal crowd, we -- so I think

6  that was a joint effort between Cole Gerring I think,

7  Chief -- now Chief of Staff Brock Juarez, then Chief of

8  Staff Cody Farrell, and I think -- I think Secretary

9  Weida also had a little bit of input when it came down

10  to selecting the venue and making sure that we had

11  adequate staff and then also arranging for security as

12  well.

13      Q      Why did you feel a need for security?

14      A      Because of this -- the controversial nature of

15  the change and how those with opinions on it -- those

16  with feelings about it, I mean, they are deep-seated.  I

17  mean, there's -- so because of the sensitivities

18  involved, we just felt that it would be best in the

19  event -- and we did think it was unlikely, but in the

20  event that someone might get upset or unruly, to have

21  security.

22      Q      Why did you pick the venue you picked?

23      A      Size and location.

24      Q      What factors did you take into consideration

25  for size and location?

1       A       That we would have adequate seating.   That, of

2   course -- of course, location where it was, being

3   downtown, so --

4           Q       Downtown being an easier location to get to?

5           A       Yes.

6           Q       Why did the location need to be easy to get

7   to?

8           A       Because, I mean, since -- I mean, you know, we

9   do government in the Sunshine, we wanted the hearing to

10  be accessible to as many people as possible, so we

11  wanted to be able to fill as many seats as we could.

12  The facilities here at AHCA weren't going to be

13  sufficient for that.   The Department of Transportation

14  auditorium was a very, very good venue, not just -- not

15  just to be able to provide those of us who were on the

16  panel visibility to the audience, but also just because

17  of the seating capacity.   So it just was an ideal venue

18  compared to what we had available at the Agency.

19          Q       Where do you normally hold rule hearings?

20          A       We usually hold them here.

21          Q       Why were you concerned about adequacy of

22  seating?

23          A       Because we did expect a large turnout.

24          Q       Why did you expect a large turnout?

25          A       Because of the amount of coverage that the

1   GAPMS report had received, because of everything that

2   we'd been seeing, as far as -- per previous news stories

3   prior to the release, we just knew that this was a

4   sensitive subject.  A lot of people have a deep-seated

5   conviction about it one way or the other, and we just

6   anticipated a large turnout.

7        Q    In the planning of the public hearing, did

8   AHCA communicate with the Governor's office at all?

9        A    No.

10        Q    Did AHCA communicate with Department of Health

11   at all?

12        A    No.

13        Q    Who participated in the public hearing from

14   AHCA?

15        A    So the participants from AHCA were myself,

16   Sheena Grantham, whose General Counsel's office,

17   Secretary Weida.  Those are the -- those are the three

18   of us who were on the panel for AHCA.  And, of course, I

19   think Cole Gerring handled the administrative procedures

20   and then I think to help -- help with crowd control, we

21   had, I think, Brock Juarez and some of the staff from

22   communications also helped arrange in making sure that

23   there's adequate seating, and just kind of serve -- just

24   helping out in any way, or any capacity that was

25   necessary, as needed.

1      Q     Did anybody at AHCA help facilitate the
2   attendance at the hearing?
3      A     There -- I think there's a speaker sign-in
4   sheet at the entrance.  I think that -- like, I think
5   one of the Agency staff under Brock at the time was --
6   was allowing people to sign in.
7      Q     Were there any particular people that were
8   encouraged to be at the hearing?
9      A     No.
10      Q     Are you aware of the Governor's office
11   encouraging anybody to attend the hearing, anybody in
12   particular?
13      A     No.  No.
14      Q     Did anybody pay someone to attend the hearing?
15      A     So for our -- for our experts, Dr. Grossman,
16   Dr. Van Meter and Dr. Van Mol, they were compensated for
17   their time spent at the hearing, or their time
18   traveling -- for Dr. Van Mol and Dr. Van Meter, their
19   time traveling and their travel expenses.  So we did
20   reimburse them, but that was it.
21      Q     Did that include the same agreement with the
22   $35,000 cap or was that a separate agreement?
23      A     I don't think it was a separate agreement,
24   because the three of them had not come anywhere close to
25   exhausting their caps.

1        Q      Did AHCA provide any materials to those

2   consultants prior to the hearing to review for the

3   hearing?

4        A      On the day of the hearing we gave -- we gave

5   them each bound copies of the report, but those

6   materials were already available online, so -- but we

7   just -- we just gave him paper copies or to reference

8   but nothing -- no other additional materials.

9        Q      You didn't provide them any other materials

10  other than the GAPMS -- the June 2022 GAPMS?

11       A      That's correct.

12       Q      To review prior to the hearing?

13       A      Correct.

14       Q      Did you have any meetings with the consultants

15  prior to the hearing to prepare for the hearing?

16       A      We had a couple -- there were a couple Zoom

17  calls.

18       Q      How long did those last?

19       A      About an hour?

20       Q      What kind of things were discussed during

21  those meetings?

22       A      Mostly the format.  You know, we were talking

23  about, like, of course, Dr. Grossman, who was not going

24  to be able to travel.  So we were talking about

25  technological arrangements.  I think with Doctors Van

1  Meter and Van Mol, we were mostly talking about travel

2  arrangements and, like, where they'd sit and so forth,

3  so I mean --

4       Q    Did you offer any questions that they might

5  anticipate from the audience and how they should

6  respond?

7       A    To our experts?  We didn't.

8       Q    And why was it necessary to have the

9  consultants there?

10      A    So -- well, since -- because we were actually

11  anticipating a crowd that was going to be largely

12  opposed to the challenge exclusion, we wanted to be able

13  to respond promptly and articulately to any comments

14  that were provided.

15      Q    If you wanted to respond promptly and

16  articulately to any comments that were provided, what

17  was the purpose of having a public hearing?

18      A    So the public hearing is to, of course, gather

19  feedback, but we also knew that we were likely going to

20  have either some type maybe medical professionals or

21  advocacy groups, or other advocates, and we did want to

22  be able to provide them with a little bit of engagement

23  to show that we do take their comments into

24  consideration, that we do think about them, that we do

25  engage with them.

1          Q      Did the consultants respond to any comments by

2     a supporter of the rule?

3          A      I don't think they did, actually.

4          Q      How about those that were opposed to the rule?

5          A      There was really -- I think Dr. Van Meter

6     responded once.   I think Dr. Van Mol responded once.

7     And Dr. Grossman didn't respond to anything.

8          Q      And that was -- both of those responses were

9     in response to individuals who were speaking in

10    opposition to the rule?

11         A      Yes.

12         Q      Have you ever participated in another rule

13    hearing where there is direct and prompt response to

14    public comment?

15         A      Yes.  Yeah, we do.  Yeah, I mean, I've

16    participated in numerous rule hearings here at the

17    Agency.  We do respond to comments.

18         Q      When you say we, do you mean the office staff?

19         A      Office staff, yes.

20         Q      What about consultants with which AHCA has

21    contracted?

22         A      We -- we generally don't -- we generally

23    don't.  It's a -- it was a unique experience for this

24    case, but we generally don't have contracted consultants

25    at our hearings.

1        Q    And where did the slogan, Let Kids Be Kids
2   come from?
3        A    So that came from within, I think, our own
4   Agency, our Communications Department or the Chief of
5   Staff's office.
6        Q    Was there any input in developing that from
7   outside entities?
8        A    No.
9        Q    So AHCA is wholly responsible for that slogan?
10       A    Yes.
11       Q    Was AHCA responsible for the printing off of
12   the stickers that had the slogan contained on it that
13   were being passed out at the hearing?
14       A    No.
15       Q    Do you know who was responsible for that?
16       A    We do not know where those came from.
17       Q    Is it normal to have slogans of an Agency
18   passed out at a rule hearing?  Have you ever seen that
19   before?
20       A    I have not seen that before, so -- but we --
21   that was not something that the Agency had anticipated,
22   and we certainly were not responsible for the passing
23   out of stickers with a slogan on it.
24       Q    Did outside counsel appear at the public
25   hearing?  Did AHCA outside counsel appear at the --

1        A     Yes, they did.

2        Q     Why?

3        A     Because, of course, sensitive nature.  I mean,

4    there were -- there were attorneys also -- there was --

5    because there was counsel that -- you know, who are

6    representing the plaintiffs who were also there.  We do

7    anticipate litigation, so it was -- we did see to it

8    that we had outside counsel there to gather information

9    and be able to observe the procedures.

10       Q     So AHCA had -- at the point of the public

11   hearing, AHCA had retained outside counsel to defend

12   against any potential litigation that the rule invited?

13       A     Yes.

14       Q     What was outside counsel's role at the

15   hearing?

16       A     Outside counsel's role, I think -- I think

17   just calling up the speakers as they came.  I think they

18   actually -- we had them helping out with the -- with the

19   hearing process and procedures.

20       Q     What kind of -- well, okay.  Did AHCA give the

21   consultants any instructions to prepare for the hearing?

22       A     Basic ones.  Most of -- I think, you know,

23   like to when responding that, you know, we would prompt

24   them to respond.  Basic -- very basic instructions.

25       Q     And so the instruction was that when AHCA

1    wanted someone to -- one of the consultants to respond,

2    you would prompt them to?

3         A    So, yes.  And during the hearing, Secretary

4    Weida would defer either to Dr. Van Meter or he would

5    defer to Dr. Van Mol when he needed -- when a response

6    was needed from one of them.

7         Q    Okay.  Just going back to the slogan really

8    quick, who in AHCA came up with that Let Kids Be Kids

9    slogan?

10        A    I think -- I think it was a -- I think it was

11   a team effort.  I think, like, it was Cody Farrell and,

12   I think, Brock Juarez.  I think they worked on the Let

13   Kids be Kids slogan.

14        Q    Anybody else?

15        A    No, it would have been primarily them.

16        Q    Who directed them to develop the slogan, or

17   was it their idea?

18        A    So the orders would have been given verbally.

19   We don't know, like, exactly how they were told to do

20   that specific slogan.

21        Q    When was the -- when was the slogan developed?

22        A    It was developed, I think, in the days

23   preceding the release of the report.

24        Q    When was the final draft of your report done?

25        A    So the final draft -- so the final draft as

1    far as -- so the very, very final draft, like the last

2    finishing touches, as much as copy edits, was done that

3    week of the 2nd, but as far as the substantive

4    components of the report, that was done probably a few

5    weeks prior to the release.

6         Q    So when was the slogan developed?

7         A    Slogan was developed -- I think they did --

8    were working on it, like, the week before the release.

9         Q    Is it normal for AHCA to develop a slogan for

10   the conclusions found in a GAPMS report?

11        A    No, this is -- this was a first.

12        Q    Why develop a slogan?

13        A    Well, we do develop slogans for whenever we do

14   have -- do releases, or whenever we have new programs.

15   For instance, Canadian Prescription Drug Importation, we

16   do have a slogan for that.  We do have a web page

17   dedicated to prescription drug transparency pricing.  So

18   we do have -- often to correspond with our press

19   releases, we often will do a logo.

20        Q    But you just said it's not normal for a slogan

21   to be developed for GAPMS.  So why do it in this

22   instance?

23        A    So because HHS had already -- had made

24   announcements with the publication of their documents,

25   Department of Health had done theirs, we, of course,

Page 185

1    likewise, because we were publishing this document, was

2    to, of course, create the website and to, of course,

3    create some graphics along with that website.

4         Q    So was the slogan meant to draw attention to a

5    particular message that the Agency was trying to send?

6         A    No, I mean, other than that, we did the report

7    and we did was evidence-based and concluded these

8    treatments were experimental and investigational.

9         Q    For children and adults, right?

10        A    For children and adults.

11        Q    And why was it Let Kids be Kids?

12        A    Because -- so for adults with -- when it comes

13   to Medicaid, states -- because you don't have the EPSDT

14   consideration, states can be much more -- have much more

15   discretion in denying coverage.  They have a lot more

16   latitude to be able to deny coverage, so -- but for

17   services that are intended for pediatrics, or are under

18   EPSDT considerations, that's partially -- partially why

19   not -- like one of the services that we evaluated was

20   puberty suppression, adults aren't going to use that.

21        Q    But the conclusion of the GAPMS report was

22   that all treatment for gender dysphoria was experimental

23   for kids and adults?

24        A    That's correct.

25        Q    The slogan's just targeted at kids?

1      A      Yes, that's correct.

2      Q      Why?

3      A      So it comes back down to the EPSDT

4  considerations.  Because like -- well, for starters, I

5  mean, when it comes to adult coverage, that's a totally

6  different category.  But for kids, especially with

7  puberty suppression and especially with the cross-sex

8  hormones, because of the experimental and

9  investigational nature, that's probably why we -- why

10 the Agency embarked on a, I guess, child-based kind of

11 graphic for its web page.

12     Q      What does it mean Let Kids be Kids?

13     A      I think, well, as far as semantics go, I think

14 that could mean something different to everybody.

15     Q      What did AHCA by it?

16     A      Let kids be free to explore their own

17 identities and figure out who they are.

18     Q      What are some examples of other slogans AHCA's

19 used for its programs?

20     A      Well, lower prescription drug costs.

21     Q      That's a slogan that we can find?

22     A      Yeah.  I mean, that's one we've been using for

23 a while.  I was using as -- under my signature on my

24 email, so things -- yeah, but, I mean, there are

25 slogans.  I think like prescription drug transparency.

1    I mean, that's part of, you know, the state's mission is

2    when it's coming up with new programs -- and obviously

3    it's not isolated to AHCA, I mean, every agency's going

4    to have slogans and graphics for their new programs.  I

5    mean, if you look at the Department of Children and

6    Families, they're promoting Hope Florida in a big

7    capacity.  So for a lot of these -- so for a lot of

8    these programs that they want to have -- they want them

9    to be now such high profile, of course there's going to

10   be graphics and slogans.

11        Q    Prescription Drug Transparency is not very

12   catchy, I'll say.  Why create a web page dedicated to

13   supposedly fact-checking Health and Human Services?  Is

14   that normal?

15        A    No, it's not, but following -- but the thing

16   is following the review of the evidence and how our

17   findings really did contradict what was in HHS

18   documents, because we really wanted to demonstrate --

19   because we do understand, it's a GAPMS report, it's 46

20   pages.  Not many people are going to take the time to

21   read it.  So we wanted to kind of put it -- we wanted to

22   put the case in more simplistic layman's terms and make

23   it accessible to the audience to show that, hey, yeah,

24   this is a sensitive report.  Yeah, if you got an hour

25   and a half and you understand medical terminology and

1   literature, you might have fun reading it, but for quick

2   information, we wanted to provide a resource, because

3   HHS had made all these claims regarding gender dysphoria

4   treatment, we want to make it accessible to everybody

5   that they could look at it and five minutes later

6   understand the gist of what we were saying in the GAPMS

7   report.

8        Q     Prior to the July 8th public hearing, did AHCA

9   communicate with anyone from the Christian Family

10  Coalition?

11       A     No.

12       Q     Anyone from Florida Citizens Alliance?

13       A     No.

14       Q     Including Pastor Rick Stevens?

15       A     No.

16       Q     Anyone from Warriors of Faith, the Florida

17  Chapter?

18       A     No.

19       Q     Including Troy Peterson?

20       A     No.

21       Q     Anyone from Protect our Children Project?

22       A     No.

23       Q     That includes Pastor Ernie Rivera?

24       A     That's correct.

25       Q     Okay.  Anyone from Florida Prayer Network?

1      A    No.

2      Q    And that includes Pam Olsen?

3      A    Correct.

4      Q    Anyone from Partners for Ethical Care?

5      A    No.

6      Q    What about Chloe Cole?

7      A    No.

8      Q    Sophia Galvin.

9      A    No.

10     Q    Anyone from the Rainbow Redemption Project?

11     A    No.

12     Q    How many comments did AHCA receive in response

13  to the proposed changes to 59G-1.050?

14     A    600 or so.

15     Q    Oh, that's all?   Did AHCA read them all?

16     A    We did.

17     Q    Who at AHCA reviewed them?

18     A    It was a combination.   So, like, I think Cole

19  Gerring, Nai Chen, myself, I remember we did sit down

20  once and we started going through all the emails.   Most

21  of them were very brief, maybe like one or two lines,

22  not substantive whatsoever.   For the more substantive

23  ones, those I did careful reviews of.

24     Q    So it's three people.   You, Nai Chen and Cole

25  Gerring?

1       A     Uh-huh.

2       Q     Okay.  And you split them up amongst each

3   other?

4       A     We read them together.

5       Q     What process did you use to decide whether or

6   not to incorporate the input into the final rule?

7       A     We wanted to look at the -- we looked at the

8   content of every -- of every single comment.  A lot of

9   the comments were just saying don't do this, or

10  something -- or something very sensationalist.  So a lot

11  of the comments we really couldn't take into

12  consideration because there wasn't -- there wasn't --

13  there was no substance behind them.  So there were some

14  comments that were -- we did receive some feedback

15  from -- I think we got something -- we got -- we got a

16  lengthy comment from American Academy of Pediatrics.  We

17  got a very lengthy one from Yale University.  We got

18  feedback from the Endocrine Society.  I think one of

19  UF's gender clinic physicians wrote us up, not a

20  terribly long comment, but wrote us a comment.  So we

21  did want to take a look at the substantive onces.  But

22  we did them into -- we did take into consideration every

23  comment submitted to us.

24      Q     Did you receive any comments from the people

25  who had Medicaid coverage for treatment of gender

1   dysphoria?

2          A      During the comment review, there wasn't any --

3   we didn't -- we didn't notice any comments from those

4   offhand, but, of course, that was over six months ago.

5   So we -- because of the volume of comments, we did have

6   to read them fairly quickly.

7          Q      Had you received a comment from anyone who was

8   receiving Medicaid coverage for treatment of gender

9   dysphoria, how would you have factored that into your

10  ultimate determination?

11         A      Well, we would -- we would have looked at it.

12  We would look at the content.  We were wondering, like,

13  what kind of services they were receiving and so forth,

14  but it depends on what the comment was.  If they

15  provided a case for why they were getting it, you know,

16  but we didn't -- we didn't receive anything like that.

17         Q      For those people who lost Medicaid coverage

18  for treatment of gender dysphoria, or were going --

19  stood to lose based on the categorical exclusion, during

20  any of this process, was there any consideration given

21  to the inability to access that care?

22         A      There was.  We did have questions.  We wanted

23  to make sure that if we were to discontinue individuals

24  who were receiving, particularly cross-sex hormones, we

25  wanted to -- we did have questions like, would there be

 1   withdrawal?  What would -- would they need some -- would

 2   they be weaned off the medication?  How would -- how

 3   would the Agency take that into consideration?  And we

 4   actually kind of realized that if, say, if they do need

 5   to discontinue testosterone because of the categorical

 6   exclusion and their doctor deems, well, they're going to

 7   need some small doses to wean themselves off, but we

 8   also realized that necessarily wouldn't be for gender

 9   dysphoria, that would be because of withdrawal symptoms,

10   and that would be a different diagnosis.

11        Q    Did you give that guidance to any treating

12   professionals or Medicaid recipients?

13        A    No, we didn't.

14        Q    Okay.  Why was it necessary to review the

15   comments quickly?

16        A    It wasn't necessary to; it was just -- I mean,

17   most of the comments were because the nature, they

18   were -- most of them were sensationalist, a lot of them

19   just hurled insults at us, a lot of them ad hominem

20   attacks, things like that.  We just kind of went through

21   a lot of them very fast.

22        Q    So that wasn't quite my question.  It sounds

23   like you were able to review them quickly.

24        A    I think I want to rephrase as we were able to.

25   We weren't really in a hurry.  Because, obviously, like,

Page 193

```
 1    we got a 47-page comment from Yale University.  That was
 2    not a five-minute skim, obviously.  So there were those
 3    we deemed to be substantive comments that warranted
 4    in-depth attention, and then there were those we deemed
 5    non-substantive comments and just read.  They're like --
 6    yeah, we received some ones that were using, I will say,
 7    the colorful metaphors.  And then we don't -- I mean,
 8    obviously, not going to pay attention to those, so --
 9    but the substantive ones that where they're putting
10    together, like, an argument or making points, being
11    something that we have to take back and think over, we
12    did invest time in those, yes.
13        Q    Were there any discussions about the comments
14    between you and Cole and Mr. Chen?
15        A    As far as the discussions go, no, most of
16    discussions were like, okay, let's move on to that one,
17    that one's just insulting us or that one's -- that one's
18    expletive-laden, let's move on.  So when we got the
19    substantive ones, of course, those were -- those were
20    handled differently.
21        Q    How were they handled differently?
22        A    So those, because they were going to take
23    in-depth review is not something that's going to be a
24    group activity.  Of course, we printed those out and
25    started reviewing with a fine-tooth comb.
```

1      Q    Did AHCA review the underlying cases and
2   studies cited in those substantive comments?
3      A    Yeah.
4      Q    Okay.  How did they factor those in to the
5   ultimate determination?
6      A    So we did take a look.  So we checked to see
7   what studies that Yale University and the AAP brought
8   into it.  And we looked at two responses from the Yale
9   University, not just the response that they made to us,
10  because Yale University frequently cited their response
11  to Texas and Arkansas, we pulled that up as well and
12  did -- and analyzed that.  So we looked to see what
13  articles they were citing and we were -- so we checked
14  to see whether our GAPMS report or any of the expert
15  reports also did evaluations of those studies to see
16  that -- make sure that we were in alignment.
17     Q    Okay.  Do you remember any particular
18  underlying cases or studies?
19     A    There's -- I think there's one by Jack Turban
20  that they cited.  I think there was one that we did cite
21  in GAPMS review.  We didn't discuss it at length, this
22  was by Tordoff, et al.  And we looked at that.  And, of
23  course, but we also captured those in Dr.
24  Brignardello-Petersen's piece that they were evaluated
25  as, like, being very low-quality or in a critical risk

Page 195

```
 1   of bias.
 2         Q     Okay.  How did you determine whether -- okay.
 3   Turning to the implementation.  Sorry.
 4         A     Okay.
 5         Q     Hold on.  One second.  Something breaking is
 6   coming in.  Did you review any comments that reference
 7   court cases?
 8         A     We did see some comments that referenced, I
 9   think, like Bostock v. Clayton.  I mean, there were some
10   cases referenced in the comments, but, of course, I
11   mean, we were primarily interested in -- we were looking
12   for comments that were providing -- that were either
13   providing examples of literature or anything that was
14   going to contradict the GAPMS report.  In other words,
15   we were looking -- we were looking for anything that, I
16   guess you could say, delivered, like, a mortal wound or
17   something like that, something that would foreseeably
18   cause us to have to go back and make revisions or cause
19   us to have to retract the rule, or something that -- or
20   a comment that we couldn't just dismiss or a comment
21   that we couldn't explain.  So those were what we were
22   looking for.
23         Q     What types of information provided by the
24   public would have mortally wounded your conclusion?
25         A     So a mortal wound would have come from a
```

1    quality study, or a number of quality studies.

2          Q    And define a quality study.

3          A    So something that -- well, a quality study,

4    well, I mean, that -- that's a pretty broad definition

5    of what you're asking for, and there are different ways

6    a quality study can come about, but something that, of

7    course, lengthy longitudinal histories on participants,

8    either has adequate control groups.  And this is not an

9    all-inclusive list.  These are just examples.  Also

10   follows participants for a lengthy period.

11         Q    Well, what's the difference between that and a

12   lengthy longitudinal study?

13         A    Long -- when it comes to a longitudinal

14   history, what we mean by longitudinal history, and this

15   is often for behavioral health, is that longitudinal

16   history is necessary to really ascertain the full

17   impacts of somebody's mental health conditions.  Because

18   it's -- because mental health, it's not necessarily like

19   an acute illness or a chronic condition diagnosis.  So,

20   like there's treatment histories, medications and --

21   like, in other words, and, of course, like activities of

22   daily living, how that all is affected.  So it's usually

23   something that has to be obtained over a number of

24   years.

25               So, mental health longitudinal histories, but

 1    we also were finding in the studies that we evaluate for

 2    the GAPMS process that they lacked participants'

 3    longitudinal histories.  If they even -- if they even

 4    did -- provided any histories or any -- identified the

 5    recipients or the participants at all.  I mean, there

 6    were so many studies where they were -- I think there

 7    was one that we came across, and this was during the

 8    comment period, that was just a massive survey and they

 9    were trying to give gift cards to participants.  And, of

10    course, people were just completing it, but it was like

11    a one-time snapshot, and it's subjective self-reports.

12    So I mean, there are a myriad examples that we can say

13    for high-quality evidence, and not to mention RCT's, as

14    well.  So --

15         Q    What does that stand for?

16         A    Randomized control trials.  So there -- so,

17    yeah, so that was what we were looking for, evidence

18    that -- evidence that would hold up to questioning, and

19    that's not what we were finding.

20         Q    So in undertaking the review of the comments,

21    the only thing you were looking for is anything that

22    would, in your definition, cause a mortal wound to your

23    conclusion in the GAPMS?

24         A    That was among one of the things we were

25    looking for.

1        Q      What else were you looking for?

2        A      I mean, we were looking -- we were looking

3    for -- I mean, we, of course, we were looking to see if

4    there's anything that would directly conflict with the

5    GAPMS report.  That was one thing, because the rule's

6    foundation was the GAPMS report.  So that's the big

7    reason why we were looking for contradictory evidence or

8    evidence that would be like, well, wait a second, we say

9    it's all -- you know, because our primary argument is

10   it's low-quality evidence and therefore experimental,

11   experimental investigational.  That basis doesn't

12   sustain itself if all of a sudden there's modern,

13   high-quality evidence out there.  So we want to make

14   sure that we had not left any stones unturned.  But we

15   were just -- you know, I mean, we -- this things we

16   weren't -- that was the primary thing we were looking

17   for.

18             Other things -- I mean, we also, I mean,

19   anything that spoke to the legality of it, but I mean,

20   of course, we wouldn't necessarily evaluate that.  We'd

21   turn that over to legal, but anything that was

22   looking -- that was looking at the legality of what we

23   were doing.  So I mean -- so, I mean, there were

24   different angles.  I think when I was looking at it

25   through my personal lens, that was what I was looking

1    for.

2         Q    Are you aware that similar exclusions have

3    been found unconstitutional in other federal districts?

4         A    I am aware at the district level that there

5    have been some -- some exclusions that have been tossed,

6    yes.

7         Q    All right.  Turning to the implementation --

8              MR. JAZIL: We've been going for an hour and a

9         half.  Could we do a five-minute break?

10             MS. DEBRIERE: Sure.

11             VIDEOGRAPHER: This concludes video three.  The

12        time is 3:00 p.m.

13             (Brief recess.)

14             VIDEOGRAPHER: This is beginning of video four.

15        The time is 3:08 p.m. we're on the record.

16   BY MS. DEBRIERE::

17        Q    Just after that break, and I should have asked

18   this earlier, just after that break, did you have any

19   conversations with anyone during that break?

20        A    During --

21        Q    Just this recent break?  Did you have

22   conversations with anyone?

23        A    I mean, talked about, like, personality types

24   on 16 personalities, just had a conversation, but as far

25   as the case goes, no.

Page 200

1    Q    Okay.  What about at lunch?

2    A    Just a quick touch-base with our attorneys.

3    Q    Okay.  How long did you talk?

4    A    15 minutes.

5    Q    Okay.  All right.  Turning to implementation

6    of the rule with managed care plans.  Did Florida

7    Medicaid managed care plans -- well, we've already

8    answered that.  What's the purpose of Inter-Qual?

9    A    Inter-Qual?

10   Q    Uh-huh.

11   A    I don't have the answer to that.

12   Q    Okay.  Are you familiar with it at all?

13   A    I'm not familiar with Inter-Qual.

14   Q    Did AHCA develop, or help develop language for

15   notices of adverse benefit determinations in order to

16   incorporate the categorical exclusion of treatment for

17   gender dysphoria?

18   A    No.

19   Q    AHCA didn't assist at all in developing the

20   language for those denials for terminations?

21   A    No, managed care plans were -- handled those

22   themselves.

23   Q    Okay.  Did AHCA review any of the language

24   that managed care plans submitted to AHCA for review?

25   A    No.

Page 201

1       Q    Same question for notices of outcome relied on

2   by EQ Health?

3       A    No, AHCA wasn't directly involved in those.

4       Q    Did they review the notices of outcome

5   language?

6       A    No.

7       Q    Okay.  What about Magellan?

8       A    Magellan?  No.

9       Q    Did AHCA develop or help develop language for

10   any other types of notices used to notify a Medicaid

11   recipient of a denial or termination of treatment for

12   gender dysphoria?

13       A    No.

14       Q    All right.  Can I have the notice of adverse

15   benefit determination, and that's Bates-stamped

16   Defendant_ 000292335, I think.  We'll check?  Did I get

17   it right?  I don't think I did.  I'll read the correct

18   Bates-stamp on -- so this is going to be the Molina

19   Health Care Notice of Adverse Benefit Determination.

20   I'm not going to name the Medicaid recipient.  And the

21   date stamp appears to be cut off, but it is dated

22   October 26th, 2022, and the initials for the recipient

23   are AS.

24              (Whereupon, Exhibit No. 15 was marked for

25   identification.)

```
 1          MR. JAZIL: Counsel, can we agree that this
 2       should be confidential, attorney's eyes only?
 3          MS. DEBRIERE: Absolutely.
 4          MR. JAZIL: Do you mind if I write that on top
 5       of the --
 6          MS. DEBRIERE: Not at all.  Not at all.  So the
 7       previous Bates stamp I gave was not correct, but
 8       the Bates stamp on this exhibit is cut off, so I
 9       can't provide the actual number, but I think I've
10       sufficiently described it.  And, of course, it will
11       be Exhibit 15.
12  BY MS. DEBRIERE::
13       Q    All right.  This particular notice of adverse
14  benefit determination is from Molina.  In that second
15  page there, it runs through AHCA's medical necessity
16  definition, correct?
17       A    Yes, that's consistent.
18       Q    And that's consistent across notices of
19  adverse benefit determinations?
20       A    So each health plan is a little idiosyncratic
21  in how they do NABD's.  We'd have -- we'd have to verify
22  with managed care plans.  I mean, the contracts does
23  provide specific requirements when it comes down NABD's
24  and sending them.
25          MS. DEBRIERE: Mo, do you know if you guys have
```

1       produced an NABD template to us?

2              MR. JAZIL: We've never --

3              MS. DEBRIERE: I know they exist.  They should

4       be pretty easy to --

5              MR. JAZIL: I'll check.  What's that stand for,

6       again?

7              THE WITNESS: Notice of Adverse Benefit

8       Determination.  It's a long phrase for a denial.

9    BY MS. DEBRIERE::

10      Q    Or termination or reduction?

11      A    Or termination, or reduction.

12      Q    Or partial reduction.

13      A    It's --

14      Q    Okay.  So this particular notice of adverse

15   benefit determination is to an actual Medicaid

16   recipient, correct?

17      A    Yes.

18      Q    And it looks like it's been it's denying a

19   request for coverage of testosterone cypionate.

20      A    That's correct.

21      Q    Okay.  And what is the reason for the denial?

22      A    The box for other authority non-covered

23   benefits is checked off.

24      Q    Why isn't the, request service is not a

25   covered benefit, checked off?

1      A     We would have to ask that question of the

2      plans.

3      Q     Okay.  So you don't require some kind of

4      uniform response to not -- that plans must provide when

5      there's a non-covered benefit?

6      A     We're not aware of one.  There -- I don't

7      think there's one mentioned in the contract.

8      Q     Okay, but I guess my other question is, would

9      it be equally sufficient, had they checked off, must

10     meet accepted medical standards and not be experimental?

11     A     They could have checked that box.  They could

12     have checked, the requested service is not a covered

13     benefit.  They could have checked other boxes, as well.

14     Q     Okay, but it is accurate to say that it is not

15     a covered benefit?

16     A     Yeah, that is accurate.

17     Q     Is any plan allowed to currently cover

18     treatment for gender dysphoria of the services listed

19     and 59G-1.050(7)?

20     A     For any plan right now currently?

21     Q     Yes.

22     A     No.  No plan can cover them.

23     Q     Since the adoption of the categorical

24     exclusion of treatment for gender dysphoria, how many

25     notices of adverse benefit determination have been sent

1   to Medicaid beneficiaries that denied coverage for

2   services on the basis of --

3       A    So for MMA plans, so we did a little looking

4   into this -- so for managed medical assistance, which

5   most of these recipients, given their ages, are going to

6   be on MMA, we do not actually require the MMA plans to

7   submit reports regarding how many NABD's that they

8   actually mail out to their enrollees.  Long-term care,

9   that process is different.  We do require them for

10  long-term care to mail those to report to the Agency how

11  many NABD's they are sending out, but for MMA we

12  currently don't have that as a requirement.

13      Q    Okay.  So is that -- does the same hold true

14  for notice of appeal plan -- plan appeal resolutions?

15      A    As far as that goes, I don't think -- I don't

16  think we're collecting information from the plans on

17  those.

18      Q    Okay.  So generally, not just as related to

19  treatment of gender dysphoria?

20      A    Generally.

21      Q    What about notice of outcomes?

22      A    Notice of outcomes, I don't think we're

23  collecting them from those informations either.

24      Q    Okay.  Just generally, do any of those notices

25  include reference to the variance in waiver process

1   described at Florida Statute 120.542?

2        A    No.   I mean, we definitely -- I mean, so

3   looking at this, this is in compliance with what we do,

4   we require them to have, which is an appeals process.

5   So, no, we don't -- we do not require the plans to

6   include the procedures for variances.

7        Q    Okay.   So those procedures are not listed in

8   notices of denial?

9        A    That would be correct.

10       Q    Okay.   How many grievances have been submitted

11  to AHCA regarding a claim related to AHCA's adoption of

12  the categorical exclusion of treatment for gender

13  dysphoria?

14       A    So that information, we do have a complaint

15  hub for recipients and providers who'd like to submit

16  complaints, be given the -- when the questions came in,

17  we, of course, have to reach out because our complaint

18  hub is actually down in Fort Myers, so it's not -- it's

19  not here locally, so that's information we're still in

20  the process of obtaining.

21       Q    And once you obtain that, you'll provide it to

22  us?

23            MR. JAZIL: Yes.

24            MS. DEBRIERE: Can you put that as a follow-up?

25  BY MS. DEBRIERE::

1       Q     How many -- how many appeals of Notice of

2    Adverse Benefit Determination denying care on the basis

3    of the exclusion have there been?

4       A     As far as appeals going up to the fair hearing

5    level, I think that's zero.

6       Q     Okay.  What about -- yeah, so that would

7    include both notice of plan appeal resolutions as well

8    as notice of outcome?

9       A     Yeah.

10      Q     Okay.  Prior to August 21st, 2022, did AHCA

11   ever reverse a decision made by AHCA or by a plan to

12   deny pubertal suppression therapy for the treatment of

13   gender dysphoria?

14      A     We did not.

15      Q     You never reversed a decision to deny?

16      A     To deny?

17      Q     Yeah.

18      A     No, we never did.  Sorry.  I misunderstood the

19   question.

20      Q     Okay.  I just want to make sure you're

21   understanding.  So prior to the adoption of the

22   categorical exclusion, did AHCA ever reverse a decision

23   to deny puberty suppression therapy for the treatment of

24   gender dysphoria?

25      A     So if a plan reviewed for medical necessity

1   criteria decided, no, it didn't meet the criteria and

2   issued denial, no, we never reversed it.

3        Q    What about upon a fair hearing review?

4        A    Are we talking about, like, since 2015?

5        Q    Well, I'm asking ever, but if 2015 is a

6   helpful marker.

7        A    I don't have that information offhand.

8        Q    Is that information you can obtain?

9        A    I think we can.

10       Q    Prior to August 21st, 2022, did AHCA ever

11  reverse a decision to deny cross-sex hormone therapy for

12  the treatment of gender dysphoria?  And by reverse I

13  include at the fair hearing level.

14       A    That's information that we would have to

15  obtain.

16       Q    Same question for surgery in furtherance of

17  the treatment for gender dysphoria.

18       A    At the fair hearing level, we would have to

19  obtain that.

20       Q    So you will tell us the number of times, if

21  ever, that AHCA reversed a decision at the fair hearing

22  level to provide treatment in furtherance of -- services

23  and treatment for gender dysphoria?

24       A    We can confirm it.  It's probably zero.

25       Q    Okay.

Page 209

```
 1        A    As far as overturning a decision that was
 2   already a denial, it's probably going to be zero, but we
 3   just want to confirm.
 4        Q    Okay.  I'll tell you, we have different
 5   information.
 6        A    Okay.
 7        Q    How many AHCA fair hearings have been provided
 8   where the categorical exclusion of treatment for gender
 9   dysphoria was an issue?
10        A    Well, can you repeat that?
11        Q    How many AHCA fair hearings have occurred
12   where the subject at issue was the categorical exclusion
13   of treatment for gender dysphoria?  So where the rule
14   exclusion --
15        A    We'll have to obtain those numbers.
16        Q    Did any -- do final orders in general
17   reference the variance and waiver process described at
18   Florida Statute 120.542?
19        A    You'll have to slow down and ask the question
20   a little bit --
21        Q    Sure.  Sure.  The final orders that are issued
22   at the end of any AHCA Medicaid fair hearing, do those
23   written final orders contain any reference to the
24   variance and waiver process at Florida Statute 120.542?
25        A    I don't think the final orders do.  I don't
```

1    think they do.

2         Q    Okay.  Is there any way you can get

3    confirmation of that answer?

4         A    I mean, we could obviously pull up a copy of

5    the final order and see if that information is included.

6         Q    If we had a copy of an AHCA final order, would

7    that be sufficient to determine, and it did not list it,

8    would that --

9         A    I'll defer to our attorneys, if that's

10   sufficient.

11             MR. JAZIL: That'd be sufficient.  If you have

12        one, you can show it to him.

13             MS. DEBRIERE: Well, we can pull one up, can't

14        we?

15             MS. CHRISS: Just one?

16             MS. DEBRIERE: Yeah.  Yeah.  Why not.  Yeah, as

17        long as their name's blocked out, which really

18        shouldn't matter here because we're dealing with an

19        AHCA employee.

20             THE WITNESS: Yeah.  I mean, I'm cleared to

21        review PHI and recipient information.  It shouldn't

22        be a problem.

23             MS. DEBRIERE: Do you want another one?  I can

24        send you another one.  Bear with me one second.

25             I'm going to forward you this email.  And

1          it's -- I can tell you what the name of the

2          document is.  It's the last document, 23.  That

3          should be the last one.  Chelsea's copied on that

4          one, too.

5               THE WITNESS: Okay.

6               MS. DEBRIERE: Okay.  Okay.  So feel free to

7          just scroll through it and see if you see any

8          reference -- oh I'm sorry, it isn't a touchscreen?

9               THE WITNESS: I don't know where the scroll

10         bar.

11              MS. CHRISS: It's just -- just use two fingers

12         and just go like that.

13              MS. DEBRIERE: Oh, it's a Mac.

14              MS. CHRISS: I'm sorry.

15              THE WITNESS: Okay.  There it goes.  Yeah.

16         Ipads and iPhones I'm good with, Mac's I never got

17         comfortable with.

18              MS. DEBRIERE: The next exhibit I'm going to do

19         is emails related to the policy transmittal and the

20         policy transmittal itself, if that helps.

21              MS. DUNN: Yep.

22              THE WITNESS: So are we talking about the --

23         that last paragraph on the final page that's, like,

24         notice of judicial review?

25    BY MS. DEBRIERE::

1       Q      Yes.  So does that relate to the variance

2    waiver process?

3       A      I mean, it doesn't point out the variance

4    processes as described in section -- or Chapter 120.  I

5    think that's more if they want to appeal to the next

6    level -- next court level.  I don't think that's in

7    response to the variance process.  That's a different

8    process.

9       Q      Okay.  Thank you.  So it does not mention the

10   variance waiver process --

11              MR. JAZIL: Would it be possible just to read

12        off the --

13              MS. DEBRIERE: Yes, absolutely.  So it says at

14        the bottom:  Notice of a right to judicial review.

15        A party who is adversely affected by this final

16        order is entitled to judicial review, shall be

17        instituted by filing the original notice of appeal

18        with the Agency clerk of AHCA, and a copy along

19        with the filing fee prescribed by law with the

20        District Court of Appeal and appellate district

21        where the Agency maintains its headquarters or

22        where a party resides.  Review proceedings shall be

23        conducted in accordance with the Florida appellate

24        rules.  The Notice of Appeal must be filed within

25        30 days at the rendition of the order to be

1    reviewed.

2        THE WITNESS: Our various processes doesn't

3    involve appellate courts, so it would not be an

4    appellate case, so it's a different affair.

5    BY MS. DEBRIERE::

6        Q    Thank you.  Okay.  Did AHCA work with Florida

7    Medicaid managed care plans to implement the exclusion

8    set forth in 59G-1.050(7) in any way?

9        A    No.  I mean, the publication's in the Florida

10   Administrative Register, that was to provide ample

11   notice -- public notice that the rule's changing, the

12   managed care plans are responsible for keeping up with

13   changes to manage -- to AHCA's coverage policies and

14   administrative policies.

15       Q    What about plan transmittal?  Are you maybe

16   forgetting those?

17       A    We do not do a plan transmittal for this.  Are

18   you referring to a policy transmittal?

19       Q    Yes.

20       A    We did not send out a policy transmittal.

21       Q    Okay.  Okay.  So we have what's marked as

22   Exhibit 16 and Exhibit 17.  Exhibit 16 is some emails

23   from Dede Pickle to Jason Weida, cc'ing Ann Dalton.  And

24   those are dated August 22, 2022.  I believe that's where

25   they start.  Also involved are you, Matt, and Ashley

1    Peterson.  Also, I just want to note that Exhibit 17 is

2    an SMMC policy transmittal dated August 22nd, 2022.

3              (Whereupon, Exhibit Nos. 16 - 17 were marked

4    for identification.)

5    BY MS. DEBRIERE::

6         Q    Getting back to the list of questions.  So did

7    AHCA not send the plan policy transmittal out, Exhibit

8    17?

9         A    We did not send them out.

10        Q    Why?

11        A    Pretty much because all it's doing is

12   reproducing what was already stated in the rule.  The

13   rules -- the rule -- the policy changes already in rule,

14   that was announced through the FAR.  Policy

15   transmittal's a little superfluous at this point.

16        Q    Why draft an entire plan transmittal and then

17   not send it out?

18        A    Which this happens frequently.  Sometimes we

19   will draft something and later decide not to -- not to

20   use it, or not to utilize that content in favor of

21   different strategy.  So, in this case, since the rule --

22   since the rule change itself was pretty self-explanatory

23   and pretty direct, just we later deemed wasn't

24   necessary.

25        Q    Who made the decision not to send out the

1    policy transmittal?

2         A     I think that would have been -- that would

3    have been Secretary Weida.

4         Q     Only Secretary Weida?  Is it Weida or Weida?

5         A     Weida.  I mean, as Assistant Deputy Secretary,

6    he would be within his purview to decide whether or not

7    to send something out -- or to send something out, but

8    given that the rule itself was self-explanatory, and we

9    just decided that a policy transmittal wasn't necessary.

10        Q     All right.  In the email exchanges -- I think

11   it's on the second page -- oh, and Jason Weida, at this

12   time that he made this decision, was not the

13   Secretary -- AHCA's Secretary, correct?  At the time

14   this was sent, Mr. Weida was not the AHCA Secretary,

15   correct?

16        A     Right, he was Assistant Deputy Secretary for

17   Policy and Quality.

18        Q     On the last page, it looks like you were the

19   person who drafted the first policy transmittal, is that

20   correct?

21        A     Yes.  Yeah, I mean, Dede and I, it was a

22   collaborative effort between the two of us.  We were, of

23   course, working on each other's language.

24        Q     Why did you think Dede -- why did you and Dede

25   think it was important to draft a policy transmittal?

Page 216

1        A      We were asked to.

2        Q      By who?

3        A      I think Ann Dalton asked Dede to work on it.

4        Q      Okay.  And later -- well, let's look to --

5   Ashley Peterson says on August 22, 2022 at 10:35 a.m.:

6   I added one thing to help clarify that these drugs will

7   still be provided, just not for gender dysphoria.

8   Please let me know if you think this is unnecessary or

9   adds confusion.

10              So at least Ashley thought there was some

11  clarity that could be provided to plans on the

12  implementation of the exclusion.

13              MR. JAZIL: Object to form.

14              THE WITNESS: Okay.  There's several emails.

15       Which one are you --

16  BY MS. DEBRIERE::

17       Q      This one is from Ashley to Dede, copying you.

18       A      August 22nd, 11:04 a.m.  That's Dede --

19       Q      10:35 a.m.

20       A      Okay.

21       Q      It's DEF_0002587.

22       A      Okay.  I think it was just a minor, minor

23  technical catch.  I mean, when we worked on this, I

24  mean, we were just fine tuning the drafts.

25       Q      And further up Ann wants to include the 60-day

Page 217

1    language in the alert, which has been later included.

2    What is the 60-day language?

3         A    That would be the bottom paragraph of the

4    policy transmittal.

5         Q    Okay.  And that you're referring to starts

6    with:  To ensure the safe discontinuation of puberty

7    blockers or hormone and hormone antagonists for the

8    treatment of gender dysphoria?

9         A    Uh-huh.

10        Q    Then the managed care plan must notify its

11   subcontractors, providers, enrollees receiving active

12   treatment and changes in coverage, and they must honor

13   any current prior authorization of prescribed outpatient

14   drugs for the treatment of gender dysphoria through 60

15   days after the date of this policy transmittal.  So that

16   means that under the 60-day rule for continuity of care,

17   the managed care plans were to continue coverage of the

18   prescribed outpatient drugs for the treatment of gender

19   dysphoria, correct?

20        A    Only for those existing prior authorizations

21   had already been approved.

22        Q    Okay.  So that meant that AHCA was -- or that

23   Florida Medicaid was covering this drugs?

24        A    Yeah, just for the sake of honoring existing

25   PA's.

1     Q    Was it not important that the plans know that
2     they should maintain continuity of care?
3     A    It's actually in the contract.  I mean, when
4     you refer to continuity of care, can you clarify what
5     you mean by continuity of care?
6     Q    In this instance, I'm talking about the
7     continued coverage for 60 days of those prescribed
8     outpatient drugs for the treatment of gender dysphoria.
9     A    As far as the continuity of care went, I mean,
10    there -- as far as medically necessary services,
11    enrollees are always going to have access to those.  So
12    when it comes to the continuity of care, whether or --
13    Q    They're not going to have access to services
14    that have been previously covered, but now are excluded,
15    correct?
16    A    That'd be correct.
17    Q    Okay.  So the 60-day continuity of care
18    ensures that after that categorical exclusion is
19    adopted, those individuals continue to access that care
20    for 60 days?
21    A    This, of course, was a draft.  It was never
22    sent out.
23    Q    At some point, AHCA thought that the 60-day
24    period of continuity of care should apply in this
25    situation, correct?

Page 219

1        A     Since this was a draft and it was not -- not

2    officially sent out, this is not -- since it is draft

3    language, it is not an official transmittal, we sent out

4    to the health plan, so this does not formally represent

5    the views of the Agency.  This is a -- this is a draft

6    that we created, deliberated upon and decided not to

7    send out.

8        Q     Who decided?

9        A     That would, of course, been leadership.  That

10   would have been -- would have gone to Assistant Deputy

11   Secretary Weida.

12       Q     And he was the only one who was involved in

13   that decision, correct?

14       A     I mean, since he oversees the bureau policy,

15   that's -- which means policy transmittal, yes, he had --

16   is within his -- is within his job description and his

17   responsibilities and rights to veto sending out a policy

18   transmittal.

19       Q     Okay.  Since the policy transmittal was not

20   sent out, then is it AHCA's position that those who had

21   a current prior authorization at the time that

22   categorical exclusion was adopted, was not entitled to

23   the 60-day continuity of care period -- were not

24   entitled?

25       A     So once the rule went into effect, that was,

1    of course, the notice of the plans that the coverage for

2    these services has to stop.

3         Q    Immediately?

4         A    Well, I mean, that's based on what the rules

5    say, yeah.

6         Q    Okay.  So they -- that means that the plans

7    were not to implement this 60-day period of continuity

8    of care as described in this transmittal?

9         A    Right, we didn't provide notice of -- them of

10   this.

11        Q    Okay.  And it was AHCA's position that

12   Medicaid beneficiaries were not entitled to that?

13        A    That's correct.

14        Q    Okay.  You previously noted how people on

15   hormones may go through withdrawal, there was something

16   as part of your 2022 GAPMS request.  Why wasn't that

17   important to communicate to the plans?

18        A    Well, because withdrawal is not gender

19   dysphoria.  It's a different -- that's a different --

20   it'd be a different diagnosis altogether.

21        Q    But in the decision to no longer cover drugs

22   that may cause withdrawal, was it important to

23   communicate to the plans or providers that they may need

24   to help facilitate transition off those drugs that would

25   no longer be covered?

1       A    We were leaving that to the health plans to

2   manage independently, as well as the providers of these

3   services.

4            MS. DEBRIERE: Do we have a document titled

5       Florida Medicaid health alert?  You just -- under

6       DEF_000258815.  I feel like I've had the same Bates

7       stamp number.  So we're marking as Exhibit 18, the

8       Florida Medicaid health care alert sign-off form.

9            (Whereupon, Exhibit No. 18 was marked for

10   identification.)

11           THE WITNESS: I'm familiar with that.  I

12       drafted it.

13   BY MS. DEBRIERE::

14       Q    That would definitely have been one of my

15   questions.

16       A    No, I'm listed on there as the analyst who

17   drafted it.

18       Q    And there's Dede and Ann.

19       A    Yeah.

20       Q    Okay.  Did this healthcare alert go out to all

21   providers?

22       A    That provider alert did not go out.

23       Q    And the provider alert on the back, it lists

24   that same language to ensure the safe discontinuation of

25   puberty blockers or hormones and hormone antagonists for

Page 222

1    the treatment of gender dysphoria, or allow transition

2    to payment to non-Medicaid funding sources.  You

3    incorporated the reference to the 60-day continuity of

4    care period.  You drafted that one.  Did you include

5    that 60-day language?

6         A    Yeah.  I -- yeah, I did include that.

7         Q    Why did you think it was important to include?

8         A    Because at the time we were -- we were

9    creating a provider alert in sync with -- in sync with

10   the policy transmittal, so we wanted to make sure that

11   they used the same language and addressed the same

12   things.

13        Q    And why wasn't this sent out?

14        A    Because -- because, well, we've deemed that

15   the notice of the rule is sufficient, and that once the

16   rule had said that AHCA will no longer cover these

17   services, we could no longer cover those services.  I

18   mean, the rule was clear-cut.  It's very -- I mean,

19   language is pretty -- pretty straight to the point and

20   direct.

21        Q    Who made the decision not to send this out?

22        A    That would have come from Assistant Deputy

23   Secretary Weida at the time.

24        Q    Did you agree with that decision?

25        A    I thought it was sufficient.  I actually

1    thought given that we put the rule out there, the rule

2    is very straightforward, noticing, like, we had the

3    providers, health plans, adequate notice was given.

4         Q    Did Ms. Dalton agree with the decision not to

5    send any of this out?

6         A    I can't speak to Ms. Dalton.  She and I didn't

7    confer on our opinions of whether to -- we didn't confer

8    on how we felt about it.

9         Q    Was there any stated opposition to not sending

10   these out?

11        A    Not that I'm aware of, no.

12        Q    So in managing withdraw, how would a plan or

13   provider know how to navigate that if AHCA wasn't -- if

14   AHCA notified them that they weren't going to cover the

15   service that was needed to help titrate individuals off

16   of their hormones or puberty suppression therapy?

17        A    So it comes back down to practitioners

18   delivering treatment to their -- to their patients.

19   Once again, it comes down to how, like -- you know, when

20   they know that they can't treat for gender dysphoria

21   anymore, and they know that the individual might

22   suffer -- might suffer withdrawal symptoms from

23   testosterone.  We, of course, did see some conflicting

24   information on that one, whether they would experience

25   symptoms or not, or estrogen, or if there were

1  withdrawal symptoms, you'd be treating the withdrawal.

2  And, of course practitioners, we do trust the medical

3  professionals to know what condition they're treating,

4  when the -- because they do so every day when their

5  course -- when they're, of course, diagnoses.  And, of

6  course, when the medical coders come in there to do the

7  billing, it's --

8        Q    If transition involved smaller dosages of

9  hormones over time to treat gender dysphoria, how was

10  the provider and the plan to know that they could

11  continue to prescribe that?

12        A    It would be coming through a different

13  diagnosis code.  And since we only said that for -- we

14  only said in the rule only for the diagnosis of gender

15  dysphoria.  So if they're -- so if they're taking on

16  some small doesn't testosterone because of withdrawal,

17  that's a different -- that's a different diagnosis

18  altogether.

19        Q    How would they know what diagnosis code to

20  use?

21        A    So, practitioners and providers often don't --

22  aren't that familiar with the coding system.  That's

23  where their coders do to figure out.  So their coders,

24  of course, review the medical records and, of course,

25  put in the CPT codes, they put in the ICD-10 codes, the

1    place of service.  So usually the claims process is

2    usually done either by often, like, a clearing house or

3    individual coders that sometimes just rotate like a

4    circuit through different physicians offices and so

5    forth.

6         Q    So when we're talking about the safe

7    discontinuation of a medication, wouldn't the prudent

8    thing to do would be to notify providers and plans of

9    the options they had to ensure that individuals who

10   could no longer access this treatment could at least

11   come off of it as safely as possible?

12        A    Given that physicians deal with that kind of

13   situation, for other diagnoses and medical services, we

14   just didn't feel it was necessary.  That's one area we

15   were going to, like, leave it.  Practitioner discretion

16   was how to withdraw their patients from testosterone or

17   estrogen, if it was even necessary at all.

18        Q    Did any managed care plan ask questions about

19   how to implement the categorical exclusion of

20   gender-affirming care?

21        A    I don't think we received any questions for

22   managed care plans.

23        Q    What about from providers?

24        A    I don't think we received any provider

25   questions either.

1      Q    Did any plan communicate that they will

2   continue coverage in spite of the categorical exclusion?

3      A    Definitely no.

4      Q    Could a plan do that?

5      A    Well, they hypothetically can --

6      Q    Would Florida Medicaid allow them to do that?

7      A    No, we would not.

8      Q    I'm showing you what's marked as -- well, I

9   will be in a second -- what is marked as DEF_ 000169125.

10   It's the template member handbook -- actually, let's

11   skip that one.  I'm sorry.  I'm sorry.

12          MS. DUNN: Oh, I'm sorry, we have numbers that

13          aren't lining up with --

14          MS. DEBRIERE: Yeah, let's actually -- let's

15          move to the emails from Susan Williams between her

16          and Magellan.  I'm not sure what the Bates stamp

17          is.  Okay.  Thank you.

18          (Whereupon, Exhibit No. 19 was marked for

19   identification.)

20   BY MS. DEBRIERE::

21      Q    And that's marked as 19 and it's a series of

22   emails between Susan Williams, Jessica Forbes at AHCA,

23   Ashley Peterson, and the first date on the document is

24   June 3rd, 2022.  The subject is for treatment of gender

25   dysphoria for children and adolescents.

1       A    Well, this was -- well, we received this prior

2    to the promulgation of the challenge exclusion.

3       Q    You did.  So, Stephanie McGriff over at

4    Magellan says, Hi, Ashley and Susan, attached are the

5    internal criteria not publicly posted.  CCM that the

6    implemented all meds with the gender code equals B, both

7    in the subsequent updated denial letter that includes

8    the non-discriminatory verbiage.  What are the internal

9    criteria she's referring to?

10      A    So it looks like the email chain started on

11   April 20th, following the release of the Department of

12   Health's guidelines.  So there were 14 impressions to

13   AHCA at that time.  We had just initiated the GAPMS

14   process for these treatments.

15      Q    Yeah.  In fact -- so looking at the email from

16   Alicia King Wilson dated April 20th -- so that would be

17   the day that the Florida Department of Health released

18   its guidance, right?

19      A    Yes.

20      Q    And Secretary Marstiller directed Tom Wallace

21   just to start the GAPMS process.

22      A    Yes.

23      Q    It says:  Leslie noted MMA does have an

24   internal gender dysphoria criteria, which is attached.

25   This internal document serves for a GnRH analog used to

1   delay puberty in adolescence with gender dysphoria, but
2   it does not speak to use of hormone therapy.  This
3   document was provided by the Agency due to a fear of
4   hearing requests received from Lupron for recipient with
5   this diagnosis.  All requests for use of the drug at
6   that time to delay puberty were to be vetted by AHCA
7   before a final determination is made.  Can you explain
8   that a little bit more?  What does it mean that AHCA had
9   to vet all determinations?  What determinations was AHCA
10  vetting?
11      A    I don't -- I mean, it's tough to fully
12  understand the context of this email.  I mean, the
13  context level is light throughout the chain, because I
14  mean, Magellan does handle the prior authorization of
15  clinical reviews for drugs in the fee-for-service
16  system.
17      Q    Okay, but it says that this document was
18  provided the Agency due to a fair hearing request
19  received from Lupron first, recipient with this
20  diagnosis, all requests required vetting by AHCA before
21  a final determination was made.  So, I mean, I interpret
22  that to mean that anytime Magellan received a request
23  for Lupron to treat gender dysphoria, AHCA had to vet it
24  before a decision as to coverage would be reached.  Am I
25  wrong?

Page 229

1       A    No, that's what it sounds like.  The

2    pharmacy -- the pharmacy processes may involve -- as far

3    as like the pharmacist job descriptions go -- I mean, as

4    far as like vetting, that's the kind of the questions

5    like, are they -- because we don't do in-house prior

6    authorizations or clinical determinations anymore.  We

7    haven't done those since SMC went into a fact.

8       Q    Was a special exception made for the coverage

9    of hormone therapy to treat gender -- I'm sorry -- for

10   the treatment of puberty suppressant?

11      A    No.  No.  Yeah.

12      Q    So not to your knowledge --

13      A    I'm just trying to figure out what they mean

14   by vetting.  Like, in other words, does this mean --

15   like, is Magellan sending the determination back to AHCA

16   for yes or no approval?

17      Q    Yeah.

18      A    So they could be doing that.

19      Q    But you don't know?

20      A    Don't know.

21      Q    Can we find that information out?

22      A    We might be able to, because like -- because

23   it's only a few emails, and we're trying to go over the

24   process.  I mean, it is possible that we could ask

25   people who do oversee this area.  I mean, they might

1   give us some information, but they may not be able to

2   describe the exact context of the email because, I mean,

3   sometimes things get lost in translation.

4        Q    Does Susan Williams still work here?

5        A    Yes, she does.

6        Q    Does Ashley Peterson still work here?

7        A    Ashley Peterson recently left us.

8        Q    What's recent?

9        A    Last week.

10       Q    Find another opportunity?

11       A    Yeah.

12       Q    How about Kelly Reuben?

13       A    Kelly Reuben's still here.

14       Q    Jessica Forbes.

15       A    Jessica Forbes is still with the Agency.

16       Q    Shantice Green.

17       A    No, she's not here anymore.

18       Q    She find another opportunity?

19       A    I believe so, yes.

20       Q    All right.  So, as a reminder, all gender

21  codes were removed from programming as directed by the

22  Agency in 2017.  What does that mean?

23       A    I'm not sure because I'm not sure what they

24  mean by CCM.  Generally, when we do -- when we make

25  systems updates, it's either done through a file

1    maintenance or a customer service request to Gainwell

2    Technologies oversees the FMMIS, so --

3         Q    You were familiar with the programming of the

4    ICD-10 codes, but you're not familiar with programming

5    of the gender codes?

6         A    Well, no, I'm familiar with the -- how

7    diagnosis codes are programmed in the system, but this

8    CCM acronym I'm not familiar with.

9         Q    What is a gender code?

10        A    You mean a gender code?  Well, what they mean

11   by gender codes, I'm assuming that means the ICD-10 Code

12   F64.  That's -- that's assuming that's what that means.

13        Q    What's a B for both?

14        A    Maybe that's written reference to male and

15   female.

16        Q    What is the significance of that?  Why does it

17   matter if it's -- what are the options?  B for both and

18   then, what, M for male, F for female?

19        A    That could -- I mean, that's what I'm assuming

20   based on -- based on this email chain.  I mean, it's a

21   little difficult because -- I mean, there's a lot of

22   extrapolation and it's -- much of it's open to

23   interpretation, so --

24        Q    Sorry, I lost my place.  Please prepare a CCM

25   to remove gender code from all the NDC's.  What are

Page 232

1   NDC's?  You said that?

2        A    National drug codes.  So that's almost like --

3   kind of like a procedure code, because each drug has a

4   corresponding NDC.  So the system doesn't recognize drug

5   names or recognize national drug codes.

6        Q    Okay.  And that was actually -- that

7   instruction was provided to someone -- Arlene Elliot

8   sent that instruction to someone back in 2017, to remove

9   the gender code.  Do you have any idea why Magellan and

10  AHCA were talking about this on June 3rd?

11       A    No.  We hadn't announced that we were going to

12  do a categorical exclusion yet.

13       Q    Okay.  I think this is just a place where

14  we're going to need to reserve some time for deposition

15  after you're able to do some adequate research on what

16  the information this email contains, and then we can do

17  some follow-up questioning.  Okay.

18            You mentioned earlier, were there any

19  communications from the plans about the exclusion prior

20  to its adoption?

21       A    What do you mean?  Do the plans have any -- do

22  we discuss with the plans prior?  No.

23       Q    All right.  Turning to waivers and variances

24  under Chapter 120, are you familiar with that process?

25       A    Oh, yes, I am.

Page 233

1        Q     Okay.  I'm going to hand you a copy of the

2     statute, Section 120.542.  We'll mark that as Exhibit

3     20.

4              (Whereupon, Exhibit No. 20 was marked for

5     identification.)

6     BY MS. DEBRIERE::

7        Q     Are you familiar with the statute?

8        A     Yes, I'm familiar with it.

9        Q     Based on your understanding, what is the

10    purpose?

11       A     So the purpose of this is because, of course,

12    agencies are granted rulemaking authority.  And because

13    agencies now -- and, of course, the rulemaking process,

14    I mean, it's public, transparent, but there are times

15    that there may be an exception that's required, so it's

16    kind of like the check and balances that if a variance

17    is required on a rule that -- like a party could apply

18    to that agency that administers that rule for

19    consideration of a variance.

20       Q     Does the purpose of the underlying rule have

21    to -- the spirit of it have to be met in granting the

22    variance or waiver?

23       A     What's meant by the spirit?

24       Q     I'm trying to look for the specific language.

25    So under subpart two, variance and waiver shall be

1  granted when the person subject to this rule

2  demonstrates the purpose of the underlying statute -- I

3  guess in this case it would be a rule -- or what statute

4  will we be referencing?

5       A    Well, in legal terminology, I mean,

6  differences between rule and statute, I mean, statutes,

7  of course, are approved by the legislature, goes to the

8  Governor, and the rules are done under the authority of

9  the statutes.  So, I mean, like agencies are authorized

10 to grant variances and waivers to requirements of the

11 rules consistent with the section and with rules adopted

12 under the authority of the section.  So, I mean, they do

13 call out rules, specific.  Then, of course, this applies

14 to all state agencies, so --

15      Q    Who makes a determination at AHCA whether a

16 petitioner has established a substantial hardship under

17 the statute?

18      A    Those come through our General Counsel's

19 office.  So if somebody wants to request a variance,

20 they do so through our agency clerk.

21      Q    And how is the determination itself made?

22      A    So the agency clerk will reach out to

23 individuals to, of course, who have pertinent knowledge

24 about the -- about the circumstances of the request of

25 the variance, will ask for input.  And, of course, the

1  determination's made.  It rides up to the Secretary.

2  The Secretary has to do the final approval for a

3  variance.

4        Q   So same question as to determining whether

5  principle -- principles of fairness are violated, who

6  makes that determination?

7        A   So when it comes to waivers and variances,

8  that's same process.  Goes to the agency clerk.  Then,

9  of course, does an investigation, consults with

10  individuals who are knowledgeable about the pertinent

11  subject, and then it goes up to the Secretary.

12        Q   Has AHCA developed any criteria to guide its

13  determination of whether to grant a variance or waiver

14  from the categorical exclusion of gender-affirming care?

15        A   No.  No, we haven't.  Variances are determined

16  on a very individualized basis.

17        Q   So, again, turning back to the -- ensuring the

18  purpose of the underlying statute, 120.542 specifically

19  states that variance and waivers shall be granted when

20  the person subject to the rule demonstrates that the

21  purpose of the underlying statute will be or has been

22  achieved by other means for the person.  So that means

23  the granting of the variance or waiver shows that the

24  purpose of the underlying statute will be or has been

25  achieved by granting it.  What statute -- in reviewing

Page 236

1   any request for a variance or waiver from 159G-1.050(7),

2   how would you demonstrate that the purpose -- well, what

3   statute will be at issue, first of all?

4        A    Well, for the statute -- I mean, would be

5   Chapter 409.  Those are the Florida Medicaid -- that

6   consists of the Florida Medicaid statute, so --

7        Q    What specific -- what specific provision of

8   409 would you be looking at?

9        A    I mean, we'd be looking at -- well, for the

10  variance, we'd probably be looking at, like, I mean,

11  somewhere under 409.9, probably under covered services

12  or optional services.

13       Q    Okay.  So how -- if someone requested a waiver

14  or variance from 59G-1.050(7), under what circumstances

15  would AHCA authorize coverage of the services listed in

16  that rule?

17       A    Well, we can't speak to those because I don't

18  think -- we haven't gotten a request for variances on

19  this yet.  So like it says, a highly individualized

20  process.  We will be looking at in-depth at the

21  recipient, looking at all the records available, and, of

22  course, discussing things with various experts and so

23  forth.  But each request is individualized.  So because

24  each request is individualized and focuses on the

25  specific individual, we can't project on what grounds we

Page 237

1    would grant a variance under.

2        Q    Well, so the June -- the categorical exclusion

3    of treatment for gender dysphoria was adopted because

4    the certain -- AHCA found that those services were

5    experimental, correct?  And Florida Medicaid cannot

6    cover services that are experimental?

7        A    That's correct.

8        Q    So in what situation could AHCA grant a waiver

9    or variance covering services that AHCA has found to be

10   experimental?

11       A    Well, I mean, based on the rule we wouldn't.

12   I mean, based on the rule, we would deny the variance,

13   but because each variance, it's individualized requests,

14   we would have to go through and evaluate each one

15   individually.

16       Q    Would the person have to establish that the

17   service they're requesting is not experimental?

18       A    We will not be placing the burden on the

19   recipient.

20       Q    Who would the burden be on?

21       A    Well, that would be on -- it'd be an

22   individualized process, evaluating all the -- all --

23   whatever medical records that we can get a hold of.

24   That's -- that's process that we use in the past, but

25   based on the rule, I mean, yeah, we say that these

1   would -- you have a categorical exclusion.  While we --

2   while the variance process is available, but because we

3   have a categorical exclusion, we do declare the services

4   to be experimental, investigational due to

5   very-low-quality evidence that -- yeah, I mean, we would

6   deny variance, but because variance reviews are

7   individualized, we don't want to speak in absolute terms

8   on the variance process.  But for -- because, I mean,

9   there's all kinds of questions that could come up in the

10  review of the medical records.  Maybe it was a -- maybe

11  it was a misdiagnosis.  Maybe something else could come

12  up.  That's pretty much why.  So --

13        Q     Okay.

14        A     Everything is different and --

15        Q     If a person sought a waiver of the application

16  of 59G-1.050(7) so they can receive Medicaid coverage

17  for a mastectomy that is specifically to treat their

18  gender dysphoria, under what circumstances would that

19  waiver be granted?

20        A     For -- under what circumstances?

21        Q     Yeah.

22        A     Well, I mean, we did declare this service to

23  be experimental investigational.

24        Q     So they could not get a waiver, correct?  The

25  waiver would be denied?

1         A     Based on the very general, hypothetical

2    situation that you provided, straight out just for

3    gender dysphoria, they got denied by their insured so

4    they request a variance.

5         Q     Yeah.

6         A     Based on our rule language, yeah, it'd be

7    denial.

8         Q     And someone is entitled to a fair hearing when

9    Medicaid coverage is denied, correct?

10        A     Yes, they are.

11        Q     Given that the Agency has found the services

12   in 1.057 -- 59G-1.050(7) to be experimental, and

13   therefore never medically necessary, correct?

14        A     Correct.

15        Q     Could someone ever prevail at a fair hearing

16   where they sought coverage of the services for gender

17   dysphoria?

18        A     Well, based on our rule, based on our

19   findings, no.

20        Q     Could someone use the variance or waiver

21   process to get around the final decision issued after

22   the fair hearing?

23        A     Well, I mean, they can request a variance, but

24   then they would go through the process, but based on our

25   rule and our findings, no.

1      Q      How often do Medicaid beneficiaries file

2  variance requests?

3      A      So in the research for this case, we found 10

4  requests, and that's since going back to about 2015,

5  2016.

6      Q      Okay.  So between 2015, 2016 to present, there

7  has been 10 requests?

8      A      That's correct.

9      Q      Okay.  These variances -- and I have copies of

10  all of them, if you'd like to reference them.  They

11  request that a service that AHCA affirmatively covers.

12  So there's -- there's a few types of variances we found

13  in our review.  There's situations in which AHCA

14  affirmatively covers the service, but the individual

15  wants an amount greater -- in a greater amount or

16  duration.

17      A      Yeah, I'm familiar with that one.  It's --

18  there was a variance request -- and it was actually

19  several various requests, because they were granted for

20  six months at a time.  We're talking about our recipient

21  under our I-budget waiver.  So, of course, our I-budget

22  waiver -- and no, it isn't, it's codified in rule.  So,

23  of course, there was a service limit on these behavior

24  assistance services at the time.  They were requesting

25  additional behavior assistance services.  So while -- so

1   because we already covered the service, and they're just

2   looking for additional services, you know, and that

3   that's -- that's flexibility that we can grant because

4   we haven't actually gone through -- the service they are

5   requesting, we have not codified as a categorical

6   exclusion, and we've not deemed that service be

7   experimental investigational.

8        Q     Okay.  And that's true for all the services

9   that are contained in the variances --

10       A     Yeah, from what I could tell, they're pretty

11  much all I-budget.

12       Q     Okay.  And they -- none of the services that

13  they were requesting some kind of variance on had been

14  categorically excluded, correct?

15       A     Correct.

16       Q     Okay.  And none of them have been determined

17  experimental?

18       A     Right.

19       Q     Okay.  Do you know of every Medicaid recipient

20  who made a request for a variance, if they were

21  represented by counsel?

22       A     No, we don't know if they were all represented

23  by counsel or not.

24       Q     Because I did notice that the recipients were

25  all listed.

Page 242

1    A    Yeah, the recipients were listed.  The

2    information is referred to the agency clerk.  Then the

3    Agency does its internal processes.

4    Q    Do you know what pro se means?

5    A    No.

6    Q    So, in any of the requests for variances to

7    the Medicaid recipient, him or herself, do any of the

8    direct request for the variance, or did they need

9    assistance?

10   A    Given the complexities of request and

11   legalities of it, I would -- I think it's safe to say

12   that they had some assistance, although it's not

13   required.

14   Q    Okay.  Between April of 2022 and August 21st

15   of 2022, did anyone at AHCA ever discuss the variance or

16   waiver process for use in challenging a denial based on

17   the categorical exclusion of treatment for gender

18   dysphoria?

19   A    No.

20   Q    All right.  Turning to our specific clients,

21   at anytime prior to August 21st, 2022, did Florida

22   Medicaid cover any of the services listed at

23   59G-1.050(7) for the treatment of gender dysphoria and

24   that actually --

25   A    You're talking about --

Page 243

1        Q    Everyone.

2        A    You're talking about after the hard date when

3    the ruling took effect?

4        Q    Anytime prior to that, did Florida Medicaid

5    cover any of the services listed at 59G-1.05 --

6        A    Prior to the effective date, yes.

7        Q    Okay.  So they covered puberty blockers?

8        A    Yes.  Well, for that small handful of

9    recipients we pulled the data on, yes.

10       Q    They cover cross-sex hormone therapy for the

11   treatment of gender dysphoria?

12       A    Yeah.  I mean, as far as data showed.

13       Q    Did they cover surgery for the treatment of

14   gender dysphoria?

15       A    From our data revealed, yes.

16       Q    At any time prior to August 21st, 2022, did

17   Florida Medicaid cover any of the services listed at

18   59G-1.050(7) for August Dekker?

19       A    We did go through our -- we did go through

20   there the recipient's histories, yeah.

21       Q    Did Florida Medicaid cover puberty blockers

22   for August Dekker to treat gender dysphoria?

23       A    For August Dekker?

24       Q    Yes.

25       A    Puberty blockers?

1       Q       Yes.

2       A       I don't believe so, no.

3       Q       Did Florida Medicaid cover hormone therapy for

4   August Dekker in treatment of gender dysphoria?

5       A       For August Dekker, yes.  I think -- I think

6   his managed care plan, Humana was providing him those.

7       Q       And he's still currently eligible for Florida

8   Medicaid?

9       A       Last time we checked he was still Medicaid

10  eligible.

11      Q       Okay.  And he's still enrolled in Humana, or

12  did he switch to another plan?

13      A       Well, we haven't -- we haven't verified

14  since -- we did have an enrollment period and recipients

15  are eligible to switch plans during that enrollment

16  period.

17      Q       In the coverage of hormones for treatment of

18  August Dekker's gender dysphoria, how long -- for how

19  long did AHCA authorize that treatment?  For how long

20  did Florida Medicaid cover that treatment?

21      A       I don't know the exact length.  We would have

22  to go back and take a look at the records we received

23  from Humana on the case.

24      Q       More than six months?

25      A       I think it was more than six months.

Page 245

1      Q     More than a year?

2      A     That's where it gets hazy.

3      Q     Was coverage for hormones to treat gender

4   dysphoria terminated for August Dekker after August

5   21st?

6      A     According to rule, yes, it would be

7   terminated.

8      Q     Did Florida Medicaid cover surgery for August

9   Dekker and treatment of gender dysphoria?

10     A     Yes.

11     Q     When?

12     A     So that would have been prior to the -- that

13  would have been prior to the challenge exclusion being

14  implemented.  Then to clarify, that was -- is -- the

15  managed care plan was covering that outside our state

16  plan benefits.

17     Q     How do you know that?

18     A     Because our state plan does not -- does not

19  specify the service as being -- as being mandated for

20  coverage.  In other words, if Humana had denied the

21  service, well, it would have just been a denial because

22  it's not a -- Medicaid doesn't -- we don't have that in

23  our state plan.  Managed care plans have to cover all

24  state plan services.  Sex change operations are not a

25  state plan covered service.

1     Q     Surgery is a state plan covered service?

2     A     Surgery, yes, but for -- but not for this --

3  necessarily this condition.

4     Q     Does the state plan specify for what

5  conditions services are provided?

6     A     No, it doesn't break down the diagnosis codes,

7  but this was one -- was the plan's discretion.  The plan

8  could have said yes.  The plan could have said no.  It

9  was up to the plan.

10     Q     Were federal Medicaid match dollars used to

11  pay for August Dekker's surgery?

12     A     So capitation rates that we pay to the plans

13  are per-member per-month rate.  That is a combination of

14  federal matching dollars and state revenue.

15     Q     Okay.  At any time prior to August 21st, 2022,

16  did Florida Medicaid cover any of the services listed at

17  59G-1.050(7) for Brit Rothstein?

18     A     Based on the -- based on the records that we

19  pulled, based on the recipient's individual histories

20  that we were -- we were able to locate, looked like,

21  yes, we did.

22     Q     Okay.  Did Florida Medicaid ever cover puberty

23  blockers for Mr. Rothstein?

24     A     So for Mr. Rothstein -- so for Mr.

25  Rothstein -- I -- so.  Sorry.  I think he's one of the

1    adult plaintiffs?

2         Q    Yes.  Yes.  And you said that he -- I'm

3    sorry -- pulled in a lot of directions.

4         A    We did cover services that we did determine to

5    be experimental investigational prior to the challenge

6    exclusion.

7         Q    And no longer cover them, correct?

8         A    Yes, because of the challenge exclusion.

9         Q    Same question for KF.

10        A    Since -- with KF, we did have a hard time

11   since for the minors we didn't have, like, their full

12   identification information.  Trying to locate their

13   records in the system, I think there were encounters,

14   based on information we had, that did show they were

15   receiving GnRH.

16        Q    Okay.  For the treatment of gender dysphoria?

17        A    Yeah.

18        Q    Okay.  And that includes Susan Doe, as well?

19        A    Based on what we could find, looked like

20   they -- that there had been some coverage.

21        Q    And they're -- KF is still currently eligible

22   for Florida Medicaid, is that correct?

23        A    We would have -- I think -- I think they would

24   be, because we haven't been doing these determinations

25   because of COVID.  So, yes, they would still be

Page 248

1    Medicaid-eligible.  That would go for all the

2    plaintiffs.

3              MS. DEBRIERE: Okay.  Let's -- can we take a

4         five-minute break?

5              MR. JAZIL: Sure.

6              VIDEOGRAPHER: Okay.  This concludes video

7         four.  The time is 4:15 p.m.

8              (Brief recess.)

9              VIDEOGRAPHER: This is the beginning of video

10        five.  The time is 4:30 p.m.  We're on the record.

11   BY MS. DEBRIERE::

12        Q    All right.  Turning back quickly to plaintiff

13   August Dekker, did Humana violate Florida Medicaid

14   policy by covering his surgery for treatment of gender

15   dysphoria?

16        A    No, they did not at the time.

17        Q    Okay.  And then I just want to talk about a

18   few more exhibits.  One labeled -- we've marked as

19   Exhibit 21, and that is the GAPMS queue that was

20   provided to us.

21              (Whereupon, Exhibit No. 21 was marked for

22        identification.)

23   BY MS. DEBRIERE::

24        Q    And it looks like the most recent date on that

25   queue was maybe an update to one of the GAPMS in 2019.

Page 249

1    That's as far as it goes.  Are all -- are these the only
2    GAPMS that are currently pending?
3         A    So the requests came in to pull the most
4    recent GAPMS queue.
5         Q    Yeah.
6         A    So at this -- when I went through our -- we
7    have a GAPMS folder that's on our shared drive.  I did
8    look through to see what -- we have a folder for the
9    GAPMS queues.  I did pull the most recent one.  This was
10   the most recent one that had been updated that was in
11   there --
12        Q    I'm sorry.  Go ahead.
13        A    This does -- this does consist of a lot of
14   GAPMS reports, which I do remember drafting some of
15   those as well, but this was our most recent one.
16        Q    And have there been GAPMS reports created
17   after 2018?
18        A    Yeah, I think there have been.
19        Q    Why aren't they on this list?
20        A    I'm not -- I'm not sure why they wouldn't be
21   included on this list.  This list should be updated on
22   regular basis, so I'm not sure why they wouldn't be
23   included on this, or on the list on the share drive,
24   because the GAPMS queue is really is not so much for the
25   GAPMS analyst, because GAPMS analysts generally have a

1    pretty good idea of what's outstanding, what's pending,

2    and what's been turned in.  It's more for leadership --

3    or their supervisor to pull and take a look at when

4    necessary, so I'm not sure why this hasn't been listed

5    to update in this current.

6        Q    So whoever's working in GAPMS at the time has

7    a good understanding of which GAPMS are pending.

8        A    When I was -- when I had the role, I could

9    tell you exactly where all my reports were, what their

10   status was and where they stood in the queue.  So, yeah,

11   I kind of had all committed to memory.

12       Q    Okay.  Would that be true of anyone holding

13   that GAPMS position?

14       A    As far as pulling it from memory, I couldn't

15   vouch for the other employees as to their memories, when

16   it came down to their reports that are outstanding.

17       Q    But they should have a good sense?

18       A    They should have a good sense of what's

19   pending and what's been turned in.

20       Q    Can you provide us a list of what's pending

21   that's not listed on this queue?

22       A    So I think -- so I think the ones that are

23   still pending aren't -- I think there were, like,

24   reopened reports.  I think we had gotten requests from

25   the manufacturers of Atheno, was the asthma tests that I

Page 251

1    discussed earlier.  That was one I had to have

2    finalized.  We've gotten a request for them to -- for us

3    to review it, provided that they don't send some more

4    evidence and more studies that have been done after our

5    original report.  So I think that one was reopened.

6    That one should still be pending.  Then there was

7    specially modified low-protein foods.  That was another

8    one that I had written up.  We had gotten requests to

9    reopen that one that, and to reevaluate that service.  I

10   think there was another one, which was the -- which was

11   a bone growth stimulator called Exigent.  I think that

12   one is still outstanding and pending.  Now, those are

13   just some examples of ones I can think are still

14   pending.

15        Q    Were there any new requests made after

16   December of 2018?

17        A    Yeah.  I mean, there have been some new

18   requests for either, like, expedited GAPMS or full

19   GAPMS.  I mean, we do get the service requests in fairly

20   frequently, so --

21        Q    Because it would be odd if any new requests

22   hadn't come in almost five years --

23        A    Correct.  Yeah.

24        Q    Okay.  But there's no way -- all right.  And

25   then I just want to put into the record, because we've

1   been referring to it quite a bit, we'll Mark it as

2   Exhibit 22, and that is the document from Health and

3   Human Services that we've referenced multiple times

4   during the deposition.  Is that the one you're referring

5   to?

6        A    That's correct.  This is it.

7             (Whereupon, Exhibit No. 22 was marked for

8   identification.)

9   BY MS. DEBRIERE::

10       Q    Thank you.  And then the guidance from the

11  Florida Department of Health regarding treatment of

12  gender dysphoria for children and adolescents dated

13  April 20th, 2022.  That's Exhibit 23.  Is that the

14  document that we've been referring to when we're talking

15  about DOH guidance?

16       A    Yes, it is.

17            (Whereupon, Exhibit No. 23 was marked for

18  identification.)

19            MS. DEBRIERE: And then -- I think that's it

20       for my questions.  The only thing I wanted to put

21       on the record, Mo, is we are at what time,

22       Videographer?

23            VIDEOGRAPHER: Do you mean the whole run time

24       or --

25            MS. DEBRIERE: Just the questioning time.

Page 253

1      Yeah, the time that we've been live and active on

2      the record.

3              VIDEOGRAPHER: Five hours, eight minutes plus

4      five and a half minutes.

5              MS. DEBRIERE: Okay.  So want to just say that

6      we have an hour and 45 minutes of questioning --

7              MR. JAZIL: Sure.

8              MS. DEBRIERE: -- to reserve?

9              MR. JAZIL: And so the depo is open.  I'd like

10     to ask questions at the end.  So I'll just reserve

11     that until after our second session, is that okay,

12     or would you like for me to --

13             MS. DEBRIERE: Can I confer with my team

14     quickly?  Okay.

15             VIDEOGRAPHER: We will remain on the record?

16             MS. DEBRIERE: We'll go off the record.

17             VIDEOGRAPHER: Okay.  Off the record at 4:36

18     p.m.

19             (Discussion off the record.)

20             VIDEOGRAPHER: We're back on the record.  The

21     time is 4:37 p.m.

22             MS. DEBRIERE: And plaintiff's counsel is all

23     finished with their questioning.

24                              EXAMINATION

25     BY MR. JAZIL::

1      Q     This is Mohammed Jazil for the defense.  I'll

2   try to be brief, recognizing we have time limitations

3   here.  Mr. Brackett, I'd like to have you look at

4   Exhibit 3 again.

5      A     Okay.

6      Q     Exhibit 3 has a date on it, May 20th, 2022.  I

7   want the record to be clear, why is that date not

8   accurate?

9      A     This date isn't accurate because that date

10  is -- automatically sets to the date you print it out.

11     Q     And what sets that date?

12     A     The template is automatically set to enter in

13  this current date that you're viewing the document.  So

14  it automatically updates the second you open it.

15     Q     And that's the template in the AHCA document?

16     A     That is our template, yeah.

17     Q     And when was this GAPMS report created?

18     A     This GAPMS was originally created in 2016.

19     Q     Thank you.  You discussed with my friend the

20  variance and waiver process.  Do you recall that

21  testimony?

22     A     Yes.

23     Q     You testified that the variance and waiver

24  process is individualized.  Do you recall that

25  testimony?

Page 255

1          A     Yes, I do.

2          Q     Once a variance and waiver request comes in,

3     it goes to the clerk is what you testified to, if my

4     understanding is correct?

5          A     Yes.

6          Q     And then the clerk routes it to whom?

7          A     The clerk gathers information and it has to be

8     routed up to the secretary.

9          Q     Is it routed directly to the Secretary or is

10    there any other office that it goes through first?

11         A     I'd have to take a look at the variances

12    again.  It might be -- I think it probably have to route

13    through General Counsel before it goes to the Secretary.

14         Q     Okay.  And is the General Counsel's office

15    responsible for the formulating the Agency's position on

16    legal issues?

17         A     Yes.

18         Q     Does that include the variance and waiver

19    process?

20         A     Yes.

21              MR. JAZIL: I have no further questions.

22                     FURTHER EXAMINATION

23    BY MS. DEBRIERE::

24         Q     Just one redirect.  Very brief.  On Exhibit 3,

25    which is the GAPMS memo dated May 20th, 2022, that was

```
 1    the date it was printed out.  It also appears changes
 2    were made on that date, is that correct?
 3         A    Based on the comments in the edits, yeah, it
 4    looks like somebody had made changes to that document on
 5    that date.
 6         Q    But you don't know who that person is?
 7         A    SG, I'm -- I can't speak to who SG is.
 8         Q    But you will find that information out for us?
 9         A    We can -- we can figure out who, but we
10    would -- probably want to verify with IT.
11              MS. DEBRIERE: Okay.  That's all.
12              MR. JAZIL: So, counsel, while we're still on
13         the record, he's still under oath, so I'm not going
14         to obviously talk to him about any issues that
15         might come up, but with your consent, I'd like to
16         at least work with him to gather the additional
17         information that's being sought.  Is that
18         appropriate?
19              MS. DEBRIERE: I mean, I would assume that
20         would be your process.
21              MR. JAZIL: He is under oath, and so I'm
22         obviously not going to try to, you know --
23              MS. DEBRIERE: I see.  I see.
24              MR. JAZIL: -- work with him while -- work with
25         him on his testimony, I say, as I try to gather
```

Page 257

1      additional information, so I'll make that clear on

2      the record.

3              VIDEOGRAPHER: Anyone else?  Anybody by Zoom?

4              MS. DEBRIERE: No.

5              VIDEOGRAPHER: Okay.  This concludes the

6      February 8th, 2023 portion of the video-recorded

7      deposition of Corporate Representative for Agency

8      for Health Care Administration.  The time is 4:40

9      p.m.

10             COURT REPORTER: Are you going to be ordering

11     this?

12             MS. DEBRIERE: Yes.

13             COURT REPORTER: All right.  And Mo has

14     requested a rough draft.  I told him I could get it

15     to him tomorrow.  Do you guys -- would you guys

16     like one, as well?

17             MS. DEBRIERE: Yes, please.

18             (Whereupon, the deposition was concluded at

19     4:40 p.m., and the witness did not waive reading

20     and signing.)

21

22

23

24

25

Page 258

1                      CERTIFICATE OF OATH

2

3

4

5     STATE OF FLORIDA   )

6     COUNTY OF LEON     )

7

8

9            I, the undersigned authority, certify that the

10    above-named witness personally appeared before me and

11    was duly sworn.

12

13           WITNESS my hand and official seal this 21st

14    day of February, 2023.

15

16

17

18

19           _____._____

20           DANA W. REEVES
             NOTARY PUBLIC

21           COMMISSION #GG970595
             EXPIRES MARCH 22, 2024

22

23

24

25

Page 259

1                      CERTIFICATE OF REPORTER
2     STATE OF FLORIDA    )
      COUNTY OF LEON      )
3
4           I, DANA W. REEVES, Professional Court
5     Reporter, certify that the foregoing proceedings were
6     taken before me at the time and place therein
7     designated; that my shorthand notes were thereafter
8     translated under my supervision; and the foregoing
9     pages, numbered 128 through 257, are a true and correct
10    record of the aforesaid proceedings.
11          I further certify that I am not a relative,
12    employee, attorney or counsel of any of the parties, nor
13    am I a relative or employee of any of the parties'
14    attorney or counsel connected with the action, nor am I
15    financially interested in the action.
16          DATED this 21st day of February, 2023.
17
18
19
20    _____._____
21    DANA W. REEVES
      NOTARY PUBLIC
22    COMMISSION #GG970595
      EXPIRES MARCH 22, 2024
23
24
25

```
                                                    Page 260

 1      Gary V. Perko, Esq.
        gperko@holtzmanvogel.com
 2
 3                          February 21, 2023
 4
 5      RE:     August Dekker, et al. vs. Jason Weida, et al.
 6              February 8, 2023/Matthew Brackett/5696545
 7
        The above-referenced transcript is available for review.
 8      The witness should read the testimony to verify its
        accuracy. If there are any changes, the witness should
 9      note those with the reason on the attached Errata Sheet.
        The witness should, please, date and sign the Errata
10      Sheet and email to the deposing attorney as well as to
        Veritext at Transcripts-fl@veritext.com and copies will
11      be emailed to all ordering parties.  It is suggested
        that the completed errata be returned 30 days from
12      receipt of testimony, as considered reasonable under
        Federal rules*, however, there is no Florida statute to
13      this regard.  If the witness fail(s) to do so, the
        transcript may be used as if signed.
14
15      Yours,
16      Veritext Legal Solutions
17      *Federal Civil Procedure Rule 30(e)/Florida Civil
        Procedure Rule 1.310(e).
18
19
20
21
22
23
24
25
```

Page 261

1    August Dekker, et al. vs. Jason Weida, et al.

2    February 8, 2023/Matthew Brackett

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it

20   are true.

21

22   _____    _____

23                Matthew Brackett                    DATE

24

25

**&**

**&**   126:19

**0**

**000169125**
   226:9
**0002587**   216:21
**000258815**
   221:6
**000292335**
   201:16
**00325**   125:3

**1**

**1.05**   243:5
**1.050**   148:23
   149:3 174:3
   189:13 204:19
   213:8 236:1,14
   238:16 239:12
   242:23 243:18
   246:17
**1.057**   239:12
**1.310**   260:17
**10**   149:16
   154:21 159:4
   224:25 231:4,11
   240:3,7
**10005**   126:13
**10:35**   216:5,19
**110**   126:14
**119**   126:20
**11:04**   216:18
**12**   149:17
**120**   126:12
   212:4 232:24

**120.542**   127:17
   206:1 209:18,24
   235:18
**120.542.**   233:2
**1229**   126:7
**125**   125:11
**128**   127:4 259:9
**12th**   126:7
**13**   127:11
   152:14
**14**   127:12
   162:20 163:6
   227:12
**15**   127:13 200:4
   201:24 202:11
**1512**   126:14
**153**   127:11
**159g**   236:1
**16**   127:14
   199:24 213:22
   213:22 214:3
**163**   127:12
**17**   127:14
   213:22 214:1,3
   214:8
**18**   127:15 221:7
   221:9
**19**   127:16
   226:18,21
**19th**   126:12
**1:30**   125:15
   128:8
**1st**   158:2,3

**2**

**2**   125:11
**20**   127:17 233:3
   233:4
**2002**   162:16
**2015**   208:4,5
   240:4,6
**2016**   143:3
   240:5,6 254:18
**2017**   139:11
   151:9 230:22
   232:8
**2018**   249:17
   251:16
**2019**   248:25
**202**   127:13
**2022**   127:14,14
   127:16 128:13
   128:18 129:2
   135:8 140:6
   147:14,19 151:1
   157:6,16 160:11
   163:7 164:12,18
   164:23 168:23
   171:21 178:10
   201:22 207:10
   208:10 213:24
   214:2 216:5
   220:16 226:24
   242:14,15,21
   243:16 246:15
   252:13 254:6
   255:25
**2023**   125:14
   147:13 257:6

258:14 259:16
   260:3,6 261:2
**2024**   258:21
   259:22
**20th**   157:24,25
   158:3 227:11,16
   252:13 254:6
   255:25
**21**   127:17
   248:19,21 260:3
**210**   137:24
**215**   127:14,14
**21st**   207:10
   208:10 242:14
   242:21 243:16
   245:5 246:15
   258:13 259:16
**22**   127:14,14,18
   213:24 216:5
   252:2,7 258:21
   259:22
**222**   127:15
**227**   127:16
**22nd**   214:2
   216:18
**23**   127:18 211:2
   252:13,17
**234**   127:17
**24**   168:22 170:2
**245,000**   137:24
**249**   127:17
**253**   127:5,18,18
**255**   127:6
**257**   259:9

**25th** 147:13
**261** 125:11
**26th** 201:22
**2727** 125:17
**27514** 126:15
**29229** 258:18
259:19
**2nd** 166:4
168:11 169:25
184:3

**3**

**3** 254:4,6 255:24
**30** 212:25
260:11,17
**3100** 126:9
**32205** 126:4
**32301** 126:20
**32308** 125:17
**32601** 126:7
**33131** 126:10
**34,999** 138:2,3
**35** 138:2
**35,000** 136:16
136:21,25
137:23 138:23
177:22
**3900** 126:4
**3:00** 199:12
**3:08** 199:15
**3rd** 127:16
168:14 170:1
226:24 232:10

**4**

**409** 236:5,8
**409.9** 236:11
**45** 253:6
**46** 164:13
187:19
**47** 193:1
**4:15** 248:7
**4:22** 125:3
**4:30** 248:10
**4:37** 253:21

**5**

**50** 149:15,21
152:16 155:12
**500** 126:20
**5696545** 260:6
**59** 148:23 149:3
169:4
**59g** 174:3
189:13 204:19
213:8 236:14
238:16 239:12
242:23 243:5,18
246:17

**6**

**60** 216:25 217:2
217:14,16 218:7
218:17,20,23
219:23 220:7
222:3,5
**600** 126:9
189:14

**7**

**7** 138:4 148:23
149:3 174:3
204:19 213:8
236:1,14 238:16
239:12 242:23
243:18 246:17
**70s** 163:3

**8**

**8** 125:14 260:6
261:2
**88** 158:12
**8th** 128:14,25
188:8 257:6

**a**

**a.m.** 216:5,18,19
**aap** 162:9,10
194:7
**aap's** 162:11
**abc** 144:10
**ability** 132:4
**able** 140:15
149:20 151:25
158:14 159:14
175:11,15
178:24 179:12
179:22 182:9
185:16 192:23
192:24 229:22
230:1 232:15
246:20
**above** 258:10
260:7

**absence** 155:7
**absolute** 150:18
238:7
**absolutely**
202:3 212:13
**academic**
160:18
**academy** 190:16
**accepted** 204:10
**access** 191:21
218:11,13,19
225:10
**accessible**
175:10 187:23
188:4
**accordance**
212:23
**account** 132:1,2
154:23
**accuracy** 260:8
**accurate** 204:14
204:16 254:8,9
**achieved** 235:22
235:25
**acronym** 231:8
**act** 173:1,12,21
173:24
**acting** 134:21
138:10
**action** 259:14
259:15
**active** 217:11
253:1
**actively** 139:25

activists 161:1
activities 196:21
activity 193:24
actual 132:15
132:20 172:5
202:9 203:15
actually 132:6
133:11 137:14
139:9 144:7
149:14 153:11
153:12 163:13
167:17 179:10
180:3 182:18
192:4 205:6,8
206:18 218:3
222:25 226:10
226:14 232:6
240:18 241:4
242:24
acute 196:19
ad 192:19
adapt 140:15
add 146:12
added 145:24
146:12 155:25
216:6
adding 170:22
addition 170:10
170:13
additional
178:8 240:25
241:2 256:16
257:1
addressed
222:11

adds 216:9
adequacy
175:21
adequate
149:15 161:5
174:11 175:1
176:23 196:8
223:3 232:15
adjuvant
151:11
administers
233:18
administration
125:16 257:8
administrative
171:25 176:19
213:10,14
administrator
169:12 170:15
adolescence
228:1
adolescents
127:19 226:25
252:12
adopt 164:23
165:22 168:8,10
168:23 169:7,24
171:20
adopted 165:5
218:19 219:22
234:11 237:3
adopting 172:25
173:24
adoption 159:10
204:23 206:11

207:21 232:20
adult 186:5
247:1
adults 185:9,10
185:12,20,23
adverse 127:13
200:15 201:14
201:19 202:13
202:19 203:7,14
204:25 207:2
adversely
212:15
advocacy
160:25 179:21
advocates 161:1
179:21
affair 213:4
affect 151:13
affected 196:22
212:15
affirmatively
240:11,14
affirming
131:13 133:1
141:6,10,25
143:20 152:19
162:7 225:20
235:14
aforesaid
259:10
agencies 233:12
233:13 234:9,14
agency 125:16
130:13 134:22
140:23 141:2

143:5,6 144:18
154:1 166:13
175:18 177:5
180:17 181:4,17
181:21 185:5
186:10 192:3
205:10 212:18
212:21 219:5
228:3,18 230:15
230:22 233:18
234:20,22 235:8
239:11 242:2,3
257:7
agency's 187:3
255:15
ages 205:5
ago 135:19
191:4
agree 202:1
222:24 223:4
agreement
136:12 138:20
177:21,22,23
agreements
136:15,23
138:12
ahca 128:13
131:1 132:14,23
134:12 135:6
136:13 138:15
138:25 139:2,6
140:4 144:20
145:4,7,18
159:11 160:7
164:14 168:22

169:12 175:12
176:8,10,14,15
176:18 177:1
178:1 180:20
181:9,11,25
182:10,11,20,25
183:8 184:9
186:15 187:3
188:8 189:12,15
189:17 194:1
200:14,19,23,24
201:3,9 206:11
207:10,11,22
208:10,21 209:7
209:11,22 210:6
210:19 212:18
213:6 214:7
215:14 217:22
218:23 222:16
223:13,14
226:22 227:13
228:6,8,9,20,23
229:15 232:10
234:15 235:12
236:15 237:4,8
237:9 240:11,13
242:15 244:19
254:15
**ahca's** 186:18
202:15 206:11
213:13 215:13
219:20 220:11
**ahead** 249:12
**al** 125:5,8
194:22 260:5,5

261:1,1
**alert** 127:15
217:1 221:5,8
221:20,22,23
222:9
**alicia** 227:16
**alignment** 133:7
194:16
**alliance** 133:13
134:13 188:12
**allocated**
137:21
**allow** 222:1
226:6
**allowed** 204:17
**allowing** 177:6
**altogether**
220:20 224:18
**ama** 162:12,13
**amending**
170:22
**amendment**
170:19
**american** 162:6
190:16
**amount** 138:4
139:14 149:18
159:7 175:25
240:15,15
**amounts** 136:16
136:24 156:6
**ample** 213:10
**analog** 227:25
**analyses** 149:11

**analysis** 151:12
151:21,23
**analyst** 221:16
249:25
**analysts** 249:25
**analytics** 159:15
**analyze** 157:1
**analyzed** 194:12
**andrew** 130:13
135:24
**anecdotes**
132:13
**angles** 198:24
**ann** 163:15
213:23 216:3,25
221:18
**announced**
214:14 232:11
**announcements**
184:24
**annually** 159:11
**answer** 143:9
200:11 210:3
**answered** 200:8
**antagonists**
217:7 221:25
**anticipate** 140:8
142:3,11 143:3
174:5 179:5
182:7
**anticipated**
140:20 176:6
181:21
**anticipating**
179:11

**anticipation**
140:10
**anybody** 129:15
133:25 172:8
177:1,11,11,14
183:14 257:3
**anymore** 223:21
229:6 230:17
**anytime** 228:22
242:21 243:4
**apologize** 135:6
**appeal** 205:14
205:14 207:7
212:5,17,20,24
**appeals** 206:4
207:1,4
**appear** 181:24
181:25
**appearances**
126:1
**appeared**
258:10
**appears** 201:21
256:1
**appellate**
212:20,23 213:3
213:4
**apples** 150:22
150:22
**application**
238:15
**applies** 234:13
**apply** 218:24
233:17

approach 131:8
appropriate
129:9 155:13
256:18
approval 164:8
229:16 235:2
approved 164:9
164:14,18
217:21 234:7
april 157:24,25
158:2 227:11,16
242:14 252:13
area 172:15
225:14 229:25
areas 140:14
argument
193:10 198:9
arkansas
194:11
arlene 232:7
arrange 176:22
arrangements
178:25 179:2
arranging
174:11
article 144:8
145:24
articles 148:8
148:14 158:8,12
160:14 194:13
articulate 146:8
articulately
179:13,16
ascertain
196:16

ashley 213:25
216:5,10,17
226:23 227:4
230:6,7
aside 136:7
asked 199:17
216:1,3
asking 130:3
196:5 208:5
assessed 130:4,7
130:10
assessment
140:1,16 141:13
assist 200:19
assistance 205:4
240:24,25 242:9
242:12
assistant 169:15
215:5,16 219:10
222:22
association's
162:6
assume 256:19
assuming
231:11,12,19
asthma 151:11
250:25
atheno 250:25
attached 227:4
227:24 260:9
attacks 140:17
192:20
attend 177:11
177:14

attendance
177:2
attention
143:23 185:4
193:4,8
attorney 259:12
259:14 260:10
attorney's 202:2
attorneys 182:4
200:2 210:9
audience 175:16
179:5 187:23
auditorium
175:14
august 125:5
127:14,14
207:10 208:10
213:24 214:2
216:5,18 242:14
242:21 243:16
243:18,22,23
244:4,5,18
245:4,4,8
246:11,15
248:13 260:5
261:1
authored 136:8
authorities
169:12
authority
203:22 233:12
234:8,12 258:9
authorization
217:13 219:21
228:14

authorizations
217:20 229:6
authorize
236:15 244:19
authorized
234:9
automatically
254:10,12,14
available
152:23 153:17
162:10 175:18
178:6 236:21
238:2 260:7
avenue 126:7,9
aware 132:23
135:20 177:10
199:2,4 204:6
223:11

**b**

b 148:10 227:6
231:13,17
back 129:1
135:6 139:11
143:19,22,24
147:1 159:6
167:3 183:7
186:3 193:11
195:18 214:6
221:23 223:17
229:15 232:8
235:17 240:4
244:22 248:12
253:20
background
130:8

**backgrounds** 128:22 129:5,9
**balances** 233:16
**bans** 171:6
**bar** 211:10
**barantorchinsky** 126:19
**base** 200:2
**based** 128:22 131:7,18 132:2 132:17 133:9,19 134:1 139:7 143:25 154:16 154:16,20 157:6 157:11,14 161:15 165:2,2 185:7 186:10 191:19 220:4 231:20,20 233:9 237:11,12,25 239:1,6,18,18 239:24 242:16 246:18,18,19 247:14,19 256:3
**bases** 160:15,21
**basic** 182:22,24 182:24
**basis** 128:24 198:11 205:2 207:2 235:16 249:22
**bates** 201:15,18 202:7,8 221:6 226:16

**bear** 210:24
**becoming** 144:17
**beginning** 128:7 199:14 248:9
**behalf** 144:18 163:15
**behavior** 240:23 240:25
**behavioral** 170:16 196:15
**believe** 172:6,6 213:24 230:19 244:2
**beneficiaries** 205:1 220:12 240:1
**benefit** 200:15 201:15,19 202:14,19 203:7 203:15,25 204:5 204:13,15,25 207:2
**benefits** 127:13 203:23 245:16
**best** 134:7 142:23 174:18
**bias** 195:1
**big** 187:6 198:6
**bigger** 153:15 162:19
**billing** 224:7
**bit** 128:12 135:5 136:18 146:8 166:24 174:9

179:22 209:20 228:8 252:1
**blocked** 210:17
**blockers** 171:7 217:7 221:25 243:7,21,25 246:23
**bone** 251:11
**bostock** 195:9
**bottom** 212:14 217:3
**bound** 178:5
**box** 164:9 203:22 204:11
**boxes** 204:13
**brackett** 125:12 127:3 128:3 254:3 260:6 261:2,23
**brand** 170:11
**break** 128:11 199:9,17,18,19 199:21 246:6 248:4
**breaking** 195:5
**brickell** 126:9
**brief** 189:21 199:13 248:8 254:2 255:24
**brignardello** 133:10 194:24
**brings** 143:19 143:22
**brit** 246:17

**broad** 196:4
**brock** 174:7 176:21 177:5 183:12
**brought** 152:7 194:7
**budget** 137:21 138:1 148:25 151:3,7,12,15 151:25 240:21 240:21 241:11
**bullets** 170:22
**burden** 237:18 237:20
**bureau** 159:17 166:17 167:12 167:21 169:9,13 172:2 219:14

**c**

**california** 155:23
**call** 156:19 234:13
**called** 128:4 251:11
**calling** 182:17
**calls** 136:2 178:17
**canadian** 184:15
**cap** 138:1 177:22
**capacity** 134:21 136:10 143:7 175:17 176:24

187:7

**capitation**
246:12

**capped** 137:25

**caps** 177:25

**captured**
194:23

**cards** 197:9

**care** 125:16
127:13,15
131:13 133:1
141:6,10,18,25
150:9 152:19
154:9 157:7,11
157:12 159:15
161:17 162:4,7
189:4 191:21
200:6,7,21,24
201:19 202:22
205:8,10 207:2
213:7,12 217:10
217:16,17 218:2
218:4,5,9,12,17
218:19,24
219:23 220:8
221:8 222:4
225:18,20,22
235:14 244:6
245:15,23 257:8

**careful** 189:23

**case** 125:3
138:10 160:19
160:20 180:24
187:22 191:15
199:25 213:4

214:21 234:3
240:3 244:23

**cases** 194:1,18
195:7,10

**catch** 216:23

**catchy** 187:12

**categorical**
157:3 159:11
165:3,6,10,15
165:21,24
169:24 172:25
173:25 191:19
192:5 200:16
204:23 206:12
207:22 209:8,12
218:18 219:22
225:19 226:2
232:12 235:14
237:2 238:1,3
241:5 242:17

**categorically**
171:15 241:14

**category** 186:6

**catherine**
126:14

**cause** 195:18,18
197:22 220:22

**cc'ing** 213:23

**ccm** 227:5
230:24 231:8,24

**certain** 149:18
237:4

**certainly** 181:22

**certificate** 258:1
259:1

**certify** 258:9
259:5,11

**cetera** 132:3
137:14

**chain** 227:10
228:13 231:20

**challenge**
179:12 227:2
245:13 247:5,8

**challenging**
242:16

**change** 166:19
174:15 214:22
245:24 261:4,7
261:10,13,16

**changes** 145:22
147:6 167:1,4,4
167:15,24
169:20 189:13
213:13 214:13
217:12 256:1,4
260:8

**changing**
213:11

**chapel** 126:15

**chapter** 188:17
212:4 232:24
236:5

**charge** 171:22

**check** 201:16
203:5 233:16

**checked** 164:9
194:6,13 203:23
203:25 204:9,11
204:12,13 244:9

**checking** 187:13

**chelsea** 126:6

**chelsea's** 211:3

**chen** 129:19
130:20 158:5
189:19,24
193:14

**chief** 169:13
174:7,7,7 181:4

**child** 186:10

**children** 127:11
127:19 185:9,10
187:5 188:21
226:25 252:12

**chloe** 189:6

**choose** 164:23

**chose** 131:14

**chriss** 126:5
210:15 211:11
211:14

**christian** 133:22
134:8 188:9

**chronic** 196:19

**circling** 135:6

**circuit** 225:4

**circumstance**
156:9

**circumstances**
143:23 234:24
236:14 238:18
238:20

**cite** 194:20

**cited** 147:15,15
147:19 148:12
148:17 158:9,11

194:2,10,20
**citing** 194:13
**citizens** 134:13
188:12
**civil** 260:17,17
**claim** 159:16
206:11
**claims** 141:14
143:25 188:3
225:1
**clarified** 161:16
**clarify** 161:14
216:6 218:4
245:14
**clarity** 216:11
**clayton** 195:9
**clear** 130:17
162:1 222:18
254:7 257:1
**cleared** 210:20
**clearer** 159:19
**clearing** 225:2
**clerk** 212:18
234:20,22 235:8
242:2 255:3,6,7
**clients** 242:20
**clinic** 190:19
**clinical** 132:2
137:17,19 139:7
160:25 161:11
228:15 229:6
**close** 177:24
**cnn** 144:9
**coalition** 133:23
134:8 188:10

**coca** 163:1
**code** 159:21,24
160:2,3,4
224:13,19 227:6
231:9,10,11,25
232:3,9
**coders** 224:6,23
224:23 225:3
**codes** 159:22
224:25,25
230:21 231:4,5
231:7,11 232:2
232:5 246:6
**codified** 240:22
241:5
**coding** 224:22
**cody** 174:8
183:11
**cola** 163:1
**cole** 171:23
174:6 176:19
189:6,18,24
193:14
**collaborative**
215:22
**collect** 152:8
**collecting**
205:16,23
**colorful** 193:7
**column** 163:8
164:8
**comb** 193:25
**combination**
160:25 189:18
246:13

**come** 138:24
141:2 155:8
162:8 165:14,18
166:6,7,8,10,21
167:1,7 177:24
181:2 195:25
196:6 222:22
224:6 225:11
234:18 238:9,11
251:22 256:15
**comes** 149:17
150:17 151:20
155:19 185:12
186:3,5 196:13
202:23 218:12
223:17,19 235:7
255:2
**comfortable**
211:17
**coming** 187:2
195:6 224:12
**commenced**
125:15
**comment**
180:14 190:8,16
190:20,20,23
191:2,7,14
193:1 195:20,20
197:8
**comments**
179:13,16,23
180:1,17 189:12
190:9,11,14,24
191:3,5 192:15
192:17 193:3,5

193:13 194:2
195:6,8,10,12
197:20 256:3
**commercials**
163:2
**commission**
258:21 259:22
**committed**
250:11
**common** 162:25
**communicate**
158:18 176:8,10
188:9 220:17,23
226:1
**communicating**
160:10
**communication**
136:4
**communicatio...**
176:22 181:4
232:19
**community**
161:1 170:15
**comparability**
173:1,21,23
**compared**
175:18
**compensated**
177:16
**competition**
150:13
**competitive**
136:22
**complaint**
206:14,17

complaints
  206:16
complete   146:18
completed
  138:8 165:12
  260:11
completely
  170:15
completing
  197:10
complexities
  242:10
compliance
  206:3
complicated
  132:9
components
  184:4
composing
  146:10,10
concern   143:14
concerned
  140:17 175:21
concluded
  185:7 257:18
concludes
  199:11 248:6
  257:5
conclusion
  165:15,18
  168:23 185:21
  195:24 197:23
conclusions
  133:9 142:1
  154:23 171:21

184:10
condition
  196:19 224:3
  246:3
conditions
  196:17 246:5
conducted
  212:23
confer   223:7,7
  253:13
confidential
  202:2
confirm   208:24
  209:3
confirmation
  210:3
conflict   198:4
conflicting
  223:23
confusion   216:9
connected
  259:14
consent   256:15
consider   131:16
  135:7 141:18
  149:2 150:1,24
consideration
  132:22 143:17
  173:24 174:24
  179:24 185:14
  190:12,22
  191:20 192:3
  233:19
considerations
  185:18 186:4

considered
  135:14 142:9
  147:19 260:12
considering
  148:22
consist   249:13
consistent
  144:17 202:17
  202:18 234:11
consists   236:6
consultancy
  161:20
consultant
  131:21 136:13
  136:14 137:11
  137:25 138:5,7
  139:3,19 144:21
consultants
  129:25 131:2,10
  132:15,24
  133:12 134:10
  135:7 137:2
  138:9,14,15,16
  138:24 139:6
  140:21 142:24
  145:5,7,17
  146:15 147:1
  158:18 160:10
  160:22 162:5
  164:14 178:2,14
  179:9 180:1,20
  180:24 182:21
  183:1
consulted
  147:19,22

consults   235:9
contact   153:21
  156:15,25
contacted
  135:12,17 136:9
contacting
  135:22,23 136:1
contain   209:23
contained
  181:12 241:9
contains   164:13
  232:16
content   145:10
  145:24 170:10
  172:17 190:8
  191:12 214:20
context   142:18
  228:12,13 230:2
continue   217:17
  218:19 224:11
  226:2
continued   218:7
continuity
  217:16 218:2,4
  218:5,9,12,17
  218:24 219:23
  220:7 222:3
contract   129:3
  204:7 218:3
contracted
  137:11,18
  180:21,24
contracting
  137:3

**contracts**
202:22
**contradict**
187:17 195:14
**contradiction**
133:4,6,7
**contradictory**
165:18 198:7
**contribute**
132:5
**control**   176:20
196:8 197:16
**controversial**
142:10 174:14
**conversation**
135:1,4 172:24
173:12,15
199:24
**conversations**
134:3,5 135:13
135:18 136:3
162:8 173:16,19
173:20 199:19
199:22
**conviction**
176:5
**copied**   211:3
**copies**   178:5,7
240:9 260:10
**copy**   145:8
184:2 210:4,6
212:18 233:1
**copying**   216:17
**corporate**   257:7

**correct**   130:22
130:25 131:12
143:2 145:25
146:18 147:16
147:17 150:24
150:25 151:9
154:15 164:11
164:20 167:22
168:9,11,12,14
169:1 171:4,9
171:10 173:9
178:11,13
185:24 186:1
188:24 189:3
201:17 202:7,16
203:16,20 206:9
215:13,15,20
217:19 218:15
218:16,25
219:13 220:13
237:5,7 238:24
239:9,13,14
240:8 241:14,15
247:7,22 251:23
252:6 255:4
256:2 259:9
**corrected**   147:3
**correspond**
184:18
**correspondence**
135:20
**corresponding**
160:2 232:4
**cost**   151:12
152:4 159:7

**costs**   186:20
**council**   133:17
**counsel**   126:6
129:13 135:2,24
166:9,12 181:24
181:25 182:5,8
182:11 202:1
241:21,23
253:22 255:13
256:12 259:12
259:14
**counsel's**
169:18 172:14
176:16 182:14
182:16 234:18
255:14
**county**   258:6
259:2
**couple**   130:15
178:16,16
**course**   129:12
131:4 134:22
135:13 136:14
136:23 139:10
139:12 141:10
142:8,8,19,21
144:8 153:18
154:10 163:16
163:16 165:10
166:11 169:14
169:17 170:17
171:4,5 175:2,2
176:18 178:23
179:18 182:3
184:25 185:2,2

187:9 191:4
193:19,24
194:23 195:10
196:7,21 197:10
198:3,20 202:10
206:17 215:23
218:21 219:9
220:1 223:23
224:2,5,5,6,24
224:24 233:11
233:13 234:7,13
234:23,25 235:9
236:22 240:21
240:23
**court**   125:1,19
147:13 195:7
212:6,20 257:10
257:13 259:4
**courts**   213:3
**cover**   150:11,12
151:8,13 152:20
154:14 155:3,24
156:12 173:8
204:17,22
220:21 222:16
222:17 223:14
237:6 242:22
243:5,10,13,17
243:21 244:3,20
245:8,23 246:16
246:22 247:4,7
**coverage**   127:11
137:13 143:1,14
144:12,14,15
149:17 150:1,5

150:21,21
151:20,22 152:9
153:6,9,11
155:13 156:6,20
159:8,12 160:4
160:8 167:4,20
170:11,16,20
171:7,15,25
173:13,18
175:25 185:15
185:16 186:5
190:25 191:8,17
203:19 205:1
213:13 217:12
217:17 218:7
220:1 226:2
228:24 229:8
236:15 238:16
239:9,16 244:17
245:3,20 247:20
**covered**  149:22
152:3 155:15
160:15,21 171:2
203:22,25 204:5
204:12,15
218:14 220:25
236:11 241:1
243:7 245:25
246:1
**covering**  151:16
151:19 217:23
237:9 245:15
248:14
**covers**  149:3
240:11,14

**covid**  247:25
**cpt**  159:22
160:2,4 224:25
**craft**  168:2
**create**  185:2,3
187:12
**created**  219:6
249:16 254:17
254:18
**creating**  222:9
**credentials**
130:4,8,11
**cretella**  134:17
**criteria**  131:9
150:20 154:5
208:1,1 227:5,9
227:24 235:12
**critical**  194:25
**cross**  161:24
171:7 186:7
191:24 208:11
243:10
**crowd**  174:5
176:20 179:11
**cumulative**
146:14
**cumulatively**
134:23
**curiosity**  148:3
148:5
**curious**  148:14
**current**  143:7
217:13 219:21
250:5 254:13

**currently**
204:17,20
205:12 244:7
247:21 249:2
**curve**  140:15
**customer**  231:1
**cut**  201:21
202:8 222:18
**cv**  125:3
**cypionate**
203:19

**d**

**d**  128:1
**daily**  196:22
**dalton**  163:15
167:19 213:23
216:3 223:4,6
**dana**  125:18
258:20 259:4,21
**data**  152:9
159:15,17 243:9
243:12,15
**date**  125:14
146:20,22 160:5
160:6 163:8,25
164:1,4,7,7
166:3 201:21
217:15 226:23
243:2,6 248:24
254:6,7,9,9,10
254:11,13 256:1
256:2,5 260:9
261:23
**date's**  163:19,22
164:5

**dated**  201:21
213:24 214:2
227:16 252:12
255:25 259:16
**dates**  163:12
**day**  157:18
164:15 168:25
178:4 216:25
217:2,16 218:17
218:23 219:23
220:7 222:3,5
224:4 227:17
258:14 259:16
**days**  139:14
164:19 183:22
212:25 217:15
218:7,20 260:11
**deal**  150:10
154:7,11 225:12
**dealing**  210:18
**debate**  155:11
**debriere**  126:3
127:4,6 128:10
130:5 133:5
148:19,21
152:24 156:14
162:14,18 163:4
199:10,16 202:3
202:6,12,25
203:3,9 206:24
206:25 210:13
210:16,23 211:6
211:13,18,25
212:13 213:5
214:5 216:16

221:4,13 226:14
226:20 233:6
248:3,11,23
252:9,19,25
253:5,8,13,16
253:22 255:23
256:11,19,23
257:4,12,17
**december**
251:16
**decide** 168:23
190:5 214:19
215:6
**decided** 129:24
142:24 165:1,23
208:1 215:9
219:6,8
**decides** 169:20
**deciding** 130:11
133:11 171:1
**decision** 129:2,6
130:15,18,19,21
130:24 131:1
142:4 156:8
165:8,9,9,22
166:3,5,14,21
168:5,10 169:6
169:24 171:20
207:11,15,22
208:11,21 209:1
214:25 215:12
219:13 220:21
222:21,24 223:4
228:24 239:21

**decisions**
166:13
**declaration**
147:12
**declare** 238:3
238:22 261:19
**dede** 129:21
130:23 149:19
152:10,25 158:5
163:14 172:13
213:23 215:21
215:24,24 216:3
216:17,18
221:18
**dedicated**
184:17 187:12
**deemed** 141:17
193:3,4 214:23
222:14 241:6
**deems** 192:6
**deep** 174:16
176:4
**def** 216:21
221:6 226:9
**defend** 182:11
**defendant**
126:17 201:16
**defendants**
125:9
**defending**
133:13
**defense** 126:11
254:1
**defer** 141:8
142:1 154:17,19

183:4,5 210:9
**deferring**
168:17,20
**define** 196:2
**defined** 137:8
**definitely**
151:22 206:2
221:14 226:3
**definition** 196:4
197:22 202:16
**degree** 140:12
**dekker** 125:5
243:18,22,23
244:4,5 245:4,9
248:13 260:5
261:1
**dekker's** 244:18
246:11
**delay** 228:1,6
**delegate** 163:14
**deliberated**
219:6
**delivered**
195:16
**delivering**
223:18
**demonstrate**
187:18 236:2
**demonstrates**
234:2 235:20
**denial** 201:11
203:8,21 206:8
208:2 209:2
227:7 239:7
242:16 245:21

**denials** 200:20
**denied** 205:1
238:25 239:3,9
245:20
**deny** 185:16
207:12,15,16,23
208:11 237:12
238:6
**denying** 185:15
203:18 207:2
**department**
134:15,16,22,23
140:25 144:25
175:13 176:10
181:4 184:25
187:5 227:11,17
252:11
**depends** 166:18
166:18,19
170:12,19
191:14
**depo** 253:9
**deposing** 260:10
**deposition**
125:12 232:14
252:4 257:7,18
**depth** 193:4,23
236:20
**deputy** 163:17
167:6 169:16,17
215:5,16 219:10
222:22
**derive** 143:8
**describe** 230:2

described
202:10 206:1
209:17 212:4
220:8
description
127:10 219:16
descriptions
229:3
designated
259:7
desk  163:20
164:1
despite  153:11
details  134:4
135:21
determination
142:12 143:6,15
151:21,22 155:4
191:10 194:5
201:15,19
202:14 203:8,15
204:25 207:2
228:7,21 229:15
234:15,21 235:6
235:13
determination's
235:1
determinations
137:13 200:15
202:19 228:9,9
229:6 247:24
determine
131:10 141:19
152:4 195:2
210:7 247:4

determined
144:1 164:25
235:15 241:16
determining
129:8 150:5
155:17 172:22
235:4
develop  137:11
183:16 184:9,12
184:13 200:14
200:14 201:9,9
developed
183:21,22 184:6
184:7,21 235:12
developing
140:6 181:6
200:19
development
135:7 137:22
168:13
diagnoses
171:11,12 224:5
225:13
diagnosis
159:21 171:13
171:16 192:10
196:19 220:20
224:13,14,17,19
228:5,20 231:7
246:6
diagnostic
160:3
difference  164:3
164:6 196:11

differences
234:6
different  141:6
141:17,25
143:21 153:16
165:14 167:2
186:6,14 192:10
196:5 198:24
205:9 209:4
212:7 213:4
214:21 220:19
220:19,20
224:12,17,17
225:4 238:14
differently
150:7 193:20,21
difficult  231:21
direct  180:13
214:23 222:20
242:8
directed  183:16
227:20 230:21
directions  167:2
247:3
directives
167:23
directly  138:24
198:4 201:3
255:9
disagreed
165:13,17
disappointed
143:17
disclaimer
162:3

discontinuation
217:6 221:24
225:7
discontinue
139:16 191:23
192:5
discontinued
139:10
discretion
185:15 225:15
246:7
discriminatory
227:8
discuss  145:24
194:21 232:22
242:15
discussed
172:20 178:20
251:1 254:19
discussing
236:22
discussion
158:23 172:16
172:18 253:19
discussions
172:11 193:13
193:15,16
dismiss  195:20
disseminate
141:3
dissertation
160:19
district  125:1,1
199:4 212:20,20

**districts** 199:3
**divide** 155:2,10
**doctor** 192:6
**doctors** 145:20
    178:25
**document**
    127:18 147:8
    158:10 163:19
    185:1 211:2,2
    221:4 226:23
    227:25 228:3,17
    252:2,14 254:13
    254:15 256:4
    261:19
**documentation**
    168:20
**documents**
    141:1 142:8
    168:19 184:24
    187:18
**doe** 247:18
**doh** 252:15
**doing** 154:11
    198:23 214:11
    229:18 247:24
**dollars** 150:23
    246:10,14
**donovan** 145:16
**donovan's**
    145:15
**dosages** 224:8
**doses** 192:7
**downtown**
    175:3,4

**dr** 128:12,12,20
    128:21 133:10
    134:17 135:2,11
    136:7,7 145:14
    145:15,16,20,23
    177:15,16,16,18
    177:18 178:23
    180:5,6,7 183:4
    183:5 194:23
**draft** 144:21
    145:19 146:3,4
    146:5,7,21,22
    157:16,21
    158:15 183:24
    183:25,25 184:1
    214:16,19
    215:25 218:21
    219:1,2,5
    257:14
**drafted** 172:5,6
    215:19 221:12
    221:17 222:4
**drafting** 145:5
    147:24 160:10
    249:14
**drafts** 145:20
    216:24
**drastic** 145:22
**draw** 185:4
**drawing** 143:24
**drew** 142:1
**drive** 125:17
    249:7,23
**drug** 159:24
    160:4 173:13,18

184:15,17
    186:20,25
    187:11 228:5
    232:2,3,4,5
**drugs** 216:6
    217:14,18,23
    218:8 220:21,24
    228:15
**due** 228:3,18
    238:4
**duly** 128:4
    258:11
**dunn** 126:6
    211:21 226:12
**duration** 240:16
**dvp** 164:21
**dysphoria**
    127:18 131:3,6
    131:22 132:7,16
    132:21 142:13
    142:14 154:15
    155:6 157:2
    159:7,8,12
    160:9 171:9,13
    185:22 188:3
    191:1,9,18
    192:9 200:17
    201:12 204:18
    204:24 205:19
    206:13 207:13
    207:24 208:12
    208:17,23 209:9
    209:13 216:7
    217:8,14,19
    218:8 220:19

222:1 223:20
    224:9,15 226:25
    227:24 228:1,23
    237:3 238:18
    239:3,17 242:18
    242:23 243:11
    243:14,22 244:4
    244:18 245:4,9
    247:16 248:15
    252:12

**e**

**e** 126:14 128:1
    260:17,17 261:3
    261:3,3
**earlier** 135:5
    155:14 199:18
    232:18 251:1
**early** 139:14
    146:23
**easier** 175:4
**easy** 175:6
    203:4
**edit** 145:7
**editing** 145:8
**edits** 145:9,11
    145:12,17 146:2
    147:1,9 184:2
    256:3
**education**
    126:11
**effect** 219:25
    243:3
**effective** 243:6
**efficacy** 141:15

efficient  153:12
effort  174:6
  183:11 215:22
eight  135:19
  157:7 253:3
either  135:15
  162:1 165:13
  167:24 179:20
  183:4 195:12
  196:8 205:23
  225:2,25 230:25
  251:18
eligible  244:7,10
  244:15 247:21
  248:1
eliminate  171:1
  171:15
elliot  232:7
else's  133:25
email  127:14
  136:4 186:24
  210:25 215:10
  227:10,15
  228:12 230:2
  231:20 232:16
  260:10
emailed  260:11
emails  127:16
  189:20 211:19
  213:22 216:14
  226:15,22
  229:23
embarked
  186:10

employed
  138:21 139:19
employee
  210:19 259:12
  259:13
employees
  250:15
encounters
  247:13
encouraged
  177:8
encouraging
  177:11
ended  136:6
endocrine  161:8
  161:10,13,19,21
  161:21,25
  190:18
engage  130:11
  131:11 132:12
  142:24 179:25
engaged  132:15
  132:24 134:12
  139:18 140:21
  141:4
engagement
  179:22
enrolled  244:11
enrollees  205:8
  217:11 218:11
enrollment
  244:14,15
ensure  217:6
  221:24 225:9

ensures  218:18
ensuring  235:17
enter  136:23
  138:19 163:12
  254:12
entire  158:20
  170:2 214:16
entities  144:21
  181:7
entitled  212:16
  219:22,24
  220:12 239:8
entrance  177:4
epsdt  173:3,6,8
  185:13,18 186:3
eq  137:15 201:2
equally  204:9
equals  227:6
ernie  188:23
errata  260:9,9
  260:11
errors  146:1
especially
  141:14 186:6,7
esq  126:3,5,6,8
  126:11,14,18,19
  260:1
establish  237:16
established
  161:11 234:16
establishing
  129:4
estimate  159:2
estrogen  223:25
  225:17

et  125:5,8 132:2
  137:13 194:22
  260:5,5 261:1,1
ethical  189:4
evaluate  148:24
  151:2,15 197:1
  198:20 237:14
evaluated  151:6
  185:19 194:24
evaluating
  132:4 141:23
  237:22
evaluations
  194:15
event  174:19,20
everybody
  186:14 188:4
everything's
  153:14
evidence  128:23
  131:7,19,24
  132:2,19 133:9
  133:19 134:1
  139:7,12 141:12
  141:16 144:1
  155:5,5 156:11
  161:16 162:2,10
  165:2 185:7
  187:16 197:13
  197:17,18 198:7
  198:8,10,13
  238:5 251:4
exact  230:2
  244:21

exactly 183:19
  250:9
examination
  127:4,5,6 128:9
  253:24 255:22
examined 128:6
example 138:13
examples
  186:18 195:13
  196:9 197:12
  251:13
exceed 136:16
  136:21,25
exception 229:8
  233:15
exchanges
  215:10
exclude 154:18
  154:21 156:16
  156:17
excluded 149:3
  152:2 218:14
  241:14
excluding
  148:24 151:2
exclusion 157:3
  159:11 165:3,6
  165:10,15,21,24
  169:25 172:25
  173:25 179:12
  191:19 192:6
  200:16 204:24
  206:12 207:3,22
  209:8,12,14
  213:7 216:12

218:18 219:22
225:19 226:2
227:2 232:12,19
235:14 237:2
238:1,3 241:6
242:17 245:13
247:6,8
exclusions
  199:2,5
exhausting
  177:25
exhibit 127:11
  127:12,13,14,14
  127:15,16,17,17
  127:18,18
  152:13,14
  162:15,20 163:6
  201:24 202:8,11
  211:18 213:22
  213:22,22 214:1
  214:3,7 221:7,9
  226:18 233:2,4
  248:19,21 252:2
  252:7,13,17
  254:4,6 255:24
exhibits 127:8
  248:18
exigent 251:11
exist 203:3
existing 128:23
  131:5,19,24
  217:20,24
expect 175:23
  175:24

expedited
  251:18
expenses 177:19
expensive
  139:15
experience
  130:9 132:15,21
  170:14 180:23
  223:24
experienced
  131:20,22
experimental
  140:1 141:20
  148:23 149:23
  150:6 154:24,25
  155:17 165:1
  173:8 185:8,22
  186:8 198:10,11
  204:10 237:5,6
  237:10,17 238:4
  238:23 239:12
  241:7,17 247:5
expert 165:17
  194:14
expertise 137:17
  137:19 140:5,12
  140:22
experts 129:12
  130:16 132:4
  136:24 137:16
  138:10 140:11
  141:5 142:13
  146:9,9 165:13
  177:15 179:7
  236:22

expires 258:21
  259:22
explain 195:21
  228:7
explained 161:3
explanation
  142:23 161:6
explanatory
  214:22 215:8
expletive 193:18
explicitly
  154:14,21
  156:16,16
explore 186:16
external 144:21
extrapolation
  231:22
eyes 202:2

**f**

f 231:18
f64 231:12
facilitate 177:1
  220:24
facilities 175:12
fact 141:1
  153:11 187:13
  227:15 229:7
factor 131:14,22
  131:23 155:16
  156:8 194:4
factored 191:9
factors 132:3
  174:24
facts 261:19

fail 260:13
fair 144:20
  207:4 208:3,13
  208:18,21 209:7
  209:11,22
  228:18 239:8,15
  239:22
fairly 191:6
  251:19
fairness 235:5
faith 188:16
familiar 132:7
  148:11 154:11
  200:12,13
  221:11 224:22
  231:3,4,6,8
  232:24 233:7,8
  240:17
familiarity
  154:7
families 187:6
family 128:21
  128:21 133:22
  134:8 188:9
far 142:21,24
  144:14,16 146:2
  155:1,24 169:23
  173:17 176:2
  184:1,3 186:13
  193:15 199:24
  205:15 207:4
  209:1 214:14
  218:9,10 229:2
  229:4 243:12
  249:1 250:14

farrell 174:8
  183:11
fast 170:13
  192:21
faster 170:23
favor 214:20
fear 228:3
february 125:14
  257:6 258:14
  259:16 260:3,6
  261:2
federal 173:1,12
  173:17,21,23
  199:3 246:10,14
  260:12,17
fee 156:1 159:16
  212:19 228:15
feedback 145:21
  145:21 179:19
  190:14,18
feel 174:13
  211:6 221:6
  225:14
feelings 174:16
felt 161:5,12
  174:18 223:8
female 231:15
  231:18
field 140:12
figure 186:17
  224:23 229:13
  256:9
file 230:25
  240:1

filed 147:12
  212:24
filing 212:17,19
fill 175:11
final 146:5
  183:24,25,25
  184:1 190:6
  209:16,21,23,25
  210:5,6 211:23
  212:15 228:7,21
  235:2 239:21
finalized 172:17
  251:2
financially
  259:15
find 149:18
  150:15,19
  151:24 153:3
  186:21 229:21
  230:10,18
  247:19 256:8
finding 162:25
  197:1,19
findings 153:18
  154:16,17,19,21
  157:6 187:17
  239:19,25
fine 193:25
  216:24
fingers 211:11
finished 145:19
  253:23
finishing 184:2
first 146:3,4,7
  146:20,22

150:20 157:20
  157:22 158:2
  163:13 171:19
  184:11 215:19
  226:23 228:19
  236:3 255:10
fiscal 151:21,23
  151:23
fiscally 156:3
five 158:19,20
  158:25 164:13
  170:16 188:5
  193:2 199:9
  248:4,10 251:22
  253:3,4
fl 260:10
flexibility 241:3
floor 126:12
florida 125:1,17
  125:20 126:3,4
  126:7,10,20
  127:15,17
  134:12,15,16
  149:7 150:8
  155:22 156:1,2
  157:1 160:7
  171:2 173:7
  187:6 188:12,16
  188:25 200:6
  206:1 209:18,24
  212:23 213:6,9
  217:23 221:5,8
  226:6 227:17
  236:5,6 237:5
  242:21 243:4,17

243:21 244:3,7
244:20 245:8
246:16,22
247:22 248:13
252:11 258:5
259:2 260:12,17
**fmmis** 231:2
**focus** 155:4
**focused** 155:4
**focuses** 236:24
**folder** 249:7,8
**folks** 136:6
148:20
**follow** 132:13
137:5,6 206:24
232:17
**following**
150:16 187:15
187:16 227:11
**follows** 128:6
196:10
**foods** 251:7
**forbes** 226:22
230:14,15
**foregoing** 259:5
259:8 261:19
**foremost** 150:20
**foreseeably**
195:17
**forgetting**
213:16
**form** 127:12,16
130:2 133:2
155:18 162:16
163:7 216:13

221:8
**formally** 219:4
**format** 178:22
**formulating**
150:2 255:15
**formulation**
162:22
**fort** 206:18
**forth** 179:2
191:13 213:8
225:5 236:23
**forward** 210:25
**found** 184:10
199:3 237:4,9
239:11 240:3,12
**foundation**
133:15 198:6
**four** 158:19,20
164:17 199:14
248:7
**franklin** 126:14
**free** 186:16
211:6
**freedom** 133:13
**frequently**
142:7 148:13
194:10 214:18
251:20
**friend** 254:19
**frustrating**
169:22
**full** 138:5,7
196:16 247:11
251:18

**fully** 228:11
**fun** 188:1
**fund** 126:12
**funded** 150:9,10
**funding** 222:2
**further** 127:6
216:25 255:21
255:22 259:11
**furtherance**
208:16,22

**g**

**g** 148:23 149:3
169:4
**gainesville**
126:7
**gainwell** 231:1
**galvin** 189:8
**gapms** 127:17
128:13,18,20
129:2 131:25
132:17 135:8
137:10,11,22
138:14,16 139:8
140:6,7 141:8,9
141:19,23 142:2
142:14 143:4,12
143:15,20
145:18 147:14
147:20,22 149:5
149:10,14,16
151:2,6,9 152:2
153:18,25
156:25 157:6,9
157:16 160:11
162:16 163:7,13

164:8,12,18,23
165:3,12 168:23
170:3 171:5,14
171:18,21 173:5
176:1 178:10,10
184:10,21
185:21 187:19
188:6 194:14,21
195:14 197:2,23
198:5,6 220:16
227:13,21
248:19,25 249:2
249:4,7,9,14,16
249:24,25,25
250:6,7,13
251:18,19
254:17,18
255:25
**gary** 126:19
260:1
**gather** 179:18
182:8 256:16,25
**gathers** 255:7
**gender** 127:18
131:3,6,13,22
132:7,16,21
133:1,19 134:1
141:6,10,25
142:13,14
143:20 152:19
154:15 155:6
157:2 159:7,8
159:12 160:8
162:7 171:8,13
185:22 188:3

190:19,25 191:8
191:18 192:8
200:17 201:12
204:18,24
205:19 206:12
207:13,24
208:12,17,23
209:8,13 216:7
217:8,14,18
218:8 220:18
222:1 223:20
224:9,14 225:20
226:24 227:6,24
228:1,23 229:9
230:20 231:5,9
231:10,11,25
232:9 235:14
237:3 238:18
239:3,16 242:17
242:23 243:11
243:14,22 244:4
244:18 245:3,9
247:16 248:14
252:12
**general** 129:13
134:20 135:2,24
140:13 166:9,11
169:18 172:14
176:16 209:16
234:18 239:1
255:13,14
**generally**
149:11 154:3
157:10 160:13
163:10 166:16

167:3 180:22,22
180:24 205:18
205:20,24
230:24 249:25
**gerring** 171:24
174:6 176:19
189:19,25
**getting** 191:15
214:6
**gg970595**
258:21 259:22
**gift** 197:9
**gigantic** 153:10
**gist** 188:6
**give** 156:23
182:20 192:11
197:9 230:1
**given** 135:3
147:9 160:9
167:23 183:18
191:20 205:5
206:16 215:8
223:1,3 225:12
239:11 242:10
**gives** 154:7
**glaring** 160:17
**gnrh** 227:25
247:15
**go** 169:4,8
186:13 193:15
195:18 211:12
220:15 221:20
221:22 229:3,23
237:14 239:24
243:19,19

244:22 248:1
249:12 253:16
**goes** 143:24
144:14 155:1
169:11,13,15
199:25 205:15
211:15 234:7
235:8,11 249:1
255:3,10,13
**going** 131:18,25
141:8 142:1
143:16 144:12
147:1 151:8,13
151:13,20,25
156:10 163:25
165:7,11 168:20
169:4 170:17
175:12 178:23
179:11,19 183:7
185:20 187:3,9
187:20 189:20
191:18 192:6
193:8,22,23
195:14 199:8
201:18,20 205:5
207:4 209:2
210:25 211:18
218:11,13
223:14 225:15
232:11,14 233:1
240:4 256:13,22
257:10
**gonzalez** 126:11
**good** 162:24
175:14 211:16

250:1,7,17,18
**gotten** 133:20
236:18 250:24
251:2,8
**govern** 136:20
**government**
175:9
**governor** 234:8
**governor's**
134:18 144:23
176:8 177:10
**gperko** 260:1
**grammar** 145:9
**grant** 234:10
235:13 237:1,8
241:3
**granted** 233:12
234:1 235:19
238:19 240:19
**grantham**
172:12,14
176:16
**granting** 233:21
235:23,25
**granular** 172:22
173:11
**graphic** 186:11
**graphics** 185:3
187:4,10
**great** 150:10
154:7,11
**greater** 240:15
240:15
**green** 230:16

**grievances**
206:10
**grossman**
128:20 135:11
136:8 145:20
177:15 178:23
180:7
**grossman's**
128:12
**ground** 162:25
**grounds** 236:25
**group** 160:25
193:24
**groups** 179:21
196:8
**growth** 251:11
**guardian**
144:11
**guess** 146:13
186:10 195:16
204:8 234:3
**guidance**
140:25 142:22
142:25 143:25
173:6 192:11
227:18 252:10
252:15
**guide** 139:12
235:12
**guideline** 173:6
**guidelines** 132:2
139:8 161:12,13
161:14,16,18,22
227:12

**guides** 153:6
**guys** 202:25
257:15,15

**h**

**h** 261:3
**half** 154:13
187:25 199:9
253:4
**hand** 233:1
258:13
**handbook**
226:10
**handful** 243:8
**handing** 163:5
**handle** 228:14
**handled** 166:16
176:19 193:20
193:21 200:21
**hands** 163:2
**happen** 167:9
167:11
**happened**
167:12
**happens** 167:10
214:18
**hard** 243:2
247:10
**hardship**
234:16
**hazy** 245:2
**head** 134:22
172:2
**headache**
169:22

**headquarters**
212:21
**health** 125:16
126:3 127:13,15
127:18 134:15
134:16,22,23
137:15 141:1
144:25 150:9
170:16 176:10
184:25 187:13
196:15,17,18,25
201:2,19 202:20
219:4 221:1,5,8
223:3 227:17
252:2,11 257:8
**health's** 227:12
**healthcare**
221:20
**hearing** 128:14
128:17,25
148:20 174:2,4
175:9 176:7,13
177:2,8,11,14
177:17 178:2,3
178:4,12,15,15
179:17,18
180:13 181:13
181:18,25
182:11,15,19,21
183:3 188:8
207:4 208:3,13
208:18,21
209:22 228:4,18
239:8,15,22

**hearings** 175:19
180:16,25 209:7
209:11
**heavily** 155:16
**help** 145:25
176:20,20 177:1
200:14 201:9
216:6 220:24
223:15
**helped** 176:22
**helpful** 208:6
**helping** 176:24
182:18
**helps** 211:20
**heritage** 133:15
**hey** 187:23
**hhs** 140:25
141:14 142:8,22
142:25 143:25
184:23 187:17
188:3
**hi** 227:4
**high** 142:9
187:9 197:13
198:13
**higher** 158:2
**highly** 168:19
236:19
**hill** 126:15
**histories** 196:7
196:20,25 197:3
197:4 243:20
246:19
**history** 196:14
196:14,16

hit   164:1
hits   163:19
hold   175:19,20
    195:5 197:18
    205:13 237:23
holding   163:2
    250:12
holtzman
    126:19
holtzmanvoge...
    260:1
hominem
    192:19
honest   144:2
honor   217:12
honoring
    217:24
hope   187:6
hormone   171:8
    208:11 217:7,7
    221:25 228:2
    229:9 243:10
    244:3
hormones
    161:24,25 186:8
    191:24 220:15
    221:25 223:16
    224:9 244:17
    245:3
hot   142:22
    144:3
hour   158:23
    172:19 178:19
    187:24 199:8
    253:6

hourly   136:15
    138:17
hours   158:25
    159:4 168:22
    170:2 253:3
house   225:2
    229:5
housed   167:21
hub   206:15,18
huge   153:12
huh   127:23
    142:16 143:2
    149:25 158:7
    164:20 190:1
    200:10 217:9
human   127:18
    187:13 252:3
humana   244:6
    244:11,23
    245:20 248:13
hurled   192:19
hurry   192:25
hybrid   161:2
hypothetical
    239:1
hypothetically
    132:11 226:5

i

icd   224:25 231:4
    231:11
idea   183:17
    232:9 250:1
ideal   175:17
identification
    152:15 162:21

201:25 214:4
    221:10 226:19
    233:5 247:12
    248:22 252:8,18
identified
    160:24,24 197:4
identify   128:13
    161:23
identities
    186:17
idiosyncrasies
    153:8
idiosyncratic
    202:20
illness   196:19
immediate
    157:8,13
immediately
    220:3
impacts   196:17
implement
    168:2 213:7
    220:7 225:19
implementation
    195:3 199:7
    200:5 216:12
implemented
    227:6 245:14
important
    132:14 215:25
    218:1 220:17,22
    222:7
importation
    184:15

impressions
    227:12
inability   191:21
include   177:21
    205:25 206:6
    207:7 208:13
    216:25 222:4,6
    222:7 255:18
included   210:5
    217:1 249:21,23
includes   145:13
    145:14 188:23
    189:2 227:7
    247:18
including
    188:14,19
inclusive   196:9
incorporate
    190:6 200:16
incorporated
    222:3
independent
    149:20
independently
    221:2
index   127:1,8
individual
    223:21 225:3
    236:25 240:14
    246:19
individualized
    235:16 236:19
    236:23,24
    237:13,22 238:7
    254:24

**individually**
237:15
**individuals**
129:1,11 131:17
132:13,19 136:8
180:9 191:23
218:19 223:15
225:9 234:23
235:10
**inevitably**
143:15
**information**
146:17 149:15
152:7 153:4
159:14,19 161:4
182:8 188:2
195:23 205:16
206:14,19 208:7
208:8,14 209:5
210:5,21 223:24
229:21 230:1
232:16 242:2
247:12,14 255:7
256:8,17 257:1
**informational**
155:1
**informations**
205:23
**informative**
149:23
**initial** 157:16,21
164:10
**initials** 201:22
**initiated** 143:13
167:15 227:13

**initiating** 168:5
**input** 133:12
172:8,10 174:9
181:6 190:6
234:25
**instance** 125:13
152:1 170:14
184:15,22 218:6
**instances**
137:13
**instituted**
212:17
**institution**
171:18
**instruction**
182:25 232:7,8
**instructions**
182:21,24
**insufficient**
144:1
**insulting** 193:17
**insults** 192:19
**insurance** 149:2
149:22 150:1,4
150:7
**insured** 239:3
**insurers** 149:6
150:9
**intact** 146:3
**integrity** 140:18
**intellectual**
148:2,4
**intended** 185:17
**inter** 200:8,9,13

**interested** 149:5
149:6 195:11
259:15
**internal** 145:3
227:5,8,24,25
242:3
**interpret** 228:21
**interpretation**
231:23
**invest** 193:12
**investigate**
131:2
**investigation**
235:9
**investigational**
140:2 165:1
185:8 186:9
198:11 238:4,23
241:7 247:5
**invited** 182:12
**involve** 213:3
229:2
**involved** 129:8
129:17,19,21
130:14,18,19,20
130:23 136:1
146:6 174:18
201:3 213:25
219:12 224:8
**involvement**
128:12
**ipads** 211:16
**iphones** 211:16
**irrelevant** 133:8

**ish** 146:24
**isolated** 187:3
**issue** 142:9
209:9,12 236:3
**issued** 168:14
208:2 209:21
239:21
**issues** 255:16
256:14
**it'd** 220:20
237:21 239:6

**j**

**jack** 148:8
194:19
**jacksonville**
126:4
**january** 147:13
**jason** 125:8
213:23 215:11
260:5 261:1
**jazil** 126:18
127:5 130:2
133:2 152:12
155:18 162:17
162:25 199:8
202:1,4 203:2,5
206:23 210:11
212:11 216:13
248:5 253:7,9
253:25 254:1
255:21 256:12
256:21,24
**jessica** 226:22
230:14,15

**job**  219:16
  229:3
**join**  161:2
**joint**  174:6
**josefiak**  126:19
**josephina**
  129:14,23
  135:25 166:9
**juarez**  174:7
  176:21 183:12
**judicial**  211:24
  212:14,16
**july**  128:14,25
  188:8
**jumped**  151:11
**june**  127:16
  128:18 129:2
  135:8 140:6
  147:14,19 151:1
  157:16 158:2,3
  160:11 162:16
  163:7 164:12,18
  166:4 168:11,14
  169:25 170:1
  178:10 226:24
  232:10 237:2
**justice**  126:3

**k**

**katy**  126:3
**keeping**  213:12
**kelly**  230:12,13
**kf**  247:9,10,21
**kids**  181:1,1
  183:8,8,13,13
  185:11,11,23,25

186:6,12,12,16
**kind**  134:3
  138:20 142:10
  151:11 153:12
  161:2 176:23
  178:20 182:20
  186:10 187:21
  191:13 192:4,20
  204:3 225:12
  229:4 232:3
  233:16 241:13
  250:11
**kinds**  154:5
  160:11 172:20
  238:9
**king**  227:16
**knew**  169:3
  176:3 179:19
**know**  137:13,23
  149:9 158:1
  159:10 175:8
  178:22 181:15
  181:16 182:5,22
  182:23 183:19
  187:1 191:15
  198:9,15 202:25
  203:3 211:9
  216:8 218:1
  223:13,19,20,21
  224:3,10,19
  229:19,20 241:2
  241:19,22 242:4
  244:21 245:17
  256:6,22

**knowledge**
  128:23 130:9
  131:24 229:12
  234:23
**knowledgeable**
  131:5 235:10

**l**

**labeled**  248:18
**lacked**  197:2
**ladapo**  134:20
  135:2
**laden**  193:18
**lambda**  126:11
**language**  172:5
  172:7 173:11
  174:3 200:14,20
  200:23 201:5,9
  215:23 217:1,2
  219:3 221:24
  222:5,11,19
  233:24 239:6
**lappert's**  145:13
  145:14
**large**  125:20
  142:20 175:23
  175:24 176:6
**largely**  146:3
  179:11
**larger**  174:5
**latitude**  150:11
  185:16
**law**  212:19
**layman's**
  187:22

**leadership**
  167:24 219:9
  250:2
**leaning**  138:3
**learned**  167:19
**learning**  140:15
**leave**  225:15
**leaving**  221:1
**left**  198:14
  230:7
**legal**  126:6,11
  198:21 234:5
  255:16 260:16
**legalities**  242:11
**legality**  198:19
  198:22
**legislative**
  167:24
**legislature**
  234:7
**length**  194:21
  244:21
**lengthier**
  170:18
**lengthy**  169:8
  170:8,20,24
  190:16,17 196:7
  196:10,12
**lens**  198:25
**leon**  258:6 259:2
**leslie**  227:23
**letter**  227:7
**level**  199:4
  207:5 208:13,18
  208:22 212:6,6

228:13

**liberally**  155:24

**liberty**  133:17

**life**  132:20

**light**  228:13

**likely**  153:8
179:19

**likewise**  169:14
185:1

**limit**  240:23

**limitations**
254:2

**line**  161:23
170:22 261:4,7
261:10,13,16

**lines**  147:7
189:21

**lining**  226:13

**list**  127:11
164:15,17 196:9
210:7 214:6
249:19,21,21,23
250:20

**listed**  144:9
148:23 204:18
206:7 221:16
236:15 241:25
242:1,22 243:5
243:17 246:16
250:4,21

**listen**  144:2,6

**lists**  221:23

**literature**  131:5
131:24 132:1,8
139:23 141:13

188:1 195:13

**litigation**  140:8
140:17,21 142:3
142:11 143:3,12
143:18 182:7,12

**little**  128:11
136:18 146:8
166:24 174:9
179:22 202:20
205:3 209:20
214:15 228:8
231:21

**live**  253:1

**living**  196:22

**llp**  126:9

**locally**  206:19

**locate**  246:20
247:12

**location**  125:16
174:23,25 175:2
175:4,6

**logo**  184:19

**long**  144:12
157:15 164:13
172:18 178:18
190:20 196:13
200:3 203:8
205:8,10 210:17
244:18,19,19

**longer**  143:6
220:21,25
222:16,17
225:10 247:7

**longitudinal**
196:7,12,13,14

196:15,25 197:3

**look**  133:8
143:11 150:4,14
153:3,23 156:24
156:24 187:5
188:5 190:7,21
191:12 194:6
216:4 233:24
244:22 249:8
250:3 254:3
255:11

**looked**  130:8
153:6,15 190:7
191:11 194:8,12
194:22 246:20
247:19

**looking**  131:4
131:15,17
141:10 150:20
152:18 154:1,10
195:11,15,15,22
197:17,21,25
198:1,2,2,3,7,16
198:22,22,24,25
205:3 206:3
227:15 236:8,9
236:10,20,21
241:2

**looks**  203:18
215:18 227:10
248:24 256:4

**lose**  191:19

**lost**  191:17
230:3 231:24

**lot**  134:4 141:14
144:6 148:13
155:8 169:23
176:4 185:15
187:7,7 190:8
190:10 192:18
192:19,21
231:21 247:3
249:13

**low**  141:12,16
162:1,2 194:25
198:10 238:5
251:7

**lower**  186:20

**lowest**  149:10

**lunch**  200:1

**lupron**  228:4,19
228:23

**m**

**m**  231:18

**mac**  211:13

**mac's**  211:16

**made**  129:2,6
141:14 142:12
145:22 146:2
147:10,10 165:8
165:9,11,22,25
166:3,4,5 167:6
168:11,25
169:25 170:1,7
171:20 184:23
188:3 194:9
207:11 214:25
215:12 222:21
228:7,21 229:8

**[made - mean]**

234:21 235:1
241:20 251:15
256:2,4
**maf** 125:3
**magellan** 201:7
201:8 226:16
227:4 228:14,22
229:15 232:9
**mahan** 125:17
**mail** 205:8,10
**mainstream**
132:25 142:7
**maintain** 218:2
**maintains**
212:21
**maintenance**
231:1
**major** 144:10
**make** 131:18
145:9 146:13
151:20 159:19
160:16,19,20
165:2,10,10,15
165:24 166:12
166:14 187:22
188:4 191:23
194:16 195:18
198:13 207:20
222:10 230:24
257:1
**makes** 162:22
234:15 235:6
**making** 131:1
133:9 139:25
143:25 146:7

155:3 160:14
172:16 174:10
176:22 193:10
**male** 231:14,18
**manage** 213:13
221:2
**managed** 154:9
159:15 200:6,7
200:21,24
202:22 205:4
213:7,12 217:10
217:17 225:18
225:22 244:6
245:15,23
**managing**
223:12
**mandated**
245:19
**manufacturers**
250:25
**map** 154:16,17
154:19,21
**march** 258:21
259:22
**mark** 152:12
162:17 233:2
252:1
**marked** 127:10
152:14 162:20
163:5 201:24
213:21 214:3
221:9 226:8,9
226:18,21 233:4
248:18,21 252:7
252:17

**marker** 208:6
**market** 150:13
**marking** 221:7
**marstiller** 166:7
227:20
**massive** 197:8
**mastectomy**
238:17
**match** 246:10
**matching**
246:14
**material** 145:4
**materials** 153:7
178:1,6,8,9
**matt** 213:25
**matter** 210:18
231:17
**matthew** 125:12
127:3 128:3
260:6 261:2,23
**mb** 164:21
**mcgriff** 227:3
**mckee** 126:14
**mean** 130:7,7,13
132:11,11 137:8
137:9 141:17
142:5,18 144:5
144:5 146:3
147:4,5 150:8
150:17 151:19
153:8 156:21,22
156:22 157:9,11
157:11,12
161:11 163:8
166:12,14 167:7

167:11,14
172:10 174:16
174:17 175:8,8
179:3 180:15,18
182:3 185:6
186:5,12,14,22
186:24 187:1,3
187:5 192:16
193:7 195:9,11
196:4,14 197:5
197:12 198:2,3
198:15,18,18,19
198:23,23
199:23 202:22
206:2,2 210:4
210:20 212:3
213:9 215:5,21
216:23,24 218:3
218:5,9 219:14
220:4 222:18,18
228:8,11,12,14
228:21,22 229:3
229:13,14,24,25
230:2,22,24
231:10,10,19,20
231:21 232:21
233:14 234:5,6
234:9,12 236:4
236:9,10 237:11
237:12,25 238:5
238:8,22 239:23
243:12 251:17
251:19 252:23
256:19

**means** 147:18 164:8 217:16 219:15 220:6 231:11,12 235:22,22 242:4
**meant** 185:4 217:22 233:23
**measure** 163:25
**media** 142:7 143:24 144:3,4 144:12,14,15 148:18
**medicaid** 127:11,12,15 141:7,20,23 149:7,8,13 150:8,13,17,19 150:23 152:9 153:5,7,7,16,21 154:1,3,4,9,13 155:6,15,20,21 155:22 156:1,2 156:3,5 157:1 160:7 162:15 163:6 166:17,22 167:13,14,21 169:10,14,18 171:3,7 172:1,3 173:1,7,12,21 173:23 185:13 190:25 191:8,17 192:12 200:7 201:10,20 203:15 205:1 209:22 213:7

217:23 220:12 221:5,8 222:2 226:6 236:5,6 237:5 238:16 239:9 240:1 241:19 242:7,22 243:4,17,21 244:3,8,9,20 245:8,22 246:10 246:16,22 247:22 248:1,13
**medical** 132:25 137:16 147:4 179:20 187:25 202:15 204:10 205:4 207:25 224:2,6,24 225:13 237:23 238:10
**medically** 218:10 239:13
**medicare** 149:7 150:8,16,23
**medication** 192:2 225:7
**medications** 196:20
**medicine** 133:19 134:1
**meds** 227:6
**meet** 204:10 208:1
**meeting** 172:11
**meetings** 178:14 178:21

**member** 226:10 246:13
**memo** 143:4 171:5 255:25
**memories** 250:15
**memory** 250:11 250:14
**memos** 143:11
**mental** 196:17 196:18,25
**mention** 197:13 212:9
**mentioned** 204:7 232:18
**message** 185:5
**met** 145:21 233:21
**metaphors** 193:7
**meter** 177:16,18 179:1 180:5 183:4
**miami** 126:10
**michelle** 134:17
**mid** 146:23
**mind** 202:4
**mine** 146:10
**miniscule** 147:6
**minnich** 126:23
**minor** 216:22 216:22
**minors** 247:11
**minute** 193:2 199:9 248:4

**minutes** 188:5 200:4 253:3,4,6
**misdiagnosis** 238:11
**mission** 187:1
**misunderstood** 207:18
**mma** 205:3,6,6 205:11 227:23
**mo** 202:25 252:21 257:13
**model** 141:11 161:23
**modern** 198:12
**modified** 251:7
**mohammad** 126:18
**mohammed** 254:1
**mol** 128:12,21 135:11 136:7 145:23 177:16 177:18 179:1 180:6 183:5
**molina** 127:13 201:18 202:14
**money** 152:5
**monroe** 126:20
**month** 246:13
**months** 135:19 191:4 240:20 244:24,25
**mortal** 195:16 195:25 197:22

**mortally** 195:24
**move** 170:6,13
170:23 193:16
193:18 226:15
**msnbc** 144:10
**multiple** 252:3
**muster** 159:17
**myers** 206:18
**myriad** 197:12

**n**

**n** 128:1 148:10
**nabd** 203:1
**nabd's** 202:21
202:23 205:7,11
**nai** 129:19
130:20 158:5
189:19,24
**name** 133:20,25
134:17,24 135:3
144:6 148:9
155:23 201:20
211:1
**name's** 210:17
**named** 258:10
**names** 232:5
**nation** 149:14
**national** 159:24
232:2,5
**nature** 136:17
140:2,8 141:15
166:19 170:12
170:19 174:14
182:3 186:9
192:17

**navigate** 154:8
154:12 223:13
**nbc** 144:10
**nc** 126:15
**ndc** 159:21,23
160:4 232:4
**ndc's** 231:25
232:1
**necessarily**
132:10,20
135:14,14 151:5
164:1 192:8
196:18 198:20
246:3
**necessary** 165:4
170:25 176:25
179:8 192:14,16
196:16 214:24
215:9 218:10
225:14,17
239:13 250:4
**necessity** 202:15
207:25
**need** 141:2
142:13 149:12
151:24 156:24
159:21,21,22
160:1,2,3
162:18 165:2
166:2 174:13
175:6 192:1,4,7
220:23 232:14
242:8
**needed** 140:11
140:23,24 141:3

176:25 183:5,6
223:15
**needs** 132:18
151:23,23
**negative** 127:23
**network** 188:25
**neutral** 148:25
151:3,16,17
**neutrality** 151:7
**never** 203:2
207:15,18 208:2
211:16 218:21
239:13
**new** 126:13
144:10 155:23
157:12,14
162:22 165:10
168:2,4 170:11
170:16 184:14
187:2,4 251:15
251:17,21
**news** 144:3
148:17 176:2
**nitrous** 151:10
**non** 193:5
203:22 204:5
222:2 227:8
**normal** 174:5
181:17 184:9,20
187:14
**normally**
175:19
**northern** 125:1
**nos** 214:3

**notary** 125:19
258:20 259:21
**note** 148:19
214:1 260:9
**noted** 220:14
227:23
**notes** 259:7
**notice** 127:13
168:13 169:25
191:3 201:14,19
202:13 203:7,14
205:14,21,22
207:1,7,8
211:24 212:14
212:17,24
213:11,11 220:1
220:9 222:15
223:3 241:24
**notices** 200:15
201:1,4,10
202:18 204:25
205:24 206:8
**noticing** 223:2
**notified** 223:14
**notify** 201:10
217:10 225:8
**notion** 156:11
**npr** 144:2,6,7
**number** 170:9
196:1,23 202:9
208:20 221:7
**numbered**
259:9
**numbers** 209:15
226:12

**numerous**
  180:16
**nw**   126:7
**ny**   126:13

**o**

**o**   126:18 128:1,1
**oath**   256:13,21
  258:1
**object**   130:2
  133:2 155:18
  216:13
**observation**
  144:19
**observe**   182:9
**obtain**   159:14
  206:21 208:8,15
  208:19 209:15
**obtained**   196:23
**obtaining**
  206:20
**obviously**
  165:13 187:2
  192:25 193:2,8
  210:4 256:14,22
**occurred**   209:11
**october**   201:22
**odd**   251:21
**offer**   179:4
**offering**   136:7
**offhand**   191:4
  208:7
**office**   134:18
  144:23 169:18
  172:15 176:8,16
  177:10 180:18

180:19 181:5
234:19 255:10
255:14
**offices**   225:4
**official**   219:3
  258:13
**officially**   219:2
**oh**   144:5 157:17
  158:19 164:21
  167:18 189:15
  211:8,13 215:11
  226:12 232:25
**okay**   129:15,23
  130:17 131:20
  132:23 133:22
  136:2 137:1
  138:5,9,13,19
  138:19,23
  144:20 146:6,15
  146:20,20,24
  147:12 148:6
  151:1 153:3
  154:20 157:15
  157:22,25 158:5
  158:14 159:3,6
  159:25 160:3,6
  160:9 162:9,12
  162:14 163:5,19
  163:22,25 164:5
  164:12 165:5
  166:2,5 167:18
  167:25 168:13
  168:22 170:7
  171:6,6,14
  172:20,24,24

173:20 182:20
183:7 188:25
190:2 192:14
193:16 194:4,17
195:2,2,4 200:1
200:3,5,12,23
201:7 203:14,21
204:3,8,14
205:13,18,24
206:7,10 207:6
207:10,20
208:25 209:4,6
210:2 211:5,6,6
211:15 212:9
213:6,21,21
216:4,14,20,22
217:5,22 218:17
219:19 220:6,11
220:14 221:20
226:17 228:17
232:6,13,17
233:1 236:13
238:13 240:6,9
241:8,12,16,19
242:14 243:7
244:11 246:15
246:22 247:16
247:18 248:3,6
248:17 250:12
251:24 253:5,11
253:14,17 254:5
255:14 256:11
257:5
**olsen**   189:2

**omar**   126:11
**once**   135:1
  140:9,9 146:10
  171:20 180:6,6
  189:20 206:21
  219:25 222:15
  223:19 255:2
**onces**   190:21
**one's**   193:17,17
  193:17
**ones**   142:15,17
  168:1,3 182:22
  189:23 193:6,9
  193:19 250:22
  251:13
**online**   153:19
  153:20 156:22
  178:6
**open**   231:22
  253:9 254:14
**operations**
  245:24
**opinions**   165:17
  174:15 223:7
**opportunity**
  230:10,18
**oppose**   132:25
**opposed**   150:13
  179:12 180:4
**opposition**
  131:13,17 133:4
  180:10 223:9
**optional**   236:12
**options**   225:9
  231:17

**order** 200:15 210:5,6 212:16 212:25
**ordering** 257:10 260:11
**orders** 183:18 209:16,21,23,25
**organization** 133:21 161:2,11
**organizations** 132:25
**original** 212:17 251:5
**originally** 254:18
**originating** 166:20
**outcome** 201:1 201:4 207:8
**outcomes** 205:21,22
**outlets** 144:10
**outpatient** 217:13,18 218:8
**outside** 138:14 139:6,18 141:4 181:7,24,25 182:8,11,14,16 245:15
**outstanding** 250:1,16 251:12
**outweigh** 131:23
**overhauled** 170:15

**overriding** 173:6
**oversee** 229:25
**oversees** 171:24 219:14 231:2
**overturning** 209:1
**overwhelming** 156:6
**own** 181:3 186:16
**oxide** 151:10

**p**

**p** 128:1
**p.m.** 125:15 128:8 199:12,15 248:7,10 253:18 253:21 257:9,19
**pa's** 217:25
**pagan** 126:11
**page** 127:3 184:16 186:11 187:12 193:1 202:15 211:23 215:11,18 261:4 261:7,10,13,16
**pages** 153:6 154:12 164:13 187:20 259:9
**paid** 136:24 137:18 138:5,7 138:23,24 159:16 160:8
**pam** 189:2

**panel** 128:24 175:16 176:18
**paper** 178:7
**paragraph** 211:23 217:3
**part** 187:1 220:16
**partial** 203:12
**partially** 185:18 185:18
**participants** 176:15 196:7,10 197:2,5,9
**participate** 128:14 139:25
**participated** 176:13 180:12 180:16
**particular** 140:22 141:15 154:25 171:16 177:7,12 185:5 194:17 202:13 203:14
**particularly** 191:24
**parties** 259:12 259:13 260:11
**partners** 189:4
**party** 143:17 212:15,22 233:17
**passed** 134:16 163:23 181:13 181:18

**passing** 181:22
**past** 143:11 144:17 237:24
**pastor** 188:14 188:23
**patients** 223:18 225:16
**pay** 138:15 149:11 150:16 177:14 193:8 246:11,12
**payers** 149:8,9 149:11 150:16 150:21
**paying** 150:19
**payment** 222:2
**payments** 139:3
**pays** 139:10
**peace** 163:2
**pediatrics** 185:17 190:16
**peer** 132:1,7
**penalties** 261:19
**pending** 249:2 250:1,7,19,20 250:23 251:6,12 251:14
**people** 129:24 130:10 132:6 136:9 164:17 166:10 170:9 175:10 176:4 177:6,7 187:20 189:24 190:24 191:17 197:10

220:14 229:25

**period**  158:17
158:21 159:1
160:9 196:10
197:8 218:24
219:23 220:7
222:4 244:14,16

**periodically**
144:7 158:23

**periods**  158:22

**perjury**  261:19

**perko**  126:19
260:1

**person**  137:19
146:6 164:9,15
215:19 234:1
235:20,22
237:16 238:15
256:6

**personal**  144:19
148:4 198:25

**personalities**
199:24

**personality**
199:23

**personally**
134:25 157:15
258:10

**pertinent**
234:23 235:10

**petersen**  133:10

**petersen's**
194:24

**peterson**  188:19
214:1 216:5

**petitioner**
234:16

**pgs**  125:11

**pharmacist**
229:3

**pharmacy**  229:2
229:2

**phi**  210:21

**phone**  136:2

**phrase**  203:8

**physician**
137:15 138:14

**physicians**
190:19 225:4,12

**pick**  164:2
174:22

**picked**  174:22

**pickle**  129:21
130:23 149:19
152:10,25 158:6
172:13 213:23

**piece**  160:17
194:24

**piecemeal**
142:19

**pillsbury**  126:9

**piloting**  168:4

**pittman**  126:9

**place**  143:18
152:23 225:1
231:24 232:13
259:6

**placing**  237:18

**plaintiff**  126:2
248:12

**plaintiff's**  163:6
253:22

**plaintiffs**  125:6
125:13 182:6
247:1 248:2

**plan**  202:20
204:17,20,22
205:14,14 207:7
207:11,25
213:15,17 214:7
214:16 217:10
219:4 223:12
224:10 225:18
226:1,4 244:6
244:12 245:15
245:16,18,23,24
245:25 246:1,4
246:7,8,9

**plan's**  246:7

**planned**  174:2

**planning**  176:7

**plans**  157:5,13
159:15 200:6,7
200:21,24
202:22 204:2,4
205:3,6,16
206:5 213:7,12
216:11 217:17
218:1 220:1,6
220:17,23 221:1
223:3 225:8,22
232:19,21,22
244:15 245:23

246:12

**play**  134:9

**please**  162:18
216:8 231:24
257:17 260:9

**plus**  155:12
161:1 253:3

**point**  182:10
212:3 214:15
218:23 222:19

**points**  193:10

**policies**  149:13
149:17 153:10
153:17 155:7
167:5 168:2,3,4
170:16,17
171:25 213:13
213:14

**policy**  127:12,14
152:21,22,23
153:11,23,24
156:23 162:15
163:6 166:17
167:13,14,20,21
169:10,14,16
170:11,20 172:3
211:19,20
213:18,20 214:2
214:7,13,14
215:1,9,17,19
215:25 217:4,15
219:14,15,17,19
222:10 248:14

**policy's**  156:22

**portion** 257:6
**position** 161:9
  161:10 162:6
  219:20 220:11
  250:13 255:15
**positions** 160:22
  160:23 162:11
**positive** 127:23
**possible** 130:14
  132:10,11
  140:24 141:4
  175:10 212:11
  225:11 229:24
**posted** 227:5
**potential** 142:11
  142:22 182:12
**potentially**
  155:11
**practice** 128:22
  132:8 139:8
**practices** 140:13
**practitioner**
  128:22 225:15
**practitioners**
  140:13 223:17
  224:2,21
**prayer** 188:25
**preceding**
  183:23
**precisely** 168:7
**prepare** 129:3
  178:15 182:21
  231:24
**prescribe**
  224:11

**prescribed**
  212:19 217:13
  217:18 218:7
**prescription**
  173:13,18
  184:15,17
  186:20,25
  187:11
**present** 126:23
  143:5,22 240:6
**presented**
  141:22
**press** 184:18
**pretty** 149:18
  151:10 157:17
  161:3 162:24
  171:17 196:4
  203:4 214:11,22
  214:23 222:19
  222:19 238:12
  241:10 250:1
**prevail** 239:15
**previous** 176:2
  202:7
**previously**
  128:4 137:18
  139:6,9 152:3
  171:2 218:14
  220:14
**pricing** 184:17
**prides** 156:2
**primarily** 149:4
  149:6,8 155:3
  161:25 183:15
  195:11

**primary** 132:3,3
  132:18,22 198:9
  198:16
**principal**
  130:15
**principle** 235:5
**principles** 235:5
**print** 148:14
  254:10
**printed** 193:24
  256:1
**printing** 181:11
**prior** 128:11
  137:10 142:14
  142:15,17 157:3
  159:10 176:3
  178:2,12,15
  184:5 188:8
  207:10,21
  208:10 217:13
  217:20 219:21
  227:1 228:14
  229:5 232:19,22
  242:21 243:4,6
  243:16 245:12
  245:13 246:15
  247:5
**priority** 149:10
**private** 149:2,6
  149:11,22 150:1
  150:4,7,9,15
**privately**
  150:10
**privy** 169:19

**pro** 242:4
**probably**
  144:17 159:17
  166:4,6 167:17
  184:4 186:9
  208:24 209:2
  236:10,11
  255:12 256:10
**problem** 169:21
  210:22
**procedure**
  137:2,4,7,9
  232:3 260:17,17
**procedures**
  176:19 182:9,19
  206:6,7
**proceed** 165:21
**proceedings**
  212:22 259:5,10
**process** 131:25
  141:8,19 146:4
  157:10 163:9
  166:24 167:20
  168:19,21 169:8
  169:9 170:2,6,8
  170:18,24
  171:18,22,23,24
  182:19 190:5
  191:20 197:2
  205:9,25 206:4
  206:20 209:17
  209:24 212:2,7
  212:8,10 225:1
  227:14,21
  229:24 232:24

233:13 235:8
236:20 237:22
237:24 238:2,8
239:21,24
242:16 254:20
254:24 255:19
256:20
**processes** 212:4
213:2 229:2
242:3
**procurement**
136:17,22 137:1
**produced**
148:15 203:1
**professional**
139:23 148:5
259:4
**professionals**
161:1 179:20
192:12 224:3
**profile** 142:9
187:9
**program** 139:12
152:9 154:9
155:6 156:3,5
160:8 170:14
**programmed**
231:7
**programming**
230:21 231:3,4
**programs** 149:7
149:13 150:14
150:19 153:7,16
153:21 154:8,13
155:16,21,21,22

184:14 186:19
187:2,4,8
**project** 126:3
128:20 188:21
189:10 236:25
**projects** 154:5,9
**promoting**
187:6
**prompt** 180:13
182:23 183:2
**promptly**
179:13,15
**promulgate**
166:15
**promulgating**
165:4
**promulgation**
171:23,24 227:2
**proposed** 170:1
174:3 189:13
**proposes** 167:1
**prospectus**
137:17
**protect** 188:21
**protein** 251:7
**provide** 129:5
132:6 136:14
140:16 145:4,17
149:10 163:11
175:15 178:1,9
179:22 188:2
202:9,23 204:4
206:21 208:22
213:10 220:9
250:20

**provided**
133:12 145:21
147:2 179:14,16
191:15 195:23
197:4 209:7
216:7,11 228:3
228:18 232:7
239:2 246:5
248:20 251:3
**provider** 221:22
221:23 222:9
223:13 224:10
225:24
**providers**
206:15 217:11
220:23 221:2,21
223:3 224:21
225:8,23
**providing**
195:12,13 244:6
**provision** 236:7
**prudent** 225:7
**psychiatric**
162:6
**psychiatrist**
128:21
**pubertal** 154:14
154:22 207:12
**puberty** 143:4
161:24 171:7
185:20 186:7
207:23 217:6
221:25 223:16
228:1,6 229:10
243:7,21,25

246:22
**public** 125:19
149:5,8,9 174:2
174:4 176:7,13
179:17,18
180:14 181:24
182:10 188:8
195:24 213:11
233:14 258:20
259:21
**publication**
184:24
**publication's**
213:9
**publicly** 227:5
**published** 141:1
156:23 158:1
**publishing**
185:1
**pull** 210:4,13
249:3,9 250:3
**pulled** 146:16
194:11 243:9
246:19 247:3
**pulling** 250:14
**purchase**
136:15
**purpose** 179:17
200:8 233:10,11
233:20 234:2
235:18,21,24
236:2
**purposes** 148:5
**purview** 215:6

**put**  152:25
153:18 159:20
162:3 187:21,22
206:24 223:1
224:25,25
251:25 252:20
**putting**  193:9

**q**

**qual**  200:8,9,13
**qualified**  129:25
**quality**  141:12
141:16 162:2
169:16 194:25
196:1,1,2,3,6
197:13 198:10
198:13 215:17
238:5
**question**  132:9
141:22 143:9,19
150:3 159:19
173:10 192:22
201:1 204:1,8
207:19 208:16
209:19 235:4
247:9
**questioning**
197:18 232:17
252:25 253:6,23
**questions**
160:11,13,14
179:4 191:22,25
206:16 214:6
221:15 225:18
225:21,25 229:4
238:9 252:20

253:10 255:21
**queue**  127:17
248:19,25 249:4
249:24 250:10
250:21
**queues**  249:9
**quick**  170:18
183:8 188:1
200:2
**quickly**  140:15
159:6 170:6
191:6 192:15,23
248:12 253:14
**quite**  144:9
192:22 252:1
**quoted**  148:13
148:16

**r**

**r**  148:10 261:3,3
**rainbow**  189:10
**randomized**
197:16
**ranges**  160:5,6
**rate**  136:15
246:13
**rates**  138:17
246:12
**rather**  170:18
**rct's**  197:13
**reach**  156:21
206:17 234:22
**reached**  142:4
154:23 228:24
**read**  129:25
158:8,10,14

187:21 189:15
190:4 191:6
193:5 201:17
212:11 260:8
261:19
**reading**  188:1
257:19
**real**  132:20
162:23
**realized**  192:4,8
**really**  131:25
132:18 133:8,8
135:20 149:5,9
150:18 155:4
159:6 170:19
180:5 183:7
187:17,18
190:11 192:25
196:16 210:17
249:24
**reason**  198:7
203:21 260:9
261:6,9,12,15
261:18
**reasonable**
260:12
**recall**  135:3
139:18 254:20
254:24
**receipt**  260:12
**receive**  189:12
190:14,24
191:16 238:16
**received**  163:25
164:4 176:1

191:7 193:6
225:21,24 227:1
228:4,19,22
244:22
**receiving**
146:19 191:8,13
191:24 217:11
247:15
**recent**  199:21
230:8 248:24
249:4,9,10,15
**recently**  230:7
**recess**  199:13
248:8
**recipient**  201:11
201:20,22
203:16 210:21
228:4,19 236:21
237:19 240:20
241:19 242:7
**recipient's**
243:20 246:19
**recipients**
192:12 197:5
205:5 206:15
241:24 242:1
243:9 244:14
**recognize**  232:4
232:5
**recognizing**
254:2
**recommend**
134:9
**recommendati...**
134:10 140:1

**recommendati...** 131:18 161:15 162:7

**record** 128:8 134:5 168:17 199:15 248:10 251:25 252:21 253:2,15,16,17 253:19,20 254:7 256:13 257:2 259:10

**recorded** 257:6

**records** 224:24 236:21 237:23 238:10 244:22 246:18 247:13

**red** 147:7

**redemption** 189:10

**redirect** 255:24

**reduction** 203:10,11,12

**reevaluate** 157:5 251:9

**reeves** 125:18 258:20 259:4,21

**refer** 218:4

**reference** 178:7 195:6 205:25 209:17,23 211:8 222:3 231:14 240:10

**referenced** 139:13 195:8,10 252:3 260:7

**referencing** 234:4

**referred** 242:2

**referring** 213:18 217:5 227:9 252:1,4 252:14

**regard** 260:13

**regarding** 130:13 145:25 174:2 188:3 205:7 206:11 252:11

**register** 213:10

**regular** 249:22

**regulations** 136:20

**reimburse** 177:20

**reimbursed** 138:10 139:2

**relate** 212:1

**related** 128:15 128:18 131:3 143:11 205:18 206:11 211:19

**relates** 132:8

**relation** 128:20

**relative** 259:11 259:13

**release** 157:7,12 157:14 176:3 183:23 184:5,8 227:11

**released** 161:12 168:25 227:17

**releases** 142:25 184:14,19

**releasing** 161:14

**relied** 147:14 201:1

**rely** 130:15 140:5 149:25 156:10

**remain** 253:15

**remember** 135:16 147:5 172:11 189:19 194:17 249:14

**reminder** 230:20

**remove** 231:25 232:8

**removed** 230:21

**rendition** 212:25

**reopen** 157:9 251:9

**reopened** 250:24 251:5

**repeat** 140:19 149:24 209:10

**rephrase** 192:24

**report** 132:5,18 135:15 140:9,18 140:23,24 141:9 142:2 145:13,14 145:15,18

146:13,16 147:2 147:15,20,24 148:12 153:18 157:6,16 158:15 160:11 164:12 164:18,23 165:12,20,25 168:24,25 171:21 173:5 176:1 178:5 183:23,24 184:4 184:10 185:6,21 187:19,24 188:7 194:14 195:14 198:5,6 205:10 251:5 254:17

**reported** 125:18

**reporter** 125:19 153:24 257:10 257:13 259:1,5

**reporters** 153:23

**reports** 129:2,3 129:6,10,25 131:7,18 135:10 136:7,8 142:20 144:21 145:5,7 146:10,11,12,16 146:19 149:16 154:5 164:13 194:15 197:11 205:7 249:14,16 250:9,16,24

**represent** 219:4

**representative**
257:7
**represented**
241:21,22
**representing**
126:2,17 182:6
**reproducing**
214:12
**request** 159:21
203:19,24
220:16 228:18
228:22 231:1
234:19,24 236:1
236:18,23,24
239:4,23 240:11
240:18 241:20
242:8,10 251:2
255:2
**requested**
204:12 236:13
257:14
**requesting**
237:17 240:24
241:5,13
**requests** 228:4,5
228:20 237:13
240:2,4,7,19
242:6 249:3
250:24 251:8,15
251:18,19,21
**require** 170:17
204:3 205:6,9
206:4,5
**required** 228:20
233:15,17

242:13
**requirement**
150:18 205:12
**requirements**
173:6,17 202:23
234:10
**requires** 173:13
**research** 143:8
154:4 232:15
240:3
**reserve** 232:14
253:8,10
**resides** 212:22
**resolutions**
205:14 207:7
**resource** 188:2
**respond** 179:6
179:13,15 180:1
180:7,17 182:24
183:1
**responded**
180:6,6
**responding**
167:23 182:23
**response** 127:23
127:23 141:3,9
180:9,13 183:5
189:12 194:9,10
204:4 212:7
**responses**
156:23 180:8
194:8
**responsibilities**
219:17

**responsible**
156:3 181:9,11
181:15,22
213:12 255:15
**result** 169:22
**resulted** 145:22
**resulting** 142:11
**retained** 139:6
182:11
**retract** 195:19
**returned** 260:11
**reuben** 230:12
**reuben's** 230:13
**revealed** 243:15
**revenue** 246:14
**reverse** 207:11
207:22 208:11
208:12
**reversed** 207:15
208:2,21
**review** 137:15
139:7,12,22
141:13 145:5
163:12 169:15
170:18,24,24
178:2,12 187:16
191:2 192:14,23
193:23 194:1,21
195:6 197:20
200:23,24 201:4
208:3 210:21
211:24 212:14
212:16,22
224:24 238:10
240:13 251:3

260:7
**reviewed** 132:1
132:7 148:7
158:2 163:23
164:14,17
189:17 207:25
213:1
**reviewing** 164:2
164:6 193:25
235:25
**reviews** 189:23
228:15 238:6
**revise** 172:8
**revisions** 195:18
**rh** 125:3
**richmond** 126:4
**rick** 188:14
**rides** 235:1
**right** 132:22
141:20,24
147:10 148:22
185:9 199:7
200:5 201:14,17
202:13 204:20
212:14 215:10
215:16 220:9
227:18 230:20
232:23 241:18
242:20 248:12
251:24 257:13
**rights** 219:17
**risk** 194:25
**rivaux** 126:8
**rivera** 188:23

**rl** 126:23
**robust** 140:23
  140:24 141:3
**role** 134:9
  163:17 166:14
  182:14,16 250:8
**romina's** 133:20
**rotate** 225:3
**rothstein**
  246:17,23,24,25
**rough** 257:14
**route** 255:12
**routed** 163:13
  170:1 255:8,9
**routes** 255:6
**routing** 127:12
  162:15 163:7,9
  169:8
**rule** 128:14,16
  132:17 164:24
  165:4,5,23
  166:15,19 167:1
  167:1,4 168:8
  168:11,13,24
  169:7,25 170:1
  170:3,4,10,19
  170:20 171:6,21
  171:23,24 172:5
  175:19 180:2,4
  180:10,12,16
  181:18 182:12
  190:6 195:19
  200:6 209:13
  214:12,13,13,21
  214:22 215:8

217:16 219:25
222:15,16,18
223:1,1 224:14
233:17,18,20
234:1,3,6
235:20 236:16
237:11,12,25
239:6,18,25
240:22 245:6
260:17,17
**rule's** 198:5
  213:11
**rulemaking**
  166:23 167:20
  168:19,21
  233:12,13
**rules** 169:10,11
  170:12 171:25
  172:2,15 212:24
  214:13 220:4
  234:8,11,11,13
  260:12
**ruling** 243:3
**run** 132:13
  252:23
**runs** 202:15

**s**

**s** 126:20 128:1
  260:13 261:3
**safe** 217:6
  221:24 225:6
  242:11
**safely** 225:11
**sake** 217:24

**salaried** 138:17
**save** 152:4
**saw** 153:17,17
**saying** 152:20
  152:21 188:6
  190:9
**says** 212:13
  216:5 227:4,23
  228:17 236:19
**schedules** 156:1
**scope** 136:12
**scroll** 211:7,9
**se** 242:4
**seal** 258:13
**search** 153:19
  153:20
**seated** 174:16
  176:4
**seating** 175:1,17
  175:22 176:23
**seats** 175:11
**second** 146:24
  157:19 195:5
  198:8 202:14
  210:24 215:11
  226:9 253:11
  254:14
**secretary** 129:7
  129:13,23
  163:16,17 166:7
  166:8,12,22
  167:6,7 169:16
  169:17,19,20
  172:13 174:8
  176:17 183:3

215:3,4,5,13,13
215:14,16
219:11 222:23
227:20 235:1,2
235:11 255:8,9
255:13
**section** 146:18
  147:15 158:9,11
  169:3,12 212:4
  233:2 234:11,12
**security** 174:11
  174:13,21
**see** 144:5,8
  146:23 148:3,14
  152:1,1,18,19
  154:6,10 156:4
  156:6,6 162:25
  164:21 182:7
  194:6,12,14,15
  195:8 198:3
  210:5 211:7,7
  223:23 249:8
  256:23,23
**seeing** 176:2
**seems** 155:7
**seen** 142:7
  181:18,20
**selecting** 128:24
  174:10
**self** 197:11
  214:22 215:8
**semantics**
  131:16 186:13
**send** 137:14
  145:19 185:5

210:24 213:20
214:7,9,17,25
215:7,7 219:7
222:21 223:5
251:3
**sending**  202:24
205:11 219:17
223:9 229:15
**senior**  167:24
**sensationalist**
190:10 192:18
**sense**  250:17,18
**sensitive**  176:4
182:3 187:24
**sensitivities**
174:17
**sent**  204:25
215:14 218:22
219:2,3,20
222:13 232:8
**separate**  138:12
142:20 164:13
177:22,23
**september**
157:6
**series**  127:16
226:21
**serve**  176:23
**serves**  227:25
**service**  139:17
140:2 141:7,20
141:23 143:16
149:23 150:6
151:7 152:3
154:25 155:15

155:17 159:16
173:8 203:24
204:12 223:15
225:1 228:15
231:1 237:17
238:22 240:11
240:14,23 241:1
241:4,6 245:19
245:21,25 246:1
251:9,19
**services**  127:18
148:23,24 149:3
151:3 154:24
155:25 156:12
171:2 185:17,19
187:13 191:13
204:18 205:2
208:22 218:10
218:13 220:2
221:3 222:17,17
225:13 236:11
236:12,15 237:4
237:6,9 238:3
239:11,16
240:24,25 241:2
241:8,12 242:22
243:5,17 245:24
246:5,16 247:4
252:3
**session**  253:11
**set**  157:12 213:8
254:12
**sets**  254:10,11
**seven**  137:23

**several**  216:14
240:19
**sex**  161:24
171:7 186:7
191:24 208:11
243:10 245:24
**sg**  256:7,7
**shani**  126:8
**shantice**  230:16
**share**  144:20
249:23
**shared**  249:7
**shaw**  126:9
**sheena**  172:12
172:14 176:16
**sheeran**  130:14
135:24
**sheet**  177:4
260:9,10
**shorthand**
259:7
**show**  179:23
187:23 210:12
247:14
**showed**  243:12
**showing**  226:8
**shows**  235:23
**side**  154:8
**sign**  127:16
163:15 165:20
169:6,13,15,17
169:18,19 177:3
177:6 221:8
260:9

**signature**
186:23 258:18
259:19
**signed**  163:16
163:17 165:12
166:1 169:11
260:13
**significance**
231:16
**signing**  257:20
**similar**  155:21
156:4 199:2
**simone**  126:5
148:19
**simple**  150:3
**simplistic**
187:22
**single**  158:10
190:8
**sit**  179:2 189:19
**situation**  218:25
225:13 237:8
239:2
**situations**
240:13
**six**  191:4 240:20
244:24,25
**size**  174:23,25
**skim**  193:2
**skip**  226:11
**slogan**  181:1,9
181:12,23 183:7
183:9,13,16,20
183:21 184:6,7
184:9,12,16,20

185:4 186:21
**slogan's** 185:25
**slogans** 181:17
   184:13 186:18
   186:25 187:4,10
**slow** 209:19
**small** 170:10
   192:7 224:16
   243:8
**smaller** 224:8
**smatterings**
   144:15
**smc** 229:7
**smmc** 127:14
   214:2
**snapshot** 197:11
**snippets** 146:12
**society** 133:19
   134:1 161:8,10
   161:13,19,21,22
   162:1 190:18
**solutions** 137:15
   260:16
**somebody**
   234:19 256:4
**somebody's**
   196:17
**sophia** 189:8
**sorry** 131:21
   133:11 135:25
   137:3 166:2
   195:3 207:18
   211:8,14 226:11
   226:11,12 229:9
   231:24 246:25

247:3 249:12
**sort** 141:17
**sought** 238:15
   239:16 256:17
**sound** 170:7
**sounds** 192:22
   229:1
**sources** 144:6,9
   147:14,18,22
   222:2
**southern** 126:6
**span** 164:18
**speak** 128:5
   136:18 143:7
   167:10 223:6
   228:2 236:17
   238:7 256:7
**speaker** 177:3
**speakers** 182:17
**speaking** 132:12
   133:10 144:18
   144:19 171:6
   180:9
**special** 229:8
**specialized**
   140:14
**specially** 251:7
**specific** 166:2
   183:20 202:23
   233:24 234:13
   236:7,7,25
   242:20
**specifically**
   131:15 235:18
   238:17

**specifics** 147:5
**specify** 245:19
   246:4
**spell** 148:9
**spends** 157:2
**spent** 157:2
   159:8,9,11
   177:17
**spirit** 233:21,23
**spite** 226:2
**split** 156:9
   190:2
**spoke** 198:19
**spreadsheet**
   152:10 153:1
**staff** 143:5
   174:7,8,11
   176:21 177:5
   180:18,19
**staff's** 181:5
**stamp** 201:18
   201:21 202:7,8
   221:7 226:16
**stamped** 201:15
**stance** 131:2
   132:24,25
**stances** 152:18
**stand** 197:15
   203:5
**standard**
   161:17 162:4
**standards** 157:7
   157:11,12
   204:10

**start** 133:11
   163:8,9,19
   164:2,5,5,7
   169:9 213:25
   227:21
**started** 146:19
   157:19,22
   189:20 193:25
   227:10
**starters** 186:4
**starts** 169:9,10
   217:5
**state** 125:20
   127:11 149:6
   150:23 152:5,8
   153:4,5,7,16,16
   155:15 234:14
   245:15,18,23,24
   245:25 246:1,4
   246:14 258:5
   259:2
**state's** 154:1
   187:1
**stated** 147:12
   154:19 214:12
   223:9 261:19
**statement**
   147:16 156:20
**statements**
   152:20
**states** 125:1
   149:15 152:16
   154:6,8,11,12
   154:13,21 155:2
   155:3,8,8,9,12

156:4,7,7,11,15
156:19,21,25
185:13,14
235:19
**statewide** 154:9
**status** 250:10
**statute** 127:17
206:1 209:18,24
233:2,7 234:2,3
234:6,17 235:18
235:21,24,25
236:3,4,6
260:12
**statutes** 234:6,9
**stay** 151:25
**stayed** 145:3
**steeped** 132:19
**stephanie** 227:3
**stevens** 188:14
**stickers** 181:12
181:23
**stimulator**
251:11
**stones** 198:14
**stood** 191:19
250:10
**stop** 220:2
**stories** 148:17
176:2
**straight** 138:2
222:19 239:2
**straightforward**
223:2
**strategy** 214:21

**street** 126:4,12
126:14,20
**strike** 159:9
**studies** 160:14
194:2,7,15,18
196:1 197:1,6
251:4
**study** 196:1,2,3
196:6,12
**stuff** 137:14
**style** 145:8
**subcontractors**
138:18,22 139:5
139:20 140:4,5
140:12 217:11
**subject** 140:8
142:6 150:12
176:4 209:12
226:24 234:1
235:11,20
**subject's** 143:23
**subjective**
197:11
**submit** 205:7
206:15
**submitted**
190:23 200:24
206:10
**subpart** 233:25
**subscribed**
139:13
**subscription**
139:15,17
**subsequent**
227:7

**substance**
190:13
**substantial**
234:16
**substantiate**
171:5 173:5
**substantive**
145:11,12 146:3
184:3 189:22,22
190:21 193:3,5
193:9,19 194:2
**subtract** 138:3
**sudden** 198:12
**suffer** 223:22,22
**sufficient**
156:23 158:4
162:11 175:13
204:9 210:7,10
210:11 222:15
222:25
**sufficiently**
202:10
**suggested**
145:23 260:11
**suitability** 129:5
**suite** 126:9,14
126:20
**sunshine** 175:9
**superfluous**
214:15
**supervision**
259:8
**supervisor**
163:14 250:3

**supplement**
149:12
**supplemental**
131:7
**support** 160:20
162:11
**supporter** 180:2
**supporting**
141:12
**supports** 162:2
**supposedly**
187:13
**suppressant**
229:10
**suppression**
143:4 154:14,22
161:24 185:20
186:7 207:12,23
223:16
**sure** 160:15,16
160:20 168:18
172:16 174:10
176:22 191:23
194:16 198:14
199:10 207:20
209:21,21
222:10 226:16
230:23,23 248:5
249:20,22 250:4
253:7
**surgeon** 134:20
**surgeries**
161:25
**surgery** 159:25
171:8 208:16

243:13 245:8
246:1,2,11
248:14
**surprised**
167:18
**survey** 149:20
197:8
**surveyed**
149:15 152:16
**susan** 226:15,22
227:4 230:4
247:18
**sustain** 198:12
**swear** 168:16
**switch** 244:12
244:15
**sworn** 128:5
258:11
**symptoms** 192:9
223:22,25 224:1
**sync** 165:16
222:9,9
**system** 150:9
163:13 224:22
228:16 231:7
232:4 247:13
**systems** 230:25

**t**

**t** 128:1 148:10
261:3,3
**take** 131:7
142:18 154:22
170:21 172:18
174:24 179:23
187:20 190:11

190:21,22 192:3
193:11,22 194:6
244:22 248:3
250:3 255:11
**taken** 173:24
259:6
**takes** 132:1,1
169:23
**talk** 162:13
166:23 167:4
200:3 248:17
256:14
**talked** 158:25
199:23
**talking** 128:11
128:16 131:16
133:3 147:11
152:2 167:3
170:3 173:10
178:22,24 179:1
208:4 211:22
218:6 225:6
232:10 240:20
242:25 243:2
252:14
**tallahassee**
125:17 126:20
**tamayo** 129:14
129:24 135:2,25
135:25 166:9
**targeted** 185:25
**taste** 162:23
**taxpayer** 150:9
150:23

**team** 183:11
253:13
**technical** 146:2
216:23
**technological**
178:25
**technologies**
231:2
**tell** 157:22
160:7 208:20
209:4 211:1
241:10 250:9
**template** 203:1
226:10 254:12
254:15,16
**ten** 154:18
**term** 157:8
205:8,10
**terminated**
245:4,7
**termination**
201:11 203:10
203:11
**terminations**
200:20
**terminology**
146:1 147:2,5
187:25 234:5
**terms** 173:13
187:22 238:7
**terribly** 190:20
**territories**
152:17,17
155:12

**test** 151:11
**testified** 128:6
254:23 255:3
**testimony**
254:21,25
256:25 260:8,12
**testosterone**
192:5 203:19
223:23 224:16
225:16
**tests** 250:25
**texas** 153:10,10
153:14,15
194:11
**text** 161:22
**thank** 212:9
213:6 226:17
252:10 254:19
**that'd** 137:23
210:11 218:16
**theirs** 130:16
184:25
**theme** 144:17
**therapy** 143:4
154:22 171:8
207:12,23
208:11 223:16
228:2 229:9
243:10 244:3
**thesis** 160:18
**thing** 162:23
187:15 197:21
198:5,16 216:6
225:8 252:20

**things** 144:9
 148:6 155:24
 160:15 165:16
 178:20 186:24
 192:20 197:24
 198:15,18
 222:12 230:3
 236:22
**think** 129:6,11
 129:12,13
 131:15 134:3
 135:5,23,23,24
 135:25 142:5,17
 142:23 144:16
 145:22,23
 146:22 151:10
 152:7,17 158:19
 159:2,3 160:23
 162:18 163:3
 166:4 171:17,18
 172:12,13,13,14
 172:15 173:14
 173:18 174:5,6
 174:8,8,19
 176:19,20,21
 177:3,4,4,23
 178:25 179:24
 180:3,5,6 181:3
 182:16,16,17,22
 183:10,10,10,11
 183:12,12,22
 184:7 186:13,13
 186:25 189:18
 190:15,18
 192:24 193:11

 194:19,20 195:9
 197:6 198:24
 201:16,17 202:9
 204:7 205:15,16
 205:22 207:5
 208:9 209:25
 210:1 212:5,6
 215:2,10,24,25
 216:3,8,22
 222:7 225:21,24
 232:13 236:18
 242:11 244:5,5
 244:25 246:25
 247:13,23,23
 249:18 250:22
 250:22,23,24
 251:5,10,11,13
 252:19 255:12
**thought** 216:10
 218:23 222:25
 223:1
**three** 128:8
 171:1 176:17
 177:24 189:24
 199:11
**time** 125:15
 128:8 129:13
 135:2 139:14,18
 142:17,18,21,23
 142:25 149:19
 157:13 158:17
 158:20,22 159:1
 160:5,9 165:23
 169:3 170:21
 171:14 177:5,17

 177:17,19
 187:20 193:12
 197:11 199:12
 199:15 215:12
 215:13 219:21
 222:8,23 224:9
 227:13 228:6
 232:14 240:20
 240:24 243:16
 244:9 246:15
 247:10 248:7,10
 248:16 250:6
 252:21,23,25
 253:1,21 254:2
 257:8 259:6
**time's** 170:24
**times** 137:10,23
 144:10 158:19
 158:20 208:20
 233:14 252:3
**titled** 221:4
**titrate** 223:15
**today** 152:8
**together** 152:25
 190:4 193:10
**told** 183:19
 257:14
**tom** 227:20
**tomorrow**
 257:15
**ton** 153:9
**took** 132:24
 168:22 243:3
**tooth** 193:25

**top** 202:4
**topic** 142:22
 144:4
**topics** 172:20
**tordoff** 194:22
**tossed** 199:5
**total** 137:21
 158:25
**totally** 186:5
**touch** 200:2
**touched** 135:5
**touches** 184:2
**touchscreen**
 211:8
**touchy** 142:6
**tough** 228:11
**towards** 138:3
**tracking** 127:12
 162:16 163:7
**traditional**
 141:18
**transcript** 260:7
 260:13
**transcripts**
 260:10
**transition**
 220:24 222:1
 224:8
**translated**
 259:8
**translation**
 230:3
**transmittal**
 127:15 211:19
 211:20 213:15

213:17,18,20
214:2,7,16
215:1,9,19,25
217:4,15 219:3
219:15,18,19
220:8 222:10
**transmittal's**
214:15
**transparency**
184:17 186:25
187:11
**transparent**
161:13 233:14
**transportation**
175:13
**travel** 177:19
178:24 179:1
**traveling**
177:18,19
**treat** 171:8,11
171:12 223:20
224:9 228:23
229:9 238:17
243:22 245:3
**treating** 131:21
131:22 132:16
132:21 192:11
224:1,3
**treatment**
127:18 131:3
132:6,12 141:11
154:14 157:2
159:7 160:8
161:23 171:16
185:22 188:4

190:25 191:8,18
196:20 200:16
201:11 204:18
204:24 205:19
206:12 207:12
207:23 208:12
208:17,22,23
209:8,13 217:8
217:12,14,18
218:8 222:1
223:18 225:10
226:24 229:10
237:3 242:17,23
243:11,13 244:4
244:17,19,20
245:9 247:16
248:14 252:11
**treatments**
155:5 185:8
227:14
**trials** 197:16
**trouble** 148:20
150:2
**troy** 188:19
**true** 205:13
241:8 250:12
259:9 261:20
**trust** 224:2
**truth** 128:5,5,6
**try** 148:3 150:15
156:4 163:10
254:2 256:22,25
**trying** 164:2
185:5 197:9
229:13,23

233:24 247:12
**tuning** 216:24
**turban** 148:8
194:19
**turn** 198:21
**turned** 151:22
250:2,19
**turning** 129:1
159:6 195:3
199:7 200:5
232:23 235:17
242:20 248:12
**turnout** 175:23
175:24 176:6
**two** 129:24
130:4,10 131:9
155:23 164:18
189:21 194:8
211:11 215:22
233:25
**type** 179:20
**types** 171:1
195:23 199:23
201:10 240:12
**typical** 166:14

**u**

**u** 148:10
**uf's** 190:19
**uh** 127:23,23,23
142:16 143:2
149:25 158:7
164:20 190:1
200:10 217:9
**ultimate** 191:10
194:5

**unable** 149:12
**unanimous**
156:13
**unconstitutional**
199:3
**under** 138:12
141:23 149:22
155:15 172:2
173:1,8,21,23
177:5 185:17
186:23 217:16
221:5 232:24
233:25 234:8,12
234:16 236:11
236:11,14 237:1
238:18,20
240:21 256:13
256:21 259:8
260:12 261:19
**underlying**
194:1,18 233:20
234:2 235:18,21
235:24
**undersigned**
258:9
**understand**
158:15 164:3
187:19,25 188:6
228:12
**understanding**
207:21 233:9
250:7 255:4
**undertake**
139:7,22 143:8

**undertaking**
197:20
**undertook**
151:1
**unfamiliar**
136:19
**uniform** 204:4
**union** 156:7
**unique** 151:5
180:23
**unit** 169:11
172:2
**united** 125:1
**units** 167:20
**university**
190:17 193:1
194:7,9,10
**unnecessary**
216:8
**unruly** 174:20
**unturned**
198:14
**unusual** 137:16
170:5
**update** 157:14
168:2 248:25
250:5
**updated** 227:7
249:10,21
**updates** 230:25
254:14
**ups** 158:2
**upset** 174:20
**use** 133:12
136:6,9 140:4

153:24 185:20
190:5 211:11
214:20 224:20
228:2,5 237:24
239:20 242:16
**used** 131:10
141:19 171:15
186:19 201:10
222:11 227:25
246:10 260:13
**using** 135:7
138:14 186:22
186:23 193:6
**usual** 137:2,6,8
**usually** 138:17
149:10,16
155:16 163:10
163:10 175:20
196:22 225:1,2
**utilize** 214:20

**v**

**v** 126:19 195:9
260:1
**valid** 159:2
**valuable** 140:16
**van** 128:12,21
135:11 136:7
145:20,23
177:16,16,18,18
178:25 179:1
180:5,6 183:4,5
**variance** 205:25
209:17,24 212:1
212:3,7,10
233:16,19,22,25

234:19,25 235:3
235:13,19,23
236:1,10,14
237:1,9,12,13
238:2,6,6,8
239:4,20,23
240:2,18 241:13
241:20 242:8,15
254:20,23 255:2
255:18
**variances** 206:6
232:23 234:10
235:7,15 236:18
240:9,12 241:9
242:6 255:11
**various** 153:16
213:2 236:22
240:19
**vendor** 131:20
137:1 138:20,24
**venue** 174:10,22
175:14,17
**verbal** 134:2,4
135:13,18 136:3
**verbally** 147:9
183:18
**verbiage** 227:8
**verified** 244:13
**verify** 202:21
256:10 260:8
**veritext** 260:10
260:16
**veritext.com**
260:10

**version** 157:7
**versus** 159:9
**vet** 228:9,23
**veto** 219:17
**vetted** 228:6
**vetting** 228:10
228:20 229:4,14
**video** 128:7
199:11,14 248:6
248:9 257:6
**videographer**
126:23 128:7
162:24 199:11
199:14 248:6,9
252:22,23 253:3
253:15,17,20
257:3,5
**videotaped**
125:12
**viewed** 142:21
**viewing** 254:13
**views** 219:5
**violate** 173:1
248:13
**violated** 235:5
**visibility** 175:16
**vogel** 126:19
**volume** 125:11
191:5
**vouch** 250:15
**vs** 125:7 260:5
261:1

| w | wanted 129:4 | websites 154:2 | 220:18,22 |
|---|---|---|---|
| w 125:18 258:20 259:4,21 | 160:16 172:17 175:9,11 179:12 | week 146:24 157:19 184:3,8 | 223:22 224:1,1 224:16 |
| wait 165:19 | 179:15 183:1 | 230:9 | witness 127:1 |

**w**

w 125:18 258:20
259:4,21
wait 165:19
169:20,20 198:8
waive 257:19
waiver 205:25
209:17,24 212:2
212:10 233:22
233:25 235:13
235:23 236:1,13
237:8 238:15,19
238:24,25
239:20 240:21
240:22 242:16
254:20,23 255:2
255:18
waivers 232:23
234:10 235:7,19
wall 126:12
wallace 163:18
227:20
want 146:23
148:3 149:9
150:19 152:12
154:6 159:20
160:20 179:21
187:8,8 188:4
190:21 192:24
198:13 207:20
209:3 210:23
212:5 214:1
238:7 248:17
251:25 253:5
254:7 256:10

wanted 129:4
160:16 172:17
175:9,11 179:12
179:15 183:1
187:18,21,21
188:2 190:7
191:22,25
222:10 252:20
wants 216:25
234:19 240:15
warranted
193:3
warriors 188:16
watch 144:3
way 136:19
156:20 159:18
176:5,24 210:2
213:8 251:24
ways 196:5
we've 149:19
173:4 186:22
199:8 200:7
203:2 222:14
241:6 248:18
251:2,25 252:3
252:14 253:1
weak 141:11
161:15,15
wean 192:7
weaned 192:2
web 153:5
154:12 184:16
186:11 187:12
website 185:2,3

websites 154:2
week 146:24
157:19 184:3,8
230:9
weeks 184:5
weida 125:8
129:7,13,23
163:16 166:8
172:13 174:9
176:17 183:4
213:23 215:3,4
215:4,4,5,11,14
219:11 222:23
260:5 261:1
weigh 155:16
went 146:9
152:11 153:5,15
163:15,17
192:20 218:9
219:25 229:7
249:6
whatsoever
189:22
whoever's 250:6
wholly 181:9
williams 226:15
226:22 230:4
wilson 227:16
window 163:11
163:11
winthrop 126:9
withdraw
223:12 225:16
withdrawal
192:1,9 220:15

220:18,22
223:22 224:1,1
224:16
witness 127:1
128:4 130:3
133:3 152:16
155:19 162:22
163:1 203:7
210:20 211:5,9
211:15,22 213:2
216:14 221:11
257:19 258:10
258:13 260:8,8
260:9,13
wol 145:20
wondering
191:12
word 147:7
words 195:14
196:21 229:14
245:20
work 138:6,8
157:15 158:9
160:18 169:23
213:6 216:3
230:4,6 256:16
256:24,24
worked 154:4
158:5 183:12
216:23
working 128:19
129:11 140:10
149:20 157:17
157:23 184:8
215:23 250:6

| | |
|---|---|
| **works**  147:15 | 180:15 186:22 |
| 150:7 158:10 | 186:24 187:23 |
| **world**  163:3 | 187:24 193:6 |
| **wound**  195:16 | 194:3 197:17 |
| 195:25 197:22 | 204:16 207:6,9 |
| **wounded** | 207:17 210:16 |
| 195:24 | 210:16,16,20 |
| **wpath**  160:22 | 211:15 215:21 |
| 161:6 | 217:24 220:5 |
| **wps**  157:7 | 221:19 222:6,6 |
| **write**  129:9 | 226:14 227:15 |
| 135:15 168:2 | 229:11,17 |
| 202:4 | 230:11 237:25 |
| **writing**  147:21 | 238:5,21 239:5 |
| **written**  132:17 | 239:6 240:17 |
| 134:5 135:19 | 241:10 242:1 |
| 209:23 231:14 | 243:12,20 |
| 251:8 | 247:17 249:5,18 |
| **wrong**  228:25 | 250:10 251:17 |
| **wrote**  129:1 | 251:23 253:1 |
| 135:10 136:15 | 254:16 256:3 |
| 146:15 190:19 | **year**  144:17 |
| 190:20 | 245:1 |

| y | |
|---|---|
| **yale**  190:17 | **years**  196:24 |
| 193:1 194:7,8 | 251:22 |
| 194:10 | **yep**  211:21 |
| **yeah**  130:7 | **york**  126:13 |
| 137:4 146:25 | 144:10 155:23 |

| | z |
|---|---|
| 147:21 152:11 | **zero**  207:5 |
| 153:20 158:4,22 | 208:24 209:2 |
| 162:22 164:7,22 | **zoom**  178:16 |
| 166:25 168:1,15 | 257:3 |
| 168:17 169:21 | |
| 170:21 180:15 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.