Page 1

1           UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF FLORIDA
2               TALLAHASSEE DIVISION
3

   AUGUST DEKKER, et al.,
4

        Plaintiffs,
5  V.                    Case No. 4:22-cv-00325-RH-MAF
6  JASON WEIDA, et al.,
7        Defendants.
   -----------------------/
8

   DEPOSITION OF:     MATTHEW BRACKETT
9

   DATE:              WEDNESDAY, MARCH 8TH, 2023
10

   TIME:              10:00 A.M. - 11:44 A.M.
11

   PLACE:             REMOTE PROCEEDINGS
12

13  STENOGRAPHICALLY

   REPORTED BY:       LAWANDA MERCER
14
15
16
17
18
19
20
21
22
23
24
25

```
                                              Page 2
 1   A P P E A R A N C E S:
 2   Katherine Jean Ann DeBriere, ESQUIRE
     Simone Chriss, ESQUIRE
 3   OF: Florida Health Justice Project
         3900 Richmond Street
 4       Jacksonville, Florida 32205-9330
         352-496-5419, FAX-352-496-5419
 5       Debriere@floridahealthjustice.org
         Simone.Chriss@southernlegal.org
 6       APPEARING ON BEHALF OF THE PLAINTIFF
 7   Gary Vergil Perko, ESQUIRE
     OF: Holtzman Vogel, et al
 8       119 S Monroe Street,  Ste 500
         Tallahassee, Florida 32301-1591
 9       850-391-0502, FAX-850-391-0502
         Gperko@holtzmanvogel.com
10       APPEARING ON BEHALF OF THE DEFENDANT
11

     ALSO PRESENT:
12
     Andrew Sheeran, Esquire
13   Jennifer Altman, Esquire
     Shani Rivaux, Esquire
14   Chelsea Dunn, Esquire
     Catherine McKee, Esquire
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

1                      I N D E X

2  TESTIMONY OF MATTHEW BRACKETT

3      DIRECT EXAMINATION BY MS. DEBRIERE................5

4  CERTIFICATE OF OATH...................................55

5  CERTIFICATE OF DEPOSITION TRANSCRIPT..................56

6  ERRATA SHEET..........................................57

7  NOTIFICATION LETTER...................................58

8

9                   INDEX OF EXHIBITS

10  PLAINTIFF'S

11                  (DESCRIPTION)              PAGE NO.

12  Exhibit 24    (Written responses)              5

13  Exhibit 25    (AHCA Summary of Public          25

                  Comments in Response to the GAPMS

14                at issue in this case)

15  Exhibit 26    (Errata sheet)                   42

16                      ------

17              S T I P U L A T I O N S

18      It is hereby stipulated and agreed by and between

19  the counsel for the respective parties and the deponent

20  that the reading and signing of the deposition

21  transcript be reserved.

22                      ------

23

24

25

```
 1              P R O C E E D I N G S

 2                  **********

 3         THE VIDEOGRAPHER:  This is the continued

 4    video-recorded deposition of Matthew Brackett in the

 5    matter of August Dekker, et al. v. Jason Weida, et

 6    al, Case No.:  4:22-cv-00325-RH-MAF.  This

 7    deposition is being held at 2727 Mahan Drive in

 8    Tallahassee, Florida.  Today's date is March 8th,

 9    2023, and the time is 10:09 a.m.  The court reporter

10    is Lawanda Mercer.  My name is R.L. Minnich, I'm the

11    videographer.

12         Would counsel please introduce themselves and

13    then the court reporter please swear in the witness.

14         MS. DEBRIERE:  Yes.  Katy DeBriere, counsel for

15    Plaintiffs.

16         MS. CHRISS:  Simone Chriss, counsel for

17    Plaintiffs.

18         MR. PERKO:  Gary Perko, Counsel for Defendants.

19         MS. DEBRIERE:  And on the line, we have several

20    counsel for Plaintiffs, including Jennifer Altman,

21    Catherine McKee, Shani Rivaux and Chelsea Dunn.

22         MR. SHEERAN:  And Andrew Sheeran of the Agency

23    is on the phone.

24         COURT REPORTER:  Sir, please raise your right

25    hand.
```

Page 5

```
 1          Do you solemnly swear, or affirm, the testimony
 2      you're about to give today is the truth, the whole
 3      truth and nothing but the truth?
 4          THE WITNESS:  I do.
 5          COURT REPORTER:  Thank you.
 6                    MATTHEW BRACKETT,
 7   having been produced and first duly sworn as a witness,
 8   testified as follows:
 9                 DIRECT EXAMINATION
10   BY MS. DEBRIERE:
11      Q.   Okay, Mr. Brackett.  So, on March 6th, 2023,
12   your counsel provided us a copy of written responses to
13   our questions.  And that was in -- in follow-up to
14   your -- the first part of this deposition on
15   February 8th.  I'm going to mark those responses as
16   Exhibit 24 and hand you this.
17          (Thereupon, Plainitiff's Exhibit No. 24 was
18   marked for identification.)
19   BY MS. DEBRIERE:
20      Q.   Do you recognize this document?
21      A.   Yes, I do.
22      Q.   And are these your responses?
23      A.   Yes, they are.
24      Q.   Okay.  And we talked about this a little bit
25   before --
```

1          MS. DEBRIERE:  Here you go, Gary.

2          MR. PERKO:  Oh, thank you.

3    BY MS. DEBRIERE:

4      Q.   Just a little bit before the deposition

5    started.  But in the second question, I just wanted to

6    correct one thing that was my mistake.  The hyperlink we

7    provided for the drug criteria in our question No. 2, it

8    did not work.  I wanted to go back to the web page now

9    and show it to you and then read off the URL in the

10   transcript.  And that way we can just agree that's the

11   one that contains the exhaustive list.  Is that okay

12   with you?

13     A.   That's okay, yeah.

14     Q.   Okay.  So is the exhaustive list of drug

15   criteria contained in this document titled "Preferred

16   Drug List"?  Oh, no.

17     A.   No.

18     Q.   That's not it.  Sorry.  My fault here.  Give me

19   one second.

20         COURT REPORTER:  For the record, which attorney

21      is speaking?

22         MS. DEBRIERE:  Katy DeBriere for the

23      plaintiffs.

24         COURT REPORTER:  Thank you.

25         MS. DEBRIERE:  Okay.

```
 1   BY MS. DEBRIERE:
 2        Q.    Okay.   So is this the web page that contains
 3   the exhaustive list of drug criteria --
 4        A.    That is the web page.
 5        Q.    -- for AHCA?   Okay.
 6        A.    Yes.
 7        Q.    And just to -- for the clarification of the
 8   record, that URL is AHCA, a-h-c-a.
 9   http://ahca.myflorida.com/medicaid/prescribed_drug/drug_
10   criteria.shtml.
11             Okay.   Thank you.   All right.   Turning to the
12        auto PA that you link in the response to your first
13        question.   We appreciate that written explanation.
14        Quick set of follow-ups:   If a drug is denied on the
15        basis of auto PA, does the beneficiary receive
16        notice of that denial?
17        A.    So it would automatically go to a PA.   The
18   recipient would learn at the pharmacy that it was being
19   auto PA'd, yes.
20        Q.    -- Okay.   Do they receive notice of the denial?
21        A.    It's for, like, a NABD?
22        Q.    Yes.   Or a pharmacy notice of some sort?
23        A.    Well, the pharmacy would definitely verbally
24   tell them.   I don't believe they would receive a written
25   notice just because their drug is being auto PA'd
```

Page 8

1   because it's not officially a denial.  It's being kicked

2   to auto prior authorization process.

3       Q.   Okay.  So it's your understanding they do not

4   receive a written -- a written denial?

5       A.   That's my understanding.

6       Q.   Okay.  Could the -- they, or in this instance

7   the prescribing drug pro -- the provider who's

8   prescribing the drug, could they resubmit their request

9   for a prior authorization using the clinical PA process,

10  if denied on auto PA?

11      A.   So the prescriber would have to go through and

12  refill the prescription if --

13      Q.   Refill the prescription or re --

14      A.   Or re -- reissue the prescription if it's --

15  goes through auto PA.

16      Q.   Okay.  Would the person then have the -- the --

17  would the Medicaid beneficiary then have the opportunity

18  to take that new prescription and submit it for clinical

19  prior authorization, if it was denied on auto PI -- PA?

20      A.   They can.  It would --

21      Q.   Okay.

22      A.   It would go to the pharmacy.

23      Q.   Okay.  How -- if -- so, if that's the case, how

24  does AHCA then determine if the prior authorization is

25  approved?  What criteria do they use?

1      A.   So that would, of course, be a case-by-case

2   basis.  And it would be in accordance with our medical

3   necessity guidelines, yeah.

4      Q.   Would you also use the drug criteria at the URL

5   we just read off?

6      A.   Yes, we would.

7      Q.   Okay.  Would it -- would you also compare it

8   against the auto PA list, if it was already denied for

9   auto PA?  Would you do a manual review, I guess, I'm

10  asking, of the auto PA list?

11     A.   Prior -- prior authorizations are manual

12  reviews.

13     Q.   Auto prior authorization is not a manual

14  review, correct, it's automatic?

15     A.   It pretty much means that it's automatically

16  referred to prior authorization.

17     Q.   Is there someone who's physically reviewing the

18  criteria for prior auth -- authorization under auto PA?

19     A.   So --

20     Q.   Or it's the computer program?

21     A.   -- the prior authorizations, those, of course,

22  are reviewed by Magellan.  Those are reviewed manually.

23     Q.   Okay.  Is that a -- what I'm trying to

24  understand is when Magellan is doing the review

25  manually, is that only for clinical PAs or is that also

1  for auto PAs?

2      A.    That would be for the clinical PA.

3      Q.    Okay.  But not for the auto PA?

4      A.    The auto PA would be, of course, automatic.

5      Q.    Great.  Okay.  Okay.  I just want to give you a

6  hypothetical real quick, looking at the auto PA list.

7  So looking at Page 27 here of the auto PA -- A list, and

8  this is the auto PA list that you provided to us linked

9  in your written responses.  For Lupron Depot, let's

10  imagine a pro -- a provider has prescribed Lupron

11  Depot-PED to treat a condition not listed in list B here

12  on Page 27.  Let's also assume the condition that it's

13  prescribed for is not gender dysphoria.  If the prior

14  authorization request is denied through auto PA, could a

15  provider submit the clinical P -- PA process and show

16  that the coverage is nevertheless required under EPSDT?

17      A.    They can do that.

18      Q.    Okay.  All right.  On February 8th, you

19  testified that AHCA's Medicaid Program Integrity Unit

20  undertakes a rest -- retrospective claims review.  Do

21  you remember that?

22      A.    Yes, I do.

23      Q.    Okay.  And that retrospective claims review is

24  of whether prescribed drugs that don't require prior --

25  any prior authorization were prescribed for a medically

Page 11

1   necessary reason.  Do you recall that testimony?

2         A.    I do recall that.

3         Q.    Okay.  So I just have some follow-up questions

4   about that retrospective review process.  The point is

5   to ensure that Medicaid dollars in that retro --

6   retrospective review process, the point is to ensure

7   that Medicaid dollars aren't being used fraudulently,

8   correct?

9         A.    Correct.

10        Q.    Okay.  Does AHCA do that retrospective review

11  for every single claim paid?

12        A.    It does not.

13        Q.    Okay.  When it does do the review on -- so

14  it -- it only does a retrospective review on select

15  drugs; is that correct?

16        A.    It does retrospective reviews when the

17  situation calls for it.  So if there's suspected fraud,

18  it could do a retrospective review.  If there's

19  suspicion of overpayments through humans might be not

20  needed.  It's basically on an ad hoc basis as needed.

21        Q.    Okay.  Okay.  Sorry.  So when it's doing that

22  retrospective review, what criteria does AHCA use to

23  determine if the claim should not have been paid?

24        A.    So if -- of course, it would look at the

25  recipient, look at their diagnosis codes, look at their

1   his -- medical history, and look -- and they would

2   evaluate to determine whether those services that are

3   being delivered and claims reimbursed for are necessary

4   for the needs of that specific recipient.

5        Q.   And if you find that the drug was prescribed

6   for in -- in this ad hoc retrospective review process,

7   if you find that the drug was prescribed for something

8   that was not medically necessary, what is the

9   consequence to the pharmacy, if any?

10        A.   To the pharmacy, since the pharmacy just

11   dispenses the drugs, I don't think we would have any

12   consequences to the pharmacy.   It would be on the pro --

13   on the prescriber.

14        Q.   Okay.   So you wouldn't take Medicaid dollars

15   back from the pharmacy who is reimbursed for dispensing

16   the drug?

17        A.   I don't believe we would.

18        Q.   Okay.   Just going back to my hypo real quick.

19   On the Lupron Depot, you said that if the PA request is

20   denied through auto PA, the provider could submit

21   through the clinical PA process and show that the

22   coverage is nevertheless required under EPSDT.   Is that

23   correct?

24        A.   Yes.

25        Q.   Okay.   In that instance, is there the

1  possibility that the drug could be covered under EPSDT?

2       A.   Any FDA-approved drug could, potentially, be

3  covered under EPSDT, that's correct.

4       Q.   Okay.  In that clinical PA review process?

5       A.   Yes.

6       Q.   Okay.  What percentage of prescription drugs

7  claims paid undergo retrospective review turning back

8  (inaudible)?

9       A.   We don't have that information offhand.

10      Q.   Okay.  Is that information you could get us?

11      A.   I don't know if we could, actually, get that

12  information.

13      Q.   But again, your understanding is it's not every

14  drug that's dispensed, without the need for a prior

15  authorization is then subject to a retrospective review?

16      A.   Retrospective reviews don't happen in -- in

17  the -- in the cases of most claims.

18      Q.   Okay.  Okay.  Could I look at what was

19  previously marked as Plaintiff's Exhibit 19?  And these

20  are e-mail exchanges between AHCA and Magellan dated

21  April 20th, 2022, to June 3rd, 2022.  Looking back at

22  your written responses -- so thank you for telling us

23  what CCM stands for.  What does Change Control Memo

24  mean?

25      A.   So a change control memo, it's -- works like

1  a -- a file maintenance for our CPT Codes, is that when

2  we need Magellan to make an update into its system, as

3  far as processing claims go, the analyst would create a

4  Change Control Memo and send it to Magellan.  And they

5  would use that as the basis to update their system.  So

6  if maybe, like, a new NDC needs to be added.  Things

7  like that.

8      Q.   Okay.  Have we been provided a copy of the

9  particular CCM or Change Control Memo that's being

10  referenced in this e-mail?

11     A.   I don't know if that document has been provided

12  to you.

13     Q.   Okay.

14         MS. DEBRIERE:  Gary, can we find that out?

15         MR. PERKO:  We'll -- we'll find it.

16         MS. DEBRIERE:  Thank you.  And if you do find

17     it, you'll provide it to us?

18         MR. PERKO:  Yes.

19         MS. DEBRIERE:  Thank you.

20  BY MS. DEBRIERE:

21     Q.   Okay.  Who provided the internal gender die --

22  dysphoria criteria to Magellan for use, when reviewing

23  prior authorization requests for GN -- GnRH (inaudible)?

24     A.   So, at the time, that would have been the

25  Bureau of Medicaid Policy.

Page 15

1    Q.   Okay.  Why wasn't that criteria clo -- publicly

2  posted?

3    A.   That -- of course, since that was almost seven

4  years ago, the -- and the staff who were -- made that

5  determination are no longer with us.  The agency

6  doesn't -- cannot recall why that occurred.

7    Q.   Okay.  But all drug criteria should be publicly

8  available?

9    A.   No, they don't absolutely have to be.

10    Q.   Okay.  As you earlier testified just now what

11  was previously marked as Plaintiff's Exhibit 4, the

12  exhaustive list of --

13    A.   Uh-huh.

14    Q.   -- internal -- I'm sorry.  Scratch that.

15         What was previously marked as Plaintiff's

16  Exhibit 4, which is the GnRH -- hold on, Mr. Brackett,

17  I'll get you a copy of it.  The Special Services

18  Criteria For Pubertal Suppression with GnRH Analog.

19    A.   Okay.

20    Q.   This represents the internal criteria AHCA

21  provided to Magellan; is that correct?  -- that's being

22  referenced in this e-mail?

23    A.   Uh-huh.  That's correct.

24    Q.   Okay.  Should this criteria have been publicly

25  posted?

1     A.    It does not have to necessarily be publicly

2   posted.   Just because what we have on our list currently

3   is exhaustive, doesn't preclude us from not necessarily

4   publicly posting one.

5     Q.    Okay.   But just to be clear, the drug criteria

6   that's posted at the website we read earlier, that is

7   the exhaustive list, right?

8     A.    That's currently exhaustive, yes.

9     Q.    Turning back to the e-mails.   In 2017, why did

10   AHCA direct the removal of all gender codes from

11   programming?

12     A.    Can you give me -- tell me the date again?

13     Q.    Yep.   Yep.   So it's 2017.

14     A.    Uh-huh.

15     Q.    Specifically, Elicia King-Wilson from Magellan

16   writes to Susan Williams and others to ah -- from AHCA,

17   "As a reminder, all gender codes were removed from"

18   program -- "programming as directed by the Agency in

19   2017."

20     A.    So the gender codes prim -- what that means is

21   that drugs can apply to either male or female.   So it --

22   removed those and just it can apply to both genders.

23     Q.    And that was the change made in 2017?

24     A.    That was the change made in 2017.

25     Q.    Okay.   So that resulted in all products within

1    the database being coded as

2    MEDICAID_STATE_VALID_SEX_CD=B-Both.

3         A.   Correct.

4         Q.   (Inaudible).  Okay.  In June 22nd, 2022, why

5    did Arlene Elliott at AHCA direct Magellan to remove the

6    Gender Code B-Both from all the NDCs that had it hard

7    coded?  And I can point you to the specific language, if

8    helpful, in the e-mail.

9         A.   Yes.

10        Q.   So on the first page -- oh, I see.  I

11   apologize.  I misspoke.  That was not in June, 2022,

12   that they were directed to remove the gender code.  It

13   was on August 21st of 2017; is that correct?

14        A.   That would be correct, yes.

15        Q.   Okay.  And that was done, again, to result in

16   all products having the Gender Code of B for Both; is

17   that correct?

18        A.   That's correct.

19        Q.   Okay.  Were there any changes to that made in

20   2022?

21        A.   Well, following the promulgation of the

22   challenge exclusion --

23        Q.   Uh-huh.

24        A.   -- yes.  Those codes would have been updated to

25   reflect the changes that would make it align with the

1    challenge exclusion.

2        Q.    Okay.  And is that what the Change Control Memo

3    directed Magellan to do?

4        A.    We would use a Change Control Memo to have

5    Magellan update its symptoms.

6        Q.    Okay.  On -- okay.  When did AHCA direct

7    Magellan to remove the Gender Code equals B-Both to

8    implement the adoption of the categorical exclusion?

9        A.    That change would be intended to take effect on

10   the date the rule went into effect.

11       Q.    Okay.  So you direct -- and -- and that date

12   was August 21st, 2017?

13       A.    I recollect that's correct.

14       Q.    So at the -- what date would -- what date did

15   AHCA direct Magellan to make that change?

16       A.    It would have been a date preceding August 21st

17   since Magellan would need advanced notice.  We don't

18   have the date offhand.

19       Q.    Okay.  Could you get us that date?

20       A.    We -- we can look into it.

21       Q.    Okay.  Is this an e-mail directing Magellan to

22   make the change?  Is this e-mail referencing -- scratch

23   that.

24             Is Exhibit 19, is this an e-mail from AHCA to

25   Magellan asking them to make the change?

1      A.    Let me take a look --

2      Q.    Yeah.

3      A.    -- at it again.  This does not appear to be

4   that e-mail.

5      Q.    Okay.  Would there have been another e-mail

6   from AHCA to Magellan directing them to make that

7   change?

8      A.    It may have, potentially, been a verbal

9   request.

10      Q.    Okay.  Can you verify that it was -- whether it

11   was an e-mail request or a verbal request for us, at

12   some point?  Is that a follow-up that you can do?

13           MR. PERKO:  I don't know if he can do it or

14      not.

15           THE WITNESS:  I'm -- Im not sure because

16      Ashley Peterson, who used to have that role, is no

17      longer with us.

18   BY MS. DEBRIERE:

19      Q.    But you could search Ashley Peterson's e-mails?

20      A.    We can -- yeah.  If there is an e-mail -- if

21   there was an e-mail for it, with all the searches we've

22   done for e-mails, it's probably been pulled up in that.

23      Q.    Okay.  When Elicia from Magellan -- so turning

24   back to the e-mail -- when Elicia from Magellan states

25   that all requests for GN -- and she's referencing GN --

1    GnRH Analogs use to delay puberty in the treatment of

2    gender dysphoria, were required to be vetted by AHCA

3    before a final determination is made.  What did she mean

4    by that?

5                MR. PERKO:  Can you point to the specific

6         language?

7                MS. DEBRIERE:  Absolutely.

8    BY MS. DEBRIERE:

9         Q.   So, looking at the e-mail from

10   Elicia King-Wilson dated April 20th, 2022, to Susan

11   Williams and others at AHCA, she states, "This internal

12   document serves for GnRH Analogs use to delay puberty in

13   adolescence with Gender Dysphoria, but it does not speak

14   to the use of hormone therapy.  This document was

15   provided by the Agency due to a fair hearing request for

16   Lupron for recipients with this diagnosis.  All requests

17   required vetting by AHCA before a final determination is

18   made and MMA will continue to do so as instructed."

19        A.   Well, vetting by AHCA would -- could be

20   interpreted as meaning that once Magellan has made its

21   determination, it would be sent to AHCA to be reviewed

22   and then returned to Magellan with a yes or no.

23        Q.   Okay.  So AHCA was making a -- a determination

24   on all requests sent to Magellan, as to whether or not

25   GnH -- GnRH Analog for the treatment of gender dysphoria

1    was medically necessary?

2         A.    Yes.

3         Q.    Okay.  And do you know if AHCA ever said yes in

4    that situation?

5         A.    We don't have a running list of when we would

6    say yes or no.

7         Q.    So you don't know?

8         A.    We don't know.

9         Q.    Okay.  So these decisions would not have been

10   documented somewhere?

11        A.    Not on any shared files, no.

12        Q.    What other type of files would there be?

13        A.    If a -- potentially if an -- an employee --

14   potentially, if an employee kept a personal file or that

15   would -- that would be it.

16        Q.    Okay.  Were there -- are there any particular

17   employees who might keep those personal files that you

18   can think of?

19        A.    One of our pharmacists, potentially, may have

20   kept one.

21        Q.    Okay.

22        A.    But given that the pharmacists often share work

23   between them, and I don't think that they would have

24   because there's -- there's no way that mid -- could --

25   you get to determine whether or not that's a complete

1   list, and other pharmacists may have vetted one, and it

2   may not have been recorded.

3       Q.   Who is the pharmacist you had in mind who might

4   have it?

5       A.   It's potentially, since this is historic,

6   Susan Williams and Kelly Rubin, who were at the time --

7   who were here at the time and -- and Susan Williams was

8   on the e-mail chain.  They are still employed with the

9   agency.

10      Q.   Is Susan Williams still employed with the

11  agency?

12      A.   Susan Williams is still employed --

13      Q.   Okay.

14      A.   -- with the agency.

15      Q.   So can you ask her if she has any of those

16  decisions documented somewhere?

17      A.   We can ask her.

18      Q.   Okay.  And -- and then get -- provide us the

19  answer?

20      A.   Okay.

21      Q.   Okay.  When AHCA was making these

22  determinations, what criteria were they using?

23      A.   So when AHCA was making its determinations, of

24  course, it's going to be in line with our internal GnRH

25  Analog for Gender Dysphoria Criteria.

1    Q.    And that's what was previously marked as

2    Plaintiff's Exhibit 4?

3    A.    That's correct.

4    Q.    Okay.  When Elicia references MMA, does MMA

5    stand for Managed Medical Assistance?

6    A.    That's correct.

7    Q.    Okay.  And Managed Medical Assistance is AHCA's

8    Managed Care Program for Florida Medicaid, correct?

9    A.    It's one of our Managed Care Programs, that's

10   correct.

11   Q.    So it's referencing -- when she says MMA, she's

12   referencing all Managed Care Plans, excluding Long-Term

13   Care Plans; is that correct?

14   A.    She's referencing all plans that have an MMA

15   contract, yes.

16   Q.    Okay.  And all plans that have an MMA contract,

17   that's publicly available on AHCA's website, correct?

18   A.    This would have been actually with our first

19   contract period.  So at the time --

20   Q.    Uh-huh.

21   A.    -- because we did a re-procurement in 2018 --

22   Q.    Uh-huh.

23   A.    -- and we had a new contract period, these

24   contracts would be historical.  That's not available on

25   our web pages right now.

1    Q.   So what plans had MMA contracts at the time?

2    A.   Staywell, Sunshine, Molina, Prestige.  That's

3  just the ones I can think of off the top of my head.

4    Q.   Humana?

5    A.   Humana was one.  Aetna.

6    Q.   And that -- Sunshine and Staywell, that would

7  include any of the specialty plans they operated as

8  well?

9    A.   This would apply to the specialty plans as

10  well.

11    Q.   Okay.  Including Children's Medical Services?

12    A.   That's correct.  But that wasn't a Managed Care

13  during this contract period.

14    Q.   2017.  So that was operated by at the time?

15    A.   At -- Department of Health operated Children's

16  Medical Services.  It didn't get -- get -- it wasn't

17  until the second contract period.  That was when CMS --

18  that's when Staywell took over CMS.

19    Q.   But this criteria -- or this requirement that

20  we've been discussing that AHCA vet every request for

21  use of GnA -- GnRH antagonist by an adolescent for the

22  treatment of gender dysphoria, they would also apply to

23  use CMS, correct?

24    A.   Yes.

25    Q.   Okay.  Okay.  So turning to the AHCA Summary of

1    Public Comments in Response to the GAPMS at issue in

2    this case.

3              MS. DEBRIERE:  We'll mark that as Exhibit 25.

4              (Thereupon, Plaintiff's Exhibit No. 25 was

5    marked for identification.)

6    BY MS. DEBRIERE:

7        Q.    Who wrote this memo?

8        A.    I wrote it.

9        Q.    Okay.  Why?

10       A.    So, at the direction of our general counsel's

11   office, following the rule hearing on July 8th, we

12   decided to go ahead and do a written comment summary in

13   response to some of the written comments that we

14   received.  And also to summarize some of the verbal

15   comments that were provided during the -- during the

16   hearing.  And -- and also because we did see Plaintiffs'

17   attorneys at the hearing.  So we figured litigation was

18   imminent.

19       Q.    So then what -- what was the purpose that this

20   document was supposed to serve?

21       A.    So we re -- did receive substantial written

22   comments, particularly from three clinical

23   organizations.  And -- which, of course, these documents

24   were not just sent to us, they were also publicly

25   released and became publicly available.  Because they

1   make substantial claims about the validity of our GAPMS

2   memo, we needed to create an internal document that

3   would, of course, explain and -- any potential issues or

4   ex -- respond to any criticisms that, of course, those

5   that weren't intimately familiar with the process might

6   be aware of.

7       Q.   And so the three organizations that you did

8   responses to, comments on, were Yale University,

9   Endocrine Society -- I'm sorry.  There's four -- no, no,

10  no, three.  Yale University, Endocrine Society and the

11  American Academy of Pediatrics.  Is that correct?

12      A.   That's correct.

13      Q.   Why did you pick those three?

14      A.   So those are the three that sent us the

15  substantial comments that had particular criticisms

16  towards our GAPMS report.

17      Q.   Why didn't you respond to any of the other

18  public comments that were provided or create a written

19  detailed response like you did with these three?

20      A.   The other comments were usually very brief,

21  made very general statements.  Some of them made

22  expletive-laden statements, because those comments

23  didn't -- weren't looking at the legality of our rule.

24  It wasn't looking at the -- the credibility of the basis

25  for that rule.  We didn't do written summaries of those

1    comments.

2        Q.    Which one of the comments looked at the --

3    criticized the legality of your role?

4        A.    Yale University's did.

5        Q.    Okay.  And then the Endocrine Society, and AAP

6    along with Yale also criticized the basis for your

7    decision; is that correct?

8        A.    Their criticisms were more limited to the GAPMS

9    memo.

10       Q.    And they disagreed with that conclusion?

11       A.    They disagreed with it.

12       Q.    Why was it sent to the experts?

13       A.    Because we also wanted them to see the comments

14   that were submitted via these institutions.  And we

15   wanted to make sure that our response were as complete

16   as possible.

17       Q.    Were you intending to release the com -- the --

18   this report at some point?  I guess, I'm still just not

19   understanding the use of the report.

20       A.    So the re -- the use of the report was to have

21   an internal memo for those involved in the GAPMS

22   process.  And those, of course, would be involved in the

23   imminent litigation of what was said about our report

24   and what our responses were.  Now only a small handful

25   of us in the agency were intimately involved in the

1   development of the GAPMS memo.  So we needed to share

2   that information with other agency staff.

3       Q.   So this report wasn't created to assess the

4   validity or -- this report was not created for use --

5   for AHCA's use in determining whether or not it should

6   adopt the rule?

7       A.   That's correct.

8       Q.   Okay.  Why not look at and respond to all

9   comments that question the validity or credibility of

10  the GAPMS report?

11      A.   Because while a lot of comments hurled

12  criticisms at us, they weren't substantiated criticisms.

13  They just were saying we're wrong or --

14      Q.   So that --

15      A.   -- things like that.  Just very general

16  statements that didn't actually provide a -- a reasoned

17  case as to why we should not go forward with the rule,

18  these comments did.

19      Q.   Okay.  So -- okay.  Was this document ever

20  intended to become public at some point?

21      A.   No.

22      Q.   Is this the only document AHCA prepared

23  summarizing or responding to public comment, provided in

24  response to the adoption of 59G-1.050(7)?

25      A.   That's the only document.

1    Q.   Including these, did any of the public --

2    including the comments from AAP, Yale and the Endocrine

3    Society, did any of the public comments submitted lead

4    AHCA to reconsider the credentials of the consultants it

5    chose to prepare and submit reports in support of the

6    GAPMS memo?

7    A.   They did not.

8    Q.   Why?

9    A.   None of the comments provided any reasoning or

10   evidence that would force us to redetermine the

11   decisions we'd already made.

12   Q.   But you did think that the comments,

13   particularly from Yale, AAP and the Endocrine Society,

14   were substantiated and -- and reasoned through?

15   A.   They -- Yale put together 47 pages, and they

16   make some pretty sensationalist claims about our report.

17   They published that report.  They -- they did a press

18   release around that report.  We needed to go through and

19   analyze it, to make sure that their claims were just

20   sensationalist and nothing more.

21   Q.   Okay.  Because you'd previously described

22   them -- the -- the reason that you gave me for why you

23   considered their comments and created a detailed summary

24   report of them was because they were reasoned and

25   substantiated, unlike the other public comments

1   provided.

2       A.    They provided some fact-based arguments, if

3   that's what you're meaning.  But these were still

4   sensationalist in nature.  They were poorly-reasoned

5   arguments.

6       Q.    What criteria did you use to determine whether

7   they were poorly reasoned?

8       A.    Just the standard critical thinking procedures

9   that you would apply to research and analysis.

10      Q.    Okay.  So it's your position that the comments

11  provided by Yale, the Endocrine Society and AAP, were

12  poorly-reasoned criticisms of the GAPMS report?

13      A.    That's my personal opinion, yes.

14      Q.    What's the Agency's opinion?

15      A.    The Agency's opinion was that they were flawed

16  arguments, and that they weren't sufficient to warrant

17  overturning the GAPMS report or decision to move forward

18  with the rule promulgation.

19      Q.    And were you the only person who determined

20  whether the report -- the comments of Yale, the

21  Endocrine Society and AAP, were comments that AHCA would

22  disregard in adopting the opinions set forth in GAPMS?

23          MR. PERKO:  Object to form.

24          THE WITNESS:  I was the only author of that

25      document, but I was not the only person who read

1          those comments.  As I said, we did mail copies to

2          their experts and, of course, we had other internal

3          staff look and review the comments and the rebuttal.

4     BY MS. DEBRIERE:

5          Q.   And what internal staff at AHCA agreed with

6     your position about the organization's comments?

7          A.   That'd have been my immediate supervisor,

8     Devona Pickle.

9          Q.   Anybody else?

10         A.   She was -- she -- she had reviewed them as well

11    and reviewed my work.

12         Q.   Uh-huh.

13         A.   That was pretty much the extent of it.  Then

14    we, of course, presented our responses to leadership.

15         Q.   And who's leadership?

16         A.   That would have been Secretary Marstiller and

17    General Counsel Josefina Tamayo.

18         Q.   Okay.  And did they agree with what is

19    contained in this report?

20         A.   They agreed with our findings.

21         Q.   Okay.  I understand that you were the only one

22    who wrote the report.  Did anybody make any edits in the

23    report?

24         A.   As far as any edits, no.  Nobody else worked on

25    that document.  We did get a suggestion from Dr. VanMol

1    to include information about Western European countries,

2    in a response to Yale.   That was it.

3        Q.    Okay.   I'm sorry, Mr. Brackett.   Say that

4    again.   You asked Dr. VanMol to include --

5        A.    No, Dr. VanMol said that we should mention

6    he -- we should consider including information from the

7    Western European countries.

8        Q.    Okay.   And so you had not previously thought

9    about that.   That was Dr. VanMol's suggestion?

10       A.    For this -- for the rebuttal, yes.   We were, of

11   course, aware of it.   But that was his suggestion to

12   make it more complete.

13       Q.    Okay.   So taking each comment individually,

14   starting with Yale, what was the basis for determining

15   whether it was poorly reasoned?

16       A.    So the basis was that no other argument's

17   valid.   What is the -- what is the basis for their

18   arguments?   Do they make a case?   Or when -- when you

19   apply scrutiny, which, in other words questioning, when

20   you start applying those standard analytical methods, do

21   they hold up.   And they didn't.   We found that they were

22   making comparisons to drugs, et cetera, making analogies

23   that just didn't apply.

24       Q.    So the reason it was poorly reasoned was simply

25   because they were making analogies that didn't apply?

1          MR. PERKO:   Object to form.

2          THE WITNESS:   That's an example.

3     BY MS. DEBRIERE:

4       Q.   Okay.  Can you give me other examples?

5       A.   I can.  But those are also explained in the --

6     in the rebuttal.

7       Q.   When you say it's not valid criteria, what

8     are -- valid reasoning, what makes something valid?

9       A.   What would make something valid is that it's a

10    point, you -- you can't really take argument with it.

11    And it make -- would make you walk back from your

12    position, knowing that that's an argument that you

13    cannot overcome.  In other words, it's well thought,

14    it's logical, it's supported by evidence.

15      Q.   So it's your position that nothing in the Yale

16    comment was supported by -- that the thrust of the Yale

17    comment was not supported by evidence?

18      A.   There was -- it could be explained that way.

19    They provide some evidence for their arguments but their

20    arguments were nonapplicable.  Their arguments danced

21    around our main points.

22      Q.   Okay.  What about the basis for determining

23    that AAP's comment was poorly reasoned?

24      A.   The same basis.

25      Q.   So they didn't have any evidence for their

1  comments?

2      A.    Correct.

3      Q.    Okay.   And they missed --

4      A.    Well, let me rephrase that.   They did not have

5  what we'd consider credible evidence, to support their

6  arguments.

7      Q.    Okay.   So what does it mean to be credible?

8      A.    Well, we do explain that in our GAPMS

9   memo.   We explain that in our rebuttal.

10     Q.    And did the -- like the -- the Yale comment,

11  did the AAP comment miss AHCA's point?

12     A.    The AAP comm -- comment was obfuscating the

13  fact that they -- that there was no standard of care

14  available for these services.   The AAP comment

15  frequently referred to one.   There was no standard of

16  care available for these.

17     Q.    So it's AHCA's position there is no standard of

18  care?

19     A.    That's not our pos -- that's not our position.

20  That's just the reality of the situation.

21     Q.    Okay.   So what was the basis for determining

22  whether the Endocrine Society's comment was poorly

23  reasoned?

24     A.    Similar basis as to Yale's.   There's was the

25  briefest of the three.

1      Q.   Okay.   So they didn't present evidence to

2   support their comment?

3      A.   Correct.

4      Q.   Okay.   And they --

5      A.   Or they didn't provide credible evidence to

6   support their comment.

7      Q.   And did they -- like the Yale report, did they

8   miss the point that AHCA was trying to make?

9      A.   I don't think they missed it.   But their --

10   their -- their responses didn't fis -- sufficiently --

11   sufficiently refute that.

12      Q.   Okay.   And what was the point that AHCA was

13   trying to make?

14      A.   The point that we made was in our GAPMS, that

15   the evidence was too low quality to constitute -- um,

16   alignment with GAPMS.

17      Q.   Was there anything in any of the three comments

18   that AHCA did agree with?

19      A.   Are we talking about, like, any last thing or

20   are we talking --

21      Q.   Yeah.

22      A.   That, of course, I think the -- probably the

23   only thing that we could agree on is, that kids who are

24   having issues and having gender dysphoria are worthy of

25   receiving some help of some kind.

1     Q.   Okay.  That's the only thing that you could

2  agree on with them?

3     A.   I'd have to review their comments to

4  redetermine whether or not there's anything we agree --

5  could agree on.  But at -- at large, we are -- I think

6  we do agree that kids who experience gender dysphoria do

7  need evidence-based treatment.  We disagree on what we

8  consider to be sufficiently evidence-based treatment.

9     Q.   Okay.  So the purpose of the report was to

10  review those comments and then summarize your opinion

11  about those comments, right?

12     A.   I wouldn't say my opinion.  I would say mostly

13  more my counter-arguments.

14     Q.   Okay.  So then when you were preparing this

15  report, the point was to refute what Yale, the AAP and

16  the Endocrine Society were saying?

17     A.   Just to point out the flaws of what they were

18  saying, and to, of course, pose counter-arguments,

19  correct.

20     Q.   Okay.  Why start from a position where the

21  point is to refute?

22          MR. PERKO:  Object to form.

23          THE WITNESS:  I'll defer to my previous

24       testimony.  They make comments.  They use hyperbolic

25       language.  This was all released nationally in the

1       media.   Internally, we needed to make sure of the

2       substance behind their statements, we needed to

3       analyze that to make sure that hey, is there

4       something in there that would be a fatal flaw or

5       not.

6   BY MS. DEBRIERE:

7       Q.   Well, analyzing whether something was in there

8   that would either support or not support your conclusion

9   under GAPMS is different from starting from a position

10  where you're writing a report to refute what they're

11  saying; is that right?

12          MR. PERKO:   Object to form.

13          THE WITNESS:   I'm having trouble following what

14      you're saying.

15  BY MS. DEBRIERE:

16      Q.   Yeah.   So your previous testimony was you wrote

17  this report to refute what the AAP, the Endocrine

18  Society and Yale were saying; is that correct?

19      A.   Since they were making arguments and criticisms

20  towards our GAPMS, that were not well founded the --

21  the -- yes, we were refuting their counter-arguments.

22      Q.   At what point did you determine that they were

23  not well-found -- founded comments?

24      A.   Shortly after I read them.

25      Q.   When you were reviewing them did you go and

1  look into any of the research that they cite?

2       A.    I did.

3       Q.    At the time that you were reading the comments

4  you did?

5       A.    I did.

6       Q.    Okay.  So, when you say pretty shortly after

7  reading them, what do you mean?

8       A.    Well, after I read them.  I mean, or -- and --

9  and as I was reading them, since Yale went

10 point-by-point, as you read something.  And, of course,

11 you being an attorney, you start analyzing the language

12 as you read it.

13      Q.    Okay.

14      A.    So either you realize, like, oh, they have a

15 point there, or you shake your head and be, like, no,

16 they don't.

17      Q.    Okay.  So after -- directly after -- once you

18 finished reading the comments, you had decided that they

19 were wrong?

20      A.    I had decided that they were -- yeah.  That

21 they were flawed, yes.

22      Q.    Okay.  Did anyone at AHCA disagree with the

23 contents of this report?

24      A.    You mean, anyone who was in -- who had read

25 it -- read it and received the information on it?

1       Q.    I mean, anyone.

2       A.    Anyone?  I can't speak to every employee.  Not

3   every employee was made aware of that document either.

4       Q.    Are you of -- aware of anyone at AHCA who

5   disagreed with this report?

6       A.    With the GAPMS memo or the comment summary?

7       Q.    Well, let's start with the comment summary.

8       A.    I'm not aware of any employee who disagreed

9   with the comment summary.

10      Q.    Are you aware of any employee who disagreed

11  with the GAPMS?

12      A.    I'm aware of one.

13      Q.    Who?

14      A.    Jeffrey English.

15      Q.    Only Jeffrey English?

16      A.    He's the only one that I'm aware of.

17      Q.    Okay.  Did anybody within leadership direct you

18  to make changes to your summary, after you drafted it?

19      A.    No.

20      Q.    Okay.  So it's perfectly written as is?  No one

21  edited it?

22            MR. PERKO:  Object to form.

23            THE WITNESS:  It is -- it is purely my work

24  product.  So we got the one suggestion from

25  Dr. VanMol, but I added that in myself.

1   BY MS. DEBRIERE:

2        Q.   So what -- no one made any changes to this

3   document.  It's just purely your work product?

4        A.   Yeah.

5        Q.   Okay.  Okay.  So the General Counsel's office

6   never made any edits to this report?

7        A.   No, they did not.

8        Q.   Okay.  They directed you to create the report,

9   but they did not tell you what content to put in it; is

10   that correct?

11        A.   We were instructed to look at the comments,

12   review them and provide analyses of them.  Of course,

13   that would be maintained internally.

14        Q.   Okay.  Other than the comment from Dr. VanMol,

15   were there any other -- was there any other feedback

16   from the experts?

17        A.   No.

18        Q.   So did they tell you anything after they read

19   the report?

20        A.   No.

21        Q.   Okay.  So you sent them the report, and then

22   they didn't make any mention of it after that?

23            MR. PERKO:  Asked and answered.

24            THE WITNESS:  I'd already said that they

25        didn't.

1  BY MS. DEBRIERE:

2      Q.   Okay.  Who did you send this document to before

3  finalizing?

4      A.   So we sent that to Dr's., VanMol, VanMeter, and

5  Grossman (phonetic).

6      Q.   Okay.  Did you send it to anyone internally to

7  AHCA, before finalizing?

8      A.   Well, I mean, we did provide copies to

9  Secretary Marstiller, General Counsel.  So they did have

10  it to review.

11      Q.   Okay.  And they provided you feedback to make

12  changes?

13      A.   They did not request any changes.

14      Q.   Okay.  And they being General Counsel's Office,

15  but also AHCA leadership?

16      A.   Correct.

17      Q.   Okay.  Okay.  So the GAPMS memo -- I'm sorry.

18  The GAPMS regulation presumes that services either meet

19  the GAPMS requirement or they do not.  And if they do

20  not, then those services are experimental, correct?

21      A.   That's what we determined, yes.

22      Q.   In the 2022 GAPMS process, you determined that

23  the services listed in 59G-1.050 subpart (7) are

24  experimental, correct?

25      A.   That's what is written in the GAPMS memo, yes.

1    Q.   And, therefore, AHCA adopted the categorical

2    exclusion for the treatment of gender dysphoria from

3    Medicaid coverage; is that correct?

4    A.   That's correct.

5    Q.   Okay.

6         MS. DEBRIERE:  So can I have the Errata sheet?

7         (Thereupon, Plaintiff's Exhibit No. 26 was

8    marked for identification.)

9    BY MS. DEBRIERE:

10   Q.   So this is marked as Exhibit 26, it's the

11   Errata sheet that you sent to us yesterday.  So, on this

12   Errata sheet, you're saying that there are potentially

13   situations where an individual can prove that the

14   treatment -- the services listed at 59G-1.050(7) to

15   treat gender dysphoria can not be experimental; is that

16   correct?

17   A.   No.  That's not how that's to be -- to be

18   interpreted.

19   Q.   Okay.  So I'm looking at this Errata sheet, and

20   it says that you can use the variance and waiver

21   process -- "An individual can use the variance and

22   waiver process to have an individual determination as to

23   whether one of the services listed at 59G-0 --

24   1.050(7) -- subpart seven is not experimental to treat

25   their gender dysphoria."

1      A.    That text means that they are entitled to

2   review under the legal process.

3      Q.    Are there any circumstances in which that

4   request would be granted?

5      A.    We don't know.   That'd be speculation.

6      Q.    Well, if it was granted, then the person would

7   have proven that the service was not experimental as to

8   them, correct?

9      A.    In a very hypothetical situation, if a variance

10   is approved for coverage of these services, it would be

11   strictly on that individual basis and that individual's

12   basis alone.

13      Q.    But that individual would have to prove that

14   the treatment for gender dysphoria listed at 59G-1.050

15   subpart(7) was not experimental as to them, correct?

16      A.    Hypothetically speaking, if it was to be

17   approved, they would have to satisfy proof, that it

18   wouldn't be experimental, as to them.

19      Q.    So AHCA believes there are situations in which

20   the services listed at 59G-1.050 subpart(7) to treat

21   gender dysphoria can not be experimental?

22          MR. PERKO:  Object to form.

23          THE WITNESS:  That is not what we are saying

24      here.  The variance of the process is a legal

25      process because of -- of the Agency's rulemaking

1      authorities.  And then, of course, every agency can

2      allow for variances, no matter what the rule says,

3      regardless of whether it applies to health care,

4      environment, business, commerce, et cetera.  This is

5      a legal process.

6   BY MS. DEBRIERE:

7      Q.   I understand that anybody can access the legal

8   process.

9      A.   Uh-huh.

10      Q.   But under what situations would AHCA grant that

11   specific variance request?

12           MR. PERKO:  Object to form.

13           THE WITNESS:  We would be speculating.

14   BY MS. DEBRIERE:

15      Q.   The individual would have to prove that the

16   services are not experimental as to them, correct?

17           MR. PERKO:  Asked and answered.

18           THE WITNESS:  The burden of proof is on the

19      recipient.

20   BY MS. DEBRIERE:

21      Q.   To prove that the service is not experimental?

22           MR. PERKO:  Objection to form.

23           THE WITNESS:  The burden of proof is on the

24      recipient.

25   BY MS. DEBRIERE:

1       Q.    What do they have to prove?

2       A.    They have to prove your -- for -- they've --

3    they have to prove substantial hardship because of

4    the -- of the rule.  That's what the grounds under which

5    a variance is granted.

6       Q.    Would they have to prove that the services are

7    not experimental, as to them?

8       A.    They would have to prove substantial hardship.

9       Q.    Substantial hardship to receive services that

10   AHCA has determined are experimental?

11          MR. PERKO:  Object to form.

12          THE WITNESS:  The GAPMS memo is -- serves as

13       the basis to say, that they're experimental and

14       investigational.  If -- if -- and if a recipient

15       feels that -- that their -- that rule is causing

16       them substantial hardship, they are welcome to try

17       to request a variance and have it undergo the review

18       process.

19   BY MS. DEBRIERE:

20       Q.    I understand that an individual -- I understand

21   that an in -- any individual can access the waiver --

22   the variance and waiver process.  What I'm asking is, in

23   order for AHCA to approve that variance request, what

24   does the individual have to establish?

25          MR. PERKO:  Object to form.  Asked and

1     answered.

2    BY MS. DEBRIERE:

3        Q.   Let's scratch that.

4             Looking at the Erat -- the Errata sheet, you

5    say, add the line, that AHCA decides whether a -- a

6    service is experimental as to the requester.

7        A.   And --

8        Q.   Is that the testimony?

9        A.   Yes.

10       Q.   Okay.  So in order to have a variance approved,

11   the individual has to -- AHCA decides whether a service

12   is experimental, as to the requester?

13       A.   It could be interpreted that way.

14       Q.   I'm trying to understand what AHCA's policy is,

15   as it relates to a request for a variance or waiver, for

16   someone who is seeking treatment -- seeking a service in

17   59G-1.050 subpart(7) to treat gender dysphoria.

18       A.   So --

19            MR. PERKO:  Object to form.

20            THE WITNESS:  -- we previously did explain the

21       variance review process.  It's very individualized.

22       Because it's very individualized, we really can't

23       speak to what we would exactly request because of

24       the individualized nature of the variance process.

25       It would be speculation.

1    BY MS. DEBRIERE:

2        Q.    So you cannot sit here today and tell me one

3    example of an individual who would be granted a variance

4    from 59G-1.050 subpart(7)?

5        A.    No, it's all hypotheticals.

6        Q.    I'm not asking for a hypothetical.  I'm asking

7    for an example.  Can you give me one example?

8            MR. PERKO:  Asked and answered.

9            THE WITNESS:  Any examples we would give would

10       be hypothetical.

11   BY MS. DEBRIERE:

12       Q.    Mr. Brackett, you have written here that it is

13   AHCA's position that when someone requests a variance or

14   waiver from this rule then it is AHCA's rule to

15   determine whether the service is experimental, as to the

16   requester.  Is that correct?

17       A.    Those are the words I wrote, yes.

18       Q.    In what situations could AHCA decide whether a

19   service is -- is not experimental as to the requester?

20           MR. PERKO:  Object to form.

21   BY MS. DEBRIERE:

22       Q.    If you have decided that these service are

23   always experimental, they're either experimental or

24   they're not.

25           MR. PERKO:  Object form.

1    BY MS. DEBRIERE:

2         Q.    Is that correct?

3         A.    I defer to the conclusions we drew -- drew in

4    the GAPMS memo.

5         Q.    The services are either experimental or they're

6    not, correct?  So -- excuse me.  Under the GAPMS memo,

7    you determine that all the services are experimental,

8    correct?

9         A.    When --

10        Q.    As to everyone?

11        A.    When used for those clinical indications,

12   correct.

13        Q.    When used for the treatment of gender

14   dysphoria?

15        A.    Correct.

16        Q.    So all situations, where one of those services

17   is being used to treat gender dysphoria, in all

18   situations, the services are experimental, correct?

19        A.    Based on our GAPMS memo determination, yes.

20        Q.    Okay.

21             MS. DEBRIERE:  Okay.  Let's -- let's take a

22        five-minute break.

23             THE VIDEOGRAPHER:  Okay.  This concludes Video

24        One of the continued video-recorded deposition of

25        Matthew Brackett.  The time is 11:07 a.m.

1          (Discussion held off the record.)

2          THE VIDEOGRAPHER:   This is the beginning of

3      Video Two of the continued video-recorded deposition

4      of Matthew Brackett.   The time is 11:17 a.m.

5  BY MS. DEBRIERE:

6      Q.   All right.   Mr. Brackett, turning back to your

7  Errata sheet.   It -- reviewing it yesterday, I noticed

8  that there are just a lot of places where you delete

9  entire lines, and then substitute a few words.   And the

10  reason behind that is, because your position it's a more

11  accurate description of agency policy.   Um, how did you

12  learn about those more accurate descriptions of agency

13  policy?

14      A.   Those came from our General Counsel's Office.

15      Q.   Um, so did you review your deposition with the

16  General's Counsel's Office, and they directed you to

17  include these in that Errata sheet?

18      A.   Yes.   And (inaudible) outside counsel to make

19  sure it was as accurate as possible.

20      Q.   Is outside counsel aware of accurate -- more

21  accurate agency policy?

22      A.   Yes.

23      Q.   How?

24      A.   Via our General Counsel's Office.

25      Q.   So General Counsel's Office gave outside

1  counsel a more accurate description of agency policy,

2  and then outside counsel directed you to fill out this

3  Errata sheet?

4      A.    It was a team effort, yes.

5      Q.    Are these policies kept anywhere?

6      A.    I mean, these policies are -- these statements

7  are more in line -- aligned with the statutes, as

8  written, when it comes to requesting variances and

9  rulemaking.

10     Q.    Okay.  But your reason is that you are

11 providing a more accurate description of agency policy.

12 So they're not policies that are written; is that

13 correct?

14     A.    If you're talking about promulgated policies

15 that go through the rulemaking process --

16     Q.    I'm not.  I'm talking about internal policies

17 or formally-adopted policies.

18     A.    This would be more reflective of -- of our

19 internal processes, yes.

20     Q.    Okay.  And are those internal processes written

21 anywhere?

22     A.    Can't speak to that at this time.

23     Q.    Okay.  So you don't know?

24     A.    Don't know.

25     Q.    Okay.  So can you find that out for me, please?

1       A.    We can check to see if there is a -- if the

2   General Counsel's Office has a written process for

3   variances.

4       Q.    As to the treatment of gender dysphoria?

5       A.    As to the treatment of gender dysphoria?

6       Q.    Uh-huh.

7       A.    There isn't one.

8       Q.    Okay.  How did you learn that your initial

9   responses were not accurate?

10      A.    We just reviewed the transcript.

11      Q.    But as it stands, what's in the Errata sheet is

12  your testimony, correct?

13      A.    This is my testimony, correct.

14      Q.    Okay.  Would you agree that there are

15  individuals for whom their gender dysphoria cannot be

16  resolved with only psychotherapy?

17      A.    That is a statement that, of course, is going

18  to be made by individual clinicians.  That's not --

19  that's not a statement -- the Agency's not in a position

20  to discuss the effectiveness of medical treatments, when

21  it comes down to individuals such as -- such as you're

22  describing.

23      Q.    Okay.  But the agency isn't in a position -- is

24  in a position to determine whether or not services are

25  experimental, as to the provision to Medicaid

1    (inaudible)?

2        A.   That's a different question.   That's a

3    different scene -- scenario.

4        Q.   Okay.   So in what scenario -- I'm sorry.   So

5    then would the --

6        A.   So can you please repeat that question?

7        Q.   Yes.   Would you agree that there are

8    individuals, for whom their gender dysphoria cannot be

9    resolved with only psychotherapy?

10       A.   So just because one treatment may not

11   necessarily be effective, doesn't mean that a treatment

12   that we've deemed to be experimental and investigational

13   is going to be effective.

14       Q.   Okay.   So it is not the Agency's position that

15   individuals who are suffering from gender dysphoria, the

16   only method of treatment that is appropriate is

17   psychotherapy?

18       A.   We can't speak to that because that's kind of

19   an absolute statement.   We do deem psychotherapy as

20   being an appropriate treatment.   But in regards to the

21   other treatments, such as those discussed in the GAPMS

22   memo, those are experimental/investigational.

23       Q.   Okay.   I -- but that's not quite my question,

24   though.   I mean, my question is, is it the Agency's

25   position that there are medical circumstances, in which

1    a Medicaid beneficiary who's suffering from gender

2    dysphoria needs treatment other than psychotherapy?

3            MR. PERKO:  Object to form.

4            THE WITNESS:  We're talking only about

5        psychotherapy, correct?

6    BY MS. DEBRIERE:

7        Q.   Yes.

8        A.   We could probably say yes.

9        Q.   Okay.

10           MS. DEBRIERE:  Are there any other questions

11       that I've missed, Simone?

12           Okay.  All right.  That's it for Plaintiff's

13       side.

14           MR. PERKO:  I got no questions.

15           THE VIDEOGRAPHER:  Anybody via Zoom?

16           MS. DEBRIERE:  We're good, but thank you.

17           THE VIDEOGRAPHER:  Okay.  This concludes the

18       video-recorded deposition of Matthew Brackett.  The

19       time is 11:23 a.m.

20           (Discussion held off the record.)

21           COURT REPORTER:  Is anyone requesting a copy of

22       this deposition at this time?

23           MS. DEBRIERE:  Yes, we will.

24           MR. PERKO:  And we will take a copy.

25           (Discussion held off the record.)

1          MS. DEBRIERE:  Ms. Mercer, can you send it to

2     the person who initially organized your services?

3          (Discussion held off the record.)

4          COURT REPORTER:  Bill it to Jennifer Altman?

5          MS. DEBRIERE:  Yes, please.

6          (Deposition concluded at 11:23 a.m.)

7                         - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 55

```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA:

 4    COUNTY OF DUVAL:

 5

 6        I, LAWANDA MERCER, Florida Professional Reporter,

 7    Notary Public, State of Florida, do hereby certify that

 8    MATTHEW BRACKETT personally appeared before me on

 9    11th day of March, 2023, and was duly sworn and produced

10    Florida driver's license as identification.

11        Signed this 23rd day of MARCH, 2023.

12

13

14

15

16

17              LAWANDA MERCER
                Florida Professional Reporter
18              Notary Public, State of Florida
                My Commission No.:  HH 285925
19              Expires:  July 25th, 2026

20

21

22

23

24

25
```

Page 56

1                  CERTIFICATE OF REPORTER

2    STATE OF FLORIDA:

3    COUNTY OF DUVAL:

4

5        I, LAWANDA MERCER, Florida Professional Reporter,

6    Notary Public, State of Florida, certify that I was

7    authorized to and did stenographically report the

8    deposition of MATTHEW BRACKETT; that a review of the

9    transcript was requested; and that the foregoing

10   transcript, pages 5 through 53, is a true and accurate

11   record of my stenographic notes.

12       I further certify that I am not a relative,

13   employee, or attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorneys or counsel connected with the action, nor am I

16   financially interested in the action.

17

18       DATED this 23rd day of March, 2023.

19

20

21

22           LAWANDA MERCER
             Florida Professional Reporter

23

24

25

```
 1                    ERRATA SHEET
 2        DO NOT WRITE ON TRANSCRIPT-ENTER CHANGES HERE
 3            IN RE:    AUGUST DEKKER ET AL. VS. JASON
    WEIDA, ET AL.,
 4            CASE NO:  4:22-CV-00325-RH-MAF
             DATE:     MARCH 8TH, 2023
 5           DEPONENT:  MATTHEW BRACKETT
 6  PAGE NO. LINE NO.  CORRECTION & REASON
 7  _____  _____    _____
 8  _____  _____    _____
 9  _____  _____    _____
10  _____  _____    _____
11  _____  _____    _____
12  _____  _____    _____
13  _____  _____    _____
14  _____  _____    _____
15  _____  _____    _____
16  _____  _____    _____
17  _____  _____    _____
18  _____  _____    _____
19  _____  _____    _____
20  _____  _____    _____
21  _____  _____    _____
22  Under penalties of perjury, I declare that I have read
    the foregoing document and that the facts stated in it
23  are true."
24
    _____
25  DATE                            MATTHEW BRACKETT
```

Page 58

1                                         March 23rd, 2023
2    MATTHEW BRACKETT
     C/o Gary Vergil Perko
3    Gperko@holtzmanvogel.com
4
5    In Re: March 8th, 2023, Deposition of MATTHEW BRACKETT
          Job# 5801255
6    Dear MATTHEW BRACKETT:
7        This letter is to advise that the transcript for the
     above-referenced deposition has been completed and is
8    available for review. Please read the transcript, make
     any changes and sign the errata sheet provided, then email
9    completed errata to transcripts-fl@veritext.com and to
     all ordering parties.
10       It is suggested that the review of this transcript
     be completed within 30 days of your receipt of this
11   letter, as considered reasonable under Federal Rules*;
     however, there is no Florida Statute to this regard.
12
         The original of this transcript has been forwarded
13   to the ordering party and your errata, once received,
     will be forwarded to all ordering parties for inclusion
14   in the transcript.
15                               Sincerely,
16
17                               Veritext Legal Solutions
18   cc:  Katherine Jean Ann DeBriere, Esquire
          Gary Vergil Perko, Esquire
19
     Waiver:
20
     I,_____, hereby waive the reading and signing
21   of my deposition transcript.
22   _____      _____
     Deponent Signature             Date
23
     *Federal Civil Procedure Rule 30(e)/Florida Civil
24   Procedure Rule 1.310(e)
25

| & | | |
| --- | --- | --- |
| **&**   57:6 | | |

**0**

**0**   42:23
**00325**   1:5 4:6
  57:4

**1**

**1.050**   28:24
  41:23 42:14,24
  43:14,20 46:17
  47:4
**1.310**   58:24
**10:00**   1:10
**10:09**   4:9
**119**   2:8
**11:07**   48:25
**11:17**   49:4
**11:23**   53:19
  54:6
**11:44**   1:10
**11th**   55:9
**19**   13:19 18:24

**2**

**2**   6:7
**2017**   16:9,13,19
  16:23,24 17:13
  18:12 24:14
**2018**   23:21
**2022**   13:21,21
  17:4,11,20
  20:10 41:22
**2023**   1:9 4:9
  5:11 55:9,11
  56:18 57:4 58:1

58:5
**2026**   55:19
**20th**   13:21
  20:10
**21st**   17:13 18:12
  18:16
**22890**   55:16
  56:21
**22nd**   17:4
**23rd**   55:11
  56:18 58:1
**24**   3:12 5:16,17
**25**   3:13,13 25:3
  25:4
**25th**   55:19
**26**   3:15 42:7,10
**27**   10:7,12
**2727**   4:7
**285925**   55:18

**3**

**30**   58:10,23
**32205-9330**   2:4
**32301-1591**   2:8
**352-496-5419**
  2:4,4
**3900**   2:3
**3rd**   13:21

**4**

**4**   15:11,16 23:2
**42**   3:15
**47**   29:15
**4:22**   1:5 4:6
  57:4

**5**

**5**   3:3,12 56:10
**500**   2:8
**53**   56:10
**55**   3:4
**56**   3:5
**57**   3:6
**58**   3:7
**5801255**   58:5
**59g**   28:24 41:23
  42:14,23 43:14
  43:20 46:17
  47:4

**6**

**6th**   5:11

**7**

**7**   28:24 41:23
  42:14,24 43:15
  43:20 46:17
  47:4

**8**

**850-391-0502**
  2:9,9
**8th**   1:9 4:8 5:15
  10:18 25:11
  57:4 58:5

**a**

**a.m.**   1:10,10 4:9
  48:25 49:4
  53:19 54:6
**aap**   27:5 29:2
  29:13 30:11,21
  34:11,12,14

36:15 37:17
**aap's**   33:23
**above**   58:7
**absolute**   52:19
**absolutely**   15:9
  20:7
**academy**   26:11
**access**   44:7
  45:21
**accordance**   9:2
**accurate**   49:11
  49:12,19,20,21
  50:1,11 51:9
  56:10
**action**   56:15,16
**actually**   13:11
  23:18 28:16
**ad**   11:20 12:6
**add**   46:5
**added**   14:6
  39:25
**adolescence**
  20:13
**adolescent**
  24:21
**adopt**   28:6
**adopted**   42:1
  50:17
**adopting**   30:22
**adoption**   18:8
  28:24
**advanced**   18:17
**advise**   58:7
**aetna**   24:5

**affirm** 5:1
**agency** 4:22
  15:5 16:18
  20:15 22:9,11
  22:14 27:25
  28:2 44:1 49:11
  49:12,21 50:1
  50:11 51:23
**agency's** 30:14
  30:15 43:25
  51:19 52:14,24
**ago** 15:4
**agree** 6:10
  31:18 35:18,23
  36:2,4,5,6 51:14
  52:7
**agreed** 3:18
  31:5,20
**ah** 16:16
**ahca** 3:13 7:5,8
  8:24 11:10,22
  13:20 15:20
  16:10,16 17:5
  18:6,15,24 19:6
  20:2,11,17,19
  20:21,23 21:3
  22:21,23 24:20
  24:25 28:22
  29:4 30:21 31:5
  35:8,12,18
  38:22 39:4 41:7
  41:15 42:1
  43:19 44:10
  45:10,23 46:5
  46:11 47:18

**ahca's** 10:19
  23:7,17 28:5
  34:11,17 46:14
  47:13,14
**ahca.myflorid...**
  7:9
**ahead** 25:12
**al** 1:3,6 2:7 4:5
  4:6 57:3,3
**align** 17:25
**aligned** 50:7
**alignment** 35:16
**allow** 44:2
**altman** 2:13
  4:20 54:4
**american** 26:11
**analog** 15:18
  20:25 22:25
**analogies** 32:22
  32:25
**analogs** 20:1,12
**analyses** 40:12
**analysis** 30:9
**analyst** 14:3
**analytical** 32:20
**analyze** 29:19
  37:3
**analyzing** 37:7
  38:11
**andrew** 2:12
  4:22
**ann** 2:2 58:18
**answer** 22:19
**answered** 40:23
  44:17 46:1 47:8

**antagonist**
  24:21
**anybody** 31:9
  31:22 39:17
  44:7 53:15
**apologize** 17:11
**appear** 19:3
**appeared** 55:8
**appearing** 2:6
  2:10
**applies** 44:3
**apply** 16:21,22
  24:9,22 30:9
  32:19,23,25
**applying** 32:20
**appreciate** 7:13
**appropriate**
  52:16,20
**approve** 45:23
**approved** 8:25
  13:2 43:10,17
  46:10
**april** 13:21
  20:10
**argument** 33:10
  33:12
**argument's**
  32:16
**arguments** 30:2
  30:5,16 32:18
  33:19,20,20
  34:6 36:13,18
  37:19,21
**arlene** 17:5

**ashley** 19:16,19
**asked** 32:4
  40:23 44:17
  45:25 47:8
**asking** 9:10
  18:25 45:22
  47:6,6
**assess** 28:3
**assistance** 23:5
  23:7
**assume** 10:12
**attorney** 6:20
  38:11 56:13
**attorneys** 25:17
  56:15
**august** 1:3 4:5
  17:13 18:12,16
  57:3
**auth** 9:18
**author** 30:24
**authorities** 44:1
**authorization**
  8:2,9,19,24 9:13
  9:16,18 10:14
  10:25 13:15
  14:23
**authorizations**
  9:11,21
**authorized** 56:7
**auto** 7:12,15,19
  7:25 8:2,10,15
  8:19 9:8,9,10,13
  9:18 10:1,3,4,6
  10:7,8,14 12:20

**automatic** 9:14
10:4
**automatically**
7:17 9:15
**available** 15:8
23:17,24 25:25
34:14,16 58:8
**aware** 26:6
32:11 39:3,4,8
39:10,12,16
49:20

**b**

**b** 10:11 17:2,6
17:16 18:7
**back** 6:8 12:15
12:18 13:7,21
16:9 19:24
33:11 49:6
**based** 30:2 36:7
36:8 48:19
**basically** 11:20
**basis** 7:15 9:2
11:20 14:5
26:24 27:6
32:14,16,17
33:22,24 34:21
34:24 43:11,12
45:13
**beginning** 49:2
**behalf** 2:6,10
**believe** 7:24
12:17
**believes** 43:19
**beneficiary** 7:15
8:17 53:1

**bill** 54:4
**bit** 5:24 6:4
**brackett** 1:8 3:2
4:4 5:6,11 15:16
32:3 47:12
48:25 49:4,6
53:18 55:8 56:8
57:5,25 58:2,5,6
**break** 48:22
**brief** 26:20
**briefest** 34:25
**burden** 44:18
44:23
**bureau** 14:25
**business** 44:4

**c**

**c** 2:1 4:1 7:8
58:2
**calls** 11:17
**care** 23:8,9,12
23:13 24:12
34:13,16,18
44:3
**case** 1:5 3:14
4:6 8:23 9:1,1
25:2 28:17
32:18 57:4
**cases** 13:17
**categorical** 18:8
42:1
**catherine** 2:14
4:21
**causing** 45:15
**cc** 58:18

**ccm** 13:23 14:9
**cd** 17:2
**certificate** 3:4,5
55:1 56:1
**certify** 55:7 56:6
56:12
**cetera** 32:22
44:4
**chain** 22:8
**challenge** 17:22
18:1
**change** 13:23,25
14:4,9 16:23,24
18:2,4,9,15,22
18:25 19:7
**changes** 17:19
17:25 39:18
40:2 41:12,13
57:2 58:8
**check** 51:1
**chelsea** 2:14
4:21
**children's** 24:11
24:15
**chose** 29:5
**chriss** 2:2 4:16
4:16
**circumstances**
43:3 52:25
**cite** 38:1
**civil** 58:23,23
**claim** 11:11,23
**claims** 10:20,23
12:3 13:7,17
14:3 26:1 29:16

29:19
**clarification** 7:7
**clear** 16:5
**clinical** 8:9,18
9:25 10:2,15
12:21 13:4
25:22 48:11
**clinicians** 51:18
**clo** 15:1
**cms** 24:17,18,23
**code** 17:6,12,16
18:7
**coded** 17:1,7
**codes** 11:25
14:1 16:10,17
16:20 17:24
**com** 27:17
**comes** 50:8
51:21
**comm** 34:12
**comment** 25:12
28:23 32:13
33:16,17,23
34:10,11,12,14
34:22 35:2,6
39:6,7,9 40:14
**comments** 3:13
25:1,13,15,22
26:8,15,18,20
26:22 27:1,2,13
28:9,11,18 29:2
29:3,9,12,23,25
30:10,20,21
31:1,3,6 34:1
35:17 36:3,10

36:11,24 37:23
38:3,18 40:11
**commerce** 44:4
**commission**
55:18
**compare** 9:7
**comparisons**
32:22
**complete** 21:25
27:15 32:12
**completed** 58:7
58:9,10
**computer** 9:20
**concluded** 54:6
**concludes** 48:23
53:17
**conclusion**
27:10 37:8
**conclusions**
48:3
**condition** 10:11
10:12
**connected** 56:15
**consequence**
12:9
**consequences**
12:12
**consider** 32:6
34:5 36:8
**considered**
29:23 58:11
**constitute** 35:15
**consultants**
29:4

**contained** 6:15
31:19
**contains** 6:11
7:2
**content** 40:9
**contents** 38:23
**continue** 20:18
**continued** 4:3
48:24 49:3
**contract** 23:15
23:16,19,23
24:13,17
**contracts** 23:24
24:1
**control** 13:23,25
14:4,9 18:2,4
**copies** 31:1 41:8
**copy** 5:12 14:8
15:17 53:21,24
**correct** 6:6 9:14
11:8,9,15 12:23
13:3 15:21,23
17:3,13,14,17
17:18 18:13
23:3,6,8,10,13
23:17 24:12,23
26:11,12 27:7
28:7 34:2 35:3
36:19 37:18
40:10 41:16,20
41:24 42:3,4,16
43:8,15 44:16
47:16 48:2,6,8
48:12,15,18
50:13 51:12,13

53:5
**correction** 57:6
**counsel** 3:19
4:12,14,16,18
4:20 5:12 31:17
41:9 49:18,20
50:1,2 56:13,15
**counsel's** 25:10
40:5 41:14
49:14,16,24,25
51:2
**counter** 36:13
36:18 37:21
**countries** 32:1,7
**county** 55:4
56:3
**course** 9:1,21
10:4 11:24 15:3
22:24 25:23
26:3,4 27:22
31:2,14 32:11
35:22 36:18
38:10 40:12
44:1 51:17
**court** 1:1 4:9,13
4:24 5:5 6:20,24
53:21 54:4
**coverage** 10:16
12:22 42:3
43:10
**covered** 13:1,3
**cpt** 14:1
**create** 14:3 26:2
26:18 40:8

**created** 28:3,4
29:23
**credentials** 29:4
**credibility**
26:24 28:9
**credible** 34:5,7
35:5
**criteria** 6:7,15
7:3 8:25 9:4,18
11:22 14:22
15:1,7,18,20,24
16:5 22:22,25
24:19 30:6 33:7
**criteria.shtml.**
7:10
**critical** 30:8
**criticisms** 26:4
26:15 27:8
28:12,12 30:12
37:19
**criticized** 27:3,6
**currently** 16:2,8
**cv** 1:5 4:6 57:4

**d**

**d** 3:1 4:1
**danced** 33:20
**database** 17:1
**date** 1:9 4:8
16:12 18:10,11
18:14,14,16,18
18:19 57:4,25
58:22
**dated** 13:20
20:10 56:18

**day** 55:9,11
56:18
**days** 58:10
**dear** 58:6
**debriere** 2:2,5
3:3 4:14,14,19
5:10,19 6:1,3,22
6:22,25 7:1
14:14,16,19,20
19:18 20:7,8
25:3,6 31:4 33:3
37:6,15 40:1
41:1 42:6,9 44:6
44:14,20,25
45:19 46:2 47:1
47:11,21 48:1
48:21 49:5 53:6
53:10,16,23
54:1,5 58:18
**decide** 47:18
**decided** 25:12
38:18,20 47:22
**decides** 46:5,11
**decision** 27:7
30:17
**decisions** 21:9
22:16 29:11
**declare** 57:22
**deem** 52:19
**deemed** 52:12
**defendant** 2:10
**defendants** 1:7
4:18
**defer** 36:23 48:3

**definitely** 7:23
**dekker** 1:3 4:5
57:3
**delay** 20:1,12
**delete** 49:8
**delivered** 12:3
**denial** 7:16,20
8:1,4
**denied** 7:14
8:10,19 9:8
10:14 12:20
**department**
24:15
**deponent** 3:19
57:5 58:22
**deposition** 1:8
3:5,20 4:4,7
5:14 6:4 48:24
49:3,15 53:18
53:22 54:6 56:8
58:5,7,21
**depot** 10:9,11
12:19
**described** 29:21
**describing**
51:22
**description** 3:11
49:11 50:1,11
**descriptions**
49:12
**detailed** 26:19
29:23
**determination**
15:5 20:3,17,21
20:23 42:22

48:19
**determinations**
22:22,23
**determine** 8:24
11:23 12:2
21:25 30:6
37:22 47:15
48:7 51:24
**determined**
30:19 41:21,22
45:10
**determining**
28:5 32:14
33:22 34:21
**development**
28:1
**devona** 31:8
**diagnosis** 11:25
20:16
**die** 14:21
**different** 37:9
52:2,3
**direct** 3:3 5:9
16:10 17:5 18:6
18:11,15 39:17
**directed** 16:18
17:12 18:3 40:8
49:16 50:2
**directing** 18:21
19:6
**direction** 25:10
**directly** 38:17
**disagree** 36:7
38:22

**disagreed** 27:10
27:11 39:5,8,10
**discuss** 51:20
**discussed** 52:21
**discussing**
24:20
**discussion** 49:1
53:20,25 54:3
**dispensed** 13:14
**dispenses** 12:11
**dispensing**
12:15
**disregard** 30:22
**district** 1:1,1
**division** 1:2
**document** 5:20
6:15 14:11
20:12,14 25:20
26:2 28:19,22
28:25 30:25
31:25 39:3 40:3
41:2 57:22
**documented**
21:10 22:16
**documents**
25:23
**doing** 9:24
11:21
**dollars** 11:5,7
12:14
**dr** 31:25 32:4,5
32:9 39:25
40:14
**dr's** 41:4

**[drafted - explanation]**

**drafted** 39:18
**drew** 48:3,3
**drive** 4:7
**driver's** 55:10
**drug** 6:7,14,16
7:3,9,9,14,25
8:7,8 9:4 12:5,7
12:16 13:1,2,14
15:7 16:5
**drugs** 10:24
11:15 12:11
13:6 16:21
32:22
**due** 20:15
**duly** 5:7 55:9
**dunn** 2:14 4:21
**duval** 55:4 56:3
**dysphoria** 10:13
14:22 20:2,13
20:25 22:25
24:22 35:24
36:6 42:2,15,25
43:14,21 46:17
48:14,17 51:4,5
51:15 52:8,15
53:2

**e**

**e** 2:1,1 3:1 4:1,1
13:20 14:10
15:22 16:9 17:8
18:21,22,24
19:4,5,11,19,20
19:21,22,24
20:9 22:8 58:23
58:24

**earlier** 15:10
16:6
**edited** 39:21
**edits** 31:22,24
40:6
**effect** 18:9,10
**effective** 52:11
52:13
**effectiveness**
51:20
**effort** 50:4
**either** 16:21
37:8 38:14 39:3
41:18 47:23
48:5
**elicia** 16:15
19:23,24 20:10
23:4
**elliott** 17:5
**email** 58:8
**employed** 22:8
22:10,12
**employee** 21:13
21:14 39:2,3,8
39:10 56:13,14
**employees**
21:17
**endocrine** 26:9
26:10 27:5 29:2
29:13 30:11,21
34:22 36:16
37:17
**english** 39:14,15
**ensure** 11:5,6

**enter** 57:2
**entire** 49:9
**entitled** 43:1
**environment**
44:4
**epsdt** 10:16
12:22 13:1,3
**equals** 18:7
**erat** 46:4
**errata** 3:6,15
42:6,11,12,19
46:4 49:7,17
50:3 51:11 57:1
58:8,9,13
**esquire** 2:2,2,7
2:12,13,13,14
2:14 58:18,18
**establish** 45:24
**et** 1:3,6 2:7 4:5
4:5 32:22 44:4
57:3,3
**european** 32:1,7
**evaluate** 12:2
**evidence** 29:10
33:14,17,19,25
34:5 35:1,5,15
36:7,8
**ex** 26:4
**exactly** 46:23
**examination** 3:3
5:9
**example** 33:2
47:3,7,7
**examples** 33:4
47:9

**exchanges**
13:20
**excluding** 23:12
**exclusion** 17:22
18:1,8 42:2
**excuse** 48:6
**exhaustive** 6:11
6:14 7:3 15:12
16:3,7,8
**exhibit** 3:12,13
3:15 5:16,17
13:19 15:11,16
18:24 23:2 25:3
25:4 42:7,10
**exhibits** 3:9
**experience** 36:6
**experimental**
41:20,24 42:15
42:24 43:7,15
43:18,21 44:16
44:21 45:7,10
45:13 46:6,12
47:15,19,23,23
48:5,7,18 51:25
52:12,22
**experts** 27:12
31:2 40:16
**expires** 55:19
**explain** 26:3
34:8,9 46:20
**explained** 33:5
33:18
**explanation**
7:13

**expletive** 26:22
**extent** 31:13

**f**

**fact** 30:2 34:13
**facts** 57:22
**fair** 20:15
**familiar** 26:5
**far** 14:3 31:24
**fatal** 37:4
**fault** 6:18
**fax** 2:4,9
**fda** 13:2
**february** 5:15
   10:18
**federal** 58:11,23
**feedback** 40:15
   41:11
**feels** 45:15
**female** 16:21
**figured** 25:17
**file** 14:1 21:14
**files** 21:11,12,17
**fill** 50:2
**final** 20:3,17
**finalizing** 41:3,7
**financially**
   56:16
**find** 12:5,7
   14:14,15,16
   50:25
**findings** 31:20
**finished** 38:18
**first** 5:7,14 7:12
   17:10 23:18

**fis** 35:10
**five** 48:22
**fl** 58:9
**flaw** 37:4
**flawed** 30:15
   38:21
**flaws** 36:17
**florida** 1:1 2:3,4
   2:8 4:8 23:8
   55:3,6,7,10,17
   55:18 56:2,5,6
   56:22 58:11,23
**floridahealthj...**
   2:5
**follow** 5:13 7:14
   11:3 19:12
**following** 17:21
   25:11 37:13
**follows** 5:8
**force** 29:10
**foregoing** 56:9
   57:22
**form** 30:23 33:1
   36:22 37:12
   39:22 43:22
   44:12,22 45:11
   45:25 46:19
   47:20,25 53:3
**formally** 50:17
**forth** 30:22
**forward** 28:17
   30:17
**forwarded**
   58:12,13

**found** 32:21
   37:23
**founded** 37:20
   37:23
**four** 26:9
**fraud** 11:17
**fraudulently**
   11:7
**frequently**
   34:15
**further** 56:12

**g**

**g** 4:1
**gapms** 3:13 25:1
   26:1,16 27:8,21
   28:1,10 29:6
   30:12,17,22
   34:8 35:14,16
   37:9,20 39:6,11
   41:17,18,19,22
   41:25 45:12
   48:4,6,19 52:21
**gary** 2:7 4:18
   6:1 14:14 58:2
   58:18
**gender** 10:13
   14:21 16:10,17
   16:20 17:6,12
   17:16 18:7 20:2
   20:13,25 22:25
   24:22 35:24
   36:6 42:2,15,25
   43:14,21 46:17
   48:13,17 51:4,5
   51:15 52:8,15

53:1
**genders** 16:22
**general** 25:10
   26:21 28:15
   31:17 40:5 41:9
   41:14 49:14,24
   49:25 51:2
**general's** 49:16
**give** 5:2 6:18
   10:5 16:12 33:4
   47:7,9
**given** 21:22
**gn** 14:23 19:25
   19:25
**gna** 24:21
**gnh** 20:25
**gnrh** 14:23
   15:16,18 20:1
   20:12,25 22:24
   24:21
**go** 6:1,8 7:17
   8:11,22 14:3
   25:12 28:17
   29:18 37:25
   50:15
**goes** 8:15
**going** 5:15
   12:18 22:24
   51:17 52:13
**good** 53:16
**gperko** 2:9 58:3
**grant** 44:10
**granted** 43:4,6
   45:5 47:3

**great** 10:5
**grossman** 41:5
**grounds** 45:4
**guess** 9:9 27:18
**guidelines** 9:3

**h**

**h** 7:8
**hand** 4:25 5:16
**handful** 27:24
**happen** 13:16
**hard** 17:6
**hardship** 45:3,8
45:9,16
**head** 24:3 38:15
**health** 2:3 24:15
44:3
**hearing** 20:15
25:11,16,17
**held** 4:7 49:1
53:20,25 54:3
**help** 35:25
**helpful** 17:8
**hey** 37:3
**hh** 55:18
**historic** 22:5
**historical** 23:24
**history** 12:1
**hoc** 11:20 12:6
**hold** 15:16
32:21
**holtzman** 2:7
**holtzmanvoge...**
2:9 58:3
**hormone** 20:14

**http** 7:9
**huh** 15:13,23
16:14 17:23
23:20,22 31:12
44:9 51:6
**humana** 24:4,5
**humans** 11:19
**hurled** 28:11
**hyperbolic**
36:24
**hyperlink** 6:6
**hypo** 12:18
**hypothetical**
10:6 43:9 47:6
47:10
**hypothetically**
43:16
**hypotheticals**
47:5

**i**

**identification**
5:18 25:5 42:8
55:10
**imagine** 10:10
**immediate** 31:7
**imminent** 25:18
27:23
**implement** 18:8
**inaudible** 13:8
14:23 17:4
49:18 52:1
**include** 24:7
32:1,4 49:17
**including** 4:20
24:11 29:1,2

32:6
**inclusion** 58:13
**index** 3:9
**indications**
48:11
**individual**
42:13,21,22
43:11,13 44:15
45:20,21,24
46:11 47:3
51:18
**individual's**
43:11
**individualized**
46:21,22,24
**individually**
32:13
**individuals**
51:15,21 52:8
52:15
**information**
13:9,10,12 28:2
32:1,6 38:25
**initial** 51:8
**initially** 54:2
**instance** 8:6
12:25
**institutions**
27:14
**instructed**
20:18 40:11
**integrity** 10:19
**intended** 18:9
28:20

**intending** 27:17
**interested** 56:16
**internal** 14:21
15:14,20 20:11
22:24 26:2
27:21 31:2,5
50:16,19,20
**internally** 37:1
40:13 41:6
**interpreted**
20:20 42:18
46:13
**intimately** 26:5
27:25
**introduce** 4:12
**investigational**
45:14 52:12,22
**involved** 27:21
27:22,25
**issue** 3:14 25:1
**issues** 26:3
35:24

**j**

**jacksonville** 2:4
**jason** 1:6 4:5
57:3
**jean** 2:2 58:18
**jeffrey** 39:14,15
**jennifer** 2:13
4:20 54:4
**job** 58:5
**josefina** 31:17
**july** 25:11 55:19
**june** 13:21 17:4
17:11

**[justice - marked]**

**justice**  2:3

**k**

**katherine**  2:2
  58:18
**katy**  4:14 6:22
**keep**  21:17
**kelly**  22:6
**kept**  21:14,20
  50:5
**kicked**  8:1
**kids**  35:23 36:6
**kind**  35:25
  52:18
**king**  16:15
  20:10
**know**  13:11
  14:11 19:13
  21:3,7,8 43:5
  50:23,24
**knowing**  33:12

**l**

**l**  3:17
**laden**  26:22
**language**  17:7
  20:6 36:25
  38:11
**large**  36:5
**lawanda**  1:13
  4:10 55:6,17
  56:5,22
**lead**  29:3
**leadership**
  31:14,15 39:17
  41:15

**learn**  7:18 49:12
  51:8
**legal**  43:2,24
  44:5,7 58:17
**legality**  26:23
  27:3
**letter**  3:7 58:7
  58:11
**license**  55:10
**limited**  27:8
**line**  4:19 22:24
  46:5 50:7 57:6
**lines**  49:9
**link**  7:12
**linked**  10:8
**list**  6:11,14,16
  7:3 9:8,10 10:6
  10:7,8,11 15:12
  16:2,7 21:5 22:1
**listed**  10:11
  41:23 42:14,23
  43:14,20
**litigation**  25:17
  27:23
**little**  5:24 6:4
**logical**  33:14
**long**  23:12
**longer**  15:5
  19:17
**look**  11:24,25
  11:25 12:1
  13:18 18:20
  19:1 28:8 31:3
  38:1 40:11

**looked**  27:2
**looking**  10:6,7
  13:21 20:9
  26:23,24 42:19
  46:4
**lot**  28:11 49:8
**low**  35:15
**lupron**  10:9,10
  12:19 20:16

**m**

**made**  15:4
  16:23,24 17:19
  20:3,18,20
  26:21,21 29:11
  35:14 39:3 40:2
  40:6 51:18
**maf**  1:5 4:6 57:4
**magellan**  9:22
  9:24 13:20 14:2
  14:4,22 15:21
  16:15 17:5 18:3
  18:5,7,15,17,21
  18:25 19:6,23
  19:24 20:20,22
  20:24
**mahan**  4:7
**mail**  13:20
  14:10 15:22
  17:8 18:21,22
  18:24 19:4,5,11
  19:20,21,24
  20:9 22:8 31:1
**mails**  16:9 19:19
  19:22

**main**  33:21
**maintained**
  40:13
**maintenance**
  14:1
**make**  14:2
  17:25 18:15,22
  18:25 19:6 26:1
  27:15 29:16,19
  31:22 32:12,18
  33:9,11,11 35:8
  35:13 36:24
  37:1,3 39:18
  40:22 41:11
  49:18 58:8
**makes**  33:8
**making**  20:23
  22:21,23 32:22
  32:22,25 37:19
**male**  16:21
**managed**  23:5,7
  23:8,9,12 24:12
**manual**  9:9,11
  9:13
**manually**  9:22
  9:25
**march**  1:9 4:8
  5:11 55:9,11
  56:18 57:4 58:1
  58:5
**mark**  5:15 25:3
**marked**  5:18
  13:19 15:11,15
  23:1 25:5 42:8
  42:10

**marstiller** 31:16
41:9
**matter** 4:5 44:2
**matthew** 1:8 3:2
4:4 5:6 48:25
49:4 53:18 55:8
56:8 57:5,25
58:2,5,6
**mckee** 2:14 4:21
**mean** 13:24
20:3 34:7 38:7,8
38:24 39:1 41:8
50:6 52:11,24
**meaning** 20:20
30:3
**means** 9:15
16:20 43:1
**media** 37:1
**medicaid** 7:9
8:17 10:19 11:5
11:7 12:14
14:25 17:2 23:8
42:3 51:25 53:1
**medical** 9:2
12:1 23:5,7
24:11,16 51:20
52:25
**medically** 10:25
12:8 21:1
**meet** 41:18
**memo** 13:23,25
14:4,9 18:2,4
25:7 26:2 27:9
27:21 28:1 29:6
34:9 39:6 41:17

41:25 45:12
48:4,6,19 52:22
**mention** 32:5
40:22
**mercer** 1:13
4:10 54:1 55:6
55:17 56:5,22
**method** 52:16
**methods** 32:20
**mid** 21:24
**mind** 22:3
**minnich** 4:10
**minute** 48:22
**missed** 34:3
35:9 53:11
**misspoke** 17:11
**mistake** 6:6
**mma** 20:18 23:4
23:4,11,14,16
24:1
**molina** 24:2
**monroe** 2:8
**move** 30:17

**n**

**n** 2:1 3:1,17 4:1
**nabd** 7:21
**name** 4:10
**nationally** 36:25
**nature** 30:4
46:24
**ndc** 14:6
**ndcs** 17:6
**necessarily** 16:1
16:3 52:11

**necessary** 11:1
12:3,8 21:1
**necessity** 9:3
**need** 13:14 14:2
18:17 36:7
**needed** 11:20,20
26:2 28:1 29:18
37:1,2
**needs** 12:4 14:6
53:2
**never** 40:6
**nevertheless**
10:16 12:22
**new** 8:18 14:6
23:23
**nonapplicable**
33:20
**northern** 1:1
**notary** 55:7,18
56:6
**notes** 56:11
**notice** 7:16,20
7:22,25 18:17
**noticed** 49:7
**notification** 3:7

**o**

**o** 3:17 4:1 58:2
**oath** 3:4 55:1
**obfuscating**
34:12
**object** 30:23
33:1 36:22
37:12 39:22
43:22 44:12
45:11,25 46:19

47:20,25 53:3
**objection** 44:22
**occurred** 15:6
**offhand** 13:9
18:18
**office** 25:11
40:5 41:14
49:14,16,24,25
51:2
**officially** 8:1
**oh** 6:2,16 17:10
38:14
**okay** 5:11,24
6:11,13,14,25
7:2,5,11,20 8:3
8:6,16,21,23 9:7
9:23 10:3,5,5,18
10:23 11:3,10
11:13,21,21
12:14,18,25
13:4,6,10,18,18
14:8,13,21 15:1
15:7,10,19,24
16:5,25 17:4,15
17:19 18:2,6,6
18:11,19,21
19:5,10,23
20:23 21:3,9,16
21:21 22:13,18
22:20,21 23:4,7
23:16 24:11,25
24:25 25:9 27:5
28:8,19,19
29:21 30:10
31:18,21 32:3,8

32:13 33:4,22
34:3,7,21 35:1,4
35:12 36:1,9,14
36:20 38:6,13
38:17,22 39:17
39:20 40:5,5,8
40:14,21 41:2,6
41:11,14,17,17
42:5,19 46:10
48:20,21,23
50:10,20,23,25
51:8,14,23 52:4
52:14,23 53:9
53:12,17
**once** 20:20
38:17 58:13
**ones** 24:3
**operated** 24:7
24:14,15
**opinion** 30:13
30:14,15 36:10
36:12
**opinions** 30:22
**opportunity**
8:17
**order** 45:23
46:10
**ordering** 58:9
58:13,13
**organization's**
31:6
**organizations**
25:23 26:7
**organized** 54:2

**original** 58:12
**outside** 49:18,20
49:25 50:2
**overcome** 33:13
**overpayments**
11:19
**overturning**
30:17

**p**

**p** 2:1,1 3:17 4:1
10:15
**pa** 7:12,15,17
8:9,10,15,19 9:8
9:9,10,18 10:2,3
10:4,6,7,8,14,15
12:19,20,21
13:4
**pa'd** 7:19,25
**page** 3:11 6:8
7:2,4 10:7,12
17:10 57:6
**pages** 23:25
29:15 56:10
**paid** 11:11,23
13:7
**part** 5:14
**particular** 14:9
21:16 26:15
**particularly**
25:22 29:13
**parties** 3:19
56:13,14 58:9
58:13
**party** 58:13

**pas** 9:25 10:1
**ped** 10:11
**pediatrics** 26:11
**penalties** 57:22
**percentage** 13:6
**perfectly** 39:20
**period** 23:19,23
24:13,17
**perjury** 57:22
**perko** 2:7 4:18
4:18 6:2 14:15
14:18 19:13
20:5 30:23 33:1
36:22 37:12
39:22 40:23
43:22 44:12,17
44:22 45:11,25
46:19 47:8,20
47:25 53:3,14
53:24 58:2,18
**person** 8:16
30:19,25 43:6
54:2
**personal** 21:14
21:17 30:13
**personally** 55:8
**peterson** 19:16
**peterson's**
19:19
**pharmacist** 22:3
**pharmacists**
21:19,22 22:1
**pharmacy** 7:18
7:22,23 8:22
12:9,10,10,12

12:15
**phone** 4:23
**phonetic** 41:5
**physically** 9:17
**pi** 8:19
**pick** 26:13
**pickle** 31:8
**place** 1:11
**places** 49:8
**plainitiff's** 5:17
**plaintiff** 2:6
**plaintiff's** 3:10
13:19 15:11,15
23:2 25:4 42:7
53:12
**plaintiffs** 1:4
4:15,17,20 6:23
25:16
**plans** 23:12,13
23:14,16 24:1,7
24:9
**please** 4:12,13
4:24 50:25 52:6
54:5 58:8
**point** 11:4,6
17:7 19:12 20:5
27:18 28:20
33:10 34:11
35:8,12,14
36:15,17,21
37:22 38:10,10
38:15
**points** 33:21
**policies** 50:5,6
50:12,14,16,17

policy  14:25
46:14 49:11,13
49:21 50:1,11
poorly  30:4,7,12
32:15,24 33:23
34:22
pos  34:19
pose  36:18
position  30:10
31:6 33:12,15
34:17,19 36:20
37:9 47:13
49:10 51:19,23
51:24 52:14,25
possibility  13:1
possible  27:16
49:19
posted  15:2,25
16:2,6
posting  16:4
potential  26:3
potentially  13:2
19:8 21:13,14
21:19 22:5
42:12
preceding  18:16
preclude  16:3
preferred  6:15
prepare  29:5
prepared  28:22
preparing  36:14
prescribed  7:9
10:10,13,24,25
12:5,7

prescriber  8:11
12:13
prescribing  8:7
8:8
prescription
8:12,13,14,18
13:6
present  2:11
35:1
presented  31:14
press  29:17
prestige  24:2
presumes  41:18
pretty  9:15
29:16 31:13
38:6
previous  36:23
37:16
previously
13:19 15:11,15
23:1 29:21 32:8
46:20
prim  16:20
prior  8:2,9,19
8:24 9:11,11,13
9:16,18,21
10:13,24,25
13:14 14:23
pro  8:7 10:10
12:12
probably  19:22
35:22 53:8
procedure
58:23,24

procedures  30:8
proceedings
1:11
process  8:2,9
10:15 11:4,6
12:6,21 13:4
26:5 27:22
41:22 42:21,22
43:2,24,25 44:5
44:8 45:18,22
46:21,24 50:15
51:2
processes  50:19
50:20
processing  14:3
procurement
23:21
produced  5:7
55:9
product  39:24
40:3
products  16:25
17:16
professional
55:6,17 56:5,22
program  9:20
10:19 16:18
23:8
programming
16:11,18
programs  23:9
project  2:3
promulgated
50:14

promulgation
17:21 30:18
proof  43:17
44:18,23
prove  42:13
43:13 44:15,21
45:1,2,3,6,8
proven  43:7
provide  14:17
22:18 28:16
33:19 35:5
40:12 41:8
provided  5:12
6:7 10:8 14:8,11
14:21 15:21
20:15 25:15
26:18 28:23
29:9 30:1,2,11
41:11 58:8
provider  8:7
10:10,15 12:20
providing  50:11
provision  51:25
psychotherapy
51:16 52:9,17
52:19 53:2,5
pubertal  15:18
puberty  20:1,12
public  3:13 25:1
26:18 28:20,23
29:1,3,25 55:7
55:18 56:6
publicly  15:1,7
15:24 16:1,4
23:17 25:24,25

**published** 29:17
**pulled** 19:22
**purely** 39:23
40:3
**purpose** 25:19
36:9
**put** 29:15 40:9

**q**

**quality** 35:15
**question** 6:5,7
7:13 28:9 52:2,6
52:23,24
**questioning**
32:19
**questions** 5:13
11:3 53:10,14
**quick** 7:14 10:6
12:18
**quite** 52:23

**r**

**r** 2:1 4:1
**r.l.** 4:10
**raise** 4:24
**read** 6:9 9:5
16:6 30:25
37:24 38:8,10
38:12,24,25
40:18 57:22
58:8
**reading** 3:20
38:3,7,9,18
58:20
**real** 10:6 12:18

**reality** 34:20
**realize** 38:14
**really** 33:10
46:22
**reason** 11:1
29:22 32:24
49:10 50:10
57:6
**reasonable**
58:11
**reasoned** 28:16
29:14,24 30:4,7
30:12 32:15,24
33:23 34:23
**reasoning** 29:9
33:8
**rebuttal** 31:3
32:10 33:6 34:9
**recall** 11:1,2
15:6
**receipt** 58:10
**receive** 7:15,20
7:24 8:4 25:21
45:9
**received** 25:14
38:25 58:13
**receiving** 35:25
**recipient** 7:18
11:25 12:4
44:19,24 45:14
**recipients** 20:16
**recognize** 5:20
**recollect** 18:13
**reconsider** 29:4

**record** 6:20 7:8
49:1 53:20,25
54:3 56:11
**recorded** 4:4
22:2 48:24 49:3
53:18
**redetermine**
29:10 36:4
**referenced**
14:10 15:22
58:7
**references** 23:4
**referencing**
18:22 19:25
23:11,12,14
**referred** 9:16
34:15
**refill** 8:12,13
**reflect** 17:25
**reflective** 50:18
**refute** 35:11
36:15,21 37:10
37:17
**refuting** 37:21
**regard** 58:11
**regardless** 44:3
**regards** 52:20
**regulation**
41:18
**reimbursed**
12:3,15
**reissue** 8:14
**relates** 46:15
**relative** 56:12
56:14

**release** 27:17
29:18
**released** 25:25
36:25
**remember**
10:21
**reminder** 16:17
**remote** 1:11
**removal** 16:10
**remove** 17:5,12
18:7
**removed** 16:17
16:22
**repeat** 52:6
**rephrase** 34:4
**report** 26:16
27:18,19,20,23
28:3,4,10 29:16
29:17,18,24
30:12,17,20
31:19,22,23
35:7 36:9,15
37:10,17 38:23
39:5 40:6,8,19
40:21 56:7
**reported** 1:13
**reporter** 4:9,13
4:24 5:5 6:20,24
53:21 54:4 55:6
55:17 56:1,5,22
**reports** 29:5
**represents**
15:20
**request** 8:8
10:14 12:19

19:9,11,11
20:15 24:20
41:13 43:4
44:11 45:17,23
46:15,23
**requested** 56:9
**requester** 46:6
46:12 47:16,19
**requesting** 50:8
53:21
**requests** 14:23
19:25 20:16,24
47:13
**require** 10:24
**required** 10:16
12:22 20:2,17
**requirement**
24:19 41:19
**research** 30:9
38:1
**reserved** 3:21
**resolved** 51:16
52:9
**respective** 3:19
**respond** 26:4,17
28:8
**responding**
28:23
**response** 3:13
7:12 25:1,13
26:19 27:15
28:24 32:2
**responses** 3:12
5:12,15,22 10:9
13:22 26:8

27:24 31:14
35:10 51:9
**rest** 10:20
**resubmit** 8:8
**result** 17:15
**resulted** 16:25
**retro** 11:5
**retrospective**
10:20,23 11:4,6
11:10,14,16,18
11:22 12:6 13:7
13:15,16
**returned** 20:22
**review** 9:9,14
9:24 10:20,23
11:4,6,10,13,14
11:18,22 12:6
13:4,7,15 31:3
36:3,10 40:12
41:10 43:2
45:17 46:21
49:15 56:8 58:8
58:10
**reviewed** 9:22
9:22 20:21
31:10,11 51:10
**reviewing** 9:17
14:22 37:25
49:7
**reviews** 9:12
11:16 13:16
**rh** 1:5 4:6 57:4
**richmond** 2:3
**right** 4:24 7:11
10:18 16:7

23:25 36:11
37:11 49:6
53:12
**rivaux** 2:13 4:21
**role** 19:16 27:3
**rubin** 22:6
**rule** 18:10 25:11
26:23,25 28:6
28:17 30:18
44:2 45:4,15
47:14,14 58:23
58:24
**rulemaking**
43:25 50:9,15
**rules** 58:11
**running** 21:5

**s**

**s** 2:1,8 3:17,17
4:1
**satisfy** 43:17
**saying** 28:13
36:16,18 37:11
37:14,18 42:12
43:23
**says** 23:11 42:20
44:2
**scenario** 52:3,4
**scene** 52:3
**scratch** 15:14
18:22 46:3
**scrutiny** 32:19
**search** 19:19
**searches** 19:21
**second** 6:5,19
24:17

**secretary** 31:16
41:9
**see** 17:10 25:16
27:13 51:1
**seeking** 46:16
46:16
**select** 11:14
**send** 14:4 41:2,6
54:1
**sensationalist**
29:16,20 30:4
**sent** 20:21,24
25:24 26:14
27:12 40:21
41:4 42:11
**serve** 25:20
**serves** 20:12
45:12
**service** 43:7
44:21 46:6,11
46:16 47:15,19
47:22
**services** 12:2
15:17 24:11,16
34:14 41:18,20
41:23 42:14,23
43:10,20 44:16
45:6,9 48:5,7,16
48:18 51:24
54:2
**set** 7:14 30:22
**seven** 15:3
42:24
**several** 4:19

sex  17:2
shake  38:15
shani  2:13 4:21
share  21:22
    28:1
shared  21:11
sheeran  2:12
    4:22,22
sheet  3:6,15
    42:6,11,12,19
    46:4 49:7,17
    50:3 51:11 57:1
    58:8
shortly  37:24
    38:6
show  6:9 10:15
    12:21
side  53:13
sign  58:8
signature  55:16
    56:21 58:22
signed  55:11
signing  3:20
    58:20
similar  34:24
simone  2:2 4:16
    53:11
simone.chriss
    2:5
simply  32:24
sincerely  58:15
single  11:11
sir  4:24
sit  47:2

situation  11:17
    21:4 34:20 43:9
situations  42:13
    43:19 44:10
    47:18 48:16,18
small  27:24
society  26:9,10
    27:5 29:3,13
    30:11,21 36:16
    37:18
society's  34:22
solemnly  5:1
solutions  58:17
sorry  6:18 11:21
    15:14 26:9 32:3
    41:17 52:4
sort  7:22
southernlegal....
    2:5
speak  20:13
    39:2 46:23
    50:22 52:18
speaking  6:21
    43:16
special  15:17
specialty  24:7,9
specific  12:4
    17:7 20:5 44:11
specifically
    16:15
speculating
    44:13
speculation
    43:5 46:25

staff  15:4 28:2
    31:3,5
stand  23:5
standard  30:8
    32:20 34:13,15
    34:17
stands  13:23
    51:11
start  32:20
    36:20 38:11
    39:7
started  6:5
starting  32:14
    37:9
state  17:2 55:3,7
    55:18 56:2,6
stated  57:22
statement  51:17
    51:19 52:19
statements
    26:21,22 28:16
    37:2 50:6
states  1:1 19:24
    20:11
statute  58:11
statutes  50:7
staywell  24:2,6
    24:18
ste  2:8
stenographic
    56:11
stenographica...
    1:13 56:7
stipulated  3:18

street  2:3,8
strictly  43:11
subject  13:15
submit  8:18
    10:15 12:20
    29:5
submitted  27:14
    29:3
subpart  41:23
    42:24 43:15,20
    46:17 47:4
substance  37:2
substantial
    25:21 26:1,15
    45:3,8,9,16
substantiated
    28:12 29:14,25
substitute  49:9
suffering  52:15
    53:1
sufficient  30:16
sufficiently
    35:10,11 36:8
suggested  58:10
suggestion
    31:25 32:9,11
    39:24
summaries
    26:25
summarize
    25:14 36:10
summarizing
    28:23
summary  3:13
    24:25 25:12

**[summary - university's]**                                   Page 74

29:23 39:6,7,9
39:18
**sunshine**  24:2,6
**supervisor**  31:7
**support**  29:5
34:5 35:2,6 37:8
37:8
**supported**
33:14,16,17
**supposed**  25:20
**suppression**
15:18
**sure**  19:15
27:15 29:19
37:1,3 49:19
**susan**  16:16
20:10 22:6,7,10
22:12
**suspected**  11:17
**suspicion**  11:19
**swear**  4:13 5:1
**sworn**  5:7 55:9
**symptoms**  18:5
**system**  14:2,5

**t**

**t**  3:17,17
**take**  8:18 12:14
18:9 19:1 33:10
48:21 53:24
**talked**  5:24
**talking**  35:19,20
50:14,16 53:4
**tallahassee**  1:2
2:8 4:8

**tamayo**  31:17
**team**  50:4
**tell**  7:24 16:12
40:9,18 47:2
**telling**  13:22
**term**  23:12
**testified**  5:8
10:19 15:10
**testimony**  3:2
5:1 11:1 36:24
37:16 46:8
51:12,13
**text**  43:1
**thank**  5:5 6:2,24
7:11 13:22
14:16,19 53:16
**that'd**  31:7 43:5
**therapy**  20:14
**thing**  6:6 35:19
35:23 36:1
**things**  14:6
28:15
**think**  12:11
21:18,23 24:3
29:12 35:9,22
36:5
**thinking**  30:8
**thought**  32:8
33:13
**three**  25:22 26:7
26:10,13,14,19
34:25 35:17
**thrust**  33:16
**time**  1:10 4:9
14:24 22:6,7

23:19 24:1,14
38:3 48:25 49:4
50:22 53:19,22
**titled**  6:15
**today**  5:2 47:2
**today's**  4:8
**together**  29:15
**took**  24:18
**top**  24:3
**towards**  26:16
37:20
**transcript**  3:5
3:21 6:10 51:10
56:9,10 57:2
58:7,8,10,12,14
58:21
**transcripts**  58:9
**treat**  10:11
42:15,24 43:20
46:17 48:17
**treatment**  20:1
20:25 24:22
36:7,8 42:2,14
43:14 46:16
48:13 51:4,5
52:10,11,16,20
53:2
**treatments**
51:20 52:21
**trouble**  37:13
**true**  56:10 57:23
**truth**  5:2,3,3
**try**  45:16
**trying**  9:23 35:8
35:13 46:14

**turning**  7:11
13:7 16:9 19:23
24:25 49:6
**two**  49:3
**type**  21:12

**u**

**u**  3:17
**uh**  15:13,23
16:14 17:23
23:20,22 31:12
44:9 51:6
**um**  35:15 49:11
49:15
**under**  9:18
10:16 12:22
13:1,3 37:9 43:2
44:10 45:4 48:6
57:22 58:11
**undergo**  13:7
45:17
**understand**
9:24 31:21 44:7
45:20,20 46:14
**understanding**
8:3,5 13:13
27:19
**undertakes**
10:20
**unit**  10:19
**united**  1:1
**university**  26:8
26:10
**university's**
27:4

**update**  14:2,5
  18:5
**updated**  17:24
**ups**  7:14
**url**  6:9 7:8 9:4
**use**  8:25 9:4
  11:22 14:5,22
  18:4 20:1,12,14
  24:21,23 27:19
  27:20 28:4,5
  30:6 36:24
  42:20,21
**used**  11:7 19:16
  48:11,13,17
**using**  8:9 22:22
**usually**  26:20

**v**

**v**  1:5 4:5
**valid**  17:2 32:17
  33:7,8,8,9
**validity**  26:1
  28:4,9
**vanmeter**  41:4
**vanmol**  31:25
  32:4,5 39:25
  40:14 41:4
**vanmol's**  32:9
**variance**  42:20
  42:21 43:9,24
  44:11 45:5,17
  45:22,23 46:10
  46:15,21,24
  47:3,13
**variances**  44:2
  50:8 51:3

**verbal**  19:8,11
  25:14
**verbally**  7:23
**vergil**  2:7 58:2
  58:18
**verify**  19:10
**veritext**  58:17
**veritext.com**
  58:9
**vet**  24:20
**vetted**  20:2 22:1
**vetting**  20:17,19
**video**  4:4 48:23
  48:24 49:3,3
  53:18
**videographer**
  4:3,11 48:23
  49:2 53:15,17
**vogel**  2:7
**vs**  57:3

**w**

**waive**  58:20
**waiver**  42:20,22
  45:21,22 46:15
  47:14 58:19
**walk**  33:11
**want**  10:5
**wanted**  6:5,8
  27:13,15
**warrant**  30:16
**way**  6:10 21:24
  33:18 46:13
**we've**  19:21
  24:20 52:12

**web**  6:8 7:2,4
  23:25
**website**  16:6
  23:17
**wednesday**  1:9
**weida**  1:6 4:5
  57:3
**welcome**  45:16
**went**  18:10 38:9
**western**  32:1,7
**williams**  16:16
  20:11 22:6,7,10
  22:12
**wilson**  16:15
  20:10
**witness**  4:13 5:4
  5:7 19:15 30:24
  33:2 36:23
  37:13 39:23
  40:24 43:23
  44:13,18,23
  45:12 46:20
  47:9 53:4
**words**  32:19
  33:13 47:17
  49:9
**work**  6:8 21:22
  31:11 39:23
  40:3
**worked**  31:24
**works**  13:25
**worthy**  35:24
**write**  57:2
**writes**  16:16

**writing**  37:10
**written**  3:12
  5:12 7:13,24 8:4
  8:4 10:9 13:22
  25:12,13,21
  26:18,25 39:20
  41:25 47:12
  50:8,12,20 51:2
**wrong**  28:13
  38:19
**wrote**  25:7,8
  31:22 37:16
  47:17

**x**

**x**  3:1

**y**

**yale**  26:8,10
  27:4,6 29:2,13
  29:15 30:11,20
  32:2,14 33:15
  33:16 34:10
  35:7 36:15
  37:18 38:9
**yale's**  34:24
**yeah**  6:13 9:3
  19:2,20 35:21
  37:16 38:20
  40:4
**years**  15:4
**yep**  16:13,13
**yesterday**  42:11
  49:7

**[zoom - zoom]**

| **z** |
|---|
| **zoom**   53:15 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.