**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

AUGUST DEKKER, et al.,      )
                              )
             Plaintiffs,    ) Case No: 4:22cv325
                              )
         v.             ) Tallahassee, Florida
                              ) May 22, 2023
JASON WEIDA, et al.,       )
                              ) 9:00 AM
            Defendants.    ) Volume VII
_____ )

**TRANSCRIPT OF BENCH TRIAL PROCEEDINGS**
**BEFORE THE HONORABLE ROBERT L. HINKLE**
**UNITED STATES CHIEF DISTRICT JUDGE**
**(Pages 1263 through )**

Court Reporter:            MEGAN A. HAGUE, RPR, FCRR, CSR
                            111 North Adams Street
                            Tallahassee, Florida 32301
                            megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

<u>APPEARANCES</u>:

For Plaintiffs:          Lambda Legal
                         By:  OMAR GONZALEZ-PAGAN
                              Attorney at Law
                              ogonzalez-pagan@lambdalegal.com
                         120 Wall Street
                         19th Floor
                         New York, New York 10005

                         Pillsbury, Winthrop, Shaw, Pittman, LLP
                         By:  JENNIFER ALTMAN
                              Attorney at Law
                              jennifer.altman@pillsburylaw.com
                         600 Brickell Avenue
                         Suite 3100
                         Miami, Florida 33131

                         Pillsbury, Winthrop, Shaw, Pittman, LLP
                         By:  JOSEPH LITTLE
                              Attorney at Law
                              joe.little@pillsburylaw.com
                         500 Capitol Mall
                         Suite 1800
                         Sacramento, California 95814

                         Lambda Legal
                         By:  CARL S. CHARLES
                              Attorney at Law
                              ccharles@lambdalegal.org
                         1 West Court Square
                         Suite 105
                         Decatur, Georgia 30030

                         Southern Legal Counsel Inc
                         By:  SIMONE M. CHRISS
                              CHELSEA LEE DUNN
                              Attorney at Law
                              simone.chriss@southernlegal.org
                              chelsea.dunn@southernlegal.org
                         1229 NW 12th Avenue
                         Gainesville, Florida 32601

                         Florida Health Justice Project
                         By:  KATHERINE JEAN ANN DEBRIERE
                              Attorney at Law
                              debriere@floridahealthjustice.org
                         3900 Richmond Street
                         Jacksonville, Florida 32205

APPEARANCES (continued):

For Plaintiffs (continued):

                              National Health Law Program
                              By:  CATHERINE ANNE MCKEE
                                   Attorney at Law
                                   mckee@healthlaw.org
                              1512 East Franklin Street
                              Chapel Hill, North Carolina 27514

                              National Health Law Program
                              By:  ABIGAIL K. COURSOLLE
                                   Attorney at Law
                                   coursolle@healthlaw.org
                              3701 Wilshire Boulevard
                              Los Angeles, California 90010

                              Pillsbury, Winthrop, Shaw, Pittman, LLP
                              By:  GARY JOSEPH SHAW
                                   Attorney at Law
                                   gary.shaw@pillsburylaw.com
                              1200 17th Street NW
                              Suite 1800
                              Washington, DC 20036


For Defendants:               Holtzman Vogel Baren, et al.
                              By:  MOHAMMAD OMAR JAZIL
                                   GARY VERGIL PERKO
                                   MICHAEL BEATO
                                   Attorneys at Law
                                   mjazil@holtzmanvogel.com
                                   garyp@holtzmanvogel.com
                                   michaelb@holtzmanvogel.com
                              119 South Monroe Street
                              Suite 500
                              Tallahassee, Florida 32301

**P R O C E E D I N G S**

1

2      (Call to Order of the Court at 9:00 AM on Monday, May 22,

3  2023.)

4          THE COURT:  Good morning.  Please be seated.

5          Mr. Jazil, please call your next witness.

6          MR. JAZIL:  Thank you, Your Honor.  The defense's next

7  witness is Dr. Sophie Scott.

8          THE COURT:  Dr. Scott, good morning.

9          THE WITNESS:  Good morning.

10          THE COURT:  I'm Judge Hinkle.  Before the lawyers

11  start asking you questions, let me ask you this:  Are you there

12  in a room all by yourself?

13          THE WITNESS:  I am, yes.  I'm in my office.  I'm on my

14  own.

15          THE COURT:  If somebody comes in, we'll deal with

16  that.  Otherwise, we'll assume you're there by yourself.

17          If you would, please, raise your right hand.

18      **DR. SOPHIE SCOTT, DEFENDANTS WITNESS, DULY SWORN**

19          THE COURT:  Please tell us your full name and spell

20  your last name for the record.

21          THE WITNESS:  My name is Sophie Kerttu Scott, and my

22  surname is Scott, S-c-o-t-t.

23          THE COURT:  And tell me again -- maybe spell the

24  middle name.

25          THE WITNESS:  K-e-r-t-t-u.

1    THE COURT:  Mr. Jazil, you may proceed.

2    MR. JAZIL:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4  BY MR. JAZIL:

5  Q.   Dr. Scott, what do you do?

6  A.   I'm a cognitive neuroscientist at University College

7  London.

8  Q.   Dr. Scott, what does a cognitive neuroscientist do?

9  A.   A cognitive neuroscientist works in the area of brains and

10  brain structure and brain function and relating that to human

11  experience and human behavior.  So it's an area of neuroscience,

12  and we work with brains.  But we're sort of a -- analogous to

13  psychologists.

14  Q.   Dr. Scott, you said that you work at University College

15  London.

16        MR. JAZIL:  I'd like to pull up what's been admitted

17  into evidence as Defendants' Exhibit 33.

18  BY MR. JAZIL:

19  Q.   Dr. Scott, this was a CV attached to your expert report.

20  Was that CV a fair and accurate summary of what you've done to

21  date?

22  A.   Yes.

23  Q.   Now, Doctor, you mentioned that you work at the Institute

24  of Cognitive Neuroscience at University College London.  On your

25  CV, it says that you are the director of that.

```
 1        What does the director of the Institute of Cognitive
 2   Neuroscience do?
 3   A.   I'm responsible for the day-to-day running of the building.
 4   So, you know, if there is a problem with staff or an issue with
 5   safety, then that's my responsibility, and I'm also responsible
 6   for the scientific direction of the research and the teaching
 7   that's carried out here.  So I have a broad scientific
 8   perspective.  In addition to that, I'm also running my own lab
 9   here at the institute.
10   Q.   Do you also do your own teaching at the university?
11   A.   Yes, yes, I teach a couple of modules.
12   Q.   I understand.
13        Doctor, just going through your résumé, it says that you
14   were previously the Wellcome trustee or fellow for several
15   years --
16   A.   Yeah.
17   Q.   -- at the Institute of Cognitive Neuroscience.
18        What is that?
19   A.   The Wellcome Trust is a big biomedical charity that funds
20   biomedical research, and they fund people at different points in
21   their careers as what they call research fellows.
22        What that means is if you apply for one of these grants and
23   you are awarded it, it pays for your salary.  So you are an
24   independent research fellow at the university.  It also pays for
25   other staff working on your grant and also for all your research
```

1   expenses, so, you know, the cost of brain scanning, for example,

2   and all your other costs, like travel and publications.

3       So they are very competitive grants to get, and they're

4   fantastic grants to get because it really lets you build up your

5   lab and build up your research profile.

6   Q.   And, Doctor, is it correct that you've been a professor

7   since 2006 at University College London in neuroscience?

8   A.   Yes.

9   Q.   Doctor, just going down, you've got a list of prizes and

10  recognitions.

11      Doctor, what is the Michael Faraday Prize by the Royal

12  Society?

13  A.   The Michael Faraday Prize is one of the prizes given by the

14  Royal Society for excellence in scientific research, but also

15  excellence in communicating science.  So it's for my work both

16  scientifically and also my work communicating research.

17  Q.   And was the work related to neuroscience or something else?

18  A.   Yes, it's all neuroscientific research.

19  Q.   Doctor, it also says that in 2020, you were appointed

20  Commander of the Most Excellent Order of the British Empire for

21  services to neuroscience.

22      Do you see that?

23  A.   Yes.

24  Q.   Who appointed you Commander of the Most Excellent Order of

25  the British Empire for services to neuroscience?

1  A.    It's awarded by the monarch.  So my -- I was appointed

2  commander of this -- CBE, it's called -- on the Queen's birthday

3  in 2020.

4  Q.    Understood.

5       It says that in 2016, you were elected a fellow of the

6  British Academy.

7       First, can you tell us what the British Academy is?

8  A.    The British Academy is one of a number of learned societies

9  in the UK which are there to promote academic research and also

10  researchers.  So the British Academy is broadly covering

11  research into the humanities, so it includes psychologists and

12  people at the -- sort of the humanity end, if you like, social

13  end of the sort of research I do, and it goes across linguistics

14  and also historians and philosophers.

15  Q.    And what were you elected as a fellow for?

16  A.    I was elected for my research into -- yeah, into human

17  communication.

18            MR. JAZIL:  Can we go on to the next page?

19  BY MR. JAZIL:

20  Q.    It says that in 2012 you were elected a fellow of the

21  Academy of Medical Sciences.

22       Doctor, what's the Academy of Medical Sciences?

23  A.    The Academy of Medical Sciences is another learned society.

24  It's a more recently developed one, and it's people doing

25  research and working in the fields of medicine and also related

1    disciplines.  So there are a lot of medics who are members of

2    the Academy of Medical Sciences but also lots of people like

3    neuroscientists or epidemiologists who do research which relates

4    to biomedical science, like me.

5    Q.   Doctor, there is a section in your CV that talks about

6    supervision of graduate students.  It says that you've

7    supervised 14 Ph.D. students at University College London and 35

8    master students at University College London and two students at

9    City University and one at the University of Reading.

10        Was the subject that all these students were studying

11   neuroscience?

12   A.   Yes.

13   Q.   And later on in your CV, it lists where some of your

14   students went.  They went on to work at Oxford, the University

15   of Amsterdam, and the Max Planck Institute; correct?

16   A.   Yes, I'm very proud that everybody who has worked on my lab

17   has gone on to a good job in academia or a related discipline.

18   Q.   Understood.

19        Doctor, there's section in here about editorial work.  It

20   lists five journals.

21        First, can you tell us what editorial work means?

22   A.   Editorial work for a peer-reviewed journal, and four of

23   those journals are peer-reviewed journals.  So *The Psychologist*

24   at the top, that's a -- that's a journal for people who are

25   members of the British Psychological Society.

1       All the other journals, my work there as an editor was to

2   oversee the peer-review process.  So people would submit papers

3   to the journal; I would read the paper; I would decide whether

4   or not it was appropriate to send out to review; I would select

5   the reviewers and invite them.  When they reviewed the paper, I

6   would get those together, read the paper, read their reviews,

7   and then come to a decision about whether the paper could be

8   accepted, whether it should be rejected, or whether changes were

9   needed.  And then I'd oversee that whole process, and that is

10  the peer-review process.

11  Q.   Understood.

12       Doctor, have you ever done work for the U.S. National

13  Institutes of Health and the National Science Foundation?

14  A.   I have.  I've been on panels overseeing the grant review

15  process for a couple of ad hoc grants for the NIH, and I was on

16  the -- an NSF panel for several years looking at psychology

17  according to neuroscience grant applications.

18       And what you're effectively doing on those panels is people

19  have written grants and submitted them to these different grant

20  causes, and what your job is to do is to read the grants that

21  have been submitted.  Some of those will have been allocated to

22  you to represent to the panel.  So you read them in more detail,

23  and you have to present them to the panel for discussion.  And

24  it's very -- in effect, what you're letting -- what you're doing

25  is you're helping the funding body, NSF or NIH, decide how to

 1    spend their money, what is the research that we should be

 2    funding.

 3        It's an extremely interesting job to do because what you

 4    have to do is, of course, read in great detail, a bit like when

 5    you're an editor of a journal -- you have to read papers and

 6    these grant submissions in great detail.  It might not

 7    necessarily be precisely in your own area of research.  So it

 8    gives you a very useful, much wider view over the sorts of

 9    research going on in what discipline that you're a part of.

10    Q.   And you've done the same work for the Royal Society?

11    A.   I have, up until last year.  For six years I was on the

12    Dorothy Hodgkin Fellowship panel, and that's actually a panel

13    that goes across all of science.  So we're seeing grants

14    submitted about computer science or oceanography or physics or

15    genetics, and the panel reflects that.  And for the six years, I

16    was the person representing sort of behavioral neuroscience,

17    cognitive neuroscience, psychology, anything to do with behavior

18    and organisms.

19        And you're doing the same thing.  You have to read the

20    grant applications, and you have to represent them to the panel,

21    and you have to interview the person who has come -- in this

22    case, who actually is there to be -- who has submitted the work,

23    who is going for this fellowship.

24        And that's extremely interesting because it's even broader

25    than those NSF panels I was on, because any -- all possible

1    areas of science are being represented, and you have to be able

2    to discuss different areas of science across a wide range of

3    disciplines.

4    Q.   Understood.

5         And, Doctor, looking at your CV, you've got approximately

6    150 refereed articles in there.

7         Can you tell what you say the term "refereed articles"

8    mean?

9    A.   Refereed articles, it's the same as a peer-reviewed

10   article.  So it's been through a formal process.  You've

11   submitted it to a journal, and it has been edited and sent out

12   for peer review, and it's gone through some, potentially, period

13   of revisions before being accepted.

14   Q.   Were all those articles in the field of neuroscience?

15   A.   I think all of them are in psychology and cognitive

16   neuroscience with the exception of one, which is in poetry.

17                 MR. JAZIL:  You can take that down.

18   BY MR. JAZIL:

19   Q.   Doctor, what were you asked to do in this case?

20   A.   I was asked to provide some expert testimony about the --

21   the use of puberty blockers, gonadotropin-releasing hormone,

22   agonists, and antagonists in teenagers -- four teenagers both in

23   terms of the possibility of teenagers to be able to engage with

24   what was -- understand the possibilities of what this kind of

25   medication could mean, but also in terms of what the effects

1    could be on the developing teenage brain of GnRH agonists.

2    Q.   Were you also asked to look at Dr. Edmiston's trial

3    testimony in this case?

4    A.   I was.

5    Q.   Were you asked to review Florida law concerning the

6    treatment of gender dysphoria?

7    A.   I was not.

8    Q.   Were you asked to review any clinical guidelines or best

9    practices on the treatment of gender dysphoria?

10   A.   I was not.

11          MR. JAZIL:  Your Honor, I'd like to ask Dr. Scott her

12   opinions in the field of neuroscience, brain development, brain

13   structures, and neurochemistry, not poetry.

14          THE COURT:  Questions at this time?

15          MR. SHAW:  Yes, sir.

16                    VOIR DIRE EXAMINATION

17   BY MR. SHAW:

18   Q.   Good morning, Professor Scott.  Good to see you again.

19   A.   Morning.  Nice to see you.

20   Q.   Professor Scott, you're not a medical doctor; right?

21   A.   I'm not.

22   Q.   And you don't have any training in adolescent healthcare?

23   A.   No.

24   Q.   You've never treated a patient with gender dysphoria?

25   A.   No.

Voir Dire Examination - Dr. Scott

1   Q.   And you've never conducted any clinical research on gender

2   dysphoria?

3   A.   No.

4   Q.   You've never published any peer-reviewed articles on gender

5   dysphoria?

6   A.   No.

7   Q.   Your main area of research looks at the effects of speech,

8   laughter, and sound on the brain; right?

9   A.   Yes.

10   Q.   And none of that --

11   A.   And to do that, what I have to -- sorry.

12   Q.   No, no.  Please.

13   A.   So what I have to do to study that is both understand the

14   physics and the acoustics and the linguistic aspects of speech,

15   but also I have to understand brain structure, brain function,

16   brain neurochemistry, and brain development to be able to

17   look -- looking at how speech is processed, for example, in the

18   human brain.

19   Q.   And none of that -- none of the things that you study --

20   speech, laughter, and sound, none of that relates to gender

21   dysphoria; correct?

22   A.   No.

23   Q.   About puberty blockers, you testified that you're not a

24   doctor.  So is it safe to say that you've never prescribed

25   puberty blockers?

1   A.   I'm not a medical doctor, and I have not prescribed puberty

2   blockers.

3   Q.   And you've never conducted any clinical research on the

4   effects of puberty blockers on the brain?

5   A.   Other than reading the literature, which is, of course,

6   research, I haven't conducted any basic science in that area,

7   no.

8   Q.   But never any clinical research yourself?

9   A.   I've applied the research.  I haven't done the research,

10  no.

11  Q.   And you've never conducted any clinical research on the

12  effectiveness of puberty blockers in treating gender dysphoria?

13  A.   Other than reviewing the literature, no.

14  Q.   So is it fair to say that your knowledge of puberty

15  blockers is based on your review of the literature?

16  A.   Yes.

17  Q.   And you submitted a report in this case; right?

18  A.   Yes.

19  Q.   Did you -- in your report, did you discuss any of the

20  literature that looked at the effects of puberty blockers in

21  treating -- in treating gender dysphoria?

22  A.   No.  I was looking at the animal research and what little

23  human research there is on the actual brain effects of the

24  puberty blockers.

25  Q.   So, no, you did not discuss any human research in your

1  report related to gender dysphoria?

2  A.   In the report, no.  No.

3  Q.   Are you aware of the Staphorsius 2015 study on executive

4  functioning?

5  A.   I am.  Would you like me to talk about it?

6  Q.   You didn't put that in your report, though?

7  A.   I didn't, because if you look at the mice research -- I'm

8  sorry; it wasn't research -- the mice study that was looking

9  at -- it was conducted, I think, in 2018, 2019, as part of the

10  case review looking at the evidence for the benefit of puberty

11  blockers in treating gender dysphoria, which concluded that

12  there were no benefits, partly because the evidence was very

13  poor, and the Staphorsius paper was an example of very bad

14  evidence for showing, for example, no difference in the effect

15  of puberty blockers.

16      So it was a study using the Tower of London test where you

17  are asking people to move -- it's a test.  It's like a

18  problem-solving test.  And they were doing a functional imaging

19  study of teenagers with or without gender dysphoria, and within

20  gender dysphoria, some of them were on puberty blockers and some

21  were not, and what they found was no overall difference.

22      But this was a study of functional imaging, which is hard

23  to find robust differences in different populations, whoever

24  they are, because it's quite noisy data.  So it's not strong

25  data either way.  I wouldn't -- with that bit of functional

1    imaging study, I wouldn't choose to say whether or not that was

2    something that was showing positively that there are no

3    differences or definitely that there are differences.  It's not

4    a good dataset, and that's -- I'm quoting the mice study on

5    that.

6    Q.   Thank you.

7         You did not mention any of that in your report; correct?

8    A.   Because of its poor evidential value, I did not.

9    Q.   Right.

10        Well, you did not mention Staphorsius at all?

11   A.   I did not for its poor evidential value.

12        MR. SHAW:  Your Honor, in light of the fact that

13   Professor Scott has no experience with gender dysphoria, no

14   experience treating patients with gender dysphoria, no

15   experience administering or clinically studying puberty blockers

16   in any setting, we would move to exclude Dr. Scott's testimony.

17        THE COURT:  Mr. Jazil.

18        Part of what I'm interested in in that exchange is

19   she's now given testimony that was not in her report.  Why does

20   she get to come to trial and discuss something that's not in her

21   report?

22        MR. JAZIL:  Your Honor, a couple of points there.

23        One, the study that my friend mentioned, that is a

24   study that she is -- that was not included in her expert report.

25   It's a study that, I believe, was referenced in Dr. Edmiston's

1  testimony.

2        THE COURT:  Why does that matter?  If it's not in her

3  report, why isn't it excluded on the ground -- I don't care how

4  good a report it is, and I don't -- why does it matter if her

5  testimony is true and relevant and helpful?  If it's not in her

6  report, isn't the answer it should be excluded?

7        MR. JAZIL:  Your Honor, testimony regarding that one

8  specific report, yes, but her testimony will be more than about

9  just that one specific report.

10        THE COURT:  Got it.  We'll double back to that.

11        But if I understand what she just said, her report

12  does not discuss studies on humans.

13        MR. JAZIL:  No, Your Honor, that was incorrect.  Her

14  report does not discuss studies on humans for the treatment of

15  gender dysphoria.  Her report does discuss studies on humans

16  for -- pardon me, Your Honor.  Her report does discuss studies

17  that talk about the use of puberty blockers for other things

18  like precocious puberty, et cetera.  So she looked at the

19  available --

20        THE COURT:  Point taken.

21        So, plainly, she can't give medical testimony about

22  treating patients, and certainly not trans patients for gender

23  dysphoria, but she can give testimony within her area, and --

24  and some of that testimony is certainly relevant to the issues

25  here.

Voir Dire Examination - Dr. Scott

1          So she can testify about cognitive neuroscience within

2   the scope of her report, and if particular questions come up

3   that the plaintiffs think aren't within her expertise, object

4   and I'll deal with it then.  But the motion to exclude her

5   testimony entirely is denied.

6          MR. JAZIL:  Thank you, Your Honor.

7          THE COURT:  And I'm not going to consider the

8   testimony she gave in response to the voir dire question on

9   subjects she did not include in her report.  She -- her

10  testimony should be received only as consistent and addressed in

11  her report.

12         MR. JAZIL:  Your Honor, clarification on that.  At the

13  end of Dr. Edmiston's testimony, there was a colloquy with the

14  Court on some issues related to transgender identifiers in the

15  brain.  There was a question asked by one of my colleagues that

16  elicited a response from Dr. Edmiston.

17         Would it be appropriate for her to comment on that

18  exchange, which was, frankly, outside the scope of both sets of

19  expert reports, but --

20         THE COURT:  Maybe, and we'll deal with it when we get

21  to it.

22         There is a difference between testimony offered by the

23  proponent, by the party that hired the expert, when that

24  testimony is outside the scope of the report on the one hand and

25  testimony elicited on cross-examination by the adverse party on

1    the other hand.

2              And there is a difference between testimony elicited

3    by the party that hired the expert on the one hand and an answer

4    volunteered on the -- during the voir dire examination by the

5    opponent on the other hand.

6              I don't recall the exchange involving Dr. Edmiston,

7    but if it was something that your side asked, then your side

8    certainly doesn't have an objection that it's beyond his report.

9    If it's something he volunteered in response to a question that

10   didn't call for it, that's different.

11             I also don't want to give the impression that I'm

12   unduly strict in the application of the requirement to tender a

13   full 26(a)(2) report.  It's a dynamic process.  Things come up

14   during a trial.  They certainly know that Dr. Scott is a

15   cognitive neuroscientist, and they know generally what it is

16   she's here to testify about.

17             So whether you can ask the question about the subject

18   that Dr. Edmiston dealt with really depends on what it is and

19   how close it is to what she's already disclosed, but I do

20   understand how a lawyer would not come to court expecting to

21   cross-examine her about this particular study when she didn't

22   discuss that study or anything like it in her report, just comes

23   up on voir dire.  And so Mr. Shaw is not ready to cross-examine

24   on that subject because he had no reason to think that's what we

25   were going to be talking about.

1          MR. JAZIL:  Understood.  And, Your Honor, just so the

2    Court's clear, Dr. Scott, in her expert report, talked about

3    animal studies, human studies.  The human studies were about

4    giving -- as I explained earlier.  So, I mean, to the extent

5    that we're talking about animal studies and human studies, it's

6    a broad category.

7          THE COURT:  I get it, and I -- this is probably a

8    longer discussion than Dr. Scott wanted to sit through or maybe

9    than we needed to have.  Let's get to the actual questions, and

10   it may turn out none of this makes any real difference.  I'll

11   hear what Dr. Scott has to say.

12         MR. JAZIL:  Thank you for the indulgence, Your Honor.

13   BY MR. JAZIL:

14   Q.   Dr. Scott, I'd like to start with brain development.

15   A.   Uh-huh.

16   Q.   What are the phases to brain development?

17   A.   There's three broad phases over life span of big changes in

18   development of the brain.  The first is during gestation and

19   through to the end of being a child up to puberty, and that's

20   when you get really big changes in the structure of the brain.

21        There's then another period during -- from puberty through

22   to the end of adolescence, and then that takes you through to

23   about the early 20s and then you have basically an adult brain,

24   which is still a work in progress.  That's still a flexible

25   organism, but it then doesn't go through any big changes until

Voir Dire Examination – Dr. Scott

1    the end of life.

2    Q.    And can you walk us through how brain structures evolve

3    during those three phases?

4    A.    So to think about this, you have to let me just very

5    briefly touch on what we -- what we talked about when we're

6    talking about brain structure.  We're talking about neural

7    tissue which is made up of brain cells called neurons, and all

8    living things are made up of cells, and cells can be very

9    different in different animals and different parts of the body,

10   but brain cells are particularly unusual.

11        They have a cell body, which is containing the cell

12   nucleus, and they're often surrounded by lots of little

13   projections, some of them big, some of them small.  And then

14   there's normally one very long, slender projection that goes

15   from that cell body that can go off and make connections

16   elsewhere in the brain, and this is how your brain can make

17   connections over relatively long distances, because the cell

18   bodies have got these long axonal projections.

19        Now, if you look at the brain, these brain cells aren't

20   just mushed in there.  What they do is they form distinct

21   layers.  So the cell bodies sit in what's called grey matter,

22   and that's the cortical mantle that sits on the surface of your

23   brain is one big layer of grey matter, and then there are little

24   nuclear grey matter sitting underneath that.

25        The cell connections, these long axons, form sort of

1    information superhighways, which are connecting different brain

2    areas and sit underneath that cortical mantle.  And that looks

3    white, and it gets called white matter for this reason, whereas

4    the cell body layers look grey, and they're called grey matter.

5           And if we look at the structure of the brain, what you're

6    seeing is something that when you're born you have almost all

7    the brain cells that you're ever going to have.  You have nearly

8    90 billion brain cells, and you're born with almost all of them.

9           And what you see between sort of birth to about the age of

10   6 is that brain gets four times bigger, not because you're

11   growing new brain cells, but because the brain structure is very

12   rapidly growing and those brain cells are growing.  They're

13   growing longer, and they're starting to make many more

14   connections.

15          So between birth and puberty, what you see is quite a

16   dynamically changing brain with the relative size of the grey

17   matter and the white matter areas changing quite a lot.  And

18   then as you go into puberty, you have this remarked change in

19   the way that the brain structure's starting to evolve where you

20   start to see a consistent thinning of the grey matter layer in

21   the cortex and a relative deceleration in the growth of the

22   white matter.  So you're picking that up as an overall change.

23          If we think about what's actually underpinning that

24   juvenile period and that change through adolescence, that's

25   being driven by two very main ways that the brain is changing,

1   the relationship of the brain cells are changing.

2       So, first of all, the brain is changing in terms of the

3   number of connections that the brain cells can make with each

4   other.  That varies a lot through adolescence, and it continues

5   to change -- so through childhood, it continues to change

6   through adolescence.

7       And you're also seeing a change in the myelination of those

8   long axonal projections.  What myelination means is that the

9   brain cells -- these long projections start to get coated in a

10  thin, fatty sheath called myelin.  And what that lets the brain

11  cells do is send signals much more efficiently and much more

12  quickly.

13      So if you track this profile going through childhood and

14  then on through adolescence, what you see is a change in these

15  connections moving towards an adult-like brain and also a change

16  in myelination, and both of these features progress through the

17  brain very roughly in the back, different direction, such as the

18  part of the brain that shows an adult-like pattern of

19  connections, and an adult-like pattern of myelination is the

20  front of the brain that comes in last.

21      Then in your early 20s, you're starting to see something

22  that has this more adult-like profile, but, as I say, that's not

23  fixed; that's still dynamic.  Your brain is changing throughout

24  your whole life span because anything that changes in your

25  brain -- anything that you learn will affect the kind of

1  connections that your brain has.  Anything you remember from the

2  conversations you'll have today is because your brain has

3  changed yet again.  But you don't get these huge changes, both

4  in size and growth pattern, that you're seeing in the period

5  from birth to puberty and then from puberty to adulthood.

6  Q.   Doctor, as puberty is affecting the brain during the phase

7  that you just described from the beginning of puberty -- to I'll

8  call it the end of adolescence, your 20s, as you said, how, if

9  at all, does that period affect decision-making in the human

10 being?

11 A.   There was a recent review in nature of neuroscience that

12 described sort of decision-making as being distinctly different

13 in adolescents in a way that's a sort of critical defining

14 feature of adolescents.  So adolescents are amazing humans.

15 They are creative; they're intelligent; they are full of

16 fantastical ideas of things to do.

17       The challenge that the adolescent brain has is that the

18 decisions that adolescents can make can be, in some

19 circumstances, more impulsive, but more generally more risky.

20 And the problem here seems to be not that there are some risky

21 things that attract adolescents more.  It's more that teenagers

22 and adolescents can struggle to understand or engage with what

23 potential outcomes of behavior could be.

24       Now, that might be something trivial like not taking an

25 umbrella with you when it might rain, or it might be something

1    really serious that might affect your health.  And that's

2    something that is associated with not necessarily a one-to-one

3    way, but it seems to be linked to the fact that, as I say, these

4    changes in the brain go from back to front in terms of

5    connectivity and in terms of myelination.  And the frontal

6    lobes, which is the last to show this pattern of adult

7    connectivity, and myelination are the brain areas which are

8    strongly involved in decision-making, in emotion regulation, in

9    managing behavior.

10   Q.   Understood.  And, Doctor, you say that you looked at

11   Dr. Edmiston's testimony in this case.  Now, Dr. Edmiston

12   discusses decision-making in a hot context, in a cold context,

13   and seemingly disagrees with your assessment of risk-taking.

14        What's your response, Doctor?

15   A.   I think my response is twofold.  First of all, Dr. Edmiston

16   is, I mean, correct in that you can identify tasks that are more

17   hot where decisions can be more driven by emotion, and you can

18   identify tasks that are more cold, more rational.

19        In the real world, I've certainly worked in areas of

20   cognitive psychology, but are strongly influenced by the idea

21   that actually, in the real world, all decisions involve

22   emotional aspects.  You can't not have an emotional contribution

23   to how you reason about the world, how you decide what to do in

24   the world.

25        And I think the second point of our disagreement with

Voir Dire Examination – Dr. Scott

1   Dr. Edmiston is that he is framing risky decisions as impulsive

2   decisions, and decisions don't have to be impulsive to still be

3   risky.  Decisions could be very well thought through and thought

4   through for a considerable amount of time and still be very

5   risky in their potential outcomes.

6   Q.   Understood.

7        Now, Doctor, are you familiar with gonadotropin-releasing

8   hormone agonists?

9   A.   Yes.  Yes.

10  Q.   And if I just call them "puberty blockers," will you know

11  what I mean?

12  A.   Yes.

13  Q.   All right.  Walk us through the effects of these chemicals

14  on the human brain.  How do they impact the brain?

15  A.   There -- so the gonadotropin-releasing hormone is something

16  that's released, I think, in the pituitary gland, and it has its

17  effect on the hypothalamus.  And this is triggering cascading

18  effects, that they can give you an increased release of sex

19  hormones from the ovaries and the testis.  So both estrogen and

20  testosterone start to be increased as a result of this.

21       The GnRH analogues, which can be agonist and sometimes

22  antagonist, they are sitting on the receptors and stopping,

23  blocking, literally, that hormone having its effect.  The

24  GnRH --

25            MR. SHAW:  Objection, Your Honor.

1        Professor Scott -- objection.  Professor Scott doesn't

2   have any expertise, has never clinically studied puberty

3   blockers or studied how they affect the brain.

4        THE COURT:  Well, Dr. Scott, tell me how you know

5   about what GnRHa does.

6        THE WITNESS:  Because I have to, as part of my job, to

7   understand brain structure, brain function, and brain

8   neurochemistry.  GnRH acts as a neurotransmitter, and the -- so

9   any neurotransmitter is picked up by receptors that -- there's

10  no other way for neurotransmitters to have their effects on the

11  brain.

12       And there are different ways that you can disturb the

13  uptake of a neurotransmitter by its receptors.  And in the case

14  of the GnRH agonist, what they're doing is they're blocking

15  the -- they're sitting on the receptors and stopping the hormone

16  from getting in there.

17       So I understand this because I understand how

18  neurochemistry works and how neurotransmitters work.

19       THE COURT:  Well, I guess two responses:  First, it

20  seems to me that this isn't the doctor's area and, second, do

21  you even disagree with that?

22       MR. SHAW:  I'm sorry?

23       THE COURT:  Do you even disagree with what she just

24  said?

25       MR. SHAW:  I -- we would disagree to the extent that

1   she does not have the -- the expertise to understand.  She gave

2   a very general explanation of --

3            THE COURT:  I get it.  I'm going to overrule the

4   objection.

5            But, look, I guess here's part of my response that

6   probably doesn't affect the ruling, but it's as if the witness

7   just said, I know the light was green, and the question -- the

8   question whether the light was green is really not debated.

9   Everybody -- it's just clear the light was green, and you

10  object, Well, she doesn't have any reason to know the light was

11  green.  Well, if she doesn't have a reason to know the light was

12  green, that's a good objection, and I would sustain it.

13           But it's a bench trial, and I'm trying to figure out

14  where we're going.  And if everybody agrees the light's green,

15  I'm not sure what we're worrying about.

16           MR. SHAW:  Understood.

17           THE COURT:  The objection is overruled.

18  BY MR. JAZIL:

19  Q.   Doctor, would you like to add anything to what you've

20  already said about how the GnRHa agonists affect the brain?

21  A.   No.  Other than the original hormone, the GnRH hormone, has

22  a very short half-life.  It's made, and it has its effects that

23  disappear very quickly, and the blockers seem to work by having

24  a longer half-life.  They are around in the system for longer,

25  so they're able to have this effect.  They have this blocking

Voir Dire Examination – Dr. Scott

1    effect for longer.

2    Q.    Understood.

3          Doctor, are there any animal studies that look at the

4    long-term effects of using the GnRH agonist on the human brain?

5    A.    On the human brain?

6    Q.    I'm sorry.  Pardon me.  On the brain?

7    A.    Yes, there are -- the majority of the studies that we

8    have -- and there still aren't many -- looking at the effects of

9    puberty blockers on brain development during the peripubertal

10   period going into adolescence is on nonhuman models, because you

11   can do experiments with nonhuman models that you can't do with

12   humans.  For example, you can do post-mortem analyses.

13         So there are, I think, five studies on sheep, there is a

14   study on yaks, and there is a study on mice.

15   Q.    Okay.  Let's take those five sheep studies, Doctor.

16         What do those five sheep studies show?

17   A.    I think the first three studies are basically on the same

18   sheep.  So there was a study showing that administering puberty

19   blockers around puberty in male and female sheep, male sheep go

20   into puberty earlier than female sheep, which is the opposite

21   with humans, so they have to treat them actually at different

22   points, slightly early for the male sheep.

23         And then it was looking at effects on behavior, and it

24   found that there are effects on sort of emotional behavior,

25   emotional reactivity in the sheep.  And it goes in the opposite

1    direction.  So the male sheep become more reactive, and the

2    female sheep become less reactive.

3        There are two follow-up studies, I think, on that same --

4    my impression is that it's the same population of sheep.  One

5    was looking at gene expression in brain areas that seem to be a

6    delaying and finding differences in the amygdala caused by

7    administering the GnRH analogues.  And this, if I remember

8    correctly, had a greater effect on the female sheep than the

9    male sheep.

10       And then if you look at the anatomy -- and this was done

11   with structural magnetic resonance imaging -- a brain area that

12   was very important in terms of social processing, learning, and

13   emotional behavior is the amygdala.  It sits in the middle of

14   the temporal lobes and in front of the hippocampus.  And

15   administering the puberty blockers led to an increased size in

16   the amygdala for both the male sheep and the female sheep.  The

17   effect was more exaggerated for the female sheep possibly

18   because there is already a sex difference in the size of the

19   amygdala, and the sheep male amygdala are larger than female

20   amygdala.  So you are seeing a growth in this area in all the

21   treated sheep, and it's more exaggerated in the female sheep.

22   Q.   Why do we care about the changes in the size of the

23   amygdala, Doctor?

24   A.   Because it's leading to a difference.  It's leading to a

25   change.  This is not having no effect on the brain.  If puberty

1   blockers were a pause button that led to, like, kind of a

2   neutral period where you could sort of -- things are changing,

3   there should not be these alterations in brain structure.  There

4   is an effect happening there.

5   Q.   And what does the amygdala control?

6   A.   The amygdala -- it's not very big, but it's a very

7   important area in terms of behavior.  I used to work a lot with

8   people who had damaged their amygdala.  They do have very

9   affected behavior.  You don't want to damage your amygdala.  It

10  can lead to big changes in your ability to deal with social

11  situations.  But it's actually comprised of a lot of tiny little

12  nuclei.

13       So all we have from the study on the sheep is a measure

14  that is bigger.  What we don't have is a very clear study of

15  actually saying which components of the amygdala, which are

16  tiny, whether they're actually changing that's driving that.  So

17  we don't actually know what's underlying this.

18  Q.   Doctor, did the sheep studies deal with spatial cognition

19  at all?

20  A.   There are a couple of other sheep studies, these ones just

21  in rams, so just in male sheep.  And what they did was they

22  administered puberty blockers in half of the sheep around

23  puberty, and then they looked at the sheep's ability to learn

24  spatial navigation in mazes.  And they were looking at this

25  because spatial navigation in mammals really relies on the

1    structure that sits just behind the amygdala called the

2    hippocampus, and it's very important in spatial navigation.  So

3    they are taking spatial navigation as a proxy for potential

4    effects on the hippocampus.

5        And what they found when the sheep were being treated with

6    the puberty blockers was that the sheep who were treated had

7    difficulties with spatial navigation.  They took longer to learn

8    their way through mazes.

9        And there was some suggestion that they also showed

10   emotional reactivity, but what they did is they then applied

11   testosterone to those sheeps, and they were replacing the

12   testosterone that their bodies aren't making.  And when they did

13   that, it improved their emotional reactivity, but it didn't

14   affect their ability to learn the mazes.

15       So then you sort of start to pull out, What's the effect of

16   the puberty blockers?  What's the effect of lacking

17   testosterone?

18       Significantly, this lab also went back -- because this is

19   missing from the rest of the literature in a way that's quite

20   frustrating.  They went back and they asked questions about what

21   happened to those sheep when they got older, because they only

22   applied the puberty blockers for an amount of time.  They didn't

23   keep the sheep on this.

24       So the studies in the first paper were all done around sort

25   of 40, 50 weeks.  They went back at 80, 90 weeks when the sheep

1    who had been treated are no longer on puberty blockers, and they

2    looked at their spatial cognition.  And what they found there

3    was that the sheep had problems with their long-term spatial

4    memory.  They were taking longer to solve mazes that they had

5    previously learned, even though they're no longer on puberty

6    blockers.  And they interpreted from that that there was a

7    longer term effect on the brain caused by the puberty blockers

8    even after the puberty blockers had ceased.

9    Q.   Understood.

10        And, Doctor, again, you reviewed Dr. Edmiston's testimony

11   in this case; right?

12        And she commented on the sheep studies, and my

13   understanding of her testimony is that she found no differences

14   in spatial cognition.

15        How do you respond?

16   A.   I didn't agree with Dr. Edmiston's interpretation of that

17   study.  He had argued that the first study showed no difference

18   in spatial ability, and that's not what the paper shows, and

19   it's not what is argued.  And it's certainly not what the data

20   show.  He also didn't pick up on the follow-up study at all.

21        MR. JAZIL:  And, Your Honor, I apologize.  I believe I

22   referred to Dr. Edmiston by the wrong pronoun.  It was

23   unintentional.

24        MR. GONZALEZ-PAGAN:  Thank you.

25        THE COURT:  Before we're done, I assure you, I'll call

1  people by the wrong name.  I do it almost in every case I

2  preside over, so this case probably wouldn't be any different.

3          MR. JAZIL:  And I meant no ill by it.  It was just a

4  slip of the tongue.

5  BY MR. JAZIL:

6  Q.   Doctor, moving on to studies in other animals, were there

7  any mice studies?

8  A.   Yes, there's a study by Anacker and colleagues.  And what

9  they did with the mice is they had, again, male and female mice,

10  and they administered puberty blockers, I think, by daily

11  injections.  And they studied what was elicited in terms of the

12  mice's behavior, and they also looked at elements of brain

13  function in the mice, the postmortem.

14      And what they found was that, A, there were effects of the

15  puberty blockers on the treated mice.  The brain and the

16  behavior measures were different.  What was clear was that for

17  every difference that they found, you either found it in the

18  male mice or the female mice.  None of the effects they reported

19  were showing you something where both the males and the females

20  were affected or anything that looked like the males were

21  becoming masculinized or the females were becoming -- I'm sorry

22  -- the males were becoming more feminized or the females were

23  becoming more masculinized.

24      So, for example, they found that the male treated mice were

25  more likely to want to spend time with an unfamiliar male mouse

1    than unfamiliar female mouse, and that's unusual in adult male

2    mice.  They tend to prefer to be around female mice.

3         So there is a difference, which, in fact, in the paper they

4    attribute to aggression, because male mice are quite aggressive

5    towards other mice, and that seems to be -- a perception that

6    seems to be reduced in the treated mice.

7         The female mice show different patterns of behavior around

8    anxiety and what is used in mice as now like a despairing

9    behavior.  So they were more likely to be nervous about eating

10   food in a novel environment.  And if you place them in water in

11   what's called a forced swim task, they were more likely to stop

12   swimming altogether and just float, which is used as a measure

13   of the mouse feeling hopeless.

14        So you see this pattern through all the behavioral measures

15   that they had an effect on male mice or female mice.  And at the

16   brain level, they looked at the dentate gyrus, which is part of

17   the hippocampus.  And what they were looking at was gene

18   expression that is associated with recent activities in those

19   areas, and they did find differences, that is, increased

20   activity in the hippocampus, for the treated female mice, but,

21   again, no difference for the male mice.

22   Q.   Understood.

23             MR. SHAW:  Objection, Your Honor.  There was no

24   discussion of any mice study in her report.

25             THE COURT:  Is that so?

1          MR. JAZIL:  That is, Your Honor.

2          THE COURT:  The testimony about the mice study is

3    struck.

4    BY MR. JAZIL:

5    Q.   Doctor, we did talk about the sheep studies.

6         Let me ask you this question:  Why should we give any

7    credence to these sheep studies when we are talking about the

8    human brain?

9    A.   Because we are able to do wholly controlled studies with

10   the sheep that are able to illustrate aspects of behavior change

11   or brain change.  We can do analyses with the sheep that we

12   can't do with humans.  We can do postmortem analyses, for

13   example, gene-expression analyses.

14        It's tempting to imagine that because sheep are animals

15   that we farm that they are uninteresting -- the sheep are highly

16   social mammals.  Like all mammals, they go through puberty.

17   They have an extended period of being juveniles, and they go to

18   sexual maturity, which involves changes in behavior.  And that

19   gives us a good model for looking at puberty.  And although it

20   is a completely different area, they studied evidence that, in

21   terms of sexual orientation, male sheep are somewhat more

22   complex than human males.

23        So sheep are definitely not -- I'm not claiming that sheep

24   have anything like gender identity, but it is certainly not the

25   case that sheep are sort of boring robots.

Voir Dire Examination - Dr. Scott

1   Q.   Understood.

2       And, Doctor, in your report you also looked at some human

3   studies.

4       Can you tell us what those studies were and what

5   conclusions you draw from them?

6   A.   There is a study of precocious puberty, and precocious

7   puberty is more -- puberty itself has a range, so it's not like

8   everybody goes into puberty at the age of 12.  So some people go

9   into it early and some people later.  Some people go in very

10  young.  And so precocious puberty is defined as girls or boys

11  going into Tanner Stage 2, which is the appearance of breast

12  tissue, around the ages of 6 or 7.  And it can be associated

13  with quite serious outcomes.  For example, your height can be

14  very badly effected if you go through puberty too young.  So

15  it's very commonly treated with puberty blockers.

16      There is only one study that I'm aware of that has gone in

17  and asked questions about the effects of these puberty blockers

18  that wound up being used to delay puberty in -- normally going

19  into puberty, but puberty was happening early, the effect of

20  that on behavior and on measures of cognition.

21      And this study showed that on many measures -- so, I should

22  say, in this study, you've got two groups of girls.  So it's all

23  girls.  They've got girls who are going through precocious

24  puberty and are being treated with puberty blockers as a result,

25  and then you've got a group of controlled girls who have no

1    problems at all, so they are just a group of average girls.

2        They were tested on a measure of emotional processing and

3    sort of distractibility.  And on one aspect of that, the girls

4    with precocious puberty did show a different response.  They

5    seemed more distractable under certain circumstances with

6    emotional faces.

7        They also did measures of IQ, and the girls in the control

8    group had an average IQ of 101, which you would expect to see.

9    Average IQ should be around 100.  The girls with precocious

10   puberty who were being treated with puberty blockers had an

11   IQ -- an average IQ of 94.

12       Now, that did not come out as being statistically

13   significant in this study when they compared the two, although

14   statistical significance is hard when you have small groups, as

15   they had there.  And, also, statistically significant is just a

16   measure of how lucky something is to have happened by chance.

17   It doesn't mean to say it couldn't be meaningful.

18       But I think it is striking that IQ isn't just relevant in

19   terms of is it different between two groups, because IQ is a

20   scaled score.  What your IQ is also matters.

21       And the girls with precocious puberty had an average IQ of

22   94.  That's seven points lower than the controlled group of

23   girls.  And, also, in the subtests of the intelligence test that

24   they used, none of those girls with precocious puberty who were

25   on puberty blockers scored higher on average than the controlled

Voir Dire Examination - Dr. Scott

1    group of girls.

2        I'm not the person to point this out.  Somebody --

3    Dr. Hayes wrote a commentary on this paper, pointing out that

4    there was no reason for being complacent around an IQ difference

5    of seven points.  I think if somebody told you you were going to

6    take medication that would knock seven points off your IQ, you

7    might think twice about it.

8        And the study itself is also not ideal, because in the way

9    that it's designed, you can't determine the effects of the

10   puberty blockers.  Or are you looking at the effects of

11   precocious puberty because you can't -- the girls have both?  So

12   we don't have another condition where there are untreated girls

13   who have precocious puberty.

14       So it's -- you know, as you tend to find with human

15   studies, it's not perfect, but it's certainly -- there is enough

16   evidence to make at least one other person say, This is slightly

17   concerning.

18   Q.   So, Doctor, based on your knowledge and experience of brain

19   development, brain structures, neurochemistry, and your review

20   of literature that you've described, what, if any, opinions have

21   you formed regarding the effects of puberty blockers on the

22   human brain?

23   A.   I think, first of all, what we can't do is be complacent

24   and assume that there's nothing happening here.  All the

25   evidence that we have from human studies is that there are

1  effects on brain development if puberty blockers are

2  administered around puberty, and that's already concerning.

3      From my reading of the literature around the use of puberty

4  blockers in gender dysphoria, it's initially -- was certainly

5  suggested in the UK at Tavistock Clinic, just up the road from

6  here, to be something that was going to be brought in at the age

7  of 16, because after puberty had happened --

8          MR. SHAW:  Objection, Your Honor.  None of this was in

9  her report.

10          THE COURT:  Are we off the report again?

11          MR. JAZIL:  Your Honor, we are off the report on the

12  Tavistock discussion, so --

13          THE WITNESS:  Okay.  Okay.  I am to leave that bit

14  out, but I'm going to go back to what's in my report, yep.

15  BY MR. JAZIL:

16  Q.   So, Doctor, based on your review of the studies we

17  discussed, the sheep studies --

18  A.   Yep.

19  Q.   -- and based on your review of the human studies that you

20  just discussed with the Court, and based on just your general

21  knowledge of how neurochemistry works, what conclusions have you

22  reached about the use of puberty blockers on the human brain?

23  A.   They are not a pause button.  They are having changes on

24  the brain, and we are seeing this in the mammal models.  We've

25  got no reason to imagine that this would be different in the

Voir Dire Examination - Dr. Scott

1    human brain.  There is nothing in the literature that would

2    suggest that.

3        So I think the problem is twofold.  It's having an effect,

4    and we don't know what the effect means.  All I can say is that

5    I can't think of another situation in which you would be

6    complacent about the potential effects of drugs on brain

7    development, particularly occurring at a very critical point in

8    development.

9    Q.   And are these changes reversible or are they irreversible,

10   the effects that you're seeing on the brain?

11   A.   From the studies that we've seen on sheep, they are --

12   there's at least some evidence that it's irreversible.  The

13   brain -- remember, you're born with all the brain cells you're

14   ever going to have, and changes in your brain are due to growth

15   in those brain cells and changes in how they're myelinated and

16   changes in how they talk to other brain areas.  That's all there

17   is.

18       So by the time you're an adult, the brain that you were --

19   we've all got different brains.  Part of the reason for that is

20   the different experiences and the different things we've done

21   with those brains.  You can't just go back to some default

22   state.  The brain is changed by experiences and by these sort of

23   things that can affect the brain, and they don't -- it doesn't

24   just snap back like an elastic band.

25   Q.   Understood.

Cross-Examination – Dr. Scott

```
 1                MR. JAZIL:  No further questions, Your Honor.

 2                THE COURT:  Cross-exam?

 3                          CROSS-EXAMINATION

 4    BY MR. SHAW:

 5    Q.   Professor, you mentioned that puberty blockers have the

 6    potential to cause a decrease in IQ; is that correct?

 7    A.   Yeah.

 8    Q.   And you cited a number of studies in your report on that,

 9    and one of them was the Mul study from 2001?

10    A.   Sorry.  How is that spelt?

11    Q.   M-u-l.

12    A.   Sorry.  I don't have my report.

13         Is it okay for me to open my report up?  I've closed

14    everything on my computer.

15    Q.   Do you not recall citing that in your report?

16    A.   I don't remember the name.  Is it possible for me to open

17    up my report?

18    Q.   Sure.  We can bring it up.

19    A.   That would be great.  Thank you.

20                MR. SHAW:  Ms. Gonzales, if you could bring up the Mul

21    study.

22                If you'd go to the first page, please.

23    BY MR. SHAW:

24    Q.   This is the --

25    A.   Oh, yes, I do remember.  So this was cited by Hayes, wasn't
```

Cross-Examination – Dr. Scott

1    it?

2    Q.   And for the record the study is called "Psychological

3    assessments before and after treatment of early puberty in

4    adopted children."

5         Do you see that?

6    A.   Yes, I do.  Thank you.

7    Q.   And this is a human -- this is a study on humans?

8    A.   Yes.

9    Q.   Yes?

10        And it looks at the effects of puberty blockers in children

11   with precocious puberty.

12        Do you recall that?

13   A.   Yeah.

14   Q.   And you reviewed this study before you cited it?

15   A.   I did look at it because Hayes had mentioned it, yep.

16   Q.   Did you review this study before you cited it?

17   A.   As I said, I looked at it because Hayes had mentioned it.

18   Q.   Because -- okay.

19        The study explicitly says that there is no relevant

20   decrease in IQ among the treated children; correct?

21   A.   It says:  *Intelligence quotient levels decreased*

22   *significantly during treatment*.

23   Q.   Right.

24             MR. SHAW:  If we could go to the PDF, page 4.

25

Cross-Examination - Dr. Scott

1    BY MR. SHAW:

2    Q.    Second column, under *Intelligence*, it says --

3    A.    Yeah.

4    Q.    *-- the IQ levels for the whole group decreased*

5    *significantly, but this was not clinically relevant.  A*

6    *comparable significant decrease was present in both groups.*

7    *There was no significant differences between Groups A and B.*

8          Did I read that correctly?

9    A.    You did.

10   Q.    Did you mention this finding in your report?

11   A.    No, because it's within the same range as the change in the

12   paper by Wojniusz with the -- the one we were talking about just

13   before.

14         So when you're talking about a clinical change in

15   intelligence tests, what you're normally talking about is

16   something that's starting to go in units of ten.  So something

17   that went under 90, under 80, that would be starting to become

18   clinically relevant, or in the opposite direction.

19   Q.    You didn't mention any of that in your report?

20   A.    No, because, as I said in the report -- and it's the same

21   case with the study with Wojniusz -- that's -- just because it's

22   not falling outside of the parameters of something that would be

23   clinically relevant.  So, for example, if you have a head

24   injury, then you probably will have a much larger decrease in

25   IQ, but it doesn't necessarily mean, as Hayes was arguing in

Cross-Examination – Dr. Scott

1  their article, that this is something about what you should be

2  complacent.

3  Q.   You've just mentioned Hayes, and you're referring to the

4  Hayes commentary of Wojniusz's 2016 study; correct?

5  A.   Yeah.

6  Q.   I want to talk about Wojniusz's study.

7       But, first, did you know Hayes was a political scientist?

8  A.   No.

9  Q.   No.

10      Do you often rely on the expertise of political scientists

11 in your research on the brain?

12 A.   If I don't know who's a political scientist, then how could

13 I know that?

14 Q.   I'm sorry?

15 A.   If I don't know if someone is a political scientist, how

16 could I know -- how could it be having a view on what I'm taking

17 to be data about the brain?

18 Q.   And you didn't know he was a political scientist?

19 A.   I think I said that.

20 Q.   Okay.  Let's talk about the 2016 Wojniusz study that Hayes

21 comments on.

22          MR. SHAW:  Ms. Gonzales, can you bring up that study?

23          And for the record, Wojniusz is W-o-j-n-i-u-s-z.

24 BY MR. SHAW:

25 Q.   This study is called "Cognitive, Emotional, and

Cross-Examination – Dr. Scott

1   Psychosocial Functioning of Girls Treated with Pharmacological

2   Puberty Blockage for Idiopathic Central Precocious Puberty";

3   right?

4   A.   Yes.

5   Q.   And this is another study of humans?

6   A.   It's the only study of humans, other than the Mul one.

7   Q.   And it looked at the effects of puberty blockers in girls

8   with precocious puberty --

9   A.   Yeah.

10  Q.   -- right?

11       Just as an aside, you would agree that puberty blockers are

12  standard treatment for precocious puberty?

13  A.   They are, yes.  As I say, the effects of precocious puberty

14  are not trivial.

15  Q.   And you would agree that puberty blockers have been used

16  for decades to treat precocious puberty?

17  A.   It doesn't go back that far.  We've only known about these

18  hormones since the '70s.  But, yes, they've been used for a

19  while.

20  Q.   Do you think we should stop using puberty blockers to treat

21  precocious puberty?

22  A.   I suspect that what you'd be looking at here is weighing up

23  the different risks, because, as I say, the precocious puberty

24  in and of itself is -- it's a risky condition for the girls.  It

25  can have serious outcomes.  So I'm not aware of any other

1   studies, other than these two, looking at issues around common

2   side effects of this.  It might be interesting to have a

3   conversation about what would be the different risk factors that

4   are involved here using them or not using them.

5   Q.   But my question was:  Do you think we should stop using

6   puberty blockers to treat precocious puberty?

7   A.   As I said, I don't think that's something that is -- it's

8   certainly -- the question is should you stop it now, or you

9   should start doing that.  If it's going to be considered, then

10  it would have to be considered in the light of what are the

11  problems of precocious puberty.

12  Q.   Okay.  I'll move on.

13  A.   You'd be weighing up the options.

14  Q.   On Wojniusz's 2016 study, Wojniusz concluded that the

15  puberty blockers had no effect on cognitive functioning;

16  correct?

17  A.   Other than they described it as interesting; that there

18  were these differences on one of the emotional measures.

19          MR. SHAW:  Ms. Gonzales, can you go to PDF page 7?

20          And blow it up.  Yep, there.

21  BY MR. SHAW:

22  Q.   So the last paragraph, it says:  *No significant differences*

23  *between the CPP and the control group were seen with regard to*

24  *cognitive performance neither on paper and pencil nor in*

25  *computer-based tests concerning memory, spatial ability,*

1    *attention, and executive functions.*

2         Did I read that right?

3    A.   Yes.  You'll notice there is also a difference in the next

4    sentence about the Trail Making Test, so there is a difference

5    there.

6    Q.   Yeah, I'll read the next sentence.  It says:  *Only in the*

7    *Trail Making Test-Number Sequencing, assessing --*

8              MR. SHAW:  If you could go down, Ms. Gonzales.

9              Keep going.

10   BY MR. SHAW:

11   Q.   *-- processing speed, the CPP group showed a significantly*

12   *poorer performance.  This finding is difficult to explain since*

13   *neither the very similar Trail Making Test-Letter Sequencing nor*

14   *any other of the processing speed tests showed significant*

15   *differences between the groups.  Taking into account that the*

16   *p-values were not corrected for multiple testing, it is possible*

17   *that this finding is accidental.*

18        Did I read that right?

19   A.   You did.

20   Q.   Okay.  Thank you.

21             MR. SHAW:  Ms. Gonzales, if you could go up, please,

22   back up to the previous page.

23   BY MR. SHAW:

24   Q.   And on IQ specifically, the second-to-the-last paragraph in

25   the right column, it says:  *The puberty-blocker-treated CPP*

Cross-Examination – Dr. Scott

1    *girls estimated IQ in the current study was within the normal*

2    *range and somewhat lower, although not significantly than that*

3    *of the controls;* correct?

4    A.   Yes, as I said before.

5    Q.   Okay.  And I just want to stay on this study for one more

6    point.

7         You mentioned in your testimony something about puberty

8    blockers affecting emotional reactivity; isn't that correct?

9    A.   Yes, yeah.

10             MR. SHAW:  Ms. Gonzales, if you could go to page 9.

11   BY MR. SHAW:

12   Q.   And it's not highlighted, but it's on the screen.  The last

13   sentence above the "Cardiac function and emotional regulation"

14   section, it says:  *In summary, although part of the findings*

15   *suggest differences in emotional reactivity between the groups,*

16   *the results are not conclusive.*

17        Did I read that right?

18   A.   Yes.

19   Q.   And I misspoke.  I want to stay on this study for one more

20   point.

21        You mentioned something about -- did you -- you mentioned

22   in your report that puberty blockers may cause a decrease in

23   heart rate.  Do you recall mentioning that in your report?

24   A.   Yes, yeah.

25   Q.   And you mentioned this study for that --

Cross-Examination – Dr. Scott

1   A.   Yes.

2   Q.   -- correct?

3   A.   Yeah.

4   Q.   A lower heart rate can mean that a person is more relaxed;

5   right?

6   A.   Yes, or healthier.

7   Q.   So a lower heart rate is a good thing?

8   A.   Well, as you'll notice towards the bottom of that

9   paragraph, like they say, through interpretation of the puberty

10  blockers as being something that's actually changing the

11  emotional regulation capacity as you're measuring by heart rate.

12  What you have to do is rule out a direct role for the puberty

13  blocker itself on heart rhythm, and they point out that you

14  can't do that if you bear in mind that the original GnRH is a

15  neurotransmitter and it's having its effect on the hypothalamus.

16       But, actually, you find GnRH receptors in a much wider area

17  of the brain.  It's not only found in areas that are directly

18  controlling the things that are happening in the ovaries and the

19  testes.  It is working as a neurotransmitter.  When you block

20  that, you could be also changing other aspects of how the body

21  is going to start working, because we don't know what this is.

22       That's precisely what they're saying here.  You can't tell

23  whether this is something to do with the precocious puberty, the

24  actions of the blocker, or the actual direct action of that

25  drug.

Cross-Examination – Dr. Scott

1  Q.   But you'll agree that the study says it's the -- in the

2  last paragraph:  *Consequently, the lower heart rate and higher*

3  *heart rate variability would suggest that treated CPP girls have*

4  *better emotion regulation capacity and higher adaptability to*

5  *changing contexts than controls.*

6  A.   I wouldn't agree with that --

7  Q.   I read that right; right?

8  A.   -- without the context of the next sentence, and the fact

9  they say "could."  Then they are definitely saying that this is

10 one mechanism, but you cannot be certain.

11 Q.   Do you have any training in puberty blockers that makes you

12 certain either way?

13 A.   No, but I have a little bit of expertise in how emotion

14 effects the brain and the body, and that's one of things you're

15 measuring here with the heart rate variability.  So I'm

16 commenting on this as something that's affecting the brain and

17 the body.

18 Q.   So you're familiar with heart rate variability?

19 A.   Yeah.

20 Q.   And heart rate variability is a measure of emotional

21 control; right?

22 A.   It can certainly be linked to that.  It can -- there are a

23 lot -- the heart is unbelievably reactive in terms of its

24 moment-to-moment changes, but also it's -- how it's influenced

25 by longer scale phenomena that can affect you.  So, for example,

1    if you are in a fight-or-flight state of extreme fear, then your

2    heart rate will be high, but your heart rate will also be less

3    variable.  So you are in a different emotionally reactive state

4    and at some ball points in between.  So it's not -- it's like a

5    world of complexity starting to understand heart rate and heart

6    rate variability.

7    Q.    Heart rate variability is associated with lower levels --

8    excuse me.  Let me rephrase.  A higher heart rate variability is

9    associated with lower levels of anxiety; correct?

10   A.    When you hold other things constant, yes, and that's

11   because what you're seeing is the heart rate is becoming -- is

12   being more reactive.  That's why it is being more variable.

13   Q.    And the first sentence -- it's still on the screen.  The

14   first sentence under "Cardiac function and emotional

15   regulation":  *GnRHa-treated CPP girls had significantly lower*

16   *resting heart rates and significantly higher heart rate*

17   *variabilities than controls.*

18        Did I read that right?

19   A.    Yes.

20   Q.    Moving away from puberty blockers, you made some comments

21   in your testimony about adolescent behavior; correct?

22   A.    Yeah.

23   Q.    And you made the point in your report, and I believe in

24   your testimony, that teenagers are more prone to impulsive

25   behavior?

Cross-Examination - Dr. Scott

1   A.   I think the bigger emphasis I was making was on risk and
2   risky behaviors.  So their behavior can be impulsive, but the
3   bigger problems are when it's associated with the riskiness of
4   things whether or not they are impulsively decided.
5   Q.   Would you agree that teenagers are able to assess -- to
6   properly assess those risks when in the company of other adults?
7   A.   No.  If you think about the overall differences between how
8   everything we understand about the adolescent brain differs from
9   the adult brain, one of the cardinal features is that it can be
10  extremely difficult for adolescents to engage with the potential
11  consequences of actions whether or not they are being impulsive,
12  whether or not they're being guided by adults.  The meaning of
13  those consequences can simply be less salient and less engaging
14  to them.
15  Q.   Would you agree that teenagers are able to properly assess
16  the risks when speaking or working with medical doctors?
17  A.   No, I think the same problem would still be there.  If
18  you -- if you can't understand what the import and the valence
19  and the severity or the potential severity of outcomes could be,
20  then it doesn't matter how well you are being supported by a
21  medic or not.  It's still going to be very difficult for
22  teenagers to fully engage with that.
23  Q.   So would you recommend that teenagers should not take any
24  advice from a medical doctor?
25  A.   No, I'm not saying that.  I think you've got a situation

1   where the outcomes are potentially extremely serious and,

2   actually, the medical doctors don't necessarily have the best

3   advice.  Then you -- and the outcomes could really be something

4   that could have life-altering possibilities.  Then I don't think

5   that that's something that a teenager -- in most of the

6   situations, we would protect teenagers from the consequences of

7   their decisions because of that.

8           MR. SHAW:  Pardon me one moment.

9       (Discussion between the attorneys.)

10  BY MR. SHAW:

11  Q.   Professor, one final question.  Do you know, in the

12  United States, that it's the parents' responsibility to consent

13  to medical treatment?

14  A.   Yes.  But I would imagine, in this situation, parents

15  aren't going to be trying to get their children on puberty

16  blockers without the child agreeing to it.

17          MR. SHAW:  No further questions.

18          THE COURT:  Redirect?

19                REDIRECT EXAMINATION

20  BY MR. JAZIL:

21  Q.   Doctor, you discussed with my friends some issues

22  concerning neurotransmitters and the effects on the

23  hypothalamus.  I'll confess I got a little lost in that

24  discussion.

25       Are you saying that puberty blockers are a mechanism to

Redirect Examination - Dr. Scott

1    block neurotransmitters, and the neurotransmitters that could be

2    blocked are in places other than the hypothalamus?  Help me

3    understand that --

4    A.   Yeah.

5    Q.   -- exchange there.

6    A.   So from when they were first discovered, GnRH,

7    gonadotropin-releasing hormone, was assumed to be having a very

8    precise role in the hypothalamus because that's triggering, you

9    know, these sex-hormone changes and the way that they behave.

10       But it turns out that, certainly in primates, if you look

11   for the receptors that are sensitive to gonadotropin-releasing

12   hormone, you don't only find them in the hypothalamus.  You find

13   them in basal ganglia.  You find them in the basal forebrain.

14   So you're finding them in a more distributive network.  We still

15   don't know what that means.

16       For example, several of the sheep studies that were looking

17   at the effects of puberty blockers onto the brains and behavior

18   in the sheep were doing that precisely, because there is the

19   potential for these neurotransmitters -- so for the blocking of

20   the function of this neurotransmitter to have an effect on

21   cognition and behavior in a way that's more widespread than the

22   effect it's having on -- in a direct way on sex hormones.

23   Q.   So just to make sure I understood this, When we started

24   studying puberty blockers, we were concerned about the effects

25   on the hypothalamus.  But since then, we've come to see that the

1    effects would be more widespread on the brain.

2         Did I get that right?

3    A.   Exactly, exactly.  There is the potential of it actually

4    having an effect on a wider network of behavior and cognition.

5    Q.   And, Doctor, my friend showed you some excerpts from the

6    Wojniusz study.

7         Did any of those excerpts change your perspective on your

8    testimony earlier about the conclusions you drew from the

9    Wojniusz study?

10   A.   No.  It is interesting.  If you read all the papers that

11   I've mentioned, every one of them, including Wojniusz, says, We

12   don't know what this means; we need to have more data,

13   particularly because these drugs are being used in adolescent

14   populations at a time when the brain is changing.  So it's not

15   changing my thoughts about this.  The effects are not big, but

16   they are there, and they are there in a direction that is

17   worrying.

18   Q.   Understood.

19             MR. JAZIL:  No further questions, Your Honor.

20             THE COURT:  Dr. Scott, one probably insignificant

21   question to start with:  Have you ever done any studies using

22   sheep?

23             THE WITNESS:  No.  I've done some studies with horses,

24   but not sheep.

25             THE COURT:  One thing you noted in your testimony was

1    that precocious puberty is not trivial, and so I think you said,

2    in response to Mr. Shaw's question about whether we should stop

3    using GnRHa on patients with precocious puberty, that we should

4    evaluate the risks -- the patient should evaluate the risks;

5    true?

6              THE WITNESS:  Well, ideally, I think the medical

7    profession would be the best place to be gathering evidence and

8    evaluating the risks so that they can then present to the

9    families and the children concerned.  But, yes, it is certainly,

10   at least potentially, the case that there are things to think

11   about here, and it may be that the severity of precocious

12   puberty is so great that it is worth taking those risks.

13             THE COURT:  Certainly for the patient and the

14   patient's parents to evaluate the risk, they need the input of

15   the doctor, and the doctor needs to know what the medical

16   profession as a whole knows.

17             You're nodding your head yes, and I think that's what

18   you just told me.

19             So precocious puberty is not trivial, and I suspect

20   everyone would agree with that.

21             Is gender dysphoria trivial?

22             THE WITNESS:  No.  No, that's not trivial.  However,

23   at the moment -- and this is in my report -- we have no way of

24   knowing.  We have no biomarkers.  We have no behavioral

25   measures.  We have no way of telling which adolescents

1    presenting with gender dysphoria are going to be the ones who

2    benefit from treatment with puberty blockers.

3              So mental health is at risk in untreated gender

4    dysphoria, but it's also significantly worse in treated gender

5    dysphoria.  So it really is the case that we're dealing with

6    people who are in a very dire situation, and they deserve much

7    better health care than they are receiving, absolutely.

8              But there's no clear evidence -- sorry.

9              THE COURT:  Go ahead.

10             THE WITNESS:  I was just going to say, there's no

11   clear evidence that puberty blockers help, other than anecdotal

12   evidence that there are some people for whom it does help, and

13   that's still a level of anecdote.  So at the moment we really

14   don't know who are the people who are going to benefit from this

15   for whom the risks really probably are worth going through for

16   this treatment.

17             I recently read a book by Hannah Barnes with people

18   absolutely making that case who are now in their 20s who are

19   very happy they went down this path, and there are also the case

20   that the vast majority of people with gender dysphoria are not

21   going to have their symptoms improved by this treatment.

22             THE COURT:  My question is this:  If patients and

23   their parents and doctors should evaluate the risk and make a

24   decision whether to use this drug when the patient has

25   precocious puberty, why isn't it the patient and parent and

1   doctor who should evaluate the risks and benefits and make the

2   decision whether to use this drug when the person has gender

3   dysphoria?

4             THE WITNESS:  I think that's probably because we know

5   that in precocious puberty it works.  What that does is it

6   delays the progression from Tanner Stage 2 all the way through

7   puberty, and it delays it for long enough that you can then take

8   the girls or the boys off it, and they go into puberty at a more

9   normal age, and you've delayed the changes in height that can be

10  associated with that.

11            We do not know this with the treatment of gender

12  dysphoria with puberty blockers.  What we do know is that the

13  evidence we do have suggests that it does not work.  It is not

14  effective, so I think --

15            THE COURT:  Let me see if I understand this.

16            You think -- you've never treated a gender dysphoria

17  patient.  I've heard evidence of many hundreds of gender

18  dysphoria patients who are substantially better off after having

19  had this drug, but what you're going to testify under oath is

20  that none of them are better off?

21            THE WITNESS:  No.  That's not what I said.  I said we

22  know that there are some people for whom this is beneficial.

23  What we cannot tell, and what the evidence is not there for, is

24  who those children are going to be.  So we don't know, in

25  advance of it working, whether or not this is going to be

1    somebody for whom this will work.  And for the people whom it

2    doesn't work, it does not improve anything.  It doesn't improve

3    mental health.  It doesn't improve a quality of life --

4            THE COURT:  Fair enough.

5            THE WITNESS:  -- so --

6            THE COURT:  If it doesn't work --

7            THE WITNESS:  (Indiscernible crosstalk.)

8            THE COURT:  If it doesn't work, it doesn't work; I get

9    it.

10           THE WITNESS:  And we can't tell in advance.

11           Sorry.

12           THE COURT:  Well, you can't.  I've heard from doctors

13   who think they can, but I don't want to get in a debate with

14   you.  I know you're not the treating doctor.

15           THE WITNESS:  Absolute --

16           THE COURT:  Questions just to follow up on that?

17           MR. SHAW:  No.

18           MR. JAZIL:  No, Your Honor.

19           THE COURT:  Thank you, Dr. Scott.

20           THE WITNESS:  Thank you.

21           THE COURT:  I appreciate your availability, and we're

22   going to disconnect you now.

23           That testimony is completed.

24           THE WITNESS:  Thank you.

25       (Dr. Scott exited the Zoom conference.)

```
 1                THE COURT:  Please call your next witness.

 2                MR. JAZIL:  Your Honor, the defense rests.

 3                THE COURT:  Rebuttal case for the plaintiffs?

 4                MR. GONZALEZ-PAGAN:  No more witnesses, Your Honor.

 5                THE COURT:  All right.  Let's take a 15-minute break,

 6     and we'll do closing arguments.

 7                10:40 we'll start back.

 8          (Recess taken at 10:25 AM.)

 9          (Resumed at 10:40 AM.)

10                THE COURT:  Please be seated.

11                Closing argument for the plaintiffs.

12                MR. GONZALEZ-PAGAN:  Briefly, Your Honor, before

13     closing arguments, if it's okay, my colleague, Ms. Dunn, would

14     like to correct something.

15                MS. DUNN:  Ms. Dunn, Chelsea Dunn.

16                Your Honor, when we submitted the deposition

17     designations, we neglected to include the completed errata

18     sheets.  We were notified by Mr. Beato, so we refiled those

19     deposition designations, but we also have copies for the Court

20     to include with the binders that we submitted.

21                THE COURT:  Got it.  Okay.

22                MR. GONZALEZ-PAGAN:  Good morning, Your Honor.

23                THE COURT:  Before you -- good morning.

24                But before you start -- before I forget it -- let me

25     tell you one thing.
```

1    We've had discussions before about the relationship

2 between this case and the Doe case that's pending on a submitted

3 motion for preliminary injunction.  My tentative plan, at least,

4 is to rule on both of these at the same time.  There will be a

5 lot of overlap between the decision in this case and decision in

6 that case.  There are obviously some differences, but there's a

7 lot of overlap.

8    Here's my suggestion to both sides:  If you appeal --

9 and it certainly seems likely to me that one side or the other

10 or both will appeal -- I'm not sure the procedures at the

11 circuit for notifying the circuit that there are these related

12 cases.

13    I recently sat with the circuit.  We had a case.  We

14 prepared.  We heard oral argument.  It turned out the exact same

15 issue with the exact same lawyers had already been argued to

16 another panel and nobody told us.  So they -- they may not have

17 the same rule that we have here that require you to notify us of

18 related cases -- or if they do have that rule, the lawyers in

19 that case just missed it -- but that was a lot of unnecessary

20 work.

21    So if these cases both wind up going up, figure out

22 what you need to do to let the circuit know that both cases are

23 pending so that they can deal with it, however it is appropriate

24 for them to deal with it, but somebody there needs to decide how

25 to do it.

1           MR. GONZALEZ-PAGAN:  Understood, Your Honor.

2      Thank you very much.

3           May it please the Court, Omar Gonzalez-Pagan for the

4      plaintiffs.  Your Honor, over the past two weeks we have been

5      building a trial record demonstrating that subsection 7 of

6      Rule 59G-1.050 of the Florida Administrative Code, or what we

7      will call the AHCA rule, and section 3 of the recently enacted

8      Senate Bill 254, which prohibits state funding for medical care

9      that affirms a person's gender identity if inconsistent with

10     their sex assigned at birth, are unlawful.

11          Both of these provisions independently serve to

12     prohibit the Florida Agency for Health Care Administration from

13     providing Medicaid coverage for gender-affirming medical care,

14     care that only transgender people need as treatment for gender

15     dysphoria.

16          In building this record we have shown that

17     gender-affirming medical care is not only safe and effective but

18     that it is not in any sense of the word experimental.  This is

19     so because under *Rush v. Parham*, based on current medical

20     knowledge, the State's determination that gender-affirming

21     medical care is experimental is not reasonable.

22          As previewed at the beginning of this trial, AHCA's

23     overt -- very own regulation to determine whether a treatment is

24     experimental, that which dictates Generally Accepted

25     Professional Medical Standards, shows that the only conclusion

1   one can reach is that the State's conclusion in this instance is

2   grossly unreasonable.

3           We have provided extensive and, in many instances,

4   uncontroverted evidence that under the six factors of subsection

5   4 of Rule 59G-1.035, gender-affirming medical care, meaning

6   puberty-delaying medications, hormone therapy, and surgery as

7   treatment for gender dysphoria meets Generally Accepted

8   Professional Medical Standards.  And, again, while those factors

9   are not binding on this Court, we do think they're instructive,

10  and they emphatically illustrate that gender-affirming medical

11  care is safe, effective, and not experimental.

12          Factor one, which the Court is very familiar with

13  already, the existence of evidence-based Clinical Practice

14  Guidelines.  It is uncontroverted that there are primarily two

15  evidence-based Clinical Practice Guidelines for the medical

16  treatment of gender dysphoria.

17          These are the WPATH standards of care, specifically

18  Version 8 published in 2022, and the Endocrine Society

19  guidelines published in 2017.  Plaintiffs' eight experts -- two

20  psychiatrists, a pediatric endocrinologist, a clinical

21  researcher and adolescent medicine physician, a surgeon, a

22  bioethicist, a neuroscientist, and a public health researcher --

23  all testified to this fact.

24          These evidence based guidelines set forth that

25  gender-affirming medical care, which is only provided after the

1   onset of puberty, is appropriate and indeed necessary when

2   medically indicated.

3          In making such a determination, one looks to the

4   patient, the particular needs of the patients after conducting

5   an individualized assessment and for which the guidelines

6   provide detailed guidance on how to conduct that assessment.

7          The State's experts, and AHCA's employee responsible

8   for the June 2022 GAPMS report, Mr. Brackett, all acknowledge

9   that the WPATH Standards of Care and Endocrine Society

10  guidelines are already applicable clinical practice guidelines.

11  They point to no competing guidelines in the United States, let

12  alone guidelines that are widely accepted.

13         As outlined in trial Exhibits 36 through 43 and 45

14  through 49 and the testimony of plaintiffs' experts, these

15  guidelines are viewed as authoritative and have been endorsed by

16  the American Medical Association, the American Psychiatrist

17  Association, American Psychological Association, the American

18  Academy of Pediatrics, American Academy of Child and Adolescent

19  Psychiatrists, the Endocrine Society, the Pediatric Endocrine

20  Society, and many more.

21         While defendants point to no recognized competing

22  guidelines in the United States, they point to three reports

23  from three different countries; namely, Finland, Sweden, and the

24  UK.  But these reports have no weight, Your Honor.  For one,

25  each of the reports only apply to medical care for adolescents

1    and not adults, and each provides for the medical treatment of

2    gender dysphoria based on an adolescent patient's individual

3    needs.

4            In this sense, as the U.S. Court of Appeals for the

5    Eighth Circuit recognized in *Brandt v. Rutledge*, the reports

6    really do not differ significantly from the WPATH Standards of

7    Care.

8            For another, even if the reports were contradictory,

9    they are in opposite.  That's because, unlike the WPATH

10   Standards of Care and Endocrine Society guidelines, each of the

11   reports is unpublished, it's not peer-reviewed, and it's

12   incomplete.  Defendants have not identified or provided full

13   copies of each of these reports.  They've provided summaries,

14   interim reports and, with regards to Finland, a summary -- a

15   translated summary of an unknown origin.  Maybe it is because

16   they have no bearing.

17           In addition, the three reports were drafted by

18   government bureaucrats in these other countries and not medical

19   professionals.  And as the State's own expert, Dr. Stephen

20   Levine, testified, standards of care and Clinical Practice

21   Guidelines are, quote, to be constructed by people in the field,

22   closed quote.

23           He gave the example of the standard of care for

24   low-grade prostate cancer and said that it is written by

25   urologists and people qualified with the expertise in evaluating

1    that quality, the quality of that evidence.

2            That is what happened with the WPATH Standards of Care

3    and Endocrine Society guidelines, not the three reports to which

4    defendants refer.

5            Finally, Dr. Levine also testified that clinical

6    guidelines tend to be much more regional, much more local.  If

7    that is so, then three unpublished, non-peer-reviewed,

8    incomplete reports from three foreign countries should have no

9    bearing on what the clinical practice guidance and standards of

10   care for the treatment of gender dysphoria in the United States

11   should be.

12           As outlined in my opening statement, this first factor

13   weighs heavily in favor of the provision and coverage of

14   gender-affirming medical care and shows that this care falls

15   squarely within Generally Accepted Professional Medical

16   Standards.

17           Next, we look to the publication of reports and

18   articles containing authoritative medical and scientific

19   literature that relate to the health service at issue.

20   Plaintiffs' experts, in particular Dr. Olson-Kennedy, who

21   conducts clinical research regarding the treatment of gender

22   dysphoria, testified to the abundance of peer-reviewed,

23   scientific literature supporting the safety and efficacy of the

24   medical interventions for the treatment of gender dysphoria.

25           When it comes to adults, as Dr. Olson-Kennedy

1    testified, the amount of published literature documenting this

2    safety and efficacy is, in research language, significant and,

3    in layperson's language, enormous.

4         Not one of the defendants' experts discussed this

5    literature regarding adults, and instead, each focused on the

6    care of minors.  But when it comes to adolescents, there is more

7    than ample scientific and medical literature documenting the

8    safety and efficacy of puberty-delaying medications, hormone

9    therapy, and surgery to treat gender dysphoria, particularly

10   chest-masculinizing surgery.

11        Dr. Olson-Kennedy walked us through numerous

12   cross-sectional and cohort longitudinal studies across the

13   United States and the world documenting the safety and efficacy

14   of gender-affirming medical care to treat gender dysphoria.

15        This included two of her own studies, studies that she

16   published and have been peer reviewed that pertain to hormone

17   therapy and chest-masculinizing surgery for older adolescents

18   and young adults.  Her testimony is corroborated and backed up

19   by the testimony of each of plaintiffs' other medical experts,

20   including Dr. Shumer, Dr. Janssen, and Dr. Karasic, as well as

21   the reviews, systematic review, of literature regarding hormones

22   conducted by Dr. Baker.

23        As anticipated, the defendants' experts critiqued a

24   handful of these studies, not all of them, but a handful of

25   these studies, because the studies have limitations.

1     Your Honor, every study known to science has

2  limitations.  It is impossible to design a scientific study

3  without limitations.  That is why, as plaintiffs' experts

4  testified, we look to the body of literature as a whole.  And

5  here the body of literature goes back decades, both for

6  adolescents and adults.

7     By contrast, when asked for a single study that would

8  support the State's position that gender dysphoria could be

9  effectively treated with gender -- with psychotherapy, the

10 State's experts could not come up with one example, not one.

11    That is understandable because there is none.  There

12 is no peer-reviewed scientific literature supporting the

13 defendants' position.  The entire body of scientific and medical

14 literature, when taken as a whole, provides strong and unrivaled

15 evidence in support of puberty-delaying medications, hormone

16 therapy, and surgery as treatment for gender dysphoria.  This

17 factor also weighs in favor of the plaintiffs.

18    Number 3, the effectiveness of the health service in

19 improving the individual's prognosis for health outcomes.  I've

20 just discussed the overwhelming universe of medical literature

21 that shows that this gender-affirming medical care is effective

22 to treat gender dysphoria.

23    But as -- just as Dr. Janssen explained, it is a

24 little drier, when talking about the effectiveness of

25 gender-affirming medical care from the data perspective, when

1    compared to the profound positive impact we see when patients

2    get access to this care.

3           The positive impact of gender-affirming medical care

4    is corroborated not only by the clinical experience of

5    plaintiffs' experts, but by the experiences of plaintiffs

6    themselves and their factual witness.

7           Plaintiffs August Dekker and Brit Rothstein both

8    testified as to the positive impacts of being able to access

9    hormones and chest-masculinizing surgery and the impact that it

10   had on their mental health, their dysphoria, and their quality

11   of life.

12          And Jane Doe and Jade Ladue testified on the similar

13   impact, positive impact, that puberty-delaying medications had

14   on their adolescent children, Susan Doe and K.F.

15          August Dekker testified that his gender dysphoria felt

16   like he had a constant void in his chest, like he had been

17   walking around with a leaden ball in his stomach that informed

18   everything else that he did and became unmanageable.  He didn't

19   want to sleep.  He didn't want to eat.  He didn't want to do

20   anything that was even remotely human because he was, in his

21   words, so disgusted with himself and the way that people

22   perceived him.  He was depressed and anxious as a result.

23   Your Honor, this is on the trial transcript pages 656 through

24   657.

25          By contrast, once he was able to obtain medical

```
1    treatment for his gender dysphoria, his depression and anxiety
2    ameliorated, and he was happier.  He was more secure in himself.
3    He was confident.  He wanted to go outside and meet people.  He
4    wanted them to know who he was and wanted them to see how he
5    presented himself because he felt proud of who he was and of
6    himself.
7            Being able to obtain chest surgery meant like the
8    world had been lifted off Mr. Dekker's shoulders.  He felt like
9    that was the way things were supposed to be all the time.  It
10   felt natural.  He had confidence in his body and was not able to
11   go -- was now able -- was now able to go swimming at the beach
12   or even wear a white shirt to this trial.  In his words, it was
13   probably the best thing he has ever done for himself.
14           The plaintiffs' experiences are like that experience
15   relayed by Kim Hutton, whose son, now 20, had been receiving
16   gender-affirming medical care for ten years, puberty-delaying
17   medications and hormones, as well as the experiences observed by
18   plaintiffs' medical experts of their patients.  This includes
19   the testimony of Dr. Karasic, Dr. Shumer, Dr. Schechter,
20   Dr. Olson-Kennedy, and Dr. Janssen.
21           Speaking of the effect of puberty-delaying
22   medications, Dr. Shumer testified about how adolescents -- it's
23   always a challenging time.  But if you throw in gender dysphoria
24   on top of that, it becomes even more challenging and difficult.
25           And when he sees an adolescent patient, they've
```

 1   oftentimes been -- have been circling that appointment on their

 2   calendar for many, many months.  Again, this illustrates that

 3   this care is provided with care and not immediately or by

 4   chance.  People plan and take time to get to know each other, to

 5   get to know themselves and work with their providers to access

 6   this care.

 7           And Dr. Shumer testified that his patients express how

 8   they've been suffering, how they're not fitting in the world

 9   because the body is changing in a way that is not consistent

10   with who they are.  And that their parents, who are there

11   because they love and support them simply want to allow their

12   adolescent to live the happiest, healthiest, most fulfilling

13   life that they can live.

14           And that one of the greatest things of Dr. Shumer's

15   job is that he gets to see these patients back in follow up and

16   see them doing so well that he gets Christmas cards five years

17   later from patients of the college, having that healthy, happy,

18   productive life that they didn't think was possible when they

19   first came.  All of that, Dr. Shumer testified, was a result of

20   gender-affirming care.

21           By contrast, the State could only produce, primarily,

22   experts who have never treated or studied gender dysphoria.

23   They couldn't really speak to its effectiveness because they

24   didn't know how.  The one expert they produced who had some

25   experience treating gender dysphoria, Dr. Levine, provided

1  additional support for gender-affirming medical interventions

2  for both adults and adolescents.  To be sure, he recommends a

3  more careful assessment of the patient, but so does the

4  standards of care, which recommends the bio-psychosocial careful

5  assessment of adolescent patients.

6          Finally, the State could not produce any evidence that

7  gender-affirming medical care was harmful and could not produce

8  any evidence beyond their say-so that treatment for

9  psychotherapy alone is sufficient or effective.

10  Gender-affirming medical care is efficacious to treat gender

11  dysphoria.  Mountains of literature document as much, the

12  clinical experience of plaintiffs' experts shows as much, and

13  the testimony of plaintiffs illustrates as much.  This factor

14  goes to the plaintiffs.

15          Next up are Factors 4 and 5, utilization trends and

16  coverage polices by other credible insurance payor sources.

17          Dr. Kellan Baker testified about how, over the years,

18  we have seen an increase in the utilization of gender-affirming

19  medical care.  He testified that this increase is attributable

20  to both greater of an ability of coverage and the fact that the

21  consensus about this care has led providers who are providing

22  this care to be explicit in their coding without fear of

23  triggering an exclusion.

24          That also relates to Factor 6.  Dr. Baker testified

25  that the trend among all types of payors in the United States,

```
 1    all types, is to cover gender-affirming medical care as

 2    necessary.  This includes private insurance in the marketplaces,

 3    employer-provided insurance, Medicare on a case-by-case basis,

 4    and state Medicaid programs.

 5              For example, he testified that a --

 6              THE COURT:  Surely the trend among Medicaid payors is

 7    the other direction?

 8              MR. GONZALEZ-PAGAN:  Well, Your Honor, he testified --

 9              THE COURT:  And that's whether that's a political

10    movement or what.

11              Yeah, he said that.  Look, I read the papers, and I

12    don't pay attention to what the newspapers say when I'm

13    evaluating my cases.  Sometimes I skip over stories on purpose.

14    But just -- I have looked at what's going on in other states.  I

15    mean, you know, I read the decisions, but I also see the

16    statutes and so forth that are being passed.  And just in the

17    last month, there have been two or three states that have taken

18    action.

19              Surely you don't assert that the trend is all your

20    way?

21              MR. GONZALEZ-PAGAN:  Your Honor, if one were to take a

22    step back from this one last year alone, the answer is, yes, it

23    is.

24              THE COURT:  All right.

25              MR. GONZALEZ-PAGAN:  Because some of those were states
```

1   that already had exclusions, like Texas, for example.  And the

2   reality is that even today, as we stand here today, of the 56

3   U.S. jurisdictions, 46 or 47 do not have any exclusions

4   whatsoever.  A few of them in the last year have adopted them,

5   but it is still less than 10.  And at the same time, 27 U.S.

6   jurisdictions have adopted policies requiring affirmative

7   coverage of gender-affirming medical care.

8           THE COURT:  I get it.  And I asked partly -- you've

9   probably heard me say something like this before.  You know,

10  sometimes it's not nearly so important what the particular

11  subject that's being addressed by an expert is or what the facts

12  are.  Sometimes it just tells you something about the expert and

13  the expert's credibility, and it was part of the reason I asked

14  the questions I did at the end of Dr. Scott.  When you get

15  experts that just won't recognize plain facts, it tells you

16  something.  When you get somebody that says the trend is all one

17  way, it's just not.

18          MR. GONZALEZ-PAGAN:  Understood, Your Honor.

19          I don't believe that was Dr. Baker's testimony.

20  Dr. Baker was taking a holistic, universal view and testified as

21  to the -- not just Medicaid, but Medicare insurance payors, the

22  fact that, in the marketplaces, over 90 precent of private

23  insurance being sold has actually no exclusions whatsoever.  And

24  that, in Florida, of the six insurance companies that operate

25  and provide insurance, only one had a limited, vague exclusion,

```
 1    the rest had none, and some of them had affirmative coverage.
 2              We all, I think, understand that Dr. Baker would
 3    acknowledge that there are policies being passed right now in
 4    certain states because of political reasons.  But I think if one
 5    were to take a step back, one would see that over the decades
 6    that this care has existed, the trend has always been for more
 7    coverage.  And, yes, now we face these questions of whether that
 8    should be reversed, but that is different than what the trend
 9    was at the time that this exclusion was excluded and the overall
10    graph that we would look at right now.
11              THE COURT:  Yeah, I get it.  And if one lived in
12    Europe, one would say that the trend was on the defense side --
13    on the plaintiffs' side, and now it's turned around a little
14    bit.  And in the United States, the trend was certainly on your
15    side, and now it's turned around a little bit.  I don't know --
16              MR. GONZALEZ-PAGAN:  Only one of six factors, Your
17    Honor, to look at.
18              THE COURT:  I get it.
19              And I'll say this to both of you:  It's almost --
20    sometimes it's almost like you think that you should only say
21    the things that support your side, and you ought to ignore
22    everything else.  That's fine.  You can do it that way, but I
23    have to deal with everything.
24              So it would really help me -- on both sides, it would
25    help me if the experts actually looked at what was going on
```

1  instead of just cherry-picking what helped their side, and the
2  same thing for the lawyers.

3         Look, it's not all one way.  There are facts that
4  support one side and facts that support the other side.  Just
5  come to grips with them.  Don't pretend like I'm not going to
6  find them out.  I'm going to do my best to find them out.  And
7  if you just pretend like it doesn't exist, you kind of forfeit
8  your chance to be heard on the question.

9         So on this, for example, I get it.  The argument is,
10 oh, yes, the trend is against us.  Recently, it's political.  It
11 might very well be that it's political.  But if you just don't
12 acknowledge the trend, you don't even get a chance to say it's
13 political.  And I would have figured that out by myself, but
14 some things I wouldn't figure out by myself.

15        So, frankly, all through this, if you'll address the
16 real issues on both sides, it will help me.

17        MR. GONZALEZ-PAGAN:  Understood, Your Honor.
18 Absolutely.

19        And my next point was the following:  Florida's
20 exclusion, just like the recently adopted exclusions in other
21 states like Texas, they represent extreme outliers within the
22 realm of the 56 U.S. jurisdictions.  Sure, some of them have
23 gone more extreme now than before, because Dr. Baker testified
24 that the few places that had exclusions, they were all
25 different, if you will, that there were exclusions that were

1   total, categorical, like that has been adopted in Florida,

2   whereas other places that adopted exclusions were limited to

3   only certain treatments, say, for example, surgery, and some of

4   which have age exclusions, specifically.

5           But, overall, if one were to take a look at the whole

6   map and take a step back, the numbers have always been in

7   support of a trend in this care.  And, of course, we are now

8   faced with the situation that we now live in politically where

9   certainly some states have sought to restrict this care in

10  multiple ways:  Passage of gender-affirming care which is under

11  litigation in several states as well as Medicaid exclusions in

12  some states.  Most of those states already have them.  They were

13  part of that ten or so jurisdictions, but they were states that

14  have now made it even more difficult, not dissimilar from the

15  actions in Florida here from passing the AHCA rule -- adopting

16  the AHCA rule and then enacting Senate Bill 254 at the same

17  time.

18          In sum, while this factor is somewhat mixed, one would

19  argue that, overall, particularly utilization trends and the

20  fact, if one were to look at private insurance policies and

21  private creditors, none of which were discussed or acknowledging

22  the GAPMS report, those factor -- these factors actually weigh

23  in favor of the plaintiffs.

24          And then the last is the recommendations or

25  assessments of clinical or technical experts on the subject or

1    field.  This implies that these experts have experience.  Most

2    of the experts provided by the State had no experience in this

3    care.  And, indeed, the process leading to the GAPMS report was

4    a sham process where only opponents of this care were selected

5    to provide input.

6           Here plaintiffs presented the Court with the testimony

7    of five providers of various disciplines who treat gender

8    dysphoria.  Each of them has treated hundreds of transgender

9    patients of varying ages for gender dysphoria.  Collectively,

10   they have treated thousands of transgender people with gender

11   dysphoria throughout the country from California to Illinois,

12   from Michigan to New York.

13          And they, Dr. Shumer and Dr. Karasic, reviewed the

14   medical records of the plaintiffs and testified that they have a

15   diagnoses of gender dysphoria and that their care was consistent

16   with the standard of care.  Each of these experts are recognized

17   as leaders in their field of gender-affirming care.  They are

18   experienced.  They are published.  They are peer reviewed.  And

19   they provided extensive testimony about the efficacy of

20   gender-affirming medical care from a research perspective and a

21   clinical experience perspective.

22          Their testimony was further supported by the testimony

23   of a bioethicist, a public health researcher, and a

24   neuroscientist, those being Dr. Antommaria, Dr. Baker, and

25   Dr. Edmiston, all of whom have studied and rated about this

```
1   care.

2           I believe one can break the State's experts into

3   buckets, if you will.  They are the experts that had no

4   experience providing this care, have not published, and had what

5   can charitably be called or referred to as extreme biases

6   against transgender people.

7           They also had other witnesses like Dr. Kaliebe who had

8   some experience, but it was very limited experience and was not

9   published in the area.  Dr. Kaliebe's testimony said he's

10  provided treatment to four people in the form of psychotherapy.

11          THE COURT:  Yeah, I said that when I was asking

12  questions.  It may have been 4 he didn't treat out of his 12.

13          MR. GONZALEZ-PAGAN:  Four that he had a prolonged

14  relationship of treatment, and 16 overall that he has diagnosed

15  with gender dysphoria.

16          THE COURT:  I just didn't want you repeating back my

17  number because I thought I might have had it wrong.  But,

18  anyway, it wasn't a big number.  It was part of his 12.

19          MR. GONZALEZ-PAGAN:  Yes, correct, Your Honor.

20          THE COURT:  Maybe it was four adolescents.  I can look

21  back at the transcript, but it was a small number.

22          MR. GONZALEZ-PAGAN:  And he could not provide any

23  testimony in support of his position that psychotherapy alone --

24  any evidence, pardon me -- that psychotherapy alone is

25  sufficient or effective in treating gender dysphoria.
```

1    This leaves us with Dr. Steven Levine, whose

2    testimony, in large part, not in all parts, supports the

3    plaintiffs.  To be sure, Dr. Steven Levine advocates a more

4    cautious and prolonged approach to assessment of gender

5    dysphoria for adolescent patients, in particular.  But he does

6    not dispute that there are positive effects of gender-affirming

7    medical care and the effect that it has had on even the patients

8    that he has seen.  And he believes that the decisions regarding

9    this care should be left to patients, their families, and their

10   doctors -- we agree -- not the government.  And he has provided

11   letters to support adolescent and adult patients obtaining

12   gender-affirming medical care.

13          To be sure, Dr. Steven Levine is a critic of the

14   standards of care as they stand now and would actually argue for

15   a more cautious and, if one will, prolonged therapy approach

16   before accessing medical care.

17          But at the end of the day, that goes to the tailoring

18   question, not whether a categorical rule that prohibits all

19   coverage of this treatment should exist.  And Dr. Steven Levine

20   is one of many people who have experience in this care, and we

21   have provided a significant number of others who testify in

22   support of the current standard of care in Clinical Practice

23   Guideline approach.

24          THE COURT:  Dr. Levine is probably correct that

25   politics have affected the organizational endorsements of this

1  care; isn't that right?

2        MR. GONZALEZ-PAGAN:  Your Honor, I would disagree with

3  that.  I just want to distinguish between politics -- about

4  gender-affirming care in the political sense and what is

5  occurring with governments versus, like, internal debates on

6  politics about what the care should look like.

7        Plaintiffs' experts testified that -- those that were

8  involved in the development of Standards of Care 8 testify that

9  there are varying degrees of views.  One would argue that

10  Dr. Steven Levine is on the more conservative side of how the

11  care should be provided, and certainly some organizations have

12  rejected that.

13        But at the end of the day, that is part of the debate

14  in science, and one could say that Dr. Steven Levine does engage

15  in that debate.  He has published literature in this area.

16        THE COURT:  Lots of people engage in it.  But I

17  guess -- let me give you a chance to address this, and it goes

18  to both sides.

19        I mean, on the defense side they can say that

20  Mr. Brackett didn't know what result he was supposed to reach.

21  Okay.  His boss knew.

22        On your side you can say, Look, the folks that have

23  participated in developing these guidelines, the folks at the

24  American Pediatric Society who endorsed these guidelines,

25  weren't affected by the higher political, moral, religious

1   disagreement about transgender individuals.  Dr. Levine said he

2   hadn't seen this level of political disagreement affect any

3   other medical assessments, standards-of-care discussions.

4   Frankly, to me that rings true.

5           Are you going to tell me, no, that's not it, that

6   nobody in the American Pediatric Society would be worried about

7   speaking up for fear of being labeled a bigot?

8           MR. GONZALEZ-PAGAN:  No, I cannot categorically say

9   no, Your Honor, of course not.

10          What I will say is this, though:  This is a reason why

11  a ruling is necessary to get the government away from banning

12  this care, and let the debate happen among the medical providers

13  and scientists.

14          I will say this:  I believe, and I believe the

15  testimony shows and the evidence provided shows, that Dr. Steven

16  Levine disagrees with some of the plaintiffs' experts,

17  certainly.  And that is part of the debate that can happen and

18  should happen.  But he doesn't represent a majority view within

19  the medical provider community, and there's no evidence that he

20  does.

21          I don't disagree that there is significant debate

22  around this, but part of that has to do with the fact that this

23  care is being banned by states like Florida or being prohibited

24  from being covered by states like Florida and injected politics

25  into what would otherwise be routine medical care.

1       This may be outside -- completely outside the scope of

2  what my closing is, Your Honor, but arduous debate in science is

3  actually the norm.  Some of my co-counsel and I were talking

4  about this recently, because we spotted a pileated woodpecker,

5  and I can note for the Court that there is vigorous debate as to

6  whether the ivory-billed woodpecker is currently extinct or not,

7  and scientists go at each other's throats at that fact.

8       But it's not a political issue that should be handled

9  by the government.  And the scientists put forth research, put

10  forth papers about that, and they then, as a community, debate

11  what makes sense.

12       Here -- here the standards of care were not just

13  drafted in a vacuum.  It involved 119 individuals all debating

14  internally about what they should look like, having divergent

15  views.  The standards of care were actually published for public

16  comment and then finalized.  And in doing so, for the

17  finalization, they were subjected to the peer-review process.

18  That is how science should work.

19       So I do agree there are some folks that disagree with

20  this care; they do.  That is fact.  But the fact that that is a

21  reality doesn't mean that plaintiffs and transgender Medicaid

22  beneficiaries should not have access to the care that their

23  doctors believe is appropriate that they need and believe is

24  appropriate and that we have shown has been documented to be

25  effective, efficacious, and safe for their gender dysphoria.

1    I don't disagree with Your Honor that there is debate

2    about this care in multiple spheres, but the overwhelming view

3    of experts in this field is that this care is appropriate.  And

4    even the State's expert, that would be in the more conservative

5    end of people who have some experience with this care, would

6    agree that it is appropriate in some circumstances.

7    This rule prohibits coverage of that care in all

8    circumstances.  It just doesn't meet the moment and endangers

9    the safety and lives and health and well-being of transgender

10   people in Florida who are low income or are disabled and,

11   therefore, rely on Medicaid for access to care.

12   Your Honor, I would argue that this discussion of the

13   six factors illustrates that even under AHCA's own regulations,

14   gender-affirming medical care conforms with Generally Accepted

15   Professional Medical Standards and is not experimental.

16   Given this, AHCA's rule and Section 3 of Senate Bill

17   254 discriminate on the basis of transgender status and sex.

18   They, therefore, violate Section 1557 of the Affordable Care Act

19   and are subject to having -- under the Fourteenth Amendment.

20   Further, because these treatments are not experimental

21   and they ameliorate gender dysphoria, Florida must cover these

22   services where they're medically necessary for beneficiaries

23   under the age of 18 -- of 21 under the Medicaid Act.

24   Beneficiaries under the age of 21 are entitled under the EPSDT

25   requirements of the Medicaid Act to have access to any care that

1    will ameliorate a condition.

2         Finally, because these services are covered for the

3    treatment of other conditions for adults, Florida must cover the

4    services as treatment for gender dysphoria under the Medicaid

5    Acts comparability requirement, which prohibits discrimination

6    among individuals with the same medical needs stemming from

7    different medical diagnoses -- medical conditions.  I can point

8    the Court to *Davis v. Shah,* 821 F.3d 231, a decision by the

9    Second Circuit in 2016.

10        Turning back to the equal protection argument, the

11   State has intimated, but not shown, that care is being provided

12   without caution.  To be clear, the State has provided no

13   evidence that this is the case in the state of Florida.  But

14   plaintiffs are not here to argue that every medical or

15   healthcare professional out there is perfect or that they do

16   things all the time by the book.  That is neither their burden

17   nor what is required of them under the Constitution and these

18   laws.

19        Rather, plaintiffs have shown that when care is

20   provided consistent with Clinical Practice Guidelines, it is

21   safe and effective to treat gender dysphoria.  That has been

22   their experience, and that has been the experience of

23   plaintiffs' experts.

24        It is the State's burden to show that their actions

25   are substantially related to an important governmental interest

1    and that they had an exceedingly persuasive justification for

2    doing so.  The defendants cannot.  Defendants point to the

3    experience of the transition and have provided one out-of-state

4    witness who testified to her own experience with the transition,

5    Ms. Hawues (phonetic).

6        But the transition does not necessarily mean regret,

7    although I believe in Ms. Hawues's case she testified that it

8    does, and everyone acknowledges that the transition or regret

9    may happen.  It is a fact that no one denies.  However, the

10   uncontroverted evidence is that the transition and regret are

11   extremely rare.  We are talking 1 percent each.  And this is for

12   a population that is already so extremely small.  This is born

13   by the fact that defendants cannot find a detransitioner from

14   Florida, notwithstanding that it is the third largest state in

15   the country.

16       Defendants have repeatedly referenced the experience

17   of one of the clinicians who offered a letter in support of

18   Mr. Dekker to obtain chest-masculinizing surgery, that of

19   Ms. Rolf.  They ignore -- and that is -- the letter from

20   Ms. Rolf is Exhibit 237A admitted into the record.

21       They ignore that a student clinician at the time,

22   Ms. Rolf, was operating under the supervision of not one, but

23   two licensed and well-practiced clinical mental health

24   professionals, and they also fail to mention or ignore that it

25   was an unnecessary letter.  It was a second letter on top of the

 1   first letter that Mr. Dekker obtained from his own psychiatrist

 2   with whom he had a long-standing relationship with.  Mr. Dekker

 3   did that as a belt-and-suspenders approach to avoid being denied

 4   coverage.

 5          I don't think the State would be arguing that medical

 6   residents cannot practice medicine if under the supervision of

 7   another doctor.  Otherwise, how would they get experience?  It

 8   is true as well with mental health counselors.

 9          In sum, these two arguments or examples are wholly

10   insufficient to support the State's actions, let alone to meet

11   their burden under intermediate scrutiny to show as exceedingly

12   persuasive justification, and one that is substantially related

13   to the actions that they have taken.

14          Finally, Your Honor, it is worth noting the

15   intentional nature of the State's actions.  Not only was the

16   AHCA rule a predetermined outcome of a fixed process, but the

17   rule in SB254 is part of a constellation of actions by Florida

18   officials seeking to erase transgender people from Florida.  In

19   signing Senate Bill 254 -- if I may, Your Honor -- the Governor

20   signed other measures targeting LGBTQ people and transgender

21   people in particular, and he also stated he -- and he also used

22   the same slogan as AHCA did in adopting the rule:  "Let kids be

23   kids."

24          The implication, Your Honor is that a trans kid is not

25   a normal kid.  I believe that is wrong.  Indeed, the Governor's

1    own words demonstrate as much.  In signing Senate Bill 254, he

2    stated:  *As the world goes mad, Florida represents a refuge of*

3    *sanity and a citadel of normalcy.*  This thinking permeated an

4    influence, the numerous deviations of process at AHCA, as they

5    pursued the rule.  These deviations were confirmed by the

6    testimony of Jeffrey English as well as the State's own

7    witnesses, Ann Dalton and Matthew Brackett.

8            Jeffrey English would have been the person who

9    ordinarily would have handled the GAPMS report at that point in

10   time.  He was excluded.  Never had AHCA hired consultants in the

11   process of promulgating a GAPMS report.  For the first time they

12   did so here, and they chose only individuals with opposing views

13   to gender-affirming care.  In fact, they chose five to include

14   attachments and two additional ones to serve as advisers.

15           At the end of the day, Your Honor, transgender

16   Floridians are just a part of the fabric of this race date as

17   any other person.  Their medical needs are as important as those

18   of any other person.  They're as important as to those -- of any

19   other person in Medicaid.  This Court has now heard from them

20   and from those who love them and those who care for them.

21   August Dekker, Bri Roth, Susan Doe, and K.F. can see a future

22   for themselves because they had access to gender-affirming

23   medical care that they needed.  It is our responsibility to

24   ensure and protect that future for them.

25           For this trial, we have demonstrated that medical

1    treatment for gender dysphoria, which AHCA previously covered,

2    is not only safe and nonexperimental, it is effective and

3    necessary.  Lives are at stake.

4            Your Honor, we thank the Court for allowing us to

5    present this case and for hearing our arguments.  We also thank

6    all of the court staff for their care and attention throughout

7    these past two weeks.

8            We ask that the Court declare AHCA's rule and Section

9    3 of SB254 unlawful and that it permanently enjoin defendants

10   from enforcing them.

11           Thank you, Your Honor.

12           THE COURT:  All right.  Thank you.

13           Mr. Jazil.

14           MR. JAZIL:  Thank you, Your Honor.  May it please the

15   Court, Mohammad Jazil for the defense.

16           Your Honor framed the issues in this case around the

17   *Rush versus Parham* test, whether, based on current medical

18   opinion, Florida's determination that certain treatments for

19   gender dysphoria are experimental is reasonable.

20           The State's contention is that its conclusion was

21   reasonable, and, Your Honor, I'd like to start with Dr. Levine's

22   testimony.  On page 982 of the record, there was a back and

23   forth with the Court in follow-up to some questions from direct,

24   and the testimony from Dr. Levine on page 98 [sic] essentially

25   lays out the framework that -- the frameworks that can be used

1    to treat gender dysphoria.

2          I like to think of it as a continuum, because that's

3    how the testimony comes across to me.  On one end of the

4    continuum, you've got the reversion model.  This is pejoratively

5    referred to as conversion therapy, where you're telling folks

6    that they ought to revert back to their natal gender.

7          On the other end of the model is -- other end of the

8    continuum is the affirmative model, where you're telling folks,

9    Look, we are going to recognize the gender you've selected.

10   We're going to acknowledge that this is your new gender, and

11   we're going to work with you along that way.

12         And then there's the middle ground, the psychotherapy

13   model, which I'll refer to as the ambivalence model because

14   you're not trying to revert someone back to their natal sex and

15   you're not trying to affirm someone into their new recognized

16   sex.  So that ambivalence model, the psychotherapy model, is

17   what Dr. Levine was advocating for, in essence, in his

18   testimony.  And Dr. Levine talked --

19         THE COURT:  He did say rather clearly that some people

20   need medical treatment, puberty blockers, cross-sex hormones;

21   true?

22         MR. JAZIL:  Yes, he did, Your Honor.  And he said

23   that -- as his testimony was developed, he said that, Okay.

24   They do.  If I use a psychotherapy model, I see them for years.

25   After I do my careful evaluation, I may write a letter

```
 1    recommending that if they want to chose surgeries or medical
 2    treatments, et cetera, they should go forward and get those.
 3    What he did refute, though, was that -- look, this isn't
 4    something that you can just pick up on, even if you have a
 5    multidisciplinary team, in a matter of minutes.  It takes years.
 6              THE COURT:  Absolutely, absolutely.  You have to do it
 7    right.
 8              And if the Florida Legislature adopted a statute
 9    consistent with Dr. Levine's testimony, we wouldn't be here, or
10    if we were, the plaintiffs would be in a much weaker position.
11    But that's not what the legislature did.
12              And I guess the question you need to answer -- and
13    this is a constitutional question, not just a Rush versus Parham
14    question.  When I said what I did there, I was dealing with a
15    preliminary injunction, and the statute hadn't been adopted.  So
16    the constitutional issue is now here, dead center of the case.
17    What you need to deal with is:  Why is it that the State of
18    Florida -- that the Legislature and the Governor get to decide
19    the medical care that an individual gets when even your own
20    expert says this kind of care is sometimes needed?
21              MR. JAZIL:  Understood, Your Honor, and I'd like to
22    approach that two ways.
23              One, Dr. Levine talked about the three models, and he
24    talked about what people believe they know, not what they
25    actually know, and he was advocating for one of those three
```

1    models.  He said also that the affirmation model has gotten a

2    lot of credence and has become sort of a model du jour.

3              And Dr. Levine then talked about some of the concerns

4    that are associated with that model, because the Court asked the

5    question and said that I should be prepared to address this at

6    closing; that, look, at the end of the day, if the affirmative

7    model is supported by low-quality evidence or very low-quality

8    evidence but we're giving certain treatments -- puberty

9    blockers, surgeries, et cetera -- why -- what then -- what kind

10   of evidence supports the model that we' advocating for, which is

11   the no puberty blockers, no surgeries, other model?

12             And so this question was also -- a variation of it, as

13   I recall, was framed for Dr. Levine, too, and Dr. Levine, in

14   advocating for his caution model -- and this appears in the next

15   page, 983 of the transcript, said that, Look, if we're talking

16   about the affirmation model and we're quick to start with the

17   puberty blockers, the surgeries, et cetera, we're talking about

18   possible long-term negative impact on fertility, sexual

19   dysfunction, et cetera.  So that was his discussion.

20             It was like, okay, if we're doing the affirmation

21   model and we begin with supposition that we should prescribe

22   puberty blockers, cross-sex hormones, et cetera, we are then

23   entering into an area where there's a greater chance of these

24   other issues happening.  That's where Zoey Hawues and Yacov

25   Sheinfeld's testimony comes in.

1    So if we take that, Your Honor -- that testimony at a

2    10,000-foot level, what Dr. Levine is saying is caution is the

3    watchword.  Caution is the watchword.  Then, in Dr. Levine's

4    perspective, that caution should come without blanket

5    prohibitions, but should come with exceptions for those

6    instances where these treatments are and aren't required.

7         From the constitutional perspective, the question then

8    becomes -- and from the *Rush versus Parham* perspective, the

9    question then becomes if caution is truly the watchword, who

10   gets to draw that line, and how do we figure out where to draw

11   that line?  Now, Your Honor, I would submit --

12        THE COURT:  Draw it anywhere other than just flat

13   prohibiting care that's going to make lots of people much better

14   off than they are without it.  So draw a line.  But that's not

15   what the legislature did.

16        MR. JAZIL:  Understood, Your Honor.  That is not what

17   the legislature did.  And, frankly, Your Honor, I am not certain

18   about the line that the legislature has drawn, because at the

19   preliminary injunction hearing when we were talking about just

20   the rule, I brought up the variance and waiver process, and the

21   variance and waiver process would have aligned with Dr. Levine's

22   perspective, because someone --

23        THE COURT:  Only if it was real.  But I get it.  And,

24   frankly, other than you, I haven't heard from anybody suggesting

25   that the exception, which applies to rules in general, ever had

1   any chance at all to be applied here.  You brought it up, and I

2   told the other side when they started to take issue with you, Do

3   you really want to take issue with that?  Because, look, this is

4   good for you.  And here we still are, so I guess they haven't

5   gotten an exception, even though they've presented pretty good

6   facts.

7           MR. JAZIL:  Your Honor, here -- one, it was a legal

8   argument, so I think it's appropriate for me to be the one who

9   provides the agency's perspective on it.

10          Two, no variances and waivers were submitted.

11          Three, had a variance or waiver been submitted and

12  granted, I think it would have strengthened my case and the

13  perspective that I've presented.

14          THE COURT:  It would have.

15          In any event, the legislature put the end to that

16  because there is no exception to the statute; right?

17          MR. JAZIL:  Well, Your Honor, there, too, I'm a little

18  confused, and I think it would be worth having a variance or

19  waiver as a test case to see how this works, because the way

20  that provision reads is that state funds cannot be expended for

21  these treatments under Medicaid, state funds.

22          I went back; I checked.  So the Medicaid program is

23  intended to be a matching program.  The question in my mind,

24  from an accountant's perspective, comes down to can the funds be

25  segregated into state funds and the federal matching funds.  If

```
 1     the answer is yes, the variance and waiver could theoretically
 2     apply.  So, Your Honor, I'm just -- I'm being candid with the
 3     Court.
 4               THE COURT:  Whose check gets cut to the hospital when
 5     they provide care?  I was going to ask one of your witnesses
 6     that, and I forgot.  But -- we can go look it up, but I think
 7     the answer is it's a state check.
 8               MR. JAZIL:  And, Your Honor, I don't know, and the
 9     legislation happened and got signed in the middle of my case, so
10     I haven't had the --
11               THE COURT:  But the way this is set up is the State
12     pays for it and gets reimbursement from the federal government,
13     I think.  We can look at that up.
14               Look, if the argument is this is really not a flat
15     ban --
16               MR. JAZIL:  It probably is.
17               THE COURT:  Yeah, I think it probably is.
18               MR. JAZIL:  Your Honor --
19               THE COURT:  Let me ask this:  Is preventing
20     individuals from being trans, from having a gender identity
21     different from their natal sex, is that a legitimate State
22     interest?
23               MR. JAZIL:  I do not think so, Your Honor.  I don't
24     think that would be a legitimate State interest.
25               THE COURT:  So when, for example, the folks on your
```

1   side argue -- and I don't know if you've adopted this, but one

2   of the things that keeps being said is, Oh, 90-plus percent of

3   the people that get puberty blockers go on to get cross-sex

4   hormones.  Actually, I do think that's in your briefing.

5           MR. JAZIL:  And, Your Honor, that didn't come from me.

6   That was Dr. Olson-Kennedy when asked on cross-examination if

7   you start on puberty blockers, what percent go on.  98 percent

8   is the plaintiffs' number, not ours.

9           THE COURT:  And that's fine.  And if, in fact, this is

10  appropriate treatment for a trans individual, the fact that they

11  got appropriate treatment at stage A and then continued into

12  stage B seems to me to only back up the theory that this was the

13  appropriate treatment and we're on the right track.

14          98 percent, probably, of people that get the first

15  round of chemo for cancer when they got assigned to a 3-chemo

16  set or a 12-chemo set, if 98 percent or 99 percent go on to

17  round two, that doesn't tell you something was wrong at stage 1.

18  That tells you something was right at stage 1.

19          But when the defense comes in and argues, Oh, look, we

20  know something's bad here because if you get puberty blockers,

21  98 percent go on to cross-sex hormones, it seems to me that

22  that's bad because that's recognizing trans identity, and the

23  State's really opposed to that.

24          That's what I take out of that argument.  When the

25  defense comes in and says, Oh, the sky is falling, because if

```
 1    you get puberty blockers, you're also going to get cross-sex
 2    hormones, I take that as an argument that the sky is falling
 3    because these people are going to keep being trans.
 4              Am I missing something?
 5              MR. JAZIL:  Yes, Your Honor.  From my perspective,
 6    what you just highlighted starts out with the supposition that
 7    the trans identity and the gender dysphoria diagnosis are
 8    intertwined and that if you are transgender, you have gender
 9    dysphoria and, therefore, you need to go down this road.  And I
10    don't think that was the testimony.
11              THE COURT:  No, no.  I'm not the one that believes
12    that.  I understand that one can be trans and not have trans --
13    gender dysphoria.
14              MR. JAZIL:  So, Your Honor, if we start by saying that
15    one can be trans and not have gender dysphoria, and then we say,
16    Okay, if you have gender dysphoria, you're on puberty blockers,
17    and once you're on puberty blockers, there's a 98 percent chance
18    you're on cross-sex hormones.
19              So to go back to Dr. Levine's perspective, we're not
20    giving folks the opportunity to explore, you know, the reasons
21    for this and that in creating the room for possible desistance,
22    if that's going to happen naturally without, you know, reverting
23    to the reversion model, and that was the point of the State,
24    Your Honor.
25              That if -- if we're doing the puberty blockers -- if
```

1    we assume that the gender affirmation model is the one and only

2    true model and that gender affirmation model requires that

3    puberty blockers be prescribed, then once we prescribe the

4    puberty blockers, we're taking away that opportunity for the

5    person to, as Dr. Levine may say, explore what's going on, and

6    naturally desist if given the space or naturally go onto the

7    next step if that's what they want.  That was the point,

8    Your Honor.

9           THE COURT:  All right.  That's why I asked.  I

10   understand the argument.

11          MR. JAZIL:  So, Your Honor -- and, again, I'd like to

12   just circle back to the point about line-drawing.  I know the

13   Court may disagree with it, but my position is this:  That if we

14   assume that caution is appropriate, then the State gets to

15   choose where it's drawing its line.  If the State has chosen to

16   draw its line towards a complete prohibition, that, too, can be

17   defensible because we're dealing with a health, safety, welfare

18   regulation.  And I think it would be appropriate to defer to the

19   State in that instance.  A way to look at it is if I'm going to

20   fix the road, at some point I have to stop the traffic and sort

21   of reassess.

22          And, Your Honor, I point out --

23          THE COURT:  Why did they shut down the research?

24          MR. JAZIL:  Your Honor, I don't think there is

25   testimony saying that we shut down the research.

1          THE COURT:  Didn't you shut down the research?  I

2     mean, they were treating patients at Florida and doing research,

3     and now they're going to have to disband the clinic because they

4     can't treat patients at all with these drugs.

5          MR. JAZIL:  Your Honor, I'm not sure that that is

6     testimony that came in during the course of the trial.  I know

7     the section 3 would say that postsecondary institutions can't be

8     reimbursed for prescribing these treatments, but I'm not

9     entirely sure that there is testimony saying that the research

10    is shut down.

11         There's testimony from one of the parents -- I think

12    Ms. Lapado -- that she had an appointment at the St. Petersburg

13    Johns Hopkins clinic, and those appointments didn't go forward.

14         THE COURT:  Here's my understanding -- and I haven't

15    gone back to recheck this.  Been a lot of information coming in,

16    so I may not have sorted it out accurately.

17         Here's what I thought:  There was originally a

18    proposal to allow research -- this may have been at the

19    rulemaking process at the board of medicine.  The proposal was

20    we were going to allow research, and then that got pulled back

21    out, and the research exception is gone.  And if it's illegal

22    for a doctor to provide this, it certainly -- there's no way for

23    anybody to study it.

24         MR. JAZIL:  There's no way for some -- Your Honor,

25    you're right.  If there's a prohibition on minors for the use of

1    these treatments, then there's no group for the research

2    institutions to study.  But, Your Honor, I point out that -- as

3    my friend pointed out, there is a movement going around in the

4    various United States dealing with this issue.  My friend

5    pointed to Texas and some of the other states that have perhaps

6    aligned with Florida on the issue, but there are others, like

7    California, who are going the other way.

8            And, Your Honor, I wanted to bring a California

9    provision to the Court's attention because it does also go to

10   the child custody issues that we discussed on Friday that deal

11   with section 1 of the legislation that was passed.

12           And it's Senate Bill 107, Chapter 810.  It was signed

13   by the governor of California on September 29, 2022.  And,

14   Your Honor, section 5 of that bill is a mirror image of the

15   Florida child custody section.  In Florida the child custody

16   section says if you're going through a divorce, you know, the

17   courts have the ability to take temporary jurisdiction over your

18   kid if the kid is getting or threatened with gender-affirming

19   care.

20           California goes the other way and says that the courts

21   of the state can take temporary emergency jurisdiction if the

22   child has been unable to obtain gender-affirming health care or

23   gender-affirming mental health care.  So what you're seeing in

24   the states is you've got a true opportunity for the laboratories

25   of democracy, and more so just laboratories generally.

1    California is taking the approach, based on this
2   statute and the others they've passed, that gender affirmation
3   is the model we're going to use.  Gender affirmation is the
4   thing that will be done.  So California can provide us a subset
5   of studies that say, Okay, what happens when gender affirmation
6   is what we're doing and how we're treating folks?
7    Florida, Your Honor, we have approved, and we are
8   still reimbursing for, a whole list of mental health treatments,
9   and so you can do a psychotherapy approach and see what happens,
10  and we can use this to fill the gaps in the data.
11    THE COURT:  And for those adolescents now whose
12  doctors say, after a -- after a team approach that meets all the
13  requirements, This adolescent is going to be far happier, less
14  anxious, less depressed, have a better long-term outcome if we
15  give this treatment -- and we have lots of clinical experience
16  that says that will be true for many people -- at least for a
17  period of time.  There are no 50-year studies because this
18  hadn't been going on for 50 years.
19    But for as long as we've had this, we've got clinical
20  experience, widespread clinical experience, saying this works.
21  For the adolescent in Florida who needs that care, the answer
22  is, Let him eat cake.  He's either going to move out of the
23  state or he's going to be less happy, more anxious, more
24  depressed.  He cannot get the treatment that his doctor and the
25  widespread clinical experience says is best.  That's what the

1    State has said.

2           MR. JAZIL:  Your Honor, I reframe that as the State

3    saying, Look, when you're saying and your physicians are saying

4    that you need these treatments in adolescence, you cannot get

5    it.  You can get it once you reach the age of majority, right,

6    because that's --

7           THE COURT:  Too late.

8           MR. JAZIL:  And I guess what the State is also saying

9    that that person who truly needs it in the adolescent stage is

10   the exception, not the rule.

11          And so if we're crafting a statutory scheme,

12   Your Honor, I would suggest that if the State is right about the

13   rule, then the exception itself should not defeat the statutory

14   scheme.

15          Your Honor, I'd also like to talk about the clinical

16   experience.  We heard from Dr. Shumer.  We heard from the others

17   who work on multidisciplinary teams.  You also heard from

18   Dr. Kaliebe.  On some level Dr. Kaliebe's experience is also

19   relevant because he's a line psychiatrist.  He is dealing with

20   these folks in -- he's dealing with patients, lots of patients

21   in lots of different settings, and he's telling you that I just

22   don't have the time to spend a lot of time with folks and go

23   through the years long psychotherapy approach that Dr. Levine

24   was advocating for.

25          So I think it's important to note that as well.  If we

1    could go to some of the plaintiffs' medical records -- not on

2    the public screen, please.

3            So, Your Honor, I'd like to start with K.F., and if we

4    could scroll through.

5            Now, Your Honor, this is an institution that even

6    Dr. Shumer recognized is outstanding.  It's where he did his

7    training.  Here we've got the medical records for a young

8    patient.  25 minutes were spent, and this is Plaintiffs' Exhibit

9    235, and the Bates number is 4243.  This is the endocrinology

10   visit.  The risks were discussed.

11           Can we go onto the next page, please.

12           Now, this is another statement from the visit where

13   the long-term side effects of the medical treatment was

14   discussed, and there was going to be issues on future fertility,

15   et cetera.  This is the material that Dr. Shumer said he thought

16   was somewhat conservative.  He wouldn't have discussed issues

17   this way.

18           So you've got -- you've got folks who are providing

19   the gender-affirmation treatment who are discussing these issues

20   with patients in 25-minute visits, and there isn't absolute

21   uniformity in what it is they're telling folks.

22           And, Your Honor, this is -- this is something that

23   came up as well.  The patient's mother testified before the

24   Court about a visit on August 6th.  And what you can see from

25   this document, Your Honor, is -- and this is in the record, is

1    that the visit was done by a telemedicine, right?

2              So it's a telemedicine visit, and the patient's mother

3    testified that the patient, who was 11 at the time, was

4    concerned about, well, is this going to hurt.  11-year-old

5    concerned about, Is this going to hurt?  But then the last

6    sentence on the first blowup says, *He desires having kids in the*

7    *future, specifically not birthing them, and does not desire*

8    *ovarian preservation at this point.*

9              So this is an 11-year-old.  We're having a discussion

10   about future fertility, whether or not there's a desire to birth

11   kids and whether or not ovarian preservation is necessary.  And,

12   Your Honor, again, just to pull out for a minute, this is an

13   11-year-old.  We don't trust 11-year-olds to drive, to drink, to

14   vote, to watch PG-13 movies, but we're talking about ovarian

15   preservation.

16             THE COURT:  You suppose a parent was involved in these

17   discussions?

18             MR. JAZIL:  For sure, Your Honor, a parent was

19   involved in this telemedicine discussion about a --

20             THE COURT:  Look, telemedicine -- this is August of

21   2020.  It's -- COVID is raging, and there is no vaccine.  So,

22   yeah, people were getting medicine over the video, but, I mean,

23   I take the point.

24             Look, I didn't need the expert to tell me that

25   adolescents' brains don't work the same as adults and that

they're more likely to engage in risky behavior.  It was more
than 50 years ago, but I was an adolescent once, and I don't
know that they've changed that much, so I get it.  Adolescents,
and certainly 11-year-olds, aren't in a position to make the
same decisions they would be able to make later in life, but
that's why we have parents involved.

        I mean, what we had discussed before -- and I don't
know that we're going to get much farther discussing it -- but
here's the problem:  A decision is going to be made, and if the
child is 11, the child is 11.  So the child and the parents are
going to make a decision.  There's going to be medical
treatment -- and by that I mean puberty blockers and cross-sex
hormone treatment -- or there's not.

        You can't say the 11-year-old and the parents aren't
able to make a good decision, and so we're going to decide for
option B instead of option A.  It's going to be a decision, and
the same people are going to make it unless, of course, the
Governor and legislature make it for them.  And that's really
the question in the case.

        When you have someone who may need treatment, the
decision whether to get treatment or not is going to be made
because it has to be made at that point.  So who's going to make
the decision?  Is it going to be the parent and child in
consultation with a doctor who does this all the time and knows
all about it or is the decision going to be made by the

 1    legislature and Governor?

 2            MR. JAZIL:  I take your point, Your Honor.  I'd simply

 3    add on to that that it's a little bit more complex.  If we take

 4    Dr. Levine's testimony, and we assume that the gender

 5    affirmation model is the one that -- you know, is the one that's

 6    being trumpeted as the one and only model, and doctors are

 7    afraid to disagree from it because they might be labeled bigots,

 8    are the doctors giving the best possible information to the

 9    parents and the patients?

10            If gender affirmation -- we start out that gender

11    affirmation is it and the Levine psychotherapy model is not it,

12    so if that is the starting point, are we then putting the

13    patients and the children in the best possible position to make

14    the decision?

15            THE COURT:  Absolutely a concern.  Absolutely a

16    concern.

17            And you heard I asked some questions earlier about,

18    you know, not everybody goes to the University of Michigan or

19    the University of Florida.  And what -- am I to be concerned

20    about somebody else, some lesser quality of care?  It's -- it's

21    absolutely a concern.  And the solution to that is make sure

22    this gets done right.

23            You keep saying, by the way, the gender-affirmation

24    model as if that's the only way to do it and without

25    psychotherapy, and that's not what the testimony is at all.

1    There's psychotherapy for all of these patients.  That goes hand

2    in hand with the administration of these drugs.  Nobody has

3    suggested otherwise.

4            And nobody has said everybody that appears and says

5    they identify in the other gender is going to be rushed right in

6    to these medicines.  The testimony is exactly the contrary, that

7    we're going to make the evaluation, and only some patients are

8    going to get this.

9            I'll grant you -- and I asked the question to the

10   other side -- and sometimes you have to evaluate the evidence in

11   the record, but you have to consider some common sense along the

12   way.  And I've lived in this world.  And so it -- does it

13   concern me that maybe at the medical society people were afraid

14   to speak up for fear of being labeled a bigot?  Absolutely it

15   does.

16           Do I think there are no bigots in the world involved

17   on this issue?  I don't think that either.  I'm pretty sure

18   there are some bigots.  When you put on witnesses who don't

19   believe that there is such a thing as being trans and that

20   gender identity is really not a thing, that's not very

21   impressive.  I shouldn't label that person a bigot.  Sometimes

22   that is a sincerely held religious belief.  I understand that.

23           I'm old enough to remember when people had sincerely

24   held religious beliefs that Blacks and Whites shouldn't be able

25   to go to school together or eat at the same restaurant.  People

```
 1  have all kinds of religious beliefs, but that's not -- upholding

 2  that religious belief is not a legitimate State interest.

 3          MR. JAZIL:  Understood, Your Honor.  And I apologize

 4  for not being more precise when I was talking about

 5  psychotherapy.

 6          What I mean to say is what I'm calling the ambivalence

 7  model where you're not using psychotherapy or any other kind of

 8  treatment to push folks one way or the other, and that's what I

 9  mean, Your Honor.

10          And I would like to point the Court to the Endocrine

11  Society guidelines, which are DX24, page 15.

12          Can we pull up DX24, page 15, 1-5?

13          Can we blow up the section that says Evidence.

14          So, Your Honor, we saw this before, and this section

15  talks about how, in prepubertal kids, the dissidence rate is

16  85 percent.  And then it goes on to say that:  If children have

17  completely socially transitioned, they may have great difficulty

18  in returning to the original gender role upon entering puberty.

19  Social transition is associated with the persistence of gender

20  dysphoria/gender incongruence as a child progresses into

21  adolescence.

22          And this is from the Endocrine Society guidelines.

23  And, Your Honor, I think this aligns with what Dr. Levine was

24  talking about.  If we don't take the ambivalence approach, if we

25  take the affirmation approach, we sort are of pushing kids --
```

1          THE COURT:  Yeah, look, you're talking about a

2    different stage in life and a different problem.

3          I don't suggest that a doctor needs to be what you

4    call ambivalent when a child appears in early childhood.  So the

5    7- or 8-year-old shows up at the doctor's office with parents

6    concerned about this kind of thing, I don't suggest that there

7    is anything wrong with a doctor being a little bit skeptical.

8    Most people are cisgender.  And most times when something has

9    happened that may concern a parent, it's just -- it's not an

10   indication of real transgender identity.

11         I get it.  And so I'm not suggesting there is anything

12   wrong with a doctor being skeptical, and that's consistent with

13   what Dr. Levine said.  I don't think he said you have to be

14   completely ambivalent.  I think he said you have to make a good,

15   honest evaluation.  It has to be a good, honest evaluation.  You

16   can't start out, as I think some of the folks on your side

17   would, by saying, Oh, this can't be real.  But you certainly

18   don't have to jump right into it.  Surely, you can be skeptical.

19   Surely, you can do a long-term evaluation.

20         And if the State had standards that required that, I

21   don't know how the plaintiffs would challenge it.  But that's

22   not what the State has done.

23         MR. JAZIL:  Understood, Your Honor.

24         And, again, I'd like to get back to the point that

25   everyone is getting these diagnoses at wonderful

1    multidisciplinary centers.  The evidence in this case doesn't

2    bear that out.

3            We have Mr. Rothstein who was diagnosed with gender

4    dysphoria by a woman named Debra Grayson -- we don't need to use

5    these -- a woman named Debra Grayson who is not an M.D., whose

6    services included hypnosis as one of the services she provided.

7    Surely, that is not someone of the caliber of a Dr. Levine, a

8    Dr. Karasic, a Dr. Janssen, or a multidisciplinary team in

9    Michigan making these diagnoses.

10           THE COURT:  And I guess my point is -- here's my

11   question to you:  Why isn't the solution to that imposing better

12   standards rather than prohibiting the treatment?

13           MR. JAZIL:  So, Your Honor, that is one possible

14   solution, but it is not the only solution.

15           And I guess the point I keep coming back to is that if

16   we know that there is a need for regulation, how perfect does

17   the regulation need to be for us to say that it's

18   constitutional?  And that gets us into the discussion about,

19   well, if it's a rational basis, we have a lot more leeway as a

20   state to get around to figuring out what the regulation ought to

21   be.  But there is a rational basis, because there is a problem.

22   We're trying to solve it.  There's a rational basis.

23           If it is intermediate scrutiny, then it needs to be --

24   it's not perfect tailoring; it's reasonable tailoring.  And

25   depending on which case one looks at for intermediate scrutiny,

1  you can find a test that favors me, a test that favors them.

2  The articulation isn't always perfect.

3      Your Honor, my point in simply highlighting the

4  hypnotist who made a diagnosis and the intern who -- you heard

5  from the plaintiff himself, Mr. Dekker:  *I saw Abbie.  I didn't*

6  *see the others.*  So if we take that into account, that these

7  diagnoses are being made in a less than perfect way through

8  doctors or interns or other providers who are not skeptical --

9  let's just use that word -- then there is a need for regulation.

10  And if there is a need for regulation, well, then what's the

11  test for the State?

12      And, again, I submit that it's the rational basis

13  test.  Your Honor and I had a colloquy about whether or not it

14  should be the intermediate scrutiny test.

15      But, Your Honor, unless you have more questions about

16  that --

17      THE COURT:  No, we went through that.

18      MR. JAZIL:  But, Your Honor, I've been thinking about

19  that exchange a lot, and I just want to take another crack at

20  one point.  And, Your Honor, we talked about *Geduldig*, *Dobbs* and

21  *Adams*.  And in *Adams*, it was a bathroom policy.  Natal males use

22  the male bathroom.  Natal females use the female bathroom.

23  *Adams* said that is sex-based discrimination.  It's subjected to

24  intermediate scrutiny.

25      In *Geduldig*, the question was, okay, we've got

1   pregnancy, and the insurance isn't covering disability for

2   pregnancy.  And the pregnancy diagnosis included only women,

3   right, and not males.  But the Court said, Well --

4           THE COURT:  Nobody got paid for pregnancy.

5           MR. JAZIL:  Yes.

6           And then in *Dobbs*, it was abortion, again, affects

7   only women.

8           My point with *Geduldig* and *Dobbs* is that the case and

9   their discussion about the groupings don't make sense unless we

10  take the diagnosis into account as well.  And if, in this case,

11  we take the diagnosis into account as well -- so it's gender

12  dysphoria, not gender dysphoria -- gender dysphoria includes

13  just trans.  Nongender dysphoria includes both trans and natal

14  males, females.  Just wanted to make that clear, Your Honor.

15          Your Honor, I'd like to move on to the process issues.

16  The plaintiffs' star witness on this point was Jeff English and,

17  more specifically, Jeff English's email to Dr. Cogle.

18  Your Honor said that we should be prepared to address that

19  document in closing, and so I'd like to begin by first

20  explaining --

21          THE COURT:  I understand why Ms. Dalton assigned that

22  the way she did.

23          MR. JAZIL:  Okay.

24          THE COURT:  I thought she was very credible.

25          MR. JAZIL:  Understood, Your Honor.

1           THE COURT:  She also said she knew what the preferred

2    result would be.

3           MR. JAZIL:  Your Honor, in fairness --

4           THE COURT:  And somehow Mr. Brackett didn't know that.

5           MR. JAZIL:  Your Honor, in fairness to her -- and I

6    think the question was framed as:  Do you read the newspapers?

7    And isn't it -- that was sort of -- there was a setup to it.

8    And I just caution, Your Honor, that newspapers aren't always

9    the best first draft of history.

10          THE COURT:  No, no, and I don't suggest they are.  But

11   if you lived in this town through this period, I just think it's

12   a little unrealistic to think that somebody didn't understand

13   which side of this issue this administration was on.  And that's

14   why I asked.

15          I mean -- and she knew.  And as I said, she was very

16   candid about it.  That doesn't mean that she would have slanted

17   the result or provided an untrue result.  She just -- but she

18   acknowledged that she knew.

19          Look, here's the -- you can run, but you can't hide.

20   I think the record establishes beyond any question this came

21   from the Governor's office.  This came down from the Executive

22   Office of the Governor.  It was a response to what came out of

23   the Biden Administration.  So you had -- the Biden

24   Administration took a position.  It came to the attention of the

25   Governor, and the Executive Office of the Governor pushed this

 1   down, and things started happening.

 2          That's not how this usually happens.  I don't suggest

 3   for a minute that it's beyond the authority of the Governor to

 4   say, Look, we need to look at this.  And the State had been

 5   paying for this for years.

 6          But if the Governor says, Let's take another look at

 7   this, that's perfectly okay.

 8          Then we get down to Mr. Brackett, and he's able, with

 9   just a few minutes' look, to know that he knows more than a

10   group of 21 professors from Yale.  That's --

11          MR. JAZIL:  Understood, Your Honor.

12          And the Court has the 30(b)(6) depo designations where

13   Mr. Brackett was designated.  And as the Court goes through

14   that -- and which are included in evidence -- the Court will see

15   that, yes, the Biden Administration had come out with some of

16   these policies in March of 2022.  And the Governor's office did

17   have a meeting on, well, what's the response?

18          The depo designations will also show that it was a

19   lawyer at AHCA who came up with the idea of why don't we go

20   through the GAPMS process.  That's what it's here to do,

21   evaluate the evidence.  And so, Your Honor, we are not running

22   from it.  It is in the depo designations.  And then you work

23   through that process.

24          Now, Mr. Brackett did conclude that there was

25   low-quality evidence to support the use of these treatments.

1379

```
1   Mr. Brackett isn't wrong about that, and I don't think their
2   experts disagree with that either.
3          THE COURT:  I fully agree.
4          Let me say that I think the GRADE system, that
5   G-R-A-D-E system -- that's an acronym.  It stands for something.
6   I don't take issue with the system.  I think it was a very
7   unfortunate choice of terminology, because someone who is
8   politically opposed to a position then can holler low quality,
9   and it obscures the actual evidence.
10         And it goes back to this question that you and I just
11  talked about a minute ago.  A decision is going to have to be
12  made, and the only evidence on either side of the question is
13  going to score out low or very low or nonexistent on the GRADE
14  system.  And so evidence can be the very best available
15  evidence, the evidence that any honest, caring parent would take
16  into account in making a decision, and yet score out as low
17  quality.
18         MR. JAZIL:  True, Your Honor.  And as the guy who was
19  charged with writing the GAPMS report, when you take a look at
20  one of the two yardsticks that's being thrown at you as the
21  basis for providing these treatments and one of those two very
22  clearly just lays out low quality, low quality, very low
23  quality, et cetera, it's not unreasonable for him to come to the
24  conclusions that he came to.
25         And I'd suggest that doesn't -- his conclusions and
```

1    the fact that he relied in part on the Endocrine Society
2    themselves to come to them doesn't suggest that he had any kind
3    of animus as he was going through the process.
4          THE COURT:  What should I make out of the idea that he
5    didn't know which result was preferred by the administration?
6          MR. JAZIL:  Your Honor, he is a civil servant
7    technocrat.  He's not the guy talking to Tom Wallace or
8    Secretary Marstiller or the Governor's office on a daily basis
9    that deal with these things.
10         THE COURT:  What should I draw -- in terms of the
11   honesty of this process, what inference, if any, should I draw
12   from the fact that the consultants who were hired were all
13   politically motivated opponents known to be opponents of this
14   kind of care before he ever started into it?
15         MR. JAZIL:  Your Honor, a couple of points there.
16         You can draw whatever conclusions you want to draw,
17   but I note that not every single one of the consultants was
18   labeled as someone who has an entrenched perspective on the
19   issue.
20         Brignardello-Peterson, whose attachment is the very
21   first one, she just did a systematic review of what's what.
22   She's someone at McMaster University.  And Your Honor will see
23   this in the next case.  She gets criticized for being a dentist,
24   but she's also an epidemiologist.  I note that the NIH director
25   is also a dentist and a researcher.  But setting that aside, she

1    was never smeared the same way.  And I make that point, number

2    one, Your Honor.

3          Number two, the fact that the Van Mols and the Miriam

4    Grossmans of the world provided their perspective as the GAPMS

5    report was being worked through, in and of itself, isn't

6    outcome-determinative because there's still a rulemaking

7    process.  The entire rulemaking process is designed to solicit

8    input from others, and there was input from the Endocrine

9    Society, WPATH, and various others that was put in.  It was

10   considered.  Mr. Brackett ultimately concluded that he didn't

11   see a high-quality study, as he put it, that he was looking for.

12         So, Your Honor, I simply note that if the fix was in,

13   there's a lot easier ways to do the fix.  But you couldn't just

14   start rulemaking and come to the conclusion and skip the GAPMS

15   process.

16         THE COURT:  Well, unless you were trying to sugarcoat

17   it, but I get it.

18         Ultimately this -- now we've got a statute, so the

19   rule process may have some relevance, and we discussed that

20   before, but now we're dealing with a statute.  So the --

21         MR. JAZIL:  Understood, Your Honor.

22         And I'd simply like to point the Court to a relatively

23   recent U.S. Supreme Court case, *Department of Homeland Security*

24   *v. Regents of the University of California*, 140 S. Ct. 1891,

25   from 2020.  It talks about the animus question.  And,

1  Your Honor, if we are dealing with the animus of agency action,

2  whose animus are we looking at?  And it's the animus of the

3  ultimate decision-makers, which would be the secretary and Tom

4  Wallace, the guy who signed it, right.  And everything else is

5  almost like circumstantial intent of the animus of these people

6  it's being derived from --

7           THE COURT:  There's a whole cat's paw theory, but I

8  don't think anybody suggests that it applies here.  The folks at

9  the top of this probably weren't being manipulated by

10  somebody -- by the cat's paw, so I don't think that matters.  I

11  get it.

12           MR. JAZIL:  Understood, Your Honor.

13           And as we are moving on to the legislation, that, in

14  and of itself -- we go through the *Arlington Heights* analysis.

15  It's for historical background, sequence of events, procedural

16  departures, contemporary statements of legislators,

17  impact/availability of less discriminatory alternatives.  But

18  there is another component in that, Your Honor, that the

19  Eleventh Circuit has been adding on:  The legislative

20  presumption of good faith.

21           Now, this concept arose in a redistricting context,

22  has been extended outside of redistricting to elections context.

23  And the language that the Eleventh Circuit used in its most

24  recent *League of Woman Voters* case doesn't limit it to elections

25  cases.  It just says there is a legislative presumption of good

1    faith that needs to be overcome.  And that legislative

2    presumption of good faith, as we are working through the

3    *Arlington Heights* factor, I posit, Your Honor, applies to every

4    one of those factors.

5              And so, for example, Your Honor, the statements -- the

6    unfortunate statements from one legislator during the bill

7    development process came up.  That in itself doesn't sink our

8    battleship, in essence, is the point.

9              THE COURT:  It doesn't.  It's one legislator who said

10   out loud what I suspect that others in our society, if not in

11   our legislature, think.

12             Tell me what there is in this record that suggests

13   that the Governor, anybody at AHCA, anybody at the Board of

14   Medicine, anybody in the legislature thinks that there are,

15   indeed, trans individuals who -- whose real gender identity is

16   different from their sex assigned at birth.

17             MR. JAZIL:  Your Honor, I would make a couple of

18   points there.

19             Number one, the rule itself -- if we focus on the

20   rule, the rule itself says you can't do three things --

21   right? -- the puberty blockers, cross-sex hormones, and the

22   surgeries.  But the fact that it leaves open a whole list of

23   psychotherapies I think is evidence that we are not trying to

24   prohibit transgender individuals accessing the care they need

25   even if it is to affirm their preferred gender.

1384

1          And, Your Honor, here I highlight one other point.  I

2    think everyone agrees that for prepubertal children, no

3    medicine, no surgeries; right?

4          THE COURT:  Absolutely.

5          MR. JAZIL:  And so for that, those -- category of

6    people, the prepubertal children, that's usually, approximating,

7    up to the age of 12, psychotherapy.  We're not banning it.  It's

8    there.  You can use it.  So from that age, then, of 12 to

9    majority, we switch over to the statute.  12 to majority, no

10   puberty blockers, no cross-sex hormones, no surgeries.  The

11   therapies are still there, including the therapies that may

12   affirm your gender identity; right?

13         And then when we go from 18 on, there is no

14   prohibition in the statutes that are part of 254 -- I think,

15   Your Honor, it's important for the Court to take all of 254 into

16   account as you're considering the animus question.  I think

17   that's just what the law says.  So if we're taking all of it

18   into account, that notion of, okay, if you're over 18, we're

19   going to let you do what you want to do and get the treatments

20   you think you need -- that part of it I think also goes to the

21   point that, look, we're not going after transgender individuals.

22   We're not saying that, you know, they shouldn't exist or

23   they're -- well, I won't use the phrase that the legislator

24   used, but Your Honor gets my point.

25         In addition, Your Honor, there is a grandfathering

1 provision in some of the other agency actions that are being

2 undertaken here.  So if you're on these treatments, we're not

3 going to take you off them.  And there's an emergency rulemaking

4 provision in the statute, in 254, that deals with these issues

5 as well.

6        THE COURT:  So I understand your answer to say, Well,

7 we didn't -- we didn't ban as much stuff as we could have.  I'm

8 not sure you could of when the anti-trans community has won a

9 constitutional case on the therapy issue.  So it would have been

10 a little hard to try to say that we can ban therapy in support

11 of trans identity when you've already got an Eleventh Circuit

12 case saying there's a First Amendment right on the other side.

13 That one would have been -- that would have tested your advocacy

14 skills quite a bit.  Leave -- leave that out of it.

15        My question was:  Has anybody -- anybody in any of

16 those areas I talked about -- Governor, anybody in the

17 Governor's office, anybody at AHCA, anybody at the Board of

18 Medicine, anybody in the legislature -- ever said, We understand

19 there are actually trans people?  Sometimes a person's gender

20 identity really doesn't match the sex assigned at birth.

21        And you told me it wasn't as bad as it could have

22 been, but you didn't point me to anything out of any of those

23 places where anybody said anything suggesting that they actually

24 believed there are trans people.

25        MR. JAZIL:  Your Honor, I don't know the answer to

1   that.  I don't know if anyone from those different agencies,

2   those different branches of government has said that there are

3   trans people.

4           I would note, Your Honor, that at the end of the day,

5   if the claim is an animus claim and the idea is that the State

6   is doing this to harm trans people, then the other side has a

7   burden of showing that the Governor, the legislature, depending

8   on which thing we're looking at, whether -- if it's the rule, it

9   would be the Governor and the executive branch; if it's a

10  statute, it would be the legislative branch.  If folks in those

11  two branches are taking actions not necessarily to impact trans

12  people, but with the intent of it affecting the trans people --

13  and I don't think that evidence is put forward in this case, and

14  so I --

15          THE COURT:  I don't think my question was limited to

16  the animus issue.

17          But however one frames the legal issue, if the

18  decision-makers just believe there's no such thing as an actual

19  trans identity, and the evidence, even from your own experts, to

20  the extent they're credible, is that there are people whose

21  actual gender identity doesn't match up with sex assigned at

22  birth, doesn't that call into question the evaluation of risks

23  and benefits that were made by the State?  I mean, if you don't

24  think the situation is real, then it's pretty easy to say there

25  shouldn't be any treatment for it.

1          MR. JAZIL:  Your Honor -- and I guess the testimony

2   you heard from all of the witnesses, both defense and the

3   plaintiffs, is no one is questioning that there is a gender

4   dysphoria diagnosis; right?  So if no one is questioning there

5   is a gender dysphoria diagnosis, I think that presupposes that

6   no one is questioning that transgender people actually exist;

7   right?

8          THE COURT:  I don't think that lines up, and one of

9   your -- one the experts -- and I don't --

10          MR. JAZIL:  It was Dr. Hruz.

11          THE COURT:  I didn't memorize their names as they came

12   through.  I can look back and find it.

13          But one of my questions to one of your experts, he

14   kind of danced all around it, and, frankly, I thought it was an

15   evasive answer.  I think there is a difference between saying

16   there is such a thing as gender dysphoria; there is not such a

17   thing as actual gender identity not aligning with natal sex.  I

18   probably haven't articulated it very well, but I hope I get

19   across what I'm talking about.

20          I think you've -- I think that expert and maybe more

21   than that think that this is all just a false identity.  One of

22   your experts signed a brief that said that:  They're just

23   masquerading; it's false identity.  Well, the more credible of

24   your experts said, Oh, it's not false identity.  There are

25   people whose gender identity doesn't match sex assigned at

 1   birth.

 2            And I just -- and my question was, you know:  What's

 3   in the record?  I'm not asking you to speculate what's in some

 4   legislator's mind, other than what they've said.  But my

 5   question was:  Is there anything in this record that suggests

 6   that any of the decision-makers agree, for example, with

 7   Dr. Levine as opposed to the expert who said this is all false

 8   identity and they're masquerading?

 9            MR. JAZIL:  Your Honor, the closest I get to is Matt

10   Brackett, who was on the stand.  He's not one of the

11   decision-makers.  He just wrote the report.  He said -- he

12   recognizes there's a transgender identity.

13            Second, Your Honor, the decision-makers didn't let me

14   hire Dr. Levine, so I suppose that's a sideways way to suggest

15   that they're not disagreeing with it.

16            That's my best answer to that question, Your Honor.

17            THE COURT:  Yeah, I got it.  You know, I'll have been

18   through the entire record by the time I enter a ruling.  So if

19   there's something there, I think I'll find it.

20            MR. JAZIL:  Understood, Your Honor.

21            THE COURT:  The fact they didn't say it doesn't mean

22   that there aren't some who believe it.  I get it.  They --

23   politicians speak a lot, but they don't have to speak about

24   everything.

25            MR. JAZIL:  Fair enough, Your Honor.

1      Your Honor, I just highlight a couple of other things

2  from the record.  I would commend for the Court's consideration

3  the Endocrine Society guidelines, the portion on the unresolved

4  questions concerning the effects on the brain.  I think that's

5  important.

6      You heard from Dr. Scott.  Dr. Scott is -- at the very

7  end I asked Dr. Scott what she meant by the effects of the

8  neurotransmitters on the hypothalamus, and she went and

9  explained that, look, really we thought it was going to affect

10  just the hypothalamus, but it's affecting other parts of the

11  brain.  And, yeah, there are sheep studies that deal with these

12  issues, but, you know, we're seeing changes in the amygdala.

13  The amygdala is important because it controls other things that

14  happen.

15      And so, Your Honor, I highlight that because Scott's

16  testimony did align with the Endocrine Society guidelines and

17  the need for further caution when we're assessing the effects of

18  puberty blockers on the brain.  It's a big unknown, and I

19  highlight that for the Court.

20      Your Honor, finally, we put this in our summary

21  judgment papers, which we then asked the Court to consider as

22  our trial brief, the 1983 argument.  I understand the Court's

23  pretrial order concerning it, and the Court laid out some of the

24  more recent cases.  And I'd note that the Court was careful in

25  saying that some of those cases didn't decide the issue but went

1390

```
 1    on to the discuss the merits.

 2             And, Your Honor, again, I'd point out that the Supreme

 3    Court heard a case November 8th dealing with whether or not 1983

 4    actions are appropriate to enforce spending clause issues or

 5    spending clause statutes, and I have a feeling this case will

 6    come out this summer.  It has to.  So I simply note that for the

 7    Court, and I just want to make sure I preserve the argument if

 8    it goes up.

 9             With that, Your Honor, unless the Court has further

10    questions, I have nothing further.

11             THE COURT:  No.  Thank you.

12             Rebuttal?

13             MR. GONZALEZ-PAGAN:  Thank you, Your Honor.  Just very

14    briefly.

15             I would just note that the rule at issue in this case

16    and the provision in section 3 regarding State funding from

17    SB 254 applies equally to minors and adults.  So it is not just

18    wait until you are 18 if you are low income or disabled.  It's

19    you're not able to get this care in the state of Florida for

20    your entire lifetime.

21             THE COURT:  You can get the care after 18, but you

22    have to pay for it.

23             MR. GONZALEZ-PAGAN:  Or leave the state because you

24    are low income.  You're on Medicaid.

25             THE COURT:  I understand.  I get it.  If you're on
```

 1    Medicaid -- if you don't have any money and you have to pay for

 2    it and there's no source of reimbursement, then --

 3                MR. GONZALEZ-PAGAN:  Yeah.

 4                THE COURT:  -- you're not going to get it.  Although

 5    one of your clients managed to set up a GoFundMe page, pretty

 6    remarkable, but that's not an answer generally.

 7                MR. GONZALEZ-PAGAN:  It is remarkable, but I don't

 8    think everybody will have that opportunity, Your Honor, and we

 9    are just fortunate that Mr. Rothstein was able to.

10                Your Honor, my friend pointed to a few of the medical

11    records of each of the plaintiffs.  I will just note that it

12    paints a very curated and cherry-picked picture.  K.F. started

13    working with the GEMS program in Boston when he was 7.  He

14    worked with them for over four years before he started puberty

15    blockers, and his initial appointment included a two-hour psych

16    evaluation, not a 25-minute visit.

17                August Dekker got diagnoses from a psychiatrist, a

18    mental health counselor at Metro Inclusive Health, and then

19    separately his psychiatrist.

20                Brit worked with several medical providers in order to

21    access -- Brit Rothstein worked with several providers in order

22    to access gender-affirming care, including Dr. Hart-Unger at Joe

23    DiMaggio's Multidisciplinary Clinic.

24                The plaintiffs have provided what I think is mostly

25    the norm in how this care is approached.  It is also consistent

 1    with Kim Hutton's own testimony about her son in another state.

 2             And I would caution the Court on a point that I think

 3    my friend has raised multiple times, and that is this idea that

 4    there is this gender dysphoria exceptionalism or transgender

 5    exceptionalism, that because there may be a bad provider out

 6    there or a -- all of a sudden we need to so strictly regulate

 7    the provision of this care.  Why?  Why do we need to treat this

 8    care any different than any other care?

 9             Of course it carries risks and benefits, and providers

10    should provide all of the information that is known, as well as

11    what they don't know, to parents and adolescent patients and to

12    adult patients.  That is what the standards of care and Clinical

13    Practice Guidelines require and recommend, and just because a

14    provider may not follow that -- which, again, there is no

15    evidence of that occurring here in Florida in the record -- it's

16    not a reason to ban care.  And, in fact, there are already tools

17    for that.  There's medical malpractice; there's professional

18    licensure and the like.

19             But just, lastly, for purposes of clarifying the

20    record, Your Honor, we did approach opposing counsel with

21    regards to the waiver for Mr. Rothstein following the

22    preliminary injunction hearing, and, unfortunately, we did not

23    get any answers as to how it would operate.  I would note that

24    Mr. Brackett's testimony at his deposition was that if the

25    medical care --

1           THE COURT:  Is this part of what you designated?

2           MR. GONZALEZ-PAGAN:  This is correct, Your Honor, and

3    this is page 80 of our trial brief.

4           That if the medical care for which it was -- one could

5    seek an exception if the care was not experimental.  But AHCA

6    has determined this care to be experimental, so there is no

7    exception to be had if one were to just follow his testimony.

8           So we did try to find this variance, but at the end of

9    the day, Your Honor, the statute here supersedes, as Your Honor

10   has noted, and it's categorical.  And even if there was this

11   variance process, I would argue that it is still discriminatory.

12   Why the extra hoops is necessary here is part of the question,

13   but those hoops are nonexistent.

14          THE COURT:  And part of my question was:  Why didn't

15   you at least try?

16          MR. GONZALEZ-PAGAN:  We did, Your Honor.  That's what

17   I was positing.

18          We did approach opposing counsel several instances

19   between October and December to try to get information about how

20   we could do that and what would be the best approach and to do

21   it on an expedited timeline given his surgery date of December,

22   and we were just unable to get that information.

23          And I believe that letter has been filed with the

24   Court in some of our pleadings.

25          THE COURT:  I would have thought the way to do that is

1394

1   some kind of petition under Chapter 120, but I --

2           MR. GONZALEZ-PAGAN:  If the Court has no further

3   questions --

4           THE COURT:  I do not.

5           Mr. Jazil, I do have a specific question, though.

6   First, I take it if you wanted the exception, there would be

7   some kind of 120 application?

8           MR. JAZIL:  Yes, Your Honor, there would be.

9   120.54(2) is the statute.  There is an accompanying rule of

10  administrative procedure.  No application was submitted.

11          THE COURT:  Apparently, Mr. Brackett said when he was

12  the 30(b)(6) designee that there wasn't any -- there wouldn't be

13  an exception if the care was experimental.

14          Was he right about that, or is that one more thing

15  that Mr. Brackett said that wasn't really in his area?

16          MR. JAZIL:  No, Your Honor, he wasn't right about

17  that, and the errata sheet goes to that issue.  That clears that

18  up.

19          Thank you, Your Honor.

20          THE COURT:  All right.  Very good.

21          I don't know if I mentioned this to you at the

22  beginning -- I don't think I did.  We talked some about telling

23  the appellate court that there is another case -- both cases.

24  My tentative plan, at least, is to rule on both cases at roughly

25  the same time.  The other decision impacts this decision, I

1395

```
 1    think.  We can go back and work through all this standing and
 2    mootness and all those issues.  It's the same kind of thing, so
 3    I'm probably going to rule on both close in time.  I'm going to
 4    do it as soon as I can.  It's not my only case.  I've got a lot
 5    of work to do.  So I'll -- I did go back and revisit some of the
 6    facts, and I note that it's -- well, it's the other case, I
 7    guess.  But I know time is of the essence, so I'll get a ruling
 8    as quickly as I can.
 9               MR. GONZALEZ-PAGAN:  Your Honor, if I may, my
10    co-counsel just informed me that the deposition designation
11    regarding Mr. Brackett postdates his errata sheet to which my
12    friend made.  There were two depositions of Mr. Brackett.
13               THE COURT:  Mr. Brackett is sometimes wrong but never
14    in doubt.  He's not a lawyer.  He's been involved in rulemaking.
15    If you wanted to know how to handle a matter under Chapter 120,
16    you might ask any of these people sitting around here with their
17    law degrees, but you probably would not ask Mr. Brackett.
18               MR. GONZALEZ-PAGAN:  Yes, Your Honor.
19               THE COURT:  So whatever he said about that, that's not
20    the answer.
21               I don't mean to suggest that that makes a difference
22    in the ruling.  It made more difference when the rule was there.
23    I don't think it matters under the statute.  Mr. Jazil and I
24    talked about that a little bit in his presentation.  I'll take
25    all that into account, and I'll try to get it right.  I too am
```

```
1   sometimes wrong, but, frankly, I'm more often in doubt.  The --

2   well, enough said.

3           We're adjourned.

4           Thank you, all.

5           MR. GONZALEZ-PAGAN:  Thank you.

6           MR. JAZIL:  Thank you.

7      (Proceedings concluded at 12:40 PM on Monday, May 22,

8   2023.)

9                     * * * * * * * *

10          I certify that the foregoing is a correct transcript
    from the record of proceedings in the above-entitled matter.
11  Any redaction of personal data identifiers pursuant to the
    Judicial Conference Policy on Privacy is noted within the
12  transcript.

13

14  /s/ Megan A. Hague                    5/22/2023

15  Megan A. Hague, RPR, FCRR, CSR        Date
    Official U.S. Court Reporter
16

17                    I N D E X

18  DEFENDANT'S WITNESS                          PAGE
```

```
19  DR. SOPHIE SCOTT
    Direct Examination                           1267
20  Voir Dire Examination By Mr. Shaw            1275
    Cross-Examination By Mr. Shaw                1305
21  Redirect Examination By Mr. Jazil            1317

22

    OTHER RECORD MADE                            PAGE
23
    Opening Closing Argument By Mr. Gonzalez-Pagan  1324
24  Closing Argument By Mr. Jazil                1353
    Rebuttal Closing Argument By  Mr. Gonzalez-Pagan  1390
25
```