Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY ET AL. *v.* TALEVSKI, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF TALEVSKI

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 21–806.   Argued November 8, 2022—Decided June 8, 2023

After Gorgi Talevski's move to a nursing home in 2016 proved problematic, Talevski (through his wife Ivanka) brought an action under 42 U. S. C. §1983 against a county-owned nursing home and its agents (collectively, HHC), claiming that HHC's treatment of Talevski violated rights guaranteed him under the Federal Nursing Home Reform Act (FNHRA).  The District Court granted HHC's subsequent motion to dismiss Talevski's complaint, reasoning that no plaintiff can enforce provisions of the FNHRA via §1983.  The Seventh Circuit reversed, concluding that the rights referred to in two FNHRA provisions invoked by Talevski—the right to be free from unnecessary chemical restraints, see §1396r(c)(1)(A)(ii), and rights to be discharged or transferred only when certain preconditions are met, see §1396r(c)—"unambiguously confer individually enforceable rights on nursing-home residents," making those rights presumptively enforceable via §1983.  6 F. 4th 713, 720.  The Seventh Circuit further found nothing in the FNHRA to indicate congressional intent to foreclose §1983 enforcement.

*Held*: The FNHRA provisions at issue unambiguously create §1983-enforceable rights, and the Court discerns no incompatibility between private enforcement under §1983 and the remedial scheme that Congress devised.  Pp. 5–23.

(a) Section 1983 has, since the 1870s, provided an express cause of action to any person deprived (by someone acting under color of state law) of "any rights . . . secured by the Constitution and laws."  The Court has long refused to read §1983's unmodified term "laws" to mean

Syllabus

only *some* of the laws. *Maine* v. *Thiboutot*, 448 U. S. 1, 6. Looking to history, HHC attempts to sow doubt about §1983's textually unqualified sweep, and proffers a Spending Clause-based argument to narrow §1983's meaning. But a fuller picture of the relevant history lends HHC no aid.

The Court is unpersuaded by HHC's argument that, because Congress seems to have enacted the FNHRA pursuant to the Spending Clause, Talevski cannot invoke §1983 to vindicate rights recognized by the FNHRA. HHC starts with the Court's observation that federal legislation premised on the Spending Clause power is "much in the nature of a contract," *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17. From there, HHC argues that Spending Clause statutes may not be enforced via §1983 because contracts were not generally enforceable by third-party beneficiaries at when §1983 was enacted in the 1870s. The Court rejects HHC's argument. First, while the Court has reasoned that Congress's failure to displace firmly rooted common-law principles generally indicates that it incorporated those established principles into §1983, *Wyatt* v. *Cole*, 504 U. S. 158, 163–164, HHC's key common-law plank here—that third-party beneficiaries could not sue to enforce contractual obligations during the relevant time—is, at a minimum, contestable. "[S]omething more than 'ambiguous historical evidence' is required [to] 'flatly overrule a number of major decisions of this Court,'" *Gamble* v. *United States*, 587 U. S. ___, ___. Second, because "[t]here is no doubt that the cause of action created by §1983 is, and was always regarded as, a tort claim," *Monterey* v. *Del Monte Dunes at Monterey, Ltd.*, 526 U. S. 687, 727 (Scalia, J., concurring in part and concurring in judgment), HHC's focus on 1870s law governing third-party-beneficiary suits in contract is perplexing, and HHC offers no reason those principles should be read to displace the plain scope of "laws" in §1983. Pp. 5–10.

(b) Under the Court's precedent, the FNHRA provisions at issue here unambiguously confer individual federal rights enforceable under §1983, and the Court discerns no intent by Congress in FNHRA to preclude private enforcement of these rights under §1983. Pp. 11–23.

(1) Although federal statutes have the potential to create §1983-enforceable rights, they do so under this Court's precedents only when the statute unambiguously confers those rights. The Court has recognized that the typical remedy for noncompliance with a federal statute enacted pursuant to the Spending Clause is not a private cause of action for noncompliance but rather termination of funds to the State. See *Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 280. The parties here thus dispute whether this is the atypical case; that is, whether the unnecessary-restraint and predischarge-notice provisions of the FNHRA

"unambiguously confe[r]" individual rights, making those rights "presumptively enforceable" under §1983. *Id.*, at 283–284.

*Gonzaga* sets forth the Court's established method for ascertaining unambiguous conferral. Courts must employ traditional tools of statutory construction to assess whether Congress has "unambiguously conferred" "individual rights upon a class of beneficiaries" to which the plaintiff belongs. *Id.*, at 283, 285–286. Notably, it must be determined that "Congress intended to create a federal right" *for* the identified class, not merely that the plaintiffs fall "within the general zone of interest that the statute is intended to protect." *Id.*, at 283 (emphasis deleted). The test for unambiguous conferral is satisfied where the provision in question is "'phrased in terms of the persons benefited'" and contains "rights-creating," individual-centric language with an "'unmistakable focus on the benefited class.'" *Id.,* at 284, 287 (emphasis deleted). If a statutory provision surmounts this significant hurdle, it "secures" individual rights that are deemed "presumptively enforceable" under §1983. *Id.*, at 284.

The unnecessary-restraint and predischarge-notice provisions in FNHRA that Talevski's complaint invokes meet this test. The FNHRA lays out a litany of statutory "[r]equirements relating to residents' rights," §1396r(c). The unnecessary-restraint provision requires nursing facilities to "protect and promote" residents' "right to be free from . . . any physical or chemical restraints . . . not required to treat the resident's medical symptoms." §1396r(c)(1)(A)(ii). The predischarge-notice provision imposes preconditions that a nursing facility must meet to "transfer or discharge [a] resident." §§1396r(c)(2)(A)–(B). Both provisions reside in §1396r(c), which expressly concerns "[r]equirements *relating to residents' rights.*" *Ibid.* (emphasis added). This framing is indicative of an individual "rights-creating" focus. *Gonzaga*, 536 U. S., at 284. That these two provisions also establish who must comply with these statutory rights (namely, the Medicaid-participant nursing homes) does not dispel the statute's focus on the nursing-home residents, *i.e.*, the benefited class. The provisions use clear "rights-creating language," speak "'in terms of the persons benefited,'" and have an "'unmistakable focus on the benefited class.'" *Id.*, at 284, 287, 290 (emphasis deleted). Thus, they satisfy *Gonzaga*'s stringent standard, and the rights they recognize are presumptively enforceable under §1983. Pp. 11–17.

(2) Even if a statutory provision unambiguously secures rights, a defendant "may defeat [the] presumption by demonstrating that Congress did not intend" that §1983 be available to enforce those rights. *Rancho Palos Verdes* v. *Abrams*, 544 U. S. 113, 120. Evidence of such intent may be found expressly in the statute creating the right, or im-

plicitly, by creating "a 'comprehensive enforcement scheme that is incompatible with individual enforcement under §1983," *ibid.* Here, the Court finds evidence of neither. The FNHRA establishes a detailed administrative scheme for inspections of nursing facilities, see §1396r(g), and authorizes governments to sanction and correct noncompliant facilities, see §1396r(h). But the statute lacks any indicia of congressional intent to preclude §1983 enforcement, such as an express private judicial right of action or any other provision that might signify that intent. HHC focuses on comprehensiveness of FNHRA's enforcement mechanisms, but implicit preclusion is shown only by a "'comprehensive enforcement scheme *that is incompatible* with individual enforcement under §1983.'" *Fitzgerald* v. *Barnstable School Comm.*, 555 U. S. 246, 252 (emphasis added). The Court's prior cases finding implicit preclusion involved statutes where private enforcement under §1983 would have thwarted Congress's scheme by circumventing the statutes' presuit procedures, or by giving plaintiffs access to tangible benefits otherwise unavailable under the statutes construed. HHC has identified no equivalent sign of incompatibility in the FNHRA, which lacks a private judicial right of action, a private federal administrative remedy, or any "carefu[l]" congressional "tailor[ing]," *Fitzgerald*, 555 U. S., at 255, that §1983 actions would "distort," *Rancho Palos Verdes*, 544 U. S., at 127. Finally, the Court rejects any speculation that because Congress knew most nursing homes are private entities not subject to suit under §1983, the FNHRA's remedial scheme "necessarily reflects Congress's judgment that these administrative enforcement mechanisms appropriately protect the rights the statute confers," Brief for United States as *Amicus Curiae* 31. The focus in the implicit-preclusion inquiry remains whether something in the FNHRA has foreclosed §1983's "genera[l]" availability as "a remedy for the vindication of rights secured by federal statutes." *Gonzaga*, 536 U. S., at 284. The Court sees no such sign, much less a license for the Court to construct and impute to Congress an intent that the FNHRA does not embody. Pp. 17–23.

6 F. 4th 713, affirmed.

JACKSON, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SOTOMAYOR, KAGAN, GORSUCH, KAVANAUGH, and BARRETT, JJ., joined. GORSUCH, J., filed a concurring opinion. BARRETT, J., filed a concurring opinion, in which ROBERTS, C. J., joined. THOMAS, J., filed a dissenting opinion. ALITO, J., filed a dissenting opinion, in which THOMAS, J., joined.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———

No. 21–806

———

## HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, ET AL., PETITIONERS v. IVANKA TALEVSKI, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GORGI TALEVSKI, DECEASED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 8, 2023]

JUSTICE JACKSON delivered the opinion of the Court.

The Federal Nursing Home Reform Act (FNHRA or Act) ensures that nursing homes that receive Medicaid funding respect and protect their residents' health, safety, and dignity. Provisions of the FNHRA refer to rights of nursing-home residents to be free from unnecessary physical or chemical restraints and to be discharged or transferred only when certain preconditions are satisfied. This case is about these particular provisions and whether nursing-home residents can seek to vindicate those FNHRA rights in court.

Respondent Ivanka Talevski maintains that she can enforce the rights these particular FNHRA provisions describe via 42 U. S. C. §1983, which, since the 1870s, has provided an express cause of action to any person deprived (by someone acting under color of state law) of "any rights . . . secured by the Constitution and laws." Petitioners insist that respondent is wrong about being able to rely on §1983 in this context, for two independent reasons. First, petitioners urge us to discard our longstanding recognition that

§1983's unqualified reference to "laws" "means what it says," *Maine* v. *Thiboutot*, 448 U. S. 1, 4 (1980), and to rule instead that §1983 contains an implicit carveout for laws that Congress enacts via its spending power—a holding that, according to petitioners, would mean that §1983 could not be used to enforce any rights the FNHRA purports to recognize. In the alternative, petitioners point to our established methods for determining whether a statutory provision creates a §1983-enforceable right and maintain that these FNHRA provisions do not create rights that nursing-home residents can enforce via §1983.

We reject both propositions. "Laws" means "laws," no less today than in the 1870s, and nothing in petitioners' appeal to Reconstruction-era contract law shows otherwise. Consequently, as we have previously held, §1983 can presumptively be used to enforce unambiguously conferred federal individual rights, unless a private right of action under §1983 would thwart any enforcement mechanism that the rights-creating statute contains for protection of the rights it has created. *Fitzgerald* v. *Barnstable School Comm.*, 555 U. S. 246, 253–255 (2009); *Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 284, and n. 4 (2002). We hold that the two FNHRA provisions at issue here do unambiguously create §1983-enforceable rights. And we discern no incompatibility between private enforcement under §1983 and the statutory scheme that Congress has devised for the protection of those rights. Accordingly, we affirm the lower court's judgment that respondent's §1983 action can proceed in court.

I

In 2016, when Gorgi Talevski's dementia progressed to the point that his family members could no longer care for him, they placed him in petitioner Valparaiso Care and Rehabilitation's (VCR) nursing home.[1] When he entered VCR,

---

[1] We rely for these facts on the operative complaint's well-pleaded allegations. See *Walden* v. *Fiore*, 571 U. S. 277, 281, n. 2 (2014).

Mr. Talevski could talk, feed himself, walk, socialize, and recognize his family. Later in 2016, however, Mr. Talevski's condition suddenly deteriorated. He became unable to eat on his own and began losing the ability to communicate in English (leaving him to rely primarily on Macedonian, his native language).

VCR staff claimed this was dementia's natural progression. But Mr. Talevski's daughter suspected, and then confirmed with outside physicians, that VCR was chemically restraining Mr. Talevski with six powerful psychotropic medications. With the help of an outside neurologist, his medication was tapered down, and he began to regain the ability to feed himself. Around this time, the Indiana State Department of Health (Department) conducted its periodic inspection of VCR, and the Talevskis filed a formal complaint with the inspectors regarding the chemical restraints.

The problems did not end there. Toward the end of 2016, VCR began asserting that Mr. Talevski was harassing female residents and staff. Based on that claim, VCR began sending Mr. Talevski to a psychiatric hospital 90 minutes away for several days at a time. VCR readmitted Mr. Talevski the first two times it sent him away. But the third time, instead of accepting him back, VCR tried to force his permanent transfer to a dementia facility in Indianapolis. It executed these changed circumstances without first notifying Mr. Talevski or his family.

The Talevskis filed a complaint with the Department regarding Mr. Talevski's forced transfer. While the complaint was pending, Mr. Talevski had to stay at another facility that was 90 minutes away from his family. Eventually, a Department administrative law judge nullified VCR's attempted transfer of Mr. Talevski. Based on that determination, the Talevskis endeavored to have Mr. Talevski returned to VCR. But VCR ignored the judge's decision and refused readmission.

The Talevskis complained again to the Department, which later issued a report regarding the Talevskis' complaints. Subsequently, petitioner American Senior Communities LLC (ASC), which manages VCR, contacted Mr. Talevski's wife, Ivanka, to discuss the possibility of Mr. Talevski's return. At this point, however, Mr. Talevski had acclimated to his new home, and the Talevskis feared retribution against him if he returned to VCR. So they opted to leave him in the new facility, which meant that every family visit required a 3-hour round trip.

In 2019, Mr. Talevski (through Ivanka) sued VCR, ASC, and petitioner Health and Hospital Corporation of Marion County (collectively, HHC) under Rev. Stat. §1979, 42 U. S. C. §1983.[2] The lawsuit claimed that HHC's treatment of Mr. Talevski—in particular, the use of chemical restraints and the persistent transfer attempts—had violated rights that the FNHRA guaranteed him as a nursing-home resident. The District Court granted HHC's subsequent motion to dismiss the complaint, reasoning that no plaintiff can enforce provisions of the FNHRA via §1983.

The Court of Appeals for the Seventh Circuit reversed. It concluded that, under this Court's precedent, the relevant FNHRA provisions "unambiguously confer individually enforceable rights on nursing-home residents," making those rights presumptively enforceable via §1983. 6 F. 4th 713, 720 (2021). The Court of Appeals held further that the presumption had not been rebutted here, because nothing in the FNHRA indicated congressional intent to foreclose §1983 enforcement of these rights. *Id.*, at 720–721.

HHC filed a petition for certiorari, which we granted.[3]

———————

[2] Marion County, Indiana, owns Health and Hospital Corporation, which in turn wholly owns VCR.

[3] After the Seventh Circuit's ruling, Mr. Talevski passed away. We granted Ivanka Talevski's substitution motion, and substituted her as a party at the same time we granted certiorari. See Supreme Court Rule

Opinion of the Court

596 U. S. ___ (2022).  For the reasons explained below, we affirm the Seventh Circuit's judgment.

## II
### A

As relevant here, §1983 provides that

> "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

That is, any person within the jurisdiction of the United States may invoke this cause of action against any other person who, acting "under color of" state law, has deprived them of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

We have been asked before to narrow the scope of this express authorization, *i.e.*, to read "laws" to mean only "civil rights or equal protection laws." *Thiboutot*, 448 U. S., at 6. We declined to do so, reasoning that a straightforward reading of the "plain language" of §1983 is required. *Id.*, at 4. That should have been no surprise; "Congress attached no modifiers to the phrase ['and laws']." *Ibid.*

Since *Thiboutot*, we have crafted a test for determining whether a particular federal law actually secures rights for §1983 purposes. See *Gonzaga*, 536 U. S., at 283–285; Part III–B, *infra*. But we have not previously doubted that any federal law can do so.

––––––––––
35.1. Subsequent references to Talevski encompass both Talevskis insofar as Ivanka is advancing Gorgi's interests.

### B

### 1

HHC attempts to sow renewed doubt about §1983's textually unqualified sweep by proffering "historical evidence." Brief for Petitioners 3; see also *id.*, at 2 (asserting that "[f]or most of this nation's history, individuals did not have a recognized private right to enforce obligations prescribed by federal statutes"). As background for our evaluation of the particulars of HHC's Spending Clause-based argument regarding §1983's meaning, see Part II–B–2, *infra*, a fuller picture of the relevant historical context is warranted. *United States* v. *Union Pacific R. Co.*, 91 U. S. 72, 79 (1875); accord, *Towne* v. *Eisner*, 245 U. S. 418, 425 (1918) (Holmes, J., for the Court).

Before the Civil War, few direct federal protections for individual rights against state infringements existed. The Thirteenth, Fourteenth, and Fifteenth Amendments worked a sea change in this regard. See *McDonald* v. *Chicago*, 561 U. S. 742, 754 (2010); *Fitzpatrick* v. *Bitzer*, 427 U. S. 445, 453–456 (1976); *Ex parte Virginia*, 100 U. S. 339, 344–345 (1880). Still, neither these Civil War Amendments nor the landmark Civil Rights Act of 1866 successfully prevented postbellum state actors from continuing to deprive American citizens of federally protected rights. *Mitchum* v. *Foster*, 407 U. S. 225, 240 (1972).

In early 1871, a Senate Select Committee produced and distributed a Report that ran hundreds of pages and recounted pervasive state-sanctioned lawlessness and violence against the freedmen and their White Republican allies. *Monroe* v. *Pape*, 365 U. S. 167, 174 (1961) (citing S. Rep. No. 1, 42d Cong., 1st. Sess. (1871)).[4] After reading the

---

[4] Encapsulating the Report, victim testimony, and press accounts for his colleagues, one Congressman (as *Monroe* noted) lamented that "'murder is stalking abroad in disguise, . . . whippings and lynchings and banishment have been visited upon unoffending American citizens, [and] the local administrations have been found inadequate or unwilling to apply

Opinion of the Court

Report, President Ulysses S. Grant implored Congress to act.

It is against this backdrop that the 42d Congress enacted, and President Grant signed, the Civil Rights Act of 1871. The first section of that statute, as reenacted in 1874, created the federal cause of action now codified as §1983. *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 608, and n. 16 (1979) (citing Rev. Stat. §1979 (1874)). The "plain language['s]" lack of "modifiers," *Thiboutot*, 448 U. S., at 4, reflected the regrettable reality that "state instrumentalities" could not, or would not, fully protect federal rights, *Mitchum*, 407 U. S., at 242.

We have adhered to this understanding of §1983's operation. To guarantee the protection of federal rights, "the §1983 remedy . . . is, in all events, supplementary to any remedy any State might have." *Owens* v. *Okure*, 488 U. S. 235, 248 (1989) (internal quotation marks omitted); *Knick* v. *Township of Scott*, 588 U. S. ___, ___ (2019) (slip op., at 11). And we have consistently refused to read §1983's "plain language" to mean anything other than what it says. *Thiboutot*, 448 U. S., at 4–6 (observing that our cases, running back to at least 1968, only make sense if "laws" indeed means "laws").

2

We are not persuaded by HHC's argument (which JUSTICE THOMAS supports, see *post*, at 1, 35 (dissenting

_____

the proper corrective.'"  365 U. S., at 175 (quoting Cong. Globe, 42d Cong., 1st Sess., App. 374 (1871)). Another, summing up the same facts, stated:

"'Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not; witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices. . . . [A]ll the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection. Among the most dangerous things an injured party can do is to appeal to justice.'"  *Mitchum*, 407 U. S., at 241 (quoting Cong. Globe, 42d Cong., 1st Sess., App. 78).

opinion)), that Talevski cannot invoke §1983 to vindicate the rights the FNHRA provisions at issue here purport to recognize because Congress seems to have enacted the FNHRA pursuant to the spending power recognized in Article I, §8, of the Constitution.[5]

HHC's argument generally proceeds as follows. Starting with our precedent regarding Congress's spending power, HHC begins by emphasizing our observation that federal legislation premised on that power is "much in the nature of a contract," because, "in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981); see also *Cummings* v. *Premier Rehab Keller*, 596 U. S. ___, ___ (2022) (slip op., at 4). HHC then seizes on the "contract" analogy to create a syllogism. It reasons that (1) any private party suing to enforce an obligation between Federal and State Governments that a Spending Clause statute creates is, essentially, a "third-party beneficiary" (by which HHC means beneficiaries of rights created in any such statute); and (2) under common-law contract principles extant at the time that Congress enacted §1983, third-party beneficiaries were "generally" barred from suing to enforce contract obligations; therefore, (3) plaintiffs like Talevski, as a purported third-party beneficiary of the FNHRA, may not use §1983 to do something that third-party beneficiaries of contracts generally could not do in the 1870s. Brief for Petitioners 13, 17–18 (citing 1870s treatises and state cases).

The upshot, for HHC, is that "Spending Clause statutes do not give rise to privately enforceable rights under Section 1983" because contracts were not "generally" enforceable by third-party beneficiaries at common law. *Id.*, at 11,

_____

[5]See Art. I, §8, cl. 1 (authorizing the Legislature to "lay and collect Taxes . . . to pay the Debts and provide for the common Defence and general Welfare of the United States").

13. On this basis alone, HHC thus, in effect, urges us to reject decades of precedent, and to rewrite §1983's plain text to read "laws (unless those laws rest on the Spending Power)."

Two well-established principles, applied here, suffice to reject HHC's invitation to reimagine Congress's handiwork (and our precedent interpreting it).

First, our prior §1983 cases reference "'firmly rooted'" common-law principles. *Wyatt* v. *Cole*, 504 U. S. 158, 164 (1992). We implement Congress's choices rather than re-make them. *Azar* v. *Allina Health Services*, 587 U. S. ___, ___–___ (2019) (slip op., at 14–15). Thus, we have reasoned that Congress's failure to displace *firmly rooted* common-law principles generally indicates that it incorporated those established principles into §1983. *Wyatt*, 504 U. S., at 163–164.[6] Here, HHC's key common-law plank—that third-party beneficiaries could not sue to enforce contractual obligations during the relevant time—is, at a minimum, contestable. See Brief for Contract Law Professors et al. as *Amici Curiae* 4 ("[A] majority of American jurisdictions . . . permit[ted] third-party beneficiaries to sue through at least the early 1870s"); see also *Hendrick* v. *Lindsay*, 93 U. S. 143, 149 (1876) (concluding that "the right of a party to

_____

[6] For example, we have recognized immunities in the §1983 context when a "'tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that "Congress would have specifically so provided had it wished to abolish"'" that particular immunity. *Wyatt*, 504 U. S., at 164 (quoting *Owen* v. *Independence*, 445 U. S. 622, 637 (1980)); see also *Tenney* v. *Brandhove*, 341 U. S. 367, 372–376 (1951) (rooting immunity in a well-settled, pre-Revolutionary tradition that Congress could not be thought to have "covert[ly]" abrogated). We relied on similar reasoning when consulting well-settled common-law principles to determine the "contours of a [§1983] claim," *Nieves* v. *Bartlett*, 587 U. S. ___, ___ (2019) (slip op., at 12), the accrual date for §1983 claims, *McDonough* v. *Smith*, 588 U. S. ___, ___ (2019) (slip op., at 5) (citing, *inter alia*, *Heck* v. *Humphrey*, 512 U. S. 477, 483 (1994)), and "prerequisites for th[e] recovery" of monetary damages, *id.*, at 483 (citing *Carey* v. *Piphus*, 435 U. S. 247, 257–258 (1978)).

maintain assumpsit on a promise not under seal, made to another for his benefit, . . . is now the prevailing rule in this country").[7]  "[S]omething more than 'ambiguous historical evidence' is required before we will 'flatly overrule a number of major decisions of this Court,'" *Gamble* v. *United States*, 587 U. S. ___, ___ (2019) (slip op., at 11), as HHC essentially asks us to do here.

Second, because "[t]here is no doubt that the cause of action created by §1983 is, and was always regarded as, a tort claim," *Monterey* v. *Del Monte Dunes at Monterey, Ltd.*, 526 U. S. 687, 727 (1999) (Scalia, J., concurring in part and concurring in judgment), HHC's particular focus on 1870s law governing third-party-beneficiary suits in contract is, at the very least, perplexing.  If there is a reason that the principles governing those suits should be read to displace the plain scope of §1983's "'species of tort liability,'" *Heck* v. *Humphrey*, 512 U. S. 477, 483 (1994), HHC has utterly failed to identify it.

We have no doubt that HHC wishes §1983 said something else.  But that is "an appeal better directed to Congress." *Nieves* v. *Bartlett*, 587 U. S. ___, ___ (2019) (GORSUCH, J., concurring in part and dissenting in part) (slip op., at 2). Hewing to §1983's text and history (not to mention our precedent and constitutional role), we reject HHC's request, and reaffirm that "laws" in §1983 means what it says.  *Thiboutot*, 448 U. S., at 4.[8]

---

[7] Black's Law Dictionary 154 (11th ed. 2019) (defining assumpsit, as relevant, as a "common-law action for . . . breach of a contract").

[8] HHC's reply brief retreats from its initial ask, by appearing to concede that Spending Clause legislation *can* secure individual rights under §1983, but (it says) only if the statutory language "giv[es] funding recipients clear notice."  Reply Brief 1.  This newly minted argument contradicts the opening brief's categorical claims about the scope of §1983.  In any event, the well-established requirement that Congress must have "unambiguously conferred" a §1983-enforceable right in a Spending Clause statute ensures the clear notice that HHC's reply brief requests. *Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 279–280, 283 (2002); Part III, *infra*.

### III

The FNHRA *can* create §1983-enforceable rights. But do the two FNHRA provisions at issue in this case actually do so? In that respect, our precedent sets a demanding bar: Statutory provisions must *unambiguously* confer individual federal rights. *Gonzaga*, 536 U. S., at 280. For the reasons explained below, we conclude that the bar has been cleared with respect to the presently contested provisions. And while the FNHRA itself might nevertheless evince Congress's intent to preclude the use of §1983 to enforce these particular rights, *id.*, at 284, n. 4, we hold further that it does not.

### A

The FNHRA provisions at issue in this case, like the rest of the Act, stem from a longstanding national commitment to provide safe and dignified care for the elderly. Since as early as the Social Security Act of 1935, federal law has aimed in myriad ways to promote nursing homes that provide quality services. Yet, concerns about the poor condition of such facilities persisted even after Congress enacted the 1965 Medicare and Medicaid Acts,[9] partly due to widespread noncompliance with existing federal and state laws. See Institute of Medicine, Improving the Quality of Care in Nursing Homes 2–3, 11, 241–246 (1986); H. R. Rep. No. 100–391, pt. 1, pp. 448–452 (1987). Thus, in 1987, Congress passed, and President Ronald Reagan signed, the FNHRA, effecting a "seismic shift" in nursing-home quality standards. B. Furrow, T. Greaney, S. Johnson, T. Jost, & R. Schwartz, Health Law 51 (3d ed. 2015) (Health Law).[10] The

---

[9] Medicare "provides Government-funded health insurance to" millions of "elderly or disabled Americans," while Medicaid "provides health insurance to all low-income individuals, regardless of age or disability." *Becerra* v. *Empire Health Foundation, for Valley Hospital Medical Center*, 597 U. S. \_\_\_, \_\_\_–\_\_\_ (2022) (slip op., at 2–3).

[10] The Omnibus Budget Reconciliation Act of 1987 added the FNHRA

FNHRA is largely composed of a litany of statutory require-
ments that Congress laid out for Medicaid-participant
States and "nursing facilities." §1396a(a)(28).[11]  Those in-
clude "[r]equirements relating to residents' rights,"
§1396r(c) (boldface deleted), two of which Talevski's com-
plaint invoked.

The first requires nursing facilities to "protect and pro-
mote" residents' "right to be free from . . . any physical or
chemical restraints imposed for purposes of discipline or
convenience and not required to treat the resident's medical
symptoms." §1396r(c)(1)(A)(ii) (referred to herein as "the
unnecessary-restraint provision"). The second appears in a
subparagraph concerning "[t]ransfer and discharge rights,"
§1396r(c)(2)(A) (boldface deleted), and tells nursing facili-
ties that they "must not transfer or discharge [a] resident"
unless certain enumerated preconditions, including ad-
vance notice of such a transfer or discharge, are met.  *E.g.*,
§§1396r(c)(2)(A)–(B) (referred to herein as "the predis-
charge-notice provision").

As for enforcement, like other aspects of Medicaid, the
FNHRA anticipates "cooperative federalism"—*i.e.*, federal
and state actors working together—to carry out the stat-
ute's aims.  *Wisconsin Dept. of Health and Family Servs.* v.
*Blumer*, 534 U. S. 473, 495 (2002).  Thus, qualifying State
Medicaid plans, which are approved by the Secretary of the
U. S. Department of Health and Human Services (HHS Sec-
retary), §1396a(b), must include provisions that relate to

––––––––––
to Title XIX of the Social Security Act, *i.e.*, Medicaid.  See 101 Stat. 1330–
182.  The FNHRA added a materially identical section to the Medicare-
focused portion of the Social Security Act, 101 Stat. 1330–160, 42 U. S. C.
§1395i–3 *et seq.*  Because Talevski's complaint relies only on the Medi-
caid-related FNHRA provisions, App. to Pet. for Cert. 76a, we hereafter
follow the parties and the Court of Appeals in referring only to the perti-
nent Medicaid provisions, as codified in the U. S. Code (§§1396a(a)(28),
1396r).

[11] "Nursing facility" is the FNHRA's term for a nursing home.
§1396r(a).

nursing facilities, and must require "any nursing facility receiving payments under" the plan to satisfy certain FNHRA mandates. §1396a(a)(28). The HHS Secretary must also "assure that" approved state plans—and "the enforcement of [plan] requirements"—are, *inter alia*, "adequate" to "protect the health, safety, welfare, and rights of [nursing-home] residents." §1396r(f)(1).

The FNHRA also establishes a detailed administrative scheme for government inspections of nursing facilities. §1396r(g). "Surveys" (in the statute's parlance) must be conducted to detect nursing homes that are falling short of the FNHRA's minimum standards, and state and federal officials must periodically file certifications, based on these surveys, regarding nursing-home compliance, see §1396r(g)(1)(A). In addition, the statute authorizes government actors to sanction and correct noncompliant facilities, or, if appropriate, exclude them from the Medicaid program entirely. §1396r(h); see also Health Law 56–63.

## B

### 1

Although federal statutes have the potential to create §1983-enforceable rights, they do not do so as a matter of course. For Spending Clause legislation in particular, we have recognized that "'the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State.'" *Gonzaga*, 536 U. S., at 280 (quoting *Pennhurst*, 451 U. S., at 28). The parties here thus dispute whether this is the atypical case; that is, whether the unnecessary-restraint and predischarge-notice provisions of the FNHRA "unambiguously confe[r]" individual rights, making those rights "presumptively enforceable" under §1983. 536 U. S., at 283–284.

*Gonzaga* sets forth our established method for ascertaining unambiguous conferral. Courts must employ traditional tools of statutory construction to assess whether Congress has "unambiguously conferred" "individual rights upon a class of beneficiaries" to which the plaintiff belongs. *Id.*, at 283, 285–286; see also *Rancho Palos Verdes* v. *Abrams*, 544 U. S. 113, 120 (2005). Notably, it must be determined that "Congress intended to create a federal right *for* the identified class, not merely that the plaintiffs fall "within the general zone of interest that the statute is intended to protect." *Gonzaga*, 536 U. S., at 283 (emphasis deleted). This paradigm respects Congress's primacy in this arena and thus vindicates the separation of powers. *Id.*, at 286.

We have held that the *Gonzaga* test is satisfied where the provision in question is "'phrased in terms of the persons benefited'" and contains "rights-creating," individual-centric language with an "'unmistakable focus on the benefited class.'" *Id.*, at 284, 287 (emphasis deleted). Conversely, we have rejected §1983 enforceability where the statutory provision "contain[ed] no rights-creating language"; had "an aggregate, not individual, focus"; and "serve[d] primarily to direct the [Federal Government's] distribution of public funds." *Id.*, at 290.

If a statutory provision surmounts this significant hurdle, it "secure[s]" §1983-enforceable rights, consistent with §1983's text. And because "§1983 generally supplies a remedy for the vindication of rights secured by federal statutes," rights so secured are deemed "presumptively enforceable" under §1983. *Gonzaga*, 536 U. S., at 284.

### 2

The unnecessary-restraint and predischarge-notice provisions meet this test. To start, we note that both reside in 42 U. S. C. §1396r(c), which expressly concerns "[r]equirements *relating to residents' rights*." *Ibid.* (emphasis added;

Opinion of the Court

boldface deleted); see also *West Virginia* v. *EPA*, 597 U. S.
___, ___ (2022) (slip op., at 16) (statutory provisions "'must
be read in their context and with a view to their place in the
overall statutory scheme'"). This framing is indicative of
an individual "rights-creating" focus. *Gonzaga*, 536 U. S.,
at 284. Examined further, the text of the unnecessary-
restraint and predischarge-notice provisions unambigu-
ously confers rights upon the residents of nursing-home fa-
cilities.

The unnecessary-restraint provision requires nursing
homes to "protect and promote . . . *[t]he right* to be free from
. . . any physical or chemical restraints imposed for pur-
poses of discipline or convenience and not required to treat
*the resident's* medical symptoms." §1396r(c)(1)(A)(ii) (em-
phasis added). The provision's enumerated exceptions fur-
ther sustain the focus on individual residents. For example,
nursing homes may use restraints "to ensure the physical
safety *of the resident or other residents*," but "only upon the
written order of a physician that specifies the duration and
circumstances under which the restraints are to be used"
(absent emergency circumstances specified by the HHS Sec-
retary). §§1396r(c)(1)(A)(ii)(I)–(II) (emphasis added).

The predischarge-notice provision is more of the same.
Nestled in a paragraph concerning "transfer and discharge
*rights*," §1396r(c)(2) (emphasis added; boldface deleted),
that provision tells nursing facilities that they "must not
transfer or discharge [a] *resident*" unless certain precondi-
tions are met, including advance notice of the transfer or
discharge to the resident and his or her family.
§§1396r(c)(2)(A)–(B) (emphasis added). And, again, the
statute's caveats remain focused on individual residents: A
nursing home may transfer or discharge such an individual
if, among other things, the transfer is "necessary to meet
*the resident's* welfare"; or if the resident's health has im-
proved so much that the facility is no longer necessary; or if

the safety or health of other individuals would be endangered. §1396r(c)(2)(A) (emphasis added). The exceptions to the advance-notice requirement, too, turn (*inter alia*) on the "*resident's* health," the "*resident's* urgent medical needs," or the existence of threats to the safety or health of other individuals in the nursing home. §§1396r(c)(2)(B)(ii)(I)–(III) (emphasis added).

To be sure, these two provisions also establish who it is that must respect and honor these statutory rights; namely, the Medicaid-participant nursing homes in which these residents reside. See, *e.g.*, §§1396a(a)(28), 1396r(c)(1)(A), 1396r(c)(2)(A); see also §§1396r(c)(1)(B)(i)–(ii) (requiring nursing homes to inform nursing-home residents of their rights, orally and in writing, upon admission and upon request). But that is not a material diversion from the necessary focus on the nursing-home residents, contrary to HHC's representations. Indeed, it would be strange to hold that a statutory provision fails to secure rights simply because it considers, alongside the rights bearers, the actors that might threaten those rights (and we have never so held).[12]

The unnecessary-restraint and predischarge-notice provisions thus stand in stark contrast to the statutory provisions that failed *Gonzaga*'s test in *Gonzaga* itself. Those provisions lacked "rights-creating language," primarily directed the Federal Government's "distribution of public funds," and had "an aggregate, not individual, focus." 536 U. S., at 290. The opposite is true here. The unnecessary-restraint and predischarge-notice provisions use clear "rights-creating language," speak "'in terms of the persons benefited,'" and have an "'unmistakable focus on the benefited class.'" *Id.*, at 284, 287, 290 (emphasis deleted). Thus, they satisfy *Gonzaga*'s stringent standard, and the rights

---

[12] The Fourteenth Amendment hardly fails to secure §1983-enforceable rights because it directs state actors not to deny equal protection.

Opinion of the Court

they recognize are presumptively enforceable under §1983.

### C

Even if a statutory provision unambiguously secures rights, a defendant "may defeat t[he] presumption by demonstrating that Congress did not intend" that §1983 be available to enforce those rights. *Rancho Palos Verdes*, 544 U. S., at 120.[13]  For evidence of such intent, we have looked to "the statute creating the right." *Ibid.*  A statute could, of course, expressly forbid §1983's use. *Fitzgerald*, 555 U. S., at 252; *Rancho Palos Verdes*, 544 U. S., at 120.  Absent such a sign, a defendant must show that Congress issued the same command implicitly, by creating "a 'comprehensive enforcement scheme that is incompatible with individual enforcement under §1983.'" *Id.*, at 120.  Only the latter path is at issue here.

### 1

Our precedent outlines what HHC must show to traverse the implicit-preclusion path.  "'The crucial consideration'" is whether "Congress intended a statute's remedial scheme to 'be *the exclusive avenue* through which a plaintiff may assert [his] claims.'" *Fitzgerald*, 555 U. S., at 252 (quoting *Smith* v. *Robinson*, 468 U. S. 992, 1009, 1012 (1984) (emphasis added)); *Fitzgerald*, 555 U. S., at 252 (framing "'[t]he

_____

[13]The "'rebuttable presumption'" that our cases describe, *Rancho Palos Verdes*, 544 U. S., at 120, is not an artificially onerous court-made hurdle.  It merely reflects what §1983's plain text commands: The §1983 remedy is available to vindicate federal individual rights "secured by . . . la[w]."  In other words, the presumption recognizes that, even where Congress has unambiguously secured certain federal individual rights by law, it *may* have simultaneously given good reason (detectable with ordinary interpretive tools) to conclude that the §1983 remedy is not available for those rights, even though it "generally" is. *Gonzaga*, 536 U. S., at 284, and n. 4.  And it also recognizes that it is the defendant's burden to show that a right otherwise secured by law is not §1983 enforceable. *Rancho Palos Verdes*, 544 U. S., at 120; *Gonzaga*, 536 U. S., at 284, and n. 4.

critical question'" as "'whether Congress meant [the statute's remedial scheme] to coexist with . . . a §1983 action'" (quoting *Rancho Palos Verdes*, 544 U. S., at 120–121)).

Our precedents make clear that the *sine qua non* of a finding that Congress implicitly intended to preclude a private right of action under §1983 is incompatibility between enforcement under §1983 and the enforcement scheme that Congress has enacted. 555 U. S., at 252–254. We have used many terms and concepts to describe the necessary discordance between §1983 and a rights-conferring statute's remedial scheme: "'incompatible,'" "'inconsistent,'" and "thwar[t]" are examples. *Id.*, at 252–255. In all events, the question is whether the design of the enforcement scheme in the rights-conferring statute is inconsistent with enforcement under §1983, such that a court must infer that "Congress did not intend" to make available the "[§1983] remedy for [these] newly created right[s]." *Rancho Palos Verdes*, 544 U. S., at 120; see also *Fitzgerald*, 555 U. S., at 252.

Put another way, the inquiry boils down to what Congress intended, as divined from text and context. The application of the traditional tools of statutory construction to a statute's remedial scheme may reveal no incompatibility between the enforcement scheme that Congress crafted in the rights-conferring statute and enforcement under §1983, or it may uncover sufficient incompatibility to make manifest Congress's intent to preclude §1983 actions. See, *e.g.*, *id.*, at 253 (explaining a past implicit-preclusion case on the ground that permitting §1983 claims there would have "thwarted Congress' intent"); *Rancho Palos Verdes*, 544 U. S., at 127 (§1983's operation would have "distort[ed]" the pertinent other statute's remedial scheme).

2

We discern no incompatibility between the FNHRA's remedial scheme and §1983 enforcement of the rights that the unnecessary-restraint and predischarge-notice provisions

Opinion of the Court

unambiguously secure.

As explained in Part III–A, *supra*, the FNHRA details administrative processes concerning inspection of covered nursing facilities and accountability for noncompliant facilities. But the statute lacks any indicia of congressional intent to preclude §1983 enforcement, such as an express private judicial right of action or any other provision that might signify that intent. See, *e.g.*, *id.*, at 121 ("[T]he existence of a more restrictive private remedy [in the statute itself] for statutory violations has been the dividing line between those cases in which we have held that an action would lie under §1983 and those in which we have held that it would not"). Nor has HHC otherwise demonstrated that enforcement via §1983 would thwart the operation of the administrative remedial scheme in any respect.

HHC's argument that we need look no further than the detail of the FNHRA's enforcement mechanisms to find conclusive evidence of implicit preclusion is unpersuasive. Implicit preclusion is shown by a "'comprehensive enforcement scheme *that is incompatible* with individual enforcement under §1983.'" *Fitzgerald*, 555 U. S., at 252 (emphasis added). HHC's single-minded focus on comprehensiveness mistakes the shadow for the substance, and it disregards the import of these FNHRA provisions' unambiguous conferral of rights. The attendant presumption is that §1983 can play its textually prescribed role as a vehicle for enforcing those rights, even alongside a detailed enforcement regime that also protects those interests, so long as §1983 enforcement is not "'incompatible'" with Congress's handiwork. *Rancho Palos Verdes*, 544 U. S., at 120, 122; *Blessing* v. *Freestone*, 520 U. S. 329, 347–348 (1997) (collecting cases).

To be clear, a defendant *can* discharge its burden of showing that the presumption is rebutted by pointing to a comprehensive scheme. *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 20 (1981)

(statutory "remedial devices" that are "sufficiently comprehensive . . . may suffice" to show implicit preclusion).  But when a particular comprehensive remedial scheme discharges the defendant's burden, it does so because the application of ordinary interpretive tools reveals incompatibility, *i.e.*, it demonstrates that "Congress intended [that] statute's remedial scheme to be the 'exclusive avenue through which a plaintiff may assert [his] claims.'" *Fitzgerald*, 555 U. S., at 252.

Nothing in the FNHRA indicates the incompatibility evinced in our three prior cases finding implicit preclusion. *Rancho Palos Verdes*, 544 U. S., at 120–123, 127; *Smith*, 468 U. S., at 1008–1013; *Sea Clammers*, 453 U. S., at 6–7, 19–21.  *Rancho Palos Verdes*, *Smith*, and *Sea Clammers* concerned statutes with self-contained enforcement schemes that included statute-specific rights of action. *Rancho Palos Verdes*, 544 U. S., at 120–123; *Smith*, 468 U. S., at 1008–1012; *Sea Clammers*, 453 U. S., at 6–7, 17, and n. 27, 19–21.  Each such statute required plaintiffs to "comply with particular procedures and/or to exhaust particular administrative remedies" under the statute's enforcement scheme before suing under its dedicated right of action.  *Fitzgerald*, 555 U. S., at 254.  And each statute-specific right of action offered fewer benefits than those available under §1983.  *Ibid.*, and n. 1.  Thus, in all three cases, §1983's operation would have thwarted Congress's scheme coming and going: It would have "circumvented" the statutes' presuit procedures, and would have also "given plaintiffs access to tangible benefits" as remedies that were "unavailable under the statutes."  *Id.*, at 254.  Those "'comprehensive enforcement scheme[s]'" were "'incompatible with individual enforcement under §1983.'"  *Id.*, at 252 (quoting *Rancho Palos Verdes*, 544 U. S., at 120).

HHC has identified no equivalent sign in the FNHRA; nor has JUSTICE ALITO, see *post*, at 1, 3–5 (dissenting opinion).  In focusing on what the FNHRA contains, they ignore

what it lacks—a private judicial right of action, a private federal administrative remedy, or any "'carefu[l]'" congressional "'tailor[ing],'" *Fitzgerald*, 555 U. S., at 255, that §1983 actions would "distort," *Rancho Palos Verdes*, 544 U. S., at 127. HHC seems to think it enough to show that Congress was not slipshod in crafting the remedial scheme. But in a world where the FNHRA's remedial scheme could "complement," not "supplant, §1983," *id.*, at 122, HHC must demonstrate more than that.

One last rebuttal argument warrants addressing. The United States says that, because private entities owned most nursing homes when the FNHRA was enacted in 1987 (as they do now), the FNHRA is a rare bird for implicit-preclusion purposes. In the United States' view, because Congress knew that most nursing homes could not be subject to suit under §1983 anyway, see, *e.g.*, *Polk County* v. *Dodson*, 454 U. S. 312, 317–319 (1981), the FNHRA's remedial scheme "necessarily reflects Congress's judgment that these administrative enforcement mechanisms appropriately protect the rights the statute confers," Brief for United States as *Amicus Curiae* 31.

This argument is unavailing. The implicit-preclusion inquiry looks to "the *statute* creating the right" and any "'comprehensive enforcement scheme'" Congress has created in the statute "'that is incompatible with individual enforcement under §1983.'" *Rancho Palos Verdes*, 544 U. S., at 120 (emphasis added). It does not invite speculation about ostensible marketplace realities that appear nowhere in the statute's text or relevant context. The relevant FNHRA provisions speak in neutral terms that do not distinguish between private and public nursing homes. And, regardless, the question remains whether something in the FNHRA has foreclosed §1983's "genera[l]" availability as "a remedy for the vindication of rights secured by federal statutes." *Gonzaga*, 536 U. S., at 284. We see no such sign,

much less a license for us to construct and impute congressional intent that the FNHRA does not embody.

The difficulty for HHC and the United States is that implicit preclusion, in this context, requires something in the statute that shows that permitting §1983 to operate would "thwar[t] Congress' intent" in crafting the FNHRA. *Fitzgerald*, 555 U. S., at 253. We see nothing in the FNHRA that even hints at Congress's intent in this regard; if anything, the language of the Act confirms otherwise, for it plainly states that "[t]he remedies provided under" its enforcement-process subsection are "*in addition to* those otherwise available under State or Federal law and shall not be construed as limiting such other remedies." §1396r(h)(8) (emphasis added).[14] We will not rewrite §1396r(h)(8) in lieu of rewriting §1983.[15]

\*    \*    \*

At oral argument, HHC's counsel remarked that the "right question" is "what rights are secured by law within

--------

[14] We found similar (but not identical) language to be insufficient to preserve the presumption in *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1 (1981), and *Rancho Palos Verdes* v. *Abrams*, 544 U. S. 113 (2005). See *id.*, at 125–127. But those clauses did not purport to preserve "other remedies," and were embedded in statutes that (unlike the FNHRA) contained private judicial rights of action. See *ibid.*; *Sea Clammers*, 453 U. S., at 6–7, 20, and n. 31. The FNHRA's explicitly expressed objective of preserving other remedies bolsters our reluctance to infer implicit displacement of the §1983 remedy. We think JUSTICE ALITO's response in this regard overreads *Rancho Palos Verdes*. See *post*, at 6. That case merely provided an unremarkable description of *Sea Clammers*' "refus[al] to read" the saving clauses there as preserving §1983 actions, in light of the different (and significant) textual and contextual evidence of preclusion that the statutes at issue provided. *Rancho Palos Verdes*, 544 U. S., at 127.

[15] The United States' suggestion that §1396r(h)(8) just ensures that remedies available under non-FNHRA, non-§1983 statutes remain available is not persuasive. Brief for United States as *Amicus Curiae* 34. Nothing in the Act supports interpreting §1396r(h)(8)'s language in that manner, especially given §1983's unqualified command.

Opinion of the Court

the meaning of §1983." Tr. of Oral Arg. 39. That is an accurate statement of the key issue in this case. Section 1983 itself provides the answer. By its terms, §1983 is available to enforce every right that Congress validly and unambiguously creates; we will not impose a categorical font-of-power condition that the Reconstruction Congress did not. And, here, the test that our precedents establish leads inexorably to the conclusion that the FNHRA secures the particular rights that Talevski invokes, without otherwise signaling that enforcement of those rights via §1983 is precluded as incompatible with the FNHRA's remedial scheme.

Accordingly, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

Cite as: 599 U. S. ____ (2023) 1

GORSUCH, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–806

_____

HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, ET AL., PETITIONERS *v.* IVANKA TALEVSKI, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GORGI TALEVSKI, DECEASED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 8, 2023]

JUSTICE GORSUCH, concurring.

Section 1983 permits individuals to sue to vindicate their "rights . . . secured by . . . la[w]." Rev. Stat. §1979, 42 U. S. C. §1983. I agree with the Court's disposition of the two questions we took this case to decide and in arriving there largely track JUSTICE BARRETT's reasoning. First, the Federal Nursing Home Reform Act qualifies as a "law" for purposes of §1983. *Post,* at 1 (BARRETT, J., concurring). Second, the text of the Act's operative provisions refers to individual "rights." *Post,* at 2–4 (same). But, to my mind, there are other issues lurking here that petitioners failed to develop fully—whether legal rights provided for in spending power legislation like the Act are "secured" as against States in particular and whether they may be so secured consistent with the Constitution's anti-commandeering principle. See, *e.g., National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519, 575–578 (2012); *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. ___, ___–___ (2018) (slip op., at 14–18). As I see it, those are questions for another day.

BARRETT, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–806

_____

## HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, ET AL., PETITIONERS v. IVANKA TALEVSKI, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GORGI TALEVSKI, DECEASED

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 8, 2023]

JUSTICE BARRETT, with whom THE CHIEF JUSTICE joins, concurring.

Today's opinion makes three important points. First, *Maine* v. *Thiboutot* remains good law. 448 U. S. 1 (1980). Second, *Gonzaga University* v. *Doe* sets the standard for determining when a Spending Clause statute confers individual rights, and the Federal Nursing Home Reform Act (FNHRA) satisfies it. 536 U. S. 273 (2002). Third, courts must carefully consider whether individual rights established by a Spending Clause statute are enforceable through 42 U. S. C. §1983—in the FNHRA's case, they are.

As to the first point: Section 1983 provides a cause of action against "[e]very person" who, under color of state law, violates "any rights, privileges, or immunities secured by the Constitution and laws." In *Thiboutot*, we held that the plain language of the statute was not limited to "some subset of laws." 448 U. S., at 4. Rather, the term "laws" encompasses all federal laws, including those passed pursuant to Congress's Spending Clause authority. *Ibid.* Like the Court, I would not abandon that holding based on petitioners' novel contract-law theory.

Second, our decision in *Gonzaga* establishes the standard for analyzing whether Spending Clause statutes give rise to

individual rights.   Under *Gonzaga*, courts must ask
whether "text and structure" indicate that the statute "unambiguously" confers federal rights.  536 U. S., at 283, 286.
Relevant considerations include whether the statute is
"'phrased in terms of the persons benefited,'" whether it
uses "explicit rights-creating terms," and whether it has an
"individual," rather than an "aggregate," focus.  *Id.*, at 284,
290.

This bar is high, and although the FNHRA clears it,
many federal statutes will not.  As the Court explains,
§1983 actions are the exception—not the rule—for violations of Spending Clause statutes.  *Ante*, at 13.  This is because "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for
noncompliance but rather action by the Federal Government to terminate funds to the State."  *Pennhurst State
School and Hospital* v. *Halderman*, 451 U. S. 1, 28 (1981).
Indeed, since *Pennhurst*, we have interpreted only two
Spending Clause statutes to be enforceable through §1983.
See *Wright* v. *Roanoke Redevelopment and Housing Authority*, 479 U. S. 418, 432 (1987); *Wilder* v. *Virginia Hospital
Assn.*, 496 U. S. 498, 522–523 (1990).

The third point is that even when a statute unambiguously confers rights, Congress can "supplant any remedy
that otherwise would be available under §1983." *Middlesex
County Sewerage Authority* v. *National Sea Clammers
Assn.*, 453 U. S. 1, 21 (1981).  At this step of the analysis,
courts should apply ordinary interpretive tools to determine
whether the statute allows access to §1983.  *Ante*, at 18; see
*Sea Clammers*, 453 U. S., at 13, 20–21 ("We look first, of
course, to the statutory language, particularly to the provisions made therein for enforcement and relief").  In some
cases, the text may expressly forbid §1983 actions.  In others, context may point to the same result.  It is especially
telling, for example, if the statute "'creat[es] a comprehen-

sive enforcement scheme that is incompatible with individual enforcement under §1983.'" *Gonzaga*, 536 U. S., at 284–285, n. 4.

As the Court notes, the presence of an "express private judicial right of action" typically demonstrates that a §1983 suit is not also available. *Ante*, at 19; see *Rancho Palos Verdes* v. *Abrams*, 544 U. S. 113, 121 (2005) (express cause of action "is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under §1983"). When the statutory cause of action restricts available remedies or imposes procedural hurdles to obtaining relief, the inference is even stronger. See *Fitzgerald* v. *Barnstable School Comm.*, 555 U. S. 246, 254 (2009) (considering whether a §1983 suit "would have circumvented these procedures and given plaintiffs access to tangible benefits—such as damages, attorney's fees, and costs—that were unavailable under the statut[e]"); *Rancho Palos Verdes*, 544 U. S., at 122–123 (similar).

But an actual clash—one private judicial remedy against another, more expansive remedy—is not required to find that a statute forecloses recourse to §1983. Our cases have looked to a wide range of contextual clues, like "enforcement provisions" that "confe[r] authority to sue . . . on government officials," *Sea Clammers*, 453 U. S., at 13, 20, and any "administrative remedies" that the statute offers, *Smith* v. *Robinson*, 468 U. S. 992, 1012 (1984). We have noted the relevance of a centralized review mechanism that would be undermined by piecemeal litigation. *Gonzaga*, 536 U. S., at 289–290 (statute directed the Secretary of Education to establish a review board to investigate and adjudicate alleged violations). And we have regularly taken account of the overall comprehensiveness of the statute's enforcement scheme. The more comprehensive the scheme, the less likely that it leaves the door open for §1983 suits. *Sea Clammers*, 453 U. S., at 20 ("When the remedial devices provided in a particular Act are sufficiently comprehensive,

they may suffice to demonstrate congressional intent to pre-
clude the remedy of suits under §1983"); *Smith*, 468 U. S.,
at 1011–1012 (§1983 suits unavailable "[i]n light of the com-
prehensive nature of the procedures and guarantees set
out" in the statute). None of these features is necessarily
determinative, but each is part of the larger picture that
courts must assess.

Courts must tread carefully before concluding that
Spending Clause statutes may be enforced through §1983.
In this case, however, the Seventh Circuit correctly allowed
Talevski's §1983 suit to proceed. I therefore join the Court's
opinion in full.

Cite as: 599 U. S. ____ (2023)          1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–806

_____

## HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, ET AL., PETITIONERS v. IVANKA TALEVSKI, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GORGI TALEVSKI, DECEASED

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 8, 2023]

JUSTICE THOMAS, dissenting.

I agree with JUSTICE ALITO that the Federal Nursing Home Reform Act (FNHRA) cannot be enforced through Rev. Stat. §1979, 42 U. S. C. §1983, under *Gonzaga Univ.* v. *Doe*, 536 U. S. 273 (2002). I write separately to highlight another and more fundamental reason why FNHRA cannot be enforced under §1983. Section 1983 provides a cause of action to redress only "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." But legislation enacted pursuant to Congress' spending power, like FNHRA, does not "secure" rights by "law."

For nearly all of our Nation's history, it was understood that there is a fundamental difference between the exercise of Congress' sovereign legislative powers, on the one hand, and the exercise of its power to spend money and to attach conditions to the receipt of that money, on the other. Only the former sort of legislation, which imposes obligations on regulated parties with the force of law, directly secures by law the rights corresponding to those obligations. By contrast, an exercise of Congress' spending power, whether it comes from the so-called Spending Clause or elsewhere in the Constitution, is no more than a disposition of funds. As

such, a *conditional* exercise of the spending power is nothing more than a contractual offer; any "rights" that may flow from that offer are "secured" only by the offeree's acceptance and implementation, not federal law itself.

Since *Maine* v. *Thiboutot*, 448 U. S. 1 (1980), however, this Court has ignored that fundamental distinction, permitting third parties who benefit from spending conditions to enforce them in §1983 suits against state actors. In doing so, it has created a constitutional quandary: If spending conditions that benefit third parties are laws and secure rights in the same manner as ordinary lawmaking under Congress' sovereign legislative powers, then such conditions would contradict the bedrock constitutional prohibition against federal commandeering of the States. We escape this quandary only by recognizing spending conditions, not as rights-securing laws, but as the terms of possible contracts that secure rights only by virtue of an offeree's acceptance—the very conclusion compelled by the traditional understanding of the spending power. The choice between these alternatives is stark and unavoidable: Either spending conditions in statutes like FNHRA are not laws that secure rights cognizable under §1983, or they are unconstitutional direct regulations of States. The Court must, at some point, revisit its understanding of the spending power and its relation to §1983.

## I

This case arises from a §1983 suit to enforce FNHRA's spending conditions against a county-owned nursing home that receives federal funding. Enacted under Congress' spending power, FNHRA conditions the receipt of federal Medicaid funding by States and nursing facilities on compliance with a broad range of requirements.

These conditions largely consist of requirements that funding recipients protect certain "rights" of nursing-home residents. In a subsection entitled "[r]equirements relating

to residents' rights," the Act requires recipients to "protect and promote the rights of each resident," including "[t]he right to choose a personal attending physician" and make informed medical decisions; "[t]he right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any [medically unnecessary] physical or chemical restraints"; and "[t]he right[s] to privacy" and "confidentiality." 42 U. S. C. §§1396r(c)(1)(A)(i)–(iv). The Act further provides that funding recipients "must permit each resident to remain in the facility and must not transfer or discharge the resident" without cause. §1396r(c)(2)(A). Recipients must also adopt procedures for residents to assert these "rights" and to otherwise "voice grievances with respect to [their] treatment or care." §1396r(c)(1)(A)(vi).

The Act also imposes many requirements directly and uniquely upon participating States, including in a subsection entitled "State requirements relating to nursing facility requirements." §1396r(e). For instance, States must establish procedures for residents to challenge transfer and discharge decisions and an appeals process for other determinations. §§1396r(e)(3) and (e)(7)(F). States are also required to certify non-state-run facilities' compliance with the Act's provisions by conducting annual surveys using protocols developed by the Secretary of Health and Human Services. §1396r(g)(2)(A). If a State finds that a facility is not providing adequate care, it must conduct an extended survey. §1396r(g)(2)(B). The Act also requires States to investigate resident complaints and perform onsite monitoring at previously noncompliant or potentially noncompliant facilities. §1396r(g)(4)(B). And, if it finds a violation that "jeopardize[s] the health or safety of [a facility's] residents, the State shall take immediate action to remove the jeopardy and correct the deficiencies." §1396r(h)(1)(A).[1]

---

[1]This survey merely scratches the surface of the requirements that FNHRA imposes upon participating States. See also, *e.g.*, 42 U. S. C.

FNHRA's scheme is illustrative of many modern federal spending programs, which often impose obligations directly on States as a condition of funding. For example, as a condition on highway funding, the Clean Air Act requires States to draft "State implementation plans" if their metropolitan areas fail to satisfy national ambient air quality standards. 42 U. S. C. §§7410 and 7509(a)–(b). Among other requirements, these plans must include emission limitations, compliance timetables, source monitoring, permitting systems, enforcement programs, and public participation. See §7410(a)(2). Other examples, spanning virtually every domain of national and state policy, abound.

The ubiquity of such spending conditions, combined with the Federal Government's overwhelming financial heft, has made Spending Clause legislation an extraordinarily potent instrument of federal control.[2] Congress and federal

---

§1396r(e)(4) ("[T]he State must have implemented and enforced the nursing facility administrator standards developed" by the Secretary for Health and Human Services); §1396r(e)(7)(B)(i)(I) (in the case of mentally ill residents, "the State . . . must review and determine . . . whether or not the resident . . . requires the level of services provided by a nursing facility" or the services of different institutions).

[2] The power of this tool has grown with the steady increase in federal income-tax revenues since the adoption of the Sixteenth Amendment. Although the Revenue Act of 1913 accounted for only 10% of federal revenue, by 1950, the income tax was the Nation's largest source of revenue, and, by 2010, it accounted for a whopping 82% of federal revenue overall. E. Jensen, Did the Sixteenth Amendment Ever Matter? Does It Matter Today? 108 Nw. U. L. Rev. 799, 807, n. 44 (2014). This explosion of funds created unprecedented threats to federalism due to the increased use of grants. Federal "[m]onetary grants, so-called grants-in-aid, became more frequent during the 1930's, and by 1950 they had reached $20 billion or 11.6% of state and local government expenditures." *National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519, 674 (2012) (*NFIB*) (joint dissent of Scalia, Kennedy, Thomas, and Alito, JJ.) (citation and footnote omitted). "By 1970 this number had grown to $123.7 billion or 29.1% of state and local government expenditures . . . . As of 2010, federal outlays to state and local governments came to over $608

THOMAS, J., dissenting

agencies "regularly us[e] conditions to direct state and local governments in their regulatory and spending policies." P. Hamburger, Purchasing Submission 139 (2021) (Hamburger). As a result, "the priorities and programs of state and local governments have increasingly come to reflect federal decisions," to the point that the States have virtually become "disaggregated sites of national governance, not separate sovereigns." *Id.*, at 141 (internal quotation marks omitted). Given the profound consequences of spending conditions for the Nation's governance and the fundamental shift that they have wrought in our federalist system, a sound understanding of their constitutional basis and permissible legal effects is essential.

## II

This case presents one aspect of that question: whether spending conditions that impose obligations on States for the benefit of third parties may be enforced under §1983. That statute provides a cause of action against any "person who, under color" of state law, deprives the plaintiff "of any rights, privileges, or immunities secured by the Constitution and laws." Accordingly, for the violation of a federal statutory provision to give rise to a cognizable §1983 claim, the provision must confer "rights, privileges, or immunities" that are "secured by . . . la[w]." This Court's cases make clear that a right is secured by law in the relevant sense if, and only if, federal law imposes a binding obligation on the defendant to respect a corresponding substantive right that belongs to the plaintiff.[3]

─────────────
billion or 37.5% of state and local government expenditures." *Ibid.* (footnotes omitted).

[3]See *Golden State Transit Corp.* v. *Los Angeles*, 493 U. S. 103, 106 (1989) ("[T]he plaintiff must assert the violation of a federal right. . . . In deciding whether a federal right has been violated, we have considered whether the provision in question creates obligations binding on the governmental unit" and "whether the provision in question was intended to benefit the putative plaintiff" (alteration and internal quotation marks

In *Thiboutot*, the Court held that "the plain language of [§1983] undoubtedly embraces [a] claim that [the defendant] violated" a spending-power statute, reasoning that "the phrase 'and laws' . . . means what it says" and is not "limited to some subset of laws." 448 U. S., at 4. The Court unquestioningly follows *Thiboutot*'s logic today.

It is obvious, however, that conditional spending legislation does not function—and, in particular, does not "secure rights"—like laws enacted under Congress' enumerated legislative powers, such as the Commerce Clause. The latter, which I will refer to as "sovereign legislative" or "regulatory" powers, include powers to directly impose obligations, duties, prohibitions, and the like on individuals and entities beyond the Federal Government, and hence to secure corresponding rights in the persons and entities to which such obligations are owed. Laws that Congress enacts pursuant to its regulatory powers are binding on the regulated parties and pre-empt contrary state law of their own force. Whatever rights such laws secure, those rights are secured "by the . . . laws" themselves. §1983.

By contrast, legislation that conditions a State's receipt of federal funds on compliance with certain requirements imposes no obligations and secures no rights of its own force. The stated conditions simply have no effect and do not arguably secure any rights ("by law" or otherwise) unless and until they are freely accepted by the State. Not only that, the Executive Branch can prevent the conditions

---

omitted)); *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 15, 16, n. 12, 18–19 (1981) (repeatedly using the formula "rights and obligations" correlatively); see also W. Hohfeld, Some Fundamental Legal Conceptions as Applied in Judicial Reasoning, 23 Yale L. J. 16, 28–32 (1913). This rule, it should be noted, addresses *what it means* for private rights to be secured by law, a distinct question from the level of clarity with which Congress must speak before courts may infer that it intended to create such rights. See *Gonzaga Univ.* v. *Doe*, 536 U. S. 273, 290 (2002).

from taking effect by rejecting a State's application to participate in the spending program, and it can terminate their effect by cutting off a State's participation for noncompliance with the conditions. In addition, States can opt out of spending programs, completely nullifying whatever force the spending conditions once had. This alone suggests that spending conditions do not operate with the force of federal law, as "Congress' legislative powers cannot be avoided by simply opting out." D. Engdahl, The Contract Thesis of the Federal Spending Power, 52 S. D. L. Rev. 496, 498 (2007) (emphasis deleted); see also *Townsend* v. *Swank*, 404 U. S. 282, 292 (1971) (Burger, C. J., concurring in result) ("[A]dherence to the provisions of [spending statutes] is in no way mandatory upon the States under the Supremacy Clause").

Indeed, spending conditions like those in FNHRA do not function as laws enacted under Congress' regulatory powers, and, if they did, they would unconstitutionally commandeer the States to administer federal programs ranging from welfare, to healthcare, to air quality, and much more. Such conditions are thus constitutional, if at all, only if understood as setting forth the terms of a federal-state contract, rather than as binding federal law imposing legally enforceable obligations of its own force. In holding that FNHRA secures rights by federal law, the majority ignores the contractual understanding of spending conditions and, by doing so, calls their very constitutionality into question.

### A

As noted earlier, a defining characteristic of modern spending legislation is the imposition of obligations on States that accept federal funds. Understanding a State's breach of such obligations as akin to violating rights secured by federal law is incompatible with this Court's anti-commandeering doctrine. Under this bedrock constitutional principle, Congress generally cannot directly

regulate the States or require them to implement federal programs.

"When the original States declared their independence, they claimed the powers inherent in sovereignty." *Murphy* v. *National Collegiate Athletic Assn.*, 584 U. S. \_\_\_, \_\_\_ (2018) (slip op., at 14) (citing Declaration of Independence ¶32).[4] Later, in ratifying the Constitution, the people of the original States granted carefully enumerated legislative powers to the new Federal Congress, while preserving the States' pre-existing legislative power. 584 U. S., at \_\_\_ (slip op., at 15). "[C]onspicuously absent from" Congress' enumerated powers was "the power to issue direct orders to the governments of the States." *Ibid.*

Thus, as this Court has made clear, the Constitution "confers upon Congress the power to regulate individuals, not States." *New York* v. *United States*, 505 U. S. 144, 166 (1992).[5] As a corollary, Congress "may not conscript state governments as its agents," nor can it "require the States to govern according to [its] instructions." *Id.*, at 162, 178. And, "[w]hatever the outer limits of [state] sovereignty may be, one thing is clear: The Federal Government may not

—————

[4] The Articles of Confederation granted Congress only the power to act upon States; it had no power to directly regulate individuals. The Constitution flipped this arrangement by granting the Federal Government the power to regulate individuals directly, but not States. See *New York* v. *United States*, 505 U. S. 144, 162 (1992) ("'The people, through [the Constitution], established a more perfect union by substituting a national government, acting, with ample power, directly upon the citizens, instead of the Confederate government, which acted with powers, greatly restricted, only upon the States'" (quoting *Lane County* v. *Oregon*, 7 Wall. 71, 76 (1869); emphasis deleted)).

[5] Congress possesses limited powers to directly regulate the States under the Reconstruction Amendments. See, *e.g., City of Boerne* v. *Flores*, 521 U. S. 507, 518 (1997). Due to the federalism concerns inherent in such regulation, these enforcement powers are cabined by the congruence-and-proportionality test. *Id.*, at 518–519. The careful tailoring of this exception vividly proves the rule.

THOMAS, J., dissenting

compel the States to enact or administer a federal regulatory program." *Id.*, at 188.[6]

Yet that is precisely what many spending conditions require the State to do. Spending conditions like FNHRA's are nothing more than commands to States, *qua* States, to administer federal benefits programs on terms dictated by Congress. Such conditions cannot be treated as having the force of federal law imposing direct obligations on the States and securing correlative rights of private parties without violating the anticommandeering doctrine.

It is no answer that the States consent to direct regulation by agreeing to the spending conditions in return for federal dollars. As the Court held in *New York*, "[w]here Congress exceeds its authority relative to the States, . . . the departure from the constitutional plan cannot be ratified by the 'consent' of state officials." *Id.*, at 182. Because the people have surrendered only limited and enumerated powers to the Federal Government, the States and Congress cannot jointly circumvent the ratification and amendment process by agreeing "to the enlargement of the powers of Congress beyond those enumerated in the Constitution." *Ibid.* The Federal Government cannot buy (or rent) the States' power to implement a federal program and then regard the conditions that the States are implementing themselves as having the force of federal law.

B

Of course, it is ultimately the States' consent that gives effect to conditions in spending legislation, but it does so in an entirely different manner from an illicit expansion of

_____

[6]The anticommandeering doctrine protects "political subdivisions" of States against federal cooptation, as well as the States themselves. *Printz* v. *United States*, 521 U. S. 898, 935 (1997); see also *id.*, at 931, n. 15 ("[T]he distinction in our Eleventh Amendment jurisprudence between States and municipalities is of no relevance here").

Congress' regulatory powers. Rather, as the Court observed in *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1 (1981), "legislation enacted pursuant to the spending power is much in the nature of a contract." *Id.*, at 17. A federal statute imposing conditions upon the receipt of federal funding does not enact those conditions with "the obligation of law"; it merely "proposes them as the terms of a contractual promise." Hamburger 132. Such spending provisions "merely stipulate what the government expects from recipients if it is to pay them or, later, not withhold further payment and demand its money back." *Ibid.* Thus, "even when fully recited in statutes, federal conditions do not come with legal obligation." *Ibid.*

Further, and as already noted, the conditions in spending legislation only come into force upon the acceptance of another party. Such conditions are thus "obligatory only by virtue of such agreement and not by force of law." D. Engdahl, The Spending Power, 44 Duke L. J. 1, 104 (1994). To be sure, "it is a statute that prescribes the funding condition and requires denial of federal assistance if the funding condition is not agreed to." *Ibid.* But, "only the agreement—and not the statute—makes the terms obligatory on the funds recipient and thus 'secures' the contemplated third-party rights." *Ibid.*[7] Accordingly, such "third-party rights

---

[7] For this reason, the mere fact that spending conditions are enacted in statutory form is irrelevant; "not everything in a statute is legally binding." Hamburger 131; see also D. Engdahl, The Contract Thesis of the Federal Spending Power, 52 S. D. L. Rev. 496, 500 (2007). In other words, while Congress may influence policy "by attaching 'strings' to grants of money given to state and local governments, . . . those strings aren't *laws*," and do not secure rights, in the sense needed to support §1983 liability. *United States* v. *Morgan*, 230 F. 3d 1067, 1073 (CA8 2000) (Bye, J., specially concurring); see also *Westside Mothers* v. *Haveman*, 133 F. Supp. 2d 549, 581–582 (ED Mich. 2001) ("[N]o interest is 'secured' by the federal Medicaid statute. Upon its enactment, this federal law does not vest in a single American the right or privilege of receiving federally-subsidized medical care. . . . [T]hough passed by both

THOMAS, J., dissenting

. . . are 'secured' (if at all) not by any 'law,' but only by the contract between the recipient and the United States." *Ibid.*

This contractual understanding of conditional spending legislation is much more than a mere analogy; it is the only possible explanation for why such legislation is not an unconstitutional direct regulation of the States. To deny or downplay this principle is to seek to have it both ways. Much spending legislation conditions States' receipt of federal funds on their undertaking obligations with respect to third parties. For such legislation to survive a federalism challenge, it must not directly impose obligations on the States with the force of federal law. But, for those conditions to be enforceable under §1983, they must secure third-party rights by directly imposing correlative obligations on the States with the force of federal law. Both of these things cannot be true.

### III

This contractual understanding of spending conditions is also a necessary consequence of the limited nature of Congress' spending power, as consistently understood for nearly two centuries of our Nation's history. Indeed, this is one point on which the Framers all seem to have agreed. Despite heated debates over the source and scope of Congress' power to spend, all understood that this power did not carry with it any independent regulatory authority. That agreement persisted throughout the 19th century. And, in the 20th, it was a critical underpinning of this Court's precedents upholding expansive uses of the spending power as consistent with Congress' limited legislative powers and our federalist system of government.

_____

houses of Congress and signed by the President, the Medicaid statute has no force of its own. It is only when a State . . . accepts the Federal Government's offer and agrees to participate in the program that any benefits accrue to eligible individuals"), rev'd, 289 F. 3d 852 (CA6 2002).

### A

At the outset, while Congress undoubtedly possesses the power to direct the expenditure of federal funds, it is important to note that the Constitution contains no "spending clause."  From the beginning, some have located the spending power in the General Welfare Clause, and that view has generally been accepted by this Court's modern doctrine. See Engdahl, 44 Duke L. J., at 53, and n. 220 (describing Alexander Hamilton's views); *South Dakota* v. *Dole*, 483 U. S. 203, 206 (1987).  Yet, there are serious problems with that view.

The General Welfare Clause is simply part of the Taxing Clause, which reads in relevant part: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  Art. 1, §8, cl. 1.  By its terms, the only authority vested by this text is a power to "lay and collect Taxes, Duties, Imposts and Excises."  This power is then qualified by the Debts and General Welfare Clauses, which limit the objects for which Congress can exercise that power.  The General Welfare Clause is thus most naturally read as a qualification on the substantive taxing power.

Consider also that the General Welfare Clause references not only the "general Welfare" but also "the common Defence."  If the Clause were construed as an affirmative grant of power to spend for the common defense, it would make redundant Congress' powers to "raise and support Armies" and to "provide and maintain a Navy," also found in Article I, §8,  cls. 12–13.  Thus, "[i]f the reference to 'common Defence' spending simply alludes to power conferred elsewhere," then it seems illogical to consider the terms "general Welfare" as the source of a freestanding power to spend for whatever purposes.  D. Engdahl, The Basis of the Spending Power, 18 Seattle U. L. Rev. 215, 222 (1995).

The Taxing Clause is also a strange candidate for the

THOMAS, J., dissenting

source of a general congressional spending power because "it fails to provide any authority at all to spend money acquired otherwise than by taxation." *Ibid.* Yet, "[t]he federal treasury receives money from many other sources, including penalties, fines, user fees, leases, surplus property sales, gifts, bequests, and returns on investments." *Ibid.* And those sums are a pittance in comparison to those raised under Congress' Borrowing Clause power, see Art. I., §8, cl. 2, which has always been one of the major sources of federal funds. Unless federal spending on credit and from revenues not derived from "Taxes, Duties, Imposts and Excises" is unconstitutional, the General Welfare Clause cannot be the source of Congress' spending power.

The Clause certainly is not an independent grant of *regulatory* power to legislate for the general welfare, as the history of the Constitution's framing and ratification makes clear. The Philadelphia Convention initially adopted a resolution that Congress be authorized "'to legislate in all cases for the general interests of the Union, and also in those to which the States are separately incompetent, or in which the harmony of the United States may be interrupted by the exercise of individual legislation.'" J. Renz, What Spending Clause? (Or the President's Paramour), 33 John Marshall L. Rev. 81, 104 (1999) (Renz). But the Convention later abandoned this vesting of a broad power to legislate for the general welfare in favor of the enumeration of specific federal legislative powers and the creation of a taxing power limited by the General Welfare Clause. See R. Natelson, The General Welfare Clause and the Public Trust: An Essay in Original Understanding, 52 Kan. L. Rev. 1, 23–29 (2003) (Natelson); see also Renz 104–105 (counting five instances in which the Convention considered and rejected attempts "to insert a grant of general legislative power into the Constitution").[8]

––––––––––

[8] One instance in particular demonstrates that the General Welfare

Consistent with its text, Federalist advocates of the Constitution defended the General Welfare Clause to the ratifying public as nothing more than a limitation on the taxing power. See, *e.g.*, 3 Debates on the Constitution 207 (J. Elliot ed. 1876) (Elliot's Debates) (E. Randolph, Virginia Convention) ("The plain and obvious meaning of this is, that no more duties, taxes, imposts, and excises, shall be laid, than are sufficient to pay the debts, and provide for the common defence and general welfare, of the United States"); N. Webster, An Examination Into the Leading Principles of the Federal Constitution, in Pamphlets on the Constitution of the United States 50 (P. Ford ed. 1888) ("[I]n the very clause which gives the power of levying duties and taxes, the purposes to which the money shall be appropriated are specified, viz. *to pay the debts and provide for the common defence and general welfare of the United States*"); see also Natelson 47–49. "[T]heir basic message was that the language in question was not a grant at all—rather it was a restriction on federal authority." *Id.,* at 39. As Governor Randolph emphatically declared: "Is this an independent, separate, substantive power, to provide for the general welfare of the United States? No, sir." 3 Elliot's Debates 466.

Federalists went out of their way to specifically disclaim that the General Welfare Clause would vest any independent *regulatory* power. For example, James Madison expressly rejected Anti-Federalist attempts to portray the General Welfare Clause as granting "an unlimited commis-

––––––––––

Clause is simply a restriction on the Taxing Clause. The Committee of Style slightly altered the text agreed to by the Convention by changing the comma after "Excises" into a semicolon, so that the General Welfare Clause "became an additional power, conjoined to the power to tax, rather than merely a limitation on it." Hamburger 283. The Convention, however, recognized the alteration and restored the comma, "corroborat[ing] the conclusion that the General Welfare Clause was not an independent power." Natelson 28.

sion to exercise every power which may be alleged to be necessary for the common defense or general welfare." The Federalist No. 41, p. 262 (C. Rossiter ed. 1961). Similarly, in rebutting Patrick Henry's warning that the Clause would vest a regulatory power, Governor Randolph observed: "You must violate every rule of construction and common sense, if you sever it from the power of raising money, and annex it to anything else, in order to make it that formidable power which it is represented to be." 3 Elliot's Debates 600. Again and again, leading Federalists represented the General Welfare Clause simply "as qualifying the fiscal power." E. Corwin, The Spending Power of Congress—Apropos the Maternity Act, 36 Harv. L. Rev. 548, 552 (1923) (citing The Federalist Nos. 30 and 34 (A. Hamilton), and 41 (J. Madison)). "It was generally understood" by the Constitution's ratifiers "that the General Welfare Clause did not confer power to regulate"; such regulatory powers were conferred only by specific enumerations such as the Commerce Clause. T. Sky, To Provide for the General Welfare 67 (2003) (Sky).

Thus, even if one implausibly regards the General Welfare Clause as a "Spending Clause," it is unambiguous that the Clause confers no independent regulatory power. Importantly, the same holds for every other plausible textual anchor for Congress' general spending power. First, the Necessary and Proper Clause is a natural candidate for the spending power because spending funds may be "necessary and proper for carrying into Execution" the Federal Government's enumerated powers. Art. I., §8, cl. 18; see G. Lawson & G. Seidman, The Constitution of Empire 30 (2004) (Lawson & Seidman) ("This 'Sweeping Clause' . . . unquestionably includes the power to enact spending laws that are 'necessary and proper' for effectuating federal powers"); K. Stith, Congress' Power of the Purse, 97 Yale L. J. 1343, 1348 (1988) (arguing that the Necessary and Proper

Clause "includes the power to spend public funds on authorized federal activities"). But, because the Clause authorizes only those spending measures that are "'necessary and proper for carrying into Execution' other enumerated federal powers[,] Congress can . . . spend only if the appropriation is tied to the execution of one of the federal government's granted powers." Lawson & Seidman 30. The Clause thus "does not provide a stand-alone grant of spending authority, and certainly not an authority to spend for a nonspecific 'general welfare of the United States.'" *Ibid.*

A second plausible source of the spending power is the Property Clause, which provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." Art. IV, §3, cl. 2. The term "other Property" may "comprehen[d] personal property no less than real," and "personal property includes money, as well as financial assets of all kinds." Engdahl, 18 Seattle U. L. Rev., at 250 (emphasis deleted). But the power to dispose of funds does not carry with it any regulatory power; the Property Clause "only authorizes the control and disposition of federal property" and "does not disturb the allocation of *governance* authority otherwise accomplished under the principle of enumerated powers." *Id.*, at 251. Thus, when disposing of federal property under the Property Clause, "Congress has no more competence to make 'law' than any private donor or testator has." Engdahl, 44 Duke L. Rev., at 104.

### B

In the early decades after ratification, both the source and the scope of the spending power were hotly contested, usually in debates over "internal improvements" such as roads and canals. One side, represented by Madison, maintained that federal spending must be strictly in aid of the Federal Government's specifically enumerated powers—for

instance, expenditures to construct a road would be justified only if the road could be constructed under the Post Roads Clause or some other enumerated power. See Renz 108–119; see also J. Eastman, Restoring the "General" to the General Welfare Clause, 4 Chap. L. Rev. 63, 72 (2001). As this side of the debate also took a narrow view of the enumerated powers, it generally argued that the Federal Government could not fund internal improvements without a constitutional amendment. See Sky 140–141. The other camp, associated with the nationalist views of Hamilton and Joseph Story, understood the General Welfare Clause to "include a very broad spending authority," which could be applied to purposes not specifically enumerated by the Constitution. Natelson 12; see also Renz 124–126.

Even this camp, however, understood that "the General Welfare Clause does not include a power to regulate." Natelson 12; see also Sky 96. Hamilton, for example, made clear that the spending power did not "imply a power to do whatever else should appear to Congress conducive to the general welfare." Report on the Subject of Manufactures 37 (1791). As he further elaborated, "[a] power to appropriate money [does] not carry a power to do any other thing, not authorized in the Constitution, either expressly or by fair implication." *Ibid.* Instead, any regulatory authority had to be tethered to some independent regulatory power. Thus, under this view, Congress could spend money on roads and canals unconnected with the enumerated powers, but it would have to depend on the States for any regulatory legislation needed to complete and preserve the improvements.

This understanding that the spending power itself extended only to the "*application of money*," *ibid.* (emphasis in original), led Hamilton to favor a constitutional amendment "empowering Congress to open canals." Letter from A. Hamilton to J. Dayton (1799), in 10 Works of Alexander Hamilton 334 (H. Lodge ed. 1904). After all, opening canals

"involve[d] much more than spending money: it involve[d] acquiring rights of way and constructing and operating the improvements." Engdahl, 44 Duke L. Rev., at 23. Thus, it was precisely the "insufficiency of the spending power to override state law obstacles to achieving the targeted end that made Hamilton conclude that a constitutional amendment for canals was necessary." *Id.*, at 24. "[F]ederal funding alone" could not "override" "incompatable or adverse state policies." *Ibid.* As this example demonstrates, even those who held the broadest conception of the spending power recognized that it was only a power to spend, not a power to impose binding requirements with the force of federal law. See Sky 95.

The limited nature of the spending power was also a rare point of agreement in Hamilton and Jefferson's bitter quarrel over the constitutionality of a national bank. Reflecting the ratification era understanding of the General Welfare Clause, Jefferson observed that "the laying of taxes is the *power* and the general welfare the *purpose* for which the power is to be exercised." Opinion on the Constitutionality of the Bill for Establishing a National Bank (Feb. 15, 1791), in 19 Papers of Thomas Jefferson 277 (J. Boyd ed. 1974) (emphasis in original). If the General Welfare Clause went beyond "describing the purpose of the" Taxing Clause and represented "a distinct and independent power to do any act [Congress may] please, which might be for the good of the Union," it "would render all the preceding and subsequent enumerations of power completely useless." *Ibid.*; accord, J. Madison, The Bank Bill (Feb. 2, 1791), in 13 Papers of James Madison 375 (C. Hobson & R. Rutland eds. 1981) (interpreting the General Welfare Clause as a distinct power "would supersede all the powers reserved to the state governments"). In response, Hamilton justified the bank based on Congress' enumerated powers, such as the Commerce and Taxing Clauses. Opinion on the Constitutionality of an

THOMAS, J., dissenting

Act To Establish a Bank (Feb. 23, 1791), in 8 Papers of Alexander Hamilton 97 (H. Syrett ed. 1965).  He discussed the General Welfare Clause only as a limitation: "It is true, that [Congress] cannot without breach of trust, lay taxes for any other purpose than the general welfare."  *Id.*, at 129.  In his view, the spending power was emphatically limited to "*the application* of *money*."  *Ibid.* (emphasis in original).  Jefferson and Hamilton could agree that it was no independent font of legislative power.

In sum, the Framers and Ratifiers understood the Taxing and General Welfare Clause as granting only a power to tax.  What our modern cases refer to as the "Spending Clause"—in fact, the General Welfare Clause—was understood by the Framers and the ratifying public as granting no regulatory authority.  One thing that the opposing men and factions of the founding generation agreed upon was that the Federal Government's power to spend was just that—a power to spend, involving no regulatory authority.  Instead, the power to bind with the force of law must come from Congress' enumerated legislative powers rather than its spending power.

C

Though the scope and source of the spending power continued to be vigorously contested into the 19th century, the fundamental understanding that federal spending measures could not bind with the force of law remained common ground.  For example, in his last official act, President Madison vetoed an internal improvements bill in part because the "train of powers incident" to constructing and maintaining such improvements were beyond Congress' enumerated powers.  30 Annals of Cong. 211, 212 (1817).  The General Welfare Clause could not provide the needed regulatory authority, as such an interpretation "would have the effect of giving to Congress a general power of legislation," thus rendering the Constitution's "special and careful

enumeration of powers . . . nugatory and improper." *Id.*, at 212. That the bill required state consent was likewise insufficient because, if the power "be not possessed by Congress, the assent of the States . . . cannot confer the power." *Ibid.*

Upon assuming office, President James Monroe sent a message to Congress agreeing with Madison's views; the message was then referred to a special Committee in the House of Representatives led by Congressman Henry Tucker. Corwin, 36 Harv. L. Rev., at 559–560. The Tucker Committee produced an exhaustive report on internal improvements, which disagreed with nearly every aspect of Madison and Monroe's position. *Id.*, at 560–561. Significantly, however, the Committee agreed that the General Welfare Clause did not vest the power needed to make internal improvements, relying instead on the Constitution's specific enumerations such as the Post Roads Clause. 31 Annals of Cong. 454 (1817) ("disavow[ing] any use of the general phrase in the Constitution to provide for the common defence and general welfare, as applicable to the enumeration of powers, or as extending the power of Congress beyond the specified powers"). The Tucker Committee also agreed with President Monroe that the spending power did not "extend the specified or incidental powers of the Government" or allow Congress to exercise any "jurisdictional [*i.e.*, regulatory] rights" over improvements. *Id.*, at 459–460. Thus, "if the power to make a road or dig a canal is not given" by one of Congress' enumerated regulatory powers, "the power of appropriating money cannot confer it." *Id.*, at 459.[9]

_____

[9]After a debate on the Tucker Report, the House approved a resolution declaring Congress' authority to appropriate money to construct internal improvements pursuant to its enumerated powers, voting down several other resolutions that would have declared a congressional power to make monetary grants to States untethered to any enumerated power and that the Federal Government had the power to itself construct and

In his second term, President Monroe set forth the fullest exposition of the understanding that the spending power involved no regulatory authority. In 1822, Congress passed a bill to establish a system of internal improvements, asserting the "power to establish turnpikes with gates and tolls, and to enforce the collection of tolls by [federal] penalties." Sky 147 (internal quotation marks omitted). President Monroe then vetoed the measure, judging that Congress' spending authority did not extend to such "a complete right of jurisdiction and sovereignty for all the purposes of internal improvement, and not merely the right of applying money under the power vested in Congress to make appropriations." 2 Messages and Papers of the Presidents 1789–1908, p. 142 (J. Richardson ed. 1897) (Richardson). Because Monroe understood "that Congress do[es] not possess this power [and] the States individually can not grant it," he agreed with Madison and Hamilton that the "power can be granted only by an amendment to the Constitution." *Id.*, at 143.

To explain his veto, President Monroe sent Congress an extensive report entitled "Views of the President of the United States on the Subject of Internal Improvements." In this report—perhaps "the most elaborate constitutional discussion ever sent to the Capitol from the White House"— Monroe synthesized the understanding of the spending power from the founding of the Republic. L. Rogers, The Postal Power of Congress 75 (1916). And, in doing so, he largely settled the contours of that understanding for over a century.

In the centerpiece of the Views, Monroe explained that the spending power carries no incidental power to regulate individuals or States. Echoing Hamilton, Monroe understood the spending power to consist of "a right to appropriate the public money, and nothing more." Richardson 162.

_____

maintain internal improvements. 32 Annals of Cong. 1381–1389 (1818).

It carries with it "no incidental power, nor does it draw after it any consequences of that kind." *Id.*, at 168. Monroe proceeded to carefully distinguish the spending power from Congress' authority to impose obligations and duties: "[T]he use or application of the money after it is raised is a power altogether of a different character" from Congress' enumerated regulatory powers such as the taxing power; "[i]t imposes no burden on the people, nor can it act on them in a sense to take power from the States." *Id.*, at 164.

Applying this understanding of the spending power to the question of internal improvements, Monroe explained that Congress could only "appropriate the money necessary to make them." *Id.*, at 168. Where none of Congress' enumerated regulatory powers was applicable, Monroe concluded, "[f]or every act requiring legislative sanction or support the State authority must be relied on." *Ibid.* Thus, Congress could not itself pass laws providing for "[t]he condemnation of the land, . . . the establishment of turnpikes and tolls, and the protection of the work when finished." *Ibid.*

Monroe's summation of the federal spending power, reflecting that it does not carry with it any regulatory power, was accepted throughout the 19th century by friends and foes of federal power alike. In his 1825 inaugural address, President John Quincy Adams explained that Monroe's Views had "conciliated the sentiments and approximated the opinions of enlightened minds upon the question of constitutional power." Inaugural Address, Mar. 4, 1825, in 5 American State Papers, Foreign Relations 753, 755 (1858). Five years later, President Andrew Jackson vetoed the Maysville Road Bill of 1830 for the same reasons Monroe had vetoed the Cumberland Road Bill of 1822: Congress lacks "[t]he right to exercise as much jurisdiction as is necessary to preserve the works and to raise funds by the collection of tolls to keep them in repair," and "[w]ithout [such power] nothing extensively useful can be effected." Richardson 492.

THOMAS, J., dissenting

Justice Joseph Story's Commentaries on the Constitution also recognized that the spending power did not carry with it any auxiliary power to bind individuals or States.  Citing Monroe's Views liberally, Story agreed that Congress could not enact a system of internal improvements under the General Welfare Clause.  Although he located the spending power in that Clause, Story understood that the power was confined "to mere appropriations of money," and that, as a result, the Federal Government could not regulate internal improvements except pursuant to its legislative "enumerated powers."  3 Commentaries on the Constitution of the United States, §1269, p. 150 (1833); see also Sky 224 ("[A]s read by Story, the General Welfare Clause did *not* constitute a regulatory power, independent of the spending power, authorizing Congress to enact whatever measures it wished . . . under an unlimited power to legislate for the general welfare of the United States").

Although disagreement on whether Congress could spend for purposes beyond the enumerated powers persisted through the Antebellum and Reconstruction eras, the understanding that the spending power did not imply regulatory power persisted.  See generally Sky 232–240, 270–291.  Because Congress was acting solely under its power to spend, it relied on the States' acceptance of terms and upon the States' legislative powers to carry out federal spending programs.

D

Given this consensus, it is not surprising that the first federal grant-in-aid spending programs were contractual in nature.  The Morrill Act of 1862, perhaps the first such program, extended an offer to the States to accept donations of federal lands on the condition that the State use the land to establish a college. 12 Stat. 504–505. States had two years to accept the federal terms in the form of an Act by the

State's legislature. *Id.*, at 505 Significantly, the only consequence for a State's breach of the use condition was contractual in nature—"the grant to such State shall cease; and said State shall be bound to pay the United States the amount received of any lands previously sold." *Id.*, at 504–505. The Second Morrill Act, enacted in 1890, followed the same framework, donating money for the endowment of agricultural and mechanical arts colleges, subject to the condition that black students not be excluded. Ch. 841, 26 Stat. 417. Like the First Morrill Act, the only consequence for noncompliance was that future appropriations under the Act would cease until the State brought itself into compliance. *Id.*, at 419.

In the early 20th century, the adoption of the Sixteenth Amendment and the national income tax vastly expanded the revenue available to the Federal Government. But the increasingly ambitious spending programs that followed did not break the contractual pattern established by the Morrill Acts. Thus, early-20th-century highway grants took the form of an offer to enter a contract, with the consequence of noncompliance being the cutoff of federal funds. See Corwin, 36 Harv. L. Rev., at 574, n. 72 (describing Federal Highway Act of 1916); see also *id.*, at 573–575 (collecting other examples).

Even in the New Deal era, advocates of far-reaching spending programs continued to understand the spending power as a mere power of appropriation. Professor Corwin, for example, recognized that the States must be depended upon to exercise the legislative power needed to implement such programs. Thus, "federal highway construction relie[d] on the state power of eminent domain, as well as on state power to police and protect highways during and after their construction." National-State Cooperation—Its Present Possibilities, 46 Yale L. J. 599, 617 (1937). Similarly, national protection of forests depended on "the power of the states to regulate the conduct of persons entering forests,"

and the provision of maternity benefits depended on "the power of the cooperating states to compel birth registration, the licensing of mid-wives, etc." *Ibid.* Thus, more than 100 years after Monroe's Views, it was still well understood that the Federal Government's spending power needed to work with "the wider coercive powers of the states" to accomplish its ends. *Ibid.* And, a State's acceptance of federal funds in return for exercising its own powers did not expand the Federal Government's legislative powers.

In sum, from the framing of the Constitution to well into the 20th century, it was virtually undisputed that Congress' spending power was nothing more than a power to spend. It included no regulatory authority to bind parties, to secure rights or impose duties with the force of federal law, and no authority to directly regulate the States even with their consent.

E

When cases concerning expansive federal spending programs first began to reach this Court, they vividly illustrated both the enduring understanding of the spending power as a nonregulatory power and the contractual understanding of spending conditions. The Federal Government defended major spending programs on the basis of that understanding, and the programs survived this Court's review only because of those traditional premises.

In *Massachusetts* v. *Mellon*, 262 U. S. 447 (1923), the Court rejected as nonjusticiable Massachusetts' claim that the Maternity Act of 1921 was "an attempt to legislate outside the powers granted to Congress by the Constitution and within the field of local powers exclusively reserved to the States." *Id.*, at 482. The Court first stated that it "[p]robably . . . would be sufficient to point out that the powers of the State are not invaded, since the statute imposes no obligation but simply extends an option which the State is free to accept or reject." *Id.*, at 480. In other words, the

State could not be injured because the Act was not a direct legal regulation. Rather, it was a mere offer to bargain—it "imposed" no "burden . . . upon the States" and did not require them "to do or to yield anything" of its own force. *Id.*, at 482. The State could not seek judicial redress because the contractual nature of the Act's provisions meant that States could vindicate their own rights "by the simple expedient of not yielding." *Ibid.*; see also Corwin, 36 Harv. L. Rev., at 579 (noting that the Maternity Act adhered to the traditional requirements of state consent and the "general *caveat* against jurisdictional rights following in the wake of appropriations"). "[T]he Justices in *Mellon* understood that Congress' power to spend money is *not a legislative* power." Engdahl, 52 S. D. L. Rev., at 498 (emphasis in original).

Cases involving New Deal spending programs teach the same lesson. For example, *United States* v. *Butler*, 297 U. S. 1 (1936), concerned the constitutionality of the Agricultural Adjustment Act, which offered subsidies to farmers not to sell crops. The Government defended the Act on the ground that it did not regulate any private or state party. Instead, "[a]ny commands or restrictions in the Act [were] imposed only upon the use by [federal] administrative officials of the money granted." Brief for United States in *United States* v. *Butler*, O. T. 1935, No. 401, p. 264. In line with the traditional distinction between mere spending and regulatory commands, the Government urged that "Congress ha[d] not gone beyond its power of authorizing an expenditure" precisely because "[i]t ha[d] not sought to force or command citizens to receive the money offered and to perform the conditions upon which the funds are to be disbursed." *Id.*, at 265. The Government expressly relied on the contractual nature of the Act's conditions, as distinct from any "exercise of sovereign regulation":

"It would be most unusual to suppose that a contract

THOMAS, J., dissenting

of this nature, entered into freely by both parties, is an exercise of sovereign regulation and control over one of the parties or over the subject matter with which the contract deals. . . . The rights of the United States under the contracts are no greater than would be the rights of a private citizen under similar contracts, and enforcement must be by ordinary judicial process according to the law of the forum. The contracts are not derogatory of any sovereign rights of the States; they are carried out pursuant to and under the protection of the laws of the States. . . . The purpose and effect of the contracts so entered into are simply to accomplish the spending of the money on the conditions imposed by Congress, and in authorizing execution of such contracts Congress was not exerting a power outside of the field of appropriation." *Id.*, at 266–267.

The Government also disclaimed that the Act would have pre-emptive effect: Because it went "no further than offering benefits to those who comply with certain conditions," States "remain[ed] as free after the passage of this Act as before to pass laws rendering it impossible for any of their inhabitants to comply with such conditions." *Id.*, at 268. Thus, to avoid a Tenth Amendment problem, the Government relied on the traditional distinction between the Federal Government's power to spend and its power to regulate:

"The distinction between an application of the Federal lawmaking power to enforce compliance with the desire of Congress and the use of the spending power to offer benefits which might persuade people to that end [was] recognized in this manner by th[e] first Congresses.

.         .         .         .         .

"When the United States goes no further than extending benefits to citizens who arrange their affairs in

a manner thought beneficial by Congress, there is no direct exercise of Federal power on those affairs and they remain subject to the unhampered control of the States. Consequently, in a case of this nature, the effect which the Act of Congress will have in a State is dependent entirely upon the voluntary action of that State and its inhabitants." *Id.*, at 274, 276.

In deciding the case, the Court took the Government's concessions as given, stating, "[i]t is not contended that [the General Welfare Clause] grants power to regulate agricultural production." *Butler*, 297 U. S., at 64. The Court then agreed with Justice Story's observation that "the only thing granted is the power to tax for the purpose of providing funds for payment of the nation's debts and making provision for the general welfare." *Ibid.* Congress' spending power, even if located in the General Welfare Clause, conferred no regulatory power.

The Court proceeded to hold the Act unconstitutional precisely because it was, in reality, "a statutory plan to regulate and control agricultural production, a matter beyond the powers delegated to the federal government." *Id.*, at 68. That was because the "regulation [was] not in fact voluntary," as it would lead to "financial ruin" for farmers who refused the Act's benefits. *Id.*, at 70–71. Confirming another aspect of the traditional doctrine, the Court held that even the purely voluntary consent of private parties could not expand Congress' limited regulatory powers. *Id.*, at 74–75.[10]

---

[10]The anticoercion rule reflected in *Butler* remains a vital part of this Court's spending-power jurisprudence. See *NFIB*, 567 U. S., at 575–585 (opinion of ROBERTS, C. J.); *id.*, at 671–678 (joint dissent of Scalia, Kennedy, THOMAS, and ALITO, JJ.). As *Butler* makes clear, that rule is firmly rooted in the contractual understanding of spending conditions, and *NFIB* further recognized the close connection between the rule and the anticommandeering doctrine when spending conditions involving States are at issue. See *NFIB*, 567 U. S., at 575–585 (opinion of ROBERTS, C. J.);

The challenge to the Social Security Act in *Steward Machine Co.* v. *Davis*, 301 U. S. 548 (1937), followed a similar pattern but reached the opposite result based on a different level of perceived coercion. As in *Butler*, the Federal Government defended a federal statute—here, the Social Security Act—by representing that conditions on the grant of federal funds "are not regulatory" in nature and are thus within the spending power. Brief for United States in *Steward Machine Co.* v. *Davis*, O. T. 1936, No. 837, p. 135. Seeking to avoid a repeat of its loss in *Butler*, the Government argued that the program was also not regulatory in fact because it did not coerce States to take or refrain from taking any actions. Brief for United States in *Steward Machine Co.* 100, 105–106.

This time, the Court agreed with the Government, finding that the Act was not coercive and thus did not "go beyond the bounds of" Congress' spending power. *Steward Machine Co.*, 301 U. S., at 591–592. Then, in rejecting a federalism challenge to the measure, the Court observed that once the State accepted the federal conditions, it was bound with even lesser force than an ordinary contract. *Id.*, at 594–595. The State was "still free, without breach of an agreement, to change her system over night." *Id.*, at 595. "No officer or agency of the national Government [could] force a compensation law upon her or keep it in existence,"

──────────

*id.*, at 677–678 (joint dissent). Indeed, the anticoercion rule supplements those doctrines through its recognition of the practical realities of Congress' modern spending power: Because the Federal Government's overwhelming fiscal resources enable it to create "gun to the head" situations in which there is no practical possibility of opting out, the rule prevents the Government from purchasing the States' regulatory powers to implement federal goals that it cannot attain through its own more limited powers. *Id.*, at 581 (opinion of Roberts, C. J.); accord, *id.*, at 677 (joint dissent) ("Congress effectively engages in this impermissible compulsion when state participation in a federal spending program is coerced, so that the States' choice whether to enact or administer a federal regulatory program is rendered illusory").

nor could they "supervise or control the application of the payments." *Ibid.*[11]

The Court again demonstrated its adherence to the traditional view in *Oklahoma* v. *Civil Serv. Comm'n*, 330 U. S. 127 (1947). There, the U. S. Civil Service Commission determined that an Oklahoma highway commissioner had violated the Hatch Act, pledging to withhold a portion of the State's highway grants equal to two years' of the commissioner's compensation if the State failed to remove him. Oklahoma challenged the Commission's order and the Act on which it was based as an illicit attempt to regulate the State's internal affairs. *Id.*, at 133. Citing *Mellon*, the Court held that the Act was valid because it did not directly regulate the State, which had "adopted the 'simple expedient' of not yielding" by refusing to remove its highway commissioner. 330 U. S., at 143.

Thus, to defend these spending programs in the first half of the 20th century, the Government relied on the long-settled understanding that the power to spend carries with it no sovereign legislative power to create rights and duties. To the contrary, the Government represented that these programs had the binding force, at most, of contracts. They did not pre-empt, nor did they bind States with the force of law; they merely spent federal dollars upon conditions, the violation of which entitled the Government to cease further payments. The Court took this position as a given, and the contractual nature of spending conditions is precisely what saved them from constitutional challenge.

In sum, the historical record is clear and consistent on a critical proposition: The spending power is the power to spend only. Any duties imposed by regulatory legislation, and any correlative rights secured by law, must find their

———————
[11] Justice Sutherland's dissent recognized that the majority had applied the traditional framework, disagreeing only with its interpretation of how the Social Security Act actually functioned. See *Steward Machine Co.*, 301 U. S., at 611–612.

THOMAS, J., dissenting

source in one of Congress' enumerated powers or the legislative powers of the States. Congress' spending power cannot secure rights by law.

## IV

The contractual nature of spending conditions was taken as a given until the second half of the 20th century, when individuals first began to bring §1983 suits premised on violations of conditions contained within spending statutes (usually, the Social Security Act). From the enactment of §1983's predecessor statute in 1871 to the Court's decision in *Thiboutot* in 1980, this Court had never held that §1983 was available to redress any and all violations of federal legislation. Indeed, there were almost "no square holdings" concerning the precise scope of the statutory rights vindicable by §1983. *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 645 (1979) (Powell, J., concurring); see also *Eisen* v. *Eastman*, 421 F. 2d 560, 561–566 (CA2 1969) (Friendly, J.). Perhaps the only such square holding was that of *Holt* v. *Indiana Mfg. Co.*, 176 U. S. 68 (1900), which narrowly construed §1983's predecessor statute to "refer to civil rights only," making it "inapplicable" in a suit based on the federal patent laws. *Id.*, at 72.[12]

————————

[12] This civil rights connection was not arbitrary. Section 1983 originated in the Enforcement Act of 1871, which Congress "passed for the express purpose of 'enforc[ing] the Provisions of the Fourteenth Amendment.'" *Thiboutot*, 448 U. S., at 25, n. 15 (Powell, J., dissenting) (quoting 17 Stat. 13; alteration in original). Moreover, the original text of the statute referred only to rights "secured by the Constitution of the United States," 17 Stat. 13, the words "and laws" being added as part of the general 1874 revision of the federal statutes. Rev. Stat. §1979, 42 U. S. C. §1983. Under the circumstances, there is substantial reason to doubt that Congress fundamentally transformed a mechanism to enforce the Reconstruction Amendments into a freestanding right of action to remediate the violation of any federal statute, even those enacted beyond Congress' civil rights enforcement powers. Importantly, if statutory §1983 actions were confined to laws enacted under Congress' Reconstruction Amendments enforcement powers—under which Congress may directly

The traditional understanding of both the spending power and §1983 began slowly eroding in the 1950s, 1960s, and 1970s, culminating in *Thiboutot*.  On the spending-power side, the Court held in *Cannon* v. *University of Chicago*, 441 U. S. 677 (1979), that the spending conditions of Title IX of the Education Amendments created binding duties on private universities, the violation of which could be the ground of a federal lawsuit by a private party.  In doing so, the Court "simply ignored the crucial difference between restraints accepted as conditions of funding, and restraints imposed by virtue of a legislative power."  Engdahl, 52 S. D. L. Rev., at 509.  And, on the §1983 side, the Court had considered a number of suits against state officials for violations of the Social Security Act without analyzing their cognizability under §1983.  See *Thiboutot*, 448 U. S., at 6 (collecting cases); *id.*, at 26 (Powell, J., dissenting) ("Far from being a long-accepted fact, purely statutory §1983 actions are an invention of the last 20 years").

The stage was thus set for *Thiboutot* to discard nearly two centuries of settled spending-power doctrine by holding that federal spending conditions secure rights by law.  Ignoring both the contractual nature of spending programs and the enforcement-power-based understanding of §1983, *Thiboutot* declared that "the plain language of the statute undoubtedly embrace[d] respondents' claim that [the State] violated the Social Security Act."  *Id.*, at 4 (majority opinion).  The centerpiece of the Court's opinion was its imprecise framing of the relevant question: "whether the phrase 'and laws,' as used in §1983, means what it says, or whether it should be limited to some subset of laws."  *Ibid.*  After framing the issue thus, the Court reasoned that nothing in the legislative history compelled limiting the term "and laws" to civil rights laws enacted under the Reconstruction

_____

regulate States—the commandeering framework might apply differently—or not at all.

THOMAS, J., dissenting

Amendments.  See *id.*, at 6–8.

But the Court's opinion completely missed the deeper conceptual question whether spending-power statutes can ever impose obligations, and thus secure corresponding rights, with the force of federal law.[13]  As explained at length above, the limited nature of the spending power dictates a negative answer.  And, a contrary understanding would transform the terms of federal-state agreements into binding regulations of state entities by federal law—violating the constitutional prohibition against directly regulating or commandeering the States.

It took less than a year after *Thiboutot* for the Court to realize the "'constitutional difficulties' with imposing affirmative obligations on the States pursuant to the spending power" and to take the first step toward ameliorating the problems with *Thiboutot*.  *Pennhurst*, 451 U. S., at 17, n. 13.  In *Pennhurst*, the Court held that a provision of the Developmentally Disabled Assistance and Bill of Rights Act (a conditional spending Act) could not be enforced against a state entity under §1983.  *Id.*, at 18.  The Court first held that the provision could not be considered as enforcement legislation under the Fourteenth Amendment.  *Id.*, at 16–17.[14]  The Court then explained the fundamentally different

---

[13] In dissent, Justice Powell set out the textual and historical case for interpreting §1983 to apply only to rights secured by laws enacted under Congress' enforcement powers.  *Thiboutot*, 448 U. S., at 11; see also *Chapman* v. *Houston Welfare Rights Organization*, 441 U. S. 600, 623 (1979) (Powell, J., concurring).  However, neither the Court, the parties, nor the dissent examined whether, even if they were considered "laws" for §1983 purposes, spending-power provisions could "secure" rights.

[14] The court below had recognized but avoided the spending-power question by holding that Congress enacted the legislation at issue pursuant to its power to enforce the Fourteenth Amendment.  See *Halderman* v. *Pennhurst State School and Hospital*, 612 F. 2d 84, 98 (CA3 1979) ("[W]e are not dealing with the implication of a private cause of action from a congressional enactment justified only by the spending power of the federal government, and we need not address the question whether such a statute could ever provide the predicate for private substantive

natures of legislation under the Reconstruction Amend-
ments and "legislation enacted pursuant to the spending
power," the latter of which "is much in the nature of a con-
tract: in return for federal funds, the States agree to comply
with federally imposed conditions." *Id.*, at 17. Consistent
with the traditional position, the Court also explained that
"[i]n legislation enacted pursuant to the spending power,
the typical remedy for state noncompliance with federally
imposed conditions is not a private cause of action for non-
compliance but rather action by the Federal Government to
terminate the funds to the State." *Id.*, at 28. Ultimately,
because the *Pennhurst* Court determined that the provision
at issue was not intended to secure rights by imposing obli-
gations on States, see *id.*, at 22–27, it did not need to con-
front the constitutional problem created by *Thiboutot*.
Nonetheless, *Pennhurst* both recognized the problem and
pointed to the solution—a return to the traditional contrac-
tual understanding that itself flows naturally from the lim-
ited nature of Congress' spending authority.

Without that understanding, however, it is unavoidable
that spending conditions that impose substantive obliga-
tions on the States with the force of federal law are uncon-
stitutional.[15]  As shown above, the federal spending power

_____

rights. . . . Congress may, under section 5 [of the Fourteenth Amend-
ment], establish certain restrictions that might otherwise implicate the
prerogatives of the states"). The petitioners in *Pennhurst* squarely rec-
ognized that, if the legislation at issue was predicated on the spending
power alone, "Congress exceeded the limits of that power." Brief for Pe-
titioners, O.T. 1980, No. 79–1404, etc., p. 36, n. 57.

[15]Many litigants have recognized the constitutional problems. See,
*e.g.*, Brief for Petitioner in *Gonzaga Univ.* v. *Doe*, O. T. 2001, No. 01–679,
p. 42, n. 14 ("Nor is it clear that the conditions in Spending Clause legis-
lation qualify as 'laws' under §1983. Such conditions only become oper-
ative when the contract is accepted by a recipient; it is the resulting con-
tract, not the federal legislation itself, that gives rise to obligations and
allegedly enforceable rights"); Brief for Petitioner in *National Collegiate
Athletic Assn.* v. *Smith*, O. T. 1998, No. 98–84, p. 3; Brief for United
States as *Amicus Curiae* in *Suter* v. *Artist M.*, O. T. 1991, No. 90–1488,

THOMAS, J., dissenting

is nothing more than the power to spend.  It neither contains nor implies any sovereign regulatory power to legislate rights and duties with the force of federal law, and the regulated party's consent cannot change that conclusion.  The contractual nature of the spending power was essential to the Government's defense and this Court's approval of far-reaching spending programs; the programs survived only with that traditional understanding as a premise.[16]  The Federal Government and private litigants cannot now discard that understanding to argue that such programs impose obligations directly on the States that are enforceable against state and local officials under §1983, without running headlong into the anticommandeering doctrine and long-recognized limitations on the federal spending power.

*        *        *

By holding that FNHRA creates rights enforceable under §1983, the majority creates a grave constitutional problem that cannot be brushed away with a mere incantation of *Thiboutot*.  As explained above, spending-power legislation cannot "secure" rights "by law."  Conditions on a State's receipt of federal funds are effective, not by virtue of federal law, but by dint of a federal-state agreement.  The very constitutionality of such conditions depends on their eschewal of securing rights and imposing concomitant obligations on

——————

p. 12, n. 6.

[16] Ironically, decades after it expressly disclaimed the pre-emptive effect of spending conditions in defending their constitutionality, see *supra*, at 26–28, the Federal Government argued the exact opposite in *Gonzaga*: "The Act of Congress establishing the program remains binding law with the full force and preemptive authority of federal legislation under the Supremacy Clause, and thus falls squarely within the 'laws' covered by Section 1983 and is fully capable of 'secur[ing]' rights."  Brief for United States as *Amicus Curiae* in No. 01–679, p. 19 (alteration in original).  With this reversal, the Government unwittingly argued that spending conditions are unconstitutional.

States.

The line from *Mellon* and *Butler*, to *Thiboutot*, to this case amounts to a constitutional bait and switch that cannot continue to be glossed over or ignored. In holding that spending conditions are not merely contractual, but can directly impose obligations on the States with the force of federal law, the Court unravels the very rationale for their constitutionality. Either conditions in statutes enacted under the spending power are in the nature of contract terms and do not secure rights by federal law, or they are unconstitutional because they exceed the spending power and illicitly commandeer the States. The consequence of the majority's rejection of the contractual understanding is not that spending conditions are enforceable under §1983. Rather, it is that they are unconstitutional. It is well past time for this Court to re-examine *Thiboutot* and the nature of Congress' spending power.

Cite as: 599 U. S. ____ (2023)   1

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————————

No. 21–806

————————

## HEALTH AND HOSPITAL CORPORATION OF MARION COUNTY, ET AL., PETITIONERS v. IVANKA TALEVSKI, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF GORGI TALEVSKI, DECEASED

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

[June 8, 2023]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, dissenting.

I agree with the Court's understanding of the high bar required to bring an action under 42 U. S. C. §1983 for the violation of a federal statute, but I disagree with how that standard applies in this case. In my view, while respondent has established that the Federal Nursing Home Reform Act (FNHRA) creates individual rights, petitioners have established that relief for the violation of those rights under §1983 is foreclosed by the remedial scheme in the Act.

I

The majority and JUSTICE BARRETT correctly identify the plaintiff's burden under §1983: a statute "must *unambiguously* confer individual federal rights" to create "rights" within the meaning of §1983, and "*Gonzaga* sets forth our established method for ascertaining unambiguous conferral." *Ante*, at 11, 14 (majority opinion); see *ante*, at 1–2 (BARRETT, J., concurring); *Gonzaga Univ.* v. *Doe*, 536 U. S. 273 (2002). In other words, "if Congress wishes to create new rights enforceable under §1983, it must do so in clear and unambiguous terms." *Id.*, at 290. Because the standard demands "*no less and no more* than what is required for

Congress to create new rights enforceable under an implied private right of action," I also agree that there is no room for "a multifactor balancing test to pick and choose which federal requirements may be enforced by §1983 and which may not." *Id.*, at 286, 290 (emphasis added) (rejecting the standard articulated in *Blessing* v. *Freestone*, 520 U. S. 329, 340–341 (1997)). None of this is new ground. We have previously held that *Gonzaga* "plainly repudiate[s] the ready implication of a §1983 action that" our earlier decisions "exemplified." *Armstrong* v. *Exceptional Child Center, Inc.*, 575 U. S. 320, 330, n. (2015).

The two FNHRA provisions that respondent invokes demonstrate what it takes to satisfy this demanding standard. First, the Act mandates that a "nursing facility must protect and promote the rights of each resident, including . . . [t]he right to be free from . . . chemical restraints imposed for purposes of discipline or convenience and not required to treat medical symptoms." 42 U. S. C. §1396r(c)(1)(A). Second, the Act protects "[t]ransfer and discharge rights," precluding a "nursing facility" from transferring or discharging "each resident" except in certain circumstances. §1396r(c)(2)(A) (boldface deleted). Both of these provisions explicitly use the term "rights" to describe discrete and concrete duties that a defined party ("nursing facility") owes to a particular individual ("each resident"). When these features are taken together, they satisfy the standard for determining whether a personal right exists. See *Gonzaga*, 536 U. S., at 285–286; *Alexander* v. *Sandoval*, 532 U. S. 275, 288–289 (2001).

## II

### A

When determining whether individual rights are enforceable under §1983, I again see much common ground with the majority and agree entirely with JUSTICE Barrett's explanation of the governing standard. That question "boils

ALITO, J., dissenting

down to what Congress intended, as divined from text and context." *Ante*, at 18 (majority opinion). Notably, we have explicitly held that this standard does not demand anything close to the level of incompatibility required to trigger implied repeal. See *Rancho Palos Verdes* v. *Abrams*, 544 U. S. 113, 120, and n. 2 (2005); see *ante*, at 2 (opinion of BARRETT, J.). Instead, the question is simply "whether the rights created by a later statute 'may be asserted within the *remedial* framework' of the earlier one." *Rancho Palos Verdes*, 544 U. S., at 120, n. 2; see *Great American Fed. Sav. & Loan Assn.* v. *Novotny*, 442 U. S. 366, 375–378 (1979). As the majority explains, §1983 does not apply where Congress has created an individual right but also "simultaneously given good reason (detectable with ordinary interpretive tools) to conclude that the §1983 remedy is not available." *Ante*, at 17, n. 13; see, *e.g.*, *Armstrong*, 575 U. S., at 328 (presumption of equitable remedies rebutted by administrative remedies and statutory requirements).

Finally, I agree that there is no bright-line rule for when a statute evidences an intent to preclude §1983 relief. See *Rancho Palos Verdes*, 544 U. S., at 122; *ante*, at 19–21 (majority opinion); *ante*, at 3–4 (opinion of BARRETT, J.). Courts should consider a "wide range of contextual clues, like 'enforcement provisions'" that government officials can invoke and "any 'administrative remedies that the statute offers.'" *Ante*, at 3 (opinion of BARRETT, J.). Whatever the context, the "more comprehensive the [enforcement] scheme" in a statute, "the less likely that it leaves the door open for §1983 suits." *Ibid.* After all, when a statute "'provides its own comprehensive enforcement scheme, the requirements of that enforcement procedure may not be bypassed by bringing suit directly under §1983.'" *Middlesex County Sewerage Authority* v. *National Sea Clammers Assn.*, 453 U. S. 1, 20 (1981).

B

When all is said and done, my disagreement with the majority is thus narrowly focused on how this standard applies to this case. In my view, FNHRA "foreclose[s] a private cause of action" even though it "admittedly create[s] substantive private rights." *Alexander*, 532 U. S., at 290. The Act creates a reticulated remedial regime that both balances federal and state enforcement and channels disputes through that regime. Allowing §1983 suits will upend this careful balance.

Consider the remedial provisions that the Act provides. When federal officials find that a nursing home does not comply with FNHRA, the Act enumerates certain limited remedies they can pursue, such as withdrawing federal funding and imposing civil penalties "in an amount not to exceed $10,000 for each day of noncompliance." §1396r(h)(3)(C). FNHRA obligates States to establish certain remedies for noncompliance (including civil penalties), but otherwise leaves them free to "specify criteria, as to when and how each of [the required] remedies is to be applied, the amounts of any fines, and the severity of each of these remedies, to be used in the imposition of such remedies." §1396r(h)(2)(A). It also empowers States to "provide for other . . . remedies" as they see fit. *Ibid.* Finally, the Act provides "[s]pecial rules where [s]tate and [federal officials] do not agree on [a] finding of noncompliance." §1396r(h)(6) (boldface deleted).

By specifying limited remedies for federal authorities and tasking States with otherwise determining the consequences for violations, the Act creates a clear division of authority that ensures States retain their historical control over nursing-home regulation. Allowing §1983 suits will upset this balance by allowing any plaintiff to demand damages regardless of the remedial regime that States establish pursuant to their explicit authority under the Act. Moreover, whenever a plaintiff files suit, the determination about

ALITO, J., dissenting

noncompliance will be taken away from federal and state authorities and given to courts. And because the remedies offered under §1983 will often dwarf the relief available under FNHRA's reticulated balance of remedies, §1983 will swallow the centralized state and federal review mechanisms the Act imposes.

The exclusivity of FNHRA's enforcement regime is buttressed by the grievance remedy FNHRA gives to nursing-home residents. Residents have the "[r]ight to voice grievances with respect to treatment or care" and "the right to prompt efforts by the facility to resolve grievances." §1396r(c)(1)(A)(vi). States, in turn, are obligated to "investigate complaints of violations of requirements by nursing facilities" and to take enforcement actions to correct those violations. §§1396r(g)(4), (h)(1); see also 42 CFR §483.10(j) (2021) (obligating States to provide a "grievance process" that includes a "written decision" in response to complaints that provides a full summary of findings, conclusions, and reasoning).

This grievance process dovetails neatly with FNHRA's centralized enforcement regime because it funnels private complaints to the same state authorities that the Act tasks with enforcement. Indeed, respondent in this case wielded FNHRA's grievance process to obtain relief for both of the rights petitioners allegedly violated. See App. to Pet. for Cert. 79a–80a. But because FNHRA's remedies are more limited than the direct judicial highway that §1983 offers, it is hard to see why anyone would use them in the future. See *Rancho Palos Verdes*, 544 U. S., at 122–123.

The only textual evidence the majority can identify in response to this tailored remedial framework is FNHRA's saving clause, which states that the Act's remedies "are in addition to those otherwise available under State or Federal law." §1396r(h)(8). But this provision only begs the question whether relief under §1983 is "otherwise availa-

ble." We have recognized as much when holding that a materially identical saving clause did not authorize implied remedies under a separate remedial provision. See *AMG Capital Management, LLC* v. *FTC*, 593 U. S. ___, ___–___ (2021) (slip op., at 12–13). And in the §1983 context, we have similarly held that saving clauses do "not 'refer to a suit for redress of a violation of the statut[e] at issue.'" *Rancho Palos Verdes*, 544 U. S., at 126–127 (alterations omitted); accord, *Sea Clammers*, 453 U. S., at 20–21, n. 31.

These results are understandable. There is a considerable difference between preserving existing remedies for conduct that happens to violate other laws and providing a one-stop remedy for the precise provisions in a statute. See *Alexander*, 532 U. S., at 289–290. The latter interpretation runs against a century of holdings that a statute "'cannot be held to destroy itself'" through a saving clause. *American Telephone & Telegraph Co.* v. *Central Office Telephone, Inc.*, 524 U. S. 214, 227–228 (1998) (quoting *Texas & Pacific R. Co.* v. *Abilene Cotton Oil Co.*, 204 U. S. 426, 446 (1907)). Conversely, concluding that FNHRA "may be enforced only through the statute's express remed[ies]" gives full effect to §1396r(h)(8) because "the claims available under §1983 prior to the enactment of the [Act] continue to be available." *Rancho Palos Verdes*, 544 U. S., at 126.

In short, "[a]llowing a plaintiff to circumvent [FNHRA's] administrative remedies would be inconsistent with Congress' carefully tailored scheme." *Smith* v. *Robinson*, 468 U. S. 992, 1012 (1984). I would thus hold that the Act precludes enforcement under §1983 and reverse the judgment below. I therefore respectfully dissent.